**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>GENERAL MOTORS LLC IGNITION SWITCH LITIGATION<br><br>*This Document Relates to All Actions* | INDEX NO. 14-MD-2543 (JMF); 14-MC-2543<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT AGAINST NEW GM FOR RECALLED VEHICLES MANUFACTURED BY OLD GM AND PURCHASED BEFORE JULY 11, 2009**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

JURISDICTION AND VENUE ........................................................................... 8

PARTIES ............................................................................................................... 9

    I.    Plaintiffs ................................................................................................ 9

    II.   Defendant ............................................................................................ 45

FACTUAL ALLEGATIONS ............................................................................. 46

    I.    There Are Serious Safety Defects in Millions of Old GM Vehicles that New GM Has Continued to Conceal from Consumers ....................... 46

        A.    The Ignition Switch Defects .................................................... 48

    II.   Old GM's Fraudulent Conduct with Respect to the 2.19 Million Defective Vehicles Subject to the February/March Recall. ................ 49

        A.    Old GM Knew That There Were Failures With The Ignition Switch Design In 2001, And Concealed These Material Facts, Putting The Safety Of The Class At Serious Risk Of Harm. ................... 49

        B.    Old GM Approved Production Of Ignition Switches In 2002 Despite Knowing That They Had Failed In Pre-Production Testing And Did Not Meet Old GM's Internal Design Specifications. ............... 51

        C.    Old GM Received Complaints And Reports On The Stalling Of Vehicles Due To The Defective Ignition Switch Turning Off And Causing Moving Stalls, And Concealed That Material Information From The Class. ....................................................................... 51

        D.    Old GM Engineers Understood The Need To Correct The Ignition Switch Defect In 2004 But Failed To Act To Disclose Or Correct The Defect. ................................................................................ 52

        E.    Old GM Closed Its First Internal Investigation With No Action Because Of Cost. .................................................................... 56

        F.    Complaints Continued And Serious Accidents Came To Old GM's Attention In 2005, While NHTSA Began To Investigate Death Cases Involving Chevy Cobalts. .............................................. 58

        G.    Old GM Engineers Proposed Design Modifications To The Ignition Switch In 2005 That Were Rejected By Old GM Management On The Basis Of Cost. ...................................... 62

# TABLE OF CONTENTS
## (continued)

Page

H.   Rather Than Implementing A Safety Recall And Fixing The Known Defect, Old GM Sent An Inadequate Technical Service Bulletin To GM Dealers In Late 2005, Advising Dealers On Taking Heavy Items Off Key Rings. ...................................................... 66

I.   Old GM Knew About And Authorized A Design Change To The Ignition Switch In 2006, But Masked The Existence Of The Change By Keeping The Part Number The Same. ................................ 68

J.   The Fatalities Resulting From The Defects And Cover-Up Came To Old GM's Attention As Early As 2004. ............................................ 70

K.   Old GM Responded To Growing Evidence Of Fatalities By Updating The Technical Service Bulletin To Dealers About Heavy Key Chains. ................................................................................................ 72

L.   Old GM Knew Of And Tracked Multiple Accidents Involving The Ignition Switch Defect By 2007 And Avoided Scrutiny By Misleading The Class, The Public, And Regulators. ............................... 73

M.   Old GM Instructed Its Personnel On Judgment Words To Be Avoided. ................................................................................................. 76

N.   By 2009, As Injuries And Deaths Continued To Mount, Old GM Opened Yet Another Internal Investigation, But Continued To Withhold Information From Its Customers And The Class About The Defects. ............................................................................................... 78

O.   The Spreadsheet Of Accidents Involving The Cobalt Ignition Switch Within Old GM Continued To Grow, But Was Never Disclosed. ............................................................................................... 79

III.   Meet The New GM, Same As The Old GM: With Knowledge of the Defects, New GM "Investigates" Further-And Continues To Conceal The Defects. ......................................................................................... 80

IV.   New GM Issues A Recall—Ten Years Too Late. ................................................. 91

V.   New GM's Recall Fails to Correct the Defect. .................................................. 93

VI.   New GM Expands the February/March Recall—and Suspends Two Engineers. ................................................................................................ 95

VII.   The June 2014 Recall For The "Ignition Key Slot" Defect Further Reveals New GM's Fraudulent Concealment of Known Serious Safety Problems. .......... 96

# TABLE OF CONTENTS
## (continued)

Page

VIII.   The July 2 and 3, 2014 Recalls Relating to the Unintended Ignition Rotation Defect Further Reveal New GM's Fraudulent Concealment of Known Serious Safety Problems. ........................................................................ 111

IX.   The September 2014 Ignition Switch Defect Recall Is the Latest Evidence of the Extent of the Defects and New GM's Ongoing Concealment. ................ 130

X.   Even As They Concealed the Safety Defects From Consumers, Old and New GM Each Presented Their Vehicles As Safe And Reliable, and Presented Itself As An Honest Company With Integrity. ................................... 133

XI.   New GM Promoted All Of Its Vehicles As Safe, Reliable, And High-Quality While It Fraudulently Concealed Numerous Safety Defects ............... 149

    A.   New GM Claimed To Be Turning Over A New Leaf After The Bankruptcy. ......................................................................................... 149

    B.   New GM's Advertising And Literature Claimed That GM Placed Safety And Quality First. .................................................................... 159

    C.   New GM Concealed And Disregarded Safety Issues As A Way Of Doing Business. ............................................................................. 172

    D.   New GM Admitted Its Failure To Disclose The Defects In Its Vehicle, Attempting To Reassure The Public That It Can Now Be Trusted. .............................................................................................. 178

XII.   Other Recently Revealed Information Demonstrates New GM's Widespread Ongoing Pattern Of Concealing Dangerous Defects In GM-Branded Vehicles That Has Caused Diminution in the Value of the Defective Vehicles. ............................................................................................ 181

    A.   The Ignition Lock Cylinder Defect. ....................................................... 182

    B.   There Have Been Extensive Additional Recalls of GM-branded Vehicles With Additional Safety-Related and Other Defects. ............... 186

XIII.   New GM's Misrepresentations That It Made Safe And Reliable Cars, The Ignition Switch Defect, and Other Safety Defects Have Harmed Plaintiffs And The Classes. ........................................................................................... 229

**TOLLING OF THE STATUTES OF LIMITATION** ..................................................... 231

**SUCCESSOR LIABILITY ALLEGATIONS** ................................................................ 235

**CHOICE OF LAW ALLEGATIONS** ............................................................................ 250

**CLASS ACTION ALLEGATIONS** ............................................................................... 252

    II.   The Nationwide Class ............................................................................... 252

**TABLE OF CONTENTS**
(continued)

Page

III.   The State Classes ................................................................. 253

**REALLEGATION AND INCORPORATION BY REFERENCE** ...................................... 259

**CLAIMS FOR RELIEF** ................................................................. 259

I.   NATIONWIDE CLASS CLAIMS ............................................. 259

FIRST CLAIM FOR RELIEF ON BEHALF OF NATIONWIDE
CLASS  VIOLATION OF THE MAGNUSON-MOSS
WARRANTY ACT 15 U.S.C. § 2301 *et. seq.* ......................... 259

SECOND CLAIM FOR RELIEF ON BEHALF OF THE
NATIONWIDE CLASS  BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (MICH. COMP.
LAWS § 440.2314) ................................................... 264

THIRD CLAIM FOR RELIEF ON BEHALF OF NATIONWIDE
CLASS  FRAUDULENT CONCEALMENT ........................... 265

FOURTH CLAIM FOR RELIEF ON BEHALF OF
NATIONWIDE CLASS  UNJUST ENRICHMENT ............... 267

II.   STATE CLASS CLAIMS ..................................................... 268

ALABAMA .................................................................. 268

FIFTH CLAIM FOR RELIEF VIOLATION OF ALABAMA
DECEPTIVE TRADE PRACTICES ACT (ALA. CODE § 8-
19-1, *et. seq.*) ....................................................... 268

SIXTH CLAIM FOR RELIEF FRAUD BY CONCEALMENT ......... 273

ALASKA ..................................................................... 274

SEVENTH CLAIM FOR RELIEF VIOLATION OF THE
ALASKA UNFAIR TRADE PRACTICES AND
CONSUMER PROTECTION ACT (ALASKA STAT. ANN.
§ 45.50.471, *et. seq.*) .............................................. 274

EIGHTH CLAIM FOR RELIEF BREACH OF THE IMPLIED
WARRANTY OF MERCHANTABILITY (ALASKA STAT.
§ 45.02.314) ........................................................... 279

NINTH CLAIM FOR RELIEF FRAUD BY CONCEALMENT ......... 280

ARIZONA .................................................................... 281

TENTH CLAIM FOR RELIEF VIOLATIONS OF THE
CONSUMER FRAUD ACT (ARIZONA REV. STAT. § 44-
1521, *et. seq.*) ....................................................... 281

**TABLE OF CONTENTS**
**(continued)**

Page

ELEVENTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................................... 286

ARKANSAS ..................................................................................... 287

TWELFTH CLAIM FOR RELIEF VIOLATIONS OF THE
DECEPTIVE TRADE PRACTICE ACT (ARK. CODE ANN.
§ 4-88-101, *et. seq.*) ................................................................. 287

THIRTEENTH CLAIM FOR RELIEF BREACH OF THE
IMPLIED WARRANTY OF MERCHANTABILITY
(**ARK. CODE ANN**. § 4-2-314)................................................. 292

FOURTEENTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................................... 293

CALIFORNIA .................................................................................. 294

FIFTEENTH CLAIM FOR RELIEF VIOLATIONS OF THE
CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE
§ 1750, *et. seq.*).......................................................................... 294

SIXTEENTH CLAIM FOR RELIEF VIOLATION OF THE
CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS.
& PROF. CODE § 17200, *et. seq.*) (Asserted on Behalf of the
California Class) ....................................................................... 303

SEVENTEENTH CLAIM FOR RELIEF VIOLATION OF SONG-
BEVERLY CONSUMER WARRANTY ACT FOR
BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (CALIFORNIA "LEMON LAW")
(CAL. CIV. CODE §§ 1791.1 & 1792)........................................ 307

EIGHTEENTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................................... 309

NINETEENTH CLAIM FOR RELIEF VIOLATION OF
CALIFORNIA'S FALSE ADVERTISING LAW CAL.
BUS. & PROF. CODE § 17500, ***et. seq.*** (Asserted on Behalf
of the California Class) ............................................................ 311

TWENTIETH CLAIM FOR RELIEF NEGLIGENT FAILURE
TO RECALL (Asserted on Behalf of the California Class) ...... 313

COLORADO ..................................................................................... 314

# TABLE OF CONTENTS
## (continued)

Page

TWENTY-FIRST CLAIM FOR RELIEF VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT (COL. REV. STAT. § 6-1-101, *et. seq.*) ................................................. 314

TWENTY-SECOND CLAIM FOR RELIEF BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (**COL. REV. STAT.** § 4-2-314) ................................................. 318

TWENTY-THIRD CLAIM FOR RELIEF FRAUD BY CONCEALMENT ................................................. 319

CONNECTICUT ................................................. 321

TWENTY-FOURTH CLAIM FOR RELIEF VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT (CONN. GEN. STAT. § 42-110a, *et. seq.*)................................................. 321

TWENTY-FIFTH CLAIM FOR RELIEF FRAUDULENT CONCEALMENT ................................................. 325

DELAWARE ................................................. 326

TWENTY-SIXTH CLAIM FOR RELIEF VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT (6 DEL. CODE § 2513, *et. seq.*)................................................. 326

TWENTY-SEVENTH CLAIM FOR RELIEF VIOLATION OF THE DELAWARE DECEPTIVE TRADE PRACTICES ACT (6 DEL. CODE § 2532, *et. seq.*)................................................. 331

TWENTY-EIGHTH CLAIM FOR RELIEF BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY **(6 DEL. CODE § 2-314)** ................................................. 335

TWENTY-NINTH CLAIM FOR RELIEF FRAUD BY CONCEALMENT ................................................. 336

DISTRICT OF COLUMBIA ................................................. 338

THIRTIETH CLAIM FOR RELIEF VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT (D.C. CODE § 28-3901, *et. seq.*)................................................. 338

THIRTY-FIRST CLAIM FOR RELIEF BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY **(D.C. CODE § 28:2-314)**................................................. 343

THIRTY-SECOND CLAIM FOR RELIEF FRAUD BY CONCEALMENT ................................................. 344

-vi-

# TABLE OF CONTENTS
## (continued)

Page

FLORIDA ................................................................................. 345

    THIRTY-THIRD CLAIM FOR RELIEF VIOLATION OF
    FLORIDA'S UNFAIR & DECEPTIVE TRADE
    PRACTICES ACT (FLA. STAT. § 501.201, *et. seq.*) ................. 345

    THIRTY-FOURTH CLAIM FOR RELIEF FRAUD BY
    CONCEALMENT .................................................... 349

GEORGIA ............................................................................... 351

    THIRTY-FIFTH CLAIM FOR RELIEF VIOLATION OF
    GEORGIA'S FAIR BUSINESS PRACTICES ACT (GA.
    CODE ANN. § 10-1-390, *et. seq.*) ................................. 351

    THIRTY-SIXTH CLAIM FOR RELIEF VIOLATION OF
    GEORGIA'S UNIFORM DECEPTIVE TRADE
    PRACTICES ACT (GA. CODE ANN. § 10-1-370, *et. seq.*) .......... 355

    THIRTY-SEVENTH CLAIM FOR RELIEF FRAUD BY
    CONCEALMENT .................................................... 359

HAWAII ................................................................................. 361

    THIRTY-EIGHTH CLAIM FOR RELIEF UNFAIR AND
    DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW
    (HAW. REV. STAT. § 480, *et. seq.*) ............................... 361

    THIRTY-NINTH CLAIM FOR RELIEF BREACH OF THE
    IMPLIED WARRANTY OF MERCHANTABILITY
    **(HAW. REV. STAT. § 490:2-314)** ............................... 365

    FORTIETH CLAIM FOR RELIEF FRAUD BY
    CONCEALMENT .................................................... 366

IDAHO ................................................................................... 368

    FORTY-FIRST CLAIM FOR RELIEF VIOLATION OF THE
    IDAHO CONSUMER PROTECTION ACT (IDAHO CIV.
    CODE § 48-601, *et. seq.*) ......................................... 368

    FORTY-SECOND CLAIM FOR RELIEF FRAUD BY
    CONCEALMENT .................................................... 372

ILLINOIS ............................................................................... 374

-vii-

## TABLE OF CONTENTS
### (continued)

Page

FORTY-THIRD CLAIM FOR RELIEF VIOLATION OF
ILLINOIS CONSUMER FRAUD AND DECEPTIVE
BUSINESS PRACTICES ACT (815 ILCS 505/1, *et. seq.*
and 720 ilcs 295/1a) ................................................................. 374

FORTY-FOURTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................................. 378

INDIANA ................................................................................................. 380

FORTY-FIFTH CLAIM FOR RELIEF VIOLATION OF THE
INDIANA DECEPTIVE CONSUMER SALES ACT (Ind.
Code § 24-5-0.5-3) ................................................................. 380

FORTY-SIXTH CLAIM FOR RELIEF BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (IND. CODE
§ 26-1-2-314) ......................................................................... 385

FORTY-SEVENTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................................. 386

IOWA ....................................................................................................... 387

FORTY-EIGHTH CLAIM FOR RELIEF VIOLATIONS OF THE
PRIVATE RIGHT OF ACTION  FOR CONSUMER
FRAUDS ACT (IOWA CODE § 714h.1, *et. seq.*) ......................... 387

FORTY-NINTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................................. 392

KANSAS ................................................................................................... 393

FIFTIETH CLAIM FOR RELIEF VIOLATIONS OF THE
KANSAS CONSUMER PROTECTION ACT (KAN. STAT.
ANN. § 50-623, *et. seq.*) ........................................................... 393

FIFTY-FIRST CLAIM FOR RELIEF BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (KAN. STAT.
ANN. § 84-2-314) ..................................................................... 399

FIFTY-SECOND CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................................. 400

KENTUCKY ............................................................................................. 401

FIFTY-THIRD CLAIM FOR RELIEF VIOLATION OF THE
KENTUCKY CONSUMER PROTECTION ACT (KY.
REV. STAT. § 367.110, *et. seq.*) ................................................. 401

-viii-

## TABLE OF CONTENTS
### (continued)

Page

FIFTY-FOURTH CLAIM FOR RELIEF FRAUD BY
    CONCEALMENT ................................................................... 405

LOUISIANA ................................................................................. 407

FIFTY-FIFTH CLAIM FOR RELIEF VIOLATION OF THE
    LOUISIANA UNFAIR TRADE PRACTICES AND
    CONSUMER PROTECTION LAW (LA. REV. STAT.
    § 51:1401, *et. seq.*) .................................................................. 407

FIFTY-SIXTH CLAIM FOR RELIEF BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (LA. CIV. CODE
    ART. 2520, 2524) ..................................................................... 411

FIFTY-SEVENTH CLAIM FOR RELIEF FRAUD BY
    CONCEALMENT ................................................................... 413

FIFTY-EIGHTH CLAIM FOR RELIEF REDHIBITION LA. CIV.
    CODE ART. 2520, *et. seq.* and 2545 (On Behalf of the
    Louisiana State Class) .............................................................. 414

MAINE ........................................................................................ 415

FIFTY-NINTH CLAIM FOR RELIEF VIOLATION OF MAINE
    UNFAIR TRADE PRACTICES ACT (ME. REV. STAT. ANN.
    TIT. 5 § 205-a, *et. seq.*) .......................................................... 415

SIXTIETH CLAIM FOR RELIEF BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (ME. REV.
    STAT. ANN. TIT. 11 § 2-314) ................................................... 420

SIXTY-FIRST CLAIM FOR RELIEF FRAUD BY
    CONCEALMENT ................................................................... 421

MARYLAND ............................................................................... 422

SIXTY-SECOND CLAIM FOR RELIEF VIOLATIONS OF THE
    MARYLAND CONSUMER PROTECTION ACT (MD.
    CODE COM. LAW § 13-101, *et. seq.*) ......................................... 422

SIXTY-THIRD CLAIM FOR RELIEF BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (MD. CODE
    COM. LAW § 2-314) ................................................................ 427

SIXTY-FOURTH CLAIM FOR RELIEF FRAUD BY
    CONCEALMENT ................................................................... 428

MASSACHUSETTS ..................................................................... 429

## TABLE OF CONTENTS
### (continued)

Page

SIXTY-FIFTH CLAIM FOR RELIEF DECEPTIVE ACTS OR
  PRACTICES PROHIBITED BY MASSACHUSETTS
  LAW (MASS. GEN. LAWS CH. 93A, § 1, *et. seq.*) ........................ 429

SIXTY-SIXTH CLAIM FOR RELIEF BREACH OF IMPLIED
  WARRANTY OF MERCHANTABILITY (ALM GL. CH.
  106, § 2-314) ............................................................... 434

SIXTY-SEVENTH CLAIM FOR RELIEF FRAUD BY
  CONCEALMENT .................................................................. 435

MICHIGAN .............................................................................. 436

SIXTY-EIGHTH CLAIM FOR RELIEF VIOLATION OF THE
  MICHIGAN CONSUMER PROTECTION ACT  (MICH.
  COMP. LAWS § 445.903, *et. seq.*) ................................................. 436

SIXTY-NINTH CLAIM FOR RELIEF BREACH OF IMPLIED
  WARRANTY OF MERCHANTABILITY (MICH. COMP.
  LAWS § 440.2314) ............................................................ 441

SEVENTIETH CLAIM FOR RELIEF FRAUD BY
  CONCEALMENT .................................................................. 442

MINNESOTA ............................................................................ 444

SEVENTY-FIRST CLAIM FOR RELIEF VIOLATION OF
  MINNESOTA PREVENTION  OF CONSUMER FRAUD
  ACT  (MINN. STAT. § 325f.68, *et. seq.*) ...................................... 444

SEVENTY-SECOND CLAIM FOR RELIEF VIOLATION OF
  MINNESOTA UNIFORM  DECEPTIVE TRADE
  PRACTICES ACT (MINN. STAT. § 325d.43-48, *et. seq.*).......... 448

SEVENTY-THIRD CLAIM FOR RELIEF BREACH OF
  IMPLIED WARRANTY OF MERCHANTABILITY
  (MINN. STAT. § 336.2-314) ...................................................... 453

SEVENTY-FOURTH CLAIM FOR RELIEF FRAUD BY
  CONCEALMENT .................................................................. 454

MISSISSIPPI ........................................................................... 455

SEVENTY-FIFTH CLAIM FOR RELIEF VIOLATION OF
  MISSISSIPPI CONSUMER PROTECTION ACT  (MISS.
  CODE. ANN. § 75-24-1, *et. seq.*) ............................................... 455

-x-

1197532.10

## TABLE OF CONTENTS
### (continued)

Page

SEVENTY-SIXTH CLAIM FOR RELIEF BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MISS. CODE ANN. § 75-2-314) ................................................. 459

SEVENTY-SEVENTH CLAIM FOR RELIEF FRAUD BY CONCEALMENT ................................................. 460

MISSOURI ................................................. 462

SEVENTY-EIGHTH CLAIM FOR RELIEF VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT (MO. REV. STAT. § 407.010, *et. seq.*) ................................................. 462

SEVENTY-NINTH CLAIM FOR RELIEF BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MO. REV. STAT. § 400.2-314) ................................................. 466

EIGHTIETH CLAIM FOR RELIEF FRAUD BY CONCEALMENT ................................................. 467

MONTANA ................................................. 469

EIGHTY-FIRST CLAIM FOR RELIEF VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973 (MONT. CODE ANN. § 30-14-101, *et. seq.*) ................................................. 469

EIGHTY-SECOND CLAIM FOR RELIEF BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MONT. CODE § 30-2-314) ................................................. 473

EIGHTY-THIRD CLAIM FOR RELIEF FRAUD BY CONCEALMENT ................................................. 474

NEBRASKA ................................................. 476

EIGHTY-FOURTH CLAIM FOR RELIEF VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT (NEB. REV. STAT. § 59-1601, *et. seq.*) ................................................. 476

EIGHTY-FIFTH CLAIM FOR RELIEF BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (NEB. REV. STAT. NEB. § 2-314) ................................................. 480

EIGHTY-SIXTH CLAIM FOR RELIEF FRAUD BY CONCEALMENT ................................................. 481

NEVADA ................................................. 482

1197532.10

# TABLE OF CONTENTS
## (continued)

Page

EIGHTY-SEVENTH CLAIM FOR RELIEF VIOLATION OF
THE NEVADA DECEPTIVE TRADE PRACTICES ACT
(Nev. Rev. Stat. § 598.0903, *Et. seq.*) .................................... 482

EIGHTY-EIGHTH CLAIM FOR RELIEF BREACH OF
IMPLIED WARRANTY OF MERCHANTABILITY
(Nev. Rev. Stat. § 104.2314) ................................... 487

EIGHTY-NINTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................... 488

NEW HAMPSHIRE ......................................... 489

NINETIETH CLAIM FOR RELIEF VIOLATION OF N.H.
CONSUMER PROTECTION ACT (N.H. REV. STAT.
ANN. § 358-A:1, Et. seq.) ......................................... 489

NINETY-FIRST CLAIM FOR RELIEF BREACH OF THE
IMPLIED WARRANTY OF MERCHANTABILITY (N.H.
REV. STAT. ANN. § 382-A:2-314) ......................................... 494

NINETY-SECOND CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................... 495

NEW JERSEY ......................................... 497

NINETY-THIRD CLAIM FOR RELIEF VIOLATION OF NEW
JERSEY CONSUMER FRAUD ACT (N.J. Stat. Ann.
§ 56:8-1, *Et. seq.*) ....................................... 497

NINETY-FOURTH CLAIM FOR RELIEF BREACH OF
IMPLIED WARRANTY OF MERCHANTABILITY (N.J.
Stat. Ann. § 12a:2-314) ......................................... 501

NINETY-FIFTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................... 502

NEW MEXICO.......................................... 504

NINETY-SIXTH CLAIM FOR RELIEF VIOLATIONS OF THE
NEW MEXICO UNFAIR TRADE PRACTICES ACT
(N.M. Stat. Ann. § 57-12-1, *et. seq.*) ......................................... 504

NINETY-SEVENTH CLAIM FOR RELIEF BREACH OF
IMPLIED WARRANTY OF MERCHANTABILITY (N.M.
stat. ann. § 55-2-314) ............................................. 509

NINETY-EIGHTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................... 510

1197532.10

## TABLE OF CONTENTS
### (continued)

Page

NEW YORK ........................................................................................ 511

   NINETY-NINTH CLAIM FOR RELIEF DECEPTIVE ACTS OR
      PRACTICES (N.Y. GEN. BUS. LAW § 349 AND 350).................. 511

   ONE HUNDREDTH CLAIM FOR RELIEF BREACH OF
      IMPLIED WARRANTY OF MERCHANTABILITY (N.Y.
      U.C.C. § 2-314).......................................................................... 516

   ONE HUNDRED FIRST CLAIM FOR RELIEF FRAUD BY
      CONCEALMENT .................................................................... 517

   ONE HUNDRED SECOND CLAIM FOR RELIEF VIOLATION
      OF NEW YORK'S FALSE ADVERTISING ACT (N.Y.
      GEN. BUS. LAW § 350) (Asserted on Behalf of the New
      York Class) ................................................................................ 518

NORTH CAROLINA ....................................................................... 520

   ONE HUNDRED THIRD CLAIM FOR RELIEF VIOLATION
      OF NORTH CAROLINA'S UNFAIR  AND DECEPTIVE
      ACTS AND PRACTICES ACT (N.C. GEN. STAT. § 75-1.1
      *et. seq.*)..................................................................................... 520

   ONE HUNDRED FOURTH CLAIM FOR RELIEF BREACH OF
      IMPLIED WARRANTY OF MERCHANTABILITY (N.C.
      GEN. STAT. **§** 25-2-314) ............................................................ 524

   ONE HUNDRED FIFTH CLAIM FOR RELIEF FRAUD BY
      CONCEALMENT .................................................................... 525

NORTH DAKOTA............................................................................. 526

   ONE HUNDRED SIXTH CLAIM FOR RELIEF VIOLATION OF
      THE NORTH DAKOTA CONSUMER FRAUD ACT
      (N.D. CENT. CODE § 51-15-02) ...................................................... 526

   ONE HUNDRED SEVENTH CLAIM FOR RELIEF BREACH
      OF IMPLIED WARRANTY OF MERCHANTABILITY
      **(N.D. CENT. CODE § 41-02-31)**................................................ 531

   ONE HUNDRED EIGHTH CLAIM FOR RELIEF FRAUD BY
      CONCEALMENT .................................................................... 532

OHIO  ............................................................................................... 533

   ONE HUNDRED NINTH CLAIM FOR RELIEF VIOLATION
      OF OHIO CONSUMER SALES PRACTICES ACT (OHIO
      REV. CODE ANN. § 1345.01, *et. seq.*)........................................... 533

## TABLE OF CONTENTS
### (continued)

Page

ONE HUNDRED TENTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................................. 540

ONE HUNDRED ELEVENTH CLAIM FOR RELIEF IMPLIED
WARRANTY IN TORT (On Behalf of the Ohio Class).......... 541

OKLAHOMA ....................................................................................... 542

ONE HUNDRED TWELFTH CLAIM FOR RELIEF
VIOLATION OF OKLAHOMA CONSUMER
PROTECTION ACT (OKLA. STAT. TIT. 15 § 751, *et. seq.*)........ 542

ONE HUNDRED THIRTEENTH CLAIM FOR RELIEF
BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (12A OKLA. STAT. ANN. § 2-314) ......... 547

ONE HUNDRED FOURTEENTH CLAIM FOR RELIEF FRAUD
BY CONCEALMENT............................................................... 548

OREGON ............................................................................................. 550

ONE HUNDRED FIFTEENTH CLAIM FOR RELIEF
VIOLATION OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT (OR. REV. STAT. § 646.605, *et. seq.*)............ 550

ONE HUNDRED SIXTEENTH CLAIM FOR RELIEF FRAUD
BY CONCEALMENT (**BASED ON OREGON LAW**)................... 554

PENNSYLVANIA................................................................................ 556

ONE HUNDRED SEVENTEENTH CLAIM FOR RELIEF
VIOLATION OF THE PENNSYLVANIA UNFAIR
TRADE PRACTICES AND CONSUMER PROTECTION
LAW (73 **P.S.** § 201-1, *et. seq.*) ................................................. 556

ONE HUNDRED EIGHTEENTH CLAIM FOR RELIEF
BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (13 PA. CONS. STAT. ANN. § 2314)....... 561

ONE HUNDRED NINETEENTH CLAIM FOR RELIEF FRAUD
BY CONCEALMENT............................................................... 562

RHODE ISLAND ................................................................................. 564

ONE HUNDRED TWENTIETH CLAIM FOR RELIEF
VIOLATION OF THE RHODE ISLAND UNFAIR
TRADE PRACTICES  AND CONSUMER PROTECTION
ACT (R.I. GEN. LAWS § 6-13.1, *et. seq.*) ..................................... 564

# TABLE OF CONTENTS
### (continued)

Page

ONE HUNDRED TWENTY-FIRST CLAIM FOR RELIEF
BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (R.I. GEN. LAWS § 6A-2-314) .............. 568

ONE HUNDRED TWENTY-SECOND CLAIM FOR RELIEF
FRAUD BY CONCEALMENT ................................ 569

SOUTH CAROLINA ...................................................................... 571

ONE HUNDRED TWENTY-THIRD CLAIM FOR RELIEF
VIOLATIONS OF THE SOUTH CAROLINA UNFAIR
TRADE PRACTICES ACT (S.C. CODE ANN. § 39-5-10, *et.
seq.*) ......................................................................... 571

ONE HUNDRED TWENTY-FOURTH CLAIM FOR RELIEF
BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (S.C. CODE § 36-2-314) .................... 576

ONE HUNDRED TWENTY-FIFTH CLAIM FOR RELIEF
VIOLATIONS OF THE SOUTH CAROLINA
REGULATION OF MANUFACTURERS,
DISTRIBUTORS, AND DEALERS ACT (S.C. CODE ANN.
§ 56-15-10, *et. seq.*) .................................................. 577

SOUTH DAKOTA ........................................................................ 578

ONE HUNDRED TWENTY-SIXTH CLAIM FOR RELIEF
VIOLATION OF THE SOUTH DAKOTA  DECEPTIVE
TRADE PRACTICES AND CONSUMER PROTECTION
LAW (S.D. CODIFIED LAWS § 37-24-6) ...................................... 578

ONE HUNDRED TWENTY-SEVENTH CLAIM FOR RELIEF
BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (S.D. CODIFIED LAWS § 57a-2-314) .... 583

ONE HUNDRED TWENTY-EIGHTH CLAIM FOR RELIEF
FRAUD BY CONCEALMENT ................................ 583

TENNESSEE ............................................................................... 585

ONE HUNDRED TWENTY-NINTH CLAIM FOR RELIEF
VIOLATION OF TENNESSEE CONSUMER
PROTECTION ACT (TENN. CODE ANN. § 47-18-101, *et.
seq.*) ......................................................................... 585

ONE HUNDRED THIRTIETH CLAIM FOR RELIEF FRAUD
BY CONCEALMENT ............................................ 590

**TABLE OF CONTENTS**
**(continued)**

Page

TEXAS ................................................................................................... 591

    ONE HUNDRED THIRTY-FIRST CLAIM FOR RELIEF
    VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
    PRACTICES — CONSUMER PROTECTION ACT (TEX.
    BUS. & COM. CODE §§ 17.41, *et. seq.*) ........................................ 591

    ONE HUNDRED THIRTY-SECOND CLAIM FOR RELIEF
    BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (TEX. BUS. & COM. CODE § 2.314) ...... 597

    ONE HUNDRED THIRTY-THIRD CLAIM FOR RELIEF
    FRAUD BY CONCEALMENT ................................................. 598

UTAH ................................................................................................... 599

    ONE HUNDRED THIRTY-FOURTH CLAIM FOR RELIEF
    VIOLATION OF UTAH CONSUMER SALES
    PRACTICES ACT (UTAH CODE ANN. § 13-11-1, *et. seq.*)......... 599

    ONE HUNDRED THIRTY-FIFTH CLAIM FOR RELIEF
    BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY (UTAH CODE ANN. § 70A-2-314) ......... 604

VERMONT ........................................................................................... 605

    ONE HUNDRED THIRTY-SIXTH CLAIM FOR RELIEF
    VIOLATION OF VERMONT CONSUMER FRAUD ACT
    (**VT. STAT. ANN. TIT.** 9, § 2451 *et. seq.*) .................................... 605

    ONE HUNDRED THIRTY-SEVENTH CLAIM FOR RELIEF
    FRAUD BY CONCEALMENT ................................................. 609

VIRGINIA ........................................................................................... 610

    ONE HUNDRED THIRTY-EIGHTH CLAIM FOR RELIEF
    VIOLATION OF VIRGINIA CONSUMER
    PROTECTION ACT (VA. CODE ANN. 15 §§ 59.1-196, *et.*
    *seq.*) .......................................................................................... 610

    ONE HUNDRED THIRTY-NINTH CLAIM FOR RELIEF
    BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (**VA. CODE ANN.** § 8.2-314) ................. 615

    ONE HUNDRED FORTIETH CLAIM FOR RELIEF FRAUD BY
    CONCEALMENT ................................................................. 616

WASHINGTON ................................................................................... 617

**TABLE OF CONTENTS**
**(continued)**

Page

ONE HUNDRED FORTY-FIRST CLAIM FOR RELIEF
VIOLATION OF THE CONSUMER PROTECTION ACT
(REV. CODE WASH. ANN. §§ 19.86.010, *et. seq.*) ........................ 617

ONE HUNDRED FORTY-SECOND CLAIM FOR RELIEF
FRAUD BY CONCEALMENT ................................ 622

WEST VIRGINIA ................................................................. 623

ONE HUNDRED FORTY-THIRD CLAIM FOR RELIEF
VIOLATIONS OF THE CONSUMER CREDIT AND
PROTECTION ACT (W. VA. CODE § 46a-1-101, *et. seq.*)......... 623

ONE HUNDRED FORTY-FOURTH CLAIM FOR RELIEF
BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (W. VA. CODE § 46-2-314) .................. 629

ONE HUNDRED FORTY-FIFTH CLAIM FOR RELIEF FRAUD
BY CONCEALMENT ............................................... 630

WISCONSIN ...................................................................... 632

ONE HUNDRED FORTY-SIXTH CLAIM FOR RELIEF
VIOLATIONS OF THE WISCONSIN  DECEPTIVE
TRADE PRACTICES ACT (WIS. STAT. § 110.18)................. 632

ONE HUNDRED FORTY-SEVENTH CLAIM FOR RELIEF
FRAUD BY CONCEALMENT ................................ 636

WYOMING ........................................................................ 638

ONE HUNDRED FORTY-EIGHTH CLAIM FOR RELIEF
VIOLATION OF THE WYOMING CONSUMER
PROTECTION ACT (WYO. STAT. § 40-12-105 *et. seq.)* ........... 638

ONE HUNDRED FORTY-NINTH CLAIM FOR RELIEF
BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (WYO. STAT. § 34.1-2-314)................. 642

ONE HUNDRED FIFTIETH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................... 643

ONE HUNDRED FIFTY-FIRST CLAIM FOR RELIEF
NEGLIGENCE (On Behalf of the Arkansas, Louisiana,
Maryland, and Ohio Classes) ................................ 645

PRAYER FOR RELIEF............................................................. 647

JURY TRIAL DEMANDED...................................................... 649

## INTRODUCTION

1.      This Consolidated Complaint ("Complaint") is filed as a civil action under the authority and direction of the Court as set forth in Section III of its August 15, 2014 Order No. 8. It is intended to serve as the Plaintiffs' Master Class Action Complaint for purposes of discovery, pre-trial motions and rulings (including for choice of law rulings relevant to Rule 23 of the Federal Rules of Civil Procedure, and class certification itself), and the determination and trial of certified claims or common questions in these multi-district litigation ("MDL") proceedings with respect to millions of vehicles recalled by New GM, that were originally sold by Old GM.

2.      Plaintiffs bring this action for a Nationwide Class of all persons in the United States who either bought or leased a vehicle with one of the ignition switch related defects, as defined herein ("Defective Vehicle") prior to the Bankruptcy Sale Order and: (i) still own or lease the vehicle, or (ii) sold the vehicle on or after February 14, 2014; or (iii) owned or leased a Defective Vehicle that was declared a total loss after an accident on or after February 14, 2104 and, as set forth in the CLASS ACTION ALLEGATIONS section of this Complaint, State Classes of such purchasers (collectively, the "Classes").

3.      This case involves New GM's egregious and ongoing failure to disclose and affirmative concealment of a known safety defect in Old GM-manufactured vehicles. This Complaint is bought on behalf of the Classes for recovery of damages, statutory penalties, and injunctive relief/equitable relief against New GM as the sole Defendant. This Complaint asserts each of the Classes' claims for relief on two distinct and separate bases of liability against New GM: First, this Complaint asserts each of the claims for relief herein based on New GM's own wrongful conduct and breaches of its own independent, non-derivative duties

toward the Classes. Second, this Complaint alternatively asserts claims on behalf of the Classes against New GM for its liability as a successor and mere continuation of Old GM.

4.      This Complaint, consistent with Fed. R. Civ. P. 1's directive to secure the "just, speedy and inexpensive determinations of every action and proceeding," sets forth those facts relating to the unprecedented abnegation by New GM of basic standards of safety, truthfulness, and accountability, to the detriment of millions of consumers and the public at large, that are capable of determination in this MDL. It draws upon an array of sources, including but not limited to documents GM recently produced to the National Highway Traffic Safety Administration ("NHTSA"), the House Energy & Commerce Committee, and the results of an internal investigation overseen by Anton R. Valukas ("Valukas Report").[1] These documents include tens of thousands of pages of unheeded consumer complaints.

5.      This Complaint neither waives nor dismisses any claims for relief against any defendant not included in this pleading that are asserted by any other plaintiffs in actions that have been or will be made part of this MDL proceeding, except by operation of the class notice and any opt-out provisions on claims or common questions asserted in this Complaint and certified by this Court. Certain claims for certain parties may, consistent with 28 U.S.C. § 1407 and the caselaw thereunder, be matters for determination on remand by transferor courts.

6.      An auto manufacturer should never make profits more important than safety and should never conceal defects that exist in its vehicles from customers or the public. New GM Vehicle Safety Chief Jeff Boyer acknowledged that: "Nothing is more important than the safety of our customers in the vehicles they drive."

---

[1] These sources are referred to as "GMNHTSA," "GMHEC," and the "Valukas Report." Other sources are described herein

7.     The first priority of a car manufacturer should be to ensure that the vehicles who bear its brands are safe, and particularly that its vehicles have operable ignition systems, airbags, power steering, power brakes, seatbelt pretensioners, and other safety features that can prevent or minimize the threat of death or serious bodily harm to the vehicle's occupants.

8.     The Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act")[2], its accompanying regulations, and state statutory and common law require prompt disclosure of serious safety defects known to a manufacturer.[3] If it is determined that the vehicle is defective, the manufacturer may be required to notify vehicle owners, purchasers, and dealers of the defect, and may be required to remedy the defect.[4]

9.     Millions of vehicles designed, manufactured, and sold by Old GM have a safety defect such that the vehicle's ignition switch inadvertently moves from the "run" position to the "accessory" or "off" position during ordinary driving conditions, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to deploy. These vehicles are referred to in this Complaint as "Defective Vehicles."

10.     In February and March of 2014, New GM, which has assumed the liabilities of Old GM for the conduct at issue in this Complaint, and which has independent and non-derivative duties of candor and care based upon its own knowledge and conduct, issued its first set of recalls of various models due to the defective ignition switch. The recalls encompassed 2.19 million vehicles in the United States and included the following models of cars manufactured by Old GM: 2005-2009 Cobalts; 2007-2009 Pontiac G5s; 2006-2009 Chevrolet HHRs and Pontiac Solstices; 2005-2006 Pontiac Pursuits; 2003-2007 Saturn Ions; and 2007-2009 Saturn Skys.

---

[2] 49 U.S.C. §§ 30101-30170.
[3] 49 U.S.C. § 30118(c)(1) & (2).
[4] 49 U.S.C. § 30118(b)(2)(A) & (B).

11.     The ignition switch systems in these vehicles are defective for several reasons, including (a) the ignition switch is too weak to hold the key in place in the "run" position; (b) the low position of the switches in the Defective Vehicles, as exacerbated by the use of a "slotted" key; and (c) they cause the airbags to become inoperable when the ignition switch is in the "accessory" or "off" position. As NHTSA's Acting Administrator testified in recent Congressional hearings, a vehicle's airbags should deploy whenever the car is moving—even if the ignition switch moves out of the "run" position.

12.     On June 23, 2014, New GM notified NHTSA and consumers that it was issuing a second recall for Defective Vehicles (the "June recall"). Here, New GM recalled 3.14 million vehicles. New GM characterized the June recall as relating to the design of the ignition key with a slot (rather than a hole), which allows the key and the key fob to hang lower down in the vehicle where it is vulnerable to being hit by the driver's knee. Despite this delineation, this "key slot defect" is substantially identical to the ignition switch defect that gave rise to the earlier recall and creates the same safety risks and dangers.

13.     According to documents on NHTSA's website, 2,349,095 of the vehicles subject to the June recall were made by Old GM. 792,636 vehicles were made and sold by New GM. The Defective Vehicles made by Old GM with the ignition key slot defect include:

- 2005-2009 Buick Lacrosse

- 2006-2009 Buick Lucerne

- 2004-2005 Buick Regal LS & GS

- 2000-2005 Cadillac Deville

- 2007-2009 Cadillac DTS

- 2006-2009 Chevrolet Impala

- 2006-2007 Chevrolet Monte Carlo

-4-

14.     Like the ignition switch defect that is the subject of the February/March recall, the ignition key slot defect poses a serious and dangerous safety risk because the key in the ignition switch can rotate and consequently cause the ignition to switch from the "on" or "run" position to "off" or "accessory" position. This, in turn, may result in a loss of engine power, stalling, loss of speed control, loss of power steering, loss of power braking, and increase the risk of a crash. Moreover, as with the ignition switch defect, because of this defect, if a crash occurs, the airbags are unlikely to deploy.

15.     New GM has tried to characterize the recall of these 3.14 million vehicles as being different than the ignition switch defect in the February/March recall when in reality it is for exactly the same defect, posing the same safety risks. New GM has attempted to distinguish the ignition key slot defect from the ignition switch defect to provide it with cover and an explanation for why it did not recall these 3.14 million vehicles much earlier, and allow New GM to provide a more limited, cheap and ineffective "fix" in the form of a key with hole (as opposed to a slot).

16.     On July 2-3, 2014 New GM announced it was recalling 7.29 million Defective Vehicles due to "unintended key rotation" (the "July recall"). The vehicles with the unintended key rotation defect were built on the same platform and with defective ignition switches, likely due to weak detent plungers just like the other Defective Vehicles. The Old GM vehicles implicated in the July recall are: 2000-2005 Chevrolet Impalas and Monte Carlos; 1997-2005 Chevrolet Malibus; 1999-2004 Oldsmobile Aleros; 1999-2005 Pontiac Grand Ams and 2004-2008 Pontiac Grand Prixs; certain 2003-2009 Cadillac CTSs; and certain 2004-2006 Cadillac SRX vehicles.

17.     As with the vehicles subject to the June recall, New GM has downplayed the severity of the "unintended key rotation" defect, and its recall offers a similarly cheap and ineffective "fix" in the form of new keys. New GM is *not* upgrading the ignition switches in these vehicles, altering the placement of the ignition so that it is not placed low on the steering column and is not correcting the algorithm that immediately disables the airbags as soon as the Defective Vehicle's ignition switch leaves the "run" position.

18.     Collectively these three groups of recalls (as well as a yet another very recent recall first posted on the NHTSA website on September 9, 2014 involving unintended ignition key rotation defects and another nearly 47,000 vehicles, including 2008-2009 Pontiac G8s) all relate to defects in the ignition switch system that New GM could and should have remedied years ago. The vehicles in these recalls are the "Defective Vehicles."

19.     From at least 2005 to the present, both Old GM and New GM received reports of crashes and injuries that put Old GM and New GM on notice of the serious safety issues presented by its ignition switch system. Given the continuity of engineers, general counsel, and other key personnel from Old GM to New GM, to say nothing of the access to Old GM's documents, New GM was aware of the ignition switch defects *from the very date of its inception* pursuant to the July 5, 2009 bankruptcy Sale Order, which became effective on July 11, 2009.

20.     Despite the dangerous, life-threatening nature of the ignition switch defects, including how the defects affect critical safety systems, New GM concealed the existence of the defects and failed to remedy the problem.

21.     The systematic concealment of known defects was deliberate, as both Old and New GM followed a consistent pattern of endless "investigation" and delay each time they

became aware (or aware yet again) of a given defect. In fact, recently revealed documents show that both Old and New GM valued cost-cutting over safety, trained their personnel to *never* use the word "defect," "stall," or other words suggesting that any GM-branded vehicles are defective, routinely chose the cheapest part supplier without regard to safety, and discouraged employees from acting to address safety issues.

22.     According to the administrator of NHTSA, Old and New GM worked to hide documents from the government regulator and to keep people within the Companies from "connecting the dots" to keep information secret.

23.     New GM's CEO, Mary Barra, has admitted in a video message that: "Something went wrong with our process in this instance, and terrible things happened." But that admission, and New GM's attempt to foist the blame on its parts supplier and engineers, lawyers and others whom it has now terminated, are cold comfort for Plaintiffs and the Class.

24.     As a result of the disclosure of these defects and Old and New GM's independent roles in concealing their existence, the value of Defective Vehicles has diminished. For example, a 2007 Saturn Ion sedan is estimated to have diminished in value by $251 in March 2014 as a direct result of these disclosures of unlawful conduct. A 2007 Saturn Sky was down $238.

25.     But there is more. In the first eight months of 2014, New GM announced at least 60 additional recalls, bringing the total number of recalled vehicles up to more than *27 million*. The unprecedented scope of these recalls has completely belied the Companies' claims that they made reliable and safe cars. As a result of these further revelations the Defective Vehicles suffered additional diminished value. For example, the 2007 Saturn Ion sedan's estimated diminution was $472 in September 2014 and the 2007 Saturn Sky had $686

in diminished value. From its very inception, New GM had the knowledge, the choice, the opportunity, and the responsibility to prevent personal and economic harm by timely and properly recalling the Defective Vehicles and timely and properly correcting the other safety defects. The economic harm to millions of customers that manifested upon the long-delayed recalls and revelation of New GM's ongoing concealment of these defects could have been prevented by timely discharge of its duties. This Complaint seeks the redress now available at law and in equity for New GM's failure to do so.

### JURISDICTION AND VENUE

26.     This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiffs and other Class members are citizens of a different state than Defendant.

27.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over New GM because it conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

28.     Venue is proper in this District under 28 U.S.C. § 1391 because New GM, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Additionally, New GM transacts business within this District, and some of the events establishing the claims arose in this District. Additionally, New GM requested that the Judicial Panel on Multi-District litigation transfer and centralize the ignition defect class actions filed by Plaintiffs to this District and the Judicial Panel has done so.

29.     Pursuant to this Court's direction that new plaintiffs can file directly in the MDL without first filing in the district in which they reside, new plaintiffs file this action as if it had been filed in the judicial district in which they reside.

## PARTIES

I.     **Plaintiffs**

30.     Unless otherwise indicated, all Plaintiffs below purchased their GM-branded vehicles primarily for personal, family, and household use.

31.     Unless otherwise indicated, all Plaintiffs' vehicles described below were manufactured, sold, distributed, advertised, marketed, and warranted by GM.

**Debra Forbes—Alabama**: Plaintiff and proposed Nationwide and Alabama State Class Representative Debra Forbes is a resident and citizen of Geneva, Alabama. Ms. Forbes purchased a new 2007 Chevrolet Cobalt in 2007 in Fort Walton Beach, Florida for $16,000. Her vehicle is covered by a seven-year warranty that expires at the end of 2014. Among other incidents consistent with ignition switch shutdown, Ms. Forbes' steering locked up on three or four occasions, in May or June 2010, fall 2010, and spring 2011, all on normal road conditions and while she was driving approximately 25-30 miles per hour. Each time she had to slam on her brakes and manipulate the ignition switch to unlock the steering. Although the ignition switch on Ms. Forbes's car has been repaired, other repairs are incomplete, pending the arrival of parts. The book value of Ms. Forbes' vehicle is presently only approximately $6,000. She would not have purchased her vehicle if she knew of the problems with the ignition switch.

**Aaron Henderson—Alabama**: Plaintiff and proposed Nationwide and Alabama State Class Representative Aaron Henderson is a resident and citizen of Buhl, Alabama. Mr. Henderson purchased a new 2007 Saturn Ion 3 in September, 2006, in Madison, Wisconsin for approximately $17,500. At the time Mr. Henderson purchased his new Saturn it was under warranty. Mr. Henderson has experienced two accidents in this car—one on December 7, 2012, and the other on February 23, 2014. The airbags failed to deploy in both accidents, and

-9-

Mr. Henderson suffered minor injuries as a result. Mr. Henderson has spent approximately $9,000 to repair his vehicle following these accidents. Mr. Henderson did not learn of the ignition switch defects until March of 2014. In May of 2014, the ignition switch recall repair work was performed on his vehicle. Mr. Henderson would not have purchased the vehicle if he had known of the problems with the ignition switch.

**Marion Smoke—Alabama**: Plaintiff and proposed Nationwide and Alabama State Class Representative Marion Smoke is a resident and citizen of Elmore, Alabama. Ms. Smoke purchased a new 2005 Chevy Cobalt the week of May 5, 2005 in Montgomery, Alabama, for $19,000. At the time Ms. Smoke purchased her new Cobalt, she also purchased the manufacturer's warranty. Ms. Smoke's Cobalt unexpectedly shut off on at least seven separate occasions, all of them while she was driving on highways. She has also had trouble with the steering wheel being hard to turn making it difficult to drive. As a result of the issues with her vehicle and ignition switch recall and associated risks, she fears driving her vehicle despite having the recall work performed on her vehicle in April of 2014. She believes the value of her vehicle has been diminished as a result of the defects. Ms. Smoke feels that the safety of the vehicle was misrepresented, and she would not have purchased this car if GM had been honest about the safety defects.

**Grace Belford—Arizona**: Plaintiff and proposed Nationwide and Arizona State Class Representative Grace Belford is a resident and citizen of Phoenix, Arizona. Ms. Belford purchased a new 2005 Chevrolet Cobalt in October 2005, in Phoenix, Arizona for $18,900. Ms. Belford also purchased the warranty for her Cobalt. On two separate occasions, Ms. Belford's ignition has unexpectedly shut off after her vehicle went over a bump in the road. Ms. Belford did not learn of the ignition switch defects until March of 2014. She immediately

requested a loaner vehicle, but she had no choice despite her concerns to continue to drive the Cobalt to work, as it was her only form of transportation. It took about three months for the recall repair work to be completed on Ms. Belford's vehicle. Ms. Belford had planned to use her Cobalt as a down payment on a new vehicle, but the resale value of her Cobalt was diminished due to the ignition switch defect. Ms. Belford traded in her Cobalt in August of 2014. She was only offered $3,000 for the vehicle - $2,000 less than current Kelley Blue Book value. Ms. Belford would never have purchased the 2005 Chevrolet Cobalt had she known about the defects and GM's indifference with regard to the safety and reliability of its vehicles.

**Camille Burns—Arkansas**: Plaintiff and proposed Nationwide and Arkansas State Class Representative Camille Burns is a resident and citizen of Pine Bluff, Arkansas. Ms. Burns purchased a used 2006 Chevrolet Cobalt on or about November 1, 2006, from Smart Chevrolet in White Hall, Arkansas, for over $16,000. At the time of purchase, the car was still covered under warranty. Ms. Burns recalls reading that GM and Chevrolet-branded vehicles were great cars with reliable parts. Ms. Burns' Cobalt shutdown "too many times to count"— approximately two to three times per week between June 2014 and the time she traded the vehicle in around July 14, 2014. These unexpected shutdowns occurred when Ms. Burns was pulling out into traffic, backing up, or turning her car. Each time she would be forced to restart the car. The last time it shut off suddenly, it almost caused an accident. She also experienced a loss of power steering while backing out of her driveway. Ms. Burns had her car checked by an independent repair shop, but they could not diagnose the problem. Upon calling a GM dealership about the ignition recall, the dealership refused to provide her a loaner car. But when she called GM directly, they advised her that she should get out of the car immediately. Although her Cobalt had been paid off, based on the repeated shutdowns,

-11-

GM's advice, and GM's inability to fix it, Ms. Burns felt compelled to trade in the Cobalt for a safer vehicle. On or about July 14, 2014, she traded it to Smart Hyundai and received only $2,500. The new car payment was a financial hardship. Ms. Burns asserts that the Cobalt suffered a diminution of value due to the ignition switch defects, the recalls, and the surrounding publicity. Ms. Burns would not have purchased the Cobalt, or she would have paid less for it, had she known about its defects.

**Patricia Barker—California**: Plaintiff and proposed Nationwide and California Class Representative Patricia Barker is a resident and citizen of Wilmington, California. Ms. Barker purchased a new 2005 Saturn Ion in Torrance, California in March 2005 for approximately $18,000. The car was covered under the standard manufacturer's warranty, and she also purchased an extended warranty. She chose the Saturn, in part, because she wanted a safely-designed and manufactured vehicle. She saw advertisements for Old GM Vehicles before she purchased the Saturn and, although she does not recall the specifics of the advertisements, she does recall that safety and quality were consistent themes across the advertisements she saw. These representations about safety and quality influenced Ms. Barker's decision to purchase the Saturn. She has experienced power steering failure in her car on at least two separate occasions. In both instances she was able to reboot the power steering after restarting the car. Ms. Barker did not learn of the ignition switch defects until about February 2014 when she received an undated recall notice in the mail. She then saw a commercial notifying affected GM drivers that they could receive a loaner car while waiting for backordered recall parts to arrive. When she went to a local GM dealership they gave her a 2014 Chevy Impala. She drove this car for forty-five days until her car was repaired in April 2014. Only after she returned the loaner did she find out that it was under recall for the same ignition issue as her

own vehicle. Ever since the recall repair has been completed on her car she has some difficulty turning the key in her ignition. Ms. Barker would not have purchased this car had she known about the defects in her GM vehicle.

**Michael and Sylvia Benton—California**: Plaintiffs and proposed Nationwide and California State Class Representatives Michael and Sylvia Benton are residents and citizens of Barstow, California. Mr. and Mrs. Benton purchased a used 2005 Chevrolet Cobalt on January 10, 2009, in Barstow, California, for $12,789.76. The Bentons chose the Cobalt, in part, because they wanted a safely designed and manufactured vehicle. They saw advertisements for vehicles before they purchased the Cobalt, and, although they do not recall the specifics of the advertisements, they do recall that safety and quality were consistent themes across the advertisements they saw, which influenced their purchase decision. The vehicle was not covered under warranty when they purchased it. Mr. and Mrs. Benton purchased gap warranty for the Cobalt for a term of 48 months. The Bentons' vehicle has shutdown at least 20 times. Mr. and Mrs. Benton did not learn of the ignition switch defects until March 2014. In April 2014, they took their Cobalt to the dealership in their area to have the recall work performed. They were provided a loaner vehicle. The Bentons still fear driving their vehicle due to the ignition switch recall and the risk posed by the ignition switch defects. They would not have purchased this car, or would have paid less than they did, if GM was honest about the safety defects.

**Melvin Cohen—California**: Plaintiff and proposed Nationwide and California State Class Representative Melvin Cohen is a resident and citizen of California City, California. Mr. Cohen purchased a new 2006 Chevrolet Cobalt on January 13, 2006, from Rally Auto Group in Palmdale, California, for $22,799.80. He does not believe his vehicle was covered by

-13-

written warranties. Mr. Cohen had a general impression that GM was a quality brand and that the vehicle was safe and reliable. In October of 2008, Mr. Cohen's wife, Karin was driving the vehicle when it suddenly shut off while making a left turn into a gas station in California City, California. Ms. Cohen was unable to control the vehicle once it shut off, and it was hit by another vehicle when it strayed out of its lane. The airbags did not deploy even though the impact was significant enough to total the vehicle. Mr. Cohen would not have purchased the vehicle had he known of the defects.

**Esperanza Ramirez—California**: Plaintiff and proposed Nationwide and California State Class Representative Esperanza Ramirez is a resident and citizen of Los Angeles, California. Ms. Ramirez purchased new 2007 Saturn Ion on March 13, 2007, at a dealership in California for $27, 215. Her vehicle was covered by a warranty at the time of purchase. Ms. Ramirez has experienced several incidents consistent with the ignition defects, and is unable to drive the car on freeways or for long distances. She had seen commercials about Saturns featuring families that trusted Saturns. Had she known of the problems with her GM car, she would not have purchased it.

**Kimberly Brown—California**: Plaintiff and proposed Nationwide and California State Class Representative Kimberly Brown is a resident and citizen of Palmdale, California. Ms. Brown purchased a new 2006 Chevrolet HHR on January 7, 2007, at Rally Auto Group in Palmdale, California, for $30,084. Her car was under a 48-month or 100,000 mile warranty at the time she purchased it. She and her husband relied on the advertising posted at the GM dealership where they purchased the vehicle, as well as the GM brand name and its purported reputation for safety and quality, which were consistent with the representations at the GM dealership. Between 2007 and 2011, Ms. Brown's vehicle inadvertently shutdown four or five

times a year, and on several other occasions she had to use heavy force to turn the wheel. Between 2012 and 2014, her vehicle inadvertently shutdown eight or nine times a year, and on several other occasions she had to use heavy force to turn the wheel. Her vehicle typically shuts down while going over bumpy roads, speed bumps, or railroad tracks. It will shutdown while the gear is in drive and the key is in the "on" position. To remedy the problem she puts the gear into neutral and restarts the car. Although the GM dealership indicated that it fixed the ignition switch defect during a post-recall repair in May of 2014, Ms. Brown and her husband have experienced their ignition shutting down at least five times since then. In September 2014, she returned to the dealer to try to have the ongoing shutdowns remedied, and she had to pay out of pocket for a loaner vehicle. Ms. Brown would not have paid the purchase price she paid if she had known GM was manufacturing and selling vehicles plagued with defects, and was not committed to the safety and reliability of its vehicles.

**Javier Malaga—California**: Plaintiff and proposed Nationwide and California State Class Representative Javier F. Malaga is a resident and citizen of in Playa Del Rey, California. On or about August 7, 2013, Mr. Malaga purchased a used 2006 Cobalt LS, which he still owns, for $15,979.08. When Mr. Malaga purchased the 2006 Cobalt LS, it was not covered by a written warranty. On two occasions Mr. Malaga was unable to turn on the engine with his ignition key. Mr. Malaga returned the car to a dealer for repairs on or about February 15, 2008, and March 25, 2010. One of GM's main selling points has been the efficiency, cost effectiveness, and safety of its vehicles. Mr. Malaga's purchase was based, in significant part, on these representations and assertions by GM. If GM had disclosed the nature and extent of its problems, Mr. Malaga would not have purchased a GM vehicle, or would not have purchased the vehicle for the price paid.

**William Rukeyser—California**: Plaintiff and proposed Nationwide and California State Class Representative William Rukeyser is a resident and citizen of Davis, California. After researching vehicles on the GM website, Mr. Rukeyser purchased a new 2008 Chevrolet Cobalt on September 4, 2008, in Lodi, California, for $16,215.54. Mr. Rukeyser purchased the manufacturer's warranty at the same time. Mr. Rukeyser had the ignition switch replaced on August 8, 2014. He was provided a loaner vehicle during the two months it took to complete the recall repair work. Mr. Rukeyser would not have purchased this car if GM had been honest about the safety defects.

**Yvonne Elaine Rodriguez—Colorado**: Plaintiff and proposed Nationwide and Colorado State Class Representative Yvonne Elaine Rodriguez is a resident and citizen of Lakewood, Colorado. She purchased a new 2007 Chevrolet HHR on December 5, 2006, at EMICH Chevrolet in Lakewood, Colorado, for $20,735.87. At the time of purchase, the HHR was covered by Chevrolet's standard warranty. Ms. Rodriguez did not find out about the ignition defect and the safety risk it posed until she received a recall notice in March 2014. After that point, Ms. Rodriguez stopped using her HHR for any long trips or highway driving, for fear of the safety of her family and herself. As soon as she received the recall notice, Ms. Rodriguez attempted to have the recall repair performed on her vehicle, but was informed that the parts were not available. Ms. Rodriguez continued to try to schedule the repair, but because of a lack of parts, she was not able to get her HHR repaired until June 2014. Even after the recall repair, however, Ms. Rodriguez does not feel her HHR is safe, and she and her family continue to avoid long trips and highway driving with the HHR. Ms. Rodriguez would not have purchased her vehicle if she had known that GM cars were plagued by defects and produced by a company that is not committed to safety.

**Dawn Orona—Colorado**: Plaintiff and proposed Nationwide and Colorado State Class Representative Dawn Orona is a resident and citizen of Limon, Colorado. Ms. Orona purchased a new 2005 Chevrolet Cobalt on August 6, 2005, from Century 1 Chevrolet in Broomfield, Colorado, for a total sale price of $35,053.92. She financed a portion of the sales price, paid a portion of the sales price by trading in an older Chevrolet vehicle, and paid the balance of the purchase in cash. Ms. Orona's vehicle was covered by a warranty and the warranty had not expired at the time the vehicle was totaled in an accident. In the years prior to her purchase and around the time of her purchase, Ms. Orona viewed multiple commercials in which GM touted the safety of its vehicles, and she believed she was purchasing a vehicle that was safe and defect-free. Ms. Orona's vehicle spontaneously shut off a number of times within the first several months of purchasing it. Approximately six months after purchasing the 2006 Chevrolet Cobalt, Ms. Orona and her husband experienced a power loss while attempting to complete a turn on a curve. Although her husband applied both feet on the brakes, the car jumped the curb and plowed into a brick wall. The impact of the crash was severe enough to break the front axle, totaling the vehicle, but the air bags never deployed. Ms. Orona would not have purchased the vehicle had she known of the defects.

**Michael Pesce—Connecticut**: Plaintiff and proposed Nationwide and Connecticut State Class Representative Michael Pesce is a resident and citizen of Waterbury, Connecticut. Mr. Pesce purchased a used 2006 Chevrolet Cobalt on May 29, 2008, in Waterbury, Connecticut, for approximately $12,000. When Mr. Pesce bought the car it was still covered under a three-year, 36,000-mile warranty. Mr. Pesce was a repeat GM customer and trusted the GM brand when he decided to purchase his Cobalt. This was Mr. Pesce's fifth time owning a GM vehicle. In August 2011, Mr. Pesce's 18 year-old son was driving the car on a

major highway in Connecticut when the vehicle lost all power. His son was able to pull over and restart the car, but after another few minutes it died again. Mr. Pesce paid to have the vehicle looked over and repaired, but he now believes the problem was related to the ignition switch defects. Mr. Pesce did not learn about the ignition switch defects until March 2014. The recall repair work was not performed until September 2014, more than six months later. While he waited for the repair work, Mr. Pesce only drove the vehicle if there was an emergency because he was afraid to drive the car. Mr. Pesce does not feel this car is worth what he paid for it and will not buy another GM vehicle.

**Lisa Teicher—Connecticut**: Plaintiff and proposed Nationwide and Connecticut State Class Representative Lisa Teicher is a resident and citizen of Manchester, Connecticut. Ms. Teicher purchased a used 2005 Chevrolet Cobalt on January 24, 2008, from Gengras Chevrolet in Hartford, Connecticut, for $7,769.22. Her vehicle was covered by written warranty that has now expired. Ms. Teicher received a direct mailing from Gengras Chevrolet advertising the vehicle she purchased. These and other consistent representations at the dealership left her with the impression that the vehicle was safe and reliable. She believed her vehicle was safe and defect free when she purchased it. Ms. Teicher's vehicle has spontaneously turned off on two occasions. In June 2008, her vehicle locked up and shut off while she was driving on an exit ramp on Route 2 in Connecticut. She was unable to control the vehicle and ended up hitting a barrier on the road. She hit her head on the dash and was injured, but hospitalization was not required. The airbags did not deploy during this collision. In May of 2009, Ms. Teicher's vehicle again shut off while she was driving to work on I-84 in Connecticut just before Exit 64. She was able to bring the vehicle to a stop and re-start the vehicle again. On June 25, 2014, she had her ignition switch replaced by Carter Chevrolet,

located in Manchester, Connecticut, in connection with the recalls GM initiated in response to the ignition switch defects. Ms. Teicher would not have purchased the vehicle had she known of the defects.

**Steven Diana—Florida**: Plaintiff and proposed Nationwide and Florida State Class Representative Steven Diana is a resident and citizen of Sebastian, Florida. Mr. Diana purchased a used 2002 Chevrolet Impala in July 2007 from Champion Motors in Mansfield, Connecticut, for $12,500. Mr. Diana did not purchase an extended warranty and does not believe his vehicle is currently covered by any written warranties. Mr. Diana expressly recalls seeing advertisements on television and in the newspaper about the 2002 Chevrolet Impala, including advertisements touting its safety. He considered and was influenced by the advertisements emphasizing the safety of the vehicle when making his purchase. Mr. Diana believed his vehicle was safe and defect-free when he purchased it. Mr. Diana's vehicle spontaneously shut off in January 2009, July 2012, and August 2012. On each occasion Mr. Diana was driving on or around I-95 near his home in Sebastian, Florida, and the road was bumpy. On each occasion, Mr. Diana had to put the vehicle in neutral to get it to restart. Mr. Diana would not have purchased the vehicle had he known of the defects.

**Maria E. Santiago—Florida**: Plaintiff and proposed Nationwide and Florida State Class Representative Maria Santiago is a resident and citizen of Cutler Bay, Florida. Ms. Santiago purchased a new 2007 Saturn Ion Coupe in late 2006 at a Saturn Dealership at Dadeland South in Miami, Florida, for approximately $20,000. Ms. Santiago also purchased an extended warranty for the vehicle that is still active. Ms. Santiago purchased her Ion because she understood and believed that GM vehicles were durable and reliable. Sometime in 2009, as Ms. Santiago was leaving a friend's house and driving onto an expressway ramp,

her Ion turned suddenly turned off. Since Ms. Santiago had just entered the expressway ramp and was driving at only 25 miles per hour, she was able to pull her vehicle over to the side of the ramp. She soon noticed the ignition key was in the off position, for no apparent reason. Ms. Santiago was able to restart the car and continue driving. Plaintiff Santiago would not have purchased her Ion had she known of the car's ignition switch defect.

**Turner Clifford—Georgia**: Plaintiff and proposed Nationwide and Georgia State Class Representative Turner Clifford is a resident and citizen of Palmetto, Georgia. He purchased a used 2004 Saturn Ion in September 2005 in Marietta, Georgia, for $15,000. Mr. Clifford purchased a standard three-year warranty on his vehicle. Mr. Clifford experienced safety issues while driving his vehicle, including periodic shut-offs, usually when driving the interstate, and the key falling out of the ignition on occasion while driving. Mr. Clifford stopped driving his vehicle as soon as he learned about the safety recall. In April 2014, he brought his vehicle to the dealership to have his ignition switch replaced, but the repair did not occur until late June/early July. During that time, Mr. Clifford incurred considerable additional fuel costs because the rental vehicle he was given consumed more fuel than his Saturn had. In August 2014, Mr. Clifford traded in his Saturn Ion. He believes he received less in trade in value as a result of the GM recalls, but he no longer wanted to own the Saturn. When he traded in his vehicle, the dealership informed him that it would have to sell the Saturns at wholesale because of the safety recalls. Knowing what he now knows about the safety defects in the Saturn Ion, Mr. Clifford would not have purchased the vehicle.

**Jennifer Gearin—Georgia**: Plaintiff and proposed Nationwide and Georgia State Class Representative Jennifer Gearin is a resident and citizen of Clermont, Georgia. Ms. Gearin purchased a new 2006 Chevrolet Cobalt in 2006 in Gainesville, Georgia, for

$18,499.52. Her Cobalt was covered under the manufacturer's warranty when she purchased it. Ms. Gearin has owned GM products before and she and her family were loyal customers. Ms. Gearin was advised at the dealership that the Cobalt was most dependable car for the lowest price. Although Ms. Gearin has not experienced her vehicle shutting down while driving, she is very afraid for her safety as a result of the ignition switch defects and she must drive a long distance to work on a daily basis. Ms. Gearin did not learn about the ignition switch defects until March 2014. She had the recall repair work completed this summer and was provided a loaner vehicle. She would not have purchased this car if GM had been honest about the safety defects.

**Winifred Mattos—Hawaii**: Plaintiff and proposed Nationwide and Hawaii State Class Representative Winifred Mattos is a resident and citizen of Honolulu, Hawaii. Ms. Mattos purchased a new Pontiac G5 in April 2007 in Culver City, California, for $20,000. She also had a three-year warranty on her vehicle. When she first learned about the recall, Ms. Mattos stopped driving her vehicle on highways or long distances and then decided it was unsafe to drive any distance at all. She requested and obtained a rental vehicle while awaiting replacement of her ignition switch pursuant to the recall. Her vehicle's ignition switch was replaced in April 2014. Ms. Mattos is still concerned about driving her vehicle. She would like to sell it, but she doubts she will be able to sell it and, even if she could, she doubts she would receive what she would have received before the recall. She would need full, pre-recall notice value for her vehicle in order to purchase another vehicle. Knowing what she now knows about the safety defects in many GM-manufactured vehicles, she would not have purchased her vehicle.

**Dennis Walther—Hawaii**: Plaintiff and proposed Nationwide and Hawaii State Class Representative Dennis Walther is a resident and citizen of Honolulu, Hawaii. Mr. Walther purchased a new 2006 Saturn Ion in 2006 in Hawaii for approximately $16,400. His car had a three-year warranty when he purchased it. The vehicle's ignition switch has been replaced under the recall. He bought the car because he trusted GM. If Mr. Walther had known about the Ion's defects, he would never have purchased it. He will never purchase another GM product.

**Donna Harris—Illinois**: Plaintiff and proposed Nationwide and Illinois State Class Representative Donna Harris is a resident and citizen of Herrin, Illinois. Ms. Harris purchased a used 2006 Chevrolet Cobalt in Herrin, Illinois, in 2007 for approximately $13,000. She purchased the vehicle with a standard three-year manufacturer's warranty. Ms. Harris bought the vehicle because her father was a "GM person" and she believed the vehicle was safe and reliable. Safety is the feature Ms. Harris finds most important feature in a vehicle. Ms. Harris started experiencing shutdowns in her Cobalt in 2009. The first time she was backing out of parking lot and the vehicle shutdown; as a result, she collided with a parked truck. In another incident, the vehicle stalled while Ms. Harris was backing out of a hospital parking lot space and she hit a cement barrier. The second shutdown cost Ms. Harris $1,700 in repairs. She also has experienced problems with her vehicle not locking. She has had her ignition switch replaced, but she still experiences problems turning the key in the ignition. Ms. Harris no longer feels safe driving her car, but she has no other means of transportation. Had she known about the problems with her GM vehicle, she would not have purchased the car, and she will never again purchase a GM vehicle.

**Heather Holleman—Indiana**: Plaintiff and proposed Nationwide and Indiana State Class Representative Heather Holleman is a resident and citizen of South Bend, Indiana. Ms. Holleman purchased a new 2007 Pontiac G5 in May 2007 from Don Meadows in South Bend, Indiana, for $17,500. Ms. Holleman has experienced numerous issues with the ignition of her Pontiac G5. The GM dealership where she purchased her vehicle has told her that the parts to fix the vehicle are unavailable, and she should simply "be careful." Ms. Holleman would not have purchased the vehicle had she known of the defects.

**James Dooley—Iowa**: Plaintiff and proposed Nationwide and Iowa State Class Representative James Dooley is a resident and citizen of Waterloo, Iowa. Mr. Dooley purchased a new 2006 Pontiac Solstice from Dan Deery Chevrolet in Cedar Falls, Iowa, in June 2006 for $28,000. Mr. Dooley purchased an extended seven-year warranty on the vehicle. Mr. Dooley did not experience a power failure during normal operation of his vehicle, but he stopped driving his vehicle in March 2014 when he learned about the safety recall because he was afraid for his safety. Because Mr. Dooley was unaware that GM was offering loaner vehicles to individuals afraid to drive their defective vehicles, he did not drive the vehicle again until August 2014 when the ignition switch was replaced. Knowing what he now knows about the safety defects in many GM-manufactured vehicles, he believes GM mislead him about the Solstice's safety and he would not have purchased the vehicle had he known the truth.

**Philip Zivnuska, D.D.S.—Kansas**: Plaintiff and proposed Nationwide and Kansas State Class Representative Philip Zivnuska, D.D.S., is a resident and citizen of Valley Center, Kansas. Mr. Zivnuska purchased a new 2006 Chevrolet Cobalt from Conklin Cars dealership in Newton, Kansas, in 2006 for approximately $25,000. His vehicle was covered by

Chevrolet's standard new car warranty at the time it was purchased. Throughout the course of his ownership of the Cobalt, Dr. Zivnuska and his family members experienced numerous issues consistent with the ignition switch defect, including frequent total power failure and loss of power steering, and an accident. Dr. Zivnuska brought the Cobalt into Conklin Cars dealership multiple times to address the issues, and became so concerned that he eventually filed a complaint with NHTSA in 2007 to document the problems he was experiencing. He never received information from GM following this complaint, although he was lead to understand GM obtained information about his car, which was subsequently totaled in a later accident. Dr. Zivnuska is appalled by the number of people who have also experienced ignition switch issues and is very upset that GM has not been forthcoming to vehicle owners, mechanics, and dealerships. Dr. Zivnuska reviewed internet websites before purchasing his car, particularly because good handling was important to him. Had he known of the problems with his GM car, he would not have purchased it.

**Dawn Talbot—Kentucky**: Plaintiff and proposed Nationwide and Kentucky State Class Representative Dawn Talbot is a resident and citizen of Glasgow, Kentucky. Ms. Talbot purchased a used 2006 Chevrolet Cobalt in May 2009 from Goodman Automotive in Glasgow, Kentucky. Ms. Talbot's vehicle has regularly lost power during driving. She would not have purchased the vehicle had she known of the defects.

**Jennifer Crowder—Louisiana**: Plaintiff and proposed Nationwide and Louisiana State Class Representative Jennifer Crowder is a resident and citizen of Shreveport, Louisiana. She purchased a used 2006 Chevrolet Cobalt in 2008 in Shreveport, Louisiana, for $14,000. Her car was not under warranty at the time of purchase. Ms. Crowder experienced many instances of stalling in her Cobalt. Her vehicle stalled on many occasions while driving to

work. She was late to work so often due to the stalling that she was dismissed from her employment for arriving late to work. On another occasion, Ms. Crowder's vehicle shut off in the middle of the road while she was making a turn. She was fortunately able to start the vehicle on the second try and avoided an accident. Knowing what she now knows about the safety defects in many GM-manufactured vehicles, and the Cobalt in particular, she would not have purchased the vehicle nor even visited the dealership to look at the Cobalt.

**Alysha Peabody—Maine**: Plaintiff and proposed Nationwide and Maine State Class Representative Alysha Peabody is a resident and citizen of Kenduskeag, Maine. Ms. Peabody purchased a used 2005 Chevrolet Cobalt in 2006 in Maine for $14,000. Her car was under warranty at the time of purchase. Although she did not have ignition switch issues before the recall, since having the repair done her vehicle does not always start on the first try. She has tried to sell her car on Craigslist since news of the ignition switch defect went public, but has not received a single inquiry about the vehicle. Ms. Peabody would have never purchased a GM vehicle if she had known about the defects.

**Robert Wyman—Maryland**: Plaintiff and proposed Nationwide and Maryland State Class Representative Robert Wyman is a resident and citizen of Baltimore, Maryland. Mr. Wyman purchased a new 2007 Saturn Sky from the Owings Mills, Maryland, Heritage Group in 2007 for $32,000. His vehicle came with a three-year warranty. Although he has not experienced an inadvertent power failure while driving his vehicle, on multiple occasions Mr. Wyman had difficulty removing and/or inserting his ignition key into the ignition cylinder or starting his vehicle. Mr. Wyman's vehicle had the recall repair done on May 31, 2014. Had he known that the Saturn Sky contained a defective ignition switch, Mr. Wyman would not have

purchased the vehicle because it is a "death car," and he worries what might have happened had he "hit a bump a certain way."

**George Mathis—Maryland**: Plaintiff and proposed Nationwide and Maryland State Class Representative George Mathis is a resident and citizen of Parkville, Maryland. Mr. Mathis purchased a new 2007 Chevrolet Cobalt on April 1, 2007, in York, Pennsylvania, for $12,000. The vehicle was covered under warranty when he purchased it. Mr. Mathis has experienced his ignition shutting down while driving on three separate occasions, with one instance resulting in a minor accident, and the other two nearly resulting in an accident. Mr. Mathis did not learn about the ignition switch defects until March 2014. In August 2014, he took his Cobalt to the dealership in his area to have the recall work performed. Mr. Mathis would not have purchased this car, or would have paid less than he did, if GM had been honest about the safety defects.

**Mary Dias—Massachusetts**: Plaintiff and proposed Nationwide and Massachusetts State Class Representative Mary Dias is a resident and citizen of Taunton, Massachusetts. Ms. Dias purchased a used 2007 Chevrolet HHR on February 28, 2008, in Woonsocket, Rhode Island, for approximately $13,000. The vehicle was under warranty when she purchased it. Because of the ignition switch defects, Ms. Dias is very concerned for her safety every time she drives her vehicle. Ms. Dias did not learn of the ignition switch defects until March 2014. When she inquired about her safety, GM told her that her vehicle had not been recalled and not to worry. On April 11, 2014, after receiving notice that her HHR was in fact recalled, Ms. Diaz took her HHR in for the recall repair work and was provided a loaner vehicle. She would not have purchased this vehicle if she had known of the safety defects.

**Colin Elliott—Massachusetts**: Plaintiff and proposed Nationwide and Massachusetts State Class Representative Colin Elliott is a resident and citizen of Buzzards Bay, Massachusetts. Mr. Elliot purchased a new 2008 Saturn Sky in Hyannis, Massachusetts, in July of 2007 for $23,000. His vehicle was covered by a standard 100,000-mile warranty at the time of purchase. At the time of purchase, Mr. Elliott was choosing between a Saturn Sky and Pontiac Solstice. To avoid defects that he believed plagued early production models, however, Mr. Elliott waited two years before ordering his Saturn in the hopes that any early production defects would be discovered and fixed. Although he has not experienced an inadvertent power failure while operating the vehicle, Mr. Elliott has not driven his Sky since learning of the recall several months ago. He has contacted his dealership to inquire about the timing of repairs, but his dealership has indicated that it does not have parts available. Because he will no longer drive his Sky, Mr. Elliott and his wife have been sharing her Kia since March. This has caused significant inconvenience, as they drive each other to work and are dependent on one another's schedule.

**Diana Cnossen—Michigan**: Plaintiff and proposed Nationwide and Michigan State Class Representative Diana Cnossen is a resident and citizen of Grand Rapids, Michigan. Ms. Cnossen purchased a new 2007 Saturn Ion on November 27, 2006, in Michigan for $18,250. Her vehicle was covered under warranty when she purchased it. She purchased the vehicle because she was attracted to its compact size when she viewed it in the showroom. Ms. Cnossen did not experience a power failure during normal operation of her vehicle, though she often experienced difficulty turning the steering wheel. Ms. Cnossen's ignition switch was replaced under the recall on June 4, 2014. While she awaited a replacement part, Ms. Cnossen continued to use her vehicle because she was not aware that GM had offered to provide loaner

1197532.10

vehicles to those too afraid to continue operating their defective vehicles. Ms. Cnossen did not learn of the ignition switch defect until it was announced in March of 2014, and she would not have purchased her Saturn Ion had she known it continued a defective ignition switch. Ms. Cnossen will "never buy another car from GM."

**David Cleland—Minnesota**: Plaintiff and proposed Nationwide and Minnesota Class Representative David Cleland is a resident and citizen of Northfield, Minnesota. He purchased a used 2004 Saturn Ion in 2005 in Northfield, Minnesota, for $10,000. Mr. Cleland's Saturn Ion was covered under the standard manufacturer's warranty at the time he purchased it. Mr. Cleland read GM promotional material about the vehicle's safety and reliability, including the vehicle's airbags, prior to purchasing the vehicle. This spring, after the recall announcement, Mr. Cleland's children had a frontal collision while driving his vehicle. The airbags did not deploy, even though they should have under the circumstances of the collision. Knowing what he now knows about the safety defects in many GM-manufactured vehicles, and particularly his Saturn Ion, Mr. Cleland would not have paid the amount of money he paid, or even purchased, the vehicle.

**Frances Howard—Mississippi**: Plaintiff and proposed Nationwide and Mississippi State Class Representative Frances Howard is a resident and citizen of Jackson, Mississippi. Ms. Howard leased and then purchased a new 2006 Saturn Ion in April 2006 at a Saturn dealership in Jackson, Mississippi, for approximately $11,000. The vehicle was covered by a warranty at the time of purchase. She recalls seeing television ads touting the Saturn brand as outstanding with dependable vehicles and high-rated customer service. In 2009, Ms. Howard's key got stuck in the ignition and she could not turn the vehicle off. She drove it to the dealership and they replaced the ignition switch on September 8, 2009, at Ms. Howard's

expense. One week later the key got stuck in the ignition again. This time the GM dealership told her it was because her car's battery was dead. Their service was unhelpful and contradictory. Ms. Howard's car has also inadvertently shutdown on two occasions. The first time happened approximately four months ago when she accidentally bumped the key while it was in the ignition. The second time, on September 2, 2014, it shut off while she was at a red light. Both times the car restarted after she turned the key off and then on again. Ms. Howard was never contacted about the ignition switch recall, and only found out about it by reading news on the internet. After contacting her GM dealership about the repairs, it took eight weeks for the parts to come in. She also asked for a loaner vehicle, but they declined, telling her there were none available and it would be only two weeks until the parts arrived. Ms. Howard would have never purchased this vehicle if she had known about these defects

**Michelle Washington—Missouri**: Plaintiff and proposed Nationwide and Missouri State Class Representative Michelle Washington is a resident and citizen of Florissant, Missouri. Ms. Washington purchased a new 2008 Chevrolet Impala in July 2007 at a GM dealership in Missouri for approximately $27,000. She also purchased a new 2014 Chevrolet Impala on May 9, 2014, at a GM dealership for approximately $37,000. The 2008 Impala was covered under warranty at the time of sale and she also purchased an extended warranty. The 2014 Impala is currently covered under warranty. In purchasing the 2008 Impala, Ms. Washington was convinced of the safety and reliability of her GM product based upon their warranties and representations. The ignition switch defect manifested in her 2008 Impala on approximately four separate occasions. In one instance the car shutdown on the highway and she had to pull to the side of the road and restart it. Before purchasing her new 2014 Impala, Washington took her 2008 Impala to two different GM dealerships to get an estimated trade-

in value. At the first GM dealership, during their test drive of her 2008 Impala, the vehicle

ignition switch defect manifested and the car shutdown. The dealership informed her that they

would have to dock her money on the trade-in amount being offered because of the problem.

Based upon the vehicle shutting down during the examination, the dealership offered her a

quote of $1,500 for a trade-in amount. Just days later, she took it to another GM dealership

who gave her $2,900 for a trade-in amount. Ms. Washington received the ignition switch

recall notice on her 2008 Impala after she had already traded it in for the 2014 Impala. Her

2014 Impala has not yet been repaired under the recall. Ms. Washington is adamant that had

she known of the defects, she would have never considered the 2008 Impala or, later, the 2014

Impala when she was looking to trade-in her vehicle.

**Patrice Witherspoon—Missouri**: Plaintiff and proposed Nationwide and Missouri

State Class Representative Patrice Witherspoon is a resident and citizen of Lee's Summit,

Missouri. Ms. Witherspoon purchased a new 2006 Saturn Ion in 2005 from a Missouri vehicle

dealer for approximately $16,828. Ms. Witherspoon reviewed GM's webpage and other

internet websites discussing the Saturn Ion prior to her purchases and believed that the vehicle

was safe and reliable based on her review. Ms. Witherspoon believed her vehicle was safe and

defect-free when she purchased it. Ms. Witherspoon's 2006 Saturn Ion spontaneously shut off

on at least five occasions while driving the vehicle. On one such occasion, she was on the

highway, but was able to avoid an accident by pulling over to the shoulder. On another

occasion, her vehicle shut off while on the exit ramp to a highway, but she was fortunately

again able to avoid an accident. On each occasion, the vehicle gearshift was in "drive" or

"reverse" and the ignition key was in the "run" position. Ms. Witherspoon had difficulty

controlling and safely stopping the vehicle on these occasions. The value of Ms.

Witherspoon's vehicle is less than she bargained for when she purchased the vehicle and has diminished as a result of the defect.

**Laurie Holzwarth—Montana**: Plaintiff and proposed Nationwide and Minnesota Class Representative Laurie Holzwarth is a resident and citizen of Billings, Montana. Ms. Holzwarth purchased a used 2005 Chevrolet Cobalt in 2008 in Billings, Montana, for approximately $7,000. Her daughter Christine has experienced countless shutdowns in the vehicle. Christine is the primary driver of the vehicle and will not let anyone else drive it, because she is concerned about the number of shutdowns that she has experienced. They have occurred on highways, in the main street of her town, pulling into parking spaces, and everything in between. The worst incident that she can remember was a definite power failure. Ms. Holzwarth witnessed this event. They were driving on the highway in August of 2010 from Billings to Bozeman, where Christine would be attending college. At a point where they had to make a sharp turn, traveling at 75-80 miles per hour, the car just quit. Christine was able to get the car to a stop without hitting the concrete wall, cycle the key, and continue. They drove another 40 miles, and the car shut off twice more on the straightaway, and once more in the town. Christine had experienced both power steering failure and power failure incidences before this, but had not done much highway driving because she mainly drove to and from high school. The ignition switch was supposedly repaired as part of the ignition switch recall on July 29, 2014. But Ms. Holzwarth's daughter is still experiencing power failures in the car. Since the vehicle was repaired, Christine experienced two shutdowns and/or power steering failures on September 3, 2014, and September 8, 2014. Ms. Holzwarth and her daughter would like to get rid of the car, but they are not financially capable of doing so—Christine is working full time to pay off her college loans and needs a vehicle to get to

1197532.10

work. Furthermore, they do not believe that they could sell this vehicle to anyone else in good conscience. Even if they were to say that the car was repaired, they do not believe it is true, and they don't want to put anyone else at risk in the car. Ms. Holzwarth would not have purchased this vehicle if she had known about its serious and dangerous defects.

**Michael Amezquita—New Jersey**: Plaintiff and proposed Nationwide and New Jersey State Class Representative Michael Amezquita is a resident and citizen of Hamilton, New Jersey. Mr. Amezquita purchased a new 2006 Chevrolet Cobalt on June 30, 2006, in East Windsor, New Jersey, for $14,000. At the time he purchased the vehicle it was covered under warranty, but the warranty has since expired. Mr. Amezquita did not learn of the ignition switch defects until March 2014. His car was not repaired under the recall until April 23, 2014. Mr. Amezquita had to demand a loaner vehicle before GM would agree to provide one. He used the loaner vehicle for approximately seven weeks, from March 19, 2014, to April 23, 2014, while he waited for the repair parts to arrive. Mr. Amezquita would not have purchased this vehicle if he had known about these defects.

**Anthony Juraitis—New Jersey**: Plaintiff and proposed Nationwide and New Jersey State Representative Anthony Juraitis is a resident and citizen of Freehold, New Jersey. He purchased a new 2004 Saturn Ion in or around the winter of 2003. Mr. Juraitis purchased the vehicle with a standard warranty. Mr. Juraitis was considering other vehicles as well, but he decided on the Ion in part because he believed the vehicle to be safe and reliable. Mr. Juraitis experienced several shutdowns/stalls while driving his Ion. The first occurred on the highway, when his vehicle "locked" while driving. Other drivers stopped to help him push his vehicle to the side of the road, where after several attempts he was able to restart his vehicle. Mr. Juraitis took the vehicle to the dealership, which replaced the ignition switch and charged Mr. Juraitis

for parts and labor. Following this supposed repair, Mr. Juraitis continued to have stalls and shutdowns with his vehicle; he estimates approximately three dozen times with about eight or ten of them being in very dangerous situations. On July 31, 2014, the ignition switch was replaced again, this time pursuant to the recall. Following this replacement, Mr. Juraitis has continued to experience safety problems with the vehicle, including in early September 2014 when his vehicle shutdown again and he was unable to immediately restart the vehicle. Mr. Juraitis would like to sell or trade in his vehicle, but he does not want another person to experience the dangerous events he has experienced or have a vehicle with an obvious safety defect. Mr. Juraitis believes the vehicle is not worth anything if it means you have to gamble with your life to drive it. Knowing what he now knows about the safety defects in many GM-manufactured vehicles, he would not have purchased the vehicle and will never again purchase a General Motors vehicle.

**Bernadette Romero—New Mexico**: Plaintiff and proposed Nationwide and New Mexico State Class Representative Bernadette Romero is a resident and citizen of Santa Fe, New Mexico. Ms. Romero purchased a new 2007 Chevrolet Cobalt on July 3, 2007, at Casa Chevrolet in Albuquerque, New Mexico, for $14,645. Her car was covered by a warranty at the time of purchase. Her vehicle had the recall repair performed in May 2014, but she went without her vehicle for five weeks while it was repaired. She drove a loaner car during that time. Ms. Romero traded in her Cobalt for $5,500 on June 20, 2014. She would never have bought this vehicle had she known about the ignition switch defects.

**Sandra Levine—New York**: Plaintiff and proposed Nationwide and New York State Class Representative Sandra Levine is a resident and citizen of Babylon, New York. Ms. Levine purchased a used 2005 Chevrolet Cobalt on May 27, 2006, from Babylon Honda in

-33-

Babylon, New York, for $16,627.96. Ms. Levine's vehicle was covered by a warranty that expired 90 days after her purchase. She does not recall any specific advertising that influenced her decision to buy the vehicle, but she had a general impression that GM was a quality brand and that the vehicle was safe and reliable. Plaintiff Levine believed her vehicle was safe and defect-free when she purchased it. Ms. Levine's vehicle spontaneously shut off on two occasions. Although she does not recall precise dates, the shut-off incidents occurred in 2011 and 2012. The shut-off incidents both took place when she was driving on Deer Park Avenue in Suffolk County, New York. There was no apparent reason for the shutdown in either case. The road was not bumpy, and Ms. Levine does not believe her knee hit the ignition switch. In both instances, Ms. Levine was able to navigate the vehicle to the shoulder of the road. Ms. Levine's ignition switch was replaced on May 22, 2014, by Chevrolet of Huntington in connection with the recall GM initiated in response to the ignition switch defects. Ms. Levine would not have purchased the vehicle had she known of the defects.

**Michael Rooney—New York**: Plaintiff and proposed Nationwide and New York State Representative Michael Rooney is a resident and citizen of Ronkonkoma, New York. She purchased a used 2005 Chevrolet Cobalt in November 2006. Ms. Rooney purchased an extended warranty for the vehicle. She purchased the Cobalt after reading several advertisements about the Cobalt and other vehicles as well; she believed the Cobalt to be a safe and reliable vehicle to drive. Further, the dealership confirmed with Ms. Rooney that the Cobalt was a safe, reliable vehicle. Ms. Rooney experienced several shutdowns in her vehicle while driving. Upon learning about the safety recall on her vehicle, she stopped driving it. The dealership later informed her of her right to a loaner vehicle while awaiting replacement of her ignition switch, and she received a loaner vehicle soon thereafter. Her ignition switch was

replaced in the summer of 2014. Following that replacement, her automatic starter no longer worked in her vehicle, which she had to have repaired. Knowing what she now knows about the safety defects in many GM-manufactured vehicles, she would not have purchased the vehicle.

**William Ross—New York**: Plaintiff and proposed Nationwide and New York State Class Representative William Ross is a resident and citizen of Bellmore, New York. Mr. Ross purchased a new 2005 Chevrolet Cobalt in 2005, in Hicksville, New York, for approximately $25,000. At the time of purchase, his vehicle was under the original manufacturer's warranty, and he did not purchase any additional warranties. Mr. Ross does not recall when the warranty expired or its terms. Mr. Ross recalls at least one incident where the car became hard to steer. He took it to a repair shop thinking added power steering fluid would fix the problem, but the repair shop told him the vehicle did not need power steering fluid. On June 23, 2012, Mr. Ross was driving his Cobalt in Nassau County, New York, at approximately 55 miles per hour when the ignition was inadvertently switched into the accessory position, causing the engine to lose power. The car's power steering, power braking, and airbag systems were disabled. Mr. Ross lost control and the car crashed into a divider lined with rubber pylons. The airbag did not deploy. Mr. Ross suffered cuts and a separation of the muscle from his tendon in his arm. It could not be surgically repaired by the time he was able to go to the VA hospital. This accident cost Mr. Ross $6,279.97 in car repairs. On March 30, 2014, Mr. Ross was again driving his Chevrolet Cobalt in Nassau County, New York, at approximately 55 miles per hour when the ignition again suddenly switched into the accessory position, causing the vehicle to lose power to the engine. Again the power steering, power braking system, and airbags were disabled. Mr. Ross lost control of the car and it hit a divider, knocking the rear

wheels out of alignment. This accident cost Mr. Ross approximately $175 in repairs. In both accidents, the road was not bumpy and Mr. Ross does not recall hitting anything with his knee to cause the key to turn. When Mr. Ross learned of the recalls he called his GM dealership to see if his vehicle was involved in the recall. GM told him it was not. Then in early March 2014, he received a recall notice. When he called about getting the recall repairs done he was told the parts to repair it were not available. Mr. Ross stopped driving the vehicle and, in April 2014, he sold it to a junkyard to scrap for approximately $4,000. He is a retired, disabled veteran. Since selling the Cobalt he now relies on veterans' transportation to go to his medical appointments and walks everywhere else. Mr. Ross would not have bought the car if he had known beforehand about the ignition switch defect.

**Donald Cameron—North Carolina**: Plaintiff and proposed Nationwide and North Carolina State Class Representative Donald Cameron is a resident and citizen of Durham, North Carolina. He purchased a new 2006 Saturn Ion in 2006 in Durham, North Carolina, for $14,000. Mr. Cameron purchased the vehicle with a five-year, 120,000-mile warranty. On several occasions, Mr. Cameron's vehicle shutdown while he was driving. Knowing what he now knows about the safety defects in many GM-manufactured vehicles, and in the Ion specifically, he would not have purchased the vehicle or, at a minimum, would not have been willing to pay the amount of money he paid for the car.

**Leland Tilson—North Carolina**: Plaintiff and proposed Nationwide and North Carolina State Representative Leland Tilson is a resident and citizen of Gastonia, North Carolina. He purchased a new 2009 Chevrolet Cobalt in February 2009. Mr. Tilson has a five-year/100,000-mile warranty on the vehicle. Mr. Tilson experienced at least one shutdown in the vehicle, while driving on a highway at highway speed. It happened when the vehicle went

over a break in the asphalt, and the vehicle shutdown. Mr. Tilson, with an 18-wheeler bearing down on him, was able to maneuver the vehicle to the side of the road to avoid an accident. During this power failure, the power steering also failed. Mr. Tilson has had his ignition replaced twice. The first time was in June 2013, not pursuant to the recall, because he was unable to shut off his vehicle. The second time was in July 2014 pursuant to the recall. Knowing what he now knows about the safety defects in many GM-manufactured vehicles, he would not have purchased a vehicle with a safety defect.

**Jayn Roush—Ohio**: Plaintiff and proposed Nationwide and Ohio State Class Representative Jayn Roush is a resident and citizen of Worthington, Ohio. Ms. Roush purchased a used 2005 Saturn Ion on May 5, 2008, from Saturn West in Hilliard, Ohio, for $14,984.59. Ms. Roush's vehicle was covered by a standard warranty that expired on August 3, 2008. Ms. Roush purchased an extended warranty, but this warranty only covers the vehicle's powertrain. She recalls advertisements for the Saturn running frequently around the time of her purchase. She had a general impression that GM was a quality brand and that Saturn vehicles were safe and reliable. Ms. Roush believed her vehicle was safe and defect-free when she purchased it. Ms. Roush's vehicle has spontaneously lost power with some regularity. She recalls a number of discrete incidents. Her vehicle suddenly lost power three different times on November 25, 2010, when she was driving in and around Columbus, Ohio. The vehicle also experienced several power-loss incidents driving in and around Columbus, Ohio, in 2013. She was able to pull over and get the vehicle to the side of the road. The vehicle most recently shut off on Highway 315 S in Ohio on January 9, 2014. Each of Ms. Roush's incidents involved a sudden loss of power accompanied by a "TRAC OFF" light. Ms. Roush had her ignition switch replaced at an out-of-pocket cost of $187.50 on June 11, 2013,

in an attempt to address the power-loss problems the vehicle was experiencing, but the replacement did not fix the problem. Indeed, the car experienced a loss of power again in January of 2014. Ms. Roush attempted to participate in GM's 2014 recall of the vehicle, initiated in response to the ignition switch defects, but her ignition switch was not replaced in connection with this recall because the parts have not been available. Ms. Roush would not have purchased the vehicle had she known of the defects.

**Bonnie Taylor—Ohio**: Plaintiff and proposed Nationwide and Ohio State Class Representative Bonnie Taylor is a resident and citizen of Laura, Ohio. Ms. Taylor purchased a new 2007 Chevrolet Cobalt on December 23, 2006, from Joe Johnson Chevrolet in Troy, Ohio, for $14,417.42. At the time Ms. Taylor purchased her new Cobalt she also purchased a warranty which expired in December 2011. This was Ms. Taylor's fourth time purchasing a vehicle from Joe Johnson Chevrolet and she trusted them to provide her with a safe and reliable vehicle. Ms. Taylor did not learn of the ignition switch defects until March 2014. She scheduled the recall work on her vehicle right away and was provided a loaner vehicle. The repair work was completed on April 21, 2014. Although Ms. Taylor has not experienced the ignition shutdown while driving her Cobalt, she believes the Cobalt has too many serious safety defects for her to ever feel safe driving it again. She also feels that the value of her vehicle is severely diminished as a result of the recall. She would not have purchased this vehicle if she had known of the safety defects.

**Sharon Dorsey—Ohio**: Plaintiff and proposed Nationwide and Ohio State Class Representative Sharon Dorsey is a resident and citizen of Dayton, Ohio. Ms. Dorsey purchased a used 2004 Chevrolet Malibu in June 2007 at Reichard dealership in Dayton, Ohio, for $12,040. At the time of purchase, Plaintiff Dorsey also secured an extended warranty

which expired in 2011. Plaintiff Dorsey has experienced no less than four engine shut-offs while driving her vehicle. In one such instance, her Malibu stalled in the middle of heavy traffic with her five-year-old grandson in the vehicle. Upon returning the vehicle to Reichard on September 10, 2014, she was informed by a GM technician that he had, in fact, been able to duplicate the engine stall event she experienced. Ms. Dorsey's sister was a former GM employee and owned a Chevrolet Impala, which influenced Ms. Dorsey's desire to own a GM vehicle. However, if she had known of the defects plaguing her Chevrolet Malibu prior to purchasing the vehicle, she would not have purchased it. Ms. Dorsey relied upon the GM Malibu brand to be a safe and reliable vehicle. As a result of the vehicle defect and subsequent recalls, Ms. Dorsey has been unable to enjoy the use of her Chevrolet Malibu since June 2014, has been unable to work regularly, and has not been provided a loaner or rental vehicle while repairs are being made on her vehicle despite repeated requests. In addition, Ms. Dorsey continues to incur significant expense, inconvenience, and economic damage as a result.

**Paulette Hand—Oklahoma**: Plaintiff and proposed Nationwide and Oklahoma State Class Representative Paulette Hand is a resident and citizen of Blanchard, Oklahoma. She purchased a new 2006 Chevrolet HHR in 2006 from Frost Chevrolet, a dealership owned by her sister, in Hennessy, Oklahoma, for $24,625. She believed that GM made safe and reliable cars. Ms. Hand experienced multiple events in which her vehicle's steering locked up and the power failed. She would not have purchased or paid as much for the vehicle if she had known the truth about GM's commitment to safety and its concealment of the defects.

**William Bernick—Oregon**: Plaintiff and proposed Nationwide and Oregon State Class Representative William Bernick is a resident and citizen of Grants Pass, Oregon. Mr. Bernick purchased a used 2005 Chevrolet Cobalt on December 29, 2006, from a dealership in

Oregon for $10,750. He also purchased a vehicle service contract, and his warranty is continuing. During the time he has owned the vehicle, Mr. Bernick has experienced power outages and difficulties with the ignition, such as keys becoming stuck in the ignition, inability to shift gears, inability to start the ignition, and transmission default. Mr. Bernick is very concerned about the ignition defect and is disappointed in the way GM has handled the recalls. He wants to see GM held accountable for putting lives at risk for so long. Had Mr. Bernick known of the problems with his GM car, he would not have purchased it.

**Shawn Doucette—Pennsylvania**: Plaintiff and proposed Nationwide and Pennsylvania State Class Representative Shawn Doucette is a resident and citizen of Hamburg, Pennsylvania. Mr. Doucette purchased a new 2007 Chevrolet Cobalt SS in September 2007 from Outten Chevrolet of Hamburg in Hamburg, Pennsylvania, for $28,000. GM should have disclosed the ignition switch defects when Mr. Doucette purchased the vehicle. Mr. Doucette has experienced numerous shutdowns and power loss events while driving. He would not have purchased the vehicle had he known of the defects.

**Shirley Gilbert—Pennsylvania**: Plaintiff and proposed Nationwide and Pennsylvania State Class Representative Shirley Gilbert is a resident and citizen of Frackville, Pennsylvania. She purchased a new 2008 Chevrolet Cobalt in Pennsylvania in June 2008 for $16,000. Her vehicle was covered by a warranty when she purchased it. The warranty expired in June 2013. She purchased the car, in part, because the dealership highlighted the safety features, namely the car's eight airbags. On two or three occasions she has experienced her vehicle shutting down immediately after it started. She would not have purchased her vehicle, or she would have paid less for it, had she known about its defects.

**Garrett Mancieri—Rhode Island**: Plaintiff and proposed Nationwide and Rhode Island State Class Representative Garrett Mancieri is a resident and citizen of Woonsocket, Rhode Island. Mr. Mancieri purchased a new 2007 Pontiac G5 on November 24, 2006 in Woonsocket, Rhode Island, for $16,138. Mr. Mancieri received a safety recall notice pertaining to his vehicle in March 2014. He promptly requested that the dealership perform the recall repair, but was told that he would be put on a waiting list because the dealership was waiting on the parts from GM. The dealership did not provide Mr. Mancieri with a loaner car, so he had to continue driving the vehicle. The recall notice received by Mr. Mancieri did not inform him of the right to a loaner vehicle, nor did the GM dealership volunteer such information. His vehicle was not scheduled to be repaired until September 18, 2014. Mr. Mancieri believes he has been damaged by the diminution of value in his vehicle due to the ignition switch defect. Mr. Mancieri also believes he has been damaged in the amount of the reasonable value of the rental car he should have received from March 2014 through the time his vehicle is finally repaired by GM.

**Annette Hopkins—South Carolina**: Plaintiff and proposed Nationwide and South Carolina State Class Representative Annette Hopkins is a resident and citizen of Bishopville, South Carolina. Ms. Hopkins purchased a used 2003 Chevrolet Impala LS on December 31, 2004, at Newsome Automotive in Florence, South Carolina, for $12,749.32. Ms. Hopkins first learned of a recall affecting her vehicle when she received a recall notice in September 2014. Although she has not yet experienced any incidents of sudden power loss with her vehicle, now that she knows about the defects and the recalls, Ms. Belford asserts that she would never have purchased the Chevrolet Impala had she known about the defects and GM's indifference with regard to the safety and reliability of its vehicles.

**Norma Lee Nelson—South Dakota**: Plaintiff and proposed Nationwide and South Dakota State Class Representative Norma Lee Nelson is a resident and citizen of Huron, South Dakota. Ms. Nelson purchased a used 2007 Chevrolet Cobalt in September 2007 from a dealership in Watertown, South Dakota, for $14,000. Her vehicle came with a standard warranty at the time of purchase that expired in 2010. She has experienced numerous ignition problems with the vehicle, and at times it requires significant force to turn the steering wheel. Ms. Nelson has removed all of the keys from her keychain, but remains nervous about driving the car. Ms. Nelson has had difficulty starting the vehicle on numerous occasions. Had she known that the Cobalt contained a defective ignition switch, Ms. Nelson would not have purchased the vehicle.

**Helen A. Brown—Tennessee**: Plaintiff and proposed Nationwide and Tennessee State Class Representative Helen A. Brown is a resident and citizen of Franklin, Tennessee. She purchased a new 2006 Chevrolet Cobalt from a GM dealer, with an extended warranty, on February 1, 2006, for approximately $10,000. Ms. Brown's vehicle lost power at least three times, twice in 2007 and once in 2014. She does not trust her car and would not have purchased the vehicle or would have paid less if the truth had been disclosed about the quality and safety of GM vehicles.

**Lisa William—Texas**: Plaintiff and proposed Nationwide and Texas State Class Representative Lisa William is a resident and citizen of Amarillo, Texas. Ms. William purchased a new 2007 Saturn Ion in 2007 in Amarillo, Texas, for approximately $16,000. Her vehicle had a standard warranty, which she believes was for five years. Ms. William purchased a Saturn because she had owned one in the past and believed the brand to be one she could trust. She has experienced problems with her airbag light turning on unexpectedly

and difficulty turning on her vehicle. These problems have caused her concern and she does not feel safe driving her vehicle. She is a college student and provides rides from time to time for certain students. She is now concerned about having other students or anyone else in her vehicle because of the safety defect. She also frequently drives out of town and is afraid of her vehicle shutting down. Ms. William had her ignition switch replaced on September 23, 2014. She wonders if she can trust the "repair." Had she known about the problems with her GM vehicle, she would not have purchased the car.

**Blair Tomlinson, D.D.S.—Utah**: Plaintiff and proposed Nationwide and Utah State Class Representative Blair Tomlinson, D.D.S., is a resident and citizen of Kaysville, Utah. Dr. Tomlinson purchased a new 2005 Chevrolet Cobalt from Murdock Chevrolet in Bountiful, Utah, in August 2005 for approximately $15,000. Throughout the course of his ownership of the Cobalt, Dr. Tomlinson and his family members have experienced various issues consistent with the ignition switch defect, including unexpected shutdowns. In one particular incident, Dr. Tomlinson's daughter was driving on the highway in Logan, Utah, when she accidentally bumped the ignition switch with her knee and the vehicle lost power. She was able to get the vehicle safely to the side of the road, but was terrified by the incident. After hearing about the recall in the news in March 2014, Dr. Tomlinson attempted to reach GM, but he had great difficulty before eventually being informed he would receive a letter if his car was recalled. He also immediately took his Cobalt to Young Chevrolet in Layton, Utah, to address the issue. However, the dealership informed him they did not have the recall parts available to fix the defect. Mr. Tomlinson continues to be concerned about the defects in his Cobalt and the safety of his family. Had he known of the problems with his GM car, he would not have purchased it or would have paid less.

**Erinn Salinas—Virginia**: Plaintiff and proposed Nationwide and Virginia State Representative Erinn Salinas is a resident and citizen of Virginia Beach, Virginia. She purchased a new 2008 Chevrolet Cobalt in April 2008. The vehicle was purchased with the standard manufacturer's warranty. Ms. Salinas purchased her vehicle after seeing television advertisements about the vehicle and also about a GM rebate. The salesperson at the dealership also told Ms. Salinas that the Cobalt was a very safe vehicle. Ms. Salinas experienced at least one shutdown while driving the vehicle. She was able to steer the vehicle to the side of the road and then to turn it back on. Once she learned about the safety recall in March or April of 2014, she stopped driving her vehicle because she believed it was not safe to drive. She was not given a rental vehicle to use and had to depend on her sister or father for transportation. On July 18, 2014, the ignition switch was replaced in her vehicle pursuant to the recall. Knowing what she now knows about the safety defects in many GM-manufactured vehicles, she would not have purchased the vehicle.

**Stephanie Renee Carden—West Virginia**: Plaintiff and proposed Nationwide and West Virginia Class Representative Stephanie Renee Carden is a resident and citizen of Huntington, West Virginia. Ms. Carden purchased a new 2004 Saturn Ion 2 on July 22, 2004, at Saturn of Hurricane in Hurricane, West Virginia, for $22,181. Ms. Carden's vehicle came with the standard manufacturer's warranty. Ms. Carden has experienced manifestation of the defect on more than one occasion. She has twice experienced loss of power due to the ignition switch defect. Shortly after the second power-loss incident, Ms. Carden's vehicle had an issue where it would not restart, causing here to have to have the vehicle towed to a service station. If she had known what she now knows about the safety defects in many GM-manufactured vehicles, Ms. Carden would not have purchased the vehicle.

-44-

**Les Rouse—Wisconsin**: Plaintiff and proposed Nationwide and Wisconsin Class Representative Les Rouse is a resident and citizen of LaCrosse, Wisconsin. Mr. Rouse purchased a new 2004 Saturn Ion 2 in October 2004 in LaCrosse, Wisconsin, for approximately $16,000. His car was covered under the manufacturer's standard warranty at the time of purchase, and Mr. Rouse also believes he purchased some kind of extended warranty. At the time of purchase, Mr. Rouse and his wife visited the dealer to learn more about the Ion. There, the dealership had Ions on display to demonstrate the safety and reliability of the vehicle. The safety and reliability of the Ion had a large impact on Mr. Rouse's decision to buy the car. Mr. Rouse experienced a loss of electrical power in his vehicle while driving and he is concerned about driving it due to the safety risks it poses. He also believes the value of his car has diminished as a result of the ignition switch defects. Mr. Rouse learned of the ignition switch defects in March 2014, but it took until May 2014 for the parts to arrive and to repair his car under the recall. Mr. Rouse would not have purchased his vehicle had he known about the ignition switch defects in his GM vehicle.

## II.    **Defendant**

Defendant General Motors LLC ("New GM") is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. The sole member and owner of General Motors LLC is General Motors Holding LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. The sole member and owner of General Motors Holdings LLC is General Motors Company. General Motors Company is a Delaware Corporation, which has its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan. New GM was incorporated in 2009 and, effective on July 10, 2009, acquired substantially all assets and

assumed certain liabilities of General Motors Corporation through a Section 363 sale under

Chapter 11 of the U.S. Bankruptcy Code.

Among the liabilities and obligations expressly assumed by New GM are the

following:

> From and after the Closing, Purchaser [New GM] shall comply
> with the certification, reporting and recall requirements of the
> National Traffic and Motor Vehicle Act, the Transportation Recall
> Enhancement, Accountability and Documentation Act, the Clean
> Air Act, the California Health and Safety Code, and similar laws,
> in each case, to the extent applicable in respect of vehicles and
> vehicle parts manufactured or distributed by [Old GM].

New GM also expressly assumed:

> [A]ll Liabilities arising under express written warranties of [Old
> GM] that are specifically identified as warranties and delivered in
> connection with the sale of new, certified used or pre-owned
> vehicles or new or remanufactured motor vehicle parts and
> equipment (including service parts, accessories, engines and
> transmissions) manufactured or sold by [Old GM] or Purchaser
> prior to or after the Closing and (B) all obligations under Lemon
> Laws

Finally, New GM also expressly assumed "all Liabilities arising out of, relating to, in

respect of, or in connection with the use, ownership or sale of the Purchased Assets after the

closing." Those assets included all contracts of Old GM, including its contracts with dealers

and service centers.

## **FACTUAL ALLEGATIONS**

**I.**     **There Are Serious Safety Defects in Millions of Old GM Vehicles that New GM Has
Continued to Conceal from Consumers.**

97.     So far, in 2014, New GM has announced over 60 recalls affecting over

27 million GM-branded vehicles from model years 1997-2014. These recalls include millions

of vehicles originally made and sold by Old GM. The numbers of recalls and serious safety

defects are unprecedented, and lead to only one conclusion: Old GM and New GM have been

incapable of building safe, defect-free vehicles, and they have systematically refused to remedy (and instead have fraudulently concealed) defects once the vehicles were on the road.

98.     The available evidence shows a common pattern: Old GM knew about an ever-growing list of serious safety defects in millions of its vehicles, but concealed those defects from consumers and regulators in order to cut costs, boost sales, and avoid the cost and publicity of recalls.

99.     The company New GM inherited from Old GM in 2009 valued cost-cutting over safety, actively discouraged its personnel from taking a "hard line" on safety issues, avoided using "hot" words like "stall" that might attract the attention of NHTSA, and trained its employees to avoid the use of words such as "defect" or "problem" that might flag the existence of a safety issue. New GM affirmatively and independently continued and ratified these practices.

100.     The Center for Auto Safety recently stated that it has identified 2,004 death and injury reports filed by New GM with federal regulators in connection with vehicles that have recently been recalled. Most or all of these deaths and injuries would have been avoided had Old GM complied with its TREAD Act obligations instead of concealing the truth.

101.     The many defects concealed by Old GM affected key safety systems in its vehicles, including the ignition, power steering, and airbag systems.

102.     The available evidence shows a consistent pattern: Old GM learned about a particular defect and, often at the prodding of regulatory authorities, "investigated" the defect and decided upon a "root cause." Old GM then took minimal action – such as issuing a carefully worded "Technical Service Bulletin" to its dealers, or even recalling a very small number of the vehicles with the defect. All the while, the true nature and scope of the defects

were kept under wraps, defective vehicles remained on the road, and Old GM enticed Class members to purchase its vehicles by touting their safety, quality, and reliability.

103.    After July 11, 2009, New GM would continue this very same pattern of conduct and concealment, for over five more years.

A.    **The Ignition Switch Defects**

104.    The Defective Vehicles all contain substantially similar ignition switch and cylinders, with the key position of the lock module located low on the steering column, in close proximity to a driver's knee. The ignition switch systems on these vehicles are prone to fail during ordinary and foreseeable driving situations.

105.    Specifically, the ignition switches can inadvertently move from the "run" to the "accessory" or "off" position at any time during normal and proper operation of the Defective Vehicles. The ignition switch is most likely to move when the vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently touches the ignition key with his or her knee; or for a host of additional reasons. When the ignition switch fails, the vehicle suddenly and unexpectedly loses engine power, power steering, and power brakes, and certain safety features are disabled, including the vehicle's airbags. This leaves occupants vulnerable to crashes, serious injuries, and death.

106.    The ignition switch systems at issue are defective in at least three major respects. First, the switches are weak; due to a faulty "detent plunger," the switch can inadvertently move from the "run" to the "accessory" position. Second, because the ignition switch is placed low on the steering column, the driver's knee can easily bump the key (or the hanging fob below the key) and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position. Third, when the ignition switch moves from the "run" to the "accessory" or "off" position, the vehicle's power is disabled. This also immediately disables

the airbags. Thus, when power is lost during ordinary operation of the vehicle, a driver is left without the protection of the airbag system even if he or she is traveling at high speeds.

107.    Vehicles with defective ignition switches are therefore unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the vehicles.

108.    Indeed, New GM itself has acknowledged that the defective ignition switches pose an "increas[ed] risk of injury or fatality" and has linked the ignition defect to at least thirteen deaths and over fifty crashes in the vehicles subject to the February recall alone. Ken Feinberg, who was hired by New GM to settle wrongful death claims arising from the ignition switch defects, has already linked the defect to twenty-seven deaths, and has over 1300 death and injury claims still to review. The Center for Auto Safety studied collisions in just two vehicle makes, and linked the defect to over 300 accidents. There is every reason to believe that as more information is made public, these numbers will continue to grow.

109.    Alarmingly, Old GM knew of the deadly ignition switch defects and their dangerous consequences from at least 2001, but concealed its knowledge from consumers and regulators. New GM did the same, and, incredibly, it was not until 2014 – more than a decade later – that the ignition switch recalls were first announced.

**II.    Old GM's Fraudulent Conduct with Respect to the 2.19 Million Defective Vehicles Subject to the February/March Recall.**

**A.    Old GM Knew That There Were Failures With The Ignition Switch Design In 2001, And Concealed These Material Facts, Putting The Safety Of The Class At Serious Risk Of Harm.**

110.    Old GM knew that the ignition switches to be used in its vehicles were defective well before the vehicles were ever sold to the public. In the late 1990s and early 2000s, Old GM and one of its suppliers, Eaton Mechatronics, finalized the specifications for

the ignition switch for the Saturn Ion. Eaton Corporation sold its Vehicle Switch/Electronic Division to Delphi Automotive Systems ("Delphi") on March 31, 2001. Delphi went on to manufacture the defective ignition switch for Old GM.

111.    In 2001, years *before* the vehicles were ever sold and available to customers, Old GM privately acknowledged in a pre-production report for the Saturn Ion that there were serious problems, including engineering test failures, with the ignition switch. During the pre-production development of the 2003 Saturn Ion, Old GM engineers learned that the ignition switch could inadvertently move from the "Run" position to the "Accessory" or "Off" position. In a section of an internal report titled "Root Cause Summary," Old GM engineers identified two "causes of failure" namely, "[l]ow contact force and low detent plunger force." The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another unless the driver turns the key.

112.    The Old GM Design Release Engineer assigned to the ignition switch was Ray DeGiorgio. DeGiorgio had worked at Old GM since 1991, and spent his career focused on vehicle switches. During early testing of the ignition switch, DeGiorgio noticed problems with the prototypes provided by Delphi. In September 2001, DeGiorgio corresponded with representatives of Koyo, the supplier of the Ion steering column into which Delphi's switch was installed. In his correspondence, DeGiorgio stated he learned that 10 of 12 prototype switches from Delphi "[f]ailed to meet engineering requirements," and the "failure is significant," adding that Old GM "must ensure this new design meets engineering requirements." This significant failure of the ignition switch design was not corrected by Old GM; moreover, it was suppressed and concealed by the failure to remedy and disclose.

**B.     Old GM Approved Production Of Ignition Switches In 2002 Despite Knowing That They Had Failed In Pre-Production Testing And Did Not Meet Old GM's Internal Design Specifications.**

113.    Old GM approved production of the ignition switches despite knowing that they did not meet Old GM's own engineering design specifications.

114.    Validation testing conducted by Delphi in late 2001 and early 2002 revealed that the ignition switch consistently failed to meet the torque values in the internal specification. These tests, conducted on various dates in the fall of 2001, included a test to determine whether the torque required to rotate the switch from Run to Accessory complied with the specification. The January 2002 test report denoted the design failure by stating "Not OK" next to each result.

115.    In February 2002, Delphi, Old GM's ignition switch supplier for the recalled vehicles, asked Old GM to approve production for the ignition switch and submitted a Production Part Approval Process ("PPAP") request. Even though testing of the ignition switch revealed that it did not meet the original specifications set by Old GM and that internal testing showed the switch would fail, Old GM approved it. The defective switch was put into Old GM vehicles unbeknownst to the Class.

**C.     Old GM Received Complaints And Reports On The Stalling Of Vehicles Due To The Defective Ignition Switch Turning Off And Causing Moving Stalls, And Concealed That Material Information From The Class.**

116.    In 2003, almost immediately after the first Old GM vehicles with the defective ignition switches were sold to the public, GM started receiving complaints regarding loss of power while driving with no Diagnostic Trouble Codes ("DTC") being recorded in 2003 Saturn Ions involving the same ignition switch and steering column. In 2003, an internal report documented an instance in which the service technician observed a stall while driving.

The service technician noted that the weight of several keys on the key ring had worn out the ignition switch. The ignition switch was replaced and the matter closed.

117.    Old GM employees were also having problems with their own model year ("MY") 2003 and 2004 Ions that contained the switch. In a January 9, 2004 report received from Old GM employee, Gerald A. Young, concerning his MY 2003 Saturn Ion, he informed Old GM, "[t]he ignition switch is too low. All other keys and the key fob hit on the driver's right knee. The switch should be raised at least one inch toward the wiper stalk," characterizing it as "a basic design flaw [that] should be corrected if we want repeat sales."

118.    In a February 19, 2004 report concerning his MY 2004 Saturn Ion, Old GM employee, Onassis Matthews, stated: "The location of the ignition key was in the general location where my knee would rest (I am 6' 3" tall, not many places to put my knee). On several occasions, I inadvertently turn [sic] the ignition key off with my knee while *driving down the road*. For a tall person, the location of the ignition key should be moved to a place that will not be inadvertently switched to the off position."

119.    In an April 15, 2004 report concerning his MY 2004 Saturn Ion, Old GM employee, Raymond P. Smith, reported experiencing an inadvertent shut-off: "I thought that my knee had inadvertently turned the key to the off position."

120.    Old GM concealed these and other similar manifestations of the defective ignition switch.

**D.    <u>Old GM Engineers Understood The Need To Correct The Ignition Switch Defect In 2004 But Failed To Act To Disclose Or Correct The Defect.</u>**

121.    In 2004, Old GM knew that the ignition switch posed a safety concern that needed to be fixed. For example, in October 2004, Old GM internally documented incidents in which Old GM engineers verified that the ignition switch was turned to the off position as a

result of being grazed by the driver's knee. The cause of the problem was found to be the "low key cylinder torque/effort."

122.    In 2004, Old GM was finalizing plans to begin production and sale of the Chevrolet Cobalt. The Chevrolet Cobalt was designed using the same ignition switch that was used in the Saturn Ion. As the Chevrolet Cobalt moved into production, it too—like its Saturn Ion predecessor— experienced inadvertent ignition switch shut-offs that resulted in moving stalls. Old GM already knew that when the ignition switch was inadvertently turned to off or accessory—by design—the airbags would not deploy. Instead of implementing a solution to the safety problem, the engineers debated partial solutions, short-term fixes, and cost.

123.    Around the time of the Cobalt launch, more reports surfaced of moving stalls caused by a driver bumping the key fob or chain with his knee. At a 2004 press event associated with the launch of the Cobalt in Santa Barbara, California, a journalist informed Doug Parks, the Cobalt Chief Engineer, that while adjusting his seat in the Cobalt he was test driving, the journalist had inadvertently turned off the car by hitting his knee against the key fob or chain. Old GM's Doug Parks asked Gary Altman, the Program Engineering Manager, to follow up on the complaint by trying to replicate the incident and to determine a fix.

124.    Old GM engineers independently encountered the ignition switch defect in early test drives of the Chevy Cobalt, before it went to market. The Old GM engineers pinpointed the problem of engine shut-off in the Cobalt and were "able to replicate this phenomenon during test drives." Despite this knowledge, Old GM told no one.

125.    According to Old GM, its engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions." But after considering the

cost and amount of time it would take to develop a fix, Old GM did not implement a fix, and the defective vehicles went to market.

126.    As soon as the Chevrolet Cobalt hit the market in late 2004, Old GM immediately started getting similar complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column." Old GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing [the] key to be cycled to [the] off position inadvertently." Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch … [and a] low position of the lock module [on] the [steering] column."

127.    From the outset, Old GM employees, customers, and members of the automotive press found repeatedly that they would hit the key fob or keychain with their knee, and the car would turn off. As noted, Old GM received some of these reports before the Cobalt's launch, and others afterwards. Despite the many complaints describing the moving stalls and customers' safety concerns, Old GM covered up the defect and made safety assurances to the driving public, its customers, and the Class, upon which they reasonably relied. Old GM received reports from dealers documenting this problem and advised dealers to tell customers to modify their key chains. For example, in response to a customer complaint in December 2004, GM internally noted:

> RECOMMENDATION/INSTRUCTIONS:
>
> There is potential for the driver to inadvertently turn off the
> ignition due to low key ignition cylinder torque/effort. The concern

is more likely to occur if the driver is short and has a large heavy
key chain.

In the cases this condition was documented, the driver's knee
would contact the key chain while the vehicle was to ruing the
steering column was adjusted all the way down. This is more likely
to happen to a person that is short as they will have the seat
positioned closer to the steering column.

In cases that fit this profile, question the customer thoroughly to
determine if this may the cause. The customer should be advised of
this potential and to take steps, such as removing unessential items
from their key chain, to prevent it.

GM then closed the complaint file and kept this "potential" problem secret.

128.    Old GM's Manager of Product Safety Communications publicly announced
and reassured customers that there was no safety issue with Cobalt moving stalls: "When this
happens, the Cobalt is still controllable. The engine can be restarted after shifting to neutral."

129.    DeGiorgio learned about the Cobalt press event moving stall and was
approached by an Old GM engineer who suggested that DeGiorgio could "beef up" the
ignition switch and increase the torque.

130.    On May 17, 2004, during a NHTSA visit to the GM Milford Proving Grounds,
Old GM gave a presentation titled "Engine Stall & Loss of Assist Demonstration." At a June 3,
2004, meeting with NHTSA, GM represented to NHTSA that in assessing a given stall, it
considered severity, incident rate, and warning to the driver. But drivers had no such warning,
certainly not from Old GM. NHTSA told Old GM that where number of stalls were high, the
factors should be considered, but did not immunize Old GM from a safety recall.

131.    On November 22, 2004, engineers in Old GM's High Performance Vehicle
Operations group wrote DeGiorgio and informed him that their group had repeatedly
experienced a moving stall during a track test of the Cobalt SS (the high-performance version
of the Cobalt) when the driver's knee "slightly graze[d]" the key fob. An Old GM engineer

-55-

1197532.10

forwarded this complaint to DeGiorgio, and explicitly asked DeGiorgio whether there was "a specification on the force/torque required to keep that switch in the RUN position." He also asked DeGiorgio: "If so, is the switch meeting that spec? If not, what are the options for implementing a stronger spring?"

     **E.**    **Old GM Closed Its First Internal Investigation With No Action Because Of Cost.**

    132.    Despite the serious safety problem posed by the ignition switch defect, Old GM took no action to correct the defect and instead covered it up. As set forth above, in the summer and fall of 2004, as the Chevrolet Cobalt moved into the production stage, engineers observed a number of moving stalls caused by the ignition switch defect.

    133.    On November 19, 2004, Old GM personnel opened an engineering inquiry known as a Problem Resolution Tracking System (PRTS) to address the complaint that the Cobalt could be "keyed off with knee while driving." At this time, PRTS issues were analyzed by a Current Production Improvement Team (CPIT). The CPIT that examined the Cobalt issue beginning in late 2004 included a cross-section of business people and engineers, including Parks, Old GM engineer Gary Altman and Lori Queen, Vehicle Line Executive for the Cobalt.

    134.    In early 2005, and as part of the PRTS, Parks sent an email with the subject, "Inadvertent Ign turn-off." In the email, Parks wrote, "For service, can we come up with a 'plug' to go into the key that centers the ring through the middle of the key and not the edge/slot? This appears to me to be the only real, quick solution."

    135.    After considering this and a number of other solutions (including changes to the key position and measures to increase the torque in the ignition switch), the CPIT examining the issue decided to do nothing. Indeed, by March 2005, the GM Cobalt Program

-56-

Engineering Manager ("PEM") issued a "directive" to close the 2004 PRTS "with no action."[5] According to Old GM's internal documents, the design change was refused because of time, i.e., because the "lead-time for all solutions is too long," and money, i.e., because the "tooling cost and piece price are too high…".[6]

136.   The 2004 PRTS was closed because "none of the solutions represents an acceptable business case"—a standard phrase used by GM personnel for closing a PRTS without action because of cost.[7] In deciding to do nothing to correct the serious safety defect that existed in its vehicles, Old GM simply shrugged off the issue entirely. What is more, Old GM downplayed the severity of the safety threat, rating the specter of a moving stall (even at highway speeds) with a severity level of 3—on a scale of 1 (most severe) to 4 (least severe). Old GM did not explain what, if any, criteria exist for an "acceptable business case" or otherwise justify its decision to do nothing. David Trush, the DRE for the ignition cylinder, explained that to present an "acceptable business case," a solution should solve the issue, be cost effective, and have an acceptable lead time to implement the change. [8] But one of the very solutions proposed by Thrush—changing the key from a slot to a hole configuration—would have cost less than one dollar per vehicle.

137.   Here, as elsewhere in the story of the ignition switch defect, the structure within Old GM was one in which no one was held responsible and no one took responsibility.[9]

---

[5] GMHEC000001735 (Nov. 19, 2004).
[6] GMHEC000001735.
[7] GMNA PRTS+ Closure Codes (Close w/out Action) (Effective Dec. 2007) [DOC ID GMCB-000000977300]. Valukas Report at 69, n. 271.
[8] Valukas Report at 69.
[9] Valukas Report at 71.

**F.    Complaints Continued And Serious Accidents Came To Old GM's Attention In 2005, While NHTSA Began To Investigate Death Cases Involving Chevy Cobalts.**

138.    After the Cobalt program team closed the November 19, 2004, PRTS with no action taken, additional complaints of Cobalt stalls and inadvertent ignition switch shut-offs continued to come into GM's Brand Quality Group.[10]

139.    In March 2005, Jack Weber, a GM engineer, reported that during "heel-toe downshifting" in a Cobalt SS with a manual transmission (a high-performance Cobalt model), his knee contacted the key fob and key ring, which caused "pulling on the key to move it to the 'Off' position."[11]

140.    In May 2005, a customer demanded that Old GM repurchase his Cobalt. The complaint was that the ignition switch shut off during normal driving conditions with no apparent contact between the driver's knee and the key chain or fob.[12] Old GM Brand Quality Manager Steven Oakley forwarded this information internally at Old GM, stating that the ignition switch "goes to the off position too easily shutting the car off."[13] DeGiorgio was one of the Old GM personnel who received this e-mail chain, which effectively stated that the customer's car, as well as others at the dealership, had ignition switches with insufficient

---

[10] Valukas Report at 75.

[11] E-mail from Jonathan L. Weber, GM, to Rajiv Mehta, GM, et al. (March 9, 2005), at 22 (attached to FPR0793/2005/US) [DOC ID GMHEC000019677]. Valukas Report at 76, n. 303.

[12] E-mail from Steven Oakley, GM, to Arnaud Dessirieix, GM (May 2, 2005) [DOC ID 000077753011; GMNHTSA000337483). Valukas Report at 76, n. 308.

[13] E-mail from Steven Oakley, GM, to Arnaud Dessirieix, GM (May 2, 2005) [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 76, n. 309.

torque and cause the car to shut off while driving.[14] This e-mail specifically included a request to DeGiorgio for an ignition switch "at the high end of the tolerance spec."[15]

141.     By May 2005, Old GM personnel thus had multiple reports of moving stalls and were receiving buyback requests for Cobalts following complaints that consumers made to dealers.[16]

142.     The problem of moving stalls and the ignition switch turning off in Old GM vehicles continued throughout 2005, and was described both within Old GM and in the media. In May and June 2005, reviewers from two newspapers, including the New York Times, wrote articles detailing how they or a family member had inadvertently turned a Cobalt off with their knees.[17] On May 26, 2005, a writer for the Sunbury Daily Item in Pennsylvania reviewed the Cobalt and reported that "[u]nplanned engine shutdowns happened four times during a hard-driving test last week. . . . I never encountered anything like this in 37 years of driving and I hope I never do again." In furtherance of covering up a material safety hazard, one of Old GM's in-house vehicle safety lawyers e-mailed a colleague to marshal evidence for the press that the risk of moving stalls was "remote" and "inconsequential." He wrote that he did not want to be criticized for failing to "defend a brand new launch."[18]

---

[14] E-mail from Joseph Joshua, GM, to Joseph Manson, GM, Raymond DeGiorgio, GM, et al. (May 4, 2005) [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 77, n. 312.

[15] E-mail from Joseph Joshua, GM, to Steven Oakley, GM, et al. (May 4, 2005) (noting "[w]e have asked the ign switch DRE for a switch at the high end of the tolerance spec") [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 76-77, n. 310.

[16] J&B Interview of Steven Oakley, May 23, 2014. Valukas Report at 78, n. 315.

[17] Jeff Sabatini, "Making a Case for Ignitions That Don't Need Keys," *New York Times*, June 19, 2005; *see also* Christopher Jensen, "Salamis, Key Rings and GM's Ongoing Sense of Humor," *Plain Dealer (Cleveland)*, June 26, 2005.

[18] Valukas Report at 86.

2c2f23669acfc6f2

143.    In June 2005, a Senior Delphi Project Engineer stated in an "e-mail that the "Cobalt is blowing up in [GM's] face in regards to the car turning off with the driver's knee."[19]

144.    An Old GM customer filed the following complaint about a 2005 Cobalt prone to moving stalls on June 29, 2005:

> Dear Customer Service:
>
> This is a safety/recall issue if ever there was one.… The problem is the ignition turn switch is poorly installed. Even with the slightest touch, the car will shut off while in motion. I don't have to list to you the safety problems that may happen, besides an accident or death, a car turning off while doing a high speed …[20]

145.    In July 2005, a 2005 Chevrolet Cobalt crashed in Maryland, killing the teenage driver, Amber Rose.[21] Calspan Crash Data Research Center was assigned by the NHTSA Special Crash Investigation Program to conduct a Special Crash Investigation (or "SCI"), which found "that the frontal airbag system did not deploy" and the "[Sensing Diagnostic Module (or "SDM")] data indicated that the 'vehicle power mode status' was in 'Accessory.'"[22] The August 15, 2005, SCI report found that the vehicles' SDM data recorded the "vehicle power mode status" of the ignition switch had shifted from "run" to "accessory" just before the crash. NHTSA continued the SCI and Old GM failed to report the crash to

---

[19] Valukas Report at 88.

[20] Customer complaint (June 29, 2005) [DOC ID 000014669078; GMNHTSA000540683]. Valukas Report at 89, n. 379.

[21] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation Case No. CA05-049, Vehicle: 2005 Chevrolet Cobalt (July 2005) (the "2005 SCI Report").

[22] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation Case No. CA05-049, Vehicle: 2005 Chevrolet Cobalt (July 2005) (the "2005 SCI Report").

NHTSA until the third quarter of 2005.[23] Upon information and belief, Old GM subsequently entered into a confidential settlement agreement with the victim's mother.

146.    Inside Old GM, the defect was raised with the Product Investigations ("PI") unit. The PI unit was charged with solving significant engineering problems, including safety problems; it was the primary unit charged with investigating and resolving potential safety defects.[24] Old GM Product Investigations Manager Doug Wachtel assigned PI employee Elizabeth Kiihr to investigate the Cobalt ignition switch shut-off. Wachtel's team looked at early data from the field and found 14 incidents related to the ignition switch. The PI group also tried to recreate the problem themselves. Doug Wachtel and Gay Kent drove a Cobalt around Old GM's property in Warren, Michigan. Gay Kent had a long and heavy key chain, and was able to knock the ignition from Run to Accessory simply by moving her leg so that her jeans caused friction against the fob.[25] Wachtel also reproduced the stall in the Cobalt test drive by contact with the key chain.[26]

147.    Notwithstanding the media reporting, the customer complaints, and its replication of moving stalls in the field, the PI team did not recommend a safety recall on vehicles with the ignition switch defect.[27] Old GM knew that a defect existed in its vehicles, but did nothing to disclose the truth or warn consumers or the Class, nor did Old GM correct the defect in vehicles that it had already sold, or in vehicles it continued to manufacture, sell, warrant, and represent as safe.

---

[23] Letter from Christina Morgan, Chief, Early Warning Division, Office of Defects Investigation to Gay P. Kent, Director, General Motors Corp. (Mar. 1, 2006) and Letter to Christina Morgan from Gay P. Kent, Director, Product Investigations (Apr. 6, 2006), (GMHEC 00198137-198210); (GMHEC00197893).
[24] Valukas Report at 86.
[25] TREAD Search Results (June 28, 2005) [DOC ID 000005586004; DOC ID 000005586005; DOC ID 000005586006]. Valukas Report at 86-87, n. 367.
[26] Valukas Report at 87.
[27] Valukas Report at 87.

G.   **Old GM Engineers Proposed Design Modifications To The Ignition Switch In 2005 That Were Rejected By Old GM Management On The Basis Of Cost.**

148.   Old GM's knowledge of the serious safety problem grew, but still there was no disclosure. In February 2005, as part of the 2004 PRTS that avoided the word "stall," Old GM engineers met to analyze how to address the ignition switch defect.[28] Indeed, between February 2005 and December 2005, Old GM opened multiple PRTS inquiries regarding reports of power failure and/or engine shutdown in the affected vehicles.

149.   Old GM engineers internally recognized that there was a need to do something in order to address the ignition switch defect. For example, Old GM engineers were directed to investigate a possible key slot change as "containment" of the defect, including development cost and time estimates.[29]

150.   In May 2005, PRTS N182276 (the "2005 PRTS") was opened by Old GM to analyze the ignition switch in the 2005 Chevrolet Cobalt following continued customer complaints that the "vehicle ignition will turn off while driving."[30] Old GM acknowledged in the 2005 PRTS that it had previously been faced with the same issue in the 2004 PRTS and "[d]ue to the level of buyback  activity that is developing in the field, Brand Quality requests that the issue be reopened."[31] In other words, customers were asking Old GM to take back the defective cars while Old GM said nothing to customers or the Class about the safety risks. Old GM continued to market and warrant the vehicles as safe. The 2005 PRTS proposed that Old

---

[28] GMHEC000001733 (Nov. 19, 2004).
[29] GMHEC000001734 (Nov. 19, 2004).
[30] 2005 PRTS, originated May 17, 2005, GMHEC000001742-54.
[31] GMHEC000001743.

GM re-design the key head from a "slotted" to a "hole" configuration. After initially

approving the proposed fix, Old GM reversed course and again declined to implement it.[32].

     151.    As part of one of the myriad PRTS inquiries opened in 2005, Quality Brand

Manager Steve Oakley asked William Chase, an Old GM warranty engineer, to estimate the

warranty impact of the ignition switch defect in Cobalt vehicles. Chase estimated that for

Cobalt and G5 vehicles on the road for 26 months, 12.40 out of every 1,000 vehicles would

experience inadvertent power failure while driving. Still, Old GM did nothing.

     152.    At a June 7, 2005, Vehicle And Process Integration Review ("VAPIR")

meeting at Old GM, the Cobalt VAPIR team discussed potential solutions to the inadvertent

shut-off issue. Around this same time, DeGiorgio was asked to propose a change to the

ignition switch that would double the torque required to turn the switch.[33] DeGiorgio

identified two possibilities. First, he proposed using a switch under development for the

Saturn Vue and the Chevrolet Equinox (the "GMT 191"). Because the GMT 191 switch was

superior to the current ignition switch both electrically and mechanically, DeGiorgio referred

to it as the "gold standard of ignition switches."[34] Second, DeGiorgio proposed redesigning

the ignition switch already in Delta platform vehicles. Part of DeGiorgio's redesign plan

included adding a second detent plunger.[35]

     153.    At the VAPIR meeting on June 14, 2005, additional proposed fixes were

presented – categorized as either "short-term" or "long-term" solutions. The short- term

solution was to use a smaller key ring and to change the key going forward with a new key

---

[32] February 24, 2014 GM Submission to NHTSA – Chronology Re: Recall of 2005-2007 Chevrolet Cobalt and 2007
Pontiac G5 Vehicles (or "February GM Chronology"), at 1; March 11, 2014 GM Submission to NHTSA –
Chronology Re: Recall of 2006-2007 Chevrolet HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Saturn
Sky Vehicles (or "March GM Chronology") at 1; April Chronology at 2.
[33] J&B Interview of Raymond DeGiorgio, May 7-8, 2014. Valukas Report at 79.
[34] J&B Interview of Raymond DeGiorgio, May 7-8, 2014. Valukas Report at 79.
[35] J&B Interview of Raymond DeGiorgio, May 7-8, 2014. Valukas Report at 79.

head design that used a hole instead of a slot—the same idea that David Thrush had proposed during the November 2004 PRTS inquiry.[36] The "long-term" solutions included DeGiorgio's idea of replacing the ignition switch with the GMT 191, or gold standard switch, which would double the torque needed to shut off the ignition. The implementation of the new switch was targeted for MY 2007 or MY 2008 vehicles, at a cost of just $1.00/vehicle, plus tooling costs which were not known at that time.[37]

154.    The presentation for this VAPIR meeting also included discussion of press coverage that described the very defect in this case that the Old GM engineers were addressing earlier in 2005: inadvertent shut-off of the ignition switch and moving stalls. The presentation included GM's official public relations statement regarding the issue reassuring the public and the Class that the vehicle was "still controllable."[38]

155.    Also on June 14, 2005, similar complaints surfaced of "inadvertent ignition shut-offs" in the Solstice, which used the same defective ignition switch as the Cobalt and the Ion. A GM engineer emailed DeGiorgio and other Old GM personnel involved in evaluating short-term and long-term fixes for the ignition switch, informing them that Solstice testing showed the "ignition inadvertently turns off when hit." The engineer noted that the complaint was "very similar to the ones on the Cobalt [sic]" and suggested that the same "preventative measures" under discussion for the Cobalt should be taken for the Solstice.[39]

---

[36] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID 000011020041; GMNHTSA0002l8772]. Valukas Report at 80, n. 331.
[37] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID 000011020041; GMNHTSA000218772]. Valukas Report at 80-81, n. 333.
[38] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID 000011020041; GMNHTSA000218772]. Valukas Report at 80-81, n. 334.
[39] E-mail from Devin Newell, GM, to Raymond DeGiorgio, GM, et al. (June 14, 2005) [DOC ID 000001748037; GMNHTSA000218756]. Valukas Report at 81, n. 336.

156.    On June 17, 2005, Old GM engineer Al Manzor conducted testing on the ignition switch, and the proposed GMT 191 ignition switch, at Old GM's Milford Proving Ground[40] to evaluate how the switches performed in the Cobalt using a key with a slotted key head versus a key head with a hole.[41]

157.    Manzor's testing demonstrated that the rotational torque required to move the key out of Run was 10 N-cm, below the Specification of 15 to 25 N-cm. However, neither Manzor, nor anyone else interviewed, compared the test results to the actual specification.[42]

158.    Later in June 2005, the VAPIR approved a fix for existing customers – a plug that could be inserted into keys when customers came to the dealer reporting problems – and a change to the key for production in the future (a change that was not implemented). On July 12, 2005, Old GM also issued another Preliminary Information to dealers, this time explaining (only for the 2005 Cobalt and 2005 Pontiac Pursuit) that a fix was available (the key insert). The key change (and the insert) did not, however, address the core problem of inadequate torque performance in the ignition switch or the low placement of the ignition switch on the steering cylinder; indeed, the engineers still regarded the key head design change as only a temporary solution – or, as one Old GM engineer described it, a "band-aid."[43]

---

[40] The Milford Proving Ground is a GM engineering facility designed for vehicle research, development, and testing in Milford, Michigan. It has extensive test tracks for vehicle testing under a range of road conditions. Valukas Report at 81, n. 337.

[41] X001 Ignition Cylinder Effort … Next Actions" (June 19, 2005) [DOC ID 000012140574; GMNHTSA000218793]; J&B Interview of Alberto Manzor, May 1, 2014; e mail from Gay Kent, GM, to Deb Nowak-Vanderhoef, GM, *et al.*(June 14, 2005) [DOC ID S006878_000038279]. Valukas Report at 81, n. 338.

[42] J&B Interview of Doug parks, May 1-2, 2014; J&B Interview of Alberto Manzor, May 1, 2014. Valukas Report at 82, n. 341.

[43] Valukas Report at 82-83.

-65-

159.    Manzor said he discussed his safety concerns about the Cobalt, including the potential for airbag non-deployment, with Parks, Altman, and a safety engineer, Naveen Ramachandrappa Nagapola.[44]

160.    Ignoring the ignition defect did not make the problem or reported incidents go away.

## H.    Rather Than Implementing A Safety Recall And Fixing The Known Defect, Old GM Sent An Inadequate Technical Service Bulletin To GM Dealers In Late 2005, Advising Dealers On Taking Heavy Items Off Key Rings.

161.    Throughout 2005, various committees within Old GM considered proposed fixes, but rejected them as too costly. In December of 2005, rather than issuing a safety recall on the ignition switch defects, Old GM sent a Technical Service Bulletin ("TSB") 05-02-35-007 to GM dealers, titled "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs" for the Chevy Cobalt and HHR, Saturn Ion, and Pontiac Solstice vehicles.[45] The TSB explained that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder/torque."

162.    When Old GM issued this TSB, the prior Preliminary Information provided to its dealers on July 12, 2005 (which had accurately used the word "stall"), was removed from the dealer database as obsolete. This TSB also did not accurately describe the danger posed by the ignition switch defect and went only to Old GM dealers, not to the public or the Class.[46] There was no mention in the TSB of the possibility of airbag non-deployment, engine stalls, loss of power steering or power brakes.

---

[44] J&B Interview of Alberto Manzor, May l, 2014. Valukas Report at 83, n. 347.
[45] TSB 05-02-35-007, "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs," (Oct. 2006), at GMHEC000329773.
[46] March 2014 GM chronology; GMHEC000329773.

163. As evidence of the international and fraudulent concealment by Old GM, multiple Old GM employees confirmed that Old GM intentionally avoided using the word "stall" in the TSB to dealers.[47]

164. Old GM Quality Brand Manager, Steve Oakley, who drafted the December 2005 TSB, stated the term "stall" is a "hot" word that Old GM did not use in TSBs because *it may raise a concern about vehicle safety*, which *"suggests Old GM should recall the vehicle, not issue a bulletin."*[48] In addition, Old GM personnel stated that "there was concern about the use of 'stall' in a TSB because such language might draw the attention of NHTSA."[49] The December 2005 TSB was intentionally misleading and incomplete. Rather than spend the money on a part with sufficient torque or recall the defective vehicles, Old GM came up with a self-described band-aid.

165. Rather than disclose the true nature of the defects and correct them, pursuant to the December 2005 TSB, Old GM, through its dealers, instead gave some customers who brought in their vehicle complaining about stalling "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key rings from moving up and down in the slot. "[T]he previous key ring" was "replaced with a smaller" one; this change was intended to keep the keys from hanging as low as they had in the past.[50] Old GM created over 10,000 key plug inserts as the defect's cheaper fix.[51] According to GM's records, Old GM dealers provided key inserts to only 474 customers who brought their vehicles into dealers for service.[52] But the band-aid failed because Old GM abandoned the key redesign effort.[53]

---

[47] Valukas Report at 91-93; (citing GMHEC000329773).
[48] Valukas Report at 92, n. 390, emphasis added.
[49] Valukas Report at 93, n. 392.
[50] Valukas Report at 1-2; March GM Chronology at 2; April GM Chronology at 2.
[51] Valukas Report at 93-94.
[52] February GM Chronology at 2.

Furthermore, while Old GM made the key insert available to consumers of previously purchased vehicles, it did not, at the same time, change the key for cars that were rolling off the assembly line and those yet to be produced. Thus, even the "band-aid" that Old GM engineers proposed was not implemented for new cars.[54]

166.    Still there was no recall and Old GM continued to receive complaints of fatalities and injuries that put it squarely on notice of the defect. Rather than issue the necessary safety recall, inside Old GM, the cover-up continued.

I.    **Old GM Knew About And Authorized A Design Change To The Ignition Switch In 2006, But Masked The Existence Of The Change By Keeping The Part Number The Same.**

167.    Old GM covertly authorized a design change for the defective ignition switch in 2006.

168.    In late 2005 and early 2006, DeGiorgio discussed with Delphi a proposal to put a stronger spring and plunger into the ignition switch.[55] An internal Delphi document indicates that this switch design—with a longer detent spring-plunger—was the same as the longer detent spring-plunger design originally drafted by Delphi in 2001.[56] In other words, this option was available when the ignition switch was first designed[57]

169.    In April 2006, DeGiorgio authorized Delphi to implement changes to fix the ignition switch defect.[58] The design change "was implemented to increase torque performance

---

*Footnote continued from previous page*

[53] Valukas Report at 94.

[54] Valukas Report at 94.

[55] E-mail from Arturo Alcala, Delphi to Raymond DeGiorgio, GM, John B. Coniff, Delphi, et al. (Jan. 6, 2006) [DOC ID 000051786002; GMNHTSA000257777]. Valukas Report at 97, n. 401.

[56] Drawing 741-76307-T [DOC ID GMHEC000003206]; 2001 Long Detent Spring Drawing, Drawing 741-79378 (2001) [Ex. A.3.a(2) 2001 Long Detent Spring Drawing]; 2001 Short Detent Spring Drawing, Drawing 741-75259 (2001) [Ex. A.3.a (1) 2001 Short Detent Spring Drawing]; e-mail from Antero Cuervo, Delphi, to Lyle Miller, Delphi (Oct. 29, 2013) [DOC ID 000004253527; GMNHTSA000223906]. Valukas Report at 97, n. 402.

[57] Valukas Report at 97.

[58] General Motors Commodity Validation Sign-Off (April 26, 2006, GMHEC000003201).

in the switch."[59] On April 26, 2006, DeGiorgio approved an ignition switch with a longer detent plunger by signing what is called a Form 3660, giving Delphi permission to begin manufacturing the longer parts for the switch.[60] The Form 3660 stated, "[n]ew detent plunger (Catera spring/plunger) was implemented to increase torque force in switch."[61] Each Form 3660 has to link back to a master work order, and this one did as well. But the work order to which it was linked was only for the electrical improvements to the ignition switch; the work order did not mention the change to the spring and plunger.[62] Old GM fraudulently concealed and acted to suppress and cover up this material fact.

170.    Delphi documents suggest that the new ignition switch went into production sometime after June 26, 2006.[63] Although the design of the ignition switch changed, *the part number remained the same*.[64]

171.    Meanwhile, consumers, NHTSA, the driving public, and the Class were not told of this change, because Old GM "*concealed the fact*" of the design change and "*failed to disclose this critical information*," with devastating consequences.[65]

172.    In congressional testimony in 2014, GM CEO Mary Barra acknowledged that GM should have changed the part number when it redesigned the ignition switch, and that its failure to do so did not meet industry standard behavior. Former New GM engineers term GM's failure to change the part number a "cardinal sin" and "an extraordinary violation of internal processes."

---

[59] General Motors Commodity Validation Sign-Off (April 26, 2006, GMHEC000003201).
[60] General Motors Commodity Validation Sign Off (April 26, 2006) GMHEC000003201.
[61] Form 3660 (April 26, 2006), at 3 [DOC ID 000004253529; GMNHTSA000223924]. Valukas Report at 98, n. 406.
[62] EWO 302726 (Feb. 19, 2004) [DOC ID 000000000080; GMNHTSA000220667]. Valukas Report at 98, n. 407.
[63] Valukas Report at 99.
[64] Valukas Report at 100 (emphasis added).
[65] Valukas Report at 34 (emphasis added).

J.     **The Fatalities Resulting From The Defects And Cover-Up Came To Old GM's Attention As Early As 2004.**

173.   Customer complaints and reports of injuries and fatalities continued.

174.   GM's legal department received notice of the first Ion airbag non-deployment claim in January 2004 in a 2004 Saturn Ion. The first Cobalt crash came to Old GM's attention in September 2005.[66]

175.   On November 17, 2005—immediately before Old GM issued the December Bulletin—a Cobalt went off the road and hit a tree in Baldwin, Louisiana. The front airbags did not deploy in this accident. Old GM received notice of the accident, opened a file, and referred to it as the "Colbert" incident.

176.   In January 2006, a 2005 Chevy Cobalt, driven by an unsuspecting Old GM customer struck several trees and its driver died en route to the hospital.[67] The vehicle's power mode status was in "accessory" at the time of the crash and the airbag did not deploy when it should have.[68]

177.   On February 10, 2006, in Lanexa, Virginia – shortly after Old GM issued the TSB – a 2005 Cobalt flew off of the road and hit a light pole. As with the Colbert incident (above), the frontal airbags failed to deploy in this incident. The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this accident, opened a file, and referred to it as the "Carroll" incident.

---

[66] Valukas Report at 103, n. 419.
[67] Calspan Corporation, Calspan On-Site Air Bag Non-Deployment Investigation, Case No. CA05-049, Dec. 12, 2006 [DOC ID GMCB-000000073786; GMHEC100026303]; GM, Activity Notes form, File No. 501661, Jan. 31, 2006 [DOC ID 000001660023; GMNHTSA000200717]. Valukas Report at 110, n. 453.
[68] Crash Data Retrieval System, [redacted] SDM Data, Sept. 14, 2005 [DOC ID 000001660011; GMNHTSA000200688]. Valukas Report at 110, n. 454.

178.    On March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole. The frontal airbags did not deploy in this incident. The download of the SDM showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this incident, opened a file, and referred to it as the "Oakley" incident.

179.    In September 2006, GM became aware of an incident in which a 2004 Saturn Ion left the road and struck a utility pole head on. The airbag did not deploy and the driver was wearing her seatbelt, but was pronounced dead at the scene. Old GM identified this crash as one in which the airbag should have deployed, and the airbag likely would have saved her life.[69] Old GM engineers agreed that "1) the airbags … should have deployed; 2) the SDM did not record the crash event, for unknown reasons;… and 4) it is reasonably likely that deployment of the driver airbag would have prevented [] death in this accident."[70] Still, Old GM admitted nothing and represented its cars were non-defective and safe.

180.    On October 24, 2006, a crash occurred in which a 2005 Cobalt left the road and struck a telephone box and two trees. There were fatalities and severe injuries and the airbag did not deploy. Alan Adler e-mailed Dwayne Davidson, Senior Manager for TREAD Reporting at Old GM, and others, copying Gay Kent, Jaclyn Palmer, Brian Everest, and Doug Wachtel, with the subject line "2005 Cobalt Air Bags—Fatal Crash; Alleged Non-Deployment."[71]

181.    In October 2006, a 2005 Chevy Cobalt was involved in a crash in Wisconsin which resulted in the deaths of the front right and rear right passengers. NHTSA assigned Indiana University Transportation Research Center to investigate the crash. The vehicle was

---

[69] Valukas Report at 112, n. 463, 464.
[70] Valukas Report at 113, n. 474.
[71] Valukas Report at 113-114.

inspected on November 6, 2006.[72] Old GM reported the crash later in 2006 in its EWR filing.[73] NHTSA requested additional information from GM in May of 2007, and GM responded a month later.[74]

182.    In 2007, two analyses of the fatalities in the Wisconsin Cobalt crash, one by Wisconsin State Trooper Keith Young and another by Indiana University researchers, both independently concluded that the movement of the ignition switch from "run" into "accessory" caused the 2006 accident, the airbag non-deployment and the tragic deaths. Officer Young was able to reach this accurate conclusion by examining GM's own engineering documents.

183.    Internal Old GM documents show that the company has received at least 248 reports of air bag non-deployment in 2005 MY vehicles.[75] Internal documents also showed that Old GM received at least 134 reports of air bag non-deployment in 2006 MY vehicles.[76]

## K.    Old GM Responded To Growing Evidence Of Fatalities By Updating The Technical Service Bulletin To Dealers About Heavy Key Chains.

184.    In October 2006, Old GM updated the prior December 2005 Service Bulletin to include additional make and MY vehicles, namely: the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, and 2007 Pontiac Solstice and G5.[77] As it had previously done, in its statement to dealers, Old GM avoided acknowledging the ignition switch defect and this time blamed the problem on height and weight of its customers, short people and heavy key rings, stating:

---

[72] Indiana Univ. Transp. Research Ctr., On-site Air Bag Non-deployment Investigation Case No. IN06-033, Vehicle: 2005 Chevrolet Cobalt (Oct. 2006) (hereinafter the "2006 SCI Report").

[73] Letter from Christina Morgan, Chief, Early Warning Division, Office of Defects Investigation, to Gay P. Kent, Director, General Motors Corp. (May 7, 2007); Letter to Christina Morgan from Gay P. Kent, Director, Product Investigations (June 7, 2007) (GMHEC00198410-198414).

[74] GMHEC00197898.

[75] GM Internal Summary Points on Airbag Non-Deployment for Cobalt, G5 and Pursuit (Aug. 2013).

[76] GM Internal Summary Points on Airbag Non-Deployment for Cobalt, G5 and Pursuit (Aug. 2013).

[77] (Service Bulletin 05-02-35-007, "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs," (Oct. 2006 revised), at GMHEC000000002).

There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort. The concern is more likely to occur if the driver is short and has a large and/or heavy key chain. In these cases, this condition was documented and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down. This is more likely to happen to a person who is short, as they will have the seat positioned closer to the steering column. In cases that fit this profile, question the customer thoroughly to determine if this may be the cause. The customer should be advised of this potential and should take steps to prevent it—such as removing unessential items from their key chain.[78]

185.    Despite the TSB to dealers, millions of the defective vehicles remained on the road endangering the lives and livelihoods of the Class and the public.

## L.    Old GM Knew Of And Tracked Multiple Accidents Involving The Ignition Switch Defect By 2007 And Avoided Scrutiny By Misleading The Class, The Public, And Regulators.

186.    Old GM knew that people were being killed and seriously injured because of the ignition switch defect in its vehicles and the resulting loss of power and airbag non-deployment.

187.    In March 2007, Old GM met with NHTSA and discussed the July 29, 2005, fatal crash involving Amber Rose.[79] At this meeting, Old GM was told by NHTSA the airbags in the Cobalt did not deploy, causing the Ms. Rose's death, and that data retrieved from the crashed vehicle's diagnostic system indicated that the ignition was in the "accessory" position. This was no surprise to Old GM; it had been secretly tracking ignition switch related accidents since well before this time. By the end of 2007, Old GM identified ten (10) other accidents, including four (4) where the ignition switch had moved into the "accessory" position.[80]

---

[78] GMHEC000143093; GM Technical Service Bulletin, "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and no DTCs," (Oct. 25, 2006), at GMHEC000138614.

[79] GM Feb. 24, 2014, Letter to NHTSA, GM February Chronology.

[80] GM Feb. 24, 2014, Letter to NHTSA, GM February chronology.

-73-

188.    Thus, by the end of 2007, Old GM knew of at least 10 frontal collisions in which the airbag did not deploy.[81] Old GM actually knew of but kept secret many other similar fatal accidents involving the ignition switch defects.

189.    For the next two years, Old GM continued to receive complaints and continued to investigate frontal crashes in which the airbags did not deploy in Defective Vehicles, but did not disclose the crucial safety information to the Class of unsuspecting drivers of Old GM vehicles.

190.    In April 2007, having continued its investigation into the July 2005 Maryland Cobalt crash, NHTSA received a 2006 SCI report stating that the "crash is of special interest because the vehicle was equipped with … dual stage air bags that did not deploy."[82] The SCI Report concluded that the air bags did not deploy "as a result of the impact with the clump of trees, possibly due to the yielding nature of the tree impact or power loss due to the movement of the ignition switch just prior to impact."[83] The Electronic Data Recorder ("EDR") for the vehicle indicated that the ignition switch was in "Accessory" mode at the time of impact.[84] The SCI Report also found that the investigation demonstrated that contact with the ignition switch could result in "engine shutdown and loss of power."[85]

191.    In August 2007, Old GM met with its airbag supplier, Continental, to review SDM data from a 2005 Chevrolet Cobalt crash where the airbags failed to deploy.[86]

---

[81] Letter from M. Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, GM, to Nancy Lewis, Assoc. Adm'r for Enforcements, NHTSA, Attach. B-573.6(c)(6) at 2 (February 24, 2014), *available at* http://democrats.energycommerce.house.gov/sites/default/files/ documents/Letter-Benavides-Lewis-2014-02-24.pdf (or "Benavides Letter").
[82] 2006 NTHSA SCI Report.
[83] 2006 NTHSA SCI Report at ii.
[84] 2006 NTHSA SCI Report at 7.
[85] 2006 NTHSA SCI Report at 7.
[86] Continental Automotive Sys. US, Inc., Field Event Analysis Report, GMHEC00003143-3153, GM Mar. 11, 2014 Letter to NHTSA, GM March chronology at 2.

192.    The next month, in September of 2007, the Chief of the Defects Assessment

Division ("DAD") within NHTSA's Office of Defects Investigation ("ODI") proposed an

investigation of "frontal airbag non-deployment in the 2003-2006 Chevrolet Cobalt/Saturn Ion"

vehicles.[87] The Chief of DAD within ODI noted that the "issue was prompted by a pattern of

reported non-deployments in VOQ [Vehicle Owner Questionnaire] complaints that was first

observed in early 2005."[88] The email stated that NHTSA had "discussed the matter with GM,"

but that Old GM had assured NHTSA that "they see no specific problem pattern."[89] NHTSA's

Greg Magno stated:

> Notwithstanding GM's indications that they see no specific
> problem, DAD perceives a pattern of non-deployment in these
> vehicles that does not exist in their peers and that their
> circumstances are such that, in our engineering judgment, merited
> a deployment, and that such a deployment would have reduced
> injury levels or saved lives.[90]

193.    In November 2007, NHTSA's ODI considered a proposal to investigate the

non-deployment of airbags in 2003-2006 model/year Chevy Cobalt and Saturn Ion vehicles.[91]

The review was prompted by twenty-nine (29) complaints, four (4) fatal crashes, and fourteen

(14) field reports that NHTSA knew about.[92] Again, Old GM not only failed to act, it worked

to thwart the agency's efforts, in furtherance of its fraud and concealment to the detriment of

the Class.

194.    As part of the cover-up, Old GM tried to avoid full regulatory investigation and

disclosure by claiming that it was unaware of any problem in its vehicles. Furthermore, Old

GM knew that the airbag system in the Defective Vehicles would be disabled when the

---

[87] E-mail from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.
[88] E-mail from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.
[89] E-mail from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.
[90] E-mail from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.
[91] DAD Panel (Nov. 17, 2007), at NHTSA-HECC-004462-4483.
[92] DAD Panel (Nov. 17, 2007), at NHTSA-HECC-004462-4483.

ignition switch to a vehicle moved from the "run" to the "accessory" position. The airbag

system, in other words, was disabled when the vehicle lost power. Old GM knew, however,

that NHTSA believed that in most, if not all, vehicles, the airbag systems were operable for

several seconds following a power loss. Although Old GM knew that NHTSA was mistaken,

it did not correct NHTSA's mistaken belief.

### M.   Old GM Instructed Its Personnel On Judgment Words To Be Avoided.

195.   In a 2008 internal presentation at Old GM, it instructed its employees to avoid

using the following judgment words:[93]

| | | |
|---|---|---|
| Always | detonate | maniacal |
| Annihilate | disemboweling | mutilating |
| Apocalyptic | enfeebling | Never |
| Asphyxiating | Evil | potentially-disfiguring |
| Bad | evicscerated [sic] | power [sic] keg |
| Band-Aid | explode | Problem |
| big time | Failed | Safety |
| brakes like an "X" car | Flawed | safety related |
| Cataclysmic | genocide | Serious |
| Catastrophic | Ghastly | spontaneous combustion |
| Challenger | grenadelike | startling |
| Chaotic | Grisly | suffocating |
| Cobain | gruesome | Suicidal |
| Condemns | Hindenburg | terrifying |
| Corvair-like | Hobbling | Titanic |
| Crippling | Horrific | tomblike |
| Critical | impaling | unstable |
| Dangerous | Inferno | widow-maker rolling sarcophagus (tomb or coffin) |
| Deathtrap | Kevorkianesque | Words or phrases with biblical connotation |
| Debilitating | lacerating | |
| Decapitating | life-threatening | |
| Defect | maiming | |
| Defective | mangling | |

---

[93] NHTSA Consent Order at Exhibit B, 2008 Q1 Interior Technical Learning Symposium.

196.    Instead of using their common sense judgment, Old GM employees were advised in Orwellian fashion to use specific words to avoid disclosure of the material safety risks, and in so doing furthered the cover-up and fraud through intentional word substitutions such as:

- "Issue, Condition [or] Matter" instead of "**Problem**"

- "Has Potential Safety Implications" instead of "**Safety**"

- "Does not perform to design" instead of "**Defect/Defective**"[94]

197.    Old GM knew its defective vehicles were killing and maiming its customers, while instructing its employees to avoid the words "defect" or "safety." Instead of publicly admitting the dangerous safety defects in its vehicles, Old GM repeatedly blamed accidents on driver error.

198.    From 2001 until July 10, 2009, Old GM was repeatedly put on notice of the defect internally and received reports of deaths and injuries in Chevy Cobalts and other GM vehicles involving airbag failures and/or steering, yet acted at every turn to fraudulently conceal the danger from the Class. Examples include, but are not limited to:

- 2005: 26 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved.

- 2006: 69 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved and 4 deaths listing the component involved as "unknown."

- 2007: 87 Cobalt Death and Injury Incidents, including 3 deaths citing "airbag" as the component involved.

- 2008: 106 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved and 2 deaths listing the component involved as "unknown."[95]

---

[94] NHTSA Consent Order at Exhibit B (emphasis added).

**N.** **By 2009, As Injuries And Deaths Continued To Mount, Old GM Opened Yet Another Internal Investigation, But Continued To Withhold Information From Its Customers And The Class About The Defects.**

199.    In February 2009, Old GM initiated yet another internal investigation of the ignition switch defect which resulted in a redesign of the ignition key for the 2010 model/year Cobalt.[96] However, Old GM took no remedial action in response to the investigation and continued to conceal the facts. Consequently, deaths, injuries, and incidents continued to occur related to the ignition switch defect. As one Old GM employee put it when the ignition defect was raised again internally at Old GM:

> "Gentleman! This issue has been around since man first lumbered out of sea and stood on two feet. In fact, I think Darwin wrote the first PRTS on this and included as an attachment as part of his Theory of Evolution."[97]

200.    Some within Old GM were not mincing words. Yet Old GM chose to conceal the truth from the Class, and the death and injury toll mounted.

201.    Again, in April 2009, a 2005 Chevy Cobalt was involved in a crash in Pennsylvania which resulted in the deaths of the driver and front passenger.[98] The crash was investigated by NHTSA.[99] The 2009 SCI Report noted that data from the Cobalt's SDM indicated that the ignition switch was in "accessory" mode at the time of the crash.[100] Still, Old GM refused to issue a recall or notify the Class of the danger.

---

*Footnote continued from previous page*

[95] NHTSA Cobalt Chronology prepared by the Center for Auto Safety, February 27, 2014.

[96] GM Feb. 24, 2014 Letter To NHSTA, GM Feb. chronology at 2; Valukas Report at 132-133; GM PRTS Complete Report (1078137)—GMNHTSA000018925.

[97] Memo, Joseph R. Manson, Feb. 18, 2009, GMHEC000282093.

[98] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case No.: CA09022, Vehicle: 2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report").

[99] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case No.: CA09022, Vehicle: 2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report").

[100] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case No.: CA09022, Vehicle: 2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report"). SDM Data Report, attached to 2009 SCI Report.

O.     **The Spreadsheet Of Accidents Involving The Cobalt Ignition Switch Within Old GM Continued To Grow, But Was Never Disclosed.**

202.    Beginning in 2007, Old GM Field Performance Assessment engineer, John Sprague, maintained a spreadsheet of accidents involving Cobalt non-airbag deployments, along with the vehicle power mode status. To gather the data for the spreadsheet, Sprague sent SDMs from crash vehicles to Continental (the SDM manufacturer) so that it could access information that Old GM could not.[101] After receiving the data from Continental, Sprague collected information regarding the Cobalt crashes and power mode status, added it to the spreadsheet, and discovered that, in fact, the power mode status was recorded as "off" or "accessory" in many accidents.[102]

203.    Sprague continued to maintain his spreadsheet until July 10, 2009 (and beyond). In doing so, Sprague noticed a pattern—the problem of non-deployment of airbags did not appear as frequently in MY 2008 and later Cobalts. That led him to question whether there had been some change in the Cobalt from MY 2007 to MY 2008.[103]

204.    Sprague brought his spreadsheet on the ignition switches and vehicles losing power while driving to a meeting with DeGiorgio in 2009 and the two of them reviewed it together.[104] Still no action was taken. Instead, there were more non-productive meetings.

205.    In May 2009, Old GM again met with its SDM supplier, Continental, and asked for data in connection with another crash involving a 2006 Chevy Cobalt where the airbags failed to deploy.[105] In a report dated May 11, 2009, Continental analyzed the SDM data and concluded that the SDM ignition state changed from "run" to "off" during the

---

[101] Valukas Report at 134.
[102] J&B Interview of John Sprague, May 27, 2014. Valukas Report at 135, n. 596.
[103] Valukas Report at 137.
[104] Valukas Report at 138, n. 616.
[105] Continental Automotive Sys. US, Inc., Field Event Analysis Report GMHEC00003129-3142.

accident. According to Continental, this, in turn, disabled the airbags. Old GM did not

disclose this finding to NHTSA, despite its knowledge that NHTSA was interested in non-

deployment incidents in Chevrolet Cobalt vehicles. Yet again, in the face of mounting death

tolls, Old GM did not correct the ignition switch defect, take the vehicles off the road, or warn

its consumers or the Class. Sprague's secret spreadsheet of accidents simply grew.

206.    The next month, in June 2009, Old GM filed a Chapter 11 petition. The

bankruptcy sale to New GM became effective on July 10, 2009.

207.    At that point, New GM assumed Old GM's obligation to report any known,

dangerous defects in GM vehicles, including the Defective Vehicles.

### III.    Meet The New GM, Same As The Old GM: With Knowledge of the Defects, New GM "Investigates" Further-And Continues To Conceal The Defects.

208.    In 2009, Old GM declared bankruptcy, and, weeks later, it emerged from

bankruptcy as New GM. Both before and after GM's bankruptcy, the ignition switches in the

Defective Vehicles continued to fail and GM, in both its incarnations, continued to conceal

the truth.

209.    On March 10, 2010, many months after the birth of New GM, Brooke Melton

was driving her 2005 Cobalt on a two-lane highway in Paulding County, Georgia. While she

was driving, her key turned from the "run" to the "accessory/off" position causing her engine

to shut off. After her engine shut off, she lost control of her Cobalt, which traveled into an

oncoming traffic lane, where it collided with an oncoming car. Brooke was killed in the crash.

210.    On March 22, 2011, Ryan Jahr, a GM engineer, downloaded the SDM from

Brooke's Cobalt. The information from the SDM download showed that the key in Brooke's

Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash. On

June 24, 2011, Brooke Melton's parents, Ken and Beth Melton, filed a lawsuit against GM.

211.    On December 31, 2010, in Rutherford County Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. New GM received notice of this incident, opened a file, and referred to it as the "Chansuthus" incident.

212.    On December 31, 2010, in Harlingen, Texas, another 2006 Cobalt traveled off the road and struck a curb. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. New GM received notice of this incident, opened a file, and referred to it as the "Najera" incident.

213.    These incidents are not limited to vehicles of model year 2007 and before. According to New GM's own investigation, there have been over 250 crashes involving 2008-2010 Chevrolet Cobalts in which the airbags failed to deploy.

214.    In 2010, New GM began a formal investigation of the frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s. New GM subsequently elevated the investigation to a Field Performance Evaluation ("FPE").

215.    In August 2011, New GM assigned Engineering Group Manager, Brian Stouffer as the Field Performance Assessment Engineer ("FPAE") to assist with the FPE investigation.

216.    On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.

-81-

217.    In spring 2012, Stouffer asked Jim Federico, a high level executive and chief engineer at Old and New GM who recently retired, to oversee the FPE investigation. Federico was the "executive champion" for the investigation to help coordinate resources for the FPE investigation.

218.    In May 2012, New GM engineers tested the torque on the ignition switches for 2005-2009 Cobalt, 2007, 2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Ion vehicles in a junkyard. The results of these tests showed that the torque required to turn the ignition switches in most of these vehicles from the "run" to the "accessory/off" position did not meet Old GM's minimum torque specification requirements, including the 2008-2009 vehicles. These results were reported to Stouffer and other members of the FPE.

219.    Indeed, airbag non-deployment incidents are not limited to vehicles of model year 2007 and before. According to New GM's own investigation, there have been over 250 crashes involving 2008-2010 Chevrolet Cobalts in which the airbags failed to deploy.

220.    In September 2012, Stouffer requested assistance from a "Red X Team" as part of the FPE investigation. The Red X Team was a group of engineers within GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s. By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective ignition switch system. The Red X Team became involved in the investigation shortly after Mr. Stouffer's request.

221.    During the field-performance-evaluation process, New GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key

would inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem.

222.    Indeed, the New GM engineers identified several additional ways to actually fix the problem. These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of run. New GM rejected each of these ideas.

223.    The photographs below are of a New GM engineer in the driver's seat of a Cobalt during the investigation of Cobalt engine stalling incidents:



224.    These photographs show the dangerous condition of the position of the key in the lock module on the steering column, as well as the key with the slot, which allow the key fob to hang too low off of the steering column. New GM engineers understood that the key fob may be impacted and pinched between the driver's knee and the steering column which causes the key to be inadvertently turned from the run to accessory/off position. The photographs show why the New GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem. It also shows why GM engineers

believe that the additional changes to the ignition switch system (such as the shroud) were necessary to fix the defects.

225.    The New GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the ignition switch problem but New GM concealed—and continues to conceal—from the public, the nature and extent of the defects.

226.    By 2012, Federico, Stouffer, and the remaining members of the Red X Team knew that the Key System in the Ion, the Cobalt, and the G5 vehicles had safety-related defects that would cause the key to move from the "run" to the "accessory/off" position while driving these vehicles. They also knew that when this happened the airbags would no longer work in frontal crashes.

227.    On October 4, 2012, there was a meeting of the Red X Team during which Federico gave an update of the Cobalt airbag non-deploy investigation. According to an email from Stouffer on the same date, the "primary discussion was on what it would take to keep the SDM active if the ignition key was turned to the accessory mode." Despite this recognition by New GM engineers that the SDM should remain active if the key is turned to the accessory/off mode, New GM has done nothing to remedy this safety defect and has fraudulently concealed, and continue to fraudulently conceal it, from the public.

228.    During the October 4, 2012 meeting, Stouffer, and the other members of the Red X Team also discussed "revising the ignition switch to increase the effort to turn the key from Run to Accessory."

229.    On October 4, 2012, at 9:07 p.m., Stouffer emailed DeGiorgio and asked him to "develop a high level proposal on what it would take to create a new switch for service with higher efforts."

230.    On October 5, 2012, at 7:39 a.m., DeGiorgio responded:

Brian,

In order to provide you with a HIGH level proposal, I need to understand what my

requirements are. what is the TORQUE value that you desire?

Without this information I cannot develop a proposal.

231.    At 9:05 a.m. on that same day, Stouffer in responding to DeGiorgio's email,

stated:

Ray,

As I said in my original statement, I currently don't know what the torque value needs

to be. Significant work is required to determine the torque. What is requested is a high

level understanding of what it would take to create a new switch.

232.    DeGiorgio responded back to Stouffer at 9:33 a.m. that same morning:

Brian,

Not knowing what my requirements are I will take a SWAG at the Torque required for

a new switch. Here is my high level proposal:

Assumption is 100 N cm Torque.

•    New switch design = Engineering Cost Estimate approx. $300,000

•    Lead Time = 18-24 months from issuance of GM Purchase Order and supplier

selection.

Let me know if you have any additional questions.

233.    Stouffer admitted during his deposition that DeGiorgio's reference to SWAG

was an acronym for Silly Wild-Ass Guess.

234.   DeGiorgio's cavalier attitude exemplifies the decade-long approach to the safety-related defects that existed in the ignition switch systems in Defective Vehicles. Rather than seriously addressing the safety defects, DeGiorgio's emails show he understood the ignition switches were contributing to the crashes and fatalities and he could not care less.

235.   It is also obvious from this email exchange that Stouffer, who was a leader of the Red X Team, had no problem with DeGiorgio's cavalier and condescending response to the request that he evaluate the redesign of the ignition switches.

236.   Federico, Stouffer, and the other members of the Red X Team also understood that these safety-related defects had caused or contributed to numerous accidents and multiple fatalities. Despite this knowledge, New GM chose to conceal this information from the public, including the Class.

237.   In December 2012, in Pensacola, Florida, Ebram Handy, a New GM engineer, participated in an inspection of components from Brooke Melton's Cobalt, including the ignition switch. At that inspection, Handy, along with Mark Hood, a mechanical engineer retained by the Meltons, conducted testing on the ignition switch from Brooke Melton's vehicle, as well as a replacement ignition switch for the 2005 Cobalt.

238.   At that inspection, Handy observed that the results of the testing showed that the torque performance on the ignition switch from Brooke Melton's Cobalt was well below Old GM's minimum torque performance specifications. Handy also observed that the torque performance on the replacement ignition switch was higher than the torque performance on the ignition switch in Brooke Melton's Cobalt.

239.   In January 2013, Handy, in preparation for his Rule 30(b)(6) deposition in the Melton case, spoke with several people who were engineers at both Old and New GM,

including DeGiorgio and Stouffer. At that time, Handy knew that, based on the testing he had observed, the original ignition switch in the 2005 Cobalt failed to meet Old GM's minimum torque performance specifications and that Old GM had redesigned the ignition switches that were being sold as replacement switches. Both Old and N that an ignition switch that did not meet its minimum torque performance requirements was a safety defect.

240.    Old and New GM engineers integrally involved with this situation have admitted that Old GM never should have sold the Defective Vehicles with ignition switches that did not meet the Company's minimum torque performance requirements.

241.    In 2013, Ray DeGiorgio, the chief design engineer for the ignition switches in millions of the Defective Vehicles was deposed. At his deposition, DeGiorgio was shown photographs of the differences between the ignition switch in Brooke Melton's Cobalt and the ignition switch in the 2008 Cobalt or replacement ignition switch. After looking at the photographs of the different ignition switches, DeGiorgio testified as follows:

Q. The one on the right, Exhibit 13 is an '05 or an '06, and the one on the left, Exhibit 14, is either an '08 or replacement. Do you see the difference?

A. Yes.

Q. Have you noticed that before today, Mr. DeGiorgio?

A. No sir.

Q. Were you aware of this before today, Mr. DeGiorgio?

    MR. HOLLADAY: Object to the form. You can answer.

THE WITNESS: No sir.

Q. It appears to be pretty clear that the plunger and the cap is taller on Exhibit 14 compared to Exhibit 13, isn't it?

A. That's correct.

Q. How is a taller cap going to affect the rotational resistance?

A. It's hard to determine from these pictures exactly if it is a taller cap or is it recessed inside the housing or not. It's hard for me to assess, really, what I'm looking at.

Q. You've taken apart a number of switches and you're telling the jury you've never noticed the difference in the plunger between the '05 and '06 versus the new resistor or switch?

MR. HOLLADAY: Object to the form.

THE WITNESS: I did not notice, no.

(DeGiorgio Deposition, pp. 149-150.)

242.     DeGiorgio was then further questioned about his knowledge of any differences in the ignition switches:

Q. And I'll ask the same question. You were not aware before today that GM had changed the spring—the spring on the ignition switch had been changed from '05 to the replacement switch?

MR. HOLLADAY: Object to the form. Lack of predicate and foundation. You can answer.

THE WITNESS: I was not aware of a detent plunger switch change. We certainly did not approve a detent plunger design change.

Q. Well, suppliers aren't supposed to make changes such as this without GM's approval, correct?

A. That is correct.

Q. And you are saying that no one at GM, as far as you know, was aware of this before today?

   MR. HOLLADAY: Object. Lack of predicate and foundation. You can answer.

THE WITNESS: I am not aware about this change.

(DeGiorgio Deposition, pp. 151-152.)

243.    DeGiorgio clearly testified that he had absolutely no knowledge of any change in the ignition switch in 2005-2010 Cobalts.

244.    DeGiorgio also provided the following testimony about the ignition switch supplier, Delphi:

Q. And there weren't any changes made—or were there changes made to the switch between '05 and 2010 that would have affected the torque values to move the key from the various positions in the cylinder?

A. There was one change made to the resistor in '08, but that should not have affected the torque or the displacement of the switch.

I can restate this way: There was an electrical change made in '08, but not a mechanical change—at least there were no official changes, mechanical changes, made to the switch that I know of.

Q. When you say no official, could there be unofficial changes made?

A. I'm not saying that there was, I'm just saying if there was something changed at the supplier side, we were not aware of it and we did not approve it, okay?

(DeGiorgio Deposition, pp. 57-58.)

Q. Did you ask Mary Fitz or anyone from Delphi whether there, in fact, had been any changes made to the ignition switch?

-89-

A. Yes, yes I did. And they came back, said there's been no changes made to the
switch since the introduction to production.

Q. Who told you that?

A. Mary Fitz.

Q. Where is she located?

A. She's located in, I want to say, Delphi headquarters here in Michigan.

(DeGiorgio Deposition, pp. 117-118.)

245.    DeGiorgio clearly testified that he had spoken with Delphi employees and that
they confirmed there were no changes made to the ignition switch in 2005-2010 Cobalts.

246.    DeGiorgio signed his errata sheet on May 23, 2013. In the signed errata sheet,
DeGiorgio did not change any testimony referenced in this Complaint.

247.    On June 12, 2013, Gary Altman, the Cobalt program engineering manager,
testified as follows during his deposition in Melton v. GM:

Q. And the vehicle never should have been sold if it didn't meet GM's minimum
torque specific—performance requirements, should it?

MR. FRANKLIN: Object to form.

THE WITNESS: That's correct.

Q. And the reason is because that could be dangerous under certain situations, because
the key can move from run to accessory?

MR. FRANKLIN: Object to form.

THE WITNESS: Yes.

(Gary Altman Dep., pp. 23-24)

248.    Altman's admission simply demonstrates that N that the Defective Vehicles were dangerous but chose to do nothing about it.

**IV.    New GM Issues A Recall—Ten Years Too Late.**

249.    On February 7, 2014, New GM informed NHTSA that it was conducting Recall No. 14V-047 for certain 2005-2007 model year Chevrolet Cobalts and 2007 model year Pontiac G5 vehicles.

250.    In its February 7, 2014, letter to NHTSA, New GM represented that as replacement ignition switches became available, New GM would replace the ignition switches on the Defective Vehicles with ignition switches with greater torque to prevent the unintended movement from the "run" to "accessory" position..

251.    On February 19, 2014, a request for timeliness query was sent to NHTSA in connection with Recall No. 14V-047 ("timeliness query"). The timeliness query pointed out that New GM had failed to recall all of the vehicles with the defective ignition switches.

252.    The February 19, 2014 timeliness query also asked NHTSA to investigate New GM's failure to fulfill its legal obligation to report the safety defects in the Defective Vehicles to NHTSA within five days of discovering the defect.

253.    On February 24, 2014, New GM sent a letter informing NHTSA it was expanding the recall to include 2006-2007 model year (MY) Chevrolet HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles.

254.    New GM included an Attachment to the February 24, 2014, letter. In the Attachment New GM, *for the first time,* admitted that Old GM had authorized a change in the ignition switch in 2006. Specifically, New GM stated:

> On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics.

The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch. This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch. GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year.

255.   New GM then produced documents in response to Congressional requests leading up to hearings on April 1 and 2, 2014. Among the documents produced by New GM is a document titled, "GENERAL MOTORS COMMODITY VALIDATION SIGN-OFF," dated April 26, 2006. According to this document, Delphi had met all of the sign-off requirements in order to provide a new ignition switch for certain Old GM vehicles. New GM has acknowledged that the ignition switch in the Cobalt was included in this design change.

256.   The design change included a new detent plunger "to increase torque force in the switch." DeGiorgio's signature is on this page as the Old GM authorized engineer who signed off on this change to the ignition switch.

257.   This Commodity Validation Sign-Off shows that DeGiorgio repeatedly perjured himself during his deposition on April 29, 2013. DeGiorgio perjured himself in order to fraudulently conceal evidence from the Meltons that Old GM had signed off on the change in the ignition switch so that the Meltons, and ultimately a jury, would never know that Old GM had changed the switches in 2007 and later model year Cobalts and concealed these changes from Brooke Melton.

258.   DeGiorgio perjured himself when he signed the errata sheet confirming that all the testimony was true and accurate.

259.    On March 17, 2014, Mary T. Barra, General Motors' chief executive issued an internal video, which was broadcast to employees.[106] In the video, Ms. Barra admits:

> Scrutiny of the recall has expanded beyond the review by the federal regulators at NHTSA, the National Highway Traffic Safety Administration. As of now, two congressional committees have announced that they will examine the issue. And it's been reported that the Department of Justice is looking into this matter…. *These are serious developments that shouldn't surprise anyone. After all, something went wrong with our process in this instance and terrible things happened.…* The bottom line is, *we will be better because of this tragic situation*, if we seize the opportunity.… I ask everyone to stay focused on making today's GM the best it can be.

260.    On March 28, 2014, New GM again expanded the first ignition switch recall to cover all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice and the Saturn Ion and Sky in the United States. This third expansion of the ignition switch recall covered an additional 824,000 vehicles in the U.S., bringing the number of recalled vehicles to 2,191,146.

**V.    New GM's Recall Fails to Correct the Defect.**

261.    Not only was New GM's recall ten years too late, it is completely insufficient to correct the safety-related defects in the Defective Vehicles.

262.    The supposed fix implemented by New GM as part of the recall—replacing the ignition switch—is insufficient and does not adequately address the safety risks posed by the defect. The ignition key and switch remains prone to inadvertently move from "run" to "accessory." Replacing the ignition switch does not address the problem posed by the low position of the ignition on the steering cylinder. Even with New GM's alleged "fix," drivers of ordinary height can hit the ignition key with their knees during ordinary driving situations.

---

[106] *See* http://media.gm.com/media/us/en/gm/news.detail.html./content/ Pages/news/us/en/2014/mar/0317-video.html. (last visited March 21, 2014) (emphasis added).

Such an impact may cause the ignition to move from the "run" to the "accessory" or "off" position while the vehicle is in operation, causing the vehicle to stall, the power brakes and power steeling to fail, and the airbags not to deploy in a collision.

263.    Since at least the November 2004 PRTS inquiry, first Old and then New GM has known that simply replacing the ignition switches on the Defective Vehicles is not a solution to the potential for the key to inadvertently turn from the "run" to the "accessory/off" position in these vehicles.

264.    New GM's recall fails to address the design defect that causes the key fob/chain to hang too low on the steering column.

265.    Thus, even when the ignition switches are replaced, this defective condition will still exist in the Defective Vehicles and there continues to be the potential for a driver to contact the key chain and inadvertently turn the key from the "run" to the "accessory/off" position.

266.    The recall is additionally insufficient because New GM is not replacing all of the keys in the Defective Vehicles with the redesigned key with a hole instead of a slot. Yet New GM's engineers have determined that the redesigned key would reduce the chance that the key could be inadvertently turned from the "run" to the "accessory/off" position.

267.    The recall also fails to address the design defects in the Defective Vehicles which disables the airbag immediately upon the engine shutting off.

268.    Although New GM began installing DeGiorgio's redesigned ignition switch in MY 2008 Defective Vehicles, later model year Defective Vehicles continue to experience non-deployment collision events. Undermining New GM's position is its own investigation

into the non-deployment events in Cobalts that identifies over 250 non-deploy crashes involving 2008-2010 Cobalts.

269.    New GM's engineers understood that increasing the detent in the ignition switch alone was not a solution to the problem, but New GM concealed—and continues to conceal from the public, including the Class, the nature and extent of the defects, which the current recall will not cure.

## VI.    New GM Expands the February/March Recall—and Suspends Two Engineers.

270.    On Wednesday, April 9, 2014, New GM issued a new recall of all the vehicles covered by the February/March ignition switch recall.

271.    New GM's stated purpose for the new recall is to replace "lock cylinder" into which the key is inserted, because the current lock cylinders allow the key to be pulled out while the car is still running.

272.    According to New GM, the defective lock cylinder could lead to "a possible roll-away, crash and occupant or pedestrian injuries."

273.    The next day, April 10, 2014, New GM announced that it was suspending Ray DeGiorgio, the lead design engineer for the Cobalt and Ion ignition switch, and Gary Altman, GM's program-engineering manager for the Cobalt, for their respective roles in GM's safety failure. (The two have since been terminated in the wake of the Valukas Report.)

274.    The April 10 announcement came after Ms. Barra, New GM's chief executive, was briefed on the results of former United States Attorney Anton R. Valukas internal investigation of the company, which was conducted in response to growing concerns regarding the safety of the Defective Vehicles.

275.    Additionally, New GM also announced a new program entitled "Speak Up for Safety," which is intended to encourage New GM employees to report potential customer

-95-

safety issues. According to Ms. Barra, this program is being adopted because New "GM must embrace a culture where safety and quality come first." Unfortunately, these actions are too little, too late.

**VII.    The June 2014 Recall For The "Ignition Key Slot" Defect Further Reveals New GM's Fraudulent Concealment of Known Serious Safety Problems.**

276.   New GM sent further shockwaves through the automotive world when it announced, on June 23, 2014, that it was recalling 3,141,731 vehicles in the United States for ignition switch, or so-called "ignition key slot" defects (NHTSA Recall Number 14V- 355).

277.   According to information on NHTSA's website, 2,349,095 of the vehicles subject to this recall were made by Old GM. 792,636 vehicles were made and/or sold by New GM.

278.   The following Old GM vehicles were included in the June 23, 2014 recall: 2005-2009 Buick Lacrosse, 2006-2009 Chevrolet Impala, 2000-2005 Cadillac Deville, 2004-2009 Cadillac DTS, 2006-2011 Buick Lucerne, 2004-2005 Buick Regal LS and RS, and 2006-20009 Chevrolet Monte Carlo.

279.   The recall notice states, "In the affected vehicles, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."

280.   Further, "[i]f the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury. Additionally, a key knocked out of the run position could cause loss of engine power, power steering, and power braking, increasing the risk of a vehicle crash."

281.    The vehicles included in this recall were built on the same platform and their defective ignition switches are likely due to weak detent plungers, just like the other Defective Vehicles recalled in February and March of 2014.

282.    Old GM was long-aware of the ignition switch defect in these vehicles, and New GM was aware of the ignition switch defect in these vehicles from the date of its inception on July 11, 2009, as it acquired on that date all of the knowledge possessed by Old GM given the continuity in personnel, databases and operations from Old GM to New GM. In addition, New GM acquired additional information thereafter. The information, all of which was known to New GM, included the following facts:

i.    In January of 2003, Old GM opened an internal investigation after it received complaints from a Michigan GM dealership that a customer had experienced a power failure while operating his model year 2003 Pontiac Grand Am.

ii.    During the investigation, Old GM's Brand Quality Manager for the Grand Am visited the dealership and requested that the affected customer demonstrate the problem. The customer was able to recreate the shutdown event by driving over a speed bump at approximately 30-35 mph.

iii.    The customer's key ring was allegedly quite heavy. It contained approximately 50 keys and a set of brass knuckles.

iv.    In May 2003, Old GM issued a voicemail to dealerships describing the defective ignition condition experienced by the customer in the Grand Am. Old GM identified the relevant population of affected vehicles as the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am.

v.      Old GM did not recall these vehicles. Nor did it provide owners and/or lessees with notice of the defective condition. Instead, its voicemail directed dealerships to pay attention to the key size and mass of the customer's key ring.

vi.      On July 24, 2003, Old GM issued an engineering work order to increase the detent plunger force on the ignition switch for the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am vehicles. Old GM engineers allegedly increased the detent plunger force and changed the part number of the ignition switch. The new parts were installed beginning in the model year 2004 Malibu, Alero, and Grand Am vehicles.

vii.      Old GM issued a separate engineering work order in March 2004 to increase the detent plunger force on the ignition switch in the Pontiac Grand Prix. Old GM engineers did not change the part number for the new Pontiac Grand Prix ignition switch.

viii.      Then-Old GM design engineer Ray DeGiorgio signed the work order in March 2004 authorizing the part change for the Grand Prix ignition switch. DeGiorgio maintained his position as design engineer with New GM.

ix.      On or around August 25, 2005, Laura Andres, an Old GM design engineer (who remains employed with New GM), sent an email describing ignition switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway. Ms. Andres' email stated, "While driving home from work on my usual route, I was driving about 45 mph, where the road changes from paved to gravel & then back to paved, some of the gravel had worn away, and the pavement acted as a speed bump when I went over it. The car shut off. I took the car in for repairs. The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off."

-98-

x.      Old GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' email on August 25, 2005 to four Old GM employees. Mr. Dickinson asked, "Is this a condition we would expect to occur under some impacts?"

xi.     On August 29, 2005, Old GM employee Jim Zito forwarded the messages to Ray DeGiorgio and asked, "Do we have any history with the ignition switch and far as it being sensitive to road bumps?"

xii.    Mr. DeGiorgio responded the same day, stating, "To date there has never been any issues with the detents being too light."

xiii.   On August 30, 2005, Ms. Andres sent an email to Old GM employee Jim Zito and copied ten other Old GM employees, including Ray DeGiorgio. Ms. Andres, in her email, stated, "I picked up the vehicle from repair. No repairs were done. . . . The technician said there is nothing they can do to repair it. He said it is just the design of the switch. He said other switches, like on the trucks, have a stronger detent and don't experience this."

xiv.    Ms. Andres' email continued: "I think this is a serious safety problem, especially if this switch is on multiple programs. I'm thinking big recall. I was driving 45 mph when I hit the pothole and the car shut off and I had a car driving behind me that swerved around me. I don't like to imagine a customer driving with their kids in the back seat, on I-75 and hitting a pothole, in rush-hour traffic. I think you should seriously consider changing this part to a switch with a stronger detent."

xv.     Ray DeGiorgio, who reportedly designed the ignition switches installed in the 2006 Chevrolet Impala vehicles, replied to Ms. Andres' email, stating that he had recently driven a 2006 Impala and "did not experience this condition."

283.    On or after July 11, 2009, senior executives and engineers at N that some of the information relayed to allay Ms. Andres' concerns was inaccurate. For example, Ray DeGiorgio knew that there had been "issues with detents being too light." Instead of relaying those "issues," Mr. DeGiorgio falsely stated that there were no such "issues."

284.    New GM has tried to characterize the recall of these 3.14 million vehicles as being different than the recall for the ignition switch defect in the Cobalts and other Defective Ignition Switch Vehicles when in reality and for all practical purposes it is for exactly the same defect that creates exactly the same safety risks. New GM has attempted to label and describe the ignition key slot defect as being different in order to provide it with cover and an explanation for why it did not recall these 3.14 million vehicles much earlier, and why it is not providing a new ignition switch and other remedies for the 3.14 million vehicles.

285.    From 2001 to the present, Old GM and New GM received numerous reports from consumers regarding complaints, crashes, injuries and deaths linked to this safety defect. The following are examples of just a few of the many reports and complaints regarding the defect:

286.    For example, on January 23, 2001, Old GM became aware of a complaint filed with NHTSA involving a 2000 Cadillac Deville and an incident that occurred on January 23, 2001, in which the following was reported:

> "COMPLETE ELECTRICAL SYSTEM AND ENGINE
> SHUTDOWN WHILE DRIVING. HAPPENED THREE
> DIFFERENT TIMES TO DATE. DEALER IS UNABLE TO
> DETERMINE CAUSE OF FAILURE. THIS CONDITION
> DEEMED TO BE EXTREMELY HAZARDOUS BY OWNER."
> NHTSA ID Number: 739850

287.    On June 12, 2001, Old GM became aware of a complaint filed with NHTSA involving a 2000 Cadillac Deville and an incident that occurred on June 12, 2001, in which the following was reported:

> "INTEERMITTENTLY AT 60MPH VEHICLE WILL STALL OUT AND DIE. MOST TIMES VEHICLE WILL START UP IMMEDIATELY AFTER. DEALER HAS REPLACED MAIN CONSOLE 3 TIMES, AND ABS BRAKES. BUT, PROBLEM HAS NOT BEEN CORRECTED. MANUFACTURER HAS BEEN NOTIFIED.*AK" NHTSA ID Number: 890227

288.    On January 27, 2003, Old GM became aware of a complaint filed with NHTSA involving a 2001 Cadillac Deville and an incident that occurred on January 27, 2003, in which the following was reported:

> "WHILE DRIVING AT HIGHWAY SPEED ENGINE SHUTDOWN, CAUSING AN ACCIDENT. PLEASE PROVIDE ANY ADDITIONAL INFORMATION.*AK" NHTSA ID Number: 10004759

289.    On September 18, 2007, Old GM became aware of a complaint filed with NHTSA involving a 2006 Chevrolet Impala and an incident that occurred on September 15, 2006, in which it was reported that:

> "TL*THE CONTACTS SON OWNS A 2006 CHEVROLET IMPALA. WHILE DRIVING APPROXIMATELY 33 MPH AT NIGHT, THE CONTACTS SON CRASHED INTO A STALLED VEHICLE. HE STRUCK THE VEHICLE ON THE DRIVER SIDE DOOR AND NEITHER THE DRIVER NOR THE PASSENGER SIDE AIR BAGS DEPLOYED. THE DRIVER SUSTAINED MINOR INJURIES TO HIS WRIST. THE VEHICLE SUSTAINED MAJOR FRONT END DAMAGE. THE DEALER WAS NOTIFIED AND STATED THAT THE CRASH HAD TO HAVE BEEN A DIRECT HIT ON THE SENSOR. THE CURRENT AND FAILURE MILEAGES WERE 21,600. THE CONSUMER STATED THE AIR BAGS DID NOT DEPLOY. THE CONSUMER PROVIDED PHOTOS OF THE VEHICLE. UPDATED 10/10/07 *TR" NHTSA ID Number: 10203350

290.    On April 02, 2009, GM became aware of a complaint filed with NHTSA involving a 2005 Buick LaCrosse and an incident that occurred on April 02, 2009, in which the following was reported:

> "POWER STEERING WENT OUT COMPLETELY, NO
> WARNING JUST OUT. HAD A VERY HARD TIME
> STEERING CAR. LUCKY KNOW ONE WAS HURT. *TR"
> NHTSA ID Number: 10263976

291.    The reports regarding the defect continued to be reported to New GM. For example, on February 15, 2010, New GM became aware of a complaint filed with NHTSA involving a 2008 Buick LaCrosse and an incident that occurred on February 13, 2010, in which a driver reported:

> "WHILE DRIVING AT 55MPH I RAN OVER A ROAD BUMP
> AND MY 2008 BUICK LACROSSE SUPER SHUT
> OFF(STALLED). I COASTED TO THE BURM, HIT BRAKES
> TO A STOP. THE CAR STARTED ON THE FIRST TRY.
> CONTINUED MY TRIP WITH NO INCIDENCES. TOOK TO
> DEALER AND NO CODES SHOWED IN THEIR COMPUTER.
> CALLED GM CUSTOMER ASSISTANCE AND THEY GAVE
> ME A CASE NUMBER. NO BULLETINS. SCARY TO DRIVE.
> TRAFFIC WAS LIGHT THIS TIME BUT MAY NOT BE THE
> NEXT TIME. *TR." NHTSA ID Number: 10310692

292.    On April 21, 2010, New GM became aware of a complaint filed with NHTSA involving a 2006 Buick Lucerne and an incident that occurred on March 22, 2010, in which the following was reported:

> "06 BUICK LUCERNE PURCHASED 12-3-09, DIES OUT
> COMPLETELY WHILE DRIVING AT VARIOUS SPEEDS.
> THE CAR HAS SHUT OFF ON THE HIGHWAY 3 TIMES
> WITH A CHILD IN THE CAR. IT HAS OCCURRED A TOTAL
> OF 7 TIMES BETWEEN1-08-10 AND 4-17-10. THE CAR IS
> UNDER FACTORY WARRANTY AND HAS BEEN
> SERVICED 7 TIMES BY 3 DIFFERENT BUICK
> DEALERSHIPS. *TR" NHTSA ID Number: 10326754

293.  On April 29, 2010, New GM became aware of a complaint filed with NHTSA involving a 2005 Buick LaCrosse and an incident that occurred on March 21, 2010, in which it was reported that:

> "TRAVELING ON INTERSTATE 57 DURING DAYTIME HOURS. WHILE CRUISING AT 73 MILES PER HOUR IN THE RIGHT HAND LANE, THE VEHICLE SPUTTERED AND LOST ALL POWER. I COASTED TO A STOP OFF THE SIDE OF THE ROAD. I RESTARTED THE VEHICLE AND EVERYTHING SEEMED OK, SO I CONTINUED ON. A LITTLE LATER IT SPUTTERED AGAIN AND STARTED LOSING POWER. THE POWER CAME BACK BEFORE IT CAME TO A COMPLETE STOP. I CALLED ON STAR FOR A DIAGNOSTIC CHECK AND THEY TOLD ME I HAD A FUEL SYSTEM PROBLEM AND THAT IF THE CAR WOULD RUN TO CONTINUE THAT IT WAS NOT A SAFETY ISSUE. THEY TOLD ME TO TAKE IT TO A DEALER FOR REPAIRS WHEN I GOT HOME. I TOOK THE CAR WORDEN-MARTEN SERVICE CENTER FOR REPAIRS ON MARCH 23RD. TO REPAIR THE CAR THEY: 1.REPLACED CAT CONVERTER AND OXYGEN SENSOR 125CGMPP- $750.47 A SECOND INCIDENT OCCURRED WHILE TRAVELING ON INTERSTATE 57 DURING DAYTIME HOURS. I WAS PASSING A SEMI TRACTOR TRAILER WITH THREE CARS FOLLOWING ME WHILE CRUISING AT 73 MILES PER HOUR WHEN THE VEHICLE SPUTTERED AND LOST ALL POWER PUTTING ME IN A VERY DANGEROUS SITUATION. THE VEHICLE COASTED DOWN TO ABOUT 60 MILES PER HOUR BEFORE IT KICKED BACK IN. I IN THE MEAN TIME HAD DROPPED BACK BEHIND THE SEMI WITH THE THREE CARS BEHIND ME AND WHEN I COULD I PULLED BACK INTO THE RIGHT HAND LANE. THIS WAS A VERY DANGEROUS SITUATION FOR ME AND MY WIFE. I CALLED ON STAR FOR A DIAGNOSTIC CHECK AND THEY TOLD ME THAT EVERYTHING WAS OK. I TOOK THE CAR WORDEN-MARTEN SERVICE CENTER FOR REPAIRS AGAIN ON APRIL 19TH TO REPAIR THE CAR THEY: 1.REPLACED MASS -AIR FLOW UNIT AND SENSOR $ 131.39 WHO KNOWS IF IT IS FIXED RIGHT THIS TIME? THIS WAS A VERY DANGEROUS SITUATION TO BE IN FOR THE CAR TO FAIL. *TR" NHTSA ID Number: 10328071

294.   On June 2, 2010, New GM became aware of a complaint filed with NHTSA involving a 2007 Buick LaCrosse and an incident that occurred on March 1, 2010, in which the following was reported:

> "2007 BUICK LACROSSE SEDAN. CONSUMER STATES
> MAJOR SAFETY DEFECT. CONSUMER REPORTS WHILE
> DRIVING THE ENGINE SHUTDOWN 3 TIMES FOR NO
> APPARENT REASON *TGW" NHTSA ID Number: 10334834

295.   On February 20, 2014, New GM became aware of a complaint filed with NHTSA involving a 2006 Chevrolet Monte Carlo and an incident that occurred on January 16, 2014, in which the following was reported:

> "I WAS DRIVING GOING APPROXIMATELY 45 MPH, I HIT
> A POT HOLE AND MY VEHICLE CUT OFF. THIS HAS
> HAPPENED THREE TIMES SINCE JANUARY. THE SAME
> THING HAPPENED THE SECOND TIME. THE LAST TIME IT
> OCCURRED WAS TUESDAY, FEBRUARY 18. THIS TIME I
> WAS ON THE EXPRESSWAY TRAVELING
> APPROXIMATELY 75 MPH, HIT A BUMP AND IT CUT OFF.
> THE CAR STARTS BACK UP WHEN I PUT IT IN NEUTRAL.
> *TR" NHTSA ID Number: 10565104

296.   On March 3, 2014, New GM became aware of a complaint filed with NHTSA involving a 2006 Chevrolet Impala and an incident that occurred on February, 29, 2012, in which the following was reported:

> "I WAS DRIVING MY COMPANY ASSIGNED CAR DOWN A
> STEEP HILL WHEN THE ENGINE STALLED WITHOUT
> WARNING. THIS HAS HAPPENED 5 OTHER TIMES WITH
> THIS VEHICLE. THIS WAS THE FIRST TIME I WAS
> TRAVELING FAST THOUGH. IT'S LIKE THE ENGINE JUST
> TURNS OFF. THE LIGHTS ARE STILL ON BUT I LOSE THE
> POWER STEERING AND BRAKES. IT WAS TERRIFYING
> AND EXTREMELY DANGEROUS. THIS PROBLEM
> HAPPENS COMPLETELY RANDOMLY WITH NO
> WARNING. IT HAS HAPPENED TO OTHERS IN MY
> COMPANY WITH THEIR IMPALAS. I LOOKED ONLINE
> AND FOUND NUMEROUS OTHER INSTANCES OF CHEVY
> IMPALAS OF VARIOUS MODEL YEARS DOING THE SAME
> THING. IT IS CURRENTLY IN THE REPAIR SHOP AND THE

MECHANIC CAN'T DUPLICATE THE PROBLEM. I TOLD
THEM ITS RANDOM AND OCCURS ABOUT EVERY 4
MONTHS OR SO. I AM AFRAID I WILL HAVE TO GET
BACK IN THIS DEATH TRAP DUE TO MY EMPLOYER
MAKING ME. PLEASE HELP- I DON'T WANT TO DIE
BECAUSE CHEVROLET HAS A PROBLEM WITH THEIR
ELECTRICAL SYSTEMS IN THEIR CARS. *TR" NHTSA ID
Number: 10567458

297.    On March 11, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2007 Cadillac DTS and an incident that occurred on January 27, 2013, in which

the following was reported:

"ENGINE STOPPED. ALL POWER EQUIPMENT CEASED TO
FUNCTION. I WAS ABLE TO GET TO THE SIDE OF THE
FREEWAY. PUT THE CAR IN NEUTRAL, TURNED THE KEY
AND THE CAR STARTED AND CONTINUED FOR THE
DURATION OF THE 200 MILE TRIP. THE SECOND TIME
APPROXIMATELY THREE WEEKS AGO MY WIFE WAS
DRIVING IN HEAVY CITY TRAFFIC WHEN THE SAME
PROBLEM OCCURRED AND SHE LOST THE USE OF ALL
POWER EQUIPMENT. SHE WAS ABLE TO PUT THE CAR IN
PARK AND GET IT STARTED AGAIN WITHOUT INCIDENT.
I CALLED GM COMPLAINT DEPARTMENT. THEY
INSTRUCTED ME TO TAKE THE CAR TO A DEALERSHIP
AND HAVE A DIAGNOSTIC TEST DONE ON IT. THIS WAS
DONE AND NOTHING WAS FOUND TO BE WRONG WITH
THE VEHICLE. I AGAIN CALLED CADILLAC COMPLAINT
DEPARTMENT AND OPENED A CASE. THIS TIME I WAS
TOLD TO TAKE THE CAR BACK TO THE DEALERSHIP
AND ASK THE SERVICE DEPARTMENT TO RECHECK IT. I
INFORMED THEM I HAVE THE DIAGNOSTIC REPORT
SHOWING NOTHING WRONG WAS FOUND. THEY
SUGGESTED I TAKE IT BACK AND HAVE THE SERVICE
PEOPLE DRIVE THE CAR. THIS DIDN'T MAKE ANY SENSE
BECAUSE I DON'T KNOW WHEN AND WHERE THE
PROBLEM WILL OCCUR AGAIN. WHAT WAS I TO DO FOR
A CAR WHILE THE DEALERSHIP HAD MINE? I INQUIRED
OF THE CADILLAC REPRESENTATIVE IF THIS CAR MAY
HAVE THE SAME IGNITION AS THE CARS CURRENTLY
BEING RECALLED BY GM. THEY WERE UNABLE TO
ANSWER THAT QUESTION. THEY FINALLY STATED THE
ONLY REMEDY WAS TO TAKE IT BACK TO THE
DEALERSHIP. IF THIS PROBLEM OCCURS AGAIN
SOMEONE COULD EASILY GET INJURED OR KILLED. I

-105-

WOULD APPRECIATE ANY ASSISTANCE YOU CAN GIVE
ME ON HOW TO RESOLVE THIS MATTER." NHTSA ID
Number: 10568491

298.    On March 19, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick LaCrosse and an incident that occurred on March 15, 2014, in which

the following was reported:

> "WHILE DRIVING UP A LONG INCLINE ON I-10 VEHICLE
> BEHAVED AS IF THE IGNITION HAD BEEN TURNED OFF
> AND KEY REMOVED. IE: ENGINE OFF, NO LIGHTS OR
> ACCESSORIES, NO WARNING LIGHTS ON DASH. TRAFFIC
> WAS HEAVY AND MY WIFE WAS FORTUNATE TO
> SAFELY COAST INTO SHOULDER. INCIDENT RECORDED
> WITH BUICK, HAVE REFERENCE NUMBER. *TR" NHTSA
> ID Number: 10573586

299.    On June 20, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2008 Buick LaCrosse and an incident that occurred on August 30, 2013, in which

the following was reported:

> "THE IGNITION CONTROL MODULE (NOT THE IGNITION
> SWITCH) FAILED SUDDENLY WHILE DRIVING ON THE
> HIGHWAY, CAUSING THE ENGINE TO SHUT OFF
> SUDDENLY AND WITHOUT WARNING. THE CAR WAS
> TRAVELING DOWNHILL, SO THE INITIAL INDICATION
> WAS LOSS OF POWER STEERING. I WAS ABLE TO PULL
> ONTO THE SHOULDER AND THEN REALIZED THAT THE
> ENGINE HAD DIED AND WOULD NOT RESTART. WHILE
> NO CRASH OR INJURY OCCURRED, THE POTENTIAL FOR
> A SERIOUS CRASH WAS QUITE HIGH." NHTSA ID Number:
> 10604820

300.    On July 1, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick LaCrosse and an incident that occurred on October 25, 2012, in which

the following was reported:

> "TRAVELING 40 MPH ON A FOUR LANE ABOUT TO PASS
> A TRUCK. MOTOR STOPPED, POWER STEERING OUT,
> POWER BRAKES OUT, MANAGED TO COAST ACROSS
> THREE LANES TO SHOULDER TO PARK. WALKED 1/4

> MILES TO STORE CALLED A LOCAL GARAGE. CAR STILL
> WOULD NOT START, TOWED TO HIS GARAGE. CHECKED
> GAS, FUEL PRESSURE OKAY BUT NO SPARK. MOVED
> SOME CONNECTORS AROUND THE STARTING MODULE
> AND CAR STARTED. HAVE NOT HAD ANY PROBLEMS
> SINCE, HAVE THE FEAR THAT I WILL BE ON A CHICAGO
> TOLL ROAD AND IT WILL STOP AGAIN." NHTSA ID
> Number: 10607535

301.    On July 12, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2009 Chevrolet Impala and an incident that occurred on March 19, 2010, in which

the following was reported:

> "I HAD JUST TURNED ONTO THIS ROAD, HAD NOT EVEN
> GONE A MILE. NO SPEED, NO BLACK MARKS, CAR
> SHUTDOWN RAN OFF THE ROAD AND HIT A TREE
> STUMP. TOTAL THE CAR. THE STEERING WHEEL WAS
> BENT ALMOST IN HALF. I HAVE PICTURES OF THE CAR. I
> GOT THIS CAR NEW, SO ALL MILES WE'RE PUT ON IT BY
> ME. I BROKE MY HIP, BACK, KNEE, DISLOCATED MY
> ELBOW, CRUSHED MY ANKLE AND FOOT. HAD A HEAD
> INJURY, A DEFLATED LUNG. I WAS IN THE HOSPITAL
> FOR TWO MONTHS AND A NURSING HOME FOR A
> MONTH. I HAVE HAD 14 SURGERIES. STILL NOT ABLE TO
> WORK OR DO A LOT OF THINGS FOR MY SELF. WITH THE
> RECALLS SHOWING THE ISSUES OF THE ENGINE
> SHUTTING OFF, I NEED THIS LOOKED INTO." NHTSA ID
> Number: 10610093

302.    On July 24, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2008 Buick LaCrosse and an incident that occurred on July 15, 2014, in which the

following was reported:

> "WHILE DRIVING NORTH ON ALTERNATE 69 HIGHWAY
> AT 65 MPH AT 5:00 P.M., MY VEHICLE ABRUPTLY LOSS
> POWER EVEN THOUGH I TRIED TO ACCELERATE. THE
> ENGINE SHUT OFF SUDDENLY AND WITHOUT WARNING.
> VEHICLE SLOWED TO A COMPLETE STOP. I WAS
> DRIVING IN THE MIDDLE LANE AND WAS UNABLE TO
> GET IN THE SHOULDER LANE BECAUSE I HAD NO
> PICKUP (UNABLE TO GIVE GAS TO ACCELERATE) SO MY
> HUSBAND AND I WERE CAUGHT IN FIVE 5:00 TRAFFIC
> WITH CARS WHIPPING AROUND US ON BOTH SIDES AND

-107-

MANY EXCEEDING 65 MPH. I PUT ON MY EMERGENCY
LIGHTS AND IMMEDIATELY CALLED ON-STAR. I WAS
UNABLE TO RESTART THE ENGINE. THANK GOD FOR
ON-STAR BECAUSE FROM THAT POINT ON, I WAS IN
TERROR WITNESSING CARS COMING UPON US NOT
SLOWING UNTIL THEY REALIZED I WAS AT A STAND
STILL WITH LIGHTS FLASHING. THE CARS WOULD
SWERVE TO KEEP FROM HITTING US. IT TOOK THE
HIGHWAY PATROL AND POLICE 15 MINUTES TO GET TO
US BUT DURING THAT TIME, I RELIVED VISIONS OF US
BEING KILLED ON THE HIGHWAY. I CAN€™T
DESCRIBE THE HORROR, LOOKING OUT MY REAR VIEW
MIRROR, WITNESSING OUR DEMISE TIME AFTER TIME.
THOSE 15 MINUTES SEEMED LIKE AN ETERNITY. WHEN
THE HIGHWAY PATROL ARRIVED THEY CLOSED LANES
AND ASSISTED IN PUSHING CAR OUT OF THE HIGHLY
TRAFFIC LANES. IT TOOK MY HUSBAND AND I BOTH TO
TURN THE STEERING WHILE IN NEUTRAL. THE CAR WAS
TOWED TO CONKLIN FANGMAN KC DEALERSHIP AND I
HAD TO REPLACE IGNITION COIL AND MODULE THAT
COST ME $933.16. THEY SAID THESE PARTS WERE NOT
ON THE RECALL LIST, WHICH I HAVE FOUND OUT SINCE
THEN GM HAS PUT DEALERSHIPS ON NOTICE OF THIS
PROBLEM. IT HAS SOMETHING TO DO WITH SUPPLYING
ENOUGH MANUFACTURED PARTS TO TAKE CARE OF
RECALL. IF I COULD AFFORD TO PURCHASE ANOTHER
CAR I WOULD BECAUSE I DON€™T FEEL SAFE ANY
LONGER IN THIS CAR. EMOTIONALLY I AM STILL
SUFFERING FROM THE TRAUMA." NHTSA ID Number:
10604820

303.   Notwithstanding New GM's recall, the reports and complaints relating to this

defect have continued to pour into New GM. Such complaints and reports indicate that New

GM's proffered recall "fix" does not work.

304.   For example, on August 2, 2014, New GM became aware of a complaint filed

with NHTSA involving a 2006 Buick LaCrosse and an incident that occurred on July 12, 2014,

in which the following was reported:

"WHILE TRAVELING IN THE FAST LANE ON THE
GARDEN STATE PARKWAY I HIT A BUMP IN THE ROAD,
THE AUTO SHUT OFF.WITH A CONCRETE DIVIDER
ALONG SIDE AND AUTOS APPROACHING AT HIGH

SPEED, MY WIFE AND DAUGHTER SCREEMING I
MANAGED TO GET TO THE END OF THE DIVIDER WERE I
COULD TURN OFF THE AUTO RESTARTED ON 1ST TRY
BUT VERY SCARY." NHTSA ID Number: 10618391

305.    On August 18, 2014, New GM became aware of a complaint filed with

NHTSA involving a 2007 Buick LaCrosse and an incident that occurred on August 18, 2014,

in which the following was reported:

"TL* THE CONTACT OWNS A 2007 BUICK LACROSSE. THE
CONTACT STATED WHILE DRIVING APPROXIMATELY 60
MPH, SHE HIT A POT HOLE AND THE VEHICLE STALLED.
THE VEHICLE COASTED TO THE SHOULDER OF THE
ROAD. THE VEHICLE WAS RESTARTED AND THE
CONTACT WAS ABLE TO DRIVE THE VEHICLE AS
NORMAL. THE CONTACT RECEIVED A RECALL NOTICE
UNDER NHTSA CAMPAIGN NUMBER: 14V355000
(ELECTRICAL SYSTEM), HOWEVER THE PARTS NEEDED
FOR THE REPAIRS WAS UNAVAILABLE. THE VEHICLE
WAS NOT REPAIRED. THE MANUFACTURER WAS NOT
NOTIFIED OF THE FAILURE. THE APPROXIMATE
FAILURE MILEAGE WAS 110,000." NHTSA ID Number:
10626067

306.    On August 20, 2014, New GM became aware of complaint filed with NHTSA

involving a 2007 Chevrolet Impala and an incident that occurred on August 6, 2014, in which

it was reported that:

"TL* THE CONTACT OWNS A 2007 CHEVROLET IMPALA.
THE CONTACT STATED THAT WHILE DRIVING 25 MPH,
THE VEHICLE STALLED WITHOUT WARNING. THE
CONTACT RECEIVED A NOTIFICATION FOR RECALL
NHTSA CAMPAIGN NUMBER: 14V355000 (ELECTRICAL
SYSTEM). THE VEHICLE WAS TAKEN TO AN
INDEPENDENT MECHANIC WHERE THE TECHNICIAN
ADVISED THE CONTACT TO REMOVE THE KEY FOB AND
ANY OTHER OBJECTS. THE VEHICLE WAS NOT
REPAIRED. THE MANUFACTURER WAS MADE AWARE OF
THE FAILURE. THE FAILURE MILEAGE WAS 79,000."
NHTSA ID Number: 10626659

307.    On August 27, 2014, New GM became aware of the following complaint filed

with NHTSA involving a 2008 Chevrolet Impala and an incident that occurred on August 27,

2014, in which it was reported that:

> "TL-THE CONTACT OWNS A 2008 CHEVROLET IMPALA.
> THE CONTACT STATED WHILE DRIVING
> APPROXIMATELY 50 MPH, THE VEHICLE LOST POWER
> AND THE STEERING WHEEL SEIZED WITHOUT
> WARNING. AS A RESULT, THE CONTACT CRASHED INTO
> A POLE AND THE AIR BAGS FAILED TO DEPLOY. THE
> CONTACT SUSTAINED A CONCUSSION, SPRAINED NECK,
> AND WHIPLASH WHICH REQUIRED MEDICAL
> ATTENTION. THE POLICE WAS NOT FILED. THE VEHICLE
> WAS TOWED TO A TOWING COMPANY. THE CONTACT
> RECEIVED NOTIFICATION OF NHTSA CAMPAIGN ID
> NUMBER: 14V355000 (ELECTRICAL SYSTEM), HOWEVER
> THE PARTS ARE NOT AVAILABLE TO PERFORM THE
> REPAIRS. THE VEHICLE WAS NOT REPAIRED. THE
> MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE.
> THE APPROXIMATE FAILURE MILEAGE WAS 70,000. MF."
> NHTSA ID Number: 10628704.

308.    Old GM and later N that this serious safety defect existed for years yet did

nothing to warn the public or even attempt to correct the defect in these vehicles until late

June of 2014 when New GM finally made the decision to implement a recall.

309.    The "fix" that New GM plans as part of the recall is to modify the ignition key

from a "slotted" key to "hole" key." This is insufficient and does not adequately address the

safety risks posed by the defect. The ignition key and switch remain prone to inadvertently

move from the "run" to the "accessory" position. Simply changing the key slot or taking other

keys and fobs off of key rings is New GM's attempt to make consumers responsible for the

safety of GM-branded vehicles and to divert its own responsibility to make GM-branded

vehicles safe. New GM's "fix" does not adequately address the inherent dangers and safety

threats posed by the defect in the design. In addition, New GM is not addressing the other

design issues that create safety risks in connection with this defect. New GM is not altering

the algorithm that prevents the airbags from deploying when the ignition leaves the "run" position even when the vehicle is moving at high speed. And New GM is not altering the placement of the ignition switch in an area where the driver's knees may inadvertently cause the ignition to move out of the "run" position.

310.    Further, as of the date of this filing, New GM has not even begun to implement this "fix," leaving owners and lessees in these vehicles exposed to the serious safety risks posed by moving stalls and the accompanying effects on powering steering, power brakes, and the vehicle's airbags.

## VIII.   The July 2 and 3, 2014 Recalls Relating to the Unintended Ignition Rotation Defect Further Reveal New GM's Fraudulent Concealment of Known Serious Safety Problems.

311.    On July 2, 2014, New GM recalled 554,328 vehicles in the United States for ignition switch defects (Recall Number 14V-394). The July 2 recall applied to the 2003-2014 Cadillac CTS and the 2004-2006 Cadillac SRX.

312.    The recall notice explains that the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine. Further, if the key is not the in the "run" position, the airbags may not deploy in the event of a collision, increasing the risk of injury.

313.    On July 3, 2014, New GM recalled 6,729,742 additional vehicles in the United States for ignition switch defects (Recall No. 14V-400).

314.    The following Old GM vehicles were included in this recall: 1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero.

315.    The recall notice states that the weight on the key and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine. If the key is not in the "run" position, the airbags may not deploy if the vehicle is involved in a collision, increasing the risk of injury.

316.    In both of these recalls, New GM notified NHTSA and the public that the recall was intended to address a defect involving unintended or "inadvertent key rotation" within the ignition switch of the vehicles. As with the ignition key defect announced June 20, however, the defects for which these vehicles have been recalled is directly related to the ignition switch defect in the Cobalt and other Defective Ignition Switch Vehicles and involves the same safety risks and dangers.

317.    Based on information on NHTSA's website, 175,896 of the recalled vehicles were manufactured by Old GM. 108,174 of the vehicles were manufactured and sold by New GM.

318.    Once again, the unintended ignition rotation defect is substantially similar to and relates directly to the other ignition switch defects, including the defects that gave rise to the initial recall of 2.1 million Cobalt and other vehicles in February and March of 2014. Like the other ignition switch defects, the unintended ignition key rotation defect poses a serious and dangerous safety risk because it can cause a vehicle to stall while in motion by causing the key in the ignition to inadvertently move from the "on" or "run" position to "off" or "accessory position." Like the other ignition switch defects, the unintended ignition key rotation defect can result in a loss of power steering, power braking and increase the risk of a crash. And as with the other ignition switch defects, if a crash occurs, the airbags will not deploy because of the unintended ignition key rotation defect.

-112-

319.    The unintended ignition key rotation defect involves several problems, and they are identical to the problems in the other Defective Vehicles: a weak detent plunger, the low positioning of the ignition on the steering column, and the algorithm that renders the airbags inoperable when the vehicle leaves the "run" position.

320.    The 2003-2006 Cadillac CTS and the 2004-2006 Cadillac SRX use the same Delphi switch and have inadequate torque for the "run"-"accessory" direction of the key rotation. This was known to Old and New GM, and was the basis for a change that was made to a stronger detent plunger for the 2007 and later model years of the SRX model. The 2007 and later CTS vehicles used a switch manufactured by Dalian Alps.

321.    In 2010, New GM changed the CTS key from a "slot" to a "hole" design to "reduce an observed nuisance" of the key fob contacting the driver's leg. But in 2012, a New GM employee reported two running stalls of a 2012 CTS that had a "hole" key and the stronger detent plunger switch. When New GM did testing in 2014 of the "slot" versus "hole" keys, it confirmed that the weaker detent plunger-equipped switches used in the older CTS and SRX could inadvertently move from "run" to "accessory" or "off" when the "vehicle goes off road or experience some other jarring event."

322.    GM has tried to characterize the recall of these 7.3 million vehicles as being different than the other ignition switch defects *even though* these recalls are aimed at addressing the same defects and safety risks as those that that gave rise to the other ignition switch defect recalls. New GM has attempted to portray the unintended ignition key rotation defect as being different from the ignition switch defect in order to deflect attention from the severity and pervasiveness of the ignition switch defect and to try to provide a story and

-113-

plausible explanation for why it did not recall these 7.3 million vehicles much earlier, and to avoid providing new, stronger ignition switches as a remedy.

323.    From 2002 to the present, Old GM and New GM received numerous reports from consumers regarding complaints, crashes, injuries and deaths linked to this safety defect. The following are just a handful of examples of some of the reports known to Old GM and New GM:

324.    On September 16, 2002, Old GM became aware of a complaint filed with NHTSA regarding a 2002 Oldsmobile Intrigue involving an incident that occurred on March 16, 2002, in which the following was reported:

> "WHILE DRIVING AT 30 MPH CONSUMER RAN HEAD ON
> INTO A STEEL GATE, AND THEN HIT THREE TREES.
> UPON IMPACT, NONE OF THE AIR BAGS DEPLOYED.
> CONTACTED DEALER. PLEASE PROVIDE FURTHER
> INFORMATION. *AK" **NHTSA ID Number:** 8018687.

325.    On November 22, 2002, Old GM became aware of complaint filed with NHTSA involving a 2003 Cadillac CTS involving an incident that occurred on July 1, 2002, in which it was reported that:

> "THE CAR STALLS AT 25 MPH TO 45 MPH, OVER 20
> OCCURANCES, DEALER ATTEMPTED 3 REPAIRS. DT"
> NHTSA ID Number: 770030.

326.    On January 21, 2003, Old GM became aware of a complaint filed with NHTSA involving a 2003 Cadillac CTS, in which the following was reported:

> "WHILE DRIVING AT ANY SPEED,THE VEHICLE WILL
> SUDDENLY SHUT OFF. THE STEERING WHEEL AND THE
> BRAKE PEDAL BECOMES VERY STIFF. CONSUMER FEELS
> ITS VERY UNSAFE TO DRIVE. PLEASE PROVIDE ANY
> FURTHER INFORMATION." NHTSA ID Number: 10004288.

327.    On June 30, 2003, Old GM became aware of a complaint with NHTSA regarding a 2001 Oldsmobile Intrigue which involved the following report:

> "CONSUMER NOTICED THAT WHILE TRAVELING DOWN
> HILL AT 40-45 MPH BRAKES FAILED, CAUSING
> CONSUMER TO RUN INTO THREES AND A POLE. UPON
> IMPACT, AIR BAGS DID NOT DEPLOY. *AK" **NHTSA ID
> Number:** 10026252.

328.    On March 11, 2004, Old GM became aware of a complaint filed with NHTSA

involving a 2004 Cadillac CTS involving an incident occurred on March 11, 2004, in which

the following was reported:

> "CONSUMER STATED WHILE DRIVING AT 55-MPH
> VEHICLE STALLED, CAUSING CONSUMER TO PULL OFF
> THE ROAD. DEALER INSPECTED VEHICLE SEVERAL
> TIMES, BUT COULD NOT DUPLICATE OR CORRECT THE
> PROBLEM. *AK" NHTSA ID Number: 10062993.

329.    On March 11, 2004, Old GM became aware of a complaint with NHTSA

regarding a 2003 Oldsmobile Alero incident that occurred on July 26, 2003, in which the

following was reported:

> "THE VEHICLE DIES. WHILE CRUISING AT ANY SPEED,
> THE HYDRAULIC BRAKES & STEERING FAILED DUE TO
> THE ENGINE DYING. THERE IS NO SET PATTERN, IT
> MIGHT STALL 6 TIMES IN ONE DAY, THEN TWICE THE
> NEXT DAY. THEN GO 4 DAYS WITH NO OCURRENCE,
> THEN IT WILL STALL ONCE A DAY FOR 3 DAYS. THEN
> GO A WEEK WITH NO OCURRENCE, THEN STALL 4 TIMES
> A DAY FOR 5 DAYS, ETC., ETC. IN EVERY OCURRENCE, IT
> TAKES APPROXIMATELY 10 MINUTES BEFORE IT WILL
> START BACK UP. AT HIGH SPEEDS, IT IS EXTREMELY
> TOO DANGEROUS TO DRIVE. WE'VE TAKEN IT TO THE
> DEALER, UNDER EXTENDED WARRANTY, THE
> REQUIRED 4 TIMES UNDER THE LEMON LAW PROCESS.
> THE DEALER CANNOT ASCERTAIN, NOR FIX THE
> PROBLEM. IT HAPPENED TO THE DEALER AT LEAST
> ONCE WHEN WE TOOK IT IN. I DOUBT THEY WILL
> ADMIT IT, HOWEVER, MY WIFE WAS WITNESS. THE CAR
> IS A 2003. EVEN THOUGH I BOUGHT IT IN JULY 2003, IT
> WAS CONSIDERED A USED CAR. GM HAS DENIED OUR
> CLAIM SINCE THE LEMON LAW DOES NOT APPLY TO
> USED CARS. THE CAR HAS BEEN PERMANENTLY
> PARKED SINCE NOVEMBER 2003. WE WERE FORCED TO
> BUY ANOTHER CAR. THE DEALER WOULD NOT TRADE.

THIS HAS RESULTED IN A BADLUCK SITUATION FOR US.
WE CANNOT AFFORD 2 CAR PAYMENTS / 2 INSURANCE
PREMIUMS, NOR CAN WE AFFORD $300.00 PER HOUR TO
SUE GM. I STOPPED MAKING PAYMENTS IN DECEMBER
2003. I HAVE KEPT THE FINANCE COMPANY ABREAST OF
THE SITUATION. THEY HAVE NOT REPOSSED AS OF YET.
THEY WANT ME TO TRY TO SELL IT. CAN YOU HELP
?*AK" **NHTSA ID Number:** 10061898.

330.    On July 20, 2004, Old GM became aware of a complaint filed with NHTSA

involving a 2004 Cadillac SRX, involving an incident that occurred on July 9, 2004, in which

the following was reported:

> "THE CAR DIES AFTER TRAVELING ON HIGHWAY. IT
> GOES FROM 65 MPH TO 0. THE BRAKES, STEERING, AND
> COMPLETE POWER DIES. YOU HAVE NO CONTROL OVER
> THE CAR AT THIS POINT. I HAVE ALMOST BEEN HIT 5
> TIMES NOW. ALSO, WHEN THE CARS DOES TURN BACK
> ON IT WILL ONLY GO 10 MPH AND SOMETIMES WHEN
> YOU TURN IT BACK ON THE RPM'S WILL GO TO THE
> MAX. IT SOUNDS LIKE THE CAR IS GOING TO EXPLODE.
> THIS CAR IS A DEATH TRAP. *LA" NHTSA ID Number:
> 10082289.

331.    In August 2004, Old GM became aware of a complaint filed with NHTSA

regarding a 2004 Chevrolet Malibu incident that occurred on June 30, 2004, in which it was

reported that:

> "WHILE TRAVELING AT ANY SPEED VEHICLE STALLED.
> WITHOUT CONSUMER HAD SEVERAL CLOSE CALLS OF
> BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL
> TIMES, BUT PROBLEM RECURRED. *AK." **NHTSA ID
> Number:** 10089418.

332.    Another report in August of 2004 which Old GM became aware of involved a

2004 Chevrolet Malibu incident that occurred on August 3, 2004, in which it was reported

that:

> "WHEN DRIVING, THE VEHICLE TO CUT OFF. THE
> DEALER COULD NOT FIND ANY DEFECTS. *JB." **NHTSA
> ID Number:** 10087966.

333.   On October 23, 2004, Old GM became aware of a complaint with NHTSA

regarding a 2003 Chevrolet Monte Carlo, in which the following was reported:

> "VEHICLE CONTINUOUSLY EXPERIENCED AN
> ELECTRICAL SYSTEM FAILURE. AS A RESULT,
> THERE'WAS AN ELECTRICAL SHUTDOWN WHICH
> RESULTED IN THE ENGINE DYING/ STEERING WHEEL
> LOCKING UP, AND LOSS OF BRAKE POWER.*AK" **NHTSA
> ID Number:** 10044624.

334.   On April 26, 2005, Old GM became aware of a complaint filed with NHTSA

involving a 2005 Pontiac Grand Prix, pertaining to an incident that occurred on December 29,

2004, in which the following was reported:

> "2005 PONTIAC GRAND PRIX GT SEDAN VIN #[XXX]
> PURCHASED 12/16/2004. INTERMITTENTLY VEHICLE
> STALLS/ LOSS OF POWER IN THE ENGINE. WHILE
> DRIVING THE VEHICLE IT WILL SUDDENLY JUST LOSES
> POWER. YOU CONTINUE TO PRESS THE ACCELERATOR
> PEDAL AND THEN THE ENGINE WILL SUDDENLY TAKE
> BACK OFF AT A GREAT SPEED. THIS HAS HAPPENED
> WHILE DRIVING NORMALLY WITHOUT TRYING TO
> ACCELERATE AND ALSO WHILE TRYING TO
> ACCELERATE. THE CAR HAS LOST POWER WHILE
> TRYING TO MERGE IN TRAFFIC. THE CAR HAS LOST
> POWER WHILE TRYING TO CROSS HIGHWAYS. THE CAR
> HAS LOST POWER WHILE JUST DRIVING DOWN THE
> ROAD. GMC HAS PERFORMED THE FOLLOWING REPAIRS
> WITHOUT FIXING THE PROBLEM. 12/30/2004 [XXX]-
> MODULE, POWERTRAIN CONTROL-ENGINE
> REPROGRAMMING. 01/24/2005 [XXX]-
> SOLENOID,PRESSURE CONTROL-REPLACED. 02/04/2005
> [XXX]-MODULE, PCM/VCM-REPLACED. 02/14/2005 [XXX]-
> PEDAL,ACCELERATOR-REPLACED. DEALERSHIP
> PURCHASED FROM CAPITAL BUICK-PONTIAC-GMC 225-
> 293-3500. DEALERSHIP HAS ADVISED THAT THEY DO
> NOT KNOW WHAT IS WRONG WITH THE CAR. WE HAVE
> BEEN TOLD THAT WE HAVE TO GO DIRECT TO PONTIAC
> WITH THE PROBLEM. HAVE BEEN IN CONTACT WITH
> PONTIAC SINCE 02/15/05. PONTIAC ADVISED THAT THEY
> WERE GOING TO RESEARCH THE PROBLEM AND SEE IF
> ANY OTHER GRAND PRI WAS REPORTING LIKE
> PROBLEMS. SO FAR THE ONLY ADVICE FROM PONTIAC
> IS THEY WANT US TO COME IN AND TAKE ANOTHER

> GRAND PRIX OFF THE LOT AND SEE IF WE CAN GET THIS
> CAR TO DUPLICATE THE SAME PROBLEM. THIS DID NOT
> IMPRESS ME AT ALL. SO AFTER WAITING FOR 2-1/2
> MONTHS FOR PONTIAC TO DO SOMETHING TO FIX THE
> PROBLEM, I HAVE DECIDED TO REPORT THIS TO NHTSA.
> *AK *JS INFORMATION REDACTED PURSUANT TO THE
> FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
> 552(B)(6)" NHTSA ID Number: 10118501.

335.    In May 2005, Old GM became aware of a complaint filed with NHTSA

regarding a 2004 Chevrolet Malibu incident that occurred on July 18, 2004, in which it was

reported that:

> "THE CAR CUT OFF WHILE I WAS DRIVING AND IN
> HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO
> WARNING THAT THIS WOULD HAPPEN. THE CAR WAS
> SERVICED BEFORE FOR THIS PROBLEM BUT IT
> CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE
> HORN FUSE HAS BEEN REPLACED TWICE, AND THE
> BLINKER IS CURRENTLY OUT. THE STEERING COLLAR
> HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED
> TO BE A NEW CAR." **NHTSA ID Number:** 10123684.

336.    On June 2, 2005, Old GM became aware of a complaint with NHTSA

regarding a 2004 Pontiac Grand Am incident that occurred on February 18, 2005, in which the

following was reported:

> "2004 PONTIAC GRAND PRIX SHUTS DOWN WHILE
> DRIVING AND THE POWER STEERING AND BRAKING
> ABILITY ARE LOST.*MR *NM." **NHTSA ID
> Number:** 10124713.

337.    On August 12, 2005, Old GM became aware of a complaint filed with NHTSA

involving a 2003 Cadillac CTS, regarding an incident that occurred on January 3, 2005, in

which it was reported that:

> "DT: VEHICLE LOST POWER WHEN THE CONSUMER HIT
> THE BRAKES. THE TRANSMISSION JOLTS AND THEN THE
> ENGINE SHUTS OFF. IT HAS BEEN TO THE DEALER 6
> TIMES SINCE JANUARY. THE DEALER TRIED
> SOMETHING DIFFERENT EVERY TIME SHE TOOK IT IN.

1197532.10

MANUFACTURER SAID SHE COULD HAVE A NEW
VEHICLE IF SHE PAID FOR IT. SHE WANTED TO GET RID
OF THE VEHICLE.*AK THE CHECK ENGINE LIGHT
ILLUMINATED. *JB" NHTSA ID Number: 10127580.

338.    On August 26, 2005, Old GM became aware of a complaint with NHTSA

regarding a 2004 Pontiac Grand Am incident that occurred on August 26, 2005, in which the

following was reported:

"WHILE DRIVING MY 2004 PONTIAC GRAND AM THE CAR
FAILED AT 30 MPH. IT COMPLETELY SHUT OFF LEAVING
ME WITH NO POWER STEERING AND NO WAY TO
REGAIN CONTROL OF THE CAR UNTIL COMING TO A
COMPLETE STOP TO RESTART IT. ONCE I HAD STOPPED
IT DID RESTART WITHOUT INCIDENT. ONE WEEK LATER
THE CAR FAILED TO START AT ALL NOT EVEN TURNING
OVER. WHEN THE PROBLEM WAS DIAGNOSED AT THE
GARAGE IT WAS FOUND TO BE A FAULTY "IGNITION
CONTROL MODULE" IN THE CAR. AT THIS TIME THE
PART WAS REPLACED ONLY TO FAIL AGAIN WITHIN 2
MONTHS TIME AGAIN WHILE I WAS DRIVING THIS TIME
IN A MUCH MORE HAZARDOUS CONDITION BEING THAT
I WAS ON THE HIGHWAY AND WAS TRAVELING AT 50
MPH AND HAD TO TRAVEL ACROSS TWO LANES OF
TRAFFIC TO EVEN PULL OVER TO TRY TO RESTART IT.
THE CAR CONTINUED TO START AND SHUT OFF ALL
THE WAY TO THE SERVICE GARAGE WHERE IT WAS
AGAIN FOUND TO BE A FAULTY "IGNITION CONTROL
MODULE". IN ANOTHER TWO WEEKS TIME THE CAR
FAILED TO START AND WHEN DIAGNOSED THIS TIME IT
WAS SAID TO HAVE "ELECTRICAL PROBLEMS"
POSSIBLE THE "POWER CONTROL MODULE". AT THIS
TIME THE CAR IS STILL UNDRIVEABLE AND UNSAFE
FOR TRAVEL. *JB" **NHTSA ID Number:** 10134303.

339.    On September 22, 2005, Old GM became aware of a complaint filed with

NHTSA involving a 2005 Cadillac CTS, concerning an incident that occurred on September

16, 2005, in which the following was reported:

"DT: 2005 CADILLAC CTS – THE CALLER'S VEHICLE WAS
INVOLVED IN AN ACCIDENT WHILE DRIVING AT 55 MPH.
UPON IMPACT, AIR BAGS DID NOT DEPLOY. THE
VEHICLE WENT OFF THE ROAD AND HIT A TREE. THIS

-119-

WAS ON THE DRIVER'S SIDE FRONT. THERE WERE NO
INDICATOR LIGHTS ON PRIOR TO THE ACCIDENT. THE
VEHICLE HAS NOT BEEN INSPECTED BY THE
DEALERSHIP, AND INSURANCE COMPANY TOTALED
THE VEHICLE. THE CALLER SAW NO REASON FOR THE
AIR BAGS NOT TO DEPLOY. . TWO INJURED WERE
INJURED IN THIS CRASH. T A POLICE REPORT WAS
TAKEN. THERE WAS NO FIRE. *AK" NHTSA ID Number:
10137348.

340.    On September 29, 2006, Old GM became aware of a complaint filed with

NHTSA involving a 2004 Cadillac CTS and an incident that occurred on September 29, 2006,

in which the following was reported:

"DT*: THE CONTACT STATED AT VARIOUS SPEEDS
WITHOUT WARNING, THE VEHICLE LOST POWER AND
WOULD NOT ACCELERATE ABOVE 20 MPH. ALSO,
WITHOUT WARNING, THE VEHICLE STALLED ON
SEVERAL OCCASIONS, AND WOULD NOT RESTART. THE
VEHICLE WAS TOWED TO THE DEALERSHIP, WHO
REPLACED THE THROTTLE TWICE AND THE THROTTLE
BODY ASSEMBLY HARNESS, BUT THE PROBLEM
PERSISTED. *AK UPDATED 10/25/2006 – *NM" NHTSA ID
Number: 10169594.

341.    On April 18, 2007, Old GM became aware of a complaint filed with NHTSA

involving a 2004 Cadillac SRX, regarding an incident that occurred on April 13, 2007, in

which it was reported that:

"TL*THE CONTACT OWNS A 2004 CADILLAC SRX. THE
ENGINE STALLED WITHOUT WARNING AND CAUSED
ANOTHER VEHICLE TO CRASH INTO THE VEHICLE. THE
VEHICLE WAS ABLE TO RESTART A FEW MINUTES
AFTER THE CRASH. THE DEALER AND MANUFACTURER
WAS UNABLE TO DIAGNOSE THE FAILURE. THE
MANUFACTURER HAD THE VEHICLE INSPECTED BY A
CADILLAC SPECIALIST WHO WAS UNABLE TO
DIAGNOSE THE FAILURE. THE DEALER UPDATED THE
COMPUTER FOUR TIMES, BUT THE ENGINE CONTINUED
TO STALL. THE CURRENT AND FAILURE MILEAGES
WERE 48,000." NHTSA ID Number: 10188245.

342.    On September 20, 2007, Old GM became aware of a complaint filed with

NHSTA involving a 2007 Cadillac CTS, in connection with an incident that occurred on

January 1, 2007, and the following was reported:

> "TL*THE CONTACT OWNS A 2007 CADILLAC CTS. WHILE
> DRIVING 40 MPH, THE VEHICLE SHUT OFF WITHOUT
> WARNING. THE FAILURE OCCURRED ON FIVE SEPARATE
> OCCASIONS. THE DEALER WAS UNABLE TO DUPLICATE
> THE FAILURE. AS OF SEPTEMBER 20, 2007, THE DEALER
> HAD NOT REPAIRED THE VEHICLE. THE POWERTRAIN
> WAS UNKNOWN. THE FAILURE MILEAGE WAS 2,000 AND
> CURRENT MILEAGE WAS 11,998." NHTSA ID Number:
> 10203516.

343.    On September 24, 2007, Old GM became aware of a complaint filed with

NHTSA involving a 2004 Cadillac SRX, regarding an incident that occurred on January 1,

2005, in which the following was reported:

> "TL*THE CONTACT OWNS A 2004 CADILLAC SRX. WHILE
> DRIVING 5 MPH OR GREATER, THE VEHICLE WOULD
> SHUT OFF WITHOUT WARNING. THE DEALER STATED
> THAT THE BATTERY CAUSED THE FAILURE AND THEY
> REPLACED THE BATTERY. APPROXIMATELY EIGHT
> MONTHS LATER, THE FAILURE RECURRED. THE DEALER
> STATED THAT THE BATTERY CAUSED THE FAILURE
> AND REPLACED IT A SECOND TIME. APPROXIMATELY
> THREE MONTHS LATER, THE FAILURE OCCURRED
> AGAIN. SHE WAS ABLE TO RESTART THE VEHICLE. THE
> DEALER WAS UNABLE TO DUPLICATE THE FAILURE,
> HOWEVER, THEY REPLACED THE CRANK SHAFT
> SENSOR. THE FAILURE CONTINUES TO PERSIST. AS OF
> SEPTEMBER 24, 2007, THE DEALER HAD NOT REPAIRED
> THE VEHICLE. THE POWERTRAIN WAS UNKNOWN. THE
> FAILURE MILEAGE WAS 8,000 AND CURRENT MILEAGE
> WAS 70,580." NHTSA ID Number: 10203943.

344.    On June 18, 2008, Old GM became aware of a complaint filed with NHTSA

involving a 2006 Cadillac CTS and an incident that occurred on June 17, 2008, in which it

was reported that:

"TL*THE CONTACT OWNS A 2006 CADILLAC CTS. WHILE DRIVING 60 MPH AT NIGHT, THE VEHICLE SHUT OFF AND LOST TOTAL POWER. WHEN THE FAILURE OCCURRED, THE VEHICLE CONTINUED TO ROLL AS IF IT WERE IN NEUTRAL. THERE WERE NO WARNING INDICATORS PRIOR TO THE FAILURE. THE CONTACT FEELS THAT THIS IS A SAFETY HAZARD BECAUSE IT COULD HAVE RESULTED IN A SERIOUS CRASH. THE VEHICLE WAS TAKEN TO THE DEALER TWICE FOR REPAIR FOR THE SAME FAILURE IN FEBURARY OF 2008 AND JUNE 17, 2008. THE FIRST TIME THE CAUSE OF THE FAILURE WAS IDENTIFIED AS A GLITCH WITH THE COMPUTER SWITCH THAT CONTROLS THE TRANSMISSION. AT THE SECOND VISIT, THE SHOP EXPLAINED THAT THEY COULD NOT IDENTIFY THE FAILURE. IT WOULD HAVE TO RECUR IN ORDER FOR THEM TO DIAGNOSE THE FAILURE PROPERLY. THE CURRENT AND FAILURE MILEAGES WERE 43,000." NHTSA ID Number: 10231507.

345.    On October 14, 2008, Old GM became aware of a complaint filed with

NHTSA involving a 2008 Cadillac CTS and an incident that occurred on April 5, 2008, in

which it was reported that:

"WHILE DRIVING MY 2008 CTS, WITH NO ADVANCE NOTICE, THE ENGINE JUST DIED. IT SEEMED TO RUN OUT OF GAS. MY FUEL GAUGE READ BETWEEN 1/2 TO 3/4 FULL. THIS HAPPENED 3 DIFFERENT OCCASIONS. ALL 3 TIMES I HAD TO HAVE IT TOWED BACK TO THE DEALERSHIP THAT I PURCHASED THE CAR FROM. ALL 3 TIMES I GOT DIFFERENT REASONS IT HAPPENED, FROM BAD FUEL PUMP IN GAS TANK, TO SOME TYPE OF BAD CONNECTION, ETC. AFTER THIS HAPPENED THE 3RD TIME, I DEMANDED A NEW CAR, WHICH I RECEIVED. I HAVE HAD NO PROBLEMS WITH THIS CTS, RUNS GREAT. *TR" NHTSA ID Number: 10245423.

346.    On November 13, 2008, Old GM became aware of a complaint with NHTSA

regarding a 2001 Oldsmobile Intrigue, in which the following was reported:

"L*THE CONTACT OWNS A 2001 OLDSMOBILE INTRIGUE. WHILE DRIVING 35 MPH, THE VEHICLE CONTINUOUSLY STALLS AND HESITATES. IN ADDITION, THE INSTRUMENT PANEL INDICATORS WOULD ILLUMINATE

AT RANDOM. THE VEHICLE FAILED INSPECTION AND
THE CRANKSHAFT SENSOR WAS REPLACED, WHICH
HELPED WITH THE STALLING AND HESITATION;
HOWEVER, THE CHECK ENGINE INDICATOR WAS STILL
ILLUMINATED. DAYS AFTER THE CRANKSHAFT SENSOR
WAS REPLACED, THE VEHICLE FAILED TO START.
HOWEVER, ALL OF THE INSTRUMENT PANEL
INDICATORS FLASHED ON AND OFF. AFTER NUMEROUS
ATTEMPTS TO START THE VEHICLE, HE HAD IT
JUMPSTARTED. THE VEHICLE WAS THEN ABLE TO
START. WHILE DRIVING HOME, ALL OF THE LIGHTING
FLASHED AND THE VEHICLE SUDDENLY SHUT OFF. THE
VEHICLE LOST ALL ELECTRICAL POWER AND POWER
STEERING ABILITY. THE CONTACT MANAGED TO PARK
THE VEHICLE IN A PARKING LOT AND HAD IT TOWED
THE FOLLOWING DAY TO A REPAIR SHOP. THE VEHICLE
IS CURRENTLY STILL IN THE SHOP. THE VEHICLE HAS
BEEN RECALLED IN CANADA AND HE BELIEVES THAT IT
SHOULD ALSO BE RECALLED IN THE UNITED STATES.
THE FAILURE MILEAGE WAS UNKNOWN AND THE
CURRENT MILEAGE WAS 106,000." **NHTSA ID
Number:** 10248694.

347.    On December 10, 2008, Old GM became aware of a complaint filed with

NHTSA regarding a 2004 Oldsmobile Alero and an incident that occurred on December 10,

2008, in which the following was reported:

"I WAS DRIVING DOWN THE ROAD IN RUSH HOUR
GOING APPROX. 55 MPH AND MY CAR COMPLETELY
SHUT OFF, THE GAUGES SHUTDOWN, LOST POWER
STEERING. HAD TO PULL OFF THE ROAD AS SAFELY AS
POSSIBLE, PLACE VEHICLE IN PARK AND RESTART CAR.
MY CAR HAS SHUTDOWN PREVIOUSLY TO THIS
INCIDENT AND FEEL AS THOUGH IT NEEDS SERIOUS
INVESTIGATION. I COULD HAVE BEEN ON THE
HIGHWAY AND BEEN KILLED. THIS ALSO HAS
HAPPENED WHEN IN A SPIN OUT AS WELL THOUGH THIS
PARTICULAR INCIDENT WAS RANDOM. *TR" **NHTSA ID
Number:** 10251280.

348.    On March 31, 2009, Old GM became aware a complaint filed with NHTSA

regarding a 2005 Chevrolet Malibu incident that occurred on May 30, 2008, in which it was

reported that:

> "TL*THE CONTACT OWNS A 2005 CHEVROLET MALIBU.
> THE CONTACT STATED THAT THE POWER WINDOWS,
> LOCKS, LINKAGES, AND IGNITION SWITCH
> SPORADICALLY BECOME INOPERATIVE. SHE TOOK THE
> VEHICLE TO THE DEALER AND THEY REPLACED THE
> IGNITION SWITCH AT THE COST OF $495. THE
> MANUFACTURER STATED THAT THEY WOULD NOT
> ASSUME RESPONSIBILITY FOR ANY REPAIRS BECAUSE
> THE VEHICLE EXCEEDED ITS MILEAGE. ALL REMEDIES
> AS OF MARCH 31, 2009 HAVE BEEN INSUFFICIENT IN
> CORRECTING THE FAILURES. THE FAILURE MILEAGE
> WAS 45,000 AND CURRENT MILEAGE WAS 51,000."
> **NHTSA ID Number:** 10263716.

349.    The defects did not get any safer and the reports did not stop when Old GM

ceased to exist. To the contrary, New GM continued receiving the same reports involving the

same defects. For example, on August 11, 2010, New GM became aware of the following

complaint filed with NHTSA involving a 2005 Cadillac CTS, the incident occurred on May

15, 2010, in which it was reported:

> "TL*THE CONTACT OWNS A 2005 CADILLAC CTS. WHILE
> DRIVING 40 MPH, ALL OF THE SAFETY LIGHTS ON THE
> DASHBOARD ILLUMINATED WHEN THE VEHICLE
> STALLED. THE VEHICLE WAS TURNED BACK ON IT
> BEGAN TO FUNCTION NORMALLY. THE FAILURE
> OCCURRED TWICE. THE DEALER WAS CONTACTED AND
> THEY STATED THAT SHE NEEDED TO BRING IT IN TO
> HAVE IT DIAGNOSED AGAIN. THE DEALER PREVIOUSLY
> STATED THAT THEY WERE UNABLE TO DUPLICATE THE
> FAILURE. THE VEHICLE WAS NOT REPAIRED. THE
> FAILURE MILEAGE WAS 4100 AND THE CURRENT
> MILEAGE WAS 58,000." NHTSA ID Number: 10348743.

350.    On April 16, 2012, New GM became aware of as complaint filed with NHTSA

involving a 2005 Cadillac SRX and an incident that occurred on March 31, 2012, in which the

following was reported:

> "TL* THE CONTACT OWNS A 2005 CADILLAC SRX. WHILE
> DRIVING APPROXIMATELY 45 MPH, THE CONTACT
> STATED THAT THE STEERING BECAME DIFFICULT TO
> MANEUVER AND HE LOST CONTROL OF THE VEHICLE.

THERE WERE NO WARNING LIGHTS ILLUMINATED ON
THE INSTRUMENT PANEL. THE CONTACT THEN
CRASHED INTO A HIGHWAY DIVIDER AND INTO
ANOTHER VEHICLE. THERE WERE NO INJURIES. THE
VEHICLE WAS TOWED TO AN AUTO CENTER AND THE
MECHANIC STATED THAT THERE WAS A RECALL
UNDER NHTSA CAMPAIGN ID NUMBER 06V125000
(SUSPENSION:REAR), THAT MAY BE RELATED TO THE
FAILURE. THE MANUFACTURER WAS MADE AWARE OF
THE FAILURE AND STATED THAT THE VIN WAS NOT
INCLUDED IN THE RECALL. THE VEHICLE WAS NOT
REPAIRED. THE APPROXIMATE FAILURE MILEAGE WAS
46,000." NHTSA ID Number: 10455394.

351.    On March 20, 2013, New GM became aware of a complaint filed with NHTSA

regarding a 2003 Chevrolet Impala incident that occurred on March 1, 2013, in which it was

reported that:

"CAR WILL SHUTDOWN WHILE DRIVING AND SECURITY
LIGHT WILL FLASH. HAS DONE IT NUMEROUS TIMES,
WORRIED IT WILL CAUSE AN ACCIDENT. THERE ARE
MULTIPLE CASES OF THIS PROBLEM ON INTERNET. *TR"
**NHTSA ID Number:** 10503840.

352.    On May 12, 2013, New GM became aware of the following complaint filed

with NHTSA regarding a 2005 Chevrolet Malibu incident that occurred on May 11, 2012, in

which the following was reported:

"I WAS AT A STOP SIGN WENT TO PRESS GAS PEDAL TO
TURN ONTO ROAD AND THE CAR JUST SHUT OFF NO
WARNING LIGHTS CAME ON NOR DID IT SHOW ANY
CODES. GOT OUT OF CAR POPPED TRUNK PULLED
RELAY FUSE OUT PUT IT BACK IN AND IT CRANKED
UP,THEN ON MY WAY HOME FROM WORK,GOING
ABOUT 25 MPH AND IT JUST SHUTDOWN AGAIN,I
REPEATED PULLING OUT RELAY FUSE AND PUT IT BACK
IN THEN WAITED A MINUTE THEN IT CRANKED AND I
DROVE STRAIGHT HOME. *TR" **NHTSA ID
Number:** 10458198.

353.    On February 26, 2014, New GM became aware of a complaint filed with

NHTSA involving a 2004 Pontiac Grand Prix, concerning an incident that occurred on May

10, 2005, in which it was reported that:

> "TL – THE CONTACT OWNS A 2004 PONTIAC GRAND
> PRIX. THE CONTACT STATED THAT WHILE DRIVING AT
> VARIOUS SPEEDS AND GOING OVER A BUMP, THE
> VEHICLE WOULD STALL WITHOUT WARNING. THE
> VEHICLE WAS TAKEN TO THE DEALER. THE
> TECHNICIAN WAS UNABLE TO DIAGNOSE THE FAILURE.
> THE MANUFACTURER WAS MADE AWARE OF THE
> FAILURE. THE VEHICLE WAS NOT REPAIRED. THE VIN
> WAS NOT AVAILABLE. THE FAILURE MILEAGE WAS
> 12,000 AND THE CURRENT MILEAGE WAS 82,000. KMJ"
> NHTSA ID Number: 10566118.

354.    On March 13, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Pontiac Grand Prix and an incident that occurred on February 27, 2014, in

which a driver reported:

> "I WAS DRIVING HOME FROM WORK AND WHEN I
> TURNED A CORNER, THE ENGINE CUT OUT. I BELIEVE IT
> WAS FROM THE KEY FLIPPING TO ACCESSORY. I'VE
> HEARD THAT THIS HAS CAUSED CRASHES THAT HAVE
> KILLED PEOPLE AND WOULD LIKE THIS FIXED. THIS IS
> THE FIRST TIME IT HAPPENED, BUT NOW I'M WORRIED
> EVERY TIME I DRIVE IT THAT THIS IS GOING TO HAPPEN
> AND I DON'T FEEL SAFE LETTING MY WIFE DRIVE THE
> CAR NOW. WHY ARE THE 2006 PONTIAC GRAND PRIX
> VEHICLES NOT PART OF THE RECALL FROM GM? *TR"
> NHTSA ID Number: 10569215.

355.    On April 1, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2003 Cadillac CTS and an incident that occurred on January 1, 2008, in which the

following was reported:

> "TL* THE CONTACT OWNS A 2003 CADILLAC CTS. THE
> CONTACT STATED THAT THE VEHICLE EXHIBITED A
> RECURRING STALLING FAILURE. THE VEHICLE WAS
> TAKEN TO THE DEALER NUMEROUS TIMES WHERE
> SEVERAL UNKNOWN REPAIRS WERE PERFORMED ON

THE VEHICLE BUT TO NO AVAIL. THE FAILURE
MILEAGE WAS 59,730 AND THE CURRENT MILEAGE WAS
79,000. UPDATED 06/30/14 MA UPDATED 07/3/2014 *JS"
NHTSA ID Number: 10576468.

356.    On April 1, 2014, New GM became aware of a complaint with NHTSA

regarding a 2003 Chevrolet Monte Carlo and an incident that occurred on September 16, 2013,

in which the following was reported:

"WHILE DRIVING AT ANY SPEED THE IGNITION SYSTEM
WOULD RESET LIGHTING UP THE DISPLAY CLUSTER
JUST AS IF THE KEY WAS TURNED OFF AND BACK ON.
THIS WOULD CAUSE A MOMENTARY SHUTDOWN OF
THE ENGINE. THE PROBLEM SEEMED TO BE MORE
PREVAILANT WHILE TURNING THE WHEEL FOR A
CURVE OR TURN OFF THE ROAD. THE TURN SIGNAL
UNIT WAS FIRST SUSPECT SINCE IT SEEMED TO
CORRELATE WITH APPLYING THE TURN SIGNAL AND
TURNING THE WHEEL. THE CONDITION WORSENED TO
THE IGNITION SHUTDOWN FOR LONGER PERIODS
SHUTTING DOWN THE ENGINE CAUSING STEERING AND
BRAKING TO BE SHUTDOWN AND FINALLY DIFFICULTY
STARTING THE CAR. AFTER 2 VISITS TO A GM SERVICE
CENTER THE PROBLEM WAS FOUND TO BE A FAULTY
IGNITION THAT WAS REPLACED AND THE PROBLEM
HAS NOT RECURRED." **NHTSA ID Number:** 10576201.

357.    On April 8, 2014, New GM became aware of a complaint with NHTSA

regarding a 2003 Chevrolet Impala and an incident that occurred on August 14, 2011 and the

following was reported:

"I HAVE HAD INCIDENTS SEVERAL TIMES OVER THE
YEARS WHERE I WOULD HIT A BUMP IN THE ROAD AND
MY CAR WOULD COMPLETLY SHUT OFF. I HAVE ALSO
HAD SEVERAL INCIDENTS WHERE I WAS TRAVELING
DOWN THE EXPRESSWAY AND MY CAR TURNED OFF ON
ME. I HAD TO SHIFT MY CAR INTO NEUTRAL AND
RESTART IT TO CONTINUE GOING. I WAS FORTUNATE
NOT TO HAVE AN ACCIDENT." **NHTSA ID
Number:** 10578158.

358.    On May 14, 2014, New GM became aware of a complaint filed with NHTSA

regarding a 2004 Chevrolet Impala incident that occurred on April 5, 2013 and reported that:

> "CHEVY IMPALA 2004 LS- THE VEHICLE IS STOPPING
> COMPLETELY WHILE DRIVING OR SITTING AT
> INTERSECTION. THERE IS NO WARNING, NO MESSAGE,
> IT JUST DIES. THE STEERING GOES WHEN THIS HAPPENS
> SO I CANNOT EVEN GET OFF THE ROAD. THEN THERE
> ARE TIMES THAT THE CAR WILL NOT START AT ALL
> AND I HAVE BEEN STRANDED. EVENTUALLY AFTER
> ABOUT 20 MINUTES THE CAR WILL START- I HAVE
> ALREADY REPLACED THE STARTER BUT THE PROBLEM
> STILL EXISTS. I HAVE HAD THE CAR CHECKED OUT AT 2
> DIFFERENT SHOPS (FIRESTONE) AND THEY CANNOT
> FIND THE PROBLEM. THERE ARE NO CODES COMING UP.
> THEY ARE COMPLETELY PERPLEXED. CHEVY STATES
> THEIR MECHANICS ARE BETTER. ALSO THE CLUSTER
> PANEL IS GONE AND CHEVY IS AWARE OF THE
> PROBLEM BUT THEY ONLY RECALLED CERTAIN
> MODELS AND DID NOT INCLUDE THE IMPALAS. I HAVE 2
> ESTIMATES REGARDING FIXING THIS PROBLEM BUT
> THE QUOTES ARE $500.00. I DO NOT FEEL THAT I
> SHOULD HAVE TO PAY FOR THIS WHEN CHEVY KNEW
> THEY HAD THIS PROBLEM WITH CLUSTER PANELS AND
> OMITTED THE IMPALAS IN THEIR RECALL. SO, TO
> RECAP: THE CAR DIES IN TRAFFIC (ALMOST HIT TWICE),
> I DO NOT KNOW HOW MUCH GAS I HAVE, HOW FAST I
> AM GOING, OR IF THE CAR IS OVERHEATING. IN
> DEALING WITH CHEVY I WAS TOLD TO TAKE THE CAR
> TO A CHEVY DEALERSHIP. THEY GAVE ME A PLACE
> THAT IS 2 1/2 HOURS HOUSE AWAY FROM MY HOME. I
> WAS ALSO TOLD THAT I WOULD HAVE THE HONOR OF
> PAYING FOR THE DIAGNOSTICS. IN RESEARCHING THIS
> PROBLEM, I HAVE PULLED UP SEVERAL COMPLAINTS
> FROM OTHER CHEVY IMPALA 2004 OWNERS THAT ARE
> EXPERIENCING THE SAME MULTIPLE PROBLEMS. I ALSO
> NOTICED THAT MOST OF THE COMPLAINTS ARE
> STATING THAT THE SAME ISSUES OCCURRED AT
> APPROX. THE SAME MILEAGE AS MINE. I HAVE
> DISCUSSED THIS WITH CHEVY CUSTOMER SERVICE
> AND BASICALLY THAT WAS IGNORED. THIS CAR IS
> HAZARDOUS TO DRIVE AND POTENTIALLY WILL CAUSE
> BODILY HARM. DEALING WITH CHEVY IS POINTLESS.
> ALL THEY CAN THINK OF IS HOW MUCH MONEY THEIR

DEFECTS WILL BRING IN. *TR" **NHTSA ID Number:** 10512006.

359.    New GM has publicly admitted that it was aware of at least seven (7) crashes, eight (8) injuries, and three (3) deaths linked to this serious safety defect before deciding to finally implement a recall. However, in reality, the number of reports and complaints is much higher.

360.    Moreover, notwithstanding years of notice and knowledge of the defect, on top of numerous complaints and reports from consumers, including reports of crashes, injuries and deaths, New GM delayed and did not implement a recall involving this defect until July of 2014.

361.    New GM's supposed recall fix does not address the defect or the safety risks that it poses, including insufficient amount of torque to resist rotation from the "run" the "accessory" position under reasonably foreseeable conditions, and puts the burden on drivers to alter their behavior and carry their ignition keys separately from their other keys, and even from their remote fob. The real answer must include the replacement of all the switches with ones that have sufficient torque to resist foreseeable rotational forces. The consequences of an unwanted rotation from the "run" to "accessory" position has the same results in all these cars: loss of power (stalling), loss of power steering, loss of power brakes after one or two depressions of the brake pedal, and suppression of seat belt pretensioners and airbag deployments.

362.    In addition, New GM is not addressing the other design issues that create safety risks in connection with this defect. New GM is not altering the algorithm that prevents the airbags from deploying when the ignition leaves the "run" position, even when the vehicle is moving. And New GM is not altering the placement of the ignition in an area where the

driver's knees may inadvertently cause the ignition to move out of the "run" position

Moreover, notwithstanding years of notice and knowledge of the defect, on top of numerous

complaints and reports from consumers, including reports of crashes, injuries and deaths, New

GM delayed and did not implement a recall involving this defect until July of 2014.

363.   Further, New GM has not begun implementing its "fix" for these affected

vehicles. Thus, owners and lessees continue to operate their vehicles, at risk of the serious

safety defects posed if and when the ignition switch in a Defective Vehicle fails during normal

and ordinary vehicle operation.

**IX.    The September 2014 Ignition Switch Defect Recall Is the Latest Evidence of the
Extent of the Defects and New GM's Ongoing Concealment.**

364.   On September 4, 2014, New GM recalled 46,873 MY 2011-2013 Chevrolet

Caprice and 2008-2009 Pontiac G8 vehicles for yet another ignition switch defect (NHTSA

Recall Number 14-V-510).

365.   New GM explains that, in these Defective Ignition Switch Vehicles, "there is a

risk, under certain conditions, that some drivers may bump the ignition key with their knee

and unintentionally move the key away from the 'run' position." New GM admits that, when

this happens, "engine power, and power barking will be affected, increasing the risk of a

crash." Moreover, "[t]he timing of the key movement out of the 'run' position, relative to the

activation of the sending algorithm of the crash event, may result in the airbags not deploying,

increasing the potential for occupant injury in certain kinds of crashes."

366.   This recall is directly related to the other ignition switch recalls and involves

the same safety risks and dangers. The defect poses a serious and dangerous safety risk

because the key in the ignition switch can rotate and consequently cause a the ignition to

switch from the "on" or "run" position to the "off" or "accessory" position, which causes the

loss of engine power, stalling, loss of speed control, loss of power steering, loss of power

braking, and increases the risk of a crash. Moreover, as with the ignition switch torque defect,

if a crash occurs, the airbags may not deploy.

367.    According to New GM, in late June 2014, "GM Holden began investigating

potential operator knee-to-key interference in Holden-produced vehicles consistent with

Safety's learning from" earlier ignition switch recalls, NHTSA recalls no. 14V-346 and 14V-

355.[107]

368.    New GM "analyzed vehicle test results, warranty data, TREAD data, NHTSA

Vehicle Owner Questionnaires, and other data."[108] This belated review, concerning vehicles

that were sold as long as six years earlier, led to the August 27, 2014 decision to conduct a

safety recall.[109]

369.    Once again, a review of NHTSA's website shows that New GM was long on

notice of ignition switch issues in the vehicles subject to the September 4 recall.

370.    For example, on February 10, 2010, New GM became aware of an incident

involving a 2009 Pontiac G8 that occurred on November 23, 2009, and again on January 26,

2010, in which the following was reported to NHTSA:

> FIRST OCCURRED ON 11/23/2009. ON THE INTERSTATE IT LOSES ALL
> POWER, ENGINE SHUTS DOWN, IGNITION STOPS, POWER STEERING
> STOPS, BRAKES FAIL - COMPLETE VEHICLE STOPPAGE AND FULL
> OPERATING SYSTEMS SHUTDOWN WITHOUT WARNING AT 70 MPH,
> TWICE! SECOND OCCURRENCE WAS 1/26/2010.

371.    On May 22, 2013, New GM became aware of an incident involving a 2008

Pontiac G8 that occurred on May 18, 2013, in which the following was reported:

---

[107] *Id.*
[108] *Id.*
[109] *Id.*

THE CONTACT OWNS A 2008 PONTIAC G8. THE CONTACT STATED THAT
WHILE DRIVING 50 MPH, THE VEHICLE STALLED WITHOUT WARNING.
THE FAILURE RECURRED TWICE. THE VEHICLE WAS TOWED TO THE
DEALER FOR DIAGNOSIS, BUT THE DEALER WAS UNABLE TO DUPLICATE
THE PROBLEM. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER
WAS NOT NOTIFIED. THE APPROXIMATE FAILURE MILEAGE WAS 60,000.

372.    Consistent with its pattern in the June and July recalls, New GM's proposed

remedy is to provide these Defective Ignition Switch Vehicle owners with a "revised key

blade and housing assembly, in which the blade has been indexed by 90 degrees."[110] Until the

remedy is provided, New GM asserts, "it is very important that drivers adjust their seat and

steering column to allow clearance between their knee and the ignition key."[111] New GM sent

its recall notice to NHTSA one week later, on September 4, 2014.

373.    New GM's supposed fix does not address the defect or the safety risks that the

defect poses, including the apparent insufficient torque to resist rotation from the "run" to the

"accessory" position under reasonably foreseeable driving conditions, and puts the burden on

drivers to alter their behavior and carry their ignition keys separately from their other keys,

and even from their remote fob. The real answer must include the replacement of all the

switches with ones that have sufficient torque to resist foreseeable rotational forces.

374.    In addition, New GM is not addressing the other design issues that create

safety risks in connection with this defect. New GM is not altering the algorithm that prevents

the airbags from deploying when the ignition leaves the "run" position, even when the vehicle

is moving. And New GM is not altering the placement of the ignition in an area where the

driver's knees may inadvertently cause the ignition to move out of the "run" position.

---

[110] New GM's Part 573 Safety Recall Report, Sept. 4, 2014.
[111] *Id.*