IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>GENERAL MOTORS LLC IGNITION SWITCH LITIGATION<br><br>This Document Relates to: All Actions | MDL No. 2543<br><br>Master File No.: 14-MDL-2543 (JMF) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM NEW GM AND KING & SPALDING LLC BASED ON THE CRIME-FRAUD EXCEPTION**

## TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. PROCEDURAL HISTORY ..... 2

III. FACTUAL BACKGROUND ..... 4

A. New GM and K&S conspired to conceal a known safety defect by quietly settling death and injury cases rather than instituting a recall. ..... 4

1. GM knew that the ignition switch was defective before it started selling Chevrolet Cobalts and other affected vehicles, and New GM was aware of this from the date of its inception. ..... 4
2. New GM and K&S knew that airbags would not deploy with the ignition switch in the off or accessory position. ..... 5
3. New GM and K&S knew by 2010 that there was [REDACTED] that was causing Cobalt airbags not to deploy, leading to severe injuries and deaths. ..... 6

a. The [REDACTED] Matter ..... 6
b. The [REDACTED] matter ..... 7
c. The [REDACTED] matter ..... 8

4. New GM knew about multiple other deaths and injuries associated with the ignition switch defect. ..... 9
5. K&S repeatedly warned New GM that evidence that the ignition switch defect existed in other Cobalt vehicles could lead to significant punitive damages. ..... 10
6. K&S advised New GM to settle ignition switch defect cases before evidence of the defect in other Cobalts could be exposed. ..... 11

B. GM and K&S lied to the [REDACTED] and the court to prevent disclosure of evidence relating to the defect in other vehicles. ..... 13

1. The parents of [REDACTED] sought discovery from New GM regarding the ignition switch defect that killed their daughter. ..... 13
2. New GM and K&S knew that airbag non-deployment in Cobalts was related to the condition identified in the TSB. ..... 14
3. New GM and K&S told the [REDACTED] and the court that [REDACTED] ..... 16
4. K&S told one thing to the court and the opposite to New GM on the same day. ..... 19
5. New GM and K&S lied to the court and the [REDACTED] about the [REDACTED] ..... 20
6. [REDACTED] ..... 22

C. New GM and K&S committed other fraudulent litigation misconduct to hide evidence of the ignition switch defect. ..... 22

1. New GM and K&S hid the existence of part change documents. ....................... 22
2. New GM and K&S [REDACTED] . .............................................. 24

D. K&S also worked for New GM in connection with the ignition switch recall and the "investigation" of the reasons for the delay. ........................................ 24

E. New GM violated its safety defect disclosure obligations. ........................................ 25

IV. ARGUMENT ........................................................................................................ 26

A. The crime-fraud exception vitiates claims of attorney-client privilege and work product protection. ........................................................................ 26

B. "Crime-fraud" is construed expansively to include illegal activity, fraud, any intentional tort or any other ongoing "wrongful conduct," and easily encompasses New GM's conduct in this case. ........................................ 28

C. New GM committed a crime-fraud by concealing a known safety defect, and its attorney-client communications with K&S and work product of both New GM and K&S were generated in furtherance of the crime-fraud. ........................................................................................ 30

1. New GM's violations of the Safety Act are a "crime" or "fraud" within the meaning of the exception. ........................................................................ 30
2. There is probable cause to believe that attorney-client communications and work product were generated in furtherance of the New GM's crime-fraud. ........................................................................................ 31

D. New GM committed a crime-fraud by lying to the [REDACTED] and the [REDACTED] court to prevent the disclosure of ignition switch defect evidence, and its attorney-client communications with K&S and work product were generated in furtherance of the crime-fraud. ........................................ 34

1. New GM's discovery lies constitute a "crime" or "fraud" within the meaning of the exception. ........................................................................ 34
2. There is probable cause to believe that attorney-client communications and work product were generated in furtherance of New GM's litigation misconduct. ........................................................................................ 36

E. There is no unique standard applicable to work product. ........................................ 37

V. CONCLUSION ........................................................................................................ 40

## TABLE OF AUTHORITIES

### Cases

*1100 West, LLC v. Red Spot Paint and Varnish Co., Inc.*,
No. 1:05-cv-1670-LJM-JMS, 2009 WL 232060,
(S.D. Ind. Jan. 30, 2009) .......... 35

*A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*,
No. 97-cv-4978, 1999 WL 61442
(S.D.N.Y. Feb. 3, 1999). .......... 28, 32

*Amusement Indus., Inc. v. Stern*,
293 F.R.D. 420 (S.D.N.Y. 2013) .......... 28, 37

*Anderson v. Hale*,
202 F.R.D. 548 (N.D. Ill. 2001) .......... 40

*Chevron Corp. v. Donziger*, No. 11 Civ. 0691,
2013 WL 1087236 (S.D.N.Y. Mar. 15, 2013) .......... 37

*Chevron v. Salazar*,
275 F.R.D. 437 (S.D.N.Y. 2011) .......... 29

*Cooksey v. Hilton Int'l Co.*,
863 F. Supp. 150 (S.D.N.Y. 1994) .......... 29

*Diamond v. Stratton*,
95 F.R.D. 503 (S.D.N.Y. 1982) .......... 28, 30

*Gutter v. E.I. Dupont de Nemours*,
124 F. Supp. 2d 1291 (S.D. Fla. 2000) .......... 35

*Haigh v. Matsushita Elec. Corp. of Am.*,
676 F. Supp. 1332 (E.D. Va. 1987) .......... 40

*In re A.H. Robins Co., Inc., "Dalkon Shield" IUD Prod. Liab. Litig.*, 107 F.R.D. 2 (D. Kan. 1985) .......... 31

*In re Grand Jury Proceeding Impounded*,
241 F.3d 308 (3d Cir. 2001) .......... 29

*In re Grand Jury Proceedings*,
102 F.3d 748 (4th Cir. 1996) .......... 37

*In re Grand Jury Proceedings*,
604 F.2d 798 (3d Cir. 1979)....................28

*In re Grand Jury Subpoena*,
220 F.R.D. 130 (D. Mass. 2004)....................31

*In re Grand Jury Subpoena*,
419 F.3d 329 (5th Cir. 2005)....................37

*In re Grand Jury Subpoenas*,
454 F.3d 511 (6th Cir. 2006)....................29, 30

*In re Heuwetter*,
584 F. Supp. 119 (S.D.N.Y. 1984)....................29

*In re John Doe Corp.*,
675 F.2d 482 (2d Cir. 1982)....................28

*In re Motors Liquidation Co.*,
2015 Bankr. LEXIS 1296
(Bankr. Ct. S.D.N.Y. Apr. 15, 2015)....................26

*In re Richard Roe, Inc.*
68 F.3d 38 (2d Cir. 1995)....................26, 27, 28, 37

*In re St. Johnsbury Trucking Co., Inc.*,
184 B.R. 446 (D. Vt. 1995)....................35

*Irving Trust Co. v. Gomez*,
100 F.R.D. 273 (S.D.N.Y. 1983)....................27

*Lugosch v. Congel*,
218 F.R.D. 41 (S.D.N.Y. 2003)....................37

*Madanes v. Madanes*,
199 F.R.D. 135 (S.D.N.Y. 2001)....................27, 29

*Moody v. IRS*,
654 F.2d 795 (D.C. Cir. 1981)....................39

*Newman v. General Motors Corp.*,
228 Fed. Appx. 245 (3d. Cir. 2007)....................36

*NXIVM Corp. v. O'Hara*,
241 F.R.D. 109 (N.D.N.Y. 2007)....................37

*Sackman v. Liggett Grp., Inc.*,
173 F.R.D. 358 (E.D.N.Y. 1997). ....................29

*State of New York v. Solvent Chem. Co., Inc.*,
166 F.R.D. 284 (W.D.N.Y. 1996) ....................40

*United States v. Fama*,
758 F.2d 834 (2d Cir. 1985)....................28

*United States v. Jacobs*,
117 F.3d 82, 87 (2d Cir. 1997)....................27

*United States v. Zolin*,
491 U.S. 554, 563 (1989) ....................26

*Wachtel v. Guardian Life Ins.*,
2007 U.S. Dist. LEXIS 43842 (D.N.J. June 18, 2007)....................29

**Statutes**

49 C.F.R. §573.6(b) ....................25

49 C.F.R. §577.7(a)....................25

49 U.S.C. §30118(c)(1). ....................25

## I. INTRODUCTION

New GM and its long-time outside counsel, King & Spalding ("K&S"), conspired to cover up the ignition switch defect that has killed and injured hundreds. By no later than October 2010–over three years before New GM finally issued the first of a series of recalls–K&S warned New GM that juries would award significantly larger punitive damages in defect-related lawsuits if New GM had to produce the evidence showing that New GM knew about a rash of cases where airbags failed to deploy in severe frontal impact crashes involving 2005-07 Chevrolet Cobalts but continued to do nothing to warn unsuspecting drivers that their cars were unsafe. So New GM and K&S buried what they knew, by November 2010 at the latest, was [REDACTED][1]

Despite New GM's clear and ongoing legal obligation to notify the National Highway Traffic Safety Administration ("NHTSA") and consumers about the known safety defect—which New GM has admitted it violated[2]—K&S advised New GM to settle ignition switch defect cases with agreements requiring confidentiality before those hurt or killed by the defect could expose facts that inevitably would lead to required recalls.

And then, when the parents of [REDACTED], a woman killed as a result of the ignition switch defect [REDACTED], pressed for evidence relating to New GM's knowledge of the defect in other cars, [REDACTED]

[1] Nov. 2, 2010 letter to Jaclyn C. Palmer, General Motors Legal Staff, from K&S attorney Harold E. Franklin, Jr. ("Nov. 2, 2010 [REDACTED] Letter"), GM-MDL2543-000660601.001 at .011, attached as Ex. 1 to the Declaration of Robert C. Hilliard In Support of Plaintiffs' Motion to Compel ("Hilliard Decl."). Unless otherwise noted, all exhibits are attached to the Hilliard Decl.

[2] Ex. 2, In re TQ14-001, NHTSA Recall No. 14V-047, Consent Order (May 16, 2014) ("Consent Order") at ¶ 10.

[REDACTED] – even though the same K&S attorney had also worked on at least two other claims resulting from defect-related crashes, including the case in which K&S first warned New GM about the specter of punitive damages if evidence of other defect-related crashes was exposed. New GM's and K&S's goal was to prevent the [REDACTED] from obtaining evidence of "GM's conscious indifference and willful misconduct when it comes to the safety of its vehicles' occupants."[3] New GM and K&S did not want any plaintiff to be able to argue that [REDACTED] [REDACTED][4]

By burying defect evidence rather than instituting a recall, New GM was sentencing tomorrow's victim to death or life-changing injury. New GM committed a "crime" or "fraud" within the meaning of the crime-fraud exception to the law of privilege and used its attorneys' services in furtherance of the crime-fraud. Accordingly, Plaintiffs respectfully request that the Court grant their motion to compel New GM and K&S to produce for *in camera* inspection specifically-enumerated and carefully-tailored attorney-client communications and work product generated by both K&S and New GM's in-house counsel in furtherance of the crime-fraud.[5]

## II. PROCEDURAL HISTORY

This motion seeks to compel documents responsive to two sets of documents requests. First, on March 17, 2015, Plaintiffs served their First Set of Consolidated Requests for Production of Documents Nos. 1-50. Request for Production ("RFP") No. 47 sought "any and all documents relating to K&S's work with GM related to the Ignition Switch Defect, including, but not limited to retention agreements with K&S and documents reflecting the scope of their

[3] Ex. 3, July 22, 2013 letter to Mr. Ronald C. Porter, General Motors LLC Legal Department, from K&S attorney Phillip E. Holladay, Jr.) ("July 22, 2013 [REDACTED] Letter"), GM-MDL2543-000985320.001 at .026.

[4] *Id.* at .012

[5] The specific categories of documents at issue on this motion are enumerated *infra* at 32-33, 36.

work." New GM objected to the production of (a) any additional privileged documents;[6] and (b) certain non-privileged documents that reflect the magnitude and scope of K&S's work for New GM.[7] Other than certain materials produced as a result of the parties' negotiations in connection with the crime-fraud motions filed in *Melton v. General Motors LLC*[8]—namely, certain privileged documents that New GM produced to the U.S. government, including certain limited documents relating to K&S's work for New GM—New GM has stood on its objections despite multiple meet and confers.

Second, on March 27, 2015, Plaintiffs served K&S with a subpoena seeking various categories of documents relating to K&S's representation of New GM on matters involving the ignition switch defect.[9] In light of K&S's representation that it had produced responsive attorney-client communications to New GM, Plaintiffs limited their request under many of the

---

[6] Ex. 4, New GM's Responses and Specific Objections to Plaintiffs' Requests for Production of Documents Related to the Phase One Requests at 32-33.

[7] *See* Ex. 5, Plaintiffs' Apr. 22, 2015 letter to New GM (describing the non-privileged retention agreements and bills for legal services with respect to K&S's work for GM that Plaintiffs seek). The parties will address their dispute about these non-privileged documents in separate submissions.

[8] This negotiation was pursuant to MDL Order No. 21. The [REDACTED] case settled just prior to oral argument on the crime-fraud motion. This was the second case the [REDACTED] filed against New GM in connection with the ignition switch defect that killed their daughter. The first, [REDACTED], once the ignition switch part change—which New GM denied during discovery in *Melton I* case—was revealed.

[9] Ex. 6, Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises In a Civil Action directed to K&S. Plaintiffs sought, *inter alia*, documents relating to: (a) [REDACTED] matters (Nos. 1-3, respectively); (b) any analysis undertaken by K&S or third parties with respect to whether any rules of professional responsibility required or permitted K&S to reveal information relating to its representation of GM in connection with the ignition switch defect (No. 13); (c) whether GM or K&S should or was required to notify consumers or NHTSA of the ignition switch defect (No. 14); (f) when K&S first received notice of the ignition switch defect (No. 17); and (g) any investigation performed by K&S or any third party regarding the ignition switch defect (No. 18). *Id.* at Ex. A. Plaintiffs also served subpoenas for deposition testimony on K&S attorneys Harold E. Franklin and Phillip E. Holladay. Plaintiffs and K&S have agreed to defer the depositions of Franklin and Holladay until after the Court resolves Plaintiffs' motion to compel.

document categories to internal work product.[10] K&S objected to the production of any responsive documents. Despite multiple meet and confer conferences, Plaintiffs and K&S could not agree.

## III. FACTUAL BACKGROUND

### A. New GM and K&S conspired to conceal a known safety defect by quietly settling death and injury cases rather than instituting a recall.

#### 1. GM knew that the ignition switch was defective before it started selling Chevrolet Cobalts and other affected vehicles, and New GM was aware of this from the date of its inception.

GM installed an ignition switch in model year 2005-2007 Chevrolet Cobalts and other affected vehicles[11] that it knew did not meet GM's own technical specifications for the torque (*i.e.*, force) required to turn the ignition from the run position to the accessory or off position.[12] Once GM started producing vehicles with below-specification ignition switches, GM learned that unintended rotation of the ignition from run to accessory was causing ignition shutoff and moving stalls[13] – a [REDACTED][14] GM refused to redesign the ignition switch because "none of the solutions represent[ed] an acceptable business case."[15]

---

[10] Ex. 7, Plaintiffs' April 27, 2015 letter to K&S. In order to further reduce the burden on non-party K&S, Plaintiffs have limited this motion to compel to seek only work product from K&S; Plaintiffs seek to compel New GM to produce all relevant communications between New GM and K&S.

[11] Other affected vehicles include: Chevrolet HR model years 2006-2007; Pontiac G5 model year 2007; Pontiac Solstice model years 2006-2007; Saturn Ion model years 2003-2007; and Saturn Sky model year 2007.

[12] *See, e.g.*, Ex. 8, excerpts of the unredacted Valukas Report, GM-MDL2543-400247671 at 5-6, 32, 39-40.

[13] *See, e.g.*, *id.* at 6, 58-62.

[14] Ex. 9, GM-MDL2543-000881742 ([REDACTED]).

[15] Ex. 8, Valukas Report at 69.

In December 2005, GM issued Technical Service Bulletin ("TSB") 05-02-35-007, which identified the potential for drivers of the affected vehicles to "inadvertently turn off the ignition due to low ignition key cylinder torque/effort"[16] – *i.e.*, accidentally turn the ignition from run to accessory because so little force was required to do so. GM intentionally omitted the word "stall" from the TSB to downplay safety concerns.[17]

**2. New GM and K&S knew that airbags would not deploy with the ignition switch in the off or accessory position.**

In addition to problems associated with power shut off (*e.g.*, loss of power steering and stalling at highway speeds), New GM and K&S also knew—years prior to the 2014 recall—that airbags would not deploy in vehicles whose ignitions rotated from run to accessory prior to a crash.[18] A defect that causes airbags not to deploy is safety-related.[19]

---

[16] *Id.* at 91; *see also* Ex. 3, July 22, 2013 [redacted] Letter at .010.

[17] Ex. 8, Valukas Report at 91-92.

[18] *See, e.g.*, [redacted]

[19] *See* Ex. 10, [redacted]

     **3. New GM and K&S knew by 2010 that there was [REDACTED] that was causing Cobalt airbags not to deploy, leading to severe injuries and deaths.**

K&S represented New GM in at least three strikingly similar product liability matters where inadvertent ignition shut-off in 2005-2007 Chevrolet Cobalts caused severe injuries and deaths. In each, counsel warned New GM about the existence of the ignition switch defect.[20]

**a. The [REDACTED] Matter**

K&S represented New GM in a Not-In-Suit-Matter ("NISM") relating to a December 31, 2009 crash that killed [REDACTED].[21] In that incident, [REDACTED] died after she lost control of her 2006 Chevrolet Cobalt on a rainy highway, crashed into another car, veered off the road, and slammed head on into a tree.[22] [REDACTED] front airbags did not deploy even though the damage to the car's front end was severe enough to trigger deployment.[23]

In an October 7, 2010 letter to GM in-house counsel Jaclyn Palmer regarding the [REDACTED] matter, K&S attorney Harold Franklin wrote that [REDACTED][24]

[20] Ex. 14, NHTSA's Path Forward, U.S. Department of Transportation, National Highway Traffic Safety Administration at 7 (New GM "was repeatedly warned by in-house and outside counsel that a defect preventing airbag deployment seemed to exist. . . ."); *id.* at 11 ("From 2007 to 2013, GM faced litigation on several more air bag non-deployment fatalities and was repeatedly warned by outside counsel that a defect existed.").

[21] *See* Ex. 15, Oct. 7, 2010 letter to Jaclyn C. Palmer, General Motors Legal Staff, from K&S attorney, Harold E. Franklin, Jr. ("October 7, 2010 [REDACTED] Letter"), GM-MDL2543-000660577.001.

[22] *Id.* at .003.

[23] *Id.* at .008.

[24] *Id.* at .008, n.2; *see also id.* at .001 [REDACTED]).

In his November 2, 2010 [redacted] case evaluation letter to GM, Mr. Franklin told Ms. Palmer that [redacted]."[25] New GM's [redacted], and New GM's top safety lawyer, William J. Kemp, Jr., were among the executives present at the Settlement Review Committee meeting where Ms. Palmer presented the [redacted] case.[26]

**b. The [redacted] matter**

K&S also represented New GM in an NISM relating to a February 13, 2011 crash in which [redacted] lost control of her 2007 Chevrolet Cobalt, veered off the road, and crashed head on into a tree.[27] The front airbags did not deploy despite a head on collision resulting in significant damage.[28] [redacted] was seriously injured.[29]

In a July 26, 2011 [redacted] case evaluation letter to Ms. Palmer, Mr. Franklin again discussed the ignition switch "anomaly" which caused [redacted] Cobalt to switch from "run" to "accessory":

> John [Sprague] advises that they have become aware of a sensing "anomaly" in some Cobalt vehicles and he is unable to rule out this "anomaly" here [redacted]

[25] Ex. 3, Nov. 2, 2010 [redacted] Letter at GM-MDL2543-000660601.011; *see also id.* at .012 [redacted]).

[26] Ex. 16, Jan. 12, 2011 [redacted] Settlement Review Committee Meeting, GM-MDL2543-000660607 (listing the attendees). New GM in-house counsel, Ron C. Porter, was also present. *Id.*; *see also* Ex. 8, Valukas Report at 145. As discussed below, Mr. Porter was the New GM attorney with primary responsibility for the [redacted] matter.

[27] *See* Ex. 13, July 26, 2011 [redacted] Letter at GM-MDL2543-003455366.002.

[28] *Id.* at .003.

[29] *Id.* at .002.

[30] "SDM" is the Sensing Diagnostic Module, the "black box" that, among other things, triggers airbag deployment and, in the Cobalt, keeps a record as to whether the vehicles was in the "run" mode (where airbags will deploy when necessary) or the "accessory" or "off" mode (where airbags cannot deploy).



   .[31]

c. **The [REDACTED] matter**

K&S also represented New GM with respect a March 10, 2010 crash that killed [REDACTED] after her 2005 Chevrolet Cobalt lost power on a rainy highway. [REDACTED] lost control of her vehicle, crashed into another car, veered off the road, and dropped fifteen feet into a creek with rising water.[32]

In a February 24, 2012 letter to New GM attorney Ronald Porter, Mr. Franklin explained that the [REDACTED] crash profile fit the pattern of the "anomaly" that New GM engineers had identified in Cobalts experiencing rough terrain:

.[33]

[31] Ex. 13, July 26, 2011 [REDACTED] Letter at GM-MDL2543-003455366.009-.010.

[32] *See* Ex. 3, July 22, 2013 [REDACTED] Letter at GM-MDL2543-000985320.001-.002; Ex. 17, February 24, 2012 letter to Mr. Ronald C. Porter, General Motors LLC Legal Department, from K&S attorney Harold E. Franklin, Jr.) ("Feb. 24, 2012 [REDACTED] Letter"), GM-MDL2543-300002915.001 at .001.

[33] Ex. 17, Feb. 24, 2012 [REDACTED] Letter at .004. *See also* Ex. 8, Valukas Rpt. at 162 ("even though the airbag was not an issue, the initial K&S [[REDACTED]] evaluation – as in the [REDACTED] cases – pointed out 'the Cobalt likely lost power approximately three seconds before the crash'").

In July 2013, K&S attorney Phillip Holladay told Mr. Porter that "[a] jury here will almost certainly conclude that the Cobalt's ignition switch is defective and unreasonably dangerous. . . ."[34]

**4. New GM knew about multiple other deaths and injuries associated with the ignition switch defect.**

New GM was also aware of multiple other lawsuits and NISMs (aside from those being litigated by K&S) that were related to the ignition switch defect, including, *inter alia*, matters involving victims ████,[35] ████,[36] ████,[37] ████,[38] ████,[39] and many others.[40] The same engineers generally worked on all of these cases.[41]

[34] Ex. 3, July 2013 ████ Letter at GM-MDL2543-000985320.002; *see also id.* at .026 ("we suspect most jurors will believe that GM's failure to more proactively address the defects in the Cobalt's ignition switch back in 2005 was the primary cause of this crash.").

[35] *See* Ex. 18, Sept. 25, 2006 Letter from GM outside counsel Dykema Gossett LLP to GM attorney Douglas E. Brown, providing early evaluation of the ████ case ("████ Letter"), GM-MDL2543-000743088 at .006 (GM engineers Manual Peace and Kathy Anderson connect airbag non-deployment in a deployable crash to loss of power).

[36] *See* Ex. 19, May 4, 2007 ████ Case Evaluation Report ("2007 ████ Evaluation"), GM-MDL2543-000741356.001 at .004 ████ must be attributable to power loss"); *id.* at .033 ████").

[37] *See* Ex. 20, ████ Settlement Roundtable/Case Summary, GM-MDL2543-001006792 at .002 (non-deployment in a deployable crash involved power loss during the crash; ████).

[38] *See* Ex. 21, April 18, 2012 ████ Case Evaluation, GM-MDL2543-000669092.001 at .002 ("Regardless of whether the impact was above the all-fire threshold or not, neither the frontal, nor side impact airbags could deploy because the Cobalt was in Accessory Mode, not Run Mode, at the time of impact.") (emphasis in original).

[39] *See* Ex. 22, October 2012 email to Ms. Palmer containing ████ case evaluation, GM-MDL2543-003456126.001 at .003 ("It is pretty straightforward on the non deployment of the air bag. It is a deployment level event but the Vehicle Mode Status was in "Accessory" when AE occurred. . . . Somehow the key cylinder put the vehicle into Accessory mode which would cause the airbags not to deploy. GM has seen this [in] a few other matters."). On December 12, 2012, Ms. Palmer presented the ████ matter to the Roundtable Committee, including Mr. Porter. Ex. 8, Valukas Report at 191.

[40] *See* Ex. 23, New GM's April 25, 2014 Supplemental, Restated and Consolidated Response to NHTSA's March 4, 2014 Special Order, GM-MDL2543-400240098 at 120-125, 242-244 (listing 56 incidents, lawsuits and NISMS that New GM identified as involving frontal impact crashes in which the recall condition may have caused or contributed to the airbags' non-deployment).

[41] *See, e.g.*, Ex. 18, ████ Letter at .002 (Manuel Peace and Kathy Anderson); Ex. 19, 2007 ████ Evaluation at .007 (Manual Peace); Ex. 20, ████ Roundtable at .002 (Manual Peace and John

By September 2012, New GM had identified at least [REDACTED] incidents involving suspect Cobalt non-deployment incidents – including the [REDACTED] matters K&S handled.[42]

5. **K&S repeatedly warned New GM that evidence that the ignition switch defect existed in other Cobalt vehicles could lead to significant punitive damages.**

K&S warned GM at least three times in 2010-2011 that New GM risked the award of significant punitive damages if it were revealed that New GM knew that the ignition switch defect existed in vehicles other than the one at issue in a particular case. In his October 2010 [REDACTED] case evaluation, K&S attorney Harold Franklin told New GM that "the facts and circumstances surrounding the investigation into the sensing system 'anomaly' that may be present in some Cobalts could provide fertile ground for laying the foundation for an award of punitive damages, resulting in a significantly larger verdict."[43] Mr. Franklin repeated that statement in his November 2010 [REDACTED] case evaluation.[44] And Mr. Franklin later used the exact same language in his July 2011 evaluation of the [REDACTED] matter.[45]

---

Sprague); Ex. 24, [REDACTED] Settlement Roundtable Case Summary, GM-MDL2543-000669168.001 (John Sprague); Ex. 21, April 18, 2012 [REDACTED] Case Evaluation at .015 (John Sprague and Kathy Anderson); Ex. 13, July 26, 2011 [REDACTED] Letter at .008 (John Sprague and Kathy Anderson); Ex. 25, [REDACTED] Settlement Review Committee/Case Summary, GM-MDL2543-000661098.001 (John Sprague and Kathy Anderson); Ex. 3, July 22, 2013 [REDACTED] Letter at .019 (Kathy Anderson).

[42] Ex. 26, GM-MDL2543-000497798 (spreadsheet listing incidents). New GM has since identified [REDACTED] incidents where injuries or fatalities resulted or may have resulted from the ignition switch defect. Ex. 23, GM-MDL2543-400240098 at 242-244. And by May 2015, New GM's Ignition Compensation Claims Resolution Facility had approved claims for over 100 deaths. *See* http://www.nytimes.com/2015/05/12/business/gms-ignition-switch-death-toll-hits-100.html?_r=0 ("The consequences of General Motors' long-delayed recall of defective small cars hit a grim milestone on Monday, when the company's compensation fund said it had approved the 100th death claim tied to the faulty ignition switches. The toll far exceeds the 13 victims that G.M. had said last year were the only known fatalities linked to ignitions that could suddenly cut off engine power and disable airbags.").

[43] Ex. 15, October 7, 2010 [REDACTED] Letter at .012.

[44] Ex. 1, Nov. 2, 2010 [REDACTED] Letter at .012.

[45] Ex. 13, July 11, 2011 [REDACTED] Letter at .015. *See also* Ex. 27, Apr. 5, 2013 email from Harold Franklin to Jaclyn Palmer regarding [REDACTED] demand letter, GM-MDL2543-000662287.001 ([REDACTED]

Similarly, on April 18, 2012, New GM's outside counsel Eckert Seamans Cherin & Mellott, LLC told New GM that the [redacted] case was "not a strong trial candidate" because, *inter alia*:

> GM will be forced to explain that the airbags did not deploy in this crash because the Cobalt was in Accessory Mode. . . . It will be difficult to explain why the ignition switch toggled to the Accessory Mode simply from running off-road. *GM will also be forced to contend with other incidents, some of which resulted in deaths, due to the non-deployment of the frontal airbags in the 2005-2007 Cobalt. Those other incidents put GM at risk for imposition of punitive damages in West Virginia.*[46]

Jaclyn Palmer, the New GM attorney in charge of the [redacted] matters, also handled the [redacted] case.[47] And Ron Porter, the New GM lawyer in charge of the [redacted] case, was aware of the facts and circumstances regarding the [redacted] case.[48]

**6. K&S advised New GM to settle ignition switch defect cases before evidence of the defect in other Cobalts could be exposed.**

In his November 2010 [redacted] case evaluation letter to Ms. Palmer, Mr. Franklin explained the strategy: [redacted]"[49]

---

[redacted]).

[46] Ex. 21, April 18, 2012 [redacted] Case Evaluation at .019 (emphasis added).

[47] Ms. Palmer told the Settlement Roundtable Committee that she agreed with outside counsel's assessment that the [redacted] case needed to be settled: "[Outside counsel] believes that if the case is tried, GM will lose and that, although the demand is high, as time goes, and the Cobalt investigation remains unresolved, the verdict exposure will increase and the defense of the case will become more complicated. I agree." Ex. 24, July 2012 [redacted] Roundtable Settlement Meeting, GM-MDL2543-000669169.001 at .002.

[48] *See* Ex. 8, Valukas Report at 183 (Porter attended the July 2012 [redacted] Roundtable Settlement meeting); Ex. 28, GM-MDL2543-000919920 (July 24, 2012 email listing "RCP," *i.e.*, Ron C. Porter, among the participants in the July 25, 2012 Roundtable meeting where Ms. Palmer presented the [redacted] case). Later, once the [redacted] were able to obtain some evidence of other similar incidents, and evidence that GM knew the ignition switch was "problematic from the outset," Mr. Holladay concluded that a jury would "almost certainly" find the Cobalt's ignition switch "defective." Ex. 3, July 22, 2013 [redacted] Letter at .002-.003. Mr. Holladay wrote: [redacted] *Id.* at .003.

New GM and K&S were similarly eager to sweep the [REDACTED] matter under the rug. In April 2012, [REDACTED].[51]

Mr. Franklin also recommended to New GM at the beginning of the [REDACTED] case that New GM settle the case before the facts could be exposed:

> [REDACTED].[52]

[REDACTED]

And again in July 2013, K&S attorney Phillip Holladay emphasized that the [REDACTED] case "need[ed] to be settled" because:

> there is little doubt that a jury here will find that the ignition switch used on [REDACTED] 2005 Cobalt was defective and unreasonably dangerous, and that it did not meet GM's own torque specifications. In addition, the PRTS [Problem Resolution

[49] Ex. 1, Nov. 2, 2010 [REDACTED] Letter at .002. Similarly, K&S suspected in 2010 that a separate power steering defect might also have contributed to the fatal [REDACTED] accident. *Id.* [REDACTED]

[50] *See* Ex. 30, Apr. 20, 2012 email from GM attorney Jaclyn Palmer to K&S attorney Harold Franklin, GM-MDL2543-400258799.

[51] Ex. 27, GM-MDL2543-000662287 ([REDACTED]

[52] Ex. 17, Feb. 24, 2012 [REDACTED] Letter at .021.

[53] *Id.*

> Tracking System] documents referenced above and the on-going FPE [Field Performance Evaluation] investigation have enabled plaintiffs' counsel to develop a record from which he can compellingly argue that GM has known about this safety defect from the time the first 2005 Cobalts rolled off the assembly line and essentially has done nothing to correct the problem for the last nine years. He specifically will criticize GM for not doing more than implementing the field service campaign back in 2005, and point to GM's failure to take any action in the on-going FPE investigation that has now been dragging on for almost two years as proof positive of GM's conscience indifference and willful misconduct when it comes to the safety of its vehicles' occupants.[54]

So time and again–with and without K&S as outside counsel–GM confidentially settled ignition switch defect claims instead of recalling the defective vehicles.[55]

**B. GM and K&S lied to the [REDACTED] and the court to prevent disclosure of evidence relating to the defect in other vehicles.**

**1. The parents of [REDACTED] sought discovery from New GM regarding the ignition switch defect that killed their daughter.**

After a post-crash inspection revealed that [REDACTED] ignition switch was in the accessory position,[56] the [REDACTED] sought discovery about the defect identified in the TSB. On September 13, 2012, the [REDACTED] plaintiffs served their Second Set of Interrogatories and their

---

[54] Ex. 3, July 22, 2013 [REDACTED] Letter at .026. *See also id.* ("For all the reasons set out above, we think GM should make its best efforts to try to settle the case at the mediation[.]"); *id.* at .012 ("Because the investigation has been on-going for almost two years now and no action has been taken, plaintiffs' counsel has done an effective job of building a record from which to argue that '9 years later' GM is still burying its head in the sand when it comes to safety issues related this ignition switch.").

[55] *See, e.g.,* [REDACTED]

[56] Ex. 3, July 22, 2013 [REDACTED] Letter at .005.

Second Request for Production of Documents.[57] The [redacted] Requests sought, *inter alia*: (a[redacted]

2. **New GM and K&S knew that airbag non-deployment in Cobalts was related to the condition identified in the TSB.**

By September 2012 (when they received the [redacted] Requests) New GM and K&S knew that the condition identified in the TSB explained airbag non-deployment in incidents where the ignition had moved from run to accessory.

[redacted]

In the April 2012 [redacted] case evaluation, New GM's outside counsel, Eckert Seamans Cherin & Mellott, LLC, wrote that the front airbags could not deploy because the "Cobalt was in

[57] *See* Ex. 39, Plaintiffs' Second Set of Interrogatories to Defendant General Motors LLC, GM-MDL2543-000728812; Ex. 40, Plaintiffs' Second Request for Production of Documents to Defendant General Motors LLC, GM-MDL2543-000936783 at 000936810 (together, the "Melton Requests").

[58] [redacted] *Id.* at GM-MDL2543-000936815.

[59] *Id.*, RFP No. 6 at GM-MDL2543-000936816.

[60] *Id.*, RFP No. 7 at GM-MDL2543-000936816; Ex. 40, Interrogatory No. 1 at GM-MDL2543-000728813.

[61] Ex. 40, RFP No. 9 at GM-MDL2543-000936816.

[62] Ex. 41, March 29, 2011 email from John Sprague to Jaclyn Palmer, GM-MDL2543-400025369.

[63] *Id.* Mr. Franklin was also representing New GM in connection with the [redacted] NISM at this time.

Accessory Mode, not Run Mode, at the time of impact."[64] New GM's counsel explicitly referenced the TSB as "address[ing] a similar problem as that seen in the field where the key in the ignition switch in the 2005 Cobalt could toggle from the Run mode to the Accessory mode by traveling off-road or over rough terrain."[65] Ms. Palmer, the GM in-house attorney responsible for the [REDACTED] discussed the TSB with the Settlement Roundtable Committee during the committee's April 2012 consideration of a possible [REDACTED] settlement.[66]

In May 2012, New GM engineer Brian Stouffer tested a variety of vehicles covered by the TSB to determine the torque required to move the key from the run to accessory position.[67] [REDACTED]

On June 12, 2012, the [REDACTED] plaintiffs' expert submitted a report that relied on the TSB in concluding that the airbag non-deployment was caused by low torque of the ignition switch.[69]

On July 25, 2012, Ms. Palmer told the Settlement Roundtable Committee that the [REDACTED] plaintiffs' expert "attributed the frontal airbag non deployment to the ignition being in the Accessory mode, which she relates to the service bulletin involving the potential for the

---

[64] Ex. 21, Apr. 18, 2012 [REDACTED] Case Evaluation, GM-MDL2543-000669092.001 at .002.

[65] *Id.* at .004. GM's outside counsel also attached the TSB as an exhibit to its case evaluation. *Id.* at .021.

[66] *See* Ex 42, April 2012 [REDACTED] Settlement Roundtable Case Summary, GM-MDL2543-000669096.001 at .002 ("There is a service bulletin related to the potential for the driver to inadvertently turn off the ignition (by contacting a large and/or heavy key chain with the knee) due to low ignition/torque effort. . . .").

[67] Ex. 3, July 22, 2013 [REDACTED] Letter at .012; *see also* Ex. 43, GM-MDL2543-002497730 (May 17, 2012 email regarding upcoming salvage yard visit to test Cobalt ignition switch torque); Ex. 44, GM-MDL2543-003511188 (May 23, 2012 email from Stouffer regarding data from testing that showed a "noticeable dip in the torque for Model Years 2005 and 2006").

[68] Ex. 3, July 22, 2013 [REDACTED] Letter at .012.

[69] Ex. 45, Engineer's Report of the [REDACTED] Crash by Erin M. Shipp, P.E., GM-MDL2543-000669158 at GM-MDL2543-000669164-66.

driver to inadvertently turn off the ignition by contacting a large and/or heavy key chain with the knee."[70] Multiple New GM attorneys attended the [REDACTED] Roundtable, including Mr. Porter – who oversaw discovery in the [REDACTED] case.[71]

**New GM and K&S told the**

[70] Ex. 24, July 2012 [REDACTED] Settlement Roundtable Case Summary, GM-MDL2543-000669168.001; *id.* at .002 (discussing the TSB).

[71] Ex. 28, GM-MDL2543-000919920 (July 24, 2012 email regarding attendees and agenda for July 25, 2012 [REDACTED] Roundtable).

[72] Ex. 46, General Motors LLC's Supplemental Responses to Plaintiffs' Second Request for Production of Documents ("Supp. RFP Resp."), GM-MDL2543-001282913.001; Ex. 47, General Motors LLC's Supplemental Responses to Plaintiffs' Second Set of Interrogatories) ("Supp. Rog. Resp."), GM-MDL2543-000958800.001

[73] *See, e.g.*, Ex. 46, Supp. RFP Resp. at .007.

[74] *Id.*, Supp. RFP Resp. at .007-.008; *see also* Ex. 47, Supp. Rog. Resp. at .004-.005 ( [REDACTED]

[75] Ex. 46, Supp. RFP Resp. at .013; Ex. 47. Supp. Rog. Resp. at .009.

[redacted]

[redacted]

---

76 [redacted]

### 4. K&S told one thing to the court and the opposite to New GM on the same day.

On July 22, 2013, [redacted][88] That same day, K&S also sent to New GM an updated [redacted] case evaluation letter.[89] K&S attorney Philip Holladay signed both documents.[90]

[redacted]

At the same time, in a letter to New GM, K&S recognized the relevance and responsiveness of documents regarding the airbag non-deployment incidents and investigation to the [redacted] case. Mr. Holladay wrote:

> [T]he [ignition switch defect] issue was assessed internally in a series of investigations conducted as part of the Product Resolution Tracking System and ultimately addressed by issuing an Information Service Bulletin in the Fall of 2005 that provided a field service fix for customers who experienced an incident involving inadvertent key movement. More recently, this [same] issue has surfaced again as part of an ongoing FPE investigation into why frontal air bags have not deployed in certain high-speed multiple impact frontal collisions involving 2005-2007 Chevrolet Cobalts. In more than half of those incidents, it appears the reason that the air bag did not deploy was because the car's ignition was in the accessory rather than the run position. While there is no

[88] *Id.* at GM-MDL2543-400159414.

[89] Ex. 3, July 22, 2013 [redacted] Letter at .001.

[90] Ex. 51, General Motors LLC's Response to Plaintiffs' Motion for Sanctions at GM-MDL2543-400159414; Ex. 3, July 22, 2013 [redacted] Letter at .027.

[91] Ex. 51, General Motors LLC's Response to Plaintiffs' Motion for Sanctions at GM-MDL2543-400159398.

[92] *Id.* at GM-MDL2543-400159411.

> allegation here that [redacted] frontal air bags should have deployed, the on-going investigation ties nicely into plaintiffs' expected theme that the original Information Service Bulletin was an inadequate "band-aid fix" for a significant safety issue that should have been addressed through a recall and design change.[93]

GM attorney Ron Porter also discussed the Cobalt airbag non-deployment incidents and investigation in his presentation of the [redacted] case to GM's Settlement Review Committee because airbag non-deployments in Cobalts may be "linked to the ignition switch issue."[94]

**5. New GM and K&S lied to the court and the [redacted].**

[93] Ex. 3, July 22, 2013 [redacted] Letter at .002-.003; *see also id.* at .026 ("the PRTS documents referenced above and the on-going FPE investigation have enabled plaintiffs' counsel to develop a record from which he can compellingly argue that GM has known about this safety defect from the time the first 2005 Cobalts rolled off the assembly line and essentially has done nothing to correct the problem for the last nine years.").

[94] Ex. 52, Aug. 8, 2013 [redacted] Settlement Review Committee Case Summary, GM-MDL2543-000672756.001 at .002. From the beginning, Mr. Franklin had also likened what happened in the [redacted] crash to the Cobalt non-deployment incidents, *see* Ex. 17, Feb. 24, 2012 [redacted] Letter at .004, – meaning that airbag non-deployment documents were both relevant and responsive in [redacted].

[95] Ex. 53, Dec. 26, 2012 email string from Franklin to Porter, GM-MDL2543-400253332 at 33.

[96] *Id.*

[97] *Id.* at GM-MDL2543-400253332.



[redacted] And the TSB had already been "made available to in-house and outside counsel."[100]

[redacted] New GM and K&S further hid ongoing airbag investigation documents from discovery in [redacted] by, *inter alia*, boxing Mr. Stouffer out of meetings relating to the investigation that *he had previously led* and hiring an expert consultant to assist with the ongoing investigation under the guise of work on the [redacted] case in order the shield ongoing analyses from discovery under claims of privilege.[104]

---

[redacted]





C. **New GM and K&S committed other fraudulent litigation misconduct to hide evidence of the ignition switch defect.**

1. **New GM and K&S hid the existence of part change documents.**

By the April 29, 2013 deposition of GM engineer Ray DeGiorgio, New GM and K&S knew that the ignition switch had been changed between 2005 and 2008.[108] Within days of the DeGiorgio deposition, New GM and K&S hired expert Subbaiah Malladi to assist with New GM's ongoing investigation.[109]

Ex. 8, Valukas Report at 197-98 ("Porter recalled Kemp contacting him in April (when Porter was preparing Stouffer for his deposition in the case), and telling Porter that FPE wanted to hire Malladi, but that Kemp and Porter ultimately agreed to hire Malladi under the auspices of the case to shield Malladi's analyses under the work product doctrine."); *id.* at 196 (although the FPE team asked Federico and Kemp to retain Malladi in February 2013 in connection with their ongoing investigation, GM did not then engage Malladi; he did not begin work until May 2013, ostensibly as part of the litigation); *id.* at 201 (Porter asked Stouffer not to participate in the meeting with Malladi because Stouffer was scheduled to be deposed in the litigation).

[105] Ex. 3, July 22, 2013 Letter at .022.

[106] *Id.* GM has redacted most of this page, presumably because it contains opinion work product. *See* MDL Order No. 23 ¶5.

[107] See Ex. 58, GM-MDL2543-400156301 ( the highest settlement amount that could be paid before GM lawyers were required to inform GM's General Counsel. Valukas Report at 207.

[108] Ex. 8, Valukas Report at 199. *See also* April 29, 2013 email from K&S attorney Holladay to GM attorney Porter, GM-MDL2543-001049338

[109] Ex. 8, Valukas Report at 200 (three days after the DeGiorgio deposition, K&S attorney Holladay spoke with GM lawyers Porter and Kemp about hiring Malladi because "GM needed to bring the FPE investigation to closure without delay"). Eventually, Malladi merely confirmed what the plaintiffs' expert had proved to New GM and K&S five months earlier – the ignition switch had been changed. *Id.* at 209.

[110] Ex. 60, General Motors LLC's Response to [ ] Plaintiffs' Fifth Request for Production of Documents, GM-MDL2543-400151182 at 83.

[111] *Id.* at 84.

[112] *See* Ex. 61, email string containing a June 20, 2013 email from Holladay to Malladi, GM-MDL000698545.001 at .002

[113] New GM settled New GM engineer Stouffer did not ask Delphi for part change documents until October 23, 2013. Ex. 8, Valukas Report at 208. .

[114] Ex. 60, General Motors LLC's Response to [ ] Plaintiffs' Fifth Request for Production of Documents at GM-MDL2543-400151184.

[115] *See* fn. 104, *supra*. New GM similarly invoked the privilege to conceal ignition switch defect information from NHTSA. *See* Ex. 14, NHTSA's Path Forward at 17 ("GM's responses often contained very little information and included invocations of legal privilege.").



D. **K&S also worked for New GM in connection with the ignition switch recall and the "investigation" of the reasons for the delay.**

K&S continued to represent New GM in connection with the ignition switch defect even after each of the product liability matters K&S handled for New GM had settled. For example: (a) Mr. Holladay continued to be involved in New GM's investigation of the defect after settled, including Malladi's investigation;[120] (b) Mr. Holladay (among others) counseled New GM with respect to the ignition switch recall, and his work included drafting communications to

116 Ex. 63,

117 Ex. 8, Valukas Report at 178.

118

119 Ex. 68,

120 Ex. 69,

NHTSA and the public;[121] and (c) K&S attorneys interviewed a number of witnesses in connection with the preparation of the Valukas Report.[122]

Upon learning that New GM CEO Mary Barra announced an internal investigation of the delayed recall, [redacted]

### E. New GM violated its safety defect disclosure obligations.

On February 7, 2014, New GM finally notified NHTSA about the ignition switch defect.[124] On February 26, 2014, NHTSA opened a civil enforcement investigation to evaluate the timing of New GM's defect decision-making and reporting of the safety-related defect to the NHTSA.[125] On May 16, 2014, New GM admitted in a Consent Order that it violated the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act"),[126] which requires motor vehicle manufacturers to notify NHTSA and owners and purchasers of a vehicle if the manufacturer determines the vehicle contains a safety-related defect.[127] Manufacturers must notify NHTSA not more than five business days after a defect is determined to be safety-related.[128] Then, "within a reasonable time,"[129] the manufacturer must notify the owners of the

---

[121] *See, e.g.,* [redacted]
[122] Ex. 8, Valukas Report at 15.
[123] Ex. 72, March 5, 2014 Robinson email, GM-MDL2543-004328231.
[124] *See* Ex. 2, Consent Order at ¶ 5.
[125] *Id.* at ¶ 9.
[126] *Id.* at ¶ 10 ("GM admits that it violated the Safety Act" by failing to provide prompt notice to NHTSA).
[127] *Id.* at ¶ 2, citing 49 U.S.C. § 30118(c)(1).
[128] *Id.*, citing 49 C.F.R. §573.6(b).
[129] 49 C.F.R. §577.7(a) was updated, effective October 11, 2013, to replace "within a reasonable time" to "no later than 60 days" from the filing of the NHTSA notification.

defective vehicles.[130] NHTSA required New GM to pay the maximum civil penalty for a related series of violations in the sum of thirty-five million dollars ($35,000,000).[131]

Moreover, the court presiding over GM bankruptcy's recently found that by the date of the sale of Old GM to New GM "at least 24 Old GM personnel (*all of whom were transferred to New GM*), including engineers, senior managers, and attorneys, were informed or otherwise aware of the Ignition Switch Defect …"[132] Based on this fact, the court concluded that "Old GM personnel knew enough as of … June 2009 ... for Old GM then to have been obligated, under the Safety Act, to conduct a recall of the affected vehicles."[133] New GM had that same knowledge and obligation from day one of its existence.

And the Department of Justice has reportedly found evidence of criminal wrongdoing by New GM in connection with its cover-up of the ignition switch defect.[134]

## IV. ARGUMENT

### A. The crime-fraud exception vitiates claims of attorney-client privilege and work product protection.

Attorney-client communications and attorney work product made in furtherance of a crime or fraud are not privileged. "Although there is a societal interest in enabling clients to get sound legal advice, there is no such interest when the communications or advice are intended to further the commission of a crime or fraud." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995);[135] *see also United States v. Zolin*, 491 U.S. 554, 563 (1989) ("It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy' between

---

[130] 49 C.F.R. §§ 577.5(a), 577.7(a).

[131] Ex. 2, Consent Order at ¶ 11.

[132] *In re Motors Liquidation co.*, 2015 Bankr. LEXIS 1296, at *54 (Bankr. Ct. S.D.N.Y. Apr. 15, 2015) (emphasis added).

[133] *Id.*, *54-55.

[134] *See "G.M. Inquiry Said to Find Criminal Wrongdoing,"* N.Y. Times (May 22, 2015).

[135] The federal common law of privilege and crime-fraud applies to this motion because Plaintiffs' Second Amended Consolidated Complaint (to be filed June 12, 2015) includes a federal claim.

lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime.") (citations omitted); *Madanes v. Madanes*, 199 F.R.D. 135, 148 (S.D.N.Y. 2001) (observing that the exception is based on "the overarching public policy principle that a court will not enforce privilege where to do so would facilitate a crime.").[136]

The crime-fraud analysis entails a two-step inquiry. First, Plaintiffs must demonstrate there is "there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." *U.S. v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997); *see also Richard Roe*, 68 F.3d at 40 (there must be "probable cause to believe that the particular communication with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal activity"). Second, once Plaintiffs show the requisite factual basis, the Court can conduct an *in camera* review, and exercise its discretion to determine whether the crime-fraud exception applies to the particular documents at issue. *Jacobs*, 117 F.3d at 87.[137]

Probable cause in this context requires that a "prudent person" would have a "a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *Id.* To establish probable cause to believe that the privileged material was made "in furtherance" of the crime or fraud, "it is sufficient that the attorney-client communication be reasonably related to the crime or fraud."

[136] *See also Irving Trust Co. v. Gomez*, 100 F.R.D. 273, 277 (S.D.N.Y. 1983) ("The interests furthered by the privilege—full and frank discussions between an attorney and his client for the purpose of promoting observance of the law—are not impinged upon by compelling discovery of communications sought or rendered in furtherance of what is known or reasonably should be known to be unlawful conduct regardless of whether such conduct constitutes fraud or any other intentional tort.") (internal citation omitted).

[137] The Court may also exercise its discretion, separate and apart from this crime fraud motion, to examine any opinion work product redacted from K&S-related documents. *See* MDL Order No. 23 ¶5 ("New GM shall provide to this Court for *in camera* review Redacted Information in any Produced Documents, if so requested by the Court (either *sua sponte* or upon proper application by the Receiving Party.")).

*Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 427 (S.D.N.Y. 2013) (internal citations omitted); *see also In re Enron Corp.*, 349 B.R. 115, 128 (S.D.N.Y. 2006). "[T]he probable cause necessary to sustain the exception is not an overly demanding standard." *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97-cv-4978, 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999)). Moreover, the "fact than an innocent explanation may be consistent with the facts alleged does not negate probable cause." *Id.* (citing *U.S. v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985)).

The crime-fraud exception applies equally to attorney-client communications and work product. *Richard Roe*, 68 F.3d at 40. There is "no reason to apply a different standard for attorney work product." *Id.* at 40 n.2 (citing *In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir. 1979)). "Where so-called work-product is in aid of a criminal scheme, fear of disclosure may serve a useful deterrent purpose and be the kind of rare occasion on which an attorney's mental processes are not immune [from disclosure]." *In re John Doe Corp.*, 675 F.2d 482, 492 (2d Cir. 1982).

### B. "Crime-fraud" is construed expansively to include illegal activity, fraud, any intentional tort or any other ongoing "wrongful conduct," and easily encompasses New GM's conduct in this case.

"Crime-fraud" must be construed broadly in keeping with the purposes of both the privilege and the exception, since "the privilege's policy of promoting the administration of justice would be undermined if the privilege could be used as a cloak or a shield." *Diamond v. Stratton*, 95 F.R.D. 503, 505 (S.D.N.Y. 1982). Thus, the *Stratton* court found:

> To deny the protection of the privilege to communications in aid of fraud while granting it to communications in aid of another intentional tort would draw a too "crude boundary," as characterized by Wigmore, who also questions "how the law can protect a deliberate plan to defy the law and oust another person of his rights, whatever the precise nature of those rights might be."

*Id.* (quoting 8 Wigmore, Evidence § 2298, at 577 (McNaughton rev. 1961)).

Accordingly, courts in this Circuit define "crime-fraud" expansively to reach conduct that is neither a violation of criminal law nor common-law fraud. *See, e.g., Madanes,* 199 F.R.D. at 148-49 (collecting cases). Intentional torts "moored in fraud" fall within the exception. *See Cooksey v. Hilton Int'l Co.*, 863 F. Supp. 150, 151 (S.D.N.Y. 1994) (exception applied to employer's communications with counsel in preparation of letter written to mislead female employee to believe her salary was commensurate with male employee in order to circumvent gender discrimination suit);[138] *see also In re Heuwetter*, 584 F. Supp. 119, 127 (S.D.N.Y. 1984) (communications in furtherance of commission of a tort are discoverable). The exception also applies to non-fraudulent intentional torts, *e.g., Chevron v. Salazar*, 275 F.R.D. 437, 452-53 (S.D.N.Y. 2011), and tortious conduct that "undermines the adversary system itself," *Madanes*, 199 F.R.D. at 149 (citing cases).[139] In fact, the exception applies to ***any*** "continuing or future crime or tort," or "illegal activities." *In Re Grand Jury Proceeding Impounded*, 241 F.3d 308, 316-17 (3d Cir. 2001). Simply put, both the attorney-client and work product protections are overridden when a lawyer's services are used in furtherance of any "ongoing or future wrongdoing." *In re Grand Jury Subpoenas*, 454 F.3d 511, 520 (6th Cir. 2006).[140]

---

[138] *Accord, e.g., Sackman v. Liggett Grp., Inc.*, 173 F.R.D. 358, 364 (E.D.N.Y. 1997).

[139] *Accord, e.g., Wachtel v. Guardian Life Ins.*, 2007 U.S. Dist. LEXIS 43842, at *7 (D.N.J. June 18, 2007) ("[t]he crime-fraud exception is not limited to evidence that supports a finding of common-law fraud," but "can encompass communications and attorney work product in furtherance of an intentional tort that undermines the adversary system itself").

[140] *See also, e.g., United States v. BDO Seidman, LLP*, 492 F.3d 806, 818-820 (7th Cir. 2007) ("our case law does not require a party seeking to invoke the crime-fraud exception to allege a particular offense or to make a prima facie showing with respect to each element of common law fraud," as "[s]uch a burden is inconsistent with our requirement that the party seeking to abrogate the privilege need only 'give colour to the charge' by showing 'some foundation in fact'"); *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) (crime-fraud rule applies "when the communications between the client and his lawyer further a crime, fraud or other misconduct"); *Irving Trust Co. v. Gomez*, 100 F.R.D. 273, 277 (S.D.N.Y. 1983) (exception applies to "unlawful conduct regardless of whether such conduct constitutes fraud or any other intentional tort").

**C. New GM committed a crime-fraud by concealing a known safety defect, and its attorney-client communications with K&S and work product of both New GM and K&S were generated in furtherance of the crime-fraud.**

New GM has admitted that it violated the Safety Act by not promptly disclosing the ignition switch defect[141] and one Court in this District has already ruled that, by 2009, New GM had sufficient information to initiate a recall. New GM's admitted concealment of the ignition switch defect—despite knowing about the safety defect for years before the delayed recall—constitutes a "crime" or "fraud." And there is probable cause to believe that New GM used its lawyers' services in furtherance of that wrongdoing by, *e.g.*, quietly settling claims involving "clear evidence of defect" rather than initiating a recall. The crime-fraud exception applies.

**1. New GM's violations of the Safety Act are a "crime" or "fraud" within the meaning of the exception.**

In violating the Safety Act, New GM defied the law at the expense of NHTSA and Plaintiffs alike. *See Diamond*, 95 F.R.D. at 505. New GM's concealment of the ignition switch defect from 2009 until 2014 is precisely the sort of "ongoing or future wrongdoing" that triggers the crime-fraud exception. *See In re Grand Jury Subpoenas,* 454 F.3d 511, 520 (6th Cir. 2006). Indeed, the Department of Justice has reportedly found evidence of criminal wrongdoing by New GM in connection with its cover-up of the ignition switch defect.[142] This unlawful and perhaps criminal conduct served to defraud consumers, regulators and litigants.

Regardless of whether New GM's challenged conduct amounts to a crime *per se*, it falls well within the ambit of the crime-fraud exception. In a similar case involving the corporate cover-up of a product's serious safety hazards, the plaintiff alleged that defendant Robins Co. "engaged in an ongoing scheme of knowing misrepresentation to the public concerning the effectiveness of the Dalkon Shield"; falsely "represent[ed] that the Shield was both safe and

[141] *See* Ex. 2, Consent Order at ¶ 10.

[142] *See "G.M. Inquiry Said to Find Criminal Wrongdoing,"* N.Y. Times (May 22, 2015).

effective"; and had "a pattern of settling cases to avoid production of documents" in product liability suits concerning the Shield. *In re A.H. Robins Co., Inc., "Dalkon Shield" IUD Prod. Liab. Litig.*, 107 F.R.D. 2, 10, 14 (D. Kan. 1985). The court found the crime-fraud exception triggered by evidence that, among other things, Robins Co. "ignored the mounting evidence against the Dalkon Shield, with knowledge of the potential harm caused by the product . . . . and attempted, with the assistance of counsel, to devise strategies to cover up Robins' responsibilities and lessen its liability with respect to the Dalkon Shield." *Id.* at 14-15. Accordingly, the court ordered production of attorney-client communications and work product generated in furtherance of the alleged fraud. *Id.* at 15. *See also In re Grand Jury Subpoena,* 220 F.R.D. 130, 151-53, 158-59 (D. Mass. 2004) ("[I]t is clear that the more XYZ and Attorney knew or had reason to know that the widgets were failing and causing injury at elevated rates (if in fact they were), the more likely it is that the crime-fraud exception would apply.").

Like defendant Robins Co. in *Dalkon Shield*, by refusing to recall vehicles with known safety defects, New GM "ignored the mounting evidence against the [Cobalt], with knowledge of the potential harm caused by the product," and "attempted, with assistance of counsel, to devise strategies to cover up [New GM's] responsibilities and lessen its liability with respect to the [defect]." Plaintiffs have thus established a factual basis to conclude that New GM committed a "crime" or "fraud" by concealing a known safety defect.

**2. There is probable cause to believe that attorney-client communications and work product were generated in furtherance of the New GM's crime-fraud.**

Plaintiffs cite evidence that establishes probable cause to believe that New GM used K&S's services in furtherance of New GM's fraudulent scheme to conceal the ignition switch defect and its tragic consequences from consumers, regulators and litigants.

While representing New GM in the [redacted] matters, K&S became aware that [redacted] existed in 2005-2007 Cobalts which caused airbags not to deploy in severe frontal impact crashes, resulting in severe injuries and deaths. *See supra* at 6-9. But even though K&S knew or should have known that New GM was legally obligated to disclose and remedy the defect, it advised New GM in each matter to suppress the defect by making "every effort [to] … settle th[e]" claims confidentially to prevent the disclosure of evidence demonstrating the existence of the defect in other Cobalts which would "provide fertile ground for laying the foundation for an award of punitive damages." *Supra* at 11-13. And, in each instance, New GM—which certainly knew its Safety Act obligations—followed K&S's advice and used K&S's services to enter confidential settlements of ignition switch defect claims without recalling the defective vehicles. *Supra* at 13.

Plaintiffs already have access to, and have attached to this motion, certain privileged communications between New GM and K&S and K&S work product that plainly show that New GM and K&S worked together in furtherance of New GM's scheme to conceal the defect from consumers, regulators and litigants. At a minimum, Plaintiffs have met their "not. . . overly demanding [probable cause] standard." *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999)).

Because there is probable cause to believe that K&S's work for New GM in evaluating and settling the [redacted] matters was in furtherance of New GM's crime or fraud, and that New GM's in-house counsel also generated work product in furtherance of the crime or fraud, this Court should conduct an *in camera* review of the following categories of documents:

(a) all communications between New GM and K&S related to the [redacted] matters concerning (i) an evaluation of the claims in

those matters; (ii) settlement; (iii) the ignition switch defect or "anomaly"; (iv) any other defense activities; and (v) whether New GM was or might be obligated to report a safety defect to NHTSA and/or consumers;[143]

(b)    all communications between New GM and K&S relating to New GM's pre-recall investigation of the ignition switch defect (not associated with any particular matter), including whether New GM was obligated to report a safety defect to NHTSA and/or consumers;

(c)    all communications between New GM and K&S lawyers Holladay and Franklin relating to the ignition switch recall and/or communications with NHTSA;

(d)    all New GM work product relating to the areas identified in (a)-(c);

(e)    all K&S work product relating to the areas identified in (a)-(c); and

(f)    all K&S documents relating to whether rules of professional responsibility applicable to lawyers permitted or required K&S to reveal information relating its representation of New GM (or withdraw from representation) in connection with the ignition switch defect.

Each of these categories of documents is "reasonably related" to New GM's ongoing crime or fraud. K&S helped and advised New GM to conceal information about the defect despite New GM's clear legal obligation to disclose and remedy the defect, and New GM's in-house counsel did the same.[144]

---

[143] Again, Plaintiffs seek attorney-client communications from New GM only.

[144] Even after the recall was announced, K&S joined in the attempt to minimize New GM's exposure both to government actions and private litigation. New GM retained K&S to assist in New GM's responses to requests from governmental agencies, and conducted some of the witness interviews in connection with the Valukas Report. Ex. 8, Valukas Report at 15. Pursuant to the fraudulent scheme, now directed towards minimizing New GM's exposure for its ongoing misconduct, that Report stated that New GM was long unaware that the ignition switch defects caused airbag non-deployment, and did not reach this conclusion until November of 2013. *Id.* at 209. In reality, New GM & K&S had long known this.

**D. New GM committed a crime-fraud by lying to [REDACTED] court to prevent the disclosure of ignition switch defect evidence, and its attorney-client communications with K&S and work product were generated in furtherance of the crime-fraud.**

**1. New GM's discovery lies constitute a "crime" or "fraud" within the meaning of the exception.**

As discussed in Sections III(B-C) above, New GM and K&S: [REDACTED] And, despite knowing that dangerous cars (including cars like [REDACTED]) were still on the road and causing ongoing safety problems, at no time did K&S withdraw from its representation of New GM. *See* Model Rule 1.2(d) (prohibiting a lawyer from engaging in conduct known to be criminal or fraudulent); Model Rule 1.16(a) (mandating a withdrawal from representation if such representation results in a violation of the rules).

It is important to underscore that New GM's and K&S's conduct went beyond covering up a *prior* fraud, and was part of an ongoing fraud to avoid the sort of exposure and publicity that would force the long-overdue recall (as well as the imposition of significant punitive damages in current and future litigations). As K&S attorney Holladay noted in implicit, albeit guarded, acknowledgment of the clear relationship of the [REDACTED] case to both the ignition switch defect and the need for present action in the form of a recall: "While there is no allegation here that [REDACTED] frontal air bags should have deployed, the on-going investigation ties nicely into plaintiffs' expected theme that the original information Service Bulletin was an inadequate 'band-aid fix' for a significant safety issue that should have been addressed through a recall and design change."

By lying to [redacted] court to conceal defect evidence that would lead to punitive damages in individual cases and a larger recall as to consumers, New GM and K&S "undermine[d] the adversary system itself." *Madanes*, 199 F.R.D. at 149. Courts have found similar frauds-on-the-court to override the privilege.[145] *See, e.g., 1100 West, LLC v. Red Spot Paint and Varnish Co., Inc.*, No. 1:05-cv-1670-LJM-JMS, 2009 WL 232060, at *5-6 (S.D. Ind. Jan. 30, 2009) (a fraud on the court vitiated claims of privilege where defendant "purposefully concealed relevant documents during discovery," and where defendant's attorneys took steps to prevent the disclosure by "caus[ing] to be filed . . . multiple documents in which they [defendant and counsel] assert that there is no evidence" of the existence of the toxic substances at issue when in fact those substances did exist); *Gutter v. E.I. Dupont de Nemours*, 124 F. Supp. 2d 1291, 1308-09 (S.D. Fla. 2000) (determining that plaintiffs had established a prima facie case that defendant committed discovery fraud upon the court and that the crime-fraud exception should be applied with respect to certain discovery documents); *cf. In re St. Johnsbury Trucking Co., Inc.* 184 B.R. 446, 453 (D. Vt. 1995) (record of "an objectively unreasonable pleading filed for an objectively improper purpose that results in extraordinary costs to other litigants and to Bankruptcy Courts . . . amounts to fraud upon the court" justifying *in camera* review; distinguishing another ruling in parallel proceedings that had denied a motion to compel production of those same documents on the basis that the other ruling relied on an overly narrow reading of the crime-fraud doctrine).

[145] Plaintiffs recognize that the fraud-on-the-court in the [redacted] case was not perpetrated on this Court, and indeed that New GM and K&S quickly settled [redacted] case (twice) – in part to avoid having the misconduct come to light in that venue. However, the fraud-on-the-court in the [redacted] litigation was part of the general crime-fraud conduct—all geared ultimately towards the ongoing concealment of the ignition switch defect from regulators, litigators and defect vehicle owners—for which Plaintiffs properly seek relief in the form of vitiation of the privilege in this Court.

Plaintiffs have thus established a factual basis to conclude that New GM committed a "crime" or "fraud" through litigation misconduct. This conduct provides additional support for the relief sought in this motion. *See generally Newman v. General Motors Corp.*, 228 Fed. Appx. 245, 246 (3d. Cir. 2007) (unpublished) (upholding determination that GM's discovery abuse vitiated the privilege under the crime-fraud exception; lower court had agreed that "because of GM's failure or refusal timely to disclose those documents in [plaintiff's] case, [plaintiff] was denied a claim for punitive damages").

**2. There is probable cause to believe that attorney-client communications and work product were generated in furtherance of New GM's litigation misconduct.**

There is probable cause to believe that New GM used K&S's services in furtherance of its discovery fraud in the [REDACTED] case. Indeed, Plaintiffs cite actual communications between New GM and K&S in which they discuss [REDACTED]

[REDACTED] Moreover, at a minimum, there is a sufficient factual basis to believe that K&S discussed with its client each of the discovery lies K&S perpetrated on behalf of New GM during the [REDACTED] case. *See supra* at 14-24.

Accordingly, this Court should conduct an *in camera* review of attorney-client communications and New GM or K&S work product relating to: (a) the [REDACTED] Requests, including motion practice regarding the same; (b) part change documents; (c) the expert Subbaiah Malladi; and (d) the potential deposition of Jim Federico. Each of these categories of documents is "reasonably related" to New GM's ongoing crime or fraud.

### E. There is no unique standard applicable to work product.

K&S opposed the [redacted] crime fraud motion on the grounds that a crime or fraud perpetrated by the client will purportedly not overcome work product protection asserted by an innocent attorney. New GM may make the same argument as to its work product. There are two fundamental errors with such an assertion. *First*, that is not the law in the Second Circuit. *Second*, neither K&S nor New GM's in-house counsel are innocent.

In this Circuit only the client's knowledge or intent is relevant in determining the applicability of the crime-fraud exception. This holds true for both attorney-client communications, *see Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 426 (S.D.N.Y. 2013) ("It is sufficient to come within the exception that the client intended to use the attorney's services in furtherance of a crime or fraud even if the attorney was unaware of this purpose."), and work product protection, *see Richard Roe*, 68 F.3d at 40 n.2 (explaining that there is "no reason to apply a different standard for attorney work product"); *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 132 (N.D.N.Y. 2007) (citing *Richard Roe* and explaining that there is "no need for a different piercing standard for attorney work product"); *Lugosch v. Congel*, 218 F.R.D. 41, 50 (S.D.N.Y. 2003) (same). As Judge Kaplan recently explained, "[i]f probable cause exists as to the commission of a fraud or crime, it is not necessary to show also that a lawyer from whom otherwise privileged or protected documents may be sought was a culpable or knowing participant in the fraud or crime." *Chevron Corp. v. Donziger*, No. 11 Civ. 0691, 2013 WL 1087236, at *3 (S.D.N.Y. Mar. 15, 2013).[146]

[146] *See also In re Grand Jury Subpoena*, 419 F.3d 329, 339 (5th Cir. 2005) (making no distinction between the standard applicable to privileged communications and work product and stating that it "is only the rightful interests of the client that the work product doctrine was designed to protect."); *In re Grand Jury Proceedings*, 102 F.3d 748, 751 (4th Cir. 1996); Restatement (Third) of the Law Governing Lawyers § 93 cmt. c ("If the client alone has the requisite criminal or fraudulent intent, work-product immunity is lost despite the innocence of the lawyer.").

*Chevron* is on point. In that matter, Donziger represented multiple Ecuadorean plaintiffs who procured a multi-billion dollar judgment against Chevron in an Ecuadorean court. *Donziger*, 2013 WL 1087236, at *1. Chevron contended that Donziger bribed the judge and procured the judgment by colluding with an expert to create a fraudulent damages report. *Id.* at *6-8. Chevron sued Donziger for fraud in this District, and also commenced satellite discovery litigation in other districts. *See id.* at *5-6. The Patton Boggs law firm led Donzinger's efforts to defeat Chevron's satellite discovery pursuits and also submitted new evidence to the Ecuadorean tribunal to replace the allegedly tainted damages report. *Id.* at *13.

Ultimately, Chevron sought attorney-client material and Patton Boggs' work product, arguing that the law firm's litigation conduct was in furtherance of Donziger's ongoing fraudulent scheme. Finding probable cause that Donziger was engaged in continuing fraud, Judge Kaplan held that the crime-fraud exception applied to both ordinary and opinion work product generated in furtherance of that fraud. *Id.* at *28-29. The Court so held even though Patton Boggs' litigation conduct may have been innocent; according to Judge Kaplan, it was "unnecessary to determine for present purposes whether there is probable cause to suspect that [Patton Boggs] or any of its personnel was a culpable or knowing participant in any alleged fraud or crime." *Id.* at *3. In other words, regardless of whether Patton Boggs was litigating in good faith, because the client's purpose was fraudulent, the lawyers' efforts to further those purposes were discoverable. The same holds true as to work product crafted by K&S or New GM's in-house counsel here.

Moreover, even if an innocent attorney's work product was protected under Second Circuit law (which it is not), that would not help K&S or New GM here. K&S was a knowing participant in New GM's crime or fraud. K&S: (a) [redacted]



In addition, by participating in New GM's defect concealment scheme and continuing to represent New GM, K&S and New GM's in-house counsel violated their ethical obligations under the Model Rules of Professional Conduct.   Model Rule of Professional Conduct 1.2(d) prohibits a lawyer from engaging in conduct the lawyer knows to be criminal or fraudulent.   *See* Model Rule 1.2(d) ("A lawyer *shall not* counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent.) (emphasis added).   And Model Rule 1.16(a) mandates that an attorney withdraw from (or decline) representation if the representation will result in a violation of the rules of professional conduct or other law.   Thus, even if it was not improper for counsel to keep confidential the defect information they learned through their representation of New GM, counsel were prohibited from continuing to counsel New GM and were required to withdraw from representation.   K&S and New GM's in-house counsel did neither.

Counsel's violation of these ethical rules provides an alternative basis to pierce the work product privilege.   "[A] lawyer's unprofessional behavior may vitiate the work product privilege." *Moody v. IRS*, 654 F.2d 795, 800 (D.C. Cir. 1981).   *See also Parrott v. Wilson*, 707

F.2d 1262, 1271 (11th Cir. 1983) (ordering disclosure of work product and explaining that while the attorney's behavior "violate[d] no law, the Code of Professional Conduct imposes a higher standard than mere legality"); *Anderson v. Hale*, 202 F.R.D. 548, 558 (N.D. Ill. 2001) (attorney's unethical, surreptitious taping of a witness interview vitiated work product privilege); *Haigh v. Matsushita Elec. Corp. of Am.*, 676 F. Supp. 1332, 1358-59 (E.D. Va. 1987) (same); *State of New York v. Solvent Chem. Co., Inc.*, 166 F.R.D. 284 (W.D.N.Y. 1996) (ordering production of work product where the defendant's attorneys had improperly engaged a potentially hostile witness as a consultant for the purpose of preventing his deposition).

As set forth above, K&S's litigation tactics—and its ongoing representation of New GM even after it learned of GM's ongoing fraudulent concealment—violated the Rules of Professional Conduct. Thus, the work product that King & Spalding and New GM's in-house counsel created to further this unethical end is subject to discovery.

## V.    CONCLUSION

For all the foregoing reasons, Plaintiffs' motion to compel should be granted.


Dated: June 10, 2015                              Respectfully Submitted,

                                                  By:   */s/ Robert C. Hilliard*
                                                  Robert C. Hilliard

                                                  HILLIARD MUÑOZ GONZALES L.L.P.

                                                  719 S Shoreline Blvd, Suite #500
                                                  Corpus Christi, TX 78401
                                                  Telephone:  (361) 882-1612
                                                  Facsimile:  (361) 882-3015
                                                  *bobh@hmglawfirm.com*

                                                  HAGENS BERMAN SOBOL SHAPIRO
                                                  LLP

                                                  Steve W. Berman

*steve@hbsslaw.com*
Sean R. Matt
*sean@hbsslaw.com*
Andrew M. Volk
*andrew@hbsslaw.com*
Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

Elizabeth J. Cabraser
*ecabraser@lchb.com*
Steven E. Fineman
*sfineman@lchb.com*
Rachel Geman
*rgeman@lchb.com*
Annika K. Martin
*akmartin@lchb.com*
275 Battery St., 29th Floor
San Francisco, CA 94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

*Co-Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on June 10, 2015, which will send notification of such filing to the e-mail addresses registered.

*s/ Robert C. Hilliard*

Robert C. Hilliard