UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION
SWITCH LITIGATION

*This Document Relates to All Actions*

-------------------------------------------------------------x

14-MD-2543 (JMF)

**SECOND AMENDED CONSOLIDATED
COMPLAINT**

[REDACTED]

# TABLE OF CONTENTS

<u>Page</u>

I.     INTRODUCTION ................................................................................................ 1

II.    JURISDICTION AND VENUE ....................................................................... 11

III.   PARTIES ........................................................................................................... 11

    A.    Plaintiffs ................................................................................................ 11

        1.    Melissa Cave – Alabama ......................................................... 12

        2.    Debra Forbes – Alabama .......................................................... 12

        3.    Valeria Glenn – Alabama......................................................... 13

        4.    Aaron Henderson – Alabama ................................................... 13

        5.    Marion Smoke – Alabama ....................................................... 14

        6.    Grace Belford – Arizona .......................................................... 14

        7.    Barbara Hill – Arizona............................................................. 15

        8.    Camille Burns – Arkansas ....................................................... 16

        9.    Nettleton Auto Sales, Inc. – Nationwide Dealer and
             Arkansas Class Representative ................................................. 17

        10.   Anna Andrews – California ...................................................... 18

        11.   Patricia Barker – California ...................................................... 18

        12.   Michael and Sylvia Benton – California.................................. 19

        13.   Kimberly Brown – California ................................................... 20

        14.   Melvin Cohen – California ....................................................... 20

        15.   Marc and Madelaine Koppelman – California.......................... 21

        16.   Javier Malaga – California ....................................................... 22

        17.   David Padilla – California ........................................................ 23

        18.   Randall Pina – California ......................................................... 24

19.   Esperanza Ramirez – California ................................................................... 24

20.   Daniel Ratzlaff – California ........................................................................ 25

21.   William Rukeyser – California .................................................................... 25

22.   Dawn Orona – Colorado .............................................................................. 26

23.   Yvonne Elaine Rodriguez – Colorado ........................................................ 26

24.   Nathan Terry – Colorado ............................................................................ 27

25.   Michael Pesce – Connecticut ...................................................................... 28

26.   Lisa Teicher – Connecticut ......................................................................... 29

27.   LaTonia Tucker – Delaware ........................................................................ 30

28.   Pajja Jackson – District of Columbia .......................................................... 30

29.   Steven Diana – Florida ................................................................................ 31

30.   Joni Ferden-Precht – Florida ...................................................................... 32

31.   Kim Genovese – Florida .............................................................................. 32

32.   Rhonda Haskins – Florida ........................................................................... 33

33.   Maria E. Santiago – Florida ........................................................................ 33

34.   Turner Clifford – Georgia ........................................................................... 34

35.   Jennifer Gearin – Georgia ........................................................................... 35

36.   Barry Wilborn – Georgia ............................................................................ 35

37.   Winifred Mattos – Hawaii ........................................................................... 36

38.   Dennis Walther – Hawaii ............................................................................ 36

39.   Donna Harris – Illinois ................................................................................ 37

40.   Patrick Painter – Illinois ............................................................................. 37

41.   Heather Holleman – Indiana ....................................................................... 38

42.   Karen Rodman – Indiana ............................................................................. 38

010440-11  784012 V1

43.    Alphonso Wright – Indiana.................................................................39

44.    James Dooley – Iowa ........................................................................39

45.    Trina & John Marvin Brutche Jr. – Kansas .......................................40

46.    Phyllis Hartzell – Kansas .................................................................40

47.    Philip Zivnuska, D.D.S. – Kansas.....................................................41

48.    Elizabeth Stewart – Kentucky...........................................................41

49.    Dawn Talbot – Kentucky ..................................................................42

50.    Jennifer Crowder – Louisiana...........................................................43

51.    Nathaniel and Frances Ann Fagans – Louisiana ...............................43

52.    Lisa West – Louisiana.......................................................................44

53.    Michelangelo De Ieso – Maine .........................................................44

54.    Alysha Peabody – Maine ..................................................................45

55.    Harry Albert – Maryland ..................................................................45

56.    George Mathis – Maryland ...............................................................46

57.    Bryan Mettee – Maryland .................................................................46

58.    Robert Wyman – Maryland ...............................................................47

59.    Mary Dias – Massachusetts ..............................................................47

60.    Colin Elliott – Massachusetts............................................................48

61.    Richard Leger – Massachusetts ........................................................48

62.    Sheree Anderson – Michigan............................................................49

63.    Diana Cnossen – Michigan ...............................................................49

64.    Rafael Lanis – Michigan ...................................................................50

65.    Anna Allhouse – Minnesota..............................................................51

66.    David Cleland – Minnesota ..............................................................51

67.  Frances Howard – Mississippi ........................................................... 52

68.  Elizabeth D. Johnson – Mississippi .................................................. 52

69.  Linda Wright – Mississippi ............................................................... 53

70.  Cynthia Hawkins – Missouri ............................................................. 53

71.  Ronald Robinson – Missouri ............................................................. 54

72.  Michelle Washington – Missouri ...................................................... 54

73.  Patrice Witherspoon – Missouri ....................................................... 55

74.  Patricia Backus – Montana ............................................................... 56

75.  Laurie Holzwarth – Montana ............................................................ 57

76.  Susan Rangel – Nebraska .................................................................. 58

77.  Sandra Horton – Nevada ................................................................... 58

78.  Wayne Wittenberg – Nevada ............................................................ 59

79.  Michael Amezquita – New Jersey ..................................................... 59

80.  Anthony Juraitis – New Jersey ......................................................... 60

81.  Gene Reagan – New Jersey ............................................................... 61

82.  Steven Sileo – New Jersey ................................................................ 61

83.  Javier Delacruz – New Mexico ......................................................... 62

84.  Lorraine De Vargas – New Mexico ................................................... 62

85.  Bernadette Romero – New Mexico ................................................... 63

86.  Renate Glyttov – New York ............................................................... 63

87.  Sandra Levine – New York ................................................................ 64

88.  Nicole Mason – New York ................................................................. 65

89.  Michael Rooney – New York ............................................................. 66

90.  William Ross – New York .................................................................. 66

010440-11  784012 V1

91.   Donald Cameron – North Carolina ........................................................ 68

92.   Leland Tilson – North Carolina ............................................................ 68

93.   Silas Walton – North Carolina .............................................................. 68

94.   Jolene Mulske – North Dakota .............................................................. 69

95.   Bedford Auto Sales, Inc. – Nationwide Dealer and Ohio
      State Class Representative .................................................................... 70

96.   Sharon Dorsey – Ohio ........................................................................... 71

97.   Peggy Robinson – Ohio ......................................................................... 72

98.   Bonnie Taylor – Ohio ............................................................................ 72

99.   Deneise Burton – Oklahoma ................................................................. 73

100.  Jerrile Gordon – Oklahoma .................................................................. 73

101.  Paulette Hand – Oklahoma ................................................................... 74

102.  Jennifer Reeder – Oklahoma ................................................................ 74

103.  Bruce and Denise Wright – Oklahoma ................................................ 76

104.  William Bernick – Oregon .................................................................... 77

105.  Janice Bagley – Pennsylvania .............................................................. 78

106.  Shawn Doucette – Pennsylvania .......................................................... 78

107.  Shirley Gilbert – Pennsylvania ............................................................ 79

108.  Garrett Mancieri – Rhode Island.......................................................... 79

109.  Annette Hopkins – South Carolina ...................................................... 80

110.  Janelle Davis – South Dakota .............................................................. 80

111.  Norma Lee Nelson – South Dakota ...................................................... 81

112.  Helen A. Brown – Tennessee ............................................................... 81

113.  Louise Tindell – Tennessee .................................................................. 81

114.  Michael Graciano – Texas .................................................................... 82

115.   Shenyesa Henry – Texas ................................................................. 84

116.   Keisha Hunter – Texas .................................................................... 84

117.   Lisa William – Texas ...................................................................... 85

118.   Alexis Crockett – Utah .................................................................... 85

119.   Blair Tomlinson, D.D.S. – Utah ..................................................... 86

120.   Ashlee Hall-Abbott – Virginia ....................................................... 87

121.   Erinn Salinas – Virginia ................................................................. 87

122.   Michael Garcia – Washington ........................................................ 88

123.   Tony Hiller – Washington .............................................................. 88

124.   Stephanie Renee Carden – West Virginia ...................................... 89

125.   Melinda Graley – West Virginia .................................................... 89

126.   Nancy Bellow – Wisconsin ............................................................ 90

127.   Henry Redic – Wisconsin ............................................................... 90

128.   Les Rouse – Wisconsin .................................................................. 91

129.   Scott Schultz – Wisconsin ............................................................. 92

130.   David Young – Wyoming ............................................................... 92

B.   Defendant ................................................................................................... 93

IV.   FACTUAL ALLEGATIONS ................................................................................ 94

A.   New GM Falsely Promoted All of Its Vehicles as Safe, Reliable, and High-Quality .................................................................................... 94

B.   New GM's Advertising and Marketing Literature Falsely Claimed that GM Placed Safety and Quality First ......................................... 106

C.   The Ignition Switch System Defects ....................................................... 120

1.   New GM was aware of the defective ignition switch problem from the date of its inception. ............................... 123

2.    The Ignition Switch Defect giving rise to the February and March 2014 Recalls. ................................................................. 129

    a.    New GM was long aware of the defect. ................................. 129

    b.    New GM continues to conceal the ignition switch defect. ............................................................................. 140

    c.    New GM received many complaints of power failures in Defective Ignition Switch Vehicles. ....................... 150

    d.    New GM recalls 2.1 million vehicles with defective ignition switches in February and March of 2014. ................... 153

3.    New GM recalls over 10 million additional vehicles for ignition switch defects in June and July of 2014. ................................ 154

    a.    June 19, 2014 Recall – Camaro Recall ............................... 155

    b.    June 20, 2014 recall – ignition key slot defect. .......................... 163

    c.    July 2 and 3, 2014 recalls – unintended ignition rotation defect. ........................................................... 176

4.    Yet another ignition switch recall is made on September 4, 2014. ............................................................................... 196

5.    The ignition switch recalls are inadequate and poorly conducted. ......................................................................... 199

    d.    New GM failed to alert drivers of recalled vehicles to the possibility of obtaining a loaner vehicle, and when consumers are aware, they often find that loaner vehicles are not available. ................................. 200

    e.    The repair is inadequate and/or results in new vehicle defects. ....................................................... 203

    f.    The recalls are not being completed in a timely fashion. ........................................................... 205

    g.    The repair of the other ignition switch defects. ......................... 207

D.    Contrary to its Barrage of Representations about Safety and Quality, New GM Concealed and Disregarded Safety Issues as a Way of Doing Business ........................................................... 209

1.      New GM's Deceptions Continued In Its Public Discussions
        of the Ignition Switch Recalls ............................................................ 218

2.      There are serious safety defects in millions of GM-branded
        vehicles across many models and years and, until recently,
        New GM concealed them from consumers. ........................................ 221

3.      Other safety defects affecting the ignition in GM-branded
        vehicles. ............................................................................................. 223

        a.      Ignition lock cylinder defect in vehicles also
                affected by the ignition switch defect that gave rise
                to the first recall of 2.1 million defective ignition
                switch vehicles. ....................................................................... 223

        b.      Ignition lock cylinder defect affecting over 200,000
                additional GM-branded vehicles. ............................................ 227

4.      Defects affecting the occupant safety restraint system in
        GM-branded vehicles. ......................................................................... 228

        a.      Safety defects of the airbag systems of GM-branded
                vehicles. ................................................................................... 228

                (1)     Wiring harness defect. ................................................. 228

        b.      Driver-side airbag shorting-bar defect. .................................... 232

                (1)     Driver-side airbag inflator defect. ............................... 233

                (2)     Roof-rail airbag defect. ............................................... 234

                (3)     Passenger-side airbag defect. ....................................... 235

                (4)     Sport seat side-impact airbag defect. ........................... 237

                (5)     Passenger-side airbag inflator defect. .......................... 237

                (6)     Front passenger airbag defect. ..................................... 238

                (7)     Electrical short circuit airbag defect. ........................... 239

        c.      Safety defects of the seat belt systems in GM-
                branded vehicles. ..................................................................... 240

                (1)     Seat belt connector cable defect. .................................. 240

                (2)     Seat belt retractor defect. ............................................ 242

(3)     Frontal lap-belt pretensioner defect. ............................243

5.     Safety defects affecting seats in GM-branded vehicles. .......................245

6.     Safety defects affecting the brakes in GM-branded vehicles................246

   a.     Brake light defect. ....................................................................246

   b.     Brake booster pump defect. ....................................................250

   c.     Hydraulic boost assist defect. ................................................251

   d.     Brake rotor defect. ..................................................................251

   e.     Reduced brake performance defect.........................................252

   f.     Parking brake defect. ..............................................................252

7.     Safety defects affecting the steering in GM-branded
       vehicles. ...........................................................................................253

   a.     Sudden power-steering failure defect. .....................................253

   b.     Power steering hose clamp defect............................................256

   c.     Power steering control module defect......................................256

   d.     Lower control arm ball joint defect. ........................................257

       (1)     Steering tie-rod defect....................................................257

   e.     Joint fastener torque defect. ....................................................258

   f.     Loss of electric power steering assist defect............................259

       (1)     Steering column assembly defect...................................259

8.     Safety defects affecting the powertrain in GM-branded
       vehicles. ...........................................................................................259

   a.     Transmission shift cable defect affecting 1.1 million
          Chevrolet and Pontiac vehicles...............................................259

9.     Transmission shift cable defect affecting Cadillac vehicles. ................262

   a.     Transmission oil cooler line defect. ........................................263

   b.     Transfer case control module software defect. .........................266

c.      Acceleration-lag defect. ............................................. 267

d.      Transmission turbine shaft fracture defect. ................. 268

e.      Automatic transmission shift cable adjuster. ............... 269

10.      Other serious defects affecting GM-branded vehicles. .......................... 270

a.      Power management mode software defect. ................ 270

b.      Light control module defect. ..................................... 271

c.      Electrical short in driver's door module defect. .......... 272

d.      Front axle shaft defect. .............................................. 272

e.      Seat hook weld defect. ............................................... 273

f.      Front turn signal bulb defect. .................................... 274

g.      Low-beam headlight defect. ....................................... 275

h.      Radio chime defect. ................................................... 276

i.      Fuel gauge defect. ...................................................... 277

j.      Fuel Pump Module Defect .......................................... 278

k.      Windshield wiper system defect. ............................... 279

l.      Console bin door latch defect. ................................... 280

m.     Driver door wiring splice defect. ............................... 280

n.      Overloaded feed defect. ............................................. 281

o.      Windshield wiper module assembly defect. ............... 282

p.      Engine block heater power cord insulation defect. .................... 283

q.      Rear shock absorber defect. ....................................... 283

r.      Electronic stability control defect. ............................. 284

s.      Unsecured floor mat defect. ....................................... 284

t.      Fuse block defect. ...................................................... 285

|  |  | u. | Diesel transfer pump defect. | 286 |
|  |  | v. | Rear suspension toe adjuster link defect. | 287 |
|  |  | w. | Hood latch defect. | 288 |
|  |  | x. | Electrical short defect. | 289 |
|  |  | y. | Headlamp Driver Module Failure. | 290 |
|  |  | z. | Ignition Lock Actuator Binding Defect. | 290 |
|  |  | aa. | Tire tread cracking defect. | 291 |
|  |  | bb. | Engine Software Defect. | 291 |
|  |  | cc. | Valve cover gasket defect. | 292 |

E.   New GM Sold Used Defective Ignition Switch Vehicles As "Certified Previously Owned" Vehicles .......................................... 292

F.   New GM's Deception Has Harmed Plaintiffs and the Class ........................... 294

V.   TOLLING OF THE STATUTES OF LIMITATION ................................. 308

A.   Discovery Rule Tolling ........................................................................... 308

B.   Fraudulent Concealment Tolling .............................................................. 309

C.   Estoppel ............................................................................................... 309

VI.   CLASS ALLEGATIONS ................................................................... 310

A.   The Nationwide Class ............................................................................ 310

B.   State Law Classes .................................................................................. 318

C.   The Classes and Subclasses Meet Rule 23 Requirements ........................ 321

VII.   CLAIMS FOR RELIEF ..................................................................... 324

COUNT I   VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961 *et seq.* ................................. 324

A.   The New GM RICO Enterprise ................................................................ 324

B.   Pattern of Racketeering Activity .............................................................. 329

C.   New GM Conducted the Enterprise to Conceal the Nature and
     Scope of the Defects from Litigants, Claimants and Courts, and by
     Extension, the Public .......................................................................................330

     1.   K&S warns GM of a defect. ..................................................................330

     2.   Continued concealment of the defect....................................................333

     3.   ESIS' awareness of the defect in numerous incidents. ..........................337

     4.   GM and K&S lied to the Meltons and the court to prevent
          disclosure of evidence relating to the defect in other
          vehicles. ...............................................................................................338

          a.   The parents of Jennifer Brooke Melton sought
               discovery from New GM regarding the ignition
               switch defect that killed their daughter.......................................338

          b.   New GM and K&S knew that airbag non-
               deployment in Cobalts was related to the condition
               identified in the Technical Service Bulletin..............................339

          c.   GM and K&S told the Meltons and the Court that
               New GM had no documents regarding other
               incidents involving the condition identified in the
               Technical Service Bulletin...........................................................340

          d.   K&S told one thing to the Court and the opposite to
               New GM on the same day.............................................................343

          e.   GM and K&S lied to the court and the Meltons
               about the relevance of the airbag non-deployment
               investigation documents..............................................................344

          f.   K&S expected the *Melton* court to sanction New
               GM for discovery abuse...............................................................346

     5.   GM and K&S committed other fraudulent litigation
          misconduct to hide evidence of the Ignition Switch Defect. ................346

          a.   GM and K&S hid the existence of part change
               documents. ..................................................................................346

          b.   New GM and K&S lied about Jim Federico's role in
               the defect investigation to prevent him from being
               deposed. ......................................................................................348

6.      K&S also worked for New GM in connection with the ignition switch recall and the "investigation" of the reasons for the delay. .................................................................................. 348

D.      New GM Conducted the Enterprise to Promote the Safety and Quality of Its Vehicles without Revealing the Defects ...................................... 349

E.      New GM Conducted the Enterprise to Issue Incomplete and Misleading Service Bulletins ................................................................. 350

F.      New GM Conducted the Enterprise to Submit Incomplete and Misleading Reports to Regulators ...................................................... 351

G.      New GM Conducted the Enterprise to Submit Incomplete and Misleading Reports to Congress and The Public ................................ 353

H.      Plaintiffs' Injuries and Damages ........................................................ 354

COUNT II  VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT 15 U.S.C. § 2301, *et seq.*.................................................................................. 355

COUNT III  NEGLIGENCE ................................................................................... 359

I.      Statewide Class Claims ........................................................................ 361

ALABAMA ............................................................................................................. 361

COUNT I  VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT  (ALA. CODE § 8-19-1, *et seq.*) .................................................... 361

COUNT II  FRAUD BY CONCEALMENT ............................................................. 366

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY ................................. 369

COUNT IV  THIRD-PARTY BENEFICIARY CLAIM ........................................... 373

COUNT V  UNJUST ENRICHMENT .................................................................... 375

ALASKA ................................................................................................................. 376

COUNT I  VIOLATION OF THE ALASKA UNFAIR TRADE  PRACTICES AND CONSUMER PROTECTION ACT  (ALASKA STAT. ANN. § 45.50.471, *et seq.*) ............................................................................ 376

COUNT II  FRAUD BY CONCEALMENT ............................................................. 381

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY  (ALASKA STAT. § 45.02.314)...................................................384

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY .......................................................385

COUNT V  THIRD-PARTY BENEFICIARY CLAIM..........................................................389

COUNT VI  UNJUST ENRICHMENT .................................................................................391

ARIZONA...................................................................................................................................393

COUNT I  VIOLATIONS OF THE CONSUMER FRAUD ACT  (ARIZONA REV.
STAT. § 44-1521, *et seq.*) .......................................................................................393

COUNT II  FRAUD BY CONCEALMENT...........................................................................397

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY .......................................................400

COUNT IV  THIRD-PARTY BENEFICIARY CLAIM .......................................................404

COUNT V  UNJUST ENRICHMENT ..................................................................................406

ARKANSAS................................................................................................................................408

COUNT I  VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT
(ARK. CODE ANN. § 4-88-101, *et seq.*) .........................................................408

COUNT II  FRAUD BY CONCEALMENT...........................................................................412

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY ................................................................................................415

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY .......................................................417

COUNT V  THIRD-PARTY BENEFICIARY CLAIM..........................................................421

COUNT VI  UNJUST ENRICHMENT .................................................................................423

CALIFORNIA .............................................................................................................................424

COUNT I  VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
(CAL. CIV. CODE § 1750, *et seq.*)....................................................................424

COUNT II  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION
LAW  (CAL. BUS. & PROF. CODE § 17200, *et seq.*)......................................429

COUNT III  FRAUD BY CONCEALMENT ........................................................... 435

COUNT IV  VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY
 ACT FOR BREACH OF IMPLIED WARRANTY OF
 MERCHANTABILITY  (CAL. CIV. CODE §§ 1791.1 & 1792) ..................................... 438

COUNT V  NEGLIGENT FAILURE TO RECALL ............................................... 440

COUNT VI FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
 CLAIM AGAINST OLD GM IN BANKRUPTCY ...................................... 441

COUNT VII THIRD-PARTY BENEFICIARY CLAIM ........................................ 445

COUNT VIII  UNJUST ENRICHMENT ................................................................. 448

COLORADO ........................................................................................................... 449

COUNT I  VIOLATIONS OF THE COLORADO CONSUMER PROTECTION
 ACT  (COL. REV. STAT. § 6-1-101, *et seq.*) ..................................................... 449

COUNT II  FRAUD BY CONCEALMENT ........................................................... 454

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
 MERCHANTABILITY  (COL. REV. STAT. § 4-2-314) ................................. 457

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
 CLAIM AGAINST OLD GM IN BANKRUPTCY ...................................... 458

COUNT V THIRD-PARTY BENEFICIARY CLAIM .......................................... 462

COUNT VI  UNJUST ENRICHMENT ................................................................. 464

CONNECTICUT ..................................................................................................... 465

COUNT I  VIOLATION OF CONNECTICUT UNLAWFUL TRADE
 PRACTICES ACT  (CONN. GEN. STAT. § 42-110A, *et seq.*) ........................ 465

COUNT II  FRAUDULENT CONCEALMENT .................................................... 470

COUNT III FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
 CLAIM AGAINST OLD GM IN BANKRUPTCY ...................................... 473

COUNT IV THIRD-PARTY BENEFICIARY CLAIM ........................................ 477

COUNT V  UNJUST ENRICHMENT ................................................................... 479

DELAWARE ........................................................................................................... 480

COUNT I  VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT  (6 Del. Code § 2513, *et seq.*) ...................................................................480

COUNT II  FRAUD BY CONCEALMENT ....................................................485

COUNT III  BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY ...........................................................................488

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY ....................................489

COUNT V  THIRD-PARTY BENEFICIARY CLAIM ....................................493

COUNT VI  UNJUST ENRICHMENT ..........................................................495

DISTRICT OF COLUMBIA ...........................................................................496

COUNT I  VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT  (D.C. Code § 28-3901, *et seq.*)............................................496

COUNT II  FRAUD BY CONCEALMENT ....................................................502

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ................505

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY ....................................506

COUNT V THIRD-PARTY BENEFICIARY CLAIM ....................................510

COUNT VI  UNJUST ENRICHMENT ..........................................................512

FLORIDA ........................................................................................................514

COUNT I  VIOLATION OF FLORIDA'S UNFAIR &  DECEPTIVE TRADE PRACTICES ACT  (Fla. Stat. § 501.201, *et seq.*) ....................................514

COUNT II  FRAUD BY CONCEALMENT ....................................................518

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY ....................................521

COUNT IV  THIRD-PARTY BENEFICIARY CLAIM ..................................525

COUNT V  UNJUST ENRICHMENT ............................................................527

GEORGIA........................................................................................................529

COUNT I  VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
(GA. CODE ANN. § 10-1-390, *et seq.*).............................................................529

COUNT II  VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE
PRACTICES ACT  (GA. CODE ANN. § 10-1-370, *et seq.*)............................534

COUNT III...........................................................................................................538

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ......................................541

COUNT V  THIRD-PARTY BENEFICIARY CLAIM................................................545

COUNT VI  UNJUST ENRICHMENT ....................................................................547

HAWAII ...............................................................................................................549

COUNT I  UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII
LAW   (HAW. REV. STAT. § 480, *et seq.*).......................................................549

COUNT II  FRAUD BY CONCEALMENT................................................................553

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY ..................................................................................556

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ......................................558

COUNT V THIRD-PARTY BENEFICIARY CLAIM................................................562

COUNT VI  UNJUST ENRICHMENT .....................................................................564

IDAHO.................................................................................................................565

COUNT I  VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
(IDAHO CIV. CODE § 48-601, *et seq.*).............................................................565

COUNT II  FRAUD BY CONCEALMENT................................................................570

COUNT III FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ......................................573

COUNT IV THIRD-PARTY BENEFICIARY CLAIM .............................................577

COUNT V  UNJUST ENRICHMENT.......................................................................579

ILLINOIS............................................................................................................580

COUNT I  VIOLATION OF ILLINOIS CONSUMER FRAUD AND
       DECEPTIVE BUSINESS PRACTICES ACT  (815 ILCS 505/1, *et seq.*
       and 720 ILCS 295/1A) ................................................................. 580

COUNT II  FRAUD BY CONCEALMENT ................................................ 585

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
       CLAIM AGAINST OLD GM IN BANKRUPTCY ...................................... 588

COUNT IV  THIRD-PARTY BENEFICIARY CLAIM ................................... 592

COUNT V  UNJUST ENRICHMENT .................................................... 594

INDIANA ............................................................................................. 596

COUNT I  VIOLATION OF THE INDIANA DECEPTIVE CONSUMER
       SALES ACT  (IND. CODE § 24-5-0.5-3) ......................................... 596

COUNT II  FRAUD BY CONCEALMENT ................................................ 601

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ................. 604

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
       CLAIM AGAINST OLD GM IN BANKRUPTCY ...................................... 605

COUNT V  THIRD-PARTY BENEFICIARY CLAIM ................................... 609

COUNT VI  UNJUST ENRICHMENT .................................................... 611

IOWA ................................................................................................ 613

COUNT I  VIOLATIONS OF THE PRIVATE RIGHT OF ACTION  FOR
       CONSUMER FRAUDS ACT  (IOWA CODE § 714H.1, *et seq.*) ................... 613

COUNT II  FRAUD BY CONCEALMENT ................................................ 617

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
       CLAIM AGAINST OLD GM IN BANKRUPTCY ...................................... 620

COUNT IV  THIRD-PARTY BENEFICIARY CLAIM ................................... 624

COUNT V  UNJUST ENRICHMENT .................................................... 626

KANSAS ............................................................................................. 628

COUNT I  VIOLATIONS OF THE KANSAS CONSUMER PROTECTION
       ACT  (KAN. STAT. ANN. § 50-623, *et seq.*) ................................... 628

COUNT II  FRAUD BY CONCEALMENT ................................................................ 633

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ................. 636

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ....................................... 637

COUNT V THIRD-PARTY BENEFICIARY CLAIM ................................................ 641

COUNT VI  UNJUST ENRICHMENT ................................................................ 643

KENTUCKY ................................................................................................ 645

COUNT I  VIOLATION OF THE KENTUCKY CONSUMER PROTECTION
    ACT  (KY. REV. STAT. § 367.110, *et seq.*) .................................... 645

COUNT II  FRAUD BY CONCEALMENT ................................................................ 649

COUNT III FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ....................................... 652

COUNT IV THIRD-PARTY BENEFICIARY CLAIM ............................................. 656

COUNT V  UNJUST ENRICHMENT ................................................................ 658

LOUISIANA ................................................................................................ 660

COUNT I  VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES
    AND CONSUMER PROTECTION LAW  (LA. REV. STAT. § 51:1401, *et
    seq.*) ........................................................................................... 660

COUNT II  FRAUD BY CONCEALMENT ................................................................ 664

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/
    WARRANTY AGAINST REDHIBITORY DEFECTS  (LA. CIV. CODE
    ART. 2520, 2524) .......................................................................... 667

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ....................................... 669

COUNT V THIRD-PARTY BENEFICIARY CLAIM ................................................ 673

COUNT VI  UNJUST ENRICHMENT ................................................................ 675

MAINE ...................................................................................................... 676

COUNT I  VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT  (ME.
    REV. STAT. ANN. TIT. 5 § 205-A, *et seq.*) ...................................... 676

COUNT II  FRAUD BY CONCEALMENT ............................................................................ 681

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(ME. REV. STAT. ANN. TIT. 11 § 2-314) ...................................................... 684

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ...................................... 685

COUNT V THIRD-PARTY BENEFICIARY CLAIM ............................................................ 689

COUNT VI  UNJUST ENRICHMENT .............................................................................. 691

MARYLAND ............................................................................................................. 693

COUNT I  VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION
ACT  (MD. CODE COM. LAW § 13-101, *et seq.*) ........................................... 693

COUNT II  FRAUD BY CONCEALMENT ............................................................................ 697

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MD. CODE COM. LAW § 2-314) ................................................................. 700

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ...................................... 701

COUNT V THIRD-PARTY BENEFICIARY CLAIM ............................................................ 705

COUNT VI  UNJUST ENRICHMENT .............................................................................. 707

MASSACHUSETTS ................................................................................................... 709

COUNT I  DECEPTIVE ACTS OR PRACTICES PROHIBITED BY
MASSACHUSETTS LAW  (MASS. GEN. LAWS CH. 93A, § 1, *et seq.*) ..................... 709

COUNT II  FRAUD BY CONCEALMENT ............................................................................ 714

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(ALM GL. CH. 106, § 2-314) ...................................................................... 717

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ...................................... 718

COUNT V THIRD-PARTY BENEFICIARY CLAIM ............................................................ 722

COUNT VI  UNJUST ENRICHMENT .............................................................................. 724

MICHIGAN ............................................................................................................. 725

COUNT I  VIOLATION OF THE MICHIGAN CONSUMER PROTECTION
ACT   (MICH. COMP. LAWS § 445.903, *et seq.*) ............................................................ 725

COUNT II  FRAUD BY CONCEALMENT ............................................................................. 731

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MICH. COMP. LAWS § 440.2314) .................................................................. 734

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ...................................... 735

COUNT V THIRD-PARTY BENEFICIARY CLAIM .................................................... 739

COUNT VI  UNJUST ENRICHMENT ...................................................................................... 741

MINNESOTA ......................................................................................................................................... 742

COUNT I  VIOLATION OF MINNESOTA PREVENTION  OF CONSUMER
FRAUD ACT   (MINN. STAT. § 325F.68, *et seq.*) ......................................... 742

COUNT II  VIOLATION OF MINNESOTA UNIFORM  DECEPTIVE TRADE
PRACTICES ACT  (MINN. STAT. § 325D.43-48, *et seq.*) ............................ 747

COUNT III  FRAUD BY CONCEALMENT ....................................................................... 751

COUNT IV  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MINN. STAT. § 336.2-314) ........................................................................ 754

COUNT V FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A CLAIM
AGAINST OLD GM IN BANKRUPTCY ...................................................... 755

COUNT VI THIRD-PARTY BENEFICIARY CLAIM ................................................. 759

COUNT VII  UNJUST ENRICHMENT ..................................................................................... 762

MISSISSIPPI ........................................................................................................................................ 763

COUNT I  VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT
(MISS. CODE. ANN. § 75-24-1, *et seq.*) ........................................................... 763

COUNT II  FRAUD BY CONCEALMENT ....................................................................... 767

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MISS. CODE ANN. § 75-2-314) ...................................................................... 770

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ...................................... 771

COUNT V THIRD-PARTY BENEFICIARY CLAIM ............................................................ 775

MISSOURI .................................................................................................................... 778

COUNT I VIOLATION OF MISSOURI MERCHANDISING PRACTICES
ACT (Mo. Rev. Stat. § 407.010, *et seq.*) .................................................. 778

COUNT II FRAUD BY CONCEALMENT ....................................................................... 783

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MO. REV. STAT. § 400.2-314) ................................................................... 786

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ....................................... 787

COUNT V THIRD-PARTY BENEFICIARY CLAIM ............................................................ 791

COUNT VI UNJUST ENRICHMENT ............................................................................. 793

MONTANA .................................................................................................................... 795

COUNT I VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND
CONSUMER PROTECTION ACT OF 1973 (Mont. Code Ann. § 30-
14-101, *et seq.*) ....................................................................................... 795

COUNT II FRAUD BY CONCEALMENT ....................................................................... 799

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(Mont. Code § 30-2-314) ......................................................................... 802

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ....................................... 803

COUNT V THIRD-PARTY BENEFICIARY CLAIM ............................................................ 807

COUNT VI UNJUST ENRICHMENT ............................................................................. 810

NEBRASKA .................................................................................................................... 811

COUNT I VIOLATION OF THE NEBRASKA CONSUMER PROTECTION
ACT (Neb. Rev. Stat. § 59-1601, *et seq.*) ................................................ 811

COUNT II FRAUD BY CONCEALMENT ....................................................................... 815

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(Neb. Rev. Stat. Neb. § 2-314) ................................................................ 818

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ..................................................... 819

COUNT V THIRD-PARTY BENEFICIARY CLAIM ............................................................ 823

COUNT VI  UNJUST ENRICHMENT ................................................................................ 825

NEVADA ............................................................................................................................... 827

COUNT I  VIOLATION OF THE NEVADA DECEPTIVE TRADE
    PRACTICES ACT  (Nev. Rev. Stat. § 598.0903, *et seq.*) ......................................... 827

COUNT II  FRAUD BY CONCEALMENT ......................................................................... 831

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
    (Nev. Rev. Stat. § 104.2314) ..................................................................................... 834

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ..................................................... 835

COUNT V THIRD-PARTY BENEFICIARY CLAIM ............................................................ 839

COUNT VI  UNJUST ENRICHMENT ................................................................................ 842

NEW HAMPSHIRE ............................................................................................................. 843

COUNT I  VIOLATION OF N.H. CONSUMER PROTECTION ACT  (N.H.
    Rev. Stat. Ann. § 358-A:1, *et seq.*) ........................................................................ 843

COUNT II  FRAUD BY CONCEALMENT ......................................................................... 848

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (N.H. Rev. Stat. Ann. § 382-A:2-314) ................................. 851

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ..................................................... 852

COUNT V THIRD-PARTY BENEFICIARY CLAIM ............................................................ 856

COUNT VI  UNJUST ENRICHMENT ................................................................................ 858

NEW JERSEY ....................................................................................................................... 860

COUNT I  VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT  (N.J.
    Stat. Ann. § 56:8-1, *et seq.*) ................................................................................... 860

COUNT II  FRAUD BY CONCEALMENT ......................................................................... 864

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(N.J. STAT. ANN. § 12A:2-314) ........................................................... 867

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ..................................... 868

COUNT V THIRD-PARTY BENEFICIARY CLAIM ..................................... 872

COUNT VI UNJUST ENRICHMENT ............................................................ 874

NEW MEXICO ............................................................................................... 876

COUNT I  VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE
PRACTICES ACT  (N.M. STAT. ANN. §§ 57-12-1, *et seq.*) ........................ 876

COUNT II  FRAUD BY CONCEALMENT ................................................... 881

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(N.M. STAT. ANN. § 55-2-314) ............................................................. 884

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ..................................... 885

COUNT V THIRD-PARTY BENEFICIARY CLAIM ..................................... 889

COUNT VI  UNJUST ENRICHMENT .......................................................... 891

NEW YORK .................................................................................................... 893

COUNT I  DECEPTIVE ACTS OR PRACTICES  (N.Y. GEN. BUS. LAW § 349
and 350) ................................................................................................... 893

COUNT II  FRAUD BY CONCEALMENT ................................................... 897

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(N.Y. U.C.C. § 2-314) ............................................................................ 901

COUNT IV  VIOLATION OF NEW YORK'S FALSE ADVERTISING ACT
(N.Y. GEN. BUS. LAW § 350) ................................................................. 902

COUNT V FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A CLAIM
AGAINST OLD GM IN BANKRUPTCY ................................................. 903

COUNT VI THIRD-PARTY BENEFICIARY CLAIM ................................... 907

COUNT VII  UNJUST ENRICHMENT ......................................................... 910

NORTH CAROLINA ...................................................................................... 911

COUNT I  VIOLATION OF NORTH CAROLINA'S UNFAIR  AND
    DECEPTIVE ACTS AND PRACTICES ACT  (N.C. GEN. STAT. § 75-1.1,
    *et seq.*) ........................................................................................................ 911

COUNT II  FRAUD BY CONCEALMENT ........................................................... 915

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
    (N.C. GEN. STAT. **§** 25-2-314) ...................................................... 919

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ...................................... 920

COUNT V THIRD-PARTY BENEFICIARY CLAIM .......................................... 924

COUNT VI  UNJUST ENRICHMENT ................................................................ 926

NORTH DAKOTA ............................................................................................... 927

COUNT I  VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD
    ACT  (N.D. CENT. CODE § 51-15-02) ............................................. 927

COUNT II  FRAUD BY CONCEALMENT ........................................................... 932

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
    (N.D. CENT. CODE § 41-02-31) ....................................................... 935

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ...................................... 936

COUNT V THIRD-PARTY BENEFICIARY CLAIM .......................................... 940

COUNT VI  UNJUST ENRICHMENT ................................................................ 942

OHIO  ................................................................................................................. 944

COUNT I  VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT
    (OHIO REV. CODE ANN. § 1345.01, *et seq.*) ................................... 944

COUNT II  FRAUD BY CONCEALMENT ........................................................... 950

COUNT III  IMPLIED WARRANTY IN TORT ..................................................... 953

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ...................................... 954

COUNT V THIRD-PARTY BENEFICIARY CLAIM .......................................... 958

COUNT VI  UNJUST ENRICHMENT ................................................................ 960

OKLAHOMA ...................................................................................................... 961

COUNT I  VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT
(OKLA. STAT. TIT. 15 § 751, *et seq.*) ............................................... 961

COUNT II  FRAUD BY CONCEALMENT .................................................................. 967

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(12A OKLA. STAT. ANN. § 2-314) .................................................... 970

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ......................... 971

COUNT V THIRD-PARTY BENEFICIARY CLAIM ............................................. 975

COUNT VI  UNJUST ENRICHMENT ..................................................................... 977

OREGON ............................................................................................................. 978

COUNT I  VIOLATION OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT  (OR. REV. STAT. §§ 646.605, *et seq.*) ........... 978

COUNT II  FRAUD BY CONCEALMENT .................................................................. 983

COUNT III FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ......................... 986

COUNT IV THIRD-PARTY BENEFICIARY CLAIM ............................................. 990

COUNT V  UNJUST ENRICHMENT ..................................................................... 992

PENNSYLVANIA................................................................................................... 993

COUNT I  VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION LAW  (73 P.S. § 201-1,
*et seq.*)..................................................................................................... 993

COUNT II  FRAUD BY CONCEALMENT .................................................................. 998

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY  (13 PA. CONS. STAT. ANN. § 2314).................. 1001

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ......................... 1002

COUNT V THIRD-PARTY BENEFICIARY CLAIM ........................................... 1006

COUNT VI  UNJUST ENRICHMENT ..................................................................... 1008

RHODE ISLAND ................................................................................................ 1010

COUNT I  VIOLATION OF THE RHODE ISLAND UNFAIR TRADE
PRACTICES  AND CONSUMER PROTECTION ACT  (R.I. GEN. LAWS
§ 6-13.1, *et seq*.) ....................................................................................... 1010

COUNT II  FRAUD BY CONCEALMENT ......................................................... 1015

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY  (R.I. GEN. LAWS § 6A-2-314) ............................ 1018

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ................................... 1019

COUNT V THIRD-PARTY BENEFICIARY CLAIM ........................................ 1023

COUNT VI  UNJUST ENRICHMENT ............................................................... 1025

SOUTH CAROLINA .......................................................................................... 1026

COUNT I  VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE
PRACTICES ACT  (S.C. CODE ANN**.** § 39-5-10, *et seq*.) ........................... 1026

COUNT II  VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF
MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT  (S.C.
CODE ANN. § 56-15-10, *et seq*.) ................................................................ 1031

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY  (S.C. CODE § 36-2-314) ...................................... 1033

COUNT IV  FRAUD BY CONCEALMENT ...................................................... 1034

COUNT V FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A CLAIM
AGAINST OLD GM IN BANKRUPTCY ................................................ 1037

COUNT VI THIRD-PARTY BENEFICIARY CLAIM ...................................... 1041

COUNT VII  UNJUST ENRICHMENT .............................................................. 1043

SOUTH DAKOTA ............................................................................................. 1044

COUNT I  VIOLATION OF THE SOUTH DAKOTA  DECEPTIVE TRADE
PRACTICES AND CONSUMER PROTECTION LAW  (S.D. CODIFIED
LAWS § 37-24-6) ....................................................................................... 1044

COUNT II  FRAUD BY CONCEALMENT ......................................................... 1049

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (S.D. CODIFIED LAWS § 57A-2-314) ................................... 1052

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY .................................................. 1053

COUNT V THIRD-PARTY BENEFICIARY CLAIM ........................................................ 1057

COUNT VI  UNJUST ENRICHMENT ............................................................................... 1059

TENNESSEE ...................................................................................................................... 1060

COUNT I  VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT
    (TENN. CODE ANN. § 47-18-101, *et seq.*) ..................................................... 1060

COUNT II  FRAUD BY CONCEALMENT ....................................................................... 1065

COUNT III FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY .................................................. 1068

COUNT IV THIRD-PARTY BENEFICIARY CLAIM ....................................................... 1072

COUNT V  UNJUST ENRICHMENT ................................................................................ 1074

TEXAS ................................................................................................................................ 1075

COUNT I  VIOLATIONS OF THE TEXAS DECEPTIVE TRADE  PRACTICES
    – CONSUMER PROTECTION ACT  (TEX. BUS. & COM. CODE §§ 17.41,
    *et seq.*) ............................................................................................................... 1075

COUNT II  FRAUD BY CONCEALMENT ...................................................................... 1081

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY   (TEX. BUS. & COM. CODE § 2.314) ................................... 1084

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY .................................................. 1086

COUNT V THIRD-PARTY BENEFICIARY CLAIM ........................................................ 1090

COUNT VI  UNJUST ENRICHMENT ............................................................................... 1092

UTAH .................................................................................................................................. 1093

COUNT I  VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT
    (UTAH CODE ANN. § 13-11-1, *et seq.*) ......................................................... 1093

COUNT II ............................................................................................................................ 1098

FRAUD BY CONCEALMENT ............................................................................... 1098

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (Utah Code Ann. § 70A-2-314) ........................ 1101

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY .................................... 1102

COUNT V THIRD-PARTY BENEFICIARY CLAIM ........................................... 1106

COUNT VI  UNJUST ENRICHMENT ................................................................. 1108

VERMONT .............................................................................................................. 1109

COUNT I  VIOLATION OF VERMONT CONSUMER FRAUD ACT  (Vt.
    Stat. Ann. tit. 9, § 2451 et seq.) ................................................................ 1109

COUNT II  FRAUD BY CONCEALMENT ........................................................... 1113

COUNT III FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY .................................... 1116

COUNT IV THIRD-PARTY BENEFICIARY CLAIM ......................................... 1120

COUNT V  UNJUST ENRICHMENT ................................................................... 1122

VIRGINIA .............................................................................................................. 1124

COUNT I  VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT
    (Va. Code Ann. 15 §§ 59.1-196, et seq.) .................................................. 1124

COUNT II  FRAUD BY CONCEALMENT ........................................................... 1128

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
    (Va. Code Ann. § 8.2-314) ......................................................................... 1131

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY .................................... 1132

COUNT V THIRD-PARTY BENEFICIARY CLAIM ........................................... 1136

COUNT VI  UNJUST ENRICHMENT ................................................................. 1138

WASHINGTON ..................................................................................................... 1139

COUNT I  VIOLATION OF THE CONSUMER PROTECTION ACT  (Rev.
    Code Wash. Ann. §§ 19.86.010, et seq.) .................................................. 1139

COUNT II  FRAUD BY CONCEALMENT.................................................................... 1143

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ..................................................... 1147

COUNT IV  THIRD-PARTY BENEFICIARY CLAIM .......................................... 1151

COUNT V  UNJUST ENRICHMENT.................................................................... 1153

WEST VIRGINIA ...................................................................................................... 1154

COUNT I  VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION
    ACT  (W. VA. CODE § 46A-1-101, *et seq.*) ..................................................... 1154

COUNT II  FRAUD BY CONCEALMENT.................................................................... 1160

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
    (W. VA. CODE § 46-2-314) ............................................................................... 1163

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ..................................................... 1165

COUNT V  THIRD-PARTY BENEFICIARY CLAIM ............................................ 1169

COUNT VI  UNJUST ENRICHMENT .................................................................... 1171

WISCONSIN ............................................................................................................... 1172

COUNT I  VIOLATIONS OF THE WISCONSIN  DECEPTIVE TRADE
    PRACTICES ACT  (WIS. STAT. § 110.18)......................................................... 1172

COUNT II  FRAUD BY CONCEALMENT.................................................................... 1176

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ..................................................... 1180

COUNT IV  THIRD-PARTY BENEFICIARY CLAIM .......................................... 1184

COUNT V  UNJUST ENRICHMENT.................................................................... 1186

WYOMING ................................................................................................................. 1187

COUNT I  VIOLATION OF THE WYOMING CONSUMER PROTECTION
    ACT  (WYO. STAT. §§ 40-12-105 *et seq.*) ..................................................... 1187

COUNT II  FRAUD BY CONCEALMENT.................................................................... 1192

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (Wyo. Stat. §§ 34.1-2-314) ................................................ 1195

COUNT IV FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY .................................................... 1196

COUNT V THIRD-PARTY BENEFICIARY CLAIM ........................................................... 1200

COUNT VI  UNJUST ENRICHMENT ................................................................................. 1202

PRAYER FOR RELIEF ........................................................................................................ 1203

This Second Amended Consolidated Complaint ("Complaint") serves as the Plaintiffs' master Class Action Complaint for purposes of discovery, pre-trial motions, and rulings (including for class certification itself), and for trial of certified claims or common questions in these multi-district litigation ("MDL") proceedings.  The Complaint details New GM's unprecedented abrogation of basic standards of safety, truthfulness, and accountability to the detriment of tens-of-millions of consumers and the public at large; its direct actions and actions through an unlawful RICO Enterprise that harmed the Class; and repeated and flagrant violations of federal standards.  This Complaint draws upon an array of sources, including documents produced to date, New GM's own public concessions, government agency investigative reports, and other extensive materials.  This Complaint is not an administrative Complaint, but one that supersedes all MDL transferee complaints.  Notwithstanding the foregoing, certain claims or issues for certain parties may, consistent with 28 U.S.C. § 1407 and the case law thereunder, be matters for determination on remand by transferor courts.

## I.      INTRODUCTION

1.      Rule No. 1:  Manufacturers of any product – from toys to automobiles to medical devices – must manufacture and sell products that are, above all else, safe for use.  Safety protects consumers, is essential to long-term brand value and corporate success, and is required by law.

2.      Rule No. 2:  Manufacturers must also tell the complete truth about the safety of their products.  When a safety defect does occur, manufacturers must initiate some form of recall to address the problem.

3.      Rule No. 3:  Manufacturers of products whose operation can cause injuries and fatalities must have good manufacturing processes in place such that they can produce safe products and detect and correct quality control issues.

4.      Through its CEO Mary Barra, New GM admitted on June 5, 2014 that it had a

duty to build safe cars and failed:

> Our job is clear:  To build high quality, safe vehicles.  In this case
> with these vehicles, we didn't do our job.  We failed these
> customers. We must face up to it and learn from it.
>
>                                    …
>
> Furthermore, numerous individuals did not accept any
> responsibility to drive our organization to understand what was
> truly happening.  The report [commissioned by New GM]
> highlights a company that operated in silos, with a number of
> individuals seemingly looking for reasons not to act, instead of
> finding ways to protect our customers.
>
> Let me be clear:  This should never have happened.  It is
> unacceptable.  Our customers have to know they can count on our
> cars, our trucks and our word.  Because of the actions of a few
> people, and the willingness of others in the company to condone
> bureaucratic processes that avoided accountability, we let these
> customers down.

5.      New GM's violation of the rules governing car manufacturers was egregious.

From the date of its inception on July 11, 2009, it manufactured and sold millions of vehicles

that were not safe and were defective.  New GM also failed to disclose the truth about its patent

inability to manufacture and sell safe and reliable vehicles and its systematic scheme to

misrepresent the safety and reliability of its vehicles, and failed to remedy the defects in millions

of GM-branded vehicles that were on the road.  These violations were in derogation of express

obligations New GM assumed, and of various laws.  And to be clear, these violations were done

by New GM and this action arises solely from New GM's actions.

6.      New GM led consumers in the United States and worldwide to believe that, after

bankruptcy, it was a new company.  For example, in numerous public announcements and public

filings, such as in its 2012 Annual Report, New GM repeatedly proclaimed that it was a company

committed to innovation, safety, and maintaining a strong brand.  An example from its 2012

Annual Report:



7.      New GM was successful in selling its "processes and culture change" and

building "the best vehicles in the world" story.  Sales of all New GM models went up, and New

GM became profitable.  As far as the public knew, a new General Motors was born, and the GM

brand once again stood strong in the eyes of consumers.

8.      New GM's brand image was an illusion given New GM's egregious failure to

disclose, and the affirmative concealment of, ignition switch defects and a plethora of other

safety and quality defects in GM-branded vehicles.  New GM concealed the existence of the

many known safety and quality defects plaguing many models and years of GM-branded

vehicles, and that New GM valued cost-cutting over safety, while concurrently marketing New

GM vehicles as "safe" and "reliable," and claiming that it built the "world's best vehicles."

Consequently, New GM enticed all post-July 11, 2009 purchasers of GM-branded vehicles to buy or lease vehicles that have now diminished in value, as the truth about the New GM brand has come out and a stigma has attached to all GM-branded vehicles.  And New GM's concealment of its safety and quality problems caused owners of Old GM vehicles to drive and retain vehicles that they would not have retained and which were worth less than the owners and the automotive marketplace thought they were worth.

9.     A vehicle made by a reputable manufacturer of safe and reliable vehicles is worth more than an otherwise similar vehicle made by a disreputable manufacturer that is known to devalue safety and to conceal serious defects from consumers and regulators.  New GM vehicle Safety Chief, Jeff Boyer, recently highlighted the heightened materiality to consumers of safety: "Nothing is more important than the safety of our customers in the vehicles they drive."  Yet New GM failed to live up to this commitment, instead choosing to conceal at least 60 serious defects in over 27 million GM-branded vehicles sold in the United States.  And the value of all GM-branded vehicles has diminished as a result of the widespread publication of those defects and New GM's corporate culture of ignoring and concealing safety defects.

10.    The systematic concealment of known defects was deliberate, as New GM followed a consistent pattern of endless "investigation" and delay each time it became aware of a given defect, as epitomized by the ignition switch defects and cover-up of same that have given rise to criminal investigations, including potential wire fraud.  Recently revealed documents show that New GM valued cost-cutting over safety, trained its personnel to ***never*** use the word "defect," "stall," or other words suggesting that any GM-branded vehicles are defective, routinely chose the cheapest parts supplier without regard to safety, and discouraged employees from acting to address safety issues.

11.     In addition, New GM was plagued by what CEO Mary Barra euphemistically calls "transactional decision making," in which New GM employees "color[] inside the lines of their own precise job description without thinking independently or holistically," *i.e.*, without looking at the larger issue of safety.[1]

12.     In light of New GM's systemic devaluation of safety issues, it is not surprising that, from the date of its inception, New GM itself produced a grossly inordinate number of vehicles with serious safety defects.  Until 2014, New GM was successful in concealing both its disregard of safety and the myriad defects that resulted from that disregard.

13.     According to the administrator of the National Highway Traffic Safety Administration ("NHTSA"), New GM worked to hide documents from NHTSA and created firewalls to prevent people within New GM from "connecting the dots" with respect to safety issues and defects.

14.     The array of concealed defects is astounding and goes far beyond the ignition switch defects, the belated revelation of which sparked GM's 2014 serial recalls.  The defects affected virtually every safety system in GM-branded vehicles, including, but by no means limited to, the airbags, seatbelts, brakes, brake lights, electronic stability control, windshield wipers, sensing and diagnostic modules, and warning chimes.  This defect list includes at least the following parts, many of which affect the vehicle's safety:  (1) ignition switch; (2) power steering; (3) airbags; (4) brake lights; (5) shift cables; (6) safety belts; (7) ignition lock cylinders; (8) key design; (9) ignition key; (10) transmission oil cooler lines; (11) power management mode software; (12) substandard front passenger airbags; (13) light control modules; (14) front axle shafts; (15) brake boosts; (16) low-beam headlights; (17) vacuum line brake boosters; (18) fuel

---

[1] TIME MAGAZINE, October 6, 2014, p. 36.

gauges; (19) accelerator; (20) flexible flat cable airbags; (21) windshield wipers; (22) brake rotors; (23) passenger-side airbags; (24) electronic stability control; (25) steering tie-rods; (26) automatic transmission shift cable adjusters; (27) fuse blocks; (28) diesel transfer pumps; (29) radio warning chimes; (30) shorting bars; (31) front passenger airbag end caps; (32) sensing and diagnostic modules ("SDM"); (33) sonic turbine shafts; (34) electrical systems; (35) the seatbelt tensioning system; (36) power doors; and (37) door modules.

15.     New GM has received reports of crashes, deaths, injuries, and safety concerns expressed by GM vehicle owners that put New GM on notice of the serious safety issues presented by many of these defects.  New GM knew and was fully aware of the now infamous ignition switch defect (and many other serious defects in numerous models of GM-branded vehicles) *from the very date of its inception on July 11, 2009*.  For example, at least two dozen New GM employees, many high-level or in positions of influence, knew of the defects as of that date.  New GM was not born innocent, and its public commitment to culture and process change remain entirely hollow.

16.     New GM's claims that the defects were known only to lower level engineers is false.  For example, current CEO Mary Barra, while head of product development, was informed in 2011 of a safety defect in the electronic power steering of several models.  Despite 4,800 consumer complaints and more than 30,000 warranty repairs, GM waited until 2014 to disclose this defect.

17.     New GM's claims about its own conduct in connection with the ignition switch defect are also false.  While New GM claims that it was unaware that the unintended movement of the ignition switch in its cars rendered the front airbags inoperable, recently produced documents show otherwise.  For example, in the course of settling the claims involving a Cobalt

in 2010, New GM and its outside litigation counsel, King & Spalding, became aware that the failure of the airbags resulted from the unintended movement of the ignition to the "accessory" position.  Armed with this knowledge, New GM chose to settle the case, and continue to cover up the ignition switch defect and its deadly consequences rather than report the defect to NHTSA and institute an immediate recall, as it was plainly required to do.

18.     New GM has now effectively admitted that the ignition switch defect alone is responsible for at least 100 deaths – and New GM bears responsibility for all the deaths that occurred on its watch after July 11, 2009.

19.     But there is more.  As noted above, New GM did not act alone.  From as early as its inception and no later than 2010, New GM, including its legal department, other outside law firms handling cases where airbags did not deploy and the car was in the accessory position, its outside counsel King & Spalding ("K&S"), and its claims administrator ESIS, were all aware of a serious safety defect such that "████████████████████████████████████ ████████████████████████████"  Despite this awareness, New GM, K&S, ESIS, and other law firms, using the mails and wires, worked to keep this defect secret.  New GM hid the defect from NHTSA, and K&S and ESIS went along with the cover-up and worked to confidentially settle all cases where evidence of the defect would be made public if the case did not settle.  And New GM, its in-house lawyers, and K&S, were aware that victims were being kept in the dark about an ignition switch defect because the crash recorder indicated the vehicle was in the "Run" position when in fact GM engineers and its outside expert concluded the recorder was in error and the vehicle was in "Accessory."  They further knew that in the accessory position the airbags would not deploy.

20.     New GM's now highly publicized campaign of deception in connection with the ignition switch defect first revealed in February 2014 sent shockwaves throughout the country. Unfortunately for all owners of vehicles sold by New GM, the ignition switch defect announced in February 2014 was only one of a parade of recalls in 2014 – many concerning safety defects that had long been known to New GM.

21.     On May 16, 2014, New GM entered into a Consent Order with NHTSA in which it admitted that it violated the TREAD Act by not disclosing the ignition switch defect that gave rise to the February and March 2014 recalls, and agreed to pay the maximum available civil penalties for its violations.

22.     New GM's CEO, Mary Barra, has admitted in a video message that: "Something went wrong with our process…, and terrible things happened."  But that admission is cold comfort for Plaintiffs and the Class, whose vehicles have diminished in value as a result of New GM's deception.

23.     New GM systematically and repeatedly breached its obligations and duties to its customers to make truthful and full disclosures concerning its vehicles – particularly, the safety, quality, and reliability of its vehicles and the importance of safety and quality to the Company. New GM's false representations and/or omissions concerning the safety and reliability of its vehicles, and its concealment of a plethora of known safety defects plaguing its vehicles and its brand, caused certain Plaintiffs and the Class to purchase GM-branded vehicles on or after July 11, 2009, under false pretenses, and caused owners of Old GM vehicles to retain and use defective vehicles.

24.     Plaintiffs and the Class have been damaged by New GM's conduct, misrepresentations, concealment, and non-disclosure of the numerous defects plaguing over

- 8 -

27 million GM-branded vehicles. Now that the truth is emerging, and consumers are aware that New GM concealed known safety and quality defects in many models and years of its vehicles, and that the Company de-valued safety and systemically encouraged its employees to conceal serious defects, the entire New GM brand is greatly tarnished by the revelation that the Company is untrustworthy and does not stand behind its vehicles. The value of GM-branded vehicles has therefore diminished and continues to diminish because of New GM's failure to timely disclose and remedy the many serious defects in GM-branded vehicles. A few examples of the decline in value caused by New GM's conduct are illustrative of the brand-wide diminution that harmed Plaintiffs and the Class: The 2010 and the 2011 Chevrolet Camaro have both seen a diminished value of $2,000 when compared to the value of comparable vehicles; the 2009 Pontiac Solstice has diminished $2,900 in value; the 2010 Cadillac STS diminished in value by $1,235 in September 2014; and the 2010 Buick LaCrosse by $649 in that same month. Other examples include: The 2011 Chevrolet Caprice has a diminished value as of April 2015 of $1,679; and the 2011 GMC Denali, as of April 2015, has a diminished value of $2,965. New GM's egregious and widely publicized conduct and the never-ending and piecemeal nature of New GM's recalls has so tarnished GM-branded vehicles that no reasonable consumer would have paid the price they did when the New GM brand supposedly meant safety and success.

25.     Plaintiffs pursue their claims on behalf of a Class generally and initially defined as:

> All persons in the United States who purchased or leased an Affected Vehicle prior to July 3, 2014, and who (i) still own or lease an Affected Vehicle, (ii) or sold an Affected Vehicle on or after February 14, 2014, and/or (iii) purchased or leased an Affected Vehicle that was declared a total loss after an accident on or after February 14, 2014. "Affected Vehicles" include (A) all New GM vehicles sold on or after July 11, 2009; (B) all GM-branded vehicles with a defective ignition switch sold as a

"Certified Pre-Owned" vehicle on or after July 11, 2009; and (C)
all GM-branded vehicles sold prior to July 11, 2009.

26.     To be clear, the claims of pre-July 11, 2009, owners or lessees arise out of

obligations and conduct of New GM directly and through its RICO enterprise.

27.     Plaintiffs assert claims for nationwide Classes under the Racketeer Influenced and

Corrupt Organizations Act (RICO), 18 U.S.C. § 1964, arising, out of New GM's, K&S's, and

ESIS' association-in-fact enterprise designed to conceal the defects.

28.     Plaintiffs also assert claims based upon the laws of all 50 states and the District of

Columbia for a Class in each jurisdiction for damages and/or statutory penalties and/or other

monetary relief, and declaratory, equitable and injunctive relief against New GM for, among

other things, violations of state unfair and deceptive trade practice acts, the law of fraudulent

concealment, and unjust enrichment, as more specifically set forth in the claims for relief

asserted below.

29.     Plaintiffs also bring third-party beneficiary and fraudulent concealment claims on

behalf of a Subclass of people who own or lease cars with defective ignition switches that were

made and sold by Old GM; these Plaintiffs allege that New GM's concealment of the ignition

switch defects, and failure to remedy the defects, prevented them from timely filing a claim

against Old GM in bankruptcy and caused the value of their cars to diminish (the "Pre-Sale

Ignition Switch Defect Subclass").  Finally, Plaintiffs bring claims for breach of the implied

warranty of merchantability on behalf of a Subclass of people who purchased New GM or

Certified Pre-Owned vehicles with defective ignition switches on or after July 11, 2009 (the

"Post-Sale Ignition Switch Defect Subclass"), and some Plaintiffs assert negligence claims as

well.

- 10 -

## II.      JURISDICTION AND VENUE

30.      This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiffs and other Class Members are citizens of a different state than Defendant.  Jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiffs' RICO claims arise under federal law, and this Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

31.      This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.  This Court has personal jurisdiction over New GM because New GM conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.  This Court also has personal jurisdiction over New GM under 18 U.S.C. § 1965 because New GM is found in, has an agent in, or transacts business in this District.

32.      Venue is proper in this District under 28 U.S.C. § 1391 because New GM, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, New GM transacts business within the District, and some of the events establishing the claims arose in this District.  Venue is also proper under 18 U.S.C. § 1965.

## III.      PARTIES

### A.      Plaintiffs

33.      Pursuant to the Court's instructions that Plaintiffs could file directly in the MDL court and reserve the right to have filed in another district, this Complaint is filed by each new Plaintiff as if they had filed in the district in which they reside.

- 11 -

34.     Unless otherwise indicated, each Plaintiff purchased or leased his or her GM-branded vehicle primarily for personal, family, or household use.

35.     The defects that New GM concealed throughout the Class Period related to the safety and reliability of the affected GM vehicles, and affected the brand perception and market value of all GM vehicles.  Information and timely corrective measures to these vehicles were material.  Reasonable consumers would consider them important in deciding whether to buy, lease, operate, trade in, or sell these vehicles.  Provided with the truth regarding these vehicles, Plaintiffs and Class Members would not have purchased or leased them and/or would have paid less; and would not, to their practical ability to do so, have continued to drive them without corrective safety measures or other affirmative steps by New GM to make these vehicles safe and protect their economic value.

### 1.     Melissa Cave – Alabama

36.     Plaintiff and proposed Nationwide and Alabama State Class Representative Melissa Cave is a resident and citizen of New Hope, Alabama.  Ms. Cave purchased a used 2006 Chevrolet Cobalt on February 15, 2013, at High Country Toyota in Scottsboro, Alabama, for approximately $7,000.  Her vehicle was not covered by a warranty.  Ms. Cave drives 23 miles to work and during her drive she has known her Cobalt to shut off more than 50 times in a trip.  On June 21, 2014, Ms. Cave totaled her car after it shut off while she was driving approximately 35-40 miles per hour.  She sustained injuries to her knee, bruising from the seatbelt, and chemical burns to her thumb and hand from the airbag.  Had she known about the problems with her GM-branded vehicle, she would not have purchased the car.

### 2.     Debra Forbes – Alabama

37.     Plaintiff and proposed Nationwide and Alabama State Class Representative Debra Forbes is a resident and citizen of Geneva, Alabama.  Ms. Forbes purchased a new 2007

Chevrolet Cobalt in 2007 in Fort Walton Beach, Florida, for $16,000.  Her vehicle is covered

by a seven-year warranty that expired at the end of 2014.  Among other incidents consistent

with ignition switch shutdown, Ms. Forbes' steering locked up on three or four occasions, in

May or June 2010, fall 2010, and spring 2011, all on normal road conditions and while she was

driving approximately 25-30 miles per hour.  Each time she had to slam on her brakes and

manipulate the ignition switch to unlock the steering.  Although the ignition switch on Ms.

Forbes' car has been repaired, other repairs are incomplete, pending the arrival of parts.  The

book value of Ms. Forbes' vehicle is presently only approximately $6,000.  She would not

have purchased her vehicle if she knew of the problems with the ignition switch.

### 3.     Valeria Glenn – Alabama

38.     Plaintiff and proposed Nationwide and Alabama State Class Representative

Valeria Glenn resides in Alabaster, Alabama.  She purchased a used 2006 Pontiac Solstice in

February 2013 in Pelham, Alabama, for $13,000.  The vehicle has a 100,000 mile warranty.  Ms.

Glenn has experienced shutdowns and locking of her steering wheel while driving her vehicle.

Ms. Glenn had her ignition switch replaced pursuant to the recall.  Since that time, the air

conditioning in her vehicle is no longer working, although it worked fine before the replacement.

Knowing what she now knows about the safety defects in many GM-branded vehicles, and the

Solstice in particular, she would not have purchased the vehicle and does not feel safe driving the

vehicle.

### 4.     Aaron Henderson – Alabama

39.     Plaintiff and proposed Nationwide and Alabama State Class Representative Aaron

Henderson is a resident and citizen of Buhl, Alabama.  Mr. Henderson purchased a new 2007

Saturn Ion 3 in September 2006 in Madison, Wisconsin, for approximately $17,500.  At the time

Mr. Henderson purchased his new Saturn it was under warranty.  Mr. Henderson has experienced

two accidents in this car – one on December 8, 2012, and the other on February 23, 2014.  The

airbags failed to deploy in both accidents, and Mr. Henderson suffered minor injuries as a result.

Mr. Henderson has spent approximately $9,000 to repair his vehicle following these accidents.

Mr. Henderson did not learn of the ignition switch defects until March 2014.  In May 2014, the

ignition switch recall repair work was performed on his vehicle.  Mr. Henderson would not have

purchased the vehicle if he had known of the problems with the ignition switch.

### 5.     Marion Smoke – Alabama

40.     Plaintiff and proposed Nationwide and Alabama State Class Representative

Marion Smoke is a resident and citizen of Elmore, Alabama.  Ms. Smoke purchased a new 2005

Chevrolet Cobalt the week of May 5, 2005, in Montgomery, Alabama, for $19,000.  At the time

Ms. Smoke purchased her new Cobalt, she also purchased the manufacturer's warranty.

Ms. Smoke's Cobalt unexpectedly shut off on at least seven separate occasions, all of them while

she was driving on highways.  She has also had trouble with the steering wheel being hard to

turn, making it difficult to drive.  As a result of the issues with her vehicle and the ignition

switch recall and associated risks, she fears driving her vehicle despite having the recall work

performed on her vehicle in April 2014.  She believes the value of her vehicle has been

diminished as a result of the defects.  Ms. Smoke feels that the safety of the vehicle was

misrepresented, and she would not have purchased this car if GM had been honest about the

safety defects.

### 6.     Grace Belford – Arizona

41.     Plaintiff and proposed Nationwide and Arizona State Class Representative Grace

Belford is a resident and citizen of Phoenix, Arizona.  Ms. Belford purchased a new 2005

Chevrolet Cobalt in October 2005, in Phoenix, Arizona, for $18,900.  Ms. Belford also

purchased the warranty for her Cobalt.  On two separate occasions, Ms. Belford's ignition has unexpectedly shut off after her vehicle went over a bump in the road.  Ms. Belford did not learn of the ignition switch defects until March 2014.  She immediately requested a loaner vehicle, but she had no choice, despite her concerns, but to continue to drive the Cobalt to work, as it was her only form of transportation.  It took about three months for the recall repair work to be completed on Ms. Belford's vehicle.  Ms. Belford had planned to use her Cobalt as a down payment on a new vehicle, but the resale value of her Cobalt was diminished due to the ignition switch defect.  Ms. Belford traded in her Cobalt in August of 2014.  She was only offered $3,000 for the vehicle – $2,000 less than current Kelley Blue Book value.  Ms. Belford would never have purchased the 2005 Chevrolet Cobalt had she known about the defects and GM's indifference with regard to the safety and reliability of its vehicles.

### 7.    Barbara Hill – Arizona

42.    Plaintiff and proposed Nationwide and Arizona State Class Representative Barbara Hill is a resident and citizen of Mesa, Arizona.  Ms. Hill purchased a used 2007 Chevrolet Cobalt on July 9, 2012, for approximately $12,000, at Auto Nation in Tempe, Arizona. Ms. Hill purchased the Cobalt after she conducted online research on the Chevrolet and Auto Nation websites to find out how stable the Cobalt was and what kind of gas mileage it received. She also checked to see if there were any recalls on the car and she did not find any.  Based on that research, she believed the Cobalt to be a safe and reliable vehicle.  She no longer feels safe driving the vehicle.  Ms. Hill had her ignition switch replaced in May 2014, but she does not trust that the replacement will resolve the vehicle's safety defect.  Had she known about the problems with her GM-branded vehicle, she would not have purchased the car.

010440-11  784012 V1

### 8.    Camille Burns – Arkansas

43.    Plaintiff and proposed Nationwide and Arkansas State Class Representative

Camille Burns is a resident and citizen of Pine Bluff, Arkansas.  Ms. Burns purchased a used

2006 Chevrolet Cobalt on or about November 1, 2006, from Smart Chevrolet in White Hall,

Arkansas, for over $16,000.  At the time of purchase, the car was still covered under warranty.

Ms. Burns recalls reading that GM and Chevrolet-branded vehicles were great cars with reliable

parts.  Ms. Burns' Cobalt shut down "too many times to count" – approximately two to three

times per week between June 2014 and the time she traded the vehicle in around July 14, 2014.

These unexpected shutdowns occurred when Ms. Burns was pulling out into traffic, backing up,

or turning her car.  Each time she would be forced to restart the car.  The last time it shut off

suddenly, it almost caused an accident.  She also experienced a loss of power steering while

backing out of her driveway.  Ms. Burns had her car checked by an independent repair shop, but

they could not diagnose the problem.  Upon calling a GM dealership about the ignition recall, the

dealership refused to provide her a loaner car.  But when she called GM directly, they advised

her that she should get out of the car immediately.  Although her Cobalt had been paid off, based

on the repeated shutdowns, GM's advice, and GM's inability to fix it, Ms. Burns felt compelled

to trade in the Cobalt for a safer vehicle.  On or about July 14, 2014, she traded it to Smart

Hyundai and received only $2,500.  The new car payment was a financial hardship.  Ms. Burns

asserts that the Cobalt suffered a diminution of value due to the ignition switch defects, the

recalls, and the surrounding publicity.  Ms. Burns would not have purchased the Cobalt, or she

would have paid less for it, had she known about its defects.

- 16 -

9.     **Nettleton Auto Sales, Inc. – Nationwide Dealer and Arkansas Class Representative**

44.     Plaintiff and proposed Nationwide and Arkansas State Class Representative Nettleton Auto Sales, Inc. maintains its principal place of business in Jonesboro, Arkansas. Nettleton Auto Sales, Inc. purchased the following GM-branded vehicles with the intention to resale same:

- Vehicle #1: used 2009 Chevy HHR on March 27, 2014, in Nashville, Tennessee, for $10,865, plus $1,268.32 in shipping costs;

- Vehicle #2: used 2011 Chevy HHR on February 14, 2014, in Jonesboro, Arkansas, for $5,850, plus $1,079.49 in shipping and repair costs; and

- Vehicle #3: used 2010 Chevy HHR on March 12, 2014, in Jonesboro, Arkansas, for $6,000, plus $5,028.13 in additional shipping and repair costs.

45.     The 2009 HHR is still in the possession of Nettleton Auto Sales, Inc.  The other two have been sold to Arkansas consumers.  The 2010 HHR was sold to consumers on June 4, 2014, for $12,900.  At the time of sale, the 2010 HHR was in fair condition and had 86,960 miles on it.  The 2011 HHR was sold to consumers on June 28, 2014, for $8,500.  At the time of sale, the 2011 HHR was in fair condition and had 126,682 miles on it.  Nettleton Auto Sales, Inc. submits that these sale prices reflect the diminished value of the vehicles.  Nettleton Auto Sales, Inc. continues to try and sell the 2009 HHR.  The 2011 HHR is currently covered by a warranty, while the other two are not.  Despite issuing a recall, GM informed Nettleton Auto Sales, Inc. that there were not enough replacement ignition switches to repair these vehicles.  Nettleton Auto Sales, Inc. believes the ignition switch on the 2011 HHR was subsequently replaced on or about June 30, 2014, by Central Chevrolet in Jonesboro, Arkansas.  Had GM been honest about

- 17 -

the safety defects described herein, Nettleton Auto Sales, Inc. would not have purchased the identified vehicles or would have paid less for them.

### 10.    Anna Andrews – California

46.    Plaintiff and proposed Nationwide and California State Class Representative Anna Andrews is a resident and citizen of La Quinta, CA.  She purchased a used 2010 Buick LaCrosse in Cathedral City, California, on August 25, 2011, for $36,686.86.  Ms. Andrews purchased her LaCrosse, in part, because she wanted a safely designed and manufactured vehicle.  She further believed that New GM was a reputable manufacturer of safe and reliable vehicles and that the Company stands behind its vehicles once they are on the road.  Plaintiff did not learn of the many defects in GM-branded vehicles until shortly before filing this lawsuit.  Had New GM disclosed the many defects in GM-branded vehicles, Plaintiff would either not have purchased her LaCrosse, or would have paid less than she did.

### 11.    Patricia Barker – California

47.    Plaintiff and proposed Nationwide and California Class Representative Patricia Barker is a resident and citizen of Wilmington, California.  Ms. Barker purchased a new 2005 Saturn Ion in Torrance, California, in March 2005 for approximately $18,000.  The car was covered under the standard manufacturer's warranty, and she also purchased an extended warranty. She chose the Saturn, in part, because she wanted a safely-designed and manufactured vehicle. She saw advertisements for Old GM Vehicles before she purchased the Saturn and, although she does not recall the specifics of the advertisements, she does recall that safety and quality were consistent themes across the advertisements she saw.  These representations about safety and quality influenced Ms. Barker's decision to purchase the Saturn.  She has experienced power steering failure in her car on at least two separate occasions.  In both instances she was able to reboot the power steering after restarting the car.  Ms. Barker did not learn of the ignition switch

defects until about February 2014 when she received an undated recall notice in the mail.  She then saw a commercial notifying affected GM drivers that they could receive a loaner car while waiting for back-ordered recall parts to arrive.  When she went to a local GM dealership they gave her a 2014 Chevrolet Impala.  She drove this car for forty-five days until her car was repaired in April 2014.  Only after she returned the loaner did she find out that it was under recall for the same ignition issue as her own vehicle.  Ever since the recall repair has been completed on her car she has some difficulty turning the key in her ignition.  Ms. Barker would not have purchased this car had she known about the defects in her GM vehicle.

### 12.    Michael and Sylvia Benton – California

48.    Plaintiffs and proposed Nationwide and California State Class Representatives Michael and Sylvia Benton are residents and citizens of Barstow, California.  Mr. and Mrs. Benton purchased a used 2005 Chevrolet Cobalt on January 10, 2009, in Barstow, California, for $12,789.76.  The Bentons chose the Cobalt, in part, because they wanted a safely designed and manufactured vehicle.  They saw advertisements for vehicles before they purchased the Cobalt, and, although they do not recall the specifics of the advertisements, they do recall that safety and quality were consistent themes across the advertisements they saw, which influenced their purchase decision.  The vehicle was not covered under warranty when they purchased it.  Mr. and Mrs. Benton purchased gap warranty for the Cobalt for a term of 48 months.  The Bentons' vehicle has shut down at least 20 times.  Mr. and Mrs. Benton did not learn of the ignition switch defects until March 2014.  In April 2014, they took their Cobalt to the dealership in their area to have the recall work performed.  They were provided a loaner vehicle.  The Bentons still fear driving their vehicle due to the ignition switch recall and the risk posed by the ignition switch defects.  They would not have purchased this car, or would have paid less than they did, if GM was honest about the safety defects.

- 19 -

### 13.     Kimberly Brown – California

49.     Plaintiff and proposed Nationwide and California State Class Representative Kimberly Brown is a resident and citizen of Palmdale, California.  Ms. Brown purchased a new 2006 Chevrolet HHR on January 7, 2007, at Rally Auto Group in Palmdale, California, for $30,084.  Her car was under a 48-month or 100,000 mile warranty at the time she purchased it. She and her husband relied on the advertising posted at the GM dealership where they purchased the vehicle, as well as the GM brand name and its purported reputation for safety and quality, which were consistent with the representations at the GM dealership.  Between 2007 and 2011, Ms. Brown's vehicle inadvertently shut down four or five times a year, and on several other occasions she had to use heavy force to turn the wheel.  Between 2012 and 2014, her vehicle inadvertently shut down eight or nine times a year, and on several other occasions she had to use heavy force to turn the wheel.  Her vehicle typically shuts down while going over bumpy roads, speed bumps, or railroad tracks.  It will shut down while the gear is in drive and the key is in the "on" position.  To remedy the problem she puts the gear into neutral and restarts the car. Although the GM dealership indicated that it fixed the ignition switch defect during a post-recall repair in May 2014, Ms. Brown and her husband have experienced their ignition shutting down at least five times since then.  In September 2014, she returned to the dealer to try to have the ongoing shutdowns remedied, and she had to pay out of pocket for a loaner vehicle.  Ms. Brown would not have paid the purchase price she paid if she had known GM was manufacturing and selling vehicles plagued with defects, and was not committed to the safety and reliability of its vehicles.

### 14.     Melvin Cohen – California

50.     Plaintiff and proposed Nationwide and California State Class Representative Melvin Cohen is a resident and citizen of California City, California.  Mr. Cohen purchased a

new 2006 Chevrolet Cobalt on January 13, 2006, from Rally Auto Group in Palmdale, California, for $22,799.80.  He does not believe his vehicle was covered by written warranties. Mr. Cohen had a general impression that GM was a quality brand and that the vehicle was safe and reliable.  In October 2008, Mr. Cohen's wife, Karin was driving the vehicle when it suddenly shut off while making a left turn into a gas station in California City, California.  Mrs. Cohen was unable to control the vehicle once it shut off, and it was hit by another vehicle when it strayed out of its lane.  The airbags did not deploy even though the impact was significant enough to total the vehicle.  Mr. Cohen would not have purchased the vehicle had he known of the defects.

### 15.    Marc and Madelaine Koppelman – California

51.    Plaintiff and proposed Nationwide and California State Class Representatives Marc and Madelaine Koppelman are residents and citizens of Torrance, California.  The Koppelmans purchased a certified used 2010 Chevrolet HHR in 2012 from JBA Chevrolet in Glen Burnie, Maryland, for approximately $12,900.00.  The 2010 HHR was Certified Pre-Owned ("CPO") by the dealer under the guidelines, including 172 safety check items the car had to pass.  This CPO provided an additional 2-year warranty and basic service (oil changes, tire rotation, and detailed safety inspection).  This warranty expired on March 17, 2014.  The Koppelmans also received a sales document from New GM given to each CPO purchaser as an incentive, claiming the CPO designation adds $2,135 to the value of a CPO car purchased through a New GM dealer.  The remainder of the original new car warranty was also included, but it expired 3 years or 36,000 miles from the original new car purchase date.  The Koppelmans' decision to buy the car was influenced by the perceived safety associated with the car's airbag system and advertising touting the car's reliability.  This was important to Mr. Koppelman because his wife was going to be the principal driver.  In June 2012, about 4 months

- 21 -

after they purchased the vehicle, while Mr. Koppelman was driving in Maryland on a residential street, the HHR lost power and lost power steering.  Mr. Koppelman managed to pump the brakes and get the car safely off the road.  When he received his recall notice, Mr. Koppelman called his GM dealership and they told him that he should reduce the weight on his keychain. Mr. Koppelman had to wait for the dealer to receive the new parts so that his HHR would be repaired under the recall.  In August 2014, the recall repair work was completed.  After the GM dealers gave him "the run-around" with regard to getting the new part installed, the Koppelmans considered selling the vehicle.  In late May or early June 2014, Mr. Koppelman researched his car on Kelley Blue Book and it was valued at approximately $9,200.  He went to his local dealer, Martin Chevrolet, in Torrance, California, and they only offered him $6,100 to trade it in.  Mr. Koppelman was shocked at the low number so he declined to sell it.  He then took the vehicle to another GM dealer in Long Beach, California, and they quoted him a similar value as the last dealership.  They told him that due to the recalls, the HHR's value had declined, and they were even lowering the retail prices on their own vehicles for sale.  In mid-July 2014, Mr. Koppelman checked Kelley Blue Book again and saw that his car value dropped to approximately $8,400.  He remembers comparable HHRs were selling for $12,000-14,000 retail at the time the recalls were first announced, but now the retail price has dropped to approximately $10,000.  Mr. Koppelman was a loyal GM-brand owner, having previously owned Chevrolet, Buick, Oldsmobile, and Cadillac vehicles, but now he says he will never purchase a GM-branded vehicle again.  Mr. Koppelman would not have purchased this vehicle had New GM been honest about the safety defects.

**16.   Javier Malaga – California**

52.     Plaintiff and proposed Nationwide and California State Class Representative Javier F. Malaga is a resident and citizen of Playa Del Rey, California.  On or about August 7,

2013, Mr. Malaga purchased a used 2006 Chevrolet Cobalt LS, which he still owns, for $15,979.08.  When Mr. Malaga purchased the 2006 Cobalt, it was not covered by a written warranty.  On two occasions, Mr. Malaga was unable to turn on the engine with his ignition key.  Mr. Malaga returned the car to the dealer for repairs on or about February 15, 2008, and March 25, 2010.  One of GM's main selling points has been the efficiency, cost effectiveness, and safety of its vehicles.  Mr. Malaga's purchase was based, in significant part, on these representations and assertions by GM.  If GM had disclosed the nature and extent of its problems, Mr. Malaga would not have purchased a GM vehicle, or would not have purchased the vehicle for the price paid.

### 17.   David Padilla – California

53.    Plaintiff and proposed Nationwide and California State Class Representative David Padilla is a resident and citizen of Stockton, California.  Mr. Padilla purchased a new 2010 Chevrolet Cobalt in April 2010 in Stockton, California, for $21,690.27.  The vehicle was under warranty when he purchased it.  Mr. Padilla recalls the salesman telling him that it was a "great" and "safe" car and relying on those representations in deciding to purchase the vehicle.  Before speaking to the salesman and deciding to buy a GM vehicle, he had been planning to purchase a Toyota.  On one occasion, Mr. Padilla was backing out of his garage when his vehicle inexplicably shut off.  As a result, Mr. Padilla was afraid to drive his vehicle.  Those fears increased once he learned of the ignition switch recall and the risks posed by the defects.  Mr. Padilla had the ignition switch replaced under the recall repair program.  He believes the value of his vehicle has been diminished as a result of the defects.  Mr. Padilla would not have purchased this car if New GM had been honest about the safety defects.

### 18.    Randall Pina – California

54.    Plaintiff Randall Pina resides in Soledad, California.  On or about April 25, 2011, Mr. Pina purchased a new 2011 Chevrolet HHR in Fresno, California, for $23,270.99.  Mr. Pina still owns the 2011 Chevrolet HHR, which is under extended warranty until April 25, 2018.  Mr. Pina's vehicle is one of the cars recently identified by New GM as a Defective Vehicle.  He believes that he overspent on a lower quality product and acquired a vehicle that posed an undisclosed risk to his health and safety.  One of New GM's main selling points has been the efficiency, cost effectiveness, and safety of its vehicles.  Plaintiff's purchase was based, in significant part, on these representations and assertions by New GM.  New GM failed to disclose that most of its models over the last few years have contained defective ignition switches that pose a serious risk of injury and death to the driver and occupants, as well as other motorists and pedestrians on the road.  If New GM had disclosed the nature and extent of its problems, Plaintiff would not have purchased a vehicle from New GM, or would not have purchased the vehicle for the price paid.

### 19.    Esperanza Ramirez – California

55.    Plaintiff and proposed Nationwide and California State Class Representative Esperanza Ramirez is a resident and citizen of Los Angeles, California.  Ms. Ramirez purchased a new 2007 Saturn Ion on March 13, 2007, at a dealership in California, for $27,215.  Her vehicle was covered by a warranty at the time of purchase.  Ms. Ramirez has experienced several incidents consistent with the ignition switch defects, and is unable to drive the car on freeways or for long distances.  She had seen commercials about Saturns featuring families that trusted Saturns.  Had she known of the problems with her GM car, she would not have purchased it.

### 20.    Daniel Ratzlaff – California

56.    Plaintiff and proposed Nationwide and California State Class Representative Daniel Ratzlaff is a resident and citizen of Quartz Hill, California.  Mr. Ratzlaff purchased a used 2005 Chevrolet Equinox in October 2013 in Palmdale, California, for $10,000.  The vehicle was under warranty when he purchased it, and he also purchased an extended warranty which expires in 2015.  Mr. Ratzlaff chose the Equinox, in part, because he wanted a safely designed and manufactured vehicle.  He saw advertisements for GM-branded vehicles before he purchased the Equinox and, although he does not recall the specifics of the advertisements, he does recall that safety and quality were consistent themes across the advertisements he saw.  These representations about safety and quality influenced Mr. Ratzlaff's decision to purchase the Equinox.  Mr. Ratzlaff experienced the ignition switch defect described by the GM recall.  On several occasions, he remembers all electrical systems turning off, including air bags and dash-signaling monitor information.  He would have to consistently turn the ignition switch on and off until the condition resolved, and felt that he was in danger.  He did not learn of the ignition switch defects until about March 2014.  Had he known about the ignition switch defects, he would not have purchased his Equinox, or would have paid less than he did, and would not have retained the vehicle.

### 21.    William Rukeyser – California

57.    Plaintiff and proposed Nationwide and California State Class Representative William Rukeyser is a resident and citizen of Davis, California.  After researching vehicles on the GM website, Mr. Rukeyser purchased a new 2008 Chevrolet Cobalt on September 4, 2008, in Lodi, California, for $16,215.54.  Mr. Rukeyser was supplied with the manufacturer's warranty at the same time.  Mr. Rukeyser had the ignition switch replaced on August 8, 2014.  He was

- 25 -

provided a loaner vehicle during the two months it took to complete the recall repair work.  Mr. Rukeyser would not have purchased this car if GM had been honest about the safety defects.

### 22.    Dawn Orona – Colorado

58.    Plaintiff and proposed Nationwide and Colorado State Class Representative Dawn Orona is a resident and citizen of Limon, Colorado.  Ms. Orona purchased a new 2005 Chevrolet Cobalt on August 6, 2005, from Century 1 Chevrolet in Broomfield, Colorado, for a total sale price of $35,053.92.  She financed a portion of the sale price, paid a portion of the sale price by trading in an older Chevrolet vehicle, and paid the balance of the purchase in cash.  Ms. Orona's vehicle was covered by a warranty and the warranty had not expired at the time the vehicle was totaled in an accident.  In the years prior to her purchase and around the time of her purchase, Ms. Orona viewed multiple commercials in which GM touted the safety of its vehicles, and she believed she was purchasing a vehicle that was safe and defect-free.  Ms. Orona's vehicle spontaneously shut off a number of times within the first several months of purchasing it.  Approximately six months after purchasing the 2006 Chevrolet Cobalt, Ms. Orona and her husband experienced a power loss while attempting to complete a turn on a curve.  Although her husband applied both feet on the brakes, the car jumped the curb and plowed into a brick wall.  The impact of the crash was severe enough to break the front axle, totaling the vehicle, but the air bags never deployed.  Ms. Orona would not have purchased the vehicle had she known of the defects.

### 23.    Yvonne Elaine Rodriguez – Colorado

59.    Plaintiff and proposed Nationwide and Colorado State Class Representative Yvonne Elaine Rodriguez is a resident and citizen of Lakewood, Colorado.  She purchased a new 2007 Chevrolet HHR on December 5, 2006, at EMICH Chevrolet in Lakewood, Colorado, for $20,735.87.  At the time of purchase, the HHR was covered by Chevrolet's standard warranty.

Ms. Rodriguez did not find out about the ignition switch defect and the safety risk it posed until she received a recall notice in March 2014. After that point, Ms. Rodriguez stopped using her HHR for any long trips or highway driving, for fear of the safety of her family and herself. As soon as she received the recall notice, Ms. Rodriguez attempted to have the recall repair performed on her vehicle, but was informed that the parts were not available. Ms. Rodriguez continued to try to schedule the repair, but because of a lack of parts, she was not able to get her HHR repaired until June 2014. Even after the recall repair, however, Ms. Rodriguez does not feel her HHR is safe, and she and her family continue to avoid long trips and highway driving with the HHR. Ms. Rodriguez would not have purchased her vehicle if she had known that GM cars were plagued by defects and produced by a company that is not committed to safety.

### 24. Nathan Terry – Colorado

60. Plaintiff and proposed Nationwide and Colorado State Class Representative Nathan Terry is a resident and citizen of Loveland, Colorado. Mr. Terry purchased a used 2007 Pontiac G5 GT on January 4, 2011, in Westminster, Colorado, for $10,589.49. He also purchased a three-year warranty on the vehicle. Mr. Terry decided to purchase this GM-branded vehicle after a thorough investigation, including online advertisements and reviews, regarding the brand and model's safety, reliability, and quality. Mr. Terry's car inadvertently shut down on him twice while driving. In one instance, he was in high traffic on the highway when the vehicle lost power and he had to force the car over to the shoulder of the road, a task made more difficult by the fact that his power steering had also shut down. Mr. Terry learned of the ignition switch defects in March 2014. The recall repairs were performed thereafter, after waiting for the parts to arrive. In the last month or two, in preparation to sell his car, Mr. Terry checked Kelley Blue Book against his vehicle, which was in excellent condition with low mileage and fully-equipped, and it was valued at $7,041. He then checked thirteen other 2007 Pontiac G5 GT models for sale

at dealerships in his vicinity, and their advertised sale prices ranged from $7,367 to $9,000.

Finally, he checked four models for sale by private owners, with sale prices ranging from $6,800

to $7,840.  Several dozen private buyers contacted Mr. Terry about his vehicle, and three visited

him to test drive it.  All three potential buyers seemed to like the car, but were aware of the

numerous GM recalls, including the ignition switch recalls pertaining to the model.  Even though

he listed his car at the $7,041 Kelley Blue Book price, the average offer for the car was $4,500.

His bargaining value was noticeably impeded, as all potential buyers repeatedly referred to the

recalls in their negotiations.  It was clear to Mr. Terry that the potential buyers knew about these

recalls and used it to their advantage.  As he browsed dealerships at the same time, he also found

the trade-in value was grossly hurt by the recalls.  Again, all dealerships mentioned the safety

and recall issues, and out of six trade-in offers, the highest was $2,634.  Because of the negative

effects of the recalls on his vehicle value, Mr. Terry was eventually forced to sell the vehicle to

CarMax at nearly half his vehicle's Kelley Blue Book value.  Mr. Terry would not have

purchased this GM-branded vehicle, or any GM-branded vehicle, had he known about its safety

defects and New GM's deception.  He will never purchase a GM-branded vehicle again.

### 25.   Michael Pesce – Connecticut

61.     Plaintiff and proposed Nationwide and Connecticut State Class Representative

Michael Pesce is a resident and citizen of Waterbury, Connecticut.  Mr. Pesce purchased a used

2006 Chevrolet Cobalt on May 29, 2008, in Waterbury, Connecticut, for approximately $12,000.

When Mr. Pesce bought the car it was still covered under a three-year, 36,000-mile warranty.

Mr. Pesce was a repeat GM customer and trusted the GM brand when he decided to purchase his

Cobalt.  This was Mr. Pesce's fifth time owning a GM vehicle.  In August 2011, Mr. Pesce's 18

year-old son was driving the car on a major highway in Connecticut when the vehicle lost all

power.  His son was able to pull over and restart the car, but after another few minutes it died

again.  Mr. Pesce paid to have the vehicle looked over and repaired, but he now believes the problem was related to the ignition switch defects.  Mr. Pesce did not learn about the ignition switch defects until March 2014.  The recall repair work was not performed until September 2014, more than six months later.  While he waited for the repair work, Mr. Pesce only drove the vehicle if there was an emergency because he was afraid to drive the car.  Mr. Pesce does not feel this car is worth what he paid for it and will not buy another GM vehicle.

### 26.    Lisa Teicher – Connecticut

62.      Plaintiff and proposed Nationwide and Connecticut State Class Representative Lisa Teicher is a resident and citizen of Manchester, Connecticut.  Ms. Teicher purchased a used 2005 Chevrolet Cobalt on January 24, 2008, from Gengras Chevrolet in Hartford, Connecticut, for $7,769.22.  Her vehicle was covered by a written warranty that has now expired.  Ms. Teicher received a direct mailing from Gengras Chevrolet advertising the vehicle she purchased.  These and other consistent representations at the dealership left her with the impression that the vehicle was safe and reliable.  She believed her vehicle was safe and defect free when she purchased it.  Ms. Teicher's vehicle has spontaneously turned off on two occasions.  In June 2008, her vehicle locked up and shut off while she was driving on an exit ramp on Route 2 in Connecticut.  She was unable to control the vehicle and ended up hitting a barrier on the road.  She hit her head on the dash and was injured, but hospitalization was not required.  The airbags did not deploy during this collision.  In May 2009, Ms. Teicher's vehicle again shut off while she was driving to work on I-84 in Connecticut just before Exit 64.  She was able to bring the vehicle to a stop and re-start the vehicle again.  On June 25, 2014, she had her ignition switch replaced by Carter Chevrolet, located in Manchester, Connecticut, in connection with the recalls GM initiated in response to the ignition switch defects.  Ms. Teicher would not have purchased the vehicle had she known of the defects.

### 27.   LaTonia Tucker – Delaware

63.     Plaintiff and proposed Nationwide and Delaware State Class Representative
LaTonia Tucker is a resident and citizen of Dover, Delaware.  Ms. Tucker purchased a used 2006
Chevrolet HHR in Dover, Delaware, in October 2013 for $8,000.  She purchased the vehicle
with a six month warranty.  Ms. Tucker purchased the HHR because she drives long distances on
the highway to and from work and wanted a safe vehicle.  Ms. Tucker experienced a stall while
driving her vehicle on a highway; she was able to stop the car at the side of the road.  It took
several tries before she was able to restart the vehicle.  After this event, she took her car to a
mechanic, but the mechanic was unable to determine the cause of the stall.  Even after having her
ignition switch replaced pursuant to the recall, Ms. Tucker feels unsafe driving her vehicle.  The
vehicle also now has a noise it did not have before the ignition switch was replaced, but the
dealership told her it is unable to find anything wrong with her vehicle.  She has grandchildren,
and does not feel safe allowing them as passengers in her vehicle.  Had she known about the
problems with her GM-branded vehicle, she would not have purchased the car.

### 28.   Pajja Jackson – District of Columbia

64.     Plaintiff and proposed Nationwide and District of Columbia State Class
Representative Pajja Jackson is a resident and citizen of Washington, D.C.  Mr. Jackson's
grandmother purchased a new 2011 Buick Regal on August 23, 2010, in Mississippi, for
$31,393.40.  The vehicle was covered under the standard manufacturer's warranty when she
purchased it.  After his grandmother fell ill last year, Mr. Jackson took possession of the car and
assumed its payments.  Over the course of 2013, he paid the remaining $10,000 owed on the note
and had the car re-titled in his name.  Ever since he began driving the vehicle, Mr. Jackson has
experienced the brakes locking up on him a handful of times.  The worst incident occurred when
he was driving at the airport.  He was driving regularly and touched on his brakes when they

- 30 -

seized up unexpectedly.  He repeatedly pumped the brakes and they eventually unlocked.  Then, this summer, the car's battery exploded and its acidic vapors infiltrated the car.  Mr. Jackson took the vehicle into a GM dealership to have the battery issue repaired.  This prompted Mr. Jackson to investigate the problems with his vehicle and the GM brand in general.  This investigation led him to the ignition switch defect, as well as the myriad of other recalls and problems associated with GM vehicles.  Mr. Jackson also recently researched the value of his vehicle via the Internet and learned that his car was only selling for approximately $15,000. Because of his concern for both the safety of his vehicle and its dropping value, he has considered trying to sell it.  But Mr. Jackson has refrained from doing so because his vehicle is paid off and he does not wish to incur a new car payment.  As a father of two sons, ages one and four, Mr. Jackson is worried about the safety of driving his vehicle with his kids in the car.  He no longer trusts the GM brand.  Had he known about the safety defects and risks posed by his car and the GM brand, he would not have purchased this car, but rather would have chosen another manufacturer.

### 29.    **Steven Diana – Florida**

65.    Plaintiff and proposed Nationwide and Florida State Class Representative Steven Diana is a resident and citizen of Sebastian, Florida.  Mr. Diana purchased a used 2002 Chevrolet Impala in July 2007 from Champion Motors in Mansfield, Connecticut, for $12,500.  Mr. Diana did not purchase an extended warranty and does not believe his vehicle is currently covered by any written warranties.  Mr. Diana expressly recalls seeing advertisements on television and in the newspaper about the 2002 Chevrolet Impala, including advertisements touting its safety.  He considered and was influenced by the advertisements emphasizing the safety of the vehicle when making his purchase.  Mr. Diana believed his vehicle was safe and defect-free when he purchased it.  Mr. Diana's vehicle spontaneously shut off in January 2009, July 2012, and

August 2012.  On each occasion Mr. Diana was driving on or around I-95 near his home in Sebastian, Florida, and the road was bumpy.  On each occasion, Mr. Diana had to put the vehicle in neutral to get it to restart.  Mr. Diana would not have purchased the vehicle had he known of the defects.

### 30.     Joni Ferden-Precht – Florida

66.     Plaintiff and proposed Nationwide and Florida State Class Representative Joni Ferden-Precht is a resident and citizen of Miami Lakes, Florida.  Ms. Ferden-Precht purchased a new 2011 Chevrolet Traverse on May 27, 2011, in Miami Lakes, Florida, for $33,262.17.  The vehicle was covered by the manufacturer's standard warranty when she purchased it.  In deciding to buy this vehicle, Ms. Ferden-Precht consulted Chevrolet's advertising materials for the Traverse and also conducted many Internet searches on the vehicle model.  She also saw TV advertisements and Miami Lakes Auto Mall newspaper advertisements about the Traverse.  These advertisements and representations mentioned the safety and reliability of the Traverse, which influenced her decision to purchase the vehicle.  Ms. Ferden-Precht experienced an airbag service light illuminating intermittently in her vehicle on multiple occasions before having her vehicle repaired under the airbag recall.  She was concerned for her safety so she stopped driving her vehicle during these times, and because she did not receive a loaner vehicle, she was forced to car pool or find alternative means of transportation.  Ms. Ferden-Precht would not have purchased this vehicle had she known about the safety defects.

### 31.     Kim Genovese – Florida

67.     Plaintiff and proposed Nationwide and Florida State Class Representative Kim Genovese is a resident and citizen of Lake Worth, Florida.  Ms. Genovese purchased a used 2005 Saturn Ion in late 2009 in Boynton Beach, Florida, for $5,500.  She also purchased a 90-day warranty on the vehicle.  She purchased the vehicle because she believed that it was a reliable

and safe vehicle with a good engine, and because it was a small, fuel efficient vehicle.

Ms. Genovese has experienced over 20 shutdown incidents with her vehicle. On many of these occasions, her vehicle would stop in the middle of the road and, sometimes, in the middle of an intersection; to restart her vehicle she would have to turn the key from the off position back to the on position. She also experienced issues with the vehicle not starting on multiple occasions. Upon hearing of the recall, Ms. Genovese stopped driving her vehicle and purchased another vehicle that she hopes is safer. On June 5, 2014, Ms. Genovese's Saturn Ion's ignition switch was replaced pursuant to the recall. Her husband still drives the vehicle because she doubts that anyone would purchase the vehicle given the widespread knowledge about the recalls. Knowing what Ms. Genovese now knows about the safety defects in her Saturn Ion, she would not have purchased the vehicle.

### 32.   Rhonda Haskins – Florida

68.   Plaintiff and proposed Nationwide and Florida State Class Representative Rhonda Haskins is a resident and citizen of Ocala, Florida. Ms. Haskins purchased a used 2007 Chevrolet Cobalt on November 15, 2013, in Ocala, Florida, for $8,473.00. The vehicle was under a 30-day or 1,000-mile warranty when she purchased it. Approximately two or three times, Ms. Haskins' vehicle has shut off while she was sitting idle in her Cobalt and her knee touched the ignition switch or key area. Ms. Haskins is concerned about her ongoing safety in driving the vehicle and believes its value is now greatly diminished as a result of the ignition switch defects. Ms. Haskins did not learn about the ignition switch defects until March 2014. She would not have purchased this vehicle had she known about the safety defects.

### 33.   Maria E. Santiago – Florida

69.   Plaintiff and proposed Nationwide and Florida State Class Representative Maria Santiago is a resident and citizen of Cutler Bay, Florida. Ms. Santiago purchased a new 2007

Saturn Ion Coupe in late 2006 at a Saturn Dealership at Dadeland South in Miami, Florida, for approximately $20,000.  Ms. Santiago also purchased an extended warranty for the vehicle that is still active.  Ms. Santiago purchased her Ion because she understood and believed that GM vehicles were durable and reliable.  Sometime in 2009, as Ms. Santiago was leaving a friend's house and driving onto an expressway ramp, her Ion turned suddenly turned off.  Since Ms. Santiago had just entered the expressway ramp and was driving at only 25 miles per hour, she was able to pull her vehicle over to the side of the ramp.  She soon noticed the ignition key was in the off position, for no apparent reason.  Ms. Santiago was able to restart the car and continue driving.  Plaintiff Santiago would not have purchased her Ion had she known of the car's ignition switch defect.

### 34.    Turner Clifford – Georgia

70.    Plaintiff and proposed Nationwide and Georgia State Class Representative Turner Clifford is a resident and citizen of Palmetto, Georgia.  He purchased a used 2004 Saturn Ion in September 2005 in Marietta, Georgia, for $15,000.  Mr. Clifford purchased a standard three-year warranty on his vehicle.  Mr. Clifford experienced safety issues while driving his vehicle, including periodic shut-offs, usually when driving the interstate, and the key falling out of the ignition on occasion while driving.  Mr. Clifford stopped driving his vehicle as soon as he learned about the safety recall.  In April 2014, he brought his vehicle to the dealership to have his ignition switch replaced, but the repair did not occur until late June/early July.  During that time, Mr. Clifford incurred considerable additional fuel costs because the rental vehicle he was given consumed more fuel than his Saturn had.  In August 2014, Mr. Clifford traded in his Saturn Ion. He believes he received less in trade-in value as a result of the GM recalls, but he no longer wanted to own the Saturn.  When he traded in his vehicle, the dealership informed him that it would have to sell the Saturns at wholesale because of the safety recalls.  Knowing what he now

knows about the safety defects in the Saturn Ion, Mr. Clifford would not have purchased the vehicle.

### 35.  Jennifer Gearin – Georgia

71.     Plaintiff and proposed Nationwide and Georgia State Class Representative Jennifer Gearin is a resident and citizen of Clermont, Georgia.  Ms. Gearin purchased a new 2006 Chevrolet Cobalt in 2006 in Gainesville, Georgia, for $18,499.52.  Her Cobalt was covered under the manufacturer's warranty when she purchased it.  Ms. Gearin has owned GM products before and she and her family were loyal customers.  Ms. Gearin was advised at the dealership that the Cobalt was most dependable car for the lowest price.  Although Ms. Gearin has not experienced her vehicle shutting down while driving, she is very afraid for her safety as a result of the ignition switch defects and she must drive a long distance to work on a daily basis.  Ms. Gearin did not learn about the ignition switch defects until March 2014.  She had the recall repair work completed this summer and was provided a loaner vehicle.  She would not have purchased this car if GM had been honest about the safety defects.

### 36.  Barry Wilborn – Georgia

72.     Plaintiff and proposed Nationwide and Georgia State Class Representative Barry Wilborn is a resident and citizen of Milner, Georgia.  He purchased a used 2007 Chevrolet Cobalt in 2013 in Canton, Georgia, in a private sale for $4,000.  The car was not under warranty at the time of purchase.  Within months of purchasing the vehicle, he experienced multiple shutdowns while driving.  The most recent shutdown occurred while driving 60 mph on the highway; he had to veer to the right to avoid hitting another vehicle, went down an embankment and had to have his vehicle towed home.  Following the last shutdown, he substantially reduced his use of the vehicle because he thought it unsafe.  Once he learned of the recall, he stopped driving the vehicle altogether.  Mr. Wilborn purchased the vehicle because he believed New

- 35 -

GM's representations that the vehicle was safe and reliable, and also based on its mileage rating. Mr. Wilborn had his ignition switch replaced after his vehicle was at the dealership for over one month.  Knowing what he now knows about the safety defects in many GM-branded vehicles, he would not have purchased the vehicle.

### 37.     Winifred Mattos – Hawaii

73.     Plaintiff and proposed Nationwide and Hawaii State Class Representative Winifred Mattos is a resident and citizen of Honolulu, Hawaii.  Ms. Mattos purchased a new 2007 Pontiac G5 in April 2007 in Culver City, California, for $20,000.  She also had a three-year warranty on her vehicle.  When she first learned about the recall, Ms. Mattos stopped driving her vehicle on highways or long distances and then decided it was unsafe to drive any distance at all. She requested and obtained a rental vehicle while awaiting replacement of her ignition switch pursuant to the recall.  Her vehicle's ignition switch was replaced in April 2014.  Ms. Mattos is still concerned about driving her vehicle.  She would like to sell it, but she doubts she will be able to sell it and, even if she could, she doubts she would receive what she would have received before the recall.  She would need full, pre-recall notice value for her vehicle in order to purchase another vehicle.  Knowing what she now knows about the safety defects in many GM-manufactured vehicles, she would not have purchased her vehicle.

### 38.     Dennis Walther – Hawaii

74.     Plaintiff and proposed Nationwide and Hawaii State Class Representative Dennis Walther is a resident and citizen of Honolulu, Hawaii.  Mr. Walther purchased a new 2006 Saturn Ion in 2006 in Hawaii for approximately $16,400.  His car had a three-year warranty when he purchased it.  The vehicle's ignition switch has been replaced under the recall.  He bought the car because he trusted GM.  If Mr. Walther had known about the Ion's defects, he would never have purchased it.  He will never purchase another GM product.

### 39.   Donna Harris – Illinois

75.    Plaintiff and proposed Nationwide and Illinois State Class Representative Donna Harris is a resident and citizen of Herrin, Illinois.  Ms. Harris purchased a used 2006 Chevrolet Cobalt in Herrin, Illinois, in 2007, for approximately $13,000. She purchased the vehicle with a standard three-year manufacturer's warranty.  Ms. Harris bought the vehicle because her father was a "GM person" and she believed the vehicle was safe and reliable.  Safety is the feature Ms. Harris finds most important feature in a vehicle.  Ms. Harris started experiencing shutdowns in her Cobalt in 2009.  The first time she was backing out of parking lot and the vehicle shut down; as a result, she collided with a parked truck.  In another incident, the vehicle stalled while Ms. Harris was backing out of a hospital parking lot space and she hit a cement barrier.  The second shutdown cost Ms. Harris $1,700 in repairs.  She also has experienced problems with her vehicle not locking.  She has had her ignition switch replaced, but she still experiences problems turning the key in the ignition.  Ms. Harris no longer feels safe driving her car, but she has no other means of transportation.  Had she known about the problems with her GM vehicle, she would not have purchased the car, and she will never again purchase a GM vehicle.

### 40.   Patrick Painter – Illinois

76.    Plaintiff and proposed Nationwide and Illinois State Class Representative Patrick Painter is a resident and citizen of Monee, Illinois.  Mr. Painter purchased a new 2010 Chevrolet Cobalt in April 2011 at a GM dealership in Joliet, Illinois, for approximately $21,000.  His car was under warranty at the time he purchased it.  In the summer of 2012, Mr. Painter had the ignition replaced because the vehicle would not turn off and the key could not be removed from the ignition.  He recently received the ignition switch recall notice in the mail, but has not yet had the recall repairs performed.  Mr. Painter believes the value of his vehicle has diminished,

- 37 -

and he would either not have purchased the vehicle, or would have paid less for it, had New GM disclosed the defects in its vehicles.

### 41.    Heather Holleman – Indiana

77.    Plaintiff and proposed Nationwide and Indiana State Class Representative Heather Holleman is a resident and citizen of South Bend, Indiana.  Ms. Holleman purchased a new 2007 Pontiac G5 in May 2007 from Don Meadows in South Bend, Indiana, for $17,500.  Ms. Holleman has experienced numerous issues with the ignition of her Pontiac G5.  The GM dealership where she purchased her vehicle has told her that the parts to fix the vehicle are unavailable, and she should simply "be careful."  Ms. Holleman would not have purchased the vehicle had she known of the defects.

### 42.    Karen Rodman – Indiana

78.    Plaintiff and proposed Nationwide and Indiana State Class Representative Karen Rodman is a resident and citizen of Kendallville, Indiana.  Ms. Rodman purchased a used 2004 Saturn Ion in 2013 in Fort Wayne, Indiana, for $6,000.  The vehicle did not have a warranty.  Ms. Rodman purchased the vehicle because she thought it was safe and reliable.  Since purchasing the vehicle, however, she has experienced many stalling incidents.  On one occasion, she was going to the doctor and stopped at a red light.  The car shut down and would not restart, and she had to have the vehicle towed.  Ms. Rodman had the ignition switch replaced pursuant to the recall in or around June 2014.  She continues to have the same stalling problems since the replacement that she had before the ignition switch was replaced.  Ms. Rodman is afraid to drive her vehicle, but it is her only form of transportation; she would like a different vehicle that is safe to drive.  Had she known about the problems with her GM-branded vehicle, she would not have purchased the car.

- 38 -

### 43.   Alphonso Wright – Indiana

79.     Plaintiff and proposed Nationwide and Indiana State Class Representative

Alphonso Wright is a resident and citizen of Fishers, Indiana.  Mr. Wright purchased a used 2005

Chevrolet Cobalt on August 16, 2012, in Indianapolis, Indiana, for $9,727.99.  His vehicle was

not covered by a written warranty at the time of purchase.  On two separate occasions, in January

2013 and April 2014, Mr. Wright's vehicle shut down while he was driving over train

tracks.  The steering locked on both occasions as well.  After waiting approximately one month

for the parts to arrive, Mr. Wright's vehicle had the recall repair done on June 5, 2014.  Mr.

Wright was truly frightened by his two inadvertent shutdown experiences, and would not have

purchased his car if he had known about the defects in his GM-branded vehicle.

### 44.   James Dooley – Iowa

80.     Plaintiff and proposed Nationwide and Iowa State Class Representative James

Dooley is a resident and citizen of Waterloo, Iowa.  Mr. Dooley purchased a new 2006 Pontiac

Solstice from Dan Deery Chevrolet in Cedar Falls, Iowa, in June 2006, for $28,000.  Mr.

Dooley purchased an extended seven-year warranty on the vehicle.  Mr. Dooley did not

experience a power failure during normal operation of his vehicle, but he stopped driving his

vehicle in March 2014 when he learned about the safety recall because he was afraid for his

safety.  Because Mr. Dooley was unaware that GM was offering loaner vehicles to individuals

afraid to drive their defective vehicles, he did not drive the vehicle again until August 2014

when the ignition switch was replaced.  Knowing what he now knows about the safety defects

in many GM-manufactured vehicles, he believes GM misled him about the Solstice's safety

and he would not have purchased the vehicle had he known the truth.

### 45.    Trina & John Marvin Brutche Jr. – Kansas

81.    Plaintiffs and proposed Nationwide and Kansas Class Representatives Trina and

John Marvin Brutche, Jr., husband and wife, are residents and citizens of Goodland, Kansas.

The Brutches purchased a used 2009 Chevrolet Impala LTZ on June 14, 2014, in Grand Junction,

Colorado, for $15,471.  They did not purchase any warranty other than the manufacturer's

warranty.  John is a longtime Chevrolet fan, and he has preferred to purchase them because he

believes, based on advertising he has seen over the years, that Chevrolets are excellent quality,

and reliable family cars.  The Brutches purchased the Impala just two weeks before its recall was

announced.  Several times, John experienced the steering on the Impala becoming tight or heavy.

He continues to drive the Impala on a daily basis, but he would like to get the recall repairs

performed.  He called about the recall, and New GM directed him to his local dealer to schedule

the maintenance.  When John called his local dealer, they acted as if New GM's referral for

service did not make sense.  The dealer reported that the recall parts were not available, so no

repair has been performed yet.  The Brutches would not have purchased their vehicle, or they

would have paid less for it, had they known about these defects.

### 46.    Phyllis Hartzell – Kansas

82.    Plaintiff and proposed Nationwide and Kansas State Class Representative Phyllis

Hartzell is a resident and citizen of Burlingame, Kansas.  Ms. Hartzell purchased a used 2006

Saturn Ion for $6,500 in 2011, in Burlingame, Kansas.  The vehicle had a 30-day dealer

warranty.  Ms. Hartzell purchased the vehicle because she thought it was safe and reliable and

would be a good vehicle for transporting her grandchildren.  She no longer feels safe driving the

vehicle and will no longer drive her grandchildren in the car.  As of September 2014,

Ms. Hartzell was still awaiting replacement of her ignition switch; she contacted her dealership

regularly, and they continued to tell her they do not have parts but should have them soon.  Had

she known about the problems with her GM-branded vehicle, she would not have purchased the car and will never again purchase a GM-branded vehicle.

### 47.   Philip Zivnuska, D.D.S. – Kansas

83.     Plaintiff and proposed Nationwide and Kansas State Class Representative Philip Zivnuska, D.D.S., is a resident and citizen of Valley Center, Kansas.  Mr. Zivnuska purchased a new 2006 Chevrolet Cobalt from Conklin Cars dealership in Newton, Kansas, in 2006, for approximately $25,000.  His vehicle was covered by Chevrolet's standard new car warranty at the time it was purchased.  Throughout the course of his ownership of the Cobalt, Dr. Zivnuska and his family members experienced numerous issues consistent with the ignition switch defect, including frequent total power failure and loss of power steering, and an accident.  Dr. Zivnuska brought the Cobalt into Conklin Cars dealership multiple times to address the issues, and became so concerned that he eventually filed a complaint with NHTSA in 2007 to document the problems he was experiencing.  He never received information from GM following this complaint, although he was led to understand GM obtained information about his car, which was subsequently totaled in an accident.  Dr. Zivnuska is appalled by the number of people who have also experienced ignition switch issues and is very upset that GM has not been forthcoming to vehicle owners, mechanics, and dealerships.  Dr. Zivnuska reviewed Internet websites before purchasing his car, particularly because good handling was important to him.  Had he known of the problems with his GM car, he would not have purchased it.

### 48.   Elizabeth Stewart – Kentucky

84.     Plaintiff and proposed Nationwide and Kentucky State Class Representative Elizabeth Stewart is a resident and citizen of Raceland, Kentucky.  She purchased a used 2010 Chevrolet Cobalt in February 2012 from a dealer in Paintsville, Kentucky, for $14,000.  Ms. Stewart's Chevrolet Cobalt was under factory warranty when she purchased it, and she also

purchased an extended bumper-to-bumper warranty.  The factory warranty and extended warranty have both expired.  Around the time of her purchase, Ms. Stewart recalls seeing several commercials in which GM touted the Cobalt's safety and stated that it is the best vehicle in its class.  She believed the vehicle was safe and defect free when she purchased it.  Just two-and-a-half months after buying the car, in April 2012, Ms. Stewart experienced her first inadvertent shutdown.  She was driving in Kentucky when the engine suddenly shut off while the key was still turned and the transmission was in "drive."  The loss of power made the steering wheel almost impossible to turn.  Ms. Stewart managed to get to the side of the road and, thankfully, was not injured.  She was also thankful that her children were not in the vehicle at the time, especially given that she purchased it primarily for use as the family car.  Ms. Stewart experienced many similar shutdowns between the purchase date of February 2012 and July 2014, when the ignition switch was replaced under the recall.  Even after the recall "repair," Ms. Stewart has issues with the car indicative of power loss, where the headlights dim and the steering wheel locks up.  GM should have disclosed these defects when Ms. Stewart purchased the vehicle.  Had New GM disclosed the defects in its vehicles, Ms. Stewart would either not have purchased the vehicle, or would have paid less.

### 49.  Dawn Talbot – Kentucky

85.    Plaintiff and proposed Nationwide and Kentucky State Class Representative Dawn Talbot is a resident and citizen of Glasgow, Kentucky.  Ms. Talbot purchased a used 2006 Chevrolet Cobalt in May 2009 from Goodman Automotive in Glasgow, Kentucky.  Ms. Talbot's vehicle has regularly lost power during driving.  She would not have purchased the vehicle had she known of the defects.

- 42 -

### 50.     Jennifer Crowder – Louisiana

86.     Plaintiff and proposed Nationwide and Louisiana State Class Representative Jennifer Crowder is a resident and citizen of Shreveport, Louisiana.  She purchased a used 2006 Chevrolet Cobalt in 2008 in Shreveport, Louisiana, for $14,000.  Her car was not under warranty at the time of purchase.  Ms. Crowder experienced many instances of stalling in her Cobalt.  Her vehicle stalled on many occasions while driving to work.  She was late to work so often due to the stalling that she was dismissed from her employment for arriving late to work.  On another occasion, Ms. Crowder's vehicle shut off in the middle of the road while she was making a turn.  She was, fortunately, able to start the vehicle on the second try and avoided an accident.  Knowing what she now knows about the safety defects in many GM-manufactured vehicles, and the Cobalt in particular, she would not have purchased the vehicle or even visited the dealership to look at the Cobalt.

### 51.     Nathaniel and Frances Ann Fagans – Louisiana

87.     Plaintiffs and proposed Nationwide and Louisiana State Class Representatives Nathaniel and Frances Ann Fagans are residents and citizens of Shreveport, Louisiana.  The Fagans purchased a new 2012 Cadillac CTS on July 2, 2012, for $42,897.78.  The vehicle came with the manufacturer's warranty, but they did not purchase an extended warranty.  The Fagans have a history of purchasing Cadillac vehicles due to the brand's advertised safety features.  Mrs. Fagans drove the 2012 Cadillac CTS on a daily basis for personal use.  Just before trading in her vehicle on June 19, 2013, Mrs. Fagans experienced a stall during a right-hand turn at an intersection.  All dashboard lights flashed and the vehicle's automatic locks clicked on and off as her car rolled to a stop approximately twelve feet after the turn.  Mrs. Fagans attempted to turn the car off and remove the key, but was unable to do so.  She also attempted to place the car in park, but all electrical in the car was disabled and she quickly exited the vehicle in fear for her

safety.  As a result of this incident and in fear for their safety, the Fagans traded in their 2012 Cadillac CTS at a significant loss of $11,197.78.  The Fagans would not have purchased their vehicle, or they would have paid less for it, had they known about the defects plaguing GM-branded vehicles.

### 52.    Lisa West – Louisiana

88.    Plaintiff and proposed Nationwide and Louisiana State Class Representative Lisa West is a resident and citizen of Baton Rouge, Louisiana.  Ms. West purchased a used 2008 Chevrolet Cobalt on August 3, 2010, from All Star Hyundai in Baton Rouge, Louisiana, for $9,621.  Her vehicle was covered by a warranty at the time of purchase.  It expired last year.  At the time she purchased it, the GM dealer told her it was a very safe vehicle.  Had New GM disclosed the defects in its vehicles, Ms. West would either not have purchased the vehicle, or would have paid less.

### 53.    Michelangelo De Ieso – Maine

89.    Plaintiff and proposed Nationwide and Maine State Class Representative Michelangelo De Ieso is a resident and citizen of Dover-Foxcroft, Maine.  Mr. De Ieso purchased a used 2008 Pontiac Solstice on June 20, 2013, in Auburn, Massachusetts, for $20,250.00.  The vehicle was not under warranty when he purchased it.  Mr. De Ieso did not learn about the ignition switch defects until March 2014.  Mr. De Ieso is concerned about his safety in driving the vehicle and believes its value is now greatly diminished as a result of the ignition switch defects.  As a precaution, Mr. De Ieso has not driven his vehicle since June 2014.  In late 2014, Mr. De Ieso had the recall work performed on his vehicle.  However, he still does not feel safe driving it.  In fact, he purchased another non-GM vehicle to drive instead.  He has tried to sell his Solstice privately but has been unsuccessful.  He would not have purchased this vehicle had he known about the safety defects.

### 54.     Alysha Peabody – Maine

90.     Plaintiff and proposed Nationwide and Maine State Class Representative Alysha Peabody is a resident and citizen of Kenduskeag, Maine.  Ms. Peabody purchased a used 2005 Chevrolet Cobalt in 2006 in Maine for $14,000.  Her car was under warranty at the time of purchase.  Although she did not have ignition switch issues before the recall, since having the repair done her vehicle does not always start on the first try.  She has tried to sell her car on Craigslist since news of the ignition switch defects went public, but has not received a single inquiry about the vehicle.  Ms. Peabody would have never purchased a GM vehicle if she had known about the defects.

### 55.     Harry Albert – Maryland

91.     Plaintiff and proposed Nationwide and Maryland State Class Representative Harry Albert is a resident and citizen of Montgomery Village, Maryland.  Mr. Albert purchased a new 2012 Chevrolet Camaro from Ourisman's Rockmont Chevrolet in Rockville, Maryland, in October 2012, for $34,000.  On at least three occasions, the power in Mr. Albert's Camaro failed during normal vehicle operation.  During the second of these incidents, on May 13, 2014, Mr. Albert was operating his vehicle on a roadway at the posted speed when his power failed. Mr. Albert was nearly rear-ended by the vehicle traveling behind him, but the vehicle swerved and avoided a collision.  Mr. Albert's knees did not impact the ignition key during this event.  He was able to restart the Camaro and immediately took it to the Ourisman Rockmont dealership for testing.  The dealership tested the vehicle, but could find nothing wrong.  Less than one month later, Mr. Albert's vehicle experienced another power failure when he was turning into a parking lot.  Again, he was almost rear-ended.  This time, Ourisman Rockmont provided Mr. Albert with a loaner car while it attempted to determine the source of the problem.  Shortly thereafter, New GM publicly announced the recall of the Camaro vehicles, but Mr. Albert did not learn of the

- 45 -

ignition switch defect in his vehicle until June 2014. He took it back to the Ourisman Rockmont

dealership, and they removed the blade from the ignition key fob and put it on a keychain and

returned the vehicle to him. Mr. Albert was nonetheless so afraid to drive his Camaro that he

traded it in for a used 2013 Chevrolet Impala in July 2014 in Germantown, Maryland. He

received $27,000 for his Camaro, and paid $17,999 for the Impala. At the time of his trade-in,

Mr. Albert did not yet know about the ignition switch recall out on his Impala. He would not

have purchased the Camaro had he known about the safety defects, and now he is concerned

about the safety of his Impala.

**56. George Mathis – Maryland**

92.     Plaintiff and proposed Nationwide and Maryland State Class Representative

George Mathis is a resident and citizen of Parkville, Maryland. Mr. Mathis purchased a new

2007 Chevrolet Cobalt on April 1, 2007, in York, Pennsylvania, for $12,000. The vehicle was

covered under warranty when he purchased it. Mr. Mathis has experienced his ignition shutting

down while driving on three separate occasions, with one instance resulting in a minor accident,

and the other two nearly resulting in an accident. Mr. Mathis did not learn about the ignition

switch defects until March 2014. In August 2014, he took his Cobalt to the dealership in his area

to have the recall work performed. Mr. Mathis would not have purchased this car, or would have

paid less than he did, if GM had been honest about the safety defects.

**57. Bryan Mettee – Maryland**

93.     Plaintiff and proposed Nationwide and Maryland State Class Representative

Bryan Mettee is a resident and citizen of Jarrettsville, Maryland. Mr. Mettee purchased a used

2006 Chevrolet Cobalt in 2012 from a dealership in Maryland for $10,000. He also purchased a

"bumper to bumper" warranty for the lifetime of the car, as well as an extended warranty.

Mr. Mettee has experienced his ignition shutting down at least ten separate times during normal

driving conditions.  The first incident occurred in September 2013 while he was going approximately 35-40 miles per hour.  He had to use the emergency brake to stop the car.  In all instances he knows his knee did not bump into the ignition switch or keys when the car shut off.  He visited the dealership no less than three times to attempt to resolve the shutdown issues, but in all cases the problem resumed after the dealer purported to fix it, and all were out of pocket repair costs.  It was only after all this hassle that he received the recall notice.  His ignition switch was repaired shortly after he received the recall notice.  Had New GM disclosed the defects in its vehicles, Mr. Mettee would either not have purchased the vehicle, or would have paid less for it.

### 58.   Robert Wyman – Maryland

94.     Plaintiff and proposed Nationwide and Maryland State Class Representative Robert Wyman is a resident and citizen of Baltimore, Maryland.  Mr. Wyman purchased a new 2007 Saturn Sky from the Heritage dealership in Owings Mills, Maryland, in 2007 for $32,000.  His vehicle came with a three-year warranty.  Although he has not experienced an inadvertent power failure while driving his vehicle, on multiple occasions Mr. Wyman had difficulty removing and/or inserting his ignition key into the ignition cylinder or starting his vehicle.  Mr. Wyman's vehicle had the recall repair done on May 31, 2014.  Had he known that the Saturn Sky contained a defective ignition switch, Mr. Wyman would not have purchased the vehicle because it is a "death car," and he worries what might have happened had he "hit a bump a certain way."

### 59.   Mary Dias – Massachusetts

95.     Plaintiff and proposed Nationwide and Massachusetts State Class Representative Mary Dias is a resident and citizen of Taunton, Massachusetts.  Ms. Dias purchased a used 2007 Chevrolet HHR on February 28, 2008, in Woonsocket, Rhode Island, for approximately $13,000.  The vehicle was under warranty when she purchased it.  Because of the ignition switch defects,

Ms. Dias is very concerned for her safety every time she drives her vehicle.  Ms. Dias did not

learn of the ignition switch defects until March 2014.  When she inquired about her safety, GM

told her that her vehicle had not been recalled and not to worry.  On April 11, 2014, after

receiving notice that her HHR was in fact recalled, Ms. Dias took her HHR in for the recall

repair work and was provided a loaner vehicle.  She would not have purchased this vehicle if she

had known of the safety defects.

### 60.   Colin Elliott – Massachusetts

96.   Plaintiff and proposed Nationwide and Massachusetts State Class Representative

Colin Elliott is a resident and citizen of Buzzards Bay, Massachusetts.  Mr. Elliott purchased a

new 2008 Saturn Sky in Hyannis, Massachusetts, in July 2007 for $23,000.  His vehicle was

covered by a standard 100,000-mile warranty at the time of purchase.  At the time of purchase,

Mr. Elliott was choosing between a Saturn Sky and Pontiac Solstice.  To avoid defects that he

believed plagued early production models, however, Mr. Elliott waited two years before ordering

his Saturn in the hopes that any early production defects would be discovered and fixed.

Although he has not experienced an inadvertent power failure while operating the vehicle, Mr.

Elliott has not driven his Sky since learning of the recall.  He has contacted his dealership to

inquire about the timing of repairs, but his dealership indicated that it does not have parts

available.  Because he will no longer drive his Sky, Mr. Elliott and his wife have been sharing

her Kia.  This has caused significant inconvenience, as they drive each other to work and are

dependent on one another's schedule.

### 61.   Richard Leger – Massachusetts

97.   Plaintiff and proposed Nationwide and Massachusetts State Class Representative

Richard Leger is a resident and citizen of Franklin, Massachusetts.  Mr. Leger purchased a used

2007 Pontiac G5 in Attleboro, Massachusetts, in 2013 for $8,000.  He purchased the vehicle with

a 90-day warranty.  Mr. Leger purchased the vehicle because he thought it was safe.  Mr. Leger's vehicle started experiencing stalling in November 2013.  The first time was at a traffic light, when the car just shut down.  That happened several more times.  He also experienced loss and/or locking of the power steering.  He does not feel safe driving the car, nor does he feel safe having his children drive it.  Mr. Leger has attempted to have the ignition switch replaced several times, but each time he went to the dealership the part was not available.  As of September 2014, he has not had his ignition switch replaced pursuant to the recall.  Had he known about the problems with his GM-branded vehicle, he would not have purchased the car.

### 62.    Sheree Anderson – Michigan

98.    Plaintiff and proposed Nationwide and Michigan State Class Representative Sheree Anderson is a resident and citizen of Detroit, Michigan.  Ms. Anderson purchased a used 2008 Chevrolet HHR on November 15, 2011, in Michigan for approximately $16,500.  The vehicle had a warranty on it when she purchased it.  Ms. Anderson chose the HHR in part because she desired a safe vehicle.  Ms. Anderson did not learn about the ignition switch defects until March 2014.  Although Ms. Anderson has not experienced her vehicle shutting down while driving, she is concerned for her safety as a result of the ignition switch defects.  She must continue to drive her vehicle, however, because it is her main form of transportation, and she must drive it to work every day.  Ms. Anderson's HHR received the ignition switch recall repair work on June 10, 2014.  She believes the value of her vehicle is now greatly diminished as a result of the ignition switch defects.  Had she known about the ignition switch defects, she would either not have purchased the HHR or would have paid less for it.

### 63.    Diana Cnossen – Michigan

99.    Plaintiff and proposed Nationwide and Michigan State Class Representative Diana Cnossen is a resident and citizen of Grand Rapids, Michigan.  Ms. Cnossen purchased a

new 2007 Saturn Ion on November 27, 2006, in Michigan for $18,250.  Her vehicle was covered

under warranty when she purchased it.  She purchased the vehicle because she was attracted to

its compact size when she viewed it in the showroom.  Ms. Cnossen did not experience a power

failure during normal operation of her vehicle, though she often experienced difficulty turning

the steering wheel.  Ms. Cnossen's ignition switch was replaced under the recall on June 4, 2014.

While she awaited a replacement part, Ms. Cnossen continued to use her vehicle because she was

not aware that GM had offered to provide loaner vehicles to those too afraid to continue

operating their defective vehicles.  Ms. Cnossen did not learn of the ignition switch defect until it

was announced in March of 2014, and she would not have purchased her Saturn Ion had she

known it contained a defective ignition switch.  Ms. Cnossen will "never buy another car from

GM."

 64.     **Rafael Lanis – Michigan**

 100.    Plaintiff and proposed Nationwide and Michigan State Class Representative

Rafael Lanis is a resident and citizen of Birmingham, Michigan.  Mr. Lanis purchased a used

2006 Chevrolet Cobalt in July 2011 at auction at Westland Auto Care in Michigan, for $2,800.

His car was no longer under warranty at the time he purchased it.  Mr. Lanis has experienced his

ignition shutting down approximately ten separate times after starting his car and then removing

his hand from the key.  It also shut down once while sitting idle at a traffic light.  His ignition

switch was repaired approximately one month after he received the recall notice, in April 2014.

But his car was affected by further recalls and when he tried to secure a loaner from New GM

before repairing his ignition switch, they refused.  Mr. Lanis tried unsuccessfully to sell his

vehicle.  He noted that the Kelley Blue Book value of his car has dropped from $4,700 to $4,000

since announcement of the recalls.  Had New GM disclosed the defects in its vehicles, Mr. Lanis

would either not have purchased the vehicle, or would have paid less for it.

### 65.   Anna Allhouse – Minnesota

101.   Plaintiff and proposed Nationwide and Minnesota State Class Representative Anna Allhouse is a resident and citizen of Clarks Grove, Minnesota.  Ms. Allhouse purchased a used 2007 Chevrolet HHR in 2012 in Minnesota for approximately $12,000.  Her car was under warranty when she purchased it, and she also purchased an extended warranty and gap insurance from the dealership at the same time.  The car is currently under warranty.  Ms. Allhouse experienced one incident related to the car shutting off on its own.  In the winter of 2013, she was backing out of her driveway, and the car suddenly turned off.  She was able to restart the car and was not involved in an accident.  After receiving the recall notice, Ms. Allhouse took her car to the GM dealer.  They told her there was nothing wrong with her ignition.  Ms. Allhouse still owes approximately $9,800 on the vehicle.  Recently, she tried to trade it in for a new vehicle at the same dealership but was told they would only offer $2,000 for the car.  Ms. Allhouse has two small children and wanted a safe, reliable vehicle.  She would never have purchased a GM-branded vehicle if she knew about the defects.

### 66.   David Cleland – Minnesota

102.   Plaintiff and proposed Nationwide and Minnesota Class Representative David Cleland is a resident and citizen of Northfield, Minnesota.  He purchased a used 2004 Saturn Ion in 2005 in Northfield, Minnesota, for $10,000.  Mr. Cleland's Saturn Ion was covered under the standard manufacturer's warranty at the time he purchased it.  Mr. Cleland read GM promotional material about the vehicle's safety and reliability, including the vehicle's airbags, prior to purchasing the vehicle.  This spring, after the recall announcement, Mr. Cleland's children had a frontal collision while driving his vehicle.  The airbags did not deploy, even though they should have under the circumstances of the collision.  Knowing what he now knows about the safety

- 51 -

defects in many GM-manufactured vehicles, and particularly his Saturn Ion, Mr. Cleland would not have paid the amount of money he paid, or even purchased, the vehicle.

### 67.   Frances Howard – Mississippi

103.   Plaintiff and proposed Nationwide and Mississippi State Class Representative Frances Howard is a resident and citizen of Jackson, Mississippi.  Ms. Howard leased and then purchased a new 2006 Saturn Ion in April 2006 at a Saturn dealership in Jackson, Mississippi, for approximately $11,000.  The vehicle was covered by a warranty at the time of purchase.  She recalls seeing television ads touting the Saturn brand as outstanding with dependable vehicles and high-rated customer service.  In 2009, Ms. Howard's key got stuck in the ignition and she could not turn the vehicle off.  She drove it to the dealership and they replaced the ignition switch on September 8, 2009, at Ms. Howard's expense.  One week later the key got stuck in the ignition again.  This time the GM dealership told her it was because her car's battery was dead.  Their service was unhelpful and contradictory.  Ms. Howard's car has also inadvertently shut down on two occasions.  The first time happened in the summer 2014 when she accidentally bumped the key while it was in the ignition.  The second time, on September 2, 2014, it shut off while she was at a red light.  Both times the car restarted after she turned the key off and then on again.  Ms. Howard was never contacted about the ignition switch recall, and only found out about it by reading news on the Internet.  After contacting her GM dealership about the repairs, it took eight weeks for the parts to come in.  She also asked for a loaner vehicle, but they declined, telling her there were none available and it would be only two weeks until the parts arrived.  Ms. Howard would have never purchased this vehicle if she had known about these defects.

### 68.   Elizabeth D. Johnson – Mississippi

104.   Plaintiff and proposed Nationwide and Mississippi State Class Representative Elizabeth D. Johnson is a resident and citizen of Jackson, Mississippi.  Ms. Johnson purchased a

used 2007 Chevrolet Cobalt on March 27, 2012, from Bond Auto Sales in Jackson, Mississippi, for $7,200.00.  Ms. Johnson twice had her vehicle shut down and on one occasion was in an accident as a result, and her airbags did not deploy.  Her car was totaled and she has lost value as a result.  Ms. Johnson would not have purchased the vehicle, or paid as much, if she had known the vehicle was a safety hazard.

### 69.   Linda Wright – Mississippi

105.   Plaintiff and proposed Nationwide and Mississippi State Class Representative Linda Wright is a resident and citizen of Greenwood, Mississippi.  Ms. Wright purchased a used 2007 Chevrolet Cobalt on July 8, 2013, in Greenwood, Mississippi, for $4,300.  At the time she purchased her vehicle, it was not covered by a warranty.  On two occasions, on November 13, 2013, and May 18, 2014, Ms. Wright experienced her engine shutting down while operating the vehicle under normal driving conditions, at 25-40 miles per hour.  Each time, she was forced to try and steer the car to the side of the road before restarting the engine.  The steering also locked up in both instances.  Her vehicle had the ignition switch repair done at a dealership in Greenwood, Mississippi.  Had New GM disclosed the defects in its vehicles, Ms. Wright would either not have purchased the vehicle, or would have paid less.

### 70.   Cynthia Hawkins – Missouri

106.   Plaintiff and proposed Nationwide and Missouri State Class Representative Cynthia Hawkins is a resident and citizen of Pevely, Missouri.  Ms. Hawkins purchased a used 2010 Chevrolet Cobalt on July 23, 2013, in Missouri for approximately $13,000.  The car was not under warranty when she purchased it.  She believed the car was a good family car and one that a teenager could drive.  Ms. Hawkins did not receive a recall notice, but rather heard about it on the news and immediately contacted her GM dealer.  The dealer told her the parts were not available.  Ms. Hawkins could not drive her vehicle from April 7, 2014, to August 29, 2014,

while she awaited the recall repair parts to come in and be installed in her car.  Since announcement of the recalls, she believes her car's value has decreased significantly, and it prevents her from re-selling it for a fair price.  Ms. Hawkins would not have purchased this GM-branded vehicle had she known about these defects.

### 71.   Ronald Robinson – Missouri

107.   Plaintiff and proposed Nationwide and Missouri State Class Representative Ronald Robinson is a resident and citizen of Bridgeton, Missouri.  Mr. Robinson purchased a used 2010 Chevrolet Impala in June 2010 in Missouri for approximately $16,000.  He purchased an extended warranty that was set to expire on March 16, 2015, or at 82,000 miles.  Before purchasing, Mr. Robinson viewed email advertising highlighting the quality of the GM product, and this positively impacted his decision to buy the car.  Mr. Robinson first heard about the recalls in the summer of 2014.  He contacted his local dealer to inquire about his Impala, and they told him his specific make and model was not being recalled.  Then just a few months later, in August 2014, he received a notice in the mail about his car being recalled for the ignition switch defect.  Mr. Robinson's vehicle has still not been repaired, however, because the GM dealership told him the parts are not available – and they do not know when they will become available.  He believes his car's value has diminished and he is worried about trying to sell the car now because he does not believe he can get a fair price for it.  Mr. Robinson would not have purchased this GM-branded vehicle had he known about these defects, and under no circumstances would he have even considered buying the car for a lesser price.

### 72.   Michelle Washington – Missouri

108.   Plaintiff and proposed Nationwide and Missouri State Class Representative Michelle Washington is a resident and citizen of Florissant, Missouri.  Ms. Washington purchased a new 2008 Chevrolet Impala in July 2007 at a GM dealership in Missouri for

- 54 -

approximately $27,000.  She also purchased a new 2014 Chevrolet Impala on May 9, 2014, at a GM dealership for approximately $37,000.  The 2008 Impala was covered under warranty at the time of sale and she also purchased an extended warranty.  The 2014 Impala is currently covered under warranty.  In purchasing the 2008 Impala, Ms. Washington was convinced of the safety and reliability of her GM product based upon their warranties and representations.  The ignition switch defect manifested in her 2008 Impala on approximately four separate occasions.  In one instance the car shut down on the highway and she had to pull to the side of the road and restart it.  Before purchasing her new 2014 Impala, Washington took her 2008 Impala to two different GM dealerships to get an estimated trade-in value.  At the first GM dealership, during their test drive of her 2008 Impala, the vehicle ignition switch defect manifested and the car shut down. The dealership informed her that they would have to dock her money on the trade in amount being offered because of the problem.  Based upon the vehicle shutting down during the examination, the dealership offered her a quote of $1,500 for a trade-in amount.  Just days later, she took it to another GM dealership who gave her $2,900 for a trade-in amount.  Ms. Washington received the ignition switch recall notice on her 2008 Impala after she had already traded it in for the 2014 Impala.  Her 2014 Impala has not yet been repaired under the recall. Ms. Washington is adamant that had she known of the defects, she would have never considered the 2008 Impala or, later, the 2014 Impala when she was looking to trade-in her vehicle.

### 73.   Patrice Witherspoon – Missouri

109.   Plaintiff and proposed Nationwide and Missouri State Class Representative Patrice Witherspoon is a resident and citizen of Lee's Summit, Missouri.  Ms. Witherspoon purchased a new 2006 Saturn Ion in 2005 from a Missouri vehicle dealer for approximately $16,828.  Ms. Witherspoon reviewed GM's webpage and other Internet websites discussing the Saturn Ion prior to her purchase and believed that the vehicle was safe and reliable based on her

review.  Ms. Witherspoon believed her vehicle was safe and defect-free when she purchased it.

Ms. Witherspoon's 2006 Saturn Ion spontaneously shut off on at least five occasions while

driving the vehicle.  On one such occasion, she was on the highway, but was able to avoid an

accident by pulling over to the shoulder.  On another occasion, her vehicle shut off while on the

exit ramp to a highway, but she was, fortunately, again able to avoid an accident.  On each

occasion, the vehicle gearshift was in "drive" or "reverse" and the ignition key was in the "run"

position.  Ms. Witherspoon had difficulty controlling and safely stopping the vehicle on these

occasions.  The value of Ms. Witherspoon's vehicle is less than she bargained for when she

purchased the vehicle and has diminished as a result of the defect.

### 74.    Patricia Backus – Montana

110.    Plaintiff and proposed Nationwide and Montana State Class Representative

Patricia Backus is a resident and citizen of Bigfork, Montana.  Ms. Backus purchased a used

2006 Chevrolet HHR in 2012 in Idaho, for $10,900.  Ms. Backus purchased a short-term

warranty, which she cancelled shortly after purchasing the vehicle.  Ms. Backus purchased the

HHR because she believed it was reliable and safe.  Within six months of purchasing the vehicle,

she experienced a stall while approaching a traffic light.  She had three additional shutdowns

while driving.  During these incidents, she had no control of the steering, and, on at least one of

the occasions, her steering locked.  It took Ms. Backus several attempts for her vehicle to turn

back on.  She no longer feels safe driving the vehicle even though the ignition switch was

replaced, and since learning about the recall she is angry towards New GM for keeping the safety

defect a secret.  Ms. Backus had her ignition switch replaced in August 2014.  Since the

replacement, the radio in her vehicle turns off.  Had she known about the problems with her GM-

branded vehicle, she would not have purchased the car.  She will never purchase another GM-

branded vehicle.

### 75.   Laurie Holzwarth – Montana

111.   Plaintiff and proposed Nationwide and Minnesota Class Representative Laurie Holzwarth is a resident and citizen of Billings, Montana.  Ms. Holzwarth purchased a used 2005 Chevrolet Cobalt in 2008 in Billings, Montana, for approximately $7,000.  Her daughter Christine has experienced countless shutdowns in the vehicle.  Christine is the primary driver of the vehicle and will not let anyone else drive it, because she is concerned about the number of shutdowns that she has experienced.  They have occurred on highways, in the main street of her town, pulling into parking spaces, and everything in between.  The worst incident that she can remember was a definite power failure.  Ms. Holzwarth witnessed this event.  They were driving on the highway in August of 2010 from Billings to Bozeman, where Christine would be attending college.  At a point where they had to make a sharp turn, traveling at 75-80 miles per hour, the car just quit.  Christine was able to get the car to a stop without hitting the concrete wall, cycle the key, and continue.  They drove another 40 miles, and the car shut off twice more on the straightaway, and once more in the town.  Christine had experienced both power steering failure and power failure incidences before this, but had not done much highway driving because she mainly drove to and from high school.  The ignition switch was supposedly repaired as part of the ignition switch recall on July 29, 2014.  But Ms. Holzwarth's daughter is still experiencing power failures in the car.  Since the vehicle was repaired, Christine experienced two shutdowns and/or power steering failures on September 3, 2014, and September 8, 2014.  Ms. Holzwarth and her daughter would like to get rid of the car, but they are not financially capable of doing so – Christine is working full-time to pay off her college loans and needs a vehicle to get to work.  Furthermore, they do not believe that they could sell this vehicle to anyone else in good conscience.  Even if they were to say that the car was repaired, they do not believe it is true, and

- 57 -

they don't want to put anyone else at risk in the car.  Ms. Holzwarth would not have purchased this vehicle if she had known about its serious and dangerous defects.

### 76.   Susan Rangel – Nebraska

112.    Plaintiff and proposed Nationwide and Nebraska Class Representative Susan Rangel is a resident and citizen of North Platte, Nebraska.  She purchased a used 2008 Chevrolet Cobalt in the fall of 2009 at Jerry Remus Chevrolet in North Platte, Nebraska, for $14,000.  At the time of purchase, the vehicle had the original manufacturer's warranty.  Ms. Rangel purchased the vehicle believing it to be safe and reliable.  When she learned about the recall, she requested a rental/loaner vehicle because she did not believe the vehicle was safe to drive, but she was informed by New GM that she would not be given a loaner vehicle.  The dealership replaced the ignition switch in June 2014 pursuant to the recall.  Nevertheless, Ms. Rangel does not believe the vehicle is safe for her family to drive and has attempted to sell the vehicle.  As of September 2014, those efforts have been unsuccessful.  Had she known about the problems with her GM-branded vehicle, she would he would not have purchased the car and will never again purchase another GM-branded vehicle.

### 77.   Sandra Horton – Nevada

113.    Plaintiff and proposed Nationwide and Nevada State Class Representative Sandra Horton is a resident and citizen of Las Vegas, Nevada.  Ms. Horton purchased a used 2007 Pontiac Solstice in October 2013 in Nevada for $10,000.  Her car was not under warranty at the time of purchase.  On several occasions she has experienced issues with her vehicle that are consistent with the ignition switch defects.  Her vehicle was repaired under the recall, but only after waiting four months for the parts to arrive.  New GM did not provide her with a loaner vehicle during this waiting period.  Ms. Horton would not have purchased her GM-branded vehicle had she known about its safety defects.

### 78.     Wayne Wittenberg – Nevada

114.     Plaintiff and proposed Nationwide and Nevada State Class Representative Wayne Wittenberg is a resident and citizen of Las Vegas, Nevada.  Mr. Wittenberg purchased a new 2006 Chevrolet HHR in September 2005 at Bill Heard Chevrolet in Las Vegas, Nevada, for $20,300.00.  Mr. Wittenberg's vehicle came with the standard new car warranty.  Mr. Wittenberg experienced stalling and shutdowns in his HHR about four to five times while driving and he would have to pull over and restart the car.  His vehicle's power steering failed thirty to forty times before the power steering motor was replaced.  The car would lose power steering while driving, forcing Mr. Wittenberg to turn off the car and restart it in order to get the power steering working again.  Mr. Wittenberg became concerned about his safety and decided to trade in the vehicle for a more reliable car.  He did not have his car repaired under the recall because he traded-in the vehicle in September 2012 for a Kia Soul.  Before trading in his HHR, Mr. Wittenberg reviewed Kelley Blue Book and noted that the value of his car varied between $6,000-7,500.  The best trade-in offer Mr. Wittenberg received for his car was approximately $4,000.  Mr. Wittenberg believes he suffered a diminution of value in his vehicle.  He would not have purchased the HHR had he known about these defects and the loss of value.

### 79.     Michael Amezquita – New Jersey

115.     Plaintiff and proposed Nationwide and New Jersey State Class Representative Michael Amezquita is a resident and citizen of Hamilton, New Jersey.  Mr. Amezquita purchased a new 2006 Chevrolet Cobalt on June 30, 2006, in East Windsor, New Jersey, for $14,000.  At the time he purchased the vehicle it was covered under warranty, but the warranty has since expired.  Mr. Amezquita did not learn of the ignition switch defects until March 2014.  His car was not repaired under the recall until April 23, 2014.  Mr. Amezquita had to demand a loaner vehicle before GM would agree to provide one.  He used the loaner vehicle for approximately

- 59 -

seven weeks, from March 19, 2014, to April 23, 2014, while he waited for the repair parts to arrive.  Mr. Amezquita would not have purchased this vehicle if he had known about these defects.

### 80.   Anthony Juraitis – New Jersey

116.    Plaintiff and proposed Nationwide and New Jersey State Representative Anthony Juraitis is a resident and citizen of Freehold, New Jersey.  He purchased a new 2004 Saturn Ion in or around the winter of 2003.  Mr. Juraitis purchased the vehicle with a standard warranty. Mr. Juraitis was considering other vehicles as well, but he decided on the Ion in part because he believed the vehicle to be safe and reliable.  Mr. Juraitis experienced several shutdowns/stalls while driving his Ion.  The first occurred on the highway, when his vehicle "locked" while driving.  Other drivers stopped to help him push his vehicle to the side of the road, where after several attempts he was able to restart his vehicle.  Mr. Juraitis took the vehicle to the dealership, which replaced the ignition switch and charged Mr. Juraitis for parts and labor.  Following this supposed repair, Mr. Juraitis continued to have stalls and shutdowns with his vehicle; he estimates approximately three dozen times with about eight or ten of them being in very dangerous situations.  On July 31, 2014, the ignition switch was replaced again, this time pursuant to the recall.  Following this replacement, Mr. Juraitis has continued to experience safety problems with the vehicle, including in early September 2014 when his vehicle shut down again and he was unable to immediately restart the vehicle.  Mr. Juraitis would like to sell or trade in his vehicle, but he does not want another person to experience the dangerous events he has experienced or have a vehicle with an obvious safety defect.  Mr. Juraitis believes the vehicle is not worth anything if it means you have to gamble with your life to drive it.  Knowing what he now knows about the safety defects in many GM-manufactured vehicles, he would not have purchased the vehicle and will never again purchase a General Motors vehicle.

### 81.    Gene Reagan – New Jersey

117.    Plaintiff and proposed Nationwide and New Jersey State Class Representative Gene Reagan is a resident and citizen of South Amboy, New Jersey.  Mr. Reagan purchased a new 2010 Chevrolet HHR in December 2009, at a dealership in Middletown, New Jersey, for approximately $20,000.  His vehicle had a standard warranty, but he does not recall its details.  Mr. Reagan purchased a GM-branded vehicle because he believed that New GM stood for safety and reliability.  Mr. Reagan has experienced several safety problems with his vehicle, including his ignition locking and inability to turn the key to the "on" position, requiring the car to be towed to the dealership.  Because of his ignition problems, Mr. Reagan had his ignition replaced approximately three years ago.  That did not solve the problems he was experiencing with his vehicle.  As of September 2014, Mr. Reagan is still awaiting replacement of his ignition switch pursuant to the recall and feels nervous driving it in its current defective condition.  Had he known about the problems with his GM-branded vehicle, and particularly that New GM was building vehicles plagued with defects and not committed to safety and reliability, he would not have purchased the car.  Mr. Reagan will never purchase another GM-branded vehicle.

### 82.    Steven Sileo – New Jersey

118.    Plaintiff and proposed Nationwide and New Jersey State Class Representative Steven Sileo is a resident and citizen of Skillman, New Jersey.  Mr. Sileo purchased a used 2009 Chevrolet Cobalt in July 2010 in Burlington, New Jersey, for $10,000.  The vehicle was under warranty when he purchased it.  Although Mr. Sileo has not experienced any ignition switch-related issues with his Cobalt, he fears driving his vehicle after learning of the ignition switch recall and the risks posed by the defects.  Mr. Sileo had the recall repair work completed sometime near the end of 2014.  He is eager to sell the vehicle but cannot honestly market it without the ignition switch being replaced.  Also, he believes the value of his vehicle has been

diminished as a result of the defects and the stigma with the GM brand.  Mr. Sileo would not have purchased this car if New GM was honest about the safety defects.

### 83.    Javier Delacruz – New Mexico

119.    Plaintiff and proposed Nationwide and New Mexico State Class Representative Javier Delacruz is a resident and citizen of Albuquerque, New Mexico.  Mr. Delacruz purchased a new 2009 Chevrolet Cobalt in September 2009 in Albuquerque, New Mexico, for $20,698.  The vehicle was under warranty when he purchased it.  In 2011, Mr. Delacruz could not shut off his vehicle and the ignition switch was replaced.  Mr. Delacruz fears driving his vehicle due to the ignition switch recall and the risks posed by the defects.  Mr. Delacruz had the ignition switch replaced, again, in 2014 as a result of the recall.  He believes the value of his vehicle has been diminished as a result of the defects.  Mr. Delacruz would not have purchased this car if New GM had been honest about the safety defects.

### 84.    Lorraine De Vargas – New Mexico

120.    Plaintiff and proposed Nationwide and New Mexico State Class Representative Lorraine De Vargas is a resident and citizen of Santa Fe, New Mexico.  Ms. De Vargas purchased a used 2005 Saturn Ion on November 25, 2009, in Santa Fe, New Mexico, for $5,000.  There was no warranty on the vehicle when Ms. De Vargas purchased it.  Ms. De Vargas bought her Ion in part because of her desire for a safe vehicle.  Ms. De Vargas was involved in an accident on December 14, 2012.  While Ms. De Vargas was driving her Ion, the vehicle shut down unexpectedly and caused her to collide with a fence at 25-30 miles per hour.  Her airbags failed to deploy.  The vehicle damage has been repaired, and while she is thankful to have survived the accident with no injuries, Ms. De Vargas must continue to drive her Ion to work every day.  She is concerned about the safety of her vehicle, the impact the defects have had on the value of her vehicle, and the costs she has incurred in fixing the vehicle previously.

Ms. De Vargas did not learn of the ignition switch defects until March 2014.  She believes that New GM withheld information about the safety of its vehicles.

### 85.   Bernadette Romero – New Mexico

121.   Plaintiff and proposed Nationwide and New Mexico State Class Representative Bernadette Romero is a resident and citizen of Santa Fe, New Mexico.  Ms. Romero purchased a new 2007 Chevrolet Cobalt on July 3, 2007, at Casa Chevrolet in Albuquerque, New Mexico, for $14,645.  Her car was covered by a warranty at the time of purchase.  Her vehicle had the recall repair performed in May 2014, but she went without her vehicle for five weeks while it was repaired.  She drove a loaner car during that time.  Ms. Romero traded in her Cobalt for $5,500 on June 20, 2014.  She would never have bought this vehicle had she known about the ignition switch defects.

### 86.   Renate Glyttov – New York

122.   Plaintiff and proposed Nationwide and New York State Class Representative Renate Glyttov is a resident and citizen of New Windsor, New York.  Ms. Glyttov purchased a certified pre-owned 2009 Chevrolet HHR on March 28, 2012, from Barton Birks Chevrolet in Newburgh, New York, for $15,995.  Ms. Glyttov's vehicle was covered by a certified pre-owned limited warranty that expired on March 28, 2013, as well as a standard maintenance plan that was effective from her purchase date until March 28, 2014.  Ms. Glyttov has purchased many GM-branded vehicles, believing that they were safe and reliable vehicles based on the strength of the brand name.  Operating under the belief that GM was a quality brand and that the vehicle would be safe and reliable and defect-free, she purchased her HHR.  Ms. Glyttov's vehicle regularly shut off spontaneously on many occasions in 2012 and 2013 while traveling around New Windsor, New York; Newburgh, New York; Wallkill, New York; and in Pennsylvania when driving onto an off-ramp of I-84.  The vehicle would shut off when Ms. Glyttov drove on

bumpy roads or hit a pothole.  On each occasion, the vehicle gearshift was in "drive" and the ignition key was in the "run" position.  Ms. Glyttov also experienced other problems with the ignition.  On several occasions in 2012 and 2013, she put the key in the ignition, but the key would not turn and would then get stuck in the ignition.  Eventually the key would move after attempting to turn the ignition on for several minutes.  On May 16, 2012, Ms. Glyttov's ignition lock cylinder was replaced during a routine oil change.  Plaintiff Glyttov experienced numerous shut off events after this replacement.  Ms. Glyttov's ignition switch was replaced in connection with the recalls initiated in response to the ignition switch defects.  First, Ms. Glyttov's ignition key was replaced on April 16, 2014, and then her ignition switch was replaced on June 11, 2014.  Ms. Glyttov would not have purchased the vehicle had she known of the defects.

### 87.   Sandra Levine – New York

123.     Plaintiff and proposed Nationwide and New York State Class Representative Sandra Levine is a resident and citizen of Babylon, New York.  Ms. Levine purchased a used 2005 Chevrolet Cobalt on May 27, 2006, from Babylon Honda in Babylon, New York, for $16,627.96.  Ms. Levine's vehicle was covered by a warranty that expired 90 days after her purchase.  She does not recall any specific advertising that influenced her decision to buy the vehicle, but she had a general impression that GM was a quality brand and that the vehicle was safe and reliable.  Plaintiff Levine believed her vehicle was safe and defect-free when she purchased it.  Ms. Levine's vehicle spontaneously shut off on two occasions.  Although she does not recall precise dates, the shut-off incidents occurred in 2011 and 2012.  The shut-off incidents both took place when she was driving on Deer Park Avenue in Suffolk County, New York. There was no apparent reason for the shutdown in either case.  The road was not bumpy, and Ms. Levine does not believe her knee hit the ignition switch.  In both instances, Ms. Levine was able to navigate the vehicle to the shoulder of the road.  Ms. Levine's ignition switch was replaced on

May 22, 2014, by Chevrolet of Huntington in connection with the recall GM initiated in response

to the ignition switch defects.  Ms. Levine would not have purchased the vehicle had she known

of the defects.

### 88.    Nicole Mason – New York

124.    Plaintiff and proposed Nationwide and New York State Class Representative

Nicole Mason is a resident and citizen of Rochester, New York.  Ms. Mason purchased a new

2010 Chevrolet Cobalt on May 17, 2010, from Bob Johnson Chevrolet in Rochester, New York,

for $22,010.47.  Ms. Mason purchased an extended warranty that covers the vehicle for 72

months or 48,000 miles.  Ms. Mason reviewed advertisements for the Cobalt that ran in her local

newspaper, the *Democrat & Chronicle*, and her decision to buy the vehicle was influenced by

these advertisements.  Ms. Mason believed the Chevrolet Cobalt was a safe and reliable vehicle.

Ms. Mason's vehicle has spontaneously shut off on at least three occasions.  The vehicle first

shut off on September 3, 2010, near Emerson and Glide streets in Rochester, New York, when

Ms. Mason's daughter, Jessica Mason, was driving it home from a test to get her driver's license.

The vehicle shut off a second time on September 16, 2010, in Rochester, New York, when

Jessica Mason was traveling on Britton Road.  Most recently, on September 4, 2014, the vehicle

shut off while Ms. Mason was driving it in Myrtle Beach, South Carolina.  On each shutdown

occasion, the vehicle lost power for no apparent reason.  Ms. Mason and her daughter were not

driving on a bumpy road and did not hit the ignition switch with their knees.  On each occasion,

the vehicle gearshift was in "drive" and the ignition key was in the "run" position.  In the

September 16, 2010 incident, Jessica Mason was forced to use the emergency break to get the

vehicle to stop and avoid an accident.  The vehicle would not turn back on immediately and had

to be towed to Ms. Mason's home.  Ms. Mason took the vehicle to a GM dealer after the

September 16, 2010 incident, but the dealer could not identify a cause for the shut off and made

no repairs to the vehicle.  Ms. Mason's ignition switch was replaced in June 2014 in connection with the recalls initiated in response to the ignition switch defect.  Had New GM disclosed the defects in its vehicles, Ms. Mason would either not have purchased the vehicle, or would have paid less.

**89.   Michael Rooney – New York**

125.   Plaintiff and proposed Nationwide and New York State Representative Michael Rooney is a resident and citizen of Ronkonkoma, New York.  She purchased a used 2005 Chevrolet Cobalt in November 2006.  Ms. Rooney purchased an extended warranty for the vehicle.  She purchased the Cobalt after reading several advertisements about the Cobalt and other vehicles as well; she believed the Cobalt to be a safe and reliable vehicle to drive.  Further, the dealership confirmed with Ms. Rooney that the Cobalt was a safe, reliable vehicle.  Ms. Rooney experienced several shutdowns in her vehicle while driving.  Upon learning about the safety recall on her vehicle, she stopped driving it.  The dealership later informed her of her right to a loaner vehicle while awaiting replacement of her ignition switch, and she received a loaner vehicle soon thereafter.  Her ignition switch was replaced in the summer of 2014.  Following that replacement, her automatic starter no longer worked in her vehicle, which she had to have repaired.  Knowing what she now knows about the safety defects in many GM-manufactured vehicles, she would not have purchased the vehicle.

**90.   William Ross – New York**

126.   Plaintiff and proposed Nationwide and New York State Class Representative William Ross is a resident and citizen of Bellmore, New York.  Mr. Ross purchased a new 2005 Chevrolet Cobalt in 2005, in Hicksville, New York, for approximately $25,000.  At the time of purchase, his vehicle was under the original manufacturer's warranty, and he did not purchase any additional warranties.  Mr. Ross does not recall when the warranty expired or its terms.  Mr.

Ross recalls at least one incident where the car became hard to steer.  He took it to a repair shop thinking added power steering fluid would fix the problem, but the repair shop told him the vehicle did not need power steering fluid.  On June 23, 2012, Mr. Ross was driving his Cobalt in Nassau County, New York, at approximately 55 miles per hour when the ignition was inadvertently switched into the accessory position, causing the engine to lose power.  The car's power steering, power braking, and airbag systems were disabled.  Mr. Ross lost control and the car crashed into a divider lined with rubber pylons.  The airbag did not deploy.  Mr. Ross suffered cuts and a separation of the muscle from the tendon in his arm.  It could not be surgically repaired by the time he was able to go to the VA hospital.  This accident cost Mr. Ross $6,279.97 in car repairs.  On March 30, 2014, Mr. Ross was again driving his Chevrolet Cobalt in Nassau County, New York, at approximately 55 miles per hour when the ignition again suddenly switched into the accessory position, causing the vehicle to lose power to the engine.  Again, the power steering, power braking system, and airbags were disabled.  Mr. Ross lost control of the car and it hit a divider, knocking the rear wheels out of alignment.  This accident cost Mr. Ross approximately $175 in repairs.  In both accidents, the road was not bumpy and Mr. Ross does not recall hitting anything with his knee to cause the key to turn.  When Mr. Ross learned of the recalls he called his GM dealership to see if his vehicle was involved in the recall. GM told him it was not.  Then in early March 2014, he received a recall notice.  When he called about getting the recall repairs done he was told the parts to repair it were not available.  Mr. Ross stopped driving the vehicle and, in April 2014, he sold it to a junkyard to scrap for approximately $4,000.  He is a retired, disabled veteran.  Since selling the Cobalt he now relies on veterans' transportation to go to his medical appointments and walks everywhere else.  Mr. Ross would not have bought the car if he had known beforehand about the ignition switch defect.

010440-11  784012 V1

### 91.    Donald Cameron – North Carolina

Plaintiff and proposed Nationwide and North Carolina State Class Representative Donald Cameron is a resident and citizen of Durham, North Carolina.  He purchased a new 2006 Saturn Ion in 2006 in Durham, North Carolina, for $14,000.  Mr. Cameron purchased the vehicle with a five-year, 120,000-mile warranty.  On several occasions, Mr. Cameron's vehicle shut down while he was driving.  Knowing what he now knows about the safety defects in many GM-manufactured vehicles, and in the Ion specifically, he would not have purchased the vehicle or, at a minimum, would not have been willing to pay the amount of money he paid for the car.

### 92.    Leland Tilson – North Carolina

127.    Plaintiff and proposed Nationwide and North Carolina State Representative Leland Tilson is a resident and citizen of Gastonia, North Carolina.  He purchased a new 2009 Chevrolet Cobalt in February 2009.  Mr. Tilson has a five-year/100,000-mile warranty on the vehicle.  Mr. Tilson experienced at least one shutdown in the vehicle, while driving on a highway at highway speed.  It happened when the vehicle went over a break in the asphalt, and the vehicle shut down.  Mr. Tilson, with an 18-wheeler bearing down on him, was able to maneuver the vehicle to the side of the road to avoid an accident.  During this power failure, the power steering also failed.  Mr. Tilson has had his ignition replaced twice.  The first time was in June 2013, not pursuant to the recall, because he was unable to shut off his vehicle.  The second time was in July 2014 pursuant to the recall.  Knowing what he now knows about the safety defects in many GM-manufactured vehicles, he would not have purchased a vehicle with a safety defect.

### 93.    Silas Walton – North Carolina

128.    Plaintiff and proposed Nationwide and North Carolina State Class Representative Silas Walton is a resident and citizen of Fayetteville, North Carolina.  Mr. Walton purchased a

used 2008 Chevrolet Cobalt in 2010 in Clarksville, Tennessee, for between $14,000 and $15,000. The vehicle was under warranty, but he does not recall the warranty terms.  Mr. Walton purchased the vehicle because he thought it was a reliable and safe vehicle.  Mr. Walton often experienced problems with starting the vehicle and turning the key to any position.  On at least one occasion, he experienced a shutdown in his vehicle, which caused the steering wheel to lock. This occurred while he was driving downhill on a highway.  At first, he was unable to control the car, but eventually he was able to maneuver it to the side of the road.  After about ten minutes, he was able to restart the vehicle.  Mr. Walton had the ignition switch replaced in the summer of 2014; however, his key continues to stick in the ignition.  He remains concerned about driving the vehicle.  Had he known about the problems with his GM-branded vehicle, he would not have purchased the car and will never again trust New GM.

### 94.    Jolene Mulske – North Dakota

129.    Plaintiff and proposed Nationwide and North Dakota State Class Representative Jolene Mulske is a resident and citizen of Gladstone, North Dakota.  Ms. Mulske purchased a used 2005 Chevrolet Cobalt in 2010 in Dickinson, North Dakota, for approximately $10,000. Ms. Mulske purchased the vehicle because she wanted a safe and reliable vehicle for her daughter to drive.  Ms. Mulske had the ignition switch replaced in the summer of 2014, but she and her daughter are afraid to drive it now.  Had she known about the problems with her GM-branded vehicle, she would not have purchased the car and will never again purchase a New GM vehicle.

**95.    Bedford Auto Sales, Inc. – Nationwide Dealer and Ohio State Class Representative**

130.    Nationwide Class and Ohio State Class Representative Bedford Auto Sales, Inc. maintains its principal place of business in Bedford, Ohio.  Plaintiff Bedford Auto Sales, Inc. purchased the following vehicles with the intention to resale same:

| YEAR | MAKE | MODEL | VIN # | DATE PURCHASED |
|------|------|-------|-------|----------------|
| 2005 | COBALT | CBT | 1G1AK12F657528414 | 2/13/2014 |
| 2005 | COBALT | CBT | 1G1AK52F757653669 | 2/13/2014 |
| 2007 | COBALT | BLT | 1G1AL15F277386297 | 12/16/2013 |
| 2005 | COBALT | BLT | 1G1AZ54F357576386 | 12/12/2013 |
| 2007 | COBALT | BLS | 1G1AK55FX77285373 | 4/7/2014 |
| 2006 | COBALT | BLS | 1G1AK55F967690011 | 12/5/2013 |
| 2007 | COBALT | BLT | 1G1AL55F677243540 | 2/13/2014 |
| 2006 | COBALT | BLT | 1G1AL15FX67834767 | 6/10/2013 |
| 2006 | COBALT | BLT | 1G1AL55F967662819 | 3/15/2014 |
| 2006 | COBALT | BLS | 1G1AK55F567673559 | 10/28/2013 |
| 2007 | COBALT | BLT | 1G1AL55F777398968 | 4/11/2014 |
| 2006 | COBALT | BLS | 1G1AK15F767730210 | 4/7/2014 |
| 2005 | COBALT | BLS | 1G1AL54F757575811 | 3/27/2014 |
| 2005 | COBALT | BLS | 1G1AL52F257540483 | 3/21/2014 |
| 2005 | COBALT | BLS | 1G1AL12FX57605136 | 4/12/2014 |
| 2006 | COBALT | BSS | 1G1AM18B367638417 | 3/28/2014 |
| 2006 | COBALT | BLS | 1G1AK55F567809334 | 3/24/2014 |
| 2005 | COBALT | BLS | 1G1AL14F357618727 | 2/21/2014 |
| 2006 | COBALT | BLS | 1G1AK55F967759635 | 4/14/2014 |
| 2006 | HHR | HHR | 3GNDA23P46S533920 | 9/30/2013 |
| 2003 | SATURN | SI2 | 1G8AJ52F43Z164264 | 3/15/2014 |
| 2003 | SATURN | SI3 | 1G8AL52F83Z104269 | 2/21/2014 |
| 2004 | SATURN | SI1 | 1G8AG52F64Z111307 | 3/24/2014 |
| 2006 | SATURN | SI2 | 1G8AN15FZ6Z130753 | 1/28/2014 |
| 2007 | SATURN | SI3 | 1G8AL55F57Z113173 | 4/9/2014 |
| 2007 | SATURN | SI2 | 1G8AJ55F97Z120648 | 2/24/2014 |
| 2007 | SATURN | SI2 | 1G8AJ55F57Z171497 | 1/15/2014 |
| 2007 | SATURN | SI2 | 1G8AJ55F57Z199235 | 3/3/2014 |

- 70 -

131.   At the time the transactions for the purchase of these vehicles were made, Plaintiff Bedford Auto Sales, Inc. did not know the vehicles were defective.  Plaintiff Bedford Auto Sales, Inc. relied on GM to produce a safely designed and manufactured vehicle.

132.   Plaintiff Bedford Auto Sales, Inc. continues to pay interest on these vehicles that sit on the lot.  Plaintiff Bedford Auto Sales, Inc. has attempted to have the vehicles repaired through Jay Buick GMC in Bedford, Ohio, on four occasions, and was informed the dealership did not have the parts to perform the repairs.

133.   As a result of the vehicle defects and subsequent recalls, Plaintiff Bedford Auto Sales, Inc. has been unable to re-sell these vehicles, or had to sell the vehicles at a discounted rate, and is incurring considerable expense, financial loss, and economic damage as a result.

**96.   Sharon Dorsey – Ohio**

134.   Plaintiff and proposed Nationwide and Ohio State Class Representative Sharon Dorsey is a resident and citizen of Dayton, Ohio.  Ms. Dorsey purchased a used 2004 Chevrolet Malibu in June 2007 at Reichard dealership in Dayton, Ohio, for $12,040.  At the time of purchase, Plaintiff Dorsey also secured an extended warranty, which expired in 2011.  Plaintiff Dorsey has experienced no less than four engine shut-offs while driving her vehicle.  In one such instance, her Malibu stalled in the middle of heavy traffic with her five-year-old grandson in the vehicle.  Upon returning the vehicle to Reichard on September 10, 2014, she was informed by a GM technician that he had, in fact, been able to duplicate the engine stall event she experienced.  Ms. Dorsey's sister was a former GM employee and owned a Chevrolet Impala, which influenced Ms. Dorsey's desire to own a GM vehicle.  However, if she had known of the defects plaguing her Chevrolet Malibu prior to purchasing the vehicle, she would not have purchased it.  Ms. Dorsey relied upon the GM Malibu brand to be a safe and reliable vehicle.  As a result of the vehicle defect and subsequent recalls, Ms. Dorsey has been unable to enjoy the use of her

Chevrolet Malibu since June 2014, has been unable to work regularly, and has not been provided a loaner or rental vehicle while repairs are being made on her vehicle, despite repeated requests. In addition, Ms. Dorsey continues to incur significant expense, inconvenience, and economic damage as a result.

### 97.     Peggy Robinson – Ohio

135.     Plaintiff and proposed Nationwide and Ohio State Class Representative Peggy Robinson is a resident and citizen of Cincinnati, Ohio.  Ms. Robinson purchased a used 2004 Saturn Ion in 2013 in Cincinnati, Ohio, for $4,999.  Ms. Robinson purchased the Ion because she thought it was safe.  Within six months of purchasing the vehicle, she began experiencing shutdowns while driving.  The shutdowns occurred two or three times per week on average.  She no longer feels safe driving the vehicle, especially because she has children.  Ms. Robinson had her ignition switch replaced in August 2014, and she has experienced two shutdowns since then. Had she known about the problems with her GM-branded vehicle, she would he would not have purchased the car.

### 98.     Bonnie Taylor – Ohio

136.     Plaintiff and proposed Nationwide and Ohio State Class Representative Bonnie Taylor is a resident and citizen of Laura, Ohio.  Ms. Taylor purchased a new 2007 Chevrolet Cobalt on December 23, 2006, from Joe Johnson Chevrolet in Troy, Ohio, for $14,417.42.  At the time Ms. Taylor purchased her new Cobalt she also purchased a warranty, which expired in December 2011.  This was Ms. Taylor's fourth time purchasing a vehicle from Joe Johnson Chevrolet and she trusted them to provide her with a safe and reliable vehicle.  Ms. Taylor did not learn of the ignition switch defects until March 2014.  She scheduled the recall work on her vehicle right away and was provided a loaner vehicle.  The repair work was completed on April 21, 2014.  Although Ms. Taylor has not experienced the ignition shutdown while driving

her Cobalt, she believes the Cobalt has too many serious safety defects for her to ever feel safe driving it again.  She also feels that the value of her vehicle is severely diminished as a result of the recall.  She would not have purchased this vehicle if she had known of the safety defects.

### 99.   Deneise Burton – Oklahoma

137.   Plaintiff and proposed Nationwide and Oklahoma State Class Representative Deneise Burton is a resident and citizen of Warr Acres, Oklahoma.  Ms. Burton purchased a used 2007 Saturn Ion on September 8, 2012, in Oklahoma for $11,995.  She also purchased a limited warranty for 24 months or 24,000 miles.  Once, in April 2013, her engine shut off while backing out of her driveway after her knee bumped the ignition switch area, knocking her keys from the ignition.  Her ignition switch was repaired after she received the recall notice.  It took two attempts before GM agreed to provide her a loaner vehicle so as not to risk her and her children's lives while using the car and waiting for the repair parts to arrive.  She has tried to sell her vehicle since the recalls were announced, but the value of her vehicle is now too low. Ms. Burton would not have purchased her vehicle, or she would have paid less for it, had she known about these defects.

### 100.   Jerrile Gordon – Oklahoma

138.   Plaintiff and proposed Nationwide and Oklahoma State Class Representative Jerrile Gordon is a resident and citizen of Del City, Oklahoma.  Mr. Gordon purchased a used 2006 Chevrolet Cobalt on September 3, 2011, in Oklahoma City, Oklahoma, for $14,950. Mr. Gordon chose the Cobalt, in part, because he wanted a safely designed and manufactured car.  Mr. Gordon's vehicle has shut down on four separate occasions between December 2011 and July 2012.  In two instances, he was driving on the highway when the shutdowns occurred, and he had to steer his vehicle to the side of the road to restart.  On the other two occasions, his

car shut off while driving over a bump in the road.  Mr. Gordon did not learn of the ignition switch defects until March 2014.  Had he been aware of the ignition switch defects, Mr. Gordon would either not have purchased his Cobalt or would have paid less for it than he did.

### 101.   Paulette Hand – Oklahoma

139.     Plaintiff and proposed Nationwide and Oklahoma State Class Representative Paulette Hand is a resident and citizen of Blanchard, Oklahoma.  She purchased a new 2006 Chevrolet HHR in 2006 from Frost Chevrolet, a dealership owned by her sister, in Hennessy, Oklahoma, for $24,625.  She believed that GM made safe and reliable cars.  Ms. Hand experienced multiple events in which her vehicle's steering locked up and the power failed.  She would not have purchased or paid as much for the vehicle if she had known the truth about GM's commitment to safety and its concealment of the defects.

### 102.   Jennifer Reeder – Oklahoma

140.     Plaintiff and proposed Nationwide and Oklahoma State Class Representative Jennifer Reeder is a resident and citizen of Oklahoma City, Oklahoma.  Ms. Reeder purchased a used 2012 Chevrolet Impala on August 30, 2013, in Norman, Oklahoma, from David Stanley Chevrolet for $18,595.  Ms. Reeder also purchased an extended warranty for the vehicle from David Stanley Chevrolet at the time of purchase.  On or about July 26, 2014, Ms. Reeder was unable to remove the key from the ignition, and the steering and brakes would not lock.  After 30 minutes of manipulating the key in an effort to remove it from the ignition, she was forced to leave the key in the ignition overnight; her husband was able to remove the key from the ignition the following day.  Ms. Reeder was unaware of any recall notice affecting her Impala until, sometime shortly after the key became stuck in the ignition overnight, a neighbor informed her about the recall covering Impalas.  Ms. Reeder watched the television concerning the recalls and researched the vehicle recalls online, but she never received a written recall notice in the mail

- 74 -

regarding her Impala.  Ms. Reeder and her son, both of whom drive the Impala to and from work, would have liked to discontinue driving the Impala until the ignition system was repaired, but they were unable to do so because it would have left her family with a single means of transportation among herself, her husband, and her son, due to the fact that their other vehicle, a Chevrolet Cobalt, was already totaled in a defect-related crash.  The family could not afford to pay for a rental car.  Finally, on September 16, 2014, a GM dealership notified her that it was ready to repair the Impala.  The repair was performed on September 22, 2014, and the dealership provided her with a loaner or rental vehicle that day while the repairs were performed.  At the time the repair was performed, Ms. Reeder reported to the dealership that the Impala's engine light sometimes comes on unexpectedly and, occasionally, the vehicle will not start at all. Replacing the battery has not eliminated the problem.  The dealership reported that there were no recalls related to such electrical problems, and they did not do anything to fix it.  The electrical problem has recurred since the ignition recall repair.  Ms. Reeder believes she has suffered a diminution of value in her vehicle due to the ignition switch defects, recalls, and surrounding publicity.

141.    Ms. Reeder also purchased a used 2010 Chevrolet Cobalt on or about February 5, 2014, in Del City, Oklahoma, from Ricks Auto Sales, for $9,595.  Ms. Reeder purchased an extended warranty for the Cobalt from Ricks Auto Sales at the same time.  Ms. Reeder purchased the vehicle primarily for Anthony Reeder, her son, for his personal, family, and household use. On May 19, 2014, Anthony Reeder was driving in bumper-to-bumper traffic when the vehicle suddenly shut off, the brakes became ineffective, the steering wheel stopped operating, and he struck the vehicle in front of him, totaling the Cobalt and injuring Anthony.  Ms. Reeder and Mr. Reeder were unaware of any recall on the Cobalt until after the accident when they learned of the

- 75 -

recall from a neighbor.  They had never received any recall notice in the mail.  After the

accident, Ms. Reeder and her son have been and are currently sharing Ms. Reeder's 2012

Chevrolet Impala, because they cannot afford another car due to the balance remaining on the

financing note of the Cobalt.  From sharing the Impala, they have increased the miles

accumulated on it so much that they have used up its extended warranty.  A combined total of

45,000 miles were added to the Impala since the crash of the Cobalt, and they had to pay the

$2,500 deductible not paid by the insurance company for the totaled Ion.  Ms. Reeder also claims

damages for the decreased value of the Impala because of its increased usage in the absence of

the Cobalt, the difference in the amount of the cost of gasoline between Mr. Reeder using the

Impala and using the better-mileage Cobalt, the value of the extended warranty on the Impala

used up by the excess of miles, and the increase in her auto insurance premiums as a result of the

accident caused by the Cobalt's defective design being attributed to Mr. Reeder.  The difference

between the settlement paid to Ms. Reeder by her insurance company, Geico, on the Cobalt after

the wreck and her loan for the vehicle left her with an outstanding balance of more than $1,500.

In valuing the Cobalt, Geico took into account values of vehicles on dates after the July 13, 2014

announcement of the ignition recall on Cobalts and other GM vehicles received wide publicity.

The valuation Geico thus arrived at was lower than it would have been had the defect not been

present in the Cobalt and other models.  Geico's valuation explicitly noted the existence of the

recalls complained of herein.

### 103.    Bruce and Denise Wright – Oklahoma

142.    Plaintiffs and proposed Nationwide and Oklahoma State Class Representatives

Bruce and Denise Wright, husband and wife, are residents and citizens of Enid, Oklahoma.  The

Wrights purchased a new 2011 Chevrolet Camaro on March 18, 2011, in Norman, Oklahoma, for

$31,000.  The vehicle was covered by a standard three-year, 36,000-mile warranty.  Prior to

buying, they saw television, print, and billboard ads regarding the vehicle's five star rating and safety.  Ms. Wright drove the vehicle daily to and from her and Mr. Wright's places of work. The Wrights learned of the June 30, 2014 recall affecting their Camaro in July 2014 through the news media, and they called the local GM dealership to confirm the recall and the safety concerns relating to recall.  Afterwards, Ms. Wright was no longer comfortable driving the Camaro, so they proceeded to dispose of the vehicle as quickly as practical.  They traded the car to a local Ford dealership on August 9, 2014.  The Wrights believe they suffered a diminution of value in their vehicle due to the ignition switch defects and the surrounding publicity, and that they could have received more for their Camaro but for the defect.  Had New GM disclosed the defects in its vehicles, Plaintiff would either not have purchased the vehicle, or would have paid less.

### 104.   William Bernick – Oregon

143.   Plaintiff and proposed Nationwide and Oregon State Class Representative William Bernick is a resident and citizen of Grants Pass, Oregon.  Mr. Bernick purchased a certified pre-owned 2005 Chevrolet Cobalt on December 29, 2006, from a dealership in Oregon for $10,750.  He also purchased a vehicle service contract.  During the time he has owned the vehicle, Mr. Bernick has experienced power outages and difficulties with the ignition, such as keys becoming stuck in the ignition, inability to shift gears, inability to start the ignition, and transmission default.  Mr. Bernick is very concerned about the ignition defect and is disappointed in the way GM has handled the recalls.  He wants to see GM held accountable for putting lives at risk for so long.  Had Mr. Bernick known of the problems with his GM car, he would not have purchased it.

### 105.   Janice Bagley – Pennsylvania

144.   Plaintiff and proposed Nationwide and Pennsylvania State Class Representative Janice Bagley is a resident and citizen of Patton, Pennsylvania.  Ms. Bagley purchased a used 2007 Chevrolet Cobalt in 2013 in Carroltown, Pennsylvania, for approximately $6,000.  The vehicle had a 30-day warranty at the time of purchase.  Ms. Bagley purchased the Cobalt because she had owned GM-branded vehicles in the past, thought her previous vehicles to be safe and reliable, and believed the Cobalt also would be safe and reliable.  She also thought it would be a safe, reliable vehicle for her 19-year-old daughter to drive.  Within the first 30 days of owning the vehicle, she experienced two stalling events; a few weeks later she had a third stalling incident.  Each time she took the vehicle to a mechanic because she was concerned she would be stranded one day.  In February 2014, she was involved in an accident when a deer ran in front of her; she was driving 35 miles per hour yet her airbags did not deploy.  Following the recall, she made the connection between the frontal collision and airbag failure and the safety recall. Ms. Bagley had her ignition switch replaced in June or July of 2014.  Had she known about the problems with her GM-branded vehicle, she would not have purchased the car and will never again purchase any GM-branded vehicle.

### 106.   Shawn Doucette – Pennsylvania

145.   Plaintiff and proposed Nationwide and Pennsylvania State Class Representative Shawn Doucette is a resident and citizen of Hamburg, Pennsylvania.  Mr. Doucette purchased a new 2007 Chevrolet Cobalt SS in September 2007 from Outten Chevrolet of Hamburg in Hamburg, Pennsylvania, for $28,000.  GM should have disclosed the ignition switch defects when Mr. Doucette purchased the vehicle.  Mr. Doucette has experienced numerous shutdowns and power loss events while driving.  He would not have purchased the vehicle had he known of the defects.

- 78 -

### 107.    Shirley Gilbert – Pennsylvania

146.    Plaintiff and proposed Nationwide and Pennsylvania State Class Representative Shirley Gilbert is a resident and citizen of Frackville, Pennsylvania.  She purchased a new 2008 Chevrolet Cobalt in Pennsylvania in June 2008 for $16,000.  Her vehicle was covered by a warranty when she purchased it.  The warranty expired in June 2013.  She purchased the car, in part, because the dealership highlighted the safety features, namely the car's eight airbags.  On two or three occasions she has experienced her vehicle shutting down immediately after it started.  She would not have purchased her vehicle, or she would have paid less for it, had she known about its defects.

### 108.    Garrett Mancieri – Rhode Island

147.    Plaintiff and proposed Nationwide and Rhode Island State Class Representative Garrett Mancieri is a resident and citizen of Woonsocket, Rhode Island.  Mr. Mancieri purchased a new 2007 Pontiac G5 on November 24, 2006, in Woonsocket, Rhode Island, for $16,138.  Mr. Mancieri received a safety recall notice pertaining to his vehicle in March 2014.  He promptly requested that the dealership perform the recall repair, but was told that he would be put on a waiting list because the dealership was waiting on the parts from GM.  The dealership did not provide Mr. Mancieri with a loaner car, so he had to continue driving the vehicle.  The recall notice received by Mr. Mancieri did not inform him of the right to a loaner vehicle, nor did the GM dealership volunteer such information.  His vehicle was not scheduled to be repaired until September 18, 2014.  Mr. Mancieri believes he has been damaged by the diminution of value in his vehicle due to the ignition switch defect.  Mr. Mancieri also believes he has been damaged in the amount of the reasonable value of the rental car he should have received from March 2014 through the time his vehicle is finally repaired by GM.

### 109.   Annette Hopkins – South Carolina

148.   Plaintiff and proposed Nationwide and South Carolina State Class Representative Annette Hopkins is a resident and citizen of Bishopville, South Carolina.  Ms. Hopkins purchased a used 2003 Chevrolet Impala LS on December 31, 2004, at Newsome Automotive in Florence, South Carolina, for $12,749.32.  Ms. Hopkins first learned of a recall affecting her vehicle when she received a recall notice in September 2014.  Although she has not yet experienced any incidents of sudden power loss with her vehicle, now that she knows about the defects and the recalls, Ms. Hopkins asserts that she would never have purchased the Chevrolet Impala had she known about the defects and GM's indifference with regard to the safety and reliability of its vehicles.

### 110.   Janelle Davis – South Dakota

149.   Plaintiff and proposed Nationwide and South Dakota State Class Representative Janelle Davis is a resident and citizen of South Sunburst, South Dakota.  Ms. Davis purchased a used 2006 Chevrolet Cobalt in 2011 in Sioux Falls, South Dakota, for $7,200.  Ms. Davis purchased the vehicle because she thought it was a reliable and safe vehicle and also because it has good mileage ratings.  When Ms. Davis learned about the recall, she contacted the dealership about a loaner vehicle because she has a one-year-old daughter and did not feel safe driving her in a vehicle with a safety defect.  She was denied a loaner and/or rental vehicle, even though she told the dealership about her fear of driving her one-year-old daughter in an unsafe vehicle, because she had not experienced shutdowns or stalls.  Ms. Davis had her ignition switch replaced pursuant to the recall in the summer of 2014.  Had she known about the problems with her GM-branded vehicle, she would not have purchased the car.

### 111.   Norma Lee Nelson – South Dakota

150.    Plaintiff and proposed Nationwide and South Dakota State Class Representative Norma Lee Nelson is a resident and citizen of Huron, South Dakota.  Ms. Nelson purchased a used 2007 Chevrolet Cobalt in September 2007 from a dealership in Watertown, South Dakota, for $14,000.  Her vehicle came with a standard warranty at the time of purchase that expired in 2010.  She has experienced numerous ignition problems with the vehicle, and at times it requires significant force to turn the steering wheel.  Ms. Nelson has removed all of the keys from her keychain, but remains nervous about driving the car.  Ms. Nelson has had difficulty starting the vehicle on numerous occasions.  Had she known that the Cobalt contained a defective ignition switch, Ms. Nelson would not have purchased the vehicle.

### 112.   Helen A. Brown – Tennessee

151.    Plaintiff and proposed Nationwide and Tennessee State Class Representative Helen A. Brown is a resident and citizen of Franklin, Tennessee.  She purchased a new 2006 Chevrolet Cobalt from a GM dealer, with an extended warranty, on February 1, 2006, for approximately $10,000.  Ms. Brown's vehicle lost power at least three times, twice in 2007 and once in 2014.  She does not trust her car and would not have purchased the vehicle, or would have paid less, if the truth had been disclosed about the quality and safety of GM vehicles.

### 113.   Louise Tindell – Tennessee

152.    Plaintiff and proposed Nationwide and Tennessee State Class Representative Louise Tindell is a resident and citizen of Murfeesboro, Tennessee.  Ms. Tindell purchased a used 2007 Saturn Ion in 2010 in Murfeesboro, Tennessee, for approximately $10,000.  The vehicle was under warranty; she believes there were two years remaining on the warranty at the time she purchased the car.  When, at the time of purchase, Ms. Tindell believed that the Ion was a safe and reliable vehicle.  Within seven months of purchasing the vehicle, Ms. Tindell's vehicle

shut down while she was driving.  She veered to the right, came to a stop, and waited before turning her car back on.  On another occasion, her vehicle shut down on her way to church. These events make her afraid to drive her car, and, since learning about the recall, she is angry towards New GM for keeping the safety defect a secret.  Ms. Tindell had her ignition switch replaced in approximately June 2014.  Since the replacement, she has experienced problems with her seat belts.  She no longer trusts the Ion; she will never feel safe regardless of repairs or replacement parts.  She continues to fear she will experience more shutdowns.  Had Ms. Tindell known about the problems with her GM-branded vehicle, she would not have purchased the car. She now tries to drive as infrequently as possible, and when she does she is fearful.

### 114.  Michael Graciano – Texas

153.   Plaintiff and proposed Nationwide and Texas State Class Representative Michael Graciano is a resident and citizen of Arlington, Texas.  On October 17, 2011, Mr. Graciano purchased a used 2007 Chevrolet Cobalt from a dealership in Arlington, Texas, for $22,197.20. Prior to March 4, 2014, his fiancée's daughter had experienced the car stalling on numerous occasions with a corresponding loss of power steering.  They had the car looked at by family members experienced in car repair and one independent repair shop, but no one was able to diagnose the problem.  Mr. Graciano received a safety recall notice pertaining to his vehicle in March 2014.  After receiving the notice, Mr. Graciano and his fiancée, fearful for her daughter's safety, instructed her not to drive the car any more.  Mr. Graciano's fiancée called a local Chevrolet dealer in Colorado twice in March 2014 about having the recall repair performed and each time she was told the dealer did not have the necessary parts, and each time the dealer failed to offer a loaner vehicle.  As a consequence, Mr. Graciano's fiancée's daughter was without a loaner vehicle for between one and two months.  During that time, the daughter used her grandfather's vehicle, a 1991 Buick Park Avenue, which got significantly worse gas mileage

than the Cobalt, resulting in increased gasoline expenditures.  The grandparents, in turn, were

forced to share a vehicle during that time, which caused them significant inconvenience.  Mr.

Graciano's fiancée finally researched the recall and found that a loaner vehicle should have been

offered by the dealer while it was waiting for delivery of the parts.  His fiancée then called back

the dealer and told then about her research, at which time the dealer finally agreed to provide a

loaner vehicle.  The car was eventually serviced under the recall by AutoNation Chevrolet North

in Denver, Colorado, and Mr. Graciano's fiancée's daughter was provided with a rental car from

Enterprise on May 5, 2014, as a loaner vehicle.  While Mr. Graciano waited on repair of the

Cobalt, his fiancée's daughter moved to Texas to go to college, and brought the rental car with

her.  Finally, in approximately mid-June, the dealer called to say the recall repair had been made,

some two months after the car was left with the dealer.  Mr. Graciano's fiancée had numerous

telephone conversations with the service manager at AutoNation to inquire if GM was willing to

cover the cost of transporting the vehicle to Texas.  Finally, Mr. Graciano's fiancée was

informed by the service manager that GM refused to cover the transportation costs and that the

GM representative he spoke to stated that GM was not responsible for transporting the vehicle to

Texas.  In fact, Mr. Graciano's fiancée received a telephone call from another GM representative

stating that she had 24 hours to return the loaner vehicle to Enterprise or criminal charges would

be pressed against her and that she was responsible for paying $5,000 for the loaner vehicle.  On

July 30, 2014, the loaner vehicle was returned to an Enterprise location in Texas.  Enterprise then

confirmed with AutoNation that there would be no expense to Mr. Graciano or his fiancée for the

loaner vehicle.  In order to transport the Cobalt back to Texas, Mr. Graciano's fiancée's brother

drove the vehicle from Denver, Colorado, to Arlington, Texas, incurring the cost of the fuel to

drive to Texas and the inconvenience of his time.  Mr. Graciano's fiancée then had to incur the

- 83 -

cost of flying her brother back to Denver, Colorado.  Had New GM disclosed the defects in the Cobalt, Mr. Graciano would not have purchased it.

**115.    Shenyesa Henry – Texas**

154.    Plaintiff and proposed Nationwide and Texas Class Representative Shenyesa Henry is a resident and citizen of Aubrey, Texas.  Ms. Henry purchased a new 2004 Saturn Ion in 2003 at a Saturn dealership in Plano, Texas, for approximately $16,000.  Her vehicle had a standard warranty, which she believes expired after five years.  Ms. Henry's vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by GM.  She purchased her GM vehicle primarily for her personal, family, and household use.  Ms. Henry purchased a Saturn because she believed it was a vehicle she could trust.  In March 2014, Ms. Henry experienced a shutdown incident in her vehicle while crossing an intersection, causing the steering wheel and brakes to lock up.  During the shutdown incident, Ms. Henry had to struggle to keep the vehicle from veering off the road.  Afterward she could not get the key out of the ignition switch and the vehicle had to be towed home.  Because of this incident, Ms. Henry does not feel safe driving her vehicle and, although she still has the Ion, she purchased a new vehicle shortly after experiencing the shutdown.  Ms. Henry's vehicle has not been repaired under the recall.  Had Ms. Henry known about the problems with her GM vehicle, she would not have purchased the car.

**116.    Keisha Hunter – Texas**

155.    Plaintiff and proposed Nationwide and Texas State Class Representative Keisha Hunter is a resident and citizen of Fort Worth, Texas.  Ms. Hunter purchased a used 2006 Chevrolet Cobalt on March 22, 2013, in Arlington, Texas, for $24,965.01.  Ms. Hunter chose the Cobalt in part because she wanted a safe vehicle.  Ms. Hunter is concerned for her safety and the diminished value of her vehicle as a result of the ignition switch defects.  Ms. Hunter did not

learn of the ignition switch defects until March 2014.  Had she been aware of the of the ignition

switch defects, Ms. Hunter would either not have purchased her Cobalt or would have paid less

for it than she did.

### 117.    Lisa William – Texas

156.    Plaintiff and proposed Nationwide and Texas State Class Representative Lisa

William is a resident and citizen of Amarillo, Texas.  Ms. William purchased a new 2007 Saturn

Ion in 2007 in Amarillo, Texas, for approximately $16,000.  Her vehicle had a standard

warranty, which she believes was for five years.  Ms. William purchased a Saturn because she

had owned one in the past and believed the brand to be one she could trust.  She has experienced

problems with her airbag light turning on unexpectedly and difficulty turning on her vehicle.

These problems have caused her concern and she does not feel safe driving her vehicle.  She is a

college student and provides rides from time to time for certain students.  She is now concerned

about having other students or anyone else in her vehicle because of the safety defects.  She also

frequently drives out of town and is afraid of her vehicle shutting down.  Ms. William had her

ignition switch replaced on September 23, 2014.  She wonders if she can trust the "repair."  Had

she known about the problems with her GM vehicle, she would not have purchased the car.

### 118.    Alexis Crockett – Utah

157.    Plaintiff and proposed Nationwide and Utah State Class Representative Alexis

Crockett is a resident and citizen of Eagle Mountain, Utah.  Ms. Crockett purchased a used 2005

Chevrolet Cobalt in 2013 in Oehi, Utah, for $5,200.  The vehicle did not have a warranty.  Ms.

Crockett experienced problems turning the vehicle on and off on numerous occasions; she also

had difficulty removing the key from the ignition.  In some weeks, the key would get stuck in the

ignition several times.  She also has experienced stalling when reversing out of her driveway.

Ms. Crockett has not had her ignition switch replaced pursuant to the recall as of September

2014.  She regularly calls the dealership and is told that the part is not ready; she has been told by another dealership that her vehicle is not on the recall list.  Ms. Crockett is afraid to drive her vehicle, especially when she has to transport her siblings to see their father, which requires highway driving.  She would like to sell her vehicle but has to pay more than the car is now worth, so cannot afford to sell it.  Had she known about the problems with her GM-branded vehicle, she would not have purchased the car.

### 119.   Blair Tomlinson, D.D.S. – Utah

158.    Plaintiff and proposed Nationwide and Utah State Class Representative Blair Tomlinson, D.D.S., is a resident and citizen of Kaysville, Utah.  Dr. Tomlinson purchased a new 2005 Chevrolet Cobalt from Murdock Chevrolet in Bountiful, Utah, in August 2005 for approximately $15,000.  Throughout the course of his ownership of the Cobalt, Dr. Tomlinson and his family members have experienced various issues consistent with the ignition switch defect, including unexpected shutdowns.  In one particular incident, Dr. Tomlinson's daughter was driving on the highway in Logan, Utah, when she accidentally bumped the ignition switch with her knee and the vehicle lost power.  She was able to get the vehicle safely to the side of the road, but was terrified by the incident.  After hearing about the recall in the news in March 2014, Dr. Tomlinson attempted to reach GM, but he had great difficulty before eventually being informed he would receive a letter if his car was recalled.  He also immediately took his Cobalt to Young Chevrolet in Layton, Utah, to address the issue.  However, the dealership informed him they did not have the recall parts available to fix the defect.  Mr. Tomlinson continues to be concerned about the defects in his Cobalt and the safety of his family.  Had he known of the problems with his GM car, he would not have purchased it or would have paid less.

### 120.   Ashlee Hall-Abbott – Virginia

159.   Plaintiff and proposed Nationwide and Virginia State Class Representative Ashlee Hall-Abbott is a resident and citizen of Hampton, Virginia.  Ms. Hall-Abbott and her husband Brian Abbott purchased a new 2014 Chevrolet Silverado in March 2014 at Hampton Chevrolet in Hampton, Virginia, for $38,204.19.  Her vehicle is currently covered by GM's two-year, 100,000-mile warranty and an unlimited lifetime warranty through Hampton Chevrolet.  Ever since purchasing the truck in 2014, Ms. Hall-Abbott's vehicle has been repaired under at least three or four separate recalls, and she just recently received what she believes is the fifth recall notice in the mail.  She and her husband recently went to the GM dealership to inquire about trading in the Silverado for a Chevrolet Tahoe.  The dealership finance manager immediately declined the offer, however, saying the dealership would be upside down in negative equity if they accepted.  Had Ms. Hall-Abbott and her husband known about the safety defects and problems associated with their Silverado, they would have purchased another vehicle.

### 121.   Erinn Salinas – Virginia

160.   Plaintiff and proposed Nationwide and Virginia State Representative Erinn Salinas is a resident and citizen of Virginia Beach, Virginia.  She purchased a new 2008 Chevrolet Cobalt in April 2008.  The vehicle was purchased with the standard manufacturer's warranty.  Ms. Salinas purchased her vehicle after seeing television advertisements about the vehicle and also about a GM rebate.  The salesperson at the dealership also told Ms. Salinas that the Cobalt was a very safe vehicle.  Ms. Salinas experienced at least one shutdown while driving the vehicle.  She was able to steer the vehicle to the side of the road and then to turn it back on.  Once she learned about the safety recall in March or April of 2014, she stopped driving her vehicle because she believed it was not safe to drive.  She was not given a rental vehicle to use and had to depend on her sister or father for transportation.  On July 18, 2014, the ignition switch

was replaced in her vehicle pursuant to the recall.  Knowing what she now knows about the safety defects in many GM-manufactured vehicles, she would not have purchased the vehicle.

### 122.   Michael Garcia – Washington

161.   Plaintiff and proposed Nationwide and Washington State Class Representative Michael Garcia is a resident and citizen of Yakima, Washington.  Mr. Garcia purchased a used 2010 Chevrolet Cobalt in June 2011 in Mt. Vernon, Washington, for $16,470.  The vehicle was under warranty when he purchased it.  Mr. Garcia fears driving his vehicle due to the ignition switch recall and the risks posed by the defects.  Mr. Garcia had the ignition switch replaced under the recall repair program.  He believes the value of his vehicle has been diminished as a result of the defects.  Mr. Garcia would not have purchased this car had New GM been honest about the safety defects.

### 123.   Tony Hiller – Washington

162.   Plaintiff and proposed Nationwide and Washington State Class Representative Tony Hiller is a resident and citizen of Sumner, Washington.  He purchased a used 2009 Chevrolet HHR in March 2013 in Puyallup, Washington, for $10,965.50.  The car was not under warranty at the time of purchase.  After learning of the recall, Mr. Hiller simulated a shutdown incident.  He pulled lightly on his key and the vehicle shut off.  On July 23, 2014, Mr. Hiller's ignition switch was replaced pursuant to the recall.  Mr. Hiller traded in his HHR on August 8, 2014, because he does not believe the vehicle is safe to drive.  He believes he received less in trade-in value due to the recall and the safety defects in the vehicle.  Knowing what he now knows about the safety defects in many GM-branded vehicles, he would not have purchased the vehicle.

### 124. **Stephanie Renee Carden – West Virginia**

163.    Plaintiff and proposed Nationwide and West Virginia Class Representative Stephanie Renee Carden is a resident and citizen of Huntington, West Virginia.  Ms. Carden purchased a new 2004 Saturn Ion 2 on July 22, 2004, at Saturn of Hurricane in Hurricane, West Virginia, for $22,181.  Ms. Carden's vehicle came with the standard manufacturer's warranty. Ms. Carden has experienced manifestation of the defect on more than one occasion.  She has twice experienced loss of power due to the ignition switch defect.  Shortly after the second power-loss incident, Ms. Carden's vehicle had an issue where it would not restart, causing her to have to have the vehicle towed to a service station.  If she had known what she now knows about the safety defects in many GM-manufactured vehicles, Ms. Carden would not have purchased the vehicle.

### 125. **Melinda Graley – West Virginia**

164.    Plaintiff and proposed Nationwide and West Virginia State Class Representative Melinda Graley is a resident of Alum Creek, West Virginia.  Ms. Graley purchased a used 2003 Saturn Ion in March 2012 in Charleston, West Virginia, for $13,000.  The car was not under warranty at the time of purchase.  In February, Ms. Graley's husband was driving the car when it inadvertently shut down, causing him to crash into an embankment.  Ms. Graley also experienced steering lock-up events with her car.  In one instance, it locked up on her while she was driving up a hill in the mountains, causing her car to drift left into the oncoming lane.  She narrowly avoided colliding with a coal truck.  The vehicle was serviced under an ignition switch recall in June 2014.  During those three months her dealership called on multiple instances, insisting she return the loaner vehicle because there was "nothing wrong" with her ignition switch and that her vehicle never failed.  With the assistance of her counsel, Ms. Graley was able to refuse these demands and retain her loaner through June, when her car was finally repaired.

Ms. Graley attempted to sell her car to a dealership, CNO Motors, in August 2014.  They only

offered her $1,000 for the car, however, so she decided not to sell it.  Had GM disclosed the

defects in its vehicles, Ms. Graley would either not have purchased the vehicle, or would have

paid less.

### 126.   Nancy Bellow – Wisconsin

165.   Plaintiff and proposed Nationwide and Wisconsin State Class Representative

Nancy Bellow is a resident and citizen of Oconto Falls, Wisconsin.  She purchased a used 2007

Chevrolet Cobalt in late March or early April 2012 at King Buick in Oconto, Wisconsin, for

$10,000.  The car was not under warranty at the time of purchase.  She purchased the vehicle

after reading advertisements about the Cobalt on the Internet.  Her ignition switch was not

repaired under the recall until September 18, 2014, and she was never offered a loaner car during

this waiting period.  Knowing what she now knows about the safety defects in many GM-

branded manufactured vehicles, she would not have purchased the vehicle.

### 127.   Henry Redic – Wisconsin

166.   Plaintiff and proposed Nationwide and Wisconsin State Class Representative

Henry Redic is a resident and citizen of Milwaukee, Wisconsin.  Mr. Redic purchased a used

2008 Buick Lucerne on September 19, 2011, from Joe Van Horn Chevrolet Inc. in Milwaukee,

Wisconsin, for $15,876.  Mr. Redic's vehicle was covered by a written warranty and is currently

covered by two extended warranties:  the Advantage Contract # AD40 473150 and the

Advantage Wrap Plan.  Mr. Redic has owned six Buicks and has long favored this vehicle

model.  He purchased the vehicle at issue based on his belief that the GM brand was a trusted

name and that the Buick was a safe and reliable vehicle.  Mr. Redic believed his vehicle was safe

and defect free when he purchased it.  Mr. Redic's vehicle has spontaneously shut off on six

different occasions.  The first shut off occurred on July 13, 2013, in Chicago, Illinois.  Mr. Redic

was driving over railroad tracks in heavy traffic when his vehicle suddenly shut off.  He attempted to pull the vehicle over without causing an accident but was unable to do so and side-swiped a utility pole.  The second incident occurred in Milwaukee, Wisconsin, on September 1, 2013, when the vehicle shut off after hitting a pothole.  The remaining four shut off incidents also occurred in Milwaukee, Wisconsin, after hitting potholes, but Mr. Redic does not recall the precise dates of those incidents.  Aside from the incident on July 13, 2013, Mr. Redic was able pull the vehicle to the side of the road and allow it to coast until he was able to get it to stop.  Mr. Redic would not have purchased the vehicle had he known of the defects.

### 128.   Les Rouse – Wisconsin

167.     Plaintiff and proposed Nationwide and Wisconsin Class Representative Les Rouse is a resident and citizen of LaCrosse, Wisconsin.  Mr. Rouse purchased a new 2004 Saturn Ion 2 in October 2004 in LaCrosse, Wisconsin, for approximately $16,000.  His car was covered under the manufacturer's standard warranty at the time of purchase, and Mr. Rouse also believes he purchased some kind of extended warranty.  At the time of purchase, Mr. Rouse and his wife visited the dealer to learn more about the Ion.  There, the dealership had Ions on display to demonstrate the safety and reliability of the vehicle.  The safety and reliability of the Ion had a large impact on Mr. Rouse's decision to buy the car.  Mr. Rouse experienced a loss of electrical power in his vehicle while driving and he is concerned about driving it due to the safety risks it poses.  He also believes the value of his car has diminished as a result of the ignition switch defects.  Mr. Rouse learned of the ignition switch defects in March 2014, but it took until May 2014 for the parts to arrive and to repair his car under the recall.  Mr. Rouse would not have purchased his vehicle had he known about the ignition switch defects in his GM vehicle.

- 91 -

### 129. Scott Schultz – Wisconsin

168.    Plaintiff and proposed Nationwide and Wisconsin State Representative Scott Schultz is a resident and citizen of Medford, Wisconsin.  Mr. Schultz purchased a used 2006 Saturn Ion in 2011 from a Chevrolet dealership in Wisconsin for $5,000-6,000.  The vehicle was not covered by a warranty.  Mr. Schultz's vehicle has shut off on him approximately ten times.  The worst incident occurred in March or April 2014 when the car shut off and he had to maneuver to avoid an incoming vehicle and ditch.  The power steering and brakes were also disabled when the vehicle shut off.  Other times the car shut off while driving on gravel roads or railroad tracks.  It is possible his knee hit the ignition switch on some occasions, but he does not recall.  He only kept two keys on his key fob.  His car first shut down about six months after purchasing it, and the most recent time occurred in the spring of 2014.  In all instances, it took all his strength to turn the steering wheel and apply the brakes.  The ignition switch on his vehicle has not been repaired under the recall because he got tired of waiting for the parts and traded it in around August 2014.  Mr. Schultz also tried selling his vehicle in a private sale but no one was interested due to the recall issues on the vehicle.  He checked the car's value on Kelley Blue Book and it was $3,700-4,700 for trade-in value.  When he traded the car in around August 2014, he only got $3,500 for it.  Mr. Schultz believes the value of his vehicle has been diminished and he would not have purchased the car, or would have at least paid less for it, had he known about these defects.

### 130. David Young – Wyoming

169.    Plaintiff and proposed Nationwide and Wyoming State Class Representative David Young is a resident and citizen of Casper, Wyoming.  Mr. Young purchased a new 2005 Chevrolet Cobalt on April 23, 2005, at Pineview Chevrolet in Macclenny, Florida, for $17,610.00.  The vehicle had a standard warranty when purchased, but Mr. Young does not

recall when it expired and he did not purchase an extended warranty.  Mr. Young has

experienced stalling and shutdowns in his Cobalt about eleven times.  Mr. Young waited more

than a year and a half before having his car repaired under the recall on May 14, 2015.  Until that

time, GM had stated that the parts were unavailable.  Mr. Young believes he suffered a

diminution of value in his vehicle due to the ignition switch defects, the faulty components and

the surrounding publicity which have damaged GM's reputation.  He would not have purchased

the Cobalt had he known about these defects.

**B.   Defendant**

170.   Defendant General Motors LLC ("New GM") is a Delaware limited liability

company with its principal place of business located at 300 Renaissance Center, Detroit,

Michigan, and is a citizen of the States of Delaware and Michigan.  The sole member and owner

of General Motors LLC is General Motors Holding LLC.  General Motors Holdings LLC is a

Delaware limited liability company with its principal place of business in the State of Michigan.

The sole member and owner of General Motors Holdings LLC is General Motors Company,

which is a Delaware Corporation with its principal place of business in the State of Michigan,

and is a citizen of the States of Delaware and Michigan.  New GM was incorporated in 2009 and,

effective on July 11, 2009, acquired substantially all assets and assumed certain liabilities of

General Motors Corporation through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy

Code.  It is undisputed that New GM had express obligations, as well as obligations by law, to

comply with the certification, reporting and recall requirements of the National Traffic and

Motor Vehicle Act and the Transportation Recall Enhancement, Accountability and

Documentation Act.

## IV.    FACTUAL ALLEGATIONS

**A.    New GM Falsely Promoted All of Its Vehicles as Safe, Reliable, and High-Quality**

171.    New GM was financially successful in emerging from the Old GM bankruptcy. Sales of all its models went up, and New GM became profitable.  New GM claimed to have turned over a new leaf in the bankruptcy – a new GM was born, and the GM brand once again stood strong in the eyes of consumers – or so the world thought.

172.    In 2010, New GM sold 4.26 million vehicles globally, an average of one every 7.4 seconds.  Joel Ewanick, New GM's global chief marketing officer at the time, described the success of one of its brands in a statement to the press:  "Chevrolet's dedication to compelling designs, quality, durability and great value is a winning formula that resonates with consumers around the world."[2]

173.    New GM repeatedly proclaimed to the world and U.S. consumers that, once it emerged from bankruptcy in 2009, it was a new and improved company committed to innovation, safety, and maintaining a strong brand:

---

[2] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Jan/0117_chev_ global.



General Motors Company 2010 Annual Report, cover page.

174.    In New GM's 2010 Annual Report, New GM proclaimed its products would "improve safety and enhance the overall driving experience for our customers:"

> As we regain our financial footing, we expect the number of new product launches to steadily rise over the next several years. And these new products will increasingly embrace advanced technology to reduce fuel consumption and emissions, ==improve safety== and enhance the overall driving experience for our customers.

General Motors Company 2010 Annual Report, pp. 4, 10.

175.    New GM claimed it would create vehicles that would define the industry standard:

> **BUILDING THE NEW GM**
> We are moving with increased speed and agility, and implementing change faster than ever before. We are becoming a company with the capability, resources and confidence to play offense, not defense. Instead of creating new vehicles that are just better than their predecessors, we're working to design, build and sell vehicles that define the industry standard.

General Motors Company 2010 Annual Report, p. 5.

176.    In its 2010 Annual Report, New GM told consumers that it built the world's best vehicles:

> *We truly are building a new GM, from the inside out.  Our vision is clear:  to design, build, and sell the world's best vehicles, and we have a new business model to bring that vision to life.  We have a lower cost structure, a stronger balance sheet, and a dramatically lower risk profile.  We have a new leadership team – a strong mix of executive talent from outside the industry and automotive veterans – and a passionate, rejuvenated workforce.*
>
> *"Our plan is to steadily invest in creating world-class vehicles, which will continuously drive our cycle of great design, high quality and higher profitability."*

- 96 -

010440-11  784012 V1

General Motors Company 2010 Annual Report, p. 2.

177.    New GM represented that it was building vehicles with design excellence, quality,

and performance:

> *And across the globe, other GM vehicles are gaining similar acclaim for design excellence, quality, and performance, including the Holden Commodore in Australia.  Chevrolet Agile in Brazil, Buick LaCrosse in China, and many others.*
>
> *The company's progress is early evidence of a new business model that begins and ends with great vehicles.  We are leveraging our global resources and scale to maintain stringent cost management while taking advantage of growth and revenue opportunities around the world, to ultimately deliver sustainable results for all of our shareholders.*

General Motors Company 2010 Annual Report, p. 3.

178.    These themes were repeatedly put forward as the core message about New GM's

Brand:

The new General Motors has one clear vision: to design, build and sell the world's best vehicles. Our new business model revolves around this vision, focusing on fewer brands, compelling vehicle design, innovative technology, improved manufacturing productivity and streamlined, more efficient inventory processes. The end result is products that delight customers and generate higher volumes and margins— and ultimately deliver more cash to invest in our future vehicles.

## A New Vision, a New Business Model

Our vision is simple, straightforward and clear: to design, build and sell the world's best vehicles. That doesn't mean just making our vehicles better than the ones they replace. We have set a higher standard for the new GM—and that means building the best.

Our vision comes to life in a continuous cycle that starts, ends and begins again with great vehicle designs. To accelerate the momentum we've already created, we reduced our North American portfolio from eight brands to four: Chevrolet, Buick, Cadillac and GMC. Worldwide, we're aggressively developing and leveraging global vehicle architectures to maximize our talent and resources and achieve optimum economies of scale.

Across our manufacturing operations, we have largely eliminated overcapacity in North America while making progress in Europe, and we're committed to managing inventory with a new level of discipline. By using our manufacturing capacity more efficiently

and maintaining leaner vehicle inventories, we are reducing the need to offer sales incentives on our vehicles. These moves, combined with offering attractive, high-quality vehicles, are driving healthier margins—and at the same time building stronger brands.

Our new business model creates a self-sustaining cycle of reinvestment that drives continuous improvement in vehicle design, manufacturing discipline, brand strength, pricing and margins, because we are now able to make money at the bottom as well as the top of the industry cycles.

We are seeing positive results already. In the United States, for example, improved design, content and quality have resulted in solid gains in segment share, average transaction prices and projected residual values for the Chevrolet Equinox, Buick LaCrosse and Cadillac SRX. This is just the beginning.

General Motors Company 2010 Annual Report, p. 6.

179.   New GM represented that it had a world-class lineup in North America:

# A World-Class Lineup in North America



**Chevrolet Cruze**
Global success is no surprise for the new Chevrolet Cruze, which is sold in more than 60 countries around the world. In addition to a 42 mpg Eco model (sold in North America), Cruze's globally influenced design is complemented by its exceptional quietness, high quality and attention to detail not matched by the competition.

**Buick Regal**
The sport-injected Buick Regal is the brand's latest addition, attracting a whole new demographic for the Buick brand. The newly designed Buick lineup, which saw 52 percent volume growth in 2010 in the United States alone, is appealing to a broader spectrum of buyers.



**Chevrolet Equinox**
The Chevrolet Equinox delivers best-in-segment 32-mpg highway fuel economy in a sleek, roomy new package. With the success of the Equinox and other strong-selling crossovers, GM leads the U.S. industry in total unit sales for the segment.



**Chevrolet Sonic**
Stylish four-door sedan and sporty five-door hatchback versions of the Chevrolet Sonic will be in U.S. showrooms in fall 2011. Currently the only small car built in the United States, it will be sold as the Aveo in other parts of the world.



**Buick LaCrosse**
Buick builds on the brand's momentum in the United States and China with the fuel-efficient LaCrosse. With eAssist technology, the LaCrosse achieves an expected 37 mpg on the highway.



**Buick Verano**
The all-new Buick Verano, which will be available in late 2011, appeals to customers in the United States, Canada and Mexico who want great fuel economy and luxury in a smaller but premium package.

- 99 -



General Motors Company 2010 Annual Report, pp. 12-13.

180.   New GM boasted of its new "culture":



General Motors Company 2010 Annual Report, p. 16.

181.    In 2010, in reaction to news about Toyota's unintended acceleration problem, GM briefed its executives to convey in "███████████ and interviews that GM believed "██t

██████████████████████████████████████████████████████████

and it was "██████████████████████████████████" [3]

182.   In its 2011 Annual Report, New GM proclaimed that it was putting its customers

first:



General Motors Company 2011 Annual Report, p. 1.

183.   New GM also announced that it is committed to leadership in vehicle safety:



General Motors Company 2011 Annual Report, p. 11.

184.   In a "Letter to Stockholders" contained in its 2011 Annual Report, New GM

noted that its brand had grown in value and that it designed the "World's Best Vehicles":

*Dear Stockholder:*

---

[3] GM-MDL2543-000773907 – Confidential.

010440-11 784012 V1

*Your company is on the move once again.  While there were highs and lows in 2011, our overall report card shows very solid marks, including record net income attributable to common stockholders of $7.6 billion and EBIT-adjusted income of $8.3 billion.*

- *GM's overall momentum, including a 13 percent sales increase in the United States, created new jobs and drove investments.  We have announced investments in 29 U.S.  facilities totaling more than $7.1 billion since July 2009, with more than 17,500 jobs created or retained.*

   *Design, Build and Sell the World's Best Vehicles*

*This pillar is intended to keep the customer at the center of everything we do, and success is pretty easy to define.  It means creating vehicles that people desire, value and are proud to own.  When we get this right, it transforms our reputation and the company's bottom line.*

General Motors Company 2011 Annual Report, p. 2.

   *Strengthen Brand Value*

*Clarity of purpose and consistency of execution are the cornerstones of our product strategy, and two brands will drive our global growth.  They are Chevrolet, which embodies the qualities of value, reliability, performance, and expressive design; and Cadillac, which creates luxury vehicles that are provocative and powerful.  At the same time the Holden, Buick, GMC, Baojun, Opel and Vauxhall brands are being carefully cultivated to satisfy as many customers as possible in select regions.*

*Each day the cultural change underway at GM becomes more striking.  The old internally focused, consensus-driven and overly complicated GM is being reinvented brick by brick, by truly accountable executives who know how to take calculated risks and lead global teams that are committed to building the best vehicles in the world as efficiently as we can.*

*That's the crux of our plan.  The plan is something we can control.  We like the results we're starting to see and we're going to stick to it – always.*

General Motors Company 2011 Annual Report, p. 3.

   185.    These themes continued in GM's 2012 Annual Report:



General Motors Company 2012 Annual Report, p. 3.

186.    New GM boasted of its "focus on the customer" and its desire to be "great" and

produce "quality" vehicles:

> *What is immutable is our focus on the customer, which requires us to go from*
> *"good" today to "great" in everything we do, including product design, initial*
> *quality, durability, and service after the sale.*

General Motors Company 2012 Annual Report, p. 4.

187.    New GM also indicated it had changed its structure to create more

"accountability" which, as shown below, was a blatant falsehood:

> *That work continues, and it has been complemented by changes to our design and engineering organization that have flattened the structure and created more accountability for produce execution, profitability and customer satisfaction.*

General Motors Company 2012 Annual Report, p. 10.

188.    And New GM represented that product quality was a key focus – another blatant falsehood:

> *Product quality and long-term durability are two other areas that demand our unrelenting attention, even though we are doing well on key measures.*

General Motors Company 2012 Annual Report, p. 10.

189.    New GM's 2013 Annual Report stated, "Today's GM is born of the passion of our people to bring our customers the finest cars and trucks we've ever built":



General Motors Company 2013 Annual Report, inside front cover dual page, (unnumbered).

190.    Most importantly given its inaccuracy and the damage wrought in this case, New GM proclaimed, "Nothing is more important than the safety of our customers":

- 105 -

General Motors Company 2013 Annual Report, p. 4.

**B.    New GM's Advertising and Marketing Literature Falsely Claimed that GM Placed Safety and Quality First**

191.    In May of 2014, New GM sponsored the North American Conference on Elderly Mobility.  Gay Kent, director of New GM global vehicle safety and a presenter at the conference, proclaimed the primacy of safety within New GM's new company culture:  "The safety of all our customers is our utmost concern."[4]

192.    New GM vigorously incorporated this messaging into its public-facing communications.  In advertisements and company literature, New GM consistently promoted all its vehicles as safe and reliable, and presented itself as a responsible manufacturer that stands behind GM-branded vehicles after they are sold.  Examples of New GM's misleading claims of safety and reliability made in public statements, advertisements, and literature provided with its vehicles follow.

193.    An online ad for "GM certified" used vehicles that ran from July 6, 2009, until April 5, 2010, stated that "GM certified means no worries."

---

[4] https://media.gm.com/media/us/en/gm/news.detail./content/Pages/news/us/en/2014/May/0514-cameras.

194.     In April 2010, General Motors Company Chairman and CEO Ed Whitacre starred

in a video commercial on behalf of New GM.  In it, Mr. Whitacre acknowledged that not all

Americans wanted to give New GM a second chance, but that New GM wanted to make itself a

company that "all Americans can be proud of again" and "exceed every goal [Americans] set for

[General Motors]."  He stated that New GM was "designing, building, and selling the best cars in

the world."  He continued by saying that New GM has "unmatched lifesaving technology" to

keep customers safe.  He concluded by inviting the viewer to take a look at "the new GM."[5]



195.     A radio ad that ran from New GM's inception until July 16, 2010, stated that "[a]t

GM, building quality cars is the most important thing we can do."

196.     On November 10, 2010, New GM published a video that told consumers that New

GM actually prevents any defects from reaching consumers.  The video, entitled "Andy Danko:

The White Glove Quality Check," explains that there are "quality processes in the plant that

prevent any defects from getting out."  The video also promoted the ideal that, when a customer

buys a New GM vehicle, they "drive it down the road and they never go back to the dealer."[6]

---

[5] https://www.youtube.com/watch?v=jbXpV0aqEM4.

[6] https://www.youtube.com/watch?v=JRFO8UzoNho&list=UUxN-Csvy_9sveql5HJviDjA.



197.   In 2010, New GM ran a television advertisement for its Chevrolet brand that implied its vehicles were safe by showing parents bringing their newborn babies home from the hospital, with the tagline "as long as there are babies, there will be Chevys to bring them home."[7]

198.   Another 2010 television ad informed consumers that "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

199.   New GM's 2010 brochure for the Chevy Cobalt states, "Chevy Cobalt is savvy when it comes to standard safety" and "you'll see we've thought about safety so you don't have to."  It also states "[w]e're filling our cars and trucks with the kind of thinking, features and craftsmanship you'd expect to pay a lot more for."[8]

---

[7] https://www.youtube.com/watch?v=rb28vTN382g.

[8] https://www.auto-brochures.com/makes/Chevrolet/Cobalt/Chevrolet_US%20Cobalt_2010.pdf.



200.   New GM's 2010 Chevy HHR brochure proclaims, "PLAY IT SAFE" and "It's easier to have fun when you have less to worry about."[9]



---

201.    New GM's brochure for the 2011 Chevrolet Silverado states, "Silverado – the most dependable, long-lasting full size pickups on the road."  It goes on to say, "There are three stages of safety.  Silverado takes every one as seriously as you do."[10]





202.    The brochure for the 2011 Cadillac DTS and STS states, "Passenger safety is a primary consideration throughout the engineering process," and "[t]he STS and DTS were carefully designed to provide a host of features to help you from getting into a collision in the first place."[11]

---

[10] https://www.auto-brochures.com/makes/Chevrolet/Silverado/Chevrolet_US%20Silverado_2011.pdf.

[11] https://www.auto-brochures.com/makes/Cadillac/Cadillac_US%20STS-DTS_2011.pdf.



203.    On August 29, 2011, New GM's website advertised:  "Chevrolet provides consumers with fuel-efficient, safe and reliable vehicles that deliver high quality, expressive design, spirited performance and value."[12]

204.    On September 29, 2011, New GM announced on the "News" portion of its website the introduction of front center airbags.  The announcement included a quote from Gay Kent, New GM Executive Director of Vehicle Safety and Crashworthiness, who stated that: "This technology is a further demonstration of New GM's above-and-beyond commitment to provide continuous occupant protection before, during and after a crash."[13]

---

[12] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2014/Jul/ 0731-mpg.

[13] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Sep/0929_air bag.

- 111 -

205.    On December 27, 2011, Gay Kent was quoted in an interview on New GM's website as saying:  "Our safety strategy is about providing continuous protection for our customers before, during and after a crash."[14]

206.    New GM's brochure for the 2012 Chevrolet Impala proclaims:  "A safety philosophy that RUNS DEEP," and that "if a moderate to severe collision does happen, Impala is designed to respond quickly":[15]



207.    New GM's brochure for the 2012 Cadillac CTS announces, "At Cadillac, we believe the best way to survive a collision is to avoid one in the first place," and "Active safety begins with a responsive engine, powerful brakes, and an agile suspension."[16]

---

[14] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Dec/1227_safety.

[15] https://www.chevrolet.com/content/dam/Chevrolet/northamerica/usa/nscwebsite/en/Home/Help%20Center /Download%20a%20Brochure/02_PDFs/2012_Impala_eBrochure.pdf.

[16] https://www.auto-brochures.com/makes/Cadillac/CTS/Cadillac_US%20CTS_2012.pdf.

010440-11  784012 V1



208.   On January 3, 2012, Gay Kent, New GM Executive Director of Vehicle Safety, was quoted on New GM's website as saying:  "From the largest vehicles in our lineup to the smallest, we are putting overall crashworthiness and state-of-the-art safety technologies at the top of the list of must-haves."[17]

209.   An online national ad campaign for New GM in April 2012 stressed "Safety. Utility.  Performance."

210.   On June 5, 2012, New GM posted an article on its website announcing that its Malibu Eco had received top safety ratings from the National Highway Traffic Safety Administration and the Insurance Institute for Highway Safety.  The article includes the following quotes:  "With the Malibu Eco, Chevrolet has earned seven 2012 TOP SAFETY PICK awards," said IIHS President Adrian Lund.  "The IIHS and NHTSA results demonstrate GM's commitment to state-of-the-art crash protection."  And, "We are now seeing the results from our commitment to design the highest-rated vehicles in the world in safety performance," said Gay

---

[17] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2012/Jan/0103_sonic.

Kent, New GM Executive Director of Vehicle Safety.  "Earning these top safety ratings demonstrates the strength of the Malibu's advanced structure, overall crashworthiness and effectiveness of the vehicle's state-of-the-art safety technologies."[18]

211.   On June 5, 2012, New GM posted an article on its website entitled "Chevrolet Backs New Vehicle Lineup with Guarantee," which included the following statement:  "We have transformed the Chevrolet lineup, so there is no better time than now to reach out to new customers with the love it or return it guarantee and very attractive, bottom line pricing," said Chris Perry, Chevrolet global vice president of marketing.  "We think customers who have been driving competitive makes or even older Chevrolets will be very pleased by today's Chevrolet designs, easy-to-use technologies, comprehensive safety and the quality built into all of our cars, trucks and crossovers."[19]

212.   On November 5, 2012, New GM published a video to advertise its "Safety Alert Seat" and other safety sensors.  The video described older safety systems and then added that new systems "can offer drivers even more protection."  A Cadillac Safety Engineer added that "are a variety of crash avoidance sensors that work together to help the driver avoid crashes." The engineer then discussed all the sensors and the safety alert seat on the Cadillac XTS, leaving the viewer with the impression safety was a top priority at Cadillac.[20]

---

[18] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2012/Jun/ 0605_malibu safety.

[19] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2012/Jul/ 0710_ confidence.

[20] https://www.youtube.com/watch?v=CBEvflZMTeM.

010440-11  784012 V1



213.    New GM's brochure for the 2013 Chevrolet Traverse states, "Traverse provides

peace of mind with an array of innovative safety features," and "[i]t helps protect against the

unexpected."[21]



214.    A national print ad campaign in April 2013 states that, "[w]hen lives are on the

line, you need a dependable vehicle you can rely on.  Chevrolet and GM … for power,

performance and safety."

---

[21] https://www.auto-brochures.com/makes/Chevrolet/Traverse/Chevrolet_US%20Traverse_
2013.pdf.

- 115 -

215.    On November 8, 2013, New GM posted a press release on its website regarding

GMC, referring to it as "one of the industry's healthiest brands":[22]

**About GMC**

GMC has manufactured trucks since 1902, and is one of the industry's healthiest brands. Innovation and engineering excellence is built into all GMC vehicles and the brand is evolving to offer more fuel-efficient trucks and crossovers, including the Terrain small SUV and Acadia crossover. The 2014 Sierra half-ton pickup boasts all-new powertrains and design, and the Sierra Heavy Duty pickups are the most capable and powerful trucks ever built by GMC. Every retail GMC model, including Yukon and Yukon XL full-size SUVs, is now available in Denali luxury trim. Details on all GMC models are available at http://www.gmc.com/, on Twitter at @thisisgmc or at http://www.facebook.com/gmc.

216.    A December 2013 New GM testimonial ad stated that "GM has been able to

deliver a quality product that satisfies my need for dignity and safety."

217.    In 2013, New GM proclaimed on its website, https://www.gm.com, the

company's passion for building and selling the world's best vehicles as "the hallmark of our

customer-driven culture":[23]



---

[22] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2013/Nov/1108-truck-lightweighting.

[23] https://www.gm.com/company/aboutGM/our_company.

218.    On the same website in 2013, New GM stated:  "At GM, it's about getting everything right for our customers – from the way we design, engineer and manufacture our vehicles, all the way through the ownership experience."[24]



219.    On its website, Chevrolet.com, New GM promises that it is "Putting safety ON TOP," and that "Chevy Makes Safety a Top Priority":[25]



220.    On its website, Buick.com, New GM represented that "Keeping you and your family safe is a priority":[26]

---

[24] https://www.gm.com/vision/quality_safety/it_begins_with_a_commitment_to_Quality.

[25] https://www.chevrolet.com/culture/article/vehicle-safety-preparation.

[26] https://www.buick.com/top-vehicle-safety-features.



221.    On March 3, 2014, GM announced that "Customer Safety is our guiding

compass" in response to the 2014 Malibu receiving a Top Safety Pick rating, from the Insurance

Institutes For Highway Safety.

222.    New GM's website in 2014 touted its purported "Commitment to Safety," which

is "at the top of the agenda at GM:"[27]

> *Innovation:  Quality & Safety; GM's Commitment to Safety; Quality and safety are at the top of the agenda at GM, as we work on technology improvements in crash avoidance and crashworthiness to augment the post-event benefits of OnStar, like advanced automatic crash notification.*

> *Understanding what you want and need from your vehicle helps GM proactively design and test features that help keep you safe and enjoy the drive.  Our engineers thoroughly test our vehicles for durability, comfort, and noise minimization before you think about them.  The same quality process ensures our safety technology performs when you need it.*

223.    New GM's website further promised "Safety and Quality First:  Safety will

always be a priority at New GM.  We continue to emphasize our safety-first culture in our

---

[27] https://www.gm.com/vision/quality_safety/gms_commitment_tosafety.

facilities," and that, "[i]n addition to safety, delivering the highest quality vehicles is a major

cornerstone of our promise to our customers":[28]



224.    According to New GM's website, "Leading the way is our seasoned leadership

team who set high standards for our company so that we can give you the best cars and trucks.

This means that we are committed to delivering vehicles with compelling designs, flawless

quality, and reliability, and leading safety, fuel economy and infotainment features."[29]

225.    In its 2011 10-K SEC filing, New GM stated "We are a leading global automotive

company.  Our vision is to design, build and sell the world's best vehicles.  We seek to

distinguish our vehicles through superior design, quality, reliability, telematics (wireless voice

and data) and infotainment and safety within their respective segments."  General Motors 2011

Form 10-K, p. 50.[30]

226.    New GM made these and similar representations to boost vehicle sales while

knowing that millions of GM-branded vehicles, across numerous models and years, were

plagued with serious and concealed safety defects.  New GM was well aware of the impact

---

[28] https://www.gm.com/company/aboutGM/our_company.

[29] http://www.gm.com/company/aboutGM/our_company.

[30] http://www.sec.gov/Archives/edgar/data/1467858/000119312511051462/d10k.htm.

- 119 -

vehicle recalls, and their timeliness, have on its brand image.  In its 2010 Form 10-K submitted

to the United States Securities and Exchange Commission ("SEC"), New GM admitted that

"Product recalls can harm our reputation and cause us to lose customers, particularly if those

recalls cause consumers to question the safety or reliability of our products.  Any costs incurred

or lost sales caused by future product recalls could materially adversely affect our business."

General Motors 2010 Form 10-K, p. 31.[31]  This is precisely why New GM decided to disregard

safety issues and conceal them.

## C.    The Ignition Switch System Defects

227.    More than 12 million GM-branded vehicles contained a defective ignition switch

and cylinder. In all of these vehicles, the key position of the lock module is located low on the

steering column, in close proximity to the driver's knee.  The ignition switch in these vehicles,

the "Defective Ignition Switch Vehicles," is prone to fail during ordinary and foreseeable driving

situations.  New GM initially recalled 2.1 million Defective Ignition Switch Vehicles in February

and March of 2014, and it was this initial recall that set in motion the avalanche of recalls that is

described in this Complaint.  In June and July of 2014, New GM recalled an additional 11

million vehicles, ostensibly for distinct safety defects involving the ignition and ignition key.  As

set forth below, however, each of these recalls involves a defective ignition switch, and the

consequences of product failure in each of the recalled vehicles is substantially similar, if not

identical.  In each case, a defective ignition switch is placed in an unreasonable position on the

steering cylinder and can cause the vehicle to stall, disable the power steering and power brakes,

and disable the airbag system in normal and foreseeable driving circumstances.

---

[31] https://www.sec.gov/Archives/edgar/data/1467858/000119312510078119/d10k.htm#toc
85733_4.

228.   More specifically, the ignition switch can inadvertently move from the "run" to the "accessory" or "off" position at any time during normal and proper operation of the Defective Ignition Switch Vehicles.  The ignition switch is most likely to move when the vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently touches the ignition key with his or her knee; or for a host of additional reasons.  When the ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and unexpectedly loses engine power, power steering, and power brakes, and certain safety features are disabled, including the vehicle's airbags.  This leaves occupants vulnerable to crashes, serious injuries, and death.

229.   The ignition switch systems at issue are defective in at least three major respects.  First, the switches are simply weak; because of a faulty "detent plunger," the switch can inadvertently move from the "run" to the "accessory" position.  Second, because the ignition switch is placed low on the steering column, the driver's knee can easily bump the key (or the hanging fob below the key) and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position.  Third, when the ignition switch moves from the "run" to the "accessory" or "off" position, the vehicle's power is disabled.  This also immediately disables the airbags.  Thus, when power is lost during ordinary operation of the vehicle, a driver is left without the protection of the airbag system even if he or she is traveling at high speeds.  New GM was aware of safer alternative designs for airbag systems that would have prevented the non-deployment of airbags caused by the ignition defects, but chose not to employ them, in part to avoid disclosure of the defective ignition switch and its tragic consequences.

230.    Vehicles with defective ignition switches are therefore unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the vehicles.

231.    Indeed, New GM itself has acknowledged that the defective ignition switches pose an "increas[ed] risk of injury or fatality." Ken Feinberg, who was hired by New GM to settle wrongful death claims arising from the ignition switch defects, has already linked the defect to over 100 deaths, and has not yet completed his review of wrongful death claims.  The Center for Auto Safety studied collisions in just two vehicle makes, and linked the defect to over 300 accidents.  There is every reason to believe that as more information is made public, these numbers will continue to grow.

232.    Alarmingly, New GM knew of the deadly ignition switch defects and their dangerous consequences from the date of its creation on July 11, 2009, but concealed its knowledge from consumers and regulators.  To this day, New GM continues to conceal material facts regarding the extent and nature of this safety defect, as well as what steps must be taken to remedy the defect.

233.    While New GM has instituted a recall of millions of vehicles for defective ignition switches, it knew – *and its own engineering documents reflect* – that the defects transcend the design of the ignition switch and also include the placement of the ignition switch on the steering column, a lack of adequate protection of the ignition switch from forces of inadvertent driver contact, and the need to redesign the airbag system so that it is not immediately disabled when the ignition switch fails in ordinary and foreseeable driving situations.  To fully remedy the problem and render the Defective Ignition Switch Vehicles safe

and of economic value to their owners again, New GM must address these additional issues (and perhaps others).

234.    Further, and as set forth more fully below, New GM's recall of the Defective Ignition Switch Vehicles has been, to date, incomplete and inadequate, and it underscores New GM's ongoing fraudulent concealment and fraudulent misrepresentation of the nature and extent of the defects.  New GM has long known of and understood the ignition switch defect, and its failure to fully remedy the problems associated with this defect underscores the necessity of this class litigation.

**1.    New GM was aware of the defective ignition switch problem from the date of its inception.**

235.    On July 10, 2009, the United States Bankruptcy Court approved the sale of General Motors Corporation, which was converted into General Motors, LLC, or New GM. From its creation, New GM, which retained the vast majority of Old GM's senior level executives and engineers as well as Old GM's books and records, knew that Old GM had manufactured and sold millions of vehicles afflicted with the ignition switch defects.

236.    In setting forth the knowledge of Old GM in connection with the ignition switch and other defects set forth herein, Plaintiffs *do not* seek to hold New GM liable for the actions of Old GM.  Instead, the knowledge of Old GM is important and relevant because it is *directly attributable* to New GM.  In light of its knowledge of the ignition switch defects, and the myriad other defects, New GM had (and breached) its legal obligations to Plaintiffs and the Class.

237.    In part, New GM's knowledge of the ignition switch defects arises from the fact that key personnel with knowledge of the defects were employed by New GM when Old GM ceased to exist.  Moreover, many of these employees held managerial and decision-making authority in Old GM, and accepted similar positions with New GM.  For example, the design

research engineer who was responsible for the rollout of the defective ignition switch in the Saturn Ion was Ray DeGiorgio. Mr. DeGiorgio continued to serve as an engineer at New GM until April 2014, when he was suspended (and ultimately fired) as a result of his involvement in the ignition switch crisis.

238.    Mr. DeGiorgio was hardly the only employee who retained his Old GM position with New GM. Other Old GM employees with knowledge of the ignition switch defects and other defects who were retained and given decision-making authority in New GM include: current CEO Mary T. Barra; Director of Product Investigations Carmen Benavides; Safety Communications Manager Alan Adler; Program Engineering Manager Gary Altman; engineer Eric Buddrius, engineer Jim Federico; Vice Presidents for Product Safety John Calabrese and Alicia Boler-Davis; Warranty Engineer William K. Chase; Engineer James Churchwell; Senior Manager for TREAD Reporting Dwayne Davidson; electrical engineer John Dolan; engineer and Field Performance Assessment Engineer Brian Everest; sensing performance engineer William Hohnstadt; Vice President of Regulatory Affairs Michael Robinson; Director of Product Investigations Gay Kent; Product Investigations Engineer Elizabeth Kiihr; engineer Alberto Manzor; Field Performance Assessment Engineer Kathy Anderson; General Counsel and Vice President Michael P. Milliken; Vehicle Chief Engineer Doug Parks; Brand Quality Manager Steven Oakley; Field Performance Assessment Engineer Manuel Peace; Manager of Internal Investigations Keith Schultz; Field Performance Assessment Engineer John Sprague; Field Performance Assessment Engineer Lisa Stacey; Design Engineer David Trush; Product Investigations Manager Douglas Wachtel; in-house counsel Douglas Brown; attorney Michael Gruskin (who at one point headed GM's product litigation team and chaired the Settlement

Review Committee from September 2007 to March 2102); in-house product liability attorney

Jaclyn C. Palmer; and in-house product liability lawyer William Kemp.

239.    A number of New GM employees were fired or "retired" as a result of the ignition

switch scandal, including:  Michael Robinson; William Kemp; Ray DeGiorgio; Gary Altman;

Jaclyn Palmer; Ron Porter; Lawrence Buonomo; Jennifer Sevigny; Gay Kent; Carmen

Benavides; Maureen Foley-Gardner; Jim Federico; John Calabrese; and Brian Stouffer.

240.    In the recent Decision on Motion to Enforce Sale Order, the bankruptcy court

found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including

engineers, senior managers, and attorneys, were informed or otherwise aware of the Ignition

Switch Defect …"[32]  Based on this fact, the court concluded that "Old GM personnel knew

enough as of … June 2009 ... for Old GM then to have been obligated, under the Safety Act, to

conduct a recall of the affected vehicles."[33]  These same 24 personnel necessarily had the same

knowledge on day one of New GM's existence.

241.    In addition, all the documents discussed herein that were generated prior to the

inception of New GM remained in New GM's files.  Given New GM's knowledge of these

documents, and its continuing and ongoing monitoring and reporting duties under the Safety

Act,[34] New GM is also charged with knowledge of each such document.

242.    In fact, New GM had ongoing obligations under the Safety Act to monitor GM-

branded vehicles on the road, to make quarterly reports to NHTSA, and to maintain all relevant

---

[32] *In re Motors Liquidation co.*, No. 09-50026 (REG) (Bankr. Ct. S.D.N.Y. Apr. 15, 2015), at 32.

[33] *Id.* at 33.

[34] The "Safety Act" refers to the National Traffic Vehicle and Motor Vehicle Safety Act, 49 U.S.C. §§ 30101, *et seq.*, as amended by the Transportation Recall, Enhancement, Accountability and Documentation Act (the "TREAD Act").

records for five years.  New GM explicitly accepted Safety Act responsibilities for Old GM

vehicles in § 6.15 of the Sale Agreement through which it acquired Old GM.

243.    The Safety Act and related regulations require the quarterly submission to

NHTSA of "early warning reporting" data, including incidents involving death or injury, claims

relating to property damage received by the manufacturer, warranty claims paid by the

manufacturer, consumer complaints, and field reports prepared by the manufacturer's employees

or representatives concerning failure, malfunction, lack of durability, or other performance

issues.  49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.  Manufacturers must retain for five years

all underlying records on which the early warning reports are based and all records containing

information on malfunctions that may be related to motor vehicle safety.  49 C.F.R. §§ 576.5 to

576.6.

244.    The Safety Act further requires *immediate* action when a manufacturer *determines

or should determine that a safety defect exists*. *United States v. General Motors Corp.*, 574 F.

Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect

that creates an "unreasonable risk of accidents occurring because of the design, construction, or

performance of a motor vehicle" or "unreasonable risk of death or injury in an accident."  49

U.S.C. § 30102(a)(8). Within five days of learning about a safety defect, a manufacturer *must*

notify NHTSA and provide a description of the vehicles potentially containing the defect,

including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a

description of how these vehicles differ from similar vehicles not included in the recall, and "a

summary of all warranty claims, field or service reports, and other information" that formed the

basis of the determination that the defect was safety related.  49 U.S.C. § 30118(c); 49 C.F.R. §

573.6(b)-(c). Then, "within a reasonable time"[35] after deciding that a safety issue exists, the manufacturer *must* notify the owners of the defective vehicles.  49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C. § 30165(a)(1).

245.    New GM used several processes to identify safety issues, including the TREAD database and Problem Resolution Tracking System ("PRTS").[36] The TREAD database, used to store the data required for the quarterly NHTSA early warning reports, was the principal database used by Old and New GM to track incidents related to GM-branded vehicles. *Id.* at 306. The database included information from (i) customer service requests; (ii) repair orders from dealers; (iii) internal and external surveys; (iv) field reports from employees who bought GM-branded vehicles and from Captured Test Fleet reports;[37] (v) complaints from the OnStar call center; and (vi) a database maintained by GM legal staff to track data concerning complaints filed in court. *Id.* A TREAD reporting team would conduct monthly database searches and prepare scatter graphs to identify spikes in the number of accidents or complaints related to various GM-branded vehicles.[38] The PRTS is a database that tracks engineering problems identified in testing, manufacturing, through warranty data, and through customer feedback.[39]

---

[35] 49 C.F.R. § 577.7(a) was updated, effective October 11, 2013, to replace "within a reasonable time" to "no later than 60 days" from the filing of the NHTSA notification.

[36] *See* Anton R. Valukas, Report to Board of Directors of General Motors Co. Regarding Ignition Switch Recalls ("Valukas Report" or "V.R."), at 282-313.

[37] Captured Test Fleet reports were submitted by employees who were given vehicles and asked to document any problems that arose while driving.  *Id.* at 300.  The Quality Group would review, summarize, and group these reports into categories.  *Id.*

[38] *Id.* at 307.

[39] *Id.* at 282.

- 127 -

The PRTS process involves five steps:  "identification of the issue; identification of the root cause; identification of a solution; implementation of the solution; and feedback."[40]

246.    Because the same employees carried out the TREAD Act obligations at Old and New GM, they not only retained the knowledge they acquired at Old GM – they were in fact required to.

247.    The TREAD team was not staffed with enough personnel to meet GM's promise of safety.  According to the Valukas Report, the TREAD team had between eight and 12 employees from 2003 through 2007 or 2008 with the responsibility of mining through the TREAD data on a month-by-month basis and preparing graphs for each of the 24 categories of data in an effort to identify any spikes in the number of accidents or complaints.  Old GM then cut the TREAD team down to three employees and pared back the monthly data mining process.  New GM chose not to restore the necessary number of employees to enable the TREAD team to adequately perform its vital function.

248.    According to the Valukas Report, until 2014 the TREAD team did not have sufficient funds to obtain any of the data mining software programs available in the industry to better identify and understand potential defects.  In his deposition, the senior manager of the TREAD team at both Old and New GM testified that ████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████

249.    In addition, New GM trained those entering data for TREAD Act purposes to avoid reporting items that would look bad to outsiders.  New GM Employees were instructed to ████████████████████████████████████████████████████████████████ .

---

[40] *Id.* at 284.

"███████ ████████████████████████[41] and were told to avoid the

following words:



250.    Indeed, from the day of its formation as an entity, New GM had notice and full

knowledge of the ignition switch, power steering, and other defects as set forth below.

**2.      The Ignition Switch Defect giving rise to the February and March 2014
Recalls.**

**a.      New GM was long aware of the defect.**

251.    When it came into existence New GM knew of the following facts:

252.    In 2001, during pre-production testing of the 2003 Saturn Ion, GM engineers

learned that the vehicle's ignition switch could unintentionally move from the "run" to the

"accessory" or "off" position.  GM further learned that where the ignition switch moved from

"run" to "accessory" or "off," the vehicle's engine would stall and/or lose power.

253.    New GM knew that Delphi Mechatronics ("Delphi"), the manufacturer of many

of the defective ignition switches in the Defective Ignition Switch Vehicles including those in the

_____

[41] GM-MDL2543-400273026 at 400273052 and 400273056 (Confidential).

vehicles that gave rise to the February and March 2014 recalls, informed Old GM that the ignition switch did not meet Old GM's design specifications.  Rather than delay production of the Saturn Ion in order to ensure that the ignition switch met specifications, Old GM's design release engineer, Ray DeGiorgio, simply lowered the specification requirements and approved use of ignition switches that he knew did not meet Old GM's specifications.

254.    New GM knew that in 2004, Old GM engineers reported that the ignition switch in the Saturn Ion was so weak and the ignition placed so low on the steering column that the driver's knee could easily bump the key and turn off the vehicle.

255.    New GM knew that this defect was sufficiently serious for an Old GM engineer to conclude, in January 2004, that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

256.    New GM knew that a July 1, 2004 report by Siemens VDO Automotive analyzed the relationship between the ignition switch in GM-branded vehicles and the airbag system.  The Siemens report concluded that when a GM-branded vehicle experienced a power failure, the airbag sensors were disabled.  The Siemens report was distributed to at least five Old GM engineers.  The Chevrolet Cobalt was in pre-production at this time.

257.    New GM knew that in 2004, Old GM began manufacturing and selling the 2005 Chevrolet Cobalt.  Old GM installed the same ignition switch in the 2005 Cobalt as it did in the Saturn Ion.

258.    New GM knew that during testing of the Cobalt, Old GM engineer Gary Altman observed an incident in which a Cobalt suddenly lost engine power because the ignition switch moved out of the "run" position during vehicle operation.

259.    New GM knew that in late 2004, while testing was ongoing on the Cobalt, Chief Cobalt Engineer Doug Parks asked Mr. Altman to investigate a journalist's complaint that he had turned off a Cobalt vehicle by hitting his knee against the key fob.

260.    New GM knew that Old GM opened an engineering inquiry known as a Problem Resolution Tracking System ("Problem Resolution") to evaluate a number of potential solutions to this moving engine stall problem.  At this time, Problem Resolution issues were analyzed by a Current Production Improvement Team ("Improvement Team").  The Improvement Team that examined the Cobalt issue beginning in late 2004 included a cross-section of business people and engineers, including Altman and Lori Queen, Vehicle Line Executive on the case.

261.    New GM knew that Doug Parks, Chief Cobalt Engineer, was also active in Problem Resolution.  On March 1, 2005, he attended a meeting whose subject was "vehicle can be keyed off with knee while driving."  Parks also attended a June 14, 2005 meeting that included slides discussing a NEW YORK TIMES article that described how the Cobalt's engine could cut out because of the ignition switch problem.

262.    New GM knew that in 2005, Parks sent an email with the subject, "Inadvertent Ign turn-off."  In the email, Parks wrote, "For service, can we come up with a 'plug' to go into the key that centers the ring through the middle of the key and not the edge/slot?  This appears to me to be the only real, quick solution."

263.    New GM knew that after considering this and a number of other solutions (including changes to the key position and measures to increase the torque in the ignition switch), the CPIT examining the issue decided to do nothing.

264.    New GM knew that Old and New GM engineer Gary Altman recently admitted that engineering managers (including himself and Ray DeGiorgio) knew about ignition switch

- 131 -

problems in the Cobalt that could cause these vehicles to stall, and disable power steering and brakes, but launched the vehicle anyway because they believed that the vehicles could be safely coasted off the road after a stall.  Mr. Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable.

265.    New GM knew that on February 28, 2005, Old GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

266.    New GM knew that in the February 28, 2005 bulletin, Old GM provided the following recommendations and instructions to its dealers – but not to the public in general:

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.  The concern is more likely to occur if the driver is short and has a large heavy key chain.
>
> In the case this condition was documented, the driver's knee would contact the key chain while the vehicle was turning.  The steering column was adjusted all the way down.  This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause.  The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.
>
> Please follow this diagnosis process thoroughly and complete each step.  If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

267.    New GM knew that on June 19, 2005, the NEW YORK TIMES reported that Chevrolet dealers were advising some Cobalt owners to remove items from heavy key rings so that they would not inadvertently move the ignition into the "off" position.  The article's author reported that his wife had bumped the steering column with her knee while driving on the freeway and the engine "just went dead."

- 132 -

268.    New GM knew that the NEW YORK TIMES contacted Old GM and Alan Adler,

manager for safety communications, who provided the following statement:

> In rare cases when a combination of factors is present, a Chevrolet
> Cobalt driver can cut power to the engine by inadvertently
> bumping the ignition key to the accessory or off position while the
> car is running.  Service advisers are telling customers they can
> virtually eliminate the possibility by taking several steps, including
> removing nonessential material from their key rings.

269.    New GM knew that, in connection with this NEW YORK TIMES article, Alder

specifically told the editor that GM "had not had any complaints," which was false, as shown

below.

270.    New GM knew that between February 2005 and December 2005, Old GM opened

multiple Problem Resolution inquiries regarding reports of power failure and/or engine shutdown

in Defective Ignition Switch Vehicles.

271.    New GM knew that one of these, opened by quality brand manager Steve Oakley

in March 2005, was prompted by Old GM engineer Jack Weber, who reported turning off a

Cobalt with his knee while driving.  After Oakley opened the PRTS, Gary Altman advised that

the inadvertent shut down was not a safety issue.  Oakley still works at New GM.

272.    New GM knew that as part of the Problem Resolution, Oakley asked William

Chase, an Old GM warranty engineer, to estimate the warranty impact of the ignition switch

defect in the Cobalt and Pontiac G5 vehicles.  Chase estimated that for Cobalt and G5 vehicles

on the road for 26 months, 12.40 out of every 1,000 vehicles would experience inadvertent

power failure while driving.

273.    New GM knew that in September 2005, Old GM received notice that Amber

Marie Rose, a 16-year old resident of Clinton, Maryland, was killed in an accident after her 2005

Chevrolet Cobalt drove off the road and struck a tree head-on.  During Old GM's investigation, it

- 133 -

learned that the ignition switch in Amber's Cobalt was in the "accessory" or "off" position at the time of the collision.  Upon information and belief, Old GM subsequently entered into a confidential settlement agreement with Amber's mother.  Old GM personnel familiar with Ms. Rose's fatal accident continued on at New GM after the bankruptcy sale.

274.    New GM knew that in December 2005, Old GM issued Technical Service Bulletin 05-02-35-007.  The Bulletin applied to 2005-2006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-2006 Pontiac Pursuits, 2006 Pontiac Solstices, and 2003-2006 Saturn Ions.  The Bulletin explained that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort."

275.    New GM knew that Old GM failed to disclose in this Technical Service Bulletin that it knew that there had been fatal incidents involving vehicles with the ignition switch defect.  On November 17, 2005 – shortly after Amber's death and immediately before Old GM issued the December Bulletin – a Cobalt went off the road and hit a tree in Baldwin, Louisiana.  The front airbags did not deploy in this accident.  Old GM received notice of the accident, opened a file, and referred to it as the "Colbert" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

276.    New GM knew that on February 10, 2006, in Lanexa, Virginia – shortly after Old GM issued the Technical Service Bulletin – a 2005 Cobalt flew off of the road and hit a light pole.  As with the Colbert incident (above), the frontal airbags failed to deploy in this incident as well.  The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash.  Old GM received notice of this accident, opened a file, and referred to it as the "Carroll" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

- 134 -

277.     New GM knew that on March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole.  The frontal airbags did not deploy in this incident. The download of the SDM showed the key was in the "accessory/off" position at the time of the crash.  Old GM received notice of this incident, opened a file, and referred to it as the "Oakley" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

278.     New GM knew that in April 2006, Old GM design engineer Ray DeGiorgio approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by Delphi. The changes included a new detent plunger and spring and were intended to generate greater torque values in the ignition switch.  These values, though improved, were still consistently below Old GM's design specifications.  Despite its redesign of the ignition switch, Old GM did not change the part number for the switch.

279.     While New GM has claimed that the ignition switch redesign was unknown to any GM personnel outside of Mr. DeGiorgio, recently revealed documents show that other GM personnel were aware of the change – including personnel who continued working at New GM after the bankruptcy sale.

280.     In congressional testimony in 2014, New GM CEO Mary Barra acknowledged that Old GM should have changed the part number when it redesigned the ignition switch, and that its failure to do so did not meet industry standard behavior.

281.     New GM knew that in October 2006, Old GM updated Technical Service Bulletin 05-02-35-007 to include additional model years:  the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Cobalt, and 2007 Pontiac Solstice and G5.  These vehicles had the same safety-related defects in the ignition switch systems as the vehicles in the original Bulletin.

282.    New GM knew that on December 29, 2006, in Sellenville, Pennsylvania, a 2005 Cobalt drove off the road and hit a tree.  The frontal airbags failed to deploy in this incident.  Old GM received notice of this incident, opened a file, and referred to it as the "Frei" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

283.    New GM knew that GM's practices were so deficient that key personnel did not critically examine red flags raising safety issues.  For example, on November 14, 2006, the senior manager for GM's TREAD reporting was asked to pull the TREAD reports in response to a media inquiry regarding ███████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████

284.    New GM knew that on November 20, 2006, Davidson was sent an email with a link to a news story ███████████████████████████████████████

████████████████████████████████.[43]   Davidson testified ████████████████

███████████████████████████████████████████████████████[44]

285.    New GM knew that in 2007, Davidson was █████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

[42] GM-MDL2543-000722839 (Highly Confidential).

[43] GM-MDL2543-400264015 (Highly Confidential).

[44] May 15, 2015 Dwayne Davidson Dep. at 87.

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

286.    New GM knew that on February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt sailed off the road and struck a truck.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "White" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

287.    New GM knew that on August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a truck.  The frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "McCormick" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

288.    New GM knew that on September 25, 2007, in New Orleans, Louisiana, a 2007 Cobalt lost control and struck a guardrail.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Gathe" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

289.    New GM knew that on October 16, 2007, in Lyndhurst, Ohio, a 2005 Cobalt traveled off road and hit a tree.  The frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Breen" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

290.     New GM knew that on April 5, 2008, in Sommerville, Tennessee, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "Freeman" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

291.     New GM knew that on May 21, 2008, in Argyle, Wisconsin, a 2007 G5 traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "Wild" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

292.     New GM knew that on May 28, 2008, in Lufkin, Texas, a 2007 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "McDonald" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

293.     New GM knew that on September 13, 2008, in Lincoln Township, Michigan, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Harding" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

- 138 -

294.    New GM knew that on November 29, 2008, in Rolling Hills Estates, California, a 2008 Cobalt traveled off the road and hit a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Dunn" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

295.    New GM knew that on December 6, 2008, in Lake Placid, Florida, a 2007 Cobalt traveled off the road and hit a utility pole.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "Grondona" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

296.    New GM knew that in February 2009, Old GM opened another Problem Resolution regarding the ignition switches in the Defective Ignition Switch Vehicles.  Old GM engineers decided at this time to change the top of the Chevrolet Cobalt key from a "slot" to a "hole" design, as had originally been suggested in 2005.  The new key design was produced for the 2010 model year.  Old GM did not provide these redesigned keys to the owners or lessees of any of the vehicles implicated in prior Technical Service Bulletins, including the 2005-2007 Cobalts.

297.    New GM knew that just prior to its bankruptcy sale, Old GM met with Continental Automotive Systems US, its airbag supplier for the Cobalt, Ion, and other Defective Ignition Switch Vehicles.  Old GM requested that Continental download SDM data from a 2006 Chevrolet Cobalt accident where the airbags failed to deploy.  In a report dated May 11, 2009, Continental analyzed the SDM data and concluded that the SDM ignition state changed from

- 139 -

"run" to "off" during the accident.  According to Continental, this, in turn, disabled the airbags.

New GM did not disclose this finding to NHTSA, despite its knowledge that NHTSA was

interested in airbag non-deployment incidents in Chevrolet Cobalt vehicles.

>   **b.     New GM continues to conceal the ignition switch defect.**

298.    Through the Valukas Report, New GM concedes, as it must, that it was aware of

the ignition switch defect giving rise to the ignition switch recalls from the date of its inception.

But, in an attempt to minimize the egregiousness of continuing concealment of the defect, it

makes several illogical claims.  Recently revealed evidence shows that the claims are false.

299.    ***First***, New GM claims that it was unaware of the fact that the movement of the

ignition from the "run" to the "accessory" position caused the airbags not to deploy – ***even***

***though***, as New GM concedes, its own engineers specifically designed the airbags to be disabled

when the ignition moves out of the run position.

300.    But recently-revealed evidence shows that (i) New GM likely was aware of this

connection from the date of its inception and (ii) was definitively aware of the connection no

later than 2010.  For example, in a case evaluation of the ███████crash, dated April 18, 2012,

GM's investigator concluded that:[45]



301.    ***Second***, New GM claims that – because it was unaware that the defect rendered

the airbags inoperable – it believed that the defect was a "customer convenience" issue and ***not*** a

safety issue.  In other words, according to New GM, no safety issues arise when a moving

vehicle stalls, loses its power steering and loses its power brakes.

---

[45] GM-MDL2543-000669092.002 (Highly Confidential).

302.    New GM's "customer convenience" claim was never credible – and the evidence now shows the falsity of the claim.

303.    So, for example, in March 2010, New GM recalled nearly 1.1 million Cobalt and Pontiac G5 vehicles with power steering defects.  In recalling these vehicles, New GM recognized that loss of power steering, standing alone, was grounds for a safety recall.  Yet, incredibly, New GM claims it did not view the ignition switch defect as a "safety issue," even though it admittedly knew that the ignition switch defect caused stalling and power brake failure *in addition to* the loss of power steering.  Despite its knowledge of the ignition switch defect, which caused a loss of power steering, New GM did not include the ignition switch defect in this recall.

304.    In the culture New GM inherited from Old GM and which did not begin to change until 2014, the Company emphasized the avoidance of recalls – not through an insistence on quality or spending on safety, but by avoiding the disclosure of safety issues and concealing safety issues of which the Company was aware.  Hence, in discussing the ignition switch issues, New GM avoided using the word "stall," in part to avoid the attention of regulators.  New GM also actively discouraged personnel from flagging the ignition switch defect (or any defect) as a safety issue that would require an immediate response under the TREAD Act.

305.    While New GM attempts to downplay the severity of its misconduct by blaming its failure on a lack of communication between "corporate silos," the truth is far more damning: New GM engaged in a prolonged and fraudulent cover-up of the ignition switch defect.

306.    But the ignition switch defect remained quite real, and quite dangerous, and New GM continued to receive reports of deadly accidents caused by the defect.

307.    On March 10, 2010, Brooke Melton was driving her 2005 Cobalt on a two-lane highway in Paulding County, Georgia.  While she was driving, her key turned from the "run" to the "accessory/off" position causing her engine to shut off.  After her engine shut off, she lost control of her Cobalt, which traveled into an oncoming traffic lane, where it collided with an oncoming car.  Brooke was killed in the crash.  New GM received notice of this incident, and knew or should have known the accident was caused by the ignition switch defect.

308.    On December 31, 2010, in Rutherford County Tennessee, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  New GM received notice of this incident, opened a file, and referred to it as the ███████████" incident, and knew the accident was caused by the ignition switch defect. ███ ███████████████████████████████████████████████████████████ ██ █████████████████████████████████████████████████.

309.    On December 31, 2010, in Harlingen, Texas, a 2006 Cobalt traveled off the road and struck a curb.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  New GM received notice of this incident, opened a file, and referred to it as the "Najera" incident.  New GM knew or should have known the accident was caused by the ignition switch defect.

310.    On March 22, 2011, Ryan Jahr, a New GM engineer, downloaded the SDM from Brooke Melton's Cobalt.  The information from the SDM download showed that the key in Brooke's Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash.  On June 24, 2011, Brooke Melton's parents, Ken and Beth Melton, filed a lawsuit against

New GM.  New GM knew or should have known the accident was caused by the ignition switch defect.

311.    In August 2011, New GM assigned Engineering Group Manager Brian Stouffer to assist with a Field Performance Evaluation that it had opened to investigate frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s.

312.    On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  New GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.  New GM knew or should have known the accident was caused by the ignition switch defect.

313.    In early 2012, Mr. Stouffer asked Jim Federico, who reported directly to Mary Barra, to oversee the Field Performance Evaluation investigation into frontal airbag non-deployment incidents.  Federico was named the "executive champion" for the investigation to help coordinate resources.

314.    In May 2012, New GM engineers tested the torque on numerous ignition switches of 2005-2009 Chevrolet Cobalt, 2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Saturn Ion vehicles that were parked in a junkyard.  The results of these tests showed that the torque required to turn the ignition switches from the "run" to the "accessory" or "off" position in most of these vehicles did not meet GM's minimum torque specification requirements.  These results were reported to Mr. Stouffer and other members of the Field Performance Evaluation team.

315.    In September 2012, Stouffer requested assistance from a "Red X Team" as part of the Field Performance Evaluation investigation.  The Red X Team was a group of engineers

- 143 -

within New GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s.  By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective ignition switch and airbag system.

316.    Indeed, Mr. Stouffer acknowledged in his request for assistance that the Chevrolet Cobalt could experience a power failure during an off-road event, or if the driver's knee contacted the key and turned off the ignition.  Mr. Stouffer further acknowledged that such a loss of power could cause the airbags not to deploy.

317.    At the time, New GM did not provide this information to NHTSA or the public.

318.    Acting NHTSA Administrator David Friedman recently stated, "at least by 2012, [New] GM staff was very explicit about an unreasonable risk to safety" from the ignition switches in the Defective Ignition Switch Vehicles involved in the February and March 2014 recalls.

319.    Mr. Friedman continued:  "[New] GM engineers knew about the defect. [New] GM lawyers knew about the defect.  But [New] GM did not act to protect Americans from the defect."

320.    There is significant evidence that multiple in-house attorneys also knew of and understood the ignition switch defect.  These attorneys, including Michael Milliken, negotiated settlement agreements with families whose loved ones had been killed and/or injured while operating a Defective Ignition Switch Vehicle.  In spite of this knowledge, New GM's attorneys concealed their knowledge and neglected to question whether the Defective Ignition Switch Vehicles should be recalled.  This quest to keep the ignition switch defect secret delayed its

- 144 -

public disclosure and contributed to increased death and injury as a result of the ignition switch defect, and also caused significant financial harm to Plaintiffs and members of the Class.

321.    The complaints from vehicle owners who experienced an ignition switch failure and a stall make it abundantly clear that New GM and ESIS knew that a safety defect was at issue:





322.    During the Field Performance Evaluation process, New GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory" or "off" position, it would not be a total solution to the problem.

323.    Indeed, the New GM engineers identified several additional ways to actually fix the problem.  These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of "run."  New GM rejected each of these ideas.

324.    The photographs below are of a New GM engineer in the driver's seat of a Cobalt during the investigation of Cobalt engine stalling incidents:



325.    These photographs show the dangerous position of the key in the lock module on the steering column, as well as the key with the slot, which allow the key fob to hang too low off the steering column.  New GM engineers understood that the key fob can be impacted and pinched between the driver's knee and the steering column, and that this will cause the key to inadvertently turn from the "run" to the "accessory" or "off" position.  The photographs show that the New GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem.  They also show why New GM engineers believed that additional changes (such as the shroud) were necessary to fix the defects with the ignition switch.

326.    The New GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem.  But New GM concealed – and continues to conceal – from the public the full nature and extent of the defects.

327.    On October 4, 2012, there was a meeting of the Red X Team during which Mr. Federico gave an update of the Cobalt airbag non-deployment investigation.  According to an email from Mr. Stouffer on the same date, the "primary discussion was on what it would take to keep the SDM active if the ignition key was turned to the accessory mode."  Despite this recognition by New GM engineers that the SDM should remain active if the key is turned to the

"accessory" or "off" position, New GM took no action to remedy the ignition switch defect or notify customers that the defect existed.

328.    During the October 4, 2012 meeting, Mr. Stouffer and other members of the Red X Team also discussed "revising the ignition switch to increase the effort to turn the key from Run to Accessory."

329.    On October 4, 2012, Mr. Stouffer emailed Ray DeGiorgio and asked him to "develop a high level proposal on what it would take to create a new switch for service with higher efforts."  On October 5, 2012, DeGiorgio responded:

> Brian,
>
> In order to provide you with a HIGH level proposal, I need to understand what my requirements are.  what is the TORQUE that you desire?
>
> Without this information I cannot develop a proposal.

330.    On October 5, Stouffer responded to DeGiorgio's email, stating:

> Ray,
>
> As I said in my original statement, I currently don't know what the torque value needs to be.  Significant work is required to determine the torque.  What is requested is a high level understanding of what it would take to create a new switch.

331.    DeGiorgio replied to Stouffer the following morning:

> Brian,
>
> Not knowing what my requirements are I will take a SWAG at the Torque required for a new switch.  Here is my level proposal
>
> **Assumption is 100 N cm Torque.**
>
> •       New switch design = Engineering Cost Estimate approx. $300,000
>
> •       Lead Time = 18 – 24 months from issuance of GM Purchase Order and supplier selection.

Let me know if you have any additional questions.

332.    Stouffer later admitted in a deposition that DeGiorgio's reference to "SWAG" was an acronym for "Silly Wild-Ass Guess."

333.    DeGiorgio's cavalier attitude exemplifies New GM's approach to the safety-related defects that existed in the ignition switch and airbag system in the Defective Ignition Switch Vehicles.  Rather than seriously addressing the safety-related defects, DeGiorgio's emails show he understood the ignition switches were contributing to the crashes and fatalities and he could not care less.

334.    It is also obvious from this email exchange that Stouffer, who was a leader of the Red X Team, had no problem with DeGiorgio's cavalier and condescending response to the request that he evaluate the redesign of the ignition switches.

335.    In December 2012, in Pensacola, Florida, Ebram Handy, a New GM engineer, participated in an inspection of components from Brooke Melton's Cobalt, including the ignition switch.  At that inspection, Handy, along with Mark Hood, a mechanical engineer retained by the Meltons, conducted testing on the ignition switch from Brooke Melton's vehicle, as well as a replacement ignition switch for the 2005 Cobalt.

336.    At that inspection, Handy observed that the results of the testing showed that the torque performance on the ignition switch from Brooke Melton's Cobalt was well below Old GM's minimum torque performance specifications.  Handy also observed that the torque performance on the replacement ignition switch was significantly higher than the torque performance on the ignition switch in Brooke Melton's Cobalt.

337.    On April 29, 2013, Ray DeGiorgio, the chief design engineer for the ignition switches in these Defective Ignition Switch Vehicles, was deposed.  At his deposition,

Mr. DeGiorgio was questioned about his knowledge of differences in the ignition switches in

early model-year Cobalts and the switches installed in later model-year Cobalts:

> Q. And I'll ask the same question. You were not aware before today that GM had changed the spring – the spring on the ignition switch had been changed from '05 to the replacement switch?
>
> MR. HOLLADAY: Object to the form. Lack of predicate and foundation. You can answer.
>
> THE WITNESS: I was not aware of a detent plunger switch change. We certainly did not approve a detent plunger design change.
>
> Q. Well, suppliers aren't supposed to make changes such as this without GM's approval, correct?
>
> A. That is correct.
>
> Q. And you are saying that no one at GM, as far as you know, was aware of this before today?
>
> MR. HOLLADAY: Object. Lack of predicate and foundation. You can answer.
>
> THE WITNESS: I am not aware about this change.

338.    When Mr. DeGiorgio testified, he knew that he personally had authorized the

ignition switch design change in 2006, but he stated unequivocally that no such change had

occurred.

> **c.    New GM received many complaints of power failures in Defective Ignition Switch Vehicles.**

339.    Throughout the entirety of its corporate existence, New GM received numerous

and repeated complaints of moving engine stalls and/or power failures. These complaints are yet

more evidence that New GM was fully aware of the ignition switch defect and should have

announced a recall much sooner than it did.

340.    New GM was aware of these problems year after year and nationwide, as

reflected not only by the internal documents reflecting knowledge and cover-up at high levels,

but in the thousands of customer complaints, some of which are reflected in the common fact patterns presented by the experiences of the named plaintiffs (as discussed above), but also, and not by way of limitation, by New GM's internal complaint logs and other documents.

341.    To demonstrate the pervasiveness and consistency of the problems, and by way of examples, New GM received and reviewed complaints of safety issues from Class Members with Defective Ignition Switch Vehicles in Puerto Rico and in the States of Alaska, Arkansas, Connecticut, Delaware, Hawaii, Indiana, Kansas, Massachusetts, Montana, Nebraska, Nevada, New Hampshire, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Virginia, and Vermont.  Documents produced by New GM show that New GM was aware of customer complaints of stalling Defective Ignition Switch Vehicles in all of these states and territories. New GM opened at least 38 complaint files between September 2009 and February 2014. Further, in December 2010, GM closed at least 40 complaint files – which Old GM had opened before the bankruptcy sale in July 2009 – without disclosing the safety defect to the customers, thus further indicating that Old GM's knowledge of these Defective Ignition Switch Vehicles carried over to New GM.

342.    New GM was certainly put on notice of safety issues with power steering.

343.    In the September 14, 2009 email a customer writes:



344.    During the years 2010 to the present, GM's Technical Assistance Center received

hundreds, if not thousands, of complaints concerning stalling or misperforming vehicles due to

ignition issues, including "heavy key chains."

345.    Within the complaint files which GM closed after the bankruptcy sale – those

opened both before and after the bankruptcy sale – at least six customers complained they did not

feel safe in their vehicles because of the stalling.  Three customers described accidents caused by

stalling.  The airbags did not deploy in one of these accidents.

346.    Another customer, who contacted New GM in February 2014, complained that he

was aware that people were dying from this defect and that he refused to risk the lives of himself,

his wife, and his children.  He was nearly rear-ended when his vehicle stalled at 60 mph.

347.    Finally, a customer contacted New GM in January 2011 complaining that he had

read various online forums describing the stalling problem and expressing his outrage that New

GM had done nothing to solve the problem.  This customer's car stalled at 65 mph on the

Interstate.

---

[46] MDL Ex. 54 (GM-MDL2543-004702427) (Highly Confidential).

      **d.**    **New GM recalls 2.1 million vehicles with defective ignition switches in February and March of 2014.**

348.    Under continuing pressure to produce high-ranking employees for deposition in the Melton litigation, New GM's Field Performance Review Committee and Executive Field Action Decision Committee ("Decision Committee") finally decided to order a recall of *some* vehicles with defective ignition switches on January 31, 2014.

349.    Initially, the Decision Committee ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007, and those were the only cars included in the first recall ordered in February 2014.

350.    After additional analysis, the Decision Committee expanded the recall on February 24, 2014 to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

351.    Public criticism in the wake of these recalls was withering.  On March 17, 2014, Mary Barra issued an internal video, which was broadcast to employees.  In the video, Ms. Barra admits:

> Scrutiny of the recall has expanded beyond the review by the federal regulators at NHTSA, the National Highway Traffic Safety Administration.  As of now, two congressional committees have announced that they will examine the issue.  And it's been reported that the Department of Justice is looking into this matter. . . . These are serious developments that shouldn't surprise anyone.  After all, something went wrong with our process in this instance and terrible things happened.

352.    The public backlash continued and intensified.  Eventually, GM expanded the ignition switch recall yet again on March 28, 2014.  This expansion covered all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky.  The expanded recall brought the total number of vehicles recalled for defective ignition switches to 2,191,146.

353.     Several high-ranking New GM employees were summoned to testify before Congress, including Ms. Barra and executive vice president and in-house counsel Michael Milliken.  Further, in an effort to counter the negative backlash, New GM announced that it had hired Anton R. Valukas to conduct an internal investigation into the decade-long concealment of the ignition switch defect.

354.     As individuals came forward who had been injured and/or whose loved ones were killed in the Defective Ignition Switch Vehicles, the public criticism continued.  Under intense, continuing pressure, New GM agreed in April 2014 to hire Ken Feinberg to design and administer a claims program in order to compensate certain victims who were injured or killed in the Defective Ignition Switch Vehicles.  Ms. Barra explained to Congress:  "[W]e will make the best decisions for our customers, recognizing that we have legal obligations and responsibilities as well as moral obligations.  We are committed to our customers, and we are going to work very hard to do the right thing for our customers."

355.     New GM's compensation of such individuals, however, was limited to the protocol set forth in the Feinberg Compensation Fund.  In the courts, New GM has taken the position that any accident that occurred prior to its bankruptcy is barred by the bankruptcy sale order.  In addition, New GM has argued that it has no responsibility whatsoever for the manufacture and sale of any vehicle prior to July 10, 2009.  This position is obviously inconsistent with the statements Ms. Barra provided to Congress and the public at large.

**3.     New GM recalls over 10 million additional vehicles for ignition switch defects in June and July of 2014.**

356.     Following the waves of negative publicity surrounding New GM's recall of the first 2.1 million Defective Ignition Switch Vehicles, New GM was forced to issue a series of

additional recalls for more than 10 million additional Defective Ignition Switch Vehicles, as summarized below.

357.    Even so, safety regulators received dozens of complaints of moving stalls and/or power failures in the vehicles covered by New GM's June and July 2014 recalls; New GM still did nothing.

358.    NHTSA's website contains more than 100 complaints about vehicle stalls for the 2006-2009 Impalas alone.  In one 2012 complaint, an Impala stalled in the middle of a large intersection.  The owner took it to a dealer four times but could not get it repaired.  The complainant stated, "I'm fearful I will be the one causing a fatal pile-up."

359.    New GM admits knowing that ignition switch defects have been linked to at least three deaths and eight injuries in the vehicle model years covered by its June and July recalls.  The fatal accidents occurred in 2003 and 2004 Chevrolet Impalas in which the airbags failed to deploy.

### a.    June 19, 2014 Recall – Camaro Recall

360.    On June 19, 2014, New GM recalled 464,712 model year 2010 through 2014 Chevrolet Camaro vehicles in the United States (NHTSA Recall Number 14V-346).

361.    The great majority of the defective Camaros were sold by New GM, though some indeterminate number of the 117,959 model year 2010 Camaros were manufactured by Old GM, and some smaller number were sold by Old GM.

362.    According to the recall notice, the driver of an affected Camaro may accidentally hit the ignition key with his or her knee, unintentionally knocking the key out of the "run" position and turning off the engine.  If the key is not in the "run" position, the airbags may not deploy during a collision.  Additionally, when the key is moved out of the "run" position, the vehicle will experience a loss of engine power, loss of power steering, and loss of power brakes.

363.    Between 2010 and 2014, NHTSA received numerous complaints of power failures in 2010-2014 Camaros.  These complaints started as early as January 2010, months after New GM's formation.

364.    One complainant described an incident in which his model year 2010 Camaro lost all power while he was driving 55-65 mph down a mountain road in heavy traffic.  The complainant was able to stop the vehicle by jamming it into a guardrail.  He stated that he was lucky he was not killed.  When he notified his dealership, however, they told him there was nothing wrong with the vehicle.

365.    Another complainant, in May 2010, described several instances in which his moving Camaro's power failed, including one instance in which he was driving on the highway at 70 mph.  This complainant concluded his report by asking, "Will I have a head[-]on collision while trying to pass another car?"

366.    Between 2010 and 2014, NHTSA received numerous complaints reporting engine stalls during normal and regular Camaro operations.

367.    For example, on May 3, 2010, New GM became aware of a complaint filed with NHTSA involving a 2010 Camaro in which the following was reported:

> WHILE DRIVING TO THE DEALERSHIP IN BROOKDALE,
> MN. ON FREEWAY APPROX 70MPH WHEN CAR
> COMPLETELY GOES DEAD. QUICKLY I PUT IT IN
> NEUTRAL AND TURNED IT BACK ON AND COMPLAINED
> TO DEALER. DRIVING IN ST CLOUD,MN AT INTOWN
> SPEEDS WHEN THE CAR SHUTS DOWN AGAIN. THEN IT
> ALSO SHUT DOWN TWICE ON ME IN BRAINERD, MN AT
> A SPEED OF 50MPH WHILE DRIVING NORMAL. THEN ON
> 3 MAY 2010 I WAS GOING AROUND A CURVE WITH 2
> FRIENDS WHEN IT AGAIN SHUT DOWN AT
> APPROXIMATELY 60 MPH. THIS TIME WHILE ON THE
> CURVE I WENT INTO THE DITCH AND HIT A MAIL BOX.
> THUS CAUSING DAMAGE TO THE RIGHT FRONT OF THE
> CAR. THE CAR WAS TOWED AND IS PRESENTLY AT THE

- 156 -

DEALERSHIP IN BRAINERD, MN. THIS CAR IS TO
DANGEROUS TO DRIVE; WILL I HAVE A HEAD[-]ON
COLLISION WHILE TRYING TO PASS ANOTHER CAR?

368.    On October 20, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

2010 CHEVROLET CHEVY CAMARO V6, SUDDEN LOSS OF
POWER, COMPLETE ELECTRICAL FAILURE, AND ENGINE
SHUTDOWN WHILE DRIVING 30 MPH IN SUBDIVISION.
PULLED TO SIDE OF ROAD. TURNED CAR "OFF" AND
BACK ON. DROVE TO DEALER WHO SAID THEY COULD
FIND NO PROBLEM AND NOTHING RECORDED IN CAR'S
COMPUTER. GOOGLED RECALL OF V8 TO SHOW
DEALER, BUT DEALER SAID THIS WAS UNRELATED.

369.    On March 6, 2012, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

WHILE DRIVING VEHICLE FIRST SHUT OFF AT A RED
LIGHT FOR NO REASON ON FEB 28 2012 SAME INCIDENT
ON MARCH 1ST SHUT OFF A RED LIGHT THIRD TIME IT
WAS WHILE DRIVING 10 MPH MAKING A TURN IN A
PARKING SPOT. WAS ABLE TO TURN BACK CAR ON
WITH NO PROBLEMS BUT IT IS OF GREAT CONCERN
NOW IF THIS SHOULD HAPPEN AT A HIGH SPEED I AM
SURE CAR CAN CAUSE INJURIES TO OTHERS AS WELL
AS MYSELF.

370.    On October 9, 2012, New GM became aware of a complaint filed with NHTSA

involving a 2012 Camaro in which the following was reported:

THE CONTACT OWNS A 2012 CHEVROLET CAMARO. THE
CONTACT STATED THAT WHILE DRIVING 50 MPH, THE
VEHICLE STALLED WITHOUT WARNING. THE CONTACT
WAS ABLE TO RESTART THE VEHICLE. THE
MANUFACTURER WAS CONTACTED AND HAD THE
VEHICLE TOWED TO A LOCAL DEALER. THE DEALER
RESET THE COMPUTER BUT THE REPAIR DID NOT
REMEDY THE ISSUE. THE CONTACT TOOK THE VEHICLE
BACK TO THE DEALER WHERE THE DEALER RESET THE
COMPUTER A SECOND TIME. THE DEALER ALSO DROVE
THE VEHICLE FOR ONE HUNDRED MILES AND COULD
NOT DUPLICATE THE STALLING ISSUE. THE VEHICLE

- 157 -

CONTINUED TO STALL SPORADICALLY. THE FAILURE
MILEAGE WAS 4,200.

371.   On July 3, 2013, New GM became aware of a complaint filed with NHTSA

involving a 2013 Camaro in which the following was reported:

> THE CONTACT OWNS A 2013 CHEVROLET CAMARO. THE
> CONTACT STATED THAT WHILE DRIVING
> APPROXIMATELY 55 MPH, THE VEHICLE STALLED
> WITHOUT WARNING. THE CONTACT MENTIONED THAT
> THE FAILURE WOULD RECUR INTERMITTENTLY. THE
> VEHICLE WAS TAKEN TO A DEALER FOR A DIAGNOSTIC
> WHERE THE FAILURE WAS UNABLE TO BE REPLICATED.
> THE MANUFACTURER WAS NOTIFIED OF THE FAILURE.
> THE APPROXIMATE FAILURE MILEAGE WAS 1,460 AND
> THE CURRENT MILEAGE WAS 1,800.

372.   On August 4, 2013, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

> I PURCHASED MY 2010 CHEVY CAMARO 2SS, IN
> FEBRUARY OF 2012. IT HAD 4,400 MILES ON IT. ABOUT A
> MONTH OR TWO, AFTER I BOUGHT IT, IT COMPLETELY
> SHUT OFF ON ME, ON A MAJOR HIGHWAY, WHILE
> DOING 65 MPH. I THREW IT INTO NEUTRAL AND TURNED
> THE KEY AND IT STARTED RIGHT BACK UP. ABOUT A
> MONTH AFTER THAT, I WAS DOING ABOUT 20MPH ON A
> BACK ROAD AND IT DID THE SAME EXACT THING. JUST
> RECENTLY, ABOUT 2 WEEKS AGO, I WAS IN 6TH GEAR,
> ON CRUISE DOING 60MPH AND I FELT THE CAR "JERK"
> OR BUCK" A LITTLE BIT. FOLLOWED IMMEDIATELY BY
> THE CAR DECELERATING. I DOWN-SHIFTED TO 4TH
> GEAR AND WAS GIVING IT GAS, BUT STILL WOULDN'T
> SPEED UP. IT FELL DOWN TO ABOUT 40MPH, BEFORE
> FINALLY CATCHING ITSELF AND SPEEDING BACK UP.
> ABOUT A MILE LATER, I GOT OFF MY EXIT AND WAS
> COMING DOWN TO THE STOP SIGN,WHEN ALL THE
> INDICATOR LIGHTS CAME ON FOR ABOUT 10 SECONDS.
> THEY WENT OFF AND I MADE A LEFT HAND TURN AND
> WENT ABOUT A MILE UP THE ROAD. AT THAT POINT,
> THE CAR COMPLETELY SHUT OFF DOING ABOUT 35MPH.
> THERE WAS HEAVY TRAFFIC, SO I PULLED OVER AND
> STARTED IT BACK UP. I CALLED THE CHEVY
> DEALERSHIP, WHERE I BOUGHT IT FROM, AND THEY
> HAD NO OPENINGS FOR A WEEK. SO I TOOK IT LAST

WEEK TO GET IT CHECKED AND THEY FOUND NOTHING
THAT COULD HAVE CAUSED IT, THEY SAY. I AM VERY
UPSET, BUT VERY THANKFUL THAT MY TWO CHILDREN
WERE NOT WITH ME WHEN IT HAPPENED. I AM
CURRENTLY CONTEMPLATING TRADING IT IN, CUZ I AM
WORRIED THAT IF IT HAPPENS AGAIN,AND MY
CHILDREN ARE IN THE CAR, THAT IT MIGHT SHUT OFF
IN VERY CONGESTED BUMPER TO BUMPER TRAFFIC, ON
THE HIGHWAY AT NIGHT, AND A TRACTOR TRAILER IS
BEHIND ME AND I CAN'T GET IT STARTED OR SOMEONE
DOESN'T SEE ME CUZ MY LIGHTS WOULD BE OFF. THE
THOUGHT OF THAT COMPLETELY SCARES ME.

373.    On September 28, 2013, New GM became aware of a complaint filed with

NHTSA involving a 2010 Camaro in which the following was reported:

THE CONTACT OWNS A 2010 CHEVROLET CAMARO. THE
CONTACT STATED THAT WHILE DRIVING 5 MPH AND
MAKING A TURN, THE VEHICLE STALLED WITHOUT
WARNING. THE CONTACT WAS ABLE TO RESTART THE
VEHICLE BUT THE FAILURE RECURRED. THE VEHICLE
WAS TAKEN TO A DEALER WHO PERFORMED A
DIAGNOSTIC AND REPLACED A COMPONENT TO
CORRECT THE FAILURE. THE CONTACT WAS UNABLE
TO DETERMINE THE EXACT COMPONENT HOWEVER,
THE FAILURE RECURRED WITHOUT WARNING. THE
VEHICLE WAS TAKEN TO DEALER HOWEVER, NO
FAILURE WAS DETERMINED. THE MANUFACTURER WAS
MADE AWARE OF THE ISSUE AND AN INCIDENT
RECORDER WAS INSTALLED ON THE VEHICLE TO
DETERMINE ANY FUTURE FAILURES. THE FAILURE
MILEAGE WAS 23,000. THE CURRENT MILEAGE WAS
24,000.

374.     On October 2, 2013, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

I REACHED OUT TO [XXX], GM CEO ON MAY 24, 2013
WITH A STRONG CONCERNS OF POWER FAILURE FOR
THE 2ND TIME WHILE DRIVING THE VEHICLE; CAUSING
ME NOT TO HAVE CONTROL WHILE THE VEHICLE WAS
DRIVEN. THUS IT WAS ALSO NOTED THAT I ORIGINALLY
REACHED OUT TO GM TO REQUEST A REPLACED
VEHICLE WHILE MY VEHICLE WAS UNDER WARRANTY
DUE TO THE VEHICLE LOSING POWER ON A MAJOR

FREEWAY; WHICH WAS LIFE THREATENING; HOWEVER
THE RESPONSE BACK FROM GM WAS A DECLINED
LETTER THAT I RECEIVED ENSURING ME THAT THE
VEHICLE WAS SAFE TO DRIVE. I TRAVEL MAJOR
FREEWAYS AS PART OF CAREER SO HAVING A
RELIABLE VEHICLE IS IMPERATIVE AS FOR I VALUE MY
LIFE. [XXX], SENIOR VICE PRESIDENT OF GLOBAL
QUALITY & CUSTOMER EXPERIENCE HAS NOT
RETURNED MY CALLS AND NOW GM IS ALSO NOT
HONORING THE WARRANTY TOO. AFTER ASSISTING ME
WITH MY CAR FOR 5 MONTHS .PLEASE NOT MY 2010
CAMARO SS IS PARK AS FOR IT'S NOT SAFE TO DRIVE.
GM OFFER ME A CONTRACT TO SIGN THAT WOULD
GUARANTEE "NO FAULT TO GM ". I COULDN'T NOT DUE
THEM SHOULD MY CAMARO HARM MYSELF OR OTHERS
WHILE DRIVING IT. ADDITIONALLY, I WAS TOLD THAT
GM KNOWS THERE IS A PROBLEM WITH THE CAMARO
BUT CAN'T FIND THE PROBLEM. IT'S HAS BEEN NOTED
THAT THE CORRECTIONS THAT I NEED TO HAVE MADE
IN ORDER TO BE SAFE IN THE GM VEHICLE CANNOT BE
OBTAINED AS FOR MY VEHICLE HAS BEEN KEEP CHEVY
FOR SHOP 5 MONTHS. ….

375.    On October 16, 2013, New GM became aware of a complaint filed with NHTSA

concerning a 2013 Camaro, in which the following was reported:

THE CONTACT OWNS A 2013 CHEVROLET CAMARO. THE
CONTACT STATED THAT WHILE MAKING A U-TURN, THE
VEHICLE STALLED WITHOUT WARNING. THE VEHICLE
WAS NOT TAKEN TO A DEALER FOR DIAGNOSIS OF THE
FAILURE. THE MANUFACTURER WAS NOT NOTIFIED OF
THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE
APPROXIMATE FAILURE AND CURRENT MILEAGE WAS
830.

376.    On April 20, 2014, New GM became aware of a complaint filed with NHTSA

concerning a 2014 Camaro, in which the following was reported:

AS I WAS TURNING THE CORNER ON TO WOODWARD
AVENUE MY CAR JUST SHUT DOWN. THE CAR WENT
TOTALLY BLACK AND SHUT DOWN IN THE MIDDLE OF
THE TURN ON THIS VERY BUSY-MAIN THOROUGHFARE.

377.    On April 30, 2014, New GM became aware of a complaint filed with NHTSA concerning a 2014 Camaro, in which the following was reported:

> WITHIN TWO WEEKS AFTER PURCHASING MY CAR IT STALLED TWICE--BOTH WHEN STOPPED AT RED LIGHTS. I TOOK CAR TO DEALERSHIP AND THEY DID A ROAD TEST BUT COULD NOT REPLICATE. ON 4/9/2014 I WAS MAKING A RIGHT HAND TURN AND THE CAR STALLED IN THE MIDDLE OF THE INTERSECTION. I RESTARTED THE CAR, DROVE TO MY OFFICE AND THE CAR STALLED WHEN TURNING INTO THE PARKING GARAGE AND AGAIN WHEN TURNING INTO THE PARKING SPACE. TOOK TO THE DEALERSHIP THE FOLLOWING DAY AND THEY KEPT FOR AN EXTENDED TEST DRIVE BUT COULD NOT REPLICATE THE PROBLEM. SINCE THERE WERE NOT ANY CODES THE CAR WAS RETURNED TO ME.

378.    On May 6, 2014, New GM became aware of a complaint filed with NHTSA concerning a 2014 Camaro, in which the following was reported:

> DRIVING ON CRUISE CONTROL. KNEE BUMPED KEY, ENGINE TURNED OFF AT 60 MPH. POWER STEERING AND BRAKES STILL WORKED, BUT ENGINE WAS OFF.

379.    On May 9, 2014, New GM became aware of a complaint filed with NHTSA involving a 2013 Camaro, in which the following was reported:

> THE CONTACT INDICATED WHILE TRAVELING 60 MPH ON A MAJOR HIGHWAY, THE VEHICLE STALLED WITHOUT WARNING. THE CONTACT WAS ABLE TO MOVE THE VEHICLE OVER TO THE SHOULDER AND AFTER SEVERAL ATTEMPTS THE VEHICLE WAS ABLE TO RESTART. THE VEHICLE WAS TO BE FURTHER INSPECTED, DIAGNOSED AND REPAIRED BY AN AUTHORIZED DEALER BUT IT WAS NOT REPAIRED. THE CONTACT WAS NOTIFIED OF NHTSA CAMPAIGN ID NUMBER: 14V346000 (ELECTRICAL SYSTEM) AFTER EXPERIENCING THE FAILURE MULTIPLE TIMES AND WAS WAITING FOR PARTS TO GET THE VEHICLE REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 28,000.

380.    On May 19, 2014, New GM became aware of a complaint filed with NHTSA involving a 2013 Camaro, in which the following was reported:

> WHILE DRIVING DOWN I 75 IN OCALA FLORIDA CAR
> STALLED IN MIDDLE OF HIGHWAY . I PULLED OVER TO
> SHOULDER AND HAD TO RESTART CAR. I TOOK IT IN TO
> A DEALER AND THEY SAID THEY COULD NOT FIND ANY
> THING WRONG. THEY SAID TAKE THE CAR.

381.    On May 20, 2014, New GM became aware of a complaint filed with NHTSA involving a 2012 Camaro, in which the following was reported:

> WHEN THE IGNITION SWITCH/ KEY IS SLIGHTLY
> BUMPED WITH KNEE, THE CAR SHUTS OFF. THREE
> TIMES NOW. DEALERSHIP NOT RESPONSIVE. TAUGHT
> MY TEEN DRIVERS WHAT TO DO IF THIS HAPPENS AND
> THIS SAVED MY DAUGHTER'S LIFE WHEN IT HAPPENED
> TO HER.

382.    Astoundingly, the *sole* remedy provided by New GM in its recall will be to "remove the key blade from the original flip key/RKE transmitter assemblies provided with the vehicle, and provide two new keys and two key rings per key."

383.    The proposed "remedy" is insufficient, because it does not address (i) the poor placement of the ignition switch such that the keys are vulnerable to being "kneed" by the driver; (ii) the airbag algorithm that can render the airbags inoperable *even when the vehicles are travelling at a high speed*; and (iii) the possible need for a new switch with higher torque.

384.    Indeed, on July 31, 2014, after the recall was announced, New GM became aware of a complaint filed with NHTSA involving a 2014 Camaro, in which the following was reported:

> I WAS TURNING ONTO THE HIGHWAY THAT THE SPEED
> LIMIT IS 65 MPH FROM A SIDE ROAD. I WAITED FOR
> ONCOMING TRAFFIC TO PASS AND THEN PULLED OUT.
> AS I PULLED OUT, TURNING RIGHT, MY CAR HAD A
> SUDDEN LOSS OF POWER. I TRIED TO RESTART AND IT
> WOULD NOT RESTART. I HAD DIFFICULTY PULLING

- 162 -

OVER TO THE SIDE OF THE ROAD DUE TO THE STEERING
WHEEL BEING STIFF AND HARD TO HANDLE. AFTER I
GOT TO THE SIDE OF THE ROAD, I WAS ABLE TO
RESTART MY CAR. I ***DID NOT BUMP THE IGNITION
SWITCH WHEN THIS HAPPENED EITHER***.  [Emphasis
added.]

b.      **June 20, 2014 recall – ignition key slot defect.**

385.    On June 20, 2014, New GM recalled 3,141,731 vehicles in the United States for

ignition switch, or ignition key slot, defects (NHTSA Recall Number 14V-355).  New GM

announced to NHTSA and the public that the recall concerns an ignition key slot defect.

386.    2,349,095 of the vehicles subject to this recall were made by Old GM.  792,636

vehicles were made and/or sold by New GM.

387.    The following vehicles were included in the June 20, 2014 recall:  2005-2009

Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac

DTS, 2006-2011 Buick Lucerne, and 2006-2008 Chevrolet Monte Carlo.

388.    The recall notice states, "In the affected vehicles, the weight on the key ring

and/or road conditions or some other jarring event may cause the ignition switch to move out of

the run position, turning off the engine."

389.    Further, "[i]f the key is not in the run position, the air bags may not deploy if the

vehicle is involved in a crash, increasing the risk of injury.  Additionally, a key knocked out of

the run position could cause loss of engine power, power steering, and power braking, increasing

the risk of a vehicle crash."

390.    Well before conducting the June 2014 recall, New GM was aware of hundreds of

complaints at its Technical Assistance Center ███████████████████████████████████

████████████████████.[47]

---

[47] *See, e.g.*, GM-MDL2543-00011834-35.

391.   The vehicles included in this recall were built on the same platform and their defective ignition switches are likely due to weak detent plungers, just like the Cobalt and other Defective Ignition Switch Vehicles recalled in February and March of 2014.

392.   New GM was aware of the ignition switch defect in these vehicles from the date of its inception on July 11, 2009, as it acquired on that date all of the knowledge possessed by Old GM given the continuity in personnel, databases, and operations from Old GM to New GM. In addition, New GM acquired additional information thereafter.  The information, all of which was known to New GM, included the following facts:

a.   On or about August 25, 2005, Laura Andres, an Old GM design engineer (who remains employed with New GM), wrote a description of ignition switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway.  Ms. Andres stated, "While driving home from work on my usual route, I was driving about 45 mph, where the road changes from paved to gravel & then back to paved, some of the gravel had worn away, and the pavement acted as a speed bump when I went over it.  The car shut off.  I took the car in for repairs.  The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off."

b.   Old GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' account on August 25, 2005 to four Old GM employees.  Mr. Dickinson asked, "Is this a condition we would expect to occur under some impacts?"

c.   On August 29, 2005, Old GM employee Jim Zito forwarded the messages to Ray DeGiorgio and asked, "Do we have any history with the ignition switch as far as it being sensitive to road bumps?"

- 164 -

     d.     Mr. DeGiorgio responded the same day, stating, "To date there has never been any issues with the detents being too light."

     e.     On August 30, 2005, Ms. Andres sent an email to Old GM employee Jim Zito and copied ten other Old GM employees, including Ray DeGiorgio. Ms. Andres, in her email, stated, "I picked up the vehicle from repair. No repairs were done. . . . The technician said there is nothing they can do to repair it. He said it is just <u>the design of the switch</u>. He said other switches, like on the trucks, have a stronger detent and don't experience this."

     f.     Ms. Andres' email continued: "I think this is a serious safety problem, especially if this switch is on multiple programs. I'm thinking big recall. I was driving 45 mph when I hit the pothole and the car shut off and I had a car driving behind me that swerved around me. I don't like to imagine a customer driving with their kids in the back seat, on I-75 and hitting a pothole, in rush-hour traffic. I think you should seriously consider changing this part to a switch with a stronger detent."

393.     On or after July 11, 2009, senior executives and engineers at New GM knew that some of the information relayed to allay Ms. Andres' concerns was inaccurate. For example, Ray DeGiorgio knew that there had been "issues with detents being too light." Instead of relaying those "issues," Mr. DeGiorgio falsely stated that there were no such "issues."

394.     New GM has tried to characterize the recall of these 3.14 million vehicles as being different than the recall for the ignition switch defect in the Cobalts and other Defective Ignition Switch Vehicles when in reality and for all practical purposes it is for exactly the same defect that creates exactly the same safety risks. New GM has attempted to label and describe the ignition key slot defect as being different in order to provide it with cover and an explanation

for why it did not recall these 3.14 million vehicles much earlier, and why it is not providing a

new ignition switch for the 3.14 million vehicles.

395.    From 2001 to the present, Old GM and New GM received numerous reports from

consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect.  The

following are examples of just a few of the many reports and complaints regarding the defect that

New GM knew at the time it came into existence or knew post sale:

396.    A January 23, 2001 complaint filed with NHTSA involving a 2000 Cadillac

Deville and an incident that occurred on January 23, 2001, in which the following was reported:

> COMPLETE ELECTRICAL SYSTEM AND ENGINE
> SHUTDOWN WHILE DRIVING. HAPPENED THREE
> DIFFERENT TIMES TO DATE. DEALER IS UNABLE TO
> DETERMINE CAUSE OF FAILURE. THIS CONDITION
> DEEMED TO BE EXTREMELY HAZARDOUS BY OWNER.
> NHTSA ID Number: 739850.

397.    A June 12, 2001 complaint filed with NHTSA involving a 2000 Cadillac Deville

and an incident that occurred on June 12, 2001, in which the following was reported:

> INTERMITTENTLY AT 60MPH VEHICLE WILL STALL OUT
> AND DIE. MOST TIMES VEHICLE WILL START UP
> IMMEDIATELY AFTER. DEALER HAS REPLACED MAIN
> CONSOLE 3 TIMES, AND ABS BRAKES. BUT, PROBLEM
> HAS NOT BEEN CORRECTED. MANUFACTURER HAS
> BEEN NOTIFIED.*AK  NHTSA ID Number: 890227.

398.    A January 27, 2003 complaint filed with NHTSA involving a 2001 Cadillac

Deville and an incident that occurred on January 27, 2003, in which the following was reported:

> WHILE DRIVING AT HIGHWAY SPEED ENGINE SHUT
> DOWN, CAUSING AN ACCIDENT. PLEASE PROVIDE ANY
> ADDITIONAL INFORMATION.*AK  NHTSA ID Number:
> 10004759.

399.    A September 18, 2007 complaint filed with NHTSA involving a 2006 Chevrolet

Impala and an incident that occurred on September 15, 2006, in which it was reported that:

- 166 -

TL*THE CONTACTS SON OWNS A 2006 CHEVROLET
IMPALA. WHILE DRIVING APPROXIMATELY 33 MPH AT
NIGHT, THE CONTACTS SON CRASHED INTO A STALLED
VEHICLE. HE STRUCK THE VEHICLE ON THE DRIVER
SIDE DOOR AND NEITHER THE DRIVER NOR THE
PASSENGER SIDE AIR BAGS DEPLOYED. THE DRIVER
SUSTAINED MINOR INJURIES TO HIS WRIST. THE
VEHICLE SUSTAINED MAJOR FRONT END DAMAGE. THE
DEALER WAS NOTIFIED AND STATED THAT THE CRASH
HAD TO HAVE BEEN A DIRECT HIT ON THE SENSOR. THE
CURRENT AND FAILURE MILEAGES WERE 21,600. THE
CONSUMER STATED THE AIR BAGS DID NOT DEPLOY.
THE CONSUMER PROVIDED PHOTOS OF THE VEHICLE.
UPDATED 10/10/07 *TR NHTSA ID Number: 10203350.

400.    An April 2, 2009 complaint filed with NHTSA involving a 2005 Buick LaCrosse

and an incident that occurred on April 02, 2009, in which the following was reported:

POWER STEERING WENT OUT COMPLETELY, NO
WARNING JUST OUT. HAD A VERY HARD TIME
STEERING CAR. LUCKY KNOW ONE WAS HURT. *TR
NHTSA ID Number: 10263976.

401.    New GM continued to receive reports regarding the defect.  For example, on

February 15, 2010, New GM became aware of a complaint filed with NHTSA involving a 2008

Buick LaCrosse and an incident that occurred on February 13, 2010, in which a driver reported:

WHILE DRIVING AT 55MPH I RAN OVER A ROAD BUMP
AND MY 2008 BUICK LACROSSE SUPER SHUT
OFF(STALLED). I COASTED TO THE BURM, HIT BRAKES
TO A STOP. THE CAR STARTED ON THE FIRST TRY.
CONTINUED MY TRIP WITH NO INCIDENCES. TOOK TO
DEALER AND NO CODES SHOWED IN THEIR COMPUTER.
CALLED GM CUSTOMER ASSISTANCE AND THEY GAVE
ME A CASE NUMBER. NO BULLETINS. SCARY TO DRIVE.
TRAFFIC WAS LIGHT THIS TIME BUT MAY NOT BE THE
NEXT TIME. *TR.  NHTSA ID Number: 10310692.

402.    On April 21, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick Lucerne and an incident that occurred on March 22, 2010, in which the

following was reported:

06 BUICK LUCERNE PURCHASED 12-3-09, DIES OUT
COMPLETELY WHILE DRIVING AT VARIOUS SPEEDS.
THE CAR HAS SHUT OFF ON THE HIGHWAY 3 TIMES
WITH A CHILD IN THE CAR. IT HAS OCCURRED A TOTAL
OF 7 TIMES BETWEEN 1-08-10 AND 4-17-10. THE CAR IS
UNDER FACTORY WARRANTY AND HAS BEEN
SERVICED 7 TIMES BY 3 DIFFERENT BUICK
DEALERSHIPS. *TR  NHTSA ID Number: 10326754.

403.    On April 29, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2005 Buick LaCrosse and an incident that occurred on March 21, 2010, in which it

was reported that:

TRAVELING ON INTERSTATE 57 DURING DAYTIME
HOURS. WHILE CRUISING AT 73 MILES PER HOUR IN THE
RIGHT HAND LANE, THE VEHICLE SPUTTERED AND
LOST ALL POWER. I COASTED TO A STOP OFF THE SIDE
OF THE ROAD. I RESTARTED THE VEHICLE AND
EVERYTHING SEEMED OK, SO I CONTINUED ON. A
LITTLE LATER IT SPUTTERED AGAIN AND STARTED
LOSING POWER. THE POWER CAME BACK BEFORE IT
CAME TO A COMPLETE STOP. I CALLED ON STAR FOR A
DIAGNOSTIC CHECK AND THEY TOLD ME I HAD A FUEL
SYSTEM PROBLEM AND THAT IF THE CAR WOULD RUN
TO CONTINUE THAT IT WAS NOT A SAFETY ISSUE. THEY
TOLD ME TO TAKE IT TO A DEALER FOR REPAIRS WHEN
I GOT HOME. I TOOK THE CAR WORDEN-MARTEN
SERVICE CENTER FOR REPAIRS ON MARCH 23RD. TO
REPAIR THE CAR THEY: 1.REPLACED CAT CONVERTER
AND OXYGEN SENSOR 125CGMPP- $750.47 A SECOND
INCIDENT OCCURRED WHILE TRAVELING ON
INTERSTATE 57 DURING DAYTIME HOURS. I WAS
PASSING A SEMI TRACTOR TRAILER WITH THREE CARS
FOLLOWING ME WHILE CRUISING AT 73 MILES PER
HOUR WHEN THE VEHICLE SPUTTERED AND LOST ALL
POWER PUTTING ME IN A VERY DANGEROUS
SITUATION. THE VEHICLE COASTED DOWN TO ABOUT
60 MILES PER HOUR BEFORE IT KICKED BACK IN. I IN
THE MEAN TIME HAD DROPPED BACK BEHIND THE SEMI
WITH THE THREE CARS BEHIND ME AND WHEN I COULD
I PULLED BACK INTO THE RIGHT HAND LANE. THIS WAS
A VERY DANGEROUS SITUATION FOR ME AND MY WIFE.
I CALLED ON STAR FOR A DIAGNOSTIC CHECK AND
THEY TOLD ME THAT EVERYTHING WAS OK. I TOOK
THE CAR WORDEN-MARTEN SERVICE CENTER FOR

> REPAIRS AGAIN ON APRIL 19TH TO REPAIR THE CAR
> THEY: 1.REPLACED MASS -AIR FLOW UNIT AND SENSOR
> $131.39 WHO KNOWS IF IT IS FIXED RIGHT THIS TIME?
> THIS WAS A VERY DANGEROUS SITUATION TO BE IN
> FOR THE CAR TO FAIL. *TR  NHTSA ID Number: 10328071.

404.    On June 2, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2007 Buick LaCrosse and an incident that occurred on March 1, 2010, in which the

following was reported:

> 2007 BUICK LACROSSE SEDAN. CONSUMER STATES
> MAJOR SAFETY DEFECT. CONSUMER REPORTS WHILE
> DRIVING THE ENGINE SHUT DOWN 3 TIMES FOR NO
> APPARENT REASON *TGW  NHTSA ID Number: 10334834.

405.    On February 20, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Chevrolet Monte Carlo and an incident that occurred on January 16, 2014, in

which the following was reported:

> I WAS DRIVING GOING APPROXIMATELY 45 MPH, I HIT A
> POT HOLE AND MY VEHICLE CUT OFF. THIS HAS
> HAPPENED THREE TIMES SINCE JANUARY. THE SAME
> THING HAPPENED THE SECOND TIME. THE LAST TIME IT
> OCCURRED WAS TUESDAY, FEBRUARY 18. THIS TIME I
> WAS ON THE EXPRESSWAY TRAVELING
> APPROXIMATELY 75 MPH, HIT A BUMP AND IT CUT OFF.
> THE CAR STARTS BACK UP WHEN I PUT IT IN NEUTRAL.
> *TR  NHTSA ID Number: 10565104.

406.    On March 3, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Chevrolet Impala and an incident that occurred on February 29, 2012, in which

the following was reported:

> I WAS DRIVING MY COMPANY ASSIGNED CAR DOWN A
> STEEP HILL WHEN THE ENGINE STALLED WITHOUT
> WARNING. THIS HAS HAPPENED 5 OTHER TIMES WITH
> THIS VEHICLE. THIS WAS THE FIRST TIME I WAS
> TRAVELING FAST THOUGH. IT'S LIKE THE ENGINE JUST
> TURNS OFF. THE LIGHTS ARE STILL ON BUT I LOSE THE
> POWER STEERING AND BRAKES. IT WAS TERRIFYING
> AND EXTREMELY DANGEROUS. THIS PROBLEM

HAPPENS COMPLETELY RANDOMLY WITH NO
WARNING. IT HAS HAPPENED TO OTHERS IN MY
COMPANY WITH THEIR IMPALAS. I LOOKED ONLINE
AND FOUND NUMEROUS OTHER INSTANCES OF CHEVY
IMPALAS OF VARIOUS MODEL YEARS DOING THE SAME
THING. IT IS CURRENTLY IN THE REPAIR SHOP AND THE
MECHANIC CAN'T DUPLICATE THE PROBLEM. I TOLD
THEM ITS RANDOM AND OCCURS ABOUT EVERY 4
MONTHS OR SO. I AM AFRAID I WILL HAVE TO GET
BACK IN THIS DEATH TRAP DUE TO MY EMPLOYER
MAKING ME. PLEASE HELP- I DON'T WANT TO DIE
BECAUSE CHEVROLET HAS A PROBLEM WITH THEIR
ELECTRICAL SYSTEMS IN THEIR CARS. *TR  NHTSA ID
Number: 10567458.

407.    On March 11, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2007 Cadillac DTS and an incident that occurred on January 27, 2013, in which the

following was reported:

ENGINE STOPPED. ALL POWER EQUIPMENT CEASED TO
FUNCTION. I WAS ABLE TO GET TO THE SIDE OF THE
FREEWAY. PUT THE CAR IN NEUTRAL, TURNED THE KEY
AND THE CAR STARTED AND CONTINUED FOR THE
DURATION OF THE 200 MILE TRIP. THE SECOND TIME
APPROXIMATELY THREE WEEKS AGO MY WIFE WAS
DRIVING IN HEAVY CITY TRAFFIC WHEN THE SAME
PROBLEM OCCURRED AND SHE LOST THE USE OF ALL
POWER EQUIPMENT. SHE WAS ABLE TO PUT THE CAR IN
PARK AND GET IT STARTED AGAIN WITHOUT INCIDENT.
I CALLED GM COMPLAINT DEPARTMENT. THEY
INSTRUCTED ME TO TAKE THE CAR TO A DEALERSHIP
AND HAVE A DIAGNOSTIC TEST DONE ON IT. THIS WAS
DONE AND NOTHING WAS FOUND TO BE WRONG WITH
THE VEHICLE. I AGAIN CALLED CADILLAC COMPLAINT
DEPARTMENT AND OPENED A CASE. THIS TIME I WAS
TOLD TO TAKE THE CAR BACK TO THE DEALERSHIP
AND ASK THE SERVICE DEPARTMENT TO RECHECK IT. I
INFORMED THEM I HAVE THE DIAGNOSTIC REPORT
SHOWING NOTHING WRONG WAS FOUND. THEY
SUGGESTED I TAKE IT BACK AND HAVE THE SERVICE
PEOPLE DRIVE THE CAR. THIS DIDN'T MAKE ANY SENSE
BECAUSE I DON'T KNOW WHEN AND WHERE THE
PROBLEM WILL OCCUR AGAIN. WHAT WAS I TO DO FOR
A CAR WHILE THE DEALERSHIP HAD MINE? I INQUIRED
OF THE CADILLAC REPRESENTATIVE IF THIS CAR MAY

- 170 -

HAVE THE SAME IGNITION AS THE CARS CURRENTLY
BEING RECALLED BY GM. THEY WERE UNABLE TO
ANSWER THAT QUESTION. THEY FINALLY STATED THE
ONLY REMEDY WAS TO TAKE IT BACK TO THE
DEALERSHIP. IF THIS PROBLEM OCCURS AGAIN
SOMEONE COULD EASILY GET INJURED OR KILLED. I
WOULD APPRECIATE ANY ASSISTANCE YOU CAN GIVE
ME ON HOW TO RESOLVE THIS MATTER.  NHTSA ID
Number: 10568491.

408.    On March 19, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick LaCrosse and an incident that occurred on March 15, 2014, in which the

following was reported:

WHILE DRIVING UP A LONG INCLINE ON I-10 VEHICLE
BEHAVED AS IF THE IGNITION HAD BEEN TURNED OFF
AND KEY REMOVED. IE: ENGINE OFF, NO LIGHTS OR
ACCESSORIES, NO WARNING LIGHTS ON DASH. TRAFFIC
WAS HEAVY AND MY WIFE WAS FORTUNATE TO
SAFELY COAST INTO SHOULDER. INCIDENT RECORDED
WITH BUICK, HAVE REFERENCE NUMBER. *TR  NHTSA
ID Number: 10573586.

409.    On July 1, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick LaCrosse and an incident that occurred on October 25, 2012, in which

the following was reported:

TRAVELING 40 MPH ON A FOUR LANE ABOUT TO PASS A
TRUCK. MOTOR STOPPED, POWER STEERING OUT,
POWER BRAKES OUT, MANAGED TO COAST ACROSS
THREE LANES TO SHOULDER TO PARK. WALKED 1/4
MILES TO STORE CALLED A LOCAL GARAGE. CAR STILL
WOULD NOT START, TOWED TO HIS GARAGE. CHECKED
GAS, FUEL PRESSURE OKAY BUT NO SPARK. MOVED
SOME CONNECTORS AROUND THE STARTING MODULE
AND CAR STARTED. HAVE NOT HAD ANY PROBLEMS
SINCE, HAVE THE FEAR THAT I WILL BE ON A CHICAGO
TOLL ROAD AND IT WILL STOP AGAIN.  NHTSA ID
Number: 10607535.

410.     On July 12, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2009 Chevrolet Impala and an incident that occurred on March 19, 2010, in which

the following was reported:

> I HAD JUST TURNED ONTO THIS ROAD, HAD NOT EVEN
> GONE A MILE. NO SPEED, NO BLACK MARKS, CAR SHUT
> DOWN RAN OFF THE ROAD AND HIT A TREE STUMP.
> TOTAL THE CAR. THE STEERING WHEEL WAS BENT
> ALMOST IN HALF. I HAVE PICTURES OF THE CAR. I GOT
> THIS CAR NEW, SO ALL MILES WE'RE PUT ON IT BY ME. I
> BROKE MY HIP, BACK, KNEE, DISLOCATED MY ELBOW,
> CRUSHED MY ANKLE AND FOOT. HAD A HEAD INJURY,
> A DEFLATED LUNG. I WAS IN THE HOSPITAL FOR TWO
> MONTHS AND A NURSING HOME FOR A MONTH. I HAVE
> HAD 14 SURGERIES. STILL NOT ABLE TO WORK OR DO A
> LOT OF THINGS FOR MY SELF. WITH THE RECALLS
> SHOWING THE ISSUES OF THE ENGINE SHUTTING OFF, I
> NEED THIS LOOKED INTO.  NHTSA ID Number: 10610093.

411.     On July 24, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2008 Buick LaCrosse and an incident that occurred on July 15, 2014, in which the

following was reported:

> WHILE DRIVING NORTH ON ALTERNATE 69 HIGHWAY
> AT 65 MPH AT 5:00 P.M., MY VEHICLE ABRUPTLY LOSS
> POWER EVEN THOUGH I TRIED TO ACCELERATE. THE
> ENGINE SHUT OFF SUDDENLY AND WITHOUT WARNING.
> VEHICLE SLOWED TO A COMPLETE STOP. I WAS
> DRIVING IN THE MIDDLE LANE AND WAS UNABLE TO
> GET IN THE SHOULDER LANE BECAUSE I HAD NO
> PICKUP (UNABLE TO GIVE GAS TO ACCELERATE) SO MY
> HUSBAND AND I WERE CAUGHT IN FIVE 5:00 TRAFFIC
> WITH CARS WHIPPING AROUND US ON BOTH SIDES AND
> MANY EXCEEDING 65 MPH. I PUT ON MY EMERGENCY
> LIGHTS AND IMMEDIATELY CALLED ON-STAR. I WAS
> UNABLE TO RESTART THE ENGINE. THANK GOD FOR
> ON-STAR BECAUSE FROM THAT POINT ON, I WAS IN
> TERROR WITNESSING CARS COMING UPON US NOT
> SLOWING UNTIL THEY REALIZED I WAS AT A STAND
> STILL WITH LIGHTS FLASHING. THE CARS WOULD
> SWERVE TO KEEP FROM HITTING US. IT TOOK THE
> HIGHWAY PATROL AND POLICE 15 MINUTES TO GET TO
> US BUT DURING THAT TIME, I RELIVED VISIONS OF US

BEING KILLED ON THE HIGHWAY. I CANNOT DESCRIBE
THE HORROR, LOOKING OUT MY REAR VIEW MIRROR,
WITNESSING OUR DEMISE TIME AFTER TIME. THOSE 15
MINUTES SEEMED LIKE AN ETERNITY. WHEN THE
HIGHWAY PATROL ARRIVED THEY CLOSED LANES AND
ASSISTED IN PUSHING CAR OUT OF THE HIGHLY
TRAFFIC LANES. IT TOOK MY HUSBAND AND I BOTH TO
TURN THE STEERING WHILE IN NEUTRAL. THE CAR WAS
TOWED TO CONKLIN FANGMAN KC DEALERSHIP AND I
HAD TO REPLACE IGNITION COIL AND MODULE THAT
COST ME $933.16. THEY SAID THESE PARTS WERE NOT
ON THE RECALL LIST, WHICH I HAVE FOUND OUT SINCE
THEN GM HAS PUT DEALERSHIPS ON NOTICE OF THIS
PROBLEM. IT HAS SOMETHING TO DO WITH SUPPLYING
ENOUGH MANUFACTURED PARTS TO TAKE CARE OF
RECALL. IF I COULD AFFORD TO PURCHASE ANOTHER
CAR I WOULD BECAUSE I DONT FEEL SAFE ANY
LONGER IN THIS CAR. EMOTIONALLY I AM STILL
SUFFERING FROM THE TRAUMA.  NHTSA ID Number:
10604820.

412.     Notwithstanding New GM's recall, the reports and complaints relating to this

defect have continued to pour into New GM.  Such complaints and reports indicate that New

GM's proffered recall "fix" does not work.

413.     For example, on August 2, 2014, New GM became aware of a complaint filed

with NHTSA involving a 2006 Buick LaCrosse and an incident that occurred on July 12, 2014,

in which the following was reported:

WHILE TRAVELING IN THE FAST LANE ON THE GARDEN
STATE PARKWAY I HIT A BUMP IN THE ROAD, THE
AUTO SHUT OFF. WITH A CONCRETE DIVIDER ALONG
SIDE AND AUTOS APPROACHING AT HIGH SPEED, MY
WIFE AND DAUGHTER SCREEMING I MANAGED TO GET
TO THE END OF THE DIVIDER WERE I COULD TURN OFF
THE AUTO RESTARTED ON 1ST TRY BUT VERY SCARY.
NHTSA ID Number: 10618391.

414.     On August 18, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2007 Buick LaCrosse and an incident that occurred on August 18, 2014, in which the

following was reported:

> TL* THE CONTACT OWNS A 2007 BUICK LACROSSE. THE
> CONTACT STATED WHILE DRIVING APPROXIMATELY 60
> MPH, SHE HIT A POT HOLE AND THE VEHICLE STALLED.
> THE VEHICLE COASTED TO THE SHOULDER OF THE
> ROAD. THE VEHICLE WAS RESTARTED AND THE
> CONTACT WAS ABLE TO DRIVE THE VEHICLE AS
> NORMAL. THE CONTACT RECEIVED A RECALL NOTICE
> UNDER NHTSA CAMPAIGN NUMBER: 14V355000
> (ELECTRICAL SYSTEM), HOWEVER THE PARTS NEEDED
> FOR THE REPAIRS WAS UNAVAILABLE. THE VEHICLE
> WAS NOT REPAIRED. THE MANUFACTURER WAS NOT
> NOTIFIED OF THE FAILURE. THE APPROXIMATE
> FAILURE MILEAGE WAS 110,000.  NHTSA ID Number:
> 10626067.

415.    On August 20, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2007 Chevrolet Impala and an incident that occurred on August 6, 2014, in which it

was reported that:

> TL* THE CONTACT OWNS A 2007 CHEVROLET IMPALA.
> THE CONTACT STATED THAT WHILE DRIVING 25 MPH,
> THE VEHICLE STALLED WITHOUT WARNING. THE
> CONTACT RECEIVED A NOTIFICATION FOR RECALL
> NHTSA CAMPAIGN NUMBER: 14V355000 (ELECTRICAL
> SYSTEM). THE VEHICLE WAS TAKEN TO AN
> INDEPENDENT MECHANIC WHERE THE TECHNICIAN
> ADVISED THE CONTACT TO REMOVE THE KEY FOB AND
> ANY OTHER OBJECTS. THE VEHICLE WAS NOT
> REPAIRED. THE MANUFACTURER WAS MADE AWARE OF
> THE FAILURE. THE FAILURE MILEAGE WAS 79,000.
> NHTSA ID Number: 10626659.

416.    On August 27, 2014, New GM became aware of the following complaint filed

with NHTSA involving a 2008 Chevrolet Impala and an incident that occurred on August 27,

2014, in which it was reported that:

> TL-THE CONTACT OWNS A 2008 CHEVROLET IMPALA.
> THE CONTACT STATED WHILE DRIVING
> APPROXIMATELY 50 MPH, THE VEHICLE LOST POWER
> AND THE STEERING WHEEL SEIZED WITHOUT
> WARNING. AS A RESULT, THE CONTACT CRASHED INTO
> A POLE AND THE AIR BAGS FAILED TO DEPLOY. THE
> CONTACT SUSTAINED A CONCUSSION, SPRAINED NECK,

010440-11  784012 V1

AND WHIPLASH WHICH REQUIRED MEDICAL
ATTENTION. THE POLICE WAS NOT FILED. THE VEHICLE
WAS TOWED TO A TOWING COMPANY. THE CONTACT
RECEIVED NOTIFICATION OF NHTSA CAMPAIGN ID
NUMBER: 14V355000 (ELECTRICAL SYSTEM), HOWEVER
THE PARTS ARE NOT AVAILABLE TO PERFORM THE
REPAIRS. THE VEHICLE WAS NOT REPAIRED. THE
MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE.
THE APPROXIMATE FAILURE MILEAGE WAS 70,000. MF.
NHTSA ID Number: 10628704.

417.     New GM knew that this serious safety defect existed for years yet did nothing to

warn the public or even attempt to correct the defect in these vehicles until late June of 2014

when New GM finally made the decision to implement a recall.

418.     The "fix" that New GM offered as part of the recall is to modify the ignition key

from a "slotted" key to "hole" key.  This is insufficient and does not adequately address the

safety risks posed by the defect.  The ignition key and switch remain prone to inadvertently

move from the "run" to the "accessory" position.  Simply changing the key slot or taking other

keys and fobs off of key rings is New GM's attempt to make consumers responsible for the

safety of GM-branded vehicles and to divert its own responsibility to make GM-branded vehicles

safe.  New GM's "fix" does not adequately address the inherent dangers and safety threats posed

by the defect in the design.

419.     In addition, New GM is not addressing the other design issues that create safety

risks in connection with this defect.  New GM is not altering the algorithm that prevents the

airbags from deploying when the ignition leaves the "run" position even when the vehicle is

moving at high speed.  And New GM is not altering the placement of the ignition switch in an

area where the driver's knees may inadvertently cause the ignition to move out of the "run"

position.

c.     **July 2 and 3, 2014 recalls – unintended ignition rotation defect.**

420.    On July 2, 2014, New GM recalled 554,328 vehicles in the United States for ignition switch defects (Recall Number 14V-394).  The July 2 recall applied to the 2003-2014 Cadillac CTS and the 2004-2006 Cadillac SRX.

421.    The recall notice explains that the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine.  Further, if the key is not in the "run" position, the airbags may not deploy in the event of a collision, increasing the risk of injury.

422.    On July 3, 2014, New GM recalled 5,877,718 additional vehicles in the United States for ignition switch defects (Recall No. 14V-400).

423.    The following vehicles were included in Recall No. 14V-400:  1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero.

424.    The recall notice states that the weight on the key and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine.  If the key is not in the "run" position, the airbags may not deploy if the vehicle is involved in a collision, increasing the risk of injury.

425.    In both of these recalls, New GM notified NHTSA and the public that the recall was intended to address a defect involving unintended or "inadvertent key rotation" within the ignition switch of the vehicles.  As with the ignition key defect announced June 20, however, the defects for which these vehicles have been recalled is directly related to the ignition switch defect in the Cobalt and other Defective Ignition Switch Vehicles and involves the same safety risks and dangers.

426.     All of the vehicles involved in Recall No. 14V-400 were manufactured by Old
GM.  Over 100,000 of the vehicles involved in Recall No. 14V-394 were manufactured and/or
sold by New GM.

427.     Once again, the unintended ignition rotation defect is substantially similar to and
relates directly to the other ignition switch defects, including the defects that gave rise to the
initial recall of 2.1 million Cobalts and other vehicles in February and March of 2014.  Like the
other ignition switch defects, the unintended ignition key rotation defect poses a serious and
dangerous safety risk because it can cause a vehicle to stall while in motion by causing the key in
the ignition to inadvertently move from the "on" or "run" position to "off" or "accessory"
position.  Like the other ignition switch defects, the unintended ignition key rotation defect can
result in a loss of power steering, power braking, and increase the risk of a crash.  And as with
the other ignition switch defects, if a crash occurs, the airbags will not deploy because of the
unintended ignition key rotation defect.

428.     The unintended ignition key rotation defect involves several problems, and they
are identical to the problems in the other Defective Ignition Switch Vehicles:  a weak detent
plunger, the low positioning of the ignition on the steering column, and the algorithm that
renders the airbags inoperable when the vehicle leaves the "run" position.

429.     The 2003-2006 Cadillac CTS and the 2004-2006 Cadillac SRX use the same
Delphi switch and have inadequate torque for the "run"-"accessory" direction of the key rotation.
This was known to Old and New GM, and was the basis for a change that was made to a stronger
detent plunger for the 2007 and later model years of the SRX model.  The 2007 and later CTS
vehicles used a switch manufactured by Dalian Alps.

430.     In 2010, New GM changed the CTS key from a "slot" to a "hole" design to "reduce an observed nuisance" of the key fob contacting the driver's leg.  But in 2012, a New GM employee reported two running stalls of a 2012 CTS that had a "hole" key and the stronger detent plunger switch.  When New GM did testing in 2014 of the "slot" versus "hole" keys, it confirmed that the weaker detent plunger-equipped switches used in the older CTS and SRX could inadvertently move from "run" to "accessory" or "off" when the "vehicle goes off road or experience some other jarring event."

431.     New GM has tried to characterize the recall of these 7.3 million vehicles as being different than the other ignition switch defects that gave rise to the February and March recalls *even though* these recalls are aimed at addressing the same defects and safety risks as those that gave rise to the other ignition switch defect recalls.  New GM has attempted to portray the unintended ignition key rotation defect as being different from the other ignition switch defects in order to deflect attention from the severity and pervasiveness of the ignition switch defect and to try to provide a story and plausible explanation for why it did not recall these 7.3 million vehicles much earlier, and to avoid providing new, stronger ignition switches as a remedy.

432.     Further, New GM acquired knowledge of the defects in these vehicles on July 11, 2009.  On that date, it acquired knowledge of the following facts, as well as others not pleaded herein:

a.     In January of 2003, Old GM opened an internal investigation after it received complaints from a Michigan GM dealership that a customer had experienced a power failure while operating his model year 2003 Pontiac Grand Am.

b.     During the investigation, Old GM's Brand Quality Manager for the Grand Am visited the dealership and requested that the affected customer demonstrate the problem.

- 178 -

The customer was able to recreate the shutdown event by driving over a speed bump at approximately 30-35 mph.

c.      The customer's key ring was allegedly quite heavy.  It contained approximately 50 keys and a set of brass knuckles.

d.      In May 2003, Old GM issued a voicemail to dealerships describing the defective ignition condition experienced by the customer in the Grand Am.  Old GM identified the relevant population of the Affected Vehicles as the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am.

e.      Old GM did not recall these vehicles.  Nor did it provide owners and/or lessees with notice of the defective condition.  Instead, its voicemail directed dealerships to pay attention to the key size and mass of the customer's key ring.

f.      On July 24, 2003, Old GM issued an engineering work order to increase the detent plunger force on the ignition switch for the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am vehicles.  Old GM engineers allegedly increased the detent plunger force and changed the part number of the ignition switch.  The new parts were installed beginning in the model year 2004 Malibu, Alero, and Grand Am vehicles.

g.      Old GM issued a separate engineering work order in March 2004 to increase the detent plunger force on the ignition switch in the Pontiac Grand Prix.  Old GM engineers did not change the part number for the new Pontiac Grand Prix ignition switch.

h.      Then-Old GM design engineer Ray DeGiorgio signed the work order in March 2004 authorizing the part change for the Grand Prix ignition switch.  Ray DeGiorgio maintained his position as design engineer with New GM.

i.      On or around August 25, 2005, Laura Andres, an Old GM design engineer (who remains employed with New GM), sent an email describing ignition switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway.  Ms. Andres' email stated, "While driving home from work on my usual route, I was driving about 45 mph, where the road changes from paved to gravel & then back to paved, some of the gravel had worn away, and the pavement acted as a speed bump when I went over it.  The car shut off.  I took the car in for repairs.  The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off."

j.      Old GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' email on August 25, 2005 to four Old GM employees.  Mr. Dickinson asked, "Is this a condition we would expect to occur under some impacts?"

k.      On August 29, 2005, Old GM employee Jim Zito forwarded the messages to Ray DeGiorgio and asked, "Do we have any history with the ignition switch as far as it being sensitive to road bumps?"

l.      Mr. DeGiorgio responded the same day, stating, "To date there has never been any issues with the detents being too light."

433.    From 2002 to the present, New GM received numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect.  The following are just a handful of examples of some of the reports known to New GM.

434.    A September 16, 2002 complaint filed with NHTSA regarding a 2002 Oldsmobile Intrigue involving an incident that occurred on March 16, 2002, in which the following was reported:

> WHILE DRIVING AT 30 MPH CONSUMER RAN HEAD ON
> INTO A STEEL GATE, AND THEN HIT THREE TREES.

> UPON IMPACT, NONE OF THE AIR BAGS DEPLOYED.
> CONTACTED DEALER. PLEASE PROVIDE FURTHER
> INFORMATION. *AK  NHTSA ID Number: 8018687.

435.    A November 22, 2002 complaint filed with NHTSA involving a 2003 Cadillac

CTS involving an incident that occurred on July 1, 2002, in which it was reported that:

> THE CAR STALLS AT 25 MPH TO 45 MPH, OVER 20
> OCCURANCES, DEALER ATTEMPTED 3 REPAIRS. DT
> NHTSA ID Number: 770030.

436.    A January 21, 2003 complaint filed with NHTSA involving a 2003 Cadillac CTS,

in which the following was reported:

> WHILE DRIVING AT ANY SPEED,THE VEHICLE WILL
> SUDDENLY SHUT OFF. THE STEERING WHEEL AND THE
> BRAKE PEDAL BECOMES VERY STIFF. CONSUMER FEELS
> ITS VERY UNSAFE TO DRIVE. PLEASE PROVIDE ANY
> FURTHER INFORMATION.  NHTSA ID Number: 10004288.

437.    A June 30, 2003 complaint filed with NHTSA regarding a 2001 Oldsmobile

Intrigue which involved the following report:

> CONSUMER NOTICED THAT WHILE TRAVELING DOWN
> HILL AT 40-45 MPH BRAKES FAILED, CAUSING
> CONSUMER TO RUN INTO THREES AND A POLE. UPON
> IMPACT, AIR BAGS DID NOT DEPLOY. *AK  NHTSA ID
> Number**:** 10026252.

438.    A March 11, 2004 complaint filed with NHTSA involving a 2004 Cadillac CTS

involving an incident that occurred on March 11, 2004, in which the following was reported:

> CONSUMER STATED WHILE DRIVING AT 55-MPH
> VEHICLE STALLED, CAUSING CONSUMER TO PULL OFF
> THE ROAD. DEALER INSPECTED VEHICLE SEVERAL
> TIMES, BUT COULD NOT DUPLICATE OR CORRECT THE
> PROBLEM. *AK  NHTSA ID Number: 10062993.

439.    A March 11, 2004 complaint with NHTSA regarding a 2003 Oldsmobile Alero

incident that occurred on July 26, 2003, in which the following was reported:

THE VEHICLE DIES. WHILE CRUISING AT ANY SPEED,
THE HYDRAULIC BRAKES & STEERING FAILED DUE TO
THE ENGINE DYING. THERE IS NO SET PATTERN, IT
MIGHT STALL 6 TIMES IN ONE DAY, THEN TWICE THE
NEXT DAY. THEN GO 4 DAYS WITH NO OCURRENCE,
THEN IT WILL STALL ONCE A DAY FOR 3 DAYS. THEN
GO A WEEK WITH NO OCURRENCE, THEN STALL 4 TIMES
A DAY FOR 5 DAYS, ETC., ETC. IN EVERY OCURRENCE, IT
TAKES APPROXIMATELY 10 MINUTES BEFORE IT WILL
START BACK UP. AT HIGH SPEEDS, IT IS EXTREMELY
TOO DANGEROUS TO DRIVE. WE'VE TAKEN IT TO THE
DEALER, UNDER EXTENDED WARRANTY, THE
REQUIRED 4 TIMES UNDER THE LEMON LAW PROCESS.
THE DEALER CANNOT ASCERTAIN, NOR FIX THE
PROBLEM. IT HAPPENED TO THE DEALER AT LEAST
ONCE WHEN WE TOOK IT IN. I DOUBT THEY WILL
ADMIT IT, HOWEVER, MY WIFE WAS WITNESS. THE CAR
IS A 2003. EVEN THOUGH I BOUGHT IT IN JULY 2003, IT
WAS CONSIDERED A USED CAR. GM HAS DENIED OUR
CLAIM SINCE THE LEMON LAW DOES NOT APPLY TO
USED CARS. THE CAR HAS BEEN PERMANENTLY
PARKED SINCE NOVEMBER 2003. WE WERE FORCED TO
BUY ANOTHER CAR. THE DEALER WOULD NOT TRADE.
THIS HAS RESULTED IN A BADLUCK SITUATION FOR US.
WE CANNOT AFFORD 2 CAR PAYMENTS / 2 INSURANCE
PREMIUMS, NOR CAN WE AFFORD $300.00 PER HOUR TO
SUE GM. I STOPPED MAKING PAYMENTS IN DECEMBER
2003. I HAVE KEPT THE FINANCE COMPANY ABREAST OF
THE SITUATION. THEY HAVE NOT REPOSSED AS OF YET.
THEY WANT ME TO TRY TO SELL IT. CAN YOU HELP
?*AK  NHTSA ID Number: 10061898.

440.    A July 20, 2004 complaint filed with NHTSA involving a 2004 Cadillac SRX,

involving an incident that occurred on July 9, 2004, in which the following was reported:

THE CAR DIES AFTER TRAVELING ON HIGHWAY. IT
GOES FROM 65 MPH TO 0. THE BRAKES, STEERING, AND
COMPLETE POWER DIES. YOU HAVE NO CONTROL OVER
THE CAR AT THIS POINT. I HAVE ALMOST BEEN HIT 5
TIMES NOW. ALSO, WHEN THE CARS DOES TURN BACK
ON IT WILL ONLY GO 10 MPH AND SOMETIMES WHEN
YOU TURN IT BACK ON THE RPM'S WILL GO TO THE
MAX. IT SOUNDS LIKE THE CAR IS GOING TO EXPLODE.
THIS CAR IS A DEATH TRAP. *LA  NHTSA ID Number:
10082289.

441.    An August 2004 complaint filed with NHTSA regarding a 2004 Chevrolet Malibu

incident that occurred on June 30, 2004, in which it was reported that:

> WHILE TRAVELING AT ANY SPEED VEHICLE STALLED.
> WITHOUT CONSUMER HAD SEVERAL CLOSE CALLS OF
> BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL
> TIMES, BUT PROBLEM RECURRED. *AK.  NHTSA ID
> Number:  10089418.

442.    A report in August of 2004 involving a 2004 Chevrolet Malibu incident that

occurred on August 3, 2004, in which it was reported that:

> WHEN DRIVING, THE VEHICLE TO CUT OFF. THE DEALER
> COULD NOT FIND ANY DEFECTS. *JB.  NHTSA ID
> Number: 10087966**.**

443.    A October 23, 2004 complaint with NHTSA regarding a 2003 Chevrolet Monte

Carlo, in which the following was reported:

> VEHICLE CONTINUOUSLY EXPERIENCED AN
> ELECTRICAL SYSTEM FAILURE. AS A RESULT,
> THERE'WAS AN ELECTRICAL SHUT DOWN WHICH
> RESULTED IN THE ENGINE DYING/ STEERING WHEEL
> LOCKING UP, AND LOSS OF BRAKE POWER.*AK  NHTSA
> ID Number: 10044624**.**

444.    An April 26, 2005 complaint filed with NHTSA involving a 2005 Pontiac Grand

Prix, pertaining to an incident that occurred on December 29, 2004, in which the following was

reported:

> 2005 PONTIAC GRAND PRIX GT SEDAN VIN #[XXX]
> PURCHASED 12/16/2004. INTERMITTENTLY VEHICLE
> STALLS/ LOSS OF POWER IN THE ENGINE. WHILE
> DRIVING THE VEHICLE IT WILL SUDDENLY JUST LOSES
> POWER. YOU CONTINUE TO PRESS THE ACCELERATOR
> PEDAL AND THEN THE ENGINE WILL SUDDENLY TAKE
> BACK OFF AT A GREAT SPEED. THIS HAS HAPPENED
> WHILE DRIVING NORMALLY WITHOUT TRYING TO
> ACCELERATE AND ALSO WHILE TRYING TO
> ACCELERATE. THE CAR HAS LOST POWER WHILE
> TRYING TO MERGE IN TRAFFIC. THE CAR HAS LOST
> POWER WHILE TRYING TO CROSS HIGHWAYS. THE CAR

HAS LOST POWER WHILE JUST DRIVING DOWN THE
ROAD. GMC HAS PERFORMED THE FOLLOWING REPAIRS
WITHOUT FIXING THE PROBLEM. 12/30/2004 [XXX]-
MODULE, POWERTRAIN CONTROL-ENGINE
REPROGRAMMING. 01/24/2005 [XXX]-
SOLENOID,PRESSURE CONTROL-REPLACED. 02/04/2005
[XXX]-MODULE, PCM/VCM-REPLACED. 02/14/2005 [XXX]-
PEDAL,ACCELERATOR-REPLACED. DEALERSHIP
PURCHASED FROM CAPITAL BUICK-PONTIAC-GMC 225-
293-3500. DEALERSHIP HAS ADVISED THAT THEY DO
NOT KNOW WHAT IS WRONG WITH THE CAR. WE HAVE
BEEN TOLD THAT WE HAVE TO GO DIRECT TO PONTIAC
WITH THE PROBLEM. HAVE BEEN IN CONTACT WITH
PONTIAC SINCE 02/15/05. PONTIAC ADVISED THAT THEY
WERE GOING TO RESEARCH THE PROBLEM AND SEE IF
ANY OTHER GRAND PRI WAS REPORTING LIKE
PROBLEMS. SO FAR THE ONLY ADVICE FROM PONTIAC
IS THEY WANT US TO COME IN AND TAKE ANOTHER
GRAND PRIX OFF THE LOT AND SEE IF WE CAN GET THIS
CAR TO DUPLICATE THE SAME PROBLEM. THIS DID NOT
IMPRESS ME AT ALL. SO AFTER WAITING FOR 2-1/2
MONTHS FOR PONTIAC TO DO SOMETHING TO FIX THE
PROBLEM, I HAVE DECIDED TO REPORT THIS TO NHTSA.
*AK *JS INFORMATION REDACTED PURSUANT TO THE
FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
552(B)(6)  NHTSA ID Number: 10118501.

445.    A May 2005 complaint filed with NHTSA regarding a 2004 Chevrolet Malibu

incident that occurred on July 18, 2004, in which it was reported that:

THE CAR CUT OFF WHILE I WAS DRIVING AND IN
HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO
WARNING THAT THIS WOULD HAPPEN. THE CAR WAS
SERVICED BEFORE FOR THIS PROBLEM BUT IT
CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE
HORN FUSE HAS BEEN REPLACED TWICE, AND THE
BLINKER IS CURRENTLY OUT. THE STEERING COLLAR
HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED
TO BE A NEW CAR.  NHTSA ID Number: 10123684.

446.    A June 2, 2005 complaint with NHTSA regarding a 2004 Pontiac Grand Am

incident that occurred on February 18, 2005, in which the following was reported:

2004 PONTIAC GRAND PRIX SHUTS DOWN WHILE
DRIVING AND THE POWER STEERING AND BRAKING

ABILITY ARE LOST.*MR *NM.  NHTSA ID
Number: 10124713.

447.    An August 12, 2005 complaint filed with NHTSA involving a 2003 Cadillac CTS,

regarding an incident that occurred on January 3, 2005, in which it was reported that:

> DT: VEHICLE LOST POWER WHEN THE CONSUMER HIT
> THE BRAKES. THE TRANSMISSION JOLTS AND THEN THE
> ENGINE SHUTS OFF. IT HAS BEEN TO THE DEALER 6
> TIMES SINCE JANUARY. THE DEALER TRIED
> SOMETHING DIFFERENT EVERY TIME SHE TOOK IT IN.
> MANUFACTURER SAID SHE COULD HAVE A NEW
> VEHICLE IF SHE PAID FOR IT. SHE WANTED TO GET RID
> OF THE VEHICLE.*AK THE CHECK ENGINE LIGHT
> ILLUMINATED. *JB  NHTSA ID Number: 10127580.

448.    An August 26, 2005 complaint with NHTSA regarding a 2004 Pontiac Grand Am

incident that occurred on August 26, 2005, in which the following was reported:

> WHILE DRIVING MY 2004 PONTIAC GRAND AM THE CAR
> FAILED AT 30 MPH. IT COMPLETELY SHUT OFF LEAVING
> ME WITH NO POWER STEERING AND NO WAY TO
> REGAIN CONTROL OF THE CAR UNTIL COMING TO A
> COMPLETE STOP TO RESTART IT. ONCE I HAD STOPPED
> IT DID RESTART WITHOUT INCIDENT. ONE WEEK LATER
> THE CAR FAILED TO START AT ALL NOT EVEN TURNING
> OVER. WHEN THE PROBLEM WAS DIAGNOSED AT THE
> GARAGE IT WAS FOUND TO BE A FAULTY "IGNITION
> CONTROL MODULE" IN THE CAR. AT THIS TIME THE
> PART WAS REPLACED ONLY TO FAIL AGAIN WITHIN 2
> MONTHS TIME AGAIN WHILE I WAS DRIVING THIS TIME
> IN A MUCH MORE HAZARDOUS CONDITION BEING THAT
> I WAS ON THE HIGHWAY AND WAS TRAVELING AT 50
> MPH AND HAD TO TRAVEL ACROSS TWO LANES OF
> TRAFFIC TO EVEN PULL OVER TO TRY TO RESTART IT.
> THE CAR CONTINUED TO START AND SHUT OFF ALL
> THE WAY TO THE SERVICE GARAGE WHERE IT WAS
> AGAIN FOUND TO BE A FAULTY "IGNITION CONTROL
> MODULE". IN ANOTHER TWO WEEKS TIME THE CAR
> FAILED TO START AND WHEN DIAGNOSED THIS TIME IT
> WAS SAID TO HAVE "ELECTRICAL PROBLEMS"
> POSSIBLE THE "POWER CONTROL MODULE". AT THIS
> TIME THE CAR IS STILL UNDRIVEABLE AND UNSAFE
> FOR TRAVEL. *JB  NHTSA ID Number: 10134303.

449.     A September 22, 2005 complaint filed with NHTSA involving a 2005 Cadillac

CTS, concerning an incident that occurred on September 16, 2005, in which the following was

reported:

> DT: 2005 CADILLAC CTS – THE CALLER'S VEHICLE WAS
> INVOLVED IN AN ACCIDENT WHILE DRIVING AT 55 MPH.
> UPON IMPACT, AIR BAGS DID NOT DEPLOY. THE
> VEHICLE WENT OFF THE ROAD AND HIT A TREE. THIS
> WAS ON THE DRIVER'S SIDE FRONT. THERE WERE NO
> INDICATOR LIGHTS ON PRIOR TO THE ACCIDENT. THE
> VEHICLE HAS NOT BEEN INSPECTED BY THE
> DEALERSHIP, AND INSURANCE COMPANY TOTALED
> THE VEHICLE. THE CALLER SAW NO REASON FOR THE
> AIR BAGS NOT TO DEPLOY. . TWO INJURED WERE
> INJURED IN THIS CRASH. T A POLICE REPORT WAS
> TAKEN. THERE WAS NO FIRE. *AK  NHTSA ID Number:
> 10137348.

450.     A September 29, 2006 complaint filed with NHTSA involving a 2004 Cadillac

CTS and an incident that occurred on September 29, 2006, in which the following was reported:

> DT*: THE CONTACT STATED AT VARIOUS SPEEDS
> WITHOUT WARNING, THE VEHICLE LOST POWER AND
> WOULD NOT ACCELERATE ABOVE 20 MPH. ALSO,
> WITHOUT WARNING, THE VEHICLE STALLED ON
> SEVERAL OCCASIONS, AND WOULD NOT RESTART. THE
> VEHICLE WAS TOWED TO THE DEALERSHIP, WHO
> REPLACED THE THROTTLE TWICE AND THE THROTTLE
> BODY ASSEMBLY HARNESS, BUT THE PROBLEM
> PERSISTED. *AK UPDATED 10/25/2006 – *NM  NHTSA ID
> Number: 10169594.

451.     An April 18, 2007 complaint filed with NHTSA involving a 2004 Cadillac SRX,

regarding an incident that occurred on April 13, 2007, in which it was reported that:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. THE
> ENGINE STALLED WITHOUT WARNING AND CAUSED
> ANOTHER VEHICLE TO CRASH INTO THE VEHICLE. THE
> VEHICLE WAS ABLE TO RESTART A FEW MINUTES
> AFTER THE CRASH. THE DEALER AND MANUFACTURER
> WAS UNABLE TO DIAGNOSE THE FAILURE. THE
> MANUFACTURER HAD THE VEHICLE INSPECTED BY A
> CADILLAC SPECIALIST WHO WAS UNABLE TO

> DIAGNOSE THE FAILURE. THE DEALER UPDATED THE
> COMPUTER FOUR TIMES, BUT THE ENGINE CONTINUED
> TO STALL. THE CURRENT AND FAILURE MILEAGES
> WERE 48,000.  NHTSA ID Number: 10188245.

452.    A September 20, 2007 complaint filed with NHTSA involving a 2007 Cadillac

CTS, in connection with an incident that occurred on January 1, 2007, in which it was reported

that:

> TL*THE CONTACT OWNS A 2007 CADILLAC CTS. WHILE
> DRIVING 40 MPH, THE VEHICLE SHUT OFF WITHOUT
> WARNING. THE FAILURE OCCURRED ON FIVE SEPARATE
> OCCASIONS. THE DEALER WAS UNABLE TO DUPLICATE
> THE FAILURE. AS OF SEPTEMBER 20, 2007, THE DEALER
> HAD NOT REPAIRED THE VEHICLE. THE POWERTRAIN
> WAS UNKNOWN. THE FAILURE MILEAGE WAS 2,000 AND
> CURRENT MILEAGE WAS 11,998.  NHTSA ID Number:
> 10203516.

453.    A September 24, 2007 complaint filed with NHTSA involving a 2004 Cadillac

SRX, regarding an incident that occurred on January 1, 2005, in which the following was

reported:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. WHILE
> DRIVING 5 MPH OR GREATER, THE VEHICLE WOULD
> SHUT OFF WITHOUT WARNING. THE DEALER STATED
> THAT THE BATTERY CAUSED THE FAILURE AND THEY
> REPLACED THE BATTERY. APPROXIMATELY EIGHT
> MONTHS LATER, THE FAILURE RECURRED. THE DEALER
> STATED THAT THE BATTERY CAUSED THE FAILURE
> AND REPLACED IT A SECOND TIME. APPROXIMATELY
> THREE MONTHS LATER, THE FAILURE OCCURRED
> AGAIN. SHE WAS ABLE TO RESTART THE VEHICLE. THE
> DEALER WAS UNABLE TO DUPLICATE THE FAILURE,
> HOWEVER, THEY REPLACED THE CRANK SHAFT
> SENSOR. THE FAILURE CONTINUES TO PERSIST. AS OF
> SEPTEMBER 24, 2007, THE DEALER HAD NOT REPAIRED
> THE VEHICLE. THE POWERTRAIN WAS UNKNOWN. THE
> FAILURE MILEAGE WAS 8,000 AND CURRENT MILEAGE
> WAS 70,580.  NHTSA ID Number: 10203943.

454.    A June 18, 2008 complaint filed with NHTSA involving a 2006 Cadillac CTS and

an incident that occurred on June 17, 2008, in which it was reported that:

> TL*THE CONTACT OWNS A 2006 CADILLAC CTS. WHILE
> DRIVING 60 MPH AT NIGHT, THE VEHICLE SHUT OFF
> AND LOST TOTAL POWER. WHEN THE FAILURE
> OCCURRED, THE VEHICLE CONTINUED TO ROLL AS IF IT
> WERE IN NEUTRAL. THERE WERE NO WARNING
> INDICATORS PRIOR TO THE FAILURE. THE CONTACT
> FEELS THAT THIS IS A SAFETY HAZARD BECAUSE IT
> COULD HAVE RESULTED IN A SERIOUS CRASH. THE
> VEHICLE WAS TAKEN TO THE DEALER TWICE FOR
> REPAIR FOR THE SAME FAILURE IN FEBURARY OF 2008
> AND JUNE 17, 2008. THE FIRST TIME THE CAUSE OF THE
> FAILURE WAS IDENTIFIED AS A GLITCH WITH THE
> COMPUTER SWITCH THAT CONTROLS THE
> TRANSMISSION. AT THE SECOND VISIT, THE SHOP
> EXPLAINED THAT THEY COULD NOT IDENTIFY THE
> FAILURE. IT WOULD HAVE TO RECUR IN ORDER FOR
> THEM TO DIAGNOSE THE FAILURE PROPERLY. THE
> CURRENT AND FAILURE MILEAGES WERE 43,000.
> NHTSA ID Number: 10231507.

455.    An October 14, 2008 complaint filed with NHTSA involving a 2008 Cadillac

CTS and an incident that occurred on April 5, 2008, in which it was reported that:

> WHILE DRIVING MY 2008 CTS, WITH NO ADVANCE
> NOTICE, THE ENGINE JUST DIED. IT SEEMED TO RUN
> OUT OF GAS. MY FUEL GAUGE READ BETWEEN 1/2 TO
> 3/4 FULL. THIS HAPPENED 3 DIFFERENT OCCASIONS. ALL
> 3 TIMES I HAD TO HAVE IT TOWED BACK TO THE
> DEALERSHIP THAT I PURCHASED THE CAR FROM. ALL 3
> TIMES I GOT DIFFERENT REASONS IT HAPPENED, FROM
> BAD FUEL PUMP IN GAS TANK, TO SOME TYPE OF BAD
> CONNECTION, ETC. AFTER THIS HAPPENED THE 3RD
> TIME, I DEMANDED A NEW CAR, WHICH I RECEIVED. I
> HAVE HAD NO PROBLEMS WITH THIS CTS, RUNS GREAT.
> *TR  NHTSA ID Number: 10245423.

456.    A November 13, 2008 complaint with NHTSA regarding a 2001 Oldsmobile

Intrigue, in which the following was reported:

> L*THE CONTACT OWNS A 2001 OLDSMOBILE INTRIGUE.
> WHILE DRIVING 35 MPH, THE VEHICLE CONTINUOUSLY

STALLS AND HESITATES. IN ADDITION, THE
INSTRUMENT PANEL INDICATORS WOULD ILLUMINATE
AT RANDOM. THE VEHICLE FAILED INSPECTION AND
THE CRANKSHAFT SENSOR WAS REPLACED, WHICH
HELPED WITH THE STALLING AND HESITATION;
HOWEVER, THE CHECK ENGINE INDICATOR WAS STILL
ILLUMINATED. DAYS AFTER THE CRANKSHAFT SENSOR
WAS REPLACED, THE VEHICLE FAILED TO START.
HOWEVER, ALL OF THE INSTRUMENT PANEL
INDICATORS FLASHED ON AND OFF. AFTER NUMEROUS
ATTEMPTS TO START THE VEHICLE, HE HAD IT
JUMPSTARTED. THE VEHICLE WAS THEN ABLE TO
START. WHILE DRIVING HOME, ALL OF THE LIGHTING
FLASHED AND THE VEHICLE SUDDENLY SHUT OFF. THE
VEHICLE LOST ALL ELECTRICAL POWER AND POWER
STEERING ABILITY. THE CONTACT MANAGED TO PARK
THE VEHICLE IN A PARKING LOT AND HAD IT TOWED
THE FOLLOWING DAY TO A REPAIR SHOP. THE VEHICLE
IS CURRENTLY STILL IN THE SHOP. THE VEHICLE HAS
BEEN RECALLED IN CANADA AND HE BELIEVES THAT IT
SHOULD ALSO BE RECALLED IN THE UNITED STATES.
THE FAILURE MILEAGE WAS UNKNOWN AND THE
CURRENT MILEAGE WAS 106,000.  NHTSA ID
Number: 10248694.

457.    A December 10, 2008 complaint filed with NHTSA regarding a 2004 Oldsmobile

Alero and an incident that occurred on December 10, 2008, in which the following was reported:

I WAS DRIVING DOWN THE ROAD IN RUSH HOUR GOING
APPROX. 55 MPH AND MY CAR COMPLETELY SHUT OFF,
THE GAUGES SHUT DOWN, LOST POWER STEERING. HAD
TO PULL OFF THE ROAD AS SAFELY AS POSSIBLE,
PLACE VEHICLE IN PARK AND RESTART CAR. MY CAR
HAS SHUT DOWN PREVIOUSLY TO THIS INCIDENT AND
FEEL AS THOUGH IT NEEDS SERIOUS INVESTIGATION. I
COULD HAVE BEEN ON THE HIGHWAY AND BEEN
KILLED. THIS ALSO HAS HAPPENED WHEN IN A SPIN
OUT AS WELL THOUGH THIS PARTICULAR INCIDENT
WAS RANDOM. *TR  NHTSA ID Number: 10251280.

458.    A March 31, 2009 complaint filed with NHTSA regarding a 2005 Chevrolet

Malibu incident that occurred on May 30, 2008, in which it was reported that:

TL*THE CONTACT OWNS A 2005 CHEVROLET MALIBU.
THE CONTACT STATED THAT THE POWER WINDOWS,

- 189 -

> LOCKS, LINKAGES, AND IGNITION SWITCH
> SPORADICALLY BECOME INOPERATIVE. SHE TOOK THE
> VEHICLE TO THE DEALER AND THEY REPLACED THE
> IGNITION SWITCH AT THE COST OF $495. THE
> MANUFACTURER STATED THAT THEY WOULD NOT
> ASSUME RESPONSIBILITY FOR ANY REPAIRS BECAUSE
> THE VEHICLE EXCEEDED ITS MILEAGE. ALL REMEDIES
> AS OF MARCH 31, 2009 HAVE BEEN INSUFFICIENT IN
> CORRECTING THE FAILURES. THE FAILURE MILEAGE
> WAS 45,000 AND CURRENT MILEAGE WAS 51,000.  NHTSA
> ID Number: 10263716.

459.    The defects did not get any safer and the reports did not stop when Old GM

ceased to exist.  To the contrary, New GM continued receiving the same reports involving the

same defects.  For example, on August 11, 2010, New GM became aware of the following

complaint filed with NHTSA involving a 2005 Cadillac CTS, the incident occurred on May 15,

2010, in which it was reported:

> TL*THE CONTACT OWNS A 2005 CADILLAC CTS. WHILE
> DRIVING 40 MPH, ALL OF THE SAFETY LIGHTS ON THE
> DASHBOARD ILLUMINATED WHEN THE VEHICLE
> STALLED. THE VEHICLE WAS TURNED BACK ON IT
> BEGAN TO FUNCTION NORMALLY. THE FAILURE
> OCCURRED TWICE. THE DEALER WAS CONTACTED AND
> THEY STATED THAT SHE NEEDED TO BRING IT IN TO
> HAVE IT DIAGNOSED AGAIN. THE DEALER PREVIOUSLY
> STATED THAT THEY WERE UNABLE TO DUPLICATE THE
> FAILURE. THE VEHICLE WAS NOT REPAIRED. THE
> FAILURE MILEAGE WAS 4100 AND THE CURRENT
> MILEAGE WAS 58,000.  NHTSA ID Number: 10348743.

460.    On April 16, 2012, New GM became aware of a complaint filed with NHTSA

involving a 2005 Cadillac SRX and an incident that occurred on March 31, 2012, in which the

following was reported:

> TL* THE CONTACT OWNS A 2005 CADILLAC SRX. WHILE
> DRIVING APPROXIMATELY 45 MPH, THE CONTACT
> STATED THAT THE STEERING BECAME DIFFICULT TO
> MANEUVER AND HE LOST CONTROL OF THE VEHICLE.
> THERE WERE NO WARNING LIGHTS ILLUMINATED ON
> THE INSTRUMENT PANEL. THE CONTACT THEN

- 190 -

> CRASHED INTO A HIGHWAY DIVIDER AND INTO
> ANOTHER VEHICLE. THERE WERE NO INJURIES. THE
> VEHICLE WAS TOWED TO AN AUTO CENTER AND THE
> MECHANIC STATED THAT THERE WAS A RECALL
> UNDER NHTSA CAMPAIGN ID NUMBER 06V125000
> (SUSPENSION:REAR), THAT MAY BE RELATED TO THE
> FAILURE. THE MANUFACTURER WAS MADE AWARE OF
> THE FAILURE AND STATED THAT THE VIN WAS NOT
> INCLUDED IN THE RECALL. THE VEHICLE WAS NOT
> REPAIRED. THE APPROXIMATE FAILURE MILEAGE WAS
> 46,000.  NHTSA ID Number: 10455394.

461.    On March 20, 2013, New GM became aware of a complaint filed with NHTSA

regarding a 2003 Chevrolet Impala incident that occurred on March 1, 2013, in which it was

reported that:

> CAR WILL SHUT DOWN WHILE DRIVING AND SECURITY
> LIGHT WILL FLASH. HAS DONE IT NUMEROUS TIMES,
> WORRIED IT WILL CAUSE AN ACCIDENT. THERE ARE
> MULTIPLE CASES OF THIS PROBLEM ON INTERNET. *TR
> NHTSA ID Number: 10503840.

462.    On May 12, 2013, New GM became aware of the following complaint filed with

NHTSA regarding a 2005 Chevrolet Malibu incident that occurred on May 11, 2012, in which

the following was reported:

> I WAS AT A STOP SIGN WENT TO PRESS GAS PEDAL TO
> TURN ONTO ROAD AND THE CAR JUST SHUT OFF NO
> WARNING LIGHTS CAME ON NOR DID IT SHOW ANY
> CODES. GOT OUT OF CAR POPPED TRUNK PULLED
> RELAY FUSE OUT PUT IT BACK IN AND IT CRANKED
> UP,THEN ON MY WAY HOME FROM WORK,GOING
> ABOUT 25 MPH AND IT JUST SHUT DOWN AGAIN,I
> REPEATED PULLING OUT RELAY FUSE AND PUT IT BACK
> IN THEN WAITED A MINUTE THEN IT CRANKED AND I
> DROVE STRAIGHT HOME. *TR  NHTSA ID
> Number: 10458198.

463.    On February 26, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2004 Pontiac Grand Prix, concerning an incident that occurred on May 10, 2005, in

which it was reported that:

- 191 -

> TL – THE CONTACT OWNS A 2004 PONTIAC GRAND PRIX.
> THE CONTACT STATED THAT WHILE DRIVING AT
> VARIOUS SPEEDS AND GOING OVER A BUMP, THE
> VEHICLE WOULD STALL WITHOUT WARNING. THE
> VEHICLE WAS TAKEN TO THE DEALER. THE
> TECHNICIAN WAS UNABLE TO DIAGNOSE THE FAILURE.
> THE MANUFACTURER WAS MADE AWARE OF THE
> FAILURE. THE VEHICLE WAS NOT REPAIRED. THE VIN
> WAS NOT AVAILABLE. THE FAILURE MILEAGE WAS
> 12,000 AND THE CURRENT MILEAGE WAS 82,000. KMJ
> NHTSA ID Number: 10566118.

464.   On March 13, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Pontiac Grand Prix and an incident that occurred on February 27, 2014, in

which a driver reported:

> I WAS DRIVING HOME FROM WORK AND WHEN I
> TURNED A CORNER, THE ENGINE CUT OUT. I BELIEVE IT
> WAS FROM THE KEY FLIPPING TO ACCESSORY. I'VE
> HEARD THAT THIS HAS CAUSED CRASHES THAT HAVE
> KILLED PEOPLE AND WOULD LIKE THIS FIXED. THIS IS
> THE FIRST TIME IT HAPPENED, BUT NOW I'M WORRIED
> EVERY TIME I DRIVE IT THAT THIS IS GOING TO HAPPEN
> AND I DON'T FEEL SAFE LETTING MY WIFE DRIVE THE
> CAR NOW. WHY ARE THE 2006 PONTIAC GRAND PRIX
> VEHICLES NOT PART OF THE RECALL FROM GM? *TR
> NHTSA ID Number: 10569215.

465.   On April 1, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2003 Cadillac CTS and an incident that occurred on January 1, 2008, in which the

following was reported:

> TL* THE CONTACT OWNS A 2003 CADILLAC CTS. THE
> CONTACT STATED THAT THE VEHICLE EXHIBITED A
> RECURRING STALLING FAILURE. THE VEHICLE WAS
> TAKEN TO THE DEALER NUMEROUS TIMES WHERE
> SEVERAL UNKNOWN REPAIRS WERE PERFORMED ON
> THE VEHICLE BUT TO NO AVAIL. THE FAILURE
> MILEAGE WAS 59,730 AND THE CURRENT MILEAGE WAS
> 79,000. UPDATED 06/30/14 MA UPDATED 07/3/2014 *JS
> NHTSA ID Number: 10576468.

466.   On April 1, 2014, New GM became aware of a complaint with NHTSA regarding a 2003 Chevrolet Monte Carlo and an incident that occurred on September 16, 2013, in which the following was reported:

> WHILE DRIVING AT ANY SPEED THE IGNITION SYSTEM
> WOULD RESET LIGHTING UP THE DISPLAY CLUSTER
> JUST AS IF THE KEY WAS TURNED OFF AND BACK ON.
> THIS WOULD CAUSE A MOMENTARY SHUTDOWN OF
> THE ENGINE. THE PROBLEM SEEMED TO BE MORE
> PREVAILANT WHILE TURNING THE WHEEL FOR A
> CURVE OR TURN OFF THE ROAD. THE TURN SIGNAL
> UNIT WAS FIRST SUSPECT SINCE IT SEEMED TO
> CORRELATE WITH APPLYING THE TURN SIGNAL AND
> TURNING THE WHEEL. THE CONDITION WORSENED TO
> THE IGNITION SHUTDOWN FOR LONGER PERIODS
> SHUTTING DOWN THE ENGINE CAUSING STEERING AND
> BRAKING TO BE SHUT DOWN AND FINALLY DIFFICULTY
> STARTING THE CAR. AFTER 2 VISITS TO A GM SERVICE
> CENTER THE PROBLEM WAS FOUND TO BE A FAULTY
> IGNITION THAT WAS REPLACED AND THE PROBLEM
> HAS NOT RECURRED.  NHTSA ID Number: 10576201.

467.   On April 8, 2014, New GM became aware of a complaint with NHTSA regarding a 2003 Chevrolet Impala and an incident that occurred on August 14, 2011, in which the following was reported:

> I HAVE HAD INCIDENTS SEVERAL TIMES OVER THE
> YEARS WHERE I WOULD HIT A BUMP IN THE ROAD AND
> MY CAR WOULD COMPLETLY SHUT OFF. I HAVE ALSO
> HAD SEVERAL INCIDENTS WHERE I WAS TRAVELING
> DOWN THE EXPRESSWAY AND MY CAR TURNED OFF ON
> ME. I HAD TO SHIFT MY CAR INTO NEUTRAL AND
> RESTART IT TO CONTINUE GOING. I WAS FORTUNATE
> NOT TO HAVE AN ACCIDENT.  NHTSA ID
> Number: 10578158.

468.   On May 14, 2014, New GM became aware of a complaint filed with NHTSA regarding a 2004 Chevrolet Impala incident that occurred on April 5, 2013, in which it was reported that:

CHEVY IMPALA 2004 LS- THE VEHICLE IS STOPPING
COMPLETELY WHILE DRIVING OR SITTING AT
INTERSECTION. THERE IS NO WARNING, NO MESSAGE,
IT JUST DIES. THE STEERING GOES WHEN THIS HAPPENS
SO I CANNOT EVEN GET OFF THE ROAD. THEN THERE
ARE TIMES THAT THE CAR WILL NOT START AT ALL
AND I HAVE BEEN STRANDED. EVENTUALLY AFTER
ABOUT 20 MINUTES THE CAR WILL START- I HAVE
ALREADY REPLACED THE STARTER BUT THE PROBLEM
STILL EXISTS. I HAVE HAD THE CAR CHECKED OUT AT 2
DIFFERENT SHOPS (FIRESTONE) AND THEY CANNOT
FIND THE PROBLEM. THERE ARE NO CODES COMING UP.
THEY ARE COMPLETELY PERPLEXED. CHEVY STATES
THEIR MECHANICS ARE BETTER. ALSO THE CLUSTER
PANEL IS GONE AND CHEVY IS AWARE OF THE
PROBLEM BUT THEY ONLY RECALLED CERTAIN
MODELS AND DID NOT INCLUDE THE IMPALAS. I HAVE 2
ESTIMATES REGARDING FIXING THIS PROBLEM BUT
THE QUOTES ARE $500.00. I DO NOT FEEL THAT I
SHOULD HAVE TO PAY FOR THIS WHEN CHEVY KNEW
THEY HAD THIS PROBLEM WITH CLUSTER PANELS AND
OMITTED THE IMPALAS IN THEIR RECALL. SO, TO
RECAP: THE CAR DIES IN TRAFFIC (ALMOST HIT TWICE),
I DO NOT KNOW HOW MUCH GAS I HAVE, HOW FAST I
AM GOING, OR IF THE CAR IS OVERHEATING. IN
DEALING WITH CHEVY I WAS TOLD TO TAKE THE CAR
TO A CHEVY DEALERSHIP. THEY GAVE ME A PLACE
THAT IS 2 1/2 HOURS HOUSE AWAY FROM MY HOME. I
WAS ALSO TOLD THAT I WOULD HAVE THE HONOR OF
PAYING FOR THE DIAGNOSTICS. IN RESEARCHING THIS
PROBLEM, I HAVE PULLED UP SEVERAL COMPLAINTS
FROM OTHER CHEVY IMPALA 2004 OWNERS THAT ARE
EXPERIENCING THE SAME MULTIPLE PROBLEMS. I ALSO
NOTICED THAT MOST OF THE COMPLAINTS ARE
STATING THAT THE SAME ISSUES OCCURRED AT
APPROX. THE SAME MILEAGE AS MINE. I HAVE
DISCUSSED THIS WITH CHEVY CUSTOMER SERVICE
AND BASICALLY THAT WAS IGNORED. THIS CAR IS
HAZARDOUS TO DRIVE AND POTENTIALLY WILL CAUSE
BODILY HARM. DEALING WITH CHEVY IS POINTLESS.
ALL THEY CAN THINK OF IS HOW MUCH MONEY THEIR
DEFECTS WILL BRING IN. *TR  NHTSA ID
Number: 10512006.

469.    New GM has publicly admitted that it was aware of at least seven (7) crashes,

eight (8) injuries, and three (3) deaths linked to this serious safety defect before deciding to

finally implement a recall.  However, in reality, the number of reports and complaints is much higher.

470.    Moreover, notwithstanding years of notice and knowledge of the defect, on top of numerous complaints and reports from consumers, including reports of crashes, injuries, and deaths, New GM delayed and did not implement a recall involving this defect until July of 2014.

471.    New GM replicated the "knee to key" report in 2012 causing inadvertent key rotation and a running stall.  New GM recalled all of the CTS and SRX and gave out new keys to those that did not have "hole" keys, and two key rings so the fob could be kept on one, and the ignition key on another.  New GM's supposed recall fix does not address the defect or the safety risks that it poses, including insufficient amount of torque to resist rotation from the "run" to "accessory" position under reasonably foreseeable conditions, and puts the burden on drivers to alter their behavior and carry their ignition keys separately from their other keys, and even from their remote fob.  The real answer must include the replacement of all the switches with ones that have sufficient torque to resist foreseeable rotational forces.  The consequences of an unwanted rotation from the "run" to "accessory" position are the same in all these cars:  loss of power (stalling), loss of power steering, loss of power brakes after one or two depressions of the brake pedal, and suppression of seat belt pretensioners and airbag deployments.

472.    In addition, New GM is not addressing the other design issues that create safety risks in connection with this defect.  New GM is not altering the algorithm that prevents the airbags from deploying when the ignition leaves the "run" position, even when the vehicle is moving.  And New GM is not altering the placement of the ignition in an area where the driver's knees may inadvertently cause the ignition to move out of the "run" position.  Moreover, notwithstanding years of notice and knowledge of the defect, on top of numerous complaints and

reports from consumers, including reports of crashes, injuries, and deaths, New GM delayed and did not implement a recall involving this defect until July of 2014.

> **4.**      **Yet another ignition switch recall is made on September 4, 2014.**

473.      On September 4, 2014, New GM recalled 46,873 MY 2011-2013 Chevrolet Caprice and 2008-2009 Pontiac G8 vehicles for yet another ignition switch defect (NHTSA Recall Number 14-V-510).

474.      New GM explains that, in these Defective Ignition Switch Vehicles, "there is a risk, under certain conditions, that some drivers may bump the ignition key with their knee and unintentionally move the key away from the 'run' position."  New GM admits that, when this happens, "engine power, and power braking will be affected, increasing the risk of a crash." Moreover, "[t]he timing of the key movement out of the 'run' position, relative to the activation of the sending algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes."[48]

475.      This recall is directly related to the other ignition switch recalls and involves the same safety risks and dangers.  The defect poses a serious and dangerous safety risk because the key in the ignition switch can rotate and consequently cause the ignition to switch from the "on" or "run" position to the "off" or "accessory" position, which causes the loss of engine power, stalling, loss of speed control, loss of power steering, loss of power braking, and increases the risk of a crash.  Moreover, as with the ignition switch torque defect, if a crash occurs, the airbags may not deploy.

---

[48] New GM's Part 573 Safety Recall Report, Sept. 4, 2014.

476.    According to New GM, in late June 2014, "GM Holden began investigating potential operator knee-to-key interference in Holden-produced vehicles consistent with Safety's learning from" earlier ignition switch recalls, NHTSA recall nos. 14V-346 and 14V-355.[49]

477.    New GM "analyzed vehicle test results, warranty data, TREAD data, NHTSA Vehicle Owner Questionnaires, and other data."[50]  This belated review, concerning vehicles that were sold as long as six years earlier, led to the August 27, 2014 decision to conduct a safety recall.[51]

478.    Once again, a review of NHTSA's website shows that New GM was long on notice of ignition switch issues in the vehicles subject to the September 4 recall.

479.    For example, on February 10, 2010, New GM became aware of an incident involving a 2009 Pontiac G8 that occurred on November 23, 2009, and again on January 26, 2010, in which the following was reported to NHTSA:

> FIRST OCCURRED ON 11/23/2009. ON THE INTERSTATE IT
> LOSES ALL POWER, ENGINE SHUTS DOWN, IGNITION
> STOPS, POWER STEERING STOPS, BRAKES FAIL -
> COMPLETE VEHICLE STOPPAGE AND FULL OPERATING
> SYSTEMS SHUT DOWN WITHOUT WARNING AT 70 MPH,
> TWICE! SECOND OCCURRENCE WAS 1/26/2010.

480.    On May 22, 2013, New GM became aware of an incident involving a 2008 Pontiac G8 that occurred on May 18, 2013, in which the following was reported:

> THE CONTACT OWNS A 2008 PONTIAC G8. THE CONTACT
> STATED THAT WHILE DRIVING 50 MPH, THE VEHICLE
> STALLED WITHOUT WARNING. THE FAILURE RECURRED
> TWICE. THE VEHICLE WAS TOWED TO THE DEALER FOR
> DIAGNOSIS, BUT THE DEALER WAS UNABLE TO
> DUPLICATE THE PROBLEM. THE VEHICLE WAS NOT

---

[49] *Id.*

[50] *Id.*

[51] *Id.*

REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED.
THE APPROXIMATE FAILURE MILEAGE WAS 60,000.

481.    Consistent with its pattern in the June and July recalls, New GM's proposed remedy is to provide these Defective Ignition Switch Vehicle owners with a "revised key blade and housing assembly, in which the blade has been indexed by 90 degrees."[52]  Until the remedy is provided, New GM asserts, "it is very important that drivers adjust their seat and steering column to allow clearance between their knee and the ignition key."[53]  New GM sent its recall notice to NHTSA one week later, on September 4, 2014.

482.    New GM's supposed fix does not address the defect or the safety risks that the defect poses, including the apparent insufficient torque to resist rotation from the "run" to the "accessory" position under reasonably foreseeable driving conditions, and puts the burden on drivers to alter their behavior and carry their ignition keys separately from their other keys, and even from their remote fob.  The real answer must include the replacement of all the switches with ones that have sufficient torque to resist foreseeable rotational forces.

483.    In addition, New GM is not addressing the other design issues that create safety risks in connection with this defect.  New GM is not altering the algorithm that prevents the airbags from deploying when the ignition leaves the "run" position, even when the vehicle is moving.  And New GM is not altering the placement of the ignition in an area where the driver's knee may inadvertently cause the ignition to move out of the "run" position.

484.    The September 4 recall is, like the earlier defective ignition switch recalls, too little and too late.

---

[52] New GM's Part 573 Safety Recall Report, Sept. 4, 2014.

[53] *Id.*

5.      **The ignition switch recalls are inadequate and poorly conducted.**

485.    New GM sent its first recall notices to the owners of vehicles with defective

ignition switches in late February and early March of 2014.  New GM's recall letter minimized

the risk of the ignition switch defect, indicating that ignition problems would occur only "under

certain circumstances."  New GM's recall notification emphasized that the risk of power failure

increased if the "key ring is carrying added weight . . . or your vehicle experiences rough road

conditions."

486.    To repair the Defective Ignition Switch Vehicles targeted in the February and

March 2014 recalls, New GM replaced the defective ignition switch with a new, presumably

improved, ignition switch.  At the time it announced the recall of these Defective Ignition Switch

Vehicles, however, New GM did not have replacement switches ready.  New GM CEO Mary

Barra told Congress that New GM would start replacing ignition switches beginning in April of

2014.

487.    Internally GM could not explain why it was recalling some vehicles subject to the

Technical Service bulletin and not others:



488.    New GM later revised its timeline, notifying NHTSA that all replacement

switches would be ready by October 4, 2014.

489.    New GM's repair of the defective switches proceeded painfully slowly.  As of

August 5, 2014, New GM had repaired only 683,196 of the 2.1 million Defective Ignition Switch

---

[54] GM-MDL2543-001054064 (Highly Confidential).

Vehicles at issue in the February and March recalls.  As of January 23, 2015, New GM had repaired only 1,229,529 of the involved vehicles – or less than 60% of the total.

490.    On September 8, 2014, Ms. Barra told CNBC radio that the repair process was "substantially complete."  Nonetheless, at that time, New GM had repaired only 1 million vehicles.

491.    Meanwhile, dealerships across the country have struggled to implement New GM's repair process.  One dealership in Kalamazoo, Michigan, hired a "recall concierge" simply to deal with the myriad issues raised by the recall repair process.

492.    Although New GM has touted to courts around the country that it is offering to provide any concerned driver with a temporary loaner vehicle while he or she awaits a replacement part (for some over five months and counting), GM's recall letter failed to inform vehicle owners whether temporary loaner vehicles would be made available while they awaited replacement parts.  The letter also provided no time frame in which repairs would be completed.

493.    To add insult to injury, the New GM recall is fraught with problems for consumers.  Many consumers are unable to obtain a loaner vehicle despite New GM's promise to provide them with one pending repair.  When individuals have been fortunate enough to obtain a loaner, they often experience problems associated with the loaner program.  Even worse, many consumers continue to experience safety problems with the Defective Ignition Switch Vehicles, even after the ignition switch has been replaced pursuant to the recall.

> **d.    New GM failed to alert drivers of recalled vehicles to the possibility of obtaining a loaner vehicle, and when consumers are aware, they often find that loaner vehicles are not available.**

494.    One common problem consumers have faced and continue to face is the difficulty, if not impossibility, of obtaining a rental or loaner vehicle while awaiting the replacement part for their Defective Ignition Switch Vehicle pursuant to the recall.  Yet since it

announced the recalls, New GM has represented to the government and courts across the country

that it is offering consumers temporary loaner vehicles, free of charge, while those consumers

wait for their Defective Ignition Switch Vehicle to be repaired.

495.    New GM did not make this information easily accessible for consumers.  Shortly

after the recall was announced, for example, New GM published a website at

gmignitionupdate.com.  The front page of that website does not inform consumers that they are

eligible to obtain a temporary replacement vehicle.

496.    Indeed, consumers must click on the Frequently Asked Questions page to learn

about New GM's offer.  Even there, the information is not included in a section entitled, "What

will GM do?"  Neither is it included in a section entitled, "What should you do if you have an

affected vehicle?"

497.    To learn that New GM is offering temporary loaner vehicles, a class member must

click on a section under the heading, "Parts Availability & Repair Timing."  A subsection

entitled, "Who is eligible for a rental vehicle?" states that "[a]ny affected customer who is

concerned about operating their vehicle may request courtesy transportation.  Dealership service

management is empowered to place the customer into a rental or loaner vehicle until parts are

available to repair the customer's vehicle."

498.    Numerous owners and/or lessees of Defective Ignition Switch Vehicles were

unaware that New GM was offering temporary loaner vehicles.  As a result, many Class

Members driving one of the Defective Ignition Switch Vehicles and who are rightfully fearful of

continuing to drive their vehicles in light of the now-disclosed safety defect are denied an

alternate vehicle pre-repair.  They either are forced to drive their unsafe Defective Ignition

Switch Vehicles out of necessity, and fear every time they sit behind the wheel they could be

- 201 -

involved in an accident that will injure them or an innocent bystander, or to park their vehicles while awaiting the replacement part for their vehicles and seek alternative means of transportation.

499.    Upon information and belief, New GM also did not widely distribute its temporary loaner vehicle guarantee to dealerships across the country.  Many dealerships do not know and have not been informed about New GM's promise to provide rental/loaner vehicles to owners of vehicles awaiting the ignition switch replacement part.

500.    Further, licensed New GM dealerships aware of the loaner program quickly exhausted their supply of loaner vehicles early into the recall.  Numerous dealerships then refused interested consumers.  Because New GM's ignition repair website only states that "[d]ealership service management" is empowered to provide a temporary loaner vehicle, many such class members reasonably believed that their sole avenue for relief was foreclosed when their dealership refused.

501.    Even where Class Members have inquired directly with New GM for provision of a temporary loaner vehicle, numerous Class Members have been refused.

502.    Such refusals not only violate New GM's representations but also cause Class Members substantial inconvenience and expense, such as:

        a.      Class Members who cannot perform their jobs because they are denied a loaner/rental, despite repeated requests to both the dealership and the New GM hotline; and

        b.      Class Members who are denied a rental/loaner vehicle because they have only property loss or property damage insurance coverage on their Defective Ignition Switch Vehicle rather than full coverage.

503.     Further, even when a loaner vehicle is provided, consumers experience varied and numerous problems with the program.  Among the problems encountered:

a.     Class Members incur substantially increased gasoline expenses with their loaner vehicles because the loaner is far less fuel efficient than the Defective Ignition Switch Vehicle;

b.     Class Members incur substantially increased monthly insurance premium – up to hundreds more per month – than they pay for their Defective Ignition Switch Vehicle because the loaner vehicle is newer and more expensive; and

c.     Class Members are threatened with charges for the loaner vehicle if they do not pick up their Defective Ignition Switch Vehicle immediately when it is repaired.  Class Members have experienced these threats even when their Defective Ignition Switch Vehicle sat idle for months at a dealership awaiting repair and the dealership provided no notice that it would repair the vehicle until the repair was complete.

**e.     The repair is inadequate and/or results in new vehicle defects.**

504.     Yet another common problem with the recall that plaintiffs are experiencing is the replacement part is not remedying the safety defect.  Numerous Class Members report repeated stalls and shut downs *after* their vehicles are purportedly repaired pursuant to the recall.  Indeed, the most common complaint is that the vehicle continues to have unintended stalls while driving, the very safety defect the recall is intended to correct.  What is more, dealerships and New GM have been known to accuse vehicle owners who report stalls and shut downs following their ignition switch being replaced of lying.

505.     Yet from its inception, New GM has known that simply replacing the ignition switches in the Defective Ignition Switch Vehicles and/or providing a new key is not a solution to the potential for the key to inadvertently turn from the "run" to the "accessory/off" position in

- 203 -

these vehicles.  The necessary modifications New GM is undertaking with respect to the

Defective Ignition Switch Vehicles' ignition switches and keys are insufficient to make the

Defective Ignition Switch Vehicles safe or to restore their value.

506.    New GM's recalls fail to address the design defect that causes the key fob/chain

to hang too low on the steering column.  During testing of the Defective Ignition Switch

Vehicles, Old GM and New GM engineers repeatedly observed that the Defective Ignition

Switch Vehicle's ignition switch could be moved to the "accessory/off" position when a driver

touched the ignition key with his or her knee during ordinary and foreseeable driving conditions.

New GM's recall repairs fail to address such occurrences.  New GM's recall is thus inadequate

to remedy the defective product.

507.    Further, New GM's recall fails to address the defective airbag system, which

disables the airbag immediately when the engine shuts off.  The loss of airbags is a serious safety

condition, especially because it can happen when the Defective Ignition Switch Vehicle is

traveling at highway speeds.

508.    Following replacement of the ignition switch pursuant to the recall, problems

occurring with the Defective Ignition Switch Vehicles include, but are not limited to:  (i) stalls

and shut down on roads and highways; (ii) the ignition key does not fully turn to the "off"

position and, instead, becomes stuck in the "accessory" position; (iii) the ignition key cannot be

removed when the engine is off; (iv) power steering fails; and (v) cars are returned following

replacement of the ignition switch with new parts in non-working order that were in working

order prior to the "repair," such as airbag light remaining on, horn not working, broken door

locking mechanism, and locking steering wheel.

509.    Among the specific problems experienced in connection with the recall are:

a.      Accidents in Defective Ignition Switch Vehicles as a result of unintended shut downs or stalls, ***after*** the ignition switch has been replaced pursuant to the recall;

b.      Class Members have been threatened with charges for leaving Defective Ignition Switch Vehicles at the dealership once the replacement part is installed pursuant to the recall, even in circumstances where the Defective Ignition Switch Vehicle has been at the dealership for months awaiting the repair and the dealership did not provide timely notice of the repair's completion;

c.      Class Members have been charged the costs of a replacement battery when their Defective Ignition Switch Vehicle's battery dies on the dealership lot while waiting for months for the ignition switch replacement parts;

d.      Class Members' Defective Ignition Switch Vehicles, following replacement of the ignition switch pursuant to the recall, often are returned without the ability to turn the ignition key to the "off" position and, instead, the key becomes stuck in the "accessory" position, and/or the driver is unable to remove the key at all; and

e.      When Defective Ignition Switch Vehicles are returned after months of storage at the dealership (pursuant to New GM's instruction to the dealerships to store the vehicles while they await repair), new damages have appeared on the vehicle and/or additional mileage has appeared on the odometer.

**f.      The recalls are not being completed in a timely fashion.**

510.    At the time it announced the first ignition switch recalls, New GM acknowledged that it was not prepared to begin replacing defective ignition switches with presumably non-defective switches.

- 205 -

511.    New GM informed NHTSA that it would complete 100% of the ignition switch replacements in connection with the February and March recalls on or before October 4, 2014. New GM did not meet that deadline.

512.    The recall was delayed even further because even the replacement ignition switches are sometimes defective.  Various news outlets have reported on New GM's delivery of faulty replacement switches.  The DETROIT NEWS reported on July 9, 2014, that New GM notified dealerships that it had delivered 542 ignition switch kits with faulty tabs.  Those switches, some of which were delivered to a dealership in New York, were sent back to New GM.

513.    The slow pace of the recall caused many problems for Class Members, including the following:

        a.    Class Members saw their vehicle's registration expire while their Defective Ignition Switch Vehicle sat on the dealership's lot awaiting recall repairs;

        b.    Class Members experienced unintended stalls and power failures in Defective Ignition Switch Vehicles while they awaited repair of their vehicles and either were refused loaner vehicles, or did not know loaner vehicles were available;

        c.    Class Members have been involved in accidents when they experienced an unintended stall in the Defective Ignition Switch Vehicle while waiting for replacement parts and repair; and

        d.    Class Members who owned only their Defective Ignition Switch Vehicle and did not obtain a loaner vehicle faced daily inconveniences and additional expense to obtain alternate transportation, as they understandably refused to drive their Defective Ignition Switch Vehicle.

514.     These delays had real and significant consequences for members of the Class.  As one illustrative example of the worst, yet entirely foreseeable, outcome of this common problem known to New GM, on September 27, 2014, the NEW YORK TIMES reported that Laura Gass, a 27-year-old owner of a 2006 Saturn Ion, was killed just days after she received her recall notice. That notice informed her that replacement parts were not yet available.  The notice also did not inform Ms. Gass that she was eligible to obtain a loaner vehicle should she not wish to drive her defective Saturn.  Ms. Gass needed transportation, and was unaware that New GM was prepared to provide temporary transportation to replace her defective automobile.  As a result, she continued to drive her defective Ion, a turn of events that had disastrous consequences.  On March 18, 2014, the ignition switch in Ms. Gass's Saturn slipped to the "accessory" or "off" position, the power to the vehicle failed, and she was unable to control the vehicle as it collided with a truck on the interstate.  Ms. Gass was killed, but the tragedy should have been prevented.

### g.     The repair of the other ignition switch defects.

515.     The repair of the vehicles recalled for ignition switch-related problems in June and July 2014 – the Camaro recall, the ignition key slot recall, and the unintended key rotation recall – is also proceeding in a problematic fashion.

516.     Owners of these vehicles – more than 10 million – have been notified that their vehicle is defective, but no replacement parts were immediately available.  New GM did not provide a timeline within which it would provide any remedy for the ignition switch defect in these vehicles.

517.     Further, because New GM claims that the defect afflicting these vehicles is distinct from the ignition switch defect affecting the 2.1 million vehicles in its initial recall of Defective Ignition Switch Vehicles, it has offered owners significantly less safe alternatives.

New GM has not offered loaner vehicles to owners of these 10 million vehicles.  It has simply advised them to remove everything from the key chain.

518.    Of course, the recall notice for each of these 10 million vehicles notes the possibility that the vehicle may experience a moving stall and/or power failure by traveling across a bumpy roadway or when a driver's knee inadvertently contacts the ignition key.

519.    What is more, New GM's proposed repair of these vehicles is wholly inadequate. New GM will modify the ignition key for all the affected vehicles so that the key is less susceptible to movement.  New GM's proposed remedy, however, does nothing to prevent one from impacting the ignition key with one's knee during ordinary and foreseeable driving conditions.  It does nothing to ensure that the airbag system is not disabled if and when the ignition switch moves into the "accessory" or "off" position.  And it does not address the fact that many of the affected vehicles contain ignition switches with inadequate "detent plungers."

520.    New GM's proposed repairs are an attempt to rid itself of safety problems on the cheap.  Indeed, New GM is not offering temporary rental vehicles to those affected customers driving the vehicles recalled in June and early July.  Nor will GM reimburse owners for any previous repairs aimed at preventing inadvertent power failure in these subject vehicles.

521.    According to New GM spokesperson Alan Adler, and despite the fact that the June and July recalls are aimed at safety problems that are substantially similar, if not identical, to those present in the February and March ignition switch recalls, the recall of more than 10 million vehicles in June and July was to remedy "key issues," not because the vehicles contain bad ignition switches.

522.    This statement is belied by the facts on the ground.  Many Class Members have experienced power failures and engine stalls, and many individuals have been in accidents

attributable to such failures.  Court supervision and involvement is required in order to force

New GM to provide its customers with a repair that will truly make the Defective Ignition

Switch Vehicles safe for ordinary and foreseeable driving conditions.

**D.      Contrary to its Barrage of Representations about Safety and Quality, New GM Concealed and Disregarded Safety Issues as a Way of Doing Business**

523.    As of or shortly after its inception, New GM possessed vastly superior (if not

exclusive) knowledge and information to that of consumers about the design and function of

GM-branded vehicles and the existence of the defects in those vehicles.

524.    Recently revealed information presents a disturbing picture of New GM's

approach to safety issues – both in the design and manufacturing stages, and in discovering and

responding to defects in GM-branded vehicles that have already been sold.

525.    New GM made very clear to its personnel that cost-cutting was more important

than safety, deprived its personnel of necessary resources for spotting and remedying defects,

trained its employees not to reveal known defects, and rebuked those who attempted to "push

hard" on safety issues.

526.    In stark contrast to New GM's public mantra that "Nothing is more important

than the safety of our customers" and similar statements, a prime "directive" at New GM was

"cost is everything."[55]  The messages from top leadership at New GM to employees, as well as

their actions, were focused on the need to control cost.[56]

527.    One New GM engineer stated that emphasis on cost control at New GM

"permeates the fabric of the whole culture."[57]

---

[55] Valukas Report at 249.

[56] *Id.* at 250.

[57] Valukas Report at 250.

528.    According to Mark Reuss (President of GMNA from 2009-2013 before
succeeding Mary Barra as Executive Vice President for Global Product Development,
Purchasing and Supply Chain in 2014), cost and time-cutting principles known as the "Big 4" at
New GM "emphasized timing over quality."[58]

529.    New GM's focus on cost-cutting created major disincentives to personnel who
might wish to address safety issues.  For example, those responsible for a vehicle were
responsible for its costs, but if they wanted to make a change that incurred cost and affected
other vehicles, they also became responsible for the costs incurred in the other vehicles.

530.    The drive to cut costs also resulted in a policy to "minimize needless part number
changes" in order to achieve "cost savings to the corporation," as reflected in a 2012
instructional document from Global Product Description System.

531.    The culture of cost cutting directly affected New GM's unwillingness to
adequately remediate the defects.  For example, in an October 2012 e-mail to Peter Judis and
John Zuzelsnski, Terrence Connolly noted that ███████████████████████████
██████████████████████████████████████████████████████████
██████ [59]

532.    This measure undoubtedly would have saved many lives and mitigated many
injuries.  But New GM – focused on costs, not customer safety – determined it would be an
"█████████████████ [60] ███████████████████████████████

---

[58] *Id.*

[59] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-003609538.

[60] HIGHLY CONFIDENTIAL DOC: *Id.*

533.    That same month, Stouffer and DeGiorgio e-mailed about another ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ [61]

534.    In a 2013 e-mail to Wachtel & Furney, Hall raised the idea of █████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Chief among Hall's concerns ███████████████████

████████████████████████████████████████████████████████

████████████████ " [62]

535.    When New GM finally decided to take action to address the ignition switch

defects, cost, not customer safety, remained the driving consideration.  A PowerPoint

presentation from December 17, 2013 revealed ████████████████████████

████████████████████████████████████ [63]  Unsurprisingly, New GM

opted not to replace all the ignition switches, and to rely solely on the key fix for many of the

Defective Ignition Switch Vehicles.

536.    Even then, Omar Perea of part supplier Srattec, advised New GM's Joseph Rec

that the key inserts "████████████████████████████████████████████

████████ "  Given this, in January 2014, Christine Witt asked John Murawa if "█████████

████████████████████████ "  Witt's response, unsurprisingly, was again focused on

---

[61] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-000592970.

[62] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-001514667.

[63] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-003328192.

cost: "███████████████████████████████████████████

██████████████████████████████████████[64]

537.    Shortly thereafter, Witt relayed to Allen that the GM Executive Decision

Committee is "████████████████████████████" with the key inserts, explained that

she was asked to ██████████████████████████████████████'"[65]

538.    As another cost-cutting measure, parts were sourced to the lowest bidder, even if

they were not the highest quality parts.[66]

539.    Because of New GM's focus on cost-cutting, New GM engineers did not believe

they had extra funds to spend on product improvements.[67]

540.    New GM's focus on cost-cutting also made it harder for New GM personnel to

discover safety defects, as in the case of the "TREAD Reporting team."

541.    New GM used its TREAD database (known as "TREAD") to store the data

required to be reported quarterly to NHTSA under the TREAD Act.[68]  From the date of its

inception in 2009, TREAD has been the principal database used by New GM to track incidents

related to its vehicles.[69]

542.    Generally, the TREAD Reporting team has consisted of employees who conduct

monthly searches and prepare scatter graphs to identify spikes in the number of accidents or

complaints with respect to various GM-branded vehicles.  The TREAD Reporting team reports

---

[64] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-002827790.

[65] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-0031419974.

[66] Valukas Report at 251.

[67] *Id.*

[68] *Id.* at 306.

[69] *Id.*

have gone to a review panel and have sometimes spawned investigations to determine if any safety defect existed.[70]

543.     In 2010, New GM elected to continue the understaffing of the TREAD team, adding two people to the team of three but opting not to have them participate in the TREAD database searches.[71]  Moreover, until 2014, the TREAD Reporting team did not have sufficient resources to obtain any of the advanced data mining software programs available in the industry to better identify and understand potential defects.[72]

544.     By starving the TREAD Reporting team of the resources it needed to identify potential safety issues, New GM helped to insure that safety issues would not come to light.

545.     "[T]here was resistance or reluctance to raise issues or concerns in the GM culture."  The culture, atmosphere and supervisor response at New GM "discouraged individuals from raising safety concerns."[73]

546.     Dwayne Davidson, senior manager for TREAD reporting at New GM, testified

██████████████████████████████████████████████████████████

████████████████████████[74]

547.     New GM CEO, Mary Barra, experienced instances where New GM engineers were "unwilling to identify issues out of concern that it would delay the launch" of a vehicle.[75]

548.     New GM supervisors warned employees to "never put anything above the company" and "never put the company at risk."[76]

---

[70] *Id.* at 307.

[71] *Id.* at 307-308.

[72] *Id.* at 208.

[73] *Id.* at 252.

[74] May 15, 2015 Dwayne Davidson Dep. at 292.

[75] Valukas Report at 252.

549.   New GM systematically "pushed back" on describing matters as safety issues and, as a result, "GM personnel failed to raise significant issues to key decision-makers."[77]

550.   So, for example, New GM discouraged the use of the word "stall" in Technical Service Bulletins ("TSBs") that it sometimes sent to dealers about issues in GM-branded vehicles.  According to Steve Oakley, who drafted a Technical Service Bulletin in connection with the ignition switch defects, "the term 'stall' is a 'hot' word that GM generally does not use in bulletins because it may raise a concern about vehicle safety, which suggests GM should recall the vehicle, not issue a bulletin."[78]  Other New GM personnel confirmed Oakley on this point, stating that "there was concern about the use of 'stall' in a TSB because such language might draw the attention of NHTSA."[79]

551.   Oakley further noted that "he was reluctant to push hard on safety issues because of his perception that his predecessor had been pushed out of the job for doing just that."[80]

552.   Many New GM employees "did not take notes at all at critical safety meetings because they believed New GM lawyers did not want such notes taken."[81]

553.   A New GM training document released by NHTSA as an attachment to its Consent Order sheds further light on the lengths to which New GM went to ensure that known defects were concealed.  It appears that the defects were concealed pursuant to New GM company policy.  The presentation focused on recalls and the "reasons for recalls."

---

[76] *Id*. at 252-253.

[77] *Id*. at 253.

[78] *Id*. at 92.

[79] *Id*. at 93.

[80] *Id*.

[81] *Id*. at 254.

554.    One major component of the presentation was captioned "Documentation Guidelines," and focused on what employees should (and should not say) when describing problems in vehicles.  Employees were instructed to "[w]rite smart," and to "[b]e factual, not fantastic" in their writing.  In practice, "factual" was a euphemism for avoiding facts and relevant details.

555.    New GM vehicle drivers were given examples of comments to avoid, including the following:  "This is a safety and security issue"; "I believe the wheels are too soft and weak and could cause a serious problem"; and "Dangerous … almost caused accident."

556.    In documents used for reports and presentations, employees were advised to avoid a long list of words, including:  "bad," "dangerous," "defect," "defective," "failed," "flawed," "life-threatening," "problem," "safety," "safety-related," and "serious."

557.    In truly Orwellian fashion, the company advised employees to use the words (1) "Issue, Condition [or] Matter" instead of "Problem"; (2) "Has Potential Safety Implications" instead of "Safety"; (3) "Broke and separated 10 mm" instead of "Failed"; (4) "Above/Below/Exceeds Specification" instead of "Good [or] Bad"; and (5) "Does not perform to design" instead of "Defect/Defective."

558.    As NHTSA's Acting Administrator Friedman noted at the May 16, 2014 press conference announcing the Ignition Switch Defect Consent Order, it was New GM's company policy to avoid using words that might suggest the existence of a safety defect.

559.    GM must rethink the corporate philosophy reflected in the documents we reviewed, including training materials that explicitly discouraged employees from using words like "defect," "dangerous," "safety related," and many more essential terms for engineers and investigators to clearly communicate up the chain when they suspect a problem.

- 215 -

560.     Thus, New GM trained its employees to conceal the existence of known safety defects from consumers and regulators.  Indeed, it is nearly impossible to convey the potential existence of a safety defect without using the words "safety" or "defect" or similarly strong language that was forbidden at New GM.

561.     So institutionalized was the "phenomenon of avoiding responsibility" at New GM that the practice was given a name:  "the 'GM salute,'" which was "a crossing of the arms and pointing outward towards others, indicating that the responsibility belongs to someone else, not me."[82]

562.     Similarly, New GM had a silo-ed culture, designed to cabin information relating to potential safety defects rather than reveal such information.

563.     In a May 13, 2013 meeting about safety defects and potential troubles with NHTSA, Maureen Foley-Gardner noted that ████████████████████████ ████████████████████████████████████████████ ████.[83]

564.     CEO Mary Barra described a related phenomenon, "known as the 'GM nod,'" which was "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture."[84]

565.     According to the New GM Report prepared by Anton R. Valukas (known as the "Valukas Report"), part of the failure to properly correct the ignition switch defect was due to problems with New GM's organizational structure[85] and a corporate culture that did not care

---

[82] GM Report at 255.

[83] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-400264009.

[84] Valukas Report at 256.

[85] *Id*. at 259-260.

enough about safety.[86]  Other culprits included a lack of open and honest communication with

NHTSA regarding safety issues,[87] and the improper conduct and handling of safety issues by

lawyers within New GM's Legal Staff.[88]  On information and belief, all of these issues

independently and in tandem helped cause the concealment of, and failure to remedy, the many

defects that have led to the spate of recalls in 2014.

566.    An automobile manufacturer has a duty to promptly disclose and remedy defects.

New GM knowingly concealed information about material safety hazards from the driving

public, its own customers, and the Class, thereby allowing unsuspecting vehicle owners and

lessees to continue unknowingly driving patently unsafe vehicles that posed a mortal danger to

themselves, their passengers and loved ones, other drivers, and pedestrians.

567.    Not only did New GM take far too long in failing to address or remedy the

defects, it deliberately worked to cover-up, hide, omit, fraudulently conceal, and/or suppress

material facts from the Class who relied upon it to the detriment of the Class.

568.    New GM further endeavored to conceal and suppress material facts by quietly

settling claims brought on behalf of people hurt by the defects in the Defective Ignition Switch

Vehicles.

569.    For example, in a November 2, 2010 evaluation of the '████████' case, New

GM's outside counsel explained that '█████████████████████████████████████

████████████████████████████████' i.e., before a case was filed and a

public record developed.[89]

---

[86] *Id*. at 260-61.

[87] *Id*. at 263.

[88] *Id*. at 264.

[89] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-00660601.

570.    New GM's counsel made a similar recommendation in the '██████' case on July

22, 2013: '████████████████████ counsel advised, because '██████████████ the

vehicle was defective and New GM needed to avoid letting the plaintiff's counsel continue to

develop and publicize '████████████████████████████████████

███████████' for almost a decade '████████████████████████.'[90]

████████████████████████████████████████████

████████████████████████████

571.    Even after the 2014 Recalls, New GM continued its efforts to conceal facts about

the defects by offering terminated employees generous severance packages tied to confidentiality

provisions.

1.    **New GM's Deceptions Continued In Its Public Discussions of the Ignition Switch Recalls**

572.    From the CEO on down, GM has once again embarked on a public relations

campaign to convince consumers and regulators that, ***this time***, New GM has sincerely reformed.

573.    On February 25, 2014, New GM North America President Alan Batey publicly

apologized and again reiterated New GM's purported commitment to safety:  "Ensuring our

customers' safety is our first order of business.  We are deeply sorry and we are working to

address this issue as quickly as we can."[91]

574.    In a press release on March 18, 2014, New GM announced that Jeff Boyer had

been named to the newly created position of Vice President, Global Vehicle Safety.  In the press

release, New GM quoted Mr. Boyer as stating that:  "Nothing is more important than the safety

---

[90] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-300002915.

[91] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2014/Feb/0225-ion.

of our customers in the vehicles they drive.  Today's GM is committed to this, and I'm ready to take on this assignment."

575.    In an April 10, 2014 press release, CEO Mary Barra announced that New GM was "creating a Speak Up for Safety program to recognize employees for ideas that make vehicles safer, and for speaking up when they see something that could impact customer safety."  Barra explained:  "We will recognize employees who discover and report safety issues to fix problems that could have been found earlier and identify ways to make vehicles safer."[92]

576.    On May 13, 2014, New GM published a video to defend its product and maintain that the ignition defect will never occur when only a single key is used.  Jeff Boyer addressed viewers and told them New GM's Milford Proving Ground is one of "the largest and most comprehensive testing facilities in the world."  He told viewers that if you use a New GM single key that there is no safety risk.[93]



577.    As of July 2014, New GM continued to praise its safety testing.  It published a video entitled "90 Years of Safety Testing at New GM's Milford Proving Ground."  The narrator describes New GM's testing facility as "one of the world's top automotive facilities" where data

---

[92] http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Apr/0410-speakup.html.

[93] https://www.youtube.com/watch?v=rXO7F3aUBAY.

is "analyzed for customer safety."  The narrator concludes by saying, "[o]ver the past ninety years one thing remained unchanged, GM continues to develop and use the most advanced technologies available to deliver customers the safest vehicles possible."[94]



578.    On July 31, 2014, Jack Jensen, the New GM engineering group manager for the "Milford Proving Ground" dummy lab, told customers that "[w]e have more sophisticated dummies, computers to monitor crashes and new facilities to observe different types of potential hazards.  All those things together give our engineers the ability to design a broad range of vehicles that safely get our customers where they need to go."[95]

579.    As discussed in this Complaint, these most recent statements from New GM personnel contrast starkly with New GM's wholly inadequate response to remedy the defects in its vehicles, including the ignition switch defect.

580.    New GM's recent actions underscore its unwillingness to reform.  Owners of 2013-2014 Buick Verano, Chevrolet Cruze, and Chevrolet Malibu have complained that their

---

[94] https://www.youtube.com/watch?v=BPQdlJZvZhE&list=UUxN-Csvy_9sveql5HJviDjA.

[95] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2014/
Jul/0731-mpg.

steering wheels can stick in one position after driving for a long period of time, compromising the driver's ability to steer effectively.[96]

581.    More than 50 complaints have been registered with NHTSA so far.  One customer reported:  "At highway speeds the steering sticks, making it scary to drive and dangerous."[97] New GM's response?  Another service bulletin.

582.    In July 2014, GM issued a TSB to dealers advising them how to install a software update to fix the problem, but only if a customer affirmatively brought it to the dealers' attention.[98]  In November 2014, GM alerted customers with a letter advising the wheel could "stick in the straight-ahead position."[99]

583.    And yet, despite this potentially dangerous defect, GM refused to issue a recall. New GM's pattern and practice of stopgap and half-measures continues unabated.

**2.    There are serious safety defects in millions of GM-branded vehicles across many models and years and, until recently, New GM concealed them from consumers.**

584.     In 2014, New GM announced at least 84 recalls for more than 70 separate defects affecting over 27 million GM-branded vehicles sold in the United States from model years 1997-2015.  The number of recalls and serious safety defects are unprecedented, and can only lead to one conclusion:  New GM was concealing the fact that it was incapable of building safe vehicles free from defects.  For context, in 2013, the whole auto industry in the United States issued recalls affecting 23 million vehicles, and the previous record for the whole industry in a given

---

[96] http://www.nytimes.com/2015/04/11/business/gm-steering-issue-pushes-automakers-limits.html?_r=1; http://gmauthority.com/blog/2015/04/general-motors-says-it-will-not-issue-steering-related-recall-based-on-nhtsa-findings/.

[97] *Id.*

[98] *Id.*

[99] *Id.*

year was 31 million in 2004.[100]  Thus, New GM's recalls in 2014 impacts more vehicles than the

***entire industry's*** recalls did in 2013, and the total of over 27 million vehicles recalled in one year

is three times larger than Honda or Chrysler.  In 2015, New GM announced five more significant

recalls for separate safety-related defects affecting over 129,000 GM-branded vehicles sold in

the United States from model years 2004-2015.

585.    Even more disturbing, the available evidence shows a common pattern:  From its

inception in 2009, New GM knew about an ever-growing list of serious safety defects in millions

of GM-branded vehicles, but concealed them from consumers and regulators in order to cut

costs, boost sales, and avoid the cost and publicity of recalls.

586.    Unsurprisingly in light of New GM's systemic devaluation of safety issues, the

evidence also shows that New GM has manufactured and sold a grossly inordinate number of

vehicles with serious safety defects.

587.    New GM valued cost-cutting over safety, actively discouraged its personnel from

taking a "hard line" on safety issues, avoided using "hot" words like "stall" that might attract the

attention of NHTSA and suggest that a recall was required, and trained its employees to not use

words such as "defect" or "problem" that might flag the existence of a safety issue.

588.    The Center for Auto Safety recently stated that it has identified 2,004 death and

injury reports filed by New GM with federal regulators in connection with vehicles that have

recently been recalled.[101]  The GM Ignition Compensation Claims Resolution Facility has

concluded that at least 104 fatalities and 191 personal injury claims are attributable to the

---

[100] In 2014, that record was broken when the whole industry issued recalls affecting 64 million vehicles.

[101] *See Thousands of Accident Reports Filed Involving Recalled GM Cars:  Report*, Irvin Jackson (June 3, 2014).

Ignition Switch Defects alone.[102]  Many of these deaths and injuries would have been avoided

had New GM complied with its TREAD Act obligations over the past five plus years.

589.    The many defects concealed and/or created by New GM affect important safety

systems in GM-branded vehicles, including the ignition, power steering, airbags, brake lights,

gearshift systems, and seatbelts.

590.    The available evidence shows a consistent pattern:  New GM learned about a

particular defect and, often only at the prodding of regulatory authorities, "investigated" the

defect and decided upon a "root cause."  New GM then took minimal action – such as issuing a

carefully worded "Technical Service Bulletin" to its dealers, or even recalling a limited number

of the vehicles with the defect.  All the while, the true nature and scope of the defects were kept

under wraps, vehicles affected by the defects remained on the road, New GM continued to create

new defects in new vehicles, and New GM enticed Class Members to purchase its vehicles by

touting the safety, quality, and reliability of its vehicles, and presenting itself as a manufacturer

that stands behind its products.

591.    Many of the most significant defects are discussed below.

**3.        Other safety defects affecting the ignition in GM-branded vehicles.**

**a.        Ignition lock cylinder defect in vehicles also affected by the ignition switch defect that gave rise to the first recall of 2.1 million defective ignition switch vehicles.**

592.    On April 9, 2014, New GM recalled 2,191,014 GM-branded vehicles with faulty

ignition lock cylinders.[103]  Though the vehicles are the same as those affected by the ignition

switch torque defect,[104] the lock cylinder defect is distinct.

---

[102] http://www.gmignitioncompensation.com/docs/program_Statistics.pdf.  These figures
continue to grow, moreover, and account for only a subset of the vehicles affected by the Ignition
Switch Defects.

593.    In these vehicles, faulty ignition lock cylinders can allow removal of the ignition key while the engine is not in the "off" position.  If the ignition key is removed when the ignition is not in the "off" position, unintended vehicle motion may occur.  That could cause a crash and injury to the vehicle's occupants or pedestrians.  Some of the vehicles with faulty ignition lock cylinders may fail to conform to Federal Motor Vehicle Safety Standard number 114, "*Theft Prevention and Rollaway Prevention.*"[105]

594.    According to New GM's Chronology that it submitted to NHTSA on April 23, 2014, the ignition lock cylinder defect arose out of New GM's notorious recalls for defective ignition switch systems in the Chevrolet Cobalt, Chevrolet HHR, Pontiac G5, Pontiac Solstice, Saturn ION, and Saturn Sky vehicles.  Those three recalls occurred in February and March of 2014.[106]

595.    In late February or March 2014, New GM personnel participating in the ignition switch recalls observed that the keys could sometimes be removed from the ignition cylinders when the ignition was not in the "off" position.  This led to further investigation.

596.    After investigation, New GM's findings were presented at a Decision Committee meeting on April 3, 2014.  New GM noted several hundred instances of potential key pullout issues in vehicles covered by the previous ignition switch recalls, and specifically listed 139 instances identified from records relating to customer and dealer reports to GM call centers, 479 instances identified from warranty repair data, one legal claim, and six instances identified from NHTSA VOQ information.  New GM investigators also identified 16 roll-away instances

---

[103] New GM Letter to NHTSA dated April 9, 2014.

[104] Namely, MY 2005-2010 Chevrolet Cobalts, 2006-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys.  *See id.*

[105] New GM Notice to NHTSA dated April 9, 2014, at 1.

[106] *See* Attachment B to New GM's letter to NHTSA dated April 23, 2014 ("Chronology").

associated with the key pullout issue from records relating to customer and dealer reports to GM call centers and legal claims information.

597.    New GM noted that excessive wear to ignition tumblers and keys may be the cause of the key pullout issue.  New GM also considered the possibility that some vehicles may have experienced key pullout issues at the time they were manufactured, based on information that included the following:  (a) a majority of instances of key pullouts that had been identified in the recall population were in early-year Saturn Ion and Chevrolet Cobalt vehicles, and in addition, repair order data indicated vehicles within that population had experienced a repair potentially related to key pullout issues as early as 47 days from the date on which the vehicle was put into service; and (b) an engineering inquiry known within New GM as a Problem Resolution related to key pullout issues was initiated in June 2005, which resulted in an engineering work order to modify the ignition cylinder going forward.

598.    A majority of the key pullout instances identified involved 2003-2004 model year Saturn Ion and 2005 model year Chevrolet Cobalt vehicles.  An April 3 New GM PowerPoint identified 358 instances of key pullouts involving those vehicles.

599.    In addition, with respect to early-year Saturn Ion and Chevrolet Cobalt vehicles, the April 3 PowerPoint materials discussed the number of days that elapsed between the "In Service Date" of those vehicles (the date they first hit the road) and the "Repair Date."  The April 3 PowerPoint stated that, with respect to the 2003 model year Saturn Ion, a vehicle was reported as experiencing a potential key pullout repair as early as 47 days from its "In Service Date;" with respect to the 2004 model year Saturn Ion, a vehicle was reported as experiencing a potential key pullout repair as early as 106 days from its "In Service Date;" with respect to the 2005 model year Chevrolet Cobalt, a vehicle was reported as experiencing a potential key

pullout repair as early as 173 days from its "In Service Date;" and with respect to the 2006 model

year Chevrolet Cobalt, a vehicle was reported as experiencing a potential key pullout repair as

early as 169 days from its "In Service Date."  The length of time between the "In Service Date"

and the "Repair Date" suggested that these vehicles were defective at the time of manufacture.

600.    The PowerPoint at the April 3 Decision Committee meeting also discussed a

Problem Resolution that was initiated in June 2005 which related to key pullout issues in the

Chevrolet Cobalt (PRTS N 183836).  According to PRTS N 183836:  "Tolerance stack up

condition permits key to be removed from lock cylinder while driving."  The "Description of

Root Cause Investigation Progress and Verification" stated, "[a]s noted a tolerance stack up

exists in between the internal components of the cylinder."  According to a "Summary," "A

tolerance stack up condition exists between components internal to the cylinder which will allow

some keys to be removed."  Problem Resolution identified the following "Solution":  "A change

to the sidebar of the ignition cylinder will occur to eliminate the stack-up conditions that exist in

the cylinder."

601.    In response to PRTS N 183836, New GM issued an engineering work order to

"[c]hange shape of ignition cylinder sidebar top from flat to crowned."

602.    According to the work order:  "Profile and overall height of ignition cylinder

sidebar [will be] changed in order to assist in preventing key pullout on certain keycodes.  Profile

of sidebar to be domed as opposed to flat and overall height to be increased by 0.23mm."

603.    According to PRTS N 183836, this "solution fix[ed] the problem" going forward.

An entry in Problem Resolution  made on March 2, 2007 stated:  "There were no incidents of the

key coming out of the ignition cylinder in the run position during a review of thirty vehicles…."

A "Summary" in Problem Resolution stated:  "Because there were no incidents of the key

coming out of the ignition cylinder in the run position during a review of thirty vehicles[,] this PRTS issue should be closed."  PRTS N 183836 was the only PRTS discussed at the April 3, 2014, Decision Committee meeting, although it is not the only engineering or field report relating to potential key pullout issues.

604.    This data led the Decision Committee to conclude that 2003-2004 model year Saturn Ion vehicles and 2005 and some 2006 model year Chevrolet Cobalt vehicles failed to conform to FMVSS 114.  In addition, the Decision Committee concluded that a defect related to motor vehicle safety existed, and decided to recall all vehicles covered by the first, second, and third ignition switch torque recalls to prevent unintended vehicle motion potentially caused by key pullout issues that could result in a vehicle crash and occupant or pedestrian injuries.  For vehicles that were built with a defective ignition cylinder that have not previously had the ignition cylinder replaced with a redesigned part, the recall called for dealers to replace the ignition cylinder and provide two new ignition/door keys for each vehicle.

### b.    Ignition lock cylinder defect affecting over 200,000 additional GM-branded vehicles.

605.    On August 7, 2014, New GM recalled 202,155 MY 2002-2004 Saturn Vue vehicles.[107]  In the affected vehicles, the ignition key can be removed when the vehicle is not in the "off" position.[108]  If this happens, the vehicle can roll away, increasing the risk for a crash and occupant or pedestrian injuries.[109]

606.    Following New GM's April 9, 2014 recall announcement regarding ignition switch defects, New GM reviewed field and warranty data for potential instances of ignition

---

[107] *See* August 7, 2014 Letter from New GM to NHTSA.

[108] *Id.*

[109] *Id.*

cylinders that permit the operator to remove the ignition key when the key is not in the "off" position in other vehicles outside of those already recalled.[110]  New GM identified 152 reports of vehicle roll away and/or ignition keys being removed when the key is not in the "off" position in the 2002-2004 MY Saturn Vue vehicles.[111]

607.    After reviewing this data with NHTSA on June 17, 2014, July 7, 2014, and July 24, 2014, GM instituted a safety recall on July 31, 2014.[112]

### 4.    Defects affecting the occupant safety restraint system in GM-branded vehicles.

#### a.    Safety defects of the airbag systems of GM-branded vehicles.

##### (1)    Wiring harness defect.

608.    On March 17, 2014, New GM recalled nearly 1.2 million model year 2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook vehicles for a dangerous defect involving airbags and seatbelt pretensioners.

609.    The affected vehicles were sold with defective wiring harnesses.  Increased resistance in the wiring harnesses of driver and passenger seat-mounted, side-impact airbag in the affected vehicles may cause the side impact airbags, front center airbags, and seat belt pretensioners to not deploy in a crash.  The vehicles' failure to deploy airbags and pretensioners in a crash increases the risk of injury and death to the drivers and front-seat passengers.

610.    Once again, New GM knew of the dangerous airbag defect long before it took anything approaching the requisite remedial action.

611.    As the wiring harness connectors in the side impact airbags corrode or loosen over time, resistance will increase.  The airbag sensing system will interpret this increase in

---

[110] *Id.*

[111] *Id.*

[112] *Id.*

resistance as a fault, which then triggers illumination of the "SERVICE AIR BAG" message on the vehicle's dashboard.  This message may be intermittent at first and the airbags and pretensioners will still deploy.  But over time, the resistance can build to the point where the SIABs, pretensioners, and front center airbags will not deploy in the event of a collision.[113]  The problem relates to the use of tin, rather than a more solid material, to connect wire harnesses.

612.    From the date of its inception, New GM knew that in 2008 there had been an increase in warranty claims for airbag service on certain of its vehicles and determined it was due to increased resistance in airbag wiring.  New GM further knew that a September 2008 analysis of the tin connectors, revealed that corrosion and wear to the connectors was causing the increased resistance in the airbag wiring. New GM knew that  a technical service bulletin had been issued on November 25, 2008, for 2008-2009 Buick Enclave, 2009 Chevy Traverse, 2008-2009 GMC Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the defect by using Nyogel grease, securing the connectors, and adding slack to the line.  Finally, New GM knew that Old GM had also begun the transition back to gold-plated terminals in certain vehicles and suspended all investigation into the defective airbag wiring without taking further action.[114]

613.    In November 2009, New GM  learned of similar reports of increased airbag service messages in 2010 Chevy Malibu and 2010 Pontiac G6 vehicles.  After investigation, New GM concluded that corrosion and wear in the same tin connector was the root of the airbag problems in the Malibu and G6 models.[115]

---

[113] *See* New GM Notice to NHTSA dated March 17, 2014, at 1.

[114] *See* New GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.

[115] *Id.* at 2.

614.    In January 2010, after review of the Malibu and G6 airbag connector issues, New GM concluded that ignoring the service airbag message could increase the resistance such that a side impact airbag might not deploy in a side impact collision.  On May 11, 2010, New GM issued a Customer Satisfaction Bulletin for the Malibu and G6 models and instructed dealers to secure both front seat-mounted, side-impact airbag wire harnesses and, if necessary, reroute the wire harness.[116]

615.    From February to May 2010, New GM revisited the data on vehicles with faulty harness wiring issues, and noted another spike in the volume of the airbag service warranty claims.  This led New GM to conclude that the November 2008 bulletin was "not entirely effective in correcting the [wiring defect present in the vehicles]."  On November 23, 2010, New GM issued another Customer Satisfaction Bulletin for certain 2008 Buick Enclave, 2008 Saturn Outlook, and 2008 GMC Acadia models built from October 2007 to March 2008, instructing dealers to secure side impact airbag harnesses and re-route or replace the side impact airbag connectors.[117]

616.    New GM issued a revised Customer Service Bulletin on February 3, 2011, requiring replacement of the front seat-mounted side-impact airbag connectors in the same faulty vehicles mentioned in the November 2010 bulletin.  In July 2011, New GM again replaced its connector, this time with a Tyco-manufactured connector featuring a silver-sealed terminal.[118]

617.    But in 2012, New GM noticed another spike in the volume of warranty claims relating to side impact airbag connectors in vehicles built in the second half of 2011.  After further analysis of the Tyco connectors, it discovered that inadequate crimping of the connector

---

[116] *Id.*

[117] *See id.* at 3.

[118] *See id.*

terminal was causing increased system resistance.  In response, New GM issued an internal

bulletin for 2011-2012 Buick Enclave, Chevy Traverse, and GMC Acadia vehicles,

recommending dealers repair affected vehicles by replacing the original connector with a new

sealed connector.[119]

618.    The defect was still uncured, however, because in 2013 New GM again noted an

increase in service repairs and buyback activity due to illuminated airbag service lights.  On

October 4, 2013, New GM opened an investigation into airbag connector issues in 2011-2013

Buick Enclave, Chevy Traverse, and GMC Acadia models.  The investigation revealed an

increase in warranty claims for vehicles built in late 2011 and early 2012.[120]

619.    On February 10, 2014, New GM concluded that corrosion and crimping issues

were again the root cause of the airbag problems.[121]

620.    New GM initially planned to issue a less-urgent Customer Satisfaction Program to

address the airbag flaw in the 2010-2013 vehicles.  But it wasn't until a call with NHTSA on

March 14, 2014, that New GM finally issued a full-blown safety recall on the vehicles with the

faulty harness wiring – years after it first learned of the defective airbag connectors, after four

investigations into the defect, and after issuing at least six service bulletins on the topic.  The

recall as first approved covered only 912,000 vehicles, but on March 16, 2014, it was increased

to cover approximately 1.2 million vehicles.[122]

---

[119] *See id.* at 4.

[120] *See id.*

[121] *See id.* at 5.

[122] *See id*.

621.    On March 17, 2014, New GM issued a recall for 1,176,407 vehicles potentially afflicted with the defective airbag system.  The recall instructs dealers to remove driver and passenger SIAB connectors and splice and solder the wires together.[123]

### b.    Driver-side airbag shorting-bar defect.

622.    On June 5, 2014, New GM issued a safety recall of 38,636 MY 2012 Chevrolet Cruze, 2012 Chevrolet Camaro, 2012 Chevrolet Sonic, and 2012 Buick Verano vehicles with a driver's airbag shorting bar defect.

623.    In the affected vehicles, the driver side frontal airbag has a shorting bar which may intermittently contact the airbag terminals.  If the bar and terminals are contacting each other at the time of a crash, the airbag will not deploy, increasing the driver's risk of injury.  New GM admits awareness of one crash with an injury where the relevant diagnostic trouble code was found at the time the vehicle was repaired.  New GM is aware of other crashes involving these vehicles where airbags did not deploy but claims not to know if they were related to this defect.

624.    New GM knew about the driver's airbag shorting bar defect in 2012.  In fact, New GM conducted two previous recalls in connection with the shorting bar defect condition involving 7,116 vehicles – one on October 31, 2012, and one on January 24, 2013.[124]  Yet it would take New GM nearly two years to finally order a broader recall.

625.    On May 31, 2013, after New GM's two incomplete recalls, NHTSA opened an investigation into reports of allegations of the non-deployment of air bags.  New GM responded to this investigation on September 13, 2013.

626.    On November 1, 2013, NHTSA questioned New GM about:  (i) the exclusion of 390 vehicles which met the criteria for the two previous safety recalls; (ii) the 30-day in-service

---

[123] *See id.*

[124] *See* New GM's Letters to NHTSA dated 10/31/2012 and 1/24/2013, respectively.

cutoff used for the recall population of one previous recall; and (iii) 12 additional build days which, as of the June 2013 data pull in the investigation, had an elevated warranty rate. In response to NHTSA's concerns, New GM added additional vehicles to the recall.

627. After announcement of the initial ignition switch torque defect in February and March of 2014, New GM re-examined its records relating to the driver's airbag shorting defect. This review finally prompted New GM to expand the recall population on May 29, 2014 – *long after the problem should have been remedied.*

### (1)    Driver-side airbag inflator defect.

628. On June 25, 2014, New GM recalled 29,019 MY 2013-2014 Chevrolet Cruze vehicles with a driver-side airbag inflator defect.

629. In the affected vehicles, the driver's front airbag inflator may have been manufactured with an incorrect part. In the event of a crash necessitating deployment of the driver-side airbag, the airbag's inflator may rupture and the airbag may not inflate. The rupture could cause metal fragments to strike and injure the vehicle's occupants. Additionally, if the airbag does not inflate, the driver will be at increased risk of injury.[125]

630. New GM was named in a lawsuit on or about May 1, 2014 involving a 2013 Chevrolet Cruze and an improperly deployed driver-side airbag that caused an injury to the driver.[126] The lawsuit prompted an inspection of "the case vehicle," the assignment of a New GM Product Investigations engineer, and discussions with NHTSA.[127]

631. Meanwhile, the airbag supplier, Takata Corporation/TK Holdings Inc., conducted its own analysis. New GM removed airbags with "build dates near the build date of the case

---

[125] *See* New GM's Letter to NHTSA dated June 25, 2014.

[126] *Id.*

[127] *Id.*

vehicle," and sent them to Takata.[128] Subsequently, on June 20, 2014, Takata informed New GM it had "discovered [the] root cause" of the driver-side airbag defect through analysis of one of the airbags sent by New GM.[129]

632.    Shortly thereafter, on June 23, 2014, New GM decided to conduct a safety recall.[130]

### (2)    Roof-rail airbag defect.

633.    On June 18, 2014, New GM recalled 16,932 MY 2011 Cadillac CTS vehicles with a roof-rail airbag defect.

634.     In the affected vehicles, vibrations from the drive shaft may cause the vehicle's roll over sensor to command the roof-rail airbags to deploy.  If the roof-rail airbags deploy unexpectedly, there is an increased risk of crash and injury to the occupants.[131]

635.    According to New GM, the defect is caused by a loss of grease from the center constant velocity joint; the loss of grease causes vibrations of the propeller shaft that are transferred to the roll over sensor in the vehicle floor above the shaft.  The vibrations can cause the deployment of the roof-rail airbags.[132]

636.    On October 28, 2010, a new supplier began shipping propeller shafts for MY 2011 Cadillac CTS vehicles; these propeller shafts used a metal gasket from the constant velocity

---

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *See* June 18, 2014 New GM Letter to NHTSA.

[132] *Id.*

joint (as opposed to the liquid sealing system used by the previous supplier).[133]  ***This new metal gasket design was not validated or approved by New GM.***[134]

637.    On June 27, 2011, a Problem Resolution Tracking System (PRTS) was opened concerning this defect.  The PRTS resulted in the "purge" of the metal gasket design.[135]  Then, on August 1, 2011, New GM issued an Engineering Work Order banning the metal gasket design, and mandating the use of the liquid sealing system.  Yet New GM "closed the investigation without action in October 2012."[136]

638.    Inexplicably, New GM waited until June of 2014 before finally recalling the affected vehicles.

### (3)    Passenger-side airbag defect.

639.    On May 16, 2014, GM recalled 1,953 MY 2015 Cadillac Escalade and Escalade ESV vehicles with a passenger-side airbag defect.

640.    The affected vehicles do not conform to Federal Motor Vehicle Safety Standard number 208, "Occupant Crash Protection."  In these vehicles, the airbag module is secured to a chute adhered to the backside of the instrument panel with an insufficiently heated infrared weld.  As a result, the front passenger-side airbag will only partially deploy in the event of crash, and this will increase the risk of occupant injury.[137]

---

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] *Id.*

[137] *See* May 16, 2014 Letter from New GM to NHTSA.

641.     On April 28, 2014, during product validation testing of the "Platinum" Escalade (a planned interim 2015 model), the passenger-side front airbag did not properly deploy.[138]  New GM then obtained information from the supplier Johnson Controls Inc. concerning the portion of the Escalade instrument panel through which the frontal airbag deploys.[139]  In particular, New GM requested information on chute weld integrity.[140]

642.     On May 13, 2014, Johnson Controls informed New GM engineering that it had modified its infrared weld process on April 2, 2014 and "corrected" that process on April 29, 2014.  New GM claims that it was unaware of the changes until May 13, 2014.[141]

643.     On May 14, 2014, the Decision Committee decided to conduct a "noncompliance recall."  On May 16, 2014, GM obtained a list of suspected serial numbers from Johnson Controls, which GM then matched to VINs through records obtained from the scanning process used during instrument panel sub-assembly.[142]  A recall notice was issued on May 16, 2014 for 1,953 vehicles, each of which will have the Johnson Controls part replaced.[143]

644.     Subsequently, GM discovered errors in the scanning process, and decided to expand the recall population to include any VINs that could have received parts bearing the suspect Johnson Controls serial numbers.[144]  GM therefore issued a second recall notice on May 27, 2014.  With respect to this second set of 885 vehicles, they will be inspected to see if they

---

[138] *See* May 27, 2014 Letter from New GM to NHTSA.

[139] *Id.*

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] *Id.*

[144] *Id.*

were made with Johnson Controls parts bearing suspect serial numbers.  If they are, the part will be replaced.[145]

### (4)    Sport seat side-impact airbag defect.

645.    On June 18, 2014, New GM issued a safety recall for 712 MY 2014 Chevrolet Corvette vehicles with a sport seat side-impact airbag defect.

646.    The affected vehicles do not meet a Technical Working Group Side Airbag Injury Assessment Reference Value specifications for protecting unbelted, out-of-position young children from injury.  In a crash necessitating side-impact airbag deployment, an unbelted, out-of-position three-year-old child may be at an increased risk of neck injury.

### (5)    Passenger-side airbag inflator defect.

647.    On June 5, 2014, New GM recalled 61 MY 2013 Chevrolet Spark and 2013 Buick Encore vehicles with a passenger-side airbag inflator defect.

648.    In the affected vehicles, because of an improper weld, the front passenger airbag end cap could separate from the airbag inflator.  This can prevent the airbag from deploying properly, and creates an increased risk of injury to the front passenger.[146]

649.    New GM was alerted to this issue on July 10, 2013, when a customer brought an affected vehicle into a dealership with "an airbag readiness light 'ON' condition."[147]  After replacing the side frontal airbag, the dealer shipped the original airbag to New GM for warranty analysis.

650.    In September 2013, New GM "noted" the "weld condition of the end cap."  New GM then sent the airbag to the airbag supplier, S&T Motive, who sent it on to the inflator

---

[145] *Id.*

[146] *See* June 5, 2014 Letter from New GM to NHTSA.

[147] *Id.*

supplier, ARC Automotive Inc., for "root cause" analysis.[148]  S&T and ARC did not conclude

their analysis until April 2014.[149]

651.    Based upon the information provided by S&T and ARC, in May 2014 New GM

Engineering linked the defect to inflators produced on December 17, 2012.  ARC records show

that on that date, an inflator end cap separated during testing, but that ARC nonetheless shipped

quarantined inflators to S&T where they were used in passenger-side frontal airbags beginning

on December 29, 2012.[150]

652.    On May 29, 2014 – nearly one year after being presented with a faulty airbag –

New GM's Safety Field Action Committee finally decided to conduct a safety recall.[151]

### (6)    Front passenger airbag defect.

653.    On March 17, 2014, five years later than it should have, New GM issued a

noncompliance recall of 303,013 MY 2009-2014 GMC Savana vehicles with a front passenger

defect.[152]

654.    In the affected vehicles, in certain frontal impact collisions below the airbag

deployment threshold, the panel covering the airbag may not sufficiently absorb the impact of

the collision (especially given the passenger-side airbag housing is plastic).[153]  These vehicles

therefore do not meet the requirements of Federal Motor Vehicle Safety Standard number 201,

"Occupant Protection in Interior Impact."[154]

---

[148] *Id.*

[149] *Id.*

[150] *Id.*

[151] *Id.*

[152] *See* March 31, 2014 Letter from New GM to NHTSA.

[153] *Id.*

[154] *Id.*

**(7)**      **Electrical short circuit airbag defect.**

655.    On June 5, 2014 New GM issued a safety recall of 33 MY 2014 Chevrolet Corvette vehicles with an electrical short circuit airbag defect. [fn. *See* June 5, 2014 Letter from New GM to NHTSA.]

656.    In the affected vehicles, an internal short circuit may prevent the Sensing and Diagnostic Module (SDM) from providing its required functionality, including air bag and pretensioner deployment. The Air Bag Readiness Light will be continuously illuminated along with a "SERVICE AIR BAG" message in the Instrument Panel Cluster. The Automatic Occupant Sensing Passenger Air Bag Status Indicator also will not   illuminate. An inoperable SDM may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.[fn. *Id.*]

657.    On April 21, 2014, two SDMs failed regular assembly programming at the Bowling Green Assembly Plant (BGA). Once Delphi, the supplier of the SDM, was aware of the failed programming at BGA, Delphi notified BGA and GM Engineering that on April 11, 2014, Delphi had discovered an SDM failure through its end-of-line testing at their Reynosa assembly plant. Sorting of suspect parts began at BGA on the same day. [fn. *Id.*]

658.    GM further learned, that on April 19, 2014, Delphi had completed a root cause analysis that determined the issue was caused by a mislabeled capacitor. The capacitor was rated for 16V, but was incorrectly labeled as 35V. [fn. *Id.*]

659.    On April 25, 2014, BGA shipped the sorted, suspect SDMs back to Delphi. [fn. *Id.*]

660.    On May 5, 2014, Delphi notified BGA that 37 SDMs were missing from the returned parts. Subsequent investigation identified errors in sorting that allowed suspect SDMs into production between April 23 and April 25, 2014. [fn. *Id.*]

### c.   Safety defects of the seat belt systems in GM-branded vehicles.

### (1)   Seat belt connector cable defect.

661.   On May 20, 2014, New GM issued a safety recall for nearly 1.4 million model year 2009-2014 Buick Enclave, 2009-2014 Chevrolet Traverse, 2009-2014 GMC Acadia, and 2009-2010 Saturn Outlook vehicles with a dangerous safety belt defect.

662.   In the affected vehicles, "[t]he flexible steel cable that connects the safety belt to the vehicle at the outside of the front outboard seating positions can fatigue and separate over time as a result of occupant movement into the seat.  In a crash, a separated cable could increase the risk of injury to the occupant."[155]

663.   New GM waited more than two years after learning about this defect before disclosing it or remedying it.[156]  This delay is consistent with New GM's long period of concealment of the other defects as set forth above.

664.   New GM first learned of the seat belt defect no later than February 10, 2012, when a dealer reported that a seat belt buckle separated from the anchor at the attaching cable in a 2010 GMC Acadia.[157]  On March 7, 2012, after notification and analysis of the returned part, the supplier determined the problem was caused by fatigue of the cable.[158]

665.   On April 20, 2012, New GM received another part exhibiting the defect from a dealership.[159]  New GM also did a warranty analysis that turned up three additional occurrences

---

[155] *See* New GM Notice to NHTSA dated May 19, 2014, at 1.

[156] *See* New GM Notice to NHTSA dated May 30, 2014, at 1-3.

[157] *Id.* at 1.

[158] *Id.* at 2.

[159] *Id.*

of similar complaints.[160]  But New GM did not order a field review until June 4, 2012.[161]  The

review, on June 11, 2012, covered just 68 vehicles, and turned up no cable damage.[162]

666.    New GM received another part exhibiting the defect on August 28, 2013, from

GM Canada Product Investigations.[163]  After further testing in October 2013, New GM

duplicated the defect condition, determining that, in some seat positions, the sleeve can present

the buckle in a manner that can subject the cable to bending during customer entry into the

vehicle.[164]  New GM duplicated the condition again in a second vehicle in November 2013.[165]

And then just a month later, on December 18, 2013, New GM received another part exhibiting

the condition from GM Canada Product Investigations.[166]  But still New GM did not issue a

safety recall.

667.    Further testing between February and April 2014 confirmed the defect resulted

from fatigue of the cable.[167]  This was the same root cause New GM identified as early as

March 7, 2012.  Finally, on April 14, 2014, these findings were turned over to New GM Product

Investigations and assigned an investigation number.[168]

668.    On May 19, 2014, New GM decided to conduct a recall of the affected

vehicles.[169]

---

[160] *Id.*

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] *Id.*

[169] New GM Notice to NHTSA dated May 19, 2014, at 1.

**(2)      Seat belt retractor defect.**

669.     On June 11, 2014, New GM recalled 28,789 MY 2004-2011 Saab 9-3 Convertible vehicles with a seat belt retractor defect.

670.     In the affected vehicles, the driver's side front seat belt retractor may break, causing the seat belt webbing spooled out by the user not to retract.[170]  In the event of a crash, a seat belt that has not retracted may not properly restrain the seat occupant, increasing the risk of injury to the driver.[171]

671.     By September of 2009 New GM was aware of an issue with seat belt retractors in MY 2004 Saab 9-3 vehicles; at that time, NHTSA informed New GM that it received 5 Vehicle Owner Questionnaires "alleging that the driver seat belt will no longer retract on 2004 Saab 9-3 vehicles built after September 30, 2003."[172]  In December 2009-January 2010, New GM conducted a survey "of customers who had a retractor replaced to determine how many were due" to a break in the Automatic Tensioning System that causes "webbing spooled out by the user not to retract."[173]

672.     On February 9, 2010, New GM issued a recall for the driver side retractor, but only in certain MY 2004 Saab 9-3 sedans – some 14,126 vehicles.[174]  New GM would wait another four years before attempting to address the full scope of the seatbelt retractor defect in Saab 9-3 vehicles.

---

[170] *See* New GM's June 11, 2013 Letter to NHTSA.

[171] *See id.*

[172] *See* New GM's February 9, 2010 Letter to NHTSA.

[173] *Id.*

[174] *Id.*

673.     New GM finally opened an investigation into the seat belt retractor defect in other Saab 9-3 vehicles in February of this year, and that was "in response to NHTSA Vehicle Owner Questionnaires claiming issues with the driver side front seat belt retractor" in the affected vehicles.[175]   As a result, New GM eventually recalled 28,789 MY 2004-2011 Saab 9-3 convertible vehicles on June 11, 2014.

### (3)     Frontal lap-belt pretensioner defect.

674.     On August 7, 2014, New GM recalled 48,059 MY 2013 Cadillac ATS and 2013 Buick Encore vehicles with a defect in the front lap-belt pretensioners.[176]

675.     In the affected vehicles, the driver and passenger lap-belt pretensioner cables may not lock in a retracted position; that allows the seat belts to extend when pulled upon.[177]   If the seat belts do not remain locked in the retracted position, the seat occupant may not be adequately restrained in a crash, increasing the risk of injury.[178]

676.     In July 2012, GM Korea learned that the lap-belt pretensioner cable and seat belt webbing slipped out after being retracted.[179]   Several months later, New GM changed the rivet position on the pretensioner bracket and the design of the pretension mounting bolt.[180]   This change was made after New GM started production on the 2013 MY Buick Encore.[181]

677.     In October 2012, New GM testing on a pre-production 2014 MY Cadillac CTS revealed that the driver side front seat belt anchor pretensioner cables retracted upon deployment

---

[175] *See* New GM's June 11, 2013 Letter to NHTSA.

[176] *See* August 7, 2014 Letter from New GM to NHTSA.

[177] *Id.*

[178] *Id.*

[179] *See* August 21, 2014 Letter from New GM to NHTSA.

[180] *Id.*

[181] *Id.*

- 243 -

to pull in the lap-belt webbing, as intended, but did not lock in that position; that allowed the retracted webbing to return ("pay out") to its original position under loading, which was not intended.[182]

678.   On November 13, 2012, New GM modified the design of the lap-belt pretensioner for the Cadillac CTS, Cadillac ATS, and Cadillac ELR vehicles to include a modified bolt, relocation of a rivet in the cam housing to reposition the locking cam, and a change in torque of the lap-belt pretensioner bolt to seat.[183]   These changes were implemented in the 2014 MY Cadillac CTS and Cadillac ELR, but not in the 2013 MY Cadillac ATS.[184]

679.   Despite making these adjustments to later MY vehicles only, New GM did not launch an investigation into the performance of the lap-belt pretensioners in the 2013 MY Buick Encore and Cadillac ATS until mid-April, 2013.[185]   New GM claims that during this year-long investigation period it found no issues potentially relating to the pay out of the lap-belt pretensioners.[186]

680.   Nonetheless, New GM decided to issue a safety recall for the affected vehicles on July 31, 2014.[187]   It later expanded the recall by 55 additional vehicles, to a total population of 48,114, on August 19, 2014.[188]

---

[182] *Id.*

[183] *Id.*

[184] *Id.*

[185] *Id.*

[186] *Id.*

[187] *Id.*

[188] *Id.*

010440-11  784012 V1

### 5.    Safety defects affecting seats in GM-branded vehicles.

681.    On July 22, 2014, New GM issued a safety recall of 414,333 MY 2010-2012 Chevrolet Equinox, MY 2011-2012 Chevrolet Camaro, MY 2010-2012 Cadillac SRX, MY 2010-2012 GMC Terrain, MY 2011-2012 Buick Regal, and MY 2011-2012 Buick LaCrosse vehicles with a power height adjustable seats defect.[189]

682.    In the affected vehicles, the bolt that secures the height adjuster in the driver and front passenger seats may become loose or fall out.  If the bolt falls out, the seat will drop suddenly to the lowest vertical position.  The sudden drop can affect the driver's ability to safely operate the vehicle, and can increase the risk of injury to the driver and the front-seat passenger if there is an accident.  New GM admits to knowledge of at least one crash caused by this defect.[190]

683.    New GM was aware of this defect by July 10, 2013 when the crash occurred, and by July 22, 2013, New GM was aware that the crash was caused when the bolt on the height adjuster fell out.[191]

684.    By September 5, 2013, New GM was aware of 27 cases of loose or missing height adjuster bolts in Camaro vehicles.[192]  Yet New GM waited until July 15, 2014 before it made the decision to conduct a safety recall.

---

[189] *See* July 22, 2014 Letter from New GM to NHTSA.

[190] *Id.*

[191] *Id.*

[192] *Id.*

### 6.   Safety defects affecting the brakes in GM-branded vehicles.

####       a.   Brake light defect.

685.   On May 14, 2014, New GM issued a safety recall of approximately 2.4 million model year 2004-2012 Chevrolet Malibu, 2004-2007 Malibu Maxx, 2005-2010 Pontiac G6, and 2007-2010 Saturn Aura vehicles with a dangerous brake light defect.

686.   In the affected vehicles, the brake lamps may fail to illuminate when the brakes are applied or illuminate when the brakes are not engaged; the same defect can disable cruise control, traction control, electronic stability control, and panic brake assist operation, thereby increasing the risk of collisions and injuries.[193]

687.   Once again, New GM knew of the dangerous brake light defect for years before it took anything approaching the requisite remedial action.  Despite repeated crashes between the time or shortly after New GM came into existence and the recall date, New GM did not recall all 2.4 million vehicles with the defect until May 2014.

688.   According to New GM, the brake defect originates in the Body Control Module connection system.  "Increased resistance can develop in the [Body Control Module] connection system and result in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS) circuit that can cause service brakes lamp malfunction."[194]  The result is brake lamps that may illuminate when the brakes are not being applied and may not illuminate when the brakes are being applied.[195]

---

[193] *See* New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.

[194] *Id.*

[195] *Id.*

689.   The same defect can also cause the vehicle to get stuck in cruise control if it is engaged, or cause cruise control to not engage, and may also disable the traction control, electronic stability control, and panic-braking assist features.[196]

690.   New GM now acknowledges that the brake light defect "may increase the risk of a crash."[197]

691.   New GM knew from the date of its inception that as early as September 2008, NHTSA opened an investigation for MY 2005-2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver does not depress the brake pedal and may **not** turn on when the driver **does** depress the brake pedal.[198]

692.   New GM knew that during an investigation of the brake light defect in 2008, Old GM had discovered elevated warranty claims for the brake light defect for MY 2005 and 2006 vehicles built in January 2005, and found "fretting corrosion in the [Body Control Module] C2 connector was the root cause" of the problem.[199]  New GM was aware that Old GM and its part supplier Delphi decided that applying dielectric grease to the [Body Control Module] C2 connector would be "an effective countermeasure to the fretting corrosion."[200]  Beginning in November of 2008, the Company began applying dielectric grease in its vehicle assembly plants.[201]

693.   New GM also knew that on December 4, 2008, Old GM issued a Technical Service Bulletin recommending the application of dielectric grease to the Body Control Module

---

[196] *Id.*

[197] *Id.*

[198] *Id.* at 2.

[199] *Id.*

[200] *Id.*

[201] *Id* at 3.

C2 connector for the MY 2005-2009 Pontiac G6, 2004-2007 Chevrolet Malibu/Malibu Maxx, 2008 Malibu Classic, and 2007-2009 Saturn Aura vehicles.[202]  One month later, in January 2009, Old GM recalled only a small subset of the vehicles with the brake light defect – 8,000 MY 2005-2006 Pontiac G6 vehicles built during the month of January 2005.[203]

694.    Not surprisingly, the brake light problem was far from resolved.

695.    In October 2010, New GM released an updated Technical Service Bulletin regarding "intermittent brake lamp malfunctions," and added MY 2008-2009 Chevrolet Malibu/Malibu Maxx vehicles to the list of vehicles for which it recommended the application of dielectric grease to the Body Control Module C2 connector.[204]

696.    In September of 2011, New GM received an information request from Canadian authorities regarding brake light defect complaints in vehicles that had not yet been recalled. Then, in June 2012, NHTSA provided New GM with additional complaints "that were outside of the build dates for the brake lamp malfunctions on the Pontiac G6" vehicles that had been recalled.[205]

697.    In February of 2013, NHTSA opened a "Recall Query" in the face of 324 complaints "that the brake lights do not operate properly" in Pontiac G6, Malibu, and Aura vehicles that had not yet been recalled.[206]

698.    In response, New GM asserts that it "investigated these occurrences looking for root causes that could be additional contributors to the previously identified fretting corrosion,"

---

[202] *Id.* at 2.

[203] *Id.*

[204] *Id.*

[205] *Id.*

[206] *Id.* at 3.

but that it continued to believe that "fretting corrosion in the [Body Control Module] C2 connector" was the "root cause" of the brake light defect.[207]

699.    In June of 2013, NHTSA upgraded its "Recall Query" concerning brake light problems to an "Engineering Analysis."[208]

700.    In August 2013, New GM found an elevated warranty rate for Body Control module C2 connectors in vehicles built *after* Old GM had begun applying dielectric grease to Body Control Module C2 connectors at its assembly plants in November of 2008.[209]  In November of 2013, New GM concluded that "the amount of dielectric grease applied in the assembly plant starting November 2008 was insufficient…."[210]

701.    Finally, in March of 2014, "[New] GM engineering teams began conducting analysis and physical testing to measure the effectiveness of potential countermeasures to address fretting corrosion.  As a result, New GM determined that additional remedies were needed to address fretting corrosion."[211]

702.    On May 7, 2014, New GM finally decided to conduct a safety recall.

703.    According to New GM, "Dealers are to attach the wiring harness to the [Body Control Module] CM with a spacer, apply dielectric lubricant to both the [Body Control Module] CR and harness connector, and on the BAS and harness connector, and relearn the brake pedal home position."[212]

---

[207] *Id.*

[208] *Id.*

[209] *Id.*

[210] *Id.*

[211] *Id.* at 4.

[212] *Id.*

704.     New GM sat on and concealed its knowledge of the brake light defect for years, and did not even consider available countermeasures (other than the application of grease that had proven ineffective) until March of this year.

**b.     Brake booster pump defect.**

705.     On March 17, 2014, New GM issued a safety recall of 63,903 MY 2013-2014 Cadillac XTS vehicles with a brake booster pump defect.

706.     In the affected vehicles, a cavity plug on the brake boost pump connector may dislodge and allow corrosion of the brake booster pump relay connector.  This can have an adverse impact on the vehicle's brakes and increase the risk of collision.  This same defect can also cause a fire in the vehicle resulting from the electrical shore in the relay connector.

707.     In June of 2013, New GM learned that a fire occurred in a 2013 Cadillac XTS vehicle while it was being transported between car dealerships.  Upon investigation, New GM determined that the fire originated near the brake booster pump relay connector, but could not determine the "root cause" of the fire.

708.     A second vehicle fire in a 2013 Cadillac XTS occurred in September of  2013.  In November 2013, the same team of New GM investigators examined the second vehicle, but, again, could not determine the "root cause" of the fire.

709.     In December 2013, New GM identified two warranty claims submitted by dealers related to complaints by customers about vibrations in the braking system of their vehicles.  The New GM team investigating the two prior 2013 Cadillac XTS fires inspected these parts and discovered the relay connector in both vehicles had melted.

710.     In January 2014, New GM determined that pressure in the relay connector increased when the brake booster pump vent hose was obstructed or pinched.  Further testing revealed that pressure from an obstructed vent hose could force out the cavity plugs in the relay

connector, and in the absence of the plugs, water, and other contaminants can enter and corrode

the relay connector, causing a short and leading to a fire or melting.

711.    On March 11, 2014, New GM issued a safety recall for the affected vehicles.

### c.    Hydraulic boost assist defect.

712.    On May 13, 2014, New GM recalled 140,067 model year 2014 Chevrolet Malibu

vehicles with a hydraulic brake boost assist defect.[213]

713.    In the affected vehicles, the "hydraulic boost assist" may be disabled; when that

happens, slowing or stopping the vehicle requires harder brake pedal force, and the vehicle will

travel a greater distance before stopping.  Therefore, these vehicles do not comply with Federal

Motor Vehicle Safety Standard number 135, "Light Vehicle Brake Systems," and are at

increased risk of collision.[214]

### d.    Brake rotor defect.

714.    On May 7, 2014, New GM recalled 8,208 MY 2014 Chevrolet Malibu and Buick

LaCrosse vehicles with a brake rotor defect.

715.    In the affected vehicles, New GM may have accidentally installed rear brake

rotors on the front brakes.  The rear rotors are thinner than the front rotors, and the use of rear

rotors in the front of the vehicle may result in a front brake pad detaching from the caliper.  The

detachment of a break pad from the caliper can cause a sudden reduction in braking which

lengthens the distance required to stop the vehicle and increases the risk of a crash.

---

[213] *See* May 13, 2014 Letter from New GM to NHTSA.

[214] *Id.*

### e. Reduced brake performance defect.

716.    On July 28, 2014, New GM recalled 1,968 MY 2009-2010 Chevrolet Aveo and 2009 Pontiac G3 vehicles.[215]  Affected vehicles may contain brake fluid which does not protect against corrosion of the valves inside the anti-lock brake system module, affecting the closing motion of the valves.[216] If the anti-lock brake system valve corrodes it may result in longer brake pedal travel or reduced performance, increasing the risk of a vehicle crash.[217]

717.    New GM was aware of this defect as far back as August 2012, when it initiated a customer satisfaction campaign.[218]  The campaign commenced in November 2012, and New GM estimates that, to date, approximately 34% of Chevrolet Aveo and Pontiac G3 vehicles included in the customer satisfaction campaign are not yet repaired.[219]  On July 19, 2014, New GM decided to conduct a safety recall for vehicles that had been included in the customer satisfaction program but had not had the service repair performed.[220]

### f. Parking brake defect.

718.    On September 20, 2014, GM recalled more than 221,000 MY 2014-15 Chevrolet Impala and 2013-15 model Cadillac XTS vehicles because of a parking-brake defect.

719.    In the affected vehicles, the brake pads can stay partly engaged, which can lead to "excessive brake heat that may result in a fire," according to documents posted on the NHTSA website.

---

[215] *See* July 28, 2014 Letter from New GM to NHTSA.

[216] *Id.*

[217] *Id.*

[218] *Id.*

[219] *Id.*

[220] *Id.*

720.    NHTSA said the fire risk stemmed from the rear brakes generating "significant heat, smoke and sparks."  The agency also warned that drivers of the Affected Vehicles might experience "poor vehicle acceleration, undesired deceleration, excessive brake heat and premature wear to some brake components."

### 7.    Safety defects affecting the steering in GM-branded vehicles.

#### a.    Sudden power-steering failure defect.

721.    Between 2003 and 2010, over 1.3 million GM-branded vehicles in the United States were sold with a safety defect that causes the vehicle's electric power steering ("power steering") to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries.

722.    The affected vehicles are MY 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura vehicles.

723.    As with the ignition switch defects and many of the other defects, New GM was aware of the power steering defect long before it took anything approaching full remedial action.

724.    When the power steering fails, a message appears on the vehicle's dashboard, and a chime sounds to inform the driver.  Although steering control can be maintained through manual steering, greater driver effort is required, and the risk of an accident is increased.

725.    In 2010, New GM first recalled Chevy Cobalt and Pontiac G5 models for these power steering issues, yet it did *not* recall the many other vehicles that had the very same power steering defect.

726.    Documents released by NHTSA show that New GM waited years to recall nearly 335,000 Saturn Ions for power-steering failure – despite receiving nearly 4,800 consumer

complaints and more than 30,000 claims for warranty repairs.  That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent.  By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000 vehicles.[221]  Here, the rate translates to 1,430 complaints per 100,000 vehicles.

727.    In response to the consumer complaints, in September 2011, NHTSA opened an investigation into the power-steering defect in Saturn Ions.

728.    NHTSA database records show complaints from Ion owners as early as June 2004, with the first injury reported in May 2007.

729.    NHTSA has linked approximately 12 crashes and two injuries to the power-steering defect in the Ions.

730.    In September 2011, after NHTSA began to make inquiries about the safety of the Saturn Ion, GM acknowledged that it had received almost 3,500 customer reports claiming a sudden loss of power steering in 2004-2007 Ion vehicles.

731.    The following month, New GM engineer Terry Woychowski informed current CEO Mary Barra – then head of product development – that there was a serious power-steering issue in Saturn Ions, and that it may be the same power steering issue that plagued the Chevy Cobalt and Pontiac G5.  Ms. Barra was also informed of the ongoing NHTSA investigation.  At the time, NHTSA reportedly came close to concluding that Saturn Ions should have been included in New GM's 2010 steering recall of Cobalt and G5 vehicles.

732.    Instead of recalling the Saturn Ion, GM sent dealers a service bulletin in May of 2012 identifying complaints about the steering system in the vehicle.

---

[221] *See* https://www-odi.nhtsa.dot.gov/cars/problems/defect/-results.cfm?action_number=EA06002&Search Type= QuickSearch&summary=true.

733.    By the time GM finally recalled the Saturn Ion – four years later, in March 2014 –
NHTSA had received more than 1,200 complaints about the vehicle's power steering.  Similar
complaints resulted in over 30,000 warranty claims with GM.

734.    After announcing the March 31, 2014 recall, Jeff Boyer, New GM's Vice
President of Global Vehicle Safety, acknowledged that New GM recalled some of these same
vehicle models previously for the ***same issue***, but that New GM "did not do enough."

735.    According to an analysis by the NEW YORK TIMES published on April 20, 2014,
New GM has "repeatedly used technical service bulletins to dealers and sometimes car owners as
stopgap safety measures instead of ordering a timely recall."

736.    Former NHTSA head Joan Claybrook echoed this conclusion, stating, "There's no
question that service bulletins have been used where recalls should have been."

737.    NHTSA has recently criticized New GM for issuing service bulletins on at least
four additional occasions in which a recall would have been more appropriate and in which New
GM later, in fact, recalled the subject vehicles.

738.    These inappropriate uses of service bulletins prompted Frank Borris, the top
defect investigator for NHTSA, to write to New GM's product investigations director, Carmen
Benavides, in July 2013, complaining that "GM is slow to communicate, slow to act, and, at
times, requires additional effort . . . that we do not feel is necessary with some of [GM's] peers."

739.    Mr. Borris' correspondence was circulated widely among New GM's top
executives including John Calabrese and Alicia Boler-Davis, two vice presidents for product
safety; Michael Robinson, vice president of regulatory affairs; engineer Jim Federico; Gay Kent,
director of product investigations who had been involved in safety issues with the Cobalt since
2006; and William Kemp, an in-house product liability lawyer.

- 255 -

### b.     Power steering hose clamp defect.

740.     On June 18, 2014, New GM issued a safety recall of 57,192 MY 2015 Chevrolet Silverado 2500/3500 HD and 2015 GMC Sierra 2500/3500 HD vehicles with a power steering hose clamp defect.

741.     In the affected vehicles, the power steering hose clamp may disconnect from the power steering pump or gear, causing a loss of power steering fluid.  A loss of power steering fluid can result in a loss of power steering assist and power brake assist, increasing the risk of a crash.

### c.     Power steering control module defect.

742.     On July 22, 2014, New GM recalled 57,242 MY 2014 Chevrolet Impala vehicles with a Power Steering Control Module defect.

743.     Drivers of the affected vehicles may experience reduced or no power steering assist at start-up or while driving due to a poor electrical ground connection to the Power Steering Control Module.  If power steering is lost, the vehicle will revert to manual steering mode.  Manual steering requires greater driver effort and increases the risk of accident.  New GM acknowledges one crash related to this condition.

744.     On May 17, 2013, New GM received a report of a 2014 Impala losing communication with the Power Steering Control Module.  On or about May 24, 2013, New GM determined the root cause was a poor electrical connection at the Power Steering Control Module grounding stud wheelhouse assembly.

745.     But New GM's initial efforts to implement new procedures and fix the issue were unsuccessful.  In January 2014, New GM reviewed warranty data and discovered 72 claims related to loss of assist or the Service Power Steering message after implementation of New GM's process improvements.

746.    Then, on February 25, 2014, New GM received notice of a crash involving a 2014 Impala that was built in 2013.  The crash occurred when the Impala lost its power steering, and crashed into another vehicle as a result.

747.    In response, New GM monitored field and warranty data related to this defect and, as of June 24, 2014, it identified 253 warranty claims related to loss of power steering assist or Service Power Steering messages.

748.    On July 15, 2014, New GM finally issued a safety recall for the vehicles, having been unsuccessful in its efforts to minimize and conceal the defect.

**d.     Lower control arm ball joint defect.**

749.    On July 18, 2014, New GM issued a safety recall of 1,919 MY 2014-2015 Chevrolet Spark vehicles with a lower control arm ball joint defect.

750.    The affected vehicles were assembled with a lower control arm bolt not fastened to specification.  This can cause the separation of the lower control arm from the steering knuckle while the vehicle is being driven, and result in the loss of steering control.  The loss of steering control in turn creates a risk of accident.[222]

**(1)     Steering tie-rod defect.**

751.    On May 13, 2014, New GM issued a safety recall of 477 MY 2014 Chevrolet Silverado, 2014 GMC Sierra, and 2015 Chevrolet Tahoe vehicles with a steering tie-rod defect.

752.    In the affected vehicles, the tie-rod threaded attachment may not be properly tightened to the steering gear rack.  An improperly tightened tie-rod attachment may allow the tie-rod to separate from the steering rack and greatly increases the risk of a vehicle crash.[223]

---

[222] *See* July 18, 2014 Letter from New GM to NHTSA.

[223] *See* May 27, 2014 Letter from New GM to NHTSA.

e.      **Joint fastener torque defect.**

753.    On June 30, 2014, New GM issued a safety recall of 106 MY 2014 Chevrolet Camaro, 2014 Chevrolet Impala, 2014 Buick Regal, and 2014 Cadillac XTS vehicles with a joint fastener torque defect.

754.    In the affected vehicles, joint fasteners were not properly torqued to specification at the assembly plant.  As a result of improper torque, the fasteners may "back out" and cause a "loss of steering," increasing the risk of a crash.[224]

755.    New GM claims that it was alerted to the problem by a warranty claim filed on December 23, 2013, at a California dealership for a Chevrolet Impala built at New GM's Oshawa car assembly plant in Ontario, Canada.  Yet the Oshawa plant was not informed of the issue until March 4, 2014.[225]

756.    Between March 4 and March 14, 2014, the Oshawa plant conducted a "root cause" investigation and concluded that the problem was caused by an improperly fastened "Superhold" joint.  Though the Impala was electronically flagged for failing to meet the requisite torque level, the employee in charge of correcting the torque level failed to do so.[226]

757.    On or about March 14, 2014, New GM learned of two more warranty claims concerning improperly fastened Superhold joints.  Both of the vehicles were approved by the same employee who had approved the corrective action for the joint involved in the December 23, 2013 warranty claim.  The two additional vehicles were also flagged for corrective action, but the employee failed to correct the problem.[227]

_____

[224] *See* July 2, 2014 Letter from New GM to NHTSA.

[225] *Id.*

[226] *Id.*

[227] *Id.*

758.    On March 20, 2014, New GM concluded the derelict employee had approved 112 vehicles after they were flagged for corrective action to the Superhold joint.[228]

759.    Yet New GM waited until June 25, 2014 before deciding to conduct a safety recall.

### f.    Loss of electric power steering assist defect.

760.    On February 4, 2015, New GM announced a recall of 69,633 MY 2006-2007 Chevrolet Malibu, 2006-2007 Chevrolet Malibu Maxx and 2006-2007 Pontiac G6 for a steering defect that may result in a sudden loss of electric power steering ("EPS") assist.[229]

761.    Loss of power steering assist requires greater effort by the driver to steer the vehicle and increases the risk of a crash.

### (1)    Steering column assembly defect.

762.    On March 20, 2015, New GM announced a recall of 2,295 MY 2015 Buick Encore and 2015 Chevrolet Trax vehicles for a steering column assembly defect.[230]

763.    In these vehicles the steering column assembly housing may come in contact the power steering printed circuit board causing a sudden loss of electric power steering assist, increasing the risk of a crash.

### 8.    Safety defects affecting the powertrain in GM-branded vehicles.

#### a.    Transmission shift cable defect affecting 1.1 million Chevrolet and Pontiac vehicles.

764.    On May 19, 2014, New GM issued a safety recall for more than 1.1 million MY 2007-2008 Chevrolet Saturn, 2004-2008 Chevrolet Malibu, 2004-2007 Chevrolet Malibu Maxx, and 2005-2008 Pontiac G6 vehicles with dangerously defective transmission shift cables.

---

[228] *Id.*

[229] *See* NHTSA Campaign Number 15V064000.

[230] *See* NHTSA Campaign Number 15V146000.

765.     In the affected vehicles, the shift cable may fracture at any time, preventing the driver from switching gears or placing the transmission in the "park" position.  According to New GM, "[i]f the driver cannot place the vehicle in park, and exits the vehicle without applying the park brake, the vehicle could roll away and a crash could occur without prior warning."[231]

766.     Yet again, New GM knew of the shift cable defect long before it issued the recent recall of more than 1.1 million vehicles with the defect.

In May of 2011, NHTSA informed New GM that it had opened an investigation into failed transmission cables in 2007 model year Saturn Aura vehicles.  In response, New GM noted "a cable failure model in which a tear to the conduit jacket could allow moisture to corrode the interior steel wires, resulting in degradation of shift cable performance, and eventually, a possible shift cable failure."[232]

767.     Upon reviewing these findings, New GM's Executive Field Action Committee conducted a "special coverage field action for the 2007-2008 MY Saturn Aura vehicles equipped with 4 speed transmissions and built with Leggett & Platt cables."  New GM apparently chose that cut-off date because, on November 1, 2007, Kongsberg Automotive replaced Leggett & Platt as the cable provider.[233]

768.     New GM did not recall any of the vehicles with the shift cable defect at this time, and limited its "special coverage field action" to the 2007-2008 Aura vehicles even though "the same or similar Leggett & Platt cables were used on … Pontiac G6 and Chevrolet Malibu (MMX380) vehicles."

---

[231] *See* New GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.

[232] *Id.* at 2.

[233] *Id.*

769.    In March 2012, NHTSA sent New GM an Engineering Assessment request to investigate transmission shift cable failures in 2007-2008 MY Aura, Pontiac G6, and Chevrolet Malibu.[234]

770.    In responding to the Engineering Assessment request, New GM for the first time "noticed elevated warranty rates in vehicles built with Kongsberg shift cables."  Similar to their predecessor vehicles built with Leggett & Platt shift cables, in the vehicles built with Kongsberg shift cables "the tabs on the transmission shift cable end may fracture and separate without warning, resulting in failure of the transmission shift cable and possible unintended vehicle movement."[235]

771.    On September 13, 2012, the Decision Committee decided to conduct a safety recall.  This initial recall was limited to 2008-2010 MY Saturn Aura, Pontiac G6, and Chevrolet Malibu vehicles with 4-speed transmission built with Kongsberg shifter cables, as well as 2007-2008 MY Saturn Aura and 2005-2007 MY Pontiac G6 vehicles with 4-speed transmissions which may have been serviced with Kongsberg shift cables.[236]

772.    But the shift cable problem was far from resolved.

773.    In March of 2013, NHTSA sent New GM a second Engineering Assessment concerning allegations of failure of the transmission shift cables on all 2007-2008 MY Saturn Aura, Chevrolet Malibu, and Pontiac G6 vehicles.[237]

---

[234] *Id.*

[235] *Id.*

[236] *Id.*

[237] *Id.*

774.     New GM continued its standard process of "investigation" and delay.  But by May 9, 2014, New GM was forced to concede that "the same cable failure mode found with the Saturn Aura 4-speed transmission" was present in a wide population of vehicles.[238]

775.     Finally, on May 19, 2014, New GM decided to conduct a safety recall of more than 1.1 million vehicles with the shift cable defect.

**9.     Transmission shift cable defect affecting Cadillac vehicles.**

776.     On June 18, 2014, New GM issued a safety recall of 90,750 MY 2013-2014 Cadillac ATS and 2014 Cadillac CTS vehicles with a transmission shift cable defect.

777.     In the affected vehicles, the transmission shift cable may detach from either the bracket on the transmission shifter or the bracket on the transmission.  If the cable detaches while the vehicle is being driven, the transmission gear selection may not match the indicated gear and the vehicle may move in an unintended or unexpected direction, increasing the risk of a crash.  Furthermore, when the driver goes to stop and park the vehicle, the transmission may not be in "PARK" even though the driver has selected the "PARK" position.  If the vehicle is not in the "PARK" position, there is a risk the vehicle will roll away as the driver and other occupants exit the vehicle or anytime thereafter.  A vehicle rollaway causes a risk of injury to exiting occupants and bystanders.

778.     On March 20, 2014, a New GM dealership contacted an assembly plant about a detached transmission shift cable.  The assembly plant investigated and discovered one additional detached shift cable in the plant.

779.     New GM assigned a product investigation engineer was assigned, and from March 24 to June 2, 2014, New GM examined warranty claims and plant assembly procedures

---

[238] *Id.*

and performed vehicle inspections.  Based on these findings, New GM issued a safety recall on June 11, 2014.

> **a.     Transmission oil cooler line defect.**

780.     On March 31, 2014, New GM issued a safety recall of 489,936 MY 2014 Chevy Silverado, 2014 GMC Sierra, 2014 GMC Yukon, 2014 GMC Yukon XL, 2015 Chevy Tahoe, and 2015 Chevy Suburban vehicles with a transmission oil cooler line defect.

781.     In the affected vehicles, the transmission oil cooler lines may not be securely seated in the fitting.  This can cause transmission oil to leak from the fitting, where it can contact a hot surface and cause a vehicle fire.

782.     On September 4, 2013, a New GM assembly plant in Silao, Mexico experienced two instances in which a transmission oil cooler line became disconnected from the thermal bypass valve in 2014 pick-up trucks on the K2XX platform during pressure tests.  As a result, New GM required the supplier of the transmission oil cooler lines and thermal bypass valve assembly (collectively the "transmission oil cooler assembly") for these vehicles to issue a Quality Alert for its facility concerning the transmission oil cooler assemblies.  The supplier sorted the over 3,000 TOC assemblies at its facility, performed manual pull checks and visual inspections, and found no defects.

783.     New GM also conducted manual pull checks and visual inspections on the transmission oil cooler assemblies in the two New GM assembly plants responsible for the K2XX platform at the time (Silao, Mexico and Fort Wayne, Indiana), and identified no defects.

784.     On September 19, 2013, the supplier provided New GM with a plan to ensure that the transmission oil cooler lines were properly connected to the thermal bypass valve going forward.  In addition to continuing its individual pull tests to verify that these connections were secure, the supplier planned to add a manual alignment feature to the three machines that it used

to connect the transmission oil cooler lines to the thermal bypass valve boxes.  The supplier completed these upgrades on October 28, 2013.

785.    On January 2, 2014, New GM's Product Investigations, Field Performance Assessment, and K2XX program teams received an investigator's report concerning a 2014 Chevrolet Silverado that caught fire during a test drive from a dealer in Gulfport, Mississippi on December 16, 2013.  New GM's on-site investigation of the vehicle revealed that a transmission oil cooler line had disconnected from the thermal bypass valve box.  The build date for this vehicle was October 10, 2013, and the build date for the transmission oil cooler assembly was September 28, 2013, prior to the supplier's October 28, 2013 completion of its machinery upgrades.

786.    On January 3, 2014, New GM issued a Quality Alert to its assembly plants for K2XX vehicles, advising them to manually inspect the transmission oil cooler assemblies from the supplier to ensure that the transmission oil cooler lines were securely connected.  New GM also informed the supplier of the Mississippi event.

787.    On January 15, 2014, New GM learned that a 2014 Chevrolet Silverado had recently caught fire while being driven by a dealer salesperson.  New GM's investigation of the incident determined that one of the vehicle's transmission oil cooler lines was disconnected from the thermal bypass valve box.  The vehicle was built on November 12, 2013.

788.    On January 29, after completing its investigation, New GM followed up with its K2XX assembly plants, and found no additional cases involving disconnected transmission oil cooler lines after the January 3 Quality Alert.

789.    On January 31, 2014, a team from New GM traveled to the supplier's facility to work with the supplier on its thermal valve assembly process.  By February 27, 2014, the

- 264 -

supplier added pressure transducers to the machine fixtures used to connect the transmission oil cooler lines to the thermal bypass valve boxes to directly monitor the delivery of air pressure to the pull-test apparatus.

790.    On March 23, 2014, a 2015 GMC Yukon caught fire during a test drive from a dealership in Anaheim, California.  On March 24, 2014, New GM formed a team to investigate the incident; the team was dispatched to Anaheim that afternoon.  On the morning of March 25, 2014, the New GM team examined the vehicle in Anaheim and determined that the incident was caused by a transmission oil cooler line that was disconnected from the thermal bypass valve box.  The assembly plants for K2XX vehicles were placed on hold and instructed to inspect all transmission oil cooler assemblies in stock, as well as those in completed vehicles.  A team from New GM also traveled to the supplier on March 25, 2014, to further evaluate the assembly process.

791.    On March 26, 2014, New GM personnel along with personnel from the supplier examined the transmission oil cooler assembly from the Anaheim vehicle.  The group concluded that a transmission oil cooler line had not been properly connected to the thermal bypass valve box.  The build date for the thermal valve assembly in the Anaheim vehicle was determined to be January 16, 2014, after the supplier's October 28, 2013 machinery upgrades, but before its February 27, 2014 process changes.

792.    On March 27, 2014, the Product Investigator assigned to this matter received a list of warranty claims relating to transmission fluid leaks in K2XX vehicles, which he had requested on March 24.  From that list, he identified five warranty claims, ranging from August 30, 2013, to November 20, 2013, that potentially involved insecure connections of transmission oil cooler

- 265 -

lines to the thermal bypass valve box, none of which resulted in a fire.  All five vehicles were built before the supplier completed its machinery upgrades on October 28, 2013.

793.    Also on March 27, 2014, following discussions with New GM, the supplier began using an assurance cap in connecting the transmission oil cooler lines to the thermal bypass valve boxes to ensure that the transmission oil cooler lines are properly secured.

794.    On March 28, 2014, New GM decided to initiate a recall of vehicles built on the K2XX platform so that they can be inspected to ensure that the transmission oil cooler lines are properly secured to the thermal bypass valve box.

### b.    Transfer case control module software defect.

795.    On June 26, 2014, New GM issued a safety recall of 392,459 MY 2014-2015 Chevrolet Silverado, 2015 Chevrolet Tahoe, 2015 Chevrolet Suburban, 2014-2015 GMC Sierra, 2015 GMC Yukon, and 2015 GMC Yukon XL vehicles with a transfer case control module software defect.

796.    In the affected vehicles, the transfer case may electronically switch to neutral without input from the driver.  If the transfer case switches to neutral while the vehicle is parked and the parking brake is not in use, the vehicle may roll away and cause injury to bystanders.  If the transfer case switches to neutral while the vehicle is being driven, the vehicle will lose drive power, increasing the risk of a crash.

797.    New GM first observed this defect on February 14, 2014, when a 2015 model year development vehicle, under slight acceleration at approximately 70 mph, shifted into a partial neutral position without operator input.  When the vehicle shifted into neutral, the driver lost power, could not shift out of neutral, and was forced to stop driving.  Once the vehicle stopped, the transfer case was in a complete neutral state and could not be moved out of neutral.

- 266 -

798.     On or about February 17, 2014, New GM contacted Magna International Inc., the supplier of the transfer case and the Transfer Case Control Module ("TCCM") hardware and software, to investigate the incident.  Magna took the suspect TCCM for testing.

799.     From mid-February through mid-March, Magna continued to conduct testing.  On March 18, Magna provided its first report to New GM but at that time, Magna had not fully identified the root cause.

800.     On March 27, Magna provided an updated report that identified three scenarios that could cause a transfer case to transfer to neutral.

801.     Between late March and April, New GM engineers continued to meet with Magna to identify additional conditions that would cause the unwanted transfer to neutral.  New GM engineers also analyzed warranty information to identify claims for similar unwanted transfer conditions.

802.     Two warranty claims for unwanted transfers were identified that appeared to match the conditions exhibited on February 14, 2014.  Those warranty claims were submitted on March 3 and March 18, 2014.  On April 23, 2014, a Product Investigation engineer was assigned.  A Problem Resolution case was initiated on May 20, 2014.

803.     The issue was presented to Open Investigation Review on June 16, 2014, and on June 18, 2014, New GM  decided to conduct a safety recall.

     **c.     Acceleration-lag defect.**

804.     On April 24, 2014, New GM issued a safety recall of 50,571 MY 2013 Cadillac SRX vehicles with an acceleration-lag defect.

805.     In the affected vehicles, there may be a three to four-second lag in acceleration due to faulty transmission control module programming.  That can increase the risk of a crash.

806.    On October 24, 2013, New GM's transmission calibration group learned of an incident involving hesitation in a company owned vehicle.  New GM obtained the vehicle to investigate and recorded one possible event showing a one second hesitation.

807.    In early December 2013, New GM identified additional reports of hesitation from the New GM company-owned vehicle driver fleet, as well as NHTSA VOQs involving complaints of transmission hesitation in the 2013 SRX vehicles.

808.    In mid-February 2014, the transmission calibration team obtained additional company vehicles and repurchased customer vehicles that were reported to have transmission hesitation in order to install data loggers and attempt to reproduce the defect.  On February 20, 2014, and February 27, 2014, New GM captured two longer hesitation events consistent with customer reports.

809.    In response to the investigation, New GM issued a safety recall for the affected vehicles on April 17, 2014.

### d.    Transmission turbine shaft fracture defect.

810.    On June 11, 2014, New GM recalled 21,567 MY 2012 Chevrolet Sonic vehicles equipped with a 6 Speed Automatic Transmission and a 1.8L Four Cylinder Engine suffering from a turbine shaft fracture defect.

811.    In the affected vehicles, the transmission turbine shaft may fracture.  If the transmission turbine shaft fracture occurs during vehicle operation in first or second gear, the vehicle will not upshift to the third through sixth gears, limiting the vehicle's speed.  If the fracture occurs during operation in third through sixth gear, the vehicle will coast until it slows enough to downshift to first or second gear, increasing the risk of a crash.[239]

---

[239] *See* June 11, 2014 Letter from New GM to NHTSA.

812.   The turbine shafts at issue were made by Sundram Fasteners Ltd.[240]  In November 2013, New GM learned of two broken turbine shafts in the affected vehicles when transmissions were returned to New GM's Warranty Parts Center.  New GM sent the shafts to Sundram, but Sundram did not identify any "non-conformities."[241]  But "[s]ubsequent investigation by GM identified a quality issue" with the Sundram turbine shafts.[242]

813.   By late January 2014, 5 or 6 more transmissions "were returned to the WPC for the same concern."  That prompted a warranty search for related claims by New GM's "Quality Reliability Durability (QRD) lead for Gears and Shafts and Validation Engineer for Global Front Wheel 6 Speed Transmission…."  That search revealed "a clear increase in incidents for 2012 Sonic built with 6T30 turbine shaft[s] during late February to June of 2012."[243]

814.   In March of 2014, New GM engineers found that turbine shafts made "in the suspect window were found to have a sharp corner and not a smooth radius in the spline."  Testing done in April of 2014 apparently showed a lower life expectancy for "shafts with sharp corners" as opposed to "shafts with smooth radii."[244]

815.   On June 4, 2014, New GM "decided to conduct a safety recall," and New GM did so on June 11, 2014.[245]

     **e.**    **Automatic transmission shift cable adjuster.**

816.   On February 20, 2014, New GM issued a noncompliance recall of 352 MY 2014 Buick Enclave, Buick LaCrosse, Buick Regal, Buick Verano, Chevrolet Cruze, Chevrolet

---

[240] *Id.*

[241] *Id.*

[242] *Id.*

[243] *Id.*

[244] *Id.*

[245] *Id.*

Impala, Chevrolet Malibu, Chevrolet Traverse, and GMC Acadia vehicles with defective automatic transmission shift cable adjusters.[246]

817.    In the affected vehicles, one end of the transmission shift cable adjuster body has four legs that snap over a ball stud on the transmission shift lever.  One or more of these legs may have been fractured during installation.  If any of the legs are fractured, the transmission shift cable adjuster may disengage from the transmission shift lever.  When that happens, the driver may be unable to shift gears, and the indicated gear position may not be accurate.  If the adjuster is disengaged when the driver attempts to stop and park the vehicle, the driver may be able to shift the lever to the "PARK" position but the vehicle transmission may not be in the "PARK" gear position.  That creates the risk that the vehicle will roll away as the driver and other occupants exit the vehicle, or anytime thereafter.[247]

818.    These vehicles may not conform with Federal Motor Vehicle Safety Standard 102 for Transmission Shift Lever Sequence Starter Interlock and Transmission Braking Effect, or Federal Motor Vehicle Safety Standard 114 for Theft Protection and Rollaway Prevention.

**10.    Other serious defects affecting GM-branded vehicles.**

        **a.    Power management mode software defect.**

819.    On January 13, 2014, New GM issued a safety recall of 324,970 MY 2014 Chevy Silverado and GMC Sierra Vehicles with a Power Management Mode software defect.[248]

820.    In the affected vehicles, the exhaust components can overheat, melt nearby plastic parts, and cause an engine fire.  GM acknowledges that the Power Management Mode software defect is responsible for at least six fires in the affected vehicles.[249]

---

[246] *See* February 20, 2014 Letter from New GM to NHTSA.

[247] *Id.*

[248] *See* New GM Letter to NHTSA dated January 23, 2014.

**b.** **Light control module defect.**

821.    On May 16, 2014, New GM issued a safety recall of 217,578 model year 2004-2008 Chevrolet Aveo vehicles with a light control module defect.[250]

822.    In the vehicles, heat generated within the daytime running lamp module in the center console in the instrument panel may melt the module and cause a vehicle fire.[251]  New GM first became aware of this issue when two Suzuki Forenza vehicles suffered interior fires in March of 2012; an investigation conducted by GM North America found evidence that the fires emanated from the connection of the wiring at the module.[252]

823.    New GM took no remedial action at this time.

824.    Then in May of 2012, New GM conducted a TREAD data and NHTSA VOQ search for "thermal issues" related.  The search uncovered 13 customer claims and two VOQs "that implied the DRL as the source of the issue."[253]

825.    Finally, on May 16, 2014, New GM decided to conduct a safety recall.

826.    New GM does not provide adequate explanation for why it took more than two years for it to remedy the problem it was aware of by March of 2012.

827.    On May 16, 2014, GM recalled 218,214 MY 2004-2008 Chevrolet Aveo (subcompact) and 2004-2008 Chevrolet Optra (subcompact) vehicles.  In these vehicles, heat generated within the light control module in the center console in the instrument panel may melt the module and cause a vehicle fire.

---

[249] *Id.*

[250] *See* May 30, 2014 Letter from New GM to NHTSA.

[251] *Id.*

[252] *Id.*

[253] *Id.*

### c.   Electrical short in driver's door module defect.

828.   On June 30, 2014, New GM issued a safety recall of 181,984 model year 2005-2007 Chevrolet Trailblazer, 2006 Chevrolet Trailblazer EXT, 2005-2007 Buick Rainier, 2005-2007 GMC Envoy, 2006 GMC Envoy XL, 2005-2007 Isuzu Ascender, and 2005-2007 Saab 9-7x vehicles with a defect that can cause an electrical short in the driver's door module.[254]

829.    In the affected vehicles, an electrical short in the driver's door module may occur that can disable the power door lock and window switches and overheat the module.  The overheated module can then cause a fire in the affected vehicles.

830.   The defect apparently arose from an earlier "repair" provided by New GM for certain vehicles which consisted of applying a "protective coating" to the modules.  The "repair" allowed fluids to enter the driver's door module, and a short could result.[255]

831.   New GM finally identified this issue, and issued a safety recall on June 30, 2014.

### d.   Front axle shaft defect.

832.   On March 28, 2014, New GM issued a safety recall of 174,046 model year 2013-2014 Chevrolet Cruze vehicles with dangerous front axle shaft defect.[256]

833.    In the affected vehicles, the right front axle shaft may fracture and separate.  If this happens while the vehicle is being driven, the vehicle will lose power and coast to a halt.  If a vehicle with a fractured shaft is parked and the parking brake is not applied, the vehicle may move unexpectedly and cause accident and injury.[257]

---

[254] *See* July 2, 2014 Letter from New GM to NHTSA.

[255] *Id.*

[256] *See* March 28, 2014 Letter from New GM to NHTSA.

[257] *Id.*

Case 1:14-md-02543-JMF   Document 1038   Filed 06/12/15   Page 305 of 600

834.    New GM admits to knowledge of "several dozen" half-shaft fractures through its warranty data.[258]

835.    The several dozen instances could have been prevented.  Indeed, in September of 2013, New GM conducted a safety recall of model year 2013-2014 Chevrolet Cruze vehicles, but limited the recall to (i) vehicles built between January 24, 2013-August 1, 2013 and (ii) had manual transmission.[259]  New GM did so even though both manual and automatic Cruze vehicles used "half shafts containing tubular bars manufactured by GM's second-tier supplier, Korea Delphi Automotive Systems Corporation."[260]

836.    The 2013 recall was inadequate.  By February of 2014, New GM was aware of at least 47 claims of fractured tubular bars in model year 2013-2014 Cruze vehicles with automatic transmission.  New GM also learned that some of the manual Cruze vehicles that were "repaired" in the 2013 recall had *subsequently* suffered fractured half shafts.  Finally, New GM learned of fractured half-shafts in Cruze vehicles that were built *after* the August 1, 2013 build-date cutoff for the 2013 recall.[261]

837.    Finally, on March 26, 2014, New GM issued a safety recall that included (i) broader "build-date" coverage; (ii) both manual and automatic Cruze vehicles, and (iii) some manual Cruze vehicles that had been improperly repaired in the 2013 recall.

### e.    Seat hook weld defect.

838.    On July 22, 2014, New GM recalled 124,007 model year 2014 Chevrolet SS, 2014 Chevrolet Caprice, 2014 Chevrolet Caprice PPC, 2014 Chevrolet Silverado 1500, 2015

---

[258] "GM recalls 172,000 Chevrolet Cruze Sedans over front axle half-shaft," *Bloomberg*, March 31, 2014.

[259] *See* April 11, 2014 Letter from New GM to NHTSA.

[260] *Id.*

[261] *Id.*

- 273 -

010440-11  784012 V1

Chevrolet Silverado 2500/3500 HD, 2013-2014 Buick Encore, 2013-2014 Cadillac ATS, 2014

Cadillac CTS, 2014 Cadillac ELR, 2014 GMC Sierra 1500, and 2015 GMC Sierra 2500/3500

HD vehicles with a seat hook weld defect.[262]

839.    In the affected vehicles, as the result of an incomplete weld on the seat hook

bracket assembly, in a "high load" situation, "the hook may separate from the seat track,

increasing the risk of occupant injury in a crash."[263]

> **f.      Front turn signal bulb defect.**

840.    On July 21, 2014, New GM recalled 120,426 model year 2013 Chevrolet Malibu

and 2011-2013 Buick Regal vehicles with a front turn signal bulb defect.

841.    In the affected vehicles, the driver will see a rapidly flashing turn signal arrow in

the instrument cluster if both bulbs in one turn signal are burned out; but if only one bulb on

either side burns out, there will be no signal to the driver.  The failure to properly warn the driver

that a turn signal is inoperable increases the risk of accident.

842.    New GM first learned of the defect on September 6, 2012, when it conducted a

read-across review on turn signal bulb outage and discovered that when one of the two front turn

signal bulbs on either side burns out, there was no indication to the driver, and that the remaining

functioning bulb did not likely meet the photometric requirements for turn signal lamps under

Federal Motor Vehicle Safety Standards.  On September 26, 2012, New GM confirmed these

vehicles did not comply with federal standards.

843.    However, New GM attempted to categorize this noncompliance as

"inconsequential as it relate[s] to motor vehicle safety" by submitting a petition for exemption

from the notification and remedy requirements of the Motor Vehicle Safety Act on October 25,

---

[262] *See* July 22, 2014 Letter from New GM to NHTSA.

[263] *Id.*

2012.  On July 15, 2014, New GM's petition was denied, and the company was forced to issue a recall.

### g.    Low-beam headlight defect.

844.    On May 14, 2014, New GM issued a safety recall of 103,158 MY 2005-2007 Chevrolet Corvette vehicles with a low-beam headlight defect.

845.    In the affected vehicles, the underhood bussed electrical center housing can expand and cause the headlamp low beam relay control circuit wire to bend.  When the wire is repeatedly bent, it can fracture and cause a loss of low-beam headlamp illumination.  The loss of illumination decreases the driver's visibility and the vehicle's conspicuity to other motorists, increasing the risk of a crash.

846.    In May of 2013, prompted by 30 reports from drivers of the affected vehicles, NHTSA opened a preliminary evaluation of allegations of simultaneous loss of both low-beam headlights without warning in the affected vehicles.  The preliminary investigation looked at the low-beam headlights and all associated components, including but not limited to, switches, fuses and fuse box, and wiring and connectors.  New GM did not respond to the preliminary evaluation until June 27, 2013.

847.    On August 23, 2013, NHTSA upgraded the preliminary evaluation to an engineering analysis and expanded the vehicle scope to include MY 2005-2013 Chevrolet Corvette vehicles.  NHTSA provided New GM with Vehicle Owners' Questionnaires related to customer complaints of loss of low-beam headlamps.

848.    On January 14, 2014, New GM responded to the engineering analysis and had ongoing discussions with NHTSA through February 2014 regarding the Corvette vehicle.

849.    But New GM did nothing further until May 1, 2014, when it finally reviewed and analyzed warranty data and other records accumulated since NHTSA's August 2013 data

request.  At this time NHTSA also provided New GM additional Vehicle Owners' Questionnaires received since January 2014.  After New GM analyzed the data received by model year for the affected vehicles, it presented its findings to the Field Performance Evaluation Review Committee on May 5, 2014, and on May 7, 2014, New GM decided to conduct a safety recall to remedy the low-beam headlight defect.

### h.    Radio chime defect.

850.    On June 5, 2014, New GM issued a noncompliance recall of 57,512 MY 2014 Chevrolet Silverado LD, 2015 Chevrolet Silverado HD, 2015 Chevrolet Suburban, 2015 Chevrolet Tahoe, 2014 GMC Sierra LD, and 2015 GMC Sierra HD vehicles with a radio chime defect.

851.    In the affected vehicles, the radios may become inoperative; when that happens, there is no audible chime to notify the driver if the door is opened with the key in the ignition and no audible seat belt warning indicating that the seat belts are not buckled.  These vehicles fail to comply with the requirements of FMVSS numbers 114, "Theft Protection and Rollaway Prevention," and 208, "Occupant Crash Protection."  Without an audible indicator, the driver may not be aware that the driver's door is open while the key is in the ignition, and that creates a risk of a vehicle rollaway.  Additionally, there will be no reminder that the driver's or front seat passenger's seat belt is not buckled, which increases the risk of injury in a crash.

852.    New GM ordered a vehicle stop-shipment on April 28, 2014.  From April 30, 2014, through May 6, 2014, affected base radios were re-flashed with updated software at assembly plants, and on May 21, 2014, a service bulletin was issued with instructions to update the software in the affected vehicles.

853.   But New GM's efforts did not comply with the FMVSS, as it learned on May 28, 2014, after consulting its regulatory engineers.  New GM issued a noncompliance recall on May 29, 2014.

### i.   Fuel gauge defect.

854.   On April 29, 2014, New GM issued a safety recall of 51,460 MY 2014 Chevrolet Traverse, GMC Acadia, and Buick Enclave vehicles with a fuel gauge defect.

855.   In the affected vehicles, the engine control module software may cause inaccurate fuel gauge readings.  An inaccurate fuel gauge may result in the vehicle unexpectedly running out of fuel and stalling, and thereby increases the risk of accident.

856.   In July 2013, New GM began producing the 2014 MY Buick Enclave, Chevrolet Traverse, and GMC Acadia vehicles with a revised software calibration to better predict fuel levels.  The revised calibration takes into account actions such as refueling events, sloshing of fuel during operation, and consumption rates to better predict fuel level readings.

857.   But in August 2013, New GM received feedback from rental fleet customers regarding errors in gauge readings predominantly at the "full" end of the range.  Many rental customers complained they were charged a fuel surcharge for vehicles that had been refueled but were still reading less than full.  In response, on September 23, 2013, New GM switched back to using the 2013 MY fuel gauge software and calibration in new productions and issued a service bulletin to address the issue in vehicles already out in the market.

858.   On November 19, 2013, New GM was put on notice of a quality concern regarding inaccurate fuel gauge readings and warranty claims indicating "running out of fuel."  It conducted further searches and, as of December 6, 2013, discovered approximately 1,000 complaints of inaccurate fuel gauge readings, with the majority of these reading less than full, and 62 related to running out fuel.

- 277 -

859.    On January 9, 2014, New GM proposed only a customer satisfaction field action. NHTSA took the matter under consideration to provide additional feedback, and returned with information supporting a safety recall in lieu of a customer satisfaction field action.

860.    Hence, New GM finally decided to recall the affected vehicles on April 22, 2014.

### j.    Fuel Pump Module Defect

861.    On September 18, 2012 New GM recalled a total of 40,859 vehicles, including certain 2007 model year Chevrolet Equinox and Pontiac Torrent vehicles originally sold or currently registered in Arizona, California, Nevada, and Texas; 2007 model year Chevrolet Cobalt, Pontiac G5, and Saturn ION vehicles originally sold or currently registered in Arizona, California, Florida, Nevada, or Texas; 2008 model year Chevrolet Cobalt and Pontiac G5 vehicles originally sold or currently registered in Arizona; and 2009 model year Chevrolet Cobalt and Pontiac G5 vehicles originally sold or currently registered in Arkansas, Arizona, California, Nevada, Oklahoma, or Texas.

862.    In affected vehicles, the plastic supply or return port on the fuel pump module may crack, which may cause a fuel leak. The customer may notice a fuel odor while the vehicle is being driven or after it is parked. If the crack becomes large enough, fuel may be observed dripping onto the ground and vehicle performance may be affected. If an ignition source were present, a fire could occur.

863.    In July 2011, GM was contacted by a dealer regarding five vans that had leaks at the fuel pump module. Although the warranty rates for the vans were low, this inquiry initiated an investigation that resulted in a read across in October 2011, which included the Chevrolet Equinox and Pontiac Torrent. The Equinox and Torrent warranty data in October 2011, showed some trend, but overall rates were low. A state-by-state analysis, conducted in June 2012, showed higher rates in certain hot weather states.

864.    Both issues entered GM's FPE process in late July 2012. The issue was presented to GM's Field Performance Evaluation Review Committee for review, and on September 12, 2012, the Executive Field Action Decision Committee decided to conduct a safety recall.

### k.    Windshield wiper system defect.

865.    On May 14, 2014, New GM recalled 19,225 MY 2014 Cadillac CTS vehicles with a windshield wiper system defect.

866.    In the affected vehicles, a defect leaves the windshield wiper system prone to failure; though the windshield wipers systems are particularly prone to failure after a vehicle jump start occurs while the wipers are on and restricted by snow and ice, "an unstable voltage in the vehicle can reproduce this condition without an external jump start."  Inoperative windshield wipers can decrease the driver's visibility and increase the risk of a crash.[264]

867.    On January 17, 2014, New GM received a warranty claim and an inoperative wiper module from an affected vehicle.  The supplier, BOSCH, examined the module and determined that the MOSFET (metal-oxide-semiconductor field-effect transistor) "Trench 4" was damaged.  (A "Trench" is a design style of a MOSFET.)  New GM engineering and BOSCH then investigated possible causes of MOSFET damage from the part manufacturing through the vehicle assembly processes.[265]

868.    On February 26, 2014, BOSCH began using MOSFET Trench 3 instead of Trench 4.

869.    On April 15, 2014, "GM was able to reproduce electrical overstress inputs that could create a damaged MOSFET failure in a vehicle with restricted wipers during a jumpstart. GM tested the MOSFET Trench 3 for electrical overstress and they did not exhibit the same

---

[264] *See* May 28, 2014 Letter to NHTSA.

[265] *Id.*

failure."  BOSCH then "duplicated the MOSFET [Trench] electrical overstress condition on a bench without a vehicle jumpstart."[266]

870.    On May 7, 2014, New GM decided to conduct a safety recall, and the recall notice was issued on May 14, 2014.

### l.    Console bin door latch defect.

871.    On August 7, 2014, New GM issued a safety recall of 14,940 MY 2014-2015 Chevrolet Impala vehicles with a console bin door latch defect.[267]

872.    In the affected vehicles, the inertia latch on the front console bin compartment door may not engage in the event of a rear collision and the front console compartment door may open, increasing the risk of occupant injury.[268]  These vehicles fail to comply with the requirements of FMVSS No. 201, "Occupant Protection In Interior Impact."[269]

### m.    Driver door wiring splice defect.

873.    On June 11, 2014, New GM recalled 14,765 MY 2014 Buick LaCrosse vehicles with a driver door wiring splice defect.

874.    In the affected vehicles, a wiring splice in the driver's door may corrode and break, resulting in the absence of an audible chime to notify the driver if the door is opened while the key is in the ignition.  Additionally, the Retained Accessory Power module may stay active for ten minutes allowing the operation of the passenger windows, rear windows, and sunroof.  As such, these vehicles fail to comply with the requirements of FMVSS numbers 114, "Theft Protection and Rollaway Prevention," and 118, "Power-Operated Window, Partition, and

---

[266] *Id.*

[267] *See* August 7, 2014 Letter from New GM to NHTSA.

[268] *Id.*

[269] *Id.*

Roof Panel Systems."  Without an audible indicator, the driver may not be aware that the driver's

door is open while the key is in the ignition, increasing the risk of a vehicle rollaway.  If the

passenger windows, rear windows, and sunroof can function when the vehicle is turned off and

the driver is not in the vehicle, there is an increased risk of injury if an unsupervised occupant

operates the power closures.

875.    New GM first learned of this defect on August 21, 2013, when a test fleet vehicle

reported an inoperable driver window swift.  New GM added the issue to Problem Resolution.

876.    But New GM did not perform a warranty analysis until nearly eight months later

in April 2014.  The warranty analysis identified additional claims for this condition for harnesses

produced July 2013 through September 2013.  On April 21, 2014, the issue was reviewed and a

New GM engineer identified "two FMVSS standards, 114 and 118, that may be impacted."

877.    A Product Investigations Engineer was assigned to investigate further.  On May 8,

2014, a review of TREAD data and additional warranty files revealed additional related claims.

878.    New GM finally issued a safety recall on June 4, 2014.

**n.    Overloaded feed defect.**

879.    On July 2, 2014, New GM recalled 9,371 MY 2007-2011 Chevrolet Silverado and

2007-2011 GMC Sierra HD vehicles with an overloaded feed defect.

880.    In the affected vehicles, an overload in the feed may cause the underhood fusible

link to melt due to electrical overload, resulting in potential smoke or flames that could damage

the electrical center cover and/or the nearby wiring harness conduit.

881.    Sometime prior to January 2012, New GM received reports of four underhood

fires resulting from an auxiliary battery fusible link wire melting, opening circuit, and contacting

surrounding components.  On January 19, 2012, New GM initiated a Customer Satisfaction

- 281 -

Program to close a product investigation into the reported fires.  New GM states a design change

had already been implemented into production in June 2011.

882.    More than two years later, on May 5, 2014, the Engineering Analysis department

requested that Product Investigations conduct an investigation to confirm the complete

population was included in the Customer Satisfaction Program and that the remedy was

effective.  From May 20 to May 23, 2014, data was reviewed from a recent pull of New GM

reports and warranty.  The investigation revealed that while all identified vehicles reported to

have an incident were included in the original investigation and vehicle population, two vehicles

involved in the Customer Satisfaction Program experienced incidents, including one fire,

subsequent to the Customer Satisfaction Program.  Both of these vehicles had not had the repair

performed.

883.    After review during an Open Investigation Review on June 23, 2014, and on June

25, 2014, New GM issued a safety recall for vehicles not yet repaired under the Customer

Satisfaction Program.

> **o.    Windshield wiper module assembly defect.**

884.    On June 26, 2014, New GM recalled 4,794 MY 2013-2014 Chevrolet Caprice and

2014 Chevrolet SS vehicles with a windshield wiper module assembly defect.

885.    In the affected vehicles, the motor gear teeth may become stripped and the wipers

inoperable.  Inoperable wipers increase the risk of accident in inclement conditions.

886.    After noting an increase in warranty claims, New GM requested that dealers

return parts related to wiper motor warranty claims on February 14, 2014.

887.    Nearly three months later, on May 1, 2014, New GM held a meeting with the

supplier of the wiper motor and learned that the supplier had used unauthorized grease in the

motors built from January 15, 2013 to August 5, 2013.  The supplier changed back to the

authorized grease after a July 24, 2013 lot test revealed the gear teeth stripping.  New GM claims that, prior to May 1, 2014, it was unaware of the grease changes or the gear stripping condition.

888.    A root cause investigation between May 7, 2014, and June 3, 2014, conducted by the supplier with New GM Engineering participation, determined the source of the problem was the unauthorized grease and its improper application to the wiper motor gear teeth.

889.    On June 19, 2014, New GM decided to conduct a safety recall.

### p.    Engine block heater power cord insulation defect.

890.    On July 2, 2014, New GM issued a safety recall of 2,990 MY 2013-2014 Chevrolet Cruze, 2012-2014 Chevrolet Sonic, 2013-2014 Buick Encore, and 2013-2014 Buick Verano vehicles with an engine block heater power cord insulation defect.

891.    In the affected vehicles the insulation on the engine block heater cord can be damaged, exposing the wires.  Exposed wires increase the risk of electrical shock and personal injury if the cord is handled while plugged in.

### q.    Rear shock absorber defect.

892.    On June 27, 2014, New GM issued a safety recall of 1,939 MY 2014 Chevrolet Corvette vehicles with a rear shock absorber defect.

893.    In the affected vehicles, an insufficient weld in the rear shocks can cause the shock absorber tube to separate from the shock absorber bracket.  That separation may cause a sudden change in vehicle handling behavior that can startle drivers and increase the risk of a crash.[270]

---

[270] *See* June 26, 2014 Letter from New GM to NHTSA.

###### r.   Electronic stability control defect.

894.   On March 26, 2014, New GM issued a safety recall for 656 MY 2014 Cadillac ELR vehicles with an electronic stability control defect.

895.   In the affected vehicles, the electronic stability control system software may inhibit certain diagnostics and fail to alert the driver that the electronic stability control system is partially or fully disabled.  Therefore, these vehicles fail to conform to FMVSS number 126, "Electronic Stability Control Systems."  A driver who is not alerted to an electronic stability control system malfunction may continue driving with a disabled system.  That may result in the loss of directional control, greatly increasing the risk of a crash.[271]

###### s.   Unsecured floor mat defect.

896.   On June 18, 2014, New GM issued a safety recall of 184 MY 2014 Chevrolet Silverado LD and 2014 GMC Sierra LD vehicles with an unsecured floor mat defect.

897.   The affected vehicles built with the optional vinyl flooring option and equipped with the optional All-Weather Floor Mats do not have the retention features necessary to properly secure the floor mat on the driver's side.  The driver's floor mat can shift such that it interferes with the accelerator pedal, and thus increases the risk of a crash.[272]

898.   On January 20, 2014, a New GM dealership informed New GM marketing that vehicles in affected class of vehicles have no floor mat retention features.  Accordingly, New GM should not have permitted that combination of options (the vinyl floor and All-Weather Floor Mats).  On January 22, 2014, New GM revised its systems to prevent vehicles being ordered with that combination.[273]

---

[271] *See* March 26, 2014 Letter from New GM to NHTSA.

[272] *See* June 18, 2014 Letter from New GM to NHTSA.

[273] *Id.*

899.    New GM waited another month before cancelling all orders for the vinyl flooring and All-Weather Floor Mats on February 24, 2014.  Then, on February 25, 2014, New GM instructed its Accessory Distribution Centers not to ship All-Weather Floor Mats to vehicles with the vinyl flooring option.[274]  New GM informed dealerships with affected vehicles, and advised them to remove and destroy any floor mats installed in the vehicles.  New GM also issued an Engineering Work Order to restrict orders for All-Weather Floor Mats to vehicles with the carpet floor covering option.[275]

900.    Inexplicably, though New GM presented this issue to the Field Performance Evaluation group on February 25, 2014, it was not until June 11, 2014 that New GM decided to conduct a safety recall.[276]

### t.    Fuse block defect.

901.    On May 23, 2014, New GM issued a safety recall of 58 MY 2015 Chevrolet Silverado HD and GMC Sierra HD vehicles with a fuse block defect.

902.    In the affected vehicles, the retention clips that attach the fuse block to the vehicle body can become loose allowing the fuse block to move out of position.  When this occurs, exposed conductors in the fuse block may contact the mounting studs or other metallic components, which in turn causes a "short to ground" event.  That can result in an arcing condition, igniting nearby combustible materials and starting an engine fire.[277]

903.    New GM became aware of this issue by January 30, 2014, when the fuse block became disconnected and resulted in the fiber wheel liner catching fire during testing of an

---

[274] *Id.*

[275] *Id.*

[276] *Id.*

[277] *See* May 30, 2014 Letter from New GM to NHTSA.

affected vehicle at the Flint Assembly Plant.  New GM put a hold on all vehicles with suspect fuse block, and assigned an internal investigator to the issue.[278]

904.    On February 3, 2014, New GM issued a Stop Delivery Order on all of the vehicles with the suspect fuse block and informed NHTSA of the issue.  At the time, New GM claims, only one of the affected vehicles had been sold; New GM contacted that customer and repaired the sold vehicle.[279]

905.    New GM issued a Service Update Bulletin (SUB 14034) for all unsold vehicles with the defective fuse blocks, and provided its dealership with repair kits in February of 2014.[280]  New GM revised the repair after it discovered a susceptibility to corrosion during a March 2014 durability test – but only used the enhanced kit for the vehicles that had not already been repaired by May of 2014.[281]

906.    On May 7, 2014, New GM found that there were 58 affected vehicles that had not been repaired.  Inexplicably, 20 of the 58 vehicles had been sold – even though New GM had known about the defect prior to the sales.[282]

907.    On May 19, 2014, New GM decided to conduct a safety recall of all 58 affected vehicles.[283]

### u.    Diesel transfer pump defect.

908.    On April 24, 2014, New GM issued a safety recall of 51 MY 2015 GMC Sierra HD and 2015 Chevrolet Silverado HD vehicles.

---

[278] *Id.*

[279] *Id.*

[280] *Id.*

[281] *Id.*

[282] *Id.*

[283] *Id.*

909.     In the affected vehicles, the fuel pipe tube nuts on both sides of the diesel fuel transfer pump may not be tightened to the properly torque.  That can result in a diesel fuel leak, which can cause a vehicle fire.[284]

**v.     Rear suspension toe adjuster link defect.**

910.     On September 17, 2014, New GM issued a safety recall for 290,241 MY 2010-2015 Cadillac SRX and 2011-2012 Saab 9-4x vehicles with a rear suspension toe adjuster link defect that can cause vehicles to sway or wander on the road.[285]

911.     According to New GM, in the affected vehicles, "the jam nut in the rear suspension toe adjuster link may not be torqued to the proper specification.  A loose toe adjuster link can cause the vehicle to sway or wander at highway speed, activate the vehicle's electronic stability control system, and cause excessive wear to the threads in the link….If the threads in the link become worn, the link may separate."[286]  If the link separates, that "would create sudden vehicle instability, increasing the risk of a crash."[287]

912.     Once again, New GM should have picked up on this defect years earlier.  In fact, in 2011, New GM conducted a safety recall of Cadillac CTS vehicles with a similar rear suspension toe adjuster link defect.[288]

913.     New GM claims that, ever since 2011, it had been "monitor[ing] warranty data associated with the suspension systems in Cadillac SRX vehicles, which utilized similar rear

---

[284] *See* April 24, 2014 Letter from New GM to NHTSA.

[285] *See* New GM's Sept. 17, 2014 Part 573 Safety Report.

[286] *Id.*

[287] *Id.*

[288] *Id.*

suspension components" to the Cadillac CTS vehicles that were recalled in 2011.[289] "As of July 2014, [New] GM had received 83 warranty claims, 14 TREAD reports, and two NHTSA VOQs relating to the rear suspension system on 2010 through 2012 MY Cadillac SRX vehicles."[290]

914.    Between July 14 and early September 2014, GM "determined that the rear suspension adjuster link jam nuts in some 2010-2015 MY Cadillac SRX vehicles may not have been torqued to the proper specification"[291] – *just as in the case of the Cadillac CTS vehicles that had been recalled several years earlier.*

915.    Finally, on September 10, 2014, New GM decided to conduct a safety recall of the Cadillac SRX vehicles.

916.    New GM offers no explanation as to why it took so long to finally expand the recall to cover vehicles sharing the same components and the same defects with vehicles that had been recalled several years earlier.

### w.    Hood latch defect.

917.    On September 23, 2014, New GM recalled 89,294 MY 2013-2015 Chevrolet Spark vehicles with a hood latch defect.[292]

918.    According to New GM, the affected vehicles "were manufactured with a secondary hood latch that may prematurely corrode at the latch pivot causing the striker to get stuck out of position and preventing the striker from properly engaging the hood latch."[293]  If this

---

[289] *Id.*

[290] *Id.*

[291] *Id.*

[292] *See* New GM's September 23, 2014 Part 573 Safety Recall Report.

[293] *Id.*

happens, "the vehicle's hood may open unexpectedly," and that will "likely" impair the driver's vision and increase the risk of a collision.[294]

919.   In November 2013, the secondary hood latch in the affected vehicles "failed a 10-year component level corrosion test."  By February 2014, New GM determined that "the anti-corrosion coating applied to the secondary hood latch was deficient and did not meet" the company's requirements.[295]

920.   New GM commenced a search for the "root cause" of the defect from March 24 through September 18, 2014.  New GM found that, in the earlier MY Chevrolet Sparks, "all secondary hood latches were coated with an 'ED' coat (electro deposition of zinc phosphate) rather than the required 'MFC-A' coat (e.g., a phosphate and oil based corrosion protection coat)."  As of July 31, 2014, MFC-A coating was used for the Sparks.[296]

921.   New GM's investigation found 10 warranty cases in the U.S. for premature corrosion of the hood latches.[297]

922.   On September 18, 2014, New GM decided to conduct a safety recall.

            **x.    Electrical short defect.**

923.   On October 2, 2014, New GM announced a recall of 117,652 MY 2013-2014 Chevrolet Tahoe, 2013-2014 Chevrolet Suburban, 2013-2014 GMC Yukon, 2013-2014 GMC Yukon, 2013-2014 Cadillac Escalade, 2013-2014 Cadillac CTS, 2014 Chevrolet Traverse, 2014

---

[294] *Id.*

[295] *Id.*

[296] *Id.*

[297] *Id.*

GMC Acadia, 2014 Buick Enclave, 2014 Chevrolet Express, 2014 GMC Savana, 2014 Chevrolet

Silverado, and 2014 GMC Sierra vehicles with a defect that can cause an electrical short.[298]

924.    In the affected vehicles, due to a defect in the chassis control module, metal

slivers can cause an electrical short that results in the vehicle stalling or not starting.[299]  This

creates a serious risk of accident.

925.    As of this writing, New GM has not yet released further information about this

defect or the recall.

### y.    Headlamp Driver Module Failure.

926.    On October 25, 2014, New GM announced a recall of 273,182 vehicles, including

the 2006-2009 Buick LaCrosse, 2006-2007 Buick Rainier, Chevrolet Trailblazer, GMC Envoy,

2006 Chevrolet Trailblazer EXT, GMC Envoy XL, 2006-2008 Isuzu Ascender, and Saab 9-7x

for headlamp driver module ("HDM") failure.[300]

927.    In the affected vehicles, the headlamp driver module can overheat and fail,

causing the headlamps and daytime running lights to fail, reducing the driver's ability to see the

roadway and reducing visibility of the vehicle to oncoming traffic.

### z.    Ignition Lock Actuator Binding Defect.

928.    On December 30, 2014, New GM announced a recall of 83,572 MY 2011-2012

Cadillac Escalade, Escalade ESV, Escalade EXT, Chevrolet Avalanche, Silverado HD, Silverado

---

[298] See "GM recalls 117,651 vehicles for potential electrical short issue," Reuters (Oct. 2, 2014).

[299] Id.

[300] See NHTSA Campaign Number 14V755000.

LD, Suburban, Tahoe, GMC Sierra LD, Sierra HD, Yukon, and Yukon XL vehicles with ignition lock actuators that may bind.[301]

929.    This defect makes turning the ignition key difficult, can cause the ignition to get struck in the Start position, and, if stuck in the Start position, it may suddenly snap back into the Accessory position causing a loss of engine, steering, and braking power and failure of the airbags to deploy.

### aa.    Tire tread cracking defect.

930.    On January 28, 2015, New GM announced a recall of 5,876 MY 2015 Buick Enclave, 2015 Chevrolet Traverse and 2015 GMC Acadia that are equipped with tires experience tread premature cracking.[302]

931.    Tire tread cracking may result in a loss of tire pressure, tire failure, and increase the risk of a crash.

### bb.    Engine Software Defect.

932.    On March 13, 2015, New GM announced a recall of 50,236 MY 2011-2013 Chevrolet Volt vehicles that require software update to limit the time that an idle vehicle can be left in the "On" position.[303]

933.    If the driver exits these defective vehicles with the electrical system in the "On" position, after a period of time the battery will drain, the gas engine will start automatically to recharge the battery, and the vehicle will emit exhaust fumes. In an enclosed space, carbon monoxide build up may occur and potentially cause injury.

---

[301] *See* NHTSA Campaign Number 14V827000.

[302] *See* NHTSA Campaign Number 15V044000.

[303] *See* NHTSA Campaign Number 15V145000.

### cc.   Valve cover gasket defect.

934.   On April 6, 2015, New GM announced a recall of 1,207 MY 2004 Buick Regal, 2004 Chevrolet Impala and 2004 Chevrolet Monte Carlo vehicles for a valve cover gasket defect.[304]

935.   In these vehicles the valve cover gasket may leak causing engine oil to drip onto the exhaust manifold increasing the risk of fire.

## E.   New GM Sold Used Defective Ignition Switch Vehicles As "Certified Previously Owned" Vehicles

936.   From the date of its inception on July 11, 2009, New GM sold GM-branded vehicles, including Defective Ignition Switch Vehicles, as "Certified Previously Owned" vehicles.  In so doing, New GM concealed the fact the vehicles contained defective ignition switches, and fraudulently represented that the vehicles were free of known safety defects.

937.   According to New GM's current website, "[b]uying  a Certified Pre-Owned vehicle can make your used car purchase and ownership worry-free.  Because every Certified Pre-Owned Chevy, Buick and GMC is a vehicle you can trust."[305]

938.   According to New GM's website, Certified Pre-Owned vehicles have "$2,135 of Built-In Value."  That is because, according to New GM:

> Before you buy, our vehicles have to meet stringent standards and inspection criteria to earn the Certified Pre-Owned badge.  After you buy, experience hassle-free driving with our maintenance, warranty and other benefits that come standard with every Certified Pre-Owned vehicle.  And we did the math.  These benefits are worth $2,135.[306]

---

[304] *See* NHTSA Campaign Number 15V201000.

[305] http://www.gmcertified.com/?seo=goo_|_%5Baccount+name%5D_|_RTN-GM+CPO-Exact_|_GM+CPO_|_gm%20certified (last visited on May 28, 2015).

[306] http://www.gmcertified.com/?seo=goo_|_%5Baccount+name%5D_|_RTN-GM+CPO-Exact_|_GM+CPO_|_gm%20certified (last visited on May 28, 2015).

939.    With respect to the Defective Ignition Switch Vehicles, these representations were false.  In fact, as a result of the ignition switch defect and the raft of negative publicity associated with the GM-brand as a result of New GM's fraudulent concealment and misrepresentations, the Defective Ignition Switch Vehicles have greatly diminished in value.

940.    California and Nationwide Class Representatives Marc and Madelaine Koppelman were among those Class Members unfortunate enough to have purchased a Defective Ignition Switch Vehicle from New GM as a Certified Pre-Owned Vehicle, in this case a 2010 Chevy HHR.

941.    On information and belief, the documentation provided to the Koppelmans is identical or similar to the documentation provided to all Certified Pre-Owned vehicle purchasers. According that documentation, before selling the Koppelman's vehicle, New GM performed a rigorous "172-Point Vehicle and Reconditioning" protocol.

942.    As part of that protocol, New GM checked boxes claiming that it had done an "inspection" of the "Engine Compartment," including, *inter alia*, the "ignition system," and claimed that it had "inspect[d] [the] operation of all components" and had "replace[d] or "repair[ed]" as necessary.

943.    In the same documentation, New GM also advised the Koppelmans – just as it still does on its website – that the "benefits" of a Certified Pre-Owned vehicle were worth "$2,135."

944.    Because of New GM's promises in connection the Certified Pre-Owned vehicles, Class Members who purchased Defective Vehicles as Certified Pre-Owned vehicles stand in the same position with respect to New GM as do purchasers of new vehicles made and sold by New GM.

- 293 -

**F.      New GM's Deception Has Harmed Plaintiffs and the Class**

945.     New GM was well aware that vehicle recalls, especially untimely ones, can taint

its brand image and the value of GM vehicles.  In its 2010 Form 10-K submitted to the SEC,

New GM admitted that "Product recalls can harm our reputation and cause us to lose customers,

particularly if those recalls cause consumers to question the safety or reliability of our products.

Any costs incurred or lost sales caused by future product recalls could materially adversely affect

our business."[307]

946.     GM also understood that safety was an important feature to Congress:

> According to GM research, safety ranks among the top 10 reasons
> for purchase. According to 2012 calendar year sales data, 54
> percent of Chevrolet, Cadillac, GMC and Buick buyers surveyed
> listed safety features as an "extremely important" purchase
> consideration. The same percentage of buyers industrywide also
> listed safety features as "extremely important."
>
> **"We design safety and crashworthiness into our vehicles very**
> **early in development," said Gay Kent, GM's general director**
> **of Vehicle Safety and Crashworthiness. "We are committed to**
> **offering advanced safety technologies on a broad range of**
> **models, not just on the most expensive vehicles. All of our**
> **vehicles are designed to provide continuous protection for**
> **customers before, during and after a crash."**[308]

947.     Unfortunately for owners of GM-branded vehicles, New GM was correct.  It is

difficult to find a brand whose reputation has taken as great a beating as has the New GM brand

starting in February 2014 when the first ignition switch recall occurred.

948.     In fact, the public outcry has been significant in response to the ongoing

revelations of the massive number of defects New GM concealed, and the massive number of

---

[307] General Motors 2010 Form 10-K, p. 31, available at
https://www.sec.gov/Archives/edgar/data/1467858/0001193125 10078119/dl0k.htm#toc857334.

[308] http://media.gm.com/media/us/en/chevrolet/news.detail.html/content/
Pages/news/us/en/2013/Sep/0920-5-star.html.

defective vehicles New GM has sold.  The following are illustrative examples of the almost constant beating the New GM brand has taken ever since the first ignition switch recall was announced on July 13, 2014.

949.    After the announcement of the first ignition switch recall the media was highly critical of GM.  For example, a CBS February 27, 2014, news report headlined:



950.    The CBS report had a video link:[309]



951.    On March 13, 2014, a CNN report was entitled:

## Feds demand answers from GM on recall defect
By Mike M. Ahlers, CNN
updated 7:51 AM EDT, Thu March 13, 2014

952.    On March 16, 2014, Reuters reported as follows:

## Owners of recalled GM cars feel angry, vindicated

(Reuters) – As details emerge about how General Motors Co dealt with faulty ignition switches in some of its models, car owners are

---

[309] http://www.cbsnews.com/news/did-general-motors-wait-too-long -to-issue-its-recall/.

increasingly angry after learning that the automaker knowingly allowed them to drive defective vehicles.

Saturn Ion owner Nancy Bowman of Washington, Michigan, said she is outraged that GM allowed her to drive a "death trap." She said her car had so many ignition problems she was afraid to resell it to an innocent buyer.

She bought the 2004 model car new and still drives it after extensive repairs and multiple run-ins with a Saturn dealer she called dismissive.

"Five times the car died right out from under me after hitting a bump in the road," she wrote in a 2013 posting on a complaint website, arfc.org, that says it sends information to the National Highway Traffic Safety Administration (NHTSA).

Every time I brought it in they said it was an isolated incident. Couldn't find the problem, so they acted like I was an idiot.

953.    On March 24, 2014, the NEW YORK TIMES issued an article entitled:

BUSINESS DAY

## *General Motors Misled Grieving Families on a Lethal Flaw*

By HILARY STOUT, BILL VLASIC, DANIELLE IVORY and REBECCA R. RUIZ   MARCH 24, 2014

954.    It contained a troublesome account of GM's conduct:

It was nearly five years ago that any doubts were laid to rest among engineers at General Motors about a dangerous and faulty ignition switch. At a meeting on May 15, 2009, they learned that data in the black boxes of Chevrolet Cobalts confirmed a potentially fatal defect existed in hundreds of thousands of cars.

But in the months and years that followed, as a trove of internal documents and studies mounted, G.M. told the families of accident victims and other customers that it did not have enough evidence of any defect in their cars, interviews, letters and legal documents show. Last month, G.M. recalled 1.6 million Cobalts and other small cars, saying that if the switch was bumped or weighed down it could shut off the engine's power and disable air bags.

In one case, G.M. threatened to come after the family of an accident victim for reimbursement of legal fees if the family did not withdraw its lawsuit. In another instance, it dismissed a family with a terse, formulaic letter, saying there was no basis for claims.

- 296 -

* * *

Since the engineers' meeting in May 2009, at least 23 fatal crashes have involved the recalled models, resulting in 26 deaths.  G.M. reported the accidents to the government under a system called Early Warning Reporting, which requires automakers to disclose claims they receive blaming vehicle defects for serious injuries or deaths.

A New York Times review of 19 of those accidents – where victims were identified through interviews with survivors, family members, lawyers and law enforcement officials – found that G.M. pushed back against families in at least two of the accidents, and reached settlements that required the victims to keep the discussions confidential.

* * *

In other instances, G.M. ignored repeated calls, families said. "We did call G.M.," said Leslie Dueno, whose 18-year-old son, Christopher Hamberg, was killed on June 12, 2009 – not quite a month after the critical May 15 meeting of G.M. engineers about the ignition data – driving his 2007 Cobalt home before dawn in Houston.  He lost control at 45 miles per hour and hit a curb, then a tree, the police report said.  "Nobody ever called me.  They never followed up.  Ever."

Last month's recalls of the Cobalt and five other models encompassed model years 2003 through 2007.  G.M. faces numerous investigations, including one by the Justice Department looking into the company's disclosures in its 2009 bankruptcy filing as well as what it told regulators.

"We are conducting an unsparing, comprehensive review of the circumstances leading to the ignition switch recall," G.M. said in a statement on Monday.  "As part of that review we are examining previous claims and our response to them.  If anything changes as a result of our review, we will promptly bring that to the attention of regulators."

G.M. has said it has evidence of 12 deaths tied to the switch problem, but it has declined to give details other than to say that they all occurred in 2009 or earlier.  It says it has no conclusive evidence of more recent deaths tied to the switch.

* * *

It was unclear how many of the 26 deaths since the 2009 meeting were related to the faulty ignition, but some appeared to fit patterns that reflected the problem, such as an inexplicable loss of control or air bags that did not deploy.  In some cases, the drivers had put themselves at risk, including having high blood-alcohol levels or texting.

Still, by the time Benjamin Hair, 20, crashed into a tree in Charlottesville, Va., on Dec. 13, 2009, while driving a Pontiac G5 home, G.M. had conducted five internal studies about the ignition problem, its records indicate.

…

Consumer complaints and claims came to the company in a variety of ways – through lawsuits, calls, letters and emails, warranty claims, or insurance claims.  G.M.'s legal staff was the recipient of lawsuits, insurance information, accident reports and any other litigation-related paperwork.  But warranty claims and customer calls were routed through the sales and service division – a vast bureaucracy that occupies most of one tower at G.M.'s headquarters in Detroit.  Because the legal staff reports to the chief executive, and the sales department to the head of G.M. North America, it is unclear whether they share information related to a specific car, like the Cobalt.

955.   NPR ran a story on March 31, 2014:

## Timeline: A History Of GM's Ignition Switch Defect

By TANYA BASU

March 31, 2014   4:31 PM ET

956.   The NPR story raised questions about GM's candor:

NPR looked into the timeline of events that led to the recall.  It's long and winding, and it presents many questions about how GM handled the situation:  How long did the company know of the problem?  Why did the company not inform federal safety officials of the problem sooner?  Why weren't recalls done sooner?  And did GM continue to manufacture models knowing of the defect?

957.   On May 11, 2014, the CHICAGO TRIBUNE ran an article entitled:

*GM ranked worst automaker by U.S. suppliers:  survey*

- 298 -

DETROIT (Reuters) – General Motors Co, already locked in a public relations crisis because of a deadly ignition defect that has triggered the recall of 2.6 million vehicles, has a new perception problem on its hands.

The U.S. company is now considered the worst big automaker to deal with, according to a new survey of top suppliers to the car industry in the United States.

Those so-called "Tier 1" suppliers say GM is now their least favorite big customer, according to the rankings, less popular even than Chrysler, the unit of Fiat Chrysler Automobiles FIA.MI, which since 2008 had consistently earned that dubious distinction.

Suppliers gave GM low marks on all kinds of key measures, including its overall trustworthiness, its communication skills, and its protection of intellectual property.

958.    On May 25, 2014, an article reported on a 2.4 million vehicle recall:

# When Will GM's Recall Mess End?

**General Motors** (NYSE: GM) on Tuesday said it is recalling about 2.4 million additional vehicles in four separate recalls for a variety of problems, including faulty seat belts and gearshift troubles.

This announcement came on the heels of another set of GM recalls, announced last Thursday, covering 2.7 million vehicles.  Including the four recalls announced on Tuesday, GM has issued a total of 30 recalls in the U.S. so far in 2014, encompassing about 13.8 million vehicles.

That's a stupendous number.[310]

959.    On May 26, 2014, the NEW YORK TIMES ran an article:

BUSINESS DAY

*13 Deaths, Untold Heartache, From G.M. Defect*

By REBECCA R. RUIZ, DANIELLE IVORY and HILARY STOUT   MAY 26, 2014

---

[310] http://www.fool.com/investing/general/2014/05/25/when-will-gms-recall-mess-end.aspx.

960.    The article once again pointed blame at GM:

BEN WHEELER, Tex. – For most of the last decade, Candice Anderson has carried unspeakable guilt over the death of her boyfriend.  He was killed in 2004 in a car accident here, and she was at the wheel.  At one point, Ms. Anderson, who had a trace of Xanax in her blood, even faced a manslaughter charge.  She was 21.

All these years, Ms. Anderson – now engaged and a mother – has been a devoted visitor to his grave.  She tidies it every season, sweeping away leaves and setting down blue daisies with gold glitter for his birthday, miniature lit trees for Christmas, stones with etched sayings for the anniversary of their accident.

"It's torn me up," Ms. Anderson said of the death of Gene Mikale Erickson.  "I've always wondered, was it really my fault?"

Last week, she learned it was not.

* * *

Inside G.M., the nation's largest automaker, some of the 13 victims appear on charts and graphs with a date and a single word:  "fatal."

961.    News of GM's misconduct and of the recalls made the front page of every major newspaper and was the lead story on every major television news program in the country.

962.    The congressional hearings where GM executives were subject to harsh questioning and criticism were widely reported in every type of media.

963.    In June 2014 GM recalled another 8.2 million vehicles and again these recalls received widespread attention in the press.  The stories often included charts and graphs depicting the ever-growing list of vehicles recalled:

## GM to recall 8.2 million more vehicles over ignition-switch defect

*POSTED AT 3:21 PM ON JUNE 30, 2014*

The recall blues continue at GM, as does the scope of their previously hidden ignition-switch defect.  The world's largest automaker added 8.45 million more vehicles to its list, with some

- 300 -

models going back to 1997.  This puts GM over the 28-million mark for cars recalled on a global basis in 2014, and over 26 million domestic.[311]

964.    The coverage did not simply die down as often happens.  On July 15, 2014, the NEW YORK TIMES ran an article entitled, "Documents Show General Motors Kept Silent on Fatal Crashes."

965.    By August 2, 2014, the press was reporting that New GM used vehicles were losing value:

THE DALLAS MORNING NEWS

**August 2, 2014 Saturday**
1 Edition

**SECTION:** BRIEFING; Pg. 10

**LENGTH:** 80 words

**HEADLINE:**  GM vehicles' resale values are taking a hit as safety recalls mount

**BODY:**

Although General Motors' sales remained solid in the midst of its recent record recalls, some vehicles experienced significant drops in their resale values.

In an analysis of more than 11 million used cars for sale between March and June of this year, iSeeCars.com found that the resale values of the main vehicles in GM's recalls dropped 14 percent from the same period last year.

966.    An August 5, 2014 article also reported that used GM vehicles were suffering loss in value due to the recalls:[312]

---

[311] http://hotair.com/archives/2014/06/30/gm-to-recall-8-2-million-more-vehicles-over-ignition-switch-defect-8-45-million-overall/.

[312] Doron Levin, FORTUNE MAGAZINE, August 5, 2014.

# Used GM cars affected by recall getting hurt in the marketplace

by Dores Lewis   ...............   ...........

Ignition recall caused resale values to take a hit – some Pontiac, Saturn and Chevy models were most affected.

General Motors Co.  GM -0.41%  has been fortunate to avoid a collapse of new-vehicle sales since the ignition-switch safety crisis blew up in January, engulfing the automaker in litigation, a federal criminal probe and Congressional inquiries.

Used GM vehicles – models affected by the recall – meanwhile have taken a substantial hit in value, according to a study by iSeeCars.com, an online search engine. GM's new-vehicles sales are up 3.5% in the U.S. through July in a market that has risen 5% in terms of unit sales.

(Holders of GM stock have gotten whacked as well since January, the value of shares falling nearly 18%, compared with a S&P 500 Index that has risen 4% during the period.)

The operators of the search engine said they created an algorithm to determine the market value of six GM cars affected by the recall, based on asking prices of used vehicles on dealer lots from March to June 2013, compared to a year later. The change in value also was compared to the dropping value of all used cars in the U.S., which has been occurring for the past few months. The sample size was 11 million cars.

The average price of the recalled GM models dropped 14% from March to June 2014, compared to a year earlier and adjusted for inflation. The drop in value of all similar models was 6.7% during the same period.

Phong Ly, chief executive and co-founder of iSeeCars.com said "recalls are playing a role in motivating sellers to sell their used cars and at a lower price point than they otherwise would." His company provides free information to car shoppers and sells sales leads to dealers.

967.    The crisis that affected the GM Brand was so significant that GM stock has been

battered.  A September 22, 2014 report observed:[313]

## GM Falls Deeper Into The Abyss

Sep. 22, 2014 7:55 AM ET  |  About: General Motors Company (GM)

**Summary**

- GM has been in a rut since the ignition switch recalls.

- More and more, GM is coming off as a perpetually troubled business.

- We continue to avoid General Motors stock.

We previously wrote about GM (NYSE:GM) and placed a $31 price target on it here. Our basic argument was that GM was going to have trouble presenting itself into the mainstream as a reputable brand to buy after the ignition switch recall.

Late Sunday, it was announced that GM was recalling 222,500 vehicles due to brake pad malfunction. This number towers over the amount of normal recalls that come during the course of business. It's also involving vehicles that were made from 2013 to 2015, a clear indicator that these vehicles (manufactured by the post-bankruptcy GM) should have had a renewed focus of safety on them from the beginning.

968.    The diminution in value was recognized by Class Members as reflected in this

email to Mary T. Barra dated May 7, 2014:[314]



---

[313] *See* http://seekingalpha.com/article/2511545-gm-falls-deeper-into-the-abyss.

[314] 400293557.



969.    Another example of the economic injury to class members comes from the

following email to Mary Barra and other New GM executives:[315]



---

[315] GM-MDL-2543-001193336.



970.    And another:

████████████████████████ ████████████████████ [316]

971.    GM was aware of how its deception has diminished the value of GM branded vehicles, and specifically asked Kelley Blue Book: ██████████████████████ ████████████████████████████████████████████████████" ██ ████████████████████████████████████████████████ █████████████

972.    The impact on the value of GM-brand is also evidenced by the decline in GM's stock price, which hit a 52 week low on October 10, 2014.

973.    New GM's unprecedented concealment of a large number of serious defects, and its irresponsible approach to safety, quality, and reliability issues, has caused damage to Plaintiffs and the Class.

974.    A vehicle made by a reputable manufacturer of safe, high quality, and reliable vehicles who stands behind its vehicles after they are sold is worth more than an otherwise similar vehicle made by a disreputable manufacturer known for selling defective vehicles and for concealing and failing to remedy serious defects after the vehicles are sold.

975.    A vehicle purchased or leased under the reasonable assumption that it is safe and reliable is worth more than a vehicle of questionable safety, quality, and reliability due to the manufacturer's recent history of concealing serious defects from consumers and regulators.

---

[316] GM-MDL2543-001236494.
[317] GM-MDL2543-200063855.

976.    Purchasers and lessees of GM-branded vehicles after the July 10, 2009 inception
of New GM paid more for the vehicles than they would have had New GM disclosed the many
defects it had a duty to disclose in GM-branded vehicles, and disclosed that GM's culture and
business model was such that it did not produce safe, high quality, and reliable vehicles.
Because New GM concealed the defects and the fact that it was a disreputable brand that valued
cost-cutting over safety, Plaintiffs and the Class did not receive the benefit of their bargain.  And
the value of all their vehicles has diminished as the result of New GM's deceptive conduct.

977.    On information and belief, an estimate of the diminished value in class vehicles
not subject to the ignition switch recall is illustrated by way of example as follows for a few
Model Year 2013 vehicles:

| | | |
|---|---|---|
| GMC | Terrain | September Diminished Value:  $1,052 |
| GMC | Sierra 1500 | September Diminished Value:  $325 |
| Buick | Lacrosse | September Diminished Value:  $954 |
| Chevrolet | Suburban | September Diminished Value:  $854 |
| Cadillac | CTS | September Diminished Value:  $867 |
| Cadillac | XTS | September Diminished Value:  $1,722 |

978.    Another example is the diminished value of illustrative 2011 models:

| | | |
|---|---|---|
| GMC | Terrain | September Diminished Value:  $891 |

- 306 -

| | | September Diminished Value:  $1,017 |
|---|---|---|
| Buick | Lacrosse | |

979.    GM-branded vehicles not involved in the ignition switch recall experienced

declines in value when the ignition switch recalls occurred due to the impact on the perception of

buyers concerning New GM's promises of safety and reliability.  As news of New GM's culture

of deceit grew, so did diminished value.  The following estimates are examples:

| | Diminished Value as of 03/2014 | Diminished Value as of 09/2014 |
|---|---|---|
| 2008 Cadillac STS | $249 | $1,243 |
| 2008 GMC Acadia | $730 | $1,011 |
| 2010 GMC Terrain | $403 | $912 |

980.    GM vehicles subject to the ignition switch recall also have suffered diminished

value by way of example:

| | Diminished Value as of 03/2014 | Diminished Value as of 09/2014 |
|---|---|---|
| 2008 Cobalt | $256 | $357 |
| 2008 HHR | $162 | $477 |
| 2009 Sky | $173 | $429 |

981.    GM vehicles have continued even in 2015 to suffer from diminished value.  By

way of example:

| | Diminished Value as of April 2015 |
|---|---|
| 2011 Chevrolet Caprice | $1,736 |
| 2013 Chevrolet Caprice | $2,678 |
| 2011 Buick Lucerne | $702 |

| 2003 Chevrolet Suburban | $377 |
|---|---|
| 2008 Chevrolet Tahoe | $2,603 |
| 2013 GMC Denali | $1,840 |
| 2010 GMC Denali Hybrid | $4,693 |
| 2013 GMC Yukon | $2,020 |
| 2012 Chevrolet Captiva Sport | $1,376 |

982.    If New GM had timely disclosed the many defects as required by the TREAD Act, the law of fraudulent concealment, and consumer laws set forth below, Class Members' vehicles would be considerably more valuable than they are now and/or Class Members would have paid less than they did.  Because of New GM's now highly publicized campaign of deception, and its belated, piecemeal and ever-expanding recalls, so much stigma has been attached to the New GM brand that no rational consumer would pay what otherwise would have been fair market value for the Affected Vehicles.

## V.      TOLLING OF THE STATUTES OF LIMITATION

### A.      Discovery Rule Tolling

983.    Class Members had no way of knowing about these defects.  Even NHTSA, the agency expert, acknowledged earlier this month the difficulties with ascertaining the problems in light of New GM's conduct.  By contrast, New GM was so intent on expressly hiding these defects that it lied to each and every stakeholder, and even attempted to stifle every internal channel of transparency.  This is the quintessential case for tolling.

984.    Within the time period of any applicable statutes of limitation, Plaintiffs and the other Class Members could not have discovered through the exercise of reasonable diligence that New GM was concealing scores of defects and misrepresenting the Company's true position on safety issues.

985.     Plaintiffs and the other Class Members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that New GM did not report information within its knowledge to federal authorities (including NHTSA), its dealerships or consumers, nor would a reasonable and diligent investigation have disclosed that New GM had information in its possession about the existence and dangerousness of numerous defects and opted to conceal that information until shortly before this action was filed, and nor would such an investigation have disclosed that New GM valued cost-cutting over safety and actively discouraged its personnel from uncovering or raising safety issues.

All applicable statutes of limitation have been tolled by operation of the discovery rule.

**B.     Fraudulent Concealment Tolling**

986.     All applicable statutes of limitation have also been tolled by New GM's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

987.     Instead of disclosing the myriad safety defects and disregard of safety of which it was aware, New GM falsely represented that its vehicles were safe, reliable, and of high quality, and that it was a reputable manufacturer that stood behind GM-branded vehicles after they were sold.

**C.     Estoppel**

988.     New GM was under a continuous duty to disclose to Plaintiffs and the other Class Members the true character, quality, and nature of the Defective Ignition Switch Vehicles.

989.     New GM knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Defective Ignition Switch Vehicles from consumers.

990.     New GM was also under a continuous duty to disclose to Plaintiffs and the Class that scores of other defects plagued GM-branded vehicles, and that it systematically devalued safety.

991.     Based on the foregoing, New GM is estopped from relying on any statutes of limitations in defense of this action.

## VI.     CLASS ALLEGATIONS

### A.     The Nationwide Class

992.     Under Rules 23(a), 23(b)(2), and/or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Class initially defined as follows for the assertion of claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") (the "Nationwide Class"):

> All persons in the United States who purchased or leased an Affected Vehicle prior to July 3, 2014, and who (i) still own or lease an Affected Vehicle, or (ii) sold an Affected Vehicle on or after February 14, 2014, and/or (iii) purchased or leased an Affected Vehicle that was declared a total loss after an accident on or after February 14, 2014. "Affected Vehicles" include (A) all New GM vehicles sold or leased on or after July 11, 2009; (B) all GM-branded vehicles with a defective ignition switch sold or leased as a "Certified Pre-Owned" vehicle on or after July 11, 2009; and (C) all GM-branded vehicles sold or leased prior to July 11, 2009.

993.     Excluded from the Nationwide Class are New GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of New GM; New GM Dealers; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

- 310 -

994.   All GM vehicles are in the class (and collectively called the "Affected Vehicles").

For ease of identification, the following are among the vehicles, if sold or leased between July

11, 2009, and July 3, 2014, that are Affected Vehicles for the Nationwide Class:

| MY 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| CHEVROLET | BUICK | GMC | CADILLAC | SATURN | PONTIAC | HUMMER | SAAB |
| Avalanche | Enclave | Acadia | CTS | Aura | G3 | H2 | 9-3 |
| Aveo | LaCrosse | Canyon | CTS-V | Aura Hybrid | G6 | H3 | 9-5 |
| Colorado | Lucerne | Envoy | DTS | Outlook | G8 | | 9-7X |
| Corvette | | Savana Cargo Van | Escalade | VUE | Solstice | | |
| Equinox | | Sierra 1500 | Escalade ESV | VUE Hybrid | Torrent | | |
| Express Cargo Van | | Sierra 2500HD | Escalade EXT | | Vibe | | |
| Express Passenger | | Sierra 3500HD | Escalade Hybrid | | | | |
| Impala | | Yukon | SRX | | | | |
| Malibu | | Yukon XL | STS | | | | |
| Silverado 1500 | | | STS-V | | | | |
| Silverado 1500 Hybrid | | | XLR | | | | |
| Silverado 3500HD | | | XLR-V | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |
| Trailblazer | | | | | | | |
| Traverse | | | | | | | |
| Impala Police | | | | | | | |

| MY 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| CHEVROLET | BUICK | GMC | CADILLAC | SATURN | PONTIAC | HUMMER | SAAB |
| Avalanche | Enclave | Acadia | CTS Sedan | Aura | G6 | H2 | 9-3 |
| Aveo | LaCrosse | Canyon | CTS-V | Outlook | Vibe | H3 SUV | 9-5 |
| Camaro | Lucerne | Savana Cargo Van | CTS Wagon | VUE | | H3T | |
| Colorado | | Sierra 1500 | DTS | | | | |
| Corvette | | Sierra 2500HD | Escalade | | | | |
| Equinox | | Sierra 3500HD | Escalade ESV | | | | |
| Express Cargo Van | | Terrain | Escalade EXT | | | | |
| Express Passenger | | Yukon | Escalade Hybrid | | | | |
| Impala | | Yukon XL | SRX | | | | |

- 311 -

| MY 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| CHEVROLET | BUICK | GMC | CADILLAC | SATURN | PONTIAC | HUMMER | SAAB |
| Malibu | | | STS | | | | |
| Malibu Hybrid | | | | | | | |
| Silverado 1500 | | | | | | | |
| Silverado 1500 Hybrid | | | | | | | |
| Silverado 2500HD | | | | | | | |
| Silverado 3500HD | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |
| Traverse | | | | | | | |

| MY 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| CHEVROLET | BUICK | GMC | CADILLAC | SATURN | PONTIAC | HUMMER | SAAB |
| Avalanche | Enclave | Acadia | CTS Coupe | N/A | N/A | N/A | N/A |
| Aveo | LaCrosse | Canyon | CTS Sedan | | | | |
| Camaro | Lucerne | Savana Cargo Van | CTS Wagon | | | | |
| Caprice Police Patrol Vehicle | Regal | Sierra 1500 | CTS-V Coupe | | | | |
| Caprice | | | | | | | |
| Colorado | | Sierra 2500HD | CTS-V Sedan | | | | |
| Corvette | | Sierra 3500HD | CTS-V Wagon | | | | |
| Cruze | | Terrain | DTS | | | | |
| Equinox | | Yukon | Escalade | | | | |
| Express Cargo Van | | Yukon XL | Escalade ESV | | | | |
| Express Passenger | | | Escalade EXT | | | | |
| Impala | | | Escalade Hybrid | | | | |
| Malibu | | | SRX | | | | |
| Silverado 1500 | | | STS | | | | |
| Silverado 1500 Hybrid | | | | | | | |
| Silverado 2500HD | | | | | | | |
| Silverado 3500HD | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |

010440-11  784012 V1

| MY 2011 | | | | | | | |
|---------|---|---|---|---|---|---|---|
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Traverse | | | | | | | |
| Volt | | | | | | | |
| Impala Police | | | | | | | |

| MY 2012 | | | | | | | |
|---------|---|---|---|---|---|---|---|
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Avalanche | Enclave | Acadia | CTS Coupe | N/A | N/A | N/A | N/A |
| Camaro | LaCrosse | Canyon | CTS Sedan | | | | |
| Captiva Sport Fleet | Regal | Savana Cargo Van | CTS Wagon | | | | |
| Caprice | | | | | | | |
| Colorado | Verano | Sierra 1500 | CTS-V Coupe | | | | |
| Corvette | | Sierra 2500HD | CTS-V Sedan | | | | |
| Cruze | | Sierra 3500HD | CTS-V Wagon | | | | |
| Equinox | | Terrain | Escalade | | | | |
| Express Cargo Van | | Yukon | Escalade ESV | | | | |
| Express Passenger | | Yukon XL | Escalade EXT | | | | |
| Impala | | | Escalade Hybrid | | | | |
| Malibu | | | SRX | | | | |
| Silverado 1500 | | | | | | | |
| Silverado 1500 Hybrid | | | | | | | |
| Silverado 2500HD | | | | | | | |
| Silverado 3500HD | | | | | | | |
| Sonic | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |
| Traverse | | | | | | | |
| Volt | | | | | | | |

| MY 2013 | | | | | | | |
|---------|---|---|---|---|---|---|---|
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Avalanche | Enclave | Acadia | ATS | N/A | N/A | N/A | N/A |
| Camaro | Encore | Savana Cargo Van | CTS Coupe | | | | |
| Captiva Sport Fleet | LaCrosse | Sierra 1500 | CTS Sedan | | | | |

- 313 -

| MY 2013 | | | | | | | |
|---------|-------|------|----------|--------|---------|--------|------|
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Caprice | | | | | | | |
| Corvette | Regal | Sierra 2500HD | CTS Wagon | | | | |
| Cruze | Verano | Sierra 3500HD | CTS-V Coupe | | | | |
| Equinox | | Terrain | CTS-V Sedan | | | | |
| Express Cargo Van | | Yukon | CTS-V Wagon | | | | |
| Express Passenger | | Yukon XL | Escalade | | | | |
| Impala | | | Escalade ESV | | | | |
| Malibu | | | Escalade EXT | | | | |
| Silverado 1500 | | | Escalade Hybrid | | | | |
| Silverado 1500 Hybrid | | | SRX | | | | |
| Silverado 2500HD | | | XTS | | | | |
| Silverado 3500HD | | | | | | | |
| Sonic | | | | | | | |
| Spark | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |
| Traverse | | | | | | | |
| Volt | | | | | | | |

| MY 2014 | | | | | | | |
|---------|-------|------|----------|--------|---------|--------|------|
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Camaro | Enclave | Acadia | ATS | N/A | N/A | N/A | N/A |
| Captiva Sport Fleet | Encore | Savana Cargo Van | CTS Coupe | | | | |
| Corvette Stingray | LaCrosse | Sierra 1500 | CTS Sedan | | | | |
| Cruze | Regal | Sierra 2500HD | CTS Wagon | | | | |
| Equinox | Verano | Sierra 3500HD | CTS-V Coupe | | | | |
| Express Cargo Van | | Terrain | CTS-V Sedan | | | | |
| Express Passenger | | Yukon | CTS-V Wagon | | | | |
| Impala | | Yukon XL | ELR | | | | |
| Impala Limited | | | Escalade | | | | |
| Malibu | | | Escalade ESV | | | | |
| Silverado 1500 | | | SRX | | | | |

| MY 2014 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Silverado 2500HD | | | XTS | | | | |
| Silverado 3500HD | | | | | | | |
| Sonic | | | | | | | |
| Spark | | | | | | | |
| Spark EV | | | | | | | |
| SS | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Traverse | | | | | | | |
| Volt | | | | | | | |

| MY 2015 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Camaro | Enclave | Acadia | ATS Coupe | N/A | N/A | N/A | N/A |
| Captiva Sport Fleet | LaCrosse | Savana Cargo Van | ATS Sedan | | | | |
| City Express Cargo Van | Regal | Sierra 2500HD | CTS Sedan | | | | |
| Equinox | | Sierra 3500HD | CTS-V Coupe | | | | |
| Express Cargo Van | | Terrain | ELR | | | | |
| Express Passenger | | Yukon | Escalade | | | | |
| Impala | | Yukon XL | Escalade ESV | | | | |
| Impala Limited | | | SRX | | | | |
| Malibu | | | XTS | | | | |
| Silverado 2500HD | | | | | | | |
| Silverado 3500HD | | | | | | | |
| Spark | | | | | | | |
| Spark EV | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Traverse | | | | | | | |
| Volt | | | | | | | |

995.     Under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure,

Plaintiffs Bedford Auto Sales and Nettleton Auto Sales bring this action on behalf of themselves

and a Dealer Class initially defined as follows for claims under RICO (the "Nationwide Dealer

Class"):

> All non-GM car dealerships in the United States that, on or after
> February 14, 2014, sold or leased an Affected Vehicle or retained
> an Affected Vehicle in their inventory, if such Affected Vehicle
> was purchased by the dealership between July 11, 2009, and July
> 3, 2014.

996.   Under Rules 23(a), (b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure,

Plaintiffs bring this action on behalf of themselves and a Subclass initially defined as follows

(the "Nationwide Post-Sale Ignition Switch Defect Subclass"):

> All persons in the United States who either (i) own or lease a
> Defective Ignition Switch Vehicle that was sold or leased as a new
> or Certified Pre-Owned vehicle by New GM between July 11,
> 2009, and July 3, 2014, (ii) sold such a vehicle on or after February
> 14, 2014, and/or (iii) purchased or leased such a vehicle that was
> declared a total loss after an accident on or after February 14,
> 2014.

997.   The following vehicles are among those included in the Nationwide Post-Sale

Ignition Switch Defect Subclass if they were sold or leased as a new vehicle between July 11,

2009, and July 3, 2014:

| VEHICLES AFFECTED |
| --- |
| · 2009-2010 Chevy Cobalt |
| · 2009-2011 Chevy HHR |
| · 2009-2010 Pontiac G5 |
| · 2009-2010 Pontiac Solstice |
| · 2009-2010 Saturn Sky |
| · 2009-2010 Chevy Cobalt |
| · 2009-2011 Chevy HHR |
| · 2009-2010 Pontiac G5 |
| · 2009-2010 Pontiac Solstice |
| · 2009-2010 Saturn Sky |
| · 2010-2014 Chevy Camaro |

- 316 -

| VEHICLES AFFECTED |
|---|
| · 2009 Buick LaCrosse |
| · 2009-2011 Buick Lucerne |
| · 2009-2011 Cadillac DTS |
| · 2009-2014 Chevy Impala |
| · 2011-2013 Chevy Caprice |
| · 2009 Pontiac G8 |

998.    A "Nationwide Ignition Pre-Sale Switch Subclass" exists comprised of:

All persons in the United States who either (i) owned or leased a Defective Ignition Switch Vehicle as of July 3, 2014, and had purchased or leased the vehicle prior to July 11, 2009, (ii) sold such a vehicle after February 14, 2014, and/or (iii) purchased or leased such a vehicle that was declared a total loss after an accident on or after February 14, 2014.

999.    The following vehicles are in the Nationwide Pre-Sale Ignition Switch Defect

Subclass:

| VEHICLES AFFECTED |
|---|
| · 1997-2007 Chevrolet Malibu |
| · 2002-2004 Saturn Vue |
| · 2000-2005 Chevrolet Impala |
| · 2000-2005 Chevrolet Monte Carlo |
| · 2000-2005 Pontiac Grand Am |
| · 2004-2008 Pontiac Grand Prix |
| · 1998-2002 Oldsmobile Intrigue |
| · 1999-2004 Oldsmobile Alero |
| · 2005-2008 Buick LaCrosse |
| · 2006-2008 Chevrolet Impala |
| · 2000-2005 Cadillac DeVille |
| · 2006-2008 Cadillac DTS |
| · 2004-2005 Buick Lucerne |
| · 2005-2010 Chevy Cobalt |
| · 2006-2008 Chevy HHR |
| · 2007-2008 Pontiac G5 |
| · 2006-2008 Pontiac Solstice |
| · 2007-2008 Saturn Sky |
| · 2003-2007 Saturn ION |
| · 2000 Chevy HHR |

| VEHICLES AFFECTED |
|---|
| · 2007-2009 Pontiac G5 |
| · 2006-2009 Pontiac Solstice |
| · 2007-2009 Saturn Sky |
| · 2003-2007 Saturn ION |
| · 2003-2008 Cadillac CTS |
| · 2004-2006 Cadillac SRX |

**B.     State Law Classes**

1000.   Plaintiffs allege claims, under the laws of each state and the District of Columbia,

for the following Statewide Classes:

> All persons who purchased or leased an Affected vehicle prior to
> July 3, 2014 and (i) who still own or lease an Affected Vehicle,
> (ii) who sold an Affected Vehicle on or after February 14, 2014,
> and/or (iii) purchased or leased an Affected Vehicle that was
> declared a total loss after an accident on or after February 14,
> 2014.

1001.   Plaintiffs also allege claims, under the laws of each state and the District of

Columbia, for the following "Statewide Post-Sale Ignition Switch State Defect Subclasses":

> All persons who either (i) own or lease a Defective Ignition Switch
> Vehicle that was sold or leased as a new or Certified Pre-Owned
> vehicle by New GM between July 11, 2009, and July 3, 2014, (ii)
> sold such a vehicle on or after February 14, 2014, and/or (iii)
> purchased or leased such a Defective Ignition Switch Vehicle that
> was declared a total loss after an accident on or after February 14,
> 2014.

1002.   The following vehicles are among those included in the Post-Sale Ignition Switch

Defect Statewide Subclasses if they were sold or leased as a new vehicle between July 11, 2009

and July 3, 2014:

| VEHICLES AFFECTED |
|---|
| · 2009-2010 Chevy Cobalt |
| · 2009-2011 Chevy HHR |
| · 2009-2010 Pontiac G5 |
| · 2009-2010 Pontiac Solstice |

| VEHICLES AFFECTED |
|---|
| · 2009-2010 Saturn Sky |
| · 2009-2010 Chevy Cobalt |
| · 2009-2011 Chevy HHR |
| · 2009-2010 Pontiac G5 |
| · 2009-2010 Pontiac Solstice |
| · 2009-2010 Saturn Sky |
| · 2010-2014 Chevy Camaro |
| · 2009 Buick LaCrosse |
| · 2009-2011 Buick Lucerne |
| · 2009-2011 Cadillac DTS |
| · 2009-2014 Chevy Impala |
| · 2011-2013 Chevy Caprice |
| · 2009 Pontiac G8 |

1003.   Plaintiffs also allege claims, under the laws of each state and the District of

Columbia, for the Pre-Sale Ignition Switch Defect Statewide Subclasses:

> All persons who either (i) own or lease a Defective Ignition Switch
> Vehicle that was sold or leased as a new vehicle by Old GM before
> July 11, 2009; (ii) sold such a vehicle on or after February 14,
> 2014, and/or (iii) purchased or leased such a Defective Ignition
> Switch Vehicle that was declared a total loss after an accident on
> or after February 14, 2014.

1004.   The following vehicles are included in the Pre-Sale Ignition Switch Defect

Statewide Subclasses:

| VEHICLES AFFECTED |
|---|
| · 1997-2007 Chevrolet Malibu |
| · 2002-2004 Saturn Vue |
| · 2000-2005 Chevrolet Impala |
| · 2000-2005 Chevrolet Monte Carlo |
| · 2000-2005 Pontiac Grand Am |
| · 2004-2008 Pontiac Grand Prix |
| · 1998-2002 Oldsmobile Intrigue |
| · 1999-2004 Oldsmobile Alero |
| · 2005-2008 Buick LaCrosse |
| · 2006-2008 Chevrolet Impala |

- 319 -

| VEHICLES AFFECTED |
|---|
| · 2000-2005 Cadillac DeVille |
| · 2006-2008 Cadillac DTS |
| · 2004-2005 Buick Lucerne |
| · 2005-2010 Chevy Cobalt |
| · 2006-2008 Chevy HHR |
| · 2007-2008 Pontiac G5 |
| · 2006-2008 Pontiac Solstice |
| · 2007-2008 Saturn Sky |
| · 2003-2007 Saturn ION |
| · 2000 Chevy HHR |
| · 2007-2009 Pontiac G5 |
| · 2006-2009 Pontiac Solstice |
| · 2007-2009 Saturn Sky |
| · 2003-2007 Saturn ION |
| · 2003-2008 Cadillac CTS |
| · 2004-2006 Cadillac SRX |

1005.   Excluded from each of the Classes and Subclasses are New GM, its employees,

co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly

owned subsidiaries or affiliates of New GM; New GM Dealers; Class Counsel and their

employees; and the judicial officers and their immediate family members and associated court

staff assigned to this case, and all persons within the third degree of relationship to any such

persons.

010440-11  784012 V1

C.    **The Classes and Subclasses Meet Rule 23 Requirements**

1006.   Plaintiffs are informed and believe that there are over 20 million Affected

Vehicles nationwide and hundreds-of-thousands of the Affected Vehicles in each state, and over

12 million Defective Ignition Switch Vehicles owned or leased by members of the Ignition

Switch Defect Subclasses.  Individual joinder of all Class Members is impracticable.

1007.   The Class can be readily identified using registration records, sales records,

production records, and other information kept by New GM or third parties in the usual course of

business and within their control.

1008.   Questions of law and fact are common to each of the Classes and Subclasses and

predominate over questions affecting only individual members, including the following:

a.      Whether numerous GM-branded vehicles suffer from serious defects;

b.      Whether New GM was aware of many or all of the defects, and concealed

the defects from regulators, Plaintiffs, and the Class;

c.      Whether New GM misrepresented to Affected Vehicle purchasers that

GM-branded vehicles are safe, reliable, and of high quality;

d.      Whether New GM misrepresented itself as a reputable manufacturer that

values safety and stands behind its vehicles after they are sold;

e.      Whether New GM actively encouraged the concealment of known defects

from regulators and consumers;

f.      Whether New GM engaged in fraudulent concealment;

g.      Whether New GM engaged in unfair, deceptive, unlawful, and/or

fraudulent acts or practices in trade or commerce by failing to disclose that many GM-branded

vehicles had serious defects;

h.      Whether New GM violated various state consumer protection statutes;

i.      Whether the Defective Ignition Switch Vehicles sold by New GM were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

j.      Whether New GM's unlawful, unfair, fraudulent, and/or deceptive practices harmed Plaintiffs and the members of the Class;

k.      Whether New GM has been unjustly enriched;

l.      Whether New GM, K&S, and ESIS formed an Enterprise within the meaning of RICO for the improper purposes and with the effect of suppressing the defects, misrepresenting the safety and quality of New GM cars and the New GM brand, and avoiding or delaying necessary recalls.

m.      Whether the Nationwide Class Members lost money and/or property within the meaning of RICO;

n.      Whether New GM had and breached a duty under the Sale Agreement to monitor and protect the vehicles owned by the Pre-Sale Ignition Switch Defect Subclass, and whether the owners of those vehicles were damaged thereby;

o.      Whether Plaintiffs and the members of the Class are entitled to equitable and/or injunctive relief;

p.      What aggregate amounts of statutory penalties, as available under the laws of certain States, are sufficient to punish and deter New GM and to vindicate statutory and public policy, and how such penalties should most equitably be distributed among Class Members; and

q.      Whether any or all applicable limitations periods are tolled by acts of fraudulent concealment.

1009.   Plaintiffs' claims are typical of the claims of the Class Members, and arise from the same course of conduct by New GM.  The relief Plaintiffs seek is typical of the relief sought for the absent Class Members.

1010.   Plaintiffs will fairly and adequately represent and protect the interests of all absent Class Members.  Plaintiffs are represented by counsel competent and experienced in product liability, consumer protection, and class action litigation.

1011.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class Members is impracticable.  Because the damages suffered by each individual Class Member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class Members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.  Rule 23 provides the Court with authority and flexibility to maximize the benefits of the class mechanism and reduce management challenges.  The Court may, on motion of Plaintiffs or on its own determination, utilize the processes of Rule 23(C)(4) and/or (C)(5) to certify common questions of fact or law and to designate subclasses.

1012.   The prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications for individual Class Members, which would establish incompatible standards of conduct for New GM.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

1013.   Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Plaintiffs

anticipate providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

1014.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for New GM's misconduct.  Absent a class action, Class Members will continue to incur damages, and New GM's misconduct will continue without remedy.

## VII.   CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961 *et seq.*

1015.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

1016.   This Claim is brought on behalf of the Nationwide Class, including the Nationwide Pre-Sale and Post-Sale Ignition Switch Defect Subclasses, against New GM for actual damages and treble damages and equitable relief under the 18 U.S.C. § 1964.  Members of the Nationwide Class and ISD Subclass are referred to herein collectively as "Class Members."

1017.   New GM, the Enterprise Members, Plaintiffs, and the Class Members are "persons" within the meaning of 18 U.S.C. § 1961(3).

## A.   The New GM RICO Enterprise

1018.   On May 24, 2015 the United States Department of Justice announced it has found evidence of criminal wrongdoing by GM, including repeated acts of fraud for its failure to

disclose the ignition switch defect.  GM committed both criminal and civil fraud and, as set forth in this Complaint, did not act alone.

1019.   From the inception of New GM onwards, New GM conducted an enterprise of associated-in-fact entities (the "Enterprise"), which was designed to conceal information regarding the true nature and scope of the defects, particularly the ignition switch defect, from the public, the federal government and its agencies, its customers, and the owners and lessees of GM-branded vehicles; and to affirmatively misrepresent the safety and quality of GM-branded vehicles, in order to (a) fraudulently induce Plaintiffs and other Class Members to purchase or lease the Affected Vehicles (as relevant to the time period after New GM's inception only) and (b) avoid the costs of fixing the defects, and undermining GM's brand image, in Affected Vehicles owned by Plaintiffs and Class Members.

1020.   New GM was associated with the illegal Enterprise, and conducted and participated in the Enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of 18 U.S.C. § 1962(c).

1021.   The RICO Enterprise which engaged in, and whose activities affected, interstate and foreign commerce, is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for the common purpose of employing the multiple deceptive, abusive, and fraudulent acts described herein.

1022.   At all times, the Enterprise consisted of at least New GM and ESIS, Inc. ("ESIS"). King & Spalding LLP ("K&S") joined the Enterprise when it began representing New GM in matters related to the ignition switch defect, which began in October 2010, if not before.

1023.   The following persons, and others presently unknown, have been members of and constitute the association-in-fact RICO Enterprise ("Enterprise Members"):

a.   <u>New GM</u>: New GM's officers, executives, engineers, and in-house lawyers collaborated and colluded with each other and with other Enterprise Members to actively conceal the nature of the defects, thereby inducing Plaintiffs and Class Members to purchase or lease the Affected Vehicles (as relevant to the time period after New GM's inception), and avoiding the responsibility and economic costs to fix or replace the Affected Vehicles already in Class Members' possession.

b.   <u>King & Spalding</u>:  K&S is a law firm that employs hundreds of attorneys in more than one dozen offices worldwide.[318]  During the duration of the Enterprise, K&S was retained by New GM to defend lawsuits and other claims involving the defects in GM-branded vehicles.  During that period, K&S knowingly collaborated with New GM and ESIS to fraudulently conceal information about the defects – particularly the ignition switch defect – from litigants and the public.  The scheme was furthered by New GM's counsel K&S, as well as New GM's communications with litigants, courts, and consumers.

c.   <u>ESIS</u>: ESIS is a company that offers "risk management products and services."[319]  It is a part of the Ace Group, headed by ACE Limited, and is separate and distinct from the other Enterprise constituents.[320]  During the duration of the Enterprise, ESIS served as New GM's claims administrator,

---

[318] http://www.kslaw.com/About-Us.

[319] http://www.acegroup.com/esis-en/about-esis/.

[320] *Id.*

routinely investigating, analyzing, and resolving claims involving defects in

General Motors vehicles, including the defects alleged herein.  Product liability

claims forwarded to ESIS for investigation and review included, among others,

those involving personal injury, fatalities, and property damage.  ESIS knowingly

collaborated with New GM and K&S to fraudulently conceal information about

the defects from claimants, the government and its agencies, and the public,

which the scheme was furthered by ESIS' mailings and wire communications

with the Enterprise and claimants.

1024.   ESIS was at all times well aware of the ignition switch defect by virtue of its

having worked with New GM for years in settling and hiding defect claims.  For example, ESIS

was notified of a June 4, 2010 accident when a customer was driving a Chevy HHR when "it

shut off."  GM turned the incident over to ESIS.

1025.   In another instance, ESIS was involved in the investigation of a 2006 Cobalt that

lost power and crashed.  According to the customer, "the power in my car shut off while I was

driving it."  These are but a few examples of dozens of reports of defects that were investigated

by New GM and ESIS, and their use of mailings and wires to communicate information on these

defects, all in furtherance of the scheme to conceal information from regulators and the public.

1026.   The Enterprise which engaged in, and whose activities affected, interstate and

foreign commerce, is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4)

and consists of "persons" associated together for the common purpose of employing the multiple

deceptive, abusive, and fraudulent acts described herein.

1027.   The RICO Enterprise is an ongoing organization with an ascertainable structure,

and a framework for making and carrying out decisions, that functions as a continuing unit with

established duties, and that is separate and distinct from the pattern of racketeering activity in which Enterprise members have engaged and are engaging.  The Enterprise was and is used by New GM as a tool to effectuate the pattern of racketeering activity.

1028.   New GM, ESIS, and K&S were entities separate and distinct from each other and from the Enterprise.  All of the Enterprise constituents are independent legal entities with the authority and responsibility to act independently of the Enterprise and of the other Enterprise members.  K&S is also governed by rules of professional conduct that require it to maintain professional independence from its clients and to avoid furthering wrongdoing by its clients.

1029.   The members of the Enterprise all had a common purpose:  to misrepresent the safety and quality of GM-branded vehicles and/or to conceal information regarding the nature and scope of the defects, particularly the ignition switch defect, from the government, its agencies, the public, and the Class.  For New GM, the purpose of the scheme to defraud was to conceal the true scope and nature of the defects in order to sell and lease more vehicles, as well as avoid incurring the cost and responsibility of repairing or replacing Affected Vehicles.  By concealing the scope and nature of the defects, New GM maintained and boosted consumer confidence in the GM brand, sold more GM vehicles, and avoided remediation costs and negative publicity associated with the defects and recalls.

1030.   Each member of the Enterprise benefited from the common purpose:  New GM sold or leased Affected Vehicles after New GM was created and New GM avoided and deferred the cost and responsibility of recalling, repairing or replacing Affected Vehicles; and K&S and ESIS secured ongoing business and income from New GM as a result of achieving fraudulent, but more favorable and less costly, litigation and settlement outcomes for New GM.

**B.      Pattern of Racketeering Activity**

1031.   As set forth below, New GM conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that lasted many years, commencing from or shortly after New GM's inception as an entity in 2009, and continuing through at least mid-2014. This pattern consisted of numerous and repeated violations of the federal mail and wire fraud statutes – namely, 18 U.S.C. §§ 1341 and 1343 – that prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud.  These mailings and wirings were executed in furtherance of the Enterprise's scheme to defraud the Class and caused injury to the property of Class members.

1032.   New GM had actual knowledge and intentionally suppressed material information on the scope and nature of all the defects described in this Complaint, including, but not limited to, the ignition switch defects.  This knowledge and information included both knowledge which New GM possessed at its inception, and additional information New GM obtained from complaints and reports it received and internal investigations it conducted after July 11, 2009, throughout the time period encompassed in this Complaint.

1033.   New GM, with the assistance and collaboration of the other persons associated in fact with the Enterprise, devised and employed a fraudulent scheme to conceal and suppress knowledge regarding the defects by use of the telephone and internet and transmitted, or caused to be transmitted, by means of wire communication traveling in interstate or foreign commerce, writing(s) and/or signal(s), including GM's website, Service Bulletins to dealers, communications with federal regulatory agencies, and communications with other members of the Enterprise, for the purpose of executing such scheme or artifice to defraud, in violation of 18 U.S.C. §§ 1341 and § 1343.

**C.    New GM Conducted the Enterprise to Conceal the Nature and Scope of the Defects from Litigants, Claimants and Courts, and by Extension, the Public**

**1.    K&S warns GM of a defect.**

1034.   Using the Enterprise, New GM caused to be transmitted interstate communications by mail and wire in furtherance of the scheme to defraud, sent with the objective of suppressing safety-related information that emerged in handling litigation and other claims.  This pattern of conduct is exemplified by the Enterprise's handling of various ignition switch cases, which is detailed herein.

1035.   GM, K&S, and ESIS were aware of and concealed multiple incidents of death or injury as a result of the ignition switch defect long before the recall.  Specific cases that New GM, K&S, and ESIS were aware of that involved the ignition switch defect include:  ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1036.   In addition, GM, K&S, and ESIS were aware of 21 Field Performance Evaluations concerning the Ignition Switch Defect.

1037.   As part of the enterprise, in October 2010, K&S attorney Harold Franklin sent a case evaluation letter to New GM counsel, Jaclyn Palmer, regarding a Not-In-Suit-Matter ("NISM") in which K&S represented GM.  The matter involved a 25-year-old nursing student, ▮▮▮▮▮▮▮▮▮▮▮ who was killed after she lost control of her 2006 Cobalt which slammed head on into a tree without triggering airbag deployment.  In this letter, and another dated November 2, 2010, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  Franklin also noted that GM's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████

████████████████████[321]

    1038.   Despite explicitly acknowledging that the ████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████[322]

    1039.   Instead, ████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

████████████████████"[323] This communication furthered the

Enterprise's fraudulent scheme to conceal information regarding the defect and reflects K&S's

participation in and complicity with the scheme and its objectives.  Because the e-mail was sent

between Franklin in Georgia, and Palmer and ESIS' Annette Rigdon in Michigan, it serves as a

predicate act in violation of 18 U.S.C. § 1343.

    1040.   K&S suspected before a March 10, 2010, inspection of the ██████ ██████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████

---

[321] HIGHLY CONFIDENTIAL DOC:  GM-MDL2543-000660577.

[322] HIGHLY CONFIDENTIAL DOC:  *Id*.

[323] HIGHLY CONFIDENTIAL DOC: *Id*.

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ in furtherance of the scheme, and in violation of

18 U.S.C. § 1343.[324]

1041.   As NHTSA found in a report issued on June 5, 2015, **New GM's outside counsel**

**knew of the defect and warned GM but neither K&S nor GM disclosed the defect**:[325]

> The number of air bag non-deployments grew, and GM faced
> litigation for air bag nondeployment claims in instances where the
> air bags inexplicably did not activate.  **GM was repeatedly**
> **warned by in-house and outside counsel that a defect**
> **preventing air bag deployment seemed to exist….**  [Emphasis
> added.]

1042.   K&S's culpable participation can also be inferred from the fact that ABA Model

Rule of Professional Conduct 1.2(d) prohibits a lawyer from engaging in conduct the lawyer

knows to be criminal or fraudulent.  *See* Model Rule 1.2(d) ("A lawyer *shall not* counsel a client

to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent."

(emphasis added)).  Further, Model Rule 1.16(a) mandates that an attorney withdraw from (or

decline) representation if the representation will result in a violation of the rules of professional

conduct or other law.  Model Rules 1.2(d) and 1.16(a) are not discretionary.  Thus, even if a

lawyer chooses to keep confidential the continuing crime or fraud, he or she may not continue to

provide counsel to that client and must withdraw from representation.  *See also* RESTATEMENT

(THIRD) OF THE LAW GOVERNING LAWYERS § 32.

1043.   K&S did neither of these things during its representation of GM.  The Rules of

Professional Conduct make clear how GM's attorneys were required to act when they learned of

---

[324] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-003455136.

[325] NHTSA's Path Forward at 7.

GM's continuing, ongoing fraud:  withdraw from representation.  At the very least, Rule 1.2(d)

forbade K&S from continuing to engage in litigation behavior that would allow the fraud to

continue.  Instead, K&S continued to advance GM's concealment of the defect and to enter into

settlement agreements that required confidentiality.

### 2. Continued concealment of the defect.

1044.   ESIS also participated and was complicit in this scheme which it, too, furthered

through the use of mail and wire communications.  

These

communications also constituted predicate violations of 18 U.S.C. §§ 1341 and 1343 and,

coupled with ESIS' inclusion in the exchange noted above, reflect ESIS' knowing collusion in

the Enterprise's scheme.

1045.   The Enterprise engaged in similar racketeering conduct in the case of ▉▉▉

▉▉▉ who lost control of her 2007 Cobalt in February 2011.  K&S represented GM in this

matter as well, and in a July 2011 e-mail to New GM, Palmer again discussed the "anomaly"

mentioned in the ▉▉▉ matter.  He explains

---

[326] HIGHLY CONFIDENTIAL DOC: GM-MDL2453-00061149.

[327] HIGHLY CONFIDENTIAL DOC: GM-MDL2453-00345366.

1046.   The Enterprise made every effort to settle this case too.  In an April 20, 2012 e-mail, Palmer explained that she had communicated with Rigdon about the ████ settlement offer and had urged K&S to seek the necessary court approval of the minor settlement, because she did '████████████████████████████[328]

1047.   The court rejected the ████████████████ however, and in an April 5, 2013 e-mail, K&S's Franklin explained to Palmer that ████████████████████████ ████████████████████████████████████████ In his e-mail, Franklin recommended increasing the settlement offer in furtherance of the scheme to conceal the scope of the defect and quell public disclosure of information regarding the defect.[329]  The interstate communications regarding this claim, including the e-mails referenced above, also constitute predicate violations of 18 U.S.C. §§ 1341 and 1343, and reflect K&S's knowing collusion in the Enterprise's scheme.

1048.   The Enterprise continued its pattern of racketeering activity in the handling of the case of ████████  As in the matters of ████████████ and others, GM's outside counsel – here, K&S – ████████████████████████ ████████████████████████████████  In a February 24, 2012, communication sent via U.S. Mail and e-mail, K&S attorney Franklin explained to GM attorney Ronald Porter:

████████████████████████
████████████████████████
████████████████████
████████████████
██████████████[30]

---

[328] HIGHLY CONFIDENTIAL DOC: GM-MDL2453-400258799.

[329] HIGHLY CONFIDENTIAL DOC: GM-MDL2453-000662287.

[330] HIGHLY CONFIDENTIAL DOC: GM-MDL2453-300002915.

1049.   Franklin further explained that "███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████ [331] This communication,

too, was sent interstate via the mails and wires in furtherance of the fraudulent scheme and in

violation of 18 U.S.C. §§ 1341 and 1343.

1050.   In an April 18, 2012 memorandum, K&S again ██████████████

███████████████████



1051.   New GM, K&S, and ESIS, in April 2012, in connection with an accident

involving ██████████ were aware that GM engineers had concluded that the airbags in a

Cobalt did not deploy because the "████████████████████████████████

██████" Or as stated elsewhere in the report:

---

[331] HIGHLY CONFIDENTIAL DOC: *Id.*

[332] HIGHLY CONFIDENTIAL DOC: GM-MDL2453-000669092.

[333] 669092.008.



1052.   The foregoing paragraphs demonstrate that New GM, New GM's legal staff and K&S knew, but concealed, that in many of the crashes, ███████████████████████ ███████████████████████████████████████████████ ” By concealing these findings, New GM, K&S, and ESIS hid from crash victims the fact that ███

1053.   This ongoing concealment helped continue to hide the defect from discovery.

1054.   In preparing discovery responses in crash cases, and in deciding to conceal material information by omitting it from production, Enterprise members sent various interstate communications to each other which furthered the fraudulent scheme and violated §§ 1341 and 1343.  For example, in a December 2012 e-mail exchange between Michigan-based GM attorneys Anneke Shepherd and Ronald Porter and Georgia-based K&S attorney Harold Franklin, the lawyers discuss ████████████████████████████████████

---

334 669092.002.

335 GM-MDL2543-000775889.  "Subbaiah" is New GM's outside consultant, Subbaiah Malladi.

██████████████████████████████

██████████████████████ [336]

### 3.    ESIS' awareness of the defect in numerous incidents.

1055.   ESIS was in a central position to receive evidence of the airbag non-deployment issue and communicate about these facts to GM and on occasion K&S.  A "Discovery Review Report for 2005-2010 Chevrolet Cobalts" reveals communications of air bag non-deployment regarding:

- An August 2006 incident with a 2005 Cobalt (settled).

- A 2/21/2007 incident with a 2005 Cobalt where K&S was counsel (settled).

- A 4/27/2007 incident in a 2006 Cobalt (settled).

- A 12/29/2006 incident in a 2005 Cobalt (settled).

- A 9/9/2007 incident in a 2007 Cobalt (discussed).

- A 6/13/2008 incident in a 2008 Cobalt (settled).

- A 12/13/2009 incident in a 2005 Cobalt (settled).

- A 7/9/2010 incident in a 2005 Cobalt (settled).

- A 4/15/2012 incident in a 2005 Cobalt (settled).

- A 9/26/2010 incident in a 2006 Cobalt (settled).

1056.   In each of these cases, ESIS used the wire communications and the mails to communicate with GM employees including Jaclyn Palmer, John T. Sprague, and Hamed Sadrina.

1057.   K&S attorneys regularly used the wires to communicate with ESIS regarding the defect.  An example is an August 21, 2013 e-mail between New GM attorneys Palmer and Porter

---

[336] HIGHLY CONFIDENTIAL DOC: GM-MDL2453-400253332.

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████S.

1058.   At the time of this exchange, ESIS and K&S knew of the ignition switch defect

and had been exchanging information on the ████ matter as early as March 4, 2011.

**4.      GM and K&S lied to the ████ and the court to prevent disclosure of evidence relating to the defect in other vehicles.**

**a.      The parents of ████████████ sought discovery from New GM regarding the ignition switch defect that killed their daughter.**

1059.   After a post-crash inspection revealed that ████████ ignition switch was in

the accessory position, the ██████ sought discovery about the defect identified in a Technical

Service Bulletin.  On September 13, 2012, the ██████ plaintiffs served their Second Set of

Interrogatories and their Second Request for Production of Documents.[337]  The ██████ Requests

sought, *inter alia*: (███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

---

[337] *See* GM-MDL2543-000728812 (Plaintiffs' Second Set of Interrogatories to Defendant General Motors LLC); GM-MDL2543-000936810 (Plaintiffs' Second Request for Production of Documents to Defendant General Motors LLC) (together, the '██████ Requests").

### b.    New GM and K&S knew that airbag non-deployment in Cobalts was related to the condition identified in the Technical Service Bulletin.

1060.   By September 2012 (when they received the ▮▮▮▮ Requests) New GM and K&S knew that the condition identified in the Technical Service Bulletin explained airbag non-deployment in incidents where the ignition had moved from run to accessory.

1061.   

1062.   In an April 2012 case evaluation, New GM's outside counsel, Eckert Seamans Cherin & Mellott, LLC, wrote that the front airbags could not deploy because the "Cobalt was in Accessory Mode, not Run Mode, at the time of impact."[340]  New GM's counsel explicitly referenced the Technical Service Bulletin as "address[ing] a similar problem as that seen in the field where the key in the ignition switch in the 2005 Cobalt could toggle from the Run mode to the Accessory mode by traveling off-road or over rough terrain."[341]  Ms. Palmer, the GM in-house attorney responsible for the ▮▮▮▮ (and ▮▮▮▮▮▮▮ matters) discussed the Technical Service Bulletin with the Settlement Roundtable Committee during the committee's April 2012 consideration of a possible ▮▮▮▮ settlement.

1063.   In May 2012, New GM engineer Brian Stouffer tested a variety of vehicles covered by the Technical Service Bulletin to determine the torque required to move the key from

---

[338] GM-MDL2543-400025369.

[339] *Id*.  Mr. Franklin was also still representing GM in connection with the ▮▮▮▮ NISM at this time.

[340] *Id*. at .001.

[341] *Id*. at .004.  GM's outside counsel also attached the TSB as an exhibit to its case evaluation.  *Id*. at .021.

- 339 -

the run to accessory position.  Stouffer concluded ███████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

    1064.   On June 12, 2012, the █████████ plaintiffs' expert, Erin Shipp, submitted a report

that relied on the Technical Service Bulletin in concluding that the airbag non-deployment was

caused by low torque of the ignition switch.[342]

    1065.   On July 25, 2012, Ms. Palmer told the Settlement Roundtable Committee that the

████████ plaintiffs' expert "attributed the frontal airbag non deployment to the ignition being in

the Accessory mode, which she relates to the service bulletin involving the potential for the

driver to inadvertently turn off the ignition by contacting a large and/or heavy key chain with the

knee."[343]  Multiple New GM attorneys attended the ████████Roundtable, including Ronald C.

Porter – who oversaw discovery in the ████████ case.[344]

            **c.    GM and K&S told the █████████████████████████**
            **███████████████████████████████**
            **███████████████████████████**

    1066.   ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[342] *See* GM-MDL2543-000669158.

[343] *See* GM-MDL2543-000669168.001 (Settlement Roundtable Case Summary) (noting that
plaintiffs' expert "████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████");
*id*. at .002 (discussing the TSB).

[344] *See* GM-MDL2543-000919920 (July 24, 2012 email regarding attendees and agenda for
July 25, 2012 Roundtable).



[345] Supp. RFP Resp. at .007 ( ;

[346] Supp. RFP Resp. at .008 Rog. Resp. at .003-.004 ( .

[347] GM-MDL2543-001282913.001 at .013.

[348] GM-MDL2543-300044406 at 300044441; *see also id.* at 300044445-46 ).

[349] *Id.* at 300044471. *Id.* at 300044472 ('

[350] (' *id.* at 300044445 (' *id.* at 300044446

- 341 -



010440-11  784012 V1

### d.     K&S told one thing to the Court and the opposite to New GM on the same day.

1071.   On July 22, 2013, ████████████████████████████████

████████████████. That same day, K&S also sent to GM an updated ███████ case evaluation

letter.  K&S attorney Philip Holladay signed both documents.

1072.  ██████████████████████████████



1073.   At the same time, in a letter to GM, K&S recognized the relevance and

responsiveness of documents regarding the airbag non-deployment incidents and investigation to

the ███████ case.  Mr. Holladay wrote:

> [T]he [ignition switch defect] issue was assessed internally in a
> series of investigations conducted as part of the Product Resolution
> Tracking System and ultimately addressed by issuing an
> Information Service Bulletin in the Fall of 2005 that provided a
> field service fix for customers who experienced an incident
> involving inadvertent key movement.  More recently, this [same]
> issue has surfaced again as part of an ongoing FPE investigation
> into why frontal air bags have not deployed in certain high-speed
> multiple impact frontal collisions involving 2005-2007 Chevrolet
> Cobalts.  In more than half of those incidents, it appears the reason
> that the air bag did not deploy was because the car's ignition was
> in the accessory rather than the run position.  While there is no
> allegation here that ███████████ s frontal air bags should have
> deployed, the on-going investigation ties nicely into plaintiffs'
> expected theme that the original Information Service Bulletin was

an inadequate "band-aid fix" for a significant safety issue that should have been addressed through a recall and design change.[351]

GM attorney Ron Porter also discussed the Cobalt airbag non-deployment incidents and investigation in his presentation of the ██████ case to GM's Settlement Review Committee because airbag non-deployments in Cobalts may be "linked to the ignition switch issue."[352]

        **e.**      **GM and K&S lied to the court and the** ████████████████

1074.



---

[351] July 22, 2013 ██████ Letter at .002-.003; *see also id.* at .026 ("the PRTS documents referenced above and the on-going FPE investigation have enabled plaintiffs' counsel to develop a record from which he can compellingly argue that GM has known about this safety defect from the time the first 2005 Cobalts rolled off the assembly line and essentially has done nothing to correct the problem for the last nine years.  He specifically will criticize GM for not doing more than implementing the field service campaign back in 2005, and point to GM's failure to take any action in the on-going FPE investigation that has now been dragging on for almost two years as proof positive of GM's conscience indifference and willful misconduct when it comes to the safety of its vehicles' occupants.").

[352] GM-MDL2543-000672756.001 at .002 (Aug. 8, 2013 ██████ Settlement Review Committee Case Summary).

[353] GM-MDL2543-400253332 at 33.

[354] *Id.*



And the Technical Service Bulletin had already been "made available to in-house and outside counsel."[357]

1075.

[360] New GM and K&S further hid ongoing airbag investigation documents from discovery in ▮▮▮ by, *inter alia*, boxing Stouffer out of meetings relating to the investigation that *he had previously led* and hiring an expert consultant to assist with the ongoing investigation under the guise of work on the ▮▮▮ case in order to shield ongoing analyses from discovery under claims of privilege.[361]

---

[355] ▮▮▮

[357] Valukas Rep. at pp. 166-67.

[358] GM-MDL2543-000885044 (▮▮▮

[359] *Id*. at 89-90.

[360] *Id*. at 55-57.

[361] GM-MDL2543-002288948 at 50 ▮▮▮

GM-MDL2543-000770767.001 (▮▮▮

f. ██████████████████████████████
████████

1076.   ██████████████████████████████████

████████████████████████████████████ █ ██████

██████████████████████████████████████

███████████ ████

5.      **GM and K&S committed other fraudulent litigation misconduct to hide evidence of the Ignition Switch Defect.**

a.      **GM and K&S hid the existence of part change documents.**

1077.   By the April 29, 2013 deposition of GM engineer Ray DeGiorgio, New GM and K&S knew that the ignition switch had been changed between 2005 and 2008.[363]  Within days of the DeGiorgio deposition, New GM and K&S hired expert Subbaiah Malladi to assist with New GM's ongoing investigation.[364]

_____

██████████████████████████████████████████████
████████████████████████████████████  Valukas Report at 197-98 ("Porter recalled Kemp contacting him in April (when Porter was preparing Stouffer for his deposition in the ██████ case), and telling Porter that FPE wanted to hire Malladi, but that Kemp and Porter ultimately agreed to hire Malladi under the auspices of the ██████ case to shield Malladi's analyses under the work product doctrine."); *id*. at 196 (although the FPE team asked Federico and Kemp to retain Malladi in February 2013 in connection with their ongoing investigation, GM did not then engage Malladi; he did not begin work until May 2013, ostensibly as part of the ██████ litigation); *id*. at 201 (Porter asked Stouffer not to participate in the meeting with Malladi because Stouffer was scheduled to be deposed in the ██████ litigation).

[362] ███████████████████████████████████████
██████████████████████████████

[363] Valukas Report at 199.  *See also* GM-MDL2543-001049338 (April 29, 2013 email from K&S attorney Holladay to GM attorney Porter: "█████████████████████████████

[364] Valukas Report at 200 (three days after the DeGiorgio deposition, K&S attorney Holladay spoke with GM lawyers Porter and Kemp about hiring Malladi because "GM needed to bring the FPE investigation to closure without delay").  Eventually, Malladi merely confirmed what the

- 346 -

1078. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ █████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ ██████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████

---

████████ plaintiffs' expert had proved to GM and K&S five months earlier – the ignition switch had been changed.  Valukas Report at 209.

[365] GM-MDL2543-400151182 at 83.

[366] *Id*. at 84.

[367] GM settled the ████████ case on September 9, 2013.  GM engineer Stouffer did not ask Delphi for part change documents until October 23, 2013.  Valukas Report at 208 ████████████████████████████████████████████████

████████████████████████████████████████████ GM-MDL2543-000862203 at 2209 (GM's Feb. 24, 2014 updated Part 573 letter to NHTSA).

**b.** 

1079.

6. **K&S also worked for New GM in connection with the ignition switch recall and the "investigation" of the reasons for the delay.**

1080.   K&S continued to represent New GM in connection with the ignition switch defect even after each of the product liability matters K&S handled for New GM had settled.  For example:  (a) K&S attorney Holladay continued to be involved in New GM's investigation of the defect after ▮▮▮▮ settled, including Malladi's investigation;[372] (b) K&S attorney Holladay counseled New GM with respect to the ignition switch recall, and his work included drafting communications to NHTSA and the public; (c) other K&S attorneys also represented New GM

---

[368] GM-MDL2543-400262624.

[369] Valukas Report at 178.

[370] GM-MDL2543-400050871 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GM-MDL2543-400068362 ▮▮▮▮▮▮▮▮▮▮ GM-MDL2543-400071297 ▮▮▮▮▮▮▮▮▮▮▮▮ ; GM-MDL2543-003116203 ▮▮▮▮▮▮▮▮

[371] GM-MDL2543-300082930 ▮▮▮▮▮▮▮▮

[372] Valukas Report at 197, 200.

in connection with recall communications with NHTSA and responses to requests from governmental agencies;[373] and (d) K&S attorneys interviewed a number of witnesses in connection with the preparation of the Valukas Report.[374]

1081.   The above are but examples of how the Enterprise Members furthered the scheme to conceal the nature and scope of all the defects and suppressed and withheld information from litigants, courts, claimants, and the public.

1082.   ESIS was equally as instrumental in this arm of the Enterprise's scheme to conceal the true nature and scope of all the defects.  As described above, ESIS was charged with handling, investigating, and resolving claims generated through New GM's customer assistance center.  In executing those responsibilities, ESIS routinely communicated with New GM lawyers, officers and engineers, as well as outside and out-of-state counsel – including K&S.  As with the litigation matters described above, the Enterprise systematically concealed from claimants the true scope and nature of the defects and strove to deny or settle claims in order to avoid exposing facts about the defects.

1083.   The regular communications between ESIS and the other Enterprise Members as well as the communications made with third parties regarding these claims, were made in furtherance of the scheme to defraud and constitute predicate violations of §§ 1341 and 1343.

**D.   New GM Conducted the Enterprise to Promote the Safety and Quality of Its Vehicles without Revealing the Defects**

1084.   To further the scheme to defraud, New GM promoted and touted the safety, reliability, and quality of its vehicles, while simultaneously, necessarily, and correspondingly

---

[373] Valukas Report at 15.  Gary G. Grindler, a K&S partner in the Government Investigations Practice Group, was involved with advising New GM on legal issues "regarding ignition switch issues" as early as September 13, 2013 (almost five months before the recall).

[374] *Id.*

concealing the nature and scope of the defects. These promotions, which included national advertising campaigns, advanced New GM's objective of concealing the nature and scope of the defects, and constitute predicate violations of §§ 1341 and 1343.

1085.   New GM further advanced its scheme to defraud through communications with its Dealerships. New GM communicated with its Dealership network on a daily basis, conveying information about the Affected Vehicles but affirmatively concealing the nature of the defects or the need for a recall. These communications, transmitted through interstate mailings and/or wires, furthered the fraudulent scheme in violation of §§ 1341 and 1343.

1086.   To further the scheme to defraud, New GM used the Enterprise to routinely conceal from litigants, claimants, regulators, and the public the true nature and scope of the defects by, among other things, misrepresenting and failing to reveal New GM's knowledge about the defects to claimants, litigants, and courts, and quickly and quietly settling claims involving the defects in order to avoid exposing the facts of the claims to the public. This process involved regular interstate mailings and wirings between the Enterprise Members as well as to courts, claimants, and litigants nationwide.

**E.    New GM Conducted the Enterprise to Issue Incomplete and Misleading Service Bulletins**

1087.   To further the scheme to defraud, New GM routinely issued Technical Service Bulletins to the dealers and/or letters to consumers as a stopgap half-measure designed to avoid costly recalls.

1088.   By way of example, on July 1, 2011, New GM issued a Technical Service Bulletin that had been previously issued by Old GM to include new vehicle and model years. In the Technical Service Bulletin, New GM blatantly concealed and misrepresented the true scope and nature of the ignition switch defect, by, among other things, omitting the word "stall" to

obscure safety concerns and avoid regulatory attention, as well as disseminating false and misleading information about the condition of the Affected Vehicles and the potential fix.  The fraudulent Technical Service Bulletin was issued in furtherance of the Enterprise's fraudulent scheme and was sent across state lines via the mail and/or wires, including through New GM's GlobalConnect website.

1089.   New GM further misused the Technical Service Bulletin process to conceal the nature and scope of other defects as well.  For example, in May 2012, New GM issued a Technical Service Bulletin identifying customer complaints about the power steering defect in Saturn Ions.  By at least September 2011, New GM had received almost 3,500 complaints regarding sudden loss of power steering in 2004-2007 Ions.  After NHTSA initiated an inquiry into the Power Steering Defect in the 2004-2007 Ions, New GM engineer Terry Woychowski informed current CEO Mary Barra – then head of product development – that there was a serious power steering issue in Saturn Ions, and that it may be the same power steering issue that plagued the Chevy Cobalt and Pontiac G5.

1090.   Instead of recalling the vehicles, New GM issued the fraudulent Technical Service Bulletin as a stopgap measure to conceal the true nature and scope of the power steering defect. This Technical Service Bulletin, like many others, was issued in furtherance of the Enterprise's fraudulent scheme and was communicated via the mail and/or wires, including through New GM's GlobalConnect website, in violation of §§ 1341 and 1343.

**F.    New GM Conducted the Enterprise to Submit Incomplete and Misleading Reports to Regulators**

1091.   As part of its obligations under the TREAD act, New GM was required to submit to NHTSA monthly and quarterly reports regarding potential safety defects and incidents and complaints involving potential safety defects.  To further the scheme to defraud, and in order to

escape investigation and costs associated with recalls, New GM systematically underreported and omitted relevant information about the nature of the defects and the number of defect-related incidents and complaints from these reports, which New GM transmitted or caused to be transmitted from its offices in Michigan to federal regulators in Washington, D.C.

1092.   To further the scheme to defraud, New GM continued to conceal the true nature and scope of the defects through the recalls and beyond.  Even as New GM began to recall the Affected Vehicles, the recalls were incomplete (in that they were under-inclusive, based on New GM's knowledge) and offered inadequate and ineffective remedies.

1093.   The concealment of the dangerous and defective condition of the defective GM vehicles, and corresponding misrepresentations about safety and reliability, are the core purposes of the underlying racketeering offense.  The Enterprise had an ascertainable structure by which GM operated and managed the association-in-fact by using its Dealers to concoct, obfuscate, carry out, and attempt to justify the fraudulent scheme described herein.

1094.   The predicate acts constituted a variety of unlawful activities, each conducted in furtherance of the Enterprise and with the common purpose of defrauding Plaintiffs and other Class Members and obtaining significant funds while providing Affected Vehicles worth significantly less than the purchase price paid by customers (as relates to purchases after New GM came into existence), and/or avoiding the costs of recalls and brand diminution.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were part of a pattern of conduct and not isolated events.

1095.   The predicate acts all had the purpose of generating significant revenue and profits for New GM at the expense of Plaintiffs and the Class Members, who were never informed of the defects in their vehicles or that New GM vehicles were not safe and reliable as a

general matter.  The predicate acts were committed or caused to be committed by New GM, through its participation in the RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and all other Class Members' funds (as to purchases or leases after New GM came into being only) and avoiding the expenses associated with remediating the defects during the entire time period from New GM's inception until the end of the Class Period.

1096.   The conduct of New GM and the Enterprise Members in furtherance of this scheme was intentional.  Plaintiffs and Class Members were harmed by New GM's conduct in the Enterprise and, as a result, purchased or leased dangerous Affected Vehicles after New GM was created for significantly more money than they would have paid absent the scheme to defraud, and/or remained in possession of vehicles of diminished value that New GM otherwise would have repaired or replaced, and/or sold Affected Vehicles after the (belated and inadequate) revelations of defects for a loss.  New GM unfairly reaped millions of dollars in excessive sales revenue as a result of this scheme and its conduct in furtherance of this scheme.

### G.   New GM Conducted the Enterprise to Submit Incomplete and Misleading Reports to Congress and The Public

After the initial ignition switch recall in February 2014, New GM issued a series of false statements designed to conceal its culpability and knowledge of the non-deployment of airbags. For example, on June 5, 2014, Mary Barra issued a statement claiming that what the Valukas Report found was "incompetence or neglect" and found "no conspiracy by the corporation to cover up the facts."  That is a true statement as to what Valukas found.  But, as revealed by the foregoing allegations, New GM, K&S, and ESIS did engage in a conspiracy to cover up the "anomaly" ("defect") that could expose GM to "punitive damages and inevitably lead to a recall:

**H.      Plaintiffs' Injuries and Damages**

1097.   Plaintiffs, the Nationwide Class, and the Nationwide Post-Sale Ignition Switch Defect Subclass were damaged and injured in their business and property by reason of New GM's conduct in violation of RICO in at least the following ways:

a.      Plaintiffs and Class Members who purchased or leased their Affected Vehicles after New GM's creation were fraudulently induced into making those transactions and/or paying more than they otherwise would have had the defects been revealed.

b.      Plaintiffs and Class Members who sold an Affected Vehicle after the revelation of the defects were injured by the low sale price relative to what the non-defective car would be worth.

c.      Plaintiffs and Class Members who owned Affected Vehicles at any time after New GM's creation remained in possession of vehicles of diminished value which GM would otherwise have been compelled to fix or replace.

d.      Plaintiffs and Class Members will also continue to incur expense and loss in connection with their efforts to implement the 2014 recall corrections and/or eliminate or reduce the risks and costs to which the Affected Vehicles and parts have exposed them.

1098.   By reason of the foregoing, New GM, through its managerial officials, has unlawfully, knowingly, and willfully conducted and participated directly or indirectly in the foregoing Enterprise through a pattern of racketeering activity in violation or attempted violation of 18 U.S.C. § 1962(c).

1099.   These violations of 18 U.S.C. § 1962(c) by New GM have directly and proximately caused Plaintiffs' and Class Members' injuries and damage set forth above.

Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as punitive damages, equitable relief, and their costs and reasonable attorneys' fees, in conducting at trial and on appeal pursuant to 18 U.S.C. § 1964(c).

### COUNT II

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. § 2301, *et seq.*

1100. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1101. Plaintiffs bring this Count on behalf of members of the Post-Sale Ignition Switch Defect Subclass who are residents of the following States:  Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia and Wyoming (the "Class," for the purposes of this Count).

1102. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

1103. The Defective Ignition Switch Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

1104. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).  They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

1105. New GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

1106.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

1107.   New GM provided Plaintiffs and the other Class Members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles on or after July 11, 2009, that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).  As a part of the implied warranty of merchantability, New GM warranted that the Defective Ignition Switch Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

1108.   New GM breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1).  Without limitation, the Defective Ignition Switch Vehicles share common design defects in that they are equipped with defective ignition switch systems that can suddenly fail during normal operation, leaving occupants of the Defective Ignition Switch Vehicles vulnerable to crashes, serious injury, and death.  New GM has admitted that the Defective Ignition Switch Vehicles are defective in issuing its recalls, but the recalls are woefully insufficient to address each of the defects.

1109.   In its capacity as a warrantor, New GM had knowledge of the inherent defects in the Defective Ignition Switch Vehicles.  Any effort by New GM to limit the implied warranties in a manner that would exclude coverage of the Defective Ignition Switch Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Defective Ignition Switch Vehicles is null and void.

1110.   Any limitations New GM might seek to impose on its warranties are procedurally unconscionable.  There was unequal bargaining power between New GM and Plaintiffs and the

other Class Members, as, at the time of purchase and lease, Plaintiffs and the other Class

Members had no other options for purchasing warranty coverage other than directly from

New GM.

1111.   Any limitations New GM might seek to impose on its warranties are substantively

unconscionable.  New GM knew that the Defective Ignition Switch Vehicles were defective and

would continue to pose safety risks after the warranties purportedly expired.  New GM failed to

disclose these defects to Plaintiffs and the other Class Members.  Thus, New GM's enforcement

of the durational limitations on those warranties is harsh and shocks the conscience.

1112.   Plaintiffs and each of the other Class Members have had sufficient direct dealings

with either New GM or its agents (dealerships) to establish privity of contract between New GM,

on the one hand, and Plaintiffs and each of the other Class Members, on the other hand.

Nonetheless, privity is not required here because Plaintiffs and each of the other Class Members

are intended third-party beneficiaries of contracts between New GM and its dealers, and

specifically, of New GM's implied warranties.  The dealers were not intended to be the ultimate

consumers of the Defective Ignition Switch Vehicles and have no rights under the warranty

agreements provided with the Defective Ignition Switch Vehicles; the warranty agreements were

designed for and intended to benefit consumers.  Finally, privity is also not required because the

Defective Ignition Switch Vehicles are dangerous instrumentalities due to the aforementioned

defects and nonconformities.

1113.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action

and are not required to give New GM notice and an opportunity to cure until such time as the

Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal

Rules of Civil Procedure.

1114.   Plaintiffs and the other Class Members would suffer economic hardship if they returned their Defective Ignition Switch Vehicles but did not receive the return of all payments made by them.  Because New GM is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class Members have not re-accepted their Defective Ignition Switch Vehicles by retaining them.

1115.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs, individually and on behalf of the other Class Members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.  In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class Members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class Members in connection with the commencement and prosecution of this action.

1116.   Further, Plaintiffs and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1).  Based on New GM's continuing failures to fix the known dangerous defects, Plaintiffs seek a declaration that New GM has not adequately implemented its recall commitments and requirements and general commitments to fix its failed processes, and injunctive relief in the form of judicial supervision over the recall process is warranted. Plaintiffs also seek the establishment of the New GM-funded program for Plaintiffs and Class Members to recover out of pocket costs incurred in attempting to rectify the Ignition Switch Defects in their vehicles.

## COUNT III

## NEGLIGENCE

1117.   Plaintiffs bring this Count on behalf of members of the Post-Sale Ignition Switch Defect Subclass who reside in Arkansas, Louisiana, Maryland, and Ohio ("Negligence Subclasses").

1118.   New GM has designed, manufactured, sold, or otherwise placed in the stream of commerce Defective Ignition Switch Vehicles, as set forth above.

1119.   New GM had a duty to design and manufacture a product that would be safe for its intended and foreseeable uses and users, including the use to which its products were put by Plaintiffs and the other members of the Negligence Subclasses.  New GM breached its duties to Plaintiffs and the other members of the Negligence Subclasses because they were negligent in the design, development, manufacture, and testing of the Defective Ignition Switch Vehicles, and New GM is responsible for this negligence.

1120.   New GM was negligent in the design, development, manufacture, and testing of the Defective Ignition Switch Vehicles because it knew, or in the exercise of reasonable care should have known, that the vehicles equipped with defective ignition systems pose an unreasonable risk of death or serious bodily injury to Plaintiffs and the other members of the Negligence Subclasses, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which brakes, power steering, and airbags are all rendered inoperable.

1121.   Whereupon Plaintiffs, individually and on behalf of the other members of the Negligence Subclasses, respectfully rely upon the RESTATEMENT (SECOND) OF TORTS § 395.

1122.   New GM further breached its duties to Plaintiffs and the other members of the Negligence Subclasses by supplying directly or through a third person defective vehicles to be

used by such foreseeable persons as Plaintiffs and the other members of the Negligence Subclasses when:

1123.   New GM knew or had reason to know that the vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

1124.   New GM failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the vehicles are likely to be dangerous.

1125.   New GM had a continuing duty to warn and instruct the intended and foreseeable users of its vehicles, including Plaintiffs and the other members of the Negligence Subclasses, of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles. Plaintiffs and the other members of the Negligence Subclasses were entitled to know that the vehicles, in their ordinary operation, were not reasonably safe for their intended and ordinary purposes and uses.

1126.   New GM knew or should have known of the defects described herein.  New GM breached its duty to Plaintiffs and the other members of the Negligence Subclasses because it failed to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles.

1127.   As a direct and proximate result of New GM's negligence, Plaintiffs and the other members of the Negligence Subclasses suffered damages.

010440-11  784012 V1

I.     **Statewide Class Claims**

## ALABAMA

## COUNT I

## VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT

## (ALA. CODE § 8-19-1, *et seq.*)

1128.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1129.   This claim is brought solely on behalf of Nationwide Class Members who are Alabama residents (the "Alabama Class").

1130.   Plaintiffs and the Alabama Class are "consumers" within the meaning of ALA. CODE § 8-19-3(2).

1131.   Plaintiffs, the Alabama Class, and New GM are "persons" within the meaning of ALA. CODE § 8-19-3(5).

1132.   The Affected Vehicles are "goods" within the meaning of ALA. CODE § 8-19-3(3).

1133.   New GM was and is engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

1134.   The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including:  "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."  ALA. CODE § 8-19-5.  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited

by the Alabama DTPA, including:  representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Affected Vehicles are of a particular standard, quality, and grade when they are not; advertising Affected Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Affected Vehicles has been supplied in accordance with a previous representation when it has not; and engaging in other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

1135.   New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles sold on or after July 11, 2009.

1136.   From the date of its inception on July 11, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, because of (i) the knowledge of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1137.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1138.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1139.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Alabama DTPA.

1140.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1141.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs , about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1142.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Alabama Class.

1143.   New GM knew or should have known that its conduct violated the Alabama DTPA.

1144.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles and the GM brand that were either false or misleading.

1145.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.      Possessed exclusive knowledge that it valued cost-cutting
> over safety, selected parts from the cheapest supplier
> regardless of quality, and actively discouraged employees
> from finding and flagging known safety defects, and that
> this approach would necessarily cause the existence of
> more defects in the vehicles it designed and manufactured;
>
> b.      Intentionally concealed the foregoing from Plaintiffs;
> and/or
>
> c.      Made incomplete representations about the safety and
> reliability of the Affected Vehicles generally, and the
> ignition switch and other defects in particular, while
> purposefully withholding material facts from Plaintiffs that
> contradicted these representations.

1146.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

1147.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Alabama Class.  A vehicle

made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects

rather than promptly remedies them.

1148.   Plaintiffs and the Alabama Class suffered ascertainable loss caused by New GM's

misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs

who purchased GM-branded vehicles after the date of New GM's inception either would have

paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not

receive the benefit of their bargain as a result of New GM's misconduct.  For Plaintiffs who purchased Old GM Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned," they too either would have paid less for their vehicles or would not have purchased them but for New GM's violations of the Alabama DTPA.

1149.   Regardless of time of purchase or lease, no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the Alabama DTPA.  And, in any event, all GM vehicle owners suffered ascertainable loss in the form of diminished value of their vehicles as a result of New GM's deceptive and unfair acts and practices made in the course of New GM's business.

1150.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1151.   As a direct and proximate result of New GM's violations of the Alabama DTPA, Plaintiffs and the Alabama Class have suffered injury-in-fact and/or actual damage.

1152.   Pursuant to ALA. CODE § 8-19-10, Plaintiffs and the Alabama Class seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff and each Alabama Class member.

1153. Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the ALA. CODE § 8-19-1, *et seq.*

1154. On October 8, 2014, certain Plaintiffs sent a letter complying with ALA. CODE § 8-19-10(e). Because New GM failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Alabama Class are entitled.

## COUNT II

## FRAUD BY CONCEALMENT

1155. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1156. This claim is brought on behalf of Nationwide Class Members who are Alabama residents (the "Alabama Class").

1157. New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1158. New GM concealed and suppressed material facts concerning the culture of New GM – a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1159. New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1160. New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles and Certified Previously Owned vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles

- 366 -

are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

1161.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM, were in fact known to New GM as of the time of its creation in 2009 and at every point thereafter, New GM had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Alabama Class.  New GM also had a duty to disclose because it made many general affirmative representations about the safety, quality, and lack of defects in its vehicles, as set forth above, which were misleading, deceptive and incomplete without the disclosure of the additional facts set forth above regarding its actual safety record, safety philosophy, and practices and the actual safety defects in its vehicles.  Having volunteered to provide information to Plaintiffs, GM had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Alabama Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1162.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Alabama Class.

1163.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Alabama Class and conceal material information regarding defects that exist in GM-branded vehicles.

1164.   Plaintiffs and the Alabama Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased cars manufactured by New GM; and/or they would not have purchased cars manufactured by Old GM in the time after New GM had come into existence and had fraudulently opted to conceal, and to misrepresent, the true facts about the vehicles; and/or would not have continued to drive their vehicles or would have taken other affirmative steps. Plaintiffs' and the Alabama Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Alabama Class.

1165.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Alabama Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs who purchased new or Certified Previously Owned vehicles after New GM came into existence either would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs regardless of time of purchase or lease would have maintained their vehicles.

1166.   The value of all Alabama Class Members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which have greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1167.   Accordingly, New GM is liable to the Alabama Class for damages in an amount to be proven at trial.

1168.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Alabama Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

1169.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1170.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Alabama residents (the "Alabama Pre-Sale ISD Subclass").

1171.   New GM was aware of the ignition switch defects in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order And Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1172.   As the bankruptcy court found, "As of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  New GM necessarily had this same knowledge from day one of its existence, as the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion."

- 369 -

1173.   The Alabama Pre-Sale ISD Subclass did not receive notice of the ignition switch defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the ignition switch defect.

1174.   In September of 2009, the bankruptcy court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1175.   Because New GM concealed its knowledge of the ignition switch defect, the Alabama Pre-Sale ISD Subclass did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the ignition switch defects.

1176.   In 2011, the bankruptcy court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1177.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1178.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

- 370 -

1179.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1180.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million – all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1181.   The bankruptcy court found that the Pre-Sale Ignition Switch Defect Subclass members were deprived of Due Process because they did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  While the court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars the Pre-Sale Ignition Switch Defect Subclass from tapping into the GUC Trust assets.

1182.   But for New GM's fraudulent concealment of the ignition switch defects, the Alabama Pre-Sale ISD Subclass (and the Pre-Sale Ignition Switch Defect Subclass members from every state) would have filed claims against Old GM before the Bar Date.

1183.   Had the Alabama Pre-Sale ISD Subclass filed timely claims before the Bar Date, the claims would have been allowed, as would have the claims of the entire Pre-Sale Ignition Switch Defect Subclass.

1184.   The estimated value of the Pre-Sale Ignition Switch Defect Subclass' claims, nationwide, is $7-10 billion.  Had the claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of the Pre-Sale Ignition Switch Defect Subclass.

1185.   New GM's concealment and suppression of the material fact of the ignition switch defect over the first several months of its existence served to prevent the filing of claims by the Pre-Sale Ignition Switch Defect Subclass and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1186.   New GM had a duty to disclose the ignition switch defects because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Alabama Pre-Sale ISD Subclass.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Defective Ignition Switch Vehicles purchased or leased by Plaintiffs and the Alabama Pre-Sale ISD Subclass, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.

1187.   Plaintiffs and the Alabama Pre-Sale ISD Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Alabama Pre-Sale ISD Subclass's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Alabama Pre-Sale ISD Subclass.

1188.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Alabama Pre-Sale ISD Subclass sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1189.   Accordingly, New GM is liable to the Alabama Pre-Sale ISD Subclass members for their damages in an amount to be proven at trial.

1190.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Alabama Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## THIRD-PARTY BENEFICIARY CLAIM

1191.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1192.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Alabama residents (the "Alabama Pre-Sale ISD Subclass").

1193.   In the Sales Agreement through which New GM acquired substantially all of the assets of New GM, New GM explicitly agreed as follows:

> From and after the Closing, [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

1194.  With the exception of the portion of the agreement that purports to immunize New GM from its own independent misconduct with respect to cars and parts made by New GM,  the Sales Agreement is a valid and binding contract.

- 373 -

1195.. But for New GM's covenant to comply with the TREAD Act with respect to cars and parts made by Old GM, the TREAD Act would have no application to New GM with respect to those cars and parts.  That is because the TREAD Act on its face imposes reporting and recall obligations only on the "manufacturers" of a vehicle.  49 U.S.C. § 30118(c).

1196.   Because New GM agreed to comply with the TREAD Act with respect to vehicles manufactured by Old GM, New GM agreed to (among other things): (a) make quarterly submissions to NHTSA of "early warning reporting" data, including incidents involving death, injury, or property damage, warranty claims, consumer complaints, and field reports concerning failure, malfunction, lack of durability or other performance issues.  *See* 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21; (b) retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety.  *See* 49 C.F.R. §§ 576.5 to 576.6; and (c) take *immediate* remedial action if it knows or should know that a safety defect exists – including notifying NHTSA and consumers and ordering a recall if necessary.  *See* 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c).; 49 C.F.R. §§ 577.5(a), 577.7(a).

1197.   Plaintiffs, as owners and lessors of vehicles and parts manufactured by Old GM, are the clear intended beneficiaries of New GM's agreement to comply with the TREAD Act. Under the Sales Agreement, Plaintiffs were to receive the benefit of having a manufacturer responsible for monitoring the safety of their Old GM vehicles and making certain that any known safety defects would be promptly remedied.

1198.   Although the Sale Order which consummated New GM's purchase of Old GM purported to give New GM immunity for claims concerning vehicles or parts made by Old GM, the bankruptcy court recently ruled that provision to be unenforceable, and that New GM can be

held liable for its own post bankruptcy sale conduct with respect to cars and parts made by Old GM.  Therefore, that provision of the Sale Order and related provisions of the Sale Agreement cannot be read to bar Plaintiffs' third-party beneficiary claim as it is based solely on New GM's post-sale breaches of the promise it made in the Sales Agreement.

1199.   New GM breached its covenant to comply with the TREAD Act with respect to the Old GM Defective Ignition Switch Vehicles, as it failed to take action to remediate the Ignition Switch Defect until 2014 when it finally issued a recall.

1200.   Plaintiffs and the Alabama Pre-Sale ISD Subclass were damaged as a result of New GM's breach.  Because of New GM's failure to timely remedy the ignition switch defect, the value of Old GM Defective Ignition Switch vehicles has diminished in an amount to be determined at trial.

**COUNT V**

**UNJUST ENRICHMENT**

1201.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1202.   This claim is brought on behalf of members of the Alabama Class who purchased New GM vehicles, or Certified Pre-Owned GM vehicles in the time period after New GM came into existence, and who purchased or leased Defective Ignition Switch Vehicles in the time period before New GM came into existence, which cars were still on the road after New GM came into existence (the "Alabama Unjust Enrichment Class").

1203.   New GM has received and retained a benefit from the Plaintiffs and inequity has resulted.

1204.   New GM has benefitted from selling and leasing defective cars, including Certified Pre-Owned cars, whose value was artificially inflated by New GM's concealment of

systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

1205.   With respect to the Defective Ignition Switch Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

1206.   Thus, all Alabama Unjust Enrichment Class Members conferred a benefit on New GM.

1207.   It is inequitable for New GM to retain these benefits.

1208.   Plaintiffs were not aware about the true facts about GM-branded vehicles, and did not benefit from GM's conduct.

1209.   New GM knowingly accepted the benefits of its unjust conduct.

1210.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### ALASKA

### COUNT I

### VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT

### (ALASKA STAT. ANN. § 45.50.471, *et seq.*)

1211.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1212.   This claim is brought only on behalf of Nationwide Class Members who are Alaska residents (the "Alaska Class").

- 376 -

1213.   The Alaska Unfair Trade Practices And Consumer Protection Act ("Alaska CPA") declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including:  "(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(8) advertising goods or services with intent not to sell them as advertised;" or  "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged."  ALASKA STAT. ANN. § 45.50.471.

1214.   New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles in violation of the Alaska CPA.  New GM also engaged in unlawful trade practices by representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Affected Vehicles are of a particular standard and quality when they are not; advertising the Affected Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Affected Vehicles.

1215.   From the date of its inception on July 11, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles because of (i) the knowledge of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD

Act obligations, as discussed above.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1216.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1217.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1218.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair or deceptive business practices in violation of the Alaska CPA.

1219.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1220.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1221.   New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Alaska Class.

1222.   New GM knew or should have known that its conduct violated the Alaska CPA.

1223.   As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles and the GM brand that were either false or misleading.

1224.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.      Possessed exclusive knowledge that it valued cost-cutting
> over safety, selected parts from the cheapest supplier
> regardless of quality, and actively discouraged employees
> from finding and flagging known safety defects, and that
> this approach would necessarily cause the existence of
> more defects in the vehicles it designed and manufactured;
>
> b.      Intentionally concealed the foregoing from Plaintiffs;
> and/or
>
> c.      Made incomplete representations about the safety and
> reliability of the Affected Vehicles generally, and the
> ignition switch and other defects in particular, while
> purposefully withholding material facts from Plaintiffs that
> contradicted these representations.

1225.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

1226.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Alaska Class.  A vehicle

made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1227.   Plaintiffs and the Alaska Class suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs who purchased GM-branded vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.  For Plaintiffs who purchased Old GM Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned," they too either would have paid less for their vehicles or would not have purchased them but for New GM's violations of the Alaska CPA.

1228.   Regardless of time of purchase or lease, no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the Alaska CPA.  And, in any event, all GM vehicle owners suffered ascertainable loss in the form of diminished value of their vehicles as a result of New GM's deceptive and unfair acts and practices made in the course of New GM's business.

1229.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1230.   As a direct and proximate result of New GM's violations of the Alaska CPA, Plaintiffs and the Alaska Class have suffered injury-in-fact and/or actual damage.

1231.   Pursuant to ALASKA STAT. ANN. § 45.50. 531, Plaintiffs and the Alaska Class seek monetary relief against New GM measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each Plaintiff and each Alaska Class member.

1232.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices pursuant to ALASKA STAT. ANN. § 45.50. 535(b)(1), attorneys' fees, and any other just and proper relief available under the Alaska CPA.

1233.   On October 8, 2014, certain Plaintiffs sent a letter complying with ALASKA STAT. ANN. § 45.50. 535(b)(1).

## COUNT II

## FRAUD BY CONCEALMENT

1234.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1235.   This claim is brought on behalf of Nationwide Class Members who are Alaska residents (the "Alaska Class").

1236.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1237.   New GM concealed and suppressed material facts concerning the culture of New GM – a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1238.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1239.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles and Certified Previously Owned vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

1240.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM, were in fact known to New GM as of the time of its creation in 2009 and at every point thereafter, New GM had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Alaska Class.  New GM also had a duty to disclose because it made many general affirmative representations about the safety, quality, and lack of defects in its vehicles, as set forth above, which were misleading, deceptive and incomplete without the disclosure of the additional facts set forth above regarding its actual safety record, safety philosophy, and practices and the actual safety defects in its vehicles.  Having volunteered to provide information to Plaintiffs, GM had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Alaska Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1241.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Alaska Class.

1242.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Alaska Class and conceal material information regarding defects that exist in GM-branded vehicles.

1243.   Plaintiffs and the Alaska Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased cars manufactured by New GM; and/or they would not have purchased cars manufactured by Old GM in the time after New GM had come into existence and had fraudulently opted to conceal, and to misrepresent, the true facts about the vehicles; and/or would not have continued to drive their vehicles or would have taken other affirmative steps. Plaintiffs' and the Alaska Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Alaska Class.

1244.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Alaska Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs who purchased new or Certified Previously Owned vehicles after New GM came into existence either would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs regardless of time of purchase or lease would have maintained their vehicles.

1245.   The value of all Alaska Class Members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which have greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of

the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1246.   Accordingly, New GM is liable to the Alaska Class for damages in an amount to be proven at trial.

1247.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Alaska Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

**(ALASKA STAT. § 45.02.314)**

1248.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1249.   This claim is brought only on behalf of Alaska residents who are members of the Nationwide Post-Sale Ignition Switch Defect Subclass and the Pre-Sale Ignition Switch Defect Subclass (the "Alaska Post-Sale ISD Subclass").

1250.   New GM was a merchant with respect to motor vehicles within the meaning of ALASKA STAT. § 45.02.104(a).

1251.   Under ALASKA STAT. § 45.02.314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Ignition Switch Vehicles from New GM on or after July 11, 2009.

- 384 -

1252.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1253.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Alaska Post-Sale ISD Subclass before or within a reasonable amount of time after New GM issued the recalls and the allegations of vehicle defects became public.

1254.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Alaska New GM ISD t Subclass have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

1255.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1256.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Alaska residents *and* who owned their Old GM Defective Ignition Switch Vehicle for at least some period of time between July 11, 2009 and November 30, 2009 (for the purposes of this claim only, the "Alaska Pre-Sale ISD Subclass").

1257.   New GM was aware of the ignition switch defects in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order And Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1258.   As the bankruptcy court found, "As of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  New GM necessarily had this same knowledge from day one of its existence, as the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion."

1259.   The Alaska Pre-Sale ISD Subclass did not receive notice of the ignition switch defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the ignition switch defect.

 1260.  In September of 2009, the bankruptcy court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1261.   Because New GM concealed its knowledge of the ignition switch defect, the Alaska Pre-Sale ISD Subclass did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the ignition switch defects.

1262.   In 2011, the bankruptcy court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1263. The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1264. Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion. In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1265. As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1266. As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities. After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million – all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1267. The bankruptcy court found that the Pre-Sale Ignition Switch Defect Subclass members were deprived of Due Process because they did not receive notice of the ignition switch defects prior to the passage of the Bar Date. While the court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars the Pre-Sale Ignition Switch Defect Subclass from tapping into the GUC Trust assets.

1268. But for New GM's fraudulent concealment of the ignition switch defects, the Alaska Pre-Sale ISD Subclass (and the Pre-Sale Ignition Switch Defect Subclass members from every state) would have filed claims against Old GM before the Bar Date.

1269.   Had the Alaska Pre-Sale ISD Subclass filed timely claims before the Bar Date, the claims would have been allowed, as would have the claims of the entire Pre-Sale Ignition Switch Defect Subclass.

1270.   Had the claims of the Pre-Sale Ignition Switch Defect Subclass been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of the Pre-Sale Ignition Switch Defect Subclass.

1271.   New GM's concealment and suppression of the material fact of the ignition switch defect over the first several months of its existence served to prevent the filing of claims by the Pre-Sale Ignition Switch Defect Subclass and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1272.   New GM had a duty to disclose the ignition switch defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Alaska Pre-Sale ISD Subclass.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Defective Ignition Switch Vehicles purchased or leased by Plaintiffs and the Alaska Pre-Sale ISD Subclass, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.

1273.   Plaintiffs and the Alaska Pre-Sale ISD Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Alaska Pre-Sale ISD Subclass's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Alaska Pre-Sale ISD Subclass.

1274.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Alaska Pre-Sale ISD Subclass sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1275.   Accordingly, New GM is liable to the Alaska Pre-Sale ISD Subclass members for their damages in an amount to be proven at trial.

1276.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Alaska Pre-Sale ISD Subclass's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## THIRD-PARTY BENEFICIARY CLAIM

1277.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1278.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Alaska residents (the "Alaska Pre-Sale ISD Subclass").

1279.   In the Sales Agreement through which New GM acquired substantially all of the assets of New GM, New GM explicitly agreed as follows:

> From and after the Closing, [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and

- 389 -

> Safety Code and similar Laws, in each case, to the extent
> applicable in respect of vehicles and vehicle parts manufactured or
> distributed by [Old GM].

1280.   With the exception of the portion of the agreement that purports to immunize New

GM from its own independent misconduct with respect to cars and parts made by Old GM, the

Sales Agreement is a valid and binding contract.

1281.   But for New GM's covenant to comply with the TREAD Act with respect to cars

and parts made by Old GM, the TREAD Act would have no application to New GM with respect

to those cars and parts.  That is because the TREAD Act on its face imposes reporting and recall

obligations only on the "manufacturers" of a vehicle.  49 U.S.C. § 30118(c).

1282.   Because New GM agreed to comply with the TREAD Act with respect to vehicles

manufactured by Old GM, New GM agreed to (among other things): (a) make quarterly

submissions to NHTSA of "early warning reporting" data, including incidents involving death,

injury, or property damage, warranty claims, consumer complaints, and field reports concerning

failure, malfunction, lack of durability or other performance issues.  *See* 49 U.S.C. §

30166(m)(3); 49 C.F.R. § 579.21; (b) retain for five years all underlying records on which the

early warning reports are based and all records containing information on malfunctions that may

be related to motor vehicle safety.  *See* 49 C.F.R. §§ 576.5 to 576.6; and (c) take *immediate*

remedial action if it knows or should know that a safety defect exists – including notifying

NHTSA and consumers and ordering a recall if necessary.  *See* 49 U.S.C. § 30118(c); 49 C.F.R.

§ 573.6(b)-(c); 49 C.F.R. §§ 577.5(a), 577.7(a).

1283.   Plaintiffs, as owners and lessors of vehicles and parts manufactured by Old GM,

are the clear intended beneficiaries of New GM's agreement to comply with the TREAD Act.

Under the Sale Agreement, Plaintiffs were to receive the benefit of having a manufacturer

responsible for monitoring the safety of their Old GM vehicles and making certain that any known safety defects would be promptly remedied.

1284.   Although the Sale Order which consummated New GM's purchase of Old GM purported to give New GM immunity from claims concerning vehicles or parts made by Old GM, the bankruptcy court recently ruled that provision to be unenforceable, and that New GM can be held liable for its own post-bankruptcy sale conduct with respect to cars and parts made by Old GM.  Therefore, that provision of the Sale Order and related provisions of the Sale Agreement cannot be read to bar Plaintiffs' third-party beneficiary claim as it is based solely on New GM's post-sale breaches of the promise it made in the Sale Agreement.

1285.   New GM breached its covenant to comply with the TREAD Act with respect to the Old GM Defective Ignition Switch Vehicles, as it failed to take action to remediate the Ignition Switch Defect until 2014 when it finally issued a recall.

1286.   Plaintiffs and the Alaska Pre-Sale ISD Subclass were damaged as a result of New GM's breach.  Because of New GM's failure to timely remedy the ignition switch defect, the value of Old GM Defective Ignition Switch Vehicles has diminished in an amount to be determined at trial.

**COUNT VI**

**UNJUST ENRICHMENT**

1287.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1288.   This claim is brought on behalf of members of the Alaska Class who purchased New GM vehicles, or Certified Pre-Owned GM vehicles in the time period after New GM came into existence, and who purchased or leased Defective Ignition Switch Vehicles in the time

period before New GM came into existence, which cars were still on the road after New GM

came into existence (the "Alaska Unjust Enrichment Class").

1289.   New GM has received and retained a benefit from the Plaintiffs and inequity has

resulted.

1290.   New GM has benefitted from selling and leasing defective cars, including

Certified Pre-Owned cars, whose value was artificially inflated by New GM's concealment of

systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and

Plaintiffs have overpaid for the cars and been forced to pay other costs.

1291.   With respect to the Defective Ignition Switch Vehicles purchased before New

GM came into existence that were still on the road after New GM came into existence and as to

which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by

avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about

the success of New GM.

1292.   Thus, all Alaska Unjust Enrichment Class Members conferred a benefit on New

GM.

1293.   It is inequitable for New GM to retain these benefits.

1294.   Plaintiffs were not aware about the true facts about GM-branded vehicles, and did

not benefit from GM's conduct.

1295.   New GM knowingly accepted the benefits of its unjust conduct.

1296.   As a result of New GM's conduct, the amount of its unjust enrichment should be

disgorged, in an amount according to proof.

# ARIZONA

## COUNT I

## VIOLATIONS OF THE CONSUMER FRAUD ACT

### (ARIZONA REV. STAT. § 44-1521, *et seq.*)

1297.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1298.   This claim is brought only on behalf of Class Members who are Arizona residents (the "Arizona Class").

1299.   New GM, Plaintiffs, and the Arizona Class are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), ARIZ. REV. STAT. § 44-1521(6).

1300.   The Affected Vehicles are "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

1301.   The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."  ARIZ. REV. STAT. § 44-1522(A).

1302.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles.

- 393 -

1303. From the date of its inception on July 11, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, because of (i) the knowledge of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD Act obligations, as discussed above. New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1304. New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles. New GM concealed this information as well.

1305. According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1306. By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Arizona CFA.

1307. In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above. New GM compounded the deception by repeatedly asserting that GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

- 394 -

1308.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1309.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Arizona Class.

1310.   New GM knew or should have known that its conduct violated the Arizona CFA.

1311.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles and the GM brand that were either false or misleading.

1312.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b.    Intentionally concealed the foregoing from Plaintiffs; and/or

c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch  and other defects in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1313.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1314.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Arizona Class.  A vehicle made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1315.   Plaintiffs and the Arizona Class suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs who purchased GM-branded vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.  For Plaintiffs who purchased Old GM Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned," they too either would have paid less for their vehicles or would not have purchased them but for New GM's violations of the Arizona CFA.

1316.   Regardless of time of purchase or lease, no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the Arizona CFA.  And, in any event, all GM vehicle owners suffered ascertainable loss in the form of diminished value of their vehicles as a result of New GM's deceptive and unfair acts and practices made in the course of New GM's business.

1317.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1318.   The recalls and repairs instituted by New GM have not been adequate.

1319.   As a direct and proximate result of New GM's violations of the Arizona CFA, Plaintiffs and the Arizona Class have suffered injury-in-fact and/or actual damage.

1320.   Plaintiffs and the Arizona Class seek monetary relief against New GM in an amount to be determined at trial.  Plaintiffs and the Arizona Class also seek punitive damages because New GM engaged in aggravated and outrageous conduct with an evil mind.

1321.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT II

### FRAUD BY CONCEALMENT

1322.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1323.   This claim is brought on behalf of Nationwide Class Members who are Alaska residents (the "Alaska Class").

1324.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1325.   New GM concealed and suppressed material facts concerning the culture of New GM – a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1326.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1327.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles and Certified Previously Owned vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

1328.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM, were in fact known to New GM as of the time of its creation in 2009 and at every point thereafter, New GM had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Alaska Class.  New GM also had a duty to disclose because it made many general affirmative representations about the safety, quality, and lack of defects in its vehicles, as set forth above, which were misleading, deceptive and incomplete without the disclosure of the additional facts set forth above regarding its actual safety record, safety philosophy, and practices and the actual safety defects in its vehicles.  Having volunteered to provide information to Plaintiffs, GM had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Alaska Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1329.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Alaska Class.

1330.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Alaska Class and conceal material information regarding defects that exist in GM-branded vehicles.

1331.   Plaintiffs and the Alaska Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased cars manufactured by New GM; and/or they would not have purchased cars manufactured by Old GM in the time after New GM had come into existence and had fraudulently opted to conceal, and to misrepresent, the true facts about the vehicles; and/or would not have continued to drive their vehicles or would have taken other affirmative steps. Plaintiffs' and the Alaska Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Alaska Class.

1332.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Alaska Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs who purchased new or Certified Previously Owned vehicles after New GM came into existence either would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs regardless of time of purchase or lease would have maintained their vehicles.

1333.   The value of all Alaska Class Members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which have greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1334.   Accordingly, New GM is liable to the Alaska Class for damages in an amount to be proven at trial.

1335.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Alaska Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

1336.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1337.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Arizona residents *and* who owned their Old GM Defective Ignition Switch Vehicle for at least some period of time between July 11, 2009 and November 30, 2009 (for the purposes of this claim only, the "Arizona Pre-Sale ISD Subclass").

1338.   New GM was aware of the ignition switch defects in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order And Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1339.   As the bankruptcy court found, "As of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  New GM necessarily had this same knowledge from day one of its existence, as the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion."

1340.   The Arizona Pre-Sale ISD Subclass did not receive notice of the ignition switch defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the ignition switch defect.

1341.   In September of 2009, the bankruptcy court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1342.   Because New GM concealed its knowledge of the ignition switch defect, the Arizona Pre-Sale ISD Subclass did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the ignition switch defects.

1343.   In 2011, the bankruptcy court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1344.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1345.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1346.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1347.   As of September 30, 2014,  the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million – all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1348.   The bankruptcy court found that the Pre-Sale Ignition Switch Defect Subclass members were deprived of Due Process because they did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  While the court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars the Pre-Sale Ignition Switch Defect Subclass from tapping into the GUC Trust assets.

1349.   But for New GM's fraudulent concealment of the ignition switch defects, the Arizona Pre-Sale ISD Subclass (and the Pre-Sale Ignition Switch Defect Subclass members from every state) would have filed claims against Old GM before the Bar Date.

1350.   Had the Arizona Pre-Sale ISD Subclass filed timely claims before the Bar Date, the claims would have been allowed, as would have the claims of the entire Pre-Sale Ignition Switch Defect Subclass.

1351.   Had the claims of the Pre-Sale Ignition Switch Defect Subclass been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of the Pre-Sale Ignition Switch Defect Subclass.

1352.   New GM's concealment and suppression of the material fact of the ignition switch defect over the first several months of its existence served to prevent the filing of claims by the Pre-Sale Ignition Switch Defect Subclass and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1353.   New GM had a duty to disclose the ignition switch defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Arizona Pre-Sale ISD Subclass.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Defective Ignition Switch Vehicles purchased or leased by Plaintiffs and the Arizona Pre-Sale ISD Subclass, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.

1354.   Plaintiffs and the Arizona Pre-Sale ISD Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Arizona Pre-Sale ISD Subclass's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Arizona Pre-Sale ISD Subclass.

1355.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Arizona Pre-Sale ISD Subclass sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1356.   Accordingly, New GM is liable to the Arizona Pre-Sale ISD Subclass members for their damages in an amount to be proven at trial.

1357.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Arizona Pre-Sale ISD Subclass's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## THIRD-PARTY BENEFICIARY CLAIM

1358.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1359.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Arizona residents (the "Arizona Pre-Sale ISD Subclass").

1360.   In the Sales Agreement through which New GM acquired substantially all of the assets of New GM, New GM explicitly agreed as follows:

> From and after the Closing, [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and

- 404 -

> Safety Code and similar Laws, in each case, to the extent
> applicable in respect of vehicles and vehicle parts manufactured or
> distributed by [Old GM].

1361.   With the exception of the portion of the agreement that purports to immunize New

GM from its own independent misconduct with respect to cars and parts made by Old GM, the

Sales Agreement is a valid and binding contract.

1362.   But for New GM's covenant to comply with the TREAD Act with respect to cars

and parts made by Old GM, the TREAD Act would have no application to New GM with respect

to those cars and parts.   That is because the TREAD Act on its face imposes reporting and recall

obligations only on the "manufacturers" of a vehicle.   49 U.S.C. § 30118(c).

1363.   Because New GM agreed to comply with the TREAD Act with respect to vehicles

manufactured by Old GM, New GM agreed to (among other things): (a) make quarterly

submissions to NHTSA of "early warning reporting" data, including incidents involving death,

injury, or property damage, warranty claims, consumer complaints, and field reports concerning

failure, malfunction, lack of durability or other performance issues.   *See* 49 U.S.C. §

30166(m)(3); 49 C.F.R. § 579.21; (b) retain for five years all underlying records on which the

early warning reports are based and all records containing information on malfunctions that may

be related to motor vehicle safety.   *See* 49 C.F.R. §§ 576.5 to 576.6; and (c) take *immediate*

remedial action if it knows or should know that a safety defect exists – including notifying

NHTSA and consumers and ordering a recall if necessary.   *See* 49 U.S.C. § 30118(c); 49 C.F.R.

§ 573.6(b)-(c); 49 C.F.R. §§ 577.5(a), 577.7(a).

1364.   Plaintiffs, as owners and lessors of vehicles and parts manufactured by Old GM,

are the clear intended beneficiaries of New GM's agreement to comply with the TREAD Act.

Under the Sale Agreement, Plaintiffs were to receive the benefit of having a manufacturer

responsible for monitoring the safety of their Old GM vehicles and making certain that any known safety defects would be promptly remedied.

1365.   Although the Sale Order which consummated New GM's purchase of Old GM purported to give New GM immunity from claims concerning vehicles or parts made by Old GM, the bankruptcy court recently ruled that provision to be unenforceable, and that New GM can be held liable for its own post-bankruptcy sale conduct with respect to cars and parts made by Old GM.  Therefore, that provision of the Sale Order and related provisions of the Sale Agreement cannot be read to bar Plaintiffs' third-party beneficiary claim as it is based solely on New GM's post-sale breaches of the promise it made in the Sale Agreement.

1366.   New GM breached its covenant to comply with the TREAD Act with respect to the Old GM Defective Ignition Switch Vehicles, as it failed to take action to remediate the Ignition Switch Defect until 2014 when it finally issued a recall.

1367.   Plaintiffs and the Arizona Pre-Sale ISD Subclass were damaged as a result of New GM's breach.  Because of New GM's failure to timely remedy the ignition switch defect, the value of Old GM Defective Ignition Switch Vehicles has diminished in an amount to be determined at trial.

**COUNT V**

**UNJUST ENRICHMENT**

1368.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1369.   This claim is brought on behalf of members of the Arizona Class who purchased New GM vehicles, or Certified Pre-Owned GM vehicles in the time period after New GM came into existence, and who purchased or leased Defective Ignition Switch Vehicles in the time

- 406 -

period before New GM came into existence, which cars were still on the road after New GM

came into existence (the "Arizona Unjust Enrichment Class").

1370.   New GM has received and retained a benefit from the Plaintiffs and inequity has

resulted.

1371.   New GM has benefitted from selling and leasing defective cars, including

Certified Pre-Owned cars, whose value was artificially inflated by New GM's concealment of

systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and

Plaintiffs have overpaid for the cars and been forced to pay other costs.

1372.   With respect to the Defective Ignition Switch Vehicles purchased before New

GM came into existence that were still on the road after New GM came into existence and as to

which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by

avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about

the success of New GM.

1373.   Thus, all Arizona Unjust Enrichment Class Members conferred a benefit on New

GM.

1374.   It is inequitable for New GM to retain these benefits.

1375.   Plaintiffs were not aware about the true facts about GM-branded vehicles, and did

not benefit from GM's conduct.

1376.   New GM knowingly accepted the benefits of its unjust conduct.

1377.   As a result of New GM's conduct, the amount of its unjust enrichment should be

disgorged, in an amount according to proof.

- 407 -

**ARKANSAS**

**COUNT I**

**VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT**

**(ARK. CODE ANN. § 4-88-101, *et seq*.)**

1378.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1379.   This claim is brought only on behalf of Class Members who are Arkansas residents (the "Arkansas Class").

1380.   New GM, Plaintiffs, and the Arkansas Class are "persons" within the meaning of Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), ARK. CODE ANN. § 4-88-102(5).

1381.   The Affected Vehicles are "goods" within the meaning of ARK. CODE ANN. § 4-88-102(4).

1382.   The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" ARK. CODE ANN. § 4-88-107(a)(10).  The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods:  "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission."  ARK. CODE ANN. § 4-88-108.  New GM violated the Arkansas DTPA and engaged in deceptive and unconscionable trade practices by, among other things, systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles and otherwise engaging in activities with a tendency or capacity to deceive.

1383.   New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles.

1384.   New GM's actions as set forth above occurred in the conduct of trade or commerce.

1385.   From the date of its inception on July 11, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, because of (i) the knowledge of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1386.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1387.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1388.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in deceptive and unconscionable business practices in violation of the Arkansas DTPA.

1389.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1390.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1391.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Arkansas Class.

1392.   New GM knew or should have known that its conduct violated the Arkansas DTPA.

1393.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles and the GM brand that were either false or misleading.

1394.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;
>
> b.   Intentionally concealed the foregoing from Plaintiffs; and/or

- 410 -

    c.        Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch  and other defects in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1395.  Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1396.  New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Arkansas Class.  A vehicle made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1397.  Plaintiffs and the Arkansas Class suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs who purchased GM-branded vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.  For Plaintiffs who purchased Old GM Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned," they too either would have paid less for their vehicles or would not have purchased them but for New GM's violations of the Arkansas DTPA.

1398.  Regardless of time of purchase or lease, no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its

- 411 -

face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing

duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the

Arkansas DTPA.  And, in any event, all GM vehicle owners suffered ascertainable loss in the

form of diminished value of their vehicles as a result of New GM's deceptive and unfair acts and

practices made in the course of New GM's business.

1399.   New GM's violations present a continuing risk to Plaintiffs as well as to the

general public.  New GM's unlawful acts and practices complained of herein affect the public

interest.

1400.   As a direct and proximate result of New GM's violations of the Arkansas DTPA,

Plaintiffs and the Arkansas Class have suffered injury-in-fact and/or actual damage.

1401.   Plaintiffs and the Arkansas Class seek monetary relief against New GM in an

amount to be determined at trial.  Plaintiffs and the Arkansas Class also seek punitive damages

because New GM acted wantonly in causing the injury or with such a conscious indifference to

the consequences that malice may be inferred.

1402.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or

deceptive practices, attorneys' fees, and any other just and proper relief available under the

Arkansas DTPA.

## COUNT II

## FRAUD BY CONCEALMENT

1403.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

1404.   This claim is brought on behalf of Nationwide Class Members who are

Arkansas residents (the "Arkansas Class").

- 412 -

1405.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1406.   New GM concealed and suppressed material facts concerning the culture of New GM – a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1407.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1408.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles and Certified Previously Owned vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

1409.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM, were in fact known to New GM as of the time of its creation in 2009 and at every point thereafter, New GM had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Arkansas Class.  New GM also had a duty to disclose because it made many general affirmative representations about the safety, quality, and lack of defects in its vehicles, as set forth above, which were misleading, deceptive and incomplete without the disclosure of the additional facts set forth above regarding its actual safety record, safety philosophy, and practices and the actual safety defects in its vehicles.  Having volunteered to

- 413 -

provide information to Plaintiffs, GM had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Arkansas Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1410.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Arkansas Class.

1411.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Arkansas Class and conceal material information regarding defects that exist in GM-branded vehicles.

1412.   Plaintiffs and the Arkansas Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased cars manufactured by New GM; and/or they would not have purchased cars manufactured by Old GM in the time after New GM had come into existence and had fraudulently opted to conceal, and to misrepresent, the true facts about the vehicles; and/or would not have continued to drive their vehicles or would have taken other affirmative steps.  Plaintiffs' and the Arkansas Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Arkansas Class.

1413.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Arkansas Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of

GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs who purchased new or Certified Previously Owned vehicles after New GM came into existence either would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs regardless of time of purchase or lease would have maintained their vehicles.

1414.   The value of all Arkansas Class Members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which have greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1415.   Accordingly, New GM is liable to the Arkansas Class for damages in an amount to be proven at trial.

1416.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Arkansas Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (ARK. CODE ANN. § 4-2-314)

1417.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 415 -

1418.   This claim is brought only on behalf of members of the Nationwide Post-Sale Ignition Switch Defect Subclass  and are Arkansas residents (the "Arkansas Post-Sale ISD Subclass").

1419.   New GM was a merchant with respect to motor vehicles within the meaning of ARK. CODE ANN. § 4-2-104(1).

1420.   Under ARK. CODE ANN. § 4-2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Ignition Switch Vehicles from New GM on or after July 11, 2009.

1421.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1422.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Arkansas Post-Sale ISD Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1423.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Arkansas Post-Sale ISD Subclass members have been damaged in an amount to be proven at trial.

## COUNT IV
## FRAUD BY CONCEALMENT OF THE RIGHT
## TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

1424.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1425.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Arkansas residents **and** who owned their Old GM Defective Ignition Switch Vehicle for at least some period of time between July 11, 2009 and November 30, 2009 (for the purposes of this claim only, the "Arkansas Pre-Sale ISD Subclass").

1426.   New GM was aware of the ignition switch defects in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order And Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1427.   As the bankruptcy court found, "As of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  New GM necessarily had this same knowledge from day one of its existence, as the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion."

1428.   The Arkansas Pre-Sale ISD Subclass did not receive notice of the ignition switch defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the ignition switch defect.

1429.   In September of 2009, the bankruptcy court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1430.   Because New GM concealed its knowledge of the ignition switch defect, the Arkansas Pre-Sale ISD Subclass did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the ignition switch defects.

1431.   In 2011, the bankruptcy court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1432.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1433.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1434.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

- 418 -

1435.   As of September 30, 2014,  the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million – all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1436.   The bankruptcy court found that the Pre-Sale Ignition Switch Defect Subclass members were deprived of Due Process because they did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  While the court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars the Pre-Sale Ignition Switch Defect Subclass from tapping into the GUC Trust assets.

1437.   But for New GM's fraudulent concealment of the ignition switch defects, the Arkansas Pre-Sale ISD Subclass (and the Pre-Sale Ignition Switch Defect Subclass members from every state) would have filed claims against Old GM before the Bar Date.

1438.   Had the Arkansas Pre-Sale ISD Subclass filed timely claims before the Bar Date, the claims would have been allowed, as would have the claims of the entire Pre-Sale Ignition Switch Defect Subclass.

1439.   Had the claims of the Pre-Sale Ignition Switch Defect Subclass been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of the Pre-Sale Ignition Switch Defect Subclass.

1440.   New GM's concealment and suppression of the material fact of the ignition switch defect over the first several months of its existence served to prevent the filing of claims by the Pre-Sale Ignition Switch Defect Subclass and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

- 419 -

1441.   New GM had a duty to disclose the ignition switch defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Arkansas Pre-Sale ISD Subclass.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Defective Ignition Switch Vehicles purchased or leased by Plaintiffs and the Arkansas Pre-Sale ISD Subclass, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.

1442.   Plaintiffs and the Arkansas Pre-Sale ISD Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Arkansas Pre-Sale ISD Subclass's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Arkansas Pre-Sale ISD Subclass.

1443.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Arkansas Pre-Sale ISD Subclass sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1444.   Accordingly, New GM is liable to the Arkansas Pre-Sale ISD Subclass members for their damages in an amount to be proven at trial.

1445.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Arkansas Pre-Sale ISD Subclass's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive

damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## THIRD-PARTY BENEFICIARY CLAIM

1446.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1447.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Arkansas residents (the "Arkansas Pre-Sale ISD Subclass").

1448.   In the Sales Agreement through which New GM acquired substantially all of the assets of New GM, New GM explicitly agreed as follows:

> From and after the Closing, [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

1449.   With the exception of the portion of the agreement that purports to immunize New GM from its own independent misconduct with respect to cars and parts made by Old GM, the Sales Agreement is a valid and binding contract.

1450.   But for New GM's covenant to comply with the TREAD Act with respect to cars and parts made by Old GM, the TREAD Act would have no application to New GM with respect to those cars and parts.  That is because the TREAD Act on its face imposes reporting and recall obligations only on the "manufacturers" of a vehicle.  49 U.S.C. § 30118(c).

1451.   Because New GM agreed to comply with the TREAD Act with respect to vehicles manufactured by Old GM, New GM agreed to (among other things): (a) make quarterly

submissions to NHTSA of "early warning reporting" data, including incidents involving death, injury, or property damage, warranty claims, consumer complaints, and field reports concerning failure, malfunction, lack of durability or other performance issues.  *See* 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21; (b) retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety.  *See* 49 C.F.R. §§ 576.5 to 576.6; and (c) take *immediate* remedial action if it knows or should know that a safety defect exists – including notifying NHTSA and consumers and ordering a recall if necessary.  *See* 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c); 49 C.F.R. §§ 577.5(a), 577.7(a).

1452.   Plaintiffs, as owners and lessors of vehicles and parts manufactured by Old GM, are the clear intended beneficiaries of New GM's agreement to comply with the TREAD Act. Under the Sale Agreement, Plaintiffs were to receive the benefit of having a manufacturer responsible for monitoring the safety of their Old GM vehicles and making certain that any known safety defects would be promptly remedied.

1453.   Although the Sale Order which consummated New GM's purchase of Old GM purported to give New GM immunity from claims concerning vehicles or parts made by Old GM, the bankruptcy court recently ruled that provision to be unenforceable, and that New GM can be held liable for its own post-bankruptcy sale conduct with respect to cars and parts made by Old GM.  Therefore, that provision of the Sale Order and related provisions of the Sale Agreement cannot be read to bar Plaintiffs' third-party beneficiary claim as it is based solely on New GM's post-sale breaches of the promise it made in the Sale Agreement.

1454.   New GM breached its covenant to comply with the TREAD Act with respect to the Old GM Defective Ignition Switch Vehicles, as it failed to take action to remediate the Ignition Switch Defect until 2014 when it finally issued a recall.

1455.   Plaintiffs and the Arkansas Pre-Sale ISD Subclass were damaged as a result of New GM's breach.  Because of New GM's failure to timely remedy the ignition switch defect, the value of Old GM Defective Ignition Switch Vehicles has diminished in an amount to be determined at trial.

**COUNT VI**

**UNJUST ENRICHMENT**

1456.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1457.   This claim is brought on behalf of members of the Arkansas Class who purchased New GM vehicles, or Certified Pre-Owned GM vehicles in the time period after New GM came into existence, and who purchased or leased Defective Ignition Switch Vehicles in the time period before New GM came into existence, which cars were still on the road after New GM came into existence (the "Arkansas Unjust Enrichment Class").

1458.   New GM has received and retained a benefit from the Plaintiffs and inequity has resulted.

1459.   New GM has benefitted from selling and leasing defective cars, including Certified Pre-Owned cars, whose value was artificially inflated by New GM's concealment of systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

1460.   With respect to the Defective Ignition Switch Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to

- 423 -

which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

1461.   Thus, all Arkansas Unjust Enrichment Class Members conferred a benefit on New GM.

1462.   It is inequitable for New GM to retain these benefits.

1463.   Plaintiffs were not aware about the true facts about GM-branded vehicles, and did not benefit from GM's conduct.

1464.   New GM knowingly accepted the benefits of its unjust conduct.

1465.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**CALIFORNIA**

**COUNT I**

**VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT**

**(CAL. CIV. CODE § 1750, *et seq.*)**

1466.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1467.   This claim is brought only on behalf of Nationwide Class Members who are California residents.

1468.   New GM is a "person" under CAL. CIV. CODE § 1761(c).

1469.   Plaintiffs and the California Class are "consumers," as defined by CAL. CIVIL CODE § 1761(d), who purchased or leased one or more Affected Vehicles.

1470.   The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the

- 424 -

sale or lease of goods or services to any consumer[.]"  CAL. CIV. CODE § 1770(a).  New GM has

engaged in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et seq*., as

described above and below, by among other things, representing that Affected Vehicles have

characteristics, uses, benefits, and qualities which they do not have; representing that Affected

Vehicles are of a particular standard, quality, and grade when they are not; advertising Affected

Vehicles with the intent not to sell or lease them as advertised; and representing that the subject

of a transaction involving Affected Vehicles has been supplied in accordance with a previous

representation when it has not.

1471.   In the course of its business, New GM systematically devalued safety and

concealed a plethora of defects in GM-branded vehicles as described herein and otherwise

engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful

trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression or omission of any material fact with intent that others rely upon such

concealment, suppression or omission, in connection with the sale of Affected Vehicles.

1472.   From the date of its inception on July 11, 2009, New GM knew of many serious

defects affecting many models and years of GM-branded vehicles, because of (i) the knowledge

of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and

notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD

Act obligations, as discussed above.  New GM became aware of other serious defects and

systemic safety issues years ago, but concealed all of that information until recently.

1473.   New GM was also aware that it valued cost-cutting over safety, selected parts

from the cheapest supplier regardless of quality, and actively discouraged employees from

finding and flagging known safety defects, and that this approach would necessarily cause the

existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1474.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1475.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the CLRA.

1476.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1477.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1478.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the California Class.

1479.   New GM knew or should have known that its conduct violated the CLRA.

1480.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles and the GM brand that were either false or misleading.

1481.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

     a.     Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

     b.     Intentionally concealed the foregoing from Plaintiffs; and/or

     c.     Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch  and other defects in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1482.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

1483.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the California Class.  A vehicle

made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects

rather than promptly remedies them.

1484.   Plaintiffs and the California Class suffered ascertainable loss caused by

New GM's misrepresentations and its concealment of and failure to disclose material

information.  Plaintiffs who purchased GM-branded vehicles after the date of New GM's

inception either would have paid less for their vehicles or would not have purchased or leased

them at all.  For Plaintiffs who purchased Old GM Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned," they too either would have paid less for their vehicles or would not have purchased them but for New GM's violations of the CLRA.

1485.   Regardless of time of purchase or lease, no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the CLRA.  And, in any event, all GM vehicle owners suffered ascertainable loss of the diminished value of their vehicles as a result of New GM's deceptive and unfair acts and practices made in the course of New GM's business.

1486.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1487.   As a direct and proximate result of New GM's violations of the CLRA, Plaintiffs and the California Class have suffered injury-in-fact and/or actual damage.

1488.   Under CAL. CIV. CODE § 1780(a), Plaintiffs and the California Class seek monetary relief against New GM measured as the diminution of the value of their vehicles caused by New GM's violations of the CLRA as alleged herein.

1489.   Under CAL. CIV. CODE § 1780(b), Plaintiffs seek an additional award against New GM of up to $5,000 for each California Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  New GM knew or should have known that its conduct was

directed to one or more California Class Members who are senior citizens or disabled persons. New GM's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more California Class Members who are senior citizens or disabled persons are substantially more vulnerable to New GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from New GM's conduct.

1490.   Plaintiffs also seek punitive damages against New GM because it carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the California Class to potential cruel and unjust hardship as a result. New GM intentionally and willfully deceived Plaintiffs on life-or-death matters, and concealed material facts that only New GM knew.  New GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under CAL. CIV. CODE § 3294.

1491.   Plaintiffs further seek an order enjoining New GM's unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

1492.   Certain Plaintiffs have sent a letter complying with CAL. CIV. CODE § 1780(b).

## COUNT II

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

### (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

1493.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1494.   This claim is brought only on behalf of Nationwide Class Members who are California residents (the "California Class").

1495.   California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."  New GM has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

1496.   New GM violated the unlawful prong of § 17200 by the following:

     a.     violations of the CLRA, CAL. CIV. CODE § 1750, *et seq*., as set forth in California Count I by the acts and practices set forth in this Complaint.

     b.     violation of the common-law claim of negligent failure to recall, in that New GM knew or should have known that the Defective Ignition Switch Vehicles, and many other vehicles suffering myriad other defects, were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner; New GM became aware of the attendant risks after the Defective Ignition Switch Vehicles and other defective vehicles were sold; continued to gain information further corroborating the ignition switch defects and many other defects; and failed to adequately recall the Defective Ignition Switch Vehicles and many other vehicles in a timely manner, which failure was a substantial factor in causing Plaintiffs and the Class harm, including diminished value and out-of-pocket costs.

     c.     violation of the National Traffic and Motor Vehicle Safety Act of 1996, codified at 49 U.S.C. §§ 30101-30170, and its regulations.  Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor vehicle manufacturer's responsibility to notify NHTSA of a motor vehicle defect within five days of determining that the defect is safety related.  *See* 49 C.F.R. § 573.6.  New GM violated these reporting requirements by failing to report the myriad defects discussed herein within the required time, and failing to timely recall all impacted vehicles, despite its explicit promise in § 6.15 of the Sales Agreement to comply with the Safety Act obligations of a "manufacturer" of Old GM vehicles.

- 430 -

1497.   New GM also violated the unfair and fraudulent prong of section 17200 by systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, information that was material to a reasonable consumer.

1498.   New GM also violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint, including systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, offend established public policy, and also because the harm New GM caused consumers greatly outweighs any benefits associated with those practices.  New GM's conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs and the California Class from making fully informed decisions about whether to lease, purchase and/or retain the Affected Vehicles.

1499.   From the date of its inception on July 11, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, because of (i) the knowledge of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1500.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1501.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1502.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unlawful, unfair, or fraudulent business acts or practices in violation of the UCL.

1503.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1504.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1505.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the California Class.

1506.   New GM knew or should have known that its conduct violated the UCL.

1507.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles and the GM brand that were either false or misleading.

1508.  New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch and other defects in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1509.  Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1510.  New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the California Class.  A vehicle made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

1511.  Plaintiffs and the California Class suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs who purchased GM-branded vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased

them at all.  For Plaintiffs who purchased Old GM Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned," they too either would have paid less for their vehicles or would not have purchased them but for New GM's violations of the UCL.

1512.   Regardless of time of purchase or lease, no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the UCL.  And, in any event, all GM vehicle owners suffered ascertainable loss in the form of diminished value of their vehicles as a result of New GM's deceptive and unfair acts and practices made in the course of New GM's business.

1513.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  Its unlawful acts and practices complained of herein affect the public interest.

1514.   As a direct and proximate result of New GM's violations of the UCL, Plaintiffs and the California Class have suffered injury-in-fact and/or actual damage.

1515.   Plaintiffs request that this Court enter such orders or judgments as may be necessary, including a declaratory judgment that New GM has violated the UCL; an order enjoining New GM from continuing its unfair, unlawful, and/or deceptive practices; an order supervising the recalls; an order and judgment restoring to the California Class Members any money lost as the result of New GM's unfair, unlawful, and deceptive trade practices, including restitution and disgorgement of any profits New GM received as a result of its unfair, unlawful,

and/or deceptive practices, as provided in CAL. BUS. & PROF. CODE § 17203, CAL CIV. PROC.

§ 384 and CAL. CIV. CODE § 3345; and for such other relief as may be just and proper.

## COUNT III

## FRAUD BY CONCEALMENT

1516.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1517.   This claim is brought on behalf of Nationwide Class Members who are California residents (the "California Class").

1518.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1519.   New GM concealed and suppressed material facts concerning the culture of New GM – a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1520.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1521.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles and Certified Previously Owned vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

1522.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM, were in fact known to New GM as

- 435 -

of the time of its creation in 2009 and at every point thereafter, New GM had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the California Class.  New GM also had a duty to disclose because it made many general affirmative representations about the safety, quality, and lack of defects in its vehicles, as set forth above, which were misleading, deceptive and incomplete without the disclosure of the additional facts set forth above regarding its actual safety record, safety philosophy, and practices and the actual safety defects in its vehicles.  Having volunteered to provide information to Plaintiffs, GM had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the California Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1523.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the California Class.

1524.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the California Class and conceal material information regarding defects that exist in GM-branded vehicles.

1525.   Plaintiffs and the California Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased cars manufactured by New GM; and/or they would not have purchased cars manufactured by Old GM in the time after New GM had come into existence and had fraudulently opted to conceal, and to misrepresent, the true facts about the

vehicles; and/or would not have continued to drive their vehicles or would have taken other affirmative steps.  Plaintiffs' and the California Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the California Class.

1526.   Because of the concealment and/or suppression of the facts, Plaintiffs and the California Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs who purchased new or Certified Previously Owned vehicles after New GM came into existence either would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs regardless of time of purchase or lease would have maintained their vehicles.

1527.   The value of all California Class Members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which have greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1528.   Accordingly, New GM is liable to the California Class for damages in an amount to be proven at trial.

1529.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the California Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an

amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (CAL. CIV. CODE §§ 1791.1 & 1792)

1530.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1531.   This claim is brought only on behalf of California residents who are members of the Nationwide Post-Sale Ignition Switch Defect Subclass and the Pre-Sale Ignition Switch Defect Subclass (the "California Post-Sale ISD Subclass").

1532.   Plaintiffs and California Post-Sale ISD Subclass members are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

1533.   The Defective Ignition Switch Vehicles are "consumer goods" within the meaning of CIV. CODE § 1791(a).

1534.   New GM was a "manufacturer" of the Defective Ignition Switch Vehicles within the meaning of CAL. CIV. CODE § 1791(j).

1535.   New GM impliedly warranted to Plaintiffs and the California Post-Sale ISD Subclass that its Defective Ignition Switch Vehicles sold or leased on or after July 11, 2009 were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792; however, the Defective Ignition Switch Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

1536.   CAL. CIV. CODE § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)     Pass without objection in the trade under the contract description.

(2)     Are fit for the ordinary purposes for which such goods are used.

(3)     Are adequately contained, packaged, and labeled.

(4)     Conform to the promises or affirmations of fact made on the container or label.

1537.   The Defective Ignition Switch Vehicles would not pass without objection in the automotive trade because of the ignition switch defects that cause the Defective Ignition Switch Vehicles to inadvertently shut down during ordinary driving conditions, leading to an unreasonable likelihood of accident and an unreasonable likelihood that such accidents will cause serious bodily harm or death to vehicle occupants.

1538.   Because of the ignition switch defects, the Defective Ignition Switch Vehicles are not safe to drive and thus not fit for ordinary purposes.

1539.   The Defective Ignition Switch Vehicles are not adequately labeled because the labeling fails to disclose the ignition switch defects and does not advise Class Members to avoid attaching anything to their vehicle key rings.  New GM failed to warn about the dangerous safety defects in the Defective Ignition Switch Vehicles.

1540.   New GM breached the implied warranty of merchantability by selling Defective Ignition Switch Vehicles containing defects leading to the sudden and unintended shut down of the vehicles during ordinary driving conditions.  These defects have deprived Plaintiffs and the California Post-Sale ISD Subclass of the benefit of their bargain and have caused the Defective Ignition Switch Vehicles to depreciate in value.

1541.   Notice of breach is not required because Plaintiffs and California Post-Sale ISD Subclass members did not purchase their automobiles directly from New GM.

1542.   As a direct and proximate result New GM's breach of its duties under California's Lemon Law, Plaintiffs and California Post-Sale ISD Subclass members received goods whose dangerous condition substantially impairs their value.  Plaintiffs and the California Post-Sale ISD Subclass members have been damaged by the diminished value of their vehicles, the product's malfunctioning, and the loss of use of their Defective Ignition Switch Vehicles.

1543.   Under CAL. CIV. CODE §§ 1791.1(d) & 1794, Plaintiffs and California Post-Sale ISD Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Defective Ignition Switch Vehicles, or the overpayment or diminution in value of their Defective Ignition Switch Vehicles.

1544.   Under CAL. CIV. CODE § 1794, Plaintiffs and California Post-Sale ISD Subclass members are entitled to costs and attorneys' fees.

## COUNT V

## NEGLIGENT FAILURE TO RECALL

1545.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1546.   This claim is brought only on behalf of California residents who are members of the Nationwide Post-Sale Ignition Switch Defect Subclass and the Pre-Sale Ignition Switch Defect Subclass (the "California Ignition Switch Defect Subclass").

1547.   New GM manufactured, distributed, and sold  Defective Ignition Switch Vehicles.

1548.   New GM knew or reasonably should have known that the Defective Ignition Switch Vehicles were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner.

- 440 -

1549.   New GM either knew of the ignition switch defects before the vehicles were sold, or became aware of the ignition switch defects and their attendant risks after the vehicles were sold.

1550.   New GM continued to gain information further corroborating the ignition switch defects and their risks from its inception until this year.

1551.   New GM failed to adequately recall the Defective Ignition Switch Vehicles in a timely manner.

1552.   Purchasers of the Defective Ignition Switch Vehicles, including the California Ignition Switch Defect Subclass, were harmed by New GM's failure to adequately recall all the Defective Ignition Switch Vehicles in a timely manner and have suffered damages, including, without limitation, damage to other components of the Defective Ignition Switch Vehicles caused by the Ignition Switch Defects, the diminished value of the Defective Ignition Switch Vehicles, the cost of modification of the defective ignition switch systems, and the costs associated with the loss of use of the Defective Ignition Switch Vehicles.

1553.   New GM's failure to timely and adequately recall the Defective Ignition Switch Vehicles was a substantial factor in causing the purchasers' harm, including that of Plaintiffs and the California Ignition Switch Defect Subclass.

### COUNT VI
### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

1554.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1555.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are California residents *and* who owned their Old GM Defective Ignition Switch

Vehicle for at least some period of time between July 11, 2009 and November 30, 2009 (for the purposes of this claim only, the "California Pre-Sale ISD Subclass").

1556.   New GM was aware of the ignition switch defects in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order And Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1557.   As the bankruptcy court found, "As of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  New GM necessarily had this same knowledge from day one of its existence, as the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion."

1558.   The California Pre-Sale ISD Subclass did not receive notice of the ignition switch defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the ignition switch defect.

1559.   In September of 2009, the bankruptcy court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1560.   Because New GM concealed its knowledge of the ignition switch defect, the California Pre-Sale ISD Subclass did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the

- 442 -

publication notice sent in connection with the Bar Date Order mentioned the ignition switch defects.

1561.   In 2011, the bankruptcy court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1562.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1563.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1564.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1565.   As of September 30, 2014,  the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million – all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1566.   The bankruptcy court found that the Pre-Sale Ignition Switch Defect Subclass members were deprived of Due Process because they did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  While the court found that these vehicle owners

- 443 -

may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars the Pre-Sale Ignition Switch Defect Subclass from tapping into the GUC Trust assets.

1567.   But for New GM's fraudulent concealment of the ignition switch defects, the California Pre-Sale ISD Subclass (and the Pre-Sale Ignition Switch Defect Subclass members from every state) would have filed claims against Old GM before the Bar Date.

1568.   Had the California Pre-Sale ISD Subclass filed timely claims before the Bar Date, the claims would have been allowed, as would have the claims of the entire Pre-Sale Ignition Switch Defect Subclass.

1569.   Had the claims of the Pre-Sale Ignition Switch Defect Subclass been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of the Pre-Sale Ignition Switch Defect Subclass.

1570.   New GM's concealment and suppression of the material fact of the ignition switch defect over the first several months of its existence served to prevent the filing of claims by the Pre-Sale Ignition Switch Defect Subclass and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1571.   New GM had a duty to disclose the ignition switch defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the California Pre-Sale ISD Subclass.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Defective Ignition Switch Vehicles purchased or leased by Plaintiffs and the California Pre-Sale ISD Subclass, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.

1572.   Plaintiffs and the California Pre-Sale ISD Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the California Pre-Sale ISD Subclass's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the California Pre-Sale ISD Subclass.

1573.   Because of the concealment and/or suppression of the facts, Plaintiffs and the California Pre-Sale ISD Subclass sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1574.   Accordingly, New GM is liable to the California Pre-Sale ISD Subclass members for their damages in an amount to be proven at trial.

1575.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the California Pre-Sale ISD Subclass's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VII
## THIRD-PARTY BENEFICIARY CLAIM

1576.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1577.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are California residents (the "California Pre-Sale ISD Subclass").

1578.   In the Sales Agreement through which New GM acquired substantially all of the assets of New GM, New GM explicitly agreed as follows:

> From and after the Closing, [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

1579.   With the exception of the portion of the agreement that purports to immunize New GM from its own independent misconduct with respect to cars and parts made by Old GM, the Sales Agreement is a valid and binding contract.

1580.   But for New GM's covenant to comply with the TREAD Act with respect to cars and parts made by Old GM, the TREAD Act would have no application to New GM with respect to those cars and parts.  That is because the TREAD Act on its face imposes reporting and recall obligations only on the "manufacturers" of a vehicle.  49 U.S.C. § 30118(c).

1581.   Because New GM agreed to comply with the TREAD Act with respect to vehicles manufactured by Old GM, New GM agreed to (among other things): (a) make quarterly submissions to NHTSA of "early warning reporting" data, including incidents involving death, injury, or property damage, warranty claims, consumer complaints, and field reports concerning failure, malfunction, lack of durability or other performance issues.  *See* 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21; (b) retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety.  *See* 49 C.F.R. §§ 576.5 to 576.6; and (c) take *immediate* remedial action if it knows or should know that a safety defect exists – including notifying

NHTSA and consumers and ordering a recall if necessary.  *See* 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c); 49 C.F.R. §§ 577.5(a), 577.7(a).

1582.   Plaintiffs, as owners and lessors of vehicles and parts manufactured by Old GM, are the clear intended beneficiaries of New GM's agreement to comply with the TREAD Act. Under the Sale Agreement, Plaintiffs were to receive the benefit of having a manufacturer responsible for monitoring the safety of their Old GM vehicles and making certain that any known safety defects would be promptly remedied.

1583.   Although the Sale Order which consummated New GM's purchase of Old GM purported to give New GM immunity from claims concerning vehicles or parts made by Old GM, the bankruptcy court recently ruled that provision to be unenforceable, and that New GM can be held liable for its own post-bankruptcy sale conduct with respect to cars and parts made by Old GM.  Therefore, that provision of the Sale Order and related provisions of the Sale Agreement cannot be read to bar Plaintiffs' third-party beneficiary claim as it is based solely on New GM's post-sale breaches of the promise it made in the Sale Agreement.

1584.   New GM breached its covenant to comply with the TREAD Act with respect to the Old GM Defective Ignition Switch Vehicles, as it failed to take action to remediate the Ignition Switch Defect until 2014 when it finally issued a recall.

1585.   Plaintiffs and the California Pre-Sale ISD Subclass were damaged as a result of New GM's breach.  Because of New GM's failure to timely remedy the ignition switch defect, the value of Old GM Defective Ignition Switch Vehicles has diminished in an amount to be determined at trial.

## COUNT VIII

## UNJUST ENRICHMENT

1586.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1587.   This claim is brought on behalf of members of the California Class who purchased New GM vehicles, or Certified Pre-Owned GM vehicles in the time period after New GM came into existence, and who purchased or leased Defective Ignition Switch Vehicles in the time period before New GM came into existence, which cars were still on the road after New GM came into existence (the "California Unjust Enrichment Class").

1588.   New GM has received and retained a benefit from the Plaintiffs and inequity has resulted.

1589.   New GM has benefitted from selling and leasing defective cars, including Certified Pre-Owned cars, whose value was artificially inflated by New GM's concealment of systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

1590.   With respect to the Defective Ignition Switch Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

1591.   Thus, all California Unjust Enrichment Class Members conferred a benefit on New GM.

1592.   It is inequitable for New GM to retain these benefits.

1593.   Plaintiffs were not aware about the true facts about GM-branded vehicles, and did not benefit from GM's conduct.

1594.   New GM knowingly accepted the benefits of its unjust conduct.

1595.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**COLORADO**

**COUNT I**

**VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**

**(COL. REV. STAT. § 6-1-101, *et seq.*)**

1596.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1597.   This claim is brought only on behalf of Nationwide Class Members who are Colorado residents (the "Colorado Class").

1598.   New GM is a "person" under § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), COL. REV. STAT. § 6-1-101, *et seq*.

1599.   Plaintiffs and Colorado Class Members are "consumers" for purposes of COL. REV. STAT § 6-1-113(1)(a) who purchased or leased one or more Affected Vehicles.

1600.   The Colorado CPA prohibits deceptive trade practices in the course of a person's business.  New GM engaged in deceptive trade practices prohibited by the Colorado CPA, including:  (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Affected Vehicles that had the capacity or tendency to deceive Colorado Class Members; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade even though New GM knew or should have known they are not; (3) advertising the Affected Vehicles with the intent not to sell them as advertised; and (4) failing to disclose

- 449 -

material information concerning the Affected Vehicles that was known to New GM at the time of advertisement or sale with the intent to induce Colorado Class Members to purchase, lease or retain the Affected Vehicles.

1601.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles.

1602.   New GM's actions as set forth above occurred in the conduct of trade or commerce.

1603.   From the date of its inception on July 11, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, because of (i) the knowledge of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD Act obligations, as discussed above. New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1604.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1605.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1606.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Colorado CPA.

1607.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1608.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1609.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Colorado Class.

1610.   New GM knew or should have known that its conduct violated the Colorado CPA.

1611.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles and the GM brand that were either false or misleading.

1612.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

- 451 -

a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b.   Intentionally concealed the foregoing from Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch and other defects in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1613.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1614.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Colorado Class.  A vehicle made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1615.   Plaintiffs and the Colorado Class suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased GM-branded vehicles after the date of New GM's inception  either would have paid less for their vehicles or would not have purchased or leased them at all .  For Plaintiffs who purchased Old GM Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned,"

they too either would have paid less for their vehicles or would not have purchased them but for New GM's violations of the Colorado CPA.

1616.   Regardless of time of purchase or lease, no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the Colorado CPA.  And, in any event, all GM vehicle owners suffered ascertainable loss in the form of diminished value of their vehicles as a result of New GM's deceptive and unfair acts and practices made in the course of New GM's business.

1617.   Plaintiffs and Colorado Class Members risk irreparable injury as a result of New GM's act and omissions in violation of the Colorado CPA, and these violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1618.   As a direct and proximate result of New GM's violations of the Colorado CPA, Plaintiffs and the Colorado Class have suffered injury-in-fact and/or actual damage.

1619.   Pursuant to COLO. REV. STAT. § 6-1-113, Plaintiffs, individually and on behalf of the Colorado Class, seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff and each Colorado Class member.

1620.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

## COUNT II

## FRAUD BY CONCEALMENT

1621.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1622.   This claim is brought on behalf of Nationwide Class Members who are Colorado residents (the "Colorado Class").

1623.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1624.   New GM concealed and suppressed material facts concerning the culture of New GM – a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1625.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1626.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles and Certified Previously Owned vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

- 454 -

1627.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM, were in fact known to New GM as of the time of its creation in 2009 and at every point thereafter, New GM had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Colorado Class.  New GM also had a duty to disclose because it made many general affirmative representations about the safety, quality, and lack of defects in its vehicles, as set forth above, which were misleading, deceptive and incomplete without the disclosure of the additional facts set forth above regarding its actual safety record, safety philosophy, and practices and the actual safety defects in its vehicles.  Having volunteered to provide information to Plaintiffs, GM had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Colorado Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1628.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Colorado Class.

1629.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Colorado Class and conceal material information regarding defects that exist in GM-branded vehicles.

1630.   Plaintiffs and the Colorado Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased cars manufactured by New GM; and/or they would not

- 455 -

have purchased cars manufactured by Old GM in the time after New GM had come into existence and had fraudulently opted to conceal, and to misrepresent, the true facts about the vehicles; and/or would not have continued to drive their vehicles or would have taken other affirmative steps.  Plaintiffs' and the Colorado Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Colorado Class.

1631.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Colorado Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs who purchased new or Certified Previously Owned vehicles after New GM came into existence either would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs regardless of time of purchase or lease would have maintained their vehicles.

1632.   The value of all Colorado Class Members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which have greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1633.   Accordingly, New GM is liable to the Colorado Class for damages in an amount to be proven at trial.

1634.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Colorado Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

**(COL. REV. STAT. § 4-2-314)**

1635.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1636.   This claim is brought only on behalf of Colorado residents who are members of the Nationwide Post-Sale Ignition Switch Defect Subclass and the Pre-Sale Ignition Switch Defect Subclass (the "Colorado Post-Sale ISD Subclass").

1637.   New GM was a merchant with respect to motor vehicles.

1638.   Under COL. REV. STAT. § 4-2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Ignition Switch Vehicles from New GM on or after July 11, 2009.

1639.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

- 457 -

1640.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Colorado Post-Sale ISD Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1641.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Colorado Post-Sale ISD Subclass members have been damaged in an amount to be proven at trial.

**COUNT IV**
**FRAUD BY CONCEALMENT OF THE RIGHT**
**TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY**

1642.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1643.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Colorado residents *and* who owned their Old GM Defective Ignition Switch Vehicle for at least some period of time between July 11, 2009 and November 30, 2009 (for the purposes of this claim only, the "Colorado Pre-Sale ISD Subclass").

1644.   New GM was aware of the ignition switch defects in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order And Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1645.   As the bankruptcy court found, "As of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  New GM necessarily had this same knowledge from day one of its existence, as the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including

- 458 -

engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion."

1646.   The Colorado Pre-Sale ISD Subclass did not receive notice of the ignition switch defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the ignition switch defect.

1647.   In September of 2009, the bankruptcy court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1648.   Because New GM concealed its knowledge of the ignition switch defect, the Colorado Pre-Sale ISD Subclass did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the ignition switch defects.

1649.   In 2011, the bankruptcy court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1650.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1651.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured

claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1652.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1653.   As of September 30, 2014,  the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million – all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1654.   The bankruptcy court found that the Pre-Sale Ignition Switch Defect Subclass members were deprived of Due Process because they did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  While the court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars the Pre-Sale Ignition Switch Defect Subclass from tapping into the GUC Trust assets.

1655.   But for New GM's fraudulent concealment of the ignition switch defects, the Colorado Pre-Sale ISD Subclass (and the Pre-Sale Ignition Switch Defect Subclass members from every state) would have filed claims against Old GM before the Bar Date.

1656.   Had the Colorado Pre-Sale ISD Subclass filed timely claims before the Bar Date, the claims would have been allowed, as would have the claims of the entire Pre-Sale Ignition Switch Defect Subclass.

1657.   Had the claims of the Pre-Sale Ignition Switch Defect Subclass been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have

- 460 -

been required to contribute additional New GM Securities to the GUC Trust for the benefit of the Pre-Sale Ignition Switch Defect Subclass.

1658. New GM's concealment and suppression of the material fact of the ignition switch defect over the first several months of its existence served to prevent the filing of claims by the Pre-Sale Ignition Switch Defect Subclass and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1659. New GM had a duty to disclose the ignition switch defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Colorado Pre-Sale ISD Subclass. These omitted and concealed facts were material because they directly impacted the safety and the value of the Defective Ignition Switch Vehicles purchased or leased by Plaintiffs and the Colorado Pre-Sale ISD Subclass, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.

1660. Plaintiffs and the Colorado Pre-Sale ISD Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Colorado Pre-Sale ISD Subclass's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Colorado Pre-Sale ISD Subclass.

1661. Because of the concealment and/or suppression of the facts, Plaintiffs and the Colorado Pre-Sale ISD Subclass sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their

vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1662.   Accordingly, New GM is liable to the Colorado Pre-Sale ISD Subclass members for their damages in an amount to be proven at trial.

1663.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Colorado Pre-Sale ISD Subclass's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V
## THIRD-PARTY BENEFICIARY CLAIM

1664.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1665.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Colorado residents (the "Colorado Pre-Sale ISD Subclass").

1666.   In the Sales Agreement through which New GM acquired substantially all of the assets of New GM, New GM explicitly agreed as follows:

> From and after the Closing, [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

1667.  With the exception of the portion of the agreement that purports to immunize New GM from its own independent misconduct with respect to cars and parts made by Old GM, the Sales Agreement is a valid and binding contract.

- 462 -

1668.  But for New GM's covenant to comply with the TREAD Act with respect to cars and parts made by Old GM, the TREAD Act would have no application to New GM with respect to those cars and parts.  That is because the TREAD Act on its face imposes reporting and recall obligations only on the "manufacturers" of a vehicle.  49 U.S.C. § 30118(c).

1669.  Because New GM agreed to comply with the TREAD Act with respect to vehicles manufactured by Old GM, New GM agreed to (among other things): (a) make quarterly submissions to NHTSA of "early warning reporting" data, including incidents involving death, injury, or property damage, warranty claims, consumer complaints, and field reports concerning failure, malfunction, lack of durability or other performance issues.  *See* 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21; (b) retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety.  *See* 49 C.F.R. §§ 576.5 to 576.6; and (c) take *immediate* remedial action if it knows or should know that a safety defect exists – including notifying NHTSA and consumers and ordering a recall if necessary.  *See* 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c); 49 C.F.R. §§ 577.5(a), 577.7(a).

1670.  Plaintiffs, as owners and lessors of vehicles and parts manufactured by Old GM, are the clear intended beneficiaries of New GM's agreement to comply with the TREAD Act. Under the Sale Agreement, Plaintiffs were to receive the benefit of having a manufacturer responsible for monitoring the safety of their Old GM vehicles and making certain that any known safety defects would be promptly remedied.

1671.  Although the Sale Order which consummated New GM's purchase of Old GM purported to give New GM immunity from claims concerning vehicles or parts made by Old GM, the bankruptcy court recently ruled that provision to be unenforceable, and that New GM

- 463 -

can be held liable for its own post-bankruptcy sale conduct with respect to cars and parts made by Old GM.  Therefore, that provision of the Sale Order and related provisions of the Sale Agreement cannot be read to bar Plaintiffs' third-party beneficiary claim as it is based solely on New GM's post-sale breaches of the promise it made in the Sale Agreement.

1672.   New GM breached its covenant to comply with the TREAD Act with respect to the Old GM Defective Ignition Switch Vehicles, as it failed to take action to remediate the Ignition Switch Defect until 2014 when it finally issued a recall.

1673.   Plaintiffs and the Colorado Pre-Sale ISD Subclass were damaged as a result of New GM's breach.  Because of New GM's failure to timely remedy the ignition switch defect, the value of Old GM Defective Ignition Switch Vehicles has diminished in an amount to be determined at trial.

**COUNT VI**

**UNJUST ENRICHMENT**

1674.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1675.   This claim is brought on behalf of members of the Colorado Class who purchased New GM vehicles, or Certified Pre-Owned GM vehicles in the time period after New GM came into existence, and who purchased or leased Defective Ignition Switch Vehicles in the time period before New GM came into existence, which cars were still on the road after New GM came into existence (the "Colorado Unjust Enrichment Class").

1676.   New GM has received and retained a benefit from the Plaintiffs and inequity has resulted.

1677.   New GM has benefitted from selling and leasing defective cars, including Certified Pre-Owned cars, whose value was artificially inflated by New GM's concealment of

- 464 -

systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

1678.   With respect to the Defective Ignition Switch Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

1679.   Thus, all Colorado Unjust Enrichment Class Members conferred a benefit on New GM.

1680.   It is inequitable for New GM to retain these benefits.

1681.   Plaintiffs were not aware about the true facts about GM-branded  vehicles, and did not benefit from GM's conduct.

1682.   New GM knowingly accepted the benefits of its unjust conduct.

1683.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**CONNECTICUT**

**COUNT I**

**VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT**

**(CONN. GEN. STAT. § 42-110A, *et seq*.)**

1684.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1685.   This claim is brought only on behalf of Class Members who are Connecticut residents (the "Connecticut Class").

- 465 -

1686.   The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  CONN. GEN. STAT. § 42-110b(a).

1687.   New GM is a "person" within the meaning of CONN. GEN. STAT. § 42-110a(3). New GM is in "trade" or "commerce" within the meaning of CONN. GEN. STAT. § 42-110a(4).

1688.   New GM participated in deceptive trade practices that violated the Connecticut UTPA as described herein.  In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles.

1689.   From the date of its inception on July 11, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, because of (i) the knowledge of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1690.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the

existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1691.  According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1692.  By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the Connecticut UTPA.

1693.  In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1694.  New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1695.  New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Connecticut Class.

1696.  New GM knew or should have known that its conduct violated the Connecticut UTPA.

1697.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles and the GM brand  that were either false or misleading.

1698.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;
>
> b.    Intentionally concealed the foregoing from Plaintiffs; and/or
>
> c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch  and other defects in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1699.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1700.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Connecticut Class.  A vehicle made by a reputable manufacturer of safe vehicles is safer and is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

1701.   Plaintiffs and the Connecticut Class suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose material

010440-11  784012 V1

information.  Plaintiffs who purchased GM-branded vehicles after the date of New GM's

inception  either would have paid less for their vehicles or would not have purchased or leased

them at all.  For Plaintiffs who purchased Old GM Defective Ignition Switch Vehicles that were

sold as "Certified Pre-Owned," they too either would have paid less for their vehicles or would

not have purchased them but for New GM's violations of the Connecticut UTPA.

1702.   Regardless of time of purchase or lease, no Plaintiffs would have maintained and

continued to drive their vehicles had they been aware of New GM's misconduct.  By

contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM

effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its

face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing

duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the

Connecticut UTPA.  And, in any event, all GM vehicle owners suffered ascertainable loss in the

form of diminished value of their vehicles as a result of New GM's deceptive and unfair acts and

practices made in the course of New GM's business.

1703.   New GM's violations present a continuing risk to Plaintiffs as well as to the

general public.  New GM's unlawful acts and practices complained of herein affect the public

interest.

1704.   As a direct and proximate result of New GM's violations of the Connecticut

UTPA, Plaintiffs and the Connecticut Class have suffered injury-in-fact and/or actual damage.

1705.   Plaintiffs and the Class are entitled to recover their actual damages, punitive

damages, and attorneys' fees pursuant to CONN. GEN. STAT. § 42-110g.

- 469 -

1706.   New GM acted with a reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights and safety of others.

## COUNT II

## FRAUDULENT CONCEALMENT

1707.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1708.   This claim is brought on behalf of Nationwide Class Members who are Connecticut residents (the "Connecticut Class").

1709.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1710.   New GM concealed and suppressed material facts concerning the culture of New GM – a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1711.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1712.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles and Certified Previously Owned vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

- 470 -

1713.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM, were in fact known to New GM as of the time of its creation in 2009 and at every point thereafter, New GM had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Connecticut Class.  New GM also had a duty to disclose because it made many general affirmative representations about the safety, quality, and lack of defects in its vehicles, as set forth above, which were misleading, deceptive and incomplete without the disclosure of the additional facts set forth above regarding its actual safety record, safety philosophy, and practices and the actual safety defects in its vehicles.  Having volunteered to provide information to Plaintiffs, GM had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Connecticut Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1714.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Connecticut Class.

1715.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Connecticut Class and conceal material information regarding defects that exist in GM-branded vehicles.

1716.   Plaintiffs and the Connecticut Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased cars manufactured by New GM; and/or they would not

have purchased cars manufactured by Old GM in the time after New GM had come into existence and had fraudulently opted to conceal, and to misrepresent, the true facts about the vehicles; and/or would not have continued to drive their vehicles or would have taken other affirmative steps.  Plaintiffs' and the Connecticut Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Connecticut Class.

1717.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Connecticut Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs who purchased new or Certified Previously Owned vehicles after New GM came into existence either would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs regardless of time of purchase or lease would have maintained their vehicles.

1718.   The value of all Connecticut Class Members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which have greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1719.   Accordingly, New GM is liable to the Connecticut Class for damages in an amount to be proven at trial.

1720.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Connecticut Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

1721.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1722.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Connecticut residents *and* who owned their Old GM Defective Ignition Switch Vehicle for at least some period of time between July 11, 2009 and November 30, 2009 (for the purposes of this claim only, the "Connecticut Pre-Sale ISD Subclass").

1723.   New GM was aware of the ignition switch defects in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order And Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1724.   As the bankruptcy court found, "As of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  New GM necessarily had this same knowledge from day one of its existence, as the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion."

- 473 -

1725.   The Connecticut Pre-Sale ISD Subclass did not receive notice of the ignition switch defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the ignition switch defect.

1726.   In September of 2009, the bankruptcy court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1727.   Because New GM concealed its knowledge of the ignition switch defect, the Connecticut Pre-Sale ISD Subclass did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the ignition switch defects.

1728.   In 2011, the bankruptcy court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1729.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1730.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1731.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1732.   As of September 30, 2014,  the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million – all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1733.   The bankruptcy court found that the Pre-Sale Ignition Switch Defect Subclass members were deprived of Due Process because they did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  While the court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars the Pre-Sale Ignition Switch Defect Subclass from tapping into the GUC Trust assets.

1734.   But for New GM's fraudulent concealment of the ignition switch defects, the Connecticut Pre-Sale ISD Subclass (and the Pre-Sale Ignition Switch Defect Subclass members from every state) would have filed claims against Old GM before the Bar Date.

1735.   Had the Connecticut Pre-Sale ISD Subclass filed timely claims before the Bar Date, the claims would have been allowed, as would have the claims of the entire Pre-Sale Ignition Switch Defect Subclass.

1736.   Had the claims of the Pre-Sale Ignition Switch Defect Subclass been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of the Pre-Sale Ignition Switch Defect Subclass.

1737.   New GM's concealment and suppression of the material fact of the ignition switch defect over the first several months of its existence served to prevent the filing of claims by the Pre-Sale Ignition Switch Defect Subclass and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1738.   New GM had a duty to disclose the ignition switch defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Connecticut Pre-Sale ISD Subclass.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Defective Ignition Switch Vehicles purchased or leased by Plaintiffs and the Connecticut Pre-Sale ISD Subclass, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.

1739.   Plaintiffs and the Connecticut Pre-Sale ISD Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Connecticut Pre-Sale ISD Subclass's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Connecticut Pre-Sale ISD Subclass.

1740.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Connecticut Pre-Sale ISD Subclass sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1741.   Accordingly, New GM is liable to the Connecticut Pre-Sale ISD Subclass members for their damages in an amount to be proven at trial.

1742.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Connecticut Pre-Sale ISD Subclass's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT IV
### THIRD-PARTY BENEFICIARY CLAIM

1743.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1744.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Connecticut residents (the "Connecticut Pre-Sale ISD Subclass").

1745.   In the Sales Agreement through which New GM acquired substantially all of the assets of New GM, New GM explicitly agreed as follows:

> From and after the Closing, [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

1746.   With the exception of the portion of the agreement that purports to immunize New GM from its own independent misconduct with respect to cars and parts made by Old GM, the Sales Agreement is a valid and binding contract.

1747.   But for New GM's covenant to comply with the TREAD Act with respect to cars and parts made by Old GM, the TREAD Act would have no application to New GM with respect

- 477 -

to those cars and parts.  That is because the TREAD Act on its face imposes reporting and recall obligations only on the "manufacturers" of a vehicle.  49 U.S.C. § 30118(c).

1748.   Because New GM agreed to comply with the TREAD Act with respect to vehicles manufactured by Old GM, New GM agreed to (among other things): (a) make quarterly submissions to NHTSA of "early warning reporting" data, including incidents involving death, injury, or property damage, warranty claims, consumer complaints, and field reports concerning failure, malfunction, lack of durability or other performance issues.  *See* 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21; (b) retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety.  *See* 49 C.F.R. §§ 576.5 to 576.6; and (c) take *immediate* remedial action if it knows or should know that a safety defect exists – including notifying NHTSA and consumers and ordering a recall if necessary.  *See* 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c); 49 C.F.R. §§ 577.5(a), 577.7(a).

1749.   Plaintiffs, as owners and lessors of vehicles and parts manufactured by Old GM, are the clear intended beneficiaries of New GM's agreement to comply with the TREAD Act. Under the Sale Agreement, Plaintiffs were to receive the benefit of having a manufacturer responsible for monitoring the safety of their Old GM vehicles and making certain that any known safety defects would be promptly remedied.

1750.   Although the Sale Order which consummated New GM's purchase of Old GM purported to give New GM immunity from claims concerning vehicles or parts made by Old GM, the bankruptcy court recently ruled that provision to be unenforceable, and that New GM can be held liable for its own post-bankruptcy sale conduct with respect to cars and parts made by Old GM.  Therefore, that provision of the Sale Order and related provisions of the Sale

- 478 -

Agreement cannot be read to bar Plaintiffs' third-party beneficiary claim as it is based solely on New GM's post-sale breaches of the promise it made in the Sale Agreement.

1751.   New GM breached its covenant to comply with the TREAD Act with respect to the Old GM Defective Ignition Switch Vehicles, as it failed to take action to remediate the Ignition Switch Defect until 2014 when it finally issued a recall.

1752.   Plaintiffs and the Connecticut Pre-Sale ISD Subclass were damaged as a result of New GM's breach.  Because of New GM's failure to timely remedy the ignition switch defect, the value of Old GM Defective Ignition Switch Vehicles has diminished in an amount to be determined at trial.

## COUNT V

## UNJUST ENRICHMENT

1753.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1754.   This claim is brought on behalf of members of the Connecticut Class who purchased New GM vehicles, or Certified Pre-Owned GM vehicles in the time period after New GM came into existence, and who purchased or leased Defective Ignition Switch Vehicles in the time period before New GM came into existence, which cars were still on the road after New GM came into existence (the "Connecticut Unjust Enrichment Class").

1755.   New GM has received and retained a benefit from the Plaintiffs and inequity has resulted.

1756.   New GM has benefitted from selling and leasing defective cars, including Certified Pre-Owned cars, whose value was artificially inflated by New GM's concealment of systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

1757.   With respect to the Defective Ignition Switch Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

1758.   Thus, all Connecticut Unjust Enrichment Class Members conferred a benefit on New GM.

1759.   It is inequitable for New GM to retain these benefits.

1760.   Plaintiffs were not aware about the true facts about GM-branded vehicles, and did not benefit from GM's conduct.

1761.   New GM knowingly accepted the benefits of its unjust conduct.

1762.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## DELAWARE

## COUNT I

## VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT

### (6 DEL. CODE § 2513, *et seq.*)

1763.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1764.   This claim is brought only on behalf of Nationwide Class Members who are Delaware residents (the "Delaware Class").

1765.   New GM is a "person" within the meaning of 6 DEL. CODE § 2511(7).

1766.   The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise,

misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."  6 DEL. CODE § 2513(a).

1767.   New GM participated in deceptive trade practices that violated the Delaware CFA as described herein.  In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles.

1768.   From the date of its inception on July 11, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, because of (i) the knowledge of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1769.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1770.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1771.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Delaware CFA.

1772.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1773.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1774.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Delaware Class.

1775.   New GM knew or should have known that its conduct violated the Delaware CFA.

1776.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles and the GM brand that were either false or misleading.

1777.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.      Possessed exclusive knowledge that it valued cost-cutting
> over safety, selected parts from the cheapest supplier
> regardless of quality, and actively discouraged employees
> from finding and flagging known safety defects, and that
> this approach would necessarily cause the existence of
> more defects in the vehicles it designed and manufactured;
>
> b.      Intentionally concealed the foregoing from Plaintiffs;
> and/or
>
> c.      Made incomplete representations about the safety and
> reliability of the Affected Vehicles generally, and the
> ignition switch and other defects in particular, while
> purposefully withholding material facts from Plaintiffs that
> contradicted these representations.

1778.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

1779.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Delaware Class.  A vehicle

made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects

rather than promptly remedying them.

1780.   Plaintiffs and the Delaware Class suffered ascertainable loss caused by

New GM's misrepresentations and its concealment of and failure to disclose material

information.  Plaintiffs who purchased GM-branded vehicles after the date of New GM's

inception either would have paid less for their vehicles or would not have purchased or leased

them at all.  For Plaintiffs who purchased Pre-Sale Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned," they too either would have paid less for their vehicles or would not have purchased them but for New GM's violations of the Delaware CFA.

1781.   Regardless of time of purchase or lease, no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the Delaware CFA.  And, in any event, all GM vehicle owners suffered ascertainable loss in the form of diminished value of their vehicles as a result of New GM's deceptive and unfair acts and practices made in the course of New GM's business.

1782.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1783.   As a direct and proximate result of New GM's violations of the Delaware CFA, Plaintiffs and the Delaware Class have suffered injury-in-fact and/or actual damage.

1784.   Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of New GM's unlawful conduct.  *See*, *e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983).  Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

1785.   New GM engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

## COUNT II

## FRAUD BY CONCEALMENT

1786.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1787.   This claim is brought on behalf of Nationwide Class Members who are Delaware residents (the "Delaware Class").

1788.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1789.   New GM concealed and suppressed material facts concerning the culture of New GM – a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1790.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1791.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles and Certified Previously Owned vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

1792.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM, were in fact known to New GM as

of the time of its creation in 2009 and at every point thereafter, New GM had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Delaware Class.  New GM also had a duty to disclose because it made many general affirmative representations about the safety, quality, and lack of defects in its vehicles, as set forth above, which were misleading, deceptive and incomplete without the disclosure of the additional facts set forth above regarding its actual safety record, safety philosophy, and practices and the actual safety defects in its vehicles.  Having volunteered to provide information to Plaintiffs, GM had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Delaware Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1793.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Delaware Class.

1794.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Delaware Class and conceal material information regarding defects that exist in GM-branded vehicles.

1795.   Plaintiffs and the Delaware Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased cars manufactured by New GM; and/or they would not have purchased cars manufactured by Old GM in the time after New GM had come into existence and had fraudulently opted to conceal, and to misrepresent, the true facts about the

vehicles; and/or would not have continued to drive their vehicles or would have taken other affirmative steps.  Plaintiffs' and the Delaware Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Delaware Class.

1796.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Delaware Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs who purchased new or Certified Previously Owned vehicles after New GM came into existence either would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs regardless of time of purchase or lease would have maintained their vehicles.

1797.   The value of all Delaware Class Members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which have greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1798.   Accordingly, New GM is liable to the Delaware Class for damages in an amount to be proven at trial.

1799.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Delaware Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount

sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

## (6 DEL. CODE § 2-314)

1800.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1801.   This claim is brought only on behalf of Delaware residents who are members of the Nationwide Post-Sale Ignition Switch Defect Subclass and the Pre-Sale Ignition Switch Defect Subclass (the "Delaware Post-Sale ISD Subclass").

1802.   New GM was a merchant with respect to motor vehicles within the meaning of 6 DEL. CODE § 2-104(1).

1803.   Under 6 DEL. CODE § 2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Ignition Switch Vehicles from New GM on or after July 11, 2009.

1804.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1805.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent

by Plaintiffs and the Delaware Post-Sale ISD Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1806.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Delaware Post-Sale ISD Subclass members have been damaged in an amount to be proven at trial.

**COUNT IV**

**FRAUD BY CONCEALMENT OF THE RIGHT
TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY**

1807.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1808.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Delaware residents ***and*** who owned their Pre-Sale Defective Ignition Switch Vehicle for at least some period of time between July 11, 2009 and November 30, 2009 (for the purposes of this claim only, the "Delaware Pre-Sale ISD Subclass").

1809.   New GM was aware of the ignition switch defects in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order And Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1810.   As the bankruptcy court found, "As of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  New GM necessarily had this same knowledge from day one of its existence, as the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion."

- 489 -

1811.   The Delaware Pre-Sale ISD Subclass did not receive notice of the ignition switch defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the ignition switch defect.

1812.   In September of 2009, the bankruptcy court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1813.   Because New GM concealed its knowledge of the ignition switch defect, the Delaware Pre-Sale ISD Subclass did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the ignition switch defects.

1814.   In 2011, the bankruptcy court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1815.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1816.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1817.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1818.   As of September 30, 2014,  the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million – all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1819.   The bankruptcy court found that the Pre-Sale Ignition Switch Defect Subclass members were deprived of Due Process because they did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  While the court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars the Pre-Sale Ignition Switch Defect Subclass from tapping into the GUC Trust assets.

1820.   But for New GM's fraudulent concealment of the ignition switch defects, the Delaware Pre-Sale ISD Subclass (and the Pre-Sale Ignition Switch Defect Subclass members from every state) would have filed claims against Old GM before the Bar Date.

1821.   Had the Delaware Pre-Sale ISD Subclass filed timely claims before the Bar Date, the claims would have been allowed, as would have the claims of the entire Pre-Sale Ignition Switch Defect Subclass.

1822.   Had the claims of the Pre-Sale Ignition Switch Defect Subclass been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of the Pre-Sale Ignition Switch Defect Subclass.

1823.   New GM's concealment and suppression of the material fact of the ignition switch defect over the first several months of its existence served to prevent the filing of claims by the Pre-Sale Ignition Switch Defect Subclass and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1824.   New GM had a duty to disclose the ignition switch defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Delaware Pre-Sale ISD Subclass.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Defective Ignition Switch Vehicles purchased or leased by Plaintiffs and the Delaware Pre-Sale ISD Subclass, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.

1825.   Plaintiffs and the Delaware Pre-Sale ISD Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Delaware Pre-Sale ISD Subclass's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Delaware Pre-Sale ISD Subclass.

1826.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Delaware Pre-Sale ISD Subclass sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1827.   Accordingly, New GM is liable to the Delaware Pre-Sale ISD Subclass members for their damages in an amount to be proven at trial.

1828.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Delaware Pre-Sale ISD Subclass's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## THIRD-PARTY BENEFICIARY CLAIM

1829.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1830.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Delaware residents (the "Delaware Pre-Sale ISD Subclass").

1831.   In the Sales Agreement through which New GM acquired substantially all of the assets of New GM, New GM explicitly agreed as follows:

> From and after the Closing, [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

1832.  With the exception of the portion of the agreement that purports to immunize New GM from its own independent misconduct with respect to cars and parts made by Old GM, the Sales Agreement is a valid and binding contract.

1833.   But for New GM's covenant to comply with the TREAD Act with respect to cars and parts made by Old GM, the TREAD Act would have no application to New GM with respect to those cars and parts.  That is because the TREAD Act on its face imposes reporting and recall obligations only on the "manufacturers" of a vehicle.  49 U.S.C. § 30118(c).

1834.   Because New GM agreed to comply with the TREAD Act with respect to vehicles manufactured by Old GM, New GM agreed to (among other things): (a) make quarterly submissions to NHTSA of "early warning reporting" data, including incidents involving death, injury, or property damage, warranty claims, consumer complaints, and field reports concerning failure, malfunction, lack of durability or other performance issues.  *See* 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21; (b) retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety.  *See* 49 C.F.R. §§ 576.5 to 576.6; and (c) take *immediate* remedial action if it knows or should know that a safety defect exists – including notifying NHTSA and consumers and ordering a recall if necessary.  *See* 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c); 49 C.F.R. §§ 577.5(a), 577.7(a).

1835.   Plaintiffs, as owners and lessors of vehicles and parts manufactured by Old GM, are the clear intended beneficiaries of New GM's agreement to comply with the TREAD Act. Under the Sale Agreement, Plaintiffs were to receive the benefit of having a manufacturer responsible for monitoring the safety of their Old GM vehicles and making certain that any known safety defects would be promptly remedied.

1836.   Although the Sale Order which consummated New GM's purchase of Old GM purported to give New GM immunity from claims concerning vehicles or parts made by Old GM, the bankruptcy court recently ruled that provision to be unenforceable, and that New GM

can be held liable for its own post-bankruptcy sale conduct with respect to cars and parts made by Old GM.  Therefore, that provision of the Sale Order and related provisions of the Sale Agreement cannot be read to bar Plaintiffs' third-party beneficiary claim as it is based solely on New GM's post-sale breaches of the promise it made in the Sale Agreement.

1837.   New GM breached its covenant to comply with the TREAD Act with respect to the Pre-Sale Defective Ignition Switch Vehicles, as it failed to take action to remediate the Ignition Switch Defect until 2014 when it finally issued a recall.

1838.   Plaintiffs and the Delaware Pre-Sale ISD Subclass were damaged as a result of New GM's breach.  Because of New GM's failure to timely remedy the ignition switch defect, the value of Old GM Defective Ignition Switch Vehicles has diminished in an amount to be determined at trial.

**COUNT VI**

**UNJUST ENRICHMENT**

1839.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1840.   This claim is brought on behalf of members of the Delaware Class who purchased New GM vehicles, or Certified Pre-Owned GM vehicles in the time period after New GM came into existence, and who purchased or leased Defective Ignition Switch Vehicles in the time period before New GM came into existence, which cars were still on the road after New GM came into existence (the "Delaware Unjust Enrichment Class").

1841.   New GM has received and retained a benefit from the Plaintiffs and inequity has resulted.

1842.   New GM has benefitted from selling and leasing defective cars, including Certified Pre-Owned cars, whose value was artificially inflated by New GM's concealment of

- 495 -

systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

1843.   With respect to the Defective Ignition Switch Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

1844.   Thus, all Delaware Unjust Enrichment Class Members conferred a benefit on New GM.

1845.   It is inequitable for New GM to retain these benefits.

1846.   Plaintiffs were not aware about the true facts about GM-branded vehicles, and did not benefit from GM's conduct.

1847.   New GM knowingly accepted the benefits of its unjust conduct.

1848.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## DISTRICT OF COLUMBIA

## COUNT I

## VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT

## (D.C. CODE § 28-3901, *et seq.*)

1849.   Plaintiffs reallege and incorporate by reference all paragraphs as if fully set forth herein.

1850.   This claim is brought only on behalf of Nationwide Class Members who are District of Columbia residents (the "District of Columbia Class").

- 496 -

1851.   New GM is a "person" under the Consumer Protection Procedures Act ("District of Columbia CPPA"), D.C. CODE § 28-3901(a)(1).

1852.   Class Members are "consumers," as defined by D.C. CODE § 28-3901(1)(2), who purchased or leased one or more Affected Vehicles.

1853.   New GM's actions as set forth herein constitute "trade practices" under D.C. CODE § 28-3901.

1854.   New GM participated in unfair or deceptive acts or practices that violated the District of Columbia CPPA.  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in unfair or deceptive practices prohibited by the District of Columbia CPPA, D.C. CODE § 28-3901, *et seq.*, including:  (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Affected Vehicles with the intent not to sell them as advertised; (4) representing that the subject of a transaction involving the Affected Vehicles has been supplied in accordance with a previous representation when it has not; (5) misrepresenting as to a material fact which has a tendency to mislead; and (6) failing to state a material fact when such failure tends to mislead.

1855.   In the course of its business in trade or commerce, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that

- 497 -

others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles.

1856.   From the date of its inception on July 11, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, because of (i) the knowledge of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1857.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1858.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1859.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the District of Columbia CPPA.

1860.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed

above.  New GM compounded the deception by repeatedly asserting that GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1861.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1862.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the District of Columbia Class.

1863.   New GM knew or should have known that its conduct violated the District of Columbia CPPA.

1864.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles and the GM brand that were either false or misleading.

1865.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

  a. Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

  b. Intentionally concealed the foregoing from Plaintiffs; and/or

  c. Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch  and other defects in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

- 499 -

1866.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1867.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the District of Columbia Class. A vehicle made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

1868.   Plaintiffs and the District of Columbia Class suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs who purchased GM-branded vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.  For Plaintiffs who purchased Pre-Sale Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned," they too either would have paid less for their vehicles or would not have purchased them but for New GM's violations of the District of Columbia CPPA.

1869.   Regardless of time of purchase or lease, no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle

- 500 -

manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the District of Columbia CPPA.  And, in any event, all GM vehicle owners suffered ascertainable loss in the form of diminished value of their vehicles as a result of New GM's deceptive and unfair acts and practices made in the course of New GM's business.

1870.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1871.   As a direct and proximate result of New GM's violations of the District of Columbia CPPA, Plaintiffs and the District of Columbia Class have suffered injury-in-fact and/or actual damage.

1872.   Plaintiff and the District of Columbia Class are entitled to recover treble damages or $1,500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the Court deems proper, under D.C. CODE § 28-3901.

1873.   Plaintiffs seek punitive damages against New GM because New GM's conduct evidences malice and/or egregious conduct.  New GM maliciously and egregiously misrepresented the safety and reliability of the Affected Vehicles, deceived Class Members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting deadly flaws in vehicles and repeatedly promised Class Members that all vehicles were safe.  New GM's unlawful conduct constitutes malice warranting punitive damages.

## COUNT II

## FRAUD BY CONCEALMENT

1874.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1875.   This claim is brought on behalf of Nationwide Class Members who are District of Columbia residents (the "District of Columbia Class").

1876.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1877.   New GM concealed and suppressed material facts concerning the culture of New GM – a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1878.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1879.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles and Certified Previously Owned vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

1880.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM, were in fact known to New GM as of the time of its creation in 2009 and at every point thereafter, New GM had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably

- 502 -

discoverable by Plaintiffs and the District of Columbia Class.  New GM also had a duty to disclose because it made many general affirmative representations about the safety, quality, and lack of defects in its vehicles, as set forth above, which were misleading, deceptive and incomplete without the disclosure of the additional facts set forth above regarding its actual safety record, safety philosophy, and practices and the actual safety defects in its vehicles. Having volunteered to provide information to Plaintiffs, GM had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the District of Columbia Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1881.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the District of Columbia Class.

1882.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the District of Columbia Class and conceal material information regarding defects that exist in GM-branded vehicles.

1883.   Plaintiffs and the District of Columbia Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased cars manufactured by New GM; and/or they would not have purchased cars manufactured by Old GM in the time after New GM had come into existence and had fraudulently opted to conceal, and to misrepresent, the true facts about the vehicles; and/or would not have continued to drive their vehicles or would have taken other affirmative steps.  Plaintiffs' and the District of Columbia Class's actions were justified.

New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the District of Columbia Class.

1884.   Because of the concealment and/or suppression of the facts, Plaintiffs and the District of Columbia Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs who purchased new or Certified Previously Owned vehicles after New GM came into existence either would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs regardless of time of purchase or lease would have maintained their vehicles.

1885.   The value of all District of Columbia Class Members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which have greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1886.   Accordingly, New GM is liable to the District of Columbia Class for damages in an amount to be proven at trial.

1887.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the District of Columbia Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

- 504 -

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (D.C. CODE § 28:2-314)

1888.   Plaintiffs reallege and incorporate by reference all paragraphs as if fully set forth herein.

1889.   This claim is brought only on behalf of District of Columbia residents who are members of the Nationwide Post-Sale Ignition Switch Defect Subclass and the Pre-Sale Ignition Switch Defect Subclass (the "D.C. Post-Sale ISD Subclass").

1890.   New GM was a merchant with respect to motor vehicles within the meaning of D.C. CODE § 28:2-104(1).

1891.   Under D.C. CODE § 28:2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Ignition Switch Vehicles from New GM on or after July 11, 2009.

1892.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1893.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the D.C. Post-Sale ISD Subclass before or within a reasonable amount of time after New GM issued the recalls and the allegations of vehicle defects became public.

1894.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the D.C. Post-Sale ISD Subclass members have been damaged in an amount to be proven at trial.

## COUNT IV
## FRAUD BY CONCEALMENT OF THE RIGHT
## TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

1895.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1896.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are District of Columbia residents *and* who owned their Pre-Sale Defective Ignition Switch Vehicle for at least some period of time between July 11, 2009 and November 30, 2009 (for the purposes of this claim only, the "District of Columbia Pre-Sale ISD Subclass").

1897.   New GM was aware of the ignition switch defects in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order And Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1898.   As the bankruptcy court found, "As of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles." New GM necessarily had this same knowledge from day one of its existence, as the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion."

1899.   The District of Columbia Pre-Sale ISD Subclass did not receive notice of the ignition switch defect prior to the entry of the Sale Order.  No recall occurred, and neither the

direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the ignition switch defect.

1900.  In September of 2009, the bankruptcy court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1901.  Because New GM concealed its knowledge of the ignition switch defect, the District of Columbia Pre-Sale ISD Subclass did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the ignition switch defects.

1902.  In 2011, the bankruptcy court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1903.  The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1904.  Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1905.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1906.   As of September 30, 2014,  the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million – all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1907.   The bankruptcy court found that the Pre-Sale Ignition Switch Defect Subclass members were deprived of Due Process because they did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  While the court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars the Pre-Sale Ignition Switch Defect Subclass from tapping into the GUC Trust assets.

1908.   But for New GM's fraudulent concealment of the ignition switch defects, the District of Columbia Pre-Sale ISD Subclass (and the Pre-Sale Ignition Switch Defect Subclass members from every state) would have filed claims against Old GM before the Bar Date.

1909.   Had the District of Columbia Pre-Sale ISD Subclass filed timely claims before the Bar Date, the claims would have been allowed, as would have the claims of the entire Pre-Sale Ignition Switch Defect Subclass.

1910.   Had the claims of the Pre-Sale Ignition Switch Defect Subclass been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of the Pre-Sale Ignition Switch Defect Subclass.

1911.   New GM's concealment and suppression of the material fact of the ignition switch defect over the first several months of its existence served to prevent the filing of claims by the Pre-Sale Ignition Switch Defect Subclass and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1912.   New GM had a duty to disclose the ignition switch defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the District of Columbia Pre-Sale ISD Subclass.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Defective Ignition Switch Vehicles purchased or leased by Plaintiffs and the District of Columbia Pre-Sale ISD Subclass, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.

1913.   Plaintiffs and the District of Columbia Pre-Sale ISD Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the District of Columbia Pre-Sale ISD Subclass's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the District of Columbia Pre-Sale ISD Subclass.

1914.   Because of the concealment and/or suppression of the facts, Plaintiffs and the District of Columbia Pre-Sale ISD Subclass sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their

vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1915.   Accordingly, New GM is liable to the District of Columbia Pre-Sale ISD Subclass members for their damages in an amount to be proven at trial.

1916.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the District of Columbia Pre-Sale ISD Subclass's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V
## THIRD-PARTY BENEFICIARY CLAIM

1917.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1918.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are District of Columbia residents (the "District of Columbia Pre-Sale ISD Subclass").

1919.   In the Sales Agreement through which New GM acquired substantially all of the assets of New GM, New GM explicitly agreed as follows:

> From and after the Closing, [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

- 510 -

1920.   With the exception of the portion of the agreement that purports to immunize New GM from its own independent misconduct with respect to cars and parts made by Old GM, the Sales Agreement is a valid and binding contract.

1921.   But for New GM's covenant to comply with the TREAD Act with respect to cars and parts made by Old GM, the TREAD Act would have no application to New GM with respect to those cars and parts.  That is because the TREAD Act on its face imposes reporting and recall obligations only on the "manufacturers" of a vehicle.  49 U.S.C. § 30118(c).

1922.   Because New GM agreed to comply with the TREAD Act with respect to vehicles manufactured by Old GM, New GM agreed to (among other things): (a) make quarterly submissions to NHTSA of "early warning reporting" data, including incidents involving death, injury, or property damage, warranty claims, consumer complaints, and field reports concerning failure, malfunction, lack of durability or other performance issues.  *See* 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21; (b) retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety.  *See* 49 C.F.R. §§ 576.5 to 576.6; and (c) take *immediate* remedial action if it knows or should know that a safety defect exists – including notifying NHTSA and consumers and ordering a recall if necessary.  *See* 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c); 49 C.F.R. §§ 577.5(a), 577.7(a).

1923.   Plaintiffs, as owners and lessors of vehicles and parts manufactured by Old GM, are the clear intended beneficiaries of New GM's agreement to comply with the TREAD Act. Under the Sale Agreement, Plaintiffs were to receive the benefit of having a manufacturer responsible for monitoring the safety of their Old GM vehicles and making certain that any known safety defects would be promptly remedied.

1924.   Although the Sale Order which consummated New GM's purchase of Old GM purported to give New GM immunity from claims concerning vehicles or parts made by Old GM, the bankruptcy court recently ruled that provision to be unenforceable, and that New GM can be held liable for its own post-bankruptcy sale conduct with respect to cars and parts made by Old GM.   Therefore, that provision of the Sale Order and related provisions of the Sale Agreement cannot be read to bar Plaintiffs' third-party beneficiary claim as it is based solely on New GM's post-sale breaches of the promise it made in the Sale Agreement.

1925.   New GM breached its covenant to comply with the TREAD Act with respect to the Pre-Sale Defective Ignition Switch Vehicles, as it failed to take action to remediate the Ignition Switch Defect until 2014 when it finally issued a recall.

1926.   Plaintiffs and the District of Columbia Pre-Sale ISD Subclass were damaged as a result of New GM's breach.   Because of New GM's failure to timely remedy the ignition switch defect, the value of Pre-Sale Defective Ignition Switch Vehicles has diminished in an amount to be determined at trial.

## COUNT VI

## UNJUST ENRICHMENT

1927.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1928.   This claim is brought on behalf of members of the District of Columbia Class who purchased New GM vehicles, or Certified Pre-Owned GM vehicles in the time period after New GM came into existence, and who purchased or leased Defective Ignition Switch Vehicles in the time period before New GM came into existence, which cars were still on the road after New GM came into existence (the "District of Columbia Unjust Enrichment Class").

010440-11  784012 V1

1929.   New GM has received and retained a benefit from the Plaintiffs and inequity has resulted.

1930.   New GM has benefitted from selling and leasing defective cars, including Certified Pre-Owned cars, whose value was artificially inflated by New GM's concealment of systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

1931.   With respect to the Defective Ignition Switch Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

1932.   Thus, all District of Columbia Unjust Enrichment Class Members conferred a benefit on New GM.

1933.   It is inequitable for New GM to retain these benefits.

1934.   Plaintiffs were not aware about the true facts about GM-branded vehicles, and did not benefit from GM's conduct.

1935.   New GM knowingly accepted the benefits of its unjust conduct.

1936.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

- 513 -

**FLORIDA**

**COUNT I**

**VIOLATION OF FLORIDA'S UNFAIR &
DECEPTIVE TRADE PRACTICES ACT**

**(FLA. STAT. § 501.201, *et seq.*)**

1937.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1938.   This claim is brought only on behalf of Nationwide Class Members who are Florida residents (the "Florida Class").

1939.   Plaintiffs are "consumers" within the meaning of Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), FLA. STAT. § 501.203(7).

1940.   New GM engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

1941.   FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" FLA. STAT. § 501.204(1).   New GM participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

1942.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.   New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles.

- 514 -

1943.   From the date of its inception on July 11, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, because of (i) the knowledge of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1944.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1945.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1946.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair, unconscionable, and deceptive business practices in violation of the FUDTPA.

1947.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that GM-branded vehicles

- 515 -

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1948.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1949.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Florida Class.

1950.   New GM knew or should have known that its conduct violated the FUDTPA.

1951.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles and the GM brand that were either false or misleading.

1952.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch and other defects in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1953.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1954.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Florida Class.  A vehicle made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

1955.   Plaintiffs and the Florida Class suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs who purchased GM-branded vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.  For Plaintiffs who purchased Pre-Sale Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned," they too either would have paid less for their vehicles or would not have purchased them but for New GM's violations of the FUDTPA.

1956.   Regardless of time of purchase or lease, no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the FUDTPA.  And, in any event, all GM vehicle owners suffered ascertainable loss in the form of diminished value of their vehicles

- 517 -

as a result of New GM's deceptive and unfair acts and practices made in the course of New GM's business.

1957. Plaintiffs and Florida Class Members risk irreparable injury as a result of New GM's act and omissions in violation of the FUDTPA, and these violations present a continuing risk to Plaintiffs as well as to the general public. New GM's unlawful acts and practices complained of herein affect the public interest.

1958. As a direct and proximate result of New GM's violations of the FUDTPA, Plaintiffs and the Florida Class have suffered injury-in-fact and/or actual damage.

1959. Plaintiffs and the Florida Class are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and attorneys' fees under FLA. STAT. § 501.2105(1).

1960. Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

## COUNT II

## FRAUD BY CONCEALMENT

1961. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1962. This claim is brought on behalf of Nationwide Class Members who are Florida residents (the "Florida Class").

1963. New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1964. New GM concealed and suppressed material facts concerning the culture of New GM – a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1965.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1966.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles and Certified Previously Owned vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

1967.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM, were in fact known to New GM as of the time of its creation in 2009 and at every point thereafter, New GM had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Florida Class.  New GM also had a duty to disclose because it made many general affirmative representations about the safety, quality, and lack of defects in its vehicles, as set forth above, which were misleading, deceptive and incomplete without the disclosure of the additional facts set forth above regarding its actual safety record, safety philosophy, and practices and the actual safety defects in its vehicles.  Having volunteered to provide information to Plaintiffs, GM had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Florida Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1968.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Florida Class.

1969.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Florida Class and conceal material information regarding defects that exist in GM-branded vehicles.

1970.   Plaintiffs and the Florida Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased cars manufactured by New GM; and/or they would not have purchased cars manufactured by Old GM in the time after New GM had come into existence and had fraudulently opted to conceal, and to misrepresent, the true facts about the vehicles; and/or would not have continued to drive their vehicles or would have taken other affirmative steps. Plaintiffs' and the Florida Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Florida Class.

1971.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Florida Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs who purchased new or Certified Previously Owned vehicles after New GM came into existence either would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs regardless of time of purchase or lease would have maintained their vehicles.

1972.   The value of all Florida Class Members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which have greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1973.   Accordingly, New GM is liable to the Florida Class for damages in an amount to be proven at trial.

1974.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Florida Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

1975.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1976.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Florida residents **and** who owned their Pre-Sale Defective Ignition Switch Vehicle for at least some period of time between July 11, 2009 and November 30, 2009 (for the purposes of this claim only, the "Florida Pre-Sale ISD Subclass").

1977.   New GM was aware of the ignition switch defects in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order And Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1978.   As the bankruptcy court found, "As of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  New GM necessarily had this same knowledge from day one of its existence, as the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion."

1979.   The Florida Pre-Sale ISD Subclass did not receive notice of the ignition switch defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the ignition switch defect.

1980.  In September of 2009, the bankruptcy court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1981.   Because New GM concealed its knowledge of the ignition switch defect, the Florida Pre-Sale ISD Subclass did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the ignition switch defects.

1982.   In 2011, the bankruptcy court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1983.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1984.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1985.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1986.   As of September 30, 2014,  the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million – all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1987.   The bankruptcy court found that the Pre-Sale Ignition Switch Defect Subclass members were deprived of Due Process because they did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  While the court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars the Pre-Sale Ignition Switch Defect Subclass from tapping into the GUC Trust assets.

1988.   But for New GM's fraudulent concealment of the ignition switch defects, the Florida Pre-Sale ISD Subclass (and the Pre-Sale Ignition Switch Defect Subclass members from every state) would have filed claims against Old GM before the Bar Date.

1989.   Had the Florida Pre-Sale ISD Subclass filed timely claims before the Bar Date, the claims would have been allowed, as would have the claims of the entire Pre-Sale Ignition Switch Defect Subclass.

1990.   Had the claims of the Pre-Sale Ignition Switch Defect Subclass been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of the Pre-Sale Ignition Switch Defect Subclass.

1991.   New GM's concealment and suppression of the material fact of the ignition switch defect over the first several months of its existence served to prevent the filing of claims by the Pre-Sale Ignition Switch Defect Subclass and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1992.   New GM had a duty to disclose the ignition switch defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Florida Pre-Sale ISD Subclass.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Defective Ignition Switch Vehicles purchased or leased by Plaintiffs and the Florida Pre-Sale ISD Subclass, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.

1993.   Plaintiffs and the Florida Pre-Sale ISD Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Florida Pre-Sale ISD Subclass's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Florida Pre-Sale ISD Subclass.

1994.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Florida Pre-Sale ISD Subclass sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1995.   Accordingly, New GM is liable to the Florida Pre-Sale ISD Subclass members for their damages in an amount to be proven at trial.

1996.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Florida Pre-Sale ISD Subclass's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## THIRD-PARTY BENEFICIARY CLAIM

1997.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1998.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Florida residents (the "Florida Pre-Sale ISD Subclass").

1999.   In the Sales Agreement through which New GM acquired substantially all of the assets of New GM, New GM explicitly agreed as follows:

> From and after the Closing, [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and

> Safety Code and similar Laws, in each case, to the extent
> applicable in respect of vehicles and vehicle parts manufactured or
> distributed by [Old GM].

2000.   With the exception of the portion of the agreement that purports to immunize New

GM from its own independent misconduct with respect to cars and parts made by Old GM, the

Sales Agreement is a valid and binding contract.

2001.   But for New GM's covenant to comply with the TREAD Act with respect to cars

and parts made by Old GM, the TREAD Act would have no application to New GM with respect

to those cars and parts.  That is because the TREAD Act on its face imposes reporting and recall

obligations only on the "manufacturers" of a vehicle.  49 U.S.C. § 30118(c).

2002.   Because New GM agreed to comply with the TREAD Act with respect to vehicles

manufactured by Old GM, New GM agreed to (among other things): (a) make quarterly

submissions to NHTSA of "early warning reporting" data, including incidents involving death,

injury, or property damage, warranty claims, consumer complaints, and field reports concerning

failure, malfunction, lack of durability or other performance issues.  *See* 49 U.S.C. §

30166(m)(3); 49 C.F.R. § 579.21; (b) retain for five years all underlying records on which the

early warning reports are based and all records containing information on malfunctions that may

be related to motor vehicle safety.  *See* 49 C.F.R. §§ 576.5 to 576.6; and (c) take *immediate*

remedial action if it knows or should know that a safety defect exists – including notifying

NHTSA and consumers and ordering a recall if necessary.  *See* 49 U.S.C. § 30118(c); 49 C.F.R.

§ 573.6(b)-(c); 49 C.F.R. §§ 577.5(a), 577.7(a).

2003.   Plaintiffs, as owners and lessors of vehicles and parts manufactured by Old GM,

are the clear intended beneficiaries of New GM's agreement to comply with the TREAD Act.

Under the Sale Agreement, Plaintiffs were to receive the benefit of having a manufacturer

- 526 -

responsible for monitoring the safety of their Old GM vehicles and making certain that any known safety defects would be promptly remedied.

2004.   Although the Sale Order which consummated New GM's purchase of Old GM purported to give New GM immunity from claims concerning vehicles or parts made by Old GM, the bankruptcy court recently ruled that provision to be unenforceable, and that New GM can be held liable for its own post-bankruptcy sale conduct with respect to cars and parts made by Old GM.  Therefore, that provision of the Sale Order and related provisions of the Sale Agreement cannot be read to bar Plaintiffs' third-party beneficiary claim as it is based solely on New GM's post-sale breaches of the promise it made in the Sale Agreement.

2005.   New GM breached its covenant to comply with the TREAD Act with respect to the Pre-Sale Defective Ignition Switch Vehicles, as it failed to take action to remediate the Ignition Switch Defect until 2014 when it finally issued a recall.

2006.   Plaintiffs and the Florida Pre-Sale ISD Subclass were damaged as a result of New GM's breach.  Because of New GM's failure to timely remedy the ignition switch defect, the value of Pre-Sale Defective Ignition Switch Vehicles has diminished in an amount to be determined at trial.

**COUNT V**

**UNJUST ENRICHMENT**

2007.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2008.   This claim is brought on behalf of members of the Florida Class who purchased New GM vehicles, or Certified Pre-Owned GM vehicles in the time period after New GM came into existence, and who purchased or leased Defective Ignition Switch Vehicles in the time

period before New GM came into existence, which cars were still on the road after New GM

came into existence (the "Florida Unjust Enrichment Class").

2009.   New GM has received and retained a benefit from the Plaintiffs and inequity has

resulted.

2010.   New GM has benefitted from selling and leasing defective cars, including

Certified Pre-Owned cars, whose value was artificially inflated by New GM's concealment of

systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and

Plaintiffs have overpaid for the cars and been forced to pay other costs.

2011.   With respect to the Defective Ignition Switch Vehicles purchased before New

GM came into existence that were still on the road after New GM came into existence and as to

which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by

avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about

the success of New GM.

2012.   Thus, all Florida Unjust Enrichment Class Members conferred a benefit on New

GM.

2013.   It is inequitable for New GM to retain these benefits.

2014.   Plaintiffs were not aware about the true facts about GM-branded vehicles, and did

not benefit from GM's conduct.

2015.   New GM knowingly accepted the benefits of its unjust conduct.

2016.   As a result of New GM's conduct, the amount of its unjust enrichment should be

disgorged, in an amount according to proof.

**GEORGIA**

**COUNT I**

**VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT**

**(GA. CODE ANN. § 10-1-390, *et seq*.)**

2017.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2018.   This claim is brought only on behalf of Nationwide Class Members who are Georgia residents (the "Georgia Class").

2019.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE. ANN. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," GA. CODE. ANN. § 10-1-393(b).

2020.   By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in unfair or deceptive practices prohibited by the FBPA, including:  (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the Affected Vehicles with the intent not to sell them as advertised.  New GM participated in unfair or deceptive acts or practices that violated the Georgia FBPA.

2021.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles.

2022.   From the date of its inception on July 11, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, because of (i) the knowledge of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2023.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM -branded vehicles.  New GM concealed this information as well.

2024.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2025.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the Georgia FBPA.

2026.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2027.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2028.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Georgia Class.

2029.   New GM knew or should have known that its conduct violated the Georgia FBPA.

2030.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles and the GM brand that were either false or misleading.

2031.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;
>
> b.   Intentionally concealed the foregoing from Plaintiffs; and/or

- 531 -

     c.     Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch  and other defects in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2032.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2033.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Georgia Class.  A vehicle made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

2034.   Plaintiffs and the Georgia Class suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs who purchased GM-branded vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.  For Plaintiffs who purchased Pre-Sale Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned," they too either would have paid less for their vehicles or would not have purchased them but for New GM's violations of the Georgia FBPA.

2035.   Regardless of time of purchase or lease, no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct had they been aware of New GM's misconduct.  By contractually assuming TREAD

Act responsibilities with respect to Old GM vehicles, New GM effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the Georgia FBPA.  And, in any event, all GM vehicle owners suffered ascertainable loss in the form of diminished value of their vehicles as a result of New GM's deceptive and unfair acts and practices made in the course of New GM's business.

2036.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2037.   As a direct and proximate result of New GM's violations of the Georgia FBPA, Plaintiffs and the Georgia Class have suffered injury-in-fact and/or actual damage.

2038.   Plaintiff and the Georgia Class are entitled to recover damages and exemplary damages (for intentional violations) per GA. CODE. ANN § 10-1-399(a).

2039.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per GA. CODE. ANN § 10-1-399.

2040.   On October 8, 2014, certain Plaintiffs sent a letter complying with GA. CODE. ANN § 10-1-399(b).  Because New GM failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Georgia Class are entitled.

010440-11  784012 V1

## COUNT II

## VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT

## (GA. CODE ANN. § 10-1-370, *et seq.*)

2041.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2042.   This claim is brought only on behalf of Nationwide Class Members who are Georgia residents (the "Georgia Class").

2043.   New GM, Plaintiffs, and the Georgia Class are "persons' within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), GA. CODE. ANN § 10-1-371(5).

2044.   The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."  GA. CODE. ANN § 10-1-372(a).  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive trade practices prohibited by the Georgia UDTPA.

2045.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles.

2046.   From the date of its inception on July 11, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, because of (i) the knowledge

of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2047.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2048.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2049.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Georgia UDTPA.

2050.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2051.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2052.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Georgia Class.

2053.   New GM knew or should have known that its conduct violated the Georgia UDTPA.

2054.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles and the GM brand that were either false or misleading.

2055.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch  and other defects in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2056.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

- 536 -

2057.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Georgia Class.  A vehicle made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

2058.   Plaintiffs and the Georgia Class suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs who purchased GM-branded vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.  For Plaintiffs who purchased Pre-Sale Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned," they too either would have paid less for their vehicles or would not have purchased them but for New GM's violations of the Georgia UDTPA.

2059.   Regardless of time of purchase or lease, no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the Georgia UDTPA.  And, in any event, all GM vehicle owners suffered ascertainable loss in the form of diminished value of their vehicles as a result of New GM's deceptive and unfair acts and practices made in the course of New GM's business.

2060.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2061.   As a direct and proximate result of New GM's violations of the Georgia UDTPA, Plaintiffs and the Georgia Class have suffered injury-in-fact and/or actual damage.

2062.   Plaintiffs seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per GA. CODE. ANN § 10-1-373.

## COUNT III

## FRAUD BY CONCEALMENT

2063.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2064.   This claim is brought on behalf of Nationwide Class Members who are Georgia residents (the "Georgia Class").

2065.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2066.   New GM concealed and suppressed material facts concerning the culture of New GM – a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2067.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2068.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles and Certified Previously Owned vehicles that New GM was

a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

2069.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM, were in fact known to New GM as of the time of its creation in 2009 and at every point thereafter, New GM had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Georgia Class.  New GM also had a duty to disclose because it made many general affirmative representations about the safety, quality, and lack of defects in its vehicles, as set forth above, which were misleading, deceptive and incomplete without the disclosure of the additional facts set forth above regarding its actual safety record, safety philosophy, and practices and the actual safety defects in its vehicles.  Having volunteered to provide information to Plaintiffs, GM had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Georgia Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2070.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Georgia Class.

2071.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Georgia Class and conceal material information regarding defects that exist in GM-branded vehicles.

2072.   Plaintiffs and the Georgia Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased cars manufactured by New GM; and/or they would not have purchased cars manufactured by Old GM in the time after New GM had come into existence and had fraudulently opted to conceal, and to misrepresent, the true facts about the vehicles; and/or would not have continued to drive their vehicles or would have taken other affirmative steps. Plaintiffs' and the Georgia Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Georgia Class.

2073.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Georgia Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs who purchased new or Certified Previously Owned vehicles after New GM came into existence either would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs regardless of time of purchase or lease would have maintained their vehicles.

2074.   The value of all Georgia Class Members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which have greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of

the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2075.   Accordingly, New GM is liable to the Georgia Class for damages in an amount to be proven at trial.

2076.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Georgia Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT IV**

**FRAUD BY CONCEALMENT OF THE RIGHT
TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY**

2077.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2078.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Georgia residents *and* who owned their Pre-Sale Defective Ignition Switch Vehicle for at least some period of time between July 11, 2009 and November 30, 2009 (for the purposes of this claim only, the "Georgia Pre-Sale ISD Subclass").

2079.   New GM was aware of the ignition switch defects in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order And Sale Agreement by which New GM acquired substantially all the assets of Old GM.

2080.   As the bankruptcy court found, "As of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  New GM

- 541 -

necessarily had this same knowledge from day one of its existence, as the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion."

2081.   The Georgia Pre-Sale ISD Subclass did not receive notice of the ignition switch defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the ignition switch defect.

2082.   In September of 2009, the bankruptcy court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

2083.   Because New GM concealed its knowledge of the ignition switch defect, the Georgia Pre-Sale ISD Subclass did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the ignition switch defects.

2084.   In 2011, the bankruptcy court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

2085.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

2086.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

2087.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

2088.   As of September 30, 2014,  the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million – all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

2089.   The bankruptcy court found that the Pre-Sale Ignition Switch Defect Subclass members were deprived of Due Process because they did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  While the court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars the Pre-Sale Ignition Switch Defect Subclass from tapping into the GUC Trust assets.

2090.   But for New GM's fraudulent concealment of the ignition switch defects, the Georgia Pre-Sale ISD Subclass (and the Pre-Sale Ignition Switch Defect Subclass members from every state) would have filed claims against Old GM before the Bar Date.

2091.   Had the Georgia Pre-Sale ISD Subclass filed timely claims before the Bar Date, the claims would have been allowed, as would have the claims of the entire Pre-Sale Ignition Switch Defect Subclass.

2092.   Had the claims of the Pre-Sale Ignition Switch Defect Subclass been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of the Pre-Sale Ignition Switch Defect Subclass.

2093.   New GM's concealment and suppression of the material fact of the ignition switch defect over the first several months of its existence served to prevent the filing of claims by the Pre-Sale Ignition Switch Defect Subclass and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

2094.   New GM had a duty to disclose the ignition switch defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Georgia Pre-Sale ISD Subclass.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Defective Ignition Switch Vehicles purchased or leased by Plaintiffs and the Georgia Pre-Sale ISD Subclass, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.

2095.   Plaintiffs and the Georgia Pre-Sale ISD Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Georgia Pre-Sale ISD Subclass's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Georgia Pre-Sale ISD Subclass.

2096.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Georgia Pre-Sale ISD Subclass sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the

accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

2097.   Accordingly, New GM is liable to the Georgia Pre-Sale ISD Subclass members for their damages in an amount to be proven at trial.

2098.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Georgia Pre-Sale ISD Subclass's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## THIRD-PARTY BENEFICIARY CLAIM

2099.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2100.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Georgia residents (the "Georgia Pre-Sale ISD Subclass").

2101.   In the Sales Agreement through which New GM acquired substantially all of the assets of New GM, New GM explicitly agreed as follows:

> From and after the Closing, [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

2102.   With the exception of the portion of the agreement that purports to immunize New GM from its own independent misconduct with respect to cars and parts made by Old GM, the Sales Agreement is a valid and binding contract.

2103.   But for New GM's covenant to comply with the TREAD Act with respect to cars and parts made by Old GM, the TREAD Act would have no application to New GM with respect to those cars and parts.  That is because the TREAD Act on its face imposes reporting and recall obligations only on the "manufacturers" of a vehicle.  49 U.S.C. § 30118(c).

2104.   Because New GM agreed to comply with the TREAD Act with respect to vehicles manufactured by Old GM, New GM agreed to (among other things): (a) make quarterly submissions to NHTSA of "early warning reporting" data, including incidents involving death, injury, or property damage, warranty claims, consumer complaints, and field reports concerning failure, malfunction, lack of durability or other performance issues.  *See* 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21; (b) retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety.  *See* 49 C.F.R. §§ 576.5 to 576.6; and (c) take *immediate* remedial action if it knows or should know that a safety defect exists – including notifying NHTSA and consumers and ordering a recall if necessary.  *See* 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c); 49 C.F.R. §§ 577.5(a), 577.7(a).

2105.   Plaintiffs, as owners and lessors of vehicles and parts manufactured by Old GM, are the clear intended beneficiaries of New GM's agreement to comply with the TREAD Act. Under the Sale Agreement, Plaintiffs were to receive the benefit of having a manufacturer responsible for monitoring the safety of their Old GM vehicles and making certain that any known safety defects would be promptly remedied.

2106.   Although the Sale Order which consummated New GM's purchase of Old GM purported to give New GM immunity from claims concerning vehicles or parts made by Old GM, the bankruptcy court recently ruled that provision to be unenforceable, and that New GM can be held liable for its own post-bankruptcy sale conduct with respect to cars and parts made by Old GM.  Therefore, that provision of the Sale Order and related provisions of the Sale Agreement cannot be read to bar Plaintiffs' third-party beneficiary claim as it is based solely on New GM's post-sale breaches of the promise it made in the Sale Agreement.

2107.   New GM breached its covenant to comply with the TREAD Act with respect to the Pre-Sale Defective Ignition Switch Vehicles, as it failed to take action to remediate the Ignition Switch Defect until 2014 when it finally issued a recall.

2108.   Plaintiffs and the Georgia Pre-Sale ISD Subclass were damaged as a result of New GM's breach.  Because of New GM's failure to timely remedy the ignition switch defect, the value of Pre-Sale Defective Ignition Switch Vehicles has diminished in an amount to be determined at trial.

**COUNT VI**

**UNJUST ENRICHMENT**

2109.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2110.   This claim is brought on behalf of members of the Georgia Class who purchased New GM vehicles, or Certified Pre-Owned GM vehicles in the time period after New GM came into existence, and who purchased or leased Defective Ignition Switch Vehicles in the time period before New GM came into existence, which cars were still on the road after New GM came into existence (the "Georgia Unjust Enrichment Class").

2111.   New GM has received and retained a benefit from the Plaintiffs and inequity has resulted.

2112.   New GM has benefitted from selling and leasing defective cars, including Certified Pre-Owned cars, whose value was artificially inflated by New GM's concealment of systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

2113.   With respect to the Defective Ignition Switch Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

2114.   Thus, all Georgia Unjust Enrichment Class Members conferred a benefit on New GM.

2115.   It is inequitable for New GM to retain these benefits.

2116.   Plaintiffs were not aware about the true facts about GM-branded vehicles, and did not benefit from GM's conduct.

2117.   New GM knowingly accepted the benefits of its unjust conduct.

2118.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

# HAWAII

## COUNT I

## UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW

### (HAW. REV. STAT. § 480, *et seq.*)

2119.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2120.   This claim is brought only on behalf of Nationwide Class Members who are Hawaii residents (the "Hawaii Class").

2121.   New GM is a "person" under HAW. REV. STAT. § 480-1.

2122.   Class Members are "consumer[s]" as defined by HAW. REV. STAT. § 480-1, who purchased or leased one or more Affected Vehicles.

2123.   New GM's acts or practices as set forth above occurred in the conduct of trade or commerce.

2124.   The Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.…"  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in unfair and deceptive trade practices prohibited by the Hawaii Act.

2125.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles.

010440-11  784012 V1

2126.   From the date of its inception on July 11, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles because of (i) the knowledge of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2127.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2128.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2129.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the Hawaii Act.

2130.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2131.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2132.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Hawaii Class.

2133.   New GM knew or should have known that its conduct violated the Hawaii Act.

2134.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles and the GM brand that were either false or misleading.

2135.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;
>
> b.   Intentionally concealed the foregoing from Plaintiffs; and/or
>
> c.   Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch and other defects in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2136.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2137.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Hawaii Class.  A vehicle made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

2138.   Plaintiffs and the Hawaii Class suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose material information.  , Plaintiffs who purchased GM-branded vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.  For Plaintiffs who purchased Pre-Sale Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned," they too either would have paid less for their vehicles or would not have purchased them but for New GM's violations of the Hawaii UDTPA.

2139.   Regardless of time of purchase or lease, no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the Hawaii UDTPA.  And, in any event, all GM vehicle owners suffered ascertainable loss in the form of diminished value of their vehicles as a result of New GM's deceptive and unfair acts and practices made in the course of New GM's business

.2140.  New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2141.  As a direct and proximate result of New GM's violations of the Hawaii Act, Plaintiffs and the Hawaii Class have suffered injury-in-fact and/or actual damage.

2142.  Pursuant to HAW. REV. STAT. § 480-13, Plaintiffs and the Hawaii Class seek monetary relief against New GM measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

2143.  Under HAW. REV. STAT. § 480-13.5, Plaintiffs seek an additional award against New GM of up to $10,000 for each violation directed at a Hawaiian elder.  New GM knew or should have known that its conduct was directed to one or more Class Members who are elders. New GM's conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder.  One or more Hawaii Class Members who are elders are substantially more vulnerable to New GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from New GM's conduct.

## COUNT II

## FRAUD BY CONCEALMENT

2144.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2145.  This claim is brought on behalf of Nationwide Class Members who are Hawaii residents (the "Hawaii Class").

2146.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2147.   New GM concealed and suppressed material facts concerning the culture of New GM – a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2148.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2149.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles and Certified Previously Owned vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

2150.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM, were in fact known to New GM as of the time of its creation in 2009 and at every point thereafter, New GM had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Hawaii Class.  New GM also had a duty to disclose because it made many general affirmative representations about the safety, quality, and lack of defects in its vehicles, as set forth above, which were misleading, deceptive and incomplete without the disclosure of the additional facts set forth above regarding its actual safety record, safety philosophy, and practices and the actual safety defects in its vehicles.  Having volunteered to

provide information to Plaintiffs, GM had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Hawaii Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2151.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Hawaii Class.

2152.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Hawaii Class and conceal material information regarding defects that exist in GM-branded vehicles.

2153.   Plaintiffs and the Hawaii Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased cars manufactured by New GM; and/or they would not have purchased cars manufactured by Old GM in the time after New GM had come into existence and had fraudulently opted to conceal, and to misrepresent, the true facts about the vehicles; and/or would not have continued to drive their vehicles or would have taken other affirmative steps. Plaintiffs' and the Hawaii Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Hawaii Class.

2154.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Hawaii Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate

- 555 -

policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs who purchased new or Certified Previously Owned vehicles after New GM came into existence either would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs regardless of time of purchase or lease would have maintained their vehicles.

2155.   The value of all Hawaii Class Members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which have greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2156.   Accordingly, New GM is liable to the Hawaii Class for damages in an amount to be proven at trial.

2157.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Hawaii Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (HAW. REV. STAT. § 490:2-314)

2158.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2159.   This claim is brought only on behalf of Hawaii residents who are members of the Nationwide Post-Sale Ignition Switch Defect Subclass and the Pre-Sale Ignition Switch Defect Subclass (the "Hawaii Post-Sale ISD Subclass").

2160.   New GM was a merchant with respect to motor vehicles within the meaning of HAW. REV. STAT. § 490:2-104(1).

2161.   Under HAW. REV. STAT. § 490:2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Ignition Switch Vehicles from New GM on or after July 11, 2009.

2162.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2163.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Hawaii Post-Sale ISD Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2164.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Hawaii Post-Sale ISD Subclass members have been damaged in an amount to be proven at trial.

## COUNT IV
## FRAUD BY CONCEALMENT OF THE RIGHT
## TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

2165.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2166.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Hawaii residents **and** who owned their Pre-Sale Defective Ignition Switch Vehicle for at least some period of time between July 11, 2009 and November 30, 2009 (for the purposes of this claim only, the "Hawaii Pre-Sale ISD Subclass").

2167.   New GM was aware of the ignition switch defects in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order And Sale Agreement by which New GM acquired substantially all the assets of Old GM.

2168.   As the bankruptcy court found, "As of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  New GM necessarily had this same knowledge from day one of its existence, as the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion."

2169.   The Hawaii Pre-Sale ISD Subclass did not receive notice of the ignition switch defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the ignition switch defect.

2170.   In September of 2009, the bankruptcy court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

2171.   Because New GM concealed its knowledge of the ignition switch defect, the Hawaii Pre-Sale ISD Subclass did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the ignition switch defects.

2172.   In 2011, the bankruptcy court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

2173.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

2174.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

2175.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

2176.   As of September 30, 2014,  the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million – all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

2177.   The bankruptcy court found that the Pre-Sale Ignition Switch Defect Subclass members were deprived of Due Process because they did not receive notice of the ignition switch defects prior to the passage of the Bar Date.  While the court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars the Pre-Sale Ignition Switch Defect Subclass from tapping into the GUC Trust assets.

2178.   But for New GM's fraudulent concealment of the ignition switch defects, the Hawaii Pre-Sale ISD Subclass (and the Pre-Sale Ignition Switch Defect Subclass members from every state) would have filed claims against Old GM before the Bar Date.

2179.   Had the Hawaii Pre-Sale ISD Subclass filed timely claims before the Bar Date, the claims would have been allowed, as would have the claims of the entire Pre-Sale Ignition Switch Defect Subclass.

2180.   Had the claims of the Pre-Sale Ignition Switch Defect Subclass been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of the Pre-Sale Ignition Switch Defect Subclass.

2181.   New GM's concealment and suppression of the material fact of the ignition switch defect over the first several months of its existence served to prevent the filing of claims by the Pre-Sale Ignition Switch Defect Subclass and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

2182.   New GM had a duty to disclose the ignition switch defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Hawaii Pre-Sale ISD Subclass.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Defective Ignition Switch Vehicles purchased or leased by Plaintiffs and the Hawaii Pre-Sale ISD Subclass, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.

2183.   Plaintiffs and the Hawaii Pre-Sale ISD Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Hawaii Pre-Sale ISD Subclass's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Hawaii Pre-Sale ISD Subclass.

2184.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Hawaii Pre-Sale ISD Subclass sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

2185.   Accordingly, New GM is liable to the Hawaii Pre-Sale ISD Subclass members for their damages in an amount to be proven at trial.

2186.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Hawaii Pre-Sale ISD Subclass's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive

damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V
## THIRD-PARTY BENEFICIARY CLAIM

2187.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2188.   This claim is brought only on behalf of Pre-Sale Ignition Switch Defect Subclass members who are Hawaii residents (the "Hawaii Pre-Sale ISD Subclass").

2189.   In the Sales Agreement through which New GM acquired substantially all of the assets of New GM, New GM explicitly agreed as follows:

> From and after the Closing, [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

2190.   With the exception of the portion of the agreement that purports to immunize New GM from its own independent misconduct with respect to cars and parts made by Old GM, the Sales Agreement is a valid and binding contract.

2191.   But for New GM's covenant to comply with the TREAD Act with respect to cars and parts made by Old GM, the TREAD Act would have no application to New GM with respect to those cars and parts.  That is because the TREAD Act on its face imposes reporting and recall obligations only on the "manufacturers" of a vehicle.  49 U.S.C. § 30118(c).

2192.   Because New GM agreed to comply with the TREAD Act with respect to vehicles manufactured by Old GM, New GM agreed to (among other things): (a) make quarterly submissions to NHTSA of "early warning reporting" data, including incidents involving death,

- 562 -

injury, or property damage, warranty claims, consumer complaints, and field reports concerning failure, malfunction, lack of durability or other performance issues.  *See* 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21; (b) retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety.  *See* 49 C.F.R. §§ 576.5 to 576.6; and (c) take *immediate* remedial action if it knows or should know that a safety defect exists – including notifying NHTSA and consumers and ordering a recall if necessary.  *See* 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c); 49 C.F.R. §§ 577.5(a), 577.7(a).

2193.   Plaintiffs, as owners and lessors of vehicles and parts manufactured by Old GM, are the clear intended beneficiaries of New GM's agreement to comply with the TREAD Act. Under the Sale Agreement, Plaintiffs were to receive the benefit of having a manufacturer responsible for monitoring the safety of their Old GM vehicles and making certain that any known safety defects would be promptly remedied.

2194.   Although the Sale Order which consummated New GM's purchase of Old GM purported to give New GM immunity from claims concerning vehicles or parts made by Old GM, the bankruptcy court recently ruled that provision to be unenforceable, and that New GM can be held liable for its own post-bankruptcy sale conduct with respect to cars and parts made by Old GM.  Therefore, that provision of the Sale Order and related provisions of the Sale Agreement cannot be read to bar Plaintiffs' third-party beneficiary claim as it is based solely on New GM's post-sale breaches of the promise it made in the Sale Agreement.

2195.   New GM breached its covenant to comply with the TREAD Act with respect to the Pre-Sale Defective Ignition Switch Vehicles, as it failed to take action to remediate the Ignition Switch Defect until 2014 when it finally issued a recall.

- 563 -

2196.   Plaintiffs and the Hawaii Pre-Sale ISD Subclass were damaged as a result of New GM's breach.  Because of New GM's failure to timely remedy the ignition switch defect, the value of Pre-Sale Defective Ignition Switch Vehicles has diminished in an amount to be determined at trial.

## COUNT VI

## UNJUST ENRICHMENT

2197.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2198.   This claim is brought on behalf of members of the Hawaii Class who purchased New GM vehicles, or Certified Pre-Owned GM vehicles in the time period after New GM came into existence, and who purchased or leased Defective Ignition Switch Vehicles in the time period before New GM came into existence, which cars were still on the road after New GM came into existence (the "Hawaii Unjust Enrichment Class").

2199.   New GM has received and retained a benefit from the Plaintiffs and inequity has resulted.

2200.   New GM has benefitted from selling and leasing defective cars, including Certified Pre-Owned cars, whose value was artificially inflated by New GM's concealment of systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

2201.   With respect to the Defective Ignition Switch Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

2202.   Thus, all Hawaii Unjust Enrichment Class Members conferred a benefit on New GM.

2203.   It is inequitable for New GM to retain these benefits.

2204.   Plaintiffs were not aware about the true facts about GM-branded vehicles, and did not benefit from GM's conduct.

2205.   New GM knowingly accepted the benefits of its unjust conduct.

2206.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**IDAHO**

**COUNT I**

**VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT**

**(IDAHO CIV. CODE § 48-601, *et seq.*)**

2207.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2208.   This claim is brought only on behalf of Class Members who are Idaho residents (the "Idaho Class").

2209.   New GM is a "person" under the Idaho Consumer Protection Act ("Idaho CPA"), IDAHO CIV. CODE § 48-602(1).

2210.   New GM's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under IDAHO CIV. CODE § 48-602(2).

2211.   New GM participated in misleading, false, or deceptive acts that violated the Idaho CPA.  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited by the Idaho CPA, including:  (1) representing that the Affected Vehicles have characteristics, uses, and

- 565 -

benefits which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Affected Vehicles with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce.  *See* IDAHO CIV. CODE § 48-603.

2212.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles.

2213.   From the date of its inception on July 11, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, because of (i) the knowledge of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2214.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2215.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2216.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Idaho CPA.

2217.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that GM –branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2218.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2219.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Idaho Class.

2220.   New GM knew or should have known that its conduct violated the Idaho CPA.

2221.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles  and the GM brand that were either false or misleading.

2222.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b.   Intentionally concealed the foregoing from Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch and other defects in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2223.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2224.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Idaho Class.  A vehicle made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

2225.   Plaintiffs and the Idaho Class suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose material information.   Plaintiffs who purchased GM-branded vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.  For Plaintiffs who purchased Pre-Sale Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned,"