IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: | MDL No. 2543 |
| GENERAL MOTORS LLC IGNITION SWITCH LITIGATION | Master File No.: 14-MDL-2543 (JMF) |
| This Document Relates to:  All Actions | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM NEW GM AND KING & SPALDING BASED ON THE CRIME-FRAUD EXCEPTION**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................ 2

   I. GM COMMITTED A CRIME-FRAUD BY CONCEALING A KNOWN
      SAFETY DEFECT AND USED ITS LAWYERS' SERVICES IN
      FURTHERANCE THEREOF. ........................................................................... 2

     A.   Concealing a known safety defect is an intentional tort that
         vitiates the privilege. ......................................................................... 3

     B.   Plaintiffs established probable cause to believe that New GM's
         concealment of a safety defect was intentional. ................................ 5

        1.   New GM and K&S knew years before the recall that a safety defect
           existed in model year 2005-07 Cobalts. .................................. 6

        2.   K&S recognized that a jury would likely find New GM's
           conduct to be intentional. ....................................................... 9

        3.   New GM confidentially settled at least 21 defect-related claims
           to prevent evidence of the defect from being disclosed. .......... 10

     C.   New GM and K&S cannot defeat Plaintiffs' probable cause showing. ......... 12

        1.   Plaintiffs need not present evidence of New GM's specific intent
           to conceal the defect from NHTSA or violate the law. ........... 12

        2.   New GM and K&S were fully aware of the defect by
           no later than October 2010. ..................................................... 14

        3.   The ignition switch defect was a defect under the Safety Act
           and under the relevant State laws. ........................................... 15

        4.   Plaintiffs need not establish K&S's intent or participation in
           New GM's crime-fraud. ......................................................... 18

        5.   New GM's and K&S's policy argument is inapplicable and
           trumped by weightier policy concerns. .................................... 19

     D.   New GM used its attorneys' services in furtherance of its crime-fraud. ....... 20

  II.  NEW GM COMMITTED CRIME-FRAUD THROUGH ITS
      MELTON DISCOVERY ABUSE AND USED ITS LAWYERS'
      SERVICES IN FURTHERANCE THEREOF. ............................................... 23

A.   New GM and K&S lied when they said New GM had no
documents regarding other incidents involving the condition
identified in the TSB. ................................................................................ 23

B.   New GM and K&S hid evidence of the ignition switch part change............................. 26

C.   Plaintiffs are not estopped from asserting that New GM's discovery
abuse is a crime-fraud. .......................................................................................... 27

III.   COUNSELS' ETHICAL RULE VIOLATIONS PROVIDE AN
ALTERNATIVE BASIS TO PIERCE THE WORK PRODUCT PRIVILEGE. ............. 28

IV.   PLAINTIFFFS PROPOSE A MANAGEABLE *IN CAMERA* REVIEW PROCESS. ...... 31

CONCLUSION ............................................................................................................. 33

## TABLE OF AUTHORITIES

**CASES**

*A.H. Robins Co., Inc., "Dalkon Shield" IUD Prod. Liab. Litig.*,
    107 F.R.D. 2 (D. Kan. 1985) .................................................................................. *passim*

*AIA Holdings S.A. v. Lehman Bros., Inc.*, No. 97-CIV-4978-LMM-HBP,
    1999 WL 61442 (S.D.N.Y. Feb. 3, 1999) ........................................................... 24, 28

*Amusement Indus., Inc. v. Stern*,
    293 F.R.D. 420 (S.D.N.Y. 2013) ............................................................................ 22

*Automated Solutions Corp. v. Paragon Data Sys., Inc.*,
    756 F.3d 504 (6th Cir. 2014) .................................................................................. 28

*Banks v. ICI Americas, Inc.*,
    450 S.E.2d 671 (GA 1994) ...................................................................................... 18

*Cendant Corp. v. Shelton*,
    256 F.R.D. 401 (D. Conn. 2007) ............................................................................ 24

*Danico A/S v. Novozymes A/S*,
    427 F. Supp. 2d 443 (S.D.N.Y. 2006) .................................................................... 28

*Fowler v. Atlanta Napp Deady, Inc.*,
    283 Ga. App. 331 (2007) ........................................................................................ 28

*Freedman v. Weatherford International Ltd.*, No. 12-civ-2121,
    2014 WL 3767034 (S.D.N.Y. July 25, 2014) ........................................................ 23

*Grand River Enterprise Six Nations, Ltd. v. Pryor*, No. 02-CIV-5068,
    2008 U.S. Dist. LEXIS 24919 (S.D.N.Y. Mar. 14, 2008) ...................................... 34

*In re Enron Corp.*,
    349 B.R. 115 (S.D.N.Y. 2006) ............................................................................... 23

*In re Grand Jury Subpoena*,
    220 F.3d 406 (5th Cir. 2000) .................................................................................. 5

*In re Grand Jury Subpoena*,
    220 F.R.D. 130 (D. Mass. 2004) ............................................................................ 4

*In re Grand Jury Subpoenas Decus Tecum*,
    798 F.2d 32 (2d Cir. 1986) ..................................................................................... 23

*In re MetLife Demutualization Litig.*, No. CV-00-2258,
   2007 WL 1017603 (S.D.N.Y. Mar. 30, 2007) ......................................................... 24

*In re Richard Roe*,
   168 F.3d 69 (2d Cir. 1999) ............................................................................. 13, 22

*In re Richard Roe, Inc.*,
   68 F.3d 38 (2d Cir. 1995) ............................................................................... 20, 22

*Kent v. Kent*,
   265 Ga. 211, 452 S.E.2d 764 (1995) ....................................................................... 30

*Mableton Pkwy CVS, Inc. v. Salter*,
   254 Ga. App. 162 (2002) ....................................................................................... 27

*MacNamara v. City of New York*, No. 04-CIV-9216,
   2008 WL 186181 (S.D.N.Y. Jan. 18, 2008) ............................................................ 24

*Madanes v. Madanes*,
   199 F.R.D. 135 (S.D.N.Y.  2001) .......................................................................... 21

*Makhoul v. Watt, Tieder, Hoffar & Fitzgerald, LLP*,
   2014 U.S. Dist. LEXIS 32239 (E.D.N.Y Mar. 12, 2014) ....................................... 34

*Moody v. IRS*,
   654 F.2d 795 (D.C. Cir. 1981) ............................................................................... 31

*NLRB v. Thalbo Corp.*,
   171 F.3d 102 (2d Cir. 1999) ................................................................................... 30

*Resource Network Int'l, Inc. v. Ritz-Carlton Hotel Co.*,
   232 Ga. App. 242 (1998) ....................................................................................... 27

*See Chevron Corp. v. Donziger*, No. 11 Civ. 0691,
   2013 WL 1087236 (S.D.N.Y. Mar. 15, 2013) ........................................................ 19

*State of Minnesota v. Philip Morris, Inc.*,
   606 N.W.2d 676 (Minn. Ct. App. 2000) ................................................................ 34

*U.S. v. Ceglia*, No. 12-CR-876-VSB,
   2015 WL 1499194 (S.D.N.Y. Mar. 8, 2015) ................................................... 22, 24

*U.S. v. Fama*,
   758 F.2d 834 (2d Cir. 1985) ................................................................................... 28

*U.S. v. Jacobs,*
   117 F.3d 82 (2d Cir. 1997) ............................................................................... 3

*U.S. v. Stewart*, No. 03-CR-717,
   2003 WL 23024461 (S.D.N.Y. Dec. 29, 2003) ............................................. 23

*U.S. v. Zolin,*
   491 U.S. 554 (1989) ...................................................................................... 21

*Zimmerman v. Poly Prep Country Day School*, No. 09-CV-4586-FB,
   2012 WL 2049493 (E.D.N.Y. June 6, 2012) ................................................ 23

**STATUTES**

49 C.F.R. §577.7(a). ........................................................................................... 14

49 U.S.C. § 30102(a)(8) ...................................................................................... 18

Ga. Code Ann. § 9-11-37 ..................................................................................... 27

S.C. Code Ann. § 15-73-10 ................................................................................... 18

Tenn. Code Ann. § 29-28-102(8) .......................................................................... 18

## INTRODUCTION

The ignition switch tragedy could have been prevented by any number of individuals had they only disclosed or taken action on what they knew about the deadly defect as their ethical and professional responsibilities demanded. The evidence presented by Plaintiffs provides probable cause to believe that New GM was long aware of but concealed the ignition switch defect and its horrific consequences, and used the services of both inside and outside counsel in furtherance of its intentional concealment of that known safety defect from regulators, car owners and the public alike.

The excuses offered by New GM and K&S do not defeat Plaintiffs' probable cause showing. Plaintiffs do not challenge routine advice to settle an isolated claim for damages. New GM knew that juries would find its years-long refusal to address a widespread safety issue in every 2005-07 Cobalt, such as through a "recall and design change,"[1] to be intentional conduct that would subject it to punitive damages. Knowing this, New GM repeatedly settled ignition switch defect claims for the express purpose of preventing evidence of the defect—including GM's long-running concealment of the defect and the real danger it posed to Cobalt drivers— from being exposed. And then, when the Melton Plaintiffs tried to obtain the very defect evidence New GM had been hiding, New GM and K&S represented that no such evidence existed. New GM's and K&S's effort to paint this conduct as mere advocacy fails in light of Plaintiffs' persuasive evidence that New GM and K&S knew that their representations regarding the existence and relevance of the defect evidence were false.

---

[1] Ex. 3 to the June 10, 2015 Hilliard Declaration at GM-MDL2543-000985320.003. References to "Ex. _" refer to exhibits attached to the June 10, 2015 Hilliard Declaration in support of Plaintiffs' opening brief. References to "Reply Ex. _" are to the Aug. 14, 2015 Hilliard Declaration submitted in conjunction with this reply brief.

New GM lawyers perpetrated and furthered a crime-fraud. This Court should order *in camera* review of the documents at issue to determine whether claims of attorney-client privilege and work product protection must now take flight under the crime-fraud rule.

New GM and K&S argue that there are a large number of documents at issue. Accordingly, and because *New GM volunteered such a procedure*, Plaintiffs propose that the Court conduct a categorical review of a limited number of documents of each type at issue on this motion. Plaintiffs are willing to meet and confer with New GM and K&S in an effort to devise a fair and reasonable selection process, and suspect that the field can be narrowed even before the selection process begins. But given the strong factual showing of a crime-fraud and the use of the lawyers' services in furtherance thereof, Plaintiffs respectfully submit that their motion should be granted.

## ARGUMENT

## I.   GM COMMITTED A CRIME-FRAUD BY CONCEALING A KNOWN SAFETY DEFECT AND USED ITS LAWYERS' SERVICES IN FURTHERANCE THEREOF.

In support of their motion, Plaintiffs cite abundant evidence that shows that:

(a)   New GM lawyers and engineers knew years before the February 2014 recall that the ignition switch defect existed in model year 2005-07 Cobalts, leading to deaths and injuries in a slew of defect-related crashes;[2]

(b)   New GM admitted that it violated its Safety Act obligation to promptly report safety defects to NHTSA and to vehicle owners and purchasers;[3]

(c)   K&S knew years before the recall, through its representation of New GM in three defect-related product liability matters (Chansuthus, Sullivan, and Melton (together, the "K&S Cases")), that (i) the ignition switch defect likely caused or contributed to the deaths and injuries suffered by the women in those cases and (ii) the defect that existed in the K&S Cases also existed

---

[2] *See* Plaintiffs' Memorandum in Support of Motion to Compel Production of Documents from New GM and King & Spalding Based on the Crime Fraud Exception ("Pl. Brf.") at 4-10; *infra* at 7-9.

[3] Ex. 2, Consent Order at ¶¶ 2, 10.

2

across 2005-07 model year Cobalts;[4]

(d)    On K&S's advice, New GM secretly settled the K&S Cases to conceal that the defect broadly affected 2005-07 Cobalts and was not limited to the particular vehicle at issue in any one crash – facts that would have subjected New GM to significant punitive damage awards;[5] and

(e)    New GM similarly settled almost twenty additional cases that New GM has admitted were defect-related without issuing a recall.[6]

This record establishes "a factual basis for a showing of probable cause to believe" that New GM committed a crime-fraud by intentionally concealing a known safety defect and that the privileged material Plaintiffs seek to be produced for *in camera* inspection was generated "in furtherance of" that crime-fraud. *U.S. v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997).

### A.    Concealing a known safety defect is an intentional tort that vitiates the privilege.

Contrary to New GM's argument, the fact that New GM admitted violating the Safety Act, a civil statute,[7] does not preclude a finding that New GM's concealment of the safety defect is a crime-fraud. Controlling law is clear that New GM's conduct need not be a crime nor meet the common law definition of fraud to vitiate the privilege; instead, the scope of conduct that may constitute a crime-fraud is expansive. *See* Pl. Brf. at 28-29. New GM takes the position that its conduct must at least rise to an intentional tort,[8] while K&S adopts a less stringent view, arguing that the crime-fraud exception applies to "intentionally wrongful conduct,"[9] and perhaps even an intentional "ethical violation."[10] Either way, Plaintiffs have established probable cause to believe that New GM's conduct was both intentional and tortious.

---

[4] Pl. Brf. at 6-8; *infra* at 7-9.
[5] Pl. Brf. at 10-13.
[6] *Infra* at 10-11.
[7] New GM Brf. at 15.
[8] *Id.*
[9] K&S Brf. at 19 (emphasis omitted).
[10] *Id.* at 2.

According to the Restatement (Second) of Torts, "[i]f the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result."[11] Knowing that a number of deaths and injuries were attributable to the ignition switch defect and that its continued concealment of the ignition switch defect would likely result in additional deaths and injuries,[12] New GM intended those tortious results under black letter tort law.

Knowingly concealing a product's serious safety hazards, including by failing to warn unsuspecting users of the product's dangers, is precisely the type of intentional conduct that triggers the crime-fraud exception. *See A.H. Robins Co., Inc., "Dalkon Shield" IUD Prod. Liab. Litig.*, 107 F.R.D. 2, 6 (D. Kan. 1985) (applying crime-fraud exception where manufacturer "ignored the mounting evidence concerning the dangers of the Shield" and "discovered the dangers of the Shield, [but] . . . failed to warn users of the dangers"); *In re Grand Jury Subpoena*, 220 F.R.D. 130, 158-59 (D. Mass. 2004) ("[I]t is clear that the more XYZ and Attorney knew or had reason to know that the widgets were failing and causing injury at elevated rates (if in fact they were), the more likely it is that the crime-fraud exception would apply."); Pl. Brf. at 30-32.

New GM misleadingly argues that these cases do not support Plaintiffs' argument that "settling claims constitutes communications in furtherance of a crime or fraud."[13] But Plaintiffs did not cite these cases solely "in the context of the settlement issue."[14] Instead, these authorities support the argument that New GM committed a crime-fraud when it intentionally concealed a known safety defect, *i.e.*, when it "ignored the mounting evidence of the dangers"

---

[11] Restatement (Second) of Torts § 8A cmt. b.

[12] *See In re Motors Liquidation Co.*, 529 B.R. 510, 557 (S.D.N.Y. Apr. 15, 2015) ("Those 24 Old GM personnel [with sufficient knowledge of the defect to issue a recall who stayed on with New GM] did not have knowledge of *which particular* car owners with Ignition Switch Defects would later be killed or injured in accidents, but they knew that some would – which is why Old GM needed to conduct the recall.") (emphasis in original).

[13] New GM Brf. at 14.

[14] *Id.* at 14, n. 18.

and "failed to warn users of the dangers" of driving model year 2005-07 Cobalts.  Pl. Brf. at 30-32.[15]

Rather than disclosing the safety defect to NHTSA and vehicle owners as the Safety Act required, New GM entered into secret settlements of defect-related claims in a continuing effort to keep New GM's knowledge of the defect from coming to light.   In this way, New GM, like the *Dalkon Shield* defendant, *also* "attempted, with the assistance of counsel, to devise strategies to cover up [New GM's] responsibilities and lessen its liability." *Dalkon Shield*, 107 F.R.D. at 15. Plaintiffs have established probable cause that New GM intentionally concealed the defect and that New GM used its attorneys' services in furtherance of a crime-fraud.

### B.      Plaintiffs established probable cause to believe that New GM's concealment of a safety defect was intentional.

New GM argues that its admitted Safety Act violation cannot constitute a crime-fraud because New GM merely "fail[ed] to meet" certain "timing provisions" of the Act.[16]   This cynical argument ignores the evidence that New GM's conduct was knowing and intentional.[17]

As K&S recognized, a jury would understand New GM's refusal to address a known safety issue, including through a "recall and design change,"[18] to be intentional conduct that would subject New GM to punitive damages.  Knowing this, New GM repeatedly entered secret settlements of ignition switch defect claims *for the express purpose of preventing evidence of the*

---

[15] *Cf. In re Grand Jury Subpoena*, 220 F.3d 406, 410 (5th Cir. 2000) (ruling that evidence established a prima facie case of crime-fraud where corporation used its counsel to help it conceal the extent of its noncompliance with environmental regulations, even though corporation had potential defenses that might preclude indictment or conviction from criminal violations). Note that, contrary to New GM's suggestion (New GM Brf. at 15), Plaintiffs do not argue that New GM's Safety Act violation standing alone is a crime-fraud. Instead, as discussed below, New GM admitted that it violated a federal law requiring the timely reporting of safety defects, and Plaintiffs have presented a sufficient factual basis to believe that New GM's conduct was intentional.

[16] New GM Brf. at 15.

[17] New GM takes issue with Plaintiffs' citation to evidence regarding when New GM knew about the ignition switch defect and the extent to which the defect was safety-related. New GM Brf. at 5-6. However, what New GM attorneys and engineers knew about the ignition switch defect is obviously relevant to, *inter alia*: (a) whether New GM's conduct was intentional; and (b) whether New GM concealed evidence it knew to be responsive in *Melton*.

[18] Ex. 3 at GM-MDL2543-000985320.003.

*defect—including GM's long-running knowledge of the defect and the real danger it posed—from being exposed.*  Pl. Brf. at 10-13.  Indeed, New GM had a pattern and practice of confidentially settling the K&S Cases and others—at least 21 cases in total—to avoid the punitive damages that would result from disclosure of the fact that New GM had known for years that the ignition switch defect posed a widespread safety hazard affecting all 2005-07 Cobalts, and to keep the defect hidden.  New GM's conduct and K&S's legal services in furtherance thereof (not to mention the dire consequences for crash victims) were hardly "routine" or "unremarkable."[19]

**1.     New GM and K&S knew years before the recall that a safety defect existed in model year 2005-07 Cobalts.**

New GM lawyers, including its outside counsel K&S, knew *years* before the 2014 recall that a pattern of crashes involving airbag non-deployment and loss of power in model year 2005-07 Cobalts was related to an ignition switch "anomaly" (a euphemism for "defect")[20] that was causing serious injuries and deaths.  Moreover, through their cumulative knowledge of the defect, developed over a number of years and by virtue of repeated crashes involving cars with ignitions in the accessory or off position, New GM and K&S knew long before the recall both that the defect existed across 2005-07 Cobalts and what was causing it.[21]  More specifically, New GM lawyers knew:

- By June 2009, that enough evidence of an ignition switch defect existed to require GM "under the Safety Act, to conduct a recall of the affected vehicles."[22]

---

[19] New GM Brf. at 1-2, 6.

[20] *See* Ex. 2 at GMNHTSA000258573 (GM presentation instructing employees not to use the words "defect," "defective," or "safety related," among others, to avoid creating smoking gun evidence in product defect suits).

[21] "[A] manufacturer does not need to have identified the cause of the defect or noncompliance, or a remedy for that issue, in order to [decide in good faith that a defect is safety-related]. Indeed, the absence of this information is not grounds for a manufacturer to delay its reporting of the safety defect or noncompliance."  Safety Recall Compendium, A Guide for the Reporting, Notification, and Remedy of Motor Vehicle and Motor Vehicle Equipment in Accordance with Title 49 of the United States Code, Chapter 301 and Supporting Federal Regulations at p. 4.

[22] *In re Motors Liquidation co.*, 529 B.R. 510, 557 (S.D.N.Y. Apr. 15, 2015) (GM personnel, including attorneys that were transferred to New GM after the bankruptcy, knew enough by June 2009 to require a recall).  New GM

- By October 7, 2010, that (a) there was an "'anomaly' in the ignition switch" of 2005-07 model year Cobalt vehicles that prevented airbag deployment,[23] (b) the "anomaly" likely caused the non-deployment in the deadly Chansuthus crash,[24] and (c) GM's knowledge and investigation of the so-called "anomaly" in multiple vehicles would provide "fertile ground" for an "award of punitive damages, resulting in a significantly larger verdict."[25]

- By November 2, 2010, that the ignition switch "anomaly" presented "clear evidence of a defect."[26]

- By July 26, 2011, that the "anomaly" caused the ignition switch to move from run to accessory mode[27] and GM engineers could not rule out the "anomaly" as the cause of non-deployment in the Sullivan crash.[28]

- By July 27, 2011 (at the very latest), that (a) the pattern of Cobalt non-deployments was a safety issue,[29] (b) the engineers should not be focused on individual product liability cases,[30] and (c) the "anomaly" was also a factor in, among others, the fatal 2005 Rose crash and 2008 Harding crashes.[31]

- By February 24, 2012, that another deadly crash (Melton) had occurred that fit the pattern of the "anomaly" New GM engineers had identified in 2005-2007 model year Cobalts that "results in the car's ignition going from the run position to the accessory mode."[32]

- By March 29, 2012, that Old GM had issued Information Service Bulletin 05-02-35-007 ("TSB"), which identified the potential for drivers of the affected vehicles to "inadvertently turn off the ignition due to low ignition key cylinder torque/effort,"[33] meaning that ignition switches in *all model year 2005-07 Cobalts* (and other affected vehicles) might inadvertently move from run to accessory or off mode because too little force was required to do so.

---

contests Plaintiffs' citation to the bankruptcy's court's finding but Plaintiffs cite the decision only in support of their probable cause showing, which does not impact this Court's rulings on the merits. *Dalkon Shield*, 107 F.R.D. at 7.

[23] Ex. 15 at GM-MDL2543-000660577.008.

[24] *Id.* at GM-MDL2543-000660577.001.

[25] *Id.* at GM-MDL2543-000660577.012.

[26] Ex. 3, Nov. 2, 2010 Chansuthus Letter at GM-MDL2543-000660601.002.

[27] Ex. 13, July 26, 2011 Sullivan Letter at GM-MDL2543-003455366.009-.010.

[28] *Id.* at GM-MDL2543-003455366.002.

[29] Reply Ex. 23, Valukas Rpt. at 150 ("the purpose of the July 27, 2011[] meeting was for GM Legal to express to [Product Investigations] that certain Cobalt non-deployment cases represented a safety concern . . . .").

[30] *Id.* at 153 ("In sum, the hand-off to PI took place because GM lawyers were frustrated with the lack of progress being made by FPA, a group of engineers whose focus was on individual products liability cases, not safety investigations.").

[31] Reply Ex. 23, Valukas Rpt. at 151 (Palmer and Sprague chose three Cobalt non-deployment incidents (Chansuthus, Rose and Harding) *among the list of other Cobalt non-deployment incidents* to present to engineers).

[32] Ex. 17, Feb. 24, 2012 Melton Letter at .004. By this point, K&S knew of at least three Cobalt crashes (two of them deadly) where the ignition had moved from run to the accessory position.

[33] Ex. 41, March 29, 2011 email from John Sprague to Jaclyn Palmer, GM-MDL2543-400025369 (attaching TSB, which Palmer forwards to Porter). K&S was aware of the TSB by no later than April 2, 2012. *Id.*

- By April 18, 2012, that (a) another Cobalt non-deployment crash (Lambert) was attributed to the ignition switch being in accessory, not run, at the time of impact, (b) the TSB addressed a "similar problem as that seen in the field where the key in the ignition switch in the 2005 Cobalt could toggle from the Run mode to the Accessory mode by traveling off-road or over rough terrain,"[34] and (c) outside counsel had warned GM *at least four times* that the existence of the defect in other vehicles put GM at risk for punitive damages.[35]

- By May 2012, that the insufficient torque issue identified in the TSB "explain[ed] why frontal air bags did not deploy in crashes in which the car was in accessory mode . . . .", and torque values for 2005 and 2006 model year Cobalts were noticeably lower than values for 2008-2010 model years.[36]

- By June 12, 2012, that a 2007 Indiana University Study of the deadly 2006 Rademaker Cobalt crash attributed non-deployment to the condition identified in the TSB.[37]

- By July 25, 2012, that at least one product liability lawyer with knowledge of the defect questioned why GM had not yet recalled the defective Cobalts.[38]

- By September 2012, that at least 22 crashes involving deaths and injuries were likely attributable to the ignition switch "anomaly."[39]

- By October 31, 2012, that another Cobalt non-deployment crash (Preuss) was attributed to the ignition switch being in accessory and that "NHTSA has also commented on the type of situation in a Cobalt."[40]

- By April 29, 2013, that the Cobalt ignition switch had been changed from 2005

---

[34] Ex. 21, Apr. 18, 2012 Lambert Case Evaluation, GM-MDL2543-000669092.001 at .004.

[35] *Id.* at .019. The other three times included: (a) the October 2010 Chansuthus case evaluation from K&S (Ex. 15); (b) the November 2010 Chansuthus case evaluation from K&S (Ex. 1); and (c) the July 2011 Sullivan case evaluation from K&S (Ex. 13). K&S advised GM again in July 2013 to settle the Melton case to avoid the punitive damages associated with GM's knowledge nine-year knowledge that the defect existed in 2005-07 model year Cobalts. Ex. 3, July 22, 2013 Melton Letter at .012 and .026. Although K&S was not counsel to New GM with respect to the Lambert crash, New GM lawyers were well aware of the facts and outside counsels' case evaluations with respect to all these cases. *See* Pl. Brf. at 11; *infra* at 11.

[36] Ex. 3, July 22, 2013 Melton Letter at .012.

[37] Ex. 45, Engineer's Report of the Lambert Crash by Erin M. Shipp, P.E., GM-MDL2543-000669158 at GM-MDL2543-000669163-65. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[38] Reply Ex. 23, Valukas Rpt. at 183-84. GM attorneys Porter, Palmer and settlement committee chair Buonomo were all present at this July 25, 2012 settlement roundtable where attorney Peracha questioned why GM had not yet recalled the defective vehicles. *Id.* at 183.

[39] Pl. Brf. at 9-10. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[40] *See* Ex. 22, October 2012 email to Ms. Palmer containing Preuss case evaluation, GM-MDL2543-003456126.001 at .003.

to 2008 Cobalts.[41]

- By July 22, 2013, that New GM's outside expert had confirmed the Melton expert's analysis revealing that the original equipment switches installed in 2005-07 Cobalts contained a shorter detent plunger and spring than replacement switches for 2005-07 Cobalts and switches installed in 2008-2010 Cobalts.[42]

- By July 30, 2013, that New GM's outside expert had confirmed that the 2005 Cobalt ignition switches did not meet GM's specifications for the force required to move the ignition between run and accessory position.[43]

Despite this knowledge, and New GM's clear and ongoing legal obligation to notify NHTSA and vehicle owners and purchasers about this known safety defect,[44] New GM did not recall the defective vehicles until February 2014.

### 2. K&S recognized that a jury would likely find New GM's conduct to be intentional.

K&S's multiple punitive damages warnings to New GM were based on its view that a jury would understand New GM's conduct to be intentional. K&S explained in Sullivan that: (a)

[45] and (b) "the facts and circumstances surrounding the investigation into the sensing system 'anomaly' that may be present in some Cobalts could provide fertile ground for laying the foundation for an award of punitive damages . . . ."[46] K&S similarly explained in Melton that: (a)

---

[41] Ex. 8, Valukas Report at 199. *See also* Ex. 59.
[42] Ex. 3 at GM-MDL2543-0009865320.021.
[43] Reply Ex. 23, Valukas Rpt. at 205-06.
[44] Ex. 2 at ¶¶ 2, 10.
[45] Ex. 13, July 26, 2011 Sullivan Letter, GM-MDL2543-003455366.001 at .014.
[46] *Id.* at .015. Information about the availability of punitive damages under Tennessee law may have been redacted from the Chansuthus case evaluation. *See* Ex. 1 at GM-MDL2543-000660601.012.

███████████████████████████[47] and (b) "the facts (including the on-going FPE investigation) [redacted] ensure that plaintiffs' claim for punitive damages will go to the jury . . . mak[ing] a large eight-figure punitive damages award a real possibility."[48]  In other words, K&S viewed punitive damages as a "real possibility" in light of New GM's *intentional* conduct—"no action has been taken"[49]—in the face of knowledge gained during its long-running investigation of a safety defect in 2005-07 Cobalts.  Given that K&S itself found "compelling" the argument that New GM displayed "conscious indifference and willful misconduct"[50] due to New GM's prolonged knowledge of the defect, Plaintiffs have demonstrated probable cause to believe that New GM acted (or refused to act) intentionally.

> **3.  New GM confidentially settled at least ██ defect-related claims to prevent evidence of the defect from being disclosed.**

Knowing that its years-long refusal to disclose or correct the ignition switch defect would likely subject it to punitive damages, New GM repeatedly settled ignition switch defect cases, including the K&S Cases, to prevent the facts from being exposed and huge verdicts awarded. *See* Pl. Brf. at pp. 9-13.

In fact, New GM settled over ████ admitted defect-related claims to keep its defect knowledge secret.  Post-recall, New GM admitted to NHTSA that 56 frontal-impact crashes resulting in deaths and injuries were defect-related.[51]  Of those, New GM confidentially settled at least ██ lawsuits or Not-In-Suit-Matters arising from a defect-related frontal-impact crash.[52]

---

[47] Ex. 3 at GM-MDL2543-000985320.024-.025 (citation omitted). Gross negligence is insufficient. *Id.*

[48] *Id.* at .003. Again, information about K&S's assessment of the likelihood of punitive damages may have been redacted. *Id.*

[49] *Id.* at .012.

[50] Ex. 3 at .026.

[51] Ex. 23 at GM-MDL2543-400240120-125, 242-244 (listing defect-related frontal crashes, including Chansuthus and Sullivan).

[52] ████████████████████████████████████████████████████

Counting Melton,[53] which involved a side-impact crash, New GM settled at least █ ignition switch defect claims—including the K&S Cases—rather than recalling the defective vehicles.[54]

The same New GM attorney, Jaclyn Palmer, was the staff attorney responsible for at least █ of these claims, including Chansuthus, Sullivan, Lambert and Preuss.[55] And the settlements of at least Chansuthus, Sullivan, Lambert, Preuss, and Melton required the approval of a committee of New GM lawyers that included, at various times, Gruskin, Fromm, Porter, Kemp, Palmer, Nowak-Vanderhoef, and Buonomo.[56] Each of these lawyers learned about the ignition switch defect and read outside counsels' evaluations of the cases which, in the K&S Cases and Lambert at a minimum, discussed the need to settle the cases to prevent the disclosure of evidence proving New GM's knowledge regarding the defect's existence across 2005-07 model year Cobalts.[57]

New GM's purpose in settling these cases before crash victims could obtain evidence of New GM's defect knowledge is clear. New GM did not want to try a case where discovery would reveal "that the original Information Service Bulletin [TSB] was an inadequate 'band-aid fix' for a significant safety issue *that should have been addressed through a recall and design change*."[58]



---

[53] Ex. 17, Feb. 24, 2012 Melton Letter at .004 (Melton fits the pattern of other Cobalt "anomaly" crashes).
[54] The actual number of pre-recall defect-related settlements is likely much higher. *See* Pl. Brf. at 10, n. 42.
[55]

[56] *See* Ex. 16 (Chansuthus Settlement Review Committee meeting included, among others, Buonomo, Fromm, Gruskin, Kemp, Nowak-Vanderhoef and Porter); Reply Ex. 23, Valukas Rpt. at 149 (Palmer and Gruskin attended the Aug. 3, 2011 Sullivan Roundtable); *id.* at 183 (Palmer, Porter, and Buonomo attended the July 25, 2012 Lambert Roundtable); *id.* at 206 (Buonomo, Gruskin, Porter, Kemp, and Nowak-Vanderhoef attended the Aug. 7, 2013 Melton Settlement Review Committee meeting); *id.* at 191 (Palmer and Porter attended the Preuss Roundtable).
[57] *See* Pl. Brf. at 10-11.
[58] Ex. 3, at GM-MDL2543-000985320.003 (emphasis added). *See also* Pl. Brf. at 11-13, 31-32.

Although this letter was written after the Meltons were finally able to obtain some evidence of New GM's knowledge of the defect, it perfectly crystallizes what New GM was trying to avoid from the beginning—disclosing to claimants evidence of New GM's defect knowledge—and why it was trying to avoid such disclosure.

New GM attempts to downplay its series of confidential settlements, calling this "core litigation activity that is neither criminal nor fraudulent."[59]  New GM's reliance on *Richard Roe II* is misplaced.  New GM incorrectly paints each defect-related claim as a one-off and says "the very act of litigating" cannot constitute a crime or fraud.  But Plaintiffs do not assert that New GM committed a crime-fraud simply by defending and settling a handful of unrelated cases involving isolated incidents.  New GM's systematic effort to continue to conceal the deadly ignition switch defect, through settlement of litigation, from vehicle owners entitled to notice of the defect falls squarely within the contours of the crime-fraud doctrine.  *See Dalkon Shield*, 107 F.R.D. at 14 ("although various steps of defense may appear innocuous in isolation, when viewed collectively . . . [they] provide support for the application of the crime or fraud exception").

**C.      New GM and K&S cannot defeat Plaintiffs' probable cause showing.**

> **1.      Plaintiffs need not present evidence of New GM's specific intent to conceal the defect from NHTSA or violate the law.**

Contrary to New GM's argument,[60] Plaintiffs need not demonstrate New GM's specific intent to conceal the defect from NHTSA or violate the Safety Act.  It is sufficient that Plaintiffs have demonstrated probable cause to believe that the conduct giving rise to the violation was intentional.  *See supra* at 4.  Thus, it is of no moment that the (redacted) case evaluations do not explicitly discuss hiding the defect from or delaying notification to NHTSA.

---

[59] New GM Brf. at 11 (quoting *In re Richard Roe*, 168 F.3d 69, 71 (2d Cir. 1999) (*Roe II*)).  None of the other cases relied on by New GM are analogous to the facts here.

[60] New GM Brf. at 15-16.

Moreover, in addition to NHTSA, New GM was also obligated under the Safety Act to notify *owners of defective vehicles* within a reasonable time after determining that a defect was safety-related.[61]  Plaintiffs have presented abundant evidence of New GM's intent to keep the defect secret from vehicle owners.   Each of the crash victims with whom New GM settled a defect-related claim was a vehicle owner entitled to notice of the defect.  Yet New GM concealed its knowledge of the nature and extent of the defect from these victims to prevent the disclosure of evidence that would provide "fertile ground" for an award of punitive damages in light of "GM's conscious indifference and willful misconduct when it comes to the safety of its vehicles' occupants."[62]  *See* Pl. Brf. at 10-13.

Further, there is probable cause to believe that New GM lawyers and K&S acted with knowledge of New GM's recall obligations.  For example, the Cobalts driven by Chansuthus, Sullivan, and Melton were all subject to New GM's recall involving a defect in the power steering system.  ████████████████████████████████████████████████████████

████████████[63] ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████[64]  As a result, each of the New GM and K&S lawyers working on, or with knowledge of, the K&S Cases was fully aware of New GM's Safety Act obligation to recall vehicles containing a safety-related defect.  Indeed, William

---

[61] 49 C.F.R. §577.7(a).  The regulation was updated, effective October 11, 2013, to replace "within a reasonable time" to "no later than 60 days" from the filing of the NHTSA notification.

[62] Ex. 3, July 22, 2013 Melton Letter, GM-MDL2543-000985320.001 at .026.

[63] *See* Ex. 1, Nov. 2, 2010 Chansuthus Letter at GM-MDL2543-000660601.002; Ex. 13, July 26, 2011 Sullivan Letter at GM-MDL2543-003455366.003 and .038; Ex. 3, July 22, 2013 Melton Letter at GM-MDL2543-000985320.013 (████████████████████████████████████).

[64] *See* Ex. 13, July 26, 2013 Sullivan Letter at GM-MDL2543-003455366.038.

Kemp, New GM's top safety lawyer,[65] who was fully aware of the ignition switch defect and its deadly consequences,[66] was a member of the Field Performance Evaluation Review Committee (FPERC), which had responsibility for recommending whether New GM's Executive Field Action Decision Committee (EFADC) should issue a recall (and so obviously knew the reporting requirements).[67]

Yet when a product liability attorney asked during a settlement roundtable why there had not yet been a recall,[68] and when outside counsel reiterated that NHTSA had commented on the non-deployment condition in Cobalts,[69] New GM (with and without K&S) continued to conceal the defect – including by settling defect-related suits to prevent the facts from being exposed.

      2.    **New GM and K&S were fully aware of the defect by no later than October 2010.**

New GM and K&S argue that they lacked the requisite intent because, at certain points in time, they had questions about the defect.[70] Yet from the very first K&S case evaluation, GM engineers and K&S knew that multiple Cobalts were affected with a design defect "in the ignition switch"[71] that was causing airbags not to deploy in severe frontal impact crashes – a clear safety hazard. And the timeline presented by Plaintiffs clearly shows that, based on their cumulative knowledge, New GM and K&S knew long before the recall that it was the

---

[65] Reply Ex. 23, Valukas Rpt. at 85 (Kemp "had principal responsibility for safety issues in the legal department"); *id.* at 104 (Kemp "is widely regarded as GM's most knowledgeable, experienced, and trusted safety lawyer").

[66] At a minimum, Kemp: (a) approved the Chanusuthus settlement at the January 2011 Settlement Review Committee meeting (Ex. 16) (b) attended the FPE meeting in July 2011, during which the deadly pattern of Cobalt crashes was discussed among GM lawyers and engineers (Reply Ex. 23, Valukas Rpt. at 144-45, 150-51); and (c) received the Indiana University Study in July 2012 (Reply Ex. 1).

[67] Reply Ex. 23, Valukas Rpt. at 11 (EFADC is the committee that considers whether to issue a recall); *id.* at 215 (the FPERC makes a recommendation to the EFADC and Kemp attended the Dec. 2, 2013 FPERC meeting); *id.* at 73 (regarding 2004 Kemp meeting with NHTSA regarding when engine stalls present a sufficient safety issue to conduct a recall).

[68] *Id.* at 183-84.

[69] Ex. 22 at GM-MDL2543-003456126.003.

[70] *E.g.*, New GM Brf. at 13; K&S Brf. at 23. As discussed in Plaintiffs' opening brief, only New GM's intent is relevant to the crime-fraud analysis. Pl. Brf. at 37-38.

[71] Ex. 15 at GM-MDL2543-000660577.008.

inadvertent movement of the ignition from run to accessory due to insufficient torque that was causing loss of power and airbag non-deployment. *See supra* at 7-9; Pl. Brf. at 14-16.

Moreover, by the time New GM and K&S settled Sullivan in August 2013[72] and Melton I in September 2013,[73] New GM lawyers and K&S were aware of: (a) the TSB; (b) the Indiana University study; (c) the ignition switch part change; and (d) that the ignition switches did not meet GM's minimum torque requirements. *See supra* at 7-9. In fact, New GM confidentially settled at least: (a) █ defect-related cases (including Sullivan and Melton) *after* New GM lawyers and K&S knew about the TSB and the Indiana University study;[74] and (b) █ defect-related claims (including Sullivan and Melton) *after* New GM lawyers and K&S knew about the TSB; the Indiana University study; the ignition switch part change; and that the ignition switches did not meet GM's minimum torque requirements.[75] New GM and K&S knew full well what was happening; they concealed evidence of the defect to prevent others from knowing it too.

### 3. The ignition switch defect was a defect under the Safety Act and under the relevant State laws.

New GM accuses Plaintiffs of "conflat[ing] 'defect' findings concerning a particular vehicle in a specific accident for the purposes of state tort law with safety defects for an entire fleet of vehicles sufficient to trigger NHTSA (or other regulatory) notification requirements."[76]

---

[72] Ex. 37 (Aug. 16, 2013 Sullivan settlement).
[73] Ex. 58 (Sept. 9, 2013 Melton I settlement).
[74] *See* Ex. 38 (T. Lambert Aug. 20, 2012 settlement), Ex. 37 (Sullivan August 16, 2013 settlement), ███████████████████████████████████████████████████████████████████████████ ██████████; and Pl. Brf. at 14-15 (GM lawyers and outside counsel knew about the TSB by March 2012 and the Indiana University study by June 2012).
[75] *See* Ex. 37, 60; Reply Exs. 12-14; Pl. Brf. at 22 (GM lawyers and K&S knew about the part change by April 2013); *see also* Reply Ex. 23, Valukas Rpt. at 176 (GM's outside expert confirmed for GM and K&S on July 30, 2013 that the ignition switches did not meet GM's torque specifications).
[76] *Id.* at 15.

But the K&S (and other) case evaluations do not merely reflect defect findings "concerning a particular vehicle in a specific accident."[77]

Instead, from the earliest K&S case evaluation, K&S told New GM counsel that GM engineers knew that the defect was not isolated to the particular crash vehicle but instead existed in other 2005-07 model year Cobalts.  For example, in Chansuthus, K&S reported that, prior to the Chansuthus crash, GM engineers had seen the same "'anomaly' in the ignition switch" in *other Cobalt vehicles* and that GM engineer Kathy Anderson was "relatively confident that this [same] anomaly prevented deployment in this accident."[78]   K&S argues that it was not in a "position to analyze whether there was a defect in any other GM vehicle"[79] but GM engineers had already done this work for them.  It was the very fact of the existence of the defect in Cobalts beyond the "particular vehicle in a specific accident" that gave rise to K&S's punitive damages warning.  Pl. Brf. at 10-11.  It was never the case (at least by the time of Chansuthus) that New GM and K&S were dealing only with isolated incidences – giving the lie to K&S's argument that it did not actually know, by November 2010, that there existed "clear evidence of a defect."  Moreover, by no later than March 2012, when New GM and K&S lawyers obtained the TSB—which identified the potential for the ignition to move from run to accessory in *all* 2005-07 Cobalts—they were clearly on notice that the defect applied to "an entire fleet of vehicles." And by the time K&S wrote its July 2013 Melton evaluation, and settled Sullivan and Melton, both New GM and K&S were well aware that the ignition switch defect had caused or contributed to deaths and injuries in at least 22 separate incidents.[80]

---

[77] *Id.*

[78] Ex. 1 at GM-MDL2543-000660601.008.

[79] K&S Brf. at 5, 6.

[80] Pl. Brf. at 10; Reply Ex. 2, GM-MDL2543-003458734, 737 (███████████████████████████████).

Further, it is clear that the ignition switch defect was a defect under the Safety Act and under the relevant State laws.  Under the Safety Act, a safety defect is defined to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8).  As New GM admitted in the Consent Decree and as commonsense dictates, the ignition switch defect plainly meets the definition of a "safety defect."  The ignition switch defect: (a) makes accidents likely, as it causes cars to stall and lose power steering and power brakes, and (b) makes those accidents extremely harmful, as it prevents airbags from deploying.

For the very same reasons, the ignition switch defect meets the definition of "defect" under the laws of every state that governed the K&S Cases. ███████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████[81]██████████████████████████

████████████████████████████████████████████████████████████

████████████████████[82]██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████[83] Each of the state-law definitions of "defect" are narrower than the definition of "safety defect" under the Safety Act.  Stated differently, it is not possible for the ignition switch to be "defective" under the state laws without also being a "safety defect" under the Safety Act.  And the very same Melton

---

[81] Ex. 15 at GM-MDL2543-000660577.010 (citing Tenn. Code Ann. § 29-28-102(8)).
[82] Ex. 13 at GM MDL2543-003455366.011 (citing S.C. Code Ann. § 15-73-10).
[83] Ex. 17 at GM-MDL2542-300002915 (citing *Banks v. ICI Americas, Inc.*, 450 S.E.2d 671, 674-675 (GA 1994)).

evaluation that discusses "defects" explicitly ███████████████████████████
███████████[84]

Finally, even if as New GM argues, a state law "defect" finding would not necessarily mean the car is defective under the Safety Act,[85] that does not defeat Plaintiffs' probable cause showing.  New GM effectively concedes this point when it argues that compliance with the Safety Act does not exempt a person from common law liability.[86]  If *compliance* with the Safety Act could be an intentional tort then surely a knowing *violation* of the Safety Act is intentionally tortious.

### 4.    Plaintiffs need not establish K&S's intent or participation in New GM's crime-fraud.

Both New GM and K&S defend against Plaintiffs' motion by arguing that K&S did not commit a crime-fraud or intend to further New GM's crime-fraud.[87]   But the law in this Circuit is clear that only New GM's conduct or intent is relevant in determining the applicability of the crime-fraud exception.  *See Chevron Corp. v. Donziger,* No. 11 Civ. 0691, 2013 WL 1087236, at *3 (S.D.N.Y. Mar. 15, 2013) ("If probable cause exists as to the commission of a fraud or crime, it is not necessary to show also that a lawyer from whom otherwise privileged or protected documents may be sought was a culpable or knowing participant in the fraud or crime."); Pl. Brf. at 37-38.  This holds true even for the vitiation of the work product privilege.  *Id.*  Neither New GM nor K&S cite any contrary controlling law – nor could they.[88]

---

[84] *Id.* at .008-10.

[85] New GM Brf. at 15.

[86] *Id.* at 16 n. 20.

[87] *See, e.g.,* New GM Brf. at 15 ("Plaintiffs fail to explain how K&S . . . intended to further a Safety Act violation."); K&S Brf. at 21-22, 25.

[88] K&S argues that because its work product was not shared with New GM, it could not have been used in furtherance of the crime-fraud.  That is a non-starter.  K&S cites no case holding that work product must have been shown to the client for the crime-fraud exception to apply.  There are no special rules for work product under controlling Second Circuit authority.  *See* Pl. Brf. at 37-40.  K&S's work product formed the basis of the advice and work performed on behalf of New GM in furtherance of the crime-fraud.

### 5.   New GM's and K&S's policy argument is inapplicable and trumped by weightier policy concerns.

New GM and K&S argue that policy reasons require the denial of Plaintiffs' motion because counsel must be free to render advice about the strengths and weaknesses of its client's case.[89] But Plaintiffs' motion does not implicate or challenge run-of-the-mill legal advice with respect to a single claim. Instead, Plaintiffs challenge New GM's continued pattern and practice of entering secret settlements of ignition switch defect claims, in the face of a clear duty to notify NHTSA and vehicle owners of the defect, for the express purpose of preventing evidence of the widespread nature of the defect from being exposed. New GM's and K&S's sky-is-falling argument, that Plaintiffs' theory would destroy the privilege any time any attorney settled a case a client might lose,[90] simply does not square with the issues presented by Plaintiffs' motion.

Moreover, K&S's complaint that Plaintiffs seek to turn the work product protection on its head[91] reflects a fundamental misunderstanding of the crime-fraud exception. The crime-fraud exception vitiates the privilege where privileged material, including work product, is used in furtherance of a crime-fraud. *See* Pl. Brf. at 26-27. It is not K&S's legal advice that destroys the privilege;[92] it is New GM's use of its lawyers' services (including work product) in furtherance of New GM's crime-fraud that vitiates the privilege. There is no "societal interest in enabling clients to get sound legal advice" where the privileged material "further[s] the commission of a crime or fraud." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995); *see also* Pl. Brf. at 26-27.

---

[89] New GM Brf. at 2, 14; K&S Brf. at 21-22.

[90] New GM Brf. at 14; K&S Brf. at 21-22.

[91] K&S Brf. at 21.

[92] K&S's confusion is the result of its improper focus on its intent or participation in New GM's crime-fraud. But, contrary to K&S's argument (K&S Brf. at 21), Plaintiffs do not assert, nor do they need to in order to establish probable cause, that *K&S* (as opposed to New GM) committed a crime-fraud by advising New GM to settle. Plaintiffs *do* assert that counsels' ethical violations are an independent basis for vitiation of claims of work product protection. *See infra* at 28-31.

19

New GM cites no authority holding or even suggesting that the public policy encouraging settlement[93] would trump "the overarching public policy principle that a court will not enforce privilege where to do so would facilitate a crime." *Madanes v. Madanes*, 199 F.R.D. 135, 148 (S.D.N.Y. 2001).   Although K&S complains that Plaintiffs offer a "dangerous theory,"[94] the bigger danger would result from sanctioning New GM's use of its lawyers to conceal evidence of a defect responsible for killing and injuring hundreds.

### D.   New GM used its attorneys' services in furtherance of its crime-fraud.

Plaintiffs' burden to establish probable cause to believe that the privileged materials were in furtherance of New GM's crime fraud is not a stringent one.   Pl. Brf. at 28; *see also U.S. v. Zolin*, 491 U.S. 554, 572 (1989).   New GM's criticisms of Plaintiffs' "in furtherance" showing should be rejected.

Plaintiffs do not rely on a mere "speculative hope" that additional privileged materials uncovered through the *in camera* review process might bolster their claims about "what and when New GM knew."[95]   Far from it.   Plaintiffs have adduced substantial evidence that by "ignor[ing] the mounting evidence of the dangers" and "fail[ing] to warn users of the dangers"[96] inherent in driving model year 2005-07 Cobalts, New GM, including its in-house counsel, perpetrated a crime-fraud.   Then, instead of disclosing the ignition switch defect, these in-house lawyers worked with K&S and other outside counsel to sweep claims about these incidents under the rug to prevent crash victims from obtaining evidence that New GM had known about the defect for years but took no action.   By participating in a pattern and practice of settling defect-related claims in order to prevent the claimants from obtaining evidence about which they should

---

[93] New GM Brf. at 14.
[94] K&S Brf. at 21.
[95] New GM Brf. at 26.
[96] *Dalkon Shield*, 107 F.R.D. at 15.

have already been made aware, New GM used its lawyers' communications and work product to "facilitate or conceal" its crime-fraud. At a minimum, therefore, any participation in settling defect-related claims after New GM and K&S were on notice of "clear evidence of [the ignition switch] defect" was in "furtherance of" New GM's crime-fraud.

Plaintiffs satisfy the "in furtherance" prong by showing that privileged material is "reasonably related" to New GM's crime-fraud. *In re Richard Roe, Inc.*, 68 F.3d 38 (2d Cir. 1995) ("*Roe I*") did not "soundly reject[]" the "reasonably related" standard, as New GM maintains. Rather, *Roe I* rejected a test that examined whether the material sought might provide evidence of a crime or fraud. *Id.* at 40; *see also Roe II*, 168 F.3d at 76 (describing *Roe I*).[97] Courts have frequently held, after *Roe I*, that the connection between the crime-fraud and the privileged material necessary to satisfy the "in furtherance" prong may be established by showing that the privileged material is "reasonably related" to the crime or fraud. *See, e.g., U.S. v. Ceglia*, No. 12-CR-876-VSB, 2015 WL 1499194, at *3 (S.D.N.Y. Mar. 8, 2015); *Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 427 (S.D.N.Y. 2013); *Zimmerman v. Poly Prep Country Day School*, No. 09-CV-4586-FB, 2012 WL 2049493 (E.D.N.Y. June 6, 2012); *In re Enron Corp.*, 349 B.R. 115, 127 (S.D.N.Y. 2006).[98]

Plaintiffs do not ask the Court to review *in camera* documents that merely may provide relevant evidence of activity in furtherance of the fraud,[99] nor do they seek review of every

---

[97] Because *Roe I* actually rejected the "evidence of a crime fraud argument" discussed by New GM at pages 25-27 of its brief, the entirety of pages 23-27 of New GM's brief all relate to the "evidence of a crime fraud" argument that is inapposite here.

[98] The requisite connection between the crime-fraud and the privileged material to establish "in furtherance" has also been described as a "purposeful nexus." *See, e.g., Amusement Indus., Inc.*, 293 F.R.D. at 427 (citing *In re Grand Jury Subpoenas Decus Tecum*, 798 F.2d 32, 34 (2d Cir. 1986)). Regardless of the test, Plaintiffs have established that the "client communication or attorney work product in question was itself in furtherance of the crime or fraud." *Roe I*, 68 F.3d at 40-41.

[99] New GM's cases (New GM Br. at 24-25) are inapposite. In *Freedman v. Weatherford International Ltd.*, No. 12-civ-2121, 2014 WL 3767034, at *2 (S.D.N.Y. July 25, 2014) (LAK) (JCF) the movant sought investigative documents, such as interview summaries, about the fraud that were created after the fraud. And, similarly, in *U.S. v.*

privileged document generated in connection with the K&S Cases.[100]   Instead, Plaintiffs

identified specific categories of privileged documents that are narrowly limited to the evaluations

and settlements of the K&S Cases and the ignition switch defect and New GM's disclosure

obligation in the context of those cases.  Pl. Brf. at 32-33.[101]  As to each, Plaintiffs have met their

burden in establishing probable cause to believe that the documents furthered or facilitated New

GM's intentional concealment of a known safety defect.[102]

   Courts have routinely held the "in furtherance" showing satisfied by the movant's

identification of tailored categories of documents that were intended to facilitate or conceal the

crime-fraud, as Plaintiffs have done here.  *See, e.g., U.S. v. Ceglia*, No. 12-CR-876-VSB, 2015

WL 1499194, at *3 (S.D.N.Y. Mar. 8, 2015); *Cendant Corp. v. Shelton*, 256 F.R.D. 401, 407 (D.

Conn. 2007); *AIA Holdings S.A. v. Lehman Bros., Inc.*, No. 97-CIV-4978-LMM-HBP, 1999 WL

61442, at *5 (S.D.N.Y. Feb. 3, 1999).[103]

---

*Stewart*, No. 03-CR-717, 2003 WL 23024461, at *2 (S.D.N.Y. Dec. 29, 2003) the government sought interview notes created by defense attorneys simply because the client was later indicted based on statements made during the interview; there was no evidence that the attorney notes were used in furtherance of the crime-fraud.

[100] Plaintiffs recognize that their request for *in camera* review of communications between New GM and K&S related to "other defense activities" (Pl. Brf. at 33) might sweep too broadly.  However, Plaintiffs used this phrase because that is the vague description used by New GM in its privilege log.  *See* Reply Ex. 16 (█████████████████ ██████████████); Reply Ex. 17 (███████████████████).  Plaintiffs will drop their request for review of all such documents provided any "defense activities" entry related to Plaintiffs' remaining categories will be subject to review by the Court.

[101] Plaintiffs cannot fairly be faulted for not identifying exactly which privileged documents were created in furtherance of the crime-fraud.  K&S has not prepared a privilege log with respect to its work product.  And New GM's log contains descriptions that are too vague for Plaintiffs to know exactly which entries pertain to the categories of documents that facilitated or concealed New GM's crime-fraud.  It is also unclear whether New GM has properly identified every entry related to the K&S Cases.  For example, a number of log entries that are likely Chansuthus-related, due to the date and recipients, are only generically identified as being related to ██████ ██████████████████ *See* Reply Ex. 18.

[102] Plaintiffs agree to drop, without prejudice, their request for review of the following categories:  "all communications between New GM and K&S relating to New GM's pre-recall investigation of the ignition switch defect (not associated with any matter)"; and "all communications between New GM and K&S lawyers Holladay and Franklin relating to the ignition switch recall and/or communications with NHTSA."  Pl. Br. at 33.

[103] In the distinguishable cases cited by New GM, movants sought the "*entirety* of the communications between Legal Bureau representatives and arresting officers," *MacNamara v. City of New York*, No. 04-CIV-9216, 2008 WL 186181, at *4 (S.D.N.Y. Jan. 18, 2008) (RJS) (JCF) (emphasis in original), and "*all* documents Defendant has withheld on the basis of privilege," *In re MetLife Demutualization Litig.*, No. CV-00-2258 (TCP) (AKT), 2007 WL

II.     **NEW GM COMMITTED CRIME-FRAUD THROUGH ITS MELTON DISCOVERY ABUSE AND USED ITS LAWYERS' SERVICES IN FURTHERANCE THEREOF.**

Plaintiffs have demonstrated probable cause to believe that the discovery misconduct in *Melton I* constituted a crime-fraud.   K&S told New GM in its case evaluations that New GM would face significant punitive damage awards in defect-related cases if the claimant obtained evidence that New GM knew that the ignition switch defect existed in other Cobalts.   Pl. Br. at 10-11.  Knowing this, New GM and K&S lied to the Meltons and the Melton court to prevent the disclosure of such evidence.   And then, when additional damning evidence became apparent, New GM and K&S prevented the Meltons from obtaining evidence proving that New GM had changed the ignition switch to remedy the design defect.

A.     **New GM and K&S lied when they said New GM had no documents regarding other incidents involving the condition identified in the TSB.**

New GM's and K&S's responses to requests regarding other incidents related to the TSB far exceeded the bounds of legitimate discovery conduct.

New GM and K&S stated that, *inter alia*: (a) "no responsive documents or claims or incidents" were located in connection with requests seeking the identity of and all documents related to every lawsuit, claim, or complaint that has been made against GM relating to the TSB (Pl. Brf. at 16); (b) New GM was "not withholding documents that are responsive"  (*id.* at 17); and (c) Mr. Franklin was personally unaware of any lawsuit or NISM "[s]ince 2005 against GM with regard to the ignition cutoff."  (*id.*).

At the time New GM and K&S made these statements, they knew them to be inaccurate. New GM knew that documents and information related to the long list of Cobalt non-deployment incidents were responsive to these requests because New GM (and K&S) knew that the condition

---

1017603, at *15 (S.D.N.Y. Mar. 30, 2007) (emphasis added).  Plaintiffs seek nowhere near all documents withheld by New GM or K&S on privilege grounds.

identified in the TSB explained airbag non-deployment in those incidents. Pl. Brf. at 14-16. And, of course, Franklin in particular was personally aware of: (a) Chansuthus and Sullivan, as he had informed New GM by this point that its engineers had identified an ignition switch "anomaly" that involved the car switching from run to accessory mode and likely caused the non-deployment in those cases (*id.* at 6-8); and (b) the fact that New GM engineers had seen other instances of the ignition switch defect besides the Chansuthus and Sullivan incidents (*id.* at 10-11). Moreover, Franklin himself had likened what occurred in Melton to the prior non-deployment incidents. *Id.* at 8.

K&S argues that it "truthfully" represented that "GM was not withholding any responsive documents *that had been found.*"[104] This is exactly the type of deceptive doublespeak that the Melton court found unacceptable: "you're representing to the Court that you've given every document." Pl. Brf. at 18. New GM and K&S knew that responsive documents existed and exactly where to find them but told the opposite to the Meltons and the Melton court.

New GM and K&S argue that they were justified in withholding documents and information related to the Cobalt non-deployment incidents because Melton was not a non-deployment case.[105] This argument ignores that, as New GM and K&S knew: (a) the Melton requests defined similar incidents as those that were related to the TSB, not by reference to whether or not the claim was for non-deployment; and (b) the condition identified in the TSB, insufficient force required to move the ignition from run to accessory, caused *both* loss of power *and* non-deployments. New GM and K&S repeatedly recognized the relevance of the airbag non-deployment incidents, as well as the TSB, to the Melton case. Franklin explained that the

---

[104] K&S Brf. at 12 (emphasis added). New GM similarly argues that "there is no evidence that anyone had located and deliberately refused to turn over documents that they believed were relevant and responsive." New GM Brf. at 18, n. 21. But New GM and K&S knew that the positions they were taking with respect to responsiveness and relevance were inaccurate, false and inconsistent with what they knew and said internally.

[105] New GM Brf. at 19; K&S Brf. at 11.

Melton facts fit the pattern seen in the Cobalt non-deployment incidents. Pl. Brf. at 8. Palmer sent the TSB to Mr. Porter as an "FYI on Melton." *Id.* at 14. Porter told the Melton Settlement Review Committee that the Cobalt non-deployments may be linked to the same ignition switch issue at play in Melton. *Id.* at 20. And K&S's July 22, 2013 Melton evaluation confirms that the same issue addressed by the TSB was at the root of the Cobalt non-deployment incidents. *Id.* at 19-20. As the lawyers knew, the same design defect – the ignition that inadvertently switched from run to accessory – was at issue in both Melton and the non-deployment incidents. The lawyers knew that the distinction upon which they relied was false.[106]

New GM's and K&S's current position, that they did nothing wrong in responding to Melton discovery, is belied by K&S's expectation that the Melton court would sanction New GM for discovery abuse. Pl. Brf. at 22. Under Georgia law, "a court may impose sanctions against a party who willfully fails to respond to discovery or who willfully disobeys a court order compelling discovery." *Resource Network Int'l, Inc. v. Ritz-Carlton Hotel Co.*, 232 Ga. App. 242, 242 (1998) (citing Ga. Code Ann. § 9-11-37); *Mableton Pkwy CVS, Inc. v. Salter*, 254 Ga. App. 162, 163 (2002). A sanction requires "a conscious or intentional failure to act, as distinguished from an accidental or involuntary non-compliance." *Id.*; *see also Fowler v. Atlanta Napp Deady, Inc.*, 283 Ga. App. 331, 334 (2007). K&S's view with respect to the likelihood of sanctions establishes probable cause to believe that New GM's conduct was intentional not inadvertent.[107]

---

[106] New GM's and K&S's argument that there could be no crime-fraud because New GM produced some documents regarding similar incidents does not defeat Plaintiffs' probable cause showing. New GM produced just *one* document related to non-deployment incidents and that was only after New GM told the Meltons at least twice that there were no responsive documents. Pl. Brf. at 16. Moreover, after that time, New GM continued to falsely withhold responsive, relevant airbag non-deployment incident documents. Pl. Brf. at 18. New GM's Melton production was far from not "perfect" (New GM Brf. at 20); it was intentionally calculated to hide evidence of the ignition switch defect. Accordingly, any cases holding that inadvertent omission of documents or other non-intentional discovery conduct are inapplicable here.

[107] The "fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause." *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 1999 WL 61442, at *5 (citing *U.S. v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985)). The cases New GM cites (New GM Brf. at 18-19) do not support any contrary rule. *Automated*

**B.      New GM and K&S hid evidence of the ignition switch part change.**

Plaintiffs have established probable cause that New GM and K&S sought to hide part change documents from discovery.  New GM and K&S told the Meltons that there were no such documents and, just a few days later, in connection with the internal investigation they sought to hide from the Meltons, began discussing the need to obtain such documents from Delphi.  Pl. Br. at 23.  Then, conveniently, New GM did not obtain part change documents until after *Melton I* settled.  *Id.*[108]



Recent deposition testimony from engineer Ray DeGiorgio

---

*Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504 (6th Cir. 2014) simply stated that an inadvertently produced privileged document did not discuss circumventing discovery obligations. *Danico A/S v. Novozymes A/S*, 427 F. Supp. 2d 443 (S.D.N.Y. 2006) simply held that the movant had failed to show any reasonable basis for a belief that complex patent positions taken during patent prosecution were in bad faith.  Neither case says anything about establishing probable cause when the facts suggest that demonstrated evidence of crime-fraud might also be consistent with an innocent explanation.

[108] New GM argues that it could not have intended to conceal part change documents because it produced to the Meltons a document that referenced the part change. New GM Brf. at 21.  But it cannot be that the production of this document evidences New GM's lack of intent, when New GM and K&S have repeatedly said that they were not aware of the part change until after DeGiorgio's deposition.  Only if New GM understood the significance of the document at the time it was produced could New GM argue that its production undercuts Plaintiffs' argument.

[109] Reply Ex. 19, Excerpts from June 19, 2015 Deposition of Raymond DeGiorgio at 451:18-22.

[110] *Id.* at 444:6-447:13; 451:7-22.

[111] *Id.* at 446:23-447:22.

[112] *Id.* at 447:14-22.



The discovery misconduct challenged by Plaintiffs was perpetrated by lawyers and furthered by lawyers.

### C.    Plaintiffs are not estopped from asserting that New GM's discovery abuse is a crime-fraud.

The is no merit to the contention that Plaintiffs are precluded from asserting that New GM's discovery abuse constitutes a crime-fraud because the Meltons settled their individual wrongful death action.[119] Whether Plaintiffs have "standing" to bring a claim on behalf of the Meltons is irrelevant; they are not bringing the Meltons' claims. They bring their own claims, and pursue their own, independent motion based on New GM's and K&S's efforts to conceal evidence of the ignition switch defects not just from the Meltons, but from Plaintiffs and the

---

[113] *Id.* at 450:19-451:22.

[114] *Id.* at 454:7-12.

[115] *See* 490:5-13 ("Q: And you knew the day after you had given your deposition in April of 2013 that your testimony was inaccurate?  A. Yes.  Q.  And when you signed the declaration a couple of weeks after that, you still knew that your testimony of being no design changes wasn't true.  A. Yes.") (objection omitted).

[116] *Id.* at 490:15-491:3.

[117] *Id.* at 452:9-453:18

[118] New GM prevented Plaintiffs from discovering exactly what Holladay told DeGiorgio about correcting his testimony on the errata sheet under claims of privilege. *Id.* at 448:16-450:18; 491:7-492:8.

[119] *See, e.g.*, New GM Brf. at 3, 21-22; K&S Brf. at 33.

public at large.  The Meltons did not settle anyone's claims but their own, and New GM points to no case law remotely suggesting that Plaintiffs' motion would in any way "disturb" the Melton wrongful death settlement.  It clearly would not.

To the extent that New GM implies that Plaintiffs are collaterally estopped, the argument contravenes hornbook law.  Issue preclusion can bar future litigation only of matters that have been actually decided. *NLRB v. Thalbo Corp.*, 171 F.3d 102, 109 (2d Cir. 1999); *Kent v. Kent*, 265 Ga. 211, 211, 452 S.E.2d 764, 766 (1995).  Here, K&S concedes that the motion on the crime-fraud exception was "mooted" before it was decided when the Melton case settled.  Because matters withdrawn before decision are not "actually decided," Plaintiffs cannot be estopped from relying on New GM's and K&S's misconduct in Melton.  *See* Wright, Miller & Cooper § 4420, 18 Fed. Prac. & Proc. Juris. § 4420 (2d ed.) (collecting cases).

## III.   COUNSELS' ETHICAL RULE VIOLATIONS PROVIDE AN ALTERNATIVE BASIS TO PIERCE THE WORK PRODUCT PRIVILEGE.

It cannot be disputed that "a lawyer's unprofessional behavior may vitiate the work product privilege." *Moody v. IRS*, 654 F.2d 795, 800 (D.C. Cir. 1981).[120]  While New GM makes light of the alleged ethical violations and their tragic results here,[121] nothing in the case law supports its argument that only "extraordinary" ethical violations pierce the privilege.  But just to be clear: Plaintiffs' proffered evidence provides probable cause to believe that had K&S and GM's in-house counsel behaved properly rather than help New GM conceal the ignition switch defect, death and catastrophic injury could have been avoided.

---

[120] *See also* Pl. Brf. at 39-40 (collecting cases).
[121] *See* New GM Brf. at 27 n. 27 (attempting to distinguish cases but not disputing the rule that ethical violations pierce the work product protections).

New GM relies on the testimony of Professors Wolfram and Green in defense of the conduct of counsel in this case.[122]  While the Court will conduct its own review of the record and reach its own conclusions, Plaintiffs have retained two highly esteemed ethicists to review the record and reach their own conclusions as to the propriety of the lawyers' conduct in light of the relevant rules of professional conduct.[123]

Professor Hazard has served as Distinguished Professor of Law Emeritus, Hastings College of Law; Trustee Professor of Law Emeritus, University of Law Emeritus, University of Pennsylvania; and Sterling Professor of Law Emeritus, Yale University.  He has also served as Reporter and chief draftsmen of the American Bar Association Model Rules of Professional Conduct.[124]  While Professor Hazard "fully accept[s] the proposition, advanced by my colleagues Professors Green and Wolfram, that a lawyer or law firm may properly represent a client in defending a series of allegedly wrongful event," he opines that "it cannot be and is not proper to continue to settle cases on a confidential basis in circumstances where the underlying conduct of the client involves continued disregard of clear and well-cognized obligations of disclosure and remediation, such as required by the Safety Act."[125]  He believes that, based on their knowledge of the "defect in the ignition switch system in Chevrolet Cobalt automobiles," and GM's concurrent obligation to recall the Cobalts, New GM's in-house counsel and K&S violated their ethical obligations under Model Rules 1.2(d) and 1.13(b) by continuing to assist New GM in its concealment of the defect and taking no remonstrative actions.[126]

---

[122] *See* New GM Brf. at 28-29.
[123] *See generally* Reply Exs. 20 and 21.
[124] Reply Ex. 20, ¶ 1.
[125] *Id.* ¶ 12.
[126] Professor Hazard found that the same or substantially similar rules were in effect in all potentially relevant jurisdictions. *See id.* at ¶¶ 6 and 9.

Professor Zitrin has been teaching legal ethics for 38 years, primarily at the University of San Francisco School of Law and the Hastings College of the Law where he currently teaches. He is the lead author of three books on legal ethics, including the widely used law school text *Legal Ethics in the Practice of Law*.[127] He also has extensive experience in the practice of law, and has tried approximately 50 cases to verdict.[128] Professor Zitrin opines that, based on his extensive review of the factual record: (a) New GM's in-house counsel had and breached the duties to advise decision-makers at New GM of the existence of the defect and New GM's resultant disclosure obligations under Model Rules 1.4(a)(3), 1.4(b), and 1.13 (as implemented in the relevant States);[129] (b) both K&S and New GM in-house counsel violated Model Rule 4.1 by participating in New GM's "pattern and practice of resolving ignition switch defect-related matters" in order to hide information about the defect from NHTSA, Cobalt car owners, dealers and others;[130] and (c) K&S violated Model Rules 3.3 and 4.1 by falsely responding to the Meltons' discovery requests.[131] █████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████[132]████████████████████████

████████████████████████████████████████████████████████████

████.[133]

In sum, while no one disputes the proper role of either zealous advocacy or work product protection in our legal system, ethical rules require that lawyers not assist clients in ongoing

---

[127] Reply Ex. 21 ¶ 2.
[128] *Id.*
[129] *Id.* ¶¶ 8-16, 31-33.
[130] *Id.* at ¶¶ 17-24, 36-38.
[131] *Id.* at ¶¶ 25-27, 34-35, 39.
[132] Reply Ex. 22, Excerpts of the Aug. 13, 2015 Deposition of Lucy Clark-Dougherty (rough transcript) at 109:22-110, 112:4-7 (Kemp); *id.* at 24:9-26:10 (Buonomo).
[133] *Id.* at 26:6-8.

fraud, not participate in conduct that deceives litigants, the public or regulators, and that they take appropriate steps when they know or should know that ongoing fraudulent or wrongful acts are being committed by agents of their clients.  Because the lawyers breached their ethical obligations here, their work product is entitled to no protection.

## IV.   PLAINTIFFFS PROPOSE A MANAGEABLE *IN CAMERA* REVIEW PROCESS.

The mere fact that the volume of documents at issue is more than a handful does not mandate the denial of Plaintiffs' motion, as K&S suggests.[134]  Indeed, New GM "*does not object*" to submitting for *in camera* review a sampling of the privileged documents, "or all of such materials," in its possession.[135]

Other courts have successfully managed *in camera* review in connection with crime-fraud challenges to a much broader universe of documents than is at issue here.  For example, movants in litigation against the tobacco companies made a sufficient showing to trigger *in camera* review of some 230,000 documents containing more than 1,000,000 pages.  *See State of Minnesota v. Philip Morris, Inc.*, 606 N.W.2d 676, 681 (Minn. Ct. App. 2000).[136]  Like the court in the *Minnesota* litigation, Plaintiffs propose that this Court conduct a "categorical review process" by which the Court will review a limited number of documents from each category in order to determine whether the crime-fraud exception applies.  *Id.* at 682.  Based on the results

---

[134] K&S Brf. at 18.  K&S, however, has not provided Plaintiffs with a privilege log and has not identified how many documents within the entire universe of K&S Case-related documents fall within the limited categories of documents Plaintiffs seek.  New GM does not state the number of allegedly privileged documents within its possession that are at issue on this motion, but apparently does not think the number is unmanageable because it has volunteered to produce them all for inspection by the Court.

[135] New GM Brf. at 5 (emphasis added); *id.* at 29.  However, there is no need, nor controlling Second Circuit authority, requiring the evidentiary hearing proposed by New GM.

[136] In a variety of contexts, other courts have conducted *in camera* review of a sample of documents to consider the propriety of privilege and work product designations.  *See, e.g., Makhoul v. Watt, Tieder, Hoffar & Fitzgerald, LLP*, 2014 U.S. Dist. LEXIS 32239 at *32 (Plaintiff permitted to select documents for *in camera* review "to serve as a sample from the entire universe of documents he challenged from Defendants' privilege log."); (E.D.N.Y. Mar. 12, 2014) (*Grand River Enterprise Six Nations, Ltd. v. Pryor*, No. 02-CIV-5068, 2008 U.S. Dist. LEXIS 24919 at *5-6 (S.D.N.Y. Mar. 14, 2008) (Plaintiff ordered to select documents for *in camera* review to resolve challenge to privilege assertions).

of that initial *in camera* review, the Court may decide to (i) review additional documents; or (ii) determine, as in *Minnesota*, that certain categories of documents are not privileged under the crime-fraud exception; or (iii) it if finds that the crime-fraud exception does not apply, it may choose to end the process at that point.

Given New GM's willingness to engage in this process, Plaintiffs propose that the parties meet and confer to develop a similar categorical review process for the Court's *in camera* review.[137] Subject to its meet and confer with New GM and K&S, Plaintiffs preliminarily propose that the Court review:

(1) **50 internal K&S documents and 75 internal New GM**[138] **documents** related to the K&S Cases concerning (i) an evaluation of the claims in those matters; (ii) settlement; (iii) the ignition switch defect or "anomaly"; and (iv) whether New GM was or might be obligated to report a safety defect to the National Highway Traffic Safety and **75 communications between K&S and New GM** related to the same topics; and

(2) A maximum of **30 internal K&S documents** and **30 internal New GM documents** generated in connection with New GM's response to the Melton Plaintiffs' Second Set of Interrogatories, Second Request for Production of Documents and Fifth Request for Production of Documents and **60 communications between K&S and New GM** related to the same topics.

(3) A maximum of **20 internal K&S documents** relating to whether rules of professional responsibility applicable to lawyers permitted or required K&S to reveal information relating to its representation of New GM (or withdraw from representation) in connection with the ignition switch defect.

Moreover, because New GM's effort to conceal the ignition switch defect through settlement was not limited to the K&S Cases, Plaintiffs also submit that, for all the reasons discussed above as to the K&S Cases, New GM should produce for *in camera* review additional documents falling within category one (1) above that relate to the Lambert and Preuss matters

---

[137] As part of the meet and confer process, Plaintiffs are willing to discuss the selection process with K&S, and whether or not documents may be segregated into appropriate categories without the need for K&S to create a privilege log.

[138] Plaintiffs inadvertently omitted from their Motion a request that the Court also review *in camera* internal New GM attorney/client communications (to the extent they are not also work product). Any *in camera* review of these topic areas should logically include such documents.

(which were both handled by New GM attorney Palmer).  Like the K&S Cases, New GM settled Lambert and Preuss to avoid having "to contend with other incidents, some of which resulted in deaths, due to the non-deployment of the frontal airbags in the 2005-2007 Cobalt"[139] and the "straightforward" non-deployment of the airbag in accessory position.[140]  To the extent the Court finds that Plaintiffs have met their probable cause showing as to the K&S Cases, it follows that Plaintiffs' have made the requisite showing as to these cases as well.

## CONCLUSION

For all the foregoing reasons and those set out in Plaintiffs' opening brief, Plaintiffs' requested relief should be granted.

Dated: August 14, 2015

Respectfully Submitted,

By: ___/s/ Robert C. Hilliard_____
Robert C. Hilliard

HILLIARD MUÑOZ GONZALES L.L.P.

719 S Shoreline Blvd, Suite #500
Corpus Christi, TX 78401
Telephone:  (361) 882-1612
Facsimile:  (361) 882-3015
*bobh@hmglawfirm.com*

Anne K. Fornecker
919 Congress Ave., Suite 1325
Austin, TX 78701
Telephone: (512) 993-3069
*anne@hilliardshadowenlaw.com*

HAGENS BERMAN SOBOL SHAPIRO LLP

Steve W. Berman
*steve@hbsslaw.com*
Sean R. Matt
*sean@hbsslaw.com*

---

[139] Pl Brf. at 11.
[140] Ex. 22 at GM-MDL2543-003456126.003.

33

Andrew M. Volk
*andrew@hbsslaw.com*
Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

Elizabeth J. Cabraser
*ecabraser@lchb.com*
Steven E. Fineman
*sfineman@lchb.com*
Rachel Geman
*rgeman@lchb.com*
Annika K. Martin
*akmartin@lchb.com*
275 Battery St., 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Co-Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on August 14, 2015, which will send notification of such filing to the e-mail addresses registered.

*s/ Robert C. Hilliard*

Robert C. Hilliard