# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE:<br><br>GENERAL MOTORS LLC IGNITION SWITCH LITIGATION<br><br>*This Document Relates To*<br><br>RICKEY SCOTT CREEGER,<br><br><br>                    PLAINTIFF,<br><br>v.<br><br><br>GENERAL MOTORS, LLC,<br><br><br>                    DEFENDANT. | MDL No. 14-MD-2543 (JMF)<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff RICKEY SCOTT CREEGER ("Creeger" or "Plaintiff") and files this Original Complaint and Jury Demand complaining of Defendant GENERAL MOTORS LLC ("New GM" or "Defendant"), and would respectfully show as follows:

## INTRODUCTION

1.      Plaintiff Creeger has brought this action against New GM[1] for the personal injuries and related damages he has sustained arising out of an incident or accident that occurred on November 17, 2014 ("Accident" or "Incident"), which were proximately caused by his 2004 Oldsmobile Alero Coupe, which was equipped with a defective Ignition Switch, and which was subsequently recalled in April 2014. This case involves personal injuries arising from Defendant General Motors LLC's ("New GM") egregious and ongoing failure to disclose, and the affirmative and fraudulent concealment of, a known safety defect in certain General Motors ("GM") vehicles. Plaintiff brings this Complaint against New GM as the sole Defendant, and asserts claims for relief based on New GM's liability based on its knowledge, conduct, and breach of its duties toward the purchasers of GM vehicles, as well as its duties as successor of Old GM.  This Complaint seeks recovery of damages arising from New GM's breaches of its independent, non-derivative duties toward Plaintiff.  This Complaint also asserts claims against New GM for liability as a successor and mere continuation of the pre-2009 bankruptcy General Motors Corporation ("Old GM").

2.      This Complaint sets forth those facts relating to Old and New GM's unprecedented abnegation of basic standards of safety, truthfulness, and accountability, to the detriment of millions of consumers and the public at large, and specifically, Plaintiff.  It draws upon an array of sources, including documents GM produced to the National Highway Traffic Safety Administration ("NHTSA"), the House Energy & Commerce Committee, and the results of an internal investigation overseen by Anton R. Valukas ("Valukas Report").

---

[1] "New GM" is what the bankruptcy court has described as "the acquirer of most of Old GM's assets in a section 363 sale back in July 2009." (*See* Decision at 1.) "Old GM" refers to General Motors Corporation, prior to the 363 Sale, which filed a Chapter 11 bankruptcy in 2009. (*Id.*)

3.      On June 1, 2015, as part of the MDL proceedings in this case, Judge Robert E. Gerber, United States Bankruptcy Judge in the Southern District of New York, entered a Judgment based on his April 15, 2015, "Decision on Motion to Enforce Sale Order" concerning what liabilities were assumed by "Old GM" versus "New GM" after the General Motors bankruptcy for certain groups of Plaintiffs who have brought a variety of claims against the General Motors entities. (*See* ECF Doc. 13109, Case No. 09-50026-REC, April 15, 2015, "Decision on Motion to Enforce Sale Order" (hereinafter, "Decision") and ECF Doc. 13177, June 1, 2015, "Judgment" on that Order.)

4.      The gist of the Judgment and Decision concern matters that are not applicable to Plaintiff Rickey Creeger lawsuit, as his is a **post-sale personal injury claim made against New GM**. Plaintiff Rickey Creeger has sued New GM. While there is a great deal of necessary background information regarding the history of the recall which involved Old GM, there are no causes of action asserted against it. Indeed, the Decision by Judge Gerber contained the following footnote:

> There may be misunderstandings as to the matters now before the Court. **New GM has already undertaken to satisfy claims for death, personal injury, and property damage in accidents occurring after the 363 Sale – involving vehicles manufactured by New GM and Old GM alike.**   Except for *pre*-Sale accidents that are the subject of the Pre-Closing Accident Plaintiffs' contentions, addressed below (where those plaintiffs wish to sue New GM in lieu of Old GM), this controversy does not involve death, personal injury, or property damage arising in accidents. Instead it involves only *economic losses* allegedly sustained with respect to Old GM vehicles or parts.

(Decision at 3, n.4.) (Bold underlined emphasis by Plaintiff; italic emphasis by Court.)

5.      As will be discussed herein, New GM assumed liabilities for personal injuries even for those arising out of defective vehicles manufactured under Old GM for those accidents or incidents occurring after the Closing Date, which was July 10, 2009. (Decision at 24, n.34.) The

Economic Loss Plaintiffs, as the Court described them in the Decision, are "claims for alleged reduction in the resale value of affected cars, other economic loss (such as unpaid time off from work when getting an ignition switch replaced), and inconvenience." (Decision at 2.) Plaintiff Rickey Creeger has not claimed such damages in his lawsuit against New GM, which is based on his personal injuries and damages resulting therefrom as a direct result of the accident or incident occurring on November 17, 2014 (after the Closing Date), involving the defective recalled 2004 Oldsmobile Alero. In addition, Plaintiff Rickey Creeger's claims are based on New GM's conduct as owner and operator of GM.[2]

6.     Plaintiff Rickey Creeger is making it clear that this is a personal injury claim against New GM based on a post-sale/post-closing date accident or injury and that those particular economic losses identified by Judge Gerber in his Decision are not a basis of his lawsuit.

**PARTIES**

7.     Plaintiff Rickey Creeger is an individual adult resident of the State of Washington. At the time of the subject automobile collision on November 17, 2014, Plaintiff was driving a General Motors vehicle (2004 Oldsmobile Alero) which was subsequently recalled in March 2014 for the now infamous Ignition Switch Defect.  The Subject Vehicle was purchased by and titled to Plaintiff.  The date in question was a nice day, weather was not a factor, and Plaintiff was driving along the road, and not speeding, when his car locked up on him while he approached a curb, he was unable to steer, and he crashed.  The airbags did not deploy and the car was totaled.  Due to the severity of the crash, Rickey Creeger lost a significant amount of time from work and incurred a very large amount of medical bills in trying to correct his broken bones, injuries, and hospital visits, and resultant physical therapy.  The Ignition Switch at issue is a simple and inexpensive

---

[2] *See* Decision at 15, n. 15 citing *Burton v. Chrysler Grp., LLC (In re. Old Carco)*, 492 B.R. 392, 405 (Bankr. S.D.N.Y. 2013) (Bernstein, C.J.).

part, as can be seen in the photographs and measurements from McSwain Engineering, Inc., below:



McS|WAIN ENGINEERING, INC.

1 of 5

PROJECT:          General Motors Ignition Switch

Exemplar Chevrolet Cobalt Switch Detent Plungers

5.9 mm

2005
Model Year

9.24 N-cm
RUN-to-ACC
Torque Value

10.6 mm

12.2 mm

New Service
Replacement
Part

17.57 N-cm
RUN-to-ACC
Torque Value

7.0 mm

1 mm

4/26/2013
MDP_A-E001

The top component is the switch detent plunger of a 2005 Chevrolet Cobalt, which is one of the seven GM models that have been recalled over problems with the vehicles' ignition switches. The bottom image is the same component in new service replacement part. It's longer in order to produce more tension. The weak tension of the shorter spring is believed to be the reason why ignition keys in the cars would easily switch from the on position to the accessory position if jostled. Courtesy of McSwain Engineering

8.      Defendant GENERAL MOTORS LLC is a Delaware corporation with its headquarters in Detroit, Michigan.  GENERAL MOTORS LLC does business in the State of New York and every state in the United States. GENERAL MOTORS LLC, also referred to as "New GM," is the successor in interest to General Motors Corporation.

9.     General Motors Corporation was a Delaware corporation with its headquarters in Detroit, Michigan.   The Corporation, through its various entities, designed, manufactured, marketed, distributed and sold Pontiac, Saturn, Chevrolet and other brand automobiles in New York, New Jersey, Washington, and multiple other locations in the United States and worldwide.

10.     In 2009, General Motors Corporation filed for bankruptcy, and substantially all of its assets were sold pursuant to a Master Sales and Purchase Agreement ("Agreement") to Defendant GENERAL MOTORS LLC ("New GM").

11.     Under the Agreement, Defendant GENERAL MOTORS LLC, New GM, also expressly assumed certain liabilities of General Motors Corporation, including certain statutory requirements:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.[3]

In addition, General Motors LLC expressly set forth that it:

> shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [General Motors Corporation] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.[4]

12.     Further, New GM, through the Agreement, also assumed liabilities for "(a) Claims for "**Products Liabilities**" (a term defined in the Sale Agreement), with respect to which New GM

---

[3] Decision at 25, n.40.
[4] Decision at 25, nn. 35-36.

would assume (but assume only) those that arose out of 'accidents or incidents' occurring on or after the Closing Date" as discussed in the Decision. (Decision at 23-25.) Judge Gerber referred to his prior "Sale Decision" (sometimes referred to as his "Sale Opinion") and noted again that the Sale Agreement was amended and "broadened the Assumed Liabilities to include '*all* product liability claims arising from accidents or other discrete incidents[5] arising from operation of GM vehicles occurring subsequent to the closing of the 363 Transaction, *regardless of when the product was purchased.*'" (*Id.* at 25 citing *In re General Motors Corp.*, 407 B.R. 463, 481-82 (emphasis in original) (Bankr. S.D.N.Y. 2009) (Gerber, J.) (the "***Sale Opinion***").[6]

13.     At all times relevant herein, General Motors Corporation and its successor in interest GENERAL MOTORS LLC, New GM, were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Subject Vehicle, as described in this Petition, and other motor vehicles and motor vehicle components throughout the United States. Pursuant to this Court's direction that new plaintiffs can file directly in the MDL without first filing in the district in which

---

[5] Decision at 24, n. 33. Judge Gerber noted the Court addressed the meaning of "incidents" in its decisions in *In re. General Motors Liquidation Co.*, 447 B.R. 142, 149 (Bankr. S.D.N.Y. 2011) (Gerber, J.) ("*GM-Deutsch*") and *In re. General Motors Liquidation Co.*, 513 B.R. 467 (Bankr. S.D.N.Y. 2014) (Gerber, J.) ("*GM-Phaneuf*"). In footnote 33, the Court stated:

> In *GM-Deutsch*, the Court accepted the explanation proffered by New GM counsel in which he stated that the language was drafted to cover situations similar to accidents that might not be said to be accidents, such as a car catching on fire, blowing up, or running off the road – in each case where it could cause a physical injury to someone. 447 B.R. at 148, n. 20. In *GM-Phaneuf*, the Court made reference to its earlier *GM-Deutsch* ruling, describing it, in a parenthetical following the citation, as "construing the 'incidents' portion of the 'accidents or incidents' language (in the context of claims against New GM by the estate of a consumer who had been in an accident before the 363 Sale, but died thereafter) as covering more than just "accidents," but covering things that were similar, such as fires, explosions, or other definite events that caused injuries and resulted in the right to sue"). 513 B.R. at 472 n. 17.

*Id.*

[6] Subsequent history: *stay pending appeal denied,* 2009 WL 2033079 (S.D.N.Y. Jul. 9, 2009) (Kaplan, J.), *appeal dismissed and aff'd sub nom Campbell v. General Motors Corp.*, 428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.) and *Parker v. General Motors Corp.*, 430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.), *appeal dismissed*, No. 10-4882-bk (2d Cir. July 28, 2011) (*per curiam*, Jacobs CJ, and Hall and Carney, JJ.), *cert denied*, 132 S.Ct. 1023 (2012.)

they reside, Plaintiff is filing this action as if it had been filed in the judicial district in which he resides.

## VENUE AND JURISDICTION

14.      This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) because the amount in controversy for this action exceeds $75,000, and Plaintiff is a citizen of a different state than Defendant.

15.      This Court has personal jurisdiction over New GM because it conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

16.      Venue is proper in this District under 28 U.S.C. § 1391 because New GM, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, New GM transacts business within this District, and some of the events establishing the claims arose in this District.

17.      Pursuant to this Court's direction that new plaintiffs can file directly in the MDL without first filing in the district in which they reside, Plaintiff is filing this action as if it had been filed in the judicial district in which they reside.

## STATEMENT OF FACTS

### Background

18.      As used in this Petition, the "Subject Vehicles" refers to the GM vehicles sold in the United States equipped at the time of sale with ignition switches (the "Ignition Switches") sharing a common, uniform, and defective design, including the following makes and model years:

- 2005-2010 Chevrolet Cobalt
- 2006-2011 Chevrolet HHR
- 2006-2010 Pontiac Solstice
- 2003-2007 Saturn Ion
- 2007-2010 Saturn Sky

- 2005-2010 Pontiac G5

19.     Plaintiff's 2004 Oldsmobile Alero (the "Subject Vehicle") falls within this line of Subject Vehicles as discussed in this Petition. An estimated 2.6 million vehicles were sold in the United States equipped with the Ignition Switches.  Upon information and belief, there are other vehicles sold in the United States equipped with the Ignition Switches that have not yet been disclosed by GM.

20.     The Ignition Switches in the Subject Vehicles turn on the vehicle's motor engine and main electrical systems when the key is turned to the "run" or "on" position.  The Ignition Switches have several common switch points, including "RUN" (or "ON"), "OFF," and "ACC" ("accessory").  At the "run" position, the vehicle's motor engine is running and the electrical systems have been activated; at the "accessories" position the motor is turned off, and electrical power is generally only supplied to the vehicle's entertainment system; and at the "off" position, both the vehicle's engine and electrical systems are turned off.  In most vehicles, a driver must intentionally turn the key in the ignition to move to these various positions.

21.     GM began installing the Delphi-manufactured Ignition Switches beginning in 2002 vehicle models.  Upon information and belief, Delphi knew the Ignition Switches were defectively designed, but nonetheless continued to manufacture and sell the Subject Ignition Switches with the knowledge that they would be used in GM vehicles, including the Subject Vehicles.

22.     Because of defects in their design, the Ignition Switches installed in the Subject Vehicles are, by their nature, loose and improperly positioned and are susceptible to failure during normal and expected conditions. The ignition module is located in a position in the vehicle that allows a driver to contact the key ring, and inadvertently switch the ignition position.  Due to faulty design and improper positioning, the Ignition Switches can unexpectedly and suddenly move from

the "on" or "run" position while the vehicle is in operation to the "Off" or "Acc" position (the "Ignition Switch Defect"). When this ignition switch failure occurs, the motor engine and certain electrical components such as power-assisted steering and anti-lock brakes are turned off, thereby endangering the vehicle occupants.

23.     The Ignition Switch Defect can occur at any time during normal and proper operation of the Subject Vehicles, meaning the ignition can suddenly switch off while it is moving at 70 mph on the freeway, leaving the driver unable to control the vehicle.

24.     GM has acknowledged that the Ignition Switch Defect has caused at least thirteen deaths.  GM has refused, however, to disclose the identities of those it counts among these thirteen deaths.  Independent safety regulators have recorded 303 deaths associated with only the Saturn Ion and Chevrolet Cobalt Subject Vehicle models. The actual number of deaths for all Subject Vehicle models is expected to be much higher.

25.     The Ignition Switch Defect precludes drivers and owners of the Subject Vehicles, such as Plaintiff, from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers them and other vehicle occupants.  However, no driver or owner of the Subject Vehicles, including Plaintiff, knew, or could reasonably have discovered, the Ignition Switch Defect, prior to it manifesting in a sudden and dangerous failure.

26.     Upon information and belief, prior to the sale of the Subject Vehicles, GM knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to GM, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field testing done in response to those complaints; aggregate data from GM dealers; and accident data, yet despite this

knowledge, GM failed to disclose and actively concealed the Ignition Switch Defect from Plaintiffs and the public, and continued to market and advertise the Subject Vehicles as reliable and safe vehicles, which they are not.

27.     New GM being fully aware of the problem also failed to warn Plaintiff and the public, which Judge Gerber noted in his Decision. (*E.g.,* Decision at 63.) From July 10, 2009, through the spring of 2014, New GM had full knowledge of the defective part and the risks associated with it and failed to recall the vehicles as it was required by statute to do and otherwise warn Plaintiff and the public.

28.     As a result of New GM's alleged misconduct, Plaintiff has suffered severe injuries due to the Subject Vehicle's unsafe nature, and due to the fact that the Subject Vehicle is unfit for their ordinary and intended use, and have manifested, or are at unreasonable risk of manifesting, the Ignition Switch Defect by way of a sudden and dangerous failure that puts users at serious risk of injury or death. Drivers and owners of the Subject Vehicles, including Plaintiff, did not receive the benefit of their bargain as purchasers and/or lessees, received vehicles that were of a lesser standard, grade, and quality than represented, and did not receive vehicles that met ordinary and reasonable consumer expectations. Drivers and owners of the Subject Vehicles, including Plaintiff, did not receive vehicles that would reliably operate with reasonable safety, and that would not place drivers and occupants in danger of encountering an ongoing and undisclosed risk of harm, which could have been avoided, as New GM knew but did not disclose, through the use of non-defective ignition parts.

### The Subject Vehicles

29.     The Saturn Ion was a compact car first introduced in 2002 for the 2003 model year, and was discontinued in 2007.

30.     The Chevrolet Cobalt was a compact car first introduced in 2004 for the 2005 model year, and was discontinued in 2010.

31.     The Pontiac G5 was first introduced in 2004 for the 2005 model year, and was discontinued in 2009.  The coupe and four-door sedan version of the G5 was marketed in Canada from 2005 to 2010.

32.     The Chevrolet HHR was a compact car first introduced in 2005 for the 2006 model year, and was discontinued in 2011.

33.     The Pontiac Solstice was a sports car first introduced in 2005 for the 2006 model year, and was discontinued in 2009.

34.     The Saturn Sky was first introduced in 2006 for the 2007 model year, and was discontinued in 2009.

35.     The Saturn Ion, Pontiac G5, Chevrolet HHR, and Chevrolet Cobalt were constructed on GM's Delta Platform.

36.     The Saturn Sky and Pontiac Solstice were constructed on GM's Kappa Platform.

37.     Upon information and belief, GM promoted these Subject Vehicles as safe and reliable in numerous marketing and advertising materials.

38.     No reasonable consumer expects that the vehicle that he or she purchases or leases contains a known but undisclosed design defect that poses a safety risk at the time or purchase or lease.

**GM Field Reports and Internal Testing Reveal a Problem**

39.     In 2001, during pre-production of the 2003 Saturn Ion, GM engineers learned that the ignition switch could unintentionally move from the "run" position to the "accessory" or "off" position. In an internal report generated at the time, GM identified the cause of the problem as "low detent plunger force." The "detent" is part of the ignition switch's inner workings that keeps

the switch from rotating from one setting to another unless the driver turns the key. The report stated that than an "ignition switch design change" was believed to have resolved the problem.

40.     In 2003, a second report documented an incident with a Saturn Ion where "a service technician observed a stall while driving." There the technician noted that the owner had several keys on the key ring and surmised that the "weight of the keys had worn out the ignition switch" and replaced the switch and closed the matter.

41.     GM engineers encountered the problem again in 2004 just prior to the launch of the 2005 Chevrolet Cobalt. GM learned of an incident in which a Cobalt vehicle suddenly switched out of the "run" position and lost engine power. GM engineers were able to replicate this problem during test drives of the Cobalt. According to GM, an engineering inquiry known as a Problem Resolution Tracking System ("PRTS") was able to pinpoint the problem and evaluate a number of solutions; however, after considering "lead time required, cost, and effectiveness," GM decided to do nothing. New GM also decided to do nothing for almost five years.

42.     After the Chevrolet Cobalt entered the market in 2004, GM began receiving complaints about incidents of sudden loss of engine power. GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently." Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch . . . [and a] low position of the lock module [on] the [steering] column."

43.     Additional PRTS's were opened to investigate the problem, and in May 2005, GM engineers proposed redesigning the key head from a "slotted" to a "hole" configuration to prevent

inadvertent shifting of the key in the ignition. Although GM initially approved the design, the company once again declined to act.

44.     GM CEO Mary Barra explained in her April 1, 2014, testimony before the House Committee on Energy and Commerce that the proposed "fix" for the Ignition Switch Defect was rejected in 2005 because it would have taken too long and cost too much. Ms. Barra testified that GM's decision making was the product of a "cost culture" versus a "culture that focuses on safety and quality."

45.     In April 2006, GM approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by the supplier, Delphi. According to GM, the changes included a new detent plunger and spring, but there was no corresponding change in the ignition switch part number. GM estimates that Delphi began producing the redesigned ignition switch for all Subject Vehicles during the 2007 model year.

46.     Delphi assigned its newly designed switch the same part number assigned to the faulty ignition switch. Upon information and belief, Delphi's action was intended to make it difficult to trace the defective switch back to its original design in 2001.

47.     After another PRTS in 2009, GM redesigned the Chevrolet Cobalt key, changing the top of the key from a "slot" design to a "hole" design—as had been suggested in 2005. GM instituted the change after finding that consumers "with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off" and the design change was intended to "significantly reduce downward force and the likelihood of this occurrence." The new key design was produced for 2010 model year under New GM.

48.     According to Delphi, the component required to fix the Ignition Switch Defect costs approximately $2 to $5. GM management estimated that replacement components would cost an additional 90 cents per vehicle, but would only save 10 to 15 cents in warranty costs.

49.     New GM also now acknowledges that Field Product Reports and PRTS reports related to the Subject Vehicles from 2003 and 2006 concerned engine stalling in the Saturn Ion and may be related to the Ignition Switch Defect.

**GM Issues Information Service Bulletins**

50.     In 2005, as a result of internal investigation, GM issued an Information Service Bulletin entitled the "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007) to GM dealers warning about a stalling problem related to inadvertent shifting of the ignition switch. The bulletin applied to 2005 and 2006 Chevrolet Cobalt, 2006 Chevrolet HHR, 2005 and 2006 Pontiac Pursuit (Canada only), 2006 Pontiac Solstice, and 2003 to 2006 Saturn Ion, which all had the same ignition switch.

51.     The bulletin advised that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort," noting that risk was greater "if the driver is short and has a large and/or heavy key chain" such that "the driver's knee would contact the key chain while the vehicle was turning." GM dealers were told to inform consumers of this risk, and recommend "removing unessential items from their key chain." The bulletin also informed dealers that GM had developed an insert for the key ring so that "the key ring cannot move up and down in the slot any longer – it can only rotate on the hole" and that the key ring has been replaced by a smaller design such that "the keys [will] not hang[ ] as low as in the past."

52.     On July 19, 2005, *The New York Times* reported that Chevrolet dealers were telling Cobalt owners to remove extra items from their key rings to prevent accidental stalling of their vehicles. Alan Adler, GM's Manager for Safety Communications, stated that the problem

manifested in only "rare cases when a combination of factors is present." Adler advised that consumers "can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings."

53.    *The Times* reporter noted that his wife had already encountered the problem with the Chevrolet Cobalt: she was driving on a freeway, accidentally bumped the steering column with her knee, and found the engine "just went dead." She was able to safely coast to the side of the road. When the vehicle was brought back to the Chevrolet dealer for an inspection, nothing was found wrong and they were advised of the service bulletin. The reporter stated that the key chain being used at the time of the stalling incident was provided by GM, and included only the key fob and a tag.

54.    GM, in a statement at the time through Adler, insisted that this problem was not a safety issue because "[w]hen this happens, the Cobalt is still controllable" and the "engine can be restarted after shifting to neutral." Adler also claimed that this ignition issue was widespread because "practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition . . . ."

55.    In October 2006, GM updated the Information Service Bulletin, "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007A) to include additional vehicles and model years. Specifically, GM included the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, the 2007 Pontiac Solstice, the 2007 Saturn Ion, and the 2007 Saturn Sky. The updated bulletin included the same service advisories to GM dealers as the earlier version.

56.    According to GM, the service bulletin was the appropriate response "given that the car's steering and braking systems remained operational even after a loss of engine power." GM

reports that GM dealers provided 474 key inserts to GM vehicle owners who brought their vehicles in for servicing.

### Reports of Unintended Engine Shut Down

57.     A number of reports from warranty and technical assistance data beginning in 2003, "addressed complaints of stalling Ion vehicles." Despite these reports, the Saturn Ion remained in production until 2007.

58.     On May 26, 2005, a reporter for *The Daily Item* in Sunbury, Pennsylvania reviewed the Chevrolet Cobalt and found that during his test drives of the vehicle there were "[u]nplanned engine shutdowns [that] happened four times during a hard-driving test week" with the vehicle.

### Crash Reports and Data

59.     The Defendant knew of the Ignition Switch Defect and its deadly consequences for consumers, but concealed that information from safety regulators and the public.

60.     National Highway Traffic Safety Administration (NHTSA) data shows that there were three fatal car crashes involving Saturn Ions due to a failure of the airbag to deploy prior to July 2005.

61.     In July 2005, a sixteen-year old was killed when her 2005 Chevrolet Cobalt crashed with the ignition switch in the accessory mode, which disabled the airbag.

62.     In 2006, there were at least two fatalities associated with a Chevy Cobalt crash. Information from the car's data recorder indicated that the ignition switch was in "accessory" instead of run, and the front airbags failed to deploy.

63.     In 2007, GM reviewed available sensor data from nine front-impact Cobalt crashes where the airbags did not deploy. GM discovered that in four of the crashes, the ignition was in the "accessory position." Crash information for the other Subject Vehicles was not reviewed.

64.     In 2007, NHTSA's early warning division reviewed available data provided by GM on airbag non-deployments in Chevrolet Cobalt vehicles. This review identified 43 incidents in which airbags may not have deployed in a crash. The early warning division referred the case to NHTSA's data analysis division for further screening. A defects panel was convened, but after reviewing the data and consulting with GM, the panel ultimately concluded that "[t]he data available at the time of this evaluation did not indicate a safety defect or defect trend that would warrant the agency opening a formal investigation." In prepared remarks delivered April 1, 2014, to the Committee on Energy and Commerce, NHTSA Acting Administrator David Friedman stated, "At the time of these reviews, NHTSA did not have the information that [New] GM has since provided—for instance, new evidence linking airbag non-deployment to faulty ignition switches."

65.     GM has identified 23 frontal-impact crashes in the United States involving 2005 to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy.

66.     GM has identified 8 frontal-impact crashes in the United States involving 2003 to 2007 Saturn Ion vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in four fatalities and six injuries to occupants.

67.     GM has identified 3 frontal-impact crashes in the United States involving 2006 and 2007 model year Chevrolet HHR vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in three injuries to occupants.

### GM's Belated Repair Recall of Some Vehicles

68.     On February 7, 2014, New GM filed a Part 573 Defect Notice with the NHTSA to recall 2005 to 2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The notice stated that the "ignition switch torque performance may not meet General Motors' specifications," explaining that if "the key ring is carrying weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position" and may result in deactivating the airbags. The notice did not acknowledge that the Ignition Switch Defect could occur under normal driving conditions, even when the key ring is not carrying added weight.

69.     The notice by New GM also did not identify all the vehicles affected by the Ignition Switch Defect.

70.     The notice by New GM failed to indicate the full extent to which New GM has been aware of the Defect. The notice suggests that New GM's knowledge of the defect is recent, stating that "[t]he issue was presented to the Field Performance Evaluation Review Committee and on January 31, 2014, the Executive Field Action Decision Committee decided to conduct a safety recall."

71.     In a February 24, 2014 letter to the NHTSA, New GM amended the Part 573 Report to include a more detailed chronology. The chronology indicated that GM first learned of the Ignition Switch Defect during the launch of the 2005 Chevrolet Cobalt from field tests by its engineers.

72.     On February 25, 2014, GM amended its Part 573 Report to cover additional models and model years due to the same Ignition Switch Defect.  Specifically, GM identified the 2003 to 2007 model years of the Saturn Ion, 2006 and 2007 model years of the Chevrolet HHR, 2007 model year of the Pontiac Solstice, and 2007 model year of Saturn Sky vehicles.

73.     According to the NHTSA Acting Administrator David Friedman, the chronology information provided by New GM on February 24, 2014 "raise[d] serious questions as to the timeliness of GM's recall."  Therefore, the NHTSA opened a "timeliness query" on February 26, 2014.

74.     On March 4, 2014, the NHTSA issued New GM a Special Order demanding that it provide additional information by April 3, 2014, on 107 specific requests, including information to "evaluate the timing of GM's defect decision making and reporting of the safety defect to NHTSA."

75.     On March 11, 2014, New GM filed a new Part 573 report superseding its February 25 filing. The new chronology provided with the report indicated that GM was aware of the Ignition Switch Defect in 2001—significantly earlier than its previous 2004 disclosure.  GM now indicated that it had a report from 2001 that revealed a problem with the ignition switch during pre-production of the Saturn Ion.

76.     On March 28, 2014, New GM filed a new Part 573 report, which expanded the recall set forth in its February 25, 2014 filing. New GM's March 28 report indicated that several additional model year vehicles may be affected by the Ignition Switch Defect. New GM identified those vehicles as the 2008-2010 Chevrolet Cobalt, 2008-2011 Chevrolet HHR, 2008-2010 Pontiac Solstice, 2008-2010 Pontiac G5, and 2008-2010 Saturn Sky. The March 28 report added over one million vehicles to the total affected by the Ignition Switch Defect.

77.     New GM notified dealers of the Subject Vehicles of the recall in February and March 2014. New GM also notified owners of the Subject Vehicles by letter of the recall. The letter minimized the risk of the defect, indicating that the Ignition Switch Defect would occur only

"under certain conditions" and emphasized that the risk increased if the "key ring is carrying added weight . . . or your vehicle experiences rough road conditions."

78.     New GM has advised the public that the replacement ignition switches "ARE NOT CURRENTLY AVAILABLE."

**The Subject November 17, 2014 Incident**

79.     At or around 5:00 p.m. on November 17, 2014, Rickey Creeger was driving a 2004 Oldsmobile Alero, VIN. 1G3NL12F74C103442 (referred to herein as the "Subject Vehicle"), on Quinimose Road in Greenacres, Spokane County, Washington.  Plaintiff was merely driving down Quinimose Road when his vehicle lost control.  The weather was not a factor, as it was a clear and bright, sunny day.  Plaintiff's use of the 2004 Oldsmobile Alero to travel on a public roadway was an ordinary and foreseeable use of the product.

80.     The 2004 Oldsmobile Alero is one of the many Subject Vehicles that contains the Ignition Switch Defect.

81.     The 2004 Oldsmobile Alero also did not have Electronic Stability Control (ESC), which is an essential safety feature that reduces the risk of loss of vehicle control.  Notably, Plaintiff's model 2004 Oldsmobile Alero did NOT have StabiliTrak (General Motors' version of ESC).

82.     Plaintiff's vehicle is described as follows: 2004 Oldsmobile Alero; Automatic Transmission; 4-Cylinder, Fuel Type: Gasoline; Washington Tag: ASG9399; VIN. 1G3NL12F74C103442.

83.     To Plaintiff's knowledge and understanding, the Subject Vehicle had not been substantially modified or changed in any material way from its initial condition as designed, manufactured, marketed, and sold by the Defendants, and Plaintiff was unaware of any problems or concerns with the Subject Vehicle or its components prior to the incident described herein.

84. At the above-described time and place, the Plaintiff was driving the Subject Vehicle on Quinimose Road in Greenacres, Spokane County, Washington, when the vehicle went out of control due to the Ignition Switch Defect. Consequently, the Subject Vehicle's recalled ignition switch caused the Subject Vehicle to accelerate and lose control.

85. The Subject Vehicle was completely uncontrollable and Plaintiff was unable to do anything to control the Subject Vehicle. As a result of the accident, Plaintiff, has and will continue to suffer from depression, stress, anxiety, physical and mental pain and suffering, and other compensable damages. Plaintiff will never be able to resume the normal life he had prior to the November 17, 2014, incident.

## CAUSES OF ACTION (AGAINST ALL DEFENDANTS)

### STRICT LIABILITY

86. Plaintiff hereby incorporates by reference each and every paragraph set forth in this Petition, as if fully copied and set forth at length herein.

87. Defendant designed, manufactured, and/or sold the Subject Vehicles, including the 2004 Oldsmobile Alero, with design, manufacturing, and/or marketing defects, more particularly set forth herein. New GM has expressly assumed these liabilities.

88. *Marketing Defect and Failure to Warn* – Defendant designed, manufactured, and/or sold the Subject Vehicle, with one or more marketing defects:

a. There was an unreasonable risk in the intended or reasonably foreseeable use of such automobile in that the above defect resulted in unexpected power loss in the vehicle, causing physical injury;

b. Defendant knew, foresaw, or should have known and foreseen the above risk;

c. Defendant failed to adequately warn Plaintiff of the above risks, failed to adequately instruct Plaintiff how to avoid the above danger, or both.

89.     *Design Defect* – Defendant designed, manufactured, and/or sold the Subject Vehicle, with one or more design defects, more particularly set forth in the preceding paragraphs in this Petition, including an Ignition Switch Defect that resulted in unexpected power loss, and a lack of Electronic Stability Control ("ESC").  Defendant designed the Subject Vehicle and knew of safer alternative designs that existed at the time of production that would have prevented or significantly reduced the above risks without substantially impairing the vehicle's utility, and was economically and technologically feasible at the time that the Subject Vehicle left Defendant's control by the application of existing or reasonably achievable scientific knowledge.

90.     *Manufacturing Defect* – Defendant designed, manufactured, and/or sold the Subject Vehicle, with one or more manufacturing defects, more particularly set forth above.  The Subject Vehicle manufactured by Defendant deviate, in their construction or quality, from the specifications or planned output in a manner that renders the automobiles unreasonably dangerous.

91.     *Unreasonably Dangerous* – The manufacturing defects, marketing defects, or both, rendered the Subject Vehicle, unreasonably dangerous by making the automobile dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the knowledge common to the community as to its characteristics. New GM was aware of the unreasonably dangerous nature of the vehicle but failed to recall or otherwise warn Plaintiff of the danger to them and the general public.

92.     The design defects, or any of them, rendered the Subject Vehicle unreasonably dangerous as designed, considering the utility of the automobile and the risks involved in its use.

93.     The design, manufacturing, and/or marketing defects, or any of them, were producing causes of Plaintiff's injuries and damages, as more particularly set forth above.

94.     It was entirely foreseeable to, and well-known by, Defendant that incidents involving its automobiles, such as occurred herein, would on occasion take place during the normal and ordinary use of said automobiles.

95.     The Subject Vehicle was defective and unreasonably dangerous in that it contained the Ignition Switch Defect that could result in unexpected power loss, and was designed without Electronic Stability Control.

96.     The Subject Vehicle was in this defective condition at the time it left the possession or control of Defendant.  The Subject Vehicle reached the consumers without substantial change to the condition of the Ignition Switch.

97.      Defendant designed, manufactured, marketed, distributed, and sold the Subject Vehicle to be unreasonably dangerous and defective within the meaning of Section 402A Restatement (Second) Torts in that the Subject Vehicle were unreasonably dangerous as designed, marketed, manufactured, or any of them. Specifically, the Subject Vehicle contained an Ignition Switch that was defective, inferior and inadequately designed, marketed and manufactured, and the Subject Vehicle also lacked Electronic Stability Control.

98.      The foregoing acts and/or omissions of Defendant were a producing and/or proximate cause of the Plaintiff's damages.

**<u>NEGLIGENCE</u>**

99.     Plaintiff hereby incorporates by reference each and every paragraph set forth in this Petition as if fully copied and set forth at length herein.

100.    Defendant was negligent in designing, manufacturing, and/or selling the Subject Vehicle, with one or more design defects, more particularly set forth above, including the Ignition Switch Defect that resulted in unexpected power loss, and the lack of Electronic Stability Control ("ESC") that would reduce the risk of loss of vehicle control.

101.    Defendant owed Plaintiff a duty to exercise ordinary care in designing, manufacturing, marketing, testing, selling and distributing the automobiles in question; and to discover dangerous propensities of its product. Defendant failed to exercise ordinary care in designing, manufacturing, marketing, testing, selling and distributing the Subject Vehicle and the Subject Vehicles in question.

102.    Defendant breached its duties to Plaintiff by designing, manufacturing, marketing, testing, selling and distributing the Subject Vehicle with a latent dangerous defect in the Ignition Switch and lack of Electronic Stability Control and/or by failing to warn of the defects and/or by failing to adopt a safer, practical, feasible or otherwise reasonable alternative design that could have then been reasonably adopted to prevent or substantially reduce the risk of harm without substantially impairing the usefulness, practicality, or desirability of the Subject Vehicle.

**FRAUD BY NEW GM**

103.    New GM made the following material misrepresentations:

a.  Representing the Subject Vehicles as being safe at the same time New GM knew the they were defective in that they are subject to sudden power loss and catastrophic personal injuries and wrongful death;

b.  Representing the Subject Vehicles as being safe at the same time New GM intentionally concealed from and/or failed to disclose to Plaintiff and all others in the chain of distribution the true nature of the dangerous installed defective Ignition switches;

c.  Representing the Subject Vehicles as being safe when they are not;

d.  Failing to recall all the Subject Vehicles even after the Ignition Switch defect was finally admitted as to some of the Subject Vehicles;

e.  The above representations were false;

f.  New GM was and is under duties to Plaintiff and to the other owners of the recalled Subject Vehicles and consumers to disclose these facts because:

o   New GM is in a superior position to know the true character and quality of the Subject Vehicles, the Ignition Switch, and the problems with the Subject Vehicles;

o   New GM made partial disclosures about the defective nature of the Subject Vehicles, while not revealing their true character or quality;

o   New GM fraudulently and actively concealed the nature of the Subject Vehicles, the Ignition Switch defect from Plaintiff, other GM owners/lessors/users and the consuming public; and

o   When New GM made the above representations, it either knew each was false, or made such representations recklessly without any knowledge of the truth and as positive assertions.

## NEGLIGENT MISREPRESENTATION BY NEW GM

104.   New GM made the following misrepresentations in the course of its business, in a transaction in which it had a pecuniary interest in both:

a.   Representing the Subject Vehicles as being safe at the same time New GM knew the Subject Vehicles were defective in that they are subject to sudden power loss and catastrophic resulting personal injuries;

b.   Representing the Subject Vehicles as being safe at the same time New GM intentionally concealed from and/or failed to disclose to Plaintiff and all others in the chain of distribution the true nature of the dangerous installed defective Ignition Switches;

c.   Representing the Subject Vehicles as being safe when they are not;

d.   New GM supplied the above false information for the guidance of others in their business;

e.   New GM failed to exercise reasonable care or competence in obtaining or communicating the above information; and

f.   Plaintiff suffered pecuniary loss by justifiably relying on the above information.

## FRAUD BY NON-DISCLOSURE/FRADULENT CONCEALMENT BY NEW GM

105.   New GM made the following misrepresentations in the course of its business, in a transaction in which it had a pecuniary interest in both:

a.   Representing the Subject Vehicles as being safe at the same time New GM knew the Subject Vehicles were defective in that they are subject to sudden power loss and catastrophic resulting personal injuries;

b.   Representing the Subject Vehicles as being safe at the same time New GM intentionally concealed from and/or failed to disclose to Plaintiff and all others in the chain of distribution the true nature of the dangerous installed defective Ignition Switches;

c.   Representing the Subject Vehicles as being safe when they are not;

d.   New GM supplied the above false information for the guidance of others in their business;

e.   New GM failed to exercise reasonable care or competence in obtaining or communicating the above information; and

f.   Plaintiff suffered pecuniary loss by justifiably relying on the above information.

## OLD GM AND NEW GM FRAUDULENTLY CONCEALED THE DEFECT IN THEIR VEHICLES, THEREBY TOLLING ALL APPLICABLE STATUTES OF LIMITATIONS

106.   All applicable statutes of limitation have been tolled by Old and New GM's knowing, ongoing and active fraudulent concealment and denial of the facts alleged herein. Plaintiff did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Old and New GM did not report information within their knowledge to federal authorities (including NHTSA), their dealerships, or consumers.  Nor would a reasonable and diligent investigation have disclosed that Old or New GM had information in their possession about the existence and dangerousness of the defects, or that each opted to conceal that information until shortly before this action was filed.

107.   All applicable statutes of limitation also have been tolled by operation of the discovery rule.   Specifically, Plaintiff could not have discovered, through the exercise of reasonable diligence, that the Subject Vehicle were defective within the time period of any applicable statutes of limitation.

108.   Instead of disclosing the myriad safety defects and disregard of safety of which it was aware, New GM falsely represented that its vehicles were safe, reliable, and of high quality, and that it was a reputable manufacturer that stood behind GM-branded vehicles after they were sold.

109.   New GM has been, since its inception, under a continuous duty to disclose to Plaintiff the true character, quality, and nature of the Defective Vehicles, including the Subject Vehicle.  Instead, New GM has consistently, knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Defective Vehicles from consumers, including Plaintiff.

110.   Based on the foregoing, New GM is estopped from relying on any statutes of limitations in defense of this action as to claims.  Overall, regardless of whether it was New GM or Old GM that manufactured or sold a particular Defective Vehicle, New GM is responsible for *its own* actions with respect to *all* the Defective Vehicles, and the resulting harm to Plaintiff that occurred as the result of GM's acts and omissions.  Simply put, GM was aware of serious safety defects, and it also knew that Defective Vehicle owners were unaware of the defect, and it chose both to conceal these defects, and to forgo or delay any action to correct them.  Under these circumstances, New GM had the clear duty to disclose and not conceal the ignition switch defects to Plaintiff and consumers—regardless of when they acquired the Defective Vehicles.

111.   New GM's obligations stem from several different sources, including, but not limited to: (i) the obligations it explicitly assumed under the TREAD Act to promptly report any safety defect to Defective Vehicle owners and to NHTSA so that appropriate remedial action could occur; (ii) the duty it had under the law of fraudulent concealment; (iii) the duty it had under State consumer protection and other laws; and (iv) the general legal principle embodied in § 324A of

the Restatement (Second) of Torts, ("Liability To Third Person For Negligent Performance Of Undertaking").

112.   In acquiring Old GM, New GM expressly assumed the obligations to make all required disclosures under the TREAD Act with respect to all the Defective Vehicles.

113.   Under the TREAD Act, if it is determined that vehicle has a safety defect, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect, and may be ordered to remedy the defect. 49 U.S.C. § 30118(b)(2)(A) & (B).

114.   Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist." 49 C.F.R. § 573.6(a) & (b).   At a minimum, the report to NHTSA must include: the manufacturer's name;  the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

115.   The manufacturer must also promptly inform NHTSA regarding: the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect.  49 C.F.R. § 276.6(b) & (c).

116.    It cannot be disputed that New GM assumed a duty to all Defective Vehicle owners under the TREAD Act, and that it violated this duty.

117.    Under § 324A of the Restatement, an entity that undertakes to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability for harm to the third person resulting from the failure to exercise reasonable care to protect the undertaking if the "failure to establish reasonable care increases the risk of such harm . . . ."

118.    Restatement § 324A applies to an undertaking which is purely gratuitous, and it applies with even greater force here, where New GM is receiving substantial remuneration for its undertaking in relation to its dealerships' service centers.  New GM provides parts for the Defective Vehicles as they are serviced at its dealerships, and receives substantial revenue from dealerships relating to the servicing of Defective Vehicles.  It also receives an additional benefit in that many of the people who own these vehicles will eventually sell or trade in their old vehicles for new ones.  Consumers using New GM service centers and buying New GM replacement parts necessarily rely upon New GM to advise its dealerships of defects, notify its dealerships of safety related issues, provide its dealerships with accurate and up to date information and enable them to remedy defects.  New GM's failure to carry out these obligations has increased the risk of harm to owners of Defective Vehicles, who regularly have their vehicles inspected and serviced at New GM dealerships and rely upon representations that the vehicles are safe and free of defects.

119.    New GM's dealerships pass along GM replacement parts, and they also rely on New GM's expertise regarding how the vehicles should be maintained, and what conditions are necessary for the dealer to conclude that the vehicles are in proper working order at the time they are inspected, serviced and released back to the owner.  The dealerships rely on New GM's

assurances of safety that New GM will tell them about safety related problems that come to New GM's attention, and that New GM will pass along knowledge of defects and how to address them. Dealers servicing the Defective Vehicles rely on New GM's representations that the vehicles and their component parts and safety features will function correctly if certain conditions are met when the vehicles are inspected and serviced, as do the consumers who go to a New GM dealership for repairs.  New GM's breach of its obligations to its dealerships has resulted in harm to Plaintiff and other consumers.

**DAMAGES**

121.    Plaintiff hereby incorporates by reference each and every paragraph set forth in this Petition as if fully copied and set forth at length herein.

122.    Plaintiff Rickey Creeger, because of Defendant's conduct, is entitled to reasonable and proper compensation for the following legal damages:

> past medical expenses and charges;
>
> past and future physical pain and mental anguish; and
>
> past lost wages and future lost wage-earning capacity.

123.    Plaintiff seeks actual and punitive damages to be awarded by the jury in an amount in excess of the minimum jurisdictional limits of this Court.

**GROSS NEGLIGENCE BY NEW GM**

124.    Plaintiff hereby incorporates by reference each and every paragraph set forth in this Petition as if fully copied and set forth at length herein.

125.    Plaintiff Rickey Creeger would further show that the clear and convincing evidence in this case will show that New GM acted with gross negligence in that when viewed objectively from the standpoint of New GM at the time of the occurrence, there was an extreme danger of risk considering the probability and magnitude of potential harm to others, and of which New GM had

actual, subjective awareness of the risk involved, but nevertheless proceeded with indifference to the rights, safety, or welfare of others, including the Plaintiff.  Therefore, punitive damages are sought and should be assessed against New GM for its independent wrongful conduct.

**JURY DEMAND**

126.    Plaintiff requests a trial by jury and would show that the appropriate fee is paid contemporaneously with the filing of this Complaint.

**PRAYER**

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff Rickey Creeger respectfully prays that Plaintiff has upon final trial, among other things:

1. Judgment against Defendant for compensatory damages in excess of the minimum jurisdictional limits of the Court;
2. Judgment for punitive damages in excess of the minimum jurisdictional limits of the Court;
3. Pre-judgment interest;
4. Post-judgment interest;
5. Reasonable and necessary attorney's fees;
6. Costs of suit; and
7. Such other and further relief as this Court may deem proper and just.

Respectfully submitted,

**LEGER KETCHUM & COHOON, PLLC**


By: /s/ Bradley L. Leger
**BRADLEY L. LEGER**
State Bar No. 24039899
bleger@lkclawfirm.com
**RANDY A CANCHÉ**
State Bar No. 24050373
rcanche@lkclawfirm.com
**KASSI DEE PATRICK MARKS**
State Bar No. 24034550
kmarks@lkclawfirm.com
10077 Grogan's Mill Road, Suite 325
The Woodlands, Texas 77380
Tel:     832.764.7200
Fax:     832.764.7211

**ATTORNEYS FOR PLAINTIFF RICKEY CREEGER**