

October 9, 2015

**Via E-mail**

Richard C. Godfrey, P.C.
Andrew B. Bloomer, P.C.
Geoffrey A. David
Allan R. Pixton
KIRKLAND & ELLIS
300 N. LaSalle
Chicago, IL  60654-3406
richard.godfrey@kirkland.com
andrew.bloomer@kirkland.com
geoffrey.david@kirkland.com
allan.pixton@kirkland.com

           Re:     *In re: General Motors LLC Ignition Switch Litigation,*
                  14-MD-2543 (JMF)

Dear Counsel:

      Pursuant to the Court's comments today during the status conference in the above litigation, we write to: (a) identify statements in New GM's crime-fraud briefing that are contrary to admissions and representations made by New GM in connection with the September 16, 2015 Deferred Prosecution Agreement ("DPA"); and (b) propose that the parties submit by October 16 simultaneous five-page, single-spaced letter briefs to the Court discussing the impact of the DPA on the crime-fraud issues.

      **A.**      **The DPA prohibits New GM from making statements in this litigation that contradict the DPA.**

      Paragraph 13 of the DPA states that "having truthfully admitted to the facts in the Statement of Facts" attached as Exhibit C to the Agreement, GM "shall not, through its attorneys, agents, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement." "Any such contradictory statement by GM, its present or future attorneys, agents, or employees shall constitute a violation of this Agreement . . . ." DPA ¶ 13.

B.     **New GM's crime-fraud briefing contains statements that contradict the DPA.**

New GM's briefing in opposition to Plaintiffs' crime-fraud motion is contrary to the DPA in at least the following ways.

*First*, New GM's argument that Plaintiffs' motion is deficient for pointing only to a civil, as opposed to a criminal, violation[1] is contrary to New GM's consent to be charged criminally with "engaging in a scheme to conceal a deadly defect from its U.S. regulatory" and committing wire fraud. DPA ¶ 1.

*Second*, although New GM's crime-fraud briefing characterizes its failure to report the ignition switch defect to the National Highway Traffic Safety Administration ("NHTSA") as a mere "violation of certain timing provisions,"[2] the DPA makes clear that New GM intentionally defrauded NHTSA and consumers. *See* DPA ¶2 ("GM further affirmatively misled consumers about the safety of GM cars afflicted by the defect"); DPA, Ex. C ¶ 3 ("from in or about the spring of 2012 through in or about February 2014, GM failed to disclose a deadly safety defect to its U.S. regulator [NHTSA]. It also falsely represented to consumers that vehicles containing the defect posed no safety concern."); *id*. at ¶ 7 ("From approximately the spring of 2012, certain GM personnel knew that the Defective Switch presented a safety defect because it could cause airbag non-deployment associated with death and serious injury."); *id*. at ¶ 9 ("Inside GM, certain personnel responsible for shepherding safety defects through GM's internal recall process delayed this recall until GM could fully package, present, explain, and handle the deadly problem, taking affirmative steps to keep the Defective Switch matter outside the normal process. On at least two occasions while the Defective Switch condition was well known by some within GM but not disclosed to the public or NHTSA, certain GM personnel made incomplete and therefore misleading presentations to NHTSA assuring the regulator that GM would and did act promptly, effectively, and in accordance with its formal recall policy to respond to safety problems—including airbag-related safety defects."); *id*. at ¶ 81 (regarding an

---

[1] *See, e.g.*, General Motors LLC's Opposition to Plaintiffs' Motion to Compel Production of Documents from New GM and King & Spalding Based on the Crime-Fraud Exception ("GM Br.") at 11 ("Plaintiffs focus on claimed 'wrongdoings'—e.g., . . . failing to recall cars earlier, etc.,—that are neither crimes, nor frauds, nor intentional torts." ); *see also id*. at 2 (arguing that Plaintiffs rely only on civil violations); *id*. at 12 ("Second, Plaintiffs point to a Consent Order acknowledging a violation of the timing requirements of the Safety Act. But this ***civil*** violation was neither a crime, nor fraud, nor an intentional tort, and thus cannot meet the threshold showing required to invoke the exception.") (emphasis in original); *id*. at 23 ("finding no evidentiary support in the record for their crime-fraud claims, Plaintiffs gratuitously refer to a newspaper's hearsay report that the Department of Justice found 'criminal wrongdoing' in connection with the ignition switch. This unsubstantiated, inadmissible hearsay is insufficient to invoke the exception."); Wolfram Decl. at ¶ 38 ("The Consent Order is clearly civil. . . ).

[2] *Id*. at 15; *see also id*. at 3 (the Consent Order "does not establish either prong of the crime-fraud inquiry because it reflects neither criminal liability nor an intentional tort"); *id*. at 11 (Plaintiffs focus on claimed 'wrongdoings' . . . failing to recall cars earlier, etc.,—that are [not] intentional torts."); *id*. at 15 ("Plaintiffs present no evidence that settlements were entered with the intent to delay NHTSA safety-defect notifications or to 'conceal the ignition switch defect' from its 'regulators.'"); Wolfram Decl. at ¶ 38 ("the evidence offered in the Motion Papers lacks several of the elements required to demonstrate that New GM had committed 'fraud' in failing to make the required timely report. 'Fraud' and 'fraudulent are defined terms under the Model Rules . . . . Among other elements, the legal definition of 'fraud' that is commonly applied requires proof of a knowing statement of material fact with intent that a person or persons rely on its truthfulness. Plaintiffs offer no prima facie proof that New GM's failure to make a timely report to NHTSA constituted such a knowing misstatement of material fact or that any person relied on."); Green Decl. ¶ 16 ("there is no direct evidence that any New GM personnel acknowledged and decided to cover up the company's civil statutory reporting obligation …").

Oct. 22, 2012 presentation to NHTSA, New GM admits that "[t]o the extent this presentation may have accurately described GM's general recall process and handling of other defects, it did not accurately describe GM's handling of the Defective Switch (about which NHTSA would remain unaware until 2014). By approximately five months prior to this presentation, certain GM personnel had identified what they knew to be a dangerous safety defect and had not started it into the first phase of the recall process."); *id*. at ¶ 99 (in a November 2012 meeting with NHTSA (well after New GM now admits it was aware that the Ignition Switch Defect caused airbag non-deployment), "portions of GM's presentation suggested that any airbag defect that presented with a failure to warn the driver and/or certain other aggravating factors would be recalled swiftly.").

*Third*, New GM argues that when New GM should have known of an ignition switch safety defect is a disputed issue,[3] but it is undisputed that New GM knew of the ignition switch safety defect by no later than Spring 2012. DPA, Ex. C ¶¶ 3, 7, 9; *see also id*. at ¶ 75 (by May of 2012, "the GM engineers involved knew that studied cars built before a certain point in 2006 were equipped with low-torque ignition switches, and that low torque in an ignition switch could result in airbag non-deployment. At this time, no further engineering tests were conducted to explore any other purported root cause of the observed non-deployment pattern or to compare the 2005 through 2007 model year Cobalt ignition switches with those of later model years."); *id*. at ¶ 78 ("The PI Investigator, the PI Senior Manager, the GM Safety Attorney, the GM Safety Director, and others met at lengthy intervals through the summer and fall of 2012 and early 2013 to consider potential solutions and further explore why the defect condition appeared to be limited to earlier model years . . . . the purpose of the meetings was not to identify the root cause of the problem, which had by approximately the spring of 2012 been traced to the Defective Switch, but rather to develop the optimal remedy for the defect condition and set with precision the scope of the anticipated recall.").

*Fourth*, New GM argues that its lawyers did not know there was an ignition switch safety defect[4] and/or "engaged in no wrongful criminal or fraudulent conduct,"[5] but the DPA makes

---

[3] GM Br. at 6.

[4] General Motors LLC's Surreply in Opposition to Plaintiffs' Motion to Compel Production of Documents from New GM and King & Spalding Based on the Crime-Fraud Exception ("GM Reply") at 1 (Plaintiffs' reply and new expert opinions are predicated on the supposition that New GM's inside and outside counsel had not only solved a technical engineering question that had baffled its engineers for years, but had also concluded that there was in fact a defect wthin the meaning of the Safety Act"); *id*. at 4 ("The foundation for Plaintiffs' reply is the assertion that New GM's counsel could and did in fact determine that there was an ignition switch safety defect under NHTSA standards long before New GM engineers had done so. This assertion defies common sense and is unsupported and incompatible with unrebutted deposition testimony that Plaintiffs have themselves elicited."); *id*. at 5 ("Plaintiffs' contention that New GM lawyers 'knew years before the February 2014 recall that the ignition switch defect existed in model year 2005-07 Cobalts,' is also based on speculation, mischaracterizes the record, and ignores sworn testimony to the contrary."); *id*. ("former New GM lawyers have testified that there as not a known ignition switch safety defect years before 2014"); *id*. (the July 22, 2013 *Melton* case evaluation "addresses an ongoing investigation into potential causes of airbag nondeployments . . . ."); *id*. ("there was not a known ignition switch safety defect years before 2014"); *id*. at 6, n. 13 ("And after ignition torque was proposed as an alternative explanation in 2012, Ms. Palmer explained that the torque issue was merely considered one 'possibility,' not a 'definitive reason,' for the airbag non-deployments."); *id*. at 8-9 ("the expert opinions proferred in support of the claimed ethics violations are premised on incorrect and speculative assumptions that New GM attorneys could and did determine that there was an ignition switch defect within the meaning of the Safety Act. New GM attorneys have testified that they did not know there was such a defect, let alone that New GM was violating any law by failing to report such a defect to

clear that New GM attorneys, including the "GM Safety Attorney": (a) understood GM's recall reporting requirements (*see* DPA, Ex. C ¶ 78, 107); (b) were fully aware of the ignition switch defect by no later than Spring 2012 (*id*. at ¶¶ 64-78, 88, 115); and (c) helped to conceal the defect (*id*. at ¶¶ 78, 107, 115).

*Fifth,* New GM argued that it was justified in representing in June 2013 that GM had not authorized a part change,[6] but the DPA makes clear that by May 2013, New GM already knew about the part change to the defective switch and "thus had an explanation for why the defect condition did not appear to affect cars built after the middle of 2006." DPA, Ex. C ¶¶ 88-89.

Each of the New GM statements quoted or cited herein is contrary to the Statement of Facts or other representations contained within the DPA and may therefore violate the terms of the DPA.

Given Mr. Godfrey's representations to the Court this morning regarding the seriousness with which New GM claims it takes the DPA, these are areas that Plaintiffs should not have to point out to New GM. Plaintiffs encourage New GM to go back and review every deposition and every pleading with an eye towards Paragraph 13 of the DPA, and New GM's necessary obligations in this MDL that flow therefrom.

### C.     The parties should brief the impact of the DPA on the crime-fraud issues.

Plaintiffs propose that the parties submit simultaneous briefs on the impact of the DPA on the crime-fraud issues. Plaintiffs are, of course, open to conferring with New GM on a schedule but propose that the parties file five-page, single-spaced letter briefs on October 16.

Sincerely,

/s/ Steve W. Berman
/s/ Elizabeth J. Cabraser
/s/ Robert C. Hilliard

*Lead Counsel for Plaintiffs*

---

NHTSA."
[5] GM Br. at 4.
[6] GM Br. at 21. New GM's representations were contained in its June 17, 2013 discovery responses. *See* Plaintiffs' Memorandum in Support of Motion to Compel Production of Documents from New GM and King & Spalding LLC Based on the Crime-Fraud Exception at 23.