Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

IN RE:
GENERAL MOTORS LLC IGNITION SWITCH
LITIGATION                                    14-MD-2543 (JMF)

*This Document Relates to All Actions*
----------------------------------------------------------------x

### DECLARATION OF CHARLES SILVER

I, Charles Silver, declare as follows pursuant to 28 U.S.C. § 1746:

I have been retained by The Cooper Firm of Marietta, Georgia to prepare an expert declaration responding to the *Declaration of Geoffrey Parsons Miller* and addressing other issues raised in the motions that Professor Miller discussed.

### I. BACKGROUND AND QUALIFICATIONS

1.    I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media. I have been a Visiting Professor at the Harvard Law School, the Michigan Law School, and the Vanderbilt University Law School. I received my law degree from Yale in 1987. I have been a member of the Texas bar since 1988. My CV is attached.

For present purposes, the following credentials are especially worth noting:

- I was an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010), and bore primary responsibility for the portions of that document that are discussed herein.

- Along with Professor Miller, I co-authored one of the first scholarly articles to address problems of MDL management. Charles Silver & Geoffrey P. Miller, *The*

*Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal*, 63 VANDERBILT L. REV. 107 (2010).

- I am the sole author of a second article that focuses on the responsibilities of lawyers who hold lead positions in multi-district litigations. Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations*, 79 FORDHAM L. REV. 1985 (2011).

- I authored an amicus curiae brief that was submitted for a group of law professors in support of the winning side in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), a Supreme Court decision that is discussed below.

## II. MATERIALS REVIEWED

When preparing this report, I reviewed the following materials. I also reviewed cases, treatises, articles published in law reviews, and news reports.

- Plaintiffs' Motion to Reconsider the Order Approving the Establishment of the 2015 New GM Ignition Switch Qualified Settlement Fund
- Plaintiffs' Motion to Remove the Co-Leads and Reconsider the Bellwether Trial Schedule
- General Motors LLC's Combined Response to Motion to Remove the Co-Leads and to Reconsider the Bellwether Trial Schedule and Motion to Reconsider the Order Approving The Establishment of the 2015 New GM Ignition Switch Qualified Settlement Fund
- Co-Lead Counsel's Memorandum in Opposition to Lance Cooper's Motion to Remove Co-Lead Counsel and for Reconsideration of the Order Approving the Qualified Settlement Fund
- Declaration of Steve W. Berman in Support of Co-Lead Counsel's Memorandum in Opposition to Lance Cooper's Motion to Remove Co-Lead Counsel and for Reconsideration of the Order Approving the Qualified Settlement Fund
- Declaration of Elizabeth J. Cabraser in Support of Co-Lead Counsel's Memorandum in Opposition to Lance Cooper's Motion to Remove Co-Lead Counsel and for Reconsideration of the Order Approving the Qualified Settlement Fund

- • Declaration of Robert C. Hilliard in Support of Co-Lead Counsel's Memorandum in Opposition to Lance Cooper's Motion to Remove Co-Lead Counsel and for Reconsideration of the Order Approving the Qualified Settlement Fund
- • Declaration of Dawn M. Barrios in Support of Co-Lead Counsel's Memorandum in Opposition to Lance Cooper's Motion to Remove Co-Lead Counsel and for Reconsideration of the Order Approving the Qualified Settlement Fund
- • Declaration of Geoffrey Parsons Miller

## III. ANALYSIS

2.      Because the purpose of this Declaration is partly to respond to the *Declaration of Geoffrey Parsons Miller*, I begin by noting that I have known Professor Miller for decades, have coauthored an important and relevant article on MDL practices with him, hold him in the highest regard, and have great personal affection for him. I take no pleasure in appearing opposite him. Not surprisingly, on many of the points his *Declaration* addresses, our opinions are the same. I necessarily focus on the differences.

3.      When I read Professor Miller's *Declaration*, what struck me first was that General Motors LLC ("New GM"), the Defendant, retained him. It is certainly proper for a named party to submit briefing and an expert report on a contested motion, but it is essential to remember that a defendant's object is to minimize its losses. It should also be recalled that Mr. Robert Hilliard, the Co-Lead Counsel in this MDL, is supposed to have the opposite objective. His job is to force New GM to pay as much money as possible. The better he does that job, the less New GM should like him and the more it should relish the prospect of having him replaced. Even if Professor Miller is right in claiming that Mr. Hilliard's conduct was proper, New GM's hope that he will retain control of the MDL is a bad sign.

4.      When thinking about Mr. Hilliard's actions, it is also important to remember that the single greatest source of bargaining leverage a plaintiffs' attorney has in settlement

negotiations is the threat of winning at trial and forcing the defendant to pay a price set by a jury. The standard economic model of the decision to settle calculates the upper bound on the defendant's willingness to pay by combining the defendant's expected trial loss and its litigation costs. The more a defendant expects to lose at trial, the more it will pay to settle. The most important task for any plaintiffs' attorney is to convince a defendant that if it takes a case to trial, it will get creamed.

5.      The point that the prospect of winning at trial is what gives plaintiffs' attorneys bargaining leverage in settlement negotiations is as true in aggregate proceedings as it is in single-plaintiff cases.   The Supreme Court emphasized the connection between trial results and bargaining leverage in *Amchem Products, Inc. v. Windsor*, 117 S.Ct. 2231 (1997), which involved a settlement class of persons injured by exposure to asbestos.  In support of the settlement, class counsel argued that it did not matter whether the requirements for certification under Rule 23(a) and (b) were met because the district court judge had to review the fairness of the settlement under Rule 23(e).  The Supreme Court disagreed.

> [I]f a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a)
> and (b), and permitting class designation despite the impossibility of litigation, *[]*
> *class counsel ... would be disarmed. Class counsel confined to settlement*
> *negotiations could not use the threat of litigation to press for a better offer.*

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 621 (1997) (citing John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM. L.REV. 1343, 1379–1380 (1995)). The amicus curiae brief that I authored in *Amchem* made exactly this point, referring to a plaintiffs'

attorney who cannot threaten a defendant with a class-wide trial judgment as "a boxer whose hands are tied."[1]

6.    Professor Miller and I emphasized the importance of trials in our joint article on MDLs.  After noting that MDLs often devalue plaintiffs' claims by "forcing plaintiffs to incur substantial delays," we wrote:

> A bigger problem is that MDL judges cannot try cases transferred to them. They can only prepare these cases for trial. This limitation on MDL courts declaws plaintiffs in transferred cases by depriving them of the weapon that pressures a defendant to pay a reasonable amount in settlement: the threat of forcing an exchange at a price set by a jury. The standard economic model of settlement implies this result directly.  Under this model, parties settle for the plaintiff's expected gain at trial because the plaintiff can credibly threaten the defendant with an equivalent loss.

Charles Silver and Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and A Proposal*, 63 VAND. L. REV. 107, 123 (2010).

---

[1]

> When the Rule 23 requirements are met for trial purposes, a plaintiffs' attorney possesses two important bargaining advantages in settlement negotiations: a credible threat to stick a defendant with an adverse class-wide judgment; and a fee-related interest in trying the lawsuit unless the defendant offers its expected value in settlement. The threat is a club. The desire for the largest possible recovery yielding the largest possible fee award is an incentive to use it. Both advantages disappear when the Rule 23 requirements can be met only in settlement. There can be no threat of an adverse class-wide judgment because the lawsuit cannot be tried as a class, and there can be no incentive to try the case because a trial will predictably yield nothing in fees. A plaintiffs' attorney who can obtain certification only if a defendant agrees to it in settlement is a boxer whose hands are tied.

*Amchem Products, Inc. v. Windsor*, 1997 WL 13605 (U.S.), 18 (U.S.Amicus.Brief, 1997).

7.    The paramount importance of trials being clear, it should be equally apparent that a lawyer in charge of the plaintiffs' side of an MDL must operate free and clear of any conflicts that might weaken the incentive to achieve the best possible results in bellwether cases. The entire point of bellwether trials is to produce information about claim values so as to facilitate settlement bargaining on a wider scale. Bad results in bellwether trials reduce claim values for all plaintiffs; good results increase them. Because of these spillover effects, it is essential for all claimants in an MDL that lead counsel be incentivized to select the best possible cases as bellwethers, to prepare them fully, and to try them well. In this MDL, the welfare of more than a thousand personal injury victims is at stake. Lead Counsel's incentives must be above reproach.

8.    Unfortunately, a clear and well-recognized potential for a serious conflict of interests exists when a lead attorney negotiates a side-settlement of his firm's inventory of cases while retaining control of an MDL (or any other aggregate proceeding). In this context, a lead attorney may encounter countless opportunities to gain additional relief for the signed clients by reducing the defendant's exposure in the unsettled cases that remain in the MDL. Essentially, the parties who *are* at the bargaining table can expropriate wealth from the parties who *are not*, and share it between themselves. The only remedy for this conflict is to require a lead attorney who wants to negotiate a side-settlement to resign.

9.    Before discussing this problem further, I wish to note that, with one possible exception, I am not saying that Mr. Hilliard knowingly or intentionally did anything improper. I assume that, when negotiating a side-settlement with New GM for his signed clients, his goal was simply to get them the best possible deal. My point is that the desire to get the largest possible sum for his signed clients is the source of the difficulty. This desire would naturally have led him to tap any opportunity to enrich the signed clients that arose in the course of settlement negotiations

with New GM, including opportunities with the potential to reduce New GM's liability exposure to other MDL claimants. This is why the terms "structural conflict" and "structural collusion" have been applied to problems of the sort I will describe. Expropriation occurs naturally when plaintiffs' attorneys and defendants simply act on the basis of their incentives. They need not consciously collude. A structural conflict may have yielded an undesirable result for the MDL claimants whose cases weren't settled even though, when negotiating a side-settlement of his inventory of cases, Mr. Hilliard simply thought he was doing his job.

10.      I also wish to make it clear that the common law requires lawyers to avoid conflicts partly because it can be difficult or impossible to determine their effects. As the Court knows, the standard rule is that a lawyer with a conflict must withdraw, unless the conflict is consentable and the client agrees to waive it after being fully informed. *See, e.g.*, RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 121 (2000). A conflicted lawyer who proceeds without a client's informed consent may suffer the penalty of fee forfeiture *even if the client cannot prove harm.* This penalty exists for several reasons, one of which is that "[t]he damage that misconduct causes is often difficult to assess." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 37 Comment *b* (2000). For example, when a conflicted lawyer loses a trial, it is impossible to know whether an unconflicted lawyer would have made different decisions and prevailed. That will be the problem in this MDL if the plaintiffs lose another bellwether trial. Conflicts must be avoided because they are insidious.

11.      Returning to the merits, I stated above that a serious potential for conflict exists when a lawyer in charge of an aggregate proceeding negotiates a side-settlement for an inventory of signed clients. The Supreme Court considered a problem with this structure in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). There, a limited amount of insurance money was divided

between a class settlement and an inventory settlement, both of which were negotiated concurrently. This concerned the Supreme Court for many reasons, one of which was unequal treatment.

> As for the settled inventory claims, their plaintiffs appeared to have obtained better
> terms than the class members. They received an immediate payment of 50 percent
> of a settlement higher than the historical average, and would get the remainder if
> the global settlement were sustained (or the coverage litigation resolved, as it turned
> out to be by the Trilateral Settlement Agreement); the class members, by contrast,
> would be assured of a 3–year payout for claims settled, whereas the unsettled faced
> a prospect of mediation followed by arbitration as prior conditions of instituting
> suit, which would even then be subject to a recovery limit, a slower payout, and the
> limitations of the trust's spendthrift protection.

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999). In practical effect, the negotiators divided the insurance money between their signed clients and the class members in a way that gave their signed clients more.

12.     The decision in *Ortiz* spawned an enormous secondary literature, the consensus point of which is that unacceptable conflicts arise when attorneys who are in charge of aggregate proceedings negotiate side-settlements of signed claimants. Consider an excerpt from an article written by two practicing attorneys:

> *Ortiz* [] dealt with … the conflict created by class counsel simultaneously
> representing 45,000 individual claimants who were strangers to the class action—
> that is, not class members. Class counsel had negotiated a "side settlement" on
> behalf of the 45,000 individual claimants …. As Justice Souter's majority opinion

explained, these facts precluded "any assumption that plaintiffs' counsel could be

of a mind to do their simple best in bargaining for the benefit of the settlement

class." To the contrary, "[c]lass counsel . . . had great incentive to reach any

agreement in the global settlement negotiations that they thought might survive a

Rule 23(e) fairness hearing, rather than the best possible arrangement for the . . .

class." The court characterized the conflict as "egregious."

Richard G. Stuhan and Sean P. Costello, *Robbing Peter to Pay Paul: The Conflict of Interest*

*Problem in Sibling Class Actions*, 21 GEO. J. LEGAL ETHICS 1195, 1213-14 (2008).  Professor

John C. Coffee, Jr., the leading commentator on class actions, read *Ortiz* the same way.

> *Ortiz* exemplified and emphasized external conflicts. In *Ortiz*, plaintiffs' counsel
>
> were offered a favorable settlement for their large inventories of individual clients,
>
> but on the condition that these same attorneys agree to serve as class counsel in an
>
> action seeking to resolve the rights of future claimants.  After *Ortiz*, such "side
>
> settlements" now seem to represent a per se "impermissible conflict of interest."

John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in*

*Representative Litigation*, 100 COLUM. L. REV. 370, 388 (2000).[2]

13.    Nothing prevents an attorney who holds a lead position in an aggregate proceeding

from negotiating a side-settlement of an inventory of signed cases.  The attorney need only

recognize the conflict and resign the lead position.  By resigning, the lawyer preserves good

---

[2] The language in quotation marks appears in an article by Professor Roger C. Cramton that was
quoted with approval in *Ortiz*, 527 U.S. at 852-53 (quoting Roger C. Cramton, *Individualized
Justice, Mass Torts, and "Settlement Class Actions": An Introduction*, 80 CORNELL L. REV. 811,
832 (1995)).

incentives by eliminating the possibility that the unrepresented claimants will be treated like sacrificial lambs.

14.    Having used such colorful language, I should repeat the point made above. The problem with side-settlements is not that the lawyers who negotiate them are bad people. It is that the structure—negotiating a side-settlement while also controlling a separate aggregate proceeding—creates incentives and opportunities to help one group of people at the expense of another, and that the opportunities cannot be policed. It is because conflicts are insidious that lawyers' incentives must be pure.

15.    Consider an example based loosely on the facts of this case.[3]  Suppose that New GM would have paid $250 million to settle Mr. Hilliard's entire inventory of signed clients. Such an all-inclusive settlement would have had an important negative consequence for New GM: All of the bellwether cases involving Mr. Hilliard's signed clients would have been dismissed, including the weak ones that New GM expected to win. Because trial victories in the weak bellwether cases would have devalued the unsettled cases in the MDL, a settlement that carved out the weak cases and left them pending would have been even more valuable to New GM than an all-inclusive deal. New GM would therefore rationally have offered more than $250 million— say, $275 million—to settle all of Mr. Hilliard's inventory *except* the bellwethers.[4]

---

[3] I say "loosely" because I do not know many of the facts, including those relating to Mr. Hilliard's inventory settlement that are confidential.

[4] This is consistent with Mr. Hilliard's statement that "[t]he only reason these five bellwether trial cases are not part of the MOU is that [New] GM refused to settle the bellwether trial cases." *Declaration of Robert C. Hilliard in Support of Co-Lead Counsel's Memorandum in Opposition to Lance Cooper's Motion to Remove Co-Lead Counsel and for Reconsideration of the Order Approving the Qualified Settlement Fund*, ¶ 32. New GM must have thought that leaving Mr. Hilliard's bellwether cases pending would help it reduce it losses.

16.    When New GM proposed the larger $275 million offer, Mr. Hilliard's rational response would be obvious.  The $275 million offer would a great deal for his signed clients, so he would accept it.  The carve-out for the bellwether cases would have an upside too: It would allow him to continue to deliver services in the MDL, thereby driving up his common benefit fee.  The only problem would be explaining to the bellwether clients why they were excluded from the inventory deal.  How, consistent with his fiduciary duty, could Mr. Hilliard leave them exposed to risks that his other clients no longer faced?  To surmount this hurdle, he had to protect the bellwether clients against the downside risk of losing at trial.  That's where the high/low agreements with New GM come in.  They ensured that the bellwether clients would gain even if their cases went badly.  The only victims of the side-settlement would be MDL claimants whom Mr. Hilliard did not represent.

17.    The high/low agreements make it especially hard to explain the decision to carve out the bellwethers on any basis other than New GM's expectation of winning them and reducing the value of the unsettled claims.  This was plainly true for the bellwether cases that were chosen by New GM.  Those were the weakest cases New GM could find.  But it likely was also true for the bellwether cases selected by Co-Lead Counsel that came out of Mr. Hilliard's inventory.  The reason for this is that the side-settlement committed New GM to paying the "lows" in these cases.  Being required to pay the "lows" in any event, New GM didn't stand to save many dollars in those cases by prevailing at trial.  But defense verdicts could greatly reduce the value of the unsettled cases in global negotiations.  In the context of a $275 million settlement of more than 1,300 pending cases, what reason other than the expectation of winning could New GM have had for agreeing to pay the "lows" but refusing to pay the small additional amounts (if any) that would have been needed to settle the bellwethers entirely?

18.    It bears emphasis that, in the scenario just set out, there need not have been any conscious collusion.  New GM sought to minimize its losses by leaving the weaker bellwether cases pending, and need only have made a settlement offer to that effect.  Mr. Hilliard sought to maximize his signed clients' recoveries and his common benefit fees, while also protecting the bellwether clients from any downside risk.  He need only have requested appropriate terms.  The MDL claimants who are not at the bargaining table suffered a loss simply because the parties who were there acted on their prevailing incentives.  That is how structural collusion works.

19.    Professor Miller's observation that Mr. Hilliard violated no duties to anyone by settling his inventory cases with New GM is consistent with the point just made, but does not get to the heart of the matter.  Professor Miller argues as follows.  First, in an MDL, every lawyer must zealously represent the interests of his or her signed clients.  *Declaration of Geoffrey Parsons Miller*, ¶ 9.  Second, the duty to advance the interests of one's signed clients "is not limited by any obligations owed to clients of other attorneys."  *Id.*  Third, a lead attorney can perform common benefit work without violating the duty of loyalty to signed clients because "'common benefit' work, by definition, serves the interest of all plaintiffs, and thus is in furtherance of, rather than contrary to, an attorney's obligations to his or her individual client[s]."  *Id.*, ¶ 10.

20.    The defect in this analysis, I believe, stems from the failure to recognize that, like all legal work, common benefit work can be done well or poorly.  Before explaining the importance of this oversight, I wish to make two points.  First, Professor Miller and I agree that the quality of common benefit work can vary.  One of the central arguments in our jointly authored article is that it is important to put the lawyers with the strongest incentives in charge of MDLs because claimants will benefit from the superior quality of the common benefit work they procure.  *See* Charles Silver & Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District*

*Litigations: Problems and a Proposal*, 63 VANDERBILT L. REV. 107, 157-159 (2010).  Second, neither I nor anyone else will be able identify all the ways in which the side-settlement may have influenced the delivery of common benefit services in the MDL until the settlement's terms are studied with care.  Because the side-settlement is confidential, observers like me who neither participated in the negotiations nor know the agreed terms are limited in what we can say.

21.    Having said that the quality of common benefit work can vary, it remains to make the normative point that an attorney who serves as lead counsel in an MDL is a fiduciary to the following extent: the attorney must manage the common benefit workload in a manner that is calculated to maximize the gains for all claimants.  In other words, a lead attorney may not allow "common benefit work" to become "common detriment work."  The attorney may not handle common benefit work in a manner that is likely to make claimants worse off, and must operate free of any incentive to do so.

22.    This is the position I argued for in an article published in 2011.

Lead lawyers are certainly fiduciaries to their signed clients. In an MDL, therefore, the question is not whether lead attorneys are fiduciaries—they are—but to whom their responsibilities extend. In particular, it is important to know whether they must treat non-client claimants as well as they treat their clients. The basis for an affirmative answer is clear. To the extent that lead attorneys displace [other] lawyers [by controlling common benefit work], they assume [other] lawyers' duties, including the fiduciary duty to refrain from exploiting clients.  Otherwise, MDL procedures would alter plaintiffs' substantive rights by allowing lead attorneys to take advantage of them.

First principles also support the conclusion that lead attorneys are fiduciaries. In contractual principal-agent relationships, a fiduciary duty is implied when an agent armed with "open-ended management power" can help a principal or act to a principal's detriment. The fiduciary duty protects the principal from exploitation . . . . In MDLs, lead attorneys possess immense power and discretion. Consequently, non-client claimants are at risk of being exploited and require the protection the fiduciary duty provides. The ALI's *Principles* takes this position. Section 1.05 encourages judges to ensure [that] passive parties are adequately represented in all aggregate proceedings and it identifies the fiduciary duty as a tool to further this goal.

Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations*, 79 FORDHAM L. REV. 1985, 1989-1990 (2011). In short, my position is that lead attorneys have a fiduciary duty when performing common benefit work that requires them to use their control of that work solely to the advantage of all claimants and to remain free of pressures to do otherwise.

23.    Professor Miller did not consider the impact a side-settlement could have on the quality of the common benefit work performed by a lead attorney. But it is evident that the affect could be substantial. A side-settlement could convert common benefit work into common detriment work in two ways: by directly causing a lead attorney to mismanage it, and by weakening a lead attorneys' investment incentives.

24.    Light can be shed on both problems by asking a straightforward question: Why does Mr. Hilliard still hold a lead position in this MDL? The inventory settlement resolved almost 100% of his cases. Only the unsettled bellwethers remain, and Mr. Hilliard's signed clients in those cases are insulated from losses by high/low agreements. Consequently, his incentive to

perform first-rate common benefit work has been greatly diminished. Other judges have appointed new lead lawyers following settlements that resolved large numbers of pending claims.

25.     In fact, Judge Jack Weinstein did so in *In re Zyprexa Products Liab. Litig.*, 467 F. Supp. 2d 256 (E.D.N.Y. 2006), the opinion that New GM cited as an example of proper MDL management. *See General Motors LLC's Combined Response to Motion to Remove the Co-Leads and to Reconsider the Bellwether Trial Schedule and Motion to Reconsider the Order Approving The Establishment of the 2015 New GM Ignition Switch Qualified Settlement Fund*, p. 14 (citing *In re Zyprexa Products Liab. Litig.*, 467 F. Supp. 2d 256 (E.D.N.Y. 2006), for the proposition that "it is common for groups or subsets of claims—particularly personal injury claims—to be settled at various times in an MDL proceeding"); *see also Zyprexa*, 467 F. Supp. 2d at 261-62 (reporting that after "many thousands of cases in this multi-district litigation ("MDL") were settled under the direction of an original Plaintiffs' Steering Committee ("PSC I") ... [a] new Plaintiffs' Steering Committee ("PSC II") was then established to deal with the thousands of incoming and remaining cases").

26.     Professor Miller and I questioned the wisdom of allowing lawyers with few cases to control MDLs in our joint article, the primary thesis of which is that control should be given to the lawyers with the largest and most valuable client inventories. We even offered a proposed procedural reform that would require MDL judges to appoint "the lawyer or group of cooperating lawyers with the most valuable client inventory" to the Plaintiffs' Management Committee. Why? "Because a lawyer with a large inventory of signed clients should rationally want a superior lawyer to provide CBW [common benefit work] at a reasonable rate." Silver & Miller, *supra*, 63 VANDERBILT L. REV. at 161. Mr. Hilliard's large inventory of signed clients once gave him a solid

incentive to perform first-rate common benefit work and a strong claim to a leadership position, but both the incentive and the claim evaporated when his cases were resolved.

27.     Mr. Hilliard's continuing occupancy of a leadership position is also odd for a second reason. In my experience, defendants who settle mass tort cases in bulk want to get rid of the plaintiffs' attorneys who are involved. For example, the global settlement in the Vioxx MDL required all lawyers who settled even one case to disqualify themselves from continuing to sue Merck on behalf of any non-settling claimants. *See* Master Settlement Agreement for In re: Vioxx, ¶¶ 1.2.4 and 1.2.8 *et seq.*[5] The lawyers had to refer non-settling clients to other attorneys and renounce any financial interest in their cases. Here, however, New GM did not get rid of Mr. Hilliard, or even attempt to. It left his bellwether cases alive, thereby securing his leadership position.

28.     This unusual action is concerning. Why would New GM have wanted to keep Mr. Hilliard actively engaged in this MDL instead of using the side-settlement to force him out? The answer must have something to do with its desire to minimize the remaining MDL claimants' recoveries—a desire that is completely antithetical to the claimants' goal of maximizing their payments. The bellwether cases provide the obvious connection. If, from the plaintiffs' perspective, they are bad cases, by winning them New GM can devalue the unsettled claims. The combination of weak cases being tried by a lawyer with a diminished interest in winning would be a dream come true for New GM and a nightmare come to life for the MDL claimants.

29.     The danger posed by the change in Mr. Hilliard's incentives seems especially clear when one focuses on the decision to replace the *Yingling* case with the *Scheuer* case in the bellwether line-up. When considering this decision, three things should be clear. First, it was a

---

[5] A copy of the agreement is available at http://www.officialvioxxsettlement.com/documents/

matter of great importance to all claimants that the plaintiffs choose their best cases as bellwethers and try their best cases first. This is so for a reason already explained: Plaintiffs' leverage in settlement negotiations depends mainly on the value of their cases at trial, and the point of bellwether trials is to create information about what pending cases are worth. Second, the decision to try a particular case first required a subjective judgment that should have been made by a lead attorney whose only desire was to maximize the value of the unsettled claims. Any competing interest would have tainted the decision maker and saddled the MDL claimants with inadequate representation. Third, Co-Lead Counsel's original assessment, reflected in the motion presented to the Court on July 27, 2015, was that *Yingling* was the better case. Nothing stated in any of the materials I read suggested that the original assessment was mistaken. I return to this point below.

30. Here, there are good reasons for thinking that Mr. Hilliard's incentives were tainted, and that this led to the poor decision to substitute *Scheuer* for *Yingling*. First, because the impending inventory settlement would resolve his signed clients' cases, Mr. Hilliard's remaining interest in the MDL would consist primarily of the common benefit fee he hoped a global resolution would generate. To maximize his share of the common benefit fee award (which would be divided among all lawyers who performed common benefit work), Mr. Hilliard had to expend as much time as he could, preferably in high-profile activities that made the importance of his contributions clear to the Court. This made the prospect of serving as trial counsel in bellwether cases especially attractive. Because trials require an enormous amount of time and take place in court, they are the ideal means of maximizing claims for common benefit fees.

31. Second, the plaintiffs involved in *Scheuer* were Mr. Hilliard's signed clients; the plaintiffs' involved in *Yingling* were not. By trying the *Scheuer* case first, Mr. Hilliard could cement his claim for common benefit fees, and he could do so before any negotiations produced a

global settlement. Had *Yingling* been tried first, this would not have been true. Mr. Victor Pribanic represents the Yingling family, and he rebuffed Mr. Hilliard's request to share fees in the matter and to be lead counsel in the case. It was on the heels of the failed negotiations with Mr. Pribanic that *Scheuer* was set for trial in place of *Yingling*. The consequences of this decision were devastating, for reasons the *Plaintiffs' Motion to Remove the Co-Leads and Reconsider the Bellwether Trial Schedule* clearly explains.

32.     On behalf of its clients, The Cooper Firm contends that *Yingling* was obviously a much stronger case than *Scheuer*, and should have been tried first, as the bellwether schedule originally provided. The superiority of *Yingling* is certainly clear now, and, although I am not a trial lawyer and am reluctant to second-guess any seasoned attorney, one must take seriously the possibility that its superiority was also clear before the *Scheuer* debacle. After all, Co-Lead Counsel originally preferred *Yingling*. My point, however, is not that Mr. Hilliard intentionally chose a weaker case over a stronger one; it is that when he substituted *Scheuer* for *Yingling*, his incentives were compromised. He had a conflict when performing common benefit work because his fee-interest in his signed clients' cases was in the process of disappearing.[6] With their cases settled and his bellwether clients protected from losses, his predominant financial interest lay in maximizing his claim for common benefit fees. This gave him a reason to try a case he could work on rather than one he could not, regardless of their relative strength or the impact on the settlement

---

[6] On July 27, 2015, Co-Lead Counsel and New GM jointly identified *Yingling* as the first bellwether case to be tried. *Scheuer* was substituted for *Yingling* on or shortly after August 3, 2015, when the negotiations between Mr. Hilliard and Mr. Pribanic failed. The side-settlement of Mr. Hilliard's inventory of cases, minus the bellwethers, was announced on September 17, 2015. The side-settlement was thus likely being negotiated when the decision to substitute *Scheuer* was made. Given how far the negotiations must have progressed, it seems reasonable to infer that the impact of the side-settlement on Mr. Hilliard's fee interest in the MDL was predictable as of August 3, 2015.

value of the cases remaining in the MDL. A lawyer with a duty to ensure that common benefit work does not become common detriment work should not operate with a conflict of this kind.

33.    Co-Lead Counsels' accounts of the reasons that supported the choice of *Scheuer* as the first bellwether strengthen my concern that poor incentives led to the decision. Most of the factors cited had little or nothing to do with the relative strength of the two cases. For example, Steve Berman says that Co-Lead Counsel were right to put *Scheuer* first because "the Court would expect Co-Lead Counsel to [lead the trial of the first bellwether] and that this was an important factor to be considered in recommending a bellwether sequence to the Court." *Declaration of Steve W. Berman in Support of Co-Lead Counsel's Memorandum in Opposition to Lance Cooper's Motion to Remove Co-Lead Counsel and for Reconsideration of the Order Approving the Qualified Settlement Fund*, ¶ 8. Should the Court's (supposed) expectation really have figured in the decision to try *Scheuer*, especially given that an order putting *Yingling* first was already in place? Or was this a poor reason for substituting a weaker case that Co-Lead Counsel could try for a stronger one that they couldn't?

34.    Elizabeth Cabraser indicates that lawyers were the focus too. She observes that "participation by Lead Counsel in bellwether trials was the norm" and that "Lead (or other common benefit) counsel took a lead role in bellwether trials, because of their developed knowledge of the case." *Declaration of Elizabeth J. Cabraser in Support of Co-Lead Counsel's Memorandum in Opposition to Lance Cooper's Motion to Remove Co-Lead Counsel and for Reconsideration of the Order Approving the Qualified Settlement Fund*, ¶ 12. Should the decision to try a weaker case rather than a stronger one have been driven by an informal norm? Were Co-Lead Counsel so much better than Mr. Pribanic as to make up for the relative weakness of *Scheuer*? Or did the desire to build up the common benefit fee award lead to a poor decision?

35.    The truth will never be known, and that is the problem.  It is often impossible to tell *ex post* whether poor decisions were the result of misaligned incentives or mere mistakes.  Not even lawyers who hold lead counsel positions in an MDL can be certain, for the reason already stated: interest conflicts are insidious.  They corrupt lawyers' judgments invisibly.  This is why lead attorneys' incentives and duties must always be tied to the results they obtain for MDL claimants.

36.    Mr. Hilliard's alleged attempt to extract fees from Mr. Pribanic raises both a separate issue and serious concerns.  I say "alleged" because there may be a disagreement as to whether such an attempt was made.  Mr. Hilliard's *Declaration* is ambiguous on the point.  *See Declaration of Robert C. Hilliard in Support of Co-Lead Counsel's Memorandum in Opposition to Lance Cooper's Motion to Remove Co-Lead Counsel and for Reconsideration of the Order Approving the Qualified Settlement Fund,* ¶ 14 ("Though sharing of fees was discussed under many different scenarios, the most significant issue, in my view, was that my team and I be allowed to assist Mr. Pribanic in actually trying the case.").  The following discussion is based on the assumption that Mr. Hilliard did demand a portion of Mr. Pribanic's fee when discussing how and when *Yingling* would be tried.

37.    There was no good reason for Mr. Hilliard to have insisted on sharing Mr. Pribanic's fee as a condition for co-counseling the case.  As a lead attorney, he could have looked to the Court for compensation from any payment that might have been made to the *Yingling* plaintiffs.  An order requiring a holdback from settlement payments for common benefit fees has already been entered in this MDL.  Order No. 42.  Mr. Hilliard's only request to Mr. Pribanic should have been for permission to co-counsel the trial.  And he should have made that request only if his participation would have increased the odds of winning.  Although I express no opinion

on this matter, I again observe that, when making this request, Mr. Hilliard's incentives were compromised.

38.    The fee-sharing request raises a serious question of breach of the fiduciary duty that, I have argued, attaches to the delivery of common benefit work. As the Court knows, a fiduciary may not use his position to enrich himself, other than by earning a contracted-for fee. Here, no contract existed between Mr. Hilliard and Mr. Pribanic. Mr. Hilliard did have a right to common benefit fees, but that compensation stream was controlled by the Court. The proper way of altering it would have been by filing a motion and obtaining a new fee order. Given these facts, it is hard to avoid the conclusion that Mr. Hilliard sought to use his position as Lead Counsel to enrich himself by an improper means.

39.    In an article quoted from above, I also argued that lead attorneys in MDLs should be subjected to a fiduciary duty that prevents them from using their control of legal proceedings to extract fees from other lawyers. Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations*, 79 FORDHAM L. REV. 1985, 1990-1991 (2011). Using the Vioxx MDL as an example, I showed how the lead attorneys used their control of global settlement negotiations to do just that. I also made the following point:

> The fiduciary duty can protect [non-lead] lawyers while still permitting lead attorneys' to do their jobs. Although a fiduciary duty would prevent lead attorneys from using their control of settlement negotiations to enrich themselves at [non-lead] lawyers' expense, it would leave them completely free to do so by increasing claimants' recoveries. This is what they are supposed to use their powers to do. The duty would also allow lead attorneys to apply to the MDL court for common benefit compensation, just as lawyers do in successful class actions.

Therein lies the rub.  Lead attorneys should focus on only one thing: Maximizing all claimants' recoveries.  To ensure that they do, MDL judges should tie their compensation for common benefit work to the size of claimants' settlement payments—and to nothing else that would create conflicting incentives.  It should be a per se violation of the fiduciary duty that applies to common benefit work for a lead attorney to seek a fee increase by negotiating a side-payment from a lawyer with a bellwether case, or in any way other than through the Court.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

DATED:  February 5, 2016

_____
CHARLES SILVER

- 22 -

Exhibit A

# RESUME OF CHARLES SILVER

## CONTACT INFORMATION

Co-Director, Center on Lawyers, Civil Justice and the Media
School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705

(512) 232-1337 (voice)

## ACADEMIC EMPLOYMENTS

School of Law, University of Texas at Austin, 1987-2015
    Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure
    W. James Kronzer Chair in Trial & Appellate Advocacy
    Cecil D. Redford Professor
    Robert W. Calvert Faculty Fellow
    Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow
    Assistant Professor

Harvard Law School, Fall 2011
    Visiting Professor

Vanderbilt University Law School, Fall 2003
    Visiting Professor

University of Michigan Law School, Fall 1994
    Visiting Professor

University of Chicago, 1983-1984
    Managing Editor, Ethics: A Journal of Social, Political and Legal Philosophy

## EDUCATION

Yale Law School, JD (1987)
University of Chicago, MA (Political Science) (1981)
University of Florida BA (Political Science) 1979

# PUBLICATIONS

## IV. SPECIAL PROJECTS

Associate Reporter, American Law Institute, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION, (2010) (with Samuel Issacharoff, Reporter, and Robert Klonoff and Richard Nagareda, Associate Reporters).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, REPORT ON CONTINGENT FEES IN CLASS ACTION LITIGATION, 25 Rev. Litig. 459 (2006).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, REPORT ON CONTINGENT FEES IN MASS TORT LITIGATION, 42 Tort Trial & Insurance Practice Law Journal 105 (2006), available at http://www.jstor.org/stable/25763828

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, REPORT ON CONTINGENT FEES IN MEDICAL MALPRACTICE LITIGATION (2004) available at http://apps.americanbar.org/tips/contingent/MedMalReport092004DCW2.pdf; published at 25 Rev. Litig. 459 (2006).

Co-Reporter, International Association of Defense Counsel PRACTICAL GUIDE FOR INSURANCE DEFENSE LAWYERS (2002) (with Ellen S. Pryor and Kent D. Syverud, Co-Reporters); published on the IADC website (2003); revised and distributed to all IADC members as a supplement to the Defense Counsel J. (2004).

## V. BOOKS

HEALTH CARE GAMES (with David A. Hyman) (in progress)

TO SUE IS HUMAN: MEDICAL MALPRACTICE LITIGATION IN TEXAS 1988-2010 (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage) (in progress).

HEALTH LAW AND ECONOMICS, Edward Elgar (coedited with Ronen Avraham and David A. Hyman) (available February 2016).

LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION, 2nd Edition (2012) (with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley) (updated 2013 & 2014).

PROFESSIONAL RESPONSIBILITIES OF INSURANCE DEFENSE COUNSEL (2012) (with William T. Barker) (updated annually 2013-2015).

## VI. ARTICLES BY SUBJECT AREA (* INDICATES PEER REVIEWED)

## HEALTH CARE LAW & POLICY

1.  "It Was on Fire When I Lay Down on It: Defensive Medicine, Tort Reform, and Healthcare Spending," in I. Glenn Cohen, Allison Hoffman, and William M. Sage, eds., OXFORD HANDBOOK OF AMERICAN HEALTH LAW (forthcoming 2015) (with David A. Hyman).*

2.  "Double, Double, Toil and Trouble: Justice-Talk and the Future of Medical Malpractice Litigation," 63 DePaul L. Rev. 574 (2014) (with David A. Hyman) (invited symposium).

3.  "Five Myths of Medical Malpractice," 143:1 Chest 222-227 (2013) (with David A. Hyman).*

4.  "Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt,'" (coauthored with David A. Hyman), 46 New England L. Rev. 101 (2012) (invited symposium).

5.  "Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?" in Ken Oliphant & Richard W. Wright, eds., MEDICAL MALPRACTICE AND COMPENSATION IN GLOBAL PERSPECTIVE (2013) (coauthored with David A. Hyman)*; originally published in 87 Chicago-Kent L. Rev. 163 (2012).

6.  "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press 531-542 (2012) (with David A. Hyman).*

7.  "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 Vanderbilt L. Rev. 1085 (2006) (with David A. Hyman) (invited symposium).

8.  "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII Widener L. J. 121 (2005) (with David A. Hyman) (invited symposium).

9.  "Speak Not of Error, Regulation (Spring 2005) (with David A. Hyman).

10. "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?" 90 Cornell L. Rev. 893 (2005) (with David A. Hyman).

11. "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 Harv. J. L. and Pub. Pol. 107 (2004) (with David A. Hyman) (invited symposium).

12. "You Get What You Pay For: Result-Based Compensation for Health Care," 58 Wash. & Lee L. Rev. 1427 (2001) (with David A. Hyman).

13. "The Case for Result-Based Compensation in Health Care," 29 J. L. Med. & Ethics 170 (2001) (with David A. Hyman).*

### EMPIRICAL STUDIES OF MEDICAL MALPRACTICE

14. "Insurance Crisis or Liability Crisis? Medical Malpractice Claiming in Illinois, 1980-2010," J. Empirical Legal Stud. (forthcoming 2016) (with Bernard S. Black, David A. Hyman, and Mohammad H. Rahmati).

15. "Policy Limits, Payouts, and Blood Money: Medical Malpractice Settlements in the Shadow of Insurance," 5 U.C. Irvine L. Rev. 559 (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik) (invited symposium).

16. "Does Tort Reform Affect Physician Supply? Evidence from Texas," Int'l Rev. of L. & Econ. (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik), available at http://dx.doi.org/10.1016/j.irle.2015.02.002.*

17. "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage), Amer. L. & Econ. Rev. (2012), doi: 10.1093/aler/ahs017.*

18. "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik), 9 J. Empirical Legal Stud. 173-216 (2012).*

19. "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 J. Empirical Legal Stud. 379 (2010) (with Bernard S. Black and David A. Hyman).*

20. "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 J. Empirical Legal Stud. 723 (2009) (with David A. Hyman and Bernard S. Black).*

21. "Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 J. Legal Analysis 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue).*

22. "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 The Advocate (Texas) 25 (2008) (with Bernard S. Black and David A. Hyman) (invited symposium).

23. "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 3neva Papers on Risk and Insurance: Issues and Practice 177-192 (2008) (with Bernard S. Black, David A. Hyman, William M. Sage and Kathryn Zeiler).*

24. "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 J. Legal Stud. S9 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

25. "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," J. Empirical Legal Stud. 3-68 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

26.    "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 J. Empirical Legal Stud. 207–259 (July 2005) (with Bernard S. Black, David A. Hyman, and William S. Sage).*

## EMPIRICAL STUDIES OF THE LAW FIRMS AND LEGAL SERVICES

27.    "The Economics of Plaintiff-Side Personal Injury Practice," U. Il. L. Rev. 1563 (2015) (with Bernard S. Black and David A. Hyman).

28.    "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 Fordham Urb. L. J. 357 (2010) (with David A. Hyman) (invited symposium).

29.    "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 Amer. Law & Econ. Rev. 185 (2008) (with Bernard S. Black, David A. Hyman, and William M. Sage).*

## ATTORNEYS' FEES—EMPIRICAL STUDIES AND POLICY ANALYSES

30.    "Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions," 115 Columbia L. Rev. 1371 (2015) (with Lynn A. Baker and Michael A. Perino).

31.    "Regulation of Fee Awards in the Fifth Circuit," 67 The Advocate (Texas) 36 (2014) (invited submission).

32.    "Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment," 66 Vanderbilt L. Rev. 1677 (2013) (with Lynn A. Baker and Michael A. Perino).

33.    "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 Vanderbilt L. Rev. 107 (2010) (with Geoffrey P. Miller).

34.    "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 DePaul L. Rev. 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

35.    "Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider," 20 The NAPPA Report 7 (Aug. 2006).

36.    "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006).

37.    "Due Process and the Lodestar Method: You Can't Get There From Here," 74 Tul. L. Rev. 1809 (2000) (invited symposium).

38.    "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 Tex. Rev. of Litig. 301 (1993).

39.    "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 Tex. L. Rev. 865 (1992).

40.    "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 <u>Cornell L. Rev.</u> 656 (1991).

## LIABILITY INSURANCE AND INSURANCE DEFENSE ETHICS

41.    "The Treatment of Insurers' Defense-Related Responsibilities in the Principles of the Law of Liability Insurance: A Critique," 68 <u>Rutgers U. L. Rev.</u> (forthcoming 2015) (with William T. Barker) (symposium issue).

42.    "The Basic Economics of the Duty to Defend," in D. Schwarcz and P. Siegelman, eds., *RESEARCH HANDBOOK IN THE LAW & ECONOMICS OF INSURANCE 438-460* (2015).\*

43.    "Insurer Rights to Limit Costs of Independent Counsel," <u>ABA/TIPS Insurance Coverage Litigation Section Newsletter</u> 1 (Aug. 2014) (with William T. Barker).

44.    "Litigation Funding Versus Liability Insurance: What's the Difference?," 63 <u>DePaul L. Rev.</u> 617 (2014) (invited symposium).

45.    "Ethical Obligations of Independent Defense Counsel," 22:4 <u>Insurance Coverage</u> (July-August 2012) (with William T. Barker), available at http://apps.americanbar.org/litigation/committees/insurance/articles/julyaug2012-ethical-obligations-defense-counsel2.html.

46.    "The Impact of the Duty to Settle on Settlement: Evidence From Texas," 8 <u>J. Empirical Leg. Stud.</u> 48-84 (2011) (with Bernard S. Black and David A. Hyman).\*

47.    "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 <u>Ariz. L. Rev.</u> 787 (2002) (invited symposium).

48.    "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 <u>G'town J. Legal Ethics</u> 29 (2001) (with Ellen S. Pryor).

49.    "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 <u>Tex. L. Rev.</u> 599 (2000) (with Ellen S. Pryor).

50.    "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 <u>Conn. Ins. L. J.</u> 205 (1998) (invited symposium).

51.    "The Lost World: Of Politics and Getting the Law Right," 26 <u>Hofstra L. Rev.</u> 773 (1998) (invited symposium).

52.    "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 <u>Fordham L. Rev.</u> 233 (1996) (invited symposium).

53.    "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6 <u>Coverage</u> 47 (1996) (with Michael Sean Quinn).

54.    "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6 <u>Coverage</u> 21 (1996) (with Michael Sean Quinn).

55.    "The Professional Responsibilities of Insurance Defense Lawyers," 45 <u>Duke L. J.</u> 255 (1995) (with Kent D. Syverud); reprinted in IX Ins. L. Anthol. (1996) and 64 <u>Def. L. J.</u> 1 (Spring 1997).

56.    "Wrong Turns on the Three Way Street: Dispelling Nonsense about Insurance Defense Lawyers," 5-6 <u>Coverage</u> 1 (Nov./Dec.1995) (with Michael Sean Quinn).

57.    "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 <u>Tex. L. Rev.</u> 1203 (1994) (with Ellen Smith Pryor).

58.    "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 <u>Tex. L. Rev.</u> 1583 (1994); reprinted in Practicing Law Institute, Insurance Law: What Every Lawyer and Businessperson Needs To Know (1998).

59.    "A Missed Misalignment of Interests: A Comment on *Syverud, The Duty to Settle*," 77 <u>Va. L. Rev.</u> 1585 (1991); reprinted in VI Ins. L. Anthol. 857 (1992).

## CLASS ACTIONS, MASS ACTIONS, AND MULTI-DISTRICT LITIGATIONS

60.    "What Can We Learn by Studying Lawyers' Involvement in Multidistrict Litigation? A Comment on *Williams, Lee, and Borden, Repeat Players in Federal Multidistrict Litigation*," 5 <u>J. of Tort L.</u> 181 (2014), DOI: 10.1515/jtl-2014-0010 (invited symposium).

61.    "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 <u>Fordham L. Rev.</u> 1985 (2011) (invited symposium).

62.    "The Allocation Problem in Multiple-Claimant Representations," 14 <u>S. Ct. Econ. Rev.</u> 95 (2006) (with Paul Edelman and Richard Nagareda).*

63.    "A Rejoinder to *Lester Brickman, On the Theory Class's Theories of Asbestos Litigation,*" 32 <u>Pepperdine L. Rev.</u> 765 (2005).

64.    "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 <u>Pepp. L. Rev.</u> 301 (2004) (invited symposium).

65.    "We're Scared To Death: Class Certification and Blackmail," 78 <u>N.Y.U. L. Rev.</u> 1357 (2003).

66.    "The Aggregate Settlement Rule and Ideals of Client Service," 41 <u>S. Tex. L. Rev.</u> 227 (1999) (with Lynn A. Baker) (invited symposium).

67.    "Representative Lawsuits & Class Actions," in B. Bouckaert & G. De Geest, eds., INT'L ENCY. OF L. & ECON. (1999).*

68.    "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 Va. L. Rev. 1465 (1998) (with Lynn A. Baker) (invited symposium).

69.    "Mass Lawsuits and the Aggregate Settlement Rule," 32 Wake Forest L. Rev. 733 (1997) (with Lynn A. Baker) (invited symposium).

70.    "Comparing Class Actions and Consolidations," 10 Tex. Rev. of Litig. 496 (1991).

71.    "Justice in Settlements," 4 Soc. Phil. & Pol. 102 (1986) (with Jules L. Coleman).*

## GENERAL LEGAL ETHICS AND CIVIL LITIGATION

72.    "The DOMA Sideshow" (in progress), available at http://ssrn.com/abstract=2584709.

73.    "Philosophers and Fiduciaries" (in progress) (presented at several law schools and conferences).

74.    "Fiduciaries and Fees," 79 Fordham L. Rev. 1833 (2011) (with Lynn A. Baker) (invited symposium).

75.    "Ethics and Innovation," 79 George Washington L. Rev. 754 (2011) (invited symposium).

76.    "In Texas, Life is Cheap," 59 Vanderbilt L. Rev. 1875 (2006) (with Frank Cross) (invited symposium).

77.    "Introduction: Civil Justice Fact and Fiction," 80 Tex. L. Rev. 1537 (2002) (with Lynn A. Baker).

78.    "Does Civil Justice Cost Too Much?" 80 Tex. L. Rev. 2073 (2002).

79.    "A Critique of Burrow v. Arce," 26 Wm. & Mary Envir. L. & Policy Rev. 323 (2001) (invited symposium).

80.    "What's Not To Like About Being A Lawyer?" 109 Yale L. J. 1443 (2000) (with Frank B. Cross) (review essay).

81.    "Preliminary Thoughts on the Economics of Witness Preparation," 30 Tex. Tech L. Rev. 1383 (1999) (invited symposium).

82.    "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 G'town J. Legal Ethics 959 (1998) (with David A. Hyman) (invited symposium).

83.    "Bargaining Impediments and Settlement Behavior," in D.A. Anderson, ed., DISPUTE RESOLUTION: BRIDGING THE SETTLEMENT GAP (1996) (with Samuel Issacharoff and Kent D. Syverud).

84.  "The Legal Establishment Meets the Republican Revolution," 37 S. Tex. L. Rev. 1247 (1996) (invited symposium).

85.  "Do We Know Enough about Legal Norms?" in D. Braybrooke, ed., SOCIAL RULES: ORIGIN; CHARACTER; LOGIC: CHANGE (1996) (invited contribution).

86.  "Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas," 58 Law and Contemporary Problems 213 (1995) (with Amon Burton, John S. Dzienkowski, and Sanford Levinson,).

87.  "Thoughts on Procedural Issues in Insurance Litigation," VII INS. L. ANTHOL. (1994).

## LEGAL AND MORAL PHILOSOPHY

88.  "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 L. & Phil. 381 (1987).*

89.  "Negative Positivism and the Hard Facts of Life," 68 The Monist 347 (1985).*

90.  "Utilitarian Participation," 23 Soc. Sci. Info. 701 (1984).*

## PRACTICE-ORIENTED PUBLICATIONS

91.  "Your Role in a Law Firm: Responsibilities of Senior, Junior, and Supervisory Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996).

92.  "Getting and Keeping Clients," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996) (with James M. McCormack and Mitchel L. Winick).

93.  "Advertising and Marketing Legal Services," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

94.  "Responsibilities of Senior and Junior Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

95.  "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 Clearinghouse Rev. 114 (June 1994) (with Stephen Yelenosky).

## MISCELLANEOUS

96.  "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 Pop. Res. & Pol. Rev. 255 (1984) (with Robert Y. Shapiro).*

## PERSONAL

Married to Cynthia Eppolito, PA; Daughter, Katherine; Step-son, Mabon.
First generation of family to attend college.