USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _04/12/2016___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

*This Document Relates To All Actions*
------------------------------------------------------------------------------x

14-MD-2543 (JMF)
14-MC-2543 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

**[Regarding the Cooper Plaintiffs' Motions To Remove Lead Counsel
and for Reconsideration of the Order Establishing the Qualified Settlement Fund,
and the Hilliard and Henry Firms' Motion for a Protective Order]**

This multi-district litigation ("MDL"), general familiarity with which is presumed, relates to highly publicized defects in certain General Motors ("GM") branded vehicles and associated vehicle recalls. The MDL includes putative class actions seeking to recover for economic losses allegedly sustained by certain GM car owners and approximately 3,000 individual personal injury or wrongful death claims. As is common in litigation of this scale and complexity, early on in the process, the Court appointed plaintiffs' lawyers to leadership positions, including three lawyers as Co-Lead Counsel — Steve W. Berman, Elizabeth J. Cabraser, and Robert C. Hilliard — and ten other lawyers to an Executive Committee. The Court directed Berman and Cabraser to focus on economic class claims and Hilliard to focus on personal injury and wrongful death claims, but the three have, in most respects, acted as a team. As a team, they and the plaintiffs' lawyers answering to them have accomplished a massive amount in a relatively short amount of time: In little more than a year and a half, they have taken or defended over three hundred depositions; reviewed or produced millions of pages of documents; briefed dozens of discovery-related issues; and brought or opposed close to fifty *in limine*, summary judgment, and *Daubert* motions for two trials held in January and March of this year. (Decl. Robert C. Hilliard Supp.

Co-Lead Counsel's Mem. Opp'n (Docket No. 2206) ("Hilliard Decl.") ¶ 8; Decl. Steve W.

Berman Supp. Co-Lead Counsel's Mem. Opp'n (Docket No. 2204) ("Berman Decl.") ¶ 4).

All appeared to be going smoothly for the MDL plaintiffs (and in the MDL as a whole)

until January, when the first "bellwether" personal injury case went to trial.  On January 22,

2016, after it came to light that the Plaintiff in that case, Robert Scheuer, may have committed

perjury and fraud, the case was voluntarily dismissed.  The next business day, a handful of

plaintiffs represented by attorney Lance Cooper (the "Cooper Plaintiffs"), one of the lawyers

appointed to the Plaintiffs' Executive Committee, filed a Motion To Remove Lead Counsel,

initially seeking to remove all three Lead Counsel, but later clarifying that they sought the

removal only of Hilliard.  (Pls.' Mot. To Remove Co-Leads & Reconsider Bellwether Trial

Schedule (Docket No. 2179) ("Cooper Pls.' Removal Mem."); Pls.' Reply Br. Resp. Co-Lead

Counsel's Mem. Opp'n (Docket No. 2243) ("Cooper Pls.' Reply")).  A few days later, the

Cooper Plaintiffs followed with a Motion for Reconsideration of the Order Approving the

Establishment of the 2015 New GM Ignition Switch Qualified Settlement Fund, essentially

seeking to undo an agreement between Hilliard and General Motors LLC ("New GM") to settle

the claims of approximately 1,380 plaintiffs represented by Hilliard.  (Pls.' Mot. To Reconsider

Order Approving Establishment of 2015 New GM Ignition Switch Qualified Settlement Fund

(Docket No. 2182) ("Cooper Pls.' QSF Mem.")).  In their motions, the Cooper Plaintiffs made a

number of serious allegations against Hilliard, accusing him of, at best, mismanagement and, at

worst, self-dealing.

On February 10, 2016, the Court issued a "bottom-line" Order denying the Cooper

Plaintiffs' motions on the ground that they were "patently untimely," fell "short of meeting the

rigorous standards applicable to motions for reconsideration," and ultimately amounted to little

more than "'Monday morning quarterbacking'" that did "not even come close to providing a

legal basis for the drastic step of removing Lead Counsel."  (Order No. 95 (Docket No. 2263), at

1-2).  In its Order, the Court promised to issue an opinion providing "a more detailed analysis"

of the issues raised by the Cooper Plaintiffs' motions "in due course."  (*Id.* at 4).  This is that

Opinion.  It provides a more detailed explanation of why the Cooper Plaintiffs' attacks missed

their mark and why their motions were denied.  It also addresses a related motion that was not

fully briefed when the Court issued its bottom-line Order — namely, a motion filed by Hilliard

and co-counsel seeking entry of a protective order prohibiting Cooper and others from contacting

their clients "in violation of Rule 4.2 of the New York Rules of Professional Conduct."  (Docket

No. 2258).  For the reasons explained below, that motion is also denied.

## BACKGROUND

### A.  Plaintiffs' Counsel Leadership Appointments and Duties

Soon after the establishment of this MDL, the Court issued Order No. 5 establishing a

leadership structure for plaintiffs' counsel and inviting applications for those positions.  (*See*

Order No. 5 (Docket No. 70)).  On August 15, 2014, following a review of the applications and

an opportunity for the applicants to be heard, the Court appointed Berman, Cabraser, and Hilliard

as Co-Lead Counsel; appointed Robin L. Greenwald and Dawn M. Barrios as Plaintiff Liaison

Counsel and Federal/State Liaison Counsel, respectively; and appointed ten attorneys —

including Cooper — to the Plaintiffs' Executive Committee.  (*See* Order No. 8 (Docket No. 249),

at 3).  That Order expressly noted that the "appointments are personal in nature.  That is,

although the Court anticipates that appointees will draw on the resources of their firms, their co-

counsel, and their co-counsel's firms, each appointee is personally responsible for the duties and

responsibilities that he or she assumes."  (*Id.*).  Order No. 8 also directed counsel to confer and

submit a proposal with respect to an order delineating the duties of the leadership positions.  (*Id.* at 3-4).

Thereafter, the responsibilities of counsel were discussed at the September 4, 2014, status conference, and memorialized in Order Nos. 12 and 13.  (*See* General Motors LLC's Combined Response Mot. To Remove Co-Leads & To Reconsider Bellwether Trial Schedule (Docket No. 2200) ("New GM's Opp'n") 2 n.3; Order No. 12 (Docket No. 296), at 5-6; Order No. 13 (Docket No. 304)).  In particular, Order No. 13 detailed the respective duties of Co-Lead Counsel, the two Liaison Counsels, and the Executive Committee.  (*See* Order No. 13, at 1-7).  That Order stated that "Lead Counsel will be responsible for prosecuting any potential common benefit claims, as well as coordinating the pretrial proceedings conducted by counsel for the individual Plaintiffs."  (*Id.* at 1-2).  Such responsibility included the duty to "coordinate the initiation and conduct of discovery on behalf of the Plaintiffs"; "delegate specific tasks to other counsel in a manner to ensure that pretrial preparation for the Plaintiffs is conducted effectively, efficiently and economically"; and "organize themselves and agree on a plan for conducting the MDL on behalf of all Plaintiffs."  (*Id.* at 2).  "In performing these duties as Lead Counsel," Order No. 13 continued, "Mr. Berman and Ms. Cabraser will focus on economic class claims and Mr. Hilliard will focus on individual Plaintiffs" (that is, personal injury and wrongful death claims).  (*Id.* at 4).  To the extent relevant here, the Order also enumerated various "duties and responsibilities" of the Executive Committee, including the need to assist Lead Counsel in various ways.  (*Id.* at 5-7).

Order No. 13 further reminded counsel that "[a]ll attorneys have an obligation to keep themselves informed about the litigation so that they can best represent their respective clients."  (*See, e.g.*, *id.* at 8-10).  Order No. 12 memorialized the process, discussed at the September 2014

4

status conference, for any plaintiffs' counsel to raise issues with the Court if counsel felt that

Lead Counsel was unable adequately to represent his or her views at any status conference.  (*See*

Order No. 12, at 6-7).  The Order made clear that Lead Counsel was expected to take the lead in

speaking on behalf of all plaintiffs and that, barring permission, would be the only counsel to

speak at conferences on behalf of plaintiffs.  (*See id.*).  Nevertheless, the Order provided a means

by which any other plaintiffs' counsel could be heard.  Specifically, if counsel did "not feel that

Lead Counsel [could] adequately represent their views," counsel was invited either to put issues

on the agenda for a particular status conference via Lead Counsel and counsel for Defendants or

to submit a letter motion to the Court requesting permission to be heard.  (*Id.*).

**B.  The Bellwether Trial Selection Process and Discovery**

The parties' agenda for the October 2, 2014 status conference included a proposal for the

selection of cases to be tried as "bellwethers."  (*See* Docket No. 325).  Thereafter, following

submissions on proposed bellwether orders, the Court issued Order No. 25 on November 19,

2014.  (*See* Order No. 25 (Docket No. 422)).  That Order set forth the bellwether trial plan for

MDL cases involving personal injury and wrongful death claims.  (*Id.* at 3).  The Order laid out

the eligibility criteria and selection process for choosing what would ultimately be six bellwether

cases to be tried.  The process involved an initial selection of eighteen cases as to which the

parties would engage in case-specific fact discovery (*see id.* at 4-5, 9-14); the selection of five of

those cases by each party to be potential "Early Trial Cases" (*see id.* at 14-15); and the exercise

of two strikes by each party on the other's list, resulting in six Early Trial Cases to proceed to

expert discovery and, presumptively, trial (*see id.* at 15).[1]  In accordance with that process, Lead

Counsel and New GM each submitted their initial lists of cases on February 17, 2015 (*see*

Docket Nos. 589, 590); narrowed the pool on June 24, 2015 (*see* Docket Nos. 1074, 1075); and

exercised their respective strikes on July 1, 2015 (*see* Docket Nos. 1110, 1114), leaving six

bellwether cases: *Cockram*, *Scheuer*, and *Yingling*, selected by plaintiffs, and *Barthelemy/Spain*,

*Norville*, and *Reid*, selected by New GM.

Of the six cases selected as bellwethers, Hilliard represented the plaintiff or plaintiffs in

five.  The only exception was *Yingling*, in which the Plaintiff is represented by Victor Pribanic, a

lawyer from Pittsburgh, Pennsylvania.  (*See* Cooper Pls.' Removal Mem. 11; Docket Nos. 589,

590).  In advance of the bellwether selection, Hilliard had approached Pribanic at least twice

(once through an associate) about Hilliard's participating in any trial in *Yingling*, and there was

some discussion about sharing fees, but Pribanic demurred.  (*See* Cooper Pls.' Reply, Ex. 6

("Pribanic Decl.") ¶¶ 7-8; Hilliard Decl. ¶¶ 13-16).  On July 27, 2015 — with Pribanic still

representing the Plaintiff in *Yingling* — Lead Counsel and New GM proposed that the cases be

tried in the following order: *Yingling*, *Barthelemy/Spain*, *Scheuer*, *Reid*, *Cockram*, then *Norville*.

(*See* Docket No. 1214).  By memorandum endorsement entered the next day, the Court adopted

that ordering.  (Docket No. 1217).

That same day, Hilliard flew to Pittsburgh and met Pribanic for dinner.  (*See* Pribanic

Decl. ¶¶ 9-10).  According to Pribanic, they "discussed the merits of *Yingling*," but Hilliard

"never broached the notion" of trying the case together.  (*Id.* ¶ 9).  In a telephone call a few days

---

[1]     Order No. 34 further refined the selection process by specifying the vehicles eligible for
inclusion in the initial case pool and the categorization of types of personal injury or wrongful
death claims.  (*See* Order No. 34 (Docket No. 610)).

later, on August 1, 2015, however, Hilliard told Pribanic "he was thinking how [they] could handle the lawyers' fee if [they] tried the case together" and proposed that they divide the fees — Pribanic "understood equally" — if the case went to trial.  (*Id.* ¶ 10).  On August 3, 2015, Pribanic sent a letter to Hilliard via e-mail stating, in relevant part as follows:

> I have been thinking of your kind offer to try this case with me.  First, I want to thank you for, however it occurred, putting it first in line.  It is obviously a tremendous opportunity for our client and a case that I absolutely relish the prospect of trying, albeit it with a bit of trepidation.
>
> I trust that I can count on you as lead counsel for the personal injury cases in this MDL to assist in any way possible and after meeting you I am confident that I can do so but I am at a complete loss as to how both of us could try this case — I cannot see me second seating you anymore than you would want to second seat me in a trial.  I have agonized over some way to split it up and I have no solution short of going it alone, with your good help, and that of my colleagues here at the office and putting my head down and getting to work immediately.

(Pribanic Decl., Ex. 1; *see id.* ¶ 11; Hilliard Decl. ¶ 19).  Two days later, Lead Counsel filed a letter requesting that *Yingling* be moved to fifth in the bellwether trial schedule, and *Scheuer* be moved to the first trial spot.  (Docket No. 1229; *see* Pribanic Decl. ¶ 12; Hilliard Decl. ¶¶ 20-23).  The Court, unaware that there might be any backstory behind what appeared to be a routine request, adopted this proposal on August 7, 2015.  (*See* Docket No. 1239).

Pribanic and Lead Counsel continued to discuss the order of the bellwether trials.  (Pribanic Decl. ¶¶ 14-16; Hilliard Decl. ¶¶ 24-27).  Pribanic objected to placing *Yingling* so late in the bellwether trial order, and indicated that he would lodge his objections with the Court.  (*See* Pribanic Decl., Exs. 3-6).  Pribanic went so far as to prepare a motion requesting that the Court move *Yingling* back to the first bellwether slot, but he did not file the motion because Lead Counsel, "at [his] request, ultimately agreed to ask this Court to move *Yingling* to position number three."  (*Id.* ¶ 17).  On November 11, 2015, Lead Counsel made that request, asking to

swap *Yingling* and *Cockram* to make *Yingling* trial three.  (*See* Docket No. 1663).  At the status conference on November 20, 2015 — as memorialized in Order No. 86 — the Court granted Lead Counsel's request over New GM's objection, making the final order of bellwether cases *Scheuer*, *Barthelemy/Spain*, *Yingling*, *Reid*, *Cockram*, then *Norville*.  (*See* Order No. 86 (Docket No. 1772)).

In preparation for the bellwether trials (and as part of pretrial discovery for the MDL cases generally), the parties conducted a tremendous amount of discovery in less than a year and a half.  As of the close of briefing on these motions — which fell in between the first and second bellwether trials — the parties had reviewed and produced millions of pages of documents (*see* New GM's Opp'n 4; Co-Lead Counsel's Mem. Opp'n Lance Cooper's Mot. To Remove Co-Lead Counsel & Reconsideration of Order Approving Qualified Settlement Fund (Docket No. 2201) ("LC's Opp'n") 1); taken or defended over three hundred depositions, including thirty-eight expert depositions (*see* New GM's Opp'n 4, 8; LC's Opp'n 1; Hilliard Decl. ¶ 4; Berman Decl. ¶ 4); attended and presented arguments at thirteen status conferences (*see* New GM's Mem. 5); and participated in over two hundred meet and confers (*see* LC's Opp'n 6).  (Since the motions were fully briefed, those numbers have only increased.)  With respect to the *Scheuer* and *Barthelemy/Spain* cases alone — the only ignition switch cases to go to trial thus far — the parties filed and briefed over forty motions *in limine*, two substantial summary judgment motions, two *Daubert* motions, two motions (or the equivalent) with respect to the admissibility of "Other Similar Incident" evidence, and a motion for judgment as a matter of law, resulting in approximately twenty opinions of the Court.  (*See* Docket Nos. 1727, 1770, 1791, 1825, 1837, 1894, 1968, 1969, 1970, 1980, 1993, 2362, 2400, 2448, 2486, 2729).

**C. Settlement Negotiations**

As the parties engaged in pretrial discovery and motion practice, some settlement discussions were, unsurprisingly, proceeding on a parallel track.  On September 17, 2015, New GM, Hilliard Munoz Gonzalez LLP, and Thomas J. Henry Injury Attorneys filed a joint letter notifying the Court that they had "entered into a Confidential Memorandum of Understanding in which approximately 1,380 post-Bankruptcy personal injury and wrongful death claimants represented by [Hilliard and Henry] may be eligible to participate in an aggregate settlement." (Docket No. 1368).  The settlement was discussed on the record at the October 9, 2015 status conference.  (*See* Oct. 9, 2015 Hr'g Tr. (Docket No 1519) 42-47).  And on October 14, 2015, the involved parties filed a motion to appoint two Special Masters to oversee the settlement.  (*See* Docket No. 1499).  On October 20, 2015, the Court held a conference call with the parties to discuss the Special Masters and the settlement fund generally, in preparation for which the parties submitted their Memorandum of Understanding ("MOU") under seal for the Court's review.  (*See* Docket Nos. 1509, 1518; *see also* Docket No. 2391 (holding that the Memorandum of Understanding and other documents could remain under seal)).  The parties filed a motion to establish a Qualified Settlement Fund ("QSF") to facilitate the settlement on December 4, 2015.  (*See* Docket No. 1798).  On December 11, 2015, the Court granted both motions, appointing the Special Masters and establishing the QSF.  (*See* Docket Nos. 1853, 1854).

**D. The First Bellwether Trial and the Instant Motions**

The *Scheuer* trial began as scheduled on January 11, 2016.  Before and during the trial, the Court developed various procedures for addressing disputes and ruled on disputes with respect to demonstratives, deposition designations, and key pieces of evidence (such as the Valukas Report and the Statement of Facts), among others.  (*See, e.g.*, Docket Nos. 2018, 2019,

2143, 2147).  On January 18, 2016, New GM filed a motion (originally under seal) to introduce

new evidence and witnesses, and to recall Lisa Scheuer, in light of allegations that her husband,

Plaintiff Robert Scheuer, had altered a check and given misleading testimony regarding, among

other things, the connection between his crash and his inability to move into his family's "dream

house."  (*See* Docket Nos. 2121, 2134).  On January 21, 2016, after the conclusion of Scheuer's

case-in-chief, the Court granted the motion in part.  (*See* Docket No. 2173; Jan. 21, 2016 Trial

Tr. 1285-1293).  The next day, Scheuer filed a notice of voluntary dismissal of his case with

prejudice.  (*See* Docket Nos. 2169, 2170).  On January 25, 2016 — the next business day — the

Cooper Plaintiffs filed their Motion To Remove Co-Lead Counsel (Docket No. 2179) (the

"Removal Motion").  Two days later, they followed with their Motion for Reconsideration of the

Order Approving the Establishment of the 2015 New GM Ignition Switch Qualified Settlement

Fund (Docket No. 2182) (the "QSF Motion").  Following briefing on the Cooper motions, Lead

Counsel filed a motion for a protective order on February 9, 2016, seeking to prohibit Cooper —

or any other attorney in the MDL — from communicating with Hilliard's and Henry's clients in

violation of Rule 4.2(a) of the New York Rules of Professional Conduct.  (*See* Docket No. 2258).

## E.  Subsequent Developments

The second bellwether trial, *Barthelemy and Spain v. General Motors LLC*, took place

between March 14 and 30, 2016.  The Court granted summary judgment for New GM on some

of its claims; granted judgment as a matter of law in favor of New GM on Spain's fraudulent

misrepresentation claim; and submitted Plaintiffs' claims under the Louisiana Products Liability

Act to the jury.  (*See* Docket Nos. 2400, 2665, 2729).  On March 30, 2016, the jury found that

Plaintiffs had proved by a preponderance of the evidence that the car at issue was unreasonably

dangerous because it deviated from manufacturing standards, and because General Motors

10

Corporation (New GM's predecessor in interest) failed to provide an adequate warning of a dangerous characteristic of the car; the jury did not find, however, that any unreasonably dangerous characteristic caused the injuries of either Plaintiff and thus returned its verdict for New GM.  (*See* Docket No. 2691, Ex. 2 (verdict form)).  Accordingly, on April 5, 2016, the Court entered judgment in New GM's favor.  (Docket No. 2741).  Two days later, the parties advised the Court that they had reached a settlement in *Yingling* and the case (which had been scheduled for trial beginning on May 2, 2016) was removed from the trial calendar.  (*See* Docket Nos. 2754, 2755).  The following day, with no explanation or warning, the *Reid* case — the fourth bellwether trial — was voluntarily dismissed with prejudice.  (Docket Nos. 2756, 2758).

## DISCUSSION

As noted, this Opinion addresses three motions: the Cooper Plaintiffs' Removal Motion and QSF Motion and the Hilliard and Henry motion for a protective order.  The Court will begin with its explanation for the denial of the Cooper motions, first with a discussion of why the motions are untimely and, second, with a discussion of each motion on the merits.  The Court will then turn to the motion for a protective order.  Finally, the Court will address Cooper's own continuing, albeit nominal, membership on the Plaintiff's Executive Committee.

### A.  Timeliness

As an initial matter, the Cooper Plaintiffs' motions are patently untimely.  The Cooper Plaintiffs style the QSF Motion as a motion for reconsideration, but contend that the Removal Motion "is an original motion, and not one asking for reconsideration."  (Cooper Pls.' Reply 11).  The Removal Motion, however, plainly seeks reconsideration too, at least to the extent it asks the Court to undo its Orders establishing the bellwether selection process and approving selection of the six bellwether cases.  As motions for reconsideration, both of the Cooper Plaintiffs' motions

fall far outside the fourteen days prescribed by Local Civil Rule 6.3 for filing a notice of motion

for reconsideration.  (*See* New GM's Opp'n 10).  And even assuming the motions were timely,

neither motion comes close to meeting the stringent standards for granting reconsideration.  *See,*

*e.g.*, *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) ("The standard for granting

such a motion is strict, and reconsideration will generally be denied unless the moving party can

point to controlling decisions or data that the court overlooked . . . ."); *Montanile v. Nat'l Broad.*

*Co.*, 216 F. Supp. 2d 341, 342 (S.D.N.Y. 2002) ("Reconsideration of a court's previous order is

an extraordinary remedy to be employed sparingly in the interests of finality and conservation of

scarce judicial resources.") (internal quotation marks omitted)).  That is, the Cooper Plaintiffs

suggest no law or facts that the Court overlooked in issuing its prior orders.  *See, e.g.*, *Davidson*

*v. Scully*, 172 F. Supp. 2d 458, 461-62 (S.D.N.Y. 2001) (holding that new evidence is not a basis

for reconsideration).

   In any event, to the extent that the motions seek anything other than reconsideration of

the Court's prior orders, they are still untimely.  Not being omniscient, courts must inevitably

rely on counsel to bring to their attention problems and issues calling for court intervention.

That is, orderly litigation depends on lawyers raising issues and problems in a timely fashion; a

failure to do so not only prevents a court from nipping problems in the bud, but also casts doubt

on whether the alleged problems were in fact so problematic.  Those common-sense principles

apply to any case, but they apply in spades to litigation of this size and complexity.  Put simply,

for this litigation to proceed smoothly (as it largely has thus far), this Court cannot tolerate a

lawyer sitting on his hands and complaining long after the alleged causes of his complaints.  Yet

that is exactly what Cooper did here.  All of Cooper's complaints relate to orders entered by the

Court and actions taken by Lead Counsel long before he first raised them.  For example, over

fourteen months passed between entry of the bellwether trial order and Cooper's motions (*see* Docket No. 422); almost seven months passed between actual selection of the six bellwether trials and his motions (*see* Docket No. 1114); more than four months passed between when the QSF settlement was first made public and Cooper's motions (*see* Docket No. 1368); and the depositions and other discovery about which Cooper complains have been ongoing since at least December 22, 2014, thirteen months before his motions (*see* Order No. 20 (Docket No. 383), at 2 (directing that New GM's Phase One document production would begin on December 22, 2014)). Cooper had ample opportunity to raise any concerns he had about these things in a timely fashion: Pursuant to Order No. 12, he could have requested to be heard at one of the more-or-less monthly status conferences that the Court has held, or he could have filed a motion or letter at any time — as he made clear he knows how to do in filing the instant motions.

In short, although Cooper was on notice of the ways in which he could be heard if he felt that Lead Counsel was not acting in the interests of all plaintiffs and has, in fact, made clear that he can make himself heard, he sat on his hands, voicing concerns only after the high-profile collapse of the first bellwether trial. Cooper's failure to make himself heard sooner is all the more striking because he himself was appointed by the Court to the Plaintiffs' Executive Committee and thus had various "duties and responsibilities" of his own. (*See* Order Nos. 8, 13). In an ironic twist, Cooper argues that Lead Counsel owed fiduciary duties to all plaintiffs and violated those duties in various ways. (*See* Cooper Pls.' Removal Mem. 2, 5-6, 10-20; Cooper Pls.' Reply 2-10). To the extent that is true, however, Cooper himself owed fiduciary duties to all plaintiffs as well, and thus had an obligation — above and beyond the obligation of plaintiffs' lawyers not appointed to a leadership position — to raise the sorts of allegations he makes now in a timely fashion. Having failed to do so, Cooper will not be heard to complain only after

things went badly.  Put simply, the Court will not countenance that sort of "Monday-morning quarterbacking" in any case, let alone a case of this complexity and size.  Accordingly, the motions can and are denied on timeliness grounds alone.

## B.  The Cooper Plaintiffs' Contentions

In any event, even putting aside the rigorous deadlines and standards for reconsideration or the common-sense concerns of timeliness, the Cooper Plaintiffs do not have sufficient basis for the relief they seek.  Throughout their motions, the Cooper Plaintiffs assert that Hilliard owes all plaintiffs in the MDL fiduciary duties.  (*See* Cooper Pls.' Removal Mem. 10-20; Cooper Pls.' Reply 3-8; *id.*, Ex. 2 ("Silver Decl."), at ¶¶ 21-22).  Notably, however, they cite no legal authority for that proposition.  They also fail to cite — and the Court has not found — any legal authority addressing the standard to be used in evaluating whether lead counsel in multi-district litigation consolidated proceedings (or their equivalent) should be removed.  In the absence of such authority, it is tempting to look to the Rule 23 class action context, where courts have generally held that lead counsel should be removed only in "exceptional circumstances."  *In re "Agent Orange" Prod. Liab. Litig. MDL No. 381*, 818 F.2d 179, 186-87 (2d Cir. 1987) (denying a request to remove lead counsel where the movant had "failed even to suggest, much less establish, any exceptional circumstances" that warranted removal, and instead "suggested nothing more than a difference of opinion" (internal quotation marks omitted)); *see, e.g., Pigford v. Veneman*, 355 F. Supp. 2d 148, 167 (D.D.C. 2005) (rejecting a motion to remove class counsel despite counsel's "poor performance and missed deadlines"); *Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 325-27 (W.D. Pa. 1997) (declining to remove class counsel despite class members' dissatisfaction with a settlement because the plaintiffs had "failed to identify 'any concrete act of impropriety'" (citing *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072

(2d Cir. 1995)); *cf. In re Am. Exp. Anti-Steering Rules Antitrust Litig.*, No. 11-MD-2221 (NGG) (RER), 2015 WL 4645240, at *11-14 (E.D.N.Y. Aug. 4, 2015) (denying final class settlement approval where class counsel had improperly disseminated the defendant's confidential information and disclosed privileged work product); *Schoenbaum v. E.I. DuPont De Nemours*, No. 05-CV-1108 (ERW), 2008 WL 877962, at *1-2 (E.D. Mo. Mar. 27, 2008) (removing class counsel who had been indicted for paying kickbacks to plaintiffs in other cases).

But the duties owed by lead counsel in the class action context are undoubtedly stronger than the duties owed by Hilliard here.  In the class context, lead counsel serve as counsel for all members of the class.  Significantly, absentee class members do not have their own separate counsel; instead, they rely on counsel for the class to represent their interests.  *See, e.g.*, *Martens v. Thomann*, 273 F.3d 159, 173 n.10 (2d Cir. 2001) (noting fiduciary duties of class representatives and class counsel towards other members of the class (citing cases)); *Maywalt*, 67 F.3d at 1077-78 ("Both class representatives and class counsel have responsibilities to absent members of the class.").  Here, by contrast, Hilliard does not serve as counsel for all personal injury and wrongful death plaintiffs in the MDL; instead, each of those plaintiffs is represented by counsel of his or her choice, whether Hilliard or someone else (such as Cooper).  That is not to say that Hilliard does not have significant authority vis-à-vis all personal injury and wrongful death plaintiffs.  He plainly does, as he speaks on their behalf (to both New GM and the Court) and has the authority to make any number of decisions that are binding, either literally or effectively, on all personal injury and wrongful death plaintiffs.  But, in contrast to absentee members of a class action, the personal injury and wrongful death plaintiffs in this MDL (at least those who are not independently represented by Hilliard) have their own counsel.  Those counsel not only can, but per Order No. 13 are required to, monitor the progress of the litigation.  And

those counsel have various means at their disposal to ensure that the rights and interests of their clients are protected in the event that they believe Hilliard has taken steps that are not in their clients' interest.  It follows that, while the duties Hilliard owes to personal injury and wrongful death plaintiffs represented by other counsel are significant, they are not as strong as the duties that lead counsel owes to absentee members of a class action.  From that premise, it follows further that the standard for removal of counsel is at least as demanding here as in the Rule 23 context, and probably even more demanding.

Ultimately, the Court need not resolve whether or to what extent the standard for removal here is more demanding than the standard for removal in the Rule 23 context because the Cooper Plaintiffs fail to meet even the Rule 23 standard.  Specifically, their (sometimes wild) accusations do not withstand scrutiny, and certainly do not rise to the level that would justify the drastic relief that they seek.  Notably, the force of their arguments is significantly undermined by the fact that they no longer seek to remove all three Lead Counsel.  (As noted, in their reply, they make clear that they levy their charges only at Hilliard, in his capacity as Lead Counsel with primary responsibility for personal injury and wrongful death cases, and do not seek to remove Berman and Cabraser.  (*See* Cooper Pls.' Reply 2 n.1).)  In doing so, they implicitly concede that there is no basis to accuse Berman and Cabraser of violating their duties to plaintiffs writ large.  Yet Berman, Cabraser, and Hilliard were appointed as *Co*-Lead Counsel and have acted together throughout the litigation.  Although Hilliard has taken primary responsibility for personal injury and wrongful death cases, the three Co-Lead Counsel have closely coordinated their efforts throughout the litigation, submitting joint letters and briefs, working together to complete discovery, appearing at all conferences, and participating in the trial of the first bellwether.  Had Hilliard breached his duties to the MDL plaintiffs, Berman and Cabraser would undoubtedly

16

have known about it and arguably would have had their own duty to bring the breach to the Court's attention.  The fact that they did not — and the fact that the Cooper Plaintiffs do not even argue that they should have — is, in and of itself, reason to doubt, if not reject, the Cooper Plaintiffs' charges.

With that, the Court turns to the Cooper Plaintiffs' allegations.  They attack Lead Counsel's conduct on three fronts: (1) pretrial discovery and management of the MDL; (2) bellwether trial selection; and (3) the QSF settlement.  The Court addresses each in turn.

### 1.  Discovery and MDL Management

First, the Cooper Plaintiffs (through Cooper, on whose declaration they place sole reliance for these purposes (Cooper Pls.' Reply 2; *see id.*, Ex. 1 ("Cooper Removal Decl.")) allege that Lead Counsel failed to include Executive Committee members in discussions about important issues in the MDL (*see* Cooper Removal Decl. ¶ 4), limited state court counsel's ability to participate at MDL depositions (*see id.* ¶ 5), "siloed" Executive Committee members with respect to depositions and document discovery (Cooper Pls.' Removal Mem. 7), and "consistently attempted to thwart efforts by the state court lawyers to coordinate the prosecution of the coordinated actions" (*id.* at 8).  Again, the Cooper Plaintiffs provide no evidence other than Cooper's own say-so that such behavior occurred — a say-so that is even harder to credit given that Cooper, by his own admission, has been largely uninvolved with the work of the MDL since at least April 2015.  (*See* Cooper Removal Decl. ¶¶ 5-7)  Tellingly, not one of the hundreds of other lawyers representing plaintiffs in the MDL or in parallel state proceedings —

and none of the other nine members of the Executive Committee — joined Cooper in making his motions or submitted affidavits in support of his factual allegations.  That silence is deafening.[2]

Additionally, Cooper's allegations are contradicted by Federal/State Liaison Counsel Dawn Barrios, who attests that significant efforts have been made to coordinate discovery and information with counsel in Coordinated Actions, including a system for sharing documents and deposition schedules (*see* Decl. Dawn M. Barrios Supp. Co-Lead Counsel's Mem. Opp'n (Docket No. 2207) ¶ 4); that state counsel were invited to participate at depositions (*see id.* ¶ 6); and that Lead Counsel have done nothing to obstruct the coordination of state proceedings, but rather had been helpful and supportive (*see id.* ¶ 8).  Cooper's allegations are further belied by several other facts: by the fact that no lawyers, including counsel in state-court actions, raised any concerns with the Court despite the mechanisms available to do so (*see* Order No. 12, at 6-7; LC's Opp'n 22-23); by the fact that Boies Schiller, a firm not affiliated with Lead Counsel (but one of whose partners, David Boies, is a member of the Executive Committee), took the lead in trying the *Barthelemy/Spain* bellwether; and by the sheer amount of work counsel has accomplished, much of which was performed by members of the Executive Committee or their firms: over a hundred depositions (Hilliard Decl. ¶ 8; Berman Decl. ¶ 4); review and production of millions of pages of documents (Berman Decl. ¶ 4); and the legal research for, and briefing of, forty-plus motions *in limine*, two summary judgment motions, and multiple *Daubert* motions

---

[2]     On the other hand, the Cooper Plaintiffs and their expert make much of the fact that New GM filed a brief opposing the Motions.  (*See* Cooper Pls.' Reply 2; Silver Decl. ¶ 3).  That New GM would oppose the Motions is hardly surprising as the Motions threatened to undo months of work that New GM put into the settlement and bellwether processes.  Furthermore, New GM makes clear that it takes no position on the "aspects of the motions that are directed specifically at Lead Counsel."  (New GM's Opp'n 1).

(Berman Decl. ¶¶ 4-5).  Indeed, as of the date Cooper's motions were fully briefed, Executive

Committee members and Liaison Counsel had spent approximately fifty thousand hours on

document review, depositions, and trial preparation; since then, that time has no doubt grown

substantially.  (*See* Decl. Elizabeth J. Cabraser Supp. Co-Lead Counsel's Mem. Opp'n ¶ 8).

It is inevitable in litigation of this size and complexity that there will tensions among

plaintiffs' counsel — whose interests are mostly aligned, but sometimes competing.  Given that,

and with the benefit of 20/20 hindsight, it is no doubt easy to criticize some decisions that Lead

Counsel have made in this complex and multi-faceted litigation and to present select examples of

the push and pull among high-powered plaintiffs' counsel that could appear unseemly.  In the

final analysis, however, the Court is not persuaded that the tensions and conflicts here were

anything more than the "normal give and take of any MDL."  (Cooper Removal Decl. ¶ 2).

Notably, Cooper himself seems to acknowledge as much, stating that his allegations about the

general management of the MDL "were not the reason for filing the Motion to Remove but were

provided as background to give this Court context as to what led up to the selection of the

bellwether trials" and to the events of *Scheuer*.  (*Id.*).  Even as background alone, however, his

unsupported claims are no more persuasive in suggesting there was anything improper in the

bellwether selection process, discussed below.[3]

---

[3]      In his declaration submitted on reply, Cooper makes allegations and attaches an affidavit
to the effect that Hilliard offered to pay a prospective client, Deirdre Betancourt, in exchange for
a contract to represent her.  (*See* Cooper Removal Decl. ¶ 6).  As an initial matter, the Court will
not consider evidence or argument introduced for the first time in a reply.  *See, e.g.*, *Conn. Bar
Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010); *Cioffi v. Averill Park Cent. Sch. Dist.
Bd. of Educ.*, 444 F.3d 158, 169 (2d Cir. 2006).  Additionally, the evidence supplied (namely, the
Betancourt affidavit) does not actually support Cooper's insinuation that Hilliard offered to pay
Betancourt to represent her.  (*See* Cooper Pls.' Reply, Ex. 5 (Betancourt Decl.), at ¶¶ 6-8; Cooper
Removal Decl. ¶ 6).

### 2.   The Bellwether Trial Selections

The heart of the Cooper Plaintiffs' Removal Motion is that Lead Counsel violated their presumed fiduciary duties to the MDL plaintiffs by not choosing the "best" cases to be bellwethers and, then, by switching the order of the cases so that *Yingling* was not first.  (*See* Cooper Pls.' Removal Mem. 10-20; Cooper Pls.' Reply Mem. 3-8).  Many of the parameters of the bellwether selection process, however, were put in place by the Court.  For example, the Cooper Plaintiffs criticize Lead Counsel for selecting the bellwethers before the Feinberg Claims Facility had run its course (*see* Cooper Pls.' Removal Mem. 8-9), but the deadline for choosing the cases was set by Orders of this Court (*see, e.g.*, Order No. 25).  Additionally, the Cooper Plaintiffs allege that one of the failings of the bellwether selections was the failure to include any state cases.  (*See, e.g.*, Cooper Pls.' Removal Mem. 9, 10, 20; Cooper Removal Decl. ¶ 4).  But they offer no authority — and the Court is not aware of any — for the proposition that a case pending in state court could be tried as a bellwether case in a federal MDL.  In any event, other than trying to ensure that the first ignition switch case tried would be one in the MDL (to allow for this Court to take the lead on deciding big picture issues that would be applicable to numerous cases), this Court has not discouraged state courts from setting trial dates in ignition switch cases — precisely on the theory that such trials serve as the functional equivalent of bellwethers.  (*See* Order No. 95 (Docket No. 2263), Ex. A).  Notably, as of February 10, 2016, there were at least *twenty* more trials relating to the ignition switch defect scheduled to begin before December 4, 2017, in state courts — one of which involves Cooper and *none* of which involve Lead Counsel.  (*See id.* at 2-3 & n.2; *id.*, Ex. A).  In light of the fact that New GM faces twenty-five some odd trials (and counting), against a wide array of plaintiffs' lawyers and with

different facts, to focus on the outcome of a single trial in the MDL — as the Cooper Plaintiffs largely do — is to myopically miss the forest for a single tree.

  More specifically, the Cooper Plaintiffs' accusations of self-dealing on Hilliard's part in selecting and ordering the bellwether trials miss their mark. The Cooper Plaintiffs criticize Hilliard for the fact that five of the six bellwethers involved his own clients. (*See* Cooper Pls.' Removal Mem. 9; Cooper Pls.' Reply 4). In doing so, however, they overlook the fact that the percentage of Hilliard's clients that he proposed as early trial candidates (namely, three of the five plaintiffs' picks, or 60%) was *lower* than the percentage of plaintiffs that Hilliard represents in the MDL as a whole (approximately 75%). (*See* LC's Opp'n 14).[4] The Cooper Plaintiffs also criticize the selection of *Scheuer* as a bellwether trial and the decision to try it first, asserting that "[i]t is axiomatic that plaintiffs' counsel always want to try their best case first in MDL

---

[4]  The Cooper Plaintiffs contend that Hilliard represents such a large share of the plaintiff pool only because he flooded the MDL with meritless cases. (*See* Cooper Pls.' Removal Mem. 19). Admittedly, events since Cooper filed his Motions and the Court's bottom-line Order denying them — namely, the outcome of the *Barthelemy/Spain* trial and the abrupt dismissal of the *Reid* case, both of which were Hilliard cases — lend some credence to those contentions. But they still do not justify the drastic step of removal for several reasons. First, without evidence that Hilliard's cases are outliers — that is, without evidence that there are many stronger cases — the mere fact that some of Hilliard's cases have problems or weaknesses proves little or nothing. Among other things, New GM settled hundreds of cases, including 124 wrongful death cases, through the Feinberg Claims Resolution Process; it may well be that the personal injury and wrongful death claims left over that form the MDL are, for the most part, cases with problems of one sort or another (such as weak proof of causation or low damages). Second, even if Hilliard subjected his clients' claims to less scrutiny than Cooper or other plaintiffs' counsel would have subjected them, that alone does not constitute impropriety, let alone impropriety that would call for his removal; Cooper does not allege, for example, that Hilliard violated Rule 11 of the Federal Rules of Civil Procedure in filing any of his cases, let alone that he committed fraud. Finally, it bears noting that, even if Hilliard were removed as Lead Counsel, the cases he filed would still be in the MDL. That is, to the extent that Cooper fairly identifies a problem, removing Hilliard would not provide a remedy for it. Instead, the remedy would be adding or substituting new cases to be tried as bellwethers — something that the Court has itself indicated may be worthwhile. (*See* February 23, 2016 Conf. Tr. 37-41).

litigation."  (Cooper Pls.' Removal Mem. 10, 15-18; Cooper Pls.' Reply 5-8).  But if by "best,"

the Cooper Plaintiffs mean "most likely to result in a large plaintiff's verdict," that proposition is

by no means "axiomatic."  After all, because the primary purpose of bellwether trials is to

provide data points for settlement discussions with respect to the universe of cases, the goal is to

select the "best" representatives of the universe of cases, not outliers likely to result in victory for

one side or the other.  To that end, the Order setting up the bellwether selection process dictated

that the bellwether selections be "representative" claims.  (*See* Order No. 25, at 9-10).  *See also*

MANUAL FOR COMPLEX LITIGATION (Fourth) § 22.315 (Fed. Judicial Ctr. 2004) (noting that if

bellwether trials "are to produce reliable information about other mass tort cases, the specific

plaintiffs and their claims should be representative of the range of cases"); Rothstein, *et al.*,

MANAGING MULTIDISTRICT LITIGATION IN PRODUCTS LIABILITY CASES: A POCKET GUIDE FOR

TRANSFEREE JUDGES 44 (Fed. Judicial Ctr. 2011) ("If bellwether trials are to produce reliable

information about the other cases in the MDL, the specific plaintiffs and their claims should be

representative of the range of cases."); Fallon, *et al.*, *Bellwether Trials in Multidistrict Litigation*,

82 TUL. L. REV. 2323, 2348 (2008) (arguing that the random selection method should be

disfavored for bellwether trials because "[i]f cases are selected at random, there is no guarantee

that the cases selected to fill the trial-selection pool will adequately represent the major

variables").

       From that perspective, putting aside the problems that ultimately resulted in its dismissal

(problems, as the Court has made clear elsewhere, for which Lead Counsel bears some blame),

*Scheuer* was arguably just as good as, if not a better, bellwether candidate than *Yingling*, the only

case the Cooper Plaintiffs cite as an comparator.  Among other things, *Scheuer* (a personal injury

case) appears to have been more representative of cases in the MDL than *Yingling* (a wrongful

death case) — perhaps a result of the number and types of cases that were resolved through the Feinberg Claims Facility.  (*See* New GM's Opp'n 11-12; *see also* LC's Opp'n 12-13 (discussing the perceived merits of *Scheuer*); New GM's Opp'n 12 n.24 (discussing some weaknesses of *Yingling*)).  Moreover, even if *Scheuer* was a "weaker" case than some others, Lead Counsel could have reasonably calculated that a win in such a case would provide an even stronger inducement to New GM to settle the rest of the cases.  And finally, in the Court's view, it is not inappropriate for Lead Counsel to consider as a factor in selecting the bellwethers — and in moving *Scheuer* to the first trial position — Hilliard's involvement at trial, given his greater familiarity with discovery (including depositions of experts and New GM witnesses), with the Court, and with opposing counsel.  (*See* LC's Opp'n 15 & n.21; Berman Decl. ¶ 9; Hilliard Decl. ¶ 22).  In fact, the Court would have been somewhat surprised had Hilliard *not* been trial counsel in the first bellwether given his deep knowledge of the case and greater familiarity with the Court and its procedures.  Ultimately, despite the unforeseen end to the *Scheuer* trial, the case provided value in the progress that was made with respect to the bellwether trials generally: the Court's rulings on motions *in limine*, which will apply in future trials, the preparation of expert reports and *Daubert* motions, and the development of procedures for handling evidentiary disputes.[5]

---

[5]    Similarly, although these motions were fully briefed before the *Barthelemy/Spain* trial took place, the fact that that trial resulted in a "loss" for Plaintiffs does not mean that the trial was not valuable to other plaintiffs and the MDL as a whole.  (*Cf.* Cooper Pls.' Removal Mem. 18-20 (accusing the *Barthelemy/Spain* case of being weak)).  The second bellwether trial allowed the Court and the parties to further refine trial procedures and decide questions of law.  (*See, e.g.*, Docket Nos. 2346, 2362, 2364, 2396).  And while the jury found in favor of New GM on causation, it also found that the car at issue was unreasonably dangerous because of a defect and a failure to warn, a finding that may well help other plaintiffs in settlement negotiations with New GM and advance the MDL as a whole.  (*See* Docket No. 2691, Ex. 2).

To be sure, *Scheuer* was not originally chosen as the first bellwether — *Yingling* was — and the Cooper Plaintiffs' allegations about why and how Hilliard proposed to switch the order are somewhat troubling.  That is, Hilliard could have — and probably should have — handled the situation more deftly, if only to avoid the appearance of impropriety (and exposure to allegations of the sort that Pribanic made and Cooper is now making).  But the evidence does not ultimately support the Cooper Plaintiffs' aggressive accusations of self-dealing.  Hilliard and Pribanic plainly had discussions with respect to trying *Yingling* together, and it is apparent that fees formed a part of that discussion.  (*See* Pribanic Decl. ¶¶ 7, 10; Hilliard Decl. ¶¶ 14-17).  But from the contemporaneous evidence, it appears that Hilliard's principal "request" was to try the case together, not for a share of the fees.  (*See* Berman Decl. ¶ 9 (indicating that the reason to place *Scheuer* first was because Lead Counsel "strongly feel that the first trials should be conducted by co lead counsel")).  In particular, Pribanic declined proposals to share fees with Hilliard as early as August 2014 and certainly by April 2015.  (*See* Pribanic Decl. ¶ 7; Hilliard Decl. ¶¶ 15-16; *id.*, Exs. 4-5).  In spite of that refusal, however, Lead Counsel still selected *Yingling* as one of the bellwether cases and, indeed, initially positioned it first.

By contrast, the communications between Hilliard and Pribanic in the summer of 2015 — which may well have precipitated Lead Counsel's request to switch the order of *Scheuer* and *Yingling* — focused on whether the two lawyers would try the cases together, not on fees.  (*See* Pribanic Decl. ¶ 8; *id.*, Ex. 1).  As discussed, however, it would not be improper to switch the bellwether order to ensure that Lead Counsel was involved in trying the first case, and the evidence does not support that anything more than that, let alone anything invidious, took place.  And notably, the alternative, "maximizing fee" theory advanced by the Cooper Plaintiffs and their expert, Professor Charles Silver — that Hilliard moved *Yingling* out of the first trial slot

24

because he would not share in the trial fees from that case — makes little sense given that *Scheuer* would have been tried regardless.  (*See* Cooper Pls.' Removal Mem. 13-14; Cooper Pls.' Reply 5-6; Silver Decl. ¶¶ 30-32).  That is, for Hilliard's purposes, there would be little or no real financial difference between scheduling *Scheuer* first or third (or even fifth), as he was effectively guaranteed the fees from that trial whenever it happened.  (In fact, Pribanic himself noted as much in his August 3, 2015 letter to Hilliard declining Hilliard's request to try the case together.  (*See* Pribanic Decl., Ex. 1).)

In short, the Cooper Plaintiffs provide an insufficient basis for their attack on the selection of the bellwether cases and fail to justify disrupting the bellwether trial schedule that has been in place for many months.  Further, to disrupt that schedule now would prejudice the parties — including the Cooper Plaintiffs — given the extensive discovery and planning that have already gone into the remaining two cases.[6]

### 3.  The QSF

That leaves the QSF Motion, in which the Cooper Plaintiffs contend that the Hilliard-New GM settlement harmed the other MDL plaintiffs and ask the Court to "[c]onduct an inquiry into the settlements . . . and Mr. Hilliard's potential conflicts related to these settlements, including the decision by Mr. Hilliard and GM to enter into the high-low agreements in the

---

[6]  As indicated at the February 23, 2016 status conference and as noted above, the Court is open to rethinking the bellwether process, including rearranging or substituting cases, should better alternatives present themselves.  (*See* February 23, 2016 Conf. Tr. 37-41).  In light of the settlement and dismissal of *Yingling* and *Reid* (*see* Docket Nos. 2755, 2758), and as indicated during the telephone conference held on April 8, 2016, the parties should be prepared to discuss revisions or additions to the bellwether schedule at the April 20, 2016 status conference.

bellwether cases." (Cooper Pls.' Reply 13; *see id.* at 8-9; Cooper Pls.' QSF Mem. 9).[7]  As an initial matter, the Cooper Plaintiffs point to no authority suggesting, let alone holding, that a lead counsel outside of the Rule 23 class action context cannot freely settle his or her own cases.  It would be one thing if the QSF were tied to a limited fund.  That was the issue in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), a case cited by Professor Silver.  (*See* Silver Decl. ¶¶ 11-12).  In a limited fund situation, the potential conflict of interest between lead counsel's own clients and other plaintiffs could be a significant issue and the court may well have a role to play.  *See, e.g.*, *Ortiz*, 527 U.S. at 855.  That may even be the case outside the Rule 23 context, to ensure that a race to the courthouse door (or, more precisely, to the settlement table), does not leave some litigants out in the cold.  But there is no suggestion here that New GM's ability to satisfy any and all potential judgments is limited.  To the contrary, evidence at the *Scheuer* trial indicated that New GM's net worth is $35.4 billion, which is presumably more than enough to satisfy any judgments entered against it in the MDL.  (*See* Jan. 21, 2016 Trial Tr. 1260-61; *see also* New GM's Opp'n 11-12 (noting that no cap was placed on the Feinberg Claims Facility)).

Notably, the Court directly asked Lead Counsel and counsel for New GM at the October 9, 2015 status conference — a conference held after the fact of the settlement had been public for almost a month — whether anyone else should be given an opportunity to be heard and whether there was any potential prejudice to non-settling parties.  (*See* Oct. 9, 2015 Conf. Tr. 42-43, 45).  Counsel assured the Court that there was no issue of limited resources, and New GM reiterated

---

[7]    A "high/low agreement" is a form of "conditional settlement" in which the parties agree that if the jury reaches a verdict outside a specified range, the "high" of the range would serve as a cap on damages, whereas the "low" of the range would serve as a floor for guaranteed recovery.  *See Leibstein v. LaFarge N. Am., Inc.*, 767 F. Supp. 2d 373, 376 (E.D.N.Y. 2011); *Cunha v. Shapiro*, 837 N.Y.S.2d 160, 163 (2d Dep't 2007).

its willingness to discuss settlement with all plaintiffs.  (*See id.* at 45).  Presumably, if there had

been any legitimate concern that the settlement could prejudice non-settling parties, Berman and

Cabraser would have had every incentive to raise the issue given that the damages sought by the

economic loss plaintiffs for whom they have primary responsibility exceed the claims of any

individual personal injury or wrongful death plaintiff by a large margin; yet, they raised no

concern, let alone objection, to the settlement.  Given all that, there is no basis to conclude that

the settlement caused any prejudice to non-settling plaintiffs.  And given *that*, there is no law or

logic for the proposition that Lead Counsel cannot settle their own cases — or alternatively, as

Professor Silver suggests, to require them to step down as Lead Counsel if they desire to settle

some of their own cases.  (*See* Silver Decl. ¶ 13).  Indeed, if anything, such a rule would be a

serious disincentive for any lawyer to seek a lead counsel position in the first instance and would

do a disservice to the interests of plaintiffs as a whole.[8]

  The Cooper Plaintiffs' final salvo is that Hilliard "cut a secret deal with GM" by

negotiating high/low agreements in Hilliard's five bellwether cases in exchange for settlement of

the rest of his cases.  (*See* Cooper Pls.' QSF Mem. 8-9; Cooper Pls.' Reply 8-9).  The fact of the

settlement, however, was anything but secret; it was announced in a public letter and press

release, and Hilliard notified the Executive Committee about it directly.  (*See* Hilliard Decl.

¶¶ 33-35).  And while most terms of the settlement have not been made public, that is because

*the Court* granted leave to keep the terms under seal (without opposition, it should be noted,

---

[8]  Notably, Cooper — although appointed by the Court to the Plaintiffs' Executive Committee — confidentially settled one of *his* own cases with New GM, *Melton v. General Motors LLC*, in March 2015.  He provides no explanation for why a private settlement was acceptable for him but is not acceptable for Lead Counsel.

from the Cooper Plaintiffs or anyone else); that is, when Hilliard and New GM negotiated their

settlement, they did not necessarily know whether its terms would remain confidential.  (*See*

Docket No. 2255 (giving any party opposed to maintaining the settlement documents under seal

an opportunity to be heard); Docket No. 2391 (weighing the parties' interest in confidentiality

against the interest in public access to judicial documents and finding that the documents could

remain under seal)).  More specifically, the fact that Hilliard and New GM entered into high/low

agreements with respect to the bellwether cases, and carved them out of the settlement, is hardly

a "stunning revelation."  (Cooper Pls.' QSF Mem. 8).  Lead Counsel (including Berman and

Cabraser) and New GM informed the Court of the agreements *in camera* on November 20, 2015.

(*See* Hilliard Decl. ¶ 37; New GM's Opp'n, Ex. 1 ("Miller Decl.") ¶ 40).  And given the amount

of work the parties had done to prepare the bellwether cases for trial, and the fact that those trials

were ultimately intended to benefit the MDL process as a whole, it is hardly surprising that

counsel would have left them out of the settlement.

More fundamentally, the Cooper Plaintiffs cite (and the Court has found) no authority for

the proposition that high/low agreements — agreements that are not unusual in American

litigation, *see, e.g.*, Prescott, *et al.*, *Trial and Settlement: A Study of High-Low Agreements*, 57

J.L & Econ. 699, 700-01 (2014) — are improper.  Nor do the Cooper Plaintiffs cite any authority

for the proposition that, even if there were evidence that the high/low agreements were part of

some larger *quid pro quo* (and there is no such evidence), the Court would have had a basis to

disapprove the parties' private settlement or deny the QSF motion.[9]  Notably, while the Cooper

---

[9]     If there were evidence that the agreements were part of some *quid pro quo* and that
counsel had sought and obtained benefits for some clients at the expense of others (again, there is

Plaintiffs stress the benefits of the high/low agreements to New GM, they ignore the countervailing benefits to the plaintiffs who entered them — namely, that the agreements presumably guarantee them some recovery, even if they were to lose at trial (as Barthelemy and Spain did).  They also ignore why such agreements are particularly sensible in the MDL bellwether context: By minimizing the risks to both sides of going to trial, they increase the probability that the chosen cases will actually go to trial and yield useful data for purposes of settling other cases in the MDL.  (*See* Miller Decl. ¶¶ 39-40).[10]  That is, a jury verdict in such a case would still accurately reflect the case's "value," even if that value is not the amount the plaintiff takes home or New GM has to pay.  In short, the Cooper Plaintiffs present no basis to undo the voluntary settlement between Hilliard and New GM as they fail to articulate any way in which they, or any other plaintiffs in the MDL, were harmed by it.  To the contrary, the settlement is likely only to benefit other plaintiffs, as New GM has repeatedly expressed its willingness to negotiate settlements with other counsel (*see* Oct. 9, 2015 Conf. Tr. 45; New GM's Opp'n 1 n.2), and the settlement provides a template and a benchmark for settlement of other cases with New GM.

---

not), that would certainly raise colorable professional ethics issues.  But those issues would not necessarily be within this Court's purview.

[10]      As a matter of common sense, the existence of a high/low agreement makes it less likely that the parties will settle as the risks are cabined on both sides.  By contrast, in the absence of such an agreement, parties are more likely to settle, even after investing time and energy to prepare for trial.  *Yingling* (with respect to which there is no evidence or suggestion that the parties entered a high/low agreement) is a good example of that, as the parties settled only after fully briefing more than fifteen motions and investing substantially in preparations for trial.  That may be good for Plaintiff in *Yingling* (and New GM), but it does little to advance the MDL.

**C. The Motion for a Protective Order**

Prompted by Cooper's communications with MDL plaintiffs in conjunction with his motions, Hilliard and Henry move for a protective order that prohibits Cooper — or any other attorney in the MDL — from communicating with Hilliard's and Henry's clients in violation of Rule 4.2(a) of the New York Rules of Professional Conduct. (*See* Docket No. 2258). Hilliard contends that Cooper has communicated, directly or indirectly, with three of Hilliard's current clients: LeAnn Storck and two unnamed clients. (*See* Mem. Law Supp. Hilliard Munoz & Gonzales LLP's & Thomas J. Henry Injury Attorneys' Mot. Protective Order (Docket No. 2259) ("Protective Order Mem.") 1-3; Reply Mem. Law Further Supp. Hilliard Munoz & Gonzales LLP's & Thomas J. Henry Injury Attorneys' Mot. Protective Order (Docket No. 2303) ("Protective Order Reply") 2-6, 7 n.9). Cooper admits that he or a member of his firm attempted to get in touch with Storck, and spoke on the phone with someone who is likely one of Hilliard's two unnamed clients. (*See* Cooper Firm's Response Hilliard Munoz & Gonzales LLP's & Thomas J. Henry Injury Attorneys' Mot. Protective Order (Docket No. 2285) ("Protective Order Opp'n") 8-12; *id.*, Ex. 2 ("Lundrigan Decl.") ¶¶ 10, 15). He contends, however, that he has not run afoul of Rule 4.2 because he did not know those parties were represented by Hilliard and that he has not contacted anyone known to be a current client. (*See* Protective Order Opp'n 4, 8-12).

Rule 4.2(a) states that "[i]n representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter" without the consent of the other lawyer or other legal authorization. N.Y. R. Prof'l Conduct 4.2(a). Notably, the Rule prohibits communicating with, not merely contacting, a represented party, and indeed Comment Three to the Rule makes clear that the prohibition "applies even though the represented party initiates or consents to the

30

communication." *Id.*, cmt. 3.  Furthermore, although the Rule applies to parties the lawyer "knows to be represented," a "lawyer cannot evade the requirement of obtaining the consent of counsel by ignoring the obvious" when it comes to the fact of representation. *Id.*, cmt. 8.  Nor can the lawyer "make a communication prohibited by paragraph (a) through the acts of another." *Id.*, cmt. 10.

Given the foregoing principles, Cooper's protestations of propriety are infirm in two ways.  First, he repeatedly emphasizes that neither he nor any employee of his firm has *initiated contact* with a represented party.  (*See* Protective Order Opp'n 4, 8, 9, 13; *id.*, Ex. 1 ("Cooper Prot. Order Decl.") ¶¶ 3, 5; Lundrigan Decl. ¶¶ 2-3).  As noted, however, the Rule is broader than that, and applies to any *communication*, without regard for whether the lawyer or client initiated it.  There is no dispute that Cooper's paralegal, Doreen Lundrigan, communicated with a current client, and Cooper (via Lundrigan) caused Laura Christian to communicate with Storck.  (*See* Lundrigan Decl. ¶¶ 10, 15; Protective Order Mem., Ex. B ¶¶ 7-9).  Second, Cooper contends that his firm did not know that either party was represented, let alone by Hilliard, until after the communication had occurred.  (*See* Protective Order Opp'n 3, 6-8, 11; Cooper Prot. Order Decl. ¶¶ 3-4; Lundrigan Decl. ¶¶ 9, 11, 15).  But Cooper did know the names of the parties at the time of the communications, and a quick search on PACER would have yielded the identity of counsel — revealing, for example, that Storck is a plaintiff in the MDL and 14-CV-8176 (JMF) and currently represented by Hilliard.  That seems tantamount to "ignoring the obvious."

Cooper and his firm thus arguably violated Rule 4.2(a), or at least came very close to the line.  That said, neither incident seems to have caused significant harm, and the communications came in the context of the motions discussed above.  Now that those motions have been decided — and the Court has clarified the scope of Rule 4.2 — the Court sees no need for a protective

31

order and trusts that Cooper and his firm (not to mention other lawyers in the MDL) will tread more carefully when communicating with potentially represented parties. The Court admonishes all counsel to err on the side of caution and reminds them, first, that knowing violations of ethical rules could obviously result in bar disciplinary proceedings and, second, that any evidence obtained in violation of ethical rules may be deemed inadmissible. (*Cf.* Protective Order Mem. 5 n.6 ("Movants anticipate that Mr. Cooper may yet try to benefit from his violation of the no-contact rule."); Protective Order Opp'n 9 n.6 ("TCF genuinely expects there to be more such calls to TCF and other lawyers.")). *See, e.g.*, *Scott v. Chipotle Mexican Grill, Inc.*, No. 12-CV-8333 (ALC) (SN), 2014 WL 4852063, at *2 (S.D.N.Y. Sept. 29, 2014) (noting that "the Court of Appeals has found exclusion of evidence to be within the arsenal of remedies available to district judges confronted with ethical violations" (internal quotation marks omitted)). The motion for a protective order is accordingly DENIED.

**D. Cooper's Membership on the Executive Committee**

One final issue demands the Court's attention: Cooper's membership on the Plaintiffs' Executive Committee. If anyone has abdicated or violated his fiduciary duties to the MDL plaintiffs in this case, it is Cooper himself. To be clear, that is not because he filed his motions (although his wild accusations have arguably done as much, if not more, harm to plaintiffs' cause than the collapse of the first bellwether, which was an embarrassing but temporary setback), but because — by his own admissions — he has flagrantly failed to satisfy his "duties and responsibilities" as an Executive Committee member. (Order No. 13, at 5-7). Cooper applied for a position on the Executive Committee, was appointed, and assumed the duties set forth in Order No. 13, including assisting Lead Counsel with pretrial work and working to conduct the MDL on behalf of all plaintiffs. By his own admission, he has not fulfilled any of those duties

for at least a year — and, until his motions, failed to share that with the Court, let alone seek the Court's permission to step down from the Committee.  (It should be noted, neither did Lead Counsel or other members of the Committee).  Whether or not Cooper announced his "formal resignation," it was not for him to decide that his neglect was for the "best" because "[n]ine law firms were still on the EC and working on the GM litigation" and their work was sufficient. (Cooper Removal Decl. ¶ 7).  Order No. 8 made clear that leadership appointments were personal, not on behalf of law firms, and they were made pursuant to the Orders of this Court.

In the Court's view, it is plainly contrary to the interest of plaintiffs for someone who has abdicated his own responsibilities to remain in a leadership role or occupy a leadership position, even if only in name.  Accordingly, and to resolve any doubt about his involvement going forward, the Court hereby formally removes Cooper from the Executive Committee to the extent that he nominally remains associated with it.  To be clear, Cooper's removal is *not* a sanction for filing his motions, even if those motions were ultimately without merit; it is based on his own admitted failure to fulfil the basic duties and responsibilities of his position.  (That said, it is important to ensure that counsel in leadership roles can work together; Cooper's motions speak for themselves in making clear that he cannot work with Hilliard.)  Lead Counsel shall confer with the remaining members of the Executive Committee and advise the Court **no later than April 18, 2016**, whether they believe that Cooper's vacancy should be filled.  If so, Lead Counsel should propose a process for such appointment and should be prepared to address the issue at the next status conference, scheduled for April 20, 2016.

## CONCLUSION

Multi-district litigation of this sort is a complex affair.  With so much at stake — in terms of money, ego, and otherwise — it is hardly surprising that conflicts would erupt among counsel,

even counsel who are ostensibly on the same "side" and share a common adversary. Nevertheless, the Court finds it regrettable that Cooper levied his broadsides against Lead Counsel in the way he did, rather than taking steps in a more measured and productive (not to mention timely) manner to address or raise any problems that he perceived.  In other words, assuming there is any merit to his allegations, he did himself — and, by extension, the plaintiffs in the MDL — a disservice by waiting to raise them until after the (admittedly embarrassing) collapse of the Plaintiff's case in the *Scheuer* trial and then raising them in the way he did. Through its bottom-line Order and this more detailed Opinion, the Court hopes that any clouds of uncertainty hovering over the status of Lead Counsel, the bellwether trial schedule, and the pending settlement have been lifted, thereby promoting the orderly management of the MDL and additional settlements.  The Court also hopes that plaintiffs' counsel will stop litigating their grievances with one another and return to focusing on their common adversary, New GM, and on obtaining relief for their respective clients.  That is, the Court hopes that counsel — and their clients — can return to focusing on what is truly at stake in this litigation: determining whether and to what extent the plaintiffs in these proceedings are entitled to relief for injuries caused by the acknowledged ignition switch defect in millions of General Motors cars.

The Clerk of Court is directed to terminate Docket No. 2258.


SO ORDERED.

Dated: April 12, 2016
       New York, New York

JESSE M. FURMAN
United States District Judge