UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ x
IN RE:                                            :   14-MD-2543 (JMF)
                                                  :
GENERAL MOTORS LLC IGNITION                       :   **FIFTH AMENDED CONSOLIDATED**
SWITCH LITIGATION                                 :   **COMPLAINT**
                                                  :
*This Document Relates to All Actions*            :   [Leave granted on November 15, 2017, Dkt. No. 4810]
                                                  :
------------------------------------------------------------ x
```

**[REDACTED VERSION]**

# TABLE OF CONTENTS

**Page**

I. PROCEDURAL INTRODUCTION.................................................................1

II. INTRODUCTION—SUMMARY OF CLAIMS ................................................4

III. JURISDICTION AND VENUE ....................................................................16

IV. PARTIES .................................................................................................17

    A.    Plaintiffs ...........................................................................................17

    B.    Defendant .......................................................................................190

V. FACTUAL ALLEGATIONS ......................................................................191

    A.    Old GM Falsely Promoted All of Its Vehicles as Safe, Reliable, and High-Quality ..............................................................................191

    B.    New GM Marketing of Its Brand and New GM Models As Safe and Reliable ....................................................................................194

        1.    The branding concept.................................................................195

        2.    Strong brands and brand equity. ................................................198

        3.    Benefits of strong brands to consumers and marketers. .............201

        4.    Leveraging brand associations—benefits and risks.....................203

        5.    Application of Spillover theory and research to the New GM ignition switch recalls.........................................................209

    C.    New GM Falsely Promoted All of Its Vehicles as Safe, Reliable, and High-Quality ..............................................................................211

    D.    New GM's Advertising and Marketing Literature Falsely Claimed that New GM Placed Safety and Quality First.......................224

    E.    The Ignition Switch System Defects.................................................254

        1.    New GM was aware of the defective ignition switch problem from the date of its inception.....................................258

        2.    The Delta Ignition Switch Defect giving rise to the February and March 2014 Recalls. ...........................................266

a.      New GM was aware of the Delta Ignition Switch Defect from the date of New GM's inception. ..............................266

b.      New GM continues to conceal the ignition switch defect..................................................................................278

c.      New GM received many complaints of power failures in the Delta Ignition Switch Vehicles. ..............................288

d.      New GM recalls 2.1 million vehicles with defective Delta Ignition Switches in February and March of 2014..........................................................................291

3.      Additional ignition switch low torque recalls............................................293

a.      Low torque Safety Recall 14v355..................................293

b.      Low torque Safety Recalls 14v394 and 14v400. ...........308

4.      "Knee-to-key" Camaro Safety Recall 14v346. ..........................332

5.      The ignition switch recalls were inadequate and poorly conducted. ..........................................................................344

a.      New GM failed to alert drivers of recalled vehicles to the possibility of obtaining a loaner vehicle, and when consumers are aware, they often find that loaner vehicles are not available. ..................................346

b.      The repair is inadequate and/or results in new vehicle defects....................................................................349

c.      The recalls were not completed in a timely fashion. ....................391

d.      The repair of the other ignition switch defects. ..............................392

F.      Side-Impact Airbag Wiring Harness Defect .............................................394

G.      Power Steering Defect ........................................................................400

H.      Contrary to their Representations about Safety and Quality, Both Old and New GM Concealed and Disregarded Safety Issues as a Way of Doing Business ........................................................................405

1.      New GM's deceptions continued in its public discussions of the ignition switch recalls....................................................415

- ii -

2.     There are serious safety defects in millions of New GM and Old GM vehicles across many models and years and, until recently, New GM concealed them from consumers.................................419

I.     New GM Sold Used Defective Ignition Switch Vehicles and Other Defective Vehicles As "Certified Pre- Owned" Vehicles.......................................424

J.     In A Deferred Prosecution Agreement Entered into with the Justice Department, New GM Made Admissions that Are Highly Relevant to Plaintiffs' Claims ...........................................426

K.     New GM's Deception Has Harmed Plaintiffs and Class Members .......................440

VI.     SUCCESSOR LIABILITY ALLEGATIONS .................................................456

VII.     TOLLING OF THE STATUTES OF LIMITATION...........................................479

A.     Discovery Rule Tolling...........................................................................479

B.     Fraudulent Concealment Tolling ...........................................................480

C.     Estoppel...................................................................................................480

VIII.     CLASS ALLEGATIONS .............................................................................481

A.     The Classes ............................................................................................481

1.     The Delta Ignition Switch Defect Class and Subclasses. ..........................481

2.     The Low Torque Ignition Switch Defect Class and Subclass.............................................................................483

3.     The Knee-to-Key Camaro Defect Class and Subclass..............................484

4.     The Side Airbag Defect Class and Subclass. ............................................484

5.     The Power Steering Defect Class and Subclass........................................485

6.     The Delta Ignition Switch Defect Bankruptcy Class. ...............................486

B.     The Classes and Subclasses Meet Rule 23 Requirements ......................486

IX.     CLAIMS FOR RELIEF .............................................................................490

A.     Nationwide Claim ..................................................................................490

COUNT I  VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *et seq.* ........................................490

- iii -

B.      The New GM RICO Enterprise ...........................................................491

C.      Pattern of Racketeering Activity.........................................................510

D.      New GM Conducted the Enterprise to Conceal the Nature and
        Scope of the Defects from Litigants, Claimants and Courts, the
        Public, and the Nationwide Class ......................................................511

        1.      K&S warns New GM of a defect................................................511

        2.      New GM and K&S knew years before the recall that a
                safety defect existed in model year 2005-2007 Cobalts. ...........515

        3.      Continued concealment of the defect..........................................518

        4.      ESIS' awareness of the defect in numerous incidents. ..............522

        5.      New GM and K&S lied to the Meltons and the court to
                prevent disclosure of evidence relating to the Delta Ignition
                Switch Defect in other vehicles. ...............................................523

                a.      The parents of Jennifer Brooke Melton sought
                        discovery from New GM regarding the Delta
                        Ignition Switch Defect that killed their daughter...........523

                b.      New GM and K&S knew that airbag non-
                        deployment in Cobalts was related to the condition
                        identified in the Technical Service Bulletin...................524

                c.      New GM and K&S told the Meltons and the Court
                        that New GM had no documents regarding other
                        incidents involving the condition identified in the
                        Technical Service Bulletin.............................................526

                d.      K&S told one thing to the Court and the opposite to
                        New GM on the same day................................................528

                e.      New GM and K&S lied to the court and the Meltons
                        about the relevance of the airbag non-deployment
                        investigation documents.................................................530

                f.      K&S expected the *Melton* court to sanction New
                        GM for discovery abuse..................................................532

        6.      New GM and K&S committed other fraudulent litigation
                misconduct to hide evidence of the Delta Ignition Switch
                Defect.........................................................................................532

7.     K&S also worked for New GM in connection with the Delta Ignition Switch recall and the "investigation" of the reasons for the delay. ..................................................533

E.     New GM Conducted the Enterprise to Affirmatively Promote the Safety and Quality of Its Vehicles While Actively Concealing the Defects ...........................................................535

F.     New GM Conducted the Enterprise to Issue Incomplete and Misleading Service Bulletins ...............................................536

G.     New GM Conducted the Enterprise to Submit Incomplete and Misleading Reports to Regulators in Order to Conceal the Defects from the Regulators, the Public, and the Nationwide Class ...................537

H.     The Members of the Nationwide Class Suffered Injuries and Damage to Their Business and Property by Reason of New GM's RICO Violations. .....................................................539

B.     MULTI-STATE CLAIMS ........................................................540

COUNT I  VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT 15 U.S.C. § 2301, *et seq.*......................................540

COUNT II SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT 15 U.S.C. § 2301, *et seq.* ..........................................................................544

C.     STATE LAW CLAIMS ...........................................................548

ALABAMA .......................................................................................548

COUNT I  VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT (ALA. CODE § 8-19-1, *et seq.*)....................................548

COUNT II  FRAUD BY CONCEALMENT...............................................553

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY ...........................556

COUNT IV  UNJUST ENRICHMENT ...................................................560

COUNT V  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT (ALS. CODE § 8-10-1, *et seq.*)..........................................................561

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT ........................................................................................565

ALASKA .........................................................................................................568

COUNT I  VIOLATION OF THE ALASKA UNFAIR TRADE  PRACTICES
    AND CONSUMER PROTECTION ACT (ALASKA STAT. ANN.
    § 45.50.471, *et seq.*) ..........................................................................568

COUNT II  FRAUD BY CONCEALMENT ........................................................573

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY (ALASKA STAT. § 45.02.314) .....................................576

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ...........................................577

COUNT V  UNJUST ENRICHMENT ...............................................................581

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
    ALASKA UNFAIR TRADE PRACTICES AND CONSUMER
    PROTECTION ACT (ALASKA STAT. ANN. § 45.50.471, *et seq.*) ...................583

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT ........................................................................................586

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (ALASKA STAT. § 45.02.3142-
    314) ........................................................................................................589

ARIZONA........................................................................................................590

COUNT I  VIOLATIONS OF THE CONSUMER FRAUD ACT (ARIZONA REV.
    STAT. § 44-1521, *et seq.*) ......................................................................590

COUNT II  FRAUD BY CONCEALMENT ........................................................595

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ...........................................598

COUNT IV  UNJUST ENRICHMENT ..............................................................602

COUNT V  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
    ARIZONA CONSUMER FRAUD ACT (ARIZONA REV. STAT. § 44-1521,
    *et seq.*) ..................................................................................................603

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
 CONCEALMENT ..................................................................................606

ARKANSAS ...................................................................................................609

COUNT I  VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT
 (ARK. CODE ANN. § 4-88-101, *et seq.*) .................................................609

COUNT II  FRAUD BY CONCEALMENT.....................................................614

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
 MERCHANTABILITY (ARK. CODE ANN. § 4-2-314)..............................617

COUNT IV  NEGLIGENCE ...........................................................................618

COUNT V  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
 CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................621

COUNT VI  UNJUST ENRICHMENT ..........................................................625

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
 DECEPTIVE TRADE PRACTICE ACT (ARK. CODE ANN. § 4-88-101,
 *ET SEQ.*) ...............................................................................................626

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
 CONCEALMENT ..................................................................................629

COUNT IX  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
 WARRANTY OF MERCHANTABILITY (ARK. CODE ANN. § 4-2-314)......................632

COUNT X  SUCCESSOR LIABILITY CLAIM FOR NEGLIGENCE ......................................633

CALIFORNIA .................................................................................................635

COUNT I  VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
 (CAL. CIV. CODE § 1750, *et seq.*)........................................................635

COUNT II  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION
 LAW (CAL. BUS. & PROF. CODE § 17200, *et seq.*) ............................641

COUNT III  FRAUD BY CONCEALMENT ..................................................646

COUNT IV  VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY
 ACT FOR BREACH OF IMPLIED WARRANTY OF
 MERCHANTABILITY (CAL. CIV. CODE §§ 1791.1 & 1792)..........................649

COUNT V  NEGLIGENT FAILURE TO RECALL ...............................................652

COUNT VI  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................653

COUNT VII  UNJUST ENRICHMENT ....................................................657

COUNT IX  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF THE
CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF.
CODE § 17200, *et seq.*) ..................................................................662

COUNT X  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ........................................................................666

COUNT XI  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF SONG-
BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF
IMPLIED WARRANTY OF MERCHANTABILITY (CAL. CIV. CODE
§§ 1791.1 & 1792) ..........................................................................669

COUNT XII  SUCCESSOR LIABILITY CLAIM FOR NEGLIGENT FAILURE
TO RECALL.................................................................................671

COLORADO ....................................................................................673

COUNT I  VIOLATIONS OF THE COLORADO CONSUMER PROTECTION
ACT (COL. REV. STAT. § 6-1-101, *et seq.*) ..................................673

COUNT II  FRAUD BY CONCEALMENT..............................................677

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (COL. REV. STAT. § 4-2-314)...........................680

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................682

COUNT V  UNJUST ENRICHMENT......................................................686

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
COLORADO CONSUMER PROTECTION ACT (COL. REV. STAT. § 6-
1-101, *et seq.*)..............................................................................687

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ........................................................................691

COUNT IX  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (COL. REV. STAT. § 4-2-314).........693

CONNECTICUT ...............................................................................694

COUNT I  VIOLATION OF CONNECTICUT UNLAWFUL TRADE
PRACTICES ACT (CONN. GEN. STAT. § 42-110A, *et seq.*) .............................................694

COUNT II  FRAUDULENT CONCEALMENT ........................................................699

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ...........................................702

COUNT IV  UNJUST ENRICHMENT ................................................................706

COUNT V  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF
CONNECTICUT UNLAWFUL TRADE PRACTICES ACT (CONN. GEN.
STAT. § 42-110A, *et seq.*) ................................................................707

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ................................................................................711

DELAWARE ......................................................................................713

COUNT I  VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT (6
DEL. CODE § 2513, *et seq.*) .............................................................713

COUNT II  FRAUD BY CONCEALMENT......................................................718

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (6 DEL. CODE § 2-314) .................................721

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ...........................................723

COUNT V  UNJUST ENRICHMENT ..........................................................727

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF THE
DELAWARE CONSUMER FRAUD ACT (6 DEL. CODE § 2513, *et seq.*).......................728

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ................................................................................731

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (6 DEL. CODE COM. LAW § 2-
314) ................................................................................................734

DISTRICT OF COLUMBIA ..................................................................735

COUNT I  VIOLATION OF THE CONSUMER PROTECTION PROCEDURES
ACT (D.C. CODE § 28-3901, *et seq.*)................................................735

COUNT II  FRAUD BY CONCEALMENT ....................................................................740

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(D.C. CODE § 28:2-314) ...........................................................................743

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................745

COUNT V  UNJUST ENRICHMENT .........................................................................749

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF THE
CONSUMER PROTECTION PROCEDURES ACT (D.C. CODE § 28-
3901, *et seq.*) ..........................................................................................750

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ....................................................................................754

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (D.C. CODE § 28-314).................757

FLORIDA .......................................................................................................................758

COUNT I  VIOLATION OF FLORIDA'S UNFAIR &  DECEPTIVE TRADE
PRACTICES ACT (FLA. STAT. § 501.201, *et seq.*) ..............................758

COUNT II  FRAUD BY CONCEALMENT ....................................................................763

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................766

COUNT IV  UNJUST ENRICHMENT .........................................................................770

COUNT V  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF
FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT (FLA.
STAT. § 501.201, *et seq.*)........................................................................771

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ....................................................................................774

GEORGIA.......................................................................................................................777

COUNT I  VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
(GA. CODE ANN. § 10-1-390, *et seq.*)....................................................777

COUNT II  VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE
PRACTICES ACT (GA. CODE ANN. § 10-1-370, *et seq.*) ....................782

COUNT III  FRAUD BY CONCEALMENT ...............................................................786

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ..........................................789

COUNT V  UNJUST ENRICHMENT........................................................................793

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF
    GEORGIA'S FAIR BUSINESS PRACTICES ACT (GA. CODE ANN.
    § 10-1-390, *et seq.*) ....................................................................................794

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT ................................................................................................798

HAWAII ......................................................................................................................800

COUNT I  UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII
    LAW  (HAW. REV. STAT. § 480, *et seq.*)...................................................800

COUNT II  FRAUD BY CONCEALMENT..................................................................805

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY (HAW. REV. STAT. § 490:2-314) .................................808

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ..........................................810

COUNT V  UNJUST ENRICHMENT .......................................................................814

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR UNFAIR AND
    DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW  (HAW. REV.
    STAT. § 480, *ET SEQ.*) .................................................................................815

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT ................................................................................................818

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (HAW. REV. STAT. § 490:2-
    314) .................................................................................................................821

IDAHO.........................................................................................................................822

COUNT I  VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
    (IDAHO CIV. CODE § 48-601, *et seq.*) .........................................................822

COUNT II  FRAUD BY CONCEALMENT..................................................................827

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ..........................................830

COUNT IV  UNJUST ENRICHMENT ......................................................834

COUNT V  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF THE
IDAHO CONSUMER PROTECTION ACT (IDAHO CIV. CODE § 48-601,
*et seq.*) .................................................................................835

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT .....................................................................839

ILLINOIS.....................................................................................841

COUNT I  VIOLATION OF ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *et seq.*
and 720 ILCS 295/1A).............................................................841

COUNT II  FRAUD BY CONCEALMENT ...............................................846

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ..........................................849

COUNT IV  UNJUST ENRICHMENT ......................................................853

COUNT V  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF
ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS
PRACTICES ACT (815 ILCS 505/1, *et seq.* and 720 ILCS 295/1A)..............854

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT .....................................................................857

INDIANA ....................................................................................860

COUNT I  VIOLATION OF THE INDIANA DECEPTIVE CONSUMER
SALES ACT (IND. CODE § 24-5-0.5-3).............................................860

COUNT II  FRAUD BY CONCEALMENT..................................................865

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY......................868

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ..........................................870

COUNT V  UNJUST ENRICHMENT ......................................................874

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF THE
INDIANA DECEPTIVE CONSUMER SALES ACT (IND. CODE § 24-5-
0.5-3) .............................................................................................................. 875

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ................................................................................................ 879

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (IND. CODE § 26-1-2-314) ............................ 881

IOWA 883

COUNT I  VIOLATIONS OF THE PRIVATE RIGHT OF ACTION  FOR
CONSUMER FRAUDS ACT (IOWA CODE § 714H.1, *et seq.*) ........................... 883

COUNT II  FRAUD BY CONCEALMENT .................................................................. 888

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................................ 891

COUNT IV  UNJUST ENRICHMENT ......................................................................... 895

COUNT V  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT
(IOWA CODE § 714H.1, *et seq.*) ....................................................................... 896

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ................................................................................................ 899

KANSAS ................................................................................................................ 902

COUNT I  VIOLATIONS OF THE KANSAS CONSUMER PROTECTION
ACT (KAN. STAT. ANN. § 50-623, *et seq.*) ...................................................... 902

COUNT II  FRAUD BY CONCEALMENT ................................................................... 907

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(KAN. STAT. ANN. § 84-2-314) ......................................................................... 910

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................................ 912

COUNT V  UNJUST ENRICHMENT .......................................................................... 916

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
KANSAS CONSUMER PROTECTION ACT (KAN. STAT. ANN. § 50-
623, *et seq.*) ................................................................................................... 917

010440-11  983080 V1

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
        CONCEALMENT ...........................................................................................921

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
        WARRANTY OF MERCHANTABILITY (KAN. CODE COM. LAW § 2-
        314) ..........................................................................................................923

KENTUCKY ..........................................................................................................925

COUNT I  VIOLATION OF THE KENTUCKY CONSUMER PROTECTION
        ACT (KY. REV. STAT. § 367.110, et seq.).................................................925

COUNT II  FRAUD BY CONCEALMENT ...................................................................929

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
        CLAIM AGAINST OLD GM IN BANKRUPTCY ..........................................932

COUNT IV  UNJUST ENRICHMENT ........................................................................936

COUNT V  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF THE
        KENTUCKY CONSUMER PROTECTION ACT (KY. REV. STAT.
        § 367.110, et seq.)....................................................................................937

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
        CONCEALMENT ...........................................................................................940

LOUISIANA ...........................................................................................................943

COUNT I  VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES
        AND CONSUMER PROTECTION LAW (LA. REV. STAT. § 51:1401, et
        seq.)...........................................................................................................943

COUNT II  FRAUD BY CONCEALMENT ...................................................................948

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/
        WARRANTY AGAINST REDHIBITORY DEFECTS (LA. CIV. CODE
        ART. 2520, 2524) .....................................................................................951

COUNT IV  NEGLIGENCE .......................................................................................953

COUNT V  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
        CLAIM AGAINST OLD GM IN BANKRUPTCY ..........................................956

COUNT VI  UNJUST ENRICHMENT ........................................................................960

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF THE
LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER
PROTECTION LAW (LA. REV. STAT. § 51:1401, *et seq.*)................................961

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ........................................................................965

COUNT IX  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY/ WARRANTY AGAINST
REDHIBITORY DEFECTS (LA. CIV. CODE ART. 2520, 2524) ........................968

COUNT X  SUCCESSOR LIABILITY CLAIM FOR NEGLIGENCE ........................970

MAINE ........................................................................................972

COUNT I  VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT (ME.
REV. STAT. ANN. TIT. 5 § 205-A, *et seq.*).............................................972

COUNT II  FRAUD BY CONCEALMENT................................................977

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(ME. REV. STAT. ANN. TIT. 11 § 2-314) ...............................................980

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................981

COUNT V  UNJUST ENRICHMENT......................................................985

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF MAINE
UNFAIR TRADE PRACTICES ACT (ME. REV. STAT. ANN. TIT. 5 § 205-
A, *et seq.*) ................................................................................986

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ........................................................................990

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (ME. REV. STAT. ANN. TIT. II
2-314)......................................................................................992

MARYLAND ................................................................................993

COUNT I  VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION
ACT (MD. CODE COM. LAW § 13-101, *et seq.*) ...................................993

COUNT II  FRAUD BY CONCEALMENT................................................998

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MD. CODE COM. LAW § 2-314)......................................................1001

COUNT IV  NEGLIGENCE ................................................................1002

COUNT V  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ...........................1005

COUNT VI  UNJUST ENRICHMENT ................................................1009

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
MARYLAND CONSUMER PROTECTION ACT (MD. CODE COM. LAW
§ 13-101, *et seq.*)........................................................................1010

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ...........................................................................1013

COUNT IX  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (MD. CODE COM. LAW § 2-
314) .................................................................................................1015

COUNT X  SUCCESSOR LIABILITY CLAIM FOR NEGLIGENCE ....................................1017

MASSACHUSETTS.......................................................................................1019

COUNT I  DECEPTIVE ACTS OR PRACTICES PROHIBITED BY
MASSACHUSETTS LAW (MASS. GEN. LAWS CH. 93A, § 1, *et seq.*)............................1019

COUNT II  FRAUD BY CONCEALMENT ..................................................1024

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(ALM GL. CH. 106, § 2-314) .......................................................1027

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ...........................1028

COUNT V  UNJUST ENRICHMENT................................................1032

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR DECEPTIVE ACTS OR
PRACTICES PROHIBITED BY MASSACHUSETTS LAW (MASS. GEN.
LAWS CH. 93A, § 1, *et seq.*) ....................................................1034

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ...........................................................................1037

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (ALM. GL CH. 106, § 2-314) ........................1040

- xvi -

MICHIGAN ...................................................................................................................1041

COUNT I  VIOLATION OF THE MICHIGAN CONSUMER PROTECTION
ACT  (MICH. COMP. LAWS § 445.903, *et seq.*) ...............................................1041

COUNT II  FRAUD BY CONCEALMENT...................................................................1046

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MICH. COMP. LAWS § 440.2314) ....................................................................1049

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................1051

COUNT V  UNJUST ENRICHMENT..........................................................................1055

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
MICHIGAN CONSUMER PROTECTION ACT  (MICH. COMP. LAWS
§ 445.903, *et seq.*)..............................................................................................1056

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ................................................................................................1059

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (MICH. COMP. LAWS §
440.2314) ...........................................................................................................1062

MINNESOTA ...............................................................................................................1063

COUNT I  VIOLATION OF MINNESOTA PREVENTION OF CONSUMER
FRAUD ACT  (MINN. STAT. § 325F.68, *et seq.*) ...........................................1063

COUNT II  VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE
PRACTICES ACT (MINN. STAT. § 325D.43-48, *et seq.*) ................................1068

COUNT III  FRAUD BY CONCEALMENT .................................................................1073

COUNT IV  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MINN. STAT. § 336.2-314) ...............................................................................1076

COUNT V  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................1077

COUNT VI  UNJUST ENRICHMENT .........................................................................1081

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF
MINNESOTA PREVENTION OF CONSUMER FRAUD ACT  (MINN.
STAT. § 325F.68, *et seq.*) ..................................................................................1082

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF
MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT
(MINN. STAT. § 325D.43-48, *et seq.*) ..............................................................1086

COUNT IX  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ..................................................................................................1089

COUNT X  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (MINN. STAT. § 336.2-314)........................1092

MISSISSIPPI .....................................................................................................................1093

COUNT I  VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT
(MISS. CODE. ANN. § 75-24-1, *et seq.*)..............................................................1093

COUNT II  FRAUD BY CONCEALMENT..................................................................1098

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MISS. CODE ANN. § 75-2-314) ..........................................................................1101

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................................1102

COUNT V  UNJUST ENRICHMENT........................................................................1106

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF
MISSISSIPPI CONSUMER PROTECTION ACT  (MISS. CODE. ANN. §
75-24-1, *et seq.*) ...............................................................................................1107

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ..................................................................................................1111

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (MISS. CODE ANN. § 75-2-314) ..................1113

MISSOURI .......................................................................................................................1114

COUNT I  VIOLATION OF MISSOURI MERCHANDISING PRACTICES
ACT (MO. REV. STAT. § 407.010, *et seq.*) .........................................................1114

COUNT II  FRAUD BY CONCEALMENT..................................................................1119

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MO. REV. STAT. § 400.2-314) ...........................................................................1122

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................................1124

COUNT V  UNJUST ENRICHMENT .......................................................................1128

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF
 MISSOURI MERCHANDISING PRACTICES ACT (MO. REV. STAT.
 § 407.010, *et seq.*) ...............................................................................1129

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
 CONCEALMENT ...................................................................................1133

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
 WARRANTY OF MERCHANTABILITY (MO. REV. STAT. § 400.2-314) ...................1135

MONTANA ...............................................................................................................1137

COUNT I_VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND
 CONSUMER PROTECTION ACT OF 1973 (MONT. CODE ANN. § 30-14-
 101, *et seq.*) ...........................................................................................1137

COUNT II  FRAUD BY CONCEALMENT ...............................................................1141

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
 (MONT. CODE § 30-2-314) ...................................................................1144

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
 CLAIM AGAINST OLD GM IN BANKRUPTCY .......................................1146

COUNT V  UNJUST ENRICHMENT .......................................................................1150

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
 MONTANA CONSUMER PROTECTION ACT (MONT. CODE ANN. §
 30-14-101, *et seq.*) ...............................................................................1151

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
 CONCEALMENT ...................................................................................1154

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
 WARRANTY OF MERCHANTABILITY (MONT. CODE § 30-2-314) .........................1157

NEBRASKA ..............................................................................................................1158

COUNT I_VIOLATION OF THE NEBRASKA CONSUMER PROTECTION
 ACT (NEB. REV. STAT. § 59-1601, *et seq.*) .......................................1158

COUNT II  FRAUD BY CONCEALMENT ...............................................................1163

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
 (NEB. REV. STAT. NEB. § 2-314) ...........................................................1166

- xix -

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................1167

COUNT V  UNJUST ENRICHMENT...............................................................1171

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
    NEBRASKA CONSUMER PROTECTION ACT (NEB. REV. STAT. § 59-
    1601, *et seq.*)......................................................................................1172

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT ...................................................................................1175

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (NEB. REV. STAT. NEB. § 2-
    314) ......................................................................................................1178

NEVADA.......................................................................................................1179

COUNT I  VIOLATION OF THE NEVADA DECEPTIVE TRADE
    PRACTICES ACT (NEV. REV. STAT. § 598.0903, *et seq.*)................................1179

COUNT II  FRAUD BY CONCEALMENT...................................................1184

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
    (NEV. REV. STAT. § 104.2314)................................................................1187

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................1189

COUNT V  UNJUST ENRICHMENT...............................................................1193

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
    NEVADA DECEPTIVE TRADE PRACTICES ACT (NEV. REV. STAT.
    § 598.0903, *et seq.*)..............................................................................1194

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT ...................................................................................1197

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (NEV. REV. STAT. § 104.2314) ...................1200

NEW HAMPSHIRE .......................................................................................1201

COUNT I  VIOLATION OF N.H. CONSUMER PROTECTION ACT (N.H.
    REV. STAT. ANN. § 358-A:1, *et seq.*) ...............................................1201

COUNT II  FRAUD BY CONCEALMENT...................................................1206

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY (N.H. REV. STAT. ANN. § 382-A:2-314)..................................1209

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................1210

COUNT V  UNJUST ENRICHMENT....................................................................1214

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
    NEW HAMPSHIRE CONSUMER PROTECTION ACT (N.H. REV.
    STAT. ANN. § 358-A:1, *et seq.*) ........................................................1216

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT ........................................................................1220

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (N.H. REV. STAT. ANN. § 382-
    A:2-314)....................................................................................1222

NEW JERSEY ........................................................................................1223

COUNT I_VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT (N.J.
    STAT. ANN. § 56:8-1, *et seq.*) ........................................................1223

COUNT II  FRAUD BY CONCEALMENT....................................................1228

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
    (N.J. STAT. ANN. § 12A:2-314) ........................................................1231

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................1233

COUNT V  UNJUST ENRICHMENT....................................................................1237

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
    NEW JERSEY CONSUMER FRAUD ACT (N.J. STAT. ANN. § 56:8-1, *et
    seq.*)........................................................................................1238

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT ........................................................................1241

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (N.J. STAT. ANN. § 12A:2-314)..................1244

NEW MEXICO....................................................................................1245

COUNT I_VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE
PRACTICES ACT (N.M. STAT. ANN. §§ 57-12-1, *et seq.*) .............................................1245

COUNT II  FRAUD BY CONCEALMENT...............................................................1250

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(N.M. STAT. ANN. § 55-2-314) ...........................................................1253

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................1254

COUNT V  UNJUST ENRICHMENT...................................................................1258

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
NEW MEXICO UNFAIR TRADE PRACTICES ACT (N.M. STAT. ANN.
§§ 57-12-1, *et seq.*) ...........................................................................1259

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ................................................................................1263

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (N.M. STAT. ANN. § 55-2-314)...................1265

NEW YORK ....................................................................................................1266

COUNT I_DECEPTIVE ACTS OR PRACTICES (N.Y. GEN. BUS. LAW §§ 349-
350) ................................................................................................1266

COUNT II  FRAUD BY CONCEALMENT...............................................................1271

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(N.Y. U.C.C. § 2-314)..........................................................................1274

COUNT IV  VIOLATION OF NEW YORK'S FALSE ADVERTISING ACT
(N.Y. GEN. BUS. LAW § 350) .................................................................1276

COUNT V  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................1277

COUNT VI  UNJUST ENRICHMENT ...................................................................1281

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
NEW YORK GBL  (N.Y. GEN. BUS. LAW §§ 349 and 350)..............................1283

COUNT VIII  SUCCESSOR LIABLITY CLAIM FOR VIOLATION OF  NEW
YORK'S FALSE ADVERTISING ACT (N.Y. GEN. BUS. LAW § 350).........................1286

COUNT IX  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ...........................................................................................1288

COUNT X  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (N.Y. U.C.C. § 2-314)................................1290

NORTH CAROLINA ....................................................................................................1292

COUNT I  VIOLATION OF NORTH CAROLINA'S UNFAIR  AND
DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN. STAT. § 75-1.1,
*et seq.*) .........................................................................................................1292

COUNT II  FRAUD BY CONCEALMENT....................................................................1296

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(N.C. GEN. STAT. § 25-2-314) .......................................................................1299

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY .........................................1301

COUNT V  UNJUST ENRICHMENT..........................................................................1305

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
NORTH CAROLINA UNFAIR AND DECEPTIVE PRACTICES ACT
(N.C. GEN. STAT. § 75-1.1, *et seq.*) ...............................................................1306

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ...........................................................................................1309

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (N.C. GEN. STAT. § 25-2-314)....................1311

NORTH DAKOTA..........................................................................................................1313

COUNT I  VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD
ACT (N.D. CENT. CODE § 51-15-02)................................................................1313

COUNT II  FRAUD BY CONCEALMENT....................................................................1318

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(N.D. CENT. CODE § 41-02-31)........................................................................1321

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY .........................................1322

COUNT V  UNJUST ENRICHMENT..........................................................................1326

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
    NORTH DAKOTA CONSUMER FRAUD ACT (N.D. CENT. CODE § 51-
    15-02).............................................................................................................1328

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT ......................................................................................1331

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (N.D. CENT. CODE § 41-02-31)..................1333

OHIO  1335

COUNT I  VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT
    (OHIO REV. CODE ANN. § 1345.01, *et seq.*) ....................................................1335

COUNT II  FRAUD BY CONCEALMENT...............................................................1341

COUNT III  IMPLIED WARRANTY IN TORT.....................................................1344

COUNT IV  NEGLIGENCE .................................................................................1345

COUNT V  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY .........................................1348

COUNT VI  UNJUST ENRICHMENT .................................................................1352

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
    OHIO CONSUMER SALES PRACTICES ACT (OHIO REV. CODE ANN.
    § 1345.01, *et seq.*)..................................................................................1353

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT ......................................................................................1358

COUNT IX  SUCCESSOR LIABILITY CLAIM FOR IMPLIED WARRANTY
    IN TORT.................................................................................................1360

COUNT X  SUCCESSOR LIABILITY CLAIM FOR NEGLIGENCE ....................................1361

OKLAHOMA ......................................................................................................1364

COUNT I  VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT
    (OKLA. STAT. TIT. 15 § 751, *et seq.*) ..............................................................1364

COUNT II  FRAUD BY CONCEALMENT...............................................................1370

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
    (12A OKLA. STAT. ANN. § 2-314)....................................................................1373

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................1374

COUNT V  UNJUST ENRICHMENT................................................................................1378

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
    OKLAHOMA CONSUMER PROTECTION ACT (OKLA. STAT. TIT. 15 §
    751, *et seq.*)...........................................................................................................1380

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT .....................................................................................................1384

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (12A OKLA. STAT. ANN. § 2-
    314) .........................................................................................................................1387

OREGON........................................................................................................................1388

COUNT I  VIOLATION OF THE OREGON UNLAWFUL TRADE
    PRACTICES ACT (OR. REV. STAT. §§ 646.605, *et seq.*) ................................1388

COUNT II  FRAUD BY CONCEALMENT....................................................................1393

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................1396

COUNT IV  UNJUST ENRICHMENT ..........................................................................1400

COUNT V  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
    OREGON UNLAWFUL TRADE PRACTICES ACT  (OR. REV. STAT.
    §§ 646.605, *ET SEQ.*) ........................................................................................1401

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT .....................................................................................................1405

PENNSYLVANIA..........................................................................................................1407

COUNT I  VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE
    PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1,
    *et seq.*)...................................................................................................................1407

COUNT II  FRAUD BY CONCEALMENT....................................................................1412

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY (13 PA. CONS. STAT. ANN. § 2314)...........................1415

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................1416

COUNT V  UNJUST ENRICHMENT...................................................................1420

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
    PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER
    PROTECTION LAW  (73 P.S. § 201-1, *et seq.*).............................................1422

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT .......................................................................................1425

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (13 PA. CONS. STAT. ANN.
    § 2314) ......................................................................................................1428

RHODE ISLAND ......................................................................................................1429

COUNT I  VIOLATION OF THE RHODE ISLAND UNFAIR TRADE
    PRACTICES  AND CONSUMER PROTECTION ACT (R.I. GEN. LAWS
    § 6-13.1, *et seq.*).........................................................................................1429

COUNT II  FRAUD BY CONCEALMENT...............................................................1434

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY (R.I. GEN. LAWS § 6A-2-314) ....................................1437

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................1438

COUNT V  UNJUST ENRICHMENT...................................................................1442

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
    RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER
    PROTECTION ACT (R.I. GEN. LAWS § 6-13.1, *et seq.*).................................1444

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT .......................................................................................1447

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (R.I. GEN. LAWS § 6A-2-314) ....................1450

SOUTH CAROLINA....................................................................................................1451

COUNT I  VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE
    PRACTICES ACT (S.C. CODE ANN. § 39-5-10, *et seq.*).................................1451

COUNT II  VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF
   MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT (S.C.
   CODE ANN. § 56-15-10, *et seq.*) ........................................................................1456

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
   MERCHANTABILITY (S.C. CODE § 36-2-314) ..........................................1458

COUNT IV  FRAUD BY CONCEALMENT ...........................................................1459

COUNT V  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
   CLAIM AGAINST OLD GM IN BANKRUPTCY ......................................1462

COUNT VI  UNJUST ENRICHMENT ...................................................................1466

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
   SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT (S.C. CODE
   ANN. § 39-5-10, *et seq.*) ....................................................................................1467

COUNT VIII  SUCCESSOR LIABLITY CLAIM FOR VIOLATIONS OF THE
   SOUTH CAROLINA REGULATION OF MANUFACTURERS,
   DISTRIBUTORS, AND DEALERS ACT (S.C. CODE ANN. § 56-15-10, *et
   seq.*) ...................................................................................................................1471

COUNT IX  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
   CONCEALMENT ................................................................................................1472

COUNT X  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
   WARRANTY OF MERCHANTABILITY (S.C. CODE § 36-2-314) .............1475

SOUTH DAKOTA ....................................................................................................1476

COUNT I  VIOLATION OF THE SOUTH DAKOTA  DECEPTIVE TRADE
   PRACTICES AND CONSUMER PROTECTION LAW (S.D. CODIFIED
   LAWS § 37-24-6) .................................................................................................1476

COUNT II  FRAUD BY CONCEALMENT ............................................................1481

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
   MERCHANTABILITY (S.D. CODIFIED LAWS § 57A-2-314) .......................1484

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
   CLAIM AGAINST OLD GM IN BANKRUPTCY ......................................1485

COUNT V  UNJUST ENRICHMENT .....................................................................1489

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
DECEPTIVE  TRADE PRACTICES AND CONSUMER PROTECTION
LAW (S.D. Codified Laws § 37-24-6) ..........................................................1491

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ...................................................................................1494

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (S.D. Codified Laws § 57A-
2-314)...................................................................................................1496

TENNESSEE ......................................................................................................1498

COUNT I  VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT
(Tenn. Code Ann. § 47-18-101, *et seq.*)..........................................1498

COUNT II  FRAUD BY CONCEALMENT....................................................1503

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ..........................................1506

COUNT IV  UNJUST ENRICHMENT .........................................................1510

COUNT V  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
TENNESSEE CONSUMER PROTECTION ACT (Tenn. Code Ann.
§ 47-18-101, *et seq.*) .........................................................................1511

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ...................................................................................1514

TEXAS ..............................................................................................................1517

COUNT I  VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
PRACTICES—CONSUMER PROTECTION ACT (Tex. Bus. & Com.
Code §§ 17.41, *et seq.*)......................................................................1517

COUNT II  FRAUD BY CONCEALMENT....................................................1523

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY  (Tex. Bus. & Com. Code § 2.314).........................1526

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ..........................................1528

COUNT V  UNJUST ENRICHMENT...........................................................1532

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
TEXAS  DECEPTIVE TRADE PRACTICES-CONSUMER
PROTECTION ACT (TEX. BUS. & COM. CODE §§ 17.41, *et seq.*) ..................................1533

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ..........................................................................................1538

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (TEX. BUS. & COM. CODE
§ 2.314) ......................................................................................................1541

UTAH 1542

COUNT I  VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT
(UTAH CODE ANN. § 13-11-1, *et seq.*) ..............................................1542

COUNT II  FRAUD BY CONCEALMENT...................................................................1547

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (UTAH CODE ANN. § 70A-2-314) ...............................1550

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY .........................................1551

COUNT V  UNJUST ENRICHMENT.........................................................................1555

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
UTAH CONSUMER PROTECTION ACT (UTAH CODE ANN. § 13-11-1,
*et seq.*) ......................................................................................................1557

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ..........................................................................................1560

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (UTAH CODE ANN. § 70A-2-
314) ............................................................................................................1563

VERMONT.................................................................................................................1564

COUNT I  VIOLATION OF VERMONT CONSUMER FRAUD ACT (VT.
STAT. ANN. TIT. 9, § 2451 *et seq.*).....................................................1564

COUNT II  FRAUD BY CONCEALMENT...................................................................1568

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY .........................................1571

- xxix -

COUNT IV  UNJUST ENRICHMENT ................................................................................1575

COUNT V  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
    VERMONT CONSUMER FRAUD ACT (VT. STAT. ANN. TIT. 9, § 2451
    *et seq.*) .....................................................................................................................1577

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT ......................................................................................................1580

VIRGINIA ...............................................................................................................................1582

COUNT I_VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT
    (VA. CODE ANN. §§ 59.1-196, *et seq.*) .............................................................1582

COUNT II  FRAUD BY CONCEALMENT .............................................................................1587

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
    (VA. CODE ANN. § 8.2-314) ................................................................................1590

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ..........................................1592

COUNT V  UNJUST ENRICHMENT ....................................................................................1596

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
    VIRGINIA CONSUMER PROTECTION ACT (VA. CODE ANN. §§ 59.1-
    196, *et seq.*) .........................................................................................................1597

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
    CONCEALMENT ......................................................................................................1601

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (VA. CODE ANN. § 8.2-314) ........................1603

WASHINGTON ........................................................................................................................1605

COUNT I  VIOLATION OF THE CONSUMER PROTECTION ACT (REV.
    CODE WASH. ANN. §§ 19.86.010, *et seq.*)........................................................1605

COUNT II  FRAUD BY CONCEALMENT .............................................................................1609

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
    CLAIM AGAINST OLD GM IN BANKRUPTCY ..........................................1612

COUNT IV  UNJUST ENRICHMENT ...................................................................................1616

COUNT V  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
WASHINGTON CONSUMER PROTECTION ACT (REV. CODE WASH.
ANN. §§ 19.86.010, *et seq.*) ...................................................................1617

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT .........................................................................................1620

WEST VIRGINIA ...............................................................................................1623

COUNT I  VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION
ACT (W. VA. CODE § 46A-1-101, *et seq.*) ..........................................1623

COUNT II  FRAUD BY CONCEALMENT.............................................................1629

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(W. VA. CODE § 46-2-314) ...................................................................1632

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ......................................1634

COUNT V  UNJUST ENRICHMENT....................................................................1638

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
CONSUMER CREDIT AND PROTECTION ACT (W. VA. CODE § 46A-
1-101, *et seq.*)........................................................................................1639

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT .........................................................................................1644

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (W. VA. CODE § 46-2-314).........1646

WISCONSIN ......................................................................................................1648

COUNT I  VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE
PRACTICES ACT (WIS. STAT. § 110.18).................................................1648

COUNT II  FRAUD BY CONCEALMENT.............................................................1652

COUNT III  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ......................................1655

COUNT IV  UNJUST ENRICHMENT ..................................................................1659

COUNT V  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
WISCONSIN DECEPTIVE TRADE PRACTICES ACT (WIS. STAT. §
110.18) ....................................................................................................1660

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ........................................................................................1663

WYOMING ............................................................................................................1666

COUNT I  VIOLATION OF THE WYOMING CONSUMER PROTECTION
ACT (WYO. STAT. §§ 40-12-105 *et seq.*) ........................................1666

COUNT II  FRAUD BY CONCEALMENT..........................................................1671

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (WYO. STAT. §§ 34.1-2-314) ....................................1674

COUNT IV  FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A
CLAIM AGAINST OLD GM IN BANKRUPTCY ........................................1675

COUNT V  UNJUST ENRICHMENT....................................................................1679

COUNT VI  SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
WYOMING CONSUMER PROTECTION ACT (WYO. STAT. §§ 40-12-
105 *et seq.*) ..........................................................................................1681

COUNT VII  SUCCESSOR LIABILITY CLAIM FOR FRAUD BY
CONCEALMENT ........................................................................................1684

COUNT VIII  SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (WYO. STAT. §§ 34.1-2-314) ......................1687

PRAYER FOR RELIEF ........................................................................................1688

# I.     PROCEDURAL INTRODUCTION

This Fifth Amended Consolidated Complaint ("Complaint") serves as the Plaintiffs'

master Class Action Complaint for purposes of discovery, pre-trial motions, and rulings

(including for class certification itself), and for trial of certified claims or common questions in

these multi-district litigation ("MDL") proceedings.  The Complaint details Old GM's and New

GM's unprecedented abrogation of basic standards of safety, truthfulness, and accountability to

the detriment of tens-of-millions of consumers and the public at large; New GM's direct

unlawful actions and actions through an unlawful RICO[1] Enterprise that harmed the Plaintiffs;

and repeated and flagrant violations of federal standards.  This Complaint is not an

administrative Complaint, but one that supersedes all MDL transferee complaints, and whose

function is set forth in the Court's Orders, including Order No. 50 (Dkt. No. 875) and the Court's

Opinion and Order dated June 10, 2015 (Dkt. No. 1024).  Notwithstanding the foregoing, certain

claims or issues for certain parties may, consistent with 28 U.S.C. § 1407 and the case law

thereunder, be matters for determination on remand by transferor courts.  Consistent with the

November 9, 2015 Decision by the Bankruptcy Court presiding over the bankruptcy of General

Motors Corporation ("Old GM"), its subsequent Judgment dated December 4, 2015, and the

decision by the United States Court of Appeals for the Second Circuit dated July 13, 2016, this

Complaint also complies with those rulings concerning what Plaintiffs may properly plead

consistent with the Sale Order through which General Motors LLC ("New GM") acquired

---

[1] Plaintiffs understand the Court has dismissed the RICO claim and brand diminution claim. These allegations remain in the Complaint to preserve these claims for appeal, though Plaintiffs note that additional allegations as to the importance of a brand and the impact on the New GM brand of the disclosure of New GM's dishonesty and other failures, have been strengthened.

substantially all of the assets of Old GM.[2]  Plaintiffs reserve the right to amend this Complaint

dependent upon the results of any further rulings by the Bankruptcy Court and any appeals of

any such rulings in any court of competent jurisdiction, and consider that all claims in their prior

Complaints filed in this MDL are still pending for purposes of any applicable statutes of

limitation.

The term "Defective Vehicles" refers to the following vehicles, classified by defect and

NHTSA Recall No., as further alleged in this Complaint and as falling within the parameters of

the proposed Class definitions below:

(i)     Delta Ignition Switch Vehicles (the vehicles included in Recall No. 14v047: 2005-2010 Chevy Cobalt; 2006-2011 Chevy HHR; 2007-2010 Pontiac G5; 2007-2010 Saturn Sky; 2003-2007 Saturn ION; and 2006-2010 Pontiac Solstice);

(ii)    Low Torque Ignition Switch Vehicles (the vehicles included in Recall Nos. 14v355, 14v396, and 14v400:  2005-2009 Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2011 Buick Lucerne, and 2006-2008 Chevrolet Monte Carlo; 2003-2014 Cadillac CTS and the 2004-2006 Cadillac SRX; and 1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero);

(iii)   Knee-to-Key Camaro Defect Vehicles (the vehicles included in Recall No. 14v346:  2010-2014 Chevrolet Camaro);

(iv)    Side Airbag Defect Vehicles (the vehicles included in Recall No. 14v118:  2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook); and

(v)     Power Steering Defect Vehicles (the vehicles included in Recall No. 14v153: 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx,

---

[2] Plaintiffs believe that *all* the claims pled in this Complaint may proceed without impediment from the Sale Order.  While the Bankruptcy Court ruled that the claim for Fraud by Concealment of the Right to File a Claim Against Old GM in Bankruptcy is barred by the Sale Order, Plaintiffs have appealed that ruling to this Court as they believe that the claim is an Independent Claim based *solely* on the conduct of New GM and may therefore proceed.

- 2 -

2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura).

The Delta Ignition Switch Vehicles, Low Torque Ignition Switch Vehicles, and Knee-to-Key Camaro Defect Vehicles are sometimes collectively referred to as the "Defective Ignition Switch Vehicles."

To the extent other defects were included in prior complaints they are no longer being pursued by Lead Counsel on behalf of the economic loss plaintiffs in this MDL.

A brief summary follows of Plaintiffs' legal claims in this Complaint, which identifies which claims are "free and clear" to proceed without impediment from the Sale Order, based on the rulings of the Bankruptcy Court and the United States Court of Appeals for the Second Circuit:[3]

(i)     **Independent Unfair and Deceptive Trade Practice Act** claims for all class members on behalf of (a) New GM purchasers of Defective Vehicles; and (b) Old GM purchasers of Defective Vehicles.

(ii)    **Independent Fraudulent Concealment** claims for all class members on behalf of (a) New GM purchasers of Defective Vehicles and (b) Old GM purchasers of Defective Vehicles.

(iii)   **Independent Implied Warranty** claims for New GM Defective Vehicle Purchasers only.

(iv)    **Independent Negligence** claims on behalf of (a) purchasers of New GM Defective Vehicles and (b) purchasers of Old GM Defective Vehicles.

---

[3] This Complaint does not include successor liability claims for non-Delta Ignition Switch Vehicles pending further rulings that the Bankruptcy Court is expected to make regarding such claims (after which Plaintiffs will again amend, depending on how the Bankruptcy Court rules).

(v) **Independent Fraud by Concealment of the Right to File A Claim Against Old GM in Bankruptcy** on behalf of Old GM Delta Ignition Switch Purchasers who owned their vehicles during the period between the approval of the Bankruptcy Sale and the Bar Date for filing proof of claims.[4]

(vi) **Independent Unjust Enrichment** claim on behalf of all Plaintiffs, regardless of whether they purchased their Defective Vehicles from New GM or Old GM.

(vii) **Successor Liability UDTPA** claim on behalf of Old GM Delta Ignition Switch purchasers.

(viii) **Successor Liability Claim for Fraud by Concealment** on behalf of Old GM Delta Ignition Switch purchasers.

(ix) **Successor Liability Claim for Implied Warranty** on behalf of Old GM Delta Ignition Switch purchasers.

(x) **Successor Liability Claim for Negligence** on behalf of Old GM Delta Ignition Switch purchasers.

## II. INTRODUCTION—SUMMARY OF CLAIMS

1. Here is what New GM falsely promised its consumers:

---

[4] The Bankruptcy Court previously ruled that this claim is based on the actions of Old GM (and therefore is *not* an Independent Claim), and therefore was barred by the "free and clear" provisions of the Bankruptcy Sale Order through which New GM acquired the assets of Old GM. Plaintiffs respectfully believe that the Bankruptcy Court erred, and that this claim *is* an Independent Claim based solely on the acts and omissions of New GM, and have therefore appealed the Bankruptcy Court's ruling to this Court.

- 4 -



2.      But, as demonstrated below, New GM was not something to believe in and was not committed to delivering "award winning quality" or "advanced safety features" because it was a company that continually broke the basic rules of the road car manufacturers must live by.

3.      Rule No. 1:  Manufacturers of any product—from toys to automobiles to medical devices—must manufacture and sell products that are, above all else, safe for use.  Safety protects consumers, is essential to long-term brand and model value and corporate success, and is required by law.

4.      Rule No. 2:  Manufacturers must also tell the complete truth about the safety of their products.  When a safety defect does occur in a consumer product, manufacturers must disclose to consumers the problem and fully initiate a fulsome recall to address the problem.

5.      Rule No. 3:  Manufacturers of products whose operation can cause injuries and fatalities must have manufacturing and inventory processes in place such that they can produce safe products, detect and correct quality control issues, and know what safety-critical parts are actually in their cars.

- 5 -

6.      Through its CEO Mary Barra, New GM admitted on June 5, 2014, that it had a

duty to build safe cars and failed:

> Our job is clear:  To build high quality, safe vehicles.  In this case
> with these vehicles, we didn't do our job.  We failed these
> customers. We must face up to it and learn from it.
>
> …
>
> Furthermore, numerous individuals did not accept any
> responsibility to drive our organization to understand what was
> truly happening.  The report [commissioned by New GM]
> highlights a company that operated in silos, with a number of
> individuals seemingly looking for reasons not to act, instead of
> finding ways to protect our customers.
>
> Let me be clear:  This should never have happened.  It is
> unacceptable.  Our customers have to know they can count on our
> cars, our trucks and our word.  Because of the actions of a few
> people, and the willingness of others in the company to condone
> bureaucratic processes that avoided accountability, we let these
> customers down.

7.      Though Barra limited her confession to "these vehicles" (the vehicles in the first

two recalls) it is not reasonable to conclude that the institutional failures were limited to Cobalts

and Ions.  Rather, as demonstrated below, these failures were widespread throughout New GM

and resulted in GM's production and sale of millions of Defective Vehicles.

8.      For example, more than 12 million New GM and Old GM vehicles contained a

defective ignition switch and cylinder.  In all of these vehicles, the key position of the lock

module is located low on the steering column, in close proximity to the driver's knee.  The

ignition switch in the Defective Ignition Switch Vehicles is prone to fail during ordinary and

foreseeable driving situations.  New GM initially recalled 2.1 million Defective Ignition Switch

Vehicles in February and March of 2014 (the "Delta Ignition Switch Vehicles"), and it was this

initial recall that set in motion the avalanche of recalls that is described in this Complaint.  In

- 6 -

June and July of 2014, New GM recalled an additional 11 million vehicles, ostensibly for distinct safety defects involving the ignition and ignition key.  As set forth below, however, each of these recalls involves a defective ignition switch, and the consequences of the defect in each of the recalled vehicles are substantially similar, if not identical.  In each case, a defective ignition switch is located in an unreasonable position on the steering cylinder and can cause the vehicle to stall, disable the power steering and power brakes, and disable the airbag system in normal and foreseeable driving circumstances.  In each case, New GM was aware of the defect well before it finally recalled the Defective Ignition Switch Vehicles in 2014.

9.      More specifically, the ignition switch can inadvertently move from the "run" to the "accessory" or "off" position at any time during normal and proper operation of the Defective Ignition Switch Vehicles.  The ignition switch is most likely to move when the vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently touches the ignition key with his or her knee; or for a host of additional reasons.  When the ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and unexpectedly loses engine power, power steering, and power brakes, and certain safety features are disabled, including the vehicle's airbags.  This leaves occupants vulnerable to crashes, serious injuries, and death.

10.      The ignition switch systems at issue are defective in at least three major respects.  First, some of the switches are simply weak; because of a faulty "detent plunger," the switch can inadvertently move from the "run" to the "accessory" position.  Though the public believes this detent issue is limited to vehicles in the 2.1 million initially recalled, this problem exists in other

models as well,[5] including the 3.14 million cars recalled in June 2014, and 5.8 million cars recalled in July 2014.  Second, because some of the ignition switches are placed low on the steering column, the driver's knee can easily bump the key (or the hanging fob below the key) and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position. Third, when the ignition switch moves from the "run" to the "accessory" or "off" position, the vehicle's power is disabled.  This also immediately disables the airbags.  Thus, when power is lost during ordinary operation of the vehicle, a driver is left without the protection of the airbag system even if he or she is traveling at high speeds.

11.     New GM was aware of safer alternative designs for airbag systems that would have prevented the non-deployment of airbags caused by the ignition switch defects, but chose not to employ them—whether by way of recall of Old GM vehicles or a design change for the New GM vehicles it manufactured—in part to avoid disclosure of the defective ignition switches and their tragic consequences.

12.     Both Old GM and New GM also failed to thoroughly conduct an industry standard Failure Modes and Effects Analysis ("FMEA") on the ignition systems in the Defective Ignition Switch Vehicles during and after their design.  FMEA is an engineering risk assessment technique used in design and failure analysis to define, identify, and eliminate known and/or potential failures, problems, and errors from the system/design before they reach the customer. An FMEA asks, "What happens if a failure actually occurs?"  While Old GM and New GM and/or their suppliers conducted component-part FMEAs, Old GM and New GM did not conduct system-wide FMEAs, that is, an FMEA for the system in which the component was included. This is a violation of industry standard engineering practices.  Had system-level FMEAs been

---

[5] *See infra* at Section E.3.

properly conducted, the downstream *effects* of the ignition switch defects—such as disabling the airbags—would have been identified at the design stage and before the Defective Ignition Switch Vehicles were sold.  The same FMEA failures also occurred with respect to the Side Airbag Defect and Power Steering Defect.

13.    Barra's admission of New GM's failures was followed by New GM's admission, in a Statement of Facts that is part of a Deferred Prosecution Agreement ("DPA") with the United States, that New GM "falsely represented to consumers that vehicles containing the defect posed no safety concern."  Statement of Facts ¶ 3.

14.    New GM's violation of the rules governing car manufacturers was egregious. From the date of its inception on July 10, 2009, it manufactured and sold millions of vehicles that were not safe and were defective.  New GM also failed to disclose the truth about its patent inability to manufacture and sell safe and reliable vehicles and its systematic scheme to misrepresent the safety and reliability of its vehicles, and failed to remedy the defects in millions of New GM and Old GM vehicles that were on the road—defects that were known to New GM but concealed from consumers, vehicle owners and lessees, and the regulators.[6]  These violations were in derogation of express obligations New GM agreed to undertake, and of various laws.

15.    The failures are even more egregious when juxtaposed with the promises and messaging New GM constantly delivered to consumers.  New GM led consumers in the United States and worldwide to believe that, after Old GM's bankruptcy, New GM was a new company. For example, in numerous public announcements and public filings, such as in its 2012 Annual

---

[6] The term "New GM vehicles" refer to vehicles manufactured by New GM, and "Old GM vehicles" refers to vehicles manufactured by Old GM.

Report excerpted below, New GM repeatedly proclaimed that it was a company committed to

innovation, safety, and building "the best vehicles:



16.     New GM was successful in selling its "processes and culture change" and

building "the best vehicles in the world" story.  Sales of all New GM models went up, and New

GM became profitable.  As far as the public knew, a new General Motors was born, and the New

GM brand and GM models stood strong in the eyes of consumers.

17.     New GM's promises were an illusion given New GM's egregious failure to

disclose, and the affirmative concealment of, ignition switch defects and a plethora of other

safety and quality defects in New GM vehicles and Old GM vehicles.  New GM concealed the

existence of the many known safety and quality defects plaguing many models and years of New

GM vehicles and Old GM vehicles, and that New GM valued cost-cutting over safety.

Concurrently, New GM marketed its vehicles as "safe" and "reliable," and claimed that it built the "world's best vehicles." Consequently, New GM enticed all post-July 10, 2009 purchasers of New GM Defective Vehicles, and New GM Certified Pre-Owned Vehicles to buy or lease vehicles under false pretenses, and deprived them of the benefit of their bargain. And New GM's concealment of its safety and quality problems caused owners of Old GM Defective Vehicles to retain vehicles that they would not have retained and which were worth less than they would have been but for New GM's concealment of the defects.

18.     A vehicle made by a reputable manufacturer of safe and reliable vehicles is worth more than an otherwise similar vehicle made by a disreputable manufacturer that is known to devalue safety and to conceal serious defects from consumers and regulators. New GM vehicle Safety Chief, Jeff Boyer, recently highlighted the heightened materiality of safety to consumers: "Nothing is more important than the safety of our customers in the vehicles they drive." Yet New GM failed to live up to this commitment, instead choosing to conceal more than 70 serious defects in over 27 million New GM vehicles and Old GM vehicles sold in the United States. And the value of all New GM and Old GM Defective Vehicles has diminished as a result of the widespread publication of those defects and New GM's corporate culture of ignoring and concealing safety defects.

19.     The systematic concealment of known defects was deliberate, as New GM followed a consistent pattern of endless "investigation" and delay each time it became aware of a given defect, as epitomized by the Delta Ignition Switch Defect and cover-up that gave rise to a criminal wire fraud investigation that was recently resolved through a Deferred Prosecution Agreement ("DPA") with the United States Department of Justice. Recently revealed documents show that New GM valued cost-cutting over safety, New GM's personnel were trained to ***never***

use the word "defect," "stall," or other words suggesting that any New GM or Old GM vehicles

are defective, New GM routinely chose the cheapest parts supplier without regard to safety, and

New GM discouraged employees from acting to address safety issues.

20.     In addition, New GM was plagued by what CEO Mary Barra euphemistically

calls "transactional decision making," in which New GM employees "color[] inside the lines of

their own precise job description without thinking independently or holistically," *i.e.*, without

looking at the larger issue of safety.[7]

21.     In light of New GM's systemic devaluation of safety issues, it is not surprising

that, from the date of its inception, New GM itself produced a grossly inordinate number of

vehicles with serious safety defects and kept silent about Old GM vehicles it knew had defects.

Until 2014, New GM was successful in concealing both its disregard of safety and the myriad

defects that existed in Old GM vehicles and New GM vehicles because of that disregard.

22.     According to the administrator of the National Highway Traffic Safety

Administration ("NHTSA"), New GM worked to hide documents from NHTSA and created

firewalls to prevent people within New GM from "connecting the dots" with respect to safety

issues and defects.

23.     The array of concealed defects is astounding and goes far beyond the Delta

Ignition Switch Defect, the belated revelation of which sparked New GM's 2014 serial recalls.

The defects affected virtually every safety system in Old and New GM vehicles, including, but

by no means limited to, the airbags, seatbelts, brakes, brake lights, electronic stability control,

windshield wipers, sensing and diagnostic modules, and warning chimes.

---

[7] TIME MAGAZINE, October 6, 2014, p. 36.

24.     Old and New GM's engineering and inventory process was in such disarray that some recalled vehicles might or might not have a defective part—because New and Old GM simply did not know which of their cars had parts that made them unsafe.  This in itself violated sound engineering and inventory manufacturing practices.

25.     New GM received reports of crashes, deaths, injuries, and safety concerns expressed by vehicle owners that put New GM on notice of the serious safety issues presented by these defects.  New GM knew and was fully aware of the now infamous Delta Ignition Switch Defect (and many other serious defects in numerous models of Old GM vehicles, including the Defective Vehicles) *from the very date of its inception on July 10, 2009*.  For example, at least two dozen New GM employees, many high-level or in positions of influence, knew of the Delta Ignition Switch Defect as of that date.  Many of these same executives were aware of the Low Torque Ignition Switch Defect, the Knee-to-Key Camaro Defect and the Power Steering Defect, as well as other defects described herein.

26.     New GM's claims that the defects were known only to lower-level engineers is false.  For example, current CEO Mary Barra, while head of product development, was informed in 2011 of the Power Steering Defect in several models.  Despite 4,800 consumer complaints and more than 30,000 warranty repairs, New GM waited until 2014 to disclose this defect.

27.     New GM's claims about its own conduct in connection with the Delta Ignition Switch Defect are also false.  While New GM claimed that it was unaware that the unintended movement of the ignition switch in its cars rendered the front airbags inoperable until shortly before the 2014 recall, it has now been forced to admit to the contrary.  In the DPA, New GM finally began to come clean and admitted that, at least by the spring of 2012, it was fully aware that the Delta Ignition Switch Defect rendered airbags inoperable, and that a recall was required.

Plaintiffs believe that New GM had more than enough knowledge that the Delta Ignition Switch Defect was a safety defect such that it should have done a recall in 2009.

28.     New GM has now effectively admitted that the Delta Ignition Switch Defect alone is responsible for 124 deaths—and New GM bears responsibility for all the deaths that occurred on its watch after July 10, 2009.

29.     New GM's now highly publicized campaign of deception in connection with the Delta Ignition Switch Defect first revealed in February 2014 sent shockwaves throughout the country.  Unfortunately, the Delta Ignition Switch Defect announced in February 2014 was only one of a parade of recalls in 2014—many concerning safety defects that had long been known to New GM.

30.     On May 16, 2014, New GM entered into a Consent Order with NHTSA in which it admitted that it violated the TREAD Act by not disclosing the Delta Ignition Switch Defect, and agreed to pay the maximum available civil penalties for its violations.

31.     New GM's CEO, Mary Barra, has admitted in a video message that:  "Something went wrong with our process…, and terrible things happened."  But that admission is cold comfort for Plaintiffs and Class members, who have suffered economic injury as a result of New GM's deception.

32.     New GM systematically and repeatedly breached its obligations and duties to Defective Vehicle owners to make truthful and full disclosures concerning New GM vehicles and Old GM vehicles—particularly, the safety, quality, and reliability of the vehicles, and the importance of safety and quality to the Company.  New GM's false representations and/or omissions concerning the safety and reliability of those vehicles, and its concealment of the known safety defects plaguing those vehicles and its brand, caused certain Plaintiffs and Class

- 14 -

members to purchase New GM vehicles or New GM Certified Pre-Owned Vehicles on or after

July 10, 2009, under false pretenses, and caused owners of Old GM Defective Vehicles to retain

and use Defective Vehicles of diminished value.

33.     Plaintiffs and Class members have been damaged by New GM's conduct,

misrepresentations, concealment, and non-disclosure of the numerous defects plaguing over

15 million Old and New GM Defective Vehicles—all vehicles which New GM has the

obligation and responsibility to monitor for safety, and to disclose and remedy known safety

defects.  Once that truth emerged and consumers became aware that New GM concealed known

safety and quality defects in the Defective Vehicles, the Defective Vehicles were greatly

tarnished by the revelation of the defects and the fact that the Company is untrustworthy and

does not stand behind its vehicles.  This decline in value is also a conservative proxy for the

amount of overpayment at the time of sale, though there exists other methods to quantify the

damage.  The value of the Defective Vehicles, has therefore diminished and continues to

diminish because of New GM's failure to timely disclose and remedy the defects.  A few

examples of the decline in value caused by New GM's conduct are illustrative of the diminution

in value that harmed Plaintiffs and Class Members:  the 2010 and the 2011 Chevrolet Camaro

have both seen a diminished value of $2,000 when compared to the value of comparable

vehicles; the 2009 Pontiac Solstice has diminished $2,900 in value; the 2010 Cadillac STS

diminished in value by $1,235 in September 2014; and the 2010 Buick LaCrosse by $649 in that

same month.  To take a few more examples:  the 2011 Chevrolet Caprice has a diminished value

as of April 2015 of $1,679; and the 2011 GMC Denali, as of April 2015, has a diminished value

of $2,965.  New GM's egregious and widely publicized conduct and the never-ending and

piecemeal nature of New GM's recalls has so tarnished the New GM brand and specific models

that no Class member would have paid the price they did when the New GM brand supposedly

meant safety and success.

34.     Plaintiffs pursue their claims on behalf of a RICO Class[8] and state-law classes

defined by defect type, with subclasses.  However, a general definition includes:

> All persons who bought or leased (i) a Delta Ignition Switch
> Vehicle on or before February 14, 2014; (ii) a Low torque Ignition
> Switch Vehicle prior to July 3, 2014; (iii) a Knee-to-Key Camaro
> Defect Vehicle prior to July 3, 2014; (iv) a Side Airbag Defect
> Vehicle prior to March 17, 2014; and/or (v) a Power Steering
> Defect Vehicle prior to April 1, 2014.

35.     To be clear, like all of the claims in this Complaint *except* for the successor

liability claims brought only on behalf of Old GM Delta Ignition Switch Vehicle owners, the

claims of pre-July 10, 2009 owners or lessees of Defective Vehicles and the claims of owners or

lessees of New GM Certified Pre-Owned Vehicles arise solely out of obligations and conduct of

New GM.

### III.     JURISDICTION AND VENUE

36.     This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a)

and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiffs and

other Class Members are citizens of a different state than Defendant.  Jurisdiction is also proper

in this Court pursuant to 28 U.S.C. § 1331 because Plaintiffs' RICO claims arise under federal

law, and this Court has supplemental jurisdiction over Plaintiffs' state law claims under 28

U.S.C. § 1367.

37.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to

the Court's jurisdiction.  This Court has personal jurisdiction over New GM because New GM

---

[8] The RICO Class is asserted to preserve these claims for appeal.

conducts substantial business in this District, and some of the actions giving rise to the Complaint took place in this District.  This Court also has personal jurisdiction over New GM under 18 U.S.C. § 1965 because New GM is found in, has an agent in, or transacts business in this District.

38.     Venue is proper in this District under 28 U.S.C. § 1391 because New GM, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, New GM transacts business within the District, and some of the events establishing the claims arose in this District.  Venue is also proper under 18 U.S.C. § 1965.

## IV.     PARTIES

### A.     Plaintiffs

39.     Pursuant to the Court's instructions that Plaintiffs could file directly in the MDL court and reserve the right to have filed in another district, this Complaint is filed by each new Plaintiff as if they had filed in the district in which they reside.[9]

40.     Unless otherwise indicated, each Plaintiff purchased or leased his or her New GM or Old GM vehicle primarily for personal, family, or household use.

41.     The defects that New GM concealed throughout the Class Period related to the safety and reliability of the Defective Vehicles, and affected the brand perception and market value of all Defective Vehicles.  Information concerning the safety of these vehicles, and whether New GM would implement necessary corrective measures for these vehicles, was material.  Reasonable consumers would consider that information important in deciding whether

---

[9] Plaintiffs incorporate by reference, to the extent not named here, all named plaintiffs from the Third Amended Consolidated Class Complaint for purposes of preserving any issues on appeal.

to buy, lease, operate, trade in, or sell these vehicles, or whether to purchase other new or

Certified Pre-Owned vehicles from New GM.  Provided with the truth regarding these vehicles,

Plaintiffs and Class Members would not have purchased or leased their Old GM or New GM

vehicles or their New GM Certified Pre-Owned Vehicles and/or would have paid less; and would

not, to their practical ability to do so, have continued to drive them without corrective safety

measures or other affirmative steps by New GM to make these vehicles safe and protect their

economic value.  Also, as a direct result of New GM's misconduct, each plaintiff and member of

the class has out-of-pocket economic damage by virtue of their having incurred the expense of

taking the time to bring their car in for repair.

42.     Class members would not have purchased or continued to own New GM and Old

GM Defective Vehicles, or New GM Certified Pre-Owned Defective Vehicles, if they had

known of GM's true corporate culture or if they had known that these cars had one or more of

the defects.  The term "true corporate culture" used herein refers to a company whose

manufacturing and decision-making process allowed cars to be made and remain on the road

with defects that were not fixed on a timely basis and were concealed.  The term also refers to a

culture where employees were trained to not to use words that might alert regulators to a safety

defect and where the "GM Nod" or "GM Salute" meant that problems would not be fixed.  The

team also refers to a company who engaged in cost cutting, was unwilling to devote the

resources needed to properly spot and evaluate safety issues, delayed recalls for cost and

publicity reasons, and had engineers and decision makers "siloed."

43.     The true corporate culture also included a company that had no true leader of

Global Safety until July 2014, was not engaging in standard engineering failure mode and effect

analysis ("FMEA"), was not "reading across" vehicle platforms to see if a defect in one platform

might be replicated as a defect in another, and did not have adequate investigators or personnel to "mine" complaint data to allow for timely detection of defects.

44.     Each of the Plaintiffs has been damaged by New GM's failure to disclose the defects in the Defective Vehicles, as well as by New GM's misrepresentations and omissions about its corporate culture and responsibility for safety, quality, and truthfulness.  The truth about New GM's culture was completely concealed until 2014 when New GM revealed the defects in New GM vehicles and Old GM vehicles on the road in the United States.  New GM's failure to timely repair the Defects at issue in the Complaint, and its concealment of those defects, injured all owners and lessees of New GM vehicles, New GM Certified Pre-Owned Vehicles and Delta Ignition Switch Vehicles, and Old GM Defective Vehicles.

**Valeria Glenn—Alabama**

45.     Plaintiff and proposed Delta Ignition Switch Defect Class Representative Valeria Glenn resides in Alabaster, Alabama.  She purchased a used 2006 Pontiac Solstice with the Delta Ignition Switch Defect for $13,000 from Southtown Motors in Pelham, Alabama on February 23, 2013.  The vehicle came with a 100,000 mile warranty.  Ms. Glenn chose this vehicle because the vehicle's safety and reliability was important to her.  On one occasion, Ms. Glenn experienced a shutdown event and her steering wheel locked up while driving her vehicle.  She learned about the recall in March 2014, and she had her ignition switch replaced under the recall in April 2014.  Ms. Glenn had to miss work on two days because she was taking the car in for service.  Ms. Glenn would not have purchased the vehicle or she would have paid less for it had she known about the defect in the vehicle.

**Gerald Smith—Alabama[10]**

46.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Gerald Smith is a resident and citizen of Montgomery, Alabama.  Mr. Smith purchased a used 2006 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for $25,000 from Larry Puckett Chevrolet in Prattville, Alabama in January 2007.  His vehicle was covered by a warranty at the time of purchase, but has since expired.  Mr. Smith chose this vehicle, in part, because the vehicle's safety and reliability was important to him.  Mr. Smith's vehicle was repaired under the recall, but he does not recall when.  Mr. Smith would not have driven the vehicle or would have sold it if he had known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about the defect in the vehicle.

---

[10] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

**Marion Smoke—Alabama**

47.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Marion Smoke is a resident and citizen of Elmore, Alabama.  Ms. Smoke purchased a new 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect for $19,000 in Montgomery, Alabama in May 2005.  The vehicle came with the standard manufacturer's warranty.  She chose this vehicle, in part, because the vehicle's safety and reliability was important to her.  Ms. Smoke's Cobalt unexpectedly shut off on at least seven separate occasions, all while she was driving on highways.  She also had trouble turning the steering wheel, making it difficult to drive.  Ms. Smoke received a recall notice and had her car repaired under the recall in April 2014.  Because of the shutdown incidents and the ignition switch defect, she feared driving her vehicle even after having the recall work performed.  She believes the value of her vehicle has been diminished as a result of the defect.  Ms. Smoke would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about the defect in the vehicle.

**Camille Burns—Arkansas**

48.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Camille Burns is a resident and citizen of Pine Bluff, Arkansas.  Ms. Burns purchased a used 2006 Chevrolet Cobalt with the Delta Ignition Switch Defect for over $16,000 from Smart Chevrolet in White Hall, Arkansas on November 1, 2006.  At the time of purchase, the car was still covered under warranty.  She chose this vehicle, in part, because the vehicle's

- 21 -

safety and reliability was important to her.  She saw GM television advertisements touting their vehicles' safety and reliability.  The GM salesman at Smart Chevrolet also told Ms. Burns about the Cobalt's safety and reliability and gas savings immediately prior to her purchase.  She relied on these representations in buying the car.  She purchased the Cobalt for her son to drive to and from college.  Once he was out of college, she started driving it.  Ms. Burns' Cobalt shut down "too many times to count"—approximately two to three times per week between June 2014 and the time she traded the vehicle in around July 14, 2014.  These unexpected shutdowns occurred when Ms. Burns was pulling out into traffic, backing up, or turning her car.  Each time she would be forced to restart the car.  The last time it shut off suddenly, it almost caused an accident with her 14-year-old son in the car.  She also experienced a loss of power steering while backing out of her driveway.  Ms. Burns had her car checked by an independent repair shop, but it could not diagnose the problem.  After Ms. Burns learned about the Delta Ignition Switch recall, she called a New GM dealership about performing the recall repair, but it told her it could not promptly perform the recall repair and refused to provide her a loaner car.  When she called New GM directly, the representative advised her that she should get out of the car immediately.  Although her Cobalt was paid off and she was not financially ready to trade it in, based on the repeated shutdowns, New GM's advice, and New GM's inability to fix the car in a timely manner, Ms. Burns felt compelled to trade in the Cobalt for a safer vehicle.  On July 14, 2014, she traded the Cobalt for a Smart Hyundai and received only $2,500.  Ms. Burns believes she received less for the Cobalt than she would have received absent the ignition switch defect.  Three months after she traded in the Cobalt, the dealership finally called her to tell her it was ready to fix the ignition switch.  Having to purchase the newer car (2010 Toyota Camry) with a payment of $282 per month was a financial hardship.  Once the defects became apparent, and the danger of driving the

car presented itself, Ms. Burns felt it was too dangerous for her and her family to drive the

Cobalt.  She would not have purchased the vehicle or she would have paid less for it had she

known about the defect in the vehicle.

**Joe Glover—Arkansas**

49.      Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative

Joe Glover is a resident and citizen of Lonoke, Arkansas.  Mr. Glover purchased a used 2010

Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for $11,000 from

Brockinton Motors in Cabot, Arkansas on March 6, 2013.  Mr. Glover saw New GM and

Gwatney Chevrolet television commercials almost every evening which highlighted the features

of New GM's vehicles, including their safety and reliability.  He also saw or heard

advertisements touting the safety and reliability of New GM vehicles on the radio, in the

newspaper (Democrat Gazette), via mailers he received, and on the Internet.  Mr. Glover

experienced multiple shut-down incidents—more than 10—in 2014, and in many of these, he

believes the ABS light came on at or before the time the vehicle stalled.  On July 7, 2014, he

took the vehicle to Gwatney GMC for service.  He reported the shut-off incidents.  The

dealership alleged that the incidents may have been caused by "aftermarket equipment…tied in

to the ECM" which the dealership felt "may create the problems."  The aftermarket equipment (a

security system installed when it was a fleet vehicle) was removed.  At this time, the dealership

performed a "belt buckle recall" (No. 10312).  Mr. Glover incurred $581.89 for the repairs.

Approximately three weeks after the vehicle was taken to the dealership and "repaired," Mr.

Glover vehicle's stopped again three separate times, in a manner similar to previous shutdowns.

Gwatney GMC refused to perform warranty work on the vehicle claiming that his VIN was not

under an ignition recall.  Mr. Glover called GM directly, and though the representative admitted

that GM knew it had a problem with the Impala, he said there had not yet been a recall and that the dealership could not do warranty work without a recall. After the shutdowns started, Mr. Glover realized the car was unsafe to drive. He knew that if he disclosed the defects as a part of a trade-in-deal, he would get dramatically less value than it should be worth. His conscience would not let him trade the car without disclosing the problems. He could not afford two car payments, and he could not afford a large repair bill. So, in the interim, he drove more slowly and in the right-hand lane. He was lucky he never had an accident caused by the shut downs. Finally, after so many incidents, and not willing to take the safety risk with his Impala any longer, he traded the vehicle for a Dodge Grand Caravan on July 29, 2014. He considered buying a Chevy Equinox instead of the Dodge Caravan, but he did not buy the Equinox because of the problems he had with the Impala and his belief that it might be under recall too. He received a $6,000 trade-in value for his Impala, but believes the recalls and defects in the vehicle decreased the amount he received by $2,000 (that he should have received $8,000). The salesman ("Buddy") noted that several models of GM products had ignition problems and that the GM dealership was going to wholesale the vehicles with ignition problems to get them off the lot. He did not want to trade it in at that time, but it had become too unsafe to drive. After Mr. Glover traded his Impala, he finally received a recall notice for the ignition switch. Plaintiff Glover believes that the value of his 2010 Impala decreased because of the ignition switch defects, causing him to lose $2,000. He would not have purchased it or he would have paid less had he known about the defects at the time of purchase.

**Nettleton Auto Sales, Inc.—Arkansas and Tennessee Class Representative**

50.     Plaintiff and proposed Delta Ignition Switch Defect Class and Power Steering Defect Class Representative Nettleton Auto Sales, Inc. maintains its principal place of business

- 24 -

in Jonesboro, Arkansas.  Nettleton Auto Sales, Inc. purchased the following vehicles with the intention to resell same:

51.     Vehicle #1: used 2009 Chevy HHR with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for $10,865, plus $1,268.32 in shipping costs from Manheim Nashville Auto Auction in Mount Juliet, Tennessee on March 27, 2014;

52.     Vehicle #2: used 2011 Chevy HHR (subject to the Delta Ignition Switch recall) for $5,850, plus $1,079.49 in shipping and repair costs in Jonesboro, Arkansas on February 14, 2014; and

53.     Vehicle #3: used 2010 Chevy HHR (subject to the Delta Ignition Switch and Power Steering recalls) for $6,000, plus $5,028.13 in additional shipping and repair costs from Scott Rose in Jonesboro, Arkansas, on March 12, 2014.

54.     The 2009 HHR received the recall repair at Central Chevrolet in Jonesboro, Arkansas prior to being sold.  Nettleton Auto waited several months to have the recall repairs performed and was told the delay was a result of not having enough replacement ignition switches to perform the repairs.  The 2009 HHR was sold for $11,375 on February 28, 2015.  At the time of sale, the 2009 HHR was in fair condition and had 67,266 miles.  The 2010 HHR was sold for $12,900 on June 4, 2014.  At the time of sale, the 2010 HHR was in fair condition and had 86,960 miles.  It had not yet had the recall repair completed at the time of sale.  The 2011 HHR was sold for $8,500 on June 28, 2014.  At the time of sale, the 2011 HHR was in fair condition and had 126,682 miles on it.  Nettleton Auto Sales, Inc. believes the ignition switch on the 2011 HHR was subsequently replaced on or about June 30, 2014, by Central Chevrolet in Jonesboro, Arkansas.  Nettleton Auto Sales, Inc. believes these sale prices reflect the diminished value of the vehicles resulting from their defects.  Each of the vehicles sold for less than its

- 25 -

expected sales price.  Based on Nettleton Auto's standard mark-up, the expected sales prices for

the subject vehicles, but for the defect, were:  (1) $13,350 (for the 2010 HHR); (2) $12,889 (for

the 2011 HHR); and (3) $16,250 (for the 2009 HHR).  Nettleton Auto also incurred carrying

costs for each vehicle, including interest, insurance, and maintenance/service costs other than

repairs (such as car washings and detailing).  It would not have purchased these vehicles or it

would have paid less for them had it known about the defects.

### Grace Belford—Arizona

55.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Delta Ignition Switch Defect Bankruptcy Class

Representative Grace Belford is a resident and citizen of Phoenix, Arizona.  Ms. Belford

purchased a new 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect for $18,900 from

Courtesy Chevrolet in Phoenix, Arizona in October 2005.  The vehicle had the standard

manufacturer's warranty, and she did not purchase an extended warranty.  Ms. Belford chose this

vehicle, in part, because the vehicle's safety and reliability was important to her.  Ms. Belford

recalls the salesman telling her the car was reliable.  On at least two separate occasions, Ms.

Belford's ignition unexpectedly shut off after her vehicle went over a bump in the road.  Ms.

Belford did not learn of the ignition switch defects until March 2014.  It took about two and half

months for the recall repair work to be completed on her vehicle.  She had to use a loaner car

during this time and this inconvenienced her because she could not plan any trips out of town.

Ms. Belford would not have driven the vehicle or would have sold it earlier if she had known

about its defect.  She planned to use her Cobalt as a down payment on a new vehicle, but the

resale value of her Cobalt was diminished due to the ignition switch defect.  Ms. Belford was

finally able to trade in her Cobalt in August 2015.  She was only offered $3,000 for the vehicle—

$2,000 less than the then-current Kelley Blue Book value.  Ms. Belford would not have

purchased the vehicle or she would have paid less for it had she known about the defect in the

vehicle.

**Barbara Hill—Arizona**

56.      Plaintiff and proposed Delta Ignition Switch Defect Class Representative Barbara

Hill is a resident and citizen of Mesa, Arizona.  Ms. Hill purchased a used 2007 Chevrolet Cobalt

with the Delta Ignition Switch Defect for $12,905.59 from Larry H. Miller Nissan in Mesa,

Arizona on June 9, 2012.  Ms. Hill purchased the vehicle after she conducted online research on

Chevrolet's website to find out how stable the Cobalt was and what kind of gas mileage it

received.  She also checked to see if there were any recalls on the car and did not find any.

Based on that research, she believed the vehicle was safe and reliable.  She no longer feels safe

driving it.  Ms. Hill learned about the recall in April 2014.  She had her ignition switch replaced

in May 2014, but she does not trust that the replacement has resolved the vehicle's safety defect.

Ms. Hill would not have purchased the vehicle or she would have paid less for it had she known

about the defect in the vehicle.

**Ray Wieters—Arizona**

57.      Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

Representative Ray Wieters is a resident and citizen of Glendale, Arizona.  Mr. Wieters

purchased a new 2008 Chevrolet Cobalt with the Delta Ignition Switch Defect for $17,961 from

Sands Chevrolet in Glendale, Arizona on July 13, 2008.  The car had the standard manufacturer's

warranty.  Mr. Wieters also purchased an extended warranty.  He chose this vehicle, in part,

based on its posted rating and the salesman's representations.  The salesman highlighted the

vehicle's full airbags and positive crash test ratings.  Mr. Wieters has experienced problems with his vehicle's power steering and ignition switch.  Specifically, the steering column assembly was replaced on December 22, 2008 because it was defective.  Mr. Wieters received a recall notice, but was told there was a delay in the repairs because there were not enough replacement parts.  Eventually, Sands Chevrolet called when the parts came in, and he had the car repaired.  Mr. Wieters still has the car and has had additional recall repairs done.  He has also paid out-of-pocket to replace the door lock motors, window drive motors, and interior trim defects.  He has invested so much time and money into the vehicle only to discover it is prone to recalls, defects, and is poorly assembled.  Mr. Wieters would not have driven the vehicle or would have sold it if he had known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Patricia Barker—California

58.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch Defect Bankruptcy Class Representative Patricia Barker is a resident and citizen of Wilmington, California.  Ms. Barker purchased a new 2005 Saturn Ion with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for approximately $18,000 from Saturn of Torrance in Torrance, California in March 2005.  The car was covered under the standard manufacturer's warranty, and she also purchased an extended warranty.  Ms. Barker chose this vehicle because she had an excellent experience with her first Saturn and because safety and reliability were important factors to her.  She recalls the dealership had several awards pertaining to the safety and reliability of their GM vehicles displayed prominently in the waiting room.  Ms. Barker has experienced power steering failure in her car on at least two separate occasions.  In both

- 28 -

instances she was able to reboot the power steering after restarting the car.  Ms. Barker did not

learn of the Delta Ignition Switch Defect until about February 2014 when she received an

undated recall notice in the mail.  Then she saw a commercial notifying affected drivers about

receiving a loaner car while waiting for back-ordered recall parts to arrive.  When she went to

Martin Chevrolet, they did not want to give her a loaner vehicle initially.  They finally agreed

and gave her a 2014 Chevy Silverado extended cab, but she had to come back the following

Monday to exchange it for a regular vehicle because the Silverado was recalled for bad seatbelts.

Martin Chevrolet then gave her a 2014 Chevrolet Impala.  Ms. Barker drove this car for 49 days

until her car was repaired in April 2014.  Only after she returned the Impala to get her vehicle

back, did she find out the Impala was also recalled for an ignition switch defect.  Before the

repair and even after the repair, there are times when she cannot turn the key in the ignition.  It

happened more frequently before the recall repair, but still occasionally occurs today.  Ms.

Barker would not have driven the vehicle had she known about its defect.  She would not have

purchased the vehicle or she would have paid less for it had she known about the defect in the

vehicle.

### Chimen Basseri—California

59.     Plaintiff and proposed Delta Ignition Switch Defect Class Representative Chimen

Basseri is a resident and citizen of Lodi, California.  Ms. Basseri purchased a used 2011

Chevrolet HHR (subject to the Delta Ignition Switch recall) for $16,333 from Nissan of Valencia

in Valencia, California on March 5, 2013.  The car had the standard manufacturer's warranty.

Ms. Basseri chose this vehicle, in part, because the vehicle's safety and reliability was important

to her.  She also recalls seeing many New GM advertisements both on television and online

about the safety and reliability of its vehicles.  Ms. Basseri has experienced a host of problems

with her vehicle, including issues with the steering system, windshield, remote key fob, transmitter, and battery and ignition.  She found out about the ignition switch recall while visiting the New GM website.  She called to schedule the repair, and it was completed at Sanborn Chevrolet on June 9, 2014.  She had to pay out-of-pocket to replace the key fob because it no longer worked after the recall repair.  On two occasions, mechanics have told Ms. Basseri that her vehicle is worth less because of its defects.  Ms. Basseri would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Michael and Sylvia Benton—California**

60.     Plaintiffs and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representatives Michael and Sylvia Benton are residents and citizens of Barstow, California. The Bentons purchased a used 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect for $12,789.76 from Ideal Auto Center, Inc. in Barstow, California on January 10, 2009.  The vehicle was not covered under warranty when they purchased it.  The Bentons purchased gap warranty for the Cobalt for a term of 48 months.  They chose the Chevy Cobalt because the salesman at the dealership recommended it as a very good used car, safe, reliable, and gas saver. Safety was important because they planned to eventually give it to their daughter as her first car for high school.  The Bentons never ended up letting her drive the car because of the defect.  The Bentons' vehicle shut down at least 20 times.  The car would shut off while driving at full speed on the freeway, at stop signs, and at drive-thru restaurants.  In April 2013, before they knew about the recall, the Bentons took the car to a mechanic to address this problem.  The technician suggested they replace the oxygen sensors.  When that did not work, they returned in July 2013 and the technician replaced the catalytic converter instead.  That did not remedy the problem

- 30 -

either.  The Bentons did not learn of the ignition switch defect until March 2014.  In April or May 2014, they took their Cobalt to a GM dealership in their area to have the recall work performed, and they were provided a loaner vehicle.  It took about six weeks to receive the parts and complete the repair.  Since having the recall repair performed, the Bentons still have issues related to the ignition.  For example, when starting the car, it will continuously over-start itself for about 45 seconds.  It has to be shut off and restarted a few times.  The Bentons still fear driving their vehicle due to the defect.  They would not have driven the vehicle or would have sold it if they had known about its defect.  The Bentons would not have purchased the vehicle or would have paid less for it had they known about the defect in the vehicle.

### Kimberly Brown—California

61.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Kimberly Brown is a resident and citizen of Palmdale, California.  Ms. Brown purchased a new 2006 Chevrolet HHR with the Delta Ignition Switch Defect for $30,084 from Rally Auto Group in Palmdale, California on January 7, 2007.  The vehicle was covered under a 48-month or 100,000 miles warranty.  She recalls seeing an advertisement at the dealership that the HHR was a reliable vehicle.  She was considering other vehicles, but the GM salesman sold her on the HHR by insisting it was reliable, dependable, and received good gas mileage.  Between 2007 and 2011, Ms. Brown's vehicle inadvertently shut down four or five times a year, and on several other occasions she had to use heavy force to turn the wheel.  Between 2012 and 2014, her vehicle inadvertently shut down eight or nine times a year, and on several other occasions she had to use heavy force to turn the wheel.  Her vehicle typically shut down while

- 31 -

going over bumpy roads, speed bumps, or railroad tracks.  It would shut down while the gear was

in drive and the key was in the "on" position.  To remedy the problem, she put the gear into

neutral and restarted the car.  Ms. Brown learned about the recall in the news but never received

a recall notice.  She brought her car into the Rally GM dealership for the recall repair in May

2014.  Nonetheless, Ms. Brown and her husband have experienced their ignition shutting down

at least five times since then.  In September 2014, Ms. Brown returned to the dealer to have the

ongoing shutdowns remedied, and she had to pay out of pocket for a loaner vehicle.  Ms. Brown

would not have driven the vehicle or would have sold it if she had known about its defect.  She

would not have purchased the vehicle or she would have paid less for it had she known about the

defect in the vehicle.

**Kellie Cereceres – California**

62.     Plaintiff and proposed Side Airbag Defect Class Representative Kellie Cereceres

is a resident and citizen of Elk Grove, California.  Ms. Cereceres purchased a new 2012

Chevrolet Traverse (subject to the Side Airbag recall) for approximately $43,000 from Maita

Chevrolet on June 18, 2012, in Elk Grove, California. The vehicle was covered by the

manufacturer's warranty at the time of purchase, but Ms. Cereceres did not purchase any

extended warranty. Both Ms. Cereceres and her husband were loyal GM consumers, and initially

they were very impressed with the Traverse after renting one for a weekend a few years ago.

They researched the Traverse before purchasing it and chose this vehicle, in part, because its

safety and reliability was important to them.  As the primary driver, Ms. Cereceres enjoyed the

car for the first few years of ownership but then had multiple problems that never seemed to

end.  Aside from the Side Airbag Defect, she has experienced electrical issues, strange noises

while driving, lift gate issues, and seat belt issues.  She never received a recall notice for the Side

Airbag Defect, but she had the defect repaired under recall at Maita Chevrolet in March 2014.  Maita Chevrolet also performed the recall work for the power lift gate, water pump, and front safety belt.  In 2017, she replaced the rack and pinion and power steering at Pearson Chevrolet in San Jose, California.  Ms. Cereceres would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Crystal Hardin—California

63.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Crystal Hardin is a resident and citizen of Cupertino, California.  Ms. Hardin purchased a new 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect from Chase Chevrolet in Stockton, California on May 17, 2005.  The car was covered by the standard manufacturer's warranty.  Ms. Hardin's vehicle sometimes stops running while idling, and other times she cannot remove the key from the ignition when the car is parked.  When this happens, she has to physically go into the steering column to remove the key.  Ms. Hardin has tried to sell her car in a private sale, but the sellers have all backed out after disclosure of the ignition switch defect, despite pricing the car below Kelley Blue Book value.  Ms. Hardin would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Yvonne James-Bivins—California[11]

---

[11] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

64.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Yvonne James-Bivins is a resident and citizen of Altadena, California.  Ms. James-Bivins purchased a new 2006 Cadillac CTS (subject to the Low Torque Ignition Switch recall) for $27,000 from Bewley Allen in Alhambra, California on January 9, 2006.  The car was covered by the standard manufacturer's warranty.  Ms. James-Bivins chose this vehicle, in part, because the vehicle's safety and reliability were important to her.  The salesman told her this was a superior vehicle with safety enhancements.  Ms. James-Bivins received a recall notice and had her car repaired under the recall.  Ms. James-Bivins would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Javier Malaga—California**

65.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Javier F. Malaga was a resident of Playa Del Rey, California until July 31, 2016. As of August 5, 2016, Mr. Malaga resides in Cincinnati, Ohio.  Mr. Malaga purchased a used 2006 Chevrolet Cobalt LS with the Delta Ignition Switch Defect for $15,979.08 from Carson Toyota in Carson, California on December 8, 2006.  When Mr. Malaga purchased the vehicle, it was covered by a written warranty.  Mr. Malaga chose this vehicle, in part, because the vehicle's safety and reliability were important to him.  On two occasions, Mr. Malaga was unable to turn on the engine with his ignition key.  The first time, he brought the car to the dealer formerly known as Cormier Chevrolet in Carson, California, now known as Win Chevrolet Carson, for repairs on or about February 15, 2008, which were covered under written warranty.  The second time it happened, he brought his vehicle to the dealer on March 25, 2010 but the repairs were not

covered under warranty.  It cost Mr. Malaga approximately $541 out-of-pocket for the repairs.

Mr. Malaga received a recall notice for the ignition switch defect, and had it repaired under the

recall between July and August 2014.  Mr. Malaga sold the vehicle on July 30, 2016.  Mr.

Malaga would not have driven the vehicle if he had known about its defect.  He would not have

purchased the vehicle had he known about its defect.

### Winifred Mattos—California

66.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied

Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

Representative Winifred Mattos is a resident and citizen of Honolulu, Hawaii.  Ms. Mattos

purchased a new 2007 Pontiac G5 with the Delta Ignition Switch Defect for $20,000 from

Hooman Chevrolet in Culver City, California in April 2007.  She had a three-year warranty on

her vehicle.  Ms. Mattos chose the vehicle because she liked the way it looked and the salesman

said it was "the car of the year."  She was also told by the Hooman salespeople that it was

Pontiac's new, highly-touted car and it would be a reliable vehicle that was suitable for her

needs.  When she first learned about the recall in March 2014, Ms. Mattos stopped driving her

vehicle on highways or for long distances, and then decided it was unsafe to drive any distance at

all.  After she learned of the recall, but before she was able to have her vehicle repaired, Ms.

Mattos experienced anxiety knowing what might happen if her vehicle lost power unexpectedly.

Her vehicle's ignition switch was replaced in April 2014.  Ms. Mattos was given a rental car, and

it took about two weeks before she got her G5 back, as they had to wait for the part to arrive.

She had to take approximately three hours off from work to take her car to the dealership, and

then pick it back up.  Ms. Mattos would not have driven the vehicle or would have sold it if she

had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Santiago Orosco—California

67.     Plaintiff and proposed Knee-to-Key Camaro Defect Class and Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass Representative Santiago Orosco is a resident and citizen of Earlimart, California.  Mr. Orosco purchased a new 2010 Chevrolet Camaro (subject to the Knee-to-Key Ignition Switch recall) for $29,000 from Ed Dena's Auto Center in Dinuba, California on September 24, 2010.  The car was covered by the standard manufacturer's warranty.  Safety and reliability in the vehicle were important to Mr. Orosco because he bought the car for his daughter.  He told the salesman he was looking for car for his daughter because she was going off to college and he wanted something safe and that would not leave her stranded on the road.  The salesman suggested the Camaro.  Mr. Orosco's daughter had one incident where the car shut off on her while she was driving home on a back road in 2013 or 2014.  She struggled to get off to the side of road and could barely stop the car.  Once she did stop she put it in park and restarted the car.  Mr. Orosco received the ignition switch recall notice in about November 2014.  He called the local dealership, Family Motors, and then they brought the vehicle in for the repair a few days later.  But when they arrived, the dealership said the parts were backordered.  Mr. Orosco tried to take the car back for the repair a few weeks later and the parts were still out.  Instead of waiting for the parts any longer, Mr. Orosco bought a GMC Sierra truck for his daughter to drive, and the Camaro sat in the driveway for six to seven weeks.  In late July or early August 2016, he sold the car to CarMax for about $8,000.  Mr. Orosco would not have purchased the vehicle if he had known about its defect; he would have looked for a safer vehicle.

- 36 -

### David Padilla—California

68.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass, Power Steering Defect Class, and Power Steering Defect Magnuson-Moss and Implied Warranty Subclass Representative David Padilla is a resident and citizen of Stockton, California.  Mr. Padilla purchased a new 2010 Chevrolet Cobalt (subject to the Delta Ignition Switch and Power Steering recalls) for $21,690.27 from Chase Chevrolet in Stockton, California in April 2010.  The vehicle was under warranty when he purchased it.  Mr. Padilla recalls the salesman telling him that it was a "great" and "safe" car and relied on those representations in deciding to purchase the vehicle.  Before speaking to the salesman and deciding to buy the Cobalt, he planned to purchase a Toyota.  On one occasion, Mr. Padilla was backing out of his garage when his Cobalt inexplicably shut off.  As a result, Mr. Padilla was afraid to drive his vehicle.  Those fears increased once he learned of the ignition switch recall and the risks posed by the defects.  Mr. Padilla had the ignition switch replaced under the recall repair program.  Mr. Padilla was without his vehicle for an entire month while his vehicle was being repaired.  His fear of driving the vehicle persisted and, in spring 2014, Mr. Padilla sold the vehicle for a mere $5,200.  He believes the value of his vehicle was diminished as a result of the defects.  Mr. Padilla would not have purchased the vehicle or would have paid less for the vehicle had he known about its defects.

### Esperanza Ramirez—California

69.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch Defect Bankruptcy Class Representative Esperanza Ramirez is a resident and citizen of Los

- 37 -

Angeles, California.  Ms. Ramirez purchased a new 2007 Saturn Ion with the Delta Ignition

Switch Defect for $27,215 from Saturn of Torrance in California on March 13, 2007.  Her

vehicle was covered by a warranty at the time of purchase.  As a single parent of two, the

vehicle's safety and/or reliability was very important to Ms. Ramirez.  Moreover, Ms. Ramirez

had previously and satisfactorily owned a Saturn for ten years, which prompted her to purchase

another vehicle of the same type.  Ms. Ramirez had also seen many television commercials about

the Saturn, some of which depicted families driving the car and that to her connoted safety and

trustworthiness.  When Ms. Ramirez went to purchase her car, salespeople at Saturn of Torrance

assured her that she would continue to be satisfied with her vehicle.  Ms. Ramirez experienced

several incidents consistent with the ignition switch defect including loose steering, problems

with the engine crank, and repeated instances of the engine light being unable to shut off.  In

those instances starting in or around late 2009 when Ms. Ramirez described these problems to

dealerships, she was never informed of the Delta Ignition Switch Defect.  Due to the continuing

problems, she had certain repairs done in 2009, and replaced her ignition switch in early

February 2014 at Mobile Lock and Key Services in Los Angeles, only to receive a recall notice

the following month (and a follow-up letter in August 2014 from New GM thanking her for her

patience as the company waited for more parts).  She was never reimbursed for any payments

associated with the defect.  Ms. Ramirez is still in possession of the vehicle, although she

remains uncomfortable driving the car, and does not drive the car on freeways or for long

distances.  Ms. Ramirez would not have driven the vehicle or would have sold it if she had

known about its defect.  She would not have purchased the vehicle or she would have paid less

for it had she known about its defect.

**William Rukeyser—California**

70.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative William Rukeyser is a resident and citizen of Davis, California.  Mr. Rukeyser purchased a new 2008 Chevrolet Cobalt with the Delta Ignition Switch Defect for $16,215.54 from Sanborn Chevrolet in Lodi, California on September 4, 2008.  Mr. Rukeyser's vehicle had the manufacturer's standard warranty at the time.  Mr. Rukeyser chose this vehicle, in part, because the vehicle's safety and reliability was important to him.  Before buying the car, he visited the Chevrolet website and saw television and newspaper ads touting the quality of Chevrolet cars.  Mr. Rukeyser learned about the recall through general news coverage.  Then he visited safercars.gov and submitted his VIN.  Finally, he received notice of the recall from GM in May 2014.  Mr. Rukeyser had the ignition switch replaced on August 8, 2014.  Mr. Rukeyser would not have driven the vehicle or would have sold it if he had known about its defect.  He would not have purchased the vehicle had he known about its defect.

**Michelle Thomas—California**

71.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Michelle Thomas is a resident and citizen of Vallejo, California.  Ms. Thomas purchased a used 2005 Buick Lacrosse (subject to the Low Torque Ignition Switch recall) for about $7,800 from Sun Motor Group in El Cerrito, California on December 9, 2010.  The car was not under warranty.  Ms. Thomas purchased this car because of the car's reliability, because she heard about from family members, and because of the safety and style of the car since it was bigger than other compact or economy cars.  She also saw advertisements about the safety ratings and

the reliability of the car.  The salesman said the car had no recalls and it was a great, long-lasting

car.  In May 2015, her car would not start, and the ignition wouldn't move to start.  It would also

come out of the run position while driving.  One time, she had to leave her car parked at an

unsafe location for four days and spend gas going back and forth to see whether it would start.

She took cabs and paid people to take her daughter to school.  She missed 16 hours of work at

$24.77 per hour because her vehicle wouldn't work.  She contacted Buick directly and was given

a case number because they would not cover the cost to fix the ignition, even though she

believed the defect was part of the ignition recall.  She was told by a New GM supervisor that the

only issue was her key and they had a quick fix for that by adding a rubber piece to the key.  This

repair did not resolve the issue with her car.  Ms. Thomas had to pay $500 out-of-pocket to get

her car fixed because Buick said it was not covered by any existing recall for my vehicle.  She

spent two weeks haggling with Buick over this issue, and was constantly told this was not part of

a recall and it was her responsibility.  Her vehicle's headlights also went out for five months, and

no mechanic could diagnose the problem.  Her headlights would randomly cut off and not work

during night operation, almost causing many accidents.  Then Ms. Thomas received a recall

letter in August 2015 explaining that the defect was due to a faulty relay, but New GM did not

have the part available anywhere in the United States.   Ms. Thomas called New GM and opened

a case number because the New GM "fix" required her to drive with her high beams on, in

violation of California law.  Ms. Thomas would not have purchased the vehicle or she would

have paid less for it had she known about its defect.

**Trina & John Marvin Brutche, Jr.—Colorado**

72.     Plaintiffs and proposed Low Torque Ignition Switch Defect Class Representatives

Trina and John Marvin Brutche, Jr., husband and wife, are residents and citizens of Goodland,

Kansas.  The Brutches purchased a used 2009 Chevrolet Impala LTZ (subject to the Low Torque

Ignition Switch recall) for $15,471 from Grand Valley Auto in Grand Junction, Colorado on June

14, 2014, just two weeks before its recall was announced.  A longtime Chevrolet fan, Mr.

Brutche preferred to purchase Chevrolets because, based on New GM advertising he had seen

over the years, he believed Chevrolets were of excellent quality and reliable family cars.  Herl

Chevrolet in Goodland, Kansas eventually performed the ignition switch recall repair after the

Brutches received the recall notice in the mail.  However, the dealership did not have the parts,

so the Brutches had to wait for it to perform the repair.  The Brutches feel the decrease in value

in their vehicle has prevented them from trading it in.  They owed around $11,000 on the Impala

as of summer 2015, and the dealer they talked to about trading the vehicle indicated its value

would only be around $9,000.  As of June 2016, the "service airbag" light has come on, and the

Brutches are concerned the airbag may not deploy properly.  The Brutches would not have

purchased the vehicle or they would have paid less for it had they known about its defect.

### Margaret Lesnansky—Colorado

73.     Plaintiff and proposed Side Airbag Defect Class and Side Airbag Defect

Magnuson-Moss and Implied Warranty Subclass Representative Margaret Lesnansky is a

resident and citizen of Aurora, Colorado.  Ms. Lesnansky purchased a Certified Pre-Owned 2012

GMC Acadia (subject to the Side Airbag recall) for about $36,000 from Stevenson Chevrolet in

Golden, Colorado on September 3, 2012.  The car was covered under warranty.  Safety in a

vehicle is always Ms. Lesnansky's first priority, followed by reliability.  She recalls the salesman

telling her this was a great, reliable vehicle.  She first learned about the recall on the news, but

she has not received a recall notice and therefore has not had her vehicle repaired under the

recall.  This is the only vehicle she has, and she is raising a grandson with medical problems, so

she cannot be without her car.  Ms. Lesnansky would have paid less for this vehicle had she known about its defect, or she would have purchased another brand.

**Yvonne Elaine Rodriguez—Colorado**

74.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Yvonne Elaine Rodriguez is a resident and citizen of Lakewood, Colorado.  Ms. Rodriguez purchased a new 2007 Chevrolet HHR with the Delta Ignition Switch Defect for $20,735.87 from EMICH Chevrolet in Lakewood, Colorado on December 5, 2006.  At the time of purchase, the HHR was covered by Chevrolet's standard warranty.  Ms. Rodriguez did not find out about the ignition switch defect and the safety risk it posed until she received a recall notice in March 2014.  Ms. Rodriguez stopped using her HHR for any long trips or highway driving, for fear of the safety of her family and herself.  As soon as she received the recall notice, Ms. Rodriguez attempted to have the recall repair performed on her vehicle, but was informed that the parts were not available.  Ms. Rodriguez continued to try to schedule the repair, but because of a lack of parts, she was not able to get her HHR repaired until June 2014.  Ms. Rodriguez would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Annet Tivin—Colorado**

75.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

- 42 -

Representative Annet Tivin is a resident and citizen of Margate, Florida.  Ms. Tivin purchased a new 2008 Chevrolet Cobalt with the Delta Ignition Switch Defect for $18,000 from Chevrolet of Broomfield in Broomfield, Colorado on July 28, 2008.  The vehicle was covered by the standard factory warranty.  She chose this vehicle, in part, because its safety and reliability were important to her.  Ms. Tivin would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Nathan Terry—Colorado**

76.     Plaintiff and proposed Delta Ignition Switch Defect Class and Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass Representative Nathan Terry is a resident and citizen of Loveland, Colorado.  Mr. Terry purchased a Certified Pre-Owned 2007 Pontiac G5 GT with the Delta Ignition Switch Defect for $10,589.49 from AutoNation Hyundai 104 in Westminster, Colorado on January 4, 2011.  He purchased a three-year warranty on the vehicle.  Mr. Terry decided to buy this vehicle after a thorough investigation, including reviewing online advertisements and reviews, regarding the brand and model's safety, reliability, and quality.  Mr. Terry's car inadvertently shut down on him twice while driving.  In one instance, he was in high traffic on the highway when the vehicle lost power and he had to force the car over to the shoulder of the road, a task made more difficult by the fact that his power steering also shut down.  Mr. Terry learned of the ignition switch defect in March 2014.  The day after receiving the recall notice, he rented a car for two days from Enterprise Rental.  After that, he took public transportation to and from work for the next week to avoid driving his car.  While the costs were minimal for taking the city bus, his drive to and from work was 15 minutes, compared to an hour and twenty minutes and three bus transfers when taking public

- 43 -

transportation.  When he learned the repair would take several more weeks to complete, the

wasted time and extra hassle of taking the bus eventually overrode his apprehension about

driving a dangerous vehicle and he drove his car again until the new parts arrived.  The recall

repair was completed after waiting about a month.  He missed a half day of work for this repair.

After the recall repair, Mr. Terry immediately began preparing to sell his vehicle because he did

not want to support a company that knowingly lied to him and other consumers about a safety

defect, and he suspected there could be other untold defects in the car.  Mr. Terry checked the

Kelley Blue Book and found that his vehicle, which was in excellent condition with low mileage

and fully-equipped, was valued at $7,041.  He then checked thirteen other 2007 Pontiac G5 GT

models for sale at dealerships in his vicinity, and their advertised sale prices ranged from $7,367

to $9,000.  Finally, he checked four models for sale by private owners, with sale prices ranging

from $6,800 to $7,840.  Several dozen private buyers contacted Mr. Terry about his vehicle, and

three visited him to test drive it.  All three potential buyers seemed to like the car, but were

aware of the numerous New GM recalls, including the ignition switch defect pertaining to his G5

model. Even though he listed his car at the $7,041 Kelley Blue Book price, the average offer for

the car was $4,500.  His bargaining value was noticeably impeded, as all potential buyers

repeatedly referred to the defect in their negotiations.  It was clear to Mr. Terry that potential

buyers knew about the ignition switch defect and used it to their advantage.  As he browsed

dealerships at the same time, he also found the trade-in value was grossly hurt by the defect.

Again, all dealerships mentioned the safety and defect issues, and out of six trade-in offers, the

highest was $2,634.  Because of the negative effects of the defect on his vehicle value, Mr. Terry

was eventually forced to sell the vehicle to CarMax at nearly half his vehicle's Kelley Blue Book

value on August 23, 2014.  Mr. Terry will never purchase a GM vehicle again.  He would not

have purchased the vehicle or he would have paid less for it had he known about the defect in the vehicle.

### Wandell Littles Beazer—Connecticut[12]

77.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Wandell Littles Beazer is a resident and citizen of New York, New York.  Ms. Beazer purchased a used 2004 Cadillac SRX (subject to the Low Torque Ignition Switch recall) from Blasius Chevrolet Cadillac Company in Waterbury, Connecticut for $26,000 on July 5, 2007.  Ms. Beazer purchased the vehicle because she believed it was a safe and reliable vehicle.  However, the vehicle experienced many problems, forcing Ms. Beazer to pay for extensive, expensive repairs.  Ms. Beazer had to repair numerous defects including:  replacement of the camshaft actuator, camshaft position actuator spool, and camshaft primary chain.  In 2011, Ms. Beazer began experiencing problems with the power steering pump in the vehicle.  It was determined the vehicle needed a new power steering rack and power steering pump, and these repairs would cost around $2,000.  In addition to the expensive power steering repairs, Ms. Beazer's car also needed a new right front axle, which would cost around $600.  Frustrated by multiple expensive repairs, Ms. Beazer sold the vehicle to Six Stars Auto in November 2011.  Finally, in 2014, the 2004 Cadillac SRX was recalled for an ignition switch defect.  Ms. Beazer would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Stacey Bowens—Connecticut[13]

---

[12] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

[13] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

78.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Stacey Bowens is a resident and citizen of Springfield, Massachusetts.  Ms. Bowens purchased a used 2004 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for $4,500 from a private seller in East Bridgewater, Connecticut in February 2009.  She cannot recall whether the car was under warranty at the time of purchase.  Ms. Bowens chose this vehicle because its safety, reliability, and size were perfect for her family.  Her vehicle would shut down on her in the middle of traffic and she also had problems with the power steering.  This was unsafe because she had her three children in the car.  In addition to the hassle and embarrassment of shutdowns and subsequent tows, it also caused her to miss appointments and work.  She complained to her local dealer, Balise Chevrolet in Springfield, Massachusetts, about this problem but they were unable to fix it.  The vehicle also had problems with the power steering.  As the problems persisted and the repair bills increased, she finally decided to junk the vehicle about two years ago.  She was notified of the recall within weeks of getting rid of her car.  It upset her to know that New GM, and possibly her dealership, knew of this defect and failed to inform her about it earlier.  Ms. Bowens would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Robert and Celeste Deleo—Connecticut[14]

79.     Plaintiff and proposed Power Steering Defect Class Representatives Robert and Celeste Deleo are residents and citizens of North Haven, Connecticut.  The Deleos purchased a used 2004 Chevrolet Malibu Max (subject to the Power Steering recall) for about $10,000 from

---

[14] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

Wallingford Buick in Wallingford, Connecticut on September 5, 2008.  The car was not covered by a warranty.  The Deleos chose this vehicle, in part, because the vehicle's safety and reliability were important to them.  Within the first year of owning the vehicle, the power steering started to go out.  They stopped letting their daughter drive the vehicle because if it went out it would be too hard for her to steer.  One time the power steering went out on Mr. Deleo while he was taking a sharp turn onto the freeway.  He ran into the guardrail on the driver's side.  He called GM and they said the harness is failing, so he should bring it but he would have to pay for it out-of-pocket because there was no recall at the time.  Mr. Deleo brought the vehicle to his own mechanic who fixed it.  The power steering eventually went out again about six months later and he brought back to his mechanic, but the mechanic would not fix it the second time.  Mr. Deleo estimates the power steering probably failed on him forty to fifty times.  He would have to pull over and restart the car.  One time he was driving about 60-65 miles per hour on the highway and it went out on him about ten times in just that trip.  After this, Mr. Deleo called New GM headquarters but no one called him back. Mr. Deleo believes they received one recall before the 2014 recall for the power steering.  In 2014, the Deleos got second recall notice for power steering.  But the local dealership did not get the replacement parts about four months.  Finally, the car was repaired under the recall at either Partica Chevrolet in Anden, Connecticut or Valenti Chevrolet in Wallingford, Connecticut.  The Deleos no longer drive the vehicle very often.  The Deleos would not have driven the vehicle or would have sold it if they had known about its defect.  They would not have purchased the vehicle or they would have paid less for it had they known about its defect.

**Michael Pesce—Connecticut**

- 47 -

80.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

Representative Michael Pesce is a resident and citizen of Waterbury, Connecticut.  Mr. Pesce

purchased a used 2006 Chevrolet Cobalt with the Delta Ignition Switch Defect for approximately

$12,000 from Loehman's Chevrolet in Waterbury, Connecticut on May 29, 2008.  When Mr.

Pesce bought the car, it was still covered under a three-year, 36,000-mile warranty.  Mr. Pesce

chose the Cobalt in part because of the vehicle's safety and reliability.  Mr. Pesce remembers

seeing television and print ads from Chevrolet stating that the Cobalt was one of the safest and

most reliable cars on the market.  Loehman's Chevrolet also had an ad regarding the safety and

reliability of the Cobalt.  In addition, the Pesce's had previously purchased a Cavalier and a

Malibu from Loehman's Chevrolet and they believed GM was a good, reputable brand.  In

August 2011, Mr. Pesce's 18-year-old son was driving the car on a major highway in

Connecticut when the vehicle lost all power.  His son was able to pull over and restart the car,

but after another few minutes it died again.  Mr. Pesce paid to have the vehicle looked over and

repaired, but he now believes the problem was related to the ignition switch defect.  Mr. Pesce

did not learn about the ignition switch defect until March 2014. The recall repair work was not

performed until September 2014, more than six months later.  While he waited for the repair

work, Mr. Pesce only drove the vehicle if there was an emergency because he was afraid to drive

the car.  Mr. Pesce was inconvenienced by the repair due to the service time slots being during

his workday.  He had to find a ride to the dealership and take a few hours off of work to take care

of the Cobalt recall service.  Mr. Pesce would not have driven the vehicle if he had known about

its defect.  He will not buy a GM vehicle again.  Mr. Pesce would not have purchased the vehicle

if he had known about its defect.

**Lisa Teicher—Connecticut**

81.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

Representative Lisa Teicher is a resident and citizen of Manchester, Connecticut.  Ms. Teicher

purchased a used 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect for $7,769.22

from Gengras Chevrolet in Hartford, Connecticut on January 24, 2008.  Her vehicle was covered

by a written warranty that has now expired.  Ms. Teicher chose this vehicle, in part, because the

vehicle's safety and reliability was important to her.  In June 2008, Ms. Teicher's vehicle shut

off while she was driving on an exit ramp on Route 2 in Connecticut.  She was unable to control

the vehicle and ended up hitting a barrier on the road.  She hit her head on the dash and was

injured, but hospitalization was not required.  The airbags did not deploy during this collision.  In

May 2009, Ms. Teicher's vehicle again shut off while she was driving to work on I-84 in

Connecticut, just before Exit 64.  She was able to bring the vehicle to a stop and restart the

vehicle again.  On April 10, 2014, she brought her vehicle to Carter Chevrolet in Manchester,

Connecticut to have her ignition switch replaced under the recall.  She was unable to retrieve her

vehicle until two-and-a-half months later, on June 25, 2014.  On September 29, 2015, her vehicle

malfunctioned and was totaled in a collision.  Ms. Teicher would not have driven the vehicle or

would have sold it if she had known about its defect.  She would not have purchased the vehicle

or she would have paid less for it had she known about its defect.

**Tracey Perillo—Delaware**

82.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Magnuson-Moss and Implied Warranty Subclass, and Delta Ignition Switch Defect

Bankruptcy Class Representative Tracey Perillo is a resident and citizen of Wilmington,

- 49 -

Delaware.  Ms. Perillo purchased a new 2009 Chevrolet Cobalt with the Delta Ignition Switch

Defect (and subject to the Power Steering recall) for $19,146.53 from Diver Chevrolet in

Wilmington, Delaware on August 6, 2009.  The vehicle was covered by the standard factory

warranty.  Ms. Perillo was purchasing this vehicle for her daughters to drive, so safety and

reliability were very important to her in deciding to buy the Cobalt.  She remembers seeing

advertisements regarding the vehicle's safety and reliability and also spoke with the salesman

regarding the same.  The keys to Ms. Perillo's vehicle got stuck in the ignition switch on one

occasion and she could not turn the car off.  She had to leave it running in the driveway and then

have it towed to the dealership for repair sometime in September 2009.  Ms. Perillo's daughter

got the vehicle repaired under the recall in Owings Mills, Maryland.  Ms. Perillo would not have

purchased the vehicle or she would have paid less for it had she known about its defect.

### LaTonia Tucker—Delaware

83.     Plaintiff and proposed Delta Ignition Switch Defect Class Representative LaTonia

Tucker is a resident and citizen of Charlotte, North Carolina.  Ms. Tucker purchased a used 2006

Chevrolet HHR with the Delta Ignition Switch Defect for $8,000 from MJ Stone Auto Sales in

Dover, Delaware in October 2013.  She purchased the vehicle with a six-month warranty.  Ms.

Tucker purchased the HHR because she drove long distances on the highway to and from work

and wanted a safe vehicle.  Ms. Tucker chose this vehicle, in part, because the vehicle's safety

and reliability was important to her.  Ms. Tucker experienced a stall while driving her vehicle on

a highway in March 2013; she was able to stop the car at the side of the road.  It took several

tries before she was able to restart the vehicle.  After this event, she took her car to a mechanic,

but the mechanic was unable to determine the cause of the stall.  Despite the mechanic's inability

to ascertain the cause of the stall, Ms. Tucker paid $69 for the attempted diagnosis.  After she

- 50 -

learned of the recall, Ms. Tucker was given a loaner vehicle.  Because the loaner was less fuel efficient than her HHR, Ms. Tucker was spending more in gas than she was when using her HHR.  Ultimately, the ignition switch in Ms. Tucker's HHR was replaced in or around April 2014.  Ms. Tucker felt unsafe driving her vehicle and allowing her grandchildren to ride in it, so she sold the car in February 2015.  Ms. Tucker would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Joni Ferden-Precht—Florida

84.     Plaintiff and proposed side Airbag Defect Class Representative Joni Ferden-Precht is a resident and citizen of Miami Lakes, Florida.  Ms. Ferden-Precht purchased a new 2011 Chevrolet Traverse (subject to the Side Airbag recall) for $33,262.17 from Miami Lakes Auto Mall in Miami Lakes, Florida on May 27, 2011.  The vehicle was covered by the manufacturer's standard warranty when she purchased it.  In deciding to buy this vehicle, Ms. Ferden-Precht consulted Chevrolet's advertising materials for the Traverse and also conducted many Internet searches on the vehicle model.  She also saw TV advertisements and Miami Lakes Auto Mall newspaper advertisements about the Traverse.  These advertisements and representations mentioned the safety and reliability of the Traverse, and influenced her decision to purchase the vehicle.  Ms. Ferden-Precht experienced an airbag service light illuminating intermittently in her vehicle on multiple occasions before having her vehicle repaired under an airbag recall on May 9, 2014.  She was concerned for her safety, so she stopped driving her vehicle during these times, and because she did not receive a loaner vehicle, she was forced to car pool or find alternative means of transportation.  Ms. Ferden-Precht would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Debra Forbes—Florida

- 51 -

85.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

Representative Debra Forbes is a resident and citizen of Geneva, Alabama.  Ms. Forbes

purchased a new 2007 Chevrolet Cobalt with the Delta Ignition Switch Defect for $16,000

from Preston Hood Chevrolet in Fort Walton Beach, Florida in 2007.  Her vehicle was covered

by a seven-year warranty that expired at the end of 2014.  When purchasing the vehicle, Ms.

Forbes told the salesman that she needed a safe and dependable vehicle that would last through

her retirement.  The salesman assured her that the Chevy Cobalt was safe and dependable and

would last a very long time.  Because safety and reliability were important to Ms. Forbes, and

the salesman repeatedly assured her that the vehicle was safe and dependable, she purchased a

new 2007 Chevy Cobalt and paid cash for the vehicle.  Ms. Forbes does remember seeing a

GM advertisement on television at the time she purchased the 2007 Chevy Cobalt but she does

not remember any details about the advertisement.  On an almost daily basis, Ms. Forbes

would have to play with the ignition switch to remove the key from the ignition.  Additionally,

Ms. Forbes' steering locked up on three or four occasions, in May or June 2010, fall 2010, and

spring 2011, all on normal road conditions and while she was driving approximately 25-30

miles per hour.  Each time she had to slam on her brakes and manipulate the ignition switch to

unlock the steering.  Ms. Forbes first learned about the ignition switch recall while watching

the news in early April 2014.  She later received the recall notice from GM, in approximately

mid-May 2014.  Although the ignition switch on Ms. Forbes' car was repaired on July 17,

2014, the ignition locked up on her again and she had to have it replaced for a second time

several months later.  Other repairs, such as the airbag, remain incomplete.  Ms. Forbes

reported that she believed there was a problem with the driver's side airbag but she was told

there was no recall and the repair technician did not think there was an issue with it.  Ms. Forbes made more than five trips to the dealership for the ignition switch, and other repairs to the Cobalt.  Ms. Forbes has spent both time and money traveling back and forth to the dealership for repairs.  At the time of the recall, the book value of Ms. Forbes' vehicle was only approximately $6,000.  Ms. Forbes still has the vehicle but has purchased a second vehicle because she is afraid to drive the Cobalt.  Being retired, Ms. Forbes has a limited income and purchasing a second vehicle was a financial hardship, but she felt the purchase was justified to ensure her safety when driving.  Ms. Forbes would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about the defect in the vehicle.

### Kim Genovese—Florida

86.     Plaintiff and proposed Delta Ignition Switch Defect Class and Power Steering Defect Class Representative Kim Genovese is a resident and citizen of Lake Worth, Florida. Ms. Genovese purchased a used 2005 Saturn Ion with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for $5,500 from CarMax in Boynton Beach, Florida in August 2009.  She also purchased a 90-day warranty on the vehicle.  Ms. Genovese purchased the vehicle because she believed that it was a reliable and safe vehicle with a good engine, and because it was a small, fuel-efficient vehicle.  Ms. Genovese experienced over twenty shutdown incidents with her vehicle.  On many of these occasions, her vehicle would stop in the middle of the road and sometimes in the middle of an intersection.  To restart her car she would have to turn the key from the off position back to the on position.  She also experienced times when the vehicle would not start at all.  After hearing about the Delta Ignition Switch recall in March 2014, Ms. Genovese stopped driving her vehicle and purchased another vehicle that she hopes is

safer.  On June 5, 2014, Ms. Genovese's vehicle was repaired under the recall.  Ms. Genovese is

a school teacher, and she was late to work on various occasions because of the ignition problems

with the car.  Ms. Genovese would not have purchased the vehicle or she would have paid less

for it had she known about its defect.

### Rhonda Haskins—Florida

87.     Plaintiff and proposed Delta Ignition Switch Defect Class Representative Rhonda

Haskins is a resident and citizen of Ocala, Florida.  Ms. Haskins purchased a used 2007

Chevrolet Cobalt with the Delta Ignition Switch Defect for $8,473 from Plaza Lincoln's pop-up

shop in a Walmart parking lot in Ocala, Florida on November 15, 2013.  The vehicle was under a

30-day or 1,000-mile warranty when she purchased it.  Ms. Haskins chose the Cobalt in part

because it looked like a good car and the car salesman was helpful in describing the Cobalt's

safety and reliability to Ms. Haskins.  Approximately two or three times, Ms. Haskins' vehicle

shut off while she was sitting idle in her Cobalt and her knee touched the ignition switch or key

area.  Ms. Haskins did not learn about the ignition switch defect until March 2014.  She had her

vehicle repaired under the recall on June 3, 2014.  It took the dealership almost three months to

repair her car, and she drove a loaner vehicle for about a month.  Ms. Haskins is still concerned

about her ongoing safety in driving the vehicle because of the defect, but she cannot afford to

buy another vehicle.  Ms. Haskins would not have purchased the vehicle or she would have paid

less for it had she known about the defect in the vehicle.

### Maria E. Santiago—Florida

88.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Delta Ignition Switch Defect Bankruptcy Class, and Power

Steering Defect Class Representative Maria Santiago is a resident and citizen of Cutler Bay,

- 54 -

Florida.  Ms. Santiago purchased a new 2007 Saturn Ion coupe with the Delta Ignition Switch

Defect (and subject to the Power Steering recall) for about $20,000 at a Saturn dealership at

Dadeland South in Miami, Florida in late 2006.  Ms. Santiago also purchased an extended

warranty for the vehicle.  Sometime in 2009, as Ms. Santiago was leaving a friend's house and

driving onto an expressway ramp, her Ion suddenly turned off.  Because she had just entered the

expressway ramp and was driving only 25 miles per hour, she was able to pull her vehicle over

to the side of the ramp.  She noticed the ignition key was in the off position.  Ms. Santiago was

able to restart the car and continue driving.  Ms. Santiago would not have driven the vehicle or

would have sold it if she had known about its defect.  She would not have purchased the vehicle

or she would have paid less for it had she known about its defect.

### Harvey Sobelman—Florida

89.     Plaintiff and proposed Knee-to-Key Camaro Defect Class Representative Harvey

Sobelman is a resident and citizen of Lake Worth, Florida.  Mr. Sobelman purchased a new 2014

Chevrolet Camaro (subject to the Knee-to-Key Ignition Switch recall) for $36,200 from

Schumacher Chevrolet in Lake Park, Florida on October 28, 2013.  The vehicle was covered by

the standard factory warranty.  Mr. Sobelman purchased this vehicle, in part, because of

nostalgia and in part because he had researched the car's resale performance and it historically

retained 53% of its purchase price.   He received a recall notice toward the end of 2015 and again

in 2016 for the ignition switch defect.  He did not have it repaired under the recall because the

dealer told him he would lose the key fob and have conventional key instead.  On April 2, 2016,

Mr. Sobelman traded in his car to Jaguar in Palm Beach.  Mr. Sobelman's car lost significant

value over the twenty-nine months he owned the car.  The value did not pay out because of the

defects.  Mr. Sobelman would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Verlena Walker—Florida[15]

90.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Verlena Walker is a resident and citizen of Detroit, Michigan.  Ms. Walker purchased a new 2006 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for $30,000 from Coggin Honda of Orlando, Florida on October 31, 2006.  The vehicle was covered by the standard factory warranty.  Ms. Walker chose this vehicle, in part, because the vehicle's safety and reliability was important to her.  She recalls the salesperson saying this car was highly-favored, very reliable, and safe.  Ms. Walker's vehicle has shut off on her while she was driving.  She never received a recall notice for the ignition switch problem, so it has not been repaired under the recall.  She has also had problems with her vehicle's internal computer draining her battery until the technician discovered the actual computer was malfunctioning.  Because of this issue, she has missed work and lost wages.  It has also disturbed any peace of mind with regard to her car.  The James Martin Chevrolet dealership told Ms. Walker the defect would decrease the value of her vehicle.  Ms. Walker would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Neysa Williams—Florida

91.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

---

[15] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

Representative Neysa Williams is a resident and citizen of Miami, Florida.  Ms. Williams

purchased a used 2007 Chevrolet Cobalt with the Delta Ignition Switch Defect for about $9,500

from a private seller in Florida on July 26, 2008.  The car was not covered by warranty when she

purchased it.  Safety and reliability were in part important to her when purchasing this vehicle.

Ms. Williams has experienced problems with her vehicle's power steering.  She doesn't feel safe

driving the car—it feels like a "death trap."  Sometime in 2014, she received the ignition switch

recall and took it to her local Chevrolet dealership for the repair work.  The dealership also gave

her a new key. The repair work took about 3 hours to complete.  Ms. Williams would not have

driven the vehicle or would have sold it if she had known about its defect.  She would not have

purchased the vehicle or she would have paid less for it had she known about its defect.

### L. Rochelle Bankhead—Georgia

92.     Plaintiff and proposed Side Airbag Defect Class Representative L. Rochelle

Bankhead is a resident and citizen of Decatur, Georgia.  Ms. Bankhead purchased a used 2008

Buick Enclave (subject to the Side Airbag recall) for $28,414.68 from CarMax in Norcross,

Georgia on February 24, 2012.  She purchased an extended warranty, for an additional 36,000

miles/3 years, as the factory warranted had expired.  She chose this vehicle, in part, because its

safety and reliability were important to her.  She also recalls the salesman pointing out its

multiple airbags during the test drive, even in the rear for passengers in the second and third row

seating, which was important as she had her toddler son sitting in the middle seating.  Ms.

Bankhead learned about the airbag defect while researching recall notices on her car due to water

damage to the vehicle's electrical system from a leaky sunroof and moonroof.  However, she was

never informed by New GM of any recall notice for the airbags.  New GM actually claimed there

were no open recalls at the time she contacted them in July 2014.  In August 2015, she received

an active safety recall notice for the gas struts in the liftgate.  She has not heard anything since

that time in regards to the airbag recall.  Ms. Bankhead would not have purchased the vehicle or

she would have paid less for it had she known about its defect.

**Carla Cartwright—Georgia**

93.    Plaintiff and proposed Low Torque Ignition Switch Defect Class and Power

Steering Defect Class Representative Carla Cartwright is a resident and citizen of Jasper,

Georgia.  Ms. Cartwright purchased a used 2004 Chevrolet Malibu LT (subject to the Low

Torque Ignition Switch and Power Steering recalls) for $6,000 from Bill Holt Chevrolet in

Canton, Georgia in 2011.  The vehicle was not covered by a warranty.  Ms. Cartwright chose this

vehicle because she grew up being told and believing that Chevrolets were trustworthy cars.  She

has experienced problems with the power steering in her car.  Ms. Cartwright only found out

about the defects when she received the recall notices starting in about May 2014.  She believes

she received notices for three different recalls.  She took her car in for repair under the recall, but

her car still loses power steering on occasion.  Although New GM provided her with a rental

vehicle while her car was waiting for parts and repair, it turned into an inconvenient debacle

when the first rental car was sold while she was using it and she had to unexpectedly and quickly

return it.  She was caring for sick grandchildren at the time and could not return it that same day

so the rental car threatened to have her arrested.  She was very upset and called the dealership

and they sent someone to come pick up the vehicle and swap it out for a new rental.  The second

rental vehicle had a recall on it and had to be returned to Canton, Georgia by Ms. Cartwright,

which was inconvenient and time-consuming and cost her fuel and money.  By then, she was fed

up with the rental car situation and insisted they provide her one from the local Jasper dealership,

to which they finally agreed.  Even though she no longer feels safe driving the car, she does not

have the money to buy a new one.  Ms. Cartwright would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Dale Dowdy—Georgia

94.     Plaintiff and proposed Power Steering Defect Class Representative Dale Dowdy is a resident and citizen of Bowdon, Georgia.  Mr. Dowdy purchased a used 2009 Saturn Aura (subject to the Power Steering recall) for about $15,000 from Drivetime in Union City, Georgia in July 2012.  The car was covered under the standard manufacturer's warranty.  The car's safety rating and the overall reliability rating was a quick selling point for him.  Mr. Dowdy heard that the Auras were great cars and very reliable and he was attracted to the OnStar feature.  He also went online and watched advertisement videos showing the car as reliable and riding smoothly on the road.  The power steering on Mr. Dowdy's car has failed on at least seven separate occasions.  In all instances he would have to pull the vehicle to safety and start the car again. About four times, his vehicle also completely shut off while driving down the road and he would have to let it drift to a stop because he couldn't steer or brake.  Mr. Dowdy was scared to drive the car.  Mr. Dowdy never received the power steering recall.  He found out about it in August 2016 after doing some online research.  After dealing with vehicle issues and being told that it would cost him thousands of dollars in repairs, Mr. Dowdy let Drivetime repossess his vehicle November 2015.  He wasn't comfortable selling it to anyone for fear that something would happen to them.  Mr. Dowdy would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Jennifer Dunn—Georgia

95.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

- 59 -

Representative Jennifer Dunn is a resident and citizen of Clermont, Georgia.  Ms. Dunn purchased a new 2006 Chevrolet Cobalt with the Delta Ignition Switch Defect for $18,499.52 from Hardy's Chevrolet in Gainesville, Georgia in 2006.  Her vehicle was covered under the manufacturer's warranty when she purchased it.  Ms. Dunn specifically asked the dealership salesman for the most dependable, safest, and most affordable car on the lot.  He introduced her to the Cobalt and told her it had the highest safety rating.  After buying the car, Ms. Dunn would not be able to get the key out of the ignition at times.  Ms. Dunn did not learn about the ignition switch defect until March 2014.  She was very afraid about the defect and her safety because she drives a long distance to work on a daily basis.  She had the recall repair work completed in May 2014.  It took about three months to receive the parts and complete the repair.  Ms. Dunn would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about the defect in the vehicle.

### Towana Ferguson—Georgia

96.      Plaintiff and proposed Side Airbag Defect Class Representative Towana Ferguson is a resident and citizen of Grayson, Georgia.  Ms. Ferguson purchased a used 2008 Buick Enclave (subject to the Side Airbag recall) for $14,000 from Quick Cars Auto in Conyers, Georgia on May 7, 2013.  She purchased an extended warranty for the car.  She chose this vehicle, in part, because its safety and reliability was important to her.  Since owning the vehicle, Ms. Ferguson has received about three recalls, including the airbag wiring harness recall, and she had her vehicle fixed under these recalls in May 2013, April 2014, and August 2014.  A few times while driving on back roads in Georgia, the Enclave has shut off and the gears would not shift and make a clicking noise.  She would stop wherever she was, even in traffic, and she

would have to restart the car.  She would drive it straight home out of fear of driving the vehicle.

The engine light would go on and off intermittently.  She would not have purchased the Enclave

knowing what she knows now.  The possibility of being stranded with her daughters because of

the car scares her.  She must drive her car though because she relies on it for doctor

appointments, volunteering, and taking her children to school, and there is no public

transportation where she lives.

**Jenny Mathis—Georgia**

97.      Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative

Jenny Mathis is a resident and citizen of Thomaston, Georgia.  Ms. Mathis purchased a used

2000 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for $5,000 from a

private seller in Georgia on August 3, 2010.  There was no warranty on the car when she

purchased it.  Ms. Mathis purchased the Impala, in part, because safety and reliability were

important to her.  She is a single mother and her son is the most important thing to her.  Ms.

Mathis's vehicle has shut down on her numerous times while driving.  She also has problems

with getting the key to turn in the ignition.  On September 2014, she received the recall for the

ignition switch.  In March 2015, she had her Impala repaired under the recall at Moore Buick

Chevrolet in Barnesville, GA.  She was inconvenienced because she needed assistance getting

her vehicle to the dealership for the repair work.  An acquaintance drove her car to the dealership

and waited for the work to be done.  Ms. Mathis was unable to drive due to a recent surgery.  On

September 7, 2016, Ms. Mathis sold her Impala to a private seller for $50—well below fair

market value.  However, Ms. Mathis was scared to drive the car and didn't feel safe driving with

her son.  Ms. Mathis would not have purchased the vehicle had she known about its defect.

**Billy Mosley—Georgia**

- 61 -

98.     Plaintiff and proposed Knee-to-Key Camaro Defect Class Representative Billy Mosley is a resident and citizen of Cartersville, Georgia.  Mr. Mosley purchased a new 2013 Chevrolet Camaro (subject to the Knee-to-Key Ignition Switch recall) for $31,000 from Days Chevrolet in Actworth, Georgia on August 16, 2012.  The car was covered under the standard manufacturer's warranty, and he also bought an extended warranty.  Mr. Mosley chose the Camaro in part because he knew it to be a safe and reliable vehicle.  Mr. Mosely recalls seeing magazine advertisements regarding JD Power ratings and the Camaro being safe and reliable.  Mr. Mosley previously owned two other Camaros and trusted the brand.  In addition, the Chevrolet salesman told him the Camaro got good gas mileage and they had no complaints from other customers and it was one of the top selling vehicles.  After a few scary ignition incidents in the car, Mr. Mosley received a recall notice in 2014 and had the key switched out with a cheap key under the recall at Days Chevrolet.  He had to keep calling the dealership and waited months for the appointment to get the fix.  It took the dealership about a day for them to repair the car. He was scared to drive it and cut back on driving it after the recall repair.  He tried trading it at a local Nissan dealership but they were not interested because of the recall.  Mr. Mosley would not have purchased the vehicle or he would have paid less for it had he known about its defect.

**Clifford Turner—Georgia**

99.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch Defect Bankruptcy Class Representative Clifford Turner is a resident and citizen of Decatur, Georgia.  Mr. Turner purchased a used 2004 Saturn Ion with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for $15,000 from Saturn of Marietta in Marietta, Georgia in September 2005.  Mr. Turner purchased a three-year warranty on his vehicle.  Mr.

Turner chose the vehicle because the vehicle's safety and reliability was important to him.

Before purchasing his Ion, Mr. Turner recalls reading an article touting the safety and reliability

of the Saturn Ion.  In particular, the article praised the car as one of the safest to drive.  Mr.

Turner's vehicle periodically shut off while driving, usually when on the interstate.  His key

would also occasionally fall out of the ignition while driving.  Mr. Turner stopped driving his

vehicle as soon as he learned about the safety recall in April 2014.  That same month he brought

his vehicle to the dealership to have his ignition switch replaced, but the repair did not occur

until late June or early July 2014.  During that time, Mr. Turner incurred considerable fuel costs

because the loaner vehicle provided consumed more fuel than his Saturn.  He also missed a few

hours of work due to picking up the loaner car.  In August 2014, Mr. Turner traded in his Saturn

Ion.  He believes he received less in trade-in value as a result of the New GM recalls, but he

wanted to get rid of the Saturn.  When he traded in his vehicle, the dealership informed him that

it would have to sell the Saturn at wholesale because of the safety recalls.  Mr. Turner would not

have driven the vehicle or would have sold it if he had known about its defect.  He would not

have purchased the vehicle or he would have paid less for it had he known about its defect.

### Barry Wilborn—Georgia

100.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Barry

Wilborn is a resident and citizen of Milner, Georgia.  Mr. Wilborn purchased a used 2007

Chevrolet Cobalt with the Delta Ignition Switch Defect for $4,000 in a private sale in Canton,

Georgia in January 2013.  The car was not under warranty at the time of purchase.  Mr. Wilborn

purchased the vehicle because he believed New GM's representations that the vehicle was safe

and reliable, and also based on its mileage rating.  Within months of purchasing the vehicle, Mr.

Wilborn experienced multiple shutdowns while driving.  In one particular shutdown, Mr.

Wilborn was driving 60 miles per hour on the highway. He veered to the right to avoid hitting another vehicle, went down an embankment, and had his vehicle towed home. Following this shutdown, he substantially reduced his use of the vehicle because he thought it was unsafe. Mr. Wilborn stopped driving the vehicle entirely in January 2014 after experiencing several issues with the car. He learned of the recall in February 2014, and he did not drive the vehicle again until the ignition switch could be replaced. The vehicle was repaired under the recall after sitting at the dealership for over a month. Mr. Wilborn would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Dennis Walther—Hawaii

101.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch Defect Bankruptcy Class Representative Dennis Walther is a resident and citizen of Sarasota, Florida. Mr. Walther purchased a new 2006 Saturn Ion with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for approximately $16,400 from Saturn of Honolulu in Hawaii in 2006. His car had a three-year warranty when he purchased it. At the time he purchased the Saturn Ion, safety and reliability were the major considerations when deciding to purchase the vehicle. Mr. Walther purchased the Saturn Ion because he trusted the reputation of the manufacturer related to safety and reliability of its vehicles. The vehicle's ignition switch was replaced under the recall in approximately August or September 2014. Mr. Walther missed eight hours of time from work related to getting the ignition switch defect repaired. Mr. Walther would not have driven the vehicle or would have sold it if he had known about its defect. He

- 64 -

would not have purchased the vehicle or he would have paid less for it had he known about its defect.

**Patricia Backus—Idaho**

102.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Patricia Backus is a resident and citizen of Bigfork, Montana.  Ms. Backus purchased a used 2006 Chevrolet HHR with the Delta Ignition Switch Defect for $10,900 from Dave Smith Motors in Kellogg, Idaho in 2012.  Ms. Backus purchased the HHR because she believed it was reliable and safe.  She also purchased an extended warranty but cancelled it after she began experiencing vehicle shutdowns and was told that the shutdowns were not covered.  Ms. Backus purchased the HHR because she believed it was reliable and safe.  Within six months of purchasing the vehicle, Ms. Backus experienced a stall while approaching a traffic light.  She experienced three additional shutdowns while driving.  During these incidents, she had no control of the steering, and, on at least one of the occasions, her steering locked.  It took Ms. Backus several attempts to turn her vehicle back on.  Ms. Backus had her ignition switch replaced in August 2014.  Since the replacement, the radio in her vehicle turns off.  Ms. Backus would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Susan Benner—Illinois**

103.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Susan Benner is a resident and citizen of Wheaton, Illinois.  Ms. Benner purchased a Certified Pre-Owned 2007 Pontiac G5 with the Delta Ignition Switch Defect for $12,500 from Bill Kay GMC in Downers Grove, Illinois on August 22, 2011.  As a Certified Pre-Owned feature, the car came with a 100,000 mile powertrain warranty.  Ms. Benner chose this vehicle, in part, because its reliability and safety were important to her.  She liked the reliability of the Certified Pre-Owned

- 65 -

distinction and the car's fuel economy as well.  The car's ignition was difficult to turn on and after the recall repair the steering wheel began vibrating.  The dealership never fixed her car's steering wheel because the dealership said it was no longer under warranty so she took it to a local mechanic.  She received a recall notice for the ignition switch recall and she had to keep calling the dealership (Bill Kay GMC), which said the parts were backordered.  Finally, on August 6, 2014, her car was repaired under the recall.  However, when they replaced the ignition switch, they only gave her two keys and kept her old key, which could have still been used in the doors and trunk of the car.  She went to the hardware store to purchase a spare key and it cost over $100 so she did not buy the spare.  Ms. Benner would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or would have paid less for it had she known about the defect in the vehicle.

### Debra Cole—Illinois

104.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Debra Cole is a resident and citizen of Belleville, Illinois.  Ms. Cole purchased a used 2004 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for $10,000 from J.D. Byrider in Belleville, Illinois in August 2009.  The car had a limited 30-day warranty.  Ms. Cole chose this vehicle, in part, because the vehicle's safety and reliability was important to her.  She also chose the vehicle because she liked its appearance.  Ms. Cole's vehicle would sometimes not start despite turning the ignition key.  This made her late for work numerous times, and she would have to arrange a ride to and from work.  She also had to borrow her mother's car at times.  Ms. Cole often took her car into J.D. Byrider for the ignition and other problems, which required a diagnostic fee each time despite the negative results.  She received a recall notice for the ignition switch in 2014.  The car was repaired under the recall at Jack Schmitt Chevrolet in

- 66 -

O'Fallon, Illinois in 2014. Ms. Cole sold the vehicle in April 2014 because she was tired of

dealing with the ignition problem, as well as electrical, fuel pump, catalytic converter, and

speedometer problems. Ms. Cole would not have purchased the vehicle or she would have paid

less for it had she known about its defect.

**Charlene Kapraun—Illinois**

105.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative

Charlene Kapraun is a resident and citizen of Chico, California. Ms. Kapraun purchased a used

2008 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for $8,600 from a

private seller in Illinois on May 27, 2011. Ms. Kapraun chose her vehicle, in part, because its

safety and reliability were important to her. She received a recall notice for the ignition switch

defect and had her vehicle repaired under the recall on July 6, 2015. It was inconvenient for her

to find the time to schedule and bring her car in for this repair. Ms. Kapraun would not have

purchased the vehicle or she would have paid less for it had she known about its defect.

**Keith Nathan—Illinois[16]**

106.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative

Keith Nathan is a resident and citizen of Vernon Hills, Illinois. Mr. Nathan purchased a new

2002 Chevrolet Malibu (subject to the Low Torque Ignition Switch recall) for $23,000 from

Raymond Chevrolet in Antioch, Illinois on November 14, 2001. The vehicle was covered by a

standard manufacturer's warranty, and he also purchased an extended warranty. Mr. Nathan

chose the vehicle, in part, because of the vehicle's safety and reliability. Those things were

important to him when he made his decision. Mr. Nathan has purchased Chevrolets his whole

---

[16] The Court has dismissed this plaintiff's claims. They are included solely for the purpose
of preserving their claims on appeal.

life, and he trusted the brand.  The ratings for his car were excellent compared to other brands and ranked higher in safety, fuel economy, and reliability.  Just after Mr. Nathan's warranty expired in 2007, his car went dead in the road while he was at a stop light.  Mr. Nathan had it towed to Raymond Chevrolet, which said it was not the ignition switch but a pass lock sensor problem that was a part of the steering column.  This cost him about $900 plus labor costs out-of-pocket to fix.  Mr. Nathan then learned from another dealer that the pass lock sensor is actually a part of the ignition switch.  So he called New GM's corporate office and fought with them for reimbursement.  They will not agree to do so.  Mr. Nathan received the recall notice for the ignition switch defect sometime in August 2014, but he has yet to get it repaired under the recall because he no longer trusts New GM.  Mr. Nathan contacted his local congressman's office because he was very upset about New GM's conduct and refusal to reimburse him.  Mr. Nathan checked Kelley Blue Book and Vehix in late spring 2014 and his car's value had dropped by $1500 after announcement of the ignition switch recall.  Mr. Nathan would not have driven the vehicle or would have sold it if he had known about its defect.  He would not have purchased the vehicle had he known about its defect.

**Patrick Painter—Illinois**

107.    Plaintiff and proposed Delta Ignition Switch Defect Class and Power Steering Defect Class Representative Patrick Painter is a resident and citizen of Monee, Illinois. Mr. Painter purchased a new 2010 Chevrolet Cobalt SS (subject to the Delta Ignition Switch and Power Steering recalls) for about $21,000 from Bill Jacobs Chevrolet in Joliet, Illinois in April 2010.  His car was under warranty at the time he purchased it.  Mr. Painter chose this vehicle, in part, because the vehicle's safety and reliability was important to him.  He does not recall any specific GM advertisements, but he generally understood GM vehicles were safe and reliable and

would not otherwise have purchased the vehicle without that reputation.  Mr. Painter's power steering failed in April 2011 and it was repaired under warranty.  In October 2011, the ignition cylinder was replaced because the vehicle would not turn off and the key could not be removed from the ignition.  Mr. Painter learned about the recalls in the news in 2014 when it became public.  He believes the value of his vehicle has diminished because of the defects.  Mr. Painter would not have purchased the vehicle or he would have paid less for it had he known about its defects.

### Cliff Redmon—Illinois

108.    Plaintiff and proposed Knee-to-Key Camaro Defect Class Representative Cliff Redmon is a resident and citizen of Saint Joseph, Illinois.  Mr. Redmon purchased a new 2010 Chevrolet Camaro (subject to the Knee-to-Key Ignition Switch recall) for about $24,000 (after a down payment and trade in) from Vermilion Chevrolet in Tilton, Illinois in spring 2010.  The vehicle was covered by the standard factory warranty, and he also purchased an extended warranty.  Mr. Redmon chose this vehicle, in part, because its safety and reliability were important to him.  He read about this vehicle's features in Car & Driver and a few other magazines and in the dealership showroom.  He also recalls the salesman telling him the Camaro was safer than the Ford Mustang.  Twice, Mr. Redmon's vehicle shut down while he was backing out of his driveway.  He did not receive a recall notice.  Instead, he went in for an oil change and the dealership said they needed to repair the ignition.  After this, the car's remote fob stopped working properly.  When he traded his vehicle in January 2015, Mr. Redmon got a very low value because of the recall despite his car being kept in good condition.  Mr. Redmon would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Lane Blackwell, Jr.—Indiana

109.     Plaintiff and proposed Power Steering Defect Class Representative Lane Blackwell is a resident and citizen of Amboy, Indiana.  Mr. Blackwell purchased a used 2009 Saturn Aura (subject to the Power Steering recall) for $8,500 from LB Auto Sales in Amboy, Indiana on June 14, 2012.  The car was not covered by a warranty.  Mr. Blackwell and his family previously owned a Malibu and were happy with its reliability, safety features, and comfort, so they trusted their experience in choosing the Aura.  Mr. Blackwell has not received a power steering recall notice.  He still owns the car, but would like to sell it because of reliability and safety concerns with the car.  Mr. Blackwell would not have purchased the vehicle or he would have paid less for it had he known about its defect.

**Martha Cesco—Indiana**

110.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Martha Cesco is a resident and citizen of Syracuse, Indiana.  Ms. Cesco purchased a used 2005 Buick Lacrosse (subject to the Low Torque Ignition Switch recall) for about $14,000 from her aunt's estate in Anderson, Indiana sometime around February 2011.  The car was not covered under any warranty at the time she purchased it.  Ms. Cesco purchased the vehicle, in part, because she believed it to be safe and reliable and these things were important to her.  She received the ignition switch recall she believes sometime around summer 2014.  On December 31, 2014, when she was due for an oil change, she had the car repaired under the ignition switch recall and remembers the dealership telling her to not have anything heavy on her keyring.  Ms. Cesco had to travel over 20 miles to Nappanee, Indiana to have the recall repair work done at McCormick Chevrolet.  Ms. Cesco would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle had she known about the defect in the vehicle.

**Heather Holleman—Indiana**

111.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Heather Holleman is a resident and citizen of South Bend, Indiana.  Ms. Holleman purchased a new 2007 Pontiac G5 with the Delta Ignition Switch Defect for $17,500 from Don Meadows, a GM dealer in South Bend, Indiana, in May 2007.  Ms. Holleman's Pontiac G5 came with a factory 3-year/36,000 mile bumper-to-bumper warranty and 5-year/100,000 mile powertrain warranty.  Ms. Holleman chose the Pontiac G5 in part because of its safety features, such as side airbags, and its reliability.  Ms. Holleman does not recall at this time seeing any GM ads about her vehicle.  However, she recalls the salesperson stressing the safety features of the vehicle prior to her purchase because Ms. Holleman was concerned about the size of the vehicle.  Ms. Holleman experienced at least one issue with the ignition of her Pontiac G5.  She had an issue fully powering on her vehicle.  When she was finally able to do so, she was unable to turn it off.  When she contacted a GM dealership to seek assistance, she was told that if she turned her steering wheel a particular way and jiggled her key, she would be able to power off her vehicle.  Ms. Holleman first learned of the Delta Ignition Switch Defect from her father, but she not receive a recall notice until approximately three weeks later.  Due to a shortage of parts, Ms. Holleman had to wait a few months for GM to repair her vehicle.  She was forced to miss one day of work in order to get her vehicle repaired under the recall.  Ms. Holleman sold her vehicle in or around November 2014.  Ms. Holleman would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have

purchased the vehicle or she would have paid less for it had she known about the defect in the vehicle.

### Valerie Mortz Rogers—Indiana

112.    Plaintiff and proposed Knee-to-Key Camaro Defect Class and Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass Representative Valerie Mortz Rogers is a resident and citizen of Kokomo, Indiana.  Ms. Rogers purchased a new 2013 Chevrolet Camaro (subject to the Knee-to-Key Ignition Switch recall) for about $34,998.11 from the Jaggers dealership in Lebanon, Indiana on January 29, 2013.  The vehicle was covered by a standard factory warranty.  She chose the Camaro because she had previously owned a Camaro and she believed the Chevrolet brand to be safe and reliable.  She trusted the Chevrolet brand. On about four or five occasions, Ms. Rogers would be driving and the dash lights would flash and the vehicle would stall.  She would have to pull off the road restart the car.  She was scared of driving the car.  Ms. Rogers remembers receiving the ignition switch recall and also seeing a television notice about it.  In June of 2015, she traded in the Camaro for a newer car.  Ms. Rogers would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Cheryl Reed—Indiana[17]

113.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Cheryl Reed is a resident and citizen of South Bend, Indiana.  Ms. Reed purchased a used 2004 Pontiac Grand Am (subject to the Low Torque Ignition Switch recall) for $16,000 from the Gates dealership in South Bend, Indiana on May 23, 2005.  The car was covered by a warranty at the

---

[17] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

time of purchase.  Ms. Reed chose this vehicle, in part, because its safety and reliability were

important to her.  She received a recall notice for the ignition switch defect and had her vehicle

repaired under the recall in 2015.  Ms. Reed would not have driven the vehicle or would have

sold it if she had known about its defect.  She would not have purchased the vehicle or she would

have paid less for it had she known about the defect in the vehicle.

### Karen Rodman—Indiana

114.     Plaintiff and proposed Delta Ignition Switch Defect Class and Power Steering

Defect Class Representative Karen Rodman is a resident and citizen of Kendallville, Indiana.

Ms. Rodman purchased a used 2004 Saturn Ion with the Delta Ignition Switch Defect (and

subject to the Power Steering recall) for $6,000 from Tom Kelley Buick GMC in Fort Wayne,

Indiana in June 2013.  The vehicle did not have a warranty.  Ms. Rodman purchased the vehicle

because she thought it was safe and reliable.  After purchasing the vehicle, Ms. Rodman

experienced many stalling incidents.  On one occasion, she was going to the doctor and stopped

at a red light.  The car shut down and would not restart, and she had to have the vehicle towed.

Ms. Rodman had the ignition switch replaced pursuant to the recall in or around June 2014.

Because she was afraid to drive her vehicle, Ms. Rodman had to rent a car at her own expense to

drive to Indianapolis to see her doctor.  After this time, she was able to obtain a rental until her

car was repaired.  The car continued to stall after the replacement as it did before the repair.  She

no longer owns the vehicle.  Ms. Rodman would not have purchased the vehicle or she would

have paid less for it had she known about its defect.

### Heidi Wood—Indiana

115.     Plaintiff and proposed Side Airbag Defect Class Representative Heidi Wood is a

resident and citizen of Beech Grove, Indiana.  Ms. Wood purchased a used 2009 Chevrolet

Traverse (subject to the Side Airbag recall) for about $24,000 from the Ray Skillman dealership in Indianapolis, Indiana on December 31, 2013.  The car was still covered under warranty at the time she purchased it.  Ms. Wood purchased the vehicle because it felt safe and safety was important to her as a single mom with four children.  She did extensive research and remembers seeing various notices about the safety and reliability of the car.  In addition, she recalls the GM salesman stating that the vehicle had a high safety rating.  Sometimes the key sticks in the ignition of Ms. Wood's vehicle and the engine will not turn over.  In early 2014, Ms. Wood received the airbag recall notice on her car right after she purchased it.  She had the recall repair work completed shortly after receiving the recall.  She does not feel safe in the car since finding out about the recall and would like to sell it but cannot afford to get another vehicle.  She was told that because of the recall that there was no way she could sell the Traverse at fair value.  Ms. Wood would not have purchased the vehicle had she known about its defect.

**Alphonso Wright—Indiana**

116.    Plaintiff and proposed Delta Ignition Switch Defect Class and Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass Representative Alphonso Wright is a resident and citizen of Fishers, Indiana.  Mr. Wright purchased a used 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect for $9,727.99 from Penske Chevrolet in Indianapolis, Indiana on August 16, 2012.  His vehicle was not covered by a written warranty at the time of purchase.  Mr. Wright chose this vehicle, in part, because the vehicle's safety and reliability was important to him.  On two separate occasions, in January 2013 and April 2014, Mr. Wright's vehicle shut down while he was driving over train tracks.  The steering locked on both occasions as well.  Mr. Wright was truly frightened by his two inadvertent shutdown experiences.  After Mr. Wright had to wait approximately one month for the parts to arrive, his vehicle was repaired

- 74 -

under the recall on June 5, 2014.  Mr. Wright would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### James Dooley—Iowa

117.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative James Dooley is a resident and citizen of Waterloo, Iowa.  Mr. Dooley purchased a new 2006 Pontiac Solstice with the Delta Ignition Switch Defect for $28,000 from Dan Deery Chevrolet in Cedar Falls, Iowa, in June 2006.  Mr. Dooley purchased an extended seven-year warranty on the vehicle.  He chose the car because he always believed that GM made reliable, safe cars.  Mr. Dooley stopped driving his vehicle in March 2014 when he learned about the safety recall because he was afraid for his safety.  Mr. Dooley was unaware that New GM was offering loaner vehicles to individuals afraid to drive their defective vehicles, and he did not drive his Solstice again until August 2014 when the ignition switch was replaced. Typically, he only drove the car in the summer, but was unable to because of the defect and delayed repair.  The car had sentimental value; he purchased the car with money he saved when he stopped smoking.  He was depressed when he could not drive it because it was his first new car and represented the milestone in his life.  Mr. Dooley would not have driven the vehicle or would have sold it if he had known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Lyle Wirtles—Iowa[18]

---

[18] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

118.     Plaintiffs and proposed Low Torque Ignition Switch Defect Class Representative Lyle Wirtles is a resident and citizen of Thompson, Iowa.  Mr. Wirtles purchased a used 2009 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for about $18,000 from a Chevrolet dealership in Buffalo Center, Iowa around March 2009.  The car was covered under the standard manufacturer's warranty at the time he purchased it.  Mr. Wirtles purchased the vehicle, in part, because reliability and safety were important to him.  He had a lot of trust in the Chevrolet brand—he had previously owned Chevrolet products.  The Impala was repaired under the ignition switch recall at the Ollenburg Motors in Garner, Iowa.  He had to miss some time from work to get the repair work done.  Mr. Wirtles would not have driven the vehicle or would have sold it if he had known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about its defect.

**Carl and Evelyn Bosch—Kansas**

119.     Plaintiff and proposed Side Airbag Defect Class and Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass Representative Carl and Evelyn Bosch are residents and citizens of Effingham, Kansas.  The Bosches purchased a new 2012 Buick Enclave (subject to the Side Airbag recall) from Lewis Chevrolet in Atchison, Kansas in August 2013.  The vehicle was covered by the standard manufacturer's warranty.  The Boches never received a recall notice for the airbag defect.  The Bosches tried trading the vehicle in 2015, but Lewis Chevrolet would not offer enough so they decided against trading it.  The Bosches would not have purchased the vehicle or they would have paid less for it had they known about its defect.

**Phyllis Hartzell—Kansas**

120.     Plaintiff and proposed Delta Ignition Switch Defect Class and Power Steering Defect Class Representative Phyllis Hartzell is a resident and citizen of Burlingame, Kansas.

- 76 -

Ms. Hartzell purchased a used 2006 Saturn Ion with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for $6,500 from a collision center in Burlingame, Kansas in 2011.  The vehicle had a 30-day dealer warranty.  Ms. Hartzell purchased the vehicle because she thought it was safe and reliable and would be a good vehicle for transporting her grandchildren.  Although the Ion had previously been in an accident and repaired, Ms. Hartzell was told by the salesperson the car was safe and reliable at the time she bought it.  According to the salesperson, the Ion had experienced front-end damage only, which required repainting.  Ms. Hartzell does not remember when she heard about the recall, though she recalls seeing it on the news when the story was breaking.  She had the car repaired under the recall.  Ms. Hartzell would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Philip Zivnuska, D.D.S.—Kansas

121.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Philip Zivnuska, D.D.S., is a resident and citizen of Valley Center, Kansas. Dr. Zivnuska purchased a new 2006 Chevrolet Cobalt with the Delta Ignition Switch Defect for about $25,000 from Conklin Cars in Newton, Kansas in 2006.  His vehicle was covered by Chevrolet's standard new car warranty at the time it was purchased.  According to Dr. Zivnuska, who had seen websites featuring and/or discussing the car, the promise of good handling was important to him.  Throughout the course of his ownership of the Cobalt, Dr. Zivnuska and his family members experienced numerous issues consistent with the ignition switch defect, including frequent electrical power failure and loss of power steering, and an accident.

Dr. Zivnuska brought the Cobalt into Conklin Cars multiple times to address the issues, and became so concerned that he eventually filed a complaint with NHTSA in 2007 to document the problems he was experiencing.  He did not receive information from New GM following this complaint, although he was led to understand Old GM obtained information about his car, which was subsequently totalled in an accident in 2010.  Dr. Zivnuska would not have driven the vehicle or would have sold it if he had known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Elizabeth Stewart—Kentucky

122.     Plaintiff and proposed Delta Ignition Switch Defect Class and Power Steering Defect Class Representative Elizabeth Stewart is a resident and citizen of Louisa, Kentucky.  She purchased a used 2010 Chevrolet Cobalt (subject to the Delta Ignition Switch and Power Steering recalls) for $14,000 from Brown's Ford in Paintsville, Kentucky in February 2012.  Ms. Stewart's Cobalt was under factory warranty when she purchased it, and she also purchased an extended bumper-to-bumper warranty.  Both have since expired. Around the time of her purchase, Ms. Stewart recalls seeing several commercials in which New GM touted the Cobalt's safety and stated that it is the best vehicle in its class.  She believed the vehicle was safe and defect free when she purchased it.  Just two-and-a-half months after buying the car, in April 2012, Ms. Stewart experienced her first inadvertent shutdown.  She was driving in Kentucky when the engine suddenly shut off while the key was in the ignition and the transmission was in "drive."  The loss of power made the steering wheel almost impossible to turn.  Ms. Stewart managed to get to the side of the road and, thankfully, was not injured.  She was also thankful that her children were not in the vehicle at the time, especially given that she purchased it primarily for use as the family car.  Ms. Stewart experienced many similar shutdowns between

the purchase date of February 2012 and July 2014, when the ignition switch was replaced under the recall.  Even after the recall "repair," Ms. Stewart has issues with the car indicative of power loss, where the headlights dim and the steering wheel locks up.  Ms. Stewart does not recall receiving a recall notice for the ignition switch or power steering recalls.  Ms. Stewart still owns her vehicle.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Dawn Talbot—Kentucky

123.   Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Dawn Talbot is a resident and citizen of Glasgow, Kentucky.  Ms. Talbot purchased a used 2006 Chevrolet Cobalt with the Delta Ignition Switch Defect from Goodman Automotive in Glasgow, Kentucky in May 2009.  Ms. Talbot's vehicle regularly lost power during driving.  Ms. Talbot would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about the defect in the vehicle.

### Frances Ann Fagans—Louisiana[19]

124.   Plaintiffs and proposed Low Torque Ignition Switch Defect Class and Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass Representative Frances Ann Fagans is a resident and citizen of Shreveport, Louisiana.  Mrs. Fagans purchased a new 2012 Cadillac CTS (subject to the Low Torque Ignition Switch recall) for $42,897.78 from Orr Cadillac Hummer in Shreveport, Louisiana on July 2, 2012.  The vehicle came with the

---

[19] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

manufacturer's warranty, but she did not purchase an extended warranty.  Mrs. Fagans has a history of purchasing Cadillac vehicles due to the brand's advertised safety features.  Mrs. Fagans was always of the opinion that Cadillac vehicles are the best brand, reliable, and have excellent customer service.  Mrs. Fagans drove the 2012 Cadillac CTS on a daily basis for personal use.  She experienced a stall during a right-hand turn at an intersection in the spring of 2013.  All dashboard lights flashed and the vehicle's automatic locks clicked on and off as her car rolled to a stop approximately twelve feet after the turn.  Mrs. Fagans attempted to turn the car off and remove the key, but was unable to do so.  She also attempted to place the car in park, but all electrical in the car was disabled and she quickly exited the vehicle in fear for her safety.  As a result of this incident and in fear for their safety, Mrs. Fagans traded in her 2012 Cadillac CTS on June 19, 2013, at a significant loss of $11,197.78, and purchased a 2013 Cadillac SRX from Orr Cadillac Hummer in Shreveport, Louisiana.  The 2013 Cadillac SRX was also recalled for a number of safety defects in 2014,  including transmission "hesitation," problematic rear suspension torqueing, and issues with the Sensing Diagnostic Module.  Mrs. Fagans would not have purchased these vehicles or would have paid less for them had she known about the defects.

**Lori Green—Louisiana**

125.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Lori Green is a resident and citizen of Harahan, Louisiana.  Ms. Green purchased a used 2009 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for about $18,000 from Walker's Big Lot in Alexandria, Louisiana on July 16, 2011.  She purchased an extended warranty at the same time.  Safety and reliability were important to her when deciding to purchase the Impala.  Last summer in 2015, Ms. Green's daughter was driving the vehicle and a truck pulled in front of her, and she hit the tail end of the truck.  None of the airbags deployed.

- 80 -

There were only minor injuries suffered as a result of the accident.  She does not recall receiving the ignition switch defect recall and does not remember having the repair work completed.  Ms. Green would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Raymond Naquin—Louisiana**

126.    Plaintiff and proposed Low Torque Ignition Switch Defect Class and Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass Representative Raymond Naquin is a resident and citizen of Marrero, Louisiana.  Mr. Naquin purchased a new 2012 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for $23,222.57 from Benson Chevrolet in Metairie, Louisiana on July 4, 2012.  The car was covered by a standard factory warranty.  Mr. Naquin received a recall notice for the ignition switch defect and he plans to get the recall repair completed soon.  Mr. Naquin would not have purchased the Impala or he would have paid less for it had he known about its defect.  Mr. Naquin also purchased a used 2007 Buick Lucerne (subject to the Low Torque Ignition Switch recall) for $8,172 from the Don Bohn dealership in Harvey, Louisiana on January 6, 2014.  The car was not covered by a warranty.  Mr. Naquin received a recall notice for the ignition switch defect and he plans to get the recall repair completed soon.  Mr. Naquin would not have purchased the Lucerne or he would have paid less for it had he known about its defect.

**Lisa West—Louisiana**

127.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Lisa West is a resident and citizen of Baton Rouge, Louisiana.  Ms. West purchased a used 2008 Chevrolet Cobalt with the Delta Ignition Switch recall for $9,621 from All-Star Hyundai in Baton Rouge, Louisiana on August 3, 2010.  Her vehicle was covered by a warranty at the time

- 81 -

of purchase, but it expired in 2014.  Ms. West chose this vehicle, in part, because the vehicle's safety and reliability was important to her.  She recalls the salesman discussing the car's positive safety features, and she believed the car was reliable.  Ms. West received a recall notice and had her vehicle repaired under the recall, although she does not recall when this occurred.  Recently, her vehicle was damaged in the massive flooding throughout Baton Rouge and the insurance company deemed the car a total loss.  She is now without a vehicle.  Ms. West would not have purchased the vehicle or she would have paid less for it has she known about its defect.

**Debra Quinn—Maine**

128.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Debra Quinn is a resident and citizen of Freeport, Maine.  Ms. Quinn purchased a used 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect for about $6,500 from a private seller in Maine on October 27, 2011.  The car was not covered by a warranty.  She chose this vehicle in part because its safety and reliability was important to her.  Ms. Quinn received the recall notice and had the car repaired under the recall at Goodwin Chevrolet in Brunswick, Maine on May 12, 2014.  She had to wait a few weeks for the repair because the parts were backordered.  The repair took a few hours.  Ms. Quinn would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Harry Albert—Maryland**

129.    Plaintiff and proposed Knee-to-Key Camaro Defect Class, Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass, and Low Torque Ignition Switch Defect Class Representative Harry Albert is a resident and citizen of Montgomery Village, Maryland.  Mr. Albert purchased a new 2012 Chevrolet Camaro (subject to the Knee-to-Key Ignition Switch recall) for $34,000 from Ourisman's Rockmont Chevrolet in Rockville, Maryland in October

2012.  The vehicle was equipped with the standard manufacturer's warranty.  On at least three

occasions, the power in Mr. Albert's Camaro failed during normal operation.  During the second

of these incidents, on May 13, 2014, Mr. Albert was operating his vehicle on a roadway at the

posted speed when his power failed.  Mr. Albert was nearly rear-ended by the vehicle traveling

behind him, but the vehicle swerved and avoided a collision.  Mr. Albert's knees did not hit the

ignition key during this event.  He was able to restart the Camaro and immediately took it to the

Ourisman Rockmont dealership for testing.  The dealership tested the vehicle, but could find

nothing wrong.  Less than one month later, Mr. Albert's vehicle experienced another power

failure when he was turning into a parking lot.  Again, he was almost rear-ended.  This time,

Ourisman Rockmont provided Mr. Albert with a loaner car while it attempted to determine the

source of the problem.  Shortly thereafter, New GM publicly announced the recall of the Camaro

vehicles, but Mr. Albert did not learn of the ignition switch defect in his vehicle until June 2014.

He took it back to the Ourisman Rockmont dealership, and they removed the blade from the

ignition key fob and put it on a keychain and returned the vehicle to him.  Mr. Albert was

nonetheless so afraid to drive his Camaro that he traded it in for a used 2013 Chevrolet Impala in

July 2014 in Germantown, Maryland.  He received $27,000 for his Camaro, and paid $17,999 for

the Impala.  At the time of his trade-in, Mr. Albert did not yet know about the Low Torque

Ignition Switch Defect and recall on the 2013 Impala.  Mr. Albert believed the Impala was safe

and reliable when he bought it.  Mr. Albert was informed by the dealer about the Impala's safety.

Mr. Albert would not have purchased the Camaro or he would have paid less for it had he known

about their defect.

**Carmel Justis—Maryland**

130.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Carmel Justis is a resident and citizen of Atlantic, Virginia.  Ms. Justis purchased a new 2004 Pontiac Grand Am (subject to the Low Torque Ignition Switch recall) for about $22,000 from the Price dealership in Salisbury, Maryland on August 12, 2003.  The vehicle was covered by a standard factory warranty.  Ms. Justis purchased the vehicle because safety and reliability were important to her.  This was her third Pontiac Grand Am, so she trusted the brand.  She does not remember receiving the ignition switch defect recall and did not have the recall repair work done.  Ms. Justis would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Marc and Madelaine Koppelman—Maryland**

131.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass, Power Steering Defect Class, and Power Steering Defect Magnuson-Moss and Implied Warranty Subclass Representatives Marc and Madelaine Koppelman are residents and citizens of Torrance, California.  The Koppelmans purchased a Certified Pre-Owned 2010 Chevrolet HHR (subject to the Delta Ignition Switch and the Power Steering recalls) for $12,900 from JBA Chevrolet in Glen Burnie, Maryland in 2012.  The 2010 HHR was certified pre-owned under New GM's guidelines, including 172 safety check items the car had to pass.  The Koppelmans also received a sales document from New GM given to each certified pre-owned purchaser as an incentive, claiming the certified pre-owned designation adds $2,135 to the value of the car.  The Koppelmans' decision to buy the car was influenced by the perceived safety associated with the car's airbag system and advertising touting the car's reliability.  This was important to Mr. Koppelman because his wife was going to

- 84 -

be the principal driver.  In June 2012, about four months after they purchased the vehicle, while

Mr. Koppelman was driving in Maryland on a residential street, the HHR lost power and power

steering.  Mr. Koppelman managed to pump the brakes and get the car safely off the road.  He

then called a local New GM dealer in Gaithersburg, Maryland, from the car on his cell phone.

The service person asked if he could start the car, and if so, instructed him to drive to the

dealership.  The dealership checked the car at the entrance and said there was no problem, stating

it was most likely Mr. Koppelman's leg that caused the ignition switch to turn off.  The dealer

service representative suggested he remove the key from the key ring to reduce the weight.  The

only things on the key ring were the key and the remote fob.  About ten months later, his vehicle

shut down again while driving, and Mr. Koppelman received the same unhelpful, non-response

from the dealership about the problem.  Then, in March 2014, Mr. Koppelman received a recall

notice but was told he would have to wait for the new parts to arrive before he could get the

repair.  Five months later, in August 2014, the recall repair work was completed.  After the

dealership gave him the run-around about getting the new part installed, Mr. Koppelman

considered selling the vehicle.  He remembers comparable HHRs were selling for $12,000-

14,000 retail at the time the recalls were first announced in early 2014.  In late May or early June

2014, Mr. Koppelman researched his car model on Kelley Blue Book and it was valued at

approximately $9,200.  He went to his local dealer, Martin Chevrolet, in Torrance, California,

and they only offered him $6,100 to trade it in.  Mr. Koppelman was shocked at the low number,

so he declined to sell it.  He then took the vehicle to another New GM dealer, Harbor Chevrolet,

in Long Beach, California, and the dealership quoted him a similar value as the last dealership.

Harbor Chevrolet told him that due to the recalls, the HHR's value had declined, and it was

lowering the retail prices on its own vehicles for sale.  In mid-July 2014, Mr. Koppelman

checked the Kelley Blue Book again and saw his car model's value had dropped to approximately $8,400.  By the end of 2014, the HHR's value dropped below $10,000, and by the end of 2015 it dropped to less than $8,000.  Recently, his online research shows his vehicle model's price falls between $4,250 and $7,500.  Mr. Koppelman was a loyal Old GM owner, having previously owned Chevrolet, Buick, Oldsmobile, and Cadillac vehicles, but now will never purchase a New GM-branded vehicle again.  The Koppelmans would not have purchased the vehicle or they would have paid less for it had they known about its defects.

### Melody Lombardo—Maryland[20]

132.    Plaintiff and proposed Power Steering Defect Class Representative Melody Lombardo is a resident and citizen of Catonsville, Baltimore County, Maryland.  Ms. Lombardo purchased a new 2006 Chevrolet Malibu (subject to the Power Steering recall) for $22,000 from the Win Kelly dealership in Clarksville, Maryland on December 5, 2005.  The vehicle was covered under the standard factory warranty.  Ms. Lombardo chose the Chevy Malibu because it was on the Consumer Reports list as one of the safest vehicles that year.  In July 2012, she began experiencing problems with the power steering.  It would stop working and she would either shift the car into neutral or restart the car and it would work again.  This happened for a few days before it completely failed and she had to have the car towed to the Win Kelly dealership.  She was told the repair was not covered by her warranty, and she paid out of pocket to repair the car's power steering on July 20, 2012.  After she had the car repaired, Ms. Lombardo found the recall notice.  She went back to the dealership and was told that it was a different part that was recalled and it was not covered.  New GM refused to reimburse her for the repair.  She was told

---

[20] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

she could take the car to an out of area dealership to have it evaluated.  She had a friend who

worked at Country Chevrolet in Warrington, Virginia so she took the car there.  Country

Chevrolet determined that her car was indeed covered by the recall and helped her get

reimbursed for the repair.  She still owns the car and in January 2016, when it was really cold,

the power steering failed again.  This occurred about a month after her extended warranty

expired.  Ms. Lombardo would not have driven the vehicle or would have sold it if she had

known about its defect. She would not have purchased the vehicle or she would have paid less

for it had she known about its defect.

### Jerrod Pinkett – Maryland

133.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative

Jerrod Pinkett is a resident and citizen of Baltimore, Maryland.  Mr. Pinkett purchased a used

2008 Buick Lucerne (subject to the Low Torque Ignition Switch recall) for $13,000 from Trident

Automotive in Edgewood, Maryland on March 3, 2014.  The car was covered by a 30-day

warranty at the time of purchase, and Mr. Pinkett purchased an extended warranty through his

local credit union.  The safety and reliability of the vehicle were important to him in buying the

Lucerne.  Mr. Pinkett was a loyal GM customer and has owned five GM-branded vehicles

throughout his lifetime.  Because of the recalls he has lost confidence in GM.  Approximately

four months after he purchased the vehicle, Mr. Pinkett experienced problems with the

transmission.  After he heard from friends and family that there were recalls on some GM-

branded vehicles, he went online to Buick's website and learned his car had the Low Torque

Ignition Switch Defect.  Mr. Pinkett never received a recall notice in the mail.  Shortly thereafter

he took his Lucerne in for the recall repair at AutoNation in Baltimore, Maryland.  Mr. Pinkett

had to wait some time for the dealership to receive the parts and repair his vehicle.  He still owns

the vehicle but has been afraid to drive it since he learned about the ignition switch recall.  He

now avoids driving it if possible.  Mr. Pinkett would not have purchased the vehicle or he would

have paid less for it had he known about its defect.

### Robert Wyman—Maryland

134.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied

Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

Representative Robert Wyman is a resident and citizen of Baltimore, Maryland.  Mr. Wyman

purchased a new 2007 Saturn Sky with the Delta Ignition Switch Defect for $32,000 from the

Heritage Chevrolet Buick dealership in Owings Mills, Maryland in 2007.  His vehicle came with

a three-year warranty.  Mr. Wyman believed GM cars were reliable and safe.  He saw some of

the safety features in an advertisement on television and was also informed by the salesperson

that it was a reliable car.  Mr. Wyman's vehicle had the recall repair done on May 31, 2014.  He

no longer has the vehicle.  Mr. Wyman would not have driven the vehicle or would have sold it

if he had known about its defect.  He would not have purchased the vehicle or he would have

paid less for it had he known about its defect.

### Debra Companion—Massachusetts

135.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Magnuson-Moss and Implied Warranty Subclass, Power Steering Defect Class, and

Power Steering Defect Magnuson-Moss and Implied Warranty Subclass Representative Debra

Companion is a resident and citizen of East Hampstead, New Hampshire.  Ms. Companion

purchased a Certified Pre-Owned 2010 Chevrolet Cobalt (subject to the Delta Ignition Switch

and Power Steering recalls) for $14,980 from McLaughlin Chevrolet in Whitman, Massachusetts

- 88 -

on December 31, 2011.  The car was covered by a warranty.  She had previously owned a

Cavalier, and she chose the Cobalt because it was modeled after the Cavalier.  She trusted the

brand, and she felt the car was safe and reliable.  Sometime in 2014, before her car was repaired

under the recall, she was driving on Route 93 South and her car shut off and she had to pull over.

She was able to restart the car.  She received the ignition switch recall notice but not the power

steering recall notice.  Ms. Companion's vehicle was repaired under the recall at Betley

Chevrolet in Derry, New Hampshire in summer 2014.  She is concerned that the resale value of

her car is diminished because of the defect and recalls.  Ms. Companion would not have

purchased the vehicle had she known about its defects.

### Colin Elliott—Massachusetts

136.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied

Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

Representative Colin Elliott is a resident and citizen of Buzzards Bay, Massachusetts.  Mr. Elliott

purchased a new 2008 Saturn Sky with the Delta Ignition Switch Defect for $23,000 from Saturn

of Hyannis in Hyannis, Massachusetts in July 2007.  His vehicle was covered by a standard

100,000-mile warranty at the time of purchase.  Mr. Elliott owned several Saturn vehicles before

this one and believed these cars were safe and reliable up until the ignition switch recall.  Mr.

Elliott's ignition switch was replaced in November 2014.  Although he has not experienced a

shutdown event while driving, he has only driven his Sky a total of ten miles since it was

repaired in November 2014.  Because he would not drive his Sky, Mr. Elliott and his wife shared

her Kia for a while.  This caused significant inconvenience, as they drove each other to work and

were dependent on one another's schedule.  He eventually got rid of the Sky because he did not

think it was safe.  Mr. Elliot would not have driven the vehicle or would have sold it if he had known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Richard Leger—Massachusetts

137.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Richard Leger is a resident and citizen of Franklin, Massachusetts.  Mr. Leger purchased a used 2007 Pontiac G5 with the Delta Ignition Switch Defect for $8,000 from the Hyundai dealership in Attleboro, Massachusetts in 2013.  He purchased the vehicle with a 90-day warranty.  Mr. Leger purchased the vehicle because he thought it was safe.  Mr. Leger's vehicle started having ignition problems in November 2013.  The first time was at a traffic light, when the car just shut down.  It happened several more times since then.  He also experienced loss and/or locking of the power steering in the car.  He learned about the recall in April 2014.  The car was not repaired because he was having issues with the dealership about getting the part replaced.  He informed them that he would not pay for the car until they fixed the issues and the car was ultimately repossessed.  Mr. Leger would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Susan Viens—Massachusetts[21]

138.    Plaintiff and proposed Power Steering Defect Class Representative Susan Viens is a resident and citizen of Monson, Massachusetts.  Ms. Viens purchased a new 2005 Chevrolet Malibu Max (subject to the Power Steering recall) for about $20,000 from Balise Chevrolet Buick GMC in Springfield, Massachusetts on September 15, 2005.  The vehicle was covered

---

[21] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

under the standard factory warranty and she also purchased an extended warranty.  She has owned at least four or five GM products and trusted the brand.  She chose the Malibu in part because safety and reliability are important to her.  She does not recall receiving the power steering recall but she did have the steering column replaced.  The steering wheel would make a clicking noise and she felt unsafe driving the vehicle.  She had to pay out of pocket for the steering column replacement.  In 2012, she traded in the Malibu for a Chevrolet Cruze because she felt unsafe in the Malibu.  Ms. Viens would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Brittany Vining – Massachusetts

139.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Brittany Vining is a resident and citizen of Lynn, Massachusetts.  In October 2010, Ms. Vining purchased a used 2007 Cadillac CTS (subject to the Low Torque Ignition Switch recall) for $19,000 from Direct Auto Mall in Framingham, Massachusetts.  The vehicle came with a GM warranty and Ms. Vining also purchased an extended warranty.  The safety and reliability of the Cadillac were important to her when she purchased the vehicle.  Before Ms. Vining purchased the Cadillac, she thought highly of the GM brand and the Cadillac CTS had always been her dream-car.  Over the past few years, the brakes on the Cadillac would fail randomly and when she was driving at low speeds.  This happened several times.  Ms. Vining brought the Cadillac to multiple dealerships to try and resolve the issue, but they were never able to figure out what was causing the brakes to fail.  Ms. Vining had to replace the engine coils and spark plugs multiple times.  She also replaced the catalytic converter and timing belt.  In January 2015, the Cadillac's transmission wet out and the cost of the repair was worth more than the vehicle, so she got rid of

it.  Ms. Vining received the ignition switch recall notice and had the recall repair done soon after

she received the notice.  Ms. Vining has always thought highly of the GM brand, but her

impression of GM products has changed since learning of the recalls.  She would not have

purchased the vehicle or she would have paid less for it had he known about its defects.

**Sheree Anderson—Michigan**

140.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Sheree

Anderson is a resident and citizen of Detroit, Michigan.  Ms. Anderson purchased a used 2008

Chevrolet HHR with the Delta Ignition Switch Defect for approximately $16,500 from the

LaFontaine Cadillac Buick GMC dealership in Highland, Michigan on November 15, 2011.  The

vehicle had a warranty on it when she purchased it.  Ms. Anderson chose the HHR in part

because she desired a safe vehicle.  Sometimes the ignition switch on Ms. Anderson's vehicle

would lock up on her and she would be unable to turn the key.  Ms. Anderson did not learn about

the ignition switch defect until March 2014.  Her HHR was repaired under the recall on June 10,

2014, after she waited about a month for the parts and repair.  For several weeks before her car

was fixed, Ms. Anderson paid a friend about $60 per week for gas to transport her to and from

work because she was scared to drive her car with the defect.  After recent mechanical issues

rendered her vehicle un-useable without expensive repairs, Ms. Anderson sold the vehicle for

scrap on August 25, 2016.  Ms. Anderson would not have purchased the vehicle or she would

have paid less for it had she known about the defect in the vehicle.

**Marquetta Chestnut—Michigan**

141.    Plaintiff and proposed Low Torque Ignition Switch Defect Class and Power

Steering Defect Class Representative Marquetta Chestnut is a resident and citizen of Detroit,

Michigan.  Ms. Chestnut purchased a used 2005 Chevrolet Malibu (subject to the Low Torque

Ignition Switch and Power Steering recalls) for $6,000 from Kals Auto Sales in Dearborn, Michigan on February 17, 2011. It was not covered by a warranty. Safety in the vehicle was important to her because she has two children that she would never knowingly put in danger. The power steering in her car went out twice last winter. Once she spun out on ice and an oncoming ambulance on the east-bound side of the street missed hitting her vehicle by inches. The second time she was on her way to work when the power steering went out and she had to coast her car across three lanes, get off an exit ramp, and restart the car. Ms. Chestnut would not have purchased the vehicle or she would have paid less for it had she known about its defects.

**Diana Cnossen—Michigan**

142.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, Power Steering Defect Class, Delta Ignition Switch Defect Bankruptcy Class Representative Diana Cnossen is a resident and citizen of Grand Rapids, Michigan. Ms. Cnossen purchased a new 2007 Saturn Ion with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for $18,250 from a Saturn dealership in Michigan on November 27, 2006. Her vehicle was covered under warranty when she purchased it. Ms. Cnossen did not learn of the ignition switch defect until it was announced in March 2014. She had her car repaired under the recall on June 4, 2014. Ms. Cnossen would not have driven the vehicle or would have sold it if she had known about its defect. She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Rafael Lanis—Michigan**

143.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Rafael Lanis is a resident and citizen of Birmingham, Michigan. Mr. Lanis purchased a used 2006

- 93 -

Chevrolet Cobalt with the Delta Ignition Switch Defect for $2,800 at auction from Westland

Auto Care in Michigan in July 2011.  His vehicle was no longer under warranty at the time he

purchased it.  At the time of purchase, safety and reliability were major considerations when

choosing that car.  Before buying, Mr. Lanis did an internet search to review the features of the

vehicle.  He also purchased the Chevy Cobalt because he trusted the reputation of the

manufacturer related to safety and reliability of its vehicles and because the vehicle had multiple

airbags.  Mr. Lanis experienced his ignition shutting down approximately ten separate times after

starting his car and then removing his hand from the key.  It also shut down once while sitting

idle at a traffic light.  On an almost a daily basis, the key would stick in the ignition, and he had

to jiggle the key to get it to come out of the ignition.  His ignition switch was repaired

approximately one month after he received the recall notice, in April 2014, but when he tried to

secure a loaner from New GM before repairing his ignition switch, they refused.  Mr. Lanis paid

approximately $400 to a co-worker to drive him to work while the ignition switch was replaced.

Mr. Lanis still owns the 2006 Chevy Cobalt and limits his use of the vehicle because of his

ongoing safety concerns.  On at least two separate occasions, Mr. Lanis tried unsuccessfully to

sell his vehicle.  After the recall was announced, he had one buyer who was interested in

purchasing the vehicle but the buyer changed his mind because he feared ongoing safety

concerns with the vehicle.  At the time of the recall in April 2014, Mr. Lanis noted that the

Kelley Blue Book value of his car had dropped from $4,700 to $4,000.  Mr. Lanis would not

have purchased the vehicle or he would have paid less for it had he known about its defect.

### Sophia Marks - Michigan[22]

---

[22] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose
of preserving their claims on appeal.

144.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Sophia Marks is a resident and citizen of Southfield, Michigan.  Ms. Marks purchased a used 2009 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for about $15,000 from Ypsilanti Motors in Ypsilanti, Michigan on July 28, 2009.  She purchased an extended warranty for the vehicle.  She purchased this car for safety and reliability purposes.  She did online research on the car and safety was her number one priority because she has an autistic son she would be driving in the car.  She also saw print advertisements about the car's safety and reliability.  On one occasion, Ms. Marks was driving on a busy street when she hit a bump in the road and the car shut off.  She had to pull over to safety and restart the vehicle.  Ms. Marks received a recall notice for the ignition switch recall and her car was repaired under the recall in 2015.  Ms. Marks has been quoted low resell value for her car, which she believes is due to the defect and recall.  Ms. Marks would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### David Price—Michigan[23]

145.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative David Price is a resident and citizen of Chesterfield, Michigan.  Mr. Price purchased a used 2001 Cadillac Deville (subject to the Low Torque Ignition Switch recall) for $28,392 from Michael Chevrolet in Chesterfield, Michigan, on May 15, 2003.  The car was still under the manufacturer's warranty at the time he purchased it.  Mr. Price chose the vehicle, in part, because safety and reliability were important to him.  Before purchasing the Deville, Mr. Price would visit his local GM dealership and pick-up literature about their vehicles and he also recalls

---

[23] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

seeing television advertisements.  Mr. Price had problems with the vehicle not starting because he could not turn the ignition into the 'park' position.  It would take several tries to get his car started.  In December 2010, he paid $500 to have repair work done but it did not fix the problem.  Sometime around April 2014, Mr. Price remembers receiving the ignition switch recall, but he did not have the repair work done on the vehicle.  He did not repair the Deville because he had already purchased a new vehicle and was no longer driving the Deville.  Mr. Price would not have driven the vehicle had known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about its defect.

**Brian Semrau—Michigan**

146.    Plaintiff and proposed Low Torque Ignition Switch Defect Class and Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass Representative Brian Semrau is a resident and citizen of Rochester Hills, Michigan.  Mr. Semrau leased a new 2013 Cadillac CTS (subject to the Low Torque Ignition Switch recall) for $45,744 from Suburban Cadillac in Troy, Michigan on August 19, 2013.  The vehicle had the standard manufacturer's warranty.  Mr. Semrau chose this vehicle, in part, because the vehicle's safety and reliability was important to him.  Safety was one the selling points the saleswoman made to Mr. Semrau to convince him this was the car he should choose over the other manufacturers he was considering. He received a recall notice for the ignition switch, and he had to do the repair himself because New GM sent him the parts with instructions on how to install them.  This was inconvenient and disappointing.  When he purchased the car he was told the dealership would take care on any issues.  Mr. Semrau felt this was something that he should not have been required to do himself. Mr. Semraud returned the vehicle to New GM on August 16, 2016, at the end of his lease.  Mr.

Semrau would not have leased the vehicle or he would have paid less for it had he known about its defect.

### Jacqueline Smith—Michigan

147.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, Power Steering Defect Class Representative, and Delta Ignition Switch Defect Bankruptcy Class Representative Jacqueline Smith is a resident and citizen of Detroit, Michigan.  Ms. Smith purchased a new 2007 Saturn Ion with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for $15,000 from Saturn of Southfield in Southfield, Michigan on June 30, 2007.  The vehicle came with the standard factory warranty.  Ms. Smith purchased the vehicle because reliability and safety were important to her and she had heard from friends that it was a good vehicle.  On more than one occasion, Ms. Smith was driving her vehicle and it cut-off in the middle of the street.  She received recall notices for the ignition switch and power steering recalls, and the repairs were performed by James Martin Chevrolet in 2014.  The repairs took three weeks because the parts were backordered.  Ms. Smith would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Bryan Wallace—Michigan[24]

148.    Plaintiff and proposed Side Airbag Defect Class Representative Bryan Wallace is a resident and citizen of Fenton, Michigan.  Mr. Wallace purchased a new 2009 Chevy Traverse

---

[24] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

(subject to the Side Airbag recall) for $41,374.27 from Al Serra Chevrolet in Grand Blanc,

Michigan on January 5, 2009.  The car came with the standard factory warranty.  Mr. Wallace

chose this vehicle, in part, because the vehicle's safety and reliability was important to him.  He

and his family had purchased Chevrolets in the past and found them to very reliable and good

when it came to a resale value.  Mr. Wallace's father-in-law worked for GM, so he always

bought Chevrolets because of its reputation for reliability and safety.  He also had younger kids

at that time so he and his wife did a lot of research on the car to make sure it was a good fit for

their family.  The salesman told Mr. Wallace how safe the car was in the crash tests.  Mr.

Wallace believes he received a recall notice for the airbag defect and had it repaired under the

recall but cannot recall the date.  Any time he received a recall he took his vehicle Vic Canever

Chevrolet for repair.  He has spent a number of days without a car or been forced to take time off

while this car was in the shop getting fixed.  There were times when his family had to borrow

cars from family members since a loaner car was not provided by the dealership or New

GM.  The car has had recall after recall, and because of this, Mr. Wallace would not buy this car

again if his life depended on it.  The mechanics at New GM dealership Vic Canever have told

Mr. Wallace that he won't get much for a trade in with his vehicle because of all the recall and

defects.  Mr. Wallace would not have driven the vehicle or would have sold it if he had known

about its defect.  He would not have purchased the vehicle or he would have paid less for it had

he known about its defect.

### Franklin Wloch—Michigan

149.    Plaintiff and proposed Low Torque Ignition Switch Defect Class and Low Torque

Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass Representative Franklin

Wloch is a resident and citizen of Oxford, Michigan.  Mr. Wloch purchased a Certified Pre-

Owned 2011 Cadillac CTS (subject to the Low Torque Ignition Switch recall) for about $27,500

from Crestview Cadillac in Rochester, Michigan on April 22, 2014.  He purchased an extended

warranty for the vehicle.  Mr. Wloch believed this car had a good safety record and he purchased

it in part because its safety and reliability was important to him.  Mr. Wloch received a recall

notice for the ignition switch and had it repaired under the recall about a year and a half ago.  Mr.

Wloch would not have purchased the vehicle or he would have paid less for it had he known

about its defects.

### Anna Allshouse—Minnesota

150.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Anna

Allshouse is a resident and citizen of Cape Coral, Florida.  Ms. Allshouse purchased a used 2007

Chevrolet HHR with the Delta Ignition Switch Defect for approximately $12,000 from New

Prague Chevrolet in New Prague, Minnesota in 2012.  Her car was under warranty when she

purchased it, and she also purchased an extended warranty and gap insurance from the dealership

at the same time.  The car is no longer under warranty.  At the time Ms. Allshouse purchased the

Chevrolet HHR, safety and reliability were of great importance because she has two small

children and it would be her family vehicle.  She remembers the salesperson telling her how

great the car was and that it was a great, safe, and reliable vehicle that would be perfect for her

and her family.  The salesperson never mentioned that there were problems with the HHR.

Based on this, Ms. Allshouse decided to purchase the Chevy HHR.  She trusted GM's perceived

reputation for safe and reliable vehicles.  Ms. Allshouse experienced one incident where the car

shut off on its own in winter 2013.  She was backing out of her driveway, and the car suddenly

turned off.  She was able to restart the car and was not involved in an accident.  After this

incident, Ms. Allshouse took her Chevy HHR to the New Prague dealership for service.  She was

- 99 -

told there was nothing wrong with her vehicle.  She later received the recall notice, in

approximately late April 2014, and in September or October 2014, Ms. Allshouse again took her

car to the New Prague GM dealer and they replaced the ignition switch under the recall.  Since

the ignition switch was replaced the vehicle's auto start and car alarm have not worked.

Ms. Allshouse still owes approximately $5,000 on the vehicle.  She tried to trade it in for a new

vehicle at the same dealership in September 2014, but she was told they would only offer $2,000

for the car.  Ms. Allshouse still owns and drives the Chevy HHR because she owes money on it

and cannot afford to buy a new vehicle.  Ms. Allshouse would not have purchased the vehicle or

she would have paid less for it had she known about its defect.

### David Cleland—Minnesota

151.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch

Defect Bankruptcy Class Representative David Cleland is a resident and citizen of Northfield,

Minnesota.  Mr. Cleland purchased a used 2004 Saturn Ion with the Delta Ignition Switch Defect

(and subject to the Power Steering recall) for $10,000 from Southside Auto Dealership in

Northfield, Minnesota, in 2005.  Mr. Cleland's Saturn Ion was covered under the standard

manufacturer's warranty at the time he purchased it.  Mr. Cleland chose this vehicle, in part,

because the vehicle's safety and reliability was important to him.  In 2014, Mr. Cleland's child

had a frontal collision while driving his vehicle.  The airbags did not deploy, even though they

should have under the circumstances of the collision.  He does not believe the ignition switch

was repaired before the accident.  Luckily, no one was injured, but the vehicle was sold for scrap

after the accident.  Mr. Cleland would not have driven the vehicle or would have sold it if he had

known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Janelle Davis—Minnesota

152.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Janelle Davis is a resident and citizen of South Sunburst, South Dakota.  Ms. Davis purchased a used 2006 Chevrolet Cobalt with the Delta Ignition Switch Defect for $7,200 from Lockwood Motors in Marshall, Minnesota, in 2011.  The vehicle was not under warranty.  Ms. Davis purchased the vehicle because she thought it was a reliable and safe vehicle, and also because it has good mileage ratings.  When Ms. Davis learned about the recall, she contacted the dealership about a loaner vehicle because she had a one-year-old daughter and did not feel safe driving her in a vehicle with a safety defect.  She was denied a loaner and/or rental vehicle, even though she told the dealership about her fear of driving her one-year-old daughter in an unsafe vehicle, because she had not experienced shutdowns or stalls.  Ms. Davis had her ignition switch replaced pursuant to the recall in summer 2014.  She has sold the car.  Ms. Davis would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### William Hill—Minnesota

153.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative William Hill is a resident and citizen of White Bear Lake, Minnesota.  Mr. Hill purchased a used 2006 Chevrolet Cobalt with the Delta Ignition Switch Defect for about $8,000 from Morries Hyundai in Golden Valley, Minnesota, on December 21, 2012.  The Cobalt was not covered by a warranty.  Mr. Hill chose the Cobalt in part because safety and reliability were important to him.  He specifically remembers seeing New GM commercials on television stating how strong and reliable New GM vehicles were and that this was a new beginning for the brand.  On one

- 101 -

occasion, Mr. Hill was coming around a corner, and the steering locked-up, the dashboard went

dim and the car shut off.  He noticed the keys had partially come out of the ignition.  He was able

to put the vehicle in neutral, get to safety and restart the vehicle.  This incident scared Mr. Hill

because it happened at night.  Mr. Hill received the ignition switch recall and promptly called

Friendly Chevrolet and they advised him that the parts were not available and that he should try

back later.  He was inconvenienced by the recall because he had to take his vehicle to the

dealership numerous times.  At the first appointment, the service department verified his VIN so

they could order the exact ignition parts.  On his second visit, he showed up for his appointment

but was unable to get service because the service department was too busy.  On his third visit, he

was able to get a loaner vehicle but as soon as he got home they called and told him his vehicle

was ready so he had to drive back the same day.  Mr. Hill would have waited for the repair work

to be completed had he known it was only going to take a few hours.  Four months later, Mr.

Hill's Cobalt was finally repaired under the recall.  When he tried to trade in the vehicle at

Friendly Chevrolet, he was told it was worth much less because of the defect and the publicity

surrounding the recalls.  Mr. Hill would not have purchased the vehicle or he would have paid

less for it had he known about its defect.

### Christine Leonzal—Minnesota

154.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative

Christine Leonzal is a resident and citizen of Ramsey, Minnesota.  Ms. Leonzal purchased a used

1998 Oldsmobile Intrigue (subject to the Low Torque Ignition Switch recall) for $1,500 from

Car Hop in Fridley, Minnesota, on February 2, 2010.  Safety in the vehicle was important to Ms.

Leonzal because she has a handicapped child who she had to transport in the car.  She

remembers the salesman telling her it was a solid, dependable vehicle without any problems and

- 102 -

that it would last her family a long time.  Ms. Leonzal experienced problems with the car's ignition switch and it left her stranded many times.  She bought several new keys for the car thinking that was the problem.  She also had a mechanic look at it for hours to no avail.  Only recently did she realize this was likely connected to the defect.  She didn't have her vehicle repaired under the recall because she didn't receive a recall notice and was unaware of the defect.  Ms. Leonzal would not have purchased the vehicle had she known about its defect.

**Cynthia Shatek—Minnesota**

155.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass, Power Steering Defect Class, and Power Steering Defect Magnuson-Moss and Implied Warranty Subclass Representative Cynthia Shatek is a resident and citizen of Chaska, Minnesota.  Ms. Shatek purchased a Certified Pre-Owned 2010 Chevrolet Cobalt (subject to the Delta Ignition Switch and Power Steering recalls) for $17,500 from Lenzen Chevrolet in Chaska, Minnesota, on August 15, 2011.  Because it was Certified Pre-Owned, the car was covered by a warranty and she may have also purchased an extended warranty.  The salesman told her the Chevy Cobalt was a good, reliable, and fuel efficient vehicle.  She has known the people at Lenzen's for a long time, and she trusted them to be honest about the vehicle.  Ms. Shatek received a recall notice for the ignition switch defect sometime in the summer of 2014.  She took the letter to Lenzen's and gave it to the service manager.  He said he would call when the parts came in.  In the meantime, he took her key off her key fob and said "Only use the key by itself, we don't want any more weight than necessary." About three weeks later she got a call to bring her car in for the recall.  It took most of the afternoon to fix it.  During those three weeks, Ms. Shatek was scared to drive her car because she

- 103 -

had heard about the steering locking up causing loss of control.  Ms. Shatek would probably not have purchased the vehicle or she would have paid less for it had she known about its defects.

### Jennifer Sullivan—Minnesota

156.    Plaintiff and proposed Side Airbag Defect Class Representative Jennifer Sullivan is a resident and citizen of Elk River, Minnesota.  Ms. Sullivan purchased a used 2010 Chevrolet Traverse (subject to the Side Airbag recall) for $27,621.36 from Princeton Auto Center in Princeton, Minnesota, on April 2, 2012.  The vehicle came with the standard manufacturer's warranty.  Ms. Sullivan purchased the vehicle because she thought it was safe and reliable and she has four children.  Ms. Sullivan does not recall seeing any advertisements about the Traverse, but the salesman helped her decide on purchasing the Traverse because he said it was the safest vehicle on the road and it has more airbags than most vehicles.  After purchasing the vehicle, Ms. Sullivan experienced shifting issues.  She also experienced power steering issues.  When she would make a hard turn, she would lose power steering.  She has received seven recalls since owning the vehicle and has had all the recall repair work completed.  Ms. Sullivan had to take time off of work to drive half-an-hour to the dealership to have her vehicle repaired under the recall.  She does not feel safe when she drives the vehicle, but it is her only form of transportation.  Over the years, she estimates she has been without her vehicle for eight days because of all the recalls she has had to take it in for to be repaired.  Ms. Sullivan brought it into the dealership to get it valued for trade-in, and she was only offered $8,000.  Ms. Sullivan would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Larry Haynes—Mississippi

157.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Larry Haynes is a resident and citizen of Clarksdale, Mississippi.  Mr. Haynes purchased a used

2006 Buick Lucerne (subject to the Low Torque Ignition Switch recall) for about $15,000 from Pratt Hyundai in Mississippi on March 30, 2010. The vehicle was not covered under warranty when he purchased it. Mr. Haynes chose the vehicle, in part, because safety and reliability were important to him. He previously owned two other Buick vehicles and he trusted the brand. Mr. Haynes received the ignition switch recall notice sometime in 2014. Shortly after he received the notice, sometime around October or November 2014, he took his vehicle to Kossmans to have the repair work completed. The vehicle was totalled in an accident in May 2016. Mr. Haynes would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Frances Howard—Mississippi

158.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch Defect Bankruptcy Class Representative Frances Howard is a resident and citizen of Jackson, Mississippi. Ms. Howard leased and then purchased a new 2006 Saturn Ion with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for approximately $11,000 from a Saturn dealership in Jackson, Mississippi in April 2006. She chose this vehicle, in part, because the vehicle's safety and reliability was important to her. She recalls seeing Saturn television commercials touting the brand's reliability. In 2009, Ms. Howard's key got stuck in the ignition and she could not turn the vehicle off. She drove it to the dealership, and it replaced the ignition switch on September 8, 2009, at Ms. Howard's expense. One week later, the key got stuck in the ignition again. This time the dealership told her it was because her car's battery was dead. The service was unhelpful and contradictory. It was also distressing to Ms. Howard

because she could barely afford the cost of these repairs, approximately $380 along with a tow charge, and she had to use vacation days at work to take her car into the shop.  Ms. Howard's car also inadvertently shut down on two occasions.  The first time happened in the summer of 2014 when she accidentally bumped the key while it was in the ignition.  The second time, on September 2, 2014, it shut off while she was at a red light.  Both times, the car restarted after she turned the key off and then on again.  Ms. Howard was never contacted about the ignition switch recall, and only found out about it by reading news on the internet.  After contacting her New GM dealership about the repairs, it took eight weeks for the parts to arrive.  She also asked for a loaner vehicle, but they declined, telling her there were none available and it would be only two weeks until the parts arrived.  The engine on her vehicle died again on July 18, 2015, as she was pulling into her parking space and it bothers her to know the car remains unsafe.  Ms. Howard's vehicle is not reliable enough to drive on the interstate, and now that she has had two hip replacements, most recently on October 28, 2015, she feels afraid of being in an accident due to engine failure.  Ms. Howard would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about the defect in the vehicle.

**Elizabeth D. Johnson—Mississippi**

159.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Elizabeth D. Johnson is a resident and citizen of Jackson, Mississippi.  Ms. Johnson purchased a used 2007 Chevrolet Cobalt with the Delta Ignition Switch Defect for $7,200 from Bond Auto Sales in Jackson, Mississippi on March 27, 2012.  The vehicle was not covered by a warranty. She chose this vehicle, in part, because its safety and reliability was important to her.  She also chose it because of the gas mileage.  Ms. Johnson's vehicle shut down three times on her.  The

last instance, on April 19, 2014, totalled the vehicle.  Her vehicle cut off and the airbags did not

deploy in the collision.  The ignition switch had not yet been repaired under the recall when the

vehicle was totalled.  In fact, she was not even aware of the outstanding recall at that time.

Because of the shutdowns and this accident, she had to pay $300 to get another car fixed and she

had to make arrangements to have her children picked up.  Ms. Johnson would not have

purchased the vehicle had she known about the defect in the vehicle.

### Ashley Murray—Mississippi

160.     Plaintiff and proposed Knee-to-Key Camaro Defect Class and Knee-to-Key

Camaro Defect Magnuson-Moss and Implied Warranty Subclass Representative Ashley Murray

is a resident and citizen of Mantee, Mississippi.  Ms. Murray purchased a new 2014 Chevrolet

Camaro (subject to the Knee-to-Key Ignition Switch recall) for about $34,000 from the Carl

Hogan dealership in Columbus, Mississippi on April 26, 2014.  The vehicle was covered by a

standard factory warranty and she also purchased an extended warranty.  Ms. Murray chose the

Camaro in part because safety and reliability are important to her.  The ignition in Ms. Murray's

vehicle often gets stuck when she tries to park the car.  Her key gets stuck, and she has to restart

the car four to five times before the ignition will release her key.  This happens two to three

times per week.  Ms. Murray has purchased several new cars in the past and has never had

problems like this.  It is embarrassing to her to own a new vehicle and have these issues.  Shortly

after purchasing the vehicle, Ms. Murray remembers receiving the ignition switch recall.

Sometime in September or October 2014, she took her Camaro to Carl Hogan dealership to have

the repair work completed.  She had to take time off of work and was inconvenienced.  Ms.

Murray would not have purchased the vehicle or she would have paid less for it had she known

about its defect.

### Youloundra Smith—Mississippi[25]

161.   Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Youloundra is a resident and citizen of Canton, Mississippi.  Ms. Smith purchased a new 2005 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for around $21,000 from Harrold Chevrolet in Canton, Mississippi on May 17, 2006.  The car was covered under the standard manufacturer's warranty.   Ms. Smith chose the vehicle, in part, because safety and reliability were important to her.  She remembers seeing advertisements on television about General Motors vehicles being safe and reliable.  Often, Ms. Smith had problems starting the car.  In January 2015, her son was driving the vehicle, and the power steering locked up and he hit an embankment.  The vehicle was totalled.  She doesn't recall receiving the recall notice for the ignition switch.  Ms. Smith sold the vehicle after the accident to a private seller who wanted parts for $300.  Ms. Smith would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Linda Wright—Mississippi

162.   Plaintiff and proposed Delta Ignition Switch Defect Class Representative Linda Wright is a resident and citizen of Greenwood, Mississippi.  Ms. Wright purchased a used 2007 Chevrolet Cobalt with the Delta Ignition Switch Defect for $4,300 from Charles Spain Auto Service in Greenwood, Mississippi on July 8, 2013.  At the time she purchased her vehicle, it was not covered by a warranty.  She chose this vehicle, in part, because the vehicle's safety and reliability was important to her.  On two occasions, on November 13, 2013, and May 18, 2014, Ms. Wright's engine shut down while operating the vehicle under normal driving conditions, at

---

[25] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

25-40 miles per hour.  Each time, she was forced to try and steer the car to the side of the road before restarting the engine.  The steering also locked up in both instances.  Ms. Wright had the ignition switch repaired under the recall at a dealership in Greenwood, Mississippi in 2015.  Ms. Wright would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Brad Akers—Missouri

163.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass, Power Steering Defect Class, Power Steering Defect Magnuson-Moss and Implied Warranty Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Brad Akers is a resident and citizen of Belgrade, Missouri.  Mr. Akers purchased a new 2009 Chevrolet HHR with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for $21,800 from the Affenberg dealership in Farmington, Missouri on September 7, 2009.  The vehicle was covered under the standard factory warranty.  Safety and reliability was the major reason Mr. Akers selected this car over other brands.  He recalls seeing advertisements on television and online about his vehicle's safety, and the dealership salesman made similar statements.  Mr. Akers's vehicle has shut off on him while driving.  His power steering has also failed while driving, and nearly caused an accident twice.  Mr. Akers received a recall notice for the ignition switch defect, but it took about ten to twelve weeks before he could get his car into a dealership because the parts were backordered and the demand was high.  He visited three dealerships before he found one that could schedule him.  He was without a car for about three weeks, and he lost several days of wages.  Mr. Akers tried to trade in his car but he was told the value was lower because of the

recalls.  Mr. Akers would not have purchased the vehicle or he would have paid less for it had he known about its defects.

**Deloris Hamilton—Missouri**

164.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Deloris Hamilton is a resident and citizen of Florissant, Missouri.  Ms. Hamilton purchased a used 2000 Oldsmobile Alero (subject to the Low Torque Ignition Switch recall) for $3,500 from 94 Auto in St. Charles, Missouri on February 24, 2012.  The car was not covered by a warranty.  Ms. Hamilton chose this vehicle, in part, because the vehicle's safety and reliability was important to her.  She received a recall notice for the ignition switch recall but did not get her car repaired because she had stopped driving the car due to the gear shift knob breaking off and she was concerned about her safety and the safety of others on the road.  And she could not afford to get the gear shift knob repaired.  She got rid of the car in April 2016.  Ms. Hamilton would not have purchased the vehicle or she would have paid less for it had she known about the defect in the vehicle.

**Cynthia Hawkins—Missouri**

165.    Plaintiff and proposed Delta Ignition Switch Defect Class and Power Steering Defect Class Representative Cynthia Hawkins is a resident and citizen of Lemay, Missouri.  Ms. Hawkins purchased a used 2010 Chevrolet Cobalt (subject to the Delta Ignition Switch and Power Steering recalls) for approximately $13,000 from South County Auto Center in Missouri on July 23, 2013.  The car was not under warranty.  Ms. Hawkins purchased this vehicle to share with her teenage daughter so the vehicle's safety and reliability were important to her in choosing this car.  Before buying the car, she researched it on Kelley Blue Book and J.D. Power.  She was told by the dealership salesman that the vehicle was a good family car, it would be easy

for a teenager to drive, and it received good mileage.  Ms. Hawkins did not receive a recall

notice, but rather heard about it on the news and immediately contacted her local New GM

dealer.  The dealer told her the parts were not available.  Out of fear for her safety, Ms. Hawkins

and her daughter did not drive the vehicle from April 7, 2014, to August 29, 2014, while she

awaited arrival and installation of the recall repair parts.  Her daughter was not permitted to drive

the loaner vehicle because she was only seventeen, so Ms. Hawkins had to purchase a

replacement vehicle for the Cobalt, a Hyundai Elantra, for about $3,000.  Because the Cobalt sat

so long, Ms. Hawkins had to replace the tires for about $375-$400 and replace the brakes for

about $275.  Post-recall repair, Ms. Hawkins no longer has a working key fob and must open the

doors manually.  Since announcement of the defect, she believes her car's value has decreased

significantly, and it prevents her from re-selling it for a fair price.  Ms. Hawkins would not have

purchased the vehicle or she would have paid less for it had she known about its defect.

### Kenneth Robinson—Missouri

166.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied

Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

Representative Kenneth Robinson is a resident and citizen of Urich, Missouri.  Mr. Robinson

purchased a new 2008 Pontiac G5 with the Delta Ignition Switch Defect for $13,000 to $14,000

from the Westfall Odell dealership in Missouri on September 7, 2008.  The vehicle was covered

under the standard factory warranty.  Mr. Robinson chose this vehicle, in part, because the

vehicle's safety and reliability was important to him.  He also remembers the salesman talking

about the vehicle's safety.  Mr. Robinson's car would shut off on him about every third time he

drove it. He would drive twenty to thirty miles and then it would shut off and he would have to

- 111 -

put it in neutral and restart it.  These shutdowns even happened on the highway, but fortunately

he never had an accident.  Before the recall was announced, he brought the car into the Excelsior

Springs, Missouri dealership to address the issue.  No one at the dealership could resolve the

problem.  Mr. Robinson did not learn about the ignition switch recall until he took the car into

the Jim Falk dealership and traded it for about $6,000 on May 13, 2013.  The salesman told him

the car was worth less because of the defect and recall, and Mr. Robinson believes he incurred a

loss as a result.  Mr. Robinson would not have purchased the vehicle or he would have paid less

for it had he known about its defect.

**Ronald Robinson—Missouri**

167.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative

Ronald Robinson is a resident and citizen of Bridgeton, Missouri.  Mr. Robinson purchased a

used 2010 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for

approximately $16,000 from Enterprise Leasing in Missouri in June 2010.  He purchased an

extended warranty that expired on March 16, 2015, or at 82,000 miles.  Both safety and

reliability were important considerations to Mr. Robinson in purchasing this vehicle.  Before

purchasing his Impala, Mr. Robinson viewed email and television advertising highlighting the

quality of the Impala, and this positively impacted his decision to buy the car.  Mr. Robinson first

heard about the recalls in summer 2014.  He contacted his local dealer to inquire about his

Impala, and they told him they were unsure if his vehicle was subject to recall.  Then he called a

New GM toll-free number, provided his VIN, and was told his specific make and model was not

being recalled.  Just a few months later, in August 2014, he received a notice in the mail about

his car being recalled for an ignition switch defect.  Mr. Robinson's vehicle was not repaired

until the summer of 2015 because the parts were not available for some time.  He believes his

car's value has diminished and he is worried about trying to sell the car now because he does not believe he can get a fair price for it.  He has also since received other recall notices for the car.  Mr. Robinson would not have purchased the vehicle had he known about its defect.

### Mario Stefano—Missouri

168.    Plaintiff and proposed Knee-to-Key Camaro Defect Class and Knee-to-Key Camaro Defect Magnusson-Moss and Implied Warranty Subclass Representative Mario Stefano is a resident and citizen of Imperial, Missouri.  Mr. Stefano purchased a Certified Pre-Owned 2011 Chevrolet Camaro (subject to the Knee-to-Key Ignition Switch recall) from Dave Sinclair Buick GMC Truck in St. Louis, Missouri on May 14, 2013.  The car was covered by the manufacturer's warranty.   Mr. Stefano's car turned off while exiting the off ramp.  He stopped the car and restarted it and then went and replaced the battery because that is what he thought might have been the problem.  Mr. Stefano would not have purchased the vehicle or he would have paid less for it had he known about its defects.

### Christopher Tinen—Missouri

169.    Plaintiff and proposed Side Airbag Defect Class and Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass Representative Christopher Tinen is a resident and citizen of Rockwall, Texas.  Mr. Tinen purchased a new 2010 GMC Acadia (subject to the Side Airbag recall) for $31,800 from the Bommarito dealership in Ellisville, Missouri on February 22, 2010.  The vehicle came with the standard factory warranty.  He chose this vehicle, in part, because the vehicle's safety and reliability was important to him.  He was persuaded to buy the car because of print and television advertisements he saw and his own online research about the vehicles' safety and reliability. The sales representative was also very persuasive about the car's fuel economy, performance, and dependability.  On dozens of occasions, almost on a

weekly basis, Mr. Tinen's Acadia would shut down.  The dealership thought it could be electrical

issues or gas issues but the problem was never resolved.  He remembers receiving a recall for

defective bolts but nothing for the airbag.  He was fearful and angered by the amount of

problems with his car.  He is required to travel for work and doing so in the GMC Acadia caused

him anxiety and stress because it was so unreliable.  In April 2012, Mr. Tinen traded in his car

for a 2012 GMC Terrain at a $5,000-$6,000 loss.  He then got rid of the Terrain in 2014.  He

believes New GM should be held responsible for its dishonesty about the safety defects.  Mr.

Tinen would not have purchased the vehicle if he had known about its defect.

### Patrice Witherspoon—Missouri

170.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied

Warranty Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch

Defect Bankruptcy Class Representative Patrice Witherspoon is a resident and citizen of Lee's

Summit, Missouri.  Ms. Witherspoon purchased a new 2006 Saturn Ion with the Delta Ignition

Switch Defect (and subject to the Power Steering recall) for approximately $16,828 from a

Missouri vehicle dealer, Saturn of Blue Springs, in Missouri in 2005.  There was an original

factory warranty on the car which expired after 100,000 miles.  Ms. Witherspoon chose this

vehicle, in part, because the vehicle's safety and reliability were important to her.  She was

looking for a safe vehicle to transport herself and her minor daughter.  She remembers seeing

television advertisements for Saturn which stated the vehicles were safe.  She was also reassured

by the Saturn salesman that the car was safe after she expressed a requirement that the car have

dual airbags in the front seats.  Ms. Witherspoon's vehicle spontaneously shut off on at least five

occasions while driving.  On one occasion, she was on the highway but was able to avoid an

accident by pulling over to the shoulder.  On another occasion, her vehicle shut off while on the exit ramp to a highway, but she was, fortunately, again able to avoid an accident.  On each occasion, the vehicle gearshift was in "drive" or "reverse" and the ignition key was in the "run" position.  Ms. Witherspoon had difficulty controlling and safely stopping the vehicle. After the recall was announced in early 2014, Ms. Witherspoon received a postcard from New GM stating that the part had not been repaired in her vehicle.  She contacted Molle Chevrolet, the dealership servicing the vehicle, and was told the part was not available.  Ms. Witherspoon was afraid to drive her car for fear that it would stall and cause an accident.  So for approximately one week, Ms. Witherspoon either borrowed her mother's car or asked her mother to personally drive her on errands and to and from work.  Her mother often had to take personal time from her own job to transport Ms. Witherspoon.  Due to the inconvenience of depending on her mother for transportation, and the fact that she could not afford to replace the vehicle or pay for a rental, Ms. Witherspoon felt she had no choice but to resume driving the Saturn.  Ms. Witherspoon waited several months for the part to arrive, all the while fearing for her and her family's safety while in the car.  In early June 2014, Molle Chevrolet said the part was available and told Ms. Witherspoon to bring her car in for service.  The following Saturday, on or about June 14, 2014, Ms. Witherspoon brought her car in for repair.  After waiting most of the day in the service department, she was told the part was not available and she would have to come back another day.  Ms. Witherspoon returned to Molle Chevrolet again on or about Saturday, June 21, 2014, and waited two hours while the ignition switch was finally repaired.  The value of Ms. Witherspoon's vehicle has diminished as a result of the defect.  Ms. Witherspoon would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have

- 115 -

purchased the vehicle or she would have paid less for it had she known about the defect in the vehicle.

### Laurie Holzwarth—Montana

171.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Laurie Holzwarth is a resident and citizen of Billings, Montana.  Ms. Holzwarth purchased a used 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect for about $7,000 from a private seller in Billings, Montana in 2008.  The car was not under warranty.  Ms. Holzwarth purchased this vehicle because safety and reliability was important to her, as this was a car for her daughter, Christine.  Christine has experienced countless shutdowns while driving the vehicle.  It has shut down on highways, on the main street of her town, and pulling into parking spaces.  The worst incident that Christine can remember was witnessed by Ms. Holzwarth while they were driving on the highway in August 2010 from Billings to Bozeman, where Christine would be attending college.  While making a sharp turn, traveling at 75-80 miles per hour, the car shutoff. Christine was able to get the car to a stop without hitting the concrete wall, cycle the key, and continue.  They drove another 40 miles, and the car shut off twice more on the straightaway, and once more in town.  Christine experienced both power steering failure and power failure incidents before this, but had not done much highway driving because she mainly drove to and from high school.  The ignition switch was supposedly repaired under the recall on July 29, 2014.  But since its repair, Christine experienced two shutdowns and power steering failures on September 3, 2014, and September 8, 2014.  In trying to resolve issues with the vehicle's repair, Ms. Holzwarth had to pay for transportation to the dealership on various occasions.  Also, in an attempt to diagnose the shutdown issues prior to disclosure of the ignition

switch defect, Ms. Holzwarth paid at least $500 to repair things that mechanics believed may be causing the vehicle shutdowns.  Ms. Holzwarth would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Susan Rangel—Nebraska**

172.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Susan Rangel is a resident and citizen of North Platte, Nebraska.  Ms. Rangel purchased a used 2008 Chevrolet Cobalt with the Delta Ignition Switch Defect for $14,000 from Jerry Remus Chevrolet in North Platte, Nebraska on September 13, 2008.  At the time of purchase, the vehicle had the original manufacturer's warranty.  Ms. Rangel purchased the vehicle believing it to be safe and reliable.  The salesman told her about the car's safety and reliability at the time she bought the car.  At the time of her purchase, there were two Cobalts left on the lot and the salesperson informed her that these cars were ideal for safety and reliability.  When she learned about the recall in April 2014, she requested a loaner vehicle because she did not believe the vehicle was safe to drive, but New GM told her they would not provide one.  The dealership repaired her vehicle under the recall in June 2014.  Ms. Rangel would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Bonnie Hensley—Nevada**

173.     Plaintiff and proposed Side Airbag Defect Class Representative Bonnie Hensley is a resident and citizen of Reno, Nevada.  Ms. Hensley purchased a used 2013 GMC Acadia (subject to the Side Airbag recall) for $42,429 from Reno Buick GMC Cadillac in Reno, Nevada

- 117 -

on January 31, 2014.  The vehicle had a standard manufacturer's warranty and Mrs. Hensley also purchased an extended warranty.  She chose this vehicle, in part, because the vehicle's safety and reliability was important to her.  Ms. Hensley does not recall receiving any recalls on her 2013 GMC Acadia.  She sold her car back to the dealership on January 24, 2016 for $24,500.  Ms. Hensley would not have purchased the vehicle or she would have paid less for it had she known about the defect in the vehicle.

**Sandra Horton—Nevada**

174.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Sandra Horton is a resident and citizen of Las Vegas, Nevada.  Ms. Horton purchased a used 2007 Pontiac Solstice with the Delta Ignition Switch Defect for $10,000 from Buckaroo Auto Sales in Nevada in October 2013.  Her car was not under warranty at the time of purchase.  She chose this vehicle, in part, because the vehicle's safety and reliability was important to her.  On several occasions she experienced issues with her vehicle that were consistent with the ignition switch defect.  Also, at times she could not get the key out of the ignition when it was in park and the engine would continue to run on its own.  Ms. Horton's vehicle was repaired under the recall on July 2, 2014, but only after she waited four or five months for the parts to arrive.  New GM did not provide her with a loaner vehicle during this waiting period.  Ms. Horton had to borrow vehicles from relatives and friends to get to classes, medical appointments, and to buy groceries for her family, and she paid them for the fuel to use their cars.  Ms. Horton would not have purchased the vehicle or she would have paid less for it had she known about the defect in the vehicle.

**Wayne Wittenberg—Nevada**

175.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Wayne Wittenberg is a resident and citizen of Las Vegas, Nevada.  Mr. Wittenberg purchased a new 2006 Chevrolet HHR with the Delta Ignition Switch Defect for $20,300 from Bill Heard Chevrolet in Las Vegas, Nevada in September 2005.  Mr. Wittenberg's vehicle came with the standard new car warranty.  Mr. Wittenberg chose this vehicle, in part, because the vehicle's safety and reliability was important to him.  He also recalls seeing television ads about the safety features of the HHR.  Mr. Wittenberg experienced stalling and shutdowns in his HHR about four to five times while driving.  Each time he would have to pull over and restart the car.  Mr. Wittenberg was concerned about this defect and his safety so he decided to trade in the vehicle for a more reliable car in September 2012, before the recall was announced.  Mr. Wittenberg reviewed Kelley Blue Book and noted that the value of his car varied between $6,000-$7,500.  The best trade-in offer he received, however, was approximately $4,000.  Mr. Wittenberg would not have driven the vehicle or would have sold it if he had known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about the defect in the vehicle.

**Crystal Mellen—New Hampshire**

176.    Plaintiff and proposed Delta Ignition Switch Defect Class and Power Steering Defect Class Representative Crystal Mellen is a resident and citizen of Nashua, New Hampshire.  Ms. Mellen purchased a used 2004 Saturn Ion with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for $6,995 from Jok's Auto in Hudson, New Hampshire on September 4, 2012.  Her car was not under warranty at the time of purchase.  Ms. Mellen chose

this vehicle, in part, because the vehicle's safety and reliability was important to her.  She has a young son and stepson, both with special needs, who she transports in the vehicle so she needed something safe.  Ms. Mellen saw television advertisements discussing the safety and reliability of Saturn vehicles.  Frequently, her key gets stuck in the ignition switch of the car.  This problem started relatively soon after she bought the car, but now is nearly an everyday occurrence since she had the recall repair completed.  Ms. Mellen's vehicle was repaired under the ignition switch recall in May 2014.  She acted quickly to get the repair because her household must share this one vehicle.  It took about a week or two for the new parts to arrive and the repair to be completed.  About a year ago, the vehicle's power steering went out while she was driving.  She was able to maneuver home, but it was very difficult without the power steering capabilities.  She eventually received a recall notice for the power steering.  Ms. Mellen would not have purchased the vehicle or she would have paid less for it had she known about the defects in the vehicle.

### Michael Amezquita—New Jersey

177.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Michael Amezquita is a resident and citizen of Hamilton, New Jersey.  Mr. Amezquita purchased a new 2006 Chevrolet Cobalt with the Delta Ignition Switch Defect for $14,000 from Beacon Chevy-Olds in Hightstown, New Jersey on June 30, 2006.  At the time he purchased the vehicle it was covered under warranty, but the warranty has since expired.  Mr. Amezquita chose to purchase an Old GM vehicle because safety and reliability were both important to him and his family.  He truly believed that he would be buying a safe car.  He also

remembers the salesman saying that he was purchasing a very reliable brand.  Mr. Amezquita did not learn of the ignition switch defects until March 2014.  His car was not repaired under the recall until April 23, 2014, after about a month of waiting on the parts and service.  Mr. Amezquita would not have driven the vehicle or would have sold it if he had known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about the defect in the vehicle.

### Heather Francis—New Jersey

178.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Heather Francis is a resident and citizen of Hamilton, New Jersey.  Ms. Francis purchased a used 2000 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) from Dani's Auto in Philadelphia, New Jersey on July 31, 2012.  Ms. Francis has experienced her steering wheel tighten up while she is driving, making it hard to steer.  Ms. Francis would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Anthony Juraitis—New Jersey

179.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch Defect Bankruptcy Class Representative Anthony Juraitis is a resident and citizen of Freehold, New Jersey.  Mr. Juraitis purchased a new 2004 Saturn Ion with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for $16,000 from a Saturn dealership in Freehold, New Jersey around the winter of 2003.  Mr. Juraitis purchased the vehicle with a standard warranty.  Mr. Juraitis chose the vehicle because the vehicle's safety and reliability was important to him.

- 121 -

He had owned Saturns before and was pleased with their safety and reliability.  Mr. Juraitis experienced several shutdowns and stalls while driving his Ion.  The first occurred on the highway when his vehicle "locked" while driving.  Other drivers stopped to help him push his vehicle to the side of the road, where, after several attempts, he was able to restart his vehicle.  Mr. Juraitis took the vehicle to the dealership, which replaced the ignition switch and charged Mr. Juraitis for parts and labor.  Following this supposed repair, Mr. Juraitis' vehicle continued to have stalls and shutdowns approximately three dozen times, with about eight or ten of them being in very dangerous situations.  On July 31, 2014, the ignition switch was replaced again, this time under the recall.  On two occasions before the recall, Mr. Juraitis paid to have his ignition serviced in an attempt to solve the vehicle's shutdown problems.  Mr. Juraitis also missed work to have the vehicle repaired. Following this replacement, Mr. Juraitis continued to experience safety problems with the vehicle, including in early September 2014, when his vehicle shut down again and he was unable to immediately restart the vehicle.  Mr. Juraitis would not have driven the vehicle or would have sold it if he had known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about its defect.

**Gene Reagan—New Jersey**

180.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass, Power Steering Defect Class, and Power Steering Defect Magnuson-Moss and Implied Warranty Subclass Representative Gene Reagan is a resident and citizen of South Amboy, New Jersey.  Mr. Reagan purchased a new 2010 Chevrolet HHR (subject to the Delta Ignition Switch and the Power Steering recalls) for about $20,000 from All American Chevrolet in Middletown, New Jersey in December 2009.  His

vehicle had a standard warranty, but he does not recall its details. Mr. Reagan purchased a

Chevrolet vehicle because he believed that New GM stood for safety and reliability. Mr. Reagan

has experienced several safety problems with his vehicle, including his ignition locking and

inability to turn the key to the "on" position, requiring the car to be towed to the dealership.

Because of his ignition problems, Mr. Reagan had his ignition replaced approximately three

years ago, but it did not solve the problems he was experiencing with his vehicle. Mr. Reagan's

ignition switch was replaced under the recall on October 28, 2014. Mr. Reagan missed a day of

work when the car was being repaired. He is unaware if the power steering was ever serviced

under the recall, and he no longer owns the car. Mr. Reagan would not have purchased the

vehicle or he would have paid less for it had he known about its defects.

### Steven Sileo—New Jersey

181.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Steven

Sileo is a resident and citizen of Skillman, New Jersey. Mr. Sileo purchased a used 2009

Chevrolet Cobalt with the Delta Ignition Switch Defect for $10,000 from Burlington Chevrolet

in Burlington, New Jersey in July 2010. It was under warranty when he purchased it. Because

Mr. Sileo purchased the vehicle for his teenage daughter to drive, he was very concerned about

the safety and reliability of the vehicle. Mr. Sileo was assured about the safety and reliability of

the vehicle by advertisements and by the salesperson who ultimately sold him the vehicle.

Although Mr. Sileo did not experience any ignition switch-related events with his Cobalt, he

feared driving the vehicle after learning of the recall and the risks posed by the defect. Mr. Sileo

had the recall repair work performed in 2011 and again in late 2014. Mr. Sileo and his daughter

were without the vehicle for more than three months while the vehicle's ignition was repaired in

2014. Mr. Sileo sold the vehicle in November 2015 for $2,500. Mr. Sileo believes the value of

his vehicle was diminished as a result of the defect.  Mr. Sileo would not have purchased the vehicle or would have paid less for the vehicle had he known about its defect.

**Javier Delacruz—New Mexico**

182.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Javier Delacruz is a resident and citizen of Albuquerque, New Mexico.  Mr. Delacruz purchased a new 2009 Chevrolet Cobalt with the Delta Ignition Switch Defect for $20,698 from Reliable Chevrolet in Albuquerque, New Mexico in September 2009.  The vehicle was under warranty when he purchased it.  In 2011, Mr. Delacruz could not shut off his vehicle and the ignition switch was replaced.  After learning about the ignition switch recall, Mr. Delacruz feared driving his vehicle because of the risks posed by the defect.  His vehicle's ignition switch was replaced again in 2014 under the recall.  Additionally, Mr. Delacruz was without his vehicle for three months while his vehicle was being repaired under the recall.  He sold the vehicle in October 2015 for $6,000.  Mr. Delacruz believes the value of his vehicle was diminished as a result of the defect.  Mr. Delacruz would not have purchased the vehicle or would have paid less for it had he known about its defect.

**Lorraine De Vargas—New Mexico**

183.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch Defect Bankruptcy Class Representative Lorraine De Vargas is a resident and citizen of Rio Rancho, New Mexico.  Ms. De Vargas purchased a used 2005 Saturn Ion with the Delta Ignition Switch Defect (and subject to the Power Steering recall) in installment payments to a private seller in October 2007 in Santa Fe, New Mexico for $5,000, and paid the vehicle off on

- 124 -

November 25, 2009.  There was no warranty on the vehicle when Ms. De Vargas purchased it.

She chose this vehicle, in part, because the vehicle's safety and reliability was important to her.

Ms. De Vargas was involved in an accident on December 12, 2012.  While she was driving her

car the vehicle shut down unexpectedly and caused her to collide with a fence at 25-30 miles per

hour.  Her power steering went out and her airbags failed to deploy.  The vehicle damage was

repaired, and while she survived the accident with no injuries, she had to pay a $500 insurance

deductible and she still had to drive the car to work every day despite her concerns about her

safety.  Ms. De Vargas did not learn of the ignition switch defects until March 2014 after reading

an article online that stated the car was unsafe to drive and New GM would offer a

complementary loaner vehicle while affected vehicles were repaired.  Ms. De Vargas contacted a

New GM dealer in Espanola, New Mexico to schedule the repair and asked for a loaner car

because she did not feel safe driving her Ion.  The New GM dealer said it did not have the part to

fix the car yet.  It also took the dealership several weeks to get her a loaner vehicle, which was an

inconvenience because she had to get a ride with a coworker to get to work.  Ms. De Vargas had

to take time off work to pick up the loaner car out in Los Alamos, New Mexico.  When she

finally had her car repaired under the recall in April 2014, after waiting a little over a month for

the parts and service, she had to take time off work as well.  Ms. De Vargas is still concerned

about the safety of her vehicle, the impact the defect has had on the value of her vehicle, and the

costs she has incurred in fixing the vehicle previously.  Because of these safety concerns, since

mid-2015, Ms. De Vargas has kept the car parked and drives it very little.  Ms. De Vargas would

not have driven the vehicle or would have sold it if she had known about its defect.  She would

not have purchased the vehicle or she would have paid less for it had she known about the defect

in the vehicle.

### Arteca Heckard—New Mexico

184.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Arteca Heckard is a resident and citizen of Hobbs, New Mexico.  Ms. Heckard purchased a used 2004 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) from a private seller in New Mexico in March 2014.  Ms. Heckard's vehicle has shut off on her while driving.  Ms. Heckard would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Bernadette Romero—New Mexico

185.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Bernadette Romero is a resident and citizen of Santa Fe, New Mexico.  Ms. Romero purchased a new 2007 Chevrolet Cobalt with the Delta Ignition Switch Defect for $14,645 from Casa Chevrolet in Albuquerque, New Mexico on July 3, 2007.  Her car was covered by a warranty at the time of purchase.  Ms. Romero's vehicle was repaired under the recall in May 2014, but she went without her vehicle for five weeks while it was repaired.  She drove a loaner car during that time.  Ms. Romero traded in her Cobalt for $5,500 on June 20, 2014.  Ms. Romero would not have driven the vehicle or would have sold it if she had known about its defect. She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Irene Torres—New Mexico

186.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Irene Torres is a resident and citizen of Las Cruces, New Mexico.  Ms. Torres purchased a used 2001 Oldsmobile Alero (subject to the Low Torque Ignition Switch recall) for $3,500 from a

private seller in New Mexico in August 2013.  The car was not under warranty.  Ms. Torres

chose this vehicle for its reliability and gas mileage because she uses it to travel back and forth to

school.  Ms. Torres's vehicle has shut off on her while she was leaving her driveway.  Ms. Torres

did not learn about the ignition switch defect until a man helping her with her car mentioned it.

She eventually received a recall notice.  Ms. Torres is a fulltime college student and she cannot

afford to buy a new car.  She would not have purchased the vehicle or she would have paid less

for it had she known about its defect.

### Renate Glyttov—New York

187.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Magnuson-Moss and Implied Warranty Subclass, Power Steering Defect Class, and

Power Steering Defect Magnuson-Moss and Implied Warranty Subclass Representative Renate

Glyttov is a resident and citizen of New Windsor, New York.  Ms. Glyttov purchased a Certified

Pre-Owned 2009 Chevrolet HHR with the Delta Ignition Switch Defect (and subject to the

Power Steering recall) for $15,995 from Barton Birks Chevrolet in Newburgh, New York on

March 28, 2012.  Ms. Glyttov's vehicle was covered by a certified pre-owned limited warranty

that expired on March 28, 2013, as well as a standard maintenance plan that was effective from

her purchase date until March 28, 2014.  Operating under the belief that New GM was a quality

brand and that the vehicle would be safe, reliable, and defect-free, she purchased her HHR.  The

salesman also told Ms. Glyttov that the HHR was a safe and reliable vehicle.  The salesman

pointed out all of the airbags and told her how safe Chevrolet makes its vehicles, and how rugged

the HHR was based on its platform.  Ms. Glyttov was particularly concerned about safety

because she would be driving with her elderly mother.  Ms. Glyttov's vehicle regularly shut off

spontaneously on many occasions in 2012 and 2013 while she traveled around New Windsor,

New York; Newburgh, New York; Wallkill, New York; and in Pennsylvania when driving onto an off-ramp of I-84. The vehicle would shut off when Ms. Glyttov drove on bumpy roads or hit a pothole. Ms. Glyttov also experienced other problems with the ignition. On several occasions in 2012 and 2013, when she put the key in the ignition it would not turn and would get stuck in the ignition. Eventually, the key would move after attempting to turn the ignition on for several minutes. On May 16, 2012, Ms. Glyttov's ignition lock cylinder was replaced during a routine oil change. She still experienced numerous shut off events after this replacement. The various ignition-related incidents led to Ms. Glyttov only using the car for driving around town and very sparingly, as she could not trust it on longer trips, and became hesitant to drive it on the highway. Ms. Glyttov she took her car in for service under the ignition recall on May 5, 2014. Her car was kept until June 11, 2014 while the ignition keys and switch were replaced. Ms. Glyttov received notice of the Power Steering recall in June of 2014, and the Notice indicated that parts were not currently available. At various points over the next six months, Ms. Glyttov made inquiries with her two local dealerships as to the availability of parts for the power steering recall. During at least one of these calls, she was told not to worry because nothing bad would happen if she was driving it and the part failed. Finally, on December 10, 2014, when the part was finally available, Ms. Glyttov had the power steering serviced under the recall at Healey Brothers Chevrolet. Ms. Glyttov needed to use some time away from work to bring the vehicle to appointments to address some of the issues with the vehicle. She ultimately traded in the vehicle in 2015. Ms. Glyttov would not have purchased the vehicle or she would have paid less for it had she known about its defects.

**Sandra Levine—New York**

188.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

Representative Sandra Levine is a resident and citizen of Babylon, New York.  Ms. Levine

purchased a used 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect for $16,627.96

from Babylon Honda in Babylon, New York on May 27, 2006.  Ms. Levine's vehicle was

covered by a warranty that expired 90 days after her purchase.  Ms. Levine purchased her Cobalt

because she believed it would be a safe and reliable vehicle.  Ms. Levine's vehicle spontaneously

shut off on two occasions in 2011 and 2012.  The shut-off incidents both took place when she

was driving on Deer Park Avenue in Suffolk County, New York. There was no apparent reason

for the shutdown in either case.  The road was not bumpy, and Ms. Levine does not believe her

knee hit the ignition switch.  Ms. Levine's ignition switch was replaced on May 22, 2014, by

Chevrolet of Huntington in connection with the recall.  Ms. Levine still owns the vehicle.  Ms.

Levine would not have driven the vehicle or would have sold it if she had known about its

defect.  She would not have purchased the vehicle or she would have paid less for it had she

known about its defect.

**Nicole Mason—New York**

189.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Magnuson-Moss and Implied Warranty Subclass, Power Steering Defect Class, and

Power Steering Defect Magnuson-Moss and Implied Warranty Subclass Representative Nicole

Mason is a resident and citizen of Rochester, New York.  Ms. Mason purchased a new 2010

Chevrolet Cobalt (subject to the Delta Ignition Switch and Power Steering recalls) for

$22,010.47 from Bob Johnson Chevrolet in Rochester, New York on May 17, 2010.  Ms. Mason

purchased an extended warranty that covered the vehicle for 72 months or 48,000 miles.

- 129 -

Ms. Mason reviewed advertisements for the Cobalt that ran in her local newspaper, the *Democrat & Chronicle*, and her decision to buy the vehicle was influenced by these advertisements. Ms. Mason believed the Chevrolet Cobalt was a safe and reliable vehicle. Ms. Mason's vehicle has spontaneously shut off on at least three occasions. The vehicle first shut off on September 3, 2010, near Emerson and Glide streets in Rochester, New York when Ms. Mason's daughter, Jessica Mason, was driving it home from a test to get her driver's license. Because of the incident, the vehicle had to be towed to be repaired, and Jessica Mason was unable to complete the driver's test. Ms. Mason purchased a AAA membership after the vehicle proved to be so unreliable. The vehicle shut off a second time on September 16, 2010, in Rochester, New York when Jessica Mason was traveling on Britton Road. Most recently, on September 4, 2014, the vehicle shut off while Ms. Mason was driving it in Myrtle Beach, South Carolina. On each shutdown occasion, the vehicle lost power for no apparent reason. Ms. Mason and her daughter were not driving on a bumpy road and did not hit the ignition switch with their knees. In the September 16, 2010 incident, Jessica Mason was forced to use the emergency brake to get the vehicle to stop and avoid an accident. The vehicle would not turn back on immediately and had to be towed to Ms. Mason's home. Ms. Mason took the vehicle to a New GM dealer after the September 16, 2010 incident, but the dealer could not identify a cause for the shut off and made no repairs. Ms. Mason's ignition switch was replaced in June 2014 under the recall, and, to the best of her recollection, Ms. Mason's power steering was serviced under the power steering recall in or shortly after November 2014. Ms. Mason still owns the vehicle. Ms. Mason would not have purchased the vehicle or she would have paid less for it had she known about its defects.

**Donna Quagliana—New York**

190.     Plaintiff and proposed Delta Ignition Switch Defect Class Representative Donna Quagliana is a resident and citizen of Westfield, New York.  Ms. Quagliana purchased a used 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect for $10,000 from Schults of Westfield, New York, a Chevrolet dealership, in 2013.  It was not covered under warranty.  She bought it because they needed a safe car for her daughter to drive to and from college in Buffalo, New York.  While Ms. Quagliana was driving to school on two separate occasions, the car turned off and she was able to get off to the side of road and restart.  This scared her daughter so much that she did not want to drive the car, and Ms. Quagliana's son had to drive it back to Westfield.  Ms. Quagliana lent her vehicle to her daughter and had to go without a car because she did not want her daughter driving the Cobalt.  Ms. Quagliana tried to diagnose the problem and get the vehicle fixed to no avail, until one day her mother sent her an article about the defective ignition switches and related fatalities.  Ms. Quagliana was so angry and scared that she had sent her daughter off in a car she thought was safe but was not.  She feels lucky her daughter is alive today.  It took months, but finally the repair was completed on the car.  In 2015, after the switch was repaired, the car was totaled in an accident when it slid on ice. They decided against another Chevy and got a Ford instead.  Ms. Quagliana would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or would have paid less for it had she known about the defect in the vehicle.

**Michael Rooney—New York**

191.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Bankruptcy Class Representative Michael Rooney is a resident and citizen of Ronkonkoma, New York.  Ms. Rooney purchased a used 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect for

$16,000 from Thomas Dodge Subaru Suzuki in Port Jefferson Station, New York on September 13, 2007.  Ms. Rooney purchased an extended warranty for the vehicle. She chose this vehicle because safety and reliability in the vehicle was important to her.  She recalls seeing advertisements for the Cobalt in Newsday and in the New York Daily News touting the vehicle's safety and reliability, and she sought out the vehicle because of these advertisements.  Ms. Rooney also recalls asking the salesman at Thomas Dodge about whether the Cobalt was safe, and he told her that the vehicle had a good safety rating.  Ms. Rooney experienced several shutdowns in her vehicle while driving.  Her ignition switch was replaced under the recall in summer 2014.  Before the ignition switch was replaced, Ms. Rooney missed three total days of work when the Cobalt stalled and Ms. Rooney was unable to remove her ignition key from the ignition.  She was not paid for these three days of missed work.  After the vehicle stalled on these three occasions, Ms. Rooney was afraid to drive it.  This fear caused her to miss multiple doctor appointments.  Ms. Rooney also rented a car the day she heard about the recall and took the Cobalt to the dealership for repair.  Following replacement of her ignition switch, her automatic starter no longer worked in her vehicle, which she had to have repaired and cost her an additional $335.  Ms. Rooney still owns the vehicle, largely because she feels that she cannot get rid of it.  Ms. Rooney would not have driven the vehicle had she known it was defective. She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**William Ross—New York**

192.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

- 132 -

Representative William Ross is a resident and citizen of Bellmore, New York.  Mr. Ross purchased a new 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect for approximately $25,000 from Robert Chevrolet in Hicksville, New York in 2005.  Mr. Ross chose the New 2005 Cobalt because his neighbor had a new Cobalt and he liked the vehicle, so he purchased one for himself.  On June 23, 2012, Mr. Ross was driving his Cobalt in Nassau County, New York, at approximately 55 miles per hour when the ignition inadvertently switched into the accessory position, causing the engine to lose power.  The car's power steering, power braking, and airbag systems were disabled.  Mr. Ross lost control and the car crashed into a divider lined with rubber pylons.  The airbag did not deploy.  Mr. Ross suffered cuts and a separation of the muscle from the tendon in his arm.  It could not be surgically repaired by the time he was able to go to the VA hospital.  This accident cost Mr. Ross $6,279.97 in car repairs.  On March 30, 2014, Mr. Ross was again driving his Chevrolet Cobalt in Nassau County, New York, at approximately 55 miles per hour when the ignition suddenly switched into the accessory position, causing the vehicle to lose power to the engine.  Again, the power steering, power braking system, and airbags were disabled.  Mr. Ross lost control of the car and it hit a divider, knocking the rear wheels out of alignment.  This accident cost Mr. Ross approximately $175 in repairs.  In both accidents, the road was not bumpy and Mr. Ross does not recall hitting anything with his knee to cause the key to turn.  When Mr. Ross learned of the recalls, he called his New GM dealership to see if his vehicle was involved in the recall.  New GM told him it was not.  Then in early March 2014 he received a recall notice.  When he called about getting the recall repairs done he was told the parts to repair it were not available.  Mr. Ross stopped driving the vehicle and, in April 2014, he sold it to a junkyard to scrap for approximately $4,000.  He is a retired, disabled veteran.  Mr. Ross would not have driven the vehicle or would have sold it if he had known about its defect.

He would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Richelle Draper—North Carolina

193.    Plaintiff and proposed Side Airbag Defect Class and Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass Representative Richelle Draper is a resident and citizen of Mint Hill, North Carolina.  Ms. Draper purchased a new 2011 GMC Acadia (subject to the Side Airbag recall) for approximately $40,000 from Liberty GMC Buick in Charlotte, North Carolina on July 16, 2011.  The car was covered by the standard factory warranty and she purchased an extended warranty at the same time.  The safety and reliability of the vehicle was important to Ms. Draper.  She liked the multiple airbags, the cars aesthetics and features, how it drove, and the roadside assistance and OnStar features made her family feel safe. She believed GMC was a very good brand.  She cannot recall the specifics of the conversation with the salesperson, but she believes they spoke about the safety of the car.  Since purchasing the car, she received numerous recall notices overall, and about three of them in a fifteen month time period.  She was nervous about safety in her vehicle after learning about the recalls and she had to wait what felt like a long time before the parts were available.  Ms. Draper received the side airbag recall notice and had her car repaired under the recall on May 19, 2014.  It was inconvenient because she or her husband had to miss work to attend to the repair.  Her husband sat and waited while it was fixed.  Ms. Draper would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Gwen Moore—North Carolina

194.    Plaintiff and proposed Low Torque Ignition Switch Defect Class and Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass Representative Gwen

Moore is a resident and citizen of Wake Forest, North Carolina. Ms. Moore purchased a new 2011 Cadillac DTS (subject to the Low Torque Ignition Switch recall) from Thompson Cadillac in Raleigh, North Carolina in September 2011. The car was covered by the standard factory warranty. Ms. Moore chose this vehicle, in part, because the vehicle's safety and reliability was important to her. She has owned three Cadillacs before this one and she believed it was a safe and reliable brand based on her previous experience. The dealership salesperson also represented that the vehicle was very safe and reliable. Ms. Moore received the recall notice for the ignition switch defect and had it repaired in 2014. It was inconvenient for Ms. Moore to go to the Raleigh dealership to have the repair completed. She was also angry to discover she had been driving around in a dangerous and defective car all that time. Ms. Moore wrote New GM two letters expressing her concern about the defect, and while she got one phone call in response, nothing came of it. Ms. Moore would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Leland Tilson—North Carolina

195. Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Leland Tilson is a resident and citizen of Gastonia, North Carolina. Mr. Tilson purchased a new 2009 Chevrolet Cobalt with the Delta Ignition Switch Defect for $15,000 from McKinney Chevrolet in Gastonia, North Carolina on February 28, 2009. The vehicle had a five-year/100,000-mile warranty. Mr. Tilson purchased this vehicle because he thought it would be reliable. He recalls discussing reliability with the salesperson who sold him the Cobalt. Mr. Tilson experienced at least one shutdown in the vehicle while he was driving on a highway at

highway speed.  It happened when the vehicle went over a break in the asphalt and the vehicle

shut down.  Mr. Tilson, with an 18-wheeler bearing down on him, was able to maneuver the

vehicle to the side of the road to avoid an accident.  During this power failure, the power steering

also failed. Mr. Tilson has had his ignition replaced twice.  The first time was in June 2013, not

under the recall, because he was unable to shut off his vehicle.  The second time was in July

2014 under the recall.  Mr. Tilson still owns the vehicle, though he would not have driven it, and

may have attempted to sell it back to the dealership, had he known the vehicle was defective.  He

would not have purchased the vehicle or he would have paid less for it had he known about its

defect.

### Jolene Mulske—North Dakota

196.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Jolene

Mulske is a resident and citizen of Gladstone, North Dakota.  Ms. Mulske purchased a used 2005

Chevrolet Cobalt with the Delta Ignition Switch Defect for about $10,000 from Sax Motor

Company in Dickinson, North Dakota in 2010.  At the time of purchase, the vehicle was not

under warranty and Ms. Mulske did not purchase an extended warranty.  Ms. Mulske purchased

the vehicle because she wanted a safe and reliable vehicle for her daughter to drive.  The

vehicle's safety and reliability was an important consideration.  Although Ms. Mulske does not

have a specific recollection of an advertisement touting the Cobalt's safety and/or reliability, she

has a general recollection of seeing such advertisements.  Ms. Mulske had the ignition switch

repaired under the recall in summer 2014.  Ms. Mulske would not have purchased the vehicle or

she would have paid less for it had she known about its defect.

**Lisa Axelrod—Ohio**[26]

197.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Lisa Axelrod is a resident and citizen of North Hollywood, California.  Ms. Axelrod purchased a new 2004 Pontiac Grand Am (subject to the Low Torque Ignition Switch recall) for about $21,895 from a Pontiac dealership in Willoughby, Ohio on January 21, 2005.  The car was covered by the standard factory warranty.  Ms. Axelrod chose this vehicle, in part, because the vehicle's safety and reliability was important to her.  She owned a Grand Am before and it had been a good, safe car that held up well.  She also saw print ads in the Cleveland Plain dealer paper and local news magazine about Old GM vehicles. About two years ago, shortly after the news about the recalls broke, the car shut off on her while she was driving.  She also lost her steering ability.  She was unable to restart the car so she called AAA and had it towed to Community Chevrolet in Burbank, California.  They would not cover the repairs because the recall was not out for her particular vehicle yet, so she took it to another mechanic to fix it more cheaply.  The mechanic replaced the three-part ignition switch.  Ms. Axelrod had to pay out-of-pocket for a rental car while the ignition was repaired.  She filed a claim for reimbursement with New GM for the ignition switch repair.  They took months to respond and declined because her vehicle was not a part of the ignition switch recall.  She has continued to go back and forth with New GM, but has yet to be repaid for the repair.  Shortly after, she received a recall notice. When she called the dealer they said it was "just a key thing" and she would have to wait because the parts were back-ordered.  It took six weeks to get the repair.  New GM did not offer her a loaner vehicle and the repair ended up taking all day, instead of an hour as originally

---

[26] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

promised.  However, the new keys did not work with her car's doors or trunk.  She did not

realize this until her electronic fob died a few months later.  She went back to the dealership and

was accused of re-keying her car although she has never done so.  The dealership had thrown

away her original keys and told her she would now need to have all the locks on the car replaced.

Ms. Axelrod can no longer use her key to open the doors and she does not want to spend the

money to replace the electronic key fob.  Ms. Axelrod would not have driven the vehicle or

would have sold it if she had known about its defect.  She would not have purchased the vehicle

or she would have paid less for it if she had she known about its defect.

### Gail Bainbridge—Ohio

198.     Plaintiff and proposed Side Airbag Defect Class Representative Gail Bainbridge

is a resident and citizen of Auburn, Indiana.  Mr. Bainbridge purchased a used 2012 Buick

Enclave (subject to the Side Airbag recall) for $34,290.51 from Jim Schmidt Chevrolet Buick in

Hicksville, Ohio on December 3, 2012.  The car was still covered by the factory warranty at time

of purchase and he did not purchase an extended warranty.  Mr. Bainbridge has not received a

recall notice for his car.  Mr. Bainbridge would not have purchased the vehicle or he would have

paid less for it had he known about its defect.

### Tracie Edwards—Ohio[27]

199.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative

Tracie Edwards is a resident and citizen of Port Clinton, Ohio.  Ms. Edwards purchased a used

2004 Pontiac Grand Am (subject to the Low Torque Ignition Switch recall) for about $13,000

from Steinle Chevrolet Buick in Clyde, Ohio on April 8, 2006.  The car was not covered by a

---

[27] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose
of preserving their claims on appeal.

warranty.  Ms. Edwards chose this vehicle, in part, because its safety and reliability was important to her.  Ms. Edwards had ignition issues with her car.  After many problems with the vehicle's performance, Ms. Edwards sold her car in November 2012.  Ms. Edwards then purchased a used 2005 Pontiac Grand Am (subject to the Low Torque Ignition Switch recall) for $600 from Auto Budget Center in Bellevue, Ohio on March 14, 2014.  The car was not covered by a warranty.  Ms. Edwards's 2005 Grand Am lost power twice while she was driving.  She had to maneuver to the side of the road.  Ms. Edwards would not have driven the 2004 Grand Am or would have sold it if she had known about its defect.  Ms. Edwards would not have purchased either vehicle or she would have paid less for them had she known about their defects.

### Georgianna Parisi—Ohio[28]

200.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Georgianna Parisi is a resident and citizen of Kettering, Ohio.  Ms. Parisi purchased a used 2004 Cadillac Deville (subject to the Low Torque Ignition Switch recall) for about $26,000 from Voss Cadillac in Dayton, Ohio on July 27, 2006.  The car was covered under warranty and she later purchased an extended warranty.  Safety and reliability were extremely important to Ms. Parisi in choosing to purchase this vehicle.  The salesman told Ms. Parisi and her husband that the car was extremely safe and reliable.  As her son was still riding in a car seat at the time, it was extremely important that to her that the vehicle had all the attachments necessary for the car seat.  She also asked about other safety features, such as airbags.  Ms. Parisi never received a recall notice for the ignition defect.  Therefore, it has never been repaired, but she would have absolutely had it repaired if she received a notice.  Ms. Parisi would not have driven the vehicle or would have

---

[28] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Peggy Robinson—Ohio**

201.    Plaintiff and proposed Delta Ignition Switch Defect Class and Power Steering Defect Class Representative Peggy Robinson is a resident and citizen of Cincinnati, Ohio. Ms. Robinson purchased a used 2004 Saturn Ion with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for $4,999 from the Oski Dealership in Cincinnati, Ohio in October 2013.  The Ion was not under warranty at the time of purchase and Ms. Robinson did not purchase an extended warranty.  Ms. Robinson purchased the Ion because she thought it was safe. Within six months of purchasing the vehicle, she began experiencing shutdowns while driving. The shutdowns occurred two or three times per week on average.  Ms. Robinson had her ignition switch replaced in August 2014, and she has experienced two shutdowns since then. After she learned of the ignition switch defect, Ms. Robinson missed work for three weeks because she did not have transportation and feared her vehicle inadvertently shutting down.  Ms. Robinson lost wages for those three weeks.  Even though the ignition switch has been replaced, her key continues to become stuck and locked in the ignition.  Although she still owns the vehicle, she does not feel safe driving it, especially because she has children.  Ms. Robinson would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Bradley Siefke—Ohio**

202.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Bradley Siefke is a resident and citizen of Alliance, Ohio.  Mr. Siefke purchased a used 2011 Buick Lucerne (subject to the Low Torque Ignition Switch recall) for about $22,000 from Lavery

- 140 -

Automotive Sales, a New GM dealership, in Alliance, Ohio in spring 2012.  The car was covered

under a warranty at the time of purchase.  Mr. Siefke chose this vehicle, in part, because the

vehicle's safety and reliability were important to him.  Previously he had owned a LeSabre and

two consecutive Rendezvous vehicles.  Mr. Siefke received a recall notice for the ignition switch

defect, but the dealership told him there was no fix other than to take the extra keys off his key

fob.  Mr. Siefke is actively trying to sell his vehicle, but the dealership offered him too low a

number, $6,000, and he thought the car was worth more like $9,000, so he declined the offer.

Mr. Siefke would have paid less for the car had he known about its defect.

**Steven M. Steidle—Ohio**

203.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative

Steven M. Steidle is a resident and citizen of Columbus, Ohio.  Mr. Steidle leased a new 2010

Cadillac CTS (subject to the Low Torque Ignition Switch recall) from a New GM dealership in

Ohio in fall 2010.  The car was covered by the standard manufacturer's warranty.  Mr. Steidle

traded the 2010 CTS in for a new 2014 Cadillac CTS in October 2014.  Mr. Steidle would not

have leased the vehicle or he would have paid less for it had he known about its defect.

**Bonnie Taylor—Ohio**

204.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Delta Ignition Switch Defect Bankruptcy Class

Representative Bonnie Taylor is a resident and citizen of Laura, Ohio.  Ms. Taylor purchased a

new 2007 Chevrolet Cobalt with the Delta Ignition Switch Defect for $14,417.42 from Joe

Johnson Chevrolet in Troy, Ohio on December 23, 2006.  She chose this vehicle, in part, because

the vehicle's safety and reliability was important to her.  Ms. Taylor did not learn of the ignition

switch defects until March 2014.  The repair work on her Cobalt was completed on April 21,

2014, after a little over a month of waiting on the parts and service.  Although Ms. Taylor has not experienced the ignition shutdown while driving her Cobalt, she believes it has too many serious safety defects for her to ever feel safe driving it again.  She also feels that the value of her vehicle is severely diminished as a result of the recall.  Ms. Taylor would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about the defect in the vehicle.

### William Troiano—Ohio

205.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative William Troiano is a resident and citizen of Eureka, California.  Mr. Troiano purchased a used 2006 Cadillac DTS (subject to the Low Torque Ignition Switch recall) for $24,874.70 from Motor Cars of Elyria in Elyria, Ohio on November 19, 2009.  The car was still covered under its factory warranty, plus Mr. Troiano purchased an additional four-year warranty to begin when the factory warranty ended.  The car was chosen because of Mr. Troiano's family history as well as personal history owning Cadillac vehicles.  To him, the name Cadillac meant safety and reliability in an automobile.  Mr. Troiano received a recall notice by mail regarding the ignition switch defect and was very upset and concerned about driving the car until the problem was rectified.  He immediately called for an appointment with the local dealership and had the car repaired as soon as possible.  It took several weeks to get an appointment and Mr. Troiano was afraid to drive the car until it was fixed.  He was definitely inconvenienced during this period.  Mr. Troiano would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Reggie Welch—Ohio

206.     Plaintiff and proposed Power Steering Defect Class Representative Reggie Welch is a resident and citizen of Richmond, Indiana.  Mr. Welch purchased a used 2009 Saturn Aura (subject to the Power Steering recall) for about $15,000 from CarMax in Dayton, Ohio on April 8, 2014.  The car was not under warranty at time of purchase.  Mr. Welch chose this vehicle, in part, because safety and reliability were important to him and his family.  He has children and he wanted to make sure they would be safe driving in the car.  He also recalls seeing New GM advertisements on television, in print, online, and at CarMax about the "top safety" of its vehicles.  He also remembers the saleswoman telling him the car was very reliable because that was one of the things he wanted.  In first year of owning the car, Mr. Welch had issues with the car's ignition and/or transmission.  While he was driving the car would cut off and go dead in the road. He could not turn the ignition over.  The power steering in Mr. Welch's vehicle also went out when the car shutdown.  He took it in to the Wetzel dealership in Richmond, Indiana and they repaired it under a recall.  But the shutdowns persisted so frequently that he stopped driving the car altogether.  Mr. Welch believes he received a recall notice for both an ignition switch and power steering defect.  Nonetheless, he does not believe the vehicle is safe to drive right now.  A few years ago, after announcement of the recalls, Mr. Welch tried to sell the car back to CarMax, but CarMax said the vehicle's value had dropped and would only offer $4,000. Mr. Welch did not go through with the sale.  Mr. Welch would not have purchased the vehicle or he would have paid less for it had he known about its defect.

**Carleta Burton—Oklahoma**

207.     Plaintiff and proposed Low Torque Ignition Switch Defect Class and Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass Representative Carleta Burton is a resident and citizen of Moore, Oklahoma.  Ms. Burton has been a loyal buyer of

- 143 -

Impala vehicles starting with a 2008 model (subject to the Low Torque Ignition Switch recall) that was badly damaged in the May 20, 2013 tornado in Moore, Oklahoma.  Between May 20, 2013, and July 27, 2013, she purchased a used, high-mileage 2009 Impala (subject to the Low Torque Ignition Switch recall), but she only kept it for a couple of months before she traded it in on the purchase of a new 2014 Impala (subject to the Low Torque Ignition Switch recall) for $35,998 from David Stanley Chevrolet in Oklahoma City, Oklahoma on July 27, 2013.  Her 2009 Impala was subject to the ignition switch recall issued September 2014 (Recall 14299), but she had disposed of the car prior to receiving notice of the recall.  Based on what she knows now, she believes that the dealership probably knew of the ignition switch defect and, as a result, paid her less for her 2009 Impala than it would have paid absent the ignition switch defect.  The vehicle was covered by a standard warranty and she also purchased an extended warranty.  She received notices of at least two recalls on the 2014 Impala:  (1) Recall 14330 in both August and October 2014 regarding poor electrical ground connection to the power steering control module ("PSCM"); and (2) Recall 14471 on October 2014 regarding the brake system warning indicator. She had service associated with both of these recalls and with several others performed by David Stanley Chevrolet in Oklahoma City.  Ms. Burton never received notice of an ignition switch recall on her 2014 Impala.  For this reason, no ignition switch recall repair has ever been performed on Ms. Burton's 2014 Impala.  Ms. Burton experienced her 2014 Impala stalling, and she had trouble shifting the vehicle out of park into drive, which may have been associated with the ignition switch defect.  David Stanley Chevrolet performed service associated with this problem on June 13, 2014.  The next day, on June 14, 2014, her 2014 Impala caught fire, and the fire had to be extinguished by the Midwest City Fire department.  The damage from the fire and other issues took David Stanley months to repair, and Ms. Burton did not have the use of her

2014 Impala from the date of the fire until mid-August.  David Stanley did not give her a loaner

car for the first week or more, and she missed at least one day of work as a result of not having

transportation.  The loaners were a hassle, and she had three different loaner cars during the time

David Stanley had her 2014 Impala, which required multiple trips to the dealership.  David

Stanley was difficult to deal with, initially uncooperative, and she had to place countless calls to

David Stanley and to New GM to get any sort of information and action regarding the situation.

New GM blamed David Stanley and vice-versa for the fire and delay in repair.  David Stanley

eventually made two months of car payments for her totaling $1,039.98 for the period during

which she was without her vehicle.  Ms. Burton was told that she would receive a "lifetime"

warranty on her vehicle, but she eventually received only a 98,000-mile warranty from

Chevrolet.  Ms. Burton believes that the value of her 2014 Impala has decreased because of New

GM's improper actions, the ignition switch defect and the events complained of herein.  She

would not have purchased her 2014 Impala had she known about the ignition switch defect.  She

also believes that she was paid less for the trade-in of her 2009 Impala, used toward the purchase

of her 2014 Impala, because of the known, but not publicly-disclosed, ignition switch defects.

### Deneise Burton—Oklahoma

208.    Plaintiff and proposed Delta Ignition Switch Defect Class and Power Steering

Defect Class Representative Deneise Burton is a resident and citizen of Warr Acres, Oklahoma.

Ms. Burton purchased a used 2007 Saturn Ion with the Delta Ignition Switch Defect (and subject

to the Power Steering recall) for $11,995 from I-35 Credit Auto in Oklahoma City on September

8, 2012.  She also purchased a limited warranty for 24 months or 24,000 miles.  Ms. Burton

chose this vehicle, in part, because the vehicle's safety and reliability was important to her, and

she liked the fuel efficiency of the vehicle.  She had seen New GM advertisements on television

about its vehicles' safety and reliability.  In April 2013, Ms. Burton's engine shut off while she was backing out of her driveway after her knee bumped the ignition switch area, knocking her keys from the ignition.  She received a recall notice in March 2014.  Before she received the notice, however, in early March 2014, Ms. Burton heard on the news about the New GM recalls and she identified her vehicle as one on the list. She contacted New GM concerning the recalls and requested the recall repair and a rental or loaner vehicle.  New GM told her that her vehicle was on the list but she would have to wait until she received a notice to be able to have the vehicle repaired and possibly receive a rental or loaner vehicle.  Realizing the danger in driving her vehicle, Ms. Burton refused to drive the vehicle and risk harm to herself, her children, and others on the road or riding with her. Because she discontinued driving the vehicle and New GM did not provide alternate transportation, Ms. Burton was forced to seek other means to get to work.  Initially, Ms. Burton borrowed her father's vehicle to take her kids to school, but she could not use it to go back and forth to work because her father needed it for his job.  When she could not find transportation, Ms. Burton missed two days of work, costing her approximately $144.00 in lost wages.  Eventually, she coordinated her schedule with her boyfriend so they could use a single vehicle, an older Ford Explorer.  Ms. Burton continued using the Explorer until she received the recall notice and the New GM dealership was willing to accept her vehicle for repairs.  She seeks the equivalent fair market value of the use of her boyfriend's Explorer for the time during which New GM refused to provide a rental car to her.  Once New GM was ready to undertake the repairs, New GM provided her a rental vehicle for approximately four weeks until they were complete.  The dealership completed two ignition recalls while it had the vehicle. Ms. Burton tried to sell her vehicle after the recalls were announced, but the value of her vehicle was too low.  Eventually, around mid-May 2016, based on the damaged valuation, she allowed

- 146 -

the vehicle to be repossessed.  She owed $4,000 and could not trade it or sell it for even close to

that amount.  Ms. Burton would not have purchased the vehicle or she would have paid less for it

had she known about its defect.

### Debra Cummings—Oklahoma

209.    Plaintiff and proposed Knee-to-Key Camaro Defect Class and Knee-to-Key

Camaro Defect Magnuson-Moss and Implied Warranty Subclass Representative Debra

Cummings is a resident and citizen of Owasso, Oklahoma.  She purchased a new 2010 Chevrolet

Camaro (subject to the Knee-to-Key Ignition Switch recall) for $32,000 from Jim Glover

Chevrolet in Tulsa, Oklahoma on November 28, 2010.  The car was covered by the standard

manufacturer's warranty.  She purchased this car specifically for her sixteen-year-old daughter,

and safety was a large part of why she chose that vehicle. At the dealership, the salesman went

over the vehicles' airbag features.  The car shut off on several occasions while Ms. Cummings's

daughter was driving the car, even once on the highway, when she accidentally hit the key with

her knee.  This also happened two or three times when Ms. Cummings drove the car.  Ms.

Cummings heard about the recall in 2014, although she doesn't recall receiving a notice, and

called the Classic Chevrolet dealership in Owasso, Oklahoma.  She had to wait about a month for

the repair because the parts were back-ordered.  The dealership did not offer a rental car, so Ms.

Cummings's daughter borrowed her parents' car during that time.  Classic Chevrolet only

provided her with one key replacement when the new ignition was put in and they said the other

three keys sets she had purchased could not be used.  She threw all keys away except one and

found that the old key works, but, when she uses the key to open the locked door the alarm goes

off until the key is inserted into the ignition.  In May 2016, she took the car to a dealership in

Tulsa to try and trade it but they only offered her $9,000 so she kept the car.  Ms. Cummings

would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Jerrile Gordon—Oklahoma

210.   Plaintiff and proposed Delta Ignition Switch Defect Class Representative Jerrile Gordon is a resident and citizen of Del City, Oklahoma.  Mr. Gordon purchased a used 2006 Chevrolet Cobalt with the Delta Ignition Switch Defect for $14,950 from Crossroads Automall in Oklahoma City, Oklahoma on September 3, 2011.  Mr. Gordon chose the Cobalt, in part, because he wanted a safely designed and manufactured car.  Mr. Gordon's vehicle shut down on four separate occasions between December 2011 and July 2012. In two instances, he was driving on the highway when the shutdowns occurred, and he had to steer his vehicle to the side of the road to restart.  On the other two occasions, his car shut off while driving over a bump in the road.  Mr. Gordon did not learn of the ignition switch defect until March 2014.  He called several times about bringing his car in for the repair, but the dealership said the parts were not available. Because the parts took so long to come in stock, and New GM did not notify him if and when they did have parts available, Mr. Gordon's car has not been repaired under the recall.  He traded-in the car for approximately $1500 in May 2014 because of the defect and because he feared for his safety when driving it.  Mr. Gordon would not have purchased the vehicle or he would have paid less for it had he known about the defect in the vehicle.

### Paulette Hand—Oklahoma

211.   Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Paulette Hand is a resident and citizen of Blanchard, Oklahoma.  She purchased a

new 2006 Chevrolet HHR with the Delta Ignition Switch Defect for $24,625 from Frost Chevrolet, a dealership owned by her sister, in Hennessy, Oklahoma in 2006.  Her vehicle came with the standard factory warranty.  She purchased the vehicle, in part, because of the vehicle's reputation for safety and reliability.  Indeed, several members of Ms. Hand's family work or worked for Old GM, and she had repeatedly been told that Old GM vehicles were safe and reliable.  The salesperson who sold Ms. Hand her HHR specifically told her that the vehicle was known for its safety.  Ms. Hand experienced multiple events in which her vehicle's steering locked up and the power failed.  Ms. Hand first heard about the ignition switch recall in early 2014 when the story broke on the news.  In approximately the summer of 2014, Ms. Hand had her HHR's ignition switch replaced.  Since the replacement, Ms. Hand's HHR continues to experience electrical problems.  The check engine light flashes on and will not turn off and the vehicle's traction control is poor.  Before she was able to have the ignition switch replaced, Ms. Hand traveled to the dealership four times; on the first three occasions, she was told the dealership was out of replacement parts or they were unable to service her ignition switch.  Ms. Hand has not sold the car because she knows she will lose money on it.  Further, because she believes the car is faulty, she would feel morally wrong selling the vehicle to another individual. Ms. Hand would not have driven the vehicle had she known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Jennifer Reeder—Oklahoma**

212.     Plaintiff and proposed Delta Ignition Switch Defect Class, Low Torque Ignition Switch Defect Class, and Power Steering Defect Class Representative Jennifer Reeder is a resident and citizen of Oklahoma City, Oklahoma.  Ms. Reeder purchased a used 2012 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for $18,595 from David Stanley

- 149 -

Chevrolet in Norman, Oklahoma on August 30, 2013. Ms. Reeder also purchased an extended

warranty for the vehicle. Her family traditionally purchased Chevrolet vehicles and she

perceived them as safe and reliable based on their experiences and based on advertisements on

television and in direct mail. She specifically remembers one advertisement touting the braking

capability and traction control for Chevrolets in general. She was hesitant to buy the car at first

because of the price, but the salesman emphasized the safety of the vehicle and its high-tech

features. On or about July 26, 2014, Ms. Reeder was unable to remove the key from the ignition,

and the steering and brakes would not lock. After thirty minutes of manipulating the key in an

effort to remove it, she was forced to leave the key in the ignition overnight. Her husband was

able to remove the key from the ignition the following day. Ms. Reeder was unaware of any

recall notice affecting her Impala until, sometime shortly after the key became stuck in the

ignition overnight, a neighbor informed her about the recall involving Impalas on the same day

as her son's crash involving the Cobalt occurred (discussed below). Ms. Reeder watched

television news concerning the recalls and she researched the vehicle recalls online, but she

never received a written recall notice in the mail regarding her Impala. Ms. Reeder and her son,

both of whom drove the Impala to and from work, would have liked to discontinue driving the

Impala until the ignition system was repaired, but they were unable to do so because it would

have left her family with a single means of transportation among herself, her husband, and her

son, due to the fact that their other vehicle, a Chevrolet Cobalt, was already totaled in a defect-

related crash. The family could not afford to pay for a rental car. Finally, on September 16,

2014, a New GM dealership notified her that it was ready to repair the Impala. The recall repair

was performed on September 22, 2014. At the time the recall repair was performed, Ms. Reeder

told the dealership that the Impala's engine light occasionally came on unexpectedly and

- 150 -

sometimes the car would not start at all. Replacing the battery did not eliminate the problem.

The electrical problem happened numerous times following the ignition recall repair.  The

dealership reported that there were no recalls related to such electrical problems, and it did not

do anything to fix it.  In approximately December 2014, Reeder permitted repossession of the car

since she did not feel safe in it and it kept shutting off randomly.  Ms. Reeder would not have

purchased the Impala or she would have paid less for it had she known about the ignition switch

defect.

213.    Ms. Reeder also purchased a used 2010 Chevrolet Cobalt (subject to the Delta

Ignition Switch and the Power Steering recalls) for $9,595 from Ricks Auto Sales in Del City,

Oklahoma on or about February 5, 2014.  Ms. Reeder purchased an extended warranty for the

Cobalt. Ms. Reeder purchased the vehicle primarily for her son, Anthony Reeder.  She had the

same general beliefs noted above about the safety and reliability of Chevrolets regarding the

Cobalt, and she had seen the same sort of advertisements.  At the time she and her son were

looking at the Cobalt, the salesperson saw her son's heavy key ring with many items and

encouraged him to only keep a couple of keys on the key ring.  Her son followed that advice with

the Cobalt.  On May 19, 2014, Anthony Reeder was driving in bumper-to-bumper traffic when

the vehicle suddenly shut off,  the brakes became ineffective, the steering wheel stopped

operating, and he struck the vehicle in front of him, totaling the Cobalt and injuring Anthony.

The two were unaware of any recall on the Cobalt until after the accident when a neighbor told

them.  They never received a recall notice in the mail.  After the accident, Ms. Reeder and

Anthony shared Ms. Reeder's 2012 Chevrolet Impala, as discussed above, because they could

not afford another car due to the balance remaining on the financing note of the Cobalt.  From

sharing the Impala, they increased the miles accumulated on it so much that they used up its

extended warranty.  A combined total of 45,000 miles were added to the Impala after the crash of

the Cobalt, and they had to pay the $2,500 deductible not paid by the insurance company for the

totaled Cobalt.  Ms. Reeder also claims damages for the difference in the amount of the cost of

gasoline between Mr. Reeder using the Impala and using the better-mileage Cobalt, the value of

the extended warranty on the Impala used up by the excess of miles, and the increase in her auto

insurance premiums as a result of the accident caused by the Cobalt's defective design being

attributed to Mr. Reeder.  The difference between the settlement paid to Ms. Reeder by her

insurance company, Geico, on the Cobalt after the wreck and her loan for the vehicle left her

with an outstanding balance of more than $1,500.  In valuing the Cobalt, Geico took into account

values of vehicles on dates after the July 13, 2014 announcement of the ignition recall on Cobalts

and other Old and New GM vehicles.  Geico's valuation was lower than it would have been had

the defect not been present in the Cobalt, and it explicitly noted the existence of the recalls.  Ms.

Reeder would not have purchased the Cobalt or she would have paid less for it had she known

about its defects.

### Bruce and Denise Wright—Oklahoma

214.    Plaintiffs and proposed Knee-to-Key Camaro Defect Class and Knee-to-Key

Camaro Defect Magnuson-Moss and Implied Warranty Subclass Representatives Bruce and

Denise Wright, husband and wife, are residents and citizens of Enid, Oklahoma.  The Wrights

purchased a new 2011 Chevrolet Camaro (subject to the Knee-to-Key Ignition Switch recall) for

$31,000 from Marc Heitz Chevrolet in Norman, Oklahoma on March 18, 2011.  The vehicle was

covered by a standard three-year, 36,000-mile warranty.  They chose this vehicle, in part,

because the vehicle's safety and reliability was important to them.  Prior to buying, they saw

television, print, and billboard advertisements regarding the vehicle's five star safety rating.

Ms. Wright drove the vehicle daily to and from her and Mr. Wright's places of work.  The Wrights learned of the recall affecting their Camaro in July 2014 through the news media, and they called the local New GM dealership to confirm the recall and the safety concerns relating to the recall.  Afterwards, Ms. Wright was no longer comfortable driving the Camaro, the Wrights traded the car to a local Ford dealership on August 9, 2014, rather than waiting for the recall repair.  There was also a problem with the power steering pump which had failed one month out of warranty. Northcutt Chevrolet would not work with them to make the power steering issue right, so they paid to fix the power steering pump—$1,400 dollars—then traded in the Camaro. The Wrights believe they received less for the Camaro from the Ford dealer because of the ignition switch defect than they would have received absent the defect.  The Wrights would not have purchased the vehicle or they would have paid less for it had they known about the ignition switch defect.

### William Bernick—Oregon

215.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative William Bernick is a resident and citizen of Grants Pass, Oregon.  Mr. Bernick purchased a used 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect for $10,750 from Jim Sigel Automotive Center in Oregon on December 29, 2006.  Some, but not all, of the documents at purchase suggest the car was Certified Pre-Owned.  Mr. Bernick purchased a vehicle service contract with his Cobalt.  Prior to purchase, Mr. Bernick received flyers in the mail from Jim Sigel Automotive showing certified used cars.  As a result, he called the dealership and had several conversations with salespeople about the Cobalt.  Mr. Bernick purchased the Cobalt in part because of certain family health issues necessitating trips to medical

- 153 -

appointments (and underscoring the need for a safe and reliable car).  Indeed, he believed that the

vehicle was safe and reliable.  During the time he owned the vehicle, Mr. Bernick has

experienced power outages and difficulties with the ignition, such as keys becoming stuck in the

ignition, inability to shift gears, inability to start the ignition, and transmission default.  Mr.

Bernick learned about the ignition switch defect when he received the April 2014 ignition switch

recall letter.  His ignition switch was replaced in June, 2014.  (Previously, Chevrolet also sent

him a recall letter regarding his Power Steering, which he had replaced.)  Mr. Bernick is still in

possession of the vehicle.  Mr. Bernick would not have driven the vehicle or would have sold it if

he had known about its defect.  He would not have purchased the vehicle or he would have paid

less for it had he known about its defect.

### Shelton Glass—Oregon

216.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative

Shelton Glass is a resident and citizen of Portland, Oregon.  Mr. Glass purchased a used 2005

Cadillac Deville (subject to the Low Torque Ignition Switch recall) for about $8,000 from

Jordanz Motors in Milwaukie, Oregon on May 10, 2012.  The vehicle was not covered under

warranty when he purchased it.   Mr. Glass chose this vehicle, in part, because safety and

reliability were important to him.  Sometime in 2014, Mr. Glass received the ignition switch

recall notice and he took it to Portland Cadillac to have repair work completed.  Mr. Glass would

not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Janice Bagley—Pennsylvania

217.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Janice

Bagley is a resident and citizen of Patton, Pennsylvania.  Ms. Bagley purchased a used 2007

Chevrolet Cobalt with the Delta Ignition Switch Defect for about $6,000 from a private seller in

- 154 -

Carrolltown, Pennsylvania in 2013.  The vehicle had a 30-day warranty at the time of purchase.  Ms. Bagley purchased the Cobalt because she had owned Old GM vehicles in the past, thought her previous vehicles to be safe and reliable, and believed the Cobalt also would be safe and reliable. She also thought it would be a safe, reliable vehicle for her 19-year-old daughter to drive.  Within the first 30 days of owning the vehicle, she experienced two stalling events.  A few weeks later she had a third stalling incident.  Each time she took the vehicle to a mechanic because she was concerned she would be stranded unexpectedly.  In February 2014, she was involved in an accident when a deer ran in front of her.  She was driving 35 miles per hour yet her airbags did not deploy.  Following the recall, she made the connection between the frontal collision and airbag failure and the safety recall.  Ms. Bagley had her ignition switch replaced in June or July 2014. Ms. Bagley still owns the car, though she would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Raymond Berg—Pennsylvania

218.     Plaintiff and proposed Side Airbag Defect Class Representative Raymond Berg is a resident and citizen of Imperial, Pennsylvania.  Mr. Berg purchased a used 2012 Chevrolet Traverse (subject to the Side Airbag recall) for about $22,500 from North Star Chevrolet in Moon, Pennsylvania in October 2013.  It was covered by a basic warranty, and he purchased an additional warranty.  He chose this vehicle, in part, because the vehicle's safety and reliability was important to him, especially because his two children regularly ride in the vehicle.  Mr. Berg never received a recall notice for the airbag defect and was unaware of the recall until recently, although he has had the car serviced for other recall repairs.  He was not made aware of any of the car's defects or recalls when he purchased the car.  Mr. Berg would not have purchased the vehicle or he would have paid less for it had he known about its defect.

**Shawn Doucette—Pennsylvania**

219.   Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Shawn Doucette is a resident and citizen of Hamburg, Pennsylvania.  Mr. Doucette purchased a new 2005 Chevrolet Cobalt SS with the Delta Ignition Switch Defect for approximately $28,000 from Outten Chevrolet of Hamburg, Pennsylvania in September 2005. Mr. Doucette's Chevrolet Cobalt SS came with a 7-year extended warranty.  He chose the Chevrolet Cobalt SS in part because of its safety and reliability.  Mr. Doucette recalls seeing at least one Old GM commercial for the Chevrolet Cobalt SS discussing some of the safety features offered in the vehicle.  He also remembers the Old GM salesman pushing the Cobalt for its anti-lock brakes, special sports suspension that made it safer to operate, and its multiple airbags.  Mr. Doucette has experienced numerous shutdowns and power loss events while driving.  He learned about the Delta Ignition Switch Defect recall in Spring 2014.  When he first became aware of the defect, Mr. Doucette took his vehicle to a New GM dealership.  The New GM dealership kept his car for two months due to a shortage of replacement parts and it was finally repaired sometime around the middle of 2014.  However, Mr. Doucette did not receive a recall notice until after he received the recall repair.  Mr. Doucette suffered out-of-pocket losses due to the Delta Ignition Switch Defect.  While operating under normal driving conditions, Mr. Doucette's vehicle unexpectedly shut off,  causing his steering to lock up and him to crash his vehicle. Mr. Doucette paid approximately $800 out-of-pocket for the repairs.  Mr. Doucette traded in his vehicle in January 2016.  Mr. Doucette would not have driven the vehicle or would have sold it if

he had known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about the defect in the vehicle.

### Shirley Gilbert—Pennsylvania

220.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Shirley Gilbert is a resident and citizen of Frackville, Pennsylvania.  She purchased a new 2008 Chevrolet Cobalt with the Delta Ignition Switch Defect for $16,000 from Bob Weaver Chevrolet in Pennsylvania in June 2008.  Her vehicle was covered by a standard and extended warranty, but any warranty expired in June 2013.  Safety and reliability were the major considerations in Ms. Gilbert's decision to purchase the vehicle.  Ms. Gilbert reviewed information about the safety of the Cobalt on the internet and she remembers that the salesperson pointed out several times that the vehicle was equipped with multiple airbags and got great gas mileage.  She purchased the Chevy Cobalt because she trusted the reputation of the manufacturer related to safety and reliability of their vehicles and because the vehicle had multiple airbags. Ms. Gilbert learned about the recall in early April 2014 while watching a local news story.  The recall repair work was done in approximately June 2014.  Ms. Gilbert still owns the Chevy Cobalt because she is disabled and is on a limited income and cannot afford to purchase a different vehicle.  Ms. Gilbert would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### George Mathis—Pennsylvania

221.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative George Mathis is a resident and citizen of Parkville, Maryland.  Mr. Mathis purchased a new 2007 Chevrolet Cobalt with the Delta Ignition Switch Defect for $12,000 from Apple Chevrolet in York, Pennsylvania on April 1, 2007.  The vehicle was covered under the standard manufacturer's warranty when he purchased it.  Mr. Mathis chose this vehicle, in part, because the vehicle's safety and reliability was important to him.  He recalls the salesman saying the Cobalt was the replacement for the Chevy Cavalier but was much more reliable and had additional safety features.  Mr. Mathis's ignition has shut off while driving on three separate occasions, with one instance resulting in a minor accident, and the other two nearly resulting in accidents.  Mr. Mathis did not learn about the ignition switch defects until March 2014.  In August 2014, he took his Cobalt to a New GM dealership in his area to have the recall work performed after waiting about six months for the parts to arrive.  He was inconvenienced by this because he had to borrow a car and take vacation time at work to deal with the repair.  He also experienced a myriad of other recalls related to defects in his car that have cost him time and money, including the power steering pump and a broken gas tank pump fitting.  In September 2015, he traded the vehicle in because of reliability and safety issues with the car.  Mr. Mathis would not have driven the vehicle or would have sold it if he had known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about the defect in the vehicle.

**Paul Pollastro—Pennsylvania**

- 158 -

222.    Plaintiff and proposed Delta Ignition Switch Defect Class and Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass Representative Paul Pollastro is a resident and citizen of Coraopolis, Pennsylvania.  Mr. Pollastro purchased a Certified Pre-Owned 2007 Chevrolet Cobalt with the Delta Ignition Switch Defect for $9,900 from Colussy Chevrolet in Bridgeville, Pennsylvania on November 22, 2010.  As a New GM Certified Pre-Owned vehicle, the Cobalt included a bumper-to-bumper limited warranty of 12-months /12,000 miles that New GM advertised as "above and beyond any remaining factory warranty."  New GM allegedly conducted a 172-point inspection of the Cobalt prior to making it available for sale to Mr. Pollastro.  This pre-sale inspection by New GM's technicians specifically included the Cobalt's keys and ignition system.  Mr. Pollastro and his wife wanted a safe car for their daughter to drive and would not have purchased anything they knew to be unsafe.  Safety was a serious concern because their daughter just turned sixteen years old at the time and they wanted to make sure they purchased a safe vehicle for her.  If it had been brought to their attention at the time of purchase that this vehicle had ignition switch problems with fatal outcomes they would never have purchased this car.  Shortly after the purchase, in May 2011, the key became stuck in the ignition switch.  Mr. Pollastro took the vehicle to Northstar Chevrolet who claimed the problem was with the floor shifter.  New GM neither disclosed the existence of the ignition defect nor did it remedy the defect.  After the recall was announced, Mr. Pollastro scheduled his Cobalt for repairs at Northstar Chevrolet on July 24, 2014.  The repair took two days due to the failure of the first replacement switch.  This repair was time-consuming and it was very irritating to go back and forth to the dealer.  The dealer tried fixing it the first time but didn't know exactly how to match the new key with the new switch so Mr. Pollastro had to go back another one or two times before they finally got it right.  At the time, Mr. Pollastro was self-employed so any

time away from his office was a detriment to his business and income. Mr. Pollastro would not have purchased the vehicle or he would have paid less for it had he known about the defect in the vehicle.

### David Schumacher—Pennsylvania

223.    Plaintiff and proposed Side Airbag Defect Class Representative David Schumacher is a resident and citizen of Erie, Pennsylvania. Mr. Schumacher purchased a used 2008 Buick Enclave (subject to the Side Airbag Defect) for about $17,900 from Bianchi Honda in Erie, Pennsylvania on May 30, 2014. He also purchased an extended warranty. Mr. Schumacher chose this vehicle because it fit his family's need for a third row SUV, and his options were quite limited in his price range. During the first twenty-four hours Mr. Schumacher owned the car, the power steering went out while he was in the middle of a turn in a major intersection and nearly caused an accident. In addition, he has experienced several other defects including the power hatch. Mr. Schumacher does not feel safe in the car and does not feel in control. His wife primarily drives the car with their three children and she does not feel safe. They had the car assessed for trade-in and they were quoted significantly less than what they saw on Kelley Blue Book. Mr. Schumacher would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Greg Theobald—Pennsylvania

224.    Plaintiff and proposed Side Airbag Defect Class and Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass Representative Greg Theobald is a resident and citizen of Eighty Four, Pennsylvania. Mr. Theobald purchased a new 2010 GMC Acadia (subject to the Side Airbag recall) for about $50,000 from #1 Cochran Buick GMC of Robinson in Pittsburgh, Pennsylvania on June 3, 2010. The car was covered by the standard factory

warranty.  Mr. Theobald purchased Old GM vehicles in the past and was satisfied with their

crash test ratings.  He selected the vehicle, in part, because of its multiple airbags and he believed

it would be a safe car for his family.  In purchasing the car, he did research online, read articles

in magazines and brochures, and talked to the salesperson about the safety of the vehicle and its

crash ratings.  The salesman explained that the car's driver and passengers would be protected by

the airbags that were located throughout the vehicle.  The vehicle's airbag service light

sometimes came on, but typically after restarting the car it would go off.  When he mentioned

this to the New GM dealership, they told him the car computer didn't read the signals properly

and he should just restart the car.  Mr. Theobald did not receive a recall notice for the Side

Airbag Defect.  He traded the vehicle to Brooks Automotive in August 2013.  Mr. Theobald

would not have purchased the vehicle or he would have paid less for it had he known about its

defect.

### Mary Dias—Rhode Island

225.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

Representative Mary Dias is a resident and citizen of Taunton, Massachusetts.  Ms. Dias

purchased a used 2007 Chevrolet HHR with the Delta Ignition Switch Defect for approximately

$13,000 from Simon Chevrolet in in Woonsocket, Rhode Island on February 28, 2008.  The

vehicle was under warranty when she purchased it.  Ms. Dias chose this vehicle, in part, because

the vehicle's safety and reliability was important to her.  She recalls her husband looked up the

vehicle and it saw that it had a five-star rating.  Ms. Dias did not learn of the ignition switch

defects until March 2014.  When she inquired about her safety, New GM told her that her vehicle

had not been recalled and not to worry.  On April 11, 2014, after receiving notice that her HHR

was in fact recalled, Ms. Dias took her HHR in for the recall repair work.  For a time, she had to

rely on a friend to transport her while her vehicle was in the shop.  Then, in November 2014, her

vehicle's power steering went out while driving on the highway.  She managed to take control of

the car and manually drove it home.  She took it on the next day and it was repaired.  Because of

the defects, Ms. Dias is concerned for her safety every time she drives her vehicle.  Ms. Dias

would not have driven the vehicle or would have sold it if she had known about its defect.  She

would not have purchased the vehicle or she would have paid less for it had she known about the

defect in the vehicle.

### Garrett Mancieri—Rhode Island

226.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied

Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

Representative Garrett Mancieri is a resident and citizen of Woonsocket, Rhode Island.  Mr.

Mancieri purchased a new 2007 Pontiac G5 with the Delta Ignition Switch Defect for $16,138

from Paul Masse Buick GMC Cadillac, now owned by Tasca Buick GMC, in Woonsocket,

Rhode Island on November 24, 2006.  The car came with the manufacturer's warranty.  While

Mr. Mancieri cannot, at this time, recall any specific Old GM advertising he saw before

purchasing the car, he did purchase it based upon his perception that it would be a safe and

reliable vehicle.  Mr. Mancieri received a safety recall notice for his vehicle in March 2014.  He

promptly requested the dealership perform the recall repair, but was told that he would be put on

a waiting list because the dealership was waiting on the parts from New GM.  The dealership did

not provide Mr. Mancieri with a loaner car, so he had to continue driving the vehicle.  The recall

notice received by Mr. Mancieri did not inform him of the right to a loaner vehicle, nor did the

New GM dealership volunteer such information.  His vehicle was not repaired until September 18, 2014.  Mr. Mancieri believes the defect diminished the value of his vehicle, which he still owns.  Mr. Mancieri would not have driven the vehicle or would have sold it if he had known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about the defect in the vehicle.

### Annette Hopkins—South Carolina[29]

227.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Annette Hopkins is a resident and citizen of Bishopville, South Carolina.  Ms. Hopkins purchased a used 2003 Chevrolet Impala LS (subject to the Low Torque Ignition Switch recall) for $12,749.32 from Newsome Automotive in Florence, South Carolina on December 31, 2004.  She purchased this vehicle, in part, because its safety and reliability were important to her.  Ms. Hopkins recalls seeing television ads for Old GM vehicles, as well as print ads in magazines, touting the safety and reliability of Old GM's vehicles.  The salesman at Newsome Automotive also told her it was a good, reliable car.  Ms. Hopkins first learned of a recall affecting her vehicle when she received a recall notice in September 2014.  It took a day for her to get the car repaired under the recall and it was inconvenient because the dealership is thirty-four miles from her home.  Ms. Hopkins would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Frances James—South Carolina

---

[29] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

228.     Plaintiff and proposed Delta Ignition Switch Defect Class and Delta Ignition Switch Defect Bankruptcy Class Representative Frances James is a resident and citizen of Florence, South Carolina.  Ms. James purchased a used 2007 Chevrolet Cobalt with the Delta Ignition Switch Defect for $8995 from Carl Yarborough Honda in Florence, Georgia on August 18, 2009.  She chose the vehicle because she was informed that it was safe and reliable.  At the time of her purchase, Ms. James believed Chevrolet was a very good brand that made long-lasting cars.  Ms. James has been diagnosed with paraplegia, and her job requires her to travel frequently, so she needed a reliable vehicle and the salesman confirmed this vehicle would fit that bill.  Unfortunately, Ms. James's vehicle has shut down on her numerous times while driving.  She called and made an appointment with the local dealership to evaluate the problem.  Her local dealership, Five Star Chevrolet, looked at it and determined she needed a new computer board.  She asked the dealer if the item was a manufacturer's defect, but they said there were no recalls on the vehicle at the time of service.  Ms. James then called the 1-800 GM number and inquired about the issues her car was having.  She asked the New GM representative if there were manufacturing issues with the 2007 Chevrolet Cobalts, and she filed a complaint about the issues in case a defect was discovered later.  Ms. James paid over $700 out-of-pocket to replace the computer board.  Then, in 2014, Ms. James received a recall notice for the ignition switch problem.  She waited more than two months to get her car back from Five Star Chevrolet because the parts were back-ordered.  The dealership only provided a loaner vehicle after she demanded it.  After the recall repair, the vehicle shut down again, and she has had ongoing problems with her car.  Ms. James would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Cassandra Legrand—South Carolina[30]

229.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Cassandra Legrand is a resident and citizen of Kingstree, South Carolina.  Ms. Legrand purchased a used 2002 Pontiac Grand Am (subject to the Low Torque Ignition Switch recall) for $4500 from a private seller in South Carolina on April 17, 2008.  The car was not covered by a warranty.  Ms. Legrand chose this vehicle, in part, because she thought it was a safe and reliable vehicle. She received a recall notice for the ignition switch recall sometime in 2014, and her vehicle was repaired under the recall in about April 2016.  Ms. Legrand would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Kimberly Mayfield—South Carolina

230.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Kimberly Mayfield is a resident and citizen of Easley, South Carolina.  Ms. Mayfield purchased a used 2008 Buick Lacrosse (subject to the Low Torque Ignition Switch recall) from Benson Ford in Easley, South Carolina on May 5, 2013.  The ignition on Ms. Mayfield's vehicle regularly shut off while driving.  She received a recall notice for the ignition switch in fall 2015 and recently had the recall repair completed.  She lives forty-five minutes away from the dealership and it was inconvenient for her to go in for the repair.  In spring 2014, she tried to trade her vehicle at a Chevrolet dealership but they did not offer enough to cover her existing loan.  Ms. Mayfield would not have purchased the vehicle or she would have paid less for it had she known about its defect.

---

[30] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

### Edith Williams—South Carolina

231.    Plaintiff and proposed Delta Ignition Switch Defect Class and Power Steering Defect Class Representative Edith Williams is a resident and citizen of Mullins, South Carolina. Ms. Williams purchased a used 2009 Chevrolet HHR with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for about $16,000 from Donnie Gerald Used Cars in Marion, South Carolina on November 9, 2010.  The car was covered by a warranty for about a year.  Ms. Williams chose the vehicle because she thought it was a safe and reliable car and that was very important to her.  The key gets stuck in the ignition often and it has been repaired twice.  She got a rental for about three to four days until the dealership finished repairing it.  The repair cost her about $350 and the rental car cost about $650, all out-of-pocket.  Ms. Williams would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Norma Lee Holmes—South Dakota

232.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class Representative Norma Lee Nelson is a resident and citizen of Granite, Minnesota.  Mrs. Holmes purchased a used 2007 Chevrolet Cobalt with the Delta Ignition Switch Defect for $14,000 from Billion Automotive in Watertown, South Dakota in September 2007.  Her vehicle came with a standard warranty at the time of purchase that expired in 2010.  Ms. Holmes purchased this vehicle because safety and reliability were important to her and she believed the Cobalt was both safe and reliable.  Indeed, the salesperson who sold Ms. Holmes the Cobalt told her the vehicle was reliable, and she relied on that representation.  She experienced numerous ignition problems with the vehicle.  Ms. Holmes had her ignition switch replaced in the spring of 2014 after she

learned of the recall.  During the time she owned the vehicle, it often would not start, causing her

to lose significant amounts of time.  Even after the ignition switch was replaced, the ignition key

would stick in the ignition and the vehicle often failed to start.  She no longer owns the vehicle.

Ms. Holmes would not have driven the vehicle or would have sold it if she had known about its

defect. She would not have purchased the vehicle or she would have paid less for it had she

known about its defect.

### Catherine Senkle—South Dakota

233.     Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied

Warranty Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch

Defect Bankruptcy Class Representative Catherine Senkle is a resident and citizen of Sioux

Falls, South Dakota.  Ms. Senkle purchased a new 2007 Saturn Ion with the Delta Ignition

Switch Defect (and subject to the Power Steering recall) for $16,000 from Saturn of Sioux Falls,

South Dakota on March 14, 2006.  The vehicle was covered by the standard factory warranty.

Safety was a huge factor in Ms. Senkle's decision to purchase that car.  She wanted a car that had

exceptional safety features without a huge price tag.  She would have made a different decision

had she known about the dangers.  Ms. Senkle's vehicle shut off on her a couple times, including

once while she was driving 80 miles per hour down the interstate.  She replaced her battery for

$151, thinking that might be what was causing her car to shut down.  She received a recall notice

and had her ignition switch fixed during the recall period.  Ms. Senkle would not have driven the

vehicle or would have sold it if she had known about its defect.  She would not have purchased

the vehicle or she would have paid less for it had she known about its defect.

### Helen A. Brown—Tennessee

234.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

Representative Helen A. Brown is a resident and citizen of Franklin, Tennessee.  She purchased

a new 2006 Chevrolet Cobalt with the Delta Ignition Switch Defect for about $20,000 from an

Old GM dealer with an extended warranty, on February 1, 2006.  Ms. Brown's vehicle lost

power at least three times, twice in 2007 and once in 2014.  She does not trust her car.  Ms.

Brown would not have driven the vehicle or would have sold it if she had known about its defect.

She would not have purchased the vehicle or she would have paid less for it had she known

about its defect.

### Alexis Byrd—Tennessee

235.    Plaintiff and proposed Side Airbag Defect Class Representative Alexis Byrd is a

resident and citizen of Lawrenceville, Georgia.  Ms. Byrd purchased a used 2008 Saturn Outlook

(subject to the Side Airbag recall) for about $14,000 from Ford of Murfreesboro, Tennessee on

August 12, 2013.  The car was not under warranty.  She and her husband chose this vehicle

because they believed it would be safe and comfortable for their family.  They have two young

children and their safety is very important.  This vehicle was the primary transportation for their

family.  Ms. Byrd and her husband were impressed with the car's features and did a quick

internet search for its reviews.  They saw nothing about the vehicle being unsafe or posing any

hazards.  She would never have put her kids in that kind of danger if she had known about it.

About a year after buying the car, the power steering started locking up and she would lose

power.  In addition, the transmission started to slip.  This scared Ms. Byrd, especially when it

would happen with her kids in the car.  In one instance, while she was taking her kids to school,

the car jerked forward violently and stalled.  It scared her and her kids terribly, and she was

grateful no one was in front of her. Otherwise an accident would have occurred. She raised this issue with New GM by contacting their customer service response line and they said there were no known issues with the power steering or transmission. There was no resolution for these issues. Ms. Byrd took her vehicle to three different mechanics hoping for an inexpensive resolution to the problems, which cost a lot of money out-of-pocket. She has never received the recall notice for the Side Airbag Defect and therefore has not had her vehicle repaired under the recall. Ms. Byrd tried to trade the vehicle in February 2014 but was told it was not worth much because of the defects. In addition, several dealership representatives told her they were surprised she was even able to drive the vehicle because of the steering. The car was repossessed in July 2014. She wants New GM to take responsibility for selling her family a defective car. Ms. Byrd would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Felisha Johnson—Tennessee

236.     Plaintiff and proposed Power Steering Defect Class Representative Felisha Johnson is a resident and citizen of Murfreesboro, Tennessee. Ms. Johnson purchased a used 2009 Chevrolet Malibu (subject to the Power Steering recall) from American Car Center in Memphis, Tennessee in February 2011. In September 2015, Ms. Johnson was driving with her sixteen-year-old daughter in Nashville, exiting the interstate, when the power steering suddenly failed. She was able to get off the road without being in an accident despite the difficulty of navigating without power steering. She was in the city interviewing for a new job so she knew no one nearby who could assist them. It was both scary and inconvenient. Ms. Johnson would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Sharon Newsome—Tennessee

237.     Plaintiff and proposed Knee-to-Key Camaro Defect Class Representative Sharon Newsome is a resident and citizen of Cordova, Tennessee.  Ms. Newsome purchased a new 2012 Chevrolet Camaro (subject to the Knee-to-Key Ignition Switch recall) for $21,000 from Jim Kerras Chevrolet in Memphis, Tennessee on May 5, 2012.  The car had the standard factory warranty and she also purchased an extended warranty.  The vehicle's safety and reliability were very important to Ms. Newsome in purchasing the car because she has a daughter that would be riding in the car.  At the time she bought the car, Ms. Newsome had just beat breast cancer and she wanted to treat herself to a new car.  Early in the first or second year of ownership, the car shut off on her while she was driving.  Ms. Newsome is short and sits very close to the steering wheel, so it is possible her knee may have struck the ignition switch.  The shut downs happened once or twice a week.  She would stop in the middle of the road, while other drivers passed around her. Ms. Newsome was typically able to restart the car, but one time she had to have it towed.  These shutdowns were a huge inconvenience because she had to keep bringing it into the Jim Kerras dealership and they could never find anything wrong with the car.  These service visits interfered with her job.  Ms. Newsome also called New GM many times regarding the issue, and even took the car to two other New GM dealerships.  At one of the other dealerships they were able to recreate the shut down and the mechanic told her she needed to get her keys changed out.  When Ms. Newsome received the recall notice she called the New GM dealership, Wolfchase, and they told her she did not need to get the repair unless she wanted to do so.  She brought the car in and they gave her a different key in 2015.  The new key will not fold into the fob.  Ms. Newsome would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Louise Tindell—Tennessee**

238.    Plaintiff and proposed Delta Ignition Switch Defect Class and Power Steering Defect Class Representative Louise Tindell is a resident and citizen of Murfeesboro, Tennessee. Ms. Tindell purchased a used 2007 Saturn Ion with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for about $10,000 from Alexander Chevrolet Buick GMC Cadillac in Murfeesboro, Tennessee on February 14, 2010.  The vehicle was under warranty, and she believes there were two years remaining on the warranty at the time she purchased the car.  At the time of purchase, Ms. Tindell believed that the Ion was a safe and reliable vehicle.  Within seven months of purchasing the vehicle, Ms. Tindell's vehicle shut down while she was driving. She veered to the right, came to a stop, and waited before turning her car back on.  On another occasion, her vehicle shut down on her way to church.  These events made her afraid to drive her car, and, since learning about the recall, she is angry at New GM for keeping the safety defect a secret.  Ms. Tindell had her ignition switch replaced around June 2014.  Before the repair, she was provided a loaner vehicle, which she used for approximately one month.  She no longer trusts the Ion and she will never feel safe in it regardless of repairs or replacement parts.  She continues to fear she will experience more shutdowns and has ceased driving her car completely. Ms. Tindell would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Silas Walton—Tennessee**

239.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Silas Walton is a resident and citizen of Fayetteville, North Carolina.  Mr. Walton purchased a used 2008 Chevrolet Cobalt with the Delta Ignition Switch Defect for around $15,000 from Wyatt Johnson Buick GMC in Clarksville, Tennessee in 2010.  Mr. Walton believes the Cobalt was under warranty at the time of his purchase.  He purchased the vehicle because he thought it was a

reliable and safe vehicle.  Mr. Walton often experienced problems with starting the vehicle and turning the key to any position.  On at least one occasion, he experienced a shutdown in his vehicle, which caused the steering wheel to lock.  This occurred while he was driving downhill on a highway.  At first, he was unable to control the car, but eventually he was able to maneuver it to the side of the road.  After about ten minutes, he was able to restart the vehicle.  Mr. Walton had the ignition switch replaced in the summer of 2014; however, his key continues to stick in the ignition.  After he learned of the recall, Mr. Walton did not drive his vehicle until it was repaired.  This required him to share a vehicle with his daughter and/or rely on his daughter for transportation.  Mr. Walton lost significant time as a result.  He remains concerned about driving the vehicle.  Mr. Walton would not have purchased the vehicle or he would have paid less for it had he known about its defect.

### Gareebah Al-ghamdi—Texas

240.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Gareebah Al-ghamdi is a resident and citizen of San Antonio, Texas.  Ms. Al-ghamdi purchased a used 2004 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for $12,999 from Auto Expo in San Antonio, Texas on September 7, 2009.  She chose this vehicle, in part, because its safety and reliability was important to her.  Ms. Al-ghamdi's vehicle shut off often while she was driving, including while driving on the highway at high speeds, which was terrifying.  On numerous occasions she was either late or missed work or school due to her vehicle shutting off while operating.  When the shutdowns first began, Ms. Al-ghamdi did not know the cause because there was no information available at the time about the recall.  Even diagnostic testing never showed a particular reason as to why the vehicle was consistently shutting off while in motion.  Therefore, her father, who has worked on cars for more than thirty

- 172 -

years, would replace various parts in an attempt to resolve the problem over the years.  In

hindsight, and in light of the defect revelations, these repairs were unnecessary and cost her

money she should not have had to spend.  She received a recall notice for the ignition switch

sometime in 2015, but she has not had her vehicle repaired yet because the dealership told her

the parts were unavailable.  Two dealerships have told Ms. Al-ghamdi her vehicle's value is

lower because of the recall.  Ms. Al-ghamdi would not have purchased the vehicle or she would

have paid less for it had she known about its defect.

**Dawn Bacon—Texas**

241.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative

Dawn Bacon is a resident and citizen of Waco, Texas.  Ms. Bacon purchased a used 2006

Cadillac CTS (subject to the Low Torque Ignition Switch recall) for $10,000 from a private

seller in Texas in September 2012.  The vehicle was not under warranty.  She purchased the

vehicle after seeing commercials touting it as best in safety in its class of vehicles.  Ms. Bacon's

car has stopped on the interstate with no warning at least eight times, many times almost causing

a serious accident.  She also has issues with the ignition requiring many turns of the ignition key

before the car will start.  But she has yet to receive a recall notice for the ignition switch defect.

She had tried to trade in her car several times, but the dealerships have said they will not sell this

particular make and model because there is no real fix for the ignition problem yet.  She would

like to get rid of the car, but cannot find anyone to buy it and she would not want to put another

family in danger.  Ms. Bacon would not have purchased the vehicle or she would have paid less

for it had she known about its defect.

**Dawn Fuller – Texas**

- 173 -

242.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Dawn Fuller is a resident and citizen of Arlington, Texas.  Ms. Fuller purchased a used 2008 Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for $10,824.74 from Moritz Kia in Fort Worth, Texas on December 17, 2011.  The vehicle was still covered by the manufacturer's warranty at the time of purchase.  Ms. Fuller did not purchase an extended warranty.  Prior to purchasing the Impala, she heard that GM-branded vehicles were reliable vehicles and her stepfather specifically recommended the Impala as a good car.  Ms. Fuller chose this vehicle, in part, because the vehicle's safety and reliability were important to her.  Before receiving the recall notice, Ms. Fuller's key would sometimes stick in the ignition and the steering column would lock up.  She received the ignition switch recall notice and had the recall repair done at Vandergriff Chevrolet in Arlington, Texas in early 2016.  The key continues to occasionally stick in the ignition.  Ms. Fuller would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Michael Graciano—Texas**

243.     Plaintiff and proposed Delta Ignition Switch Defect Class Representative Michael Graciano is a resident and citizen of Arlington, Texas.  Mr. Graciano purchased a used 2007 Chevrolet Cobalt with the Delta Ignition Switch Defect for $22,197.20 from Holt Chrysler Jeep Dodge in Arlington, Texas on October 17, 2011.  He purchased a warranty with the vehicle.  He chose this vehicle, in part, because the vehicle's safety and reliability was important to him.  Before March 4, 2014, his fiancée's daughter experienced stalling and corresponding loss of power steering on numerous occasions while driving the car.  Mr. Graciano had the car looked at by family members experienced in car repair and one independent repair shop, but no one was able to diagnose the problem.  Mr. Graciano received a safety recall notice for his vehicle in

- 174 -

March 2014.  After receiving the notice, Mr. Graciano and his fiancée, fearful for her daughter's

safety, instructed her not to drive the car anymore.  Mr. Graciano's fiancée called a local

Colorado Chevrolet dealer twice in March 2014 about having the recall repair performed and

each time she was told the dealer did not have the necessary parts, and each time the dealer failed

to offer a loaner vehicle.  As a consequence, Mr. Graciano's fiancée's daughter was without a

loaner vehicle for one to two months.  During that time, the daughter used her grandfather's

vehicle, a 1991 Buick Park Avenue, which got significantly worse gas mileage than the Cobalt,

resulting in increased gasoline expenditures.  The grandparents, in turn, were forced to share a

vehicle during that time, which caused them significant inconvenience.  Mr. Graciano's fiancée

finally researched the recall and found that a loaner vehicle should have been offered by the

dealer while it was waiting for delivery of the parts.  His fiancée called the dealer back and

relayed her research, at which time the dealer finally agreed to provide a loaner vehicle.  The car

was eventually serviced under the recall by AutoNation Chevrolet North in Denver, Colorado,

and Mr. Graciano's fiancée's daughter was provided a loaner car from Enterprise on May 5,

2014.  While Mr. Graciano waited on repair of the Cobalt, his fiancée's daughter moved to Texas

to go to college, and brought the rental car with her.  Eventually, in approximately mid-June, the

dealer called to say the recall repair had been made, some two months after the car was left with

the dealer.  Mr. Graciano's fiancée had numerous telephone conversations with the service

manager at AutoNation to inquire if New GM was willing to cover the cost of transporting the

vehicle to Texas.  Finally, Mr. Graciano's fiancée was informed by the service manager that New

GM refused to cover the transportation costs and that New GM was not responsible for

transporting the vehicle to Texas.  Mr. Graciano's fiancée received a telephone call from another

New GM representative stating that she had twenty-four hours to return the loaner vehicle to

Enterprise or criminal charges would be pressed against her, and that she was responsible for

paying $5,000 for the loaner vehicle.  On July 30, 2014, the loaner vehicle was returned to an

Enterprise location in Texas.  Enterprise confirmed with AutoNation that there would be no

expense to Mr. Graciano or his fiancée for the loaner vehicle.  In order to transport the Cobalt

back to Texas, Mr. Graciano's fiancée's brother drove the vehicle from Denver, Colorado, to

Arlington, Texas, incurring the cost of the fuel to drive to Texas and the inconvenience of his

time.  Mr. Graciano's fiancée also incurred the cost of flying her brother back to Denver,

Colorado.  Mr. Graciano still owns the vehicle.  He would not have purchased the vehicle or he

would have paid less for it had he known about its defect.

### Shenyesa Henry—Texas

244.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied

Warranty Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch

Defect Bankruptcy Class Representative Shenyesa Henry is a resident and citizen of Aubrey,

Texas.  Ms. Henry purchased a new 2004 Saturn Ion with the Delta Ignition Switch Defect (and

subject to the Power Steering recall) for approximately $16,000 at a Saturn of Plano in Plano,

Texas in 2003.  Her vehicle had a standard warranty, which she believes expired after five years.

Ms. Henry chose this vehicle, in part, because the vehicle's safety and reliability was important

to her.  In March 2014, Ms. Henry experienced a shutdown incident in her vehicle while crossing

an intersection, causing the steering wheel and brakes to lock up.  During the shutdown incident,

Ms. Henry had to struggle to keep the vehicle from veering off the road.  Afterward, she could

not get the key out of the ignition switch and the vehicle had to be towed home.  Because of this

incident, Ms. Henry did not feel safe driving her Ion and she purchased a new vehicle shortly

thereafter.  Ms. Henry first learned about the recall in March 2014 after seeing something about it on television.  Because she had a new vehicle, she did not get her Ion repaired under the recall. Recently, she donated her Ion to a charity organization.  Ms. Henry would not have driven the vehicle or would have sold it if she had known about its defect.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Keisha Hunter—Texas**

245.     Plaintiff and proposed Delta Ignition Switch Defect Class Representative Keisha Hunter is a resident and citizen of Fort Worth, Texas.  Ms. Hunter purchased a used 2006 Chevrolet Cobalt with the Delta Ignition Switch Defect for $24,965.01 from Drivetime in Arlington, Texas on March 22, 2013.  Ms. Hunter chose this vehicle, in part, because the vehicle's safety and reliability was important to her.  Ms. Hunter did not learn of the ignition switch defect until March 2014.  She was concerned for her safety and the diminished value of her vehicle because of the ignition switch defect.  Ms. Hunter's vehicle was repaired under the recall in early 2015 at a New GM dealership in North Richland Hills, Texas.  Her ability to get the defect repaired was affected by a delay in parts and also the fact that she had to miss work to get it done.  She missed work twice because, after scheduling an appointment the first time, she got to the dealership and discovered they scheduled her too late in the afternoon.  The second time she missed a half day of work to get the repair completed.  After increasing mechanical problems with the car, Ms. Hunter defaulted on her loan and returned the car to Drivetime in June 2016.  Ms. Hunter would not have purchased the vehicle or she would have paid less for it had she known about the defect in the vehicle.

**Tajah Liddy—Texas**

246.     Plaintiff and proposed Side Airbag Defect Class Representative Tajah Liddy is a resident and citizen of Round Rock, Texas.  Ms. Liddy purchased a used 2011 GMC Acadia (subject to the Side Airbag recall) from Don Hewlett Chevrolet in Georgetown, Texas on May 22, 2011.  She also purchased a 100,000 mile extended warranty.  She decided to purchase the Acadia because she liked the way it drove and the roominess of the vehicle.  In addition to the airbag recall and sensor issue, the vehicle had problems with the timing change sensor and an oil pan leak.  Ms. Liddy has also received recalls for the hatchback motor and seatbelts.  She has been told that the engine needs to be replaced and this will cost her several thousand dollars out-of-pocket.  Ms. Liddy's opinion of New GM as a brand has changed because of the recalls, and she now fears driving her vehicle because of all the defects.  She does not believe the safety of the vehicle lives up to New GM's representations and New GM should be held responsible.  Ms. Liddy would not have purchased the vehicle or she would have paid less for it had she known about its defects.

### Lisa McClellan—Texas

247.     Plaintiff and proposed Low Torque Ignition Switch Defect Class and Power Steering Defect Class Representative Lisa McClellan is a resident and citizen of Houston, Texas.  Ms. McClellan purchased a used 2005 Malibu Max (subject to the Low Torque Ignition Switch and Power Steering recalls) for $10,551 from La Fiesta Auto Sales in Houston, Texas on November 22, 2010.  At the time of purchase, the vehicle was under a 90-day warranty.  Ms. McClellan purchased this vehicle, in part, because the vehicle's safety and reliability were important to her.  Immediately after she purchased it, the Malibu's cruise control wouldn't work and it was in and out of the service shop.  Over the course of the year and a half that she owned it, the car would shut off while she was driving at least fifty to sixty times.  The Malibu was at

the service repair shop often. She does not remember receiving any recall notices for her vehicle. Ms. McClellan eventually returned the car to the dealership because it had so many problems. She suffered economically because of the vehicle.  Ms. McClellan would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Lisa Simmons—Texas**

248.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch Defect Bankruptcy Class Representative Lisa Simmons is a resident and citizen of Amarillo, Texas.  Mrs. Simmons purchased a new 2007 Saturn Ion with the Delta Ignition Switch Defect for about $16,000 from the Saturn dealership in Amarillo, Texas in 2007.  Her vehicle had a standard warranty, which she believes was for five years.  Ms. Simmons purchased the Ion because she believed that it was a safe and reliable vehicle.  Indeed, Ms. Simmons recalls that the salesperson told her at the time of purchase that the vehicle was safe and reliable.  She is a college student and provides rides from time to time for certain students.  After learning about the defect around March 2014, Ms. Simmons became concerned about having other students or anyone else in her vehicle.  She also frequently drives out of town and is afraid of her vehicle shutting down.  Mrs. Simmons had her ignition switch repaired under the recall on September 23, 2014. She wonders if she can trust the "repair."   Before her vehicle was repaired, Ms. Simmons attempted to get a loaner vehicle on multiple occasions, but her dealership resisted her requests.  She was ultimately able to obtain a loaner after several attempts, arguments with the dealership, and significant stress.  Had she known of the ignition switch defect, however, Ms.

Simmons would not have driven the vehicle and would have attempted to sell it.  She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**Malinda Stafford - Texas**[31]

249.     Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative Malinda Stafford is a resident and citizen of Vacaville, California.  She purchased a new 2008 Buick Lucerne (subject to the Low Torque Ignition Switch recall) for $27,747.47 from Classic Buick Pontiac GMC in Arlington, Texas on January 19, 2008.  The car was covered under the standard manufacturer's warranty, and she also purchased an extended warranty.  She chose this vehicle, in part, because the vehicle's safety and reliability was of the utmost importance to her.  She also selected this vehicle because of Buick's perceived reliability history.  She received a recall notice for the ignition switch defect and had it repaired in January 2015.  Ms. Stafford believes life is worth more than a discounted vehicle.  She would have made a totally different choice of vehicle brand had she known about her vehicle's defect.

**Alexis Crockett—Utah**

250.     Plaintiff and proposed Delta Ignition Switch Defect Class Representative Alexis Crockett is a resident and citizen of Eagle Mountain, Utah.  Ms. Crockett purchased a used 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect for $5,200 from Blacks Auto in Lehi, Utah in 2013.  The vehicle did not have a warranty.  Ms. Crockett purchased this vehicle because safety and reliability were important to her and she believed the Cobalt was safe and reliable.  Indeed, at the time of her purchase, Ms. Crockett was working as a nanny and had charge of children's lives.  She explained this to the salesperson, who emphasized the reliability and safety

---

[31] The Court has dismissed this plaintiff's claims.  They are included solely for the purpose of preserving their claims on appeal.

features of the Cobalt at the time of sale.  Ms. Crockett experienced problems turning the vehicle

on and off on numerous occasions; she also had difficulty removing the key from the ignition.  In

some weeks, the key would get stuck in the ignition several times.  She also has experienced

stalling when reversing out of her driveway.  Ms. Crockett's ignition switch was replaced in

October or November of 2014.  This replacement caused a problem with the vehicle's gear shift.

She often was unable to lock the vehicle and/or remove the ignition key from the ignition.  The

dealership was not able to fix the Cobalt's gear shift problem until February or March of 2015.

Prior to the ignition switch replacement, Ms. Crockett's key would often become stuck in the

ignition. This typically took 20-30 minutes to remove, often causing Ms. Crockett to be late to

appointments and/or work.  She also missed a total of 6-8 hours of work in obtaining her ignition

switch replacement.  Ms. Crockett no longer owns the vehicle and she would not have purchased

the vehicle or she would have paid less for it had she known about its defect.

### Blair Tomlinson, D.D.S.—Utah

251.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied

Warranty Successor Liability Subclass, and Delta Ignition Switch Defect Bankruptcy Class

Representative Blair Tomlinson, D.D.S., is a resident and citizen of Kaysville, Utah.  Dr.

Tomlinson purchased a new 2005 Chevrolet Cobalt with the Delta Ignition Switch Defect for

about $15,000 from Murdock Chevrolet in Bountiful, Utah in August 2005.  Dr. Tomlinson's

Chevrolet Cobalt came with a three-year warranty.  Safety was an important factor to him in

choosing this vehicle.  Dr. Tomlinson and his family have purchased their last three cars from

Murdock Chevrolet and so they went there to look at cars before buying their new 2005

Chevrolet Cobalt.  Dr. Tomlinson and his family members have experienced various issues

consistent with the ignition switch defect, including unexpected shutdowns.  In one particular

incident, Dr. Tomlinson's daughter was driving on the highway in Logan, Utah, when she

accidentally bumped the ignition switch with her knee and the vehicle lost power.  She was able

to get the vehicle safely to the side of the road, but was terrified by the incident.  After hearing

about the recall in the news in March 2014, Dr. Tomlinson attempted to reach New GM, but he

had great difficulty before eventually being informed he would receive a letter if his car was

recalled.  He also took his Cobalt to Young Chevrolet in Layton, Utah, to address the issue.  The

dealership informed him they did not have the recall parts available to fix the defect.  Young

Chevrolet provided a rental car for Dr. Tomlinson for approximately three months while they

waited for parts to arrive.  Dr. Tomlinson, who still owns the vehicle, is still concerned about his

Cobalt and the safety of his family. Dr. Tomlinson would not have driven the vehicle or would

have sold it if he had known about its defect.  He would not have purchased the vehicle or he

would have paid less for it had he known about its defect.

### Paul Jenks – Virginia

252.    Plaintiff and proposed Side Airbag Class Representative Paul Jenks is a resident

and citizen of Virginia Beach, Virginia. Mr. Jenks purchased a new 2012 GMC Acadia (subject

to the Side Airbag recall) for approximately $31,000 from Southern GMC-- Greenbrier in

Chesapeake, Virginia in April 2012.  The vehicle was covered by the manufacturer's warranty at

the time of purchase. Mr. Jenks did not purchase any extended warranty.  The safety and

reliability of the vehicle were important to him in buying it.  Before the Acadia, Mr. Jenks owned

a 1994 Saturn for over 20 years.  He thought highly of the GM brand, but his impression of GM

products has changed since learning of the recall.  In recent years, Mr. Jenks had to replace the

Engine Control Module. This failure caused his car to go to half power on multiple occasions

- 182 -

with at least one occurrence while driving on the freeway.  Additionally, he had the Fuel Rail

Pressure Sensor and the Power Steering Pressure Line to the Rack and Pinion replaced, which is

currently leaking, again. There was also, a leaking Engine Timing Cover, which the dealer

covered under warranty along with a Lift Gate issue, which ended up being covered under a

recall. It was sticking and wouldn't close, then sometimes it would close on his wife after having

been stuck.  Mr. Jenks received the Airbag recall notice and had his vehicle repaired at Southern

GMC in Chesapeake, Virginia in approximately July of 2017.  The Check Airbag Light has

come on intermittently since the recall repair was performed.  Southern GMC repaired seat

sensors related to the airbag, after Mr. Jenks reported the issue to them several times over a 6

month, or more, period of time.  The light was coming on intermittently and the dealership said

they were unable to find a code every time he brought the vehicle in because the light was not on

at that time.  Mr. Jenks even paid another mechanic to troubleshoot the issue because he was so

concerned about the issue. GM finally covered the repair, after Mr. Jenks pressed the dealership

on the issue. The Check Airbag Light came on again last month, after already having the sensors

in the seat repaired.  This time, an independent dealership told Mr. Jenks the issue is related to

sensors in the seatbelt that impact the airbags.  Mr. Jenks would not have purchased the vehicle

or he would have paid less for it had he known about its defects.

**Reynaldo Spellman – Virginia**

253.    Plaintiff and proposed Power Steering Defect Class Representative Reynaldo

Spellman is a resident and citizen of Virginia Beach, Virginia.  Mr. Spellman purchased a used

2008 Saturn Aura (subject to the Power Steering recall) for $11,995 from CarMax in Virginia

Beach, Virginia in 2013.  The vehicle was covered by the remaining factory powertrain

warranty.  He chose this vehicle, in part, because the vehicle's safety and reliability were

important to him.  Mr. Spellman had his vehicle repaired under the recall about two and a half

years ago at Perry Buick in Norfolk, Virginia.  He still drives the vehicle because it is his only

form of transportation.  Mr. Spellman would not have purchased the vehicle or he would have

paid less for it had he known about its defect.

**Michael Garcia—Washington**

254.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied

Warranty Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch

Defect Bankruptcy Class Representative Michael Garcia is a resident and citizen of Yakima,

Washington.  Mr. Garcia purchased a used 2010 Chevrolet Cobalt (subject to the Delta Ignition

Switch and Power Steering recalls) for $16,470 from Blader Chevrolet in Mt. Vernon,

Washington in June 2011.  The vehicle was under warranty when he purchased it.  Mr. Garcia

purchased this vehicle, in part, because the vehicle's safety and reliability were important to he

and his family.  After learning about the ignition switch recall in February 2014, Mr. Garcia and

his family feared driving the vehicle because of the risks posed by the defect and discontinued

driving the vehicle until the ignition switch was replaced under the recall repair program in April

2014.  Mr. Garcia still owns the vehicle and believes its value has been diminished as a result of

the defect.  Mr. Garcia would not have purchased the vehicle or would have paid less for it had

he known about its defect.

**Tony Hiller—Washington**

255.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch

Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied

Warranty Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch

Defect Bankruptcy Class Representative Tony Hiller is a resident and citizen of Sumner, Washington.  Mr. Hiller purchased a used 2009 Chevrolet HHR with the Delta Ignition Switch (and subject to the Power Steering recall) for $10,965.50 from Puyallup Auto Center in Puyallup, Washington in March 2013.  The car was not under warranty at the time of purchase.  Mr. Hiller chose this vehicle, in part, because safety and reliability was important to him, and he believed that the HHR was both safe and reliable.  After learning of the recall, Mr. Hiller simulated an ignition shutdown incident.  He pulled lightly on his key and the vehicle shut off.  On July 23, 2014, Mr. Hiller's ignition switch was replaced under the recall.  By the time his ignition switch was replaced, however, Mr. Hiller had to make several trips to his dealership.  On the first several trips, the dealership did not have replacement switches in stock.  It took several months before the dealership informed Mr. Hiller that his vehicle could be repaired.  Mr. Hiller was also told that his power steering defect was repaired at the same time as his ignition switch repair.  Mr. Hiller traded in his HHR on August 8, 2014, because he does not believe the vehicle is safe to drive.  He believes he received less in trade-in value due to the recall and the safety defects in the vehicle.  Mr. Hiller would not have purchased the vehicle or he would have paid less for it had he known about its defects.

### Stephanie Renee Carden—West Virginia

256.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch Defect Bankruptcy Class Representative Stephanie Renee Carden is a resident and citizen of Huntington, West Virginia.  Ms. Carden purchased a new 2004 Saturn Ion 2 with the Delta Ignition Switch Defect (and subject to the Power Steering recall) for $22,181 at Saturn of

Hurricane in Hurricane, West Virginia on July 22, 2004. Ms. Carden's vehicle came with the standard manufacturer's warranty. Safety and reliability were important to Ms. Carden when she purchased her 2004 Saturn Ion. GM's advertisements regarding their vehicles' safety and reliability were one of the reasons Ms. Carden purchased her 2004 Saturn Ion. In addition to the national advertising campaigns, at the time of purchase, a GM salesman informed Ms. Carden of a previous Ion owner who was involved in a major crash that would have resulted in the Ion driver's death had it not been for the Ion's safety features. Ms. Carden has twice experienced loss of power due to the ignition switch defect. Shortly after the second power-loss incident, Ms. Carden's vehicle had an issue where it would not restart, requiring her to have the vehicle towed to a service station. Ms. Carden learned of the recall on or about March 2014 when she received a recall notice for the ignition switch. Ms. Carden did not have her vehicle repaired under the recall following its failure to restart. Her vehicle, which is not operable, remains in her possession and control. Ms. Carden would not have driven the vehicle or would have sold it if she had known about its defect. She would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Melinda Graley—West Virginia

257.     Plaintiff and proposed Delta Ignition Switch Defect Class Representative Melinda Graley is a resident of Alum Creek, West Virginia. Mrs. Graley purchased a used 2003 Saturn Ion with the Delta Ignition Switch Defect for $13,000 from JD Buyrider in Charleston, West Virginia in March 2012. The car was not under warranty at the time of purchase. Mrs. Graley's husband was driving the car when it inadvertently shut down, causing him to crash into an embankment. Mrs. Graley also experienced steering lock-up events with her car. In one instance, it locked up on her while she was driving up a hill in the mountains, causing her car to

drift left into the oncoming lane.  She narrowly avoided colliding with a coal truck.  The vehicle was serviced under recall in June 2014.  During those three months, her dealership called on multiple instances, insisting she return the loaner vehicle because there was "nothing wrong" with her ignition switch and that her vehicle never failed.  With the assistance of her counsel, Mrs. Graley was able to refuse these demands and retain her loaner through June, when her car was finally repaired.  Mrs. Graley attempted to sell her car to a dealership, CNO Motors, in August 2014.  They only offered her $1,000 for the car, however, so she decided not to sell it at that time.  After experiencing further issues with her Ion, Mrs. Graley sold her car in February 2015 for approximately $750.  Mrs. Graley would not have purchased the vehicle or she would have paid less for it had she known about its defect.

### Nancy Bellow—Wisconsin

258.    Plaintiff and proposed Delta Ignition Switch Defect Class Representative Nancy Bellow is a resident and citizen of Oconto Falls, Wisconsin.  Ms. Bellow purchased a used 2007 Chevrolet Cobalt with the Delta Ignition Switch Defect for $10,000 from King Buick in Oconto, Wisconsin on March 31, 2012.  The car was not under warranty at the time of purchase.  Ms. Bellow purchased the Cobalt because safety and reliability were important to her and she believed that the vehicle was safe and reliable. She purchased the vehicle after reading advertisements about the Cobalt on the Internet.  Her ignition switch was not repaired under the recall until September 18, 2014, and she was never offered a loaner car during this waiting period.  Ms. Bellow was fearful of driving her vehicle before it was repaired, so she often borrowed her sister's vehicle, which was an inconvenience.  Ms. Bellow still owns the Cobalt, but only uses it because she has no other means of transportation.  She does not use the vehicle if

she needs to make a long drive, instead borrowing her sister's vehicle.  Ms. Bellow would not

have purchased the vehicle or she would have paid less for it had she known about its defect.

### Dion Jones—Wisconsin

259.    Plaintiff and proposed Low Torque Ignition Switch Defect Class Representative

Dion Jones is a resident and citizen of Fitchburg, Wisconsin.  Mr. Jones purchased a used 2007

Chevrolet Impala (subject to the Low Torque Ignition Switch recall) for $6,000 from a private

seller in Madison, Wisconsin in May 2013.  Mr. Jones purchased the car primarily to drive for

hire with Uber and he believed the vehicle would be a safe and reliable car for himself and his

customers.  He also recalls seeing advertisements about the safety and reliability of New GM

vehicles.  Mr. Jones experienced a few problems with the ignition switch.  Eventually the vehicle

became so unreliable he could no longer run his business and he was replaced by Uber.  When he

has attempted to sell the car, the potential buyer always asks about the ignition switch and they

are no longer interested in the car.  Mr. Jones would not have purchased the vehicle or he would

have paid less for it had he known about its defect.

### Thomas Linder – Wisconsin

260.    Plaintiff and proposed Low Torque Ignition Switch Defect and Power Steering

Defect Class Representative Thomas Linder is a resident and citizen of Ixonia, Wisconsin.  Mr.

Linder purchased a used 2004 Chevrolet Malibu (subject to the Low Torque Ignition Switch and

Power Steering recalls) for $6,995 from K&W Auto Sales in St. Genoa City, Wisconsin on

November 9, 2011.  Mr. Linder believes the car was still covered by the manufacturer's warranty

when he purchased it.  The safety and reliability of the vehicle were important to him in buying

the Malibu.  Before the Malibu, Mr. Linder owned a Chevrolet Blazer and thought highly of the

GM brand, but his impression of GM products has changed since learning of the recalls.  Over

- 188 -

the past few years, the ignition switch in the vehicle has been faulty and sometimes the car will not turn over on the first attempt.  Mr. Linder received the power steering recall notice and had his vehicle repaired at Ewald Chevy Buick in Oconomowoc, Wisconsin on August 14, 2014.  He believes the ignition switch has also been repaired under the recall, but he does not specifically remember it.  Mr. Linder would not have purchased the vehicle or he would have paid less for it had he known about its defects.

**Les Rouse—Wisconsin**

261.    Plaintiff and proposed Delta Ignition Switch Defect Class, Delta Ignition Switch Defect Successor Liability Subclass, Power Steering Defect Class, and Delta Ignition Switch Defect Bankruptcy Class Representative Les Rouse is a resident and citizen of LaCrosse, Wisconsin.  Mr. Rouse purchased a new 2004 Saturn Ion 2 with the Delta Ignition Switch (and subject to the Power Steering recall) for approximately $16,000 from Saturn of LaCrosse in October 2004 in LaCrosse, Wisconsin.  His car was covered under the manufacturer's standard warranty and he may have purchased an extended warranty.  This was the second Saturn Mr. Rouse purchased new from this dealership, and he bought this car because of its safety rating.  Mr. Rouse experienced a loss of electrical power in his vehicle while driving.  He learned about the ignition switch defect in March 2014, but it took until May 2014 to receive the parts and have the repair completed.  He is concerned about driving the car because of safety risks, and he also believes the value of his car has diminished because of the defect.  Mr. Rouse would not have driven the vehicle or would have sold it if he had known about its defect.  He would not have purchased the vehicle or he would have paid less for it had he known about the defect in the vehicle.

**Christy Smith—Wisconsin**

262.     Plaintiff and proposed Side Airbag Defect Class Representative Christy Smith is a resident and citizen of Soldiers Grove, Wisconsin.  Mrs. Smith purchased a used 2008 Buick Enclave (subject to the Side Airbag recall) for $17,000 from Mad City Sales used car dealership in Madison, Wisconsin on December 20, 2012.  She purchased an extended warranty for the car. The safety of the vehicle was a very big factor in Ms. Smith's decision to buy it.  The airbag light came on in Mrs. Smith's car almost immediately after purchasing it.  She returned to the dealership and they replaced the airbag.  Mrs. Smith would not have purchased the vehicle or she would have paid less for it had she known about its defect.

**B.      Defendant**

263.     Defendant General Motors LLC ("New GM") is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan.  The sole member and owner of General Motors LLC is General Motors Holding LLC.  General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware Corporation with its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan.  New GM was incorporated in 2009 and, effective on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.  It is undisputed that New GM had express obligations, as well as obligations by law, to comply with the certification, reporting, and recall requirements of the National Traffic and

- 190 -

Motor Vehicle Act and the Transportation Recall Enhancement, Accountability and
Documentation Act with respect to all Old and New GM vehicles.

## V.     FACTUAL ALLEGATIONS

**A.     Old GM Falsely Promoted All of Its Vehicles as Safe, Reliable, and High-Quality**[32]

264.     A central theme in Old GM's brand-wide and model-specific advertising was to
tout the safety of its vehicles through specific (and objectively false) promises of safety.  The
following are a few examples of such advertising.  In general Old GM used brochures, print and
TV advertisements to promote Old GM models as safe.  Old GM undertook this advertising
campaign, and spent tens of millions of dollars in doing so, with the specific intent that
consumers rely on those promises.

265.     An Old GM print advertisement exclaimed in bold print:  "**At GM, Safety Isn't
One Thing, It's Everything**."  GM-MDL2543-301025786.

266.     A 2006 GM brand-wide marketing brochure contained a page dedicated to safety.
The page was titled:  "YOUR SAFETY AND SECURITY.  IT'S OUR PRIORITY."  Old GM
then promised:  "General Motors is the only automotive manufacturer committed to offering a
full range of cars, trucks, and SUVs with GM continuous safety:  protection before, during and—
thanks to OnStar—after vehicle collisions."  GM-MDL2543-301443177.

267.     This theme was repeated in another marketing brochure for the Old GM brand,
touting:  "OUR PRIORITY—YOUR SAFETY AND SECURITY."  Old GM then again
promised:   "General Motors is the only automotive manufacturer committed to offering a full
range of cars, trucks, and SUVs with GM continuous safety:  protection before, during and—

---

[32] These ads are only relevant to the claims of the Delta Ignition Switch Defect Successor
Liability Subclass.

thanks to OnStar—after vehicle collisions." GM-MDL2543-301463604; *see also* GM-MDL2543-302767597. Of course, as is now known, this promise of continuous safety is false as the airbags do not work if the ignition switch is not in the Run position.

268.     In early 2009 owner loyalty mailings, Old GM touted the quality and reliability of its vehicles as well as safety:

> **Safe**.
>
> - 37 of our 2009 models have five-star frontal crash safety ratings.
>
> - We offer the safety and security of OnStar, including Automatic Crash Response, OnStar Vehicle Diagnostics, and Turn-By-Turn Navigation. Nobody else offers these services. Not Honda. Not Toyota. Not Ford. Not Chrysler. Not Nissan. Not Dodge. [GM-MDL2543-100182783 (footnotes omitted).]

269.     A 2006 GMC *The Magazine* article titled "Not Just HOT AIR" discussed the importance of a vehicle's air bags. It advised that "Your vehicle's air bags are poised to help protect you in a moment's notice." Further: "When appropriate conditions arise, your vehicle's air bags inflate rapidly and powerfully to work with your safety belt system to help protect you in the event of a collision." GM-MDL2543-100223694. This statement is objectively false as GM's airbags do not deploy at critical times.

270.     Safety was an express selling point in a 2006 HHR brochure touting the "HHR Selling Advantage" of "Added Safety and Security," including "enhanced airbag protection." GM-MDL2543-301464481-82. A 2006 GM press release for the HHR added that that "HHR is designed to protect occupants in the event of a crash" through such "safety features" such as "dual-stage frontal air bags." GM-MDL2543-301452586. A 2007 HHR marketing brochure reiterated the GM "WE'VE GOT YOUR BACK" promise, explaining that "Chevrolet is committed to keeping you and your family safe." GM-MDL2543-3023158819. Marketing copy

for the HHR promised that the "HHR is designed to protect occupants in the event of a crash" in ad copy from 2008 and 2009.  GM-MDL2543-301452598; GM-MDL2543-301458742.

271.    A 2005 Pontiac G6 brochure makes "**SAFETY ASSURANCES**," including standard "dual-stage front airbags."  GM-MDL2543-301463441.  A brochure for the 2008 Pontiac G6 promised that "safety is all around you.  Standard equipment includes dual-stage frontal driver and front passenger air bags," that would—presumably—actually work.  GM-MDL2543-302131852.

272.    Old GM touted safety for the Malibu and Malibu Maxx, stating in a brochure that "Safety is built into the heart of the all-new 2004 Chevrolet Malibu sedan and Malibu Maxx extended sedan," specifically highlighting the airbags.  GM-MDL2543-302128438.  (Of course, safety was not "built into the heart" of these models when Old GM knew it was selling these cars with defective ignition switches.)

273.    Brochures for the 2009 and 2010 Cadillac CTS contain the tagline, "**THE ONLY PLACE WHERE WE PLAY IT SAFE**", claiming that "Passenger safety is one of the first and most important considerations throughout the engineering process" and that "Of course, the ultimate luxury is passenger safety.  So it's needless to say that this aspect of the CTS has been scrutinized with utmost care."  GM-MDL2543-302127737; GM-MDL2543-301626861.

274.    In a print ad for the 2006 Buick LaCrosse, Old GM represented:  "Occupant safety received high priority in the design of LaCrosse—with the goal of providing excellent protection in the event of a collision."  GM-MDL2543-006787272.

275.    A marketing brochure for the 2007 Buick Lucerne promised "PROTECTION BEYOND PROTECTION:"

- 193 -

> Lucerne was designed with safety and protection as top priorities. Helping occupants avoid serious injury in the event of a crash was a given.  But our engineers were committed to doing much more.  Like helping the driver avoid crashes. …  If a crash is unavoidable, Lucerne's six air bags and industry leading technology will be there to help protect.

276.    Similarly, a 2008 Buick Enclave brochure said, "From the outset, safety and protection were top priorities in the design of the Enclave. . . .  If a crash is unavoidable, Enclave's advanced safety technology will be there to help protect."  GM-MDL2543-303150775.

277.    The promise of "Safety" was central to an Old GM press release for the 2006 Saturn Outlook:  "Saturn Outlook is designed to protect passengers before, during and after a crash."  The air bags were highly touted.  GM-MDL2543-301451107.

278.    A marketing brochure for the 2009 Saturn VUE asked, "Can good looks keep you Safe?"  The answer:  "The Saturn VUE Compact SUV.  Six air bags.  StabiliTrak vehicle stability control system.  OnStar.  Now safety isn't a luxury."  GM-MDL2543-100222943.

279.    As alleged below, the foregoing representations are proven to be false and misleading.

**B.    New GM Marketing of Its Brand and New GM Models As Safe and Reliable**

280.    Brands and branding have been critical components of marketing strategy for many years.  This was true for New GM as well which spent tens of millions trying to rebuild its image after Old GM's bankruptcy. The importance of the "brand name" has increased, however, as companies have sought additional ways to differentiate their products from others as differences in the physical characteristics of products become harder to create and sustain.  Creating, managing, and sustaining strong brands is a complex endeavor that requires steady,

- 194 -

long-term commitment by company managers.  The reward for doing so, however, is possession

of an extremely valuable asset that may provide a large return on the company's investment.

What follows below in Sections B.1—B.4 are allegations based on accredited academic studies

and research, as well as the opinions of an advertising/marketing expert, about the importance of

a brand.  After establishing such, the Complaint will detail specific promises that were false,

about the New GM brand and specific New GM models.  The falsity of these promises are quite

different from a brand falling out of favor.  Rather as alleged herein, the revelation that the

promises about the New GM brand were lies, coupled with disclosure of the defects, caused

economic injury to millions of New GM car owners.

### 1.    The branding concept.

281.    At a minimum, a brand is simply "a name, term, sign, symbol, or design, or a

combination of them, intended to identify the goods or services of one seller or group of sellers

and to differentiate them from those of competitors.[33]  Thus, any time a product or service is

given a name, technically it becomes a "brand."  This naming function is important, allowing

users to know who will be responsible for the performance of the brand, but it is only a small

portion of the meaning of a "brand" as created and managed by corporations today.  In general, a

'brand' is the sum total of the beliefs and associations that consumers have with respect to that

brand.  That is why it is often said that products are made in the factory while brands live in

consumers' minds.  Products can be copied and outdated, but properly managed brands are

unique and potentially timeless.  The formulation of Ivory soap, its packaging and advertising,

---

[33] American Marketing Association, as quoted in Kevin Lane Keller, **Strategic Brand Management**, 4th edition (Pearson Prentice-Hall:  Upper Saddle River, NJ, 2013), p. 2.

for example, have changed over the years, but the brand concept of Ivory as "pure," gentle, and wholesome has remained unchanged.



Figure 1:  Brand Associations[34]

282.    As shown in Figure 1, these values can be tangible or physical (product and service features or benefits) as well as intangible or symbolic (images, emotions, values, feelings of community with other brand users, etc.).  Brands can serve functional needs, but also emotional needs and self-expressive needs.

---

[34] Taken from Aaker, David A., **Building Strong Brands** (New York:  The Free Press, 1996), p. 74.

283.    The resulting mental network of associations for any brand, then, can become quite complex.  Figure 2 provides an example of one possible mental network for McDonald's restaurants.



Figure 2:  Mental Associations Network[35]

284.    A different, more qualitative example comes from the well-known annual Interbrand[36] global brand study and valuation describing the Starbucks brand:

> "There are not many places left in this world where absolutely everyone is invited."  Starbucks (SBUX) says, "come in, sit where you want, bring what you want, wear what you want, and enjoy yourself."  "Starbucks built a comfy couch for the planet, and brought community and hospitality back into a culture that had lost it."[37]

---

[35] From Aaker, David A., 1996, op., cit., p. 94.

[36] Interbrand is a leading brand consulting firm that has developed a proprietary brand valuation method.  This study has been conducted each year since 2000.  *See* http://www.interbrand.com, and http://interbrand.com/best-brands/.

[37] *BusinessWeek*, "Millennial Girls—Best Global Brands", 2008.

### 2. Strong brands and brand equity.

285.    According to the well-established customer-based brand equity model,[38] brands can be characterized not only by the positive (and negative) associations linked to them, but also by the strength of consumers' knowledge of these associations. ***Strong brands*** are those for which consumers have a high level of knowledge of the brand, *i.e.*, both a high awareness of the brand and a clear awareness of what the brand stands for.[39] Marketers create and build strong brands by managing brand investments over time so as to create this consumer knowledge. Brand investments include (1) the selection of appropriate brand elements (*e.g.*, brand name, logo, symbols, packaging design, etc.), (2) the creation and execution of a marketing mix (*e.g.*, product design and features, distribution, communications, and pricing as well as target market selection), and (3) management of customer experiences and interactions with the brand such that all brand investments and all points of contact of the consumer with the brand are consistent with the desired positioning of the brand. For most firms, significant resources applied consistently over time are required to build strong brands.[40] The clarity of consumers' brand knowledge is significantly affected by the degree to which all brand-building activities are consistent with each other and consistent over time.

286.    In turn, strong brands, through their high level of consumer knowledge (awareness and associations), create ***brand equity***, which is defined as:

> The differential effect that brand knowledge has on consumer
> response to the marketing of that brand. A brand has positive
> customer-based brand equity when consumers react more

---

[38] Keller, 2013, op. cit.

[39] Keller, 2013, op. cit., p. 44.

[40] *See* Erdem, Tulin and Joffre Swait, "Brand Equity as a Signaling Phenomenon," *Journal of Consumer Psychology*, 7 (2), 1998, pp. 131-157.

favorably to a product and the way it is marketed when the brand is identified than when it is not (say, when the product is attributed to a fictitious name or is unnamed).

287.     The power of brands to shift consumers' responses to products has been shown in many studies.  For example, in one test, consumers were asked to taste three colas with no indication of their brands.  One was Coke, and the other two were two different store brands.  When the brands were not identified, consumer preferences were split fairly evenly among the three—31 percent preferred Coke, and 33 percent and 35 percent preferred the two store brands respectively.  When the brands were identified, however, preferences were very different.  In this case, 50 percent of the testers preferred Coke.[41]  The value of the brand name to consumers is expressed in their differential response to the branded versus unbranded products.

288.     In the case of a relatively expensive consumer durable product, brands also have been shown to exert significant power.  Sullivan studied the used car prices for twin automobile pairs, *i.e.*, those automobiles that are exactly the same, but offered under different automobile brands.  Examples of these in certain years were the Ford Thunderbird and the Mercury Cougar, the Dodge Colt and the Mitsubishi Mirage, and Plymouth Valiant and Dodge Dart.  The results showed that the parent brand, *i.e.*, Ford, Mercury, Dodge, etc., had a significantly positive effect on the relative used car prices of twin pairs.  The model brand (*e.g.*, Thunderbird, Colt, etc.) and model-level quality and advertising variables had little or no effect on relative prices.[42]  Here, the brand name is shown to have a quantifiable value to consumers, *i.e.*, the difference in price of otherwise identical products.  In other words, a brand's value to consumer appears to be "baked

---

[41] Berneiser, Jennifer E. and Sarah N. Allen, "Taste Preference for Brand Name versus Store Brand Sodas," *North American Journal of Psychology*, 13 (2), 2011, pp. 281-290.

[42] Sullivan, Mary W., "How Brand Names Affect the Demand for Twin Automobiles," *Journal of Marketing Research*, 35 (May, 1998), 154-165.

into" the price that consumers are willing to pay for the product. And finally, other researchers have found that brand strength has a positive effect on returns to stockholders and less risk.[43]

289.    Taking an information economics point of view, Erdem and Swait stress an additional characteristic, *brand credibility*, in creating brand equity.[44]   In their model, a brand is seen as a signal which embodies the product's positioning and history in the marketplace. An important characteristic of the signal, which contributes to the brand's power (along with the content and clarity of the brand's associations), and which underlies many of the benefits of a strong brand to consumers, is its credibility. Credibility relates to the brand's willingness and ability to deliver what is promised, and it is determined by the dynamic interactions between firms and consumers. A highly credible brand is seen as having both expertise and trustworthiness. Subsequent research has shown that the dimension of trustworthiness is a significant determination of brand consideration and choice.[45]   Combining the two perspectives of Keller and Erdem and Swait, a strong brand may be seen as one that has high brand awareness, a favorable image based on knowledge of positive associations or characteristics, and a history of delivering what it promises, *e.g.*, the ability (expertise) and willingness (trustworthiness) that combine to create credibility. Undermining a brand's credibility may

---

[43] Madden, Thomas J., Frank Fehle, and Susan Fournier, "Brands Matter:  An Empirical Demonstration of the Creation of Shareholder Value Through Branding," *Journal of the Academy of Marketing Science*, 34 (2), 2006, pp. 224-235.

[44] Erdem, Tulin and Joffre Swait, "1998, op. cit.

[45] Erdem, Tulin and Joffre Swait, "Brand Credibility, Brand Consideration and Choice," *Journal of Consumer Research*, 31 (1), 2005, pp. 191-198.

destroy a brand's value or equity apart from any change in awareness or associations promulgated by the brand's owner.[46,47]

### 3. Benefits of strong brands to consumers and marketers.

290.    Seen from the perspective of information provided by strong brands, it is clear why they provide several benefits to consumers.  At the very least, brands identify the source of the product and allow the consumer to know who is responsible for its performance.  Through prior experiences, interactions with the company offering the brand and its marketing programs, and word of mouth, consumers learn which brands match their needs.  As a result consumers can use brand names as a shortcut for making product decisions.  Strong brands are credible signals of quality, and thus reduce the need for a costly search and the perceived risk in making choices. Further, through their particular images, brands are a symbolic device that allow consumers to express their own values and personalities.  A strong brand provides reassurance that the consumer will get what he or she wants, that the product will send the desired signals to others and perhaps confer membership in desired brand communities, and that the purchase of the product will support organizations with values similar to the consumer.[48]

291.    For firms, brands also provide several valuable functions.  Like for consumers, brands serve an identification purpose to simplify handling and tracing.  A brand also offers a

---

[46] *See* Swait, Joffre, Tulin Erdem, and Tom Peters, "Shocks to Brand Equity:  An Information Economic Perspective on the U.S. Auto Industry 2006-2011," *Customer Needs and Solutions*, 1 (4), December, 2014, pp. 317-332.

[47] A different formulation of brand equity has been proposed by Aaker which conceptualizes brand equity as the assets that belong to the brand:  name awareness, brand associations, perceived quality, brand loyalty, and any other proprietary assets (logos, symbols, etc.).  *See* Aaker, David A., **Managing Brand Equity** (New York:  The Free Press, 1991), Chapter 1, pp. 1-33.

[48] *See* Keller, op cit., 2013, pp. 6-7.

platform for legal protection.  It can be protected through registered trademarks, copyrights for

packaging and other designs.  This intellectual property can be a valuable asset.  When firms are

bought and sold, a strong brand with its ability to signal desirable associations can command a

considerable premium.  Interbrand, for example, has developed a methodology to determine the

value of a firm's brand, apart from its other assets.  In 2015, Interbrand estimated that Apple's

brand, the most valuable in the world, was worth $170,276,000,000.  Even the last brand on

Interbrands list of the 100 most valuable global brands, Lenovo, was worth $4,114,000,000.[49]

Strong brands provide opportunities for additional revenue generation by leveraging the brand

name and its associations to new products in new categories, *e.g*., "brand extensions", and thus

reduce the cost and risk of introducing products.  HP, Inc., for example, sells HP personal

computers, HP printers, HP ink cartridges, and HP calculators.  Advertising the HP brand can

support all of these product lines, automatically instilling the new products with the

characteristics associated with the HP brand.  Alternatively, the firm may choose to license the

brand name—and its associations—to other companies.

> 292.    Brands allow firms to differentiate their products using unique associations and

meanings.  This type of differentiation may be harder to copy than product technology and

features.  In addition, it allows the firm to target market offerings to different segments of the

market.  Procter and Gamble, for example, markets multiple brands of laundry detergent (*e.g*.,

Tide, Cheer, etc.), each with its own brand image, to different market segments.  The company

increases its revenues streams by being able to serve a larger portion of the market.  Consumers

may be willing to pay a higher price for a brand that is perceived to best fit their needs, and/or

firms may be able to generate greater margins due to a lesser reliance on price promotions to

---

[49] *See* www.interbrand.com/best-brands.

stimulate sales.  Finally, strong brands and strong relationships with consumers may provide

firms with a degree of insulation from competing marketing efforts and from occasional

missteps.[50]

293.    In summary, strong brands provide significant benefits to consumers and firms

alike.  Both receive considerable value from well designed and supported strong, credible brands.

Building strong brands and generating the power to evoke a differential response among

consumers is not an easy nor inexpensive task.  Considerable management time and monetary

resources are required to develop a high level of brand awareness and an extensive level of

consumer brand knowledge, and such was the case at New GM.  A firm must show consumers

that it is both willing and able to fulfill its brand promise over time to develop brand credibility.

Once built, however, a strong brand creates considerable revenue opportunities for the firm.

### 4.    Leveraging brand associations—benefits and risks.

294.    One of the most important benefits of establishing a strong brand is the

opportunity to leverage the brand's high awareness, positive associations, and credibility to assist

in the introduction of other products under the established brand's name, *i.e.*, "brand

extensions."[51]  The high awareness of the shared brand name provides some degree of immediate

familiarity with the new product, and the brand name serves as a signal of the quality of the new

brand.[52]  For example, Apple Macintosh (iMac) computers historically were known for their

elegant styling as well as simplicity of operation and ease of use.  These associations were

---

[50] *See* Keller, 2013, op. cit, pp. 6-7, and Aaker, 1991, op. cit., pp. 16-18.

[51] Keller, Kevin Lane, 2013, op. cit. and Aaker, David A., 1991, op. cit.

[52] Montgomery, Cynthia and Birger Wernerfelt, "Risk Reduction and Umbrella Branding," *Journal of Business*, 65 (1), 1992, pp. 31-50; Wernerfelt, Birger, "Umbrella Branding as a Signal of New Product Quality:  An Example of Signaling by Posting a Bond," *Rand Journal of Economics*, 19 (3), 1988, pp. 458-66.

leveraged in the introduction of the Apple iPod, which both benefited from, and enhanced

through additional confirmation, Apple's reputation for these attributes, and in the subsequent

introductions of the iPhone and Apple Watch.  Because the iPod was made by Apple—and

shared its brand name—the qualities consumers associated with Apple and its established

products were transferred to the new product, reducing the cost of marketing and advertising for

Apple and reducing the uncertainty/risks and need for information search by consumers.  In this

way, the high costs of establishing a strong brand can be spread over multiple products and

sources of revenue.[53]

295.    Much marketing research has confirmed these positive benefits to a new

product.[54]  For example, Erdem[55] demonstrated that consumers expect that the quality levels of

products marketed under a shared, or "umbrella" brand, to be highly correlated.  Other research

has investigated the conditions under which the acceptance of a brand extension is most likely to

benefit from a connection to an established brand name.[56]  Extensions are more likely to benefit

---

[53] Among the possible reasons for the increasing costs of creating a strong brand are brand proliferation which makes it difficult to gain consumers' attention and to get exposure through distribution, the high volume of television advertising and the resulting impact of it, and the increasing sophistication of consumers which also has reduced the effectiveness of advertising. *See* Sullivan, Mary C., "Measuring Image Spillovers in Umbrella-branded Products," *Journal of Business*, 63 (3), 1990, pp. 309-329.

[54] *See* Keller, 2013, op. cit., chapter 12, pp. 403-448, and Loken, Barbara, Christopher Joiner and Michael J. Houston, "Leveraging a Brand Through Brand Extension:  A Review of Two Decades of Research," in Barbara Loken, Roini Ahluwalia and Michael J. Houston (eds.), **Brand and Brand Management:  Contemporary Perspectives** (New York:  Routledge, 2010) for reviews of this literature.

[55] Erdem, Tulin, "An Empirical Analysis of Umbrella Branding," *Journal of Marketing Research*, 35 (3), 1998, pp. 339-351.

[56] Loken, *et al.*, 2010, op cit.

from high-quality brands, from brands that consumers trust, and from brands for which there is some similarity or degree of "fit" between the original product category and the new.

296.    Information about an extension that directly contradicts a central belief about the original brand may undermine the credibility of the original brand resulting in a loss of brand equity.  If the original brand is a corporate brand, *i.e.*, the name of the company that manufactures the product, the damage may be increased.  This is because a corporate brand reflects an organization that presumably will deliver and stand behind the product or service. The associations tied to a corporate brand generally are more abstract as the corporate brand must be consistent with, or provide an "umbrella" over all of the other brands nested beneath it. For example, the corporate brand can provide credibility based on trust, liking and generalized perceived expertise.  Trust, in particularly, may be easier for an organization than a product to develop.[57]  Negative feedback to a corporate brand that undermines the trust that consumers have in it will undermine the brand equity of that brand.

297.    Other researchers have investigated the related phenomenon of "spillover," in which information about or marketing actions taken in support of one product "spills over" to affect demand for other products that share the brand name.  The information may be positive or negative, and the products may belong to different product categories (*e.g.*, toothbrushes and toothpaste) or to a company's portfolio of brands in the same product category (*e.g.*, Toyota Camry and Toyota Corolla).  While much of the brand extension literature is focused on the use of an established brand name to aid the launch of a new product and the interaction between the established product reputation and information about the new product, spillover refers to the

---

[57]See Aaker, David, A., **Brand Portfolio Strategy** (New York:  Free Press, 2004), Chapter 9, "Leveraging the Corporate Brand", pp. 257-288.

impact of information about an established product and the other products that share a brand name.

298.    Two studies have investigated the impact of product recalls on other products that share the same brand name, but are not the subject of the recall.  First, Sullivan analyzed the effects of the sudden-acceleration incidents that occurred in 1986 as Audi 5000 owners began to report a high incidence of sudden-acceleration problems.[58]  The safety of 250,000 Audi 5000 cars sold between 1978 and 1986 were called into question as several deaths occurred due to the problem.  Audi executives initially denied that there was a problem, initially refused to recall the products, and appeared to blame the drivers of the vehicles for any problems they experienced.  Sullivan's study tested whether the demand for Audi 4000s and Quattros were affected along with the demand for 1978-86 Audi 5000s.  Specifically, Sullivan tested whether the negative information about the Audi 5000 models resulted in an increased depreciation for used Audi 4000 and Quattros.  Her analysis demonstrated that all of the Audis were significantly affected by the sudden-acceleration incident.  Audi 5000s depreciated 11.5% more than they would have in the absence of the issue, while the Audi 4000s depreciated 9.2% more than expected and the Quattro depreciated 6.8% more than expected.  No other brand included in the analysis, including Porsche which was frequently sold by the same dealers as Audi, was affected.  Further, the damage to Audis was sustained over time.  The year after the incidents were disclosed, the depreciation rates were 12.0%, 11.1%, and 6.1% higher than expected for the 5000, the 4000, and the Quattro respectively.  Two years later, the 5000 and the 4000 models declined more than expected by 7.0% and 8.4%, respectively.

---

[58] Sullivan, Mary C., "Measuring Image Spillovers in Umbrella-branded Products," Journal of Business, 63 (3), 1990, pp. 309-329.

299.     Interestingly, Sullivan was also able to demonstrate a positive spillover for used models of Jaguar that occurred following favorable publicity regarding Jaguar's introduction in 1988 of its first major model change in 16 years.  The new technology introduced kept the classic look of the Jaguar, but improved its reliability.  The launch was accompanied by an unprecedented advertising campaign for the new models, and demand for them was higher than executives had predicted.  A positive spillover on used Jaguars due to the enhancement of the Jaguar name was found.  Specifically, used Jaguars depreciated more slowly than they otherwise would have, *i.e.*, 3.9% lower than expected.

300.     In a second study, Swait, Erdem, and Peters examined the effects of shocks to brand equity in the U.S. automobile industry during the period of 2006-2011.[59]  Their primary focus was the effects of a series of sustained product recalls in 2009 and 2010 by Toyota related to problems of sudden unintended acceleration of some makes of its cars.  Like Audi mentioned previously, Toyota engaged in denials, contradictory information, and stonewalling that led to a crisis of confidence in the brand.  As these authors note, purchase consideration of the Toyota brand declined from a high of almost 35% in the second quarter of 2007 to a low of about 23% in the fourth quarter of 2010, a 34% decline.  Overall sales, vehicle resale values, brand market share, and perceptions of safety all declined.  The 2009-2019 year-to-year sales of Toyota dropped .4% while Ford, Honda, General Motors, Hyundai, and Nissan all experienced sales increases of at least 6.9%.[60]  In their study, the authors examine changes over time in the

---

[59] Swait, Joffre, Tulin Erdem, and Tom Peters, 2014, op. cit.

[60] *See* CNN Money, "Toyota:  One Year Later—But a Toyota?  Wouldn't Think of It," Cable News Network, Time Warner Company, 2011a, http://oney.cnn.com/galleries/2011/autos/1101/ gallery.toyota_one_year_later/ 3.html. and CNN Money, "Toyota :  One Year Later—The Only Loser," Cable News Network, Time Warner Company, 2011b, http:// money.cnn.com/galleries/ 2011/autos/1101/gallery.toyota.one_year_later/index.html.

perceived marketing mix consistency, brand credibility, perceived quality (and consequently purchase consideration) of Toyota.  Measurements were taken in November 2006, and then again in February, 2011.

301.    The results shows that the average likelihood of consideration of Toyota decreased.  The proportion of respondents that had Ford in their consideration set increased from 38% in 2006 to 51.9% in 2011, a 36.4% increase.  The proportion of respondents who put Toyota in their consideration set decreased from 61.1% to 42.2%, a 30.9% decrease.  Further, Toyota was perceived more negatively in terms of service orientation, warranty quality, vehicle reliability, and low operating costs.  Essentially, Toyota's problems with the serious and sustained recalls cast a negative halo over the brand.  The Toyota brand lost ground on the question of credibility of its claims about its products in the face of the recalls and the company's handling of the problems, and this resulted in widespread negative ratings.  Consumers perceived that the brand was reneging on its promises related to product quality.  Meanwhile, other brands seemingly held their own through a very turbulent period that saw bankruptcies and government bailouts.  One report on the effect of Toyota recalls indicates that the severity of the damage to the brand was due, at least in part, to the centrality of the attributes of safety and reliability to the Toyota brand, to the severity of the consequences of the quality problems, *i.e*., multiple deaths, the graphic publicity of the issues, and the company's poor handling of the situation.[61]

302.    Finally, a more recent example of widespread spillover effects of negative information about some products on others that share a brand name comes relates to Volkswagen and its admission of cheating on federal emissions tests for 11 million diesel cars worldwide.

---

[61] NADA Used Car Guide, "The Impact of Vehicle Recalls on the Automotive Market," Q3, 2014.

According to one report,[62] demand for used affected Volkswagen diesel vehicles are down and prices have fallen.  Negative spillover to non-affected Volkswagen vehicles, however, has also been observed, with one executive stating that overall, the number of Volkswagen shoppers on his website have declined by 6 percent since the scandal began.  Volkswagen's prior attempts to position itself as an environmentally friendly brand by planting a forest and building the first green certified car factory may have resulted in stronger spillover effects due to perceived inconsistency between the brand's claims and its performance, and thus a decrease in brand credibility particularly related to a core attribute.

303.    In summary, both theory and empirical research show that common brand names among products either in the same product category or across different product categories result in the transfer of associations on a two-way basis.  An strong established product may lend positive associations to a new brand, but information (positive or negative) about that new product—or any other product that shares the brand name—may affect any other product that uses the brand name.  Research on brands as signals suggests that the spillover to other products is due in part to a reduction (or enhancement of) the credibility of the shared brand name that potentially affects any and all that use it.

**5.    Application of Spillover theory and research to the New GM ignition switch recalls.**

304.    The theory and empirical research, reviewed above, support the allegations that the repeated recalls of car brands and models by New GM had a negative impact not just on the brands and models recalled, but also on any Old and New GM automobile.  The degree to which

---

[62] NPR Morning Edition, "Emissions Scandal is Hurting VW Owners Trying to Resell," heard on October 26, 2015.  *See* http://www.npr.org/2015/10/26/450238773/emissions-scandal-is-hurting-vw-owners-trying-to-resell.

such negative impacts occur may depend on the salience of the General Motors corporate brand and the importance of safety and reliability to its brand image and credibility.

305.     Prior research has shown that negative effects can be reduced if a brand name is able to distance itself somewhat from the product that performs badly.  One mechanism for distancing a parent brand is to use sub-brands, *i.e*., the Sony VAIO line, or endorser brands such as Courtyard by Marriott, where Marriott is positioned as the endorser of, but not the same as the Courtyard brand.  Thus, any negative effects of product recalls for ignition switch failures in cars may depend upon the salience of the General Motors corporate brand name relative to the family sub-brand, *e.g*., Buick, Chevrolet, Oldsmobile, etc.  In this case, General Motors might be a "shadow endorser" in that it is not typically connected visibly to the endorsed brand, but many consumers know about its link to the various sub-brands, New GM promotes its ties to its various sub-brands on its website, and it was New GM who made the product recall announcements and has handled the public relations surrounding them.  It is very likely that the shared corporate brand has been made very salient.

306.     In terms of brand architecture, New GM uses a hybrid form of the "House of Brands" structure.[63]  In a typical House of Brands structure, a parent corporation owns a number of separate brands, and its ownership connection to these brands is downplayed and is not promoted on its products.  Although Old GM is generally credited with pioneering this structure, the architype of it today is Procter & Gamble ("P&G").  P&G keeps a very low profile in connection with its many brands (*e.g*., Tide, Dawn, Crest, Pampers, etc.), although the connection is better known for some brands than others.  A House of Brands structure is diametrically opposite to a Branded House structure in which the parent corporation is part of

---

[63] *See* Aaker, 2004, op cit., pp. 46-63.

every brand's name, *e.g*., Dell computers, HP printer and computers, etc.  The New GM brand

including GMC is:

| | |
|---|---|
| Corporate brand | General Motors |
| Family brands | Buick, Cadillac, Chevrolet lines |
| Model brands | (Buick) Regal, (Cadillac) Escalade, (Chevrolet) Camaro |
| Model descriptors | ES, GS, etc. |

In this structure, the corporate brand does not play a highly visible role with respect to sales of

the family brands nested under it, but neither is it hidden or silent.

307.    Following the extant research on product recall effects, the degree to which safety

is a core association of the shared brand,[64] the degree to which the company is perceived to have

failed to take timely action with respect to the ignition failures, the degree to which serious

injuries or deaths attributed to the defect have occurred and have been made public, among other

factors will determine the degree of spillover effects to non-affected products will be observed,

as they are in this case.

## C.    New GM Falsely Promoted All of Its Vehicles as Safe, Reliable, and High-Quality

308.    New GM was financially successful after Old GM's bankruptcy.  Sales of all its

models went up, and New GM became profitable.  New GM claimed to have turned over a new

leaf after Old GM's bankruptcy—a new GM was born, and the New GM brand stood strong in

the eyes of consumers—or so the world thought.

309.    New GM's success, in part, was created by its constant and expensive marketing

campaign designed to convince U.S. consumers that New GM produced safe and high quality

cars and that New GM as a brand stood for safety and quality.  New GM spent tens of millions of

---

[64] Ignition switch failures could also impact other perceptions that are also central to brand evaluations.  Perceptions of innovativeness and technical expertise may be affected, and lower perceptions of these characteristics may cause negative spillover to any and all other New GM brands.

dollars advertising its brand and specific models with the express purpose that consumers rely on them.  New GM did not intend for consumers to believe promises about safety and reliability were "puffery."  What follows are just a few examples of New GM's advertising.

310.    In 2010, New GM sold 4.26 million vehicles globally, an average of one every 7.4 seconds.  Joel Ewanick, New GM's global chief marketing officer at the time, described the success of one of its brands in a statement to the press:  "Chevrolet's dedication to compelling designs, *quality*, *durability* and *great* value is a winning formula that resonates with consumers around the world."[65]

311.    New GM repeatedly proclaimed to the world and U.S. consumers that, after Old GM's bankruptcy in 2009, New GM was a new and improved company committed to innovation, safety, and maintaining a strong brand:

---

[65] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Jan/0117_chev_ global.



General Motors Company 2010 Annual Report, cover page.

312.   In New GM's 2010 Annual Report, New GM proclaimed its products would "improve safety and enhance the overall driving experience for our customers":

> As we regain our financial footing, we expect the number of new product launches to steadily rise over the next several years.  And these new products will increasingly embrace advanced technology to reduce fuel consumption and emissions, improve safety and enhance the overall driving experience for our customers.

General Motors Company 2010 Annual Report, pp. 4, 10.

313.     These statements are not mere puffery as the statement that New GM was committed to safety can be objectively measured, as Valukas did in his report, and can be measured by engineers who can opine on whether the acts and/or omissions of New GM are consistent with engineering and manufacturing practices devoted to safety.

314.     New GM claimed it would create vehicles that would define the industry standard:



BUILDING THE NEW GM

We are moving with increased speed and agility, and implementing change faster than ever before. We are becoming a company with the capability, resources and confidence to play offense, not defense. Instead of creating new vehicles that are just better than their predecessors, we're working to design, build and sell vehicles that define the industry standard.

General Motors Company 2010 Annual Report, p. 5.

315.     Statements that New GM's cars will "define the industry standard" are capable of objective measurement as Dr. Stevick did in opining that New GM failed to meet the FMEA standard.

316.     In its 2010 Annual Report, New GM told consumers that it built the world's best vehicles:

> We truly are building a new GM, from the inside out.  Our vision is clear:  to design, build, and sell the world's best vehicles, and we have a new business model to bring that vision to life.  We have a lower cost structure, a stronger balance sheet, and a dramatically lower risk profile.  We have a new leadership team—a strong mix of executive talent from outside the industry and automotive veterans—and a passionate, rejuvenated workforce.

> "Our plan is to steadily invest in creating world-class vehicles, which will continuously drive our cycle of great design, high quality and higher profitability."

General Motors Company 2010 Annual Report, p. 2.

317.    New GM represented that it was building vehicles with design excellence, quality, and performance:

> And across the globe, other GM vehicles are gaining similar acclaim for design excellence, quality, and performance, including the Holden Commodore in Australia.  Chevrolet Agile in Brazil, Buick LaCrosse in China, and many others.

> The company's progress is early evidence of a new business model that begins and ends with great vehicles.  We are leveraging our global resources and scale to maintain stringent cost management while taking advantage of growth and revenue opportunities around the world, to ultimately deliver sustainable results for all of our shareholders.

General Motors Company 2010 Annual Report, p. 3.

318.    These statements are not mere puffery.  New GM's own admissions in 2014 make it clear that it was not creating a world class vehicle or the best vehicle.  One way to measure the truth of that statement is by referencing New GM's failure to follow its own design specifications.

319.    These themes, building "the world's best vehicles" through improved manufacturing and design, were repeatedly put forward as the core message about New GM's brand:

- 215 -

The new General Motors has one clear vision: to design, build and sell the world's best vehicles. Our new business model revolves around this vision, focusing on fewer brands, compelling vehicle design, innovative technology, improved manufacturing productivity and streamlined, more efficient inventory processes. The end result is products that delight customers and generate higher volumes and margins— and ultimately deliver more cash to invest in our future vehicles.

## A New Vision, a New Business Model

Our vision is simple, straightforward and clear: to design, build and sell the world's best vehicles. That doesn't mean just making our vehicles better than the ones they replace. We have set a higher standard for the new GM—and that means building the best.

Our vision comes to life in a continuous cycle that starts, ends and begins again with great vehicle designs. To accelerate the momentum we've already created, we reduced our North American portfolio from eight brands to four: Chevrolet, Buick, Cadillac and GMC. Worldwide, we're aggressively developing and leveraging global vehicle architectures to maximize our talent and resources and achieve optimum economies of scale.

Across our manufacturing operations, we have largely eliminated overcapacity in North America while making progress in Europe, and we're committed to managing inventory with a new level of discipline. By using our manufacturing capacity more efficiently

and maintaining leaner vehicle inventories, we are reducing the need to offer sales incentives on our vehicles. These moves, combined with offering attractive, high-quality vehicles, are driving healthier margins—and at the same time building stronger brands.

Our new business model creates a self-sustaining cycle of reinvestment that drives continuous improvement in vehicle design, manufacturing discipline, brand strength, pricing and margins, because we are now able to make money at the bottom as well as the top of the industry cycles.

We are seeing positive results already. In the United States, for example, improved design, content and quality have resulted in solid gains in segment share, average transaction prices and projected residual values for the Chevrolet Equinox, Buick LaCrosse and Cadillac SRX. This is just the beginning.

General Motors Company 2010 Annual Report, p. 6.

320.    GM made specific promises about its culture recognizing that culture was important to consumers:



General Motors Company 2010 Annual Report, p. 16.

321.    New GM's statements about its culture are not puffery in that culture can be measured by experts and indeed Mr. Valukas did so in his report.

322.     In 2010, in reaction to news about Toyota's unintended acceleration problem, New GM briefed its executives to convey in "public activities" and interviews that New GM believed "that automotive safety design, engineering and testing is serious business with serious consequences" and it was "making sure GM designs and builds safe cars."[66]

323.     In its 2011 Annual Report, New GM proclaimed that it was putting its customers first:



General Motors Company 2011 Annual Report, p. 1.

324.     This statement is not mere puffery and is capable of being proven true or false. The Valukas Report and many admissions in the Deferred Prosecution Agreement establish that New GM was not putting customers first.

325.     New GM also announced that it was committed to leadership in vehicle safety:

---

[66] GM-MDL2543-000773907—Confidential.

> **Automotive**
>
> We offer a global vehicle portfolio of cars, crossovers and trucks. We are committed to leadership in vehicle design, quality, reliability, telematics and infotainment and safety, as well as to developing key energy efficiency, energy diversity and advanced propulsion technologies, including electric vehicles with range extending capabilities such as the Chevrolet Volt. Our business is

General Motors Company 2011 Annual Report, p. 11.

326.     In a "Letter to Stockholders" contained in its 2011 Annual Report, New GM

noted that its brand had grown in value and that it designed the "World's Best Vehicles":

> *Dear Stockholder:*
>
> *Your company is on the move once again.  While there were highs and lows in 2011, our overall report card shows very solid marks, including record net income attributable to common stockholders of $7.6 billion and EBIT-adjusted income of $8.3 billion.*
>
> •     *GM's overall momentum, including a 13 percent sales increase in the United States, created new jobs and drove investments.  We have announced investments in 29 U.S.  facilities totaling more than $7.1 billion since July 2009, with more than 17,500 jobs created or retained.*
>
>     *Design, Build and Sell the World's Best Vehicles*
>
> *This pillar is intended to keep the customer at the center of everything we do, and success is pretty easy to define.  It means creating vehicles that people desire, value and are proud to own.  When we get this right, it transforms our reputation and the company's bottom line.*

General Motors Company 2011 Annual Report, p. 2.

> *Strengthen Brand Value*
>
> *Clarity of purpose and consistency of execution are the cornerstones of our product strategy, and two brands will drive our global growth.  They are Chevrolet, which embodies the qualities of value, reliability, performance, and expressive design; and Cadillac, which creates luxury vehicles that are provocative and powerful.  At the same time the Holden, Buick, GMC, Baojun, Opel and Vauxhall brands are being carefully cultivated to satisfy as many customers as possible in select regions.*
>
> *Each day the cultural change underway at GM becomes more striking.  The old internally focused, consensus-driven and overly complicated GM is being*

*reinvented brick by brick, by truly accountable executives who know how to take calculated risks and lead global teams that are committed to building the best vehicles in the world as efficiently as we can.*

*That's the crux of our plan.  The plan is something we can control.  We like the results we're starting to see and we're going to stick to it—always.*

General Motors Company 2011 Annual Report, p. 3.

327.    These themes continued in New GM's 2012 Annual Report:



General Motors Company 2012 Annual Report, p. 3.

328.    The foregoing statements regarding New GM's processes and culture are capable

of being proven false.  In this case facts such as failing to meet specifications, cost cutting,

- 220 -

siloing, the GM Nod, and many others, belie the truth of the statements above about the New

GM culture.

329.    New GM boasted of its "focus on the customer" and its desire to be "great" and

produce "quality" vehicles:

> *What is immutable is our focus on the customer, which requires us to go from "good" today to "great" in everything we do, including product design, initial quality, durability, and service after the sale.*

General Motors Company 2012 Annual Report, p. 4.

330.    New GM also indicated it had changed its structure to create more

"accountability" which, as shown below, was a blatant falsehood:

> *That work continues, and it has been complemented by changes to our design and engineering organization that have flattened the structure and created more accountability for product execution, profitability and customer satisfaction.*

General Motors Company 2012 Annual Report, p. 10.

331.    And New GM represented that product quality was a key focus—another blatant

falsehood:

> *Product quality and long-term durability are two other areas that demand our unrelenting attention, even though we are doing well on key measures.*

General Motors Company 2012 Annual Report, p. 10.

332.    New GM's 2013 Annual Report stated, "Today's GM is born of the passion of

our people to bring our customers the finest cars and trucks we've ever built:"

- 221 -



General Motors Company 2013 Annual Report, inside front cover dual page, (unnumbered).

333.   With great irony given its inaccuracy and the damage wrought in this case, New GM proclaimed, "Nothing is more important than the safety of our customers:"

> Nothing is more important than the safety of our customers, so we are also making changes to ensure that something like this does not happen again. One of our first actions was to name a vice president of Global Vehicle Safety to oversee the safety development of GM vehicle systems on a global basis, the confirmation and validation of safety performance, and post-sale safety activities such as recalls. There will be more changes because we are determined to emerge from this crisis stronger and wiser so we can accelerate the momentum we generated through-out 2013.

General Motors Company 2013 Annual Report, p. 4.

334.     The statement about the importance of safety can be proven to be false by virtue

of New GM's Admissions in the Deferred Prosecution Agreement, the Valukas Report, and Trial

Exhibits such as:

> Delphi's and GM's pre-production testing of the ignition switch that repeatedly showed that the torque on the switch was "Not OK."[67]
>
> A directive to Delphi from GM's design release engineer for the ignition switch to "do nothing" and "maintain present course" when confronted with torque measurements that fell well below specification.[68]
>
> A warning from GM engineer Laura Andres that the weak detent "is a serious safety problem." "I'm thinking big recall," she said. "I think you should seriously consider changing this part to a switch with a stronger detent."[69]  Instead of being commended for uncovering and escalating a safety defect, Ms. Andres was criticized and told to "leave that to the safety engineers to decide what is safety and what is not safety."[70]
>
> GM's acknowledgement in documents that it failed to remedy a deadly safety defect in 2005 because the tooling cost and piece cost are too high," and therefore none of the proposed solutions "represents an acceptable business case."[71]
>
> A Cleveland Plain Dealer article from June 2005 reporting that "[I]t is, please excuse me, a knee slapper, suggesting that an engine that can be inadvertently turned off is not a safety problem. . . . So, if you're whisking along at 65 mph or trying to pull across an intersection and the engine stops, that's what you do. Only a gutless ninny would worry about such a problem. Real men are not afraid of temporary reductions in forward momentum."[72]

---

[67] SOF ¶ 21.

[68] *Scheuer v. GM*, Plaintiff's Exhibit 2167.

[69] MDL Exhibit 2120.

[70] L. Andres Depo. Tr. 124:20-21.

[71] *Scheuer v. GM*, Plaintiff's Exhibit 160.

[72] *Scheuer v. GM*, Plaintiff's Exhibit 140.

A February 2007 Wisconsin State Patrol Report authored by Trooper Young stating that the "key turned to accessory [because] of low torque," which "prevented the airbags from deploying."[73]

A February 2009 e-mail written by a GM Program Engineering Manager explaining that "[t]his [ignition switch] issue has been around since man first lumbered out of the sea."  "In fact," explains the manager, "I think Darwin wrote the first PRTS on this and included as an attachment as part of his Theory of Evolution."[74]

An October 2010 case evaluation warning New GM that the air-bag non-deployment "anomaly" exposed GM to punitive damages.[75]

**D.     New GM's Advertising and Marketing Literature Falsely Claimed that New GM Placed Safety and Quality First**

335.    In May of 2014, New GM sponsored the North American Conference on Elderly Mobility.  Gay Kent, director of New GM global vehicle safety and a presenter at the conference, proclaimed the primacy of safety within New GM's new company culture:  "The safety of all our customers is our utmost concern."[76]

336.    New GM vigorously incorporated this messaging into its public communications. In advertisements and company literature, New GM consistently promoted all its vehicles as safe and reliable, and presented itself as a responsible manufacturer that stands behind New GM vehicles and Old GM vehicles that are on the road.  Examples of New GM's misleading claims of safety and reliability made in public statements, advertisements, and literature provided with its vehicles follow.

---

[73] *Scheuer v. GM*, Plaintiff's Exhibit 462.

[74] GM-MDL2543-000727831

[75] *Scheuer v. GM*, Plaintiff's Exhibit 92.

[76] https://media.gm.com/media/us/en/gm/news.detail./content/Pages/news/us/en/2014/May/0514-cameras.

337.    An advertisement for the Chevy Malibu promoted "Safety" and "Value."[77]



338.    The same brochure promises "world class engineering."[78]

---

[77] GM-MDL2543-100182616-100182625.

[78] *Id.*



339.    A 2010 advertisement for Chevy emphasized that "What Makes A Chevy—A Chevy" was "precise design" and "premium quality."[79]  As set forth below, this statement is easily disproven by an objective measure simply by virtue of New GM's allowing the use of a switch that was out of design specification.



340.    A 2010 advertisement emphasized safety:[80]

---

[79] GM-MDL2543-100216045.

[80] GM-MDL2543-301439199.



341.    No owner would be proud to own a vehicle that had an ignition switch with torque that was out of specification, had been built in a cost cutting culture, and had an airbag that would not work when needed.

342.    And the same advertisement, as did many others, contained a promise that New

GM would:  "Build vehicles that anyone would be proud to own."[81]

343.    New GM also touted its brand, as in the following advertisement stating that,

"Advanced safety and security features will confirm GM's role as an innovation leader":[82]



344.    In April 2010, General Motors Company Chairman and CEO Ed Whitacre starred

in a video commercial on behalf of New GM.  In it, Mr. Whitacre acknowledged that not all

Americans wanted to give New GM a chance, but that New GM wanted to make itself a

company that "all Americans can be proud of again" and "exceed every goal [Americans] set for

[General Motors]."  He stated that New GM was "designing, building, and selling the best cars in

---

[81] GM-MDL2543-301439211.

[82] GM-MDL2543-100222744.

the world."  He continued by saying that New GM has "unmatched lifesaving technology" to keep customers safe.  He concluded by inviting the viewer to take a look at "the new GM."[83]



345.    A radio advertisement that ran from New GM's inception until July 16, 2010, stated that "[a]t GM, building quality cars is the most important thing we can do."  Once again, the veracity of this statement can be objectively disproven by just the Valukas Report.

346.    On November 10, 2010, New GM published a video that told consumers that New GM actually prevents any defects from reaching consumers.  The video, entitled "Andy Danko: The White Glove Quality Check," explains that there are "quality processes in the plant that prevent any defects from getting out."  The video also promoted the ideal that, when a customer buys a New GM vehicle, they "drive it down the road and they never go back to the dealer."[84]

---

[83] https://www.youtube.com/watch?v=jbXpV0aqEM4.

[84] https://www.youtube.com/watch?v=JRFO8UzoNho&list=UUxN-Csvy_9sveql5HJviDjA.



Andy Danko
Flint Assembly Quality Director

347.    The statements about preventing defects and quality processes can be objectively disproven by numerous documents and New GM's Admissions in the DPA.

348.    In 2010, New GM ran a television advertisement for its Chevrolet brand that implied its vehicles were safe by showing parents bringing their newborn babies home from the hospital, with the tagline "as long as there are babies, there will be Chevys to bring them home."[85]

349.    Another 2010 television advertisement informed consumers that "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

350.    New GM's 2010 brochure for the Chevy Cobalt (a car subject to the Delta Ignition Switch recall) states, "Chevy Cobalt is savvy when it comes to standard safety" and "you'll see we've thought about safety so you don't have to."  It also states "[w]e're filling our

---

[85] https://www.youtube.com/watch?v=rb28vTN382g.

cars and trucks with the kind of thinking, features and craftsmanship you'd expect to pay a lot more for."[86]



351. According to a 2010 Chevrolet brand-wide advertisement: "At Chevrolet, there's only one thing we take as seriously as designing, engineering, and building the best vehicles on the road: taking care of the people who drive them."[87] The vehicles featured in this advertisement include: 2010 Chevrolet Malibu (touting the safety of the car as a 5-star frontal and side-impact crash safety rating by NHTSA and top safety pick by IIHS—yet the car had both a brake light defect and a transmission shift cable defect), 2010 Chevrolet Camaro (ignition

---

[86] https://www.auto-brochures.com/makes/Chevrolet/Cobalt/Chevrolet_US%20Cobalt_2010.pdf.

[87] GM-MDL2543-100208377-100208390.

switch defect), 2010 Chevrolet Silverado (overloaded feed defect), and 2010 Chevrolet Traverse (wiring harness defect and seat belt connector defect).

352.    A 2010 Chevrolet brand-wide advertisement states:  "What makes a Chevy—A Chevy….  It's the philosophy of building vehicles that anyone would be proud to own.  Putting them within reach—*and then taking care of our own*" [italics in original].  The vehicles featured in this 2010 advertisement include:  Chevy Equinox, 2010 Chevy Malibu (brake light defect and transmission shift cable defect), 2010 Chevy Traverse (wiring harness defect and seat belt connector defect), and 2010 Chevy Cobalt XFE (subject to the Delta Ignition Switch Defect recall, a faulty ignition lock cylinder defect, and a sudden power-steering failure defect).[88]

353.    According to a 2010 New GM brand-wide advertisement, "Buick is a strong symbol of quality and dependability."  The advertisement goes on to promise:  "Delivering award-winning quality for you is at the forefront of everything we do.  Advanced safety and security features will confirm GM's role as an innovation leader."  The advertisement further states: "For added protection, GM vehicles feature a variety of air bag systems frontal air bags, dual-stage frontal air bags, side-impact air bags, head-curtain side-impact air bags, and rollover-capable head-curtain air bags.  GM Safety Technology.  Always Ready."  The 2010 MY vehicles featured in this advertisement include:  Buick LaCrosse, Buick Lucerne (ignition switch defect), and Buick Enclave (Side Airbag Defect and seat belt connector cable defect).[89]  By way of example, the veracity of this advertisement can be objectively disproven as the airbags in the Buick Lucerne did not provide added protection in critical times -- when the car's ignition moves from Run to Accessory.

---

[88] GM-MDL2543-100216043-100216048.

[89] GM-MDL2543-100222727-100222742.

- 232 -

354.    An August 2, 2010 mailing to Chevy customers states that "[t]here's only one thing we take as seriously as designing, engineering and building the best cars and trucks on the road:  taking care of the people who own them."  The vehicles featured in this advertisement include:  2011 Chevrolet Malibu (brake light defect), 2010 Chevrolet Equinox (touted in the ad as a top safety pick by the IIHS, the vehicle had a power height adjustable seats defect), 2010 Chevrolet Silverado (overloaded feed defect), 2010 Chevrolet Camaro (ignition switch defect), and 2010 Chevrolet Malibu (though the ad highlights the vehicle's safety in receiving 5-star frontal and side-impact crash safety ratings and a top safety pick from the IIHS, the vehicle was subject to a brake light defect and a transmission shift cable defect).[90]

355.    A 2010 Chevrolet brand-wide advertisement states "At Chevrolet, there's only one thing we take as seriously as designing, engineering, and building the best vehicles on the road:  taking care of the people who drive them."  The vehicles featured in this advertisement include:  2010 Chevrolet Malibu (touting the safety of a 5-star frontal and side-impact crash safety rating by NHTSA and noting that the car is a top safety pick by IIHS, but not disclosing that the car was subject to a brake light defect and a transmission shift cable defect), 2010 Chevrolet Camaro (defective ignition switch), 2010 Chevrolet Silverado (overloaded feed defect), and 2010 Chevrolet Traverse (Side Airbag Defect and seat belt connector defect).[91]

---

[90] GM-MDL2543-100231635-100231650.

[91] GM-MDL2543-100208377-100208390.





356.    A 2010 Chevrolet brand-wide advertisement captioned, "What Drives Your Peace

of Mind?" featured the:  2010 Chevy Malibu (brake light defect); 2010 Chevy Traverse (Side

Airbag Defect and seatbelt connector cable defect); 2010 Chevy Cobalt XFE (subject to the

Delta Ignition Switch recall, faulty ignition lock cylinder, and sudden power-steering failure

defect); 2010 Chevy Silverado (overloaded feed defect); 2010 Buick LaCrosse; and 2010 GMC

Acadia (Side Airbag Defect and seatbelt connector cable defect).  Elsewhere the advertisement

- 234 -

boasted of safety, and "world class engineering."  DeGiorgio and the 23 other Old GM

employees aware of the ignition switch Defects were hardly world class.



357.    A 2011 New GM brand-wide advertisement states that the company was:  "Open,

accountable and honest….  Providing you with award-winning quality is at the forefront of

everything we do."  The advertisement features the following models:  2011 Chevrolet Cruze,

2011 GMC Sierra, and 2011 Cadillac CTS (ignition switch defect and roof-rail airbag defect).[92]

The statement about being "accountable and honest" can be objectively disproven through the

DPA alone.

358.    The brochure for the 2011 Cadillac DTS (defective ignition switch and ignition

key slot defect) and STS states, "Passenger safety is a primary consideration throughout the

---

[92] GM-MDL2543-100234281-100234294.

engineering process," and "[t]he STS and DTS were carefully designed to provide a host of

features to help you from getting into a collision in the first place."[93]



359.    A 2011 Chevrolet vehicle guide states Chevrolet "believe[s] that safety is a big

thing."  The guide features the following 2011 MY Chevrolet vehicles:  Cruze, Volt (engine

software defect), Malibu (highlighting the vehicle is engineered for dependability but not

disclosing a brake light defect), Silverado (touting the vehicle is the most dependable, longest-

lasting full-size pickup on the road, but the vehicle was subject to an overloaded feed defect),

Aveo, Equinox (power height adjustable seats defect), Camaro (defective ignition switch and

power height adjustable seats defect), Traverse (Side Airbag Defect and seat belt connector cable

defect), Suburban (ignition lock actuator binding defect), Tahoe (ignition lock actuator binding

defect), and Corvette.[94]

---

[93] https://www.auto-brochures.com/makes/Cadillac/Cadillac_US%20STS-DTS_2011.pdf.

[94] GM-MDL2543-301746180-301746207.

360.    New GM states in another advertisement ending July 5, 2011, that it has "a powerful lineup of some of the highest-quality trucks in our company's history."  The featured 2011 MY vehicles include:  Chevy Silverado 1500, Buick Enclave (Side Airbag Defect and seat belt connector cable defect), GMC Acadia Denali (Side Airbag Defect and seat belt connector cable defect), and Cadillac Escalade (ignition lock actuator binding defect).[95]



361.    In an advertisement with an offer running from July 6, 2011, to September 6, 2011, New GM claims "[t]he word is on the street:  Our best vehicles yet."  New GM further states "[t]he news is definitely out:  Our latest vehicles aren't like anything else on the road today. In fact, we believe they're some of the best Chevrolet, Buick, GMC and Cadillac models we've ever built."[96]

362.    On September 29, 2011, New GM announced on the "News" portion of its website the introduction of front center airbags.  The announcement included a quote from Gay Kent, New GM Executive Director of Vehicle Safety and Crashworthiness, who stated that:

---

[95] GM-MDL2543-100184629-100184630.

[96] GM-MDL2543-100179851-100179852.

"This technology is a further demonstration of New GM's above-and-beyond commitment to provide continuous occupant protection before, during and after a crash."[97]

363.     On December 27, 2011, Gay Kent was quoted in an interview on New GM's website as saying:  "Our safety strategy is about providing continuous protection for our customers before, during and after a crash."[98]

364.     New GM's brochure for the 2012 Chevrolet Impala (defective ignition switch and ignition key slot defect) proclaims:  "A safety philosophy that RUNS DEEP," and that "if a moderate to severe collision does happen, Impala is designed to respond quickly":[99]



---

[97] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Sep/0929_airbag.

[98] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Dec/1227_safety.

[99] https://www.chevrolet.com/content/dam/Chevrolet/northamerica/usa/nscwebsite/en/Home/Help%20Center /Download%20a%20Brochure/02_PDFs/2012_Impala_eBrochure.pdf.

365.    The promise of a safety philosophy that runs deep is easily disproven on an objective basis by the Valukas Report, the DPA, and numerous MDL trial exhibits.

366.    New GM's brochure for the 2012 Cadillac CTS (defective ignition switch) announces, "At Cadillac, we believe the best way to survive a collision is to avoid one in the first place," and "Active safety begins with a responsive engine, powerful brakes, and an agile suspension."[100]



367.    The promise in the above advertisement of a "Holistic Approach to Safety" is capable of being proven false through findings in the Valukas Report and admissions in the MDL trial exhibits.

368.    A 2012 New GM Car & Truck Guide states that New GM's first commitment is "providing the world's best vehicles and accomplishing that…. We are designing and building safe, reliable vehicles and we are selling our customers great value." New GM's fifth commitment is to "put the customer first in everything we do." The Guide lists under standard

---

[100] https://www.auto-brochures.com/makes/Cadillac/CTS/Cadillac_US%20CTS_2012.pdf.

safety features the number and type of air bags.  Among the featured model year 2012 vehicles

are:  Buick LaCrosse (power height adjustable seats defect), Buick Regal (power height

adjustable seats defect, and front turn signal bulb defect), Chevy Impala (defective ignition

switch and ignition key slot defect), Chevy Camaro (defective ignition switch, driver-side airbag

shorting-bar defect, and power height adjustable seats defect), Cadillac CTS (defective ignition

switch), and Cadillac SRX (power height adjustable seats defect, and rear suspension toe adjuster

link defect).[101]

369.    New GM's brochure for the 2012 Cadillac CTS (defective ignition switch) states

"[d]river and passenger safety is the foremost consideration throughout the Cadillac engineering

process.  As a result, CTS vehicles are designed with some of the world's most sophisticated

safety technology to help avoid accidents, and protect all occupants in the event of a

collision."[102]

370.    A 2012 New GM brand-wide brochure states:  "Only the best will do.  The goal is

simple … build the best cars, crossovers, SUVs and trucks in the world.  Here you'll discover

just a few of the many great models in the GM lineup, including the commitment to quality,

innovation, style and value of Chevrolet, the smartest thinking, inspired design and intelligent

luxury of Buick, the Professional Grade engineering and never-say-never attitude of GMC, and

the iconic luxury of Cadillac—the new standard of the world."  The brochure includes the

following 2012 MY vehicles:  Chevrolet Cruze (driver-side airbag defect), Buick Verano (driver-

side airbag defect), GMC Terrain (power height adjustable seats defect), GMC Sierra Denali,

---

[101] GM-MDL2543-200292736-200292849.

[102] GM-MDL2543-301477257-301477278.

Cadillac CTS (defective ignition switch), and Cadillac Escalade (ignition lock actuator binding defect).[103]

371.    An advertisement that ended January 3, 2012, stressed that Chevrolet has "uncompromising quality."  The 2012 model year Chevrolet vehicles included in the advertisement are:  Cruze Eco (driver-side airbag defect), and Camaro (defective ignition switch, driver-side airbag shorting-bar defect, and power height adjustable seats defect).[104]

372.    On January 3, 2012, Gay Kent, New GM Executive Director of Vehicle Safety, was quoted on New GM's website as saying:  "From the largest vehicles in our lineup to the smallest, we are putting overall crashworthiness and state-of-the-art safety technologies at the top of the list of must-haves."[105]

373.    On June 5, 2012, New GM posted an article on its website announcing that its Malibu Eco had received top safety ratings from the National Highway Traffic Safety Administration and the Insurance Institute for Highway Safety.  The article includes the following quotes:  "With the Malibu Eco, Chevrolet has earned seven 2012 TOP SAFETY PICK awards," said IIHS President Adrian Lund.  "The IIHS and NHTSA results demonstrate GM's commitment to state-of-the-art crash protection."  And, "We are now seeing the results from our commitment to design the highest-rated vehicles in the world in safety performance," said Gay Kent, New GM Executive Director of Vehicle Safety.  "Earning these top safety ratings

---

[103] GM-MDL2543-301440224—301440235.

[104] GM-MDL2543-100210411—100210412.

[105] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2012/Jan/0103_sonic.

demonstrates the strength of the Malibu's advanced structure, overall crashworthiness and effectiveness of the vehicle's state-of-the-art safety technologies."[106]

374.     On June 5, 2012, New GM posted an article on its website entitled "Chevrolet Backs New Vehicle Lineup with Guarantee," which included the following statement:  "We have transformed the Chevrolet lineup, so there is no better time than now to reach out to new customers with the love it or return it guarantee and very attractive, bottom line pricing," said Chris Perry, Chevrolet global vice president of marketing.  "We think customers who have been driving competitive makes or even older Chevrolets will be very pleased by today's Chevrolet designs, easy-to-use technologies, comprehensive safety and the quality built into all of our cars, trucks and crossovers."[107]

375.     On November 5, 2012, New GM published a video to advertise its "Safety Alert Seat" and other safety sensors.  The video described older safety systems and then added that new systems "can offer drivers even more protection."  A Cadillac Safety Engineer added that there "are a variety of crash avoidance sensors that work together to help the driver avoid crashes."  The engineer then discussed all the sensors and the safety alert seat on the Cadillac XTS, leaving the viewer with the impression safety was a top priority at Cadillac.[108]

---

[106] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2012/Jun/0605_malibu safety.

[107] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2012/Jul/0710_ confidence.

[108] https://www.youtube.com/watch?v=CBEvflZMTeM.



376.    New GM's brochure for the 2013 Chevrolet Traverse states, "Traverse provides peace of mind with an array of innovative safety features," and "[i]t helps protect against the unexpected."[109]



The brochure does not disclose that the 2013 Traverse came with the Side Airbag Defect that caused airbags not to deploy, as well as a seat belt connector cable defect.

---

[109] https://www.auto-brochures.com/makes/Chevrolet/Traverse/Chevrolet_US%20Traverse_2013.pdf.

377.    A national print advertisement campaign in April 2013 states that, "[w]hen lives are on the line, you need a dependable vehicle you can rely on.  Chevrolet and GM … for power, performance and safety."

378.    A 2013 Chevrolet brand-wide advertisement states, "Chevrolet vehicles are giving our consumers the quality they deserve….  At Chevrolet, quality is at the center of every decision that affects the development of every vehicle."  This advertisement features the following vehicles:  2014 Chevy Impala (defective ignition switch, ignition key slot defect, parking brake defect, power steering control module defect, joint fastener torque defect, automatic transmission shift cable adjuster defect, and console bin door latch defect), 2014 Chevy Silverado (steering tie-rod defect, transmission oil cooler line defect, transfer case control module software defect, power management mode software defect, and electrical short defect), 2014 Chevy Camaro (defective ignition switch and joint fastener torque defect), 2014 Chevy Traverse (seat belt connector cable defect, automatic transmission shift cable adjuster defect, fuel gauge defect, and electrical short defect), 2014 Chevy Volt, 2014 Chevy Malibu (hydraulic brake boost assist defect, brake rotor defect, and automatic transmission shift cable adjuster defect), 2014 Sonic (engine block heater power cord insulation defect), 2014 Chevy Equinox, and 2014 Chevy Spark (lower control arm ball joint defect and hood latch defect).[110]

---

[110] GM-MDL2543-100179552—100179566.

Chevrolet vehicles are giving our consumers the quality they deserve. According to the 2013 J.D. Power Initial Quality Study,™ Chevrolet received five segment awards, more than any other automotive brand.

These results highlight Chevrolet's commitment to quality. Customers want inventive designs, advanced features, exhilarating performance and great quality — without any sacrifices. At Chevrolet, quality is at the center of every decision that affects the development of every vehicle.

**SEGMENT AWARD RECIPIENTS**[1]

*Camaro* – Midsize Sporty Car
*Impala* – Large Car
*Tahoe* – Large CUV
*Silverado HD* – Large Heavy-Duty Pickup
*Avalanche* – Large Light-Duty Pickup

[1] The Chevrolet Impala, Camaro, Tahoe, Silverado HD and Avalanche received the lowest number of problems per 100 vehicles among Large Car, Midsize Sporty Car (tie), Large CUV, Large Heavy-Duty Pickup and Large Light Duty Pickup (tie) in the proprietary J.D. Power 2013 Initial Quality Study.™ Study based on responses from 83,442 new-vehicle owners, measuring 230 models and measures opinions after 90 days of ownership. Proprietary study results are based on experiences and perceptions of owners surveyed from February to May 2013. Your experiences may vary. Visit jdpower.com.

379.     In a 2013 Chevrolet brand-wide advertisement, New GM boasted "Chevrolet, quality is at the center of every decision that affects the development of every vehicle."  This advertisement features the following vehicles:  2014 Chevy Impala (defective ignition switch), 2014 Chevy Silverado (unsecured floor mat defect), 2014 Chevy Camaro (defective ignition switch), 2014 Chevy Traverse (seat belt connector cable defect, fuel gauge defect, and electrical short defect), 2014 Chevy Volt, 2014 Chevy Malibu (hydraulic brake boost assist defect, brake rotor defect, and automatic transmission shift cable adjuster defect), 2014 Sonic (engine block heater power cord insulation defect), 2014 Chevy Equinox, and 2014 Chevy Spark (lower control arm ball joint defect and hood latch defect):

- 245 -



*"HIGHEST RANKED IN INITIAL QUALITY FOR MIDSIZE SPORTY CAR (TIE), LARGE CAR, LARGE CUV, LARGE HEAVY DUTY PICKUP, LARGE LIGHT DUTY PICKUP (TIE)."[1] CHEVROLET HAS RECEIVED MORE 2013 J.D. POWER INITIAL QUALITY AWARDS THAN ANY OTHER AUTOMOTIVE BRAND.*

Chevrolet vehicles are giving our consumers the quality they deserve. According to the 2013 J.D. Power Initial Quality Study," Chevrolet received five segment awards, more than any other automotive brand.

These results highlight Chevrolet's commitment to quality. Customers want inventive designs, advanced features, exhilarating performance and great quality—without any sacrifices. At Chevrolet, quality is at the center of every decision that affects the development of every vehicle.

**SEGMENT AWARD RECIPIENTS[1]**

*Camaro* – Midsize Sporty Car
*Impala* – Large Car
*Tahoe* – Large CUV
*Silverado HD* – Large Heavy-Duty Pickup
*Avalanche* – Large Light-Duty Pickup

[1] The Chevrolet Impala, Camaro, Tahoe, Silverado HD and Avalanche received the lowest number of problems per 100 vehicles among Large Car, Midsize Sporty Car (tie), Large CUV, Large Heavy Duty Pickup and Large Light Duty Pickup (tie) in the proprietary J.D. Power 2013 Initial Quality Study.℠ Study based on responses from 83,442 new-vehicle owners, measuring 230 models and measures opinions after 90 days of ownership. Proprietary study results are based on experiences and perceptions of owners surveyed from February to May 2013. Your experiences may vary. Visit jdpower.com.

380.    On November 8, 2013, New GM posted a press release on its website regarding GMC, referring to it as "one of the industry's healthiest brands."[111]

**About GMC**

GMC has manufactured trucks since 1902, and is one of the industry's healthiest brands. Innovation and engineering excellence is built into all GMC vehicles and the brand is evolving to offer more fuel-efficient trucks and crossovers, including the Terrain small SUV and Acadia crossover. The 2014 Sierra half-ton pickup boasts all-new powertrains and design, and the Sierra Heavy Duty pickups are the most capable and powerful trucks ever built by GMC. Every retail GMC model, including Yukon and Yukon XL full-size SUVs, is now available in Denali luxury trim. Details on all GMC models are available at http://www.gmc.com/, on Twitter at @thisisgmc or at http://www.facebook.com/gmc.

381.    A December 2013 New GM testimonial advertisement stated that "GM has been able to deliver a quality product that satisfies my need for dignity and safety."

---

[111] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2013/Nov/1108-truck-lightweighting.

382.    In 2013, New GM proclaimed on its website, https://www.gm.com, the company's passion for building and selling the world's best vehicles as "the hallmark of our customer-driven culture":[112]



383.    On the same website in 2013, New GM stated:  "At GM, it's about getting everything right for our customers—from the way we design, engineer and manufacture our vehicles, all the way through the ownership experience."[113]



---

[112] https://www.gm.com/company/aboutGM/our_company.

[113] https://www.gm.com/vision/quality_safety/it_begins_with_a_commitment_to_Quality.

- 247 -

384.   On its website, https://www.chevrolet.com, New GM promised that it was "Putting safety ON TOP," and that "Chevy Makes Safety a Top Priority":[114]



385.   On its website, https://www.buick.com, New GM represented that "Keeping you and your family safe is a priority":[115]

---

[114] https://www.chevrolet.com/culture/article/vehicle-safety-preparation.

[115] https://www.buick.com/top-vehicle-safety-features.

- 248 -



386.     On March 3, 2014, GM announced that "Customer Safety is our guiding compass" in response to the 2014 Malibu receiving a Top Safety Pick rating, from the Insurance Institutes For Highway Safety.

387.     New GM's website in 2014 touted its purported "Commitment to Safety," which is "at the top of the agenda at GM:"[116]

> *Innovation:  Quality & Safety; GM's Commitment to Safety; Quality and safety are at the top of the agenda at GM, as we work on technology improvements in crash avoidance and crashworthiness to augment the post-event benefits of OnStar, like advanced automatic crash notification.*
>
> *Understanding what you want and need from your vehicle helps GM proactively design and test features that help keep you safe and enjoy the drive.  Our engineers thoroughly test our vehicles for durability, comfort, and noise minimization before you think about them.  The same quality process ensures our safety technology performs when you need it.*

---

[116] https://www.gm.com/vision/quality_safety/gms_commitment_tosafety.

388.    New GM's website further promised "Safety and Quality First:  Safety will always be a priority at New GM.  We continue to emphasize our safety-first culture in our facilities," and that, "[i]n addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers":[117]



389.    These statements regarding "commitment to safety" and "top of the agenda," are objective and capable of being measured and particularly so given the fact that in 2014 GM has admitted it was concealing a safety defect and delaying a recall for public relations purposes.

390.    A January 6, 2014 New GM mailing states that GMC vehicles represent the highest standards of design and engineering, and that New GM was a company that refused to build anything less than professional grade.[118]  The vehicles featured in this advertisement include:  2014 GMC Terrain Denali, 2014 GMC Sierra Denali, 2015 GMC Yukon Denali, 2015 GMC Sierra HD, and 2014 GMC Acadia (advertisement states the vehicle offers enhanced safety but fails to disclose defects in the vehicle such as the seat belt connector cable defect, automatic transmission shift cable adjuster defect, fuel gauge defect, and electrical short defect):

---

[117] https://www.gm.com/company/aboutGM/our_company.

[118] GM-MDL2543-100226626-100226629.



391.    In February 2014, New GM sent a mailing to Saturn owners with a loyalty offer for New GM vehicles.  The advertisement states "[t]ake a look through the following pages, and you'll get a sense of the exceptional performance, efficiency and quality of Chevrolet, the Professional Grade engineering of GMC the accessible luxury of Buick and the bold design and innovative technology of Cadillac."  Regarding Chevrolet, the advertisement states it "is finding new roads to bring you a wide array of stylish, well-engineered vehicles with surprising performance, extreme comfort and award-winning quality.  Chevrolet is on a mission to bring you the cars, trucks and crossovers you want and need."  The advertisement also states that

Buick has a silky smooth ride quality.  The 2014 model year vehicles featured include: Chevrolet Impala (ignition key slot defect, parking brake defect, power steering control module defect, joint fastener torque defect, automatic transmission shift cable adjuster defect, and console bin door latch defect), Chevrolet Camaro (defective ignition switch), Chevrolet Corvette (sport seat side-impact airbag defect, electrical short circuit airbag defect, and rear shock absorber defect),  and Cadillac CTS (defective ignition switch).[119]



SATURN
P.O. BOX 909978
MILWAUKEE, WI 53209

Dear Sample,

As the owner of a Saturn, we understand that your expectations run well above those of the average driver. Meeting and surpassing those expectations has led to the development of a new generation of vehicles built to be every bit as impressive — if not more — in quality, style and value.

Take a look through the following pages, and you'll get a sense of the exceptional performance, efficiency and quality of Chevrolet, the Professional Grade engineering of GMC, the accessible luxury of Buick and the bold design and innovative technology of Cadillac. You'll also see some of the most appealing innovations we're offering today.

Sincerely,

Your Saturn Team

392.    An April 15, 2014 GMC brand-wide advertisement asserts that "Professional Grade engineering is exemplified in every GMC."  The featured GMC vehicles are:  2014 Acadia Denali (seat belt connector cable defect, automatic transmission shift cable adjuster defect, fuel gauge defect, and electrical short defect), 2015 Yukon Denali (transfer case control module software defect), 2014 Terrain Denali, and 2014 Sierra Denali (transfer case control module software defect, power management mode software defect, and electrical short defect).[120/121]

---

[119] GM-MDL2543-301436300—301436324.

[120] GM-MDL2543-301450684—301450686.

393.     According to New GM's website, "Leading the way is our seasoned leadership team who set high standards for our company so that we can give you the best cars and trucks. This means that we are committed to delivering vehicles with compelling designs, flawless quality, and reliability, and leading safety, fuel economy and infotainment features."[122]

394.     In its 2011 10-K SEC filing, New GM stated "We are a leading global automotive company.  Our vision is to design, build and sell the world's best vehicles.  We seek to distinguish our vehicles through superior design, quality, reliability, telematics (wireless voice and data) and infotainment and safety within their respective segments."  General Motors 2011 Form 10-K, p. 50.[123]

395.     New GM made these and similar representations to boost vehicle sales while knowing that millions of New GM vehicles and Old GM vehicles, across numerous models and years, were plagued with serious and concealed safety defects, and knowing that its manufacturing and inventory processes were so poor that there was a substantial risk that many models contained defects New GM was unaware of just like New GM did not know which cars had Defective Switches and which did not.

396.     New GM was well aware of the impact vehicle recalls, and their timeliness, have on its brand image.  In its 2010 Form 10-K submitted to the United States Securities and Exchange Commission ("SEC"), New GM admitted that "Product recalls can harm our reputation and cause us to lose customers, particularly if those recalls cause consumers to question the safety or reliability of our products.  Any costs incurred or lost sales caused by

---

[121] To the extent advertisements in this Complaint refer to cars other than the Defective Vehicles, these are in the Complaint to preserve brand diminution claims for appeal.

[122] http://www.gm.com/company/aboutGM/our_company.

[123] http://www.sec.gov/Archives/edgar/data/1467858/000119312511051462/d10k.htm.

future product recalls could materially adversely affect our business." General Motors 2010 Form 10-K, p. 31.[124] This is precisely why New GM decided to disregard safety issues and conceal them.

## E.    The Ignition Switch System Defects

397.    More than 12 million New GM and Old GM vehicles contained a defective ignition switch and cylinder. In most of these vehicles, the key position of the lock module is located low on the steering column, in close proximity to the driver's knee. The ignition switch in the Defective Ignition Switch Vehicles is prone to fail during ordinary and foreseeable driving situations. New GM initially recalled 2.1 million Defective Ignition Switch Vehicles in February and March of 2014 (the "Delta Ignition Switch Vehicles"), and it was this initial recall that set in motion the avalanche of recalls that is described in this Complaint. In June and July of 2014, New GM recalled an additional 11 million vehicles, ostensibly for distinct safety defects involving the ignition and ignition key. As set forth below, however, each of these recalls involves a defective ignition switch, and the consequences of the defect in each of the recalled vehicles are substantially similar, if not identical. In each case, a defective ignition switch is located in an unreasonable position on the steering cylinder and can cause the vehicle to stall, disable the power steering and power brakes, and disable the airbag system in normal and foreseeable driving circumstances. In each case, New GM was aware of the defect well before it finally recalled the Defective Ignition Switch Vehicles in 2014.

398.    More specifically, the ignition switches can inadvertently move from the "run" to the "accessory" or "off" position at any time during normal and proper operation of the

---

[124] https://www.sec.gov/Archives/edgar/data/1467858/000119312510078119/d10k.htm#toc 85733_4.

Defective Ignition Switch Vehicles.  The ignition switch is most likely to move when the vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently touches the ignition key with his or her knee; or for a host of additional reasons.  When the ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and unexpectedly loses engine power, power steering, and power brakes, and certain safety features are disabled, including the vehicle's airbags.  This leaves occupants vulnerable to crashes, serious injuries, and death.

399.    The ignition switch systems at issue are defective in at least three major respects.  First, some of the switches are simply weak; because of a faulty "detent plunger," the switch can inadvertently move from the "run" to the "accessory" position.  Second, because some of the ignition switches are placed low on the steering column, the driver's knee can easily bump the key (or the hanging fob below the key) and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position.  Third, when the ignition switch moves from the "run" to the "accessory" or "off" position, the vehicle's power is disabled.  This also immediately disables the airbags.  Thus, when power is lost during ordinary operation of the vehicle, a driver is left without the protection of the airbag system even if he or she is traveling at high speeds.

400.    New GM was aware of safer alternative designs for airbag systems that would have prevented the non-deployment of airbags caused by the ignition switch defects, but chose not to employ them –whether by way of recall of Old GM vehicles or a design change for the New GM vehicles it manufactured—in part to avoid disclosure of the defective ignition switch and its tragic consequences.

401.    Both Old GM and New GM also failed to thoroughly conduct an industry standard Failure Modes and Effects Analysis ("FMEA") on the ignition systems in the Defective

Vehicles during and after their design.  FMEA is an engineering risk assessment technique used in design and failure analysis to define, identify, and eliminate known and/or potential failures, problems, and errors from the system/design before they reach the customer.  It asks, "What happens if a failure actually occurs?"  While Old GM and New GM and/or their suppliers conducted component-part FMEAs, Old GM and New GM did not conduct system-wide FMEAs, that is, an FMEA for the system in which the component was included.  This is a violation of industry standard engineering practices.  Had system-level FMEAs been properly conducted, the downstream *effects* of the ignition switch defect—such as disabling the airbags—would have been identified at the design stage and before the Defective Vehicles were sold.

402.   New GM, in 2014, admitted in internal documents that it had failed to comply with FMEA procedures:[125]

GPD APM June 2014                                                                            3/06/2014

## Why the GPI organization was formed...

**Alignment of safety/compliance systems focused on critical parts/components.**

|  | **Before Org Change** | **After Org Change** |
|---|---|---|
| **Validation** | Component and vehicle validation focus with limited system level test plans | Tailored validation plans designed using system DFMEAs to ensure proper testing |
| **Supplier Quality/ Industrial Eng.** | Limited/No connectivity btw DFMEA & PFMEA, resulting in weak prioritization of safety critical characteristics in design & mfg. environment | Proactive supplier manufacturing process development integrating DFMEA & PFMEA |
| **Safety** | Limited visibility to safety-related issues and proactive mining of data in the field | Field performance feedback going to systems engineers in addition to part owners |
| **Safety and Systems Eng.** | Lack of recognition that the ignition switch was a safety critical feature | Developing Roadmap of key safety and compliance hazards |
| **Safety and Systems Eng.** | Lack of consistent categorization of safety and compliance issues | Creating "Safety Knothole" to categorize issues |
| **Systems Eng.** | Single-point failure allowed to disable the airbags | System Safety Process applied to systems and components that affect safety hazards |
| **Systems Eng.** | Issue root cause and solution did not capture system-level effects | Identify root cause as Systems Engineering responsibility |

GM                                                                           **GM Confidential**
                                                                                         **Page 8**

---

[125] PX-02118-009 (Scheuer Trial).

403.     Vehicles with defective ignition switches are unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the vehicles.

404.     Indeed, New GM itself has acknowledged that the defective ignition switches pose an "increas[ed] risk of injury or fatality."  Ken Feinberg, who was hired by New GM to settle wrongful death claims arising from the Delta Ignition Switch Defects, linked the defect to over 124 deaths and 275 physical injuries.  The Center for Auto Safety studied collisions in just two vehicle makes, and linked the defect to over 300 accidents.  With many personal injury cases still pending, these numbers will continue to grow.

405.     Alarmingly, New GM knew of the deadly ignition switch defects and their dangerous consequences from the date of its creation on July 10, 2009, but concealed its knowledge from consumers and regulators.  To this day, New GM continues to conceal material facts regarding the extent and nature of this safety defect, as well as what steps must be taken to remedy the defect.

406.     While New GM has instituted a recall of millions of vehicles for defective ignition switches, it knew—***and its own engineering documents reflect***—that the defects transcend the design of the ignition switch and also include the placement of the ignition switch on the steering column, a lack of adequate protection of the ignition switch from forces of inadvertent driver contact, and the need to redesign the airbag system so that it is not immediately disabled when the ignition switch fails in ordinary and foreseeable driving situations.  To fully remedy the problem and render the Defective Ignition Switch Vehicles safe and of economic value to their owners again, New GM must address these additional issues (and perhaps others).

407.    Further, and as set forth more fully below, New GM's recall of the Defective

Ignition Switch Vehicles has been, to date, incomplete and inadequate, and it underscores New

GM's ongoing fraudulent concealment and fraudulent misrepresentation of the nature and extent

of the defects.  New GM has long known of and understood the ignition switch defects, and its

failure to fully remedy the problems associated with this defect underscores the necessity of this

class litigation.

      **1.**     **New GM was aware of the defective ignition switch problem from the date of its inception.**

408.    On July 10, 2009, the United States Bankruptcy Court approved the sale of

General Motors Corporation's assets to a predecessor of General Motors, LLC, or New GM.

From its creation, New GM, which retained the vast majority of Old GM's senior level

executives and engineers as well as Old GM's books and records, knew that Old GM had

manufactured and sold millions of vehicles afflicted with the ignition switch defects.

409.    Plaintiffs set forth the actions and knowledge of Old GM in connection with the

ignition switch defect for two independent reasons.  ***First***, New GM can be held liable for the

conduct of Old GM under the law of successor liability.  The Delta Ignition Switch Defect

Successor Liability Subclass—purchasers and lessors of Old GM Delta Ignition Switch Defect

Vehicles—assert successor liability claims in this Complaint in light of the July 13, 2016

decision by the United States Court of Appeals for the Second Circuit.  ***No other Plaintiffs***

***assert successor liability claims in this Complaint.***  ***Second***, the knowledge of Old GM of the

ignition switch defect, the other defects in the Defective Vehicles and the myriad safety issues

plaguing Old GM is important and relevant because it may be imputed to New GM under

governing non-bankruptcy law, given that (i) New GM chose to hire the same Old GM personal

with that knowledge; (ii) that knowledge is reflected in documents generated during the days of

Old GM that transferred to New GM as a result of Old GM's bankruptcy sale; (iii) that

knowledge was germane to the responsibilities of the transferred New GM employees when they

were acting within the scope of their employment with Old GM; and (iv) that knowledge was

germane to the responsibilities of the New GM employees acting within the scope of their

employment with New GM.  In light of its knowledge of the ignition switch defects, and the

other defects in the Defective Vehicles, New GM had (and breached) its legal obligations to

Plaintiffs and Class members.

410.    In part, New GM's knowledge of the ignition switch defects arises from the fact

that key personnel with knowledge of the defects were employed by New GM when Old GM

ceased to exist.  Moreover, many of these employees held managerial and decision-making

authority in Old GM, and accepted similar positions with New GM.  For example, the design

research engineer who was responsible for the rollout of the defective ignition switch in the

Saturn Ion was Ray DeGiorgio.  Mr. DeGiorgio continued to serve as an engineer at New GM

until April 2014, when he was suspended (and ultimately fired) as a result of his involvement in

the ignition switch crisis.

411.    Mr. DeGiorgio was hardly the only employee who retained his Old GM position

with New GM.  Other Old GM employees with knowledge of the ignition switch defects and

other defects who were retained and given decision-making authority in New GM include:

current CEO Mary T. Barra; Director of Product Investigations Carmen Benavides; Safety

Communications Manager Alan Adler; Program Engineering Manager Gary Altman; Engineer

Eric Buddrius, Engineer Jim Federico; Vice Presidents for Product Safety John Calabrese and

Alicia Boler-Davis; Warranty Engineer William K. Chase; Engineer James Churchwell; Senior

Manager for TREAD Reporting Dwayne Davidson; Electrical Engineer John Dolan; Engineer

and Field Performance Assessment Engineer Brian Everest; Sensing Performance Engineer

William Hohnstadt; Vice President of Regulatory Affairs Michael Robinson; Director of Product

Investigations Gay Kent; Product Investigations Engineer Elizabeth Kiihr; Engineer Alberto

Manzor; Field Performance Assessment Engineer Kathy Anderson; General Counsel and Vice

President Michael P. Milliken; Vehicle Chief Engineer Doug Parks; Brand Quality Manager

Steven Oakley; Field Performance Assessment Engineer Manuel Peace; Manager of Internal

Investigations Keith Schultz; Field Performance Assessment Engineer John Sprague; Field

Performance Assessment Engineer Lisa Stacey; Design Engineer David Trush; Product

Investigations Manager Douglas Wachtel; in-house counsel Douglas Brown; attorney Michael

Gruskin (who at one point headed GM's product litigation team and chaired the Settlement

Review Committee from September 2007 to March 2102); in-house product liability attorney

Jaclyn C. Palmer; in-house product liability lawyer William Kemp; Design Engineer Laura

Andres; Victor Hakim; Vehicle Line Executive Lori Queen; Matthew Schroeder; and James

Sewell.

412.    A number of New GM employees were fired or "retired" as a result of the ignition

switch scandal, including:  Michael Robinson; William Kemp; Ray DeGiorgio; Gary Altman;

Jaclyn Palmer; Ron Porter; Lawrence Buonomo; Jennifer Sevigny; Gay Kent; Carmen

Benavides; Maureen Foley-Gardner; Jim Federico; John Calabrese; and Brian Stouffer.

413.    In its Decision on Motion to Enforce Sale Order, the Bankruptcy Court found that

"at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers,

senior managers, and attorneys, were informed or otherwise aware of the Ignition Switch

Defect…."[126]  Based on this fact, the court concluded that "Old GM personnel knew enough as of … June 2009 ... for Old GM then to have been obligated, under the Safety Act, to conduct a recall of the affected vehicles."[127]  The Second Circuit affirmed the Bankruptcy Court's finding based upon its own review of the full factual record.  The same 24 personnel with knowledge of the Delta Ignition Switch Defect necessarily had the same knowledge when they went to work at New GM.

414.    In addition, all the documents discussed herein that were generated prior to the inception of New GM remained in New GM's files.  Given New GM's knowledge of these documents, and its continuing and ongoing monitoring and reporting duties under the Safety Act,[128] New GM is also charged with knowledge of each such document.

415.    In fact, New GM had ongoing obligations under the Safety Act to monitor New GM and Old GM vehicles on the road, to make quarterly reports to NHTSA, and to maintain all relevant records for five years.  New GM explicitly accepted Safety Act responsibilities for Old GM vehicles in § 6.15 of the Sale Agreement through which it acquired Old GM.

416.    The Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including incidents involving death or injury, claims relating to property damage received by the manufacturer, warranty claims paid by the manufacturer, consumer complaints, and field reports prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance

---

[126] *In re Motors Liquidation Co.*, No. 09-50026 (REG) (Bankr. S.D.N.Y. Apr. 15, 2015), at 32.

[127] *Id.* at 33.

[128] The "Safety Act" refers to the National Traffic Vehicle and Motor Vehicle Safety Act, 49 U.S.C. §§ 30101, *et seq.*, as amended by the Transportation Recall, Enhancement, Accountability and Documentation Act (the "TREAD Act").

- 261 -

issues. 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21. Manufacturers must retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety. 49 C.F.R. §§ 576.5 to 576.6.

417.    The Safety Act further requires *immediate* action when a manufacturer *determines or should determine that a safety defect exists*. *United States v. General Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8). Within five days of learning about a safety defect, a manufacturer *must* notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related. 49 U.S.C. § 30118(c); 49 C.F.R. §§ 573.6(b)-(c). Then, "within a reasonable time"[129] after deciding that a safety issue exists, the manufacturer *must* notify the owners of the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C. § 30165(a)(1).

---

[129] 49 C.F.R. § 577.7(a) was updated, effective October 11, 2013, to replace "within a reasonable time" to "no later than 60 days" from the filing of the NHTSA notification.

418.    New GM used several processes to identify safety issues, including the TREAD database and Problem Resolution Tracking System ("PRTS").[130]  The TREAD database, used to store the data required for the quarterly NHTSA early warning reports, was the principal database used by Old and New GM to track incidents related to Old GM vehicles and New GM vehicles.  *Id.* at 306.  The database included information from (i) customer service requests; (ii) repair orders from dealers; (iii) internal and external surveys; (iv) field reports from employees who bought New GM and Old GM vehicles and from Captured Test Fleet reports;[131] (v) complaints from the OnStar call center; and (vi) a database maintained by New GM legal staff to track data concerning complaints filed in court.  *Id.*  A TREAD reporting team would conduct monthly database searches and prepare scatter graphs to identify spikes in the number of accidents or complaints related to various Old GM and New GM vehicles.[132] The PRTS is a database that tracks engineering problems identified in testing, manufacturing, through warranty data, and through customer feedback.[133]  The PRTS process involves five steps:  "identification of the issue; identification of the root cause; identification of a solution; implementation of the solution; and feedback."[134]

419.    Because the same employees carried out the TREAD Act obligations at Old and New GM, and were responsible for monitoring and reviewing the same databases and documents

---

[130] *See* Anton R. Valukas, Report to Board of Directors of General Motors Co. Regarding Ignition Switch Recalls ("Valukas Report" or "V.R."), at 282-313.

[131] Captured Test Fleet reports were submitted by employees who were given vehicles and asked to document any problems that arose while driving.  *Id.* at 300.  The Quality Group would review, summarize, and group these reports into categories.  *Id.*

[132] *Id.* at 307.

[133] *Id.* at 282.

[134] *Id.* at 284.

in order to ensure compliance with the TREAD Act, they not only retained the knowledge they acquired at Old GM—they were in fact required to.

420.   Dwayne F. Davidson headed-up the TREAD reporting team at both Old and New GM.  Mr. Davidson and the other TREAD reporting team members at New GM (who held the same roles at Old GM) not only had knowledge of pre-Sale events—they were required to act on that knowledge under the Sale Agreement in which New GM undertook to monitor Old GM vehicles for safety defects and promptly disclose and remedy any such defects New GM knew about.  As Mr. Davidson, his subordinates and others at New GM were well-aware, from 2003-2007 or 2008, the TREAD Reporting team had between eight and twelve employees who would conduct monthly searches and prepare scatter graphs to identify spikes in the number of accidents or complaints with respect to various Old GM vehicles.

421.   As Mr. Davidson and his subordinates at Old GM who stayed on at New GM were aware, and therefore New GM was aware, in or around 2007-08, Old GM reduced the TREAD Reporting team from eight to three employees, and pared down the monthly data mining process.[135]  In 2010, New GM restored two people to the team, but they did not participate in the TREAD database searches.[136]  Moreover, until 2014, the TREAD Reporting team at New GM did not have sufficient resources to obtain any of the advanced data mining software programs available in the industry to better identify and understand potential defects.[137]

422.   According to the Valukas Report, until 2014 the TREAD team did not have sufficient funds to obtain any of the data mining software programs available in the industry to

---

[135] *Id*.

[136] *Id*. at 307-308.

[137] *Id*. at 208.

better identify and understand potential defects.  In his deposition, Mr. Davidson, the senior manager of the TREAD team at both Old and New GM, testified that he did not have the necessary expertise, manpower or resources, and the team did not have the right people in place after Old GM's bankruptcy to enable the team to perform effectively.

423.    By starving the TREAD Reporting team of the resources it needed to identify potential safety issues, New GM helped to ensure that safety issues would not come to light.

424.    In addition, New GM knew that those personnel entering data for TREAD Act purposes were trained to avoid reporting items that would look bad to outsiders.  New GM Employees had been instructed to "consider how documents will be interpreted by people outside GM"[138] and were told to avoid the following words:



425.    Indeed, from the day of its formation as an entity or shortly thereafter, New GM had notice and full knowledge of the ignition switch, power steering, and other defects as set forth below.

---

[138] GM-MDL2543-400273026 at 400273052 and 400273056 (Confidential).

    **2.**    **The Delta Ignition Switch Defect giving rise to the February and March 2014 Recalls.**

        **a.**    **New GM was aware of the Delta Ignition Switch Defect from the date of New GM's inception.**

426.    At or shortly after it came into existence, New GM knew of the following facts either from knowledge in the minds of New GM employees acting within the scope of their authority or from the books and records of Old GM, which New GM acquired as a result of Old GM's bankruptcy sale and which it and its employees were required to act upon based on the TREAD Act obligations New GM expressly agreed to undertake in § 6.15 of the Sale Agreement through which it came into being:

427.    New GM knew that, in 2001, during pre-production testing of the 2003 Saturn Ion, Old GM engineers learned that the vehicle's ignition switch could unintentionally move from the "run" to the "accessory" or "off" position.  New GM also knew that where the ignition switch moved from "run" to "accessory" or "off," the vehicle's engine would stall and/or lose power.

428.    New GM knew that Delphi Mechatronics ("Delphi"), the manufacturer of many of the defective ignition switches in the Defective Ignition Switch Vehicles, including those in the vehicles that gave rise to the February and March 2014 recalls, informed Old GM that the ignition switch did not meet Old GM's design specifications.  Rather than delay production of the Saturn Ion in order to ensure that the ignition switch met specifications, Old GM's design release engineer, Ray DeGiorgio, simply lowered the specification requirements and approved use of ignition switches that he knew did not meet Old GM's specifications.

429.     New GM knew that in 2004, Old GM engineers reported that the ignition switch in the Saturn Ion was so weak and the ignition placed so low on the steering column that the driver's knee could easily bump the key and turn off the vehicle.

430.     New GM knew that this defect was sufficiently serious for an Old GM engineer to conclude, in January 2004, that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

431.     New GM knew that a July 1, 2004 report by Siemens VDO Automotive analyzed the relationship between the ignition switch in Old GM vehicles and the airbag system.  The Siemens report concluded that when an Old GM vehicle experienced a power failure, the airbag sensors were disabled.  The Siemens report was distributed to at least five Old GM engineers, most or all of whom continued on at New GM.  The Chevrolet Cobalt was in pre-production at this time.

432.     New GM knew that in 2004, Old GM began manufacturing and selling the 2005 Chevrolet Cobalt.  Old GM installed the same ignition switch in the 2005 Cobalt as it did in the Saturn Ion.

433.     New GM knew that during testing of the Cobalt, Old GM and New GM engineer Gary Altman observed an incident in which a Cobalt suddenly lost engine power because the ignition switch moved out of the "run" position during vehicle operation.

434.     New GM knew that in late 2004, while testing was ongoing on the Cobalt, Chief Cobalt Engineer Doug Parks asked Mr. Altman to investigate a journalist's complaint that he had turned off a Cobalt vehicle by hitting his knee against the key fob.

435.     New GM knew that Old GM opened an engineering inquiry known as a Problem Resolution Tracking System ("Problem Resolution") to evaluate a number of potential solutions

to this moving engine stall problem.  At this time, Problem Resolution issues were analyzed by a Current Production Improvement Team ("Improvement Team").  The Improvement Team that examined the Cobalt issue beginning in late 2004 included a cross-section of business people and engineers, including Mr. Altman and Lori Queen, Vehicle Line Executive on the case, both of whom continued on at New GM.

436.    New GM knew that Doug Parks, Chief Cobalt Engineer, was also active in Problem Resolution.  On March 1, 2005, he attended a meeting whose subject was "vehicle can be keyed off with knee while driving."  Parks also attended a June 14, 2005 meeting that included slides discussing a NEW YORK TIMES article that described how the Cobalt's engine could cut out because of the ignition switch problem.

437.    New GM knew that in 2005, Parks sent an e-mail with the subject, "Inadvertent Ign turn-off."  In the e-mail, Parks wrote, "For service, can we come up with a 'plug' to go into the key that centers the ring through the middle of the key and not the edge/slot?  This appears to me to be the only real, quick solution."

438.    New GM knew that after considering this and a number of other solutions (including changes to the key position and measures to increase the torque in the ignition switch), the Current Product Improvement Team examining the issue decided to do nothing.

439.    New GM knew that Old and New GM engineer Gary Altman recently admitted that engineering managers (including himself and Ray DeGiorgio) knew about ignition switch problems in the Cobalt that could cause these vehicles to stall, and disable power steering and brakes, but launched the vehicle anyway because they believed that the vehicles could be safely coasted off the road after a stall.  Mr. Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable.

440.    New GM knew that on February 28, 2005, Old GM issued a bulletin to its dealers

regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian

version of the Pontiac G5).

441.    New GM knew that in the February 28, 2005 bulletin, Old GM provided the

following recommendations and instructions to its dealers—but not to the public in general:

> There is potential for the driver to inadvertently turn off the
> ignition due to low key ignition cylinder torque/effort.  The
> concern is more likely to occur if the driver is short and has a large
> heavy key chain.
>
> In the case this condition was documented, the driver's knee would
> contact the key chain while the vehicle was turning.  The steering
> column was adjusted all the way down.  This is more likely to
> happen to a person that is short as they will have the seat
> positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to
> determine if this may be the cause.  The customer should be
> advised of this potential and to take steps, such as removing
> unessential items from their key chains, to prevent it.
>
> Please follow this diagnosis process thoroughly and complete each
> step.  If the condition exhibited is resolved without completing
> every step, the remaining steps do not need to be performed.

442.    New GM knew that on June 19, 2005, the NEW YORK TIMES reported that

Chevrolet dealers were advising some Cobalt owners to remove items from heavy key rings so

that they would not inadvertently move the ignition into the "off" position.  The article's author

reported that his wife had bumped the steering column with her knee while driving on the

freeway and the engine "just went dead."

443.    New GM knew that the NEW YORK TIMES contacted Old GM and Alan Adler,

manager for safety communications, who provided the following statement:

> In rare cases when a combination of factors is present, a Chevrolet
> Cobalt driver can cut power to the engine by inadvertently

> bumping the ignition key to the accessory or off position while the
> car is running.  Service advisers are telling customers they can
> virtually eliminate the possibility by taking several steps, including
> removing nonessential material from their key rings.

444.    New GM knew that, in connection with this NEW YORK TIMES article, Alder

specifically told the editor that Old GM "had not had any complaints," which was false, as

shown below.

445.    New GM knew that between February 2005 and December 2005, Old GM opened

multiple Problem Resolution inquiries regarding reports of power failure and/or engine shutdown

in Delta Ignition Switch Vehicles.

446.    New GM knew that one of these, opened by quality brand manager Steve Oakley

in March 2005, was prompted by Old GM engineer Jack Weber, who reported turning off a

Cobalt with his knee while driving.  After Oakley opened the PRTS, Gary Altman advised that

the inadvertent shut down was not a safety issue.  Oakley still works at New GM.

447.    New GM knew that as part of the Problem Resolution, Oakley asked William

Chase, an Old GM warranty engineer, to estimate the warranty impact of the ignition switch

defect in the Cobalt and Pontiac G5 vehicles.  Chase estimated that for Cobalt and G5 vehicles

on the road for 26 months, 12.40 out of every 1,000 vehicles would experience inadvertent

power failure while driving.

448.    New GM knew that in September 2005, Old GM received notice that Amber

Marie Rose, a 16-year old resident of Clinton, Maryland, was killed in an accident after her 2005

Chevrolet Cobalt drove off the road and struck a tree head-on.  During Old GM's investigation, it

learned that the ignition switch in Amber's Cobalt was in the "accessory" or "off" position at the

time of the collision.  Upon information and belief, Old GM subsequently entered into a

confidential settlement agreement with Amber's mother.  Old GM personnel familiar with Ms. Rose's fatal accident continued on at New GM after the bankruptcy sale.

449.   New GM knew that in December 2005, Old GM issued Technical Service Bulletin 05-02-35-007.  The Bulletin applied to 2005-2006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-2006 Pontiac Pursuits, 2006 Pontiac Solstices, and 2003-2006 Saturn Ions.  The Bulletin explained that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort."

450.   New GM knew that Old GM failed to disclose in this Technical Service Bulletin that it knew that there had been fatal incidents involving vehicles with the ignition switch defect.  On November 17, 2005—shortly after Amber's death and immediately before Old GM issued the December Bulletin—a Cobalt went off the road and hit a tree in Baldwin, Louisiana.  The front airbags did not deploy in this accident.  Old GM received notice of the accident, opened a file, and referred to it as the "Colbert" incident.  Old GM personnel familiar with this incident continued on at New GM after Old GM's bankruptcy sale.

451.   New GM knew that on February 10, 2006, in Lanexa, Virginia—shortly after Old GM issued the Technical Service Bulletin—a 2005 Cobalt flew off of the road and hit a light pole.  As with the Colbert incident (above), the frontal airbags failed to deploy in this incident as well.  The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash.  Old GM received notice of this accident, opened a file, and referred to it as the "Carroll" incident.  Old GM personnel familiar with this incident continued on at New GM after Old GM's bankruptcy sale.

452.   New GM knew that on March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole.  The frontal airbags did not deploy in this incident.

- 271 -

The download of the SDM showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this incident, opened a file, and referred to it as the "Oakley" incident. Old GM personnel familiar with this incident continued on at New GM after Old GM's bankruptcy sale.

453.   New GM knew that in April 2006, Old GM design engineer Ray DeGiorgio approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by Delphi. The changes included a new detent plunger and spring and were intended to generate greater torque values in the ignition switch. These values, though improved, were still consistently below Old GM's design specifications. Despite its redesign of the ignition switch, Old GM did not change the part number for the switch.

454.   Old GM's decision not to change the part number is a violation of generally accepted engineering standards and practices. For example, the American Society of Mechanical Engineers (ASME) issued ASME Y14.100-2004, Engineering Drawing Practices, that sets forth essential minimum requirements for engineering drawings and related documentation practices. Such standards are generally relied upon by automotive engineers (indeed, a General Motors engineer was on the ASME Y14 Standards Committee at the time ASME Y14.100-2004 was approved). ASME Y14.100-2004, Section 6.8.1 governs "Change Requiring New Identification" and provides that "New PINs [part identification numbers] shall be assigned when a part or item is changed in such a manner that any of the following conditions occur: (a) When performance or durability is affected to such an extent that the previous versions must be discarded or modified for reasons of safety or malfunction." Old GM redesigned the switch "for reasons of safety or malfunction." ASME Y14.100-2004, Section 6.8.1, applies here and mandates that Old GM should have changed the part number.

455.    Old GM's decision not to change the part number is also a violation of generally accepted inventory management standards and practices, which dictate that a modification that is necessary to meet product safety specifications requires a part number change.

456.    While New GM has claimed that the ignition switch redesign was unknown to any Old or New GM personnel outside of Mr. DeGiorgio, recently revealed documents show that other Old GM personnel were aware of the change—including personnel who continued working at New GM after Old GM's bankruptcy sale.

457.    In congressional testimony in 2014, New GM CEO Mary Barra acknowledged that Old GM should have changed the part number when it redesigned the ignition switch, and that its failure to do so did not meet industry standard behavior.  Mr. DeGiorgio, who approved the design change without changing the part number, continued on at New GM until 2014, when he was terminated for his role in the Delta Ignition Switch crisis.

458.    New GM knew that in October 2006, Old GM updated Technical Service Bulletin 05-02-35-007 to include additional model years:  the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Cobalt, and 2007 Pontiac Solstice and G5.  These vehicles had the same safety-related defects in the ignition switch systems as the vehicles in the original Bulletin.

459.    New GM knew that on December 29, 2006, in Sellenville, Pennsylvania, a 2005 Cobalt drove off the road and hit a tree.  The frontal airbags failed to deploy in this incident.  Old GM received notice of this incident, opened a file, and referred to it as the "Frei" incident.  Old GM personnel familiar with this incident continued on at New GM after Old GM's bankruptcy sale.

460.    New GM knew that GM's practices were so deficient that key personnel did not critically examine red flags raising safety issues.  For example, on November 14, 2006, the

senior manager for Old and New GM's TREAD reporting was asked to pull the TREAD reports in response to a media inquiry regarding "a 2005 Cobalt fatal crash in which two teenage girls were killed October 24th in Woodville, Wisconsin.  Parents and sheriff says front airbags did not deploy when vehicle hit a tree."[139]

461.    New GM knew that on November 20, 2006, Senior Manager for TREAD Reporting Dwayne Davidson was sent an e-mail with a link to a news story that ran on KSTP in Minneapolis that featured suspected airbag non-deployment along with GM's claim of no safety recalls.[140]  Davidson testified he did not recall if he took enough interest in the story at the time to actually click on the link and watch it.[141]

462.    New GM knew that in 2007, Davidson was involved in a death inquiry involving two teenage girls who were killed in a Chevy Cobalt on October 24, 2006.  The death inquiry was the result of a request for further information by NHTSA arising out of GM's quarterly report to NHTSA concerning the Wisconsin accident.  As part of the death inquiry, Davidson received a report prepared by Trooper Young from the Wisconsin State Patrol.  Trooper Young's report noted that the ignition switch on the vehicle "appears to have been in the 'accessory' position when it impacted the trees preventing the airbags from deploying."  Rather than critically analyzing the report, Davidson only scanned the report to see if the CD was working properly.  Davidson, when asked at his deposition if he connected this report to the prior media inquiry involving the two girls killed in Wisconsin, where airbags did not deploy in a 2005 Chevy Cobalt, testified that he "did not put two-and-two together."

---

[139] GM-MDL2543-000722839 (Highly Confidential).

[140] GM-MDL2543-400264015 (Highly Confidential).

[141] May 15, 2015 Dwayne Davidson Dep. at 87.

463.     New GM knew that on February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt sailed off the road and struck a truck.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "White" incident.  Old GM personnel familiar with this incident continued on at New GM after Old GM's bankruptcy sale.

464.     New GM knew that on August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a truck.  The frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "McCormick" incident.  Old GM personnel familiar with this incident continued on at New GM after Old GM's bankruptcy sale.

465.     New GM knew that on September 25, 2007, in New Orleans, Louisiana, a 2007 Cobalt lost control and struck a guardrail.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Gathe" incident.  Old GM personnel familiar with this incident continued on at New GM after Old GM's bankruptcy sale.

466.     New GM knew that on October 16, 2007, in Lyndhurst, Ohio, a 2005 Cobalt traveled off road and hit a tree.  The frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Breen" incident.  Old GM personnel familiar with this incident continued on at New GM after Old GM's bankruptcy sale.

467.     New GM knew that on April 5, 2008, in Sommerville, Tennessee, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to

it as the "Freeman" incident.  Old GM personnel familiar with this incident continued on at New GM after Old GM's bankruptcy sale.

468.    New GM knew that on May 21, 2008, in Argyle, Wisconsin, a 2007 G5 traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "Wild" incident.  Old GM personnel familiar with this incident continued on at New GM after Old GM's bankruptcy sale.

469.    New GM knew that on May 28, 2008, in Lufkin, Texas, a 2007 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "McDonald" incident.  Old GM personnel familiar with this incident continued on at New GM after Old GM's bankruptcy sale.

470.    New GM knew that on September 13, 2008, in Lincoln Township, Michigan, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Harding" incident.  Old GM personnel familiar with this incident continued on at New GM after Old GM's bankruptcy sale.

471.    New GM knew that on November 29, 2008, in Rolling Hills Estates, California, a 2008 Cobalt traveled off the road and hit a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Dunn" incident.  Old GM personnel familiar with this incident continued on at New GM after Old GM's bankruptcy sale.

472.   New GM knew that on December 6, 2008, in Lake Placid, Florida, a 2007 Cobalt traveled off the road and hit a utility pole.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "Grondona" incident.  Old GM personnel familiar with this incident continued on at New GM after Old GM's bankruptcy sale.

473.   New GM knew that in February 2009, Old GM opened another Problem Resolution regarding the ignition switches in the Defective Ignition Switch Vehicles.  Old GM engineers decided at this time to change the top of the Chevrolet Cobalt key from a "slot" to a "hole" design, as had originally been suggested in 2005.  The new key design was produced for the 2010 model year.  Old GM did not provide these redesigned keys to the owners or lessees of any of the vehicles implicated in prior Technical Service Bulletins, including the 2005-2007 Cobalts.

474.   New GM knew that just prior to Old GM's bankruptcy sale, Old GM met with Continental Automotive Systems US, its airbag supplier for the Cobalt, Ion, and other Defective Ignition Switch Vehicles.  Old GM requested that Continental download SDM data from a 2006 Chevrolet Cobalt accident where the airbags failed to deploy.  In a report dated May 11, 2009, Continental analyzed the SDM data and concluded that the SDM ignition state changed from "run" to "off" during the accident.  According to Continental, this, in turn, disabled the airbags. New GM did not disclose this finding to NHTSA, despite its knowledge that NHTSA was interested in airbag non-deployment incidents in Chevrolet Cobalt vehicles.

### b. New GM continues to conceal the ignition switch defect.

475. Through the Valukas Report, New GM concedes, as it must, that it was aware of the Delta Ignition Switch Defect from the date of its inception. But, in an attempt to minimize the egregiousness of continuing concealment of the defect, it makes several illogical claims. Recently revealed evidence shows that the claims are false.

476. *First*, New GM claims that it was unaware of the fact that the movement of the ignition from the "run" to the "accessory" position caused the airbags not to deploy—***even though***, as New GM concedes, its own engineers specifically designed the airbags to be disabled when the ignition moves out of the run position. (In the recent Deferred Prosecution Agreement with the Justice Department, New GM finally concedes that it was fully aware of this by the spring of 2012; Plaintiffs believe that New GM was aware of this far earlier.)

477. But recently-revealed evidence shows that (i) New GM likely was aware of this connection from the date of its inception and (ii) was definitively aware of the connection no later than 2010. For example, in a case evaluation of the Lambert crash, dated April 18, 2012, New GM's investigator concluded that:[142]

> Regardless of whether the impact was above the all-fire threshold or not, neither the frontal, nor side impact airbags could deploy because the Cobalt was in Accessory Mode, not Run Mode, at the time of impact.

478. *Second*, New GM claims that—because it was unaware that the defect rendered the airbags inoperable—it believed that the defect was a "customer convenience" issue and ***not*** a safety issue. In other words, according to New GM, no safety issues arise when a moving vehicle stalls, loses its power steering, and loses its power brakes.

---

[142] GM-MDL2543-000669092.002 (Highly Confidential).

479.    New GM's "customer convenience" claim was never credible—and the evidence now shows the falsity of the claim.

480.    For example, in March 2010, New GM recalled nearly 1.1 million Cobalt and Pontiac G5 vehicles with Power Steering Defects.  In recalling these vehicles, New GM recognized that loss of power steering, standing alone, was grounds for a safety recall.  Yet, incredibly, New GM claims it did not view the Delta Ignition Switch Defect as a "safety issue," even though it admittedly knew that the defect caused stalling and power brake failure *in addition to* the loss of power steering.  Despite its knowledge of the Delta Ignition Switch Defect, which caused a loss of power steering, New GM did not include the Delta Ignition Switch Defect in this recall.

481.    In the culture New GM inherited from Old GM and which New GM took no steps to change until 2014, the Company emphasized the avoidance of recalls—not through an insistence on quality or spending on safety, but by avoiding the disclosure of safety issues and concealing safety issues of which the Company was aware.  Hence, in discussing the ignition switch issues, New GM avoided using the word "stall," in part to avoid the attention of regulators.  New GM also actively discouraged personnel from flagging the ignition switch defect (or any defect) as a safety issue that would require an immediate response under the TREAD Act.

482.    While New GM attempts to downplay the severity of its misconduct by blaming its failure on a lack of communication between "corporate silos," the truth is far more damning: New GM engaged in a prolonged and fraudulent cover-up of the Delta Ignition Switch Defect.

483.    But the defect remained quite real, and quite dangerous, and New GM continued to receive reports of deadly accidents caused by the defect.

- 279 -

484.    On March 10, 2010, Brooke Melton was driving her 2005 Cobalt on a two-lane highway in Paulding County, Georgia.  While she was driving, her key turned from the "run" to the "accessory/off" position, causing her engine to shut off.  After her engine shut off, she lost control of her Cobalt, which traveled into an oncoming traffic lane, where it collided with an oncoming car.  Brooke was killed in the crash.  New GM received notice of this incident, and knew or should have known the accident was caused by the Delta Ignition Switch Defect.

485.    On December 31, 2010, in Rutherford County, Tennessee, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  New GM received notice of this incident, opened a file, referred to it as the "Chansuthus" incident, and knew the accident was caused by the Delta Ignition Switch Defect.  When a lawsuit was filed over the Chansuthus incident, New GM chose to settle it confidentially and continue to conceal the defect and its horrible consequences from NHTSA and the public.

486.    On December 31, 2010, in Harlingen, Texas, a 2006 Cobalt traveled off the road and struck a curb.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  New GM received notice of this incident, opened a file, and referred to it as the "Najera" incident.  New GM knew or should have known the accident was caused by the Delta Ignition Switch Defect.

487.    On March 22, 2011, Ryan Jahr, a New GM engineer, downloaded the SDM from Brooke Melton's Cobalt.  The information from the SDM download showed that the key in Brooke's Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash.  On June 24, 2011, Brooke Melton's parents, Ken and Beth Melton, filed a lawsuit against

- 280 -

New GM.  New GM knew or should have known the accident was caused by the Delta Ignition Switch Defect.

488.    In August 2011, New GM assigned Engineering Group Manager Brian Stouffer to assist with a Field Performance Evaluation that it had opened to investigate frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s.

489.    On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  New GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.  New GM knew or should have known the accident was caused by the Delta Ignition Switch Defect.

490.    In early 2012, Mr. Stouffer asked Jim Federico, who reported directly to Mary Barra, to oversee the Field Performance Evaluation investigation into frontal airbag non-deployment incidents.  Federico was named the "executive champion" for the investigation to help coordinate resources.

491.    In May 2012, New GM engineers tested the torque on numerous ignition switches of 2005-2009 Chevrolet Cobalt, 2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Saturn Ion vehicles that were parked in a junkyard.  The results of these tests showed that the torque required to turn the ignition switches from the "run" to the "accessory" or "off" position in most of these vehicles did not meet GM's minimum torque specification requirements.  These results were reported to Mr. Stouffer and other members of the Field Performance Evaluation team.

492.    In September 2012, Mr. Stouffer requested assistance from a "Red X Team" as part of the Field Performance Evaluation investigation.  The Red X Team was a group of

- 281 -

engineers within New GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s.  By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective ignition switch and airbag system.

493.    Indeed, Mr. Stouffer acknowledged in his request for assistance that the Chevrolet Cobalt could experience a power failure during an off-road event, or if the driver's knee contacted the key and turned off the ignition.  Mr. Stouffer further acknowledged that such a loss of power could cause the airbags not to deploy.

494.    At the time, New GM did not provide this information to NHTSA or the public.

495.    Acting NHTSA Administrator David Friedman recently stated, "at least by 2012, [New] GM staff was very explicit about an unreasonable risk to safety" from the ignition switches in the Delta Ignition Switch Vehicles.

496.    Mr. Friedman continued:  "[New] GM engineers knew about the defect. [New] GM lawyers knew about the defect.  But [New] GM did not act to protect Americans from the defect."

497.    There is significant evidence that multiple in-house attorneys also knew of and understood the ignition switch defect.  These attorneys, including Michael Milliken, negotiated settlement agreements with families whose loved ones had been killed and/or injured while operating a Delta Ignition Switch Vehicle.  In spite of this knowledge, New GM's attorneys concealed their knowledge and neglected to question whether the Delta Ignition Switch Vehicles should be recalled.  This quest to keep the Delta Ignition Switch Defect secret delayed its public disclosure and contributed to increased death and injury as a result of the ignition switch defect, and also caused significant financial harm to Plaintiffs and members of the Class.

- 282 -

498.    The complaints from Delta Ignition Switch Vehicle owners who experienced an

ignition switch failure and a stall make it abundantly clear that New GM and ESIS knew that a

safety defect was at issue:

> COMPLAINT 1/21/2010:  CUSTOMER WAS INVOLVED IN
> AN ACCIDENT ON THE 4TH OF JANUARY.  WHEN HE WAS
> DRIVING VEHICLE HAS SHUTTED OFF, AND HE
> SMASHED AGAINST A TREE.
>
> COMPLAINT 9/10/2007:  CUSTOMER WAS VERY UPSET
> AND CRYING—ALLEGES DAUGHTER INJURED B/C OF
> VEHICLE FAILURE THAT HAS BEEN ONGOING. CUST STS:
> WE DONT WANT THIS VEHICLE ANYMORE. WE'VE HAD
> THIS ISSUE SINCE WE BOUGHT IT. THE DEALER HASN'T
> BEEN ABLE TO FIX IT. AND NOW MY DAUGHTER IS
> HURT! SHE COULD HAVE BEEN KILLED! WAS DRIVING
> ON HWY 80 IN PA. NEAR LOCKHAVEN DRIVING AROUND
> 80 MPH WHENTHE VEHICLE COMPLETELY SHUT OFF IN
> THE MIDDLE OF THE HWY. NO EMERGANY LIGHTS. NO
> POWER. NO ENGINE. JUST DEAD. THANK GO SHE
> WASN'T HIT BY ANYTHING BUT SHE COULD HAVE!
> THEY SENT AN AMBULENCE AND POLICE. SO I DON'T
> KNOW WHATS HAPPENING YET. BUT THI IS UNSAFE!
> HOW DO I ENACT THE LEMON LAW?
>
> COMPLAINT 11/29/2006:  FIRST, I ACTUALLY HAVE A 2006
> COBALT, BUT THAT OPTION WASN'T AVAILABLE ON
> THE PULL-DOWN MENU ABOVE. SECOND, THE PROBLEM
> I HAVE WITH MY CAR IS A SCARY ONE. MY CAR IS
> CURRENTLY AT HERITAGE AUTO PLAZA. IT IS THERE
> BECAUSE I WAS IN A CAR ACCIDENT WHEN THE POWER
> IN MY CAR COMPLETELY SHUT OFF WHILE I WAS
> DRIVING IT.  THE STEERING WHEEL DID NOT WORK.
> THE BRAKES WERE UNRESPONSIVE, AND EVERYTHING
> IN THE COCKPIT WENT DOWN TO ZERO. ONLY THE
> HEADLIGHTS AND RADIO CONTINUE TO WORK. THIS IS
> THE SECOND TIME THIS HAPPENED. THE FIRST TIME, I
> WAS ABLE TO MOVE THE CAR OFF THE ROAD. I TOOK
> MY CAR TO ROSENTHAL CHEVROLET, THEY TOLD ME
> NOTHING WAS WRONG. IT WAS A FLUKE, AND WOULD
> NEVER HAPPEN AGAIN. I AM NOW COMPLETELY
> AFRAID OF MY CAR. AGAIN THEY HAVE SAID THERE IS
> NO PROBLEM. I HAVE SINCE LEARNED SOME THINGS

- 283 -

ABOUT HOW THE COBALT IS MADE. IT IS VERY DISTURBING. I DO NOT WANT THE CAR. CAN SOMEONE PLEASE CONTACT ME SO WE CAN DISCUSS HOW TO RESOLVE THIS?

COMPLAINT 2/12/2008:  ALLEGED PRODUCT ALLEGATION-INJURY/COLLISONCUST STS. THE IGNITION AND THE SHIFTER AND THE WHEEL LOCKS UP AND THE CAR SHUFTS OFF. A WEEK AGO I WRECKED THE VEHICLE. AND IT IS GOING TO COST $5000.00. THAT IS HOW MUCH DAMAGE. BUT I DO HAVE A DEDUCTABLE FOR MY INSURANCE. THE DIR SHIP DIDN'T WANT TO TOUCH IT UNTIL YOU SAID WHAT WE ARE GOING TO DO IT. AND EVEN WHEN I WRECKED THE CAR THE AIRBAGS DIDN'T DEPLY. DLR STATED IT WAS IN THE CRUISE CONTROL THERE WAS A BAD SENSOR WHICH CAUSED EVRYTHGIN TO LCOK UP. MY 2 WRISTS ARE BRUISED AND I HIT MY HEAD. BUT I HAVE BEEN BACK AND FORTH TO THE HOSPITAL AND I HAVE INSURANCE FOR ALL OF THAT.

499.    During the Field Performance Evaluation process, New GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory" or "off" position, it would not be a total solution to the problem.

500.    Indeed, the New GM engineers identified several additional ways to actually fix the problem.  These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of "run."  New GM rejected each of these ideas.

501.    The photographs below are of a New GM engineer in the driver's seat of a Cobalt during the investigation of Cobalt engine stalling incidents:

- 284 -



502.    These photographs show the dangerous position of the key in the lock module on the steering column, as well as the key with the slot, which allow the key fob to hang too low off the steering column.  New GM engineers understood that the key fob can be impacted and pinched between the driver's knee and the steering column, and that this will cause the key to inadvertently turn from the "run" to the "accessory" or "off" position.  The photographs show that the New GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem.  They also show why New GM engineers believed that additional changes (such as the shroud) were necessary to fix the defects with the ignition switch.

503.    The New GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem.  But New GM concealed—and continues to conceal—from the public the full nature and extent of the defects.

504.    On October 4, 2012, there was a meeting of the Red X Team during which Mr. Federico gave an update of the Cobalt airbag non-deployment investigation.  According to an e-mail from Mr. Stouffer on the same date, the "primary discussion was on what it would take to keep the SDM active if the ignition key was turned to the accessory mode."  Despite this

- 285 -

recognition by New GM engineers that the SDM should remain active if the key is turned to the "accessory" or "off" position, New GM took no action to remedy the ignition switch defect or notify customers that the defect existed.

505.    During the October 4, 2012 meeting, Mr. Stouffer and other members of the Red X Team also discussed "revising the ignition switch to increase the effort to turn the key from Run to Accessory."

506.    On October 4, 2012, Mr. Stouffer e-mailed Ray DeGiorgio and asked him to "develop a high level proposal on what it would take to create a new switch for service with higher efforts."  On October 5, 2012, Mr. DeGiorgio responded:

> Brian,
>
> In order to provide you with a HIGH level proposal, I need to understand what my requirements are.  what is the TORQUE that you desire?
>
> Without this information I cannot develop a proposal.

507.    On October 5, Mr. Stouffer responded to Mr. DeGiorgio's e-mail, stating:

> Ray,
>
> As I said in my original statement, I currently don't know what the torque value needs to be.  Significant work is required to determine the torque.  What is requested is a high level understanding of what it would take to create a new switch.

508.    Mr. DeGiorgio replied to Mr. Stouffer the following morning:

> Brian,
>
> Not knowing what my requirements are I will take a SWAG at the Torque required for a new switch.  Here is my level proposal
>
> **Assumption is 100 N cm Torque.**
>
> •     New switch design = Engineering Cost Estimate approx. $300,000

- 286 -

- Lead Time = 18—24 months from issuance of GM
  Purchase Order and supplier selection.

Let me know if you have any additional questions.

509.    Mr. Stouffer later admitted in a deposition that Mr. DeGiorgio's reference to "SWAG" was an acronym for "Silly Wild-Ass Guess."

510.    Mr. DeGiorgio's cavalier attitude exemplifies New GM's approach to the safety-related defects that existed in the ignition switch and airbag system in the Delta Ignition Switch Vehicles.  Rather than seriously addressing the safety-related defects, Mr. DeGiorgio's e-mails show he understood the ignition switches were contributing to the crashes and fatalities and he could not care less.

511.    It is also obvious from this e-mail exchange that Mr. Stouffer, who was a leader of the Red X Team, had no problem with Mr. DeGiorgio's cavalier and condescending response to the request that he evaluate the redesign of the ignition switches.

512.    In December 2012, in Pensacola, Florida, Ebram Handy, a New GM engineer, participated in an inspection of components from Brooke Melton's Cobalt, including the ignition switch.  At that inspection, Mr. Handy, along with Mark Hood, a mechanical engineer retained by the Meltons, conducted testing on the ignition switch from Brooke Melton's vehicle, as well as a replacement ignition switch for the 2005 Cobalt.

513.    At that inspection, Mr. Handy observed that the results of the testing showed that the torque performance on the ignition switch from Brooke Melton's Cobalt was well below Old GM's minimum torque performance specifications.  Mr. Handy also observed that the torque performance on the replacement ignition switch was significantly higher than the torque performance on the ignition switch in Brooke Melton's Cobalt.

- 287 -

514.    On April 29, 2013, Ray DeGiorgio, the chief design engineer for the ignition

switches in the Delta Ignition Switch Vehicles, was deposed.  At his deposition, Mr. DeGiorgio

was questioned about his knowledge of differences in the ignition switches in early model-year

Cobalts and the switches installed in later model-year Cobalts:

> Q.  And I'll ask the same question.  You were not aware before
> today that GM had changed the spring—the spring on the ignition
> switch had been changed from '05 to the replacement switch?
>
> MR. HOLLADAY:  Object to the form.  Lack of predicate and
> foundation.  You can answer.
>
> THE WITNESS:  I was not aware of a detent plunger switch
> change.  We certainly did not approve a detent plunger design
> change.
>
> Q.  Well, suppliers aren't supposed to make changes such as this
> without GM's approval, correct?
>
> A.  That is correct.
>
> Q.  And you are saying that no one at GM, as far as you know, was
> aware of this before today?
>
> MR. HOLLADAY:  Object.  Lack of predicate and foundation.
> You can answer.
>
> THE WITNESS:  I am not aware about this change.

515.    When Mr. DeGiorgio testified, he knew that he personally had authorized the

ignition switch design change in 2006 (though he continues to claim to the contrary), but he

stated unequivocally that no such change had occurred.

### c.    New GM received many complaints of power failures in the Delta Ignition Switch Vehicles.

516.    Throughout the entirety of its corporate existence, New GM received numerous

and repeated complaints of moving engine stalls and/or power failures.  These complaints are yet

- 288 -

more evidence that New GM was fully aware of the Delta Ignition Switch Defect and should have announced a recall much sooner than it did.

517.    New GM was aware of these problems year after year and nationwide, as reflected not only by the internal documents reflecting knowledge and cover-up at high levels, but in the thousands of customer complaints, some of which are reflected in the common fact patterns presented by the experiences of the named plaintiffs (as discussed above), but also, and not by way of limitation, by New GM's internal complaint logs and other documents.

518.    To demonstrate the pervasiveness and consistency of the problems, and by way of examples, New GM received and reviewed complaints of safety issues from Class Members with Delta Ignition Switch Vehicles in Puerto Rico and in the States of Alaska, Arkansas, Connecticut, Delaware, Hawaii, Indiana, Kansas, Massachusetts, Montana, Nebraska, Nevada, New Hampshire, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Virginia, and Vermont.  Documents produced by New GM show that New GM was aware of customer complaints of stalling Defective Ignition Switch Vehicles in all of these states and territories. New GM opened at least 38 complaint files between September 2009 and February 2014. Further, in December 2010, GM closed at least 40 complaint files—which Old GM had opened before Old GM's bankruptcy sale in July 2009—without disclosing the safety defect to the customers, thus further indicating that Old GM's knowledge of these defective Delta Ignition Switch Vehicles carried over to New GM.

519.    New GM was certainly put on notice of safety issues with power steering.

520.    In a September 14, 2009 e-mail, a customer writes:

> "THIS IS MY SECOND COMPLAINT I HAVE HAD TO MAKE. I
> HAVE BEEN DOING RESEARCH ON THIS TOPIC FOR OVER A
> YEAR NOW. ALL YOU HAVE TO DO IS TYPE IN "COBALT

POWER STEERING" INTO GOOGLE AND MILLIONS OF
COMPLAINTS ON VARIOUS WEBSITES AND FORUMS COME UP.
LAST YEAR WHEN I FILED A COMPLAINT THERE WAS NO
DAMAGE INVOLVED. THIS TIME THERE IS AND IT NEEDS TO
BE FIXED. I THINK THERE ARE PLENTY OF PEOPLE
COMPLAINING ABOUT THIS SUBJECT. I HAVE A 05' CHEVY
COBALT THAT WHEN DRIVING RANDOMLY THE ELECTRONIC
POWER STEERING GOES OUT. I CAN'T DRIVE MORE THAN FIVE
MINUTES AND EVERY TIME I GET IN THE CAR IT CUTS OUT.
THIS TIME I WAS BACKING OUT OF A DRIVEWAY AND THE
POWER STEERING WENT OUT AS I WAS COMING TO MY
PARENTS MAILBOX. I WENT TO TURN AND I COULDN'T AND I
HIT IT. I HAVE $500 IN DAMAGE THAT I DON'T WANT TO
CLAIM TO INSURANCE BECAUSE THEN IT WILL JUST COST
MORE IN THE LONG RUN BECAUSE MY INSURANCE WILL GO
UP. I AM A FIREFIGHTER IN CENTRAL FLORIDA. I SEE CAR
ACCIDENTS ALL THE TIME BECAUSE OF VEHICLE PROBLEMS
OR FAILURE. IS IT GOING TO TAKE ME GOING DOWN THE
HIGHWAY, SOMEONE PULLING OUT IN FRONT OF ME, AND ME
DYING? ONE LESS PUBLIC SAFETY EMPLOYEE IN FLORIDA.[143]

521.     During the years 2010 to 2014, New GM's Technical Assistance Center received

hundreds, if not thousands, of complaints concerning stalling or otherwise malfunctioning

vehicles due to ignition issues, including "heavy key chains."

522.     Within the complaint files which New GM closed after Old GM's bankruptcy

sale—those opened both before and after Old GM's bankruptcy sale—many customers

complained they did not feel safe in their vehicles because of the stalling.  Some customers

described accidents caused by stalling.  The airbags did not deploy in some of these accidents.

523.     One customer, who contacted New GM in February 2014, complained that he was

aware that people were dying from the Delta Ignition Switch Defect and that he refused to risk

the lives of himself, his wife, and his children.  He was nearly rear-ended when his vehicle

stalled at 60 mph.

---

[143] GM-MDL2543-004702427 (Highly Confidential).

524.    Finally, a customer contacted New GM in January 2011 complaining that he had read various online forums describing the stalling problem and expressing his outrage that New GM had done nothing to solve the problem.  This customer's car stalled at 65 mph on the Interstate.

> ### d.    New GM recalls 2.1 million vehicles with defective Delta Ignition Switches in February and March of 2014.

525.    Under continuing pressure to produce high-ranking employees for deposition in the Melton litigation, New GM's Field Performance Review Committee and Executive Field Action Decision Committee ("Decision Committee") finally decided to order a recall of *some* vehicles with defective Delta Ignition Switches on January 31, 2014.

526.    Initially, the Decision Committee ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007, and those were the only cars included in the first recall ordered in February 2014.

527.    After additional analysis, the Decision Committee expanded the recall on February 24, 2014, to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

528.    Public criticism in the wake of these recalls was withering.  On March 17, 2014, Mary Barra issued an internal video, which was broadcast to employees.  In the video, Ms. Barra admits:

> Scrutiny of the recall has expanded beyond the review by the federal regulators at NHTSA, the National Highway Traffic Safety Administration.  As of now, two congressional committees have announced that they will examine the issue.  And it's been reported that the Department of Justice is looking into this matter. . . . These are serious developments that shouldn't surprise anyone.  After all, something went wrong with our process in this instance and terrible things happened.

529.    The public backlash continued and intensified.  Eventually, New GM expanded

the Delta Ignition Switch recall yet again on March 28, 2014.  This expansion finally included all

vehicles that had (or might have) the defective Delta Ignition Switch, and covered all model

years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky.

The expanded recall brought the total number of vehicles recalled for defective Delta Ignition

Switches to 2,191,146.

530.    Several high-ranking New GM employees were summoned to testify before

Congress, including Ms. Barra and executive vice president and in-house counsel Michael

Milliken.  Further, in an effort to counter the negative backlash, New GM announced that it had

hired Anton R. Valukas to conduct an internal investigation into the decade-long concealment of

the ignition switch defect.

531.    As individuals came forward who had been injured and/or whose loved ones were

killed in the Delta Ignition Switch Vehicles, the public criticism continued.  Under intense,

continuing pressure, New GM agreed in April 2014 to hire Ken Feinberg to design and

administer a claims program in order to compensate certain victims who were injured or killed in

the Defective Ignition Switch Vehicles.  Ms. Barra explained to Congress:  "[W]e will make the

best decisions for our customers, recognizing that we have legal obligations and responsibilities

as well as moral obligations.  We are committed to our customers, and we are going to work very

hard to do the right thing for our customers."

532.    New GM's compensation of such individuals, however, was limited to the

protocol set forth in the Feinberg Compensation Fund.  In the courts, New GM has taken the

position that any accident that occurred prior to the Old GM bankruptcy is barred by the Sale

Order.  In addition, New GM has argued that it has no independent responsibility for any vehicle

manufactured prior to July 10, 2009.  This position is obviously inconsistent with the statements

Ms. Barra provided to Congress and the public at large.

533.    Following the waves of negative publicity surrounding New GM's recall of the

first 2.1 million defective Delta Ignition Switch Vehicles, New GM was forced to issue a series

of additional recalls for more than 10 million additional Defective Ignition Switch Vehicles, as

summarized below.

### 3.    Additional ignition switch low torque recalls.

534.    In June and July 2014, New GM conducted three additional recalls of more than

10.4 million vehicles for ignition switches with low torque:  Safety Recalls 14v355, 14v396, and

14v400.

535.    Each of these three recalls involves the same defect (low-torque switches that

inadvertently move out of the "run" position on rough roads or due to a weight hanging from the

key or knee interaction with the switch) with the same adverse effect (loss of power to steering,

brakes, and airbag).

### a.    Low torque Safety Recall 14v355.

536.    On June 20, 2014, New GM recalled 3,141,731 vehicles in the United States for

ignition switch, or ignition key slot, defects (Recall No. 14v355).

537.    Approximately 2,349,095 of the vehicles subject to this recall were made by Old

GM, and approximately 792,636 of the vehicles were made by New GM.

538.    The following vehicles were included in the June 20, 2014 recall:  2005-2009

Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac

DTS, 2006-2011 Buick Lucerne, and 2006-2008 Chevrolet Monte Carlo.

539.     The recall notice states, "In the affected vehicles, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."  New GM's internal description of the defect was similar:  "The ignition switch may inadvertently move out of the 'run' position if the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event." Thus, New GM has admitted that all models involved in Safety Recall 14v355 have a common defect.

540.     The recall notice also explains that, "[i]f the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury. Additionally, a key knocked out of the run position could cause loss of engine power, power steering, and power braking, increasing the risk of a vehicle crash."  This is similar to how New GM internally described the *effect* of the defect:  "If the ignition switch moves out of the 'run' position, there is an effect on power steering and power braking.  In addition, the timing of the key movement out of the "run position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying."  New GM has thus admitted that the effect of the defect is the same for all models involved in Safety Recall 14v355.

541.     New GM internally described the root cause of the defect as follows:  "The ignition switch torque performance may be below target curve.  The system torque performance may be insufficient to resist energy generated from weight hanging on slotted key."

542.     Well before conducting the June 2014 recall, New GM was aware of hundreds of complaints at its Technical Assistance Center in which the weight of the key chain was identified as a source of the problem.[144]

543.     The vehicles included in this recall were built on the same platform and their defective ignition switches have weak detent plungers, just like the Cobalt and other Delta Ignition Switch Vehicles recalled in February and March of 2014.

544.     New GM was aware of the ignition switch defect in these vehicles beginning on or soon after the date of its inception on July 10, 2009, as it acquired all of the knowledge possessed by Old GM given the continuity in personnel, databases, and operations from Old GM to New GM.  In addition, New GM acquired additional information thereafter.  The information, all of which was known to New GM, included the following facts:

a.     New GM knew that, on or about August 25, 2005, Laura Andres, an Old GM design engineer (who remains employed with New GM), wrote a description of ignition switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway.  Ms. Andres stated, "While driving home from work on my usual route, I was driving about 45 mph, where the road changes from paved to gravel & then back to paved, some of the gravel had worn away, and the pavement acted as a speed bump when I went over it.  The car shut off.  I took the car in for repairs.  The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off."

b.     New GM knew that Old GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' account on August 25, 2005, to four Old GM employees.  Mr. Dickinson asked, "Is this a condition we would expect to occur under some impacts?"

_____

[144] *See, e.g.*, GM-MDL2543-00011834-35.

c.     New GM knew that, on August 29, 2005, Old GM employee Jim Zito forwarded the messages to Ray DeGiorgio and asked, "Do we have any history with the ignition switch as far as it being sensitive to road bumps?"

d.     New GM knew that Mr. DeGiorgio responded the same day, stating, "To date there has never been any issues with the detents being too light."

e.     New GM knew that, on August 30, 2005, Ms. Andres sent an e-mail to Old GM employee Jim Zito and copied ten other Old GM employees, including Ray DeGiorgio. Ms. Andres, in her e-mail, stated, "I picked up the vehicle from repair.  No repairs were done. . . . The technician said there is nothing they can do to repair it.  He said it is just the design of the switch.  He said other switches, like on the trucks, have a stronger detent and don't experience this."

f.     New GM knew that Ms. Andres' e-mail continued:  "I think this is a serious safety problem, especially if this switch is on multiple programs.  I'm thinking big recall. I was driving 45 mph when I hit the pothole and the car shut off and I had a car driving behind me that swerved around me.  I don't like to imagine a customer driving with their kids in the back seat, on I-75 and hitting a pothole, in rush-hour traffic.  I think you should seriously consider changing this part to a switch with a stronger detent."

545.     On or after July 10, 2009, senior executives and engineers at New GM knew that some of the information relayed to allay Ms. Andres' concerns was inaccurate.  For example, Ray DeGiorgio knew that there had been "issues with detents being too light."  Instead of relaying those "issues," Mr. DeGiorgio falsely stated that there were no such "issues."

546.     New GM has tried to characterize the recall of these 3.14 million vehicles as being different than the recall for the ignition switch defect in the Cobalts and other Delta

Ignition Switch Vehicles when in reality, and for all practical purposes, it is for exactly the same defect that creates exactly the same safety risks. New GM has attempted to label and describe the ignition key slot defect as being different in order to provide it with cover and an explanation for why it did not recall these 3.14 million vehicles much earlier, and why it is not providing a new ignition switch for the 3.14 million vehicles.

547.   From 2001 to the present, Old GM and New GM received numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect. The following are examples of just a few of the many reports and complaints regarding the defect that New GM knew at the time it came into existence or knew post-sale:

548.   New GM knew of a January 23, 2001 complaint filed with NHTSA involving a 2000 Cadillac Deville and an incident that occurred on January 23, 2001, in which the following was reported:

> COMPLETE ELECTRICAL SYSTEM AND ENGINE SHUTDOWN WHILE DRIVING. HAPPENED THREE DIFFERENT TIMES TO DATE. DEALER IS UNABLE TO DETERMINE CAUSE OF FAILURE. THIS CONDITION DEEMED TO BE EXTREMELY HAZARDOUS BY OWNER. NHTSA ID Number: 739850.

549.   New GM knew of a June 12, 2001 complaint filed with NHTSA involving a 2000 Cadillac Deville and an incident that occurred on June 12, 2001, in which the following was reported:

> INTERMITTENTLY AT 60MPH VEHICLE WILL STALL OUT AND DIE. MOST TIMES VEHICLE WILL START UP IMMEDIATELY AFTER. DEALER HAS REPLACED MAIN CONSOLE 3 TIMES, AND ABS BRAKES. BUT, PROBLEM HAS NOT BEEN CORRECTED. MANUFACTURER HAS BEEN NOTIFIED.*AK  NHTSA ID Number: 890227.

550.   New GM knew of a January 27, 2003 complaint filed with NHTSA involving a

2001 Cadillac Deville and an incident that occurred on January 27, 2003, in which the following

was reported:

> WHILE DRIVING AT HIGHWAY SPEED ENGINE SHUT
> DOWN, CAUSING AN ACCIDENT. PLEASE PROVIDE ANY
> ADDITIONAL INFORMATION.*AK  NHTSA ID Number:
> 10004759.

551.   New GM knew of a September 18, 2007 complaint filed with NHTSA involving a

2006 Chevrolet Impala and an incident that occurred on September 15, 2006, in which it was

reported that:

> TL*THE CONTACTS SON OWNS A 2006 CHEVROLET
> IMPALA. WHILE DRIVING APPROXIMATELY 33 MPH AT
> NIGHT, THE CONTACTS SON CRASHED INTO A STALLED
> VEHICLE. HE STRUCK THE VEHICLE ON THE DRIVER
> SIDE DOOR AND NEITHER THE DRIVER NOR THE
> PASSENGER SIDE AIR BAGS DEPLOYED. THE DRIVER
> SUSTAINED MINOR INJURIES TO HIS WRIST. THE
> VEHICLE SUSTAINED MAJOR FRONT END DAMAGE. THE
> DEALER WAS NOTIFIED AND STATED THAT THE CRASH
> HAD TO HAVE BEEN A DIRECT HIT ON THE SENSOR. THE
> CURRENT AND FAILURE MILEAGES WERE 21,600. THE
> CONSUMER STATED THE AIR BAGS DID NOT DEPLOY.
> THE CONSUMER PROVIDED PHOTOS OF THE VEHICLE.
> UPDATED 10/10/07 *TR NHTSA ID Number: 10203350.

552.   New GM knew of an April 2, 2009 complaint filed with NHTSA involving a

2005 Buick LaCrosse and an incident that occurred on April 2, 2009, in which the following was

reported:

> POWER STEERING WENT OUT COMPLETELY, NO
> WARNING JUST OUT. HAD A VERY HARD TIME
> STEERING CAR. LUCKY KNOW ONE WAS HURT. *TR
> NHTSA ID Number: 10263976.

553. New GM continued to receive reports regarding the defect. For example, on

February 15, 2010, New GM became aware of a complaint filed with NHTSA involving a 2008

Buick LaCrosse and an incident that occurred on February 13, 2010, in which a driver reported:

> WHILE DRIVING AT 55MPH I RAN OVER A ROAD BUMP
> AND MY 2008 BUICK LACROSSE SUPER SHUT
> OFF(STALLED). I COASTED TO THE BURM, HIT BRAKES
> TO A STOP. THE CAR STARTED ON THE FIRST TRY.
> CONTINUED MY TRIP WITH NO INCIDENCES. TOOK TO
> DEALER AND NO CODES SHOWED IN THEIR COMPUTER.
> CALLED GM CUSTOMER ASSISTANCE AND THEY GAVE
> ME A CASE NUMBER. NO BULLETINS. SCARY TO DRIVE.
> TRAFFIC WAS LIGHT THIS TIME BUT MAY NOT BE THE
> NEXT TIME. *TR.  NHTSA ID Number: 10310692.

554. On April 21, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick Lucerne and an incident that occurred on March 22, 2010, in which the

following was reported:

> 06 BUICK LUCERNE PURCHASED 12-3-09, DIES OUT
> COMPLETELY WHILE DRIVING AT VARIOUS SPEEDS.
> THE CAR HAS SHUT OFF ON THE HIGHWAY 3 TIMES
> WITH A CHILD IN THE CAR. IT HAS OCCURRED A TOTAL
> OF 7 TIMES BETWEEN 1-08-10 AND 4-17-10. THE CAR IS
> UNDER FACTORY WARRANTY AND HAS BEEN
> SERVICED 7 TIMES BY 3 DIFFERENT BUICK
> DEALERSHIPS. *TR  NHTSA ID Number: 10326754.

555. On April 29, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2005 Buick LaCrosse and an incident that occurred on March 21, 2010, in which it

was reported that:

> TRAVELING ON INTERSTATE 57 DURING DAYTIME
> HOURS. WHILE CRUISING AT 73 MILES PER HOUR IN THE
> RIGHT HAND LANE, THE VEHICLE SPUTTERED AND
> LOST ALL POWER. I COASTED TO A STOP OFF THE SIDE
> OF THE ROAD. I RESTARTED THE VEHICLE AND
> EVERYTHING SEEMED OK, SO I CONTINUED ON. A
> LITTLE LATER IT SPUTTERED AGAIN AND STARTED

LOSING POWER. THE POWER CAME BACK BEFORE IT
CAME TO A COMPLETE STOP. I CALLED ON STAR FOR A
DIAGNOSTIC CHECK AND THEY TOLD ME I HAD A FUEL
SYSTEM PROBLEM AND THAT IF THE CAR WOULD RUN
TO CONTINUE THAT IT WAS NOT A SAFETY ISSUE. THEY
TOLD ME TO TAKE IT TO A DEALER FOR REPAIRS WHEN
I GOT HOME. I TOOK THE CAR WORDEN-MARTEN
SERVICE CENTER FOR REPAIRS ON MARCH 23RD. TO
REPAIR THE CAR THEY: 1.REPLACED CAT CONVERTER
AND OXYGEN SENSOR 125CGMPP- $750.47 A SECOND
INCIDENT OCCURRED WHILE TRAVELING ON
INTERSTATE 57 DURING DAYTIME HOURS. I WAS
PASSING A SEMI TRACTOR TRAILER WITH THREE CARS
FOLLOWING ME WHILE CRUISING AT 73 MILES PER
HOUR WHEN THE VEHICLE SPUTTERED AND LOST ALL
POWER PUTTING ME IN A VERY DANGEROUS
SITUATION. THE VEHICLE COASTED DOWN TO ABOUT
60 MILES PER HOUR BEFORE IT KICKED BACK IN. I IN
THE MEAN TIME HAD DROPPED BACK BEHIND THE SEMI
WITH THE THREE CARS BEHIND ME AND WHEN I COULD
I PULLED BACK INTO THE RIGHT HAND LANE. THIS WAS
A VERY DANGEROUS SITUATION FOR ME AND MY WIFE.
I CALLED ON STAR FOR A DIAGNOSTIC CHECK AND
THEY TOLD ME THAT EVERYTHING WAS OK. I TOOK
THE CAR WORDEN-MARTEN SERVICE CENTER FOR
REPAIRS AGAIN ON APRIL 19TH TO REPAIR THE CAR
THEY: 1.REPLACED MASS -AIR FLOW UNIT AND SENSOR
$131.39 WHO KNOWS IF IT IS FIXED RIGHT THIS TIME?
THIS WAS A VERY DANGEROUS SITUATION TO BE IN
FOR THE CAR TO FAIL. *TR  NHTSA ID Number: 10328071.

556.    On June 2, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2007 Buick LaCrosse and an incident that occurred on March 1, 2010, in which the

following was reported:

2007 BUICK LACROSSE SEDAN. CONSUMER STATES
MAJOR SAFETY DEFECT. CONSUMER REPORTS WHILE
DRIVING THE ENGINE SHUT DOWN 3 TIMES FOR NO
APPARENT REASON *TGW  NHTSA ID Number: 10334834.

557.    On February 20, 2014, New GM became aware of a complaint filed with NHTSA involving a 2006 Chevrolet Monte Carlo and an incident that occurred on January 16, 2014, in which the following was reported:

> I WAS DRIVING GOING APPROXIMATELY 45 MPH, I HIT A POT HOLE AND MY VEHICLE CUT OFF. THIS HAS HAPPENED THREE TIMES SINCE JANUARY. THE SAME THING HAPPENED THE SECOND TIME. THE LAST TIME IT OCCURRED WAS TUESDAY, FEBRUARY 18. THIS TIME I WAS ON THE EXPRESSWAY TRAVELING APPROXIMATELY 75 MPH, HIT A BUMP AND IT CUT OFF. THE CAR STARTS BACK UP WHEN I PUT IT IN NEUTRAL. *TR  NHTSA ID Number: 10565104.

558.    On March 3, 2014, New GM became aware of a complaint filed with NHTSA involving a 2006 Chevrolet Impala and an incident that occurred on February 29, 2012, in which the following was reported:

> I WAS DRIVING MY COMPANY ASSIGNED CAR DOWN A STEEP HILL WHEN THE ENGINE STALLED WITHOUT WARNING. THIS HAS HAPPENED 5 OTHER TIMES WITH THIS VEHICLE. THIS WAS THE FIRST TIME I WAS TRAVELING FAST THOUGH. IT'S LIKE THE ENGINE JUST TURNS OFF. THE LIGHTS ARE STILL ON BUT I LOSE THE POWER STEERING AND BRAKES. IT WAS TERRIFYING AND EXTREMELY DANGEROUS. THIS PROBLEM HAPPENS COMPLETELY RANDOMLY WITH NO WARNING. IT HAS HAPPENED TO OTHERS IN MY COMPANY WITH THEIR IMPALAS. I LOOKED ONLINE AND FOUND NUMEROUS OTHER INSTANCES OF CHEVY IMPALAS OF VARIOUS MODEL YEARS DOING THE SAME THING. IT IS CURRENTLY IN THE REPAIR SHOP AND THE MECHANIC CAN'T DUPLICATE THE PROBLEM. I TOLD THEM ITS RANDOM AND OCCURS ABOUT EVERY 4 MONTHS OR SO. I AM AFRAID I WILL HAVE TO GET BACK IN THIS DEATH TRAP DUE TO MY EMPLOYER MAKING ME. PLEASE HELP- I DON'T WANT TO DIE BECAUSE CHEVROLET HAS A PROBLEM WITH THEIR ELECTRICAL SYSTEMS IN THEIR CARS. *TR  NHTSA ID Number: 10567458.

559.    On March 11, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2007 Cadillac DTS and an incident that occurred on January 27, 2013, in which the

following was reported:

>ENGINE STOPPED. ALL POWER EQUIPMENT CEASED TO
>FUNCTION. I WAS ABLE TO GET TO THE SIDE OF THE
>FREEWAY. PUT THE CAR IN NEUTRAL, TURNED THE KEY
>AND THE CAR STARTED AND CONTINUED FOR THE
>DURATION OF THE 200 MILE TRIP. THE SECOND TIME
>APPROXIMATELY THREE WEEKS AGO MY WIFE WAS
>DRIVING IN HEAVY CITY TRAFFIC WHEN THE SAME
>PROBLEM OCCURRED AND SHE LOST THE USE OF ALL
>POWER EQUIPMENT. SHE WAS ABLE TO PUT THE CAR IN
>PARK AND GET IT STARTED AGAIN WITHOUT INCIDENT.
>I CALLED GM COMPLAINT DEPARTMENT. THEY
>INSTRUCTED ME TO TAKE THE CAR TO A DEALERSHIP
>AND HAVE A DIAGNOSTIC TEST DONE ON IT. THIS WAS
>DONE AND NOTHING WAS FOUND TO BE WRONG WITH
>THE VEHICLE. I AGAIN CALLED CADILLAC COMPLAINT
>DEPARTMENT AND OPENED A CASE. THIS TIME I WAS
>TOLD TO TAKE THE CAR BACK TO THE DEALERSHIP
>AND ASK THE SERVICE DEPARTMENT TO RECHECK IT. I
>INFORMED THEM I HAVE THE DIAGNOSTIC REPORT
>SHOWING NOTHING WRONG WAS FOUND. THEY
>SUGGESTED I TAKE IT BACK AND HAVE THE SERVICE
>PEOPLE DRIVE THE CAR. THIS DIDN'T MAKE ANY SENSE
>BECAUSE I DON'T KNOW WHEN AND WHERE THE
>PROBLEM WILL OCCUR AGAIN. WHAT WAS I TO DO FOR
>A CAR WHILE THE DEALERSHIP HAD MINE? I INQUIRED
>OF THE CADILLAC REPRESENTATIVE IF THIS CAR MAY
>HAVE THE SAME IGNITION AS THE CARS CURRENTLY
>BEING RECALLED BY GM. THEY WERE UNABLE TO
>ANSWER THAT QUESTION. THEY FINALLY STATED THE
>ONLY REMEDY WAS TO TAKE IT BACK TO THE
>DEALERSHIP. IF THIS PROBLEM OCCURS AGAIN
>SOMEONE COULD EASILY GET INJURED OR KILLED. I
>WOULD APPRECIATE ANY ASSISTANCE YOU CAN GIVE
>ME ON HOW TO RESOLVE THIS MATTER.  NHTSA ID
>Number: 10568491.

560.    On March 19, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick LaCrosse and an incident that occurred on March 15, 2014, in which the

following was reported:

> WHILE DRIVING UP A LONG INCLINE ON I-10 VEHICLE
> BEHAVED AS IF THE IGNITION HAD BEEN TURNED OFF
> AND KEY REMOVED. IE: ENGINE OFF, NO LIGHTS OR
> ACCESSORIES, NO WARNING LIGHTS ON DASH. TRAFFIC
> WAS HEAVY AND MY WIFE WAS FORTUNATE TO
> SAFELY COAST INTO SHOULDER. INCIDENT RECORDED
> WITH BUICK, HAVE REFERENCE NUMBER. *TR  NHTSA
> ID Number: 10573586.

561.    On July 1, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick LaCrosse and an incident that occurred on October 25, 2012, in which

the following was reported:

> TRAVELING 40 MPH ON A FOUR LANE ABOUT TO PASS A
> TRUCK. MOTOR STOPPED, POWER STEERING OUT,
> POWER BRAKES OUT, MANAGED TO COAST ACROSS
> THREE LANES TO SHOULDER TO PARK. WALKED 1/4
> MILES TO STORE CALLED A LOCAL GARAGE. CAR STILL
> WOULD NOT START, TOWED TO HIS GARAGE. CHECKED
> GAS, FUEL PRESSURE OKAY BUT NO SPARK. MOVED
> SOME CONNECTORS AROUND THE STARTING MODULE
> AND CAR STARTED. HAVE NOT HAD ANY PROBLEMS
> SINCE, HAVE THE FEAR THAT I WILL BE ON A CHICAGO
> TOLL ROAD AND IT WILL STOP AGAIN.  NHTSA ID
> Number: 10607535.

562.    On July 12, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2009 Chevrolet Impala and an incident that occurred on March 19, 2010, in which

the following was reported:

> I HAD JUST TURNED ONTO THIS ROAD, HAD NOT EVEN
> GONE A MILE. NO SPEED, NO BLACK MARKS, CAR SHUT
> DOWN RAN OFF THE ROAD AND HIT A TREE STUMP.
> TOTAL THE CAR. THE STEERING WHEEL WAS BENT
> ALMOST IN HALF. I HAVE PICTURES OF THE CAR. I GOT

THIS CAR NEW, SO ALL MILES WE'RE PUT ON IT BY ME. I
BROKE MY HIP, BACK, KNEE, DISLOCATED MY ELBOW,
CRUSHED MY ANKLE AND FOOT. HAD A HEAD INJURY,
A DEFLATED LUNG. I WAS IN THE HOSPITAL FOR TWO
MONTHS AND A NURSING HOME FOR A MONTH. I HAVE
HAD 14 SURGERIES. STILL NOT ABLE TO WORK OR DO A
LOT OF THINGS FOR MY SELF. WITH THE RECALLS
SHOWING THE ISSUES OF THE ENGINE SHUTTING OFF, I
NEED THIS LOOKED INTO.  NHTSA ID Number: 10610093.

563.    On July 24, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2008 Buick LaCrosse and an incident that occurred on July 15, 2014, in which the

following was reported:

WHILE DRIVING NORTH ON ALTERNATE 69 HIGHWAY
AT 65 MPH AT 5:00 P.M., MY VEHICLE ABRUPTLY LOSS
POWER EVEN THOUGH I TRIED TO ACCELERATE. THE
ENGINE SHUT OFF SUDDENLY AND WITHOUT WARNING.
VEHICLE SLOWED TO A COMPLETE STOP. I WAS
DRIVING IN THE MIDDLE LANE AND WAS UNABLE TO
GET IN THE SHOULDER LANE BECAUSE I HAD NO
PICKUP (UNABLE TO GIVE GAS TO ACCELERATE) SO MY
HUSBAND AND I WERE CAUGHT IN FIVE 5:00 TRAFFIC
WITH CARS WHIPPING AROUND US ON BOTH SIDES AND
MANY EXCEEDING 65 MPH. I PUT ON MY EMERGENCY
LIGHTS AND IMMEDIATELY CALLED ON-STAR. I WAS
UNABLE TO RESTART THE ENGINE. THANK GOD FOR
ON-STAR BECAUSE FROM THAT POINT ON, I WAS IN
TERROR WITNESSING CARS COMING UPON US NOT
SLOWING UNTIL THEY REALIZED I WAS AT A STAND
STILL WITH LIGHTS FLASHING. THE CARS WOULD
SWERVE TO KEEP FROM HITTING US. IT TOOK THE
HIGHWAY PATROL AND POLICE 15 MINUTES TO GET TO
US BUT DURING THAT TIME, I RELIVED VISIONS OF US
BEING KILLED ON THE HIGHWAY. I CANNOT DESCRIBE
THE HORROR, LOOKING OUT MY REAR VIEW MIRROR,
WITNESSING OUR DEMISE TIME AFTER TIME. THOSE 15
MINUTES SEEMED LIKE AN ETERNITY. WHEN THE
HIGHWAY PATROL ARRIVED THEY CLOSED LANES AND
ASSISTED IN PUSHING CAR OUT OF THE HIGHLY
TRAFFIC LANES. IT TOOK MY HUSBAND AND I BOTH TO
TURN THE STEERING WHILE IN NEUTRAL. THE CAR WAS
TOWED TO CONKLIN FANGMAN KC DEALERSHIP AND I

> HAD TO REPLACE IGNITION COIL AND MODULE THAT
> COST ME $933.16. THEY SAID THESE PARTS WERE NOT
> ON THE RECALL LIST, WHICH I HAVE FOUND OUT SINCE
> THEN GM HAS PUT DEALERSHIPS ON NOTICE OF THIS
> PROBLEM. IT HAS SOMETHING TO DO WITH SUPPLYING
> ENOUGH MANUFACTURED PARTS TO TAKE CARE OF
> RECALL. IF I COULD AFFORD TO PURCHASE ANOTHER
> CAR I WOULD BECAUSE I DONT FEEL SAFE ANY
> LONGER IN THIS CAR. EMOTIONALLY I AM STILL
> SUFFERING FROM THE TRAUMA.  NHTSA ID Number:
> 10604820.

564.    Notwithstanding New GM's recall, the reports and complaints relating to this

defect have continued to pour into New GM.  Such complaints and reports indicate that New

GM's proffered recall "fix" does not work.

565.    For example, on August 2, 2014, New GM became aware of a complaint filed

with NHTSA involving a 2006 Buick LaCrosse and an incident that occurred on July 12, 2014,

in which the following was reported:

> WHILE TRAVELING IN THE FAST LANE ON THE GARDEN
> STATE PARKWAY I HIT A BUMP IN THE ROAD, THE
> AUTO SHUT OFF. WITH A CONCRETE DIVIDER ALONG
> SIDE AND AUTOS APPROACHING AT HIGH SPEED, MY
> WIFE AND DAUGHTER SCREEMING I MANAGED TO GET
> TO THE END OF THE DIVIDER WERE I COULD TURN OFF
> THE AUTO RESTARTED ON 1ST TRY BUT VERY SCARY.
> NHTSA ID Number: 10618391.

566.    On August 18, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2007 Buick LaCrosse and an incident that occurred on August 18, 2014, in which the

following was reported:

> TL* THE CONTACT OWNS A 2007 BUICK LACROSSE. THE
> CONTACT STATED WHILE DRIVING APPROXIMATELY 60
> MPH, SHE HIT A POT HOLE AND THE VEHICLE STALLED.
> THE VEHICLE COASTED TO THE SHOULDER OF THE
> ROAD. THE VEHICLE WAS RESTARTED AND THE
> CONTACT WAS ABLE TO DRIVE THE VEHICLE AS

- 305 -

> NORMAL. THE CONTACT RECEIVED A RECALL NOTICE
> UNDER NHTSA CAMPAIGN NUMBER: 14V355000
> (ELECTRICAL SYSTEM), HOWEVER THE PARTS NEEDED
> FOR THE REPAIRS WAS UNAVAILABLE. THE VEHICLE
> WAS NOT REPAIRED. THE MANUFACTURER WAS NOT
> NOTIFIED OF THE FAILURE. THE APPROXIMATE
> FAILURE MILEAGE WAS 110,000.  NHTSA ID Number:
> 10626067.

567.    On August 20, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2007 Chevrolet Impala and an incident that occurred on August 6, 2014, in which it

was reported that:

> TL* THE CONTACT OWNS A 2007 CHEVROLET IMPALA.
> THE CONTACT STATED THAT WHILE DRIVING 25 MPH,
> THE VEHICLE STALLED WITHOUT WARNING. THE
> CONTACT RECEIVED A NOTIFICATION FOR RECALL
> NHTSA CAMPAIGN NUMBER: 14V355000 (ELECTRICAL
> SYSTEM). THE VEHICLE WAS TAKEN TO AN
> INDEPENDENT MECHANIC WHERE THE TECHNICIAN
> ADVISED THE CONTACT TO REMOVE THE KEY FOB AND
> ANY OTHER OBJECTS. THE VEHICLE WAS NOT
> REPAIRED. THE MANUFACTURER WAS MADE AWARE OF
> THE FAILURE. THE FAILURE MILEAGE WAS 79,000.
> NHTSA ID Number: 10626659.

568.    On August 27, 2014, New GM became aware of the following complaint filed

with NHTSA involving a 2008 Chevrolet Impala and an incident that occurred on August 27,

2014, in which it was reported that:

> TL-THE CONTACT OWNS A 2008 CHEVROLET IMPALA.
> THE CONTACT STATED WHILE DRIVING
> APPROXIMATELY 50 MPH, THE VEHICLE LOST POWER
> AND THE STEERING WHEEL SEIZED WITHOUT
> WARNING. AS A RESULT, THE CONTACT CRASHED INTO
> A POLE AND THE AIR BAGS FAILED TO DEPLOY. THE
> CONTACT SUSTAINED A CONCUSSION, SPRAINED NECK,
> AND WHIPLASH WHICH REQUIRED MEDICAL
> ATTENTION. THE POLICE WAS NOT FILED. THE VEHICLE
> WAS TOWED TO A TOWING COMPANY. THE CONTACT
> RECEIVED NOTIFICATION OF NHTSA CAMPAIGN ID

NUMBER: 14V355000 (ELECTRICAL SYSTEM), HOWEVER
THE PARTS ARE NOT AVAILABLE TO PERFORM THE
REPAIRS. THE VEHICLE WAS NOT REPAIRED. THE
MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE.
THE APPROXIMATE FAILURE MILEAGE WAS 70,000. MF.
NHTSA ID Number: 10628704.

569.    New GM knew that this serious safety defect existed for years yet did nothing to

warn the public or even attempt to correct the defect in these vehicles until late June 2014 when

New GM finally made the decision to implement a recall.

570.    The "fix" that New GM offered as part of the recall is to modify the ignition key

from a "slotted" key to a "hole" key.  This is insufficient and does not adequately address the

safety risks posed by the defect.  First, New GM was "VERY concerned about the 'cost'

associated with this particular field action, mainly because it involves so many vehicles," and

"[t]hey have asked that I 'remind' you that we need to keep the costs of these inserts 'very

low.'"[145]  Key inserts were chosen as the "obvious choice" "[c]ost-wise," even though one

engineer expressed concerns that the inserts fall out.[146]  The ignition key and switch remain

prone to inadvertently moving from the "run" to the "accessory" position.  Simply changing the

key slot or taking other keys and fobs off of key rings is New GM's attempt to make consumers

responsible for the safety of New GM and Old GM vehicles and to divert its own responsibility

to make the vehicles safe.  New GM considered replacing the ignition switch but rejected the

remedy on the basis of cost, and New GM's "fix" does not adequately address the inherent

dangers and safety threats posed by the defect in the design.

---

[145] GM-MDL2543-000766203.

[146] *See* GM-MDL2543-002827790.

571.     Third, New GM is not addressing the other design issues that create safety risks in connection with this defect.  New GM is not altering the algorithm that prevents the airbags from deploying when the ignition leaves the "run" position even when the vehicle is moving at high speed.  Fourth, New GM is not altering the placement of the ignition switch in an area where the driver's knees may inadvertently cause the ignition to move out of the "run" position.

**b.     Low torque Safety Recalls 14v394 and 14v400.**

572.     On July 2, 2014, New GM recalled 554,328 vehicles in the United States for ignition switch defects (Recall Number 14v394).

573.     The July 2 recall applied to the 2003-2014 Cadillac CTS and the 2004-2006 Cadillac SRX.  Approximately 100,000 of the vehicles involved in Recall No. 14v394 were manufactured and/or sold by New GM.

574.     The recall notice explains that the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine.  Further, if the key is not in the "run" position, the airbags may not deploy in the event of a collision, increasing the risk of injury.  Internally, New GM characterized the defect as "The ignition switch may move from RUN to ACCESSORY or OFF due to driver interaction with the key or due to the weight of objects on the key ring."  Thus, New GM has admitted that all vehicles subject to Safety Recall 14v394 have the same defect.

575.     New GM internally described the effect of the defect as follows:  "This will result in a partial loss of electrical power and turn off the engine.  Power steering/braking will be affected and the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury or fatality."  New GM has thus admitted that the effect of the defect is the same for all models involved in Safety Recall 14v394.

576.    On July 3, 2014, New GM recalled 5,877,718 additional vehicles in the United States for ignition switch defects (Recall No. 14v400).

577.    The following vehicles were included in Recall No. 14v400:  1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero.  All of the vehicles involved in Recall No. 14v400 were manufactured by Old GM.

578.    The recall notice states that the weight on the key and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine.  If the key is not in the "run" position, the airbags may not deploy if the vehicle is involved in a collision, increasing the risk of injury.  New GM internally described the defect similarly:  "The ignition switch may inadvertently move out of the 'run' position if the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event."  Thus, New GM has admitted that all vehicles subject to Safety Recall 14v400 have the same defect.

579.    New GM described the effect of the defect as follows:  "If the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, it may unintentionally move the key away from the 'run' position.  If this occurs, engine power, power steering and power braking will be affected, increasing the risk of a crash.  The timing of the key movement out of the 'run' position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes."  New GM has thus admitted that the effect of the defect is the same for all models involved in Safety Recall 14v400.

580.     New GM internally described the root cause of the defect as follows:  "The ignition switch torque performance may be below target curve.  The system torque performance may be insufficient to resist energy generated from weight hanging on slotted key."

581.     In both Safety Recall 14v394 and 14v400, New GM notified NHTSA and the public that the recall was intended to address a defect involving unintended or "inadvertent key rotation" within the ignition switch of the vehicles.  As with the ignition key defect announced June 20, however, the defects for which these vehicles have been recalled is directly related to the ignition switch defect in the Cobalt and other Defective Ignition Switch Vehicles and involves the same safety risks and dangers.

582.     Once again, the unintended ignition rotation defect is substantially similar to and relates directly to the other ignition switch defects, including the Delta Ignition Switch Vehicles.  Like the other ignition switch defects, the unintended ignition key rotation defect poses a serious and dangerous safety risk because it can cause a vehicle to stall while in motion by causing the key in the ignition to inadvertently move from the "on" or "run" position to the "off" or "accessory" position.  Like the other ignition switch defects, the unintended ignition key rotation defect can result in a loss of power steering, power braking, and increase the risk of a crash.  And as with the other ignition switch defects, if a crash occurs, the airbags will not deploy because of the unintended ignition key rotation defect.

583.     The unintended ignition key rotation defect involves several problems, and they are identical to the problems in the other Defective Ignition Switch Vehicles:  a weak detent plunger, the low positioning of the ignition on the steering column, and the algorithm that renders the airbags inoperable when the vehicle leaves the "run" position.

584.    The 2003-2006 Cadillac CTS and the 2004-2006 Cadillac SRX use the same

Delphi switch and have inadequate torque for the "run"-"accessory" direction of the key rotation.

This was known to Old GM and New GM, and was the basis for a change that was made to a

stronger detent plunger for the 2007 and later model years of the SRX model.  The 2007 and

later CTS vehicles used a switch manufactured by Dalian Alps.

585.    In 2010, New GM changed the CTS key from a "slot" to a "hole" design to

"reduce an observed nuisance" of the key fob contacting the driver's leg.  But in 2012, a New

GM employee reported two running stalls of a 2012 CTS that had a "hole" key and the stronger

detent plunger switch.  When New GM did testing in 2014 of the "slot" versus "hole" keys, it

confirmed that the weaker detent plunger-equipped switches used in the older CTS and SRX

could inadvertently move from "run" to "accessory" or "off" when the "vehicle goes off road or

experience[s] some other jarring event."

586.    New GM has tried to characterize the recall of these 7.3 million vehicles as being

different than the Delta Ignition Switch recall *even though* these recalls are aimed at addressing

the same defects and safety risks as those that gave rise to the other ignition switch defect recalls.

New GM has attempted to portray the unintended ignition key rotation defect as being different

from the other ignition switch defects in order to deflect attention from the severity and

pervasiveness of the ignition switch defect, to try to provide a story and plausible explanation for

why it did not recall these 7.3 million vehicles much earlier, and to avoid providing new,

stronger ignition switches as a remedy.

587.    Further, New GM acquired knowledge of the defects in these vehicles on or

shortly after July 10, 2009.  On that date, it acquired knowledge of the following facts through

the knowledge of personnel who transferred from Old GM as well as through databases and documents that transferred to New GM, as discussed above:

a.      New GM knew that, in January of 2003, Old GM opened an internal investigation after it received complaints from a Michigan GM dealership that a customer had experienced a power failure while operating his model year 2003 Pontiac Grand Am.

b.      New GM knew that, during the investigation, Old GM's Brand Quality Manager for the Grand Am visited the dealership and requested that the affected customer demonstrate the problem.  The customer was able to recreate the shutdown event by driving over a speed bump at approximately 30-35 mph.

c.      New GM knew that the customer's key ring was allegedly quite heavy.  It contained approximately 50 keys and a set of brass knuckles.

d.      New GM knew that in May 2003, Old GM issued a voicemail to dealerships describing the defective ignition condition experienced by the customer in the Grand Am.  Old GM identified the relevant population of the Defective Vehicles as the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am.

> This information goes out to Chevrolet, Oldsmobile and Pontiac dealers and concerns the 1999 through 2003 Chevrolet Malibu, Oldsmobile Alero and Pontiac Grand Am. This voicemail provides information about a condition that may be driving no trouble found claims on customer vehicles on part replacements such as BCMs, ignition lock cylinders, ignition switches and also some PCMs, ABS modules, door lock modules, restraint control system and theft security system replacements.  We were able to capture a customer's vehicle for the complaint of intermittent vehicle shuts off while driving.  At times this vehicle would start up and then shut off for no apparent reason.  Sometimes no codes would set and sometimes multiple codes would set.  In both instances the vehicle would immediately restart.  The customer had brought the vehicle in to the dealership four times.  On the first three trips the condition could not be duplicated.  On the fourth trip back the

dealership service manager noticed the customer's excess size key ring and mass. The condition was duplicated using the customer's full key ring, which was not left at the dealership on prior visits. The actual cause of this customer's condition was that over bumps the mass and weight of the customer's key ring forces the dash mounted key lock cylinder switch out of its switch detent and allows the key to rotate back one sixteenth of an inch from the on position towards the accessory position. This amount of key movement will shut the vehicle off and create this customer's complaint. Also, when the vehicle is started and the key is quickly released between the ignition lock spring and weight and mass of the key chain, the key can snap back just past the on position detent and allow the engine to shut off. Noting the size of the customer's key ring, replacing the ignition lock cylinder with another one of the same would not have corrected this issue. Additionally, when the ignition is turned off in this type of manner, depending on which module is communicating on the data line at the time, is dependent on whether or not DTC codes will set and which codes will set. The DTCs that set most consistently during this condition was usually the communication or serial data codes DTC U1040, U1088, U1255, C1298, B, as in boy, 2958 and/or B, as in boy, 2960. As we investigated this condition further we also found that it was not uncommon for customers to have a number of items attached to their key rings. In many instances, especially when the vehicle was in for service overnight, the customer usually left only the vehicle key and key fob. Large key rings with multiple items attached can also be responsible for customer complaints of the vehicle shuts off while shifting into park on column mounted ignition lock cylinders. This is caused when the customer is shifting from a drive gear upward into park and an item on the key ring hits the ignition lock cylinder key tabs on the way up and moves the switch back out of the on detent position. Please be aware that these conditions can be caused by excessive key size and mass from the customer's key ring, and attention to this detail should be paid to allow you to better and more properly diagnose the customer's complaint. I also wanted to thank Rob Maziac, the service manager at Art Moran, in Michigan, for his efforts here in assisting General Motors with this issue. And many of you others who have taken the time out of your busy schedules and assisted us in the identification on many other issues. I appreciate your time. Thanks. [GM-MDL2543-300732518]

e.      New GM knew that Old GM did not recall these vehicles.  Nor did it provide owners and/or lessees with notice of the defective condition.  Instead, its voicemail directed dealerships to pay attention to the key size and mass of the customer's key ring.

f.      New GM also knew that engineers had "recommended a higher spring rate from day one," as "this would be the least costly fastest fix."

g.      New GM knew that, on July 24, 2003, Old GM issued an engineering work order to increase the detent plunger force on the ignition switch for the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am vehicles.  Old GM engineers allegedly increased the detent plunger force and changed the part number of the ignition switch.  The new parts were installed beginning in the model year 2004 Malibu, Alero, and Grand Am vehicles.  No recall was done at the time to increase detent plunger force in prior models.

h.      New GM knew that Old GM issued a separate engineering work order in March 2004 to increase the detent plunger force on the ignition switch in the Pontiac Grand Prix, ostensibly to "maintain commonality" between the Grand Prix and the Malibu, Grand Am, and the Alero.  This change was made only in production vehicles beginning in 2005, and no recall was done at the time to increase detent plunger force in prior models.  Old GM engineers did not change the part number for the new Pontiac Grand Prix ignition switch.

i.      New GM knew that then-Old GM design engineer Ray DeGiorgio signed the work order in March 2004 authorizing the part change for the Grand Prix ignition switch without changing the part number (Ray DeGiorgio maintained his position as design engineer with New GM).  An Engineering Group Manager approved the design change "w/o part number change."  Old GM's decision not to change the part number is a violation of generally accepted engineering standards.  For example, the American Society of Mechanical Engineers (ASME)

issued ASME Y14.100-2004, Engineering Drawing Practices, which sets forth essential

minimum requirements for engineering drawings and related documentation practices.  Such

standards are generally relied upon by automotive engineers (indeed, a General Motors engineer

was on the ASME Y14 Standards Committee at the time ASME Y14.100-2004 was approved).

ASME Y14.100-2004, Section 6.8.1 governs "Change Requiring New Identification" and

provides that "New PINs [part identification numbers] shall be assigned when a part or item is

changed in such a manner that any of the following conditions occur:  (a) When performance or

durability is affected to such an extent that the previous versions must be discarded or modified

for reasons of safety or malfunction."  Old GM redesigned the switch "for reasons of safety or

malfunction."  ASME Y14.100-2004, Section 6.8.1, applies here and mandates that Old GM

should have changed the part number.  Old GM's decision not to change the part number is also

a violation of generally accepted inventory management standards and practices, which dictate

that a modification that is necessary to meet product safety specifications requires a part number

change.

       j.     New GM knew that, on or around August 25, 2005, Laura Andres, an Old

GM design engineer (who remains employed with New GM), sent an e-mail describing ignition

switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway.

Ms. Andres' e-mail stated, "While driving home from work on my usual route, I was driving

about 45 mph, where the road changes from paved to gravel & then back to paved, some of the

gravel had worn away, and the pavement acted as a speed bump when I went over it.  The car

shut off.  I took the car in for repairs.  The technician thinks it might be the ignition detent,

because in a road test in the parking lot it also shut off."

k.      New GM knew that Old GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' e-mail on August 25, 2005 to four Old GM employees.  Mr. Dickinson asked, "Is this a condition we would expect to occur under some impacts?"

l.      New GM knew that on August 29, 2005, Old GM employee Jim Zito forwarded the messages to Ray DeGiorgio and asked, "Do we have any history with the ignition switch as far as it being sensitive to road bumps?"

m.      New GM knew that DeGiorgio responded the same day, stating, "To date there has never been any issues with the detents being too light."

588.    From 2002 to the present, first Old GM and then New GM received numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect, and New GM was aware of all of them.  The following are just a handful of examples of some of the reports known to New GM.

589.    New GM knew of a September 16, 2002 complaint filed with NHTSA regarding a 2002 Oldsmobile Intrigue involving an incident that occurred on March 16, 2002, in which the following was reported:

> WHILE DRIVING AT 30 MPH CONSUMER RAN HEAD ON
> INTO A STEEL GATE, AND THEN HIT THREE TREES.
> UPON IMPACT, NONE OF THE AIR BAGS DEPLOYED.
> CONTACTED DEALER. PLEASE PROVIDE FURTHER
> INFORMATION. *AK  **NHTSA ID Number:** 8018687.

590.    New GM knew of a November 22, 2002 complaint filed with NHTSA involving a 2003 Cadillac CTS involving an incident that occurred on July 1, 2002, in which it was reported that:

> THE CAR STALLS AT 25 MPH TO 45 MPH, OVER 20
> OCCURANCES, DEALER ATTEMPTED 3 REPAIRS. DT
> NHTSA ID Number: 770030.

591.   New GM knew of a January 21, 2003 complaint filed with NHTSA involving a

2003 Cadillac CTS, in which the following was reported:

> WHILE DRIVING AT ANY SPEED,THE VEHICLE WILL
> SUDDENLY SHUT OFF. THE STEERING WHEEL AND THE
> BRAKE PEDAL BECOMES VERY STIFF. CONSUMER FEELS
> ITS VERY UNSAFE TO DRIVE. PLEASE PROVIDE ANY
> FURTHER INFORMATION.  NHTSA ID Number: 10004288.

592.   New GM knew of a June 30, 2003 complaint filed with NHTSA regarding a 2001

Oldsmobile Intrigue, which involved the following report:

> CONSUMER NOTICED THAT WHILE TRAVELING DOWN
> HILL AT 40-45 MPH BRAKES FAILED, CAUSING
> CONSUMER TO RUN INTO THREES AND A POLE. UPON
> IMPACT, AIR BAGS DID NOT DEPLOY. *AK  **NHTSA ID
> Number:** 10026252.

593.   New GM knew of a March 11, 2004 complaint filed with NHTSA involving a

2004 Cadillac CTS involving an incident that occurred on March 11, 2004, in which the

following was reported:

> CONSUMER STATED WHILE DRIVING AT 55-MPH
> VEHICLE STALLED, CAUSING CONSUMER TO PULL OFF
> THE ROAD. DEALER INSPECTED VEHICLE SEVERAL
> TIMES, BUT COULD NOT DUPLICATE OR CORRECT THE
> PROBLEM. *AK  NHTSA ID Number: 10062993.

594.   New GM knew of a March 11, 2004 complaint with NHTSA regarding a 2003

Oldsmobile Alero incident that occurred on July 26, 2003, in which the following was reported:

> THE VEHICLE DIES. WHILE CRUISING AT ANY SPEED,
> THE HYDRAULIC BRAKES & STEERING FAILED DUE TO
> THE ENGINE DYING. THERE IS NO SET PATTERN, IT
> MIGHT STALL 6 TIMES IN ONE DAY, THEN TWICE THE
> NEXT DAY. THEN GO 4 DAYS WITH NO OCURRENCE,
> THEN IT WILL STALL ONCE A DAY FOR 3 DAYS. THEN
> GO A WEEK WITH NO OCURRENCE, THEN STALL 4 TIMES
> A DAY FOR 5 DAYS, ETC., ETC. IN EVERY OCURRENCE, IT
> TAKES APPROXIMATELY 10 MINUTES BEFORE IT WILL
> START BACK UP. AT HIGH SPEEDS, IT IS EXTREMELY

> TOO DANGEROUS TO DRIVE. WE'VE TAKEN IT TO THE
> DEALER, UNDER EXTENDED WARRANTY, THE
> REQUIRED 4 TIMES UNDER THE LEMON LAW PROCESS.
> THE DEALER CANNOT ASCERTAIN, NOR FIX THE
> PROBLEM. IT HAPPENED TO THE DEALER AT LEAST
> ONCE WHEN WE TOOK IT IN. I DOUBT THEY WILL
> ADMIT IT, HOWEVER, MY WIFE WAS WITNESS. THE CAR
> IS A 2003. EVEN THOUGH I BOUGHT IT IN JULY 2003, IT
> WAS CONSIDERED A USED CAR. GM HAS DENIED OUR
> CLAIM SINCE THE LEMON LAW DOES NOT APPLY TO
> USED CARS. THE CAR HAS BEEN PERMANENTLY
> PARKED SINCE NOVEMBER 2003. WE WERE FORCED TO
> BUY ANOTHER CAR. THE DEALER WOULD NOT TRADE.
> THIS HAS RESULTED IN A BADLUCK SITUATION FOR US.
> WE CANNOT AFFORD 2 CAR PAYMENTS / 2 INSURANCE
> PREMIUMS, NOR CAN WE AFFORD $300.00 PER HOUR TO
> SUE GM. I STOPPED MAKING PAYMENTS IN DECEMBER
> 2003. I HAVE KEPT THE FINANCE COMPANY ABREAST OF
> THE SITUATION. THEY HAVE NOT REPOSSED AS OF YET.
> THEY WANT ME TO TRY TO SELL IT. CAN YOU HELP
> ?*AK  **NHTSA ID Number:** 10061898.

595.     New GM knew of a July 20, 2004 complaint filed with NHTSA involving a 2004

Cadillac SRX, involving an incident that occurred on July 9, 2004, in which the following was

reported:

> THE CAR DIES AFTER TRAVELING ON HIGHWAY. IT
> GOES FROM 65 MPH TO 0. THE BRAKES, STEERING, AND
> COMPLETE POWER DIES. YOU HAVE NO CONTROL OVER
> THE CAR AT THIS POINT. I HAVE ALMOST BEEN HIT 5
> TIMES NOW. ALSO, WHEN THE CARS DOES TURN BACK
> ON IT WILL ONLY GO 10 MPH AND SOMETIMES WHEN
> YOU TURN IT BACK ON THE RPM'S WILL GO TO THE
> MAX. IT SOUNDS LIKE THE CAR IS GOING TO EXPLODE.
> THIS CAR IS A DEATH TRAP. *LA  NHTSA ID Number:
> 10082289.

596.     New GM knew of an August 23, 2004 complaint filed with NHTSA regarding a

2004 Chevrolet Malibu incident that occurred on June 30, 2004, in which it was reported that:

> WHILE TRAVELING AT ANY SPEED VEHICLE STALLED.
> WITHOUT CONSUMER HAD SEVERAL CLOSE CALLS OF

> BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL
> TIMES, BUT PROBLEM RECURRED. *AK.  **NHTSA ID**
> **Number:** 10089418.

597.   New GM knew of a report in August of 2004 involving a 2004 Chevrolet Malibu

incident that occurred on August 3, 2004, in which it was reported that:

> WHEN DRIVING, THE VEHICLE TO CUT OFF. THE DEALER
> COULD NOT FIND ANY DEFECTS. *JB.  **NHTSA ID**
> **Number:** 10087966**.**

598.   New GM knew of an October 23, 2004 complaint filed with NHTSA regarding a

2003 Chevrolet Monte Carlo, in which the following was reported:

> VEHICLE CONTINUOUSLY EXPERIENCED AN
> ELECTRICAL SYSTEM FAILURE. AS A RESULT,
> THERE'WAS AN ELECTRICAL SHUT DOWN WHICH
> RESULTED IN THE ENGINE DYING/ STEERING WHEEL
> LOCKING UP, AND LOSS OF BRAKE POWER.*AK  **NHTSA**
> **ID Number:** 10044624**.**

599.   New GM knew of an April 26, 2005 complaint filed with NHTSA involving a

2005 Pontiac Grand Prix, pertaining to an incident that occurred on December 29, 2004, in which

the following was reported:

> 2005 PONTIAC GRAND PRIX GT SEDAN VIN #[XXX]
> PURCHASED 12/16/2004. INTERMITTENTLY VEHICLE
> STALLS/ LOSS OF POWER IN THE ENGINE. WHILE
> DRIVING THE VEHICLE IT WILL SUDDENLY JUST LOSES
> POWER. YOU CONTINUE TO PRESS THE ACCELERATOR
> PEDAL AND THEN THE ENGINE WILL SUDDENLY TAKE
> BACK OFF AT A GREAT SPEED. THIS HAS HAPPENED
> WHILE DRIVING NORMALLY WITHOUT TRYING TO
> ACCELERATE AND ALSO WHILE TRYING TO
> ACCELERATE. THE CAR HAS LOST POWER WHILE
> TRYING TO MERGE IN TRAFFIC. THE CAR HAS LOST
> POWER WHILE TRYING TO CROSS HIGHWAYS. THE CAR
> HAS LOST POWER WHILE JUST DRIVING DOWN THE
> ROAD. GMC HAS PERFORMED THE FOLLOWING REPAIRS
> WITHOUT FIXING THE PROBLEM. 12/30/2004 [XXX]-
> MODULE, POWERTRAIN CONTROL-ENGINE
> REPROGRAMMING. 01/24/2005 [XXX]-

> SOLENOID,PRESSURE CONTROL-REPLACED. 02/04/2005
> [XXX]-MODULE, PCM/VCM-REPLACED. 02/14/2005 [XXX]-
> PEDAL,ACCELERATOR-REPLACED. DEALERSHIP
> PURCHASED FROM CAPITAL BUICK-PONTIAC-GMC 225-
> 293-3500. DEALERSHIP HAS ADVISED THAT THEY DO
> NOT KNOW WHAT IS WRONG WITH THE CAR. WE HAVE
> BEEN TOLD THAT WE HAVE TO GO DIRECT TO PONTIAC
> WITH THE PROBLEM. HAVE BEEN IN CONTACT WITH
> PONTIAC SINCE 02/15/05. PONTIAC ADVISED THAT THEY
> WERE GOING TO RESEARCH THE PROBLEM AND SEE IF
> ANY OTHER GRAND PRI WAS REPORTING LIKE
> PROBLEMS. SO FAR THE ONLY ADVICE FROM PONTIAC
> IS THEY WANT US TO COME IN AND TAKE ANOTHER
> GRAND PRIX OFF THE LOT AND SEE IF WE CAN GET THIS
> CAR TO DUPLICATE THE SAME PROBLEM. THIS DID NOT
> IMPRESS ME AT ALL. SO AFTER WAITING FOR 2-1/2
> MONTHS FOR PONTIAC TO DO SOMETHING TO FIX THE
> PROBLEM, I HAVE DECIDED TO REPORT THIS TO NHTSA.
> *AK *JS INFORMATION REDACTED PURSUANT TO THE
> FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
> 552(B)(6)  NHTSA ID Number: 10118501.

600.    New GM knew of a May 31, 2005 complaint filed with NHTSA regarding a 2004

Chevrolet Malibu incident that occurred on July 18, 2004, in which it was reported that:

> THE CAR CUT OFF WHILE I WAS DRIVING AND IN
> HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO
> WARNING THAT THIS WOULD HAPPEN. THE CAR WAS
> SERVICED BEFORE FOR THIS PROBLEM BUT IT
> CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE
> HORN FUSE HAS BEEN REPLACED TWICE, AND THE
> BLINKER IS CURRENTLY OUT. THE STEERING COLLAR
> HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED
> TO BE A NEW CAR.  **NHTSA ID Number:** 10123684.

601.    New GM knew of a June 2, 2005 complaint filed with NHTSA regarding a 2004

Pontiac Grand Am incident that occurred on February 18, 2005, in which the following was

reported:

> 2004 PONTIAC GRAND PRIX SHUTS DOWN WHILE
> DRIVING AND THE POWER STEERING AND BRAKING

> ABILITY ARE LOST.*MR *NM.  **NHTSA ID Number:** 10124713.

602.    New GM knew of an August 12, 2005 complaint filed with NHTSA involving a

2003 Cadillac CTS, regarding an incident that occurred on January 3, 2005, in which it was

reported that:

> DT: VEHICLE LOST POWER WHEN THE CONSUMER HIT
> THE BRAKES. THE TRANSMISSION JOLTS AND THEN THE
> ENGINE SHUTS OFF. IT HAS BEEN TO THE DEALER 6
> TIMES SINCE JANUARY. THE DEALER TRIED
> SOMETHING DIFFERENT EVERY TIME SHE TOOK IT IN.
> MANUFACTURER SAID SHE COULD HAVE A NEW
> VEHICLE IF SHE PAID FOR IT. SHE WANTED TO GET RID
> OF THE VEHICLE.*AK THE CHECK ENGINE LIGHT
> ILLUMINATED. *JB  NHTSA ID Number: 10127580.

603.    New GM knew of an August 26, 2005 complaint with NHTSA regarding a 2004

Pontiac Grand Am incident that occurred on August 26, 2005, in which the following was

reported:

> WHILE DRIVING MY 2004 PONTIAC GRAND AM THE CAR
> FAILED AT 30 MPH. IT COMPLETELY SHUT OFF LEAVING
> ME WITH NO POWER STEERING AND NO WAY TO
> REGAIN CONTROL OF THE CAR UNTIL COMING TO A
> COMPLETE STOP TO RESTART IT. ONCE I HAD STOPPED
> IT DID RESTART WITHOUT INCIDENT. ONE WEEK LATER
> THE CAR FAILED TO START AT ALL NOT EVEN TURNING
> OVER. WHEN THE PROBLEM WAS DIAGNOSED AT THE
> GARAGE IT WAS FOUND TO BE A FAULTY "IGNITION
> CONTROL MODULE" IN THE CAR. AT THIS TIME THE
> PART WAS REPLACED ONLY TO FAIL AGAIN WITHIN 2
> MONTHS TIME AGAIN WHILE I WAS DRIVING THIS TIME
> IN A MUCH MORE HAZARDOUS CONDITION BEING THAT
> I WAS ON THE HIGHWAY AND WAS TRAVELING AT 50
> MPH AND HAD TO TRAVEL ACROSS TWO LANES OF
> TRAFFIC TO EVEN PULL OVER TO TRY TO RESTART IT.
> THE CAR CONTINUED TO START AND SHUT OFF ALL
> THE WAY TO THE SERVICE GARAGE WHERE IT WAS
> AGAIN FOUND TO BE A FAULTY "IGNITION CONTROL
> MODULE". IN ANOTHER TWO WEEKS TIME THE CAR

- 321 -

> FAILED TO START AND WHEN DIAGNOSED THIS TIME IT
> WAS SAID TO HAVE "ELECTRICAL PROBLEMS"
> POSSIBLE THE "POWER CONTROL MODULE". AT THIS
> TIME THE CAR IS STILL UNDRIVEABLE AND UNSAFE
> FOR TRAVEL. *JB  **NHTSA ID Number:** 10134303.

604.    New GM knew of a September 22, 2005 complaint filed with NHTSA involving a

2005 Cadillac CTS, concerning an incident that occurred on September 16, 2005, in which the

following was reported:

> DT: 2005 CADILLAC CTS—THE CALLER'S VEHICLE WAS
> INVOLVED IN AN ACCIDENT WHILE DRIVING AT 55 MPH.
> UPON IMPACT, AIR BAGS DID NOT DEPLOY. THE
> VEHICLE WENT OFF THE ROAD AND HIT A TREE. THIS
> WAS ON THE DRIVER'S SIDE FRONT. THERE WERE NO
> INDICATOR LIGHTS ON PRIOR TO THE ACCIDENT. THE
> VEHICLE HAS NOT BEEN INSPECTED BY THE
> DEALERSHIP, AND INSURANCE COMPANY TOTALED
> THE VEHICLE. THE CALLER SAW NO REASON FOR THE
> AIR BAGS NOT TO DEPLOY. . TWO INJURED WERE
> INJURED IN THIS CRASH. T A POLICE REPORT WAS
> TAKEN. THERE WAS NO FIRE. *AK  NHTSA ID Number:
> 10137348.

605.    New GM knew of a September 29, 2006 complaint filed with NHTSA involving a

2004 Cadillac CTS and an incident that occurred on September 29, 2006, in which the following

was reported:

> DT*: THE CONTACT STATED AT VARIOUS SPEEDS
> WITHOUT WARNING, THE VEHICLE LOST POWER AND
> WOULD NOT ACCELERATE ABOVE 20 MPH. ALSO,
> WITHOUT WARNING, THE VEHICLE STALLED ON
> SEVERAL OCCASIONS, AND WOULD NOT RESTART. THE
> VEHICLE WAS TOWED TO THE DEALERSHIP, WHO
> REPLACED THE THROTTLE TWICE AND THE THROTTLE
> BODY ASSEMBLY HARNESS, BUT THE PROBLEM
> PERSISTED. *AK UPDATED 10/25/2006—*NM  NHTSA ID
> Number: 10169594.

606.   New GM knew of an April 18, 2007 complaint filed with NHTSA involving a

2004 Cadillac SRX, regarding an incident that occurred on April 13, 2007, in which it was

reported that:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. THE
> ENGINE STALLED WITHOUT WARNING AND CAUSED
> ANOTHER VEHICLE TO CRASH INTO THE VEHICLE. THE
> VEHICLE WAS ABLE TO RESTART A FEW MINUTES
> AFTER THE CRASH. THE DEALER AND MANUFACTURER
> WAS UNABLE TO DIAGNOSE THE FAILURE. THE
> MANUFACTURER HAD THE VEHICLE INSPECTED BY A
> CADILLAC SPECIALIST WHO WAS UNABLE TO
> DIAGNOSE THE FAILURE. THE DEALER UPDATED THE
> COMPUTER FOUR TIMES, BUT THE ENGINE CONTINUED
> TO STALL. THE CURRENT AND FAILURE MILEAGES
> WERE 48,000.  NHTSA ID Number: 10188245.

607.   New GM knew of a September 20, 2007 complaint filed with NHTSA involving a

2007 Cadillac CTS, in connection with an incident that occurred on January 1, 2007, in which it

was reported that:

> TL*THE CONTACT OWNS A 2007 CADILLAC CTS. WHILE
> DRIVING 40 MPH, THE VEHICLE SHUT OFF WITHOUT
> WARNING. THE FAILURE OCCURRED ON FIVE SEPARATE
> OCCASIONS. THE DEALER WAS UNABLE TO DUPLICATE
> THE FAILURE. AS OF SEPTEMBER 20, 2007, THE DEALER
> HAD NOT REPAIRED THE VEHICLE. THE POWERTRAIN
> WAS UNKNOWN. THE FAILURE MILEAGE WAS 2,000 AND
> CURRENT MILEAGE WAS 11,998.  NHTSA ID Number:
> 10203516.

608.   New GM knew of a September 24, 2007 complaint filed with NHTSA involving a

2004 Cadillac SRX, regarding an incident that occurred on January 1, 2005, in which the

following was reported:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. WHILE
> DRIVING 5 MPH OR GREATER, THE VEHICLE WOULD
> SHUT OFF WITHOUT WARNING. THE DEALER STATED
> THAT THE BATTERY CAUSED THE FAILURE AND THEY

- 323 -

REPLACED THE BATTERY. APPROXIMATELY EIGHT
MONTHS LATER, THE FAILURE RECURRED. THE DEALER
STATED THAT THE BATTERY CAUSED THE FAILURE
AND REPLACED IT A SECOND TIME. APPROXIMATELY
THREE MONTHS LATER, THE FAILURE OCCURRED
AGAIN. SHE WAS ABLE TO RESTART THE VEHICLE. THE
DEALER WAS UNABLE TO DUPLICATE THE FAILURE,
HOWEVER, THEY REPLACED THE CRANK SHAFT
SENSOR. THE FAILURE CONTINUES TO PERSIST. AS OF
SEPTEMBER 24, 2007, THE DEALER HAD NOT REPAIRED
THE VEHICLE. THE POWERTRAIN WAS UNKNOWN. THE
FAILURE MILEAGE WAS 8,000 AND CURRENT MILEAGE
WAS 70,580.  NHTSA ID Number: 10203943.

609.   New GM knew of a June 18, 2008 complaint filed with NHTSA involving a 2006

Cadillac CTS and an incident that occurred on June 17, 2008, in which it was reported that:

TL*THE CONTACT OWNS A 2006 CADILLAC CTS. WHILE
DRIVING 60 MPH AT NIGHT, THE VEHICLE SHUT OFF
AND LOST TOTAL POWER. WHEN THE FAILURE
OCCURRED, THE VEHICLE CONTINUED TO ROLL AS IF IT
WERE IN NEUTRAL. THERE WERE NO WARNING
INDICATORS PRIOR TO THE FAILURE. THE CONTACT
FEELS THAT THIS IS A SAFETY HAZARD BECAUSE IT
COULD HAVE RESULTED IN A SERIOUS CRASH. THE
VEHICLE WAS TAKEN TO THE DEALER TWICE FOR
REPAIR FOR THE SAME FAILURE IN FEBURARY OF 2008
AND JUNE 17, 2008. THE FIRST TIME THE CAUSE OF THE
FAILURE WAS IDENTIFIED AS A GLITCH WITH THE
COMPUTER SWITCH THAT CONTROLS THE
TRANSMISSION. AT THE SECOND VISIT, THE SHOP
EXPLAINED THAT THEY COULD NOT IDENTIFY THE
FAILURE. IT WOULD HAVE TO RECUR IN ORDER FOR
THEM TO DIAGNOSE THE FAILURE PROPERLY. THE
CURRENT AND FAILURE MILEAGES WERE 43,000.
NHTSA ID Number: 10231507.

610.   New GM knew of an October 14, 2008 complaint filed with NHTSA involving a

2008 Cadillac CTS and an incident that occurred on April 5, 2008, in which it was reported that:

WHILE DRIVING MY 2008 CTS, WITH NO ADVANCE
NOTICE, THE ENGINE JUST DIED. IT SEEMED TO RUN
OUT OF GAS. MY FUEL GAUGE READ BETWEEN 1/2 TO

3/4 FULL. THIS HAPPENED 3 DIFFERENT OCCASIONS. ALL 3 TIMES I HAD TO HAVE IT TOWED BACK TO THE DEALERSHIP THAT I PURCHASED THE CAR FROM. ALL 3 TIMES I GOT DIFFERENT REASONS IT HAPPENED, FROM BAD FUEL PUMP IN GAS TANK, TO SOME TYPE OF BAD CONNECTION, ETC. AFTER THIS HAPPENED THE 3RD TIME, I DEMANDED A NEW CAR, WHICH I RECEIVED. I HAVE HAD NO PROBLEMS WITH THIS CTS, RUNS GREAT. *TR  NHTSA ID Number: 10245423.

611.   New GM knew of a November 13, 2008 complaint with NHTSA regarding a

2001 Oldsmobile Intrigue, and an incident that occurred on July 1, 2004, in which the following

was reported:

L*THE CONTACT OWNS A 2001 OLDSMOBILE INTRIGUE. WHILE DRIVING 35 MPH, THE VEHICLE CONTINUOUSLY STALLS AND HESITATES. IN ADDITION, THE INSTRUMENT PANEL INDICATORS WOULD ILLUMINATE AT RANDOM. THE VEHICLE FAILED INSPECTION AND THE CRANKSHAFT SENSOR WAS REPLACED, WHICH HELPED WITH THE STALLING AND HESITATION; HOWEVER, THE CHECK ENGINE INDICATOR WAS STILL ILLUMINATED. DAYS AFTER THE CRANKSHAFT SENSOR WAS REPLACED, THE VEHICLE FAILED TO START. HOWEVER, ALL OF THE INSTRUMENT PANEL INDICATORS FLASHED ON AND OFF. AFTER NUMEROUS ATTEMPTS TO START THE VEHICLE, HE HAD IT JUMPSTARTED. THE VEHICLE WAS THEN ABLE TO START. WHILE DRIVING HOME, ALL OF THE LIGHTING FLASHED AND THE VEHICLE SUDDENLY SHUT OFF. THE VEHICLE LOST ALL ELECTRICAL POWER AND POWER STEERING ABILITY. THE CONTACT MANAGED TO PARK THE VEHICLE IN A PARKING LOT AND HAD IT TOWED THE FOLLOWING DAY TO A REPAIR SHOP. THE VEHICLE IS CURRENTLY STILL IN THE SHOP. THE VEHICLE HAS BEEN RECALLED IN CANADA AND HE BELIEVES THAT IT SHOULD ALSO BE RECALLED IN THE UNITED STATES. THE FAILURE MILEAGE WAS UNKNOWN AND THE CURRENT MILEAGE WAS 106,000.  **NHTSA ID Number:** 10248694.

612.     New GM knew of a December 10, 2008 complaint filed with NHTSA regarding a

2004 Oldsmobile Alero and an incident that occurred on December 10, 2008, in which the

following was reported:

> I WAS DRIVING DOWN THE ROAD IN RUSH HOUR GOING
> APPROX. 55 MPH AND MY CAR COMPLETELY SHUT OFF,
> THE GAUGES SHUT DOWN, LOST POWER STEERING. HAD
> TO PULL OFF THE ROAD AS SAFELY AS POSSIBLE,
> PLACE VEHICLE IN PARK AND RESTART CAR. MY CAR
> HAS SHUT DOWN PREVIOUSLY TO THIS INCIDENT AND
> FEEL AS THOUGH IT NEEDS SERIOUS INVESTIGATION. I
> COULD HAVE BEEN ON THE HIGHWAY AND BEEN
> KILLED. THIS ALSO HAS HAPPENED WHEN IN A SPIN
> OUT AS WELL THOUGH THIS PARTICULAR INCIDENT
> WAS RANDOM. *TR  **NHTSA ID Number:** 10251280.

613.     New GM knew of a March 31, 2009 complaint filed with NHTSA regarding a

2005 Chevrolet Malibu incident that occurred on May 30, 2008, in which it was reported that:

> TL*THE CONTACT OWNS A 2005 CHEVROLET MALIBU.
> THE CONTACT STATED THAT THE POWER WINDOWS,
> LOCKS, LINKAGES, AND IGNITION SWITCH
> SPORADICALLY BECOME INOPERATIVE. SHE TOOK THE
> VEHICLE TO THE DEALER AND THEY REPLACED THE
> IGNITION SWITCH AT THE COST OF $495. THE
> MANUFACTURER STATED THAT THEY WOULD NOT
> ASSUME RESPONSIBILITY FOR ANY REPAIRS BECAUSE
> THE VEHICLE EXCEEDED ITS MILEAGE. ALL REMEDIES
> AS OF MARCH 31, 2009 HAVE BEEN INSUFFICIENT IN
> CORRECTING THE FAILURES. THE FAILURE MILEAGE
> WAS 45,000 AND CURRENT MILEAGE WAS 51,000.  **NHTSA
> ID Number:** 10263716.

614.     The defects did not get any safer and the reports did not stop when Old GM

ceased to exist.  To the contrary, New GM continued receiving the same reports involving the

same defects.  For example, on August 11, 2010, New GM became aware of the following

complaint filed with NHTSA involving a 2005 Cadillac CTS incident that occurred on May 15,

2010, in which it was reported:

TL*THE CONTACT OWNS A 2005 CADILLAC CTS. WHILE
DRIVING 40 MPH, ALL OF THE SAFETY LIGHTS ON THE
DASHBOARD ILLUMINATED WHEN THE VEHICLE
STALLED. THE VEHICLE WAS TURNED BACK ON IT
BEGAN TO FUNCTION NORMALLY. THE FAILURE
OCCURRED TWICE. THE DEALER WAS CONTACTED AND
THEY STATED THAT SHE NEEDED TO BRING IT IN TO
HAVE IT DIAGNOSED AGAIN. THE DEALER PREVIOUSLY
STATED THAT THEY WERE UNABLE TO DUPLICATE THE
FAILURE. THE VEHICLE WAS NOT REPAIRED. THE
FAILURE MILEAGE WAS 4100 AND THE CURRENT
MILEAGE WAS 58,000.  NHTSA ID Number: 10348743.

615.    On April 16, 2012, New GM became aware of a complaint filed with NHTSA

involving a 2005 Cadillac SRX and an incident that occurred on March 31, 2012, in which the

following was reported:

TL* THE CONTACT OWNS A 2005 CADILLAC SRX. WHILE
DRIVING APPROXIMATELY 45 MPH, THE CONTACT
STATED THAT THE STEERING BECAME DIFFICULT TO
MANEUVER AND HE LOST CONTROL OF THE VEHICLE.
THERE WERE NO WARNING LIGHTS ILLUMINATED ON
THE INSTRUMENT PANEL. THE CONTACT THEN
CRASHED INTO A HIGHWAY DIVIDER AND INTO
ANOTHER VEHICLE. THERE WERE NO INJURIES. THE
VEHICLE WAS TOWED TO AN AUTO CENTER AND THE
MECHANIC STATED THAT THERE WAS A RECALL
UNDER NHTSA CAMPAIGN ID NUMBER 06V125000
(SUSPENSION:REAR), THAT MAY BE RELATED TO THE
FAILURE. THE MANUFACTURER WAS MADE AWARE OF
THE FAILURE AND STATED THAT THE VIN WAS NOT
INCLUDED IN THE RECALL. THE VEHICLE WAS NOT
REPAIRED. THE APPROXIMATE FAILURE MILEAGE WAS
46,000.  NHTSA ID Number: 10455394.

616.    On March 20, 2013, New GM became aware of a complaint filed with NHTSA

regarding a 2003 Chevrolet Impala incident that occurred on March 1, 2013, in which it was

reported that:

CAR WILL SHUT DOWN WHILE DRIVING AND SECURITY
LIGHT WILL FLASH. HAS DONE IT NUMEROUS TIMES,

> WORRIED IT WILL CAUSE AN ACCIDENT. THERE ARE
> MULTIPLE CASES OF THIS PROBLEM ON INTERNET. *TR
> **NHTSA ID Number:** 10503840.

617.    On May 12, 2013, New GM became aware of the following complaint filed with

NHTSA regarding a 2005 Chevrolet Malibu incident that occurred on May 11, 2012, in which

the following was reported:

> I WAS AT A STOP SIGN WENT TO PRESS GAS PEDAL TO
> TURN ONTO ROAD AND THE CAR JUST SHUT OFF NO
> WARNING LIGHTS CAME ON NOR DID IT SHOW ANY
> CODES. GOT OUT OF CAR POPPED TRUNK PULLED
> RELAY FUSE OUT PUT IT BACK IN AND IT CRANKED
> UP,THEN ON MY WAY HOME FROM WORK,GOING
> ABOUT 25 MPH AND IT JUST SHUT DOWN AGAIN,I
> REPEATED PULLING OUT RELAY FUSE AND PUT IT BACK
> IN THEN WAITED A MINUTE THEN IT CRANKED AND I
> DROVE STRAIGHT HOME. *TR  **NHTSA ID**
> **Number:** 10458198.

618.    On February 26, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2004 Pontiac Grand Prix, concerning an incident that occurred on May 10, 2005, in

which it was reported that:

> TL—THE CONTACT OWNS A 2004 PONTIAC GRAND PRIX.
> THE CONTACT STATED THAT WHILE DRIVING AT
> VARIOUS SPEEDS AND GOING OVER A BUMP, THE
> VEHICLE WOULD STALL WITHOUT WARNING. THE
> VEHICLE WAS TAKEN TO THE DEALER. THE
> TECHNICIAN WAS UNABLE TO DIAGNOSE THE FAILURE.
> THE MANUFACTURER WAS MADE AWARE OF THE
> FAILURE. THE VEHICLE WAS NOT REPAIRED. THE VIN
> WAS NOT AVAILABLE. THE FAILURE MILEAGE WAS
> 12,000 AND THE CURRENT MILEAGE WAS 82,000. KMJ
> NHTSA ID Number: 10566118.

619.    On March 13, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Pontiac Grand Prix and an incident that occurred on February 27, 2014, in

which a driver reported:

I WAS DRIVING HOME FROM WORK AND WHEN I
TURNED A CORNER, THE ENGINE CUT OUT. I BELIEVE IT
WAS FROM THE KEY FLIPPING TO ACCESSORY. I'VE
HEARD THAT THIS HAS CAUSED CRASHES THAT HAVE
KILLED PEOPLE AND WOULD LIKE THIS FIXED. THIS IS
THE FIRST TIME IT HAPPENED, BUT NOW I'M WORRIED
EVERY TIME I DRIVE IT THAT THIS IS GOING TO HAPPEN
AND I DON'T FEEL SAFE LETTING MY WIFE DRIVE THE
CAR NOW. WHY ARE THE 2006 PONTIAC GRAND PRIX
VEHICLES NOT PART OF THE RECALL FROM GM? *TR
NHTSA ID Number: 10569215.

620.    On April 1, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2003 Cadillac CTS and an incident that occurred on January 1, 2008, in which the

following was reported:

TL* THE CONTACT OWNS A 2003 CADILLAC CTS. THE
CONTACT STATED THAT THE VEHICLE EXHIBITED A
RECURRING STALLING FAILURE. THE VEHICLE WAS
TAKEN TO THE DEALER NUMEROUS TIMES WHERE
SEVERAL UNKNOWN REPAIRS WERE PERFORMED ON
THE VEHICLE BUT TO NO AVAIL. THE FAILURE
MILEAGE WAS 59,730 AND THE CURRENT MILEAGE WAS
79,000. UPDATED 06/30/14 MA UPDATED 07/3/2014 *JS
NHTSA ID Number: 10576468.

621.    On April 1, 2014, New GM became aware of a complaint with NHTSA regarding

a 2003 Chevrolet Monte Carlo and an incident that occurred on September 16, 2013, in which

the following was reported:

WHILE DRIVING AT ANY SPEED THE IGNITION SYSTEM
WOULD RESET LIGHTING UP THE DISPLAY CLUSTER
JUST AS IF THE KEY WAS TURNED OFF AND BACK ON.
THIS WOULD CAUSE A MOMENTARY SHUTDOWN OF
THE ENGINE. THE PROBLEM SEEMED TO BE MORE
PREVAILANT WHILE TURNING THE WHEEL FOR A
CURVE OR TURN OFF THE ROAD. THE TURN SIGNAL
UNIT WAS FIRST SUSPECT SINCE IT SEEMED TO
CORRELATE WITH APPLYING THE TURN SIGNAL AND
TURNING THE WHEEL. THE CONDITION WORSENED TO
THE IGNITION SHUTDOWN FOR LONGER PERIODS

> SHUTTING DOWN THE ENGINE CAUSING STEERING AND
> BRAKING TO BE SHUT DOWN AND FINALLY DIFFICULTY
> STARTING THE CAR. AFTER 2 VISITS TO A GM SERVICE
> CENTER THE PROBLEM WAS FOUND TO BE A FAULTY
> IGNITION THAT WAS REPLACED AND THE PROBLEM
> HAS NOT RECURRED.  **NHTSA ID Number:** 10576201.

622.    On April 8, 2014, New GM became aware of a complaint with NHTSA regarding

a 2003 Chevrolet Impala and an incident that occurred on August 14, 2011, in which the

following was reported:

> I HAVE HAD INCIDENTS SEVERAL TIMES OVER THE
> YEARS WHERE I WOULD HIT A BUMP IN THE ROAD AND
> MY CAR WOULD COMPLETLY SHUT OFF. I HAVE ALSO
> HAD SEVERAL INCIDENTS WHERE I WAS TRAVELING
> DOWN THE EXPRESSWAY AND MY CAR TURNED OFF ON
> ME. I HAD TO SHIFT MY CAR INTO NEUTRAL AND
> RESTART IT TO CONTINUE GOING. I WAS FORTUNATE
> NOT TO HAVE AN ACCIDENT.  **NHTSA ID
> Number:** 10578158.

623.    On May 14, 2014, New GM became aware of a complaint filed with NHTSA

regarding a 2004 Chevrolet Impala incident that occurred on April 5, 2013, in which it was

reported that:

> CHEVY IMPALA 2004 LS- THE VEHICLE IS STOPPING
> COMPLETELY WHILE DRIVING OR SITTING AT
> INTERSECTION. THERE IS NO WARNING, NO MESSAGE,
> IT JUST DIES. THE STEERING GOES WHEN THIS HAPPENS
> SO I CANNOT EVEN GET OFF THE ROAD. THEN THERE
> ARE TIMES THAT THE CAR WILL NOT START AT ALL
> AND I HAVE BEEN STRANDED. EVENTUALLY AFTER
> ABOUT 20 MINUTES THE CAR WILL START- I HAVE
> ALREADY REPLACED THE STARTER BUT THE PROBLEM
> STILL EXISTS. I HAVE HAD THE CAR CHECKED OUT AT 2
> DIFFERENT SHOPS (FIRESTONE) AND THEY CANNOT
> FIND THE PROBLEM. THERE ARE NO CODES COMING UP.
> THEY ARE COMPLETELY PERPLEXED. CHEVY STATES
> THEIR MECHANICS ARE BETTER. ALSO THE CLUSTER
> PANEL IS GONE AND CHEVY IS AWARE OF THE
> PROBLEM BUT THEY ONLY RECALLED CERTAIN

MODELS AND DID NOT INCLUDE THE IMPALAS. I HAVE 2
ESTIMATES REGARDING FIXING THIS PROBLEM BUT
THE QUOTES ARE $500.00. I DO NOT FEEL THAT I
SHOULD HAVE TO PAY FOR THIS WHEN CHEVY KNEW
THEY HAD THIS PROBLEM WITH CLUSTER PANELS AND
OMITTED THE IMPALAS IN THEIR RECALL. SO, TO
RECAP: THE CAR DIES IN TRAFFIC (ALMOST HIT TWICE),
I DO NOT KNOW HOW MUCH GAS I HAVE, HOW FAST I
AM GOING, OR IF THE CAR IS OVERHEATING. IN
DEALING WITH CHEVY I WAS TOLD TO TAKE THE CAR
TO A CHEVY DEALERSHIP. THEY GAVE ME A PLACE
THAT IS 2 1/2 HOURS HOUSE AWAY FROM MY HOME. I
WAS ALSO TOLD THAT I WOULD HAVE THE HONOR OF
PAYING FOR THE DIAGNOSTICS. IN RESEARCHING THIS
PROBLEM, I HAVE PULLED UP SEVERAL COMPLAINTS
FROM OTHER CHEVY IMPALA 2004 OWNERS THAT ARE
EXPERIENCING THE SAME MULTIPLE PROBLEMS. I ALSO
NOTICED THAT MOST OF THE COMPLAINTS ARE
STATING THAT THE SAME ISSUES OCCURRED AT
APPROX. THE SAME MILEAGE AS MINE. I HAVE
DISCUSSED THIS WITH CHEVY CUSTOMER SERVICE
AND BASICALLY THAT WAS IGNORED. THIS CAR IS
HAZARDOUS TO DRIVE AND POTENTIALLY WILL CAUSE
BODILY HARM. DEALING WITH CHEVY IS POINTLESS.
ALL THEY CAN THINK OF IS HOW MUCH MONEY THEIR
DEFECTS WILL BRING IN. *TR  **NHTSA ID
Number:** 10512006.

624.    New GM has publicly admitted that it was aware of at least seven (7) crashes,

eight (8) injuries, and three (3) deaths linked to this serious safety defect before deciding to

finally implement a recall.  However, in reality, the number of reports and complaints is much

higher.

625.    Moreover, notwithstanding years of notice and knowledge of the defect, on top of

numerous complaints and reports from consumers, including reports of crashes, injuries, and

deaths, New GM delayed and did not implement a recall involving this defect until July of 2014.

626.    New GM replicated the "knee to key" report in 2012 causing inadvertent key

rotation and a running stall.  New GM recalled all of the CTS and SRX models and gave out new

keys to those that did not have "hole" keys, and two key rings so the fob could be kept on one, and the ignition key on another.  New GM's supposed recall fix does not address the defect or the safety risks that it poses, including insufficient amount of torque to resist rotation from the "run" to "accessory" position under reasonably foreseeable conditions, and puts the burden on drivers to alter their behavior and carry their ignition keys separately from their other keys, and even from their remote fob.  The real answer must include the replacement of all the switches with ones that have sufficient torque to resist foreseeable rotational forces.  The consequences of an unwanted rotation from the "run" to "accessory" position are the same in all these cars:  loss of power (stalling), loss of power steering, loss of power brakes after one or two depressions of the brake pedal, and suppression of seat belt pretensioners and airbag deployments.

627.    In addition, New GM is not addressing the other design issues that create safety risks in connection with this defect.  New GM is not altering the algorithm that prevents the airbags from deploying when the ignition leaves the "run" position, even when the vehicle is moving.  And New GM is not altering the placement of the ignition in an area where the driver's knees may inadvertently cause the ignition to move out of the "run" position.  Moreover, notwithstanding years of notice and knowledge of the defect, on top of numerous complaints and reports from consumers, including reports of crashes, injuries, and deaths, New GM delayed and did not implement a recall involving this defect until July of 2014.

**4.    "Knee-to-key" Camaro Safety Recall 14v346.**

628.    On June 19, 2014, New GM recalled 464,712 model year 2010 through 2014 Chevrolet Camaro vehicles in the United States (NHTSA Recall Number 14V-346).

629.     The great majority of the defective Camaros were made and sold by New GM, though some indeterminate number of the 117,959 model year 2010 Camaros were manufactured by Old GM, and some smaller number were sold by Old GM.

630.     New GM has described the defect as follows:  "The ignition switch may move from the RUN position due to driver knee interaction."  Thus, New GM has admitted that all models involved in Safety Recall 14v346 have a common defect.

631.     Internally, New GM described the *effect* of the defect as follows:  "This will result in a partial loss of electrical power and turn off the engine.  Power steering/braking will be affected and the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury or fatality."  Thus, New GM has admitted that the effect of the defect is the same for all models involved in Safety Recall 14v346.

632.     New GM's June 19, 2014 letter to NHTSA described the risk as follows:  "There is a risk, under certain conditions, that some drivers may bump the ignition key with their knee and unintentionally move the key away from the 'run' position.  If this occurs, engine power, and power braking will be affected and power steering may be affected, increasing the risk of a crash.  The timing of the key movement out of the 'run' position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes."

633.     The model year 2010-2014 Camaro had a "flip key" in which the key blade is incorporated into an RKE transmitter.  The blade is hidden in the RKE until the driver pushes a button and the blade flips out.

634.     During a Spring 2014 read-across conducted as a result of the Cobalt/Delta ISD recall, New GM personnel found that the 2010-2014 Camaro had inadequate clearance between

- 333 -

the key and the driver's knee.[147]  When low clearance is combined with a key fob that is integrated with the blade and oriented at 124 degrees, a tall driver's knee can easily turn the key when he's seated in a "normal" position:[148]

 

Camaro: Gen I flip key shown in RUN position, approximately 124 degrees CW from vertical.

Camaro: 6' 3" occupant, foot on brake pedal, knee to key distance = 30 mm

635.    In addition to very tall drivers, New GM found that drivers of varying heights could also easily turn the Camaro key with their knees when seated in an abnormal position:[149]

| Vehicle | Knee Key | | | | | |
|---|---|---|---|---|---|---|
| | 5th Percentile Female | | 50th Percentile Male | | 95th Percentile Male | |
| | Ease | Normal | Ease | Normal | Ease | Normal |
| Buick Verano (14) | Impossible | NA | Easy | No | Impossible | NA |
| Buick Verano (15) | Impossible | NA | Easy | No | Impossible | NA |
| Buick Lacrosse | Impossible | NA | Easy | No | Impossible | NA |
| Buick Regal | Impossible | NA | Impossible | NA | Impossible | NA |
| Chevy Cruze (14) | Impossible | NA | DNE | DNE | Impossible | NA |
| Chevy Cruze (16) | Medium | No | Easy | No | Easy | Yes |
| Chevy Spark | Impossible | NA | Impossible | Broke Key | Impossible | No |
| M2XX Spark | Easy | | Easy | | Easy | Yes |
| Chevy Spark | Impossible | NA | Medium | No | Im... | ... |
| Chevy Camaro | Easy | No | Easy | No | Easy | Yes |
| Chevy Impala (14) | Difficult | No | Easy | No | Impossible | NA |
| Chevy Impala (15) | Easy | No | Easy | No | Impossible | NA |

<hr>

[147]  GM-MDL2453-10013440.

[148]  GM-MDL2453-10013440.

[149]  GM-MDL2543-10013376.  As part of these preliminary tests, GM also found that turning was easy for 95% males in a normal position in the Chevy Cruze, M2XX Spark, and Chevy Colorado/GMC Canyon. GM's plan was to implement the same solution in these vehicles as for the Camaro.  We have not studied whether this was implemented for these vehicles, but they are not included in this recall.

636.    GM also tested the torque on the Camaro ignition, with one test finding that the torque values in the Camaro were close to 11 NCm.[150]

637.    Between 2010 and 2014, NHTSA received numerous complaints of power failures in 2010-2014 Camaros.  These complaints started as early as January 2010, months after New GM's formation.

638.    One complainant described an incident in which his model year 2010 Camaro lost all power while he was driving 55-65 mph down a mountain road in heavy traffic.  The complainant was able to stop the vehicle by jamming it into a guardrail.  He stated that he was lucky he was not killed.  When he notified his dealership, however, they told him there was nothing wrong with the vehicle.

639.    Another complainant, in May 2010, described several instances in which his moving Camaro's power failed, including one instance in which he was driving on the highway at 70 mph.  This complainant concluded his report by asking, "Will I have a head[-]on collision while trying to pass another car?"

640.    Between 2010 and 2014, NHTSA received numerous complaints reporting engine stalls during normal and regular Camaro operations.

641.    For example, on May 3, 2010, New GM became aware of a complaint filed with NHTSA involving a 2010 Camaro in which the following was reported:

> WHILE DRIVING TO THE DEALERSHIP IN BROOKDALE,
> MN. ON FREEWAY APPROX 70MPH WHEN CAR
> COMPLETELY GOES DEAD. QUICKLY I PUT IT IN
> NEUTRAL AND TURNED IT BACK ON AND COMPLAINED
> TO DEALER. DRIVING IN ST CLOUD, MN AT INTOWN
> SPEEDS WHEN THE CAR SHUTS DOWN AGAIN. THEN IT
> ALSO SHUT DOWN TWICE ON ME IN BRAINERD, MN AT

---

[150] GM-MDL2543-001350437.

> A SPEED OF 50MPH WHILE DRIVING NORMAL. THEN ON
> 3 MAY 2010 I WAS GOING AROUND A CURVE WITH 2
> FRIENDS WHEN IT AGAIN SHUT DOWN AT
> APPROXIMATELY 60 MPH. THIS TIME WHILE ON THE
> CURVE I WENT INTO THE DITCH AND HIT A MAIL BOX.
> THUS CAUSING DAMAGE TO THE RIGHT FRONT OF THE
> CAR. THE CAR WAS TOWED AND IS PRESENTLY AT THE
> DEALERSHIP IN BRAINERD, MN. THIS CAR IS TO
> DANGEROUS TO DRIVE; WILL I HAVE A HEAD[-]ON
> COLLISION WHILE TRYING TO PASS ANOTHER CAR?

642.   On October 20, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

> 2010 CHEVROLET CHEVY CAMARO V6, SUDDEN LOSS OF
> POWER, COMPLETE ELECTRICAL FAILURE, AND ENGINE
> SHUTDOWN WHILE DRIVING 30 MPH IN SUBDIVISION.
> PULLED TO SIDE OF ROAD. TURNED CAR "OFF" AND
> BACK ON. DROVE TO DEALER WHO SAID THEY COULD
> FIND NO PROBLEM AND NOTHING RECORDED IN CAR'S
> COMPUTER. GOOGLED RECALL OF V8 TO SHOW
> DEALER, BUT DEALER SAID THIS WAS UNRELATED.

643.   On March 6, 2012, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

> WHILE DRIVING VEHICLE FIRST SHUT OFF AT A RED
> LIGHT FOR NO REASON ON FEB 28 2012 SAME INCIDENT
> ON MARCH 1ST SHUT OFF A RED LIGHT THIRD TIME IT
> WAS WHILE DRIVING 10 MPH MAKING A TURN IN A
> PARKING SPOT. WAS ABLE TO TURN BACK CAR ON
> WITH NO PROBLEMS BUT IT IS OF GREAT CONCERN
> NOW IF THIS SHOULD HAPPEN AT A HIGH SPEED I AM
> SURE CAR CAN CAUSE INJURIES TO OTHERS AS WELL
> AS MYSELF.

644.   On October 9, 2012, New GM became aware of a complaint filed with NHTSA

involving a 2012 Camaro in which the following was reported:

> THE CONTACT OWNS A 2012 CHEVROLET CAMARO. THE
> CONTACT STATED THAT WHILE DRIVING 50 MPH, THE
> VEHICLE STALLED WITHOUT WARNING. THE CONTACT
> WAS ABLE TO RESTART THE VEHICLE. THE

> MANUFACTURER WAS CONTACTED AND HAD THE
> VEHICLE TOWED TO A LOCAL DEALER. THE DEALER
> RESET THE COMPUTER BUT THE REPAIR DID NOT
> REMEDY THE ISSUE. THE CONTACT TOOK THE VEHICLE
> BACK TO THE DEALER WHERE THE DEALER RESET THE
> COMPUTER A SECOND TIME. THE DEALER ALSO DROVE
> THE VEHICLE FOR ONE HUNDRED MILES AND COULD
> NOT DUPLICATE THE STALLING ISSUE. THE VEHICLE
> CONTINUED TO STALL SPORADICALLY. THE FAILURE
> MILEAGE WAS 4,200.

645.    On July 3, 2013, New GM became aware of a complaint filed with NHTSA

involving a 2013 Camaro in which the following was reported:

> THE CONTACT OWNS A 2013 CHEVROLET CAMARO. THE
> CONTACT STATED THAT WHILE DRIVING
> APPROXIMATELY 55 MPH, THE VEHICLE STALLED
> WITHOUT WARNING. THE CONTACT MENTIONED THAT
> THE FAILURE WOULD RECUR INTERMITTENTLY. THE
> VEHICLE WAS TAKEN TO A DEALER FOR A DIAGNOSTIC
> WHERE THE FAILURE WAS UNABLE TO BE REPLICATED.
> THE MANUFACTURER WAS NOTIFIED OF THE FAILURE.
> THE APPROXIMATE FAILURE MILEAGE WAS 1,460 AND
> THE CURRENT MILEAGE WAS 1,800.

646.    On August 4, 2013, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

> I PURCHASED MY 2010 CHEVY CAMARO 2SS, IN
> FEBRUARY OF 2012. IT HAD 4,400 MILES ON IT. ABOUT A
> MONTH OR TWO, AFTER I BOUGHT IT, IT COMPLETELY
> SHUT OFF ON ME, ON A MAJOR HIGHWAY, WHILE
> DOING 65 MPH. I THREW IT INTO NEUTRAL AND TURNED
> THE KEY AND IT STARTED RIGHT BACK UP. ABOUT A
> MONTH AFTER THAT, I WAS DOING ABOUT 20MPH ON A
> BACK ROAD AND IT DID THE SAME EXACT THING. JUST
> RECENTLY, ABOUT 2 WEEKS AGO, I WAS IN 6TH GEAR,
> ON CRUISE DOING 60MPH AND I FELT THE CAR "JERK"
> OR BUCK" A LITTLE BIT. FOLLOWED IMMEDIATELY BY
> THE CAR DECELERATING. I DOWN-SHIFTED TO 4TH
> GEAR AND WAS GIVING IT GAS, BUT STILL WOULDN'T
> SPEED UP. IT FELL DOWN TO ABOUT 40MPH, BEFORE
> FINALLY CATCHING ITSELF AND SPEEDING BACK UP.

ABOUT A MILE LATER, I GOT OFF MY EXIT AND WAS
COMING DOWN TO THE STOP SIGN,WHEN ALL THE
INDICATOR LIGHTS CAME ON FOR ABOUT 10 SECONDS.
THEY WENT OFF AND I MADE A LEFT HAND TURN AND
WENT ABOUT A MILE UP THE ROAD. AT THAT POINT,
THE CAR COMPLETELY SHUT OFF DOING ABOUT 35MPH.
THERE WAS HEAVY TRAFFIC, SO I PULLED OVER AND
STARTED IT BACK UP. I CALLED THE CHEVY
DEALERSHIP, WHERE I BOUGHT IT FROM, AND THEY
HAD NO OPENINGS FOR A WEEK. SO I TOOK IT LAST
WEEK TO GET IT CHECKED AND THEY FOUND NOTHING
THAT COULD HAVE CAUSED IT, THEY SAY. I AM VERY
UPSET, BUT VERY THANKFUL THAT MY TWO CHILDREN
WERE NOT WITH ME WHEN IT HAPPENED. I AM
CURRENTLY CONTEMPLATING TRADING IT IN, CUZ I AM
WORRIED THAT IF IT HAPPENS AGAIN,AND MY
CHILDREN ARE IN THE CAR, THAT IT MIGHT SHUT OFF
IN VERY CONGESTED BUMPER TO BUMPER TRAFFIC, ON
THE HIGHWAY AT NIGHT, AND A TRACTOR TRAILER IS
BEHIND ME AND I CAN'T GET IT STARTED OR SOMEONE
DOESN'T SEE ME CUZ MY LIGHTS WOULD BE OFF. THE
THOUGHT OF THAT COMPLETELY SCARES ME.

647.    On September 28, 2013, New GM became aware of a complaint filed with

NHTSA involving a 2010 Camaro in which the following was reported:

THE CONTACT OWNS A 2010 CHEVROLET CAMARO. THE
CONTACT STATED THAT WHILE DRIVING 5 MPH AND
MAKING A TURN, THE VEHICLE STALLED WITHOUT
WARNING. THE CONTACT WAS ABLE TO RESTART THE
VEHICLE BUT THE FAILURE RECURRED. THE VEHICLE
WAS TAKEN TO A DEALER WHO PERFORMED A
DIAGNOSTIC AND REPLACED A COMPONENT TO
CORRECT THE FAILURE. THE CONTACT WAS UNABLE
TO DETERMINE THE EXACT COMPONENT HOWEVER,
THE FAILURE RECURRED WITHOUT WARNING. THE
VEHICLE WAS TAKEN TO DEALER HOWEVER, NO
FAILURE WAS DETERMINED. THE MANUFACTURER WAS
MADE AWARE OF THE ISSUE AND AN INCIDENT
RECORDER WAS INSTALLED ON THE VEHICLE TO
DETERMINE ANY FUTURE FAILURES. THE FAILURE
MILEAGE WAS 23,000. THE CURRENT MILEAGE WAS
24,000.

648.    On October 2, 2013, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

> I REACHED OUT TO [XXX], GM CEO ON MAY 24, 2013
> WITH A STRONG CONCERNS OF POWER FAILURE FOR
> THE 2ND TIME WHILE DRIVING THE VEHICLE; CAUSING
> ME NOT TO HAVE CONTROL WHILE THE VEHICLE WAS
> DRIVEN. THUS IT WAS ALSO NOTED THAT I ORIGINALLY
> REACHED OUT TO GM TO REQUEST A REPLACED
> VEHICLE WHILE MY VEHICLE WAS UNDER WARRANTY
> DUE TO THE VEHICLE LOSING POWER ON A MAJOR
> FREEWAY; WHICH WAS LIFE THREATENING; HOWEVER
> THE RESPONSE BACK FROM GM WAS A DECLINED
> LETTER THAT I RECEIVED ENSURING ME THAT THE
> VEHICLE WAS SAFE TO DRIVE. I TRAVEL MAJOR
> FREEWAYS AS PART OF CAREER SO HAVING A
> RELIABLE VEHICLE IS IMPERATIVE AS FOR I VALUE MY
> LIFE. [XXX], SENIOR VICE PRESIDENT OF GLOBAL
> QUALITY & CUSTOMER EXPERIENCE HAS NOT
> RETURNED MY CALLS AND NOW GM IS ALSO NOT
> HONORING THE WARRANTY TOO. AFTER ASSISTING ME
> WITH MY CAR FOR 5 MONTHS .PLEASE NOT MY 2010
> CAMARO SS IS PARK AS FOR IT'S NOT SAFE TO DRIVE.
> GM OFFER ME A CONTRACT TO SIGN THAT WOULD
> GUARANTEE "NO FAULT TO GM ". I COULDN'T NOT DUE
> THEM SHOULD MY CAMARO HARM MYSELF OR OTHERS
> WHILE DRIVING IT. ADDITIONALLY, I WAS TOLD THAT
> GM KNOWS THERE IS A PROBLEM WITH THE CAMARO
> BUT CAN'T FIND THE PROBLEM. IT'S HAS BEEN NOTED
> THAT THE CORRECTIONS THAT I NEED TO HAVE MADE
> IN ORDER TO BE SAFE IN THE GM VEHICLE CANNOT BE
> OBTAINED AS FOR MY VEHICLE HAS BEEN KEEP CHEVY
> FOR SHOP 5 MONTHS….

649.    On October 16, 2013, New GM became aware of a complaint filed with NHTSA

concerning a 2013 Camaro, in which the following was reported:

> THE CONTACT OWNS A 2013 CHEVROLET CAMARO. THE
> CONTACT STATED THAT WHILE MAKING A U-TURN, THE
> VEHICLE STALLED WITHOUT WARNING. THE VEHICLE
> WAS NOT TAKEN TO A DEALER FOR DIAGNOSIS OF THE
> FAILURE. THE MANUFACTURER WAS NOT NOTIFIED OF
> THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE

- 339 -

> APPROXIMATE FAILURE AND CURRENT MILEAGE WAS
> 830.

650.    On April 20, 2014, New GM became aware of a complaint filed with NHTSA

concerning a 2014 Camaro, in which the following was reported:

> AS I WAS TURNING THE CORNER ON TO WOODWARD
> AVENUE MY CAR JUST SHUT DOWN. THE CAR WENT
> TOTALLY BLACK AND SHUT DOWN IN THE MIDDLE OF
> THE TURN ON THIS VERY BUSY-MAIN THOROUGHFARE.

651.    On April 30, 2014, New GM became aware of a complaint filed with NHTSA

concerning a 2014 Camaro, in which the following was reported:

> WITHIN TWO WEEKS AFTER PURCHASING MY CAR IT
> STALLED TWICE--BOTH WHEN STOPPED AT RED LIGHTS.
> I TOOK CAR TO DEALERSHIP AND THEY DID A ROAD
> TEST BUT COULD NOT REPLICATE. ON 4/9/2014 I WAS
> MAKING A RIGHT HAND TURN AND THE CAR STALLED
> IN THE MIDDLE OF THE INTERSECTION. I RESTARTED
> THE CAR, DROVE TO MY OFFICE AND THE CAR STALLED
> WHEN TURNING INTO THE PARKING GARAGE AND
> AGAIN WHEN TURNING INTO THE PARKING SPACE.
> TOOK TO THE DEALERSHIP THE FOLLOWING DAY AND
> THEY KEPT FOR AN EXTENDED TEST DRIVE BUT COULD
> NOT REPLICATE THE PROBLEM. SINCE THERE WERE
> NOT ANY CODES THE CAR WAS RETURNED TO ME.

652.    On May 6, 2014, New GM became aware of a complaint filed with NHTSA

concerning a 2014 Camaro, in which the following was reported:

> DRIVING ON CRUISE CONTROL. KNEE BUMPED KEY,
> ENGINE TURNED OFF AT 60 MPH. POWER STEERING AND
> BRAKES STILL WORKED, BUT ENGINE WAS OFF.

653.    On May 9, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2013 Camaro, in which the following was reported:

> THE CONTACT INDICATED WHILE TRAVELING 60 MPH
> ON A MAJOR HIGHWAY, THE VEHICLE STALLED
> WITHOUT WARNING. THE CONTACT WAS ABLE TO
> MOVE THE VEHICLE OVER TO THE SHOULDER AND

- 340 -

AFTER SEVERAL ATTEMPTS THE VEHICLE WAS ABLE TO
RESTART. THE VEHICLE WAS TO BE FURTHER
INSPECTED, DIAGNOSED AND REPAIRED BY AN
AUTHORIZED DEALER BUT IT WAS NOT REPAIRED. THE
CONTACT WAS NOTIFIED OF NHTSA CAMPAIGN ID
NUMBER: 14V346000 (ELECTRICAL SYSTEM) AFTER
EXPERIENCING THE FAILURE MULTIPLE TIMES AND
WAS WAITING FOR PARTS TO GET THE VEHICLE
REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE
FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS
28,000.

654.    On May 19, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2013 Camaro, in which the following was reported:

WHILE DRIVING DOWN I 75 IN OCALA FLORIDA CAR
STALLED IN MIDDLE OF HIGHWAY . I PULLED OVER TO
SHOULDER AND HAD TO RESTART CAR. I TOOK IT IN TO
A DEALER AND THEY SAID THEY COULD NOT FIND ANY
THING WRONG. THEY SAID TAKE THE CAR.

655.    On May 20, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2012 Camaro, in which the following was reported:

WHEN THE IGNITION SWITCH/ KEY IS SLIGHTLY
BUMPED WITH KNEE, THE CAR SHUTS OFF. THREE
TIMES NOW. DEALERSHIP NOT RESPONSIVE. TAUGHT
MY TEEN DRIVERS WHAT TO DO IF THIS HAPPENS AND
THIS SAVED MY DAUGHTER'S LIFE WHEN IT HAPPENED
TO HER.

656.    New GM's supposed "remedy" to correct the unintended rotation of the ignition

key from RUN to ACC or OFF in Camaro models is to provide Camaro owners with new keys

and key rings.[151]   Dealers were instructed to remove the key blade from the original flip

---

[151] GM-MDL2543-100138040.

key/RKE transmitter assemblies provided with the vehicle, and provide two new keys and two

key rings per key:[152]



**Camaro key & RKE before recall repair**



**Camaro key & RKE after recall repair**

657.     But New GM's remedy—providing new keys and key rings to Camaro owners—

does not resolve the issue.  Before New GM's decision to recall the Camaro in June 2014,

Valarie Boatman conducted an investigation of the Camaro ignition switches and recommended

turning the run position on the Camaro models 55 degrees counter clockwise (CCW).[153]  This

recommendation was based on testing the key with drivers of different heights.  By turning the

run position 55 degrees CCW, hitting the key with the driver's knee and knocking it out of the

run position would become more difficult to do.  This is because the key is in a position that is

much less likely to be hit by the driver's knee and moved out of position.

---

[152] GM-MDL2543-100332357.

[153] GM-MDL2543-402052790, GM-MDL2543-100702466 (revision 2), GM-MDL2543-300896296 (revision 8), GM-MDL2543-300897782 (recommendation for -54 degrees CCW and 34 degrees CCW).

- 342 -

658.    New GM did <u>not</u> implement Boatman's recommendation.[154]  New GM's solution—substituting keys and providing new key rings—***does not address the position of the key in the run position or the possibility of it being hit by the driver's knee***.  Neither does this quick modification resolve the matter of the position of the ignition switch on the steering column which, as evident in the photos in the GM knee key studies, creates the risk for unintended key rotation for tall drivers because the position of the ignition switch is too low on the steering column.[155]  This remedy thus does nothing to address the basic ergonomics of the vehicle.  The remedy also disregards torque, thereby ignoring early testing showing low torque values.

659.    Further, there is no evidence that that a full 3D analysis was done of the vehicle cab, or that post-remedy testing was done to validate the remedy.

660.    The remedy for yet another recall involving the ignition switch in Old and New GM vehicles also calls into question the efficacy of Recall 14v346.  In Safety Recall 14v540, New GM described the defect in MY 2011-2013 Chevy Caprices and MY 2008-2009 Pontiac G8s as "[u]nintended key rotation from 'RUN'; to 'ACC' position while driving as a result of interaction between the vehicle operator's knee and the ignition key."  New GM described the root cause of the defect as follows:  "The key blade orientation (perpendicular to the transmitted body) and the alignment of the key cylinder in the 'RUN' position result in a sufficient surface area of key transmitter being available for potential knee contact."  The remedy was to change the position of the key while in the ignition switch:  "Replace fixed-blade key with the blade rotated by 90 degrees."  The blade rotation is designed to present the key transmitter in a vertical

---

[154] GM-MDL2543-100702516, p. 5.

[155] GM-MDL2543-300736014.

plane (instead of a horizontal one) when the key is in the RUN position.[156]  The goal is for any

knee contact with the key to turn the key towards RUN position rather than away from RUN.[157]

661.    In sum, the proposed "remedy" for Safety Recall 14v346 is insufficient because it

does not address (i) the poor placement of the ignition switch such that the keys are vulnerable to

being "kneed" by the driver; (ii) the airbag algorithm that can render the airbags inoperable *even

when the vehicles are travelling at a high speed*; and (iii) the possible need for a new switch with

higher torque.

662.    Indeed, on July 31, 2014, after the recall was announced, New GM became aware

of a complaint filed with NHTSA involving a 2014 Camaro, in which the following was

reported:

> I WAS TURNING ONTO THE HIGHWAY THAT THE SPEED
> LIMIT IS 65 MPH FROM A SIDE ROAD. I WAITED FOR
> ONCOMING TRAFFIC TO PASS AND THEN PULLED OUT.
> AS I PULLED OUT, TURNING RIGHT, MY CAR HAD A
> SUDDEN LOSS OF POWER. I TRIED TO RESTART AND IT
> WOULD NOT RESTART. I HAD DIFFICULTY PULLING
> OVER TO THE SIDE OF THE ROAD DUE TO THE STEERING
> WHEEL BEING STIFF AND HARD TO HANDLE. AFTER I
> GOT TO THE SIDE OF THE ROAD, I WAS ABLE TO
> RESTART MY CAR. I *DID NOT BUMP THE IGNITION
> SWITCH WHEN THIS HAPPENED EITHER*.  [Emphasis
> added.]

**5.    The ignition switch recalls were inadequate and poorly conducted.**

663.    New GM sent its first recall notices to the owners of vehicles with defective

ignition switches in late February and early March of 2014.  New GM's recall letter minimized

the risk of the ignition switch defect, indicating that ignition problems would occur only "under

certain circumstances."  New GM's recall notification emphasized that the risk of power failure

---

[156] GM-MDL2543-303953937.

[157] *Id.*

increased if the "key ring is carrying added weight . . . or your vehicle experiences rough road conditions."

664.    To repair the Delta Ignition Switch Vehicles targeted in the February and March 2014 recalls, New GM replaced the defective ignition switch with a new ignition switch.  At the time it announced the recall of these cars, however, New GM did not have replacement switches ready.  New GM CEO Mary Barra told Congress that New GM would start replacing ignition switches beginning in April of 2014.

665.    Internally, New GM could not explain why it was recalling some vehicles subject to the Technical Service bulletin and not others:

> I am very concerned about answering the question why some vehicles listed on the TSBs were not recalled.  From our review, we do not, with confidence, know the answer to the question.  On the ION, for example, we have been told that there is no record on ignition status from the SDM.  We have ION's non-deployed with blank records.[158]

666.    New GM later revised its timeline, notifying NHTSA that all replacement switches would be ready by October 4, 2014.

667.    New GM's repair of the defective switches proceeded painfully slowly.  As of August 5, 2014, New GM had repaired only 683,196 of the 2.1 million Defective Ignition Switch Vehicles at issue in the February and March recalls.  As of January 23, 2015, New GM had repaired only 1,229,529 of the involved vehicles—or less than 60% of the total.

668.    On September 8, 2014, Ms. Barra told CNBC radio that the repair process was "substantially complete."  Nonetheless, at that time, New GM had repaired only 1 million vehicles.

---

[158] GM-MDL2543-001054064 (Highly Confidential).

669.     Meanwhile, dealerships across the country struggled to implement New GM's repair process.  One dealership in Kalamazoo, Michigan, hired a "recall concierge" simply to deal with the myriad issues raised by the recall repair process.

670.     Although New GM touted to courts around the country that it was offering to provide any concerned driver with a temporary loaner vehicle while he or she awaited a replacement part (for many, over five months), New GM's recall letter failed to inform vehicle owners whether temporary loaner vehicles would be made available while they awaited replacement parts.  The letter also provided no time frame in which repairs would be completed.

671.     To add insult to injury, the New GM recalls were fraught with problems for consumers.  Many consumers were unable to obtain a loaner vehicle despite New GM's promise to provide them with one pending repair.  When individuals were fortunate enough to obtain a loaner, they often experienced problems associated with the loaner program.  Even worse, many consumers continued to experience safety problems with the Delta Ignition Switch Vehicles, even after the ignition switch was replaced pursuant to the recall.

672.     Moreover, for those Class Members who did have work performed under the recall, they were required to expend substantial uncompensated time dealing with the issue, including getting the recall work scheduled, taking in the vehicle, dropping it off, and picking it up.

> **a.      New GM failed to alert drivers of recalled vehicles to the possibility of obtaining a loaner vehicle, and when consumers are aware, they often find that loaner vehicles are not available.**

673.     One common problem consumers faced was the difficulty, if not impossibility, of obtaining a rental or loaner vehicle while awaiting the replacement part for their Delta Ignition Switch Vehicle pursuant to the recall.  Yet after it announced the recalls, New GM represented to

the government and courts across the country that it was offering consumers temporary loaner vehicles, free of charge, while those consumers wait for their Delta Ignition Switch Vehicle to be repaired.

674.   New GM did not make this information easily accessible for consumers.  Shortly after the Delta Ignition Switch Recall was announced, for example, New GM published a website at gmignitionupdate.com.  The front page of that website did not inform consumers that they were eligible to obtain a temporary replacement vehicle.

675.   Indeed, consumers had to click on the Frequently Asked Questions page to learn about New GM's offer.  Even there, the information was not included in a section entitled, "What will GM do?"  Neither is it included in a section entitled, "What should you do if you have an affected vehicle?"

676.   To learn that New GM offered temporary loaner vehicles, a class member had to click on a section under the heading, "Parts Availability & Repair Timing."  A subsection entitled, "Who is eligible for a rental vehicle?" stated that "[a]ny affected customer who is concerned about operating their vehicle may request courtesy transportation.  Dealership service management is empowered to place the customer into a rental or loaner vehicle until parts are available to repair the customer's vehicle."

677.   Numerous owners and/or lessees of Delta Ignition Switch Vehicles were unaware that New GM was offering temporary loaner vehicles.  As a result, many Class Members driving Delta Ignition Switch Vehicles and who were rightfully fearful of continuing to drive their vehicles in light of the now-disclosed safety defect were denied an alternate vehicle pre-repair.  They were either forced to drive their unsafe Delta Ignition Switch Vehicles out of necessity, and fear every time they sat behind the wheel they could be involved in an accident that would injure

- 347 -

them or an innocent bystander, or to park their vehicles while awaiting the replacement part for their vehicles and seek alternative means of transportation.

678.    Upon information and belief, New GM also did not widely distribute its temporary loaner vehicle guarantee to dealerships across the country.  Many dealerships did not know and have not been informed about New GM's promise to provide rental/loaner vehicles to owners of vehicles awaiting the ignition switch replacement part.

679.    Further, licensed New GM dealerships aware of the loaner program quickly exhausted their supply of loaner vehicles early into the recall.  Numerous dealerships then refused interested consumers.  Because New GM's ignition repair website only stated that "[d]ealership service management" was empowered to provide a temporary loaner vehicle, many such Class Members reasonably believed that their sole avenue for relief was foreclosed when their dealership refused.

680.    Even where Class Members inquired directly with New GM for provision of a temporary loaner vehicle, numerous Class Members were refused.

681.    Such refusals not only violated New GM's representations, but also caused Class Members substantial inconvenience and expense, such as:

        a.    Class Members who could not perform their jobs because they were denied a loaner/rental, despite repeated requests to both the dealership and the New GM hotline; and

        b.    Class Members who were denied a rental/loaner vehicle because they have only property loss or property damage insurance coverage on their Delta Ignition Switch Vehicle rather than full coverage.

- 348 -

682.    Further, even when a loaner vehicle was provided, consumers experience varied and numerous problems with the program.  Among the problems encountered:

a.    Class Members incurred substantially increased gasoline expenses with their loaner vehicles because the loaner is far less fuel efficient than the Delta Ignition Switch Vehicle;

b.    Class Members incurred substantially increased monthly insurance premium—up to hundreds more per month—than they paid for their Delta Ignition Switch Vehicle because the loaner vehicle was newer and more expensive; and

c.    Class Members were threatened with charges for the loaner vehicle if they did not pick up their Delta Ignition Switch Vehicle immediately when it was repaired.  Class Members experienced these threats even when their Delta Ignition Switch Vehicle sat idle for months at a dealership awaiting repair and the dealership provided no notice that it would repair the vehicle until the repair was complete.

### b.    The repair is inadequate and/or results in new vehicle defects.

683.    Yet another common problem with the recall that Plaintiffs are experiencing is the replacement part is not remedying the safety defect.  Numerous Class Members report repeated stalls and shut downs *after* their vehicles are purportedly repaired pursuant to the recalls.  Indeed, the most common complaint is that the vehicle continues to have unintended stalls while driving, the very safety defect the Defective Ignition Switch Vehicle recalls are intended to correct.  What is more, dealerships and New GM have been known to accuse vehicle owners who report stalls and shut downs following their ignition switch being replaced of lying.  A

- 349 -

sampling of post-recall repair complaints made by consumers to NHTSA include the

following:[159]

> [Malibu 2004  No.10648335, 10/17/2014] TL* THE CONTACT OWNS A 2004 CHEVROLET MALIBU. THE CONTACT STATED THAT THE POWER STEERING AND SERVICE ENGINE SENSORS ILLUMINATED ON SEVERAL OCCASIONS. THE VEHICLE WAS TAKEN TO THE AUTHORIZED DEALER. THE TECHNICIAN SERVICED THE VEHICLE ACCORDING TO NHTSA CAMPAIGN NUMBER: 14V153000 (STEERING) AND NHTSA CAMPAIGN NUMBER: 14V252000 (ELECTRICAL SYSTEM, ELECTRONIC STABILITY CONTROL, EXTERIOR LIGHTING, SERVICE BRAKES, HYDRAULIC AND VEHICLE SPEED CONTROL). THE CONTACT INDICATED THAT THE VEHICLE STALLED SEVERAL TIMES AFTER THE RECALL REPAIR AND THE POWER STEERING FAILURE PERSISTED. THE VEHICLE WAS TAKEN BACK TO THE AUTHORIZED DEALER FOR FURTHER INSPECTION, DIAGNOSIS AND REPAIR. THE MANUFACTURER WAS NOTIFIED OF THE FAILURES. THE APPROXIMATE FAILURE MILEAGE WAS 298, 000.
>
> [Camaro 2011 No. 10653348, 12/2/2014] 2011 CHEVROLET CAMARO CONSUMER IS NOT SATISFIED WITH RECALL REPAIRS *CN THE CONSUMER STATED SHE THOUGHT THE ISSUE WAS THE IGNITION. HOWEVER, WHEN THE VEHICLE WAS RETURNED TO HER, SHE NOTICED THE KEY FOBS WERE BROKEN AND AN ADDITIONAL KEY WAS ADDED, WHICH WAS VERY ANNOYING AND HANGING ON HER KNEE. THE CONSUMER STATED THE REMEDY WAS A CHEAP FIX. *JB
>
> [Camaro 2011  No.10640422, 10/1/2014] BROUGHT MY CAMARO TO DEALERSHIP FOR RECALL 14294, IGNITION KEY PROBLEM. THE SOLUTION OF REMOVING THE BLADE FROM THE "FLIP" KEY AND ADDING A SEPARATE KEY CREATES A WORSE PROBLEM. ONE, IT WEIGHS MORE DEFEATING THE RECALL CONCERN AND TWO HANGS LOWER INCREASING THE PROBABILITY OF HITTING YOUR KNEE, AGAIN DEFEATING THE REASON FOR THE RECALL AND ADDING A POTENTIAL MEDICAL

---

[159] In the examples that follow, "No." refers to the NHTSA ID Number, and the date refers to the date the consumer made the complaint.

CONCERN. AND WE WOULD BE RECEIVING AN INFERIOR DESIGN TO WHAT I BOUGHT. I TOLD THEM TO CHANGE IT BACK BECAUSE OF THE ABOVE FLAWS. SINCE THEY STILL SELL THE CARS WITH THE "FLIP" KEY, WHY CANT THEY JUST REPLACE THE KEYS COMPLETE AND NOT JUST BAND AID THE PROBLEM. I BROKE THE BLADE OF THE "FLIP" KEY ON MY 2011 EQUINOX AND COULDN'T JUST REPLACE THE BLADE....A NEW KEY HAD TO BE ORDERED AND BOTH KEYS REPROGRAMMED AT THE COST OF $140. BOTTOM LINE IS THEY SHOULD REPLACE DEFECTIVE MATERIAL WITH SOMETHING EQUAL OR BETTER. AS CONSUMERS WE SHOULD NOT BE PENALIZED FOR THEIR DESIGN MISTAKE....ESPECIALLY TWICE! *TR

[Camaro 2011 No. 10640422, 10/1/2014] BROUGHT MY CAMARO TO DEALERSHIP FOR RECALL 14294, IGNITION KEY PROBLEM. THE SOLUTION OF REMOVING THE BLADE FROM THE "FLIP" KEY AND ADDING A SEPARATE KEY CREATES A WORSE PROBLEM. ONE, IT WEIGHS MORE DEFEATING THE RECALL CONCERN AND TWO HANGS LOWER INCREASING THE PROBABILITY OF HITTING YOUR KNEE, AGAIN DEFEATING THE REASON FOR THE RECALL AND ADDING A POTENTIAL MEDICAL CONCERN. AND WE WOULD BE RECEIVING AN INFERIOR DESIGN TO WHAT I BOUGHT. I TOLD THEM TO CHANGE IT BACK BECAUSE OF THE ABOVE FLAWS. SINCE THEY STILL SELL THE CARS WITH THE "FLIP" KEY, WHY CANT THEY JUST REPLACE THE KEYS COMPLETE AND NOT JUST BAND AID THE PROBLEM. I BROKE THE BLADE OF THE "FLIP" KEY ON MY 2011 EQUINOX AND COULDN'T JUST REPLACE THE BLADE....A NEW KEY HAD TO BE ORDERED AND BOTH KEYS REPROGRAMMED AT THE COST OF $140. BOTTOM LINE IS THEY SHOULD REPLACE DEFECTIVE MATERIAL WITH SOMETHING EQUAL OR BETTER. AS CONSUMERS WE SHOULD NOT BE PENALIZED FOR THEIR DESIGN MISTAKE....ESPECIALLY TWICE! *TR

[Camaro 2011 No. 10631658, 9/8/2014] GM SAFETY RECALL 14294, WE HAD NO ISSUES WITH THE IGNITION KEY PRIOR TO THE RECALL. WE TOOK OUR CAMARO TO THE GM DEALERSHIP, HAD THE RECALL TAKEN CARE OF. UPON DRIVING THE CAMARO AFTER THE IGNITION KEY WAS CHANGED DUE TO THE RECALL, IT IS NOW MORE

- 351 -

OF A SAFETY HAZARD WITH THE KEY ACTUALLY DANGLING DOWN ON OUR KNEE/LEGS WHILE DRIVING. WE WOULD APPRECIATE THE OPPORTUNITY TO GET THE PREVIOUS IGNITION KEY REFIGURED AS IT WAS WHEN WE PURCHASED THE CAMARO AS WE HAD NO PROBLEMS/ISSUES WITH IT PRIOR TO FOLLOWING THE RECALL INSTRUCTIONS OF TAKING OUR CAMARO TO THE DEALER. *TR

[Camaro 2014 No. 10671079, 3/10/2015] 2014 CHEVROLET CAMARO. CONSUMER WRITES IN REGARDS TO UNSATISFACTORY IGNITION SWITCH REPAIR WORK DONE AT DEALERSHIP. *SMD THE CONSUMER STATE HIS KNEE NEVER HIT THE KEY IN THE IGNITION SWITCH, UNTIL AFTER THE RECALL WAS PERFORMED. THE CONSUMER STATED HIS KNEE PINCHED THE RKE TRANSMITTER AGAINST THE KEY IN THE IGNITION SWITCH EVERY TIME HE MOVED HIS FOOT TO BRAKE PEDAL. *JB

[Cobalt, 2005, No. 10573579, 3/19/2014]TL* THE CONTACT OWNS A 2005 CHEVROLET COBALT. THE CONTACT STATED WHILE DRIVING APPROXIMATELY 55 MPH, THE VEHICLE STALLED AS THE POWER STEERING WARNING LIGHT ILLUMINATED. THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE IGNITION SWITCH NEEDED TO BE REPLACED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE VEHICLE WAS REPAIRED BUT THE FAILURE RECURRED. THE APPROXIMATE FAILURE MILEAGE WAS 31, 000 AND THE CURRENT MILEAGE WAS 71, 155.

[Cobalt, 2009, No. 10630177, 9/2/2014],  I HAVE ALREADY HAD THE RECALL SERVICE PERFORMED ON MY 2009 CHEVROLET COBALT, BUT THE IGNITION SWITCH PROBLEM STILL PERSISTS AFTER HAVING THE RECALL SERVICE PERFORMED. THERE'S THE POSSIBILITY THAT A SAFETY HAZARD TO THE AMERICAN PUBLIC STILL EXISTS IF THERE ARE CASES SIMILAR TO MINE. THE VEHICLE IGNITION WAS INADVERTENTLY SWITCHED TO THE "OFF" POSITION WHILE I WAS GETTING ONTO A HIGHWAY. I WAS SHIFTING MY HIPS TO ADJUST MY SEATING POSITION,  AND MY KNEE BUMPED INTO MY KEYCHAIN AND CAUSED THE IGNITION TO SWITCH TO THE "OFF" POSITION. I LOST SPEED CONTROL AND POWER STEERING, BUT I WAS LUCKILY ABLE TO MOVE

- 352 -

TO THE SHOULDER OF THE HIGHWAY, SHIFT INTO "PARK", AND RE-START THE VEHICLE. THIS EVENT HAPPENED WITHIN 48 HOURS OF ME HAVING THE RECALL SERVICE PERFORMED AT A CHEVROLET DEALERSHIP. *TR

[Cobalt, 2009, No. 10605114, 6/23/2014],  TL* THE CONTACT OWNS A 2009 CHEVROLET COBALT. WHILE DRIVING APPROXIMATELY 30 MPH, THE ENGINE STALLED WITHOUT WARNING. THE VEHICLE WAS ABLE TO BE RESTARTED AND RESUMED NORMAL OPERATION. THE FAILURE OCCURRED IMMEDIATELY AFTER THE VEHICLE WAS SERVICED FOR NHTSA CAMPAIGN NUMBER: 14V047000 (AIR BAG, ELECTRICAL SYSTEM). THE VEHICLE WAS NOT REPAIRED AND THE MANUFACTURER WAS NOTIFIED. THE APPROXIMATE FAILURE MILEAGE WAS 60, 000.

[Cobalt, 2010, No. 10717308, 5/19/2015], TL* THE CONTACT OWNS A 2010 CHEVROLET COBALT. THE CONTACT STATED THAT THE VEHICLE RECEIVED THE RECALL REPAIR FOR NHTSA CAMPAIGN NUMBER: 14V171000 (ELECTRICAL SYSTEM). MONTHS LATER, THE VEHICLE STALLED SEVERAL TIMES. THE VEHICLE WAS TAKEN BACK TO AN AUTHORIZED DEALER FOR FURTHER INSPECTION TO DETERMINE THE FAILURE. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE VIN WAS UNAVAILABLE. THE APPROXIMATE FAILURE MILEAGE WAS 95, 000.

[Cobalt, 2010, No. 10638140, 9/22/2014], TL* THE CONTACT OWNS A 2010 CHEVROLET COBALT. THE CONTACT STATED THAT THE VEHICLE WAS RECENTLY REPAIRED UNDER RECALL NHTSA CAMPAIGN ID NUMBER: 14E021000 (ELECTRICAL). THE FAILURE RECURRED AS THE CONTACT WAS LEAVING THE DEALER. THE VEHICLE WAS TAKEN BACK TO THE DEALER. TECHNICIAN STATED THAT THE IGNITION SWITCH NEEDED TO BE REPLACED BUT SINCE THE VEHICLE HAD ALREADY BEEN REPAIRED UNDER THE RECALL THE MANUFACTURER WAS NO LONGER RESPONSIBLE FOR THE REPAIRS. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 22, 000.

[Cobalt, 2010, No. 10620681, 8/7/2014], TL* THE CONTACT OWNS A 2010 CHEVROLET COBALT. THE CONTACT STATED THAT THE VEHICLE FAILED TO START AFTER NUMEROUS ATTEMPTS. IN ADDITION,  THE VEHICLE STALLED ON THREE OCCASIONS. THE VEHICLE WAS ABLE TO RESTART ON SEVERAL OCCASIONS. THE VEHICLE WAS PREVIOUSLY REPAIRED UNDER NHTSA CAMPAIGN ID NUMBER: 14V171000 (ELECTRICAL SYSTEM). THE FAILURE OCCURRED AFTER THE VEHICLE WAS REPAIRED UNDER THE RECALL. THE VEHICLE WAS NOT REPAIRED FOR THE INITIAL FAILURE. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 68, 000.

[Cobalt, 2006, No. 10705425, 4/13/2015], MY VEHICLE SUDDENLY AND COMPLETELY TURNED OFF BY ITSELF, WHILE I WAS DRIVING ON A VERY BUSY, DANGEROUS HIGHWAY. NOTE- I ALREADY HAD THE IGNITION SWITCH REPAIRED UNDER THE RECALL, AND I HAVE NOTHING ON MY KEY RING!!! I CONTACTED THE GM CUSTOMER SERVICE NUMBER (1-800-222-1020) AND IT FELT LIKE NO ONE IS TAKING THIS COMPLAINT VERY SERIOUSLY. THEY PUT ME IN CONTACT WITH THE DEALER THAT DID THE RECALL REPAIR, AND I NOW HAVE AN APPOINTMENT SCHEDULED IN 12 DAYS, WHICH I HAVE TO PAY FOR DIAGNOSTIC TESTING AT $104/HOUR!!! WHAT'S HAPPENING TO MY CAR NOW IS THE SAME THING THAT WAS HAPPENING TO INITIATE THIS RECALL (AND LAWSUITS) IN THE FIRST PLACE. HOW CAN THEY BE SO NONCHALANT ABOUT THIS COMPLAINT, AND FURTHERMORE, MAKE ME PAY FOR IT? CLEARLY THERE IS A DIFFERENT PROBLEM THAN WHAT GM IS CLAIMING, AS I'VE SEARCHED ONLINE AND HAVE FOUND OTHERS STILL HAVING THE SAME DANGEROUS PROBLEM OF THEIR CAR COMPLETELY TURNING OFF IN THE MIDDLE OF DRIVING, SINCE THEY TOO HAVE HAD THE REPAIRS!!!

[Cobalt, 2006, No. 10693442, 3/11/2015], STARTING ON SUNDAY I WAS DRIVING DOWN THE HIGHWAY AND MY CAR SUDDENLY SHUT OFF. THE POWER STEERING LIGHT FLASHED AND THEN THE SERVICE AIR BAG LIGHT AS WELL. I PULLED OVER, STOPPED COMPLETELY, AND TURNED MY CAR BACK ON AND

TOOK THE BACK ROADS HOME. AFTER TURNING THE CAR BACK ON THE WARNING LIGHTS ON THE DISPLAY WERE GONE. THE NEXT DAY I WAS ON A DIFFERENT HIGHWAY AND THE SAME THING HAPPENED EXCEPT WHEN I TURNED MY CAR BACK ON THE SERVICE AIR BAG LIGHT STAYED ON UNTIL I RETURNED HOME. I HAD THE RECALL ON THE IGNITION SWITCH REPLACED LAST YEAR.

[Cobalt, 2006, No. 10679149, 3/25/2015], 2006 CHEVROLET COBALT. CONSUMER WRITES IN REGARDS TO TOTAL POWER LOSS AND OTHER VEHICLE PROBLEMS. *SMD THE CONSUMER STATED THE DASHBOARD LIGHTS FLICKERED AND THE POWER STEERING FAILED. HE ALSO STATED THE TRUCK WOULD NOT OPEN, AFTER THE IGNITION RECALL WAS PERFORMED. *JB

[Cobalt, 2006, 10648486, 10/17/2014], TL* THE CONTACT OWNS A 2006 CHEVROLET COBALT. THE CONTACT STATED THAT WHILE DRIVING AT VARIOUS SPEEDS, THE VEHICLE STALLED WITHOUT WARNING. THE DEALER DIAGNOSED THAT THE CYLINDER KIT NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED UNDER RECALL NHTSA CAMPAIGN NUMBER: 14V047000 (ELECTRICAL SYSTEM). HOWEVER, THE FAILURE PERSISTED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE VIN WAS UNAVAILABLE. THE APPROXIMATE FAILURE MILEAGE WAS 155, 214.

[Cobalt, 2006, No. 10629441, 8/29/2014], MY CAR WAS PART OF THE GM RECALL FOR THE INCORRECT IGNITION SWITCHES. IT WAS RETURNED TO ME ON JULY 23RD, FIXED OR SO I WAS TOLD WITH A NEW IGNITION TO FIX THE ISSUE. HOWEVER WITHIN A WEEK OF HAVING THE CAR BACK, IT WAS DOING THE SAME AS BEFORE THE RECALL FIX WAS DONE. SLIPPING INTO ACCESSIBILITY MODE AND NOT GIVING ME ANY OPTION TO HIT THE GAS, ONLY PULL OFF IF I WAS ABLE, TURN THE CAR OFF, THEN BACK ON AND GO. THIS HAPPENED A COUPLE OF TIMES WHEN I WAS GOING UPWARDS OF 40 MPH. THE LAST FEW TIMES THIS HAS HAPPENED WAS PULLING FROM MY STREET INTO A BUSY STREET WITH TRAFFIC GOING UPWARDS OF 55 MPH. I HAD TO PULL OFF AS QUICKLY AS I COULD ONTO THE SHOULDER AND TURN OFF THE CAR, BACK ON AGAIN AND GO MEANWHILE HOPING TO NOT BE HIT. I CONTACTED GM

AGAIN AND WAS TOLD THAT MY RECALLED PART WAS
FIXED AND THIS HAD TO BE ANOTHER ISSUE.
HOWEVER, IT'S THE EXACT ISSUE THAT HAPPENED
BEFORE MY CAR WAS FIXED. I'M 7 MONTHS PREGNANT
AND OFTEN DRIVE WITH MY 16 MONTH OLD SON IN
THIS CAR WITH ME. I DO NOT FEEL SAFE DRIVING IT
AND CANNOT JUST GO PURCHASE A NEW CAR. I FEEL
LIKE THIS NEEDS TO BE LOOKED INTO FURTHER TO
FIND OUT IF THERE ARE MORE ISSUES AFTER THE
INITIAL RECALL FIX. *TR

[Cobalt, 2006, No. 10620922, 8/8/2014], TL* THE CONTACT
OWNS A 2006 CHEVROLET COBALT. THE CONTACT
STATED WHILE DRIVING APPROXIMATELY 25 MPH , THE
VEHICLE STALLED WITHOUT ANY WARNING LIGHTS
ILLUMINATED. THE CONTACT RECEIVED NOTIFICATION
OF NHTSA CAMPAIGN NUMBER 14E021000 (IGNITION
SWITCH) AND THE VEHICLE WAS TAKEN TO THE
DEALER TO REMEDY THE RECALL HOWEVER, THE
FAILURE RECURRED. THE FAILURE WAS NOT
DIAGNOSED. THE MANUFACTURER WAS NOTIFIED OF
THE FAILURE. THE APPROXIMATE FAILURE MILEAGE
WAS 90, 000.

[Cobalt, 2006, No. 10599019, 6/17/2014], TL* THE CONTACT
OWNS A 2006 CHEVROLET COBALT. THE CONTACT
STATED WHEN MAKING A TURN, THE VEHICLE
INTERMITTENTLY STALLED. THE VEHICLE WAS TAKEN
TO THE DEALER WHO WAS UNABLE TO DUPLICATE THE
FAILURE. A COUPLE OF MONTHS LATER, THE CONTACT
RECEIVED RECALL NHTSA CAMPAIGN NUMBER:
14V171000 (ELECTRICAL SYSTEM) AND NHTSA
CAMPAIGN NUMBER: 14V047000 (AIR BAGS, ELECTRICAL
SYSTEM). THE VEHICLE WAS SERVICED UNDER BOTH
RECALLS. HOWEVER, THE NEXT DAY THE FAILURE
RECURRED. THE DEALER WAS MADE AWARE OF THE
FAILURE AND THE TECHNICIAN STATED THAT DURING
SERVICE THE VEHICLE BATTERY TESTED LOW. THE
VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC,
WHO DIAGNOSED THAT THE IGNITION SWITCH FUSE
HAD BLOWN AND THAT THE BATTERY HAD TESTED
NORMAL. THE VEHICLE WAS REPAIRED. THE FAILURE
MILEAGE WAS 141, 420.

[Cobalt, 2006, No. 10598301, 6/14/2014], WE TOOK THE
COBOLT TO OURISMAN CHEVROLET, ALEXANDRIA, VA

FOR REPAIRS TO THE IGNITION SWITCH WHICH IS
SUBJECT OF A RECALL. DEALER KEPT SAYING THE
NECESSARY PARTS WERE NOT AVAILABLE AND IT
WOULD TAKE MONTHS. WE TOOK THE CAR TO THEM
SINCE WE HAD 2 EVENTS WHEN THE IGNITION TURNED
OFF AND THE STEERING WHEEL LOCKED. TO OUR
SURPRISE THE DEALER HAD THE PART AND
SUPPOSEDLY FIXED IT THE SAME AFTERNOON. ABOUT
A WEEK LATER, WHEN WE WERE PULLING OUT OF THE
PARKING LOT, THE CAR STARTED TO TURN OFF AND ON
AND THEN THE IGNITION TURNED OFF COMPLETELY
AND THE STEERING LOCKED, WHICH WAS THE SAME
PROBLEM BEFORE THE SUPPOSED REPAIRS AND
SUBJECT TO THE RECALL. WE ARE LUCKY IT DIDN'T
HAPPEN ON THE HIGHWAY AND WANT TO ALERT
FEDERAL AUTHORITIES TO POTENTIAL FAULTY
REPLACEMENT PARTS OR IMPROPER REPAIRS. EITHER
WAY, THE PROBLEM CAN CAUSE ACCIDENTS, AS IT HAS
IN THE PAST AND COULD RESULT IN DEATHS. WE
CALLED GM AND WAS GIVEN A NUMBER. HOWEVER, A
CUSTOMER ADVISOR SUGGESTED THE PROBLEM IS
SOMETHING ELSE AND NOT RELATED, WHICH IS
HOGWASH. THE SAME PROBLEM AS BEFORE THE SO
CALLED REPAIRS. *JS

[Cobalt, 2006, No. 10594813, 5/29/2014], TL - THE CONTACT
OWNS A 2006 CHEVROLET COBALT. THE CONTACT
STATED THAT THE VEHICLE WAS SERVICED UNDER
NHTSA CAMPAIGN NUMBER: 14V047000. THE CONTACT
STATED THAT THE FAILURE RECURRED AFTER THE
REPAIRS WERE COMPLETED. THE MANUFACTURER WAS
NOT MADE AWARE OF THE FAILURE. THE FAILURE AND
CURRENT MILEAGE WAS 142, 000. DR UPDATED
8/27/14*CN THE CONSUMER STATED THE VEHICLE
EXPERIENCED POWER FAILURE AT ANY GIVEN TIME.
UPDATED 09/8/2014 *JS

[Cobalt, 2006, No. 10576147, 4/1/2014], TL* THE CONTACT
OWNS A 2006 CHEVROLET COBALT. THE CONTACT
STATED WHILE DRIVING APPROXIMATELY 25 MPH, THE
VEHICLE STALLED WITHOUT WARNING. AFTER
NUMEROUS ATTEMPTS THE CONTACT WAS ABLE TO
START THE VEHICLE. THE FAILURE OCCURRED THIRTY
TIMES OVER A ONE YEAR PERIOD. THERE WAS A
RECALL NOTIFICATION RELATED TO NHTSA CAMPAIGN

ID NUMBER 14V047000; HOWEVER, THE CONTACT
NEVER RECEIVED DOCUMENTATION. THE VEHICLE WAS
TAKEN TO THE DEALER WHO REPLACED THE IGNITION
SWITCH; YET, THE FAILURE CONTINUED TO OCCUR.
THE MANUFACTURER WAS NOT NOTIFIED. THE
APPROXIMATE FAILURE MILEAGE WAS 141, 478.

[HHR, 2008, No. 10640923, 10/2/2014], TL* THE CONTACT
OWNS A 2008 CHEVROLET HHR. THE CONTACT STATED
THAT THE REMEDY FOR NHTSA CAMPAIGN NUMBER:
14V047000 (ELECTRICAL SYSTEM) FAILED. THE
SPECIFICS OF THE FAILURE WERE NOT AVAILABLE. THE
MANUFACTURER WAS MADE AWARE OF THE FAILURE.
THE APPROXIMATE FAILURE MILEAGE WAS 75, 000.
UPDATED 11/20/14*LJ THE IGNITION SWITCH WAS
REPLACE TWICE. THE CONSUMER STATED THE
PROBLEM STILL EXISTS. UPDATED 12/11/14*JB

[Impala, 2003, No. 10762858, 9/10/2015], TL* THE CONTACT
OWNS A 2003 CHEVROLET IMPALA. WHILE DRIVING AT
30 MPH, THE VEHICLE STALLED WITHOUT WARNING.
THE VEHICLE WAS ABLE TO RESTART AFTER SEVERAL
ATTEMPTS. ON SOME OCCASIONS, THE VEHICLE FAILED
TO START. THE VEHICLE WAS SERVICED UNDER NHTSA
CAMPAIGN NUMBER: 14V400000 (ELECTRICAL SYSTEM)
BUT THE REMEDY FAILED TO REPAIR THE VEHICLE.
THE MANUFACTURER WAS NOTIFIED OF THE FAILURE.
THE FAILURE MILEAGE WAS 100, 600.

[Impala, 2003, No. 10721505, 5/26/2015], TL* THE CONTACT
OWNS A 2003 CHEVROLET IMPALA. THE CONTACT
STATED THAT THE VEHICLE STALLED WHILE IN
MOTION AND STATIONARY WITHOUT WARNING. THE
VEHICLE RESTARTED AFTER 20 MINUTES. THE VEHICLE
WAS TAKEN A DEALER AND REPAIRED UNDER NHTSA
CAMPAIGN NUMBER: 14V400000 (ELECTRICAL SYSTEM);
HOWEVER, THE FAILURE RECURRED. THE
MANUFACTURER WAS NOT MADE AWARE OF THE
FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS
109, 000.

[Impala, 2002, No. 10658705, 11/17/2014], TL* THE CONTACT
OWNS A 2002 CHEVROLET IMPALA. THE CONTACT
STATED THAT THE KEY FAILED TO TURN AND
PREVENTED THE VEHICLE FROM STARTING. THE
CONTACT MENTIONED THAT THE VEHICLE WAS

REPAIRED UNDER NHTSA CAMPAIGN NUMBER:
14V400000 (ELECTRICAL SYSTEM). IN ADDITION,  WHILE
DRIVING VARIOUS SPEEDS, THE VEHICLE WOULD
STALL. THE DEALER AND MANUFACTURER WERE MADE
AWARE OF THE FAILURE. THE VEHICLE WAS NOT
REPAIRED. THE APPROXIMATE FAILURE MILEAGE WAS
100, 000. UPDATED 1/7/15*CN THE CONSUMER STATED
THE VEHICLE WOULD NOT START WHEN THE KEY WAS
IN THE IGNITION. UPDATED 03/03/15

[Impala, 2000, No. 10643333, 10/8/2014], HIT A POT HOLE ON
THE HIGHWAY. KEY FELL OUT OF THE IGNITION,  WAS
ABLE TO RETRIEVE THE KEY OFF THE FLOOR AND
RESTART THE CAR WHILE DRIVING. I THINK THAT MY
KNEE MAY HAVE HIT THE KEY KNOCKING IT INTO THE
ACCESSORIES POSITION RESULTING IN THE KEY
FALLING OUT OF THE IGNITION. I JUST LEFT MORAN
CHEVROLET IN CLINTON TOWNSHIP, MI TO HAVE THE
IGNITION KEY RECALL FIX. I NOTICE THE KEY CAN
STILL BE REMOVED IN THE ACCESSORIES POSITION. IN
MY OPINION ALL THE FIX DID FOR GM RECALL 14350
WAS ADD MORE WEIGHT TO MY KEY BY PUTTING A
LARGER, HEAVIER HEAD ON MY KEY. NHTSA
CAMPAIGN NUMBER: 14V400000. *TR

[Impala, 2001, No. 10721124, 5/23/2015], MY CAR WAS
RECENTLY SERVICED FOR THE RECALL ISSUE ON THE
IGNITION,  WHICH I HAD THE ISSUE OF THE CAR
TURNING OFF WHILE DRIVING SEVERAL TIMES BEFORE
THEY FIXED IT, ANYWAYS WHILE DRIVING HOME
YESTERDAY (05/21/2016) MY CAR AGAIN SHUT OFF THIS
WAS AFTER I TOOK IT TO A CHEVROLET DEALER TO
HAVE IT FIXED. LUCKLY NO ONE WAS INJURED AS I DID
CAUSE A BIT OF PANIC ON THE ROAD AS I WAS TRYING
TO GAIN ENOUGH CONTROL TO PULL MY CAR OFF THE
ROAD.

[Impala, 2001, No. 10650892, 10/28/2014], WE'VE HAD
NUMEROUS ISSUES OVER THE LAST FEW YEARS
INCLUDING INTERMITTENT ELECTRICAL ISSUES,
ENGINE CUTTING OUT, ENGINE LURCHING, AND
DIFFICULTY STARTING. TWO PARTICULARLY
DANGEROUS TIMES WERE ESPECIALLY SCARY -- ONE
TIME THE ENGINE CUT OUT, WITHOUT WARNING,
WHILE MY SON WAS DRIVING IN TRAFFIC, ON A FOUR
LANE ROAD, WITH CHILDREN IN THE CAR. THE OTHER

TIME WAS WHEN I WAS DRIVING DOWN A HILL IN A
SNOW STORM AT NIGHT. THE ROADS WERE SLIPPERY
AND I LOST ALL POWER INCLUDING THE LIGHTS AND
POWER STEERING. WE'VE SPENT AT LEAST $2000 FOR
DIAGNOSTICS/REPAIRS FOR FUEL SYSTEM CHECKS,
ELECTRICAL CHECKS, NEW IGNITION,  NEW IGNITION
WIRES, NEW A/C COMPRESSOR (A/C WOULDN'T COOL),
AND ONE FUEL INJECTOR REPLACED. FOR SEVERAL
MONTHS IT DIDN'T CUT OUT BUT THE ENGINE WOULD
STILL LURCH ONCE IN AWHILE. FOUR DAYS AGO MY
HUSBAND TOOK IT IN FOR THE KEY RECALL AND THE
DEALER SAID THAT THE FUEL INJECTORS NEEDED
CLEANING SO WE HAD IT DONE. THE CAR RAN
FANTASTIC... UNTIL TODAY WHEN OUT OF THE BLUE,
WHILE DRIVING DOWN THE ROAD AT 30MPH, THE
ENGINE CUT OUT AFTER GOING OVER A BUMP IN THE
ROAD. WE CALLED THE DEALER AND THEY SAID TO
KEEP A JOURNAL OF WHEN THE ISSUE HAPPENS AGAIN.

[Impala, 2007, No. 10712697, 4/24/2015], TL* THE CONTACT
OWNS A 2007 CHEVROLET IMPALA. THE VEHICLE WAS
INCLUDED IN NHTSA CAMPAIGN NUMBER: 14V355000
(ELECTRICAL SYSTEM) AND RECEIVED THE RECALL
REPAIR. WITHIN TWO WEEKS LATER, THE VEHICLE
STALLED. THE CONTACT HAD TO MERGE TO THE SIDE
OF THE ROAD, WHERE THE VEHICLE WAS SHUT OFF
AND WAS ABLE TO RESTART THE VEHICLE TO RESET
THE COMPUTER. THE STALLING OCCURRED MORE
THAN FIVE TIMES. THE VEHICLE WAS NOT SAFE TO
DRIVE AND THE CONTACT NEEDED TO HAVE THE
VEHICLE TAKEN BACK TO THE AUTHORIZED DEALER
FOR FURTHER INSPECTIONS. THE VEHICLE WAS NOT
REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE
FAILURE AND PROVIDED NO REMEDY. THE FAILURE
MILEAGE WAS NOT AVAILABLE.

[Impala, 2007, No. 10654054, 11/10/2014], TL* THE CONTACT
OWNS A 2007 CHEVROLET IMPALA. THE CONTACT
STATED THAT WHILE DRIVING AT APPROXIMATELY 25
MPH, THE VEHICLE STALLED. THE CONTACT
MENTIONED THAT THE AIR BAG WARNING LIGHT
ILLUMINATED. THE CONTACT STATED THAT THE
FAILURE OCCURRED AFTER THE VEHICLE WAS
SERVICED UNDER NHTSA CAMPAIGN NUMBER:
14V355000 (ELECTRICAL SYSTEM). THE VEHICLE WAS

TAKEN TO A DEALER WHERE THE FAILURE WAS
UNABLE TO BE DETERMINED. THE VEHICLE WAS NOT
REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE
FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS
30, 000.

[Impala, 2008, No. 10669828, 1/3/2015], I HAVE HAD THE
IGNITION SWITCH REPAIRED UNDER THE THE RECALL
THINKING THIS MIGHT HELP THE PROBLEM. I WILL BE
DRIVING DOWN THE ROAD WHEN THE STEERING WILL
LOCK UP AND THE CAR SLOWS AND CUTS OFF. I HAVE
HAD SEVERAL NEAR MISS ACCIDENTS WITH OTHER
CARS AND AM LITERALLY AFRAID TO DRIVE THE CAR
ANYMORE.I HAVE TAKEN THE CAR TO SEVERAL OTHER
DEALERS AND THEY CLAIM THEY ARE UNABLE TO
DETERMINE WHAT IS WRONG OR HOW TO FIX IT.IT IS
ONLY A MATER OF TIME BEFORE I HAVE AN ACCIDENT
AND INJURE MYSELF OR OTHERS .

[Impala, 2008, No. 10669552, 1/2/2015], TL* THE CONTACT
OWNS A 2008 CHEVROLET IMPALA. THE CONTACT
STATED THAT WHILE DRIVING AT APPROXIMATELY 5
MPH, THE VEHICLE STALLED WITHOUT WARNING. THE
VEHICLE WAS RESTARTED; HOWEVER, THE FAILURE
RECURRED ON SEVERAL OCCASIONS. THE VEHICLE
WAS REPAIRED UNDER NHTSA CAMPAIGN NUMBER:
14V355000 (ELECTRICAL SYSTEM) BUT THE FAILURE
RECURRED. THE MANUFACTURER WAS MADE AWARE
OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE
WAS 175, 812.

[Impala, 2009, No. 10731446, 7/1/2015], I WAS DERIVING
DOWN A STEEP GRADE ON THE GATLINBURG BYPASS
TOWARD PIGEON FORGE, TN IN SECOND GEAR FOR
ENGINE BREAKING. I FIRST NOTICED THE CAR GETTING
WARMER AND I CHECKED THE DUAL CLIMATE
CONTROL BY FEEL TO MAKE SURE MY RIDER HAD NOT
INCREASED THE TEMPERATURE. THEN I NOTICED THE
STEERING WAS HARDER ON SLIGHT CURVES; THEN I
NOTICED THE TACHOMETER GOING TO ZERO AND SONE
OTHER GAUGES DECREASING; THEN I HAD TO SLOW
FOR A CHARPER CURVE WHERE I HAD NO POWER
BRAKE ASSIST AND NO POWERING STEERING ASSIST. I
MANAGED TO BRING THE VEHICLE TO A SAFE STOP
WHERE I TRIED TO RESTART THE ENGINE. THE VEHICLE
RESTARTED AFTER A SHORT CRANKING BUT ACTED IF

- 361 -

IT WAS STARVING FOR FUEL. ONCE RESTARTED THE VEHICLE RAN SATISFACTORY, IF I HAD BEEN A WEAK PERSON OR HAD PANICKED THIS INCIDENT WOULD PROBABLY HAVE RESULTED IN A CRASH. THE IGNITION SWITCH RECALL HAD RECENTLY BEEN ACCOMPLISHED. THE FUEL LEVEL WAS 1/2 TANK. AS AN ELECTRICAL ENGINEER THIS APPEARED TO BE AN ELECTRICAL PROBLEM WHERE THE ENGINE POWER WAS CUT OFF SHUTTING DOWN THE FUEL PUMP, INSTRUMENT CLUSTER, IGNITION,  AND ELECTRIC STEERING ASSIST.

[Impala, 2009, No. 10648106, 10/22/2014],  2009 CHEVROLET IMPALA. CONSUMER WRITES IN REGARDS TO RECALL REPAIR. *TGW THE CONSUMER STATED THE RECALL WAS PERFORMED ON SEPTEMBER 15, 2014. HOWEVER, THE REPAIR ONLY LAST FOR ABOUT 10 MILES. THE DEALER STATED THERE WAS PROBABLY SOMETHING ELSE WRONG WITH THE VEHICLE. THE VEHICLE WOULD NOT STAY IN THE RUN POSITION WHICH RESULTED IN LOSS OF ENGINE POWER.*JB

[Impala, 2010, No. 10631642, 9/8/2014], TL* THE CONTACT OWNS A 2010 CHEVROLET IMPALA. WHILE APPROACHING A STOP OR DECELERATING AT VARIOUS SPEEDS, THE VEHICLE WOULD STALL WITHOUT WARNING. THE DEALER WAS UNABLE TO DIAGNOSE THE CAUSE OF THE FAILURE. THE VEHICLE WAS REPAIRED ACCORDING TO NHTSA CAMPAIGN NUMBER: 14355000 (ELECTRICAL SYSTEM); HOWEVER, THE FAILURE RECURRED. THE MANUFACTURER WAS NOT NOTIFIED. THE APPROXIMATE FAILURE MILEAGE WAS 81, 800.

[Ion,  2004, No. 10609205, 41829, TL* THE CONTACT OWNS A 2004 SATURN ION. THE CONTACT STATED THAT THE VEHICLE WAS REPAIRED UNDER THE NHTSA CAMPAIGN ID NUMBER: 14E021000 (IGNITION SWITCH). THE CONTACT STATED THE REPAIR DID NOT REMEDY THE FAILURE. THE CONTACT STATED THAT WHILE DRIVING AT APPROXIMATELY 55 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 133, 000.

[Ion,  2003, No. 10640439, 10/1/2014], ASK A MECHANIC SPRING 2014, WE HAD THE RECALL ON THE IGNITION

FIXED ON MY 2003 SATURN. ON SEPTEMBER 9TH MY SON DROVE THE SATURN TO DETROIT MI. ABOUT HALF WAY THERE ON I-94, AT RUSH HOUR, THE SATURN LOST POWER AND BEGAN STOPPING. HE WAS GOING ABOUT 70 MILES/HOUR AND DIDNÂ€™T HAVE EXTRA KEYS ON THE KEY RING. LUCKILY, HE IS STRONG, SMART AND QUICK THINKING. HE WAS ABLE TO WRESTLE THE STEERING COLUMN TOWARD AN EXIT, WHILE DEPRESSING THE CLUTCH AND RESTARTING THE CAR. THANKFULLY IT STARTED! IF I HAD BEEN DRIVING THE CAR, I DONÂ€™T THINK I COULD HAVE DONE THOSE THINGS. WE CALLED THE DEALERSHIP THAT FIXED THE CAR AND AFTER NUMEROUS CALLS, THEY SAID THEY WERE NOT AUTHORIZED TO TOW THE CAR AND FIX IT. NOW SEVERAL WEEKS LATER AND IN RESPONSE TO LETTERS SENT TO GM EXECUTIVES, THEY TELL US THE SAME THING. I AM TELLING THEM THEIR FIX IS NOT A FIX! I DONÂ€™T WANT OTHERS INJURED OR DEAD. WHY IS THIS ENTITLED Â€œASK A MECHANICÂ€  ? WE WERE TOLD MANY YEARS AGO BY A MECHANIC AT THE SATURN DEALER NOT TO HANG EXTRA KEYS ON OUR RING. THIS DEALER HAS BEEN GONE FOR MANY YEARS. MAYBE SOMEONE NEEDS TO ASK A CURRENT MECHANIC IF THIS IS THE RIGHT FIX FOR GM VEHICLES. *TR

[Ion,  2006, No. 10714985, 5/6/2015], I DO NOT RECALL THE EXACT DATE OF THE FIRST OCCURRENCE. MY CAR DIES RANDOMLY WHILE DRIVING. IT HAPPENED A SEVERAL TIMES BEFORE THE RECALL. I HAD THE RECALLED ITEMS RELATED TO THIS PROBLEM 'SUPPOSEDLY' REPAIRED SEVERAL MONTHS AGO BY AN AUTHORIZED GM DEALERSHIP. IT CONTINUED TO DIE WHILE DRIVING. I TOOK IT BACK SATURDAY TO THE DEALER AND MY CAR IS STILL THERE. THEY ARE HAVING PROBLEMS DUPLICATING THE DYING SITUATION. I TOLD THEM THEY DON'T NEED TO DUPLICATE IT, JUST RE-REPAIR THE RECALL ITEMS. IF THEY CANNOT FIND THE PROBLEM, I DO NOT FEEL SAFE DRIVING MY CAR AND DO NOT WANT IT BACK. THE DAY I TOOK IT TO THE DEALER, I WAS MAKING A LEFT HAND TURN FROM THE BUSY MAIN STREET OF MY TOWN INTO A PARKING LOT AND IT DIED BEFORE I EVEN REACHED THE CURB (NO BUMP). LUCKILY, THERE WAS NO ONCOMING TRAFFIC (I TAKE EXTRA PRECAUTIONS FOR FEAR OF

MY CAR DYING) OR I WOULD HAVE BEEN CREAMED. A
WOMAN DRIVING OUT OF THE LOT HAD TO STOP AND
ALLOW ME TO PUT MY CAR INTO NEUTRAL AND START
IT BACK UP AGAIN. WHAT RECOURSE DO I HAVE IF THE
PROBLEM IS NOT FIXED AND FOUND THIS TIME? IT WAS
SUPPOSED TO BE FIXED THE FIRST TIME AND IT WAS
NOT. HOW DO I HAVE A GUARANTEE THAT IT WILL
ACTUALLY BE FIXED THIS TIME? WHAT IF IT IS NOT? I
DO NOT WANT TO OUT MY CHILD'S LIFE OR MY LIFE OR
ANY OTHER HUMAN BEING'S LIFE IN DANGER BY
DRIVING A DEATHTRAP CAR. WILL GM REPLACE MY
CAR FOR ME WITH A DIFFERENT ONE? MY CAR IS
COMPLETELY PAID OFF. PLEASE HELP! *TR

[Ion, 2006, No. 10691857, 3/3/2015], WHILE DRIVING THE
CAR WILL AUTOMATICALLY SHUT OFF. I CAN BE ON
THE FREEWAY AT 55 MILES AND THE CAR WILL JUST
DIE. I CAN BE AT A STOP LIGHT AND THE CAR WILL DIE.
I HAVE TAKEN IT IN AND TWICE THEY SAID THEY
FOUND NOTHING HOWEVER THE PROBLEM STILL
EXSIST. I THOUGHT THAT WITH THE RECALL REPAIR OF
THE IGNITION SWITCH IT MIGHT HELP BUT IT HASN'T
AND MY KEY STILL GETS STUCK IN THE IGNITION AT
TIMES AND I DON'T EVEN HAVE ANYTHING HANGING
ON THE KEY ONLY THE REMOTE. BASICALLY ONCE
YOU FEEL THE CAR LOSING POWER AND ALL DASH
LIGHTS SHOW UP, YOU NEED TO RESTART THE CAR TO
PROCEED. VERY DANGEROUS ESPECIALLY ON THE
ROAD.

[Ion, 2006, No. 10655364, 11/17/2014], WHILE DRIVING AND
COME TO A COMPLETE STOP CAR WILL JUST CUT OFF,
ALOTT OF JERKING, POWER STEEING COMES ON AND
STEERING HARD, ELECTRICAL DISPLAY WILL
AUTOMATIC START SHOWING UP.HAVE TAKEN CAR TO
DEALERSHIP FOR RECALL REPAIRS AND STILL HAVE
PROBLEMS WITH STERRING. WHEN I BROUGHT THE CAR
HAD TAKEN IT TO THE DEALERSHIP AND THEY SAID IT
WAS FIXED BUT GOT ON THE ROAD AND CAR STOPED,
THE DEALSHIP HAD CAR TOWED TO FACILITY AND SAID
IF WAS FIXED, IT WAS ELECTRIDAL PROBLEM WHEN I
TOOK BACK AND THE PROBLEM IS STILL ON GOING TO
THIS DAY.

[Ion, 2006, No. 10641172, 10/3/2014], TL* THE CONTACT
OWNS A 2006 SATURN ION. THE CONTACT STATED THAT

- 364 -

THE VEHICLE STALLED INTERMITTENTLY WITHOUT
WARNING. THE VEHICLE WAS PREVIOUSLY REPAIRED
ACCORDING TO NHTSA CAMPAIGN NUMBER: 14V047000
(AIR BAGS, ELECTRICAL SYSTEM); HOWEVER, THE
FAILURE RECURRED. THE MANUFACTURER AND
DEALER WERE NOTIFIED. THE VEHICLE WAS NOT
REPAIRED. THE FAILURE MILEAGE WAS 72, 480.

[Lacrosse, 2005, No. 10681060, 2/3/2015], GM SENT OUT A
RECALL FOR THE BUICK LACROSSE 2005. THE RECALL
WAS TO FIX AN ISSUE THAT CAUSED THE CAR TO
SWITCH OFF AT RANDOM WHILE RUNNING CAUSING
FOR POTENTIAL CRASH AND LACK OF AIRBAGS TO
WORK AND OTHER POSSIBLE HAZARDS. THEY
RECOMMENDED THAT WE TAKE ANY THINGS OFF OF
THE KEY RING OTHER THAN THE KEY WHEN IN DRIVE. I
HAD NEVER EXPERIENCED THE ISSUE OF MY CAR
TURNING OFF ON ITS OWN PREVIOUS TO RECEIVING
THIS RECALL. BEING PROACTIVE I TOOK MY CAR TO
THE WILKINS GMC BUICK DEALERSHIP LOCATED AT
6913 RITCHIE HIGHWAY, GLEN BURNIE, MD 21061 IN
ORDER TO HAVE THE RECALL SERVICED. WHILE
HAVING THE RECALL FIXED I FOUND OUT FROM A
SERVICE WORKER AT THE DEALERSHIP THAT THE
RECALL FIX IS ONLY A CHANGE IN THE KEY. ONCE THE
RECALL FIX WAS COMPLETED I LEFT AND A WEEK
LATER HAD THE ISSUE OF THE CAR TURNING OFF
WHILE DRIVING OCCUR. I CALLED THE DEALERSHIP TO
SEE IF THEY WOULD LIKE TO TAKE A LOOK AT THE KEY
TO ENSURE THE FIX WAS PROPERLY DONE, THEY
INFORMED ME IT WAS PROPERLY DONE AND NO NEED
TO COME IN. I THEN CALLED GM CORPORATE AND WAS
TOLD THEY HAVE NO RECALL ON THE IGNITION PART
(THE REAL PROBLEM) AND THE KEY SHOULD HAVE
FIXED THE ISSUE. I WAS GIVEN NO ASSISTANCE FOR
THE TRUE CAUSE OF THE PROBLEM AND AM VERY
DISAPPOINTED IN THE LACK OF QUALITY AND QUALITY
ASSURANCE FROM THIS COMPANY. MY CAR HAS
PROGRESSIVELY GOTTEN WORSE AND NOW WILL
BARELY STAY ON WITHOUT THE KEY TURNING TO THE
OFF POSITION. I HAVE DONE RESEARCH AND SPOKEN
WITH MANY MECHANICS WITH ALL OF THE
INFORMATION POINTING TO THE NEED FOR A NEW
PROPER RECALL ON THE IGNITION ITSELF AND NOT THE
KEY.

[Lacrosse, 2005, No. 10679413, 1/28/2015], TL*THE CONTACT OWNS A 2005 BUICK LACROSSE. THE CONTACT STATED THAT IMMEDIATELY AFTER BEING REPAIRED UNDER NHTSA CAMPAIGN NUMBER: 14V355000 (ELECTRICAL SYSTEM), THE ENGINE LOST POWER. THE VEHICLE WAS TAKEN BACK TO THE DEALER, WHERE IT WAS DIAGNOSED THAT THE IGNITION SWITCH NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 112, 460.

[Lacrosse, 2007, No. 10672237, 1/13/2015], TL* THE CONTACT OWNS A 2007 BUICK LACROSSE. WHILE DRIVING APPROXIMATELY 35 MPH, THE VEHICLE STALLED. THE VEHICLE WAS ABLE TO RESTART. THE FAILURE RECURRED ON MULTIPLE OCCASIONS. THE VEHICLE WAS REPAIRED UNDER NHTSA CAMPAIGN NUMBER: 14V355000 (ELECTRICAL SYSTEM) BUT THE REMEDY FAILED TO REPAIR THE VEHICLE. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 63, 000. THE VIN WAS UNAVAILABLE.

[Lacrosse, 2006, No. 10659947, 11/21/2014, TL* THE CONTACT OWNS A 2006 BUICK LACROSSE. THE CONTACT STATED THAT WHILE DRIVING 60 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE VEHICLE WAS REPAIRED UNDER NHTSA CAMPAIGN NUMBER: 14V355000 (ELECTRICAL SYSTEM) HOWEVER, THE FAILURE RECURRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 170, 000. THE VIN WAS NOT AVAILABLE.

[Lacrosse, 2007, No. 10672237, 1/13/2015], TL* THE CONTACT OWNS A 2007 BUICK LACROSSE. WHILE DRIVING APPROXIMATELY 35 MPH, THE VEHICLE STALLED. THE VEHICLE WAS ABLE TO RESTART. THE FAILURE RECURRED ON MULTIPLE OCCASIONS. THE VEHICLE WAS REPAIRED UNDER NHTSA CAMPAIGN NUMBER: 14V355000 (ELECTRICAL SYSTEM) BUT THE REMEDY FAILED TO REPAIR THE VEHICLE. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 63, 000. THE VIN WAS UNAVAILABLE.

[Lucerne, 2006, No. 10652548, 11/4/2014], TL* THE CONTACT OWNS A 2006 BUICK LUCERNE. THE CONTACT STATED WHILE STOPPED AT A TRAFFIC SIGN, THE VEHICLE STALLED WITHOUT WARNING. THE CONTACT WAS ABLE TO RESTART THE VEHICLE AFTER SHIFTING INTO PARK. THE FAILURE RECURRED MULTIPLE TIMES. THE CONTACT MENTIONED THAT THE VEHICLE WAS REPAIRED UNDER NHTSA CAMPAIGN NUMBER: 14V355000 (ELECTRICAL SYSTEM). HOWEVER, THE FAILURE PERSISTED. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 101, 000.

[Lucerne, 2007, No. 10668004, 2/26/2015], 2007 BUICK LUCERNE. CONSUMER WRITES IN REGARDS TO IGNITION SWITCH RECALL NOTICE. *SMD THE CONSUMER STATED THE RECALL, DID NOT CORRECT THE ISSUE. RECALL # 14V355000.*JB

[Malibu, 1998, No. 10731739, 7/2/2015], TL* THE CONTACT OWNS A 1998 CHEVROLET MALIBU. WHILE DRIVING AT 45 MPH, THE VEHICLE SHUT OFF WITHOUT WARNING. THE VEHICLE WAS SERVICED UNDER NHTSA CAMPAIGN NUMBER: 14V400000 (ELECTRICAL SYSTEM), BUT THE REMEDY FAILED TO REPAIR THE VEHICLE. THE CONTACT MENTIONED THAT THE VEHICLE CONTINUED TO FAIL INTERMITTENTLY AFTER THE RECALL REPAIR WAS PERFORMED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 285, 000.

[Malibu, 1999, No. 10713496, 4/29/2015], IGNITION SWITCH HAS BEEN GETTING LOOSE AND DIFFICULT TO TURN ON FOR A LONG TIME. RECEIVED NTSB RECALL LETTER ABOUT UNINTENTIONAL KEY ROTATION FOR THE 1999 CHEVY MALIBU. I FOLLOWED THE NTSB INSTRUCTIONS AND REMOVED THE KEY FROM THE KEY RING. ON APRIL 21, 2015 THE CHEVY DEALER GLUED A PLASTIC HOUSING TO MY KEYS. AFTER RECEIVING MY KEYS BACK I COULD HARDLY GET THE KEY TO ROTATE THE IGNITION LOCK, I HAD TO JIGGLE THE KEY QUITE VIGOROUSLY TO GET THE IGNITION TO OPERATE. FOUR DAYS LATER THE KEY FELL OUT OF THE IGNITION AND THE ENGINE SHUT DOWN WHILE I WAS DRIVING ABOUT 40 MPH. ALTHOUGH DIFFICULT TO STEER AND BRAKE I WAS ABLE TO SAFELY BRING THE CAR TO THE SIDE OF

- 367 -

THE ROAD, LOCATE THE KEY ON THE FLOOR AND
AFTER REINSERTING THE KEY RESTARTED HE CAR. I
HAD A ROLL OF TAPE IN THE GLOVE BOX AND I USED IT
TO TAPE THE KEY IN POSITION. NO FURTHER
DIFFICULTIES. ON APRIL 27, 2015 I REPLACED THE LOCK
CORE SUCCESSFULLY. THE RECALL FIX FOR THIS
PROBLEM IS NOT ACCEPTABLE OR SAFE. I KNEW THE
IGNITION LOCK WAS GETTING BAD BUT WAS NOT
AWARE THAT THE ENGINE WOULD SHUT DOWN IF THE
KEY FELL OUT. THIS FIX GAVE ME A FALSE SENSE OF
SECURITY THAT A PROBLEM WAS TAKEN CARE OF.
WHEN I TOOK THE CAR TO THE DEALER I THOUGHT
THEY WOULD REPLACE THE LOCK CORE AND KEYS
AND NOT JUST GLUE A HOUSING ONTO MY WORN-OUT
KEYS. MY REPLACEMENT OF THE LOCK CORE SOLVED
THE PROBLEM THE WAY THE DEALER SHOULD HAVE. A
LETTER NEEDS TO GO OUT TO ALL THAT RECEIVED THE
RECALL LETTER THAT THIS IS NOT AN ACCEPTABLE FIX
IF THE LOCK CORE IS NOT REPLACED. WHEN THE
DEALER SHOWED ME THE FIX I LAUGHED AT THE TIME
AND SAID YOU HAVE TO BE KIDDING ME THAT I'VE
WASTED 1:45 OF MY TIME WAITING FOR THE GLUE TO
DRY. I DO NOT KNOW WHO THOUGHT THIS WOULD
SOLVE ANYTHING OR APPROVED IT BUT I THINK THEY
ARE AN IDIOT AND SHOULD BE FIRED FROM ANY
POSITION OF RESPONSIBILITY FOR THE SAFETY THAT
THESE RECALLS ARE SUPPOSE TO ADDRESS.

[Malibu, 2000, No. 10661656, 12/2/2014], THIS VEHICLE HAS
A DEFECTIVE IGNITION SWITCH. THE KEY COMES OUT
IN RUN POSITION WHILE CAR IS RUNNING. THIS
VEHICLE WAS PART OF THE GM RECALL FOR A FAULTY
IGNITION SWITCH. AS PART OF THIS RECALL, THE KEY
WAS MODIFIED. THIS DID NOT CORRECT THE PROBLEM
OF THE FAULTY SWITCH AND REMAINS A SAFETY
CONCERN.

[Malibu, 2000, No. 10643669, 10/9/2014], TL* THE CONTACT
OWNS A 2000 CHEVROLET MALIBU. THE CONTACT
STATED THAT THE VEHICLE STALLED WITHOUT
WARNING. THE CONTACT MENTIONED THAT THE
FAILURE STARTED OCCURRING AFTER THE VEHICLE
WAS REPAIRED UNDER RECALL NHTSA CAMPAIGN
NUMBER: 14V400000 (ELECTRICAL SYSTEM).THE
CONTACT WAS ABLE TO RESTART THE VEHICLE. THE

VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 160, 000.

[Malibu, 2005, No. 10654527, 41955], TL* THE CONTACT OWNS A 2005 CHEVROLET MALIBU. THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 35 MPH, THE VEHICLE STALLED WITHOUT WARNING CAUSING THE THE STEERING WHEEL TO SEIZE. ALSO, THE CONTACT STATED THAT THE WINDOWS AND WINDSHIELD WIPERS FAILED TO OPERATE. THE FAILURE RECURRED NUMEROUS TIMES. VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC FOR DIAGNOSTIC TESTING AND THE IGNITION WAS REPLACED. THE FAILURE RECURRED. THE VEHICLE WAS REPAIRED UNDER RECALL NHTSA CAMPAIGN ID NUMBER: 14V400000 (ELECTRICAL SYSTEM) BUT THE FAILURE PERSISTED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 120, 000. UPDATED 12/22/14*LJ

[Malibu, 2003, No. 10705370, 4/13/2015], TL* THE CONTACT OWNS A 2003 CHEVROLET MALIBU. WHILE DRIVING AT AN UNKNOWN SPEED, THE VEHICLE STALLED. IN ADDITION,  THE CHECK ENGINE LIGHT, POWER STEERING, TRACTION CONTROL, AND AIR BAG WARNING LIGHTS ILLUMINATED. THE CONTACT MENTIONED THAT THE VEHICLE WAS PRECIOUSLY REPAIRED UNDER NHTSA CAMPAIGN NUMBER: 14V40000 (ELECTRICAL SYSTEM); HOWEVER, THE RECALL REMEDY FAILED TO REPAIR THE VEHICLE. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 119, 000.

[Malibu, 2003, No. 10690062, 2/23/2015], TL*THE CONTACT OWNS A 2003 CHEVROLET MALIBU. THE CONTACT STATED THAT WHILE DRIVING AT APPROXIMATELY 65 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE VEHICLE WAS REPAIRED UNDER NHTSA CAMPAIGN ID NUMBER: 14V400000 (ELECTRICAL SYSTEM) HOWEVER, THE FAILURE PERSISTED ON NUMEROUS OCCASIONS. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 65, 200.

[Malibu, 2003, No. 10655059, 11/14/2014], TL* THE CONTACT OWNS A 2003 CHEVROLET MALIBU. WHILE DRIVING 10 MPH, THE ENGINE STALLED AND ALL OF THE INSTRUMENT PANEL LIGHTS ILLUMINATED. THE CONTACT STATED THAT THE VEHICLE STARTED TO EXHIBIT THE FAILURE IMMEDIATELY AFTER BEING REPAIRED UNDER NHTSA CAMPAIGN NUMBER: 14V400000 (ELECTRICAL SYSTEM). THE DEALER AND MANUFACTURER WERE NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 168, 000.

[Malibu, 2001, No. 10694096, 3/13/2015], TL* THE CONTACT OWNS A 2001 CHEVROLET MALIBU. THE CONTACT STATED THAT THE VEHICLE WAS REPAIRED UNDER NHTSA CAMPAIGN NUMBER: 14V400000 (ELECTRICAL SYSTEM); HOWEVER, THE FAILURE RECURRED AND THE VEHICLE BECAME INOPERABLE. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 67, 000.

[Malibu, 2001, No. 10643886, 10/10/2014, TL* THE CONTACT OWNS A 2001 CHEVROLET MALIBU. THE CONTACT STATED THAT AFTER SERVICING THE VEHICLE UNDER NHTSA CAMPAIGN NUMBER: 14V400000 (ELECTRICAL SYSTEM), THE VEHICLE STALLED. THE FAILURE OCCURRED ON TWO OCCASIONS. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 114, 000.

[Malibu Classic, 2005, No. 10663018, 12/9/2014], FROM THE TIME WE BOUGHT THIS CAR IN JUNE 2014 TO NOW, THE CAR HAS PERIODICALLY SHUT OFF WHILE THE CAR IS IN MOTION. USUALLY IT HAS OCCURRED AT VERY LOW SPEED FORTUNATELY. IT IS DIFFICULT TO GET THE KEY TO THE THE TRUE OFF POSITION DESPITE THIS. THE RECALL ONLY CALLS FOR A PLASTIC INSERT TO BE INSTALLED ON THE KEY, WHICH WAS DONE ON 10/30/14. THE CAR STILLS HAS THE SHUT OFF ISSUE, IT HAS GOTTEN WORSE, AND THE DEALERSHIP SAYS IT NEEDS THE IGNITION SWITCH AND THE LOCK CYLINDER REPLACED. THE INSERT ON THE KEY IS INSUFFICIENT TO FIX THE IGNITION SWITCH ISSUE. ONE STILL HAS TO KEEP NOTHING ELSE ON THE KEY RING, YET GM INSISTS THE PROBLEM IS TRULY FIXED BY PUTTING AN

INSERT ON THE KEY. SOUNDS LIKE THE IGNITION SWITCH IS FAULTY, TOO SENSITIVE AND THEY HAVE AN INSUFFICIENT FIX.

[Malibu Classic, 2005, No. 10649442, 10/23/2014], MY CAR HAS BEEN STALLING OUT RANDOMLY USUALLY AT HIGHWAY SPEEDS HAS DONE THIS ABOUT 5 TIMES IN TWO WEEKS I JUST HAD MY RECALL DONE BUT THE PROBLEM STILL EXISTS VERY DANGEROUS MECHANIC SEEM TO THINK ITS MY IGNITION SWITCH NOT JUST THE KEYS AND COVER GM DID ON RECALL I'M WONDERING IF OTHER COMPLAINTS HAVE COME IN AND WHAT SHOULD I DO. I THOUGHT THIS IS WHY THEY RECALLED THE CARS FOR STALLING OUT, NO STEERING, BRAKES ETC. *TR

[Cobalt, 2008, No. 10630846, 9/4/2014], TL* THE CONTACT OWNS A 2008 CHEVROLET COBALT. THE CONTACT STATED THAT WHILE DRIVING AT AN UNKNOWN SPEED, THE VEHICLE STALLED WITHOUT WARNING. THE CONTACT STATED THAT THE VEHICLE STARTED EXHIBITING THIS PROBLEM AFTER BEING REPAIRED UNDER RECALL NHTSA CAMPAIGN NUMBER: 14V047000 (AIR BAGS, ELECTRICAL SYSTEM). THE VEHICLE WAS TAKEN TO THE DEALER. THE TECHNICIAN WAS UNABLE TO DIAGNOSE THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS 209, 000.

[Cobalt, 2007, No. 10614521, 7/18/2014], TL* THE CONTACT OWNS A 2007 CHEVROLET COBALT. THE CONTACT STATED THAT THE VEHICLE WAS REPAIRED UNDER NHTSA CAMPAIGN ID NUMBER: 14V047000 (AIR BAGS, ELECTRICAL SYSTEM). THE CONTACT STATED THAT SHORTLY AFTER THE REPAIRS WERE COMPLETED ON THE VEHICLE UNDER THE RECALL, THE FAILURE RECURRED. THE VEHICLE WAS TAKEN BACK TO THE DEALER, WHO PERFORMED THE RECALL REPAIRS ON THREE DIFFERENT OCCASIONS. THE REMEDY FAILED TO REPAIR THE VEHICLE. UPDATED 08/25/14*LJ

[CTS, 2003, No. 10659968, 11/21/2014], TL* THE CONTACT OWNS A 2003 CADILLAC CTS. THE CONTACT STATED THAT THE AIR BAG WARNING LIGHT ILLUMINATED. THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC, WHO DIAGNOSED THAT THE AIR BAG MODULE NEEDED TO BE REPLACED. THE VEHICLE WAS

REPAIRED. THE CONTACT ALSO STATED THAT WHILE
DRIVING AT 3 MPH, THE VEHICLE SUDDENLY SHUT OFF
DUE TO THE KEY FOB MAKING CONTACT WITH THE
DRIVER'S KNEE. THE VEHICLE WAS ABLE TO RESTART.
THE CONTACT STATED THAT NHTSA CAMPAIGN
NUMBER 14V394000 (ELECTRICAL SYSTEM) WAS
PREVIOUSLY PERFORMED. THE MANUFACTURER WAS
NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE
WAS 28, 000.

[Deville, 2001, No. 10682163, 2/9/2015], TL*THE CONTACT
OWNS A 2001 CADILLAC DEVILLE. THE CONTACT
STATED THAT WHILE DRIVING APPROXIMATELY 27
MPH, THE VEHICLE STALLED WITHOUT ANY
WARNINGS. THE CONTACT HAD TO MANEUVER TO THE
SIDE OF THE ROAD. THE VEHICLE RESTARTED AND WAS
DRIVEN HOME. THE VEHICLE WAS NOT TAKEN TO THE
DEALER. THE VEHICLE HAD PREVIOUSLY BEEN
REPAIRED UNDER AN IGNITION SWITCH RELATED
RECALL. THE VEHICLE WAS NOT REPAIRED. THE
MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE.
THE APPROXIMATE FAILURE MILEAGE WAS 109, 000.

[Deville, 2001, No. 10662781, 1/29/2015], 2001 CADILLAC
DEVILLE. CONSUMER STATES AFTER THE IGNITION
REPAIRS WERE DONE, THE CAR BEGIN SHUTTING OFF
MORE THAN THREE TIMES. *TA THE CONSUMER
STATED SHE HAD NO CONTROL OVER THE VEHICLE.
THERE WAS NO STEERING OR BRAKES. THE CONSUMER
RETURNED TO THE DEALER. HOWEVER, THERE WERE
UNABLE TO IDENTIFY THE PROBLEM AND THEREFORE
DID NOT PERFORM ANY REPAIRS. *JB

[Deville, 2001, No. 10661734, 12/1/2014], S10 APPROPRIATE
HANDLING- LETTER TO THE SECRETARY FROM
CONSTITUENT RE COPY OF COMPLAINT TO MARY
BARRA, CHIEF EXECUTIVE OFFICER OF GENERAL
MOTORS (GM) COMPANY REGARDING VEHICLE RECALL
(CERT. NO. 7014 0150 0002 3462). *SMD THE CONSUMER
STATED AFTER THE IGNITION RECALL WAS
PERFORMED, THE VEHICLE SHUT OFF WHILE IN THE
MIDST OF DRIVING. THE CONSUMER HAD NO BRAKES
OR POWER STEERING. THE FIRST TWO OCCURRENCES,
SHE WAS ALMOST STOPPED OR MOVING SLOWLY. THE
THIRD OCCURRENCE WAS SERIOUSLY LIFE
THREATENING, AS SHE WAS DRIVING HER HUSBAND TO

- 372 -

AN APPOINTMENT, WHEN SUDDENLY THE VEHICLE
SHUT OFF FOR NO APPARENT REASON, WITH ANOTHER
VEHICLE DIRECTLY BEHIND HER. THE VEHICLE WAS
TOWED TO THE DEALER. THEY WERE UNABLE TO
IDENTIFY THE PROBLEM AND THEREFORE DID NOT
PERFORM ANY REPAIRS. *JB

[DeVille, 2003, No. 10682286, 3/18/2015], 2003 CADILLAC
DEVILLE. CONSUMER WRITES IN REGARDS TO IGNITION
SWITCH ISSUES. *SMD THE CONSUMER STATED THE
RECALL REPAIR WAS NOT EFFECTIVE. THE CONSUMER
STATED THE IGNITION SWITCH SHOULD HAVE BEEN
REPLACED, AS THE VEHICLE SHUT OFF WHILE DRIVING
IN TRAFFIC. THE CONSUMER HAD TO PUT THE VEHICLE
IN NEUTRAL AND RE-START THE VEHICLE. THE
VEHICLE USUALLY RE-STARTED, BUT A TIMES WHEN
HE TURNED THE SWITCH NOTHING HAPPENED. ALSO,
THE AIR BAG LIGHT ILLUMINATED ON AN
INTERMITTENT BASIS. *JB

[DeVille, 2003, No. 10679929, 1/30/2015], TL*THE CONTACT
OWNS A 2003 CADILLAC DEVILLE. THE CONTACT
STATED THAT WHILE DRIVING AT APPROXIMATELY 10
MPH, THE VEHICLE STALLED WITHOUT WARNING. THE
VEHICLE WAS ABLE TO RESTART BUT THE FAILURE
RECURRED ON SEVERAL OCCASIONS. THE VEHICLE
WAS NOT DIAGNOSED OR REPAIRED. THE CONTACT
STATED THAT THE VEHICLE WAS PREVIOUSLY
SERVICED UNDER NHTSA CAMPAIGN NUMBER:
14V355000 (ELECTRICAL SYSTEM) AND THAT THE
RECALL REMEDY FAILED TO REPAIR THE VEHICLE. THE
MANUFACTURER WAS NOT MADE AWARE OF THE
FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS
55, 000. UPDATED 3/31/15*CN

[DeVille, 2002, No. 10701990, 3/26/2015], TL* THE CONTACT
OWNS A 2002 CADILLAC DEVILLE. THE CONTACT
STATED THAT THE VEHICLE STALLED. THE VEHICLE
WAS REPAIRED UNDER NHTSA CAMPAIGN NUMBER:
14V355000 (ELECTRICAL SYSTEM) BUT THE FAILURE
PERSISTED. THE MANUFACTURER WAS NOTIFIED OF
THE FAILURE. THE FAILURE MILEAGE WAS UNKNOWN.
UPDATED 6/11/15*CN

[HHR, 2006, No. 10577847, 4/7/2014], ENGINE SHUT OFF
FIRST TIME RESULTING IN MINOR CONTACT WITH

GARAGE DOOR WHILE PULLING INTO DRIVEWAY. SHUT DOWN 2 MORE TIMES AT LOW SPEEDS AND A 4TH TIME AT 50MPH IN A CEMENT BARRIER CONSTRUCTION ZONE ON A BRIDGE, NO ROAD SHOULDER, DUE TO SPEED AT SHUT DOWN WAS ABLE TO COAST THROUGH CONSTRUCTION TO ROADSIDE. IGNITION CONTROL MODULE WAS REPLACED AFTER INCIDENT, HOWEVER SHUTDOWNS CONTINUED AFTER. DROVE CAR WITH SINGLE KEY ONLY SINCE IGNITION CONTROL MODULE WAS REPLACED, HOWEVER MY VEHICLE STILLS SHUTS DOWN! IT HAS BEEN INCLUDED IN THE RECALL BUT IT STILL IS NOT SAFE AND I DON'T BELIEVE WILL BE SAFE AFTER RECALL REPAIR! I DON'T WANT TO WAIT UNTIL I KILL SOMEONE TO HAVE THE GOV, GM, OR ANYONE CARE, THAT THE CARS THAT ARE ACTUALLY SHUTTING DOWN NEED TO BE TAKEN OFF THE ROAD AND REPLACED! PLEASE SOMEONE HELP THE CAR OWNERS LIKE ME! HELP US FEEL SAFE AGAIN AND NOT AS THOUGH WE ARE PLAYING RUSSIAN ROULETTE EVERY TIME WE DRIVE OUR CARS! I AM BEGGING SOMEONE AT THIS AGENCY TO PLEASE MAKE THEM REPLACE OUR KNOWN DEFECTIVE AND UNSAFE CARS! MY CAR CONTINUES TO SHUTDOWN AFTER REMOVAL OF ALL THINGS ON THE KEY! HELP! I HAVE 2 SMALL KIDS AND HAVE TO KEEP THEM SAFE! *TR

[HHR, 2010, 10615339, 7/22/2014], TL* THE CONTACT OWNS A 2010 CHEVROLET HHR. THE CONTACT STATED THAT SHE RECEIVED NHTSA CAMPAIGN NUMBER: 14E021000 (IGNITION SWITCH). THE CONTACT STATED THAT AFTER THE VEHICLE WAS SERVICED FOR THE RECALL, THE VEHICLE ENGINE STALLED WHEN STOPPING FOR TRAFFIC LIGHTS. THE CONTACT ALSO MENTIONED THAT ALL OF THE WARNING LIGHTS, INCLUDING THE "DISABLED AIR BAG" WARNING LIGHT, ILLUMINATED PRIOR TO THE ENGINE STALLING. THE VEHICLE WAS ABLE TO RESTART. THE FAILURE RECURRED ON MULTIPLE OCCASIONS. THE VEHICLE WAS TAKEN TO THE DEALER WHERE THE FAILURE WAS UNDETERMINED. IN ADDITION,  THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC WHERE THEY DIAGNOSED THAT THE SECURITY FEATURE CHIP NEEDED TO BE REPLACED WHICH WAS THE CAUSE OF ALL THE SECURITY LIGHTS ILLUMINATING. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER

WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE
FAILURE MILEAGE WAS UNAVAILABLE.

[HHR, 2007, No. 10643807, 10/10/2014], TL* THE CONTACT
OWNS A 2007 CHEVROLET HHR. THE CONTACT STATED
THAT THE VEHICLE WAS SERVICED ACCORDING TO
NHTSA CAMPAIGN NUMBER: 14V047000 (AIR BAGS,
ELECTRICAL SYSTEM) AND WAS CONCERNED THAT THE
REMEDY FAILED TO REPAIR THE VEHICLE. WHILE
DRIVING APPROXIMATELY 25 MPH, THE ENGINE
STALLED. THE CONTACT WAS UNABLE TO REMOVE THE
KEY FROM THE IGNITION AND THE VEHICLE
RESTARTED INDEPENDENTLY. THE VEHICLE WAS NOT
DIAGNOSED OR REPAIRED. THE CONTACT HAD NOT
EXPERIENCED A FAILURE PRIOR TO THE RECALL
REPAIR. THE MANUFACTURER WAS NOTIFIED OF THE
FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS
84, 000.

[Alero, 2000, No. 10658644, 11/17/2014], TL* THE CONTACT
OWNS A 2000 OLDSMOBILE ALERO. WHILE DRIVING
APPROXIMATELY 25 MPH, THE KEY EJECTED FROM THE
IGNITION SWITCH INADVERTENTLY. ALSO, THE
IGNITION SWITCH WOULD TURN TO THE OFF POSITION
AND THE VEHICLE STALLED MULTIPLE TIMES. THE
VEHICLE WAS TAKEN TO THE DEALER. THE
TECHNICIAN DIAGNOSED THAT THE IGNITION
SWITCHED NEEDED TO BE REPLACED. THE VIN WAS
INCLUDED IN NHTSA CAMPAIGN NUMBER: 14V400000
(ELECTRICAL SYSTEM). THE VEHICLE WAS REPAIRED
UNDER THE RECALL, BUT THE FAILURE RECURRED
MULTIPLE TIMES. THE MANUFACTURER WAS NOT
NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS
UNAVAILABLE.

[Grand Am, 2003, No. 10713751, 4/30/2015], VEHICLE HAS
BEEN "REPAIRED" AS PER NHTSA RECALL #14V400000
WITHIN THE LAST TWO (2) MONTHS. ON WEDNESDAY
APRIL 29, 2015, AT APPROXIMATELY 7:30 PM CDST,
WHEN DRIVING THE VEHICLE IS SHUT OFF AGAIN JUST
AS IT DID PRIOR TO THE RECALL "REPAIR". KEYS ON
KEY CHAIN ARE MINIMAL (6). VEHICLE RESTARTED
WITH NO FURTHER ISSUE OR INDICATION THAT THERE
WAS A ISSUE WITH THE ENGINE (NO CHECK ENGINE
LIGHT, ETC.).

- 375 -

[Grand Prix, 2005, No. 10712325, 4/22/2015], MY CAR HAS BEEN ACTING UP FOR A WHILE. IT STARTED WITH GAUGES AND INFO CENTER FLICKERING WHILE GOING DOWN THE ROAD LIKE IT WAS LOSING POWER INTERMITTENTLY. THAN STARTED DOING THIS THING WHEN YOU START IT AND LET OFF ON THE KEY IT CONTINUES TO TURN ENGINE OVER. I RECEIVED THE LETTER FOR THE RECALL AND TOOK IT IN. I TOLD DEALER WHAT IT WAS DOING AND THEY SNAPPED BACK AND SAID THAT WASN'T PART OF THE RECALL. I SAID OH I THOUGHT THE IGNITION SWITCH WAS THE PROBLEM THEY SAID NO. THEY TOOK MY KEYS PUT THEIR STUIPID INCERTS IN AND SENT ME ON MY WAY. I HAVE BEEN NERVOUS ABOUT IT AND THAN TODAY IT HAPPENED GOING DOWN HIGHWAY AT 65MPH AND EVERYTHING SHUT OFF!!! NO AIR BAGS NO POWER STEERING NO POWER BRAKES LUCKLY I WAS NOT IN TRAFFIC AND COSTED TO SHOULDER SHUT KEY OFF RESTARTED CAR EVERYTHING FINE AGAIN. KEY NEVER TURNED TO OFF POSITION. THE SWITCH ITSELF IS THE PROBLEM. WHY DID SOME GET A NEW SWITCH AND ALL I GET IS A KEY UPGRADE. I AM VERY DISAPPOINTED AND I FEEL THEY HAVE NOT FIXED THE REALLY PROBLEM. I CAN NOT LET ANYONE IN MY FAMILY DRIVE THIS CAR. I LOOK FORWARD TO HEARING YOUR RESPONSE.

[Alero, 2001, No. 10653853, 11/10/2014], TL* THE CONTACT OWNS A 2001 OLDSMOBILE ALERO. THE CONTACT STATED THAT WHILE DRIVING AT VARIOUS SPEEDS, THE VEHICLE WOULD SUDDENLY STALLED. THE VEHICLE WAS TAKEN TO THE DEALER WHO PERFORMED THE REMEDY LISTED FOR NHTSA CAMPAIGN NUMBER 14V400000 (ELECTRICAL). THE CONTACT STATED THAT IMMEDIATELY AFTER LEAVING THE DEALER, THE VEHICLE STALLED WHILE ATTEMPTING TO ACCELERATE FROM A STOP LIGHT. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 106, 677.

[Alero, 2003, No. 10694691, 3/16/2015], TL* THE CONTACT OWNS A 2003 OLDSMOBILE ALERO. WHILE DRIVING AT VARIOUS SPEEDS, THE VEHICLE STALLED WITHOUT WARNING. THE CONTACT STATED THAT THE VEHICLE

WAS SERVICED UNDER NHTSA CAMPAIGN NUMBER: 14V400000 (ELECTRICAL SYSTEM); HOWEVER, THE REMEDY FAILED TO REPAIR THE FAILURE. THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC. THE TECHNICIAN DIAGNOSED THAT THE IGNITION SWITCH WAS DEFECTIVE. THE VEHICLE WAS REPAIRED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 159, 800.

[Alero, 2003, No. 10693503, 3/9/2015], RECALL 14350 WAS FIXED BUT AFTER A WEEK, THE CAR STARTED TO SHUT OFF AGAIN WHILE DRIVING . PLEASE HELP.NO ONE SEEM TO KNOW WHAT IS WRONG . THIS IS MY TRANSPORTATION BACK AND FOURTH TO WORK. I NEVER NO WHETHER I'AM GOING TO GET HOME OR NOT.

[Monte Carlo, 2001, 10722350, 5/29/2015], 2001 MONTE CARLO SS; I'VE HAD MANY DIFFERENT OCCASIONS ON WHERE THE CAR JUST DIES WHILE I'M DRIVING IT. THEY HAD A RECALL FOR THE "IGNITION KEY" I TOOK IT IN, THEY "FIXED" THE KEY-NOT THE IGNITION,  AND STILL, TO THIS DAY, THE VEHICLE CONTINUES TO DIE WHILE DRIVING, WHICH INCLUDES LOSS OF POWER STEERING COMPLETELY. LUCKILY, I HAVE NOT HAD A CAR ACCIDENT DUE TO THIS ISSUE, BUT IT'S STILL SCARY WHEN IT HAPPENS. IT HAPPENED AGAIN TODAY, 5/29/2015 WHILE DRIVING AND COMPLETELY LOST STEERING CONTROL WHEN IT DIED.

[Monte Carlo, No. 2002, 10662013, 12/3/2014], TL* THE CONTACT OWNS A 2002 CHEVROLET MONTE CARLO. THE CONTACT RECEIVED A NOTIFICATION FOR NHTSA CAMPAIGN ID NUMBER: 14V400000 (ELECTRICAL SYSTEM) AND RECEIVED THE RECALL REPAIR. THE CONTACT STATED THE IGNITION FAILED SEVERAL TIMES BEFORE THE NOTIFICATION WAS RECEIVED. THE CONTACT MENTIONED THAT THE KEY WOULD NOT TURN OVER TO START THE VEHICLE ON NUMEROUS OCCASIONS BEFORE AND AFTER THE RECALL REPAIR AS WELL AS THE VEHICLE STALLED REPEATEDLY. THE DEALER DID NOT PROVIDE A REMEDY FOR THE IGNITION SWITCH FAILURE AND INDICATED THAT THE CONTACT MAY HAVE THE VEHICLE INPSECTED AND DIAGNOSED TO DETERMINE THE FAILURE. THE VEHICLE CONTINUED TO STALL. THE VEHICLE WAS

- 377 -

TAKEN TO A MECHANIC WHO DIAGNOSED THAT THE
IGNITION SWITCH NEEDED TO BE REPLACED AND WAS
ALSO GOING TO FURTHER INSPECT THE VEHICLE. THE
VIN WAS NOT AVAILABLE. THE MANUFACTURER WAS
NOTIFIED OF THE FAILURE. THE APPROXIMATE
FAILURE MILEAGE WAS 129, 000.

[Monte Carlo, 2003, No. 10702827, 3/31/2015], TL* THE
CONTACT OWNS A 2003 CHEVROLET MONTE CARLO.
THE CONTACT STATED THAT THE VEHICLE WAS
REPAIRED UNDER NHTSA CAMPAIGN NUMBER:
14V400000 (ELECTRICAL SYSTEM); HOWEVER, THE
REMEDY FAILED TO WORK AND THE FAILURE
PERSISTED. THE VEHICLE WAS TAKEN BACK TO THE
DEALER AND THE IGNITION SWITCH HAD TO BE
REPLACED. THE CONTACT STATED THAT THE
MANUFACTURER REFUSED TO COVER THE REPAIRS
SINCE THE KEY FOB WAS LISTED AS THE REMEDY ON
THE NOTIFICATION. THE VEHICLE WAS REPAIRED. THE
FAILURE MILEAGE WAS UNKNOWN.

[Monte Carlo, 2003, No. 10671677, 1/11/2015, JANUARY 11,
2015] 2003 CHEVROLET MONTE CARLO - VIN: [XXX],
MILEAGE: APPROX 120, 000 SINCE OCTOBER 2014, THE
CAR SHUTS OFF WHILE DRIVING. I LOOSE THE POWER
STEERING AND IT'S VERY SCARY IF YOU ARE ON THE
FREEWAY. IT'S HARD TO BRING TO A STOP AND
SOMETIMES WHEN I SHIFT TO PARK IT MAKES A
HORRIBLE GRINDING NOISE. IT ALWAYS RESTARTS
AFTER I SIT AWHILE AND DRIVES LIKE NOTHING HAS
HAPPENED. . IT HAS HAPPENED NUMEROUS TIMES AND
NOW IT'S HAPPENING MORE OFTEN. IT COULD CAUSE A
BAD ACCIDENT. IT'S TO THE POINT I AM VERY SCARED
TO DRIVE IT, BECAUSE I NEVER KNOW WHEN IT'S
GOING TO HAPPEN. LAST WEE IT HAPPENED THREE
TIMES. I TOOK IT IN FOR THE RECALL WHERE THEY
MODIFY THE KEY. IT DID NOT HELP. MY EXCELLENT
MECHANIC SAID HE HAS NEVER HAD A SITUATION LIKE
THIS WHERE HE CAN'T FIGURE OUT WHAT'S WRONG.
(INCIDENT INFORMATION WILL NOT LET ME ENTER
DATES). INFORMATION REDACTED PURSUANT TO THE
FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
552(B)(6). *TR

[Grand Am, 2001, No. 10661706, 12/29/2014], 2001 PONTIAC
GRAND AM. CONSUMER STATES HAD PROBLEMS WITH

IGNITION SWITCH. *TA THE IGNITION SWITCH WAS REPLACED. *JB

[Intrigue, 2000, No. 10658850, 11/18/2014], WHEN I DROVE ON HIGH WAY OR LOCAL, SUDDENLY THE CAR IS POWER OFF, ENGINE AND POWER STEERING DO NOT WORK AT ALL, NEED PULL OVER RESTART SEVERAL TIMES, THEN DRIVE A WHILE THIS HAPPEN AGAIN. THIS HAPPENED SEVERAL TIMES IN THE PAST YEARS. I GOT RECALL 14350 AND THE DEALER FIXED THE KEY RING, I THOUGHT THE POWER OFF PROBLEM IS GONE, BUT IT HAPPENED AGAIN, THIS MAY CAUSE CRASH AND SERIOUS INJURY. I DON'T KNOW WHAT I CAN DO FOR THIS, I CANNOT AFFORD NEW CAR AND DEFINITELY WILL NOT SOLD THIS DEFECT CAR TO ANYONE ELSE. *TR

[Intrigue, 1999, No. 10652582, 11/4/2014], I'D BEEN NOTICING THAT MY CAR WOULD QUIT AT RANDOM TIMES A LITTLE OVER A YEAR AGO, AT FIRST ONCE EVERY MONTH OR THREE, THEN GRADUALLY WORKED UP TO MAYBE ONCE OR TWICE A WEEK. WHEN I RECEIVED THE RECALL NOTICE AND TOOK MY KEY OFF MY KEY RING. I HAD NO FURTHER QUITTING INCIDENTS UNTIL I TOOK MY CAR IN TO THE DEALER OCTOBER 31ST. THEY DID THEIR THING WITH MY KEY, AND MY CAR QUIT TEN MINUTES LATER, ON THE WAY TO AN URGENT APPOINTMENT. I GOT IT STARTED AGAIN, THEN IT QUIT AGAIN A COUPLE OF BLOCKS DOWN THE ROAD. I FINALLY MADE IT TO MY APPOINTMENT, 5 MINUTES LATE. I PUT ASIDE THE "NEW" KEY, USED A SPARE FROM THEN ON, AND THE CAR SEEMED FINE OVER THE WEEKEND. BUT ON MONDAY MORNING I DROVE TO THE GYM TO WORK OUT, AND THE CAR WOULD NOT START WHEN I FINISHED MY WORKOUT AND I WALKED THE REST OF THE WAY TO WORK. IT STARTED FINE THAT EVENING, THEN AGAIN THIS MORNING, BUT CONKED OUT HALF WAY TO WORK AGAIN. I GOT IT STARTED AGAIN BEFORE IT COASTED TO A STOP, BUT THIS IS GETTING RIDICULOUS. I THINK THE RECALL IS A FAILURE, AND GM NEEDS TO DO SOMETHING MUCH MORE THAN REPLACING THE KEY HEAD FOR IT TO BE EFFECTIVE. IF I WASN'T A STRONG MAN, I COULD HAVE HAD MANY SERIOUS ACCIDENTS BY NOW. *TR

[DeVille, 2001, No. 10795113, 11/20/2015], TL* THE CONTACT OWNS A 2001 CADILLAC DEVILLE. WHILE DRIVING 72 MPH, THE VEHICLE STALLED AND THE SERVICE AIR BAG WARNING LIGHT ILLUMINATED ON THE INSTRUMENT PANEL. THE CONTACT STATED THAT THE VEHICLE WAS ABLE TO BE MANEUVERED TO THE SHOULDER OF THE HIGHWAY WHERE THE VEHICLE WAS SUCCESSFULLY RESTARTED AFTER THE INITIAL ATTEMPT. THE CONTACT STATED THAT THE FAILURE OCCURRED ON A PREVIOUS OCCASION. THE VEHICLE WAS SERVICED UNDER NHTSA CAMPAIGN NUMBER: 14V355000 (ELECTRICAL SYSTEM), BUT THE REMEDY FAILED TO REPAIR THE VEHICLE. THE CONTACT MENTIONED THAT THE ENGINE CONTINUED TO STALL AFTER THE RECALL REPAIR. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 77, 000.

[DeVille, 2003, No. 10820714, 1/17/2016], IGNITION RECALL: ON 12 MARCH 2015 I TOOK MY 2003 CADILLAC DEVILLE INTO VALLEY CADILLAC ROCHESTER, NY AS PART OF THE GM IGNITION RECALL. PRIOR TO THAT MY VEHICLE WOULD JUST SHUT DOWN FOR NO REASON. AFTER HAVING MY VEHICLE SERVICED, I HIT A POT HOLE ON THE CITY STREET AND MY VEHICLE STOPPED RUNNING. LAST WEEK I WAS TURNING A CORNER AFTER COMING OFF THE FREEWAY OFF RAMP TURNING ON TO A CITY STREET AND MY VEHICLE STOPPED AGAIN AND EVERYTHING LOCKED UP. THE RECALL FIX DID NOT REPAIR MY VEHICLE. I AM CALLING VALLEY CADILLAC FIRST THING MONDAY TO GET IT SERVICED AGAIN.

[DeVille, 2003, No. 10809048, 12/8/2015, MY CAR TURNS OFF WHILE DRIVING. NO POWER FOR BRAKES, STEERING OR LIGHTS. I HAD RECALL FOR KEY ROTATION COMPLETED LAST WEEK BUT MY CAR TURNED OFF LAST NIGHT WHILE DOING 70 ON INTERSTATE. THE MOSSY OF PICAYUNE DEALERSHIP STATES THAT THE RECALL MAY NOT BE THE CAUSE BUT FROM WHAT I READ BEFORE TAKING CAR IN...THE PROBLEM WITH KEY ROTATION CAUSES CAR TO TURN OFF WITHOUT WARNING. I CONSIDER THIS A LIFE THREATENING PROBLEM AND NEED TO KNOW HOW TO PROCEED TO PREVENT BODILY HARM TO MYSELF AND POSSIBLY

OTHERS. THE CAR HAD BEEN TURNING OFF PRIOR TO THE RECALL.

[DeVille, 2003, 10703620, 4/3/2015], AFTER TAKING OFF FROM A STOP SIGN, I DROVE UP OVER ABOUT 1 1/2 INCH VERTICAL RISE IN THE PAVEMENT (SMALL BUMP). THE ENGINE AND ELECTRICAL SYSTEMS SHUT DOWN. I LOST POWER STIRRING AND POWER BRAKES. I GOT STOPPED AND RESTARTED THE ENGINE. THIS OCCURRED ABOUT 3 DAYS AFTER I HAD TAKEN MY CAR TO THE GM DEALER FOR REPAIRS COVERED BY GM RECALL 14299, "UNINTENDED IGNITION KEY ROTATION". MY KEY DID NOT ROTATE. YESTERDAY APRIL 2, 2015 WHEN DRIVING 45 MPH ON A STATE HIGHWAY, THE ENGINE STOPPED AGAIN WITHOUT HITTING ANY BUMPS. I WAS ABLE TO COAST, PUT THE CAR IN NEUTRAL, AND RESTART THE ENGINE, BEFORE THE CAR BEHIND ME COULD HIT ME. THERE WAS NO SHOULDER TO PULL OFF.AGAIN THERE WAS NO KEY ROTATION. I CALLED MY GM DEALER AFTER THE FIRST OCCURRENCE AND WAS TOLD I WOULD HAVE TO PAY FOR A NEW IGNITION SWITCH OR WHAT EVER WAS CAUSING THE PROBLEM. THE RECALL ONLY REMOVED ALL OTHER KEYS FROM THE IGNITION KEY RING. THIS IS A VERY DANGEROUS DEFECT THAT GM NEEDS ANOTHER RECALL TO FIX THIS SUDDEN ENGINE AND ELECTRICAL SYSTEM SHUT DOWN BECAUSE IF THERE IS A CRASH THE AIR BAGS WILL NOT DEPLOY. ALSO LOST OF POWER STIRRING AND POWER BRAKES MAKES CONTROL OF THE CAR VERY DIFFICULT.

[Camaro, 2014, No. 10763901, 9/15/2015], TL* THE CONTACT OWNS A 2014 CHEVROLET CAMARO. PRIOR TO PURCHASING THE VEHICLE, THE CONTACT STATED THAT THE IGNITION SWITCH KEY FOB WAS REPLACED. WHILE DRIVING AT ANY SPEEDS, THE CONTACT'S KNEE TOUCHED THE KEY AND THE ENGINE LIGHT ILLUMINATED. THE VEHICLE WENT FROM RUNNING TO THE ACCESSORY MODE AND THEN THE STEERING WHEEL SEIZED. THE CONTACT HAD TO PULL THE VEHICLE OVER TO THE SIDE OF THE ROAD AND PLACE THE GEAR IN THE PARK POSITION TO RESTART THE VEHICLE. THE FAILURE RECURRED. THE VEHICLE WAS NOT REPAIRED. THE APPROXIMATE FAILURE MILEAGE WAS 800.

[CTS, 2003, No. 10762302, 9/8/2015], TL* THE CONTACT OWNS A 2003 CADILLAC CTS. THE CONTACT STATED THAT THE REPAIR FOR NHTSA CAMPAIGN NUMBER: 14V394000 (ELECTRICAL SYSTEM) WAS PERFORMED; HOWEVER, THE REPAIR DID NOT REMEDY THE FAILURE. THE CONTACT STATED THAT THE VEHICLE STALLED SEVERAL TIMES WHILE DRIVING AND THAT THE "REMOVE DISABLE KEY" WARNING LIGHT ILLUMINATED. THE VEHICLE COULD BE RESTARTED AND RESUMED TO NORMAL FUNCTION. THE FAILURE OCCURRED SEVERAL TIMES. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE VIN WAS NOT AVAILABLE. THE FAILURE MILEAGE WAS 99, 000.

[Alero, 2004, No. 10884842, 7/14/2016], TL* THE CONTACT OWNS A 2004 OLDSMOBILE ALERO. WHILE DRIVING 55 MPH, THE ENGINE STALLED WITHOUT WARNING. THE VEHICLE WAS REPAIRED PER NHTSA CAMPAIGN NUMBER: 14V400000 (ELECTRICAL SYSTEM). THE FAILURE RECURRED NUMEROUS TIMES. THE VEHICLE WAS ABLE TO RESTART AFTER SEVERAL ATTEMPTS. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 162, 000.

[Intrigue, 2000, No. 10836616, 2/17/2016], MY CAR STALLS WHILE I'M MOVING! I BOUGHT THE CAR FROM A USED LOT IN AUG 2014, SHORTLY AFTER I RECEIVED A RECALL NOTICE. I TOOK THE CAR IN TO A DEALER AND THE DEALER PUT SHELLS OVER THE KEYS & SUPPOSEDLY DIDWHATEVER ELSE WAS REQUIRED IN THE RECALL. SHORTLY AFTER THAT, I WAS HAVING A HARD TIME STARTING THE CAR, I TOOK IT BACK TO THE LOT WHERE I BOUGHT IT THIS TIME. THEIR MECHANIC CHECKED IT OUT & DETERMINED THE CRANKSHAFT POSITION SENSOR NEEDED TO BE REPLACED. SO THEY REPLACED IT. RECENTLY MY CAR IS HAVING A HARD TIME STARTING BUT MORE IMPORTANTLY, MY CAR WILL STALL WHILE I'M DRIVING! THIS IS SCARY TO BE GOING 25-45 MPH AND NOT BE ABLE TO CONTROL MY CAR! THIS MORNING I SLOWED DOWN TO TURN A CORNER & IT JUST SHUT OFF ON ME AND I COULD NOT TURN THE WHEEL! CAUSED MY TO COME ABOUT 2 FEET FROM HITTING A

MEDIAN & ALMOST BE REAR ENDED! MY KIDS RODE IN
THIS VEHICLE & ONE OR ALL OF US IS GONNA END UP
SERIOUSLY INJURED OR KILLED! THIS SEEMS TO BE A
SERIOUS ISSUE WITH THESE VEHICLES & IT NEEDS TO
BE FIXED & QUICKLY! I CAN'T KEEP PRAYING TO HAVE
THIS FIXED ONCE A YEAR NOR SHOULD I HAVE TO! THIS
ISSUE NEEDS TO BE ADDRESSED IMMEDIATELY &
THERE SHOULD BE A RECALL OUT REGARDING THIS
ISSUE!

[Grand Prix, 2004, No. 10811434, 12/21/2015], CAR HAD KEY
RETROFIT BY DEALER BUT IGNITION SWITCH IS
TURNING OFF WHILE CAR IS IN DRIVE AT FULL POWER.
IT IS IF THE KEY IS BEING TURNED OFF. ALL POWER TO
VEHICLE IS LOST. OBVIOUSLY THE KEY RETROFIT DID
NOT SOLVE THE PROBLEM. I BELIEVE THE IGNITION
SWITCH ITSELF IS THE ISSUE.

[Malibu, 2002, No. 10806455, 11/24/2015], GM HAS A RECALL
ON IGNITION SWITCH (GM#14350). WE HAD THE WORK
DONE AT A GM DEALER FOR THE RECALL. (DEALER
PROVIDES 2 KEY RINGS AND A KEY COVER AND CALLS
IT FIXED.) APPARENTLY IT DIDN'T WORK. CAR
CURRENTLY IN MY LOCAL MECHANIC SHOP FOR
ROUTINE MAINTENANCE. DURING INSPECTION,
MECHANIC FOUND THE VEHICLE NEEDS A NEW
IGNITION SWITCH ASSEMBLY TO SOLVE THE SAME
PROBLEM. MECHANIC SAYS CAR EXTREMELY UNSAFE
TO DRIVE UNLESS REPLACED. HE TOOK A VIDEO OF MY
IGNITION SHOWING THAT JUST TOUCHING THE KEY
WHILE IN IGNITION CAUSES CAR TO TURN OFF. (HAVE
20 YR RELATIONSHIP WITH MECHANIC - VERY
RELIABLE.) PLEASE INVESTIGATE IF GM IS REALLY
DOING THE PROPER WORK FOR THE RECALL OR JUST
SUGAR COATING A DANGEROUS DEFECT.

[Camaro, 2014, No. 10763901, 9/15/2015], TL* THE CONTACT
OWNS A 2014 CHEVROLET CAMARO. PRIOR TO
PURCHASING THE VEHICLE, THE CONTACT STATED
THAT THE IGNITION SWITCH KEY FOB WAS REPLACED.
WHILE DRIVING AT ANY SPEEDS, THE CONTACT'S KNEE
TOUCHED THE KEY AND THE ENGINE LIGHT
ILLUMINATED. THE VEHICLE WENT FROM RUNNING TO
THE ACCESSORY MODE AND THEN THE STEERING
WHEEL SEIZED. THE CONTACT HAD TO PULL THE
VEHICLE OVER TO THE SIDE OF THE ROAD AND PLACE

- 383 -

THE GEAR IN THE PARK POSITION TO RESTART THE
VEHICLE. THE FAILURE RECURRED. THE VEHICLE WAS
NOT REPAIRED. THE APPROXIMATE FAILURE MILEAGE
WAS 800.

[Malibu Classic, 2005, No. 10765796, 9/20/2015], AFTER
TAKING MY CHEVROLET MALIBU CLASSIC 2005 INTO
THE DEALERSHIP FOR THE RECALL IN WHICH THEY PUT
INSERTS ON MY KEY AND A KING RING, RIDICULOUS IF
YOU ASK ME, MY CAR HAS NOW DONE THE SAME
THING THREE MORE TIMES I THOUGHT THE RECALL
WAS SUPPOSE TO FIX. WHILE DRIVING AT DIFFERENT
SPEEDS ( 60 MPH., 45 MPH., 20 MPH) MY CARS SHUTS OFF
AS IF I TURNED THE KEY OFF. MY POWER STEERING,
BRAKES ALL ELECTRICAL COMPONENTS ARE
EFFECTED. I HAVE TO THEN TURN MY KEY TO THE OFF
POSITION AND AGAIN START MY CAR TO CONTINUE
DRIVING. IT DOES THIS WITH NO WARNING, WHILE
DRIVING DOWN A HIGHWAY, WHILE TURNING, WHILE
DRIVING DOWN A HILL WHICH ARE ALL VERY MUCH
SAFETY ISSUES. DRIVING 60 ON A HIGHWAY AND THE
CAR SHUTS DOWN LEAVING YOU WITH NO POWER
STEERING NO POWER BRAKES NO WARNING LIGHTS
ETC. VERY SCARY. WHILE TURNING A CORNER ALL OF
A SUDDEN NO POWER STEERING SEEMS TO ME COULD
CAUSE A MAJOR WRECK, AND WHILE DRIVING DOWN A
HILL LOOSING YOUR POWER BRAKES COULD ALSO.
THIS HAPPEN TO ME NUMEROUS TIMES BEFORE THE
RECALL ALSO. I DO BELIEVE IT WAS A CHEAP WAY OF
CHEVY TO TRY TO GET OUT OF THE RESPONSIBILITY
FOR THIS PROBLEM. WHEN I EXPLAINED TO THE
DEALER MECHANIC WHAT WAS HAPPENING HE
INFORMED ME THAT THE RECALL THAT FIXED THE KEY
WOULD NOT HELP THE PROBLEM OF MY CAR
RANDOMLY SHUTTING OFF WHILE DRIVING IT SO
WHAT WAS IT FOR THEN?

[Ion, 2007, No. 10809556, 12/10/2015], TL* THE CONTACT
OWNS A 2007 SATURN ION. WHILE DRIVING 35 MPH AND
ATTEMPTING TO AVOID A VEHICLE THAT WAS STOPPED
IN THE ROADWAY, THE IGNITION KEY BECAME JARRED
AND MOVED TO THE OFF POSITION,  WHICH CAUSED
THE VEHICLE TO STALL WITHOUT WARNING. THE
CONTACT ATTEMPTED TO SWITCH LANES; HOWEVER,
THE STEERING WHEEL SEIZED AND THE BRAKES

FAILED TO FUNCTION WHEN THE PEDAL WAS
DEPRESSED. THE CONTACT STATED THAT THE VEHICLE
CRASHED INTO THE REAR OF THE PARKED VEHICLE.
THE AIR BAGS FAILED TO DEPLOY. THERE WAS NO
POLICE REPORT FILED. THE CONTACT SUSTAINED
INJURIES TO THE NECK, SHOULDER, AND LOWER BACK
THAT REQUIRED MEDICAL ATTENTION. THE CONTACT
STATED THAT THE VEHICLE WAS REPAIRED UNDER
NHTSA CAMPAIGN NUMBER: 14E021000 (ELECTRICAL
SYSTEM); HOWEVER, THE FAILURE RECURRED. THE
VEHICLE WAS TOWED TO A DEALER TO BE REPAIRED.
THE MANUFACTURER WAS NOTIFIED OF THE FAILURE.
THE APPROXIMATE FAILURE MILEAGE WAS 76, 000.

[HHR, 2006, No. 10760032, 8/28/2015], TL* THE CONTACT
OWNS A 2006 CHEVROLET HHR. THE CONTACT STATED
THAT NHTSA CAMPAIGN NUMBER: 14V171000
(ELECTRICAL SYSTEM) WAS PERFORMED; HOWEVER,
THE REPAIR DID NOT CORRECT THE FAILURE. THE
VEHICLE STALLED SEVERAL TIMES. IN ADDITION,
WHEN THE GEAR WAS SHIFTED INTO PARK, THE
IGNITION SWITCH FAILED TO TURN TO THE OFF
POSITION AND THE KEY DID NOT RELEASE FROM THE
IGNITION SWITCH. THE BATTERY WAS DISCONNECTED
TO BE ABLE TO SHUT THE ENGINE OFF. THE VEHICLE
WAS TOWED TO THE DEALER BUT WAS NOT
DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS
NOTIFIED OF THE FAILURE. THE APPROXIMATE
FAILURE MILEAGE WAS 160, 000.

[Lacrosse, 2007, No. 10715998, 5/12/2015], TL* THE CONTACT
OWNS A 2007 BUICK LACROSSE. THE CONTACT HAD THE
DEALER PERFORM THE REPAIR FOR NHTSA CAMPAIGN
NUMBER: 14V355000 (ELECTRICAL SYSTEM) AND THE
DEALER ONLY REPAIRED THE FILLER FOR THE KEY.
THE CONTACT STATED THAT THE VEHICLE STALLED
BEFORE AND AFTER THE RECALL REPAIR WAS
PERFORMED. THE CONTACT SPOKE WITH THE DEALER
WHO STATED THAT THE MANUFACTURER REPLACED
THE IGNITION, BUT CHANGED IT TO JUST THE KEY
FILLER. THE CONTACT FELT THAT THE REPAIR WAS
INADEQUATE. THE CONTACT HAD NOT EXPERIENCED A
FAILURE.

[Malibu, 1999, No. 10679297, 1/27/2015], TL* THE CONTACT
OWNS A 1999 CHEVROLET MALIBU. WHILE DRIVING AT

35 MPH, THE VEHICLE STALLED. THE CONTACT WAS ABLE TO RESTART THE VEHICLE AND ALL THE WARNING LIGHTS ILLUMINATED. THE VEHICLE WAS TAKEN TO A DEALER. THE VEHICLE WAS REPAIRED UNDER NHTSA CAMPAIGN NUMBER: 14V400000 (ELECTRICAL SYSTEM); HOWEVER, THE FAILURE RECURRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 166, 000. UPDATED 03/24/15*LJ

[G5, 2007, No. 10730540, 6/26/2015], TL* THE CONTACT OWNS A 2007 PONTIAC G5. WHILE DRIVING APPROXIMATELY 25 MPH, THE VEHICLE STALLED. THE VEHICLE WAS TOWED TO A DEALER WHERE THE BCI AND THE IGNITION CYLINDER SWITCH NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE CONTACT MENTIONED THAT A YEAR PRIOR TO THE FAILURE OCCURRING, THE VEHICLE WAS SERVICED UNDER A MANUFACTURERS RECALL FOR THE RELATED FAILURE. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 41, 100. THE VIN WAS NOT AVAILABLE.

[HHR, 2006, No. 10692136, 3/4/2015], TL* THE CONTACT OWNS A 2006 CHEVROLET HHR. AFTER THE VEHICLE WAS SERVICED UNDER NHTSA CAMPAIGN NUMBERS: 14V047000 (AIR BAGS, ELECTRICAL SYSTEM) AND 14V171000 (ELECTRICAL SYSTEM), THE STEERING WHEEL SEIZED AND THE VEHICLE STALLED. THE VEHICLE WAS ABLE TO RESTART. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS NOT AVAILABLE.

[Cobalt, 2006, No. 10595540, 6/2/2014], TL* THE CONTACT OWNS A 2006 CHEVROLET COBALT. THE CONTACT STATED THAT THE VEHICLE INTERMITTENTLY STALLED WITHOUT WARNING. THE DEALER WAS UNABLE TO DIAGNOSE THE FAILURE. TWO MONTHS LATER, THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBERS: 14V047000 (AIR BAGS, ELECTRICAL SYSTEM) AND 14V171000 (ELECTRICAL SYSTEM). THE VEHICLE WAS TAKEN TO THE DEALER FOR THE RECALL REPAIRS, BUT IT DID NOT REMEDY THE FAILURE THE CONTACT WAS EXPERIENCING. THE VEHICLE RECENTLY STALLED AND WAS TOWED TO THE

DEALER, WHO WAS ABLE TO DIAGNOSE THE VEHICLE
AFTER TWO MONTHS AS THE IGNITION SWITCH
NEEDING TO BE REPLACED. THE VEHICLE WAS
REPAIRED AND THE MANUFACTURER WAS MADE
AWARE OF THE FAILURE. THE APPROXIMATELY
FAILURE MILEAGE WAS 101, 000.

[Cobalt, 2006, No. 10654168, 11/11/2014], I HAVE OWNED MY
2006 CHEVY COBALT SINCE 2008. STARTING IN 2009 ALL
THE WAY UNTIL NOW 2014 I HAVE HAD ISSUES WITH
THE CAR THAT ARE RELATED TO THE IGNITION SWITCH
RECALL. I TOOK MY CAR IN TO THE CHEVY DEALER TO
TAKE CARE OF THE IGNITION SWITCH RECALL ON
NOVEMBER 5, 2014. I GOT MY CAR BACK THE SAME
DAY, THEY REPLACED THE IGNITION SWITCH AND
GAVE ME TWO NEW KEYS. SURPRISE! TWO DAYS LATER
ON NOVEMBER 7, 2014 MY CAR AGAIN HAD THE EXACT
SAME PROBLEMS RELATED TO THE IGNITION SWITCH
RECALL THAT IT DID BEFORE I TOOK IT IN FOR THE
RECALL FIX. HENCE, CHEVY'S "RECALL IGNITION
SWITCH FIX" DOES NOT SOLVE THE PROBLEM WITH
THESE CARS! MY CAR STILL DOES THE FOLLOWING
THINGS EVEN AFTER THE IGNITION SWITCH FIX THAT IS
SUPPOSED TO SOLVE THESE PROBLEMS. WHENEVER IT
PLEASES IT WILL LOSE ELECTRICAL POWER AND TURN
OFF THE ENGINE, LEAVING ME STUCK IN THE MIDDLE
OF A BUSY HIGHWAY, THIS HAS HAPPENED ON
NUMEROUS OCCASIONS!! AS IF THAT ISN'T BAD
ENOUGH THERE'S MORE! THE POWER STEERING LIGHT
FLASHES, THE CHECK ENGINE LIGHT COMES ON, THE
SERVICE AIRBAG LIGHT COMES ON, THE GAUGES ON
THE DASH COMPLETELY STOP WORKING PROPERLY
THE SPEEDOMETER NEEDLE GOES HAYWIRE MOVING
FROM 0 MPH TO 60 MPH BACK AND FORTH NON-STOP
WHEN I'M NOT EVEN ACCELERATING TO THOSE SPEEDS.
THE RPM GAUGE DOES THE EXACT SAME THING. THE
CAR JOLTS FORWARD UNCONTROLLABLY, LIKE IT IS
HAVING A PROBLEM SHIFTING ESPECIALLY WHEN THE
RPM IS BETWEEN 2000 AND 3000. WHEN YOU GO TO
BRAKE YOU HAVE TO SLAM THE BRAKES ALL THE WAY
DOWN BECAUSE YOU LOSE YOUR NORMAL BRAKING
POWER THE CAR SKIDS AS YOU'RE BRAKING AND
CONTINUES TO JOLT FORWARD UNCONTROLLABLY. OH
AND ON TOP OF ALL OF THIS SOMETIMES THE POWER
STEERING COMPLETELY GOES OUT LEAVING YOU WITH

ALL OF THE PROBLEMS MENTIONED ABOVE AND YOU
CAN'T STEER PROPERLY! SOMETHING NEEDS TO BE
DONE IMMEDIATELY! THE IGNITION SWITCH RECALL
FIX DOES NOT WORK! THESE CARS SHOULD NOT BE ON
THE ROAD PERIOD.

[Impala, 2005, No. 10702838, 3/31/2015], PROBLEMS BEFORE
GM RECALL 14350/CAMPAIGN ID 14V400. PROBLEM 1
THE IGNITION SWITCH CONTINUED TO STILL ENGAGE
AFTER VEHICLE WAS STARTED AND KEY WAS IN THE
RUN POSITION. PROBLEM 2 AFTER TURNING THE KEY
TO STOP ENGINE WOULD CONTINUE TO RUN UNTIL YOU
JIGGLED THE KEY IN THE IGNITION SWITCH. PROBLEM 3
HITTING A POT HOLE AT 45 MPH SHUT THE CAR OFF
LUCKY MY QUICK REACTION WAS PUT IT INTO
NEUTRAL AND RESTARTED THE CAR. SEPTEMBER 2014
RECEIVED THE SAFETY RECALL FOLLOWED THE
INSTRUCTIONS AS CLAIMED WHICH MADE ME LAUGH
CAUSE THE ONLY THING I HAD ON THE KEY RING WAS
THE KEY AND ENTRY REMOTE. NOVEMBER 2014
RECALL WAS DONE WITH A PLASTIC INSERT ON THE
KEY TO KEEP THE WEIGHT CENTER MASS ON THE KEY.
AS OF THIS DAY MARCH 2015 I STILL HAVE ALL 3
PROBLEMS I STATED EARLIER, THAT RECALL HAS NOT
FIXED THE UNDER LINING PROBLEM OF A DEFECTIVE
IGNITION SWITCH ITS NOT THE KEY ITS THE SWITCH
ITSELF BECAUSE THE CAR STILL DOES ALL THE
PROBLEMS I MENTIONED IN THE BEGINNING, I FIND
THIS A CHEAP AND SCARY NO FIX BUT TO SATISFY
ANYONE WHO THINKS THIS WAS A FIX BUT IN REALITY
WILL CAUSE MORE HARM. THE SWITCH NEEDS
REPLACED.

[Grand Am, 2000, No. 10670734, 1/7/2015], TL* THE
CONTACT OWNS A 2000 PONTIAC GRAND AM. THE
CONTACT STATED THAT WHILE DRIVING AT
APPROXIMATELY 10 MPH, THE VEHICLE STALLED
WITHOUT WARNING. THE VEHICLE WAS TAKEN TO A
DEALER WHERE IT WAS SERVICED UNDER NHTSA
CAMPAIGN NUMBER: 14V400000 (ELECTRICAL SYSTEM)
HOWEVER, THE FAILURE RECURRED. IN ADDITION,  THE
CONTACT STATED THAT AFTER THE VEHICLE WAS
SERVICED, THE IGNITION KEY FAILED TO TURN TO THE
OFF POSITION. THE VEHICLE WAS NOT DIAGNOSED OR

REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE
FAILURE. THE FAILURE MILEAGE WAS 99, 000.

684.    Yet from its inception, New GM has known that simply replacing the ignition

switches in the Defective Ignition Switch Vehicles and/or providing a new key is not a solution

to the potential for the key to inadvertently turn from the "run" to the "accessory/off" position in

these vehicles.  The necessary modifications New GM undertook with respect to the Defective

Ignition Switch Vehicles' ignition switches and keys are insufficient to make the Defective

Ignition Switch Vehicles safe or to restore their value.

685.    New GM's recalls fail to address the design defect that causes the key fob/chain

to hang too low on the steering column.  During testing of the Delta Ignition Switch Vehicles,

Old GM (then New GM) engineers repeatedly observed that the vehicles' ignition switches could

be moved to the "accessory/off" position when a driver touched the ignition key with his or her

knee during ordinary and foreseeable driving conditions.  New GM's recall repairs fail to address

such occurrences.  New GM's recall is thus inadequate to remedy the defective product.

686.    Further, New GM's recalls fail to address the defective airbag system, which

disables the airbag immediately when the engine shuts off.  The loss of airbags is a serious safety

condition, especially because it can happen when a vehicle is traveling at highway speeds.

687.    Following replacement of the ignition switch pursuant to the recall, problems

occurring with the Defective Ignition Switch Vehicles include, but are not limited to:  (i) stalls

and shut down on roads and highways; (ii) the ignition key does not fully turn to the "off"

position and, instead, becomes stuck in the "accessory" position; (iii) the ignition key cannot be

removed when the engine is off; (iv) power steering fails; and (v) cars are returned following

replacement of the ignition switch with new parts in non-working order that were in working

order prior to the "repair," such as an airbag light remaining on, the horn not working, a broken

door locking mechanism, and the steering wheel locking.

688.    Among the specific problems experienced in connection with the recalls are:

a.      Accidents in Delta Ignition Switch Vehicles as a result of unintended shut

downs or stalls, *after* the ignition switch has been replaced pursuant to the recall;

b.      Class Members were threatened with charges for leaving Delta Ignition

Switch Vehicles at the dealership once the replacement part is installed pursuant to the recall,

even in circumstances where the Delta Ignition Switch Vehicle has been at the dealership for

months awaiting the repair and the dealership did not provide timely notice of the repair's

completion;

c.      Class Members have been charged the costs of a replacement battery when

their Delta Ignition Switch Vehicle's battery dies on the dealership lot while waiting for months

for the ignition switch replacement parts;

d.      Class Members' Delta Ignition Switch Vehicles, following replacement of

the ignition switch pursuant to the recall, often are returned without the ability to turn the

ignition key to the "off" position and, instead, the key becomes stuck in the "accessory" position,

and/or the driver is unable to remove the key at all; and

e.      When Delta Ignition Switch Vehicles were returned after months of

storage at the dealership (pursuant to New GM's instruction to the dealerships to store the

vehicles while they await repair), new damages appeared on the vehicle and/or additional

mileage has appeared on the odometer.

689.    And each Class Member who participated in the recall incurred the expense of

their time in taking the car into the dealer that they would not have but for the defect.

### c.   The recalls were not completed in a timely fashion.

690.   At the time it announced the Delta Ignition Switch recall, New GM acknowledged that it was not prepared to begin replacing defective ignition switches with presumably non-defective switches.

691.   New GM informed NHTSA that it would complete 100% of the ignition switch replacements in connection with the February and March recalls on or before October 4, 2014. New GM did not meet that deadline.

692.   The recall was delayed even further because even the replacement ignition switches were sometimes defective.  Various news outlets reported on New GM's delivery of faulty replacement switches.  The DETROIT NEWS reported on July 9, 2014, that New GM notified dealerships that it had delivered 542 ignition switch kits with faulty tabs.  Those switches, some of which were delivered to a dealership in New York, were sent back to New GM.

693.   The slow pace of the recall caused many problems for Class Members, including the following:

a.   Class Members saw their vehicle's registration expire while their Defective Ignition Switch Vehicle sat on the dealership's lot awaiting recall repairs;

b.   Class Members experienced unintended stalls and power failures in Delta Ignition Switch Vehicles while they awaited repair of their vehicles and either were refused loaner vehicles, or did not know loaner vehicles were available;

c.   Class Members were involved in accidents when they experienced an unintended stall in their Delta Ignition Switch Vehicle while waiting for replacement parts and repair; and

d.      Class Members who owned only their Delta Ignition Switch Vehicle and did not obtain a loaner vehicle faced daily inconveniences and additional expense to obtain alternate transportation, as they understandably refused to drive their Delta Ignition Switch Vehicle.

694.    These delays had real and significant consequences for Class members.  As one illustrative example of the worst, yet entirely foreseeable, outcome of this common problem known to New GM, on September 27, 2014, the NEW YORK TIMES reported that Laura Gass, a 27-year-old owner of a 2006 Saturn Ion, was killed just days after she received her recall notice. That notice informed her that replacement parts were not yet available.  The notice also did not inform Ms. Gass that she was eligible to obtain a loaner vehicle should she not wish to drive her defective Saturn.  Ms. Gass needed transportation, and was unaware that New GM was prepared to provide temporary transportation to replace her defective automobile.  As a result, she continued to drive her defective Ion, a turn of events that had disastrous consequences.  On March 18, 2014, the ignition switch in Ms. Gass's Saturn slipped to the "accessory" or "off" position, the power to the vehicle failed, and she was unable to control the vehicle as it collided with a truck on the interstate.  Ms. Gass was killed, but the tragedy should have been prevented.

### d.      The repair of the other ignition switch defects.

695.    The repair of the vehicles recalled for ignition switch-related problems in June and July 2014 also proceeded in a problematic fashion.

696.    Owners of these vehicles—more than 10 million—were notified that their vehicle is defective, but no replacement parts were immediately available.  New GM did not provide a timeline within which it would provide any remedy for the ignition switch defect in these vehicles.

697.    Further, because New GM claims that the defect afflicting these vehicles was distinct from the ignition switch defect affecting the 2.1 million vehicles implicated in the Delta Ignition Switch recall, it offered owners significantly less safe alternatives.  New GM did not offer loaner vehicles to owners of these 10 million vehicles.  It simply advised them to remove everything from the key chain.

698.    Of course, the recall notice for each of these 10 million vehicles noted the possibility that the vehicle may experience a moving stall and/or power failure by traveling across a bumpy roadway or when a driver's knee inadvertently contacts the ignition key.

699.    What is more, New GM's "repair" of these vehicles is wholly inadequate.  New GM simply modified the ignition key for all the Defective Ignition Switch Vehicles so that the key is less susceptible to movement.  New GM's remedy, however, does nothing to prevent one from impacting the ignition key with one's knee during ordinary and foreseeable driving conditions.  It does nothing to ensure that the airbag system is not disabled if and when the ignition switch moves into the "accessory" or "off" position.  And it does not address the fact that many of the Defective Vehicles contain ignition switches with inadequate "detent plungers."

700.    New GM's "repairs" are an attempt to rid itself of safety problems on the cheap.  Indeed, New GM did not offer temporary rental vehicles to those affected customers driving the vehicles recalled in June and early July.  Nor will New GM reimburse owners for any previous repairs aimed at preventing inadvertent power failure in these subject vehicles.

701.    According to New GM spokesperson Alan Adler, and despite the fact that the June and July recalls were aimed at safety problems that are substantially similar, if not identical, to those present in the Delta Ignition Switch Vehicles, the recall of more than 10 million vehicles

- 393 -

in June and July was to remedy "key issues," not because the vehicles contain bad ignition switches.

702.   This statement is belied by the facts on the ground.  Many Class Members have experienced power failures and engine stalls, and many individuals have been in accidents attributable to such failures.  Court supervision and involvement is required in order to force New GM to provide its customers with a repair that will truly make the Defective Ignition Switch Vehicles safe for ordinary and foreseeable driving conditions.

**F.     Side-Impact Airbag Wiring Harness Defect**

703.   On March 17, 2014, New GM recalled nearly 1.2 million model year 2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook vehicles in Safety Recall No. 14v118 for a dangerous defect involving airbags and seatbelt pretensioners.

704.   In a March 31, 2014 letter to NHTSA, New GM described the defect as follows: "Corrosion and/or loose crimps in the driver and passenger seat mounted side impact airbag (SIAB) wiring harness connectors can cause an increase in resistance.  The airbag sensing system will interpret an increase in resistance as a fault.  A fault will illuminate the airbag readiness light on the instrument cluster and a 'SERVICE AIR BAG' message in the Driver Information Center (DIC), and set a Diagnostic Trouble Code (DTC).  At first, at lower levels of resistance, the light and DIC message may be intermittent and the airbags and pretensioners will still deploy.  Over time, the resistance may reach a level where the SIABs, front center side airbag, if equipped, and pretensioners will not deploy in a crash."  Thus, New GM has admitted that all models involved in Safety Recall 14v118 have a common defect.

705.    Internally, New GM described the *effect* of the defect as follows: "If the resistance reaches a high enough level, the SIABs, driver's center side airbag, or pretensioners may not deploy in a crash." Thus, New GM has admitted that the effect of the defect is the same for all models involved in Safety Recall 14v118.

706.    Once again, New GM knew of the dangerous airbag defect long before it took anything approaching the requisite remedial action.

707.    The SIAB module is mounted to the seat back structure and has a direct electrical connection to the inflator. The wiring harness routes from the airbag, attaches to the seat suspension, secures to the seat structure, and mounts to the front edge of the seat. The mating socket side of the connector is on a breakout from the body harness that exits through an opening in the carpet.[160]



**Fig. 1 Connecter location and setup**[161]

708.    New GM knew that in 2007 the GMC Acadia and Saturn Outlook were launched using a Delphi Metropak 150 connector for the driver and passenger SIABs. Old GM plant

---

[160] GM-MDL2543-000698574, sheet 2, row 1686.

[161] GM-MDL2543-402353770.

Lansing Delta Township expressed concern using that connector because the orientation required the operator to reach in and behind the connector to install the connector position assurance clip.[162]  The blind installation and limited hand clearance prompted LDT to issue PRTS N208096 so that it could meet production requirements.[163]  To meet these requirements, Old GM replaced the Delphi Metropak connecter with a two way connector from JST that was easier to connect— it could be locked with a one-handed single motion.[164]

709.    New GM knew that, in June 2008, Old GM found that even after corrections had been made to prevent claims related to wire routing and terminal crimping, there were still significant SIAB warranty claims for May 2008-built vehicles.[165]

710.    New GM knew that, from September 2, 2008 through September 16, 2008, three pairs of failed parts were analyzed by supplier JST,[166] which concluded that the issue was fretting corrosion.[167]  An Old GM current production PRTS opened in October 2008 confirmed that the issue was indeed fretting corrosion.[168]  Vinod Katothia, Problem Resolution Process Engineer found that fretting corrosion of non-noble metals (tin in this case) is the result of the continual rupture of oxide films on the contact surfaces caused by motion of the contact interface.[169]

---

[162] GM-MDL2543-000698574, sheet 2, row 1686.

[163] GM-MDL2543-402353770.

[164] GM-MDL2543-000698574, sheet 2, row 1686; GM-MDL2543-303352291 (EWO CSXTJ); GM-MDL2543-303352291 (Supply Contract).

[165] GM-MDL2543-402353770.

[166] GM-MDL2543-304666870.

[167] *Id.*

[168] GM-MDL2543-300128031.

[169] *Id.* at p.11.

711.   New GM knew that, in November of 2008, Old GM released a field service "rework" for 2008 vehicles.[170]   The dealers were advised to clear the terminal of debris and apply Nyogel 760G, a grease that seals electrical contacts from oxygen, moisture, aggressive gasses and other hostile elements.  No action was taken for 2009 vehicles.

712.   Thus, from the date of its inception, New GM knew that in 2008 there had been an increase in warranty claims for airbag service on certain of its vehicles and determined it was due to increased resistance in airbag wiring.  New GM further knew that a September 2008 analysis of the tin connectors revealed that corrosion and wear to the connectors was causing the increased resistance in the airbag wiring.  New GM knew that  a technical service bulletin had been issued on November 25, 2008, for 2008-2009 Buick Enclave, 2009 Chevy Traverse, 2008-2009 GMC Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the defect by using Nyogel grease, securing the connectors, and adding slack to the line.  Finally, New GM knew that Old GM had also begun the transition back to gold-plated terminals in certain vehicles and suspended all investigation into the defective airbag wiring without taking further action.[171]

713.   This same issue arose again in late 2009.  As a result of an investigation of connector wear in Chevrolet Malibu and Pontiac G6 vehicles, New GM reviewed warranty data for Lambda vehicles and noticed another spike in warranty data.[172]   The 2009 vehicles with supposed gold connectors were also experiencing wear.[173]   On further investigation, New GM

---

[170] GM-MDL2543-302802992 (TSB 08-09-41-011).

[171] *See* New GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.

[172] GM-MDL2543-303776028.

[173] GM-MDL2543-200125245.

determined that JST did not revise the parts for the 2009 model year, and therefore some connectors still used tin.[174]   As a result of its review, New GM extended a Customer Satisfaction bulletin previously issued for Malibu and G6 vehicles to include Lambda vehicles (certain 2008 Buick Enclave, 2008 Saturn Outlook, and 2008 GMC Acadia models built from October 2007 to March 2).[175]   New GM's instruction to dealers was to re-route or replace the SIAB connectors.

714.    New GM issued a revised Customer Service Bulletin on February 3, 2011, requiring replacement of the front seat-mounted side-impact airbag connectors in the same faulty vehicles mentioned in the November 2010 bulletin.  In July 2011, New GM again replaced its connector, this time with a Tyco-manufactured connector featuring a silver-sealed terminal.[176]

715.    In 2012, New GM noticed another spike in the volume of warranty claims relating to side impact airbag connectors in vehicles built in the second half of 2011.  After further analysis of the Tyco connectors, it discovered that inadequate crimping of the connector terminal was causing increased system resistance.  In response, New GM issued an internal bulletin for 2011-2012 Buick Enclave, Chevy Traverse, and GMC Acadia vehicles, recommending dealers repair Defective Vehicles by replacing the original connector with a new sealed connector.[177]

716.    Warranty data for 2011-2012 Lambda vehicles continued to rise throughout 2012 and 2013.[178]   In October 2013 another FPE investigation was opened.  Initially, New GM's EFADC determined that a special coverage was necessary, but after a call with NHTSA, it

---

[174] *Id.*

[175] GM-MDL2543-402160516.

[176] New GM Notification Campaign No. 14V-118 dated March 31, 2014, at 3.

[177] *See id.* at 4.

[178] GM-MDL2543-304666597.

determined that it would issue a safety recall instead.[179]  The population included 2010-2013 Lambda models, as well as 2008-2009 Lambda models that had not previously been repaired under the numerous Customer Satisfaction and Special Coverage bulletins.[180]  New GM ultimately conceded after the recall that this was a systemic issue caused by New GM's failure to test the part to make sure it could withstand the vibration from the vehicle and the occupant.[181]

717.    New GM estimated that for one model and model year, it could expect 99 airbag non-deployments in ten years due to this defect.[182]  But New GM repeatedly classified this issue as an "annoyance/continuous improvement" defect.  It wasn't until March 14, 2014, three days before the recall, that New GM converted this issue to a safety field action.[183]  The new treatment as a safety concern arose from a conversation that Carmen Benavides had with NHTSA, at which Gerald Johnson, Jeff Wrona, and John Calabrese were present.  On the day that a safety recall was finally announced, Alan Adler described it to Selim Bingol as "borderline safety."[184]

718.    New GM initially planned to issue a less-urgent Customer Satisfaction Program to address the airbag flaw in the 2010-2013 vehicles.  But it wasn't until a call with NHTSA on March 14, 2014, that New GM finally issued a full-blown safety recall on the vehicles with the faulty harness wiring—years after it first learned of the defective airbag connectors, after four investigations into the defect, and after issuing at least six service bulletins on the topic.  The

---

[179] GM-MDL2543-402058927.

[180] *E.g.*, GM-MDL2543-304666314 (Customer Satisfaction); GM-MDL2543-304666333 (Special Coverage, Re-route wiring harness).

[181] GM-MDL2543-304843794.

[182] GM-MDL2543-304666390, p.8.

[183] GM-MDL2543-402058927.

[184] GM-MDL2543-303156131.

recall as first approved covered only 912,000 vehicles, but on March 16, 2014, it was increased to cover approximately 1.2 million vehicles.[185]

719.    On March 17, 2014, New GM issued a recall for 1,176,407 vehicles potentially afflicted with the defective airbag system.  The recall instructs dealers to remove driver and passenger SIAB connectors and splice and solder the wires together.[186]  But this is an error-prone process for dealers to follow.  On March 27, 2014, Kathy Koski, New GM Global Technical Lead and Safety Liason for Passive Safety Electronics e-mailed Brian Everest and Lisa Stacey regarding an issue with the wiring that the dealers are instructed to follow.[187]  Ms. Koski explained that certain circuits may be wired incorrectly, and the SDM would not detect the faulty wiring.[188]

## G.    Power Steering Defect

720.    Between 2003 and 2010, over 1.3 million Old GM and New GM vehicles in the United States were sold with a safety defect that causes the vehicle's electric power steering ("power steering") to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries.

721.    The affected vehicles are model year 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura vehicles.  All of these recalls were covered by Safety Recall 14v153.

---

[185] New GM Notification Campaign No. 14V-118 dated March 31, 2014 at 5.

[186] *See id.*

[187] GM-MDL2543-402326622.

[188] *Id.*

722.     In a March 28, 2014 letter to NHTSA, New GM described the Power Steering

Defect as follows:  "The subject vehicles equipped with electric power steering (EPS) may

experience a sudden loss of power steering assist that could occur at any time while driving."

Thus, New GM has admitted that all models involved in Safety Recall 14v153 have a common

defect.

723.     New GM internally described the *effect* of the defect as follows:  "The Driver

Information Center (DIC) displays 'PWR STRG', a diagnostic trouble code is set, and the power

steering assist is lost.  A chime is momentarily activated to alert the driver to the DIC message.

Steering control is maintained, although greater driver effort is required at low vehicle speeds.

Typically, at the next ignition cycle, power assist is regained and the DIC message is off."  In its

March 28, 2014 letter to NHTSA, New GM acknowledged that steering that requires greater

driver effort at low vehicle speeds "could result in an increased risk of a crash."  Thus, New GM

has admitted that the effect of the defect is the same for all models involved in Safety Recall

14v153.

724.     As with the ignition switch defects and many of the other defects, New GM was

aware of the Power Steering Defect long before it took anything approaching full remedial

action.

725.     From the date of its inception, New GM knew that, in 2003, Old GM began

receiving customer complaints regarding loss of power steering in Ions, and in 2004, Old GM

instituted a "Customer Satisfaction program" for 2004 Malibus in which dealers were instructed

to replace the steering column if a customer complained.  Despite acknowledging the problem,

no recall was initiated.

726.   New GM knew that, in response to a NHTSA Preliminary Investigation into potential Power Steering Defect in the 2005-2006 Pontiac G6, Old GM extended warranty coverage for the 2005-06 G6 and 2005 Malibu and Malibu Maxx to replace the steering column assembly.  No recall was done.

727.   In 2010, New GM first recalled MY 2005-2010 Chevy Cobalts and MY 2007-2010 Pontiac G5s for these power steering issues, yet it did *not* recall the many other vehicles that had the same Power Steering Defects.  Moreover, the Valukas Report found that New GM's recall was not motivated by customer safety but by the desire to avoid further government scrutiny:  "Alan Adler, GM's manager for safety communications, remembered that GM had initially been planning to categorize the electric power-steering issue as a customer satisfaction issue, but as a result of the congressional scrutiny of Toyota and the unintended acceleration issues, it was agreed that GM should issue a safety recall before the hearings so that 'we would not get mentioned or dragged in to the Senate.'"  Valukas Report at 140.

728.   New GM enacted a series of "half measures" well short of a safety recall for other models that would not ultimately be recalled until 2014.  In June 2010, New GM approved Special Coverage for model year 2004-2007 Saturn Ions, extending EPS warranty to 10 years or 100,000 miles and instructing dealers to replace power steering motors under Service Bulletin 10187 for customers who complained.  A similar Special Coverage program was initiated in June for the following models:  (i) Chevrolet Malibu and Malibu Maxx MY 2005-2006 and 2008; (ii) Pontiac G6 MY2006; (iii) Saturn Aura MY 2008, and (iv) Saturn Ion MY 2004-2007.  And in July 2010,  New GM issued Service Bulletins to provide special coverage to replace the power steering motor for (i) certain Saturn Ion MY 2004-2007, (ii) Malibu and Malibu Maxx MY 2005-

- 402 -

2006 and 2008; (iii) Pontiac G6 MY 2006; and (iv) Saturn Aura MY 2008.  Yet, again, no safety recall was initiated.

729.     In December 2010, GM Canada issued a recall for EPS defects in 2003-07 Ion and 2006-10 HHR—models equipped with the same EPS motor as the 2005-2010 Cobalts and G5's recalled earlier.  But New GM did not issue a recall in the United States, although NHTSA had begun investigating.

730.     In October 2012, GM Canada issued a notice of defect for certain Malibu, Malibu Maxx, G6, and Aura vehicles, although it would take almost two more years for New GM to recall those vehicles in the United States.

731.     Documents released by NHTSA show that New GM waited years to recall nearly 335,000 Saturn Ions for power-steering failure—despite receiving nearly 4,800 consumer complaints and more than 30,000 claims for warranty repairs.  That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent.  By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000 vehicles.[189]  Here, the rate translates to 1,430 complaints per 100,000 vehicles.

732.     In response to the consumer complaints, in September 2011, NHTSA opened an investigation into the Power Steering Defect in Saturn Ions.

733.     NHTSA has linked approximately 12 crashes and two injuries to the Power Steering Defect in the Ions.  The first injury was reported in May 2007, and was known to New GM from the date of its inception.

---

[189] *See* https://www-odi.nhtsa.dot.gov/cars/problems/defect/-results.cfm?action_number=EA06002&Search Type= QuickSearch&summary=true.

734.     In September 2011, after NHTSA began to make inquiries about the safety of the Saturn Ion, New GM acknowledged that it had received almost 3,500 customer reports claiming a sudden loss of power steering in 2004-2007 Ion vehicles.

735.     The following month, New GM engineer Terry Woychowski informed current CEO Mary Barra—then head of product development—that there was a serious power-steering issue in Saturn Ions, and that it may be the same power steering issue that plagued the Chevy Cobalt and Pontiac G5.  Ms. Barra was also informed of the ongoing NHTSA investigation.  At the time, NHTSA reportedly came close to concluding that Saturn Ions should have been included in New GM's 2010 steering recall of Cobalt and G5 vehicles.

736.     Instead of recalling the Saturn Ion, New GM sent dealers a service bulletin in May of 2012 identifying complaints about the steering system in the vehicle.

737.     By the time New GM finally recalled the Saturn Ion in March 2014, NHTSA had received more than 1,200 complaints about the vehicle's power steering.  Similar complaints resulted in over 30,000 warranty claims with New GM.

738.     After announcing the March 31, 2014 recall, Jeff Boyer, New GM's Vice President of Global Vehicle Safety, acknowledged that New GM recalled some of these same vehicle models previously for the *same issue*, but that New GM "did not do enough."

739.     According to an analysis by the NEW YORK TIMES published on April 20, 2014, New GM has "repeatedly used technical service bulletins to dealers and sometimes car owners as stopgap safety measures instead of ordering a timely recall."

740.     Former NHTSA head Joan Claybrook echoed this conclusion, stating, "There's no question that service bulletins have been used where recalls should have been."

- 404 -

741.    NHTSA has recently criticized New GM for issuing service bulletins on at least four additional occasions in which a recall would have been more appropriate and in which New GM later, in fact, recalled the subject vehicles.

742.    These inappropriate uses of service bulletins prompted Frank Borris, the top defect investigator for NHTSA, to write to New GM's product investigations director, Carmen Benavides, in July 2013, complaining that "GM is slow to communicate, slow to act, and, at times, requires additional effort . . . that we do not feel is necessary with some of [GM's] peers."

743.    Mr. Borris' correspondence was circulated widely among New GM's top executives including John Calabrese and Alicia Boler-Davis, two vice presidents for product safety; Michael Robinson, vice president of regulatory affairs; engineer Jim Federico; Gay Kent, director of product investigations who had been involved in safety issues with the Cobalt since 2006; and William Kemp, an in-house product liability lawyer.

## H.    Contrary to their Representations about Safety and Quality, Both Old and New GM Concealed and Disregarded Safety Issues as a Way of Doing Business

744.    From its inception, New GM has possessed vastly superior (if not exclusive) knowledge and information to that of consumers about the design and function of Old GM and New GM vehicles and the existence of the defects in those vehicles.

745.    Old GM also had similar knowledge about the defects in the Defective Vehicles. This knowledge both (i) renders New GM liable on a successor liability theory for Old GM's acts and omissions with respect to the Delta Ignition Switch Vehicles and (ii) may be imputed to New GM with respect to all of the Defective Vehicles.

746.     Recently revealed information presents a disturbing picture of the approach to safety issues of both Old and New GM—both in the design and manufacturing stages, and in discovering and responding to defects in New GM and Old GM vehicles that are on the road.

747.     Like Old GM before it, New GM made very clear to its personnel that cost-cutting was more important than safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety issues.

748.     In stark contrast to New GM's public mantra that "Nothing is more important than the safety of our customers" and similar statements, a prime "directive" at New GM was "cost is everything."[190]  The messages from top leadership at both Old and New GM to employees, as well as their actions, were focused on the need to control cost.[191]

749.     One New GM engineer stated that emphasis on cost control at New GM "permeates the fabric of the whole culture," and the same emphasis existed at Old GM.[192]

750.     According to Mark Reuss (President of General Motors North America from 2009-2013 before succeeding Mary Barra as Executive Vice President for Global Product Development, Purchasing and Supply Chain in 2014), cost and time-cutting principles known as the "Big 4" at both Old and New GM "emphasized timing over quality."[193]

751.     The focus on cost-cutting at Old and New GM created major disincentives to personnel who might wish to address safety issues.  For example, those responsible for a vehicle

---

[190] Valukas Report at 249.

[191] *Id*. at 250.

[192] Valukas Report at 250.

[193] *Id*.

were responsible for its costs, but if they wanted to make a change that incurred cost and affected other vehicles, they also became responsible for the costs incurred in the other vehicles.

752.    The drive to cut costs at both Old and New GM also resulted in a policy to "minimize needless part number changes" in order to achieve "cost savings to the corporation," as reflected in a 2012 instructional document from Global Product Description System.

753.    The culture of cost cutting contributed to the unwillingness of both Old and New GM to adequately remediate the defects.  For example, in an October 2012 e-mail to Peter Judis and John Zuzelsnski, Terrence Connolly noted that New GM engineers determined it was possible to cause the airbag to stay active for five seconds after an ignition switch rotated to the accessory position.[194]

754.    This measure undoubtedly would have saved many lives and mitigated many injuries.  But New GM—focused on costs, not customer safety—determined it would be an "expensive field fix"[195] and ultimately decided not to implement the "fix."

755.    That same month, Stouffer and DeGiorgio e-mailed about another potential fix for the Delta Ignition Switch defect:  increasing the torque required to rotate the key from the accessory position.  Stouffer was particularly focused on the cost of the potential replacements.[196]

756.    In a 2013 e-mail to Wachtel & Furney, Hall raised the idea of re-mailing special coverage bulletins regarding many known defects including, but not limited to, the power steering defect in Ions, the airbag defect in Acadias, Enclaves, Outlooks and Traverses, and the

---

[194] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-003609538.

[195] HIGHLY CONFIDENTIAL DOC: *Id.*

[196] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-000592970.

- 407 -

ignition switch defect in Cobalts and HHRs. Chief among Hall's concerns was the fact that re-mailing the bulletins, a measure which could have raised awareness and saved lives, would "drive a lot of cost and will create part issues."[197]

757. When New GM finally decided to take action to address the ignition switch defects, cost, not customer safety, remained the driving consideration. A PowerPoint presentation from December 17, 2013, revealed the cost comparison between replacing ignition switches—$37.7 million—and adding "key inserts"—$14.2 million.[198] Unsurprisingly, New GM opted not to replace all the ignition switches, and to rely solely on the key fix for many of the Defective Ignition Switch Vehicles.

758. Even then, Omar Perea of part supplier Srattec, advised New GM's Joseph Rec that the key inserts "have a history of becoming loose and a tendency of falling out of the overmold." Given this, in January 2014, Christine Witt asked John Murawa if "the key insert [is] still the way we want to respond." Witt's response, unsurprisingly, was again focused on cost: "Due to the cost of a key set ▮▮▮▮ versus the inserts ▮▮▮▮ replacing the keys and reprogramming is approximately ▮▮▮▮ more than using the inserts."[199]

759. Shortly thereafter, Witt relayed to Allen that the New GM Executive Decision Committee is "VERY concerned about the cost associated" with the key inserts, explained that she was asked to "'remind' [Allen] that we need to keep the costs of these inserts 'very low.'"[200]

---

[197] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-001514667.

[198] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-003328192.

[199] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-002827790.

[200] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-0031419974.

760.    As another cost-cutting measure at both Old and New GM, parts were sourced to the lowest bidder, even if they were not the highest quality parts.[201]

761.    Because of the focus on cost-cutting at both Old and New GM, engineers did not believe they had extra funds to spend on product improvements.[202]

762.    The focus of Old and New GM on cost-cutting also made it harder for personnel to discover safety defects, as in the case of the "TREAD Reporting team."

763.    Both Old and New GM used the TREAD database (known as "TREAD") to store the data required to be reported quarterly to NHTSA under the TREAD Act.[203]  From the date of its inception in 2009, TREAD has been the principal database used by New GM to track incidents related to its vehicles, just as was the case at Old GM.[204]

764.    Generally, the TREAD Reporting team has consisted of employees who conduct monthly searches and prepare scatter graphs to identify spikes in the number of accidents or complaints with respect to various New GM and Old GM vehicles.  The TREAD Reporting team reports have gone to a review panel and have sometimes spawned investigations to determine if any safety defect existed.[205]

765.    In 2010, New GM elected to continue the understaffing of the TREAD team implemented by Old GM, adding two people to the team of three but opting not to have them participate in the TREAD database searches.[206]  Moreover, until 2014, the TREAD Reporting

---

[201] Valukas Report at 251.

[202] *Id.*

[203] *Id.* at 306.

[204] *Id.*

[205] *Id.* at 307.

[206] *Id.* at 307-308.

team did not have sufficient resources to obtain any of the advanced data mining software programs available in the industry to better identify and understand potential defects.[207]

766.    By starving the TREAD Reporting team of the resources it needed to identify potential safety issues, both Old and New GM helped to insure that safety issues would not come to light.

767.    "[T]here was resistance or reluctance to raise issues or concerns in the GM culture."  The culture, atmosphere and supervisor response at both Old and New GM "discouraged individuals from raising safety concerns."[208]

768.    Dwayne Davidson, senior manager for TREAD reporting at both Old and New GM, testified that after the creation of New GM, his team did not have the expertise, manpower, or resources necessary to perform his job.

769.    New GM CEO, Mary Barra, experienced instances where Old and New GM engineers were "unwilling to identify issues out of concern that it would delay the launch" of a vehicle.[209]

770.    Old and New GM supervisors warned employees to "never put anything above the company" and "never put the company at risk."[210]

771.    Old and New GM systematically "pushed back" on describing matters as safety issues and, as a result, "GM personnel failed to raise significant issues to key decision-makers."[211]

---

[207] *Id*. at 208.

[208] *Id*. at 252.

[209] Valukas Report at 252.

[210] *Id*. at 252-253.

772.    So, for example, Old and New GM discouraged the use of the word "stall" in Technical Service Bulletins ("TSBs") that sometimes went to dealers about issues in New GM and Old GM vehicles.  According to Steve Oakley, who drafted a Technical Service Bulletin in connection with the ignition switch defects while working at Old GM, "the term 'stall' is a 'hot' word that GM generally does not use in bulletins because it may raise a concern about vehicle safety, which suggests GM should recall the vehicle, not issue a bulletin."[212]  Other New GM (and former Old GM) personnel confirmed Oakley on this point, stating that "there was concern about the use of 'stall' in a TSB because such language might draw the attention of NHTSA."[213]

773.    Oakley further noted that "he was reluctant to push hard on safety issues because of his perception that his predecessor had been pushed out of the job for doing just that."[214]

774.    Many Old and New GM employees "did not take notes at all at critical safety meetings because they believed New GM lawyers did not want such notes taken."[215]

775.    A training document released by NHTSA as an attachment to its Consent Order sheds further light on the lengths to which Old and New GM went to ensure that known defects were concealed.  The vast majority of employees who participated in this webinar presentation given at Old GM continued on in their same positions at New GM after July 10, 2009, and New GM never altered these instructions to its employees.  It therefore appears that the defects were concealed pursuant to Old and New GM company policy.  The presentation focused on recalls and the "reasons for recalls."

---

[211] *Id*. at 253.

[212] *Id*. at 92.

[213] *Id*. at 93.

[214] *Id*.

[215] *Id*. at 254.

776.    One major component of the presentation was captioned "Documentation Guidelines," and focused on what employees should (and should not say) when describing problems in vehicles.  Employees were instructed to "[w]rite smart," and to "[b]e factual, not fantastic" in their writing.  In practice, "factual" was a euphemism for avoiding facts and relevant details.

777.    Old and New GM vehicle drivers were given examples of comments to avoid, including the following:  "This is a safety and security issue"; "I believe the wheels are too soft and weak and could cause a serious problem"; and "Dangerous … almost caused accident."

778.    In documents used for reports and presentations, employees were advised to avoid a long list of words, including:  "bad," "dangerous," "defect," "defective," "failed," "flawed," "life-threatening," "problem," "safety," "safety-related," and "serious."

779.    In truly Orwellian fashion, the company advised employees to use the words (1) "Issue, Condition [or] Matter" instead of "Problem"; (2) "Has Potential Safety Implications" instead of "Safety"; (3) "Broke and separated 10 mm" instead of "Failed"; (4) "Above/Below/Exceeds Specification" instead of "Good [or] Bad"; and (5) "Does not perform to design" instead of "Defect/Defective."

780.    As NHTSA's Acting Administrator Friedman noted at the May 16, 2014 press conference announcing the Delta Ignition Switch Defect Consent Order, it was Old and New GM's company policy to avoid using words that might suggest the existence of a safety defect.

781.    According to Friedman, "[New] GM must rethink the corporate philosophy reflected in the documents we reviewed, including training materials that explicitly discouraged employees from using words like 'defect,' 'dangerous,' 'safety related,' and many more essential

- 412 -

terms for engineers and investigators to clearly communicate up the chain when they suspect a problem."

782.    Thus, Old and New GM employees were trained to conceal the existence of known safety defects from consumers and regulators.  Indeed, it is nearly impossible to convey the potential existence of a safety defect without using the words "safety" or "defect" or similarly strong language that was forbidden at New GM.

783.    So institutionalized was the "phenomenon of avoiding responsibility" at both Old and New GM that the practice was given a name:  "the 'GM salute,'" which was "a crossing of the arms and pointing outward towards others, indicating that the responsibility belongs to someone else, not me."[216]

784.    Similarly, Old and New GM had a silo-ed culture, designed to cabin information relating to potential safety defects rather than reveal such information.

785.    In a May 13, 2013 meeting about safety defects and potential troubles with NHTSA, Maureen Foley-Gardner noted that Old and New GM engineers were abided by the practice of shielding upper management from information about safety defects that might require recalls.[217]

786.    CEO Mary Barra described a related phenomenon, "known as the 'GM nod,'" which was "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture."[218]

---

[216] Valukas Report at 255.

[217] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-400264009.

[218] Valukas Report at 256.

- 413 -

787.    According to the New GM Report prepared by Anton R. Valukas (known as the "Valukas Report"), part of the failure to properly correct the Delta Ignition Switch Defect was due to problems with Old and New GM's organizational structure[219] and a corporate culture that did not care enough about safety.[220]  Other culprits included a lack of open and honest communication with NHTSA regarding safety issues,[221] and the improper conduct and handling of safety issues by lawyers within New GM's Legal Staff.[222]  On information and belief, all of these issues independently and in tandem helped cause the concealment of, and failure to remedy, all of the many defects that have led to the spate of recalls in 2014, including those in the Defective Vehicles.

788.    An automobile manufacturer has a duty to promptly disclose and remedy defects. Yet both Old and New GM knowingly concealed information about material safety hazards from the driving public, their own customers, and the Class, thereby allowing unsuspecting vehicle owners and lessees to continue unknowingly driving patently unsafe vehicles that posed a mortal danger to themselves, their passengers and loved ones, other drivers, and pedestrians.

789.    Not only did Old and New GM take far too long in failing to address or remedy the defects, they deliberately worked to cover-up, hide, omit, fraudulently conceal, and/or suppress material facts from the Class who relied upon it to the detriment of the Class.

---

[219] *Id*. at 259-260.

[220] *Id*. at 260-61.

[221] *Id*. at 263.

[222] *Id*. at 264.

790.    New GM further endeavored to conceal and suppress material facts by quietly
settling claims brought on behalf of people hurt by the defects in the Delta Ignition Switch
Vehicles.

791.    For example, in a November 2, 2010 evaluation of the "Chansuthus" case, New
GM's outside counsel explained that "because there appears to be clear evidence of a defect,
every effort should be made to settle this claim at this stage," *i.e.*, before a case was filed and a
public record developed.[223]

792.    New GM's counsel made a similar recommendation in the "Melton" case on July
22, 2013:  "This case needs to be settled," counsel advised, because "there is little doubt" the
vehicle was defective and New GM needed to avoid letting the plaintiff's counsel continue to
develop and publicize "a record from which he can compelling argue that GM has known about
this safety defect" for almost a decade "and has done nothing to correct the problem."[224]  The
case was settled confidentially for the maximum amount the Settlement Review Committee
could authorize without direct approval of New GM's general counsel.

793.    Even after the 2014 Recalls, New GM continued its efforts to conceal facts about
the defects by offering terminated employees generous severance packages tied to confidentiality
provisions.

**1.    New GM's deceptions continued in its public discussions of the ignition
        switch recalls.**

794.    From the CEO on down, New GM once again embarked on a public relations
campaign to convince consumers and regulators that, ***this time***, New GM has sincerely reformed.

---

[223] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-00660601.

[224] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-300002915.

795.    On February 25, 2014, New GM North America President Alan Batey publicly apologized and again reiterated New GM's purported commitment to safety:  "Ensuring our customers' safety is our first order of business.  We are deeply sorry and we are working to address this issue as quickly as we can."[225]

796.    In a press release on March 18, 2014, New GM announced that Jeff Boyer had been named to the newly created position of Vice President, Global Vehicle Safety.  In the press release, New GM quoted Mr. Boyer as stating that:  "Nothing is more important than the safety of our customers in the vehicles they drive.  Today's GM is committed to this, and I'm ready to take on this assignment."

797.    In an April 10, 2014 press release, CEO Mary Barra announced that New GM was "creating a Speak Up for Safety program to recognize employees for ideas that make vehicles safer, and for speaking up when they see something that could impact customer safety."  Barra explained:  "We will recognize employees who discover and report safety issues to fix problems that could have been found earlier and identify ways to make vehicles safer."[226]

798.    On May 13, 2014, New GM published a video to defend its product and maintain that the Delta Ignition Switch Defect will never manifest when only a single key is used.  Jeff Boyer addressed viewers and told them New GM's Milford Proving Ground is one of "the largest and most comprehensive testing facilities in the world."  He told viewers that if you use a New GM single key that there is no safety risk.[227]

---

[225] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2014/Feb/0225-ion.

[226] http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Apr/0410-speakup.html.

[227] https://www.youtube.com/watch?v=rXO7F3aUBAY.

- 416 -



799.    As of July 2014, New GM continued to praise its safety testing.  It published a

video entitled "90 Years of Safety Testing at New GM's Milford Proving Ground."  The narrator

describes New GM's testing facility as "one of the world's top automotive facilities" where data

is "analyzed for customer safety."  The narrator concludes by saying, "[o]ver the past ninety

years one thing remained unchanged, GM continues to develop and use the most advanced

technologies available to deliver customers the safest vehicles possible."[228]



800.    On July 31, 2014, Jack Jensen, the New GM engineering group manager for the

"Milford Proving Ground" dummy lab, told customers that "[w]e have more sophisticated

---

[228] https://www.youtube.com/watch?v=BPQdlJZvZhE&list=UUxN-Csvy_9sveql5HJviDjA.

dummies, computers to monitor crashes and new facilities to observe different types of potential hazards. All those things together give our engineers the ability to design a broad range of vehicles that safely get our customers where they need to go."[229]

801.    As discussed in this Complaint, these recent statements from New GM personnel contrast starkly with New GM's wholly inadequate response to remedy the defects in its vehicles, including the Defective Ignition Switch Vehicles.

802.    New GM's recent actions underscore its unwillingness to reform. Owners of 2013-2014 Buick Verano, Chevrolet Cruze, and Chevrolet Malibu have complained that their steering wheels can stick in one position after driving for a long period of time, compromising the driver's ability to steer effectively.[230]

803.    More than 50 complaints have been registered with NHTSA so far. One customer reported: "At highway speeds the steering sticks, making it scary to drive and dangerous."[231] New GM's response? Another service bulletin.

804.    In July 2014, New GM issued a TSB to dealers advising them how to install a software update to fix the problem, but only if a customer affirmatively brought it to the dealers' attention.[232] In November 2014, New GM alerted customers with a letter advising the wheel could "stick in the straight-ahead position."[233]

---

[229] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2014/Jul/0731-mpg.

[230] http://www.nytimes.com/2015/04/11/business/gm-steering-issue-pushes-automakers-limits.html?_r=1; http://gmauthority.com/blog/2015/04/general-motors-says-it-will-not-issue-steering-related-recall-based-on-nhtsa-findings/.

[231] *Id.*

[232] *Id.*

[233] *Id.*

805.     And yet, despite this potentially dangerous defect, New GM refused to issue a

recall.  New GM's pattern and practice of stopgap and half-measures continues unabated.

> **2.     There are serious safety defects in millions of New GM and Old GM vehicles across many models and years and, until recently, New GM concealed them from consumers.**

806.     In 2014, New GM announced at least 84 recalls for more than 70 separate defects

affecting over 27 million New GM and Old GM vehicles sold in the United States from model

years 1997-2015.  The number of recalls and serious safety defects are unprecedented, and can

only lead to troubling conclusions:  New GM was concealing the fact that it was incapable of

building safe vehicles free from defects, and, with respect to Old GM vehicles, it was concealing

its knowledge of serious safety defects in order to protect its profits, avoid costly recalls and

maintain New GM's false claims that safety was its highest priority.  For context, in 2013, the

whole auto industry in the United States issued recalls affecting 23 million vehicles, and the

previous record for the whole industry in a given year was 31 million in 2004.[234]  Thus, New

GM's recalls in 2014 impacts more vehicles than the ***entire industry's*** recalls did in 2013, and

the total of over 27 million vehicles recalled in one year is three times larger than Honda or

Chrysler.  In 2015, New GM announced five more significant recalls for separate safety-related

defects affecting over 129,000 New and Old GM vehicles sold in the United States from model

years 2004-2015.

807.     Even more disturbing, the available evidence shows a common pattern:  From its

inception in 2009, New GM knew about an ever-growing list of serious safety defects in millions

---

[234] In 2014, that record was broken when the whole industry issued recalls affecting 64 million vehicles.

- 419 -

of Old GM vehicles, but concealed them from consumers and regulators in order to cut costs, boost sales, and avoid the cost and publicity of recalls.

808.    Unsurprisingly in light of New GM's systemic devaluation of safety issues, the evidence also shows that New GM has manufactured and sold a grossly inordinate number of vehicles with serious safety defects.

809.    New GM valued cost-cutting over safety, actively discouraged its personnel from taking a "hard line" on safety issues, avoided using "hot" words like "stall" that might attract the attention of NHTSA and suggest that a recall was required, and its employees were trained to not use words such as "defect" or "problem" that might flag the existence of a safety issue.

810.    The Center for Auto Safety recently stated that it has identified 2,004 death and injury reports filed by New GM with federal regulators in connection with vehicles that were recalled in 2014.[235]  The GM Ignition Compensation Claims Resolution Facility has concluded that at 124 fatalities and 275 personal injury claims are attributable to the Delta Ignition Switch Defect alone.[236]  Many of these deaths and injuries would have been avoided had New GM complied with its TREAD Act obligations over the past five plus years.

811.    The many defects concealed and/or created by New GM affect important safety systems in New GM and Old GM vehicles, including the ignition, power steering, airbags, brake lights, gearshift systems, and seatbelts.

---

[235] *See Thousands of Accident Reports Filed Involving Recalled GM Cars:  Report*, Irvin Jackson (June 3, 2014).

[236] http://www.gmignitioncompensation.com/docs/program_Statistics.pdf.  These figures continue to grow, moreover, and account for only a subset of the vehicles affected by the Ignition Switch Defects.

812.    The available evidence shows a consistent pattern:  New GM learned about a particular defect and, often only at the prodding of regulatory authorities, "investigated" the defect and decided upon a "root cause."  New GM then took minimal action—such as issuing a carefully worded "Technical Service Bulletin" to its dealers, or even recalling a limited number of the vehicles with the defect.  All the while, the true nature and scope of the defects were kept under wraps, vehicles affected by the defects remained on the road, New GM continued to create new defects in new vehicles, and New GM enticed Class Members to purchase its vehicles by touting the safety, quality, and reliability of its vehicles, and presenting itself as a manufacturer that stands behind its products.

813.    Many of the most significant, additional defects leading to recalls in 2014 include the following:

- ignition lock cylinder defect (2,393,169 vehicles);

- driver-side airbag shorting-bar defect (38,636 vehicles);

- driver-side airbag inflator defect (29,019 vehicles);

- roof-rail airbag defect (16,932 vehicles);

- passenger-side airbag defect (1,953  vehicles);

- sport seat side-impact airbag defect (712 vehicles);

- passenger-side airbag inflator defect (61 vehicles);

- front passenger airbag defect (303,013 vehicles);

- electrical short circuit airbag defect (33 vehicles);

- seat belt connector cable defect (1.4 million vehicles);

- seat belt retractor defect (28,789 vehicles);

- frontal lap-belt pretensioner defect (48,059 vehicles);

- power height adjustable seat defect (414,333 vehicles);

- brake light defect (2.4 million vehicles);

- brake booster pump defect (63,903 vehicles);

- hydraulic boost assist defect (140,067 vehicles);

- brake rotor defect (8,208 vehicles);

- reduced brake performance defect (1,968 vehicles);

- parking brake defect (221,000 vehicles);

- power steering hose clamp defect (57,192 vehicles);

- power steering control module defect (57,242 vehicles);

- lower control arm ball joint defect (1,919 vehicles);

- steering tie-rod defect (477 vehicles);

- joint fastener torque defect (106 vehicles);

- loss of electric power steering assist defect (69,633 vehicles);

- steering column assembly defect (2,295 vehicles);

- transmission shift cable defect (1.1 million vehicles);

- transmission shift cable defect for Cadillacs (90,750 vehicles);

- transmission oil cooler line defect (489,936 vehicles);

- transfer case control module software defect (392,459 vehicles);

- acceleration-lag defect (50,571 vehicles);

- transmission turbine shaft fracture defect (21,567 vehicles);

- automatic transmission shift cable adjuster (352 vehicles);

- 422 -

- power management mode software defect (324,970 vehicles);

- light control module defect (217,578 vehicles);

- electrical short in driver's door module defect (181,984 vehicles);

- front axle shaft defect (174,046 vehicles);

- seat hook weld defect (124,007 vehicles);

- front turn signal bulb defect (120,426 vehicles);

- low-beam headlight defect (103,158 vehicles);

- radio chime defect (57,512 vehicles);

- fuel gauge defect (51,460 vehicles);

- fuel pump module defect (40,859 vehicles);

- windshield wiper system defect (19,225 vehicles);

- console bin door latch defect (14,940 vehicles);

- driver door wiring splice defect (14,765 vehicles);

- overloaded feed defect (9,371 vehicles);

- windshield wiper module assembly defect (4,794 vehicles);

- engine block heater power cord insulation defect (2,990 vehicles);

- rear shock absorber defect (1,939 vehicles);

- electronic stability control defect (656 vehicles);

- unsecured floor mat defect (184 vehicles);

- fuse block defect (58 vehicles);

- diesel transfer pump defect (51 vehicles);

- rear suspension toe adjuster link defect (290,241 vehicles);

- 423 -

- hood latch defect (89,294 vehicles);

- electrical short defect (117,652 vehicles);

- headlamp driver module failure (273,182 vehicles);

- ignition lock actuator binding defect (83,572 vehicles);

- tire tread cracking defect (5,876 vehicles);

- engine software defect (50,236 vehicles); and

- valve cover gasket defect (1,207 vehicles).

## I.   New GM Sold Used Defective Ignition Switch Vehicles and Other Defective Vehicles As "Certified Pre- Owned" Vehicles

814.   From the date of its inception on July 10, 2009, New GM sold New GM vehicles

and Old GM vehicles, including Defective Vehicles, as "Certified Pre-Owned" vehicles.  In so

doing, New GM concealed the fact that the vehicles contained serious safety defects,

fraudulently represented that the vehicles were free of known safety defects, and were built with

"premium" and superior engineering and design.

815.   According to New GM's current website, "[b]uying  a Certified Pre-Owned

vehicle can make your used car purchase and ownership worry-free.  Because every Certified

Pre-Owned Chevy, Buick, and GMC is a vehicle you can trust."[237]

816.   According to New GM's website, Certified Pre-Owned vehicles have "$2,135 of

Built-In Value."  That is because, according to New GM:

> Before you buy, our vehicles have to meet stringent standards and
> inspection criteria to earn the Certified Pre-Owned badge.  After
> you buy, experience hassle-free driving with our maintenance,
> warranty and other benefits that come standard with every

---

[237] http://www.gmcertified.com/?seo=goo_|_%5Baccount+name%5D_|_RTN-GM+CPO-
Exact_|_GM+CPO_|_gm%20certified (last visited on May 28, 2015).

Certified Pre-Owned vehicle.  And we did the math.  These benefits are worth $2,135.[238]

817.    With respect to all New GM and Old GM vehicles in general, and Defective Ignition Vehicles in particular, these representations were false.  In fact, as a result of the ignition switch defect and the raft of negative publicity associated with the New GM-brand as a result of New GM's fraudulent concealment and misrepresentations, the Certified Pre-Owned vehicles have greatly diminished in value, as have all New GM made vehicles that were sold to consumers prior to July 2014.

818.    California and Nationwide Class Representatives Marc and Madelaine Koppelman were among those Class Members unfortunate enough to have purchased vehicles subject to the Delta Ignition Switch recall from New GM as a Certified Pre-Owned vehicle, in this case a 2010 Chevy HHR.

819.    On information and belief, the documentation provided to these plaintiffs is identical or similar to the documentation provided to all Certified Pre-Owned vehicle purchasers.  According that documentation, before selling the Koppelman's vehicle, New GM performed a rigorous "172-Point Vehicle and Reconditioning" protocol.

820.    As part of that protocol, New GM checked boxes claiming that it had done an "inspection" of the "Engine Compartment," including, *inter alia*, the "ignition system," and claimed that it had "inspect[d] [the] operation of all components" and had "replace[d] or "repair[ed]" as necessary.

821.    In the same documentation, New GM also advised these plaintiffs—just as it still does on its website—that the "benefits" of a Certified Pre-Owned vehicle were worth "$2,135."

---

[238] http://www.gmcertified.com/?seo=goo_|_%5Baccount+name%5D_|_RTN-GM+CPO-Exact_|_GM+CPO_|_gm%20certified (last visited on May 28, 2015).

- 425 -

822.     Because of New GM's promises in connection the Certified Pre-Owned vehicles, Class Members who purchased Defective Vehicles as Certified Pre-Owned vehicles stand in the same position with respect to New GM as do purchasers of new vehicles made and sold by New GM.

**J.     In A Deferred Prosecution Agreement Entered into with the Justice Department, New GM Made Admissions that Are Highly Relevant to Plaintiffs' Claims**

823.     On September 16, 2015, New GM and the Department of Justice entered into a Deferred Prosecution Agreement ("DPA").  In that agreement, New GM consented to the filing of an Information charging it with a scheme to conceal a deadly safety defect from its U.S. Regulator in violation of 18 U.S.C. § 1001, and committing wire fraud in violation of 18 U.S.C. § 1343.

824.     As part of the DPA, New GM agreed to a Statement of Facts as being "true and accurate."[239]

825.     The following agreed facts are relevant to claims and allegations pled in this Complaint:[240]

> 2.     At all times relevant to this Statement of Facts, GM designed, manufactured, assembled, and sold Chevrolet brand vehicles.  From the earliest date relevant to this Statement of Facts until in or about 2010, GM designed, manufactured, assembled, and sold Pontiac brand vehicles.  From the earliest date relevant to this Statement of Facts until in or about 2009, GM designed, manufactured, assembled, and sold Saturn brand vehicles.  And

---

[239] *See* Deferred Prosecution Agreement, p. 2, ¶ 2.

[240] The term "GM" appears in the Statement of Facts agreed to and admitted by New GM. The term refers to New GM with respect to all incidents that occurred on or after July 10, 2009. With respect to events that occurred prior to that point, the allegations are relevant to the Plaintiffs' claims here because New GM was aware of them from the date of its inception given that the same personnel involved in and/or with knowledge of those events transferred to New GM, along with documents reflecting all the events related in the Statement of Facts.

from the earliest date relevant to this Statement of Facts until in or about the spring of 2013, GM promoted sales of "pre-owned" (*i.e.*, used) Chevrolet, Pontiac, and Saturn brand vehicles by GM dealerships nationwide.

3.    As set forth in more detail below, from in or about the spring of 2012 through in or about February 2014, GM failed to disclose a deadly safety defect to its U.S. regulator, the National Highway Traffic Safety Administration ("NHTSA").  It also falsely represented to consumers that vehicles containing the defect posed no safety concern.

7.    From approximately the spring of 2012, certain GM personnel knew that the Defective Switch presented a safety defect because it could cause airbag non-deployment associated with death and serious injury.

8.    Yet not until approximately 20 months later, in February 2014, did GM first notify NHTSA and the public of the connection between the Defective Switch and fatal airbag non-deployment incidents.  This announcement accompanied an initial recall of approximately 700,000 vehicles—a population that would, by March 2014, grow to more than 2 million.

9.    Inside GM, certain personnel responsible for shepherding safety defects through GM's internal recall process delayed this recall until GM could fully package, present, explain, and handle the deadly problem, taking affirmative steps to keep the Defective Switch matter outside the normal process.  On at least two occasions while the Defective Switch condition was well known by some within GM but not disclosed to the public or NHTSA, certain GM personnel made incomplete and therefore misleading presentations to NHTSA assuring the regulator that GM would and did act promptly, effectively, and in accordance with its formal recall policy to respond to safety problems— including airbag-related safety defects.

10.    Moreover, for much of the period during which GM failed to disclose this safety defect, it not only failed to correct its June 2005 assurance that the Defective Switch posed no safety concern but also actively touted the reliability and safety of cars equipped with the Defective Switch, with a view to promoting sales of used GM cars.  Although GM sold no *new* cars equipped with the Defective Switch during this period, GM dealers were still, from in or about the spring of 2012 through in or about the spring of 2013, selling pre-owned Chevrolet, Pontiac, and Saturn

brand cars that would later become subject to the February 2014 recalls. These sales were accompanied by certifications from GM, assuring the unwitting consumers that the vehicles' components, including their ignition systems and keys, met all safety standards.

11. After the spring of 2012 but before the recall was announced, the fifteenth Company-acknowledged death associated with the Defective Switch occurred.

44. As noted, the too-easy movement of the Defective Switch from the Run to the Accessory or Off position resulted in an unexpected shutoff of the engine and—as both the February 2005 Preliminary Information and the 2005 Service Bulletin properly described—a "loss of electrical system[s]." These electrical systems included power steering and power brakes. They also included the sensing diagnostic module or "SDM," which controlled airbag deployment. Internal GM documents reflect that although the impact of an engine shutoff on the SDM was not on GM engineers' minds, certain employees within GM understood no later than 2001 the natural connection between a loss of electrical systems and non-deployment of airbags: if the ignition switch turned to Off or Accessory, the SDM would "drop," and the airbags would therefore be disabled. If a crash then ensued, neither the driver nor any passengers could have the protection of an airbag.

45. And, indeed, the deadly effects of the Defective Switch on airbag non-deployment began manifesting themselves early on, in crashes about which GM was made aware contemporaneously. In July 2004, the 37 year-old driver of a 2004 Ion, a mother of three children and two step-children, died in a crash after her airbags failed to deploy. A few months later, in November 2004, the passenger of a 2004 Ion died in another crash where the airbags failed to deploy. The driver was charged with, and ultimately pled guilty to, negligent homicide. Then, in June 2005, a 40-year-old man suffered serious injuries after his 2005 Ion crashed and the airbags failed to deploy.

46. For each of these Ion crashes in which the subject vehicles evidently lost power before impact, the SDM data recovered from the crashed vehicles was unilluminating. Unlike the SDM installed in the Cobalt, the Ion's SDM was incapable of recording data—including power mode status—after the vehicle had lost power.

- 428 -

47. The Cobalt SDM data, by contrast, reflected a number of non-deployments accompanied by a power mode status recording of Accessory or Off.

48. In July 2005, just months after GM closed its first engineering inquiry into the Defective Switch, a 16-year-old driver died in Maryland when the airbags in her 2005 Cobalt failed to deploy. The power mode status recorded for that vehicle at the time of the crash was Accessory.

49. In October 2006, two more teenagers died, also in a 2005 Cobalt, in Wisconsin. The airbags in the vehicle failed to deploy when they should have, and the police officer who examined the crashed vehicle noted in a February 2007 report on the incident that the ignition switch "appeared to have been in the accessory position … preventing the airbags from deploying." An April 2007 report about the same crash by Indiana University likewise posited that the airbags had failed to deploy because the key was in the Accessory position. This report even specifically referenced the October 2006 version of the 2005 Service Bulletin, which described the Defective Switch.

50. In the spring of 2007, NHTSA approached certain GM personnel to express concern about a high number of airbag non-deployment complaints in Cobalts and Ions, and to ask questions about the July 2005 Cobalt crash resulting in the death of the 16-year-old girl. Around this same time, and as a result of NHTSA's inquiries, a GM field performance assessment engineer with expertise in airbags who worked principally with GM lawyers (the "Airbag FPA Engineer") began, at the request of his supervisors, to track reports of crashes in Cobalts where the airbags failed to deploy. And, in May 2007, the PI group even placed the issue of Cobalt airbag non-deployment into the first stage of GM's recall process, the ISR. But the PI group, under the supervision of the PI Senior Manager, conducted no follow-up at the time.

51. In September 2008, another crash, this one involving a 2006 Cobalt, killed two people. The airbags failed to deploy when they should have. GM sent the crashed car's SDM to the Company's SDM supplier for examination. In May 2009, the SDM supplier reported that the power mode status was at one point during the crash recorded as Off, and that this was one of two possible explanations for the failure of the airbags to deploy. This report was provided in writing, but also in person, at a meeting attended by several GM employees—including a member of the PI

- 429 -

group, in-house counsel, and the Airbag FPA Engineer who had been tracking the Cobalt non-deploy incidents.

52.     In April 2009, a 73-year-old grandmother and her 13-year-old granddaughter were killed in rural Pennsylvania in a crash when the ignition switch in the grandmother's 2005 Cobalt slipped into the Accessory position, thereby disabling the frontal airbags and preventing their deployment.  The grandmother and her 13-year-old granddaughter, who was in the front passenger seat, both died at the scene.  A 12-month-old great grandson, the sole survivor, was paralyzed from the waist down.  He was hospitalized for 33 days following the crash.

53.     In December 2009, a 35-year-old Virginia woman crashed her 2005 Cobalt, sustaining serious head injuries and rib fractures (hereinafter, the "Virginia Crash").  The airbags failed to deploy, and, as the Airbag FPA Engineer noted, the power mode at the time of the crash was recorded as Accessory.

54.     Two weeks later, a 25-year-old nursing student died in Tennessee following a head-on collision in her 2006 Cobalt (hereinafter, the "Tennessee Crash").  Again, the airbags failed to deploy when they should have, and the power mode status was recorded as Off at the time of the crash.

55.     In March 2010, a 29 year-old woman was killed in Georgia after her 2005 Cobalt crashed (hereinafter, the "Georgia Crash").  Although there was no allegation that the frontal airbag should have deployed, there was an allegation that loss of power steering caused the crash.  The SDM from the vehicle showed that the power mode status was recorded as Accessory at the time of the crash.

56.     Notably, just nine days before the Georgia Crash, GM had conducted a safety recall for a power steering problem in the Cobalt unrelated to the Defective Switch, in which it acknowledged that loss of power steering, standing alone, constituted a "defect … relate[d] to motor vehicle safety" and thus warranted recall action.  The Defective Switch, of course, caused more than just loss of power steering; it also caused loss of other electrical systems.  This was known by many within GM by no later than 2004—even if they did not appreciate precisely what electrical, system components were affected (*e.g.*, the airbag SDM).  Yet at no time before February 2014 did GM announce a recall for cars associated with the Defective Switch.

- 430 -

57.     Many of the deaths and serious injuries associated with airbag non-deployment discussed in the foregoing paragraphs became the subject of legal claims—formal and informal—against GM.  Certain GM lawyers, aided by the Airbag FPA Engineer and others like him who assisted in evaluating causes of crashes, realized by no later than early 2011 that a number of these non-deployment cases involved some sort of "anomaly" in the ignition switch.  Specifically, in connection with the Tennessee Crash, discussed above, a GM engineer explained to legal staff that when the ignition switch power mode status is in Off (as it was in that case), the SDM "powers down," and the airbags fail to deploy. The engineer further opined that the "a crash sensing system 'anomaly'" resulting in a power mode status of Off had indeed caused non-deployment in the Tennessee Crash case.

60.     Meanwhile, the GM attorney principally responsible for airbag non-deployment claims (the "GM Airbag Attorney"), who had become familiar with a number of Cobalt non-deployment incidents, grew concerned that the "anomaly" identified in these cases was getting insufficient attention from the PI group, which was supposed to investigate and work toward remedying safety problems with cars on the road.  At the time, no one within GM had yet sourced the "anomaly" to the Defective Switch's torque.

61.     Certain members of the legal department took the unusual step of arranging a meeting with PI.  The meeting, which took place on July 27, 2011, was attended not just by the PI Senior Manager, who ran the PI group on a day-to-day basis, but also by his boss, the GM Director of Product Investigations (the "GM Safety Director").  Also present were the Airbag FPA Engineer, the GM Airbag Attorney, and the GM Safety Attorney.  In advance of the meeting, the PI Senior Manager wrote to a colleague that the Cobalt airbag non-deployment problem was "ugly" and would make for "a difficult investigation."

62.     At the July 27, 2011 meeting, the Airbag FPA Engineer showed photographs of three of the most serious non-deployment crashes he had seen involving Cobalts, including photographs of the Tennessee Crash, and specifically highlighted his observations that many of these Cobalt non-deployment crashes had occurred while the power mode was in Accessory or Off.

64.     One of the first steps the PI Investigator took, in or about August 2011, was to gather learning and materials from the Airbag FPA Engineer who had been tracking non-deployment

incidents in Cobalts since 2007, and who had been involved in evaluating a number of crashes that were the subject of Cobalt non-deployment legal claims.  The Airbag FPA Engineer explained to the PI Investigator that he had observed that in some of these cases the power mode was recorded as either Accessory or Off at the time of the subject crashes.  The Airbag FPA Engineer further noted that the non-deployment problem appeared to be limited to 2005-2007 model years of the Cobalt and appeared not to affect model years 2008 and later.

65.   By March 2012, more than six months after he had been assigned to the matter, the PI Investigator had done little to advance the investigation.  The GM Airbag Attorney called another meeting with PI for March 15, 2012.  Attendees at this meeting included the GM Safety Attorney, the GM Airbag Attorney, the GM Safety Director, the PI Investigator, the PI Senior Manager, and the Airbag FPA Engineer.  During the meeting, the PI Investigator complained that he needed more support from GM's electrical engineering group to investigate a potential electrical (as opposed to mechanical) explanation for the Accessory and Off power mode recordings in many of the subject crashes.

70.   In an April 23, 2012 email responding to a query about an ignition switch turning too easily from Run to Off, the PI Senior Manager wrote to colleagues claiming—inexplicably—that he had "not heard of" complaints about low torque in the "Cobalt or other models" since 2005, when the first PI examination was conducted and closed with the issuance of the 2005 Service Bulletin.  The PI Investigator, meanwhile, pressed electrical engineers to continue to look into other possible causes of non-deployment, beyond the low torque problem.

71.   No one from PI ushered the matter into the first stage of the formal recall process, the ISR, at this time.  This approach represented a stark contrast even to the way in which the Defective Switch itself had been handled in 2005.  Back then, *before* the dangerous connection to airbag non-deployment had been drawn, PI had promptly introduced the matter into the ISR.

72.   In May 2012, the GM Safety Attorney asked a GM Vice President to act as an "Executive Champion" in order to propel the matter forward.  During the first meeting chaired by this Executive Champion, on May 15, 2012, the GM Electrical Engineer presented his view that the Defective Switch was the cause of non-deployment in the affected Cobalt models.  Those in

- 432 -

attendance included the GM Safety Attorney, the GM Safety
Director, the PI Senior Manager, the PI Investigator, and others.
The Executive Champion encouraged confirmation of this
hypothesis through more scientific study.

73.    Days later, on May 22, 2012, such confirmation was
obtained.  The GM Electrical Engineer, the PI Investigator, and
others traveled once more to an auto salvage yard and, using
equipment much more sophisticated than fish scales, conducted a
thorough study of torque in the ignition switches of several model
years of Cobalt, Ion, and other cars.  The results confirmed that the
majority of vehicles from model years 2003 through 2007
exhibited torque performance below the Torque Specification that
GM had adopted in 2001.  They also showed that starting
somewhere in model year 2007 (that is, for vehicles produced at
some point in 2006), the torque values were higher and within
specification.

74.    The observed discrepancy was, of course, due to the
ignition switch part change that the Switch DRE had ordered in
April 2006.  But neither anyone from PI nor others working on the
airbag non-deployment investigation in the spring of 2012 knew
yet about that change; the part number was the same for the
Defective Switch and the new one.  Indeed, when the PI
Investigator asked the Switch DRE in early 2012 to detail any
changes that might account for the discrepancy observed at the
salvage yard, the Switch DRE denied any of relevance.  This was
baffling to the PI Investigator and others.

75.    Still, the engineers involved knew that studied cars
built before a certain point in 2006 were equipped with low-torque
ignition switches, and that low torque in an ignition switch could
result in airbag non-deployment.  At this time, no further
engineering tests were conducted to explore any other purported
root cause of the observed non-deployment pattern or to compare
the 2005 through 2007 model year Cobalt ignition switches with
those of later model years.

76.    On June 12, 2012, three weeks after the May 2012
salvage yard expedition, an expert retained by the Virginia Crash
plaintiffs issued a report.  Noting both the 2005 Service Bulletin
and the Indiana University study from 2007 that had identified a
connection between the Defective Switch and non-deployment of
an airbag in a fatal Cobalt crash, the expert opined that the
Defective Switch was indeed responsible for non-deployment in
the Virginia Crash.  In early July, outside counsel for GM

forwarded the Virginia Crash expert's report to the GM Airbag Attorney.  In late July, the GM Airbag Attorney forwarded the Indiana University study to the PI Senior Manager, the GM Safety Attorney, and the Airbag FPA Engineer.

77.    At a meeting among GM lawyers in late July 2012 in which the Virginia Crash expert's report was discussed, a newly hired GM attorney asked the group why the Cobalt had not been recalled for the Defective Switch.  Those present explained that the engineers had yet to devise a solution to the problem but that engineering was looking into it.  The new attorney took from this that the GM legal department had done all it could do.

78.    The PI Investigator, the PI Senior Manager, the GM Safety Attorney, the GM Safety Director, and others met at lengthy intervals through the summer and fall of 2012 and early 2013 to consider potential solutions and further explore why the defect condition appeared to be limited to earlier model years.  As one of the several Executive Champions who would be tasked with overseeing these meetings from early 2012 through 2013 has explained, the purpose of the meetings was *not* to identify the root cause of the problem, which had by approximately the spring of 2012 been traced to the Defective Switch, but rather to develop the optimal remedy for the defect condition and set with precision the scope of the anticipated recall.  Certain GM personnel wanted to be sure that the fix adopted for the problem would be affordable and yet appeal to consumers; that GM would have sufficient parts on hand to address the recall; and that GM representatives would be able to fully articulate to NHTSA and the public a "complete root cause" accounting for the discrepancy between the earlier and later vehicle populations.

79.    At the same time, the manner in which the responsible GM personnel were approaching the Defective Switch and its deadly consequences in 2012 contrasted with the picture the Company was presenting to NHTSA about its recall process.

80.    On October 22, 2012, certain GM personnel, including the GM Safety Director, met with NHTSA officials in Washington, D.C., and gave a description of the Company's recall process intended to assure the regulator that safety issues were routinely addressed in a methodical and efficient fashion.  The presentation, which touted a "common global process" with "standard work templates," explained that the first step toward potential recall involved investigation by PI of the suspected safety problem.  Then, according to the presentation, the matter would be

placed promptly into the FPE process, which was controlled not by engineers but by personnel in charge of Quality.  At this stage, GM further explained, the FPET would consider the logistics of implementing the proposed recall or other contemplated action; the FPERC would recommend the particular field action to be taken (recall or, for example, a customer advisory); and, in short order thereafter, the EFADC would either make the final decision concerning that recommended field action or order "further study." According to individuals who attended this meeting and others in 2012 and 2013, GM gave the impression that its recall process was linear, robust, uniform, and prompt.

81.     To the extent this presentation may have accurately described GM's general recall process and handling of other defects, it did not accurately describe GM's handling of the Defective Switch (about which NHTSA would remain unaware until 2014).  By approximately five months prior to this presentation, certain GM personnel had identified what they knew to be a dangerous safety defect and had not started it into the first phase of the recall process.

82.     By early 2013, the Defective Switch *still* had not been introduced into the FPE process. GM was exploring optimal remedies and trying to understand why the defect appeared to affect only a limited population.  Those involved remained unaware of the part change that the Switch DRE had made back in April 2006—the change that explained why cars built after around late 2006 seemed not to be affected.

83.     Meanwhile, during this same period, GM lawyers were engaged in heavy litigation related to the Georgia Crash, referenced above.  The Georgia Crash plaintiffs' attorney had learned about the 2005 Service Bulletin, and had developed a theory that the Defective Switch caused the driver to lose control of her vehicle.  The attorney was seeking discovery related to the bulletin and the Defective Switch more generally.  He was also asking about any design changes that had been made to the switch.

84.     GM denied that any such design changes had been made that would affect the amount of torque it takes to move the key from Run to Accessory.

85.     Then, on April 29, 2013, the Georgia Crash plaintiffs' attorney took the deposition of the Switch DRE.  During that deposition, the plaintiffs' attorney showed x-ray photographs of the ignition switch from the subject vehicle (the Defective

- 435 -

Switch) and another switch from a later model year Cobalt (one installed after implementation of the Switch DRE's April 2006 part change directive). The photographs showed that the detent plunger in the Georgia Crash car was much shorter—and therefore would have had much lower torque performance—than the one in the later model year Cobalt. The Switch DRE, confronted with these photographs, continued to deny knowledge of any change to the switch that would have accounted for this difference.

86. But, as the Switch DRE has acknowledged, he knew almost immediately following his deposition that there had been a design change to the switch following production of the model year 2005 Cobalt, and that he must have been the engineer responsible for that design change. He knew as much because, the day after the April 29, 2013 deposition, he personally collected and took apart switches from a 2005 Cobalt and a later model year Cobalt and observed the difference in lengths of their respective detent plungers.

87. The Switch DRE has said that he recalls communicating these observations to his boss and to another supervisor and being advised to let the legal department handle the matter.

88. The GM Safety Attorney learned what transpired during the Switch DRE's deposition. Having previously received a request from the PI group for retention of an outside expert (the "Switch Expert") to help determine why the Defective Switch seemed to affect only a limited vehicle population, the GM Safety Attorney, on or about May 2, 2013, authorized retention of the Switch Expert in connection with the Georgia Crash case. The PI Investigator and the PI Senior Manager did not participate in meetings with the Switch Expert until the Switch Expert presented his conclusions following the settlement of the Georgia Crash case. The PI Investigator understood that he was to put his own investigation on hold pending the Switch Expert's evaluation.

89. Of course, by the time the Switch Expert had been retained, certain GM personnel had already learned from the Georgia Crash plaintiffs' attorney about the design change to the Defective Switch, and the Switch DRE had already confirmed that the change had in fact occurred. GM thus had an explanation for why the defect condition did not appear to affect cars built after the middle of 2006. And, indeed, some within GM had known for approximately a year that a confirmed population of GM's compact cars was equipped with the Defective Switch. Yet *still*

- 436 -

there was no recall; indeed, still there was no move to even place the matter into the FPE process.  Instead, GM personnel awaited the study and conclusions of the Switch Expert.

90.     Meanwhile, on June 22, 2013, a 23-year-old man was killed in a crash on a highway near Roxton Pond, Quebec after his 2007 Cobalt left the road and ran into some trees.  The driver-side airbag in the Cobalt failed to deploy.  The power mode status was recorded as Accessory.

91.     By July 2013, the Switch Expert had confirmed what the Georgia Crash plaintiffs' expert and the Switch DRE had known since no later than April 2013:  Cobalts from model years 2008 through 2010 had longer detent plungers and springs than those from model years 2005 and 2006.  GM's outside counsel in the Georgia Crash case urged GM in-house lawyers to settle it: "[T]here is little doubt that a jury here will find that the ignition switch used on [the Georgia Crash car] was defective and unreasonably dangerous, and that it did not meet GM's own torque specifications.  In addition, the [engineering inquiry documents about the Defective Switch from 2004 and 2005] and the on-going FPE investigation have enabled plaintiffs' counsel to develop a record from which he can compellingly argue that GM has known about this safety defect from the time the first 2005 Cobalts rolled off the assembly line and essentially has done nothing to correct the problem for the last nine years."

92.     GM followed its outside counsel's advice and settled the Georgia Crash case at the end of August 2013, agreeing to pay $5 million.

93.     Then, in late October 2013, GM received documentary confirmation from the Switch Supplier that the Switch DRE had in fact directed a part change to fix the Defective Switch in April 2006.  This evidence further showed that the part was changed without a corresponding change to the part number.

94.     Only at this point did GM finally place the Defective Switch matter into the formal FPE process.  An ISR was scheduled for November 5, 2013.  Meanwhile, on October 30, the PI Investigator, who was by now back working on the matter and helping to lay the practical groundwork for a recall, asked an employee in charge of ordering vehicle parts what the costs of new ignition switch components would be for the 2005 through 2007 Cobalts.

- 437 -

95.     On July 23, 2013, one day after GM's outside counsel had advised GM to settle the Georgia Crash case and noted that plaintiffs' counsel could make a "compelling" argument that GM "essentially has done nothing to correct" the Defective Switch "for the last nine years," the GM Safety Director received an email from NHTSA's Director of Defects Investigation accusing GM of being "slow to communicate" and "slow to act" in the face of safety defects—including defects unrelated to the Defective Switch (about which NHTSA remained unaware) but related to non-deployment of airbags.

96.     Two days later, certain GM personnel, including the GM Safety Director, met with NHTSA to try to quell the agency's concerns.  According to notes taken by the GM Safety Director at that meeting, NHTSA agreed with GM that the Company appeared to have a "robust and rigorous process" for evaluating and addressing safety issues, but worried that it "tend[ed] to focus on proving the issue [wa]s not a safety defect."

97.     On November 7, 2013, two days after the ISR concerning the Defective Switch, certain GM personnel met again with NHTSA, this time to give a more in-depth presentation targeted at assuring the regulator that GM was "responsive" and "customer focused" when it came to safety concerns.  Although the presentation did not specifically address the Defective Switch-related airbag non-deployment problem—which, having just entered the recall process within GM, remained unknown to NHTSA—it did address concerns related to airbag non-deployment more generally.

98.     First, certain GM personnel showed NHTSA slides that touted the increasing swiftness with which GM had addressed safety defects from 2008 through 2012.  One graph reflected that the average time taken from identification of the issue through to execution of the recall was 160 days in 2008 and 84 days in 2012.  It further showed that the average time an issue remained in the "pre-FPE" stage was 105 days in 2008 and 33 days in 2012.  And the average number of days between entry into the FPE process and recall decision was 15 days in 2008 and 13 days in 2012.

99.     Other portions of GM's presentation suggested that any airbag defect that presented with a failure to warn the driver and/or certain other aggravating factors would be recalled swiftly.

108.     On January 31, the voting members agreed that a recall of the affected model year Cobalts, G5s, and Pursuits was

- 438 -

warranted. On February 7, 2014, GM announced the recall to the public and NHTSA.

109.   Although other models—the Ion, most notably—were likewise equipped with the Defective Switch, these were not recalled on February 7. The stated reasons for not including these other models varied. Some believed there were differences in electronic architecture and physical switch placement between the unrecalled cars and the recalled cars, such that the risk of switch movement and/or airbag non-deployment was reduced. Others cited an error by the PI Investigator in collecting incident data about the Ion, which they said gave the erroneous impression that there was no comparable problem with the Ion.

110.   In any event, following intense criticism from the press about the limited scope of the February 7 recall, GM held another EFADC meeting on February 24, 2014 to consider the affected model years of the Ion, Sky, HHR, and Solstice. Voting members agreed that the February 7 recall should be expanded to encompass these other models. The next day, GM announced that decision.

111.   All of the cars subject to the February and March 2014 airbag non-deployment recalls were relatively old. GM stopped manufacturing the Ion in 2006; stopped manufacturing the Cobalt, the G5, the Sky, and the Solstice in 2009; and stopped manufacturing the HHR in 2010.

112.   From in or about the spring of 2012, when certain GM personnel knew that the Defective Switch could cause airbag non-deployment, through at least in or about May of 2013, GM dealerships (which GM had not made aware of the issue) continued to sell "certified pre-owned" cars equipped with the Defective Switch. GM, which profited indirectly from these sales, certified the safety of the vehicles to the public, explaining that the certification process involved testing of over a hundred components, including, specifically, the ignition system.

113.   But the safety certification was made despite there being no change or alteration to either the ignition switch itself or the accompanying key in these cars. The Defective Switch was left intact and unremedied.

114.   Approximately 800 consumers purchased certified pre-owned vehicles equipped with the Defective Switch. The GM dealer certifications thus may have caused consumers who relied

on the certifications to buy vehicles that they may incorrectly have believed to be safe.

115.  As detailed above, starting no later than 2003, GM knowingly manufactured and sold several models of vehicles equipped with the Defective Switch.  By approximately the spring of 2012, certain GM personnel knew that the Defective Switch could cause frontal airbag non-deployment in at least some model years of the Cobalt, and were aware of several fatal incidents and serious injuries that occurred as a result of accidents in which the Defective Switch may have caused or contributed to airbag non-deployment.  This knowledge extended well above the ranks of investigating engineers to certain supervisors and attorneys at the Company—including GM's Safety Director and the GM Safety Attorney.  Yet, GM overshot the five-day regulatory reporting requirement for safety defects by approximately 20 months.  And throughout this 20-month period, GM failed to correct its 2005 statement that the Defective Switch posed no "safety" problem.

826.  The Old and New GM personnel referred to in the foregoing agreed facts include the following:  Ray DeGiorgio is the "Switch DRE;" Alberto Manzor is the "Vehicle Performance Manager;" Doug Wachtel is the "PI Senior Manager;" Gay Kent is the "Director of Vehicle Safety & Crashworthiness;" William Kemp is the "GM Safety Attorney;" Jaclyn Palmer is the "GM Airbag Attorney;" Carmen Benavides is the "GM Safety Director;" John Sprague is the "Airbag FPA Engineer;" Brian Stouffer is the "PI Investigator;" John Dolan is the "GM Electrical Engineer;" and Maureen Foley-Gardner is the "FPE Director."

## K.    New GM's Deception Has Harmed Plaintiffs and Class Members

827.  New GM was well aware that vehicle recalls, especially untimely ones, can taint its brand image and the value of New GM vehicles and Defective Vehicles in particular.  In its 2010 Form 10-K submitted to the SEC, New GM admitted that "Product recalls can harm our reputation and cause us to lose customers, particularly if those recalls cause consumers to

- 440 -

question the safety or reliability of our products.  Any costs incurred or lost sales caused by

future product recalls could materially adversely affect our business."[241]

828.    New GM also understood that safety was an important feature to consumers:

> According to GM research, safety ranks among the top 10 reasons
> for purchase. According to 2012 calendar year sales data, 54
> percent of Chevrolet, Cadillac, GMC and Buick buyers surveyed
> listed safety features as an "extremely important" purchase
> consideration. The same percentage of buyers industrywide also
> listed safety features as "extremely important."

> **"We design safety and crashworthiness into our vehicles very
> early in development," said Gay Kent, GM's general director
> of Vehicle Safety and Crashworthiness. "We are committed to
> offering advanced safety technologies on a broad range of
> models, not just on the most expensive vehicles. All of our
> vehicles are designed to provide continuous protection for
> customers before, during and after a crash."**[242]

829.    Unfortunately for owners of New GM and Old GM vehicles, New GM Certified

Pre-Owned Vehicles and Defective Vehicles, New GM was correct.  It is difficult to find a brand

whose reputation has taken as great a beating as has the New GM brand starting in February

2014 when the first ignition switch recall occurred.

830.    In fact, the public outcry has been significant in response to the ongoing

revelations of the massive number of defects New GM concealed, and the massive number of

defective vehicles New GM has sold.  The following are illustrative examples of the almost

constant beating the New GM brand has taken ever since the first ignition switch recall was

announced on July 13, 2014.

---

[241] General Motors 2010 Form 10-K, p. 31, available at
https://www.sec.gov/Archives/edgar/data/1467858/0001193125 10078119/dlOk.htm#toc857334.

[242] http://media.gm.com/media/us/en/chevrolet/news.detail.html/content/
Pages/news/us/en/2013/Sep/0920-5-star.html.

- 441 -

831.   After the announcement of the first ignition switch recall the media was highly

critical of New GM.  For example, a CBS February 27, 2014 news report headlined:

By AIMEE PICCHI   MONEYWATCH   *February 27, 2014, 5:45 PM*

# Did GM wait too long to issue its recall?

832.   The CBS report had a video link:[243]



Play **VIDEO**

**13 deaths now linked to GM faulty ignition switches, recall expanded**

833.   On March 13, 2014, a CNN report was entitled:

# Feds demand answers from GM on recall defect

By **Mike M. Ahlers, CNN**
updated 7:51 AM EDT, Thu March 13, 2014

834.   On March 16, 2014, Reuters reported as follows:

# Owners of recalled GM cars feel angry, vindicated

(Reuters)—As details emerge about how General Motors Co dealt with faulty ignition switches in some of its models, car owners are increasingly angry after learning that the automaker knowingly allowed them to drive defective vehicles.

Saturn Ion owner Nancy Bowman of Washington, Michigan, said she is outraged that GM allowed her to drive a "death trap."  She

---

[243] http://www.cbsnews.com/news/did-general-motors-wait-too-long -to-issue-its-recall/.

said her car had so many ignition problems she was afraid to resell it to an innocent buyer.

She bought the 2004 model car new and still drives it after extensive repairs and multiple run-ins with a Saturn dealer she called dismissive.

"Five times the car died right out from under me after hitting a bump in the road," she wrote in a 2013 posting on a complaint website, arfc.org, that says it sends information to the National Highway Traffic Safety Administration (NHTSA).

Every time I brought it in they said it was an isolated incident. Couldn't find the problem, so they acted like I was an idiot.

835. On March 24, 2014, the NEW YORK TIMES issued an article entitled:

BUSINESS DAY

## General Motors Misled Grieving Families on a Lethal Flaw

By HILARY STOUT, BILL VLASIC, DANIELLE IVORY and REBECCA R. RUIZ   MARCH 24, 2014

836. It contained a troublesome account of New GM's conduct:

It was nearly five years ago that any doubts were laid to rest among engineers at General Motors about a dangerous and faulty ignition switch.  At a meeting on May 15, 2009, they learned that data in the black boxes of Chevrolet Cobalts confirmed a potentially fatal defect existed in hundreds of thousands of cars.[244]

But in the months and years that followed, as a trove of internal documents and studies mounted, G.M. told the families of accident victims and other customers that it did not have enough evidence of any defect in their cars, interviews, letters and legal documents show.  Last month, G.M. recalled 1.6 million Cobalts and other small cars, saying that if the switch was bumped or weighed down it could shut off the engine's power and disable air bags.

In one case, G.M. threatened to come after the family of an accident victim for reimbursement of legal fees if the family did not withdraw its lawsuit.  In another instance, it dismissed a family with a terse, formulaic letter, saying there was no basis for claims.

---

[244] New GM was of course aware of this for all the reasons discussed throughout this Complaint.

- 443 -

* * *

Since the engineers' meeting in May 2009, at least 23 fatal crashes have involved the recalled models, resulting in 26 deaths.  G.M. reported the accidents to the government under a system called Early Warning Reporting, which requires automakers to disclose claims they receive blaming vehicle defects for serious injuries or deaths.

A New York Times review of 19 of those accidents—where victims were identified through interviews with survivors, family members, lawyers and law enforcement officials—found that G.M. pushed back against families in at least two of the accidents, and reached settlements that required the victims to keep the discussions confidential.

* * *

In other instances, G.M. ignored repeated calls, families said. "We did call G.M.," said Leslie Dueno, whose 18-year-old son, Christopher Hamberg, was killed on June 12, 2009—not quite a month after the critical May 15 meeting of G.M. engineers about the ignition data—driving his 2007 Cobalt home before dawn in Houston.  He lost control at 45 miles per hour and hit a curb, then a tree, the police report said.  "Nobody ever called me.  They never followed up.  Ever."

Last month's recalls of the Cobalt and five other models encompassed model years 2003 through 2007.  G.M. faces numerous investigations, including one by the Justice Department looking into the company's disclosures in its 2009 bankruptcy filing as well as what it told regulators.

"We are conducting an unsparing, comprehensive review of the circumstances leading to the ignition switch recall," G.M. said in a statement on Monday.  "As part of that review we are examining previous claims and our response to them.  If anything changes as a result of our review, we will promptly bring that to the attention of regulators."

G.M. has said it has evidence of 12 deaths tied to the switch problem, but it has declined to give details other than to say that they all occurred in 2009 or earlier.  It says it has no conclusive evidence of more recent deaths tied to the switch.

* * *

- 444 -

It was unclear how many of the 26 deaths since the 2009 meeting were related to the faulty ignition, but some appeared to fit patterns that reflected the problem, such as an inexplicable loss of control or air bags that did not deploy.  In some cases, the drivers had put themselves at risk, including having high blood-alcohol levels or texting.

Still, by the time Benjamin Hair, 20, crashed into a tree in Charlottesville, Va., on Dec. 13, 2009, while driving a Pontiac G5 home, G.M. had conducted five internal studies about the ignition problem, its records indicate.

* * *

Consumer complaints and claims came to the company in a variety of ways—through lawsuits, calls, letters and emails, warranty claims, or insurance claims.  G.M.'s legal staff was the recipient of lawsuits, insurance information, accident reports and any other litigation-related paperwork.  But warranty claims and customer calls were routed through the sales and service division—a vast bureaucracy that occupies most of one tower at G.M.'s headquarters in Detroit.  Because the legal staff reports to the chief executive, and the sales department to the head of G.M. North America, it is unclear whether they share information related to a specific car, like the Cobalt.

837.    NPR ran a story on March 31, 2014:



Timeline: A History Of GM's Ignition Switch Defect

838.    The NPR story raised questions about New GM's candor:

NPR looked into the timeline of events that led to the recall.  It's long and winding, and it presents many questions about how GM handled the situation:  How long did the company know of the problem?  Why did the company not inform federal safety officials of the problem sooner?  Why weren't recalls done sooner?  And did GM continue to manufacture models knowing of the defect?

839.    On May 11, 2014, the CHICAGO TRIBUNE ran an article entitled:

*GM ranked worst automaker by U.S. suppliers:  survey*

- 445 -

DETROIT (Reuters)—General Motors Co, already locked in a public relations crisis because of a deadly ignition defect that has triggered the recall of 2.6 million vehicles, has a new perception problem on its hands.

The U.S. company is now considered the worst big automaker to deal with, according to a new survey of top suppliers to the car industry in the United States.

Those so-called "Tier 1" suppliers say GM is now their least favorite big customer, according to the rankings, less popular even than Chrysler, the unit of Fiat Chrysler Automobiles FIA.MI, which since 2008 had consistently earned that dubious distinction.

Suppliers gave GM low marks on all kinds of key measures, including its overall trustworthiness, its communication skills, and its protection of intellectual property.

840.    On May 25, 2014, an article reported on a 2.4 million vehicle recall:

# When Will GM's Recall Mess End?

**General Motors** (NYSE: GM) on Tuesday said it is recalling about 2.4 million additional vehicles in four separate recalls for a variety of problems, including faulty seat belts and gearshift troubles.

This announcement came on the heels of another set of GM recalls, announced last Thursday, covering 2.7 million vehicles.  Including the four recalls announced on Tuesday, GM has issued a total of 30 recalls in the U.S. so far in 2014, encompassing about 13.8 million vehicles.

That's a stupendous number.[245]

841.    On May 26, 2014, the NEW YORK TIMES ran an article:

BUSINESS DAY

*13 Deaths, Untold Heartache, From G.M. Defect*

By REBECCA R. RUIZ, DANIELLE IVORY and HILARY STOUT   MAY 26, 2014

---

245 http://www.fool.com/investing/general/2014/05/25/when-will-gms-recall-mess-end.aspx.

- 446 -

842.   The article once again pointed blame at New GM:

BEN WHEELER, Tex.—For most of the last decade, Candice Anderson has carried unspeakable guilt over the death of her boyfriend.  He was killed in 2004 in a car accident here, and she was at the wheel.  At one point, Ms. Anderson, who had a trace of Xanax in her blood, even faced a manslaughter charge.  She was 21.

All these years, Ms. Anderson—now engaged and a mother—has been a devoted visitor to his grave.  She tidies it every season, sweeping away leaves and setting down blue daisies with gold glitter for his birthday, miniature lit trees for Christmas, stones with etched sayings for the anniversary of their accident.

"It's torn me up," Ms. Anderson said of the death of Gene Mikale Erickson.  "I've always wondered, was it really my fault?"

Last week, she learned it was not.

\* \* \*

Inside G.M., the nation's largest automaker, some of the 13 victims appear on charts and graphs with a date and a single word:  "fatal."

843.   News of New GM's misconduct and of the recalls made the front page of every major newspaper and was the lead story on every major television news program in the country.

844.   The congressional hearings where New GM executives were subject to harsh questioning and criticism were widely reported in every type of media.

845.   In June 2014, New GM recalled another 8.2 million vehicles and again these recalls received widespread attention in the press.  The stories often included charts and graphs depicting the ever-growing list of vehicles recalled:

- 447 -

## GM to recall 8.2 million more vehicles over ignition-switch defect

*POSTED AT 3:21 PM ON JUNE 30, 2014*

The recall blues continue at GM, as does the scope of their previously hidden ignition-switch defect.  The world's largest automaker <u>added 8.45 million more vehicles to its list</u>, with some models going back to 1997.  This puts GM over the 28-million mark for cars recalled on a global basis in 2014, and over 26 million domestic.[246]

846.    The coverage did not simply die down as often happens.  On July 15, 2014, the

NEW YORK TIMES ran an article entitled, "Documents Show General Motors Kept Silent on Fatal

Crashes."

847.    By August 2, 2014, the press was reporting that New GM used vehicles were

losing value:

THE DALLAS MORNING NEWS

**August 2, 2014 Saturday**
1 Edition

**SECTION:**  BRIEFING; Pg. 10

**LENGTH:**  80 words

**HEADLINE:**  <u>GM vehicles' resale values are taking a hit as safety</u>
<u>recalls mount</u>

**BODY:**

Although General Motors' sales remained solid in the midst of its recent record recalls, some vehicles experienced significant drops in their resale values.

In an analysis of more than 11 million used cars for sale between March and June of this year, iSeeCars.com found that the resale

---

[246] http://hotair.com/archives/2014/06/30/gm-to-recall-8-2-million-more-vehicles-over-ignition-switch-defect-8-45-million-overall/.

values of the main vehicles in GM's recalls dropped 14 percent
from the same period last year.

848.    An August 5, 2014 article also reported that used New GM and Old GM vehicles,

particularly those affected by the Delta Ignition Switch recall, were suffering loss in value due to

the recalls:[247]



# Used GM cars affected by recall getting hurt in the marketplace

Ignition recall caused resale values to take a hit—some Pontiac,
Saturn and Chevy models were most affected.

General Motors Co.  GM -0.41%  has been fortunate to avoid a
collapse of new-vehicle sales since the ignition-switch safety crisis
blew up in January, engulfing the automaker in litigation, a federal
criminal probe and Congressional inquiries.

Used GM vehicles—models affected by the recall—meanwhile
have taken a substantial hit in value, according to a study by
iSeeCars.com, an online search engine. GM's new-vehicles sales
are up 3.5% in the U.S. through July in a market that has risen 5%
in terms of unit sales.

(Holders of GM stock have gotten whacked as well since January,
the value of shares falling nearly 18%, compared with a S&P 500
Index that has risen 4% during the period.)

The operators of the search engine said they created an algorithm
to determine the market value of six GM cars affected by the
recall, based on asking prices of used vehicles on dealer lots from
March to June 2013, compared to a year later. The change in value
also was compared to the dropping value of all used cars in the
U.S., which has been occurring for the past few months. The
sample size was 11 million cars.

---

[247] Doron Levin, FORTUNE MAGAZINE, August 5, 2014.

- 449 -

The average price of the recalled GM models dropped 14% from March to June 2014, compared to a year earlier and adjusted for inflation. The drop in value of all similar models was 6.7% during the same period.

Phong Ly, chief executive and co-founder of iSeeCars.com said "recalls are playing a role in motivating sellers to sell their used cars and at a lower price point than they otherwise would." His company provides free information to car shoppers and sells sales leads to dealers.

849.    The crisis that affected the New GM Brand was so significant that New GM stock has been battered.  A September 22, 2014 report observed:[248]

## GM Falls Deeper Into The Abyss

Sep. 22, 2014 7:55 AM ET  |  About: General Motors Company (GM)

**Summary**

- GM has been in a rut since the ignition switch recalls.

- More and more, GM is coming off as a perpetually troubled business.

- We continue to avoid General Motors stock.

We previously wrote about GM (NYSE:GM) and placed a $31 price target on it here. Our basic argument was that GM was going to have trouble presenting itself into the mainstream as a reputable brand to buy after the ignition switch recall.

Late Sunday, it was announced that GM was recalling 222,500 vehicles due to brake pad malfunction. This number towers over the amount of normal recalls that come during the course of business. It's also involving vehicles that were made from 2013 to 2015, a clear indicator that these vehicles (manufactured by the post-bankruptcy GM) should have had a renewed focus of safety on them from the beginning.

---

[248]    *See* http://seekingalpha.com/article/2511545-gm-falls-deeper-into-the-abyss.

850.    The diminution in value was recognized by Class Members as reflected in this e-mail to Mary T. Barra dated May 7, 2014:[249]

> I am writing to request your help. I own a 2007 Pontiac G5 and a 2006 Chevy Cobalt, both under your recent recall [for the defective Delta Ignition Switch.] **Because of the recall and all the publicity the value of my vehicles have plummeted by over $3,000 in the past 2 months.**
>
> Because of my concerns and the fact that both vehicles are driven by my to college age sons, my intent is to sell them. As you can imagine now I'm out significant amounts of money. So I am reaching out to ask for your assistance prior to hiring an attorney. I am simply wanting the difference between today's value and the value prior to the recall announcement. Or for you to have a dealership buy my vehicles directly. Each vehicle was value over $9000 just a few short months ago; today under $6000! If anyone will even look at them.

851.    Another example of the economic injury to Class Members comes from the following e-mail to Mary Barra and other New GM executives:[250]

> I am highly upset finding out that my 2007 Chevy Cobalt is being recalled yet again for the 3rd  time.  This has been the unsafest vehicle that I have ever purchased.  I am a single mother with a small child.  I depend on my vehicle to get us everywhere and everytime I turn around it is being recalled.  This is UNACCEPTABLE.
>
> The first recall my son was a little over two years when the power steering recall was replaced.  Then again last year the faulty fuel line that broke and leaked fuel out of my car.  I was told that the car had to be parked because it had the potential to blow up and was unsafe to drive until it was repaired from the recall.  Not only is this vehicle unsafe, but I paid $13,500 dollars for a vehicle that has CLEARLY not been worth the money.  Not to mention a list of other things that have gone wrong with this car.
>
> The fact remains your company knew by 2007 they had **10 incidents** where the air bag didn't deploy in this type of crash."

---

[249] GM-MDL2543-400293557 (emphasis added).

[250] GM-MDL-2543-001193336 (emphasis in original).

As a matter of FACT, my airbag light keeps going on and off saying it needs to be services, on top of this car leaving not just myself but my son on the side of the interstate twice in the last month because the traction and engine starts flashing and the car starts jumbling and says the engine is powering down.  THIS IS UNACCEPTABLE!!!  The fact is this company knew in 2004 that this needed to be replaced and did NOTHING ABOUT IT, the only reason that it was recalled was because deaths and crashes have been escalating, and I am myself nor my son will be part of this trial and error on this companys faulty manufacturing.  If I have to contact an attorney and have this issue resolved and take it to a higher level and sue with a class action suit I will.  I will report this to the Federal Trade Commission, the news, the Better Business Bureau and so fourth if I am not taken out of this vehicle and given a replacement in compensation for the faulty vehicle that I have purchased or until it is fixed.

852.    And another:

For a new car, not a Chevy, this has caused us to spend thousands of dollars we really do not have.[251]

853.    And another to Mary Barra about the 2004 Saturn Ion 2:[252]

Due to the fact we had purchased an additional car to replace the unsafe Saturn, we decided to sell it.  Unfortunately no one would not buy the vehicle due to the recalls and the only offer I received was to sell it as junk.

854.    Another owner wrote CEO Barra and confirmed the trust consumers placed in New GM, the defect at work and loss of value.[253]

June 5, 2014:

I realize you are extremely busy & under immense pressure with the Chevy Cobalt issue.  My daughter, Anna, who is going into her college senior year for Registered Nursing, has a 2006 Chevy Cobalt.  She had a situation with her car shutting off on the highway, due to the ignition problem.  Fortunately, she was able to

---

[251] GM-MDL2543-001236494.

[252] GM-MDL2543-100373492.

[253] GM-MDL2543-400396144.

get the car off the road & restarted, without being involved in an accident. We are grateful that she wasn't hurt or killed.

We put our faith & trust into GM to produce a safe vehicle for our which turned out not to be the case.  The government has issued a record fine against your company, but now with all the media attention, my daughter's Cobalt is essentially worthless in value. This, GM and the government, has not addressed.  We would like to get our daughter a newer vehicle, but with no trade in value, it makes the next purchase more costly.

855.   New GM was aware of how its deception has diminished the value of Defective Vehicles, and specifically asked Kelley Blue Book: '



856.   Internally New GM was receiving advice that '

857.   The impact on the value of the New GM-brand is also evidenced by the decline in New GM's stock price, which hit a 52-week low on October 10, 2014 and dropped even lower by September of 2015.

858.   New GM's unprecedented concealment of a large number of serious defects, and its irresponsible approach to safety, quality, and reliability issues, has caused damage to Plaintiffs and Class Members.

859.   A vehicle made by a reputable manufacturer of safe, high quality, and reliable vehicles who stands behind its vehicles after they are sold is worth more than an otherwise

---

254 GM-MDL2543-200063855.

255 GM-MDL2543-006254731.

- 453 -

similar vehicle made by a disreputable manufacturer known for selling Defective Vehicles and for concealing and failing to remedy serious defects after the vehicles are sold.

860.     A vehicle purchased or leased under the reasonable assumption that it is safe and reliable is worth more than a vehicle of questionable safety, quality, and reliability due to the manufacturer's recent history of concealing serious defects from consumers and regulators.

861.     Purchasers and lessees of New GM and Old GM vehicles, New GM Certified Pre-Owned Vehicles and Defective Vehicles after the July 10, 2009 inception of New GM paid more for the vehicles than they would have had New GM disclosed the many defects it had a duty to disclose in New GM and Old GM vehicles, and disclosed that GM's culture and business model was such that it did not produce safe, high quality, and reliable vehicles.  Because New GM concealed the defects and the fact that it was a disreputable company that valued cost-cutting over safety, Plaintiffs and Class Members did not receive the benefit of their bargain.  And the value of all their vehicles has diminished as the result of New GM's deceptive conduct.  Owners of Old GM Defective Vehicles have also been harmed by New GM's deceptive conduct, as the value of their vehicles has also diminished.  To be clear the value of class vehicles, those with Defects, and GM owners with vehicles without defects, all suffered injury in the loss of value and/or overpayment at the time of purchase.

862.     On information and belief, an estimate of the diminished value in Class vehicles is illustrated by way of example for a few Model Year 2013 vehicles:

| GMC | Terrain | September Diminished Value:  $1,052 |
| GMC | Sierra 1500 | September Diminished Value:  $325 |
| Buick | Lacrosse | September Diminished Value:  $954 |

- 454 -

| Chevrolet | Suburban | September Diminished Value: $854 |
| Cadillac | CTS | September Diminished Value: $867 |
| Cadillac | XTS | September Diminished Value: $1,722 |

863.    Another example is the diminished value of illustrative 2011 models:

| GMC | Terrain | September Diminished Value: $891 |
| Buick | Lacrosse | September Diminished Value: $1,017 |

864.    Old GM vehicles subject to the Delta Ignition Switch recall also have suffered

diminished, including, value by way of example:

| | Diminished Value as of 03/2014 | Diminished Value as of 09/2014 |
| --- | --- | --- |
| 2008 Cobalt | $256 | $357 |
| 2008 HHR | $162 | $477 |
| 2009 Sky | $173 | $429 |

865.    New GM vehicles have continued even in 2015 to suffer from diminished value.

By way of example:

| | Diminished Value as of April 2015 |
| --- | --- |
| 2011 Chevrolet Caprice | $1,736 |
| 2013 Chevrolet Caprice | $2,678 |
| 2011 Buick Lucerne | $702 |
| 2013 GMC Denali | $1,840 |
| 2010 GMC Denali Hybrid | $4,693 |
| 2013 GMC Yukon | $2,020 |
| 2012 Chevrolet Captiva Sport | $1,376 |

866.    Other examples are as follows of diminished value through June 2016:

|  | Diminished Value as of June 2016 |
| --- | --- |
| 2008 Buick Enclave | $410 |
| 2005 Buick Lacrosse | $270 |
| 2006 Buick Lucerne | $170 |
| 2010 Chevrolet Camaro | $1,104 |
| 2011 Chevrolet Camaro Convertible | $3,365 |
| 2010 Chevrolet Caprice Police Vehicle | $2,502 |
| 2003 Chevrolet Impala | $195 |
| 2009 Chevrolet Traverse | $3,080 |
| 2008 Chevrolet Acalia | $2,587 |
| 2003 Oldsmobile Alero | $287 |
| 2004 Pontiac Grand Prix | $238 |
| 2008 Saturn Aura | $948 |
| 2008 Saturn Outlook | $932 |

867.    If New GM had timely disclosed the many defects as required by the TREAD

Act, the law of fraudulent concealment, and consumer laws set forth below, Class Members'

vehicles would be considerably more valuable than they are now and/or Class Members would

have paid less than they did.

## VI.    SUCCESSOR LIABILITY ALLEGATIONS

868.    General Motors Corporation ("Old GM") was founded on September 16, 1908, in

Flint, Michigan, and was incorporated on October 13, 1916, in Delaware. On June 1, 2009,

General Motors Corporation ("Old GM") filed a Chapter 11 bankruptcy petition in the United

States Bankruptcy Court for the Southern District of New York.[256]

---

[256] Valukas Report at 1 n.1 and Valukas Report at 131.

869.     On July 5, 2009, the Bankruptcy Court approved the sale of substantially all of the assets of Old GM to a predecessor of General Motors LLC ("New GM").[257] Old GM sold all of its assets to New GM in a transaction (the "363 Sale") finalized on July 10, 2009.[258]

870.     Through the 363 sale, all Old GM brands, inventory, physical assets, management, personnel, vehicles and general business operations were transferred to New GM. New GM also acquired the contracts, books, and records of Old GM, as well as the goodwill and intellectual property of Old GM.

871.     New GM provided no cash consideration for the 363 Sale.[259]  However, New GM assumed more than $7 billion of debt owed by Old GM, and provided Old GM with 10% of New GM's common stock, in addition to warrants to purchase 15% of New GM's common stock.[260]

872.     Old GM's decision to file for bankruptcy, and all of the major decisions made in the course of the 363 Sale negotiations, and with respect to all the actions of Old and New GM during Old GM's bankruptcy proceedings, originated from the company headquarters at 300 Renaissance Center, Detroit, Michigan.

873.     At no time was the business enterprise of the General Motors Company interrupted, and the New GM brand was continued as the same brand as Old GM.[261] New GM is the mere continuation or reincarnation of the same business enterprise as Old GM.

---

[257] *Id.*

[258] Valukas Report at 131-132.

[259] New GM August 7, 2009 Form 8-K, at 16; Bankruptcy Court July 5, 2009 Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief ("Sale Order") at 18-19.

[260] *Id.*

874.    Before the 363 Sale, Old GM's principal executive offices were located at 300 Renaissance Center, Detroit, Michigan.[262]  After the Sale, New GM's principal executive offices were located at 300 Renaissance Center, Detroit, Michigan.[263]

875.    Old GM established the General Motors Proving Grounds in Milford, Michigan in 1924, for vehicle testing; the Milford Proving Grounds property is still owned and used by New GM.

876.    Under the terms of 363 Sale, New GM assumed the majority of Old GM's dealer franchise agreements.[264]  New GM also assumed certain Old GM agreements with suppliers, including substantially all of Old GM's executory contracts with direct suppliers.[265]

877.    After the 363 Sale, New GM continued to use over 111 Old GM facilities in 28 states and 89 cities in the United States, 18 locations in Canada, and locations in 56 other countries.[266]

878.    New GM retained ownership and control over nearly all of Old GM's manufacturing plants, and closed only 14.[267] New GM also assumed ownership and responsibility for over 3,600 of Old GM's U.S. dealerships.[268]

879.    After the 363 Sale, New GM continued to produce Old GM's "core" automobile brands.[269]

---

[261] Valukas Report at 132 n.577.

[262] Old GM April 27, 2009 Form 8-K.

[263] New GM August 7, 2009 Form 8-K.

[264] New GM August 7, 2009 Form 8-K; Sale Order at 5.

[265] New GM August 7, 2009 Form 8-K, at 19; Sale Order at 20.

[266] New GM August 27 Form 8-K at 32.

[267] http://money.cnn.com/2009/07/10/news/companies/new_gm/.

[268] *Id.*

880.    After the 363 Sale, New GM continued the manufacture, marketing sale and warranty of such former Old GM vehicles as the Chevrolet Cobalt, the Chevrolet HHR, the Buick Allure, the Buick LaCrosse, the Buick Lucerne, the Cadillac Deville, the Cadillac DTS, the Cadillac CTS, the Cadillac SRX, the Chevrolet Impala, the Chevrolet Camaro, the Chevrolet Malibu, and the Chevrolet Monte Carlo.

881.    Saturn Corporation was established on January 7, 1985 as a subsidiary of Old GM. The Saturn Sky was first manufactured in 2006 for the 2007 model year ("MY"), and the Pontiac Solstice was first manufactured in 2005 for the 2006 MY. Old GM manufactured both of these vehicles at its Wilmington, Delaware plant, and New GM continued to manufacture market and sell these vehicles after Old GM's bankruptcy. After attempting to sell the Saturn brand to Penske, New GM announced on September 30, 2009, that it was going to wind down the Saturn brand by October 2010.[270]

882.    Adam Opel AG was founded on January 21, 1862 as a sewing machine manufacturer and produced its first automobiles in 1899. Opel, based in Russelsheim, Hesse, Germany, became a subsidiary of Old GM in 1931. The Opel/Vauxhall GT was introduced as a production model in late 1968. Production of the Opel/Vauxhall GT was shut down in 1973 only to return 34 years later as a 2007 MY vehicle for GM. The Daewoo G2X was a rebadged version of the Opel GT available in September 2007. Old GM manufactured these vehicles from 2007 until July 28, 2009 at its Wilmington, Delaware plant, and New GM continued to manufacture,

---

[269] New GM August 7, 2009 Form 8-K, at 1.

[270] Valukas Report at 19;
http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2009/Jun/0601_PlantClosures.html;
http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aioTrH.Mfo0o.

market, and sell these same vehicles after Old GM's bankruptcy. New GM announced on July 21, 2014, that Opel Group, a new entity created by Adam Opel AG and New GM, would manage and maintain full responsibility for New GM's European business, including Cadillac, Chevrolet, and the Opel/Vauxhall brands.[271]

883.    Old GM began production of the Chevrolet Cobalt at its Lordstown Assembly plant in Lordstown, Ohio, in 2004 for the 2005 MY. New GM continued to manufacture, market, and sell the Cobalt after Old GM's bankruptcy until New GM discontinued the brand in 2010.[272]

884.    The Chevrolet HHR was manufactured at Old GM's Ramos Arizpe, Mexico plant for the 2006 MY. New GM continued to manufacture, market, and sell the Chevrolet HHR after Old GM's bankruptcy.[273]

885.    Old GM introduced the Pontiac G5/Pursuit in Canada for the 2005 MY and in the U.S. for the 2007 MY. New GM continued to manufacture, market, and sell the Pontiac G5/Pursuit after Old GM's bankruptcy.[274]

886.    Old GM began manufacturing the Buick LaCrosse (U.S.) (or Buick Allure in Canada) in September 2004 for the 2005 MY.[275] The last vehicle of the first-generation Buick LaCrosse was manufactured on December 23, 2008, at Old GM's Oshawa, Ontario plant. The second-generation Buick LaCrosse was unveiled at the North American International Auto Show

---

[271] http://en.wikipedia.org/wiki/Opel_GT; http://en.wikipedia.org/wiki/Saturn_Sky; http://www.detroitnews.com/ article/20140721/AUTO0103/307210084.

[272] Valukas Report at 18; http://www.cleveland.com/business/index.ssf/2010/06/gm_taking_some _unusual_risks_i.html.

[273] Valukas Report at 18; http://www.prlog.org/11024409-chevrolet-discontinues-the-hhr.html; http://www.autofieldguide.com/articles/lookingthe-chevy-hhr.

[274] http://www.answers.com/topic/pontiac-g5.

[275] *Ward's Automotive Yearbook 2005*. Ward's Communications, Inc. 2005. p. 115.

in Detroit, Michigan in January 2009. New GM continued to manufacture, market, and sell the LaCrosse.[276]

887.    Old GM began production of the Buick Lucerne in 2005 for the 2006 MY.[277] New GM continued production of the Buick Lucerne model vehicle until 2011.[278]

888.    Old GM began manufacturing the Cadillac DTS in 2005 for the 2006 MY. In Old GM's bankruptcy, New GM acquired the Cadillac brand and continued to manufacture, market, and sell the Cadillac DTS until 2011.[279]

889.    The first-generation Cadillac SRX was manufactured and sold by Old GM between 2004 and 2009. New GM released the second-generation Cadillac SRX in 2010 and continued to manufacture, market, and sell those vehicles.[280]

890.    Old GM began production of the Cadillac CTS in 2002 for the 2003 MY. Old GM redesigned portions of the Cadillac CTS in 2008, and New GM completed another redesign of this model in 2014.[281] New GM continued to manufacture, market, and sell the Cadillac CTS.

891.    The Chevrolet Impala was manufactured, marketed, and sold by Old GM since 1958. Old GM manufactured, marketed, and sold the eighth-generation Impala from 2000-2005; followed by the ninth-generation Impala from 2006-2009. New GM continued to manufacture, market, and sell the ninth-generation Chevrolet Impala between 2009 and 2013. New GM

---

[276] http://www.autoblog.com/2009/01/08/detroit-preview-2010-buick-lacrosse-breaks-cover/.

[277] http://www.edmunds.com/buick/lucerne/.

[278] http://www.just-auto.com/news/gm-axes-cadillac-dts-and-buick-lucerne_id111499.aspx.

[279] http://www.edmunds.com/cadillac/dts/.

[280] http://www.edmunds.com/cadillac/srx/.

[281] http://www.edmunds.com/cadillac/cts/.

performed a redesign in 2013 for the 2014 MY, and continued to manufacture, market, and sell the Chevrolet Impala. [282]

892.    Old GM began manufacturing and selling the Chevrolet Malibu in 1963 for the 1964 MY. Four generations of Malibu were manufactured, marketed, and sold by Old GM between 1964 and 1983, when the Malibu was discontinued. Old GM brought back the Malibu make in 1996 for the 1997 MY. With MY 2004, Old GM redesigned the Malibu, manufacturing, marketing, and selling the second-generation Malibu until 2008. The third-generation Chevrolet Malibu was manufactured, marketed, and sold by Old GM from 2008 to 2009. New GM continued to manufacture, market, and sell the third-generation Chevrolet Malibu from July 10, 2009 through 2012. New GM continued to manufacture, market, and sell the current version of the Malibu as redesigned for MY 2013. [283]

893.    Old GM manufactured, marketed, and sold the Chevrolet Camaro model from its inception in the late 1960s until 2002, when the model was discontinued. The Chevrolet Camaro returned to the New GM lineup in 2009 for the 2010 MY, and continued to be manufactured, marketed, and sold by New GM. [284]

894.    New GM enjoyed the benefits of the Old GM brands in continuing these brands and product lines. And New GM knowingly and intentionally undertook ongoing duties to the purchasers and lessees of Old GM vehicles to ensure the safety, function, and value of these vehicles.

895.    Old GM did substantial business in Michigan, and so does New GM.

---

[282] http://www.edmunds.com/chevrolet/impala/.

[283] http://wot.motortrend.com/a-quick-history-of-the-chevy-malibu-125595.html; http://www.edmunds.com/ chevrolet/malibu/.

[284] http://www.edmunds.com/chevrolet/camaro/.

896.     Michigan hosted a significant number of Old GM's U.S. operations, and also hosts a significant number of New GM's U.S. operations.

897.     Old GM's conduct that forms the basis of certain Delta Ignition Switch Vehicle owners' successor liability claims against New GM emanated from Old GM's headquarters in Detroit, Michigan.

898.     Old GM personnel responsible for customer communications were located at Old GM's Michigan headquarters, and the core decision not to disclose the Delta Ignition Switch Defect to consumers was made and implemented from there.

899.     Some or all of Old GM marketing campaigns falsely promoting the Delta Ignition Switch Vehicles as safe and reliable were conceived and designed in Michigan.

900.     Old GM had a far more substantial presence in Michigan than in any other state.

901.     New GM's conduct that forms the basis of all Class Members' independent claims against New GM emanated from New GM's headquarters in Detroit, Michigan.

902.     New GM personnel responsible for customer communications were located at New GM's Michigan headquarters, and the decision not to disclose defects at issue in this case to consumers was made and implemented from there.

903.     Some or all of the New GM marketing campaigns falsely promoting the Defective Vehicles at issue in the case as safe and reliable were conceived and designed in Michigan.

904.     Old GM's decision to file for bankruptcy, and other key decisions in connection with Old GM's bankruptcy, were made in Michigan.

905.     New GM has a far more substantial presence in Michigan than in any other state.

906.     New GM honored the vehicle warranties and customer programs of Old GM on Old GM vehicles. On June 1, 2009, days before it was to file for bankruptcy protection, Old GM

- 463 -

posted on its Internet website (www.gm.com) a "Customer FAQ on GM's Chapter 11 Filing,"

which remained accessible on New GM's website (www.gm.com) after Old GM's bankruptcy.[285]

Among other things, New GM promised its customers:

> There will be no interruptions in GM's ability to take care of our customers and honor customer programs, warranties and provide replacement parts. In fact, GM has asked the Court for specific orders authorizing GM to honor customer warranties and programs as it always has. You should have total confidence that:
>
> - Our products are safe and sound;
>
> - We will honor your existing warranty;
>
> - Customer promotions and incentives will continue without interruption;
>
> - You do not need to do anything differently regarding your warranty.[286]

907.   New GM continued:

> Will New GM honor customer warranty claims?
>
> Yes. GM will succeed and win by taking care of our customers every day. New GM will assume the obligations to support the express warranties issued by GM to its customers.[287]

908.   With respect to Old GM's loyalty program—GM Card Earnings:

> What happens to my GM Card Earnings?
>
> Your GM Card Earnings will continue to be honored in accordance with the Program Rules. You can keep using

---

[285]

http://web.archive.org/web/20090606083403/http://www.gmreinvention.com/index.php/site/progress_reports/0601_Viability_CustomerFAQ/#;
http://web.archive.org/web/20100107122701/;
http://www.gmreinvention.com/index.php/site/progress_reports/.

[286] *Id.*

[287] *Id.*

> your Card at more than 18 million outlets where
> MasterCard is accepted to accumulate Earnings and redeem
> them toward eligible, new GM vehicles.[288]

909. Under the 363 Sale Agreement, New GM also expressly agreed to comply with

certain statutory requirements:

> From and after the Closing, Purchaser [New GM] shall comply
> with the certification, reporting and recall requirements of the
> National Traffic and Motor Vehicle Safety Act, the Transportation
> Recall Enhancement, Accountability and Documentation Act, the
> Clean Air Act, the California Health and Safety Code and similar
> Laws, in each case, to the extent applicable in respect of vehicles
> and vehicle parts manufactured or distributed by Seller.

910. In the Sale Agreement, New GM expressly agreed that it:

> shall be responsible for the administration, management and
> payment of all Liabilities arising under (i) express written
> warranties of Sellers [Old GM] that are specifically identified as
> warranties and delivered in connection with the sale of new,
> certified used or pre-owned vehicles or new or remanufactured
> motor vehicle parts and equipment (including service parts,
> accessories, engines and transmissions) manufactured or sold by
> Sellers or Purchaser prior to or after the Closing and (ii) Lemon
> Laws.

911. Seven out of thirteen of New GM's Directors after the 363 Sale were previously

associated with Old GM:

a. Errol B. David, Jr. had been a member of the Board of Old GM;

b. Stephen J. Girsky had been a special advisor to the Chief Executive

Officer and the Chief Financial Officer of Old GM from 2005 to 2006;

c. Frederick A. Henderson had been a member of the Board of Old GM, and

"had been associated with" Old GM since 1984;

d. E. Neville Isdell had been a member of the Board of Old GM;

---

[288] *Id.*

      e.      Kent Kresa had been a member of the Board of Old GM and served as interim non-executive Chairman from March 29, 2009, to July 10, 2009;

      f.      Philip A. Laskawy had been a member of the Board of Old GM; and

      g.      Kathryn Marinello had been a member of the Board of Old GM.[289]

912.   ***All twelve*** of New GM's Executive Officers after the 363 Sale were previously associated with and employed by Old GM:

      a.      Walter G. Borst, New GM's Vice President and Treasurer, had been "associated with" Old GM since 1980 and had served as an officer of certain Old GM subsidiaries and an officer of Old GM;

      b.      Nicholas S. Cyprus, New GM's Vice President, Controller and Chief Accounting Officer, had served as Old GM's Controller and Chief Accounting Officer since 2006;

      c.      Frederick A. Henderson, New GM's first Chief Executive Officer, had been a member of the Board of Old GM, and "had been associated with" Old GM since 1984;

      d.      Mark R. LaNeve, New GM's Vice President, U.S. Sales, had been "associated with" Old GM since 2001 and had served as an officer of certain Old GM subsidiaries;

      e.      Timothy E. Lee, New GM's Group Vice President, Global Manufacturing and Labor, had been "associated with" Old GM since 1969 and had served as an officer of certain Old GM subsidiaries;

---

[289] New GM August 7, 2009 Form 8-K at 35-36.

- 466 -

      f.     Robert Lutz, New GM's Vice Chairman, Marketing and Communications, was "first associated with" Old GM in 1964 and "rejoined [Old GM] on September 4, 2001" as its Vice Chairman, Product Development;

      g.     Michael P. Millikin, New GM's Vice President and General Counsel until 2015, had been "associated with" Old GM since 1977 and had previously served as Old GM's Assistant General Counsel and Associate General Counsel;

      h.     David N. Reilly, New GM's Executive Vice President, GMIO, had been "associated with" Old GM since 1975 and had served as an officer of certain Old GM subsidiaries;

      i.     John F. Smith, New GM's Vice President, Planning and Alliances, had been "associated with" Old GM since 1968 and had previously served as an officer of Old GM;

      j.     Robert E. Socia, New GM's Vice President, Global Purchasing and Supply Chain, had been "associated with" Old GM since 1975 and had previously served as an officer of Old GM and certain Old GM subsidiaries;

      k.     Thomas G. Stephens, New GM's Vice Chairman, Global Product Development, had been "associated with" Old GM since 1969 and had served as Old GM's Vice Chairman, Global Product Development, since April 1, 2009; and

      l.     Ray G. Young, New GM's Executive Vice President and Chief Financial Officer, had been "associated with" Old GM since 1986 and had served as Old GM's Executive Vice President and Chief Financial Officers since March 3, 2008.[290]

---

[290] New GM's August 7, 2009 Form 8-K at 37-38.

913.     In the 363 Sale, New GM assumed the compensation agreements of Old GM's senior executives.[291]

914.     New GM kept the same employees as Old GM and retained over 65,000 of Old GM's employees.  In fact, New GM made an offer of employment to all of Old GM's non-unionized employees and those unionized employees represented by the United Automobile Workers union ("UAW").[292]

915.     New GM retained much of Old GM's top management and key players involved in the defects at issue in this case, including, among others:

- Alan Adler served as Old GM's Safety Communications Manager in 2005when he acknowledged an ignition switch defect in the 2005 Chevrolet Cobalt but claimed it was not a safety issue, and was also aware of airbag nondeployment incidents in the Cobalt by November 2006.  He continued working in the same or similar capacity at New GM.[293]

- Gary Altman served as Old GM's Program Engineering Manager for the Chevrolet Cobalt in 2004 and continued to serve New GM as a manager until he was fired in 2014.[294]

- Kathy Anderson was an Old GM Field Performance Assessment Engineer who was assigned to gather information and assess technical issues in lawsuits and NISMs (not-in-suit matters).[295]  Beginning in 2006, she investigated fatal crashes involving airbag nondeployment in a 2004 Saturn Ion and a 2005 Chevrolet Cobalt.[296]  She

---

[291] New GM's August 7, 2009 Form 8-K at 40.

[292] Sale Order at 20.

[293] Valukas Report at 84-85, 140.

[294] Valukas Report at 58; http://www.newsweek.com/gm-fired-15-over-defect-killed-least-13-253685.

[295] Valukas Report at 105, 106.

[296] Valukas Report at 110, 112.

continued to work in the same or similar capacity at New GM.[297]

- Mary T. Barra, current New GM Chief Executive Officer, began her career at Old GM in 1980 as a student at General Motors Institute.[298] She served in a number of engineering and management positions throughout Old GM and New GM prior to becoming New GM's Executive Vice President, Global Product Development, Purchasing and Supply Chain in 2013.[299] She assumed her current role with New GM on January 15, 2014.[300]

- Douglas Brown was in-house counsel at Old GM when Cobalt and Ion airbag nondeployment cases began to reach the Old GM legal staff, including Brown. He continued on in the same or similar capacity at New GM.[301]

- Eric Buddrius was an engineer in Old GM's Product Investigations unit, the primary unit charged with resolving significant engineering problems, including safety problems.[302] He continued to work in the same or similar capacity at New GM.[303]

- Lawrence Buonomo served as an attorney in Old GM's legal department from 1994-2009, and served as New GM's Executive Director of Litigation from 2009-2012.[304] New GM named him Practice Area Manager and Global Legal Process Leader—Litigation in 2012, a position in which he served until he was fired in 2014.[305]

---

[297] Valukas Report at 141.

[298] http://www.gm.com/company/aboutGM/board_of_directors0/mary_barra.html.

[299] *Id.*

[300] *Id.*

[301] Valukas Report at 103 & n.419.

[302] Valukas Report at 86.

[303] Valukas Report at 153 n.685.

[304] http://www.linkedin.com/pub/lawrence-larry-buonomo/5/978/499

[305] *Id.; See also* http://online.wsj.com/articles/gm-dismissals-include-lawyers-lawrence-buonomo-bill-kemp-1402003050

- John R. Buttermore began his career at GM as an engineer in 1978.[306] He served Old GM as Vice President of Powertrain and Manufacturing Operations, and has served as New GM's Vice President of Manufacturing since September 2009.[307]

- William K. Chase worked for Old GM and then New GM from 1984-2009.[308]  In 2005, he worked as a Warranty Engineer for Old GM where he was responsible for reducing warranty costs for vehicles produced in Lordstown, Ohio, where the Cobalt and the Pontiac G5 were produced.[309]  He first learned of an ignition switch problem with the 2005 Cobalt in 2005, when he was asked to estimate the warranty impact of the problem.[310]

- Dwayne Davidson was Old GM's Senior Manager for TREAD Reporting, charged with reviewing relevant data in order for Old GM to comply with its federal safety monitoring and reporting obligations under the TREAD Act.  He continued to head the TREAD reporting team at New GM.[311]

- Raymond DeGiorgio served Old GM as the Design Release Engineer for defective ignition switches.[312] He continued to be employed by New GM in an engineering role until he was fired in 2014.[313]

---

[306]

http://investing.businessweek.com/research/stocks/people/person.asp?personId=2971371&ticker=GM&previousCapId=61206100&previousTitle=GENERAL%20MOTORS%20CO.

[307] *Id.*

[308] Chase Dep. at 6:24-7:3.

[309] Chase Dep. at 7:16-8:2, 20:14-18.

[310] Chase Dep. at 7:7-14, 8:3-8.

[311] Valukas Report at 113-114, 117, 159.

[312] Valukas Report at 37-38.

[313] http://www.newsweek.com/gm-fired-15-over-defect-killed-least-13-253685.

- 470 -

- John Dolan was an electrical engineer for Old GM and continued to work in the same or similar capacity at New GM.[314]

- Brian Everest, an engineer, was an Old GM Field Performance Assessment Supervisor involved with the Cobalt airbag nondeployment investigation.  He continued to work in the same or similar capacity at New GM.[315]

- Michael Gruskin was an attorney for Old GM who chaired the Settlement Review Committee and the Roundtable (both charged with approving settlements, including of claims resulting from defective ignition switches) from September 2007 to March 2012 (by which time he was of course an attorney for New GM).[316]

- William Hohmstadt was an Old GM sensing performance engineer involved in the investigation of Cobalt airbag nondeployment.  He continued to work at New GM in the same or similar capacity.[317]

- William J. Kemp served as a top product safety attorney for Old GM during 2003-2013.[318] He continued to serve in New GM's legal department until his termination in 2014.[319]

- Gay Kent, an engineer, was Old GM's Director of Product Investigations, where she studied the ignition switch defect in the Chevrolet Cobalt.  She continued working in the same or similar capacity at New GM.[320]

- Elizabeth Kiihr was an engineer in Old GM's Product Investigations Unit and was assigned in 2005 to investigate

---

[314] Valukas Report at 134, 165, 174 n.793; Dolan Dep. at 87:1-9, 186:17-188:5.

[315] Valukas Report at 114, 118-119, 134-35, 153.

[316] Valukas Report at 107, 110.

[317] Valukas Report at 134-135.

[318] Valukas Report at 85-86, 104, 147-148, 150, 153, 164-165, 171, 178, 183 and 196.

[319] *Id*; http://online.wsj.com/articles/gm-dismissals-include-lawyers-lawrence-buonomo-bill-kemp-1402003050

[320] Valukas Report at 86-87, 113-14.

the ignition switch defect in the Chevrolet Cobalt. She continued to work in the same or similar capacity at New GM.[321]

- Alberto Manzor was an Old GM engineer who became involved in the investigation of the Cobalt ignition switch in 2005.[322] He continued to work in the same or similar capacity at New GM.[323]

- Stephen Oakley was a Brand Quality Manager at Old GM who wrote Technical Services Bulletins concerning defective ignition switches.[324] He continued to work in the same or similar capacity at New GM.[325]

- Jaclyn Palmer was an in-house product liability attorney at Old GM who attended Roundtable meetings and was described as an "airbag lawyer."[326] She continued working in the same or similar capacity at New GM until she was terminated in 2014.

- Doug Parks was an Old GM Vehicle Chief Engineer for the Chevrolet Cobalt leading up to its launch.[327] He continued to work for New GM where, in February 2016, he became Vice President of Autonomous Technology and Vehicle Execution.[328]

- Manuel Peace was an Old GM Field Performance Assessment Engineer who investigated at least three crashes in Saturn Ion or Chevrolet Cobalt vehicles.[329] He

---

[321] Valukas Report at 86-88. Kiihr Dep. at 23:24-24:12.

[322] Valukas Report at 83-84.

[323] Manzor Dep. at 301:15-302:6.

[324] Valukas Report at 92-93.

[325] Oakley Dep. at 223:8-23, 274:1-20.

[326] Valukas Report at 108, 113-114, 140-141; GM-MDL2543-000660577.

[327] Valukas Report at 57-60, 81-84.

[328] https://www.boardroominsiders.com/executive-profiles/1000807/General-Motors-Corporation/Douglas-L.-(Doug)-Parks

[329] Valukas Report at 110, 112, 124-126.

- 472 -

continued to work at New GM where he remains a Senior Manager.[330]

- Lori Queen was an Old GM Vehicle Line Director involved with the Chevrolet Cobalt.[331] She continued to work at New GM in the same or similar capacity before she retired.[332]

- Mark L. Reuss began his career with Old GM as an engineering intern in 1983.[333] Having held numerous management positions in engineering for GM, he served as President of GM North America from 2009-2013.[334] He currently serves New GM as Executive Vice President, Global Product Development, Purchasing and Supply Chain, having assumed the role from Barra.[335]

- Michael J. Robinson joined Old GM in 1984, and moved up to become North American General Counsel in 2008.[336] He continued to serve in New GM's legal department, becoming New GM's Vice President of Environment, Energy and Safety Policy in September 2009, holding that position until he was fired in 2014.[337]

- Keith Schultz was Manager of Internal Investigations at Old GM's Product Investigations Unit, in which capacity he was involved with the Cobalt/Ion airbag nondeployment issue.[338] He continued to work at New GM in the same or in a similar capacity.[339]

---

[330] https://www.linkedin.com/in/manuel-peace-94bb398

[331] Valukas Report at 63-64.

[332] Queen Dep. at 139:24-140:11.

[333] http://www.gm.com/company/corporate-officers/mark-reuss.

[334] *Id.*

[335] *Id.*

[336] http://green.autoblog.com/2009/09/04/general-motors-announces-mike-robinson-as-new-environment-vp/.

[337] *Id*; http://fortune.com/2014/06/06/report-names-top-gm-workers-fired-over-gm-safety-probe/.

[338] Valukas Report at 113-114, 118-119.

[339] GM-MDL2543-402369642.

- James Sewell was an Old GM Engineer who authored an August 2001 pre-production report regarding stalls in a pre-Ion prototype vehicle.[340]  He continued to work for New GM in the same or in a similar capacity as a Performance Engineer.[341]

- John Sprague was an Old GM Field Performance Assessment Engineer tasked with supporting Old GM's product liability defense team.[342]  He continued to work at New GM in the same or in a similar capacity.[343]

- Lisa Stacey was an Old GM Field Performance Assessment Engineer involved in the investigation of airbag nondeployment in Chevrolet Cobalts.[344]  She continued to work at New GM in the same or in a similar capacity.[345]

- David Trush was the Old GM Design Engineer for the ignition cylinder and key of the 2005 Chevrolet Cobalt.[346]  He continued to work for New GM in the same or in a similar capacity where he remains a Design and Release Engineer to this day.[347]

- Douglas Wachtel was a manager in Old GM's Product Investigations Unit.[348]  He continued to work for New GM in the same or in a similar capacity.[349]

- Chester N. Watson served as General Auditor for Old GM and New GM from 2003 through 2010.[350]

---

[340] Valukas Report at 42-43.

[341] Sewell Dep. at 10:10-15, 16:7-17:5; https://www.linkedin.com/in/james-sewell-03312112.

[342] Valukas Report at 9, 126.

[343] Valukas Report at 141.

[344] Valukas Report at 132, 134-135.

[345] Stacey Dep. at 11:3-6, 13:24-14:1.

[346] Trush Dep. at 11:1-3, 20:11-16, 21:10-17.

[347] Trush Dep. at 16:10-14, 95:8-17. https://www.linkedin.com/in/david-trush-1a6442b.

[348] Valukas Report at 114, 120.

[349] Valukas Report at 145.

- Terry J. Woychowski was with Old GM since 1978, serving in various engineering positions including Global Vehicle Chief Engineer.[351] He held the position of Vice President of Global Quality and Vehicle Launch for New GM until retiring in June 2012.[352]

916.    New GM kept the same logos and brand marketing as Old GM. Old GM unveiled its "Mark of Excellence" logo in 1966.



917.    The words "Mark of Excellence" were removed in the late 1970's, but what remained of the logo is still in use today.



---

[350] http://www.dbusiness.com/January-February-2011/General-Motors-Co/?cparticle=5&siarticle=4#. VBrd9U1OXcs; *See also* GM Annual Reports.

[351] http://www.dbusiness.com/January-February-2011/General-Motors-Co/?cparticle=5&siarticle=4#. VBsxQE1OXcs.

[352] Valukas Report at 171.

918.   On August 24, 2009, New GM announced the removal of its logo from all of its vehicles starting with the 2010 model year; however, New GM continued to use this logo on its websites and marketing materials.

919.   New GM has also maintained the logos and branding for Chevrolet and Cadillac, after acquiring these brand assets post-bankruptcy. The Chevrolet bowtie was introduced in late 1913 containing the "Chevrolet" name within the bowtie. Old GM continued to use the bowtie logo after it purchased Chevrolet in 1918.



920.   Around 2000, the Chevrolet name was removed from the logo, and, despite slight design variations to the bowtie, the logo and brand remained the same as used by New GM.



921.   The iconic Cadillac crest was first unveiled in 1906. Though there have been slight varying designs of the crest, the Cadillac logo consisting of a silver, gold, red, and blue crest surrounded by a wreath has remained conceptually the same since 1982.

010440-11  983080 V1



922.    In January of 2014, New GM announced it was removing the Cadillac wreath from the logo and widening the crest for a more streamlined appearance.



923.    New GM undertook the same manufacturing operations as Old GM. New GM continued the product lines of Old GM. The totality of the transaction between the predecessor and successor corporations demonstrates a basic continuity of the predecessor corporation's business. Indeed, the purpose of the bankruptcy transaction funded by taxpayer dollars was to save and continue the Old GM brand, the Old GM name, the Old GM product line, and to ensure the continuation or reincarnation of the same business enterprise as New GM. The fraudulent concealment of material facts begun under Old GM was continued, carried on, and furthered by New GM and its agents.

010440-11  983080 V1

924.    New GM continued the business of General Motors as evidenced by the continuity of management, personnel, physical location, assets, and general business operations of Old GM.

925.    New GM expressly and impliedly assumed the obligations of Old GM to manufacture non-defective vehicles by warranting to the Class and the public that the GM brand would remain in operation as a continuation of the same company. At all relevant times, New GM held itself out to the Class, and to the world, as the effective continuation of Old GM.

926.    So, for example, after the 363 Sale, New GM stated, "We believe that continuity in our Senior Leadership Group is in our best interests and those of our stockholders."[353]

927.    After the 363 Sale, New GM released a commercial in which New GM Chairman and Chief Executive Officer Ed Whitacre stated "a lot of Americans didn't agree with giving GM a second chance."[354]

928.    After the 363 Sale, New GM stated its "long-term profitability depends on" New GM's "ability to restore consumers' confidence in us."[355]

929.    Old GM ceased its ordinary business operations and was dissolved by terms of Old GM's bankruptcy.  Old GM became Motors Liquidation Company, and remained a legal entity for the sole purpose of liquidating its remaining assets and liabilities.[356]  Old GM dissolved on December 15, 2011.[357]

---

[353] New GM's August 7, 2009 Form 8-K at 51, 71.

[354] New GM April 2010 Commercial, available at https://www.youtube.com/watch?v=jbXpV0aqEM4.

[355] New GM's August 7, 2009 Form 8-K at 21.

[356] New GM's August 7, 2009 Form 8-K at 1, Sale Order at 18.

[357] Old GM December 15, 2011 Form 8-K at 2.

## VII.   TOLLING OF THE STATUTES OF LIMITATION

### A.   Discovery Rule Tolling

930.    Class Members had no way of knowing about the defects and the other information concealed by New GM.  Even NHTSA, the agency expert, acknowledged the difficulties in ascertaining the problems in light of New GM's conduct.  By contrast, New GM was so intent on expressly hiding the defects and is systemic devaluation of safety that it lied to each and every stakeholder, and even attempted to stifle every internal channel of transparency.  This is the quintessential case for tolling.

931.    Within the period of any applicable statutes of limitation, Plaintiffs and the other Class Members could not have discovered through the exercise of reasonable diligence that New GM was concealing scores of defects and misrepresenting the Company's true position on safety issues.

932.    Plaintiffs and the other Class Members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that New GM did not report information within its knowledge to federal authorities (including NHTSA), its dealerships, or consumers, nor would a reasonable and diligent investigation have disclosed that New GM had information in its possession about the existence and dangerousness of numerous defects and opted to conceal that information until shortly before this action was filed, nor would such an investigation have disclosed that New GM valued cost-cutting over safety and actively discouraged its personnel from uncovering or raising safety issues.

933.    All applicable statutes of limitation have been tolled by operation of the discovery rule.

**B.      Fraudulent Concealment Tolling**

934.     All applicable statutes of limitation have also been tolled by New GM's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

935.     Instead of disclosing the myriad safety defects and disregard of safety of which it was aware, including the defects in the Defective Vehicles, New GM falsely represented that its vehicles were safe, reliable, and of high quality, and that it was a reputable manufacturer that stood behind New GM and Old GM vehicles that were on the road.

**C.      Estoppel**

936.     New GM was under a continuous duty to disclose to Plaintiffs and the other Class Members the true character, quality, and nature of the many defects plaguing Old GM vehicles and New GM vehicles, including those in the Defective Vehicles.

937.     New GM knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Delta Ignition Switch Defect, the Low Torque Ignition Switch Defect, the Knee-to-Key Camaro Defect, the Side Airbag Defect, and the Power Steering Defect from consumers.

938.     New GM was also under a continuous duty to disclose to Plaintiffs and Class Members that scores of other defects plagued New GM and Old GM vehicles, and that it systematically devalued safety.

939.     Based on the foregoing, New GM is estopped from relying on any statutes of limitations in defense of this action.

- 480 -

## VIII.   CLASS ALLEGATIONS

### A.      The Classes

940.    Under Rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4), and 23(g) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the Classes and Subclasses initially defined below for the assertion of claims under the laws of each state and the District of Columbia.[358]

941.    Excluded from the Classes are New GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of New GM; New GM Dealers; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### 1.      The Delta Ignition Switch Defect Class and Subclasses.

942.    Plaintiffs allege claims, under the laws of each state and the District of Columbia, for the following Delta Ignition Switch Defect Class:

> All persons who bought or leased a Delta Ignition Switch Vehicle
> on or before February 14, 2014.

943.    The following vehicles are included in the Delta Ignition Switch Defect Class:

| VEHICLES |
|---|
| 2005-2010 Chevy Cobalt |
| · 2006-2011 Chevy HHR |
| · 2007-2010 Pontiac G5 |
| · 2007-2010 Saturn Sky |
| · 2003-2007 Saturn ION |
| 2006-2010 Pontiac Solstice |

---

[358] Plaintiffs incorporate by reference the class claims and models identified therein, asserted in the Third Amended and Consolidated Class Action Complaint to preserve these claims for appeal.  Plaintiffs classes asserted in this Complaint include any vehicles with a specific defect.

944.    Plaintiffs also allege claims under the laws of the following jurisdictions for the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass for vehicles sold or leased as new or Certified Pre-Owned vehicles between July 10, 2009, and February 14, 2014: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming.

945.    Plaintiffs also allege claims, under the laws of each state and the District of Columbia, on behalf of the following Delta Ignition Switch Defect Successor Liability Subclass:

> All persons who bought or leased a Delta Ignition Switch Vehicle
> on or before July 9, 2009.

946.    Plaintiffs also allege claims under the laws of the following jurisdictions for the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass on behalf of all persons who bought or leased a new or Certified Pre-Owned Delta Ignition Switch Vehicle  on or before July 9, 2009:  Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming.

- 482 -

2.      **The Low Torque Ignition Switch Defect Class and Subclass.**

947.    Plaintiffs allege claims, under the laws of each state and the District of Columbia,

for the following Low Torque Ignition Switch Defect Class:

> All persons in the United States who bought or leased a Low
> Torque Ignition Switch Vehicle prior to July 3, 2014.

948.    The following vehicles are included in the Low Torque Ignition Switch Defect

Class:

| VEHICLES |
| --- |
| · 2005-2009 Buick Lacrosse |
| · 2000-2014 Chevrolet Impala |
| · 2000-2005 Cadillac Deville |
| · 2006-2011 Cadillac DTS |
| · 2006-2011 Buick Lucerne |
| · 2000-2008 Chevrolet Monte Carlo |
| · 2003-2014 Cadillac CTS |
| · 2004-2006 Cadillac SRX |
| · 1997-2005 Chevrolet Malibu |
| · 2000-2005 Pontiac Grand Am |
| · 2004-2008 Pontiac Grand Prix |
| · 1998-2002 Oldsmobile Intrigue |
| · 1999-2004 Oldsmobile Alero |
| · 2009-2010 Chevy Cobalt |

949.    Plaintiffs also allege claims under the laws of the following jurisdictions for the

Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass for

vehicles sold or leased as new or Certified Pre-Owned vehicles between July 10, 2009, and July

3, 2014:  Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii,

Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi,

Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York,

North Carolina, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South

Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming.

**3.      The Knee-to-Key Camaro Defect Class and Subclass.**

950.    Plaintiffs allege claims, under the laws of each state and the District of Columbia,

for the following Knee-to-Key Camaro Defect Class:

> All persons in the United States who bought or leased a Knee-to-
> Key Camaro Defect Vehicle prior to July 3, 2014.

951.    The following vehicles are included in the Knee-to-Key Camaro Defect Class,

2014:

| VEHICLES |
|---|
| 2010-2014    Chevy Camaro |

952.    Plaintiffs also allege claims under the laws of the following jurisdictions for the

Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass for vehicles sold

or leased as new or Certified Pre-Owned vehicles between July 10, 2009, and July 3, 2014:

Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana,

Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi,

Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York,

North Carolina, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South

Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming.

**4.      The Side Airbag Defect Class and Subclass.**

953.    Plaintiffs allege claims, under the laws of each state and the District of Columbia,

for the following Side Airbag Defect Class:

> All persons in the United States who bought or leased a Side
> Airbag Defect Vehicle prior to March 17, 2014.

- 484 -

954.   The following vehicles are included in the Side Airbag Defect Class:

| VEHICLES |
| --- |
| 2008-2013 Buick Enclave |
| 2009-2013 Chevrolet Traverse |
| 2008-2013 Acadia |
| 2008-2010 Saturn Outlook |

955.   Plaintiffs also allege claims under the laws of the following jurisdictions for the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass for vehicles sold or leased as new or Certified Pre-Owned vehicles between July 10, 2009, and March 17, 2014:  Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming.

**5.     The Power Steering Defect Class and Subclass.**

956.   Plaintiffs allege claims, under the laws of each state and the District of Columbia, for the following Power Steering Defect Class:

> All persons in the United States who bought or leased a Power Steering Defect Vehicle prior to April 1, 2014.

957.   The following vehicles are included in the Power Steering Defect Class:

| VEHICLES |
| --- |
| 2004-2006 and 2008-2009 Chevrolet Malibu |
| 2004-2006 Chevrolet Malibu Maxx |
| 2009-2010 Chevrolet HHR |
| 2008-2010 Saturn Outlook |
| 2010 Chevrolet Cobalt |
| 2005-2006 and 2008-2009 Pontiac G6 |

- 485 -

| VEHICLES |
| --- |
| 2004-2007 Saturn Ion |
| 2008-2009 Saturn Aura |

958.     Plaintiffs also allege claims under the laws of the following jurisdictions for the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass for vehicles sold or leased as new or Certified Pre-Owned vehicles between July 10, 2009, and April 1, 2014:

Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming.

**6.     The Delta Ignition Switch Defect Bankruptcy Class.**

959.     Plaintiffs allege claims, under the laws of each state and the District of Columbia, for the following Delta Ignition Switch Defect Bankruptcy Class:

> All persons who owned or leased a Delta Ignition Switch Vehicle between July 10, 2009, and November 30, 2009.

960.     The following vehicles are included in the Delta Ignition Switch Defect Bankruptcy Class:

| VEHICLES |
| --- |
| 2005-2010 Chevy Cobalt |
| · 2006-2011 Chevy HHR |
| · 2007-2010 Pontiac G5 |
| · 2007-2010 Saturn Sky |
| · 2003-2007 Saturn ION |
| 2006-2010 Pontiac Solstice |

**B.     The Classes and Subclasses Meet Rule 23 Requirements**

961.    Plaintiffs are informed and believe that there are over 20 million Defective

Vehicles nationwide and hundreds-of-thousands of the Defective Vehicles in each state.  The

approximate number of Defective Vehicles owned or leased by members of each Class are:

Delta Ignition Switch Class, over 2 million; Low Torque Ignition Switch Defect Class, over 3.6

million; Knee-to-Key Camaro Defect Class, more than 460,000; Side Airbag Defect Class, more

than 1.2 million; and Power Steering Defect Class, over 1.3 million.  Individual joinder of all

Class Members is impracticable.

962.    The Class can be readily identified using registration records, sales records,

production records, and other information kept by New GM or third parties in the usual course of

business and within their control.

963.    Questions of law and fact are common to each of the Classes and Subclasses and

predominate over questions affecting only individual members, including the following:

       a.    Whether the Defective Vehicles suffer from serious defects;

       b.    Whether Old and New GM were aware of, and concealed the defects from

regulators, Plaintiffs, and the Class;

       c.    Whether Old and New GM misrepresented to Defective Vehicle

purchasers that the Defective Vehicles were safe, reliable, and of high quality;

       d.    Whether New GM misrepresented itself as a reputable manufacturer that

values safety and stands behind its vehicles after they are sold;

       e.    Whether New GM actively encouraged the concealment of such known

defects from regulators and consumers;

       f.    Whether New GM engaged in fraudulent concealment;

g.      Whether New GM engaged in unfair, deceptive, unlawful, and/or fraudulent acts or practices in trade or commerce by failing to disclose that many New GM and Old GM vehicles had serious defects;

h.      Whether New GM violated various state consumer protection statutes;

i.      Whether the Defective Vehicles manufactured and sold by New GM were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

j.      Whether New GM's unlawful, unfair, fraudulent, and/or deceptive practices harmed Plaintiffs and the members of the Class;

k.      Whether New GM has been unjustly enriched;

l.      Whether New GM has successor liability for Old GM's violations of law;

m.      Whether New GM had and breached a duty under the bankruptcy Sale Agreement to monitor and protect the vehicles owned by the Delta Ignition Switch Defect Class, and whether the owners of those vehicles were damaged thereby;

n.      Whether Plaintiffs and the members of the classes are entitled to equitable and/or injunctive relief;

o.      What aggregate amounts of statutory penalties, as available under the laws of certain States, are sufficient to punish and deter New GM and to vindicate statutory and public policy, and how such penalties should most equitably be distributed among Class Members; and

p.      Whether any or all applicable limitations periods are tolled by New GM's acts of fraudulent concealment.

964.     Plaintiffs' claims are typical of the claims of the Class Members, and arise from the same course of conduct by New GM.  The relief Plaintiffs seek is typical of the relief sought for the absent Class Members.

965.     Plaintiffs will fairly and adequately represent and protect the interests of all absent Class Members.  Plaintiffs are represented by counsel competent and experienced in product liability, consumer protection, and class action litigation.

966.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class Members is impracticable.  Because the damages suffered by each individual Class Member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class Members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.  Rule 23 provides the Court with authority and flexibility to maximize the benefits of the class mechanism and reduce management challenges.  The Court may, on motion of Plaintiffs or on its own determination, utilize the processes of Rule 23(c)(4) and/or (c)(5) to certify common questions of fact or law and to designate subclasses.

967.     The prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications for individual Class Members, which would establish incompatible standards of conduct for New GM.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

968.     Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Plaintiffs

- 489 -

anticipate providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

969.    Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for New GM's misconduct.  Absent a class action, Class Members will continue to incur damages, and New GM's misconduct will continue without remedy.

## IX.    CLAIMS FOR RELIEF

**A.    Nationwide Claim**

## COUNT I

## VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *et seq.*[359]

970.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

971.    This Claim is brought on behalf of the Nationwide RICO Class against New GM for actual damages and treble damages and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1961 *et seq.*  Members of the RICO Class are referred to herein collectively as "Class Members."

972.    New GM, the Enterprise Members, Plaintiffs, and the Class Members are "persons" within the meaning of 18 U.S.C. § 1961(3).

---

[359] Plaintiffs are aware the that the Court has dismissed this claim, and include it here solely for the purposes of preserving the claim for appellate purposes.

B.      **The New GM RICO Enterprise**

973.    On May 24, 2015, the United States Department of Justice announced it had found evidence of criminal wrongdoing by New GM, including repeated acts of fraud for its failure to disclose the Delta Ignition Switch Defect.  New GM committed both criminal and civil fraud and, as set forth in this Complaint, did not act alone.

974.    On September 16, 2015, New GM and the Department of Justice entered into a Deferred Prosecution Agreement ("DPA").  In that agreement, New GM consented to the filing of an Information charging it with a scheme to conceal a deadly safety defect from its U.S. Regulator in violation of 18 U.S.C. § 1001, and committing wire fraud in violation of 18 U.S.C. § 1343.

975.    As part of the DPA, New GM agreed to a Statement of Facts as being "true and accurate."[360]

976.    The following agreed facts are relevant to the mail and wire fraud allegations, and the other causes of action, pleaded in this Complaint:[361]

> 2.      At all times relevant to this Statement of Facts, GM designed, manufactured, assembled, and sold Chevrolet brand vehicles.  From the earliest date relevant to this Statement of Facts until in or about 2010, GM designed, manufactured, assembled, and sold Pontiac brand vehicles.  From the earliest date relevant to this Statement of Facts until in or about 2009, GM designed, manufactured, assembled, and sold Saturn brand vehicles.  And from the earliest date relevant to this Statement of Facts until in or

---

[360] *See* Deferred Prosecution Agreement, p. 2, ¶ 2.

[361] The term "GM" appears in the Statement of Facts agreed to and admitted by New GM. The term refers to New GM with respect to all incidents that occurred on or after July 10, 2009. With respect to events that occurred prior to that point, the allegations are relevant to the Plaintiffs' claims here because New GM was aware of them from the date of its inception given that the same personnel involved in and/or with knowledge of those events transferred to New GM, along with documents reflecting all the events related in the Statement of Facts.

- 491 -

about the spring of 2013, GM promoted sales of "pre-owned" (*i.e.*, used) Chevrolet, Pontiac, and Saturn brand vehicles by GM dealerships nationwide.

3.     As set forth in more detail below, from in or about the spring of 2012 through in or about February 2014, GM failed to disclose a deadly safety defect to its U.S. regulator, the National Highway Traffic Safety Administration ("NHTSA").  It also falsely represented to consumers that vehicles containing the defect posed no safety concern.

7.     From approximately the spring of 2012, certain GM personnel knew that the Defective Switch presented a safety defect because it could cause airbag non-deployment associated with death and serious injury.

8.     Yet not until approximately 20 months later, in February 2014, did GM first notify NHTSA and the public of the connection between the Defective Switch and fatal airbag non-deployment incidents.  This announcement accompanied an initial recall of approximately 700,000 vehicles—a population that would, by March 2014, grow to more than 2 million.

9.     Inside GM, certain personnel responsible for shepherding safety defects through GM's internal recall process delayed this recall until GM could fully package, present, explain, and handle the deadly problem, taking affirmative steps to keep the Defective Switch matter outside the normal process.  On at least two occasions while the Defective Switch condition was well known by some within GM but not disclosed to the public or NHTSA, certain GM personnel made incomplete and therefore misleading presentations to NHTSA assuring the regulator that GM would and did act promptly, effectively, and in accordance with its formal recall policy to respond to safety problems— including airbag-related safety defects.

10.     Moreover, for much of the period during which GM failed to disclose this safety defect, it not only failed to correct its June 2005 assurance that the Defective Switch posed no safety concern but also actively touted the reliability and safety of cars equipped with the Defective Switch, with a view to promoting sales of used GM cars.  Although GM sold no *new* cars equipped with the Defective Switch during this period, GM dealers were still, from in or about the spring of 2012 through in or about the spring of 2013, selling pre-owned Chevrolet, Pontiac, and Saturn brand cars that would later become subject to the February 2014

- 492 -

recalls.  These sales were accompanied by certifications from GM, assuring the unwitting consumers that the vehicles' components, including their ignition systems and keys, met all safety standards.

11.    After the spring of 2012 but before the recall was announced, the fifteenth Company-acknowledged death associated with the Defective Switch occurred.

44.    As noted, the too-easy movement of the Defective Switch from the Run to the Accessory or Off position resulted in an unexpected shutoff of the engine and—as both the February 2005 Preliminary Information and the 2005 Service Bulletin properly described—a "loss of electrical system[s]."  These electrical systems included power steering and power brakes.  They also included the sensing diagnostic module or "SDM," which controlled airbag deployment.  Internal GM documents reflect that although the impact of an engine shutoff on the SDM was not on GM engineers' minds, certain employees within GM understood no later than 2001 the natural connection between a loss of electrical systems and non-deployment of airbags:  if the ignition switch turned to Off or Accessory, the SDM would "drop," and the airbags would therefore be disabled.  If a crash then ensued, neither the driver nor any passengers could have the protection of an airbag.

45.    And, indeed, the deadly effects of the Defective Switch on airbag non-deployment began manifesting themselves early on, in crashes about which GM was made aware contemporaneously.  In July 2004, the 37 year-old driver of a 2004 Ion, a mother of three children and two step-children, died in a crash after her airbags failed to deploy.  A few months later, in November 2004, the passenger of a 2004 Ion died in another crash where the airbags failed to deploy.  The driver was charged with, and ultimately pled guilty to, negligent homicide.  Then, in June 2005, a 40-year-old man suffered serious injuries after his 2005 Ion crashed and the airbags failed to deploy.

46.    For each of these Ion crashes in which the subject vehicles evidently lost power before impact, the SDM data recovered from the crashed vehicles was unilluminating.  Unlike the SDM installed in the Cobalt, the Ion's SDM was incapable of recording data—including power mode status—after the vehicle had lost power.

- 493 -

47.     The Cobalt SDM data, by contrast, reflected a number of non-deployments accompanied by a power mode status recording of Accessory or Off.

48.     In July 2005, just months after GM closed its first engineering inquiry into the Defective Switch, a 16-year-old driver died in Maryland when the airbags in her 2005 Cobalt failed to deploy.  The power mode status recorded for that vehicle at the time of the crash was Accessory.

49.     In October 2006, two more teenagers died, also in a 2005 Cobalt, in Wisconsin.  The airbags in the vehicle failed to deploy when they should have, and the police officer who examined the crashed vehicle noted in a February 2007 report on the incident that the ignition switch "appeared to have been in the accessory position …  preventing the airbags from deploying."  An April 2007 report about the same crash by Indiana University likewise posited that the airbags had failed to deploy because the key was in the Accessory position.  This report even specifically referenced the October 2006 version of the 2005 Service Bulletin, which described the Defective Switch.

50.     In the spring of 2007, NHTSA approached certain GM personnel to express concern about a high number of airbag non-deployment complaints in Cobalts and Ions, and to ask questions about the July 2005 Cobalt crash resulting in the death of the 16-year-old girl.  Around this same time, and as a result of NHTSA's inquiries, a GM field performance assessment engineer with expertise in airbags who worked principally with GM lawyers (the "Airbag FPA Engineer") began, at the request of his supervisors, to track reports of crashes in Cobalts where the airbags failed to deploy.  And, in May 2007, the PI group even placed the issue of Cobalt airbag non-deployment into the first stage of GM's recall process, the ISR.  But the PI group, under the supervision of the PI Senior Manager, conducted no follow-up at the time.

51.     In September 2008, another crash, this one involving a 2006 Cobalt, killed two people.  The airbags failed to deploy when they should have.  GM sent the crashed car's SDM to the Company's SDM supplier for examination.  In May 2009, the SDM supplier reported that the power mode status was at one point during the crash recorded as Off, and that this was one of two possible explanations for the failure of the airbags to deploy.  This report was provided in writing, but also in person, at a meeting attended by several GM employees—including a member of the PI

- 494 -

group, in-house counsel, and the Airbag FPA Engineer who had been tracking the Cobalt non-deploy incidents.

52.    In April 2009, a 73-year-old grandmother and her 13-year-old granddaughter were killed in rural Pennsylvania in a crash when the ignition switch in the grandmother's 2005 Cobalt slipped into the Accessory position, thereby disabling the frontal airbags and preventing their deployment.  The grandmother and her 13-year-old granddaughter, who was in the front passenger seat, both died at the scene.  A 12-month-old great grandson, the sole survivor, was paralyzed from the waist down.  He was hospitalized for 33 days following the crash.

53.    In December 2009, a 35-year-old Virginia woman crashed her 2005 Cobalt, sustaining serious head injuries and rib fractures (hereinafter, the "Virginia Crash").  The airbags failed to deploy, and, as the Airbag FPA Engineer noted, the power mode at the time of the crash was recorded as Accessory.

54.    Two weeks later, a 25-year-old nursing student died in Tennessee following a head-on collision in her 2006 Cobalt (hereinafter, the "Tennessee Crash").  Again, the airbags failed to deploy when they should have, and the power mode status was recorded as Off at the time of the crash.

55.    In March 2010, a 29 year-old woman was killed in Georgia after her 2005 Cobalt crashed (hereinafter, the "Georgia Crash").  Although there was no allegation that the frontal airbag should have deployed, there was an allegation that loss of power steering caused the crash.  The SDM from the vehicle showed that the power mode status was recorded as Accessory at the time of the crash.

56.    Notably, just nine days before the Georgia Crash, GM had conducted a safety recall for a power steering problem in the Cobalt unrelated to the Defective Switch, in which it acknowledged that loss of power steering, standing alone, constituted a "defect … relate[d] to motor vehicle safety" and thus warranted recall action.  The Defective Switch, of course, caused more than just loss of power steering; it also caused loss of other electrical systems.  This was known by many within GM by no later than 2004—even if they did not appreciate precisely what electrical, system components were affected (*e.g.*, the airbag SDM).  Yet at no time before February 2014 did GM announce a recall for cars associated with the Defective Switch.

- 495 -

57.     Many of the deaths and serious injuries associated with airbag non-deployment discussed in the foregoing paragraphs became the subject of legal claims—formal and informal—against GM.  Certain GM lawyers, aided by the Airbag FPA Engineer and others like him who assisted in evaluating causes of crashes, realized by no later than early 2011 that a number of these non-deployment cases involved some sort of "anomaly" in the ignition switch.  Specifically, in connection with the Tennessee Crash, discussed above, a GM engineer explained to legal staff that when the ignition switch power mode status is in Off (as it was in that case), the SDM "powers down," and the airbags fail to deploy.  The engineer further opined that the "a crash sensing system 'anomaly'" resulting in a power mode status of Off had indeed caused non-deployment in the Tennessee Crash case.

60.     Meanwhile, the GM attorney principally responsible for airbag non-deployment claims (the "GM Airbag Attorney"), who had become familiar with a number of Cobalt non-deployment incidents, grew concerned that the "anomaly" identified in these cases was getting insufficient attention from the PI group, which was supposed to investigate and work toward remedying safety problems with cars on the road.  At the time, no one within GM had yet sourced the "anomaly" to the Defective Switch's torque.

61.     Certain members of the legal department took the unusual step of arranging a meeting with PI.  The meeting, which took place on July 27, 2011, was attended not just by the PI Senior Manager, who ran the PI group on a day-to-day basis, but also by his boss, the GM Director of Product Investigations (the "GM Safety Director").  Also present were the Airbag FPA Engineer, the GM Airbag Attorney, and the GM Safety Attorney.  In advance of the meeting, the PI Senior Manager wrote to a colleague that the Cobalt airbag non-deployment problem was "ugly" and would make for "a difficult investigation."

62.     At the July 27, 2011 meeting, the Airbag FPA Engineer showed photographs of three of the most serious non-deployment crashes he had seen involving Cobalts, including photographs of the Tennessee Crash, and specifically highlighted his observations that many of these Cobalt non-deployment crashes had occurred while the power mode was in Accessory or Off.

64.     One of the first steps the PI Investigator took, in or about August 2011, was to gather learning and materials from the Airbag FPA Engineer who had been tracking non-deployment

- 496 -

incidents in Cobalts since 2007, and who had been involved in evaluating a number of crashes that were the subject of Cobalt non-deployment legal claims.  The Airbag FPA Engineer explained to the PI Investigator that he had observed that in some of these cases the power mode was recorded as either Accessory or Off at the time of the subject crashes.  The Airbag FPA Engineer further noted that the non-deployment problem appeared to be limited to 2005-2007 model years of the Cobalt and appeared not to affect model years 2008 and later.

65.     By March 2012, more than six months after he had been assigned to the matter, the PI Investigator had done little to advance the investigation.  The GM Airbag Attorney called another meeting with PI for March 15, 2012.  Attendees at this meeting included the GM Safety Attorney, the GM Airbag Attorney, the GM Safety Director, the PI Investigator, the PI Senior Manager, and the Airbag FPA Engineer.  During the meeting, the PI Investigator complained that he needed more support from GM's electrical engineering group to investigate a potential electrical (as opposed to mechanical) explanation for the Accessory and Off power mode recordings in many of the subject crashes.

70.     In an April 23, 2012 email responding to a query about an ignition switch turning too easily from Run to Off, the PI Senior Manager wrote to colleagues claiming—inexplicably—that he had "not heard of" complaints about low torque in the "Cobalt or other models" since 2005, when the first PI examination was conducted and closed with the issuance of the 2005 Service Bulletin.  The PI Investigator, meanwhile, pressed electrical engineers to continue to look into other possible causes of non-deployment, beyond the low torque problem.

71.     No one from PI ushered the matter into the first stage of the formal recall process, the ISR, at this time.  This approach represented a stark contrast even to the way in which the Defective Switch itself had been handled in 2005.  Back then, *before* the dangerous connection to airbag non-deployment had been drawn, PI had promptly introduced the matter into the ISR.

72.     In May 2012, the GM Safety Attorney asked a GM Vice President to act as an "Executive Champion" in order to propel the matter forward.  During the first meeting chaired by this Executive Champion, on May 15, 2012, the GM Electrical Engineer presented his view that the Defective Switch was the cause of non-deployment in the affected Cobalt models.  Those in

- 497 -

attendance included the GM Safety Attorney, the GM Safety
Director, the PI Senior Manager, the PI Investigator, and others.
The Executive Champion encouraged confirmation of this
hypothesis through more scientific study.

73.     Days later, on May 22, 2012, such confirmation was
obtained.  The GM Electrical Engineer, the PI Investigator, and
others traveled once more to an auto salvage yard and, using
equipment much more sophisticated than fish scales, conducted a
thorough study of torque in the ignition switches of several model
years of Cobalt, Ion, and other cars.  The results confirmed that the
majority of vehicles from model years 2003 through 2007
exhibited torque performance below the Torque Specification that
GM had adopted in 2001.  They also showed that starting
somewhere in model year 2007 (that is, for vehicles produced at
some point in 2006), the torque values were higher and within
specification.

74.     The observed discrepancy was, of course, due to the
ignition switch part change that the Switch DRE had ordered in
April 2006.  But neither anyone from PI nor others working on the
airbag non-deployment investigation in the spring of 2012 knew
yet about that change; the part number was the same for the
Defective Switch and the new one.  Indeed, when the PI
Investigator asked the Switch DRE in early 2012 to detail any
changes that might account for the discrepancy observed at the
salvage yard, the Switch DRE denied any of relevance.  This was
baffling to the PI Investigator and others.

75.     Still, the engineers involved knew that studied cars
built before a certain point in 2006 were equipped with low-torque
ignition switches, and that low torque in an ignition switch could
result in airbag non-deployment.  At this time, no further
engineering tests were conducted to explore any other purported
root cause of the observed non-deployment pattern or to compare
the 2005 through 2007 model year Cobalt ignition switches with
those of later model years.

76.     On June 12, 2012, three weeks after the May 2012
salvage yard expedition, an expert retained by the Virginia Crash
plaintiffs issued a report.  Noting both the 2005 Service Bulletin
and the Indiana University study from 2007 that had identified a
connection between the Defective Switch and non-deployment of
an airbag in a fatal Cobalt crash, the expert opined that the
Defective Switch was indeed responsible for non-deployment in
the Virginia Crash.  In early July, outside counsel for GM

- 498 -

forwarded the Virginia Crash expert's report to the GM Airbag Attorney.  In late July, the GM Airbag Attorney forwarded the Indiana University study to the PI Senior Manager, the GM Safety Attorney, and the Airbag FPA Engineer.

77.    At a meeting among GM lawyers in late July 2012 in which the Virginia Crash expert's report was discussed, a newly hired GM attorney asked the group why the Cobalt had not been recalled for the Defective Switch.  Those present explained that the engineers had yet to devise a solution to the problem but that engineering was looking into it.  The new attorney took from this that the GM legal department had done all it could do.

78.    The PI Investigator, the PI Senior Manager, the GM Safety Attorney, the GM Safety Director, and others met at lengthy intervals through the summer and fall of 2012 and early 2013 to consider potential solutions and further explore why the defect condition appeared to be limited to earlier model years.  As one of the several Executive Champions who would be tasked with overseeing these meetings from early 2012 through 2013 has explained, the purpose of the meetings was *not* to identify the root cause of the problem, which had by approximately the spring of 2012 been traced to the Defective Switch, but rather to develop the optimal remedy for the defect condition and set with precision the scope of the anticipated recall.  Certain GM personnel wanted to be sure that the fix adopted for the problem would be affordable and yet appeal to consumers; that GM would have sufficient parts on hand to address the recall; and that GM representatives would be able to fully articulate to NHTSA and the public a "complete root cause" accounting for the discrepancy between the earlier and later vehicle populations.

79.    At the same time, the manner in which the responsible GM personnel were approaching the Defective Switch and its deadly consequences in 2012 contrasted with the picture the Company was presenting to NHTSA about its recall process.

80.    On October 22, 2012, certain GM personnel, including the GM Safety Director, met with NHTSA officials in Washington, D.C., and gave a description of the Company's recall process intended to assure the regulator that safety issues were routinely addressed in a methodical and efficient fashion.  The presentation, which touted a "common global process" with "standard work templates," explained that the first step toward potential recall involved investigation by PI of the suspected safety problem.  Then, according to the presentation, the matter would be

placed promptly into the FPE process, which was controlled not by engineers but by personnel in charge of Quality.  At this stage, GM further explained, the FPET would consider the logistics of implementing the proposed recall or other contemplated action; the FPERC would recommend the particular field action to be taken (recall or, for example, a customer advisory); and, in short order thereafter, the EFADC would either make the final decision concerning that recommended field action or order "further study."  According to individuals who attended this meeting and others in 2012 and 2013, GM gave the impression that its recall process was linear, robust, uniform, and prompt.

81.    To the extent this presentation may have accurately described GM's general recall process and handling of other defects, it did not accurately describe GM's handling of the Defective Switch (about which NHTSA would remain unaware until 2014).  By approximately five months prior to this presentation, certain GM personnel had identified what they knew to be a dangerous safety defect and had not started it into the first phase of the recall process.

82.    By early 2013, the Defective Switch *still* had not been introduced into the FPE process. GM was exploring optimal remedies and trying to understand why the defect appeared to affect only a limited population.  Those involved remained unaware of the part change that the Switch DRE had made back in April 2006—the change that explained why cars built after around late 2006 seemed not to be affected.

83.    Meanwhile, during this same period, GM lawyers were engaged in heavy litigation related to the Georgia Crash, referenced above.  The Georgia Crash plaintiffs' attorney had learned about the 2005 Service Bulletin, and had developed a theory that the Defective Switch caused the driver to lose control of her vehicle.  The attorney was seeking discovery related to the bulletin and the Defective Switch more generally.  He was also asking about any design changes that had been made to the switch.

84.    GM denied that any such design changes had been made that would affect the amount of torque it takes to move the key from Run to Accessory.

85.    Then, on April 29, 2013, the Georgia Crash plaintiffs' attorney took the deposition of the Switch DRE.  During that deposition, the plaintiffs' attorney showed x-ray photographs of the ignition switch from the subject vehicle (the Defective

Switch) and another switch from a later model year Cobalt (one installed after implementation of the Switch DRE's April 2006 part change directive). The photographs showed that the detent plunger in the Georgia Crash car was much shorter—and therefore would have had much lower torque performance—than the one in the later model year Cobalt. The Switch DRE, confronted with these photographs, continued to deny knowledge of any change to the switch that would have accounted for this difference.

86.   But, as the Switch DRE has acknowledged, he knew almost immediately following his deposition that there had been a design change to the switch following production of the model year 2005 Cobalt, and that he must have been the engineer responsible for that design change. He knew as much because, the day after the April 29, 2013 deposition, he personally collected and took apart switches from a 2005 Cobalt and a later model year Cobalt and observed the difference in lengths of their respective detent plungers.

87.   The Switch DRE has said that he recalls communicating these observations to his boss and to another supervisor and being advised to let the legal department handle the matter.

88.   The GM Safety Attorney learned what transpired during the Switch DRE's deposition. Having previously received a request from the PI group for retention of an outside expert (the "Switch Expert") to help determine why the Defective Switch seemed to affect only a limited vehicle population, the GM Safety Attorney, on or about May 2, 2013, authorized retention of the Switch Expert in connection with the Georgia Crash case. The PI Investigator and the PI Senior Manager did not participate in meetings with the Switch Expert until the Switch Expert presented his conclusions following the settlement of the Georgia Crash case. The PI Investigator understood that he was to put his own investigation on hold pending the Switch Expert's evaluation.

89.   Of course, by the time the Switch Expert had been retained, certain GM personnel had already learned from the Georgia Crash plaintiffs' attorney about the design change to the Defective Switch, and the Switch DRE had already confirmed that the change had in fact occurred. GM thus had an explanation for why the defect condition did not appear to affect cars built after the middle of 2006. And, indeed, some within GM had known for approximately a year that a confirmed population of GM's compact cars was equipped with the Defective Switch. Yet *still*

- 501 -

there was no recall; indeed, still there was no move to even place the matter into the FPE process.  Instead, GM personnel awaited the study and conclusions of the Switch Expert.

90.     Meanwhile, on June 22, 2013, a 23-year-old man was killed in a crash on a highway near Roxton Pond, Quebec after his 2007 Cobalt left the road and ran into some trees.  The driver-side airbag in the Cobalt failed to deploy.  The power mode status was recorded as Accessory.

91.     By July 2013, the Switch Expert had confirmed what the Georgia Crash plaintiffs' expert and the Switch DRE had known since no later than April 2013:  Cobalts from model years 2008 through 2010 had longer detent plungers and springs than those from model years 2005 and 2006.  GM's outside counsel in the Georgia Crash case urged GM in-house lawyers to settle it: "[T]here is little doubt that a jury here will find that the ignition switch used on [the Georgia Crash car] was defective and unreasonably dangerous, and that it did not meet GM's own torque specifications.  In addition, the [engineering inquiry documents about the Defective Switch from 2004 and 2005] and the on-going FPE investigation have enabled plaintiffs' counsel to develop a record from which he can compellingly argue that GM has known about this safety defect from the time the first 2005 Cobalts rolled off the assembly line and essentially has done nothing to correct the problem for the last nine years."

92.     GM followed its outside counsel's advice and settled the Georgia Crash case at the end of August 2013, agreeing to pay $5 million.

93.     Then, in late October 2013, GM received documentary confirmation from the Switch Supplier that the Switch DRE had in fact directed a part change to fix the Defective Switch in April 2006.  This evidence further showed that the part was changed without a corresponding change to the part number.

94.     Only at this point did GM finally place the Defective Switch matter into the formal FPE process.  An ISR was scheduled for November 5, 2013.  Meanwhile, on October 30, the PI Investigator, who was by now back working on the matter and helping to lay the practical groundwork for a recall, asked an employee in charge of ordering vehicle parts what the costs of new ignition switch components would be for the 2005 through 2007 Cobalts.

- 502 -

95.     On July 23, 2013, one day after GM's outside counsel had advised GM to settle the Georgia Crash case and noted that plaintiffs' counsel could make a "compelling" argument that GM "essentially has done nothing to correct" the Defective Switch "for the last nine years," the GM Safety Director received an email from NHTSA's Director of Defects Investigation accusing GM of being "slow to communicate" and "slow to act" in the face of safety defects—including defects unrelated to the Defective Switch (about which NHTSA remained unaware) but related to non-deployment of airbags.

96.     Two days later, certain GM personnel, including the GM Safety Director, met with NHTSA to try to quell the agency's concerns.  According to notes taken by the GM Safety Director at that meeting, NHTSA agreed with GM that the Company appeared to have a "robust and rigorous process" for evaluating and addressing safety issues, but worried that it "tend[ed] to focus on proving the issue [wa]s not a safety defect."

97.     On November 7, 2013, two days after the ISR concerning the Defective Switch, certain GM personnel met again with NHTSA, this time to give a more in-depth presentation targeted at assuring the regulator that GM was "responsive" and "customer focused" when it came to safety concerns.  Although the presentation did not specifically address the Defective Switch-related airbag non-deployment problem—which, having just entered the recall process within GM, remained unknown to NHTSA—it did address concerns related to airbag non-deployment more generally.

98.     First, certain GM personnel showed NHTSA slides that touted the increasing swiftness with which GM had addressed safety defects from 2008 through 2012.  One graph reflected that the average time taken from identification of the issue through to execution of the recall was 160 days in 2008 and 84 days in 2012.  It further showed that the average time an issue remained in the "pre-FPE" stage was 105 days in 2008 and 33 days in 2012.  And the average number of days between entry into the FPE process and recall decision was 15 days in 2008 and 13 days in 2012.

99.     Other portions of GM's presentation suggested that any airbag defect that presented with a failure to warn the driver and/or certain other aggravating factors would be recalled swiftly.

108.     On January 31, the voting members agreed that a recall of the affected model year Cobalts, G5s, and Pursuits was

- 503 -

warranted. On February 7, 2014, GM announced the recall to the public and NHTSA.

109.    Although other models—the Ion, most notably—were likewise equipped with the Defective Switch, these were not recalled on February 7.  The stated reasons for not including these other models varied.  Some believed there were differences in electronic architecture and physical switch placement between the unrecalled cars and the recalled cars, such that the risk of switch movement and/or airbag non-deployment was reduced.  Others cited an error by the PI Investigator in collecting incident data about the Ion, which they said gave the erroneous impression that there was no comparable problem with the Ion.

110.    In any event, following intense criticism from the press about the limited scope of the February 7 recall, GM held another EFADC meeting on February 24, 2014 to consider the affected model years of the Ion, Sky, HHR, and Solstice.  Voting members agreed that the February 7 recall should be expanded to encompass these other models.  The next day, GM announced that decision.

111.    All of the cars subject to the February and March 2014 airbag non-deployment recalls were relatively old.  GM stopped manufacturing the Ion in 2006; stopped manufacturing the Cobalt, the G5, the Sky, and the Solstice in 2009; and stopped manufacturing the HHR in 2010.

112.    From in or about the spring of 2012, when certain GM personnel knew that the Defective Switch could cause airbag non-deployment, through at least in or about May of 2013, GM dealerships (which GM had not made aware of the issue) continued to sell "certified pre-owned" cars equipped with the Defective Switch.  GM, which profited indirectly from these sales, certified the safety of the vehicles to the public, explaining that the certification process involved testing of over a hundred components, including, specifically, the ignition system.

113.    But the safety certification was made despite there being no change or alteration to either the ignition switch itself or the accompanying key in these cars.  The Defective Switch was left intact and unremedied.

114.    Approximately 800 consumers purchased certified pre-owned vehicles equipped with the Defective Switch.  The GM dealer certifications thus may have caused consumers who relied

- 504 -

on the certifications to buy vehicles that they may incorrectly have believed to be safe.

115.    As detailed above, starting no later than 2003, GM knowingly manufactured and sold several models of vehicles equipped with the Defective Switch.  By approximately the spring of 2012, certain GM personnel knew that the Defective Switch could cause frontal airbag non-deployment in at least some model years of the Cobalt, and were aware of several fatal incidents and serious injuries that occurred as a result of accidents in which the Defective Switch may have caused or contributed to airbag non-deployment.  This knowledge extended well above the ranks of investigating engineers to certain supervisors and attorneys at the Company—including GM's Safety Director and the GM Safety Attorney.  Yet, GM overshot the five-day regulatory reporting requirement for safety defects by approximately 20 months.  And throughout this 20-month period, GM failed to correct its 2005 statement that the Defective Switch posed no "safety" problem.

977.    As demonstrated in part in the facts admitted in the Statement of Facts, from the inception of New GM onwards, New GM conducted an enterprise of associated-in-fact entities (the "Enterprise").  The Enterprise was designed and conducted to conceal information regarding the true nature and scope of the defects, particularly the Delta Ignition Switch Defect, from the public, the federal government and its agencies, its customers, and the owners and lessees of New GM vehicles and Old GM vehicles; and to simultaneously and affirmatively misrepresent the safety and quality of New GM vehicles and Old GM vehicles, in order to: (a) fraudulently induce Plaintiffs and other Class Members to purchase or lease the Defective Vehicles (as relevant to the period after New GM's inception only), (b) maintain the brand image of New GM and the value of New GM cars as well as the value of all Old and New GM vehicles on the road, and (c) avoid the costs of fixing the defects, undermining New GM's brand image in Defective Vehicles owned by Plaintiffs and Class Members.

- 505 -

978.     New GM was associated with the illegal Enterprise, and conducted and participated in the Enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of 18 U.S.C. § 1962(c).

979.     The RICO Enterprise which engaged in, and whose activities affected, interstate and foreign commerce, is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for the common purpose of employing the multiple deceptive, abusive, and fraudulent acts described herein.

980.     The New GM RICO Enterprise is an ongoing organization with an ascertainable structure, and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the pattern of racketeering activity in which Enterprise members have engaged and are engaging.  The Enterprise was and is used by New GM as a tool to effectuate the pattern of racketeering activity.

981.     At all times, the Enterprise consisted of at least New GM, including its senior lawyers and engineers, ESIS, Inc. ("ESIS"), and King & Spalding LLP ("K&S") and other unnamed outside law firms that handled numerous accidents involving the Delta Ignition Switch and/or defective airbags who knowingly and/or unknowingly joined the Enterprise when each began representing New GM in matters related to the Delta Ignition Switch Defect, which began in October 2010, if not before.

982.     The following persons, and others presently unknown, have been members of and constitute the association-in-fact RICO Enterprise ("Enterprise Members"):

a.     <u>New GM</u>: New GM's officers, executives, engineers, and in-house lawyers collaborated and colluded with each other and with other Enterprise Members to

- 506 -

actively conceal the nature of the defects, thereby inducing Plaintiffs and Class Members to purchase or lease Defective Vehicles (as relevant to the time period after New GM's inception), and avoiding the responsibility and economic costs to fix or replace the Defective Vehicles already in Class Members' possession.  This collusion also caused members of the Class to retain Defective Vehicles even if they purchased them prior to New GM's existence.

           b.    <u>King & Spalding</u>:  K&S is a law firm that employs hundreds of attorneys in more than one dozen offices worldwide.[362]  During the duration of the Enterprise, K&S was retained by New GM to defend lawsuits and other claims involving the defects in Old GM vehicles.  During that period, K&S knowingly or unknowingly collaborated with New GM and ESIS to fraudulently conceal information about the defects—particularly the Delta Ignition Switch Defect—from litigants and the public.  The scheme was furthered by New GM's counsel K&S, as well as New GM's communications with litigants, courts, and consumers.

           c.    <u>Unnamed Law Firms</u>:  Unnamed Law Firms that handled lawsuits involving accidents and injuries caused by the defective Delta Ignition Switch and/or defective airbags.  During their involvement, these unnamed firms either knowingly or unknowingly aided New GM's scheme to hide the defects from the public.

           d.    <u>ESIS</u>:  ESIS is a company that offers "risk management products and services."[363]  It is a part of the Ace Group, headed by ACE Limited, and is separate

---

[362] http://www.kslaw.com/About-Us.

[363] http://www.acegroup.com/esis-en/about-esis/.

and distinct from the other Enterprise constituents.[364]  During the duration of the

Enterprise, ESIS served as New GM's claims administrator, routinely investigating,

analyzing, and resolving claims involving defects in New and Old GM vehicles,

including the defects alleged herein.  Product liability claims forwarded to ESIS for

investigation and review included, among others, those involving personal injury,

fatalities, and property damage.  ESIS knowingly collaborated with New GM and K&S in

a scheme to fraudulently conceal information about the defects from claimants, the

government and its agencies, and the public, which was furthered by ESIS' mailings and

wire communications with the Enterprise and claimants.

983.    ESIS was at all relevant times well aware of the Delta Ignition Switch Defect by

virtue of its having worked with New GM for years in settling and hiding defect claims.  For

example, ESIS was notified of a June 4, 2010 accident when a customer was driving a Chevy

HHR when "it shut off."  New GM turned the incident over to ESIS.

984.    In another instance, ESIS was involved in the investigation of a 2006 Cobalt that

lost power and crashed.  According to the customer, "the power in my car shut off while I was

driving it."  These are but a few examples of dozens of reports of Delta Ignition Switch defects

that were investigated by New GM and ESIS, and their use of mailings and wires to

communicate information on these defects, all in furtherance of the scheme to conceal

information from regulators and the public.

985.    The Enterprise, which engaged in, and whose activities affected, interstate and

foreign commerce, is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4)

---

[364] *Id.*

and consists of "persons" associated together for the common purpose of employing the multiple deceptive, abusive, and fraudulent acts described herein.

986.    New GM, ESIS, K&S, and the unnamed law firms were entities separate and distinct from each other and from the Enterprise.  All of the Enterprise constituents are independent legal entities with the authority and responsibility to act independently of the Enterprise and of the other Enterprise members.  K&S and the unnamed law firms are governed by rules of professional conduct that require they maintain professional independence from clients and to avoid furthering wrongdoing by clients.

987.    The members of the Enterprise all had a common purpose:  to misrepresent the safety and quality of New GM vehicles and Old GM vehicles and/or to conceal information regarding the nature and scope of the defects, particularly the Delta Ignition Switch Defect, from the government, its agencies, the public, and the Class.  For New GM, the purpose of the scheme to defraud was to conceal the true scope and nature of the defects in order to sell and lease more vehicles, maintain the value of existing vehicles, and avoid incurring the cost and responsibility of repairing or replacing Defective Vehicles.  By concealing the scope and nature of the defects, New GM maintained and boosted consumer confidence in the New GM brand, maintained the sales price of New GM vehicles and the value of used New GM and Old GM vehicles, sold more New GM vehicles and Certified Pre-Owned vehicles, and avoided remediation costs and negative publicity associated with the defects and recalls.  New GM has admitted its intent with respect to concealing the Delta Ignition Switch defect in the Deferred Prosecution Agreement Statement of Facts where, for example, New GM admitted that it "delayed" the recall "until [New] GM could fully package, present, explain and handle the deadly problem" such that

- 509 -

certain insiders at New GM kept the Delta Ignition Switch issue "outside the normal process."[365] New GM's motive and scheme is further revealed by its admission that it delayed disclosure until the fix "would be affordable."[366]

988.   Alternatively, each of the members of the Enterprise, if they did not knowingly join in New GM's purpose, aided New GM in its accomplishment of New GM's scheme to conceal the Delta Ignition Switch Defect.

989.   Each member of the Enterprise benefited from the common purpose, knowingly or unknowingly facilitating New GM's scheme:  New GM sold or leased Defective Vehicles after New GM was created and New GM avoided and deferred the cost and responsibility of recalling, repairing or replacing Defective Vehicles; K&S, the unnamed law firms and ESIS secured ongoing business and income from New GM as a result of achieving settlements for New GM that avoided public disclosure of the Delta Ignition Switch Defect.

## C.   Pattern of Racketeering Activity

990.   As set forth below, New GM conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that lasted many years, commencing from on or shortly after New GM's inception as an entity in 2009, and continuing through at least mid-2014.  This pattern consisted of numerous and repeated violations of the federal mail and wire fraud statutes—namely, 18 U.S.C. §§ 1341 and 1343—that prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud.  These mailings and wirings were executed in furtherance of the Enterprise's scheme to defraud the Class and caused injury to the property of Class members.

---

[365] Statement of Facts, ¶ 9.

[366] Statement of Facts, ¶ 78.

991.   New GM had actual knowledge and intentionally suppressed material information on the scope and nature of all the defects described in this Complaint, including, but not limited to, the Delta Ignition Switch Defect.  This knowledge and information included both knowledge that New GM possessed at its inception, and additional information New GM obtained from complaints and reports it received and internal investigations it conducted after July 10, 2009, throughout the period encompassed in this Complaint.

992.   New GM, with the assistance and collaboration of the other persons associated in fact with the Enterprise, devised and employed a fraudulent scheme to conceal and suppress knowledge regarding the defects by use of the telephone and internet and transmitted, or caused to be transmitted, by means of wire communication traveling in interstate or foreign commerce, writing(s) and/or signal(s), including New GM's website, Service Bulletins to dealers, communications with federal regulatory agencies, and communications with other members of the Enterprise, for the purpose of executing such scheme or artifice to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

**D.   New GM Conducted the Enterprise to Conceal the Nature and Scope of the Defects from Litigants, Claimants and Courts, the Public, and the Nationwide Class**

**1.   K&S warns New GM of a defect.**

993.   Using the Enterprise, New GM caused to be transmitted interstate communications by mail and wire in furtherance of the scheme to defraud, sent with the objective of suppressing safety-related information that emerged in handling litigation and other claims.  This pattern of conduct is exemplified by the Enterprise's handling of various Delta Ignition Switch cases, which is detailed herein.

994.     GM, K&S, the unnamed law firms, and ESIS were aware of and concealed multiple incidents of death or injury as a result of the Delta Ignition Switch Defect long before the recall.  Specific cases that New GM, K&S, the unnamed law firms, and ESIS were aware of that involved the Delta Ignition Switch Defect include:  Rademaker, Dunn, Towne, Lambert, Anderson, Chansuthus, Gemmill, Sullivan, Harding, and Preuss.

995.     In addition, New GM, K&S, and ESIS were aware of 21 Field Performance Evaluations concerning the Delta Ignition Switch Defect.

996.     As part of the Enterprise, in October 2010, K&S attorney Harold Franklin sent a case evaluation letter to New GM in-house counsel, Jaclyn Palmer, regarding a Not-In-Suit-Matter ("NISM") in which K&S represented New GM.  The matter involved a 25-year-old nursing student, Hasaya Chansuthus, who was killed after she lost control of her 2006 Cobalt, which slammed head-on into a tree without triggering airbag deployment.  In this letter, and another dated November 2, 2010, Franklin attributed the non-deployment to an "anomaly" New GM had seen in other Cobalt vehicles, and which presented "clear evidence of defect."  Franklin also noted that New GM's Kathy Anderson explained to K&S that the anomaly occurred when Cobalts experience rough conditions that can "bounce" the ignition switch off, power down the vehicle, and deactivate the airbags.[367]

997.     Despite explicitly acknowledging that the "anomaly" was present in other Cobalts and that it resulted in power loss and airbag non-deployment that could, and did, lead to serious injuries and fatalities, K&S did not investigate the issue further, or warn consumers and regulators.  Nor did K&S counsel New GM to take any actions to protect consumers.[368]  From its

---

[367] HIGHLY CONFIDENTIAL DOC:  GM-MDL2543-000660577.

[368] HIGHLY CONFIDENTIAL DOC:  *Id.*

representation of New GM, K&S was aware of New GM's obligation to report safety defects to

NHTSA and knew that the defect it had discovered while working for New GM was a reportable

event.

998.     Instead, K&S advised New GM to suppress the facts of the case by quietly

making "every effort [to] . . . settle th[e] claim" confidentially before litigation, especially since,

in K&S's words, "the facts and circumstances surrounding the investigation into the sensing

'anomaly' that may be present in some Cobalts could provide fertile ground for laying the

foundation for an award of punitive damages. . . ."[369]  This communication furthered the

Enterprise's fraudulent scheme to conceal information regarding the defect and reflects K&S's

participation in and complicity with the scheme and its objectives.  Because the e-mail was sent

between Franklin in Georgia, and Palmer and ESIS' Annette Rigdon in Michigan, it serves as a

predicate act in violation of 18 U.S.C. § 1343.

999.     K&S suspected before a March 10, 2010 inspection of the Chansuthus vehicle

that the accident may have implicated a power steering defect.  But because the claimant had not

explicitly alleged a steering defect at that time, K&S chose not to inspect the vehicle for the

"steering defect issue" out of concern that it would put the defect on claimant's "radar screen."

When Palmer later proposed the idea of another inspection, K&S noted that a "downside" of

such an inspection was that it could reveal "the steering codes" associated with the defect were in

fact present.  In other words, rather than work to uncover and understand dangerous safety

defects, the Enterprise schemed to conceal them.  All of this was communicated in an interstate

---

[369] HIGHLY CONFIDENTIAL DOC:  *Id.*

e-mail exchange between Palmer and Franklin, in furtherance of the scheme, and in violation of

18 U.S.C. § 1343.[370]

1000.   As NHTSA found in a report issued on June 5, 2015, **New GM's outside counsel**

**knew of the Delta Ignition Switch defect and warned New GM but neither K&S nor New**

**GM disclosed the defect**:[371]

> The number of air bag non-deployments grew, and GM faced
> litigation for air bag nondeployment claims in instances where the
> air bags inexplicably did not activate.  **GM was repeatedly**
> **warned by in-house and outside counsel that a defect**
> **preventing air bag deployment seemed to exist….**  [Emphasis
> added.]

1001.   K&S's and the unnamed law firms' culpable participation can also be inferred

from the fact that ABA Model Rule of Professional Conduct 1.2(d) prohibits a lawyer from

engaging in conduct the lawyer knows to be criminal or fraudulent.  *See* Model Rule 1.2(d) ("A

lawyer *shall not* counsel a client to engage, or assist a client, in conduct that the lawyer knows is

criminal or fraudulent." (emphasis added)).  Further, Model Rule 1.16(a) mandates that an

attorney withdraw from (or decline) representation if the representation will result in a violation

of the rules of professional conduct or other law.  Model Rules 1.2(d) and 1.16(a) are not

discretionary.  Thus, even if a lawyer chooses to keep confidential the continuing crime or fraud,

he or she may not continue to provide counsel to that client and must withdraw from

representation.  *See also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 32.

1002.   K&S and the unnamed law firms did neither of these things during their

representation of New GM.  The Rules of Professional Conduct make clear how New GM's

---

[370] HIGHLY CONFIDENTIAL DOC: GM-MDL2543-003455136.

[371] NHTSA's Path Forward at 7.

attorneys were required to act when they learned of New GM's continuing, ongoing fraud: withdraw from representation.  At the very least, Rule 1.2(d) forbade K&S from continuing to engage in litigation behavior that would allow the fraud to continue.  Instead, K&S continued to advance New GM's concealment of the defect and to enter into settlement agreements that required confidentiality while knowing that New GM was obligated to disclose the defect to NHTSA.

1003.   As K&S recognized, a jury would understand New GM's refusal to address a known safety issue, including through a "recall and design change," to be intentional conduct that would subject New GM to punitive damages.  Knowing this, New GM repeatedly entered secret settlements of Delta Ignition Switch Defect claims *for the express purpose of preventing evidence of the defect—including New GM's long-running knowledge of the defect and the real danger it posed—from being exposed*.  Indeed, New GM had a pattern and practice of confidentially settling the K&S cases and others—at least 21 cases in total—to avoid the punitive damages that would result from disclosure of the fact that New GM had known for years that the Delta Ignition Switch posed a widespread safety hazard affecting all 2005-2007 Cobalts (and several other models with the same Delta Ignition Switch), and to keep the defect hidden.  New GM's conduct and K&S's legal services in furtherance thereof (not to mention the dire consequences for crash victims) were hardly "routine" or "unremarkable."

**2.  New GM and K&S knew years before the recall that a safety defect existed in model year 2005-2007 Cobalts.**

1004.   New GM lawyers, including its outside counsel, K&S, and the unnamed law firms, knew years before the 2014 recall that a pattern of crashes involving airbag non-deployment and loss of power in model year 2005-2007 Cobalts was related to an ignition switch

"anomaly" (a euphemism for "defect") that was causing serious injuries and deaths.  Moreover,

through their cumulative knowledge of the defect, developed over a number of years and by

virtue of repeated crashes involving cars with ignitions in the "accessory" or "off" position, New

GM, K&S, ESIS, and the unnamed law firms, knew long before the recall both that the defect

existed across 2005-2007 Cobalts and what was causing it.  More specifically, New GM lawyers

knew:

- By June 2009, that enough evidence of an ignition switch defect existed to require Old GM "under the Safety Act, to conduct a recall of the affected vehicles," *i.e.*, those with the Delta Ignition Switch Defect.[372]

- By October 7, 2010, that (a) there was an "anomaly" in the ignition switch of 2005-2007 model year Cobalt vehicles that prevented airbag deployment, (b) the "anomaly" likely caused the non-deployment in the deadly Chansuthus crash, and (c) New GM's knowledge and investigation of the so-called "anomaly" in multiple vehicles would provide "fertile ground" for an "award of punitive damages, resulting in a significantly larger verdict."

- By November 2, 2010, that the ignition switch "anomaly" presented "clear evidence of a defect."

- By July 26, 2011, that the "anomaly" caused the ignition switch to move from "run" to "accessory" mode and New GM engineers could not rule out the "anomaly" as the cause of non-deployment in the Sullivan crash.

- By July 27, 2011 (at the very latest), that (a) the pattern of Cobalt non-deployments was a safety issue, (b) the engineers should not be focused on individual product liability cases, and (c) the "anomaly" was also a factor in, among others, the fatal 2005 Rose crash and 2008 Harding crashes.

- By February 24, 2012, that another deadly crash (Melton) had occurred that fit the pattern of the "anomaly" New GM engineers had identified in model year 2005-2007 Cobalts that "results in the car's ignition going from the run position to the accessory mode."

- By March 29, 2012, that Old GM had issued Information Service Bulletin 05-02-35-007 ("TSB"), which identified the potential for drivers of the

---

[372] *In re Motors Liquidation Co.*, 529 B.R. 510, 557 (S.D.N.Y. Apr. 15, 2015).

affected vehicles to "inadvertently turn off the ignition due to low ignition key cylinder torque/effort," meaning that ignition switches in *all model year 2005-2007 Cobalts* (and other Defective Vehicles) might inadvertently move from "run" to "accessory" or "off" mode because too little force was required to do so.

- By April 18, 2012, that (a) another Cobalt non-deployment crash (Lambert) was attributed to the ignition switch being in "accessory", not "run", at the time of impact, (b) the TSB addressed a "similar problem as that seen in the field where the key in the ignition switch in the 2005 Cobalt could toggle from the Run mode to the Accessory mode by traveling off-road or over rough terrain," and (c) outside counsel had warned New GM *at least four times* that the existence of the defect in other vehicles put New GM at risk for punitive damages.

- By May 2012, that the insufficient torque issue identified in the TSB "explain[ed] why frontal air bags did not deploy in crashes in which the car was in accessory mode....," and torque values for 2005 and 2006 model year Cobalts were noticeably lower than values for 2008-2010 model years.

- By June 12, 2012, that a 2007 Indiana University Study of the deadly 2006 Rademaker Cobalt crash attributed non-deployment to the condition identified in the TSB.

- By July 25, 2012, that at least one product liability lawyer with knowledge of the Delta Ignition Switch Defect questioned why New GM had not yet recalled the defective Cobalts.

- By September 2012, that at least 22 crashes involving deaths and injuries were likely attributable to the ignition switch "anomaly."

- By October 31, 2012, that another Cobalt non-deployment crash (Preuss) was attributed to the ignition switch being in "accessory" mode and that "NHTSA has also commented on the type of situation in a Cobalt."

- By April 29, 2013, that the Cobalt ignition switch had been changed from 2005 to 2008 Cobalts.

- By July 22, 2013, that New GM's outside expert had confirmed the Melton expert's analysis revealing that the original equipment switches installed in 2005-2007 Cobalts contained a shorter detent plunger and spring than replacement switches for 2005-2007 Cobalts and switches installed in 2008-2010 Cobalts.

- By July 30, 2013, that New GM's outside expert had confirmed that the 2005 Cobalt ignition switches did not meet GM's specifications for the force required to move the ignition between "run" and "accessory" position.

1005.   Despite this knowledge, and New GM's clear and ongoing legal obligation to notify NHTSA and vehicle owners and purchasers about this known safety defect, New GM did not recall the defective Delta Ignition Switch Vehicles until February 2014.  K&S, ESIS, and the unnamed law firms knew that New GM had an obligation to report the defect to NHTSA.

**3.      Continued concealment of the defect.**

1006.   ESIS also participated and was complicit in this scheme which it, too, furthered through the use of mail and wire communications.  Annette Rigdon of ESIS communicated via mail, telephone, and e-mail with the estate's attorneys at the law firm of Butler, Wooten & Fryhofer, LLP in Georgia, as well as with the estate representatives in Tennessee, in furtherance of the settlement efforts.  This included a check request submitted by Rigdon which caused a check to be sent via Federal Express from Michigan to Georgia via Tennessee.[373]  These communications also constituted predicate violations of 18 U.S.C. §§ 1341 and 1343 and, coupled with ESIS' inclusion in the exchange noted above, reflect ESIS' knowing collusion in the Enterprise's scheme.

1007.   The Enterprise engaged in similar racketeering conduct in the case of Bridgette Sullivan, who lost control of her 2007 Cobalt in February 2011.  K&S represented New GM in this matter as well, and in a July 2011 e-mail to New GM, Palmer again discussed the "anomaly" mentioned in the Chansuthus matter.  He explains that the vehicle was in "accessory" mode, and that the profile of the crash fit the pattern of the "anomaly" that New GM engineers identified in

---

[373] HIGHLY CONFIDENTIAL DOC: GM-MDL2453-00061149.

Cobalts—that the car was traversing rough terrain, the bounce likely caused the ignition switch to slip from "run" to "accessory" mode, and the airbag did not deploy.[374]

1008.   The Enterprise made every effort to settle this case, too.  In an April 20, 2012 e-mail, Palmer explained that she had communicated with Rigdon about the Sullivan settlement offer and had urged K&S to seek the necessary court approval of the minor settlement, because she did "not want this one to come back somewhere down the line."[375]

1009.   The court rejected the original settlement for $8,000, however, and in an April 5, 2013 e-mail, K&S's Franklin explained to Palmer that "the fact that the vehicle was in accessory mode provides a[] . . . compelling defect theory . . . that could provide fertile ground for laying a foundation for a punitives award."  In his e-mail, Franklin recommended increasing the settlement offer in furtherance of the scheme to conceal the scope of the defect and quell public disclosure of information regarding the defect.[376]  The interstate communications regarding this claim, including the e-mails referenced above, also constitute predicate violations of 18 U.S.C. §§ 1341 and 1343, and reflect K&S's knowing collusion in the Enterprise's scheme.

1010.   The Enterprise continued its pattern of racketeering activity in the handling of the case of Brooke Melton.  As in the matters of Chansuthus, Sullivan, and others, New GM's outside counsel—here, K&S—recommended New GM seek early settlement of a suspected Delta Ignition Switch Defect claim to minimize the exposure that would be created if the defect were publicly disclosed.  In a February 24, 2012 communication sent via U.S. Mail and e-mail, K&S attorney Franklin explained to New GM attorney Ronald Porter:

---

[374] HIGHLY CONFIDENTIAL DOC: GM-MDL2453-00345366.

[375] HIGHLY CONFIDENTIAL DOC: GM-MDL2453-400258799.

[376] HIGHLY CONFIDENTIAL DOC: GM-MDL2453-000662287.

> [T]hat a jury will almost certainly conclude that the Cobalt's
> ignition switch is defective and unreasonably dangerous because
> the torque effort required to move the key from the run to
> accessory is too low, which leads to inadvertent key movement and
> the engine shutting off with little to no warning.[377]

1011.   Franklin further explained that "the phenomena was identified almost

immediately after the 2005 Cobalt went into production" and "the issue was assessed internally"

in 2005 and "more recently" in connection with non-deployment incidents in 2005-2007 Cobalts.

Given the above, Franklin advised Palmer to "talk settlement sooner rather than later" before the

"thorough" plaintiff's attorney could develop all the facts of the case.[378]   This communication,

too, was sent interstate via the mails and wires in furtherance of the fraudulent scheme and in

violation of 18 U.S.C. §§ 1341 and 1343.

1012.   In an April 18, 2012 memorandum, K&S again warned New GM of the

possibility of punitive damages:

> It will be difficult to explain why the ignition switch toggled to the
> Accessory Mode simply from running off-road.  GM will also be
> forced to contend with other incidents, some of which resulted in
> deaths, due to the non-deployment of the frontal airbags in the
> 2005-2007 Cobalt.  Those other incidents put GM at risk for
> imposition of punitive damages in West Virginia.[379]

1013.   New GM, K&S, and ESIS, in April 2012, in connection with an accident

involving Tonya Lambert, were aware that New GM engineers had concluded that the airbags in

a Cobalt did not deploy because the "Cobalt was in Accessory Mode, not Run Mode at the time

of impact."  Or as stated elsewhere in the report:

---

[377] HIGHLY CONFIDENTIAL DOC: GM-MDL2453-300002915.

[378] HIGHLY CONFIDENTIAL DOC: *Id.*

[379] HIGHLY CONFIDENTIAL DOC: GM-MDL2453-000669092.

- 520 -

> Since the Cobalt was in the Accessory Mode, instead of Run Mode at the time of the crash, the algorithm that the SDM runs to determine whether to deploy the airbags was disabled.  Therefore, the SDM was incapable of deploying the airbags, regardless of the severity of the impact.[380]

> Regardless of whether the impact was above the all-fire threshold or not, neither the frontal, nor side impact airbags could deploy because the Cobalt was in Accessory Mode, not Run Mode, at the time of impact.[381]

1014.   The foregoing paragraphs demonstrate that New GM, New GM's legal staff, and K&S knew, but concealed, that in many of the crashes, where the crash recorder indicated that the ignition switches were in the "run" position, they were actually in "accessory."  By concealing these findings, New GM, K&S, and ESIS hid from crash victims the fact that their vehicles' ignition switches were in the "accessory" position at the time of the accident:

> The big anomaly was why we had some non-deploys with the SDM recording run position and some that were recorded as accessory.  That was confounding for a long time but ultimately it was concluded that in all these events the ignition was actually in accessory position but due to the timing the sampling of data by the SDM some were recorded as the run position because that was the data available to the SDM.  I don't think that was ever proven experimentally but Subbaiah and the in house engineers were confident of the analysis.[382]

1015.   This ongoing concealment helped continue to hide the Delta Ignition Switch Defect from discovery.

1016.   In preparing discovery responses in crash cases, and in deciding to conceal material information by omitting it from production, Enterprise members sent various interstate

---

[380] *Id.* at 000669092.008.

[381] *Id.* at 000669092.002.

[382] GM-MDL2543-000775889.  "Subbaiah" is New GM's outside consultant, Subbaiah Malladi.

communications to each other which furthered the fraudulent scheme and violated 18 U.S.C. §§ 1341 and 1343.  For example, in a December 2012 e-mail exchange between Michigan-based GM attorneys Anneke Shepherd and Ronald Porter and Georgia-based K&S attorney Harold Franklin, the lawyers discuss whether to produce a Field Performance Evaluation ("FPE") related to airbag non-deployment.  Notwithstanding New GM and K&S's knowledge that the airbag non-deployments at issue in the FPE were directly related to the ignition switch issue addressed by the Technical Service Bulletin, Franklin ultimately opined that he was "comfortable with excluding" the FPE from production.[383]

### 4.    ESIS' awareness of the defect in numerous incidents.

1017.   ESIS was in a central position to receive evidence of the airbag non-deployment issue and communicate these facts to New GM and, on occasion, K&S and the other unnamed law firms.  A "Discovery Review Report for 2005-2010 Chevrolet Cobalts" reveals communications of airbag non-deployment regarding:

- An August 2006 incident with a 2005 Cobalt (settled).

- A February 21, 2007 incident with a 2005 Cobalt where K&S was counsel (settled).

- An April 27, 2007 incident in a 2006 Cobalt (settled).

- A December 29, 2006 incident in a 2005 Cobalt (settled).

- A September 9, 2007 incident in a 2007 Cobalt (discussed).

- A June 13, 2008 incident in a 2008 Cobalt (settled).

- A December 13, 2009 incident in a 2005 Cobalt (settled).

- A July 9, 2010 incident in a 2005 Cobalt (settled).

---

[383] HIGHLY CONFIDENTIAL DOC: GM-MDL2453-400253332.

- An April 15, 2012 incident in a 2005 Cobalt (settled).

- A September 26, 2010 incident in a 2006 Cobalt (settled).

1018.  In each of these cases, ESIS used the wire communications and the mails to communicate with New GM employees, including Jaclyn Palmer, John T. Sprague, and Hamed Sadrina.

1019.  K&S attorneys regularly used the wires to communicate with ESIS regarding the Delta Ignition Switch Defect.  An example is an August 21, 2013 e-mail between New GM attorneys Palmer and Porter concerning ESIS data showing a vehicle in an accident was in "accessory" mode at the time of the accident.  The vehicle was a 2005 Cobalt and the airbags did not deploy.  ESIS conducted an investigation of "non-deployment of the driver's frontal airbags," and in doing so used the wires and mails to communicate with New GM and K&S.

1020.  At the time of this exchange, ESIS and K&S knew of the Delta Ignition Switch Defect and had been exchanging information on the Melton matter as early as March 4, 2011.

**5.  New GM and K&S lied to the Meltons and the court to prevent disclosure of evidence relating to the Delta Ignition Switch Defect in other vehicles.**

**a.  The parents of Jennifer Brooke Melton sought discovery from New GM regarding the Delta Ignition Switch Defect that killed their daughter.**

1021.  After a post-crash inspection revealed that Ms. Melton's ignition switch was in the "accessory" position, the Meltons sought discovery about the defect identified in a Technical Service Bulletin.  On September 13, 2012, the Melton plaintiffs served their Second Set of Interrogatories and their Second Request for Production of Documents.[384]  The *Melton* Requests

---

[384] *See* GM-MDL2543-000728812 (Plaintiffs' Second Set of Interrogatories to Defendant General Motors LLC); GM-MDL2543-000936810 (Plaintiffs' Second Request for Production of Documents to Defendant General Motors LLC) (together, the "*Melton* Requests").

sought, *inter alia*:  (a) all documents relating to the Technical Service Bulletin; (b) all documents

relating to "other similar incidents, being identified as incidents which allegedly occurred as a

result of the defective conditions identified in the Technical Service Bulletin" (*id*. at RFP No. 6);

(c) the identity of, and all documents relating to, "every lawsuit, claim, or complaint that has

been made against GM relating to the Technical Service Bulletin"; and (d) "[a]ll documents and

materials relating to the design and testing of the ignition switch and key cylinder" in the

affected vehicles (*id*. at RFP No. 9).

> **b.   New GM and K&S knew that airbag non-deployment in Cobalts was related to the condition identified in the Technical Service Bulletin.**

1022.   By September 2012 (when they received the *Melton* Requests) New GM and

K&S knew that the condition identified in the Technical Service Bulletin explained airbag non-

deployment in incidents where the ignition had moved from "run" to "accessory."

1023.   On March 29, 2012, Ms. Palmer received the Technical Service Bulletin from

New GM engineer John Sprague.[385]  Ms. Palmer forwarded the Technical Service Bulletin to

Mr. Porter, who forwarded the Technical Service Bulletin to K&S attorney Mr. Franklin as an

"FYI on Melton."[386]

1024.   In an April 2012 case evaluation, New GM's outside counsel, Eckert Seamans

Cherin & Mellott, LLC, wrote that the front airbags could not deploy because the "Cobalt was in

Accessory Mode, not Run Mode, at the time of impact."[387]  New GM's counsel explicitly

referenced the Technical Service Bulletin as "address[ing] a similar problem as that seen in the

field where the key in the ignition switch in the 2005 Cobalt could toggle from the Run mode to

---

[385] GM-MDL2543-400025369.

[386] *Id*.  Mr. Franklin was also still representing New GM in connection with the Sullivan NISM at this time.

[387] *Id*. at .001.

the Accessory mode by traveling off-road or over rough terrain."[388]  Ms. Palmer, the New GM

in-house attorney responsible for the Lambert (and Chansuthus and Sullivan) matters discussed

the Technical Service Bulletin with the Settlement Roundtable Committee during the

committee's April 2012 consideration of a possible Lambert settlement.

1025.   In May 2012, New GM engineer Brian Stouffer tested a variety of vehicles

covered by the Technical Service Bulletin to determine the torque required to move the key from

the "run" to "accessory" position.  Stouffer concluded "that the condition described in

Information Service Bulletin 05-02-007 [the Technical Service Bulletin] explains why the frontal

air bags did not deploy in crashes in which the car was in accessory mode…."

1026.   On June 12, 2012, the Lambert plaintiffs' expert, Erin Shipp, submitted a report

that relied on the Technical Service Bulletin in concluding that the airbag non-deployment was

caused by low torque of the ignition switch.[389]

1027.   On July 25, 2012, Ms. Palmer told the Settlement Roundtable Committee that the

Lambert plaintiffs' expert "attributed the frontal airbag non deployment to the ignition being in

the Accessory mode, which she relates to the service bulletin involving the potential for the

driver to inadvertently turn off the ignition by contacting a large and/or heavy key chain with the

---

[388] *Id*. at .004.  New GM's outside counsel also attached the TSB as an exhibit to its case
evaluation.  *Id*. at .021.

[389] *See* GM-MDL2543-000669158.

knee."[390]  Multiple New GM attorneys attended the Lambert Roundtable, including Ronald C.

Porter—who oversaw discovery in the Melton case.[391]

> ### c. New GM and K&S told the Meltons and the Court that New GM had no documents regarding other incidents involving the condition identified in the Technical Service Bulletin.

1028.   On January 17, 2013, K&S served New GM's supplemental responses to the

*Melton* Requests, telling the Meltons that New GM had not located any documents responsive to

the *Melton* Requests.  For example, New GM and K&S told the Meltons that New GM had no

documents or information about any "other similar incidents, being identified as incidents which

allegedly occurred as a result of the defective conditions identified in the Technical Service

Bulletin"[392] or any other "lawsuit, claim or complaint that has been made against GM relating to

the Technical Service Bulletin."[393]  K&S attorneys Philip Holladay and Harold Franklin signed

New GM's January 2013 supplemental discovery responses.[394]

---

[390] *See* GM-MDL2543-000669168.001 (Settlement Roundtable Case Summary) (noting that plaintiffs' expert "attributed the frontal airbag non deployment to the ignition being in the Accessory mode, which she relates to the service bulletin involving the potential for the driver to inadvertently turn off the ignition by contacting a large and/or heavy key chain with the knee"); *id*. at .002 (discussing the TSB).

[391] *See* GM-MDL2543-000919920 (July 24, 2012 email regarding attendees and agenda for July 25, 2012 Roundtable).

[392] Supp. RFP Resp. at .007 (New GM found no documents "relating to other similar incidents, being identified as incidents which allegedly occurred as a result of the defective conditions identified in the TSB");

[393] *Id*. at .008 (New GM found no documents in response to request seeking documents and materials "for every lawsuit, claim or complaint that has been made against GM relating to the TSB"); Rog. Resp. at .003-.004 (GM found no information or documents responsive to interrogatory seeking the identity of "every lawsuit, claim or complaint that has been made against GM wherein in was alleged that an injury or death resulted from a problem related to" the TSB).

[394] GM-MDL2543-001282913.001 at .013.

- 526 -

1029.   At a February 7, 2013 motion to compel hearing, Mr. Franklin repeatedly told the Court that New GM was "not withholding documents that are responsive."[395]  Mr. Franklin— who wrote the Chansuthus and Sullivan case evaluation letters to New GM in 2010 and 2011— also told the Court that he was personally unaware of any lawsuit or NISM "[s]ince 2005 against GM with regard to the ignition cutoff."[396]

1030.   Mr. Franklin justified New GM's refusal to produce any responsive documents on the basis that New GM had run searches for documents that yielded no results.[397]  New GM and K&S, however, had crafted the searches to omit responsive documents.  Mr. Franklin told the Court that "[w]e did search for stalling with lawsuits and 'NISMs' and there were none that came back related to this issue."  Yet a search for lawsuits alleging stalling that were related to the Technical Service Bulletin was unlikely to yield any results because  New GM purposefully omitted the word "stall" from the Technical Service Bulletin in order to downplay the safety risk associated with loss of power.  Moreover, New GM and K&S did not search for lawsuits, complaints or claims related to airbag non-deployment despite their knowledge that non-deployment was related to the condition identified in the Technical Service Bulletin.

---

[395] GM-MDL2543-300044406 at 300044441; *see also id.* at 300044445-46 ("And so, Your Honor, again, it's not as if we got documents and decided not to produce them.").

[396] *Id.* at 300044471.  Moreover, Mr. Franklin later led the Court to believe that he could not know whether, in fact, other similar incidents or lawsuits existed.  *Id.* at 300044472 ("Your Honor, with all due respect, I mean, I'm not all-knowing.  I'm not at GM I'm not able to query databases myself.").  But Mr. Franklin did have personal knowledge of other similar incidents or lawsuits—no database queries needed.

[397] *Id.* ("GM has, in fact, produced the documents that it—that resulted from its searches and has produced them…."); *id.* at 300044445 ("the results of those searches, nothing came back with regard to the lawsuit searches in interrogatory number one"); *id.* at 300044446 ("There were no documents that resulted from those searches and, again, in terms of the searches, you see there in GM's response what it said it would do.  We did supplement the response by making it clear that nothing came back.").

1031.   The Court criticized Mr. Franklin's and New GM's refusal to say definitively whether any similar lawsuits existed, noting that New GM's responses were "written with ambivalence and ambiguity."  The Court ruled that, rather than relying on search results, Mr. Franklin needed to speak with a knowledgeable product liability lawyer at New GM to determine whether or not responsive documents existed.  The Court further required New GM and K&S to give the Meltons unqualified answers to the discovery as written and not hide behind search-based responses or general objections.  The Court warned Mr. Franklin:

> You're going to have to say it in a supplemental response…And then be held to the answer…And if you don't answer again, there might be consequences. So you've got to find out the answer. Because you're representing to the Court that you've given every document.

1032.   On February 28, 2013, New GM and K&S sent their second supplemental responses to the *Melton* Requests.  Those responses relied—as before—on general objections and searches designed by New GM and K&S to yield incomplete results.  And although New GM expanded its searches somewhat, it still refused to search for other lawsuits, claims, and complaints related to airbag non-deployment.

### d.   K&S told one thing to the Court and the opposite to New GM on the same day.

1033.   On July 22, 2013, K&S filed its response to the *Melton* plaintiffs' motion for sanctions against it.  That same day, K&S also sent to New GM an updated *Melton* case evaluation letter.  K&S attorney Philip Holladay signed both documents.

1034.   In its response to the Court, K&S argued that New GM should not be sanctioned for refusing to produce documents related to airbag non-deployment incidents because such incidents were purportedly not relevant to the *Melton* case and not responsive to the *Melton*

Requests.  New GM and K&S represented to the Court that New GM had "adhered to the Court's instruction to expansively and broadly interpret plaintiffs' discovery requests in conducting its supplemental searches."

1035.   At the same time, in a letter to New GM, K&S recognized the relevance and responsiveness of documents regarding the airbag non-deployment incidents and investigation to the *Melton* case.  Mr. Holladay wrote:

> [T]he [Delta Ignition Switch Defect] issue was assessed internally in a series of investigations conducted as part of the Product Resolution Tracking System and ultimately addressed by issuing an Information Service Bulletin in the Fall of 2005 that provided a field service fix for customers who experienced an incident involving inadvertent key movement.  More recently, this [same] issue has surfaced again as part of an ongoing FPE investigation into why frontal air bags have not deployed in certain high-speed multiple impact frontal collisions involving 2005-2007 Chevrolet Cobalts.  In more than half of those incidents, it appears the reason that the air bag did not deploy was because the car's ignition was in the accessory rather than the run position.  While there is no allegation here that Ms. Melton's frontal air bags should have deployed, the on-going investigation ties nicely into plaintiffs' expected theme that the original Information Service Bulletin was an inadequate "band-aid fix" for a significant safety issue that should have been addressed through a recall and design change.[398]

---

[398] July 22, 2013 Melton Letter at .002-.003; *see also id.* at .026 ("the PRTS documents referenced above and the on-going FPE investigation have enabled plaintiffs' counsel to develop a record from which he can compellingly argue that GM has known about this safety defect from the time the first 2005 Cobalts rolled off the assembly line and essentially has done nothing to correct the problem for the last nine years.  He specifically will criticize GM for not doing more than implementing the field service campaign back in 2005, and point to GM's failure to take any action in the on-going FPE investigation that has now been dragging on for almost two years as proof positive of GM's conscience indifference and willful misconduct when it comes to the safety of its vehicles' occupants.").

New GM attorney Ron Porter also discussed the Cobalt airbag non-deployment incidents and investigation in his presentation of the *Melton* case to New GM's Settlement Review Committee because airbag non-deployments in Cobalts may be "linked to the ignition switch issue."[399]

  **e. New GM and K&S lied to the court and the Meltons about the relevance of the airbag non-deployment investigation documents.**

  1036. After the Meltons filed their motion to compel in December 2012, New GM and K&S discussed what documents New GM would produce.  Brian Stouffer, the New GM engineer heading the Field Performance Evaluation ("FPE") charged with assessing whether a recall was necessary, provided to Porter and K&S lawyer Anneke Shepard "file materials…relating to [Stouffer's] work with regard to the Cobalt ignition switch issues for possible production in the Melton case."[400]  Porter told Stouffer that the lawyers needed Stouffer's help in understanding the documents and their background so that New GM could "assert any privileges or other protection from discovery that GM is entitled to."[401]  Stouffer told Shepard that "[t]he airbag investigation has nothing to do with the information bulletin or the investigation that lead to the information bulletin."[402]  Franklin then determined that New GM should not produce the FPE file.[403]  By this time, however, Stouffer had already determined that the condition described in the Technical Service Bulletin was the cause of frontal airbag non-

---

[399] GM-MDL2543-000672756.001 at .002 (Aug. 8, 2013 Melton Settlement Review Committee Case Summary).

[400] GM-MDL2543-400253332 at 33.

[401] *Id.*

[402] *Id.* at 32.

[403] "If the airbag investigation was separate and distinct…from the information bulletin at issue (and the info bulletin was merely later used by the folks doing the airbag investigation (and thus included in the airbag investigation file)), I am comfortable excluding it."

deployments in crashes in which the vehicle was in the "accessory" position.[404]  And the

Technical Service Bulletin had already been "made available to in-house and outside counsel."[405]

    1037.   New GM did not produce the FPE file to the Meltons in response to their

Requests.[406]  New GM eventually agreed to produce some airbag investigation documents that

one of its experts had viewed prior to his deposition.[407]  But New GM maintained its position

that all other documents regarding New GM's airbag investigation were irrelevant to the *Melton*

case and unresponsive to the Melton Requests.[408]  New GM and K&S further hid ongoing airbag

investigation documents from discovery in *Melton* by, *inter alia*, boxing Stouffer out of meetings

relating to the investigation that *he had previously led* and hiring an expert consultant to assist

with the ongoing investigation under the guise of work on the *Melton* case in order to shield

ongoing analyses from discovery under claims of privilege.[409]

---

    [404] The Meltons' counsel told the Court:  "The results of this 2005-2006 Cobalt ignition switch testing is critical evidence.  It supports the testimony of Plaintiffs' expert witnesses that the low torque from the ignition switch on Brooke Melton's 2005 Cobalt caused her vehicle to shut off that evening, resulting in the accident and her death."

    [405] Valukas Report at pp. 166-67.

    [406] GM-MDL2543-000885044 (Jan. 31, 2013 email from Shepard to Porter and Franklin: "Please note that we are not referencing the FPE file in the response to this motion [to compel] because our position is that the file is not responsive to plaintiffs' requests. . . .").

    [407] *Id*. at 89-90.

    [408] *Id*. at 55-57.

    [409] GM-MDL2543-002288948 at 50 (May 2, 2013 calendar invitation for a May 3, 2013 meeting about "Cobalt Airbag Non-deployments" that includes Stouffer as a required attendee); GM-MDL2543-000770767.001 (May 3, 2013 email from Porter to GM lawyer Jennifer Sevigny stating that the invite list for the May 3, 2013 Cobalt airbag non-deployment meeting "is going to be pared to Kemp, me, Hollady, Subbaiah [Malladi], Gay and you" because "[w]e are very focused on maintaining work product protection for Subbaiah's work and because, discovery in Melton is ongoing, wanted to keep the numbers with knowledge limited"); Valukas Report at 197-98 ("Porter recalled Kemp contacting him in April (when Porter was preparing Stouffer for his deposition in the [Melton] case), and telling Porter that FPE wanted to hire Malladi, but that Kemp and Porter ultimately agreed to hire Malladi under the auspices of the [Melton] case to shield Malladi's analyses under the work product doctrine."); *id*. at 196 (although the FPE team

---

**f.    K&S expected the *Melton* court to sanction New GM for discovery abuse.**

1038.   The *Melton* court scheduled a hearing on the Meltons' sanctions motion for September 16, 2013.  K&S "suspect[ed] Judge Tanksley will go into the September 16th hearing inclined to grant plaintiffs some relief."  New GM settled the *Melton I* case before the sanctions motion hearing.[410]

**6.    New GM and K&S committed other fraudulent litigation misconduct to hide evidence of the Delta Ignition Switch Defect.**

1039.   By the end of the April 29, 2013 deposition of Old and New GM engineer Ray DeGeorgio, New GM and K&S knew that the ignition switch had been changed between 2005 and 2008.[411]  Within days of the DeGeorgio deposition, New GM and K&S hired expert Subbaiah Malladi to assist with New GM's ongoing investigation.[412]

1040.   Thereafter, the Meltons served their Fifth Request for Production of Documents, which sought, *inter alia*, documents relating to "GM's investigation into the change in the cap and spring in the 2005 Cobalt ignition switch to the cap and spring in the 2008 Cobalt ignition

---

asked Federico and Kemp to retain Malladi in February 2013 in connection with their ongoing investigation, GM did not then engage Malladi; he did not begin work until May 2013, ostensibly as part of the Melton litigation); *id*. at 201 (Porter asked Stouffer not to participate in the meeting with Malladi because Stouffer was scheduled to be deposed in the Melton litigation).

[410] New GM and K&S settled *Melton* for $5 million—the highest settlement amount that could be paid before New GM lawyers were required to inform GM's General Counsel.  Valukas Report at 207.

[411] Valukas Report at 199.  *See also* GM-MDL2543-001049338 (April 29, 2013 email from K&S attorney Holladay to GM attorney Porter:  "It has not been pretty and we need to talk. Lance has dropped a bombshell that we need to discuss and figure out how to address.").

[412] Valukas Report at 200 (three days after the DeGiorgio deposition, K&S attorney Holladay spoke with GM lawyers Porter and Kemp about hiring Malladi because "GM needed to bring the FPE investigation to closure without delay").  Eventually, Malladi merely confirmed what the Melton plaintiffs' expert had proved to GM and K&S five months earlier—the ignition switch had been changed.  Valukas Report at 209.

switch."[413]  In a June 17, 2013 response, New GM and K&S refused to produce any responsive

documents, relying on DeGiorgio's false testimony that "GM LLC did not request and was not

asked to authorize or approve a change in the cap and spring in the ignition switch used in the

2008 Chevrolet Cobalt or in replacement ignition switches for the 2005-2007 that would affect

the torque required to move the key from the run to accessory position."[414]  Just days later, on

June 21, 2013, Holladay, Porter, and Malladi discussed the need to obtain part change

documentation from New GM's part supplier Delphi in connection with New GM's ongoing

investigation.  New GM, however, waited to confirm the part change with Delphi until October

2013—five months after the "bombshell" deposition and after New GM settled the *Melton*

case.[415]  New GM and K&S also refused to produce responsive documents under the guise of the

attorney-client and/or work product privileges—all according to New GM's and K&S's plan to

thwart the Meltons' discovery of New GM's investigation documents and to continue to conceal

the Delta Ignition Switch Defect and its tragic consequences.

> **7.    K&S also worked for New GM in connection with the Delta Ignition Switch recall and the "investigation" of the reasons for the delay.**

1041.  K&S continued to represent New GM in connection with the Delta Ignition

Switch Defect even after each of the product liability matters K&S handled for New GM had

settled.  For example:  (a) K&S attorney Holladay continued to be involved in New GM's

---

[413] GM-MDL2543-400151182 at 83.

[414] *Id*. at 84.

[415] New GM settled the *Melton* case on September 9, 2013.  GM engineer Stouffer did not ask Delphi for part change documents until October 23, 2013.  Valukas Report at 208.  "On October 29, 2013, after dialogue with the supplier, New GM was provided with supplier records showing that changes had in fact been made to the detent plunger and spring late in the 2006 calendar year.  Those changes increased the switch's torque performance."  GM-MDL2543-000862203 at 2209 (GM's Feb. 24, 2014 updated Part 573 letter to NHTSA).

- 533 -

investigation of the defect after *Melton* settled, including Malladi's investigation;[416] (b) K&S attorney Holladay counseled New GM with respect to the Delta Ignition Switch recall, and his work included drafting communications to NHTSA and the public; (c) other K&S attorneys also represented New GM in connection with recall communications with NHTSA and responses to requests from governmental agencies;[417] and (d) K&S attorneys interviewed a number of witnesses in connection with the preparation of the Valukas Report.[418]

1042.   The above are but examples of how the Enterprise Members furthered the scheme to conceal the nature and scope of all the defects and suppressed and withheld information from litigants, courts, claimants, and the public.

1043.   ESIS was equally as instrumental in this arm of the Enterprise's scheme to conceal the true nature and scope of all the defects.  As described above, ESIS was charged with handling, investigating, and resolving claims generated through New GM's customer assistance center.  In executing those responsibilities, ESIS routinely communicated with New GM lawyers, officers, and engineers, as well as outside and out-of-state counsel—including K&S. As with the litigation matters described above, the Enterprise systematically concealed from claimants the true scope and nature of the defects, including the Delta Ignition Switch Defect, and strove to deny or settle claims in order to avoid exposing facts about the defects.

1044.   The regular communications between ESIS and the other Enterprise Members as well as the communications made with third parties regarding these claims, were made in

---

[416] Valukas Report at 197, 200.

[417] Valukas Report at 15.  Gary G. Grindler, a K&S partner in the Government Investigations Practice Group, was involved with advising New GM on legal issues "regarding ignition switch issues" as early as September 13, 2013 (almost five months before the recall).

[418] *Id.*

furtherance of the scheme to defraud and constitute predicate violations of 18 U.S.C. §§ 1341
and 1343.

**E.      New GM Conducted the Enterprise to Affirmatively Promote the Safety and
         Quality of Its Vehicles While Actively Concealing the Defects**

1045.   To further the scheme to defraud, New GM promoted and touted the safety,
reliability, and quality of its vehicles, while simultaneously, necessarily, and correspondingly
concealing the nature and scope of the defects, including the Delta Ignition Switch Defect.
These promotions, which included national advertising campaigns, advanced New GM's
objective of concealing the nature and scope of the defects, and constitute predicate violations of
18 U.S.C. §§ 1341 and 1343.

1046.   New GM further advanced its scheme to defraud through communications with its
Dealerships.  New GM communicated with its Dealership network on a daily basis, conveying
information but affirmatively concealing the nature of the defects or the need for a recall in Delta
Ignition Switch Vehicles and other Defective Vehicles.  These communications, transmitted
through interstate mailings and/or wires, furthered the fraudulent scheme in violation of 18
U.S.C. §§ 1341 and 1343.

1047.   To further the scheme to defraud, New GM used the Enterprise to routinely
conceal from litigants, claimants, regulators, and the public the true nature and scope of the
defects by, among other things, misrepresenting and failing to reveal New GM's knowledge
about the defects to claimants, litigants, and courts, and quickly and quietly settling claims
involving the defects in order to avoid exposing the facts of the claims to the public.  This
process involved regular interstate mailings and wirings between the Enterprise Members as well
as to courts, claimants, and litigants nationwide.

**F.    New GM Conducted the Enterprise to Issue Incomplete and Misleading Service Bulletins**

1048.   To further the scheme to defraud, New GM routinely issued Technical Service Bulletins to the dealers and/or letters to consumers as a stopgap half-measure designed to avoid costly recalls.

1049.   By way of example, on July 1, 2011, New GM issued a Technical Service Bulletin that had been previously issued by Old GM to include new vehicle and model years.  In the Technical Service Bulletin, New GM blatantly concealed and misrepresented the true scope and nature of the Delta Ignition Switch Defect, by, among other things, omitting the word "stall" to obscure safety concerns and avoid regulatory attention, as well as disseminating false and misleading information about the condition of the defective vehicles and the potential fix.  The fraudulent Technical Service Bulletin was issued in furtherance of the Enterprise's fraudulent scheme and was sent across state lines via the mail and/or wires, including through New GM's GlobalConnect website.

1050.   New GM further misused the Technical Service Bulletin process to conceal the nature and scope of other defects as well.  For example, in May 2012, New GM issued a Technical Service Bulletin identifying customer complaints about the Power Steering Defect.  By at least September 2011, New GM had received almost 3,500 complaints regarding sudden loss of power steering in 2004-2007 Ions.  After NHTSA initiated an inquiry into the Power Steering Defect in the 2004-2007 Ions, New GM engineer Terry Woychowski informed current CEO Mary Barra—then head of product development—that there was a serious power steering issue in Saturn Ions, and that it may be the same power steering issue that plagued the Chevy Cobalt and Pontiac G5.

1051.   Instead of recalling the vehicles, New GM issued the fraudulent Technical Service Bulletin as a stopgap measure to conceal the true nature and scope of the power steering defect. This Technical Service Bulletin, like many others, was issued in furtherance of the Enterprise's fraudulent scheme and was communicated via the mail and/or wires, including through New GM's GlobalConnect website, in violation of §§ 1341 and 1343.

**G.    New GM Conducted the Enterprise to Submit Incomplete and Misleading Reports to Regulators in Order to Conceal the Defects from the Regulators, the Public, and the Nationwide Class**

1052.   As part of its obligations under the TREAD act, New GM was required to submit to NHTSA monthly and quarterly reports regarding potential safety defects and incidents and complaints involving potential safety defects.  To further the scheme to defraud, and in order to escape investigation and costs associated with recalls, New GM systematically underreported and omitted relevant information about the nature of the defects and the number of defect-related incidents and complaints from these reports, which New GM transmitted or caused to be transmitted from its offices in Michigan to federal regulators in Washington, D.C.

1053.   To further the scheme to defraud, New GM continued to conceal the true nature and scope of the defects through the recalls and beyond.  Even as New GM began to recall the Delta Ignition Switch Vehicles, the recalls were incomplete (in that they were under-inclusive, based on New GM's knowledge) and offered inadequate and ineffective remedies.

1054.   The concealment of the dangerous and defective condition of the Defective Vehicles, and corresponding misrepresentations about safety and reliability, are the core purposes of the underlying racketeering offense.  The Enterprise had an ascertainable structure by which New GM operated and managed the association-in-fact by using its Dealers to concoct, obfuscate, carry out, and attempt to justify the fraudulent scheme described herein.

1055.   The predicate acts constituted a variety of unlawful activities, each conducted in furtherance of the Enterprise and with the common purpose of defrauding Plaintiffs and other Class Members and obtaining significant funds while providing Defective Vehicles worth significantly less than the purchase price paid by customers (as relates to purchases after New GM came into existence), and/or avoiding the costs of recalls and brand diminution.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were part of a pattern of conduct and not isolated events.

1056.   The predicate acts all had the purpose of generating significant revenue and profits for New GM at the expense of Plaintiffs and the Class Members, who were never informed of the defects in their vehicles or that New GM vehicles and Certified Pre-Owned vehicles were not safe and reliable as a general matter.  The predicate acts were committed or caused to be committed by New GM, through its participation in the RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and all other Class Members' funds (as to purchases or leases after New GM came into being) and avoiding the expenses associated with remediating the defects during the entire time period from New GM's inception until the end of the Class Period.

1057.   The conduct of New GM and the Enterprise Members in furtherance of this scheme was intentional.  Plaintiffs and Class Members were harmed by New GM's conduct in the Enterprise and, as a result, purchased or leased dangerous Defective Vehicles after New GM was created for significantly more money than they would have paid absent the scheme to defraud, and/or remained in possession of vehicles of diminished value that New GM otherwise would have repaired or replaced, and/or sold Defective Vehicles after the (belated and

inadequate) revelations of defects for a loss.  New GM unfairly reaped millions of dollars in excessive sales revenue as a result of this scheme and its conduct in furtherance of this scheme.

**H.    The Members of the Nationwide Class Suffered Injuries and Damage to Their Business and Property by Reason of New GM's RICO Violations.**

1058.   Plaintiffs and the Nationwide Class were damaged and injured in their business and property by reason of New GM's conduct in violation of RICO in at least the following ways:

a.    Plaintiffs and Class Members who purchased or leased their Defective Vehicles after New GM's creation were fraudulently induced into making those transactions and/or paying more than they otherwise would have had the defects been revealed; and/or continued driving vehicles they would not have but for the RICO violations.

b.    Plaintiffs and Class Members who sold a Defective Vehicle after the revelation of the defects were injured by the low sale price relative to what the car would be worth in the absence of New GM's fraudulent scheme.

c.    Plaintiffs and Class Members who owned Defective Vehicles after New GM's creation remained in possession of vehicles of diminished value.

d.    Plaintiffs and Class Members who owned Defective Vehicles remained in possession of vehicles of diminished value which New GM would otherwise have been compelled to fix or replace.

e.    Plaintiffs and Class Members whose vehicles were recalled in 2014 incurred expense and loss in connection with their efforts to implement the

2014 recall corrections and/or eliminate or reduce the risks and costs to which

their vehicles  and parts have exposed them.

1059.   By reason of the foregoing, New GM, through its managerial officials, has

unlawfully, knowingly, and willfully conducted and participated directly or indirectly in the

foregoing Enterprise through a pattern of racketeering activity in violation or attempted violation

of 18 U.S.C. § 1962(c).

1060.   These violations of 18 U.S.C. § 1962(c) by New GM have directly and

proximately caused Plaintiffs' and Class Members' injuries and damage set forth above.

Plaintiffs and Class Members are entitled to bring this action for three times their actual

damages, equitable relief, and their costs and reasonable attorneys' fees, in conducting this

litigation at trial and on appeal pursuant to 18 U.S.C. § 1964(c).

## B.     MULTI-STATE CLAIMS

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. § 2301, *et seq.*

1061.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

1062.   Plaintiffs bring this Count on behalf of all persons who are members of (i) the

Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low

Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-

to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag

Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect

Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, the "Magnuson-Moss Subclass").

1063. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

1064. The Defective Vehicles sold as new or New GM Certified Pre-Owned vehicles on or after July 10, 2009 (hereinafter, in this Count, "Defective Vehicles") are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

1065. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

1066. New GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

1067. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

1068. New GM provided Plaintiffs with an implied warranty of merchantability in connection with the purchase or lease of their vehicles on or after July 10, 2009, that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, New GM warranted that the Defective Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

1069. New GM breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the

- 541 -

Defective Ignition Switch Vehicles share common design defects in that they are equipped with defective ignition switch systems that can suddenly fail during normal operation, leaving occupants of the Defective Ignition Switch Vehicles vulnerable to crashes, serious injury, and death. New GM has admitted that the Defective Ignition Switch Vehicles are defective in issuing its recalls, but the recalls are insufficient to address each of the defects. In addition, the Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death. And the Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

1070.   In its capacity as a warrantor, New GM had knowledge of the inherent defects in the Defective Vehicles. Any effort by New GM to limit the implied warranties in a manner that would exclude coverage of the Defective Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Old GM is null and void.

1071.   Any limitations New GM might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between New GM and Plaintiffs, as, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from New GM.

1072.   Any limitations New GM might seek to impose on its warranties are substantively unconscionable. New GM knew that the Defective Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. New GM failed to disclose these

- 542 -

defects to Plaintiffs.  Thus, New GM's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

1073.   Plaintiffs have had sufficient direct dealings with either New GM or its agents (dealerships) to establish privity of contract between New GM and Plaintiffs.  Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between New GM and its dealers, and specifically, of New GM's implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit consumers.  Finally, privity is also not required because the Defective Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

1074.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give New GM notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

1075.   Plaintiffs would suffer economic hardship if they returned their Defective Vehicles but did not receive the return of all payments made by them.  Because New GM is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs have not re-accepted their Defective Vehicles by retaining them.

1076.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs, individually and on behalf of all other Magnuson-Moss Subclass members, seek all damages

permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.  In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Magnuson-Moss Subclass members in connection with the commencement and prosecution of this action.

1077.   Further, Plaintiffs and the Magnuson-Moss Subclass are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1).  Based on New GM's continuing failures to fix the known dangerous defects, Plaintiffs seek a declaration that New GM has not adequately implemented its recall commitments and requirements and general commitments to fix its failed processes, and injunctive relief in the form of judicial supervision over the recall process is warranted. Plaintiffs also seek the establishment of a New GM-funded program for Plaintiffs and Magnuson-Moss Subclass members to recover out of pocket costs incurred in attempting to rectify the defects in their vehicles.

<div align="center">

**COUNT II**
**SUCCESSOR LIABILITY CLAIM FOR VIOLATION**
**OF THE MAGNUSON-MOSS WARRANTY ACT**
**15 U.S.C. § 2301, *et seq.***

</div>

1078.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1079.   Plaintiffs bring this Count on behalf of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (the "Subclass," for the purposes of this Count only).

<div align="center">

- 544 -

</div>

1080.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

1081.   The Delta Ignition Switch Vehicles manufactured and sold by Old GM on or before July 9, 2009, are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

1082.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).  They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

1083.   Old  GM was a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

1084.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

1085.   Old GM provided Plaintiffs with an implied warranty of merchantability in connection with the purchase or lease of its vehicles on or before July 9, 2009, that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).  As a part of the implied warranty of merchantability, Old  GM warranted that the Delta Ignition Switch Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

1086.   Old GM breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs and the Subclass pursuant to 15 U.S.C. § 2310(d)(1).  Without limitation, the Delta Ignition Switch Vehicles were equipped with defective ignition switch systems that can suddenly fail during normal operation, causing sudden stalling, the loss of

power steering and power brakes, and rendering the airbags inoperable.  The occupants of the Delta Ignition Switch Vehicles were therefore vulnerable to crashes, serious injury, and death. New GM (the successor to Old GM) admitted that the Delta Ignition Switch Vehicles are defective in issuing its recalls, but the recalls are insufficient to address the defects.

1087.   In its capacity as a warrantor, Old GM had knowledge of the inherent defects in the Delta Ignition Switch Vehicles.  Any effort by New GM (in its capacity as successor to Old GM) to limit the implied warranties in a manner that would exclude coverage of the Delta Ignition Switch Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Delta Ignition Switch Vehicles is null and void.

1088.   Any limitations New GM might seek to impose on Old GM's warranties are procedurally unconscionable.  There was unequal bargaining power between Old GM and Plaintiffs and the other Subclass members, as, at the time of purchase and lease, Plaintiffs and the other Subclass Members had no other options for purchasing warranty coverage other than directly from New GM.

1089.   Any limitations New GM might seek to impose on Old GM's warranties are substantively unconscionable.  Old GM knew that the Delta Ignition Switch Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. Old GM failed to disclose these defects to Plaintiffs and the other Subclass members.  Thus, any enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

1090.   Plaintiffs and each of the other Subclass members have had sufficient direct dealings with either Old GM or its agents (dealerships) to establish privity of contract between Old GM, on the one hand, and Plaintiffs and each of the other Subclass members, on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Subclass

- 546 -

members are intended third-party beneficiaries of contracts between Old GM and its dealers, and specifically, of Old GM's implied warranties. The dealers were not intended to be the ultimate consumers of the Delta Ignition Switch Vehicles and have no rights under the warranty agreements provided with the Delta Ignition Switch Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Delta Ignition Switch Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

1091.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give New GM notice and an opportunity to cure (in its capacity as successor to Old GM) until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

1092.   Plaintiffs and the other Subclass members would suffer economic hardship if they returned their Delta Ignition Switch Vehicles but did not receive the return of all payments made by them. Because New GM (in its capacity as successor to Old GM) is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Subclass members have not re-accepted their Defective Vehicles by retaining them.

1093.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Subclass members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Subclass members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees

based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Subclass members in connection with the commencement and prosecution of this action.

1094.   Further, Plaintiffs and the Subclass are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1).  Based on New GM's continuing failures to fix the known dangerous defects (in its capacity as successor to Old GM), Plaintiffs seek a declaration that New GM has not adequately implemented its recall commitments and requirements and general commitments to fix its failed processes, and injunctive relief in the form of judicial supervision over the recall process is warranted.  Plaintiffs also seek the establishment of a New GM-funded program for Plaintiffs and Subclass Members to recover out of pocket costs incurred in attempting to rectify the defects in their vehicles.

## C.   STATE LAW CLAIMS

### ALABAMA

### COUNT I

### VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT
#### (ALA. CODE § 8-19-1, *et seq.*)

1095.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1096.   This claim is brought on behalf of Alabama residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1097.   Plaintiffs are "consumers" within the meaning of ALA. CODE § 8-19-3(2).

1098.   Plaintiffs and New GM are "persons" within the meaning of ALA. CODE § 8-19-3(5).

1099.   The Defective Vehicles are "goods" within the meaning of ALA. CODE § 8-19-3(3).

1100.   New GM was and is engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

1101.   The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including:  "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."  ALA. CODE § 8-19-5.  By concealing the defects in the Defective Vehicles and promoting the safety of New GM vehicles, New GM engaged in deceptive business practices prohibited by the Alabama DTPA, including:  representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard, quality, and grade when they are not; advertising Defective Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving a Defective Vehicle has been supplied in accordance with a previous representation when it has not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the

defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process. All of these defective processes would be material to a reasonable consumer.

1102. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles on or after July 10, 2009.

1103. From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above. New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

1104. By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Alabama DTPA.

1105. In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1106.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

1107.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

1108.   New GM knew or should have known that its conduct violated the Alabama DTPA.

1109.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

1110.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

> a.    Possessed exclusive knowledge about the defects in the Defective Vehicles;
>
> b.    Intentionally concealed the foregoing from Plaintiffs;
>
> c.    Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1111.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

1112.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the deadly ignition switch defect, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

1113.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1114.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

1115.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Delta Ignition Switch Vehicles had they been aware of New GM's misconduct.  By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Alabama DTPA—regardless of when those owners acquired their vehicles.

1116.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta

Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

1117.   As a direct and proximate result of New GM's violations of the Alabama DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

1118.   Pursuant to ALA. CODE § 8-19-10, Plaintiffs seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff.

1119.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under ALA. CODE § 8-19-1, *et seq.*

1120.   On October 8, 2014, certain Plaintiffs sent a letter complying with ALA. CODE § 8-19-10(e).  Because New GM failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

## COUNT II

## FRAUD BY CONCEALMENT

1121.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1122.   This claim is brought on behalf of Alabama residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

- 553 -

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs"). The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1123.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

1124.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

1125.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

1126.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

1127.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing, or already owned were safe, and to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

1128.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs. New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in

- 554 -

the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to

disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all

of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

implementing regulations, including the duty to promptly notify consumers of known safety

defects.

1129.   New GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM

money, and it did so at the expense of Plaintiffs.

1130.   On information and belief, New GM has still not made full and adequate

disclosure and continues to defraud Plaintiffs and conceal material information regarding defects

that exist in the Defective Vehicles.

1131.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Defective Vehicles manufactured by New GM; and/or would not have

continued to own and drive their Old GM Defective Vehicles or would have taken other

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the

material facts and such facts were not known to the public, including Plaintiffs.  The Defective

1132.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their

bargain since the Defective Vehicles were worth less than they would have been without the

defects, and because they own vehicles that diminished in value as a result of New GM's

concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as

alleged above.  Had they been aware of the concealed defects that existed in the Defective

- 555 -

Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

1133.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

1134.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT III**

**FRAUD BY CONCEALMENT OF THE RIGHT
TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY**

</div>

1135.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1136.   This claim is brought only on behalf of Alabama residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

1137.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1138.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required

<div align="center">- 556 -</div>

… to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

1139.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

1140.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1141.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

1142.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1143.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1144.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1145.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1146.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1147.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

1148.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

1149.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

1150.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute

additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

1151.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1152.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

1153.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1154.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1155. Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

1156. New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT IV**

**UNJUST ENRICHMENT**

</div>

1157. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1158. This claim is brought on behalf of Alabama residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs"). The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1159. This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

1160. New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

1161.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

1162.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

1163.   Thus, all Plaintiffs conferred a benefit on New GM.

1164.   It is inequitable for New GM to retain these benefits.

1165.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

1166.   New GM knowingly accepted the benefits of its unjust conduct.

1167.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT V

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT
### (ALS. CODE § 8-10-1, *et seq.*)

1168.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1169.   This claim is brought on behalf of Alabama residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1170.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1171.   Old GM and Plaintiffs are "persons" within the meaning of ALA. CODE § 8-19-3(5).

1172.   Plaintiffs are "consumers" within the meaning of ALA. CODE § 8-19-3(2).

1173.   The Delta Ignition Switch Vehicles sold by Old GM are "goods" within the meaning of ALA. CODE § 8-19-3(3).

1174.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce within the meaning of ALA. CODE § 8-19-3(8).

1175.   The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including:  "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."  ALA. CODE § 8-19-5.  By concealing the defects in the Delta Ignition Switch Vehicles and promoting the safety of Old GM vehicles, Old GM engaged in deceptive business practices prohibited by the Alabama DTPA, including:  representing that the vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the vehicles are of a particular standard, quality, and grade when they are not; advertising the vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction

- 562 -

involving a Delta Ignition Switch Vehicle has been supplied in accordance with a previous representation when it has not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce.

1176.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1177.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

1178.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Alabama DTPA.

1179.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1180.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

1181.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

1182.   Old GM knew or should have known that its conduct violated the Alabama DTPA.

1183.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1184.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

> a.   Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>
> c.   Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1185.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1186.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1187.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.

1188.   As a direct and proximate result of Old GM's violations of the Alabama DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.  Plaintiffs also incurred repair costs, as alleged above.

1189.   Pursuant to ALA. CODE § 13-19-10, Plaintiffs seek monetary relief against New GM (as the successor to Old GM), measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each of the Plaintiffs.

1190.   Certain Plaintiffs sent a letter complying with ALA. CODE § 8-19-10(e).  Because New GM failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

## COUNT VI

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

1191.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1192.   This claim is brought on behalf of Alabama residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1193.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1194.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

1195.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

1196.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

1197.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

1198.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

1199.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

1200.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

1201.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1202.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

1203.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

1204.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

# ALASKA

## COUNT I

### VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### (ALASKA STAT. ANN. § 45.50.471, *et seq.*)

1205.   Plaintiffs realleges and incorporate by reference all paragraphs as though fully set forth herein.

1206.   This claim is brought on behalf of Alaska residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").   The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1207.   The Alaska Unfair Trade Practices And Consumer Protection Act ("Alaska CPA") declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including:  "(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(8) advertising goods or services with intent not to sell them as advertised;" or  "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services

whether or not a person has in fact been misled, deceived or damaged." ALASKA STAT. ANN. § 45.50.471.

1208.   New GM participated in misleading, false, or deceptive acts that violated the Alaska CPA.  By concealing the known defects in Plaintiffs' vehicles, New GM engaged in deceptive business practices prohibited by the Alaska CPA.  New GM also engaged in unlawful trade practices by representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; advertising the Defective Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Defective Vehicles.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

1209.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1210.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

1211.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

1212.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Alaska CPA.

1213.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1214.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

1215.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

1216.   New GM knew or should have known that its conduct violated the Alaska CPA.

1217.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

1218.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

    a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

    b.      Intentionally concealed the foregoing from Plaintiffs;

    c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1219.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair. Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

1220.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects. Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect. This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

1221.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1222.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Plaintiffs who purchased

New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

1223.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Alaska CPA—regardless of when those owners acquired their vehicles.

1224.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

1225.   As a direct and proximate result of New GM's violations of the Alaska CPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

1226.   Pursuant to ALASKA STAT. ANN. § 45.50.531, Plaintiffs seek monetary relief against New GM measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each Plaintiff.

1227.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices pursuant to ALASKA STAT. ANN. § 45.50.535(b)(1), attorneys' fees, and any other just and proper relief available under the Alaska CPA.

1228.   On October 8, 2014, certain Plaintiffs sent a letter complying with ALASKA STAT. ANN. § 45.50.535(b)(1).

## COUNT II

## FRAUD BY CONCEALMENT

1229.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1230.   This claim is brought on behalf of Alaska residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1231.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

1232.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

1233.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

- 573 -

1234.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

1235.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that the vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

1236.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Defective Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

1237.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

- 574 -

1238.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

1239.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1240.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

1241.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

1242.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (ALASKA STAT. § 45.02.314)

1243.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1244.   This claim is brought only on behalf of Alaska residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

1245.   New GM was a merchant with respect to motor vehicles within the meaning of ALASKA STAT. § 45.02.104(a).

1246.   Under ALASKA STAT. § 45.02.314 a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

1247.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1248.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1249.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

1250.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1251.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1252.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

## FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

1253.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1254.   This claim is brought only on behalf of Alaska residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

1255.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1256.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

1257.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

1258.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1259.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

- 578 -

1260.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1261.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1262.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1263.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1264.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1265.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness

- 579 -

bars Plaintiffs from tapping into the GUC Trust assets. The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

1266. But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

1267. Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

1268. Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

1269. New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1270. New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs. These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM. New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

- 580 -

1271.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1272.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1273.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

1274.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

1275.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1276.   This claim is brought on behalf of Alaska residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1277.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

1278.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

1279.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

1280.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

1281.   Thus, all Plaintiffs conferred a benefit on New GM.

1282.   It is inequitable for New GM to retain these benefits.

1283.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

1284.   New GM knowingly accepted the benefits of its unjust conduct.

1285.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
#### (ALASKA STAT. ANN. § 45.50.471, *et seq.*)

1286.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1287.   This claim is brought on behalf of Alaska residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1288.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1289.   The Alaska Unfair Trade Practices And Consumer Protection Act ("Alaska CPA") declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including:  "(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(8) advertising goods or services with intent not to sell them as advertised;" or  "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services

- 583 -

whether or not a person has in fact been misled, deceived or damaged." ALASKA STAT. ANN. § 45.50.471.

1290.   Old GM participated in misleading, false, or deceptive acts that violated the Alaska CPA.  By concealing the known defects in Plaintiffs' vehicles, New GM engaged in deceptive business practices prohibited by the Alaska CPA.  Old GM also engaged in unlawful trade practices by representing that the Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the vehicles are of a particular standard and quality when they are not; advertising the vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Delta Ignition Switch Vehicles.

1291.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1292.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1293.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

1294.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Alaska CPA.

1295.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1296.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

1297.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

1298.   Old GM knew or should have known that its conduct violated the Alaska CPA.

1299.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1300.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

     a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

     b.    Intentionally concealed the foregoing from Plaintiffs;

     c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

     d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1301.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of

the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1302.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1303.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

1304.   As a direct and proximate result of Old GM's violations of the Alaska CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

1305.   Pursuant to ALASKA STAT ANN. § 45.50.531, Plaintiffs seek monetary relief against New GM (as the successor of Old GM) measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $ 500 for each Plaintiff.

1306.   Plaintiffs also seek attorneys' fees, and any other just and proper relief available under the Alaska CPA.

1307.   On October 8, 2014, certain Plaintiffs sent a letter complying with ALASKA STAT ANN. § 45.50.535(b)(1).

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

1308.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1309.   This claim is brought on behalf of Alaska residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1310.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1311.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

1312.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

1313.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

1314.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

1315.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

1316.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably

- 587 -

discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

1317.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

1318.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1319.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

1320.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

1321.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (ALASKA STAT. § 45.02.3142-314)

1322.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1323.   This claim is brought on behalf of Alaska residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1324.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1325.   Old GM was a merchant with respect to motor vehicles within the meaning of ALASKA STAT. § 45.02.104(a).

1326.   Under ALASKA STAT. 45.02-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

1327.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the

Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1328.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1329.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## ARIZONA

## COUNT I

## VIOLATIONS OF THE CONSUMER FRAUD ACT
### (ARIZONA REV. STAT. § 44-1521, *et seq*.)

1330.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1331.   This claim is brought on behalf of Arizona residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1332.   New GM and Plaintiffs are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), ARIZ. REV. STAT. § 44-1521(6).

1333.   The Defective Vehicles are "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

1334.   The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."  ARIZ. REV. STAT. § 44-1522(A).

1335.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1336.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management,

and the failure to follow a proper FMEA process. All of these defective processes would be material to a reasonable consumer.

1337. From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above. New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

1338. By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Arizona CFA.

1339. In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1340. New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

1341. New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

1342. New GM knew or should have known that its conduct violated the Arizona CFA.

1343. As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

1344.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1345.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

1346.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defects.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

1347.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1348.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

1349.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Arizona CFA—regardless of when those owners acquired their vehicles.

1350.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

1351.   As a direct and proximate result of New GM's violations of the Arizona CFA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

1352.   Plaintiffs seek monetary relief against New GM in an amount to be determined at trial.  Plaintiffs also seek punitive damages because New GM engaged in aggravated and outrageous conduct with an evil mind.

1353.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

<div align="center">

**COUNT II**

**FRAUD BY CONCEALMENT**

</div>

1354.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1355.   This claim is brought on behalf of Arizona residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1356.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

1357.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

1358.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

<div align="center">

- 595 -

</div>

1359.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

1360.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

1361.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

1362.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

1363.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

1364.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1365.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

1366.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

1367.  New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT III

### FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

1368.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1369.  This claim is brought only on behalf of Arizona residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

1370.  New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1371.  As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

1372.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

1373.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1374.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

1375.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1376.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1377.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1378.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1379.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1380.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

1381.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

1382.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

1383.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

1384.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims

by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1385.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

1386.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1387.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1388.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

1389.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to

be determined according to proof.

## COUNT IV

## UNJUST ENRICHMENT

1390.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

1391.   This claim is brought on behalf of Arizona residents who are members of any of

the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition

Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count,

"Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct

of New GM.

1392.   This claim is pleaded in the alternative to any contract-based claims brought on

behalf of Plaintiffs.

1393.   New GM has received and retained a benefit from Plaintiffs and inequity has

resulted.

1394.   New GM has benefitted from selling and leasing the Defective Vehicles, for more

than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have

overpaid for the cars and been forced to pay other costs.

1395.   With respect to the Defective Vehicles purchased before New GM came into

existence that were still on the road after New GM came into existence and as to which New GM

had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs

of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

1396.   Thus, all Plaintiffs conferred a benefit on New GM.

1397.   It is inequitable for New GM to retain these benefits.

1398.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

1399.   New GM knowingly accepted the benefits of its unjust conduct.

1400.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT V

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT
#### (ARIZONA REV. STAT. § 44-1521, *et seq.*)

1401.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1402.   This claim is brought on behalf of Arizona residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1403.   New GM and Plaintiffs are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), ARIZ. REV. STAT. § 44-1521(6).

1404.   The Defective Vehicles are "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

1405.   The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment,

suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A).  By concealing the known defects in Plaintiffs' vehicles, Old GM engaged in deceptive business practices prohibited by the Arizona CFA.

1406.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1407.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1408.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

1409.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Arizona CFA.

1410.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1411.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

1412.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

1413.   Old GM knew or should have known that its conduct violated the Arizona CFA.

1414.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1415.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Plaintiffs;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1416.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1417.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1418.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of

- 605 -

the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

1419.   As a direct and proximate result of Old GM's violations of the Arizona CFA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

1420.   Plaintiffs seek monetary relief against New GM (as the successor to Old GM) in an amount to be determined at trial, as well as attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT VI

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

1421.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1422.   This claim is brought on behalf of Arizona residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1423.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1424.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

- 606 -

1425.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

1426.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

1427.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

1428.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

1429.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

1430.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

1431.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1432.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

1433.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

1434.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

# ARKANSAS

## COUNT I

### VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT
(ARK. CODE ANN. § 4-88-101, *et seq.*)

1435.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1436.   This claim is brought on behalf of Arkansas residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").   The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1437.   New GM and Plaintiffs are "persons" within the meaning of the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), ARK. CODE ANN. § 4-88-102(5).

1438.   The Defective Vehicles are "goods" within the meaning of ARK. CODE ANN. § 4-88-102(4).

1439.   The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" ARK. CODE ANN. § 4-88-107(a)(10).   The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods:  "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment,

suppression, or omission."  ARK. CODE ANN. § 4-88-108.  New GM violated the Arkansas DTPA and engaged in deceptive and unconscionable trade practices by, among other things, concealing the defects in the Defective Vehicles and otherwise engaging in activities with a tendency or capacity to deceive.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

1440.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1441.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

1442.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed

above.  New GM acquired additional information concerning the serious defects and safety

issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its

forced revelation in 2014.

1443.   By failing to disclose and by actively concealing the defects in Plaintiffs'

vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and

deceptive business practices in violation of the Arkansas DTPA.

1444.   In the course of New GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1445.   New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their

vehicles.

1446.   New GM intentionally and knowingly misrepresented material facts regarding the

Defective Vehicles with the intent to mislead Plaintiffs.

1447.   New GM knew or should have known that its conduct violated the Arkansas

DTPA.

1448.   As alleged above, New GM made material statements about the safety and

reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

1449.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Defective Vehicles because New GM:

      a.     Possessed exclusive knowledge about the defects in the
Defective Vehicles;

      b.     Intentionally concealed the foregoing from Plaintiffs;

      c.     Made incomplete representations about the safety and
reliability of the Defective Vehicles, while purposefully

withholding material facts from Plaintiffs that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1450. Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair. Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

1451. Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects. Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defects. This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

1452. New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1453. Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

1454.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Arkansas DTPA—regardless of when those owners acquired their vehicles.

1455.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

1456.   As a direct and proximate result of New GM's violations of the Arkansas DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

1457.   Plaintiffs seek monetary relief against New GM in an amount to be determined at trial.  Plaintiffs also seek punitive damages because New GM acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred.

1458.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

- 613 -

## COUNT II

## FRAUD BY CONCEALMENT

1459.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1460.   This claim is brought on behalf of Arkansas residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1461.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

1462.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

1463.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

1464.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

1465.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to

- 614 -

consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

1466.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

1467.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

1468.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

1469.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the

material facts and such facts were not known to the public, including Plaintiffs.

1470.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their

bargain since the Defective Vehicles were worth less than they would have been without the

defects, and because they own vehicles that diminished in value as a result of New GM's

concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as

alleged above.  Had they been aware of the concealed defects that existed in the Defective

Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their

vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the

time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all

Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty

and omissions with respect to the quality and safety of these vehicles.

1471.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be

proven at trial.

1472.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such

conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
#### (ARK. CODE ANN. § 4-2-314)

1473.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1474.   This claim is brought only on behalf of Arkansas residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

1475.   New GM was a merchant with respect to motor vehicles within the meaning of ARK. CODE ANN. § 4-2-104(1).

1476.   Under ARK. CODE ANN. § 4-2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

1477.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1478.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1479.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

1480.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1481.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1482.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

## NEGLIGENCE

1483.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1484.   Plaintiffs bring this Count on behalf of Arkansas residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  All claims in this Count are Independent Claims, and challenge only the conduct of New GM.

- 618 -

1485.   New GM has designed, manufactured and/ or "certified" and sold or otherwise placed in the stream of commerce Defective Vehicles as New GM or New GM Certified Pre-Owned vehicles, as set forth above.

1486.   New GM had a duty to design, manufacture, and/or "certify" only a product that would be safe for its intended and foreseeable uses and users, including the use to which its products were put by Plaintiffs.  New GM breached its duties to Plaintiffs because it was negligent in the design, development, manufacture, and testing of the Defective Vehicles it manufactured and/or sold as Certified Pre-Owned vehicles on or after July 10, 2009, and New GM is responsible for this negligence.

1487.   New GM was negligent in the design, development, manufacture, testing, and/or "certification" of the Defective Vehicles because it knew, or in the exercise of reasonable care should have known, that the vehicles equipped with defective ignition systems, defective wiring harnesses controlling side airbags and/or defective power steering pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which brakes, power steering, seatbelt pretensioners, and/or airbags are rendered inoperable.

1488.   New GM thus "failed to exercise reasonable care in the manufacture of [its Defective Vehicles]", in violation of RESTATEMENT (SECOND) OF TORTS § 395 ("A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.").

1489.   New GM further breached its duties to by supplying directly or through a third person Defective Vehicles to be used by such foreseeable persons as Plaintiffs when:

        a.      New GM knew or had reason to know that the vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

        b.      New GM failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the vehicles are likely to be dangerous.

1490.   New GM had a continuing duty to warn and instruct the intended and foreseeable users of its vehicles, including Plaintiffs, of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles. Plaintiffs were entitled to know that the vehicles, in their ordinary operation, were not reasonably safe for their intended and ordinary purposes and uses.

1491.   Pursuant to its ongoing relationship with owners and lessees of Old GM Defective Vehicles, New GM also had a duty to warn those Plaintiffs of the defects, and inform these Plaintiffs that their vehicles, in their ordinary operation, were not reasonably safe for their intended purposes.

1492.   New GM knew or should have known of the defects described herein.  New GM breached its duty to Plaintiffs because it failed to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles.

1493.   As a direct and proximate result of New GM's negligence, Plaintiffs suffered damages, including overpayment at the time of purchase, diminished value, and cost of repair.

## COUNT V

## FRAUD BY CONCEALMENT OF THE RIGHT
## TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

1494.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1495.   This claim is brought only on behalf of Arkansas residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

1496.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1497.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

1498.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

1499.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1500.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

1501.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1502.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1503.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1504.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1505.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1506.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

1507.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

1508.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

1509.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

1510.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1511.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

1512.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1513.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1514.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

1515.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VI

## UNJUST ENRICHMENT

1516.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1517.   This claim is brought on behalf of Arkansas residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").   The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1518.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

1519.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

1520.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

1521.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

1522.   Thus, all Plaintiffs conferred a benefit on New GM.

1523.   It is inequitable for New GM to retain these benefits.

1524.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

1525.   New GM knowingly accepted the benefits of its unjust conduct.

1526.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

<div align="center">

**COUNT VII**

**SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF
THE DECEPTIVE TRADE PRACTICE ACT
(ARK. CODE ANN. § 4-88-101, *ET SEQ.*)**

</div>

1527.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1528.   This claim is brought on behalf of Arkansas residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1529.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1530.   Old GM and Plaintiffs are "persons" within the meaning of the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), ARK. CODE ANN. § 4-88-102(5).

1531.   The Delta Ignition Switch Vehicles are "goods" within the meaning of ARK. CODE ANN. § 4-88-102(4).

<div align="center">

- 626 -

</div>

1532.   The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" ARK. CODE ANN. § 4-88-107(a)(10).  The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods:  "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission."  ARK. CODE ANN. § 4-88-108.  Old GM violated the Arkansas DTPA and engaged in deceptive and unconscionable trade practices by, among other things, concealing the defects in the Delta Ignition Switch Vehicles and otherwise engaging in activities with a tendency or capacity to deceive.

1533.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1534.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1535.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

1536.   By failing to disclose and by actively concealing the defects in Plaintiffs'

vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and

deceptive business practices in violation of the Arkansas DTPA.

1537.   In the course of Old GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1538.   Old GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their

vehicles.

1539.   Old GM intentionally and knowingly misrepresented material facts regarding the

Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

1540.   Old GM knew or should have known that its conduct violated the Arkansas

DTPA.

1541.   As alleged above, Old GM made material statements about the safety and

reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1542.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Delta Ignition Switch Vehicles, because Old GM:

> a.      Possessed exclusive knowledge about the defects in the
>         Delta Ignition Switch Vehicles;
>
> b.      Intentionally concealed the foregoing from Plaintiffs;
>
> c.      Made incomplete representations about the safety and
>         reliability of the Delta Ignition Switch Vehicles, while
>         purposefully withholding material facts from Plaintiffs that
>         contradicted these representations; and/or
>
> d.      Had duties under the TREAD Act and related regulations to
>         disclose and remedy the defects.

1543.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1544.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1545.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

1546.   As a direct and proximate result of Old GM's violations of the Arkansas DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

1547.   Plaintiffs seek monetary relief against New GM (as successor to Old GM) in an amount to be determined at trial.  Plaintiffs also seek attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

1548.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1549.   This claim is brought on behalf of Arkansas residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1550.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1551.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

1552.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

1553.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

1554.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

1555.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

1556.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge

- 630 -

and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

1557.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

1558.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.  Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1559.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

1560.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

1561.  Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

### COUNT IX

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (ARK. CODE ANN. § 4-2-314)

1562.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1563.  This claim is brought on behalf of Arkansas residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1564.  This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1565.  Old GM was a merchant with respect to motor vehicles within the meaning of ARK. CODE ANN. § 4-2-104(1).

1566.  Under ARK. CODE ANN. § 4-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

1567.  The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the

Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1568.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1569.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT X

## SUCCESSOR LIABILITY CLAIM FOR NEGLIGENCE

1570.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1571.   This claim is brought on behalf of Arkansas residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1572.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1573.   Old GM designed, manufactured and sold or otherwise placed in the stream of commerce Delta Ignition Switch Vehicles, as set forth above.

1574.   Old GM had a duty to design, manufacture, and sell only a product that would be safe for its intended and foreseeable uses and users, including the use to which its products were put by Plaintiffs.  Old GM breached its duties to Plaintiffs because it was negligent in the design, development, manufacture, and testing of the Delta Ignition Switch Vehicles it manufactured and sold on or before July 9, 2009, and New GM is responsible for Old GM's negligence under the doctrine of successor liability.

1575.   Old GM was negligent in the design, development, manufacture, testing, and/or "certification" of the Delta Ignition Switch Vehicles because it knew, or in the exercise of reasonable care should have known, that the vehicles equipped with defective ignition systems pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which brakes, power steering, seatbelt pretensioners, and airbags are rendered inoperable.

1576.   Old GM thus "failed to exercise reasonable care in the manufacture of [its Defective Vehicles]", in violation of RESTATEMENT (SECOND) OF TORTS § 395 ("A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.").

1577.   Old GM further breached its duties to Plaintiffs by supplying directly or through a third person defective Delta Ignition Switch Vehicles to be used by such foreseeable persons as Plaintiffs when:

a.      Old GM knew or had reason to know that the vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

b.      Old GM failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the vehicles are likely to be dangerous.

1578.   Old GM had a continuing duty to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles. Plaintiffs were entitled to know that the vehicles, in their ordinary operation, were not reasonably safe for their intended and ordinary purposes and uses.

1579.   Old GM knew or should have known of the defects described herein.  Old GM breached its duty to Plaintiffs because it failed to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles.

1580.   As a direct and proximate result of Old GM's negligence, Plaintiffs suffered damages, for which New GM has successor liability.  The damages include overpayment for the Delta Ignition Switch Vehicles and repair costs, as discussed above.

## CALIFORNIA

## COUNT I

### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750, *et seq.*)

1581.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1582.   This claim is brought on behalf of California residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition

- 635 -

Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1583.   New GM is a "person" under CAL. CIV. CODE § 1761(c).

1584.   Plaintiffs are "consumers," as defined by CAL. CIVIL CODE § 1761(d), who purchased or leased one or more Defective Vehicles.

1585.   The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]"  CAL. CIV. CODE § 1770(a).  New GM has engaged in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et seq*., as described above and below, by among other things, concealing the known defects in Plaintiffs' vehicles, representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard, quality, and grade when they are not; advertising Defective Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

1586.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1587.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

1588.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

1589.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the CLRA.

1590.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1591.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

1592.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

1593.   New GM knew or should have known that its conduct violated the CLRA.

1594.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

1595.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

    a.   Possessed exclusive knowledge about the defects in the Defective Vehicles;

    b.   Intentionally concealed the foregoing from Plaintiffs;

    c.   Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1596.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

1597.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defects.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

1598.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1599.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

1600.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the CLRA—regardless of when those owners acquired their vehicles.

1601.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta

Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

1602.   As a direct and proximate result of New GM's violations of the CLRA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

1603.   Under CAL. CIV. CODE § 1780(a), Plaintiffs seek monetary relief against New GM for the harm caused by New GM's violations of the CLRA as alleged herein.

1604.   Under CAL. CIV. CODE § 1780(b), Plaintiffs seek an additional award against New GM of up to $5,000 for each Plaintiff who qualifies as a "senior citizen" or "disabled person" under the CLRA.  New GM knew or should have known that its conduct was directed to one or more Plaintiffs who are senior citizens or disabled persons.  New GM's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.  One or more Plaintiffs who are senior citizens or disabled persons are substantially more vulnerable to New GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from New GM's conduct.

1605.   Plaintiffs also seek punitive damages against New GM because it carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to potential cruel and unjust hardship as a result.  New GM intentionally and

willfully deceived Plaintiffs on life-or-death matters, and concealed material facts that only New GM knew.  New GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under CAL. CIV. CODE § 3294.

1606.   Plaintiffs further seek an order enjoining New GM's unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

1607.   Certain Plaintiffs have sent a letter complying with CAL. CIV. CODE § 1780(b).

## COUNT II

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
(CAL. BUS. & PROF. CODE § 17200, *et seq.*)

1608.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1609.   This claim is brought on behalf of California residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1610.   California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."  New GM has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

1611.   New GM violated the unlawful prong of § 17200 by the following:

- 641 -

a.     violations of the CLRA, CAL. CIV. CODE § 1750, *et seq*., as set forth in California Count I by the acts and practices set forth in this Complaint.

b.     violation of the National Traffic and Motor Vehicle Safety Act of 1996, codified at 49 U.S.C. §§ 30101-30170, and its regulations. Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor vehicle manufacturer's responsibility to notify NHTSA of a motor vehicle defect within five days of determining that the defect is safety related. *See* 49 C.F.R. § 573.6. New GM violated these reporting requirements by failing to report the defects in the Defective Vehicles within the required time, and failing to timely recall all impacted vehicles.

1612.   New GM also violated the "fraudulent" prong of section 17200 by concealing the defects in the Defective Vehicles, information that was material to a reasonable consumer, while it touted the safety and reliability of its vehicles.

1613.   New GM also violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint, including devaluing safety and concealing the defects in the Defective Vehicles, offend established public policy, and also because the harm New GM caused consumers greatly outweighs any benefits associated with those practices. New GM's conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs from making fully informed decisions about whether to lease, purchase and/or retain the Defective Vehicles.

1614.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection

- 642 -

with the sale of the Defective Vehicles.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

1615.   New GM's actions, as set forth above, occurred in the conduct of New GM's business, and in trade or commerce.

1616.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

1617.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the UCL.

1618.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1619.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

1620.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

1621.   New GM knew or should have known that its conduct violated the UCL.

1622.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

1623.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1624.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

1625.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defects.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

1626.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1627.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

1628.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the UCL— regardless of when those owners acquired their vehicles.

1629.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta

- 645 -

Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

1630.   As a direct and proximate result of New GM's violations of the UCL, Plaintiffs have suffered injury-in-fact and/or actual damage.

1631.   Plaintiffs request that this Court enter such orders or judgments as may be necessary, including a declaratory judgment that New GM has violated the UCL; an order enjoining New GM from continuing its unfair, unlawful, and/or deceptive practices; an order supervising the recalls; an order and judgment restoring to the Plaintiffs any money lost as the result of New GM's unfair, unlawful, and deceptive trade practices, including restitution and disgorgement of any profits New GM received as a result of its unfair, unlawful, and/or deceptive practices, as provided in CAL. BUS. & PROF. CODE § 17203, CAL CIV. PROC. § 384 and CAL. CIV. CODE § 3345; and for such other relief as may be just and proper.

## COUNT III

## FRAUD BY CONCEALMENT

1632.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1633.   This claim is brought on behalf of California residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs")  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

- 646 -

1634.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

1635.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

1636.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

1637.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

1638.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

1639.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

- 647 -

implementing regulations, including the duty to promptly notify consumers of known safety defects.

1640.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

1641.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

1642.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1643.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all

Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

1644.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

1645.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CAL. CIV. CODE §§ 1791.1 & 1792)

1646.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1647.   This claim is brought only on behalf of California residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

1648.   Plaintiffs are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

1649.   The Defective Vehicles are "consumer goods" within the meaning of CIV. CODE § 1791(a).

- 649 -

1650.   New GM is the "manufacturer" of the Defective Vehicles within the meaning of CAL. CIV. CODE § 1791(j).

1651.   New GM impliedly warranted to Plaintiffs that Defective Vehicles sold or leased as new or New GM Certified Pre-Owned vehicles on or after July 10, 2009 were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792; however, the Defective Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

1652.   CAL. CIV. CODE § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1)     Pass without objection in the trade under the contract description.
>
> (2)     Are fit for the ordinary purposes for which such goods are used.
>
> (3)     Are adequately contained, packaged, and labeled.
>
> (4)     Conform to the promises or affirmations of fact made on the container or label.

1653.   The Defective Vehicles would not pass without objection in the automotive trade because of the dangerous defects in each vehicle that created an unreasonable likelihood of accident and/or an unreasonable likelihood that such accidents will cause serious bodily harm or death to vehicle occupants.

1654.   Because of the ignition switch defects that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death., the Defective Ignition Switch Vehicles are not safe to drive and thus not fit for ordinary purposes.

- 650 -

1655.   The Power Steering Defect Vehicles are inherently defective and not fit for ordinary purposes in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

1656.   The Side Airbag Defect Vehicles are inherently defective and not fit for ordinary purposes in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1657.   The Defective Ignition Switch Vehicles are not adequately labeled because the labeling fails to disclose the ignition switch defects and does not advise Plaintiffs to avoid attaching anything to their vehicle key rings.  New GM failed to warn about the dangerous safety defects in the Defective Ignition Switch Vehicles.

1658.   New GM breached the implied warranty of merchantability by selling Defective Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power steering and/or the disablement of the vehicles' airbags.  These defects have deprived Plaintiffs of the benefit of their bargain and have caused the Defective Vehicles to depreciate in value.

1659.   Notice of breach is not required because Plaintiffs did not purchase their automobiles directly from New GM.

1660.   As a direct and proximate result New GM's breach of its duties under California's Lemon Law, Plaintiffs received goods whose dangerous condition substantially impairs their value.  Plaintiffs have been damaged by the diminished value of their vehicles, the product's malfunctioning, and the loss of use of their Defective Vehicles.

1661.   Under CAL. CIV. CODE §§ 1791.1(d) & 1794, Plaintiffs are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Defective Vehicles, or the overpayment or diminution in value of their Defective Vehicles.

1662.   Under CAL. CIV. CODE § 1794, Plaintiffs are entitled to costs and attorneys' fees.

## COUNT V

## NEGLIGENT FAILURE TO RECALL[419]

1663.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1664.   Plaintiffs bring this Count on behalf of California residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  All claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1665.   New GM manufactured, distributed, and sold Defective Vehicles. It also sold Defective Vehicles as New GM Certified Pre-Owned Vehicles.  It also had a duty in negligence to all owners and lessees of the Defective Vehicles, regardless of when those vehicles were bought or leased.

1666.   New GM knew or reasonably should have known that the Defective Vehicles were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner.

---

[419] Plaintiffs are aware that this Court has held that California's economic loss rule bars this claim, and are asserting this claim here solely for the purposes of preserving the claim for appellate purposes.

- 652 -

1667.   New GM either knew of the defects before the Defective Vehicles were sold, or became aware of the ignition switch defects and their attendant risks after the vehicles were sold.

1668.   New GM failed to adequately recall the Defective Vehicles in a timely manner.

1669.   Owners and lessees of the Defective Vehicles, including Plaintiffs, were harmed by New GM's failure to adequately recall all the Defective Vehicles in a timely manner and have suffered damages, including, without limitation, damage to other components of the Defective Vehicles caused by the defects, the diminished value of the Defective Vehicles, and the costs associated with the loss of use of the Defective Vehicles.

1670.   New GM's failure to timely and adequately recall the Defective Vehicles was a substantial factor in causing Plaintiffs' harm, including overpayment at the time of purchase, diminished value, and cost of repair.

## COUNT VI

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

1671.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1672.   This claim is brought only on behalf of California residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

1673.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1674.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required

… to send out mailed recall notices to owners of affected Old GM vehicles." The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding. New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

1675. Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

1676. In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1677. Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

1678. In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1679. The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1680.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1681.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1682.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1683.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

1684.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

1685.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

1686.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute

additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

1687.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1688.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

1689.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1690.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1691.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

1692.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT VII**

**UNJUST ENRICHMENT[420]**

</div>

1693.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1694.   This claim is brought on behalf of California residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1695.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

1696.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

---

[420] Plaintiffs understand that this Court has found Plaintiffs cannot state this claim *if* they had an express warranty with New GM.  This claim is asserted here on behalf of such Plaintiffs solely for the purpose of preserving the claim for appellate purposes.

<div align="center">

- 657 -

</div>

1697.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

1698.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

1699.   Thus, all Plaintiffs conferred a benefit on New GM.

1700.   It is inequitable for New GM to retain these benefits.

1701.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

1702.   New GM knowingly accepted the benefits of its unjust conduct.

1703.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT

### (CAL. CIV. CODE § 1750, *ET SEQ.*)

1704.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1705.   This claim is brought on behalf of California residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1706.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1707.   Old GM was a "person" under CAL. CIV. CODE § 1761(c).

1708.   Plaintiffs are "consumers," as defined by CAL. CIVIL CODE § 1761(d), who purchased or leased one or more Defective Vehicles.

1709.   The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]"  CAL. CIV. CODE § 1770(a).  Old GM engaged in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et seq*., as described above and below, by among other things, concealing the known defects in Plaintiffs' Delta Ignition Switch Vehicles, representing that the vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the vehicles s are of a particular standard, quality, and grade when they are not; advertising the vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving a Delta Ignition Switch Vehicle has been supplied in accordance with a previous representation when it has not.

1710.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1711.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1712.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

1713.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the CLRA.

1714.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1715.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

1716.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

1717.   Old GM knew or should have known that its conduct violated the CLRA.

1718.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1719.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

  a.  Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

  b.  Intentionally concealed the foregoing from Plaintiffs;

  c.  Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

  d.  Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1720. Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Plaintiffs been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1721. Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1722. Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

1723. As a direct and proximate result of Old GM's violations of the CLRA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

1724. Under CAL. CIV. CODE § 1780(a), Plaintiffs seek monetary relief against New GM for the harm caused by Old GM's violations of the CLRA as alleged herein.

1725.   Under CAL. CIV. CODE § 1780(b), Plaintiffs seek an additional award against New GM of up to $5,000 for each Plaintiff who qualifies as a "senior citizen" or "disabled person" under the CLRA.  Old GM knew or should have known that its conduct was directed to one or more Plaintiffs who are senior citizens or disabled persons.  Old GM's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.  One or more Plaintiffs who are senior citizens or disabled persons were substantially more vulnerable to Old GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Old GM's conduct for which New GM has successor liability.

1726.   Plaintiffs further seek costs of court, attorneys' fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

1727.   Certain Plaintiffs have sent a letter complying with CAL. CIV. CODE § 1780(b).

## COUNT IX

### SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
#### (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

1728.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1729.   This claim is brought on behalf of California residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

- 662 -

1730.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1731.   California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."  Old GM engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

1732.   Old GM violated the unlawful prong of § 17200 by the following:

   a.   violations of the CLRA, CAL. CIV. CODE § 1750, *et seq*., as set forth in California Count 8 by the acts and practices set forth in this Complaint.

   b.   violation of the National Traffic and Motor Vehicle Safety Act of 1996, codified at 49 U.S.C. §§ 30101-30170, and its regulations.  Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor vehicle manufacturer's responsibility to notify NHTSA of a motor vehicle defect within five days of determining that the defect is safety related.  *See* 49 C.F.R. § 573.6.  Old GM violated these reporting requirements by failing to report the defects in the Delta Ignition Switch Vehicles within the required time, and failing to timely recall all impacted vehicles.

1733.   Old GM also violated the "fraudulent" prong of section 17200 by concealing the defects in the Delta Ignition Switch Vehicles, information that was material to a reasonable consumer, while it touted the safety and reliability of its vehicles.

1734.   Old GM also violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint, including devaluing safety and concealing the defects in the Delta Ignition Switch Vehicles, offend established public policy, and also because the harm Old GM caused consumers greatly outweighs any benefits associated with those practices.  Old GM's

- 663 -

conduct also impaired competition within the automotive vehicles market and prevented Plaintiffs from making fully informed decisions about whether to lease, purchase and/or retain their vehicles.

1735.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Delta Ignition Switch Vehicles.

1736.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1737.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1738.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

1739.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the UCL.

1740.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1741.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

1742.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

1743.   Old GM knew or should have known that its conduct violated the UCL.

1744.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1745.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

      a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1746.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Plaintiffs been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

- 665 -

1747.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1748.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.

1749.   As a direct and proximate result of Old GM's violations of the UCL, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

1750.   As a direct and proximate result of Old GM's violations of the UCL for which New GM has successor liability, Plaintiffs have suffered injury-in-fact and/or actual damage.

1751.   Plaintiffs request that this Court enter such orders or judgments as may be necessary, including an order and judgment restoring to the Plaintiffs any money lost as the result of Old GM's unfair, unlawful, and deceptive trade practices, including restitution and disgorgement of any profits Old GM received as a result of its unfair, unlawful, and/or deceptive practices, as provided in CAL. BUS. & PROF. CODE § 17203, CAL CIV. PROC. § 384 and CAL. CIV. CODE § 3345; and for such other relief as may be just and proper.

## COUNT X

### SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

1752.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1753.   This claim is brought on behalf of California residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1754.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1755.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

1756.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

1757.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

1758.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

1759.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

1760.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as

set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

1761.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

1762.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1763.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

1764.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

1765.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old

- 668 -

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT XI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CAL. CIV. CODE §§ 1791.1 & 1792)

1766.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1767.   This claim is brought on behalf of California residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1768.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1769.   Plaintiffs are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

1770.   The Delta Ignition Switch Vehicles are "consumer goods" within the meaning of CIV. CODE § 1791(a).

1771.   Old GM was the "manufacturer" of the Defective Vehicles within the meaning of CAL. CIV. CODE § 1791(j).

1772.   Old GM impliedly warranted to Plaintiffs that Delta Ignition Switch Vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792; however, the

- 669 -

Delta Ignition Switch Vehicles did not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

1773.   CAL. CIV. CODE § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1)   Pass without objection in the trade under the contract description.
>
> (2)   Are fit for the ordinary purposes for which such goods are used.
>
> (3)   Are adequately contained, packaged, and labeled.
>
> (4)   Conform to the promises or affirmations of fact made on the container or label.

1774.   The Delta Ignition Switch Vehicles would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accident, and an unreasonable likelihood that such accidents will cause serious bodily harm or death to vehicle occupants.

1775.   Because of the ignition switch defects that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death., the Delta Ignition Switch Vehicles are not safe to drive and thus not fit for ordinary purposes.

1776.   The Delta Ignition Switch Vehicles are not adequately labeled because the labeling fails to disclose the ignition switch defects and does not advise Plaintiffs to avoid attaching anything to their vehicle key rings.  Old GM failed to warn about the dangerous safety defects in the Delta Ignition Switch Vehicles.

1777.   Old GM breached the implied warranty of merchantability by selling Delta Ignition Switch Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions,  the failure of power steering and power brakes, and the disablement of the vehicles' airbags.  The defects deprived Plaintiffs of the benefit of their bargain.

1778.   Notice of breach is not required because Plaintiffs did not purchase their automobiles directly from Old GM.

1779.   As a direct and proximate result of Old GM's breach of its duties under California's Lemon Law, Plaintiffs received goods whose dangerous condition substantially impaired their value.  .

1780.   Under CAL. CIV. CODE §§ 1791.1(d) & 1794, Plaintiffs are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their vehicles, or the overpayment or diminution in value of their vehicles.

1781.   Under CAL. CIV. CODE § 1794, Plaintiffs are entitled to costs and attorneys' fees.

## COUNT XII

## SUCCESSOR LIABILITY CLAIM FOR NEGLIGENT FAILURE TO RECALL[421]

1782.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1783.   This claim is brought on behalf of California residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

---

[421] Plaintiffs are aware that this Court has held that California's economic loss rule bars this claim, and are asserting this claim here solely for the purposes of preserving the claim for appellate purposes.

1784.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1785.   Old GM knew or reasonably should have known that the Delta Ignition Switch Vehicles were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner.

1786.   Old GM either knew of the defects before the Delta Ignition Switch Vehicles were sold, or became aware of the ignition switch defect and its attendant risks after the vehicles were sold.

1787.   Old GM failed to recall the Delta Ignition Switch Vehicles.

1788.   Owners and lessees of the Delta Ignition Switch Vehicles sold by Old GM, including Plaintiffs, were harmed by Old GM's failure to recall all the vehicles and have suffered damages, including, without limitation, damage to other components of the vehicles caused by the defects, the diminished value of the vehicles, the costs associated with the loss of use of the vehicles, overpayment for the Delta Ignition Switch Vehicles and repair costs, as discussed above.

1789.   Old GM's failure to recall the Delta Ignition Switch Vehicles was a substantial factor in causing Plaintiffs' harm, including overpayment, diminishment of value, and repair costs as alleged above.

# COLORADO

## COUNT I

### VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
#### (COL. REV. STAT. § 6-1-101, *et seq.*)

1790.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1791.   This claim is brought on behalf of Colorado residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").   The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1792.   New GM is a "person" under § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), COL. REV. STAT. § 6-1-101, *et seq.*

1793.   Plaintiffs are "consumers" for purposes of COL. REV. STAT § 6-1-113(1)(a).

1794.   The Colorado CPA prohibits deceptive trade practices in the course of a person's business.   New GM engaged in deceptive trade practices prohibited by the Colorado CPA, including:  (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Defective Vehicles that had the capacity or tendency to deceive Plaintiffs; (2) representing that the Defective Vehicles are of a particular standard, quality, and grade even though New GM knew or should have known they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Defective Vehicles that was known to New GM at the time of

advertisement or sale with the intent to induce Plaintiffs to purchase, lease or retain the Defective

Vehicles.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition

Switch), but also include the defective process through which New GM built cars, a process that

included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of

resources devoted to recognizing and studying safety issues, the failure to follow acceptable

engineering and inventory processes concerning parts management, and the failure to follow a

proper FMEA process.  All of these defective processes would be material to a reasonable

consumer.

1795.   New GM's actions, as set forth above, occurred in the conduct of trade or

commerce.

1796.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles

as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

New GM also engaged in unlawful trade practices by employing deception, deceptive acts or

practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection

with the sale of the Defective Vehicles.

1797.   From the date of its inception on July 10, 2009, New GM knew of serious defects

affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of

Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that

transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory

authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed

above.  New GM acquired additional information concerning the serious defects and safety

- 674 -

issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

1798.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Colorado CPA.

1799.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1800.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

1801.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

1802.   New GM knew or should have known that its conduct violated the Colorado CPA.

1803.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

1804.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1805.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

1806.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defects.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

1807.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1808.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

1809.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.

By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Colorado CPA—regardless of when those owners acquired their vehicles.

1810.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

1811.   As a direct and proximate result of New GM's violations of the Colorado CPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

1812.   Pursuant to COLO. REV. STAT. § 6-1-113, Plaintiffs seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff.

1813.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

## COUNT II

### FRAUD BY CONCEALMENT

1814.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1815.   This claim is brought on behalf of Colorado residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs")  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1816.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

1817.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

1818.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

1819.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

1820.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

1821.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by

Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

1822.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

1823.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

1824.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1825.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the

defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects. They also incurred repair costs as alleged above. Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle. As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

1826. Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

1827. New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT III**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(COL. REV. STAT. § 4-2-314)**

</div>

1828. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1829. This claim is brought only on behalf of Colorado residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied

Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

1830.   New GM was a merchant with respect to motor vehicles.

1831.   Under COL. REV. STAT. § 4-2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

1832.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1833.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1834.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

1835.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1836.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent

- 681 -

by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1837.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

1838.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1839.   This claim is brought only on behalf of Colorado residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

1840.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1841.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

1842.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

1843.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1844.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

1845.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1846.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1847.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

010440-11  983080 V1

1848.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1849.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1850.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

1851.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

1852.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

1853.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

1854.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims

by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

1855.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

1856.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1857.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

1858.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

1859.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

1860.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1861.   This claim is brought on behalf of Colorado residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").

1862.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

1863.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

1864.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

1865.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs

- 686 -

of a recall and other lawsuits, and further benefitted from its statements about the success of New

GM.

1866.   Thus, all Plaintiffs conferred a benefit on New GM.

1867.   It is inequitable for New GM to retain these benefits.

1868.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did

not benefit from New GM's conduct.

1869.   New GM knowingly accepted the benefits of its unjust conduct.

1870.   As a result of New GM's conduct, the amount of its unjust enrichment should be

disgorged, in an amount according to proof.

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
### (COL. REV. STAT. § 6-1-101, *et seq.*)

1871.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

1872.   This claim is brought on behalf of Colorado residents who are members of the

Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count,

"Plaintiffs").

1873.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing

New GM for the conduct of Old GM.   Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply Plaintiffs, so they are free

to assert this successor liability claim without impediment from the Sale Order.

1874.   Old GM was a "person" under § 6-1-102(6) of the Colorado Consumer Protection

Act ("Colorado CPA"), COL. REV. STAT. § 6-1-101, *et seq*.

1875.   Plaintiffs are "consumers" for purposes of COL. REV. STAT § 6-1-113(1)(a).

1876.   The Colorado CPA prohibits deceptive trade practices in the course of a person's business.  Old GM engaged in deceptive trade practices prohibited by the Colorado CPA, including:  (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Delta Ignition Switch Vehicles that had the capacity or tendency to deceive Plaintiffs; (2) representing that the Delta Ignition Switch were of a particular standard, quality, and grade even though Old GM knew or should have known they are not; (3) advertising the Delta Ignition Switch Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Delta Ignition Switch that was known to Old GM at the time of advertisement or sale with the intent to induce Plaintiffs to purchase, lease or retain the Delta Ignition Switch Vehicles.

1877.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1878.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1879.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

1880.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Colorado CPA.

1881.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1882.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

1883.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

1884.   Old GM knew or should have known that its conduct violated the Colorado CPA.

1885.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1886.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Plaintiffs;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1887.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their

bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1888.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1889.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.

1890.   As a direct and proximate result of Old GM's violations of the Colorado CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

1891.   Pursuant to COLO. REV. STAT. § 6-1-113, Plaintiffs seek monetary relief against New GM (as Old GM's successor) measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff.

1892.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

1893.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1894.   This claim is brought on behalf of Colorado residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1895.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1896.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

1897.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

1898.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

1899.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

1900.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material

to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

1901.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

1902.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

1903.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.  Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1904.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

1905.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

1906.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT IX

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (COL. REV. STAT. § 4-2-314)

1907.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1908.   This claim is brought on behalf of Colorado residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1909.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1910.   Old GM was a merchant with respect to motor vehicles.

1911.   Under COL. REV. STAT. § 4-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

1912.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1913.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1914.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## CONNECTICUT

## COUNT I

## VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT
### (CONN. GEN. STAT. § 42-110A, *et seq.*)

1915.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1916.   This claim is brought on behalf of Connecticut residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition

Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1917.  The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  CONN. GEN. STAT. § 42-110b(a).

1918.  New GM is a "person" within the meaning of CONN. GEN. STAT. § 42-110a(3). New GM's challenged acts occurred is in "trade" or "commerce" within the meaning of CONN. GEN. STAT. § 42-110a(4).

1919.  New GM participated in deceptive trade practices that violated the Connecticut UTPA as described herein.  In the course of its business, New GM concealed the defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles.

1920.  In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering

- 695 -

and inventory processes concerning parts management, and the failure to follow a proper FMEA process. All of these defective processes would be material to a reasonable consumer.

1921. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

1922. From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above. New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

1923. By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Connecticut UTPA.

1924. In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1925. New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

- 696 -

1926.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

1927.   New GM knew or should have known that its conduct violated the Connecticut UTPA.

1928.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

1929.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.     Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.     Intentionally concealed the foregoing from Plaintiffs;

      c.     Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1930.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

1931.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the

defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defects. This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

1932.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

1933.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

1934.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers. 49 U.S.C. § 30118(c). New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Connecticut UTPA—regardless of when those owners acquired their vehicles.

1935.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective. New GM's unlawful acts and practices complained of herein affect the public interest.

- 698 -

1936.   As a direct and proximate result of New GM's violations of the Connecticut UTPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

1937.   As a direct and proximate result of New GM's violations of the Connecticut UTPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

1938.   Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to CONN. GEN. STAT. § 42-110g.

1939.   New GM acted with a reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights and safety of others.  Therefore, punitive damages are warranted.

## COUNT II

## FRAUDULENT CONCEALMENT

1940.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1941.   This claim is brought on behalf of Connecticut residents who purchased or leased Defective Vehicles, regardless of whether the vehicles were sold by New GM or Old GM (the "Connecticut Class").  who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

- 699 -

1942.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

1943.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

1944.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

1945.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

1946.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

1947.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

implementing regulations, including the duty to promptly notify consumers of known safety defects.

1948.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

1949.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

1950.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

1951.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all

Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

1952.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

1953.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

1954.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1955.   This claim is brought only on behalf of Connecticut residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

1956.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

1957.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge

- 702 -

from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

1958.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

1959.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

1960.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

1961.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

1962.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

1963.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured

claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

1964.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

1965.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

1966.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

1967.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

1968.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

1969.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

1970.   New GM's concealment and suppression of the material fact of the Delta Ignition

Switch Defect over the first several months of its existence served to prevent the filing of claims

by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would

otherwise have had to make.

1971.   New GM had a duty to disclose the Delta Ignition Switch Defect because the

information was known and/or accessible only to New GM who had superior knowledge and

access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted

the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who

had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old

GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its

implementing regulations that required the disclosure of the defect.

1972.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were

justified.  New GM was in exclusive control of the material facts and such facts were not known

to the public, including Plaintiffs.

1973.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage because they lost their chance to file a claim against Old GM and seek payment from the

GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims

and would have recovered from the GUC Trust.

1974.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be

proven at trial.

1975.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## UNJUST ENRICHMENT

1976.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1977.   This claim is brought on behalf of all Connecticut residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

1978.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

1979.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

1980.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

1981.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

1982.   Thus, all Plaintiffs conferred a benefit on New GM.

1983.   It is inequitable for New GM to retain these benefits.

1984.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

1985.   New GM knowingly accepted the benefits of its unjust conduct.

1986.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**COUNT V**

**SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT**
**(CONN. GEN. STAT. § 42-110A, *et seq.*)**

1987.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1988.   This claim is brought on behalf of Connecticut residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

1989.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

- 707 -

the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

1990.   The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  CONN. GEN. STAT. § 42-110b(a).

1991.   Old GM was a "person" within the meaning of CONN. GEN. STAT. § 42-110a(3). Old GM's challenged acts occurred in "trade" or "commerce" within the meaning of CONN. GEN. STAT. § 42-110a(4).

1992.   Old GM participated in deceptive trade practices that violated the Connecticut UTPA as described herein.  In the course of its business, Old GM concealed the defects in the Delta Ignition Switch Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles. In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1993.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1994.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1995.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

1996.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Connecticut UTPA.

1997.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

1998.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

1999.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

2000.   Old GM knew or should have known that its conduct violated the Connecticut UTPA.

2001.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

2002.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Delta Ignition Switch Vehicles, because Old GM:

      a.      Possessed exclusive knowledge about the defects in the
                Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and
                reliability of the Delta Ignition Switch Vehicles, while
                purposefully withholding material facts from Plaintiffs that
                contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to
                disclose and remedy the defects.

2003.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their

bargain since the vehicles they purchased were worth less than they would have been if they

were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of

the defects in their vehicles, they would have either not bought their Delta Ignition Switch

Vehicles or would have paid less for them.

2004.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to

Plaintiffs.

2005.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and

its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of

the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their

vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs,

as alleged above.

2006.   As a direct and proximate result of Old GM's violations of the Connecticut UDTPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability

2007.   Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to CONN. GEN. STAT. § 42-110g.

<div align="center">

**COUNT VI**

**SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT**

</div>

2008.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2009.   This claim is brought on behalf of Connecticut residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2010.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2011.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2012.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

2013.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

<div align="center">

- 711 -

</div>

2014.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

2015.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

2016.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

2017.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

2018.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.

Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2019.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

2020.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2021.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## DELAWARE

## COUNT I

## VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
(6 DEL. CODE § 2513, *et seq.*)

2022.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2023.   This claim is brought only on behalf of Delaware residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag

Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2024.  New GM is a "person" within the meaning of 6 DEL. CODE § 2511(7).

2025.  The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."  6 DEL. CODE § 2513(a).

2026.  New GM participated in deceptive trade practices that violated the Delaware CFA as described herein.  In the course of its business, New GM concealed the defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles.

- 714 -

2027.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

2028.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

2029.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

2030.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Delaware CFA.

2031.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2032.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2033.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

2034.   New GM knew or should have known that its conduct violated the Delaware CFA.

2035.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

2036.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

> a.     Possessed exclusive knowledge about the defects in the Defective Vehicles;
>
> b.     Intentionally concealed the foregoing from Plaintiffs;
>
> c.     Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

2037.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

- 716 -

2038.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defects.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

2039.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2040.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

2041.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Delaware CFA—regardless of when those owners acquired their vehicles.

2042.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta

Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

2043.   As a direct and proximate result of New GM's violations of the Delaware CFA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

2044.   Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of New GM's unlawful conduct.  *See*, *e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983).  Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

2045.   New GM engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

## COUNT II

## FRAUD BY CONCEALMENT

2046.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2047.   This claim is brought on behalf of Delaware residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count,

"Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct

of New GM.

2048.   New GM concealed and suppressed material facts concerning the serious safety

defects in Plaintiffs' vehicles.

2049.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and

took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

2050.   In order to conceal and suppress the defects from the owners and lessees of the

Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could

notify NHTSA or the public as to the existence of a safety issue.

2051.   New GM concealed and suppressed the defects in the Defective Vehicles with the

intent to deceive Plaintiffs.

2052.   New GM did so in order to falsely assure purchasers, lessees, and owners of the

Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and

to avoid the cost and negative publicity of a recall.  The concealed information was material to

consumers, both because it concerned the quality and safety of the Defective Vehicles and

because the information played a significant role in the value of the vehicles.

2053.   New GM had a duty to disclose the defects in the Defective Vehicles because they

were known and/or accessible only to New GM; New GM had superior knowledge and access to

the facts; and New GM knew the facts were not known to, or reasonably discoverable, by

Plaintiffs.  New GM also had a duty to disclose because it made many affirmative

representations about the safety, quality, and lack of defects in New GM vehicles, as set forth

above, which were misleading, deceptive, and incomplete without the disclosure of the defects in

the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to

disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all

of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

implementing regulations, including the duty to promptly notify consumers of known safety

defects.

2054.   New GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM

money, and it did so at the expense of Plaintiffs.

2055.   On information and belief, New GM has still not made full and adequate

disclosure and continues to defraud Plaintiffs and conceal material information regarding defects

that exist in the Defective Vehicles.

2056.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Defective Vehicles manufactured by New GM; and/or would not have

continued to own and drive their Old GM Defective Vehicles or would have taken other

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the

material facts and such facts were not known to the public, including Plaintiffs.

2057.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their

bargain since the Defective Vehicles were worth less than they would have been without the

defects, and because they own vehicles that diminished in value as a result of New GM's

concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as

alleged above.  Had they been aware of the concealed defects that existed in the Defective

Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their

vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

2058.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2059.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT III**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(6 DEL. CODE § 2-314)**

</div>

2060.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2061.   This claim is brought only on behalf of Delaware residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

2062.   New GM was a merchant with respect to motor vehicles within the meaning of 6 DEL. CODE § 2-104(1).

2063.   Under 6 DEL. CODE § 2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

2064.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

2065.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

2066.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

2067.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

2068.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2069.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

2070.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2071.   This claim is brought only on behalf of Delaware residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

2072.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

2073.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

2074.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

010440-11  983080 V1

2075.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

2076.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

2077.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

2078.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

2079.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

2080.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

2081.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

2082.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

2083.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

2084.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

2085.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

2086.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

2087.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

- 725 -

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

2088.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2089.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

2090.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

2091.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

2092.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2093.   This claim is brought on behalf Delaware residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").   The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2094.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

2095.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

2096.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

2097.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

2098.   Thus, all Plaintiffs conferred a benefit on New GM.

2099.   It is inequitable for New GM to retain these benefits.

2100.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

2101.   New GM knowingly accepted the benefits of its unjust conduct.

2102.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

<div align="center">

**COUNT VI**

**SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF
THE DELAWARE CONSUMER FRAUD ACT
(6 DEL. CODE § 2513, *et seq.*)**

</div>

2103.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2104.   This claim is brought on behalf of Delaware residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2105.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2106.   Old GM was a "person" within the meaning of 6 DEL. CODE § 2511(7).

2107.   The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale,

<div align="center">- 728 -</div>

lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."  6 DEL. CODE § 2513(a).

2108.   Old GM participated in deceptive trade practices that violated the Delaware CFA as described herein.  In the course of its business, Old GM concealed the defects in the Delta Ignition Switch Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

2109.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

2110.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

2111.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

2112.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Delaware CFA.

2113.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2114.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2115.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

2116.   Old GM knew or should have known that its conduct violated the Delaware CFA.

2117.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

2118.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

   a.   Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

   b.   Intentionally concealed the foregoing from Plaintiffs;

   c.   Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

   d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

2119.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of

the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

2120.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2121.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

2122.   As a direct and proximate result of Old GM's violations of the Delaware CFA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

2123.   Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of Old GM's unlawful conduct.  *See*, *e.g*., *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983).  Plaintiffs also seek an order for declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

2124.   Old GM engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages for which New GM has successor liability.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

2125.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2126.   This claim is brought on behalf of Delaware residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2127.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2128.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2129.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

2130.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2131.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

2132.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

2133.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge

- 732 -

and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

2134.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

2135.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.  Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2136.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

2137.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2138.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF
### IMPLIED WARRANTY OF MERCHANTABILITY
### (6 DEL. CODE COM. LAW § 2-314)

2139.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2140.   This claim is brought on behalf of Delaware residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2141.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2142.   Old GM was a merchant with respect to motor vehicles within the meaning of 6 DEL. CODE § 2-104(1).

2143.   Under 6 DEL. CODE § 2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

2144.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the

Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

2145.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2146.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## DISTRICT OF COLUMBIA

## COUNT I

### VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT
### (D.C. CODE § 28-3901, *et seq.*)

2147.   Plaintiffs reallege and incorporate by reference all paragraphs as if fully set forth herein.

2148.   This claim is brought on behalf of District of Columbia residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2149.   New GM is a "person" under the Consumer Protection Procedures Act ("District of Columbia CPPA"), D.C. CODE § 28-3901(a)(1).

2150.   Plaintiffs are "consumers," as defined by D.C. CODE § 28-3901(1)(2), who purchased or leased one or more Defective Vehicles.

2151.   New GM's actions as set forth herein constitute "trade practices" under D.C. CODE § 28-3901.

2152.   New GM participated in unfair or deceptive acts or practices that violated the District of Columbia CPPA.  By systematically concealing the defects in the Defective Vehicles, New GM engaged in unfair or deceptive practices prohibited by the District of Columbia CPPA, D.C. CODE § 28-3901, *et seq.*, including:  (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; (4) representing that the subject of a transaction involving the Defective Vehicles has been supplied in accordance with a previous representation when it has not; (5) misrepresenting as to a material fact which has a tendency to mislead; and (6) failing to state a material fact when such failure tends to mislead.

2153.   In the course of its business in trade or commerce, New GM systematically concealed the defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety

- 736 -

issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles.

2154.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

2155.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the District of Columbia CPPA.

2156.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2157.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2158.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

2159.   New GM knew or should have known that its conduct violated the District of Columbia CPPA.

2160.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

2161.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

       a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

       b.      Intentionally concealed the foregoing from Plaintiffs;

       c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

       d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

2162.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

2163.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the

defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defects.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

2164.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2165.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

2166.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the District of Columbia CPPA—regardless of when those owners acquired their vehicles.

2167.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

2168.   As a direct and proximate result of New GM's violations of the District of Columbia CPPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above. As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

2169.   Plaintiffs are entitled to recover treble damages or $1,500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the Court deems proper, under D.C. CODE § 28-3901.

2170.   Plaintiffs seek punitive damages against New GM because New GM's conduct evidences malice and/or egregious conduct.  New GM maliciously and egregiously misrepresented the safety and reliability of the Defective Vehicles, deceived Plaintiffs on life-or-death matters, concealed material facts that only it knew, and repeatedly promised Plaintiffs that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting deadly flaws in the Defective Vehicles.  New GM's unlawful conduct constitutes malice warranting punitive damages.

## COUNT II

## FRAUD BY CONCEALMENT

2171.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2172.   This claim is brought on behalf of District of Columbia residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of

010440-11  983080 V1

this Count, "Plaintiffs"). The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2173.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2174.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

2175.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2176.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

2177.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

2178.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to

- 741 -

disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all

of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

implementing regulations, including the duty to promptly notify consumers of known safety

defects.

2179.   New GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM

money, and it did so at the expense of Plaintiffs.

2180.   On information and belief, New GM has still not made full and adequate

disclosure and continues to defraud Plaintiffs and conceal material information regarding defects

that exist in the Defective Vehicles.

2181.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Defective Vehicles manufactured by New GM; and/or would not have

continued to own and drive their Old GM Defective Vehicles or would have taken other

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the

material facts and such facts were not known to the public, including Plaintiffs.

2182.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their

bargain since the Defective Vehicles were worth less than they would have been without the

defects, and because they own vehicles that diminished in value as a result of New GM's

concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as

alleged above.  Had they been aware of the concealed defects that existed in the Defective

Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their

vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

2183.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2184.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (D.C. CODE § 28:2-314)

2185.   Plaintiffs reallege and incorporate by reference all paragraphs as if fully set forth herein.

2186.   This claim is brought only on behalf of District of Columbia residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

2187.   New GM was a merchant with respect to motor vehicles within the meaning of D.C. CODE § 28:2-104(1).

2188.   Under D.C. CODE § 28:2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Ignition Switch Vehicles from New GM on or after July 10, 2009.

2189.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

2190.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

2191.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

2192.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

2193.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2194.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

2195.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2196.   This claim is brought only on behalf of District of Columbia residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

2197.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

2198.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles." The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

2199.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

2200.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

2201.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

2202.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

2203.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

2204.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

2205.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

2206.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

2207.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

2208.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

2209.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

2210.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

2211.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims

by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

2212.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

2213.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2214.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

2215.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

2216.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT[422]

2217.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2218.   This claim is brought on behalf of District of Columbia residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2219.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

2220.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

2221.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

---

[422] Plaintiffs are aware that this Court has held that the existence of an express warranty between with New GM is a bar to this claim, and assert the claim on behalf of such Plaintiffs here solely to preserve the claim for appellate review.

2222.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

2223.   Thus, all Plaintiffs conferred a benefit on New GM.

2224.   It is inequitable for New GM to retain these benefits.

2225.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

2226.   New GM knowingly accepted the benefits of its unjust conduct.

2227.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

<div align="center">

**COUNT VI**

**SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF THE CONSUMER
PROTECTION PROCEDURES ACT
(D.C. CODE § 28-3901, *et seq*.)**

</div>

2228.   Plaintiffs reallege and incorporate by reference all paragraphs as if fully set forth herein.

2229.   This claim is brought on behalf of District of Columbia residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2230.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

<div align="center">- 750 -</div>

the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2231. Old GM was a "person" under the District of Columbia Consumer Protection Procedures Act ("District of Columbia CPPA"), D.C. CODE § 28-3901(a)(1).

2232. Plaintiffs are "consumers," as defined by D.C. CODE § 28-3901(1)(2), who purchased or leased one or more Defective Vehicles.

2233. Old GM's actions as set forth herein constitute "trade practices" under D.C. CODE § 28-3901.

2234. Old GM participated in unfair or deceptive acts or practices that violated the District of Columbia CPPA. By systematically concealing the defects in the Delta Ignition Switch Vehicles, Old GM engaged in unfair or deceptive practices prohibited by the District of Columbia CPPA, D.C. CODE § 28-3901, *et seq.*, including: (1) representing that the Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Delta Ignition Switch Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Delta Ignition Switch Vehicles with the intent not to sell them as advertised; (4) representing that the subject of a transaction involving the Delta Ignition Switch Vehicles has been supplied in accordance with a previous representation when it has not; (5) misrepresenting as to a material fact which has a tendency to mislead; and (6) failing to state a material fact when such failure tends to mislead.

2235. In the course of its business in trade or commerce, Old GM systematically concealed the defects in the Delta Ignition Switch Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Delta Ignition Switch Vehicles.

2236.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

2237.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

2238.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

2239.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the District of Columbia CPPA.

2240.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2241.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2242.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

2243.   Old GM knew or should have known that its conduct violated the District of
Columbia CPPA.

2244.   As alleged above, Old GM made material statements about the safety and
reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

2245.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the
Delta Ignition Switch Vehicles, because Old GM:

      a.      Possessed exclusive knowledge about the defects in the
Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and
reliability of the Delta Ignition Switch Vehicles, while
purposefully withholding material facts from Plaintiffs that
contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

2246.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch
Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their
bargain since the vehicles they purchased were worth less than they would have been if they
were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of
the defects in their vehicles, they would have either not bought their Delta Ignition Switch
Vehicles or would have paid less for them.

2247.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to
Plaintiffs.

2248.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and
its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of
the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their

vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above

2249.   As a direct and proximate result of Old GM's violations of the District of Columbia CPPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

2250.   Plaintiff are entitled to recover treble damages or $1,500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the Court deems proper, under D.C. Code § 28-3901.

2251.   Plaintiffs seek punitive damages against New GM as the successor to Old GM because Old GM's conduct evidences malice and/or egregious conduct.  Old GM maliciously and egregiously misrepresented the safety and reliability of the Delta Ignition Switch Vehicles, deceived Plaintiffs on life-or-death matters, concealed material facts that only it knew, and repeatedly promised Plaintiffs that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting deadly flaws in the Delta Ignition Switch Vehicles.  This unlawful conduct constitutes malice warranting punitive damages.

## COUNT VII

### SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

2252.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2253.   This claim is brought on behalf of District of Columbia residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2254.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2255.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2256.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

2257.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2258.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

2259.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

2260.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as

set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

2261.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

2262.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2263.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

2264.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2265.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (D.C. CODE § 28-314)

2266.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2267.   This claim is brought on behalf of District of Columbia residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2268.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2269.   Old GM was a merchant with respect to motor vehicles within the meaning of D.C. Code § 28:2-104(1).

2270.   Under D.C. Code § 28:2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

2271.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of

- 757 -

power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

2272.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2273.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## FLORIDA

## COUNT I

### VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201, *et seq.*)

2274.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2275.   This claim is brought on behalf of Florida residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2276.   Plaintiffs are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), FLA. STAT. § 501.203(7).

2277.   New GM engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

2278.   The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" FLA. STAT. § 501.204(1).  By concealing the known defects in Plaintiffs' vehicles, New GM participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

2279.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

2280.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

2281.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of

Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above. New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

2282. By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the FUDTPA.

2283. In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2284. New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2285. New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

2286. New GM knew or should have known that its conduct violated the FUDTPA.

2287. As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

2288. New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

> a. Possessed exclusive knowledge about the defects in the Defective Vehicles;

b.      Intentionally concealed the foregoing from Plaintiffs;

c.      Made incomplete representations about the safety and
reliability of the Defective Vehicles, while purposefully
withholding material facts from Plaintiffs that contradicted
these representations; and/or

d.      Had duties under the TREAD Act and related regulations to disclose and
remedy the defects.

2289.   Because New GM fraudulently concealed the defects in New GM vehicles, New

GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from defects.

Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for

repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they

would have either not have bought their Defective Vehicles or would have paid less for them.

2290.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and

deceptive trade practices since their vehicles were worth less as the result of New GM's

concealment of, and failure to remedy, the defects.  Further, once the truth came out about the

defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the

vehicles would have had in the absence of the defect.  This diminished value is directly attributed

to New GM's dishonesty and omissions with respect to the quality and safety of the Defective

Vehicles.

2291.   New GM's concealment of the defects in Plaintiffs' vehicles was material to

Plaintiffs.

2292.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and

its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased

New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date

- 761 -

of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

2293.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the FUDTPA—regardless of when those owners acquired their vehicles.

2294.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

2295.   As a direct and proximate result of New GM's violations of the FUDTPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

2296.   Plaintiffs are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and attorneys' fees under FLA. STAT. § 501.2105(1).

2297.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

## COUNT II

## FRAUD BY CONCEALMENT[423]

2298.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2299.   This claim is brought on behalf of Florida residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2300.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2301.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

2302.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2303.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

2304.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and

---

[423] Plaintiffs understand that this Court has held that this claim is barred by Florida's economic loss rule, and assert the claim here solely for the purpose of preserving the claim for appellate review.

010440-11  983080 V1

to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

2305.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

2306.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

2307.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

2308.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have

continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2309.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

2310.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2311.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**

**FRAUD BY CONCEALMENT OF THE RIGHT
TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY**

2312.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2313.   This claim is brought only on behalf of Florida residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

2314.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

2315.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

2316.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

2317.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

2318.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

2319.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

2320.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

2321.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

2322.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

2323.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

2324.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

2325.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

2326.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

2327.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

2328.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

2329.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

- 768 -

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted

the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who

had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old

GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its

implementing regulations that required the disclosure of the defect.

2330.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were

justified.  New GM was in exclusive control of the material facts and such facts were not known

to the public, including Plaintiffs.

2331.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage because they lost their chance to file a claim against Old GM and seek payment from the

GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims

and would have recovered from the GUC Trust.

2332.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be

proven at trial.

2333.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to

be determined according to proof.

## COUNT IV

## UNJUST ENRICHMENT[424]

2334.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2335.   This claim is brought on behalf Florida residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2336.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

2337.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

2338.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

2339.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs

---

[424] Plaintiffs understand that this Court has found that the existence of an express warranty between New GM and Plaintiffs is a bar to this claim, and are asserting this claim here solely for the purposes of preserving the claim for appellate purposes.

- 770 -

of a recall and other lawsuits, and further benefitted from its statements about the success of New

GM.

2340.   Thus, all Plaintiffs conferred a benefit on New GM.

2341.   It is inequitable for New GM to retain these benefits.

2342.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did

not benefit from New GM's conduct.

2343.   New GM knowingly accepted the benefits of its unjust conduct.

2344.   As a result of New GM's conduct, the amount of its unjust enrichment should be

disgorged, in an amount according to proof.

## COUNT V

## SUCCESSOR LIABILITY CLAIM FOR VIOLATION
## OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT
### (FLA. STAT. § 501.201, *et seq.*)

2345.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

2346.   This claim is brought on behalf of Florida residents who are members of the Delta

Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2347.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing

New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are

free to assert this successor liability claim without impediment from the Sale Order.

2348.   Plaintiffs are "consumers" within the meaning of the Florida Unfair and

Deceptive Trade Practices Act ("FUDTPA"), FLA. STAT. § 501.203(7).

2349.   Old GM engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

2350.   The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" FLA. STAT. § 501.204(1).  Old GM participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.  In particular, by concealing the known defects in Plaintiffs' vehicles, Old GM engaged in deceptive business practices prohibited by the FUDTPA.

2351.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

2352.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

2353.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

2354.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the FUDTPA.

2355.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2356.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2357.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

2358.   Old GM knew or should have known that its conduct violated the FUDTPA.

2359.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

2360.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

> a.     Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;
>
> b.     Intentionally concealed the foregoing from Plaintiffs;
>
> c.     Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

2361.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

2362.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2363.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

2364.   As a direct and proximate result of Old GM's violations of the FUDTPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

2365.   Plaintiffs are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and attorneys' fees under FLA. STAT. § 501.2105(1).

2366.   Plaintiffs also seek attorneys' fees, and any other just and proper relief available under the FUDTPA.

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

2367.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2368.   This claim is brought on behalf of Florida residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2369.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2370.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2371.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

2372.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2373.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

2374.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

2375.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old

- 775 -

GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had

monitoring and disclosure duties under the TREAD Act, as alleged above.

2376.   Old GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM

money, and it did so at the expense of Plaintiffs.

2377.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.

Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such

facts were not known to the public, including Plaintiffs.

2378.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get

the benefit of their bargain since the Defective Vehicles were worth less than they would have

been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not

have purchased or leased them at all, and Plaintiffs sustained repair damages.

2379.   Accordingly, based on the conduct of Old GM for which it has successor liability,

New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2380.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such

conduct by New GM in the future, which amount is to be determined according to proof

# GEORGIA

## COUNT I

### VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
(GA. CODE ANN. § 10-1-390, *et seq.*)

2381.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2382.   This claim is brought on behalf of Georgia residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2383.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE. ANN. § 10-1-393(a), including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," GA. CODE. ANN. § 10-1-393(b).

2384.   By systematically concealing the defects in the Defective Vehicles, New GM engaged in unfair or deceptive practices prohibited by the Georgia FBPA, including:  (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which

- 777 -

they do not have; (2) representing that the Defective Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the Defective Vehicles with the intent not to sell them as advertised.  New GM participated in unfair or deceptive acts or practices that violated the Georgia FBPA.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

2385.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

2386.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

2387.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed

above.  New GM acquired additional information concerning the serious defects and safety

issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its

forced revelation in 2014.

2388.   By failing to disclose and by actively concealing the defects in Plaintiffs'

vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and

deceptive business practices in violation of the Georgia FBPA.

2389.   In the course of New GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2390.   New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their

vehicles.

2391.   New GM intentionally and knowingly misrepresented material facts regarding the

Defective Vehicles with the intent to mislead Plaintiffs.

2392.   New GM knew or should have known that its conduct violated the Georgia

FBPA.

2393.   As alleged above, New GM made material statements about the safety and

reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

2394.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the
Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and
reliability of the Defective Vehicles, while purposefully

> withholding material facts from Plaintiffs that contradicted
> these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

2395.  Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

2396.  Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

2397.  New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2398.  Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

2399.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Georgia FBPA—regardless of when those owners acquired their vehicles.

2400.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

2401.   As a direct and proximate result of New GM's violations of the Georgia FBPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

2402.   Plaintiff are entitled to recover damages and exemplary damages (for intentional violations) per GA. CODE. ANN § 10-1-399(a).

2403.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per GA. CODE. ANN § 10-1-399.

2404.   On October 8, 2014, certain Plaintiffs sent a letter complying with GA. CODE. ANN § 10-1-399(b).  Because New GM failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which they are entitled.

## COUNT II

### VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (GA. CODE ANN. § 10-1-370, *et seq.*)

2405.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2406.   This claim is brought on behalf of Georgia residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2407.   New GM and Plaintiffs are "persons' within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), GA. CODE. ANN § 10-1-371(5).

2408.   The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."  GA. CODE. ANN § 10-1-372(a).  By systematically concealing the defects in the Defective Vehicles, New GM engaged in deceptive trade practices prohibited by the Georgia UDTPA.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-

cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

2409.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

2410.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

2411.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

2412.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Georgia UDTPA.

2413.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2414.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2415.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

2416.   New GM knew or should have known that its conduct violated the Georgia UDTPA.

2417.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

2418.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

        a.       Possessed exclusive knowledge about the defects in the Defective Vehicles;

        b.       Intentionally concealed the foregoing from Plaintiffs;

        c.       Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

        d.       Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

2419.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for

- 784 -

repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

2420.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

2421.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2422.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

2423.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Georgia UDTPA—regardless of when those owners acquired their vehicles.

2424.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

2425.   As a direct and proximate result of New GM's violations of the Georgia UDTPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

2426.   Plaintiffs seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per GA. CODE. ANN § 10-1-373.

## COUNT III

## FRAUD BY CONCEALMENT

2427.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2428.   This claim is brought on behalf of Georgia residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

- 786 -

2429.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2430.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

2431.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2432.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

2433.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

2434.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

implementing regulations, including the duty to promptly notify consumers of known safety defects.

2435.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

2436.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

2437.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2438.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all

Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

2439.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2440.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

2441.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2442.   This claim is brought only on behalf of Georgia residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

2443.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

2444.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge

from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

2445.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

2446.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

2447.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

2448.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

2449.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

2450.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured

claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

2451.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

2452.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

2453.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

2454.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

2455.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

2456.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

2457.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

2458.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

2459.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2460.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

2461.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

2462.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

2463.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2464.   This claim is brought on behalf of Georgia residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2465.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

2466.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

2467.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

2468.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

2469.   Thus, all Plaintiffs conferred a benefit on New GM.

2470.   It is inequitable for New GM to retain these benefits.

2471.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

2472.   New GM knowingly accepted the benefits of its unjust conduct.

2473.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**COUNT VI**

**SUCCESSOR LIABILITY CLAIM FOR VIOLATION
OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
(GA. CODE ANN. § 10-1-390, *et seq.*)**

2474.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2475.   This claim is brought on behalf of Georgia residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2476.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

- 794 -

the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are

free to assert this successor liability claim without impediment from the Sale Order.

2477.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or

deceptive acts or practices in the conduct of consumer transactions and consumer acts or

practices in trade or commerce" to be unlawful, GA. CODE. ANN. § 10-1-393(a), including, but

not limited to, "representing that goods or services have sponsorship, approval, characteristics,

ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or

services are of a particular standard, quality, or grade … if they are of another," and

"[a]dvertising goods or services with intent not to sell them as advertised," GA. CODE. ANN. § 10-

1-393(b).

2478.   By systematically concealing the defects in the Delta Ignition Switch Vehicles,

Old GM engaged in unfair or deceptive practices prohibited by the Georgia FBPA, including:

(1) representing that the Delta Ignition Switch Vehicles have characteristics, uses, benefits, and

qualities which they do not have; (2) representing that the Delta Ignition Switch Vehicles are of a

particular standard, quality, and grade when they are not; and (3) advertising the Delta Ignition

Switch Vehicles with the intent not to sell them as advertised.  Old GM participated in unfair or

deceptive acts or practices that violated the Georgia FBPA.

2479.   Old GM's actions, as set forth above, occurred in the conduct of trade or

commerce.

2480.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles

as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or

practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

2481.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

2482.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Georgia FBPA.

2483.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2484.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2485.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

2486.   Old GM knew or should have known that its conduct violated the Georgia FBPA.

2487.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

2488.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

      a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while

purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.  Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

2489.  Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.  Plaintiffs also incurred repair costs, as alleged above.

2490.  Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2491.  Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.

2492.  As a direct and proximate result of Old GM's violations of the Georgia FBPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

2493.  Plaintiffs are entitled to recover damages and exemplary damages (for intentional violations) per GA. CODE. ANN § 10-1-399(a).

2494.  Plaintiffs also seek attorneys' fees, and any other just and proper relief available under the Georgia FBPA per GA. CODE. ANN § 10-1-399.

2495.   On October 8, 2014, certain Plaintiffs sent a letter complying with GA. CODE. ANN § 10-1-399(b).  Because New GM failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

2496.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2497.   This claim is brought on behalf of Georgia residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2498.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2499.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2500.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

2501.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2502.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

2503.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

2504.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

2505.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

2506.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2507.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

2508.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2509.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## HAWAII

## COUNT I

### UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW
### (HAW. REV. STAT. § 480, *et seq.*)

2510.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2511.   This claim is brought on behalf of Hawaii residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count,

"Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct

of New GM.

2512.   New GM is a "person" under HAW. REV. STAT. § 480-1.

2513.   Plaintiffs are "consumer[s]" as defined by HAW. REV. STAT. § 480-1, who

purchased or leased one or more Defective Vehicles.

2514.   New GM's acts or practices as set forth above occurred in the conduct of trade or

commerce.

2515.   The Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce.…"  By systematically

concealing the defects in the Defective Vehicles, New GM engaged in unfair and deceptive trade

practices prohibited by the Hawaii Act.  The defects in each vehicle include not only the specific

defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which

New GM built cars, a process that included cost-cutting, minimizing the importance of safety

issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the

failure to follow acceptable engineering and inventory processes concerning parts management,

and the failure to follow a proper FMEA process.  All of these defective processes would be

material to a reasonable consumer.

2516.   New GM's actions, as set forth above, occurred in the conduct of trade or

commerce.

2517.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles

as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

New GM also engaged in unlawful trade practices by employing deception, deceptive acts or

practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

2518.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

2519.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Hawaii Act.

2520.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2521.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2522.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

2523.   New GM knew or should have known that its conduct violated the Hawaii Act.

2524.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

2525.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the
              Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and
              reliability of the Defective Vehicles, while purposefully
              withholding material facts from Plaintiffs that contradicted
              these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and
              remedy the defects.

2526.   Because New GM fraudulently concealed the defects in New GM vehicles, New

GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from defects.

Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for

repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they

would have either not have bought their Defective Vehicles or would have paid less for them.

2527.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and

deceptive trade practices since their vehicles were worth less as the result of New GM's

concealment of, and failure to remedy, the defects.  Further, once the truth came out about the

defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the

vehicles would have had in the absence of the defect.  This diminished value is directly attributed

to New GM's dishonesty and omissions with respect to the quality and safety of the Defective

Vehicles.

2528.   New GM's concealment of the defects in Plaintiffs' vehicles was material to

Plaintiffs.

2529.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

2530.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Hawaii Act—regardless of when those owners acquired their vehicles.

2531.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

2532.   As a direct and proximate result of New GM's violations of the Hawaii Act, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

2533.   Pursuant to HAW. REV. STAT. § 480-13, Plaintiffs seek monetary relief against New GM measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

2534.   Under HAW. REV. STAT. § 480-13.5, Plaintiffs seek an additional award against New GM of up to $10,000 for each violation directed at a Hawaiian elder.  New GM knew or should have known that its conduct was directed to one or more Plaintiffs who are elders.  New GM's conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder.  Plaintiffs who are elders are substantially more vulnerable to New GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from New GM's conduct.

## COUNT II

## FRAUD BY CONCEALMENT

2535.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2536.   This claim is brought on behalf of Hawaii residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2537.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2538.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

2539.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2540.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

2541.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

2542.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

- 806 -

implementing regulations, including the duty to promptly notify consumers of known safety

defects.

2543.   New GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM

money, and it did so at the expense of Plaintiffs.

2544.   On information and belief, New GM has still not made full and adequate

disclosure and continues to defraud Plaintiffs and conceal material information regarding defects

that exist in the Defective Vehicles.

2545.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Defective Vehicles manufactured by New GM; and/or would not have

continued to own and drive their Old GM Defective Vehicles or would have taken other

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the

material facts and such facts were not known to the public, including Plaintiffs.

2546.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their

bargain since the Defective Vehicles were worth less than they would have been without the

defects, and because they own vehicles that diminished in value as a result of New GM's

concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as

alleged above.  Had they been aware of the concealed defects that existed in the Defective

Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their

vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the

time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all

Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

2547.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2548.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (HAW. REV. STAT. § 490:2-314)

2549.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2550.   This claim is brought only on behalf of Hawaii residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

2551.   New GM was a merchant with respect to motor vehicles within the meaning of HAW. REV. STAT. § 490:2-104(1).

2552.   Under HAW. REV. STAT. § 490:2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Ignition Switch Vehicles from New GM on or after July 10, 2009.

2553.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

2554.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

2555.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

2556.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

2557.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2558.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**COUNT IV**

**FRAUD BY CONCEALMENT OF THE RIGHT
TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY**

2559.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2560.   This claim is brought only on behalf of Hawaii residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

2561.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

2562.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

2563.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

2564.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

2565.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

2566.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

2567.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

2568.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

2569.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

2570.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

2571.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

2572.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

2573.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

2574.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

2575.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

2576.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

- 812 -

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

2577.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2578.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

2579.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

2580.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

2581.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2582.   This claim is brought on behalf of Hawaii residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").   The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2583.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

2584.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

2585.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

2586.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

2587.   Thus, all Plaintiffs conferred a benefit on New GM.

2588.   It is inequitable for New GM to retain these benefits.

2589.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

2590.   New GM knowingly accepted the benefits of its unjust conduct.

2591.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

<div align="center">

**COUNT VI**

**SUCCESSOR LIABILITY CLAIM FOR UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW
(HAW. REV. STAT. § 480, *ET SEQ.*)**

</div>

2592.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2593.   This claim is brought on behalf of Hawaii residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2594.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2595.   Old GM was a "person" under HAW. REV. STAT. § 480-1.

2596.   Plaintiffs are "consumer[s]" as defined by HAW. REV. STAT. § 480-1.

2597.   Old GM's acts or practices as set forth above occurred in the conduct of trade or commerce.

2598.   The Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.…"  By systematically

<div align="center">- 815 -</div>

concealing the defects in the Delta Ignition Switch Vehicles, Old GM engaged in unfair and deceptive trade practices prohibited by the Hawaii Act for which New GM has successor liability.

2599.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

2600.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

2601.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Hawaii Act.

2602.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2603.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2604.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

2605.   Old GM knew or should have known that its conduct violated the Hawaii Act.

- 816 -

2606.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

2607.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

  a.   Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

  b.   Intentionally concealed the foregoing from Plaintiffs;

  c.   Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

  d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

2608.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

2609.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2610.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

2611.   As a direct and proximate result of Old GM's violations of the Hawaii Act, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

2612.   Pursuant to HAW. REV. STAT. § 480-13, Plaintiffs seek monetary relief against New GM measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

2613.   Under HAW. REV. STAT. § 480-13.5, Plaintiffs seek an additional award against New GM of up to $10,000 for each violation directed at a Hawaiian elder.  Old GM knew or should have known that its conduct was directed to one or more Plaintiffs who are elders.  Old GM's conduct (for which New GM has successor liability) caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder.  Elders are substantially more vulnerable to Old GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each Plaintiff-elder suffered substantial physical, emotional, or economic damage resulting from Old GM's conduct.

## COUNT VII

### SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

2614.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2615.   This claim is brought on behalf of Hawaii residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2616.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2617.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2618.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

2619.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2620.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

2621.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

2622.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old

GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had

monitoring and disclosure duties under the TREAD Act, as alleged above.

2623.   Old GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM

money, and it did so at the expense of Plaintiffs.

2624.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.

Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such

facts were not known to the public, including Plaintiffs.

2625.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get

the benefit of their bargain since the Defective Vehicles were worth less than they would have

been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not

have purchased or leased them at all, and Plaintiffs sustained repair damages.

2626.   Accordingly, based on the conduct of Old GM for which it has successor liability,

New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2627.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such

conduct by New GM in the future, which amount is to be determined according to proof.

**COUNT VIII**

**SUCCESSOR LIABILITY CLAIM FOR BREACH OF
IMPLIED WARRANTY OF MERCHANTABILITY
(HAW. REV. STAT. § 490:2-314)**

2628.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2629.   This claim is brought on behalf of Hawaii residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2630.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2631.   Old GM was a merchant with respect to motor vehicles within the meaning of HAW. REV. STAT. § 490-2-104(1).

2632.   Under HAW. REV. STAT. § 490-§ 2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

2633.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

2634.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2635.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## IDAHO

## COUNT I

### VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
(IDAHO CIV. CODE § 48-601, *et seq.*)

2636.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2637.   This claim is brought on behalf of Idaho residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2638.   New GM is a "person" under the Idaho Consumer Protection Act ("Idaho CPA"), IDAHO CIV. CODE § 48-602(1).

2639.   New GM's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under IDAHO CIV. CODE § 48-602(2).

2640.   New GM participated in misleading, false, or deceptive acts that violated the
Idaho CPA.  By systematically concealing the defects in the Defective Vehicles, New GM
engaged in deceptive business practices prohibited by the Idaho CPA, including:
(1) representing that the Defective Vehicles have characteristics, uses, and benefits which they
do not have; (2) representing that the Defective Vehicles are of a particular standard, quality, and
grade when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as
advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive
to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct
of trade or commerce.  *See* IDAHO CIV. CODE § 48-603.  The defects in each vehicle include not
only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process
through which New GM built cars, a process that included cost-cutting, minimizing the
importance of safety issues, siloing, the depletion of resources devoted to recognizing and
studying safety issues, the failure to follow acceptable engineering and inventory processes
concerning parts management, and the failure to follow a proper FMEA process.  All of these
defective processes would be material to a reasonable consumer.

2641.   New GM's actions, as set forth above, occurred in the conduct of trade or
commerce.

2642.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles
as described herein and otherwise engaged in activities with a tendency or capacity to deceive.
New GM also engaged in unlawful trade practices by employing deception, deceptive acts or
practices, fraud, misrepresentations, or concealment, suppression or omission of any material
fact with intent that others rely upon such concealment, suppression or omission, in connection
with the sale of the Defective Vehicles.

- 823 -

2643.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.   New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

2644.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Idaho CPA.

2645.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2646.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2647.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

2648.   New GM knew or should have known that its conduct violated the Idaho CPA.

2649.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

2650.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

b.      Intentionally concealed the foregoing from Plaintiffs;

c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

2651.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

2652.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

2653.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2654.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased

- 825 -

New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

2655.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Idaho CPA—regardless of when those owners acquired their vehicles.

2656.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

2657.   As a direct and proximate result of New GM's violations of the Idaho CPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

2658.   Pursuant to IDAHO CODE § 48-608, Plaintiffs seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Plaintiff.

2659.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

2660.   Plaintiffs also seek punitive damages against New GM because New GM's conduct evidences an extreme deviation from reasonable standards.  New GM flagrantly, maliciously, and fraudulently misrepresented the safety and reliability of the Defective Vehicles, deceived Plaintiffs on life-or-death matters, concealed material facts that only it knew, and repeatedly promised Plaintiffs that the Defective Vehicles were safe—all to avoid the expense and public relations nightmare of correcting the dangerous defects in the Defective Vehicles. New GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT II

## FRAUD BY CONCEALMENT

2661.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2662.   This claim is brought on behalf of Idaho residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2663.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2664.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

2665.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2666.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

2667.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

2668.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

2669.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

2670.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

2671.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.   Plaintiffs' actions were justified.   New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2672.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.   Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.   They also incurred repair costs as alleged above.   Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.   As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

2673.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2674.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT III**

**FRAUD BY CONCEALMENT OF THE RIGHT
TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY**

</div>

2675.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2676.   This claim is brought only on behalf of Idaho residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

2677.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

2678.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel

(all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

2679.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

2680.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

2681.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

2682.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

2683.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

2684.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

2685.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

2686.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

2687.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

2688.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

2689.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

2690.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

2691.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims

by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

2692.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

2693.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2694.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

2695.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

2696.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to

be determined according to proof.

## COUNT IV

## UNJUST ENRICHMENT

2697.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

2698.   This claim is brought on behalf of Idaho residents who are members of any of the

following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition

Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count,

"Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct

of New GM.

2699.   This claim is pleaded in the alternative to any contract-based claims brought on

behalf of Plaintiffs.

2700.   New GM has received and retained a benefit from Plaintiffs and inequity has

resulted.

2701.   New GM has benefitted from selling and leasing the Defective Vehicles, for more

than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have

overpaid for the cars and been forced to pay other costs.

2702.   With respect to the Defective Vehicles purchased before New GM came into

existence that were still on the road after New GM came into existence and as to which New GM

had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs

of a recall and other lawsuits, and further benefitted from its statements about the success of New

GM.

2703.   Thus, all Plaintiffs conferred a benefit on New GM.

2704.   It is inequitable for New GM to retain these benefits.

2705.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did

not benefit from New GM's conduct.

2706.   New GM knowingly accepted the benefits of its unjust conduct.

2707.   As a result of New GM's conduct, the amount of its unjust enrichment should be

disgorged, in an amount according to proof.

### COUNT V

### SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF
### THE IDAHO CONSUMER PROTECTION ACT
### (IDAHO CIV. CODE § 48-601, *et seq.*)

2708.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

2709.   This claim is brought on behalf of Idaho residents who are members of the Delta

Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2710.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing

New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are

free to assert this successor liability claim without impediment from the Sale Order.

2711.   Old GM was a "person" under the Idaho Consumer Protection Act ("Idaho

CPA"), IDAHO CIV. CODE § 48-602(1).

2712.   Old GM's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under IDAHO CIV. CODE § 48-602(2).

2713.   Old GM participated in misleading, false, or deceptive acts that violated the Idaho CPA.  By systematically concealing the defects in the Delta Ignition Switch Vehicles, Old GM engaged in deceptive business practices prohibited by the Idaho CPA, including: (1) representing that the Delta Ignition Switch Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the Delta Ignition Switch Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Delta Ignition Switch Vehicles with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce.  *See* IDAHO CIV. CODE § 48-603.

2714.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

2715.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

2716.  Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

2717.   By failing to disclose and by actively concealing the defects in Plaintiffs'
vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and
deceptive business practices in violation of the Idaho CPA.

2718.   In the course of Old GM's business, it willfully failed to disclose and actively
concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2719.   Old GM's unfair or deceptive acts or practices were likely to and did in fact
deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their
vehicles.

2720.   Old GM intentionally and knowingly misrepresented material facts regarding the
Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

2721.   Old GM knew or should have known that its conduct violated the Idaho CPA.

2722.   As alleged above, Old GM made material statements about the safety and
reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

2723.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the
Delta Ignition Switch Vehicles, because Old GM:

   a.      Possessed exclusive knowledge about the defects in the
           Delta Ignition Switch Vehicles;

   b.      Intentionally concealed the foregoing from Plaintiffs;

   c.      Made incomplete representations about the safety and
           reliability of the Delta Ignition Switch Vehicles, while
           purposefully withholding material facts from Plaintiffs that
           contradicted these representations; and/or

   d.      Had duties under the TREAD Act and related regulations to
           disclose and remedy the defects.

2724.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch
Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their

bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

2725.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2726.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

2727.   As a direct and proximate result of Old GM's violations of the Idaho CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

2728.   Pursuant to IDAHO CODE § 48-608, Plaintiffs seek monetary relief against New GM (in its capacity as successor to Old GM) measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Plaintiff.

2729.   Plaintiffs also seek attorneys' fees, and any other just and proper relief available under the Idaho CPA.

## COUNT VI

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

2730.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2731.   This claim is brought on behalf of Idaho residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2732.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2733.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2734.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

2735.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2736.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

2737.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material

to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

2738.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

2739.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

2740.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2741.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

2742.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2743.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## ILLINOIS

### COUNT I

**VIOLATION OF ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT
(815 ILCS 505/1, *et seq*. and 720 ILCS 295/1A)**

2744.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2745.   This claim is brought on behalf of Illinois residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2746.   New GM is a "person" as that term is defined in 815 ILCS 505/1(c).

2747.   Plaintiffs are "consumers" as that term is defined in 815 ILCS 505/1(e).

2748.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2.

2749.   New GM participated in misleading, false, or deceptive acts that violated the Illinois CFA.  By concealing the known defects in Plaintiffs' vehicles, New GM engaged in deceptive business practices prohibited by the Illinois CFA.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

2750.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

2751.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

2752.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

2753.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Illinois CFA.

2754.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2755.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2756.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

2757.   New GM knew or should have known that its conduct violated the Illinois CFA.

2758.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

2759.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

2760.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

2761.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

2762.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2763.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

2764.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Illinois CFA—regardless of when those owners acquired their vehicles.

2765.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

2766.   As a direct and proximate result of New GM's violations of the Illinois CFA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

2767.   Pursuant to 815 ILCS 505/10a(a), Plaintiffs seek monetary relief against New GM in the amount of actual damages, as well as punitive damages because New GM acted with fraud and/or malice and/or was grossly negligent.

2768.   Plaintiffs also seek an order enjoining New GM's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq*.

## COUNT II

## FRAUD BY CONCEALMENT

2769.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2770.   This claim is brought on behalf of Illinois residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2771.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2772.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

2773.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2774.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

2775.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

2776.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

2777.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

2778.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

2779.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2780.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

2781.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2782.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT III

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

2783.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2784.   This claim is brought only on behalf of Illinois residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

2785.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

2786.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

2787.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

2788.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

2789.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

2790.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

2791.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

2792.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

2793.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

2794.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

2795.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

2796.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

2797.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

2798.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

2799.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims

by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

2800.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

2801.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2802.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

2803.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

2804.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to

be determined according to proof.

<div align="center">

**COUNT IV**

**UNJUST ENRICHMENT**

</div>

2805.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

2806.   This claim is brought on behalf of Illinois residents who are members of any of

the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition

Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count,

"Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct

of New GM.

2807.   This claim is pleaded in the alternative to any contract-based claims brought on

behalf of Plaintiffs.

2808.   New GM has received and retained a benefit from Plaintiffs and inequity has

resulted.

2809.   New GM has benefitted from selling and leasing the Defective Vehicles, for more

than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have

overpaid for the cars and been forced to pay other costs.

2810.   With respect to the Defective Vehicles purchased before New GM came into

existence that were still on the road after New GM came into existence and as to which New GM

had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs

<div align="center">

- 853 -

</div>

of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

2811.   Thus, all Plaintiffs conferred a benefit on New GM.

2812.   It is inequitable for New GM to retain these benefits.

2813.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

2814.   New GM knowingly accepted the benefits of its unjust conduct.

2815.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT V

### SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *et seq*. and 720 ILCS 295/1A)

2816.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2817.   This claim is brought on behalf of Illinois residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2818.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2819.   Old GM was a "person" as that term is defined in 815 ILCS 505/1(c).

2820.   Plaintiffs are "consumers" as that term is defined in 815 ILCS 505/1(e).

2821.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2.

2822.   Old GM participated in misleading, false, or deceptive acts that violated the Illinois CFA.  By concealing the known defects in Plaintiffs' vehicles, Old GM engaged in deceptive business practices prohibited by the Illinois CFA.

2823.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

2824.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

2825.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

2826.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Illinois CFA.

2827.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2828.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2829.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

2830.   Old GM knew or should have known that its conduct violated the Illinois CFA.

2831.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

2832.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

> a.   Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>
> c.   Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

2833.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of

the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

2834.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2835.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

2836.   As a direct and proximate result of Old GM's violations of the Illinois CFA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability

2837.   Pursuant to 815 ILCS 505/10a(a), Plaintiffs seek monetary relief against New GM (as successor to Old GM) in the amount of actual damages, as well as punitive damages because Old GM acted with fraud and/or malice and/or was grossly negligent, attorneys' fees, and such other relief as may be just and proper under the Illinois CFA.

## COUNT VI

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

2838.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2839.   This claim is brought on behalf of Illinois residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2840.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2841.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2842.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

2843.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2844.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

2845.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

2846.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as

set forth above, which were misleading, deceptive, and incomplete without the disclosure of the

defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old

GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had

monitoring and disclosure duties under the TREAD Act, as alleged above.

2847.   Old GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM

money, and it did so at the expense of Plaintiffs.

2848.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.

Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such

facts were not known to the public, including Plaintiffs.

2849.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get

the benefit of their bargain since the Defective Vehicles were worth less than they would have

been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not

have purchased or leased them at all, and Plaintiffs sustained repair damages.

2850.   Accordingly, based on the conduct of Old GM for which it has successor liability,

New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2851.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## INDIANA

## COUNT I

### VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
#### (IND. CODE § 24-5-0.5-3)

2852.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2853.   This claim is brought on behalf of Indiana residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2854.   New GM is a "person" within the meaning of IND. CODE § 24-5-0.5-2(2) and a "supplier" within the meaning of IND. CODE § 24-5-.05-2(a)(3).

2855.   Plaintiffs' purchases of Defective Vehicles are "consumer transactions" within the meaning of IND. CODE § 24-5-.05-2(a)(1).

2856.   Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes representing:  "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction

- 860 -

is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

2857.   New GM participated in misleading, false, or deceptive acts that violated the Indiana DCSA.  By systematically concealing the defects in the Defective Vehicles, New GM engaged in deceptive business practices prohibited by the Indiana DCSA.  New GM also engaged in unlawful trade practices by:  (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective Vehicles are of a particular standard and quality when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging in conduct likely to deceive.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

2858.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

2859.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

2860.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

2861.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Indiana DCSA.

2862.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2863.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2864.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

2865.   New GM knew or should have known that its conduct violated the Indiana DCSA.

2866.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

2867.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

2868.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

2869.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

2870.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2871.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

2872.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Indiana DCSA—regardless of when those owners acquired their vehicles.

2873.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta

Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

2874.   As a direct and proximate result of New GM's violations of the Indiana DCSA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

2875.   Pursuant to IND. CODE § 24-5-0.5-4, Plaintiffs seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff, including treble damages up to $1,000 for New GM's willfully deceptive acts.

2876.   Plaintiffs also seek punitive damages based on the outrageousness and recklessness of the New GM's conduct and New GM's high net worth.

2877.   On October 8, 2014, certain Plaintiffs sent a letter complying with IND. CODE § 24-5-0.5-5(a).  Because New GM failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

## COUNT II

## FRAUD BY CONCEALMENT

2878.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2879.   This claim is brought on behalf of Indiana residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

- 865 -

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2880.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2881.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

2882.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2883.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

2884.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

2885.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in

the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to

disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all

of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

implementing regulations, including the duty to promptly notify consumers of known safety

defects.

2886.   New GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM

money, and it did so at the expense of Plaintiffs.

2887.   On information and belief, New GM has still not made full and adequate

disclosure and continues to defraud Plaintiffs and conceal material information regarding defects

that exist in the Defective Vehicles.

2888.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Defective Vehicles manufactured by New GM; and/or would not have

continued to own and drive their Old GM Defective Vehicles or would have taken other

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the

material facts and such facts were not known to the public, including Plaintiffs.

2889.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their

bargain since the Defective Vehicles were worth less than they would have been without the

defects, and because they own vehicles that diminished in value as a result of New GM's

concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as

alleged above.  Had they been aware of the concealed defects that existed in the Defective

Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

2890.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2891.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

## (IND. CODE § 26-1-2-314)

2892.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2893.   This claim is brought only on behalf of Indiana residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

2894.   New GM was a merchant with respect to motor vehicles within the meaning of IND. CODE § 26-1-2-104(1).

2895.   Under IND. CODE § 26-1-2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

2896.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

2897.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

2898.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

2899.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

2900.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2901.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

2902.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2903.   This claim is brought only on behalf of Indiana residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

2904.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

2905.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

2906.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

2907.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

2908.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

2909.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

2910.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

2911.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

2912.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

2913.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

- 871 -

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

2914.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

2915.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

2916.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

2917.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

2918.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

2919.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted

the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who

had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old

GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its

implementing regulations that required the disclosure of the defect.

2920.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were

justified.  New GM was in exclusive control of the material facts and such facts were not known

to the public, including Plaintiffs.

2921.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage because they lost their chance to file a claim against Old GM and seek payment from the

GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims

and would have recovered from the GUC Trust.

2922.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be

proven at trial.

2923.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to

be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

2924.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2925.   This claim is brought on behalf of Indiana residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2926.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

2927.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

2928.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

2929.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

2930.   Thus, all Plaintiffs conferred a benefit on New GM.

2931.   It is inequitable for New GM to retain these benefits.

2932.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

2933.   New GM knowingly accepted the benefits of its unjust conduct.

2934.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
### (IND. CODE § 24-5-0.5-3)

2935.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2936.   This claim is brought on behalf of Indiana residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2937.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2938.   Old GM was a "person" within the meaning of IND. CODE § 24-5-0.5-2(2) and a "supplier" within the meaning of IND. CODE § 24-5-.05-2(a)(3).

2939.   Plaintiffs' purchases of the Old GM Delta Ignition Switch Vehicles were "consumer transactions" within the meaning of IND. CODE § 24-5-.05-2(a)(1).

2940.   Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes representing:  "(1) That such

subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

2941.   Old GM participated in misleading, false, or deceptive acts that violated the Indiana DCSA.  By systematically concealing the defects in the Delta Ignition Switch Vehicles, Old GM engaged in deceptive business practices prohibited by the Indiana DCSA.  Old GM also engaged in unlawful trade practices by:  (1) representing that the Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Delta Ignition Switch Vehicles are of a particular standard and quality when they are not; (3) advertising the Delta Ignition Switch e Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging in conduct likely to deceive.

2942.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

2943.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

2944.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

2945.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Indiana DCSA.

2946.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2947.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2948.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

2949.   Old GM knew or should have known that its conduct violated the Indiana DCSA.

2950.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

2951.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.      Intentionally concealed the foregoing from Plaintiffs;

c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

2952.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

2953.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2954.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

2955.   As a direct and proximate result of Old GM's violations of the Indiana DCSA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

- 878 -

2956.   Pursuant to IND. CODE § 24-5-0.5-4, Plaintiffs seek monetary relief against New GM (as Old GM's successor) measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff, including treble damages up to $1,000 for Old GM's willfully deceptive acts.

2957.   On October 8, 2014, certain Plaintiffs sent a letter complying with IND. CODE § 24-5-0.5-5(a).  Because New GM failed to remedy the unlawful conduct of Old GM (for which it has successor liability) within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

2958.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2959.   This claim is brought on behalf of Indiana residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2960.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2961.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

2962.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

2963.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

2964.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

2965.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

2966.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

2967.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

2968.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

2969.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

2970.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

2971.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(IND. CODE § 26-1-2-314)

2972.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2973.   This claim is brought on behalf of Indiana residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

2974.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

2975.   Old GM was a merchant with respect to motor vehicles within the meaning of IND. CODE § 26-1-2-104(1).

2976.   Under IND. CODE § 26-1-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

2977.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

2978.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

- 882 -

2979.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## IOWA

## COUNT I

## VIOLATIONS OF THE PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT
### (IOWA CODE § 714H.1, *et seq.*)

2980.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2981.   This claim is brought on behalf of Iowa residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

2982.   New GM is "person" under IOWA CODE § 714H.2(7).

2983.   Plaintiffs are "consumers," as defined by IOWA CODE § 714H.2(3), who purchased or leased one or more Defective Vehicles.

2984.   The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer

- 883 -

merchandise."  IOWA CODE § 714H.3.  New GM participated in misleading, false, or deceptive

acts that violated the Iowa CFA.  By systematically concealing the defects in Defective Vehicles,

New GM engaged in deceptive business practices prohibited by the Iowa CFA.  The defects in

each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also

include the defective process through which New GM built cars, a process that included cost-

cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to

recognizing and studying safety issues, the failure to follow acceptable engineering and

inventory processes concerning parts management, and the failure to follow a proper FMEA

process.  All of these defective processes would be material to a reasonable consumer.

2985.   New GM's actions, as set forth above, occurred in the conduct of trade or

commerce.

2986.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles

as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

New GM also engaged in unlawful trade practices by employing deception, deceptive acts or

practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection

with the sale of the Defective Vehicles.

2987.   From the date of its inception on July 10, 2009, New GM knew of serious defects

affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of

Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that

transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory

authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed

above.  New GM acquired additional information concerning the serious defects and safety

issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

2988.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Iowa CFA.

2989.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

2990.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

2991.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

2992.   New GM knew or should have known that its conduct violated the Iowa CFA.

2993.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

2994.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

2995.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

2996.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

2997.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

2998.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

2999.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.

By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Iowa CFA—regardless of when those owners acquired their vehicles.

3000.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

3001.   As a direct and proximate result of New GM's violations of the Iowa CFA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

3002.   Pursuant to IOWA CODE § 714H.5, Plaintiffs seek an order enjoining New GM's unfair and/or deceptive acts or practices; actual damages; in addition to an award of actual damages, statutory damages up to three times the amount of actual damages awarded as a result of New GM's willful and wanton disregard for the rights or safety of others; attorneys' fees; and such other equitable relief as the Court deems necessary to protect the public from further violations of the Iowa CFA.

## COUNT II

## FRAUD BY CONCEALMENT

3003.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3004.   This claim is brought on behalf of Iowa residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").   The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3005.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3006.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

3007.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3008.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

3009.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.   The concealed information was material to

consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

3010.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

3011.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

3012.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

3013.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3014.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

3015.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

3016.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

3017.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3018.   This claim is brought only on behalf of Iowa residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

3019.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

3020.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

3021.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

3022.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

3023.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

3024.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

3025.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

3026.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

3027.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

3028.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

3029.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

3030.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

3031.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

3032.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

3033.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

3034.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

3035.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3036.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

3037.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

3038.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## UNJUST ENRICHMENT

3039.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3040.   This claim is brought on behalf of Iowa residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3041.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

3042.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

3043.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

3044.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

3045.   Thus, all Plaintiffs conferred a benefit on New GM.

3046.   It is inequitable for New GM to retain these benefits.

3047.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

3048.   New GM knowingly accepted the benefits of its unjust conduct.

3049.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT V

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT
### (IOWA CODE § 714H.1, *et seq.*)

3050.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3051.   This claim is brought on behalf of Iowa residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3052.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3053.   Old GM was a "person" under IOWA CODE § 714H.2(7).

3054.   Plaintiffs are "consumers," as defined by IOWA CODE § 714H.2(3), who purchased or leased one or more Delta Ignition Switch Vehicles from Old GM.

3055.   The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment,

suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise." IOWA CODE § 714H.3.  New GM participated in misleading, false, or deceptive acts that violated the Iowa CFA.  By systematically concealing the defects in the Delta Ignition Switch Vehicles, Old GM engaged in deceptive business practices prohibited by the Iowa CFA.

3056.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3057.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

3058.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

3059.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Iowa CFA.

3060.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3061.  Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3062.  Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

3063.  Old GM knew or should have known that its conduct violated the Iowa CFA.

3064.  As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

3065.  Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

> a.     Possessed exclusive knowledge about the defects in the
>        Delta Ignition Switch Vehicles;
>
> b.     Intentionally concealed the foregoing from Plaintiffs;
>
> c.     Made incomplete representations about the safety and
>        reliability of the Delta Ignition Switch Vehicles, while
>        purposefully withholding material facts from Plaintiffs that
>        contradicted these representations; and/or
>
> d.     Had duties under the TREAD Act and related regulations to
>        disclose and remedy the defects.

3066.  Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

3067.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

3068.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

3069.   As a direct and proximate result of Old GM's violations of the Iowa CFA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

3070.   Pursuant to IOWA CODE § 714H.5, Plaintiffs seek actual damages; in addition to an award of actual damages, statutory damages up to three times the amount of actual damages awarded as a result of Old GM's willful and wanton disregard for the rights or safety of others (for which New GM has successor liability); attorneys' fees; and such other relief as the Court deems necessary under the Iowa CFA.

## COUNT VI

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

3071.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3072.   This claim is brought on behalf of Iowa residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3073.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3074.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3075.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

3076.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3077.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

3078.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

3079.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old

GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

3080.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

3081.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3082.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

3083.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

3084.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

# KANSAS

## COUNT I

### VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
#### (KAN. STAT. ANN. § 50-623, *et seq.*)

3085.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3086.   This claim is brought on behalf of Kansas residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").   The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3087.   New GM is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), KAN. STAT. ANN. § 50-624(l).

3088.   Plaintiffs are "consumers," within the meaning of KAN. STAT. ANN. § 50-624(b), who purchased or leased one or more Defective Vehicles.

3089.   The sale of the Defective Vehicles to Plaintiffs was a "consumer transaction" within the meaning of KAN. STAT. ANN. § 50-624(c).

3090.   The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," KAN. STAT. ANN. § 50-626(a), and that deceptive acts or practices include:  (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are

of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction."  KAN. STAT. ANN. § 50-627(a).

3091.   New GM participated in misleading, false, or deceptive acts that violated the Kansas CPA.  By systematically concealing the defects in Defective Vehicles, New GM engaged in deceptive business practices prohibited by the Kansas CPA.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.  New GM also engaged in unlawful trade practices by:  (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective Vehicles are of a particular standard and quality when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

3092.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3093.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

3094.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

3095.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Kansas CPA.

3096.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3097.  New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3098.  New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

3099.  New GM knew or should have known that its conduct violated the Kansas CPA.

3100.  As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

3101.  New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

3102.  Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

3103.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

3104.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

3105.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

3106.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Kansas CPA—regardless of when those owners acquired their vehicles.

3107.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta

Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

3108.   As a direct and proximate result of New GM's violations of the Kansas CPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

3109.   Pursuant to KAN. STAT. ANN. § 50-634, Plaintiffs seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiff.

3110.   Plaintiff also seeks an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under KAN. STAT. ANN § 50-623, *et seq*.

## COUNT II

## FRAUD BY CONCEALMENT

3111.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3112.   This claim is brought on behalf of Kansas residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3113.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3114.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

3115.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3116.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

3117.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

3118.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

implementing regulations, including the duty to promptly notify consumers of known safety

defects.

3119.   New GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM

money, and it did so at the expense of Plaintiffs.

3120.   On information and belief, New GM has still not made full and adequate

disclosure and continues to defraud Plaintiffs and conceal material information regarding defects

that exist in the Defective Vehicles.

3121.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Defective Vehicles manufactured by New GM; and/or would not have

continued to own and drive their Old GM Defective Vehicles or would have taken other

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the

material facts and such facts were not known to the public, including Plaintiffs.

3122.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their

bargain since the Defective Vehicles were worth less than they would have been without the

defects, and because they own vehicles that diminished in value as a result of New GM's

concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as

alleged above.  Had they been aware of the concealed defects that existed in the Defective

Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their

vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the

time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all

Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

3123.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

3124.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (KAN. STAT. ANN. § 84-2-314)

3125.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3126.   This claim is brought only on behalf of Kansas residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

3127.   New GM was a merchant with respect to motor vehicles within the meaning of KAN. STAT. ANN. § 84-2-104(1).

3128.   Under KAN. STAT. ANN. § 84-2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Ignition Switch Vehicles from New GM on or after July 10, 2009.

3129.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

3130.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3131.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

3132.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3133.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

3134.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

## FRAUD BY CONCEALMENT OF THE RIGHT
## TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

3135.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

3136.   This claim is brought only on behalf of Kansas residents who are members of the

Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

3137.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles

sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale

Agreement by which New GM acquired substantially all the assets of Old GM.

3138.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale

Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required

… to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit

Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full

evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge

from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel

(all of whom were transferred to New GM), including engineers, senior managers and attorneys,

were informed or otherwise aware of the defect prior to the Sale Motion."

3139.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order.

No recall occurred, and neither the direct mail notice nor the publication notice sent in

connection with the Sale Motion mentioned the defect.

3140.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

3141.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

3142.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

3143.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

3144.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

3145.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

3146.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

- 913 -

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the

GUC Trust's expenses and existing beneficiaries of the Trust.

3147.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because

they did not receive notice of the defect prior to the passage of the Bar Date, and the Second

Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these

vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness

bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals

vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

3148.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have

filed claims against Old GM before the Bar Date.

3149.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have

been allowed.

3150.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale

Agreement would have been triggered, and New GM would have been required to contribute

additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect

Bankruptcy Class Members across the country.

3151.   New GM's concealment and suppression of the material fact of the Delta Ignition

Switch Defect over the first several months of its existence served to prevent the filing of claims

by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would

otherwise have had to make.

3152.   New GM had a duty to disclose the Delta Ignition Switch Defect because the

information was known and/or accessible only to New GM who had superior knowledge and

access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

3153.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3154.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

3155.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

3156.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT V**

**UNJUST ENRICHMENT**

3157.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3158.   This claim is brought on behalf of Kansas residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").   The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3159.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

3160.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

3161.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

3162.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

3163.   Thus, all Plaintiffs conferred a benefit on New GM.

3164.   It is inequitable for New GM to retain these benefits.

3165.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

3166.   New GM knowingly accepted the benefits of its unjust conduct.

3167.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
#### (KAN. STAT. ANN. § 50-623, *et seq.*)

3168.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3169.   This claim is brought on behalf of Kansas residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3170.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3171.   Old GM was a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), KAN. STAT. ANN. § 50-624(l).

3172.   Plaintiffs are "consumers," within the meaning of KAN. STAT. ANN. § 50-624(b), who purchased or leased one or more Defective Vehicles.

3173.   Each sale of a Delta Ignition Switch Vehicle to Plaintiffs was a "consumer transaction" within the meaning of KAN. STAT. ANN. § 50-624(c).

3174.   The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," KAN. STAT. ANN. § 50-626(a), and that deceptive acts or practices include:  (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction."  KAN. STAT. ANN. § 50-627(a).

3175.   Old GM participated in misleading, false, or deceptive acts that violated the Kansas CPA.  By systematically concealing the defects in Delta Ignition Switch Vehicles, Old GM engaged in deceptive business practices prohibited by the Kansas CPA.  Old GM also engaged in unlawful trade practices by:  (1) representing that the Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Delta Ignition Switch Vehicles are of a particular standard and quality when they are not; (3) advertising the Delta Ignition Switch Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

3176.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3177.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

3178.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

3179.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Kansas CPA.

3180.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3181.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3182.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

3183.   Old GM knew or should have known that its conduct violated the Kansas CPA.

3184.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

3185.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Delta Ignition Switch Vehicles, because Old GM:

      a.      Possessed exclusive knowledge about the defects in the
              Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and
              reliability of the Delta Ignition Switch Vehicles, while
              purposefully withholding material facts from Plaintiffs that
              contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to
              disclose and remedy the defects.

3186.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their

bargain since the vehicles they purchased were worth less than they would have been if they

were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of

the defects in their vehicles, they would have either not bought their Delta Ignition Switch

Vehicles or would have paid less for them.

3187.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to

Plaintiffs.

3188.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and

its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of

the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their

vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs,

as alleged above.

3189.   As a direct and proximate result of Old GM's violations of the Kansas CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

3190.   Pursuant to KAN. STAT. ANN. § 50-634, Plaintiffs seek monetary relief against New GM (as the successor to Old GM) measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiff.

3191.   Plaintiff also seeks attorneys' fees, and any other just and proper relief available under KAN. STAT. ANN § 50-623, *et seq*.

<div align="center">

**COUNT VII**

**SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT**

</div>

3192.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3193.   This claim is brought on behalf of Kansas residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3194.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3195.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3196.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

<div align="center">

- 921 -

</div>

3197.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3198.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

3199.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

3200.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

3201.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

3202.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3203.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

3204.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

3205.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (KAN. CODE COM. LAW § 2-314)

3206.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3207.   This claim is brought on behalf of Kansas residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3208.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3209.   Old GM was a merchant with respect to motor vehicles within the meaning of KAN. STAT. ANN. § 84-2-104(1).

3210.   Under KAN. STAT. ANN. § 84-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

3211.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3212.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

3213.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial

## KENTUCKY

## COUNT I

## VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT
### (KY. REV. STAT. § 367.110, *et seq.*)

3214.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3215.   This claim is brought on behalf of Kentucky residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs"). The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3216.   New GM and Plaintiffs are "persons" within the meaning of the KY. REV. STAT. § 367.110(1).

3217.   New GM engaged in "trade" or "commerce" within the meaning of KY. REV. STAT. § 367.110(2).

3218.   The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce ...." KY. REV. STAT. § 367.170(1).  New GM participated in misleading, false, or deceptive acts that violated the Kentucky CPA.  By systematically concealing the defects in the Defective Vehicles, New GM engaged in deceptive business practices prohibited by the

- 925 -

Kentucky CPA.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

3219.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3220.   In the course of its business, New GM systematically concealed the defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles.

3221.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

3222.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Kentucky CPA.

3223.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3224.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3225.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

3226.   New GM knew or should have known that its conduct violated the Kentucky CPA.

3227.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

3228.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

  a.   Possessed exclusive knowledge about the defects in the Defective Vehicles;

  b.   Intentionally concealed the foregoing from Plaintiffs;

  c.   Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

  d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

3229.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

3230.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

3231.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

3232.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

3233.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively

undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Kentucky CPA—regardless of when those owners acquired their vehicles.

3234.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

3235.   As a direct and proximate result of New GM's violations of the Kentucky CPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

3236.   Pursuant to KY. REV. STAT. ANN. § 367.220, Plaintiffs seek to recover actual damages in an amount to be determined at trial; an order enjoining New GM's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under KY. REV. STAT. ANN. § 367.220.

<div align="center">

**COUNT II**

**FRAUD BY CONCEALMENT**

</div>

3237.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3238.   This claim is brought on behalf of Kentucky residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition

Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3239.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3240.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

3241.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3242.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

3243.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

3244.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth

- 930 -

above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

3245.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

3246.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

3247.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3248.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as

alleged above.  Had they been aware of the concealed defects that existed in the Defective

Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their

vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the

time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all

Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty

and omissions with respect to the quality and safety of these vehicles.

3249.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be

proven at trial.

3250.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such

conduct in the future, which amount is to be determined according to proof.

## COUNT III

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

3251.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

3252.   This claim is brought only on behalf of Kentucky residents who are members of

the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

3253.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles

sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale

Agreement by which New GM acquired substantially all the assets of Old GM.

3254.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

3255.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

3256.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

3257.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

3258.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

3259.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two

series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

3260.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

3261.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

3262.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

3263.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

3264.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

3265.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

- 934 -

3266.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale

Agreement would have been triggered, and New GM would have been required to contribute

additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect

Bankruptcy Class Members across the country.

3267.   New GM's concealment and suppression of the material fact of the Delta Ignition

Switch Defect over the first several months of its existence served to prevent the filing of claims

by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would

otherwise have had to make.

3268.   New GM had a duty to disclose the Delta Ignition Switch Defect because the

information was known and/or accessible only to New GM who had superior knowledge and

access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted

the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who

had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old

GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its

implementing regulations that required the disclosure of the defect.

3269.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were

justified.  New GM was in exclusive control of the material facts and such facts were not known

to the public, including Plaintiffs.

3270.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage because they lost their chance to file a claim against Old GM and seek payment from the

GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

3271.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

3272.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT IV**

**UNJUST ENRICHMENT**

</div>

3273.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3274.   This claim is brought on behalf of Kentucky residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3275.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

3276.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

<div align="center">

- 936 -

</div>

3277.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

3278.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

3279.   Thus, all Plaintiffs conferred a benefit on New GM.

3280.   It is inequitable for New GM to retain these benefits.

3281.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

3282.   New GM knowingly accepted the benefits of its unjust conduct.

3283.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT V

### SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT
### (KY. REV. STAT. § 367.110, *et seq.*)

3284.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3285.   This claim is brought on behalf of Kentucky residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3286.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3287.   Old GM and Plaintiffs are "persons" within the meaning of the KY. REV. STAT. § 367.110(1).

3288.   Old GM engaged in "trade" or "commerce" within the meaning of KY. REV. STAT. § 367.110(2).

3289.   The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce …."  KY. REV. STAT. § 367.170(1).  Old GM participated in misleading, false, or deceptive acts that violated the Kentucky CPA.  By systematically concealing the defects in the Delta Ignition Switch Vehicles, New GM engaged in deceptive business practices prohibited by the Kentucky CPA.

3290.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3291.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

3292.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

3293.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Kentucky CPA.

3294.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3295.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3296.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

3297.   Old GM knew or should have known that its conduct violated the Kentucky CPA.

3298.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

3299.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

> a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;
>
> b.      Intentionally concealed the foregoing from Plaintiffs;
>
> c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

3300.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

3301.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

3302.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

3303.   As a direct and proximate result of Old GM's violations of the Kentucky CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

3304.   Pursuant to KY. REV. STAT. ANN. § 367.220, Plaintiffs seek to recover actual damages in an amount to be determined at trial; attorneys' fees; and any other just and proper relief available under KY. REV. STAT. ANN. § 367.220.

## COUNT VI

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

3305.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3306.   This claim is brought on behalf of Kentucky residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3307.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3308.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3309.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

3310.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3311.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

3312.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

3313.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge

and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

3314.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

3315.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3316.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

3317.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

3318.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## LOUISIANA

## COUNT I

### VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (La. Rev. Stat. § 51:1401, *et seq.*)[425]

3319.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3320.   This claim is brought on behalf of Louisiana residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").   The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3321.   New GM and Plaintiffs are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8).

3322.   Plaintiffs are "consumers" within the meaning of  La. Rev. Stat. § 51:1402(1).

---

[425] Plaintiffs understand that this Court has found that the claims of New GM vehicle purchasers and lessees are barred by the Louisiana Products Liability Act ("LPA"), and are asserting those claims here solely for the purpose of preserving the claims for appellate purposes. As this Court held in the *Scheuer* litigation, the LPA does **not** bar claims against New GM brought by Old GM purchasers since New GM did not manufacture the Old GM vehicles.  *In re Gen. Motors*, 2016 WL 874778, at *4.

3323.   New GM engaged in "trade" or "commerce" within the meaning of LA. REV. STAT. § 51:1402(9).

3324.   The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. § 51:1405(A).   New GM participated in misleading, false, or deceptive acts that violated the Louisiana CPL.   By systematically concealing the defects in Defective Vehicles, New GM engaged in deceptive business practices prohibited by the Louisiana CPL.   The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.   All of these defective processes would be material to a reasonable consumer.

3325.   New GM participated in misleading, false, or deceptive acts that violated the Louisiana CPL.   By concealing the known defects in Plaintiffs' vehicles, New GM engaged in deceptive business practices prohibited by the Louisiana CPL.

3326.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3327.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

3328.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

3329.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Louisiana CPL.

3330.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3331.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3332.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

3333.   New GM knew or should have known that its conduct violated the Louisiana CPL.

3334.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

3335.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

3336.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

3337.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

3338.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

3339.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

3340.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Louisiana CPL—regardless of when those owners acquired their vehicles.

3341.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

3342.   As a direct and proximate result of New GM's violations of the Louisiana CPL, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

- 947 -

3343.   Pursuant to LA. REV. STAT. § 51:1409, Plaintiffs seek to recover actual damages in an amount to be determined at trial; treble damages for New GM's knowing violations of the Louisiana CPL; an order enjoining New GM's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under LA. REV. STAT. § 51:1409.

## COUNT II

## FRAUD BY CONCEALMENT[426]

3344.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3345.   This claim is brought on behalf of Louisiana residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3346.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3347.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

---

[426] Plaintiffs understand that this Court has found that the claims of New GM vehicle purchasers and lessees are barred by the Louisiana Products Liability Act ("LPA"), and are asserting those claims here solely for the purpose of preserving the claims for appellate purposes. As this Court held in the *Scheuer* litigation, the LPA does ***not*** bar claims against New GM brought by Old GM purchasers since New GM did not manufacture the Old GM vehicles.  *In re Gen. Motors*, 2016 WL 874778, at *4.

3348.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3349.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

3350.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

3351.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

- 949 -

3352.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

3353.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

3354.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3355.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

3356.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

3357.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/ WARRANTY AGAINST REDHIBITORY DEFECTS (LA. CIV. CODE ART. 2520, 2524)[427]

3358.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3359.   This claim is brought only on behalf of Louisiana residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

3360.   At the time Plaintiffs acquired their Defective Vehicles, those vehicles had a redhibitory defect within the meaning of  LA. CIV. CODE ART. 2520, in that (a) the defects

---

[427] Plaintiffs understand that this Court has found, albeit it in dicta, that the implied warranty claims of New GM vehicle purchasers and lessees are barred by the Louisiana Products Liability Act ("LPA"), and are asserting those claims here solely for the purpose of preserving the claims for appellate purposes.

rendered the use of the Defective Vehicles so inconvenient that Plaintiffs either would not have purchased the Defective Vehicles had they known of the defects, or, because the defects so diminished the usefulness and/or value of the Defective Vehicles such that it must be presumed that the Plaintiffs would have purchased the Defective Vehicles, but for a lesser price.

3361.   No notice of the defect is required under LA. CIV. CODE ART. 2520, since New GM had knowledge of a redhibitory defect in the Defective Vehicles at the time they were sold to Plaintiffs.

3362.   Under LA. CIV. CODE ART. 2524, a warranty that the Defective Vehicles were in merchantable condition, or fit for ordinary use, was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

3363.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

3364.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3365.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

3366.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3367.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

3368.   As a direct and proximate result of New GM's sale of vehicles with redhibitory defects, and in violation of the implied warranty that the Defective Vehicles were fit for ordinary use, Plaintiffs are entitled to either rescission or damages in an amount to be proven at trial.

## COUNT IV

## NEGLIGENCE[428]

3369.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3370.   Plaintiffs bring this Count on behalf of Louisiana residents who are members of any of the following Classes: (i) Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs"). All claims in this Count are Independent Claims, and challenge only the conduct of New GM.

---

[428] Plaintiffs understand that this Court has found that the claims of New GM vehicle purchasers and lessees are barred by the Louisiana Products Liability Act ("LPA"), and are asserting those claims here solely for the purpose of preserving the claims for appellate purposes. As this Court held in the *Scheuer* litigation, the LPA does **not** bar claims against New GM brought by Old GM purchasers since New GM did not manufacture the Old GM vehicles.  *In re Gen. Motors*, 2016 WL 874778, at *4.

3371.   New GM has designed, manufactured and/ or "certified" and sold or otherwise placed in the stream of commerce Defective Vehicles as New GM or New GM Certified Pre-Owned vehicles, as set forth above.

3372.   New GM had a duty to design, manufacture, and/or "certify" only a product that would be safe for its intended and foreseeable uses and users, including the use to which its products were put by Plaintiffs.  New GM breached its duties to Plaintiffs because it was negligent in the design, development, manufacture, and testing of the Defective Vehicles it manufactured and/or sold as Certified Pre-Owned vehicles on or after July 10, 2009, and New GM is responsible for this negligence.

3373.   New GM was negligent in the design, development, manufacture, testing, and/or "certification" of the Defective Vehicles because it knew, or in the exercise of reasonable care should have known, that the vehicles equipped with defective ignition systems, defective wiring harnesses controlling side airbags and/or defective power steering pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which brakes, power steering, seatbelt pretensioners, and/or airbags are rendered inoperable.

3374.   New GM thus "failed to exercise reasonable care in the manufacture of [its Defective Vehicles]", in violation of RESTATEMENT (SECOND) OF TORTS § 395 ("A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.").

- 954 -

3375.   New GM further breached its duties to Plaintiffs by supplying directly or through a third person Defective Vehicles to be used by such foreseeable persons as Plaintiffs when:

      a.    New GM knew or had reason to know that the vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

      b.    New GM failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the vehicles are likely to be dangerous.

3376.   New GM had a continuing duty to warn and instruct the intended and foreseeable users of its vehicles, including Plaintiffs, of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles. Plaintiffs were entitled to know that the vehicles, in their ordinary operation, were not reasonably safe for their intended and ordinary purposes and uses.

3377.   Pursuant to its ongoing relationship with owners and lessees of Old GM Defective Vehicles, New GM also had a duty to warn those Plaintiffs of the defects, and inform these Plaintiffs that their vehicles, in their ordinary operation, were not reasonably safe for their intended purposes.

3378.   New GM knew or should have known of the defects described herein.  New GM breached its duty to Plaintiffs because it failed to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles.

3379.   As a direct and proximate result of New GM's negligence, Plaintiffs suffered damages, including overpayment at the time of purchase, diminished value, and cost of repair.

**COUNT V**

**FRAUD BY CONCEALMENT OF THE RIGHT
TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY**

3380.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3381.   This claim is brought only on behalf of Louisiana residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

3382.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

3383.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

3384.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

3385.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

3386.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

3387.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

3388.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

3389.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

3390.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

3391.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

- 957 -

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

3392.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

3393.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

3394.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

3395.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

3396.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

3397.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

- 958 -

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

3398.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3399.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

3400.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

3401.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VI

## UNJUST ENRICHMENT[429]

3402.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3403.   This claim is brought on behalf Louisiana residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").   The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3404.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

3405.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

3406.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

3407.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM

---

[429] Plaintiffs understand that this Court has found that the claims of New GM vehicle purchasers and lessees are barred by the Louisiana Products Liability Act ("LPA"), and are asserting those claims here solely for the purpose of preserving the claims for appellate purposes. As this Court held in the *Scheuer* litigation, the LPA does ***not*** bar claims against New GM brought by Old GM purchasers since New GM did not manufacture the Old GM vehicles.   *In re Gen. Motors*, 2016 WL 874778, at \*4.

had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

3408.   Thus, all Plaintiffs conferred a benefit on New GM.

3409.   It is inequitable for New GM to retain these benefits.

3410.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

3411.   New GM knowingly accepted the benefits of its unjust conduct.

3412.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

<div align="center">

**COUNT VII**

**SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF THE
LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
(LA. REV. STAT. § 51:1401, *et seq.*)[430]**

</div>

3413.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3414.   This claim is brought on behalf of Louisiana residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3415.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

---

[430] Plaintiffs understand that this Court has found that the claims of new vehicle purchasers and lessees are barred by the Louisiana Products Liability Act, and are asserting those claims here solely for the purpose of preserving the claims for appellate purposes.

the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3416.   Old GM and Plaintiffs are "persons" within the meaning of the LA. REV. STAT. § 51:1402(8).

3417.   Plaintiffs are "consumers" within the meaning of  LA. REV. STAT. § 51:1402(1).

3418.   Old GM engaged in "trade" or "commerce" within the meaning of LA. REV. STAT. § 51:1402(9).

3419.   The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. § 51:1405(A).  Old GM participated in misleading, false, or deceptive acts that violated the Louisiana CPL.  By systematically concealing the defects in Delta Ignition Switch Vehicles, Old GM engaged in deceptive business practices prohibited by the Louisiana CPL.

3420.   Old GM participated in misleading, false, or deceptive acts that violated the Louisiana CPL.  By concealing the known defects in Plaintiffs' vehicles, Old GM engaged in deceptive business practices prohibited by the Louisiana CPL.

3421.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3422.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

- 962 -

3423.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

3424.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Louisiana CPL.

3425.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

3426.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

3427.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Louisiana CPL.

3428.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3429.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3430.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

3431.   Old GM knew or should have known that its conduct violated the Louisiana CPL.

3432.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

3433.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

> a.   Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>
> c.   Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

3434.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of

the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

3435.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

3436.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

3437.   As a direct and proximate result of Old GM's violations of the Louisiana CPL, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

3438.   Pursuant to LA. REV. STAT. § 51:1409, Plaintiffs seek to recover actual damages in an amount to be determined at trial; treble damages for Old GM's knowing violations of the Louisiana CPL (for which New GM has successor liability); attorneys' fees; and any other just and proper relief available under LA. REV. STAT. § 51:1409.

## COUNT VIII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT[431]

3439.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

---

[431] Plaintiffs understand that this Court has held that new car purchasers' claims for fraud by concealment are barred by the Louisiana Products Liability Act, and assert these claims here solely for the purpose of preserving the claims for appellate review.

3440.   This claim is brought on behalf of Louisiana residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3441.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3442.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3443.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

3444.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3445.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

3446.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

3447.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge

- 966 -

and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

3448.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

3449.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3450.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

3451.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

3452.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT IX

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/ WARRANTY AGAINST REDHIBITORY DEFECTS (LA. CIV. CODE ART. 2520, 2524)[432]

3453.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3454.   This claim is brought only on behalf of Louisiana residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3455.   At the time Plaintiffs acquired their Delta Ignition Switch Vehicles, those vehicles had a redhibitory defect within the meaning of LA. CIV. CODE ART. 2520, in that (a) the defects rendered the use of the Delta Ignition Switch Vehicles so inconvenient that Plaintiffs either would not have purchased the Delta Ignition Switch Vehicles had they known of the defects, or, because the defects so diminished the usefulness and/or value of the Delta Ignition Switch Vehicles such that it must be presumed that the Plaintiffs would have purchased the Delta Ignition Switch Vehicles, but for a lesser price.

---

[432] Plaintiffs understand that this Court has held, albeit it in dicta, that implied warranty claims are barred by the Louisiana Products Liability Act, and assert these claims here solely for the purpose of preserving the claims for appellate review.

010440-11  983080 V1

3456.   No notice of the defect is required under LA. CIV. CODE ART. 2520, since Old GM had knowledge of a redhibitory defect in the Delta Ignition Switch Vehicles at the time they were sold to Plaintiffs.

3457.   Under LA. CIV. CODE ART. 2524, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition, or fit for ordinary use, was implied by law in the transactions when Plaintiffs purchased or leased their Delta Ignition Switch Vehicles from Old GM on or before July 9, 2009.

3458.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3459.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

3460.   As a direct and proximate result of Old GM's sale of vehicles with redhibitory defects, and in violation of the implied warranty that the Delta Ignition Switch Vehicles were fit for ordinary use, Plaintiffs are entitled to either rescission or damages in an amount to be proven at trial.

## COUNT X

## SUCCESSOR LIABILITY CLAIM FOR NEGLIGENCE[433]

3461.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3462.   This claim is brought on behalf of Louisiana residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3463.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3464.   Old GM designed, manufactured and sold or otherwise placed in the stream of commerce Delta Ignition Switch Vehicles, as set forth above.

3465.   Old GM had a duty to design, manufacture, and sell only a product that would be safe for its intended and foreseeable uses and users, including the use to which its products were put by Plaintiffs.  Old GM breached its duties to Plaintiffs because it was negligent in the design, development, manufacture, and testing of the Delta Ignition Switch Vehicles it manufactured and sold on or before July 9, 2009, and New GM is responsible for Old GM's negligence under the doctrine of successor liability.

3466.   Old GM was negligent in the design, development, manufacture, testing, and/or "certification" of the Delta Ignition Switch Vehicles because it knew, or in the exercise of

---

[433] Plaintiffs understand that this Court has held that new car purchasers' claims are barred by the Louisiana Products Liability Act, and assert these claims here solely for the purpose of preserving the claims for appellate review.

reasonable care should have known, that the vehicles equipped with defective ignition systems pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which brakes, power steering, seatbelt pretensioners, and airbags are rendered inoperable.

3467. Old GM thus "failed to exercise reasonable care in the manufacture of [its Defective Vehicles]", in violation of RESTATEMENT (SECOND) OF TORTS § 395 ("A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.").

3468. Old GM further breached its duties to Plaintiffs by supplying directly or through a third person defective Delta Ignition Switch Vehicles to be used by such foreseeable persons as Plaintiffs when:

a. Old GM knew or had reason to know that the vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

b. Old GM failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the vehicles are likely to be dangerous.

3469. Old GM had a continuing duty to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles. Plaintiffs were entitled to know that the vehicles, in their ordinary operation, were not reasonably safe for their intended and ordinary purposes and uses.

3470.   Old GM knew or should have known of the defects described herein.  Old GM breached its duty to Plaintiffs because it failed to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles.

3471.   As a direct and proximate result of Old GM's negligence, Plaintiffs suffered damages, for which New GM has successor liability.  The damages include overpayment for the Delta Ignition Switch Vehicles and repair costs, as discussed above.

## MAINE

## COUNT I

## VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT
### (ME. REV. STAT. ANN. TIT. 5 § 205-A, *et seq.*)

3472.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3473.   This claim is brought on behalf of Maine residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3474.   New GM and Plaintiffs are "persons" within the meaning of ME. REV. STAT. ANN. TIT. § 206(2).

3475.   New GM is engaged in "trade" or "commerce" within the meaning of ME. REV. STAT. ANN. TIT. § 206(3).

- 972 -

3476.   The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…."  ME. REV. STAT. ANN. TIT. 5 § 207.  New GM participated in misleading, false, or deceptive acts that violated the Maine UTPA.  By concealing the known defects in Plaintiffs' vehicles, New GM engaged in deceptive business practices prohibited by the Maine UTPA.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

3477.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3478.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

3479.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory

authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

3480.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Maine UTPA.

3481.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3482.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3483.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

3484.   New GM knew or should have known that its conduct violated the Maine UTPA.

3485.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

3486.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.     Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.     Intentionally concealed the foregoing from Plaintiffs;

      c.     Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully

- 974 -

withholding material facts from Plaintiffs that contradicted
these representations; and/or

  d. Had duties under the TREAD Act and related regulations to disclose and
remedy the defects.

3487. Because New GM fraudulently concealed the defects in New GM vehicles, New
GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles
they purchased were worth less than they would have been if they were free from defects.
Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for
repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they
would have either not have bought their Defective Vehicles or would have paid less for them.

3488. Old GM Defective Vehicle owners were also harmed by New GM's unfair and
deceptive trade practices since their vehicles were worth less as the result of New GM's
concealment of, and failure to remedy, the defects.  Further, once the truth came out about the
defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the
vehicles would have had in the absence of the defect.  This diminished value is directly attributed
to New GM's dishonesty and omissions with respect to the quality and safety of the Defective
Vehicles.

3489. New GM's concealment of the defects in Plaintiffs' vehicles was material to
Plaintiffs.

3490. Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and
its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased
New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date
of New GM's inception either would have paid less for their vehicles or would not have
purchased or leased them at all.

3491.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Maine UTPA—regardless of when those owners acquired their vehicles.

3492.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

3493.   As a direct and proximate result of New GM's violations of the Maine UTPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

3494.   Pursuant to ME. REV. STAT. ANN. TIT. 5 § 213, Plaintiffs seek an order enjoining New GM's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Maine UTPA.

3495.   On October 8, 2014, certain Plaintiffs sent a letter complying with ME. REV. STAT. ANN. TIT. 5, § 213(1-A).  Because New GM failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

## COUNT II

## FRAUD BY CONCEALMENT

3496.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3497.   This claim is brought on behalf of Maine residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").   The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3498.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3499.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

3500.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3501.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

3502.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.   The concealed information was material to

- 977 -

consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

3503.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

3504.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

3505.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

3506.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other

- 978 -

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the

material facts and such facts were not known to the public, including Plaintiffs.

3507.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their

bargain since the Defective Vehicles were worth less than they would have been without the

defects, and because they own vehicles that diminished in value as a result of New GM's

concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as

alleged above.  Had they been aware of the concealed defects that existed in the Defective

Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their

vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the

time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all

Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty

and omissions with respect to the quality and safety of these vehicles.

3508.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be

proven at trial.

3509.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such

conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (ME. REV. STAT. ANN. TIT. 11 § 2-314)

3510.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3511.   This claim is brought only on behalf of Maine residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

3512.   New GM is a merchant with respect to motor vehicles within the meaning of ME. REV. STAT. ANN. TIT. 11 § 2-104(1).

3513.   Under ME. REV. STAT. ANN. TIT. 11 § 2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

3514.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

3515.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3516.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

3517.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3518.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

3519.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

3520.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3521.   This claim is brought only on behalf of Maine residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

3522.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

- 981 -

3523.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

3524.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

3525.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

3526.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

3527.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

3528.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two

series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

3529.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

3530.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

3531.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

3532.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

3533.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

3534.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

- 983 -

3535.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale

Agreement would have been triggered, and New GM would have been required to contribute

additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect

Bankruptcy Class Members across the country.

3536.   New GM's concealment and suppression of the material fact of the Delta Ignition

Switch Defect over the first several months of its existence served to prevent the filing of claims

by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would

otherwise have had to make.

3537.   New GM had a duty to disclose the Delta Ignition Switch Defect because the

information was known and/or accessible only to New GM who had superior knowledge and

access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted

the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who

had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old

GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its

implementing regulations that required the disclosure of the defect.

3538.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were

justified.  New GM was in exclusive control of the material facts and such facts were not known

to the public, including Plaintiffs.

3539.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage because they lost their chance to file a claim against Old GM and seek payment from the

GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

3540.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

3541.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

3542.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3543.   This claim is brought on behalf of Maine residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3544.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

3545.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

- 985 -

3546.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

3547.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

3548.   Thus, all Plaintiffs conferred a benefit on New GM.

3549.   It is inequitable for New GM to retain these benefits.

3550.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

3551.   New GM knowingly accepted the benefits of its unjust conduct.

3552.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**COUNT VI**

**SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF MAINE
UNFAIR TRADE PRACTICES ACT
(ME. REV. STAT. ANN. TIT. 5 § 205-A, *et seq.*)**

3553.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3554.   This claim is brought on behalf of Maine residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3555.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3556.   Old GM and Plaintiffs are "persons" within the meaning of ME. REV. STAT. ANN. TIT. § 206(2).

3557.   Old GM was engaged in "trade" or "commerce" within the meaning of ME. REV. STAT. ANN. TIT. § 206(3).

3558.   The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…."  ME. REV. STAT. ANN. TIT. 5 § 207.  Old GM participated in misleading, false, or deceptive acts that violated the Maine UTPA.  By concealing the known defects in Plaintiffs' vehicles, Old GM engaged in deceptive business practices prohibited by the Maine UTPA.

3559.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3560.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

3561.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

3562.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Maine UTPA.

3563.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3564.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3565.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

3566.   Old GM knew or should have known that its conduct violated the Maine UTPA.

3567.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

3568.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

      a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

3569.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their

bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

3570.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

3571.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

3572.   As a direct and proximate result of Old GM's violations of the Maine UTPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

3573.   Pursuant to MD. CODE COM. LAW § 13-408, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maine UTPA.

3574.   Pursuant to ME. REV. STAT. ANN. TIT. 5 § 213, Plaintiffs seek damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Maine UTPA.

3575.   On October 8, 2014, certain Plaintiffs sent a letter complying with ME. REV. STAT. ANN. TIT. 5, § 213(1-A).  Because New GM failed to remedy Old GM's unlawful conduct (for which it has successor liability) within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

3576.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3577.   This claim is brought on behalf of Maine residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3578.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3579.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3580.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

3581.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3582.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

3583.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material

to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

3584.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

3585.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

3586.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.  Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3587.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

3588.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

3589.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (ME. REV. STAT. ANN. TIT. II 2-314)

3590.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3591.   This claim is brought on behalf of Maine residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3592.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3593.   Old GM was a merchant with respect to motor vehicles within the meaning of ME. REV. STAT. ANN. TIT. II § 2-104(1).

3594.   Under ME. REV. STAT. ANN. TIT. II § 2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

3595.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3596.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

3597.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## MARYLAND

## COUNT I

## VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT
### (MD. CODE COM. LAW § 13-101, *et seq.*)

3598.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3599.   This claim is brought on behalf of Maryland residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition

Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3600.   New GM and Plaintiffs are "persons" within the meaning of MD. CODE COM. LAW § 13-101(h).

3601.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good.  MD. COM. LAW CODE § 13-303.  New GM participated in misleading, false, or deceptive acts that violated the Maryland CPA.  By concealing the known defects in Plaintiffs' vehicles, New GM engaged in deceptive business practices prohibited by the Maryland CPA. The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

3602.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3603.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

3604.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

3605.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Maryland CPA.

3606.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3607.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3608.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

3609.   New GM knew or should have known that its conduct violated the Maryland CPA.

3610.  As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

3611.  New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

    a.    Possessed exclusive knowledge about the defects in the Defective Vehicles;

    b.    Intentionally concealed the foregoing from Plaintiffs;

    c.    Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

3612.  Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

3613.  Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defects.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

3614.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

3615.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

3616.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Maryland CPA—regardless of when those owners acquired their vehicles.

3617.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

3618.   As a direct and proximate result of New GM's violations of the Maryland CPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

- 997 -

3619.   Pursuant to MD. CODE COM. LAW § 13-408, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT II

## FRAUD BY CONCEALMENT

3620.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3621.   This claim is brought on behalf of all Maryland residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3622.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3623.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

3624.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3625.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

3626.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and

- 998 -

to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

3627.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

3628.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

3629.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

3630.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have

continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3631.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

3632.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

3633.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MD. CODE COM. LAW § 2-314)

3634.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3635.   This claim is brought only on behalf of Maryland residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

3636.   New GM was a merchant with respect to motor vehicles within the meaning of MD. COM.  LAW § 2-104(1).

3637.   Under MD. COM.  LAW § 2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

3638.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

3639.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3640.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

3641.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3642.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

3643.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

## NEGLIGENCE

3644.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3645.   Plaintiffs bring this Count on behalf of Maryland residents who are members of any of the following Classes: (i) Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  All claims in this Count are Independent Claims, and challenge only the conduct of New GM.

- 1002 -

3646.   New GM has designed, manufactured and/ or "certified" and sold or otherwise placed in the stream of commerce Defective Vehicles as New GM or New GM Certified Pre-Owned vehicles, as set forth above.

3647.   New GM had a duty to design, manufacture, and/or "certify" only a product that would be safe for its intended and foreseeable uses and users, including the use to which its products were put by Plaintiffs.  New GM breached its duties to Plaintiffs because it was negligent in the design, development, manufacture, and testing of the Defective Vehicles it manufactured and/or sold as Certified Pre-Owned vehicles on or after July 10, 2009, and New GM is responsible for this negligence.

3648.   New GM was negligent in the design, development, manufacture, testing, and/or "certification" of the Defective Vehicles because it knew, or in the exercise of reasonable care should have known, that the vehicles equipped with defective ignition systems, defective wiring harnesses controlling side airbags and/or defective power steering pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which brakes, power steering, seatbelt pretensioners, and/or airbags are rendered inoperable.

3649.   New GM thus "failed to exercise reasonable care in the manufacture of [its Defective Vehicles]", in violation of RESTATEMENT (SECOND) OF TORTS § 395 ("A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.").

- 1003 -

3650.   New GM further breached its duties to by supplying directly or through a third person Defective Vehicles to be used by such foreseeable persons as Plaintiffs when:

        a.      New GM knew or had reason to know that the vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

        b.      New GM failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the vehicles are likely to be dangerous.

3651.   New GM had a continuing duty to warn and instruct the intended and foreseeable users of its vehicles, including Plaintiffs, of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles. Plaintiffs were entitled to know that the vehicles, in their ordinary operation, were not reasonably safe for their intended and ordinary purposes and uses.

3652.   Pursuant to its ongoing relationship with owners and lessees of Old GM Defective Vehicles, New GM also had a duty to warn those Plaintiffs of the defects, and inform these Plaintiffs that their vehicles, in their ordinary operation, were not reasonably safe for their intended purposes.

3653.   New GM knew or should have known of the defects described herein.  New GM breached its duty to Plaintiffs because it failed to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles.

3654.   As a direct and proximate result of New GM's negligence, Plaintiffs suffered damages, including overpayment at the time of purchase, diminished value, and cost of repair.

## COUNT V

## FRAUD BY CONCEALMENT OF THE RIGHT
## TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

3655.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3656.   This claim is brought only on behalf of Maryland residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

3657.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

3658.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

3659.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

3660.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

3661.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

3662.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

3663.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

3664.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

3665.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

3666.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

- 1006 -

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

3667.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

3668.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

3669.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

3670.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

3671.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

3672.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

3673.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3674.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

3675.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

3676.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VI

## UNJUST ENRICHMENT[434]

3677.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3678.   This claim is brought on behalf of Maryland residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3679.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

3680.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

3681.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

3682.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs

---

[434] Plaintiffs understand that this Court has found that the existence of an express warranty between New GM and Plaintiffs is a bar to this claim, and are asserting this claim here solely for the purposes of preserving the claim for appellate purposes.

of a recall and other lawsuits, and further benefitted from its statements about the success of New

GM.

3683.   Thus, all Plaintiffs conferred a benefit on New GM.

3684.   It is inequitable for New GM to retain these benefits.

3685.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did

not benefit from New GM's conduct.

3686.   New GM knowingly accepted the benefits of its unjust conduct.

3687.   As a result of New GM's conduct, the amount of its unjust enrichment should be

disgorged, in an amount according to proof.

## COUNT VII

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF
### THE MARYLAND CONSUMER PROTECTION ACT
### (MD. CODE COM. LAW § 13-101, *et seq.*)

3688.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

3689.   This claim is brought on behalf of Maryland residents who are members of the

Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count,

"Plaintiffs").

3690.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing

New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are

free to assert this successor liability claim without impediment from the Sale Order.

3691.   Old GM and Plaintiffs are "persons" within the meaning of MD. CODE COM. LAW

§ 13-101(h).

3692.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good.  MD. COM. LAW CODE § 13-303.  Old GM engaged in misleading, false, or deceptive acts that violated the Maryland CPA.  By concealing the known defects in Plaintiffs' vehicles, Old GM engaged in deceptive business practices prohibited by the Maryland CPA.

3693.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3694.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

3695.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

3696.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Maryland CPA.

3697.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3698.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3699.   Old GM intentionally and knowingly misrepresented material facts regarding the

Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

3700.   Old GM knew or should have known that its conduct violated the Maryland CPA.

3701.   As alleged above, Old GM made material statements about the safety and

reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

3702.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Delta Ignition Switch Vehicles, because Old GM:

> a.      Possessed exclusive knowledge about the defects in the
>         Delta Ignition Switch Vehicles;
>
> b.      Intentionally concealed the foregoing from Plaintiffs;
>
> c.      Made incomplete representations about the safety and
>         reliability of the Delta Ignition Switch Vehicles, while
>         purposefully withholding material facts from Plaintiffs that
>         contradicted these representations; and/or
>
> d.      Had duties under the TREAD Act and related regulations to
>         disclose and remedy the defects.

3703.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their

bargain since the vehicles they purchased were worth less than they would have been if they

were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of

the defects in their vehicles, they would have either not bought their Delta Ignition Switch

Vehicles or would have paid less for them.

3704.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to

Plaintiffs.

3705.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and

its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of

the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

3706.   As a direct and proximate result of Old GM's violations of the Maryland CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

3707.   Pursuant to MD. CODE COM. LAW § 13-408, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT VIII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

3708.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3709.   This claim is brought on behalf of Maryland residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3710.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3711.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3712.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

- 1013 -

3713.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3714.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

3715.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

3716.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

3717.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

3718.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3719.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

3720.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

3721.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

### COUNT IX

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF
### IMPLIED WARRANTY OF MERCHANTABILITY
### (MD. CODE COM. LAW § 2-314)

3722.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3723.   This claim is brought on behalf of Maryland residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3724.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3725.   Old GM was a merchant with respect to motor vehicles within the meaning of MD. COM. LAW § 2-104(1).

3726.   Under MD. COM. LAW § 2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

3727.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3728.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

3729.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT X

## SUCCESSOR LIABILITY CLAIM FOR NEGLIGENCE

3730.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3731.   This claim is brought on behalf of Maryland residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3732.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3733.   Old GM designed, manufactured and sold or otherwise placed in the stream of commerce Delta Ignition Switch Vehicles, as set forth above.

3734.   Old GM had a duty to design, manufacture, and sell only a product that would be safe for its intended and foreseeable uses and users, including the use to which its products were put by Plaintiffs.  Old GM breached its duties to Plaintiffs because it was negligent in the design, development, manufacture, and testing of the Delta Ignition Switch Vehicles it manufactured and sold on or before July 9, 2009, and New GM is responsible for Old GM's negligence under the doctrine of successor liability.

3735.   Old GM was negligent in the design, development, manufacture, testing, and/or "certification" of the Delta Ignition Switch Vehicles because it knew, or in the exercise of

reasonable care should have known, that the vehicles equipped with defective ignition systems pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which brakes, power steering, seatbelt pretensioners, and airbags are rendered inoperable.

3736. Old GM thus "failed to exercise reasonable care in the manufacture of [its Defective Vehicles]", in violation of RESTATEMENT (SECOND) OF TORTS § 395 ("A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.").

3737. Old GM further breached its duties to Plaintiffs by supplying directly or through a third person defective Delta Ignition Switch Vehicles to be used by such foreseeable persons as Plaintiffs when:

a. Old GM knew or had reason to know that the vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

b. Old GM failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the vehicles are likely to be dangerous.

3738. Old GM had a continuing duty to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles. Plaintiffs were entitled to know that the vehicles, in their ordinary operation, were not reasonably safe for their intended and ordinary purposes and uses.

3739.   Old GM knew or should have known of the defects described herein.  Old GM breached its duty to Plaintiffs because it failed to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles.

3740.   As a direct and proximate result of Old GM's negligence, Plaintiffs suffered damages, for which New GM has successor liability.  The damages include overpayment for the Delta Ignition Switch Vehicles and repair costs, as discussed above.

## MASSACHUSETTS

## COUNT I

## DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW
### (MASS. GEN. LAWS CH. 93A, § 1, *et seq.*)

3741.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3742.   This claim is brought on behalf of Massachusetts residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3743.   New GM and Plaintiffs are "persons" within the meaning of MASS. GEN. LAWS ch. 93A, § 1(a).

3744.   New GM engaged in "trade" or "commerce" within the meaning of MASS. GEN. LAWS ch. 93A, § 1(b).

3745.   Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  MASS. GEN. LAWS ch. 93A, § 2. New GM participated in misleading, false, or deceptive acts that violated the Massachusetts Act. By concealing the known defects in Plaintiffs' vehicles, New GM engaged in deceptive business practices prohibited by the Massachusetts Act.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

3746.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3747.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

3748.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory

authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

3749.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Massachusetts Act.

3750.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3751.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3752.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

3753.   New GM knew or should have known that its conduct violated the Massachusetts Act.

3754.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

3755.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

c.     Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

3756.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

3757.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

3758.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

3759.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

- 1022 -

3760.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Massachusetts Act—regardless of when those owners acquired their vehicles.

3761.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

3762.   As a direct and proximate result of New GM's violations of the Massachusetts Act, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

3763.   Pursuant to MASS. GEN. LAWS ch. 93A, § 9, Plaintiffs seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff.  Because New GM's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff, up to three times actual damages, but no less than two times actual damages.

3764.   Plaintiffs also seek an order enjoining New GM's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

3765.   On October 8, 2014, certain Plaintiffs sent a letter complying with MASS. GEN. LAWS ch. 93A, § 9(3).  Because New GM failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which they are entitled.

<div align="center">

**COUNT II**

**FRAUD BY CONCEALMENT**

</div>

3766.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3767.   This claim is brought on behalf of Massachusetts residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3768.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3769.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

3770.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

<div align="center">

- 1024 -

</div>

3771.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

3772.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

3773.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

3774.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

3775.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

3776.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.   Plaintiffs' actions were justified.   New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3777.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.   Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.   They also incurred repair costs as alleged above.   Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.   As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

3778.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

3779.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (ALM GL. CH. 106, § 2-314)

3780.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3781.   This claim is brought only on behalf of Massachusetts residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

3782.   New GM was a merchant with respect to motor vehicles within the meaning of ALM GL CH. 106, § 2-104(1).

3783.   Under ALM GL CH. 106, § 2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

3784.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

3785.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3786.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

3787.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3788.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

3789.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

## FRAUD BY CONCEALMENT OF THE RIGHT
## TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

3790.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3791.   This claim is brought only on behalf of Massachusetts residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

3792.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

3793.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

3794.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

3795.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

3796.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither

the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

3797.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

3798.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

3799.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

3800.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

3801.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

3802.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these

- 1030 -

vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

3803.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

3804.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

3805.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

3806.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

3807.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

3808.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3809.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

3810.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

3811.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

3812.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3813.   This claim is brought on behalf of Massachusetts residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag

Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3814.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

3815.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

3816.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

3817.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

3818.   Thus, all Plaintiffs conferred a benefit on New GM.

3819.   It is inequitable for New GM to retain these benefits.

3820.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

3821.   New GM knowingly accepted the benefits of its unjust conduct.

3822.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

- 1033 -

**COUNT VI**

**SUCCESSOR LIABILITY CLAIM FOR DECEPTIVE ACTS OR PRACTICES
PROHIBITED BY MASSACHUSETTS LAW
(Mass. Gen. Laws Ch. 93A, § 1, *et seq.*)**

3823.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3824.   This claim is brought on behalf of Massachusetts residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3825.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3826.   Old GM and Plaintiffs are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

3827.   Old GM engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

3828.   Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2.  Old GM participated in misleading, false, or deceptive acts that violated the Massachusetts Act.  By concealing the known defects in Plaintiffs' vehicles, Old GM engaged in deceptive business practices prohibited by the Massachusetts Act.

3829.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3830.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

3831.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

3832.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Massachusetts Act.

3833.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3834.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3835.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

3836.   Old GM knew or should have known that its conduct violated the Massachusetts Act.

3837.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

3838.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

     a.     Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

     b.     Intentionally concealed the foregoing from Plaintiffs;

     c.     Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

     d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

3839.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

3840.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

3841.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

3842.    As a direct and proximate result of Old GM's violations of the Massachusetts Act, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

3843.    Pursuant to MASS. GEN. LAWS ch. 93A, § 9, Plaintiffs seek monetary relief against New GM (as Old GM's successor) measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff.  Because Old GM's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff, up to three times actual damages, but no less than two times actual damages.

3844.    Plaintiffs also seek punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

3845.    On October 8, 2014, certain Plaintiffs sent a letter complying with MASS. GEN. LAWS ch. 93A, § 9(3).  Because New GM failed to remedy Old GM's unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

3846.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3847.    This claim is brought on behalf of Massachusetts residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3848.    This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3849.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3850.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

3851.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3852.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

3853.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

3854.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old

- 1038 -

GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had

monitoring and disclosure duties under the TREAD Act, as alleged above.

3855.   Old GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM

money, and it did so at the expense of Plaintiffs.

3856.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.

Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such

facts were not known to the public, including Plaintiffs.

3857.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get

the benefit of their bargain since the Defective Vehicles were worth less than they would have

been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not

have purchased or leased them at all, and Plaintiffs sustained repair damages.

3858.   Accordingly, based on the conduct of Old GM for which it has successor liability,

New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

3859.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such

conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

## SUCCESSOR LIABILITY CLAIM FOR BREACH OF
## IMPLIED WARRANTY OF MERCHANTABILITY
### (Alm. Gl Ch. 106, § 2-314)

3860.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3861.   This claim is brought on behalf of Massachusetts residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3862.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3863.   Old GM was a merchant with respect to motor vehicles within the meaning of Alm. Gl Ch. 106, § 2-104(1).

3864.   Under Alm. Gl Ch. 106, § 2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

3865.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

- 1040 -

3866.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

3867.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## MICHIGAN

## COUNT I

### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
(MICH. COMP. LAWS § 445.903, *et seq.*)

3868.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3869.   This claim is brought on behalf of Michigan residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3870.   Plaintiffs are "person[s]" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d).

3871.   At all relevant times hereto, New GM was a "person" engaged in "trade or commerce" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d) and (g).

- 1041 -

3872.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce …."  MICH. COMP. LAWS § 445.903(1).  New GM engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including:  "(c) Representing that goods or services have … characteristics … that they do not have ….;" "(e) Representing that goods or services are of a particular standard … if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  MICH. COMP. LAWS § 445.903(1).

3873.   By concealing the known defects in Plaintiffs' vehicles, New GM engaged in deceptive business practices prohibited by the Michigan CPA.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

3874.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

- 1042 -

3875.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

3876.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

3877.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Michigan CPA.

3878.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3879.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3880.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

3881.   New GM knew or should have known that its conduct violated the Michigan CPA.

3882.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

3883.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

> a.   Possessed exclusive knowledge about the defects in the Defective Vehicles;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>
> c.   Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

3884.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

3885.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the

defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

3886.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

3887.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

3888.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Michigan CPA—regardless of when those owners acquired their vehicles.

3889.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

- 1045 -

3890.   As a direct and proximate result of New GM's violations of the Michigan CPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

3891.   Plaintiffs seek injunctive relief to enjoin New GM from continuing its unfair and deceptive acts; monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each Plaintiff; reasonable attorneys' fees; and any other just and proper relief available under MICH. COMP. LAWS § 445.911.

3892.   Plaintiffs also seek punitive damages against New GM because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others. New GM intentionally and willfully misrepresented the safety and reliability of the Defective Vehicles, deceived Plaintiffs on life-or-death matters, concealed material facts that only they knew, and repeatedly promised Plaintiffs that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting the defects in the Defective Vehicles.  New GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT II

## FRAUD BY CONCEALMENT

3893.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3894.   This claim is brought on behalf of Michigan residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

- 1046 -

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs"). The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3895.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3896.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

3897.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3898.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

3899.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

3900.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs. New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in

- 1047 -

the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to

disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all

of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

implementing regulations, including the duty to promptly notify consumers of known safety

defects.

3901.   New GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM

money, and it did so at the expense of Plaintiffs.

3902.   On information and belief, New GM has still not made full and adequate

disclosure and continues to defraud Plaintiffs and conceal material information regarding defects

that exist in the Defective Vehicles.

3903.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Defective Vehicles manufactured by New GM; and/or would not have

continued to own and drive their Old GM Defective Vehicles or would have taken other

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the

material facts and such facts were not known to the public, including Plaintiffs.

3904.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their

bargain since the Defective Vehicles were worth less than they would have been without the

defects, and because they own vehicles that diminished in value as a result of New GM's

concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as

alleged above.  Had they been aware of the concealed defects that existed in the Defective

- 1048 -

Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

3905.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

3906.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MICH. COMP. LAWS § 440.2314)

3907.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3908.   This claim is brought only on behalf of Michigan residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

- 1049 -

3909.   New GM was a merchant with respect to motor vehicles within the meaning of MICH. COMP. LAWS § 440.2314(1).

3910.   Under MICH. COMP. LAWS § 440.2314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

3911.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

3912.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3913.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

3914.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3915.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

3916.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

3917.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3918.   This claim is brought only on behalf of Michigan residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

3919.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

3920.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

3921.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

3922.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

3923.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

3924.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

3925.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

3926.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

3927.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

3928.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

- 1052 -

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

3929.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

3930.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

3931.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

3932.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

3933.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

3934.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

- 1053 -

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted

the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who

had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old

GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its

implementing regulations that required the disclosure of the defect.

3935.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were

justified.  New GM was in exclusive control of the material facts and such facts were not known

to the public, including Plaintiffs.

3936.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage because they lost their chance to file a claim against Old GM and seek payment from the

GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims

and would have recovered from the GUC Trust.

3937.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be

proven at trial.

3938.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to

be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

3939.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3940.   This claim is brought on behalf of Michigan residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

3941.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

3942.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

3943.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

3944.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

3945.   Thus, all Plaintiffs conferred a benefit on New GM.

- 1055 -

3946.   It is inequitable for New GM to retain these benefits.

3947.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

3948.   New GM knowingly accepted the benefits of its unjust conduct.

3949.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

<div align="center">

**COUNT VI**

**SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT**
**(MICH. COMP. LAWS § 445.903, *et seq.*)**

</div>

3950.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3951.   This claim is brought on behalf of Michigan residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3952.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3953.   At all relevant times hereto, Old GM was a "person" engaged in "trade or commerce" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d) and (g).

3954.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce …."  MICH. COMP. LAWS § 445.903(1).  Old GM engaged in unfair, unconscionable, or

<div align="center">- 1056 -</div>

deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have … characteristics … that they do not have ….;" "(e) Representing that goods or services are of a particular standard … if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(1).  By concealing the known defects in Plaintiffs' vehicles, Old GM engaged in deceptive business practices prohibited by the Michigan CPA.

3955.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3956.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

3957.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

3958.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Michigan CPA.

3959.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

3960.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

3961.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

3962.   Old GM knew or should have known that its conduct violated the Michigan CPA.

3963.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

3964.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

      a.       Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

      b.       Intentionally concealed the foregoing from Plaintiffs;

      c.       Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.       Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

3965.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their

bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

3966.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

3967.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

3968.   As a direct and proximate result of Old GM's violations of the Michigan CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

3969.   Plaintiffs seek monetary relief against New GM (as successor to Old GM) measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each Plaintiff; reasonable attorneys' fees; and any other just and proper relief available under MICH. COMP. LAWS § 445.911.

<div align="center">

**COUNT VII**

**SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT**

</div>

3970.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

<div align="center">

- 1059 -

</div>

3971.   This claim is brought on behalf of Michigan residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3972.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3973.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

3974.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

3975.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

3976.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

3977.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

3978.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge

- 1060 -

and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

3979.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

3980.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.  Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

3981.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

3982.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

3983.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

## SUCCESSOR LIABILITY CLAIM FOR BREACH OF
## IMPLIED WARRANTY OF MERCHANTABILITY
### (MICH. COMP. LAWS § 440.2314)

3984.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3985.   This claim is brought on behalf of Michigan residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

3986.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

3987.   Old GM was a merchant with respect to motor vehicles within the meaning of MICH. COMP. LAWS § 440.2314(1).

3988.   Under MICH. COMP. LAWS § 440.2314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

3989.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the

Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

3990.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

3991.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## MINNESOTA

## COUNT I

### VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
(MINN. STAT. § 325F.68, *et seq.*)

3992.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3993.   This claim is brought on behalf of Minnesota residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

- 1063 -

3994.   The Defective Vehicles constitute "merchandise" within the meaning of MINN. STAT. § 325F.68(2).

3995.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." MINN. STAT. § 325F.69(1).  New GM participated in misleading, false, or deceptive acts that violated the Minnesota CFA.

3996.   By concealing the known defects in Plaintiffs' vehicles, New GM engaged in deceptive business practices prohibited by the Minnesota CFA.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

3997.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

3998.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material

- 1064 -

fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

3999.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

4000.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Minnesota CFA.

4001.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4002.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4003.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

4004.   New GM knew or should have known that its conduct violated the Minnesota CFA.

4005.  As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

4006.  New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

4007.  Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

4008.  Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

4009.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4010.   Plaintiffs' ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

4011.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Minnesota CFA—regardless of when those owners acquired their vehicles.

4012.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

4013.   As a direct and proximate result of New GM's violations of the Minnesota CFA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

4014.   Pursuant to MINN. STAT. § 8.31(3a), Plaintiffs seek actual damages, attorneys'

fees, and any other just and proper relief available under the Minnesota CFA.

4015.   Plaintiffs also seek punitive damages under MINN. STAT. § 549.20(1)(a) given the

clear and convincing evidence that New GM's acts show deliberate disregard for the rights or

safety of others.

## COUNT II

## VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (MINN. STAT. § 325D.43-48, *et seq.*)

4016.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

4017.   This claim is brought on behalf of Minnesota residents who are members of any

of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition

Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count,

"Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct

of New GM.

4018.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits

deceptive trade practices, which occur when a person "(5) represents that goods or services have

sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not

have or that a person has a sponsorship, approval, status, affiliation, or connection that the person

does not have;" "(7) represents that goods or services are of a particular standard, quality, or

grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises

goods or services with intent not to sell them as advertised."  MINN. STAT. § 325D.44.  In the

course of the New GM's business, it systematically concealed the defects in Defective Vehicles and engaged in deceptive practices by representing that Defective Vehicles have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that Defective Vehicles are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Defective Vehicles with intent not to sell them as advertised.

4019.   New GM participated in misleading, false, or deceptive acts that violated the Minnesota DTPA.  By concealing the known defects in Plaintiffs' vehicles, New GM engaged in deceptive business practices prohibited by the Minnesota DTPA.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

4020.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

4021.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

4022.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

4023.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Minnesota DTPA.

4024.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4025.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4026.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

4027.   New GM knew or should have known that its conduct violated the Minnesota DTPA.

4028.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

4029.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Defective Vehicles because New GM:

      a.        Possessed exclusive knowledge about the defects in the
                Defective Vehicles;

      b.        Intentionally concealed the foregoing from Plaintiffs;

      c.        Made incomplete representations about the safety and
                reliability of the Defective Vehicles, while purposefully
                withholding material facts from Plaintiffs that contradicted
                these representations; and/or

      d.        Had duties under the TREAD Act and related regulations to disclose and
                remedy the defects.

4030.   Because New GM fraudulently concealed the defects in New GM vehicles, New

GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from defects.

Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for

repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they

would have either not have bought their Defective Vehicles or would have paid less for them.

4031.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and

deceptive trade practices since their vehicles were worth less as the result of New GM's

concealment of, and failure to remedy, the defects.  Further, once the truth came out about the

defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the

vehicles would have had in the absence of the defect.  This diminished value is directly attributed

to New GM's dishonesty and omissions with respect to the quality and safety of the Defective

Vehicles.

4032.   New GM's concealment of the defects in Plaintiffs' vehicles was material to

Plaintiffs.

4033.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

4034.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Minnesota DTPA—regardless of when those owners acquired their vehicles.

4035.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

4036.   As a direct and proximate result of New GM's violations of the Minnesota DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

4037.   Pursuant to MINN. STAT. § 8.31(3a) and 325D.45, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

4038.   Plaintiffs also seek punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that New GM's acts show deliberate disregard for the rights or safety of others.

## COUNT III

## FRAUD BY CONCEALMENT

4039.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4040.   This claim is brought on behalf of Minnesota residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4041.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4042.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

4043.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4044.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

- 1073 -

4045.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

4046.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

4047.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

4048.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

4049.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4050.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

4051.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

4052.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MINN. STAT. § 336.2-314)

4053.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4054.   This claim is brought only on behalf of Minnesota residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

4055.   New GM was a merchant with respect to motor vehicles within the meaning of MINN. STAT. § 336.2-104(1).

4056.   Under MINN. STAT. § 336.2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

4057.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

4058.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4059.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

4060.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4061.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4062.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT V

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

4063.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4064.   This claim is brought only on behalf of Minnesota residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

4065.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

- 1077 -

4066.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

4067.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

4068.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

4069.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

4070.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

4071.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two

- 1078 -

series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

4072.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

4073.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

4074.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

4075.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

4076.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

4077.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

- 1079 -

4078.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale

Agreement would have been triggered, and New GM would have been required to contribute

additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect

Bankruptcy Class Members across the country.

4079.   New GM's concealment and suppression of the material fact of the Delta Ignition

Switch Defect over the first several months of its existence served to prevent the filing of claims

by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would

otherwise have had to make.

4080.   New GM had a duty to disclose the Delta Ignition Switch Defect because the

information was known and/or accessible only to New GM who had superior knowledge and

access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted

the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who

had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old

GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its

implementing regulations that required the disclosure of the defect.

4081.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were

justified.  New GM was in exclusive control of the material facts and such facts were not known

to the public, including Plaintiffs.

4082.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage because they lost their chance to file a claim against Old GM and seek payment from the

GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the

- 1080 -

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

4083.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

4084.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT VI**

**UNJUST ENRICHMENT**

</div>

4085.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4086.   This claim is brought on behalf of Minnesota residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4087.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

4088.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

<div align="center">

- 1081 -

</div>

4089.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

4090.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

4091.   Thus, all Plaintiffs conferred a benefit on New GM.

4092.   It is inequitable for New GM to retain these benefits.

4093.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

4094.   New GM knowingly accepted the benefits of its unjust conduct.

4095.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VII

### SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
### (MINN. STAT. § 325F.68, *et seq*.)

4096.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4097.   This claim is brought on behalf of Minnesota residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4098.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4099.   The Old GM Delta Ignition Switch Vehicles constitute "merchandise" within the meaning of MINN. STAT. § 325F.68(2).

4100.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."  MINN. STAT. § 325F.69(1).  Old GM participated in misleading, false, or deceptive acts that violated the Minnesota CFA.  By concealing the known defects in Plaintiffs' vehicles, Old GM engaged in deceptive business practices prohibited by the Minnesota CFA.

4101.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

4102.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

4103.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

4104.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Minnesota CFA.

4105.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4106.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4107.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

4108.   Old GM knew or should have known that its conduct violated the Minnesota CFA.

4109.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

4110.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

a.   Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.   Intentionally concealed the foregoing from Plaintiffs;

c.   Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

        d.     Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

4111.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their

bargain since the vehicles they purchased were worth less than they would have been if they

were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of

the defects in their vehicles, they would have either not bought their Delta Ignition Switch

Vehicles or would have paid less for them.

4112.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to

Plaintiffs.

4113.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and

its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of

the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their

vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs,

as alleged above.

4114.   As a direct and proximate result of Old GM's violations of the Minnesota CFA,

Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor

liability.

4115.   Pursuant to MINN. STAT. § 8.31(3a), Plaintiffs seek actual damages, attorneys'

fees, and any other just and proper relief available under the Minnesota CFA.

4116.   Plaintiffs also seek punitive damages under MINN. STAT. § 549.20(1)(a) given the

clear and convincing evidence that Old GM's acts (for which New GM has successor liability)

show deliberate disregard for the rights or safety of others, and to dissuade New GM from engaging in similarly egregious misconduct in the future.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (MINN. STAT. § 325D.43-48, *et seq.*)

4117.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4118.   This claim is brought on behalf of Minnesota residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4119.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4120.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised."  MINN. STAT. § 325D.44.  In the course of Old GM's business, it systematically concealed the defects in Delta Ignition Switch Vehicles and engaged in deceptive practices by representing that Delta Ignition Switch Vehicles

- 1086 -

have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that Delta Ignition Switch Vehicles are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Delta Ignition Switch Vehicles with intent not to sell them as advertised.  Old GM participated in misleading, false, or deceptive acts that violated the Minnesota DTPA.  By concealing the known defects in Plaintiffs' vehicles, Old GM engaged in deceptive business practices prohibited by the Minnesota DTPA.

4121.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

4122.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

4123.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

4124.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Minnesota DTPA.

4125.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4126.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4127.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

4128.   Old GM knew or should have known that its conduct violated the Minnesota DTPA.

4129.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

4130.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

   a.   Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

   b.   Intentionally concealed the foregoing from Plaintiffs;

   c.   Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

   d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

4131.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

- 1088 -

4132.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4133.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

4134.   As a direct and proximate result of Old GM's violations of the Minnesota DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

4135.   Pursuant to MINN. STAT. §§ 8.31(3a) and 325D.45, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

4136.   Plaintiffs also seek punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that Old GM's acts (for which New GM has successor liability) show deliberate disregard for the rights or safety of others.

## COUNT IX

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

4137.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4138.   This claim is brought on behalf of Minnesota residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4139.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4140.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4141.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

4142.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4143.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

4144.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

4145.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as

- 1090 -

set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

4146.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

4147.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4148.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

4149.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

4150.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT X

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MINN. STAT. § 336.2-314)

4151.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4152.   This claim is brought on behalf of Minnesota residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4153.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4154.   Old GM was a merchant with respect to motor vehicles within the meaning of MINN. STAT. § 336.2-104(1).

4155.   Under MINN. STAT. § 336.2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

4156.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of

- 1092 -

power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4157.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4158.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

<div align="center">

**MISSISSIPPI**

**COUNT I**

**VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT**
(MISS. CODE. ANN. § 75-24-1, *et seq.*)

</div>

4159.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4160.   This claim is brought on behalf of Mississippi residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4161.   The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce."  MISS. CODE. ANN. § 75-24-5(1).  Unfair or deceptive practices include, but are not limited to, "(e) Representing that goods or services

<div align="center">- 1093 -</div>

have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do

not have or that a person has a sponsorship, approval, status, affiliation, or connection that he

does not have;" "(g) Representing that goods or services are of a particular standard, quality, or

grade, or that goods are of a particular style or model, if they are of another;" and "(i)

Advertising goods or services with intent not to sell them as advertised."

4162.   New GM participated in deceptive trade practices that violated the Mississippi

CPA as described herein, including representing that Defective Vehicles have characteristics,

uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a

particular standard and quality when they are not; and advertising Defective Vehicles with the

intent not to sell them as advertised.  The defects in each vehicle include not only the specific

defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which

New GM built cars, a process that included cost-cutting, minimizing the importance of safety

issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the

failure to follow acceptable engineering and inventory processes concerning parts management,

and the failure to follow a proper FMEA process.  All of these defective processes would be

material to a reasonable consumer.

4163.   New GM's actions, as set forth above, occurred in the conduct of trade or

commerce.

4164.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles

as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

New GM also engaged in unlawful trade practices by employing deception, deceptive acts or

practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

4165.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

4166.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Mississippi CPA.

4167.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4168.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4169.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

4170.   New GM knew or should have known that its conduct violated the Mississippi CPA.

4171.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

4172.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

4173.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

4174.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

4175.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4176.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

4177.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Mississippi CPA—regardless of when those owners acquired their vehicles.

4178.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

4179.   As a direct and proximate result of New GM's violations of the Mississippi CPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

4180.   Plaintiffs' seek actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

## COUNT II

## FRAUD BY CONCEALMENT

4181.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4182.   This claim is brought on behalf of Mississippi residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4183.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4184.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

4185.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4186.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

4187.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and

- 1098 -

to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

4188.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

4189.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

4190.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

4191.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have

continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4192.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

4193.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

4194.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MISS. CODE ANN. § 75-2-314)

4195.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4196.  This claim is brought only on behalf of Mississippi residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

4197.  New GM was a merchant with respect to motor vehicles within the meaning of MISS. CODE ANN. § 75-2-104(1).

4198.  Under MISS. CODE ANN. § 75-2-314, a warranty that the Defective Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

4199.  The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

4200.  The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4201.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

4202.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4203.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4204.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**

**FRAUD BY CONCEALMENT OF THE RIGHT
TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY**

</div>

4205.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4206.   This claim is brought only on behalf of Mississippi residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

4207.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

4208.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale

Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required

… to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit

Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full

evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge

from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel

(all of whom were transferred to New GM), including engineers, senior managers and attorneys,

were informed or otherwise aware of the defect prior to the Sale Motion."

4209.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order.

No recall occurred, and neither the direct mail notice nor the publication notice sent in

connection with the Sale Motion mentioned the defect.

4210.   In September 2009, the Bankruptcy Court entered the Bar Date Order,

establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed

against Old GM.

4211.   Because New GM concealed its knowledge of the defect, Plaintiffs did not

receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither

the direct mail notice nor the publication notice sent in connection with the Bar Date Order

mentioned the defect.

4212.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the

General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the

bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

4213.   The out-of-pocket consideration provided by New GM for its acquisition of Old

GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two

series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

4214.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

4215.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

4216.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

4217.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

4218.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

4219.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

- 1104 -

4220.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale

Agreement would have been triggered, and New GM would have been required to contribute

additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect

Bankruptcy Class Members across the country.

4221.   New GM's concealment and suppression of the material fact of the Delta Ignition

Switch Defect over the first several months of its existence served to prevent the filing of claims

by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would

otherwise have had to make.

4222.   New GM had a duty to disclose the Delta Ignition Switch Defect because the

information was known and/or accessible only to New GM who had superior knowledge and

access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted

the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who

had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old

GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its

implementing regulations that required the disclosure of the defect.

4223.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were

justified.  New GM was in exclusive control of the material facts and such facts were not known

to the public, including Plaintiffs.

4224.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage because they lost their chance to file a claim against Old GM and seek payment from the

GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

4225.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

4226.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

4227.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4228.   This claim is brought on behalf of Mississippi residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4229.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

4230.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

4231.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

4232.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

4233.   Thus, all Plaintiffs conferred a benefit on New GM.

4234.   It is inequitable for New GM to retain these benefits.

4235.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

4236.   New GM knowingly accepted the benefits of its unjust conduct.

4237.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT
### (MISS. CODE. ANN. § 75-24-1, *et seq.*)

4238.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4239.   This claim is brought on behalf of Mississippi residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4240.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4241.   The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce."  MISS. CODE. ANN. § 75-24-5(1).  Unfair or deceptive practices include, but are not limited to, "(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;" "(g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(i) Advertising goods or services with intent not to sell them as advertised."

4242.   Old GM participated in deceptive trade practices that violated the Mississippi CPA as described herein, including representing that Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Delta Ignition Switch Vehicles are of a particular standard and quality when they are not; and advertising Delta Ignition Switch Vehicles with the intent not to sell them as advertised.

4243.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

4244.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material

- 1108 -

fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

4245.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

4246.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Mississippi CPA.

4247.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4248.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4249.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

4250.   Old GM knew or should have known that its conduct violated the Mississippi CPA.

4251.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

4252.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

> a.      Possessed exclusive knowledge about the defects in the
>         Delta Ignition Switch Vehicles;
>
> b.      Intentionally concealed the foregoing from Plaintiffs;

- 1109 -

c.   Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

4253.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

4254.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4255.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

4256.   As a direct and proximate result of Old GM's violations of the Mississippi CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

4257.   Plaintiffs' seek actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

4258.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4259.   This claim is brought on behalf of Mississippi residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4260.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4261.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4262.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

4263.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4264.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

4265.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material

- 1111 -

to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

4266.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

4267.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

4268.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.  Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4269.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

4270.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

4271.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (MISS. CODE ANN. § 75-2-314)

4272.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4273.   This claim is brought on behalf of Mississippi residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4274.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4275.   Old GM was a merchant with respect to motor vehicles within the meaning of MISS. CODE ANN. § 75-2-104(1).

4276.   Under MISS. CODE ANN. § 75-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

4277.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4278.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4279.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## MISSOURI

## COUNT I

## VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT
### (MO. REV. STAT. § 407.010, *et seq.*)

4280.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4281.   This claim is brought on behalf of Missouri residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition

Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count,

"Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct

of New GM.

4282.   New GM and Plaintiffs are "persons" within the meaning of MO. REV. STAT. §

407.010(5).

4283.   New GM engaged in "trade" or "commerce" in the State of Missouri within the

meaning of MO. REV. STAT. § 407.010(7).

4284.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful

the "act, use or employment by any person of any deception, fraud, false pretense,

misrepresentation, unfair practice, or the concealment, suppression, or omission of any material

fact in connection with the sale or advertisement of any merchandise."  MO. REV. STAT. §

407.020.

4285.   In the course of its business, New GM systematically omitted, suppressed, and

concealed the defects in the Defective Vehicles as described herein.  By failing to disclose these

defects or facts about the defects described herein known to it or that were available to New GM

upon reasonable inquiry, New GM deprived consumers of all material facts about the safety and

functionality of their vehicle.  By failing to release material facts about the defects, New GM

curtailed or reduced the ability of consumers to take notice of material facts about their vehicle,

and/or it affirmatively operated to hide or keep those facts from consumers.  15 MO. CODE OF

SERV. REG. § 60-9.110.  The defects in each vehicle include not only the specific defect (*e.g.*, the

Delta Ignition Switch), but also include the defective process through which New GM built cars,

a process that included cost-cutting, minimizing the importance of safety issues, siloing, the

depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.  Moreover, New GM has otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices, and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles.

4286.  From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

4287.  By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Missouri MPA.

4288.  In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4289.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4290.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

4291.   New GM knew or should have known that its conduct violated the Missouri MPA.

4292.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

4293.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

> a.   Possessed exclusive knowledge about the defects in the Defective Vehicles;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>
> c.   Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

4294.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

- 1117 -

4295.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

4296.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4297.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

4298.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Missouri MPA—regardless of when those owners acquired their vehicles.

4299.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta

Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective. New GM's unlawful acts and practices complained of herein affect the public interest.

4300. As a direct and proximate result of New GM's violations of the Missouri MPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above. As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

4301. New GM is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining New GM's unfair and deceptive practices, and any other just and proper relief under MO. REV. STAT. § 407.025.

## COUNT II

## FRAUD BY CONCEALMENT

4302. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4303. This claim is brought on behalf of Missouri residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs"). The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4304. New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4305.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

4306.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4307.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

4308.   New GM did so in order to falsely assure purchasers, lessees, and owners of the Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

4309.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

4310.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

4311.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

4312.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4313.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

4314.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

4315.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MO. REV. STAT. § 400.2-314)[435]

4316.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4317.   This claim is brought only on behalf of Missouri residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

4318.   New GM was a merchant with respect to motor vehicles within the meaning of MO. REV. STAT. § 400.2-314(1).

---

[435] Plaintiffs understand that this Court has held that this claim cannot be asserted under Missouri law unless the Plaintiff's vehicle has suffered from an actual manifestation of the defect, and here assert the claim on behalf of Plaintiffs whose vehicles have not suffered from an actual manifestation solely for the purpose of preserving the claims for appellate review.

4319.   Under MO. REV. STAT. § 400.2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

4320.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

4321.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4322.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

4323.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4324.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4325.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

- 1123 -

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

4326.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4327.   This claim is brought only on behalf of Missouri residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

4328.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

4329.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

4330.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

4331.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

4332.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

4333.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

4334.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

4335.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

4336.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

4337.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

- 1125 -

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

4338.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

4339.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

4340.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

4341.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

4342.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

4343.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

- 1126 -

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

4344.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4345.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature). Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

4346.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

4347.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT[436]

4348.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4349.   This claim is brought on behalf of all Missouri residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4350.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

4351.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

4352.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

4353.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs

---

[436] Plaintiffs understand that this Court has held that this claim may not be asserted by Plaintiffs whose vehicles were purchased under an express warranty, and here assert such claims solely for the purpose of preserving the issue for appeal.

of a recall and other lawsuits, and further benefitted from its statements about the success of New

GM.

4354.   Thus, all Plaintiffs conferred a benefit on New GM.

4355.   It is inequitable for New GM to retain these benefits.

4356.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did

not benefit from New GM's conduct.

4357.   New GM knowingly accepted the benefits of its unjust conduct.

4358.   As a result of New GM's conduct, the amount of its unjust enrichment should be

disgorged, in an amount according to proof.

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT
### (MO. REV. STAT. § 407.010, *et seq.*)

4359.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

4360.   This claim is brought on behalf of Missouri residents who are members of the

Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count,

"Plaintiffs").

4361.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing

New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are

free to assert this successor liability claim without impediment from the Sale Order.

4362.   Old GM and Plaintiffs are "persons" within the meaning of MO. REV. STAT. §

407.010(5).

4363.   New GM engaged in "trade" or "commerce" in the State of Missouri within the meaning of MO. REV. STAT. § 407.010(7).

4364.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020.

4365.   In the course of its business, Old GM systematically omitted, suppressed, and concealed the defects in the Delta Ignition Switch Vehicles as described herein. By failing to disclose these defects or facts about the defects described herein known to it or that were available to Old GM upon reasonable inquiry, Old GM deprived consumers of material facts about the safety and functionality of their vehicles. By failing to release material facts about the defects, Old GM curtailed or reduced the ability of consumers to take notice of material facts about their vehicles, and/or it affirmatively operated to hide or keep those facts from consumers. 15 MO. CODE OF SERV. REG. § 60-9.110. Moreover, GM otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices, and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

4366.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

4367.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

4368.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

4369.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Missouri MPA.

4370.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4371.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4372.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

4373.   Old GM knew or should have known that its conduct violated the Missouri MPA.

4374.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

4375.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

- 1131 -

      a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

4376.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

4377.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4378.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

4379.   As a direct and proximate result of Old GM's violations of the Missouri MPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

4380.   New GM has successor liability to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, and any other just and proper relief under MO. REV. STAT. § 407.025.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

4381.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4382.   This claim is brought on behalf of Missouri residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4383.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4384.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4385.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

4386.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4387.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

- 1133 -

4388.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

4389.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

4390.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

4391.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.  Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4392.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

4393.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

4394.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF
### IMPLIED WARRANTY OF MERCHANTABILITY
### (MO. REV. STAT. § 400.2-314)

4395.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4396.   This claim is brought on behalf of Missouri residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4397.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4398.   Old GM was a merchant with respect to motor vehicles within the meaning of MO. REV. STAT § 400.2-104(1).

4399.   Under MO. REV. STAT § 400.2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

4400.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4401.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4402.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## MONTANA

## COUNT I

## VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973
(MONT. CODE ANN. § 30-14-101, *et seq.*)

4403.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4404.   This claim is brought on behalf of Montana residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4405.   New GM and Plaintiffs are "persons" within the meaning of MONT. CODE ANN. § 30-14-102(6).

4406.   Plaintiffs are "consumer[s]" under MONT. CODE ANN. § 30-14-102(1).

4407.   The sale or lease of the Defective Vehicles to Plaintiffs occurred within "trade and commerce" within the meaning of MONT. CODE ANN. § 30-14-102(8), and New GM committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

4408.   The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  MONT. CODE ANN. § 30-14-103.  By systematically devaluing safety and concealing a plethora of defects in New GM vehicles and

- 1137 -

Old GM vehicles, New GM engaged in unfair and deceptive acts or practices in violation of the Montana CPA.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

4409.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

4410.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

- 1138 -

4411.   By failing to disclose and by actively concealing the defects in Plaintiffs'
vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and
deceptive business practices in violation of the Montana CPA.

4412.   In the course of New GM's business, it willfully failed to disclose and actively
concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4413.   New GM's unfair or deceptive acts or practices were likely to and did in fact
deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their
vehicles.

4414.   New GM intentionally and knowingly misrepresented material facts regarding the
Defective Vehicles with the intent to mislead Plaintiffs.

4415.   New GM knew or should have known that its conduct violated the Montana CPA.

4416.   As alleged above, New GM made material statements about the safety and
reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

4417.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the
Defective Vehicles, because New GM:

      a.      Possessed exclusive knowledge about the defects in the
Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and
reliability of the Defective Vehicles, while purposefully
withholding material facts from Plaintiffs that contradicted
these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and
remedy the defects.

4418.   Because New GM fraudulently concealed the defects in New GM vehicles, New
GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from defects.

Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for

repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they

would have either not have bought their Defective Vehicles or would have paid less for them.

4419.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and

deceptive trade practices since their vehicles were worth less as the result of New GM's

concealment of, and failure to remedy, the defects.  Further, once the truth came out about the

defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the

vehicles would have had in the absence of the defect.  This diminished value is directly attributed

to New GM's dishonesty and omissions with respect to the quality and safety of the Defective

Vehicles.

4420.   New GM's concealment of the defects in Plaintiffs' vehicles was material to

Plaintiffs.

4421.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and

its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased

New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date

of New GM's inception either would have paid less for their vehicles or would not have

purchased or leased them at all.

4422.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained

and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.

By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New

GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on

its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing

duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Montana CPA—regardless of when those owners acquired their vehicles.

4423.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

4424.   As a direct and proximate result of New GM's violations of the Montana CPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

4425.   Because New GM's unlawful methods, acts, and practices have caused Plaintiffs to suffer an ascertainable loss of money and property, Plaintiffs seek from New GM actual damages or $500, whichever is greater, discretionary treble damages, reasonable attorneys' fees, an order enjoining New GM's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under MONT. CODE ANN. § 30-14-133.

## COUNT II

## FRAUD BY CONCEALMENT

4426.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4427.   This claim is brought on behalf of all Montana residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4428.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4429.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

4430.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4431.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

4432.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

4433.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in

- 1142 -

the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to

disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all

of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

implementing regulations, including the duty to promptly notify consumers of known safety

defects.

4434.   New GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM

money, and it did so at the expense of Plaintiffs.

4435.   On information and belief, New GM has still not made full and adequate

disclosure and continues to defraud Plaintiffs and conceal material information regarding defects

that exist in the Defective Vehicles.

4436.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Defective Vehicles manufactured by New GM; and/or would not have

continued to own and drive their Old GM Defective Vehicles or would have taken other

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the

material facts and such facts were not known to the public, including Plaintiffs.

4437.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their

bargain since the Defective Vehicles were worth less than they would have been without the

defects, and because they own vehicles that diminished in value as a result of New GM's

concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as

alleged above.  Had they been aware of the concealed defects that existed in the Defective

Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

4438.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

4439.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MONT. CODE § 30-2-314)

4440.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4441.   This claim is brought only on behalf of Montana residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

- 1144 -

4442.   New GM was a merchant with respect to motor vehicles under MONT. CODE § 30-2-104(1).

4443.   Under MONT. CODE § 30-2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

4444.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

4445.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4446.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

4447.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4448.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4449.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

4450.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4451.   This claim is brought only on behalf of Montana residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

4452.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

4453.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

4454.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

- 1146 -

4455.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

4456.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

4457.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

4458.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

4459.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

4460.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

4461.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

- 1147 -

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

4462.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

4463.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

4464.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

4465.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

4466.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

4467.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

- 1148 -

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted

the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who

had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old

GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its

implementing regulations that required the disclosure of the defect.

4468.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were

justified.  New GM was in exclusive control of the material facts and such facts were not known

to the public, including Plaintiffs.

4469.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage because they lost their chance to file a claim against Old GM and seek payment from the

GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims

and would have recovered from the GUC Trust.

4470.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be

proven at trial.

4471.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to

be determined according to proof.

- 1149 -

**COUNT V**

**UNJUST ENRICHMENT**

4472.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4473.   This claim is brought on behalf of Montana residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4474.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

4475.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

4476.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

4477.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

4478.   Thus, all Plaintiffs conferred a benefit on New GM.

4479.   It is inequitable for New GM to retain these benefits.

4480.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

4481.   New GM knowingly accepted the benefits of its unjust conduct.

4482.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

<div align="center">

**COUNT VI**

**SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
MONTANA CONSUMER PROTECTION ACT
(MONT. CODE ANN. § 30-14-101, *et seq.*)**

</div>

4483.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4484.   This claim is brought on behalf of Montana residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4485.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4486.   Old GM and Plaintiffs are "persons" within the meaning of MONT. CODE ANN. § 30-14-102(6).

4487.   Plaintiffs are "consumer[s]" under MONT. CODE ANN. § 30-14-102(1).

4488.   The sale or lease of the Delta Ignition Switch Vehicles to Plaintiffs occurred within "trade and commerce" within the meaning of MONT. CODE ANN. § 30-14-102(8), and

<div align="center">- 1151 -</div>

Old GM committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

4489.   The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MONT. CODE ANN. § 30-14-103. By systematically devaluing safety and concealing a plethora of defects in Plaintiffs' vehicles, Old GM engaged in unfair and deceptive acts or practices in violation of the Montana CPA.

4490.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

4491.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

4492.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Montana CPA.

4493.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4494.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

- 1152 -

4495.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

4496.   Old GM knew or should have known that its conduct violated the Montana CPA.

4497.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

4498.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

> a.   Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>
> c.   Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

4499.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

4500.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4501.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of

- 1153 -

the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

4502.   As a direct and proximate result of Old GM's violations of the Montana CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

4503.   Because Old GM's unlawful methods, acts, and practices have caused Plaintiffs to suffer an ascertainable loss of money and property, Plaintiffs seek from New GM actual damages or $500, whichever is greater, discretionary treble damages, reasonable attorneys' fees, an order enjoining New GM's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under MONT. CODE ANN. § 30-14-133.

## COUNT VII

### SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

4504.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4505.   This claim is brought on behalf of Montana residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4506.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

- 1154 -

4507.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4508.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

4509.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4510.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

4511.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

4512.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

- 1155 -

4513.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

4514.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4515.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

4516.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

4517.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

**COUNT VIII**

**SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY
(MONT. CODE § 30-2-314)**

4518.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4519.   This claim is brought on behalf of Montana residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4520.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4521.   Old GM was a merchant with respect to motor vehicles within the meaning of MONT. CODE § 30-2-104(1).

4522.   Under MONT. CODE § 30-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Ignition Switch Vehicles from Old GM on or before July 9, 2009.

4523.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of

- 1157 -

power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4524.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4525.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## NEBRASKA

## COUNT I

## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
(NEB. REV. STAT. § 59-1601, *et seq.*)

4526.   Plaintiff incorporates by reference all preceding and succeeding paragraphs as if set forth fully herein.

4527.   This claim is brought on behalf of Nebraska residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4528.   New GM and Plaintiffs are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), NEB. REV. STAT. § 59-1601(1).

010440-11  983080 V1

4529.   New GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under NEB. REV. STAT. § 59-1601(2).

4530.   The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  NEB. REV. STAT. § 59-1602.  New GM participated in misleading, false, or deceptive acts that violated the Nebraska CPA.  By concealing the known defects in Plaintiffs' vehicles, New GM engaged in deceptive business practices prohibited by the Nebraska CPA.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

4531.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

4532.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

4533.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of

Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

4534.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Nebraska CPA.

4535.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4536.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4537.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

4538.   New GM knew or should have known that its conduct violated the Nebraska CPA.

4539.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

4540.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

b.      Intentionally concealed the foregoing from Plaintiffs;

c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

4541.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

4542.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

4543.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4544.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased

- 1161 -

or leased Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

4545.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Nebraska CPA—regardless of when those owners acquired their vehicles.

4546.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

4547.   As a direct and proximate result of New GM's violations of the Nebraska CPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

4548.   Because New GM's conduct caused injury to Plaintiffs' property through violations of the Nebraska CPA, Plaintiffs seek recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining New GM's unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under NEB. REV. STAT. § 59-1609.

## COUNT II

## FRAUD BY CONCEALMENT

4549.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4550.   This claim is brought on behalf of all Nebraska residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4551.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4552.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

4553.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4554.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

4555.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to

- 1163 -

consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

4556.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

4557.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

4558.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

4559.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the

material facts and such facts were not known to the public, including Plaintiffs.

4560.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their

bargain since the Defective Vehicles were worth less than they would have been without the

defects, and because they own vehicles that diminished in value as a result of New GM's

concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as

alleged above.  Had they been aware of the concealed defects that existed in the Defective

Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their

vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the

time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all

Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty

and omissions with respect to the quality and safety of these vehicles.

4561.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be

proven at trial.

4562.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such

conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (NEB. REV. STAT. NEB. § 2-314)

4563.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4564.   This claim is brought only on behalf of Nebraska residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

4565.   New GM was a merchant with respect to motor vehicles within the meaning of NEB. REV. STAT. § 2-104(1).

4566.   A warranty that the Defective Vehicles were in merchantable condition was implied by law under NEB. REV. STAT. § 2-314 in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

4567.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

4568.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4569.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

4570.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4571.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4572.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

4573.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4574.   This claim is brought only on behalf of Nebraska residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

4575.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

4576.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

4577.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

4578.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

4579.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

4580.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

4581.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two

series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

4582.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

4583.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

4584.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

4585.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

4586.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

4587.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

- 1169 -

4588.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

4589.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

4590.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

4591.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4592.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the

- 1170 -

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

4593.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

4594.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

4595.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4596.   This claim is brought on behalf of Nebraska residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4597.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

4598.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

4599.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

4600.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

4601.   Thus, all Plaintiffs conferred a benefit on New GM.

4602.   It is inequitable for New GM to retain these benefits.

4603.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

4604.   New GM knowingly accepted the benefits of its unjust conduct.

4605.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE NEBRASKA CONSUMER PROTECTION ACT
### (NEB. REV. STAT. § 59-1601, *et seq.*)

4606.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4607.   This claim is brought on behalf of Nebraska residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

- 1172 -

4608.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4609.   Old GM and Plaintiffs are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), NEB. REV. STAT. § 59-1601(1).

4610.   Old GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under NEB. REV. STAT. § 59-1601(2).

4611.   The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  NEB. REV. STAT. § 59-1602.  Old GM engaged in misleading, false, or deceptive acts that violated the Nebraska CPA.  By concealing the known defects in Plaintiffs' vehicles, Old GM engaged in deceptive business practices prohibited by the Nebraska CPA.

4612.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

4613.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

4614.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

- 1173 -

4615.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Nebraska CPA.

4616.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4617.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4618.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

4619.   Old GM knew or should have known that its conduct violated the Nebraska CPA.

4620.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

4621.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

      a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

4622.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their

bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

4623.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4624.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

4625.   As a direct and proximate result of Old GM's violations of the Nebraska CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

4626.   Because Old GM's conduct caused injury to Plaintiffs' property through violations of the Nebraska CPA, Plaintiffs seek recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining New GM's unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under NEB. REV. STAT. § 59-1609.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

4627.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4628.   This claim is brought on behalf of Nebraska residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4629.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4630.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4631.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

4632.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4633.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

4634.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

4635.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge

- 1176 -

and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

4636.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

4637.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4638.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

4639.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

4640.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (NEB. REV. STAT. NEB. § 2-314)

4641.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4642.   This claim is brought on behalf of Nebraska residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4643.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4644.   Old GM was a merchant with respect to motor vehicles within the meaning of NEV. REV. STAT. § 104.2104(1).

4645.   A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Delta Ignition Switch Vehicles from Old GM on or before July 9, 2009.

4646.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the

Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4647.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4648.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## NEVADA

## COUNT I

### VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
(NEV. REV. STAT. § 598.0903, *et seq.*)

4649.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4650.   This claim is brought on behalf of Nevada residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

- 1179 -

4651.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT. § 598.0903, *et seq.* prohibits deceptive trade practices.  NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person:  "5.  Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7.  Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9.  Advertises goods or services with intent not to sell or lease them as advertised"; or "15.  Knowingly makes any other false representation in a transaction."

4652.   New GM engaged in deceptive trade practices that violated the Nevada DTPA, including:  knowingly representing that Defective Vehicles have uses and benefits which they do not have; representing that Defective Vehicles are of a particular standard, quality, and grade when they are not; advertising Defective Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not; knowingly making other false representations in a transaction; and concealing the known defects in Plaintiffs' vehicles. The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering

and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

4653.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

4654.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

4655.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

4656.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Nevada Deceptive Trade Practices Act.

4657.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4658.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4659.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

4660.   New GM knew or should have known that its conduct violated the Nevada Deceptive Trade Practices Act.

4661.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

4662.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

> a.   Possessed exclusive knowledge about the defects in the Defective Vehicles;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>
> c.   Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

4663.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

4664.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

4665.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4666.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

4667.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Nevada Deceptive Trade Practices Act—regardless of when those owners acquired their vehicles.

4668.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

4669.   As a direct and proximate result of New GM's violations of the Nevada Deceptive Trade Practices Act, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

4670.   Accordingly, Plaintiffs seek their actual damages, punitive damages, an order enjoining New GM's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act.  NEV. REV. STAT. § 41.600.

## COUNT II

## FRAUD BY CONCEALMENT

4671.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4672.   This claim is brought on behalf of all Nevada residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

- 1184 -

4673.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4674.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

4675.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4676.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

4677.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

4678.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

- 1185 -

implementing regulations, including the duty to promptly notify consumers of known safety defects.

4679.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

4680.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

4681.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4682.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all

Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

4683.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

4684.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (NEV. REV. STAT. § 104.2314)

4685.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4686.   This claim is brought only on behalf of Nevada residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

4687.   New GM was a merchant with respect to motor vehicles within the meaning of NEV. REV. STAT. § 104.2104(1).

010440-11  983080 V1

4688.   A warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

4689.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4690.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

4691.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4692.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

4693.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4694.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4695.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

4696.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4697.   This claim is brought only on behalf of Nevada residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

4698.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

4699.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

4700.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

010440-11  983080 V1

4701.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

4702.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

4703.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

4704.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

4705.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

4706.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

4707.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

- 1190 -

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

4708.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

4709.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

4710.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

4711.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

4712.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

4713.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

- 1191 -

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

4714.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4715.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

4716.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

4717.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

4718.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4719.   This claim is brought on behalf of Nevada residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").   The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4720.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

4721.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

4722.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

4723.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

4724.   Thus, all Plaintiffs conferred a benefit on New GM.

010440-11  983080 V1

4725.   It is inequitable for New GM to retain these benefits.

4726.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

4727.   New GM knowingly accepted the benefits of its unjust conduct.

4728.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
(NEV. REV. STAT. § 598.0903, *et seq.*)

4729.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4730.   This claim is brought on behalf of Nevada residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4731.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4732.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT. § 598.0903, *et seq.* prohibits deceptive trade practices.  NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person:  "5.  Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false

- 1194 -

representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7.  Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9.  Advertises goods or services with intent not to sell or lease them as advertised"; or "15.  Knowingly makes any other false representation in a transaction."

4733.   Old GM engaged in deceptive trade practices that violated the Nevada DTPA, including:  knowingly representing that Defective Vehicles have uses and benefits which they do not have; representing that Defective Vehicles are of a particular standard, quality, and grade when they are not; advertising Defective Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

4734.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

4735.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

4736.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

4737.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Nevada DTPA.

4738.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4739.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4740.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

4741.   Old GM knew or should have known that its conduct violated the Nevada DTPA.

4742.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

4743.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

    a.    Possessed exclusive knowledge about the defects in the
          Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Plaintiffs;

    c.    Made incomplete representations about the safety and
          reliability of the Delta Ignition Switch Vehicles, while
          purposefully withholding material facts from Plaintiffs that
          contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to
          disclose and remedy the defects.

4744.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their

- 1196 -

bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

4745.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4746.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

4747.   As a direct and proximate result of Old GM's violations of the Nevada DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

4748.   Accordingly, Plaintiffs seek their actual damages, punitive damages, an order enjoining New GM's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act.  NEV. REV. STAT. § 41.600.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

4749.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4750.   This claim is brought on behalf of Nevada residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4751.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4752.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4753.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

4754.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4755.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

4756.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

4757.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge

- 1198 -

and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs. Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles. Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth. Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

4758.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

4759.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified. Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4760.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage. Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects. Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

4761.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

4762.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (NEV. REV. STAT. § 104.2314)

4763.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4764.   This claim is brought on behalf of Nevada residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4765.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4766.   Old GM was a merchant with respect to motor vehicles within the meaning of NEV. REV. STAT. § 104.2104(1).

4767.   A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Delta Ignition Switch Vehicles from Old GM on or after July 10, 2009.

4768.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the

Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4769.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4770.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

<div align="center">

**NEW HAMPSHIRE**

**COUNT I**

**VIOLATION OF N.H. CONSUMER PROTECTION ACT**
**(N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*)**

</div>

4771.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4772.   This claim is brought on behalf of New Hampshire residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4773.   New GM and Plaintiffs are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. REV. STAT. § 358-A:1.

4774.   New GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. REV. STAT. § 358-A:1.

4775.   The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised."  N.H. REV. STAT. § 358-A:2.

4776.   New GM participated in unfair or deceptive acts or practices that violated the New Hampshire CPA as described above and below.  By systematically devaluing safety and concealing a plethora of defects in New GM vehicles and Old GM vehicles, New GM engaged in deceptive business practices prohibited by the CPA, including representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard, quality, and grade when they are not; advertising Defective Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the

- 1202 -

depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

4777.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

4778.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

4779.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the New Hampshire CPA.

4780.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4781.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4782.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

4783.   New GM knew or should have known that its conduct violated the New Hampshire CPA.

4784.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

4785.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

> a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;
>
> b.      Intentionally concealed the foregoing from Plaintiffs;
>
> c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

4786.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

4787.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

4788.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4789.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

4790.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the New Hampshire CPA—regardless of when those owners acquired their vehicles.

4791.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta

- 1205 -

Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

4792.   As a direct and proximate result of New GM's violations of the New Hampshire CPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

4793.   Because New GM's willful conduct caused injury to Plaintiffs' property through violations of the New Hampshire CPA, Plaintiffs seek recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, an order enjoining New GM's unfair and/or deceptive acts and practices, and any other just and proper relief under N.H. REV. STAT. § 358-A:10.

<div align="center">

**COUNT II**

**FRAUD BY CONCEALMENT**

</div>

4794.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4795.   This claim is brought on behalf of all New Hampshire residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

<div align="center">

- 1206 -

</div>

4796.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4797.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

4798.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4799.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

4800.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

4801.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

- 1207 -

implementing regulations, including the duty to promptly notify consumers of known safety defects.

4802.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

4803.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

4804.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4805.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all

Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

4806. Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

4807. New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (N.H. REV. STAT. ANN. § 382-A:2-314)

4808. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4809. This claim is brought only on behalf of New Hampshire residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

4810. New GM was a merchant with respect to motor vehicles within the meaning of N.H. REV. STAT. ANN. § 382-A:2-104(1).

- 1209 -

4811.   A warranty that the Defective Vehicles were in merchantable condition was implied by law under N.H. REV. STAT. ANN. § 382-A:2-314 in the transactions when Plaintiffs purchased their Defective Vehicles on or after July 10, 2009.

4812.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

4813.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4814.   As a direct and proximate result of New GM's breach of the warranties of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**

**FRAUD BY CONCEALMENT OF THE RIGHT
TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY**

</div>

4815.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4816.   This claim is brought only on behalf of New Hampshire residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

010440-11  983080 V1

4817.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

4818.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

4819.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

4820.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

4821.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

4822.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

4823.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

4824.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

4825.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

4826.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

4827.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness

bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

4828.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

4829.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

4830.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

4831.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

4832.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

4833.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4834.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

4835.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

4836.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

4837.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4838.   This claim is brought on behalf of New Hampshire residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag

- 1214 -

Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4839.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

4840.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

4841.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

4842.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

4843.   Thus, all Plaintiffs conferred a benefit on New GM.

4844.   It is inequitable for New GM to retain these benefits.

4845.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

4846.   New GM knowingly accepted the benefits of its unjust conduct.

4847.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

- 1215 -

## COUNT VI

## SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
## NEW HAMPSHIRE CONSUMER PROTECTION ACT
### (N.H. REV. STAT. ANN. § 358-A:1, *et seq.*)

4848.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4849.   This claim is brought on behalf of New Hampshire residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4850.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4851.   Old GM and Plaintiffs are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. REV. STAT. § 358-A:1.

4852.   Old GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. REV. STAT. § 358-A:1.

4853.   The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised."  N.H. REV. STAT. § 358-A:2.

4854.   Old GM participated in unfair or deceptive acts or practices that violated the New Hampshire CPA as described above and below.  By systematically devaluing safety and concealing a plethora of defects in Old GM vehicles, Old GM engaged in deceptive business practices prohibited by the CPA, including representing that Defective Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they did not; representing that Defective Ignition Switch Vehicles are of a particular standard, quality, and grade when they were not; advertising Defective Ignition Switch Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Defective Ignition Switch Vehicles had been supplied in accordance with a previous representation when it had not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce.

4855.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

4856.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

4857.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

4858.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the New Hampshire CPA.

4859.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4860.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4861.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

4862.   Old GM knew or should have known that its conduct violated the New Hampshire CPA.

4863.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

4864.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

> a.  Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;
>
> b.  Intentionally concealed the foregoing from Plaintiffs;
>
> c.  Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.  Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

- 1218 -

4865.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

4866.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4867.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

4868.   As a direct and proximate result of Old GM's violations of the New Hampshire CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

4869.   Because Old GM's willful conduct caused injury to Plaintiffs' property through violations of the New Hampshire CPA, Plaintiffs seek recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, an order enjoining New GM's unfair and/or deceptive acts and practices, and any other just and proper relief under N.H. Rev. Stat. § 358-A:10.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

4870.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4871.   This claim is brought on behalf of New Hampshire residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4872.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4873.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4874.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

4875.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4876.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

4877.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material

to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

4878.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

4879.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

4880.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.  Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4881.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

4882.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

4883.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.H. REV. STAT. ANN. § 382-A:2-314)

4884.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4885.   This claim is brought on behalf of New Hampshire residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4886.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4887.   Old GM was a merchant with respect to motor vehicles within the meaning of N.H. REV. STAT. ANN. § 382-A:2-104(1).

4888.   A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law under N.H. REV. STAT. ANN. § 382-A:2-314 in the transactions when Plaintiffs purchased their vehicles on or before July 9, 2009.

4889.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4890.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4891.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## NEW JERSEY

## COUNT I

## VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT
### (N.J. STAT. ANN. § 56:8-1, *et seq.*)

4892.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4893.   This claim is brought on behalf of New Jersey residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition

Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4894.   New GM and Plaintiffs are or were "persons" within the meaning of N.J. STAT. ANN. § 56:8-1(d).

4895.   New GM engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (d).

4896.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…"  N.J. STAT. ANN. § 56:8-2. New GM engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Plaintiffs rely upon their acts, concealment, suppression or omissions.

4897.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection

- 1224 -

with the sale of the Defective Vehicles.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

4898.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

4899.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the New Jersey CFA.

4900.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4901.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

- 1225 -

4902.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

4903.   New GM knew or should have known that its conduct violated the New Jersey CFA.

4904.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

4905.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

4906.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

4907.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the

defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

4908.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4909.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

4910.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the New Jersey CFA—regardless of when those owners acquired their vehicles.

4911.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

- 1227 -

4912.   As a direct and proximate result of New GM's violations of the New Jersey CFA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

4913.   Plaintiffs are entitled to recover legal and/or equitable relief including an order enjoining New GM's unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19, and any other just and appropriate relief.

## COUNT II

## FRAUD BY CONCEALMENT

4914.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4915.   This claim is brought on behalf of all New Jersey residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4916.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4917.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

4918.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4919.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

4920.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

4921.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

- 1229 -

4922.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

4923.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

4924.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

4925.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

4926.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

4927.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.J. STAT. ANN. § 12A:2-314)

4928.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4929.   This claim is brought only on behalf of New Jersey residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

4930.   New GM was a merchant with respect to motor vehicles within the meaning of N.J. STAT. ANN. § 12A:2-104(1).

4931.   A warranty that the Defective Vehicles were in merchantable condition was implied by law under N.J. STAT. ANN. § 12A:2-104(1) in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

4932.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

4933.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4934.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

4935.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

4936.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

4937.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

## FRAUD BY CONCEALMENT OF THE RIGHT
## TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

4938.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4939.   This claim is brought only on behalf of New Jersey residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

4940.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

4941.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

4942.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

4943.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

4944.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

4945.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

4946.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

4947.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

4948.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

4949.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

4950.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

4951.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

4952.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

4953.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

4954.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

4955.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

- 1235 -

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted

the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who

had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old

GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its

implementing regulations that required the disclosure of the defect.

4956.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were

justified.  New GM was in exclusive control of the material facts and such facts were not known

to the public, including Plaintiffs.

4957.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage because they lost their chance to file a claim against Old GM and seek payment from the

GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims

and would have recovered from the GUC Trust.

4958.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be

proven at trial.

4959.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to

be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

4960.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4961.   This claim is brought on behalf of New Jersey residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

4962.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

4963.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

4964.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

4965.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

4966.   Thus, all Plaintiffs conferred a benefit on New GM.

4967.   It is inequitable for New GM to retain these benefits.

4968.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

4969.   New GM knowingly accepted the benefits of its unjust conduct.

4970.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J. STAT. ANN. § 56:8-1, *et seq.*)

4971.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4972.   This claim is brought on behalf of New Jersey residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

4973.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4974.   Old GM and Plaintiffs are or were "persons" within the meaning of N.J. STAT. ANN. § 56:8-1(d).

4975.   Old GM engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (d).

4976.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby …."  N.J. STAT. ANN. § 56:8-2. Old GM engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Plaintiffs rely upon their acts, concealment, suppression or omissions.

4977.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

4978.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

4979.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

4980.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the New Jersey CFA.

4981.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

4982.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

4983.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

4984.   Old GM knew or should have known that its conduct violated the New Jersey CFA.

4985.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

4986.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

      a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

4987.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of

- 1240 -

the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

4988.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

4989.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

4990.   As a direct and proximate result of Old GM's violations of the New Jersey CFA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

4991.   Plaintiffs are entitled to recover legal and/or equitable relief including an order enjoining New GM's unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19, and any other just and appropriate relief.

<div align="center">

**COUNT VII**

**SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT**

</div>

4992.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

4993.   This claim is brought on behalf of New Jersey residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

<div align="center">

- 1241 -

</div>

4994.  This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

4995.  Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

4996.  Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

4997.  In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

4998.  Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

4999.  Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

5000.  Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as

- 1242 -

set forth above, which were misleading, deceptive, and incomplete without the disclosure of the

defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old

GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had

monitoring and disclosure duties under the TREAD Act, as alleged above.

5001.   Old GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM

money, and it did so at the expense of Plaintiffs.

5002.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.

Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such

facts were not known to the public, including Plaintiffs.

5003.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get

the benefit of their bargain since the Defective Vehicles were worth less than they would have

been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not

have purchased or leased them at all, and Plaintiffs sustained repair damages.

5004.   Accordingly, based on the conduct of Old GM for which it has successor liability,

New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5005.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.J. STAT. ANN. § 12A:2-314)

5006.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5007.   This claim is brought on behalf of New Jersey residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5008.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5009.   Old GM was a merchant with respect to motor vehicles within the meaning of N.J. STAT. ANN. § 12A:2-104(1).

5010.   Under N.J. STAT. ANN. § 12A:2-104(1), a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

5011.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of

- 1244 -

power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5012.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

5013.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## NEW MEXICO

## COUNT I

## VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### (N.M. STAT. ANN. §§ 57-12-1, *et seq.*)

5014.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5015.   This claim is brought on behalf of New Mexico residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5016.   New GM and Plaintiffs are or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. STAT. ANN. § 57-12-2.

- 1245 -

5017.   New GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. STAT. ANN. § 57-12-2.

5018.   The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive."  N.M. STAT. ANN. § 57-12-2(D).  New GM's acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. STAT. ANN. § 57-12-2(D).  In addition, New GM's actions constitute unconscionable actions under N.M. STAT. ANN. § 57-12-2(E), since they took advantage of the lack of knowledge, ability, experience, and capacity of Plaintiffs to a grossly unfair degree.

5019.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management,

and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

5020.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

5021.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the New Mexico UTPA.

5022.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5023.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

5024.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

5025.   New GM knew or should have known that its conduct violated the New Mexico UTPA.

5026.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

5027.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

        a.        Possessed exclusive knowledge about the defects in the Defective Vehicles;

        b.        Intentionally concealed the foregoing from Plaintiffs;

        c.        Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

        d.        Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

5028.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

5029.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

5030.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

5031.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

5032.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the New Mexico UTPA—regardless of when those owners acquired their vehicles.

5033.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

5034.   As a direct and proximate result of New GM's violations of the New Mexico UTPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

5035.   Because New GM's unconscionable, willful conduct caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

## COUNT II

## FRAUD BY CONCEALMENT

5036.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5037.   This claim is brought on behalf of all New Mexico residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5038.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

5039.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

5040.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

5041.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

- 1250 -

5042.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

5043.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

5044.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

5045.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

5046.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5047.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

5048.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5049.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.M. STAT. ANN. § 55-2-314)

5050.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5051.   This claim is brought only on behalf of New Mexico residents who are members of any of the following Subclasses: (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

5052.   New GM was a merchant with respect to motor vehicles within the meaning of N.M. STAT. ANN. § 55-2-104(1).

5053.   Under N.M. STAT. ANN. § 55-2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

5054.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

5055.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

5056.   As a direct and proximate result of New GM's breach of the warranties of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**

**FRAUD BY CONCEALMENT OF THE RIGHT
TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY**

</div>

5057.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5058.   This claim is brought only on behalf of New Mexico residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

5059.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

5060.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel

<div align="center">- 1254 -</div>

(all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

5061.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

5062.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

5063.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

5064.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

5065.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

5066.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

5067.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

5068.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

5069.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

5070.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

5071.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

5072.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

5073.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims

by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

5074.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

5075.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5076.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

5077.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

5078.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

- 1257 -

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to

be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

5079.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

5080.   This claim is brought on behalf of New Mexico residents who are members of any

of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition

Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count,

"Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct

of New GM.

5081.   This claim is pleaded in the alternative to any contract-based claims brought on

behalf of Plaintiffs.

5082.   New GM has received and retained a benefit from Plaintiffs and inequity has

resulted.

5083.   New GM has benefitted from selling and leasing the Defective Vehicles, for more

than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have

overpaid for the cars and been forced to pay other costs.

5084.   With respect to the Defective Vehicles purchased before New GM came into

existence that were still on the road after New GM came into existence and as to which New GM

had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs

- 1258 -

of a recall and other lawsuits, and further benefitted from its statements about the success of New

GM.

5085.   Thus, all Plaintiffs conferred a benefit on New GM.

5086.   It is inequitable for New GM to retain these benefits.

5087.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did

not benefit from New GM's conduct.

5088.   New GM knowingly accepted the benefits of its unjust conduct.

5089.   As a result of New GM's conduct, the amount of its unjust enrichment should be

disgorged, in an amount according to proof.

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
### NEW MEXICO UNFAIR TRADE PRACTICES ACT
### (N.M. STAT. ANN. §§ 57-12-1, *et seq.*)

5090.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

5091.   This claim is brought on behalf of New Mexico residents who are members of the

Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count,

"Plaintiffs").

5092.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing

New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are

free to assert this successor liability claim without impediment from the Sale Order.

5093.   Old GM and Plaintiffs are or were "person[s]" under the New Mexico Unfair

Trade Practices Act ("New Mexico UTPA"), N.M. STAT. ANN. § 57-12-2.

5094.   Old GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. STAT. ANN. § 57-12-2.

5095.   The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive."  N.M. STAT. ANN. § 57-12-2(D).  Old GM's acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. STAT. ANN. § 57-12-2(D).  In addition, Old GM's actions constitute unconscionable actions under N.M. STAT. ANN. § 57-12-2(E), since they took advantage of the lack of knowledge, ability, experience, and capacity of Plaintiffs to a grossly unfair degree.

5096.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

5097.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

5098.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

- 1260 -

5099.   By failing to disclose and by actively concealing the defects in Plaintiffs'
vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and
deceptive business practices in violation of the New Mexico UTPA.

5100.   In the course of Old GM's business, it willfully failed to disclose and actively
concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5101.   Old GM's unfair or deceptive acts or practices were likely to and did in fact
deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their
vehicles.

5102.   Old GM intentionally and knowingly misrepresented material facts regarding the
Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

5103.   Old GM knew or should have known that its conduct violated the New Mexico
UTPA.

5104.   As alleged above, Old GM made material statements about the safety and
reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

5105.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the
Delta Ignition Switch Vehicles, because Old GM:

> a.   Possessed exclusive knowledge about the defects in the
>      Delta Ignition Switch Vehicles;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>
> c.   Made incomplete representations about the safety and
>      reliability of the Delta Ignition Switch Vehicles, while
>      purposefully withholding material facts from Plaintiffs that
>      contradicted these representations; and/or
>
> d.   Had duties under the TREAD Act and related regulations to
>      disclose and remedy the defects.

- 1261 -

5106.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

5107.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

5108.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

5109.   As a direct and proximate result of Old GM's violations of the New Mexico UTPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

5110.   Because Old GM's unconscionable, willful conduct caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

5111.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5112.   This claim is brought on behalf of New Mexico residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5113.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5114.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

5115.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

5116.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

5117.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

5118.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material

- 1263 -

to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

5119. Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs. Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles. Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth. Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

5120. Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

5121. Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified. Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5122. Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage. Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects. Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

5123.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5124.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.M. STAT. ANN. § 55-2-314)

5125.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5126.   This claim is brought on behalf of New Mexico residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5127.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5128.   Old GM was a merchant with respect to motor vehicles within the meaning of N.M. STAT. ANN. § 55-2-104(1).

- 1265 -

5129.   Under N.M. STAT. ANN. § 55-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

5130.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5131.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

5132.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## NEW YORK

## COUNT I

## DECEPTIVE ACTS OR PRACTICES
### (N.Y. GEN. BUS. LAW §§ 349-350)

5133.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5134.   This claim is brought on behalf of New York residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition

Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count,

"Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct

of New GM.

5135.   Plaintiffs are "persons" within the meaning of New York General Business Law

("New York GBL"), N.Y. GEN. BUS. LAW § 349(h).

5136.   New GM is a "person," "firm," "corporation," or "association" within the

meaning of N.Y. GEN. BUS. LAW § 349.

5137.   The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct

of any business, trade or commerce."  N.Y. GEN. BUS. LAW § 349.  New GM's conduct, as

described above and below, constitutes "deceptive acts or practices" within the meaning of the

New York GBL.  Furthermore, New GM's deceptive acts and practices, which were intended to

mislead consumers who were in the process of purchasing and/or leasing the Defective Vehicles,

was conduct directed at consumers.

5138.   New GM's actions, as set forth above, occurred in the conduct of trade or

commerce.

5139.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles

as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

New GM also engaged in unlawful trade practices by employing deception, deceptive acts or

practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection

with the sale of the Defective Vehicles.  The defects in each vehicle include not only the specific

defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which

New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process. All of these defective processes would be material to a reasonable consumer.

5140.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above. New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

5141.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the New York GBL.

5142.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5143.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

5144.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

5145.   New GM knew or should have known that its conduct violated the New York GBL.

5146.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

5147.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

a.   Possessed exclusive knowledge about the defects in the Defective Vehicles;

b.   Intentionally concealed the foregoing from Plaintiffs;

c.   Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

5148.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

5149.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed

to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

5150.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

5151.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

5152.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the New York GBL—regardless of when those owners acquired their vehicles.

5153.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

5154.   As a direct and proximate result of New GM's violations of the New York GBL, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result

- 1270 -

of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

5155.   Because New GM's willful and knowing conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining New GM's deceptive conduct, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT II

## FRAUD BY CONCEALMENT

5156.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5157.   This claim is brought on behalf of New York residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5158.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

5159.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

5160.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

5161.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

5162.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

5163.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

5164.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

5165.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

5166.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5167.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

5168.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5169.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.Y. U.C.C. § 2-314)

5170.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5171.   This claim is brought only on behalf of New York residents who are members of any of the following Subclasses:  (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

5172.   New GM was a merchant with respect to motor vehicles within the meaning of N.Y. U.C.C. § 2-104(1).

5173.   Under N.Y. U.C.C. § 2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

5174.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

5175.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5176.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

5177.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5178.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

5179.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

- 1275 -

**COUNT IV**

**VIOLATION OF NEW YORK'S FALSE ADVERTISING ACT**
**(N.Y. GEN. BUS. LAW § 350)**

5180.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5181.   This claim is brought on behalf of New York residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5182.   New GM was and is engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. GEN. BUS. LAW § 350.

5183.   N.Y. GEN. BUS. LAW § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."  False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …."  N.Y. GEN. BUS. LAW § 350-a.

5184.   New GM caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to New GM, to be untrue and misleading to consumers including Plaintiffs.

5185.   New GM has violated § 350 because the misrepresentations and omissions regarding the defects in the Defective Vehicles, as set forth above, were material and likely to deceive a reasonable consumer.

5186.   Plaintiffs have suffered an injury, including the loss of money or property, as a result of New GM's false advertising.  In purchasing or leasing their vehicles, Plaintiffs relied on the misrepresentations and/or omissions of New GM with respect to the safety and reliability of the Defective Vehicles.  New GM's representations were false and/or misleading because the concealed defects and safety issues seriously undermine the value of the Defective Vehicles. Had Plaintiffs known this, they would not have either not purchased or leased their Defective Vehicles, or paid less for them.

5187.   Pursuant to N.Y. GEN. BUS. LAW § 350e, Plaintiffs seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff.  Because New GM's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover three times actual damages, up to $10,000 each.

5188.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under General Business Law §§ 349–350.

## COUNT V

## FRAUD BY CONCEALMENT OF THE RIGHT
## TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

5189.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5190.   This claim is brought only on behalf of New York residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

5191.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

5192.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

5193.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

5194.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

5195.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

5196.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

5197.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

5198.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

5199.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

5200.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

5201.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness

bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

5202.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

5203.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

5204.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

5205.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

5206.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

5207.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5208.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

5209.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

5210.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VI

### UNJUST ENRICHMENT

5211.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5212.   This claim is brought on behalf of New York residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

- 1281 -

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5213.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

5214.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

5215.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

5216.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

5217.   Thus, all Plaintiffs conferred a benefit on New GM.

5218.   It is inequitable for New GM to retain these benefits.

5219.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

5220.   New GM knowingly accepted the benefits of its unjust conduct.

5221.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VII

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE NEW YORK GBL
### (N.Y. GEN. BUS. LAW §§ 349 and 350)

5222.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5223.   This claim is brought on behalf of New York residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5224.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5225.   Plaintiffs are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. GEN. BUS. LAW § 349(h).

5226.   Old GM is a "person," "firm," "corporation," or "association" within the meaning of N.Y. GEN. BUS. LAW § 349.

5227.   The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  N.Y. GEN. BUS. LAW § 349.  Old GM's conduct, as described above and below, constitutes "deceptive acts or practices" within the meaning of the New York GBL.  Furthermore, Old GM's deceptive acts and practices, which were intended to mislead consumers who were in the process of purchasing and/or leasing the Defective Vehicles, was conduct directed at consumers.

- 1283 -

5228.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

5229.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

5230.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

5231.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the New York GBL.

5232.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5233.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

5234.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

5235.   Old GM knew or should have known that its conduct violated the New York GBL.

5236.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

5237.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

a.     Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.     Intentionally concealed the foregoing from Plaintiffs;

c.     Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

5238.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

5239.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

5240.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

5241.   As a direct and proximate result of Old GM's violations of the New York GBL, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

5242.   Because New GM's willful and knowing conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining New GM's deceptive conduct, and any other just and proper relief available under N.Y. GEN. BUS. LAW § 349.

## COUNT VIII

### SUCCESSOR LIABLITY CLAIM FOR VIOLATION OF NEW YORK'S FALSE ADVERTISING ACT (N.Y. GEN. BUS. LAW § 350)

5243.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5244.   This claim is brought on behalf of New York residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5245.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5246.   Old GM was engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. GEN. BUS. LAW § 350.

5247.   N.Y. Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."  False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …."  N.Y. Gen. Bus. Law § 350-a.

5248.   Old GM caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to Old GM, to be untrue and misleading to consumers and Plaintiffs.

5249.   Old GM violated § 350 because the misrepresentations and omissions regarding the defects, and Old GM's systemic devaluation of safety, as set forth above, were material and likely to deceive a reasonable consumer.

5250.   Plaintiffs have suffered an injury, including the loss of money or property, as a result of Old GM's false advertising.  In purchasing or leasing their vehicles, Plaintiffs relied on the misrepresentations and/or omissions of Old GM with respect to the safety and reliability of the Delta Ignition Switch Vehicles.  Old GM's representations were false and/or misleading because the concealed defects and safety issues seriously undermine the value of the Delta Ignition Switch Vehicles.  Had Plaintiffs known this, they would not have purchased or leased their Delta Ignition Switch Vehicles and/or paid as much for them.

5251.   Pursuant to N.Y. Gen. Bus. Law § 350e, Plaintiffs seek monetary relief against New GM (as the successor to Old GM) measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each

- 1287 -

Plaintiff.  Because Old GM's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover three times actual damages, up to $10,000 per Plaintiff.

5252.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under General Business Law §§ 349–350.

<div align="center">

**COUNT IX**

**SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT**

</div>

5253.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5254.   This claim is brought on behalf of New York residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5255.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5256.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

5257.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

5258.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

5259.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

5260.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

5261.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

5262.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

5263.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.

Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5264.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

5265.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5266.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT X

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.Y. U.C.C. § 2-314)

5267.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5268.   This claim is brought on behalf of New York residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

- 1290 -

5269.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5270.   Old GM was a merchant with respect to motor vehicles within the meaning of N.Y. U.C.C. § 2-104(1).

5271.   Under N.Y. U.C.C. § 2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

5272.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5273.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

5274.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

# NORTH CAROLINA

## COUNT I

### VIOLATION OF NORTH CAROLINA'S UNFAIR
### AND DECEPTIVE ACTS AND PRACTICES ACT
### (N.C. GEN. STAT. § 75-1.1, *et seq.*)

5275.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5276.   This claim is brought on behalf of North Carolina residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5277.   New GM engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

5278.   The North Carolina Act broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."  N.C. GEN. STAT. § 75-1.1(a).  As alleged above and below, New GM willfully committed unfair or deceptive acts or practices in violation of the North Carolina Act.

5279.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

5280.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material

- 1292 -

fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles. The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process. All of these defective processes would be material to a reasonable consumer.

5281.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above. New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

5282.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the North Carolina Act.

5283.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5284.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

5285.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

5286.   New GM knew or should have known that its conduct violated the North Carolina Act.

5287.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

5288.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

5289.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

- 1294 -

5290.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

5291.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

5292.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

5293.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the North Carolina Act—regardless of when those owners acquired their vehicles.

5294.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta

Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

5295.   As a direct and proximate result of New GM's violations of the North Carolina Act, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

5296.   Plaintiffs seek an order for treble their actual damages, an order enjoining New GM's unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

## COUNT II

## FRAUD BY CONCEALMENT

5297.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5298.   This claim is brought on behalf of North Carolina residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5299.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

5300.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

5301.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

5302.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

5303.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

5304.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

- 1297 -

5305.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

5306.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

5307.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5308.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

5309.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5310.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C. GEN. STAT. § 25-2-314)

5311.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5312.   This claim is brought only on behalf of North Carolina residents who are members of any of the following Subclasses:  (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs")..

5313.   New GM was a merchant with respect to motor vehicles within the meaning of N.C. GEN. STAT. § 25-2-104(1).

5314.   Under N.C. GEN. STAT. § 25-2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

5315.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

5316.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5317.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

5318.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5319.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

5320.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**COUNT IV**

**FRAUD BY CONCEALMENT OF THE RIGHT
TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY**

5321.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5322.   This claim is brought only on behalf of North Carolina residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

5323.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

5324.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

5325.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

5326.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

5327.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

5328.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

5329.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

5330.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

5331.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

5332.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

- 1302 -

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

5333.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

5334.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

5335.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

5336.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

5337.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

5338.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

- 1303 -

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

5339.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5340.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

5341.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

5342.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

5343.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5344.   This claim is brought on behalf of North Carolina residents who are members of any of the following Classes: (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5345.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

5346.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

5347.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

5348.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

5349.   Thus, all Plaintiffs conferred a benefit on New GM.

- 1305 -

5350.   It is inequitable for New GM to retain these benefits.

5351.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

5352.   New GM knowingly accepted the benefits of its unjust conduct.

5353.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE PRACTICES ACT
### (N.C. GEN. STAT. § 75-1.1, *et seq.*)

5354.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5355.   This claim is brought on behalf of North Carolina residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5356.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5357.   Old GM engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

5358.   The North Carolina Act broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."  N.C. GEN. STAT. § 75-1.1(a).  As alleged above and below, Old GM willfully committed unfair or deceptive acts or practices in violation of the North Carolina Act.

- 1306 -

5359.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

5360.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

5361.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

5362.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the North Carolina Act.

5363.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5364.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

5365.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

5366.   Old GM knew or should have known that its conduct violated the North Carolina Act.

- 1307 -

5367.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

5368.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

       a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

       b.      Intentionally concealed the foregoing from Plaintiffs;

       c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

       d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

5369.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

5370.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

5371.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

- 1308 -

5372.   As a direct and proximate result of Old GM's violations of the North Carolina Act, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

5373.   Plaintiffs seek an order for treble their actual damages, an order enjoining New GM's unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

## COUNT VII

### SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

5374.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5375.   This claim is brought on behalf of North Carolina residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5376.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5377.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

5378.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

5379.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

5380.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

5381.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

5382.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

5383.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

5384.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5385.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

5386.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5387.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C. Gen. Stat. § 25-2-314)

5388.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5389.   This claim is brought on behalf of North Carolina residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5390.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5391.   Old GM was a merchant with respect to motor vehicles within the meaning of N.C. GEN. STAT. § 25-2-104(1).

5392.   Under N.C. GEN. STAT. § 25-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

5393.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5394.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

5395.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## NORTH DAKOTA

## COUNT I

## VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT
### (N.D. CENT. CODE § 51-15-02)

5396.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5397.   This claim is brought on behalf of North Dakota residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5398.   New GM and Plaintiffs are "persons" within the meaning of N.D. CENT. CODE § 51-15-02(4).

5399.   New GM engaged in the "sale" of "merchandise" within the meaning of N.D. CENT. CODE § 51-15-02(3), (5).

5400.   The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise…."  N.D. CENT. CODE § 51-15-02.  As set forth above and below, New GM committed deceptive acts or practices, with the

intent that Plaintiffs rely thereon in connection with their purchase or lease of the Defective
Vehicles.

5401.   New GM's actions, as set forth above, occurred in the conduct of trade or
commerce.

5402.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles
as described herein and otherwise engaged in activities with a tendency or capacity to deceive.
New GM also engaged in unlawful trade practices by employing deception, deceptive acts or
practices, fraud, misrepresentations, or concealment, suppression or omission of any material
fact with intent that others rely upon such concealment, suppression or omission, in connection
with the sale of the Defective Vehicles.  The defects in each vehicle include not only the specific
defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which
New GM built cars, a process that included cost-cutting, minimizing the importance of safety
issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the
failure to follow acceptable engineering and inventory processes concerning parts management,
and the failure to follow a proper FMEA process.  All of these defective processes would be
material to a reasonable consumer.

5403.   From the date of its inception on July 10, 2009, New GM knew of serious defects
affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of
Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that
transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory
authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed
above.  New GM acquired additional information concerning the serious defects and safety

- 1314 -

issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

5404.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the North Dakota CFA.

5405.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5406.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

5407.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

5408.   New GM knew or should have known that its conduct violated the North Dakota CFA.

5409.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

5410.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

> a.   Possessed exclusive knowledge about the defects in the Defective Vehicles;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>
> c.   Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

5411.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

5412.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

5413.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

5414.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

5415.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the North Dakota CFA—regardless of when those owners acquired their vehicles.

5416.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

5417.   As a direct and proximate result of New GM's violations of the North Dakota CFA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

5418.   Further, New GM knowingly committed the conduct described above, and thus, under N.D. CENT. CODE § 51-15-09, New GM is liable to Plaintiffs for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements.  Plaintiffs further seek an order enjoining New GM's unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

- 1317 -

## COUNT II

## FRAUD BY CONCEALMENT

5419.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5420.   This claim is brought on behalf of North Dakota residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5421.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

5422.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

5423.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

5424.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

5425.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to

consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

5426.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

5427.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

5428.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

5429.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the

material facts and such facts were not known to the public, including Plaintiffs.

5430.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their

bargain since the Defective Vehicles were worth less than they would have been without the

defects, and because they own vehicles that diminished in value as a result of New GM's

concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as

alleged above.  Had they been aware of the concealed defects that existed in the Defective

Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their

vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the

time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all

Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty

and omissions with respect to the quality and safety of these vehicles.

5431.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be

proven at trial.

5432.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such

conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.D. CENT. CODE § 41-02-31)

5433.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5434.   This claim is brought only on behalf of North Dakota residents who are members of any of the following Subclasses:  (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

5435.   New GM was a merchant with respect to motor vehicles.

5436.   A warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

5437.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

5438.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5439.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

5440.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5441.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

5442.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

5443.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5444.   This claim is brought only on behalf of North Dakota residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

5445.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

5446.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

5447.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

5448.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

5449.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

5450.  In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

5451.  The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

5452.  Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

5453.  As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

5454.  As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

5455.  The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness

bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

5456.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

5457.   Had Plaintifs filed timely claims before the Bar Date, the claims would have been allowed.

5458.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

5459.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

5460.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

- 1325 -

5461.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5462.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

5463.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

5464.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

5465.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5466.   This claim is brought on behalf of North Dakota residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag

Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs"). The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5467.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

5468.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

5469.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

5470.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

5471.   Thus, all Plaintiffs conferred a benefit on New GM.

5472.   It is inequitable for New GM to retain these benefits.

5473.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

5474.   New GM knowingly accepted the benefits of its unjust conduct.

5475.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

- 1327 -

## COUNT VI

## SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
## NORTH DAKOTA CONSUMER FRAUD ACT
### (N.D. Cent. Code § 51-15-02)

5476.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5477.   This claim is brought on behalf of North Dakota residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5478.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5479.   Old GM and Plaintiffs are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

5480.   Old GM engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. Code § 51-15-02(3), (5).

5481.   The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise…." N.D. Cent. Code § 51-15-02. As set forth above and below, Old GM committed deceptive acts or practices, with the intent that Plaintiffs rely thereon in connection with their purchase or lease of the Defective Vehicles.

- 1328 -

5482.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

5483.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

5484.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

5485.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the North Dakota CFA.

5486.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5487.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

5488.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

5489.   Old GM knew or should have known that its conduct violated the North Dakota CFA.

- 1329 -

5490.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

5491.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

     a.     Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

     b.     Intentionally concealed the foregoing from Plaintiffs;

     c.     Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

     d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

5492.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

5493.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

5494.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

- 1330 -

5495.   As a direct and proximate result of Old GM's violations of the North Dakota CFA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

5496.   Further, Old GM knowingly committed the conduct described above, and thus, under N.D. CENT. CODE § 51-15-09, New GM is liable to Plaintiffs for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements.  Plaintiffs further seek an order enjoining New GM's unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

<div align="center">

**COUNT VII**

**SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT**

</div>

5497.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5498.   This claim is brought on behalf of North Dakota residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5499.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5500.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

5501.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

<div align="center">

- 1331 -

</div>

5502.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

5503.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

5504.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

5505.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

5506.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

5507.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5508.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

5509.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5510.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.D. CENT. CODE § 41-02-31)

5511.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5512.   This claim is brought on behalf of North Dakota residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5513.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5514.   Old GM was a merchant with respect to motor vehicles.

5515.   A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

5516.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5517.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

5518.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

- 1334 -

**OHIO**

**COUNT I**

**VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT**
(OHIO REV. CODE ANN. § 1345.01, *et seq.*)

5519.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5520.   This claim is brought on behalf of Ohio residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5521.   New GM is a "supplier" as that term is defined in OHIO REV. CODE § 1345.01(C).

5522.   Plaintiffs are "consumers" as that term is defined in OHIO REV. CODE § 1345.01(D), and their purchases and leases of the Defective Vehicles are "consumer transactions" within the meaning of OHIO REV. CODE § 1345.01(A).

5523.   The Ohio Consumer Sales Practices Act ("Ohio CSPA"), OHIO REV. CODE § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction.  Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) the subject of a consumer transaction has been supplied in accordance with a previous representation, if it

- 1335 -

has not.  *Id.*  New GM's conduct as alleged above and below constitutes unfair and/or deceptive

consumer sales practices in violation of OHIO REV. CODE § 1345.02.

5524.   By systematically devaluing safety and concealing a plethora of defects in New

GM and Old GM vehicles, New GM engaged in deceptive business practices prohibited by the

Ohio CSPA, including:  representing that Defective Vehicles have characteristics, uses, benefits,

and qualities which they do not have; representing that Defective Vehicles are of a particular

standard, quality, and grade when they are not; representing that the subject of a transaction

involving Defective Vehicles has been supplied in accordance with a previous representation

when it has not; and engaging in other unfair or deceptive acts or practices.  The defects in each

vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the

defective process through which New GM built cars, a process that included cost-cutting,

minimizing the importance of safety issues, siloing, the depletion of resources devoted to

recognizing and studying safety issues, the failure to follow acceptable engineering and

inventory processes concerning parts management, and the failure to follow a proper FMEA

process.  All of these defective processes would be material to a reasonable consumer.

5525.   New GM's actions, as set forth above, occurred in the conduct of trade or

commerce.

5526.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles

as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

New GM also engaged in unlawful trade practices by employing deception, deceptive acts or

practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection

with the sale of the Defective Vehicles.

5527.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

5528.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Ohio CSPA.

5529.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5530.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

5531.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

5532.   New GM knew or should have known that its conduct violated the Ohio CSPA.

5533.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

5534.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

- 1337 -

     a.     Possessed exclusive knowledge about the defects in the Defective Vehicles;

     b.     Intentionally concealed the foregoing from Plaintiffs;

     c.     Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

     d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

5535.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

5536.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

5537.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

5538.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased

- 1338 -

New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

5539.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Ohio CSPA—regardless of when those owners acquired their vehicles.

5540.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

5541.   As a direct and proximate result of New GM's violations of the Ohio CSPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

5542.   Plaintiffs seek punitive damages against New GM because New GM's conduct was egregious.  New GM misrepresented the safety and reliability of millions of vehicles, concealed myriad defects in millions of New GM vehicles and Old GM vehicles and the systemic safety issues plaguing New GM, deceived Plaintiffs on life-or-death matters, and

concealed material facts that only New GM knew, all to avoid the expense and public relations

nightmare of correcting the serious flaw in its culture and in millions of vehicles.  New GM's

egregious conduct warrants punitive damages.

5543.   Plaintiffs specifically do not allege herein a claim for violation of OHIO REV.

CODE § 1345.72.

5544.   New GM was on notice pursuant to OHIO REV. CODE § 1345.09(B) that its actions

constituted unfair, deceptive, and unconscionable practices by, for example, *Mason v. Mercedes-*

*Benz USA*, *LLC*, 2005 Ohio App. LEXIS 3911, at *33 (S.D. Ohio Aug. 18, 2005), and *Lilly v.*

*Hewlett-Packard Co.*, 2006 U.S. Dist. LEXIS 22114, at *17-18 (S.D. Ohio Apr. 21, 2006).

Further, New GM's conduct as alleged above constitutes an act or practice previously declared to

be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 and

previously determined by Ohio courts to violate Ohio's Consumer Sales Practices Act and was

committed after the decisions containing these determinations were made available for public

inspection under division (A)(3) of O.R.C. § 1345.05.  The applicable rule and Ohio court

opinions include, but are not limited to:  OAC 109:4-3-16; *Mason v. Mercedes-Benz USA*, *LLC*,

2005 Ohio 4296 (Ohio Ct. App. 2005); *Khouri v. Lewis*, Cuyahoga Common Pleas No. 342098

(2001); *State ex rel. Montgomery v. Canterbury*, Franklin App. No. 98CVH054085 (2000); and

*Fribourg v. Vandemark* (July 26, 1999), Clermont App. No. CA99-02-017, unreported (PIF #

10001874).

5545.   As a result of the foregoing wrongful conduct of New GM, Plaintiffs have been

damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but

not limited to, actual and statutory damages, an order enjoining New GM's deceptive and unfair

conduct, treble damages, court costs and reasonable attorneys' fees, pursuant to OHIO REV. CODE § 1345.09, *et seq*.

## COUNT II

## FRAUD BY CONCEALMENT

5546.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5547.   This claim is brought on behalf of Ohio residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5548.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

5549.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

5550.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

5551.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

5552.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and

- 1341 -

to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

5553. New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs. New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles. Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth. Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

5554. New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

5555. On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

5556. Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have

continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5557.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

5558.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5559.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## IMPLIED WARRANTY IN TORT

5560.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5561.   This claim is brought only on behalf of Ohio residents who are members of any of the following Subclasses:  (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

5562.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

5563.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5564.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

5565.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt

- 1344 -

pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5566.   The design, manufacturing, and/or assembly defects existed at the time the Defective Vehicles containing the defective ignition systems left the possession or control of New GM.

5567.   Based upon the dangerous product defects, New GM failed to meet the expectations of a reasonable consumer.  The Defective Ignition Switch Vehicles failed their ordinary, intended use because the ignition systems in the vehicles do not function as a reasonable consumer would expect.  Moreover, the defects present a serious danger to Plaintiffs that cannot be eliminated without significant cost.

5568.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

5569.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**COUNT IV**

**NEGLIGENCE**

5570.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5571.   Plaintiffs bring this Count on behalf of Ohio residents who are members of any of the following Classes: (i) Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count,

"Plaintiffs").  All claims in this Count are Independent Claims, and challenge only the conduct of

New GM.

5572.   New GM has designed, manufactured and/ or "certified" and sold or otherwise

placed in the stream of commerce Defective Vehicles as New GM or New GM Certified Pre-

Owned vehicles, as set forth above.

5573.   New GM had a duty to design, manufacture, and/or "certify" only a product that

would be safe for its intended and foreseeable uses and users, including the use to which its

products were put by Plaintiffs.  New GM breached its duties to Plaintiffs because it was

negligent in the design, development, manufacture, and testing of the Defective Vehicles it

manufactured and/or sold as Certified Pre-Owned vehicles on or after July 10, 2009 (hereinafter,

in this Count, "Defective Vehicles"), and New GM is responsible for this negligence.

5574.   New GM was negligent in the design, development, manufacture, testing, and/or

"certification" of the Defective Vehicles because it knew, or in the exercise of reasonable care

should have known, that the vehicles equipped with defective ignition systems, defective wiring

harnesses controlling side airbags and/or defective power steering pose an unreasonable risk of

death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the

public at large, because they are susceptible to incidents in which brakes, power steering, seatbelt

pretensioners and/or airbags are rendered inoperable.

5575.   New GM thus "failed to exercise reasonable care in the manufacture of [its

Defective Vehicles]", in violation of RESTATEMENT (SECOND) OF TORTS § 395 ("A manufacturer

who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully

made, he should recognize as involving an unreasonable risk of causing physical harm to those

- 1346 -

who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.").

5576.   New GM further breached its duties to Plaintiffs by supplying directly or through a third person Defective Vehicles to be used by such foreseeable persons as Plaintiffs when:

        a.      New GM knew or had reason to know that the vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

        b.      New GM failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the vehicles are likely to be dangerous.

5577.   New GM had a continuing duty to warn and instruct the intended and foreseeable users of its vehicles, including Plaintiffs, of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles.  Plaintiffs were entitled to know that the vehicles, in their ordinary operation, were not reasonably safe for their intended and ordinary purposes and uses.

5578.   Pursuant to its ongoing relationship with owners and lessees of Old GM Defective Vehicles, New GM also had a duty to warn those Plaintiffs of the defects, and inform these Plaintiffs that their vehicles, in their ordinary operation, were not reasonably safe for their intended purposes.

5579.   New GM knew or should have known of the defects described herein.  New GM breached its duty to Plaintiffs because it failed to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles.

- 1347 -

5580.   As a direct and proximate result of New GM's negligence, Plaintiffs suffered damages, including overpayment at the time of purchase, diminished value, and cost of repair.

## COUNT V

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

5581.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5582.   This claim is brought only on behalf of Ohio residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

5583.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

5584.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

5585.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

5586.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

5587.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

5588.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

5589.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

5590.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

5591.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

5592.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

- 1349 -

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

5593.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

5594.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

5595.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

5596.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

5597.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

5598.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

- 1350 -

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted

the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who

had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old

GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its

implementing regulations that required the disclosure of the defect.

5599.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were

justified.  New GM was in exclusive control of the material facts and such facts were not known

to the public, including Plaintiffs.

5600.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage because they lost their chance to file a claim against Old GM and seek payment from the

GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims

and would have recovered from the GUC Trust.

5601.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be

proven at trial.

5602.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to

be determined according to proof.

- 1351 -

## COUNT VI

## UNJUST ENRICHMENT

5603.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5604.   This claim is brought on behalf of Ohio residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5605.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

5606.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

5607.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

5608.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

5609.   Thus, all Plaintiffs conferred a benefit on New GM.

5610.   It is inequitable for New GM to retain these benefits.

5611.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

5612.   New GM knowingly accepted the benefits of its unjust conduct.

5613.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VII

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT
#### (OHIO REV. CODE ANN. § 1345.01, *et seq.*)

5614.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5615.   This claim is brought on behalf of Ohio residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5616.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5617.   Old GM is a "supplier" as that term is defined in OHIO REV. CODE § 1345.01(C).

5618.   Plaintiffs are "consumers" as that term is defined in OHIO REV. CODE § 1345.01(D), and their purchases and leases of the Defective Vehicles are "consumer transactions" within the meaning of OHIO REV. CODE § 1345.01(A).

5619.   The Ohio Consumer Sales Practices Act ("Ohio CSPA"), OHIO REV. CODE § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer

- 1353 -

transaction. Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not. *Id.* Old GM's conduct as alleged above and below constitutes unfair and/or deceptive consumer sales practices in violation of OHIO REV. CODE § 1345.02.

5620.   By systematically devaluing safety and concealing a plethora of defects in Old GM vehicles, Old GM engaged in deceptive business practices prohibited by the Ohio CSPA, including:  representing that Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Delta Ignition Switch Vehicles are of a particular standard, quality, and grade when they are not; representing that the subject of a transaction involving Delta Ignition Switch Vehicles has been supplied in accordance with a previous representation when it has not; and engaging in other unfair or deceptive acts or practices.

5621.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

5622.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

- 1354 -

5623.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

5624.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Ohio CSPA.

5625.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5626.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

5627.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

5628.   Old GM knew or should have known that its conduct violated the Ohio CSPA.

5629.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

5630.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

<blockquote>

a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.      Intentionally concealed the foregoing from Plaintiffs;

c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

</blockquote>

- 1355 -

5631.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

5632.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

5633.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

5634.   As a direct and proximate result of Old GM's violations of the Ohio CSPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

5635.   Plaintiffs seek punitive damages against New GM because Old GM's conduct was egregious.  Old GM misrepresented the safety and reliability of millions of vehicles, concealed myriad defects in millions of Old GM vehicles and the systemic safety issues plaguing Old GM, deceived Plaintiffs on life-or-death matters, and concealed material facts that only Old GM knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in its culture and in millions of vehicles.  Old GM's egregious conduct warrants punitive damages.

5636.   Plaintiffs specifically do not allege herein a claim for violation of OHIO REV. CODE § 1345.72.

5637.   Old GM was on notice pursuant to OHIO REV. CODE § 1345.09(B) that its actions constituted unfair, deceptive, and unconscionable practices by, for example, *Mason v. Mercedes-Benz USA, LLC*, 2005 Ohio App. LEXIS 3911, at *33 (S.D. Ohio Aug. 18, 2005), and *Lilly v. Hewlett-Packard Co.*, 2006 U.S. Dist. LEXIS 22114, at *17-18 (S.D. Ohio Apr. 21, 2006). Further, Old GM's conduct as alleged above constitutes an act or practice previously declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 and previously determined by Ohio courts to violate Ohio's Consumer Sales Practices Act and was committed after the decisions containing these determinations were made available for public inspection under division (A)(3) of O.R.C. § 1345.05.  The applicable rule and Ohio court opinions include, but are not limited to:  OAC 109:4-3-16; *Mason v. Mercedes-Benz USA, LLC*, 2005 Ohio 4296 (Ohio Ct. App. 2005); *Khouri v. Lewis*, Cuyahoga Common Pleas No. 342098 (2001); *State ex rel. Montgomery v. Canterbury*, Franklin App. No. 98CVH054085 (2000); and *Fribourg v. Vandemark* (July 26, 1999), Clermont App. No. CA99-02-017, unreported (PIF #10001874).

5638.   As a result of the foregoing wrongful conduct of Old GM, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining New GM's deceptive and unfair conduct, treble damages, court costs and reasonable attorneys' fees, pursuant to OHIO REV. CODE § 1345.09, *et seq*.

## COUNT VIII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

5639.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5640.   This claim is brought on behalf of Ohio residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5641.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5642.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

5643.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

5644.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

5645.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

5646.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material

to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

5647.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

5648.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

5649.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5650.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their

- 1359 -

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

5651.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5652.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT IX**

**SUCCESSOR LIABILITY CLAIM FOR IMPLIED WARRANTY IN TORT**

</div>

5653.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5654.   This claim is brought on behalf of Ohio residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5655.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5656.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of

<div align="center">- 1360 -</div>

power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5657.   Based upon the dangerous product defects, Old GM failed to meet the expectations of a reasonable consumer.  The Delta Ignition Switch Vehicles failed their ordinary, intended use because the ignition systems in the vehicles do not function as a reasonable consumer would expect.  Moreover, the defect presents a serious danger to Plaintiffs that cannot be eliminated without significant cost.

5658.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

5659.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability (for which New GM has successor liability), Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT X

## SUCCESSOR LIABILITY CLAIM FOR NEGLIGENCE

5660.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5661.   This claim is brought on behalf of Ohio residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5662.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5663.   Old GM designed, manufactured and sold or otherwise placed in the stream of commerce Delta Ignition Switch Vehicles, as set forth above.

5664.   Old GM had a duty to design, manufacture, and sell only a product that would be safe for its intended and foreseeable uses and users, including the use to which its products were put by Plaintiffs.  Old GM breached its duties to Plaintiffs because it was negligent in the design, development, manufacture, and testing of the Delta Ignition Switch Vehicles it manufactured and sold on or before July 9, 2009, and New GM is responsible for Old GM's negligence under the doctrine of successor liability.

5665.   Old GM was negligent in the design, development, manufacture, testing, and/or "certification" of the Delta Ignition Switch Vehicles because it knew, or in the exercise of reasonable care should have known, that the vehicles equipped with defective ignition systems pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which brakes, power steering, seatbelt pretensioners and airbags are rendered inoperable.

5666.   Old GM thus "failed to exercise reasonable care in the manufacture of [its Defective Vehicles]," in violation of RESTATEMENT (SECOND) OF TORTS § 395 ("A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.").

5667.   Old GM further breached its duties to Plaintiffs by supplying directly or through a third person defective Delta Ignition Switch Vehicles to be used by such foreseeable persons as Plaintiffs when:

a.      Old GM knew or had reason to know that the vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

b.      Old GM failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the vehicles are likely to be dangerous.

5668.   Old GM had a continuing duty to warn and instruct the intended and foreseeable users of its vehicles, including Plaintiffs, of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles.  Plaintiffs were entitled to know that the vehicles, in their ordinary operation, were not reasonably safe for their intended and ordinary purposes and uses.

5669.   Old GM knew or should have known of the defects described herein.  Old GM breached its duty to Plaintiffs because it failed to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles.

5670.   As a direct and proximate result of Old GM's negligence, Plaintiffs suffered damages, for which New GM has successor liability.

**OKLAHOMA**

**COUNT I**

**VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT**
**(OKLA. STAT. TIT. 15 § 751, *et seq.*)**[437]

5671.   Plaintiffs reallege and incorporate by reference each paragraph as if set forth

fully herein.

5672.   This claim is brought on behalf of Oklahoma residents who are members of any

of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition

Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count,

"Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct

of New GM.

5673.   Plaintiffs are "persons" under the Oklahoma Consumer Protection Act

("Oklahoma CPA"), OKLA. STAT. TIT. 15 § 752.

5674.   New GM is a "person," "corporation," or "association" within the meaning of

OKLA. STAT. TIT. 15 § 15-751(1).

5675.   The sale or lease of the Defective Vehicles to Plaintiffs was a "consumer

transaction" within the meaning of OKLA. STAT. TIT. 15 § 752, and New GM's actions as set

forth herein occurred in the conduct of trade or commerce.

5676.   The Oklahoma CPA declares unlawful, *inter alia*, the following acts or practices

when committed in the course of business:  "mak[ing] a false or misleading representation,

---

[437] Plaintiffs understand that this Court has held that no Plaintiff may bring this claim under
Oklahoma law unless their vehicle has suffered from a manifestation of a defect, and here assert
this claim on behalf of Plaintiffs whose vehicles have not suffered a manifestation solely for the
purposes of preserving the claim for appellate review.

- 1364 -

knowingly or with reason to know, as to the characteristics…, uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." *See* OKLA. STAT. TIT. 15, § 753.

5677.   By systematically devaluing safety and concealing a plethora of defects in New GM vehicles and Old GM vehicles, New GM engaged in unfair and deceptive business practices prohibited by the Oklahoma CPA, including:  representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard, quality, and grade when they are not; and advertising Defective Vehicles with the intent not to sell or lease them as advertised; misrepresenting, omitting and engaging in other practices that have deceived or could reasonably be expected to deceive or mislead; and engaging in practices which offend established public policy or are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

5678.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

5679.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

5680.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Oklahoma CPA.

5681.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5682.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

5683.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

5684.   New GM knew or should have known that its conduct violated the Oklahoma

CPA.

5685.   As alleged above, New GM made material statements about the safety and

reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

5686.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Defective Vehicles, because New GM:

        a.      Possessed exclusive knowledge about the defects in the
Defective Vehicles;

        b.      Intentionally concealed the foregoing from Plaintiffs;

        c.      Made incomplete representations about the safety and
reliability of the Defective Vehicles, while purposefully
withholding material facts from Plaintiffs that contradicted
these representations; and/or

        d.      Had duties under the TREAD Act and related regulations to disclose and
remedy the defects.

5687.   Because New GM fraudulently concealed the defects in New GM vehicles, New

GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from defects.

Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for

repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they

would have either not have bought their Defective Vehicles or would have paid less for them.

5688.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and

deceptive trade practices since their vehicles were worth less as the result of New GM's

concealment of, and failure to remedy, the defects.  Further, once the truth came out about the

defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the

vehicles would have had in the absence of the defect.  This diminished value is directly attributed

to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

5689.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

5690.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

5691.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Oklahoma CPA—regardless of when those owners acquired their vehicles.

5692.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

5693.   As a direct and proximate result of New GM's violations of the Oklahoma CPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result

- 1368 -

of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

5694.   Plaintiffs seek punitive damages against New GM because New GM's conduct was egregious.  New GM misrepresented the safety and reliability of millions of New GM vehicles and Old GM vehicles, concealed myriad defects in millions of New GM vehicles and Old GM vehicles and the systemic safety issues plaguing New GM, deceived Plaintiffs on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in its culture and in millions of New GM vehicles and Old GM vehicles.  New GM's egregious conduct warrants punitive damages.

5695.   New GM's conduct as alleged herein was unconscionable because (1) New GM, knowingly or with reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) at the time the consumer transaction was entered into, New GM knew or had reason to know that price grossly exceeded the price at which similar vehicles were readily obtainable in similar transactions by like consumers; and (3) New GM knew or had reason to know that the transaction New GM induced the consumer to enter into was excessively one-sided in favor of New GM.

5696.   Because New GM's unconscionable conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15 § 761.1.  Plaintiffs further seeks an order enjoining New GM's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

## COUNT II

## FRAUD BY CONCEALMENT

5697.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5698.   This claim is brought on behalf of Oklahoma residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5699.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

5700.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

5701.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

5702.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

5703.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to

consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

5704.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

5705.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

5706.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

5707.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other

- 1371 -

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5708.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

5709.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5710.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (12A OKLA. STAT. ANN. § 2-314) [438]

5711.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5712.  This claim is brought only on behalf of Oklahoma residents who are members of any of the following Subclasses:  (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

5713.  New GM was a merchant with respect to motor vehicles.

5714.  A warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Ignition Switch Vehicles from New GM on or after July 10, 2009.

5715.  The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

5716.  The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the

---

[438] Plaintiffs understand that this Court has held that no Plaintiff may bring this claim under Oklahoma law unless their vehicle has suffered from a manifestation of a defect, and here assert this claim on behalf of Plaintiffs whose vehicles have not suffered a manifestation solely for the purposes of preserving the claim for appellate review.

attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5717.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

5718.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5719.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

5720.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

5721.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5722.   This claim is brought only on behalf of Oklahoma residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

- 1374 -

5723.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

5724.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

5725.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

5726.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

5727.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

5728.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

5729.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

5730.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

5731.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

5732.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

5733.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness

bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

5734.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

5735.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

5736.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

5737.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

5738.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

5739.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5740.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

5741.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

5742.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT[439]

5743.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

---

[439] Plaintiffs understand that this Court has found that the existence of an express warranty between New GM and Plaintiffs is a bar to this claim, and are asserting this claim here solely for the purpose of preserving the claim for appellate review.

5744.   This claim is brought on behalf of Oklahoma residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5745.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

5746.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

5747.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

5748.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

5749.   Thus, all Plaintiffs conferred a benefit on New GM.

5750.   It is inequitable for New GM to retain these benefits.

5751.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

5752.   New GM knowingly accepted the benefits of its unjust conduct.

5753.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE OKLAHOMA CONSUMER PROTECTION ACT
### (OKLA. STAT. TIT. 15 § 751, *et seq.*)

5754.   Plaintiffs reallege and incorporate by reference each paragraph as if set forth fully herein.

5755.   This claim is brought on behalf of Oklahoma residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5756.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5757.   Plaintiffs are "persons" under the Oklahoma Consumer Protection Act ("Oklahoma CPA"), OKLA. STAT. TIT. 15 § 752.

5758.   Old GM is a "person," "corporation," or "association" within the meaning of OKLA. STAT. TIT. 15 § 15-751(1).

5759.   The sale or lease of the Delta Ignition Switch Vehicles to Plaintiffs was a "consumer transaction" within the meaning of OKLA. STAT. TIT. 15 § 752, and Old GM's actions as set forth herein occurred in the conduct of trade or commerce.

5760.   The Oklahoma CPA declares unlawful, *inter alia*, the following acts or practices when committed in the course of business:  "mak[ing] a false or misleading representation,

knowingly or with reason to know, as to the characteristics…, uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice."  *See* OKLA. STAT. TIT. 15, § 753.

5761.   By systematically devaluing safety and concealing a plethora of defects Old GM vehicles, Old GM engaged in unfair and deceptive business practices prohibited by the Oklahoma CPA, including:  representing that Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Delta Ignition Switch Vehicles are of a particular standard, quality, and grade when they are not; and advertising Delta Ignition Switch Vehicles with the intent not to sell or lease them as advertised; misrepresenting, omitting and engaging in other practices that have deceived or could reasonably be expected to deceive or mislead; and engaging in practices which offend established public policy or are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

5762.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

5763.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

5764.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Oklahoma CPA.

5765.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5766.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

5767.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

5768.   Old GM knew or should have known that its conduct violated the Oklahoma CPA.

5769.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

5770.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

    a.      Possessed exclusive knowledge about the defects in the
            Delta Ignition Switch Vehicles;

    b.      Intentionally concealed the foregoing from Plaintiffs;

    c.      Made incomplete representations about the safety and
            reliability of the Delta Ignition Switch Vehicles, while
            purposefully withholding material facts from Plaintiffs that
            contradicted these representations; and/or

- 1382 -

      d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

5771.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

5772.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

5773.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

5774.   As a direct and proximate result of Old GM's violations of the Oklahoma CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

5775.   Plaintiffs seek punitive damages against New GM because Old GM's conduct was egregious.  Old GM misrepresented the safety and reliability of millions of Old GM vehicles, concealed myriad defects in millions of Old GM vehicles and the systemic safety issues plaguing Old GM, deceived Plaintiffs on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting the serious

flaw in its culture and in millions of Old GM vehicles.  Old GM's egregious conduct warrants punitive damages.

5776.   Old GM's conduct as alleged herein was unconscionable because (1) Old GM, knowingly or with reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) at the time the consumer transaction was entered into, Old GM knew or had reason to know that price grossly exceeded the price at which similar vehicles were readily obtainable in similar transactions by like consumers; and (3) Old GM knew or had reason to know that the transaction Old GM induced the consumer to enter into was excessively one-sided in favor of Old GM.

5777.   Because Old GM's unconscionable conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15 § 761.1.  Plaintiffs further seek an order enjoining New GM's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

5778.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5779.   This claim is brought on behalf of Oklahoma residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

010440-11  983080 V1

5780.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5781.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

5782.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

5783.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

5784.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

5785.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

5786.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as

- 1385 -

set forth above, which were misleading, deceptive, and incomplete without the disclosure of the

defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old

GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had

monitoring and disclosure duties under the TREAD Act, as alleged above.

5787.   Old GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM

money, and it did so at the expense of Plaintiffs.

5788.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.

Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such

facts were not known to the public, including Plaintiffs.

5789.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get

the benefit of their bargain since the Defective Vehicles were worth less than they would have

been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not

have purchased or leased them at all, and Plaintiffs sustained repair damages.

5790.   Accordingly, based on the conduct of Old GM for which it has successor liability,

New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5791.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (12A Okla. Stat. Ann. § 2-314)

5792.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5793.   This claim is brought on behalf of Oklahoma residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5794.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5795.   Old GM was a merchant with respect to motor vehicles.

5796.   A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

5797.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of

- 1387 -

power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5798.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

5799.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## OREGON

## COUNT I

### VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
### (OR. REV. STAT. §§ 646.605, *et seq.*)

5800.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5801.   This claim is brought on behalf of Oregon residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5802.   New GM is a person within the meaning of OR. REV. STAT. § 646.605(4).

5803.   The Defective Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

5804.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following:  "(e) Represent[ing] that … goods … have … characteristics … uses, benefits, … or qualities that they do not have; (g) Represent[ing] that … goods … are of a particular standard [or] quality … if they are of another; (i) Advertis[ing] … goods or services with intent not to provide them as advertised;" and "(u) engag[ing] in any other unfair or deceptive conduct in trade or commerce."  OR. REV. STAT. § 646.608(1).

5805.   New GM engaged in unlawful trade practices, including representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; advertising Defective Vehicles with the intent not to sell them as advertised; and engaging in other unfair or deceptive acts.

5806.   New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

5807.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

5808.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

5809.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

5810.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Oregon UTPA.

5811.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5812.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

5813.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

5814.   New GM knew or should have known that its conduct violated the Oregon UTPA.

5815.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

5816.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

5817.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

5818.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

5819.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

5820.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

5821.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Oregon UTPA—regardless of when those owners acquired their vehicles.

5822.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta

Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

5823.   As a direct and proximate result of New GM's violations of the Oregon UTPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

5824.   Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1).  Plaintiffs are also entitled to punitive damages because New GM engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

## COUNT II

## FRAUD BY CONCEALMENT

5825.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5826.   This claim is brought on behalf of Oregon residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5827.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

- 1393 -

5828.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

5829.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

5830.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

5831.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

5832.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

5833.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

5834.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

5835.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5836.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

5837.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5838.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

5839.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5840.   This claim is brought only on behalf of Oregon residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

5841.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

5842.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel

- 1396 -

(all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

5843.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

5844.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

5845.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

5846.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

5847.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

5848.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

5849.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

5850.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

5851.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

5852.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

5853.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

5854.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

5855.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims

- 1398 -

by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

5856.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

5857.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5858.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

5859.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

5860.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to

be determined according to proof.

## COUNT IV

## UNJUST ENRICHMENT

5861.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

5862.   This claim is brought on behalf of Oregon residents who are members of any of

the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition

Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count,

"Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct

of New GM.

5863.   This claim is pleaded in the alternative to any contract-based claims brought on

behalf of Plaintiffs.

5864.   New GM has received and retained a benefit from Plaintiffs and inequity has

resulted.

5865.   New GM has benefitted from selling and leasing the Defective Vehicles, for more

than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have

overpaid for the cars and been forced to pay other costs.

5866.   With respect to the Defective Vehicles purchased before New GM came into

existence that were still on the road after New GM came into existence and as to which New GM

had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs

- 1400 -

of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

5867.   Thus, all Plaintiffs conferred a benefit on New GM.

5868.   It is inequitable for New GM to retain these benefits.

5869.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

5870.   New GM knowingly accepted the benefits of its unjust conduct.

5871.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT V

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
#### (OR. REV. STAT. §§ 646.605, *ET SEQ.*)

5872.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5873.   This claim is brought on behalf of Oregon residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5874.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5875.   Old GM is a person within the meaning of OR. REV. STAT. § 646.605(4).

5876.   The Defective Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

5877.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following:  "(e) Represent[ing] that … goods … have … characteristics … uses, benefits, … or qualities that they do not have; (g) Represent[ing] that … goods … are of a particular standard [or] quality … if they are of another; (i) Advertis[ing] … goods or services with intent not to provide them as advertised;" and "(u) engag[ing] in any other unfair or deceptive conduct in trade or commerce."  OR. REV. STAT. § 646.608(1).

5878.   Old GM engaged in unlawful trade practices, including representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; advertising Defective Vehicles with the intent not to sell them as advertised; and engaging in other unfair or deceptive acts.

5879.   Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles.

5880.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

5881.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

5882.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

5883.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Oregon UTPA.

5884.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5885.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

5886.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

5887.   Old GM knew or should have known that its conduct violated the Oregon UTPA.

5888.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

5889.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

        a.      Possessed exclusive knowledge about the defects in the
                Delta Ignition Switch Vehicles;

        b.      Intentionally concealed the foregoing from Plaintiffs;

        c.      Made incomplete representations about the safety and
                reliability of the Delta Ignition Switch Vehicles, while

- 1403 -

> purposefully withholding material facts from Plaintiffs that
> contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

5890.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their

bargain since the vehicles they purchased were worth less than they would have been if they

were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of

the defects in their vehicles, they would have either not bought their Delta Ignition Switch

Vehicles or would have paid less for them.

5891.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to

Plaintiffs.

5892.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and

its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of

the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their

vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs,

as alleged above.

5893.   As a direct and proximate result of Old GM's violations of the Oregon UTPA,

Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor

liability.

5894.   Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to

OR. REV. STAT. § 646.638(1).  Plaintiffs are also entitled to punitive damages because New GM

engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of

others.

- 1404 -

## COUNT VI

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

5895.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5896.   This claim is brought on behalf of Oregon residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5897.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5898.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

5899.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

5900.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

5901.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

5902.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material

- 1405 -

to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

5903.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

5904.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

5905.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5906.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

5907.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5908.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## PENNSYLVANIA

## COUNT I

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (73 P.S. § 201-1, *et seq.*)

5909.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5910.   This claim is brought on behalf of Pennsylvania residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5911.   Plaintiffs purchased or leased their Defective Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

- 1407 -

5912.   All of the acts complained of herein were perpetrated by New GM in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

5913.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including:  (i) "Representing that goods or services have … characteristics, ….  Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;:" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."  73 P.S. § 201-2(4).

5914.   New GM engaged in unlawful trade practices, including representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; advertising Defective Vehicles with the intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

5915.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety

issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

5916.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

5917.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Pennsylvania CPL.

5918.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

5919.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

5920.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

5921.   New GM knew or should have known that its conduct violated the Pennsylvania CPL.

5922.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

5923.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

> a.   Possessed exclusive knowledge about the defects in the Defective Vehicles;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>
> c.   Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

5924.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

5925.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed

to New GM's dishonesty and omissions with respect to the quality and safety of the Defective vehicles.

5926.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

5927.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

5928.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Pennsylvania CPL—regardless of when those owners acquired their vehicles.

5929.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

5930.   As a direct and proximate result of New GM's violations of the Pennsylvania CPL, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct

- 1411 -

result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

5931.   New GM is liable to Plaintiffs for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.  73 P.S. § 201-9.2(a).  Plaintiffs are also entitled to an award of punitive damages given that New GM's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT II

## FRAUD BY CONCEALMENT

5932.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5933.   This claim is brought on behalf of Pennsylvania residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

5934.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

5935.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

5936.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

- 1412 -

5937.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

5938.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

5939.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

5940.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

5941.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

5942.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5943.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

5944.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

5945.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (13 PA. CONS. STAT. ANN. § 2314)

5946.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5947.   This claim is brought only on behalf of Pennsylvania residents who are members of any of the following Subclasses:  (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

5948.   New GM is a merchant with respect to motor vehicles.

5949.  A warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

5950.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

- 1415 -

5951.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5952.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

5953.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

5954.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

5955.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

5956.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5957.   This claim is brought only on behalf of Pennsylvania residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

5958.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

5959.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

5960.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

5961.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

5962.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither

the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

5963.  In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

5964.  The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

5965.  Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

5966.  As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

5967.  As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

5968.  The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these

vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

5969.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

5970.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

5971.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

5972.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

5973.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

5974.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

5975.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

5976.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

5977.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

5978.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5979.   This claim is brought on behalf of Pennsylvania residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag

Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this

Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the

conduct of New GM.

5980.   This claim is pleaded in the alternative to any contract-based claims brought on

behalf of Plaintiffs.

5981.   New GM has received and retained a benefit from Plaintiffs and inequity has

resulted.

5982.   New GM has benefitted from selling and leasing the Defective Vehicles, for more

than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have

overpaid for the cars and been forced to pay other costs.

5983.   With respect to the Defective Vehicles purchased before New GM came into

existence that were still on the road after New GM came into existence and as to which New GM

had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs

of a recall and other lawsuits, and further benefitted from its statements about the success of New

GM.

5984.   Thus, all Plaintiffs conferred a benefit on New GM.

5985.   It is inequitable for New GM to retain these benefits.

5986.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did

not benefit from New GM's conduct.

5987.   New GM knowingly accepted the benefits of its unjust conduct.

5988.   As a result of New GM's conduct, the amount of its unjust enrichment should be

disgorged, in an amount according to proof.

## COUNT VI

## SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1, *et seq.*)

5989. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

5990. This claim is brought on behalf of Pennsylvania residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

5991. This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM. Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

5992. Plaintiffs purchased or leased their Delta Ignition Switch Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

5993. All of the acts complained of herein were perpetrated by Old GM in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

5994. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;:" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

- 1422 -

5995.   Old GM engaged in unlawful trade practices, including representing that Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Delta Ignition Switch Vehicles are of a particular standard and quality when they are not; advertising Delta Ignition Switch Vehicles with the intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

5996.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

5997.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

5998.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Pennsylvania CPL.

5999.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6000.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6001. Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

6002. Old GM knew or should have known that its conduct violated the Pennsylvania CPL.

6003. As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

6004. Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

    a. Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b. Intentionally concealed the foregoing from Plaintiffs;

    c. Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d. Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

6005. Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

6006. Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

- 1424 -

6007.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

6008.   As a direct and proximate result of Old GM's violations of the Pennsylvania CPL, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

6009.   New GM is liable to Plaintiffs for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.  73 P.S. § 201-9.2(a).  Plaintiffs are also entitled to an award of punitive damages given that Old GM's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

<div align="center">

**COUNT VII**

**SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT**

</div>

6010.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6011.   This claim is brought on behalf of Pennsylvania residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6012.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6013.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6014.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

6015.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6016.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

6017.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

6018.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

6019.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

6020.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6021.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

6022.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

6023.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

## SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (13 Pa. Cons. Stat. Ann. § 2314)

6024.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6025.   This claim is brought on behalf of Pennsylvania residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6026.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6027.   Old GM was a merchant with respect to motor vehicles.

6028.   A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

6029.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

- 1428 -

6030.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

6031.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## RHODE ISLAND

## COUNT I

## VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### (R.I. GEN. LAWS § 6-13.1, *et seq.*)

6032.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6033.   This claim is brought on behalf of Rhode Island residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6034.   Plaintiffs are persons who purchased or leased one or more Defective Vehicles primarily for personal, family, or household purposes within the meaning of R.I. GEN. LAWS § 6-13.1-5.2(a).

6035.   Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or

- 1429 -

commerce" including:  "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(vii) Representing that goods or services are of a particular standard, quality, or grade …, if they are of another"; "(ix) Advertising goods or services with intent not to sell them as advertised"; "(xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding"; "(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer"; and "(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect."  R.I. GEN. LAWS § 6-13.1-1(6).

6036.   New GM engaged in unlawful trade practices, including:  (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective Vehicles are of a particular standard and quality when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging in conduct that is unfair or deceptive and likely to deceive.

6037.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

6038.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety

- 1430 -

issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

6039.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

6040.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Rhode Island CPA.

6041.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6042.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6043.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

6044.   New GM knew or should have known that its conduct violated the Rhode Island

CPA.

6045.   As alleged above, New GM made material statements about the safety and

reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

6046.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Defective Vehicles, because New GM:

> a.   Possessed exclusive knowledge about the defects in the
>      Defective Vehicles;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>
> c.   Made incomplete representations about the safety and
>      reliability of the Defective Vehicles, while purposefully
>      withholding material facts from Plaintiffs that contradicted
>      these representations; and/or
>
> d.   Had duties under the TREAD Act and related regulations to disclose and
>      remedy the defects.

6047.   Because New GM fraudulently concealed the defects in New GM vehicles, New

GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from defects.

Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for

repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they

would have either not have bought their Defective Vehicles or would have paid less for them.

6048.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and

deceptive trade practices since their vehicles were worth less as the result of New GM's

concealment of, and failure to remedy, the defects.  Further, once the truth came out about the

defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the

vehicles would have had in the absence of the defect.  This diminished value is directly attributed

to New GM's dishonesty and omissions with respect to the quality and safety of the Defective vehicles.

6049.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

6050.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

6051.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Rhode Island CPA—regardless of when those owners acquired their vehicles.

6052.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

6053.   As a direct and proximate result of New GM's violations of the Rhode Island CPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct

result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

6054.   Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to R.I. GEN. LAWS § 6-13.1-5.2(a).  Plaintiffs also seek punitive damages in the discretion of the Court because of New GM's egregious disregard of consumer and public safety and its long-running concealment of the serious safety defects and their tragic consequences.

<div align="center">

**COUNT II**

**FRAUD BY CONCEALMENT**

</div>

6055.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6056.   This claim is brought on behalf of Rhode Island residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6057.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6058.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

6059.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6060.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

6061.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

6062.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

6063.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

6064.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

6065.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6066.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

6067.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

6068.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (R.I. GEN. LAWS § 6A-2-314)

6069.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6070.   This claim is brought only on behalf of Rhode Island residents who are members of any of the following Subclasses:  (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

6071.   A warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

6072.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

6073.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the

- 1437 -

attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6074.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

6075.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6076.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

6077.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

6078.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6079.   This claim is brought only on behalf of Rhode Island residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

- 1438 -

6080.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

6081.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

6082.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

6083.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

6084.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

6085.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

6086.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

6087.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

6088.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

6089.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

6090.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness

bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

6091.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

6092.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

6093.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

6094.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

6095.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

6096.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6097.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

6098.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

6099.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

6100.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6101.   This claim is brought on behalf of Rhode Island residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag

Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6102.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

6103.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

6104.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

6105.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

6106.   Thus, all Plaintiffs conferred a benefit on New GM.

6107.   It is inequitable for New GM to retain these benefits.

6108.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

6109.   New GM knowingly accepted the benefits of its unjust conduct.

6110.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

- 1443 -

**COUNT VI**

**SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE RHODE ISLAND
UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
(R.I. GEN. LAWS § 6-13.1, *et seq.*)**

6111.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

6112.   This claim is brought on behalf of Rhode Island residents who are members of the

Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count,

"Plaintiffs").

6113.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing

New GM for the conduct of Old GM.   Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are

free to assert this successor liability claim without impediment from the Sale Order.

6114.   Plaintiffs are persons who purchased or leased one or more Delta Ignition Switch

Vehicles primarily for personal, family, or household purposes within the meaning of R.I. GEN.

LAWS § 6-13.1-5.2(a).

6115.   Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode

Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or

commerce" including:  "(v) Representing that goods or services have sponsorship, approval,

characteristics, ingredients, uses, benefits, or quantities that they do not have";

"(vii) Representing that goods or services are of a particular standard, quality, or grade …, if

they are of another"; "(ix) Advertising goods or services with intent not to sell them as

advertised"; "(xii) Engaging in any other conduct that similarly creates a likelihood of confusion

or of misunderstanding"; "(xiii) Engaging in any act or practice that is unfair or deceptive to the

consumer"; and "(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect."  R.I. GEN. LAWS § 6-13.1-1(6).

6116.   Old GM engaged in unlawful trade practices, including:  (1) representing that the Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Delta Ignition Switch Vehicles are of a particular standard and quality when they are not; (3) advertising the Delta Ignition Switch Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging in conduct that is unfair or deceptive and likely to deceive.

6117.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

6118.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

6119.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

6120.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Rhode Island CPA.

6121.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

- 1445 -

6122.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6123.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

6124.   Old GM knew or should have known that its conduct violated the Rhode Island CPA.

6125.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

6126.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.      Intentionally concealed the foregoing from Plaintiffs;

c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

6127.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

6128.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

6129.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

6130.   As a direct and proximate result of Old GM's violations of the Rhode Island CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

6131.   Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to R.I. GEN. LAWS § 6-13.1-5.2(a).  Plaintiffs also seek punitive damages in the discretion of the Court because of New GM's egregious disregard of consumer and public safety and its long-running concealment of the serious safety defects and their tragic consequences.

## COUNT VII

### SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

6132.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6133.   This claim is brought on behalf of Rhode Island residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6134.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6135. Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6136. Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

6137. In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6138. Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

6139. Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

6140. Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs. Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles. Having provided information to Plaintiffs, Old

- 1448 -

GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had

monitoring and disclosure duties under the TREAD Act, as alleged above.

6141.   Old GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM

money, and it did so at the expense of Plaintiffs.

6142.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.

Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such

facts were not known to the public, including Plaintiffs.

6143.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get

the benefit of their bargain since the Defective Vehicles were worth less than they would have

been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not

have purchased or leased them at all, and Plaintiffs sustained repair damages.

6144.   Accordingly, based on the conduct of Old GM for which it has successor liability,

New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

6145.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such

conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

## SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (R.I. GEN. LAWS § 6A-2-314)

6146.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6147.   This claim is brought on behalf of Rhode Island residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6148.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6149.   Old GM was a merchant with respect to motor vehicles.

6150.   A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

6151.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6152.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

6153.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

<div align="center">

**SOUTH CAROLINA**

**COUNT I**

**VIOLATIONS OF THE SOUTH CAROLINA
UNFAIR TRADE PRACTICES ACT
(S.C. CODE ANN. § 39-5-10, *et seq.*)**

</div>

6154.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6155.   This claim is brought on behalf of South Carolina residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6156.   New GM is a "person" under S.C. CODE ANN. § 39-5-10.

6157.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." S.C. CODE ANN. § 39-5-20(a).  New GM engaged in unfair and deceptive acts or practices and violated the South Carolina UTPA by systematically devaluing safety and concealing a plethora

<div align="center">- 1451 -</div>

of defects in New GM and Old GM vehicles. The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process. All of these defective processes would be material to a reasonable consumer.

6158.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

6159.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

6160.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above. New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

6161.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the South Carolina UTPA.

6162.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6163.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6164.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

6165.   New GM knew or should have known that its conduct violated the South Carolina UTPA.

6166.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

6167.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

> a.     Possessed exclusive knowledge about the defects in the Defective Vehicles;
>
> b.     Intentionally concealed the foregoing from Plaintiffs;
>
> c.     Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

- 1453 -

6168.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

6169.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

6170.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

6171.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

6172.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New

GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the South Carolina UTPA—regardless of when those owners acquired their vehicles.

6173.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

6174.   As a direct and proximate result of New GM's violations of the South Carolina UTPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

6175.   Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiffs seek monetary relief against New GM to recover for their economic losses.  Because New GM's actions were willful and knowing, Plaintiffs' damages should be trebled.  *Id.*

6176.   Plaintiffs further allege that New GM's malicious and deliberate conduct warrants an assessment of punitive damages because New GM carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust hardship as a result.  New GM intentionally and willfully misrepresented the safety and reliability of the Defective Vehicles, deceived Plaintiffs on life-or-death matters, concealed material facts that only New GM knew, and repeatedly promised Plaintiffs that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a deadly flaw in New

GM and Old GM vehicles.  New GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

6177.   Plaintiffs further seek an order enjoining New GM's unfair or deceptive acts or practices.

## COUNT II

### VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT
### (S.C. CODE ANN. § 56-15-10, *et seq.*)

6178.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6179.   This claim is brought on behalf of South Carolina residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6180.   New GM was a "manufacturer" as set forth in S.C. CODE ANN. § 56-15-10, as it was engaged in the business of manufacturing or assembling new and unused motor vehicles.

6181.   New GM committed unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. CODE ANN. § 56-15-30.

6182.   New GM engaged in actions which were arbitrary, in bad faith, unconscionable, and which caused damage to Plaintiffs and to the public.

6183.   New GM's bad faith and unconscionable actions include, but are not limited to: (1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Defective Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Defective Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not.

6184.   New GM resorted to and used false and misleading advertisements in connection with its business.  As alleged above, New GM made numerous material statements about the safety and reliability of the Defective Vehicles that were either false or misleading.  Each of these statements contributed to the deceptive context of New GM's unlawful advertising and representations as a whole.

6185.   Plaintiffs bring this action pursuant to S.C. CODE ANN. § 56-15-110(2), as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

6186.   Plaintiffs are entitled to double their actual damages, the cost of the suit, and attorney's fees pursuant to S.C. CODE ANN. § 56-15-110.  Plaintiffs also seek injunctive relief under S.C. CODE ANN. § 56-15-110.  Plaintiffs also seek treble damages because New GM acted maliciously.

## COUNT III

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (S.C. CODE § 36-2-314)

6187.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6188.   This claim is brought only on behalf of South Carolina residents who are members of any of the following Subclasses:  (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

6189.   New GM was a merchant with respect to motor vehicles under S.C. CODE § 36-2-314.

6190.   Under S.C. CODE § 36-2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

6191.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

6192.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6193.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

6194.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6195.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

6196.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

## FRAUD BY CONCEALMENT

6197.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6198.   This claim is brought on behalf of South Carolina residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

- 1459 -

6199.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6200.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

6201.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6202.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

6203.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

6204.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

- 1460 -

implementing regulations, including the duty to promptly notify consumers of known safety defects.

6205.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

6206.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

6207.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6208.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all

Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

6209.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

6210.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT V**

**FRAUD BY CONCEALMENT OF THE RIGHT
TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY**

</div>

6211.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6212.   This claim is brought only on behalf of South Carolina residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

6213.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

6214.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full

<div align="center">- 1462 -</div>

evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

6215.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

6216.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

6217.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

6218.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

6219.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

6220.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured

claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

6221.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

6222.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

6223.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

6224.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

6225.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

6226.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

6227.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

6228.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

6229.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6230.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

6231.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

6232.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VI

## UNJUST ENRICHMENT

6233.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6234.   This claim is brought on behalf of South Carolina residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6235.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

6236.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

6237.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

- 1466 -

6238.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

6239.   Thus, all Plaintiffs conferred a benefit on New GM.

6240.   It is inequitable for New GM to retain these benefits.

6241.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

6242.   New GM knowingly accepted the benefits of its unjust conduct.

6243.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

<div align="center">

**COUNT VII**

**SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
(S.C. CODE ANN. § 39-5-10, *et seq.*)**

</div>

6244.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6245.   This claim is brought on behalf of South Carolina residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6246.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

<div align="center">- 1467 -</div>

the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6247.   Old GM is a "person" under S.C. CODE ANN. § 39-5-10.

6248.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." S.C. CODE ANN. § 39-5-20(a).  Old GM engaged in unfair and deceptive acts or practices and violated the South Carolina UTPA by systematically devaluing safety and concealing defects in Delta Ignition Switch Vehicles.

6249.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

6250.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

6251.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

6252.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the South Carolina UTPA.

6253.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

- 1468 -

6254.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6255.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

6256.   Old GM knew or should have known that its conduct violated the South Carolina UTPA.

6257.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

6258.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.      Intentionally concealed the foregoing from Plaintiffs;

c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

6259.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

- 1469 -

6260.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

6261.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

6262.   As a direct and proximate result of Old GM's violations of the South Carolina UTPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

6263.   Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiffs seek monetary relief against New GM to recover for their economic losses.  Because Old GM's actions were willful and knowing, Plaintiffs' damages should be trebled.  *Id.*

6264.   Plaintiffs further allege that Old GM's malicious and deliberate conduct warrants an assessment of punitive damages because Old GM carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust hardship as a result.  Old GM intentionally and willfully misrepresented the safety and reliability of the Delta Ignition Switch Vehicles, deceived Plaintiffs on life-or-death matters, concealed material facts that only Old GM knew, and repeatedly promised Plaintiffs that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a deadly flaw Delta Ignition Switch Vehicles.  Old GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

6265.   Plaintiffs further seek an order enjoining New GM's unfair or deceptive acts or practices.

## COUNT VIII

## SUCCESSOR LIABLITY CLAIM FOR VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT (S.C. CODE ANN. § 56-15-10, *et seq.*)

6266.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6267.   This claim is brought on behalf of South Carolina residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6268.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6269.   Old GM was a "manufacturer" as set forth in S.C. CODE ANN. § 56-15-10, as it was engaged in the business of manufacturing or assembling new and unused motor vehicles.

6270.   Old GM committed unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. CODE ANN. § 56-15-30.

6271.   Old GM engaged in actions which were arbitrary, in bad faith, unconscionable, and which caused damage to Plaintiffs and to the public.

6272.   Old GM's bad faith and unconscionable actions include, but are not limited to: (1) representing that Delta Ignition Switch Vehicles have characteristics, uses, benefits, and

- 1471 -

qualities which they do not have, (2) representing that Delta Ignition Switch Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Delta Ignition Switch Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Delta Ignition Switch Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Delta Ignition Switch Vehicles has been supplied in accordance with a previous representation when it has not.

6273.   Old GM resorted to and used false and misleading advertisements in connection with its business.  As alleged above, Old GM made numerous material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of old GM's unlawful advertising and representations as a whole.

6274.   Plaintiffs bring this action pursuant to S.C. CODE ANN. § 56-15-110(2), as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

6275.   Plaintiffs are entitled to double their actual damages, the cost of the suit, and attorney's fees pursuant to S.C. CODE ANN. § 56-15-110.  Plaintiffs also seek injunctive relief under S.C. CODE ANN. § 56-15-110.  Plaintiffs also seek treble damages because New GM acted maliciously.

## COUNT IX

### SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

6276.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6277.   This claim is brought on behalf of South Carolina residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6278.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6279.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6280.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

6281.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6282.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

6283.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

6284.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge

- 1473 -

and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

6285.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

6286.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.  Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6287.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

6288.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable Plaintiffs for damages in an amount to be proven at trial.

- 1474 -

6289.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT X

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (S.C. CODE § 36-2-314)

6290.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6291.   This claim is brought on behalf of South Carolina residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6292.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6293.   Old GM was a merchant with respect to motor vehicles under S.C. CODE § 36-2-314.

6294.   Under S.C. CODE § 36-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

6295.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the

Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6296.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

6297.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## SOUTH DAKOTA

## COUNT I

### VIOLATION OF THE SOUTH DAKOTA
### DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW
#### (S.D. CODIFIED LAWS § 37-24-6)

6298.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6299.   This claim is brought on behalf of South Dakota residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

- 1476 -

6300.   The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL") prohibits deceptive acts or practices, which are defined for relevant purposes to include "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby [.]" S.D. CODIFIED LAWS § 37-24-6(1).  The conduct of New GM as set forth herein constitutes deceptive acts or practices, fraud, false promises, misrepresentation, concealment, suppression and omission of material facts in violation of S.D. Codified Laws § 37-24-6 and 37-24-31, including, but not limited to, New GM's misrepresentations and omissions regarding the safety and reliability of the Defective Vehicles, and New GM's misrepresentations concerning a host of other defects and safety issues.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

6301.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

6302.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or

practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

6303.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

6304.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the South Dakota CPL.

6305.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6306.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6307.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

6308.   New GM knew or should have known that its conduct violated the South Dakota CPL.

6309.   As alleged above, New GM made material statements about the safety and

reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

6310.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Defective Vehicles, because New GM:

> a. Possessed exclusive knowledge about the defects in the
>    Defective Vehicles;
>
> b. Intentionally concealed the foregoing from Plaintiffs;
>
> c. Made incomplete representations about the safety and
>    reliability of the Defective Vehicles, while purposefully
>    withholding material facts from Plaintiffs that contradicted
>    these representations; and/or
>
> d. Had duties under the TREAD Act and related regulations to disclose and
>    remedy the defects.

6311.   Because New GM fraudulently concealed the defects in New GM vehicles, New

GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from defects.

Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for

repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they

would have either not have bought their Defective Vehicles or would have paid less for them.

6312.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and

deceptive trade practices since their vehicles were worth less as the result of New GM's

concealment of, and failure to remedy, the defects.  Further, once the truth came out about the

defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the

vehicles would have had in the absence of the defect.  This diminished value is directly attributed

to New GM's dishonesty and omissions with respect to the quality and safety of the Defective

Vehicles.

6313.  New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

6314.  Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

6315.  Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the South Dakota CPL—regardless of when those owners acquired their vehicles.

6316.  New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

6317.  As a direct and proximate result of New GM's violations of the South Dakota CPL, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

6318.   Under S.D. CODIFIED LAWS § 37-24-31, Plaintiffs are entitled to a recovery of their actual damages suffered as a result of New GM's acts and practices.

## COUNT II

## FRAUD BY CONCEALMENT

6319.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6320.   This claim is brought on behalf of South Dakota residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6321.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6322.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

6323.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6324.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

6325.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and

- 1481 -

to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

6326.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

6327.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

6328.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

6329.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have

- 1482 -

continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6330.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

6331.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

6332.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (S.D. Codified Laws § 57A-2-314)

6333.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6334.   This claim is brought only on behalf of South Dakota residents who are members of any of the following Subclasses:  (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

6335.   New GM was a merchant with respect to motor vehicles.

6336.   A warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

6337.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

6338.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6339.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

6340.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6341.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

6342.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

6343.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6344.   This claim is brought only on behalf of South Dakota residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

6345.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

6346.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

6347.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

6348.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

6349.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

6350.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

6351.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

6352.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

6353.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

6354.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

6355.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness

- 1487 -

bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

6356.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

6357.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

6358.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

6359.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

6360.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

- 1488 -

6361.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6362.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

6363.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

6364.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

6365.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6366.   This claim is brought on behalf of South Dakota residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag

- 1489 -

Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this

Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the

conduct of New GM.

6367.   This claim is pleaded in the alternative to any contract-based claims brought on

behalf of Plaintiffs.

6368.   New GM has received and retained a benefit from Plaintiffs and inequity has

resulted.

6369.   New GM has benefitted from selling and leasing the Defective Vehicles, for more

than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have

overpaid for the cars and been forced to pay other costs.

6370.   With respect to the Defective Vehicles purchased before New GM came into

existence that were still on the road after New GM came into existence and as to which New GM

had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs

of a recall and other lawsuits, and further benefitted from its statements about the success of New

GM.

6371.   Thus, all Plaintiffs conferred a benefit on New GM.

6372.   It is inequitable for New GM to retain these benefits.

6373.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did

not benefit from New GM's conduct.

6374.   New GM knowingly accepted the benefits of its unjust conduct.

6375.   As a result of New GM's conduct, the amount of its unjust enrichment should be

disgorged, in an amount according to proof.

## COUNT VI

## SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (S.D. CODIFIED LAWS § 37-24-6)

6376.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6377.   This claim is brought on behalf of South Dakota residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6378.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6379.   The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL") prohibits deceptive acts or practices, which are defined for relevant purposes to include "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby [.]" S.D. CODIFIED LAWS § 37-24-6(1).  The conduct of Old GM as set forth herein constitutes deceptive acts or practices, fraud, false promises, misrepresentation, concealment, suppression and omission of material facts in violation of S.D. Codified Laws § 37-24-6 and 37-24-31, including, but not limited to, Old GM's misrepresentations and omissions regarding the safety

- 1491 -

and reliability of the Delta Ignition Switch Vehicles, and Old GM's misrepresentations concerning a host of other defects and safety issues.

6380.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

6381.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

6382.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

6383.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the South Dakota CPL.

6384.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6385.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6386.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

6387.   Old GM knew or should have known that its conduct violated the South Dakota CPL.

6388.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

6389.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

>        a.      Possessed exclusive knowledge about the defects in the
>                Delta Ignition Switch Vehicles;
>
>        b.      Intentionally concealed the foregoing from Plaintiffs;
>
>        c.      Made incomplete representations about the safety and
>                reliability of the Delta Ignition Switch Vehicles, while
>                purposefully withholding material facts from Plaintiffs that
>                contradicted these representations; and/or
>
>        d.      Had duties under the TREAD Act and related regulations to
>                disclose and remedy the defects.

6390.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

6391.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

6392.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their

- 1493 -

vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

6393.   As a direct and proximate result of Old GM's violations of the South Dakota CPL, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

6394.   Under S.D. CODIFIED LAWS § 37-24-31, Plaintiffs are entitled to a recovery of their actual damages suffered as a result of New GM's acts and practices.

## COUNT VII

### SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

6395.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6396.   This claim is brought on behalf of South Dakota residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6397.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6398.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6399.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

6400.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6401.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

6402.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

6403.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

6404.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

010440-11  983080 V1

6405.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6406.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

6407.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

6408.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (S.D. Codified Laws § 57A-2-314)

6409.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6410.   This claim is brought on behalf of South Dakota residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6411.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6412.   Old GM was a merchant with respect to motor vehicles.

6413.   A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

6414.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6415.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

6416.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

- 1497 -

## TENNESSEE

## COUNT I

## VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT
### (TENN. CODE ANN. § 47-18-101, *et seq.*)

6417.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6418.   This claim is brought on behalf of Tennessee residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6419.   Plaintiffs are "natural persons" and "consumers" within the meaning of TENN. CODE ANN. § 47-18-103(2).

6420.   New GM is a "person" within the meaning of TENN. CODE ANN. § 47-18-103(2).

6421.   New GM's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of TENN. CODE ANN. § 47-18-103(19).

6422.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to:  "Representing that goods or services have … characteristics, [or] … benefits … that they do not have…;" "Representing that goods or services are of a particular standard, quality or grade… if they are of another;" and "Advertising goods or services with intent not to sell them as advertised."  TENN. CODE ANN. § 47-18-104.  New GM violated the Tennessee CPA by engaging

- 1498 -

in unfair or deceptive acts, including representing that Defective Vehicles have characteristics or benefits that they did not have; representing that Defective Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Defective Vehicles with intent not to sell them as advertised.

6423.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

6424.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety

issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

6425.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Tennessee CPA.

6426.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6427.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6428.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

6429.   New GM knew or should have known that its conduct violated the Tennessee CPA.

6430.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

6431.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

> a.   Possessed exclusive knowledge about the defects in the Defective Vehicles;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>
> c.   Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

6432.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

6433.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

6434.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

6435.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

6436.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Tennessee CPA—regardless of when those owners acquired their vehicles.

6437.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

6438.   As a direct and proximate result of New GM's violations of the Tennessee CPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

6439.   Pursuant to TENN. CODE § 47-18-109(a), Plaintiffs seek monetary relief against New GM measured as actual damages in an amount to be determined at trial, treble damages as a result of New GM's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT II

## FRAUD BY CONCEALMENT

6440.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6441.   This claim is brought on behalf of Tennessee residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6442.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6443.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

6444.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6445.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

6446.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to

- 1503 -

consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

6447.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

6448.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

6449.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

6450.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other

- 1504 -

affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6451.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

6452.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

6453.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

6454.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6455.   This claim is brought only on behalf of Tennessee residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

6456.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

6457.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

6458.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

6459.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

6460.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

6461.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

6462.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

6463.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

6464.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

6465.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

6466. The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling. While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets. The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

6467. But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

6468. Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

6469. Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

6470. New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

6471. New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

6472.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6473.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

6474.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

6475.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT IV**

**UNJUST ENRICHMENT**

6476.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6477.   This claim is brought on behalf of Tennessee residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6478.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

6479.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

6480.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

6481.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

6482.   Thus, all Plaintiffs conferred a benefit on New GM.

6483.   It is inequitable for New GM to retain these benefits.

6484.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

6485.   New GM knowingly accepted the benefits of its unjust conduct.

6486.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

<div align="center">

**COUNT V**

**SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
TENNESSEE CONSUMER PROTECTION ACT
(TENN. CODE ANN. § 47-18-101, *et seq.*)**

</div>

6487.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6488.   This claim is brought on behalf of Tennessee residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6489.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6490.   Plaintiffs are "natural persons" and "consumers" within the meaning of TENN. CODE ANN. § 47-18-103(2).

6491.   Old GM is a "person" within the meaning of TENN. CODE ANN. § 47-18-103(2).

6492.   Old GM's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of TENN. CODE ANN. § 47-18-103(19).

<div align="center">

- 1511 -

</div>

6493.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to:  "Representing that goods or services have … characteristics, [or] … benefits … that they do not have…;" "Representing that goods or services are of a particular standard, quality or grade… if they are of another;" and "Advertising goods or services with intent not to sell them as advertised."  TENN. CODE ANN. § 47-18-104.  Old GM violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Delta Ignition Switch Vehicles have characteristics or benefits that they did not have; representing that Delta Ignition Switch Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Delta Ignition Switch Vehicles with intent not to sell them as advertised.

6494.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

6495.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

6496.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

6497.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Tennessee CPA.

- 1512 -

6498.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6499.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6500.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

6501.   Old GM knew or should have known that its conduct violated the Tennessee CPA.

6502.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

6503.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

   a.      Possessed exclusive knowledge about the defects in the
           Delta Ignition Switch Vehicles;

   b.      Intentionally concealed the foregoing from Plaintiffs;

   c.      Made incomplete representations about the safety and
           reliability of the Delta Ignition Switch Vehicles, while
           purposefully withholding material facts from Plaintiffs that
           contradicted these representations; and/or

   d.      Had duties under the TREAD Act and related regulations to
           disclose and remedy the defects.

6504.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of

the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

6505.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

6506.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

6507.   As a direct and proximate result of Old GM's violations of the Tennessee CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

6508.   Pursuant to TENN. CODE § 47-18-109(a), Plaintiffs seek monetary relief against New GM measured as actual damages in an amount to be determined at trial, treble damages as a result of Old GM's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

<div style="text-align:center">

**COUNT VI**

**SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT**

</div>

6509.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6510.   This claim is brought on behalf of Tennessee residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

<div style="text-align:center">- 1514 -</div>

6511.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6512.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6513.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

6514.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6515.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

6516.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

6517.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as

- 1515 -

set forth above, which were misleading, deceptive, and incomplete without the disclosure of the

defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old

GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had

monitoring and disclosure duties under the TREAD Act, as alleged above.

6518.   Old GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM

money, and it did so at the expense of Plaintiffs.

6519.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.

Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such

facts were not known to the public, including Plaintiffs.

6520.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get

the benefit of their bargain since the Defective Vehicles were worth less than they would have

been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not

have purchased or leased them at all, and Plaintiffs sustained repair damages.

6521.   Accordingly, based on the conduct of Old GM for which it has successor liability,

New GM is liable Plaintiffs for damages in an amount to be proven at trial.

6522.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## TEXAS

## COUNT I

### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES—CONSUMER PROTECTION ACT (TEX. BUS. & COM. CODE §§ 17.41, *et seq.*)

6523.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6524.   This claim is brought on behalf of Texas residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6525.   Plaintiffs are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* TEX. BUS. & COM. CODE § 17.41.

6526.   The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides a private right of action to a consumer where the consumer suffers economic damage as the result of either (i) the use of false, misleading or deceptive act or practice specifically enumerated in TEX. BUS. & COM. CODE § 17.46(b); (ii) "breach of an express or implied warranty"; or (iii) "an unconscionable action or course of action by any person."  TEX. BUS. & COM. CODE § 17.50(a)(2) & (3).

- 1517 -

6527.   An "unconscionable action or course of action," means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5).  As detailed herein, New GM has engaged in an unconscionable action or course of action and thereby caused economic damages to Plaintiffs.

6528.   New GM has also breached the implied warranty of merchantability with respect to Plaintiffs, as set forth in Texas Count III below.

6529.   New GM has also violated the specifically enumerated provisions of TEX. BUS. & COM. CODE § 17.46(b) by, at a minimum:  (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Defective Vehicles with the intent to induce consumers to purchase or lease the Defective Vehicles.

6530.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the

- 1518 -

failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

6531.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

6532.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Texas DTPA.

6533.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6534.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6535.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

6536.   New GM knew or should have known that its conduct violated the Texas DTPA.

6537.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

6538.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles, because New GM:

    a.    Possessed exclusive knowledge about the defects in the Defective Vehicles;

    b.    Intentionally concealed the foregoing from Plaintiffs;

    c.    Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

6539.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

6540.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

6541.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

6542.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

6543.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Texas DTPA—regardless of when those owners acquired their vehicles.

6544.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

6545.   As a direct and proximate result of New GM's violations of the Texas DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

6546.   As the foregoing allegations demonstrate, New GM, by its misrepresentations and failure to disclose material facts about the defects in the Defective Vehicles, which resulted in the deaths and injuries of hundreds, and economically injured millions more.  New GM thereby engaged in acts or practices which, to the detriment of Plaintiffs, took advantage of their lack of knowledge, ability, experience, and capacity to a grossly unfair degree.  In other words, New GM engaged in unconscionable actions or an unconscionable course of action as to Plaintiffs.

6547.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose material information.  As the result of New GM's performance of deceptive practices, and of unconscionable actions and an unconscionable course of action, as set forth in detail above, Plaintiffs who purchased Defective Vehicles sold as new or New GM Certified Pre-Owned vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.  Under TEX. BUS. & COM. CODE § 17.50(b)(1), Plaintiffs are entitled to recover such economic damages.

6548.   As set forth above and in Texas Count III below, New GM breached the implied warranty of merchantability, and engaged in unconscionable actions and an unconscionable course of action "knowingly," which means it did so with "actual awareness of the fact of the act, practice, condition, defect or failure constituting the breach of warranty" and with "actual awareness, at the time of the act or practice complained of, of the falsity, deception or unfairness of the act or practice giving rise to the consumer's claim…."  TEX. BUS. & COM. CODE § 17.45(9).  Accordingly, pursuant to TEX. BUS. COM. CODE § 17.50(b)(1), Plaintiffs are entitled to additional damages in an amount up to three times the amount of economic damages.

6549.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

6550.   Pursuant to TEX. BUS. & COM. CODE § 17.50(a)(1) and (b), Plaintiffs seek monetary relief against New GM measured as actual damages in an amount to be determined at trial, treble damages for New GM's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

6551.   Alternatively, or additionally, pursuant to TEX. BUS. & COM. CODE § 17.50(b)(3) & (4), Plaintiffs who purchased vehicles from New GM on or after July 10, 2009 are entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA or which the Court deems proper.

6552.   Plaintiffs are also entitled to recover court costs and reasonable and necessary attorneys' fees under § 17.50(d) of the Texas DTPA.

6553.   On October 8, 2014, certain Plaintiffs sent a letter complying with TEX. BUS. & COM. CODE § 17.505(a).

## COUNT II

## FRAUD BY CONCEALMENT

6554.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6555.   This claim is brought on behalf of all Texas residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

- 1523 -

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs"). The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6556.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6557.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

6558.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6559.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

6560.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

6561.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs. New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in

- 1524 -

the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

6562.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

6563.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

6564.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6565.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective

Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

6566.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

6567.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT III**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
(TEX. BUS. & COM. CODE § 2.314)

</div>

6568.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6569.   This claim is brought only on behalf of Texas residents who are members of any of the following Subclasses:  (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

<div align="center">

- 1526 -

</div>

6570.   New GM was a merchant with respect to motor vehicles under TEX. BUS. & COM. CODE § 2.104.

6571.   Under TEX. BUS. & COM. CODE § 2.314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

6572.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

6573.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6574.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

6575.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6576.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

- 1527 -

6577.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

6578.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6579.   This claim is brought only on behalf of Texas residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

6580.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

6581.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

6582.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

6583.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

6584.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

6585.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

6586.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

6587.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

6588.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

6589.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

- 1529 -

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

6590.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

6591.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

6592.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

6593.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

6594.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

6595.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

- 1530 -

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted

the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who

had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old

GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its

implementing regulations that required the disclosure of the defect.

6596.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were

justified.  New GM was in exclusive control of the material facts and such facts were not known

to the public, including Plaintiffs.

6597.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage because they lost their chance to file a claim against Old GM and seek payment from the

GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims

and would have recovered from the GUC Trust.

6598.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be

proven at trial.

6599.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to

be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

6600.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6601.   This claim is brought on behalf of Texas residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6602.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

6603.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

6604.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

6605.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

6606.   Thus, all Plaintiffs conferred a benefit on New GM.

- 1532 -

6607.   It is inequitable for New GM to retain these benefits.

6608.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

6609.   New GM knowingly accepted the benefits of its unjust conduct.

6610.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT
(TEX. BUS. & COM. CODE §§ 17.41, *et seq.*)

6611.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6612.   This claim is brought on behalf of Texas residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6613.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6614.   Plaintiffs are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* TEX. BUS. & COM. CODE § 17.41.

6615.   The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides a private right of action to a consumer where the consumer suffers economic damage as the result of either (i) the use of false, misleading or deceptive act or practice specifically

enumerated in TEX. BUS. & COM. CODE § 17.46(b); (ii) "breach of an express or implied warranty"; or (iii) "an unconscionable action or course of action by any person." TEX. BUS. & COM. CODE § 17.50(a)(2) & (3).

6616.   An "unconscionable action or course of action," means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5).  As detailed herein, Old GM has engaged in an unconscionable action or course of action and thereby caused economic damages to Plaintiffs.

6617.   Old GM also breached the implied warranty of merchantability with respect to Plaintiffs, as set forth in Texas Count VIII below.

6618.   Old GM has also violated the specifically enumerated provisions of TEX. BUS. & COM. CODE § 17.46(b) by, at a minimum:  (1) representing that the Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Delta Ignition Switch Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Delta Ignition Switch Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Delta Ignition Switch Vehicles with the intent to induce consumers to purchase or lease the Delta Ignition Switch Vehicles.

6619.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

6620.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or

- 1534 -

practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection

with the sale of Delta Ignition Switch Vehicles.

6621.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles

owned or leased by Plaintiffs.

6622.   By failing to disclose and by actively concealing the defects in Plaintiffs'

vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and

deceptive business practices in violation of the Texas DTPA.

6623.   In the course of Old GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6624.   Old GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their

vehicles.

6625.   Old GM intentionally and knowingly misrepresented material facts regarding the

Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

6626.   Old GM knew or should have known that its conduct violated the Texas DTPA.

6627.   As alleged above, Old GM made material statements about the safety and

reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

6628.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Delta Ignition Switch Vehicles, because Old GM:

    a.    Possessed exclusive knowledge about the defects in the
          Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Plaintiffs;

- 1535 -

     c.     Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

     d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

6629.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

6630.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

6631.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

6632.   As a direct and proximate result of Old GM's violations of the Texas DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

6633.   As the foregoing allegations demonstrate, Old GM, by its misrepresentations and failure to disclose material facts about the safety and quality of the Delta Ignition Switch Vehicles, which resulted in the deaths and injuries of hundreds, and economically injured

millions more. Old GM thereby engaged in acts or practices which, to the detriment of

Plaintiffs, took advantage of their lack of knowledge, ability, experience, and capacity to a

grossly unfair degree. In other words, Old GM engaged in unconscionable actions or an

unconscionable course of action as to Plaintiffs.

6634. Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and

its concealment of and failure to disclose material information. As the result of Old GM's

performance of deceptive practices, and of unconscionable actions and an unconscionable course

of action, as set forth in detail above, Plaintiffs who purchased Old GM Delta Ignition Switch

Vehicles either would have paid less for their vehicles or would not have purchased or leased

them at all. Under TEX. BUS. & COM. CODE § 17.50(b)(1), Plaintiffs are entitled to recover such

economic damages.

6635. As set forth above and in Texas Count VIII below, New GM breached the implied

warranty of merchantability with respect to Plaintiffs, and engaged in unconscionable actions

and an unconscionable course of action "knowingly," which means it did so with "actual

awareness of the fact of the act, practice, condition, defect or failure constituting the breach of

warranty" and with "actual awareness, at the time of the act or practice complained of, of the

falsity, deception or unfairness of the act or practice giving rise to the consumer's claim…."

TEX. BUS. & COM. CODE § 17.45(9). Accordingly, pursuant to TEX. BUS. COM. CODE §

17.50(b)(1), Plaintiffs are entitled to additional damages in an amount up to three times the

amount of economic damages.

6636. Old GM's violations present a continuing risk to Plaintiffs as well as to the

general public. Old GM's unlawful acts and practices complained of herein affect the public

interest.

6637.   Pursuant to TEX. BUS. & COM. CODE § 17.50(a)(1) and (b), Plaintiffs seek monetary relief against New GM measured as actual damages in an amount to be determined at trial, treble damages for Old GM's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

6638.   Alternatively, or additionally, pursuant to TEX. BUS. & COM. CODE § 17.50(b)(3) & (4), Plaintiffs are entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA or which the Court deems proper.

6639.   Plaintiffs are also entitled to recover court costs and reasonable and necessary attorneys' fees under § 17.50(d) of the Texas DTPA.

6640.   On October 8, 2014, certain Plaintiffs sent a letter complying with TEX. BUS. & COM. CODE § 17.505(a).

## COUNT VII

### SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

6641.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6642.   This claim is brought on behalf of Texas residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6643.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

- 1538 -

6644.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6645.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

6646.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6647.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

6648.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

6649.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

6650.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

6651.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6652.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

6653.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

6654.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

## SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (TEX. BUS. & COM. CODE § 2.314)

6655.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6656.   This claim is brought on behalf of Texas residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6657.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6658.   Old GM was a merchant with respect to motor vehicles under TEX. BUS. & COM. CODE § 2.104.

6659.   Under TEX. BUS. & COM. CODE § 2.314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

6660.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6661.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

6662.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## UTAH

## COUNT I

### VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT
(UTAH CODE ANN. § 13-11-1, *et seq.*)

6663.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6664.   This claim is brought on behalf of Utah residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6665.   New GM is a "supplier" under the Utah Consumer Sales Practices Act ("Utah CSPA"), UTAH CODE ANN. § 13-11-3.

6666.   Plaintiffs are "persons" under UTAH CODE ANN. § 13-11-3.

6667.   The sale of the Defective Vehicles to Plaintiffs was a "consumer transaction" within the meaning of UTAH CODE ANN. § 13-11-3.

- 1542 -

6668.   The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under UTAH CODE ANN. § 13-11-4.  Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally:  (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." UTAH CODE ANN. § 13-11-4.  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.  UTAH CODE ANN. § 13-11-5.

6669.   New GM committed deceptive acts or practices in the conduct of trade or commerce, by, among other things, engaging in unconscionable acts, representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; and representing that the Defective Vehicles are of a particular standard, quality, and grade when they are not.

6670.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management,

- 1543 -

and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

6671.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

6672.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Utah CSPA.

6673.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6674.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6675.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

6676.   New GM knew or should have known that its conduct violated the Utah CSPA.

6677.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

6678.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the
                 Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and
                 reliability of the Defective Vehicles, while purposefully
                 withholding material facts from Plaintiffs that contradicted
                 these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and
                 remedy the defects.

6679.   Because New GM fraudulently concealed the defects in New GM vehicles, New

GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from defects.

Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for

repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they

would have either not have bought their Defective Vehicles or would have paid less for them.

6680.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and

deceptive trade practices since their vehicles were worth less as the result of New GM's

concealment of, and failure to remedy, the defects.  Further, once the truth came out about the

defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the

vehicles would have had in the absence of the defect.  This diminished value is directly attributed

to New GM's dishonesty and omissions with respect to the quality and safety of the Defective

Vehicles.

6681.   New GM's concealment of the defects in Plaintiffs' vehicles was material to

Plaintiffs.

6682.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

6683.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Utah CSPA—regardless of when those owners acquired their vehicles.

6684.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

6685.   As a direct and proximate result of New GM's violations of the Utah CSPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

6686.   Pursuant to UTAH CODE ANN. § 13-11-4, Plaintiffs seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial

and (b) statutory damages in the amount of $2,000 for each Plaintiff, reasonable attorneys' fees, and any other just and proper relief available under the Utah CSPA.

## COUNT II

## FRAUD BY CONCEALMENT

6687.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6688.   This claim is brought on behalf of all Utah residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6689.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6690.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

6691.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6692.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

6693.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and

- 1547 -

to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

6694.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

6695.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

6696.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

6697.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have

continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6698.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

6699.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

6700.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (UTAH CODE ANN. § 70A-2-314)

6701.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6702.   This claim is brought only on behalf of Utah residents who are members of any of the following Subclasses:  (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

6703.   New GM was at all relevant times a merchant with respect to motor vehicles.

6704.   New GM impliedly warranted that its vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use—transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public. This warranty was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

6705.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

6706.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the

- 1550 -

attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6707.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

6708.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6709.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

6710.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

6711.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6712.   This claim is brought only on behalf of Utah residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

- 1551 -

6713.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

6714.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

6715.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

6716.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

6717.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

6718.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

6719.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

6720.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

6721.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

6722.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

6723.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness

bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

6724.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

6725.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

6726.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

6727.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

6728.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

- 1554 -

6729.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6730.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

6731.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

6732.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

6733.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6734.   This claim is brought on behalf of Utah residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6735.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

6736.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

6737.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

6738.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

6739.   Thus, all Plaintiffs conferred a benefit on New GM.

6740.   It is inequitable for New GM to retain these benefits.

6741.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

6742.   New GM knowingly accepted the benefits of its unjust conduct.

6743.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**COUNT VI**

**SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
UTAH CONSUMER PROTECTION ACT
(UTAH CODE ANN. § 13-11-1, *et seq.*)**

6744.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6745.   This claim is brought on behalf of Utah residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6746.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6747.   Old GM is a "supplier" under the Utah Consumer Sales Practices Act ("Utah CSPA"), UTAH CODE ANN. § 13-11-3.

6748.   Plaintiffs are "persons" under UTAH CODE ANN. § 13-11-3.

6749.   The sale of the Delta Ignition Switch Vehicles to Plaintiffs was a "consumer transaction" within the meaning of UTAH CODE ANN. § 13-11-3.

6750.   The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under UTAH CODE ANN. § 13-11-4.  Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally:  (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not."

UTAH CODE ANN. § 13-11-4.  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.  UTAH CODE ANN. § 13-11-5.

6751.   Old GM committed deceptive acts or practices in the conduct of trade or commerce, by, among other things, engaging in unconscionable acts, representing that the Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; and representing that the Delta Ignition Switch Vehicles are of a particular standard, quality, and grade when they are not.

6752.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

6753.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

6754.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Utah CSPA.

6755.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6756.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6757.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

6758.   Old GM knew or should have known that its conduct violated the Utah CSPA.

6759.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

6760.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

> a.   Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>
> c.   Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or
>
> d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

6761.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

6762.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

6763.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of

the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

6764.   As a direct and proximate result of Old GM's violations of the Utah CSPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

6765.   Pursuant to UTAH CODE ANN. § 13-11-4, Plaintiffs seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff, reasonable attorneys' fees, and any other just and proper relief available under the Utah CSPA.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

6766.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6767.   This claim is brought on behalf of Utah residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6768.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6769.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6770.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

6771.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6772.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

6773.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

6774.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

6775.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

6776.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them. Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6777.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

6778.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

6779.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

## SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (UTAH CODE ANN. § 70A-2-314)

6780.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6781.   This claim is brought on behalf of Utah residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6782.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6783.   Old GM was at all relevant times a merchant with respect to motor vehicles.

6784.   Old GM impliedly warranted that its vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use—transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.  This warranty was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

6785.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of

- 1563 -

power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6786.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

6787.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## VERMONT

## COUNT I

### VIOLATION OF VERMONT CONSUMER FRAUD ACT
(VT. STAT. ANN. TIT. 9, § 2451 *et seq.*)

6788.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6789.   This claim is brought on behalf of Vermont residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6790.   New GM is a seller within the meaning of VT. STAT. ANN. TIT. 9, § 2451(a)(c).

6791.   The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce...."

- 1564 -

VT. STAT. ANN. TIT. 9, § 2453(a).  New GM engaged in unfair and deceptive acts or practices in trade or commerce in violation of the Vermont CFA by systematically devaluing safety and concealing a plethora of defects in New GM vehicles and Old GM vehicles.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

6792.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

6793.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

6794.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety

- 1565 -

issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

6795.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Vermont CFA.

6796.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6797.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6798.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

6799.   New GM knew or should have known that its conduct violated the Vermont CFA.

6800.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

6801.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

       a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

       b.      Intentionally concealed the foregoing from Plaintiffs;

       c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

       d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

6802.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

6803.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

6804.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

6805.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

6806.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.

- 1567 -

By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Vermont CFA—regardless of when those owners acquired their vehicles.

6807.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

6808.   As a direct and proximate result of New GM's violations of the Vermont CFA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

6809.   Plaintiffs are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]" pursuant to VT. STAT. ANN. TIT. 9, § 2461(b).

## COUNT II

## FRAUD BY CONCEALMENT

6810.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 1568 -

6811.   This claim is brought on behalf of all Vermont residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6812.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6813.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

6814.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6815.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

6816.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

6817.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by

- 1569 -

Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

6818.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

6819.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

6820.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6821.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the

defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

6822.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

6823.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## FRAUD BY CONCEALMENT OF THE RIGHT
## TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

6824.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6825.   This claim is brought only on behalf of Vermont residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

6826.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

6827.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM ), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

6828.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

6829.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

6830.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

6831.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

6832.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

6833.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

6834.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

6835.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

6836.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness

bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

6837.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

6838.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

6839.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

6840.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

6841.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

6842.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6843.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

6844.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

6845.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## UNJUST ENRICHMENT

6846.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6847.   This claim is brought on behalf of Vermont residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

- 1575 -

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6848.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

6849.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

6850.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

6851.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

6852.   Thus, all Plaintiffs conferred a benefit on New GM.

6853.   It is inequitable for New GM to retain these benefits.

6854.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

6855.   New GM knowingly accepted the benefits of its unjust conduct.

6856.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT V

## SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
## VERMONT CONSUMER FRAUD ACT
### (Vт. Stat. Ann. tit. 9, § 2451 *et seq.*)

6857.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

6858.   This claim is brought on behalf of Vermont residents who are members of the

Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count,

"Plaintiffs").

6859.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing

New GM for the conduct of Old GM.   Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are

free to assert this successor liability claim without impediment from the Sale Order.

6860.   Old GM was a seller within the meaning of Vт. Stat. Ann. tit. 9, § 2451(a)(c).

6861.   The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair

methods of competition in commerce, and unfair or deceptive acts or practices in commerce.…"

Vт. Stat. Ann. tit. 9, § 2453(a).   Old GM engaged in unfair and deceptive acts or practices in

trade or commerce in violation of the Vermont CFA by systematically devaluing safety and

concealing a plethora of defects in Delta Ignition Switch Vehicles.

6862.   Old GM's actions, as set forth above, occurred in the conduct of trade or

commerce.

6863.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles

as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or

- 1577 -

practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection

with the sale of Delta Ignition Switch Vehicles.

6864.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles

owned or leased by Plaintiffs.

6865.   By failing to disclose and by actively concealing the defects in Plaintiffs'

vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and

deceptive business practices in violation of the Vermont CFA.

6866.   In the course of Old GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6867.   Old GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their

vehicles.

6868.   Old GM intentionally and knowingly misrepresented material facts regarding the

Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

6869.   Old GM knew or should have known that its conduct violated the Vermont CFA.

6870.   As alleged above, Old GM made material statements about the safety and

reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

6871.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Delta Ignition Switch Vehicles, because Old GM:

       a.     Possessed exclusive knowledge about the defects in the
             Delta Ignition Switch Vehicles;

       b.     Intentionally concealed the foregoing from Plaintiffs;

- 1578 -

     c.       Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

     d.       Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

6872.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

6873.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

6874.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

6875.   As a direct and proximate result of Old GM's violations of the Vermont CFA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

6876.   Plaintiffs are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them],

reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]" pursuant to V$_T$. S$_{TAT}$. A$_{NN}$. $_{TIT}$. 9, § 2461(b).

## COUNT VI

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

6877.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6878.   This claim is brought on behalf of Vermont residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6879.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6880.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6881.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

6882.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6883.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

6884.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

6885.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

6886.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

6887.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.  Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

- 1581 -

6888.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

6889.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

6890.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## VIRGINIA

## COUNT I

### VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT
(VA. CODE ANN. §§ 59.1-196, *et seq.*)

6891.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6892.   This claim is brought on behalf of Virginia residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count,

"Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct

of New GM.

6893.   New GM is a "supplier" under VA. CODE ANN. § 59.1-198.

6894.   The sale of the Defective Vehicles to Plaintiffs was a "consumer transaction"

within the meaning of VA. CODE ANN. § 59.1-198.

6895.   The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited

"practices" which include:  "5. Misrepresenting that goods or services have certain

characteristics;" "6. Misrepresenting that goods or services are of a particular standard, quality,

grade style, or model;" "8. Advertising goods or services with intent not to sell them as

advertised, or with intent not to sell at the price or upon the terms advertised;" "9.  Making false

or misleading statements of fact concerning the reasons for, existence of, or amounts of price

reductions;" and "14. Using any other deception, fraud, or misrepresentation in connection with a

consumer transaction."  VA. CODE ANN. § 59.1-200.  New GM violated the Virginia CPA by

misrepresenting that Defective Vehicles had certain quantities, characteristics, ingredients, uses,

or benefits; misrepresenting that Defective Vehicles were of a particular standard, quality, grade,

style, or model when they were another; advertising Defective Vehicles with intent not to sell

them as advertised; and otherwise "using any other deception, fraud, false pretense, false

promise, or misrepresentation in connection with a consumer transaction."

6896.   New GM's actions, as set forth above, occurred in the conduct of trade or

commerce.

6897.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles

as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

New GM also engaged in unlawful trade practices by employing deception, deceptive acts or

practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection

with the sale of the Defective Vehicles.  The defects in each vehicle include not only the specific

defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which

New GM built cars, a process that included cost-cutting, minimizing the importance of safety

issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the

failure to follow acceptable engineering and inventory processes concerning parts management,

and the failure to follow a proper FMEA process.  All of these defective processes would be

material to a reasonable consumer.

6898.   From the date of its inception on July 10, 2009, New GM knew of serious defects

affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of

Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that

transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory

authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed

above.  New GM acquired additional information concerning the serious defects and safety

issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its

forced revelation in 2014.

6899.   By failing to disclose and by actively concealing the defects in Plaintiffs'

vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and

deceptive business practices in violation of the Virginia CPA.

6900.   In the course of New GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6901.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6902.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

6903.   New GM knew or should have known that its conduct violated the Virginia CPA.

6904.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

6905.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

6906.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

6907.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

6908.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

6909.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

6910.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Virginia CPA—regardless of when those owners acquired their vehicles.

6911.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta

Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

6912.   As a direct and proximate result of New GM's violations of the Virginia CPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

6913.   Pursuant to VA. CODE ANN. § 59.1-204, Plaintiffs seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff.  Because New GM's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff, the greater of (a) three times actual damages or (b) $1,000.

6914.   Plaintiffs also seek an order enjoining New GM's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under General Business Law § 59.1-204, *et seq*.

## COUNT II

## FRAUD BY CONCEALMENT

6915.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6916.   This claim is brought on behalf of all Virginia residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count,

"Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6917.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6918.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

6919.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

6920.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

6921.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

6922.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to

- 1588 -

disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

6923.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

6924.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

6925.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

6926.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their

vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

6927.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

6928.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(VA. CODE ANN. § 8.2-314)

6929.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6930.   This claim is brought only on behalf of Virginia residents who are members of any of the following Subclasses:  (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

6931.   New GM was at all relevant times a merchant with respect to motor vehicles.

- 1590 -

6932.   New GM impliedly warranted that the Defective Vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use—transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.  This warranty was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

6933.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

6934.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6935.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

6936.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

6937.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

- 1591 -

6938.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs members have been damaged in an amount to be proven at trial.

## COUNT IV

## FRAUD BY CONCEALMENT OF THE RIGHT
## TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

6939.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6940.   This claim is brought only on behalf of Virginia residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

6941.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

6942.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

6943.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

010440-11  983080 V1

6944.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

6945.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

6946.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

6947.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

6948.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

6949.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

6950.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

- 1593 -

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

6951.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

6952.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

6953.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

6954.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

6955.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

6956.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

- 1594 -

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted

the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who

had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old

GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its

implementing regulations that required the disclosure of the defect.

6957.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were

justified.  New GM was in exclusive control of the material facts and such facts were not known

to the public, including Plaintiffs.

6958.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage because they lost their chance to file a claim against Old GM and seek payment from the

GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims

and would have recovered from the GUC Trust.

6959.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be

proven at trial.

6960.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to

be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT[440]

6961.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6962.   This claim is brought on behalf of Virginia residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

6963.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

6964.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

6965.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

6966.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs

---

[440] Plaintiffs understand that this Court has found that the existence of an express warranty between New GM and Plaintiffs is a bar to this claim, and are asserting this claim here solely for the purposes of preserving the claim for appellate purposes.

- 1596 -

of a recall and other lawsuits, and further benefitted from its statements about the success of New

GM.

6967.   Thus, all Plaintiffs conferred a benefit on New GM.

6968.   It is inequitable for New GM to retain these benefits.

6969.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did

not benefit from New GM's conduct.

6970.   New GM knowingly accepted the benefits of its unjust conduct.

6971.   As a result of New GM's conduct, the amount of its unjust enrichment should be

disgorged, in an amount according to proof.

### COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT
### (VA. CODE ANN. §§ 59.1-196, *et seq.*)

6972.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

6973.   This claim is brought on behalf of Virginia residents who are members of the

Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count,

"Plaintiffs").

6974.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing

New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are

free to assert this successor liability claim without impediment from the Sale Order.

6975.   Old GM was a "supplier" under VA. CODE ANN. § 59.1-198.

- 1597 -

6976.   The sale of the Delta Ignition Switch Vehicles to Plaintiffs was a "consumer transaction" within the meaning of VA. CODE ANN. § 59.1-198.

6977.   The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices" which include:  "5. Misrepresenting that goods or services have certain characteristics;" "6. Misrepresenting that goods or services are of a particular standard, quality, grade style, or model;" "8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;" "9.  Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "14. Using any other deception, fraud, or misrepresentation in connection with a consumer transaction."  VA. CODE ANN. § 59.1-200.  Old GM violated the Virginia CPA by misrepresenting that Delta Ignition Switch Vehicles had certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that Delta Ignition Switch Vehicles were of a particular standard, quality, grade, style, or model when they were another; advertising Delta Ignition Switch Vehicles with intent not to sell them as advertised; and otherwise "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

6978.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

6979.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material

- 1598 -

fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

6980.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

6981.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Virginia CPA.

6982.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

6983.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

6984.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

6985.   Old GM knew or should have known that its conduct violated the Virginia CPA.

6986.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

6987.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

> a. Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;
>
> b. Intentionally concealed the foregoing from Plaintiffs;
>
> c. Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while

- 1599 -

> purposefully withholding material facts from Plaintiffs that
> contradicted these representations; and/or
>
> d.    Had duties under the TREAD Act and related regulations to
> disclose and remedy the defects.

6988.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch
Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their
bargain since the vehicles they purchased were worth less than they would have been if they
were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of
the defects in their vehicles, they would have either not bought their Delta Ignition Switch
Vehicles or would have paid less for them.

6989.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to
Plaintiffs.

6990.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and
its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of
the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their
vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs,
as alleged above.

6991.   As a direct and proximate result of Old GM's violations of the Virginia CPA,
Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor
liability.

6992.   Pursuant to VA. CODE ANN. § 59.1-204, Plaintiffs seek monetary relief against
New GM measured as the greater of (a) actual damages in an amount to be determined at trial
and (b) statutory damages in the amount of $500 for each Plaintiff.  Because Old GM's conduct

was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff, the greater of (a) three times actual damages or (b) $1,000.

6993.   Plaintiffs also seek an order enjoining New GM's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under General Business Law § 59.1-204, *et seq*.

## COUNT VII

### SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

6994.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

6995.   This claim is brought on behalf of Virginia residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

6996.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

6997.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

6998.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

6999.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

- 1601 -

7000.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

7001.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

7002.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

7003.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

7004.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.

Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

7005.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

7006.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable Plaintiffs for damages in an amount to be proven at trial.

7007.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (VA. CODE ANN. § 8.2-314)

7008.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7009.   This claim is brought on behalf of Virginia residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

- 1603 -

7010.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

7011.   Old GM was at all relevant times a merchant with respect to motor vehicles.

7012.   Old GM impliedly warranted that the Delta Ignition Switch Vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use—transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.  This warranty was implied by law in the transactions when Plaintiffs purchased or leased their Delta Ignition Switch Vehicles from Old GM on or before July 9, 2009.

7013.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

7014.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

7015.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

- 1604 -

# WASHINGTON

## COUNT I

### VIOLATION OF THE CONSUMER PROTECTION ACT
### (REV. CODE WASH. ANN. §§ 19.86.010, *et seq.*)

7016.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7017.   This claim is brought on behalf of Washington residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

7018.   New GM committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE. WASH. ANN. § 19.96.010.

7019.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  WASH. REV. CODE. WASH. ANN. § 19.96.010.  New GM engaged in unfair and deceptive acts and practices and violated the Washington CPA by systematically devaluing safety and concealing a plethora of defects in New GM vehicles and Old GM vehicles.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering

- 1605 -

and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

7020.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

7021.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

7022.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Washington CPA.

7023.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

7024.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

7025.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

7026.   New GM knew or should have known that its conduct violated the Washington CPA.

7027.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

7028.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

    a.   Possessed exclusive knowledge about the defects in the Defective Vehicles;

    b.   Intentionally concealed the foregoing from Plaintiffs;

    c.   Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

7029.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

- 1607 -

7030.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

7031.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

7032.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

7033.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Washington CPA—regardless of when those owners acquired their vehicles.

7034.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta

Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

7035.   As a direct and proximate result of New GM's violations of the Washington CPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

7036.   New GM is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under REV. CODE. WASH. ANN. § 19.86.090.

## COUNT II

## FRAUD BY CONCEALMENT

7037.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7038.   This claim is brought on behalf of all Washington residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

7039.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

7040.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

7041.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

7042.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

7043.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

7044.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

- 1610 -

7045.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

7046.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

7047.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

7048.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

7049.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

7050.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.ch New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## FRAUD BY CONCEALMENT OF THE RIGHT
## TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

7051.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7052.   This claim is brought only on behalf of Washington residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

7053.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

7054.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge

from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

7055.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

7056.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

7057.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

7058.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

7059.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

7060.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured

- 1613 -

claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

7061.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

7062.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

7063.   The Bankruptcy Court found that Plaintiffs members were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

7064.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

7065.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

7066.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute

additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

7067.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

7068.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

7069.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

7070.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

- 1615 -

7071.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

7072.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## UNJUST ENRICHMENT

7073.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7074.   This claim is brought on behalf of Washington residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

7075.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

7076.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

7077.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

7078.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

7079.   Thus, all Plaintiffs conferred a benefit on New GM.

7080.   It is inequitable for New GM to retain these benefits.

7081.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

7082.   New GM knowingly accepted the benefits of its unjust conduct.

7083.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT V

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT (REV. CODE WASH. ANN. §§ 19.86.010, *et seq*.)

7084.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7085.   This claim is brought on behalf of Washington residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

- 1617 -

7086.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

7087.   Old GM committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE. WASH. ANN. § 19.96.010.

7088.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  WASH. REV. CODE. WASH. ANN. § 19.96.010.  Old GM engaged in unfair and deceptive acts and practices and violated the Washington CPA by systematically devaluing safety and concealing a plethora of defects in New GM vehicles and Old GM vehicles.

7089.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

7090.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

7091.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Washington CPA.

7092.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

7093.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

7094.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

7095.   Old GM knew or should have known that its conduct violated the Washington CPA.

7096.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

7097.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

     a.     Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

     b.     Intentionally concealed the foregoing from Plaintiffs;

     c.     Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

     d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

7098.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of

the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

7099.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

7100.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

7101.   As a direct and proximate result of Old GM's violations of the Washington CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

7102.   New GM is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under REV. CODE. WASH. ANN. § 19.86.090.

<div align="center">

**COUNT VI**

**SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT**

</div>

7103.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7104.   This claim is brought on behalf of Washington residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

7105.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

7106.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

7107.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

7108.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

7109.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

7110.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

7111.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as

- 1621 -

set forth above, which were misleading, deceptive, and incomplete without the disclosure of the

defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old

GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had

monitoring and disclosure duties under the TREAD Act, as alleged above.

7112.   Old GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM

money, and it did so at the expense of Plaintiffs.

7113.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.

Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such

facts were not known to the public, including Plaintiffs.

7114.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get

the benefit of their bargain since the Defective Vehicles were worth less than they would have

been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not

have purchased or leased them at all, and Plaintiffs sustained repair damages.

7115.   Accordingly, based on the conduct of Old GM for which it has successor liability,

New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

7116.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## WEST VIRGINIA

## COUNT I

### VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT
(W. VA. CODE § 46A-1-101, *et seq.*)

7117.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7118.   This claim is brought on behalf of West Virginia residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

7119.   New GM is a "person" under W.VA. CODE § 46A-1-102(31).

7120.   Plaintiff are "consumers," as defined by W.VA. CODE §§ and 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Defective Vehicles.

7121.   New GM engaged in trade or commerce as defined by W. VA. CODE § 46A-6-102(6).

7122.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." W. VA. CODE § 46A-6-104.  Without limitation, "unfair or deceptive" acts or practices include:

> (I)   Advertising goods or services with intent not to sell them as advertised;

- 1623 -

(K)     Making false or misleading statements of fact concerning the reasons for, existence of or amounts of price reductions;

(L)     Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

(M)     The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby;

(N)     Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive;

W. VA. CODE § 46A-6-102(7).

7123.   By systematically devaluing safety and concealing a plethora of defects in New GM vehicles and Old GM vehicles, New GM engaged in deceptive business practices prohibited by the West Virginia CCPA, including:  (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; (4) representing that a transaction involving the Defective Vehicles confers or involves rights,

- 1624 -

remedies, and obligations which it does not; and (5) representing that the subject of a transaction involving the Defective Vehicles has been supplied in accordance with a previous representation when it has not.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

7124.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

7125.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

7126.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety

issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

7127.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the West Virginia CCPA.

7128.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

7129.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

7130.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

7131.   New GM knew or should have known that its conduct violated the West Virginia CCPA.

7132.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

7133.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

a.   Possessed exclusive knowledge about the defects in the Defective Vehicles;

b.   Intentionally concealed the foregoing from Plaintiffs;

c.   Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

- 1626 -

d. Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

7134. Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair. Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

7135. Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects. Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect. This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

7136. New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

7137. Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

- 1627 -

7138.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the West Virginia CCPA—regardless of when those owners acquired their vehicles.

7139.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

7140.   As a direct and proximate result of New GM's violations of the West Virginia CCPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

7141.   Pursuant to W. Va. Code § 46A-6-106, Plaintiffs seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff.

7142.   Plaintiffs also seek punitive damages against New GM because New GM carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust hardship as a result.  New GM intentionally and willfully

- 1628 -

misrepresented the safety and reliability of the Defective Vehicles, deceived Plaintiffs on life-or-death matters, concealed material facts that only New GM knew, and repeatedly promised Plaintiffs that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a deadly flaw in New GM and Old GM vehicles.  New GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

7143.   Plaintiffs further seek an order enjoining New GM's unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under W. VA. CODE § 46A-5-101, *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

7144.   On October 8, 2014, certain Plaintiffs sent a letter complying with W. VA. CODE § 46A-6-106(b).  Because New GM failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

COUNT II

**FRAUD BY CONCEALMENT**

7145.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7146.   This claim is brought on behalf of West Virginia residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

7147.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

7148.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

7149.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

7150.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

7151.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

7152.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and

implementing regulations, including the duty to promptly notify consumers of known safety defects.

7153.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

7154.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

7155.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

7156.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all

Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

7157.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

7158.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT III**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(W. VA. CODE § 46-2-314)**

</div>

7159.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7160.   This claim is brought only on behalf of West Virginia residents who are members of any of the following Subclasses:  (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

7161.   New GM was at all relevant times a seller of motor vehicles under W. VA. CODE § 46-2-314, and was also a "merchant" as the term is used in W. VA. CODE § 46A-6-107 and § 46-2-314.

<div align="center">

- 1632 -

</div>

7162.   Under W. Va. Code § 46-2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

7163.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

7164.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

7165.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

7166.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

7167.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

7168.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

### FRAUD BY CONCEALMENT OF THE RIGHT
### TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

7169.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7170.   This claim is brought only on behalf of West Virginia residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

7171.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

7172.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

7173.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

7174.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

7175.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

7176.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

7177.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

7178.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

7179.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

7180.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC

- 1635 -

Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

7181.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

7182.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

7183.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

7184.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

7185.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

7186.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs.  These omitted and concealed facts were material because they directly impacted

the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who

had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old

GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its

implementing regulations that required the disclosure of the defect.

7187.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were

justified.  New GM was in exclusive control of the material facts and such facts were not known

to the public, including Plaintiffs.

7188.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage because they lost their chance to file a claim against Old GM and seek payment from the

GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the

ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims

and would have recovered from the GUC Trust.

7189.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be

proven at trial.

7190.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs'

rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to

be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

7191.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7192.   This claim is brought on behalf of West Virginia residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

7193.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

7194.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

7195.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

7196.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

7197.   Thus, all Plaintiffs conferred a benefit on New GM.

7198.   It is inequitable for New GM to retain these benefits.

7199.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

7200.   New GM knowingly accepted the benefits of its unjust conduct.

7201.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT
### (W. VA. CODE § 46A-1-101, *et seq.*)

7202.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7203.   This claim is brought on behalf of West Virginia residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

7204.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

7205.   Old GM was a "person" under W.VA. CODE § 46A-1-102(31).

7206.   Plaintiffs are "consumers," as defined by W.VA. CODE §§ and 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Defective Vehicles.

7207.   Old GM engaged in trade or commerce as defined by W. VA. CODE § 46A-6-102(6).

7208.  The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA")

prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …."

W. VA. CODE § 46A-6-104.  Without limitation, "unfair or deceptive" acts or practices include:

> (I)   Advertising goods or services with intent not to sell them as advertised;
>
> (K)   Making false or misleading statements of fact concerning the reasons for, existence of or amounts of price reductions;
>
> (L)   Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;
>
> (M)   The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby;
>
> (N)   Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive;

W. VA. CODE § 46A-6-102(7).

7209.  By systematically devaluing safety and concealing a plethora of defects in Old

GM vehicles, Old GM engaged in deceptive business practices prohibited by the West Virginia

- 1640 -

CCPA, including:  (1) representing that the Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Delta Ignition Switch Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Delta Ignition Switch Vehicles with the intent not to sell them as advertised; (4) representing that a transaction involving the Delta Ignition Switch Vehicles confers or involves rights, remedies, and obligations which it does not; and (5) representing that the subject of a transaction involving the Delta Ignition Switch Vehicles has been supplied in accordance with a previous representation when it has not.

7210.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

7211.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

7212.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

7213.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the West Virginia CCPA.

7214.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

- 1641 -

7215.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

7216.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

7217.   Old GM knew or should have known that its conduct violated the West Virginia CCPA.

7218.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

7219.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

     a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

     b.      Intentionally concealed the foregoing from Plaintiffs;

     c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

     d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

7220.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

7221.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

7222.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

7223.   As a direct and proximate result of Old GM's violations of the West Virginia CCPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

7224.   Pursuant to W. VA. CODE § 46A-6-106, Plaintiffs seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff.

7225.   Plaintiffs also seek punitive damages against New GM because Old GM carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust hardship as a result.  Old GM intentionally and willfully misrepresented the safety and reliability of the Delta Ignition Switch Vehicles, deceived Plaintiffs on life-or-death matters, concealed material facts that only Old GM knew, and repeatedly promised Plaintiffs that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a deadly flaw in New GM and Old GM vehicles.  New GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

7226.   Plaintiffs further seek an order enjoining New GM's unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under W. Va. Code § 46A-5-101, *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

## COUNT VII

### SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

7227.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7228.   This claim is brought on behalf of West Virginia residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

7229.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

7230.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

7231.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

7232.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

- 1644 -

7233.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

7234.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

7235.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

7236.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

7237.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.

- 1645 -

Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

7238.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

7239.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

7240.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

### SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (W. VA. CODE § 46-2-314)

7241.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7242.   This claim is brought on behalf of West Virginia residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

7243.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

7244.   Old GM was at all relevant times a seller of motor vehicles under W. VA. CODE § 46-2-314, and was also a "merchant" as the term is used in W. VA. CODE § 46A-6-107 and § 46-2-314.

7245.   Under W. VA. CODE § 46-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

7246.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

7247.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

7248.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

# WISCONSIN

## COUNT I

### VIOLATIONS OF THE WISCONSIN
### DECEPTIVE TRADE PRACTICES ACT
### (WIS. STAT. § 110.18)

7249.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7250.   This claim is brought on behalf of Wisconsin residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

7251.   New GM is a "person, firm, corporation or association" within the meaning of WIS. STAT. § 100.18(1).

7252.   Plaintiffs are members of "the public" within the meaning of WIS. STAT. § 100.18(1).  Plaintiffs purchased or leased one or more Defective Vehicles.

7253.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading."  WIS. STAT. § 100.18(1).  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles and Old GM vehicles, New GM engaged in unfair and deceptive acts and practices and violated the Wisconsin DTPA.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of

- 1648 -

safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

7254.   New GM's actions, as set forth above, occurred in the conduct of trade or commerce.

7255.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

7256.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

7257.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Wisconsin DTPA.

7258.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

7259.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

7260.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

7261.   New GM knew or should have known that its conduct violated the Wisconsin DTPA.

7262.   As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

7263.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

    a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

    b.      Intentionally concealed the foregoing from Plaintiffs;

    c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

7264.   Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for

repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

7265.   Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

7266.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

7267.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

7268.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Wisconsin DTPA—regardless of when those owners acquired their vehicles.

7269.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

7270.   As a direct and proximate result of New GM's violations of the Wisconsin DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

7271.   Plaintiffs are entitled to damages and other relief provided for under WIS. STAT. § 100.18(11)(b)(2).  Because New GM's conduct was committed knowingly and/or intentionally, Plaintiffs are entitled to treble damages.

7272.   Plaintiffs also seek court costs and attorneys' fees under WIS. STAT. § 110.18(11)(b)(2).

## COUNT II

## FRAUD BY CONCEALMENT

7273.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7274.   This claim is brought on behalf of all Wisconsin residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this

Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

7275.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

7276.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

7277.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

7278.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

7279.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

7280.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to

- 1653 -

disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

7281.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

7282.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

7283.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

7284.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their

vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

7285.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

7286.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## FRAUD BY CONCEALMENT OF THE RIGHT
## TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

7287.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7288.   This claim is brought only on behalf of Wisconsin residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

7289.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

7290.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit

Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

7291.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

7292.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

7293.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

7294.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

7295.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

7296.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

7297.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

7298.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

7299.   The Bankruptcy Court found that Plaintiffs were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

7300.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

7301.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

7302.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute

- 1657 -

additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

7303.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

7304.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.   These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.   New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

7305.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.   Plaintiffs' actions were justified.   New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

7306.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).   Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

- 1658 -

7307.   Accordingly, New GM is liable Plaintiffs for their damages in an amount to be proven at trial.

7308.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## UNJUST ENRICHMENT

7309.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7310.   This claim is brought on behalf of Wisconsin residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

7311.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

7312.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

7313.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

7314.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

7315.   Thus, all Plaintiffs conferred a benefit on New GM.

7316.   It is inequitable for New GM to retain these benefits.

7317.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

7318.   New GM knowingly accepted the benefits of its unjust conduct.

7319.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT V

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT (WIS. STAT. § 110.18)

7320.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7321.   This claim is brought on behalf of Wisconsin residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

- 1660 -

7322.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

7323.   Old GM is a "person, firm, corporation or association" within the meaning of WIS. STAT. § 100.18(1).

7324.   Plaintiffs are members of "the public" within the meaning of WIS. STAT. § 100.18(1).  Plaintiffs purchased or leased one or more Delta Ignition Switch Vehicles.

7325.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading."  WIS. STAT. § 100.18(1).  By systematically devaluing safety and concealing a plethora of defects in Old GM vehicles, Old GM engaged in unfair and deceptive acts and practices and violated the Wisconsin DTPA.

7326.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

7327.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

7328.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

7329.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Wisconsin CPA.

7330.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

7331.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

7332.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

7333.   Old GM knew or should have known that its conduct violated the Wisconsin CPA.

7334.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

7335.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

      a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

- 1662 -

7336.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

7337.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

7338.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

7339.   Plaintiffs are entitled to damages and other relief provided for under WIS. STAT. § 100.18(11)(b)(2).  Because Old GM's conduct was committed knowingly and/or intentionally, Plaintiffs are entitled to treble damages.

7340.   Plaintiffs also seek court costs and attorneys' fees under WIS. STAT. § 110.18(11)(b)(2).

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

7341.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7342.   This claim is brought on behalf of Wisconsin residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

7343.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do ***not*** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

7344.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

7345.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

7346.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

7347.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

7348.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

7349.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge

and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had monitoring and disclosure duties under the TREAD Act, as alleged above.

7350.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM money, and it did so at the expense of Plaintiffs.

7351.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.  Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

7352.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects.  Had they been aware of the concealed defects that existed in their Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all, and Plaintiffs sustained repair damages.

7353.   Accordingly, based on the conduct of Old GM for which it has successor liability, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

7354.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct by New GM in the future, which amount is to be determined according to proof.

## WYOMING

## COUNT I

### VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
(WYO. STAT. §§ 40-12-105 *et seq.*)

7355.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7356.   This claim is brought on behalf of Wyoming residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

7357.   New GM and Plaintiffs are "persons" within the meaning of WYO. STAT. § 40-12-102(a)(i).

7358.   The sales of the Defective Vehicles to Plaintiffs were "consumer transactions" within the meaning of WYO. STAT. § 40-12-105.

7359.   Under the Wyoming Consumer Protection Act ("Wyoming CPA"), a person engages in a deceptive trade practice when, in the course of its business and in connection with a consumer transaction it knowingly:  "(iii) Represents that merchandise is of a particular standard,

- 1666 -

grade, style or model, if it is not"; "(v) Represents that merchandise has been supplied in accordance with a previous representation, if it has not…"; "(viii) Represents that a consumer transaction involves a warranty, a disclaimer of warranties, particular warranty terms, or other rights, remedies or obligations if the representation is false"; "(x) Advertises merchandise with intent not to sell it as advertised"; or  "(xv) Engages in unfair or deceptive acts or practices." WYO. STAT. § 45-12-105.

7360.   By systematically devaluing safety and concealing a plethora of defects in New GM and Old GM vehicles as described above, New GM violated the Wyoming CPA.  New GM engaged in deceptive trade practices, including (among other things) representing that the Defective Vehicles are of a particular standard and grade, which they are not; advertising the Defective Vehicles with the intent not to sell them as advertised; and overall engaging in unfair and deceptive acts or practices.  The defects in each vehicle include not only the specific defect (*e.g.*, the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defective processes would be material to a reasonable consumer.

7361.   In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles.

7362.   From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above.  New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

7363.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Wyoming CPA.

7364.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

7365.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

7366.   New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

7367.   New GM knew or should have known that its conduct violated the Wyoming CPA.

7368.  As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

7369.  New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

      a.      Possessed exclusive knowledge about the defects in the Defective Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

7370.  Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

7371.  Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects.  Further, once the truth came out about the defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect.  This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

7372.   New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

7373.   Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

7374.   Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct. By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Wyoming CPA—regardless of when those owners acquired their vehicles.

7375.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective.  New GM's unlawful acts and practices complained of herein affect the public interest.

7376.   As a direct and proximate result of New GM's violations of the Wyoming CPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.  As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

7377.   Pursuant to WYO. STAT. § 40-12-108(a), Plaintiffs seek monetary relief against New GM measured as actual damages in an amount to be determined at trial, in addition to any other just and proper relief available under the Wyoming CPA.

7378.   On October 8, 2014, certain Plaintiffs sent a letter complying with WYO. STAT. §§ 45-12-109.  Because New GM failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

<div align="center">

**COUNT II**

**FRAUD BY CONCEALMENT**

</div>

7379.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7380.   This claim is brought on behalf of all Wyoming residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

7381.   New GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

7382.   New GM sold Defective Vehicles to Plaintiffs without disclosing the defects, and took active steps to conceal the defects in the Defective Vehicles from regulators and consumers.

7383.   In order to conceal and suppress the defects from the owners and lessees of the Defective Vehicles, New GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

<div align="center">

- 1671 -

</div>

7384.   New GM concealed and suppressed the defects in the Defective Vehicles with the intent to deceive Plaintiffs.

7385.   New GM did so in order to falsely assure purchasers, lessees, and owners of Defective Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Defective Vehicles and because the information played a significant role in the value of the vehicles.

7386.   New GM had a duty to disclose the defects in the Defective Vehicles because they were known and/or accessible only to New GM; New GM had superior knowledge and access to the facts; and New GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  New GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective Vehicles.  Having provided information to Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, New GM had a duty to monitor all of the Defective Vehicles (*including* Old GM Vehicles) under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

7387.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs.

7388.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in the Defective Vehicles.

7389.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Defective Vehicles manufactured by New GM; and/or would not have continued to own and drive their Old GM Defective Vehicles or would have taken other affirmative steps.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

7390.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage.  Plaintiffs who purchased New GM Defective Vehicles did not get the benefit of their bargain since the Defective Vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the defects.  They also incurred repair costs, as alleged above.  Had they been aware of the concealed defects that existed in the Defective Vehicles, Plaintiffs who purchased New GM Defective Vehicles would have paid less for their vehicles or would not have purchased or leased them at all; and no Plaintiffs, regardless of the time of purchase or lease, would have maintained their Defective Vehicle.  As alleged above, all Old GM Defective Vehicles suffer from diminished value attributable to New GM's dishonesty and omissions with respect to the quality and safety of these vehicles.

7391.   Accordingly, New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

- 1673 -

7392.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (WYO. STAT. §§ 34.1-2-314)

7393.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7394.   This claim is brought only on behalf of Wyoming residents who are members of any of the following Subclasses:  (i) the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (ii) the Low Torque Ignition Switch Defect Magnuson-Moss and Implied Warranty Subclass; (iii) the Knee-to-Key Camaro Defect Magnuson-Moss and Implied Warranty Subclass; (iv) the Side Airbag Defect Magnuson-Moss and Implied Warranty Subclass; and (v) the Power Steering Defect Magnuson-Moss and Implied Warranty Subclass (collectively for the purposes of this Count, "Plaintiffs").

7395.   New GM was at all relevant times a merchant with respect to motor vehicles.

7396.   Under Wyoming law, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

7397.   The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

7398.   The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

7399.   The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

7400.   The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

7401.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

7402.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

## FRAUD BY CONCEALMENT OF THE RIGHT
## TO FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY

7403.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7404.   This claim is brought only on behalf of Wyoming residents who are members of the Delta Ignition Switch Defect Bankruptcy Class (for the purposes of this Count, "Plaintiffs").

7405.   New GM was aware of the Delta Ignition Switch Defect in millions of vehicles sold by Old GM from the moment it came into existence upon entry of the Sale Order and Sale Agreement by which New GM acquired substantially all the assets of Old GM.

7406.   As the Bankruptcy Court found, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles."  The Second Circuit Court of Appeals recently affirmed the Bankruptcy Court's finding based on its review of the full evidentiary record that gave rise to that finding.  New GM necessarily had this same knowledge from day one of its existence, as the Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the defect prior to the Sale Motion."

7407.   Plaintiffs did not receive notice of the defect prior to the entry of the Sale Order. No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Sale Motion mentioned the defect.

7408.   In September 2009, the Bankruptcy Court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

7409.   Because New GM concealed its knowledge of the defect, Plaintiffs did not receive notice of the defect prior to the passage of the Bar Date.  No recall occurred, and neither the direct mail notice nor the publication notice sent in connection with the Bar Date Order mentioned the defect.

7410.   In 2011, the Bankruptcy Court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of claims that were ultimately allowed.

7411.   The out-of-pocket consideration provided by New GM for its acquisition of Old GM consisted of 10% of the post-closing outstanding shares of New GM common stock and two series of warrants, each to purchase 7.5% of the post-closing shares of New GM (collectively, the "New GM Securities").

7412.   Through an "accordion feature" in the Sale Agreement, New GM agreed that it would provide additional consideration if the aggregate amount of allowed general unsecured claims exceeded $35 billion.  In that event, New GM would be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries.

7413.   As of September 30, 2014, the total amount of Allowed Claims was approximately $31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.

7414.   As of September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities.  After a subsequent November 12 distribution, the total assets of the GUC Trust were approximately $773.7 million—all or nearly all of which is already slated to pay the GUC Trust's expenses and existing beneficiaries of the Trust.

7415.   The Bankruptcy Court found that Plaintiffs members were deprived of Due Process because they did not receive notice of the defect prior to the passage of the Bar Date, and the Second Circuit Court of Appeals affirmed this ruling.  While the Bankruptcy Court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars Plaintiffs from tapping into the GUC Trust assets.  The Second Circuit Court of

- 1677 -

Appeals vacated the equitable mootness holdings on the grounds that it was not yet ripe for review.

7416.   But for New GM's fraudulent concealment of the defect, Plaintiffs would have filed claims against Old GM before the Bar Date.

7417.   Had Plaintiffs filed timely claims before the Bar Date, the claims would have been allowed.

7418.   Had Plaintiffs' claims been allowed, the "accordion-feature" of the Sale Agreement would have been triggered, and New GM would have been required to contribute additional New GM Securities to the GUC Trust for the benefit of Delta Ignition Switch Defect Bankruptcy Class Members across the country.

7419.   New GM's concealment and suppression of the material fact of the Delta Ignition Switch Defect over the first several months of its existence served to prevent the filing of claims by Plaintiffs and thereby helped New GM avoid the accordion-feature payments it would otherwise have had to make.

7420.   New GM had a duty to disclose the Delta Ignition Switch Defect because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs.  These omitted and concealed facts were material because they directly impacted the safety and the value of the Delta Ignition Switch Vehicles owned or leased by Plaintiffs, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.  New GM also had monitoring and disclosure duties under the TREAD Act and its implementing regulations that required the disclosure of the defect.

7421.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

7422.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they lost their chance to file a claim against Old GM and seek payment from the GUC Trust (supplemented, if necessary, by the accordion feature).  Had they been aware of the ignition switch defects that existed in their vehicles, Plaintiffs would have timely filed claims and would have recovered from the GUC Trust.

7423.   Accordingly, New GM is liable to Plaintiffs for their damages in an amount to be proven at trial.

7424.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and prevent Plaintiffs from filing proofs of claim, and in reckless disregard of Plaintiffs' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

7425.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7426.   This claim is brought on behalf of Wyoming residents who are members of any of the following Classes:  (i) the Delta Ignition Switch Defect Class; (ii) the Low Torque Ignition Switch Defect Class; (iii) the Knee-to-Key Camaro Defect Class; (iv) the Side Airbag Defect

Class; and (v) the Power Steering Defect Class (collectively for the purposes of this Count, "Plaintiffs").  The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

7427.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

7428.   New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

7429.   New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

7430.   With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

7431.   Thus, all Plaintiffs conferred a benefit on New GM.

7432.   It is inequitable for New GM to retain these benefits.

7433.   Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

7434.   New GM knowingly accepted the benefits of its unjust conduct.

7435.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VI

### SUCCESSOR LIABILITY CLAIM FOR VIOLATIONS OF THE
### WYOMING CONSUMER PROTECTION ACT
### (WYO. STAT. §§ 40-12-105 *et seq.*)

7436.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7437.   This claim is brought on behalf of Wyoming residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

7438.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

7439.   Old GM and Plaintiffs are "persons" within the meaning of WYO. STAT. § 40-12-102(a)(i).

7440.   The sales of the Delta Ignition Switch Vehicles to Plaintiffs were "consumer transactions" within the meaning of WYO. STAT. § 40-12-105.

7441.   Under the Wyoming Consumer Protection Act ("Wyoming CPA"), a person engages in a deceptive trade practice when, in the course of its business and in connection with a consumer transaction it knowingly:  "(iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not"; "(v) Represents that merchandise has been supplied in accordance with a previous representation, if it has not…"; "(viii) Represents that a consumer transaction involves a warranty, a disclaimer of warranties, particular warranty terms, or other rights, remedies or obligations if the representation is false"; "(x) Advertises merchandise with

- 1681 -

intent not to sell it as advertised"; or  "(xv) Engages in unfair or deceptive acts or practices."
WYO. STAT. § 45-12-105.

7442.   By systematically devaluing safety and concealing a plethora of defects in Old GM vehicles as described above, Old GM violated the Wyoming CPA.  Old GM engaged in deceptive trade practices, including (among other things) representing that the Delta Ignition Switch Vehicles are of a particular standard and grade, which they are not; advertising the Delta Ignition Switch Vehicles with the intent not to sell them as advertised; and overall engaging in unfair and deceptive acts or practices.

7443.   Old GM's actions, as set forth above, occurred in the conduct of trade or commerce.

7444.   In the course of its business, Old GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

7445.   Old GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Plaintiffs.

7446.   By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, Old GM engaged in unfair and deceptive business practices in violation of the Wyoming CPA.

7447.   In the course of Old GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

7448.   Old GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

7449.   Old GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Plaintiffs.

7450.   Old GM knew or should have known that its conduct violated the Wyoming CPA.

7451.   As alleged above, Old GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

7452.   Old GM owed Plaintiffs a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because Old GM:

     a.     Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

     b.     Intentionally concealed the foregoing from Plaintiffs;

     c.     Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

     d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

7453.   Because Old GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Old GM Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Old GM Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

7454.   Old GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

7455.   Plaintiffs suffered ascertainable loss caused by Old GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs also incurred repair costs, as alleged above.

7456.   As a direct and proximate result of Old GM's violations of the Wyoming CPA, Plaintiffs have suffered injury-in-fact and/or actual damage for which New GM has successor liability.

7457.   Pursuant to WYO. STAT. § 40-12-108(a), Plaintiffs seek monetary relief against New GM measured as actual damages in an amount to be determined at trial, in addition to any other just and proper relief available under the Wyoming CPA.

## COUNT VII

## SUCCESSOR LIABILITY CLAIM FOR FRAUD BY CONCEALMENT

7458.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7459.   This claim is brought on behalf of Wyoming residents who are members of the Delta Ignition Switch Defect Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

7460.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals,

the bankruptcy Sale Order's "free and clear" provisions do **not** apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

7461.   Old GM concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

7462.   Old GM sold Delta Ignition Switch Vehicles to Plaintiffs without disclosing the defects, and indeed took active steps to conceal the defects from regulators and consumers.

7463.   In order to conceal and suppress the defects from the owners and lessees of Delta Ignition Switch Vehicles, Old GM went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue.

7464.   Old GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Plaintiffs.

7465.   Old GM did so in order to falsely assure purchasers, lessees, and owners of Delta Ignition Switch Vehicles that vehicles they were purchasing, leasing or already owned were safe, and to avoid the cost and negative publicity of a recall.  The concealed information was material to consumers, both because it concerned the quality and safety of the Delta Ignition Switch Vehicles and because the information played a significant role in the value of the vehicles.

7466.   Old GM had a duty to disclose the defects in the Delta Ignition Switch Vehicles because they were known and/or accessible only to Old GM; Old GM had superior knowledge and access to the facts; and Old GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs.  Old GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in Old GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to Plaintiffs, Old

- 1685 -

GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, Old GM had

monitoring and disclosure duties under the TREAD Act, as alleged above.

7467.   Old GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost Old GM

money, and it did so at the expense of Plaintiffs.

7468.   Plaintiffs were unaware of these omitted material facts and would not have acted

as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased their Delta Ignition Switch Vehicles, or would have paid less for them.

Plaintiffs' actions were justified.  Old GM was in exclusive control of the material facts and such

facts were not known to the public, including Plaintiffs.

7469.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained

damage.  Plaintiffs who purchased or leased Old GM Delta Ignition Switch Vehicles did not get

the benefit of their bargain since the Defective Vehicles were worth less than they would have

been without the defects.  Had they been aware of the concealed defects that existed in their

Delta Ignition Switch Vehicles, Plaintiffs would have paid less for their vehicles or would not

have purchased or leased them at all, and Plaintiffs sustained repair damages.

7470.   Accordingly, based on the conduct of Old GM for which it has successor liability,

New GM is liable to Plaintiffs for damages in an amount to be proven at trial.

7471.   Old GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Old GM.  Old

GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such

conduct by New GM in the future, which amount is to be determined according to proof.

## COUNT VIII

## SUCCESSOR LIABILITY CLAIM FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (WYO. STAT. §§ 34.1-2-314)

7472.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

7473.   This claim is brought on behalf of Wyoming residents who are members of the Delta Ignition Switch Defect Magnuson-Moss and Implied Warranty Successor Liability Subclass (for the purposes of this Count, "Plaintiffs").

7474.   This claim is brought as a successor liability claim, wherein Plaintiffs are suing New GM for the conduct of Old GM.  Under the ruling of the Second Circuit Court of Appeals, the bankruptcy Sale Order's "free and clear" provisions do *not* apply to Plaintiffs, so they are free to assert this successor liability claim without impediment from the Sale Order.

7475.   Old GM was at all relevant times a merchant with respect to motor vehicles.

7476.   Under Wyoming law, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Old GM on or before July 9, 2009.

7477.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

7478.   New GM, as the successor to Old GM, was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

7479.   As a direct and proximate result of Old GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter a judgment against New GM and in favor of Plaintiffs and the Classes and Subclasses, and grant the following relief:

A.      Determine that this action may be maintained as a class action and certify it as such under Rule 23(b)(2), 23(b)(3), and/or 23(c)(4), or alternatively certify all issues and claims that are appropriately certified under Rule 23(c)(4); and designate and appoint Plaintiffs as Class Representatives and Plaintiffs' chosen counsel as Class Counsel;

B.      Declare, adjudge, and decree the conduct of New GM as alleged herein to be unlawful, unfair, and/or deceptive and otherwise in violation of law, enjoin any such future conduct, and issue an injunction under which the Court will monitor New GM's response to problems with the recalls and efforts to improve its safety processes, and will establish by Court decree and administration under Court supervision a program funded by New GM under which claims can be made and paid for Defective Vehicle owners and lessees' out-of-pocket expenses and costs;

C.      Award Plaintiffs and Class Members actual, compensatory damages or, in the alternative, statutory damages, as proven at trial;

D.      Award Plaintiffs and the Class Members exemplary damages in such amount as proven;

E.      Award damages and other remedies, including, but not limited to, statutory penalties, as allowed by any applicable law, such as the consumer laws of the various states;

F.      Award Plaintiffs and the Class Members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

G.      Award Plaintiffs and Class Members restitution and/or disgorgement of New GM's ill-gotten gains relating to the conduct described in this Complaint; and

H.      Award Plaintiffs and the Class Members such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

010440-11  983080 V1

DATED:  September 8, 2017        HAGENS BERMAN SOBOL SHAPIRO LLP

By: _____*/s/ Steve W. Berman*_____
    Steve W. Berman
*steve@hbsslaw.com*
Sean R. Matt
*sean@hbsslaw.com*
Andrew M. Volk
*andrew@hbsslaw.com*
Nick Styant-Browne
*nick@hbsslaw.com*
Jessica Thompson
*jessicat@hbsslaw.com*
Shelby Smith
*Shelby@hbsslaw.com*
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

DATED:  September 8, 2017        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By: _____*/s/ Elizabeth J. Cabraser*_____
    Elizabeth J. Cabraser
*ecabraser@lchb.com*
Steven E. Fineman
*sfineman@lchb.com*
Rachel Geman
*rgeman@lchb.com*
Annika K. Martin
*akmartin@lchb.com*
275 Battery St., 29th Floor
San Francisco, CA 94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

*Co-Lead Counsel with Primary Focus on Economic
Loss Cases*

010440-11  983080 V1

DATED:  September 8, 2017

HILLIARD MUÑOZ GONZALES L.L.P.

By: _____/s/ Robert Hilliard_____
    Robert Hilliard
*bobh@hmglawfirm.com*
719 S Shoreline Blvd, Suite #500
Corpus Christi, TX 78401
Telephone:  (361) 882-1612
Facsimile:  (361) 882-3015

*Co-Lead Counsel with Primary Focus on Personal
Injury Cases*

WEITZ & LUXENBERG, PC
Robin L. Greenwald
James J. Bilsborrow
700 Broadway
New York, NY 10003
Telephone:  (212) 558-5500

*Liaison Counsel*

BOIES, SCHILLER & FLEXNER LLP
David Boies
333 Main Street
Armonk, NY  10504
Telephone:  (914) 749-8200

COTCHETT, PITRE & MCCARTHY, LLP
Frank Pitre
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000

GRANT & EISENHOFER, P.A.
Adam J. Levitt
John Tangren
30 N. LaSalle Street, Suite 1200
Chicago, IL  60602
Telephone:  (312) 214-0000

MOTLEY RICE LLC
Joseph F. Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone:  (843) 216-9159

NAST LAW LLC
Dianne M. Nast
1101 Market St., Suite 2801
Philadelphia, PA 19107
Telephone:  (215) 923-9300

OTTERBOURG, STEINDLER, HOUSTON & ROSEN
Melanie Cyganowski
230 Park Avenue
New York, NY 10169-0075
Telephone:  (212) 661-9100

PODHURST ORSECK, P.A.
Peter Prieto
City National Bank Building
25 West Flagler Street, Suite 800
Miami, FL 33130
Telephone:  (305) 358-2800

ROBINSON CALCAGNIE ROBINSON
  SHAPIRO DAVIS, INC.
Mark P. Robinson, Jr.
19 Corporate Plaza
Newport Beach, CA 92660
Telephone:  (949) 720-1288

SUSMAN GODFREY, L.L.P.
Marc M. Seltzer
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067
Telephone:  (310) 789-3102

*Executive Committee*

BARRIOS, KINGSDORF & CASTEIX, LLP
Dawn M. Barrios
701 Poydras St., Suite 3650
New Orleans, LA 70139
Telephone:  (504) 524-3300

*Federal / State Liaison Counsel*

BARON & BUDD, PC
Mark Philip Pifko
Roland K. Tellis
15910 Ventura Boulevard
Encino Plaza, Suite 1600
Encino, CA  91436
Telephone:  818-839-2333

BARRETT LAW GROUP, PA
Don Barrett
404 Court Square
Lexington, MS 39095
Telephone:  662-834-2488

BEASLEY, ALLEN, CROW, METHVIN, PORTIS &
MILES, P.C.
W. Daniel "Dee" Miles
Jere L. Beasley
J. Cole Portis
D. Michael Andrews
Benjamin E. Baker
218 Commerce Street
Montgomery, AL  36104
Telephone:  (800) 898-2034

BLOCK & LEVITON, LLP
Joel A. Fleming
155 Federal Street, Suite 1303
Boston, MA 02110
Telephone:  617-398-5600

CARNEY BATES & PULLIAM, PLLC
David Slade
James Allen Carney, Jr.
Joseph Henry Bates, III
Randall Keith Pulliam
11311 Arcade Drive, Suite 200
Little Rock, AR 72212
Telephone:  501-312-8500

CLIFFORD LAW OFFICES
Robert A. Clifford
Shannon M. McNulty
Kristofer S. Riddle
120 N. LaSalle, Suite 3100
Chicago, IL 60602
Telephone:  312-899-9090

CUNEO GILBERT & LADUCA LLP
Jonathan W. Cuneo
Pamela Gilbert
507 C Street NE
Washington, DC 20002
Telephone:  202-789-3960

EDWARD L. WHITE, PC
Edward L. White
853 E. 33rd Street
Edmond, OK  73013
Telephone:  405-810-8188

FINKELSTEIN BLANKINSHIP FREI-PEARSON &
GARBER
Douglas Gregory Blankinship
1311 Mamaroneck Avenue, Suite 220
White Plains, NY 10605
Telephone:  914-298-3281

GRAY RITTER & GRAHAM
Don M. Downing
701 Market Street, Suite 800
St. Louis, MO  63101
Telephone:  314-241-5620

HAZZARD LAW, LLC
Brent Hazzard
P.O. Box 24382
Jackson, MS 39225
Telephone:  601-977-5253

LACKEY HERSHMAN, LLP
Roger L. Mandel
3102 Oak Lawn Avenue, Suite 777
Dallas, TX  75219
Telephone:  214-560-2238

010440-11  983080 V1

STUEVE SIEGEL HANSON, LLP
Patrick J. Stueve
Todd E. Hilton
Bradley T. Wilders
460 Nichols Road, Suite 200
Kansas City, MO  64112
Telephone:  816-714-7100

STUEVE SIEGEL HANSON, LLP
Jason S. Hartley
Jason M. Lindner
550 W. C Street, Suite 1750
San Diego, CA 92101
Telephone:  619-400-5822

*Counsel to Certain Plaintiffs*

- 1695 -

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorneys of record for each other party through the Court's electronic filing service on September 8, 2017, which will send notification of such filing to the e-mail addresses registered.


*s/ Steve W. Berman*
Steve W. Berman

010440-11  983080 V1