# Exhibit 1

HIGHLY CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
 4   ------------------------------------X
      IN RE:                             )
 5                                       ) 14-MD-2543 (JMF)
         GENERAL MOTORS LLC IGNITION     )
 6            SWITCH LITIGATION          )
                                         )
 7   ------------------------------------X
 8                    December 7, 2017
 9                       8:41 a.m.
10
11       ** H I G H L Y   C O N F I D E N T I A L **
12
13        VIDEOTAPED DEPOSITION OF STEVEN PAUL LOUDON,
14   an expert witness herein, taken by Defendant, held at
15   the offices of Hagens Berman Sobol Shapiro LLP,
16   1918 8th Avenue, Suite 3300, Seattle, Washington,
17   pursuant to Notice, before Mayleen Ahmed, a
18   Registered Merit Reporter, Certified Realtime
19   Reporter, Certified Realtime Captioner, Certified
20   Court Reporter in and for the State of Washington,
21   and Notary Public in and for the State of New York.
22
23
24
25   JOB NO. 2764961
```

1    Q.    Have you ever reviewed the expert reports
2    of Dr. Stevick that have been submitted relating to
3    the ignition switch matter?
4    A.    Some of the older reports, but I haven't
5    seen the report in this matter.
6    Q.    And you understand that Dr. Stevick
7    provides certain opinions as it relates to SDM
8    prolongation?
9    A.    I understand that, yes.
10   Q.    And it's correct that you also offer
11   opinions related to SDM prolongation, correct?
12   A.    Yes.
13   Q.    Is there a distinction between the opinions
14   that Dr. Stevick is offering and the opinions that
15   you are offering as it relates to SDM prolongation?
16   A.    There may be some differences in -- in--
17   between the recommended fixes within the system.
18   Q.    Okay.  And can you articulate what are
19   those differences as far as the recommended features
20   of SDM prolongation?
21   A.    Not entirely.  I -- I would have to review
22   his -- his opinions again.  It's been a while since
23   I've done that.  I know what mine are.
24   Q.    Is it correct to say that Dr. Stevick also
25   has the opinion that GM vehicles should implement SDM

HIGHLY CONFIDENTIAL

Page 76

1  effects of the loss of ignition.
2      Q.   Is -- has the recall remedy that GM
3  implemented in 2014 for the Delta ignition switch
4  vehicles effectively addressed the issue of
5  inadvertent key rotation?
6      A.   I was not asked to -- to investigate that
7  specifically, so I can't answer the degree to which
8  it was effective.
9      Q.   Is it correct that you have not analyzed
10 whether the recall remedy implemented in 2014 for the
11 Delta ignition switch vehicles effectively addresses
12 inadvertent key rotation?
13     A.   I have not specifically looked at that, but
14 I know that, you know, when you make a change like
15 this, it will require some time to understand
16 statistically whether it is an effective solution.
17 And in order to -- in order to ensure that, that you
18 attempt to mitigate the -- the bad effects of a loss
19 of ignition, an SDM prolongation would have certainly
20 been a very effective solution at further reducing
21 the -- the effects that a loss of ignition would
22 have.
23     Q.   To be clear, you have not specifically
24 looked at the issue of whether the recall remedy
25 implemented in 2014 effectively addresses inadvertent

Page 77

1    key rotation, correct?
2        A.    I was not asked to look at that.
3        Q.    Have you conducted -- well, strike that.
4              Have you evaluated the testing that GM
5    conducted in 2014 to evaluate the recall remedy for
6    inadvertent key rotation?
7        A.    I -- I looked at that material.  But,
8    again, I was not asked to opine specifically on
9    the -- on that matter.
10       Q.    Have you formed any opinions as to the
11   testing that GM conducted in 2014 to evaluate the
12   recall remedy for inadvertent key rotation?
13       A.    I -- I was not asked to look at that, so I
14   have nothing, no opinions specifically --
15       Q.    You're --
16       A.    -- on that matter.
17       Q.    -- aware that GM conducted testing in 2014
18   to validate the recall remedy for the issue of
19   inadvertent key rotation, correct?
20       A.    I'm aware that they did some level of
21   testing, yes.
22       Q.    As you sit here today, do you have any
23   criticism with respect to the testing that GM
24   conducted in 2014 to evaluate the recall remedy for
25   inadvertent key rotation?

Page 80

1   the inadvertent key rotation has been addressed,
2   correct?
3       A.   Yes.  I think given that, you know, they --
4   they had designed this defectively.  Certainly
5   providing a -- multiple redundant solutions to fix
6   the problem, I think, is -- is appropriate.
7       Q.   Now, you agree what the concept of SDM
8   prolongation does not address the issue of
9   inadvertent key rotation, correct?
10      A.   Yes.  I understand that.
11      Q.   And you'd agree that it is addressing a
12  different defective condition, correct?
13           MR. MATT:  Object to form.
14      A.   It's addressing the effect of a loss of
15  ignition which an inadvertent key rotation causes.
16      Q.   If a vehicle is not susceptible to
17  inadvertent key rotation, would that vehicle still
18  need SDM prolongation implemented?
19      A.   I would have to review that scenario in
20  more detail to -- to be able to answer it.  But, yes,
21  possibly.
22      Q.   Are you aware of -- well, strike that.
23           Other automotive manufacturers have
24  vehicles with steering column-mounted ignition
25  systems, correct?

Page 97

1    Q.   But based on where you are today, that's
2  not something that you are prepared or have conducted
3  enough research to offer; is that right?
4    A.   I have not formed opinions, as documented
5  in my report, on those things.
6    Q.   Now, with respect to the Impala key
7  rotation recall, have you conducted any review of
8  field performance data to assess the effectiveness of
9  the recall remedy that was implemented?
10   A.   I don't recall specifically doing that, no.
11   Q.   Have you conducted any testing or
12 engineering analysis to assess the effectiveness of
13 the recall remedy that was implemented for the Impala
14 key rotation recall?
15   A.   I was not asked to do that, so, no, I don't
16 have any specific.
17   Q.   Now, the Impala key rotation recall, that
18 involves different vehicles and different vehicle
19 platforms from the Delta ignition switch recall,
20 correct?
21   A.   Yes, they're different vehicles.
22   Q.   And you understand that there is a
23 different ignition switch that was used with respect
24 to the vehicles subject to the Impala key rotation
25 recall from the vehicles that were subject to the

1     Q.    And you understand that the remedy that GM
2    supplied for the Cadillac key rotation recall was
3    directed towards addressing the issue of inadvertent
4    key rotation that was described in the defective
5    condition paragraph, correct?
6     A.    That was the intention of it, yes.
7     Q.    And similar to the Impala key rotation
8    recall, is it correct that you are not offering any
9    opinion as to the effectiveness of the recall remedy
10   to address the issue of inadvertent key rotation?
11    A.    I am not providing specific opinions on
12   that.
13    Q.    And you have conducted no testing or
14   scientific analysis to assess the effectiveness of
15   the recall remedy to address inadvertent key rotation
16   for the Cadillac key rotation recall, correct?
17    A.    I was not asked to do that, so, no, I have
18   not done that.
19    Q.    And you have not evaluated -- well, strike
20   that.
21          Have you evaluated the testing that GM
22   conducted in 2014 to assess the effectiveness of the
23   recall remedy for the Cadillac key rotation recall?
24    A.    I have reviewed what material has been
25   given to me.  I don't recall whether that was

HIGHLY CONFIDENTIAL

Page 131

1  Q. You're aware that this 573 letter was
2  submitted to NTHSA, correct?
3  A. Yes.
4  Q. Are you aware of any criticism or concern
5  that NTHSA raised with respect to the description of
6  the defect in this paragraph?
7  A. No.
8  Q. If you go to the bottom of the page,
9  there's a paragraph 573.6(c)(8). Do you see that?
10 A. Yes.
11 Q. And it describes the recall remedy that GM
12 implemented for the -- for this recall 14V-400,
13 correct?
14 A. Yes.
15 Q. And it identifies that dealers are to
16 install two key rings and key cover on all ignition
17 keys, correct?
18 A. That's what it says, yes.
19 Q. And you understand that remedy was
20 implemented to address the issue of inadvertent key
21 rotation that is described in the 573 letter,
22 correct?
23 A. That was what it was intended to resolve, yes.
24 Q. And have you formed any opinion as to
25 whether the recall remedy that GM provided here and

Page 132

1  implemented for Recall No. 14V-400 was effective to
2  address the defective condition of inadvertent key
3  rotation?
4      A.    I was not asked to specifically look at
5  that, so no.
6      Q.    Have you conducted any testing or analysis
7  to evaluate whether the recall remedy that was
8  implemented for 14V-400 was effective for addressing
9  inadvertent key rotation?
10     A.    No, I wasn't asked to do that.
11     Q.    Is the opinion that you have as it relates
12 to the vehicles subject to 14V-400, that those
13 vehicles are defective because they have not
14 implemented SDM prolongation?
15     A.    Yes, I would say they fall under the same
16 classification.
17     Q.    And your opinion that those vehicles are
18 defective is the case regardless of whether the
19 recall remedy that is implemented effectively
20 addresses inadvertent key rotation?
21     A.    Yes.
22     Q.    Are you aware of the SDM that is used with
23 the various vehicles that are subject to Recall
24 No. 14V-400?
25     A.    I -- I did look at that.  I don't recall

HIGHLY CONFIDENTIAL

Page 142

CERTIFICATE

STATE OF WASHINGTON )
                    ) ss.
COUNTY OF KING      )

       I, MAYLEEN AHMED, a Registered Merit Reporter, Certified Realtime Reporter and Washington Certified Court Reporter, do hereby certify that the foregoing deposition of STEVEN PAUL LOUDON was taken stenographically before me on December 7, 2017 and transcribed by me, or under my direction.

       That the witness was duly sworn by me pursuant to RCW 5.28.010 to testify, and that such deposition is a true record of the testimony given by such witness.

       I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

       IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of December 2017.

*Mayleen Ahmed*

------------------------------------

MAYLEEN AHMED, RMR, CRR, WA CCR No. 3402