UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>GENERAL MOTORS LLC IGNITION<br>SWITCH LITIGATION<br><br><br>This Document Relates to:<br><br>ALL ACTIONS | No. 14-MD-2543 (JMF)<br>No. 14-MC-2543 (JMF)<br><br>Hon. Jessee M. Furman |

**PLAINTIFFS' OPPOSITION TO GENERAL MOTORS LLC'S MOTION FOR
SUMMARY JUDGMENT AGAINST THE BELLWETHER
<u>ECONOMIC LOSS PLAINTIFFS</u>**

**[REDACTED VERSION]**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    RELEVANT FACTS ............................................................................................4

A.     GM has not fixed the ignition switch defects. ....................................................4

1.     All vehicles subject to Recall No. 14v047 are defective, and GM has not
       cured the defects. .......................................................................................4

       a.     All vehicles subject to Recall No. 14v047, including the Service Part
              Vehicles, were sold with defective ignition switches. ..................................4

              (1)     The first "wave" 14v047 recalled vehicles
                      manufactured with the 423 Delta switch had defective
                      switches.............................................................................................5

              (2)     The second "wave" 14v047 recalled vehicles (Service
                      Part Vehicles) manufactured with the 190 Delta switch
                      had defective switches. ......................................................................6

       b.     All vehicles subject to Recall No. 14v047 are still defective. ....................8

              (1)     The 14v047 vehicles still have a knee-key defect due
                      to the low placement of the switch on the steering
                      column.................................................................................................8

              (2)     The 14v047 vehicles also suffer from a single-point-
                      of-failure defect...............................................................................10

2.     GM has not cured the ignition switch defects in the vehicles subject to
       Recall Nos. 14v355, 14v394, and 14v400. ...........................................13

       a.     The switches in the vehicles subject to Recall Nos. 14v355, 14v394,
              and 14v400 are defective because they have low torque.........................13

       b.     The switches in the vehicles subject to Recall Nos. 14v355 and
              14v394 are also defective because they still have a knee-to-key defect,
              and all vehicles subject to Recall Nos. 14v355, 14v394, and 14v400
              have a single-point-of-failure defect.......................................................16

3.     All vehicles subject to Recall No. 14v346 still have a knee-to-key defect...........17

B.     GM knew about the defects at issue from day one of its existence. ................17

C.    Plaintiffs were harmed at the point of sale in a quantifiable amount, and many suffered additional injury in the form of lost time. ........................................... 19

     1.    Plaintiffs' point-of-sale damages model. ............................................... 20

     2.    Plaintiffs' lost time damages model. ..................................................... 21

III.    ARGUMENT ....................................................................................................... 21

A.    GM's deceptive and fraudulent conduct caused Plaintiffs to suffer legally cognizable harm. .................................................................................................. 22

     1.    Plaintiffs were deprived of the benefit of their bargain because they did not bargain for cars with known safety defects. ........................................ 22

         a.    The undisclosed defects created damage at the time of sale, even for cars that were later repaired. ............................................. 25

             (1)    California law calculates benefit-of-the-bargain damages as of the time of sale, and not at any later time. ................................................................................ 27

             (2)    Missouri law also calculates benefit-of-the-bargain damages as of the time of sale, and not at any later time. ................................................................................ 30

             (3)    Texas law also calculates benefit-of-the-bargain damages as of the time of sale and not at any later time. ................................................................................ 32

         b.    Plaintiffs' damage model fairly accounts for GM's belated recalls. ......... 32

     2.    Plaintiffs' vehicles remain defective. ................................................... 33

         a.    GM has not repaired the vehicles. ............................................. 33

         b.    Plaintiffs' evidence of un-remedied defects is admissible. ........................ 34

     3.    Plaintiffs' evidence properly quantifies their benefit-of-the-bargain damages and precludes summary judgment. ......................................... 34

     4.    Plaintiffs who disposed of their vehicles before the recalls suffered compensable benefit-of-the-bargain damages at the point of sale. ...................... 37

     5.    Recent precedent applying Missouri law confirms manifestation is not required for a Missouri implied warranty claim. ................................... 38

B.    Plaintiffs can recover consequential damages in the form of lost time. ........................... 40

1.  California does not require a showing of lost wages. ..............................................41

2.  Missouri permits lost time damages. ...................................................................43

3.  Texas does not require a showing of lost wages....................................................43

C.  Plaintiffs with Service Part Vehicles have viable claims because those vehicles are defective. .........................................................................................................44

D.  Plaintiffs who acquired used Old GM vehicles after GM's inception have valid claims against GM given GM's breaches of its uncontested duty to recall Old GM cars with safety defects and GM's strong relationship with the defective cars..........46

1.  Because GM had a strong relationship with the Used-Car Purchasers' vehicles, California law provides a remedy for the economic losses caused by GM's failure to disclose the safety defects in the vehicles...................................47

2.  Missouri law also provides a remedy for the Used-Car Purchaser's economic losses caused by GM's failure to disclose the safety defects in vehicles. .............49

3.  Texas law also provides a remedy for the Used-Car Purchaser's economic losses caused by GM's failure to disclose the safety defects in vehicles. .............52

4.  The Used-Car Purchasers conferred benefits upon GM sufficient to make out unjust enrichment..........................................................................................55

E.  Plaintiffs satisfy applicable reliance requirements. ..........................................................55

F.  GM's material omissions violated California, Missouri, and Texas law..........................59

G.  Plaintiffs have valid implied warranty claims. ..................................................................60

H.  Plaintiffs have valid unjust enrichment claims. ................................................................63

I.  GM has not "mitigated" its unconscionable conduct under Texas law. ...........................65

J.  Plaintiffs state claims against GM for fraudulent concealment of the right to file bankruptcy claims because, but for GM's concealment of the Delta Ignition Switch Defect, Plaintiffs' claims would have been timely asserted in the Bankruptcy Court while the GUC Trust still had assets..................................................................................66

K.  Plaintiffs are entitled to injunctive relief. ........................................................................70

IV.  CONCLUSION....................................................................................................................75

010440-11 1054543 V1

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Agliori v. Metro. Life Ins. Co.*,
   879 A.2d 315 (Pa. Super. Ct. 2005) ...................................................................26

*Aguilar v. GM, LLC*,
   2013 WL 5670888 (E.D. Cal. Oct. 13, 2013) .........................................................63

*Allen v. JPMorgan Chase Bank, N.A.*,
   2012 WL 12865210 (N.D. Tex. July 6, 2012) ........................................................44

*Amstadt v. U.S. Brass Corp.*,
   919 S.W.2d 644 (Tex. 1996) ..............................................................................53, 66

*Anderson v. Ford Motor Co.*,
   2017 WL 6733972 (W.D. Mo. Dec. 29, 2017) .......................................................51

*In re Anthem, Inc. Data Breach Litig.*,
   162 F. Supp. 3d 953 (N.D. Cal. 2016) ...................................................................41

*In re Anthem, Inc. Data Breach Litig.*,
   2016 WL 3029783 (N.D. Cal. May 27, 2016) ........................................................41

*Apodaca v. Whirlpool Corp.*,
   2013 U.S. Dist. LEXIS 176363 (C.D. Cal. Nov. 8, 2013) .....................................56

*Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*,
   844 F.2d 1174 (5th Cir. 1988) .............................................................................62

*Arthur Andersen & Co. v. Perry Equip. Corp.*,
   945 S.W.2d 812 (Tex. 1997) ................................................................................32

*Auffenberg v. Hafley*,
   457 S.W.2d 929 (Mo. Ct. App. 1970) ...................................................................31

*Balestriere PLLC v. CMA Trading, Inc.*,
   2014 WL 929813 (S.D.N.Y. Mar 7, 2014) ............................................................38

*Beck v. Test Masters Educ. Servs. Inc.*,
   994 F. Supp. 2d 98 (D.D.C. 2014) ........................................................................72

*BPP Wealth, Inc. v. Weiser Capital Mgmt., LLC*,
   623 F. App'x 7 (2d Cir 2015) ...............................................................................35

*Bradford v. Vento*,
   48 S.W.3d 749 (Tex. 2001)................................................................................65

*Cameron v. Terrell & Garrett, Inc.*,
   618 S.W.2d 535 (Tex. 1981)..............................................................................53

*In re Carrier IQ, Inc. Consumer Privacy Litig.*,
   78 F. Supp. 3d 1051 (N.D. Cal. 2015) ...............................................................57

*Carriuolo v. GM Co.*,
   823 F.3d 977 (11th Cir. 2016) ...........................................................................25

*Cel-Tech Commcn's, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) .......................................................................................48

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...........................................................................................21

*Chamberlan v. Ford Motor Co.*,
   369 F. Supp. 2d 1138 (N.D. Cal. 2005) .............................................................48

*Cholakyan v. Mercedes-Benz USA, LLC*,
   796 F. Supp. 2d 1220 (C.D. Cal. 2011) .............................................................63

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices, & Prods. Liab.
   Litig.*,
   295 F. Supp. 3d 927 (N.D. Cal. 2018) ..........................................................57, 58

*Clayworth v. Pfizer*,
   233 P.3d 1066 (Cal. 2010) .................................................................................30

*Colgan v. Leatherman Tool Grp., Inc.*,
   135 Cal. App. 4th 663 (2006) ........................................................................29, 30

*Collins v. eMachines, Inc.*,
   134 Cal. Rptr. 3d 598 (Cal. Ct. App. 2011) .......................................................47

*Columbia Pictures Corp. v. De Toth*,
   197 P.2d 580 (Cal. Ct. App. 1948) ....................................................................18

*Conmar Prods. Corp. v. Univ. Slide Fastener Co.*,
   172 F.2d 150 (2d Cir. 1949)...............................................................................18

*Conway v. CitiMortgage, Inc.*,
   438 S.W.3d 410 (Mo. 2014) ..........................................................................50, 52

*Corona v. Sony Pictures Entm't, Inc.*,
   2015 WL 3916744 (C.D. Cal. June 15, 2015) ...................................................41

010440-11 1054543 V1

*Cortez v. State Farm Mut. Auto. Ins. Co.*,
  2006 WL 8435999 (W.D. Tex. Oct. 25, 2006) ....................................................................62

*Crawford v. Whittaker Constr., Inc.*,
  772 S.W.2d 819 (Mo. Ct. App. 1989).................................................................................31

*Crewse v. Shelter Mut. Ins. Co.*,
  706 S.W.2d 35 (Mo. Ct. App. 1985)...................................................................................69

*Cruz v. PacifiCare Health Sys., Inc.*,
  66 P.3d 1157 (2003)...........................................................................................................74

*Daniel v. Ford Motor Co.*,
  806 F.3d 1217 (9th Cir. 2015) .....................................................................................56, 57

*Daugherty v. Jacobs*,
  187 S.W.3d 607 (Tex. Ct. App. 2006) ...............................................................................65

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018) .............................................................................................27

*De Armon v. City of St. Louis*,
  525 S.W.2d 795 (Mo. Ct. App. 1975).................................................................................31

*DePeralta v. Dlorah, Inc.*,
  2012 WL 4092191 (W.D. Mo. Sept. 17, 2012) ..................................................................49

*Doe v. Boys Clubs*,
  907 S.W.2d 472 (Tex. 1995)...............................................................................................53

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*,
  2017 WL 3863866 (W.D. Mo. Aug. 3, 2017)......................................................................64

*In re Duramax Diesel Litig.*,
  298 F. Supp. 3d 1037 (E.D. Mich. 2018)............................................................................60

*Engalla v. Permanente Med. Grp.*,
  15 Cal. 4th 951 (1997) ..................................................................................................56, 69

*Eveready Heating & Sheet Metal, Inc. v. D. H. Overmyer, Inc.*,
  476 S.W.2d 153 (Mo. Ct. App. 1972).................................................................................18

*Falk v. GMC*,
  496 F. Supp. 2d 1088 (N.D. Cal. 2007)..............................................................................56

*Faltermeier v. FCA US LLC*,
  2016 WL 4771100 (W.D. Mo. Sept. 13, 2006) ..................................................................51

*Faltermeier v. FCA US LLC*,
2017 WL 1128467 (W.D. Mo. Mar. 24, 2017), *aff'd*, 899 F.3d 617 (8th Cir.
2018) ................................................................................................................................51

*Farmers & Merchs. State Bank of Krum v. Ferguson*,
617 S.W.2d 918 (Tex. 1981)............................................................................................43

*Fazio v. Cypress/GR Houston I, L.P.*,
403 S.W.3d 390 (Tex. Ct. App. 2013) ............................................................................32

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
2017 WL 1382297 (E.D. Mich. Apr. 18, 2017)...............................................................74

*Flenniken v. Longview Bank & Tr. Co.*,
661 S.W.2d 705 (Tex. 1983)............................................................................................53

*Flora v. Amega Mobile Home Sales, Inc.*,
958 S.W.2d 322 (Mo. Ct. App. 1998)..............................................................................31

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*,
2012 WL 379944 (D.N.J. Feb. 6, 2012) ..........................................................................59

*Fulford v. Logitech*,
2009 WL 837639 (N.D. Cal. Mar. 26, 2009)...................................................................49

*Giannullo v. City of N.Y.*,
322 F.3d 139 (2d Cir. 2003).............................................................................................22

*Gibbons v. J. Nuckolls, Inc.*,
216 S.W.3d 667 (Mo. 2007) ............................................................................................50

*In re GM LLC Ignition Switch Litig.*,
154 F. Supp. 3d 30 (S.D.N.Y. 2015)..........................................................................46, 48

*In re GM LLC Ignition Switch Litig.*,
2016 WL 3920353 (S.D.N.Y. July 15, 2016) ........................................................ *passim*

*In re GM LLC Ignition Switch Litig.*,
2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017) .................................................................. 37

*In re GM LLC Ignition Switch Litig.*,
2018 WL 1638096 (S.D.N.Y. Apr. 3, 2018)..............................................23, 29, 32, 33

*In re GM LLC Ignition Switch Litig.*,
202 F. Supp. 3d 362 (S.D.N.Y. 2016)..........................................................................46, 52

*In re GM LLC Ignition Switch Litig.*,
257 F. Supp. 3d 372 (S.D.N.Y. 2017)..................................................25, 32, 33, 60

*In re GMC Anti-Lock Brake Prods. Liab. Litig.*,
  966 F. Supp. 1525 (E.D. Mo. 1997)...................................................63

*GMC v. Brewer*,
  966 S.W.2d 56 (Tex. 1998)...........................................................63

*Gonzales v. CarMax Auto Superstores, LLC*,
  845 F.3d 916 (9th Cir. 2017) .......................................................75

*Great Am. Mortg. Inv'rs v. Louisville Title Ins. Co.*,
  597 S.W.2d 425 (Tex. Civ. App. 1980) ...........................................18

*Haas Automation, Inc. v. Denny*,
  2014 WL 2966989 (C.D. Cal. July 1, 2014)................................70, 71

*Heberer v. Shell Oil Co.*,
  744 S.W.2d 441 (Mo. 1988) (*en banc*) .........................................30

*Henry S. Miller Co. v. Bynum*,
  836 S.W.2d 160 (Tex. 1992)........................................................32

*Hess v. Chase Manhattan Bank, USA, N.A.*,
  220 S.W.3d 758 (Mo. 2007) ........................................................58

*Hoffman v. 162 N. Wolfe LLC*,
  228 Cal. App. 4th 1178 (2014) ....................................................49

*Home Sav. Ass'n v. Guerra*,
  733 S.W.2d 134 (Tex. 1987)....................................................53, 54

*Hope v. Nissan N. Am., Inc.*,
  353 S.W.3d 68 (Mo. Ct. App. 2011)..............................................38

*Howard v. Turnbull*,
  258 S.W.3d 73 (Mo. Ct. App. 2008)..............................................64

*Hunter v. SMS, Inc.*,
  843 F.2d 1391 (6th Cir. 1988) .....................................................26

*Int'l Bhd. of Elec. Workers, AFL-CIO, Local Union No. 3 v. Charter Commc'ns,
  Inc.*,
  277 F. Supp. 3d 356 (E.D.N.Y. 2017) ...........................................73

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liab.
  Litig.*,
  2018 WL 4292359 (3d Cir. Sept. 6, 2018) ...............................26, 27

010440-11 1054543 V1

*Johnson v. Nissan N. Am., Inc.*,
  272 F. Supp. 3d 1168 (N.D. Cal. 2017) ...............................................48, 49

*Keegan v. Am. Honda Motor Co.*,
  838 F. Supp. 2d 929 (C.D. Cal. 2012) ..................................................62, 63

*Kwikset Corp. v. Superior Court*,
  246 P.3d 877 (Cal. 2011) ...................................................................... 47

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011) ..........................................................................29, 30

*Larabee v. Eichler*,
  271 S.W.3d 542 (Mo. 2008) ..................................................................31, 36

*Lawson v. Town & Country Shops, Inc.*,
  323 P.2d 843 (Cal. Ct. App. 1958) .......................................................42

*In re Lenovo Adware Litig.*,
  2016 WL 6277245 (N.D. Cal. Oct. 27, 2016)......................................28, 36

*Ligon v. City of New York*,
  925 F. Supp. 2d 478 (S.D.N.Y. 2013)..................................................73

*LiMandri v. Judkins*,
  60 Cal. Rptr. 2d 539 (Cal. Ct. App. 1997)...........................................49

*Lindemann v. Eli Lilly & Co.*,
  816 F.2d 199 (5th Cir. 1987) ................................................................61

*Mabry v. Hester*,
  2014 WL 1848739 (S.D.N.Y. May 8, 2014) .......................................22

*Marshall v. Kusch*,
  84 S.W.3d 781 (Tex. Ct. App. 2002) ...................................................54, 55

*McAdams v. Monier, Inc.*,
  105 Cal. Rptr. 3d 704 (Cal. Ct. App. 2010) ........................................48

*McLeod v. Gyr*,
  439 S.W.3d 639 (Tex. Ct. App. 2014) .................................................53

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
  500 F.3d 171 (2d Cir. 2007)..................................................................26

*Meyer v. Sprint Spectrum L.P.*,
  200 P.3d 295 (Cal. 2009) ......................................................................42, 75

010440-11 1054543 V1

*Miller v. Higgins*,
    452 S.W.2d 121 (Mo. 1970) ........................................................................31

*Miller v. Keyser*,
    90 S.W.3d 712 (Tex. 2002) .........................................................................54

*Millers Cas. Ins. Co. of Tex. v. Lyons*,
    798 S.W.2d 339 (Tex. Ct. App. 1990) ........................................................36

*In re Motors Liquidation Co.*,
    2018 WL 2416567 (S.D.N.Y. May 29, 2018) ......................................66, 68

*In re Motors Liquidation Co.*,
    529 B.R. 510 (Bankr. S.D.N.Y. 2015)...........................................17, 18, 67

*In re Motors Liquidation Co.*,
    829 F.3d 135 (2d Cir. 2016).................................................................46, 67

*Mui Ho v. Toyota Motor Corp.*,
    931 F. Supp. 2d 987 (N.D. Cal. 2013) ........................................................56

*In re Myford Touch Consumer Litig.*,
    2016 WL 6873453 (N.D. Cal. Nov. 22, 2016) ............................................57

*In re Myford Touch Consumer Litig.*,
    2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) ...........................................29

*Myre v. Meletio*,
    307 S.W.3d 839 (Tex. Ct. App. 2010) ........................................................54

*Nagy v. Nagy*,
    258 Cal. Rptr. 787 (Cal. Ct. App. 1989) .....................................................42

*State ex rel. Nixon v. Estes*,
    108 S.W.3d 795 (Mo. Ct. App. 2003).........................................................50

*Norhill Energy LLC v. McDaniel*,
    517 S.W.3d 910 (Tex. Ct. App. 2017) ........................................................64

*Oldham's Farm Sausage Co. v. Salco, Inc.*,
    633 S.W.2d 177 (Mo. Ct. App. 1982)..........................................................61

*Owen v. GMC*,
    533 F.3d 913 (8th Cir. 2008) ......................................................................62

*Owino v. CoreCivic, Inc.*,
    2018 WL 2193644 (S.D. Cal. May 14, 2018).............................................64

*Packard Mfg. Co. v. Indiana Lumbermens Mut. Ins. Co.*,
203 S.W.2d 415 (Mo. 1947) ...................................................................18

*Patterson Oil Co. v. VeriFone, Inc.*,
2015 WL 6149594 (W.D. Mo. Oct. 19, 2015) ....................................61, 62

*Patterson v. McMickle*,
191 S.W.3d 819 (Tex. Ct. App. 2006) ....................................................59

*Peel v. Credit Acceptance Corp.*,
408 S.W.3d 191 (Mo. Ct. App. 2013) .....................................................50

*People v. JTH Tax, Inc.*,
151 Cal. Rptr. 3d 728 (Cal. Ct. App. 2013) ...........................................70

*Perales v. Bank of Am., N.A.*,
2014 WL 3907793 (S.D. Tex. Aug. 11, 2014) .......................................64

*Persh v. Peterson*,
2016 WL 4766338 (S.D.N.Y. Sept. 13, 2016) .......................................35

*Pulaski & Middleman, LLC v. Google, Inc.*,
802 F.3d 979 (9th Cir. 2015) .................................................27, 28, 36

*Rhey v. Redic*,
408 S.W.3d 440 (Tex. Ct. App. 2013) ....................................................44

*Rogozienski v. Allen*,
2007 WL 867773 (Cal. Ct. App. Mar. 23, 2007) ....................................49

*Rupp v. Summerfield*,
326 P.2d 912 (Cal. Ct. App. 1958) .........................................................41

*Russo v. Hilltop Lincoln-Mercury, Inc.*,
479 S.W.2d 211 (Mo. Ct. App. 1972) .....................................................61

*Sanchez v. Guerrero*,
885 S.W.2d 487 (Tex. Ct. App. 1994) ....................................................65

*SEC v. Saltsman*,
2016 WL 4136829 (E.D.N.Y. 2016 Aug. 2, 2016) .................................71

*Serv. Corp. Int'l v. Aragon*,
268 S.W.3d 112 (Tex. Ct. App. 2008) ....................................................65

*Seven Elves, Inc. v. Eskenazi*,
704 F.2d 241 (5th Cir. 1983) .................................................................18

*Seymour v. House*,
305 S.W.2d 1 (Mo. 1957) ....................................................................................43

*Sherlock v. Quality Control Equip. Co.*,
79 F.3d 731 (8th Cir. 1996) .............................................................................52

*St. Bethel Missionary Baptist Church, Inc., v. St. Louis Builders, Inc.*,
388 S.W.2d 776 (Mo. 1965) .............................................................................75

*St. Pierre v. Dyer*,
208 F.3d 394 (2d Cir. 2000)......................................................................21, 22

*Star Indem. & Liab. Co. v. Cont'l Cement Co., LLC*,
2013 WL 1442456 (E.D. Mo. Apr. 9, 2013)...............................................58, 69

*State Farm Lloyds v. Nicolau*,
951 S.W.2d 444 (Tex. 1997)...........................................................................66

*Steele v. Goddard*,
2013 WL 3013671 (Tex. Ct. App. June 13, 2013) ...........................................54

*Stewart v. Electrolux Home Prods., Inc.*,
304 F. Supp. 3d 894 (E.D. Cal. 2018).............................................................63

*Stout v. Turney*,
586 P.2d 1228 (Cal. 1978) ..............................................................................42

*Sud v. Costco Whoesale Corp.*,
229 F. Supp. 3d 1075 (N.D. Cal. 2017) ..........................................................58

*In re Takata Airbag Prods. Liab. Litig.*,
2017 WL 5706147 (S.D. Fla. Nov. 1, 2017).....................................................74

*Terry v. Mercedes-Benz, USA, LLC*,
2007 WL 2045231 (Tex. Ct. App. 2007)..........................................................54

*Tershakovec v. Ford Motor Co.*,
2018 WL 3405245 (S.D. Fla. July 12, 2018)....................................................38

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prod. Liab.
Litig.*,
288 F.R.D. 445 (C.D. Cal. 2013) .....................................................................29

*In re Toyota Motor Corp. Unintended Acceleration Mktg.*,
2012 U.S. Dist. LEXIS 189744 (C.D. Cal. May 4, 2012) ..................................48

*Trinity Prods. Inc. v. Burgess Steel, L.L.C.*,
486 F.3d 325 (8th Cir. 2007) .....................................................................60, 61

010440-11 1054543 V1

*U.S. v. GMC,*
    574 F. Supp. 1047 (D.D.C. 1983) .......................................................................47

*In re Usery,*
    123 F.3d 1089 (8th Cir. 1997) ..........................................................................31

*Vaguely Qualified Prods. LLC v. Metro. Transp. Auth.,*
    2015 WL 5916699 (S.D.N.Y. Oct. 7, 2015) .......................................................71

*In re Vizio, Inc. Consumer Privacy Litig.,*
    238 F. Supp. 3d 1204 (C.D. Cal. 2017) .............................................................64

*Waller v. Hewlett-Packard Co.,*
    295 F.R.D. 472 (S.D. Cal. 2013) ......................................................................29

*White v. Bowman,*
    304 S.W.3d 141 (Mo. Ct. App. 2009) ...............................................................51

*Wilson v. John Daugherty Realtors, Inc.,*
    981 S.W.2d 723 (Tex. Ct. App. 1998) ..............................................................55

*Woodling v. Garrett Corp.,*
    813 F.2d 543 (2d Cir. 1987) .............................................................................56

## STATUTES

15 U.S.C. § 2304(a)(4) ...........................................................................................75

49 U.S.C. §§ 30101-30170 .....................................................................................47

49 U.S.C. § 30102(a)(8) ..........................................................................................47

CAL. BUS. CODE § 1780(a)(4) ................................................................................30

CAL. CIV. CODE § 2332 ...........................................................................................17

MO. REV. STAT. § 407.020.1 ..................................................................................50

MO. REV. STAT. § 407.025.1 ..................................................................................30

TEX. BUS. & COM. CODE ANN. § 17.45(5) ............................................................65

TEX. BUS. & COM. CODE § 17.50(a)(1) .................................................................53

# I.     INTRODUCTION

Defendant General Motors LLC's (GM) motion for summary judgment should be denied. For years, GM knowingly sold millions of cars containing serious safety defects to unsuspecting consumers who paid a price reflecting the belief that the cars had no known defects.  GM placed its customers and the public in grave danger by hiding the truth until it was finally forced to issue historic recalls of millions of defective vehicles in 2014.  The recalls are themselves admissions of defects; the undisputed record also shows that GM knew the vehicles were defective when sold and failed to disclose this material information.

The overarching issue that GM's motion raises is whether GM can obtain "full price" for cars that GM knew had serious safety defects from consumers who would have paid substantially less had they known of the defects, and then avoid liability for the overcharges by instituting a series of belated (and largely ineffective) recalls *only after* its fraud was uncovered.  GM's "heads I win, tails you lose" position is particularly repugnant given the deadly results of its gamesmanship, and, in any event, is unsupported by the laws of the bellwether jurisdictions.

GM's primary arguments fail.  *First*, GM's assertion that Plaintiffs have no recoverable damages as a result of its belated recalls is inconsistent with the Court's repeated holdings that Plaintiffs' "benefit-of-the-bargain" damages were incurred at the point of sale *and* that post-sale facts have no relevance to benefit-of-the-bargain analysis.  Such is the law in the bellwether jurisdictions, and GM cannot avoid responsibility for the economic impacts of its fraud with belated recalls that (even if effective) neither compensate Plaintiffs for their overpayment nor deprive GM of its ill-gotten gains.  *See infra* Section III.A.1.a.  Moreover, GM's contention that Plaintiffs' damages model does not account for the recalls is false; Plaintiffs' expert conjoint analysis explicitly considers the *actual* value that GM's belated recalls would have had to consumers *at the moment of purchase*, which is the relevant moment in a benefit-of-the-bargain

claim.  *See infra* Section III.A.1.b.  In any event, the record shows that the recall "remedies" for the defective ignition switches at issue here were *not* effective.  *See infra* Section III.A.2. Further, in each of the bellwether states, Plaintiffs may recover "lost time" damages in appropriate circumstances.  *See infra* Section III.B.

*Second*, GM argues that Plaintiffs have no claims because they cannot prove individual damage amounts.  Not so.  Plaintiffs' expert, Stefan Boedeker, provides a methodology for calculating "overpayment" damages with respect to the defective vehicles at issue, and using a few, objective record facts, each Plaintiff's damages are readily calculated.  Those calculations preclude summary judgment.  *See infra* Section III.A.3.

*Third*, GM is liable to Plaintiffs who sold their defective vehicles before the recalls were announced because they, too, overpaid for the cars as a result of GM's fraud.  In reinstating such claims in response to Plaintiffs' reconsideration motion at the Rule 12(b)(6) stage, the Court chose to resolve the issue on a more fulsome record; now, Mr. Boedeker's conjoint analysis demonstrates that *all* purchasers suffered quantifiable loss at the moment of sale (regardless of later events), and this evidence, again, precludes summary judgment.  *See infra* Section III.A.4.

*Fourth*, GM is liable to Plaintiffs who bought so-called "Service Part Vehicles"—cars built after the original low-torque "Delta Ignition Switch" was secretly modified by the now-infamous Old GM engineer Ray DeGiorgio—because the evidence shows that the modified switch was still defective.  *See infra* Section III.C.

*Fifth*, GM cannot escape liability to those who purchased defective Old GM cars *after* GM's inception (Used-Car Purchasers).  The bellwether states do *not* restrict consumer-fraud liability solely to those who manufactured or sold the vehicles.  Instead, because GM has a strong relationship with the defective cars (especially given its duty to monitor and repair the

cars under the TREAD Act), *and* because GM's conduct caused Plaintiffs' economic losses, the Used-Car Purchasers' claims stand.  *See infra* Section III.D.

*Sixth*, GM's scattered attacks on various claims also fail to meet GM's heavy burden on summary judgment.  In this omissions case, Plaintiffs satisfy relaxed consumer protection reliance requirements based on the materiality of the omitted information, to wit, the existence of serious safety defects (*see infra* Sections III.E-F); Plaintiffs' implied warranty claims survive GM's contractual limitation of remedies, statute of limitations, and merchantability challenges (*see infra* Section III.G); Plaintiffs' alternatively pled unjust enrichment claims survive (*see infra* Section III.H); GM has not mitigated its unconscionable conduct (*see infra* Section III.I); and the California and Missouri Plaintiffs may maintain claims against GM for fraudulent concealment of the right to file bankruptcy claims because, but for GM's concealment of the Delta Ignition Switch Defect, Plaintiffs' claims would have been timely asserted in the Bankruptcy Court while the GUC Trust still had assets (*see infra* Section III.J)

*Seventh*, summary judgment cannot be granted on Plaintiffs' claims for injunctive relief because the record contains ample evidence that the defective vehicles pose an ongoing risk of irreparable bodily harm that cannot be adequately remedied with money damages, and Plaintiffs meet the substantive requirements for obtaining injunctive relief under the laws of the bellwether states.  *See infra* Section III.K.

GM fails to satisfy the heavy burden of demonstrating that summary judgment is warranted.  Its motion should be denied, and except as noted herein, Plaintiffs' claims should proceed to trial.

## II.     RELEVANT FACTS

**A.     GM has not fixed the ignition switch defects.**

The five ignition switch recalls—Recall Nos. 14v047, 14v355, 14v394, 14v400, and 14v346—have not cured the defects plaguing the relevant vehicles.[1]  Plaintiffs' supporting evidence is robust and, at a minimum, presents reasonably disputed issues of fact precluding summary judgment in GM's favor.  The evidence is a compelling combination of facts found in GM's stipulated plea deal with the Department of Justice, GM documents, GM witness testimony, and Delphi documents and witness testimony, buttressed by reliable opinions and targeted testing by Plaintiffs' experts Dr. Glen Stevick and Steve Loudon.

**1.     All vehicles subject to Recall No. 14v047 are defective, and GM has not cured the defects.**

**a.     All vehicles subject to Recall No. 14v047, including the Service Part Vehicles, were sold with defective ignition switches.**

Recall No. 14v047 was done in two "waves."  In February and March of 2014, GM initiated the recall to cover vehicles containing the "Delta" ignition switch with part number 10392423 (the 423 Delta switch).  GMSUF at ¶ 2.[2]  In announcing the recall, GM said that the "ignition switch torque performance may not meet General Motors' specification," which could cause the Delta ignition switch to "unintentionally move from the 'run' position to the

---

[1]  Regarding Recall Nos. 14v118 (side-impact airbags) and 14v153 (power steering), although GM acted unlawfully by knowingly selling defective vehicles and failing to timely recall those vehicles, Plaintiffs acknowledge that the evidence now demonstrates that the remedies offered under those recalls are effective in repairing the defects.

[2]  These vehicles were:  2005-2007 model year (MY) Chevrolet Cobalt; 2007 MY Pontiac G5; 2006-2007 MY Chevrolet HHR and Pontiac Solstice; 2003-2007 MY Saturn Ion; and 2007 MY Saturn Sky vehicles.  *Id.* at ¶ 1.  "GMSUF" refers to Plaintiffs' Response to Defendant General Motors LLC's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment (Dkt. No. 5860).

'accessory' or 'off' position with a corresponding reduction or loss of power" and potential for airbags not to deploy in a crash.  PSUF at ¶ 2.[3]

In April 2014, GM expanded the 14v047 recall to include a second "wave" of vehicles, which were manufactured ████████████████████████████████████████████ ████████████████████████████████████████ GMSUF at ¶ 5; PSUF at ¶ 26.[4]  The recall notice explained that a defect relating to motor vehicle safety existed in "service parts" and kits containing the 423 Delta switch that may have been used to repair up to 2,664 vehicles and that the recall was being done "[o]ut of an abundance of caution and to provide a replacement switch to all customers whose vehicles could have been impacted by the subject ignition switch . . . ." PSUF at ¶ 28.   GM calls these the "Service Part Vehicles" and maintains that the vehicles themselves were not defective.  GMSUF at ¶¶ 4, 8.  This is false; the Service Part Vehicles ████ ██████████████████████████ PSUF at ¶¶ 29-56.

**(1)** **The first "wave" 14v047 recalled vehicles manufactured with the 423 Delta switch had defective switches.**

Old GM established a torque specification for the Delta switches in all vehicles subject to Recall No. 14v047 of no less than 15 Newton-centimeters (N-cm).  *Id.* at ¶ 7.  The torque specification was communicated to the switch supplier, Delphi, which tested switches pre-production and found that the switches had "low detent plunger force" and did not meet Old GM's specifications.  *Id.* at ¶¶ 7-12.  Nonetheless, Old GM installed the defective Delta switches into vehicles, quickly learned of vehicle stalls resulting from the defective switch inadvertently moving out of the "run" position, did nothing to repair or replace the switches, continued to

---

[3] "PSUF" refers to Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Support of Plaintiffs' Opposition to GM's Motion for Summary Judgment Against the Bellwether Economic Loss Plaintiffs.

[4] The April 2014 expansion of the 14v047 recall included the following vehicles that were manufactured with the 190 Delta switch:  2008-2010 MY Chevrolet Cobalt, 2008-2011 MY Chevrolet HHR, 2008-2010 MY Pontiac Solstice, 2008-2010 MY Pontiac G5, and 2008-2010 MY Saturn Sky vehicles.  GMSUF at ¶¶ 4-5.

install the defective switches in millions of new vehicles, and concealed the defect.  *Id.* at ¶¶ 12-19.  GM has *admitted* that it *knew* that these vehicles were sold with defective switches that did not meet the torque specifications; that GM concealed this knowledge from the public and regulators until the recalls in 2014; that GM "falsely represented to consumers that vehicles containing the defect posed no safety concern;" and that GM misled consumers.  *Id.* at ¶ 6.  In a Consent Order with NHTSA, GM also admitted to violating the TREAD Act by not disclosing the defect.  And GM agreed to a Deferred Prosecution Agreement (DPA) with the U.S. Department of Justice in which GM consented to the filing of an Information charging it with a scheme to conceal the deadly defect in violation of 18 U.S.C. § 1001, and committing wire fraud in violation of 18 U.S.C. § 1343.  *Id.* at ¶ 5.

In 2006, Old GM secretly altered the Delta ignition switch to include a stronger "Catera" plunger that improved torque performance in vehicle models beginning in 2007.  *Id.* at ¶¶ 20-27.  ██████████████████████████████████████████████████████████  ██████████████████████████████████████████████████  *id.* at ¶¶ 20-25, ██████████████████████████████████████████████████████  ████████████████████████████████████████.  GMSUF at ¶ 5; PSUF at ¶ 26.

> **(2)   The second "wave" 14v047 recalled vehicles (Service Part Vehicles) manufactured with the 190 Delta switch had defective switches.**

Contrary to GM's contention, the 190 Delta switch installed in the Service Part Vehicles was also defective.  ██████████████████████████████████████████  ██████████████████████████████████████████████████████  ████████████████████████████████████████████████████████.  *Id.* at ¶ 31.  Delphi representatives confirmed to Congress that these test results "████████████████████████

██████████████████████████████████████████

████████." *Id.* at ¶ 32.   GM's corporate representative confirmed under oath that the

██████████████████████████████████████████

█████████ *Id.* at ¶ 33.  GM testing confirmed ████████████████████████

██████████████████████████████████████████

███████████████████████████████████████. *Id.* at ¶ 34.

Litigation experts for both sides have confirmed that the 190 Delta switch suffers from

low torque.  Defense expert Michael Stevenson, ████████████████████████████

██████████████████████████████████████████

█████████████, testified that, █████████████████████████████████

██████████████████████████████████████████

████████████████████ *Id.* at ¶¶ 35-36.   He also testified that █████████████

████████████████ *Id.* at ¶¶ 37-38.  Plaintiffs' expert Glen Stevick's testing obtained similar

results, finding that, ███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████.

*Id.* at ¶¶ 39-41 (citing Nov. 10, 2017 Stevick report).   Further, GM and its consultants ████

██████████████████████████████. *Id.* at ¶¶ 42-46.

GM has repeatedly highlighted the importance of torque, as demonstrated in the

following examples.  *First*, GM emphasized that ███████████████████████████

███████████████ *id.* at ¶¶ 8, and GM's engineers have ██████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████ *Id.* at ¶ 29.  *Second*, GM initiated Recall 14v047 precisely because, as GM itself said, the "ignition switch *torque performance may not meet General Motors' specification.*"  *Id.* at ¶ 2 (emphasis added).  *Third*, in response to ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ *Id.* at ¶¶ 47-56.  This ████████████████████ is particularly damning to GM's litigation position that the switches in the Service Part Vehicles were not defective given that GM sold the recall remedy to NHTSA on the basis that every switch would meet torque specifications.  The evidentiary record could not be clearer:  the 190 Delta switches used in the Service Part Vehicles were defective.

### b.      All vehicles subject to Recall No. 14v047 are still defective.

While the 14v047 recall remedied the low torque problem, all cars with the Delta switch remain defective because (i) the ignition switch is placed too low on the steering column and is still vulnerable to knee-to-key turn offs, and (ii) the vehicles suffer from a single point of failure in that critical safety systems, including airbags, are disabled if the ignition switch moves out of the "run" position.

#### (1)      The 14v047 vehicles still have a knee-key defect due to the low placement of the switch on the steering column.

As Dr. Stevick has opined, the 14v047 vehicles ████████████████████████

████████████████████████████████████████████████

████████████████████████ *Id.* at ¶ 57 (citing Nov. 10, 2017 and May 18, 2018 Stevick reports).  Dr. Stevick's opinion is fully supported by GM documents and GM witness testimony.

- 8 -

The ignition cylinder in the 14v047 cars is located in the lower right side of the steering column, placing the key and any items hanging from it close to the driver's right knee.  PSUF at ¶ 58.  Over time, Old GM and then GM attributed ████████████████████████████ ████████████ and Ray DeGiorgio in 2004 identified ██████████████████ ████████████████████ PSUF at ¶¶ 59, 61-62 (citing GM documents and GM witness testimony).  In early 2005, Old GM engineers proposed a change to the switch location as a "sure solution," which was rejected due to cost considerations.  *Id.* at ¶ 60 (citing the Valukas report).

On multiple occasions, GM engineers identified ██████████████████████ ██████████████████████████████████████████████████████████ *Id.* at ¶¶ 64-65.  In 2012, GM engineer Terrance Connolly opined that ████████████████████ █████████████████████.  *Id.* at ¶ 63.  In 2014, GM hired consultants at Virginia Tech Transportation Institute (VTTI) to evaluate GM's testing, and VTTI concluded that ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████████████ *Id.* at ¶ 66 (citing VTTI report and testimony of GM engineer Joe Fedullo).  Indeed, VTTI confirmed that ████████████████████████████████████████████████████████████ ████████ *id.,* ██████████████████████████████████ *id.* at ¶¶ 69-70, and found that " ██████████████████████████████████████████ ████████████████████████████████ *id.* at ¶ 68.  In her deposition, GM engineer Valarie Boatman endorsed VTTI's findings and ████████████ ████████████████████████████████████████████████ *Id.* at ¶ 67.

Additional evidence that GM did not solve the knee-to-key defect is ████████
██████████████████████████████████████████████████████████████████████
████████ *Id.* at ¶¶ 71-85 (citing GM documents).  Just before the recalls were announced in early 2014, GM decision-makers contemplated ████████████████████████████████████
███████████████.  Investigator John Murawa concluded by mid-December that the "root cause" of airbag non-deployment in Cobalt models was ████████████████████████████████
████████████████████████████████████████████████ *Id.* at ¶ 72.  But GM ██████████████████████████████████████████████████████████████████████
██████████████████████████████████.  *Id.* at ¶¶ 77-85.

Tellingly, GM still advises customers to keep all items removed from their key chains even after receiving a replacement switch meeting GM's torque specification.  *Id.* at ¶ 89 (citing GM documents).  This, of course, would be unnecessary if remedying the low-torque issue with stronger switches addressed the only root cause of inadvertent key rotation.  GM has not "fixed" these vehicles.[5]

**(2)    The 14v047 vehicles also suffer from a single-point-of-failure defect.**

An ignition switch transitioning from "run" to "acc" results in the loss of engine power. A serious safety concern results, as other safety systems power down, including the seat belt pretensioners, power steering, power brakes, electronic stability control, and airbags.  PSUF at ¶ 234 (citing Nov. 10, 2017 Loudon report); *see also id.* at ¶¶ 235-38 (citing DPA Statement of Facts).  ████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████

---

[5] Moreover, even if low torque is not the root cause of defects (and it is), relying on consumers to change keys and rings and follow GM's instructions to never weight the key is not an effective remedy ██████████████
████████████████████████████████████████████.  *Id.* at ¶ 215.

███████████████████████   ████████████████████████

████████████████████████████████████████████████████████

██████   █████████████████████████████████████████████

████████████ *Id.* at ¶ 239 (citing Dr. Stevick and Loudon reports).

As Dr. Stevick opines, engineers "█████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████." *Id.* at ¶ 240.  In other words, as Mr. Loudon

explains, "███████████████████████████████████████████████████

████████████████████████." *Id.* at ¶ 241.  The ignition-switch recalls at issue in this case did not

address this single point of failure.  So, the cars remain defective even after recall.  *Id.* at ¶ 242.

In Dr. Stevick's opinion, power should have been supplied to the SDM for a longer period after ignition switch power-off in order to be available during a crash scenario, or the SDM should have been connected directly to the battery and either software logic or an additional hardware circuit should have been implemented to ensure airbag deployment if the vehicle was still moving.  PSUF at ¶ 243 (citing Ex. 8 at 73-75; SJ Ex. 9 at 26-50 (July 29, 2015 Stevick Report); SJ Ex. 10 at 62:10-64:4, 100:2-22, 130:25-135:18 (Sept. 28, 2015 Stevick Dep.).  Dr. Stevick even designed, built, and tested a simple circuit that powers the SDM if the vehicle is moving more than 15 mph.  PSUF at ¶ 244 (citing SJ Ex. 10 at 13:4-19:24 (Sept. 28, 2015 Stevick Dep.).  Mr. Loudon concurs, opining that the loss of engine power and power steering, moving stalls, and airbag non-deployment present serious safety issues, and that GM

should have designed the SDM to remain active and allow the airbags to deploy where the ignition switch moved out of "run." *Id.* at ¶ 245 (citing Ex. 126 at 4).

GM could have fixed this problem but did not. █████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████, *id.* at ¶ 246 (citing Dr. Stevick), ████████████████

████████████████████ *Id.* (citing VTTI documents). ████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████ *Id.* at ¶ 247 (citing Nov. 10, 2017 Loudon report).

████████████████████████████████████████████████████████████████

████████████████████████████████████ *See id.* at ¶ 248. ████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* (citing SJ Ex. 11 GM-MDL2543-000673219-225); SJ Exs. 12 (GM-MDL2543-003853956-959) and 13 (GM-MDL2543-002134382)). ████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████ PSUF at ¶¶ 249-55 (citing Ex. 48; SJ Exs. 14 (GM-MDL2543-000851826-841), 15 (GM-MDL2543-004241860-861), 16 (GM-MDL2543-402048593-604), 17 (GM-MDL2543-003501412-414), 18 (GM-MDL2543-002375439-503); Exs. 129-32). ███

████████████████████████████████████████████████████████████████████████████

████████████████████████████████ PSUF at ¶ 254 (citing SJ Exs. 19 (GM-MDL2543-003575716-720), 18 (GM-MDL2543-002375439-503), 20 (GM-MDL2543-002139814-815)).

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████ PSUF at ¶ 255 (citing SJ Ex. 21 at 15 (Nov. 13, 2015 Stevick Report); SJ Ex. Ex. 22 (GM-MDL2543-400955824); SJ Ex. 23 at 53:1-54:5 (Jul. 21, 2015 John Capp Dep.); *see also* Ex. 130; SJ Ex. 24 at 38:22-40:13, 34:11-16, 86:14-93:9, 96:10-97:14, 94:11-95:6, 101:20-103:2, 104:13-18, 109:4-13, 110:15-111:16, 131:22-132:9, 155:5-7 (June 1, 2015 Vipul Modi Dep.); SJ Ex. 25 at 21:19-27:17 (Nov. 5, 2015 Eric Buddrius Dep.). ████████

███████████████████████████████████████████████████████████████

██████ PSUF at ¶¶ 248-56 (citing GM documents and Loudon report).

   2.   **GM has not cured the ignition switch defects in the vehicles subject to Recall Nos. 14v355, 14v394, and 14v400.**

      a.   **The switches in the vehicles subject to Recall Nos. 14v355, 14v394, and 14v400 are defective because they have low torque.**

The recall procedure for cars subject to the 14v355, 14v394, and 14v400 recalls consisted entirely of modifying key covers and key rings.[6]  GM contends that these switch defects differ from the 14v047 defect, even though all of the vehicles in all four recalls have the same defect (a weak switch) that created exactly the same safety risks (inadvertent rotation with moving stalls and loss of safety systems).  The low-torque defect in these switches has not been remedied by GM's recalls that merely change key covers and key rings.

GM has known since its inception that the defect in the 14v355 vehicles is low-torque ignition switches.  In 2005, ████████████████████████████████████████████████████████████ ██████████████████████████████████████. PSUF at ¶¶ 93-102 (citing

---

[6] Recall No. 14v355 recalled the 2005-2009 Buick Lacrosse, 2006-2011 Buick Lucerne, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2014 Chevrolet Impala, 2006-2007 Chevrolet Monte Carlo, and 2014 Chevrolet Impala Limited.  PSUF ¶ 90.  Recall No. 14v394 recalled the 2003-2014 Cadillac CTS and 2004-2006 Cadillac SRX.  *Id.* at ¶ 130.  Recall 14v400 applied to the 2000-05 Chevy Impala, 2000-05 Chevy Monte Carlo, 1997-03 Chevy Malibu, 2004-05 Chevy Malibu Classic, 1999-04 Olds Alero, 1998-02 Olds Intrigue, 1999-05 Pontiac Grand Am, and 2004-08 Pontiac Grand Prix.  *Id.* at ¶ 176.  GM said the defect underpinning all three recalls related solely to a key ring carrying added weight which, if bumped or if the vehicle goes off road or experiences another jarring event, may cause the key to unintentionally rotate out of "run."  *Id.* at ¶¶ 91, 131; GMSUF at ¶ 80.

Old GM documents and Ms. Andres testimony).  A company technician confirmed the problem,

████████████████████████████████████████████████████████████  *Id.* at

¶ 97.  ███████████████████████████████████████████.  *Id.* at ¶ 101.

██████████████████████████████████████████████████████████████

███████████████████████████████████  *Id.* at ¶ 98.  Indeed, GM torque testing in

2014 found that the 14v355 vehicle switches performed below the target specification of ████

██████████████████████████████████████████████████████████████

█████████████████████.  *Id.* at ¶¶ 117-21 (citing GM documents and testimony of GM

engineers Joe Reiss and Brian Thompson).  Dr. Stevick's testing also found that all three relevant

switch models implicated by Recall No. 14v355 (which have the same housing and mechanics)

failed GM's minimum torque specification of 15 N-cm.  *Id.* at ¶ 122 (citing Nov. 10, 2017

Stevick report).

████████████████████████████████████████████████████████████.

*Id.* at ¶¶ 106-16 (citing GM documents and testimony of GM engineers Joe Reiss and Brian

Thompson).  ██████████████████████████████████████████

███████████████████  *Id.* at ¶ 116.

Low-torque switches also play a pivotal role in the 14v394 defect, which has not been

remedied by installing two key rings and a key insert.  *Id.* at ¶¶ 155-59 (citing Nov. 10, 2017

Stevick report, GM documents, and testimony of GM engineer Brian Thompson).  GM testing in

2014 ██████████████████████████████████████████.  *Id.* at

¶¶ 160-65 (citing GM documents and testimony of GM engineer Brian Thompson).  This is not

surprising, ██████████████████████████████████████████████

██████████████████████████████████████████████████████████████

- 14 -

████████████████████████████████████████████████████████████

████████████ *Id.* at ¶¶ 132-36 (citing GM documents, testimony of GM engineer Brian

Thompson, Delphi documents, and testimony of Delphi engineer Eric Mattson).  And like the

Delta switch, ██████████████████████████████████████████████████

██████████████████. *Id.* at ¶¶ 137-38.[7]  Further, ████████████████████

████████████████████████████████████████████████████████████

████████████ *id.* at ¶ 147 (GM contends that the slot, coupled with new key rings, fixes the

problem).

As for Recall No. 14v400, while GM told NHTSA that the defect was limited to the risk

of a key ring carrying added weight (GMSUF at ¶ 79), GM internally described ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ PSUF at ¶ 177.  Early on,

Old GM engineers ████████████████████████████████████████ *id.* at ¶¶ 179-99

(citing GM documents and testimony of GM engineers Brian Thompson and Ray Romeo), but

this did not solve the problem.  GM testing in 2014 demonstrated ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ *Id.* at ¶¶ 205-09 (citing GM documents and

testimony of GM engineers Brian Thompson and Valarie Boatman).  Dr. Stevick's testing of

---

[7] The Catera switch was redesigned in 2006 for the Cadillac SRX, the plunger and spring remained the same as in the original Catera.  *Id.* at ¶¶ 140-41.  And while the switch was redesigned again for the CTS models beginning in model year 2008, inadvertent switch rotation problems impelled GM to change the key head opening from a slot to a hole and use smaller key rings.  *Id.* at ¶¶ 142-47.

three switch part numbers associated with Recall No. 14v400 ███████████

███████████████████████ *Id.* at ¶ 210.[8]

      **b.**    **The switches in the vehicles subject to Recall Nos. 14v355 and 14v394 are also defective because they still have a knee-to-key defect, and all vehicles subject to Recall Nos. 14v355, 14v394, and 14v400 have a single-point-of-failure defect.**

The 14v355 vehicles also remain defective because the key insert and ring changes do not eliminate the potential for knee-to-key interaction, just as those modifications did not remedy the 14v047 defect. *See supra* Section IIA.b.1. ████████████████████



███████████ PSUF at ¶¶ 128-29 (citing GM documents and testimony of Joe Reiss). For vehicles subject to the 14v394 recall, GM testing revealed ████████████

████████████████████████████████, *id.* at ¶¶ 168-72 (citing GM documents and testimony of GM engineers Valarie Boatman and Brian Thompson), and GM has ████████████████████, *id.* at ¶¶ 148-154 (citing GM documents and testimony of GM engineers Mark Beauregard and Brian Thompson). And all vehicles involved in all three recalls, like the 14v047 vehicles, still suffer from a single-point-of-failure defect, *id.* at ¶¶ 234-56 (citing Dr. Stevick and Loudon reports, VTTI documents, GM documents, and testimony of GM engineer Vipul Modi).

---

[8] Dr. Stevick also found that suppliers of replacement keys for the subject GM cars are selling keys with slots, thereby mooting the effectiveness of even the slot-to-hole key insert half-measure. SJ Ex. 38 at 208-10 (July 11, 2018 Stevick Dep.).

3.      **All vehicles subject to Recall No. 14v346 still have a knee-to-key defect.**

Recall No. 14v346 involves an admitted knee-to-key defect in the 2010-2014 Chevrolet Camaro for which GM made available new key heads and key rings.  But this action is not an adequate remedy; ███████████████████████████████████████████████████

████████████████████████.  *Id.* at ¶¶ 216-33 (citing GM documents, testimony of GM engineers Valarie Boatman and Anthony Melocchi, and Nov. 10, 2017 Stevick report).  Prior to announcing the recall, █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████.  *Id.* at ¶¶ 224-26. ██████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████.  *Id.* at ¶ 227. ██████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████.  *Id.* at ¶¶ 228-32.  At a minimum, blade rotation should have been part of the Recall No. 14v346 remedy.

B.      **GM knew about the defects at issue from day one of its existence.**

Plaintiffs' proof demonstrates that Old GM had knowledge of the pre-Sale Defects.[9] Because GM retained nearly all of Old GM's employees, documents and databases, *id.* at ¶¶ 319-50, Old GM's knowledge of the Defects is imputed to GM from its inception.[10]  *See*, *e.g.*, CAL. CIV. CODE § 2332 ("both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to

---

[9] The "pre-Sale Defects" are all those that first impacted vehicles sold before the July 20, 2009 effective date of the bankruptcy Sale—all the defects at issue here *except* for the defect that led to Recall No. 14v346.

[10] *See*, *e.g.*, *In re Motors Liquidation Co.*, 529 B.R. 510, 538 (Bankr. S.D.N.Y. 2015) ("at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion….").

communicate to the other");[11] *Eveready Heating & Sheet Metal*, *Inc. v. D. H. Overmyer*, *Inc.*, 476 S.W.2d 153, 155 (Mo. Ct. App. 1972) ("unbroken line of decisions" provides that "knowledge of an agent while acting within the scope of authority [is] knowledge of the principal");[12] *Great Am. Mortg. Inv'rs v. Louisville Title Ins. Co.*, 597 S.W.2d 425, 432 (Tex. Civ. App. 1980) ("knowledge of an agent relating to information, acts and events within the scope of the agency is imputed to the principal").[13]

Contrary to GM's position in prior briefing, Plaintiffs imputation argument is not limited to the fact that some employees worked at both companies. Rather, a "critical mass" of high-level Old GM employees with knowledge of the Delta Ignition Switch Defect stayed on at GM, *In re Motors Liquidation Co.*, 529 B.R. at 558 n.154, . PSUF at ¶¶ 340-50.

*Id.* at ¶¶ 331-39.[14]

None of GM's authorities involve remotely similar facts,[15] and Old GM's pre-Sale knowledge of the defects is imputed to—and in fact was transferred to and possessed by—GM.

---

[11] *See also Columbia Pictures Corp. v. De Toth*, 197 P.2d 580, 587 (Cal. Ct. App. 1948) (the principal is "charged with knowledge which his agent acquires before the commencement of the relationship when that knowledge can reasonably be said to be present in the mind of the agent while acting for the principal").

[12] *See also Packard Mfg. Co. v. Indiana Lumbermens Mut. Ins. Co.*, 203 S.W.2d 415, 421 (Mo. 1947) (corporate agent's knowledge within the scope of his authority and employment is imputed to the corporation).

[13] *See also Seven Elves*, *Inc. v. Eskenazi*, 704 F.2d 241, 245 (5th Cir. 1983) (collecting Texas authorities).

[14] Indeed, Old GM documents are now GM documents.

[15] In arguing against imputation in the past, GM has relied on *Conmar Prods. Corp. v. Univ. Slide Fastener Co.*, 172 F.2d 150 (2d Cir. 1949), but that case is inapposite. The *Conmar* plaintiff had to prove that the defendants knew that plaintiff's former employees had executed contracts promising not to divulge plaintiff's methods, and that defendants "induced the men to divulge the secrets they had learned." *Id.* at 154. The Second Circuit affirmed the district court's finding that defendants "had no knowledge of the secrecy contract," *id.* at 154, and therefore ruled in favor of the defendants: "[h]aving acquired the secrets innocently, they were entitled to exploit them." *Id.* at 157. *Conmar* provides no support for GM.

**C.      Plaintiffs were harmed at the point of sale in a quantifiable amount, and many suffered additional injury in the form of lost time.**

All Plaintiffs were damaged when they bought or leased their cars.  As the Court has recognized, damages occur at the point of sale, *In re GM LLC Ignition Switch Litig.*, 2016 WL 3920353, at *30 (S.D.N.Y. July 15, 2016) ("*TACC Order*"), when GM's omissions caused Plaintiffs to acquire defective cars they otherwise would not have acquired or for which they would have paid less.  *See id.* at *20 ("a concealed defect" that "implicated a safety issue … would have affected a reasonable person's decision to purchase a car—making the omission material").  Indeed, each of the Plaintiffs testified that safety was a materially important factor in their purchase or lease of their vehicle, and that they would not have bought their vehicle, or paid less, had GM disclosed the defects.  PSUF at ¶¶ 266-67.  Of course, GM understood that safety was and is an important factor in a consumer's purchase decision.  *Id.* at ¶¶ 257-63.  For example, in 2006 customers told Old GM that ████████████████████████████ ████████████████████," *id.* at ¶ 263, and in 2012, GM recognized that safety "ranks among the top 10 reasons for purchase," *id.* at ¶ 259.  That is why GM includes implicit and explicit safety messages in so much of its vehicle advertising and promotional material.  *Id.* at ¶ 268.

GM's understanding of the importance of safety to consumers is echoed in publicly available research, including *Consumer Reports* surveys in which 88% of participants reported safety as a "top three" priority in purchasing a vehicle.  *Id.* at ¶¶ 264-65.  Plaintiffs' advertising expert reliably concludes that safety is a major consideration for consumers.  *Id.* at ¶ 268.  Even GM's own experts ████████████████████████████████████████████ ████████████████████████████████████. *Id.* at ¶ 271.

### 1.    Plaintiffs' point-of-sale damages model.

Consistent with the foregoing evidence, Plaintiffs' damages expert Stefan Boedeker has

constructed a reliable damage model that measures Plaintiffs' benefit-of-the-bargain damages.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████    █████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████    █████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████. *Id.* at ¶¶ 272-98.

████████████████████████████████████████████████

████████████████    █████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████. *Id.* at ¶ 283.  Where, as in the case of Recall No. 14v047, ███████████

███████████████████████████████████████████████ *Id.* at ¶ 284.

The  calculated  median  economic  loss  numbers,  when  applied  to  the  circumstances  of  each

Plaintiff, establish each Plaintiff's specific damage amount.  *Id.* at ¶¶ 289-97.  Professor Joshua Gans opines that "Mr. Boedeker's approach to damages is conceptually appropriate as a matter of economics" and that "it is valid to measure economic harm calculating the reduction in value for the cars that they had actually purchased had consumers known about the Defect at the time of purchase." *Id.* at ¶ 298.[16]

### 2. Plaintiffs' lost time damages model.

Plaintiffs' damages are not limited to loss of benefit-of-the-bargain.  They were also damaged by losing valuable time in responding to the recall notices and taking the vehicles to the GM dealership for recall service.[17]  Many Plaintiffs spent hours and sometimes days of their time seeking and waiting for recall repairs.  *See*, *e.g.*, *id.* at ¶¶ 453 (Plaintiff Thomas), 462 (Plaintiff Akers), 522 (Plaintiff Witherspoon), 548 (Plaintiff Fuller).  Plaintiffs' expert Ernest Manuel has created a reliable model for estimating these consequential damages in terms of average time spent.  *Id.* at ¶¶ 314-18.

## III.   ARGUMENT

Summary judgment is inappropriate here because there are genuine issues of material fact supporting Plaintiffs' claims.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  GM has not satisfied its initial burden of demonstrating the absence of a genuine issue of material fact in any area.  *See id.* at 322.  If the movant fails to carry that initial burden, the motion must be denied, even if the opposing party has not disputed any of the moving party's facts.  *See id.* at 140-41; *St. Pierre v. Dyer*, 208 F.3d 394, 404-05 (2d Cir. 2000).

---

[16] To be clear, on this motion GM has not challenged Mr. Boedeker's qualifications, the reliability of his methodology, or the relevance of his opinions.  Instead, GM claims that Mr. Boedeker has not rendered specific opinions about the specific losses of the named plaintiffs, including those at issue in this motion.  However, and as discussed more fully below, this argument is wrong because Mr. Boedeker has shown that *every class member* has been damaged.

[17] As shown below, in California, lost time is itself sufficient to confer a plaintiffs' entitlement to these damages; in other states, damages are available for people who suffered lost wages.

A moving party cannot satisfy its burden by simply stating an affirmative fact that is unsupported in the evidentiary record.  *See*, *e.g.*, *Giannullo v. City of N.Y.*, 322 F.3d 139, 141 n.2, 143 n.5 (2d Cir. 2003); *St. Pierre*, 208 F.3d at 404-05.  A defendant seeking summary judgment must introduce admissible, supporting evidence.  *St. Pierre*, 208 F.3d at 405.  Allowing anything else "would derogate the truth-finding functions of the judicial process by substituting convenience for facts."  *Giannullo*, 322 F.3d at 143 n.5.  In making its determination, the Court "must construe all evidence in the light most favorable to the non-movant, which requires drawing all reasonable inferences in the non-movant's favor."  *Mabry v. Hester*, 2014 WL 1848739, at *1-2 (S.D.N.Y. May 8, 2014) (Furman, J.).

There are ample genuine issues of material fact here, and GM cannot carry its burden of demonstrating that it is entitled to summary judgment.

**A.     GM's deceptive and fraudulent conduct caused Plaintiffs to suffer legally cognizable harm.**

**1.     Plaintiffs were deprived of the benefit of their bargain because they did not bargain for cars with known safety defects.**

The Court has repeatedly held that Plaintiffs' "benefit-of-the-bargain" injury occurs at the moment of purchase, and that "the benefit-of-the-bargain defect theory . . . measures the difference in value between the defective car the consumer received and the defect-free car the consumer thought she was getting (and for which she paid)."  *TACC Order*, 2016 WL 3920353, at *30.  In accordance with the Court's orders, logic, and the weight of authority, Plaintiffs' damages must be calculated as of the moment of purchase or lease, and are not vitiated or mitigated by GM's belated recalls (even if the recalls were completely effective in remedying all the defects at issue in this case, which they were not).

GM's assertion that Plaintiffs' damages would be obviated by free and effective recalls fails to consider the relevant facts at the moment of transacting—the key moment in this benefit-

of-the-bargain fraud case for economic loss.  Had Plaintiffs (and other purchasers) been aware of the serious safety defects in Plaintiffs' cars at the moment of purchase, the cars would have been worth less.[18]  Regardless of what happened later, Plaintiffs paid (and GM received) an excess amount for the cars—and those are the precise amounts Plaintiffs seek to recover in this action.[19]  A repair—days, months or years later—cannot restore Plaintiffs' overpayment.  And absolving GM of liability would reward GM for misconduct that allowed it to continue selling defective vehicles and postpone the business harm that prompt revelation would cause.  The belated recalls (even if they were 100% effective) are therefore no substitute for the benefit-of-the-bargain damages that Plaintiffs may recover under established law.  As the Court expressly held, "*the recalls, even those sufficient to remedy the defects, do not compensate Plaintiffs fully for the damages sought here.*"  *TACC Order*, 2016 WL 3920353, at * 40 (emphasis added).

GM incorrectly contends that Plaintiffs suffered no benefit-of-the-bargain damages.  GM Br. at 12-24.  As the Court has recognized, the "crux of New GM's argument is that Plaintiffs did, in fact, receive the benefit of their bargain" because GM eventually "fixed (or offered to fix) each vehicle free of charge to each plaintiff…."  *In re GM LLC Ignition Switch Litig.*, 2018 WL 1638096, at *2 (S.D.N.Y. Apr. 3, 2018) ("*BoB Opinion*"); *see also* GM Br. at 13 (repeating this assertion).  GM is wrong, because Plaintiffs did not bargain and willingly pay for vehicles with serious safety defects known to GM at the time of sale—defects that might cause them to suffer death or serious bodily harm, and that might not be repaired.  At the moment of sale, Plaintiffs overpaid for their cars based on GM's fraud and concealment, and GM should not be permitted

---

[18] As the Court has recognized, "a concealed defect" that "implicated a safety issue … would have affected a reasonable person's decision to purchase a car—making the omission material."  *TACC Order*, 2016 WL 3920353 at *20.

[19] GM further benefitted by avoiding the cost and adverse publicity of recalls.

to retain that overpayment simply because subsequent events forced GM to belatedly attempt to cure the defects.  GM's argument fails for several independent reasons.

*First and foremost*, because of the Court's ruling that benefit-of-the-bargain damages are incurred at the time of sale and that diminished-value damages are not available here, Plaintiffs are not seeking damages based on a diminished-value theory.[20]   Post-sale developments (including free repairs) are relevant only to a diminution-of-value analysis that is not at issue as a result of this Court's prior rulings.  *See infra* at Section III.A.1.a.

*Second*, Plaintiffs' conjoint damage analysis explicitly accounts for the recall repairs in an appropriate and fair fashion—at the time of sale when the consumer's damages were incurred (and GM's ill-gotten overpayment received).  Tellingly, GM does *not* challenge the admissibility of Plaintiffs' conjoint analysis for the purposes of this motion.  Accordingly, Plaintiffs' undisputed expert evidence shows that consumers (including the named Plaintiffs, *see infra* at Section III.A.3) would have paid less for a vehicle with a safety defect *even if* they knew that repairs would be immediate.  And, crucially with respect to GM's argument, the further out in time that the consumer knew a recall was to occur, the less the consumer would be willing to pay (and hence the higher the damages).  Thus, the belated recalls (if effective) may, at most, *impact* Plaintiffs' damages, but cannot *eliminate* them.  *See infra* at Section III.A.1.b.

*Third*, even if the law permitted free and effective repairs to eliminate Plaintiffs' damages, Plaintiffs' evidence presents a question of fact as to whether the ignition switch-related recalls fully cured most of the defects at issue (they did not).  *See infra* at Section III.A.2.[21]

---

[20] In any event, GM's own expert analysis, when properly applied, demonstrates that the recalls *did* diminish the value of Plaintiffs' vehicles *even after* the repairs.  *See* SJ Ex. 47 at ¶ 9 (May 18, 2018 Weisberg Report).  That is further proof that the recalls (even if 100% effective) do not make Plaintiffs whole; only benefit-of-the-bargain damages can do that.

[21] Plaintiffs concede that the recall repairs fully cured the Side Impact Airbag and Power Steering defects.

Plaintiffs thus present substantial, undisputed evidence that they were harmed at the point of sale, and GM's belated repairs (even if fully effective) cannot change that fact.

### a. The undisclosed defects created damage at the time of sale, even for cars that were later repaired.

Contrary to GM's "no harm, no foul" recall defense, Plaintiffs were damaged at the point of sale without regard to whether GM later repaired the defects. Again, as the Court held: "The benefit-of-the-bargain defect theory compensates a plaintiff for the fact that he or she overpaid, *at the time of sale*, for a defective vehicle. That form of injury has been recognized by many jurisdictions." *TACC Order*, 2016 WL 3920353, at *10 (emphasis added).[22] Further, the Court held that benefit-of-the-bargain damage analysis does *not* consider the alleged post-sale fact of diminution of value of the impacted automobile; that post-sale fact analysis could *only* be relevant to the "brand devaluation theory" rejected by the Court. *Id.*[23]

Given the Court's rulings, it follows that Plaintiffs' damages are not obviated by post-sale developments. *See*, *e.g.*, *Carriuolo v. GM Co.*, 823 F.3d 977, 987 (11th Cir. 2016) (recognizing point-of-sale benefit-of-the-bargain damages—even if fraud later "cured"—because a "vehicle that the manufacturer knows to be safe is more valuable than a vehicle that the manufacturer perhaps anticipates will later be declared safe"); *see also id.* (defendant may not escape Florida statutory consumer fraud liability "merely because a deceptive or misleading statement later turns out to be true. The injury occurs at the point of sale because the false statement allows the seller to command a premium on the sales price."). That benefit-of-the-bargain damages are

---

[22] *Cf. In re GM LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 401 (S.D.N.Y. 2017) ("*FACC Order*") (emphasis added) (rejecting the argument New GM's post-sale misconduct could be considered as a cause of Old GM purchasers' damages; holding that "*Plaintiffs' injury*, if any, *was complete at the time of sale*, and thus is not attributable to New GM's conduct.").

[23] The Court stated: "The benefit-of-the bargain defect theory does not compensate a plaintiff for a decrease in resale value"—the brand devaluation theory does. *Id.*

measured as of the time of purchase without regard to subsequent events is the law in the bellwether jurisdictions, and across the country.[24]

Plaintiffs anticipate that GM will cite *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liab. Litig.*, 2018 WL 4292359 (3d Cir. Sept. 6, 2018), a case holding that a baby powder consumer lacked standing to bring claims for economic loss because she had not adequately pled an injury in fact. However, standing is not challenged in this case and, unlike here, the *Johnson & Johnson* plaintiff failed to plead that she would have paid less for the product had she known the truth. *Id.* at *8. Also, here Plaintiffs' proof shows that *every* defective vehicle carried serious safety risks, whereas the *Johnson & Johnson* plaintiff "chose not to allege … that she was ever at risk of developing ovarian cancer." *Id.* at *9. Moreover, *Johnson & Johnson* did "not involve allegations of a defective product," and did "not involve a durable product still in a plaintiff's possession." *Id.* at *1.[25] Most significantly, in stark contrast to this case where Plaintiffs offer expert conjoint analysis showing that all Plaintiffs overpaid for their defective vehicles, *see* PSUF at ¶¶ 272-98, the *Johnson & Johnson* plaintiff failed to allege "that the Baby Powder provided her with an economic benefit worth one penny less than what she paid" and failed "to provide a non-conjectural basis for concluding that she did not receive

---

[24] *See, e.g., Hunter v. SMS, Inc.*, 843 F.2d 1391 (6th Cir. 1988) (Michigan law) ("[I]f subsequent events in the company's operations result in the [property] at some later date being worth as much as the plaintiff paid for it, this would not, under the benefit of the bargain approach, prevent plaintiff from recovery of damages for the false representations. What occurs *after* the bargain was made is thus normally not relevant to the representation made at the time of the bargain regarding the value of the [property] *at that time*.") (emphasis in original); *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184-85 (2d Cir. 2007) (New York law) ("It is a well-established principle that … damages are measured at the time of the breach." Inquiries into the product's value "in the months following the acquisition [are] improper because events subsequent to the breach, viewed in hindsight, may neither offset nor enhance general damages.") (citations omitted); *Agliori v. Metro. Life Ins. Co.*, 879 A.2d 315, 316-17 (Pa. Super. Ct. 2005) ("If the court permits the appellee-defendants simply to repay what is owed the consumer under the fraudulently induced contract, the deterrence value of the [Pennsylvania consumer protection statute] is weakened, if not lost entirely. We cannot accept such an evisceration of the statutory goals.").

[25] The *Johnson & Johnson* court expressly distinguished the case before it from a case like this one, which involves a "plaintiff who…alleged that her automobile was at risk of imminently malfunctioning because of a particular defect," noting that such a case "would present a much different case than the one at hand." *Id.* at *1 n.4.

the benefit of her bargain." *Johnson & Johnson*, 2018 WL 4292359, at *7, 12.  Even if *Johnson & Johnson* were correctly decided,[26] it does not support GM's motion.

> **(1)     California law calculates benefit-of-the-bargain damages as of the time of sale, and not at any later time.**

As a remedy for their statutory consumer and implied-warranty claims, the California Plaintiffs may recover the difference in value between what they thought they were purchasing (a car without known safety defects) and what they actually received, measured as of the time of the transaction under traditional benefit-of-the-bargain analysis.[27]   The California Unfair Competition Law (UCL), CAL. BUS. CODE § 17200, and the California Legal Remedies Act (CLRA), CAL. BUS. CODE § 1750, *et seq.*, compensate consumers who "purchase a product that he or she *paid more for* than he or she otherwise might have been willing to pay … whether or not a court might objectively view the products as functionally equivalent." *TACC Order*, 2016 WL 3920353, at *20 (citing *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 329 (2011) (emphasis in original)); *see also id.* at *21 (*Kwikset* applies equally to claims under the CLRA).

Hence, under both the UCL and the CLRA, benefit-of-the-bargain damages are calculated based "on the difference between what was paid and what a reasonable consumer would have paid *at the time of purchase* without the fraudulent or omitted information." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (citing *Kwikset*, 510 Cal. 4th at 329 (emphasis added)); *accord Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir.

---

[26] As the *Johnson & Johnson* dissent points out, the majority decision appears to be inconsistent with the rule that a "consumer's subjective willingness to pay more for the product than he or she would have been willing to pay in the absence of the misrepresentation is itself a form of economic injury 'whether or not a court might objectively view the products as functionally equivalent.'" *Id.* at *15 (quoting *Hansen v. Newegg.com Americas, Inc.*, 236 Cal. Rptr. 3d 61, 72 (2018) (quoting *Kwikset*, 246 P.3d at 890)).

[27] The Court has held that benefit-of-the-bargain damages are not available as a remedy for fraudulent concealment under California law.  *TACC Order*, 2016 WL3920353, at *22.

2018) (upholding claims under UCL and CLRA).[28]  The *Pulaski* Court explicitly held that whether the plaintiff actually obtained benefits after the challenged fraudulent conduct is irrelevant because "restitution under the UCL … measures what the [plaintiff] would have paid at the outset, rather than accounting for what occurred after the purchase."  *Pulaski*, 802 F.3d at 989.  So, even if a defendant effectively cures a defect with free repairs, plaintiffs may recover benefit-of-bargain damages.  *See also In re Lenovo Adware Litig.*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016) (following *Pulaski*) (damage model properly did not consider effects of free repairs because "the 'calculation need not account for benefits received after purchase because the focus is on the value of the service at the time of purchase").  This rule serves two purposes:  "to restore the defrauded party to the position he would have had absent the fraud," (*i.e.*, to return the "overpay") and "to deny the fraudulent party any benefits, whether or not for[e]seeable, which derive from his wrongful act."  *Pulaski*, 802 F.3d at 988.  Applying the rule here also properly focuses on the difference in value between the cars Plaintiffs received (with safety defects known to GM) and the  price Plaintiffs paid when they were *unaware* of the safety defects in their cars; their awareness of the safety defects would necessarily have impacted the price they would have willingly paid *at the time of purchase* when future events were unknowable (including whether they would be lucky and not suffer harm or unlucky and suffer harm, and when and if a "free" and effective repair would be offered).

GM now asks the Court to deviate from the rule and its prior holdings in order to allow GM to reduce (or even eliminate) its liability for fraud by relying on cases involving "diminution in value" damages, and "tortious injury to personal property," *see* Dkt. No. 4868 at 25-27,

---

[28] Rejecting the defendant's argument that plaintiff was required to prove post-sale harm in order to show damages, the Ninth Circuit reaffirmed that benefit-of-the-bargain damages under California law are incurred at the moment of sale:  "[Plaintiff] was not required to allege damage to her plumbing or pipes.  Under California law, the economic injury of paying a premium for a falsely advertised product is sufficient harm to maintain a cause of action."  *Davidson*, 889 F. 3d at 965.

neither of which is at issue in this benefit-of-the-bargain case concerning consumer fraud in which the Court has categorically rejected any diminished-value damage theory. The California Supreme Court has explicitly declined to import damage theories from other areas of law to benefit-of-the-bargain consumer cases. *See Kwikset Corp. v. Superior Court*, 246 P.3d 877, 893 (Cal. 2011) (rejecting defendants' invitation to calculate benefit-of-the bargain damages in accordance with "two real property fraud cases"). In its previous summary judgment motion, GM provided no real basis for the Court to deviate from its prior rulings in this case and established California law, and GM provides no additional authorities here.[29]

*In re Myford Touch Consumer Litig.*, 2016 WL 7734558 (N.D. Cal. Sept. 14, 2016), does not warrant the about-face GM asks the Court to take with respect to the consistent holdings in this and other cases that benefit-of-bargain damages (as opposed to diminished value damages) are incurred at of the time of sale, rendering post-sale events irrelevant. *See BoB Order*, 2018 WL 1638096, at *2 (suggesting that, consistent with *Myford Touch*, evidence of "post-sale mitigation" might "affect the availability or calculation of [benefit-of-bargain] damages"). *Myford Touch* is neither controlling nor persuasive. That opinion begins with the dubious premise that *Pulaski*'s holding—that the damages "calculation need not account for benefits received after purchase"—"appears to be confined to situations in which a plaintiff seeks (1) restitution under (2) California's UCL." *Myford Touch*, 2016 WL 7734558, at *18.[30] Plaintiffs respectfully submit that *Myford Touch* is mistaken on this point because consumers can also recover restitution under the CLRA. *E.g.*, *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal.

---

[29] GM previously cited two California District Court cases in support of its claim that repair offers can obviate a plaintiff's damages, *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prod. Liab. Litig.*, 288 F.R.D. 445 (C.D. Cal. 2013), and *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472 (S.D. Cal. 2013), but both of these cases pre-date *Pulaski* and are therefore effectively overruled.

[30] The California Plaintiffs seek restitution under the UCL here, putting this case on all fours with *Pulaski* under any analysis.

App. 4th 663, 694 (2006).  Moreover, *Pulaski* itself was grounded in the holding of *Kwikset*, 246 P.3d at 890—that damages arise at the point of sale when "a consumer purchase[s] a product that he or she *paid more for* than he or she otherwise might have been willing to pay … whether or not a court might objectively view the products as functionally equivalent."  And this Court has recognized that *Kwikset* applies equally to UCL and CLRA claims.  *TACC Order*, 2016 WL 3920353, at *21.  Accordingly, the California Plaintiffs' benefit-of-the-bargain damages are not obviated by GM's belated remedial measures, even if effective.[31]  The California Plaintiffs may recover their benefit-of-the-bargain damages, as well as punitive damages,[32] and lost-time damages (*see infra* at Section III.B).

### (2)   Missouri law also calculates benefit-of-the-bargain damages as of the time of sale, and not at any later time.

The Court has held that benefit-of-the-bargain damages are an available remedy for the Missouri Plaintiffs' claims for violations of the Missouri Merchandising Practices Act, MO. REV. STAT. § 407.010, *et seq.* (MMPA), fraudulent concealment, and implied warranty.  *See TACC Order*, 2016 WL 3920353, at *33-35.  Punitive damages are also available under the MMPA. MO. REV. STAT. § 407.025.1.  In cases concerning the sale of a car, benefit-of-the-bargain damages are calculated as "the difference between the actual value of the car and the value the car would have had if the representation had been true."  *Auffenberg v. Hafley*, 457 S.W.2d 929, 937 (Mo. Ct. App. 1970).  As in California, these "damages are measured at the time of the transaction."  *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. 1988) (*en banc*).

---

[31] *Clayworth v. Pfizer*, 233 P.3d 1066, 1072 (Cal. 2010), cited by GM, is inapposite as it did not involve benefit-of-the-bargain damages and concerned only the question of standing.  In rejecting the defendants' argument that the plaintiffs lacked standing because they passed-on their alleged overpayments to their consumers, the *Clayworth* court found that the defendants' argument "conflates the issue of standing with the issue of the remedies to which a party may be entitled." 233 P.3d at 1087.  In holding that the plaintiffs had standing, the court explicitly did not rule on the issue of what damages the plaintiffs might recover, or, more specifically, whether damages might be reduced through the doctrine of mitigation.  *Id.*

[32] *See* CAL. BUS. CODE § 1780(a)(4) (punitive damages available under the CLRA).

*Auffenberg* expressly rejected the seller's argument that post-sale events should be taken into account when calculating consumer damages arising from the sale of a misrepresented car:

> It is true that after the completion of the transaction [seller]-plaintiffs forced a return of the property by a suit in replevin and [consumer] Mrs. Hafley persuaded plaintiffs to give her back her old car, but this was after the date of the transaction to which this action of fraud is directed.  As stated above, *the damages are to be ascertained on the date of the transaction.*  Mrs. Hafley … was entitled … to the "benefit of the bargain" to compensate for the alleged wrong done her.

*Auffenberg*, 457 S.W.2d at 938 (emphasis added); *see also Miller v. Higgins*, 452 S.W.2d 121, 125 (Mo. 1970) ("Is the victim of fraud to be penalized or denied any recovery when he is successful in mitigating the damage?  We know of no authority so holding."); *In re Usery*, 123 F.3d 1089, 1094 (8th Cir. 1997) (citing *Auffenberg*) ("Damages are measured as of the time of the transaction."); *Larabee v. Eichler*, 271 S.W.3d 542, 548 (Mo. 2008) (same).  Missouri law could not be clearer:  for claims based on fraud in connection with a consumer sale, benefit-of-bargain damages are measured at the time of transaction, and post-sale events are irrelevant.

Once again, GM's prior briefing that it incorporates by reference (GM Br. at 13) ignores the relevant consumer fraud authorities, and mainly relies on factually and legally inapposite cases that do not involve misrepresented-product sales or benefit-of-the-bargain damages. *See*, *e.g.*, *Crawford v. Whittaker Constr.*, *Inc.*, 772 S.W.2d 819, 822 (Mo. Ct. App. 1989) (discussing "diminution of value" damages); *De Armon v. City of St. Louis*, 525 S.W.2d 795, 801 (Mo. Ct. App. 1975) (discussing "diminution in value" damages); *Flora v. Amega Mobile Home Sales*, *Inc.*, 958 S.W.2d 322, 324 (Mo. Ct. App. 1998) (discussing "measure of damages in a negligence action for damage to real property").  But this Court has repeatedly distinguished diminished value damages (not at issue in this case) from benefit-of-the-bargain damages.  Further, Plaintiffs' claims do not sound in negligence.  As in California, then, GM's belated post-fraud recalls (even if effective) do not eliminate its liability.  The Missouri Plaintiffs may recover their

benefit-of-the-bargain damages as of the time of sale, as well as punitive damages and lost-time damages (*see infra* at Section III.B).

> **(3)   Texas law also calculates benefit-of-the-bargain damages as of the time of sale and not at any later time.**

The Texas Plaintiffs' remaining claims at issue on this motion are brought under the Texas Deceptive Trade Practices Act (TDPA), Tex. Bus. & Com. § 17.41, *et seq.*, which permits recovery of benefit-of-the-bargain damages.  *See FACC Order*, 257 F. Supp. 3d at 448-49.  As in California and Missouri, these damages "are properly measured at the time of the sale induced by the fraud . . . and not at some future time."  *Fazio v. Cypress/GR Houston I, L.P.*, 403 S.W.3d 390, 396 (Tex. Ct. App. 2013); *see also Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997) ("damages are determined at the time of sale").

GM's argument that post-sale repairs should vitiate its liability (GM Br. at 13-14) rings particularly hollow in Texas, where the Court has held that Plaintiffs must prove a manifestation of the defect.  Whatever the efficacy of the recall repairs, they were too late to save Plaintiffs from the ill-effects of the defects.  *See infra* at Section III.A.2.  In any event, GM has proffered no on-point authorities granting it the immunity it seeks under Texas law, and Plaintiffs are not aware of any.  The Texas Plaintiffs may recover benefit-of-the-bargain damages, as well as other damages (including lost-time damages, *see infra* at Section III.B).  *See*, *e.g*., *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 162 (Tex. 1992) (under the TDPA, "such direct measures as 'benefit-of-the-bargain' and 'out-of-pocket' are not exclusive[,]" and courts may award "other damages to ensure that the plaintiff is made whole").

> **b.   Plaintiffs' damage model fairly accounts for GM's belated recalls.**

To the extent that the Court may use this motion to elaborate on its tentative "surmise" that GM's post-sale recalls could "affect the availability or calculation of damages," *BoB Order*,

2018 WL 1638096, at *2, Plaintiffs' damage model factors in the actual value of belated repair (properly measured as of the time of purchase, the relevant moment in this benefit-of-the-bargain case).[33]  PSUF at ¶¶ 282-83.  Thus, GM's complaint that Plaintiffs' damage analysis fails to account for its recalls is misguided.  Plaintiffs' damage analysis fairly discerns the impact of the latent safety defects on the price of the defective vehicles and takes into account the time between sale and recall.

### 2.   Plaintiffs' vehicles remain defective.

In any event, Plaintiffs' damages have not been mitigated by the recalls.  The recalls did not fix the ignition switch-related defects.

#### a.   GM has not repaired the vehicles.

With regard to all defects other than side airbag (Recall No. 14v118) and power steering (Recall No. 14v153), there is—at a minimum—an issue of fact as to whether GM's recall repairs actually cured the defects.  As described above, the evidence indicates that GM chose not to fix aspects of the cars that GM knew were causing or contributing to the safety hazards, and as a result the cars remain defective.  Vehicles subject to the 14v355, 14v394, and 14v400 recalls still suffer from low-torque switch defects because GM did not replace the switches as part of the recalls; vehicles subject to the 14v047, 14v355, and 14v394 recalls still suffer from knee-to-key defects because of the low placement of the ignition switch on the steering column; and all of the vehicles still have a single-point-of-failure defect because critical safety systems, including airbags, are disabled if the ignition switch moves out of run.  *See Section* II.A, *supra*.

---

[33] As demonstrated above, the Court's prior rulings are inconsistent with any notion that post-sale events can be viewed as exculpatory or mitigating.  *See, e.g.*, *TACC Order*, 2016 WL 3920353, at *30 ("the benefit-of-the-bargain defect theory… measures the difference in value between the defective car the consumer received and the defect-free car the consumer thought she was getting (and for which she paid)"); *FACC Order*, 257 F. Supp. 3d at 401 ("*Plaintiffs' injury*, if any, *was complete at the time of sale*, and thus is not attributable to New GM's conduct.") (emphasis added); *TACC Order*, 2016 WL 3920353, at *40 ("the recalls, even those sufficient to remedy the defects, do not compensate Plaintiffs fully for the damages sought here").

### b.       Plaintiffs' evidence of un-remedied defects is admissible.

GM contends that none of Plaintiffs' evidence demonstrating the un-remedied defects is admissible, GM. Br. at 16-19, but GM is wrong.  While Plaintiffs rely on the opinions of experts Glen Stevick and Steve Loudon, much of the evidence is comprised of GM's admissions from its own switch testing.  For example, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████  *See* PSUF at ¶¶ 117-21, 160-65, 205-09.  For a fuller treatment, Plaintiffs respectfully refer the Court to their Opposition to GM's Motion to Exclude Plaintiffs' Expert Opinions under *Daubert* and Federal Rules of Evidence 702, which is incorporated herein by this reference.  Plaintiffs' evidence that GM has not fixed these cars is admissible.

### 3.       Plaintiffs' evidence properly quantifies their benefit-of-the-bargain damages and precludes summary judgment.

Plaintiffs' damages are the same damages suffered by all class members:  their overpayments resulting from GM's failure to disclose the safety defects in their vehicles.  Once again, these amounts arise from the impact on price the safety defects *would have had* if GM had disclosed (i) the particular defect at issue and (ii) when (if ever) a free fix would be available.  *See* PSUF at ¶¶ 271-97.  Thus, Plaintiffs' benefit-of-the-bargain damages are determinable, based on the vehicle they purchased, the defect that vehicle contained, and the length of time from the sale to the recall.[34]  The damages are itemized in Exhibit SJ Ex. 43.  Contrary to GM's argument, then, the record evidence establishes for each Plaintiff the "fact that he or she overpaid, at the time of sale, for a defective vehicle."  *TACC Order*, 2016 WL 3920353, at *7- 10.  That is all they are required to show, and GM's arguments to the contrary fail.

---

[34] The California and Missouri Ignition Switch Defect Bankruptcy Class Plaintiffs' damages are limited to the percentage of the value of their claims that they would have recovered if they had filed timely claims in Old GM's bankruptcy.  *See infra* at Section III.J.

***Named Plaintiffs need not themselves be experts as to the impact of the safety defects on the value of their cars.***  GM Br. at 20-22.  GM chastises Plaintiffs because they "deferred to their experts" as to the impact of the undisclosed defects on the value of their cars.  *Id.*  But GM cites no authority requiring Plaintiffs to have such expertise themselves, or to refrain from using experts.  *See*, *e.g.*, *BPP Wealth*, *Inc. v. Weiser Capital Mgmt.*, *LLC*, 623 F. App'x 7 (2d Cir 2015) (affirming damages finding based on expert testimony).

***Plaintiffs' expert need not separately calculate each Named Plaintiffs' damages.***  GM Br. at 22-24.  As GM states, Mr. Boedeker himself did not allocate individual Plaintiffs' damages.  Instead, he provided a methodology for doing so that establishes that each and every class member overpaid for defective cars and thereby suffered damages.  Crucially, GM does *not* challenge that methodology for the purposes of summary judgment.  Depending upon the findings made by the trier of fact, Boedeker's conjoint analyses can readily determine each Plaintiffs' damages, and SJ Ex. 43 sets forth the range of damages the jury might award depending upon its findings.  *See*, *e.g.*, PSUF ¶ 293 (citing July 5, 2018 Boedeker Dep. at 132:6-7 ("███████████████████████████████████████████."); *id.* at 134:10-11 (████████████████████████████████████████████████████████████

███████ .  Plaintiffs easily meet their burden in opposing summary judgment by offering proof that they overpaid for the cars, even if the precise amount of their damages is dependent upon the jury's findings.  *See*, *e.g.*, *Persh v. Peterson*, 2016 WL 4766338, at *5 (S.D.N.Y. Sept. 13, 2016) (summary judgment denied where "a reasonable jury could conclude that [Plaintiff] was damaged by … even though the precise amount" of damage was "not certain").

GM next complains that Plaintiffs' expert did not individually compute each Plaintiffs' damages—but again cites no authority imposing such a requirement.  It is certainly true that

Plaintiffs' experts offer a methodology for assessing "the amount of *classwide* overpayment damages."  GM Br. at 22 (emphasis supplied by GM).  But that same *classwide* methodology shows each Plaintiff's damages by simply plugging in a few simple record facts for each Plaintiff, which Plaintiffs have done.  *See* PSUF at ¶¶ 288-296; SJ Ex. 43.[35]

***Plaintiffs need not proffer proof of the prices they paid for their vehicles in order to prove damages***.  GM mistakenly suggests that each Plaintiff must offer proof to a mathematical certainty of "what each plaintiff paid and the allegedly defective vehicle's market value."  GM Br. at 19.  That is not the law.  Instead, the calculation of damages "'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'"  *Pulaski*, 802 F.3d at 989 (quoting *Marsu*, *B.V. v. Walt Disney Co.*, 185 F.3d 932, 938-39 (9th Cir. 1999)) (California law); *accord In re Lenovo Adware Litig.*, 2016 WL 6277245, at *21 (conjoint analysis sufficient to calculate benefit-of-the-bargain damages); *Larabee*, 271 S.W.3d at 548 (reversing grant of summary judgment where plaintiffs submitted an estimate of damages in a real property fraud case based on a "Sales Comparison Analysis" reviewing the sales price of 90 "similar properties" and concluding that the subject property "had a decrease in value of forty percent" as compared with the property as represented); *Millers Cas. Ins. Co. of Tex. v. Lyons*, 798 S.W.2d 339, 345 (Tex. Ct. App. 1990) (law does not require proof of damages "with mathematical exactness" as long as the evidence affords "a reasonable basis for estimating the amount of damage").

Plaintiffs provide adequate proof of their damages such that, at a minimum, there is a material issue of fact to be decided at trial.

---

[35] While it is true that "not all consumers pay the same price for identical vehicles" and that "many variables" impact the price of a car, GM Br. at 22-23, Plaintiffs' benefit-of-the-bargain damages are based on the precisely-modeled impact of the safety defects on the value of their cars—and not on, for example, the paint color or age of the car.  That is why Plaintiffs' experts have reliably modeled the impact of safety defects on the overall car value, as opposed to the impact of other factors not at issue in this case.

4.      **Plaintiffs who disposed of their vehicles before the recalls suffered
        compensable benefit-of-the-bargain damages at the point of sale.**

In moving to reconsider the Court's dismissal of the claims of Plaintiffs who sold their
cars prior to the recalls ("Pre-Recall Plaintiffs"), Plaintiffs advised the Court that they planned to
"prove, through expert testimony" that they suffered damages.  Dkt. No. 4344, at 8.  While the
Court noted that Plaintiffs had not *alleged* "sufficient factual matter" as to why the Pre-Recall
Plaintiffs suffered losses, *In re GM LLC Ignition Switch Litig.*, 2017 WL 3443623, at *2
(S.D.N.Y. Aug. 9, 2017), the Court nonetheless denied GM's motion to dismiss the Pre-Recall
Plaintiffs and chose to "defer" ruling on the issue "to 'another day—either in connection with
motions for class certification or dispositive motions examining the laws of each applicable
state.'"  *Id.* at *3 (citation omitted).  Now that day has come; the evidentiary record (including
uncontested expert reports from Messrs. Boedeker and Gans) and bellwether state law
demonstrate that the Pre-Recall Plaintiffs' claims stand.

As discussed *supra*, under the laws of the bellwether states, benefit-of-the-bargain
damages are measured at the time of purchase.  Where, as here, a plaintiff overpays for a product
as the result of a defendant's deceptive and fraudulent conduct, the plaintiff is entitled to receive
(and the defendant is not permitted to retain) the amount of that overpayment.  The fact that
subsequent purchasers were *also* harmed by GM's fraud does not change the fact that the Pre-
Recall Plaintiffs overpaid for their vehicles and are entitled to a remedy.

Dispositive of GM's motion here, Plaintiffs' expert's conjoint analysis demonstrates
precisely how *all* Plaintiffs incurred damages at the moment of sale consistent with the
governing authorities in the bellwether states—including the Pre-Recall Plaintiffs.  Because GM
does not challenge Plaintiffs' conjoint evidence in connection with this motion, it cannot obtain
summary judgment with respect to the Pre-Recall Plaintiffs.  Stated differently, GM has failed to

produce sufficient evidence to support its contention that Pre-Recall Plaintiffs suffered no economic loss as a matter of law.  *See* GM Br. at 26 (citing only evidence that three Plaintiffs disposed of their calls before the recalls, but providing no evidence of the impact of their alleged fraud on the price Plaintiffs paid for their cars).  In the absence of such evidence, GM cannot prevail on its motion.  *See, e.g.*, *Balestriere PLLC v. CMA Trading, Inc.*, 2014 WL 929813, at *12-13 (S.D.N.Y. Mar 7, 2014) (summary judgment denied where movant failed to provide evidence of contentions central to motion).

> ### 5.     Recent precedent applying Missouri law confirms manifestation is not required for a Missouri implied warranty claim.

GM does not dispute that manifestation is not required for Plaintiffs to prevail on any of their California claims or the majority of their Missouri claims.  GM Br. at 24 (challenging only Texas and Missouri implied warranty claims).  While this Court previously held that a single Missouri Court of Appeals case—*Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68 (Mo. Ct. App. 2011)—"suggests that . . . manifestation is required to plead a viable breach of warranty claim under Missouri law[,]" *TACC Order*, 2016 WL 3920353, at *35, subsequent developments in the law confirm this is not so.  Earlier this year, a federal court held that *Hope*'s reliance on two Eighth Circuit cases was misplaced because neither "were decisions based on Missouri law[.]" *Tershakovec v. Ford Motor Co.*, 2018 WL 3405245, at *8 (S.D. Fla. July 12, 2018) (declining to require manifestation and denying motion to dismiss Missouri implied warranty claims). Consequently, *Hope* alone "is unpersua[sive] that the clear weight of authority in Missouri requires a manifestation of the defect [.]"  *Id.*; *see also* Dkt. No. 6028, Op. & Order Re Manifestation, Lost Time, & Unjust Enrichment at 7 (Sept. 12, 2018) ("the Court can no longer say with confidence that, across the states, the 'majority view' is that manifestation is required to state claims for fraud, violations of consumer protection statutes, and breaches of warranty"); *id.*

at 8 ("[W]hile manifestation may be helpful in proving the presence of a defect, it does not follow that recovery for economic loss should turn on whether the defect also caused property or personal damage.").

Plaintiffs concede, however, that Texas law requires manifestation in order to prevail on a breach of implied warranty claim. But there is a genuine issue of material fact regarding defect manifestation in Plaintiffs' vehicles, including the four Texas Plaintiffs and four of the Missouri Plaintiffs that GM has highlighted. Dawn Fuller (Texas) testified that ██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ PSUF at ¶ 547 (citing Nov. 20, 2017 D. Fuller Dep. Tr. at 33:11-23; 55:2-11).

Gareebah Al-ghamdi (Texas) testified ████████████████████████████████

██████████████████ PSUF at ¶ 528 (citing May 5, 2017 G. Al-ghamdi Dep. at 59:8-10). She also

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████ *Id.* (citing May 5, 2017 G. Al-ghamdi Dep. at 61:21-62:4; 63:14-21 (emphasis added)). Ms. Al-ghamdi also testified ████████████████████

████████████████████████████████████████████████████████████ *Id.* at (citing May 5, 2017 G. Al-ghamdi Dep. at 168:21-169:9).

Lisa McClellan (Texas) testified ██████████████████████████████████

██████████  ██████████████████████████████████ PSUF at ¶ 563 (citing May 4,

2017 L. McClellan Dep. at 69:7-10, 70:7-9, 73:20-74:6, 82:3-10, 85:21-86:1, 94:6-11, 95:14-18).

Michael Graciano's stepdaughter (Texas) testified ███████████████████████

███████████████████████████████████. PSUF at ¶¶ 554-55. In each

incident, the ignition switch had moved into the "off" position. *Id.*

Mario Stefano (Missouri) testified ████████████████████ PSUF at ¶ 502

(citing Apr. 14, 2017 M. Stefano Dep. at 52:18-53:4; 93:3-9). Brad Akers (Missouri) testified

that ███████████████████████████████████████████.

PSUF at ¶ 458 (citing B. Akers PFS Q 58 at ELPLNTFF00013453). Kenneth Robinson

(Missouri) testified ████████████████████████ PSUF at

¶ 485 (citing May 9, 2017 K. Robinson Dep. at 67:8-20; 70:21-71:11). And Patrice Witherspoon

(Missouri) testified ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ PSUF at ¶¶ 518-19 (citing GM-MDL2543-305118727, 33; GM-

MDL2543-305154067-70; ELPLNTFFF00009318). The recall notice indicated that the recall

repair was only required if the defect had manifested which, according to Ms. Witherspoon's

records, it had. *Id.* at ¶ 519 (citing ELPLNTFFF00009318; GM-MDL2543-305154067-68).

**B.      Plaintiffs can recover consequential damages in the form of lost time.**

Summary judgment is not warranted with respect to Plaintiffs' claims for lost time

damages under California, Missouri, or Texas law.[36]

---

[36] Plaintiffs seek lost-time damages only on behalf of those Plaintiffs who brought their vehicles in for repair.

1.      **California does not require a showing of lost wages.**

Like Colorado, New York, Ohio, Oklahoma, Utah, and Virginia, California allows recovery for lost time beyond lost earnings.  Dkt. No. 6028, Op. & Order Re Manifestation, Lost Time, & Unjust Enrichment at 82.  California courts expressly distinguish damages for loss of time from damages for loss of earnings, and California law permits lost time damages for UCL, CLRA, and fraud-based claims in the circumstances presented here.  GM ignores relevant precedent and cites cases out of context in arguing otherwise.

Courts in California recognize "a clear distinction" between damages for "loss of time" and "loss of earnings."  *Rupp v. Summerfield*, 326 P.2d 912, 918 (Cal. Ct. App. 1958).  In *Rupp*, the California Court of Appeals rejected defendant's argument that "allowing a person both the value of his time and loss of earnings is to permit a duplication of damages."  *Id.*  Rather, the court instructed the jury "to place a monetary value upon the time lost away from plaintiff's normal pursuits in addition to money lost in the form of salary or wages."  *Id.*

With respect to restitution under the UCL, federal courts recognize that the contours of economic injury sufficient to confer UCL standing are "still developing."  Notably, some courts define "a loss of money or property" under the UCL far more broadly than GM suggests.  *See*, *e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 985-86 (N.D. Cal. 2016).  For example, in *Corona v. Sony Pictures Entm't, Inc.*, 2015 WL 3916744, at *4-5 (C.D. Cal. June 15, 2015), the Northern District of California held that "costs relating to credit monitoring, identity theft protection, and penalties"—including the cost of lost time related to such activities, *see id.* at *4 (citing "costs already incurred" as alleged in specific paragraphs of the complaint)— constitute "a cognizable injury" under the UCL.  None of the costs that the *Corona* court discussed included lost income.  *See also In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *26 (N.D. Cal. May 27, 2016) ("using their own time for credit monitoring" in

- 41 -

response to a data breach "resulted in damages that may be recoverable" under federal law without discussing lost income).

As to the CLRA, its "any damage" provision may encompass "opportunity costs," which are "the benefit[s] forgone by employing a resource in a way that prevents it from being put to another use."  *Meyer v. Sprint Spectrum L.P.*, 200 P.3d 295, 299 n.1 (Cal. 2009) (citation omitted).  Here, as a result of GM's unfair or deceptive acts or practices, Plaintiffs had to spend time obtaining repairs to their vehicles rather than putting that time to another use.  PSUF at ¶¶ 314-18, 355, 364, 371, 383, 391, 395, 403, 405, 412-13, 419, 425, 432-33, 441, 450, 452-53, 460-62, 477, 485-86, 494, 501, 520, 522, 529, 548-49, 556, 563-64.

As for Plaintiffs' fraud-based claims, the California Supreme Court explicitly recognizes that damages may include "lost time and money reasonably expended in reliance" on a defendant's fraudulent acts.  *Stout v. Turney*, 586 P.2d 1228, 1233 (Cal. 1978); *see also Lawson v. Town & Country Shops, Inc.*, 323 P.2d 843, 849 (Cal. Ct. App. 1958) (citing *Sutter v. Gen. Petroleum Corp.*, 170 P.2d 898, 903 (Cal. 1946)) ("Loss of time and effort or loss of salary . . . proximately caused by making fraudulent misrepresentations . . . have been held to be recoverable."); *Nagy v. Nagy*, 258 Cal. Rptr. 787, 793 (Cal. Ct. App. 1989) (Johnson, J., concurring) (observing in fraud case that "harm suffered through the loss of appellant's investment of time and money in the fathering of a child he was fraudulently led to believe was his own flesh and blood" was "a compensable item of damages").

Here, there are genuine issues of material fact regarding the value of Plaintiffs' lost time. Michelle Thomas testified ███████████████████████████████████████ ████████████████████████████  PSUF at ¶ 453 (citing M. Thomas PFS Q 424 at ELPLNTFF00014026).  Thomas, Basseri, Cereceres, Padilla and other Plaintiffs are laypersons

who further rely on expert analysis and opinion to prove their damages.  ███████████

████████████████████████████████████████████████████████████ .

PSUF at ¶¶ 314-18; 355, 364, 371, 383, 391, 395, 403, 405, 412-13, 419, 425, 432-33, 441, 450,

452-53.  This includes Plaintiff Cereceres, who's routine maintenance appointment lasted longer

than it would have had her vehicle not required the 90-minute recall repair.  GM fails to cite a

single authority in support of its contention that plaintiffs may not rely on expert testimony to

establish their lost-time damages.  GM Br. at 30.

> **2. Missouri permits lost time damages.**

In Missouri, GM concedes that plaintiffs with evidence of resulting financial losses may

recover damages for lost time and that Plaintiff Brad Akers has presented such evidence.  GM

Br. at 30 (conceding that the court should not award summary judgment on lost time against

Missouri Plaintiff Brad Akers).  *See also Seymour v. House*, 305 S.W.2d 1, 3 (Mo. 1957) (in the

personal injury context, plaintiffs "may prove a resulting loss of time, and a consequent loss of

personal earnings or wages as an item of special damages").  Consequently, summary judgment

should be denied with respect to Akers's claims for lost-time damages.  Plaintiffs concede that,

to the extent other Plaintiffs have not presented evidence demonstrating resulting financial loss,

they may not recover for lost time under Missouri law.

> **3. Texas does not require a showing of lost wages.**

Texas, too, allows recovery for lost time beyond lost earnings.  Specifically, in *Farmers*

*& Merchs. State Bank of Krum v. Ferguson*, 617 S.W.2d 918, 921-22 (Tex. 1981), plaintiff

alleged that the defendant bank wrongfully dishonored his checks and that he was entitled to

damages for "lost time calling creditors and attempting to explain the situation to them."  A

Texas jury awarded the plaintiff "$5,000.00 for loss of time," and the Supreme Court upheld the

award on appeal, rejecting defendant's argument "that there is no evidence in the record to

support the jury's findings on . . . loss of time[.]"  *Id.*  The result should be no different under statutory consumer law.   Indeed, in *Rhey v. Redic*, 408 S.W.3d 440, 454-55 (Tex. Ct. App. 2013), the Texas Court of Appeals affirmed an award for lost time damages, among other things, in a statutory fraud case.  Federal courts applying Texas law likewise recognize the availability of lost-time damages.   For instance, in *Allen v. JPMorgan Chase Bank*, *N.A.*, 2012 WL 12865210, at *3 (N.D. Tex. July 6, 2012), the court included claimed damages under the DTPA for "the value of the time that Plaintiffs spent trying to obtain the correct amount to pay on the loan" when assessing the amount in controversy and denying a motion to remand to state court. Consequently, summary judgment should be denied with respect to Plaintiff Fuller's and Graciano's claims for lost time damages.[37]

## C.     Plaintiffs with Service Part Vehicles have viable claims because those vehicles are defective.

GM falsely contends that plaintiffs whose vehicles are subject to the Service Parts Vehicle recall have no claim because their cars are not defective unless the 190 switch was replaced with a 423 switch.  GM Br. at 32-33.  As detailed above in Section II.A.1.a, GM put into production the 190 switch knowing that it did not meet GM's safety torque specifications—specifications that were so important that GM ensured that *all* of the new switches used in the 14v047 repairs met the required minimum torque spec.   This makes the switches defective. While GM derides the torque specification as "plaintiffs' own standard," GM Br. at 33, GM is wrong.  The evidence clearly demonstrates that Old GM and then GM established the standard and believed—until GM filed the instant motion—that cars are defective if their switches may

---

[37] Even assuming that Texas law requires evidence of lost earnings to recover damages for lost time, which it does not, Plaintiff Fuller has put forth evidence giving rise to a genuine issue of material fact.  Ms. Fuller testified ██████████████████████████████████████████████████ PSUF at ¶¶ 548 (citing D. Fuller PFS Q 424 at ELPLNTFF00016420). Thus, there is, at a minimum, a genuine issues of material fact regarding whether Fuller may recover lost time damages and summary judgment should be denied with respect to her claim.

not meet the torque standard.  *See*, *e.g.*, PSUF ¶ 2 (describing ignition switches as defective because they may not meet the company's torque specification); ¶ 29 

); *see also id.* at ¶ 32 (

").

Thus, Old GM's 2006 design change that ultimately led to the 190 switch did not remedy the defect.  While GM maintains that the longer Catera spring used in the 190 switch effectively cured the low torque problem in the 423 switch, this is untrue, as GM's own documents reveal. The ignition switches in the Service Part Vehicles are all defective, PSUF at ¶¶ 28-56, rendering it unnecessary to test the torque in each individual Plaintiff's car.  And the Service Part Vehicles also suffer from knee-to-key and single-point-of-failure defects.  *See supra* Section II.A.1.b.

For these reasons, Plaintiffs Basseri, K. Robinson, Padilla, Akers, and Hawkins, who have so-called Service Part Vehicles, do not need to show that they had a 423 switch installed, because the evidence shows that both the 190 and 423 switch models are defective.  Tellingly, in issuing the Service Part Vehicles portion of the 14v049 recall, GM did not just recall the 2,664 vehicles into which the 423 switches had been installed.  Instead, it recalled *all* Service Part Vehicles—over 820,000 of them.  PSUF at ¶¶ 4, 28.  And, in doing so, it did not examine each switch to determine whether it was a 190 or 423 switch and replace just the 423 switches, but replaced *all* switches.  Nor did it test switches and replace only those not meeting the torque minimum; again, it replaced *all* switches.  It did so because GM knew that all pre-recall 190 and 423 switches are defective.

In any event, at a minimum, an issue of material fact exists such that summary judgment in favor of GM must be rejected.  As the Court already held in denying GM's *Daubert* and

summary judgment motions in the *Ward* case, "whether and to what extent the 190 switch suffers from the same defect as the 423 switch" is a "core factual dispute" on which, based on the evidence, the jury could find for Plaintiffs.  Dkt. No. 4110 at 7; *see also id.* at 14-15 (evidence supported the conclusion that 190 switch was defective but was insufficient to grant summary judgment in favor of Ward).

**D.   Plaintiffs who acquired used Old GM vehicles after GM's inception have valid claims against GM given GM's breaches of its uncontested duty to recall Old GM cars with safety defects and GM's strong relationship with the defective cars.**

As the Second Circuit held, consumers who bought Old GM cars after the effective date of the bankruptcy Sale ("Used-Car Purchasers") may bring claims against GM without impediment from the bankruptcy Sale Order because those Plaintiffs "purchased Old GM cars *after* the closing, without knowledge of the defect or possible claim against New GM."  *In re Motors Liquidation Co.*, 829 F.3d 135, 157 (2d Cir. 2016).  Just as it has repeatedly done in the personal injury context,[38] the Court should reject GM's claim that it owed no duty to Used-Car Purchasers because it did not make or sell the cars.  GM's argument must fail because it alone had both knowledge of the defects and the ability to forestall the Used-Car Purchasers' economic losses.  Under the consumer protection and fraudulent concealment laws of the bellwether jurisdictions,[39] GM is liable to Used-Car Purchasers for breaching its clear duty to disclose and remedy safety defects and for foreseeably causing economic harm to *all* who purchased defective Old GM cars after GM's inception.[40]

---

[38] *See, e.g.*, *In re GM LLC Ignition Switch Litig.*, 154 F. Supp. 3d 30, 37-41 (S.D.N.Y. 2015) (finding New GM had post-sale duty to warn of the Ignition Switch Defect under Oklahoma law); *In re GM LLC Ignition Switch Litig.*, 202 F. Supp. 3d 362, 366-72 (S.D.N.Y. 2016) (same under Virginia law).

[39] Plaintiffs are not pursuing implied warranty claims on behalf of Used-Car Purchasers, and (of the bellwether jurisdictions) only have surviving fraudulent concealment claims for Used-Car Purchasers in Missouri.

[40] Confusingly, GM discusses the law on duty to warn in California and Texas (but not in Missouri where, presumably, the law is worse for GM).  *See* GM Br. at 59-61.  Because the economic loss Plaintiffs do *not* bring duty to warn claims, they will not address GM's arguments on that score.

1.    **Because GM had a strong relationship with the Used-Car Purchasers' vehicles, California law provides a remedy for the economic losses caused by GM's failure to disclose the safety defects in the vehicles.**

GM cannot contest that it owed a duty to disclose the safety defects at issue. Under the CLRA and the UCL, a duty to disclose exists when a defendant "ha[s] exclusive knowledge of material facts not known or reasonably accessible to the plaintiff," or "when the defendant actively conceals a material fact from the plaintiff." *Collins v. eMachines*, *Inc.*, 134 Cal. Rptr. 3d 598, 593 (Cal. Ct. App. 2011). A misrepresented (or omitted) fact is material "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action…." *Kwikset*, 246 P.3d at 892. The Court has held that a concealed safety defect "would have affected a reasonable person's decision to purchase a car—making the omission material." *TACC Order*, 2016 WL 3920353 at *20.

GM cannot evade this duty simply because Old GM made the Used-Car Purchasers' vehicles. From day one of its existence in July 2009, GM was aware of the ignition switch defect in California Plaintiff Michelle Thomas' 2005 Lacrosse, *see* PSUF at ¶¶ 319-50, and ██ ████████████████████████████████████████████████████████████████████ *Id.* at ¶ 448. It is also undisputed that GM had disclosure and recall duties with respect to Ms. Thomas' vehicle under the Federal Safety Act,[41] which required GM to take immediate action as soon as it determined or should have determined that a safety defect exists. *See, e.g.*, *U.S. v. GMC*, 574 F. Supp. 1047, 1049-50 (D.D.C. 1983) (Safety Act "imposes an independent duty upon manufacturers of motor vehicles to give notification of and to remedy known safety-related

---

[41] 49 U.S.C. §§ 30101-30170. A "safety defect" is one that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8). It is undisputed that all the defects at issue in this case were "safety defects."

defects").[42]  Because the UCL "borrows" violations of other laws and makes them actionable under its "unlawful" prong, *Cel-Tech Commcn's, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999), Safety Act violations are actionable under the UCL.  *In re Toyota Motor Corp. Unintended Acceleration Mktg.*, 2012 U.S. Dist. LEXIS 189744, at *265-272 (C.D. Cal. May 4, 2012).  There can be no question that GM's disclosure obligations ran to Plaintiff Thomas' vehicle and therefore to Plaintiff Thomas.

California courts have squarely rejected GM's argument that only consumers who purchase from a defendant may sue under consumer protection laws.  Instead, Used-Car Purchasers can bring claims under the CLRA and the UCL against responsible parties for failure to disclose material facts (including safety defects).  *See Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1183 (N.D. Cal. 2017) (used-car purchasers who did not buy from a Nissan dealer could sue Nissan under the UCL and the CLRA for failure to disclose a latent safety defect because "the CLRA does not require a direct transaction between plaintiffs and defendants") (quoting CAL. CIV. CODE § 1780(a) ("Any consumer who suffers any damage as a result of the use or employment by any person of a method, act or practice declared to be unlawful by Section 1770 may bring an action against that person."));[43] *see also Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1144 (N.D. Cal. 2005) (used car purchasers "have standing to bring CLRA claims, despite the fact that they never entered into a transaction directly with [the] Defendant"); *McAdams v. Monier, Inc.*, 105 Cal. Rptr. 3d 704, 712-13 (Cal. Ct. App. 2010) ("a cause of action under the CLRA may be established independent of any contractual

---

[42] In order to get the bankruptcy Sale approved, GM agreed to step into the shoes of the manufacturer, Old GM, and comply with the Safety Act with respect to Old GM cars.  *E.g.*, *In re GM LLC Ignition Switch Litig.*, 154 F. Supp. 3d at 40.  Accordingly, the Court recognized that the Safety Act fully applied to New GM with respect to Old GM cars.  *Id.* ("The notification and recall obligations under the Safety Act that New GM inherited provide another kind of service and repair duty" with respect to Old GM car owners.").

[43] In contrast, the Court dismissed the used-car purchasers' implied-warranty claims under the Song-Beverly Act.  *Johnson*, 272 F. Supp. 3d at 1179.

relationship between the parties"). The same result obtains under the UCL. *See Johnson*, 272 F. Supp. 3d at 1184 (because the used car purchaser's "allegations are sufficient to state a claim under the CLRA based on the deceptive act of fraudulent omissions or concealment, [she] has likewise stated a claim under the unlawfulness prong of the UCL"). While *LiMandri v. Judkins*, 60 Cal. Rptr. 2d 539, 543 (Cal. Ct. App. 1997), states that the duty to disclose normally arises in the context of a transaction between the parties, GM Br. at 56, GM ignores cases making clear that such a transaction is not *required*.[44] GM cannot prevail in its effort to avoid liability for the sale of defective used GM vehicles by dint of the fact that it didn't sell or make the cars.

### 2. Missouri law also provides a remedy for the Used-Car Purchaser's economic losses caused by GM's failure to disclose the safety defects in vehicles.

Just like California, Missouri imposes a duty to disclose a material fact (including a safety defect) when the defendant "has superior knowledge of information not within the fair and reasonable reach of the" plaintiff. *See TACC Order*, 2016 WL 3920353, at *34 (fraudulent concealment); *DePeralta v. Dlorah, Inc.*, 2012 WL 4092191, at *6 (W.D. Mo. Sept. 17, 2012) (quoting *White v. Bowman*, 304 S.W.3d 141, 149 (Mo. Ct. App. 2009)).[45] From its inception on July 2009, GM knew about the ignition switch defect in Missouri Plaintiff Deloris Hamilton's

---

[44] Instead of discussing those cases, GM relies on a handful of cases that are inapposite or do not contradict Plaintiffs' authorities. *LiMandri* involved the failure to disclose a security lien to plaintiff, and the court held there was no duty to disclose the lien because there was no transaction or relationship between the plaintiff and the lender holding the lien. 60 Cal. Rptr. 2d at 543-44. *See also Hoffman v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178 (2014) (defendant, who claimed an easement right in the property purchased by plaintiff, had no duty to disclose that right to plaintiff as there was no transaction between the parties); *Rogozienski v. Allen*, 2007 WL 867773 (Cal. Ct. App. Mar. 23, 2007) (wife's attorney, who had given a gift to the judge presiding over the dissolution proceeding, had no duty to disclose the gift to the husband since no relationship existed between the parties); *Fulford v. Logitech*, 2009 WL 837639 (N.D. Cal. Mar. 26, 2009) (plaintiff did not allege that defendant owned him a fiduciary duty nor that the parties entered into any transaction because plaintiff purchased from a friend, and not from defendant).

[45] A fact is material "'if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so. The test of materiality is objective and not subjective." *DePeralta*, 2012 WL 4092191, at *6 (quoting *Grosseohme v. Cordell*, 904 S.W.2d 392, 397 (Mo. Ct. App. 1995)).

2000 Oldsmobile Alero, PSUF at ¶¶ 319-50, and ████████████████████████████

███████████████████ *Id.* at ¶¶ 471-72.  GM breached its disclosure duties under Missouri law.

Controlling Missouri precedent squarely rejects GM's argument that it had no duty to Used-Car Purchasers under Missouri law because it did not sell the cars.  GM Br. at 58-59. While GM correctly notes that the MMPA prohibits actionable omissions made "'in connection with the sale or advertisement of any merchandise,'" GM Br. at 59 (quoting MO. REV. STAT. § 407.020), GM ignores Missouri courts' broad interpretation of that provision in particular and the MMPA more generally:  "there is no compelling reason to interpret 'in connection with' to apply only when the entity engaged in the misconduct was a party to the transaction at the time the transaction was initiated." *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 415 (Mo. 2014).[46]  Instead, the MMPA "prohibits the use of the enumerated deceptive practices if there is a relationship between the sale of merchandise and the alleged unlawful action.  According to the statute, *the unlawful action may occur at any time before, during or after the sale and by any person*." *Id.* at 414 (emphasis added).

That the "in connection with" language of the MMPA imposes liability on GM here is underscored by *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007), where the plaintiff sued an automobile wholesaler for concealing the fact that the car the plaintiff purchased from a third-party dealer had been involved in an accident.  In sustaining the MMPA claim against the wholesaler, the court rejected the wholesaler's argument that it was immune from suit

---

[46] As GM omits, the "in connection with" language of the MMPA is modified by the phrase "the sale or advertisement of *any merchandise in trade or commerce*." MO. REV. STAT. § 407.020.1 (emphasis added). This broad provision generally covers all conduct connected to "trade" and "commerce"—meaning any practice "directly or *indirectly* affecting the people of [Missouri]." *Id.* § 407.010(7) (emphasis added); *see also Peel v. Credit Acceptance Corp.*, 408 S.W.3d 191, 208 (Mo. Ct. App. 2013) (referring to the MMPA's definition of "trade" and "commerce" as evidence of the breadth of the "in connection with" language in the statute); *State ex rel. Nixon v. Estes*, 108 S.W.3d 795, 800 (Mo. Ct. App. 2003) ("[T]he definition of trade or commerce . . . makes clear the intent of the General Assembly that the terms should be understood to include, but not necessarily be limited to, economic activity which has a direct or indirect effect on the people of this state.").

because it had sold the car to the dealer but not to Gibbons (the dealer had).  *Id.*  Noting that Missouri "precedent consistently reinforces the plain language and spirit of the statute to further the ultimate objective of consumer protection," the *Gibbons* court held that the "in connection with" language of the MMPA does not require a contractual relationship between the plaintiff and the defendant.  *Id.* at 669-70.  The law is the same for fraudulent concealment.[47]

*Faltermeier v. FCA US LLC*, 2016 WL 4771100, at *1 (W.D. Mo. Sept. 13, 2006), also demonstrates that Used-Car Purchasers may sue here.  There, the plaintiff in 2013 purchased a defective used Jeep manufactured by Chrysler prior to its bankruptcy in 2009.  He brought an MMPA claim for economic loss against Chrysler's successor, FCA, based on alleged misrepresentations made by FCA in press releases opposing NHTSA's recall request in 2013.  *Id.* at *2-3.  In seeking dismissal, FCA argued that "the alleg[ed] misrepresentations were not made 'in connection with the sale or advertisement of any merchandise in trade or commerce.'"  *Id.* at *6 (quoting Mo. Rev. Stat. § 407.020.1).  Rejecting FCA's argument, the *Faltermeier* court held that the plaintiff had properly "alleged a relationship between the alleged misrepresentations and the Jeep Vehicle purchases" since "it can be reasonably inferred that FCA expected the representations contained in those statements to reach current and future owners of Jeep Vehicles" and that "future purchasers of Jeep Vehicles could rely on the statements in making their purchases."  *Id.* at *7.[48]

---

[47] "[P]rivity of contract between the parties is not an element of fraudulent misrepresentation."  *White v. Bowman*, 304 S.W.3d 141, 147 (Mo. Ct. App. 2009) (citing *Westerhold v. Carroll*, 419 S.W.2d 73, 77 (Mo. 1967)); *Anderson v. Ford Motor Co.*, 2017 WL 6733972, at *3 (W.D. Mo. Dec. 29, 2017) (Missouri law does not require privity of contract for fraudulent concealment claim) (citing *White*, 304 S.W.3d at 147-50)).

[48] The *Faltermeier* court subsequently granted summary judgment to FCA because "the press release statements … reached Plaintiff *after* he purchased his Jeep," and therefore there was "no connection of any kind with the sale of Plaintiffs' Jeep."  *See Faltermeier v. FCA US LLC*, 2017 WL 1128467, at *4 (W.D. Mo. Mar. 24, 2017), *aff'd*, 899 F.3d 617 (8th Cir. 2018) (emphasis in original).  In sharp contrast in this omissions case, GM's concealment of and failure to disclose the defect occurred prior to Plaintiff Hamilton's purchase, and prevented her (and all Used-Car Purchasers) from learning the material fact of the safety defect.

Under Missouri law, then, an aggrieved party may sue a defendant when the defendant has a relationship with the merchandise at issue *and* the defendant's deceptive conduct has caused the plaintiff's damage.  *See Conway*, 438 S.W.3d at 414 (*any* "person" can commit the misconduct, and it can occur at any time before the sale).  Here, GM had the requisite relationship with Plaintiff Hamilton's vehicle, as it alone had knowledge of the defect and notification and recall obligations under the Safety Act.  Moreover, the Court has held that "the relationship between GM and Old GM's customers … was 'direct and continuing' and sufficiently 'special' to give rise to a duty to warn…."  *In re GM LLC Ignition Switch Litig.*, 202 F. Supp. 3d 362, 371 (S.D.N.Y. 2016).  Missouri law is the same.  *See Sherlock v. Quality Control Equip. Co.*, 79 F.3d 731, 735 (8th Cir. 1996) (finding sufficient evidence of a duty-to-warn relationship between a successor and its predecessor's customers under Missouri law where the successor "perceived it to be economically advantageous to foster relationships with [the predecessor's] customers; for, through these associations [the successor] would have the opportunity not only to peddle replacement parts, but to one day possibly benefit from the sale of new machines" to those same customers).  GM plainly had the requisite relationship with Ms. Hamilton and her vehicle.  And GM's misconduct in concealing and failing to disclose the defect is the cause of Plaintiff's economic losses.   Ms. Hamilton's claim stands.

### 3.    Texas law also provides a remedy for the Used-Car Purchaser's economic losses caused by GM's failure to disclose the safety defects in vehicles.

Texas courts do not require that a plaintiff buy a misrepresented product from the defendant in order to bring a claim under the DTPA.  Instead, the plaintiff can bring a claim when the defendant and its misconduct have a sufficient relationship with the product.  Here, the Used-Car Purchasers have a claim because of GM's undisputed connection with the defective

cars and because GM's failure to disclose the defects at issue caused Plaintiffs' economic damages.

The Texas Supreme Court has held that the DTPA is *not* limited "to deceptive trade practices committed by persons who furnish the goods or services on which the complaint is based," and there is no "other similar privity requirement" under the Act. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540-41 (Tex. 1981). Instead, the "Act is designed to protect consumers from any deceptive trade practice made *in connection with* the purchase or lease of any goods or services." *Id.* at 541 (emphasis added); *see also Flenniken v. Longview Bank & Tr. Co.*, 661 S.W.2d 705, 707 (Tex. 1983) (quoting *Cameron*, 618 S.W.2d at 539) ("A plaintiff establishes his standing as a consumer in terms of his relationship to a transaction, not by a contractual relationship with the defendant.").[49]

Consumer-plaintiffs state a claim under the DTPA when there is a "connection between the plaintiffs, their transactions, and the defendants' conduct…." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649-50 (Tex. 1996). Such a connection exists where, as here, the defendant's actionable conduct is a "producing cause" of the consumer's injury. TEX. BUS. & COM. CODE § 17.50(a)(1).[50] A "producing cause" is "a substantial factor which brings about the injury and without which the injury would not have occurred." *Doe v. Boys Clubs*, 907 S.W.2d 472, 481 (Tex. 1995). The "producing cause" requirement is satisfied by "evidence that the consumer was adversely affected by the defendant's deceptive conduct." *McLeod v. Gyr*, 439 S.W.3d 639, 649 (Tex. Ct. App. 2014) (citations omitted); *see also Home Sav. Ass'n v. Guerra*, 733 S.W.2d 134,

---

[49] The Used-Car Purchasers are plainly "consumers" under the DTPA since they "acquired goods or services by purchase or lease" and "the goods or services purchased or leased . . . form the basis of the complaint." *Cameron*, 618 S.W.2d at 539.

[50] *Cf. Amstadt*, 919 S.W.2d at 650 (citing *Sw. Bell Tel. Co. v. Boyce Iron Works, Inc.*, 726 S.W.2d 182, 187 (Tex. Ct. App. 1987) for the proposition that requisite connection was lacking where there was no proof that defendant's deceptive conduct was the "producing cause" of plaintiff's damages).

136 (Tex. 1987) (plaintiff states claim when a defendant has "*some connection* either with the actual sales transaction or with a deceptive act related to" it) (emphasis added).

The Texas Used-Car Purchasers present ample proof that GM's failure to disclose (and concealment) was a producing cause of their injuries.  From its inception on July 2009, GM knew of the ignition switch defect in the Texas Used-Car Purchasers' cars, PSUF at ¶¶ 319-50, ███████████████████████████████████████████████████████████. *Id.* at ¶¶ 532, 535-36, 550, 553, 566.  ████████████████████████████████████ ████████████████████████████████████████████████ *Id.* at 532, 542, 550, 559, 566-67.   GM is liable to the Texas Used-Car Purchasers for its DTPA violations.

GM's authorities are again unavailing.  *Myre v. Meletio*, 307 S.W.3d 839, 844 (Tex. Ct. App. 2010), declining to extend duty of disclosure beyond the seller in a real estate transaction, is irrelevant because the claim was not brought under the DTPA (where, as discussed above, there is no such limitation).  *See Miller v. Keyser*, 90 S.W.3d 712, 715-16 (Tex. 2002) (DTPA provides consumers with a means to redress deceptive practices "without the burden of proof and numerous defenses encountered in a common law fraud or breach of warranty suit").

GM's DTPA authorities (all but one involving real estate transactions) are equally inapposite.  In *Terry v. Mercedes-Benz*, *USA, LLC*, 2007 WL 2045231, at *3 (Tex. Ct. App. 2007), the court found no duty to disclose the height of the car's bumper because it was "open and obvious" and there was no evidence that plaintiff lacked an equal opportunity to discover the information.  Here, in stark contrast, only GM (and not Plaintiffs) knew of the concealed defects. In *Steele v. Goddard*, 2013 WL 3013671, at *5 (Tex. Ct. App. June 13, 2013), the defendant had no duty to disclose the termites in the house because plaintiff did not offer evidence that defendant had any knowledge of the termites.  In *Marshall v. Kusch*, 84 S.W.3d 781 (Tex. Ct.

App. 2002), the court rejected Marshall's argument that the DTPA did not apply to him because he was not a party to the transaction; however, the court found that none of Marshall's misrepresentations reached Kusch, and there was no other evidence connecting him to the sale. Here, GM's omissions and concealment impacted the Used-Car Purchasers' knowledge (and the cars' price) at the time of the sale and were a "producing cause" of Plaintiffs' damages. Finally, *Wilson v. John Daugherty Realtors*, *Inc.*, 981 S.W.2d 723 (Tex. Ct. App. 1998), yet another real estate transaction case, turned on contractual limitations in the appraisal report and, again, is wholly inapposite. The Texas Used-Car Purchasers' claims should proceed to trial.

### 4. The Used-Car Purchasers conferred benefits upon GM sufficient to make out unjust enrichment.

Unlike in GM's authorities, *see* GM Br. at 63, the Used-Car Purchasers here provide evidence that their purchase of defective used Old GM cars conferred a benefit upon GM. Of course, by concealing the defects and allowing the used cars to be sold in a defective condition, GM avoided the immediate cost of repair and the harm to its reputation the recalls would have caused. Moreover, many Plaintiffs conferred benefits on GM by having their cars serviced at GM dealers, and/or buying GM parts or cars, and/or developing or maintaining a relationship with GM that would lead to further expenditures for the benefit of GM. *See*, *e.g.*, PSUF at ¶¶ 452 (Michelle Thomas); 460, 465 (Brad Akers); 566 (Lisa McClellan). As all of these benefits flowed directly from the purchase of the cars at issue, the Used-Car Purchasers state claims under the Unjust Enrichment laws of the bellwether jurisdictions. *See infra* at Section III.H.

### E. Plaintiffs satisfy applicable reliance requirements.

GM contends that Plaintiffs cannot show required reliance under their consumer protection and fraudulent concealment claims, GM Br. at 34-40, but GM is wrong. The California, Missouri, and Texas Plaintiffs can recover on their omissions claims upon proof of

the materiality of the omitted information—here, the fact of the safety defect—without the need

for individualized proof of reliance.

Under California law, plaintiffs my prove reliance on an omission by "simply proving

'that, had the omitted information been disclosed, one would have been aware of it and behaved

differently.'"  *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (quoting *Mirkin v.*

*Wasserman*, 23 Cal. Rptr. 2d 101, 107 (Cal. 1993)).  "That one would have behaved differently

can be presumed, or at least inferred, when the omission is material[,]" and it is well-established

that "defects that create 'unreasonable safety risks' are considered material."  *Id.*; *see also*

*Engalla v. Permanente Med. Grp.*, 15 Cal. 4th 951, 977 (1997) (a misrepresented or omitted fact

is material "if a reasonable man would attach importance to its existence or nonexistence in

determining his choice of action…").  "[M]ateriality is generally a question of fact unless the

'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a

reasonable man would have been influenced by it.'"  *Id.* (citation omitted).[51]  And reliance or

causation can be inferred from the misrepresentation (or omission) of a material fact.  *E.g.*,

*Engalla*, 15 Cal. 4th at 977 ("a presumption, or at least an inference, of reliance arises wherever

there is a showing that a misrepresentation was material");[52] *see also Falk v. GMC*, 496 F. Supp.

2d 1088, 1099 (N.D. Cal. 2007) ("justifiable reliance element of the fraud by omission claim is

easily satisfied" where a 'reasonable customer' … may have justifiably relied on GM's failure

to disclose defects").

---

[51] It is "a basic rule of California law" that "a fact can give rise to a duty to disclose and an actionable omission if it implicates safety concerns that a reasonable consumer would find material."  *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 987, 997 (N.D. Cal. 2013); *see also Apodaca v. Whirlpool Corp.*, 2013 U.S. Dist. LEXIS 176363, at *16 (C.D. Cal. Nov. 8, 2013) ("Nondisclosures about safety considerations of consumer products are material.").

[52] This inference (or presumption) creates a question of fact for trial.  *See*, *e.g.*, *Woodling v. Garrett Corp.*, 813 F.2d 543, 555-56 (2d Cir. 1987) (citation omitted) (when "circumstances permit varying inferences as to the foreseeability of the intervening act, the proximate cause issue is a question of fact for the jury").

Here, as in *Daniel*, a reasonable fact finder could infer that a vehicle that experiences stalls, disabled power steering and power brakes, and disabled airbag systems in normal and foreseeable driving circumstances would pose an unreasonable safety risk, "such that it can be presumed that the nondisclosure of the safety risk impacted Plaintiffs' purchasing decision." 806 F.3d at 1226. The Court has recognized that "a concealed defect" that "implicated a safety issue … would have affected a reasonable person's decision to purchase a car—making the omission material." *TACC Order*, 2016 WL 3920353 at *20. Indeed, each of the Plaintiffs testified that safety was a materially important factor in their purchase or lease of their GM vehicle, and that they would not have bought their vehicle, or paid less, had GM disclosed the defects. PSUF at ¶¶ 266-67.[53]

Plaintiffs have also put forth evidence that GM knowingly sold vehicles with defective ignition, power steering, and airbag systems. PSUF at ¶¶ 5-256. Had GM disclosed the defects, "it is plausible that the media would pick up that story, and it would have made national news" such that even Plaintiffs who purchased their vehicles from non-GM affiliated dealerships or private sellers would have been aware of the disclosure. *In re Chrysler-Dodge-Jeep EcoDiesel Mktg.*, *Sales Practices*, *& Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 1015 (N.D. Cal. 2018); *see also In re Carrier IQ*, *Inc. Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1114 (N.D. Cal. 2015) (inferring reliance on omissions where plaintiffs "alleged that had they been aware of the Carrier IQ Software, they would not have purchased affected mobile devices" and alleged facts

---

[53] ██████████████████████████████████████████████████████████████████
███████. PSUF at ¶¶ 418, 424 (citing Mar. 9, 2017 S. Orosco Dep. at 74:1-13, 55:21-56 & Dep. Ex. 2 at ELPLNTFF00011516; Feb. 17, 2017 D. Padilla Dep. at 20:22-21:3; 37:25-38:4). Such evidence "is sufficient to sustain a factual finding that Plaintiffs would have been aware of the disclosure if it had been made through [GM's] authorized dealerships." *Daniel*, 806 F.3d at 1226; *see also In re Myford Touch Consumer Litig.*, 2016 WL 6873453, at *2 (N.D. Cal. Nov. 22, 2016) ("reliance may be presumed on the basis of omissions of material facts by authorized dealers").

"regarding the public outcry regarding the Carrier IQ Software once its existence became public knowledge").  The maelstrom that arose when GM finally disclosed the defects is strong evidence that Plaintiffs would have learned of the defects prior to purchase if GM had not concealed them.[54]

With respect to Missouri law, GM concedes that reliance is not required to prevail on an MMPA claim.  GM Br. at 34.  The Supreme Court of Missouri has explained that where, as here, plaintiffs allege fraudulent concealment based on omissions, the fact finder "is empowered to find that the buyer has a right to rely on the seller to disclose where the undisclosed material information would not be discoverable through ordinary diligence."  *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. 2007).  Consequently, "the analysis of proof of a duty to disclose and of the right to rely collapses into a combined inquiry as to whether [defendant] had knowledge of undisclosed material information that [plaintiff] would not have discovered through ordinary diligence."  *Id.* at 765-66.  And an omission "is material if it would likely affect the conduct of a reasonable man with respect to his transaction with another."  *Star Indem. & Liab. Co. v. Cont'l Cement Co., LLC*, 2013 WL 1442456, *16 (E.D. Mo. Apr. 9, 2013) (quoting *Crewse v. Shelter Mut. Ins. Co.*, 706 S.W.2d 35, 39 (Mo. Ct. App. 1985)).  Here, there are at the very least genuine disputes of material fact as to whether GM knew about the defects (it did) and whether Plaintiffs could have discovered the defects through ordinary diligence (they could not).  Moreover, because plaintiffs expressly allege fraudulent concealment based on

---

[54] GM's cases recognize this rule (which was not altered by Proposition 64) but note that Plaintiffs are not entitled to the presumption of reliance in an extreme case where the evidence indisputably shows "an actual lack of reliance."  *Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1083 (N.D. Cal. 2017).  The evidence here shows that this is not such a case, as safety was a factor in all Plaintiffs' purchase decisions.  And GM's suggestion that Plaintiffs would not have learned of the serious safety defects because they "did not review any New GM material" prior to purchase (GM Br. at 39) is misplaced because announcements of serious safety defects receive widespread publicity far beyond ordinary promotional materials.  *See In re Chrysler-Dodge-Jeep EcoDiesel*, 295 F. Supp. 3d at 1015.

omission, GM's reliance on affirmative misrepresentation cases is misplaced.  GM Br. at 40 (quoting *Stein v. Novus Equities Co.*, 284 S.W.3d 597, 603 (Mo. Ct. App. 2009); citing *Grossoeheme v. Cordelle*, 904 S.W.2d 392, 397 (Mo. Ct. App. 1995)).

Texas courts recognize that, for omissions-based DTPA claims such as Plaintiffs' claims here, the "reliance" requirement is satisfied where the defendant withheld material information "with the intent of inducing the consumer to engage in a transaction" and "the consumer would not have entered into the transaction had the information been disclosed."  *Patterson v. McMickle*, 191 S.W.3d 819, 827 (Tex. Ct. App. 2006); *see also In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, 2012 WL 379944, at *22 (D.N.J. Feb. 6, 2012) ("[T]o satisfy the reliance element for an omission, a plaintiff must show that defendant had intent to induce a transaction through failure to disclose, and that plaintiff would not have entered into the transaction if the information had been disclosed." (citation omitted)).  GM's citations to affirmative misrepresentation cases are therefore inapposite.  GM Br. at 35–36 (collecting affirmative misrepresentation cases).  GM has admitted that it "falsely represented to consumers that vehicles containing the defect posed no safety concern" and that it mislead consumers by failing to disclose the truth.  PSUF at ¶ 6 (quoting DPA).  And Plaintiffs Al-ghamdi and McClellan both testified ███████████████████████████████████████████████  PSUF at ¶¶ 532, 567 (citing May 5, 2017 G. Al-ghamdi Dep. at 169:20-24; 171:4-13; May 4, 2017 McClellan Dep. at 176:16-21).  The evidence is easily sufficient to proceed to trial.

### F.      GM's material omissions violated California, Missouri, and Texas law.

This is predominantly an *omissions*, and not an affirmative misrepresentation case, and GM is wrong to reframe it as grounded in misrepresentations.  Plaintiffs' consumer law claims primarily turn on GM's actionable omissions in violation of California, Missouri, and Texas consumer laws, among others.  *See*, *e.g.*, *TACC Order*, 2016 WL 3920353, at *20-21 (Plaintiffs'

- 59 -

UCL and CLRA claims rest on "undisclosed defects in GM Vehicles" and "allegations that new GM actively concealed and failed to disclose safety defects in GM cars"); *id.* at *33 (Plaintiffs' MMPA claims rest on "actionable omissions"); *FACC Order*, 257 F. Supp. 3d at 448 (Plaintiffs' allege that GM "conceal[ed] defects prior to Plaintiffs' purchases" in violation of the DTPA). GM has admitted that it "falsely represented to consumers that vehicles containing the defect posed no safety concern" and that it mislead consumers by failing to disclose the truth. PSUF at ¶ 6 (quoting DPA SOF). Plaintiffs have testified that safety was a materially important factor in their purchase or lease of their cars, *see* PSUF at ¶¶ 266-67, and GM's heavy focus on safety in its advertisements is further proof that safety is material to *all* car purchasers. *See In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1062, 1084 (E.D. Mich. 2018) (in omissions case, GM's ads stressing that its diesel cars had low emissions "reveal[] an understanding that consumers believe emission levels are material to their purchasing decisions" and serve as proof that low-emission "was a material consideration for consumers purchasing a vehicle"). For this reason, GM's "puffery" argument, already rejected by this Court,[55] is inapplicable here. *See id.* at 1084 (puffery argument irrelevant where ads are used to show materiality in an omissions case). GM's reliance on affirmative misrepresentation cases is misguided and not relevant to this Court's summary judgment analysis of Plaintiffs' UCL, CLRA, MMPA, or DTPA claims.

## G.    Plaintiffs have valid implied warranty claims.

GM's argument regarding contractual limitation of remedies under Texas and Missouri law fails because the purported limitation is unconscionable, and therefore unenforceable, in light of GM's active concealment of material safety defects.[56] *See Trinity Prods. Inc. v. Burgess*

---

[55] *See* 257 F. Supp.3d at 457-58. Contrary to GM's argument, that ruling cannot be limited to Wisconsin law, as the Court cites California law in finding that at least some of GM's statements are not "puffery." *Id.*

[56] GM raises the statutory unconscionability exception in both Missouri and Texas. GM Br. at 46.

*Steel*, *L.L.C.*, 486 F.3d 325, 332 (8th Cir. 2007) (quoting MO. REV. STAT. §§ 400.2-719(2), (3)) ("[T]he Missouri UCC bars damage disclaimers where 'circumstances cause an exclusive or limited remedy to fail of its essential purpose,' or where the exclusion of consequential damages 'is unconscionable.'"); *Lindemann v. Eli Lilly & Co.*, 816 F.2d 199, 202 (5th Cir. 1987) (quoting TEX. BUS. & COM. CODE § 2.719(c)) ("Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable."). GM's attempt to limit Plaintiffs' remedies under warranty while knowingly concealing serious safety defects that Plaintiffs could not have discovered on their own is precisely the kind of unconscionability that Missouri courts recognize, namely "'an inequality so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it.'" *Patterson Oil Co. v. VeriFone*, *Inc.*, 2015 WL 6149594, at *5 (W.D. Mo. Oct. 19, 2015) (quoting *State, Mo. Dep't of Soc. Servs.*, *Div. of Aging v. Brookside Nursing Ctr.*, *Inc.*, 50 S.W.3d 273, 277 (Mo. 2001)); *see also Oldham's Farm Sausage Co. v. Salco*, *Inc.*, 633 S.W.2d 177, 182-83 (Mo. Ct. App. 1982) (limitation on consequential damages unconscionable where "clause [was] tucked away in fine print on the back side of the signature page").

The sole Missouri case GM cites in support of its purported limitation, *Russo v. Hilltop Lincoln-Mercury*, *Inc.*, 479 S.W.2d 211 (Mo. Ct. App. 1972), is distinguishable because it did not involve claims of unconscionability or active concealment. Under Texas law, courts determine unconscionability based on:  (i) "the circumstances surrounding the agreement," (ii) "the alternatives, if any, which were available to the parties at the time of making the contract," (iii) "the nonbargaining ability of one party," and (iv) "whether the contract is illegal or against public policy."  *Lindemann*, 816 F.2d at 203.  These factors weigh in Plaintiffs' favor.  Because the circumstances include GM knowingly concealing a material safety defect from consumers—

who had no alternative means of discovering the defect and therefore no ability to bargain with respect to the defect—it would be against public policy to enforce such a fraudulently induced agreement.  By contrast, none of the Texas cases on which GM relies, *see* GM Br. at 47 n.38, involved active concealment.

GM's attempt to limit the duration of any implied warranties fails for the same reason— the purported limitations are unconscionable in light of GM's fraudulent conduct.  *See*, *e.g.*, *Patterson Oil Co.*, 2015 WL 6149594, at *6 (Missouri courts' ability to refuse to enforce or limit application of unconscionable contract clauses extends to warranty disclaimers); *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988) (Texas law "permits a court to disregard any unconscionable clause in a contract").

Regarding statutes of limitations, there is a genuine dispute of material fact as to whether GM's knowing and active concealment of defects tolled the applicable statutes of limitation.  *See Owen v. GMC*, 533 F.3d 913, 920 n.5 (8th Cir. 2008) (Missouri law governing implied warranty provides for "equitable tolling on account of fraudulent concealment"); *Cortez v. State Farm Mut. Auto. Ins. Co.*, 2006 WL 8435999, at *7 (W.D. Tex. Oct. 25, 2006) (recognizing "fraudulent concealment as a basis for equitable tolling" of statute of limitations for implied warranty claims under Texas law).  GM has admitted that it "falsely represented to consumers that vehicles containing the defect posed no safety concern" and that it mislead consumers by failing to disclose the truth.  PSUF at ¶ 6 (quoting DPA SOF).

GM's arguments regarding the "merchantability" of Plaintiffs' vehicles are similarly without merit.  It is well-established that "California courts reject the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability."  *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929,

946 (C.D. Cal. 2012) (quoting *Isip v. Mercedes-Benz USA*, *LLC*, 65 Cal. Rptr. 3d 695 (Cal. Ct. App. 2007)).  Rather, "a defective product that causes a safety hazard will generally render that product unfit for its ordinary purpose" and thus establish a breach of implied warranty of merchantability.  *Stewart v. Electrolux Home Prods.*, *Inc.*, 304 F. Supp. 3d 894, 913 (E.D. Cal. 2018).  Courts have routinely found vehicles unmerchantable under California law in light of defects similar to the safety defects at issue here.  *See*, *e.g.*, *Aguilar v. GM, LLC*, 2013 WL 5670888, at *7 (E.D. Cal. Oct. 13, 2013) (GM vehicles "unfit for the ordinary use of driving due to a steering defect that can result in potential failure of power steering, pulling to the left and right, and loss of steering control during the normal course of driving"); *Cholakyan v. Mercedes-Benz USA*, *LLC*, 796 F. Supp. 2d 1220, 1244 (C.D. Cal. 2011) ("Vehicles subject to engine failure cannot be said to be merchantable.").

Missouri law likewise recognizes claims for breach of implied warranty where a vehicle fails to "provide safe, reliable transportation" and is therefore "unfit for its ordinary purpose of providing transportation."  *In re GMC Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1533 (E.D. Mo. 1997) (citations omitted).  The safety defects present in Plaintiffs' vehicles also render them "unfit" for driving under Texas law.  *GMC v. Brewer*, 966 S.W.2d 56, 57 (Tex. 1998).   GM has admitted that moving stalls and loss of power present a safety-related defect. PSUF at ¶ 46.  And Plaintiffs have put forth evidence showing that other safety systems power down during moving stalls, including seat belt pretensioners, airbags, power steering, power brakes, and electronic stability control.  PSUF at ¶ 234.

## H.   Plaintiffs have valid unjust enrichment claims.

California Plaintiffs plead their unjust enrichment claims in the alternative to other causes of action.  FACC at ¶ 1695.  Although the Court dismissed the California unjust enrichment claims of Plaintiff Padilla and may be inclined to do the same for the remaining California

Plaintiffs, recent California precedent recognizes that "[t]he Ninth Circuit has instructed district courts to construe claims for unjust enrichment under California law as quasi-contract claims." *In re Vizio, Inc. Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1233 (C.D. Cal. 2017) (citing *Astiana v. Hain Celestial Grp.*, 783 F.3d 753, 762 (9th Cir. 2015)).  "[W]here a plaintiff states a claim for relief under a quasi-contract cause of action that cause should not be dismissed as 'duplicative or superfluous' to the plaintiff's other claims."  *Owino v. CoreCivic, Inc.*, 2018 WL 2193644, at*27 (S.D. Cal. May 14, 2018) (quoting *Astiana*, 783 F.3d at 762).  Consequently, in *In re Vizio, Inc. Consumer Privacy Litig.*, the court found "no basis" for dismissing unjust enrichment claims despite defendants' argument that plaintiffs had "adequate remedies at law." 238 F. Supp. 3d at 1233.  The same principle applies here.

Similarly, recent Texas precedent confirms that "[u]njust enrichment is an implied-contract basis for requiring restitution when it would be unjust to retain the benefits received." *Perales v. Bank of Am.*, *N.A.*, 2014 WL 3907793, at *3 (S.D. Tex. Aug. 11, 2014).  Notably, since this Court last considered Plaintiffs' unjust enrichment claims under Texas law, Texas courts have emphasized that the "bar on equitable claims" where other remedies are available "is a general rule, not an absolute one" and "exceptions apply."  *Norhill Energy LLC v. McDaniel*, 517 S.W.3d 910, 919 (Tex. Ct. App. 2017).

Missouri courts allow plaintiffs to advance unjust enrichment claims in the alternative to other claims, regardless of whether or not the validity or enforceability of a contract is in question.  *See*, *e.g.*, *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*, 2017 WL 3863866, at *10 (W.D. Mo. Aug. 3, 2017) (citing *Thornton v. Pinnacle Foods Grp.*, 2016 WL 4073713, at *4 (E.D. Mo. Aug. 1, 2016)); *Howard v. Turnbull*, 258 S.W.3d 73, 76 (Mo. Ct. App. 2008).  That is precisely what Plaintiffs do here.  *See* FACC at ¶ 4350.

### I.   GM has not "mitigated" its unconscionable conduct under Texas law.

There is a genuine dispute of material fact regarding whether GM is liable for unconscionable conduct under the Texas DTPA.  "Unconscionable" is defined as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a *grossly unfair degree*."  TEX. BUS. & COM. CODE ANN. § 17.45(5) (emphasis added).  "To prove an unconscionable action or course of action," the Texas Supreme Court has held that "a plaintiff must show that the defendant took advantage of his lack of knowledge and 'that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated.'"  *Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001) (quoting *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998)).  GM took advantage of Plaintiffs by intentionally concealing a material safety defect—of which Plaintiffs had no knowledge and no ability, experience, or capacity to discover—and knowingly selling dangerous vehicles to Plaintiffs and class members at a premium price.  GM's conduct—intentionally risking the safety of unwitting consumers and their families—was thus grossly unfair because, examining "the entire transaction," *Daugherty v. Jacobs*, 187 S.W.3d 607, 616 (Tex. Ct. App. 2006), the resulting unfairness to Plaintiffs is glaringly noticeable, flagrant, complete, and unmitigated.  *See*, *e.g.*, *Serv. Corp. Int'l v. Aragon*, 268 S.W.3d 112, 118-19 (Tex. Ct. App. 2008) (upholding jury finding of unconscionability where funeral home moved decedent to another burial plot without family's consent); *Sanchez v. Guerrero*, 885 S.W.2d 487, 493 (Tex. Ct. App. 1994) (upholding jury finding of unconscionability where real estate broker failed to disclose that accused child molester was a previous occupant when asked about home's former owners).

GM's argument that it entirely mitigated such gross unfairness through repairs alone is unavailing (especially given the evidence that the repairs were not effective).  At best, any "mitigation" is partial because it does not remedy the full spectrum of Plaintiffs' damages.  "The

purpose of the DTPA is to 'protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection.'"  *Amstadt*, 919 S.W.2d at 649 (quoting Tex. Bus. & Com. Code Ann. § 17.44).  It would be outrageous and against public policy as codified by the DTPA for GM to escape the full consequences of its unconscionable actions merely by offering belated repairs.  The sole case GM cites in support of its argument is distinguishable because it did not involve fraudulent concealment of safety risks.  Rather, in assessing the unfairness to a homeowner denied coverage by his insurance company for foundation problems, the Texas Supreme Court concluded that, in light of evidence of thorough reimbursement for testing and repairs and the "continual exchange of information between" the parties, "[t]he record . . . provides no support for the conclusion that State Farm took advantage of [the homeowner] to a grossly unfair degree."  *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 451 (Tex. 1997).  That is not the case here.

**J.    Plaintiffs state claims against GM for fraudulent concealment of the right to file bankruptcy claims because, but for GM's concealment of the Delta Ignition Switch Defect, Plaintiffs' claims would have been timely asserted in the Bankruptcy Court while the GUC Trust still had assets.**

As the Court has recognized, Plaintiffs' claim for "fraud by concealment of the right to file a claim against Old GM in bankruptcy" is premised on the facts that "New GM had knowledge of the [Delta] Ignition Switch Defect" and "improperly concealed its knowledge of that defect;" as a result, Plaintiffs "suffered *damages* because they could not timely file proofs of claim" and therefore could not timely partake of the proceeds of Old GM's bankruptcy.  *In re Motors Liquidation Co.*, 2018 WL 2416567, at *12 (S.D.N.Y. May 29, 2018).  Under these well-

documented facts, the claims of the California and Missouri Delta Ignition Switch Defect Bankruptcy Plaintiffs should proceed to trial.[57]

Under the Bankruptcy Court's Bar Date Order, November 30, 2009 was the deadline for proof of claims to be filed against Old GM (the Bar Date). *In re Motors Liquidation Co*., 829 F.3d at 147. As the Bankruptcy Court found, "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the [Delta Ignition Switch] Defect prior to the Sale Motion, as early as 2003." *In re Motors Liquidation Co*., 529 B.R. at 538. Further, "[a]s of June 2009, when entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required . . . to send out mailed recall notices to owners of affected Old GM vehicles." *Id.* at 524; *see also* PSUF at ¶¶ 319-50 (documenting these facts).[58] GM necessarily had this same knowledge from day one of its existence, and it also had the undisputed duty to notify *all* affected car owners of the defect (including Plaintiffs) and to institute a recall. *See supra* Section III.D.1 (discussing GM's Safety Act duties with respect to Old GM car owners). And there can be no real question but that Plaintiffs would have promptly pursued a remedy in the bankruptcy had they been able to do so in a timely fashion given the massive outcry and tsunami of litigation that began immediately upon GM's belated recall in 2014.[59] *See In re Motors Liquidation Co.*, 529 B.R. at 521 (GM's belated announcement of the defect "was almost immediately followed by the filing of about 60 class actions" alleging economic loss).

---

[57] The Texas Plaintiffs do not pursue this claim.

[58] The Court need not take up GM's likely argument that the stipulated facts from the bankruptcy proceedings are not binding here. Plaintiffs present evidence of all those facts—and more—in opposition to this motion. *See id.*

[59] Plaintiffs anticipate that GM will point to a statement in open court by bankruptcy counsel to the effect that Plaintiffs *in 2014* made a strategic choice to focus on GM rather than Old GM. But the circumstances would have been different in 2009, when claims could be timely filed and when the GUC Trust still had substantial monies. *See, e.g.*, *In Re Motors Liquidation Co.*, 529 B.R. at 586 (by the time Plaintiffs learned of the Delta Ignition Switch Defect and sought remedies, there were no available assets left in the GUC Trust).

GM's arguments against this claim consist of assertions already rejected by the Court, and arguments already addressed in this brief.  *First*, GM repeats the argument that it owed no duty to Old GM purchasers because a "duty to disclose can arise only where the plaintiff and defendant have engaged in a transaction."  GM Br. at 66-67.  GM is wrong.  It owed a duty because (i) it (and it alone) had knowledge of the safety defect and the undisputed obligation to disclose and remedy known defects; (ii) its conduct was a producing cause of Plaintiffs' damages and (iii) it had a close relationship with the cars.  *See supra* Section III.D.   Similarly unavailing is GM's repeated assertion that Plaintiffs can recover on a fraudulent concealment claim "only if the asset purchaser also has a duty to warn, in addition to a duty to disclose."  GM Br. at 67.  No authority supports GM's position.  Because Plaintiffs don't bring duty-to-warn claims, they need not prove the existence of that duty.

*Second*, GM incorrectly argues that this claim should be dismissed because Plaintiffs have no claim under bankruptcy law.  *Id*. at 68 (citing *In re Chateeaugay Corp.*, 53 F.3d 478, 497 (2d Cir. 1995)).  The Court has already rejected GM's argument (or its close cousin), and found that this claim is an independent claim against GM for its post-petition conduct.  *In re Motors Liquidation Co.*, 2018 WL 2416567, at *12 (emphasis in original) (Plaintiffs "contend that New GM had a duty to disclose *under nonbankruptcy law*…").  The claim is neither a claim based on "bankruptcy law" nor a successor liability claim based on the conduct of Old GM.  For this claim, Plaintiffs' damages arose after the Bankruptcy Sale, when they lost the right to timely partake in the spoils of Old GM's bankruptcy.  GM (not Old GM) caused this economic loss.

*Third*, while GM correctly notes that Plaintiffs cannot obtain benefit-of-the-bargain damages for this claim, GM Br. at 68-69, Plaintiffs do not directly seek benefit-of-the-bargain damages (incurred at the point-of-sale) for this claim.  *GM did not cause Plaintiffs' damages at*

the point-of-sale; *Old GM* did.  Plaintiffs in this count seek to recover from GM precisely what they lost as the result of GM's concealment of the Delta Ignition Switch Defect between the Sale Date and the Bar Date: namely, the amounts they would have recovered on a timely-filed claim in the bankruptcy.[60]

*Fourth*, as discussed, *supra* at Section III.E-F, the California and Missouri Plaintiffs can recover on these omissions claims upon proof of the materiality of the omitted information—here, the fact of the defect and therefore their right to file a claim in the bankruptcy—without the need for individualized proof of reliance.  *See*, *e.g.*, *Engalla*, 15 Cal. 4th at 977 (California law) (materiality "is generally a question of fact," a misrepresented or omitted fact is material "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action," and materiality leads to a presumption of reliance); *Star Indem. & Liab. Co.*, 2013 WL 1442456, at *16 (Missouri law) (omission is material if it would likely affect the conduct of a reasonable man with respect to his transaction); *Crewse*, 706 S.W.2d at 39 (Missouri law) (in most cases, materiality is a fact question for the jury); *TACC Order*, 2016 WL 3920353 at *34 (concealed safety defects material under Missouri law).  A jury could well find that reasonable car owners would have behaved differently, and filed timely proofs of claim in Old GM's bankruptcy *but for* GM's fraudulent concealment of the Delta Ignition Switch Defect.

*Fifth*, GM correctly notes that, in order to prevail on this claim against GM, the California and Missouri Delta Ignition Switch Defect Bankruptcy Plaintiffs must demonstrate that they would have had a viable claim against Old GM in the bankruptcy.  GM Br. at 69-70 (relying on arguments made "throughout" its brief against the underlying claim, including the

---

[60] Those damages are the percentage of the benefit-of-the-bargain damages Plaintiffs would have recovered on a timely-filed proof of claim.  *See* PSUF at ¶¶ 299-313.  Hence, as GM correctly points out in a later portion of its brief, in order to recover on this claim, Plaintiffs must demonstrate that they would have had viable claims against Old GM to assert in the bankruptcy.  For the reasons discussed throughout this brief, Plaintiffs had such claims.

argument that Service-Part Vehicle owners have no claim).  For the reasons discussed throughout this brief, Plaintiffs have viable underlying claims.

**K.      Plaintiffs are entitled to injunctive relief.**

Pursuant to California, Missouri, and Texas state consumer laws, Plaintiffs seek injunctive relief in the form of an order enjoining GM from continuing its unfair, unlawful, and/or deceptive practices; an order supervising, promoting, and accelerating the completion of the relevant recalls, to prevent or reduce ongoing crashes, injuries, and deaths; and any other relief that the Court deems just and proper.  FACC at ¶¶ 1606, 1631, 4301, 6550.  GM is wrong to argue that there is either insufficient harm or insufficient public interest to justify such relief or that the yet-to-be-determined contours of such relief would be overbroad.[61]  GM Br. at 70–75.  GM's arguments for summary judgment regarding injunctive relief are therefore misplaced.

GM ignores the standards for and availability of injunctive relief under applicable state laws.  In California, for example, the "UCL empowers the Court to enjoin uncompetitive acts, as well as to 'make such orders or judgments . . . as may be necessary to prevent the use or employment of any practice which constitutes unfair competition.'"  *Haas Automation*, *Inc. v. Denny*, 2014 WL 2966989, at *7 (C.D. Cal. July 1, 2014) (alterations in original) (quoting CAL. BUS. & PROF. CODE § 17203).  "The remedial power granted under" California consumer law "is extraordinarily broad."  *People v. JTH Tax*, *Inc.*, 151 Cal. Rptr. 3d 728, 759 (Cal. Ct. App. 2013) (citation omitted).  Because "unfair business practices can take many forms, the Legislature has given the courts the power to fashion remedies to prevent their 'use or employment' in whatever context they may occur."  *Id.* (quoting *Consumers Union of U.S.*, *Inc. v. Alta-Dena Certified Dairy*, 6 Cal. Rptr. 2d 193, 198 (Cal. Ct. App. 1992)).  Moreover, "[t]he standard for an

---

[61] The contours of such relief would be determined when and if liability is found.

injunction under California law differs from the federal standard." *Haas Automation*, 2014 WL 2966989, at *9.  To obtain a permanent injunction under the UCL, "'the plaintiff must prove (1) the elements of a cause of action involving the wrongful act sought to be enjoined and (2) the grounds for equitable relief, such as, inadequacy of the remedy at law.'"  *Id.* (quoting *City of S. Pasadena v. Dep't of Transp.*, 35 Cal. Rptr. 2d 113, 120 (Cal. Ct. App. 1994)).  Grounds for equitable relief exist where there is a threat of future harm.  *Id.* at *10.

As explained above, Plaintiffs are entitled to proceed on their UCL claims as a matter of fact and law and, consequently, Plaintiffs have proven the necessary "elements" of that cause of action, among others, for purposes of summary judgment.  *See supra* Sections III.E & III.F. Plaintiffs have also shown grounds for equitable relief because GM's conduct demonstrates that there is a risk GM will continue to engage in unlawful, unfair, and fraudulent business practices. Specifically, GM knowingly concealed material safety defects while offering its vehicles for public sale (PSUF at ¶¶ 5-256), ███████████████████████████ ██████████ (*id.* at ¶¶ 20-27), ███████████████████████████ (*id.* at ¶¶ 28-56).  Absent an injunction, there is a serious risk that GM will continue to engage in similarly deceptive and harmful conduct.

Plaintiffs also satisfy the federal standard for purposes of summary judgment. Injunctions are forward-looking remedies, designed to prevent or reduce future or ongoing harm. *See*, *e.g.*, *SEC v. Saltsman*, 2016 WL 4136829, at *29 (E.D.N.Y. 2016 Aug. 2, 2016) (citation omitted) ("injunctions are equitable, forward-looking remedies"); *Vaguely Qualified Prods. LLC v. Metro. Transp. Auth.*, 2015 WL 5916699, at *12 (S.D.N.Y. Oct. 7, 2015) ("injunctions are forward looking").  To obtain a permanent injunction, a plaintiff "must demonstrate "that (1) it will suffer an irreparable injury in the absence of an injunction; (2) legal remedies are

insufficient to compensate for that injury; (3) considering the balance of hardships between the parties, an equitable remedy is warranted; and (4) the injunction is in the public interest." *Beck v. Test Masters Educ. Servs. Inc.*, 994 F. Supp. 2d 98, 101 (D.D.C. 2014) (citing *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 156–57 (2010); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

The record evidence shows that vehicles experiencing sudden moving stalls and/or loss of power pose a serious risk of injury and death for drivers, passengers, and anyone in their path. PSUF at ¶¶ 46, 238. That accidents continue to occur well past the recalls (as documented in cases pending in this MDL) indicates the temporal consistency to support injunctive relief. *See, e.g.*, *Soppeck v. Gen. Motors Corp.*, No. 18-cv-08322 (crash occurred Sept. 12, 2017, involving recall no. 14v400); *Curcio v. Gen. Motors Corp.*, No. 18-cv-06993 (crash occurred Aug. 4, 2017, involving recall no. 14v355); *Bauer v. Gen. Motors Corp.*, No. 18-cv-06980 (crash occurred Aug. 3, 2017, involving recall 14v355); *Sheffield-Turner v. Gen. Motors Corp.*, No. 18-cv-04112 (crash occurred May 15, 2017, involving recall 14v355); *Buchanan v. Gen. Motors Corp.*, No. 18-cv-03549 (crash occurred Apr. 21, 2017, involving recall 14v355); *Jones v. Gen. Motors Corp.*, No. 18-cv-02161 (crash occurred Mar. 10, 2017, involving recall 14v355); *Young v. Gen. Motors Corp.*, No. 18-cv-07986 (crash occurred Sept. 3, 2016, involving recall 14v400); *Gillard v. Gen. Motors Corp.*, No. 18-cv-07872 (crash occurred Aug. 29, 2016, involving recall 14v355); *Kuch v. Gen. Motors Corp.*, No. 18-cv-07901 (crash occurred Aug. 29, 2016, involving recall 14v355); *Allyn v. Gen. Motors Corp.*, No.18-cv-06297 (crash occurred Aug. 20, 2016, involving recall 14v355); *Willams- Leirmo v. Gen. Motors Corp.*, No. 18-cv-07532 (crash occurred Aug. 20, 2016, involving recall 14v355); *Scott v. Gen. Motors Corp.*, No. 18-cv-07255 (crash occurred Aug. 12, 2016, involving recall 14v047); *Zamarripa v. Gen. Motors Corp.*, No.

18-cv-07145 (crash occurred Aug. 9, 2016, involving recall 14v047); *Brown v. Gen. Motors Corp.*, No. 18-cv-05546 (crash occurred June 20, 2016, involving recall 14v355); *Veale v. Gen. Motors Corp.*, No. 18-cv-05524 (crash occurred June 20, 2016, involving recall 14v355); *Cardwell v. Gen. Motors Corp.*, No. 18-cv-05499 (crash occurred June 19, 2016, involving recall 14v394); *Williams v. Gen. Motors Corp.*, No. 18-cv-05450 (crash occurred June 18, 2016, involving recall 14v400); *Duwyenie v. Gen. Motors Corp.*, No. 18-cv-05349 (crash occurred June 14, 2016, involving recall 14v400); *Duncan v. Gen. Motors Corp.*, 18-cv-05198 (crash occurred June 10, 2016, involving recall 14v047); *Paxton v. Gen. Motors Corp.*, No. 18-cv-04904 (crash occurred June 1, 2016, involving recall 14v047); *McDuff v. Gen. Motors Corp.*, No. 18-cv-04305 (crash occurred May 16, 2016, involving recall 14v394); *Hogan v. Gen. Motors Corp.*, No. 18-cv-02114 (crash occurred Mar. 8, 2016, involving recall 14v355); *Kelley v. Gen. Motors Corp.*, No. 18-cv-01905 (crash occurred Mar. 3, 2016, involving recall 14v400); *Perry v. Gen. Motors Corp.*, No. 18-cv-01459 (crash occurred Feb. 18, 2016, involving recall 14v400).

Overall, the balance of hardships weighs in favor of equitable relief. *See, e.g., Int'l Bhd. of Elec. Workers*, *AFL-CIO, Local Union No. 3 v. Charter Commc'ns, Inc.*, 277 F. Supp. 3d 356, 363 (E.D.N.Y. 2017) (quoting *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999)) (a party demonstrates irreparable harm "for which a monetary award does not adequately compensate" where "it shows that there is a 'substantial chance' that, absent an injunction, the parties cannot be returned to the pre-injunction status quo"); *Ligon v. City of New York*, 925 F. Supp. 2d 478, 540 (S.D.N.Y. 2013) (weighing "the relative hardships faced by the parties" in light of "potentially dire and long-lasting consequences"). Notably, NHTSA itself has recognized that injunctive relief serves the public interest—NHTSA filed a "position statement" in multi-district litigation involving alleged fraudulent conduct by Fiat Chrysler expressing its

view that "court supervision of a prospective remedy for the alleged defects would not interfere with, and could well aid, the progress and resolution of its recall investigation and any subsequent technical determination of the most appropriate remedy." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2017 WL 1382297, at *7 (E.D. Mich. Apr. 18, 2017).[62]

Another recent automotive multi-district litigation, involving defective Takata airbags, is also instructive.  There, court-approved settlement agreements with various auto manufacturers provided additional recall-related equitable remedies to class members, with the court "retain[ing] continuing and exclusive jurisdiction over the Action and all matters relating to the administration, consummation, enforcement, and interpretation of the Settlement Agreement[.]" *In re Takata Airbag Prods. Liab. Litig.*, 2017 WL 5706147, at *6 (S.D. Fla. Nov. 1, 2017) ("Mazda Final Approval Order"); *see also id.* at *1 ("incorporat[ing] the [Mazda] Settlement Agreement and its exhibits" into final order).  More specifically, the Takata-related settlement agreements generally provide for an "Outreach Program with the goal of maximizing, to the extent practicable, completion of the Recall Remedy in Subject Vehicles[,]" Mazda Settlement Agreement at 18,[63] a "Rental Car/Loaner Program" for certain Class Members awaiting recall repairs, *id.* at 21-22, an "Out-of-Pocket Claims Process" to pay for Class Members' reasonable out-of-pocket expenses related to the recalls, *id.* at 22–25, and a "Customer Support Program" extending for 10 years after the recall repairs, *id.* at 27–29.[64]

---

[62] State law also demonstrates the importance of the public interest in constructing or allowing injunctive remedies.  For example, the California Supreme Court has characterized injunctions pursuant to the CLRA as "public injunctions" because such "relief is for the benefit of the general public rather than the party bringing the action." *Cruz v. PacifiCare Health Sys., Inc.*, 66 P.3d 1157, 1162 (2003).

[63] https://www.autoairbagsettlement.com/Content/Documents/Mazda/Mazda%20Settlement%20Agreement.pdf.

[64] Information on the Takata airbag class action settlements with BMW, Honda, Mazda, Nissan, Subaru, and Toyota can be found on the court-approved website, www.autoairbagsettlement.com.

Accordingly, GM cannot and has not shown that it is entitled to summary judgment on the availability of injunctive relief.[65]

## IV. CONCLUSION

For the reasons stated above, the Court should deny GM's motion for summary judgment in its entirety.

DATED:  September 21, 2018          HAGENS BERMAN SOBOL SHAPIRO LLP

By:  _____*/s/ Steve W. Berman*_____
     Steve W. Berman
*steve@hbsslaw.com*
Sean R. Matt
*sean@hbsslaw.com*
Andrew M. Volk
*andrew@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

---

[65] GM incorrectly asserts that Plaintiffs would have no claims for injunctive relief without damages.  GM Br. at 31-32.  Although this may be true for the Texas Plaintiffs (who in any event have shown damages), it is not for the California and Missouri Plaintiffs.  California Plaintiffs bring claims under the CLRA, which does *not* require proof of monetary "damages," but only proof of "damage" (here, the receipt of a defective vehicle).  *See Meyer*, 200 P.3d at 298-99 (citing § 1780(a), and finding that "the phrase 'any damage' is not synonymous with 'actual damages,' which generally refers to pecuniary damages."); *see also Gonzales v. CarMax Auto Superstores*, *LLC*, 845 F.3d 916, 918 (9th Cir. 2017) (citing *Meyer*) (CLRA claim can be brought for injunctive relief alone).  In addition, the Moss-Magnuson Act Plaintiffs can obtain injunctive relief without proof of damages.  *See* 15 U.S.C. § 2304(a)(4).  For the Missouri Plaintiffs, they can obtain injunctive relief *without* damages on their fraud claim.  *See*, *e.g.*, *St. Bethel Missionary Baptist Church, Inc.*, *v. St. Louis Builders*, *Inc.*, 388 S.W.2d 776 (Mo. 1965) (discussing equitable proceeding to enjoin foreclosure on the basis of fraud).

DATED:  September 21, 2018          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By: _____*/s/ Elizabeth J. Cabraser*_____
      Elizabeth J. Cabraser
*ecabraser@lchb.com*
Rachel Geman
*rgeman@lchb.com*
275 Battery St., 29th Floor
San Francisco, CA 94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

*Co-Lead Counsel with Primary Focus on Economic Loss Cases*

- 76 -

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on September 21, 2018, which will send notification of such filing to the e-mail addresses registered.

*/s/ Steve W. Berman*
Steve W. Berman

010440-11 1054543 V1