**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>GENERAL MOTORS LLC<br>IGNITION SWITCH LITIGATION<br><br>*This Document Relates To All Actions* | No. 14-MD-2543 (JMF)<br>No. 14-MC-2543 (JMF)<br><br>Hon. Jesse M. Furman |

**DEFENDANT GENERAL MOTORS LLC'S AMENDED MEMORANDUM IN OPPOSITION TO ECONOMIC LOSS PLAINTIFFS' MOTION TO CERTIFY BELLWETHER CLASSES IN THE STATES OF CALIFORNIA, MISSOURI, AND TEXAS**

Richard C. Godfrey, P.C.
Andrew B. Bloomer, P.C.
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654-3406
Phone: 312-862-2000
Fax: 312-862-2200
richard.godfrey@kirkland.com
andrew.bloomer@kirkland.com

*Attorneys for Defendant General Motors LLC*

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 4

A. Plaintiffs Seek To Certify 23 Separate Classes Involving 7 Different Recalls. ........................................................................................................ 4

1. The 7 Recalls At Issue Involve Different Vehicles, Different Components, Different Factual Backgrounds, Different Alleged Defects, And Different Remedies. ........................................................................ 4

2. Plaintiffs' Allegations Show That New GM's Knowledge Of The Various Recall Conditions Differed By Vehicle And Time Period. .......... 7

B. Plaintiffs' Alleged Classes And Claims. ........................................................................ 8

C. Plaintiffs And Absent Putative Class Members. ........................................................ 9

D. The Market Prices And Market Shares Of The Recalled GM Vehicles Did Not Systematically Decrease After The Recalls. ........................................ 12

ARGUMENT ........................................................................................................ 14

I. INDIVIDUAL ISSUES REGARDING FACT OF INJURY AND DAMAGES PREDOMINATE OVER ANY COMMON QUESTIONS. ........................................ 16

A. Individual Issues Predominate For Plaintiffs' Alleged Benefit-Of-The-Bargain Damages. ........................................................................................ 16

1. Prices And Sales Of Recalled Vehicles Did Not Systematically Decline. ........................................................................................ 17

2. Plaintiffs' Experts Cannot Satisfy Class Certification Requirements. ........................................................................................ 19

3. Boedeker's Methodology Violates Article III, Due Process, And The Rules Enabling Act. ........................................................................ 24

a. No Class Can Be Certified Where, As Here, Plaintiffs' Data Shows Many Putative Class Members Have No Injury. ........................................................................................ 27

b. Individually Negotiated Prices Also Cause Individual Fact-Of-Injury Questions To Predominate. ........................................ 30

**TABLE OF CONTENTS (CONT'D)**

**Page**


4. Boedeker's Methodology Does Not Fit Plaintiffs' Legal Theory, Violating *Comcast*. ... 32

   a. Boedeker's Economic Loss Theory Contradicts Plaintiffs' Benefit-of-the-Bargain Theory of Damages. ... 33

   b. Boedeker's Calculations Have No Supply Analysis And Do Not Prove Market Prices. ... 34

   c. Boedeker Measures The Impact Of Disclosures On The Willingness-To-Pay For Safety Feature Packages, Not The Price Of Vehicles. ... 35

   d. Boedeker Does Not Measure The Impact Of Disclosures On Used Vehicle Purchases Or Vehicle Leases. ... 36

   e. Boedeker's Disclosure Scenarios Conflict With Plaintiffs' Defect Disclosure Theory. ... 37

   f. Boedeker Measures The Impact Of Disclosures On Consumers Who Unrealistically Expect Defect-Free Vehicles... 38

   g. Boedeker's Damages Estimates Compensate For Alleged Post-Sale Risk Of Injury, Not Overpayment At The Time of Sale. ... 39

   h. Boedeker's Methodology Would Lead To Both Overcompensation And Double Recoveries. ... 40

5. Boedeker's Averaging Methodology Is Not Permitted Under Supreme Court Precedent And Applicable Law. ... 42

6. Plaintiffs' "Proposed Trial Procedure" Confirms That Plaintiffs Cannot Meet Their Burden of Proving the Requirements of Rule 23... 43

B. Individual Differences Predominate Regarding Whether Putative Class Members Incurred Any Alleged Benefit-Of-The-Bargain Damages... 45

C. Proving Alleged "Lost Time" Damages Is An Individual Issue. ... 46

D. For Texas, Plaintiffs' Class Definition Is Improper And Individual Proof Of Manifest Defect Predominates Over Any Alleged Common Issues. ... 48

II. INDIVIDUAL ISSUES REGARDING LIABILITY PREDOMINATE OVER ANY COMMON QUESTIONS. ... 51

**TABLE OF CONTENTS (CONT'D)**

**Page**


A. Individual Differences In Reliance And Causation Predominate For Consumer Fraud And Common Law Fraud Claims. .......... 51

1. Reliance And Causation Are Individual Issues For Consumer Purchases Such As Vehicles. .......... 53

2. Each Bellwether State Requires Proof Of Reliance Or Causation For Plaintiffs' Consumer Fraud And Common Law Fraud Claims.......... 54

a. California Requires Individual Proof Of Reliance.......... 55

i. Reliance Is Required For Plaintiffs' UCL Claims. .......... 55

ii. Absent Class Members Need To Prove Individual Reliance For UCL Claims.......... 56

b. California Requires Individual Proof Of Reliance For CLRA And Common Law Fraud Claims. .......... 59

c. California Requires Proof That Each Plaintiff Would Have Been Aware Of The Disclosure And Behaved Differently To Prove Reliance On Omissions. .......... 63

d. Missouri Requires Individual Proof Of Causation For MMPA Claims And Reliance For Common Law Fraud. .......... 64

e. Texas Requires Individual Proof Of Causation And Reliance For DTPA Claims. .......... 65

3. The Individual Factual Determinations Required For Reliance And Causation Predominate Over Any Common Issues. .......... 67

a. Reliance And Causation Cannot Be Presumed. .......... 67

b. Reliance And Causation Are Individual Issues. .......... 68

i. Differences In Why Named Plaintiffs and Putative Class Members Purchased Their Vehicles.......... 69

ii. Differences In The Information Putative Class Members Considered And Relied Upon. .......... 73

iii. The Lack Of Market Shifts After The Recall Announcements Is "Compelling Evidence" That Vehicle Owners Cannot Prove Reliance Or Causation.......... 74

**TABLE OF CONTENTS (CONT'D)**

**Page**


4. No Misrepresentation Claims Can Be Certified. ..... 75

B. Individual Differences In New GM's Knowledge Predominate Over Any Common Issues. ..... 76

1. Plaintiffs' Claims Depend on New GM's Knowledge Over Time. ..... 76

2. New GM's Knowledge Varied Across Recalls And Over Time. ..... 79

C. Whether Each Putative Class Member Purchased An Old GM Or New GM Vehicle Is An Important Individual Fact Difference. ..... 84

D. Plaintiffs Cannot Demonstrate Commonality, Much Less That Common Issues Predominate, For Their Song-Beverly Act Claims. ..... 85

E. Individual Issues Predominate For Texas DTPA Unconscionability Claims. ..... 87

F. Individual Issues Predominate For The Bankruptcy-Claim-Fraud Counts. ..... 89

III. NAMED PLAINTIFFS ARE NEITHER TYPICAL NOR ADEQUATE CLASS REPRESENTATIVES. ..... 90

A. Named Plaintiffs Do Not Have Legally Viable Or Typical Claims. ..... 91

B. Various Named Plaintiffs Are Subject To Unique Defenses. ..... 91

1. Named Plaintiffs With Direct Claims Are Atypical. ..... 92

2. Named Plaintiffs With Bankruptcy-Claim-Fraud Counts Are Atypical. ..... 95

C. The Process By Which Plaintiffs' Counsel Selected The Named Plaintiffs Confirms That They Are Not Typical Of Any Putative Class. ..... 95

IV. PLAINTIFFS' PROPOSED CLASSES ARE NEITHER SUPERIOR NOR MANAGEABLE. ..... 98

A. New GM's Recalls Are A Superior Method Of Resolving Plaintiffs' Claims. ..... 98

B. Plaintiffs Are Adequately Incentivized To Pursue Any Meritorious Individual Claims. ..... 99

C. Plaintiffs' Proposed Classes And Trial Plan Are Not Manageable. ..... 100

V. PLAINTIFFS' PROPOSED CLASSES ARE OVERBROAD AND IMPROPER. ..... 102

**TABLE OF CONTENTS (CONT'D)**

**Page**

CONCLUSION........................................................................................................................ 103

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Target Corp.*,
2014 WL 12558858 (C.D. Cal. Nov. 25, 2014) .......... 33

*Adkins v. Morgan Stanley*,
307 F.R.D. 119 (S.D.N.Y. 2015) .......... 98

*Algarin v. Maybelline, LLC*,
300 F.R.D. 444 (S.D. Cal. 2014) .......... 62

*Allen v. DaimlerChrysler Motors Co. LLC*,
2007 WL 2774440 (Cal. App. Ct. Sept. 25, 2007) .......... 62

*Am. Suzuki Motor Corp., v. Superior Court*,
44 Cal. Rptr. 2d 526 (Cal. App. Ct. 1995) .......... 85, 86

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 28, 103

*American Honda Motor Co. v. Superior Court*,
199 Cal. App. 4th 1367 (2011) .......... 86

*Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*,
879 F.3d 474 (2d Cir. 2018) .......... 104

*Arnold v. Directv, LLC*,
2017 WL 1251033 (E.D. Mo. Mar. 31, 2017) .......... 43

*Autohaus, Inc. v. Aguilar*,
794 S.W.2d 459 (Tex. App. 1990) .......... 76

*Avedisian v. Mercedes-Benz USA, LLC*,
43 F. Supp. 3d 1071 (C.D. Cal. 2014) .......... 85

*Avritt v. Reliastar Life Ins. Co.*,
615 F.3d 1203 (8th Cir. 2010) .......... 55, 57

*Backhaut v. Apple, Inc.*,
74 F. Supp. 3d 1033 (N.D. Cal. 2014) .......... 55

*Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*,
222 F.3d 52 (2d Cir. 2000) .......... 91

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**


*Bagdasarian v. Gragnon*,
192 P.2d 935 (Cal. 1948) ........................................................................................ 16

*Baghdasarian v. Amazon.com, Inc.*,
2009 WL 4823368 (C.D. Cal. Dec. 9, 2009), *aff'd*, 458 F. App'x 622 (9th Cir. 2011) ........... 62

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ........................................................................................ 53, 54

*Beck v. FCA US LLC*,
2018 WL 3359100 (E.D. Mich. July 10, 2018)........................................................ 87

*Beck v. FCA US LLC*,
273 F. Supp. 3d 735 (E.D. Mich. 2017) ............................................................ 86, 87

*Beck v. Maximus, Inc.*,
457 F.3d 291 (3d Cir. 2006)........................................................................................ 91

*Beck v. Status Game Corp.*,
1995 WL 422067 (S.D.N.Y. July 14, 1995) ........................................................ 97, 98, 105

*Bohac v. Walsh*,
223 S.W.3d 858 (Mo. Ct. App. 2007) ........................................................................ 84

*Bossier Chrysler Dodge II, Inc. v. Rauschenberg*,
201 S.W. 3d 787 (Tex. App. 2006) ........................................................................ 46

*Bouder v. Prudential Fin., Inc.*,
2013 WL 246848 (D.N.J. Jan. 18, 2013) ................................................................ 100

*Bowles v. Mars, Inc.*,
2015 WL 3629717 (S.D. Tex. June 10, 2015) ........................................................ 67

*Bratton Hershey Co.*,
2018 WL 934899 (W.D. Mo. Feb. 1, 2018)............................................................ 64

*Brazil v. Dell Inc.*,
585 F. Supp. 2d 1158 (N.D. Cal. 2008) ................................................................ 67

*Broadbent v. Internet Direct Response*,
2011 WL 13217499 (C.D. Cal. Feb. 2, 2011)........................................................ 62

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998)................................................................................ 29, 48

*Budach v. NIBCO, Inc.*,
2015 WL 6870145 (W.D. Mo. Nov. 6, 2015)........................................................ 77

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Burroughs v. Precision Airmotive Corp.*,
93 Cal. Rptr. 2d 124 (Cal. App. Ct. 2000) .......... 84

*Burton v. Chrysler Group LLC*,
2012 WL 7153877 (D.S.C. 2012) .......... 98

*Butler v. Porsche Cars N. Am., Inc.*,
2017 WL 1398316 (N.D. Cal. Apr. 19, 2017) .......... 74

*Calvo v. City of New York*,
2017 WL 4231431 (S.D.N.Y. Sept. 21, 2017) .......... 28, 104

*Calvo v. City of New York*,
2018 WL 1633565 (S.D.N.Y. Apr. 2, 2018) .......... 28

*Campion v. Old Republic Home Prot. Co., Inc.*,
272 F.R.D. 517 (S.D. Cal. 2011) .......... 57, 60

*Caro v. Procter & Gamble Co.*,
18 Cal. App. 4th 644 (1993) .......... 60

*Causey v. Sewell Cadillac-Chevrolet, Inc.*,
394 F.3d 285 (5th Cir. 2004) .......... 71

*Chang v. Fage USA Dairy Industry, Inc.*,
2016 WL 5415678 (E.D.N.Y. 2016) .......... 55

*Charron v. Pinnacle Grp. N.Y. LLC*,
269 F.R.D 221 (S.D.N.Y. 2010) .......... 50

*Chin v. Chrysler Corp.*,
182 F.R.D. 448 (D.N.J. 1998) .......... 53, 54, 69, 99

*Chow v. Neutrogena Corp.*,
2013 WL 5629777 (C.D. Cal. Jan. 22, 2013) .......... 62

*Circle Click Media LLC v. Regus Mgmt. Group LLC*,
2015 WL 6638929 (N.D. Cal. Oct. 30, 2015) .......... 103

*Cohen v. DIRECTV, Inc.*,
178 Cal. App. 4th 966 (2009) .......... 56, 57

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......... passim

*Conroy v. Regents of Univ. of Cal.*,
203 P.3d 1127 (Cal. 2009) .......... 77

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Consumer Advocates v. Echostar Satellite Corp.*,
113 Cal. App. 4th 1351 (2d Dist. 2003) ........ 76

*Contramano v. United Techs. Corp. & Palm Beach Aggregates, LLC*,
2018 WL 2047468 (S.D. Fla. May 2, 2018) ........ 27

*Cruz v. Andrews Restoration, Inc.*,
364 S.W.3d 817 (Tex. 2012) ........ 65

*Cummings v. Connell*,
402 F.3d 936 (9th Cir. 2005) ........ 58

*Daigle v. Ford Motor Co.*,
2012 WL 3113854 (D. Minn. July 31, 2012) ........ 99

*Dandong v. Pinnacle Performance Ltd.*,
2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ........ 54

*Danzig v. Jack Grynberg & Assocs.*,
161 Cal. App. 3d 1128 (1984) ........ 60

*Darisse v. Nest Labs, Inc.*,
2016 WL 4385849 (N.D. Cal. Aug. 15, 2016) ........ 61

*Davidson v. Apple, Inc.*,
2018 WL 2325426 (N.D. Cal. May 8, 2018) ........ 32, 39

*Davis-Miller v. Auto. Club of S. Cal.*,
201 Cal. App. 4th 106 (2011) ........ 57, 60

*Deitz v. Comcast Corp.*,
2007 WL 2015440 (N.D. Cal. July 11, 2007) ........ 62

*Denney v. Deutsche Bank AG*,
443 F. 3d 253 (2d Cir. 2006) ........ 28, 58

*DePeralta v. Dlorah, Inc.*,
2012 WL 4092191 (W.D. Mo. Sept. 17, 2012) ........ 84

*Diais v. Land Rover Dallas, L.P.*,
2016 WL 1298392 (Tex. App. Apr. 4, 2016) ........ 88

*Doe v. Successfulmatch.com*,
2014 WL 1494347 (N.D. Cal. Apr. 16, 2014) ........ 55

*Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*,
2016 WL 6523428 (S.D. Cal. Nov. 3, 2016) ........ 46

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Durell v. Sharp Healthcare*,
183 Cal. App. 4th 1350 (2010)....................55, 59, 75

*Dzielak v. Whirlpool Corp.*,
2017 WL 1034197 (D.N.J. 2017)....................41

*East Tex. Motor Freight Sys. Inc. v. Rodriguez*,
431 U.S. 395 (1977)....................91

*Edwards v. Ford Motor Co.*,
603 F. App'x 538 (9th Cir. 2015)....................62

*Eng-Hatcher v. Sprint Nextel Corp.*,
2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009)....................50

*Espenscheid v. DirectSat USA, LLC*,
705 F.3d 770 (7th Cir. 2013)....................43

*Evergreen Nat'l Corp. v. Carr*,
129 S.W.3d 492 (Mo. Ct. App. 2004)....................65

*Fairbanks v. Farmers New World Life Ins. Co.*,
197 Cal. App. 4th 544 (2011)....................62

*Falcon v. Philips Elecs. N. Am. Corp.*,
304 F. App'x 896 (2d Cir. Nov. 5, 2008)....................92, 104

*Feinstein v. Firestone Tire & Rubber Co.*,
535 F. Supp. 595 (S.D.N.Y. 1982)....................105

*Fid. & Guar. Life Ins. Co. v. Pina*,
165 S.W.3d 416 (Tex. App. 2005)....................66, 67

*Fine v. ConAgra Foods, Inc.*,
2010 WL 3632469 (C.D. Cal Aug. 26, 2010)....................62, 69

*Fleischman v. Albany Med. Ctr.*,
2008 WL 2945993 (N.D.N.Y. July 28, 2008)....................18, 27, 28

*Football Ass'n Premier League Ltd. v. YouTube, Inc.*,
297 F.R.D. 64 (S.D.N.Y. 2013)....................91, 105

*Ford Motor Co. v. Ocanas*,
138 S.W.3d 447 (Tex. App. 2004)....................66, 67

*Ford Motor Co. v. Sheldon*,
113 S.W.3d 839 (Tex. App. 2003)....................78, 83

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Ford v. St. Louis Metro. Towing, L.C.*,
2010 WL 618491 (E.D. Mo. Feb. 18, 2010) ... 46

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) ... 45, 104

*Freeland v. AT & T Corp.*,
238 F.R.D. 130 (S.D.N.Y. 2006) ... 104

*Friedman v. Old Republic Home Prot. Co., Inc.*,
2015 WL 9948093 (C.D. Cal. May 18, 2015) ... 61

*Galvan v. KDI Distribution Inc.*,
2011 WL 5116585 (C.D. Cal. Oct. 25, 2011) ... 56

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990) ... 91, 104

*Gen. Motors Corp. v. Garza*,
179 S.W.3d 76 (Tex. App. 2005) ... 49

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ... 91

*Gilmore v. Ally Fin. Inc.*,
2017 WL 1476596 (E.D.N.Y. Apr. 24, 2017) ... 17

*GJP, Inc. v. Ghosh*,
251 S.W.3d 854 (Tex. App. 2008) ... 16

*Golden Hill Paugussett Tribe of Indians v. Weicker*,
39 F.3d 51 (2d Cir. 1994) ... 28

*Gonzalez v. Proctor & Gamble Co.*,
247 F.R.D. 616 (S.D. Cal. 2007) ... 60

*Grossoeheme v. Cordell*,
904 S.W.2d 392 (Mo. Ct. App. 1995) ... 65

*Guido v. L'Oreal, USA, Inc.*,
2013 WL 3353857 (C.D. Cal. July 1, 2013) ... 63

*Guido v. L'Oreal, USA, Inc.*,
2014 WL 6603730 (C.D. Cal. 2014) ... 42

*Hall v. Time Inc.*,
158 Cal. App. 4th 847 (2008) ... 55

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) .................... 15

*Hardings v. Tambrands*,
165 F.R.D. 623 (D. Kan. 1996) .................... 100

*Harnish v. Widener Univ. Sch. of Law*,
833 F.3d 298 (3d Cir. 2016) .................... 17

*Harris v. Nortek Glob. HVAC LLC*,
2016 WL 4543108 (S.D. Fla. Jan. 29, 2016) .................... 41

*Henry Schein, Inc. v. Stromboe*,
102 S.W.3d 675 (Tex. 2002) .................... 66, 67

*Hindsman v. Gen. Motors LLC*,
2018 WL 2463113 (N.D. Cal. June 1, 2018) .................... 64, 74

*Hobbs v. Brother Int'l Corp.*,
2016 WL 4734394 (C.D. Cal. Sept. 8, 2016) .................... 57

*Hope v. Nissan N. Am.*,
353 S.W.3d 68 (Mo. Ct. App. 2011) .................... 77, 79

*Howard v. GC Servs., Inc.*,
2015 WL 5163328 (Cal. App. Ct. Sept. 3, 2015) .................... 62

*Hughes v. Ester C. Co.*,
320 F.R.D. 337 (E.D.N.Y. 2017) .................... 36

*Hughes v. The Ester C Co.*,
317 F.R.D. 333 (E.D.N.Y. 2016) .................... 36

*In re Avon Anti-Aging Skincare Creams & Prod. Mktg. & Sales Practices Litig.*,
2015 WL 5730022 (S.D.N.Y. Sept. 30, 2015) .................... 104

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*,
2011 WL 6740338 (W.D. Mo. Dec. 22, 2011) .................... 51, 64, 79

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002) .................... 40, 41

*In re Chateaugay Corp.*,
53 F.3d 478 (2d Cir. 1995) .................... 89

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014) .................... 45, 67

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015)........................................................................42, 66

*In re Davenport*,
491 B.R. 911 (Bankr. W.D. Mo. 2013)..........................................................................16

*In re Digital Music Antitrust Litig.*,
2015 WL 13678846 (S.D.N.Y. 2015) ............................................................................97

*In re Digital Music Antitrust Litig.*,
321 F.R.D. 64 (S.D.N.Y. 2017)..................................................................................92, 105

*In re First Am. Home Buyers Prot. Corp. Class Action Litig.*,
313 F.R.D. 578 (S.D. Cal. 2016)...............................................................................59, 61

*In re Fluidmaster*,
2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ...........................................................passim

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
174 F.R.D. 332 (E.D. La. 1997) ...............................................................................passim

*In re Ford Motors Co. Vehicle Paint Litig.*,
182 F.R.D. 214 (E.D. La. 1998) ...................................................................51, 53, 54, 78

*In re Ford Tailgate Litig.*,
2015 WL 7571772 (N.D. Cal. Nov. 25, 2015)..................................................................77

*In re Gen. Motors LLC Ignition Switch Litig.*,
2016 WL 3920353 (S.D.N.Y. July 15, 2016) ...........................................................passim

*In re Gen. Motors LLC Ignition Switch Litig.*,
2017 WL 6509256 (S.D.N.Y. Dec. 19, 2017)..................................................................101

*In re Gen. Motors LLC Ignition Switch Litig.*,
257 F. Supp. 3d 372 (S.D.N.Y. 2017) .......................................................................passim

*In re Gen. Motors LLC Ignition Switch Litig.*,
2017 WL 3443623 (S.D.N.Y. August 9, 2017)..........................................................45, 92

*In re GM Dex-Cool Prods. Liab. Litig.*,
241 F.R.D. 305 (S.D. Ill. 2007)........................................................................................102

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008) .......................................................................................29

*In re Initial Public Offerings Secs. Litig.*,
471 F.3d 24 (2d Cir. 2006)..................................................................................15, 52, 104

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018) .......... 15

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
209 F.R.D. 323 (S.D.N.Y. 2002) .......... 50, 104

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008) .......... 32

*In re NJOY, Inc. Consumer Class Action Litig.*,
120 F. Supp. 3d 1050 (C.D. Cal. 2015) .......... 16

*In re NJOY, Inc. Consumer Class Action Litig.*,
2016 WL 787415 (C.D. Cal. Feb. 2, 2016) .......... 33, 34

*In re NYSE Specialists Secs. Litig.*,
240 F.R.D. 128 (S.D.N.Y. 2007) .......... 92

*In re Petrobras Secs.*,
862 F.3d 250 (2d Cir. 2017) .......... passim

*In re POM Wonderful LLC Mktg. & Sales Pracs. Litig.*,
2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) .......... 63

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) .......... 17

*In re Scotts EZ Seed Litig.*,
2017 WL 3396433 (S.D.N.Y. 2017) .......... 41

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) .......... passim

*In re Vioxx Class Cases*,
180 Cal. App. 4th 116 (Cal. App. Ct. 2009) .......... 61, 69

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) .......... 55

*Janes v. Triborough Bridge & Tunnel Auth.*,
889 F. Supp. 2d 462 (S.D.N.Y. 2012) .......... 17

*Jasper v. Abbott Labs., Inc.*,
834 F. Supp. 2d 766 (N.D. Ill. 2011) .......... 41

*Johnson v. Harley-Davidson Motor Co. Grp. LLC*,
285 F.R.D. 573 (E.D. Cal. 2012) .......... 61, 69, 99

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Johnson v. Nextel Commc'ns Inc.*,
780 F.3d 128 (2d Cir. 2015) ............ 104

*Jones v. ConAgra Foods, Inc.*,
2014 WL 2702726 (N.D. Cal. June 13, 2014) ............ 57

*Jones v. SIG Arms, Inc.*,
2001 WL 1617187 (Tex. App. Dec. 19, 2001) ............ 84

*Keegan v. Am. Honda Motor Co., Inc.*,
284 F.R.D. 504 (C.D. Cal. 2012) ............ 59, 62

*Kent v. Hewlett–Packard Co.*,
2010 WL 2681767 (N.D. Cal. July 6, 2010) ............ 87

*Khoday v. Symantec Corp.*,
93 F. Supp. 3d 1067 (D. Minn. 2015) ............ 42

*Klein v. Earth Elements*,
59 Cal. App. 4th 965 (1st Dist. 1997) ............ 77

*Kline v. Wolf*,
702 F.2d 400 (2d Cir. 1983) ............ 92, 104

*Knapp v. AT&T Wireless Servs., Inc.*,
195 Cal. App. 4th 932 (Cal. App. Ct. 2011) ............ 57, 60

*Kottler v. Deutsche Bank AG*,
2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010) ............ 105

*La Mar v. H & B Novelty & Loan Co.*,
489 F.2d 461 (9th Cir. 1973) ............ 91

*Larabee v. Eichler*,
271 S.W.3d 542 (Mo. 2008) ............ 16

*Larsen v. Nissan N. Am.*,
2009 WL 1766797 (Cal. Ct. App. June 23, 2009) ............ 85

*Laster v. T–Mobile USA, Inc.*,
2009 WL 4842801 (S.D. Cal. Dec. 14, 2009), *vacated on other grounds*, 466 F. App'x 613 (9th Cir. 2012) ............ 55

*Levitt v. J.P. Morgan Secs., Inc.*,
710 F.3d 454 (2d Cir. 2013) ............ 15, 104

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*LiMandri v. Judkins*,
60 Cal. Rptr. 2d 539 (Cal. Ct. App. 1997) .......... 84

*Lon Smith & Assocs., Inc. v. Key*,
527 S.W.3d 604 (Tex. App. 2017) .......... 87, 88

*Lucas v. Breg, Inc.*,
212 F. Supp. 3d 950 (S.D. Cal. 2016) .......... 59

*Lueras v. BAC Home Loans Servicing, LP*,
163 Cal. Rptr. 3d 804 (Cal. Ct. App. 2013) .......... 46

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 28

*Mahtani v. Wyeth*,
2011 WL 2609857 (D.N.J. June 30, 2011) .......... 49

*Maloney v. Microsoft Corp.*,
2012 WL 715856 (D.N.J. Mar. 5, 2012) .......... 49

*Martin v. Ford Motor Co.*,
292 F.R.D. 252 (E.D. Pa. 2013) .......... 16

*Martinez v. Welk Group, Inc.*,
2012 WL 2888536 (S.D. Cal. July 13, 2012) .......... 59

*Mass. Mutual Life Ins. Co. v. Superior Court*,
97 Cal. App. 4th 1282 (2002) .......... 60

*Mathison v. Bumbo*,
2008 WL 8797937 (C.D. Cal. Aug. 18, 2008) .......... 77

*Mayo v. UBS Real Estate Secs., Inc.*,
2012 WL 4361571 (W.D. Mo. Sept. 21, 2012) .......... 103

*Mazza v. Am. Honda Motor Co., Inc.*,
666 F.3d 581 (9th Cir. 2012) .......... passim

*Mazzei v. Money Store*,
829 F.3d 260 (2d Cir. 2016) .......... 90, 104

*McCracken v. Best Buy Stores, L.P.*,
248 F.R.D. 162 (S.D.N.Y. 2008) .......... 105

*McKernan v. United Techs. Corp.*,
120 F.R.D. 452 (S.D.N.Y. 1998) .......... 92, 105

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*McLaughlin v. American Tobacco Co.*,
522 F. 3d 215 (2d Cir. 2008) ........ passim

*McLaughlin v. Northstar Drillings Techs., Inc.*,
138 S.W.3d 24 (Tex. App. 2004) ........ 67

*McManus v. Fleetwood Enters., Inc.*,
320 F.3d 545 (5th Cir. 2003) ........ 66

*Medrazo v. Honda of N. Hollywood*,
205 Cal. App. 4th 1 (2012) ........ 56

*Messina v. Prather*,
42 S.W.3d 753 (Mo. Ct. App. 2001) ........ 46

*Mirkin v. Wasserman*,
858 P.2d 568 (Cal. 1993) ........ 59, 60, 63

*Monteferrante v. Williams-Sonoma, Inc.*,
241 F. Supp. 3d 264 (D. Mass. 2017) ........ 103

*Moore v. PaineWebber*,
306 F.3d 1247 (2d Cir. 2002) ........ 52, 54, 75, 104

*Moore v. Panini Am.*,
2016 WL 7163899 (Tex App. Nov. 7, 2016) ........ 65

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015) ........ 49

*Myers v. BMW of N. Am., LLC*,
2016 WL 5897740 (N.D. Cal. Oct. 11, 2016) ........ 55, 64

*Myre v. Meletio*,
307 S.W.3d 839 (Tex. App. 2010) ........ 84

*Newman v. RCN Telecom Servs., Inc.*,
238 F.R.D. 57 (S.D.N.Y. 2006) ........ 93, 105

*Newton v. City of New York*,
640 F. Supp. 2d 426 (S.D.N.Y. 2009) ........ 71

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001) ........ 17, 29, 48, 51

*Nunes v. Toshiba Am. Info. Sys., Inc.*,
2016 WL 5920345 (C.D. Cal. June 23, 2016) ........ 62

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Occidental Land, Inc. v. Superior Court*,
18 Cal. 3d 355 (1976) .......... 60

*Ohio Pub. Employees Ret. System v. Fed. Home Loan Mortg. Corp.*,
2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) .......... 44

*Opperman v. Kong Techs., Inc.*,
2017 WL 3149295 (N.D. Cal. July 25, 2017) .......... 32

*Opperman v. Path, Inc.*,
2016 WL 3844326 (N.D. Cal. July 15, 2016) .......... 27, 32, 43

*Ortiz v. Ford Motor Co.*,
909 So. 2d 479 (Fla. Dist. Ct. App. 2005) .......... 99

*Oshana v. Coca-Cola Co.*,
472 F.3d 506 (7th Cir. 2006) .......... 58

*Owen v. Gen. Motors Corp.*,
533 F.3d 913 (8th Cir. 2008) .......... 64

*Parkinson v. Hyundai Motor Am.*,
258 F.R.D. 580 (C.D. Cal. 2008) .......... 59

*Pelman v. McDonald's Corp.*,
272 F.R.D. 82 (S.D.N.Y. 2010) .......... 105

*Peltier Enters. v. Hilton*,
51 S.W.3d 616 (Tex. App. 2000) .......... 66, 67, 87, 88

*Peterson v. Cont'l Boiler Works, Inc.*,
783 S.W.2d 896 (Mo. 1990) .......... 16

*Philips v. Ford Motor Co.*,
2016 WL 7428810 (N.D. Cal. Dec. 22, 2016) .......... 58

*Plubell v. Merck & Co., Inc.*,
289 S.W.3d 707 (Mo. Ct. App. 2009) .......... 65, 77

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
244 F. Supp. 2d 289 (S.D.N.Y. 2003) .......... 17, 28

*Princess Cruise Lines, Ltd. v. Superior Court*,
179 Cal. App. 4th 36 (2009) .......... 59

*Prof'l Laundry Mgmt. Sys., Inc. v. Aquatic Techs., Inc.*,
109 S.W.3d 200 (Mo. Ct. App. 2003) .......... 65

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*,
896 S.W.2d 156 (Tex. 1995) ........ 77

*Ramthun v. Bryan Career College-Inc.*,
93 F. Supp. 3d 1011 (W.D. Ark. 2015) ........ 102

*Rapcinsky v. Skinnygirl Cocktails, L.L.C.*,
2013 WL 93636 (S.D.N.Y. Jan. 9, 2013) ........ 90

*Resnick v. Hyundai Motor Am., Inc.*,
2016 WL 9455016 (C.D. Cal. Nov. 14, 2016) ........ 77

*Reynante v. Toyota Motor Sales USA, Inc.*,
2018 WL 329569 (Cal. App. Ct. Jan. 9, 2018) ........ 61

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015) ........ 27, 32

*Road Hog Trucking, LLC v. Hilmar Cheese Co., Inc.*,
2016 WL 6125677 (N.D. Tex. Oct. 19, 2016) ........ 100

*Rodman v. Safeway, Inc.*,
2014 WL 988992 (N.D. Cal. Mar. 10, 2014) ........ 59

*Rojas-Lozano v. Google, Inc.*,
159 F. Supp. 3d 1101 (N.D. Cal. 2016) ........ 63

*Romberio v. UnumProvident Corp.*,
385 F. App'x 423 (6th Cir. Jan. 12, 2009) ........ 91

*Rosen v. Chrysler Corp.*,
2000 WL 34609135 (E.D. Mich. July 18, 2000) ........ 99

*Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017) ........ 105

*Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*,
2018 WL 4007285 (S.D.N.Y. Aug. 14, 2018) ........ 105

*Rylott-Rooney v. Alitalita-Linee Aeree Italiane SpA*,
2009 WL 37817 (S.D.N.Y. Jan. 6, 2009) ........ 71

*Saavedra v. Eli Lilly & Co.*,
2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ........ passim

*Safaie v. Jacuzzi Whirlpool Bath, Inc.*,
2008 WL 4868653 (Cal. App. Ct. Nov. 12, 2008) ........ 62

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Salgado v. Piedmont Capital Corp.*,
534 F. Supp. 938 (D.P.R. 1981) ............ 91

*Sanchez v. Wal-Mart Stores, Inc.*,
2009 WL 1514435 (E.D. Cal. May 28, 2009) ............ 97

*Sanchez-Knutson v. Ford Motor Co.*,
181 F. Supp. 3d 988 (S.D. Fla. 2016) ............ 42

*Sanneman v. Chrysler*,
191 F.R.D. 441 (E.D. Pa. 2000) ............ 53, 78, 99

*Santamarina v. Sears Roebuck & Co.*,
2016 WL 1714226 (Cal. App. Ct. Apr. 26, 2016) ............ 57

*Savino v. Computer Credit, Inc.*,
164 F.3d 81 (2d Cir. 1998) ............ 92

*Schmidt v. Bassett Furniture Indus.*,
2011 WL 67255 (E.D. Wis. Jan. 10, 2011) ............ 31

*Seymour v. House*,
305 S.W.2d 1 (Mo. 1957) ............ 46

*Shoots v. iQor Holdings US Inc.*,
325 F.R.D. 253 (D. Minn. 2018) ............ 102

*Sicav v. James Jun Wang*,
2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ............ 45, 104

*Sims v. Kia Motors Am., Inc.*,
2014 WL 12558249 (C.D. Cal. Mar. 31, 2014) ............ 76

*Skeen v. BMW of N. Am., LLC*,
2014 WL 283628 (D.N.J. Jan. 24, 2014) ............ 85

*Smith v. Tracy*,
372 S.W.2d 925 (Mo. 1963) ............ 16

*Smook v. Minnehaha Cty.*,
457 F.3d 806 (8th Cir. 2006) ............ 91

*Solano v. Landamerica Commonwealth Title of Fort Worth, Inc.*,
2008 WL 5115294 (Tex. App. Dec. 4, 2008) ............ 75

*Sotelo v. MediaNews Grp., Inc.*,
207 Cal. App. 4th 639 (2012) ............ 60

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Spann v. AOL Time Warner, Inc.*,
219 F.R.D. 307 (S.D.N.Y. 2003)........................................................................92, 105

*Sprague v. Gen. Motors Corp.*,
133 F.3d 388 (6th Cir. 1998)...............................................................................102

*State ex rel. Bunting v. Koehr*,
865 S.W.2d 351 (Mo. 1993).................................................................................71

*State ex rel. Coca-Cola Co. v. Nixon*,
249 S.W.3d 855 (Mo. 2008)...........................................................................64, 65

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011)........................................................................59, 62

*Stein v. Novus Equities Co.*,
284 S.W.3d 597 (Mo. Ct. App. 2009)..................................................................65

*Stewart v. Electrolux Home Prods., Inc.*,
304 F. Supp. 3d 894 (E.D. Cal. 2018)..................................................................55

*Sud v. Costco Wholesale Corp.*,
229 F. Supp. 3d 1075 (N.D. Cal. 2017)...........................................................55, 63

*Sykes v. Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015)........................................................................17, 27, 28

*Szymczak v. Nissan N. Am., Inc.*,
2011 WL 7095432 (S.D.N.Y. Dec. 16, 2011).......................................................85

*Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*,
992 F. Supp. 2d 962 (C.D. Cal. 2014)...................................................................87

*Terry v. Mercedes-Benz, USA, LLC*,
2007 WL 2045231 (Tex. App. July 18, 2007) .......................................................84

*Tex. S. Rentals, Inc. v. Gomez*,
267 S.W.3d 228 (Tex. App. 2008) ........................................................................66

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
445 F.3d 311 (4th Cir. 2006)..........................................................................29, 51

*Thurston v. Bear Naked, Inc.*,
2013 WL 5664985 (S.D. Cal. July 30, 2012).........................................................62

*Torres v. Nissan N. Am. Inc.*,
2015 WL 5170539 (C.D. Cal. Sept. 1, 2015).........................................................86

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Town E. Ford Sales, Inc. v. Gray*,
730 S.W.2d 796 (Tex. App. 1987) .......... 16

*Townsend v. Monster Beverage Corp.*,
303 F. Supp. 3d 1010 (C.D. Cal. 2018) .......... 32, 36, 37

*Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*,
549 U.S. 443 (2007) .......... 89

*Triggs v. Risinger*,
772 S.W.2d 381 (Mo. Ct. App. 1989) .......... 65

*Tucker v. Pac. Bell Mobile Servs.*,
208 Cal. App. 4th 201 (2012) .......... 57, 60

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016) .......... passim

*Valley Nissan, Inc. v. Davila*,
133 S.W.3d 702 (Tex. App. 2003) .......... 46

*Vasquez v. Superior Court*,
4 Cal. 3d 800 (1971) .......... 60

*Veera v. Banana Republic, LLC*,
6 Cal. App. 5th 907 (2016) .......... 56

*Wal-Mart Stores, Inc v. Dukes*,
564 U.S. 338 (2011) .......... passim

*Walsh v. Ford Motor Co.*,
130 F.R.D. 260 (D.D.C. 1990) .......... 100

*Warth v. Seldin*,
422 U.S. 490 (1975) .......... 56

*Washburn v. Sterling McCall Ford*,
521 S.W.3d 871 (Tex. App. 2017) .......... 77

*Webb v. Carter's, Inc.*,
272 F.R.D. 489 (C.D. Cal. 2011) .......... 61, 63, 69

*Werdebaugh v. Blue Diamond Growers*,
2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) .......... 16

*White v. Just Born, Inc.*,
2018 WL 3748405 (W.D. Mo. Aug., 7, 2018) .......... 64

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Williams v. HSBC Bank USA, N.A.*,
467 S.W.3d 836 (Mo. Ct. App. 2015) .......... 75

*Williams v. Mohawk Indus. Inc.*,
568 F.3d 1350 (11th Cir. 2009) .......... 58

*Williams v. United Techs. Corp.*,
2015 WL 7738370 (W.D. Mo. Nov. 30, 2015) .......... 76

*Williams v. Yamaha Motor Corp., U.S.A.*,
2015 WL 13626022 (C.D. Cal. Jan. 7, 2015) .......... 71

*Wilner v. Sunset Life Ins. Co.*,
78 Cal. App. 4th 952 (2000) .......... 60

*Wilson v. Hewlett-Packard Co.*,
668 F.3d 1136 (9th Cir. 2012) .......... 77

*Windham v. Am. Brands, Inc.*,
565 F.2d 59 (4th Cir. 1977) .......... 45

*Withers v. eHarmony, Inc.*,
2010 WL 11520198 (C.D. Cal. June 2, 2010) .......... 62

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) .......... 49

*Woodard v. Fidelity Nat'l Title Ins. Co.*,
2008 WL 5737364 (D.N.M. Dec. 8, 2008) .......... 101

*Yamada v. Nobel Biocare Holding AG*,
275 F.R.D. 573 (C.D. Cal. 2011) .......... 63

**Statutes**

11 U.S.C. § 502(b)(1) .......... 89

28 U.S.C. § 2072 .......... 2, 24, 28, 50

Mo. Rev. Stat. § 407.025.1 .......... 64

Tex. Bus. & Com. Code § 17.45(5) .......... 87

Tex. Bus. & Com. Code § 17.50 .......... 88

U.S. CONST. art. III .......... 2, 28, 56, 57

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

**Other Authorities**

1 McLaughlin on Class Actions § 5:55 (14th ed. 2017) ........ 53, 62

1 McLaughlin on Class Actions § 5:59 (14th ed. 2017) ........ 58

2 McLaughlin on Class Actions § 8:16 (14th ed. 2017) ........ 18

Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, The Law of Torts § 689 (2d ed.) ........ 17

Manual for Complex Litigation § 21.222 ........ 50

**Rules**

Fed. R. Civ. P. 23 ........ passim

Fed. R. Civ. P. 23(a) ........ 15

Fed. R. Civ. P. 23(b)(3) ........ 15, 32, 41, 104

Fed. R. Evid. 611(c) ........ 71

## INTRODUCTION

Plaintiffs seek to certify broad classes of differently situated purchasers and lessees of Old GM and New GM vehicles who were not injured. Their proposed classes concern seven different recalls involving millions of different vehicles with different vehicle systems, field histories, field actions, and repair remedies. Lacking market evidence or any other legally cognizable injuries, plaintiffs' experts purport to calculate "benefit-of-the-bargain" damages that do not attempt to compensate class members for any difference in market values, but rather seek to quantify post-purchase risks of vehicle malfunctions that never materialized. Plaintiffs' economic damages methodology contravenes benefit-of-the-bargain law in the bellwether states and does not satisfy plaintiffs' burden under *Comcast Corp. v. Behrend* to proffer damages consistent with liability theories. 569 U.S. 27 (2013). In addition, any trial of plaintiffs' liability claims would necessarily require highly individualized, plaintiff-specific inquiries, including reliance and causation. The many individual fact issues will swamp any purported common issues, making any class trial unmanageable. Manageability problems will be exacerbated because New GM has unique factual and legal defenses to many claims brought by differently situated putative class members, including for successor liability or bankruptcy fraud. In short, no proposed class can be certified.

**First**, **there are no class-wide or common injuries in this case.** The factual differences in whether each putative class member has any injury or damages predominate over any alleged common issues. Plaintiffs seek benefit-of-the-bargain damages, claiming that they overpaid at purchase or lease for Old GM or New GM vehicles because of undisclosed defects. State law and this Court's prior opinions require that any such injuries or damages be calculated by the difference in market price, if any, between a vehicle with and without the various safety defects.

Plaintiffs, however, do not rely on market data to show class-wide injury or damages. Instead, plaintiffs and their experts turned to internet surveys of respondents who were asked

whether they would be willing to pay for hypothetical "scenarios" of "safety" feature options and other "information revealed at point of purchase / lease." Setting aside the admissibility of this work under Rule 702, the proffered damages methodology does not prove benefit-of-the-bargain damages for any class of new or used vehicle purchasers or lessees. Among other deficiencies, plaintiffs' surveys do not generate the market values for vehicles with disclosed safety defects, or the differences between prices putative class members actually paid and the market values of vehicles with disclosed defects. Moreover, plaintiffs' survey data shows that 26.6% to 39.1% of respondents have no injury or damages under plaintiffs' theory. Rule 23, Article III, the Rules Enabling Act, and Second Circuit precedent all bar certifying a class without common injuries.

Furthermore, New GM's experts demonstrate that the market prices of the GM vehicles at issue did not systematically decline after the 2014 recalls. This lack of a systematic market price decline refutes any claim that the putative classes overpaid for their vehicles and confirms that plaintiffs cannot prove common injury. If plaintiffs' theory that a known safety defect would drive down prices had merit, then used GM vehicle prices would have gone down across-the-board after the 2014 recall announcements, especially after the very public ignition switch recall. But they did not. This lack of a statistically valid systematic decline in market prices in the real world refutes plaintiffs' damages methodology that is predicated on subjective post-purchase risk assessments from hypothetical survey data.

The lack of injury is exacerbated by plaintiffs' proposed classes including putative members who sold, traded-in, or disposed of their vehicles before the 2014 recalls. None of these individuals have economic losses under the law of this case. Plaintiffs' alleged "lost time" damages depend upon individual fact issues, such as whether each putative class member had his or her vehicle repaired and whether the time spent having repairs performed caused the plaintiff to

lose earnings. Finally, whether each putative Texas class member's vehicle manifested a defect turns on individual facts—as confirmed by the evidence for each Texas named plaintiff.

**Second**, **factual differences in whether each putative class member can prove liability predominate over any alleged common issues.** Plaintiffs' Missouri consumer protection claim requires proof of causation, and their other consumer protection and fraudulent concealment claims require proof of both causation and reliance. Expert evidence and named plaintiffs' testimony establishes that putative class members had different reasons for purchasing their vehicles, with many not mentioning safety as a reason for purchase, or consulting numerous different sources, with many not considering information from New GM. Whether each putative class member can prove reliance and/or causation is an individual fact issue.

Other important individual fact issues predominate over any common ones, including:

- Differences in New GM's knowledge concerning the recall conditions over time and across the numerous, different, and changing vehicle models;
- Differences in whether each plaintiff purchased a New GM or Old GM vehicle, with the latter being subject to additional defenses;
- Differences in each California putative class member's experience with their vehicles, to determine if each vehicle was unmerchantable under implied warranty law;
- Differences among Texas putative class members regarding their experience and sophistication, on which plaintiffs' Texas consumer protection claims depend; and
- Differences in whether plaintiffs alleging New GM fraudulently concealed bankruptcy claims against Old GM can show they had a meritorious underlying claim against Old GM and relied on New GM's alleged omissions from July 10 to November 30, 2009 in not filing claims against Old GM.

**Third, the named plaintiffs are not typical of the proposed classes nor adequate class representatives**. New GM's Motion for Summary Judgment, Dkt. 5858-60, demonstrates that no named plaintiff has valid claims, precluding plaintiffs from representing any class. For example, certain named plaintiffs cannot recover under this Court's prior orders, such as those who sold or

disposed of their vehicles before the recalls, or those who purchased 2008 and later Cobalt/Ion vehicles who cannot prove that their vehicle's original ignition switch was replaced with a faulty one. Even if summary judgment is not entered against each named plaintiff's claims, they are subject to unique defenses preventing them from being typical. Factual differences among the named plaintiffs confirm this lack of typicality. Finally, nearly all named plaintiffs are inadequate class representatives because admit they have given counsel complete discretion, they do not make strategic decisions, and they have no role in settlement.

**Fourth, no class action is superior or manageable under the facts here**. Numerous courts have held that a recall is superior to a class action in resolving claims. This principle applies here, where plaintiffs have no proof of a systematic decline in market prices and the recalls remedied the issues. New GM Summ. J. Memo. at 13-19. Moreover, plaintiffs' attempt to resolve 23 classes and subclasses involving 7 different recalls and numerous different claims, vehicles, and facts in a single trial would confuse any jury and be hopelessly unmanageable.

**Fifth**, **plaintiffs' proposed class definitions are legally and constitutionally impermissible.** As defined, plaintiffs' proposed classes include numerous putative members with no injury and no claim, such as those who sold or disposed of their vehicles before the recall announcements, or those who—based on plaintiffs' expert's survey data—did not overpay for their vehicles. Such overbroad classes cannot be certified.

## BACKGROUND

### A. Plaintiffs Seek To Certify 23 Separate Classes Involving 7 Different Recalls.

#### 1. The 7 Recalls At Issue Involve Different Vehicles, Different Components, Different Factual Backgrounds, Different Alleged Defects, And Different Remedies.

Plaintiffs here seek unprecedented classes based on seven recalls involving more than 160 different vehicle makes and models manufactured over 17 years by two companies (implicating

bankruptcy or successor liability issues) with different components, systems, alleged defects, and recall remedies:

| Recall No. | Short Name | Vehicles | GM Platforms | Alleged Defect |
|---|---|---|---|---|
| 14v047 | Delta Ignition Switch / Service Parts (for MY 2008 and later) | 2005-2010 Chevrolet Cobalt<br>2006-2011 Chevrolet HHR<br>2007-2010 Pontiac G5<br>2007-2010 Saturn Sky<br>2003-2007 Saturn Ion<br>2006-2010 Pontiac Solstice | Delta | Low-torque, Knee-key |
| 14v400 | Malibu | 1997-2005 Chevrolet Malibu<br>1998-2002 Oldsmobile Intrigue<br>1999-2004 Oldsmobile Alero<br>1999-2005 Pontiac Grand Am<br>2000-2005 Chevrolet Impala<br>2000-2005 Chevrolet Monte Carlo<br>2004-2008 Pontiac Grand Prix | Epsilon<br>N Car<br>P90<br>W Car<br>MS-2000 | Low-torque |
| 14v355 | Impala | 2000-2005 Cadillac Deville<br>2005-2009 Buick Lacrosse<br>2006-2007 Chevrolet Monte Carlo<br>2006-2011 Buick Lucerne<br>2006-2011 Cadillac DTS<br>2006-2013 Chevrolet Impala<br>2014 Chevrolet Impala Limited (U.S. Fleet) | H Car<br>K Car<br>W Car | Low-torque, Knee-key |
| 14v394 | CTS | 2003-2014 Cadillac CTS<br>2004-2006 Cadillac SRX | Sigma | Low-torque, Knee-key |
| 14v346 | Camaro | 2010-2014 Chevrolet Camaro | Zeta | Knee-key |
| 14v118 | SIAB | 2008-2013 Buick Enclave<br>2008-2013 GMC Acadia<br>2009-2012 Chevrolet Traverse<br>2008-2010 Saturn Outlook | Lambda | Side airbag service light |
| 14v153 | EPS Assist | 2004-2006 Chevrolet Malibu Maxx<br>2004-2007 Saturn Ion<br>2004-2006, 2007-2009 Chevrolet Malibu<br>2005-2009 Pontiac G6<br>2008-2009 Saturn Aura<br>2009-2010 Chevrolet HHR<br>2010 Chevrolet Cobalt | Delta<br>Epsilon | Power steering assist |

The vehicle models and component parts at issue significantly differ. Two of the recalls, 14v118 ("Side Impact Airbag" or "SIAB") and 14v153 ("Electronic Power Steering Assist" or "EPS Assist"), involve two separate component systems which in turn are entirely different

component systems from the other five recalls.

The other five recalls vary, as the ignition system in each recall is for different vehicles and is comprised of different components and ignition switches, resulting in different recall remedies. Ex. 1, 2/23/18 Fedullo Rpt. at 24; Ex. 2, GM-MDL2543-301838188 at 206.[1] The vehicles in each recall have material differences in the circumstances under which the key may unintentionally rotate and the specific remedy varied due to mechanical design differences, such as chassis and interior compartment design, suspension, and ignition switch and system design. Ex. 1, 2/23/18 Fedullo Rpt. at 25-26; *see also* New GM Memo. in Supp. of Mot. to Exclude Stevick and Loudon, Dkt. 5855, at 3-6. Plaintiffs' defect claims also vary among those five recalls (*e.g.*, the Camaro Recall does not include a claim that the ignition key has a low torque, whereas the Malibu Recall does not include a claim that the ignition can inadvertently rotate through knee-key contact), rendering each recall distinct. *Compare* Pls. Offer of Proof at Section I.F.2 *with id.* at Section I.E.2. Plaintiffs' alleged knee-key defect depends upon multiple variables, including the driver's height and weight, proximity of the driver's knee to the key, angle of the key head, and angle of the leg when seated. Pls. Offer of Proof ¶¶ 25, 27; Ex. 1, 2/23/18 Fedullo Rpt. at 25; Ex. 3, VTTI Report (GM-MDL2543-301432431) at 581-592.

These components changed with vehicle models over time. The ignition switch for model year ("MY") 2008 and later vehicles subject to Recall No. 14v047 (the "Service Part Vehicles") had a higher torque resistance than earlier vehicles subject to the same recall. Pls. Offer of Proof ¶ 13; Ex. 4, 11/10/17 Stevick Rpt. at 23. Similarly, the EPS recall involved two different platforms

[1] Citations to Exhibits A through F are to the charts regarding the named plaintiffs attached to this memorandum. All other record citations are to the concurrently filed Declaration of R. Allan Pixton. All record and legal citations omit internal quotation marks, citations, footnotes, brackets, and other modifications unless otherwise indicated.

(Epsilon and Delta), two unique issues (torque sensor and EPS motor), and two separate recall remedies (torque sensor replacement and motor replacement). Ex. 5, 2/23/18 Hakim Rpt. at 4. Even within the two different systems involved in the EPS Recall, the root causes and fixes differed. *Id.* at 4-5 (three different root causes in the Epsilon EPS system); *id.* at 5 (identifying a different root cause in the Delta EPS system).

### 2. Plaintiffs' Allegations Show That New GM's Knowledge Of The Various Recall Conditions Differed By Vehicle And Time Period.

New GM's knowledge of conditions leading to any of the seven different recalls evolved over time. Plaintiffs claim New GM knew of alleged defects "from the very first day of its existence on July 10, 2009" (Pls' Offer of Proof, ¶¶ 8, 41, 54, 68), but the record evidence shows that New GM's knowledge differed over time, giving rise to dynamic field histories, warranty claims, customer satisfaction actions, and other remedial actions, ultimately leading to recalls in 2014. *E.g.*, Ex. 6, GM-MDL2543-401952506 (March 2010 email regarding customer complaints related to CTS vehicles); Ex. 7, GM-MDL2543-401964941 (investigation related to stalling for CTS vehicles opened in April 2012); Ex. 8, 12/2/15 A. Hendricks Dep. Tr. at 103-119 (detailing the different steps taken in 2012 to investigate issues related to stalling for CTS vehicles); Ex. 9, GM-MDL2543-401961908 at 920 (evaluating the data for CTS vehicles in Spring 2012); *id.* at 926 (closing the investigation related to CTS vehicles in November 2013).

New GM's knowledge of the SIAB recall condition also changed after July 9, 2009. Pls. Offer of Proof ¶¶ 96-98. Starting in January 2010, New GM reviewed airbag connector issues for the 2010 Malibu and Pontiac G6, and determined a root cause was excessive wear. Ex. 10, GM-MDL2543-304843468 at 12. This was confirmed by further investigation in the fall of 2010. *Id.* at 77. New GM launched a second investigation in September 2010 resulting in a Customer Satisfaction Bulletin. Ex. 11, GM-MDL2543-304843740. In the fall of 2013, New GM launched

a further investigation of the SIAB wiring harness in certain MY2008-2013 vehicles. Ex. 12, GM-MDL2543-300767863.

Similarly, New GM's knowledge of the EPS Assist recall condition evolved in the post-July 9, 2009 period. New GM and NHTSA examined EPS complaints in January 2010. Pls. Offer of Proof ¶ 105. In March 2010, New GM's EFADC presentation showed incident rates for the Chevrolet HHR and Ion were "lower and not consistent with the Cobalt," so Cobalt vehicles were not included in New GM's field action. Ex. 5, 2/23/18 Hakim Rpt. at 6. New GM acquired additional information from communications with NHTSA and New GM during 2010 to 2012. Pls. Offer of Proof ¶ 106.; Ex. 5, 2/23/18 Hakim Rpt. at 7. Plaintiffs' allegations also depend on different actions taken by New GM and GM Canada in late 2010, 2011, and mid-2012. Pls. Offer of Proof ¶¶ 107-109.

**B. Plaintiffs' Alleged Classes And Claims.**

Plaintiffs seek separate classes for each recall and state. Pls. Mot. at 1-12; Pls. Memo at 36. They also seek classes or subclasses for Missouri and California alleging New GM fraudulently concealed alleged defects, such that Old GM vehicle owners could not timely file claims in Old GM's bankruptcy ("Bankruptcy-Claim-Fraud"), successor liability claims for Missouri, and implied warranty claims in California. *Id*. at 4-5, 9-10. In total, plaintiffs seek the certification of 23 separate classes and subclasses. Pls. Mot. at 1-12; Pls. Memo at 36.

Plaintiffs assert different types of claims for each state. For California, plaintiffs seek to certify Consumers Legal Remedies Act ("CLRA"), Unfair Competition Law ("UCL"), and fraudulent concealment claims for all plaintiffs, and Song-Beverly Consumer Warranty Act ("SBA"), and Magnuson-Moss Warranty Act ("MMWA") claims for plaintiffs who bought new vehicles. Pls. Mot. at 1. For Missouri, plaintiffs seek to certify Missouri Merchandising Practices Act ("MMPA") and fraudulent concealment claims. *Id*. at 5-6. For Texas, plaintiffs seek to certify

Deceptive Trade Practices Consumer Protection Act ("DTPA") claims of only those owners who experienced a manifest defect. *Id*. at 10-12.

### C. Plaintiffs And Absent Putative Class Members.

The named plaintiffs and their basic information are listed on Exhibit A. The named plaintiffs differ in many respects, and those individual differences multiply when considering the legal elements of the claims that putative class members are making in the bellwether states.

**Differences in why plaintiffs bought their vehicles**: As shown in Exhibit B, plaintiffs' reasons for purchasing their vehicles vary widely. Mario Stefano had a history of purchasing Camaros. Kenneth Robinson had a friend at Old GM who could provide a price discount. Crystal Hardin bought a Cobalt because of an advertisement showing it racing a Corvette. Shenyesa Henry emphasized the vehicle's "undentable panels."[2] Lisa Simmons explained "I'm more into color and shapes than the maker or whatever else." Plaintiffs were motivated by price, gas mileage, or purchasing a new car, American-made, similar to vehicles they had previously driven, and myriad other reasons. *See* Exhibit B. New GM's expert Wayne Hoyer, Professor of Marketing at University of Texas at Austin, conducted surveys that included putative class members and found that "Owners / lessees of Recalled GM Vehicles report many different main reasons for making their purchase / lease decisions, and the combination of those reasons varies across different individuals," and that they "rank[] those reasons differently in terms of importance to their decisions." Ex. 13, 2/23/18 Hoyer Rpt. ¶ 76.

**Differences in safety as a reason for buying their vehicles**: Named plaintiffs differ in whether safety was a purchase reason. Chimen Basseri, David Padilla, Ronald Robinson, Martio

---

[2] Texas named plaintiffs Shenyesa Henry and Lisa Simmons are not proposed class representatives. New GM cites to their facts to illustrate differences among putative class members.

Stefano, Gareebah Al-ghamdi, and Lisa McClellan did not discuss safety when asked why they purchased their vehicles. Plaintiffs who mentioned safety differed about whether it was one of a few factors or was part of a list of considerations. *See* Exhibit B. Professor Hoyer's survey establishes that "safety is very infrequently cited by owners / lessees of Recalled GM Vehicles as a main purchase or lease reason, and this varies across individuals in how it is ranked in terms of its importance (or lack of importance) to purchase or lease decisions." Ex. 13, 2/23/18 Hoyer Rpt. ¶ 76.

**Differences in information considered before purchasing their vehicles**: Plaintiffs such as Mario Stefano bought their vehicles on "impulse." Kimberly Brown, Ramirez Esperanza, Crystal Hardin, and Lisa McClellan did not do any research beforehand. David Padilla relied on the independent dealer's salesperson's recommendation. Kenneth Robinson, Gareebah Al-ghamdi, and Dawn Fuller relied on the advice of friends or family. Orosco Santiago and Michelle Thomas considered third-party sources such as reviews in magazines or internet sites. Patricia Barker and Christopher Tinen claim they relied on information from Old GM or New GM, such as advertisements, brochures, and websites. *See* Exhibit C. Professor Hoyer's survey showed that "Recalled GM Vehicle owners / lessees (including putative class members) typically identified multiple information sources to be influential on their decisions, reported a wide variety of influential information sources, and ranked the importance of influential information sources differently." Ex. 13, 2/23/18 Hoyer Rpt. ¶ 24.

**Differences in whether and how plaintiffs considered New GM advertisements**: Most named plaintiffs testified they did not see any New GM advertisements before purchasing their vehicles. Of the minority who allegedly saw ads, some could not remember their content. Others testified they did not rely on the ads, or did not think the ads were false or misleading. The few

named plaintiffs who recall seeing an Old GM or New GM ad and claimed that it influenced their decision-making each saw different ads containing different messages. *See* Exhibit D. The "share of those who may have considered GM marketing communications was generally small and varied across the [survey] samples," from a range of 6.7% in the Texas sample of putative class members to 22.1% for California. Ex. 13, 2/23/18 Hoyer Rpt. ¶ 87.

**Differences in vehicle sellers**: Some plaintiffs purchased their vehicles from an independent dealer affiliated with Old GM or New GM. Others bought from non-GM dealerships, used car lots, or private sellers. *See* Exhibit E.

**Differences in purchase prices**: Plaintiffs paid widely varying prices, especially given the predominance of used vehicle purchasers in the putative classes. Deloris Hamilton bought a used 12-year-old 2000 Oldsmobile Alero for $3,500 and Gareebah Al-ghamdi bought a used 2004 Impala for $12,999. By contrast, Orosco Santiago bought a new 2010 Camaro for $28,000 and Christopher Tinen bought a new 2010 GMC Acadia for $32,080.27. *See* Exhibit F; *see also* Ex. 14, 2/23/18 Willig Rpt. ¶¶ 17-19 (differences in prices paid for GM at-issue vehicles with same characteristics varied by around 22% for new vehicles and 48% for used vehicles).

**Differences in buying new versus used vehicles**: Fifteen named plaintiffs purchased new vehicles, while fourteen purchased used vehicles. Plaintiffs also differ in whether they own a vehicle manufactured by Old GM or New GM. *See* Exhibit A.

**Differences in buyers' experiences with their vehicles**: Named plaintiffs Brad Akers and Patrice Witherspoon have driven their vehicles nearly 200,000 miles without any evidence of incidents caused by a recall condition. Michelle Thomas drove over 100,000 miles before claiming that the ignition switch rotated out of position, while Dawn Fuller drove for almost 100,000 miles without experiencing an incident. Other plaintiffs claim to have experienced multiple incidents

with their vehicles, whether recall-related or not. *See* Exhibit A; *see also* New GM Summ. J. Memo. at 52-54.

**Differences among Texas plaintiffs regarding manifest defect**: Dawn Fuller does not allege that her vehicle experienced any manifestation of the recall condition. Ex. 15, 11/20/17 D. Fuller Dep. at 74:5-10. Plaintiffs such as Gareebah Al-ghamdi, Lisa McClellan, and Michael Graciano do not have any evidence that their ignition keys rotated. Ex. 16, 5/5/17 G. Al-ghamdi Dep. at 100:11-101:9; Ex. 17, 5/4/17 L. McClellan Dep. at 112:11-13; Ex. 18, 5/1/17 M. Graciano Dep. at 79:14-23, 81:5-11; *see also* New GM Summ. J. Memo. at 24-25.

### D. The Market Prices And Market Shares Of The Recalled GM Vehicles Did Not Systematically Decrease After The Recalls.

Plaintiffs allege that the putative class overpaid for Old GM and New GM vehicles because they were not advised of an existing safety defect at purchase. *E.g.*, 5ACC ¶ 1596. If this assertion were accurate, the prices of the GM vehicles at issue should have fallen across-the-board after the widely publicized 2014 recall announcements. But that is not what happened.

New GM's experts analyzed both the market prices and market shares of the vehicles at issue before and after the 2014 recalls. Robert Willig, Professor of Economics and Public Affairs Emeritus at Princeton University, showed that vehicles of the same make, model, and trim sold for widely varying retail prices due to individualized factors. Ex. 14, 2/23/18 Willig Rpt. ¶ 12-27. Moreover, retail prices of different recalled vehicles changed over time in heterogeneous ways. *Id.* ¶ 9(b). Plaintiffs' expert Sanford Weisberg acknowledges that retail prices of comparable vehicles vary widely, in part because of individual factors specific to buyers and sellers. Ex. 19, 5/18/18 Weisberg Rebuttal Rpt. ¶ 14; 7/9/18 S. Weisberg Dep. at 53. Whether New GM's conduct resulted in class-wide price impacts depends on prices of the individual at-issue GM vehicles, not average prices of aggregated groups of vehicles. Ex. 14, 2/23/18 Willig Rpt. ¶¶ 12-13.

Professor Willig also showed that the recalls did not lead to a systematic class-wide decline in the prices of individual at-issue GM vehicles following the 2014 recalls. Because vehicle market values depreciate, New GM's experts examined "whether the prices of at-issue GM vehicles declined on a class-wide basis after the recalls by more than would otherwise have occurred without any recall." *Id.* ¶¶ 32-33. Professor Willig studied the movements in retail prices of individual at-issue GM vehicles in comparison with movements in benchmarks comprised of non-GM vehicles in the same segment and model year before and after the 2014 recalls. *Id*. ¶¶ 30-33. His analysis establishes "that more than 90% of at-issue GM vehicles did not have statistically significant price declines relative to their benchmarks in the first two years after their recalls." *Id.* ¶ 9. Indeed, prices of about 40% of at-issue GM vehicles increased relative to their benchmarks following the recalls with near 100% probability. *Id.*[3]

Bradford Cornell, Visiting Professor of Financial Economics at Caltech, employed a different method and different data to study market prices and arrived at a similar finding. Professor Cornell constructed "synthetic control" benchmarks using wholesale auction price data from a combination of vehicles that best tracked the price of the relevant vehicle before the 2014 recalls. Ex. 21, 2/23/18 Cornell Rpt. ¶ 36-38. He then compared to those benchmarks the prices of the recalled vehicles after the recall announcements. *Id.* ¶¶ 38-41. Professor Cornell found "no

[3] Willig has demonstrated the robustness of these results by showing that they do not materially change following multiple extensions to his baseline analysis, including: (a) examining only used vehicles sold in the first three months and the first six months after the recalls, a time during which only 4% and 10% of used at-issue vehicles were repaired prior to their sale, which demonstrates the absence of class-wide post-recall price declines even for unrepaired at-issue GM vehicles, Ex. 14, 5/7/18 Willig Rpt., Appendix B - Technical App'x Tables 9-14 at Table 13; (b) adjusting for pre-recall relative price trends, which demonstrates that pre-recall price trends are not driving Willig's results, Ex. 14, 8/13/18 Willig Sur-Rebuttal Rpt., ¶ 37; (c) removing all non-GM vehicles subject to non-at-issue recalls from the analysis, which shows Willig's results are not driven by the presence of recalled vehicles in the benchmark population, Ex. 14, 8/13/17 Willig Sur-Rebuttal Rpt. ¶ 44(f)).

systematic decline in the prices of recalled GM vehicles relative to their synthetic benchmarks in the post-recall period." *Id.* ¶ 41; *see also id.* ¶ 44.

Dominique Hanssens, Distinguished Professor of Marketing at the UCLA Anderson School of Management, prepared visual plots of sales and market shares over time and constructed a market response model to statistically assess determinants of sales and market shares. Ex. 22, 2/23/18 Hanssens Rpt. ¶¶ 40-50, 51-59; 67-83. Both reflect no consistent drop in sales or market shares for Buick, Cadillac, GMC, or Chevrolet brands after the 2014 recalls, nor any systematic declines in market shares for recalled models continuously produced before and after the recalls. *Id.* Professor Hanssens separately found that New GM vehicle price promotions did not change relative to competitors after the recalls, further confirming the lack of New GM vehicle price declines. Ex. 23, Hanssens Rpt. Ex. 31-32.

These market-based results reflect that safety recalls "are a commonplace occurrence, involving the great majority (approximately 82%) of the thousands of model/model-years combinations in service in the U.S. in 1996-2017." Ex. 24, 2/23/18 Marais Rpt. ¶ 25. The "recall rate across all manufacturers was 1,115 recalls per 1,000 vehicles sold over the three decades period from 1985 to 2016 (i.e., an average of more than one recall per vehicle sold)." Ex. 21, 2/23/18 Cornell Rpt. ¶ 19. Vehicle purchasers understand this: when asked whether the manufacturer of their new vehicle would issue a safety recall, only 16% of survey respondents believed a recall was "extremely unlikely." Ex. 25, 2/23/18 Keller Rpt. ¶ 115. The possibility of a safety defect is why vehicles have warranties and owner manuals provide information about reporting safety defects to New GM and NHTSA. Ex. 26, 2/23/18 Jason Rpt. at 10-11.

## ARGUMENT

Plaintiffs "wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable)

the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014) (emphasis in original). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores, Inc v. Dukes*, 564 U.S. 338, 351 (2011). "Rule 23(b)(3)'s predominance criterion is even more demanding that Rule 23(a)." *Comcast*, 569 U.S. at 34.

"In evaluating a motion for class certification, the district court is required to make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, and must resolve material factual disputes relevant to each Rule 23 requirement." *Levitt v. J.P. Morgan Secs., Inc.*, 710 F.3d 454, 464-65 (2d Cir. 2013); *see also In re Initial Public Offerings Secs. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006) (describing class certification requirements). "[D]isputes between experts must be resolved if necessary to the Rule 23 analysis." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 471 (S.D.N.Y. 2018) (citing *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 42). "The Rule 23 requirements must be established by at least a preponderance of the evidence." *Levitt*, 710 F.3d at 464-65.

Seeking only Rule 23(b)(3) certification, plaintiffs must prove "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The predominance inquiry is a core feature of the Rule 23(b)(3) class mechanism, and is not satisfied simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." *In re Petrobras Secs.*, 862 F.3d 250, 270 (2d Cir. 2017). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036,

1045 (2016). "Where individualized questions permeate the litigation, those fatal dissimilarities among putative class members make use of the class-action device inefficient or unfair." *Id*.

"Failure to satisfy the predominance requirement, especially in automotive defect cases, has often been the reason courts have denied certification." *Martin v. Ford Motor Co.*, 292 F.R.D. 252, 271 (E.D. Pa. 2013). This case should be added to that long list of vehicle defect cases denying certification for lack of predominance, given the multiple factual determinations arising out of seven recalls involving 160 different model vehicles.

## I. INDIVIDUAL ISSUES REGARDING FACT OF INJURY AND DAMAGES PREDOMINATE OVER ANY COMMON QUESTIONS.

### A. Individual Issues Predominate For Plaintiffs' Alleged Benefit-Of-The-Bargain Damages.

"The gravamen of the benefit-of-the-bargain defect theory is that Plaintiffs who purchased defective cars were injured when they purchased for *x* dollars a New GM car that contained a latent defect; had they known about the defect, they would have paid fewer than *x* dollars for the car (or not bought the car at all), because a car with a safety defect is worth less than a car without a safety defect." *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *7 (S.D.N.Y. July 15, 2016) ("*TACC MTD Opinion")*; *see also, e.g.*, 5ACC ¶ 1596. California,[4] Missouri,[5] and Texas[6] require that benefit-of-the-bargain damages compare the actual price paid to the allegedly

[4] *See In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1118, 1120-22 (C.D. Cal. 2015); *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *3-7 (C.D. Cal. Dec. 18, 2014); *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923, at *8 (N.D. Cal. Dec. 15, 2014); *Bagdasarian v. Gragnon*, 192 P.2d 935, 940-41 (Cal. 1948).

[5] *See Larabee v. Eichler*, 271 S.W.3d 542, 548 (Mo. 2008); *Smith v. Tracy*, 372 S.W.2d 925, 938-39 (Mo. 1963); *In re Davenport*, 491 B.R. 911, 921 (Bankr. W.D. Mo. 2013); *see also Peterson v. Cont'l Boiler Works, Inc.*, 783 S.W.2d 896, 900 (Mo. 1990).

[6] *See Town E. Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 801-03 (Tex. App. 1987); *see also GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 888-89 (Tex. App. 2008).

defective vehicle's market price if the defect had been disclosed. *See also* New GM Summ. J. Memo. at 20 & nn. 10-12; *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *4 (C.D. Cal. Dec. 18, 2014) ("[T]he typical benefit-of-the bargain claim relies on a difference in fair market value (i.e. the amount that a willing buyer and willing seller would both accept) between the product as represented and the product actually received."); Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, THE LAW OF TORTS § 689 (2d ed.) ("benefit of the bargain measure" of damages is "based on market value").

#### 1. Prices And Sales Of Recalled Vehicles Did Not Systematically Decline.

As described in Background Section D, the market evidence establishes no single price for recalled vehicles and no systematic class-wide decline in recalled vehicle prices. Without such evidence, plaintiffs cannot show—on a class or any other basis—the differences between the prices paid and the market price with the disclosed defects, which is what they must prove under each bellwether state's law. As plaintiffs cannot establish the **fact of injury** by common proof for all class members, no class can be certified. *See Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) ("The plaintiffs must ... show that they can prove, through common evidence, that all class members were ... injured by the alleged conspiracy. ... [W]e do expect the common evidence to show all class members suffered some injury."); *McLaughlin v. American Tobacco Co.*, 522 F. 3d 215, 228 (2d Cir. 2008) (Where "losses cannot be shown by common evidence because they constitute an inherently individual inquiry ... plaintiffs cannot meet their burden of showing that injury is amenable to common proof.").[7]

[7] *See also Tyson*, 136 S. Ct. at 1053 (C.J. Roberts) (concurring) ("if there is no way to ensure that the jury's damages award goes only to injured class members, that award cannot stand."); *Gilmore v. Ally Fin. Inc.*, 2017 WL 1476596, at *7 (E.D.N.Y. Apr. 24, 2017); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 334 (S.D.N.Y. 2003); *Janes v. Triborough Bridge & Tunnel Auth.*, 889 F. Supp. 2d 462, 466 (S.D.N.Y. 2012); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013); *Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 313 (3d Cir. 2016); *Newton v. Merrill*

Plaintiffs' attempts at analyzing market data (which plaintiffs offer only in rebuttal to New GM's experts, Ex. 27, Boedeker 2nd Rpt. ¶ 289) confirm that the recalls did not cause any systematic change in the recalled vehicles' market prices. Applying plaintiffs' regression analysis to prices of individual at-issue GM vehicles demonstrates that "[p]ost-recall prices of 94.7% of at-issue GM vehicles were not below [by a statistically significant amount] the level that would be expected if they had not been recalled." Ex. 14.F, 8/13/18 Willig Sur-Rebuttal Rpt. ¶ 25.[8] Indeed, "there is nearly 100% probability that post-recall prices of at least 45% of at-issue GM vehicles were *higher* than would be expected if they had not been recalled." *Id*. ¶¶ 11, 25.[9] Professor

---

*Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 189 (3d Cir. 2001); 2 MCLAUGHLIN ON CLASS ACTIONS § 8:16 (14th ed. 2017) ("Accordingly, certification is not permissible where it relies on a damages model under which gross or aggregate damages would be calculated and awarded without considering whether each class member had a valid claim, thereby risking that the defendant would be liable for damages that it was not proved to have caused, or that some class members would recover damages that do not correspond to the true value of their claims.").

[8] Plaintiffs do not dispute that their regression analysis is unreliable because it fails to satisfy what is known as the "common trends" assumption, a condition their own expert describes as "the most critical" condition for reliability of such analyses. Ex. 126, 6/1/18 Boedeker Supp. Rpt. re Willig ¶ 9; Ex. 28, 4th Boedeker Rpt. ¶ 45 (acknowledging that Willig contends that Boedeker's analysis "is unreliable because it fails to satisfy the 'common trends' assumption" and then failing to contest this contention). In contrast, as noted on page 13 n.3, Willig employed several robustness tests of his analysis of post-recall prices, which showed that his results "do not change materially when pre-recall relative price trends are explicitly considered." Ex. 14 8/13/18 Willig Sur-Rebuttal Report ¶ 37.

[9] The appropriate test for class certification is the one Professor Willig's conducted which examines whether the prices of each individual vehicle at issue declined post-recall relative to appropriate benchmark vehicles, not whether on average, the prices of highly aggregated groups of heterogeneous vehicles at issue declined, as plaintiffs assert. *E.g.*, *Fleischman v. Albany Med. Ctr*., 2008 WL 2945993, at *7 (N.D.N.Y. July 28, 2008) (rejecting class plaintiffs' expert's proposed "single formula capable of assessing all damages among class members" based on "averages" because the formula ignored "vast differences" in individual plaintiff's circumstances); Ex. 28, Boedeker 4th Rpt. at 22. In addition, plaintiffs' critiques of the low power of Professor Willig's tests are flawed because they (i) rely on vehicle price changes showing little dispersion, which Professor Willig demonstrated is not the case, (ii) require the ratio of vehicle prices before and after the recall to be normally distributed, which it is not, and (iii) are based on a coding error by Dr. Weisberg. Ex. 14, 8/13/18 Willig Sur-Rebuttal ¶ 50.

Moreover, Professor Willig's test establishes there is no systematic negative effect of GM's recalls on prices of each individual at-issue vehicle. Claims by plaintiffs' rebuttal expert, Dr. Sanford Weisberg, are irrelevant because they are based upon incorrect assumptions, improper averaging and a mis-statement of

Cornell's analysis rejected plaintiffs' putative expert Boedeker's median loss values (discussed in Section I.A.2.) with 95% confidence for the vast majority of the more than 160 recalled GM vehicle model types. Ex. 21, 8/13/18 Cornell Sur-Rebuttal ¶¶ 22-32. "The results of [Professor Cornell's] synthetic control analysis demonstrate to a high degree of statistical confidence that Mr. Boedeker's new survey results are inconsistent with marketplace evidence and thus not reliable or an accurate measure of economic losses incurred by potential classes." *Id.* ¶ 3. Even with plaintiffs' improper adjustments[10] to Professor Hanssens' market response model, plaintiffs' analysis fails to show uniform post-recalls market share declines. Ex. 22, 8/13/18 Hanssens Sur-Rebuttal Rpt. ¶¶ 17-20. When Professor Hanssens corrected for plaintiffs' improper adjustments, he found that New GM sales and market shares did not decline following the recalls. *Id.* ¶¶ 5-7.

### 2. Plaintiffs' Experts Cannot Satisfy Class Certification Requirements.

Without market evidence to support a finding of injury as required by bellwether state law, plaintiffs turned to Stefan Boedeker, who has no Ph.D. Boedeker purported to conduct a "choice-based conjoint analysis" based on survey data. Plaintiffs later hired Dr. Joshua Gans to bolster Boedeker's analysis. To understand why plaintiffs' experts cannot show the fact of injury by common proof, class-wide injury, or any benefit-of-the-bargain damages, one must first understand the surveys they performed and the various conclusions they make:[11]

Step 1: Boedeker hired a company to administer internet-based surveys in California,

---

Dr. Willig's test. Ex. 38, 7/9/18 Weisberg Dep. at 180, 185-186, 224-225; Ex. 19, 8/31/18 Weisberg Reply Rpt. re Willig ¶ 3; Ex. 14, 8/13/18 Willig Sur-Rebuttal Rpt. ¶ 49.

[10] Mr. Boedeker's adjustments to Professor Hanssens' model either create econometric issues (collinearity) or are inconsistent with prior marketing literature and lead to model misspecification. *See* Ex. 22, 8/13/18 Hanssens Sur-Rebuttal Rpt. ¶¶ 10, 15.

[11] Further description of Boedeker's methodology is in Ex. 29.B, 8/13/18 Rossi Sur-Rebuttal Rpt. to Boedeker at 25-34; Ex. 30.B,8/13/18 List Sur-Rebuttal Rpt. ¶¶ 24-25; Ex. 30.A, 2/23/18 List Rpt. ¶ 36.

Missouri, and Texas. Boedeker developed original MDL conjoint survey results, but bases his current damages estimates on a rebuttal report survey for all recalls except for the Delta Ignition Switch Recall (No. 14v047). Ex. 31, Boedeker 3rd Rpt. ¶ 4. For the 14v047 Recall, he selected the results from the conjoint survey in the litigation against New GM brought by the Orange County District Attorney ("OCDA"). *Id.* ¶¶ 4-5. None of Boedeker's surveys concerned actual vehicles, but instead involved combinations of hypothetical add-on "scenarios" or "packages" of "safety features" (arbitrarily chosen by Boedeker) and "information revealed at point of purchase / lease" regarding defects, recall timing, and injury risks. Survey respondents were asked to choose among such combinations at hypothetical prices made up by Boedeker without any market or empirical study, as shown in the example below (drawn from his rebuttal MDL conjoint survey):

PROGRESS:

Please select the most desired combination of safety features and price relative to the additional information that you receive at the point of purchase / lease.

| Safety Feature | Choice 1 | Choice 2 | Choice 3 | Choice 4 |
|---|---|---|---|---|
| Collision Avoidance System with Automatic Emergency Braking | Not Included | Included | Included | Not Included |
| Blind-spot Warning | Not Included | Not Included | Included | Not Included |
| Rear View Camera | Included | Not Included | Not Included | Not Included |
| Information Revealed at Point of Purchase / Lease | | | | |
| At point of purchase / lease, is manufacturer aware of a side airbag defect that would normally require immediate recall? | Yes | No, no defect | Yes | No, no defect |
| Actual timing of recall (based on when manufacturer offcially notifies NHTSA of defect) | Recall immediately | No recall required | Recall more than one year after the date of purchase | No recall required |
| Defect may cause accidents with... | Injuries but not fatalities | No defect that would cause accidents | Fatalities and injuries | No defect that would cause accidents |
| Price total for the options | $2500 | $1500 | $2500 | $2500 |
| Which would you prefer? | ○ | ○ | ○ | ○ |

<< Back   Continue >>

After a selection is made the following question dynamically appeared just below the question above:

Would you purchase / lease the option you selected above?

○ Yes
○ No

<u>Step 2</u>: Based on survey respondent's choices, Boedeker computed "part-worth utilities"[12]

[12] Conjoint expert Prof. Rossi explains that a "part-worth is a measure of utility of each attribute-level combination. For example, each survey and conjoint screen included the rear camera attribute (with levels

measuring the "subjective value" to each individual survey respondent of each hypothetical package attribute (*e.g.*, rearview camera, and package price) and recall scenario (*e.g.*, ignition switch defect, disclosed at the point of purchase with an immediate recall). Ex. 32, Boedeker 1st Rpt. ¶¶ 26, 101-104, 107.

<u>Step 3</u>: For each hypothetical combination of attributes, recall scenario, and each of the five arbitrary package price points ($500, $1,000, $1,500, $2,000, and $2,500) that he made up for his survey, Boedeker summed the part-worths for each respondent to calculate the probability that individual respondent would purchase that hypothetical package at that price.

<u>Step 4</u>: For each hypothetical combination of attributes, recall scenario and each of his five arbitrary package price points, Boedeker calculated (a) the overall **average** probability that respondents would purchase that hypothetical package at that price (orange dots in the figure below), and (b) the overall **average** probability that respondents would purchase a defect-free version of that hypothetical package at that price (blue dots). Ex. 33, 2/6/18 Boedeker Dep. at 450:11-451:13; Ex. 34, 7/5/18 Boedeker Dep. at 276:2-278:3; Ex. 32, Boedeker 1st Rpt., Figure 19. This is how Boedeker determined the ten points used to construct the "willingness to pay" demand curves in his Figure 19. As we indicate with arrows in the figure below, **these ten points are all "averages" across all survey respondents.**

'included' or 'not included'). A part-worth for the camera attribute is a number for each respondent that measures the value of this attribute on what economists call a utility scale. … Since these part-worths are person-specific, you cannot say anything about the part-worths of consumers outside of the sample." Ex. 29.A, 2/23/18 Rossi Rpt. at 32-33.

*Figure 19: Demand Curves in the Actual-World and the But-For-World*




*Source:*

Step 5: Based on these ten averaged data points, Boedeker used regression analysis to construct the demand curves shown in the figure (the light gray and dark gray lines above). Ex. 34, 7/5/18 Boedeker Dep. at 278:9-279:24. This regression is itself a form of averaging the ten averaged data points.

Step 6: Boedeker calculated the difference between the two average-based demand curves at each of his five arbitrary price points. Ex. 34, 7/5/18 Boedeker Dep. at 283:19-286:11. For each hypothetical recall scenario (*e.g.*, "recall immediately," or "recall more than one year after date of purchase") in each Boedeker conjoint analysis, he calculated a set of five such differences in average willingness-to-pay for each of eight possible hypothetical packages of safety features (*e.g.*, all three safety features included, only one safety feature included, etc.) and labeled these differences "Economic Loss[es]." Corresponding to each hypothetical recall scenario, he then summarized the 40 differences in box plots as shown in the example below (drawn from Boedeker's initial MDL conjoint survey):

*Figure 20: Conjoint 1 – Defective Ignition Switch - Point Estimates of Economic Loss Based on Simulation – All Bellwether States Combined*




*Source: Own Analysis based on Conjoint Survey.*

Ex. 32, Boedeker 1st Rpt. at 45 (Fig. 20). Boedeker's rebuttal surveys included nine distinct recall timing/injury disclosure scenarios, each summarized by a box plot representing 40 differences in average willingness-to-pay. Ex. 30B, 8/13/18 List Sur-Rebuttal Rpt. ¶¶ 44-48. Boedeker's OCDA conjoint survey included multiple recall disclosure scenarios, each summarized by a box plot representing 80 differences in average willingness-to-pay. *Id.*

Step 7: Boedeker applied yet another level of **averaging**: for each set of 40 or 80 differences in average-based demand curves representing a specific recall disclosure scenario, he selects the **median** value of the 40 or 80 distinct differences to serve as a single common damages number for all class vehicles receiving that recall. Ex. 33, 2/6/18 Boedeker Dep. 62:23-63:12, 67:19-68:18. For example, Boedeker proposes that if the but-for scenario is such that "if the consumer is told at the point of purchase that the ignition switch is defective and will be recalled immediately, the median of the estimated economic loss per vehicle is $619.6," which is the

median of 40 differences of average-based demand curves. Ex. 32, Boedeker 1st Rpt. ¶ 119.

Each such median "economic loss" value calculated by Boedeker is effectively an average (Step 7) based on an average (Step 5) of averages (Step 4). Boedeker invites the Court to select from these medians and offers "illustrative" "damages estimates" based on the median values. *Compare* Ex. 27, Boedeker 2nd Rpt. ¶ 736 *with* Ex. 31, Boedeker 3rd Rpt. ¶ 2. Boedeker admits this process yields an aggregate damages number and he has not analyzed how any damages amount would apply to any individual putative class members. Ex. 34, 7/5/18 Boedeker Dep. at 193:5-16; *see also id*. ("I have not done any allocation to individuals as you suggest, plaintiffs or class members."); Ex. 35, 6/27/2018 Gans Dep. at 358:5-22 ("I have not analyzed the allocation of damages, of the aggregate of damages in this class and who should get what.").

After New GM's experts submitted their reports explaining the many problems with Boedeker's damages construct, plaintiffs hired Dr. Gans. The only additional work performed by Dr. Gans was his request of Boedeker's staff to change the baseline for comparison from a hypothetical defect-free scenario to a scenario that involved disclosing the defect at the point of purchase and then recalling the vehicle immediately. Ex. 36, Gans Rpt. ¶ 56; Ex. 37, 6/28/18 Gans Dep. at 552:12-554:14. This resulted in a lower set of damages estimates, though these calculations inherit the same methodological flaws as Boedeker's calculations. Ex. 36, Gans Rpt. ¶ 56; Ex. 37, 6/28/18 Gans Dep. at 552:12-554:14, 613:10-20; *see also* New GM's Motion to Exclude the Opinions of Dr. Joshua Gans.

#### 3. Boedeker's Methodology Violates Article III, Due Process, And The Rules Enabling Act.

Boedeker's and Dr. Gans' opinions should be excluded for the reasons explained in New GM's contemporaneously filed *Daubert* motions, including because Boedeker's surveys yield unreliable and unrealistic results. Separately, Boedeker's methodology violates fundamental legal

rules by compensating putative class members who have no injury and no standing. Boedeker's methodology is based upon each consumer's preferences and "willingness to pay," which admittedly vary among individuals. Ex. 33, 2/6/18 Boedeker Dep. 278.[13]

The graphic below from New GM expert Dr. Peter Rossi's report illustrates how the disparity in respondent preferences leads to enormous variations in willingness-to-pay differentials for Boedeker's packages of features with and without defects:

**Figure 4.**




Ex. 29.B, 8/23/18 Rossi Sur-Rebuttal Rpt. to Boedeker at 40. Under Boedeker's methodology, all

---

[13] Dr. Peter Rossi, who developed the Hierarchical Bayesian Choice-Based Conjoint method used in the software Boedeker employed, agrees that "WTP is fundamentally an individual specific measure and has to be assessed on an individual-by-individual basis." Ex. 29.A, 2/23/18 Rossi Rpt. at 6; *id.* at 11, 38; *see also, e.g.*, *id.* at 6, 8, 13-14 ("Moreover, there are likely to be some purchasers of recalled GM vehicles whose reduction in utility measured by WTP is zero or near zero.").

putative class members whose estimated willingness-to-pay is $0 or less (*i.e.*, all survey respondents at or to the left of the $0 in the above figure) would have been willing to pay the same price for the packages if the defect had been disclosed and therefore have no injury or damages. *Id*. at 39-43 (A "very large fraction of respondents [putative class members] were not injured even if you accept Mr. Boedeker's biased and unreliable survey as the basis of this conclusion."). **Similarly, after reviewing Boedeker's data, New GM's expert Dr. John List found that between 26.6% and 35.6% (MDL conjoint) and 29.4% and 39.1% (rebuttal MDL conjoint) of respondents in each of Boedeker's surveys had no injury because they would be willing to pay the same amount or more in scenarios with disclosed defects as compared to the same scenario with no defects.** Ex. 30, 2/23/18 List Rpt. ¶¶ 116-18; Ex. 30.B, 8/13/18 List Rpt. ¶¶ 55-59 & App. 5; *see also* Ex. 29, 2/23/18 Rossi Rpt., Appendix E at 71-83. The same no-injury findings apply to Boedeker's OCDA conjoint surveys. Ex. 29.B, 8/13/18 Rossi Sur-Rebuttal Rpt. to Boedeker at 8-9 & Figures 3-6.

Under Boedeker's methodology, and depending on which of his surveys is chosen, fully one quarter to well over one-third of the putative class members have no injury, no damages, and no claim. According to Boedeker, such buyers are "risk friendly ... they still don't care about the recall and maybe they had an experience where cars were recalled that they owned." Ex. 33, 2/6/18 Boedeker Dep. at 237:4-8. Plaintiffs' expert Weisberg agrees, explaining that "for any particular buyer, it could be that there was no impact from the recall, it could be that the recall impacted the price by causing somebody to pay a higher price, or it could be that the recall impacted the price by causing that individual to pay a lower price." Ex. 38, 7/9/18 Weisberg Dep. at 183:19-184:6.

**a. No Class Can Be Certified Where, As Here, Plaintiffs' Data Shows Many Putative Class Members Have No Injury.**

The law prohibits certifying a class with such large numbers of uninjured members. *First*, Rule 23 does not permit certification without "common evidence to show all class members suffered some injury."[14] *Sykes*, 780 F.3d at 81-82; *see also McLaughlin.*, 522 F. 3d at 228; *In re Fluidmaster*, 2017 WL 1196990, at *31, 58-59 (N.D. Ill. Mar. 31, 2017).[15] Conjoint surveys that do not prove injury for all class members cannot support certification. In *Opperman v. Path, Inc.*, plaintiffs sought to use a conjoint survey to establish the value of privacy in smartphone applications. 2016 WL 3844326, at *14 (N.D. Cal. July 15, 2016). *Opperman* rejected plaintiffs' proposed class-wide damages methodology: "No damages number arising from this model will apply to all class members, particularly since some of the class members, by this measure, will not have been injured at all—*i.e.*, they would have not have required any premium to allow Path to access their contacts, because they don't attach any value to them." *Id.* Similarly, *Fleischman v. Albany Med. Ctr*. rejected class plaintiffs' expert's proposed "single formula capable of assessing all damages among class members" based on "averages" as it ignored "vast differences" in individual plaintiffs' circumstances. 2008 WL 2945993, at *7 (N.D.N.Y. July 28, 2008).

*Second*, Article III requires injury in fact. *See Lujan v. Defenders of Wildlife*, 504 U.S.

[14] The issue here is not just that "damages are not capable of measurement on a classwide basis." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408-09 (2d Cir. 2015). Boedeker purports to prove that each individual class member suffered an injury and damages. Ex. 32, Boedeker 1st Rpt. ¶ 22 ("The non-disclosure of defects **caused** class members to overpay for their vehicles, leading to class-wide damages.") (emphasis added). His own survey data proves just the opposite.

[15] *See also Saavedra*, 2014 WL 7338930, at *8 (rejecting under *Daubert* the use of a conjoint analysis to calculate benefit-of-the-bargain class-wide damages based on a difference in value theory in part because it "is unclear to the Court why any individual is harmed when she purchases a product that the average person (but not necessarily the purchaser) subjectively overvalues because of a misrepresentation. … This argument is akin to relying on proof of the personal injuries incurred by the average car accident victim to show that a particular car accident caused that same amount of harm to a particular victim. Neither argument rests on a sound causal nexus."); *Contramano v. United Techs. Corp. & Palm Beach Aggregates, LLC*, 2018 WL 2047468, at *19 (S.D. Fla. May 2, 2018) ("The Court agrees that Kilpatrick cannot reliably

555, 560 (1992); *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58 (2d Cir. 1994). The "class must … be defined in such a way that anyone within it would have standing" and "no class may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank AG*, 443 F. 3d 253, 264 (2d Cir. 2006); *see also Sykes*, 780 F.3d 70; *McLaughlin*, 522 F. 3d at 228; *Calvo v. City of New York*, 2018 WL 1633565, at *2 (S.D.N.Y. Apr. 2, 2018); *Calvo v. City of New York*, 2017 WL 4231431, at *3 (S.D.N.Y. Sept. 21, 2017); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 334 (S.D.N.Y. 2003). Boedeker's survey data shows that 26.6% to 39.1% of the proposed class members have no injury, precluding certification for this reason alone.

*Third*, any class certified based on Boedeker's methodology would violate the Rules Enabling Act and the Supreme Court's *Amchem* decision. The Rules Enabling Act provides that the Federal Rules "shall not abridge, enlarge or modify any substantive right. All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." 28 U.S.C. § 2072; *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Boedeker's methodology would impermissibly "enlarge" the rights of the 26.6% to 39.1% of putative class members who suffered no injury and would have no claim under substantive law. *See, e,g,, Fleischman*, 2008 WL 2945993, at *7 ("Plaintiffs' proposed damages calculation would offend both the Rules Enabling Act and the Due Process Clause. Aggregating the award compounds the

---

use sales trend analysis to determine a single percentage diminution for the entire proposed class area, containing almost 18,000 properties (15,000 under the secondary definition proposed), and that the mass appraisal methodology proposed by him simply does not fit under the facts of this case. The affected community is not remarkably homogeneous, as he originally claimed, but rather includes a wide variety and scale of homes (equestrian farms, up-scale villas, simple ranch houses) of various ages, sizes and conditions – diverse properties which are not logically impacted in the same way by the alleged environmental stigma which Plaintiffs contend attaches by virtue of their general proximity to contaminated properties at the UTC site or at localized areas within the Acreage.").

risk of inaccuracies in both initial payment and subsequent allocation.”).

*Fourth*, Boedeker’s methodology violates New GM’s due process rights to defend against claims based on individual evidence where putative class members have a zero or negative willingness-to-pay, resulting in no injury. New GM has “the right to raise individual defenses against each class member.” *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191-92 (3d Cir. 2001).[16] As plaintiffs’ expert Weisberg admitted, an “average … could … give you a total dollar amount of damages, but it can’t tell you which particular members of the class incurred the damages and which didn’t.” Ex. 38, 7/9/18 Weisberg Dep. at 91:4-14. New GM cannot be “forced to defend against a fictional composite without the benefit of deposing or cross-examining the disparate individuals behind the composite creation.” *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998); *see also In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 493 (N.D. Cal. 2008) (“If data points are lumped together and averaged before the analysis, the averaging compromises the ability to tease meaningful relationships out of the data”); *Fluidmaster*, 2017 WL 1196990, at *31, 58-59 (rejecting price premium theory based on willingness-to-pay because “some consumers may place no value on a 10-year warranty and thus lose nothing in this bargain.”). If Boedeker’s methodology and opinions were permitted, New GM’s “right [] to challenge the allegations of individual plaintiffs [would be] lost, resulting in a due process violation.” *McLaughlin*, 522 F.3d at 231-33.

[16] *See also Dukes*, 564 U.S. at 367 (“a class cannot be certified on the premise that [defendant] will not be entitled to litigate its statutory defenses to individual claims”); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (in analyzing class certification, court must protect the “right of the defendant to present facts or raise defenses that are particular to individual class members”).

**b. Individually Negotiated Prices Also Cause Individual Fact-Of-Injury Questions To Predominate.**

Boedeker asserts that his method somehow calculates a difference in the "average price" component of vehicle prices that applies to all putative class members. Ex. 32, Boedeker 1st Rpt. ¶¶ 65, 113; Ex. 27, Boedeker Resp. Rpt. ¶¶ 39-40; Ex. 36, 11/10/17 Gans Rpt. ¶ 31. Boedeker's assertion is without merit. Boedeker does not calculate any market price, which is required by law and necessary to show a class-wide impact. And his own survey data shows that putative class members have widely varying preferences; 26.6% to 39.1% of those surveyed would be willing to pay the same amount or more even if the defects had been disclosed, and thus have no injury.

But even if (contrary to law and fact) Boedeker's averaged willingness-to-pay numbers based on hypothetical scenarios were "average prices," many alleged class members have no injury because vehicle prices are individually negotiated. Professor Willig showed that for the same make, model, and trims of vehicles, the difference between minimum and maximum retail prices was around 22 percent for new vehicles and 48 percent for used vehicles. Ex. 14, 2/23/18 Willig Rpt. ¶¶ 16-19. Plaintiffs' experts agree "that not all consumers pay the same price for identical vehicles," and the prices paid for the same vehicle could vary by thousands of dollars. Ex. 19, 5/18/18 Weisberg Rep. ¶¶ 13, 16 18; *see also* Ex. 38, 7/9/18 Weisberg Dep. at 51:21-53:7; Ex. 35, 6/27/18 Gans Dep. at 358:23-359:7. Because of the individually negotiated prices paid for vehicles, some plaintiffs might pay the same amount or even more after the disclosure of a safety defect and recall than before. Ex. 38, 7/9/18 Weisberg Dep. at 97:6-17. Thus, many buyers will have no injury or damages because they would pay the same price with or without a defect, even if (contrary to the actual market data in this case) there is a drop in the so-called "average price" component of the individualized prices consumers pay. Ex. 29, 2/23/18 Rossi Rpt. at 38-43; Ex. 29.B, 8/13/18 Rossi Sur-Rebuttal Rpt. to Boedeker at 8-9 & Figures 3-6; Ex. 30, 2/23/18 List Rpt.

¶¶ 113-19; List Sur-Rebuttal ¶¶55-59 & App'x 5-6.

That Boedeker's supposed difference in "average price" cannot establish class-wide injury is further demonstrated by how he applies the same damages number regardless of the vehicle's make, model, trim, options or whether it was new or used, or leased or purchased. Prices paid by named plaintiffs show significant variation. Deloris Hamilton bought a used 12-year-old 2000 Oldsmobile Alero for $3,500; Gareebah Al-ghamdi bought a used 2004 Impala for $12,999; and Orosco Santiago bought a new 2010 Camaro for $28,000. Ex. 39, 3/13/17 D. Hamilton Dep. at 24:20-25:2; 95:18-23; Ex. 15, 5/5/2017 G. Al-ghamdi Dep. at 26:2-4; Ex. 47, 3/9/17 S. Orosco Dep. at 49:18-50:13. Yet under Boedeker's "illustrative" damages estimate, all vehicles subject to the ignition system recalls (besides Delta Ignition Switch vehicles) have the same median "economic loss" amount of $966. This estimate, which would award Santiago 3.5% of his purchase price while Al-ghamdi receives 27.6%, ignores the record evidence and defies market realities. Ex. 31, Boedeker 3rd Rpt. Tables 1-3; *see also* Ex. 40, 7/6/18 Boedeker Dep. at 483:19-484:2 ("I have not done any analyses specific to—to the whatever that quote was, the brand, make, and trim and so forth. So I don't have an opinion about that as of now."). Boedeker's imposition of the same "economic loss" for all vehicles confirms that his methodology is an artificial construct that does not reflect any actual prices putative class members would have paid, or injury or damages allegedly suffered, if any defects had been disclosed. Ex. 24.C,8/14/18 Marais Sur-Rebuttal ¶ 34.

Where, as here, individual negotiations factor into the prices consumers pay, benefit-of-the-bargain damages claims "cannot be properly resolved as part of a class action." *Schmidt v. Bassett Furniture Indus.*, 2011 WL 67255, at *5 (E.D. Wis. Jan. 10, 2011) ("Thus, calculating the market price and sales price for particular pieces of furniture requires an individualized analysis.");

*see also In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 29 (1st Cir. 2008) (rejecting plaintiffs' reliance "on an inference that any upward pressure on national pricing would necessarily raise the prices actually paid by individual consumers" for vehicles because "[t]oo many factors play into an individual negotiation to allow [such] an assumption").

#### 4. Boedeker's Methodology Does Not Fit Plaintiffs' Legal Theory, Violating *Comcast*.

*Comcast* requires that "any model supporting a plaintiff's damages case must be consistent with its liability case." 569 U.S. at 35. "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*; *see also Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015).

Conjoint-based damage methodologies such as Boedeker's fail under *Comcast* where the survey design and analysis do not satisfy plaintiffs' alleged measure of damages. *See Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1049 (C.D. Cal. 2018) (denying certification because Boedeker's conjoint survey's use of unimportant attributes "render[ed] it useless for the purpose of determining price premiums attributable to the challenged statements"); *Davidson v. Apple, Inc.*, 2018 WL 2325426, at *23 (N.D. Cal. May 8, 2018) (denying certification because Boedeker's survey measured the wrong smartphone defect scenarios and made assumptions contrary to named plaintiff testimony).[17]

[17] *See also Fluidmaster*, 2017 WL 1196990, at *27-31 (denying certification because conjoint analysis failed to measure the relevant difference in a product's "failure propensity"); *Opperman v. Kong Techs., Inc.*, 2017 WL 3149295, at *10-12 (N.D. Cal. July 25, 2017) (denying certification because proposed conjoint survey would measure the "value of security of privacy broadly" rather than the value of specific allegedly misrepresented features); *Opperman*, 2016 WL 3844326, at *13-15 (rejecting conjoint analysis because "[n]o damages number arising from this model will apply to all class members...[i]t may be that the average damages that Dr. Fishkind's model would predict will be very close to the damages actually suffered by every class member, but there is no way of knowing this. It is equally or more likely that his model would overcompensate some class members, while undercompensating others."); *In re NJOY. Inc. Consumer Class Action Litig.*, 2016 WL 787415, at *4-5, *8 (denying certification because conjoint analysis model "only look[ed] to the demand side of the market equation," "completely ignore[d] the price for which [the defendant] is willing to sell its products," and "focus[ed] on a consumer's subjective

### a. Boedeker's Economic Loss Theory Contradicts Plaintiffs' Benefit-of-the-Bargain Theory of Damages.

Benefit-of-the-bargain damages require calculating market prices. *See* authorities cited at page 16-17 & nn. 4-6. But plaintiffs and Boedeker reject measuring benefit-of-the-bargain damages based on market prices determined by actual supply and demand. Ex. 32, 11/10/17 Boedeker 1st Rpt. ¶ 61. Instead, they measure damages based on a but-for price that "GM would have needed to charge to sell the same quantity of vehicles to the same buyers." Ex. 27, 5/18/18 Boedeker 2nd Rpt. ¶ 68; *id.* ¶¶ 32(a), 40, 98, 492, 502-503, 560, 568; Ex. 32, 11/10/17 Boedeker 1st Rpt. ¶¶ 65, 67; Ex. 33, 2/6/18 Boedeker Dep. at 270:3-9, 289:8-16, 297:7-17, 298:6-299:2.[18] Boedeker asserts that "the new price in the but-for world" is determined by "the consumer who actually bought the vehicle with the undisclosed defect and who, when fully informed, has the lowest [willingness-to-pay]" for that vehicle. Ex. 27, 5/18/18 Boedeker 2nd Rpt. ¶ 502; *see also*

valuation" thus "not permit[ting] the court to calculate the *true market price* of N–JOY cigarettes absent the purported misrepresentations and omissions."); *Saavedra*, 2014 WL 7338930, at *3-7 (denying certification because conjoint analysis measured a difference in how "the average consumer subjectively values" a product, not "benefit of the bargain" damages based "on a difference in fair market value (i.e. the amount that a willing buyer and willing seller would both accept) between the product as represented and the product actually received."); *Adams v. Target Corp.*, 2014 WL 12558858, at *2-3 (C.D. Cal. Nov. 25, 2014) (denying certification because proposed conjoint would "average results across several products" thus ignoring "distinctions among products" and because the attribute tied to plaintiffs' theory—"sized as advertised"—is "not a [product] feature…in any normal sense" and "conjoint analysis is not effective when the features that it focuses on are artificial because the analysis does not reflect real-world consumer behavior").

[18] *See also* Ex. 41, 8/31/18 Gans Sur-Rebuttal ¶ 14 ("What Mr. Boedeker and I are proposing…involves consumers having a WTP that reflects the defect with all of those consumers choosing to buy the product regardless.") (emphasis added); Ex. 36, 5/17/18 Gans Rpt. ¶ 23.

In fact, Boedeker's actual purported "economic loss" calculations are inconsistent with this own theory, and make no effort to determine the price "GM would have needed to charge to sell the same quantity of vehicles to the same buyers" or the "lowest willingness-to-pay" of any original purchasers. Ex. 29.B,8/13/18 Rossi Sur-Rebuttal Rpt. to Boedeker at 11. Instead, Boedeker's methodology looks at differences in demand for packages of safety features rather than vehicles, fails to account for any willingness-to-sell those packages, and merely simulates the difference in demand curves controlling for the "same quantity" of safety packages, not the "same buyers."

Ex. 33, Boedeker 2/6/2018 Dep. at 270:3-9, 289:8-16, 297:7-17, 298:6-299:2.

Boedeker's theory is "clearly an overcompensation" because it measures damages for all consumers based on the subjective preferences of the purchaser who least wants to buy the product knowing of a defect, not the price determined by the market. Ex. 29.B, 8/13/18 Rossi Sur-Rebuttal Rpt. to Boedeker at 11-12. Boedeker does not even attempt to measure a difference in market prices that the putative class members would have paid. As a result, his methodology is incompatible with plaintiffs' benefit-of-the-bargain theory. *See In re NJOY, Inc. Consumer Class Action Litig.*, 2016 WL 787415, at *4-5 (C.D. Cal. Feb. 2, 2016) (denying certification under *Comcast* for failing to account for willingness-to-sell in price premium damage calculations); *Saavedra*, 2014 WL 7338930, at *3-7 (same); s*ee also* Ex. 42, 8/13/18 McFadden Sur-Rebuttal Rpt. ¶ 3(c); Ex. 29.B, 8/13/18 Rossi Sur-Rebuttal Rpt. to Boedeker at 10.

**b. Boedeker's Calculations Have No Supply Analysis And Do Not Prove Market Prices.**

Boedeker acknowledges that market prices are determined by the intersection of supply and demand where consumer willingness-to-pay (demand) matches a seller's willingness-to-accept (supply). Ex. 32, Boedeker 1st Rpt. ¶¶ 34-43. But Boedeker admits that he has not estimated supply curves for the packages of safety features used in his surveys and does not know the supply for such packages in the real world. Ex. 34, 7/5/18 Boedeker Dep. at 238:21-239:14, 295:3-23. He made no effort to assess willingness to sell vehicles or safety packages. Ex. 40, 7/6/18 Boedeker Dep. 462:11-18; Ex. 37, 6/28/18 Gans Dep. 429:2-8. Because willingness to sell is an essential ingredient for determining a market price, Boedeker cannot determine market prices as the law requires. *See NJOY*, 2016 WL 787415, at *4-5; *Saavedra*, 2014 WL 7338930, at *3-7.

Instead of analyzing willingness to sell, Boedeker makes a penalty-based "fixed supply" assumption incapable of calculating "market prices." Ex. 27, 5/18/18 Boedeker 2nd Rpt. at. 5; Ex.

43, 2/7/18 Boedeker Dep. at 374:15-376:13; Ex. 42, 2/23/18 McFadden Rpt. ¶ 17-18; Ex. 30, 2/23/18 List Rpt. ¶ 34-40; Ex. 29, 2/23/18 Rossi Rpt. at 8, 11-14. Such a "penalty" has no basis in the law of benefit-of-the-bargain damages, which are meant to compensate rather than punish. Ex. 42, 8/13/18 McFadden Sur-rebuttal to Boedeker Rpt. ¶¶ 7, 11.

#### c. Boedeker Measures The Impact Of Disclosures On The Willingness-To-Pay For Safety Feature Packages, Not The Price Of Vehicles.

Boedeker's surveys address various packages of safety features, not vehicles as required by plaintiffs' theory. Ex. 40, 7/6/18 Boedeker Dep. at 427:12-15. His surveys do not include other vehicle features relevant to consumers, nor describe the potential vehicle to which his safety features are to be added. Ex. 44, Transportation Study (screenshots) (11.10.17); Ex. 45, Multi-State Transportation Survey Screenshots (5.14.18). Boedeker admits that his surveys do not simulate the trade-offs consumers make when purchasing vehicles.[19] Ex. 32, Boedeker 1st Rpt. 93; Ex. 27, 6/27/18 Boedeker 2nd Rpt. ¶ 657; *see also* Ex. 30, 2/23/18 List Rpt. ¶¶ 97-99.

"[N]one of the hypothetical markets in Mr. Boedeker's three conjoint studies are close enough to the real market for vehicles with various options packages to provide evidence on the impact of safety features and defect disclosure on vehicle demand, let alone but-for equilibrium market prices for the vehicles."[20] Ex. 42, 8/13/18 McFadden Sur-Rebuttal ¶ 16. Because Boedeker's conjoint analysis does not measure consumer demand for vehicles or the impact of

---

[19] Ex. 35, 6/27/18 Gans Dep. 242:20-23 ("Q. So Boedeker doesn't do demand curves for cars; he does demand curves for safety packages; fair? A. Yes."); *id.* at 242:12-16.

[20] *See also* Ex. 42, 8/13/18 McFadden Sur-Rebuttal ¶ 16 ("Moreover, Mr. Boedeker does not provide—either in his conjoint study or through other data—evidence that there is a dollar-for-dollar relationship between: (i) what his conjoint analysis finds to be the reduced value of options in a vehicle with a disclosed defect, and (ii) the reduction (if any) in the threshold price at which consumers would choose to buy their GM vehicles after disclosure of the defect."); Ex. 42, 2/23/18 McFadden Rpt. ¶ 37; Ex. 29.A, 2/23/18 Rossi Rpt. at 19; Ex. 29.B, 8/13/18 Rossi Sur-Rebuttal Rpt. to Boedeker at 4; Ex. 30.A, 2/23/18 List Rpt. ¶¶ 97-100.

defect disclosures on vehicle prices, it cannot establish plaintiffs' alleged damages. *See Townsend*, 303 F. Supp. 3d at 1051 (Boedeker's use of attributes untethered to consumer preferences for the overall product rendered "it useless for the purpose of determining price premiums attributable to the challenged statements"); *Fluidmaster*, 2017 WL 1196990, at *27-31 (denying certification because conjoint analysis failed to measure difference in product's "failure propensity"); *see also Hughes v. The Ester C Co.*, 317 F.R.D. 333, 341-43, 354-55 (E.D.N.Y. 2016), *reconsideration denied sub nom. Hughes v. Ester C. Co.*, 320 F.R.D. 337 (E.D.N.Y. 2017) (denying certification because conjoint analysis could not "isolate the premium attributable to Plaintiffs' theory of the case, namely, that consumers paid more for the Products due to the representation"); Mem. of Law in Supp. of General Motors LLC's Motion to Exclude the Opinions of Stefan Boedeker, Section II.

#### d. Boedeker Does Not Measure The Impact Of Disclosures On Used Vehicle Purchases Or Vehicle Leases.

Half of the named plaintiffs purchased a used GM vehicle, as did 72% of the proposed classes. *See* page 11; Ex. 14.E, 5/7/18 Willig Rpt., App'x B, Table 9. Boedeker's decision to measure the impact of disclosures on packages of safety features does not apply to used vehicle purchases. Plaintiffs' experts acknowledge that any economic loss is likely to vary between new and used car buyers. Ex. 38, Weisberg 7/9/18 Dep. 45:25-46:12 ("[I]f an analysis is done only of newer vehicles, there is—it's possible an analysis based on newer vehicles can be applied to older vehicles, and it's possible that they can't, and you can't assume that it could be applied to older vehicles without some sort of demonstration of that.").[21] Boedeker's survey offered safety features

[21] Ex. 35, Gans 6/27/18 Dep. at 388:24-389:5 ("Q. And you would agree with me, though, that the -- the determination of economic loss could -- the amount of economic loss could vary, depending on whether it's new or used, right? A. The amount to particular use cases could vary, even if, you know, we were able to assess an average across all of them."); Ex. 28, Boedeker 4th Sur-Rebuttal Rpt. ¶ 141.

that could only be offered in new vehicles and not be added as an aftermarket option[22] and he admits that his purchasing scenario—involving the addition of safety features to a vehicle—does not reflect the process of buying a used car. Ex. 34, Boedeker 7/5/18 Dep. at 410:3-11; *see also* Ex. 42, 8/13/18 McFadden Sur-Rebuttal to Boedeker Rpt. ¶ 15. Boedeker's methodology cannot measure the impact of defect disclosures on used car purchasers. *See Townsend*, 303 F. Supp. 3d at 1049.

Nor does Boedeker's methodology apply to leased vehicles, despite those vehicles being included in plaintiffs purported classes. Lessees contract for vehicles for a limited time, and any economic impact would differ from buyers. Ex. 14, 2/23/18 Willig Rpt. ¶ 55. Moreover, leases vary amongst themselves based on the vehicle's expected residual value, the length of the lease, and other contract terms. *Id.* Determining whether each lessee was injured would require an individual analysis of his or her lease terms and other factors. *Id.* But Boedeker does not address lessees and completely fails to show any injury, much less a common injury, for lessees.

#### e. Boedeker's Disclosure Scenarios Conflict With Plaintiffs' Defect Disclosure Theory.

Plaintiffs allege that New GM failed to disclose specific defects. 5ACC ¶¶ 45-49, 55-262 (alleging that every plaintiff "would not have purchased the vehicle or would have paid less for it had they known about the defect in the vehicle"). Rather than measure the impact of a defect disclosure on consumer preferences, Boedeker's conjoint surveys measure the impact of the disclosure of other information, including how long after a purchase a recall repair might occur, the probability of a "malfunction" caused by the defect, the potential harm that could result from

[22] *See* Ex. 44, 2/6/18 Dep. Ex. 7, November 2017 Survey Screenshots ; Ex. 46, Dee Ann Durbin, Adding Safety Technology to an Older Car) (*cited in* Ex. 27, Boedeker 2nd Rpt. ¶ 419(b), n.445) ("automatic braking isn't available as an aftermarket option").

the defect, and whether "at the point of purchase" the "manufacturer is aware of" a "defect that would normally require immediate recall." Ex. 44, MDL Conjoint Screenshots; Ex. 45, Rebuttal MDL Conjoint Screenshots. Thus Boedeker measured the impact of disclosures that are not the basis of plaintiffs' legal claims.[23] *Davidson*, 2018 WL 2325426, at *23 (rejecting Boedeker's conjoint analysis in part because survey used improper disclosure scenarios).

**f. Boedeker Measures The Impact Of Disclosures On Consumers Who Unrealistically Expect Defect-Free Vehicles.**

Boedeker's methodology measures his purported economic loss as the difference in demand for a vehicle that consumers "believe to be defect free" compared to a "vehicle where the defect was disclosed at the point of purchase." Ex. 32, 11/10/17 Boedeker 1st Rpt. ¶ 113; Ex. 27, 5/18/18 Boedeker 2nd Rpt. ¶¶ 103, 552; Ex. 28, Boedeker 4th Rpt. ¶ 22; *see also* Boedeker *Daubert* Motion, at I.B.[24] Boedeker has no empirical support for his defect-free assumption,[25] and it conflicts with named plaintiffs' testimony[26] and with the fact that safety recalls are "a commonplace occurrence, involving the great majority (approximately 82%) of the thousands of

[23] In addition, nowhere do plaintiffs allege that New GM could have disclosed the information used in Boedeker's surveys at the time of putative class member purchases. *See, e.g.*, *TACC MTD Opinion*, 2016 WL 3920353, at *32–33 (discussing Missouri law) (plaintiffs "must show that the defendant knew or reasonably should have known the material fact, and failed to disclose it to consumers."). Moreover such disclosures are not required under federal regulations governing recalls. *See, e.g.*, 49 U.S.C. § 30119 and 49 C.F.C. § 577.1 *et seq.*

[24] Ex. 35, 6/27/18 Gans Dep. at 328:5-12 ("As Mr. Boedeker has explained, he was estimating changes in demand that were associated with putting to consumers that they were getting a defect-free vehicle versus knowingly getting a vehicle with defects. That's how the survey was described and I believe that is relevant information properly used for this case."); *id.* at 328:14-19.

[25] Ex. 33, 2/6/18 Boedeker Dep. at 99:4-17 (Boedeker has "not done any separate studies that would test specifically consumers' perceptions of defects or recalls.").

[26] *See, e.g.*, Ex. 47, 3/9/17 S. Orosco Dep. at 89:9-90:1; Ex. 48, 3/23/17 B. Akers Dep. at 70:24- 71:5; Ex. 49, 5/9/17 K. Robinson Dep. at 61:8-11; Ex. 50, 3/21/17 R. Robinson Dep. at 64:21-25; Ex. 51, 4/14/17 M. Stefano Dep. at 80:20-81:12; Ex. 52, 4/13/17 C. Tinen Dep. at 91:14-92:6; Ex. 53, 5/31/17 P. Witherspoon Dep. at 114:10-115:2; Ex. 16, 5/5/17 G. Al-ghamdi Dep. at 44:1:4, 9-13; Ex. 18, 5/1/17 M. Graciano Dep. at 110:24-111:13.

model/model-year combinations" of vehicles in service. Ex. 24, 2/23/18 Marais Rpt. ¶ 25; *see also* Ex. 26, 2/23/18 Jason Rpt. at 10-11 (collecting evidence contradicting Boedeker's defect-free assumption); Background Section D. When asked whether the manufacturer of their new vehicle would issue a safety recall to fix a defect, only 16% of survey respondents believed a recall was "extremely unlikely." Ex. 25, 2/23/18 Keller Rpt. ¶ 115. While Boedeker claims that consumer expectations regarding recalls are "irrelevant" to his study, Ex. 27, 5/18/18 Boedeker 2nd Rpt. ¶ 378, prices paid in the real world depend on consumer expectations. Ex. 29, 2/23/18 Rossi Rpt. 43-44; Ex. 24, 2/23/18 Marais Rpt. ¶ 56-60.

Boedeker's measure of damages is based on an unrealistic assumption that they expected defect-free vehicles. Boedeker's method thus fails under *Comcast. See, e.g., Fluidmaster*, 2017 WL 1196990, at *27-31 (rejecting conjoint analysis that failed to account for fact that "even a non-defective product would still have a propensity to fail sometimes" and inclusion of an attribute promising no failure "provides no insight into the value of the product that consumers ultimately received"); *see also Davidson*, 2018 WL 2325426, at *23 (rejecting Boedeker's conjoint analysis in part based on assumptions contrary to plaintiff testimony).

#### g. Boedeker's Damages Estimates Compensate For Alleged Post-Sale Risk Of Injury, Not Overpayment At The Time of Sale.

Boedeker's damages methodology would impermissibly compensate putative class members for an alleged post-sale risk of harm that never materialized in the real world. Boedeker claims that "[a]fter being overcharged for their initial purchase price, the economic loss to class members grows at least until the actual recall occurs." Ex. 32, 11/10/17 Boedeker 1st Rpt. at ¶¶ 22, 134; Ex. 27, 5/18/18 Boedeker 2nd Rpt. ¶ 223 (Consumers "**had to drive the vehicle bearing the risk of the defect for as long as they did in the actual world** before the defective vehicle would be recalled.") (emphasis added); *id.* ¶ 730 ("[T]he longer GM waited to recall the vehicles

… the larger the economic loss to the consumer"). Dr. Gans admits that Boedeker's methodology is based on a "theory of harm that between purchase and recall purchasers of at-issue vehicles were driving around at a greater degree of risk." Ex. 36, 5/17/18 Gans Rpt. ¶ 53. This "theory of harm" conflicts with plaintiffs' benefit-of-the-bargain theory alleging plaintiffs "overpaid, **at the time of sale**, for a defective vehicle, and thus fails under *Comcast*." *TACC MTD Opinion*, 2016 WL 3920353, at *7 (emphasis added); Pls. Memo at 28.

#### h. Boedeker's Methodology Would Lead To Both Overcompensation And Double Recoveries.

As Judge Easterbrook has explained, "[i]f tort law fully compensates those who are physically injured, then any recoveries by those whose products function properly mean excess compensation." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002). A tort system allowing buyers who suffer no personal injuries to "collect damages on the theory that the risk of failure made" a product less valuable would "overcompensate[] buyers and lead[] to excess precautions" by manufacturers. *Id.*[27] Boedeker's methodology results in both overcompensation and double recoveries, because: (1) he would compensate for the **risk** of physical injury, while

[27] *Bridgestone/Firestone*, 288 F.3d at 1017 n.1 ("Consider an example. Defendant sells 1,000 widgets for $10,000 apiece. If 1% of the widgets fail as the result of an avoidable defect, and each injury creates a loss of $50,000, then the group will experience 10 failures, and the injured buyers will be entitled to $500,000 in tort damages. That is full compensation for the entire loss; a manufacturer should not spend more than $500,000 to make the widgets safer. Suppose, however, that uninjured buyers could collect damages on the theory that the risk of failure made each widget less valuable . . . This would both overcompensate buyers as a class and induce manufacturers to spend inefficiently much to reduce the risks of defects. A consistent system—$500 in damages to every buyer, or $50,000 in damages to every injured buyer—creates both the right compensation and the right incentives. A mixed system overcompensates buyers and leads to excess precautions."); *see also Harris v. Nortek Glob. HVAC LLC*, 2016 WL 4543108, at *5 (S.D. Fla. Jan. 29, 2016) ("Judge Easterbrook of the Seventh Circuit notably explained that a mixed system of class compensation—for those who had been physically injured in addition to those whose products had functioned properly—would lead to overcompensation and perverse incentives."); *Jasper v. Abbott Labs., Inc.*, 834 F. Supp. 2d 766, 774 (N.D. Ill. 2011) ("If tort law fully compensates those who are physically injured, then any recoveries by those whose products function properly mean excess compensation.") (citing *Bridgestone/Firestone*, 288 F.3d at 1017).

(2) nearly all class members did not experience any personal injury and those that did have had the opportunity to assert personal injury claims. Moreover, plaintiffs' proposed economic loss classes do not even exclude individuals with alleged personal injuries and/or who received compensation.[28] *See* Pls. Mot. at 1-12.

* * *

With no model showing fact of injury for each putative class member, much less common fact of injury or class-wide damages, plaintiffs "cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34.[29]

---

[28] The problems noted by Judge Easterbrook would exist even if plaintiffs had excluded personal injury plaintiffs from the class, but their inclusion makes matters worse.

[29] The class cases cited in plaintiffs' brief at pages 30-31 are inapplicable and involve some combination of: (1) products for which there is little if any price negotiation (e.g., cooking oil or "Scotts EZ Seed"); (2) conjoint analyses that included actual market prices for the product at issue, as opposed to the Boedeker conjoint involving scenarios for which no real-world market prices exist; (3) no discussion of whether the state laws at issue required proof of market price or willingness to sell at that price; (4) cases in which plaintiffs offered willingness to sell evidence for the products at issue, as opposed to here where Boedeker does not consider willingness to sell at any of his conjoint prices; and/or (5) proposed conjoint analyses that had been described in general but not actually carried out when the Court ordered class certification. *See, e.g.*, *In re Scotts EZ Seed Litig.*, 2017 WL 3396433, at *8, 16 (S.D.N.Y. Aug. 8, 2017) (granting in part and denying in part *Daubert* and summary judgment motions where expert used "actual Scotts EZ Seed price data" in the surveys, and "plaintiffs cite[d] several categories of evidence addressing" defendant's "willing[ness] to sell" at a lower price); *Dzielak v. Whirlpool Corp.*, 2017 WL 1034197, at *5, 12 (D.N.J. Mar. 17, 2017) (denying *Daubert* challenge to conjoint analysis that "compared the values for the Washers (represented as costing being $300 and $500) with and without the Energy Star logo;" expert incorporated "retail market prices into his analysis" and "did consider what retailers actually charged putative class members"; court did not address whether California, Texas, or Missouri law required consideration of willingness to sell); *Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988, 996 (S.D. Fla. 2016) (survey respondents were asked to choose between versions of actual product at issue, including "$45,000 purchase price for Ford Explorers"; no discussion of whether California, Texas, or Missouri law require proof of market price or willingness to sell at that price); *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1082 (D. Minn. 2015) (permitting conjoint analysis without addressing whether state law required determination of market price or consideration of willingness to sell at that price); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 945 (C.D. Cal. 2015) (expert used "data from various spreadsheets and reports reflecting historical price, cost, profit and attribute information for Wesson Oils and competitor brands"; court approved the use of conjoint in conjunction with a hedonic regression analysis that accounted for "supply and market factors"); *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *10 (C.D. Cal. July 24, 2014) (expert relied on two proposed methodologies, including one that relied on "running regressions on historical marketing

### 5. Boedeker's Averaging Methodology Is Not Permitted Under Supreme Court Precedent And Applicable Law.

As explained in Section I.A.2,, Boedeker's methodology uses multiple levels of averaging to obscure that his data shows that many class members have no injury and thus no claim. In addition to the reasons previously discussed, plaintiffs' reliance on Boedeker's averaging methodology fails because plaintiffs may not use aggregate or representative data in a class action unless such evidence could be used by a plaintiff in an individual case. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046, 1048-49 (2016). *Tyson* allowed use of representative evidence, but only because individual, plaintiff-specific evidence was unavailable. *Id*. at 1047. The Court limited its holding to the FLSA claims at issue in that case; "the fairness and utility of statistical methods in contexts other than those presented here will depend on facts and circumstances particular to those cases." *Tyson*, at 1049.

*Tyson* forecloses plaintiffs' use of Boedeker's averaging methodology in this case. *Tyson* requires that the relevant facts be sufficiently similar among the plaintiffs such that a representative subset could be probative for an individual plaintiff's claim. *Id. Tyson* reaffirmed *Dukes*, 564 U.S. 338, which barred use of sample evidence to establish liability where the employees were not similarly situated and "none of them could have prevailed in an individual suit by relying on depositions detailing the ways in which other employees were discriminated against by their particular store managers." 136 S. Ct. at 1048. Here, an individual plaintiff could not prove injury and damages for his or her particular vehicle by relying on an average of survey respondents'

data"; conjoint analysis was proposed, but not yet performed, as additional methodology in which "surveys here could ask consumers to choose between [hairstyling products] that differed in price"; not addressing whether state law required consideration of willingness to sell); *see also* Memorandum of Law in Support of General Motors LLC's Motion to Exclude the Opinions of Stefan Boedeker at 38-42 & n. 78 (distinguishing additional cases).

willingness-to-pay for a hypothetical scenario divorced from the actual price paid, make, model, trim, options, and other features of his vehicle. *See, e.g.*, *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 774-75 (7th Cir. 2013) ("To extrapolate from the experience of the 42 to that of the 2341 would require that all 2341 have done roughly the same amount of work, including the same amount of overtime work, and had been paid the same wage. No one thinks there was such uniformity."); *Opperman*, 2016 WL 3844326, at *14; *Arnold v. Directv, LLC*, 2017 WL 1251033, at *7 (E.D. Mo. Mar. 31, 2017). Instead, as this Court has explained, benefit-of-the-bargain damages must be measured by vehicle-specific "variables … such as age, mileage, technical features, consumer preference, and even paint color." *TACC MTD Opinion*, 2016 WL 3920353, at *7. Because Boedeker's methodology could not be used in an individual case, *Tyson* holds that it cannot be used for a class.

Nor does the result in *Tyson* aid plaintiffs here. *Tyson* did not involve a proposed class where plaintiffs' data shows that 26.6% to 39.1% of the putative members have no injury, and nothing in *Tyson* undercuts case law holding that no such class can be certified. Moreover, unlike the FLSA, state law here requires proof of the difference between each vehicle's purchase price and its market value if the alleged defect had been disclosed. *See* pages 16-17 & nn. 4-6. As plaintiffs do not use the market value of any vehicle to determine damages, they have no claim under the bellwether states' laws. Finally, while plaintiff-specific evidence was unavailable in *Tyson*, the information necessary to calculate any benefit-of-the-bargain damages here are the price and characteristics of plaintiffs' own vehicles, which are readily available.

#### 6. Plaintiffs' "Proposed Trial Procedure" Confirms That Plaintiffs Cannot Meet Their Burden of Proving the Requirements of Rule 23.

Plaintiffs contend that if a verdict is in their favor a "single monetary sum [is] to be entered on behalf of each Class and Subclass for damage. A post-judgment administrative proceeding will

follow, in which checks to each individual Class member will be distributed." Pls. Memo. at 36. The Second Circuit, however, has rejected this sort of reverse-engineered method of determining fact of injury and calculating damages:

> [S]uch an aggregate determination is likely to result in an astronomical damages figure that does not accurately reflect the number of plaintiffs actually injured by defendants and that bears little or no relationship to the amount of economic harm actually caused by defendants. … Roughly estimating the gross damages to the class as a whole and only subsequently allowing for the processing of individual claims would inevitably alter defendants' substantive right to pay damages reflective of their actual liability.

*McLaughlin*, 522 F.3d at 231-33.

Plaintiffs also fail to explain how their proposed post-judgment proceedings would work. They do not have a plan for excluding from the jury's verdict any damages that would be paid to uninjured class members (equal to about 25-40% of the putative classes according to Boedeker's data), used car purchasers (which Boedeker admits are different), or vehicle lease holders (which Boedeker did not study at all). Nor do they describe how to allocate the "single monetary sum" to individual class members. *See* page 24 (Boedeker and Dr. Gans admitting they have not done any analysis of how to allocate any aggregate judgement). Plaintiffs "trial procedure" is no plan at all, and fails to comply with Rule 23. *See Ohio Pub. Employees Ret. System v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) ("When a class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts ... that there are unspecified 'tools' available to measure damages, the model amounts to 'no damages model at all,' and the class cannot be certified."); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014) ("Although the methodologies he describes may very well be capable of calculating damages in this action, [plaintiffs' economic expert] has made no showing that this is the case.").[30]

[30] Nor can plaintiffs leave such questions for after trial: "[t]he possibility of post-certification procedural tailoring does not attenuate the [court's] obligation to take a 'close look' at predominance when assessing the motion for certification." *See Petrobras*, 862 F.3d at 274; *see also Windham v. Am. Brands, Inc.*, 565

### B. Individual Differences Predominate Regarding Whether Putative Class Members Incurred Any Alleged Benefit-Of-The-Bargain Damages.

"The Court previously held that Plaintiffs who sold their vehicles at an allegedly still-inflated value before a defect became public did not have valid claims for economic loss because they had suffered no damages." Opinion re Order No. 131 Issues, Dkt. 6028, at 11. Plaintiffs "who disposed of their vehicles before the recall could not have realized any 'diminished value' because they did not own the defective vehicles when the recalls were announced," and could not have benefit-of-the-bargain damages. *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 403 (S.D.N.Y. 2017) ("*FACC MTD Opinion")*; *see also In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 3443623, at *2 (S.D.N.Y. August 9, 2017). Nor could such plaintiffs have "lost time" by taking their vehicles in for recalls, since repairs were not available until after plaintiffs disposed of their vehicles.

Whether each putative class member has incurred any economic losses is an individual issue. Plaintiffs' proposed classes include all putative class members who "bought or leased" a vehicle "at some point during the time period July 10, 2009 through" the particular recall announcement at issue. Pls. Mot. at 1-12. However, "over 25% of the at-issue vehicles had multiple owners within each of the Bellwether states" between July 2009 and the date of each applicable recall. Ex. 22, 8/13/18 Hanssens Sur-Rebuttal Rpt. ¶ 23 & Ex. 14. Plaintiffs' proposed classes therefore over-include masses of persons who disposed of their vehicles—whether by resale or other means—before the 2014 recall announcements and who have no recoverable

F.2d 59, 70 (4th Cir. 1977) ("[W]here the court finds... that there are serious problems now appearing, it should not certify the class merely on the assurance of counsel that some solution will be found."); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014); *Sicav v. James Jun Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015).

economic losses under the law of this case, and thus no claims.[31] Section I.A.3.

### C. Proving Alleged "Lost Time" Damages Is An Individual Issue.

Whether any plaintiff can recover lost time damages requires an individual analysis. Consistent with the Court's holding that "forty-one of the contested states limit lost time damages to lost income or earnings," Opinion re Order No. 131 Issues, Dkt. 6028, at 62. California, Missouri, and Texas do not allow "lost time" without lost income. *See* New GM's Summ. J. Memo. at 27-29.[32] None of plaintiffs' cases suggest that lost time can be recovered without lost income. Pls. Memo. at 32 n.27. Indeed, *Seymour v. House* explains that "a plaintiff claiming personal injuries may prove a resulting loss of time, **and a consequent loss of personal earnings or wages** as an item of special damages," and denies lost time damages where plaintiff could not show his "lost earnings." 305 S.W.2d 1, 3-5 (Mo. 1957) (emphasis added).

Whether any plaintiff lost income due to completing a recall repair is a classic individual fact issue. *First*, if a putative class member did not have the repairs performed, he or she cannot have lost time damages. Various named plaintiffs have no claim for lost time because they either disposed of their vehicles before the 2014 recalls (Kenneth Robinson, Christopher Tinen, and Lisa McClellan)[33] or chose not to have the repairs performed (Santiago Orosco, Deloris Hamilton,

---

[31] All the claims at issue require proof of actual damages. New GM. Summ J. Memo. at 31-32. Even if some claims did not require actual damages, intra-class conflicts could arise if some putative class members could recover economic losses without proof of injury, but others had to prove actual damages.

[32] *E.g.*, *Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*, 2016 WL 6523428, at *11 (S.D. Cal. Nov. 3, 2016); *Lueras v. BAC Home Loans Servicing, LP*, 163 Cal. Rptr. 3d 804, 829 (Cal. Ct. App. 2013); *Ford v. St. Louis Metro. Towing, L.C.*, 2010 WL 618491, at *13 (E.D. Mo. Feb. 18, 2010); *Messina v. Prather*, 42 S.W.3d 753, 764 (Mo. Ct. App. 2001); *Valley Nissan, Inc. v. Davila*, 133 S.W.3d 702, 713 (Tex. App. 2003); *Bossier Chrysler Dodge II, Inc. v. Rauschenberg*, 201 S.W. 3d 787, 810 (Tex. App. 2006), *rev'd in part on other grounds*, 238 S.W. 3d 376 (Tex. 2007).

[33] Ex. 49, 5/9/17 K. Robinson Dep. at 65:25-66:5; Ex. 52, 4/13/17 C. Tinen Dep. at 70:23-71:1; 95:13-96:1; Ex. 17, 5/4/17 L. McClellan Dep. at 106:3-22.

Gareebah Al-ghamdi, and Dawn Bacon).[34] New GM's Summ. J. Memo. at 26.[35] Other putative class members likewise have not had repairs performed, and determining who has is an individual issue. Ex. 54, 5/11/18 Manuel Reply Rpt. ¶ 32; *see also* Ex 14 4/20/18 Willig Rpt. ¶¶ 25-26.

*Second*, for putative class members who had their vehicles repaired, whether they lost earnings is an individual issue. New GM has the right to present evidence contesting the existence or amount of any lost income, including whether there was any mitigation of such lost income. *See* Ex. 14.C, 4/20/18 Willig Rpt. ¶¶ 53, 63. Whether each putative class member would have performed "household work" during the time their vehicle was repaired and the value of that work are additional individual questions. Opinion re Order No. 131 Issues, Dkt. 6028, at 75.

*Third*, whether each vehicle owner "lost time" because of the recall repair is an individual issue. Approximately 14-15% of vehicle owners had the recall repairs performed during the same dealership visit for unrelated repairs or routine service, as named plaintiff Kellie Cereceres did. Ex. 14.C, 4/20/18 Willig Rpt. ¶¶ 25-26, 43; Ex. 55, 12/18/17 K. Cereceres Dep. at 31:6-15, 52:22-53:16. Others dropped the vehicle off on the way to or from work; had a relative or friend take the vehicle in for repairs; or worked, shopped, or otherwise productively used their time during the repair. Ex. 14.C, 4/20/18 Willig Rpt. ¶ 61; Ex. 24.B, 4/18/18 Marais Supp. Rpt. ¶¶ 15-18.

*Fourth*, plaintiffs' expert Ernest Manuel cannot show class-wide lost time. Manuel's

---

[34] Ex. 47, 3/9/17 S. Orosco Dep. at 115:1-118:6; Ex. 56, Delano Chevrolet Buick GMC Invoice at ELPLNTFF00011445; Ex. 39, 3/13/17 D. Hamilton Dep. at 114:5-25; Ex. 16, 5/5/17 G. Al-ghamdi Dep. at 30:5-7, 32:1-3; Ex. 57, 3/28/17 D. Bacon Dep. at 88:14-89:14; 91:7-17.

[35] Nor is ascertaining whether a putative class member had the recall performed a simple task. Orosco alleges that he had the recall performed, but he has no evidence to support that claim, and a 2014 service receipt from his dealership states that his daughter (who had brought the vehicle in for service) declined the recall repair. Ex. 47, 3/9/17 S. Orosco Dep. at 115:1-118:6; Ex. 56, Delano Chevrolet Buick GMC Invoice at ELPLNTFF00011445. Similar individual evidence would be necessary to determine which putative class members had the recall performed.

opinions should be excluded for the reasons in New GM's *Daubert* Motion. If considered, Manuel provides no method for distinguishing among class members who lost income from those who did not, or who had the recall performed as compared to those who did not, or who "lost" time from having the recall performed versus using that time for personal or productive reasons. Ex. 14.C, 4/20/18 Willig Rpt. ¶ 61; Ex. 24.B, 4/18/18 Marais Supp. Rpt. ¶¶ 15-18.

Moreover, Manuel uses averages of local wages, travel distances, and repair time to calculate lost time damages, but plaintiffs do not cite any case law allowing such averages. Pls. Memo. at 33. Instead, lost time damages are determined by looking at the wages or income that each particular individual supposedly lost. *See* New GM's Summ. J. Memo. at 27-29. Vehicle owners with zero wages—*e.g.*, those who are unemployed, retired, or students—have no lost time damages. *See also* Ex. 14.C, 4/20/18 Willig Rpt. ¶¶ 49-51, 64. New GM is entitled to present evidence on each putative class member's wage rate, travel distance, and time waiting while the recall repair was performed and cannot be deprived of this right through composites or averages. *See Dukes*, 564 U.S. at 367; *Newton*, 259 F.3d at 191-92; *Broussard*, 155 F.3d at 345.

These individual variations in the fact of injury and damages for lost time claims predominate over any supposed common issues, precluding certification of plaintiffs' claims for lost time damages. *See* authorities at page 16-17 & nn. 4-6.

### D. For Texas, Plaintiffs' Class Definition Is Improper And Individual Proof Of Manifest Defect Predominates Over Any Alleged Common Issues.

A "manifest defect is a necessary element of a DTPA claim." *FACC MTD Opinion*, 257 F. Supp. at 452. Whether a person's vehicle manifested a defect can only be proven through an individual analysis, such as (1) if the vehicle owner alleges manifestation of a recall condition (as opposed to alleging some other issue unrelated to the recalls); (2) if the owner can prove a stall, or loss of power steering for the EPS Assist recall; and (3) if the plaintiff can prove that the stall or

power steering loss occurred because of recall condition instead of the various other reasons a vehicle might stall or lose power.

Because individual evidence is necessary, Texas and other courts deny certification where manifestation is required. *See Gen. Motors Corp. v. Garza*, 179 S.W.3d 76, 81-82 (Tex. App. 2005) (denying certification because whether and when vehicle owners experienced pulsation from brake defect and whether pulsations resulted from defect or another cause required individual evidence); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332 (E.D. La. 1997) (denying certification because whether alleged ignition switch defect causing fires had manifested in vehicles and whether fires were caused by the defect were individual issues); *Maloney v. Microsoft Corp.*, 2012 WL 715856, at *7 (D.N.J. Mar. 5, 2012); *Mahtani v. Wyeth*, 2011 WL 2609857, at *8 (D.N.J. June 30, 2011).[36]

Plaintiffs cannot avoid this result by defining their Texas classes to include only those "whose vehicles had an ignition switch related malfunction." Pls. Memo. at 9. *First*, "classes that are defined in terms of success on the merits—so-called 'fail-safe classes'—… are not properly defined". *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015) (collecting cases). The Second Circuit has described ascertainability as "'allowing the Court to readily identify Class members without needing to resolve the merits of Plaintiffs' claims.'" *Petrobras*, 862 F.3d at 267 (quoting *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D 221, 229 (S.D.N.Y. 2010)); *see also Eng-Hatcher v. Sprint Nextel Corp.*, 2009 WL 7311383, at *7 (S.D.N.Y. Nov. 13, 2009); MANUAL FOR COMPLEX LITIGATION § 21.222 (4th ed. 2018 update) ("The order defining the class should avoid

---

[36] *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010) indicated that "proof of manifestation of a defect is not a prerequisite to class certification," but that case involved Florida and Michigan consumer protection statutes, which this Court has concluded do not require a manifest defect. *TACC MTD Opinion*, 2016 WL 3920353, at *25-27; *FACC MTD Opinion*, 257 F. Supp. 3d at 423-24.

… terms that depend on resolution of the merits (e.g., persons who were discriminated against)"). Plaintiffs' Texas class definition impermissibly requires the Court to make a merits determination of manifest defect to ascertain who is in the class.

*Second*, plaintiffs cannot ignore individual differences among class members' claims through their class definition. In *Petrobras*, plaintiffs sought to certify a class of purchasers of a company's stock that did not trade on a United States exchange. 862 F.3d at 256-57. Under the securities laws, such purchasers could have a claim only if they purchased in a "domestic transaction." *Id.* Accordingly, the plaintiffs defined their class to include only those who purchased securities in "domestic transactions." *Id.* The Second Circuit held that whether securities had been purchased in a domestic transaction was a predominant individual fact question and vacated certification. *Id.* at 272-74. Similarly, in *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, plaintiffs defined their class to include only plaintiffs who owned property with wells that contained a detectable level of an allegedly hazardous chemical called MTBE. 209 F.R.D. 323, 335 (S.D.N.Y. 2002). Judge Scheindlin denied certification because of differences in "the level of contamination that the named plaintiffs allege" and the "task inherent in ascertaining the class members also renders this case unmanageable." *Id.* at 344, 348. Under *Petrobras* and *MTBE*, determining whether each putative class member experienced manifestation is a predominant individual issue, precluding certification.

*Third*, putative class members cannot use "self-identification" to avoid the lack of ascertainability or predominance. Pls. Memo. at 9. The "Rules Enabling Act forbids interpreting Rule 23 to abridge, enlarge or modify any substantive right." *Dukes*, 564 U.S. at 367. "A plaintiff in a typical case is not allowed to establish an element of a defendant's liability merely by completing an affidavit swearing the element is satisfied, and this should be no different for a class

action." *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, 2011 WL 6740338, at *8 (W.D. Mo. Dec. 22, 2011). Moreover, plaintiffs' proposed "self-identification" would abrogate New GM's right to discovery and to raise individual fact defenses against each class member, which the law does not allow. *Dukes*, 564 U.S. at 367; *Newton*, 259 F.3d at 191-92; *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006).

The cases plaintiffs cite regarding "self-identification" do not support their position. Pls. Memo. at 9. Those cases conclude only that putative class members can submit declarations that they purchased a product; none use self-identification to satisfy merits requirements. Furthermore, unlike the straightforward task of stating whether a consumer purchased a product, determining whether a vehicle manifested any of the defects at issue is complex. Courts have refused to certify classes where putative class members would submit affidavits claiming their vehicle had a defect. *E.g.*, *In re Ford Motors Co. Vehicle Paint Litig.*, 182 F.R.D. 214 (E.D. La. 1998). Named plaintiffs' own circumstances confirm the need for individual inquiry and evidence. *See* page 12. Indeed, even where a vehicle owner alleges that a stall occurred, plaintiffs' putative expert Stevick admits that "moving stalls are something that can happen in all vehicles," and occur for a "variety of reasons," such as "running out of gas," "[b]ad spark plugs," a "[b]ad ignition cable," or a "[c]logged EGR valve." Ex. 58, 9/28/15 G. Stevick Dep. at 165:4-166:16. These named plaintiff differences and the need for individual-specific facts will be multiplied thousands-fold when considering all Texas putative class members, and thus predominate over any common questions.

## II. INDIVIDUAL ISSUES REGARDING LIABILITY PREDOMINATE OVER ANY COMMON QUESTIONS.

### A. Individual Differences In Reliance And Causation Predominate For Consumer Fraud And Common Law Fraud Claims.

Courts frequently deny certification because reliance and causation are individual questions permeating the class. In *McLaughlin v. American Tobacco Co.*, plaintiffs brought a

RICO fraud claim alleging that tobacco companies had misrepresented that "Light" cigarettes were healthier than regular cigarettes. 522 F.3d 215, 220 (2d Cir. 2008). The cigarette companies had engaged in a common course of conduct and used a uniform marketing campaign to misrepresent that Light cigarettes were healthier. *Id.* at 223. But "proof of misrepresentations—even widespread and uniform misrepresentation—only satisfies half of the equation; the other half, reliance on the misrepresentation, cannot be the subject of general proof." *Id.* "Individualized proof is needed to overcome the possibility that a member of the purported class purchased Lights for some reason other than the belief that Lights were a healthier alternative—for example, if a Lights smoker was unaware of that representation, preferred the taste of Lights, or chose Lights as an expression of personal style." *Id.* (collecting cases); *see also In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006) ("establishing reliance individually by members of the class would defeat the requirement of Rule 23 that common questions of law or fact predominate over questions affecting only individual members"); *Moore v. PaineWebber*, 306 F.3d 1247, 1255 (2d Cir. 2002) (a common course of conduct could not establish predominance because "each plaintiff must prove that he or she personally received a material misrepresentation, and that his or her reliance on this misrepresentation was the proximate cause of his or her loss").

Individual differences in reliance likewise preclude certification in cases alleging that a vehicle manufacturer concealed defects. In *Ford Ignition Switch*, plaintiffs alleged a defective ignition switch found in 23-25 million vehicles had a propensity to short circuit and caused smoke or fires in over 2,000 vehicles, including when driving. 174 F.R.D. at 336-37. Plaintiffs moved to certify claims including fraudulent concealment and violation of state consumer fraud statutes. *Id.* at 338. *Ford Ignition Switch* denied certification because of individual differences in reliance and causation: "plaintiffs must persuade the finder of fact that disclosure of the allegedly

dangerous nature of the ignition switches would have affected the purchaser's decision whether to purchase the vehicle. Obviously, this determination could not be accurately and fairly made on a class-wide basis, especially when even under plaintiffs' version of the facts the chance of these ignition switches ever causing a fire is relatively slim." *Id.* at 346-47.

Similarly, in *Chin v. Chrysler Corp.*, plaintiffs alleged that Chrysler failed to disclose that its vehicle lines were equipped with a "dangerously defective" anti-lock braking system ("ABS") that could fail over time, leading to a NHTSA investigation resulting in Chrysler recalling the vehicles. 182 F.R.D. 448, 450-52 (D.N.J. 1998). *Chin* denied class certification because of individual issues including reliance and causation: "Plaintiffs must persuade the finder of fact that disclosure of the allegedly dangerous nature of the ABS systems would have affected the purchaser's decision whether to purchase the vehicle." *Id.* at 456; *see also*, *e.g.*, *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 595-96 (9th Cir. 2012); *Ford Vehicle Paint*, 182 F.R.D. 214, 220; *Sanneman v. Chrysler*, 191 F.R.D. 441, 453 (E.D. Pa. 2000).

**1. Reliance And Causation Are Individual Issues For Consumer Purchases Such As Vehicles.**

Contrary to plaintiffs' argument, reliance cannot be presumed under the facts here. *McLaughlin* rejected using the presumption of reliance that applies to securities traded in efficient markets, *see Basic Inc. v. Levinson*, 485 U.S. 224 (1988), for consumer products such as cigarettes. 522 F.3d at 224. The Second Circuit explained "a financial transaction does not usually implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase." *Id.* at 225 n.7; *see also* 1 MCLAUGHLIN ON CLASS ACTIONS § 5:55 (14th ed. 2017). This Court's opinion in *Dandong v. Pinnacle Performance Ltd*. involved the purchase of financial instruments and quoted this statement from *McLaughlin*. 2013 WL 5658790, at *9 (S.D.N.Y. Oct. 17, 2013) (Furman, J.) (emphasis added); Pls. Memo. at 25. Plaintiffs also cite *Moore*, 306 F.3d at 1253, Pls. Memo. at

25, but *McLaughlin* explains that reliance is an individual issue that predominates even where there are uniform misrepresentations if putative class members had diverse reasons for buying a product, 522 F.3d at 223.

Mirroring *McLaughlin*, cases involving allegedly concealed vehicle defects have consistently rejected presumptions of reliance or arguments that reliance can be shown through common evidence. *E.g.*, *Mazza*, 666 F.3d at 596 (rejecting presumption of reliance where putative class members "were exposed to quite disparate information from various representatives of the defendant"); *Ford Vehicle Paint*, 182 F.R.D. at 220-21 (undertaking state law analysis and determining "that the vast majority of states have never adopted a rule allowing reliance to be presumed in common law fraud cases, and some states have expressly rejected such a proposition"); *Chin*, 182 F.R.D. at 452.

#### 2. Each Bellwether State Requires Proof Of Reliance Or Causation For Plaintiffs' Consumer Fraud And Common Law Fraud Claims.

Plaintiffs' consumer protection and common law fraud claims in all three bellwether states require individual proof of reliance and causation, and plaintiffs' Missouri MPA claim requires individual proof of causation. Contrary to plaintiffs' arguments, reliance or causation requirements cannot be presumed or shown through common evidence.

**a. California Requires Individual Proof Of Reliance.**

**i. Reliance Is Required For Plaintiffs' UCL Claims.**

Plaintiffs must prove reliance to recover under the UCL. Before November 2, 2004, UCL claims did not require individual proof of reliance, injury, or damages. *Hall v. Time Inc.*, 158 Cal. App. 4th 847, 852 (2008). On that date, Proposition 64 amended the UCL to require that plaintiffs prove they have "suffered injury in fact" and "lost money or property as a result of such unfair competition." *Id.*

Proposition 64's "language imposes an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong." *In re Tobacco II Cases*, 46 Cal. 4th 298, 306, 326 (2009). This reliance requirement applies to all allegations based in fraud, regardless of whether the plaintiff pleads misrepresentations or omissions.[37] *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1203, 1034-35 (8th Cir. 2010) (reliance required for UCL claims alleging that defendant did not disclose its method for crediting interest to annuity policies); *Doe v. Successfulmatch.com*, 2014 WL 1494347, at *2, 5 (N.D. Cal. Apr. 16, 2014) (where "critical allegation is that Defendant fraudulently and deceptively failed to disclose that profiles" created on one dating site could be viewed on others, plaintiff was required to prove reliance on omissions to state UCL claim).[38]

[37] Reliance is required regardless of the UCL prong at issue: "A consumer's burden of pleading causation in a UCL action should hinge on the nature of the alleged wrongdoing rather than the specific prong of the UCL the consumer invokes." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1363 (2010); *Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1082-83 (N.D. Cal. 2017); *Chang v. Fage USA Dairy Industry, Inc.*, 2016 WL 5415678, *7 n.8 (E.D.N.Y. 2016); *Laster v. T–Mobile USA, Inc.*, 2009 WL 4842801, at *5 n. 1 (S.D. Cal. Dec. 14, 2009), *vacated on other grounds*, 466 F. App'x 613 (9th Cir. 2012).

[38] *See also Myers v. BMW of N. Am., LLC*, 2016 WL 5897740, *6 (N.D. Cal. Oct. 11, 2016) (plaintiff was required to allege actual reliance on omissions for UCL claims based on defective vehicle key remote); *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1047-48 (N.D. Cal. 2014); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318, *29-30 (N.D. Cal. Aug. 30, 2017); *Stewart v. Electrolux Home Prods., Inc.*, 304 F. Supp. 3d 894, 910 (E.D. Cal. 2018).

Plaintiffs' claim that reliance and causation are not required unless the UCL claim is based on misrepresentations or false advertising is legally incorrect. Pls. Memo. at 19. Plaintiffs cite *Medrazo v. Honda of N. Hollywood*, 205 Cal. App. 4th 1, 12 (2012), but the California appellate court subsequently admitted that it "went too far in *Medrazo*" and confirmed that reliance is required for fraud-based allegations under the UCL. *Veera v. Banana Republic, LLC*, 6 Cal. App. 5th 907, 919 (2016). Plaintiffs' only other authority is a district court case involving a "strict liability" statute rather than fraud. *Galvan v. KDI Distribution Inc.*, 2011 WL 5116585, at *9 (C.D. Cal. Oct. 25, 2011). Plaintiffs' claims here are paradigmatic fraud claims alleging that New GM omitted material information. *E.g.*, 5ACC ¶¶ 14-18.

#### ii. Absent Class Members Need To Prove Individual Reliance For UCL Claims.

Plaintiffs' assertion that the UCL does not require individual proof of causation and injury for absent class members likewise is incorrect. Pls. Memo. at 19. While *Tobacco II* held in a California state court class action that absent class members need not prove individual reliance to have statutory standing in the context of tobacco companies' decades-long advertising campaign, 46 Cal. 4th at 315-16, that ruling does not support plaintiffs' argument.

*First*, *Tobacco II* addressed whether Proposition 64's **standing** requirements apply to absent class members, not what absent class members must prove on the merits. *E.g.*, *Tobacco II*, 46 Cal. 4th at 306 (stating "that standing requirements are applicable only to the class representations"); *id.* at 315-16, 319; *see also Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 980-81 (2009) (*Tobacco II's* ruling regarding absent class members was "for purposes of standing"). *Tobacco II* compared the UCL's standing requirement to Article III standing. 46 Cal. 4th at 319. Under Article III, "standing in no way depends on the merits of the plaintiff's" claim. *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

As the California appellate court held in *Cohen*, standing to bring a UCL claim is separate from whether individual absent class members can succeed on the claim's merits, which is relevant for determining whether the certification requirements of commonality and predominance are satisfied. 178 Cal. App. 4th at 981. "We see no language in *Tobacco II* which suggests to us that the Supreme Court intended our state's trial courts to dispatch with an examination of commonality when addressing a motion for class certification." *Id.*

*Cohen* affirmed denial of class certification in a case under the UCL (and CLRA) because of individual difference in reliance among absent class members: "the trial court's concerns that the UCL and the CLRA claims … would involve factual questions associated with their reliance on DIRECTV's alleged false representations was a proper criterion for the court's consideration when examining 'commonality' …, even after *Tobacco II*." *Id.*; *see also Davis-Miller v. Auto. Club of S. Cal.*, 201 Cal. App. 4th 106, 123-24 (2011); *Tucker v. Pac. Bell Mobile Servs.*, 208 Cal. App. 4th 201, 227-28 (2012).[39]

*Second*, plaintiffs' interpretation of *Tobacco II* violates Article III standing requirements and should not govern in federal court. To "the extent that *Tobacco II* holds that a single injured plaintiff may bring a class action on behalf of a group of individuals who may not have had a cause of action themselves, it is inconsistent with the doctrine of standing as applied by federal courts." *Avritt*, 615 F.3d at 1034. A "named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves." *Id.* The Second Circuit follows the same rule that a class "must therefore be defined in such a way that anyone within it would have standing." *Denney*, 443 F.3d

[39] *See also Knapp v. AT&T Wireless Servs., Inc.*, 195 Cal. App. 4th 932, 945 (Cal. App. Ct. 2011); *Santamarina v. Sears Roebuck & Co.*, 2016 WL 1714226, at *8 (Cal. App. Ct. Apr. 26, 2016); *Avritt*, 615 F.3d at 1033-34; *Campion v. Old Republic Home Prot. Co., Inc.*, 272 F.R.D. 517, 535 (S.D. Cal. 2011); *Tucker*, 208 Cal. App. 4th at 227-28; *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *14 (N.D. Cal. June 13, 2014); *Hobbs v. Brother Int'l Corp.*, 2016 WL 4734394, *3-6 & n.1 (C.D. Cal. Sept. 8, 2016).

at 263-64.[40] Whatever *Tobacco II's* impact on class actions in California state court, federal courts must evaluate whether absent class members can prove a claim, which requires proof of actual reliance under the UCL.

*Third*, *Tobacco II* involved an "extensive and long-term advertising" campaign by tobacco companies uniformly denying that cigarette smoking caused diseases such that all smokers could be presumed to have received that message. 46 Cal. 4th at 327-28. Courts have distinguished *Tobacco II* where those conditions have not been met. In *Mazza*, plaintiffs brought UCL claims alleging that Honda had misrepresented and omitted information about its vehicles' braking system. 666 F.3d at 585, 587. Plaintiffs relied on *Tobacco II* to argue that differences in reliance should not be considered for absent class members, but the Ninth Circuit "agree[d] with Honda's contentions that the misrepresentations at issue here do not justify a presumption of reliance." *Id.* at 595. "*Tobacco II's* holding was in the context of a 'decades-long' tobacco advertising campaign where there was little doubt that almost every class member had been exposed to defendants' misleading statements, and defendants were not just denying the truth but representing the opposite." *Id.* at 596. Because not all Honda buyers might have been exposed to the advertising campaign, *Tobacco II's* presumption did not apply. *Id.*

*Mazza's* holding expressly applies to alleged omissions as well as misrepresentations. "For everyone in the class to have been exposed to the omissions … it is necessary for everyone in the class to have viewed the allegedly misleading advertising." *Id.*; *see also Philips v. Ford Motor*

[40] *See also Cummings v. Connell*, 402 F.3d 936, 944 (9th Cir. 2005); *Williams v. Mohawk Indus. Inc.*, 568 F.3d 1350, 1360 (11th Cir. 2009); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514-15 (7th Cir. 2006); 1 MCLAUGHLIN ON CLASS ACTIONS § 5:59 (14th ed. 2017) ("Moreover, in California state court, absent class members need not satisfy the UCL's standing requirements, including 'injury in fact' and reliance. In federal court, however, standing principles of constitutional dimension require that only persons who have suffered injury and otherwise have a UCL claim be included in a class.").

*Co.*, 2016 WL 7428810, at *15 (N.D. Cal. Dec. 22, 2016) (rejecting plaintiffs' argument that *Mazza* was inapplicable to claims based on omissions: "the holding in *Mazza* cannot be so limited; *Mazza* itself involved alleged omissions as well as allegedly misleading advertising").[41]

As explained in Section II.A.3.a., expert evidence and the named plaintiff's own testimony establish that they were exposed to a variety of different advertising and information, with many never seeing any New GM advertising or representations at all. Under these facts, *Tobacco II* cannot be used to avoid analyzing individual issues of causation and reliance.[42]

**b. California Requires Individual Proof Of Reliance For CLRA And Common Law Fraud Claims.**

Plaintiffs do not dispute that reliance is required under the CLRA and for common law fraud. *E.g.*, *Princess Cruise Lines, Ltd. v. Superior Court*, 179 Cal. App. 4th 36, 46 (2009); *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1362-63, 1366-67 (2010); *Mirkin v. Wasserman*, 858 P.2d 568, 573-74 (Cal. 1993).

Plaintiffs instead seek to avoid individual reliance determinations by claiming there is an

---

[41] *See also Martinez v. Welk Group, Inc.*, 2012 WL 2888536, at *6 (S.D. Cal. July 13, 2012) (denying certification based on a class-wide omission because "individual inquiries would be necessary to determine what Welk represented or omitted to each class member. Therefore, reliance may not be presumed for all putative class members, whether via an alleged misrepresentation or an alleged omission."); *Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 969 (S.D. Cal. 2016); *Rodman v. Safeway, Inc.*, 2014 WL 988992, at *11 (N.D. Cal. Mar. 10, 2014); *In re First Am. Home Buyers Prot. Corp. Class Action Litig.*, 313 F.R.D. 578, 605-06 (S.D. Cal. 2016).

[42] Plaintiffs' assertion that relief under the UCL is available without individual proof of deception, reliance, and injury fails under this state and federal case law. Pls. Memo. at 17-18. *Tobacco II* holds that after Proposition 64, plaintiffs must prove actual reliance. As for absent class members, cases such as *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 (9th Cir. 2011), *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504 (C.D. Cal. 2012), and *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580 (C.D. Cal. 2008), did not consider how California state cases have held that *Tobacco II* applies only to standing and does not apply in the absence of a decades-long, extensive advertising campaign. Moreover, *Stearns* recognizes that individual issues would predominate in a UCL claim if class members "were exposed to quite disparate information from various representatives of the defendant," which is the case here as explained in Section II.A.3.a. 655 F.3d at 1020.

"inference" of reliance if the omissions are material, but this argument fails. Pls. Memo. at 18, 24-25. *First*, the California Supreme Court in *Mirkin* rejected plaintiffs' argument that reliance could be shown by pleading "material misrepresentations to the class, plus action consistent with reliance thereon." 858 P.2d at 575. Instead, an inference or reliance arises only "*when the same material misrepresentations have actually been communicated to each member of a class* . . . ." *Id.* (emphasis in original). *Mirkin* clarified that the cases plaintiffs cite for a presumption of reliance, such as *Vasquez v. Superior Court*, 4 Cal. 3d 800 (1971), and *Occidental Land, Inc. v. Superior Court*, 18 Cal. 3d 355 (1976), Pls. Memo. at 24-25, apply only where uniform misrepresentations are made to all putative class members.[43]

In accord with *Mirkin*, cases applying California law have rejected presumptions or inferences of reliance for either omissions or misrepresentations where, as here, consumers received disparate information. *See*, *e.g.*, *Mazza*, 666 F.3d at 587, 595-96 (rejecting presumption of reliance for CLRA as well as UCL claims where plaintiffs were exposed to disparate information and omissions); *Campion*, 272 F.R.D. at 536 ("Where a class of consumers may have seen all, some, or none of the advertisements that form the basis of a plaintiff's suit, an inference of common reliance or liability is not permitted. Furthermore, courts are reticent to extend an inference of reliance to 'mixed' cases, i.e. those involving allegations of material omissions and

[43] *Mirkin's* holding likewise applies to other cases plaintiffs cite involving uniform misrepresentations concerning a financial investment, where profit is the only reason for the purchase. *E.g.*, *Wilner v. Sunset Life Ins. Co.*, 78 Cal. App. 4th 952, 960-63 (2000) (defendant defrauded plaintiffs into reducing cash or cumulative value of life insurance policies through common misrepresentations); *Danzig v. Jack Grynberg & Assocs.*, 161 Cal. App. 3d 1128, 1133-34 (1984) (common misrepresentations made to defraud putative class members into investing in limited partnership interests); *Mass. Mutual Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282 (2002) (case concerning uniform misrepresentation regarding guaranteed financial return on insurance policy). Indeed, *Mass. Mutual* confirms that "an inference will not arise where the record will not permit it" such as where individuals would have varying views on whether they believed the defendant's misrepresentations, were misled by them, or have different views on materiality. *Id.* at 1294-95 (discussing *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644 (1993)).

misrepresentations.”).[44]

*Second*, reliance cannot be inferred where the evidence shows different reasons for purchase. In the *In re Vioxx Class Cases*, plaintiffs alleged that defendant concealed adverse health risks in the drug Vioxx, and that they would not have purchased Vioxx had they known of these risks. 180 Cal. App. 4th 116, 122-23 (Cal. App. Ct. 2009). The California appellate court held that a class-wide inference of reliance and materiality could not be presumed for CLRA claims, despite plaintiffs' arguments that "there can be nothing more material than an increased risk of death." *Id.* at 133. The court relied on evidence such as that some plaintiffs would use Vioxx if it were still available, patients received information from a variety of sources which could override reliance on the defendant's statements, and each consumer had his or her own particular preferences and characteristics. *Id.* at 134; *see also Johnson v. Harley-Davidson Motor Co. Grp. LLC*, 285 F.R.D. 573, 576, 581 (E.D. Cal. 2012) (denying certification of UCL and CLRA claims based on engine heat presenting an unreasonable risk of burns where "there are numerous individualized issues as to whether the reasonable consumer purchasing one of Defendants' motorcycles would find the excessive heat material"); *Webb v. Carter's, Inc.*, 272 F.R.D. 489, 502-03 (C.D. Cal. 2011) (denying certification of UCL and CLRA claims that defendant's toxic clothing injured children because "a consumer's response to a warning will vary based on many factors including, but not limited to, the perceived likelihood of severe or moderate injury, whether the warning provides information that is substantially new, whether the information conflicts with

[44] *See also Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 624 (S.D. Cal. 2007); *Davis-Miller*, 201 Cal. App. 4th at 125-26; *Tucker*, 208 Cal. App. 4th at 222-25; *Sotelo v. MediaNews Grp., Inc.*, 207 Cal. App. 4th 639, 656 (2012); *Knapp v. AT&T Wireless Services, Inc.*, 195 Cal. App. 4th 932, 945-46 (2011); *Friedman v. Old Republic Home Prot. Co., Inc.*, 2015 WL 9948093, at *4 (C.D. Cal. May 18, 2015); *In re First Am. Home Buyers Prot. Corp. Class Action Litig.*, 313 F.R.D. 578, 604-05 (S.D. Cal. Feb. 22, 2016); *Darisse v. Nest Labs, Inc.*, 2016 WL 4385849, at *6 (N.D. Cal. Aug. 15, 2016).

his/her previous experience"); *Reynante v. Toyota Motor Sales USA, Inc.*, 2018 WL 329569, at *5 (Cal. App. Ct. Jan. 9, 2018) (even if a customer was misled by Prius's fuel calculator, "this does not necessarily mean that the calculation caused the customer to purchase the vehicle," and "[i]ndividual inquiry would be necessary to determine whether it was the fuel calculator that induced his purchase").[45] Courts also have denied certification because putative class members may have considered information from third party sources. *E.g.*, *Howard v. GC Servs., Inc.*, 2015 WL 5163328, at *9-10 (Cal. App. Ct. Sept. 3, 2015) (class-wide reliance on misrepresentations in debt collection letters could not be presumed where consumer received communications from a variety of sources); *Nunes v. Toshiba Am. Info. Sys., Inc.*, 2016 WL 5920345, at *8 (C.D. Cal. June 23, 2016) (issues of materiality required individualized inquiry because evidence demonstrated that consumers purchased televisions "based on a variety of factors, including their own research, speaking with sales people, comparison shopping, or recommendations from family, friends, or co-workers"). As described in Section II.A.3.b., buying a vehicle is one of the most idiosyncratic purchases a consumer can make.[46]

---

[45] *See also Fine v. ConAgra Foods, Inc.*, 2010 WL 3632469, at *1, 4 (C.D. Cal Aug. 26, 2010) (denying certification of UCL and CLRA claims based on harmful ingredient in microwave popcorn where "class that would likely include people with varying rationales behind their purchases—many who would, as Defendant points out, purchase popcorn based on factors like flavor or brand"); *Safaie v. Jacuzzi Whirlpool Bath, Inc.*, 2008 WL 4868653, at *8-9 (Cal. App. Ct. Nov. 12, 2008); *Allen v. DaimlerChrysler Motors Co. LLC*, 2007 WL 2774440, at *8 (Cal. App. Ct. Sept. 25, 2007); *Fairbanks v. Farmers New World Life Ins. Co.*, 197 Cal. App. 4th 544, 565 (2011); *Withers v. eHarmony, Inc.*, 2010 WL 11520198, at *5 (C.D. Cal. June 2, 2010); *Broadbent v. Internet Direct Response*, 2011 WL 13217499, at *4-5 (C.D. Cal. Feb. 2, 2011); *Thurston v. Bear Naked, Inc.*, 2013 WL 5664985, at *8 (S.D. Cal. July 30, 2012); *Baghdasarian v. Amazon.com, Inc.*, 2009 WL 4823368, at *6 (C.D. Cal. Dec. 9, 2009), *aff'd*, 458 F. App'x 622 (9th Cir. 2011); *Deitz v. Comcast Corp.*, 2007 WL 2015440, at *6-7 (N.D. Cal. July 11, 2007); *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 457 (S.D. Cal. 2014); *Chow v. Neutrogena Corp.*, 2013 WL 5629777, at *2 (C.D. Cal. Jan. 22, 2013); 1 McLaughlin on Class Actions § 5:55 (14th ed. 2017) ("The existence of individualized issues of causation, reliance, and knowledge will preclude certification where class members' decisions to enter into a transaction with defendant could be explained by considerations other than reliance on defendant's alleged misrepresentations.").

[46] Plaintiffs' inference of reliance cases are inapplicable and distinguishable, as they involved a uniform misrepresentation made to all class members where the evidence did not show idiosyncratic reasons for the

In sum, California law regarding reliance and causation is similar to the Second Circuit. Where, as here, putative class members received disparate information about a product or might purchase the product for different reasons, reliance and causation require individual proof.

**c. California Requires Proof That Each Plaintiff Would Have Been Aware Of The Disclosure And Behaved Differently To Prove Reliance On Omissions.**

Under California law "to show actual reliance, whether based on an affirmative misrepresentation or a material omission, Plaintiffs must demonstrate that the misrepresentation or omission was an immediate cause of the injury-causing conduct." *Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1083 (N.D. Cal. 2017) (collecting cases). Plaintiffs must "show that the misrepresentation or omission was a substantial factor in their decision making process." *Id.*; *see also Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101 (N.D. Cal. 2016).

To show reliance on omissions, each putative class member in California must prove that

---

purchase. *E.g.*, *Edwards v. Ford Motor Co.*, 603 F. App'x 538 (9th Cir. 2015) (short, summary decision that does not consider what representations consumers saw or whether they had differing motivations for their purchases); *Stearns*, 655 F.3d at 1022-24 (defendant made uniform misrepresentation on website and decision acknowledges that if motivations for accepting website offer differed then class certification may not have been appropriate); *Keegan*, 284 F.R.D. at 531 (failing to consider whether consumer received different misrepresentations or have different motivations for purchase; notably, holding that the alleged omission could be material only if it was likely to manifest: "to show that defendants' omissions was material, plaintiffs must demonstrate that the alleged design defect is likely to manifest in premature tire wear in class vehicle of the type pled in the complaint" because "only with such proof" could a jury "find that defendants' omission was material"); *Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857, at *11, 16 (C.D. Cal. July 1, 2013) (case involved uniform information and omissions being provided to the class through product packaging, where court did not consider different motivations for purchasing product; courts denied certification of California class because of lack of evidence "demonstrating a gap between the true market price of Serum and its historical market price"); *Yamada v. Nobel Biocare Holding AG*, 275 F.R.D. 573, 578 (C.D. Cal. 2011) (defendant made identical misrepresentations and omissions to all class members regarding dental implants, and no rational class member would have purchased dental implants given that implants failed and caused bone damage). Indeed, one of plaintiffs' cases involved a class based on a defendant misrepresenting that its juice provided health benefits where the court decertified the class based on differences among consumer motivations in purchasing juice. *In re POM Wonderful LLC Mktg. & Sales Pracs. Litig.*, 2014 WL 1225184, at *4 (C.D. Cal. Mar. 25, 2014) ("where, as here, consumers buy a product for myriad reasons, damages resulting from the allegations misrepresentations will not possibly be uniform or amenable to class proof"); *see also id.* at *5-6 & nn. 6, 9.

(1) "had the omitted information been disclosed one would have been aware of it" and (2) he or she would have "behaved differently." *Mirkin*, 858 P.2d at 574; *see also Webb*, 272 F.R.D. at 502; *Sud*, 229 F. Supp. at 1083; *Hindsman v. Gen. Motors LLC*, 2018 WL 2463113, at *13 (N.D. Cal. June 1, 2018); *Myers v. BMW of N. Am., LLC*, 2016 WL 5897740, at *6 (N.D. Cal. 2016).

**d. Missouri Requires Individual Proof Of Causation For MMPA Claims And Reliance For Common Law Fraud.**

Under the MMPA, each plaintiff and putative class member must prove he or she "suffers an ascertainable loss of money or property … as a result of" a practice prohibited by the MMPA. Mo. Rev. Stat. § 407.025.1. "[C]ausation is a necessary element of an MMPA claim," as is injury. *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 922 (8th Cir. 2008); *White v. Just Born, Inc.*, 2018 WL 3748405, at *3 (W.D. Mo. Aug., 7, 2018).

"A plaintiff who 'did not care' about an allegedly misleading marketing practice … was not injured by the practice" and thus cannot show causation or injury. *Bratton Hershey Co.*, 2018 WL 934899, at *2 (W.D. Mo. Feb. 1, 2018); *see also White*, 2018 WL 3748405, at *3. In reversing certification based on Coca-Cola's concealment of saccharin in its fountain drinks, the Missouri Supreme Court held that those who would continue to drink Diet Coke "if they knew it contained saccharin … ***suffered no injury***." *State ex rel. Coca-Cola Co. v. Nixon*, 249 S.W.3d 855, 862 (Mo. 2008) (emphasis in original). Similarly, summary judgment was granted in a case alleging Old GM concealed a vehicle defect where plaintiffs did not offer "any evidence that they would not have purchased their Tahoe had GM told them of the potential defect." *Owen*, 2007 WL 1655760, at *5, *aff'd*, 533 F.3d 913; *see also Bratton*, 2018 WL 934899, at *2. As *Coca-Cola* demonstrates, Missouri courts have rejected MMPA certification because of individual issues in proving causation and injury. *See also BPA*, 2011 WL 6740338, at *1-2 (denying certification because whether class members could show they would not have bought cups if they had known

of presence of BPA was an individual issue).

Plaintiffs argue that reliance is not required under the MMPA, but ignore that individual causation and injury must be proven for each plaintiff. Pls. Memo. at 21-22. Similarly, in the cases plaintiffs cite certifying MMPA classes, the courts did not consider, and the defendants apparently did not argue, the need for individual analysis of causation and injury under the Missouri Supreme Court's *Coca-Cola* decision—which controls and governs. *Id.* at 21-22.[47] That decision is now Missouri law, and requires individual proof, plaintiff by plaintiff.

For common law fraudulent concealment, Missouri requires proof of reliance, as well as individual causation and damages—again on an individual, plaintiff-by-plaintiff basis. *Triggs v. Risinger*, 772 S.W.2d 381, 384 (Mo. Ct. App. 1989); *Prof'l Laundry Mgmt. Sys., Inc. v. Aquatic Techs., Inc.*, 109 S.W.3d 200, 206 (Mo. Ct. App. 2003). The "test of whether a plaintiff relied upon a misrepresentation is simply whether the representation was a material factor influencing final action." *Stein v. Novus Equities Co.*, 284 S.W.3d 597, 603 (Mo. Ct. App. 2009); *Grossoeheme v. Cordell*, 904 S.W.2d 392, 397 (Mo. Ct. App. 1995).

While plaintiffs claim that reliance can be presumed based on materiality, they cite only California and Second Circuit case law for that proposition. Pls. Memo. at 24-25. Not only are those cases distinguishable for the reasons described in Sections II.A.1 and II.A.II.A.2.a-b., but under Missouri law "fraud is never presumed." *Evergreen Nat'l Corp. v. Carr*, 129 S.W.3d 492, 496 (Mo. Ct. App. 2004); *Prof'l Laundry*, 109 S.W.3d at 206.

#### e. Texas Requires Individual Proof Of Causation And Reliance For DTPA Claims.

[47] To the extent *Plubell v. Merck & Co., Inc.*, can be interpreted as suggesting that causation or injury need not be proven under the MMPA, it contradicts the Missouri Supreme Court decision in *Coca-Cola* (as well as subsequent case law) and should not be followed. 289 S.W.3d 707, 714 (Mo. Ct. App. 2009).

"Generally, to prevail on a DTPA claim, a plaintiff must establish that: . . . the defendant engaged in false, misleading, deceptive, or unconscionable acts upon which the plaintiff relied to his detriment." *Moore v. Panini Am.*, 2016 WL 7163899, at *3 (Tex App. Nov. 7, 2016); *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 823-24 (Tex. 2012) (under DTPA, a "consumer loses without proof that he relied to his detriment on the deceptive act"); *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675 (Tex. 2002); *Peltier Enters. v. Hilton*, 51 S.W.3d 616, 623-24 (Tex. App. 2000) (under unconscionability prong of DTPA there "must be a showing of what the consumer could have or would have done if he had known about the information").

Reliance and causation under the DTPA cannot be presumed. *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 549 (5th Cir. 2003). The Texas Supreme Court held in a DTPA case that "the 20,000 class members in the present case are held to the same standards of proof of reliance—and for that matter all the other elements of their claims—that they would be required to meet if each sued individually." *Henry Schein*, 102 S.W.3d at 693. The defendants had made "substantially similar" misrepresentations to the class, yet the Texas Supreme Court reversed certification because common evidence regarding reliance was lacking. *Id.* at 686-87, 694. The court explained that "there is, for example, significant evidence that purchasers relied on recommendations from colleagues and others rather than any statements made directly or indirectly by Schein" in holding that individual issues of reliance predominated. *Id.* at 694.

Later Texas cases confirm that while *Henry Schein* "did not entirely preclude class actions in which reliance was an issue, ... it did make such cases a near-impossibility." *Fid. & Guar. Life Ins. Co. v. Pina*, 165 S.W.3d 416, 423 (Tex. App. 2005); *Tex. S. Rentals, Inc. v. Gomez,* 267 S.W.3d 228, 237 (Tex. App. 2008) (same). Even where a defendant made material, uniform representations, Texas courts deny certification where reliance is required. *Pina*, 165 S.W.3d at

424-25; *Ford Motor Co. v. Ocanas*, 138 S.W.3d 447, 450 (Tex. App. 2004).[48]

Under Texas law, reliance "is a thought process or one step in a larger thought process; it can be shown only by demonstrating the person's thought processes in reaching the decision." *Pina*, 165 S.W.3d at 423. Reliance cannot be proven without showing "what the consumer could have or would have done if he had known about the information." *Peltier*, 51 S.W.3d at 623-24. Texas courts regularly reject DTPA or fraud claims where plaintiffs rely on third party statements. *See Henry Schein*, 102 S.W.3d at 694; *McLaughlin v. Northstar Drillings Techs., Inc.*, 138 S.W.3d 24, 30 (Tex. App. 2004); *Bowles v. Mars, Inc.*, 2015 WL 3629717, at *4 (S.D. Tex. June 10, 2015).

**3. The Individual Factual Determinations Required For Reliance And Causation Predominate Over Any Common Issues.**

**a. Reliance And Causation Cannot Be Presumed.**

Under the facts of this case, reliance and causation cannot be presumed under federal law, California law (under *Tobacco II* or otherwise), or any other bellwether states' laws because the proposed classes did not receive uniform representations or omissions and (as described in the next subsection) vehicle purchases are based on idiosyncratic and widely varying reasons. Most plaintiffs—including Santiago Orosco, David Padilla, Deloris Hamilton, Cynthia Hawkins,

[48] Plaintiffs do not cite any Texas cases holding that reliance can be inferred, instead citing two California federal district court cases. Pls. Opp. at 23. Remarkably, *In re ConAgra Foods*, cites *Henry Schein* to conclude that reliance and causation can be proven class-wide when appropriate, even though the Texas appellate courts concluded that *Henry Schein* makes such proof a "near-impossibility." 90 F. Supp. 3d 919, 1016-17 (C.D. Cal. 2015). *ConAgra's* summary analysis does not cite any other Texas case law regarding reliance, and in particular does not cite any authority suggesting—notwithstanding cases such as *Pina* and *Ocanas*—that Texas infers reliance from materiality. *Id.*

*Brazil v. Dell Inc.*, a choice-of-law case which also struck plaintiffs' class allegations, conducted a similarly cursory review of Texas law. 585 F. Supp. 2d 1158, 1164-65 (N.D. Cal. 2008). Moreover, *Brazil* concluded that Texas and California law were similar in part because "California courts will reject a presumption of reliance where the same omission has not been communicated to each class member." *Id.* at 1165. *Brazil* thus reinforces that California would not recognize a presumption of reliance under the facts here. And neither *Brazil* nor *ConAgra* is a substitute for Texas law as applied by Texas courts.

Kenneth Robinson, Mario Stefano, Gareebah Al-ghamdi, Dawn Fuller, Michael Graciano, and Lisa McClellan—testified they did not see or did not rely on New GM advertisements or materials before buying their vehicles. Ex. D. The few who allege they did were exposed to a wide variety of materials from New GM that varied by individual plaintiff. *Id*.

Expert evidence confirms that putative class members received disparate information, if any. Surveys of GM vehicle purchasers show that 82% avoided television car commercials and 66% avoided radio car commercials. Exhibit No. 25, 2/23/18 Keller Rpt. ¶¶ 49, 52. Moreover, few New GM ads had a main theme of safety—only 2.2% of ads before the recalls had safety as a main theme, and only 16.5% included any mention of safety or safety-related features. *Id*. ¶¶ 94-95. The small portion of New GM advertisements that concerned safety varied in their messages. *Id*. ¶ 95.

Whether each putative class member (1) saw or heard any New GM representations or ad; and (2) if so, whether that representation or ad had a safety-related message, depend on individual evidence. And whether any representations influenced a purchase or lease decision depends on each plaintiff's individual facts and circumstances. With no uniform misrepresentation, reliance cannot be presumed. Likewise, *Tobacco II* does not apply as there is no "'decades-long' … advertising campaign where there was little doubt that almost every class member had been exposed to defendants' misleading statements, and defendants were not just denying the truth but representing the opposite." *Mazza*, 666 F.3d at 596. To the contrary, most named plaintiffs admitted they were not exposed to any New GM ads, let alone false or misleading ads. Ex. D.

**b. Reliance And Causation Are Individual Issues.**

Buying a vehicle is precisely the "type or degree of personal idiosyncratic choice" that precludes any presumption of reliance. *McLaughlin*, 522 F.3d at 225 n.7; *see also* Ex. 25, 2/23/18 Keller Rpt. ¶ 17. This point is magnified in this case where plaintiffs' sprawling classes involve 7

recalls, 160 different models, and millions of vehicles. Indeed, courts deny certification where defendants allegedly concealed safety defects because of individual differences in reliance or causation.[49] The law, expert evidence, and named plaintiffs' facts demonstrate individual issues as to whether New GM's alleged omissions caused each putative class member's supposed injuries or were relied upon.

#### i. Differences In Why Named Plaintiffs and Putative Class Members Purchased Their Vehicles.

"[P]urchasing or leasing a car is a complex, multifaceted decision that varies considerably from one consumer to the next." Ex. 13, 2/23/18 Hoyer Rpt. ¶ 76. New GM's expert Professor Wayne Hoyer conducted nationwide, California, and Texas surveys of owners and lessees of the at-issue vehicles (including putative class members) to ask their main reasons for buying or leasing their vehicles and the information sources they considered.[50] *Id.* ¶¶ 40-59. Safety or safety-related features were mentioned as a main reason for purchase by only 3.4% of the nationwide sample, 6.7% of the Texas sample, and 2.3% of the California sample. *Id.* ¶ 63.

---

[49] For example, the *Ford Ignition Switch* court denied certification where defective ignition switches caused smoke or fire in over 2,000 vehicles, including during driving: "plaintiffs must persuade the finder of fact that disclosure of the allegedly dangerous nature of the ignition switches would have affected the purchaser's decision whether to purchase the vehicle. Obviously, this determination could not be accurately and fairly made on a class-wide basis, especially when even under plaintiffs' version of the facts the chance of these ignition switches ever causing a fire is relatively slim." 174 F.R.D. at 346-47. *Chin* likewise held that "Plaintiffs must persuade the finder of fact that disclosure of the allegedly dangerous nature of the ABS systems would have affected the purchaser's decision whether to purchase the vehicle." 182 F.R.D. at 456. *Vioxx Class Cases* rejected plaintiffs' argument that "there can be nothing more material than an increased risk of death," finding that individual issues predominated based on consumer preferences and differences in consumers' information sources. 180 Cal. App. 4th at 133-34. *See also Mazza*, 666 F.3d at 595-96 (rejecting presumption of reliance and vacating certification in case alleging that Honda failed to disclose safety defects in its braking system); *Johnson*, 285 F.R.D. at 576, 581; *Webb*, 272 F.R.D. at 502; *Fine*, 2010 WL 3632469, at *1, 4.

[50] In contrast, plaintiffs' experts conducted no survey or other empirical study of the reasons putative class members purchased or leased their GM vehicles, and, indeed, never asked any plaintiffs or alleged class members about their purchase/lease decisions. E.g., Ex. 76, 2/7/18 Goldberg Dep. at 31-32, 44-45, 47; Ex. 59, 4/20/17 OCDA Goldberg Dep. at 104-09, 111, 23; Ex. 60, 6/26/18 Goldberg Dep. at 383-84, 398.

Moreover, owners and lessees of different brands differed in the extent to which they reported safety or safety-related features as a main purchase or lease reason. Owners of Buick and Cadillac vehicles cited safety somewhat more frequently than owners of Pontiac, GMC, or Oldsmobile vehicles. Ex. 13, 2/23/18 Hoyer Rpt. ¶ 73. In addition, the role of safety or safety-related features as a main purchase or lease reason differed depending on whether the vehicle was purchased or leased—no lessee in the nationwide sample mentioned safety or safety-related features as a reason for their lease decision. *Id.* ¶ 72.

Instead, in the nationwide sample, 59.4% of the sample mentioned "Price or Deal," 38.0% mentioned "Overall Design and Styling," and 20.5% mentioned "Gas Mileage," with various other reasons such as "Riding Comfort," "Previous Experience," "Condition," "Engine Performance," and "Dealer" all ranking above safety and safety-related features. *Id.* ¶ 61 & Ex. 1 (California and Texas samples largely tracked the nationwide sample).[51]

Even when directly asked about safety, vehicle buyers express varying opinions on its importance. In a different survey, advanced safety features were rated "very unimportant" by 16% of survey respondents, "unimportant" by another 11%, and "neither important nor unimportant" by 26%. Ex. 61, Rauschenberger Rpt. at 6.

Putative class members responding to Professor Hoyer's survey also vary widely in how they ranked the importance of the reasons they considered, including safety. Ex. 13, 2/23/18 Hoyer Rpt. ¶¶ 66-70. Other surveys demonstrate that consumers further differ in how they incorporate

---

[51] In addition to Hoyer's survey, other sources such as a 2016 JD Power survey report that consumers rely on many different reasons unrelated to safety in purchasing vehicles, such as exterior styling, previous brand model, and experience, ride and handling, price or payment, fuel economy/range, and interior comfort. Ex. 25, 2/23/18 Keller Rpt. ¶¶ 69-70. Indeed, one study of new vehicle purchasers found that half of respondents chose the type of vehicle they wanted first before considering safety. Ex. 61, 2/23/18 Rauschenberger Rpt. at 6.

safety into their decision-making process for vehicles purchases and leases. Ex. 25, 2/23/18 Keller Rpt. ¶¶ 80-86; *see also* Ex. 22, 2/23/18 Hanssens Rpt. ¶¶ 89-94.

How putative class members would react to disclosures is another individual issue. Studies establish that people have difficulty predicting how they or others will react to safety-related disclosures and consistently overestimate safety-related behavior. Ex. 61, 2/23/18 Rauschenberger Rpt. at 4. "These findings illustrate that one cannot simply assume reliance upon, or modified behavior in response to, disclosures from manufacturers." *Id.* at 4; *see also* Ex. 30, 2/23/18 List Rpt. ¶ 44; Ex. 42, 2/23/18 McFadden Rpt. ¶¶ 25-28.

These empirical findings are confirmed by the named plaintiffs, whose testimony illustrates the diversity of factors individuals consider important in buying vehicles. Chimen Basseri, David Padilla, Crystal Hardin, Ronald Robinson, Mario Stefano, Gareebah Al-ghamdi, and Lisa McClellan did not mention safety as a reason when asked why they decided to purchase their vehicles. Each of these named plaintiffs gave different reasons for their purchase, such as Padilla relying on the independent dealer salesperson's recommendation[52] or Stefano buying because he and his wife have "always enjoyed Camaros." Ex. B.[53]

---

[52] New GM cannot be held liable for statements or conduct by dealerships. *E.g.*, *Williams v. Yamaha Motor Corp., U.S.A.*, 2015 WL 13626022, at *6 & n.9 (C.D. Cal. Jan. 7, 2015); *State ex rel. Bunting v. Koehr*, 865 S.W.2d 351, 354 (Mo. 1993); *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 290 (5th Cir. 2004); *see also* New GM. Summ. J. Memo. at 42-43 & n.30.

[53] The named plaintiffs in this paragraph, and others as shown on Exhibit B, did not mention safety as a purchase reason when asked open-ended questions about why they bought their vehicles. On re-direct, plaintiffs' counsel used leading questions to have plaintiffs answer that they would not have purchased the vehicle if they had known of the alleged defects. Counsel's tactics cannot avoid that reliance and causation are individual issues. *First*, that plaintiffs' counsel asked each named plaintiff this question shows that it represents an individual issue. How every other putative class member would answer can be determined only through taking each one's testimony. *Second*, improper leading questions cannot change that when various named plaintiffs were asked why they purchased each vehicle, they did not rely on safety. *See, e.g.*, Fed. R. Evid. 611(c); *Rylott-Rooney v. Alitalita-Linee Aeree Italiane SpA*, 2009 WL 37817, at *2-3 (S.D.N.Y. Jan. 6, 2009); *Newton v. City of New York*, 640 F. Supp. 2d 426, 444-45 (S.D.N.Y. 2009). *Third*,

Of the named plaintiffs who did mention safety, some identified only a few other factors, with those factors varying among the named plaintiffs. In addition to mentioning safety, Kellie Cereceres noted she had a favorable experience previously renting a Traverse, Sylvia Benton said she was looking for a gas saver, and Brad Akers wanted a vehicle his grandmother could get into and out of easily. Ex. B at 1-2, 4. Other named plaintiffs mentioned several factors in addition to safety, such as Michelle Thomas who wanted a car that was new, spacious, with a smooth ride, for the right price, and selected a Buick LaCrosse because she had rented them in the past and her family members had positive experiences with Buicks. Ex. B at 4.

Moreover, some plaintiffs chose not to have the recall repairs performed even after they were notified of the recalls. Florida named plaintiff Harvey Sobelman has not had the repair performed on his 2014 Camaro because he "liked the [key] fob." Ex. 62, 3/29/17 H. Sobelman Dep. at 105:10-109:20. Instead, he has taken his keys off the fob and drives his Camaro without the repairs, testifying that he "wasn't concerned about" any safety risks and "didn't give it a thought."[54] *Id.* Santiago's daughter declined the recall repair on his 2010 Camaro when she brought it in for service, and the vehicle has not been repaired. Ex. 47, 3/9/2017 S. Orosco Dep. at 15:1-118:6; Ex. 56, Delano Chevrolet Buick GMC Invoice at ELPLNTFF00011445.

The record in this case, including expert evidence and the named plaintiffs' testimony, proves that the extent to which putative class members considered safety in buying a vehicle varied

---

the Second Circuit in *McLaughlin* held that asking cigarette smokers whether they would prefer a safer cigarette to a less safe one could not constitute common evidence of reliance. 522 F.3d at 225 n.6.

[54] *See also* Ex. 62, 6/2/17 R. Berg Dep. at 31:15-32:13 (Pennsylvania named plaintiff Raymond Berg did not have repair as of mid-2017, admitted there was no reason he had not had his vehicle repaired, and said "other things, like, kept that from being top priority"); Ex. 63, 5/5/17 R. Naquin Dep. at 59:6-12 (Louisiana named plaintiff Raymond Naquin did not have repair as of mid-2017 because his wife used the vehicle and would not leave it with him to have the remedy performed).

greatly. Whether each putative class member relied on an alleged safety defect non-disclosure and how that disclosure would have affected their purchase or lease decisions requires individual evidence, predominating over any alleged common issues.

**ii. Differences In The Information Putative Class Members Considered And Relied Upon.**

Owners and lessees of recalled GM vehicles also considered a wide variety of information before acquiring their new or used vehicles. Ex. 13, 2/23/18 Hoyer Rpt. ¶ 85. In a nationwide sample, 27.8% cited "Third-Party Sources" (such as Consumer Reports, newspapers, other professional reviews, as well as mechanics and current vehicle owners), 27.2% cited "Dealer Sources," and 21.3% cited "Internet" as information sources that influenced their purchase or lease decisions. *Id*. ¶ 85; *see also* Ex. 25, 2/23/18 Keller Rpt. ¶¶ 24, 28.

By contrast, only 12.7% relied on "Manufacturer Sources" such as New GM's website or its ads. Ex. 13, 2/23/18 Hoyer Rpt. ¶ 87. Similarly, only 6.7% of Texas respondents and 22.1% of California respondents considered information from New GM. *Id*. ¶ 87 & Ex. 7. These low percentages are consistent with research showing that a substantial majority of consumers are generally skeptical of manufacturers' advertising. Ex. 61, 2/23/18 Rauschenberger Rpt. at 8.

As with the different reasons for their vehicle purchases, individual consumers varied in how influential each information source was. Ex. 13, 2/23/18 Hoyer Rpt. ¶¶ 90-91. "[P]utative class members generally considered multiple and many different information sources influential when making their purchase or lease decisions, and … the importance putative class members assigned to each of those information sources varied from individual to individual." *Id*. ¶ 93; *see also* Ex. C.

Named plaintiffs and putative class members that were influenced by sources other than New GM cannot show reliance or causation. The bellwether states hold that plaintiffs who relied

on other sources such as dealer representatives, friends, or family cannot prove causation or reliance. *See* pages 62, 67. Determining whether each class member considered information from New GM versus other sources can be determined only through individual fact inquiries.

Individual differences in the information putative class members considered, if any, is especially important for California, which requires proof that "had the omitted information been disclosed one would have been aware of it." Section II.A.2.c. As shown by Professor Hoyer's survey, the majority of putative class members (as well as many named plaintiffs, *see* Ex. C) did not consider New GM information and hence would have been unlikely to learn of any safety defect disclosures. This applies with even greater force for used vehicle purchasers (72% of putative class members) who purchased from non-New GM-affiliated dealerships. *See Butler v. Porsche Cars N. Am., Inc.*, 2017 WL 1398316, at *11 (N.D. Cal. Apr. 19, 2017) (noting that "a class member who purchased a used Class Vehicle from a third party may not have interacted with a Porsche representative *at all* prior to purchase, and indeed may not have viewed *any* material or advertisements from Porsche") (emphases in original); *Hindsman*, 2018 WL 2463113, at *13; Ex. 14.E, 5/7/18 Willig Rpt., App'x B, Table 9. Whether each putative class member would have been aware of any New GM disclosures requires an individual fact inquiry.

#### iii. The Lack Of Market Shifts After The Recall Announcements Is "Compelling Evidence" That Vehicle Owners Cannot Prove Reliance Or Causation.

Under Second Circuit precedent, the lack of any class-wide shifts in the recalled vehicles' prices or shift in their market shares confirms that most putative class members' purchase decisions would not have been affected if the recall conditions had been disclosed earlier. In *McLaughlin*, an institute published Monograph 13 disclosing that Light cigarettes were not safer than regular ones, leading to the *McLaughlin* plaintiffs' suit. *Id.* at 220-21. In reversing certification because causation and reliance were individual issues, *McLaughlin* relied on Monograph 13's lack of effect

on Lights' price or market share:

> [E]ach plaintiff in this case could have elected to purchase light cigarettes for any number of reasons, including a preference for the taste and a feeling that smoking Lights was "cool." Indeed, the fact that the market did not shift away from light cigarettes after the publication of Monograph 13 is compelling evidence that plaintiffs had other, non-health-related reasons for purchasing Lights.

*Id.* at 226; *see also id.* at 227 ("Given the lack of an appreciable drop in demand or price of light cigarettes after the truth about Lights was revealed in Monograph 13, plaintiffs' argument that defendants' misrepresentation caused the market to shift and the price of Lights to be inflated fails as a matter of law.").

As in *McLaughlin*, New GM's 2014 recalls did not have a class-wide effect on the prices of recalled vehicle or cause the markets to shift away from the recalled vehicles. *See* Background Section D and Section I.A.1. Under *McLaughlin*, this is "compelling evidence" that putative class members' purchase decisions would not have been affected by earlier disclosure of the recall conditions, and thus plaintiffs cannot prove reliance or causation on a class-wide basis.

**4. No Misrepresentation Claims Can Be Certified.**

Although the 5ACC alleges misrepresentations for consumer protection claims, plaintiffs do not appear to seek certification based on misrepresentations. Pls. Memo. at 18, 22, 24. No such claims could ever be certified. *E.g.*, *Moore*, 306 F.3d at 1255; *Mazza*, 666 F.3d at 595-96.

*First*, plaintiffs must have seen or heard the alleged misrepresentation at issue. *E.g.*, *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1363 (2010); *Solano v. Landamerica Commonwealth Title of Fort Worth, Inc.*, 2008 WL 5115294, at *9-10 (Tex. App. Dec. 4, 2008); *Williams v. HSBC Bank USA, N.A.*, 467 S.W.3d 836, 845 (Mo. Ct. App. 2015); *see also* New GM Summ. J. Memo. at 40-41 & nn. 27-29. Many named plaintiffs did not see any New GM ads or other materials before buying their vehicles, or cannot remember what the ads said or even if they were from New GM. *See* Ex. D. No uniform misrepresentations were made to all consumers, and neither reliance

nor causation can be shown class-wide.

*Second*, whether plaintiffs believed the statements they saw or heard were false or misleading is an individual issue. Some named plaintiffs who recalled seeing New GM ads admitted that the statements were not false, untrue, or misleading. Ex. D; New GM Summ. J. Memo. at 42. Claims cannot be based on statements that are not false or misleading. *E.g.*, *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1360-62 (2d Dist. 2003); *Sims v. Kia Motors Am., Inc.*, 2014 WL 12558249, at *1, 7 (C.D. Cal. Mar. 31, 2014).

*Third*, whether plaintiffs relied on any New GM statements or whether such statements caused injury is an individual issue. Various named plaintiffs denied relying on any New GM advertising. Ex. D. For example, David Padilla testified that "[n]obody tells me which [car] to buy. I make my own choice." Ex. 64, 2/17/17 D. Padilla Dep. at 27:1-2. Surveys of owners and lessees of recalled GM vehicles show that 87% nationwide, 93.3% in Texas, and 77.9% in California did not identify New GM advertisements as influencing their purchase or lease decisions. Ex. 13, 2/23/18 Hoyer Rpt. ¶ 24.

*Fourth*, whether a statement is actionable presents another individual question. Statements that are puffery are not actionable as a matter of law. *See Echostar*, 113 Cal. App. 4th at 1353; *Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 462 (Tex. App. 1990); *Williams v. United Techs. Corp.*, 2015 WL 7738370, at *8 (W.D. Mo. Nov. 30, 2015); *see also* New GM Summ. J. Memo. at 43-46. Statements that are true also are not actionable. *See Echostar*, 113 Cal. App. 4th at 1360; *Sims*, 2014 WL 12558249, at *7.

### B. Individual Differences In New GM's Knowledge Predominate Over Any Common Issues.

#### 1. Plaintiffs' Claims Depend on New GM's Knowledge Over Time.

Other than for the pre-MY2008 Delta Ignition Switch recalls, New GM did not have

sufficient knowledge of safety defects to recall the other vehicles before the 2014 recalls. New GM's knowledge of the alleged safety defects is an essential element of plaintiffs' consumer protection and common law fraud claims. One critical series of questions for trial, therefore, is what did New GM know about each of the other recall conditions when putative class members acquired their vehicles at various points in time from July 10, 2009 until the recalls were announced in 2014. The record evidence demonstrates that New GM's knowledge of dynamic field conditions evolved and changed over time for each recall and included many different vehicle models, rendering uncommon the issues for which plaintiffs broadly seek certification.

California requires proof of defendant's knowledge for UCL, CLRA, and common law fraud claims. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145 (9th Cir. 2012); *In re Ford Tailgate Litig.*, 2015 WL 7571772, at *10-11 (N.D. Cal. Nov. 25, 2015).[55] Texas likewise requires proof of a defendant's knowledge for DTPA claims. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995); *Washburn v. Sterling McCall Ford*, 521 S.W.3d 871, 876 (Tex. App. 2017).

Missouri also requires proof of defendant's knowledge for MMPA claims based on omission of a material fact. *TACC MTD Opinion*, at *33; Pls. Memo. at 22; *see also Hope v. Nissan N. Am.*, 353 S.W.3d 68, 85 (Mo. Ct. App. 2011); *Budach v. NIBCO, Inc.*, 2015 WL 6870145, at *5 (W.D. Mo. Nov. 6, 2015). While plaintiffs argue that the defendant's knowledge is not required for claims based on "concealment" or "suppression," Pls. Memo. at 22, those claims require the defendant to make actionable representations to the public. In *Hope*, the defendant

[55] *See also Resnick v. Hyundai Motor Am., Inc.*, 2016 WL 9455016, at *12 (C.D. Cal. Nov. 14, 2016); *Klein v. Earth Elements*, 59 Cal. App. 4th 965, 968-70 (1st Dist. 1997); *Mathison v. Bumbo*, 2008 WL 8797937, at *12 (C.D. Cal. Aug. 18, 2008); *Conroy v. Regents of Univ. of Cal.*, 203 P.3d 1127, 1136 (Cal. 2009).

affirmatively represented that its vehicles were "luxury vehicles." 353 S.W.3d at 84. In *Plubell v. Merck & Co., Inc.*, the defendant denied the results of an industry-sponsored study showing that its drug Vioxx increased the risk of hypertension and stroke. 289 S.W.3d 707, 711 (Mo. Ct. App. 2009). Plaintiffs do not rely on any such affirmative misrepresentations here, and doing so would create additional individual issues. *See* Section II.A.4.

Given that consumer protection and common law fraud claims depend on what the defendant knew at the time of sale, differences in a defendant's knowledge over time create differences in what each individual plaintiff could prove about a defendant's knowledge when that plaintiff bought the product. An owner who purchased a vehicle at the end of 2013 would be able to rely on evidence of New GM's knowledge in 2010 to 2013, while an owner who purchased at the end of 2009 would not.

Accordingly, courts deny certification in vehicle and other product defect cases where the defendant's knowledge varied over time. *E.g.*, *Sanneman*, 191 F.R.D. at 453 ("Because knowing concealment is a required element of Plaintiff's fraud claims, Defendant's knowledge would have to be determined for each time period at issue. Clearly, Defendant's knowledge would not be class-wide."); *Ford Vehicle Paint*, 182 F.R.D. at 220 ("[T]here is evidence that Ford's state of knowledge was not uniform over the period in issue and that certain of its alleged 'concealing' activities occurred in 1992, which could not have affected plaintiffs' purchasing 1990 model-year vehicles. When defendant's conduct means different things for different class members, trying the issue of its liability for that conduct on an aggregated basis is problematic.").

In *Ford Motor Co. v. Sheldon*, plaintiffs alleged that paint peeled in various MY 1984-1993 Ford vehicles. 113 S.W.3d 839, 843 (Tex. App. 2003). *Sheldon* held that the defendant's knowledge "will involve individual determinations":

> The evidence might show that Ford had knowledge of a paint defect on a certain date and not before. This finding would prohibit recovery of damages for vehicles that were painted before this date. The evidence might also show that Ford became aware of a paint-peeling problem on some models and not others, or became aware of a paint-peeling problem at different times for different models.

*Id.* at 849 ("Because of the fluid nature of when and if Ford had knowledge of the alleged defect, resolving that issue will depend on individual considerations and proof, further evidence that this action is unsuitable for class treatment.").

Similarly, in considering MMPA claims involving bubbling defects on dashboards, *Hope* explained that "Nissan contends that because it has been determined that Nissan had different levels of knowledge regarding the bubbling issue over the class period as defined, no class-wide proof exists over the entire class for all class members. This is a pertinent observation." 353 S.W.3d at 84-85. Many consumers would not be able to recover "because they purchased their vehicles from Nissan before Nissan had knowledge of the bubbling defect."[56] *Id.*; *BPA*, 2011 WL 6740338, at *5 ("Class-wide evidence cannot be used to show what Defendants knew or should have known because their knowledge and the available information about BPA changed during the class period."). These principles apply with even more force here as plaintiff seek to certify classes involving not just one recall condition, but seven different ones.

### 2. New GM's Knowledge Varied Across Recalls And Over Time.

New GM's knowledge of field conditions and issues differed across vehicle lines and varied over time:

**Service Parts Recall:** MY 2008 and later vehicles in Recall No. 14v047 (the "Service Part Vehicles") were manufactured with a non-defective switch that differed from the earlier,

[56] While *Hope* suggested that the class could be split into sub-classes based on differences in Nissan's knowledge, or that members could be excluded from the class, 353 S.W.3d at 85, this approach of "certify now, worry later" is impermissible in federal court. *See* pages at 14-16.

faulty switch. The Court previously held that Service Parts Vehicles "were not manufactured with the faulty ignition switch, but which could have been repaired at some point using the faulty ignition switch. Accordingly, if they [Service Parts Vehicle plaintiffs] are ultimately to succeed on their claims with respect to the ignition switch, they will have to show that their cars in fact contained that defect." *TACC MTD Opinion*, 2016 WL 3920353, at *20 n.15. Whether each putative Service Parts Vehicle class member had his or her ignition switch replaced, and if so, whether it was replaced with a faulty switch, is an individual issue on which their claims depend, thus predominating over any common issues.

Plaintiffs contend that the Service Parts Vehicles are defective regardless of whether the switch was replaced. Pls. Offer of Proof ¶ 14. Not only does this argument contradict the Court's *TACC MTD* Opinion, it also creates numerous individualized issues. Plaintiffs allege that the Delta Ignition Switch recall involves two defects: a low-torque defect and a knee-key defect. *Id.* ¶¶ 7, 20, 23. With respect to plaintiffs' alleged low-torque defect, the torque of the ignition switch increased starting in MY 2008 vehicles, creating a significant difference with the MY 2007 and earlier vehicles. Pls. Offer of Proof ¶ 13; Ex. 4, 11/10/17 Stevick Rpt. at 23. Further, the key design for these vehicles was modified in 2010, altering the dynamics with respect to inadvertent rotation that may be caused by any low-torque switch. Pls. Offer of Proof ¶ 13. As to plaintiffs' alleged knee-key defect, plaintiffs' technical expert admits that "there is a difference from vehicle to vehicle regarding how susceptible it is to key rotation from knee-key interaction." Ex. 65, 11/24/15 Stevick Dep. at 574:5-9. Plaintiffs' knee-key defect claim relies on details as minute as how far each driver adjusts the seat forward or backward in their vehicle. Pls. Offer of Proof ¶ 27. VTTI, an independent automotive engineering organization, detailed the numerous highly specific factors that must be taken into account when evaluating the potential for inadvertent knee-key

rotation. Ex. 3, VTTI Rpt. at 581-592. Thus, evidence of New GM's knowledge regarding the alleged knee-key defect varies not only by vehicle but also depends on what drivers reported.

**Impala Recall:** Plaintiffs allege that the Impala recall involves two defects: a low-torque defect and a knee-key defect. For the alleged low-torque defect, in 2007 a smaller key ring was introduced for Cadillac vehicles, and was used with the MY2006-2011 Cadillac DTS vehicles subject to the Impala recall. Ex. 66, GM-MDL2543-301838317. This smaller key ring would alter the dynamics with respect to inadvertent rotation that may be caused by any low-torque switch, creating different evidence regarding whether and when New GM learned of the recall condition in the Cadillac DTS vehicles. For the alleged knee-key defect, vehicles vary on how susceptible they are to rotation from knee-key interaction (Ex. 65, 11/24/15 Stevick Dep. at 574:5-9), again showing that New GM's purported knowledge of this alleged defect varied vehicle by vehicle. *See also* Ex. 3, VTTI Rpt. at 581-592.

**Malibu Recall:** Plaintiffs allege that the Malibu recall involves a single defect: a low-torque defect. However, the alleged defect involved in the Malibu recall involved four different ignition switches, all with different torque specifications. Ex. 67, 2/23/2017 B. Thompson Dep. at 42:23-43:15. Even assuming the ignition switch torque is the relevant measurement (which New GM disputes), MY2004-2008 Pontiac Grand Prix vehicles contained an ignition switch with a torque specification of 13-22 N-cm, whereas MY2003-2003 Grand Am, MY2002-2003 Oldsmobile Aleros, and MY2002-2003 Chevrolet Malibus contained an ignition switch with a torque specification of 10-19 N-cm. *Id.* at 56:17-21; 58:19-59:5. These differences create individual issues regarding New GM's knowledge for each of the four different ignition switches, especially given the torque specification differences.

**CTS Recall:** Plaintiffs allege that the CTS recall involves two defects: a low-torque defect

and a knee-key defect. For the alleged low-torque defect, plaintiffs admit that MY2008 and later Cadillac CTS vehicles had a different switch than prior ones. Pls. Offer of Proof ¶ 56. And the key system was redesigned in January 2010 and thereafter used in Cadillac CTS vehicles from December 2010 through MY2014 Cadillac CTS vehicles. *Id.* ¶ 57. For the alleged knee-key defect, vehicles vary on how susceptible they are to rotation from knee-key interaction. Ex. 65, 11/24/15 Stevick Dep. at 574:5-9; *see also* Ex. 3, VTTI Rpt. at 581-592. In addition, New GM conducted an investigation from 2012 to 2013 related to the potential for inadvertent rotation in Cadillac CTS vehicles, resulting in New GM having different knowledge at different points in time. *E.g.* Ex. 6, GM-MDL2543-401952506 (March 2010 email regarding customer complaints); Ex. 7, GM-MDL2543-401964941 (investigation related to stalling opened in April 2012); Ex. 8, 12/2/15 A. Hendricks Dep. Tr. at 103-119 (detailing the different steps taking in 2012 to investigate issues related to stalling); Ex. 9, GM-MDL2543-401961908 at 920 (evaluating the data as it existed in Spring 2012); *id.* at 926 (closing the investigation in November 2013).

**Camaro Recall**: Plaintiffs allege that the Camaro recall involves one defect: a knee-key defect. But all parties agree that a knee-key defect allegation depends on numerous factors that change on a vehicle-by-vehicle and individual-by-individual basis, *e.g.* the cabin configuration, the seat configuration, and the height and weight of the driver. Ex. 65, 11/24/15 Stevick Dep. at 574:5-9; Ex. 3, VTTI Rpt at 581-592. Plaintiffs also ignore that there is no evidence that New GM had knowledge of the alleged defect at issue in the Camaro Recall prior to 2014. Indeed, plaintiffs' Offer of Proof relies solely on a limited number of NHTSA complaints, vehicle owner questionnaires (VOQs), and customer complaints that do not mention key rotation at all, let alone identify a potential knee-key defect. Pls. Offer of Proof ¶¶ 79-80; *see* Dkt. 4065 at 15 (excluding NHTSA complaints as providing notice of a defect). Plaintiffs' proffer proves the point: New

GM's knowledge necessarily varied as each complaint was received, and thus creates important individual issues about New GM's knowledge of the defect in the Camaro recall.

**EPS Assist Recall:** Plaintiffs rely on various actions taken by New GM between 2010 and 2012, and correspondence between New GM and NHTSA in 2010 to allege New GM had knowledge of the issue that led to the EPS Assist recall. Pls. Offer of Proof ¶¶ 105-109. These differences in New GM's knowledge are exacerbated by the EPS Assist recall involving vehicles from two different platforms (Epsilon and Delta) with two different problems (torque sensor and EPS motor) and two different recall remedies (torque sensor replacement or motor replacement). Ex. 5, 2/23/18 Hakim Rpt. at 4. And, even within the two different systems involved in the EPS Assist recall, there were different root causes with different fixes. *Id.* at 4-5 (identifying three different root causes in the Epsilon EPS system); *id.* at 5 (identifying an entirely different root cause in the Delta EPS system).

**SIAB Recall**: The vehicles involved in the SIAB recall have two different connectors: a JST connector for MY2008-2011 vehicles and a Tyco connector for MY2011-2013 vehicles. Ex. 68, 2/23/18 Churchwell Rpt. at 6. Not only were the connectors different, the root issue was also different and unrelated: JST connectors experienced higher than expected corrosion due to moisture or seat movement, whereas the Tyco connectors had crimps and voids in the connector terminals. *Id.* at 7. There were different potential remedies: the MY2008-2011 was remedied through Customer Satisfaction Campaign 10085, which involved a different remedy than the remedy for the SIAB recall. *Id.* at 12-13. New GM monitored warranty data during 2012-2014 and initiated numerous different investigations, including one of the MY2011-2013 vehicles that was separate from the investigation of the MY2008-2011 vehicles. *Id.* The ongoing investigations create differences as to New GM's knowledge for different vehicles over different time periods

and thus render class certification inappropriate. *E.g.*, *Sheldon*, 113 S.W.3d at 849.

### C. Whether Each Putative Class Member Purchased An Old GM Or New GM Vehicle Is An Important Individual Fact Difference.

Whether each plaintiff purchased an Old GM or New GM vehicle is dispositive for their consumer protection and fraudulent concealment claims. As explained in New GM's Summary Judgment Memorandum, New GM does not have a duty to disclose, under the different state laws at issue, to Old GM vehicle purchasers, with whom it had no transactions. *E.g.*, *LiMandri v. Judkins*, 60 Cal. Rptr. 2d 539, 543 (Cal. Ct. App. 1997); *Bohac v. Walsh*, 223 S.W.3d 858, 865 (Mo. Ct. App. 2007); *Myre v. Meletio*, 307 S.W.3d 839, 844 (Tex. App. 2010); New GM Summ. J. Memo. at 56-59. California and Texas also hold that an asset purchaser (such as New GM) does not have a duty to warn the customers of an asset seller (such as Old GM) of alleged defects. *E.g.*, *Burroughs v. Precision Airmotive Corp.*, 93 Cal. Rptr. 2d 124, 136 (Cal. App. Ct. 2000); *Jones v. SIG Arms, Inc.*, 2001 WL 1617187, at *3-4 (Tex. App. Dec. 19, 2001); New GM Summ. J. Memo. at 59-61. Without both a duty to disclose and a duty to warn, a plaintiff cannot maintain consumer protection claims based on omissions or fraudulent concealment claims. *TACC MTD Opinion*, 2016 WL 3920353, at *20-22; *Terry v. Mercedes-Benz, USA, LLC*, 2007 WL 2045231, at *5 (Tex. App. July 18, 2007); *DePeralta v. Dlorah, Inc.*, 2012 WL 4092191, at *7 (W.D. Mo. Sept. 17, 2012); New GM Summ. J. Memo. at 56-59. The Court and parties will need to determine for each putative class member which company manufactured his or her vehicle, an individual issue.

Similarly, used vehicle purchasers cannot bring a Song-Beverly Act claim. Pls. Memo. at 8 n.4; New GM Summ. J. Memo. at 62. Indeed, plaintiffs seek separate classes consisting only of those who purchased new vehicles for their SBA claims. Pls. Mot. at 2-5. As explained in Section I.D., regardless of how plaintiffs have defined the class, examining whether each plaintiff bought their vehicle new or used is another individual issue.

**D. Plaintiffs Cannot Demonstrate Commonality, Much Less That Common Issues Predominate, For Their Song-Beverly Act Claims.**

Breach of implied warranty under the SBA requires proof that the vehicle is not "merchantable." *TACC MTD Opinion*, 2016 WL 3920353, at *23. "Merchantable" under the SBA has the same meaning as under the Uniform Commercial Code ("UCC"). *See Am. Suzuki Motor Corp., v. Superior Court*, 44 Cal. Rptr. 2d 526, 528 n.2 (Cal. App. Ct. 1995). "Merchantability" is an individual issue, not a common one, for two reasons.

*First*, courts in California and elsewhere "have consistently held that an automobile that was driven for years without problems was merchantable and fit for its ordinary use at the time of sale." *Szymczak v. Nissan N. Am., Inc.*, 2011 WL 7095432, at *11 (S.D.N.Y. Dec. 16, 2011); *see also Skeen v. BMW of N. Am., LLC*, 2014 WL 283628, at *16 (D.N.J. Jan. 24, 2014).

This rule applies where plaintiffs allege that the vehicle has a latent, safety-related defect. In *American Suzuki*, plaintiffs alleged that the Suzuki Samurai had "an unacceptable risk of a deadly roll-over accident." 44 Cal. Rptr. 2d at 528. But because "the vast majority of the Samurais sold to the putative class did what they were supposed to do for as long as they were supposed to do it, we conclude that these vehicles remained fit for their ordinary purpose." *Id.* at 531. California courts have rejected SBA claims where "Plaintiffs' car operated for four years without apparent problem, easily satisfying any implied warranty that might attach as a matter of law." *Larsen v. Nissan N. Am.*, 2009 WL 1766797, at *6 (Cal. Ct. App. June 23, 2009); *see also Avedisian v. Mercedes-Benz USA, LLC*, 43 F. Supp. 3d 1071, 1079 (C.D. Cal. 2014) (vehicle was merchantable where plaintiff drove it for approximately 4.5 years and 65,000 miles, despite peeling chrome cutting plaintiffs' hands).

Thus, whether a plaintiff can prove that a vehicle was not merchantable under the SBA depends on individual facts such as (1) how many miles the plaintiff has driven the vehicle, (2)

how many years the plaintiff has driven the vehicle, (3) whether the plaintiff has had any incident caused by a recall condition, (4) how many problems a plaintiff has had caused by the recall condition, and (5) how many miles and years were on the vehicle when each alleged problem occurred. In this case, facts vary widely among plaintiffs and individual class members. Some vehicle owners—such as named plaintiffs Brad Akers and Patrice Witherspoon—have driven their vehicles nearly 200,000 miles without any evidence of incidents or issues caused by the recall conditions. Ex. A. Other vehicle owners might allege they experienced multiple incidents shortly after purchasing the vehicle. Determining these facts, and thus whether each vehicle is merchantable, cannot be done through common evidence.

California courts have denied class certification because of the individual fact issues required to assess and determine merchantability. In *American Honda Motor Co. v. Superior Court*, the plaintiff sought to certify a class of Acura owners because of a latent defect where the vehicles would "pop out" of third gear while the vehicle was running. 199 Cal. App. 4th 1367, 1369 (2011). No class could be certified because of differences among vehicles, particularly that "at least some, if not most, of the affected vehicles sold in 2002 to 2004 were outside of the four-year, 50,000-mile warranty period by the time Lee filed suit in 2008 and had not reported any third gear problems." *Id.* at 1377; *see also Torres v. Nissan N. Am. Inc.*, 2015 WL 5170539, at *4-5 (C.D. Cal. Sept. 1, 2015). This Court should reach the same conclusion.

*Second*, "in the case of automobiles, the implied warranty of merchantability can be breached only if the vehicle manifests a defect that is so basic it renders the vehicle unfit for its ordinary purpose of providing transportation." *Am. Suzuki*, 44 Cal. Rptr. at 529. Accordingly, implied warranty claims have been dismissed where the plaintiff continued to drive the vehicle after it malfunctioned. In *Beck v. FCA US LLC,* the plaintiff brought SBA and other claims

alleging that certain Dodge models had a defective gearshift system indicating that vehicles were in "park" when they were not, presenting a safety hazard because the vehicles could roll away. 273 F. Supp. 3d 735, 741, 744 (E.D. Mich. 2017). Even though the plaintiff had experienced a rollaway incident, "as FCA correctly points out, there is no indication in the complaint that, despite the safety concerns, he has actually stopped driving his vehicle. The lack of such an allegation warrants dismissal of his implied warranty claims." *Id.* at 762; *Beck v. FCA US LLC*, 2018 WL 3359100, at *2 (E.D. Mich. July 10, 2018) (denying motion to reconsider dismissal of implied warranty claims because "in those cases cited by the Court, the continued use of the vehicle was clearly the predominant factor considered"); *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 980 (C.D. Cal. 2014) (dismissing implied warranty claim because "Plaintiffs have not alleged that they stopped using their vehicles"); *see also Kent v. Hewlett–Packard Co.*, 2010 WL 2681767, at *4 (N.D. Cal. July 6, 2010). Whether each plaintiff stopped driving his or her vehicle after learning of a recall is another individual issue.

**E. Individual Issues Predominate For Texas DTPA Unconscionability Claims.**

Plaintiffs' attempt to certify a Texas DTPA unconscionability class, Pls. Memo. at 23-24, is likewise unavailing. This claim presents individual issues regarding each vehicle owner's sophistication and experience. The DTPA's unconscionability prong requires proof that the defendant took "advantage of the [plaintiff's] lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code § 17.45(5); *see also Peltier*, 51 S.W.3d at 623.

The "unconscionable-act-or-course-of-action element of a DTPA section 17.50 unconscionability claim requires proof of each consumer's knowledge, ability, experience, or capacity." *Lon Smith & Assocs., Inc. v. Key*, 527 S.W.3d 604, 624 (Tex. App. 2017). "Because the unconscionable-act-or-course-of-action element of a DTPA section 17.50 unconscionability

claim requires proof of each consumer's knowledge, ability, experience, or capacity, courts generally refuse to certify DTPA unconscionability claims for class treatment." *Id.* (collecting cases). In a case alleging that vehicle dealerships received undisclosed kickbacks from banks, the Texas appellate court denied certification of a DTPA unconscionability claim because "there would need to be some showing of each customer's 'knowledge, ability, experience, or capacity.' A plaintiff with knowledge about indirect lending or with years of experience in the car-selling business would not be able to show that Peltier did anything that was 'unconscionable.'" *Peltier*, 51 S.W.3d at 624.

*Diais v. Land Rover Dallas, L.P.*, a non-class case, illustrates how unconscionability is an individual fact inquiry. 2016 WL 1298392 (Tex. App. Apr. 4, 2016). In *Diais*, the plaintiff bought a vehicle with a defective engine that would cause the vehicle not to move, make knocking noises, and not accelerate over 30 miles per hour. *Id.* at *1-2. When the dealership would not refund his purchase price, the plaintiff sued alleging DTPA unconscionability. *Id.* at *2. The Texas appellate court rejected this claim based on plaintiff being a "sophisticated businessman" who had negotiated and purchased several new cars in the past and had talked with family members in the car business about the vehicle. *Id.* at *5.

In this case, unconscionability would turn on factors specific to the experiences and sophistication of each vehicle owner. These include (1) the person's experience in buying vehicles; (2) whether they consulted family or friends in the automobile business; (3) their overall sophistication, including their work history; (4) their experience concerning defects and recalls for previously owned vehicles; and (5) the extent they were aware that vehicles could be recalled. *See also* New GM Summ. J. Memo. at 65-66. As in *Peltier* and *Lon Smith*, these individual inquiries predominate over any alleged common issues.

### F. Individual Issues Predominate For The Bankruptcy-Claim-Fraud Counts.

Individual issues predominate for the California and Missouri Bankruptcy-Claim-Fraud counts. *First*, a plaintiff can recover on a bankruptcy claim only if they have a meritorious underlying action against the debtor. *See* 11 U.S.C. § 502(b)(1); *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450 (2007); *In re Chateaugay Corp.*, 53 F.3d 478, 497 (2d Cir. 1995). Whether each putative Bankruptcy-Claim-Fraud class member could recover on a bankruptcy claim against Old GM depends on whether they could state an underlying claim against Old GM between by November 30, 2009 (the deadline for filing a bankruptcy claim against Old GM), such as for consumer protection or fraudulent concealment. For the reasons explained in the preceding Sections, whether the putative Bankruptcy-Claim-Fraud class members had a meritorious claim against Old GM is an individual fact inquiry. Whether each vehicle consumer can prove injury and damages, reliance and causation, Old GM's knowledge at the time the consumer purchased the vehicle, or that their vehicle was not merchantable (for SBA claims) can be determined only by examining the evidence for each particular consumer, predominating over any alleged common issues.

*Second*, the Bankruptcy-Claim-Fraud plaintiffs' counts are based on fraudulent concealment, which raises its own set of individual fact issues. Fraudulent concealment requires proof of reliance and causation. Reliance cannot be presumed because the Bankruptcy-Claim-Fraud plaintiffs were not exposed to any uniform misrepresentation by New GM. *See* Section II.A.3.a. Whether putative class members even knew that Old GM had filed for Chapter 11 such that they could have filed claims is an individual issue. If from July 10 to November 30, 2009 a vehicle owner had not known that Old GM had filed for Chapter 11, he or she would not have known to file a bankruptcy claim, regardless of whether New GM disclosed the recall conditions in Old GM vehicles. Named plaintiffs Patricia Barker and Esperanza Ramirez were not even aware

that Old GM had filed for Chapter 11 in 2009. Ex. 69, 2/27/17 P. Barker Dep. at 230:4-9; Ex. 70, 3/03/17 E. Ramirez Dep. at 188:8-22.

A separate individual issue is whether putative class members knew during July 10 to November 30, 2009 that they could file claims in Old GM's bankruptcy. If putative class members lacked such knowledge, New GM's non-disclosure could not have injured them, as such class members would not have filed claims even if they received disclosures.

Finally, even if a putative class member during the period July 10 to November 30, 2009 knew that Old GM had filed for Chapter 11, and knew that they could file a claim in the bankruptcy, individuals may have chosen not to file a claim if the recall conditions had been disclosed. Filing a claim would have required the individual to to timely file a proof of claim against Old GM in anticipation of receiving a speculative recovery in the future that may be only a fraction of the asserted claim amount. If an individual would not have filed a claim against Old GM even if New GM had disclosed the recall conditions during July 10 to November 30, 2009, then the nondisclosure could not have caused the individual any damages. Thus, whether each putative class member can produce evidence that they knew of Old GM's Chapter 11 proceeding, knew they could file a claim, and actually would have filed a claim are all individual issues predominating over any common questions.

## III. NAMED PLAINTIFFS ARE NEITHER TYPICAL NOR ADEQUATE CLASS REPRESENTATIVES.

"Typicality requires that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016); *see generally Rapcinsky v. Skinnygirl Cocktails, L.L.C.*, 2013 WL 93636, at *5-6 (S.D.N.Y. Jan. 9, 2013). A "class representative must be part of the class and possess the same interest and suffer the same injury as

the class members." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982).

### A. Named Plaintiffs Do Not Have Legally Viable Or Typical Claims.

If a named plaintiff cannot state a claim against the defendant, then he or she cannot have typical claims and or be a class representative. *E.g.*, *East Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403-04 (1977); *Smook v. Minnehaha Cty.*, 457 F.3d 806, 814 (8th Cir. 2006); *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973); *Salgado v. Piedmont Capital Corp.*, 534 F. Supp. 938, 953 (D.P.R. 1981).

As explained in New GM's Motion for Summary Judgment, each named plaintiff's claims fail for multiple reasons. Without a representative, no class can be certified. Even if the Court partially grants New GM summary judgment as to certain claims, such an outcome would further confirm the lack of typicality and predominance by illustrating that the viability of an individual claim turns on unique facts or different laws.

Independently, the facts establishing a lack of predominance demonstrate that "no claim is typical of another in the sense of providing common answers, and leaves the 'class' no more than a diverse and unmanageable aggregation of individual claims, better dealt with separately." *Football Ass'n Premier League Ltd. v. YouTube, Inc.*, 297 F.R.D. 64, 68 (S.D.N.Y. 2013); *see also Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006); *Romberio v. UnumProvident Corp.*, 385 F. App'x 423, 431 (6th Cir. Jan. 12, 2009).

### B. Various Named Plaintiffs Are Subject To Unique Defenses.

"[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990). "In assessing the typicality of the plaintiff's claims, the court must pay special attention to unique defenses that are not shared

by the class representatives and members of the class." *Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307, 316 (S.D.N.Y. 2003). If a plaintiff's "problems could become the focus of cross-examination and unique defenses at trial," then he or she is not an appropriate class representative. *In re NYSE Specialists Secs. Litig.*, 240 F.R.D. 128, 144 (S.D.N.Y. 2007); *see also Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998); *Kline v. Wolf*, 702 F.2d 400, 402-03 (2d Cir. 1983). "[T]he defendant need not show at the certification stage that [a] unique defense will prevail, only that it is meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense." *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 97 (S.D.N.Y. 2017).

**1. Named Plaintiffs With Direct Claims Are Atypical.**

Various named plaintiffs are subject to unique defenses or have claims that are otherwise not typical of their putative class. *First*, Kenneth Robinson, Christopher Tinen, and Lisa McClellan each disposed of their vehicles before the recalls and thus do not have any benefit-of-the-bargain-damages. *FACC MTD Opinion*, 257 F. Supp. 3d at 403; *see also In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 3443623, at *2 (S.D.N.Y. August 9, 2017); New GM Summ. J. Memo. at 26-27. These three named plaintiffs are not typical because they will have an incentive to avoid benefit-of-the-bargain damages and instead develop alternate damages theories to save their claims. *See Falcon v. Philips Elecs. N. Am. Corp.*, 304 F. App'x 896, 897 (2d Cir. Nov. 5, 2008); *McKernan v. United Techs. Corp.*, 120 F.R.D. 452, 454 (S.D.N.Y. 1998).

*Second*, four Texas named plaintiffs are subject to the unique defense that they cannot show a manifest defect, an essential element of their DTPA claims:

- Dawn Fuller does not claim that her 2008 Impala experienced any kind of stall or other manifestation. Ex. 15, 11/20/17 D. Fuller Dep. at 74:5-10.
- Gareebah Al-ghamdi testified that she experienced stalls but that either her ignition was in the "on" position and did not rotate, or that she did not know the position and thus had no evidence of rotation. Ex. 16, 5/5/17 G. Al-ghamdi Dep. at 100:11-101:9.

- Michael Graciano did not experience any stalls in his 2007 Cobalt, but instead relies on his then-fiancee's daughter's hearsay that she once lost power steering and the breaks did not work. Ex. 18, 5/1/17 M. Graciano Dep. at 79:14-23, 81:5-11. Graciano's claim thus is subject to a unique defense that his alleged manifestation is based on hearsay, and also that he has no evidence of key rotation. *Id.*

- Lisa McClellan, the proposed representative for the Texas Power Steering Defect Class, does not allege that she lost power steering assist. Ex. 17, 5/4/17 L. McClellan Dep. at 112:11-13.

*See* New GM Summ. J. Memo. at 24-25. Indeed, because they cannot prove manifestation, these plaintiffs are not even members of the alleged classes they purport to represent.

*Third*, various named plaintiffs are subject to unique defenses regarding lack of reliance and causation, and thus do not have typical consumer protection or common law fraud claims:

- Chimen Basseri and David Padilla testified that they purchased their vehicles because they liked the particular car or based on the dealership's salesman's recommendation, respectively, not because of safety. Ex. B at 1, 3-4.

- Padilla and Orosco did not view any New GM materials before purchasing their vehicles, and Basseri purchased from a non-New GM-affiliated dealer unlikely to pass on such information. Thus, Padilla, Orosco, and Basseri cannot show they would have been aware of any information disclosed about the defect as required under California law. *See* Section II.A.1.c.; Ex. B at 1, 3-4.

- Ronald Robinson did not list safety as a reason for his purchase, but instead relied on the vehicle's low mileage and price. Ex. B at 6.

- Mario Stefano bought his Camaro because he and his wife have long enjoyed Camaros and owned them for many years. Ex. B at 6.

- Gareebah Al-ghamdi did not cite safety as a reason for buying her vehicle, chose not to have the recall repaired, and relied on her family and stepfather rather than New GM. Ex. B at 7.

- Lisa McClellan likewise did not mention safety as a reason for buying her vehicle, but instead made her purchase because of her car's low mileage, appearance, and being American-made. Ex. B at 8.

*See, e.g., Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 64 (S.D.N.Y. 2006); New GM Summ. J. Memo. at 34-40.

*Fourth*, named plaintiffs who bought used Old GM vehicles are subject to unique defenses

because New GM has neither a duty to disclose nor a duty to warn them under state law. *See* Section II.C.; New GM Summ. J. Memo. at 56-61. Accordingly, all named plaintiffs who bought Old GM vehicles—Orosco Santiago, Mitchell Thomas, Brad Akers, Deloris Hamilton, Gareebah Al-ghamdi, Dawn Bacon, Dawn Fuller, Michael Graciano, and Lisa McClellan—do not have claims typical of the classes they seek to represent.

*Fifth*, California named plaintiffs who drove their vehicles for years or tens of thousands of miles before having any significant problems, or who continued to drive their vehicles after the recall conditions were disclosed in 2014, are subject to unique defenses that they cannot show that their vehicles are unmerchantable:

- Chimen Basseri has driven her vehicle over four years and 26,000 miles without experiencing a shut off or other similar incident. Ex. 71, 11/22/17 C. Basseri Dep. at 38:9-13, 44:9-12, 55:22-25, 57:1-5, 68:24-69:21.
- Kellie Cereceres has driven her vehicle for more than 80,000 miles over five years and claims only that her airbag light briefly flickered, without any evidence that this was related to the recall condition, much less that it made her vehicle unmerchantable. Ex. 55, 12/18/17 K. Cereceres Dep. at 40:1-14, 44:19-46:15.
- Santiago Orosco drove his vehicle 145,000 miles over seven years before selling it without ever experiencing a shut off incident. Ex. 47, 3/9/17 S. Orosco Dep. at 48:3-10, 49:10-17, 52:18-21; 101:9-15; 105:6-15. Orosco claims his daughter told him she experienced a single shut-off, but this is hearsay creating another evidentiary defense and this one incident is not sufficient to show a lack of merchantability, especially where Orosco continued driving the vehicle. *Id.* at 102:8-19.
- David Padilla drove his 2010 Cobalt for over 20,000 miles before trading it in, without experiencing a stall or shut off. Ex. 64, 2/17/17 D. Padilla Dep. at 65:25-66:9, 66:24-67:4; Ex. 72, Padilla PFS Q 37.

*See* Section II.D.; New GM Summ. J. Memo. at 50-54.

*Sixth*, plaintiffs who bought Service Parts Vehicles cannot recover unless they prove that their vehicles were repaired using a faulty switch. *See TACC MTD Opinion*, 2016 WL 3920353, at *20 n.15; Section II.B.2.; New GM Summ. J. Memo. at 32-33. None of the five named plaintiffs who owned Service Parts Vehicles—Chimen Basseri, David Padilla, Kenneth Robinson, Brad

Akers, and Cynthia Hawkins—have any evidence that their ignition switches were replaced prior to the 2014 recalls, much less that they were replaced with a faulty switch. Thus, each of them is subject to a unique defense—indeed, none of them have claims at all—and they cannot serve as class representatives.

*Seventh*, Brad Akers' claims are atypical because he alleges lost earnings from having his vehicle repaired. A plaintiff must prove lost earnings to recover for "lost time." *See* Section I.C.; New GM Summ. J. Memo. at 27-30. Almost none of the named plaintiffs allege they lost earnings, and plaintiffs do not have any evidence regarding putative class members. *See* Section I.C. Akers' claims are not typical because he can focus on recovering lost time damages, while other putative class members will need to focus on different types of damages.

#### 2. Named Plaintiffs With Bankruptcy-Claim-Fraud Counts Are Atypical.

Various Bankruptcy-Claim-Fraud named plaintiffs are subject to unique defenses or are otherwise atypical. *First*, fraudulent concealment requires proof of reliance, and in California that proof includes showing that the plaintiff would behaved different if the information had been disclosed. *See* Section II.A.2.c. Patricia Barker and Esperanza Ramirez were not even aware that Old GM had filed for Chapter 11 in 2009, and thus would not have known to file claims in Old GM's bankruptcy even if the defects had been disclosed. Ex. 69, 2/27/17 P. Barker Dep. at 230:4-9; Ex. 70, 3/03/17 E. Ramirez Dep. at 188:8-22.

*Second*, William Rukeyser owns a Service Parts Vehicle but does not allege that his switch was replaced. Ex. 73, W. Rukeyser Vehicle Package at GM-MDL2543-305117907; Ex. 74, Rukeyser PFS at Q45. As with other Service Parts Vehicle owners, he cannot recover without proof that his switch was replaced with a faulty one.

### C. The Process By Which Plaintiffs' Counsel Selected The Named Plaintiffs Confirms That They Are Not Typical Of Any Putative Class.

Named plaintiffs arise from putative class counsels' multi-year attempt to find representatives for these no injury classes. That process of selection confirms the lack of typicality, however. Thus, plaintiffs' counsel used internet advertising and a website called TopClassActions.com ("TCA") to solicit clients. Docket No. 3963. Of the many millions of potential class members nationwide, only approximately 3,500 responded affirmatively to counsel's solicitations by filling out a form on the TCA website. Ex. 20, Pixton Decl. ¶ 4. These 3,500 are less than .1% of the putative class members nationwide. This decision in response to a solicitation to apply to become a plaintiff by filling out a form on the TCA website creates the first level of filtering, as it is evidence that the respondents are different from all other putative class members since they are more likely to believe their cars are defective and that they have been damaged. Yet even for this self-selected less-than-.1%, approximately 53% of the respondents who wanted to sue told plaintiffs' counsel through TCA that their vehicles did not experience any defect. *Id*. The other 47% asserted their vehicles had a defect, but generally did not identify this supposed "defect" and, when they did, often described an issue unrelated to the recalls forming that basis of plaintiffs' claims. *Id*.

Plaintiffs' counsel then selected as their clients those who they believed were the best of the few putative class members who filled out the TCA form. *Id*. This use of TCA creates the second layer of filtering. Counsel were able to screen out respondents with no claims, weaker claims, or claims with unique individualized issues, resulting in named representatives who would best suit their needs.

The third step plaintiffs' counsel used to filter out those putative class members involved the litigation itself. A total of 273 plaintiffs have joined at least one of the various consolidated complaints, but only 213 plaintiffs were named in the 5ACC, with 22 included "solely for the

purpose of preserving their claims on appeal." *E.g.*, 5ACC ¶¶ 64, 249. Fifty plaintiffs from the three bellwether states have joined at least one consolidated complaint, but 21 (42%) have dropped out or been dismissed. Eleven of the twenty-seven plaintiffs for whom Lead Counsel seek appointment as class representatives—specifically Chimen Basseri, Kellie Cereceres, Crystal Hardin, Michelle Thomas, Brad Akers, Delores Hamilton, Kenneth Robinson, Mario Stefano, Christopher Tinen, Gareebah Al-ghamdi, and Dawn Bacon—were recruited through TCA. Ex. 20, Pixton Decl. ¶ 4. In short, even the small group of plaintiffs carefully selected by plaintiffs' counsel to be named representatives have experienced significant attrition to eliminate any plaintiff whose facts and circumstances illustrate the lack of typicality as well as the lack of predominant commonality. *See In re Digital Music Antitrust Litig.*, 2015 WL 13678846, at *4 (S.D.N.Y. 2015) (denying motion to remove certain named plaintiffs and add others because "Plaintiffs cannot cherry-pick their Proposed Class Representatives after examining what discovery would reveal in order to create a more uniform class.").

Finally, the named plaintiffs selected by counsel, who are not typical of the class, also lack any ability to fairly and adequately represent the proposed classes. "[I]n analyzing whether a putative class representative is adequate, a court must determine whether the party is simply lending his name to a suit controlled entirely by the class attorney." *Beck v. Status Game Corp.*, 1995 WL 422067, at *6 (S.D.N.Y. July 14, 1995); *Sanchez v. Wal-Mart Stores, Inc.*, 2009 WL 1514435, at *3 (E.D. Cal. May 28, 2009). A "class is entitled to an adequate representative, one who will check the otherwise unfettered discretion of counsel in prosecuting the suit." *Beck*, 1995 WL 422067, at *6 (collecting cases). Moreover, "a putative class representative is inadequate when the putative representative has demonstrated lack of familiarity with the class-action suit." *Beck*, 1995 WL 422067, at *6; *see also Burton v. Chrysler Group LLC*, 2012 WL 7153877, at *7

(D.S.C. 2012). As shown in Exhibit F, the named plaintiffs' testimony demonstrates that they have given their lawyers complete discretion, have no involvement in strategic decisions or settlement, and many do not understand their responsibility as proposed class representatives.[57] All putative class representatives listed on Exhibit F are inadequate and cannot represent any class.

## IV. PLAINTIFFS' PROPOSED CLASSES ARE NEITHER SUPERIOR NOR MANAGEABLE.

"The superiority requirement reflects the goal of class actions to achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness." *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 141 (S.D.N.Y. 2015). "Four other factors—individual control of litigation, prior actions involving the parties, the desirability of the forum, and manageability—should also be considered in making these determinations." *Id.* "Of the four factors that inform the Court's predominance and superiority inquiries, manageability is, by far, the most critical concern in determining whether a class action is a superior means of adjudication." *Id.* at 142.

### A. New GM's Recalls Are A Superior Method Of Resolving Plaintiffs' Claims.

A class is not superior when a vehicle manufacturer offers a recall to cure any alleged defects. "The Court is convinced that … the administrative remedy provided by NHTSA, including recall of vehicles for inspection and/or repair, is more appropriate than civil litigation seeking equitable relief and money damages in a federal court." *Chin*, 182 F.R.D. at 463-64; *see also Daigle v. Ford Motor Co.*, 2012 WL 3113854, at *5-6 (D. Minn. July 31, 2012) ("Despite the

---

57 For example, Mario Stefano testified that he does not "make any decisions to what happens in the lawsuit. I simply tell what I know and what's about to happen to me and what has happened to me." Ex. F at 6-7. When David Padilla was asked if he knew about his responsibilities as a class representation, he answered "No, I don't—that's out of my league." *Id.* at 4. When Michael Graciano was asked if he knows "anything about the claims of the class members that you propose to represent" he replied, "No." *Id.* at 8-9.

possibility that certain class members will not be fully reimbursed through the recall, the Court nonetheless finds that the recall weighs against a finding that a class action is a superior method of adjudication of the claims asserted in this case."); *Ford Ignition Switch*, 174 F.R.D. at 353 ("the administrative remedy provided by NHTSA, including recall of vehicle for inspection and/or repair, is more appropriate than civil litigation seeking money damages in a federal court"); *Johnson*, 285 F.R.D. at 584 (collecting cases); *Ortiz v. Ford Motor Co.*, 909 So. 2d 479, 481-82 (Fla. Dist. Ct. App. 2005).

New GM's voluntary recalls are a superior method of resolving vehicle owners' claims. New GM has offered to repair each vehicle free of charge to the owner. Such repairs cure the defects and provide plaintiffs with what they were entitled to and give them the benefit of their bargain. Recalls are a superior method especially where plaintiffs have no class-wide evidence that the market value of their vehicles decreased as required under the bellwether states' laws, but are only seeking compensation for historical risks of malfunctions that never occurred.

**B. Plaintiffs Are Adequately Incentivized To Pursue Any Meritorious Individual Claims.**

While plaintiffs assert that the value of their claims is too small to incentivize class members to litigate their claims individually, Pls. Memo. at 34, courts in similar cases hold that individual claims are sufficient because plaintiffs can obtain statutory damages, attorney's fees, or punitive damages. *E.g.*, *Sanneman*, 191 F.R.D. at 456; *Rosen v. Chrysler Corp.*, 2000 WL 34609135, at *15 (E.D. Mich. July 18, 2000).

Plaintiffs here are seeking a substantial amount of compensatory damages for each putative class member —a median alleged economic loss of $9,274 for the Delta Ignition Switch recall vehicles, $966 for the other recalls involving the ignition system; $936 for EPS assist; and $839 for SIAB. Ex. 31, Boedeker Damages Estimates Based on Currently Available Data at 3.

Moreover, plaintiffs and putative class members seek "reasonable attorneys' fees" that are commonly available under consumer protection statutes and can allow plaintiffs to recover the costs of litigation even if the monetary value of their claims is small. 5ACC, Prayer for Relief ¶¶ F. Plaintiffs also seek "statutory damages," "exemplary damages," "statutory penalties," and "reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest." 5ACC, Prayer for Relief ¶¶ C-F. These potential recoveries would provide any vehicle owner who believes he or she has a meritorious claim with more than a sufficient incentive to pursue that individual claim against New GM. Any individual claims, in short, are not small value claims.

### C. Plaintiffs' Proposed Classes And Trial Plan Are Not Manageable.

"Plaintiffs envision a single trial" of 23 separate classes and subclasses applying the differing laws of 3 states; involving 7 distinct recalls involving 160 different vehicle models; under 7 counts, each with their own varying elements; and with diverse bases for claims against New GM, such as direct liability, successor liability, and novel Bankruptcy-Claim-Fraud counts. Pls. Memo. at 36; Pls. Mot. at 1-13. Any jury would be hopelessly confused by attempting to apply so many different legal standards to the different facts of each recall, which would be compounded by determining the individual facts for each named plaintiff.[58]

*First*, a jury would have to consider that the bases of plaintiffs' claims vary among direct, successor liability, and Bankruptcy-Claim-Fraud counts. Each basis will require a jury to consider

---

[58] *See, e.g.*, *Hardings v. Tambrands*, 165 F.R.D. 623, 630-32 (D. Kan. 1996) ("The potential for numerous different subclasses weighs against a finding of predominance of common issues" as well as manageability, especially where differing jury instructions would be required for each state's law: "The court finds that the advantages of a class action do not outweigh the problems of case manageability and jury confusion."); *Bouder v. Prudential Fin., Inc.*, 2013 WL 246848, at *5 (D.N.J. Jan. 18, 2013) ("The number of individual State Subclasses that exist here, coupled with the potential for individualized inquiry, … the Court foresees significant difficult[y] in how this case will be managed and in how it will play out before a jury at trial."); *Road Hog Trucking, LLC v. Hilmar Cheese Co., Inc.*, 2016 WL 6125677, at *3 (N.D. Tex. Oct. 19, 2016); *see also Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 277 (D.D.C. 1990).

different facts and legal questions. For example, successor liability plaintiffs must provide evidence on the successor liability factors, which will be irrelevant to all other plaintiffs and claims. *In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 6509256, at *5-6 (S.D.N.Y. Dec. 19, 2017). What evidence can be considered for each basis also varies. Plaintiffs with direct claims could rely on New GM's conduct before the putative class member's purchase plus what New GM knew about the knowledge of Old GM personnel or in Old GM files, while Bankruptcy-Claim-Fraud plaintiffs would be limited to what New GM knew between July 10 to November 30, 2009 about the knowledge of Old GM personnel or in Old GM files.

*Second*, plaintiffs' claims differ by state. A jury would have to consider whether vehicles were merchantable under California law, but not Missouri or Texas. The jury would have to consider whether common law fraud could be proven under California and Missouri law, but not Texas. Plaintiffs' consumer protection claims also vary by state. The UCL has three separate prongs not shared by any other statute, *id.* at *19; the CLRA contains a general standard with unique provisions, *id.* at *21, the MMPA contains yet a different standard with specific elements such as "an ascertainable loss of money or property," *id.* at *33; while the Texas DTPA unconscionability prong requires that New GM took advantage of plaintiff's lack of sophistication, *FACC MTD Opinion*, 257 F. Supp. 3d 372, 449. The UCL, CLRA, and DTPA require both causation and reliance, while the MMPA requires causation. Each state uses a different test for causation and reliance. *See* Sections II.A.2.c-e. Applying so many different legal standards across different claims will be an insurmountable and confusing task for any jury. *See Woodard v. Fidelity Nat'l Title Ins. Co.*, 2008 WL 5737364, at *6 (D.N.M. Dec. 8, 2008); *Shoots v. iQor Holdings US Inc.*, 325 F.R.D. 253, 269 (D. Minn. 2018); *Ramthun v. Bryan Career College-Inc.*, 93 F. Supp. 3d 1011, 1021 (W.D. Ark. 2015).

*Third*, plaintiffs seek to adjudicate the merits of 7 different recalls in one trial. Both across and within recalls, unintended key rotation vehicles showed material differences in the circumstances under which the key may rotate. *See* Section II.B.2. Consequently, the specific remedy implemented also differed due to mechanical design differences such as chassis and interior compartment design, suspension, and ignition switch and system design. Combining all 5 separate key rotation recalls, and the differing facts for all recalls, in one trial creates a likelihood that the jury will confuse the separate recalls with the pre-MY2008 Delta Ignition Switch recall.

SIAB and EPS Assist recalls are unrelated to the ignition recalls, or each other. Neither involves ignition switch rotation. Old GM and New GM repeatedly changed vehicle parts to address the SIAB and EPS Assist recall conditions. Pls. Offer of Proof ¶¶ 92, 94-98, 103-07.

Given the above, common questions would not predominate at the trial involving so many disparate vehicles, field histories, recalls and purchase or lease conditions. *See*, *e.g.*, *Ford Ignition Switch*, 174 F.R.D. at 342; *In re GM Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305, 326 (S.D. Ill. 2007) (collecting cases). "The district court's use of subclasses did not solve the problem [that the class claims were based on widely divergent facts]. Subclasses are not a substitute for compliance with Rule 23." *See*, *e.g.*, *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 & n.9 (6th Cir. 1998).

Finally, plaintiffs argue that their trial plan should be compared to the alternatives, Pls. Memo. at 35; yet, in point of fact, more manageable alternatives exist—NHTSA's recall process and individual consumer protection act claims.

## V. PLAINTIFFS' PROPOSED CLASSES ARE OVERBROAD AND IMPROPER.

Rule 23 is partly "designed to protect absentees by blocking unwarranted or overbroad class definitions." *Amchem*, 52 U.S. at 620. A class definition is overbroad where a significant portion of the putative members cannot recover from the defendant. *E.g.*, *Mayo v. UBS Real Estate Secs.*, *Inc.*, 2012 WL 4361571, at *5 (W.D. Mo. Sept. 21, 2012) ("Plaintiff's proposed class

definition includes numerous borrowers who lack standing, therefore the Court may not certify the class."); *Circle Click Media LLC v. Regus Mgmt. Group LLC*, 2015 WL 6638929, at *12 (N.D. Cal. Oct. 30, 2015) ("Plaintiffs' proposed class definitions are therefore overbroad insofar as they encompass" agreements that disclosed allegedly improper fees); *Monteferrante v. Williams-Sonoma, Inc.*, 241 F. Supp. 3d 264, 270-71, 274 (D. Mass. 2017).

Plaintiffs' proposed classes here are overbroad for two reasons. *First*, the proposed classes contain persons who purchased their vehicles after July 10, 2009 but sold or otherwise disposed of their vehicles before the 2014 recalls. The Court has repeatedly held that such plaintiffs have no economic loss claim; nor could they have any claim for lost time incident to the recalls. *See* Section I.B. "[O]ver 25% of the at-issue vehicles had multiple owners within each of the Bellwether states" between July 2009 and the date of each applicable recall. Ex. 22, Hanssens Sur-Rebuttal Rpt. ¶ 23 & Ex. 14. *Second*, under plaintiffs' expert Boedeker's own survey data, 26.6% to 39.1% of the putative class members have no injury, no damages, and no claim. *See* Section I.A.3. Plaintiffs' proposed classes cannot be certified as they consist of large numbers of putative members with no injury and no claim.

**CONCLUSION**

Decisions from the Second Circuit and this district reject certification where there is no class-wide proof of injury, or reliance is an individual issue, or causation is an individual issue, or named plaintiffs are subject to unique defenses. *E.g.*, *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 222-28 (2d Cir. 2008) (Walker, J.) (reversing certification where "reliance … cannot be the subject of general proof," causation "would require individualized proof," and fact of injury likewise was "an inherently individual inquiry"); *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 148 (2d Cir. 2015) (Lynch, J.) (vacating certification where "liability for a significant bloc of the class members and damages for the entire class must be decided on an individual basis"); *Levitt v.*

*J.P. Morgan Secs., Inc.*, 710 F.3d 454, 465-70 (2d Cir. 2013) (Livingston, J.) (reversing certification where plaintiffs "cannot employ a classwide presumption of reliance" and "nor, therefore, can Plaintiffs satisfy the predominance requirements of Rule 23(b)(3).").[59] In this case,

[59] *In re Initial Public Offerings Secs. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006) (Newman, J.) (vacating certification where plaintiffs could not establish presumption of reliance and thus "individual questions of reliance would predominate over common questions"); *Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 484 (2d Cir. 2018) (Wesley, J.) (vacating certification and noting that requiring plaintiffs to prove actual reliance "dooms the predominance of class-wide issues"); *Mazzei v. Money Store*, 829 F.3d 260, 272-73 (2d Cir. 2016) (Jacobs, J.) (affirming decertification where evidence showed that proving element of privity was not subject to class-wide evidence); *Moore v. PaineWebber*, 306 F.3d 1247, 1255 (2d Cir. 2002) (Sotomayor, J.) (holding "that a common course of conduct is not enough to show predominance" where they were individual questions regarding what misrepresentations each putative class member received); *In re Petrobras Secs.*, 862 F.3d 250, 270-75 (2d Cir. 2017) (Garaufis, J.) (vacating certification where "domestic transactions" requirement of securities fraud claims required individual evidence); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir. 1990) (Pierce, J.) (affirming denial of class certification where named plaintiff was "subject to several unique defenses"); *Kline v. Wolf*, 702 F.2d 400, 402-03 (2d Cir. 1983) (Mansfield, J.) (denying certification as plaintiff was an inadequate class representative because of mistaken testimony); *Falcon v. Philips Elecs. N. Am. Corp.*, 304 F. App'x 896, 897 (2d Cir. Nov. 5, 2008) (per curiam) (plaintiff's "disposal of the television set, standing alone, was sufficient to support the District Court's exercise of discretion" in finding that plaintiff was not an adequate representative); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,, 209 F.R.D. 323, 349-50 (S.D.N.Y. 2002) (Scheindlin, J.) ("courts deny certification where individualized issues of fact abound"); *In re Avon Anti-Aging Skincare Creams & Prod. Mktg. & Sales Practices Litig.*, 2015 WL 5730022, at *4 (S.D.N.Y. Sept. 30, 2015) (Oetken, J.) (denying certification where there were "material variations in the representations made and the kinds or degrees of reliance by the persons to whom they were addressed"); *Freeland v. AT & T Corp.*, 238 F.R.D. 130, 152 (S.D.N.Y. 2006) (Cole, J.) (denying certification where "proof, even though made on a classwide basis, cannot establish injury to each individual class member"); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) (Oetken, J.) (denying certification because "without assurance beyond [plaintiffs' proffered expert]'s say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis"); *Sicav v. James Jun Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015) (Engelmayer, J.) (denying certification where "plaintiffs have not shown or explained, concretely, how damages would be calculated"); *Calvo v. City of New York*, 2017 WL 4231431, at *3-4, 7 (S.D.N.Y. Sept. 21, 2017) (Caproni, J.) (denying certification where some putative class members were not injured and thus lacked standing); *Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*, 2018 WL 4007285, at *8 (S.D.N.Y. Aug. 14, 2018) (Marrero, J.) (denying certification where individualized inquiry into each plaintiff's standing would predominate over common issues); *Kottler v. Deutsche Bank AG*, 2010 WL 1221809, at *3 (S.D.N.Y. Mar. 29, 2010) (Crotty, J.) (denying certification and noting "[r]eliance and causation are inherently individualized elements and generally not susceptible to common proof"); *Football Ass'n Premier League Ltd. v. YouTube, Inc.*, 297 F.R.D. 64, 68 (S.D.N.Y. 2013) (Stanton, J.) (denying certification despite common issues pertaining to defendants' conduct where plaintiffs' claims presented individual factual issues); *McCracken v. Best Buy Stores, L.P.*, 248 F.R.D. 162, 169 (S.D.N.Y. 2008) (Chin, J.) (denying certification on predominance grounds where there were "material variations" in the manner in which plaintiffs were induced to subscribe to sales offer); *Pelman v. McDonald's Corp.*, 272 F.R.D. 82, 95 (S.D.N.Y. 2010) (Pogue, J.) (denying certification where individualized causation issues would predominate); *Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307,

all of these challenges exist, combining to form a multiplicity of individual issues, uncommon facts, flawed damages methodologies, and substantive problems with plaintiffs' proposed classes. No class has ever been certified under such circumstances, and this case should not be the first.

316-21 (S.D.N.Y. 2003) (Cote, J.) (denying certification on typicality and adequacy grounds where named plaintiffs were subject to individual defenses); *McKernan v. United Techs. Corp.*, 120 F.R.D. 452, 454 (S.D.N.Y. 1998) (Nevas, J.) (where named plaintiffs had sold their defective helicopters, "they cannot be said to have claims typical of the class they seek to represent," which included current owners); *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 64 (S.D.N.Y. 2006) (Marrero, J.) (named plaintiff was not typical where he alleged class was induced to subscribe to defendant's internet service because of speed, and he personally switched to save money not for speed); *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 98 (S.D.N.Y. 2017) (Preska, J.) (denying certification where affirmative defense is "meritorious enough to require Plaintiffs to devote considerable time to its rebuttal"); *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2017 WL 1331288, at *4 (S.D.N.Y. Apr. 4, 2017) (Nathan, J.) (denying certification where defined class was impermissibly broad and not ascertainable); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 606 (S.D.N.Y. 1982) (Haight, J.) (denying certification where "plaintiffs so tailored the class claims in an effort to improve the possibility of demonstrating commonality" which "was purchased at the price of presenting putative class members with significant risks of being told later that they had impermissibly split a single cause of action"); *Beck v. Status Game Corp.*, 1995 WL 422067, at *6 (S.D.N.Y. July 14, 1995) (Edelstein, J.) (denying certification where named plaintiffs did not check the unfettered discretion of plaintiffs' attorneys).

Respectfully submitted,

Dated: September 21, 2018

*/s/ Richard C. Godfrey, P.C.*

Richard C. Godfrey, P.C.
Andrew B. Bloomer, P.C.
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654-3406
Phone: 312-862-2000
Fax: 312-862-2200
richard.godfrey@kirkland.com
andrew.bloomer@kirkland.com

*Attorneys for Defendant General Motors LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2018, I electronically filed the foregoing using the CM/ECF system which will serve notification of such filing to the email of all counsel of record in this action.

By: /s/ *Andrew B. Bloomer, P.C.*
Andrew B. Bloomer, P.C.