**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

IN RE:

| | |
|---|---|
| **GENERAL MOTORS LLC IGNITION SWITCH LITIGATION** | **14-MD-2543(JMF)**<br>**14-MC-2543(JMF)** |

This Document Relates To:

**CRYSTAL LEEGRAND, individually,**
**LONNIE WHITE, individually;**
**and LANELLE BANKS, individually,**

           **Plaintiffs,**         **Case No.: 1:16-CV-09999-JFM (mro)**

**v.**

**GENERAL MOTORS COMPANY LLC,**

           **Defendant.**

## <u>AMENDED COMPLAINT AND JURY DEMAND</u>

      **COMES NOW** Plaintiffs, Crystal Leegrand, Lonnie White, and Lanelle Banks, by and through their undersigned attorneys, and sues Defendant, GENERAL MOTORS COMPANY LLC, and alleges as follows:

### I.    <u>PREFACE</u>

*"Something went wrong with our process in this instance, and terrible things happened."*
**- Mary Barra, CEO of General Motors LLC**

      1.     Between 2003 and 2010, over 1.3 million GENERAL MOTORS branded vehicles in the United States were also sold with a safety defect that causes the vehicle's electric power steering ("power steering") to suddenly fail during ordinary driving conditions and revert back to

manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries.

2.     The affected vehicles are MY 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura vehicles, <u>which includes the plaintiff's vehicle, a 2009 Pontiac G6</u>.

3.     GENERAL MOTORS was aware of the power steering defect long before it took anything approaching full remedial action.

4.     When the power steering fails, a message appears on the vehicle's dashboard, and a chime sounds to inform the driver.  Although steering control can be maintained through manual steering, greater driver effort is required, and the risk of an accident is increased.

5.     In 2010, GENERAL MOTORS first recalled Chevy Cobalt and Pontiac G5 models for these power steering issues, yet it did not recall the many other vehicles that had the very same power steering defect.

6.     Documents released by NHTSA show that GENERAL MOTORS waited years to recall nearly 335,000 Saturn Ions for power-steering failure – despite receiving nearly 4,800 consumer complaints and more than 30,000 claims for warranty repairs.  That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent.  By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000 vehicles.  Here, the rate translates to 1,430 complaints per 100,000 vehicles.

7.     In response to the consumer complaints, in September 2011, NHTSA opened an investigation into the power-steering defect in Saturn Ions.

8.      NHTSA database records show complaints from Ion owners as early as June 2004, with the first injury reported in May 2007. NHTSA has linked approximately 12 crashes and two injuries to the power steering defect in the Ions.

9.      In September 2011, after NHTSA began to make inquiries about the safety of the Saturn Ion, GENERAL MOTORS acknowledged that it had received almost 3,500 customer reports claiming a sudden loss of power steering in 2004-2007 Ion vehicles.

10.     The following month, GENERAL MOTORS engineer Terry Woychowski informed current CEO Mary Barra – then head of product development – that there was a serious power-steering issue in Saturn Ions, and that it may be the same power steering issue that plagued the Chevy Cobalt and Pontiac G5.  Ms. Barra was also informed of the ongoing NHTSA investigation.  At the time, NHTSA reportedly came close to concluding that Saturn Ions should have been included in GENERAL MOTORS' 2010 steering recall of Cobalt and G5 vehicles.

11.     Instead of recalling the Saturn Ion, GENERAL MOTORS sent dealers a service bulletin in May of 2012 identifying complaints about the steering system in the vehicle. See https://www-odi.nhtsa.dot.gov/cars/problems/defect/results.cfm?action_number=EA06002&Search Type= QuickSearch&summary=true.

12.     By the time GENERAL MOTORS finally recalled the Saturn Ion in March 2014, NHTSA had received more than 1,200 complaints about the vehicle's power steering. Similar complaints resulted in over 30,000 warranty claims with GENERAL MOTORS.

13.     After announcing the March 31, 2014 recall, Jeff Boyer, GENERAL MOTOR's Vice President of Global Vehicle Safety, acknowledged that GENERAL MOTORS recalled some of these same vehicle models previously for the same issue, but that GENERAL MOTORS "did not do enough."

14.     According to an analysis by the NEW YORK TIMES published on April 20, 2014, GENERAL MOTORS has "repeatedly used technical service bulletins to dealers and sometimes car owners as stopgap safety measures instead of ordering a timely recall."

15.     Former NHTSA head Joan Claybrook echoed this conclusion, stating, "There's no question that service bulletins have been used where recalls should have been."

16.     NHTSA has recently criticized GENERAL MOTORS for issuing service bulletins on at least four additional occasions in which a recall would have been more appropriate and in which GENERAL MOTORS later, in fact, recalled the subject vehicles.

17.     These inappropriate uses of service bulletins prompted Frank Borris, the top defect investigator for NHTSA, to write to GENERAL MOTOR'S product investigations director, Carmen Benavides, in July 2013, complaining that "GM is slow to communicate, slow to act, and, at times, requires additional effort . . . that we do not feel is necessary with some of [GENERAL MOTOR'S] peers."

18.     Mr. Borris' correspondence was circulated widely among GENERAL MOTOR'S top executives including John Calabrese and Alicia Boler-Davis, two vice presidents for product safety; Michael Robinson, vice president of regulatory affairs; engineer Jim Federico; Gay Kent, director of product investigations who had been involved in safety issues with the Cobalt since 2006; and William Kemp, an in-house product liability lawyer.

19.     This case arises from GENERAL MOTORS' negligent design of the vehicles, its knowing marketing and sale of defective and unsafe vehicles, and its failure to disclose that as a result of defective electric power steering, potentially over 10 million vehicles may have the propensity to lose power steering during normal driving conditions and create an extreme and unreasonable risk of accident, serious bodily harm, and death.

20.     The defective vehicles are defective and dangerous for multiple reasons, including:

- When the power steering shuts down, it creates a serious risk of accident.

21.     The power steering defect makes the defective vehicles, including the Subject 2009 Pontiac G6, unreasonably dangerous.  Because of the defects, defective vehicles including the Subject 2009 Pontiac G6 are likely to be involved in accidents and individuals in the defective vehicles are likely to suffer serious bodily harm or death, especially when the airbags fail to deploy.

22.     Moreover, the power steering defect presents a significant and unreasonable safety risk exposing the owners of the defective vehicles, their passengers, and others in the vicinity to a risk of serious injury or death.

23.     Finally, these dangerous defects impact the economic value of the vehicle as purchasers (1) are not getting what they pay for (a reasonably safe and functional vehicle); (2) the defects must be repaired; (3) the defects render the cars dangerous and stigmatized and thus less attractive to buyers and (4) other potential purchasers of the subject vehicles are less likely or unwilling to buy the vehicle or would only do for reduced amounts.

## I.     JURISDICTION AND VENUE

24.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

25.     GENERAL MOTORS is authorized to conduct, and conducts, substantial business in California and in this District, and the Court has personal jurisdiction over the Defendant.  GENERAL MOTORS marketed, promoted, distributed and sold the 2009 Pontiac G6, VIN# 1G2ZK57N294235350 (the "Subject Pontiac") in which Plaintiff was injured.

26.     Venue is proper in this District pursuant to MDL Order which allows direct filing in the above captioned MDL and is proper in California pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this action occurred in this California, and Defendant transacts business within this California.

## II.     <u>**PARTIES**</u>

27.     Plaintiff Crystal Leegrand is a resident of California and was the owner of the Subject Pontiac on April 7, 2016.

28.     Plaintiff Lonnie White, Ms. Leegrand's son, is a resident of California and was a passenger in the Subject Pontiac on April 7, 2016.

29.     Plaintiff Lanelle Banks, Ms. Leegrand's son, is a resident of California and was the driver of the Subject Pontiac on April 7, 2016.

30.     Defendant GENERAL MOTORS is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, 48265.

31.     GENERAL MOTORS was established in 2009, and on July 10, 2009, acquired substantially all assets and assumed certain liabilities of GENERAL MOTORS CORPORATION ("GMC") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code. GENERAL MOTORS manufactured and distributed the Subject Pontiac to consumers throughout the United States.

32.     GENERAL MOTORS succeeds GMC in connection with defects relating to safety defects in the Subject Pontiac.

33.     Among the liabilities and obligations expressly assumed by GENERAL MOTORS after the bankruptcy are the following:

From and after the Closing, Purchaser [GENERAL MOTORS] shall

> comply with the certification, reporting and recall requirements of the
> National Traffic and Motor Vehicle Act, the Transportation Recall
> Enhancement, Accountability and Documentation Act, the Clean Air
> Act…and similar laws, in each case, to the extent applicable in respect of
> vehicles and vehicle parts manufactured or distributed by GMC.

34.     GENERAL MOTORS assumed all liabilities arising under express written

warranties of GMC that are specifically identified as warranties and delivered in connection

with the sale of new vehicles manufactured or sold by GMC prior to or after the sale.

35.     Through the bankruptcy and asset sale from GMC to GENERAL MOTORS,

GENERAL MOTORS also assumed the liabilities of GMC for post-sale accidents involving

personal injury.

36.     At all times relevant herein, GMC was a corporation engaged in the

business of designing, manufacturing and selling motor vehicles, including the

Subject Pontiac.

### III.      <u>GENERAL ALLEGATIONS</u>

*a.     The Crash*

37.     On April 7, 2016, Plaintiff Banks was the driver of the Subject Pontiac which he

was driving in Hesperia, California.

38.     As the Subject Pontiac was entering the freeway onramp, the Subject

Pontiac's power steering failed, causing Plaintiff Banks to lose control of the vehicle and

strike the guard rail and overturn, totaling the Subject Pontiac and causing injuries to its

passengers.

39.     As a result of the failure of the Subject Pontiac's power steering and subsequently

caused loss of control and impact, Plaintiff Bank's body collided with the front area of the

Subject Pontiac/s interior and windshield, causing injuries to his body, including injuries to his

face, head, neck and knee.  These injuries would not have occurred but for the failure of the power steering.

40.     As a result of the failure of the Subject Pontiac's power steering and subsequently caused loss of control and impact, Plaintiff White suffered back, leg, knee and neck injuries. These injuries would not have occurred but for the failure of the power steering.

41.     Although GENERAL MOTORS publicly admitted that the power steering was defective and agreed to recall the defective vehicles, including the Subject Pontiac, Plaintiff Leegrand, the owner of the Subject Pontiac, never received notice of the recall.

42.     At all material times, GENERAL MOTORS possessed vastly superior knowledge and information to that of Plaintiffs about the design and function of the power steering of the Subject Pontiac and the existence of the defect in Plaintiff Leegrand's vehicle.

43.     The power steering defect have caused damages to Plaintiffs, including bodily injuries and economic loss.

## COUNT I
## NEGLIGENCE

44.     Plaintiffs incorporate each and every allegation set forth above.

45.     Plaintiff Leegrand's Subject Pontiac reached the consumer without substantial changes in condition from its manufacture.

46.     GENERAL MOTORS had a duty to its customers as a manufacturer of motor vehicles to design, manufacture, market, and provide vehicles that, in its ordinary operation, are reasonably safe for its intended uses. GENERAL MOTORS further had a duty to adequately test its vehicles' safety before selling them to consumers.

47.     GENERAL MOTORS had a heightened duty to test vehicles for power steering

problems once GENERAL MOTORS was on notice that its vehicles were inclined to experience power steering loss, which can cause bodily injury, death, and property damage. Moreover, GENERAL MOTORS had a duty to provide true and accurate information to the public to prevent undue risks arising from the foreseeable use of its products.

48.     GENERAL MOTORS breached these duties by negligently and carelessly designing, manufacturing, testing, marketing and selling the defective vehicles, including the Subject Pontiac, in at least the following ways:

a.    The Subject Pontiac was negligently designed in that its power steering would sometimes fail during normal driving causing loss of control of the vehicle;

b.    The Subject Pontiac was not adequately tested to determine if it was safe for use by the consuming public, including Plaintiffs;

c.     The Subject Pontiac was not properly manufactured in that its power steering would sometimes fail during normal driving causing loss of control of the vehicle;

d.    The defective and unreasonable condition of the Subject Pontiac was not obvious to the average consumer or reasonably foreseeable user, including Plaintiff;

e.    GENERAL MOTORS withheld and failed to timely disclose material information to consumers, including Plaintiffs, failed to timely issue consumer warnings, and failed to timely recall the Subject Pontiac after it became aware of the defects alleged above; and

f.    GENERAL MOTORS knew or should have known that the Subject Pontiac was dangerously defective in a manner which could cause serious bodily harm or death.

49.     In addition to the above-described design and manufacturing defects, at all times relevant, GENERAL MOTORS sold, marketed, advertised, distributed, and otherwise placed defective vehicles, including the Subject Pontiac, into the stream of commerce in an unlawful, unfair, fraudulent, and/or deceptive manner that was likely to deceive the public and negligently failed to warn Plaintiffs of defects in the Subject Pontiac, about which GENERAL MOTORS

either knew or should have known.

50.     As direct and proximate causes of GENERAL MOTORS' breaches, Plaintiffs have suffered damages, including but not limited to bodily injuries, costs of medical treatment, gross and debilitating pain and suffering, and the financial loss of the defective Subject Pontiac which was unsafe. Plaintiffs further face continuing and future damages, including but not limited to costs of medical treatment and support, and gross and debilitating pain and suffering.

**WHEREFORE**, Plaintiffs pray this Court adjudicate this dispute and enter judgment:

o     That GENERAL MOTORS was negligent;

o     That GENERAL MOTORS' negligence caused damages to Plaintiffs;

o     That GENERAL MOTORS is liable to Plaintiffs in the amount of such damages.

Plaintiffs further pray for an award of costs, interest, and such other relief as this Court may find just and equitable.

## COUNT II

## **STRICT LIABILITY**

51.     Plaintiffs incorporates each and every allegation set forth above.

52.     The Subject Pontiac manufactured and distributed by GENERAL MOTORS was unfit and unsafe for its intended uses and purposes because of defects inherent in its design and manufacturer.

53.     GENERAL MOTORS knew that the Subject Pontiac was expected to be used by consumers without inspection for defects.

54.     Plaintiff Leegrand 's Subject Pontiac reached the consumer without substantial change in condition from its manufacture.

55.     The defective and unreasonably dangerous condition of the Subject Pontiac

existed  when it left control of GENERAL MOTORS.

56.     At all material times, Plaintiffs were unaware of the defective and unreasonably

dangerous condition of the Subject Pontiac.

57.     The Subject Pontiac was defective, inherently dangerous for its intended use

and an  unreasonably dangerous product which caused injuries to Plaintiff in the following

ways:

a.     The Subject Pontiac was negligently designed in that its power
steering would sometimes fail during normal driving causing loss of
control of the vehicle;

b.     The Subject Pontiac was not adequately tested to determine if it was
safe for use by the consuming public, including Plaintiffs;

c.     The Subject Pontiac was not properly manufactured in that its power
steering would sometimes fail during normal driving causing loss of
control of the vehicle;

d.     The defective and unreasonable condition of the Subject Pontiac was
not obvious to  the average consumer or reasonably foreseeable user,
including Plaintiff;

e.     GENERAL MOTORS withheld and failed to timely disclose material
information to  consumers, including Plaintiffs, failed to timely issue
consumer warnings, and failed to  timely recall the Subject Pontiac after it
became aware of the defects alleged above;  and

f.     GENERAL MOTORS knew or should have known that the Subject
Pontiac was dangerously defective in a manner which could cause serious
bodily harm or death.

58.     The defects enumerated above were unexpected by ordinary consumers,

including Plaintiffs, and the Subject Pontiac failed to perform as expected by the

ordinary consumer.

59.     As direct and proximate causes of the GENERAL MOTORS' design and

manufacturing  defects inherent in the Subject Pontiac, Plaintiffs have suffered damages,

including but not limited  to bodily injuries, costs of medical treatment, gross and debilitating

pain and suffering, and the financial loss of the defective Subject Pontiac which was unsafe. Plaintiffs further face continuing and future damages, including but not limited to costs of medical treatment and support, and gross and debilitating pain and suffering.

      **WHEREFORE**, Plaintiffs pray this Court adjudicate this dispute and enter judgment:

      o      That GENERAL MOTORS is strictly liable;

      o      That the Subject Pontiac manufactured and distributed by GENERAL MOTORS is unfit and unsafe for its intended use and purpose because of defects inherent it its design and manufacture;

      o      That as the direct and proximate causes of such design and manufacturing defects, Plaintiff has suffered damages; and

      o      That GENERAL MOTORS is liable to Plaintiffs in the amount of such damages.

      Plaintiffs further pray for an award of costs, interest, and such other relief as this Court may find just and equitable.

**COUNT III**
**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT**
**FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**AND BREACH OF THE IMPLIED WARRANTY OF**
**MERCHANTABILITY**

60.      Plaintiffs incorporate each and every allegation set forth above.

61.      This cause of action is brought pursuant to the California's Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§1791.1 & 1792 *et seq.* (the "Song-Beverly Act").

62.      Plaintiffs are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

63.      The Subject Pontiac and other vehicles like it built by GENERAL MOTORS are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

64.      GENERAL MOTORS was a manufacturer of the Subject Pontiac vehicle and vehicles like it within the meaning of Cal. Civ. Code § 1791(j).

65.     The Subject Pontiac was not reasonably fit for the ordinary purpose for which such goods are used and did not meet the expectations for the performance of the product when used in a reasonably foreseeable manner, nor was it minimally safe for its foreseeable purpose in that the power steering may fail on its own during driving causing severe risk of loss of control, crash, and or injury and death.

66.     This same defect also caused to car to depreciate in value.

67.     At all relevant times, Plaintiffs used the Subject Pontiac in the manner foreseeable by Defendant.

68.     A warranty that the Subject Pontiac was in merchantable condition within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792, was implied by law when GENERAL MOTORS placed the vehicle into the stream of commerce.

69.     At material times, GENERAL MOTORS knew of the defects which caused the Subject Pontiac to have been in non-merchantable condition when it was placed into the stream of commerce, and to have been unfit for its ordinary purpose.

70.     Notice of breach is not required because Plaintiffs did not purchase the Subject Pontiac directly from GENERAL MOTORS.

71.     As a direct and proximate result of GENERAL MOTORS' breach of the warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**WHEREFORE**, Plaintiffs pray this Court adjudicate this dispute and enter judgment:

o   That GENERAL MOTORS breached the implied warranty of merchantability;

o   That GENERAL MOTORS' breach caused damages to Plaintiffs; and

o   That GENERAL MOTORS is liable to Plaintiffs in the amount of such damages.

Plaintiffs further pray for an award of costs, attorneys' fees (pursuant to Cal. Civ. Code § 1794), interest, and such other relief as this Court may find just and equitable.

## COUNT IV
## VIOLATIONS OF MAGNUSON-MOSS CONSUMER PRODUCTS WARRANTIES ACT
("Magnuson-Moss Act") <u>15 U.S.C. § 2301, *et seq.*</u>

72.    Plaintiffs incorporate each and every allegation set forth above.

73.    The Magnuson-Moss Act provides a private right of action by purchasers of consumer products against manufacturers or retailers who, among other things, fail to comply with the terms of express or implied warranties. *See* 15 U.S.C. § 2310(d)(1).  As alleged *supra*, GENERAL MOTORS failed at material times to comply with the terms of the implied warranty of merchantability.

74.    The Subject Pontiac is a "consumer product," as that term is defined in 15 U.S.C. § 2301(1).

75.    GENERAL MOTORS is a "warrantor," as that term is defined in 15 U.S.C. § 2301(5).

76.    Plaintiffs are "consumer[s]," as that term is defined in 15 U.S.C. § 2301(3).

77.    The Magnuson-Moss Act provides a cause of action for, among other things, breach of warranty. *See* 15 U.S.C. § 2310(d)(1). GENERAL MOTORS has breached the implied warranty of merchantability, which it cannot disclaim under Magnuson-Moss, *see* 15 U.S.C. §2308(a)(1),  by failing to provide merchantable goods.

78.    Plaintiff has suffered damages as a result of GENERAL MOTORS' breach of the implied warranty of merchantability, *supra. See* 15 U.S.C. § 2310(d)(1)-(2).

79.    GENERAL MOTORS was on notice of the power steering defects as early as 2004, yet did not undertake any cure until 2010, nearly nine years later (and not until 2014 for the Subject Pontiac) when GENERAL MOTORS' knowledge of the power steering defects was first

made public.

80.     Plaintiffs have suffered, and are entitled to recover, damages as a result of GENERAL MOTORS' breaches of warranty and violations of Magnuson-Moss.

81.     Upon prevailing in this action, Plaintiffs are entitled to an award of costs  and expenses, including attorneys' fees. See 15 U.S.C. § 2310(d)(2).

**WHEREFORE**, Plaintiffs pray this Court adjudicate this dispute and enter judgment:

o        That GENERAL MOTORS violated the Magnuson-Moss Consumer Products Warranties Act;

o        That GENERAL MOTORS' violation caused damages to Plaintiffs; and

o        That GENERAL MOTORS is liable to Plaintiffs in the amount of such damages.

Plaintiffs further pray for an award of costs, interest, and such other relief as this Court may find just and equitable.

## COUNT V
## NEGLIGENT FAILURE TO RECALL

82.     Plaintiff incorporates each and every allegation set forth above.

83.     GENERAL MOTORS manufactured, distributed, and sold cars with defective power steering.  It owed a duty in negligence to all owners and lessees of those vehicles regardless of when those vehicles were bought or leased.

84.     GENERAL MOTORS knew or reasonably should have known that the defective vehicles were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner.

85.     GENERAL MOTORS either knew of power steering defects before the vehicles were sold and, or became aware of the power steering defects and their attendant

risks after the vehicles were sold.

86.     GENERAL MOTORS continued to gain information further corroborating the defects and their risks from its until 2014 and beyond.

87.     GENERAL MOTORS failed to adequately recall the defective vehicles in a timely manner.

88.     Owners and lessees of the defective vehicles (including the Subject Pontiac), including Plaintiffs, were harmed by GENERAL MOTORS' failure to adequately recall all the defective vehicles in a timely manner and have suffered damages, including, without limitation, diminished value of the defective vehicles, the cost of modification of the defective systems, and the costs associated with the loss of use of the defective vehicles.

89.     GENERAL MOTORS' failure to timely and adequately recall the defective power steering vehicles was a substantial factor in causing Plaintiffs harm.

90.     Plaintiffs have suffered, and are entitled to recover, damages as a result of GENERAL MOTORS' violation of the Consumer Protection Act.

**WHEREFORE**, Plaintiffs pray this Court adjudicate this dispute and enter judgment:

o     That GENERAL MOTORS negligently failed to recall the Subject Pontiac;

o     That GENERAL MOTORS' violation caused damages to Plaintiffs; and

o     That GENERAL MOTORS is liable to Plaintiffs in the amount of such damages.

Plaintiffs further pray for an award of costs, interest, and such other relief as this Court may find just and equitable.

## COUNT VI
## VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq*.)

91.     Plaintiffs incorporate each and every allegation set forth above.

92.     This claim is brought on behalf of Plaintiffs who are California residents.

93.     GENERAL MOTORS is a "person" under CAL. CIV. CODE § 1761(c).

94.     Plaintiffs are "consumers," as defined by CAL. CIVIL CODE § 1761(d), who purchased the Subject Pontiac.

95.     The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" CAL. CIV. CODE § 1770(a).

96.     GENERAL MOTORS has engaged in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et seq*., as described above and below, by among other things, representing that Subject Pontiac and other like it that have characteristics, uses, benefits, and qualities which they do not have; representing that Subject Pontiac and ones like it are of a particular standard, quality, and grade when they are not; advertising the Subject Pontiac and ones like it with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving the Subject Pontiac has been supplied in accordance with a previous representation when it has not.

97.     In the course of its business, GENERAL MOTORS systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GENERAL MOTORS also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Subject Pontiac and ones like it.

98.     From the date of its inception on July 11, 2009, GENERAL MOTORS knew of

many serious defects affecting many models and years of GENERAL MOTORS vehicles, because of (i) the knowledge of GENERAL MOTORS' personnel; (ii) documents and databases that transferred from the old GENERAL MOTORS to the new GENERAL MOTORS; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of GENERAL MOTORS' TREAD Act obligations, as discussed above.  GENERAL MOTORS became aware of other serious defects and systemic safety issues in GENERAL MOTORS vehicles years ago, but concealed all of that information until recently.

99.     GENERAL MOTORS was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  GENERAL MOTORS concealed this information as well.

100.    According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and GENERAL MOTORS should have recalled the vehicles years ago and thereby prevented many of those deaths and injuries.

101.    By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, GENERAL MOTORS engaged in unfair and deceptive business practices in violation of the CLRA.

102.    In the course of GENERAL MOTORS' business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  GENERAL MOTORS compounded the deception by repeatedly asserting that GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

103.    GENERAL MOTORS' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM branded vehicles, the quality of the GENERAL MOTORS brand, the devaluing of safety at GENERAL MOTORS, and the true value of the Subject Pontiac and ones like it.

104.    GENERAL MOTORS intentionally and knowingly misrepresented material facts regarding the Subject Pontiac and ones like it with an intent to mislead Plaintiffs.

105.    GENERAL MOTORS knew or should have known that its conduct violated the CLRA.

106.    As alleged above, GENERAL MOTORS made material statements about the safety and reliability of the Subject Pontiac and ones like it and the GENERAL MOTORS brand that were either false or misleading.

107.    GENERAL MOTORS owed Plaintiffs a duty to disclose the true safety and reliability of the Subject Pontiac and ones like it and the devaluing of safety at GENERAL MOTORS because GENERAL MOTORS:

a. Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees

from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b. Intentionally concealed the foregoing from Plaintiffs; and/or

c. Made incomplete representations about the safety and reliability of the Subject Pontiac and ones like it generally, and the power steering and other defects in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

108.    Because GENERAL MOTORS fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Subject Pontiac has greatly diminished.  In light of the stigma attached to those vehicles by GENERAL MOTORS' conduct, they are now worth significantly less than they otherwise would be.

109.    GENERAL MOTORS' systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs.  A vehicle made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

110.    Plaintiffs suffered ascertainable loss caused by GENERAL MOTORS' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased the GM-branded vehicles like the Subject Pontiac vehicles after the date of new GENERAL MOTORS' inception either would have paid less for their vehicles or would not have purchased or leased them at all.

111.     Regardless of time of purchase or lease, no one, including Plaintiffs would have maintained and continued to drive their defective vehicles had they been aware of GENERAL MOTORS' misconduct.  By contractually assuming TREAD Act responsibilities with respect to old GENERAL MOTORS' vehicles, new GENERAL MOTORS' effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  GENERAL MOTORS had an ongoing duty to all GM-branded vehicle owners to refrain from unfair and deceptive acts or practices under the CLRA.  And in any event, Plaintiffs suffered ascertainable loss of the diminished value of their vehicle (not to mention physical injuries) as a result of GENERAL MOTORS' deceptive and unfair acts and practices made in the course of GENERAL MOTORS' business.

112.     GENERAL MOTORS' violations present a continuing risk to Plaintiffs as well as to the general public.  GENERAL MOTORS' unlawful acts and practices complained of herein affect the public interest.

113.     As a direct and proximate result of GENERAL MOTORS' violations of the CLRA, Plaintiffs have suffered injury-in-fact and/or actual damage.

114.     Under CAL. CIV. CODE § 1780(a), Plaintiffs seek monetary relief against GENERAL MOTORS measured as the diminution of the value of their vehicles caused by GENERAL MOTORS' violations of the CLRA as alleged herein.

115.     Plaintiffs also seek punitive damages against GENERAL MOTORS because it carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to potential cruel and unjust hardship as a result. GENERAL MOTORS intentionally and willfully deceived Plaintiffs on life-or-death matters, and

concealed material facts that only GENERAL MOTORS knew.  GENERAL MOTORS'

unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under

CAL. CIV. CODE § 3294.

116.    Plaintiffs further seek an order enjoining GENERAL MOTORS' unfair or

deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under

CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

117.    Certain other MDL Plaintiffs have sent a letter complying with CAL. CIV.

CODE § 1780(b).

**WHEREFORE**, Plaintiffs pray this Court adjudicate this dispute and enter judgment:

o        That GENERAL MOTORS violated the CRLA;

o        That GENERAL MOTORS' violation caused damages to Plaintiffs; and

o        That GENERAL MOTORS is liable to Plaintiffs in the

amount of such damages.

Plaintiffs further pray for an award of costs, attorneys' fees, interest, and such other

relief as this Court may find just and equitable.

### COUNT VII
### VIOLATION OF CALIFONRIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200, *et seq.*)

118.    Plaintiffs incorporate each and every allegation set forth above.

119.    California Business and Professions Code § 17200 prohibits any "unlawful,

unfair, or fraudulent business act or practices."  GENERAL MOTORS has engaged in unlawful,

fraudulent, and unfair business acts and practices in violation of the UCL.

120.    GENERAL MOTORS violated the unlawful prong of § 17200 by the following:

 a. violations of the CLRA, CAL. CIV. CODE § 1750, et seq., as set forth in California

Count I by the acts and practices set forth in this Complaint.

b. violation of the common-law claim of negligent failure to recall, in that GENERAL

MOTORS knew or should have known that the defective vehicles were dangerous and/or were

likely to be dangerous when used in a reasonably foreseeable manner; GENERAL MOTORS

became aware of the attendant risks after the defective vehicles were sold; continued to gain

information further corroborating the power steering defect; and failed to adequately recall the

defective vehicles in a timely manner, which failure was a substantial factor in causing Plaintiffs

harm, including diminished value and out-of-pocket costs.

c. violation of the National Traffic and Motor Vehicle Safety Act of 1996, codified at 49

U.S.C. §§ 30101-30170, and its regulations. Federal Motor Vehicle Safety Standard ("FMVSS")

573 governs a motor vehicle manufacturer's responsibility to notify NHTSA of a motor vehicle

defect within five days of determining that the defect is safety related.  *See* 49 C.F.R. § 573.6.

121.    GENERAL MOTORS violated these reporting requirements by failing to report

the myriad defects discussed herein within the required time, and failing to timely recall all

impacted vehicles, despite its explicit promise in § 6.15 of the Sales Agreement to comply

with the Safety Act obligations of a "manufacturer" of old GENERAL MOTORS's vehicles.

122.    GENERAL MOTORS also violated the unfair and fraudulent prong of section

17200 by systematically devaluing safety and concealing a plethora of defects in GM-branded

vehicles, information that was material to a reasonable consumer.

123.    GENERAL MOTORS also violated the unfair prong of section 17200 because

the acts and practices set forth in the Complaint, including systematically devaluing safety and

concealing a plethora of defects in GM-branded vehicles, offend established public policy, and

also because the harm GENERAL MOTORS caused consumers greatly outweighs any

benefits associated with those practices.  GENERAL MOTORS' conduct has also impaired

competition within the automotive vehicles market and has prevented Plaintiffs from making fully informed decisions about whether to lease, purchase and/or retain the affected vehicles.

124.    From the date of its inception on July 11, 2009, GENERAL MOTORS knew of many serious defects affecting many models and years of old GENERAL MOTORS vehicles, because of (i) the knowledge of old GM's personnel who remained at new GM; (ii) old GM documents and databases that transferred to new GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of new GM's TREAD Act obligations, as discussed above.  GENERAL MOTORS became aware of other serious defects and systemic safety issues in GENERAL MOTORS' vehicles years ago, but concealed all of that information until recently.

125.    GENERAL MOTORS was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  GENERAL MOTORS concealed this information as well.

126.    According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and GENERAL MOTORS should have recalled the vehicles years ago and thereby prevented many of those deaths and injuries.

127.    By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles

after they were sold, GENERAL MOTORS engaged in unlawful, unfair, or fraudulent business acts or practices in violation of the UCL.

128.    In the course of GENERAL MOTORS business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  GENERAL MOTORS compounded the deception by repeatedly asserting that GM-branded vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

129.    GENERAL MOTORS' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM branded vehicles, the quality of the GENERAL MOTORS brand, the devaluing of safety at GENERAL MOTORS, and the true value of the defective vehicles.

130.    GENERAL MOTORS intentionally and knowingly misrepresented material facts regarding the defective vehicles with an intent to mislead Plaintiffs.

131.    GENERAL MOTORS knew or should have known that its conduct violated the UCL.

132.    As alleged above, GENERAL MOTORS made material statements about the safety and reliability of the defective vehicles and the GENERAL MOTORS brand that were either false or misleading.

133.    GENERAL MOTORS owed Plaintiffs a duty to disclose the true safety and reliability of the defective vehicles and the devaluing of safety at GENERAL MOTORS, because GENERAL MOTORS:

    a. Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts

from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b. Intentionally concealed the foregoing from Plaintiffs; and/or

c. Made incomplete representations about the safety and reliability of the defective vehicles generally, and the power steering defect and other defects in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

134.   Because GENERAL MOTORS fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the defective vehicles has greatly diminished.  In light of the stigma attached to those vehicles by GENERAL MOTORS' conduct, they are now worth significantly less than they otherwise would be.

135.   GENERAL MOTORS' systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs.  A vehicle made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

136.   Plaintiffs suffered ascertainable loss caused by GENERAL MOTORS' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased GM-branded vehicles after the date of new GENERAL MOTORS' inception either would have paid less for their vehicles or would not have purchased or leased them at all.

137.   Regardless of time of purchase or lease, Plaintiffs would not have maintained

and continued to drive the defective Subject Pontiac had they been aware of GENERAL

MOTORS' misconduct.  By contractually assuming TREAD Act responsibilities with respect

to old GM vehicles, new GM effectively assumed the role of manufacturer of those vehicles

because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. §

30118(c).  GENERAL MOTORS had an ongoing duty to all GM-branded vehicle owners to

refrain from unfair and deceptive acts or practices under the UCL.

138.    As a direct and proximate result of GENERAL MOTORS' violations of the

UCL, Plaintiffs have suffered injury-in-fact and/or actual damage.

139.    Plaintiffs request that this Court enter such orders or judgments as may be

necessary, including a declaratory judgment that GENERAL MOTORS has violated the UCL;

an order enjoining GENERAL MOTORS from continuing its unfair, unlawful, and/or

deceptive practices; an order supervising the recalls; an order and judgment restoring to

Plaintiffs any money lost as the result of GENERAL MOTORS' unfair, unlawful, and

deceptive trade practices, including restitution and disgorgement of any profits GENERAL

MOTORS received as a result of its unfair, unlawful, and/or deceptive practices, as provided

in CAL. BUS. & PROF. CODE § 17203, CAL CIV. PROC.

**WHEREFORE**, Plaintiffs pray this Court adjudicate this dispute and enter judgment:

o        That GENERAL MOTORS violated the UCL;

o        That GENERAL MOTORS' violation caused damages to Plaintiffs; and

o        That GENERAL MOTORS is liable to Plaintiffs in the

amount of such damages.

Plaintiffs further prays for an award of costs, attorneys' fees, interest, and such other

relief as this Court may find just and equitable.

## COUNT VIII
## <u>FRAUDULENT CONCEALMENT</u>

140.   Plaintiffs incorporate each and every allegation set forth above.

141.   GENERAL MOTORS concealed and suppressed material facts concerning the quality of its vehicles.

142.    GENERAL MOTORS concealed and suppressed material facts concerning the culture of GENERAL MOTORS – a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

143.   GENERAL MOTORS concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, including the Subject Pontiac and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

144.   GENERAL MOTORS did so in order to boost confidence in its vehicles and falsely assure purchasers and lessees of GENERAL MOTORS vehicles, including the Subject Pontiac that GENERAL MOTORS was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the defective vehicles and because the representations played a significant role in the value of the vehicles.

145.   GENERAL MOTORS had a duty to disclose the many defects in GM-branded vehicles and because they were known and/or accessible only to GENERAL MOTORS. GENERAL MOTORS had superior knowledge and access to the facts; and GENERAL MOTORS knew the facts were not known to, or reasonably discoverable, by Plaintiffs. GENERAL MOTORS also had a duty to disclose because it made many general affirmative

representations about the safety, quality, and lack of defects in GM-branded vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding its actual safety record, safety philosophy, and practices and the actual safety defects in its vehicles.  Having volunteered to provide information to Plaintiffs, GENERAL MOTORS had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value and safety of the defective vehicles including the Subject Pontiac. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind the products whose safety it is responsible for ensuring, are material concerns to a consumer.

146.    GENERAL MOTORS actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost GENERAL MOTORS money, and it did so at the expense of Plaintiffs.

147.    On information and belief, GENERAL MOTORS has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding defects that exist in GM-branded vehicles, including the Subject Pontiac.

148.     Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Subject Pontiac or driven it.

149.    Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they own the Subject Pontiac that diminished in value and caused a wreck. Had Plaintiffs been aware of the many concealed defects that existed in the Subject Pontiac and other like it, and GENERAL MOTORS' callous disregard for safety, Plaintiffs would have

paid less for their vehicles or would not have purchased at all; and certainly wouldn't have continued to drive the car.

150. The value of all Subject Pontiac has diminished as a result of GENERAL MOTORS' fraudulent concealment of the many defects and its systemic safety issues which have greatly tarnished the GENERAL MOTORS brand and made any reasonable consumer reluctant to purchase any of the defective vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

151. Accordingly, GENERAL MOTORS is liable to Plaintiffs in an amount to be proven at trial.

152. GENERAL MOTORS' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich GENERAL MOTORS.  GENERAL MOTORS' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**WHEREFORE**, Plaintiffs pray this Court adjudicate this dispute and enter judgment:

o    That GENERAL MOTORS committed fraud;

o    That GENERAL MOTORS' fraud caused damages to Plaintiffs; and

o    That GENERAL MOTORS is liable to Plaintiffs in the amount of such damages.

Plaintiffs further pray for an award of costs, attorneys' fees, interest, and such other relief as this Court may find just and equitable.

## JURY DEMAND AND PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief as follows:

a.      Compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

b.      Medical expenses and other economic damages in an amount to be determined at trial of this action;

c.      Double or triple damages as allowed by law;

d.      Restitution and disgorgement of profits;

e.      Reasonable attorneys' fees;

f.      Punitive damages;

g.      Injunctive and declaratory relief;

h.      The costs of these proceedings; and

i.      Such other and further relief as this Court deems just and proper.

Dated: March 13, 2019                         Respectfully submitted,

/s/ Adam Zaffos
**FERNALD LAW GROUP APC**
Adam Zaffos, Esq.
Brandon C. Fernald, Esq.
510 W. 6th Street, Suite 700
Los Angeles, California 90014
Tel.: 323-410-0327
Fax: (323-410-0330
adam@fernaldlawgroup.com
brandon.fernald@fernaldlawgroup.com
***Attorneys for Plaintiffs***