UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>GENERAL MOTORS LLC IGNITION<br>SWITCH LITIGATION<br><br><br>This Document Relates to:<br><br>ALL ACTIONS | No. 14-MD-2543 (JMF)<br>No. 14-MC-2543 (JMF)<br><br>Hon. Jesse M. Furman |

## PLAINTIFFS' OPPOSITION TO GENERAL MOTORS LLC'S SEPTEMBER 5, 2019 MOTION FOR SUMMARY JUDGMENT AGAINST THE BELLWETHER ECONOMIC LOSS PLAINTIFFS

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................1

II.  RELEVANT FACTS ..................................................................................................3

    A.   GM has not fixed the ignition switch defects. ....................................................3

        1.   All vehicles subject to Recall No. 14v047 are defective, and
             GM has not cured the defects...........................................................4

            a.   All vehicles subject to Recall No. 14v047, including the
                Service Part Vehicles, were sold with defective ignition
                switches.............................................................................4

                (1)   The first "wave" 14v047 recalled vehicles
                    manufactured with the 423 Delta switch had
                    defective switches.............................................5

                (2)   The second "wave" 14v047 recalled vehicles
                      (Service Part Vehicles) manufactured with the
                      190 Delta switch had defective switches. ...........................6

              b.   All vehicles subject to Recall No. 14v047 are still
                defective.............................................................................7

                (1)   The 14v047 vehicles still have a knee-key defect
                      due to the low placement of the switch on the
                      steering column.............................................8

                  (2)   The 14v047 vehicles also suffer from a single-point-
                      of-failure defect.............................................10

         2.   GM has not cured the ignition switch defects in the vehicles
              subject to Recall Nos. 14v355, 14v394, and 14v400...............................12

             a.   The switches in the vehicles subject to Recall Nos.
                  14v355, 14v394, and 14v400 are defective because they
                  have low torque...........................................................12

              b.   The switches in the vehicles subject to Recall Nos.
                  14v355 and 14v394 are also defective because they
                  still have a knee-to-key defect, and all vehicles subject to
                  Recall Nos. 14v355, 14v394, and 14v400 have a single-
                  point-of-failure defect. ................................................15

        3.   All vehicles subject to Recall No. 14v346 still have a knee-to-key
              defect...............................................................................16

    B.   GM knew about the defects at issue from day one of its existence. ....................16

    C.   Plaintiffs suffered injury in the form of lost time. ................................................18

III.  ARGUMENT ............................................................................................................19

A.    GM's deceptive and fraudulent conduct caused Plaintiffs to suffer legally cognizable harm. ...............................................................20

      1.    Plaintiffs did not bargain for cars with known safety defects.................20

      2.    Recent precedent applying Missouri law confirms manifestation is not required for a Missouri implied warranty claim. ...........................21

B.    Plaintiffs can recover consequential damages in the form of lost time. ...............24

      1.    California does not require a showing of lost wages. ...............................24

      2.    Missouri permits lost-time damages. ......................................................26

      3.    Texas does not require a showing of lost wages.......................................26

C.    Plaintiffs with Service Part Vehicles have viable claims because those vehicles are defective. ...............................................................................27

D.    Plaintiffs who acquired used Old GM vehicles after GM's inception have valid claims against GM given GM's breaches of its uncontested duty to recall Old GM cars with safety defects and GM's strong relationship with the defective cars........................................................29

      1.    Because GM had a strong relationship with the Used-Car Purchasers' vehicles, California law provides a remedy for the economic losses caused by GM's failure to disclose the safety defects in the vehicles. ...............................................................30

      2.    Missouri law also provides a remedy for the Used-Car Purchaser's economic losses caused by GM's failure to disclose the safety defects in vehicles. ...................................................32

      3.    Texas law also provides a remedy for the Used-Car Purchaser's economic losses caused by GM's failure to disclose the safety defects in vehicles. ...................................................36

      4.    The Used-Car Purchasers conferred benefits upon GM sufficient to make out unjust enrichment. ...............................................38

E.    Plaintiffs satisfy applicable reliance requirements. ...............................................39

F.    GM's material omissions violated California, Missouri, and Texas law.............43

G.    Plaintiffs have valid implied warranty claims. ......................................................44

H.    Plaintiffs have valid unjust enrichment claims. .....................................................47

I.    GM has not "mitigated" its unconscionable conduct under Texas law. ...............48

J.    Plaintiffs state claims against GM for fraudulent concealment of the right to file bankruptcy claims because, but for GM's concealment of the Delta Ignition Switch Defect, Plaintiffs' claims would have been timely asserted in the Bankruptcy Court while the GUC Trust still had assets. ...................................................................................................50

K.    Plaintiffs are entitled to injunctive relief. ..............................................................53

IV.    CONCLUSION...................................................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Aguilar v. GM, LLC*,
2013 WL 5670888 (E.D. Cal. Oct. 13, 2013) ........................................................46

*Allen v. JPMorgan Chase Bank*, *N.A.*,
2012 WL 12865210 (N.D. Tex. July 6, 2012) ........................................................27

*Amstadt v. U.S. Brass Corp.*,
919 S.W.2d 644 (Tex. 1996) ...............................................................36, 37, 49

*Anderson v. Ford Motor Co.*,
2017 WL 6733972 (W.D. Mo. Dec. 29, 2017) ......................................................34

*In re Anthem, Inc. Data Breach Litig.*,
162 F. Supp. 3d 953 (N.D. Cal. 2016) ..................................................................24

*In re Anthem, Inc. Data Breach Litig.*,
2016 WL 3029783 (N.D. Cal. May 27, 2016) ........................................................25

*Apodaca v. Whirlpool Corp.*,
2013 U.S. Dist. LEXIS 176363 (C.D. Cal. Nov. 8, 2013) ....................................39

*Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*,
844 F.2d 1174 (5th Cir. 1988) ..............................................................................45

*Beck v. Test Masters Educ. Servs. Inc.*,
994 F. Supp. 2d 98 (D.D.C. 2014) ........................................................................55

*Bradford v. Vento*,
48 S.W.3d 749 (Tex. 2001) ...................................................................................48

*Cameron v. Terrell & Garrett*, *Inc.*,
618 S.W.2d 535 (Tex. 1981) .................................................................................36

*In re Carrier IQ*, *Inc. Consumer Privacy Litig.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) ..................................................................41

*Cel-Tech Commcn's, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ..........................................................................................31

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..............................................................................................19

*Chamberlan v. Ford Motor Co.*,
  369 F. Supp. 2d 1138 (N.D. Cal. 2005) ..............................................................32

*Cholakyan v. Mercedes-Benz USA, LLC*,
  796 F. Supp. 2d 1220 (C.D. Cal. 2011) ...............................................................46

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices, & Prods. Liab. Litig.*,
  295 F. Supp. 3d 927 (N.D. Cal. 2018) ..................................................................41

*Collins v. eMachines, Inc.*,
  134 Cal. Rptr. 3d 598 (Cal. Ct. App. 2011) .........................................................30

*Columbia Pictures Corp. v. De Toth*,
  197 P.2d 580 (Cal. Ct. App. 1948) .......................................................................17

*Conmar Prods. Corp. v. Univ. Slide Fastener Co.*,
  172 F.2d 150 (2d Cir. 1949) .................................................................................18

*Conway v. CitiMortgage, Inc.*,
  438 S.W.3d 410 (Mo. 2014) ...........................................................................33, 35

*Corona v. Sony Pictures Entm't, Inc.*,
  2015 WL 3916744 (C.D. Cal. June 15, 2015) ......................................................24

*Cortez v. State Farm Mut. Auto. Ins. Co.*,
  2006 WL 8435999 (W.D. Tex. Oct. 25, 2006) .....................................................46

*Crewse v. Shelter Mut. Ins. Co.*,
  706 S.W.2d 35 (Mo. Ct. App. 1985)......................................................................52

*Cruz v. PacifiCare Health Sys., Inc.*,
  66 P.3d 1157 (2003)...............................................................................................57

*Daniel v. Ford Motor Co.*,
  806 F.3d 1217 (9th Cir. 2015) ........................................................................39, 40

*Daugherty v. Jacobs*,
  187 S.W.3d 607 (Tex. Ct. App. 2006) ..................................................................49

*DePeralta v. Dlorah, Inc.*,
  2012 WL 4092191 (W.D. Mo. Sept. 17, 2012) ....................................................33

*Doe v. Boys Clubs*,
  907 S.W.2d 472 (Tex. 1995)..................................................................................37

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*,
  2017 WL 3863866 (W.D. Mo. Aug. 3, 2017)........................................................48

*In re Duramax Diesel Litig.*,
   298 F. Supp. 3d 1037 (E.D. Mich. 2018) .......................................................43, 44

*Engalla v. Permanente Med. Grp.*,
   15 Cal. 4th 951 (1997) .....................................................................39, 40, 52

*Eveready Heating & Sheet Metal, Inc. v. D. H. Overmyer, Inc.*,
   476 S.W.2d 153 (Mo. Ct. App. 1972) ........................................................17

*Falk v. GMC*,
   496 F. Supp. 2d 1088 (N.D. Cal. 2007) .....................................................40

*Faltermeier v. FCA US LLC*,
   2016 WL 4771100 (W.D. Mo. Sept. 13, 2006) ........................................34, 35

*Faltermeier v. FCA US LLC*,
   2017 WL 1128467 (W.D. Mo. Mar. 24, 2017), *aff'd*, 899 F.3d 617 (8th Cir.
   2018) ...........................................................................................35

*Farmers & Merchants State Bank of Krum v. Ferguson*,
   617 S.W.2d 918 (Tex. 1981) ..................................................................26, 27

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
   2017 WL 1382297 (E.D. Mich. Apr. 18, 2017) ...........................................57

*Flenniken v. Longview Bank & Tr. Co.*,
   661 S.W.2d 705 (Tex. 1983) ...................................................................36

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*,
   2012 WL 379944 (D.N.J. Feb. 6, 2012) ....................................................42

*Fulford v. Logitech*,
   2009 WL 837639 (N.D. Cal. Mar. 26, 2009) ...............................................32

*Giannullo v. City of N.Y.*,
   322 F.3d 139 (2d Cir. 2003) .................................................................19, 20

*Gibbons v. J. Nuckolls, Inc.*,
   216 S.W.3d 667 (Mo. 2007) ...................................................................34

*In re GM LLC Ignition Switch Litig.*,
   154 F. Supp. 3d 30 (S.D.N.Y. 2015) ........................................................29, 31

*In re GM LLC Ignition Switch Litig.*,
   2016 WL 3920353 (S.D.N.Y. July 15, 2016) ........................................... *passim*

*In re GM LLC Ignition Switch Litig.*,
   202 F. Supp. 3d 362 (S.D.N.Y. 2016) ......................................................29, 35

010440-11/1196612 V1

*In re GM LLC Ignition Switch Litig.*,
   257 F. Supp. 3d 372 (S.D.N.Y. 2017)....................................................43, 44

*In re GMC Anti-Lock Brake Prods. Liab. Litig.*,
   966 F. Supp. 1525 (E.D. Mo. 1997)...............................................................47

*GMC v. Brewer*,
   966 S.W.2d 56 (Tex. 1998).............................................................................47

*Gonzales v. CarMax Auto Superstores, LLC*,
   845 F.3d 916 (9th Cir. 2017) .........................................................................58

*Great Am. Mortg. Inv'rs v. Louisville Title Ins. Co.*,
   597 S.W.2d 425 (Tex. Civ. App. 1980) .........................................................17

*Haas Automation, Inc. v. Denny*,
   2014 WL 2966989 (C.D. Cal. July 1, 2014)............................................53, 54

*Hess v. Chase Manhattan Bank, USA, N.A.*,
   220 S.W.3d 758 (Mo. 2007) .....................................................................41, 42

*Hoffman v. 162 N. Wolfe LLC*,
   228 Cal. App. 4th 1178 (2014) ......................................................................32

*Home Sav. Ass'n v. Guerra*,
   733 S.W.2d 134 (Tex. 1987)...........................................................................37

*Hope v. Nissan N. Am., Inc.*,
   353 S.W.3d 68 (Mo. Ct. App. 2011)...............................................................21

*Howard v. Turnbull*,
   258 S.W.3d 73 (Mo. Ct. App. 2008)...............................................................48

*Int'l Bhd. of Elec. Workers, AFL-CIO, Local Union No. 3 v. Charter Commc'ns, Inc.*,
   277 F. Supp. 3d 356 (E.D.N.Y. 2017) ...........................................................56

*Johnson v. Nissan N. Am., Inc.*,
   272 F. Supp. 3d 1168 (N.D. Cal. 2017) ....................................................31, 32

*Keegan v. Am. Honda Motor Co.*,
   838 F. Supp. 2d 929 (C.D. Cal. 2012) ...........................................................46

*Kwikset Corp. v. Superior Court*,
   246 P.3d 877 (Cal. 2011) ............................................................................... 30

*Lawson v. Town & Country Shops, Inc.*,
   323 P.2d 843 (Cal. Ct. App. 1958) ................................................................25

*Ligon v. City of New York*,
    925 F. Supp. 2d 478 (S.D.N.Y. 2013) ................................................................56

*LiMandri v. Judkins*,
    60 Cal. Rptr. 2d 539 (Cal. Ct. App. 1997) ........................................................32

*Lindemann v. Eli Lilly & Co.*,
    816 F.2d 199 (5th Cir. 1987) ......................................................................44, 45

*Mabry v. Hester*,
    2014 WL 1848739 (S.D.N.Y. May 8, 2014) ......................................................20

*Marshall v. Kusch*,
    84 S.W.3d 781 (Tex. Ct. App. 2002) ................................................................38

*McAdams v. Monier, Inc.*,
    105 Cal. Rptr. 3d 704 (Cal. Ct. App. 2010) ......................................................32

*McLeod v. Gyr*,
    439 S.W.3d 639 (Tex. Ct. App. 2014) ..............................................................37

*Meyer v. Sprint Spectrum L.P.*,
    200 P.3d 295 (Cal. 2009) ..........................................................................25, 58

*Miller v. Keyser*,
    90 S.W.3d 712 (Tex. 2002) ..............................................................................37

*In re Motors Liquidation Co.*,
    2018 WL 2416567 (S.D.N.Y. May 29, 2018) ..............................................50, 52

*In re Motors Liquidation Co.*,
    529 B.R. 510 (Bankr. S.D.N.Y. 2015) ....................................................17, 50, 51

*In re Motors Liquidation Co.*,
    829 F.3d 135 (2d Cir. 2016) ......................................................................29, 50

*Mui Ho v. Toyota Motor Corp.*,
    931 F. Supp. 2d 987 (N.D. Cal. 2013) ..............................................................39

*In re Myford Touch Consumer Litig.*,
    2016 WL 6873453 (N.D. Cal. Nov. 22, 2016) ..................................................40

*Myre v. Meletio*,
    307 S.W.3d 839 (Tex. Ct. App. 2010) ..............................................................37

*Nagy v. Nagy*,
    258 Cal. Rptr. 787 (Cal. Ct. App. 1989) ..........................................................25

*State ex rel. Nixon v. Estes,*
    108 S.W.3d 795 (Mo. Ct. App. 2003) .................................................................33

*Norhill Energy LLC v. McDaniel,*
    517 S.W.3d 910 (Tex. Ct. App. 2017) .................................................................48

*Oldham's Farm Sausage Co. v. Salco, Inc.,*
    633 S.W.2d 177 (Mo. Ct. App. 1982) .............................................................44, 45

*Owen v. GMC,*
    533 F.3d 913 (8th Cir. 2008) .............................................................................45

*Owino v. CoreCivic, Inc.,*
    2018 WL 2193644 (S.D. Cal. May 14, 2018) ...................................................47

*Packard Mfg. Co. v. Indiana Lumbermens Mut. Ins. Co.,*
    203 S.W.2d 415 (Mo. 1947) .............................................................................17

*Patterson Oil Co. v. VeriFone, Inc.,*
    2015 WL 6149594 (W.D. Mo. Oct. 19, 2015) .................................................44, 45

*Patterson v. McMickle,*
    191 S.W.3d 819 (Tex. Ct. App. 2006) .................................................................42

*Peel v. Credit Acceptance Corp.,*
    408 S.W.3d 191 (Mo. Ct. App. 2013) .................................................................33

*People v. JTH Tax, Inc.,*
    151 Cal. Rptr. 3d 728 (Cal. Ct. App. 2013) .......................................................53

*Perales v. Bank of Am., N.A.,*
    2014 WL 3907793 (S.D. Tex. Aug. 11, 2014) ...................................................47

*Rhey v. Redic,*
    408 S.W.3d 440 (Tex. Ct. App. 2013) .................................................................27

*Rogozienski v. Allen,*
    2007 WL 867773 (Cal. Ct. App. Mar. 23, 2007) ..............................................32

*Rupp v. Summerfield,*
    326 P.2d 912 (Cal. Ct. App. 1958) .....................................................................24

*Russo v. Hilltop Lincoln-Mercury, Inc.,*
    479 S.W.2d 211 (Mo. Ct. App. 1972) .................................................................45

*Sanchez v. Guerrero,*
    885 S.W.2d 487 (Tex. Ct. App. 1994) .................................................................49

*SEC v. Saltsman*,
   2016 WL 4136829 (E.D.N.Y. 2016 Aug. 2, 2016)...............................................54

*Serv. Corp. Int'l v. Aragon*,
   268 S.W.3d 112 (Tex. Ct. App. 2008) ...............................................................49

*Seven Elves, Inc. v. Eskenazi*,
   704 F.2d 241 (5th Cir. 1983) ...............................................................................17

*Seymour v. House*,
   305 S.W.2d 1 (Mo. 1957) ......................................................................................26

*Sherlock v. Quality Control Equip. Co.*,
   79 F.3d 731 (8th Cir. 1996) ................................................................................35

*St. Bethel Missionary Baptist Church, Inc., v. St. Louis Builders, Inc.*,
   388 S.W.2d 776 (Mo. 1965) .................................................................................58

*St. Pierre v. Dyer*,
   208 F.3d 394 (2d Cir. 2000)................................................................................19

*Star Indem. & Liab. Co. v. Cont'l Cement Co., LLC*,
   2013 WL 1442456 (E.D. Mo. Apr. 9, 2013)...................................................42, 52

*State Farm Lloyds v. Nicolau*,
   951 S.W.2d 444 (Tex. 1997)................................................................................49

*Steele v. Goddard*,
   2013 WL 3013671 (Tex. Ct. App. June 13, 2013) ............................................38

*Stewart v. Electrolux Home Prods., Inc.*,
   304 F. Supp. 3d 894 (E.D. Cal. 2018)...............................................................46

*Stout v. Turney*,
   586 P.2d 1228 (Cal. 1978) ..................................................................................25

*Sud v. Costco Whoesale Corp.*,
   229 F. Supp. 3d 1075 (N.D. Cal. 2017) .............................................................41

*In re Takata Airbag Prods. Liab. Litig.*,
   2017 WL 5706147 (S.D. Fla. Nov. 1, 2017).......................................................57

*Terry v. Mercedes-Benz, USA, LLC*,
   2007 WL 2045231 (Tex. Ct. App. 2007) ............................................................38

*Tershakovec v. Ford Motor Co.*,
   2018 WL 3405245 (S.D. Fla. July 12, 2018).......................................................21

*In re Toyota Motor Corp. Unintended Acceleration Mktg.*,
   2012 U.S. Dist. LEXIS 189744 (C.D. Cal. May 4, 2012) ....................................31

*Trinity Prods. Inc. v. Burgess Steel, L.L.C.*,
   486 F.3d 325 (8th Cir. 2007) ...............................................................................44

*United States v. GMC*,
   574 F. Supp. 1047 (D.D.C. 1983) ........................................................................31

*Vaguely Qualified Prods. LLC v. Metro. Transp. Auth.*,
   2015 WL 5916699 (S.D.N.Y. Oct. 7, 2015) ........................................................54

*In re Vizio, Inc. Consumer Privacy Litig.*,
   238 F. Supp. 3d 1204 (C.D. Cal. 2017) ...............................................................47

*White v. Bowman*,
   304 S.W.3d 141 (Mo. Ct. App. 2009) ..................................................................34

*Wilson v. John Daugherty Realtors, Inc.*,
   981 S.W.2d 723 (Tex. Ct. App. 1998) ..................................................................38

*Woodling v. Garrett Corp.*,
   813 F.2d 543 (2d Cir. 1987).................................................................................40

## STATUTES

15 U.S.C. § 2304(a)(4)....................................................................................................58

49 U.S.C. §§ 30101-30170 ............................................................................................31

49 U.S.C. § 30102(a)(8)..................................................................................................31

CAL. CIV. CODE § 2332 ..................................................................................................17

MO. REV. STAT. § 407.010(7) ........................................................................................33

MO. REV. STAT. § 407.020.1 ..........................................................................................33

TEX. BUS. & COM. CODE ANN. § 17.45(5) ....................................................................48

TEX. BUS. & COM. CODE § 17.50(a)(1) .....................................................................36, 37

## I.    INTRODUCTION

Defendant General Motors LLC's (GM) motion for summary judgment should be denied. For years, GM knowingly sold millions of cars containing serious safety defects to unsuspecting consumers who paid a price reflecting the belief that the cars had no known defects.  GM placed its customers and the public in grave danger by hiding the truth until it was finally forced to issue historic recalls of millions of defective vehicles in 2014.  The recalls are themselves admissions of defects; the undisputed record also shows that GM knew the vehicles were defective when sold and failed to disclose this material information.

GM's primary arguments fail.  *First*, Plaintiffs respectfully disagree with the Court's August 6, 2019 Order as to whether Plaintiffs have set forth evidence of damages at the point of sale, *see* (Dkt. No. 7055) (motion to reconsider), but, consistent with the Court's instructions, this briefing is limited to (a) liability issues and (b) damages other than benefit-of-the-bargain. As relevant to these issues, including Plaintiffs' remaining claims for injunctive relief, the record shows that the recall "remedies" for the defective ignition switches at issue here were *not* effective.  *See infra* Section III.A.2.  Further, in each of the bellwether states, Plaintiffs may recover "lost time" damages in appropriate circumstances.  *See infra* Section III.B.

*Second*, GM argues that Plaintiffs have no claims because they cannot prove individual damage amounts.  Not so.  Even if the Court denies Plaintiffs' motion for reconsideration of the August 6, 2019 Order, Plaintiffs still have claims for "lost time" and injunctive relief.

*Third*, GM is liable for "lost time" damages to Plaintiffs who bought so-called "Service Part Vehicles"—cars built after the original low-torque "Delta Ignition Switch" was secretly modified by the now-infamous Old GM engineer Ray DeGiorgio—because the evidence shows that the modified switch was still defective, and, in any event, they were subjected to the recall. *See infra* Section III.C.

- 1 -

*Fourth*, GM cannot escape liability to those who purchased defective Old GM cars *after* GM's inception (Used-Car Purchasers).  The bellwether states do *not* restrict consumer-fraud liability solely to those who manufactured or sold the vehicles.  Instead, because GM has a strong relationship with the defective cars (especially given its duty to monitor and repair the cars under the TREAD Act), *and* because GM's conduct caused Plaintiffs' economic losses, the Used-Car Purchasers' claims stand.  *See infra* Section III.D.

*Fifth*, GM's scattered attacks on various claims also fail to meet GM's heavy burden on summary judgment.  In this omissions case, Plaintiffs satisfy relaxed consumer protection reliance requirements based on the materiality of the omitted information, to wit, the existence of serious safety defects (*see infra* Sections III.E-F); Plaintiffs' implied warranty claims survive GM's contractual limitation of remedies, statute of limitations, and merchantability challenges (*see infra* Section III.G); Plaintiffs' alternatively pled unjust enrichment claims survive (*see infra* Section III.H); GM has not mitigated its unconscionable conduct (*see infra* Section III.I); and the California and Missouri Plaintiffs may maintain claims against GM for fraudulent concealment of the right to file bankruptcy claims because, but for GM's concealment of the Delta Ignition Switch Defect, Plaintiffs' claims would have been timely asserted in the Bankruptcy Court while the GUC Trust still had assets (*see infra* Section III.J).

*Sixth*, summary judgment cannot be granted on Plaintiffs' claims for injunctive relief because the record contains ample evidence that the defective vehicles pose an ongoing risk of irreparable bodily harm that cannot be adequately remedied with money damages, and Plaintiffs meet the substantive requirements for obtaining injunctive relief under the laws of the bellwether states.  *See infra* Section III.K.

GM fails to satisfy the heavy burden of demonstrating that summary judgment is warranted.  Its motion should be denied, and except as noted herein, Plaintiffs' claims should proceed to trial.

## II.    RELEVANT FACTS

For ease of the Court's review, "GMSUF" refers to Plaintiffs' Response to Defendant General Motors LLC's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment (Dkt. No. 7097). Plaintiffs also refer to Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Support of Plaintiffs' Opposition to GM's Motion for Summary Judgment Against the Bellwether Economic Loss Plaintiffs ("PSUF"), filed herewith.

### A.    GM has not fixed the ignition switch defects.

The five ignition switch recalls—Recall Nos. 14v047, 14v355, 14v394, 14v400, and 14v346—have not cured the defects plaguing the relevant vehicles.[1]  Plaintiffs' supporting evidence is robust and, at a minimum, presents reasonably disputed issues of fact precluding summary judgment in GM's favor.  The evidence is a compelling combination of facts found in GM's stipulated plea deal with the Department of Justice, GM documents, GM witness testimony, and Delphi documents and witness testimony, buttressed by reliable opinions and targeted testing by Plaintiffs' experts, Dr. Glen Stevick and Steve Loudon.

---

[1] Regarding Recall Nos. 14v118 (side-impact airbags) and 14v153 (power steering), although GM acted unlawfully by knowingly selling defective vehicles and failing to timely recall those vehicles, Plaintiffs acknowledge that the evidence now demonstrates that the remedies offered under those recalls are effective in repairing the defects.

1. **All vehicles subject to Recall No. 14v047 are defective, and GM has not cured the defects.**

   a. **All vehicles subject to Recall No. 14v047, including the Service Part Vehicles, were sold with defective ignition switches.**

Recall No. 14v047 was done in two "waves." In February and March of 2014, GM initiated the recall to cover vehicles containing the "Delta" ignition switch with part number 10392423 (the 423 Delta switch). GMSUF ¶¶ 1-2.[2] In announcing the recall, GM said that the "ignition switch torque performance may not meet General Motors' specification," which could cause the Delta ignition switch to "unintentionally move from the 'run' position to the 'accessory' or 'off' position with a corresponding reduction or loss of power" and potential for airbags not to deploy in a crash. PSUF ¶ 2.

In April 2014, GM expanded the 14v047 recall to include a second "wave" of vehicles, which were manufactured with a modified Delta ignition switch that would, in 2008, be assigned part number 15886190 (the 190 Delta switch). GMSUF ¶ 5; PSUF ¶ 26.[3] The recall notice explained that a defect relating to motor vehicle safety existed in "service parts" and kits containing the 423 Delta switch that may have been used to repair up to 2,664 vehicles and that the recall was being done "[o]ut of an abundance of caution and to provide a replacement switch to all customers whose vehicles could have been impacted by the subject ignition switch . . . ." PSUF ¶ 28. GM calls these the "Service Part Vehicles" and maintains that the vehicles themselves were not defective. GMSUF ¶ 4. This is false; the Service Part Vehicles also had defective, low-torque switches. PSUF ¶¶ 29-56.

---

[2] These vehicles were: 2005-2007 model year (MY) Chevrolet Cobalt; 2007 MY Pontiac G5; 2006-2007 MY Chevrolet HHR and Pontiac Solstice; 2003-2007 MY Saturn Ion; and 2007 MY Saturn Sky vehicles. *Id.* ¶ 1.

[3] The April 2014 expansion of the 14v047 recall included the following vehicles that were manufactured with the 190 Delta switch: 2008-2010 MY Chevrolet Cobalt, 2008-2011 MY Chevrolet HHR, 2008-2010 MY Pontiac Solstice, 2008-2010 MY Pontiac G5, and 2008-2010 MY Saturn Sky vehicles. GMSUF ¶¶ 4-5.

- 4 -

(1)     **The first "wave" 14v047 recalled vehicles manufactured with the 423 Delta switch had defective switches.**

Old GM established a torque specification for the Delta switches in all vehicles subject to Recall No. 14v047 of no less than 15 Newton-centimeters (N-cm).  *Id.* ¶ 7.   The torque specification was communicated to the switch supplier, Delphi, which tested switches pre-production and found that the switches had "low detent plunger force" and did not meet Old GM's specifications.  *Id.* ¶¶ 7-12.   Nonetheless, Old GM installed the defective Delta switches into vehicles, quickly learned of vehicle stalls resulting from the defective switch inadvertently moving out of the "run" position, did nothing to repair or replace the switches, continued to install the defective switches in millions of new vehicles, and concealed the defect.  *Id.* ¶¶ 12-19. GM has *admitted* that it *knew* that these vehicles were sold with defective switches that did not meet the torque specifications; that GM concealed this knowledge from the public and regulators until the recalls in 2014; that GM "falsely represented to consumers that vehicles containing the defect posed no safety concern;" and that GM misled consumers.  *Id.* ¶ 6.   In a Consent Order with NHTSA, GM also admitted to violating the TREAD Act by not disclosing the defect.  And GM agreed to a Deferred Prosecution Agreement (DPA) with the U.S. Department of Justice in which GM consented to the filing of an Information charging it with a scheme to conceal the deadly defect in violation of 18 U.S.C. § 1001, and committing wire fraud in violation of 18 U.S.C. § 1343.  *Id.* ¶ 5.

In 2006, Old GM secretly altered the Delta ignition switch to include a stronger "Catera" plunger that improved torque performance in vehicle models beginning in 2007.  *Id.* ¶¶ 20-26. Contrary to standard company practice and sound engineering and inventory management principles, Old GM did not immediately change the part number for the modified switches, *id.* ¶¶ 20-25, although part number 15886190 was eventually assigned (the 190 Delta switch) for

2008 models after an electrical modification not affecting torque was made.  GMSUF ¶ 5; PSUF ¶ 26.

> ### (2)  The second "wave" 14v047 recalled vehicles (Service Part Vehicles) manufactured with the 190 Delta switch had defective switches.

Contrary to GM's contention, the 190 Delta switch installed in the Service Part Vehicles was also defective.  Old GM knew that the switch did not consistently meet the torque curve specification of 20 plus or minus 5 N-cm, because Delphi's pre-production testing in October and November 2005 found that the modified switch did not comply with the target torque curve. PSUF ¶ 31.  Delphi representatives confirmed to Congress that these test results "mean[t] that the ignition switches currently in use 2008-2011 vehicles [did] not meet GM performance specifications."  *Id.* ¶ 32.  GM's corporate representative confirmed under oath that the modified switches with the Catera plunger, including the 190 Delta switch, were indeed below specification.  *Id.* ¶ 33.  GM testing confirmed that the modified Delta switches did not meet specification and are defective, including GM salvage yard testing in May 2012 showing that nearly half of the *post*-2007 MY Delta vehicles tested had torque below spec.  *Id.* ¶ 34.

Litigation experts for both sides have confirmed that the 190 Delta switch suffers from low torque.  Defense expert Michael Stevenson, who found that 2008 and later model year switches in his sample did not meet the minimum 15 N-cm torque specification approximately 25% of the time, testified that, "[i]f I were presented with a circumstance where 10 to 20 percent . . . of a switch population was below specification, I would not accept that as a population. That's unacceptable."  *Id.* ¶¶ 35-36.  He also testified that the 190 switches contain manufacturing defects.  *Id.* ¶¶ 37-38.  Plaintiffs' expert Glen Stevick's testing obtained similar results, finding that, while torque performance improved for post-2007 Delta switches containing the Catera plunger, 25% of them failed to meet the 15 N-cm torque minimum, and nearly 90%

failed to meet the 20 N-cm design target.  In the 2007 transition year, more than 60% failed to meet the design minimum, and more than 90% of these switches failed to meet the design target. *Id.* ¶¶ 39-41 (citing Nov. 10, 2017 Stevick Report).  Further, GM and its consultants were aware of moving stalls in Service Part Vehicles.  *Id.* ¶¶ 42-46.

GM has repeatedly highlighted the importance of torque, as demonstrated in the following examples.  *First*, GM emphasized that the torque specification applies throughout the life of the vehicle, *id.* ¶ 8, and GM's engineers have repeatedly stressed the importance of meeting GM's torque specification, with GM engineer Gary Altman acknowledging that a vehicle should not be sold if it does not meet GM's torque minimum because the vehicle could be dangerous.  *Id.* ¶ 29.  *Second*, GM initiated Recall 14v047 precisely because, as GM itself said, the "ignition switch *torque performance may not meet General Motors' specification*."  *Id.* ¶ 2 (emphasis added).  *Third*, in response to Delphi's concerns that using the 190 Delta switch in recall repairs would not "actually correct the problem," GM had Delphi overhaul the switch manufacturing process to ensure that each and every switch used in recall repairs met torque specification, and even changed the part number for the improved switch.  *Id.* ¶¶ 47-56.  This modified production process is particularly damning to GM's litigation position that the switches in the Service Part Vehicles were not defective given that GM sold the recall remedy to NHTSA on the basis that every switch would meet torque specifications.  The evidentiary record could not be clearer: the 190 Delta switches used in the Service Part Vehicles were defective.

### b.    All vehicles subject to Recall No. 14v047 are still defective.

While the 14v047 recall remedied the low torque problem, all cars with the Delta switch remain defective because (i) the ignition switch is placed too low on the steering column and is still vulnerable to knee-to-key turn offs, and (ii) the vehicles suffer from a single point of failure

in that critical safety systems, including airbags, are disabled if the ignition switch moves out of the "run" position.

> **(1)** **The 14v047 vehicles still have a knee-key defect due to the low placement of the switch on the steering column.**

As Dr. Stevick has opined, the 14v047 vehicles remain defective because the ignition switch location has not changed and is still vulnerable to knee-to-key turn-offs notwithstanding the key and ring modifications. *Id.* ¶ 57 (citing Nov. 10, 2017 and May 18, 2018 Stevick Reports). Dr. Stevick's opinion is fully supported by GM documents and GM witness testimony.

The ignition cylinder in the 14v047 cars is located in the lower right side of the steering column, placing the key and any items hanging from it close to the driver's right knee. PSUF ¶ 58. Over time, Old GM and then GM attributed inadvertent rotation to several causes, including switch location, and Ray DeGiorgio in 2004 identified this switch location as a "major road block" to solving the problem. *Id.* ¶¶ 59, 61-62 (citing GM documents and GM witness testimony). In early 2005, Old GM engineers proposed a change to the switch location as a "sure solution," which was rejected due to cost considerations. *Id.* ¶ 60 (citing the Valukas report).

On multiple occasions, GM engineers identified direct knee-to-key interaction as a "root cause" of inadvertent switch rotation, in addition to knees hitting items hanging from the key. *Id.* ¶¶ 64-65. In 2012, GM engineer Terrance Connolly opined that the only "realistic[] fix" would be installation of a column knee shroud. *Id.* ¶ 63. In 2014, GM hired consultants at Virginia Tech Transportation Institute (VTTI) to evaluate GM's testing, and VTTI concluded that "the designed torque of the ignition switch had little impact on a driver's ability to manipulate key position with their knee," that the problem was not limited to low-torque, and that several variables contribute to inadvertent key rotation, including knee-to-key interaction. *Id.* ¶ 66 (citing VTTI report and testimony of GM engineer Joe Fedullo). Indeed, VTTI

confirmed that keys could be manipulated out of the "run" position even in vehicles that did not have low-torque switches, *id.*, uncovered customer complaints about knee-to-key incidents, *id.* ¶¶ 69-70, and found that "[a]lthough low-torque ignition switches may be more susceptible to knee-key interactions, it is an issue that increased torque alone will not address," *id.* ¶ 68.  In her deposition, GM engineer Valarie Boatman endorsed VTTI's findings and agreed that direct knee-to-key contact can result in problems even when switches have high torque. *Id.* ¶ 67.

Additional evidence that GM did not solve the knee-to-key defect is the whitewash campaign conducted by GM counsel to limit the "root cause" description of the defect to low-torque. *Id.* ¶¶ 71-85 (citing GM documents).  Just before the recalls were announced in early 2014, GM decision-makers contemplated the implications of citing knee-key contact in the defect description.  Investigator John Murawa concluded by mid-December that the "root cause" of airbag non-deployment in Cobalt models was a combination of factors, including that "[t]he driver's knee may be interacting with the keys (ignition cylinder location)." *Id.* ¶ 72.  But GM attorneys—not engineers—delineated the exact wording to describe the defect, emphasizing that root cause should *not* mention knee-key contact or other factors. *Id.* ¶¶ 77-85.

Tellingly, GM still advises customers to keep all items removed from their key chains even after receiving a replacement switch meeting GM's torque specification. *Id.* ¶ 89 (citing GM documents).  This, of course, would be unnecessary if remedying the low-torque issue with stronger switches addressed the only root cause of inadvertent key rotation.  GM has not "fixed" these vehicles.[4]

---

[4] Moreover, even if low torque is not the root cause of defects (and it is), relying on consumers to change keys and rings and follow GM's instructions to never weight the key is not an effective remedy given that, as GM's own consultants at VTTI have studied, only 20-25% of consumers will comply with the directive. *Id.* ¶ 215.

- 9 -

### (2) The 14v047 vehicles also suffer from a single-point-of-failure defect.

An ignition switch transitioning from "run" to "acc" results in the loss of engine power. A serious safety concern results, as other safety systems power down, including the seat belt pretensioners, power steering, power brakes, electronic stability control, and airbags.  PSUF ¶ 234 (citing Nov. 10, 2017 Loudon Report); *see also id.* ¶¶ 235-38 (citing DPA Statement of Facts).  When the ignition switch moves out of "run," a signal is sent to the car's Body Control Module, which then turns off the power supply to the Sensing Diagnostic Module (SDM), which powers the vehicle's safety systems.  This means that the ignition switch is a "single point of failure": if the ignition switch fails, the vehicle's safety systems—including the airbags—power off.  No backup system or redundancy powers the airbags in the event of an ignition switch malfunction.  *Id.* ¶ 239 (citing Dr. Stevick and Loudon Reports).

As Dr. Stevick opines, engineers "are supposed to avoid single points of failure in safety systems so that safety devices will be available in the event of a failure somewhere else in the system.  The airbag system is an important safety system, and it should not have a single point of failure; it should always be active if the car is moving at high speeds—especially given that GM knew the ignition switches were troublesome."  *Id.* ¶ 240.  In other words, as Mr. Loudon explains, "safety-critical systems are considered safe only if they can withstand the occurrence of any single point failure."  *Id.* ¶ 241.  The ignition-switch recalls at issue in this case did not address this single point of failure.  So, the cars remain defective even after recall.  *Id.* ¶ 242.

In Dr. Stevick's opinion, power should have been supplied to the SDM for a longer period after ignition switch power-off in order to be available during a crash scenario, or the SDM should have been connected directly to the battery and either software logic or an additional hardware circuit should have been implemented to ensure airbag deployment if the

- 10 -

vehicle was still moving.  PSUF ¶ 243 (citing Ex. 8 at 73-75; SJ Ex. 9 at 26-50 (July 29, 2015 Stevick Report); SJ Ex. 10 at 62:10-64:4, 100:2-22, 130:25-135:18 (Sept. 28, 2015 Stevick Dep.)).  Dr. Stevick even designed, built, and tested a simple circuit that powers the SDM if the vehicle is moving more than 15 mph.  PSUF ¶ 244 (citing SJ Ex. 10 at 13:4-19:24 (Sept. 28, 2015 Stevick Dep.)).  Mr. Loudon concurs, opining that the loss of engine power and power steering, moving stalls, and airbag non-deployment present serious safety issues, and that GM should have designed the SDM to remain active and allow the airbags to deploy where the ignition switch moved out of "run."  *Id.* ¶ 245 (citing Ex. 126 at 4).

GM could have fixed this problem but did not.  Alternative designs were available to ensure that safety systems, including airbags, remain active in the event of inadvertent switch rotation.  GM could have implemented a simple circuit that supplied power to the SDM when the vehicle was moving at certain minimum speed, *id.* ¶ 246 (citing Dr. Stevick), a design solution posited by GM's consultants at VTTI.  *Id.* (citing VTTI documents).  And software existed that GM considered installing to allow the SDM and airbags to deploy even if the ignition switch transitioned out of "run."  *Id.* ¶ 247 (citing Nov. 10, 2017 Loudon Report).

GM repeatedly discussed the benefits of SDM prolongation and developed software to mitigate the dangers posed by the ignition switch defect.  *See id.* ¶ 248.  More specifically, GM internally discussed how SDM software could be changed so that the airbags could deploy for a period of time after the ignition switch moved out of "run."  *Id.* (citing SJ Ex. 11 GM-MDL2543-000673219-225); SJ Exs. 12 (GM-MDL2543-003853956-959) and 13 (GM-MDL2543-002134382)).  GM recognized that it would be expensive to install in existing vehicles because replacing hardware may be necessary given that there was not enough ROM space left on the SDMs.  PSUF ¶¶ 249-55 (citing Ex. 48; SJ Exs. 14 (GM-MDL2543-000851826-841), 15 (GM-

MDL2543-004241860-861), 16 (GM-MDL2543-402048593-604), 17 (GM-MDL2543-003501412-414), 18 (GM-MDL2543-002375439-503); Exs. 129-32).   GM engineers and lawyers continued to discuss SDM prolongation, but ultimately opted for a mechanical fix instead of a software change.  PSUF ¶ 254 (citing SJ Exs. 19 (GM-MDL2543-003575716-720), 18 (GM-MDL2543-002375439-503), 20 (GM-MDL2543-002139814-815)).   GM even applied for a patent on technology enabling airbag deployment while the vehicle is in motion without regard to switch position, and GM is now taking steps to implement SDM prolongation in new vehicles.  PSUF ¶ 255 (citing SJ Ex. 21 at 15 (Nov. 13, 2015 Stevick Report); SJ Ex. 22 (GM-MDL2543-400955824); SJ Ex. 23 at 53:1-54:5 (Jul. 21, 2015 John Capp Dep.); *see also* Ex. 130; SJ Ex. 24 at 38:22-40:13, 34:11-16, 86:14-93:9, 96:10-97:14, 94:11-95:6, 101:20-103:2, 104:13-18, 109:4-13, 110:15-111:16, 131:22-132:9, 155:5-7 (June 1, 2015 Vipul Modi Dep.); SJ Ex. 25 at 21:19-27:17 (Nov. 5, 2015 Eric Buddrius Dep.)).   Although GM considered alternative designs, to this day, it has not remedied the single-point-of-failure defect.  PSUF ¶¶ 248-56 (citing GM documents and Loudon Report).

> **2.     GM has not cured the ignition switch defects in the vehicles subject to Recall Nos. 14v355, 14v394, and 14v400.**
>
> > **a.     The switches in the vehicles subject to Recall Nos. 14v355, 14v394, and 14v400 are defective because they have low torque.**

The recall procedure for cars subject to the 14v355, 14v394, and 14v400 recalls consisted entirely of modifying key covers and key rings.[5]  GM contends that these switch defects differ from the 14v047 defect, even though all of the vehicles in all four recalls have the same defect (a

---

[5] Recall No. 14v355 recalled the 2005-2009 Buick Lacrosse, 2006-2011 Buick Lucerne, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2014 Chevrolet Impala, 2006-2007 Chevrolet Monte Carlo, and 2014 Chevrolet Impala Limited.  PSUF ¶ 90.  Recall No. 14v394 recalled the 2003-2014 Cadillac CTS and 2004-2006 Cadillac SRX.  *Id.* ¶ 130.  Recall 14v400 applied to the 2000-05 Chevy Impala, 2000-05 Chevy Monte Carlo, 1997-2003 Chevy Malibu, 2004-05 Chevy Malibu Classic, 1999-2004 Olds Alero, 1998-2002 Olds Intrigue, 1999-2005 Pontiac Grand Am, and 2004-08 Pontiac Grand Prix.  *Id.* ¶ 176.  GM said the defect underpinning all three recalls related solely to a key ring carrying added weight which, if bumped or if the vehicle goes off road or experiences another jarring event, may cause the key to unintentionally rotate out of "run."  *Id.* ¶¶ 91, 131; GMSUF ¶ 18.

weak switch) that created exactly the same safety risks (inadvertent rotation with moving stalls and loss of safety systems).  The low-torque defect in these switches has not been remedied by GM's recalls that merely change key covers and key rings.

GM has known since its inception that the defect in the 14v355 vehicles is low-torque ignition switches.  In 2005, Old GM's Laura Andres reported that her 2006 Impala stalled after hitting a large bump in the road when her knee did not hit the key.  PSUF ¶¶ 93-102 (citing Old GM documents and Ms. Andres' testimony).  A company technician confirmed the problem, advising that inadvertent rotation does not occur in switches that have a "stronger detent."  *Id.* ¶ 97.  Engineer Jim Zito said that he noticed the problem on other Old GM vehicles.  *Id.* ¶ 101.  Ms. Andres called it a "serious safety problem" and said that Old GM should "seriously consider changing this part to a switch with a stronger detent."  *Id.* ¶ 98.  Indeed, GM torque testing in 2014 found that the 14v355 vehicle switches performed below the target specification of 20 N-cm; many switches had torque well below the 15 N-cm minimum; and a majority of those tested did not satisfy the minimum.  *Id.* ¶¶ 117-21 (citing GM documents and testimony of GM engineers Joe Reiss and Brian Thompson).  Dr. Stevick's testing also found that all three relevant switch models implicated by Recall No. 14v355 (which have the same housing and mechanics) failed GM's minimum torque specification of 15 N-cm.  *Id.* ¶ 122 (citing Nov. 10, 2017 Stevick Report).

Cost, not safety, drove GM's decision not to replace the switches in the 14v355 vehicles. *Id.* ¶¶ 106-16 (citing GM documents and testimony of GM engineers Joe Reiss and Brian Thompson).  By replacing only key covers and rings, and not switches (as was done in Recall No. 14v047), GM saved approximately $176 million.  *Id.* ¶ 116.

Low-torque switches also play a pivotal role in the 14v394 defect, which has not been remedied by installing two key rings and a key insert.  *Id.* ¶¶ 155-59 (citing Nov. 10, 2017 Stevick Report, GM documents, and testimony of GM engineer Brian Thompson).  GM testing in 2014 revealed that a significant number of switches were below the torque specification.  *Id.* ¶¶ 160-65 (citing GM documents and testimony of GM engineer Brian Thompson).  This is not surprising, as the "Catera" switch installed in 2003-07 Cadillac CTS and 2004-2006 Cadillac SRX vehicles included in Recall 14v394 (as well as the Epsilon ignition switch installed in the Recall 14v400 vehicles) is "extremely similar" to the Delta switch that was replaced in Recall No. 14v047.  *Id.* ¶¶ 132-36 (citing GM documents, testimony of GM engineer Brian Thompson, Delphi documents, and testimony of Delphi engineer Eric Mattson).  And like the Delta switch, pre-production testing of the Catera switch revealed torque that did not meet Old GM's minimum specification.  *Id.* ¶¶ 137-38.[6]  Further, a GM employee experienced a stall in his 2011 CTS caused by knee contact with the key fob, even though the key had a hole rather than a slot, *id.* ¶ 147 (GM contends that the slot, coupled with new key rings, fixes the problem).

As for Recall No. 14v400, while GM told NHTSA that the defect was limited to the risk of a key ring carrying added weight (GMSUF ¶ 18), GM internally described the "root cause" of the defect as "[t]he ignition switch torque performance may be below target curve," or, in other words, low-torque failing to meet GM's torque specifications.  PSUF ¶ 177.  Early on, Old GM engineers increased the detent plunger force in order to increase torque, *id.* ¶¶ 179-99 (citing GM documents and testimony of GM engineers Brian Thompson and Ray Romeo), but this did not solve the problem.  GM testing in 2014 demonstrated switch torque well below 15 N-cm for

---

[6] While the Catera switch was redesigned in 2006 for the Cadillac SRX, the plunger and spring remained the same as in the original Catera.  *Id.* ¶¶ 140-41.  And while the switch was redesigned again for the CTS models beginning in model year 2008, inadvertent switch rotation problems impelled GM to change the key head opening from a slot to a hole and use smaller key rings.  *Id.* ¶¶ 142-47.

certain Malibu, Grand Am, Alero, Impala, Monte Carlo, Grand Prix, and Intrigue models, results that GM did not disclose to NHTSA. *Id.* ¶¶ 205-09 (citing GM documents and testimony of GM engineers Brian Thompson and Valarie Boatman). Dr. Stevick's testing of three switch part numbers associated with Recall No. 14v400 showed that *all* switches failed GM's minimum torque specification of 15 N-cm. *Id.* ¶ 210.[7]

        **b.**     **The switches in the vehicles subject to Recall Nos. 14v355 and 14v394 are also defective because they still have a knee-to-key defect, and all vehicles subject to Recall Nos. 14v355, 14v394, and 14v400 have a single-point-of-failure defect.**

The 14v355 vehicles also remain defective because the key insert and ring changes do not eliminate the potential for knee-to-key interaction, just as those modifications did not remedy the 14v047 defect. *See supra* Section II.A.b.1. In an early version of a Safety Field Investigation report, GM investigator Joe Reiss described the technical root cause as "Driver interaction with the key or weight of items on key ring," a description that he testified was supported by the customer complaint TREAD data that he had reviewed. But he later removed the knee-key language from the root-cause description and admitted that the omission was not supported by data or testing. PSUF ¶¶ 128-29 (citing GM documents and testimony of Joe Reiss). For vehicles subject to the 14v394 recall, GM testing revealed switch rotations caused by direct knee-to-key contact that is not cured by simply changing key slots and rings, *id.* ¶¶ 168-72 (citing GM documents and testimony of GM engineers Valarie Boatman and Brian Thompson), and GM has received reports of rotations caused by knee-key contact, *id.* ¶¶ 148-154 (citing GM documents and testimony of GM engineers Mark Beauregard and Brian Thompson). And all vehicles involved in all three recalls, like the 14v047 vehicles, still suffer from a single-point-of-

---

[7] Dr. Stevick also found that suppliers of replacement keys for the subject GM cars are selling keys with slots, thereby mooting the effectiveness of even the slot-to-hole key insert half-measure. SJ Ex. 38 at 208-10 (July 11, 2018 Stevick Dep.).

failure defect, *id.* ¶¶ 234-56 (citing Dr. Stevick and Loudon Reports, VTTI documents, GM documents, and testimony of GM engineer Vipul Modi).

### 3.    All vehicles subject to Recall No. 14v346 still have a knee-to-key defect.

Recall No. 14v346 involves an admitted knee-to-key defect in the 2010-2014 Chevrolet Camaro for which GM made available new key heads and key rings.  But this action is not an adequate remedy; the vehicles still have a knee-to-key defect because of the location of the switch low on the steering column.  *Id.* ¶¶ 216-33 (citing GM documents, testimony of GM engineers Valarie Boatman and Anthony Melocchi, and Nov. 10, 2017 Stevick Report).  Prior to announcing the recall, GM's Valarie Boatman conducted testing and recommended rotating the key blade position 54 degrees counter clockwise, which averted knee-key contact problems by orienting the key so that it is less likely to be hit by the driver's knee.  *Id.* ¶¶ 224-26.  But GM did not implement Boatman's recommendation, instead choosing the less expensive option of removing the key blade from the fob and attaching it to a ring, a modification that resulted after testing just five subjects on a single afternoon.  *Id.* ¶ 227.  Boatman's testing showed that the key and ring change alone, which she described as a "temporary solution," still resulted in a "medium" risk that knee-key contact would occur for certain drivers.  *Id.* ¶¶ 228-32.  At a minimum, blade rotation should have been part of the Recall No. 14v346 remedy.

## B.    GM knew about the defects at issue from day one of its existence.

Plaintiffs' proof demonstrates that Old GM had knowledge of the pre-Sale Defects.[8] Because GM retained nearly all of Old GM's employees, documents and databases, *id.* ¶¶ 277-

---

[8] The "pre-Sale Defects" are all those that first impacted vehicles sold before the July 20, 2009 effective date of the bankruptcy Sale—all the defects at issue here *except* for the defect that led to Recall No. 14v346.

308, Old GM's knowledge of the Defects is imputed to GM from its inception.[9]  *See, e.g.*, CAL. CIV. CODE § 2332 ("both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other");[10] *Eveready Heating & Sheet Metal, Inc. v. D. H. Overmyer, Inc.*, 476 S.W.2d 153, 155 (Mo. Ct. App. 1972) ("unbroken line of decisions" provides that "knowledge of an agent while acting within the scope of authority [is] knowledge of the principal");[11] *Great Am. Mortg. Inv'rs v. Louisville Title Ins. Co.*, 597 S.W.2d 425, 432 (Tex. Civ. App. 1980) ("knowledge of an agent relating to information, acts and events within the scope of the agency is imputed to the principal").[12]

Contrary to GM's position in prior briefing, Plaintiffs' imputation argument is not limited to the fact that some employees worked at both companies.  Rather, a "critical mass" of high-level Old GM employees with knowledge of the Delta Ignition Switch Defect stayed on at GM, *In re Motors Liquidation Co.*, 529 B.R. at 558 n.154, and the same is necessarily true for the other pre-Sale defects since virtually *all* Old GM employees transferred to GM.  PSUF ¶¶ 285, 298-308.  They worked in the same capacities at GM with the same TREAD Act responsibilities for monitoring and remedying safety defects in all Old GM and GM vehicles and accessed the same information to perform the same job functions with respect to those vehicles.  *Id.* ¶¶ 285-

---

[9] *See, e.g.*, *In re Motors Liquidation Co.*, 529 B.R. 510, 538 (Bankr. S.D.N.Y. 2015) ("at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion . . . .").

[10] *See also Columbia Pictures Corp. v. De Toth*, 197 P.2d 580, 587 (Cal. Ct. App. 1948) (the principal is "charged with knowledge which his agent acquires before the commencement of the relationship when that knowledge can reasonably be said to be present in the mind of the agent while acting for the principal").

[11] *See also Packard Mfg. Co. v. Indiana Lumbermens Mut. Ins. Co.*, 203 S.W.2d 415, 421 (Mo. 1947) (corporate agent's knowledge within the scope of his authority and employment is imputed to the corporation).

[12] *See also Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241, 245 (5th Cir. 1983) (collecting Texas authorities).

296.[13]   None of GM's authorities involve remotely similar facts,[14] and Old GM's pre-Sale knowledge of the defects is imputed to—and in fact was transferred to and possessed by—GM.

## C.    Plaintiffs suffered injury in the form of lost time.

As the Court has recognized, damages occur at the point of sale, *In re GM LLC Ignition Switch Litig.*, 2016 WL 3920353, at *30 (S.D.N.Y. July 15, 2016) ("*TACC Order*"), when GM's omissions caused Plaintiffs to acquire defective cars they otherwise would not have acquired or for which they would have paid less.  *See id.* at *20 ("a concealed defect" that "implicated a safety issue . . . would have affected a reasonable person's decision to purchase a car—making the omission material").  Indeed, each of the Plaintiffs testified that safety was a materially important factor in their purchase or lease of their vehicle, and that they would not have bought their vehicle, or would have paid less, had GM disclosed the defects.  PSUF ¶¶ 266-67.  Of course, GM understood that safety was and is an important factor in a consumer's purchase decision. *Id.* ¶¶ 257-63.  For example, in 2006 customers told Old GM that "safety is the price of entry today the way vehicle quality was a few years ago," *id.* ¶ 263, and in 2012, GM recognized that safety "ranks among the top 10 reasons for purchase," *id.* ¶ 259.  That is why GM includes implicit and explicit safety messages in so much of its vehicle advertising and promotional material. *Id.* ¶ 268.

GM's understanding of the importance of safety to consumers is echoed in publicly available research, including *Consumer Reports* surveys in which 88% of participants reported

---

[13] Indeed, Old GM documents are now GM documents.

[14] In arguing against imputation in the past, GM has relied on *Conmar Products Corp. v. Universal Slide Fastener Co.*, 172 F.2d 150 (2d Cir. 1949), but that case is inapposite.  The *Conmar* plaintiff had to prove that the defendants knew that plaintiff's former employees had executed contracts promising not to divulge plaintiff's methods, and that defendants "induced the men to divulge the secrets they had learned." *Id.* at 154.  The Second Circuit affirmed the district court's finding that defendants "had no knowledge of the secrecy contract," *id.*, and therefore ruled in favor of the defendants: "[h]aving acquired the secrets innocently, they were entitled to exploit them." *Id.* at 157.  *Conmar* provides no support for GM.

- 18 -

safety as a "top three" priority in purchasing a vehicle. *Id.* ¶¶ 264-65. Plaintiffs' advertising expert reliably concludes that safety is a major consideration for consumers. *Id.* ¶ 268. Even GM's own experts recognize the importance of safety and that damaging information and recalls can adversely impact the company's brand as a whole. *Id.* ¶ 271.

Plaintiffs were damaged by losing valuable time in responding to the recall notices and taking the vehicles to the GM dealership for recall service.[15] Many Plaintiffs spent hours and sometimes days of their time seeking and waiting for recall repairs. *See, e.g.*, *id.* ¶¶ 411 (Plaintiff Thomas), 420 (Plaintiff Akers), 479 (Plaintiff Witherspoon), 505 (Plaintiff Fuller). Plaintiffs' expert Ernest Manuel has created a reliable model for estimating these consequential damages in terms of average time spent. *Id.* ¶¶ 272-76.

### III.   ARGUMENT

Summary judgment is inappropriate here because there are genuine issues of material fact supporting Plaintiffs' claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). GM has not satisfied its initial burden of demonstrating the absence of a genuine issue of material fact in any area. *See id.* at 322. If the movant fails to carry that initial burden, the motion must be denied, even if the opposing party has not disputed any of the moving party's facts. *See id.* at 140-41; *St. Pierre v. Dyer*, 208 F.3d 394, 404-05 (2d Cir. 2000).

A moving party cannot satisfy its burden by simply stating an affirmative fact that is unsupported in the evidentiary record. *See, e.g.*, *Giannullo v. City of N.Y.*, 322 F.3d 139, 141 n.2, 143 n.5 (2d Cir. 2003); *St. Pierre*, 208 F.3d at 404-05. A defendant seeking summary judgment must introduce admissible, supporting evidence. *St. Pierre*, 208 F.3d at 405. Allowing anything else "would derogate the truth-finding functions of the judicial process by substituting

---

[15] As shown below, in California, lost time is itself sufficient to confer a plaintiffs' entitlement to these damages; in other states, damages are available for people who suffered lost wages.

convenience for facts." *Giannullo*, 322 F.3d at 143 n.5.  In making its determination, the Court "must construe all evidence in the light most favorable to the non-movant, which requires drawing all reasonable inferences in the non-movant's favor."  *Mabry v. Hester*, 2014 WL 1848739, at *1-2 (S.D.N.Y. May 8, 2014) (Furman, J.).

There are ample genuine issues of material fact here, and GM cannot carry its burden of demonstrating that it is entitled to summary judgment.

**A.      GM's deceptive and fraudulent conduct caused Plaintiffs to suffer legally cognizable harm.**

**1.      Plaintiffs did not bargain for cars with known safety defects.**

The Court has repeatedly held that Plaintiffs' "benefit-of-the-bargain" injury occurs at the moment of purchase, and that "the benefit-of-the-bargain defect theory . . . measures the difference in value between the defective car the consumer received and the defect-free car the consumer thought she was getting (and for which she paid)."  *TACC Order*, 2016 WL 3920353, at *30.  Plaintiffs' point-of-sale model of harm has been rejected by this Court, and Plaintiffs have moved to reconsider or for interlocutory appeal.  Plaintiffs address below issues that remain relevant, either because they were not addressed in the Court's August 6 Order (*e.g.*, "lost time" damages), or because they are relevant to both issues that were addressed *and* to issues that were not addressed by the August 6 Order (*e.g.*, the question of whether the recalls were effective, as relevant to the necessity for injunctive relief).

Plaintiffs assert that the recalls did not fix the ignition switch-related defects.  In other words, with regard to all defects other than side airbag (Recall No. 14v118) and power steering (Recall No. 14v153), there is—at a minimum—an issue of fact as to whether GM's recall repairs actually cured the defects.  As described above, the evidence indicates that GM chose not to fix aspects of the cars that GM knew were causing or contributing to the safety hazards, and as a

result the cars remain defective.  Vehicles subject to the 14v355, 14v394, and 14v400 recalls still suffer from low-torque switch defects because GM did not replace the switches as part of the recalls; vehicles subject to the 14v047, 14v355, and 14v394 recalls still suffer from knee-to-key defects because of the low placement of the ignition switch on the steering column; and all of the vehicles still have a single-point-of-failure defect because critical safety systems, including airbags, are disabled if the ignition switch moves out of run.  *See Section* II.A, *supra*.

GM previously contended that none of Plaintiffs' evidence demonstrating the un-remedied defects is admissible, and now apparently considers this evidence as somehow mooted by the August 6, 2019 Order, although the Court did not rule on this factual issue.  While Plaintiffs rely on the opinions of experts Glen Stevick and Steve Loudon, much of the evidence is comprised of GM's admissions from its own switch testing.  For example, GM's testing demonstrates that switches in cars subject to the 14v355, 14v394, and 14v400 recalls suffer from low torque switches that do not meet GM's specifications.  *See* PSUF ¶¶ 117-21, 160-65, 205-09.

### 2. Recent precedent applying Missouri law confirms manifestation is not required for a Missouri implied warranty claim.

GM does not dispute that manifestation is not required for Plaintiffs to prevail on any of their California claims or the majority of their Missouri claims.  While this Court previously held that a single Missouri Court of Appeals case—*Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68 (Mo. Ct. App. 2011)—"suggests that . . . manifestation is required to plead a viable breach of warranty claim under Missouri law[,]" *TACC Order*, 2016 WL 3920353, at *35, subsequent developments in the law confirm this is not so.  Earlier this year, a federal court held that *Hope*'s reliance on two Eighth Circuit cases was misplaced because neither "were decisions based on Missouri law[.]"  *Tershakovec v. Ford Motor Co.*, 2018 WL 3405245, at *8 (S.D. Fla. July 12, 2018) (declining to require manifestation and denying motion to dismiss Missouri implied warranty

claims).   Consequently, *Hope* alone "is unpersua[sive] that the clear weight of authority in Missouri requires a manifestation of the defect[.]"   *Id.*; *see also* Dkt. No. 6028, Op. & Order Re Manifestation, Lost Time, & Unjust Enrichment at 7 (Sept. 12, 2018) ("the Court can no longer say with confidence that, across the states, the 'majority view' is that manifestation is required to state claims for fraud, violations of consumer protection statutes, and breaches of warranty"); *id.* at 8 ("[W]hile manifestation may be helpful in proving the presence of a defect, it does not follow that recovery for economic loss should turn on whether the defect also caused property or personal damage.").

Plaintiffs concede, however, that Texas law requires manifestation in order to prevail on a breach of implied warranty claim.   But there is a genuine issue of material fact regarding defect manifestation in Plaintiffs' vehicles, including the four Texas Plaintiffs and four of the Missouri Plaintiffs that GM has highlighted.   Dawn Fuller (Texas) testified that she has experienced ten to fifteen incidents where "I would put the key in the ignition and try to turn it, but it wouldn't turn. And the steering column felt locked up, and the wheel wouldn't turn.   Each time I would take the key out and wait and try again.   And eventually it would turn."   PSUF ¶ 504 (citing Nov. 20, 2017 D. Fuller Dep. Tr. at 33:11-23; 55:2-11).

Gareebah Al-ghamdi (Texas) testified that her vehicle experienced twenty or more shutdown events.   *Id.* ¶ 485 (citing May 5, 2017 G. Al-ghamdi Dep. at 59:8-10).   She also testified that during the May 2012 incident "[t]he vehicle was off but the key was still in the on position so I turned it *all the way off*," and "I made sure that the vehicle switch or the ignition was *all the way off* because I didn't want—when this happened, I thought maybe the engine— something was wrong with the engine and I didn't want to restart the vehicle and run the risk of doing more damage than good."   *Id.* (citing May 5, 2017 G. Al-ghamdi Dep. at 61:21-62:4;

- 22 -

63:14-21 (emphasis added)).  Ms. Al-ghamdi also testified that in all of her shutdown incidents, including the May 2012 incident, it is possible that the key was in the accessory position.  *Id.* (citing May 5, 2017 G. Al-ghamdi Dep. at 168:21-169:9).

Lisa McClellan (Texas) testified that she experienced three stalling incidents while driving.  During each incident, the vehicle lost power steering.  *Id.* ¶ 520 (citing May 4, 2017 L. McClellan Dep. at 69:7-10, 70:7-9, 73:20-74:6, 82:3-10, 85:21-86:1, 94:6-11, 95:14-18).  Michael Graciano's stepdaughter (Texas) testified that the vehicle experienced five to six shutdown incidents in which it lost power steering and brakes.  *Id.* ¶¶ 511-12.  In each incident, the ignition switch had moved into the "off" position.  *Id.*

Mario Stefano (Missouri) testified that his vehicle once lost power.  *Id.* ¶ 460 (citing Apr. 14, 2017 M. Stefano Dep. at 52:18-53:4; 93:3-9).  Brad Akers (Missouri) testified that his vehicle lost engine power and that the key was in between the "off" and "on" position.  *Id.* ¶ 416 (citing B. Akers PFS Q 58 at ELPLNTFF00013453).  Kenneth Robinson (Missouri) testified that his vehicle shut down numerous times while he was driving.  *Id.* ¶ 443 (citing May 9, 2017 K. Robinson Dep. at 67:8-20; 70:21-71:11).  And Patrice Witherspoon (Missouri) testified to several vehicle shut offs.  GM's own records show that a GM dealership repaired Ms. Witherspoon's Class Vehicle in November 2011 under the same technical service bulletin for the power steering defect (No. 10187) that was the subject of a recall notice that GM sent her in June 2012.  *Id.* ¶¶ 475-76 (citing GM-MDL2543-305118727-33; GM-MDL2543-305154067-70; ELPLNTFFF00009318).  The recall notice indicated that the recall repair was only required if the defect had manifested which, according to Ms. Witherspoon's records, it had.  *Id.* ¶ 476 (citing ELPLNTFFF00009318; GM-MDL2543-305154067-68).

- 23 -

**B.      Plaintiffs can recover consequential damages in the form of lost time.**

Summary judgment is not warranted with respect to Plaintiffs' claims for lost-time damages under California, Missouri, or Texas law.[16]

**1.      California does not require a showing of lost wages.**

Like Colorado, New York, Ohio, Oklahoma, Utah, and Virginia, California allows recovery for lost time beyond lost earnings.  Dkt. No. 6028, Op. & Order Re Manifestation, Lost Time, & Unjust Enrichment at 82.  California courts expressly distinguish damages for loss of time from damages for loss of earnings, and California law permits lost-time damages for UCL, CLRA, and fraud-based claims in the circumstances presented here.  GM ignores relevant precedent and cites cases out of context in arguing otherwise.

Courts in California recognize "a clear distinction" between damages for "loss of time" and "loss of earnings."  *Rupp v. Summerfield*, 326 P.2d 912, 918 (Cal. Ct. App. 1958).  In *Rupp*, the California Court of Appeals rejected defendant's argument that "allowing a person both the value of his time and loss of earnings is to permit a duplication of damages."  *Id.*  Rather, the court instructed the jury "to place a monetary value upon the time lost away from plaintiff's normal pursuits in addition to money lost in the form of salary or wages."  *Id.*

With respect to restitution under the UCL, federal courts recognize that the contours of economic injury sufficient to confer UCL standing are "still developing."  Notably, some courts define "a loss of money or property" under the UCL far more broadly than GM suggests.  *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 985-86 (N.D. Cal. 2016).  For example, in *Corona v. Sony Pictures Entm't, Inc.*, 2015 WL 3916744, at *4-5 (C.D. Cal. June 15, 2015), the Central District of California held that "costs relating to credit monitoring, identity

---

[16] Plaintiffs seek lost-time damages only on behalf of those Plaintiffs who brought their vehicles in for repair.

theft protection, and penalties"—including the cost of lost time related to such activities, *see id.* at *4 (citing "costs already incurred" as alleged in specific paragraphs of the complaint)— constitute "a cognizable injury" under the UCL.  None of the costs that the *Corona* court discussed included lost income.  *See also In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *26 (N.D. Cal. May 27, 2016) (holding that "using their own time for credit monitoring" in response to a data breach "resulted in damages that may be recoverable" under federal law without discussing lost income).

As to the CLRA, its "any damage" provision may encompass "opportunity costs," which are "the benefit[s] forgone by employing a resource in a way that prevents it from being put to another use."  *Meyer v. Sprint Spectrum L.P.*, 200 P.3d 295, 299 n.1 (Cal. 2009) (citation omitted).  Here, as a result of GM's unfair or deceptive acts or practices, Plaintiffs had to spend time obtaining repairs to their vehicles rather than putting that time to another use.  PSUF ¶¶ 272-276, 313, 320, 329, 341, 349, 353, 361, 363, 370-71, 377, 383, 390-91, 399, 408, 410-11.

As for Plaintiffs' fraud-based claims, the California Supreme Court explicitly recognizes that damages may include "lost time and money reasonably expended in reliance" on a defendant's fraudulent acts.  *Stout v. Turney*, 586 P.2d 1228, 1233 (Cal. 1978); *see also Lawson v. Town & Country Shops, Inc.*, 323 P.2d 843, 849 (Cal. Ct. App. 1958) (citing *Sutter v. Gen. Petroleum Corp.*, 170 P.2d 898, 903 (Cal. 1946)) ("Loss of time and effort or loss of salary . . . proximately caused by making fraudulent misrepresentations . . . have been held to be recoverable."); *Nagy v. Nagy*, 258 Cal. Rptr. 787, 793 (Cal. Ct. App. 1989) (Johnson, J., concurring) (observing in fraud case that "harm suffered through the loss of appellant's investment of time and money in the fathering of a child he was fraudulently led to believe was his own flesh and blood" was "a compensable item of damages").

- 25 -

Here, there are genuine issues of material fact regarding the value of Plaintiffs' lost time. Michelle Thomas testified that she missed three days of work, which equates to $600, dealing with ignition problems on her class vehicle. PSUF ¶ 411 (citing M. Thomas PFS Q 424 at ELPLNTFF00014026). Thomas, Basseri, Cereceres, Padilla, and other Plaintiffs are laypersons who further rely on expert analysis and opinion to prove their damages. Each lost at least 90 minutes of their time, if not longer, waiting for a GM dealership to repair their class vehicle. *Id.* ¶¶ 272-276, 313, 320, 329, 341, 349, 353, 361, 363, 370-71, 377, 383, 390-91, 399, 408, 410-11. This includes Plaintiff Cereceres, whose routine maintenance appointment lasted longer than it would have had her vehicle not required the 90-minute recall repair. GM fails to cite a single authority in support of its contention that plaintiffs may not rely on expert testimony to establish their lost-time damages. GM Br. at 15.

### 2. Missouri permits lost-time damages.

In Missouri, GM concedes that Plaintiffs with evidence of resulting financial losses may recover damages for lost time and that Plaintiff Brad Akers has presented such evidence. GM Br. at 14 (conceding that the Court should not award summary judgment on lost time against Missouri Plaintiff Brad Akers). *See also Seymour v. House*, 305 S.W.2d 1, 3 (Mo. 1957) (in the personal injury context, plaintiffs "may prove a resulting loss of time, and a consequent loss of personal earnings or wages as an item of special damages"). Consequently, summary judgment should be denied with respect to Akers's claims for lost-time damages. Plaintiffs concede that, to the extent other Plaintiffs have not presented evidence demonstrating resulting financial loss, they may not recover for lost time under Missouri law.

### 3. Texas does not require a showing of lost wages.

Texas, too, allows recovery for lost time beyond lost earnings. Specifically, in *Farmers & Merchants State Bank of Krum v. Ferguson*, 617 S.W.2d 918, 921-22 (Tex. 1981), plaintiff

alleged that the defendant bank wrongfully dishonored his checks and that he was entitled to damages for "lost time calling creditors and attempting to explain the situation to them." A Texas jury awarded the plaintiff "$5,000.00 for loss of time," and the Supreme Court upheld the award on appeal, rejecting defendant's argument "that there is no evidence in the record to support the jury's findings on . . . loss of time[.]" *Id.* The result should be no different under statutory consumer law. Indeed, in *Rhey v. Redic*, 408 S.W.3d 440, 454-55 (Tex. Ct. App. 2013), the Texas Court of Appeals affirmed an award for lost-time damages, among other things, in a statutory fraud case. Federal courts applying Texas law likewise recognize the availability of lost-time damages. For instance, in *Allen v. JPMorgan Chase Bank, N.A.*, 2012 WL 12865210, at *3 (N.D. Tex. July 6, 2012), the court included claimed damages under the DTPA for "the value of the time that Plaintiffs spent trying to obtain the correct amount to pay on the loan" when assessing the amount in controversy and denying a motion to remand to state court. Consequently, summary judgment should be denied with respect to Plaintiff Fuller's and Graciano's claims for lost-time damages.[17]

## C.     Plaintiffs with Service Part Vehicles have viable claims because those vehicles are defective.

GM falsely contends that Plaintiffs whose vehicles are subject to the Service Parts Vehicle recall have no claim because their cars are not defective unless the 190 switch was replaced with a 423 switch. Yet GM put into production the 190 switch knowing that it did not meet GM's safety torque specifications—specifications that were so important that GM ensured that *all* of the new switches used in the 14v047 repairs met the required minimum torque spec.

---

[17] Even assuming that Texas law requires evidence of lost earnings to recover damages for lost time, which it does not, Plaintiff Fuller has put forth evidence giving rise to a genuine issue of material fact. Ms. Fuller testified that some of the key incidents happened while she was leaving for work and caused her to miss approximately two hours of work at an hourly rate of $25. PSUF ¶ 505 (citing D. Fuller PFS Q 424 at ELPLNTFF00016420). Thus, there are, at a minimum, genuine issues of material fact regarding whether Fuller may recover lost-time damages and summary judgment should be denied with respect to her claim.

This makes the switches defective.  The evidence clearly demonstrates that Old GM and then GM established the standard and believed—until its litigation stance to the contrary—that cars are defective if their switches may not meet the torque standard.  *See, e.g.*, PSUF ¶ 2 (describing ignition switches as defective because they may not meet the company's torque specification); ¶ 29 (citing GM engineer explaining that vehicles should not be sold unless they meet GM's minimum torque performance requirements); *see also id.* ¶ 32 (citing Delphi testimony explaining that "ignition switches currently in use in [14v047] 2008-2011 vehicles do not meet GM performance specifications").

Thus, Old GM's 2006 design change that ultimately led to the 190 switch did not remedy the defect.  While GM maintains that the longer Catera spring used in the 190 switch effectively cured the low torque problem in the 423 switch, this is untrue, as GM's own documents reveal.  The ignition switches in the Service Part Vehicles are all defective, PSUF ¶¶ 28-56, rendering it unnecessary to test the torque in each individual Plaintiff's car.  And the Service Part Vehicles also suffer from knee-to-key and single-point-of-failure defects.  *See supra* Section II.A.1.b.

For these reasons, Plaintiffs Basseri, K. Robinson, Padilla, Akers, and Hawkins, who have so-called Service Part Vehicles, do not need to show that they had a 423 switch installed, because the evidence shows that both the 190 and 423 switch models are defective.  Tellingly, in issuing the Service Part Vehicles portion of the 14v049 recall, GM did not just recall the 2,664 vehicles into which the 423 switches had been installed.  Instead, it recalled *all* Service Part Vehicles—over 820,000 of them.  PSUF ¶¶ 4, 28.  And, in doing so, it did not examine each switch to determine whether it was a 190 or 423 switch and replace just the 423 switches, but replaced *all* switches.  Nor did it test switches and replace only those not meeting the torque

- 28 -

minimum; again, it replaced *all* switches.  It did so because GM knew that all pre-recall 190 and 423 switches are defective.

In any event, at a minimum, an issue of material fact exists such that summary judgment in favor of GM must be rejected.  As the Court already held in denying GM's *Daubert* and summary judgment motions in the *Ward* case, "whether and to what extent the 190 switch suffers from the same defect as the 423 switch" is a "core factual dispute" on which, based on the evidence, the jury could find for Plaintiffs.  Dkt. No. 4110 at 7; *see also id.* at 14-15 (evidence supported the conclusion that 190 switch was defective but was insufficient to grant summary judgment in favor of Ward).

**D.     Plaintiffs who acquired used Old GM vehicles after GM's inception have valid claims against GM given GM's breaches of its uncontested duty to recall Old GM cars with safety defects and GM's strong relationship with the defective cars.**

As the Second Circuit held, consumers who bought Old GM cars after the effective date of the bankruptcy Sale ("Used-Car Purchasers") may bring claims against GM without impediment from the bankruptcy Sale Order because those Plaintiffs "purchased Old GM cars *after* the closing, without knowledge of the defect or possible claim against New GM."  *In re Motors Liquidation Co.*, 829 F.3d 135, 157 (2d Cir. 2016) (emphasis in original).  Just as it has repeatedly done in the personal injury context,[18] the Court should reject GM's claim that it owed no duty to Used-Car Purchasers because it did not make or sell the cars.  GM's argument must fail because it alone had both knowledge of the defects and the ability to forestall the Used-Car Purchasers' economic losses. Under the consumer protection and fraudulent concealment laws of

---

[18] *See, e.g., In re GM LLC Ignition Switch Litig.*, 154 F. Supp. 3d 30, 37-41 (S.D.N.Y. 2015) (finding New GM had post-sale duty to warn of the Ignition Switch Defect under Oklahoma law); *In re GM LLC Ignition Switch Litig.*, 202 F. Supp. 3d 362, 366-72 (S.D.N.Y. 2016) (same under Virginia law).

010440-11/1196612 V1

the bellwether jurisdictions,[19] GM is liable to Used-Car Purchasers for breaching its clear duty to disclose and remedy safety defects and for foreseeably causing economic harm to *all* who purchased defective Old GM cars after GM's inception.[20]

> **1.  Because GM had a strong relationship with the Used-Car Purchasers' vehicles, California law provides a remedy for the economic losses caused by GM's failure to disclose the safety defects in the vehicles.**

GM cannot contest that it owed a duty to disclose the safety defects at issue. Under the CLRA and the UCL, a duty to disclose exists when a defendant "ha[s] exclusive knowledge of material facts not known or reasonably accessible to the plaintiff," or "when the defendant actively conceals a material fact from the plaintiff." *Collins v. eMachines, Inc.*, 134 Cal. Rptr. 3d 598, 593 (Cal. Ct. App. 2011). A misrepresented (or omitted) fact is material "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action . . . ." *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 892 (Cal. 2011). The Court has held that a concealed safety defect "would have affected a reasonable person's decision to purchase a car—making the omission material." *TACC Order*, 2016 WL 3920353, at *20.

GM cannot evade this duty simply because Old GM made the Used-Car Purchasers' vehicles. From day one of its existence in July 2009, GM was aware of the ignition switch defect in California Plaintiff Michelle Thomas' 2005 Lacrosse, *see* PSUF ¶¶ 277-308, and Ms. Thomas did not have that knowledge when she bought the vehicle in December of 2010. *Id.* ¶ 412. It is also undisputed that GM had disclosure and recall duties with respect to Ms.

---

[19] Plaintiffs are not pursuing implied warranty claims on behalf of Used-Car Purchasers, and (of the bellwether jurisdictions) only have surviving fraudulent concealment claims for Used-Car Purchasers in Missouri.

[20] Confusingly, GM discusses the law on duty to warn in California and Texas (but not in Missouri where, presumably, the law is worse for GM). Because the economic loss Plaintiffs do *not* bring duty to warn claims, they will not address GM's arguments on that score.

Thomas' vehicle under the Federal Safety Act,[21] which required GM to take immediate action as soon as it determined or should have determined that a safety defect exists.  *See, e.g.*, *United States v. GMC*, 574 F. Supp. 1047, 1049-50 (D.D.C. 1983) (Safety Act "imposes an independent duty upon manufacturers of motor vehicles to give notification of and to remedy known safety-related defects").[22]  Because the UCL "borrows" violations of other laws and makes them actionable under its "unlawful" prong, *Cel-Tech Commc'ns*, *Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999), Safety Act violations are actionable under the UCL.  *In re Toyota Motor Corp. Unintended Acceleration Mktg.*, 2012 U.S. Dist. LEXIS 189744, at *265-272 (C.D. Cal. May 4, 2012).  There can be no question that GM's disclosure obligations ran to Plaintiff Thomas' vehicle and therefore to Plaintiff Thomas.

California courts have squarely rejected GM's argument that only consumers who purchase from a defendant may sue under consumer protection laws.  Instead, Used-Car Purchasers can bring claims under the CLRA and the UCL against responsible parties for failure to disclose material facts (including safety defects).  *See Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1183 (N.D. Cal. 2017) (used-car purchasers who did not buy from a Nissan dealer could sue Nissan under the UCL and the CLRA for failure to disclose a latent safety defect because "the CLRA does not require a direct transaction between plaintiffs and defendants") (quoting CAL. CIV. CODE § 1780(a) ("Any consumer who suffers any damage as a result of the use or employment by any person of a method, act or practice declared to be

---

[21] 49 U.S.C. §§ 30101-30170.  A "safety defect" is one that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident."  49 U.S.C. § 30102(a)(8).  It is undisputed that all the defects at issue in this case were "safety defects."

[22] In order to get the bankruptcy Sale approved, GM agreed to step into the shoes of the manufacturer, Old GM, and comply with the Safety Act with respect to Old GM cars.  *E.g.*, *In re GM LLC Ignition Switch Litig.*, 154 F. Supp. 3d at 40.  Accordingly, the Court recognized that the Safety Act fully applied to New GM with respect to Old GM cars.  *Id.* ("The notification and recall obligations under the Safety Act that New GM inherited provide another kind of service and repair duty" with respect to Old GM car owners.).

unlawful by Section 1770 may bring an action against that person.")) ;[23] *see also Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1144 (N.D. Cal. 2005) (used car purchasers "have standing to bring CLRA claims, despite the fact that they never entered into a transaction directly with [the] Defendant"); *McAdams v. Monier, Inc.*, 105 Cal. Rptr. 3d 704, 712-13 (Cal. Ct. App. 2010) ("a cause of action under the CLRA may be established independent of any contractual relationship between the parties").  The same result obtains under the UCL.  *See Johnson*, 272 F. Supp. 3d at 1184 (because the used car purchaser's "allegations are sufficient to state a claim under the CLRA based on the deceptive act of fraudulent omissions or concealment, [she] has likewise stated a claim under the unlawfulness prong of the UCL").  While *LiMandri v. Judkins*, 60 Cal. Rptr. 2d 539, 543 (Cal. Ct. App. 1997), states that the duty to disclose normally arises in the context of a transaction between the parties, GM Br. at 42, GM ignores cases making clear that such a transaction is not *required*.[24]  GM cannot prevail in its effort to avoid liability for the sale of defective used GM vehicles by dint of the fact that it didn't sell or make the cars.

## 2.   Missouri law also provides a remedy for the Used-Car Purchaser's economic losses caused by GM's failure to disclose the safety defects in vehicles.

Just like California, Missouri imposes a duty to disclose a material fact (including a safety defect) when the defendant "has superior knowledge of information not within the fair and reasonable reach of the" plaintiff.  *See TACC Order*, 2016 WL 3920353, at *34 (fraudulent

---

[23] In contrast, the Court dismissed the used-car purchasers' implied-warranty claims under the Song-Beverly Act.  *Johnson*, 272 F. Supp. 3d at 1179.

[24] Instead of discussing those cases, GM relies on a handful of cases that are inapposite or do not contradict Plaintiffs' authorities.  *LiMandri* involved the failure to disclose a security lien to plaintiff, and the court held there was no duty to disclose the lien because there was no transaction or relationship between the plaintiff and the lender holding the lien.  60 Cal. Rptr. 2d at 543-44.  *See also Hoffman v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178 (2014) (defendant, who claimed an easement right in the property purchased by plaintiff, had no duty to disclose that right to plaintiff as there was no transaction between the parties); *Rogozienski v. Allen*, 2007 WL 867773 (Cal. Ct. App. Mar. 23, 2007) (wife's attorney, who had given a gift to the judge presiding over the dissolution proceeding, had no duty to disclose the gift to the husband since no relationship existed between the parties); *Fulford v. Logitech*, 2009 WL 837639 (N.D. Cal. Mar. 26, 2009) (plaintiff did not allege that defendant owned him a fiduciary duty nor that the parties entered into any transaction because plaintiff purchased from a friend, and not from defendant).

concealment); *DePeralta v. Dlorah, Inc.*, 2012 WL 4092191, at *6 (W.D. Mo. Sept. 17, 2012)

(quoting *White v. Bowman*, 304 S.W.3d 141, 149 (Mo. Ct. App. 2009)).[25]  From its inception on

July 2009, GM knew about the ignition switch defect in Missouri Plaintiff Deloris Hamilton's

2000 Oldsmobile Alero, PSUF ¶¶ 277-308, and Ms. Hamilton was unaware of the defect when

she bought in 2012.  *Id.* ¶¶ 429-30.  GM breached its disclosure duties under Missouri law.

Controlling Missouri precedent squarely rejects GM's argument that it had no duty to

Used-Car Purchasers under Missouri law because it did not sell the cars.  GM Br. at 44.  While

GM correctly notes that the MMPA prohibits actionable omissions made "in connection with the

sale or advertisement of any merchandise," *id.* (quoting MO. REV. STAT. § 407.020), GM ignores

Missouri courts' broad interpretation of that provision in particular and the MMPA more

generally: "there is no compelling reason to interpret 'in connection with' to apply only when the

entity engaged in the misconduct was a party to the transaction at the time the transaction was

initiated." *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 415 (Mo. 2014).[26]  Instead, the

MMPA "prohibits the use of the enumerated deceptive practices if there is a relationship between

the sale of merchandise and the alleged unlawful action.  According to the statute, *the unlawful*

*action may occur at any time before, during or after the sale and by any person*." *Id.* at 414

(emphasis added).

---

[25] A fact is material "if it would be likely to induce a reasonable person to manifest his assent, or if the maker
knows that it would be likely to induce the recipient to do so.  The test of materiality is objective and not
subjective." *DePeralta*, 2012 WL 4092191, at *6 (quoting *Grosseohme v. Cordell*, 904 S.W.2d 392, 397 (Mo. Ct.
App. 1995)).

[26] As GM omits, the "in connection with" language of the MMPA is modified by the phrase "the sale or
advertisement of *any merchandise in trade or commerce*."  MO. REV. STAT. § 407.020.1 (emphasis added). This
broad provision generally covers all conduct connected to "trade" and "commerce"—meaning any practice "directly
or *indirectly* affecting the people of [Missouri]."  *Id.* § 407.010(7) (emphasis added); *see also Peel v. Credit
Acceptance Corp.*, 408 S.W.3d 191, 208 (Mo. Ct. App. 2013) (referring to the MMPA's definition of "trade" and
"commerce" as evidence of the breadth of the "in connection with" language in the statute); *State ex rel. Nixon v.
Estes*, 108 S.W.3d 795, 800 (Mo. Ct. App. 2003) ("[T]he definition of trade or commerce . . . makes clear the intent
of the General Assembly that the terms should be understood to include, but not necessarily be limited to, economic
activity which has a direct or indirect effect on the people of this state.").

That the "in connection with" language of the MMPA imposes liability on GM here is underscored by *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007), where the plaintiff sued an automobile wholesaler for concealing the fact that the car the plaintiff purchased from a third-party dealer had been involved in an accident.   In sustaining the MMPA claim against the wholesaler, the court rejected the wholesaler's argument that it was immune from suit because it had sold the car to the dealer but not to Gibbons (the dealer had).  *Id*.  Noting that Missouri "precedent consistently reinforces the plain language and spirit of the statute to further the ultimate objective of consumer protection," the *Gibbons* court held that the "in connection with" language of the MMPA does not require a contractual relationship between the plaintiff and the defendant.  *Id.* at 669-70.  The law is the same for fraudulent concealment.[27]

*Faltermeier v. FCA US LLC*, 2016 WL 4771100, at *1 (W.D. Mo. Sept. 13, 2006), also demonstrates that Used-Car Purchasers may sue here.  There, the plaintiff in 2013 purchased a defective used Jeep manufactured by Chrysler prior to its bankruptcy in 2009.  He brought an MMPA claim for economic loss against Chrysler's successor, FCA, based on alleged misrepresentations made by FCA in press releases opposing NHTSA's recall request in 2013. *Id.* at *2-3.  In seeking dismissal, FCA argued that "the alleg[ed] misrepresentations were not made 'in connection with the sale or advertisement of any merchandise in trade or commerce.'" *Id.* at *6 (quoting MO. REV. STAT. § 407.020.1).  Rejecting FCA's argument, the *Faltermeier* court held that the plaintiff had properly "alleged a relationship between the alleged misrepresentations and the Jeep Vehicle purchases" since "it can be reasonably inferred that FCA expected the representations contained in those statements to reach current and future

---

[27] "[P]rivity of contract between the parties is not an element of fraudulent misrepresentation."  *White v. Bowman*, 304 S.W.3d 141, 147 (Mo. Ct. App. 2009) (citing *Westerhold v. Carroll*, 419 S.W.2d 73, 77 (Mo. 1967)); *Anderson v. Ford Motor Co.*, 2017 WL 6733972, at *3 (W.D. Mo. Dec. 29, 2017) (Missouri law does not require privity of contract for fraudulent concealment claim) (citing *White*, 304 S.W.3d at 147-50)).

- 34 -

owners of Jeep Vehicles" and that "future purchasers of Jeep Vehicles could rely on the statements in making their purchases." *Id.* at *7.[28]

Under Missouri law, then, an aggrieved party may sue a defendant when the defendant has a relationship with the merchandise at issue *and* the defendant's deceptive conduct has caused the plaintiff's damage. *See Conway*, 438 S.W.3d at 414 (*any* "person" can commit the misconduct, and it can occur at any time before the sale). Here, GM had the requisite relationship with Plaintiff Hamilton's vehicle, as it alone had knowledge of the defect and notification and recall obligations under the Safety Act. Moreover, the Court has held that "the relationship between GM and Old GM's customers . . . was 'direct and continuing' and sufficiently 'special' to give rise to a duty to warn . . . ." *In re GM LLC Ignition Switch Litig.*, 202 F. Supp. 3d 362, 371 (S.D.N.Y. 2016). Missouri law is the same. *See Sherlock v. Quality Control Equip. Co.*, 79 F.3d 731, 735 (8th Cir. 1996) (finding sufficient evidence of a duty-to-warn relationship between a successor and its predecessor's customers under Missouri law where the successor "perceived it to be economically advantageous to foster relationships with [the predecessor's] customers; for, through these associations [the successor] would have the opportunity not only to peddle replacement parts, but to one day possibly benefit from the sale of new machines" to those same customers). GM plainly had the requisite relationship with Ms. Hamilton and her vehicle. And GM's misconduct in concealing and failing to disclose the defect is the cause of Plaintiff's economic losses. Ms. Hamilton's claim stands.

---

[28] The *Faltermeier* court subsequently granted summary judgment to FCA because "the press release statements . . . reached Plaintiff *after* he purchased his Jeep," and therefore there was "no connection of any kind with the sale of Plaintiffs' Jeep." *See Faltermeier v. FCA US LLC*, 2017 WL 1128467, at *4 (W.D. Mo. Mar. 24, 2017), *aff'd*, 899 F.3d 617 (8th Cir. 2018) (emphasis in original). In sharp contrast in this omissions case, GM's concealment of and failure to disclose the defect occurred prior to Plaintiff Hamilton's purchase, and prevented her (and all Used-Car Purchasers) from learning the material fact of the safety defect.

### 3. Texas law also provides a remedy for the Used-Car Purchaser's economic losses caused by GM's failure to disclose the safety defects in vehicles.

Texas courts do not require that a plaintiff buy a misrepresented product from the defendant in order to bring a claim under the DTPA. Instead, the plaintiff can bring a claim when the defendant and its misconduct have a sufficient relationship with the product. Here, the Used-Car Purchasers have a claim because of GM's undisputed connection with the defective cars and because GM's failure to disclose the defects at issue caused Plaintiffs' economic damages.

The Texas Supreme Court has held that the DTPA is *not* limited "to deceptive trade practices committed by persons who furnish the goods or services on which the complaint is based," and there is no "other similar privity requirement" under the Act. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540-41 (Tex. 1981). Instead, the "Act is designed to protect consumers from any deceptive trade practice made *in connection with* the purchase or lease of any goods or services." *Id.* at 541 (emphasis added); *see also Flenniken v. Longview Bank & Tr. Co.*, 661 S.W.2d 705, 707 (Tex. 1983) (quoting *Cameron*, 618 S.W.2d at 539) ("A plaintiff establishes his standing as a consumer in terms of his relationship to a transaction, not by a contractual relationship with the defendant.").[29]

Consumer-plaintiffs state a claim under the DTPA when there is a "connection between the plaintiffs, their transactions, and the defendants' conduct . . . ." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649-50 (Tex. 1996). Such a connection exists where, as here, the defendant's actionable conduct is a "producing cause" of the consumer's injury. TEX. BUS. & COM.

---

[29] The Used-Car Purchasers are plainly "consumers" under the DTPA since they "acquired goods or services by purchase or lease" and "the goods or services purchased or leased . . . form the basis of the complaint." *Cameron*, 618 S.W.2d at 539.

CODE § 17.50(a)(1).[30]  A "producing cause" is "a substantial factor which brings about the injury and without which the injury would not have occurred." *Doe v. Boys Clubs*, 907 S.W.2d 472, 481 (Tex. 1995).  The "producing cause" requirement is satisfied by "evidence that the consumer was adversely affected by the defendant's deceptive conduct." *McLeod v. Gyr*, 439 S.W.3d 639, 649 (Tex. Ct. App. 2014) (citations omitted); *see also Home Sav. Ass'n v. Guerra*, 733 S.W.2d 134, 136 (Tex. 1987) (plaintiff states claim when a defendant has "*some connection* either with the actual sales transaction or with a deceptive act related to" it) (emphasis added).

The Texas Used-Car Purchasers present ample proof that GM's failure to disclose (and concealment) was a producing cause of their injuries.  From its inception on July 2009, GM knew of the ignition switch defect in the Texas Used-Car Purchasers' cars, PSUF ¶¶ 277-308, knowledge that these Plaintiffs (and other purchasers) did not have at the time of transacting. *Id.* ¶¶ 489, 499, 507, 510, 523.  Had the Texas Used-Car Purchasers (and other purchasers) been aware of the concealed defects, they would have either paid less for their cars, or not have purchased them. *Id.* ¶¶ 489, 499, 507, 516, 523-24.  GM is liable to the Texas Used-Car Purchasers for its DTPA violations.

GM's authorities are again unavailing. *Myre v. Meletio*, 307 S.W.3d 839, 844 (Tex. Ct. App. 2010), declining to extend duty of disclosure beyond the seller in a real estate transaction, is irrelevant because the claim was not brought under the DTPA (where, as discussed above, there is no such limitation). *See Miller v. Keyser*, 90 S.W.3d 712, 715-16 (Tex. 2002) (DTPA provides consumers with a means to redress deceptive practices "without the burden of proof and numerous defenses encountered in a common law fraud or breach of warranty suit").

---

[30] *Cf. Amstadt*, 919 S.W.2d at 650 (citing *Sw. Bell Tel. Co. v. Boyce Iron Works, Inc.*, 726 S.W.2d 182, 187 (Tex. Ct. App. 1987), for the proposition that requisite connection was lacking where there was no proof that defendant's deceptive conduct was the "producing cause" of plaintiff's damages).

GM's DTPA authorities (all but one involving real estate transactions) are equally inapposite. In *Terry v. Mercedes-Benz, USA, LLC*, 2007 WL 2045231, at *3 (Tex. Ct. App. 2007), the court found no duty to disclose the height of the car's bumper because it was "open and obvious" and there was no evidence that plaintiff lacked an equal opportunity to discover the information. Here, in stark contrast, only GM (and not Plaintiffs) knew of the concealed defects. In *Steele v. Goddard*, 2013 WL 3013671, at *5 (Tex. Ct. App. June 13, 2013), the defendant had no duty to disclose the termites in the house because plaintiff did not offer evidence that defendant had any knowledge of the termites. In *Marshall v. Kusch*, 84 S.W.3d 781 (Tex. Ct. App. 2002), the court rejected Marshall's argument that the DTPA did not apply to him because he was not a party to the transaction; however, the court found that none of Marshall's misrepresentations reached Kusch, and there was no other evidence connecting him to the sale. Here, GM's omissions and concealment impacted the Used-Car Purchasers' knowledge (and the cars' price) at the time of the sale and were a "producing cause" of Plaintiffs' damages. Finally, *Wilson v. John Daugherty Realtors, Inc.*, 981 S.W.2d 723 (Tex. Ct. App. 1998), yet another real estate transaction case, turned on contractual limitations in the appraisal report and, again, is wholly inapposite. The Texas Used-Car Purchasers' claims should proceed to trial.

4.      **The Used-Car Purchasers conferred benefits upon GM sufficient to make out unjust enrichment.**

Unlike in GM's authorities, *see* GM Br. at 48-49, the Used-Car Purchasers here provide evidence that their purchase of defective used Old GM cars conferred a benefit upon GM. Of course, by concealing the defects and allowing the used cars to be sold in a defective condition, GM avoided the immediate cost of repair and the harm to its reputation the recalls would have caused. Moreover, many Plaintiffs conferred benefits on GM by having their cars serviced at GM dealers, and/or buying GM parts or cars, and/or developing or maintaining a relationship

with GM that would lead to further expenditures for the benefit of GM.  *See, e.g.*, PSUF ¶¶ 410 (Michelle Thomas); 420 (Brad Akers); 522 (Lisa McClellan).  As all of these benefits flowed directly from the purchase of the cars at issue, the Used-Car Purchasers state claims under the Unjust Enrichment laws of the bellwether jurisdictions.  *See infra at* Section III.H.

## E.      Plaintiffs satisfy applicable reliance requirements.

GM contends that Plaintiffs cannot show required reliance under their consumer protection and fraudulent concealment claims, GM Br. at 18-25, but GM is wrong.  The California, Missouri, and Texas Plaintiffs can recover on their omissions claims upon proof of the materiality of the omitted information—here, the fact of the safety defect—without the need for individualized proof of reliance.

Under California law, plaintiffs may prove reliance on an omission by "simply proving 'that, had the omitted information been disclosed, one would have been aware of it and behaved differently.'"  *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (quoting *Mirkin v. Wasserman*, 23 Cal. Rptr. 2d 101, 107 (Cal. 1993)).  "That one would have behaved differently can be presumed, or at least inferred, when the omission is material[,]" and it is well-established that "defects that create 'unreasonable safety risks' are considered material."  *Id.*; *see also Engalla v. Permanente Med. Grp.*, 15 Cal. 4th 951, 977 (1997) (a misrepresented or omitted fact is material "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action . . . .").  "[M]ateriality is generally a question of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.'"  *Id.* (citation omitted).[31]  And reliance or

---

[31] It is "a basic rule of California law" that "a fact can give rise to a duty to disclose and an actionable omission if it implicates safety concerns that a reasonable consumer would find material."  *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 997 (N.D. Cal. 2013); *see also Apodaca v. Whirlpool Corp.*, 2013 U.S. Dist. LEXIS 176363, at *16 (C.D. Cal. Nov. 8, 2013) ("Nondisclosures about safety considerations of consumer products are material.").

causation can be inferred from the misrepresentation (or omission) of a material fact.  *E.g.*, *Engalla*, 15 Cal. 4th at 977 ("a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material");[32] *see also Falk v. GMC*, 496 F. Supp. 2d 1088, 1099 (N.D. Cal. 2007) ("justifiable reliance element of the fraud by omission claim is easily satisfied" where "a 'reasonable customer' . . . may have justifiably relied on GM's failure to disclose defects").

Here, as in *Daniel*, a reasonable fact finder could infer that a vehicle that experiences stalls, disabled power steering and power brakes, and disabled airbag systems in normal and foreseeable driving circumstances would pose an unreasonable safety risk, "such that it can be presumed that the nondisclosure of the safety risk impacted Plaintiffs' purchasing decision."  806 F.3d at 1226.  The Court has recognized that "a concealed defect" that "implicated a safety issue . . . would have affected a reasonable person's decision to purchase a car—making the omission material."  *TACC Order*, 2016 WL 3920353 at *20.  Indeed, each of the Plaintiffs testified that safety was a materially important factor in their purchase or lease of their GM vehicle, and that they would not have bought their vehicle, or paid less, had GM disclosed the defects.  PSUF ¶¶ 266-67.[33]

Plaintiffs have also put forth evidence that GM knowingly sold vehicles with defective ignition, power steering, and airbag systems.  PSUF ¶¶ 5-256.  Had GM disclosed the defects, "it

---

[32] This inference (or presumption) creates a question of fact for trial.  *See, e.g.*, *Woodling v. Garrett Corp.*, 813 F.2d 543, 555-56 (2d Cir. 1987) (citation omitted) (when "circumstances permit varying inferences as to the foreseeability of the intervening act, the proximate cause issue is a question of fact for the jury").

[33] Further, California Plaintiffs—including Orosco and Padilla—have presented evidence that they interacted with and received information from sales representatives at authorized GM dealerships prior to purchasing their vehicles.  PSUF ¶¶ 376, 382 (citing Mar. 9, 2017 S. Orosco Dep. at 74:1-13, 55:21-56 & Dep. Ex. 2 at ELPLNTFF00011516; Feb. 17, 2017 D. Padilla Dep. at 20:22-21:3; 37:25-38:4).  Such evidence "is sufficient to sustain a factual finding that Plaintiffs would have been aware of the disclosure if it had been made through [GM's] authorized dealerships."  *Daniel*, 806 F.3d at 1226; *see also In re Myford Touch Consumer Litig.*, 2016 WL 6873453, at *2 (N.D. Cal. Nov. 22, 2016) ("reliance may be presumed on the basis of omissions of material facts by authorized dealers").

is plausible that the media would pick up that story, and it would have made national news" such that even Plaintiffs who purchased their vehicles from non-GM affiliated dealerships or private sellers would have been aware of the disclosure. *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices*, *& Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 1015 (N.D. Cal. 2018); *see also In re Carrier IQ, Inc. Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1114 (N.D. Cal. 2015) (inferring reliance on omissions where plaintiffs "alleged that had they been aware of the Carrier IQ Software, they would not have purchased affected mobile devices" and alleged facts "regarding the public outcry regarding the Carrier IQ Software once its existence became public knowledge").   The maelstrom that arose when GM finally disclosed the defects is strong evidence that Plaintiffs would have learned of the defects prior to purchase if GM had not concealed them.[34]

With respect to Missouri law, GM concedes that reliance is not required to prevail on an MMPA claim.  GM Br. at 18-19.  The Supreme Court of Missouri has explained that where, as here, plaintiffs allege fraudulent concealment based on omissions, the fact finder "is empowered to find that the buyer has a right to rely on the seller to disclose where the undisclosed material information would not be discoverable through ordinary diligence."  *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. 2007).  Consequently, "the analysis of proof of a duty to disclose and of the right to rely collapses into a combined inquiry as to whether [defendant] had knowledge of undisclosed material information that [plaintiff] would not have

---

[34] GM's cases recognize this rule (which was not altered by Proposition 64) but note that Plaintiffs are not entitled to the presumption of reliance in an extreme case where the evidence indisputably shows "an actual lack of reliance."  *Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1083 (N.D. Cal. 2017).  The evidence here shows that this is not such a case, as safety was a factor in all Plaintiffs' purchase decisions.  And GM's suggestion that Plaintiffs would not have learned of the serious safety defects because they "did not review any New GM material" prior to purchase (GM Br. at 39) is misplaced because announcements of serious safety defects receive widespread publicity far beyond ordinary promotional materials.  *See In re Chrysler-Dodge-Jeep EcoDiesel*, 295 F. Supp. 3d at 1015.

discovered through ordinary diligence." *Id.* at 765-66.  And an omission "is material if it would likely affect the conduct of a reasonable man with respect to his transaction with another." *Star Indem. & Liab. Co. v. Cont'l Cement Co.*, *LLC*, 2013 WL 1442456, at *16 (E.D. Mo. Apr. 9, 2013) (quoting *Crewse v. Shelter Mut. Ins. Co.*, 706 S.W.2d 35, 39 (Mo. Ct. App. 1985)).  Here, there are at the very least genuine disputes of material fact as to whether GM knew about the defects (it did) and whether Plaintiffs could have discovered the defects through ordinary diligence (they could not).  Moreover, because plaintiffs expressly allege fraudulent concealment based on omission, GM's reliance on affirmative misrepresentation cases is misplaced.  GM Br. at 24 (quoting *Stein v. Novus Equities Co.*, 284 S.W.3d 597, 603 (Mo. Ct. App. 2009); citing *Grossoehme v. Cordelle*, 904 S.W.2d 392, 397 (Mo. Ct. App. 1995)).

Texas courts recognize that, for omissions-based DTPA claims such as Plaintiffs' claims here, the "reliance" requirement is satisfied where the defendant withheld material information "with the intent of inducing the consumer to engage in a transaction" and "the consumer would not have entered into the transaction had the information been disclosed."  *Patterson v. McMickle*, 191 S.W.3d 819, 827 (Tex. Ct. App. 2006); *see also In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, 2012 WL 379944, at *22 (D.N.J. Feb. 6, 2012) ("[T]o satisfy the reliance element for an omission, a plaintiff must show that defendant had intent to induce a transaction through failure to disclose, and that plaintiff would not have entered into the transaction if the information had been disclosed." (citation omitted)).  GM's citations to affirmative misrepresentation cases are therefore inapposite.  GM Br. at 20-21 (collecting affirmative misrepresentation cases).  GM has admitted that it "falsely represented to consumers that vehicles containing the defect posed no safety concern" and that it mislead consumers by failing to disclose the truth.  PSUF ¶ 6 (quoting DPA).  And Plaintiffs Al-ghamdi and McClellan both

- 42 -

testified that they would not have purchased their vehicles if GM had disclosed the defect.  PSUF ¶¶ 489, 524 (citing May 5, 2017 G. Al-ghamdi Dep. at 169:20-24; 171:4-13; May 4, 2017 McClellan Dep. at 176:16-21).  The evidence is easily sufficient to proceed to trial.

**F.      GM's material omissions violated California, Missouri, and Texas law.**

This is predominantly an *omissions*, and not an affirmative misrepresentation case, and GM is wrong to reframe it as grounded in misrepresentations.  Plaintiffs' consumer law claims primarily turn on GM's actionable omissions in violation of California, Missouri, and Texas consumer laws, among others.  *See, e.g.*, *TACC Order*, 2016 WL 3920353, at *20-21 (Plaintiffs' UCL and CLRA claims rest on "undisclosed defects in GM Vehicles" and "allegations that new GM actively concealed and failed to disclose safety defects in GM cars"); *id.* at *33 (Plaintiffs' MMPA claims rest on "actionable omissions"); *In re GM LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 448 (S.D.N.Y. 2017) ("*FACC Order*") (Plaintiffs' allege that GM "conceal[ed] defects prior to Plaintiffs' purchases" in violation of the DTPA).  GM has admitted that it "falsely represented to consumers that vehicles containing the defect posed no safety concern" and that it mislead consumers by failing to disclose the truth.  PSUF ¶ 6 (quoting DPA SOF). Plaintiffs have testified that safety was a materially important factor in their purchase or lease of their cars, *see id.* ¶¶ 266-67, and GM's heavy focus on safety in its advertisements is further proof that safety is material to *all* car purchasers.  *See In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1062, 1084  (E.D. Mich. 2018) (in omissions case, GM's ads stressing that its diesel cars had low emissions "reveal[] an understanding that consumers believe emission levels are material to their purchasing decisions" and serve as proof that low-emission "was a material consideration for consumers purchasing a vehicle").  For this reason, GM's "puffery" argument,

already rejected by this Court,[35] is inapplicable here.  *See id.* at 1084 (puffery argument irrelevant where ads are used to show materiality in an omissions case).  GM's reliance on affirmative misrepresentation cases is misguided and not relevant to this Court's summary judgment analysis of Plaintiffs' UCL, CLRA, MMPA, or DTPA claims.

## G.     Plaintiffs have valid implied warranty claims.

GM's argument regarding contractual limitation of remedies under Texas and Missouri law fails because the purported limitation is unconscionable, and therefore unenforceable, in light of GM's active concealment of material safety defects.[36]  *See Trinity Prods. Inc. v. Burgess Steel, L.L.C.*, 486 F.3d 325, 332 (8th Cir. 2007) (quoting MO. REV. STAT. §§ 400.2-719(2), (3)) ("[T]he Missouri UCC bars damage disclaimers where 'circumstances cause an exclusive or limited remedy to fail of its essential purpose,' or where the exclusion of consequential damages 'is unconscionable.'"); *Lindemann v. Eli Lilly & Co.*, 816 F.2d 199, 202 (5th Cir. 1987) (quoting TEX. BUS. & COM. CODE § 2.719(c)) ("Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable."). GM's attempt to limit Plaintiffs' remedies under warranty while knowingly concealing serious safety defects that Plaintiffs could not have discovered on their own is precisely the kind of unconscionability that Missouri courts recognize, namely "an inequality so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it." *Patterson Oil Co. v. VeriFone, Inc.*, 2015 WL 6149594, at *5 (W.D. Mo. Oct. 19, 2015) (quoting *State, Mo. Dep't of Soc. Servs., Div. of Aging v. Brookside Nursing Ctr., Inc.*, 50 S.W.3d 273, 277 (Mo. 2001)); *see also Oldham's Farm Sausage Co. v. Salco, Inc.*, 633 S.W.2d 177, 182-83

---

[35] *See FACC Order*, 257 F. Supp. 3d at 457-58.  Contrary to GM's argument, that ruling cannot be limited to Wisconsin law, as the Court cites California law in finding that at least some of GM's statements are not "puffery." *Id.*

[36] GM raises the statutory unconscionability exception in both Missouri and Texas.  GM Br. at 32-33.

(Mo. Ct. App. 1982) (limitation on consequential damages unconscionable where "clause [was] tucked away in fine print on the back side of the signature page").

The sole Missouri case GM cites in support of its purported limitation, *Russo v. Hilltop Lincoln-Mercury, Inc.*, 479 S.W.2d 211 (Mo. Ct. App. 1972), is distinguishable because it did not involve claims of unconscionability or active concealment. Under Texas law, courts determine unconscionability based on: (i) "the circumstances surrounding the agreement," (ii) "the alternatives, if any, which were available to the parties at the time of making the contract," (iii) "the nonbargaining ability of one party," and (iv) "whether the contract is illegal or against public policy." *Lindemann*, 816 F.2d at 203.  These factors weigh in Plaintiffs' favor.  Because the circumstances include GM knowingly concealing a material safety defect from consumers— who had no alternative means of discovering the defect and therefore no ability to bargain with respect to the defect—it would be against public policy to enforce such a fraudulently induced agreement.  By contrast, none of the Texas cases on which GM relies, *see* GM Br. at 26 n.26, involved active concealment.

GM's attempt to limit the duration of any implied warranties fails for the same reason— the purported limitations are unconscionable in light of GM's fraudulent conduct.  *See, e.g.*, *Patterson Oil Co.*, 2015 WL 6149594, at *6 (Missouri courts' ability to refuse to enforce or limit application of unconscionable contract clauses extends to warranty disclaimers); *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988) (Texas law "permits a court to disregard any unconscionable clause in a contract").

Regarding statutes of limitations, there is a genuine dispute of material fact as to whether GM's knowing and active concealment of defects tolled the applicable statutes of limitation.  *See Owen v. GMC*, 533 F.3d 913, 920 n.5 (8th Cir. 2008) (Missouri law governing implied warranty

provides for "equitable tolling on account of fraudulent concealment"); *Cortez v. State Farm Mut. Auto. Ins. Co.*, 2006 WL 8435999, at *7 (W.D. Tex. Oct. 25, 2006) (recognizing "fraudulent concealment as a basis for equitable tolling" of statute of limitations for implied warranty claims under Texas law).  GM has admitted that it "falsely represented to consumers that vehicles containing the defect posed no safety concern" and that it mislead consumers by failing to disclose the truth.  PSUF ¶ 6 (quoting DPA SOF).

GM's arguments regarding the "merchantability" of Plaintiffs' vehicles are similarly without merit.  It is well-established that "California courts reject the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability."  *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 946 (C.D. Cal. 2012) (quoting *Isip v. Mercedes-Benz USA, LLC*, 65 Cal. Rptr. 3d 695 (Cal. Ct. App. 2007)).  Rather, "a defective product that causes a safety hazard will generally render that product unfit for its ordinary purpose" and thus establish a breach of implied warranty of merchantability.  *Stewart v. Electrolux Home Prods., Inc.*, 304 F. Supp. 3d 894, 913 (E.D. Cal. 2018).  Courts have routinely found vehicles unmerchantable under California law in light of defects similar to the safety defects at issue here.  *See, e.g.*, *Aguilar v. GM, LLC*, 2013 WL 5670888, at *7 (E.D. Cal. Oct. 13, 2013) (GM vehicles "unfit for the ordinary use of driving due to a steering defect that can result in potential failure of power steering, pulling to the left and right, and loss of steering control during the normal course of driving"); *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1244 (C.D. Cal. 2011) ("Vehicles subject to engine failure cannot be said to be merchantable.").

Missouri law likewise recognizes claims for breach of implied warranty where a vehicle fails to "provide safe, reliable transportation" and is therefore "unfit for its ordinary purpose of

providing transportation."  *In re GMC Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1533 (E.D. Mo. 1997) (citations omitted).  The safety defects present in Plaintiffs' vehicles also render them "unfit" for driving under Texas law.  *GMC v. Brewer*, 966 S.W.2d 56, 57 (Tex. 1998).  GM has admitted that moving stalls and loss of power present a safety-related defect.  PSUF ¶ 46.  And Plaintiffs have put forth evidence showing that other safety systems power down during moving stalls, including seat belt pretensioners, airbags, power steering, power brakes, and electronic stability control.  *Id.* ¶ 234.

## H.    Plaintiffs have valid unjust enrichment claims.

California Plaintiffs plead their unjust enrichment claims in the alternative to other causes of action.  FACC ¶ 1695.  Although the Court dismissed the California unjust enrichment claims of Plaintiff Padilla and may be inclined to do the same for the remaining California Plaintiffs, recent California precedent recognizes that "[t]he Ninth Circuit has instructed district courts to construe claims for unjust enrichment under California law as quasi-contract claims."  *In re Vizio, Inc. Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1233 (C.D. Cal. 2017) (citing *Astiana v. Hain Celestial Grp.*, 783 F.3d 753, 762 (9th Cir. 2015)).  "[W]here a plaintiff states a claim for relief under a quasi-contract cause of action that cause should not be dismissed as 'duplicative or superfluous' to the plaintiff's other claims."  *Owino v. CoreCivic, Inc.*, 2018 WL 2193644, at *27 (S.D. Cal. May 14, 2018) (quoting *Astiana*, 783 F.3d at 762).  Consequently, in *In re Vizio, Inc. Consumer Privacy Litigation*, the court found "no basis" for dismissing unjust enrichment claims despite defendants' argument that plaintiffs had "adequate remedies at law."  238 F. Supp. 3d at 1233.  The same principle applies here.

Similarly, recent Texas precedent confirms that "[u]njust enrichment is an implied-contract basis for requiring restitution when it would be unjust to retain the benefits received."  *Perales v. Bank of Am., N.A.*, 2014 WL 3907793, at *3 (S.D. Tex. Aug. 11, 2014).  Notably,

- 47 -

since this Court last considered Plaintiffs' unjust enrichment claims under Texas law, Texas courts have emphasized that the "bar on equitable claims" where other remedies are available "is a general rule, not an absolute one" and "exceptions apply." *Norhill Energy LLC v. McDaniel*, 517 S.W.3d 910, 919 (Tex. Ct. App. 2017).

Missouri courts allow plaintiffs to advance unjust enrichment claims in the alternative to other claims, regardless of whether or not the validity or enforceability of a contract is in question. *See, e.g.*, *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*, 2017 WL 3863866, at *10 (W.D. Mo. Aug. 3, 2017) (citing *Thornton v. Pinnacle Foods Grp.*, 2016 WL 4073713, at *4 (E.D. Mo. Aug. 1, 2016)); *Howard v. Turnbull*, 258 S.W.3d 73, 76 (Mo. Ct. App. 2008). That is precisely what Plaintiffs do here. *See* FACC ¶ 4350.

## I.     GM has not "mitigated" its unconscionable conduct under Texas law.

There is a genuine dispute of material fact regarding whether GM is liable for unconscionable conduct under the Texas DTPA. "Unconscionable" is defined as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a *grossly unfair degree*." TEX. BUS. & COM. CODE ANN. § 17.45(5) (emphasis added). "To prove an unconscionable action or course of action," the Texas Supreme Court has held that "a plaintiff must show that the defendant took advantage of his lack of knowledge and 'that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated.'" *Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001) (quoting *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998)). GM took advantage of Plaintiffs by intentionally concealing a material safety defect—of which Plaintiffs had no knowledge and no ability, experience, or capacity to discover—and knowingly selling dangerous vehicles to Plaintiffs and class members. GM's conduct—intentionally risking the safety of unwitting consumers and their families—was thus grossly unfair because, examining "the entire

transaction," *Daugherty v. Jacobs*, 187 S.W.3d 607, 616 (Tex. Ct. App. 2006), the resulting unfairness to Plaintiffs is glaringly noticeable, flagrant, complete, and unmitigated.  *See, e.g.*, *Serv. Corp. Int'l v. Aragon*, 268 S.W.3d 112, 118-19 (Tex. Ct. App. 2008) (upholding jury finding of unconscionability where funeral home moved decedent to another burial plot without family's consent); *Sanchez v. Guerrero*, 885 S.W.2d 487, 493 (Tex. Ct. App. 1994) (upholding jury finding of unconscionability where real estate broker failed to disclose that accused child molester was a previous occupant when asked about home's former owners).

GM's argument that it entirely mitigated such gross unfairness through repairs alone is unavailing (especially given the evidence that the repairs were not effective).  At best, any "mitigation" is partial because it does not remedy the full spectrum of Plaintiffs' damages.  "The purpose of the DTPA is to 'protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection.'"  *Amstadt*, 919 S.W.2d at 649 (quoting TEX. BUS. & COM. CODE ANN. § 17.44).  It would be outrageous and against public policy as codified by the DTPA for GM to escape the full consequences of its unconscionable actions merely by offering belated repairs.  The sole case GM cites in support of its argument is distinguishable because it did not involve fraudulent concealment of safety risks.  Rather, in assessing the unfairness to a homeowner denied coverage by his insurance company for foundation problems, the Texas Supreme Court concluded that, in light of evidence of thorough reimbursement for testing and repairs and the "continual exchange of information between" the parties, "[t]he record . . . provides no support for the conclusion that State Farm took advantage of [the homeowner] to a grossly unfair degree."  *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 451 (Tex. 1997).  That is not the case here.

**J.    Plaintiffs state claims against GM for fraudulent concealment of the right to file bankruptcy claims because, but for GM's concealment of the Delta Ignition Switch Defect, Plaintiffs' claims would have been timely asserted in the Bankruptcy Court while the GUC Trust still had assets.**

As the Court has recognized, Plaintiffs' claim for "fraud by concealment of the right to file a claim against Old GM in bankruptcy" is premised on the facts that "New GM had knowledge of the [Delta] Ignition Switch Defect" and "improperly concealed its knowledge of that defect;" as a result, Plaintiffs "suffered *damages* because they could not timely file proofs of claim" and therefore could not timely partake of the proceeds of Old GM's bankruptcy.  *In re Motors Liquidation Co.*, 2018 WL 2416567, at *12 (S.D.N.Y. May 29, 2018).  Under these well-documented facts, the claims of the California and Missouri Delta Ignition Switch Defect Bankruptcy Plaintiffs should proceed to trial.[37]

Under the Bankruptcy Court's Bar Date Order, November 30, 2009, was the deadline for proof of claims to be filed against Old GM (the Bar Date).  *In re Motors Liquidation Co.*, 829 F.3d at 147.  As the Bankruptcy Court found, "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the [Delta Ignition Switch] Defect prior to the Sale Motion, as early as 2003." *In re Motors Liquidation Co.*, 529 B.R. at 538.  Further, "[a]s of June 2009, when entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required . . . to send out mailed recall notices to owners of affected Old GM vehicles."  *Id.* at 524; *see also* PSUF ¶¶ 277-308 (documenting these facts).[38]  GM necessarily had this same knowledge from day one of its existence, and it also had the undisputed duty to notify *all* affected car owners of the defect (including Plaintiffs) and to institute a recall.  *See supra* Section

---

[37] The Texas Plaintiffs do not pursue this claim.

[38] The Court need not take up GM's likely argument that the stipulated facts from the bankruptcy proceedings are not binding here.  Plaintiffs present evidence of all those facts—and more—in opposition to this motion.  *See id.*

III.D.1 (discussing GM's Safety Act duties with respect to Old GM car owners).  And there can be no real question that Plaintiffs would have promptly pursued a remedy in the bankruptcy had they been able to do so in a timely fashion given the massive outcry and tsunami of litigation that began immediately upon GM's belated recall in 2014.[39]  *See In re Motors Liquidation Co.*, 529 B.R. at 521 (GM's belated announcement of the defect "was almost immediately followed by the filing of about 60 class actions" alleging economic loss).

GM's arguments against this claim consist of assertions already rejected by the Court, and arguments already addressed in this brief.  *First*, GM repeats the argument that it owed no duty to Old GM purchasers because a "duty to disclose can arise only where the plaintiff and defendant have engaged in a transaction."  GM Br. at 52.  GM is wrong.  It owed a duty because (i) it (and it alone) had knowledge of the safety defect and the undisputed obligation to disclose and remedy known defects; (ii) its conduct was a producing cause of Plaintiffs' damages, and (iii) it had a close relationship with the cars.  *See supra* Section III.D.   Similarly unavailing is GM's repeated assertion that Plaintiffs can recover on a fraudulent concealment claim "only if the asset purchaser also has a duty to warn, in addition to a duty to disclose."  GM Br. at 53. No authority supports GM's position.  Because Plaintiffs don't bring duty-to-warn claims, they need not prove the existence of that duty.

*Second*, GM incorrectly argues that this claim should be dismissed because Plaintiffs have no claim under bankruptcy law.  *Id*. at 54 (citing *In re Chateeaugay Corp.*, 53 F.3d 478, 497 (2d Cir. 1995)).  The Court has already rejected GM's argument (or its close cousin), and found that this claim is an independent claim against GM for its post-petition conduct.  *In re*

---

[39] Plaintiffs anticipate that GM will point to a statement in open court by bankruptcy counsel to the effect that Plaintiffs *in 2014* made a strategic choice to focus on GM rather than Old GM.   But the circumstances would have been different in 2009, when claims could be timely filed and when the GUC Trust still had substantial monies. *See, e.g.*, *In Re Motors Liquidation Co.*, 529 B.R. at 586 (by the time Plaintiffs learned of the Delta Ignition Switch Defect and sought remedies, there were  no available assets  left  in the GUC Trust).

*Motors Liquidation Co.*, 2018 WL 2416567, at *12 (emphasis in original) (Plaintiffs "contend that New GM had a duty to disclose *under nonbankruptcy law* . . . ."). The claim is neither a claim based on "bankruptcy law" nor a successor liability claim based on the conduct of Old GM. For this claim, Plaintiffs' damages arose after the Bankruptcy Sale, when they lost the right to timely partake in the spoils of Old GM's bankruptcy. GM (not Old GM) caused this economic loss.

*Third*, as discussed, *supra* at Section III.E-F, the California and Missouri Plaintiffs can recover on these omissions claims upon proof of the materiality of the omitted information—here, the fact of the defect and therefore their right to file a claim in the bankruptcy—without the need for individualized proof of reliance. *See, e.g.*, *Engalla*, 15 Cal. 4th at 977 (California law) (materiality "is generally a question of fact," a misrepresented or omitted fact is material "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action," and materiality leads to a presumption of reliance); *Star Indem. & Liab. Co.*, 2013 WL 1442456, at *16 (Missouri law) (omission is material if it would likely affect the conduct of a reasonable man with respect to his transaction); *Crewse v. Shelter Mut. Ins. Co.*, 706 S.W.2d 35, 39 (Mo. Ct. App. 1985) (Missouri law) (in most cases, materiality is a fact question for the jury); *TACC Order*, 2016 WL 3920353 at *34 (concealed safety defects material under Missouri law). A jury could well find that reasonable car owners would have behaved differently, and filed timely proofs of claim in Old GM's bankruptcy *but for* GM's fraudulent concealment of the Delta Ignition Switch Defect.

*Fourth*, GM correctly notes that, in order to prevail on this claim against GM, the California and Missouri Delta Ignition Switch Defect Bankruptcy Plaintiffs must demonstrate

- 52 -

that they would have had a viable claim against Old GM in the bankruptcy.  GM Br. at 55-56.

For the reasons discussed throughout this brief, Plaintiffs have viable underlying claims.

**K.      Plaintiffs are entitled to injunctive relief.**

Pursuant to California, Missouri, and Texas state consumer laws, Plaintiffs seek injunctive relief in the form of an order enjoining GM from continuing its unfair, unlawful, and/or deceptive practices; an order supervising, promoting, and accelerating the completion of the relevant recalls, to prevent or reduce ongoing crashes, injuries, and deaths; and any other relief that the Court deems just and proper.  FACC ¶¶ 1606, 1631, 4301, 6550.  GM is wrong to argue that there is either insufficient harm or insufficient public interest to justify such relief or that the yet-to-be-determined contours of such relief would be overbroad.[40]  GM Br. at 56–61. GM's arguments for summary judgment regarding injunctive relief are therefore misplaced.

GM ignores the standards for and availability of injunctive relief under applicable state laws.  In California, for example, the "UCL empowers the Court to enjoin uncompetitive acts, as well as to 'make such orders or judgments . . . as may be necessary to prevent the use or employment of any practice which constitutes unfair competition.'"  *Haas Automation, Inc. v. Denny*, 2014 WL 2966989, at *7 (C.D. Cal. July 1, 2014) (alterations in original) (quoting CAL. BUS. & PROF. CODE § 17203).  "The remedial power granted under" California consumer law "is extraordinarily broad."  *People v. JTH Tax, Inc.*, 151 Cal. Rptr. 3d 728, 759 (Cal. Ct. App. 2013) (citation omitted).  Because "unfair business practices can take many forms, the Legislature has given the courts the power to fashion remedies to prevent their 'use or employment' in whatever context they may occur."  *Id.* (quoting *Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy*, 6 Cal. Rptr. 2d 193, 198 (Cal. Ct. App. 1992)).  Moreover, "[t]he standard for an

---

[40] The contours of such relief would be determined when and if liability is found.

injunction under California law differs from the federal standard." *Haas Automation*, 2014 WL 2966989, at *9.  To obtain a permanent injunction under the UCL, "the plaintiff must prove (1) the elements of a cause of action involving the wrongful act sought to be enjoined and (2) the grounds for equitable relief, such as, inadequacy of the remedy at law." *Id.* (quoting *City of S. Pasadena v. Dep't of Transp.*, 35 Cal. Rptr. 2d 113, 120 (Cal. Ct. App. 1994)).  Grounds for equitable relief exist where there is a threat of future harm.  *Id.* at *10.

As explained above, Plaintiffs are entitled to proceed on their UCL claims as a matter of fact and law and, consequently, Plaintiffs have proven the necessary "elements" of that cause of action, among others, for purposes of summary judgment.  *See supra* Sections III.E & III.F. Plaintiffs have also shown grounds for equitable relief because GM's conduct demonstrates that there is a risk GM will continue to engage in unlawful, unfair, and fraudulent business practices. Specifically, GM knowingly concealed material safety defects while offering its vehicles for public sale (PSUF ¶¶ 5-256), secretly redesigned the defective switch without changing the part number (*id.* ¶¶ 20-27), and covered up further defects in the redesigned switch (*id.* ¶¶ 28-56). Absent an injunction, there is a serious risk that GM will continue to engage in similarly deceptive and harmful conduct.

Plaintiffs also satisfy the federal standard for purposes of summary judgment. Injunctions are forward-looking remedies, designed to prevent or reduce future or ongoing harm. *See, e.g.*, *SEC v. Saltsman*, 2016 WL 4136829, at *29 (E.D.N.Y. 2016 Aug. 2, 2016) (citation omitted) ("injunctions are equitable, forward-looking remedies"); *Vaguely Qualified Prods. LLC v. Metro. Transp. Auth.*, 2015 WL 5916699, at *12 (S.D.N.Y. Oct. 7, 2015) ("injunctions are forward looking").  To obtain a permanent injunction, a plaintiff "must demonstrate "that (1) it will suffer an irreparable injury in the absence of an injunction; (2) legal remedies are

- 54 -

insufficient to compensate for that injury; (3) considering the balance of hardships between the parties, an equitable remedy is warranted; and (4) the injunction is in the public interest." *Beck v. Test Masters Educ. Servs. Inc.*, 994 F. Supp. 2d 98, 101 (D.D.C. 2014) (citing *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 156–57 (2010); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

The record evidence shows that vehicles experiencing sudden moving stalls and/or loss of power pose a serious risk of injury and death for drivers, passengers, and anyone in their path. PSUF ¶¶ 46, 238. That accidents continue to occur well past the recalls (as documented in cases pending in this MDL) indicates the temporal consistency to support injunctive relief. *See, e.g.*, *Soppeck v. Gen. Motors Corp.*, No. 18-cv-08322 (crash occurred Sept. 12, 2017, involving recall no. 14v400); *Curcio v. Gen. Motors Corp.*, No. 18-cv-06993 (crash occurred Aug. 4, 2017, involving recall no. 14v355); *Bauer v. Gen. Motors Corp.*, No. 18-cv-06980 (crash occurred Aug. 3, 2017, involving recall 14v355); *Sheffield-Turner v. Gen. Motors Corp.*, No. 18-cv-04112 (crash occurred May 15, 2017, involving recall 14v355); *Buchanan v. Gen. Motors Corp.*, No. 18-cv-03549 (crash occurred Apr. 21, 2017, involving recall 14v355); *Jones v. Gen. Motors Corp.*, No. 18-cv-02161 (crash occurred Mar. 10, 2017, involving recall 14v355); *Young v. Gen. Motors Corp.*, No. 18-cv-07986 (crash occurred Sept. 3, 2016, involving recall 14v400); *Gillard v. Gen. Motors Corp.*, No. 18-cv-07872 (crash occurred Aug. 29, 2016, involving recall 14v355); *Kuch v. Gen. Motors Corp.*, No. 18-cv-07901 (crash occurred Aug. 29, 2016, involving recall 14v355); *Allyn v. Gen. Motors Corp.*, No.18-cv-06297 (crash occurred Aug. 20, 2016, involving recall 14v355); *Willams-Leirmo v. Gen. Motors Corp.*, No. 18-cv-07532 (crash occurred Aug. 20, 2016, involving recall 14v355); *Scott v. Gen. Motors Corp.*, No. 18-cv-07255 (crash occurred Aug. 12, 2016, involving recall 14v047); *Zamarripa v. Gen. Motors Corp.*, No.

18-cv-07145 (crash occurred Aug. 9, 2016, involving recall 14v047); *Brown v. Gen. Motors Corp.*, No. 18-cv-05546 (crash occurred June 20, 2016, involving recall 14v355); *Veale v. Gen. Motors Corp.*, No. 18-cv-05524 (crash occurred June 20, 2016, involving recall 14v355); *Cardwell v. Gen. Motors Corp.*, No. 18-cv-05499 (crash occurred June 19, 2016, involving recall 14v394); *Williams v. Gen. Motors Corp.*, No. 18-cv-05450 (crash occurred June 18, 2016, involving recall 14v400); *Duwyenie v. Gen. Motors Corp.*, No. 18-cv-05349 (crash occurred June 14, 2016, involving recall 14v400); *Duncan v. Gen. Motors Corp.*, 18-cv-05198 (crash occurred June 10, 2016, involving recall 14v047); *Paxton v. Gen. Motors Corp.*, No. 18-cv-04904 (crash occurred June 1, 2016, involving recall 14v047); *McDuff v. Gen. Motors Corp.*, No. 18-cv-04305 (crash occurred May 16, 2016, involving recall 14v394); *Hogan v. Gen. Motors Corp.*, No. 18-cv-02114 (crash occurred Mar. 8, 2016, involving recall 14v355); *Kelley v. Gen. Motors Corp.*, No. 18-cv-01905 (crash occurred Mar. 3, 2016, involving recall 14v400); *Perry v. Gen. Motors Corp.*, No. 18-cv-01459 (crash occurred Feb. 18, 2016, involving recall 14v400).

Overall, the balance of hardships weighs in favor of equitable relief.  *See, e.g., Int'l Bhd. of Elec. Workers, AFL-CIO, Local Union No. 3 v. Charter Commc'ns, Inc.*, 277 F. Supp. 3d 356, 363 (E.D.N.Y. 2017) (quoting *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999)) (a party demonstrates irreparable harm "for which a monetary award does not adequately compensate" where "it shows that there is a 'substantial chance' that, absent an injunction, the parties cannot be returned to the pre-injunction status quo"); *Ligon v. City of New York*, 925 F. Supp. 2d 478, 540 (S.D.N.Y. 2013) (weighing "the relative hardships faced by the parties" in light of "potentially dire and long-lasting consequences").  Notably, NHTSA itself has recognized that injunctive relief serves the public interest—NHTSA filed a "position statement" in multi-district litigation involving alleged fraudulent conduct by Fiat Chrysler expressing its

view that "court supervision of a prospective remedy for the alleged defects would not interfere with, and could well aid, the progress and resolution of its recall investigation and any subsequent technical determination of the most appropriate remedy." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2017 WL 1382297, at *7 (E.D. Mich. Apr. 18, 2017).[41]

Another recent automotive multi-district litigation, involving defective Takata airbags, is also instructive. There, court-approved settlement agreements with various auto manufacturers provided additional recall-related equitable remedies to class members, with the court "retain[ing] continuing and exclusive jurisdiction over the Action and all matters relating to the administration, consummation, enforcement, and interpretation of the Settlement Agreement[.]" *In re Takata Airbag Prods. Liab. Litig.*, 2017 WL 5706147, at *6 (S.D. Fla. Nov. 1, 2017) ("Mazda Final Approval Order"); *see also id.* at *1 ("incorporat[ing] the [Mazda] Settlement Agreement and its exhibits" into final order). More specifically, the Takata-related settlement agreements generally provide for an "Outreach Program with the goal of maximizing, to the extent practicable, completion of the Recall Remedy in Subject Vehicles[,]" Mazda Settlement Agreement at 18,[42] a "Rental Car/Loaner Program" for certain Class Members awaiting recall repairs, *id.* at 21-22, an "Out-of-Pocket Claims Process" to pay for Class Members' reasonable out-of-pocket expenses related to the recalls, *id.* at 22–25, and a "Customer Support Program" extending for 10 years after the recall repairs, *id.* at 27–29.[43]

---

[41] State law also demonstrates the importance of the public interest in constructing or allowing injunctive remedies. For example, the California Supreme Court has characterized injunctions pursuant to the CLRA as "public injunctions" because such "relief is for the benefit of the general public rather than the party bringing the action." *Cruz v. PacifiCare Health Sys., Inc.*, 66 P.3d 1157, 1162 (2003).

[42] https://www.autoairbagsettlement.com/Content/Documents/Mazda/Mazda%20Settlement%20Agreement.pdf.

[43] Information on the Takata airbag class action settlements with BMW, Honda, Mazda, Nissan, Subaru, and Toyota can be found on the court-approved website, www.autoairbagsettlement.com.

Accordingly, GM cannot and has not shown that it is entitled to summary judgment on the availability of injunctive relief.[44]

### IV.     CONCLUSION

For the reasons stated above, the Court should deny GM's motion for summary judgment.

DATED:  October 7, 2019              HAGENS BERMAN SOBOL SHAPIRO LLP

                                     By:         /s/ Steve W. Berman
                                            Steve W. Berman
                                     *steve@hbsslaw.com*
                                     Sean R. Matt
                                     *sean@hbsslaw.com*
                                     Andrew M. Volk
                                     *andrew@hbsslaw.com*
                                     HAGENS BERMAN SOBOL SHAPIRO LLP
                                     1301 Second Avenue, Suite 2000
                                     Seattle, WA  98101
                                     Telephone:  (206) 623-7292
                                     Facsimile:  (206) 623-0594

---

[44] GM incorrectly asserts that Plaintiffs would have no claims for injunctive relief without damages.  Although this may be true for the Texas Plaintiffs (who in any event have shown damages), it is not for the California and Missouri Plaintiffs.  California Plaintiffs bring claims under the CLRA, which does *not* require proof of monetary "damages," but only proof of "damage" (here, the receipt of a defective vehicle).  *See Meyer*, 200 P.3d at 298-99 (citing § 1780(a), and finding that "the phrase 'any damage' is not synonymous with 'actual damages,' which generally refers to pecuniary damages."); *see also Gonzales v. CarMax Auto Superstores, LLC*, 845 F.3d 916, 918 (9th Cir. 2017) (citing *Meyer*) (CLRA claim can be brought for injunctive relief alone).  In addition, the Moss-Magnuson Act Plaintiffs can obtain injunctive relief without proof of damages.  *See* 15 U.S.C. § 2304(a)(4).  For the Missouri Plaintiffs, they can obtain injunctive relief *without* damages on their fraud claim.  *See, e.g.*, *St. Bethel Missionary Baptist Church, Inc.*, *v. St. Louis Builders, Inc.*, 388 S.W.2d 776 (Mo. 1965) (discussing equitable proceeding to enjoin foreclosure on the basis of fraud).

- 58 -

DATED:  October 7, 2019                    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By: _____*/s/ Elizabeth J. Cabraser*_____
        Elizabeth J. Cabraser
*ecabraser@lchb.com*
Rachel Geman
*rgeman@lchb.com*
275 Battery St., 29th Floor
San Francisco, CA 94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

*Co-Lead Counsel with Primary Focus on Economic Loss Cases*

- 59 -

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 7, 2019, which will send notification of such filing to the e-mail addresses registered.

*/s/ Steve W. Berman*
Steve W. Berman

010440-11/1196612 V1