# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: | ) |
| | ) |
| | ) No. 14-MD-2543 (JMF) |
| GENERAL MOTORS LLC | ) No. 14-MC-2543 (JMF) |
| IGNITION SWITCH LITIGATION | ) |
| | ) Hon. Jesse M. Furman |
| *This Document Relates To All Actions* | ) |
| | ) |

## PLAINTIFFS' RESPONSE TO DEFENDANT GENERAL MOTORS LLC'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

I.  NEW GM'S RECALLS TO REPAIR VEHICLES. ............................................................ 1

    A.  Recall No. 14v047 ("Delta Ignition Switch"). ........................................... 1

    B.  Recall No. 14v355 ("Impala Key Rotation"). ........................................... 4

    C.  Recall No. 14v394 ("Cadillac CTS / SRX Key Rotation"). ..................... 6

    D.  Recall No. 14v400 ("Malibu Key Rotation"). ......................................... 7

    E.  Recall No. 14v346 ("Camaro Knee-Key Rotation"). .............................. 8

    F.  Recall No. 14v118 ("SIAB Wiring Harness"). ........................................ 8

    G.  Recall No. 14v153 ("Electric Power Steering Assist"). .......................... 9

II.  PLAINTIFFS SUBJECT TO THE SUMMARY JUDGMENT MOTION. ..................... 11

    A.  California Plaintiffs. ................................................................................ 11

    B.  California Plaintiffs With Claims for Fraudulent Concealment of Right to File Bankruptcy Claims. ...................................................................... 26

    C.  Dismissed California Plaintiffs. .............................................................. 41

    D.  Missouri Plaintiffs. ................................................................................. 41

    E.  Texas Plaintiffs. ..................................................................................... 64

    F.  Texas Plaintiffs With Claims for Fraudulent Concealment of Right to File Bankruptcy Claims. ...................................................................... 80

    G.  Dismissed Texas Plaintiffs. .................................................................... 83

III.  WARRANTY INFORMATION FOR THE ACTIVE PLAINTIFFS. ............................ 84

IV.  PLAINTIFFS' PUTATIVE EXPERT DID NOT DETERMINE "LOST TIME" DAMAGES FOR ANY INDIVIDUAL PLAINTIFF. ...................................................... 87

V.  PLAINTIFFS' PUTATIVE EXPERT ADMITS THAT STALLS CAN HAPPEN FOR A VARIETY OF REASONS. ................................................................................ 88

VI.  DEALERS ARE NOT NEW GM'S AGENTS. ............................................................. 89

Pursuant to Local Rule 56.1(a), Plaintiffs respectfully submit the following response to Defendant General Motors LLC's ("GM") Statement of Undisputed Material Facts without admitting that any of GM's statements are material:

## I. NEW GM'S RECALLS TO REPAIR VEHICLES.

### A. Recall No. 14v047 ("Delta Ignition Switch").

1. On February 7, 2014, and March 11, 2014, New GM notified NHTSA of its decision to issue a recall (NHTSA Recall No. 14v047) for the following vehicles: 2005-2007 model year ("MY") Chevrolet Cobalt; 2007 MY Pontiac G5; 2006-2007 MY Chevrolet HHR and Pontiac Solstice; 2003-2007 MY Saturn Ion; and 2007 MY Saturn Sky vehicles. (Ex. 1, MDL_DEP_EX_01447 at 1; Ex. 2, GM-MDL2543-001243265 at 265.)

*Plaintiffs' Response:*

Undisputed.

2. The MY 2003-2007 vehicles subject to NHTSA Recall No. 14v047 were manufactured with GM ignition switch part number 10392423 (the "'423 ignition switch"). (Ex. 3, 1/11/17 A. Antonucci Dep. Tr. at 19:25-20:7, 22:7-23:10, 69:20-70:2.)

*Plaintiffs' Response:*

Undisputed.

3. New GM submitted a letter pursuant to 49 C.F.R. 573.6(c)(6) to notify NHTSA of that recall decision:

> The ignition switch torque performance may not meet General Motors' specification. If the torque performance is not to specification, the ignition switch may unintentionally move from the "run" position to the "accessory" or "off" position with a corresponding reduction or loss of power. This risk may be increased if the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event. The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

(Ex. 1, MDL_DEP_EX_01447 at 1.)

*Plaintiffs' Response:*

Undisputed.

4.      On March 28, 2014, New GM notified NHTSA of its decision to supplement NHTSA Recall No. 14v047 for the following vehicles (the "Service Parts Vehicle recall"): 2008-2010 MY Chevrolet Cobalt; 2008-2011 MY Chevrolet HHR; 2008-2010 MY Pontiac Solstice; 2008-2010 MY Pontiac G5; and 2008-2010 MY Saturn Sky vehicles.  (Ex. 4, 3/28/2014 New GM Letter to NHTSA.)

*Plaintiffs' Response:*

Undisputed.

5.      The vehicles in the Service Parts Vehicle recall were manufactured with GM ignition switch part number 15886190 (the "'190 ignition switch") and not with the '423 ignition switch.  (*Id.* at 922; Ex. 3, 1/11/17 A. Antonucci Dep. Tr. at 18:9-19:6, 19:25-21:22, 41:11-19.)

*Plaintiffs' Response:*

Undisputed.

6.      The '190 ignition switch was designed with a longer detent plunger and higher torque resistance than the '423 ignition switch.  (Ex. 3, 1/11/17 A. Antonucci Dep. Tr. at 70:3-71:12.)

*Plaintiffs' Response:*

Plaintiffs do not dispute that GM designed the '190 ignition switch with a longer detent plunger and higher intended torque resistance than the '423 switch.  Plaintiffs, however, dispute this paragraph to the extent that it suggests that the design changes that resulted in the '190 switch remedied the defects that were present in the '423 switch, as the evidence demonstrates that the

'190 switch also suffered from low torque and was defective.  *See* Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Support of Plaintiffs' Opposition to GM's Motion for Summary Judgment Against the Bellwether Economic Loss Plaintiffs (PSUF) at ¶¶ 28-56.

7.        "During the weeks of March 3 and March 10, research into GM's repair order database indicated that [ignition switch] housing kits with the ['423] ignition switch may have been used to repair certain 2008-2011 model year vehicles whose makes and models fell within the scope of [NHTSA Recall No. 14v047]."  (Ex. 5, 4/11/2014 New GM Letter to NHTSA re Notification Campaign No. 14v047, GM-MDL2543-401373912 at 922.)

*Plaintiffs' Response:*

Plaintiffs do not dispute that the document is accurately quoted, but Plaintiffs object to the statement on the grounds of hearsay.  Admission into evidence of the statements contained in the letter should be limited to non-hearsay purposes, and not as evidence that this was the first notice that GM had that the Service Part Vehicles were defective.

8.        "Out of an abundance of caution," New GM decided to expand NHTSA Recall No. 14v047 "to include all 2008-2011 Model Year Vehicles."  (*Id*. at 923.)

*Plaintiffs' Response:*

Plaintiffs do not dispute that the document is accurately quoted, but Plaintiffs dispute that GM decided to expand NHTSA Recall No. 14v047 "[o]ut of an abundance of caution."  GM included the Service Part Vehicles in NHTSA Recall No. 14v047 because the '190 ignition switches used in the Service Part Vehicles were defective.  *See* PSUF at ¶¶ 28-89, 234-56.  Testing on the '190 ignition switch conducted by switch supplier Delphi, GM itself, GM's expert Michael Stevenson, and Plaintiffs' expert Glen Stevick demonstrates that the '190 switch suffered from

3

low torque and is defective.  *See* PSUF at ¶¶ 31-41.  GM and its consultants knew that there were incidents of moving stalls in Service Part Vehicles.  *Id.* at ¶¶ 42-46.  GM could not use the '190 switch in the Recall No. 14v047 recall repairs because it was defective and, instead, modified its production process to produce a switch with more robust torque, even changing the part number for the new switch.  *Id.* at ¶¶ 47-56.  Further, Plaintiffs object to the statement on the grounds of hearsay.  Admission into evidence of the statements contained in the letter should be limited to non-hearsay purposes, and not as evidence that GM expanded Recall No. 14v047 purely out of an abundance of caution based on the inclusion of the '423 switch in repairs of a limited number of vehicles.

9.       New GM submitted a letter pursuant to 49 C.F.R. 573.6(c)(6) to notify NHTSA of the recall decision:

> General Motors has decided that a defect which relates to motor vehicle safety exists in GM Parts and ACDelco Ignition & Start Switch service part number 10392423, and the following Ignition & Start Switch Housing Kits that contain or may contain part number 10392423:  GM Parts and ACDelco service part numbers 10392737, 15857948, 15854953, 15896640, and 25846762.  GM records indicate these service parts may have been installed during repairs in some [2008-2011 MY] vehicles.

(*Id*. at 912.)

*Plaintiffs' Response:*

Undisputed.

**B.       Recall No. 14v355 ("Impala Key Rotation").**

10.       On June 16, 2014, New GM announced a recall (NHTSA Recall No. 14v355) for the following vehicles: 2005-2009 model year MY Buick Lacrosse/Allure, 2006-2011 MY Buick Lucerne, 2000-2005 MY Cadillac Deville, 2006-2011 MY Cadillac DTS, 2006-2014 MY Chevrolet Impala, and 2006-2007 MY Chevrolet Monte Carlo.  (Ex. 6, GM-MDL2543-301838574 at 574.)

4

*Plaintiffs' Response:*

Undisputed.

11.    New GM submitted a letter pursuant to 49 C.F.R. 573.6(c)(6) to notify NHTSA of

that recall decision:

> If the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, it may unintentionally move the key away from the "run" position.  If this occurs, engine power, power steering and power braking will be affected, increasing the risk of a crash.  The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

(*Id.*)

*Plaintiffs' Response:*

Undisputed.

12.    The ignition key for the recalled vehicles was originally designed with a slot across

the top of the key for attaching the key ring.  (Ex. 7, 2/9/2017 B. Thompson Dep. Tr. at 18:5-19:5.)

*Plaintiffs' Response:*

Undisputed.

**C.      Recall No. 14v394 ("Cadillac CTS / SRX Key Rotation").**

13.     On June 25, 2014 New GM decided to issue a recall (NHTSA Recall No. 14v394) for the following vehicles: 2003-2014 MY Cadillac CTS and 2004-2006 MY Cadillac SRX vehicles.  (Ex. 8, GM-MDL2543-301859704 at 704.)

*Plaintiffs' Response:*

Undisputed.

14.     New GM submitted a letter pursuant to 49 C.F.R. 573.6(c)(6) to notify NHTSA of that recall decision:

> If the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, or if the driver unintentionally bumps the key ring or items attached to the key ring with their knee, the key may unintentionally move away from the "run" position.  If this occurs, engine power, power steering and power braking may be affected, increasing the risk of a crash.  The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

(*Id.*)

*Plaintiffs' Response:*

Undisputed.

15.     The ignition key for the 2003-2007 MY Cadillac CTS ("Generation I Cadillac CTS") vehicles and 2004-2006 MY Cadillac SRX vehicles was originally designed with a slot across the top of the key for attaching the key ring.  (*Id.* at 705; Ex. 9, GM-MDL2543-304842204.)

*Plaintiffs' Response:*

Undisputed.

16.     The ignition key for the 2008-2014 MY Cadillac CTS ("Generation II Cadillac CTS") vehicles was also originally designed with a slot, but the key ring opening was changed

010440-11 1197516 V1

from a slot to a hole in December of 2010.  (Ex. 10, 3/9/2017 B. Thompson Dep. Tr. at 29:14-20; Ex. 9, GM-MDL2543-304842204.)

*Plaintiffs' Response:*

Undisputed.

**D.      Recall No. 14v400 ("Malibu Key Rotation").**

17.      On June 26, 2014, New GM decided to issue a recall (NHTSA Recall No. 14v400) for the following vehicles: 2000-2005 MY Chevrolet Impala and Monte Carlo; 1997-2005 MY Chevrolet Malibu; 1999-2004 MY Oldsmobile Alero; 1998-2002 MY Oldsmobile Intrigue; 1999-2005 MY Pontiac Grand Am; and 2004-2008 MY Pontiac Grand Prix vehicles.  (Ex. 11, GM-MDL2543-304846175 at 175, 177.)

*Plaintiffs' Response:*

Undisputed.

18.      New GM submitted a letter pursuant to 49 C.F.R. 573.6(c)(6) to notify NHTSA of that recall decision:

> If the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, it may unintentionally move the key away from the "run" position.  If this occurs, engine power, power steering and power braking will be affected, increasing the risk of a crash.  The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

(*Id*. at 175.)

*Plaintiffs' Response:*

Undisputed.

19.      The ignition key for the recalled vehicles was originally designed with a slot across the top of the key for attaching the key ring.  (Ex. 12, GM-MDL2543-304846258; Ex. 34, 2/23/2017 B. Thompson Dep. Tr. at 114:7-17.)

*Plaintiffs' Response:*

Undisputed.

**E.     Recall No. 14v346 ("Camaro Knee-Key Rotation").**

20.     On June 12, 2014, New GM decided to issue a recall (NHTSA Recall No. 14v346)

for 2010-2014 MY Chevrolet Camaro vehicles.  (Ex. 14, GM-MDL2543-402373524 at 524.)

*Plaintiffs' Response:*

Undisputed.

21.     New GM submitted a letter pursuant to 49 C.F.R. 573.6(c)(6) to notify NHTSA of

that recall decision:

> There is a risk, under certain conditions, that some drivers may bump the ignition key with their knee and unintentionally move the key away from the "run" position. If this occurs, engine power, and power braking will be affected and power steering may be affected, increasing the risk of a crash.  The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

(*Id.*)

*Plaintiffs' Response:*

Undisputed.

**F.     Recall No. 14v118 ("SIAB Wiring Harness").**

22.     On March 17, 2014, New GM notified NHTSA of its decision to issue a recall

(NHTSA Recall No. 14v118) for the following vehicles:  2008-2013 Buick Enclave, 2009-2013

Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook.  (Ex. 15, GM-

MDL2543-301545439 at 439.)

*Plaintiffs' Response:*

Undisputed.

23.     New GM submitted a letter pursuant to 49 C.F.R. 573.6(c)(6) to notify NHTSA of

that recall decision:

> Corrosion and/or loose crimps in the driver and passenger seat mounted side impact
> airbag (SIAB) wiring harness connectors can cause an increase in resistance.  The
> airbag sensing system will interpret an increase in resistance as a fault.  A fault will
> illuminate the airbag readiness light on the instrument cluster and a "SERVICE
> AIR BAG" message in the Driver Information Center (DIC), and set a Diagnostic
> Trouble Code (DTC).  At first, at lower levels of resistance, the light and DIC
> message may be intermittent and the airbags and pretensioners will still deploy.
> Over time, the resistance may reach a level where the SIABs, front center side
> airbag, if equipped, and pretensioners will not deploy in a crash.

(*Id.*)

*Plaintiffs' Response:*

Undisputed.

**G.     Recall No. 14v153 ("Electric Power Steering Assist").**

24.     On March 31, 2014, New GM notified NHTSA of its decision to issue a recall

(NHTSA Recall No. 14v153) relating to motor vehicle safety for the following vehicles:  MY

2004-2005 and some MY 2006 MY and MY 2008-2009 Chevrolet Malibu; MY 2004-2005 and

some MY 2006 Chevrolet Malibu Maxx; some MY 2009-2010 Chevrolet HHR; some MY 2010

Chevrolet Cobalt; some MY 2008-2009 Saturn Aura; MY 2004-2007 Saturn Ion; and MY 2005

and some MY 2006 and MY 2008-2009 Pontiac G6.  (Ex. 16, GM-MDL2543-401371463 at 463.)

*Plaintiffs' Response:*

Undisputed.

25.     New GM submitted a letter pursuant to 49 C.F.R. 573.6(c)(6) to notify NHTSA of

that recall decision:

> The subject vehicles equipped with electric power steering (EPS) may experience
> a sudden loss of power steering assist that could occur at any time while driving.  If
> the power steering assist is lost, a message is displayed on the Driver Information
> Center and a chime sounds to inform the driver.  Steering control can be maintained,

as the vehicle will revert to a manual steering mode, but would require greater driver effort at low vehicle speeds, which could result in an increased risk of a crash.

(*Id.*)

**Plaintiffs' Response:**

Undisputed.

26.     New GM described the cause of the loss of electric power steering in Delta platform vehicles—*e.g.,* the Chevrolet Cobalt, the Chevrolet HHR, and the Saturn Ion—as oil contamination or intrusion within the electric power steering motor case that results in the disabling of electric power steering assist in the vehicle and reversion to a manual steering mode until the next ignition cycle.  (Ex. 17, GM-MDL2543-300334072 at 078-079.)

**Plaintiffs' Response:**

Disputed.  Plaintiffs do not dispute that in general terms, New GM described the condition to NHTSA as averred in paragraph 26.  To the extent that GM is offering this description for its truth—that GM did in fact identify the cause as described—the statements in the letter are inadmissible double-hearsay not subject to any exception.

27.     New GM identified the cause of the loss of electric power steering in Epsilon platform vehicles—*e.g.*, the Pontiac G6, the Saturn Aura, and the Chevrolet Malibu/Malibu Maxx—as independent supplier manufacturing issues concerning the torque sensor and power steering motor controller unit.  (*Id.*)

**Plaintiffs' Response:**

Disputed.  Plaintiffs do not dispute that in general terms, New GM described the condition to NHTSA as averred in paragraph 27.  To the extent that GM is offering this description for its truth—that GM did in fact identify the cause as described—the statements in the letter are inadmissible double-hearsay not subject to any exception.

10

II.     **PLAINTIFFS SUBJECT TO THE SUMMARY JUDGMENT MOTION.**

    A.     ***California Plaintiffs.***

28.     **Chimen Basseri** owns a used 2011 Chevrolet HHR subject to Recall No. 14v047 (5ACC ¶ 59; Ex. 18, 11/22/2017 C. Basseri Dep. Tr. at 8:19-23 (PDF Pg. 530).)

    ***Plaintiffs' Response:***

Undisputed.

29.     Ms. Basseri purchased the 2011 HHR from Nissan of Valencia in Valencia, California on March 5, 2013.  (5ACC ¶ 59; Ex. 18, 11/22/2017 C. Basseri Dep. Tr. at 38:9-13 (PDF Pg. 531).)  She received a warranty with the vehicle.  (5ACC ¶ 59; Ex. 18, 11/22/2017 C. Basseri Dep. Tr. at 38:18-39:3 (PDF Pgs. 531-532).)

    ***Plaintiffs' Response:***

Plaintiffs do not dispute Ms. Basseri's vehicle purchase details or that Ms. Basseri received a warranty with her vehicle providing "the balance of original warranty start date and mileage, whichever comes from first," but Ms. Basseri's "Bumper-to-Bumper" warranty had already expired when she purchased the vehicle.  SJ Ex. 57 (Nov. 22, 2017 C. Basseri Dep. at 23:18-25).[1] In addition to the "Bumper-to-Bumper" warranty, the 2011 Chevrolet warranty booklet provides a "Powertrain" warranty for "the first 5 years or 100,000 miles, whichever comes first."  GM Ex. 54, Warranty Booklet at p. 2, GM-MDL2543-300549738.  This Powertrain warranty was in effect when she bought her vehicle because it was less than five years old and had 37,354 miles on it at

---

[1] All "SJ Ex. __" references cited herein are to the Declaration of Steve W. Berman in Support of:  (1) Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Support of Plaintiffs' Opposition to GM's Motion for Summary Judgment Against the Bellwether Economic Loss Plaintiffs; and (2) Plaintiffs' Response to Defendant General Motors LLC's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment, filed on September 21, 2018.

the time.  SJ Ex. 58 (ELPLNTFF00010252-254); SJ Ex. 57 (Nov. 22, 2017 C. Basseri Dep. at

55:22-25).

30.     Ms. Basseri chose the 2011 HHR because it was white, and because she and her

fiancé liked the car:

> Q:  How did you decide to buy a 2011 HHR from Valencia of Nissan of Valencia? Sorry.
>
> A. I was looking through the cars.com, you know, locally, but that's the only place that
> there was a 2011 white HHR, and we wanted to buy that car because we wanted to buy the
> car. You know, me and my fiancé, we liked the car.

 (5ACC ¶ 59; Ex. 18, 11/22/2017 C. Basseri Dep. Tr. at 109:2-8 (PDF Pg. 545).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Ms. Basseri's quoted deposition testimony, but dispute GM's

characterization that these were the exclusive reasons she purchased the vehicle.  Ms. Basseri

testified that she "chose this vehicle, in part, because the vehicle's safety and reliability was

important to her."  SJ Ex. 57 (Nov. 22, 2017 C. Basseri Dep. at 39:4-11).  She also testified that

she relied on several GM advertisements she saw in deciding to buy her vehicle, and that these

advertisements "guaranteed good, reliable cars."  *Id.* at 107:13-108:13; SJ Ex. 63 (C. Basseri PFS

Q 433 at ELPLNTFF00010315).

31.     She recalls seeing online and television advertisements about New GM vehicles,

but cannot remember the content of those advertisements, or whether the advertisements she saw

were described in the 5ACC.  (5ACC ¶ 59; Ex. 18, 11/22/2017 C. Basseri Dep. Tr. at 106:12-

107:11 (PDF Pgs. 542-543).)  She does not contend that any of the general advertisements she saw

from New GM were false or misleading.  (Ex. 18, 11/22/2017 C. Basseri Dep. Tr. at 108:16-24.)

Ms. Basseri also conducted internet research on Cars.com prior to purchasing the 2011 HHR.  (*Id.*

at 109:2-8 (PDF Pg. 545).)

*Plaintiffs' Response:*

12

Plaintiffs do not dispute Ms. Basseri's testimony that she viewed GM advertisements, but Plaintiffs' dispute GM's characterization of this testimony. Ms. Basseri testified that she recalled GM ads "guarantee[ing] good, reliable cars," and she relied on these ads in purchasing her vehicle. SJ Ex. 57 (Nov. 22, 2017 C. Basseri Dep. at 107:13-108:13); SJ Ex. 63 (C. Basseri PFS Q 433 at ELPLNTFF00010315).

Plaintiffs do not dispute Ms. Basseri's testimony that she conducted online research on Cars.com before buying her car.

32.     Ms. Basseri's 2011 HHR has not ever shut off while driving.  (*Id*. at 44:9-12 (PDF Pg. 533).)  She does not contend that the ignition switch ever moved out of the run position, that she experienced a moving stall, or that she lost power steering or power assist brakes while driving the 2011 HHR.  (*Id.* at 68:24-69:21 (PDF Pgs. 537-538).)

*Plaintiffs' Response:*

Undisputed.

33.     Ms. Basseri had the recall repair conducted in June 2014.  (5ACC ¶ 59; Ex. 18, 11/22/2017 C. Basseri Dep. Tr. at 51:12-15 (PDF Pg. 534).)  To the best of her knowledge, the 2011 HHR contained the original manufacturer ignition switch at that time.  (Ex. 18, 11/22/2017 C. Basseri Dep. Tr. at 74:18-23 (PDF Pg. 539).)

*Plaintiffs' Response:*

Undisputed.

34.     Ms. Basseri's 2011 HHR had 37,358 miles on it at the time of purchase and 50,683 at the time the recall repair was conducted.  (*Id*. at 55:22-25 (PDF Pg. 535); Ex. 19, 6/9/14 Sanborn Chevrolet invoice, at ELPLNTFF00010241.)  It had approximately 63,000 miles on it as of November 2017. (Ex. 18, 11/22/2017 C. Basseri Dep. Tr. at 57:1-5 (PDF Pg. 536).)

*Plaintiffs' Response:*

Undisputed.

35.   **Kellie Cereceres** owns a 2012 Chevrolet Traverse subject to Recall No. 14v118. (5ACC ¶ 62; Ex 18, 12/18/2017 K. Cereceres Dep. Tr. at 8:24-9:9 (PDF Pg. 549).)

*Plaintiffs' Response:*

Undisputed.

36.   Ms. Cereceres purchased her 2012 Traverse from Maita Chevrolet in Elk Grove, California on June 18, 2012.  (5ACC ¶ 62; Ex. 18, 12/18/2017 K. Cereceres Dep. Tr. at 26:17-27:11 (PDF Pgs. 551-552).)  She received the manufacturer's warranty with the vehicle.  (*Id.*)

*Plaintiffs' Response:*

Undisputed, except as to the vehicle purchase date. Ms. Cereceres purchased her vehicle on June 16, 2012.  SJ Ex. 84 (ELPLNTFF00015637-639).

37.   Ms. Cereceres alleges that she saw advertisements involving the Traverse, but she does not remember what those advertisements said.  (Ex. 18, 12/18/2017 K. Cereceres Dep. Tr. at 94:21-95:7 (PDF Pgs. 564-565).)   She does not claim that anything in those commercial was untrue.  (*Id.* at 95:14-96:4 (PDF Pgs. 565-566).)

*Plaintiffs' Response:*

Plaintiffs dispute GM's characterization of Ms. Cereceres's testimony regarding the GM advertising she viewed before purchasing her vehicle. Ms. Cereceres testified that she saw Traverse commercials and would think, "that's my next car."  SJ Ex. 85 (Dec. 18, 2017 K. Cereceres Dep. at 88:18-22; 94:21-25).  Ms. Cereceres testified that she could not say whether the television commercials she viewed said anything untrue because she could not remember exactly what they said.  *Id.* at 95:1-17.

38.     Ms. Cereceres alleges that she reviewed the brochure for the 2012 Traverse prior to her purchase and could not point to anything in that brochure that was not true.  (*Id*. at 89:14-91:8 (PDF Pgs. 561-563).)

*Plaintiffs' Response:*

Plaintiffs dispute GM's characterization of Ms. Cereceres's testimony regarding the GM advertising she viewed before purchasing her vehicle. Ms. Cereceres testified that she obtained a GM brochure for the 2012 Traverse before purchasing her vehicle and it "greatly" affected her decision to buy the car because, as she testified, "I loved all the safety components in it, because I drive it, and I have children in the car and their friends in the car."  SJ Ex. 85 (Dec. 18, 2017 K. Cereceres Dep. at 88:4-89:12; 91:9-24).  She testified that she kept the brochure near her office and used it as a sort of "vision board," and that she reviewed the brochure and "read all the safety issues on it."  *Id.* at 88:7-17.  Ms. Cereceres repeatedly testified that she could not say whether the brochure said anything untrue because she did not have it in front of her and she could not remember what it said.  *Id.* at 89:14-90:6; 90:14-91:8.

39.     Ms. Cereceres alleges that, on a single occasion, the service airbag light in her 2012 Traverse illuminated briefly before turning off again.  (*Id*. at 44:19-45:23) (PDF Pgs. 555-556).)  She does not know if the light related to the side-impact airbag, did not take her vehicle to a dealership after this occasion, and has never been told that the incident was related to the side airbag recall.  (*Id*. at 45:24-46:15 (PDF Pgs. 556-557).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Ms. Cereceres's testimony about the service airbag light incident in Ms. Cereceres' vehicle, but Plaintiffs dispute GM's characterization of this testimony.  Ms. Cereceres testified the service airbag light came on before the recall repair was conducted, and she

15

cannot recall whether it "went off immediately or if it was by the time I got to where I was going…" SJ Ex. 85 (Dec. 18, 2017 K. Cereceres Dep. at 29:3-20). Ms. Cereceres also testified that she is not an expert in the technical or mechanical performance of motor vehicles. *Id.* at 72:5-8.

40. Ms. Cereceres's 2012 Traverse was repaired pursuant to Recall No. 14v118 in April, 2014 when she brought her vehicle in for routine maintenance. (*Id.* at 31:6-15, 52:22-53:16 (PDF Pgs. 553; 558-559).) She has not had any recall related incidents since that repair. (*Id.* at 45:8-16 (PDF Pg. 556).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Ms. Cereceres's testimony about the recall repair, but Plaintiffs dispute GM's characterization of her testimony as conclusive that the defect did not manifest or that the recall remedy is effective. Ms. Cereceres testified that she did not receive a recall notice and "was driving around in a car that [she] had no idea had a [sic] airbag recall on it." SJ Ex. 85 (Dec. 18, 2017 K. Cereceres Dep. at 52:22-53:2; 82:23-83:13; 84:25-85:3). Ms. Cereceres testified that because she never had an accident that would have triggered the safety bags to go off, she could not answer whether the vehicle's safety features operated the way they were intended, but finding out about the recall afterward "didn't strengthen [her] confidence" in the vehicle she bought. *Id.* at 92:16-93:6. Ms. Cereceres testified that she does not know whether GM fixed the side airbag defect in her vehicle but she is "assuming" so, and that she would "hope" the recall repair was performed correctly. *Id.* at 99:18-25; 101:8-13.

41. Ms. Cereceres's 2012 Traverse had 32,778 miles on it at the time the recall repair was conducted. (Ex. 20, 4/21/14 Maita Chevrolet Invoice, ELPLNTFF00015646.) She continues to drive the vehicle, which had over 80,000 miles on it as of December 2017. (Ex. 18, 12/18/2017 K. Cereceres Dep. Tr. at 40:1-14 (PDF Pg. 554).)

*Plaintiffs' Response:*

Undisputed.

42.     **Santiago Orosco** owned a 2010 Chevrolet Camaro subject to Recall No. 14v346. (5ACC ¶ 67; Ex. 18, 3/9/2017 S. Orosco Dep. Tr. at 12:1-5 (PDF Pg. 569).)

*Plaintiffs' Response:*

Undisputed.

43.     Mr. Orosco purchased the 2010 Camaro from Ed Dena's Auto Center in Dinuba, California in August 2009.  (5ACC ¶ 67; Ex. 18, 3/9/2017 S. Orosco Dep. Tr. at 52:18-21; 48:3-10 (PDF Pgs. 573; 570).)  He paid approximately $28,000 for the 2010 Camaro.  (Ex. 18, 3/9/2017 S. Orosco Dep. Tr. at 49:18-50:13 (PDF Pgs. 571-572).)  He received a warranty with the vehicle. (5ACC ¶ 67; Ex. 18, 3/9/2017 S. Orosco Dep. Tr. at 86:22-87:2 (PDF Pgs. 580-581).)

*Plaintiffs' Response:*

Undisputed.

44.     Mr. Orosco's 2010 Camaro was built by Old GM.  (Ex. 21, S. Orosco Vehicle package at GM-MDL2543-305119582, 84)

*Plaintiffs' Response:*

Undisputed.

45.     Mr. Orosco recalls that the salesman recommended the Camaro.  (5ACC ¶ 67; Ex. 18, 3/9/2017 S. Orosco Dep. Tr. at 74:1-13 (PDF Pg. 577).)  Mr. Orosco reviewed Consumer Reports when considering his purchase.  (Ex. 18, 3/9/2017 S. Orosco Dep. Tr. at 63:8-64:4 (PDF Pgs. 574-575).)

*Plaintiffs' Response:*

17

Plaintiffs do not dispute that the GM dealership salesman recommended the Camaro, but GM understates this recommendation and Plaintiffs note that the salesman specifically represented that it was a safer vehicle than the Mustang, the other vehicle Mr. Orosco was considering. Mr. Orosco testified, "When, I was buying the Camaro for my daughter, I told the salesman that I was looking for a car that was safe and reliable for my daughter. The salesman stated "this is one of the safest cars you can get for your daughter, and is very reliable. We redesigned the old Camaro and made the new Camaro better and safer." SJ Ex. 101 (Mar. 9, 2017 S. Orosco Dep. at 74:1-13); SJ Ex. 105 (S. Orosco PFS Q 433 at ELPLNTFF00011516). Mr. Orosco testified, "Well, also according to the salesman, the Camaro was completely redesigned and it had a Corvette chassis, and that it was a safer car than the Mustang, because we were discussing that in the showroom that I wanted the Mustang for her and he said the Camaro was a safer car than the Mustang." SJ Ex. 101 (Mar. 9, 2017 S. Orosco Dep. at 55:18-56:1).

Plaintiffs do not dispute that Mr. Orosco reviewed Consumer Reports when considering his purchase.

46.     Mr. Orosco did not review any New GM or Old GM advertisements or brochures that led him to buy the 2010 Camaro. (Ex. 18, 3/9/2017 S. Orosco Dep. Tr. at 72:4-6 (PDF Pg. 576).)

*Plaintiffs' Response:*

Undisputed.

47.     Mr. Orosco alleges that his daughter had an incident in 2016 where the car shut off while she was driving it. (5ACC ¶ 67; Ex. 18, 3/9/2017 S. Orosco Dep. Tr. at 102:8-19 (PDF Pg. 583).) He was not present during the alleged event, and never personally experienced an incident

18

related to the ignition switch in the 2010 Camaro.  (Ex. 18, 3/9/2017 S. Orosco Dep. Tr. at 101:9-15; 105:6-15. (PDF Pgs. 582; 584).)

    *Plaintiffs' Response:*

    Undisputed.

    48.    Mr. Orosco does not have evidence of the recall repair being performed on his 2010 Camaro; a service receipt dated September 4, 2014, when Mr. Orosco's daughter brought the vehicle to the mechanic for service, states that "client does not want to perform product safety recall 14294 . . . Did not want to perform recall, recall declined."  (*Id*. at 115:1-118:6 (PDF Pgs. 585-588); Ex. 22, Delano Chevrolet Buick GMC Invoice at ELPLNTFF00011445.)

    *Plaintiffs' Response:*

    Plaintiffs do not dispute that Mr. Orosco sold his Camaro before the recall repair was done on the vehicle, but Plaintiffs dispute that his daughter Dolores declined the recall repair.  SJ Ex. 101 (Mar. 9, 2017 S. Orosco Dep. at 125:5-13); SJ Ex. 203 (D. Peterson Decl., ¶ 3).  According to Dolores, when she took the Camaro in for service at the GM dealership they told her there was a recall on her vehicle but the dealership representative said he would call her to schedule the recall repair.  SJ Ex. 203 (D. Peterson Decl., ¶ 3).  She testified that "[h]e made it seem like the recall repair was not a big deal" and "[h]e never called me to schedule the repair."  *Id*.  Dolores never declined any recall repair on the Camaro.  *Id*.  Mr. Orosco testified that shortly after receiving the recall notice, he went to Family Motors to discuss the recall repair and the GM dealership told him they did not have the parts.  SJ Ex. 101 (S. Orosco Dep. at 138:9-17).  Mr. Orosco testified the GM dealership told him they would call him when the parts came in but they never called.  *Id.*

49.     Mr. Orosco and his family drove the vehicle approximately 145,000 miles.  (Ex. 18, 3/9/2017 S. Orosco Dep. Tr. at 49:10-17 (PDF Pg. 571).)  Mr. Orosco sold the 2010 Camaro in August 2016 to CarMax.  (Ex. 18, 3/9/2017 S. Orosco Dep. Tr. at 80:17-23 (PDF Pg. 578).)

*Plaintiffs' Response:*

Undisputed.

50.     **David Padilla** owned a 2010 Chevrolet Cobalt subject to Recall Nos. 14v047 and 14v153.  (5ACC ¶ 68; Ex.  18, 2/17/2017 D. Padilla Dep. Tr. at 20:20-23 (PDF Pg. 2).)

*Plaintiffs' Response:*

Undisputed.

51.     Mr. Padilla purchased the 2010 Cobalt from Chase Chevrolet in Stockton, California in April 2010.  (5ACC ¶ 68).  He received a warranty with the vehicle.  (5ACC ¶ 68; Ex. 18, 2/17/2017 D. Padilla Dep. Tr. at 37:15-17 (PDF Pg. 9).)

*Plaintiffs' Response:*

Undisputed.

52.     Mr. Padilla purchased his vehicle based on statements by an independent dealer's salesperson that the vehicle was a good buy and because he believed the salesperson was honest:

Q. When you purchased the 2010 Chevy Cobalt why did you pick that car over the other two or three?

A. Told me it is a good buy.  He says, "It is in good shape."  It wasn't.  Later I found out, but he told me it was and I believed him.  But he was honest.  He said, "Get it in here."  He says, "There is something wrong with it."

…

Q. Do you recall specifically what [the dealer's salesperson] told you about the Chevy Cobalt when you spoke with him on the day that you purchased it?

A. No. I really -- I liked it and I bought it.  I didn't ask no questions on it.

…

20

Q. How much time did you spend shopping around before you purchased the Cobalt?

A. Not much time. When [the dealer's salesperson] called me he had the car there. I liked it. I went and bought it.

Q. Maybe a couple of days?

A. I didn't do no shopping for that one. I -- I purchased it when he suggested it.

(Ex. 18, 2/17/2017 D. Padilla Dep. Tr. at 29:17-23, 30:10-14, 31:19-25 (PDF Pgs. 4; 5; 6).)

*Plaintiffs' Response:*

Plaintiffs do not dispute the fact that Mr. Padilla relied on the statements of the GM dealership salesman in purchasing the car, but Plaintiffs dispute GM's attempt to disclaim responsibility for the representations of its agents. Mr. Padilla testified the GM dealership salesman also told him "the car is perfect, nothing is wrong with it" and that Mr. Padilla believed this "until [he] read in the paper what [was] going on." SJ Ex. 110 (Feb. 17, 2017 D. Padilla Dep. at 20:22-21:3). Mr. Padilla testified that he "believes it when they say [the car is] in good shape, especially a new car." *Id.* at 37:25-38:4.

53. Mr. Padilla did not do any research or review any New GM or Old GM advertisements or brochures prior to purchasing the 2010 Cobalt. (*Id.* at 32:8-33:2 (PDF Pgs. 7-8).) Mr. Padilla testified that "[n]obody tells me which [car] to buy. I make my own choice." (*Id.* at 27:1-2 (PDF Pg. 3).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Mr. Padilla's deposition testimony, but Plaintiffs dispute GM's suggestion that Mr. Padilla did not rely on any representations from GM agents in choosing to purchase his vehicle. Mr. Padilla relied on the statements of the GM salesman, testifying that the salesman told him, "the car is perfect, nothing is wrong with it" and that Mr. Padilla believed this "until [he] read in the paper what [was] going on." SJ Ex. 110 (Feb. 17, 2017 D. Padilla Dep. at

21

20:22-21:3).)  Mr. Padilla also testified that he "believes it when they say [the car is] in good shape, especially a new car."  *Id.* at 37:25-38:4.

54.     Mr. Padilla's 2010 Cobalt never shut down while the car was moving, and his only alleged ignition issues related to not being able to start the vehicle.  (Ex. 18, 2/17/2017 D. Padilla Dep. Tr. at 66:24-67:4) (PDF Pgs. 18-19).)  Mr. Padilla drove his vehicle over 20,000 miles. (Ex. 24, Padilla PFS Q 37.)

   *Plaintiffs' Response:*

   Undisputed.

55.     Mr. Padilla's 2010 Cobalt has been repaired pursuant to Recall Nos. 14v047 and 14v153.  (Ex. 18, 2/17/2017 D. Padilla Dep. Tr. at 51:12-53:5 (PDF Pgs. 12-14).)  There is no evidence that the ignition switch originally installed in the 2010 Cobalt had been replaced prior to the recall repair.  (Ex. 23, D. Padilla Vehicle Package at GM-MDL2543-304721712) (Ex. 24, Padilla PFS Q 45, Q 48.)

   *Plaintiffs' Response:*

   Undisputed.

56.     After the recall repairs were performed, Mr. Padilla claims that on two occasions the key would not turn when he tried to start the 2010 Cobalt.  (Ex. 18, 2/17/2017 D. Padilla Dep. Tr. at 53:10-54:12 (PDF Pgs. 14-15).)  He brought the 2010 Cobalt to the dealership a second time to have it repaired, with New GM again paying for the repairs.  (*Id.* at 64:19-65:15 (PDF Pgs. 16-17).)

   *Plaintiffs' Response:*

   Disputed. According to GM's records, Mr. Padilla's ignition switch was only repaired once.  SJ Ex. 108 (GM-MDL2543-304721712); SJ Ex. 109 (GM-MDL2543-304721740); *see also*

SJ Ex. 110 (Feb. 17, 2017 D. Padilla Dep. at 58:11-14 ("Q: After you had the problem where the key wouldn't turn you took it back to the dealership to be serviced again. Is that— A: No, I didn't fix it. We got rid of it.")). But Mr. Padilla did testify the recall repair was ineffective and that afterward he experienced two incidents where the key would not turn and he could not start the engine.  SJ Ex. 110 (Feb. 17, 2017 D. Padilla Dep. at 47:3-10 ("Well, after the recall then I had problems with it. It stalled me twice downtown. It wouldn't start. The key wouldn't turn."); 47:11-14 ("It wasn't fixed right."); 49:17-22 ("Well, [the GM dealership salesman] told me it was fixed, but it wasn't."); 53:1-5 ("They didn't tell me what they did to it. They said, 'It is all fixed.' But it wasn't.")). Mr. Padilla testified that he called the dealership after the incidents with the ignition switch and they told him "well, we fixed it," and he responded, "then what—how come it stalled on me? The key wouldn't turn."  *Id.* at 57:13-20.  Mr. Padilla also testified that because of this ignition trouble post-recall he got rid of the vehicle.  *Id.* at 30:20-24 ("They notified me to take it in the first time. And then after that we had trouble with it, so I got rid of it."); 51:5-10 ("Stranded me twice. And then I said, 'No, I don't drive it.'").

57.    After the second repair, Mr. Padilla gave the car to his grandson to trade it in.  (*Id.* at 65:25-66:9 (PDF Pgs. 17-18).)  At that time, Mr. Padilla had not had the vehicle appraised and had not done anything to investigate its resale value.  (*Id.* at 40:20-41:11 (PDF Pgs. 10-11).)

   *Plaintiffs' Response:*

   Undisputed, except as to GM's reference to a "second repair."  Plaintiffs dispute there was a second recall repair, as explained more fully in Plaintiffs' response to paragraph 56, *supra*.

58.    **Michelle Thomas** owns a used 2005 Buick Lacrosse subject to Recall No. 14v355. (5ACC ¶ 71; Ex. 18 3/21/2017 M. Thomas Dep. Tr. at 12:7-12 (PDF Pg. 164).)

   *Plaintiffs' Response:*

Undisputed.

59.     Ms. Thomas purchased the used 2005 Lacrosse from Sun Motor Group in El Cerrito, California on December 9, 2010.  (5ACC ¶ 71; Ex. 18, 3/21/2017 M. Thomas Dep. Tr. at 32:4-12 (PDF Pg. 165).)  She did not receive a warranty with the vehicle. (5ACC ¶ 71.)

*Plaintiffs' Response:*

Undisputed.

60.     Ms. Thomas alleges that she saw advertisements talking generally about "safety" and "reliability," of the car, though she does not recall what the advertisements said.  (Ex. 18, 3/21/2017 M. Thomas Dep. Tr. at 74:19-75:24; 76:14-78:8 (PDF Pgs. 168-169; 170-172).)  She also did online research, searched her email for advertisements for car companies, researched gas mileage, and reviewed Kelley Blue Book for vehicle pricing.  (*Id.* at 46:17-23 (PDF Pg. 167).)  According to Ms. Thomas, the Sun Motor Group salesman did not mention any recalls and told her that the Lacrosse was a long-lasting car.  (5ACC ¶ 71; Ex. 18, 3/21/2017 M. Thomas Dep. Tr. at 85:21-86:8 (PDF Pgs. 173-174).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Ms. Thomas's testimony regarding her research into the vehicle or the salesman's statements to her, but Plaintiffs do dispute GM's characterization of Ms. Thomas's testimony regarding the advertising she viewed before purchasing her car. Ms. Thomas testified that from 2007 to the time of her deposition, she saw email advertisements regarding the vehicle's reliability and safety ratings, which made her feel comfortable buying it.  SJ Ex. 124 (Mar. 21, 2017 M. Thomas Dep. at 74:19-75:17).  Ms. Thomas testified she received mailings from Team Chevy regarding Buick vehicles stating that the cars were reliable and safe.  *Id.* at 76:14-77:7.     Ms.  Thomas  testified  that  she  saw  Buick  advertisements  and  commercials

24

communicating their safety ratings.  *Id.* at 81:18-82:10.  Ms. Thomas testified that she relied on

all of these advertisements in buying the car.  *Id.* at 36:12-37:4; 86:18-22.

61.     Ms. Thomas alleges that the ignition switch in the 2005 Lacrosse has rotated out of

the run position while she was driving it.  (5ACC ¶ 71; Ex. 18, 3/21/2017 M. Thomas Dep. Tr. at

93:6-94:22 (PDF Pgs. 175-176).)

*Plaintiffs' Response:*

Undisputed.

62.     Ms. Thomas' 2005 Lacrosse was repaired pursuant to Recall No. 14v355 in June

or July 2015.  (Ex. 18, 3/21/2017 M. Thomas  Dep. Tr. at 122:17-123:7, 149:8-152:17 (PDF Pgs.

191-192; 193-196); Ex. 25, Team Chevrolet Service File at GM-MDL2543-107201809, 31, 33.)

*Plaintiffs' Response:*

Plaintiffs dispute this fact because GM's service records are ambiguous and conflict with

Ms. Thomas's testimony. Ms. Thomas testifies that GM initially conducted the recall repair in

December 2014.  SJ Ex. 124 (Mar. 21, 2017 M. Thomas Dep. at 152:18-154:20).  GM's own

records are ambiguous as to whether GM conducted the recall repair in June 2015 or in July 2015.

*Compare*  SJ  Ex.  126  (GM-MDL2543-107201829-834)  *with*  SJ  Ex.  127  (GM-MDL2543-

107201824-828).

63.     The 2005 Lacrosse had approximately 72,000 miles on it at the time of purchase.

(Ex. 26, Thomas PFS Q 30, at 3)  The vehicle had 172,184 miles at the time the recall repair was

conducted, and as of January 2017 the vehicle had 193,390 miles on it. (Ex. 25, Team Chevrolet

Service File at GM-MDL2543-107201829; Ex. 26, Thomas PFS Q 37, at 4.)

*Plaintiffs' Response:*

Undisputed.

64.     Although Ms. Thomas reported incidents where she would have difficulty turning the key and the engine would cut off when she put the parked car into "drive" in the months before taking her 2005 Lacrosse to the dealership for the recall repair, she does not allege any incidents associated with Recall No. 14v355 after the repair.  (Ex. 18, 3/21/2017 M. Thomas  Dep. Tr. at 96:7-105:13, 117:21-120:8, 150:3-22 (PDF Pgs. 177-186; 187-190; 194).)

*Plaintiffs' Response:*

Plaintiffs dispute this fact because Plaintiffs dispute GM's contention that the dealership conducted the recall repair on Ms. Thomas's vehicle in June or July 2015. Ms. Thomas testified that GM initially conducted the recall repair in December 2014.  SJ Ex. 124 (Mar. 21, 2017 M. Thomas Dep. at 152:18-154:20).  She also testified that she experienced the shutdown events between May and June 2015.  *Id.* at 138:1-5.  GM's own records are ambiguous as to whether GM conducted the recall repair in June 2015 or in July 2015.  *Compare* SJ Ex. 126 (GM-MDL2543-107201829-834) *with* SJ Ex. 127 (GM-MDL2543-107201824-828).

**B.     California Plaintiffs With Claims for Fraudulent Concealment of Right to File Bankruptcy Claims.**

65.     **Patricia Barker** owns a 2005 Saturn Ion subject to Recall Nos. 14v047 and 14v153 (5ACC ¶ 58; Ex. 18, 2/27/2017 P. Barker Dep. Tr. at 12:18-21 (PDF Pg. 22).)

*Plaintiffs' Response:*

Undisputed.

66.     Ms. Barker purchased her 2005 Ion in March 2005 from Ross Thor Saturn in Torrrance, CA.  (5ACC ¶ 58; Ex. 18, 2/27/2017 P. Barker Dep. Tr. at 69:1-2; 173:2-4 (PDF Pgs. 26; 33).)  She received a new car warranty with the vehicle. (Ex. 18, 2/27/2017 P. Barker Dep. Tr. at 126:12-14 (PDF Pg. 27).)

*Plaintiffs' Response:*

26

Undisputed.

67.    Ms. Barker is not aware of any incident in the 2005 Saturn Ion in which the ignition switch inadvertently rotated from the run to accessory position.  (*Id.* at 273:4-9 (PDF Pg. 35).)

***Plaintiffs' Response:***

Plaintiffs do not dispute Ms. Barker's statement in her deposition, but Plaintiffs dispute GM's characterization of Ms. Barker's testimony regarding the ignition-related events she experienced.  Ms. Barker experienced one incident in which her vehicle lost power while she was driving, and more than a dozen instances in which she could not turn the key in the ignition to start the vehicle.  SJ Ex. 52 (Feb. 27, 2017 P. Barker Dep. at 138:18-139:7; 149:3-16).  Ms. Barker testified she could not be sure the ignition switch defect caused the incident where her vehicle lost power but she thought it was more likely than not, and that she believes the key issue stems from a problem with the ignition system.  *Id.* at 262:6-16; 153:20-25.

68.    She had the ignition switch recall repair performed in March and April 2014 (*id.* at 62:3-12 (PDF Pg. 23), and had the power steering motor control module replaced in April 2012, (*id.* at  63:22-64:14 (PDF Pgs. 24-25)).

***Plaintiffs' Response:***

Undisputed.

69.    Ms. Barker's 2005 Ion had approximately 122,905 miles on it at the time of the recall repair, and approximately 179,000 miles on it as of February 2017.  (*Id.* at 135:4-13 (PDF Pg. 28).)

***Plaintiffs' Response:***

Undisputed.

70.     Ms. Barker became aware that Old GM filed for bankruptcy in 2013 or 2014.  (*Id.* at 230:4-9 (PDF Pg. 34).)

*Plaintiffs' Response:*

Undisputed.

71.     **Sylvia Benton** and **Michael Benton** own a used 2005 Chevrolet Cobalt subject to Recall No. 14v047 (5ACC ¶ 60; Ex. 18, 2/28/2017 Sylvia Benton Dep. Tr. at 17:25-18:2 (PDF Pgs. 54-55).)

*Plaintiffs' Response:*

Undisputed, except to note that the Bentons sold their vehicle in August 2018.  SJ Ex. 200 (ELPLNTFF00017319-322).

72.     Mr. and Ms. Benton purchased their 2005 Cobalt in January 2009 from Ideal Auto Sales, which was not a dealership affiliated with General Motors.  (5ACC ¶ 60; Ex. 18, 2/28/2017 S. Benton Dep. Tr. at 18:19-19:1; 80:7-14 (PDF Pgs. 55-56; 59).)  The vehicle was not covered under the manufacturer's warranty when they purchased it.  (Ex. 27, M. Benton PFS Q 41, at 5; 5ACC ¶ 60.)

*Plaintiffs' Response:*

Undisputed.

73.     Ms. Benton alleges that on one occasion the 2005 Cobalt shut down while she was driving it.  (Ex. 18, 2/28/2017 S. Benton Dep. Tr. at 31:1-6 (PDF Pg. 58).)  To the best of her memory, the key was in the "on" position when the vehicle shut down.  (*Id.* at 27:1-5 (PDF Pg. 57).)  Mr. Benton alleges that the vehicle shut down on numerous occasions.  (Ex. 18, 2/28/2017 M. Benton Dep. Tr. at 132:24-133:17 (PDF Pgs. 43-44).)  He does not know the position of the

ignition key, or whether it rotated, on any of those occasions.  (*Id.* at 140:17-141:18 (PDF Pgs. 46-47).)

### *Plaintiffs' Response:*

Plaintiffs do not dispute that the Bentons experienced shutdown events, but Plaintiffs dispute GM's characterization of the Bentons' testimony about these shutdowns. Mr. Benton testified that in the 25 to 30 times the vehicle shutoff on him while driving, he did not inspect the position of the key: "I never inspected it. I always turned it back on. You know, I would finish shutting it off, and then turn it back on to start the car."  SJ Ex. 69 (Feb. 28, 2017 M. Benton Dep. at 140:5-12; 178:16-19).   Ms. Benton testified that in the single incident where the vehicle shutdown while she was driving she did not know the key position because she was not paying attention to that.  SJ Ex. 66 (Feb. 28, 2017 S. Benton Dep. at 25:12-26:3).

74.     Mr. Benton and Ms. Benton testified that the recall repair was conducted on her vehicle.  (Ex. 18, 2/28/2017 S. Benton Dep. Tr. at 82:4-18 (PDF Pg. 40); Ex. 18, 2/28/2017 M. Benton Dep. Tr. at 76:14-24 (PDF Pg. 39).)  They do not allege that the vehicle has had any shutdown incidents since the recall repair was performed.  (Ex. 18, 2/28/2017 S. Benton Dep. Tr. at 103:2-4 (PDF Pg. 62); Ex. 18, 2/28/2017 M. Benton Dep. Tr. at 90:20-22; 138:1-4 (PDF Pgs. 42; 45).)

### *Plaintiffs' Response:*

Undisputed.

75.     The Bentons' 2005 Cobalt had 56,621 miles on it at the time of purchase (Ex. 18, 2/28/2017 M. Benton Dep. Tr. at 54:4-7 (PDF Pg. 38)), 167,691 miles on it at the time of the recall repair (*Id.* at 82:21-83:2 (PDF Pgs. 40-41)), and approximately 217,885 miles on it as of February, 2017.  (*Id.* at 143:16-18 (PDF Pg. 48).)

29

*Plaintiffs' Response:*

Undisputed.

76.    **Kimberly Brown** owns a 2006 Chevrolet HHR subject to Recall No. 14v047. (5ACC ¶ 61; Ex. 18, 4/24/2017 Kimberly Brown Dep. Tr. at 26:25-27:7 (PDF Pgs. 349-350).)

*Plaintiffs' Response:*

Undisputed.

77.    Ms. Brown purchased her 2006 HHR in January 2007 from Rally Automotive in Palmdale, CA. (5ACC ¶ 61; Ex. 18, 4/24/2017 K. Brown Dep. Tr. at 27:4-5; 27:8-11 (PDF Pg. 350).)  She received a warranty with the vehicle.  (Ex. 18, 4/24/2017 K. Brown Dep. Tr. at 41:6-19 (PDF Pg. 356).)

*Plaintiffs' Response:*

Undisputed.

78.    Ms. Brown received the HHR as an unexpected gift from her husband, so she did not do any research on, or test driving of, vehicles.  (*Id.* at 28:17-30:8 (PDF Pgs. 351-353).)  Ms. Brown testified that she did not see any advertisements or brochures related to the HHR, nor did she look up any information on the HHR prior to purchasing it.  (*Id.* at 35:24-36:6 (PDF Pgs. 354-355).)  She subsequently noted in her deposition that she saw a poster of an HHR in the dealership where she purchased the vehicle, but she could not recall what it said.  (*Id.* at 122:1-123:3 (PDF Pgs. 364-365).)

*Plaintiffs' Response:*

Plaintiffs do not dispute that Ms. Brown-Shipley did not do any online research or test-drive the vehicle before purchasing it, but at the dealership the GM salesman told her and her husband that the vehicle was "a good, safe, and reliable car" and gave them the car's safety ratings,

30

and Ms. Brown-Shipley relied on this information in purchasing it.  SJ Ex. 72 (Apr. 24, 2017 K. Brown-Shipley Dep. at 32:20-35:13).  In her Interrogatory responses, Ms. Brown-Shipley also testified that she saw a poster in the dealership saying the HHR was a reliable car, and while she could no longer recall the content of that poster by the time she was deposed, she stated, "If I stated that on [my Interrogatories], I said it."  *Id.* at 122:1-24.

79.     Ms. Brown alleges that there were multiple occasions where her car would shut off while she was driving it.  (*Id.* at 61:8-10 (PDF Pg. 357).)  She claims these incident continued after the recall repair was performed. (*Id.* at 92:5-17 (PDF Pg. 358)), but does not know the position of the ignition switch for any of those incidents.  (*Id.* at 94:12-20 (PDF Pg. 359).)  No one has ever told her that a problem with the ignition switch was causing the car to turn off.  (*Id.* at 95:4-9 (PDF Pg. 360).)  She does not have an understanding of what might cause a car to turn off while driving.  (*Id.* at 95:22-24 (PDF Pg. 360).)  Her vehicle also has had transmission and gearshift issues, and she does not have any understanding of whether problems with the transmission or gearshift could cause the vehicle to turn off while driving.  (*Id.* at 95:25-96:20 (PDF Pg. 360).)  She also had the floor shifter replaced on the vehicle, and does not know whether problems with the floor shifter might cause the vehicle to turn off while driving.  (*Id.* at 96:21-97:20) (PDF Pgs. 361-362).)

***Plaintiffs' Response:***

Plaintiffs do not dispute that Ms. Brown-Shipley experienced shutdown events while she was driving the vehicle both before and after the recall repair, but Plaintiffs dispute GM's characterization of Ms. Brown-Shipley's testimony regarding these events. Ms. Brown-Shipley experienced approximately 50 shutdown events while she was driving the vehicle, and 20y or more of them occurred after the recall repair was conducted. SJ Ex. 72 (Apr. 24, 2017 K. Brown-Shipley Dep. at 61:8-10; 92:12-23).  She testified that while she did not notice the position of the ignition

31

switch, she always had to turn the key forward to turn it back on after these incidents and she believes that the ignition switch defect was the cause of these shutdown events. *Id.* at 94:12-20; 95:4-21. Ms. Brown-Shipley generally understood what triggered the shutdown events, testifying, "If I hit a bump, if the pavement was uneven, even if I hit a pebble in the street, it would shut off. I could be driving and it would just shut off on me." *Id.* at 60:12-61:3. When asked whether a different issue than the ignition switch could cause the continued shutdowns post-recall repair, Ms. Brown-Shipley testified "no" because "the recall on the ignition switch and it -- the problem never changed. And I was told it was cutting out because of the ignition switch. So if they would have replaced it, it should have stopped, but it never stopped. And no one told me it was something else." *Id.* at 100:20-101:13. Finally, Ms. Brown-Shipley is unqualified to diagnose the cause of her shutdown events when she has no training or expertise in performing maintenance work on vehicles, and her training, education, and expertise in the technical or mechanical performance of a vehicle is limited to her time as a train and bus operator. *Id.* at 21:15-22:17.

80.     She had the recall repair conducted on her vehicle in May 2014. (*Id.* at 119:15-21 (PDF Pg. 363).)

*Plaintiffs' Response:*

Disputed. The recall repair was conducted on Ms. Brown-Shipley's vehicle in July 2014. SJ Ex. 72 (Apr. 24, 2017 K. Brown-Shipley Dep. at 157:7-158:7); SJ Ex. 75 (GM-MDL2543-305120276).

81.     The 2006 HHR had approximately 126,000 miles on it at the time the recall repair was conducted (Ex. 28, K. Brown Vehicle Package, at GM-MDL2543-305120276), and 150,000 miles on it as of November 2016 (Ex. 29, K. Brown PFS Q 37, at 4.)

*Plaintiffs' Response:*

32

Undisputed.

82.     **Crystal Hardin** owned a 2005 Chevrolet Cobalt subject to Recall No. 14v047. (5ACC ¶ 63; Ex. 18, 3/2/2017 C. Hardin Dep. Tr. at 27:12-24 (PDF Pg. 65).)

*Plaintiffs' Response:*

Undisputed.

83.     Ms. Hardin purchased her 2005 Cobalt in May 2005 from Chase Chevrolet (5ACC ¶ 63; Ex. 18, 3/2/2017 C. Hardin Dep. Tr. at 62:6-12; 46:25-47:3 (PDF Pgs. 68; 66-67).)   She received a warranty with the vehicle.  (Ex. 18, 3/2/2017 C. Hardin Dep. Tr. at 163:6-10 (PDF Pg. 76).)

*Plaintiffs' Response:*

Undisputed, except as to the purchase date of the vehicle. Ms. Hardin purchased her vehicle in April 2005.  SJ Ex. 87 (Mar. 2, 2017 C. Hardin Dep. at 123:8-12).

84.     Ms. Hardin alleges that there were two occasions in which the 2005 Cobalt shut down while running: once while it was idling, and once while it was on the freeway.  (*Id.* at 187:3-188:10 (PDF Pgs. 78-79).)   With respect to the incident while the car was idling, Ms. Hardin recalled that she had to rotate the key away from the "run" position to put the car in "park" and then before rotating it back to the "run" position to restart the vehicle.  (*Id.* at 194:18-195:22 (PDF Pgs. 81-82).)  She alleges that the occasion in which the vehicle shut down on the freeway was in May 2016 after the recall repair had been performed, though she did not include this alleged incident in her sworn plaintiff fact sheet.  (*Id.* at 186:13-23, 187:15-22 (PDF Pgs. 77; 78).)  She does not have any idea as to why her vehicle shut down on the freeway.  (*Id.* at 190:13-16 (PDF Pg. 80).)

*Plaintiffs' Response:*

Plaintiffs do not dispute that Ms. Hardin experienced these two shutdown events, but Plaintiffs do dispute GM's characterization of Ms. Hardin's testimony regarding these events. Regarding the first shutdown incident, Ms. Hardin testified that as she approached a stoplight the car "completely shut off" and the engine "died." SJ Ex. 87 (Mar. 2, 2017 C. Hardin Dep. at 192:16-20; 193:21-194:1). She did not see the position of the ignition switch. *Id.* at 194:2-22. Ms. Hardin believes both shutdown incidents are linked to the ignition switch defect. *Id.* at 246:16-247:2. Ms. Hardin submitted her plaintiff fact sheet before her March 2, 2017 deposition, she clarified her testimony about the freeway shutdown incident in her deposition, and GM's counsel had many opportunities to, and did, question Ms. Hardin about the freeway shutdown incident during her deposition. *Id.* at 181:1-17; 182:4-183:1; 85:4-92:11; 186:8-18; 189:1-190:23.

85.     Ms. Hardin had the recall repair conducted on her vehicle in July 2014. (*Id.* at 216:8-217:8 (PDF Pgs. 83-84).)

*Plaintiffs' Response:*

Undisputed.

86.     The 2005 Cobalt had 149,671 miles on it at the time the recall repair was conducted (*Id.* at 218:4-11 (PDF Pg. 85)), and approximately 160,000 miles on it when Ms. Hardin sold it. (*Id.* at 126:2-6 (PDF Pg. 69).)

*Plaintiffs' Response:*

Undisputed.

87.     Ms. Hardin stopped driving the vehicle in May of 2016. (*Id.* at 186:8-12 (PDF Pg. 77).) She sold the 2005 Cobalt in December 2016 to her gardener. (*Id.* at 150:17-153:16 (PDF Pgs. 70-73).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Ms. Hardin's testimony, but GM omits critical information surrounding Ms. Hardin's decision to stop driving the vehicle and sell it. Ms. Hardin testified that in May 2016, after the vehicle had the recall repair, her vehicle shutdown while she was driving on the freeway. SJ Ex. 87 (Mar. 2, 2017 C. Hardin Dep. at 23:9-14; 186:8-18. Ms. Hardin testified that this incident "really shook [her] up," and "[she] drove the vehicle home and parked it and never got into it again." *Id.* at 23:9-14.

88.     **Javier Malaga** owned a used 2006 Chevrolet Cobalt subject to Recall No. 14v047. (5ACC ¶ 65; Ex. 18 3/24/2017 J. Malaga Dep. Tr. at 9:1-5 (PDF Pg. 238).)

*Plaintiffs' Response:*

Undisputed.

89.     Mr. Malaga purchased his used 2006 Cobalt in November 2006, from the Carson Toyota Dealership in Carson, CA.  (Ex. 18, 3/24/2017 J. Malaga Dep. Tr. at 42:23-25; 141:2-8 (PDF Pgs. 239; 248).)  He received a warranty with the vehicle. (*Id.* at 88:3-10 (PDF Pg. 244).)

*Plaintiffs' Response:*

Undisputed.

90.     Mr. Malaga contends that on two occasions he experienced difficulty turning the ignition switch from "off" to "run" (*i.e.,* starting the vehicle) but on neither occasion did the vehicle's ignition switch ever move out of the "run" position, and neither occasion involved a moving stall.  (*Id.* at 103:9-104:2 (PDF Pg. 245-246).)

*Plaintiffs' Response:*

Undisputed.

91.     Mr. Malaga had the recall repair conducted on the vehicle on November 1, 2014. (*Id.* at 116:11-15 (PDF Pg. 247).)  He sold the vehicle on July 30, 2016 to an individual in a private

sale. (*Id.* at 73:20-25 (PDF Pg. 243).)  He sold the vehicle for $800 based on the fact that he was moving away from California and felt some pressure to dispose of the vehicle. (*Id.* at 67:18-68:5 (PDF Pgs. 241-242).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Mr. Malaga's testimony about the sale, but Plaintiffs dispute GM's characterization of his testimony. Mr. Malaga believes he could have gotten more money in the sale had it not been for the ignition switch recall because when he previously explored selling the vehicle in late 2015 and early 2016 he received feedback from prospective buyers that they were concerned about the recall. SJ Ex. 93 (Mar. 24, 2017 J. Malaga Dep. at 71:15-73:7; 106:1-11).

92.     The 2006 Cobalt had approximately 22,000 miles on it at the time of purchase (*Id.* at 46:11-24 (PDF Pg. 240)) approximately 107,640 miles on it at the time the recall repair was conducted (Ex. 30, Malaga Deposition Exhibit No. 7 at 1 (ELPLNTFF00009361), and approximately 121,464 miles on it at the time of sale. (Ex. 31, Malaga PFS Q 37, at 4.)

*Plaintiffs' Response:*

Undisputed.

93.     **Winifred Mattos** owns a 2007 Pontiac G5 subject to Recall No. 14v047. (5ACC ¶ 66; Ex. 18, 3/03/17 W. Mattos Dep. Tr. at 11:16-18 (PDF Pg. 90).)

*Plaintiffs' Response:*

Undisputed.

94.     Ms. Mattos purchased her 2007 G5 in April 2007 from Hooman Pontiac GMC Buick (5ACC ¶ 66; Ex. 18, 3/03/17 W. Mattos Dep. Tr. at 89:8-15; 74:13-18 (PDF Pgs. 98; 96).) She received a warranty with the vehicle. (Ex. 18, 3/03/17 W. Mattos Dep. Tr. at 83:15-17 (PDF Pg. 97).)

*Plaintiffs' Response:*

Undisputed.

95.     Ms. Mattos did not rely on any Old GM advertisements in purchasing the 2007 G5, nor did she speak with any representative of Old GM before buying the vehicle.  (*Id.* at 30:13-15; 31:22-32:2 (PDF Pgs. 91; 92-93).)

*Plaintiffs' Response:*

Plaintiffs dispute GM's contention that Ms. Mattos did not speak with any Old GM representative before buying her vehicle. Ms. Mattos testified that when she went to purchase her vehicle at the GM dealership she told the salesman she wanted a new, safe, pretty-looking car with better mileage, and the salesman brought her to the G5.  SJ Ex. 98 (Mar. 3, 2017 W. Mattos Dep. at 28:13-29:3; 30:6-15; 30:24-31:2).  The GM dealership salesman told her the G5 would be a reliable car that was suitable for her needs.  *Id.* at 90:8-15.  Ms. Mattos bought this car with the understanding that it would be safe, but "then [she] found out that it really wasn't, there had been problems with this ignition, and yet it still was used in [her] car, they continued to use this."  *Id.* at 49:7-20.

96.     Ms. Mattos testified that the ignition switch defect never manifested in the 2007 G7.  (*Id.* at 47:1-13 (PDF Pg. 95).)

*Plaintiffs' Response:*

Undisputed.

97.     Ms. Mattos had the ignition switch recall repair conducted in April 2014. (*Id.* at 92:25-93:2 (PDF Pgs. 99-100).)

*Plaintiffs' Response:*

Undisputed.

010440-11 1197516 V1

98.     The 2007 G7 had approximately 54,412 miles on it at the time the recall repair was conducted (Ex. 32, Mattos Deposition Exhibit No. 8 at 1 (ELPLNTFF00009875)) and 77,000 miles on it as of October 2016. (Ex. 18 3/03/17 W. Mattos Dep. Tr. at 42:16-22 (PDF Pg. 94)).

*Plaintiffs' Response:*

Undisputed.

99.     **Esperanza Ramirez** owns a 2007 Saturn Ion subject to Recall No. 14v047.  (5ACC ¶ 69; Ex. 18, 3/03/17 E. Ramirez Dep. Tr. at 12:11-18 (PDF Pg. 103).)  Ms. Ramirez also alleges that her vehicle is also subject to Recall No. 14v153. (Ex. 18, 3/03/17 E. Ramirez Dep. Tr. at 149:25-151:24 (PDF Pgs. 109-111).) (Ex. 33, E. Ramirez Vehicle Package, at GM-MDL2543-305118571.)

*Plaintiffs' Response:*

Undisputed.

100.    Ms. Ramirez purchased her 2007 Ion in March 2007 from Saturn of Torrance in Torrance, CA.  (Ex. 18, 3/03/17 E. Ramirez Dep. Tr. at 214:17-25 (PDF Pg. 113).)  She received a warranty with the vehicle. (*Id.* at 58:6-9 (PDF Pg. 105).)

*Plaintiffs' Response:*

Undisputed.

101.    Neither the ignition switch recall condition nor the power steering recall condition ever manifested in Ms. Ramirez's 2007 Ion.  (*Id.* at 38:3-22 (PDF Pg. 104).)

*Plaintiffs' Response:*

Plaintiffs dispute GM's contention that the defect never manifested in Ms. Ramirez's vehicle. Ms. Ramirez's vehicle had problems with loose steering, the engine crank, and the engine light not shutting off. SJ Ex. 115 (E. Ramirez PFS Q 49 at ELPLNTFF00016852); SJ Ex. 112

38

(Mar. 3, 2017 E. Ramirez Dep. at 124:3-125:22).  In or around February 2014, the vehicle would not shut off. SJ Ex. 112 (Mar. 3, 2017 E. Ramirez Dep. at 113:20-114:23; 135:8-12); SJ Ex. 115 (E. Ramirez PFS Q 49, 70 at ELPLNTFF00016852, ELPLNTFF00016856).  She took it to two GM dealerships and both turned her away and denied responsibility.  SJ Ex. 115 (E. Ramirez PFS Q 75 at ELPLNTFF00016856).  Ms. Ramirez had the ignition switch replaced in February 2014 for $200 out-of-pocket at Mobile Lock and Key Services just about a month before GM issued the ignition switch recall and she received the recall notice.  SJ Ex. 112 (Mar. 3, 2017 E. Ramirez Dep. at 135:8-12); SJ Ex. 115 (E. Ramirez PFS Q 45 at ELPLNTFF00016852); SJ Ex. 116 (ELPLNTFF00009956).  She believes the ignition switch defect may be the cause of these issues with her vehicle. SJ Ex. 112 (Mar. 3, 2017 E. Ramirez Dep. at 116:18-118:6; 119:13-23).

102.   Ms. Ramirez alleges she had the ignition switch replaced in the vehicle in February 2014, although not at a GM dealership.  (*Id*. at 92:8-10 (PDF Pg. 107).)

*Plaintiffs' Response:*

Plaintiffs do not dispute that Ms. Ramirez had her ignition switch replaced at a non-GM repair shop in February 2014, but Plaintiffs dispute GM's characterization of this event. Ms. Ramirez testified that because of problems with her ignition switch, described in Plaintiffs' response to paragraph 101, *supra*, she replaced it in February 2014 at Mobile Lock and Key Services just a month before GM issued the ignition switch recall and she received the recall notice. SJ Ex. 112 (Mar. 3, 2017 E. Ramirez Dep. at 135:8-12); SJ Ex. 115 (E. Ramirez PFS Q 45 at ELPLNTFF00016852); SJ Ex. 116 (ELPLNTFF00009956).  Then, on April 15, 2017, Ms. Ramirez had the ignition switch replaced under the recall at Martin GMC.  SJ Ex. 115 (E. Ramirez PFS Q 45 at ELPLNTFF00016852); SJ Ex. 117 (ELPLNTFF00016820-821).

103.    The 2007 Ion had approximately 131,430 miles on it as of November 2016 (*Id.* at 69:5-10 (PDF Pg. 106).)

*Plaintiffs' Response:*

Undisputed.

104.    Ms. Ramirez believes she first learned of General Motors Corporation's bankruptcy in 2013 or 2014.  (*Id.* at 188:8-22 (PDF Pg. 112).)

*Plaintiffs' Response:*

Undisputed.

105.    **William Rukeyser** owns a 2008 Chevrolet Cobalt subject to Recall No. 14v047. (5ACC ¶ 70; Ex. 18, 3/17/17 W. Rukeyser Dep. Tr. at 70:11-21 (PDF Pg. 116).)

*Plaintiffs' Response:*

Undisputed.

106.    Mr. Rukeyser purchased his 2008 Cobalt in September 2008 from Sanborn Chevrolet.  (5ACC ¶ 70; Ex. 18, 3/17/17 W. Rukeyser Dep. Tr. at 70:22-71:5; 71:23-72:4 (PDF Pgs. 116-118).)  He received a warranty with the vehicle.  (Ex. 18, 3/17/17 W. Rukeyser Dep. Tr. at 108:21-24 (PDF Pg. 119).)

*Plaintiffs' Response:*

Undisputed.

107.    The ignition switch recall condition never manifested in Mr. Rukeyser's 2008 Cobalt.  (*Id.* at 123:3-10 (PDF Pg. 121).)  There is no evidence that the ignition switch originally installed in the 2008 Cobalt had been replaced prior to the recall repair.  (Ex. 34, W. Rukeyser Vehicle Package at GM-MDL2543-305117907; Ex. 35, Rukeyser PFS at Q45 at 5.)

*Plaintiffs' Response:*

Plaintiffs dispute GM's characterization of Mr. Rukeyser's deposition testimony regarding defect manifestation. When asked whether the ignition switch defect has ever manifested in his vehicle, Mr. Rukeyser testified that the vehicle has stalled while driving, and while he could not connect the stalls with the ignition switch defect because he "is not an expert," he is not "ruling it out." SJ Ex. 122 (Mar. 17, 2017 W. Rukeyser Dep. at 123:3-125:7).

108.    Mr. Rukeyser had the ignition switch recall repair performed on the vehicle in 2014. (Ex. 18, 3/17/2017 W. Rukeyser Dep. Tr. at 114:18-20 (PDF Pg. 120).)

*Plaintiffs' Response:*

Undisputed.

109.    The 2008 Cobalt had approximately 62,171 miles on it at the time the recall repair was conducted (Ex. 34, W. Rukeyser Vehicle Package at GM-MDL2543-305117913) and approximately 78,000 miles on it as of March, 2017 (*id.* at 71:12-19 (PDF Pg. 117)).

*Plaintiffs' Response:*

Undisputed.

**C.    Dismissed California Plaintiffs.**

110.    **Yvonne James-Bivins** had her claims dismissed by the Court and was included in the Fifth Amended Complaint for the express and sole purpose of preserving her claims on appeal. (5ACC, ¶33 n.11.)

*Plaintiffs' Response:*

Undisputed.

**D.    Missouri Plaintiffs.**

111.    **Brad Akers** owns a 2009 Chevrolet HHR subject to Recall Nos. 14v047 and 14v153.  (5ACC ¶ 163; Ex. 18, 3/23/17 B. Akers Dep. Tr. at 7:22-24 (PDF Pg. 201).)

*Plaintiffs' Response:*

41

Undisputed.

112.   Mr. Akers purchased the 2009 HHR from the Auffenberg Chevrolet dealership in Farmington, Missouri in November 2009.  (5ACC ¶ 163; Ex. 36, Akers PFS Q 26, Q 31, at 3-4; Ex. 18, 3/23/17 B. Akers Dep. Tr. at 36:7-12 (PDF Pg. 203).)  He received a warranty with the vehicle.  (5ACC ¶ 163; Ex. 18, 3/23/17 B. Akers Dep. Tr. at 67:13-22 (PDF Pg. 208).)

**_Plaintiffs' Response:_**

Undisputed, except as to the vehicle purchase date. Mr. Akers testified he purchased the car in November 2009, but GM-produced documents suggest it was actually purchased in September 2009.  *Compare* SJ Ex. 129 (Mar. 23, 2017 B. Akers Dep. at 36:7-12) *with* SJ Ex. 131 (GM-MDL2543-305120158).

113.   Mr. Akers's 2009 HHR was built by Old GM. (Ex. 37, B. Akers Vehicle Package, GM-MDL2543-305120157 at 60, 62.)

**_Plaintiffs' Response:_**

Undisputed.

114.   Mr. Akers alleges that the dealership salesman represented to him that the 2009 HHR was a safe car. (Ex. 18, 3/23/17 B. Akers Dep. Tr. at 49:20-50:21 (PDF Pgs. 204-205).)  He believes he also saw advertisements about the vehicle's safety, but does not recall whether what he saw was an advertisement or an article, or whether it was Old GM or New GM promotional material at all.  (Ex. 18, 3/23/17 B. Akers Dep. Tr. at 55:10-56:15 (PDF Pgs. 206-207).)

**_Plaintiffs' Response:_**

Plaintiffs do not dispute Mr. Akers's testimony, but add that the GM dealership salesman also told Mr. Akers that the HHR had better safety features in comparison to another vehicle Mr. Akers was considering, the Kia Sportage, and that the print advertisement Mr. Akers saw also

discussed the HHR's safety features as better compared to other vehicles.  SJ Ex. 129 (Mar. 23, 2017 B. Akers Dep. at 49:20-50:21; 52:4-54:12; 55:10-56:8).

115.    Mr. Akers claims that he experienced only one incident in which his 2009 HHR lost engine power (*id*. at 128:1-6 (PDF Pg. 210)), which occurred in a six-month window in 2013 (*id*. at 134:4-24 (PDF Pg. 211)), many months before his vehicle was repaired.  He does not recall what position the key was in when that incident occurred.  (*Id*. at 148:16-19 (PDF Pg. 212).)

*Plaintiffs' Response:*

Plaintiffs dispute GM's statement about the position of the vehicle's key.  Although Mr. Akers did testify that he did not recall the position of the key in his deposition, Mr. Akers's earlier testimony in November 2016 was that the key was in between the "off" and "on" position.  (SJ Ex. 132 (B. Akers PFS Q 58 at ELPLNTFF00013453).)

116.    Mr. Akers's 2009 HHR was repaired pursuant to Recall Nos. 14v047 and 14v153 between June and August 2014.  (*Id*. at 84:21-25 (PDF Pg. 209).)  He alleges that he was without a car for approximately three weeks and lost several days of wages.  (5ACC ¶ 163; Ex. 18, 3/23/17 B. Akers Dep. Tr. at 156:18-157:19 (PDF Pgs. 213-214).)  He claims that he earned between $9 and $10 an hour for the last five to ten years.  (Ex. 18, 3/23/17 B. Akers Dep. Tr. at 15:3-16 (PDF Pg. 202).)  There is no evidence that the ignition switch originally installed in the 2009 HHR had been replaced prior to the recall repair.  (Ex. 37, B. Akers Vehicle Package, GM-MDL2543-305120157 at 62; Ex. 36, Akers PFS Q 40, Q 43, Q45 at 5-7.)

*Plaintiffs' Response:*

Plaintiffs' dispute GM's recounting of Mr. Akers's loss of use of his vehicle and related damages. Mr. Akers missed nine to twelve days of work at $60 per day, after taxes, because he had to travel long distances to various GM dealerships and/or rental car agencies to deal with the

43

ignition switch and power steering defects, the repairs, and the rental car.  SJ Ex. 129 (Mar. 23, 2017 B. Akers Dep. at 156:18-157:19);  SJ Ex. 132 (B. Akers PFS Q 424, 425 at ELPLNTFF00013455).  He testified, "I did have costs associated with the vehicle because I had to drive 130 to 140 mile round trip weekly to re-sign a contract which most of the time meant that I missed work. And they wouldn't like literally give it to me and let me keep it the full amount of time. I had to go back once a week and renew a contract at the car rental place. I believe it was on Sapaugh's lot or maybe affiliated with them. I believe it might have been an Enterprise."  SJ Ex. 129 (Mar. 23, 2017 B. Akers Dep. at 89:5-90:2; 126:16-127:6).  Mr. Akers paid $200-$230 for a rental car at some point during the recalls, and that this was not for the complimentary rental car provided to him by the dealership.  *Id.* at 156:6-17.  Mr. Akers paid his girlfriend $130 and his aunt $80 to use and gas up their cars at various times because of the defect manifestation.  *Id.* at 112:22-113:2; 118:10-13; 120:16-20; 126:16-127:6; 157:20-158:19; SJ Ex. 132 (B. Akers PFS Q 424, 425 at ELPLNTFF00013455).  Mr. Akers spent $279.12 to repair the vehicle's power steering just a few months before GM finally issued the power steering recall, and he does not believe GM ever reimbursed him for those costs despite his efforts to obtain repayment.  SJ Ex. 129 (Mar. 23, 2017 B. Akers Dep. at 159:2-22); SJ Ex. 135 (ELPLNTFF00013405); SJ Ex. 133 (GM-MDL2543-105195233-235); SJ Ex. 134 (GM-MDL2543-105195247-263).  Finally, Mr. Akers suffered economic damage from the third power steering failure incident in which his vehicle crashed into a ditch and was damaged.  SJ Ex. 129 (Mar. 23, 2017 B. Akers Dep. at 124:24-126:4).

117.  Mr. Akers's 2009 HHR had 133,781 miles on it at the time the recall repair was conducted.  (Ex. 38, 8/8/14 Sapaugh GM Country Invoice, ELPLNTFF00013403-04.)  He continues to drive the vehicle, which had 177,777 miles on it as of November 2016.  (Ex. 36, Akers PFS Q 37 at 4.)

*Plaintiffs' Response:*

Undisputed.

118.    **Deloris Hamilton** owned a used 2000 Oldsmobile Alero subject to Recall No. 14v400.  (5ACC ¶ 164; Ex. 18, 3/13/17 D. Hamilton Dep. Tr. at 34:5-8 (PDF Pg. 127).)

*Plaintiffs' Response:*

Undisputed.

119.    Ms. Hamilton purchased the used 2000 Alero from 94 Auto in St. Charles, Missouri on February 24, 2012.  (5ACC ¶ 164; Ex. 18, 3/13/17 D. Hamilton Dep. Tr. at 79:4-6; 25:5-7 (PDF Pgs. 126; 129).)  She paid $3,500 for it and did not receive a warranty.  (5ACC ¶ 164; Ex. 18, 3/13/17 D. Hamilton Dep. Tr. at 24:20-25:2; 95:18-23 (PDF Pgs. 126; 135).)

*Plaintiffs' Response:*

Undisputed.

120.    Ms. Hamilton claims that the sales representative from 94 Auto made representations that the vehicle had good gas mileage, was reliable and safe, and was in good mechanical condition.  (*Id*. at 85:1-13; 90:23-91:6 (PDF Pgs. 131; 132-133).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Ms. Hamilton's testimony, but add Ms. Hamilton testified that she bought her vehicle because she thought it was safe and in good mechanical condition.  SJ Ex. 136 (Mar. 13, 2017 D. Hamilton Dep. at 89:11-14; 89:18-90:2; 90:5-7; 90:23-91:2).

121.    Ms. Hamilton did not rely on any New GM advertisements or marketing materials when purchasing the 2000 Alero.  (*Id.* at 137:15-19 (PDF Pg. 144).)  She did not conduct any research on the 2000 Alero prior to purchasing the vehicle.  (*Id.* at 84:3-7; 91:21-23 (PDF Pgs. 130; 133).)

*Plaintiffs' Response:*

Undisputed.

122.    Ms. Hamilton never experienced a moving stall, a loss of power steering, or a loss of power assist brakes in the 2000 Alero.  (*Id.* at 107:10-108:1 (PDF Pgs. 137-138).)  The ignition switch in her 2000 Alero did not inadvertently rotate.  (*Id.* at 113:11-19; (PDF Pg. 140).)

*Plaintiffs' Response:*

Undisputed.

123.    Ms. Hamilton received the notice for Recall No. 14v400.  (*Id.* at 110:1-5) (PDF Pg. 139).)  She did not have the recall repair conducted on the 2000 Alero because she had already stopped driving the vehicle due to the gear shift knob breaking off in November 2014.  (5ACC ¶ 164; Ex. 18, 3/13/17 D. Hamilton Dep. Tr. at 114:5-25(PDF Pg. 141).)

*Plaintiffs' Response:*

Undisputed.

124.    Ms. Hamilton gifted the 2000 Alero to her daughter in April 2016.  (5ACC ¶ 164; Ex. 18, 3/13/17 D. Hamilton Dep. Tr. at 73:2-4 (PDF Pg. 128).)  Ms. Hamilton believes she put approximately 12,000 to 13,000 miles on the 2000 Alero.  (*Id.* at 100:1-4 (PDF Pg. 136).)

*Plaintiffs' Response:*

Undisputed.

125.    **Cynthia Hawkins** owns a used 2010 Chevrolet Cobalt subject to Recall Nos. 14v047 and 14v153.  (5ACC ¶ 165; Ex. 18, 3/24/17 C. Hawkins Dep. Tr. at 7:25-8:2 (PDF Pgs. 220-221).)

*Plaintiffs' Response:*

Undisputed.

126.    Ms. Hawkins purchased the used 2010 Cobalt from South County Auto Center in Missouri on July 23, 2013.  (5ACC ¶ 165; Ex. 18, 3/24/17 C. Hawkins Dep. Tr. at 27:1-5 (PDF Pg. 222).)  She did not receive a warranty with the vehicle.  (5ACC ¶ 165; Ex. 18, 3/24/17 C. Hawkins Dep. Tr. at 110:6-8 (PDF Pg. 234).

*Plaintiffs' Response:*

Undisputed, except as to the warranty. Ms. Hawkins' vehicle was covered under the powertrain warranty when she purchased it.  SJ Ex. 142 (GM-MDL2543-304722463).

127.    Prior to purchasing the 2010 Cobalt, Ms. Hawkins conducted research in the Kelley Blue Book and J.D. Power and Associates.  (5ACC ¶ 165; Ex. 18, 3/24/17 C. Hawkins Dep. Tr. at 48:13-17; (PDF Pg. 228).)  She did not review any New GM or Old GM brochures or materials prior to purchasing the vehicle.  (Ex. 18, 3/24/17 C. Hawkins Dep. Tr. at 48:18-24; (PDF Pg. 228_).)  Ms. Hawkins alleges in the Fifth Amended Complaint that she was told by the dealership salesman that it was a good family car, would be easy for a teenager to drive, and that it received good gas mileage, but at deposition she could not recall anything that the salesman said.  (5ACC ¶ 165; Ex. 18, 3/24/17 C. Hawkins Dep. Tr. at 35:13-20; (PDF Pg. 224).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Ms. Hawkins's testimony, but Plaintiffs dispute GM's characterization of this testimony.  Ms. Hawkins testified that before she bought the Cobalt she was "looking for a family car that [her daughter] would be safe driving in and that [her daughter] could -- we could share."  SJ Ex. 139 (Mar. 24, 2017 C. Hawkins Dep. at 30:24-31:4).  Ms. Hawkins told the salesman they were looking for a "family-oriented car." *Id.* at 35:13-17.  Ms. Hawkins testified, "When we found this car, it had -- you know, it was something that would fit into our family budget and something that I considered a family safe car." *Id.* at 32:6-14.

47

128.    Ms. Hawkins's 2010 Cobalt was repaired pursuant to Recalls Nos. 14v047 and 14v153 (Ex. 18, 3/24/17 C. Hawkins Dep. Tr. at 82:9-10 (PDF Pg. 233).)  There is no evidence that the ignition switch originally installed in the 2009 Cobalt had been replaced prior to the recall repair.  (Ex. 39, C Hawkins Vehicle Package at GM-MDL2543-304722463) (Ex. 40, Hawkins PFS Q 43, Q 45 at 5).

*Plaintiffs' Response:*

Undisputed.

129.    Ms. Hawkins has never experienced a moving stall or a loss of power steering in her 2010 Cobalt, and she has not experienced any mechanical issues with her 2010 Cobalt since the recall repairs were performed.  (Ex. 18, 3/24/17 C. Hawkins Dep. Tr. at 46:9-47:2 (PDF Pgs. 226-227).)

*Plaintiffs' Response:*

Undisputed.

130.    The 2010 Cobalt had approximately 52,000 miles on it at the time of purchase.  (*Id.* at 27:24-28:6 (PDF Pgs. 222-223).)  The vehicle had 68,404 miles at the time the recall repair was conducted, and as of March 2017, the vehicle had over 100,000 miles on it.  (Ex. 41, 8/29/14 Jim Trenary Automotive Group Invoice, at ELPLNTFF00008129; Ex. 18, 3/24/17 C. Hawkins Dep. Tr. at 45:5-9; (PDF Pg. 225).)

*Plaintiffs' Response:*

Undisputed.

131.    **Kenneth Robinson** owned a 2008 Pontiac G5 subject to Recall No. 14v047. (5ACC ¶ 166; Ex. 18, 5/9/17 K. Robinson Dep. Tr. at 8:3-9 (PDF Pg. 453).)

*Plaintiffs' Response:*

48

Undisputed.

132.    Mr. Robinson purchased the 2008 G5 from Westfall Odell dealership in Missouri on September 7, 2008.  (5ACC ¶ 166; Ex. 18, 5/9/17 K. Robinson Dep. Tr. at 34:21-25 (PDF Pg. 454).)  He received a warranty with the vehicle.  (5ACC ¶ 166; Ex. 18, 5/9/17 K. Robinson Dep. Tr. at 59:18-22 (PDF Pg. 456).)

*Plaintiffs' Response:*

Undisputed.

133.    Mr. Robinson remembers the salesman talking about the vehicle's safety.  (5ACC ¶ 166; Ex. 18, 5/9/17 K. Robinson Dep. Tr. at 40:4-20 (PDF Pg. 455).)  Mr. Robinson did not review or rely on any advertisements when purchasing the 2008 G5.  (Ex. 18, 5/9/17 K. Robinson Dep. Tr. at 113:13-19 (PDF Pg. 467).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Mr. Robinson's testimony, but dispute GM's characterization of it. In purchasing the car, Mr. Robinson was looking for a safe and fuel-efficient car.  SJ Ex. 145 (May 9, 2017 K. Robinson Dep. at 40:17-20; 44:3-7).  He wanted the best safety features there were, and he was particularly concerned with the airbags and brakes.  *Id.* at 44:8-16.  Mr. Robinson testified that the GM dealership salesman told him about the vehicle's safety features, and said "[i]t is a great car, a lot of safety features on it, the air bags, the braking, the steering, gas mileage was great."  *Id.* at 40:4-16; 56:24-57:2; 44:17-24.

134.    Mr. Robinson alleges that the 2008 G5 shut down while he was driving on multiple occasions.  (5ACC ¶ 166; Ex. 18, 5/9/17 K. Robinson Dep. Tr. at 67:8-20; 70:21-71:11 (PDF Pgs. 460; 461-462).)  He does not recall the position of the ignition switch during those occasions.  (Ex. 18, 5/9/17 K. Robinson Dep. Tr. at 72:10-13 (PDF Pg. 463).)

49

*Plaintiffs' Response:*

Undisputed.

135.     Mr. Robinson sold the 2008 G5 in May 2013, prior to the announcement of Recall No. 14v047.  (Ex. 18, 5/9/17 K. Robinson Dep. Tr. at 65:25-66:5 (PDF Pgs. 458-459).)   Mr. Robinson's vehicle had approximately 88,000 miles on it when he sold it in May, 2013. (Ex. 42, K. Robinson Vehicle Package at GM-MDL-2543-305118316')   The subsequent owner had the 2008 G5 repaired pursuant to Recall 14v047 in April 2014.  (*Id.* at GM-MDL2543-305118315.)  Mr. Robinson testified that, during his entire ownership of the subject vehicle, it contained the same ignition switch that was originally installed in the vehicle. (Ex. 18, 5/9/17 K. Robinson Dep. Tr. at 64:13-21 (PDF Pg. 457).)

*Plaintiffs' Response:*

Plaintiffs do not dispute that Mr. Robinson traded the vehicle in May 2013 or its mileage at trade in, but Plaintiffs dispute GM's contention that Mr. Robinson's vehicle contained the same ignition switch during his ownership of it. According to GM's records, the ignition switch was replaced in April 2013.  SJ Ex. 146 (GM-MDL2543-305118316, 305118322, 305118335-337). The vehicle's ignition switch was replaced again, this time under the recall, in August 2014, after Mr. Robinson no longer owned it. *Id.* (GM-MDL2543-305118316, 305118321, 305118326-331).

136.     **Ronald Robinson** owns a used 2010 Chevrolet Impala subject to Recall No. 14v355.  (5ACC ¶ 167; Ex. 18, 3/21/17 R. Robinson Dep. Tr. at 10:11-13 (PDF Pg. 147).)

*Plaintiffs' Response:*

Undisputed.

137.    Mr. Robinson purchased the used 2010 Impala from Enterprising Leasing in Missouri in June 2011.  (5ACC ¶ 167; Ex. 18, 3/21/17 R. Robinson Dep. Tr. at 42:12-18 (PDF Pg. 152).)

*Plaintiffs' Response:*

Undisputed.

138.    When asked "[w]hat were you looking for when you went to Enterprise to purchase a vehicle in June of 2011," Mr. Robinson testified that he "was looking for low mileage and what I would consider a decent price."  (Ex. 18, 3/21/17 R. Robinson Dep. Tr. at 59:23-60:3 (PDF Pgs. 154-155).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Mr. Robinson's testimony, but Plaintiffs dispute GM's contention that these were Mr. Robinson's only considerations in buying the Impala. Mr. Robinson was attracted to the vehicle "because of the advertisement of seeing the GM products; the price looked decent." SJ Ex. 148 (Mar. 21, 2017 R. Robinson Dep. at 55:23-56:2).  Mr. Robinson also testified that safety and price were both important to him in purchasing the vehicle, and that "at the time of purchase I assumed that it was a reliable, safe vehicle."  *Id.* at 107:8-108:11; 110:3-17; 118:23-119:2.

139.    Mr. Robinson alleges that email and television advertisements highlighting the Impala's "quality" positively impacted his decision to purchase the vehicle.  (5ACC ¶ 167; Ex. 18, 3/21/17 R. Robinson Dep. Tr. at 33:22-34:2 (PDF Pgs. 148-149).)  He does not believe there was anything untruthful in that advertising.  (*Id.* at 34:3-34:12 (PDF Pg. 149).)

*Plaintiffs' Response:*

Plaintiffs dispute GM's characterization of Mr. Robinson's testimony regarding the advertisements he viewed and relied on before buying his Impala. Mr. Robinson testified that he "viewed e-mail advertising highlighting the quality of the GM product and that positively impacted [his] decision to buy the car." SJ Ex. 148 (Mar. 21, 2017 R. Robinson Dep. at 33:22-34:2); SJ Ex. 151 (R. Robinson PFS Q 433 at ELPLNTFF00017001). Mr. Robinson saw GM television commercials advertising that GM makes good products and that GM stands behind its products, and while he thought they were true at the time, he no longer does. SJ Ex. 148 (Mar. 21, 2017 R. Robinson Dep. at 62:5-21; 63:6-11). He believes these GM commercials were false with regard to the quality of the GM product. *Id.* at 62:22-63:5; 64:9-14; 67:17-68:3; 133:22-134:22. These ads made him feel comfortable buying the Impala. *Id.* at 64:5-8. When asked whether he could point to specific GM advertisements with untruthful statements, Mr. Robinson testified, "they're speaking about how safe the cars are, putting the consumer first, and from all that I've read, I don't see that as being truthful." *Id.* at 141:14-23.

140.    Prior to the purchase, Mr. Robinson discussed the vehicle with his brother-in-law, who is in the auto repair business. (Ex. 18, 3/21/17 R. Robinson Dep. Tr. at 36:5-9 (PDF Pg. 151).) He believes that he may have also done research on Kelley Blue Book and other used car websites. (*Id.* at 60:18-25 (PDF Pg. 155).)

*Plaintiffs' Response:*

Undisputed.

141.    Mr. Robinson's 2010 Impala was repaired pursuant to Recall No. 14v355. (*Id.* at 65:7-11 (PDF Pg. 156).)

*Plaintiffs' Response:*

Undisputed.

142.     Mr. Robinson has never experienced an ignition switch-related event in his 2010 Impala.  (*Id*. at 77:9-17 (PDF Pg. 157).)

*Plaintiffs' Response:*

Undisputed.

143.     The 2010 Impala had approximately 25,000 miles on it at the time of purchase.  (*Id*. at 35:2-4 (PDF Pg. 150).)  The vehicle had 77,029 at the time the recall repair was conducted, and as of March 2017, the vehicle had approximately 105,000 miles on it.  (Ex. 43, 11/20/14 Chevrolet Weber Invoice at ELPLNTFF00008159; Ex. 18, 3/21/17 R. Robinson Dep. Tr. at 55:7-9 (PDF Pg. 153).)  Mr. Robinson continues to drive the vehicle.  (Ex. 18, 3/21/17 R. Robinson Dep. Tr. at 81:2-4 (PDF Pg. 159).)

*Plaintiffs' Response:*

Undisputed.

144.     **Mario Stefano** owns a used 2011 Chevrolet Camaro subject to Recall No. 14v346.  (5ACC ¶ 168; Ex. 18, 4/14/17 M. Stefano Dep. Tr. at 8:18-24 (PDF Pg. 322).)

*Plaintiffs' Response:*

Undisputed, except to note that Mr. Stefano purchased the vehicle certified pre-owned from the GM dealership Dave Sinclair Buick GMC Truck.  SJ Ex. 158 (Apr. 14, 2017 M. Stefano Dep. at 43:16-44:1); SJ Ex. 159 (ELPLNTFF00013479).

145.     Mr. Stefano purchased the used 2011 Camaro from Dave Sinclair Buick GMC Truck in St. Louis, Missouri on May 14, 2013.  (5ACC ¶ 168; Ex. 18, 4/14/17 M. Stefano Dep. Tr. at 43:16-44:1 (PDF Pgs. 327-328).)  He received a warranty with the vehicle. (5ACC ¶ 168; Ex. 18, 4/14/17 M. Stefano Dep. Tr. at 79:17-23 (PDF Pg. 337).)

*Plaintiffs' Response:*

Undisputed, except to note that Mr. Stefano purchased the vehicle certified pre-owned from the GM dealership Dave Sinclair Buick GMC Truck. SJ Ex. 158 (Apr. 14, 2017 M. Stefano Dep. at 43:16-44:1); SJ Ex. 159 (ELPLNTFF00013479).

146.   When he purchased the vehicle, Mr. Stefano testified he was looking only at Camaros. (Ex. 18, 4/14/17 M. Stefano Dep. Tr. at 56:10-13 (PDF Pg. 332).)  When asked "why did you buy the subject vehicle," Mr. Stefano emphasized he and his wife's enjoyment of Camaros:

> Because it is a vehicle that my wife and I enjoy. We've always enjoyed Camaros. It was everything that she wanted in a car, we thought, and the dealership is somewhere that we frequent for buying our vehicles. So this is our second one buying from there, and our daughter's bought one from there, and you just kind of make a habit of buying from the same place.

(*Id.* at 55:18-56:2 (PDF Pgs. 331-332).)  Mr. Stefano testified that he and his wife had a long-running interest in Camaros:

> Well, we would like to, but you know, it's -- it's a love my wife has for these cars that she loves Camaros. She's had them for so long, and she's driven them for many years. She had when she was a kid one of the -- one of the old Camaros. It was somewhere in the late '70s Camaro, and then she got one of the IROC Camaros. This was before we were together.
>
> And then when we were together she had a 2010 Camaro, and now she's got the 2011, and so it's always been something that she loves, and we try and support each other by getting vehicles that we like.  Because it's -- it's -- you know, you want to have something you enjoy, you know, and that's important to us.

(*Id.* at 21:12-22:1 (PDF Pgs. 324-325).)  Given the couple's shared enjoyment of Camaros, Mr. Stefano testified that he did no research before buying and that the purchase was "completely impulse."  (*Id.* at 62:6-23 (PDF Pg. 336).)

### *Plaintiffs' Response:*

Plaintiffs do not dispute that Mr. Stefano and his wife have had a long running interest in Camaros, but Plaintiffs dispute the characterization of this testimony as meaning the Stefanos purchased the vehicle on a whim. Mr. Stefano testified they purchased the vehicle, "[b]ecause it is a vehicle that my wife and I enjoy. We've always enjoyed Camaros. It was everything that she

54

wanted in a car, we thought, and the dealership is somewhere that we frequent for buying our vehicles." SJ Ex. 158 (Apr. 14, 2017 M. Stefano Dep. at 55:18-24).  Mr. Stefano's prior GM patronage and experience influenced his expectation for the vehicle, testifying, "[i]t should be a quality product. We've always had good products from you guys before -- not you in particular but from the company, but now we're looking at our car is not the quality that we've always come to expect when we bought those."  *Id.* at 29:6-30:14.  With regard to purchasing the vehicle certified pre-owned, Mr. Stefano testified, "you walk into the dealer and they give you that paper that says it's certified and we've looked at it and we've hired a mechanic that has gone through schooling and been taught to look at everything, and this vehicle is perfect but it's not. So shouldn't a -- I don't know if I can ask you that, but I mean to me I think that when you fill out a sheet that says that this vehicle is certified and it's just like new again, that vehicle should be just like new again. That's them standing behind their vehicle."  *Id.* at 62:24-63:14. With regard to the safety features he was looking for, Mr. Stefano testified, "[t]he Camaro is a very safe-built car, you know. It's got a solid body to it, and the build of the frame is almost looks like a roll cage in there, you know. So it's got good safety ratings from what I understand." *Id.* at 60:9-15.

147.    Mr. Stefano testified that he and his wife were looking specifically for a Camaro that was black or silver, with a certain sized motor, a sunroof, leather, heated seats, the "rally package," remote start, a switchblade key, adjustable seats, adjustable steering wheel, and a stereo package.  (*Id.* at 50:7-18; 59:17-60:8 (PDF Pgs. 329; 334-335).)

   *Plaintiffs' Response:*

   Undisputed.

148.    New GM advertisements did not have any effect on Mr. Stefano's decision to purchase the 2011 Camaro.  (*Id.* at 115:23-116:1 (PDF Pgs. 342-343).)

*Plaintiffs' Response:*

Plaintiffs do not dispute that Mr. Stefano did not rely on GM advertisements in purchasing the Camaro, but Mr. Stefano's prior GM patronage and experience influenced his expectation for the vehicle, testifying, "[i]t should be a quality product. We've always had good products from you guys before -- not you in particular but from the company, but now we're looking at our car is not the quality that we've always come to expect when we bought those." SJ Ex. 158 (Apr. 14, 2017 M. Stefano Dep. at 55:18-24; 29:6-30:14).   With regard to purchasing the vehicle certified pre-owned, Mr. Stefano testified, "you walk into the dealer and they give you that paper that says it's certified and we've looked at it and we've hired a mechanic that has gone through schooling and been taught to look at everything, and this vehicle is perfect but it's not. So shouldn't a -- I don't know if I can ask you that, but I mean to me I think that when you fill out a sheet that says that this vehicle is certified and it's just like new again, that vehicle should be just like new again. That's them standing behind their vehicle." *Id.* at 62:24-63:14. With regard to the safety features he was looking for, Mr. Stefano testified, "[t]he Camaro is a very safe-built car, you know. It's got a solid body to it, and the build of the frame is almost looks like a roll cage in there, you know. So it's got good safety ratings from what I understand." *Id.* at 60:9-15.

149.    Mr. Stefano's 2011 Camaro was repaired pursuant to Recall No. 14v346.   (*Id.* at 86:5-8 (PDF Pg. 338).)

*Plaintiffs' Response:*

Undisputed.

150.    Mr. Stefano alleges he experienced only one event where he lost power, which occurred "four years ago, three years ago, something like that," (*id.* at 53:8-21; 92:8-94:23 (PDF Pgs. 330; 339-341)) before his vehicle was repaired.  Mr. Stefano believed the incident was caused

56

by a faulty battery in the vehicle's key fob, and he has not had problems since the key fob battery was replaced.  (*Id.* at 92:15-94:23 (PDF Pgs. 339-341).)

> ***Plaintiffs' Response:***

Disputed. Mr. Stefano testified he does not know when he lost power in the Camaro.  SJ Ex. 158 (Apr. 14, 2017 M. Stefano Dep. at 52:18-53:4; 93:1-9).  He was specifically asked if the incident occurred prior to receiving the recall notice, and again answered that he did not recall when it happened.  *Id.*  Mr. Stefano also testified about a similar incident where he lost power while driving his Challenger:

> Q: "What are you referring to?"
>
> A: "The Challenger when I was driving down the highway just about the same area, actually, 155, it just dies while we were driving, and it said, No key fob in range. And Chrysler said that they didn't know anything about it, but the battery basically died on the key fob and it's a push start, you know, so that was something that I guess they fixed, but yeah, it just didn't have the  range and it died.
>
> Q: "When was that incident?"
>
> A: "Oh, I guess four years ago, three years ago, something like that."

*Id.* at 53:8-21.

151.    The 2011 Camaro had 31,703 miles on it at the time of purchase.  (*Id.* at 42:19-21 (PDF Pg. 326).)  The vehicle had 43,109 miles on it at the time the recall repair was conducted, and as of November 2016, the vehicle had 56,867 miles on it.  (Ex. 44, 9/19/14 Repair Order at ELPLNTFF00013478; Ex. 18, 4/14/17 M. Stefano Dep. Tr. at 42:22-43:2 (PDF Pgs. 326-327).)

> ***Plaintiffs' Response:***

Undisputed.

152.    Mr. Stefano regularly displays the 2011 Camaro at car shows.  (*Id.* at 20:12-22 (PDF Pg. 323).)  He and his wife are considering purchasing another Camaro.  (*Id.* at 57:21-23; 62:12-19) (PDF Pgs. 333; 336).)

*Plaintiffs' Response:*

Undisputed, but Plaintiffs clarify that Mr. Stefano's full testimony was, "[w]e're actually thinking about getting another one, and we're just not sure, you know."  SJ Ex. 158 (Apr. 14, 2017 M. Stefano Dep. at 57:21-23).

153.    **Christopher Tinen** owned a 2010 Acadia subject to Recall No. 14v118.  (5ACC ¶ 169; Ex. 18, 4/13/17 C. Tinen Dep. Tr. at 28:6-15 (PDF Pg. 274).)

*Plaintiffs' Response:*

Undisputed.

154.    Mr. Tinen purchased the 2010 Acadia from the Bommarito dealership in Ellisville, Missouri on February 22, 2010.  (5ACC ¶ 169; Ex. 18, 4/13/17 C. Tinen Dep. Tr. at 28:21-23; 53:12-25 (PDF Pgs. 274; 282).)

*Plaintiffs' Response:*

Undisputed.

155.    Mr. Tinen paid $32,080.27 for the 2010 Acadia.  (Ex. 18, 4/13/17 C. Tinen Dep. Tr. at 29:19-21 (PDF Pg. 275).)  He received a warranty with the vehicle. (5ACC ¶ 169; Ex. 18, 4/13/17 C. Tinen Dep. Tr. at 89:14-16 (PDF Pg. 288).)

*Plaintiffs' Response:*

Undisputed.

156.    Prior to purchasing the vehicle, Mr. Tinen alleged that he reviewed Old GM or New GM advertisements.  (5ACC ¶ 169; Ex. 18, 4/13/17 C. Tinen Dep. Tr. at 117:10-17 (PDF Pg.

293).)  Mr. Tinen claims to have seen advertising with general themes of dependability and performance, but did not identify whether that advertising was Old GM or New GM, could not recall if these advertisements were about the vehicle he purchased, and could not recall whether he relied on any such themes or statements.  (Ex. 18, 4/13/17 C. Tinen Dep. Tr. at 117:18-119:5, 122:1-3) (PDF Pgs. 293-296).)  Mr. Tinen could not identify any representations that he believed were untrue.  (Ex. 18, 4/13/17 C. Tinen Dep. Tr. at 122:4-:21) (PDF Pg. 296).)

   *Plaintiffs' Response:*

   Plaintiffs do not dispute that Mr. Tinen viewed GM advertisements, but Plaintiffs dispute GM's characterization of Mr. Tinen's testimony about this.  Mr. Tinen reviewed information about the features and benefits of the vehicle on the GM website before purchase. SJ Ex. 164 (Apr. 13, 2017 C. Tinen Dep. at 45:14-46:1). He also reviewed the Acadia brochure. *Id.* at 50:3-13. Mr. Tinen reviewed GM advertisements that influenced his decision to purchase the vehicle, testifying, "[a]t the time I believe there was a TV commercial by General Motors touting dependability and performance." *Id.* at 117:10-21. These advertisements also reinforced safety as a topic. *Id.* at 118:11-20. Mr. Tinen recalls seeing GM advertisements in 2009 that related to dependability, performance, and safety, testifying, "my feeling the message was by buying American, you're not only saving jobs, but you have got a dependable, safe car, and we stand behind it as the new GMC or the new GM. There was some reference to the new GM behind it." *Id.* at 119:12-120:5. Mr. Tinen relied on these GM advertisements. *Id.* at 121:19-20. The GM dealership salesman also told him about the vehicle's fuel economy, performance, and dependability. *Id.* at 58:16-21.

   157.    Mr. Tinen also conducted research in the newspaper, Kelley Blue Book, dealership websites, and visited at least one auto show.  (Ex. 18, 4/13/17 C. Tinen Dep. Tr. at 29:24-30:6; 31:4; 46:8; 47:4-10; 50:17-51:1 (PDF Pgs. 275-276; 277; 278; 279; 280-281).)  He alleges that he

was told about the vehicle's fuel economy, performance, and dependability by the sales representative at Bommarito.  (5ACC ¶ 169; Ex. 18, 4/13/17 C. Tinen Dep. Tr. at 58:16-21 (PDF Pg. 283).)

*Plaintiffs' Response:*

Undisputed.

158.    Mr. Tinen's vehicle had over 52,000 miles on it when he traded it in.  (Ex. 45, C. Tinen Vehicle Package at GM-MDL-2543-305119203.)

*Plaintiffs' Response:*

Undisputed.

159.    Mr. Tinen alleges that on several occasions the side impact airbag light in the 2010 Acadia flickered, but does not know how many times this occurred.  (Ex. 18, 4/13/17 C. Tinen Dep. Tr. at 97:18-98:3 (PDF Pgs. 291-292).)

*Plaintiffs' Response:*

Undisputed.

160.    Mr. Tinen sold his 2010 Acadia in April 2012, prior to the announcement of Recall No. 14v118.  (Ex. 18, 4/13/17 C. Tinen Dep. Tr. at 70:23-71:1; 95:13-96:1 (PDF Pgs. 286-287; 289-290).)  The subsequent owner had the 2010 Acadia repaired pursuant to Recall No. 14v118. (Ex. 46, C. Tinen Warranty History at GM-MDL2543-107571944-45.)

*Plaintiffs' Response:*

Undisputed.

161.    **Patrice Witherspoon** owns a 2006 Saturn Ion subject to Recall Nos. 14v047 and 14v153.  (5ACC ¶ 170; Ex. 18, 5/31/17 P. Witherspoon Dep. Tr. at 13:4-6 (PDF Pg. 486).)

*Plaintiffs' Response:*

Undisputed.

162.    Ms. Witherspoon purchased the 2006 Ion from Saturn of Blue Springs in 2005. (5ACC ¶ 170; Ex. 18, 5/31/17 P. Witherspoon Dep. Tr. at 14:18-19; 88:23-89:4 (PDF Pgs. 487; 497-498).)    She received a warranty with the vehicle.    (5ACC ¶ 170; Ex. 18, 5/31/17 P. Witherspoon Dep. Tr. at 109:9-19 (PDF Pg. 502).)

*Plaintiffs' Response:*

Undisputed.

163.    Ms. Witherspoon recalls seeing Saturn television advertisements that she interpreted as indicating the vehicle was safe.  (5ACC ¶ 170; Ex. 18, 5/31/17 P. Witherspoon Dep. Tr. at 54:12-55:20 (PDF Pgs. 488-489).)    She does not claim the advertisements made any statements, but rather depicted vehicles being hit with a baseball bat or shopping cart, which she asserts gave her the impression of safety.  (Ex. 18 5/31/17 P. Witherspoon Dep. Tr. at 54:12-55:20 (PDF Pgs. 488-489).)    She also claims the Saturn salesman indicated that the vehicle was safe. (5ACC ¶ 170; Ex. 18, 5/31/17 P. Witherspoon Dep. Tr. at 60:5-17 (PDF Pg. 490).)

*Plaintiffs' Response:*

Plaintiffs dispute GM's characterization of Ms. Witherspoon's testimony regarding the GM advertisements and representations she saw and heard. Ms. Witherspoon "reviewed GM's Web page and other Internet websites discussing the Saturn ION prior to her purchase and believed that the vehicle was safe and reliable based on her review," and she "believed her vehicle was safe and defect-free when she purchased it."  SJ Ex. 168 (May 31, 2017 P. Witherspoon Dep. at 45:22-46:7).  When she visited GM's website before buying the car, she testified that she "[l]ooked to see what they said in terms of safety and I think like stars that they gave a certain vehicle."  *Id.* at 103:13-16.  She believes the GM website statements that the vehicle was safe and reliable were

untrue. *Id.* at 46:8-24.  Ms. Witherspoon also saw Saturn television advertisements that stated its vehicles were safe.  *Id.* at 54:4-11.  She testified, "I remember a specific commercial where it showed the Saturn ION and it had different things like hitting the vehicle, like a baseball bat, shopping cart ran into it. It was just different items. That was the whole gimmick to show that the car would be durable and not be able to cause harm to it easily. That's the one specific commercial I remember." *Id.* at 54:19-55:5.  She testified this commercial was untrue or misleading "because the implied [sic] is that it's a safe vehicle and it wasn't." *Id.* at 55:6-20.  The GM dealership salesman told Witherspoon that her vehicle was safe and reliable, and he specifically discussed the front airbags with her. *Id.* at 60:5-21.  She believes the car was not in fact safe and reliable because of the defects in the car and "[b]ecause the vehicle would turn off while driving. That was potentially deadly. Also, the vehicle you couldn't steer if it were to shut off, which is potentially deadly," and "I feel also the fact that I repetitively brought the vehicle in complaining of those issues and nothing was done timely also was unsafe." *Id.* at 61:3-62:9.  She testified, "[it] was mostly the advertisements that were running at the time about the Saturn made me look into Saturn, and then also I did comparisons to other four-door vehicles in terms of cost. This was going to be my first vehicle, so I did a lot of research to narrow it down to the Saturn." *Id.* at 87:8-17.

164.    Ms. Witherspoon conducted internet research and visited the Old GM website in advance of her purchase.  (5ACC ¶ 170; Ex. 18, 5/31/17 P. Witherspoon Dep. Tr. at 102:16-104:6 (PDF Pgs. 499-501).)

   *Plaintiffs' Response:*

Undisputed, but Plaintiffs note their response to paragraph 163, *supra*, contains a more complete discussion of the online representations Ms. Witherspoon viewed.

165.    Ms. Witherspoon alleges that her vehicle shut off on several occasions while driving.  (5ACC ¶ 170; Ex. 18, 5/31/17 P. Witherspoon Dep. Tr. at 62:18-63:16 (PDF Pgs. 491-492).)  On each of those occasions, however, the ignition key was in the "run" position. (5ACC ¶ 170; Ex. 18, 5/31/17 P. Witherspoon Dep. Tr. at 63:12-16 (PDF Pg. 492).)  Furthermore, no one has ever told her that these incidents were related to the ignition switch defect.  (Ex. 18, 5/31/17 P. Witherspoon Dep. Tr. at 118:18-119:4 (PDF Pgs. 504-505).)  Ms. Witherspoon does not recall ever driving her vehicle with the power steering warning light illuminated.  (*Id*. at 140:7-16 (PDF Pg. 506).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Ms. Witherspoon's testimony, but Plaintiffs dispute GM's suggestion that her ignition-related problems were unrelated to the ignition switch defect. GM acknowledged these problems were related to the defect when it reimbursed Ms. Witherspoon for two separate out-of-pocket ignition-related repairs—one conducted on February 6, 2013, and the other on July 15, 2013, at Molle Chevrolet—after GM announced the ignition switch recall. SJ Ex. 174 (ELPLNTFF0009319); SJ Ex. 175 (ELPLNTFF00015417-420); SJ Ex. 168 (May 31, 2017 P. Witherspoon Dep. at 135:14-23).

Plaintiffs also dispute GM's suggestion that the power steering defect did not manifest in Ms. Witherspoon's vehicle. Ms. Witherspoon could not recall whether the power steering warning light ever came on.  SJ Ex. 168 (May 31, 2017 P. Witherspoon Dep. at 140:7-13).  But GM records show that the GM dealership actually repaired her vehicle in November 2011 under the same field action/tech bulletin for a power steering defect (No. 10187) that GM eventually sent her a recall notice about in June 2012.  SJ Ex. 172 (GM-MDL2543-305118727, 305118733); SJ Ex. 171 (GM-MDL2543-305154066-070); SJ Ex. 173 (ELPLNTFFF00009318).  This recall notice indicated the

recall repair was only required if the defect had manifested, which according to Ms. Witherspoon's records, it had. SJ Ex. 173 (ELPLNTFFF00009318); SJ Ex. 171 (GM-MDL2543-305154066-070).

166.    There were 136,446 miles on the 2006 Ion at the time the recall repair was conducted, and approximately 175,000 to 180,000 miles on it as of May 2017.  (Ex. 47, 6/21/14 Molle Chevrolet invoice, at ELPLNTFF00009320; 5ACC ¶ 170; Ex. 18, 5/31/17 P. Witherspoon Dep. Tr. at 55:21-23 (PDF Pg. 489).)

*Plaintiffs' Response:*

Undisputed.

167.    Ms. Witherspoon's 2006 Ion was repaired pursuant to Recall Nos. 14v047 and 14v153.  (Ex. 18, 5/31/17 P. Witherspoon Dep. Tr. at 115:12-24; 153:7-10 (PDF Pgs. 503; 507).)

*Plaintiffs' Response:*

Plaintiffs do not dispute that these recall repairs were conducted on Ms. Witherspoon's vehicle, but Ms. Witherspoon cannot attest to the effectiveness of these repairs.  She testified, "I'm even not aware now whether or not the problem is actually, truly fixed because, like you stated, some people that had the vehicle, it never manifest, so I can only go by what GM has told me now in terms of the repair. I'm not completely aware whether or not that's true or not."  SJ Ex. 168 (May 31, 2017 P. Witherspoon Dep. at 148:21-149:12).

168.    Ms. Witherspoon has not had an ignition switch issue since her 2006 Ion was repaired.  (*Id*. at 115:12-24 (PDF Pg. 503).)

*Plaintiffs' Response:*

Undisputed.

**E.    Texas Plaintiffs.**

64

169.     **Gareebah Al-Ghamdi** owned a used 2004 Chevrolet Impala subject to Recall No. 14v400.  (5ACC ¶ 240; Ex. 18, 5/5/2017 G. Al-Ghamdi Dep. Tr. at 7:13-17 (PDF Pg. 426)).)

*Plaintiffs' Response:*

Undisputed.

170.     Ms. Al-Ghamdi purchased her 2004 Impala from Auto Expo used car lot in San Antonio, Texas on September 7, 2009.  (5ACC ¶ 240; Ex. 18, 5/5/2017 G. Al-Ghamdi Dep. Tr. at 20:2-24 (PDF Pg. 427).)  She paid $12,999 for the 2004 Impala.  (*Id.* at 26:2-4 (PDF Pg. 430).)  She did not receive a warranty.  (*Id*. at 127:20-22 (PDF Pg. 446).)

*Plaintiffs' Response:*

Undisputed.

171.     Ms. Al-Ghamdi alleges she chose the Impala because of its reliability and because her family members had had good experiences with Chevrolets.  (*Id*. at 38:23-24; 32:13-18; 33:2-15 (PDF Pgs. 437; 433; 434).)  When Ms. Al-Ghamdi shopped for her 2004 Impala, she had her stepfather with her who "is very knowledgeable on vehicles, and he can fix anything." (*Id*. at 24:8-14, 79:13-23 (PDF Pgs. 428; 443).)  Her stepfather accompanied her on trips to the dealerships, test drove the Impala, and negotiated its price with the dealership.  (*Id*. at 24:8-14, 25:4-7, 26:2-13 (PDF Pgs. 428; 429; 430).)  While Ms. Al-Ghamdi said she wanted a reliable car, she relied on her stepfather to determine this, as he discussed "status of the vehicles, maintenance, and things of that sort" with the dealerships.  (*Id*. at 32:13-18, 38:9-19 (PDF Pgs. 433; 437).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Ms. Al-ghamdi's testimony, but Plaintiffs dispute GM's suggestion that she or her stepfather were GM vehicle experts or that they could have possibly uncovered the ignition switch defect at any point before GM finally disclosed it publically in 2014.

Ms. Al-ghamdi testified that no one, including her stepfather, indicated to her that her ignition switch might be an issue in her vehicle and that "[o]nce GM did release that information, it was just kind of like a light bulb, okay, here it is, you know, this has to be the reason." SJ Ex. 177 (May 5, 2017 G. Al-ghamdi Dep. at 102:14-103:4). Ms. Al-ghamdi repeatedly testified about her stepfather's attempts to diagnose the shutdown problem, including taking it to Advanced Auto Parts several times for diagnosis, but the shop could not identify the shutdown cause either. *Id.* at 65:24-66:13; 71:19-72:6; 139:5-140:12).

172.   Ms. Al-Ghamdi used the internet to research vehicles (mainly Craigslist.com) and did not receive or review any advertising from New GM or Chevrolet before purchasing the 2004 Impala. (*Id*. at 34:20-24; 36:6-13 (PDF Pgs. 435; 436).)

**Plaintiffs' Response:**

Undisputed.

173.   Ms. Al-Ghamdi alleges that she experienced multiple moving stalls in her Impala. (5ACC ¶ 240; Ex. 18, 5/5/2017 G. Al-Ghamdi Dep. Tr. at 59:8-10 (PDF Pg. 442).) She testified that the ignition switch was in the "on" position during the first incident, and does not know the position of the switch for any other incident. (Ex. 18, 5/5/2017 G. Al-Ghamdi Dep. Tr. at 100:11-101:9 (PDF Pgs. 444-445).)

**Plaintiffs' Response:**

Plaintiffs do not dispute Ms. Al-ghamdi's testimony about the repeated shutdown events she experienced, but Plaintiffs dispute GM's characterization of her testimony regarding the key's position in these events. Ms. Al-ghamdi experienced 20 or more shutdown events. SJ Ex. 177 (May 5, 2017 G. Al-ghamdi Dep. at 59:8-10). In her plaintiff fact sheet, Ms. Al-ghamdi testified that in the May 2012 incident, "[t]he vehicle was off but the key was still in the on position so I

66

turned it ***all the way off***," and "I made sure that the vehicle switch or the ignition was ***all the way off*** because I didn't want -- when this happened, I thought maybe the engine -- something was wrong with the engine and I didn't want to restart the vehicle and run the risk of doing more damage than good." *Id.* at 61:21-62:4; 63:14-21 (emphasis added).  Ms. Al-ghamdi repeatedly testified that she did not know the key position in the other shutdown incidents because "[w]hen you're in a position like that and your vehicle loses power, your concern is not what is the position of the vehicle.  It's how do I get out of this situation and how do I get out of it avoiding a collision or possibly losing my life because I'm going so fast and the vehicle just shuts off." *Id.* at 70:7-10; 80:2-13; 81:20-22.  In all of her shutdown incidents, including the May 2012 incident, Ms. Al-ghamdi believes it is possible the key was in the accessory position.  *Id.* at 168:21-169:9.

174.   Ms. Al-Ghamdi received several recall notices in the mail.  (*Id.* at 31:4-25 (PDF Pg. 432).)  Nevertheless, she chose not to have the recall repair conducted on her 2004 Impala. (*Id.* at 30:5-7, 32:1-3 (PDF Pgs. 431; 433).)  She alleges that she did not have the recall repair performed because by the time the parts became available she was looking into purchasing a new vehicle.  (*Id.* at 40:8-18.)  Ms. Al-Ghamdi believes it is common knowledge that vehicles can be recalled for defects, and she was personally aware that vehicles could be recalled for defects prior to her purchase of the 2004 Impala.  (*Id.* at 44:1-13 (PDF Pg. 440).)

***Plaintiffs' Response:***

Plaintiffs do not dispute that Ms. Al-ghamdi received the ignition switch recall notice or that she did not take her vehicle in for the recall repair, but Plaintiffs dispute GM's characterization for why she did not do so. After a shutdown incident in early summer 2014, Ms. Al-ghamdi decided to buy another vehicle because she felt it was unsafe to continue driving the Impala.  SJ Ex. 177 (May 5, 2017 G. Al-ghamdi Dep. at 86:10-22; 90:11-13; 157:8-15).  In September 2014, she

purchased another used vehicle. *Id.* at 40:8-20. During this time in 2014, the recall repair parts were unavailable and Ms. Al-ghamdi testified, "I would have preferred that parts would have been made available when the recall notice that I received in the mail came out, but they weren't." *Id.* at 157:3-15.

Plaintiffs do not dispute Ms. Al-ghamdi's testimony regarding her knowledge of recalls.

175.    The 2004 Impala had approximately 80,000 miles when Ms. Al-Ghamdi purchased it, and she put approximately 100,000 additional miles on it.  (*Id.* at 54:1-16 (PDF Pg. 441).)  She sold the vehicle in April 2017 to a family member.  (*Id.* at 39:1-24 (PDF Pg. 438).)

***Plaintiffs' Response:***

Undisputed.

176.    **Dawn Bacon** owns a used 2006 Cadillac CTS subject to Recall No. 14v394. (5ACC ¶ 241; Ex. 18, 3/28/17 D. Bacon Dep. Tr. at 9:8-10 (PDF Pg. 300).)

***Plaintiffs' Response:***

Undisputed.

177.    Ms. Bacon purchased her used 2006 CTS from her former stepfather on January 13, 2013.  (Ex. 18, 3/28/17 D. Bacon Dep. Tr. at 22:14-23; 175:4-10 (PDF Pgs. 302; 318).)  She did not receive a warranty.  (5ACC ¶ 241; Ex. 18, 3/28/17 D. Bacon Dep. Tr. at 47:4-6 (PDF Pg. 306).)

***Plaintiffs' Response:***

Undisputed.

178.    Ms. Bacon testified that she remembered advertisements indicating the CTS was "first in its class in safety" when she purchased the vehicle.  (*Id.* at 30:13-22, 36:5-11.)

***Plaintiffs' Response:***

68

Plaintiffs do not dispute Ms. Bacon's testimony, but add that before she purchased her car, Ms. Bacon's former father-in-law, a GM dealership salesman, also told her it was a good, safe car. SJ Ex. 180 (Mar. 28, 2017 D. Bacon Dep. at 30:13-22; 31:19-33:20). Ms. Bacon also testified that she thought about how the CTS was supposed to be safe for its class when she was purchasing the vehicle. *Id.* at 36:5-11.

179.     Ms. Bacon alleges that her CTS turned off while she was driving on approximately seven or eight occasions. (5ACC ¶ 241; Ex. 18, 3/28/17 D. Bacon Dep. Tr. at 66:20-23 (PDF Pg. 311).)

*Plaintiffs' Response:*

Undisputed.

180.     She admits that she has known of the recall since October 2015 at the latest and has received a recall notice. (Ex. 18, 3/28/17 D. Bacon Dep. Tr. at 54:13-57:4 (PDF Pgs. 307-310).) Nevertheless, Ms. Bacon chose not to have the repair performed and stopped driving the vehicle in April 2016, approximately nineteen months after the recall was announced in September 2014. (*Id.* at 88:14-89:14; 91:7-17 (PDF Pgs. 312-313; 314).) Ms. Bacon still owns the 2006 CTS. (*Id.* at 20:10-14 (PDF Pg. 301).)

*Plaintiffs' Response:*

Plaintiffs dispute GM's contention that Ms. Bacon knew about the ignition switch recall and received a recall notice in October 2015. Ms. Bacon cannot recall when she first learned about the ignition switch defect, and GM's records show that GM did not mail the ignition switch recall notice to Ms. Bacon until November 2016, while the previous notices were mailed to the car's former owner, Mike Zoller. SJ Ex. 180 (Mar. 28, 2017 D. Bacon Dep. at 160:2-161:21); SJ Ex. 183 (GM-MDL2543-305148958-964).

Plaintiffs do not dispute the date that Ms. Bacon stopped driving the vehicle or the fact that the vehicle has not been repaired under the recall, but Plaintiffs do dispute GM's characterization of Ms. Bacon's testimony regarding the recall repair. Ms. Bacon is keeping the CTS for now because she is waiting to sell it for a fair price and because she does not want to put anyone else at risk with the car as she does not feel it is safe to sell.  SJ Ex. 180 (Mar. 28, 2017 D. Bacon Dep. at 21:6-12; 107:9-16; 114:25-115:4).  When asked, "[w]ould you agree with me that if the recall repair is designed to address the situation with the ignition switch that once it is done, that would no longer be a safety concern of the vehicle?" Ms. Bacon responded, "I don't know if that's true or not. I don't know that."  *Id.* at 150:7-14.

181.    The 2006 CTS had approximately 160,000 miles when Ms. Bacon purchased it, and it had approximately 200,000 miles on it when she stopped driving it in 2016.  (*Id.* at 23:2-4; 106:25-107:3 (PDF Pgs. 303; 315-316).)

*Plaintiffs' Response:*

Undisputed.

182.    **Dawn Fuller** owns a used 2008 Chevrolet Impala subject to Recall No. 14v355. (5ACC ¶ 242; Ex. 18, 11/20/17 D. Fuller Dep. Tr. at 9:7-11(PDF Pg. 510).)

*Plaintiffs' Response:*

Undisputed.

183.    Ms. Fuller purchased her used 2008 Impala from Moritz Kia in Fort Worth, Texas on December 17, 2011.  (5ACC ¶ 242; Ex. 18, 11/20/17 D. Fuller Dep. Tr. at 30:9-18 (PDF Pg. 511).)  At the time of purchase, the vehicle was still covered by the manufacturer's warranty. (5ACC ¶ 242; Ex. 18, 11/20/17 D. Fuller Dep. Tr. at 31:13-33:16 (PDF Pgs. 512-514).)

*Plaintiffs' Response:*

70

Undisputed.

184.    Ms. Fuller did not do any research on vehicles prior to her purchase, and she did not rely on any New GM or Old GM advertisements.  (Ex. 18, 11/20/17 D. Fuller Dep. Tr. at 85:25-86:8 (PDF Pgs. 524-525).)

*Plaintiffs' Response:*

Undisputed.

185.    Ms. Fuller has never experienced the Recall No. 14v355 recall condition.  (*Id.* at 74:5-10 (PDF Pg. 523).)  Ms. Fuller does not allege that her 2008 Impala experienced a moving stall, a loss of power steering, a loss of power assist brakes, or a failure of the airbags to deploy. (*Id.* at 56:4-25 (PDF Pg. 520).)  Each of the "ignition switch-related events" alleged by Ms. Fuller involved her having difficulty starting the car while it was turned off and in park.  (*Id.* at 51:7-52:17 (PDF Pgs. 518-519).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Ms. Fuller's testimony about her problems with the key and ignition, but Plaintiffs dispute GM's characterization of this testimony as not related to the recall. Ms. Fuller has experienced 10 to 15 incidents that she described as: "I would put the key in the ignition and try to turn it, but it wouldn't turn. And the steering column felt locked up, and the wheel wouldn't turn. Each time I would take the key out and wait and try again. And eventually it would turn."  SJ Ex. 184 (Nov. 20, 2017 D. Fuller Dep. at 33:11-23; 55:2-11).  Ms. Fuller she is not an expert and does not know whether her incidents with the key are related to the ignition switch defect.  *Id.* at 53:25-54:11; 57:18-58:1.

186.    Ms. Fuller received the Recall No. 14v355 notice in mid-2014. (*Id.* at 50:5-8 (PDF Pg. 517).)  She claimed that the recall repair was conducted in early 2015, but her vehicle package

indicates that the repair was not conducted until September 17, 2016 (*Id.* at 50:23-51:2 (PDF pgs. 517-518); Ex. 48, Vehicle Package VIN 2G1WT58K681244605.)

**Plaintiffs' Response:**

Undisputed.

187.    Ms. Fuller still owns and continues to drive the 2008 Impala.  (*Id.* at 43:2-5 (PDF Pg. 516).)  The vehicle had 79,630 miles on it when Ms. Fuller purchased it and approximately 175,000 miles on it as of September 2017.  (*Id.* at 41:19-24; 43:17-19 (PDF Pgs. 515; 516).)  At no time did she discontinue driving the 2008 Impala due to issues allegedly related to Recall No. 14v355.  (Ex. 18, 11/20/17 D. Fuller Dep. Tr. at 61:24-62:4 (PDF Pgs. 521-522).)

**Plaintiffs' Response:**

Plaintiffs do not dispute that Ms. Fuller still owns and drives the Impala, but Plaintiffs dispute the mileage on the vehicle. Although Ms. Fuller testified the vehicle had 79,630 miles on it when she purchased it, GM's documents state the vehicle had 60,400 miles on it when the GM dealership conducted the recall repair on September 17, 2016.  SJ Ex. 189 (D. Fuller PFS Q 30 at ELPLNTFF00016600); SJ Ex. 188 (GM-MDL2543-402676145).

Plaintiffs do not dispute that Ms. Fuller continued to drive her vehicle despite the ignition switch defect, but Plaintiffs dispute GM's characterization of this testimony. Ms. Fuller purchased the Impala after her previous car was totaled in an accident, and up until she bought the Impala she was using a rental or relying on rides from others.  SJ Ex. 184 (Nov. 20, 2017 D. Fuller Dep. at 77:17-23; 78:12-17; 79:19-22).  She purchased the Impala so she could get to work.  *Id.* at 79:23-80:12.  Ms. Fuller also testified that this is the only vehicle she and her kids have to share.  *Id.* at 93:15-94:4.

188.     **Michael Graciano** owns a used 2007 Chevrolet Cobalt subject to Recall No. 14v047.  (5ACC ¶ 243; Ex. 18, 5/1/17 M. Graciano Dep. Tr. at 11:7-10 (PDF Pg. 370).)

*Plaintiffs' Response:*

Undisputed.

189.     Mr. Graciano purchased his used 2007 Cobalt from Holt Chrysler Jeep Dodge in Arlington, Texas on October 17, 2011.  (5ACC ¶ 243; Ex. 18, 5/1/17 M. Graciano Dep. Tr. at 66:18-19 (PDF Pg. 383).)

*Plaintiffs' Response:*

Undisputed.

190.     Mr. Graciano did not review any advertising or marketing materials relating to the 2007 Cobalt.  (Ex. 18, 5/1/17 M. Graciano Dep. Tr. at 133:22-134:1 (PDF Pg. 395).)  Nor did he do any research prior to visiting the dealership. (*Id.* at 67:10-12 (PDF Pg. 384).)  Mr. Graciano was told by a salesman that the 2007 Cobalt was "a good, safe, reliable vehicle for a teenager." (*Id.* at 64:19-23 (PDF Pg. 382).)

*Plaintiffs' Response:*

Undisputed.

191.     Mr. Graciano alleges that his then-fiancée's daughter experienced numerous incidents where she lost power steering and the brakes did not work in the 2007 Cobalt. (5ACC ¶ 243; Ex. 18, 5/1/17 M. Graciano Dep. Tr. at 78:20-79:13 (PDF Pgs. 385-386).)  He was not in the vehicle during any of these alleged incidents, and he does not remember when they allegedly occurred.  (Ex. 18, 5/1/17 M. Graciano Dep. Tr. at 79:14-23 (PDF Pg. 386).)  His then-fiancée's daughter does not recall details about any specific incident according to Mr. Graciano, other than

one in which she claims her brakes went out and she went through a stoplight.  (Ex. 49, M. Graciano PFS Q49, at 6; Ex. 18, 5/1/17 M. Graciano Dep. Tr. at 81:5-11 (PDF Pg. 387).)

       *Plaintiffs' Response:*

Plaintiffs do not dispute that Davonne Vigil, Mr. Graciano's former fiancé's daughter, experienced shutdowns while driving the vehicle and that Mr. Graciano was not present for these events, but Plaintiffs dispute GM's characterizations of these shutdowns as simply a loss of power steering and brakes and that Davonne does not recall details about these incidents.  Davonne's sworn declaration states that before the ignition switch recall she experienced five or six incidents in which "the engine on the Cobalt stopped running and the power steering stopped working so that it was almost impossible for me to turn the wheel."  SJ Ex. 193 (D. Vigil Decl. at ¶ 3).  She also testified that in each shutdown incident "the key in the ignition had turned into the off position."  *Id.* at ¶ 4.

192.     Mr. Graciano's 2007 Cobalt has been repaired pursuant to Recall No. 14v047.  (Ex. 18, 5/1/2017 M. Graciano Dep. Tr. at 106:21-107:15 (PDF Pgs. 390-391).)  After the repair was performed, Mr. Graciano's stepdaughter regularly drove the 2007 Cobalt until she purchased a new vehicle in April 2017.  (*Id.* at 24:1-26:13 (PDF Pgs. 374-376).)  As of May 2017, Mr. Graciano still owned the 2007 Cobalt. (Ex. 18, 5/1/2017 M. Graciano Dep. Tr. at 25:18-26:4 (PDF Pgs. 375-376).)

       *Plaintiffs' Response:*

Plaintiffs do not dispute Mr. Graciano's testimony about the recall repair and the vehicle's usage, but Plaintiffs note that Mr. Graciano testified the vehicle was parked and not in use from March 2014 to August 2014 while the vehicle awaited the recall repair.  SJ Ex. 190 (May 1, 2017

010440-11 1197516 V1

M. Graciano Dep. at 104:21-25; 105:13-106:24); SJ Ex. 193 (G. Vigil Decl. at ¶ 5); SJ Ex. 194

(M. Graciano PFS Q 425 at ELPLNTFF00000511).

193.    The 2007 Cobalt had 43,991 miles on it at the time of purchase, and had 101,854

miles on it as of December 2016.  (Ex. 49, M. Graciano PFS Q30, at 3; Q37 at 4).

   *Plaintiffs' Response:*

   Undisputed.

194.    Mr. Graciano has taken technical course work on automotive maintenance and has

been working on cars since he was approximately sixteen years old (Ex. 18, 5/1/17 M. Graciano

Dep. Tr. at 16:15-18:3 (PDF Pg. 371).)  He believes he can work on "[a]nything from brakes to

power steering pump, alternatives to serpentine valve, heater core, radiator, head gasket" and do

just about anything that an automotive mechanic can other than fixing transmissions.  (*Id.* at 18:14-

22 (PDF Pg. 373).)

   *Plaintiffs' Response:*

   Plaintiffs do not dispute Mr. Graciano's testimony, but Plaintiffs dispute GM's

characterization of Mr. Graciano's experience and the suggestions that Mr. Graciano was a GM

vehicle expert or technician or that Mr. Graciano could have possibly uncovered the ignition switch

defect before GM finally disclosed it publically in 2014. With regard to the automotive course he

took, Mr. Graciano testified, "I took little technical – it's kind of like at a community college. You

just kind of volunteer to go but that's about it," and it included "[j]ust basic brakes, oil changes. I

mean, just the basic, nothing too technical."  SJ Ex. 190 (May 1, 2017 M. Graciano Dep. at 16:15-

17:2).  In discussing the shutdown events his stepdaughter experienced in the Cobalt, Graciano

testified, "[Davonne] just -- she just told me that the car would cut out on her. It would start right

back up but she'd have to cycle the key for the actual car to start. And she didn't know why. I

didn't know why either. I never seen that happen before." *Id.* at 85:22-86:6.  He also testified, "Davonne called me on one occasion. I just don't remember when, asking me what's going on with the car because she knows I know a little bit about cars. And I told her I don't know. Does it start up again? And she was like it starts right back up again. So, I said, 'well, I don't know.'" *Id.* at 86:16-24.  Mr. Graciano told his fiancé to have Davonne get the vehicle looked at, but "the mechanic couldn't find out what the issue was." *Id.* at 88:1-9; SJ Ex. 193 (G. Vigil Decl. at ¶ 4).

195.     Mr. Graciano owned several vehicles before buying his 2007 Cobalt, including a MY 05 Jeep Cherokee, a MY 62 Chevy Impala Super Sport, a MY 07 Ford Expedition, a Mazda MX-6, and "a couple Chevy trucks."  (*Id.* at 52:11-54:16, 57:18-58:7 (PDF Pgs. 377-379; 380-381).)

> *Plaintiffs' Response:*

Undisputed.

196.     Prior to purchasing the 2007 Cobalt, Mr. Graciano understood that vehicles could be recalled for defects, and that this was not a rare occurrence.  (*Id.* at 110:24-111:13 (PDF Pgs. 392-393).)

> *Plaintiffs' Response:*

Plaintiffs do not dispute Mr. Graciano's testimony about recalls, but dispute GM's characterization of it. Before this Cobalt, Mr. Graciano had never experienced one of his cars being recalled or having to take a car in for a recall repair while he owned it.  SJ Ex. 190 (May 1, 2017 M. Graciano Dep. at 110:10-23).  When asked his understanding of why vehicles might be recalled, he testified, "just -- simple stuff, I would guess. I mean I have never had a vehicle that I had to take in for a recall. So I didn't just really think about it. Especially something that -- that dangerous. Because that's a pretty good recall."  *Id.* at 111:3-10.

197.     **Lisa McClellan** owned a used 2005 Malibu Max subject to Recall No. 14v153. (5ACC ¶ 247; Ex. 18, 5/4/17 L. McClellan Dep. Tr. at 8:4-14 (PDF Pg. 399).)

*Plaintiffs' Response:*

Undisputed.

198.     Ms. McClellan's vehicle was not subject to Recall No. 14v400 or any other recall involving inadvertent key rotation.   (Ex. 50, L. McClellan Vehicle Package, GM-MDL2543-107510230 at 34).)

*Plaintiffs' Response:*

Undisputed.

199.     Ms. McClellan purchased the used 2005 Malibu Maxx from La Fiesta Auto Sales in Houston, Texas on November 22, 2010.  (5ACC ¶ 247; Ex. 18, 5/4/17 L. McClellan Dep. Tr. at 27:12-17 (PDF Pg. 401).)

*Plaintiffs' Response:*

Undisputed.

200.     She claims she purchased the 2005 Malibu Maxx because she wanted something reliable and affordable, she liked the mileage and the way it looked, liked Chevrolets in general, and wanted an American vehicle.  (5ACC ¶ 247; Ex. 18, 5/4/17 L. McClellan Dep. Tr. at 40:14-19; 29:7-10; 44:14-24 (PDF Pgs. 404; 403; 407).)

*Plaintiffs' Response:*

Undisputed.

201.     Ms. McClellan did not see any advertisements, brochures, magazines or websites for the 2005 Malibu Maxx prior to her purchase. (Ex. 18, 5/4/17 L. McClellan Dep. Tr. at 47:3-5; 41:20-42:3 (PDF Pgs. 408; 405-406).)

*Plaintiffs' Response:*

Undisputed.

202.     Ms. McClellan alleges that the vehicle shut off on multiple occasions while she was driving it.  (5ACC ¶ 247; Ex. 18, 5/4/17 L. McClellan Dep. Tr. at 16:13-14; 66:6-14 (PDF Pgs. 400; 410).)  She does not know the position of the ignition for any of those occasions.  (Ex. 18, 5/4/17 L. McClellan Dep. Tr. at 112:11-13 (PDF Pg. 412).)  Outside of those occasions, she did not have any issues with the vehicle's power steering. (*Id.* at 142:18-22; 152:23-153:1 (PDF Pgs. 413; 414-415).)

*Plaintiffs' Response:*

Plaintiffs do not dispute Ms. McClellan's testimony, but Plaintiffs dispute GM's characterization of this testimony or the suggestion that the power steering did not go out.  After inspecting her vehicle, a local mechanic shop told her "there might be something wrong with the steering and something else on the column and that would be too expensive for [her] to repair." SJ Ex. 197 (L. McClellan PFS Q 49 at ELPLNTFF00016770).  In the first incident she described, Ms. McClellan was taking a left turn and testified, "When it -- when it stalled, I tried to steer it. It wasn't moving," "I remember I didn't have brakes or steering, so I was just at the mercy of the car until it came to a stop," and "I couldn't turn it so it was just going where it was going."  SJ Ex. 196 (May 4, 2017 L. McClellan Dep. at 69:7-10; 70:7-9; 73:20-74:6).  In the second incident, she testifies that the car stalled she was completing a left turn and when she attempted to steer the car it did not work.  *Id.* at 82:3-10; 85:21-86:1.  In the third incident, Ms. McClellan testified she was making a left turn again, and the steering did not respond.  *Id.* at 94:4-11; 95:14-18.  Ms. McClellan testified that these incidents were "always when I was turning left or right, but nine times out of ten, it was a left turn."  *Id.* at 109:12-25.

78

203.     Ms. McClellan returned her vehicle to the dealership in April 2012, before the 2014 recalls were announced.  (Ex. 18, 5/4/17 L. McClellan Dep. Tr. at 106:3-22 (PDF Pg. 411).)  She testified that after she returned the vehicle to the dealership, the approximately $2,000 she still owed on the vehicle was forgiven.  (*Id.* at 52:2-20 (PDF Pg. 409).)

*Plaintiffs' Response:*

Plaintiffs do not dispute that Ms. McClellan returned the vehicle, but Plaintiffs dispute GM's contention about the amount owed and that it was forgiven. In April 2012, Ms. McClellan voluntarily surrendered the vehicle back to the dealer because of all the problems with the car.  SJ Ex. 196 (May 4, 2017 L. McClellan Dep. at 29:5-6; 50:14-51:11; 106:8-10). Ms. McClellan still owed about $2,000 left on the vehicle when she returned it and she did not pay this balance. *Id.* at 51:21-52:8.  She testified that the document she signed when she relinquished the vehicle did not forgive the $2,000 balance owed. *Id.* at 53:1-3. Ms. McClellan's credit report reflected more than just the $2,000 loan balance when she returned the vehicle because by then she had incurred fees for nonpayment of the remaining $2,000.  *Id.* at 51:21-52:8; 158:20-159:25.

204.     Ms. McClellan admitted that the defect did not cause her to lose any income.  (*Id.* at 164:23-165:2 (PDF Pgs. 421-422).)  McClellan also claimed that after she returned the car to the dealership, an amount of $4,716 was left owing on her credit report, but at deposition she admitted that "I'm not even sure where I got the $4,716," that she did not know where the number came from, and that she did not have a credit report listing that any debt was owed to the dealership. (*Id.* at 159:9-160:25 (PDF Pgs. 418-419).)  Similarly, McClellan alleged that she spent $1,500 at different shops to correct problems with the vehicle and $200 in rental charges, but admitted she does not have any receipts or documentation to prove these alleged amounts.  (*Id.* at 163:8-24 (PDF Pg. 420).)

*Plaintiffs' Response:*

Disputed. Ms. McClellan testified that she believed she still owed about $2,000 left on the vehicle when she returned it and she did not pay this balance.  SJ Ex. 196 (May 4, 2017 L. McClellan Dep. at 51:21-52:8).  But Ms. McClellan testified that her credit report reflected more than just the $2,000 loan balance when she returned the vehicle because by then she had incurred fees for nonpayment of the remaining $2,000.  *Id.* at 51:21-52:8; 158:20-159:25.

Plaintiffs do not dispute Ms. McClellan's testimony that she does not have receipts for the rental car and vehicle troubleshooting repairs, but Plaintiffs dispute GM's suggestion that this implies she never had such documentation. Ms. McClellan has moved twice since she owned the vehicle and during that time she got rid of documents related to the car because she no longer owned it.  *Id.* at 53:20-54:1; 115:19-25.

205.    Ms. McClellan's 2005 Malibu Maxx had approximately 60,000 to 70,000 miles on it at the time of purchase and Ms. McClellan believes she put less than 10,000 additional miles on it.  (*Id.* at 28:22-24; 29:2-6 (PDF Pgs. 402-403).)

*Plaintiffs' Response:*

Undisputed.

**F.    Texas Plaintiffs With Claims for Fraudulent Concealment of Right to File Bankruptcy Claims.**

206.    **Shenyesa Henry** owned a 2004 Saturn Ion subject to Recall Nos. 14v047 and 14v153.  (5ACC ¶ 244; Ex. 18, 3/27/2017 S. Henry Dep. Tr. at 9:16-23 (PDF Pg. 255).)

*Plaintiffs' Response:*

Plaintiffs concede Ms. Henry's claim for fraudulent concealment of the right to bring a bankruptcy claim has effectively been dismissed, and therefore do not dispute these facts.

207.     Ms. Henry purchased the 2004 Ion from Saturn of Plano in Plano, Texas in 2003. (5ACC ¶ 244; Ex. 18, 3/27/17 S. Henry Dep. Tr. at 28:18-29:3 (PDF Pgs. 256-257).)  She received a warranty with the vehicle.  (Ex. 18, 3/27/2017 S. Henry Dep. Tr. at 43:17-19 (PDF Pg. 258).)

*Plaintiffs' Response:*

Plaintiffs concede Ms. Henry's claim for fraudulent concealment of the right to bring a bankruptcy claim has effectively been dismissed, and therefore do not dispute these facts.

208.     Ms. Henry alleges that the 2004 Ion's key got stuck in the ignition on two occasions. (*Id.* at 75:12-19 (PDF Pg. 261).)  She also alleges that on one occasion, the 2004 Ion's steering and brakes locked up and she had to pull over to the side of the road.  (*Id.* at 82:14-84:13 (PDF Pgs. 264-266).)  She is not aware of any incidents of inadvertent key rotation in the 2004 Ion.  (*Id.* at 77:24-78:6 (PDF Pgs. 262-263).)

*Plaintiffs' Response:*

Plaintiffs concede Ms. Henry's claim for fraudulent concealment of the right to bring a bankruptcy claim has effectively been dismissed, and therefore do not dispute these facts.

209.     She donated the vehicle to the Purple Heart Foundation in 2016 and believes it had over 100,000 miles on it at that time.  (*Id.* at 51:2-8; 53:8-13 (PDF Pgs. 259; 260).)  She did not have the recall repair conducted on the vehicle prior to the donation because she had already purchased a new vehicle when the recall was issued.  (*Id.* at 102:1-22 (PDF Pg. 267).)

*Plaintiffs' Response:*

Plaintiffs concede Ms. Henry's claim for fraudulent concealment of the right to bring a bankruptcy claim has effectively been dismissed, and therefore do not dispute these facts.

210.     **Lisa Simmons** owns a 2007 Saturn Ion that is subject to Recall Nos. 14v047 and 14v153.  (5ACC ¶ 248; Ex. 18, 6/21/17 L. Simmons Dep. Tr. at 7:7-14 (PDF Pg. 471).)

81

*Plaintiffs' Response:*

Plaintiffs concede Ms. Simmon's claim for fraudulent concealment of the right to bring a bankruptcy claim has effectively been dismissed, and therefore do not dispute these facts.

211.    Ms. Simmons purchased the 2007 Ion from a Saturn dealership in Amarillo, Texas in 2007.  (5ACC ¶ 248; Ex. 18, 6/21/17 L. Simmons Dep. Tr. at 49:5-18 (PDF Pg. 473).)  She received a warranty with the vehicle.  (Ex. 18, 6/21/17 L. Simmons Dep. Tr. at 85:17-19 (PDF Pg. 481).)

*Plaintiffs' Response:*

Plaintiffs concede Ms. Simmon's claim for fraudulent concealment of the right to bring a bankruptcy claim has effectively been dismissed, and therefore do not dispute these facts.

212.    Ms. Simmons did not review any Old GM advertisements or brochures that led her to buy the vehicle.  (*Id.* at 85:8-11 (PDF Pg. 481).)

*Plaintiffs' Response:*

Plaintiffs concede Ms. Simmon's claim for fraudulent concealment of the right to bring a bankruptcy claim has effectively been dismissed, and therefore do not dispute these facts.

213.    Ms. Simmons does not claim to have experienced an ignition switch related event in the 2007 Ion, nor is she aware of an incident in which the ignition switch rotated from the run position to another position.  (*Id.* at 63:12-15; 37:13-18 (PDF Pgs. 479; 472).)  She alleges that on occasion, the engine in the vehicle has died and she has had to wait on the side of the road, but no one has ever connected that experience to the ignition switch defect.  (*Id.* at 50:19-53:17 (PDF Pgs. 474-477).)

*Plaintiffs' Response:*

Plaintiffs concede Ms. Simmon's claim for fraudulent concealment of the right to bring a bankruptcy claim has effectively been dismissed, and therefore do not dispute these facts.

214.    Ms. Simmons had the ignition switch repair performed on the vehicle on September 23, 2014.  (*Id.* at 62:14-19 (PDF Pg. 478).)

*Plaintiffs' Response:*

Plaintiffs concede Ms. Simmon's claim for fraudulent concealment of the right to bring a bankruptcy claim has effectively been dismissed, and therefore do not dispute these facts.

215.    The 2007 Ion had 98,880 miles on it at the time the recall repair was performed (*Id.* at 62:14-63:1 (PDF Pg. 478-479)) and more than 124,000 miles on it as of June 2017.  (*Id.* at 92:21-24 (PDF Pg. 482).)

*Plaintiffs' Response:*

Plaintiffs concede Ms. Simmon's claim for fraudulent concealment of the right to bring a bankruptcy claim has effectively been dismissed, and therefore do not dispute these facts.

216.    Ms. Simmons indicated in her plaintiff fact sheet that her damages include "loss of time for repair," but admitted at her deposition that those were not her words, and she did not otherwise reference those damages.  (*Id.* at 64:8-20 (PDF Pg. 480).)

*Plaintiffs' Response:*

Plaintiffs concede Ms. Simmon's claim for fraudulent concealment of the right to bring a bankruptcy claim has effectively been dismissed, and therefore do not dispute these facts.

G.    **Dismissed Texas Plaintiffs.**

217.    **Keisha Hunter** is a Texas plaintiff who alleged claims for violations of the Texas Deceptive Trade Practices Consumer Protection Act (and a successor liability claim for same), fraud by concealment (and a successor liability claim for same), breach of the implied warranty of merchantability (and a successor liability claim for same), fraud by concealment of the right to file

83

a claim against Old GM in bankruptcy, and unjust enrichment. (5ACC pp. xxviii-xxix.) Pursuant

to the Court's June 30, 2017 Order, each of these claims was dismissed as to Ms. Hunter. (6/30/17

Opinion and Order, Docket No. 4175 at 110.)

*Plaintiffs' Response:*

Undisputed.

218.   **Tajah Liddy** was dismissed with prejudice for failure to comply with the Court's

orders on April 13, 2018. (4/13/18 Order of Dismissal, Docket No. 5377.)

*Plaintiffs' Response:*

Undisputed.

219.   **Malinda Stafford** had her claims dismissed by the Court and was included in the

Fifth Amended Complaint for the express and sole purpose of preserving her claims on appeal.

(5ACC, at p. 180 n.31.) Her claims have since been dismissed, again, pursuant to the Court's April

25, 2018 Opinion and Order regarding New GM's Motion for Partial Reconsideration of the

Court's December 19, 2017 Order and Opinion on Successor Liability. (Docket No. 5410.)

*Plaintiffs' Response:*

Undisputed.

## III.   WARRANTY INFORMATION FOR THE ACTIVE PLAINTIFFS.

220.   The warranty booklet for each vehicle owned by an active plaintiff contains the

following language, with the emphasis in the original:

> GM does not authorize any person to create for it any other obligation or liability in
> connection with these vehicles. **Any implied warranty of merchantability or fitness for**
> **a particular purpose applicable to this vehicle is limited in duration to the duration**
> **of this written warranty. Performance of repairs and needed adjustments is the**
> **exclusive remedy under this written warranty or any implied warranty. GM shall**
> **not be liable for incidental or consequential damages, such as, but not limited to, lost**
> **wages or vehicle rental expenses, resulting from breach of this written warranty or**
> **any implied warranty.**

- 2005 Buick Lacrosse:  Ex. 51, Warranty Booklet at p. 8, GM-MDL2543-300613864

- 2006 Cadillac CTS:  Ex. 52, Warranty Booklet at p. 8, GM-MDL2543-300543614

- 2010 Chevrolet Camaro:  Ex. 53, Warranty Booklet at p. 10, GM-MDL2543-300141868

- 2011 Chevrolet Camaro:  Ex. 54, Warranty Booklet at p. 13, GM-MDL2543-300549749

- 2007 Chevrolet Cobalt:  Ex. 55, Warranty Booklet at p. 11, GM-MDL2543-300142170

- 2010 Chevrolet Cobalt:  Ex. 53, Warranty Booklet at p. 10, GM-MDL2543-300141868

- 2009 Chevrolet HHR:  Ex. 56, Warranty Booklet at p. 10, GM-MDL2543-300612991

- 2011 Chevrolet HHR:  Ex. 54, Warranty Booklet at p. 13, GM-MDL2543-300549749

- 2004 Chevrolet Impala:  Ex. 57, Warranty Booklet at p. 8, GM-MDL2543-300258103

- 2008 Chevrolet Impala:  Ex. 58, Warranty Booklet at p. 9, GM-MDL2543-301318601

- 2010 Chevrolet Impala:  Ex. 53, Warranty Booklet at p. 10, GM-MDL2543-300141868

- 2005 Chevrolet Malibu Max: Ex. 59, Warranty Booklet at p. 8, GM-MDL2543-000207476

- 2012 Chevrolet Traverse:  Ex. 60, Warranty Booklet at p. 12, GM-MDL2543-303865046

- 2010 GMC Acadia:  Ex. 61, Warranty Booklet at p. 9, GM-MDL2543-302767746

- 2000 Oldsmobile Alero:  Ex. 62, Warranty Booklet at p. 10, GM-MDL2543-300645456-57

- 2008 Pontiac G5:  Ex. 63, Warranty Booklet at p. 9, GM-MDL2543-301460325

- 2006 Saturn Ion:  Ex. 64, Warranty Booklet at p. 8, GM-MDL2543-401995461

*Plaintiffs' Response:*

Plaintiffs do not dispute that the warranty booklets for the vehicles listed above contain the language quoted by GM. But GM's quote leaves out the language immediately preceding and following the quote, "This warranty gives you specific legal rights and you may also have other rights which vary from state to state," and "Some states do not allow limitations on how long an implied warranty will last or the exclusion or limitation of incidental or consequential damages, so the above limitations or exclusions may not apply to you." (Cites are same as GM's, above.)

221.    With the exception of the 2006 Cadillac CTS, the warranty booklet for each vehicle owned by an active plaintiff provides a "**Bumper-to-Bumper**" "**New Vehicle Limited Warranty**" where "Coverage is for the first 3 years or 36,000 miles, whichever comes first."

- 2005 Buick Lacrosse:  Ex. 51, Warranty Booklet at p. 2, GM-MDL2543-300613858

- 2010 Chevrolet Camaro:  Ex. 53, Warranty Booklet at p. 2, GM-MDL2543-300141860

- 2011 Chevrolet Camaro:  Ex. 54, Warranty Booklet at p. 2, GM-MDL2543-300549738

- 2007 Chevrolet Cobalt:  Ex. 55, Warranty Booklet at p. 3, GM-MDL2543-300142162

- 2010 Chevrolet Cobalt:  Ex. 53, Warranty Booklet at p. 2, GM-MDL2543-300141860

- 2009 Chevrolet HHR:  Ex. 56, Warranty Booklet at p. 2, GM-MDL2543-300612983

- 2011 Chevrolet HHR:  Ex. 54, Warranty Booklet at p. 2, GM-MDL2543-300549738

- 2004 Chevrolet Impala: Ex. 57, Warranty Booklet at p. 2, GM-MDL2543-300258097

- 2008 Chevrolet Impala:  Ex. 58, Warranty Booklet at p. 2, GM-MDL2543-301318594

- 2010 Chevrolet Impala:  Ex. 53, Warranty Booklet at p. 2; GM-MDL2543-300141860

- 2005 Chevrolet Malibu Max: Ex. 59, Warranty Booklet at p. 2, GM-MDL2543-000207470

- 2012 Chevrolet Traverse:  Ex. 60, Warranty Booklet at p. 2, GM-MDL2543-303865036

- 2010 GMC Acadia:  Ex. 61, Warranty Booklet at p. 2, GM-MDL2543-302767739

- 2000 Oldsmobile Alero:  Ex. 62, Warranty Booklet at p. 6, GM-MDL2543-300645451

- 2008 Pontiac G5:  Ex. 63, Warranty Booklet at p. 2, GM-MDL2543-301460318

- 2006 Saturn Ion:  Ex. 64, Warranty Booklet at p. 2, GM-MDL2543-401995455

*Plaintiffs' Response:*

Plaintiffs do not dispute that the warranty booklets for the vehicles listed above provide the "Bumper-to-Bumper" coverage described. But the warranty booklets for the vehicles listed above, with the exception of the 2005 Buick Lacrosse (Michelle Thomas's vehicle), 2004 Chevrolet Impala (Gareebah Al-ghamdi's vehicle), 2000 Oldsmobile Alero (Deloris Hamilton's vehicle),

86

2006 Saturn Ion (Patrice Witherspoon's vehicle), and 2005 Chevrolet Malibu Max (Lisa McClellan's vehicle), also provide a "Powertrain" warranty that covers "the first 5 years or 100,000 miles, whichever comes first." (Cites are same as what GM provides above.)

222.     The warranty booklet for the 2006 Cadillac CTS provides a "**Bumper-to-Bumper**" "**New Vehicle Limited Warranty**" where "Coverage is for the first 4 years or 50,000 miles, whichever comes first."  (Ex. 52, Warranty Booklet at p. 2, GM-MDL2543-300543608.)

*Plaintiffs' Response:*

Undisputed.

223.     The warranty booklets define what is included in powertrain coverage.  The powertrain coverage includes various parts of the engine, transmission, transaxle, transfer case, and drive systems (subject to various exclusions), but does not include the ignition system.  (*E.g.*, Ex. 55, 2007 Chevrolet Cobalt Warranty Booklet at p. 6, GM-MDL2543-300142165; Ex. 63, 2008 Pontiac G5 Warranty Booklet at p. 5, GM-MDL2543-301460321;   Ex. 60, 2012 Chevrolet Traverse Warranty Booklet at p. 4-5, GM-MDL2543-303865038-39.)

*Plaintiffs' Response:*

Undisputed.

## IV.     PLAINTIFFS' PUTATIVE EXPERT DID NOT DETERMINE "LOST TIME" DAMAGES FOR ANY INDIVIDUAL PLAINTIFF.

224.     Counsel for Plaintiffs requested that putative expert Ernest Manuel develop a method for estimating "the monetary value of time lost by Class members who obtained recall repairs."  (Ex. 65, 4/4/18 E. Manuel Rpt. ¶ 31.)

*Plaintiffs' Response*:

Undisputed that this was included in the scope of Dr. Manuel's work.

87

225.    In reaching his opinions, Manuel did not review any other expert report authored in this case, did not review any named plaintiff's deposition testimony, and did not review any named plaintiff's Plaintiff Fact Sheet.  (Ex. 66, 3/22/18 E. Manuel Dep. Tr. at 121:23-122:3, 122:23-123:4 (PDF Pgs. 38-39; 40).)

**Plaintiffs' Response:**

Undisputed that Dr. Manuel did not review those materials, but Plaintiffs dispute the implication that Dr. Manuel did not use plaintiff-specific information.  Dr. Manuel had data repair data for all potential class members, and he analyzed all of that data.  Named plaintiffs, to the extent they took their cars in for repairs, were part of Dr. Manuel's class-wide analysis of time spent obtaining repairs.

## V.   PLAINTIFFS' PUTATIVE EXPERT ADMITS THAT STALLS CAN HAPPEN FOR A VARIETY OF REASONS.

226.    Plaintiffs' putative expert Glen Stevick is not aware of the names of the named plaintiffs, has not met with or interviewed any of the named plaintiffs, has not studied the vehicles or vehicle history for any of the named plaintiffs, and admits he "know[s] nothing of the named plaintiffs."  (Ex. 66, 7/11/2018 G. Stevick Dep. Tr. at 213:10-214:15 (PDF Pgs. 63-64); *see also* Ex. 66, 1/8/2018 G. Stevick Dep. Tr. at 116:11-23; 135:9-14; 136:9-19; 137:3-24; 166:8-18 (PDF Pgs. 27; 28; 29; 30; 32).)  Stevick also concedes that "moving stalls are something that can happen in all vehicles," and that moving stalls can occur in a vehicle for a "variety of reasons," such as "running out of gas," "[b]ad spark plugs," a "[b]ad ignition cable," or a "[c]logged EGR valve." (Ex. 14, 9/28/15 G. Stevick Dep. Tr. at 165:4-166:16 (PDF Pgs. 2-3)).

**Plaintiffs' Response:**

Disputed.  Plaintiffs do not dispute the accuracy of the quotes.  Plaintiffs object to the relevancy of other reasons why a vehicle would stall in addition to stalls caused by the ignition

switch defects.  And GM fails to include additional context that Dr. Stevick provided in answering the line of inquiry.  He explained that, in those examples, the driver receives some sort of warning, unlike when bumping the ignition, in which case the vehicle shuts down without warning and "surprises people."  GM Ex. 66 at 166:4-25.

## VI.    DEALERS ARE NOT NEW GM'S AGENTS.

227.    Pursuant to the Dealer Sales and Service Agreement ("DSSA") between New GM and its independent, authorized dealers ("Dealers"), such Dealers are not the agents or legal representatives of New GM and those Dealers are not authorized to make any representations on behalf of New GM.  (Ex. 67, 7/14/18 J. Lines Decl. ¶ 3.)

*Plaintiffs' Response:*

Undisputed that the paragraph accurately summarizes the Lines Declaration.  However, the DSSA does not state that the dealers" are not the agents of New GM agents or legal representatives of New GM and those Dealers are not authorized to make any representations on behalf of New GM."  Rather, the DSSA states that the DSSA "does not make" the dealers agents or legal representatives of New GM.  Moreover, the question of whether dealers are agents of New GM for any or all purposes is a question of state law, and not a "Fact" that requires a response.  Nor is it a proper subject for expert testimony, and, even if it were, Mr. Lines has not been qualified as an expert in agency law in the bellwether states.

228.    The DSSA expressly states that the Dealers are not the agents of New GM. Article 17.1 of the DSSA provides:  "This Agreement does not make either party the agent or legal representative of the other for any purpose, nor does it grant either party authority to assume or create any obligation on behalf of or in the name of the others."  (Ex. 67, 7/14/18J. Lines Decl. ¶ 4 & Ex. A.)

*Plaintiffs' Response:*

Disputed that the quoted paragraph of the DSSA "expressly states that the Dealers are not the agents of New GM." Rather, the DSSA states that the DSSA "does not make" the dealers agents of New GM. Undisputed that the paragraph accurately quotes the DSSA. But, the question of whether dealers are agents of New GM for any or all purposes is a question of state law, and not a "Fact" that requires a response. Nor is it a proper subject for expert testimony, and, even if it were, Mr. Lines has not been qualified as an expert in agency law in the bellwether states.

229.    All versions of the DSSA executed between New GM and the Dealers, from July 10, 2009 and continuing forward throughout New GM's existence, have contained the language in the current DSSA Article 17.1 expressly stating that the Dealers are not agents of New GM. (Ex. 67, 7/14/18 J. Lines Decl. ¶ 5.)

**Plaintiffs' Response:**

Undisputed that the paragraph accurately summarizes the Lines Declaration. Disputed that the DSSA "expressly state[s] that the Dealers are not the agents of New GM." Rather, the DSSA states that the DSSA "does not make" the dealers agents of New GM. Further, the question of whether dealers are agents of New GM for any or all purposes is a question of state law, and not a "Fact" that requires a response. Nor is it a proper subject for expert testimony, and, even if it were, Mr. Lines has not been qualified as an expert in agency law in the bellwether states

DATED: October 7, 2019                    HAGENS BERMAN SOBOL SHAPIRO LLP


                                          By: _____ */s/ Steve W. Berman*_____
                                                  Steve W. Berman
                                          *steve@hbsslaw.com*
                                          Sean R. Matt
                                          *sean@hbsslaw.com*
                                          Andrew M. Volk
                                          *andrew@hbsslaw.com*
                                          1918 Second Avenue, Suite 2000
                                          Seattle, WA 98101
                                          Telephone: (206) 623-7292
                                          Facsimile: (206) 623-0594

DATED: October 7, 2019                    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

                                          By: _____ */s/ Elizabeth J. Cabraser*_____
                                                  Elizabeth J. Cabraser
                                          *ecabraser@lchb.com*
                                          Rachel Geman
                                          *rgeman@lchb.com*
                                          275 Battery St., 29th Floor
                                          San Francisco, CA 94111
                                          Telephone: (415) 956-1000
                                          Facsimile: (415) 956-1008

                                          *Co-Lead Counsel with Primary Focus on Economic
                                          Loss Cases*

010440-11 1197516 V1

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 7, 2019, which will send notification of such filing to the e-mail addresses registered.

*/s/ Steve W. Berman*
Steve W. Berman

010440-11 1197516 V1